UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
——————————————————————————   )
LISA SVENSSON,                )
                  Plaintiff,  )
                              )
            v.                )        CIVIL ACTION
                              )        NO. 04-12711 PBS
PUTNAM INVESTMENTS LLC, f/k/a )
PUTNAM INVESTMENTS, INC. and, )
LAWRENCE J. LASSER            )
                 Defendants.  )
——————————————————————————   )
```

**PLAINTIFF'S REPLY TO PUTNAM INVESTMENTS' OPPOSITION TO PLAINTIFF'S
MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Now comes the Plaintiff, Lisa Svensson, by and through her attorneys and hereby replies

to Defendant, Putnam Investments' Opposition to Plaintiff's Motion to Compel Production of

Documents as follows:

I.      INTRODUCTION

Plaintiff, Lisa Svensson ("Svensson") submits this memorandum in reply to Defendant,

Putnam Investments ("Putnam's") Opposition to Plaintiff's Motion to Compel Production of

Documents.

This reply is necessary because Putnam's opposition memorandum ("Opposition"), (1)

misstates applicable law, (2) ignores important facts, and (3) mischaracterizes discussions with

Plaintiff's counsel regarding the narrowing of the areas of dispute.

## I.    **BACKGROUND**

In Plaintiff Lisa Svensson's Amended Complaint filed in this Court on January 11, 2005 (a copy of which is attached hereto at Exhibit 1 for the Court's convenience), she undertook the burden to prove, by a preponderance of the evidence, her factual allegations supportive of each and every one of her causes of action, including unlawful gender discrimination based upon either disparate treatment or disparate impact, unlawful retaliation, violations of Equal Pay statutes, fraudulent inducement to join and to remain employed at Putnam, fraud, breach of contract and other viable causes of action as set forth therein. Plaintiff's claims covered the entire period of her employment at Putnam, and in particular covered certain promises made to her at the time of her hiring after a Putnam manager himself expressed doubt about whether Putnam was a good place for women to work. Concededly, Plaintiff's case focuses in substantial part on the period from 2000 through 2003, during which period she was repeatedly denied promotions to Managing Director or Partner; was demoted in early 2002 from her Portfolio Management position and forced to return to the Research Department while similarly-situated males were allowed to remain in Portfolio Management; was forced to suffer extraordinary declines in her compensation which her male comparators in Portfolio Management did not suffer; was not promoted to be Director of Research in April, 2003, in favor of a male from outside Putnam, when her immediate male supervisor left the Research Department Director position vacant; was demoted and deprived of her management responsibilities in August, 2003 purportedly due to inadequate job performance, this despite her having been made Associate Director of Research at the beginning of that year, and despite the fact that the sole justification for this employment action related to Putnam's phony perception that their inability to retain two of her male subordinates in Research was due to the males alleged inability to interact

2

successfully with their female manager; and, when Plaintiff refused to accept this demotion and

the resultant destruction of her intended career, or to resign after an interim 2-3 month period of

continued employment, or to resign immediately with a severance package and cede her civil

right to sue Putnam for discrimination, was summarily terminated on September 15, 2003. The

Amended Complaint further alleges that Putnam, based upon her pre-termination and post-

termination statements that Putnam's actions were based upon unlawful gender discrimination,

retaliated against Plaintiff by deliberately withholding deferred compensation and stock rights

which she had received in earlier years as a portion of her compensation in those years, solely

because she refused to sign a Separation Agreement under which she would be required to

forever waive and forego her right to sue Putnam for gender discrimination.  At trial, Plaintiff

will need to prove facts supportive of each of these individual claims, as well as that there

existed at Putnam throughout her time there a so-called "glass ceiling" for women, especially at

the levels of Managing Director and above, that she was disparately treated in comparison to her

male comparators in promotions, transfers, demotions and compensation, and was ultimately

terminated because two male subordinates purportedly objected to her continuing as their

supervisor, and Putnam acceded to their threats to leave unless she were removed; and that

Putnam's policies respecting promotions, transfers, demotions and terminations had a disparate

impact upon Putnam female employees.

In order for Plaintiff to sustain her burden of proof on each of these claims, it is critically

necessary for her to obtain unfettered access to Putnam's business records respecting the circum-

stances surrounding the awarding of promotions and opportunities to transfer to more desirable

and lucrative jobs to males, as well as the specific reasons why these same opportunities were

given to females. Plaintiff also needs unfettered access to the basis for not demoting her male

comparators (who, Svensson specifically identified in her deposition on November 30, 2005), as well as to the extraordinary compensation relative to Plaintiff which she believes her male comparators have received as a result of avoiding the demotions which Plaintiff was forced to endure. Thirdly, Plaintiff needs unfettered access to emails and other documents prepared or received by her managers and other superiors within Putnam not only to refute their stated reasons for taking adverse employment actions against Ms. Svensson, but also to show that gender discrimination motivated, at least in substantial part, their actions. Plaintiff submits that she has, through this first document request, undertaken reasonable and necessary discovery within the framework of Rule 26 of the Federal Rules, and should not now be encumbered by Putnam's unreasonable and unabated efforts to thwart such discovery through the assertion of unreasonable objections based upon lack of relevance, burdensomeness and attorney-client and work product privileges, and through unilateral redaction of critically-important documents so as to make them essentially indecipherable. Simply put, these objections and redactions, whatever tactical advantage they may avail Putnam, are entirely unreasonable in the context of this litigation, and are being interposed solely to throw up as many roadblocks as possible to proving Plaintiff's meritorious claims. Accordingly, Plaintiff respectfully submits that this Court should enter an order directing Putnam to produce fully responsive documents forthwith, together with an imposition of legal sanctions for Putnam's ongoing efforts to stall the expeditious prosecution of this case by refusing to timely produce relevant documents, to assert insubstantial and baseless objections to reasonable discovery requests, by producing documents which are so substantially redacted as to render them incomprehensible, without any prior authorization from this Court, and by asserting legal privileges without even providing a privilege log, thereby preventing Plaintiff from determining whether the privilege assertion was

4

meritorious; and in rejecting the reasonable compromise proposed by Plaintiff at the pre-motion conference, thereby necessitating the intervention of the Court.

## PROCEDURAL HISTORY

Plaintiff Svensson served her document requests and First Set of Interrogatories on or about August 9, 2005. Putnam provided its response to the Document Request on September 16, 2005, but failed to produce any responsive documents until October 3, 2005, at which time they produced relatively few documents, consisting almost exclusively of documents contained in Plaintiff's personnel file (which was the subject of only one of Svensson's Requests.) As the apparent reason for non-production of other responsive documents, Putnam seemingly relied on the broad assertion of general objections contained in their September 16, 2005 response, and Putnam made no effort to explain their general objections, or to correlate their objections to specific categories of documents being withheld. Plaintiff was thereby left with the impossible task of ferreting out on her own the manner in which the requested documents were privileged, confidential, not relevant to discovery, too burdensome for the largest employer in Boston to produce, too time-consuming, would seek the mental impressions of counsel without explaining their rationale, and otherwise went beyond the issues raised in the Amended Complaint. Because these objections were highly ambiguous, and because the production by Putnam had been so minimal in comparison to Plaintiff's production of thousands of pages of relevant documents to Putnam's counsel on August 31, 2005, and because a number of the produced documents had been redacted, Plaintiff saw no alternative but to bring on the instant motion. In accordance with the Rules governing discovery disputes, Plaintiff undertook to schedule a pre-motion conference with all counsel, which conference was held on October 25, 2005, and was preceded by a letter from Nancie Edgren, Esq., one of Svensson's retained counsel, setting forth Plaintiff's position.

After the telephone conference failed to achieve a reasonable resolution, counsel further ex-

changed emails articulating their respective positions, but to no avail. Additionally, the Court

should be apprised that the fact discovery deadline set by the Court at the Scheduling Conference

is February 1, 2006, and that a Court-directed mediation is presently scheduled for January 11,

2006. At the Scheduling Conference, the Court directed the parties' counsel to conduct sufficient

discovery prior to the mediation in order to have a meaningful mediation process. This motion

should therefore be viewed as an effort to comply with the Court's directive.

## III. ARGUMENT

Svensson relies upon the arguments set forth in her Motion to Compel Production of

Documents. In addition, however, Svensson replies as follows to Putnam's Opposition:

A.    Svensson's Request Does Not Go Well Beyond Issues Raised in the Complaint

Plaintiff's First Amended Complaint is thirty four pages long and is extremely detailed in

both facts and claims against Putnam. Putnam had the opportunity to either file a Motion to

Strike, or to file a Motion to Dismiss with regard to particular claims they deemed to be legally

insufficient, yet they failed to do so. Absent a dismissal or a court ruling regarding Svensson's

particular claims, each of Plaintiff's claims in the Amended Complaint must be deemed

appropriate subjects for discovery. In particular, Putnam speciously objects to production of

documents relevant to Svensson's assertion that Putnam treated women who were married with

children much less favorably than men with children, which is an entirely permissible and

legally-cognizable form of gender discrimination, and also supports the fundamental premise of

Svensson's case that female investment professionals were treated unfairly by Putnam. Putnam

erroneously claims that the requested information regarding women with children versus men

with children is solely related to discrimination based on marital status, which they assert is not a

6

protected class under federal or Massachusetts law. Even if this questionable assertion is correct, it in no way should prevent Plaintiff from obtaining the requested discovery, because it is relevant to Svensson's gender discrimination claims. If, as Plaintiff strongly suspects, the documents confirm that Putnam's employment policies resulted in disparate treatment of, or have a disparate impact upon, married females with children as compared to married males with children, then this evidence will seriously undermine Putnam's claim that they do not engage in discriminatory employment practices based upon gender, and will virtually compel the jury to infer discriminatory and gender-based motives for the various adverse employment actions taken against Plaintiff

Putnam's audacious assertion that Svensson's discovery requests go beyond the scope of permissible discovery because they go beyond the issues raised in the Amended Complaint is demonstrably inaccurate, especially as Svensson, at the pre-motion conference, agreed to substantially limit her document requests to specific managers and specific events alleged in her Amended Complaint. Additionally, as Svensson testified at her deposition on November 30, 2005 as to the male investment professionals she deems to be her appropriate male comparators, she would be amenable to limiting the scope of this or future document requests to only those males she has now identified. As to females, Plaintiff would be willing to limit the scope of disclosure to the female investment professionals identified in her Initial Disclosures, all of whom she believes suffered disparate treatment at Putnam because of their gender. Accordingly, as modified by the outcome of the pre-motion conference, Plaintiff's  document requests pertain directly to the Amended Complaint's allegations, are specific, and reference particular paragraphs of the Amended Complaint,  See Plaintiff's Motion to Compel with regard to Document Request No. 7 (Plaintiff limited the scope of these requests to paragraphs 18-40, 43

and 49-51 of the Amended Complaint, and with respect to Requests Nos. 10 and 11 only, to the events referenced in Paragraphs 21, 22, 24- 30, 32, 35, 36-40, 43 and 49-51.) Plaintiff also has limited the discovery requests to Plaintiff's specific managers over the course of her truncated career at Putnam, and has further identified appropriate male and female comparators. As so modified, Putnam should be ordered to produce forthwith all documents encompassed within the Request in an unredacted form, excepting only those documents which are the subject of a legitimate assertion of privilege, as to which documents Putnam should provide a privilege log identifying title, author, general subject matter and the specific privilege being asserted.

In Putnam's Opposition to Plaintiff's Motion to Compel, Putnam also purports to raise an issue with respect to "questionable discovery tactics" allegedly engaged in by Plaintiff's counsel, an argument which relates to serving in excess of the allowable number of Interrogatories on or about August 9, 2005. Although the belated and insufficient Answers to those Interrogatories by Putnam on November 18, 2005 are likely to be the subject of a further motion to compel at a later date after a pre-motion conference is held with opposing counsel, the mere number of interrogatories served by Plaintiff hardly supports Putnam's spurious allegation of "questionable discovery tactics". Although Svensson admittedly served 32 Interrogatories, seven more than the allowable number under the Local Rules, it is Putnam's reaction to that oversight which raises the sole issue of questionable discovery tactics herein. Initially, and without objection to their number, Putnam requested and was granted an extension of time within which to answer the Interrogatories, and  provided purported Answers to Interrogatories on the adjourned date, October 6, 2005, that cynically stated that because there were too many Interrogatories, and because they had identified the problem to Plaintiff's counsel and had not yet had a response, they were choosing not to answer any of the propounded Interrogatories. Plaintiff thereupon

made minor revisions to the Interrogatories to reduce them to an allowable number, and advised

Putnam counsel of their intent, during which conversation Putnam's counsel stated that the

Answers were largely ready for final review and signature by Putnam's designated

representative, and would be served "within a few days" once the Putnam signatory returned to

the office. Again, there was no assertion of any objections to the Interrogatories communicated

either verbally or in writing. However, Putnam did not provide Answers to Interrogatories until

November 18, 2005; a copy of same is attached hereto at Exhibit 2. These Interrogatory answers

are also inadequate and unresponsive, and assert many of the same baseless objections as are

asserted with respect to the document request. In addition, the objections are untimely, because

no extensions of the time frame for objections was ever requested by Putnam nor granted by

Plaintiff. In short, the Answers to Interrogatories provide yet another example of the

"questionable discovery tactics" of Putnam, by which they seek to thwart reasonable discovery

of evidence pertinent and critically necessary to the Plaintiff's case, or to delay the time frame

for discovery until after the scheduled mediation on January 11, 2006, and indeed until after the

close of fact discovery on February 1, 2006. As but one example of these tactics, Putnam

continues to refuse to provide information regarding Putnam's work force and comparators to

Svensson's position, stating, after referencing the general objections, that "[this Interrogatory]

seeks information relating to employees who are not similarly situated to Svensson. (See

Putnam's Answer to Interrogatory No. 3.) Putnam's answers to Plaintiff's First Set of

Interrogatories further exemplifies Putnam's tactics in withholding discoverable information

even though Svensson has now provided her Answers to Interrogatories, has provided

voluminous documents, and has now been deposed. Notably, Putnam fails to define their

proposed comparators, fails to articulate why Plaintiff's proposed male and female comparators

are over-inclusive, and also fails to provide the requested information regarding the Plaintiff's comparators under either side's definition of the appropriate group. In addition, Putnam has provided information regarding the number of male/female employees at Putnam, but again has not provided any of the requested information concerning those persons who were designated by Putnam as "Partners." Under these circumstances, Putnam's suggestion that Plaintiff has engaged in questionable discovery tactics is not only false and knowingly defamatory, but continues their pattern of manipulating the discovery process to thwart the search for the truth behind Putnam's discriminatory practices toward women, and Plaintiff in particular.

Putnam next cites Svensson's refusal to enter into a Confidentiality Agreement-Protective Order in its Opposition, as a reason why certain documents have not been produced. This argument is factually absurd. Plaintiff has long since answered Putnam's interrogatories and produced voluminous documents on August 31, 2005, without even a whisper of the need for any confidentiality agreement. Indeed, the very first mention of a confidentiality agreement was in an email from Putnam's counsel in late October, 2005, in which it was indicated that Putnam was awaiting response to their proposed confidentiality agreement, which Plaintiff's counsel had never seen. Accordingly, Plaintiff's counsel responded that they had no record of receipt of any such document, and indicated that it was unlikely that Plaintiff, given the belated nature of the request, would agree to enter into a confidentiality agreement voluntarily. Subsequently, in early November, 2005, an email was sent to Plaintiff's counsel again purporting to enclose a proposed confidentiality agreement, yet the email contained no such enclosure. When counsel responded questioning the purported enclosure, Putnam's counsel finally sent a proposed broad confidentiality agreement quite different in scope than the more limited order currently before the Court on another motion. Notably, there was no mention of any proposed Confidentiality

10

Agreement in Putnam's Response to Request for Production of Documents. See Exhibit B of

Plaintiff's Motion to Compel. Meanwhile, Putnam has produced little more than Svensson's

personnel file, and has unilaterally decided to redact significant portions of documents they have

produced in discovery, so as to render the document incomprehensible. Nor have they explained

the legal basis for any such redactions. Given the complexity of this case, and Putnam's stance

on providing relevant and necessary discovery, Svensson may very well be forced to serve

further document requests, seek permission from the Court to serve additional interrogatories

upon Putnam, and seek continued depositions of Putnam witnesses to identify and interpret

documents which were not produced, or were produced in redacted form, at the time their

depositions were taken, pending the outcome of Svensson's Motion to Compel and further

guidance from this Court. All of this would have been unnecessary had Putnam opted to provide

complete and necessary discovery in this case in accordance with the Federal Rules.

     In addition, as Putnam well knows, Svensson has not yet taken a position with respect to

any confidentiality agreement in this case, and in particular the more recent and more limited

confidentiality agreement currently under consideration by the Court. In fact, at the depositions

conducted to date, Plaintiff voluntarily agreed to interim confidentiality protection to protect

employment status and compensation information respecting other Putnam current or former

employees, pending a ruling by the Court. However, Plaintiff will not agree to any agreement

which, without limitation, would allow Putnam to designate virtually every document, or

testimony respecting documents, as being confidential, as Putnam still proposes to do, even

documents that were produced by Svensson and as to which no confidentiality objection was

asserted at the time of their production. Nor does Plaintiff in any way agree that Putnam has the

right to utilize belated assertions of confidentiality to thwart the prosecution of legitimate claims

of gender discrimination rampant at Putnam for many years solely because, years earlier, Putnam

coerced her into signing a document generally providing for return of "confidential documents"

upon her termination. Clearly, Svensson would have been in a far less favorable position if she

were forced to rely on or to prove her case solely on the flimsy, redacted production by Putnam,

or else to seek through protracted and expensive motion practice the relevant documents which

Putnam should have produced in the first instance. Had Svensson not produced her own

documents, Putnam would never have produced them, as is patently demonstrable by Putnam's

current stance.

Putnam cites privacy rights of other employees as being one of the reasons why certain

documents are not being produced, without showing either that the affected employees, many of

which are now former employees of Putnam, are in any way concerned about the privacy of

their compensation in prior years, or in the circumstances which led to their departures from

Putnam. Indeed, but for the separation agreements that Putnam requires departing employees in

protected groups to sign as a condition of receipt of any severance, which agreements require

confidentiality, it could just as easily be the case that these former employees want the

circumstances and the involuntary nature of their departures, and their demeaning treatment prior

to their forced departures, to be judicially reviewed. Thus, in light of Svensson's position (which

will be more fully set forth in response to the separate motion by Putnam for confidentiality), and

in light of the belated nature of the request, and in light of the questionable tactic of unilateral

redaction of documents, and upon weighing Putnam's questionable assertion of former

employees' privacy interests with Svensson's right to pursue her causes of action against

Putnam in accordance with the Federal Rules, Putnam should be compelled to produce all of the

requested documents, as such request has been modified by the pre-motion conference and by

the post-conference email from Plaintiff's counsel, and by Plaintiff's identification of specific

male comparators in her November 30, 2005 deposition, and female comparators in her Initial

Disclosures .


B.      Svensson's Document Requests are Relevant and Not Burdensome

        Simply because it is burdensome for Putnam to produce all requested written

communication that pertains to Svensson's discrimination claims should not preclude Putnam

from complying with relevant discovery requests. Fed.R.Civ.P. 26 and 33; Local Rules 26.1 and

33.1. Fed.R.Civ.P. 26 states that, as a matter of right:

> [p]arties may obtain discovery regarding any matter, not
> privileged, that is relevant to the claim or defense of any party,
> including the existence, description, nature, custody, condition, and
> location of any books, documents, or other tangible things and the
> identity and location of persons having knowledge of any
> discoverable matter....[    ]  Relevant information need not be
> admissible at the trial if the discovery appears reasonably
> calculated to lead to the discovery of admissible evidence.....
>
> (Emphasis added.)

        Certainly, information pertaining to the identity and gender of the

investment professionals in Defendant's work force is relevant to the Plaintiff's

gender discrimination claims, and is also likely to lead to the discovery of

admissible evidence because such evidence may show that the Defendant had a

history of discriminatory animus based upon gender, or a  pattern of terminating,

demoting, and failing to promote qualified female employees.

        Putnam claims that Svensson has not made an adequate showing that the information she

seeks regarding other employees is relevant to her claims. However, Putnam also claims that

"Putnam is unaware of any other employee in Global Equity Research during the period between

1999 and 2003 who was terminated for precisely the same reason that Svensson was terminated."
See Exhibit 2, Putnam's Answer to Interrogatory No. 10. Putnam goes on to state that Svensson
must show that the files she requests are relevant to her claims- that the files relate to people who
are similarly situated to her and that have suffered similar treatment, citing Whittingham v.
Amherst College, 164 F.R.D. 124, 127 (D.Mass. 1995). Svensson is unable to disprove
Putnam's assertion that no other employees that were similarly situated as her were similarly
treated without access to the requested documents, yet, Putnam states the Svensson must prove
this in order to have access to the documents.

Putnam also argues that one reason for not producing all of the requested documents is
that Svensson was in continuous contact with numerous employees on a daily basis, and it would
be too burdensome to search all of those employees' e-mails because employees at Putnam
communicate largely by e-mail and, on any given day, an employee may send and receive in
excess of 100 e-mails and the search would constitute an undue burden and expense to Putnam.
Svensson agrees that most businesses conduct at least some portion of their communication
through e-mails. However, the chosen means of communication between employees should not
now shield Putnam from having to produce relevant and discoverable information, or serve as a
legitimate reason to refuse to produce them. Svensson, far from engaging in the "fishing
expedition" as Putnam claims, is seeking documents that are in Putnam's possession that will,
she believes, support her claims of gender discrimination based either on disparate treatment of
females or a disparate impact upon females. In fact, Svensson has narrowed her request to
documents pertaining to her claims of discrimination as detailed in her Amended Complaint and
has limited her requests as indicated above. Given the critical nature of the requested discovery,
Plaintiff's good-faith attempts to limit the scope of the requests, and Putnam's belated and

14

questionable tactics to avoid any meaningful production, Putnam should be compelled to at least

make a good faith effort to search its files (which they have apparently not done) and to produce

responsive documents. Putnam has cited the difficulty in searching Josh Brooks's in and out

email box in preparation for his deposition, however, when Mr. Brooks was asked during his

deposition whether he had been asked by counsel at any point during 2005 to produce any

documents responsive to document requests served by Plaintiff, he said that he had not been

asked to search for any such documents, which if true is a clear violation of Putnam's discovery

obligations. Seeking documents in Putnam's possession relating to a defined list of events

referenced in the Amended Complaint and a defined list of managers or male and female

comparators to Svensson is not beyond the scope of permissible discovery. Therefore, Putnam

should be compelled to produce the requested documents, and their objections based upon

burdensomeness should be stricken.


C.    Svensson's Request Does Not Violate the Work Product Doctrine and Does Not Seek
      the Mental Impressions of Putnam's Counsel

Putnam claims that Rule 26(b)(3) protects them from having to produce all documents

requested in Request No. 7, which seeks documents which relate to or support any of the

admissions, denials, of knowledge or information or other allegations contained in the

Defendant's Answer. Svensson did in fact specify particular paragraphs to which this request

applied during the Conference Call, and thereafter via correspondence.

Rule 26(b)(3) applies to trial preparation materials and states

> "a party may obtain discovery of documents and
> tangible things otherwise discoverable [. . . ] and prepared in
> anticipation of litigation or for trial by or for another party or by
> or for that other party's representative [ . . . ] only upon a
> showing that the party seeking discovery has substantial need of

15

> the materials in the preparation of the party's case and that the
> party is unable without undue hardship to obtain the substantial
> equivalent of the materials by other means."

Svensson is not seeking documents **prepared** in anticipation of litigation. Svensson is

seeking documents which existed prior to the institution of her lawsuit that relate to the events

and matters referenced in her Amended Complaint and Putnam's Answer. Svensson is not

seeking the mental impressions of Putnam's counsel, however, Putnam should not be able to

unfairly surprise Svensson at trial with documents which they now find convenient to label as

mental impressions of counsel, without even fulfilling their obligation to identify said documents

by title, author, general subject matter, or to make a showing that they are in fact privileged

communications, by producing a privilege log of identified documents. Svensson has agreed to

limit her requests to particular paragraphs of the First Amended Complaint, and Putnam should

be compelled to produce the requested documents, to provide a privilege log, and to produce in

unredacted form unprivileged responsive documents that are not comprehensible in their

redacted form.

Lastly, Putnam erroneously contends that Svensson appears to have repudiated an alleged

agreement that Request No. 22 would be limited to Patrick O'Donnell, Robert Swift, Steve

Gorman, Darren Peers, Konstantin Stoev, Ellis Ecklund, Chris O'Malley, Carol MacMullen and

Tim Ferguson. While Plaintiff strongly believes that the proposals made at the pre-motion

conference and thereafter represented a good-faith attempt to avoid motion practice on discovery

issues, and not a beginning negotiating point for further erosion of the requested relevant

discovery, Plaintiff is prepared to adhere to the limitations identified in these motion papers, and

in the email communications following the pre-motion conference as to the scope of said

discovery. However, that discovery always encompassed individuals other than the persons

identified above, and in particular included Defendant Lasser and Ed Haldeman.


### III. CONCLUSION

For all of the reasons set forth above, and in Svensson's memoranda filed on November

4, 2005, the court should allow Svensson's Motion to Compel Production of Documents, should

require Putnam to produce the requested documents forthwith, should require Putnam to bear all

costs associated with this long-overdue production, and should impose upon Defendant Putnam

the attorneys' fees and costs incurred by Plaintiff in making the instant motion.


                                        Respectfully submitted,
                                        The Plaintiff, By her attorneys,


                                        /s/ Nancie L. Edgren
                                        Denise L. Page, Esq.
                                        BBO No. 119415
                                        Nancie L. Edgren, Esq.
                                        BBO  No. 648665
                                        BARRON & STADFELD, P.C.
                                        100 Cambridge Street, Suite 1310
                                        Boston, Massachusetts 02114
                                        617.723.9800

                                        and

                                        /s/ John K. Weir
                                        John K. Weir, Esq. Admitted Pro Hac Vice
                                        John K. Weir Law Offices
                                        300 Park Avenue
                                        Suite 1700
                                        New York, New York, 10022
                                        212-572-5374


Date: December 7, 2005


17

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LISA SVENSSON,                          *
                 Plaintiff,             *
                                        *
                                        *
                                        *      CIVIL ACTION NO.
v.                                      *
                                        *
PUTNAM INVESTMENTS LLC, f/k/a           *
PUTNAM INVESTMENTS, INC. and            *
LAWRENCE J. LASSER                      *
                 Defendants             *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Lisa Svensson (hereinafter "Plaintiff" or "Svensson"), by her

attorneys John K. Weir Law Offices LLC and Barron & Stadfeldt P.C., alleges

upon information and belief as follows:

## PRELIMINARY STATEMENT

1.  This Complaint concerns the unlawful actions of Defendants Putnam

Investments LLC, f/k/a Putnam Investments Inc. (hereinafter "Putnam") and

Lawrence J. Lasser, former Chief Executive Officer of Putnam (hereinafter

"Lasser"), who directly aided and abetted Putnam in illegally and discriminatorily

treating and ultimately terminating Svensson, after inducing her to accept their

offer of employment by means of false pretenses and fraudulent and deceptive

representations, only to renege on their promises relating to her expected career

path, and on her ability to be treated on an equal footing with males in terms of promotions, compensation and benefits.

2.   Svensson alleges that Putnam, under Lasser's direction and control, unjustifiably and improperly created artificial barriers to the career advancement of women, and Svensson in particular; maintained gender-biased attitudes and created a male-dominated culture at Putnam, particularly at the levels of Managing Director and Partner; engaged in a double standard of evaluation for male and female employees; disparately treated males and females in terms of compensation; disparately implemented employment policies which had an adverse impact on female employees; and retaliated against females, and in particular Svensson, because she objected to such discriminatory and disparate treatment, and otherwise objected to the nefarious, illegal or unethical business practices engaged in by Putnam. As a direct result of said gender bias, disparate treatment, wrongful implementation of employment policies with a disparate impact on women, and retaliation, Svensson was willfully, deliberately and maliciously denied promotions, forced to accept demotions, reductions in compensation, and, on September 15, 2003, was abruptly and unceremoniously terminated when she refused to accept any further demotions, and instead insisted on her right to be compensated and otherwise treated fairly relative to her male colleagues at Putnam.

3.   At the time of her termination, Svensson advised Putnam of her strong belief that their employment action against her was motivated by gender bias. Following her termination, Svensson advised Putnam of her intent to pursue legal

2

claims asserting her fundamental right to be treated fairly and on a non-discriminatory basis, and thereupon refused to accede to Putnam's outrageous demands that she cede all her legal rights against Putnam and Lasser by executing a release of all such claims. Upon becoming aware of her views and her intent to pursue legal claims, Putnam's response was to further retaliate against Svensson, by withholding from her deferred compensation and stock rights to which she had become entitled by virtue of longstanding service, outstanding performance of her job responsibilities, and significant contributions to Putnam's financial revenues and profits.

4.    Plaintiff's claims herein are premised upon the litany of unkept promises, the unmitigated gender bias practiced against her, disparate treatment of her compared to her male colleagues, wrongful treatment of her because of her stated objections to certain improper, illegal and unethical business practices, wrongful termination of her employment owing to an ingrained culture of chauvinism, and a long history of wrongful treatment of females, the maintenance of a "glass ceiling", and retaliation against her for asserting, or threatening to assert, her legal rights. Svensson, by way of this Complaint, seeks substantial monetary damages, including back pay, front pay in lieu of reinstatement, other compensatory damages as may be proven at trial, attorney's fees and costs, and a significant award of punitive damages against both Defendants, in an attempt to deter Putnam and Lasser from lining their own pockets at the expense, and to the detriment, of females in Putnam's workforce, including Svensson.

5.   Defendant's conduct constitutes unlawful gender discrimination under federal and state law, violation of equal pay provisions of federal and state law, retaliation, wrongful discharge in violation of public policy, breach of contract, breach of the covenant of good faith and fair dealing, violations of the ERISA statute, fraudulent inducement, misrepresentation, conversion and unjust enrichment.

## JURISDICTION AND VENUE

6.   This Court has subject matter jurisdiction over the matter pursuant to 28 USC § 1331 in that the Complaint asserts claims under federal law, and the amount in controversy is in excess of $75,000.

7.   This Court also has supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367.

8.   Venue in this District is proper because the unlawful practices of which Plaintiff complains occurred within this District, as required by 28 USC § 1391, and Putnam maintains a place of employment for male and female employees in Boston, Massachusetts, and contracts a substantial part of its business in this District.  Venue in this District is proper as to the state law claims pursuant to 28 USC § 1391 (b), because a substantial number of the events or omissions giving rise to these claims occurred within this District.

## PARTIES

9.   Plaintiff Svensson is an individual currently residing at 68 Commonwealth Avenue, Boston, Massachusetts, and will be residing as of January, 2005 at 54 Hull Street, Newton MA 02460

4

10. Defendant Putnam is a Delaware limited liability company, with its principal place of business located at One Post Office Square, Boston, Massachusetts.

11. Defendant Lasser is an individual who, upon information and belief, resides at 342 Warren Street, Brookline, Norfolk County, Massachusetts.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. Plaintiff Svensson duly and timely filed with the Massachusetts Commission Against Discrimination ("MCAD") a Charge of gender discrimination against Putnam on or about March 1, 2004, was permitted to amend said Charge to name Lasser as an additional Respondent in or about July, 2004, and also filed a separate Charge of Discrimination alleging post-termination retaliation in or about July, 2004. Both Charges were also filed with the Equal Employment Opportunity Commission ("EEOC").

13. By letter dated October 21, 2004 to Plaintiff's Counsel, MCAD issued a letter order (attached as Exhibit A) allowing Svensson to pursue a private civil action for said discrimination and retaliation under Massachusetts state law.

14. By letter dated December 7, 2004, and received by fax on December 8, 2004, EEOC issued a Notice of Right to Sue to Svensson, granting her request to commence a private civil action for said discrimination and retaliation under federal law. A copy of the Notices of Right to Sue are collectively attached hereto as Exhibit B.

15. Plaintiff Svensson has fulfilled all conditions precedent to the institution of this action, and has filed the Complaint within ninety (90) days from receipt of

the Notice of Right to Sue from the EEOC. Plaintiff has duly exhausted all

available administrative remedies, and hereby invokes her right to a trial by jury

with respect to her claims of gender discrimination and retaliation against Putnam,

her claim of "aider and abettor" liability for gender discrimination against Lasser,

and for various state law claims asserted herein.

## ALLEGATIONS COMMON TO ALL CLAIMS

16. Plaintiff Svensson is a female, and as such is a member of a protected

class under both federal and Massachusetts state discrimination laws.

17. Svensson, in 1994, was gainfully employed as an Analyst at Lord Abbett

& Co., in New York, with seven years of experience in the industry and

reasonable expectations for significant career advancement, promotions and

increased income potential.

18. In or about June, 1994, plaintiff was recruited away from this position

through promises made to her by Putnam, principally through Mr. Patrick O'

Donnell ("O'Donnell"), that, after an initial period of time during which Plaintiff

would be assigned to the Research Department, she would be transferred to the

Portfolio Management area, which, at Putnam, constituted a far more promising

career path, with significantly higher compensation and a better opportunity to

become a Managing Director, and ultimately a Partner, than would have existed

for an employee who had remained in the Research Department.

19. By offer letter from O'Donnell dated June 9,1994, plaintiff was promised

an annualized salary of $125,000, guaranteed prorated bonuses for 1994 and 1995

of $150,000 each year, and eligibility, after one year of employment, for the

Putnam Profit Sharing Retirement Plan, as well as a broad array of employee benefit programs. Although she was admonished by a male with whom she interviewed that Putnam was not a good place for women to work, she relied upon Putnam's assurances as to her projected career path, and their statements that Putnam was implementing procedures, such as diversity groups for females and persons of color, to assure that gender-based discrimination would not be tolerated and would not be a hindrance to Svensson's advancement.

20.  Acting in reliance on the promises respecting career advancement and non-discrimination made by Putnam, Plaintiff, on June 14, 1994, signed the offer letter and commenced a new career at Putnam, and thereby forsook her anticipated compensation and career path at Lord Abbett. Shortly after her arrival, Svensson joined, and began to participate in, a women's advisory committee formed for the purpose of discussing and resolving gender-based issues in the workplace.

21. From July, 1994 until her termination of employment on September 15, 2003, Svensson was employed by Putnam, initially in the Equity Research Department, then from December, 1997 until March, 2002 as a member of the newly-formed International Growth Equity Team.  Throughout this entire period, Svensson received excellent annual performance evaluations, repeated praise from supervisors and colleagues, salary increases, bonuses, restricted stock grants and the opportunity to participate in various employee benefit programs, as well as stock plans, stock option plans, and deferred compensation plans.

22. In March, 2002, despite having received positive job performance evaluations from her supervisors, repeated praise from her colleagues, and having achieved financial performance results equal to or better than similarly-positioned male colleagues, Svensson was forcibly required by Putnam to return to the Global Equity Research Department ("GER"). This forced demotion was in breach of the express promises made to her at the outset of her employment by O'Donnell, and in breach of the implied promise to be free from pernicious gender discrimination, at a time when her male colleagues, despite lesser experience and inferior performance records, were allowed to remain in Portfolio Management positions, and thereby continued to enjoy extraordinarily high compensation with maintenance of their expected career paths.

23. Plaintiff's 2002 demotion, albeit abrupt, exacerbated a disturbing long-term trend at Putnam, by which highly-qualified, intelligent and experienced women, such as Svensson, were repeatedly and consistently denied promotional opportunities granted to male colleagues with lesser qualifications, experience and intelligence, particularly promotions to the level of Managing Director and Partner, at which levels women, who were significantly under-represented in all non-clerical and managerial employment at Putnam, were even more egregiously short-changed. This deliberate under-representation of women imposed a so-called "glass ceiling" on their career opportunities, especially married women with children or who had plans to have children, including Svensson. Many women denied such career advancement either left in disgust and sought employment elsewhere, or were demoted or terminated. The women's advisory

8

group withered and died as the direct result of these departures and the perception by those who stayed on that the situation was beyond repair.

24. In particular, Svensson, in 2000, 2001, 2002 and 2003, was denied promotion to the Managing Director level in favor of male employees with equivalent or lesser ability, intelligence and achievement, despite a positive recommendation from her supervisor, thereby preventing Svensson from achieving the significantly-higher compensation, ascendant career path within the organization, and opportunity to become one of the Partners at Putnam, for which becoming a Managing Director was a necessary prerequisite.

25. After Svensson was denied the Managing Director position in 2001, she inquired as to why she had not been selected, and was told that it was a bad year for her to get promoted because she had been out on maternity leave at the end of 2000. She approached Mr. Robert Swift to object to that response. When she then approached Mr. Steve Oristaglio to ask why she had not been promoted, she was instead advised that she lacked "that certain something", and had a "volatile" nature. Plaintiff thus became aware that, as a female, she was being held by Putnam to a higher standard for advancement than were her male colleagues, who, almost without exception, were deemed by management to have had "that certain something", and for whom volatility translated as much-admired, and financially rewarded, aggressiveness.

26. At the time of, and after, plaintiff's involuntary demotion and departure from the International Growth Equity Team in March, 2002, and her return to the Global Equity Research Department (GER), she repeatedly inquired of Putnam

whether there were other positions in Money Management, especially on the Growth Teams, to which she could be transferred, and was told there were none. However, similarly-situated but lesser-performing males were allowed to remain in Portfolio Management positions, including on the Growth Teams, were not demoted, and did not experience significant reductions in compensation, as occurred to Svensson. When she brought this seemingly disparate treatment to the attention of management, she was told there was "no room" on the Growth Team for her. However, "room" had been found for a more junior male employee. When she asked about a position on the Domestic Growth Team, she was advised that Putnam wanted certain skills in that job, and when she responded that she had equal or better skills than the males who were being retained in or transitioned to Domestic Growth, she was told repeatedly by management that she needed to "go back to GER", and was not even offered any interview opportunities for alternative positions.

27. As a direct result of Putnam's willful demotion of Svensson and her forced return to GER, plaintiff suffered a loss of compensation of approximately $1,000,000 in 2002, and was put on a descendent career path, while similarly-situated male colleagues were not so demoted, did not suffer any significant declines in compensation, and were not put on descendent career paths, but instead were permitted to become Managing Directors, and, in some cases, Partners, in far greater numbers than their female colleagues, and particularly compared to married female employees with children.

28. After her forced return to GER, Svensson continued to perform her job capably, while also continuing to seek out other job opportunities within Putnam more in line with her expected and promised career path. Despite these efforts, she was consistently denied these opportunities by Putnam and Lasser.

29. On one occasion in 2002, Svensson was advised of an available position as Portfolio Manager on The Global Core Team, but was told by Mr. Bill Landes ("Landes") that the job was being given to a younger male because they wanted someone "more junior" than Svensson. When Svensson indicated to Landes her belief that it was because "they wanted a guy", Landes admitted that her statement was true.

30. On another occasion in 2002, Svensson was advised by Landes that they wanted to promote a more junior male to become Associate Director of Research, but he was unsure whether this male employee could do the job, and he knew Plaintiff could do it, and thus wanted Svensson to function as the male's "right-hand person", and actually perform all the people management aspects of the job. Although Svensson inquired as to why she was being asked to do most of the work, while a less capable, more junior male was being offered the title, the credit and the enhanced compensation, Putnam failed to come forward with any response.

31. In October, 2002, Mr. Charles "Ed" Haldeman became Putnam's Head of Investments, reporting to Lasser. At a meeting of analysts on October 31, 2002, two days after he assumed his new position, Mr. Haldeman was asked what style of investor he was, and he replied that he would give his own answer, which

11

answer had not been "vetted by the EEOC". He said that, if his son asked him in the privacy of his own home whether, not knowing anything else, a 25 year-old woman or a 53 year-old woman would be more attractive, and with all other things being equal, he would have a bias in favor of the 25 year old, although at his age (53) he was not going to be "running around" with any 25 year-olds. Because this was Svensson's first meeting with Mr. Haldeman, because defendant Lasser had long tolerated, and even promoted, a hostile work environment for women at Putnam, particularly married women with children, and because Haldeman had a reputation for mass firings earned at his previous employer (where he was known as "The Sweeper"), plaintiff Svensson became extremely concerned about this remark, which she felt was highly discriminatory toward women employees, particularly those older than 25, as was Plaintiff.

32. In January, 2003, after receiving highly-positive performance evaluations in her annual review, Svensson was appointed by Landes as the Associate Director of Research, a month before his own departure. However, although Svensson was fully qualified, experienced and able to assume Landes' own position as Director of Research upon his departure, Putnam and Lasser decided to pass on Svensson, and other qualified females, and instead went outside the company to hire a male, Joshua Brooks, ("Brooks") as Director of Research. Brooks commenced his responsibilities in April 2003, and thereby became Plaintiff Svensson's new boss, with compensation, upon information and belief, far exceeding that of Svensson.

33. Although Svensson continued to search for money management opportunities within Putnam after Haldeman's arrival and Brooks' ascendancy, she never received any available opportunities, while more junior male analysts and Portfolio Managers with lesser performance records, obtained or retained such promotions or transfers, and were allowed to earn or retain compensation approximating, or in some instances far exceeding, $1 million.

34. Upon information and belief, after Brooks' arrival in April, 2003, Lasser, Haldeman and Brooks conspired to further discriminate against females, and especially married females with children, by denying them promotional opportunities, demoting them and, in Svensson's case, by concocting a scheme to force her to quit Putnam.

35. In the late spring and summer of 2003, plaintiff, on a number of occasions raised with Brooks significant concerns which she had about the allocation of brokerage commissions on the "buy" side to reserve shelf space, believing that this business practice was a breach of Putnam's fiduciary duties to its clients, and thereby, quite possibly, illegal or, at the least, unethical and improper, and that it was only a matter of time until the SEC started to investigate. Brooks stated that he would report Plaintiff's concerns to Lasser, but never reported back to Plaintiff on Lasser's reaction.

36. Very shortly thereafter, and in furtherance of the scheme concocted by Lasser, Haldeman and Brooks, Human Resources personnel began conducting interviews of Plaintiff's colleagues in GER to "check up" on her performance, in the stated guise of evaluating her for a higher-level position, but in reality, they

13

were seeking to develop negative information sufficient to justify her termination. No similar interviews were conducted with respect to similarly-situated male employees at Putnam at this time. Upon information and belief, the Human Resources persons performing the interviews were instructed to engage in this discriminatory conduct by Brooks, Haldeman and/or Lasser.

37. Without any discussion of the results, or even the existence, of the aforementioned interviews, and without any other explanation, on August 28, 2003, Svensson was informed by Brooks that she would be summarily removed from her position as Associate Director of Research, and that she was being given three options: 1) Continue employment as an analyst, a significant demotion with no long term career opportunities, and with the explicit statement that she would not be able to make any more money or be eligible for future promotion; or 2) Accept a severance package of 18 weeks of salary, half of her 2002 bonus, and her accumulated deferred compensation, with no bonus for 2003, while providing for a release of all legal claims she might assert against Putnam; or 3) continue employment at Putnam for a limited period of time in the lesser capacity, during which time she would be expected to search out alternative employment, with no severance package and a "voluntary" resignation at the end of the brief period of continued employment.

38. On September 12, 2003, Svensson met with Brooks in his office, and advised Brooks that none of the three proposed options for continued employment were acceptable to her, that she would instead need some type of written assurance that her career at Putnam could be put back "on track", and that her

14

future promotions and compensation would be based on her contributions, and not impacted by her gender. Brooks stated that he would see what he could do.

39. On September 15, 2003, Plaintiff Svensson met with Brooks and Ms. Mary McNamee ("McNamee") of Human Resources. Brooks stated that Svensson had made demands that Putnam could not meet, and that therefore Putnam had unilaterally determined that Svensson had elected the third option. Svensson objected that she had not chosen this option and instead was being fired, and stated that she wanted a document to this effect. McNamee thereupon presented to and reviewed with Svensson a letter outlining a severance package, and incorporating a release of all legal claims against Putnam. She also presented a separate document which stated that there would be no problem with the proceeds from the stock sale Svensson had recently submitted, and that the final 750 shares would vest on schedule, and that Svensson would also get stock options, but that the stock needed to be held for at least 6 months before she could sell it.

40. Approximately 15 minutes after the meeting ended, McNamee presented Svensson with a revised document, this time indicating that Putnam was indeed terminating Svensson's employment. After her termination, Plaintiff refused to accept the written severance agreement because it provided for a complete release of all her legal claims, and offered her paltry compensation as consideration for same, particularly given Putnam's promise relating to the stock and stock options as well as the deferred compensation to which she had already become legally entitled.

41. Her gender, female, and her status as a married female with children, were substantial motivating factors in Putnam's overall treatment of Svensson, in their unwarranted denials of promotions to her, in their unwarranted reductions in her compensation, in their refusals to compensate her in accordance with the compensation packages received by her male colleagues, in their inexplicable and unjustifiable demotions of her, in their refusals to allow her even to interview for positions outside of GER, and in their decision to mandate her invidious and unlawful termination.

42. At all times relevant herein, Putnam consistently treated women less favorably than men, especially married women with children or with plans to have children, particularly with respect to those women who sought promotion to, or who wished to remain at, the Managing Director level or above. After the arrivals of Haldeman and Brooks, and continuing after Svensson's termination, the rate of non-promotions, demotions and forced departures of women accelerated.

43. Similarly, upon information and belief, of the approximately fifty Partners at Putnam between 1999 and 2003, only six were women, with no more than three at any one time. The disparity in the number of males versus females in the highly secretive Partnership occurred as a direct result of the failure and refusal by Putnam and Lasser to promote Svensson and other qualified female employees to the position of Managing Director, and the conscious maintenance of a "glass ceiling" or, alternatively, the conscious maintenance of facially neutral

16

employment policies which had, and continue to have, a disparate impact upon women at Putnam.

44. Defendant Lasser participated in, and helped to sustain, a corporate culture at Putnam that fostered gender discrimination. Lasser aided and abetted Putnam directly in the gender discrimination which was perpetrated against Svensson by his participation in the decision-making process which led to denial of promotions, denial of equivalent pay, demotions and, ultimately, Svensson's termination. Upon information belief, his conspiratorial conduct, as herein set forth, led directly to Svensson's termination of employment, and was undertaken because of his desire to reduce the number of females, and especially married females with children, within the Putnam workforce, and to prevent their accession to top management.

45. At the time of Svensson's termination, she possessed a portfolio of significant Putnam stock options and grants, as well as a significant sum in the deferred compensation plan at Putnam.

46. Following her termination and despite the promises made by McNamee at the time of her departure, Svensson's stock portfolio remained in Putnam's possession and control; nevertheless, Svensson continued to receive periodic dividend statements and dividends on the stocks in her portfolio.

47. On November 12, 2003, Svensson, through her attorney, wrote to Putnam's then General Counsel and notified Putnam in writing of her intention to prosecute her claims of gender discrimination and violations of state and federal law.

48. On or about March 1, 2004, Svensson, by letter of her counsel dated February 27, 2004, filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination, which Charge was thereafter also filed with the Equal Employment Opportunity Commission in early March, 2004.

49. Through correspondence sent to Putnam on March 5, 2004, Svensson instructed Putnam to sell her shares of Putnam stock in her portfolio.

50. On March 10, 2004, Putnam informed Svensson by return correspondence that it had retroactively divested Svensson of the 750 shares of Putnam stock promised to her by McNamee, and on which she had been receiving dividends and dividend statements, because Svensson had decided not to execute a Separation Agreement incorporating a release of all legal claims against Putnam.

51. Putnam further has continuously maintained custody and control of Plaintiff's deferred compensation account, and since becoming aware of Plaintiff's claims of gender discrimination, has continuously failed to pay the monies in said account to Plaintiff.

52. Putnam, through its agents, servants, or employees, thereby retaliated against Svensson for asserting her claims of gender discrimination at the time of her termination; for notifying Putnam of her intent to file, and thereafter filing, a claim of gender discrimination with the MCAD and EEOC; and for her decision not to sign the Separation Agreement, under which she would have released and relinquished important legal rights.

53. As a result of Svensson's non-promotions, demotions and her termination, she has suffered monetary damages, including loss of compensation, loss of raises

in compensation, loss of bonuses, loss of employee benefits and enhancements of those benefits, loss of stock grants and stock options, loss of deferred compensation, loss of the opportunity for further career advancement, extraordinary damage to her business reputation, emotional distress damages and other compensatory damages.

54. In addition thereto, Svensson is entitled to punitive damages because certain of the Partners, officers, directors and members of the management of Putnam, including but not limited to defendant Lasser, as former Chief Executive Officer, acted deliberately, maliciously, and with conscious intent to discriminate against women at Putnam, particularly married women with children, such as Svensson; or, at the very least, were recklessly indifferent to the lawful rights of female employees such as Svensson to equal opportunity in their employment. Svensson is further entitled to punitive damages because of defendants' deliberate and malicious acts in retaliating against Svensson because of her assertion of gender discrimination claims, and other claims of legal wrongdoing or breaches of ethical obligations, and because of their willful conversion, to their own account and for their own financial benefit, of monies properly due and owing to Plaintiff.

## COUNT I
## SEX DISCRIMINATION (TITLE VII)

55. Plaintiff repeats and re-alleges the allegations contained in paragraph 1 through 54, as though fully set forth herein.

56. It is unlawful under Title VII of the Civil Rights Act of 1964, for any covered employer to refuse to hire, to discharge, or to otherwise discriminate against any person regarding promotions, demotions compensation or other terms

19

and conditions of employment because of said person's race, color, religion, sex or national origin, to pay male employees higher compensation for substantially equivalent work, or to retaliate against any person because they assert, or attempt to assert, Title VII rights.

57. Plaintiff Svensson in a member of a protected group under Title VII because she is a women. Defendant Putnam is a covered employer.

58. By the above described conduct, Defendant Putnam has discriminated against Svensson, because of her sex in the terms, conditions, and privileges of her employment, in violation of Title VII, 42 U.S.C. § 2000e-(5).

59. As a result of Putnam's gender discrimination, Svensson has suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs and other compensatory damages. Putnam is further obligated to pay to plaintiff punitive damages for said discrimination.

## COUNT II
## VIOLATION OF M.G.L.CH. 151B§ 4

60. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 59 above, as if set forth here in their entirety;

61. Under Massachusetts law, it is a violation of the Fair Employment Practices Law (M.G.L.CH. 151B) for an employer to refuse to hire, to discharge, or to discriminate against any individual in compensation or in terms, conditions, or privileges of employment, because of that individual's genetics, race, color, religious creed, national origin, sex, age, sexual orientation, or ancestry;

20

62. Plaintiff, Svensson is a member of a protected class under M.G.L.CH151B because she is a woman.

63. Putnam discriminated against Svensson due to her gender in their treatment and termination of her.

64. The above acts and practices of Putnam constitute unlawful discriminatory acts in violation of M.G.L.Ch. 151B §4.

65. Putnam's decision to target Svensson for demotions and termination, while less qualified, younger males were retained and promoted or not demoted, was willful, intentional and committed with reckless disregard for the rights of Plaintiff.

66. Svensson was, at all times relevant herein, fully qualified to perform her job, as well as the jobs to which she aspired or sought promotion, and which she was denied because of gender discrimination.

67. As a result of Putnam's discrimination, Svensson suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs, and other compensatory damages.

## COUNT III
## VIOLATION OF THE
## MASSACHUSETTS EQUAL RIGHTS ACT, M.G.L.Ch.93, §102

68. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 67 above as if set forth here in their entirety.

69. Pursuant to M.G.L.Ch.93,§102, all persons within the Commonwealth, regardless of sex, race, color, creed, or national origin, shall have, except as otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts; to inherit, purchase, lease, sell, hold and convey real and personal property; to sue, be parties to suits, give evidence in suits, and to enjoy the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

70. The above-recited acts and practices of Putnam constitute unlawful discriminatory acts in violation of M.G.L.C.93,§102;

71. Putnam's and Lasser's decision to target Svensson for demotions and termination, while less qualified, younger white males were retained, promoted or not demoted, was willful, intentional and committed with reckless disregard for Plaintiff's rights;

72. As a result of Putnam's discrimination, Svensson suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs, and other compensatory damages. Svensson is further entitled to an award of punitive damages.

## COUNT IV
## VIOLATION OF THE
## MASSACHUSETTS EQUAL PAY ACT, M.G.L.Ch.149, §105A

73. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 72 above as if set forth here in their entirety;

74. Under the Massachusetts Equal Pay Act (MEPA), Putnam was required to pay, and Svensson was entitled to receive, equal wages from work "of like comparable character";

75. The above acts and practices of Putnam constituted unlawful discriminatory acts in violation of M.G.L.Ch.149, §105A;

76. Putnam's decision to refuse to promote Svensson, to target Svensson for demotion and termination, and to compensate Svensson at a considerably lower level than her male counterparts for the same or substantially equivalent work, was willful, intentional and committed with reckless disregard for Plaintiff's rights;

77. As a result of Putnam's discrimination, Svensson suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of business and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs, and other compensatory damages. Svensson is further entitled to an award of punitive damages.

## COUNT V
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

78. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 77 above as if set forth herein their entirety;

79. There existed an implied covenant of good faith and fair dealing, which Putnam breached in its dealings with Svensson, by failing to promote her to various positions she sought at Putnam, and for which she was fully qualified; by demoting her without adequate reason while retaining or promoting, or not demoting, less qualified male employees in equivalent positions; and by terminating her from employment at Putnam on September 15, 2003;

80. The above acts and practices of Putnam, as more fully set forth herein, constitute a breach of the implied covenant of good faith and fair dealing;

81. As a result of Putnam's breach of the covenant of good faith and fair dealing, Svensson has suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs and other compensatory damages.

## COUNT VI
## BREACH OF CONTRACT

82. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 81 above, as if set forth here in their entirety;

83. By its actions as set forth above, Putnam has breached the implied contract it had with Svensson to promote her to available positions for which she was qualified based upon her performance; to compensate her for the work she had performed at a level substantially equivalent to the level of compensation of male employees performing the same work; not to demote her, or reduce her compensation, should she perform her job satisfactorily and achieve satisfactory

or better financial results for Putnam; and not to terminate her based upon contrived excuses when she attempted to assert important civil rights in the workplace.

84.  As a result of Putnam's breach of contract, Svensson has suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs and other compensatory damages.

**COUNT VII**
**RETALIATION FOR ALLEGING RIGHTS UNDER FEDERAL ANTI-DISCRIMINATION STATUTES**

85. Plaintiff repeats and re-alleges Paragraphs 1 through 84 above as if set forth herein in their entirely.

86.  At the time of plaintiff's termination and thereafter, Plaintiff, directly or through her counsel, made verbal and written statements to Defendant Putnam, objecting to and opposing Putnam's actions as violative of federal anti-discrimination statutes, and refused to accede to Putnam's demand that she release her civil rights by signing Putnam's proposed Separation Agreement.

87.  After Plaintiff objected to, and opposed, Putnam's actions, Putnam unlawfully withheld, and continues to withhold, monies due and owing to Plaintiff under Putnam's deferred compensation plans.

88. In further retaliation for complaining about Putnam's unlawful discrimination, defendant Putnam took action to prevent Plaintiff from trading certain stock grants which had been given to her as compensation for the

exceptional professional services she had consistently rendered throughout her career at Putnam, and as a reward for achieving outstanding financial results in the year preceding the year in which the stock was granted.

89. Putnam's wrongful withholding of Plaintiff's deferred compensation, and its interference with Plaintiff's exercise of her right to sell her stock, were undertaken in retaliation for Plaintiff's opposition to Putnam's discriminatory employment practices as set forth herein, and her refusal to release Putnam from legal liability in connection with said discrimination.

90.    The aforementioned acts of Defendant constitute unlawful retaliation discrimination against Plaintiff.

91. As a result of Putnam's retaliatory conduct, Plaintiff is entitled to damages, for loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, emotional distress, attorney's fees and costs, all because of Putnam's outrageous and malicious conduct in retaliating against her for assertion of her civil rights. Plaintiff is further entitled to an award of punitive damages in an amount to be determined by the trier of fact.

## COUNT VIII
## RETALIATION UNDER MASS. GEN. LAW. CH 151B

92.  Plaintiff repeats and re-alleges Paragraph 1 through 91 above as though fully and completely set forth herein.

93. The aforementioned acts of Defendant constitute unlawful retaliation discrimination against Plaintiff in violation of the Massachusetts anti-discrimination law.

94. As a result of Putnam's unlawful retaliatory actions, Svensson is entitled to monetary damages for loss of employment; loss of substantial income; loss of valuable employee benefits; loss of stock, stock options and deferred compensation; damages for emotional distress; attorney's fees and costs; prejudgment interest, other compensatory damages and punitive damages.

### COUNT IX
### FRAUDUALENT INDUCEMENT AND MISREPRESENTATION

95.    Plaintiff repeats and re-alleges Paragraph 1 through 94 above as though fully and completely set forth herein.

96.    During Putnam's aggressive recruitment efforts, Putnam's representatives made certain material representations to Svensson concerning the terms and conditions of her employment to induce her to leave Lord Abbett in New York, to move to Boston and to join Putnam.

97.    In reasonable and intended reliance on the representations made by Putnam's representatives, Plaintiff left her employment with Lord Abbett & Co., and accepted a position with Putnam as an Analyst with a base compensation of One Hundred Twenty-Fifty Thousand Dollars ($125,000), with a guaranteed bonus of at least $150,000, valuable employment benefits, with promises of long-term employment in a specified career path, with significant enhancements of base compensation, bonuses and benefits, and with promised opportunities for females to work, and to succeed, in a non-discriminatory working environment.

98.    Plaintiff thereafter relocated herself to Boston, purchased a home in Boston, entering into a long-term financing arrangement for this purchase, all in reliance on Putnam's assurances of long-term employment pursuant to a specified

career path in a non-discriminatory environment, accepting of females and receptive to their promotion to top positions within the organization based solely on merit.

99.    Defendant Putnam possessed superior knowledge as to matters to which its material representations related, and Plaintiff reasonably relied on their superior knowledge in believing these representations to be true.

100.    The material representations made by Defendant Putnam to induce Plaintiff to take a position with Putnam were false, and were known by Putnam to be false at the time they were made, in that defendant Putnam never intended to fulfill its promises respecting the advancement of women, including Svensson, up the corporate ladder, and instead intended to impose a "glass ceiling" on her advancement within the organization, and on the advancement of other females.

101.    In particular, Putnam's representations were false in that Plaintiff was not given the opportunity to remain in Putnam's Portfolio Management business, was not given the opportunity to become a Managing Director or a Partner, and was instead forcibly demoted, inequitably compensated, and ultimately terminated without any justification, and without payment of earned, but deferred, compensation.  Moreover, Putnam's representations in 1997 that Plaintiff would be granted valuable stock were false, and known to be false when made.

102.    Plaintiff reasonably relied to her detriment on Putnam's representations and has incurred substantial monetary damages as a result thereof, including, but not limited to, the loss of her Analyst position at Lord & Abbett & Co., the loss of the opportunity for advancement within that organization, the disruption of her

personal and family life, the expenses related to the purchase of a home in Boston, the diminution (and ultimately complete loss) of earned income associated with her position at Putnam, and loss of business reputation because of her unwarranted termination.

103. Defendant Putnam, by acting as described herein, did so knowingly, or in such a reckless manner as to constitute a fraud and deceit upon the Plaintiff, and fraudulently induced her to perform valuable services for Putnam based upon false promises, in exchange for compensation of substantially lesser value than had been promised to her, or which was paid to male employees for equivalent work.

104. In particular, at the time Putnam's misrepresentations were made, they were aware that Svensson would not ultimately be allowed to advance to the levels of Managing Director or Partner, would not be able to remain in Portfolio Management, would not be paid equivalent compensation to males, and would instead be demoted or terminated, thereby allowing Putnam to reap substantial financial benefit through its fraud, deceit and misrepresentation of the true facts.

105. In reasonable and intended reliance on Putnam's representations, and ignorant of the true and complete facts, Plaintiff continued her performance of services for Putnam, until September 15, 2003, at which time Putnam abruptly terminated Plaintiff, and attempted to deprive her of valuable compensation and stock.

## COUNT X
## (VIOLATION OF § 510 OF ERISA, 29 U.S.C. § 1140)

106. Plaintiff repeats and re-alleges Paragraphs 1 through 105 above as though fully and completely set forth herein.

107. Defendant Putnam wrongfully terminated Plaintiff's certain employment on September 15, 2003. Putnam's decision to terminate Plaintiff was, in part, motivated by its desire to avoid paying Plaintiff employee benefits of significant value, and in particular medical benefits, and was thereby intended to interfere with Plaintiff's attainment of employee benefits and rights.

108. By reason of the foregoing, Putnam has violated Section 510 of ERISA, and Plaintiff is entitled to damage sin accordance with the provisions of that statute.

## COUNT XI
## CONVERSION / UNJUST ENRIICHMENT

109. Plaintiff repeats and re-alleges Paragraph 1 through 108 above as though fully and completely set forth herein.

110. Defendant Putnam granted bonuses, stock, stock options and the right to participate in Putnam's deferred compensation plans to Plaintiff, in exchange for the valuable services rendered by Plaintiff to the financial benefit of Putnam, and represented that the bonuses, stock, stock options and right to deposit monies into the deferred compensation plans were valuable, and thereby induced Plaintiff to continue to perform said valuable services for Putnam through remaining employed at the company.

111.   As a result of Defendants' unlawful conduct, Plaintiff has been, and is being, prevented from receiving a bonus for 2003, and Putnam has retained stock and monies in Plaintiff's deferred compensation account, and has thereby converted said monies and stock for its own use and benefit, and has been unjustly enriched to Plaintiff's detriment.

112.   By reason of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, representing the value of the 2003 bonus, plus interest; the value of the stock in Plaintiff's account as of September 15, 2003, plus interest; the value of the deferred compensation in Plaintiff's account as of September 15, 2003, plus interest; attorney's fees and costs, and other compensatory and punitive damages.

### COUNT XII
### AIDING AND ABETTING DISCRIMINATION IN VIOLATION OF TITLE VII AND M.G.L.CH 151B

113.   Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 112 as though fully and completely set forth herein.

114.   As more fully described elsewhere herein, defendant Lasser aided and abetted Putnam's discriminatory agenda in deliberately (and with specific discriminatory intent) creating or fostering a work environment hostile to women; in conspiring to deprive Svensson of promotional opportunities; in conspiring to deprive Svensson of equivalent compensation compared to her male colleagues; in conspiring to repeatedly demote her; and in conspiring to effect her termination because of her gender, in violation of Title VII and M.G.L.Ch.151B, and because

of her legitimate inquires concerning Putnam's illegal or unethical business

practices.

115.  As a direct and proximate result of Lasser's conduct as described herein,

Svensson was caused to suffer loss of employment, loss of substantial income,

loss of valuable employee benefits, loss of personal and professional

opportunities, loss of business reputation, emotional distress, attorney's fees and

costs, and other compensatory damages. Plaintiff is further entitled to an award of

substantial punitive damages because of the willful, deliberate and malicious

nature of Lasser's conduct, or his reckless indifference to Plaintiff's civil rights.

WHEREFORE, Plaintiff Lisa Svensson respectfully prays that this Court
award the following relief:

1.  that Defendant Putnam be found liable for damages on Count I in an
    amount to be determined at trial, and believed to be excess of
    $25,000,000, plus punitive damages;

2.  that Defendant Putnam and Lasser be found liable for damages on
    Count II in an amount to be determined at trial, and believed to be in
    excess of $25,000,000, plus punitive damages;

3.  that Defendant Putnam be found liable for damages on Count III in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

4.  that Defendant Putnam be found liable for damages on Count IV in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

5.  that Defendant Putnam be found liable for damages on Count V in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

6.  that Defendant Putnam be found liable for damages on Count VI in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

7.  that Defendant Putnam be found liable for damages on Count VII in an amount to be determined at trial, and believed to be in excess of $25,000,000, plus punitive damages;

8.  that Defendant Putnam be found liable for damages on Count VIII in an amount to be determined at trial, and believed to be in excess of $25,000,000, plus punitive damages;

9.  that Defendant Putnam be found liable for damages on Count IX in an amount to be determined at trial, and believed to be in excess of $25,000,000, plus punitive damages;

10. that Defendant Putnam be found liable for damages on Count X in an amount to be determined at trial, and believed to be in excess of $15,000,000, plus punitive damages;

11. that Defendant Putnam be found liable for damages on Count XI in an amount to be determined at trial, and believed to be in excess of $25,000,000, plus punitive damages;

12. that Defendant Putnam be found liable for damages on Count XII in an amount to be determined at trial, and believed to be in excess of $25,000,000, plus punitive damages;

13. that plaintiff be awarded interest, attorney's fees and costs, as appropriate;

14. that, because an award of monetary damages to Plaintiff in this lawsuit will not prove sufficient to fully and adequately redress the harm caused to current and former female employees of Putnam by the aforesaid acts of gender discrimination and retaliation, and by the ongoing hostile environment toward women at Putnam, Plaintiff hereby petitions the Court to grant appropriate injunctive or declaratory relief, in such form as the Court may deem just and proper in the circumstance

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury.

Respectfully submitted,
Lisa Svensson,
By Her Attorneys,

Denise L. Page, Esq., BBO #119415
Nancie L. Edgren, Esq., BBO #648665
BARRON & STADFELD, P.C.
100 Cambridge Street
Boston, MA 02114
(617) 723-9800

and

John K. Weir Law Offices LLC
300 Park Avenue - Suite 1700
New York, NY 10022
(212) 572-6374

Dated: January 5, 2005

310648/file no. 21312-1

# EXHIBIT A

10/21/04

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
One Ashburton Place, Boston, MA 02108
Phone: (617) 994-6000 Fax: (617) 994-6024

Date Issued: 10/21/2004

John K. Weir, Esq.
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, NY 10022

Re: **Complainant(s)** Lisa Svensson

Vs.

**Respondent(s)** Putnam Investment, Inc.; Lawrence J. Lasser

**MCAD Docket Number: 04BEM02175**
**EEOC/HUD Charge Number: 16CA402289**

Dear Counsel:

The Commission has received notice that a civil action is being filed in *Superior Court* in the above-referenced matter. Pursuant to M.G.L.A. 151B, Section 9 (Chapter 478 of the Acts of 1974), the complaint before the Commission is hereby dismissed without prejudice as to the merits.

**Please be advised that pursuant to 804 CMR 1.15(2), the parties are required to serve upon the Commission's General Counsel a copy of any final order obtained in court. In addition, any party filing an appeal of such final order is required to serve a notice of appeal upon the Commission's General Counsel.**

Please be advised the Complainant is barred from subsequently bring a complaint on the same matter before this Commission.

Very truly yours,

Walter J. Sullivan Jr.
Commissioner

Cc:

Putnam Investment, Inc.
Director, Human Resources
One Post Office Square
Boston, MA 02109

# THE COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION
### ONE ASHBURTON PLACE
#### BOSTON, MA 02108-1518]

Tel: (617) 994-6000    TTY: (617) 994-6196    Fax: (617) 994-6024

TO:      File
FR:      Robin Edwards-King
RE:      Lisa Svensson v. Putman Investment, Inc.,
         Lawrence J. Lasser
MCAD #   04BEM02175
EEOC #   16CA402289 (25+ employees)
DATE:    October 21, 2004

## RECOMMENDATION: CASE CLOSURE – WITHDRAWN IN ORDER TO FILE A PRIVATE RIGHT OF ACTION ON THE SAME MATTER IN CIVIL COURT

On July 9, 2004 Complainant filed a complaint with the Massachusetts Commission Against Discrimination and the EEOC. Complainant alleged Respondents discriminated against her on or around March 10, 2003 on the basis of Sex and Retaliation in violation of M.G.L. c.151B§4 (16A)(1) and Title VII.

On October 15, 2004 Complainant's Counsel submitted a request to withdraw this complaint from the MCAD and EEOC in order to pursue the matter as a private right of action in civil court.

The Commission finds no reason to investigate this matter further. Therefore, it is recommended that Complainant be allowed to withdraw this complaint.

Robin Edwards-King
Administrative Assistant

*10/21/04*

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Boston, MA 02108
Phone: (617) 994-6000 Fax: (617) 994-6024

Date Issued: 10/21/2004

John K. Weir, Esq.
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, NY 10022

Re:  Complainant(s)  Lisa Svensson

Vs.

Respondent(s)  Putnam Investment, Inc.

MCAD Docket Number: 04BEM00757
EEOC/HUD Charge Number: 16CA401238

Dear Counsel:

The Commission has received notice that a civil action is being filed in *Superior Court* in the above-referenced matter.  Pursuant to M.G.L.A. 151B, Section 9 (Chapter 478 of the Acts of 1974), the complaint before the Commission is hereby dismissed without prejudice as to the merits.

**Please be advised that pursuant to 804 CMR 1.15(2), the parties are required to serve upon the Commission's General Counsel a copy of any final order obtained in court.  In addition, any party filing an appeal of such final order is required to serve a notice of appeal upon the Commission's General Counsel.**

Please be advised the Complainant is barred from subsequently bring a complaint on the same matter before this Commission.

Very truly yours,

Walter J. Sullivan Jr.
Commissioner

Cc:

Louis A. Rodrigues, Esq.
Sullivan & Worcester, LLP
One Post Office Square
Boston, MA 02109

MCAD Docket Number 04BEM00757, Case Removed to Court Cover Letter          Page  1

# THE COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION
### ONE ASHBURTON PLACE
#### BOSTON, MA 02108-1518]

Tel: (617) 994-6000          TTY: (617) 994-6196          Fax: (617) 994-6024

TO:        File
FR:        Robin Edwards-King
RE:        Lisa Svensson v. Putman Investment, Inc.,
MCAD #     04BEM00757
EEOC #     16CA401238 (25+ employees)
DATE:      October 21, 2004

## RECOMMENDATION: CASE CLOSURE – WITHDRAWN IN ORDER TO FILE A PRIVATE RIGHT OF ACTION ON THE SAME MATTER IN CIVIL COURT

On March 1, 2004 Complainant filed a complaint with the Massachusetts Commission Against Discrimination and the EEOC. Complainant alleged Respondents discriminated against her on or around September 15, 2003 on the basis of Sex in violation of M.G.L. c.151B§4 (1) and Title VII.

On October 15, 2004 Complainant's Counsel submitted a request to withdraw this complaint from the MCAD and EEOC in order to pursue the matter as a private right of action in civil court.

The Commission finds no reason to investigate this matter further. Therefore, it is recommended that Complainant be allowed to withdraw this complaint.


Robin Edwards-King
Administrative Assistant

# EXHIBIT B

Dec-08-04  12:05pm    From-EEOC BOSTON AREA OFFICE

617-565-3196                    T-652   P.002/004   F-613

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To:  Lisa Svensson
     68 Commonwealth Avenue
     Boston, MA 02116

From:  Boston Area Office
       John F. Kennedy Fed Bldg
       Government Ctr, Room 475
       Boston, MA 02203

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16C-2004-01238 | Rance A. O'Quinn, Enforcement Supervisor | (617) 565-3192 |

NOTICE TO THE PERSON AGGRIEVED:                    (See also the additional information enclosed with this form.)

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X]  More than 180 days have passed since the filing of this charge.

[ ]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[X]  The EEOC is terminating its processing of this charge.

[ ]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ]  The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

[signature]

Robert L. Sanders,
Area Office Director

DEC  7 2004

(Date Mailed)

Enclosure(s)

CC:  PUTNAM INVESTMENT, INC.
     One Post Office Square
     Boston, MA 02109

EEOC Form 161-B (3/98)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To:  Lisa Svensson
     68 Commonwealth Avenue
     Boston, MA 02116

From:  Boston Area Office
       John F. Kennedy Fed Bldg
       Government Ctr, Room 475
       Boston, MA 02203

[ ]  On behalf of person(s) aggrieved whose identity is
     CONFIDENTIAL (29 CFR § 1601.7(a))

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16C-2004-02289 | Rance A. O'Quinn, Enforcement Supervisor | (617) 565-3192 |

NOTICE TO THE PERSON AGGRIEVED:
(See also the additional information enclosed with this form.)

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ ]  More than 180 days have passed since the filing of this charge.

[X]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[X]  The EEOC is terminating its processing of this charge.

[ ]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ]  The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Robert L. Sanders,
Area Office Director

DEC 7 2004
(Date Mailed)

Enclosure(s)

cc:  PUTNAM INVESTMENT, INC.
     One Post Office Square
     Boston, MA 02109

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| LISA SVENSSON, | \* |
| Plaintiff, | \* |
| | \* |
| | \* |
| | \* |
| v. | \* |
| | \* |
| | \* |
| PUTNAM INVESTMENTS LLC, f/k/a | \* |
| PUTNAM INVESTMENTS, INC. and | \* |
| LAWRENCE J. LASSER | \* |
| Defendants | \* |

CIVIL ACTION NO. 04-12711 PBS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## RESPONSES OF DEFENDANT PUTNAM INVESTMENTS, LLC TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant, Putnam Investments, LLC ("Putnam") hereby objects and responds to Plaintiff Lisa Svensson's ("Svensson") First Set of Interrogatories (the "Interrogatories").

## GENERAL OBJECTIONS

A.    Pursuant to Fed.R.Civ.P. 26 and 33, and without waiving any substantive objections, Putnam hereby objects to Plaintiff's First Set of Interrogatories because the Interrogatories continue to fail to conform to the requirements of Local Rule 26.1(C), which limits the number of Interrogatories that Plaintiff may propound to 25, including sub-parts. Presently, Svensson propounds 16 Interrogatories, 10 of which constitute multiple Interrogatories do to the existence of numerous sub-parts.

B.    Putnam objects to the Interrogatories to the extent that they ask Putnam to provide information about complaints based on "marital status," or "women with children" which are not protected characteristics under federal or Massachusetts law.

C.     Putnam objects to any Interrogatory requesting information relating to partner-level positions at Putnam, on the ground that such information is neither relevant to the subject-matter of this litigation nor likely to lead to the discovery of admissible evidence. Svensson has never alleged that Putnam failed to nominate or elect her to the position of partner on account of her gender.

D.     Putnam objects to the Interrogatories to the extent that they attempt to impose upon Putnam requirements, obligations, and duties not prescribed by the Federal Rules of Civil Procedure, and other applicable rules.

E.     Putnam objects to the Interrogatories to the extent that compliance with the same would be burdensome, impose an extreme hardship on Putnam, or would result in the expenditure of unnecessary time and resources.

F.     Putnam objects to the Interrogatories to the extent that they seek the disclosure of private and confidential information relating to third parties not subject to this suit or make inquiries about matters the disclosure of which is prohibited by statute, regulation or other applicable laws.

G.     Putnam objects to each and every Interrogatory in which Svensson has not offered a definition of a term used in the Interrogatory and where the lack a definition has rendered the Interrogatory vague, ambiguous, uncertain or difficult to understand. Subject to this objection, where possible, Putnam has attempted to respond to each Interrogatory as written.

H.     Putnam objects to each and every Interrogatory to the extent such Interrogatories are overbroad, vague, argumentative, unduly burdensome, unreasonable, cumulative, duplicative, seek information obtainable from more convenient sources, including

Svensson's own knowledge, or otherwise seek information beyond the scope of discovery permitted by the Federal Rules of Civil Procedure.

I.      Putnam objects to the Interrogatories to the extent that they seek disclosure of information which is not discoverable due to the attorney-client privilege, the attorney work-product doctrine, confidential communications passing between or among Putnam agents, representatives and/or employees made subsequent to the occurrence upon which this matter is based, information protected by the common interest or joint defense privilege, and information otherwise privileged under the Federal Rules of Civil Procedure, the common law or applicable statutes.

J.      Putnam objects to any Interrogatory to the extent it seeks detail concerning oral communications over a period of time on the grounds that such requests are unduly burdensome and an interrogatory is not the appropriate discovery tool for obtaining information concerning such communications.

K.      Putnam objects to any Interrogatory requesting information relating to persons or events at Putnam prior to January 1, 1999, on the ground that such information is unrelated to the instant litigation and/or not reasonably calculated to lead to the discovery of admissible evidence.

L.      Where applicable, all General Objections apply to each response as if each General Objection was specifically set forth therein.

M.      Putnam reserves the right to supplement each response as necessary.

## SPECIFIC RESPONSES

INTERROGATORY NO. 1

Please state fully and completely each and every basis, reason, criteria, or factor which the Defendant Corporation alleges or contends was relied upon by Putnam for

terminating the Plaintiff's employment, including the names, job title and gender of all persons who determined each basis, reason, criteria, or factor for her termination.

RESPONSE NO. 1

Putnam objects to this Interrogatory for the reasons set forth in General Objection H. Subject to this objection, Putnam responds that Josh Brooks ("Brooks"), a male, who served as Director of Research, gave Svensson the option of assuming a non-managerial role when it became apparent that Svensson's management of subordinates was problematic, and that she had not been forthright with Putnam concerning the performance of her subordinates and the steps she had taken to evaluate that performance. When Svensson refused to accept any of the employment options offered to her, and instead demanded a promotion to Managing Director and a substantial increase in her compensation, Brooks determined that Putnam had no option but to terminate Svensson's employment. See also Response to Interrogatory 13.

INTERROGATORY NO. 2

Please state the Defendant Corporation's estimate of value of each element of the Plaintiff's compensation at the time of discharge, including salary, bonus, stock, stock options, life insurance, health insurance, and pension plan, and state the basis by which Defendant Corporation arrived at the value.

RESPONSE NO. 2

Putnam objects to this Interrogatory for the reasons set forth in General Objection H. Subject to this objection, Putnam refers Svensson to documents previously produced pursuant to Fed.R.Civ.P. 33. Svensson's salary at the time of her discharge was $155,000. Svensson was not entitled to a bonus at the time of her discharge. The values of the non-equity account balances listed on the documents referred to above reflect the values of the underlying investments as of the date of the report. The values of the equity

(shares and options) listed on the documents referred to above were determined using the pricing formula set forth in the Equity Partnership Plan.

During 2003, Svensson enrolled in the Putnam sponsored Blue Cross Blue Shield national PPO plan, with family level coverage. The internal "working rate" for this (self-insured) family coverage plan at that time was $841.52 per month with the employee paying 17.5% of the cost or $147.27 by pre-tax payroll deduction per month. Thus, the annual value of Company provided health insurance could be expressed as $8,331 per year (which is $841.52 less $147.27 or $694.25 per month x 12).

Svensson carried two times the amount of her base salary in group term life insurance coverage. Putnam provided her with one times pay or $155,000 coverage. The portion of the premium paid by Putnam was $0.56 per thousand dollars of coverage per month. This would amount to $155,000 x $0.056, or $8.68 per month for a company-provided value of $104.16 annually.

INTERROGATORY NO. 3

With respect to Putnam's entire exempt employment force, please state:

a.     The name of each job category and subcategory from January 1, 1994 to date;

b.     The duties performed and responsibilities fulfilled by employees in each job category and subcategory,

c.     The names and number of female employees within each job category and subcategory each year from January 1, 1994 to date.

d.     The names and number of female employees with children within each job category and subcategory each year from January 1, 1994 to date.

RESPONSE NO. 3

Putnam objects to this Interrogatory for the reasons set forth in General Objections A, B, E, F, H and K, which are incorporated herein by reference. Putnam

further objects to this Interrogatory on the ground that it seeks information relating to employees who are not similarly situated to Svensson.

INTERROGATORY NO. 4

For each employee identified in answer to Interrogatory No. 3, who was terminated during the period from January 1, 1994 to the present, state:

a.  The name and gender of the employee;

b.  The job category or subcategory in which the employee worked;

c.  The nature of the termination, e.g. as layoff, voluntary quit, discharge for cause, discharge without case, etc.

d.  A statement of any transfer offered to the employee prior to his/her termination as an alternative to termination.

e.  The age and marital status of each such employee at the time of termination;

f.  The years of service of the employee at the time of termination;

g.  The years of service of all other employees remaining in the terminated employee's place of business or other working areas at the time of termination (stated in such a manner as can be correlated with the answers to subparagraph f),

h.  The name and gender of the replacement, if any, or person assuming the job duties for each such terminated employee;

i.  The years of service of the replacement for each terminated employee;

j.  A statement of each and every reduction in pay, or downgrading in job position, experienced by the terminated employee within five years prior to the date of his or her termination.

RESPONSE NO. 4

Putnam objects to this Interrogatory for the reasons set forth in General Objections A, B, E, F, H and K, which are incorporated herein by reference. Putnam further objects to this Interrogatory on the ground that it seeks information relating to employees who are not similarly situated to Svensson.

INTERROGATORY NO. 5

For each employee identified in answer to Interrogatory No. 3, who was denied promotion demoted or had other adverse employment action taken against them, state:

    a.    The name and gender of the employee;

    b.    The job category or subcategory in which the employee worked;

    c.    The nature of the adverse employment action taken;

    d.    The age and marital status of each such employee;

    e.    The year of service of the employee at the time of the adverse employment action;

    f.    A statement of each and every reduction in pay, or downgrading in job position experienced by the employee against whom the adverse employment action was taken.

RESPONSE NO. 5

Putnam objects to this Interrogatory for the reasons set forth in General Objections A, B, E, F, H and K, which are incorporated herein by reference. Putnam further objects to this Interrogatory on the ground that it seeks information relating to employees who are not similarly situated to Svensson.

INTERROGATORY NO. 6

Please state whether the Defendant has ever received a complaint of a) sexual harassment or b) discrimination based on gender, or marital status. If yes, please state:

    a.    The date when the complaint was received, or when the charge, notice, or action was filed;

    b.    The administrative body or court in which the matter was filed, and the docket number or other numerical designation;

    c.    The name of the complainant, charging party or Plaintiff;

    d.    The current status of the charge, notice or complaint, if it is currently pending;

    e.    The disposition of the charge, notice or complaint if it is no longer pending.

7

RESPONSE NO. 6

Putnam objects to this Interrogatory for the reasons set forth in General Objections A, B, E, F, H and K, which are incorporated herein by reference. Putnam further objects to this Interrogatory on the ground that it seeks information relating to employees who are not similarly situated to Svensson. Putnam further objects to this Interrogatory on the ground that relates to claims that are not being asserted by Svensson or that are not cognizable under applicable law, and/or information that is not probative of Svennson's claims.

INTERROGATORY NO. 7

Has Putnam or any of the Putnam's supervisory personnel ever received knowledge of internal complaints or statements relating to any employee's gender, gender bias, or stereotypical comments, ridicule, or joking in the workplace respective any employer's gender? If yes, please state:

a.    The acts or circumstances involved;

b.    The dates of their occurrence;

c.    The names and job titles of those involved;

d.    The names and job titles of those responsible for investigating the acts and/or circumstances;

e.    The date and description of the actions taken by management in response to each such charge or circumstance;

f.    Whether the actions continued after management's response to each such charge or circumstance.

g.    Attach a copy of each and every written report of investigation of any such internal complaints, or state the substance thereof.

RESPONSE NO. 7

Putnam objects to this Interrogatory for the reasons set forth in General Objections A, B, E, F, G, H, I and K, which are incorporated herein by reference. Putnam further objects to this Interrogatory on the ground that it seeks information that

Putnam does not retain, that it cannot obtain without unreasonable effort, and/or that is not probative of Svennson's claims.

INTERROGATORY NO. 8

Please identify all persons with knowledge of Putnam's business practices relevant to claims of gender discrimination, marital status discrimination or sexual harassment or any defense of the Defendant, including:

    a.    The name, address, and job title of each such person;

    b.    The dates during which each such person knew of the Defendant's business practices;

    c.    The substance of all relevant information or knowledge known to each such person;

    d.    Whether any such person has given any statement or account, either orally or in writing, of his or her knowledge of the Defendant's business practices.

RESPONSE NO. 8

Putnam objects to this Interrogatory for the reasons set forth in General Objections B, E, F, H, J and K, which are incorporated herein by reference. Subject to its General Objections, Putnam responds that all supervisory personnel have some general knowledge of Putnam's business practices relevant to claims of gender discrimination and sexual harassment, because all employees are apprised of Putnam's EEOC policy, its employee handbook policies and procedures, and participate in training concerning these matters from time to time. Putnam further responds that Putnam's Human Resources and Legal Department personnel are generally charged with managing or responding to issues relating to discrimination and harassment. Putnam's Head of Human Resources is:

    a.    Richard B. Tibbetts, Putnam Investments, One Post Office Square, Boston, MA 02109.

    b.    1999 – 2003.

    c.    Putnam objects to this Interrogatory on the grounds that the

Interrogatory does not define "relevant information," and, therefore, is vague, ambiguous and difficult to understand.

d.     Mr. Tibbetts has not given any statement or account, in any form, of his knowledge of Putnam's business practices.

INTERROGATORY NO. 9

For each employee who was a) denied promotion to Managing Director; or b) denied or refused a partner-level position at Putnam for the period January 1, 1994 to the present, please state:

a.     The name, position, department, salary, gender and marital status of each employee who was denied or refused said promotion or partnership;

b.     The criteria established at Putnam to select employees for promotion to Managing Director or Partner;

c.     The date of each such denial;

d.     The form and manner of communication of each such denial;

e.     The reason for each such denial;

f.     The name, job title, gender and marital status of the person(s) responsible for determining which employees were to receive promotions to Managing Director or Partner.

g.     The names, job titles, gender and marital status of the person(s) who received such promotions at the time of each such denial.

RESPONSE NO. 9

Putnam objects to this Interrogatory for the reasons set forth in General Objections A, B, C, E, F, H, and J, which are incorporated herein by reference. Subject to these General Objections, Putnam responds that exempt, regular, active employees who had held the position of Senior Vice President for at least one full year were potentially eligible to be nominated to Managing Director. The nomination process was a matter of discussion and consensus-building. In any given year, many eligible employees were discussed and winnowed down to an elected group. Those individuals who participated in the process of considering promotions to Managing Director included

members of senior management of the firm, along with representatives from Human

Resources.  Input was solicited from a wide range of individuals in each business unit.  It

is not possible to determine the identities of everyone who participated in this process for

any given year.

Putnam elected the following to Managing Director for the Years 1999 – 2003:

1999 – Males: Mark Pollard (Portfolio Manager); Females: Debbie Farrell (Deputy Director of Research), Pam Holding (Director, Corporate Research), Kelly Morgan (Portfolio Manager).

2000 – Males: Jeff Lindsey (Portfolio Manager), Michael Mufson (Portfolio Manager), Leo Smith (Trader), Manny Weiss (Senior Portfolio Manager); Females: Elizabeth MacElwee-Jones (Quantitative Analyst), Rosemary Thomsen (Portfolio Manager), Yumiko Sai (Analyst).

2001 – Males: John Boselli (Analyst), Joshua Byrne (Senior Portfolio Manager), Tony Elavia (Head of Int'l Quant. Research), Stephen Gorman (Director of Quantitative Research/Portfolio Design), Hugh Mullin (Senior Portfolio Manager), William Sullivan (Director of Global Syndicate/Floor Trading); Females: Margaret Smith (Team Leader, Health Care).

2002 – Males: Richard Block (Director of Derivatives Trading), Rob Bloemker (Mortgage Specialist), David Hamlin (Director of Investment Grade), Jeff Knight (CIO/GAA), Andrew Matteis (Team Leader, Tax Exempt Credit Research), James Prusko (Senior Portfolio Manager).

2003 – Putnam did not elect any Managing Directors in Investments.

Putnam directs Svensson to the threshold criteria it used in considering

promotions to Managing Director, and, pursuant to Fed.R.Civ.P 33, produces documents

labeled Bates PRM 00717 - 00753.  In addition to these criteria, those participating in the

promotion process considered a wide range of other issues, such as the performance of

individuals, their interpersonal and team-building skills, the performance of their business

unit and the firm, the number of other candidates, the governance implications of

increasing the number of Managing Directors and other similar issues.

INTERROGATORY NO. 10

Were other employees subject to termination based on the same factors that resulted in Plaintiff's termination? If yes, please state:

    a.    The names, job titles, gender and marital status of employees terminated or laid off as a result of these factors;

    b.    The dates of their termination(s).

    c.    The dates of rehire, if any.

RESPONSE NO. 10

Putnam is unaware of any other employee in Global Equity Research ("GER") during the period between 1999 and 2003 who was terminated for precisely the same reason that Svensson was terminated.

INTERROGATORY NO. 11

Please identify all employees who assumed all or any part of Plaintiff's responsibilities and workload, and state:

    a.    Their names, job titles, ages, gender, and marital status;

    b.    Their qualifications for the position;

    c.    Their salary as of September 15, 2003, and as of the present time.

    d.    The length of time employed by Putnam as of September 15, 2003.

RESPONSE NO. 11

    a.    Maria Drew assumed the majority of Svensson's stock coverage. She had the title of Vice President. She is 32 years old;

    b.    Putnam directs Svensson to Ms. Drew's resume, produced at Bates 00754, pursuant to Fed.R.Civ.P. 33;

    c.    Ms. Drew was not employed by Putnam as of September 15, 2003, and thus did not have a salary. Ms. Drew's entering salary was $150,000 annually; her current salary is $156,000;

    d.    Putnam did not employ Ms. Drew as of September 15, 2003.

INTERROGATORY NO. 12

Please identify the gender makeup of Putnam's workforce at the time of the Plaintiff's termination on September 15, 2003, as follows:

 a.  Total employees on a full-time equivalency basis;

 b.  By department;

 c.  Employees at the level of Managing Director and above;

 d.  Employees who performed Portfolio Management responsibilities;

 e.  Persons who were designated by Putnam as "Partners".

RESPONSE NO. 12

Putnam objects to this Interrogatory for the reasons set forth in General Objections A, C, E, F, and H, which are incorporated herein by reference. Without waiving its General Objections, Putnam further objects to this Interrogatory to the extent that it seeks information with respect to employees who were not similarly situated to Svensson or with respect to departments of which Svensson was not a member. Pursuant to Fed.R.Civ.P. 33, Putnam directs Svensson to the documents labeled Bates 00755 - 00758.

INTERROGATORY NO. 13

State in chronological order each event leading to the decision to terminate Plaintiffs employment at Putnam.

RESPONSE NO. 13

In the late summer of 2003, Svensson contacted Mary McNamee ("McNamee") in the Human Resources Department and made highly critical comments about one of her subordinates, Chris O'Malley ("O'Malley"). Simultaneously, Human Resources had received a lengthy email from O'Malley complaining about Svensson and her mistreatment of him. By then, Putnam had reason to believe that another highly regarded

analyst who reported to Svensson, Darren Peers, was leaving Putnam, at least in part because of the difficulty he experienced working for Svensson. Surprised by Svensson's comments about O'Malley, and in light of the conflicting email from O'Malley himself, Human Resources and the management of GER decided to investigate Svensson's claims about O'Malley's performance and capabilities. During that investigation, Putnam learned that key statements made by Svensson about O'Malley were false. In particular, Svensson claimed that certain portfolio managers had made a number of critical comments about O'Malley's performance. When contacted by Putnam, however, some portfolio managers explained that they had never made such comments to Svensson, or said that Svensson had not spoken to them about O'Malley's performance. Based on that review and other feedback obtained about Svensson's job performance, and in light of her history, Putnam concluded that Svensson could no longer function effectively as a manager. Putnam offered Svensson three employment options: (a) remain an Analyst but in a non-managerial role; (b) seek employment elsewhere or within Putnam, or (c) leave Putnam with an appropriate severance package. Svensson refused all three options, and instead demanded a promotion to Managing Director, and a guaranteed annual compensation of at least $1 million. Svensson's refusal to accept any of its employment options left Putnam with no option but to terminate her employment.

These events occurred in the following context. Throughout her career at Putnam, Svensson exhibited poor interpersonal and mixed management skills, as reflected in her 360 and Performance Reviews already produced in discovery. When Putnam's International Growth Team was disbanded and reorganized, the only team willing to work with Svensson was Putnam's GER Department. Upon joining this group, Bill

14

Landes, then Head of GER, counseled Svensson with regards to her shortcomings, and advised her that, to remain in GER, she would need to address her deficiencies in her interpersonal and people management skills. During her discussions with Mr. Landes, Svensson assured him that she had put her problems behind her.

INTERROGATORY NO. 14

State the name, gender, and marital status of each employee of the Defendant employer who made any complaint to Putnam concerning Plaintiff or her job performance or attitude and for each such complaint state the date of the complaint, the conduct of which the individual complained, and what action, if any, Putnam took in response thereto.

RESPONSE NO. 14

Putnam objects to this Interrogatory for the reasons set forth in General Objections B, E, F, H, I, J and K, which are incorporated herein by reference. Subject to its General Objections, Putnam responds that it has produced Svensson's 360 and Performance Reviews which set forth its complaints with regard to her management of subordinates and difficulty working and communicating effectively with her colleagues, including the events that culminated in her termination. To the extent that Putnam locates (or has located) documents relating to such complaints and criticisms, it will or has produced them. Beyond that, it is not possible for Putnam to identify every instance in which any Putnam employee or third party made a comment about Svennson's performance during Svensson's nine years at Putnam.

INTERROGATORY NO. 15

Please describe the amount and dates of commissions, bonuses or deferred compensation, stock grants, vesting of stock options, or other form of incentive remuneration which Plaintiff received from January 1, 1994 to the present, including how the amount of the payment for each such commission, bonus, deferred compensation grant, vesting of stock options, or other incentive remuneration was calculated or determined, whether the commission bonus, grant, stock option or other incentive

15

remuneration has been paid to Plaintiff, and if not, the present status of the account, identifying all documents in relation thereto.

RESPONSE NO. 15

Pursuant to Fed.R.Civ.P. 33, Putnam refers Svensson to the spreadsheet produced at Bates 00759 - 00761. Svensson remains entitled to any monies in her 401(k) Plan or Executive Deferred Compensation Plan, subject to the terms of these plans, to the extent that she has not yet received any monies due her under those plans. Svensson similarly is entitled to her voluntarily deferred compensation, which she has elected to have paid in February 2015. Svensson forfeited any deferred compensation under Putnam's Profit Growth Incentive Compensation Plan, per the terms of that plan, when she refused to sign a release of claims against Putnam after she was terminated. Svensson also forfeited any unvested equity she held pursuant to Putnam's Equity Partnership Plan, per the terms of that plan, when she refused to sign a release of claims against Putnam after she was terminated.

INTERROGATORY NO. 16

Set forth in complete detail the employee benefits, which Plaintiff received from Putnam after January 1, 1994, including the dates on which Plaintiff received each such benefit, the present status of all accounts relating to each such benefit. State whether Plaintiff was required to pay any amount for each such benefit.

RESPONSE NO. 16

Putnam objects to this Interrogatory for the reasons set forth in General Objections D, H and K, which are incorporated herein by reference. Subject to these objections, Putnam directs Svensson to its responses to Interrogatories 2 and 15.

As to Responses:

I, Mary McNamee, depose and state that I am duly authorized on behalf of Putnam to sign these Responses to Plaintiff's Second Set of Interrogatories. The Responses set forth are based on, and therefore necessarily limited by, either my own personal knowledge or the records and information still in existence, presently recollected, thus far discovered in the course of the preparation of these answers, and currently available to Putnam. Subject to the limitations set forth herein, the foregoing answers are accurate to the best of my present knowledge. Signed under pains and penalties of perjury this 18th day of November, 2005.

Mary McNamee

As to Objections,

PUTNAM, LLC,
By its attorneys,

Joseph L. Kociubes, BBO# 276360
Louis A. Rodriques, BBO# 424720
Rachael Splaine Rollins, BBO# 641972
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

Dated: November 18, 2005

17

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon plaintiff's counsel by hand (Boston) and by regular mail on November 18, 2005.

Rachael Splaine Rollins

LITDOCS/621973.1

Candidate: _____

# NOMINATION
## MANAGING DIRECTOR, MEMBER OF EXECUTIVE COMMITTEE

| CRITERIA | SPECIFIC EXAMPLES |
|---|---|
| **Professional Criteria**<br>• Manages large numbers of people or complex processes<br><br>• Holds senior level authority and decision making in his/her areas<br><br>• Operates with a great deal of autonomy and little oversight<br><br>• Current role is such that it significantly impacts support or infrastructure areas<br><br>• Contributes to the company in roles outside his/her direct responsibility<br><br>• Recognized and admired by a broad cross-section of senior management as making an important contribution to the organization's success outside his/her functional job responsibilities<br><br><br>**Personal criteria**<br>• 10 years in professional capacity<br><br>• Established above-average track record at Putnam<br><br>• Perceived as "peer leader"<br><br>• Professional presence and credibility in his/her technical field | |

Operating Head Signature: _____    Date: _____

~ME145B

PRM 00717

## PUTNAM *INVESTMENTS*
## 1999 OFFICER NOMINATION FORM

Employee's Name: _____

Social Security Number: _____

Date of Hire: _____

Department: _____

Reports to: _____

|  | **CURRENT:** | **RECOMMENDED:** |
|---|---|---|
| Officer Title: |  |  |
| Functional Title: | _____ |  |

Please document how the nominee meets the *Officer Nomination General Criteria* and demonstrates *Putnam Investments Executive Success Factors*. Additional or supporting documentation may be attached to this nomination form if required by individual business units.

Recommending Manager:

Print Name: _____    Signature: _____    Date: _____

Approving Senior Managing Director:

Print Name: _____    Signature: _____    Date: _____

ONOMFORM.DOC

PRM 00718

# Putnam *Investments*
## Executive Success Factors

## THINKING

**Seasoned Judgment:** Applies broad knowledge and seasoned experience to address critical issues; Defines strategic issues clearly despite incomplete or ambiguous information; Takes all important issues into account when making decisions; makes tough, pragmatic decisions when necessary.

**Visionary Thinking:** Has a clear vision for the future of the business or organization; Sees problems and understands issues before others do; Comes up with fresh perspectives and innovative ideas; Maintains a long-term, big picture view of the business.

**Global Perspective:** Stays abreast of important trends (e.g., competitive, technological, social, economic); Understands the impact of global trends on the organization's plans and growth; Recognizes opportunities for global expansion and alliances.

**Intellectual Versatility:** Viewed by others as bright and highly capable; Performs conceptually complex and difficult tasks with ease; Grasps and integrates new information and ideas rapidly.

**Embracing Paradox:** Demonstrates flexibility; can be Objective and tough as well as compassionate and empathetic; Balances self-confidence and humility.

**Learning from Experience:** Analyzes experiences to discover core insights; Adapts past successes in innovative and creative ways to deal with new challenges; Strive to surpass past achievements; Has "street smarts".

## STRATEGIC MANAGEMENT

**Driving Execution:** Assigns clear accountability backed by appropriate authority; Integrates efforts across functions and organizations; Orchestrates the pace and process of change to maintain operating effectiveness; tackles problems head-on and works to resolve them without delay; Monitors results.

**Shaping Strategy:** Develops distinctive strategies to

achieve and sustain competitive advantage; Sees that broad strategies are translated into clear objectives and practical action plans; Aligns the organization and allocates resources according to strategic priorities.

## LEADERSHIP

**Attracting and Developing Talent:** Attracts and selects high caliber talent; Develops teams and talent with diverse capabilities; Accurately appraises strengths and weaknesses of others; Gives clear, motivating and constructive feedback; Develops successors and talent pools for key positions.

**Empowering Others:** Creates a climate that fosters personal investment and excellence; Nurtures commitment to a common vision and shared values; Gives people opportunity and latitude to grow and achieve; Promotes collaboration and removes obstacles to teamwork across the organization.

**Influencing and Negotiating:** Promotes and sells ideas persuasively; Shapes the opinions of others (customers, shareholders, employees, etc.; Promotes and projects a positive image of the organization; Works through conflicts to create win/win results; Negotiates skillfully to get the best deal possible.

**Taking Charge:** Does what is necessary despite resistance; Encounters tough situations with tenacity; Encourages direct debate but know when to move on; Relishes leading under pressure.

**Leadership Versatility:** When appropriate: Plays a driving, demanding leadership role; Plays an evaluative, analytic leadership role; Plays a hands-off, fully delegating leadership role; Plays a supportive, encouraging leadership role; Uses a participatory leadership style; Adjusts to leadership style to meet the needs of different individuals and teams.

**Building on Difference:** Works well with individuals and team members who think in dramatically different ways; Recognizes differences in people as potentially complementary; Values and seeks out people with differing opinions to gain broader perspective; Encourages consideration of a wide array of views.

## INTERPERSONAL

**Building Organization Relationships:** Stays in touch with people at all levels of the organization; Cultivates a broad network to exchange ideas and rally support; Relates well to bosses, peers, and direct reports.

**Fundamental Business Thinking:** Focuses on asset quality (i.e., selectively assesses clients and business opportunities to yield high, sustainable profits); Is dedicated to providing the highest quality products and services; Is driven by customer needs and expectations; Encourages continuos improvement and experimentation; makes decisions based on data.

**Inspiring Trust:** Maintains high standards of personal integrity; Behaves in accord with expressed beliefs and commitments; Establishes open, candid, and trusting relationships; Treats others fairly and consistently.

# Putnam *Investments*
# Executive Success Factors

## MOTIVATION

**Drive for Success:** Establishes aggressive goals and drives for results; Places organizational success above individual gain; Effectively balances the competing priorities of different constituencies; Conveys a commitment to understanding and doing what is best for employees and customers; Models a strong work ethic.

**Entrepreneurial Risk Taking:** Creates an environment that encourages innovation and risk taking; Pursues new business opportunities and makes them a reality; Champions breakthrough ideas and initiatives.

## SELF MANAGEMENT

**Emotional Balance:** Uses humor to reduce tension and maintain balance; Laughs at self and with others; handles frustrations positively; Identifies and focuses on the positive aspects of a situation as well as the negative.

**Adaptability:** Responds resourcefully to new demands and challenges; Works constructively under pressure; Works effectively in ambiguous situations.

**Mature Confidence:** Projects self-assurance and unshakable confidence; readily shares credit and gives opportunities for visibility to others; Realistically appraises own strengths and weaknesses.

**Career and Self-Direction:** Conveys a clear sense of personal goals and values; manages own time according to priorities; uses time economically and efficiently; Personally pursues continuous learning and self development.

## COMMUNICATION

**Fostering Open Dialogue:** Creates open channels of communication; Keeps others well informed; Expresses opinions without intimidating others; Listens carefully to input and feedback.

## BREADTH AND DEPTH

**Cross Functional Capability:** Understands the role and interrelationships of each management function; Has experience and skill in managing across functional and organizational lines; makes decisions based on corporate-wide interests (i.e., wears the corporate "hat").

**Industry Knowledge:** Knows what it takes to be successful in this industry; Has thorough knowledge of this industry's history and growth patterns; Displays insight into the competition's strengths, weaknesses, and strategies.

**Business Situation Versatility:** Would function effectively in a corporate (staff) position; Would function effectively in a business unit (line) position; Would do well at starting up a new business venture or major organizational function; Would do well running a fast-growth, highly dynamic business or organization; Would do well running a stable business or organization to yield maximum results; Would do well in turning around a business or organization that was in trouble; Would have the talent required to run many different organizational units simultaneously.

ONOMFORM.DOC

OFFICER NOMINATION PROGRAM
2000

PRM 00721





Employment
Opportunities
Job Postings

Recommend-A-Friend

Career Development
TA Career Guide
DC Career Guide
Performance Mgmt.

Employee Relations
EAP (Employee
Assistance Program)
Contacts

Employee Handbook

Officer Nominations

Frequently Asked
Questions

Back to HR Home

# Officer Nominations

Officer Criteria
Success Factors
Nomination Process
Nomination Forms

The use of Officer Titles provides Putnam Investments with the opportunity to appropriately recognize existing individuals throughout the company. The Officer Title policy ensures consistency by establishing standard officer titles with a required nomination, approval and notification process. An employee cannot be granted an officer title without the appropriate approval as outlined in this policy. This policy does not apply to new hires.

## Who is eligible?
Exempt, regular, active employees who over their time at Putnam Investments have made significant contributions to Putnam. In order to be nominated for an officer level promotion, an employee must have been hired prior to January 1st of the previous year and employees cannot be nominated for consecutive year promotions.

## When are employees nominated?
Officer nominations are made on an annual basis for existing employees. Human Resources solicits Officer Nomination Forms from each business unit in the 1st quarter of each year and approved nominations are effective April 1st of each year.

## OFFICER TITLES

The following list includes Officer Titles utilized by Putnam Investments, in order from lowest to highest:

Assistant Vice President
Vice President
Senior Vice President
Managing Director
Senior Managing Director
Chief Executive Officer

## OFFICER CRITERIA

PRM 00722

The table below outlines the general criteria for the various levels of criteria for each Officer Title.

## Senior Vice President

| Position Scope | Establishes operating policies for respective business unit, supporting the overall company's strategic objectives. |
| --- | --- |
| Position Impact | Erroneous decisions or recommendations would normally result in critical delays and modifications to projects or operations, cause substantial expenditures of time, human resources and funds, and could jeopardize future business activities. |

## Vice President

| Position Scope | Interprets and executes policies and recommends modifications where appropriate. Responsibilities are complex in nature within broad area of expertise. |
| --- | --- |
| Position Impact | Frequent contacts with outside customer representatives at senior management levels concerning the operations of specific project plans or contracts. |

## Assistant Vice President

| Position Scope | Responsibilities are complex in nature within defined area of expertise. Acts independently while interpreting operating policies in support of divisional objectives. |
| --- | --- |
| Position Impact | Erroneous decisions or recommendations or failure to complete assignments would normally cause delays in program schedules and may have an impact on the company's profitability, prestige or efficiency. |

Back To Top

# EXECUTIVE SUCCESS FACTORS

In addition to the general criteria described above, nominated employees should have a documented record of demonstrating the following success factors.

## Thinking

PRM 00723

| Seasoned Judgement | Applies broad knowledge and seasoned experience to address critical issues; defines strategic issues clearly despite incomplete or ambiguous information; takes all important issues into account when making decisions; makes tough, pragmatic decisions when necessary. |
| Visionary Thinking | Has a clear vision for the future of the business or organization; sees problems and understands issues before others do; comes with a fresh perspective and innovative ideas; maintains a long-term, big pictures view of the business. |
| Global Perspective | Stays abreast of important trends (e.g., competitive, technological, social, economic); understands the impact of global on the organization's plans and growth; recognizes opportunities for global expansion and alliances. |
| Intellectual Versatility | Viewed by others as bright and highly capable; performs conceptually complex and difficult tasks with ease; grasps and integrates new information and ideas rapidly. |
| Embracing Paradox | Demonstrates flexibility; can be objective and tough as well as compassionate and empathetic; balances self-confidence and humility. |
| Learning from Experience | Analyzes experiences to discover core insights; adapts past success in innovative and creative ways to deal with new challenges; strives to surpass past achievements. |

## Strategic Management Factor

| Shaping Strategy | Develops distinctive strategies to achieve competitive advantage; translates broad strategies into specific objectives and action plans; aligns the organization to support strategic priorities. |
| Driving Execution | Assigns clear authority and accountability; directs change while maintaining operating effectiveness; integrates efforts across units and functions; monitors results; tackles problems directly and with dispatch. |
| Fundamental Business Thinking | Focuses on asset quality; is dedicated to providing the highest quality products and services; is driven by customer needs and expectations; encourages continuos improvement and experimentation; makes decisions based on data. |

## Leadership Factor

PRM 00724

| Attracting and Developing Talent | Attracts high-caliber people; develops teams and talent with diverse capabilities; accurately appraises the strengths and weaknesses of others; provides constructive feedback; develops successors and talent pools. |
| Empowering Others | Creates a climate that fosters personal investment and excellence; nurtures commitment to a common vision and shared values; gives people opportunity and latitude to grow and achieve; promotes collaboration and teamwork. |
| Influencing and Negotiating | Promotes ideas and proposals persuasively; shapes stakeholder opinions; projects a positive image; works through conflicts; negotiates win/win solutions. |
| Leadership Versatility | Plays a variety of leadership roles (e.g., driving, delegating, supporting, coaching) as appropriate; adapts style and approach to match the needs of different individuals and teams. |
| Taking Charge | Does what is necessary despite resistance; encounters tough situations with tenacity; encourages direct debate but knows when to move on; relishes leading under pressure. |
| Building on Differences | Works well with individuals and team members who think in dramatically different ways; recognizes differences are potentially complementary; uses difference to gain broader perspectives; values and seeks out people with differing opinions; encourages consideration of a wide array of views. |

## Interpersonal Factor

| Building Organizational Relationships | Cultivates an active network of relationships inside and outside of the organization; relates well to key colleagues (i.e., bosses, peers, direct reports); stays in touch with employees at all levels. |
| Inspiring Trust | Establishes open, candid trusting relationships; treats all individuals fairly and with respect; behaves in accord with expressed beliefs and commitments; maintains high standards of integrity. |

## Communication Factor

| Fostering Open Dialogue | Promotes a free flow of information and communication throughout the organization (upward, downward, and across); listens actively; encourages open expression of ideas and opinions. |
| High-Impact Delivery | Delivers clear, convincing, and well-organized presentations; projects credibility and poise even in highly visible adversarial situations. |

## Motivation Factor

PRM 00725

| Drive for Success | Sets and pursues aggressive goals; drives for results; demonstrates a strong commitment to organizational success; works to do what is best for all (customers, shareholders, employees, etc.). |
| Entrepreneurial Risk Taking | Champions new ideas and initiatives; identifies new business opportunities and makes them a reality; fosters innovation and risk taking. |

## Self-Management Factor

| Mature Confidence | Realistically appraises own strengths and weaknesses; shares credit and visibility; maintains and projects confidence; fosters innovation and risk taking. |
| Adaptability | Maintains a positive outlook, resisting stress and working constructively under pressure; responds resourcefully to change and ambiguity. |
| Career and Self-Direction | Conveys a clear sense of personal goals and values; manages time efficiently; pursues continuous learning and self-development. |
| Emotional Balance | Uses humor to reduce tension and maintain balance; laughs at self and with others; has a lighthearted nature; handles frustrations positively. |

## Breadth and Depth Factor

| Cross-functional Capability | Understands the role and interrelationships of each organizational function (e.g., marketing, sales, operations, finance, human resources); has experience and skills in managing across functional and organizational lines; makes decisions based on corporate-wide interests; wears the corporate "hat". |
| Industry Knowledge | Knows what it takes to be successful in this industry; has a thorough knowledge of this industry's history, customers, and competitive environment. |
| Business Situation Versatility | Knows how to size up and meet the challenges of different business situations (e.g., start-up, fast growth, steady state, turnaround, close-down, merge/acquisition). |

Back To Top

# OFFICER NOMINATION PROCESS

All Officer Title nominations are processes using the "Putnam Investments Officer Nomination Form". Each nomination will include rationale for the nomination, a biographical sketch of the employee, the employee latest Performance Appraisal, and an assessment of the individual's potential.

PRM 00726

The table below outlines the procedures to nominate an officer title.

| Step | Responsible Party | Action |
|------|-------------------|--------|
| 1 | Human Resources | Distributes solicitations to Senior Managers for Officer Nominations during the 1st quarter of each year. |
| 2 | Senior Management | Solicit nomination from Division Management. |
| 3 | Division Management | Completes the "Putnam Investments Officer Nomination Form", providing all requisite information. Submits nomination(s) to Senior Management. |
| 4 | Senior Management / Human Resources | Senior Management and Human Resources review and approve nominations for each division. |
| 5 | Human Resources | Nominations are forwarded to Chief Executive Officer. |
| 6 | Chief Executive Officer | Chief Executive Officer reviews and approves. Approved nominations and congratulatory letters are returned to Human Resources. |
| 7 | Human Resources | Human Resources updates employee records and distributes congratulatory letters form CEO to appropriate line management. |

<u>Back To Top</u>

# Officer Nomination Form

To download, read instructions below.
**PC users:**

- Right mouse-click on "Download" icon below
- Select "Save Link As..." (or "Save Target As..." for Internet Explorer users) in the shortcut menu that appears
- Save document to your desktop

**Mac users:**

- Click "Download" icon below
- Your browser may give you three options, "More info", "Pick app", and "Save file." Click "Save file."
- Save file to desktop

**PC Users**        **Mac Users**

        

PRM 00727



| From: | **Sherrie Holder-Watts** |
| | 01/11/2002 04:11 PM |

To:     Debby Kuenstner/BOS/PutnamInv@PUTNAM, Edward Shadek/BOS/PutnamInv@PUTNAM
cc:
Subject:   2002 Officer Nomination Process - IMPORTANT - REQUIRES RESPONSE

To All:

The use of Officer Titles provides Putnam Investments with the opportunity to appropriately recognize existing individuals throughout the company.   The Officer Title policy ensures consistency by establishing standard officer titles with a required nomination, approval and notification process.

Exempt, regular, active employees who over their time at Putnam Investments have made significant contributions to Putnam are eligible to be nominated for an officer level promotoion, provided they were hired prior to January 1st of the previous year and did not receive an officer level promotion in 2001.

For this year, Larry Lasser has decided that we will run the Officer nomination process concurrent with the Bonus process, so that individuals who are being promoted will learn of their promotion at the same time they get their 2001 bonus award(s).  Therefore, we have to greatly truncate our standard Officer Nomination calendar in order to hit the ultimate due date.  Attached is an Officer nomination calendar laying out the revised schedule for 2002.

Also attached are the following:

1) MD Nomination Criteria & Form -- a Word document to be used for any MD nominations;

2) Officer Nomination Form -- a Word document to be used for all SVP / VP / AVP nominations;

3) Officer Nomination Criteria & Success Factors -- a Word document to be used to help determine who should be nominated.

Please call me if I can provide any additional info at this time re: the 2002 Officer Nomination process.

2002 Officer Nomination Process Cale   MD Nomination Criteria & Fo   Officer Nomination Form

Officer Nomination Criteria & Success F

PRM 00728

# 2002 OFFICER NOMINATION PROCESS CALENDAR

| | | |
|---|---|---|
| Jan. 9 | Officer Nomination Forms, Eligibility Requirements, Executive Success Factors, and reports of existing officers are distributed to HR Directors. | Compensation |
| Jan. 9 – Jan. 11 | HR Directors distribute Officer Nomination Material to Business Units. | HR Directors |
| Jan. 9 – Feb. 15 | Business Units solicit Officer Nominations from Line Managers and obtain SMD approval for recommendations. | Individual Divisions |
| Feb. 15 | Officer Nomination recommendations are due back to HR Directors | Individual Divisions |
| Feb. 15 – Feb. 20 | HR Directors review Officer Nomination recommendations for policy compliance, content, and suitability. | HR Directors |
| Feb. 20 | HR Directors finalize inputting all approved Officer Nomination into PeopleSoft. | HR Directors |
| Feb. 20 – Feb. 25 | Compensation creates statistical reports and prepares final consolidated presentation of recommendations to CEO. | Compensation |
| **Feb. 25 – Mar. 1 Date TBD** | Compensation reviews and obtains approval of Officer Nomination Recommendations from CEO. | Compensation |
| Mar. 1 – Mar. 15 | Congratulatory letters from CEO are distributed to newly promoted Officers. | Compensation |
| Apr. 1 | Approved Officer Nominations become effective for 2002. | Compensation |

Revised 01/15/02

Candidate: _____

# NOMINATION
## MANAGING DIRECTOR, MEMBER OF EXECUTIVE COMMITTEE

| CRITERIA | SPECIFIC EXAMPLES |
|---|---|
| **Professional Criteria** <br> • Manages large numbers of people or complex processes <br><br> • Holds senior level authority and decision making in his/her areas <br><br> • Operates with a great deal of autonomy and little oversight <br><br> • Current role is such that it significantly impacts support or infrastructure areas <br><br> • Contributes to the company in roles outside his/her direct responsibility <br><br> • Recognized and admired by a broad cross-section of senior management as making an important contribution to the organization's success outside his/her functional job responsibilities <br><br><br> **Personal criteria** <br> • 10 years in professional capacity <br><br> • Established above-average track record at Putnam <br><br> • Perceived as "peer leader" <br><br> • Professional presence and credibility in his/her technical field | |

Operating Head Signature: _____    Date: _____

MD Nomination Criteria & Form

PRM 00730

## PUTNAM INVESTMENTS
## OFFICER NOMINATION FORM

**Employee's Name:** _____

**Social Security Number:** _____

**Functional Title:** _____

**Department:** _____

<table>
<tr><td></td><td>__CURRENT:__</td><td>__RECOMMENDED:__</td></tr>
<tr><td>**Officer Title:**</td><td></td><td></td></tr>
</table>

---

Please document how the nominee meets the *Officer Nomination General Criteria* and demonstrates *Putnam Investments Executive Success Factors*. Additional or supporting documentation may be attached to this nomination form if required by individual business units.

---

**Recommending Manager:**

**Print Name:** _____    **Signature:** _____    **Date:** _____

**Approving Senior Managing Director:**

**Print Name:** _____    **Signature:** _____    **Date:** _____

ONOMFORM.DOC

# PUTNAM INVESTMENTS, LLC
## OFFICER CRITERIA

The information below outlines the general criteria for each Officer Title:

### Senior Vice President

Position Scope:

Establishes operating policies for respective business unit, supporting the overall company's strategic objectives.

Position Impact:

Erroneous decisions or recommendations would normally result in critical delays and modifications to projects or operations, cause substantial expenditures of time, human resources and funds, and could jeopardize future business activities.

### Vice President

Position Scope:

Interprets and executes policies and recommends modifications where appropriate. Responsibilities are complex in nature within broad area of expertise.

Position Impact:

Frequent contacts with outside customer representatives at senior management levels concerning the operations of specific project plans or contracts.

### Assistant Vice President

Position Scope:

Responsibilities are complex in nature within defined area of expertise.   Acts independently while interpreting operating policies in support of divisional objectives.

Position Impact:

Erroneous decisions or recommendations or failure to complete assignments would normally cause delays in program schedules and may have an impact on the company's profitability, prestige or efficiency.

PRM 00732

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

In addition to the general criteria described above, nominated employees should have a documented record of demonstrating the following success factors:

### Thinking

Seasoned Judgement:
> Applies broad knowledge and seasoned experience to address critical issues; defines strategic issues clearly despite incomplete or ambiguous information; takes all important issues into account when making decisions; makes tough, pragmatic decisions when necessary.

Visionary Thinking:
> Has a clear vision for the future of the business or organization; sees problems and understands issues before others do; comes with a fresh perspective and innovative ideas; maintains a long-term, big pictures view of the business.

Global Perspective:
> Stays abreast of important trends (e.g., competitive, technological, social, economic); understands the impact of global on the organization's plans and growth; recognizes opportunities for global expansion and alliances.

Intellectual Versatility:
> Viewed by others as bright and highly capable; performs conceptually complex and difficult tasks with ease; grasps and integrates new information and ideas rapidly.

Embracing Paradox:
> Demonstrates flexibility; can be objective and tough as well as compassionate and empathetic; balances self-confidence and humility.

Learning from Experience:
> Analyzes experiences to discover core insights; adapts past success in innovative and creative ways to deal with new challenges; strives to surpass past achievements.

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

Strategic Management Factor

Shaping Strategy:
Develops distinctive strategies to achieve competitive advantage; translates broad strategies into specific objectives and action plans; aligns the organization to support strategic priorities.

Driving Execution:
Assigns clear authority and accountability; directs change while maintaining operating effectiveness; integrates efforts across units and functions; monitors results; tackles problems directly and with dispatch.

Fundamental Business Thinking:
Focuses on asset quality; is dedicated to providing the highest quality products and services; is driven by customer needs and expectations; encourages continuous improvement and experimentation; makes decisions based on data.

Leadership Factor

Attracting and Developing Talent:
Attracts high-caliber people; develops teams and talent with diverse capabilities; accurately appraises the strengths and weaknesses of others; provides constructive feedback; develops successors and talent pools.

Empowering Others:
Creates a climate that fosters personal investment and excellence; nurtures commitment to a common vision and shared values; gives people opportunity and latitude to grow and achieve; promotes collaboration and teamwork.

Influencing and Negotiating:
Promotes ideas and proposals persuasively; shapes stakeholder opinions; projects a positive image; works through conflicts; negotiates win/win solutions.

Leadership Versatility:
Plays a variety of leadership roles (e.g., driving, delegating, supporting, coaching) as appropriate; adapts style and approach to match the needs of different individuals and teams.

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

Leadership Factor (cont.)

Taking Charge:
> Does what is necessary despite resistance; encounters tough situations with tenacity; encourages direct debate but knows when to move on; relishes leading under pressure.

Building on Differences:
> Works well with individuals and team members who think in dramatically different ways; recognizes differences are potentially complementary; uses difference to gain broader perspectives; values and seeks out people with differing opinions; encourages consideration of a wide array of views.

Interpersonal Factor

Building Organizational Relationships:
> Cultivates an active network of relationships inside and outside of the organization; relates well to key colleagues (i.e., bosses, peers, direct reports); stays in touch with employees at all levels.

Inspiring Trust:
> Establishes open, candid trusting relationships; treats all individuals fairly and with respect; behaves in accord with expressed beliefs and commitments; maintains high standards of integrity.

Communication Factor

Fostering Open Dialogue:
> Promotes a free flow of information and communication throughout the organization (upward, downward, and across); listens actively; encourages open expression of ideas and opinions.

High-Impact Delivery:
> Delivers clear, convincing, and well-organized presentations; projects credibility and poise even in highly visible adversarial situations.

# PUTNAM INVESTMENTS, LLC
# EXECUTIVE SUCCESS FACTORS

## Motivation Factor

Drive for Success:
> Sets and pursues aggressive goals; drives for results; demonstrates a strong commitment to organizational success; works to do what is best for all (customers, shareholders, employees, etc.).

Entrepreneurial Risk Taking:
> Champions new ideas and initiatives; identifies new business opportunities and makes them a reality; fosters innovation and risk taking.

## Self-Management Factor

Mature Confidence:
> Realistically appraises own strengths and weaknesses; shares credit and visibility; maintains and projects confidence; fosters innovation and risk taking.

Adaptability:
> Maintains a positive outlook, resisting stress and working constructively under pressure; responds resourcefully to change and ambiguity.

Career and Self-Direction:
> Conveys a clear sense of personal goals and values; manages time efficiently; pursues continuous learning and self-development.

Emotional Balance:
> Uses humor to reduce tension and maintain balance; laughs at self and with others; has a lighthearted nature; handles frustrations positively.

PRM 00736

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

Breadth and Depth Factor

Cross-functional Capability:
> Understands the role and interrelationships of each organizational function (e.g., marketing, sales, operations, finance, human resources); has experience and skills in managing across functional and organizational lines; makes decisions based on corporate-wide interests; wears the corporate "hat".

Industry Knowledge:
> Knows what it takes to be successful in this industry; has a thorough knowledge of this industry's history, customers, and competitive environment.

Business Situation Versatility:
> Knows how to size up and meet the challenges of different business situations (e.g., start-up, fast growth, steady state, turnaround, close-down, merge/acquisition).

## PUTNAM INVESTMENTS
## 2001 OFFICER NOMINATION FORM

Employee's Name: _____

Social Security Number: _____

Date of Hire: _____

Department: _____

Reports to: _____

|  | **<u>CURRENT:</u>** | **RECOMMENDED:** |
|---|---|---|
| Officer Title: | | |
| Functional Title: | | |

Please document how the nominee meets the *Officer Nomination General Criteria* and demonstrates *Putnam Investments Executive Success Factors.* Additional or supporting documentation may be attached to this nomination form if required by individual business units.

Recommending Manager:

Print Name: _____    Signature: _____    Date: _____

Approving Senior Managing Director:

Print Name: _____    Signature: _____    Date: _____

ONOMFORM.DOC

PRM 00738

# OFFICER NOMINATION PROGRAM
## GENERAL CRITERIA

In order to be nominated for an officer level promotion, an employee must have one year of service. An officer cannot be nominated for a consecutive year promotion.

## SENIOR VICE PRESIDENT

Position Scope                 Establishes operating policies for respective business unit, supporting the overall company's strategic objectives.

Position Impact                Erroneous decisions or recommendations would normally result in critical delays and modifications to projects or operations, cause substantial expenditures of time, human resources and funds, and could jeopardize future business activities.

## VICE PRESIDENT

Position Scope                 Interprets and executes policies and recommends modifications where appropriate. Responsibilities are complex in nature within broad area of expertise.

Position Impact                Frequent contacts with outside customer representative at senior management levels concerning the operations of specific project plans or contracts.

## ASSISTANT VICE PRESIDENT

Position Scope                 Responsibilities are complex in nature within defined area of expertise. Acts independently while interpreting operating policies in support of divisional objectives.

Position Impact                Erroneous decisions or recommendations or failure to complete assignments would normally cause delays in program schedules and may have an impact on the company's profitability, prestige or efficiency.

PRM 00739

# Putnam *Investments*
## Executive Success Factors

## THINKING

**Seasoned Judgment:** Applies broad knowledge and seasoned experience to address critical issues; Defines strategic issues clearly despite incomplete or ambiguous information; Takes all important issues into account when making decisions; makes tough, pragmatic decisions when necessary.

**Visionary Thinking:** Has a clear vision for the future of the business or organization; Sees problems and understands issues before others do; Comes up with fresh perspectives and innovative ideas; Maintains a long-term, big picture view of the business.

**Global Perspective:** Stays abreast of important trends (e.g., competitive, technological, social, economic); Understands the impact of global trends on the organization's plans and growth; Recognizes opportunities for global expansion and alliances.

**Intellectual Versatility:** Viewed by others as bright and highly capable; Performs conceptually complex and difficult tasks with ease; Grasps and integrates new information and ideas rapidly.

**Embracing Paradox:** Demonstrates flexibility; can be Objective and tough as well as compassionate and empathetic; Balances self-confidence and humility.

**Learning from Experience:** Analyzes experiences to discover core insights; Adapts past successes in innovative and creative ways to deal with new challenges; Strive to surpass past achievements; Has "street smarts".

## STRATEGIC MANAGEMENT

**Driving Execution:** Assigns clear accountability backed by appropriate authority; Integrates efforts across functions and organizations; Orchestrates the pace and process of change to maintain operating effectiveness; tackles problems head-on and works to resolve them without delay; Monitors results.

**Shaping Strategy:** Develops distinctive strategies to achieve and sustain competitive advantage; Sees that broad strategies are translated into clear objectives and practical action plans; Aligns the organization and allocates resources according to strategic priorities.

**Fundamental Business Thinking:** Focuses on asset quality (i.e., selectively assesses clients and business opportunities to yield high, sustainable profits); Is dedicated to providing the highest quality products and services; Is driven by customer needs and expectations; Encourages continuos improvement and experimentation; makes decisions based on data.

ONOMFORM.DOC

## LEADERSHIP

**Attracting and Developing Talent:** Attracts and selects high caliber talent; Develops teams and talent with diverse capabilities; Accurately appraises strengths and weaknesses of others; Gives clear, motivating and constructive feedback; Develops successors and talent pools for key positions.

**Empowering Others:** Creates a climate that fosters personal investment and excellence; Nurtures commitment to a common vision and shared values; Gives people opportunity and latitude to grow and achieve; Promotes collaboration and removes obstacles to teamwork across the organization.

**Influencing and Negotiating:** Promotes and sells ideas persuasively; Shapes the opinions of others (customers, shareholders, employees, etc.; Promotes and projects a positive image of the organization; Works through conflicts to create win/win results; Negotiates skillfully to get the best deal possible.

**Taking Charge:** Does what is necessary despite resistance; Encounters tough situations with tenacity; Encourages direct debate but know when to move on; Relishes leading under pressure.

**Leadership Versatility:** When appropriate: Plays a driving, demanding leadership role; Plays an evaluative, analytic leadership role; Plays a hands-off, fully delegating leadership role; Plays a supportive, encouraging leadership role; Uses a participatory leadership style; Adjusts to leadership style to meet the needs of different individuals and teams.

**Building on Difference:** Works well with individuals and team members who think in dramatically different ways; Recognizes differences in people as potentially complementary; Values and seeks out people with differing opinions to gain broader perspective; Encourages consideration of a wide array of views.

## INTERPERSONAL

**Building Organization Relationships:** Stays in touch with people at all levels of the organization; Cultivates a broad network to exchange ideas and rally support; Relates well to bosses, peers, and direct reports.

**Inspiring Trust:** Maintains high standards of personal integrity; Behaves in accord with expressed beliefs and commitments; Establishes open, candid, and trusting relationships; Treats others fairly and consistently.

PRM 00740

# Putnam *Investments*
# Executive Success Factors

## MOTIVATION

**Drive for Success:** Establishes aggressive goals and drives for results; Places organizational success above individual gain; Effectively balances the competing priorities of different constituencies; Conveys a commitment to understanding and doing what is best for employees and customers; Models a strong work ethic.

**Entrepreneurial Risk Taking:** Creates an environment that encourages innovation and risk taking; Pursues new business opportunities and makes them a reality; Champions breakthrough ideas and initiatives.

## SELF MANAGEMENT

**Emotional Balance:** Uses humor to reduce tension and maintain balance; Laughs at self and with others; handles frustrations positively; Identifies and focuses on the positive aspects of a situation as well as the negative.

**Adaptability:** Responds resourcefully to new demands and challenges; Works constructively under pressure; Works effectively in ambiguous situations.

**Mature Confidence:** Projects self-assurance and unshakable confidence; readily shares credit and gives opportunities for visibility to others; Realistically appraises own strengths and weaknesses.

**Career and Self-Direction:** Conveys a clear sense of personal goals and values; manages own time according to priorities; uses time economically and efficiently; Personally pursues continuous learning and self development.

## COMMUNICATION

**Fostering Open Dialogue:** Creates open channels of communication; Keeps others well informed; Expresses opinions without intimidating others; Listens carefully to input and feedback.

**High Impact Delivery:** Delivers clear, well-organized presentations; Projects a credible executive image with polish and poise; Handles questions well in highly visible, adversarial situations.

## BREADTH AND DEPTH

**Cross Functional Capability:** Understands the role and interrelationships of each management function; Has experience and skill in managing across functional and organizational lines; makes decisions based on corporate-wide interests (i.e., wears the corporate "hat").

**Industry Knowledge:** Knows what it takes to be successful in this industry; Has thorough knowledge of this industry's history and growth patterns; Displays insight into the competition's strengths, weaknesses, and strategies.

**Business Situation Versatility:** Would function effectively in a corporate (staff) position; Would function effectively in a business unit (line) position; Would do well at starting up a new business venture or major organizational function; Would do well running a fast-growth, highly dynamic business or organization; Would do well at running a stable business or organization to yield maximum results; Would do well in turning around a business or organization that was in trouble; Would have the talent required to run many different organizational units simultaneously.

Candidate: _____

## NOMINATION
## MANAGING DIRECTOR, MEMBER OF EXECUTIVE COMMITTEE

| CRITERIA | SPECIFIC EXAMPLES |
|---|---|
| **Professional Criteria**<br>• Manages large numbers of people or complex processes<br><br>• Holds senior level authority and decision making in his/her areas<br><br>• Operates with a great deal of autonomy and little oversight<br><br>• Current role is such that it significantly impacts support or infrastructure areas<br><br>• Contributes to the company in roles outside his/her direct responsibility<br><br>• Recognized and admired by a broad cross-section of senior management as making an important contribution to the organization's success outside his/her functional job responsibilities<br><br><br>**Personal criteria**<br>• 10 years in professional capacity<br><br>• Established above-average track record at Putnam<br><br>• Perceived as "peer leader"<br><br>• Professional presence and credibility in his/her technical field | |

Operating Head Signature: _____    Date: _____

MD Nomination Criteria & Form

PRM 00742

**PUTNAM INVESTMENTS**
**OFFICER NOMINATION FORM**

**Employee's Name:** _____

**Social Security Number:** _____

**Functional Title:** _____

**Department:** _____

|  | <u>CURRENT:</u> | <u>RECOMMENDED:</u> |
|---|---|---|
| **Officer Title:** | | |

Please document how the nominee meets the *Officer Nomination General Criteria* and demonstrates *Putnam Investments Executive Success Factors*. Additional or supporting documentation may be attached to this nomination form if required by individual business units.

**Recommending Manager:**

**Print Name:** _____  **Signature:** _____  **Date:** _____

**Approving Senior Managing Director:**

**Print Name:** _____  **Signature:** _____  **Date:** _____

ONOMFORM.DOC

PRM 00743

## PUTNAM INVESTMENTS, LLC
### OFFICER CRITERIA

The information below outlines the general criteria for each Officer Title:

### Senior Vice President

Position Scope:
> Establishes operating policies for respective business unit, supporting the overall company's strategic objectives.

Position Impact:
> Erroneous decisions or recommendations would normally result in critical delays and modifications to projects or operations, cause substantial expenditures of time, human resources and funds, and could jeopardize future business activities.

### Vice President

Position Scope:
> Interprets and executes policies and recommends modifications where appropriate. Responsibilities are complex in nature within broad area of expertise.

Position Impact:
> Frequent contacts with outside customer representatives at senior management levels concerning the operations of specific project plans or contracts.

### Assistant Vice President

Position Scope:
> Responsibilities are complex in nature within defined area of expertise. Acts independently while interpreting operating policies in support of divisional objectives.

Position Impact:
> Erroneous decisions or recommendations or failure to complete assignments would normally cause delays in program schedules and may have an impact on the company's profitability, prestige or efficiency.

PRM 00744

## PUTNAM INVESTMENTS, LLC
## <u>EXECUTIVE SUCCESS FACTORS</u>

In addition to the general criteria described above, nominated employees should have a documented record of demonstrating the following success factors:

### <u>Thinking</u>

**Seasoned Judgement:**

Applies broad knowledge and seasoned experience to address critical issues; defines strategic issues clearly despite incomplete or ambiguous information; takes all important issues into account when making decisions; makes tough, pragmatic decisions when necessary.

**Visionary Thinking:**

Has a clear vision for the future of the business or organization; sees problems and understands issues before others do; comes with a fresh perspective and innovative ideas; maintains a long-term, big pictures view of the business.

**Global Perspective:**

Stays abreast of important trends (e.g., competitive, technological, social, economic); understands the impact of global on the organization's plans and growth; recognizes opportunities for global expansion and alliances.

**Intellectual Versatility:**

Viewed by others as bright and highly capable; performs conceptually complex and difficult tasks with ease; grasps and integrates new information and ideas rapidly.

**Embracing Paradox:**

Demonstrates flexibility; can be objective and tough as well as compassionate and empathetic; balances self-confidence and humility.

**Learning from Experience:**

Analyzes experiences to discover core insights; adapts past success in innovative and creative ways to deal with new challenges; strives to surpass past achievements.

PRM 00745

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

### Strategic Management Factor

Shaping Strategy:
> Develops distinctive strategies to achieve competitive advantage; translates broad strategies into specific objectives and action plans; aligns the organization to support strategic priorities.

Driving Execution:
> Assigns clear authority and accountability; directs change while maintaining operating effectiveness; integrates efforts across units and functions; monitors results; tackles problems directly and with dispatch.

Fundamental Business Thinking:
> Focuses on asset quality; is dedicated to providing the highest quality products and services; is driven by customer needs and expectations; encourages continuous improvement and experimentation; makes decisions based on data.

### Leadership Factor

Attracting and Developing Talent:
> Attracts high-caliber people; develops teams and talent with diverse capabilities; accurately appraises the strengths and weaknesses of others; provides constructive feedback; develops successors and talent pools.

Empowering Others:
> Creates a climate that fosters personal investment and excellence; nurtures commitment to a common vision and shared values; gives people opportunity and latitude to grow and achieve; promotes collaboration and teamwork.

Influencing and Negotiating:
> Promotes ideas and proposals persuasively; shapes stakeholder opinions; projects a positive image; works through conflicts; negotiates win/win solutions.

Leadership Versatility:
> Plays a variety of leadership roles (e.g., driving, delegating, supporting, coaching) as appropriate; adapts style and approach to match the needs of different individuals and teams.

PRM 00746

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

Leadership Factor (cont.)

Taking Charge:
> Does what is necessary despite resistance; encounters tough situations with tenacity; encourages direct debate but knows when to move on; relishes leading under pressure.

Building on Differences:
> Works well with individuals and team members who think in dramatically different ways; recognizes differences are potentially complementary; uses difference to gain broader perspectives; values and seeks out people with differing opinions; encourages consideration of a wide array of views.

Interpersonal Factor

Building Organizational Relationships:
> Cultivates an active network of relationships inside and outside of the organization; relates well to key colleagues (i.e., bosses, peers, direct reports); stays in tough with employees at all levels.

Inspiring Trust:
> Establishes open, candid trusting relationships; treats all individuals fairly and with respect; behaves in accord with expressed beliefs and commitments; maintains high standards of integrity.

Communication Factor

Fostering Open Dialogue:
> Promotes a free flow of information and communication throughout the organization (upward, downward, and across); listens actively; encourages open expression of ideas and opinions.

High-Impact Delivery:
> Delivers clear, convincing, and well-organized presentations; projects credibility and poise even in highly visible adversarial situations.

PRM 00747

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

### Motivation Factor

Drive for Success:

Sets and pursues aggressive goals; drives for results; demonstrates a strong commitment to organizational success; works to do what is best for all (customers, shareholders, employees, etc.).

Entrepreneurial Risk Taking:

Champions new ideas and initiatives; identifies new business opportunities and makes them a reality; fosters innovation and risk taking.

### Self-Management Factor

Mature Confidence:

Realistically appraises own strengths and weaknesses; shares credit and visibility; maintains and projects confidence; fosters innovation and risk taking.

Adaptability:

Maintains a positive outlook, resisting stress and working constructively under pressure; responds resourcefully to change and ambiguity.

Career and Self-Direction:

Conveys a clear sense of personal goals and values; manages time efficiently; pursues continuous learning and self-development.

Emotional Balance:

Uses humor to reduce tension and maintain balance; laughs at self and with others; has a lighthearted nature; handles frustrations positively.

## PUTNAM INVESTMENTS, LLC
## EXECUTIVE SUCCESS FACTORS

<u>Breadth and Depth Factor</u>

Cross-functional Capability:
> Understands the role and interrelationships of each organizational function (e.g., marketing, sales, operations, finance, human resources); has experience and skills in managing across functional and organizational lines; makes decisions based on corporate-wide interests; wears the corporate "hat".

Industry Knowledge:
> Knows what it takes to be successful in this industry; has a thorough knowledge of this industry's history, customers, and competitive environment.

Business Situation Versatility:
> Knows how to size up and meet the challenges of different business situations (e.g., start-up, fast growth, steady state, turnaround, close-down, merge/acquisition).

PRM 00749

**Proposed**
**Putnam Investments, LLC**
**Officer Criteria**
**Revised 2003**

## MANAGING DIRECTOR

**Success Factors:**

Thinking

Visionary Thinking:  Has a clear vision for the future of the business or organization; sees problems and understands issues before others do; comes with a fresh perspective and innovative ideas; maintains a long-term, big picture view of the business.

Strategic Management

Shaping Strategy:  Develops distinctive strategies to achieve competitive advantage; translates broad strategies into specific objectives and action plans; aligns the organization to support strategic priorities.

Leadership

Empowering Others:  Creates a climate that fosters personal investment and excellence; nurtures commitment to a common vision and shared values; gives people opportunity and latitude to grow and achieve; promotes collaboration and teamwork.

Interpersonal

Inspiring Trust:  Establishes open, candid trusting relationships; treats all individuals fairly and with respect; behaves in accord with expressed beliefs and commitments; maintains high standard of integrity.

PRM 00750

## SENIOR VICE PRESIDENT

| | |
|---|---|
| Position Scope | Establishes operating policies for respective business unit, supporting the overall company's strategic objectives. |
| Position Impact | Erroneous decisions or recommendations would normally result in critical delays and modifications to projects or operations, cause substantial expenditures of time, human resources and funds, and could jeopardize future business activities. |

**Success Factors:**

**Thinking**

Seasoned Judgment: Applies broad knowledge and seasoned experience to address critical issues; defines strategic issues clearly despite incomplete or ambiguous information; takes all important issues into account when making decisions; makes tough, pragmatic decisions when necessary.

Global Perspective: Stays abreast of important trends (e.g., competitive, technological, social, economic); understands the impact of global on the organization's plans and growth; recognizes opportunities for global expansion and alliances.

**Leadership**

Attracting and Developing Talent: Attracts high-caliber people; develops teams and talent with diverse capabilities; accurately appraises the strengths and weaknesses of others, provides constructive feedback; develops successors and talent pools.

Leadership Versatility: Plays a variety of leadership roles (e.g. driving, delegating, supporting, coaching) as appropriate; adapts style and approach to match the needs of different individuals and teams.

**Interpersonal**

Building Organizational Relationships: Cultivates an active network of relationships inside and outside of the organization; relates well to key colleagues (i.e., bosses, peers, direct reports); stays in touch with employees at all levels.

**Communication**

Fostering Open Dialogue: Promotes a free flow of information and communication throughout the organization (upward, downward, and across); listens actively; encourages open expression of ideas and opinions.

PRM 00751

## VICE PRESIDENT

Position Scope

Interprets and executes policies and recommends modifications where appropriate. Responsibilities are complex in nature within broad area of expertise.

Position Impact

Frequent contacts with outside customer representative at senior management levels concerning the operations of specific project plans or contracts.

**Success Factors:**

Thinking

Intellectual Versatility: Viewed by others as bright and highly capable; performs conceptually complex and difficult tasks with ease; grasps and integrates new information and ideas rapidly.

Embracing Paradox: Demonstrates flexibility; can be objective and tough as well as compassionate and empathetic; balances self-confidence and humility.

Strategic Management

Driving Execution: Assigns clear authority and accountability; directs change while maintaining operating effectiveness; integrates efforts across units and functions; monitors results; tackles problems directly and with dispatch.

Leadership

Influencing and Negotiating: Promotes ideas and proposals persuasively; shapes stakeholder opinions; projects a positive image; works through conflicts; negotiates win/win solutions.

Communication

High-Impact Delivery: Delivers clear, convincing, and well-organized presentations; projects credibility and poise even in highly visible adversarial situations.

Motivation

Entrepreneurial Risk Taking: Champions new ideas and initiatives; identifies new business opportunities and makes them a reality; fosters innovation and risk taking.

PRM 00752

## ASSISTANT VICE PRESIDENT

Position Scope

Responsibilities are complex in nature within defined area of expertise.  Acts independently while interpreting operating policies in support of divisional objectives.

Position Impact

Erroneous decisions or recommendations or failure to complete assignments would normally cause delays in program schedules and may have an impact on the company's profitability, prestige or efficiency.

**Success Factor:**

Strategic Management

Fundamental Business Thinking: Focuses on asset quality; is dedicated to providing the highest quality products and services; is driven by customer needs and expectations; encourages continuous improvement and experimentation; makes decisions based on data.

PRM 00753

**Maria Elena Drew**
210 Locust Street, Apt. 18H
Philadelphia, PA 19106

Work telephone: (215) 255-8777
Mobile telephone: (215) 850-1622
Email: drewster@vzavenue.net

## EXPERIENCE:

**Delaware Investment Advisers**, *Assistant Vice President* (October 2000-present)
Equity analyst on the Large Cap Value team. Responsibilities include:
- Analyzing and selecting stocks for purchase/sale in the energy and consumer products sectors. Energy sub-sectors under coverage include integrated oils, E&P, oilfield service, drillers, pipelines and refiners. Consumer products sub-sectors currently under coverage include household products/personal care, food retailers and medical technology (previous coverage has included broadline retailers, hardline retailers, consumer durables, homebuilders and apparel manufacturers).
- Commodity price analysis for use within the large cap value team.
- Meeting with existing and prospective clients.

**Donaldson, Lufkin & Jenrette**, *Equity Research Associate* (March 1999-October 2000)
Research Associate for Phokion Potamianos covering integrated oils and independent refiners. Responsibilities included:
- Writing morning meeting notes, weekly publications and research reports as well as developing and maintaining financial models.
- Speaking with management of companies under coverage, attending company meetings and gathering information relevant to the oil industry.
- Speaking with salespeople and institutional clients regarding companies under coverage.

**Brean Murray & Co. and Rodman & Renshaw, Inc.**, *Equity Research Associate* (April 1997-March 1999)
Research Associate for Marie de Lucia covering consumer products and apparel manufacturers. I began working with Marie at Rodman & Renshaw in April 1997 and accompanied her to Brean Murray & Co. in March 1998. Responsibilities were similar to those at Donaldson, Lufkin & Jenrette.

**Cravath, Swaine & Moore**, *Corporate Legal Assistant* (June 1996-April 1997)
Worked closely with attorneys in the tax and project finance groups. Responsibilities included: preparing summary statements of legal documentation of benefit plans for client use; preparing concise descriptions of historic transactions and securities offerings for lawyers to review in conjunction with current transactions; editing and formatting time sensitive legal documents for clarity and appearance; preparing closing sets, and organizing data rooms, participating in due diligence sessions and distributing documents to clients.

## EDUCATION:

**Smith College**, Graduated in 1996 with a B.A. in Economics. Minor in Geology.
- Recipient of Outstanding Leadership Award designated for seniors who have demonstrated leadership skills in many areas within the Smith College community.
- Staff writer for *The Sophian*, a weekly newspaper published by Smith College students, Smith College Dormitory President, member of Student Government Association and House President's Association, Representative for Service Organization of Smith - a volunteer organization.
- Member of Smith College squash team.

## INTERNSHIPS & ACTIVITIES:
- **Republican National Committee**, Eisenhower Intern, Washington D.C. (June-August 1995)
- **American Enterprise Institute**, Intern, Washington D.C. (Fall Semester 1994)
- **Congressman Jim Ramstad**, Intern, Bloomington, MN (December 1994-January 1995)
- Extensive wilderness experience including participating in a 45 day whitewater canoe trip in the Northwest Territories, Canada and assisting handicapped campers on canoe trips through the Boundary Waters Canoe Area in Minnesota.
- Exchange student in the Soviet Union; taught English to high school students in Novosibirsk, Siberia (January -March 1991)

RCVD OCT 15 '03

469 - 13 - 4138 1

PRM 00754

**Entire Company**

| Count of ID | |
|---|---|
| Sex | Total |
| Female | 2682 |
| Male | 2549 |
| Grand Total | 5231 |

**GER**

| Count of ID | |
|---|---|
| Sex | Total |
| Female | 52 |
| Male | 55 |
| Grand Total | 107 |

PRM 00755

| Location | EEO-1 Category | Male (White, Black, Hispanic, Asian/Pacific Islander, American Indian/Alaskan Native, Unknown) | | | | | | Male Total | Female (White, Black, Hispanic, Asian/Pacific Islander, American Indian/Alaskan Native, Unknown) | | | | | | Female Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Andover | Officials and Managers | REDACTED | | | | | | 141 | REDACTED | | | | | | 97 | 238 |
| | Professionals | | | | | | | 254 | | | | | | | 167 | 421 |
| | Technicians | | | | | | | 7 | | | | | | | 5 | 12 |
| | Sales Workers | | | | | | | 76 | | | | | | | 16 | 92 |
| | Office and Clerical | | | | | | | 183 | | | | | | | 222 | 605 |
| | Craft Workers (Skilled) | | | | | | | 0 | | | | | | | 0 | 0 |
| | Service Workers | | | | | | | 1 | | | | | | | 0 | 1 |
| | No EEO-1 Reporting | | | | | | | 5 | | | | | | | 3 | 8 |
| | Total | | | | | | | 668 | | | | | | | 610 | 1,278 |
| Australia | Officials and Managers | | | | | | | 1 | | | | | | | 0 | 1 |
| | Professionals | | | | | | | 1 | | | | | | | 0 | 1 |
| | Total | | | | | | | 2 | | | | | | | 0 | 2 |
| Boston - Liberty Square | Officials and Managers | | | | | | | 61 | | | | | | | 36 | 97 |
| | Professionals | | | | | | | 88 | | | | | | | 60 | 129 |
| | Technicians | | | | | | | 3 | | | | | | | 0 | 3 |
| | Office and Clerical | | | | | | | 3 | | | | | | | 39 | 42 |
| | Craft Workers (Skilled) | | | | | | | 1 | | | | | | | 0 | 1 |
| | Operatives (Semi-Skilled) | | | | | | | 2 | | | | | | | 0 | 2 |
| | Service Workers | | | | | | | 1 | | | | | | | 1 | 2 |
| | No EEO-1 Reporting | | | | | | | 1 | | | | | | | 1 | 2 |
| | Total | | | | | | | 160 | | | | | | | 127 | 287 |
| Boston - Post Office Square | Officials and Managers | | | | | | | 128 | | | | | | | 67 | 195 |
| | Professionals | | | | | | | 407 | | | | | | | 233 | 640 |
| | Technicians | | | | | | | 2 | | | | | | | 0 | 2 |
| | Office and Clerical | | | | | | | 20 | | | | | | | 144 | 164 |
| | Operatives (Semi-Skilled) | | | | | | | 0 | | | | | | | 0 | 0 |
| | No EEO-1 Reporting | | | | | | | 8 | | | | | | | 6 | 6 |
| | Total | | | | | | | 671 | | | | | | | 477 | 1,148 |
| Buenos Aires | Officials and Managers | | | | | | | 1 | | | | | | | 1 | 1 |
| | Total | | | | | | | 1 | | | | | | | 1 | 1 |
| Franklin | Officials and Managers | | | | | | | 120 | | | | | | | 86 | 206 |
| | Professionals | | | | | | | 286 | | | | | | | 60 | 173 |
| | Office and Clerical | | | | | | | 10 | | | | | | | 227 | 693 |
| | Operatives (Semi-Skilled) | | | | | | | 0 | | | | | | | 0 | 10 |
| | Laborers (Unskilled) | | | | | | | 1 | | | | | | | 0 | 1 |
| | Service Workers | | | | | | | 28 | | | | | | | 6 | 6 |
| | No EEO-1 Reporting | | | | | | | 2 | | | | | | | 1 | 28 |
| | Total | | | | | | | 632 | | | | | | | 786 | 1,216 |
| Germany | Sales Workers | | | | | | | 2 | | | | | | | 0 | 2 |
| | Total | | | | | | | 2 | | | | | | | 0 | 2 |
| Ireland | Officials and Managers | | | | | | | 1 | | | | | | | 0 | 1 |
| | Total | | | | | | | 1 | | | | | | | 0 | 1 |
| Italy | Officials and Managers | | | | | | | 1 | | | | | | | 0 | 1 |
| | Sales Workers | | | | | | | 1 | | | | | | | 0 | 1 |
| | Total | | | | | | | 4 | | | | | | | 0 | 1 |
| London | Officials and Managers | | | | | | | 17 | | | | | | | 9 | 26 |
| | Professionals | | | | | | | 7 | | | | | | | 1 | 4 |
| | Sales Workers | | | | | | | 0 | | | | | | | 0 | 4 |
| | Office and Clerical | | | | | | | 1 | | | | | | | 1 | 1 |
| | No EEO-1 Reporting | | | | | | | 25 | | | | | | | 19 | 44 |
| | Total | | | | | | | 6 | | | | | | | 4 | 4 |
| Maine | Officials and Managers | | | | | | | 27 | | | | | | | 16 | 16 |
| | Professionals | | | | | | | 33 | | | | | | | 89 | 79 |
| | Office and Clerical | | | | | | | 169 | | | | | | | 79 | 112 |
| | Total | | | | | | | 200 | | | | | | | 123 | 287 |
| Norwood | Officials and Managers | | | | | | | 4 | | | | | | | 207 | 410 |
| | Professionals | | | | | | | 91 | | | | | | | 2 | 6 |
| | Technicians | | | | | | | 2 | | | | | | | 177 | 248 |
| | Sales Workers | | | | | | | 7 | | | | | | | 0 | 1 |
| | Office and Clerical | | | | | | | 468 | | | | | | | 2 | 2 |
| | Craft Workers (Skilled) | | | | | | | 4 | | | | | | | 10 | 10 |
| | Operatives (Semi-Skilled) | | | | | | | 6 | | | | | | | 617 | 995 |
| | No EEO-1 Reporting | | | | | | | 3 | | | | | | | 1 | 1 |
| | Total | | | | | | | 16 | | | | | | | 5 | 9 |
| Tokyo | Officials and Managers | | | | | | | 1 | | | | | | | 0 | 8 |
| | Professionals | | | | | | | 2 | | | | | | | 0 | 1 |
| | Sales Workers | | | | | | | 14 | | | | | | | 16 | 30 |
| | Office and Clerical | | | | | | | 16 | | | | | | | 0 | 1 |
| | No EEO-1 Reporting | | | | | | | | | | | | | | 37 | 81 |
| | Total | | | | | | | | | | | | | | 38 | 54 |
| Uruguay | Sales Workers | | | | | | | | | | | | | | | |
| | Total | | | | | | | | | | | | | | | |
| Vermont | Officials and Managers | | | | | | | | | | | | | | | |
| | Office and Clerical | | | | | | | | | | | | | | | |
| | Total | | | | | | | | | | | | | | | |
| | **Grand Total** | | | | | | | 2,684 | | | | | | | 2,679 | 5,388 |

Headcount by EEO1 code   location 12312003.xls

GER Headcount as of 9-15-03
Regular Employees
Active, Paid Leave, Unpaid Leave

| ID | Name | Officer Cd | Job Title | Division Descr | Bus. Unit Descr | DeptID | Dept Name | Sex |
|---|---|---|---|---|---|---|---|---|
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | None | Admin. Team Leader | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate III | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate III | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | None | Administrative Supervisor | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Managing Director | Dir., Global Equity Research | Investment Management | Investment Management | V22113 | Research Admin | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Administrative Assistant II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate III | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Information Manager | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Information Manager | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29101 | Global Equity Research-London | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29102 | Global Equity Research-London | Male |
| | | Senior Vice President | Senior Economist | Investment Management | Investment Management | V29102 | Global Equity Research-Boston | Male |
| | | None | Administrative Assistant II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | Vice President | Senior Research Librarian | Investment Management | Investment Management | V21024 | Information Center | Female |
| | REDACTED | Managing Director | Associate Director, GER | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29101 | Global Equity Research-London | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Research Associate | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29113 | Global Equity Research-Tokyo | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29102 | Global Equity Research-London | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Administrative Assistant II | Investment Management | Investment Management | V29113 | Global Equity Research-Tokyo | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29113 | Global Equity Research-Tokyo | Male |

PRM 00757

GER Headcount as of 9-15-03
Regular Employees
Active, Paid Leave, Unpaid Leave

| ID | Name | Officer Cd | Job Title | Division Descr | Bus. Unit Descr | DeptID | Dept Name | Sex |
|---|---|---|---|---|---|---|---|---|
| | | None | Administrative Assistant II | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | None | Investment Associate II | Investment Management | Investment Management | V29102 | Global Equity Research-London | Male |
| | | None | Investment Associate III | Investment Management | Investment Management | V29101 | Global Equity Research-London | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Senior Research Librarian | Investment Management | Investment Management | V21024 | Information Center | Female |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Research Associate | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate II | Investment Management | Investment Management | V29113 | Global Equity Research-Tokyo | Male |
| | | None | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Administrative Assistant II | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | None | Library Assistant | Investment Management | Investment Management | V21024 | Information Center | Female |
| | | Vice President | Senior Research Librarian | Investment Management | Investment Management | V21024 | Information Center | Female |
| | | None | Admin. Team Leader | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Investment Associate III | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | Managing Director | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Associate Director, GER | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Information Manager | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | REDACTED | None | Investment Associate II | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29102 | Global Equity Research-London | Female |
| | | None | Business Analyst I | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Assistant Vice President | Research Librarian | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V21024 | Information Center | Female |
| | | Managing Director | TL_Japanese Research | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29113 | Global Equity Research-Tokyo | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | None | Administrative Assistant | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Senior Vice President | Quantitative Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Quantitative Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Senior Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | None | Investment Associate | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Male |
| | | Senior Vice President | Associate Director, GER | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |
| | | Assistant Vice President | Analyst | Investment Management | Investment Management | V29101 | Global Equity Research-Boston | Female |

Svensson,Lisa H.

| Job Title | Officer | Year | Salary | Sum Act Awrd | Sum Man Def Am | Cash Bonus Received | Restricted Shares Granted |
|-----------|---------|------|--------|--------------|----------------|---------------------|---------------------------|
| EQUITY ANALYST | None | 1994 | $125,000 | $99,000 | $0 | $99,000 | |
| EQUITY ANALYST | Senior Vice President | 1995 | $132,500 | $200,000 | $0 | $200,000 | |
| EQUITY ANALYST | Senior Vice President | 1996 | $140,500 | $284,500 | $0 | $284,500 | |
| Analyst | Senior Vice President | 1997 | $140,500 | $325,000 | $0 | $325,000 | 6,000 |
| Portfolio Manager | Senior Vice President | 1998 | $140,500 | $365,000 | $0 | $365,000 | 2,500 |
| Portfolio Manager | Senior Vice President | 1999 | $140,500 | $991,000 | $380,000 | $611,000 | 3,000 |
| Sr. Portfolio Manager | Senior Vice President | 2000 | $145,500 | $1,350,000 | $600,000 | $750,000 | |
| Sr. Portfolio Manager | Senior Vice President | 2001 | $155,000 | $500,000 | $160,000 | $340,000 | |
| Analyst | Senior Vice President | 2002 | $155,000 | $500,000 | $60,000 | $440,000 | |
| Analyst | Senior Vice President | 2003 | $155,000 | | | | |

PRM 00759

| Grant Price | Restricted Value | Options Granted | Price | Options Value (30% discount) | Restricted Shares Granted | Grant Price | Restricted Value | Options Granted |
|---|---|---|---|---|---|---|---|---|
| $41.51 | $249,060 | 6,000 | $41.51 | $174,342 | 5,000 | $50.99 | $254,950 | 5,000 |
| $76.97 | $192,425 | 2,500 | $76.97 | $134,698 | | | | |
| $86.93 | $260,790 | 3,000 | $86.93 | $182,553 | | | | |
| | | 10,000 | $42.99 | $300,930 | | | | |

| Price | Options Value (30% discount) | Total Comp |
|---|---|---|
| | | $224,000 |
| | | $332,500 |
| | | $425,000 |
| $50.99 | $178,465 | $1,322,317 |
| | | $832,623 |
| | | $1,574,843 |
| | | $1,495,500 |
| | | $655,000 |
| | | $655,043 |
| | | $155,000 |

PRM 00761