UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * * * * | Civil Action No. 04-12711-PBS |
| * | |
| LISA SVENSSON * | |
| * | BBO No. 351000 |
| Plaintiff, * | |
| * | Memorandum **[REDACTED]** |
| v. * | of |
| * | Plaintiff Lisa Svensson |
| PUTNAM INVESTMENTS, * | in Support of her Motion, |
| LLC and LAWRENCE * | Pursuant to Fed. R. Civ. P. 37(a)(2), |
| LASSER, * | for an Order Compelling Defendant |
| * | Putnam Investments LLC to Answer |
| Defendants. * | Interrogatory Nos.3, 4, 5, 7, 9, 10 and 12 |
| * | and, Pursuant to Fed. R. Civ. |
| * * * * * * * * * * * * * * * * | P. 37(a)(2)(4), for an Award |
| | of Attorneys' Fees and Expenses |

1. Introduction.

Plaintiff Lisa Svensson ("Svensson") has moved the court to enter an order compelling defendant Putnam Investments, LLC ("Putnam") to answer Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12 because Putnam, having interposed numerous unwarranted objections, has failed to answer virtually all of the questions at issue.

Putnam, a nationally known investment firm, is one of a number of subsidiaries of Marsh & McLellan Companies, Inc. ("MMC").[1] Svensson, who holds a Bachelor of Science degree in petroleum engineering from Texas A&M University and the MBA degree from Cornell University, had seven years of sophisticated investment experience prior to her being employed by Putnam in 1994.[2] Svensson served first at Putnam in its Investment Management Division ("IMD") as a Senior Vice President, Supervisory Analyst, in Global Equity Research ("GER"). Id. Then, starting in 1997 she served Putnam as a Senior Vice President, Portfolio Manager, for the Putnam Global Growth Fund.. Id. In this position,

---

[1] First Affidavit of Lisa Svensson ("Svensson first affidavit"), filed herewith, ¶2.
[2] See Svensson's resume, a copy of which is annexed as Exhibit "1" to both the Second Affidavit of Lisa Svensson ("Svensson Second Affidavit") and the Third Affidavit of Lisa Svensson ("Svensson Third Affidavit"), each of which is filed herewith.

among other things, Svensson was responsible for performance of Putnam's Large Cap International

Growth products: Putnam Global Growth Fund, International Large Cap Growth Equity, and Global ex-

Japan. Id. Also in this position, she helped develop the investment process, including development of

quantitative screening, portfolio construction, and risk management techniques; she recruited and trained

numerous junior investment professionals, including coverage plans and performance evaluation and

designed marketing materials and participated in new business development and ongoing client service

initiatives. Id.

In 2002, Svensson was demoted from this position to GER and, ultimately, her employment was

terminated on September 15, 2003.

It is Svensson's position in this case, among others, that her demotion and ultimate termination

were the result of unlawful discrimination by Putnam on the basis of gender.

Svensson contends that the male investment professionals at Putnam, including those who were

promoted to the Putnam position of, or were hired from the outside as a, Managing Director, who are

identified in Exhibit 2 to the Svensson Second Affidavit, are, for the reasons referred to in that Analysis

of Male Comparators, her male comparators. Svensson's contends that the female investment

professionals identified in Exhibit 2 to the Svensson Third Affidavit are, for the reasons set forth in that

Analysis of Female Comparators, her female comparators.

Yet Putnam has taken the startling position that during Svensson's nine years of employment as

an investment professional in Putnam's IMD, Svensson had virtually no comparators. Indeed, Putnam's

counsel has announced that Svensson will not get comparator information from Putnam absent a court

order.[3]  However, the Putnam position that Svensson had and has no comparators is belied by facts and

---

[3] During the deposition of Putnam's Chief Executive Officer Charles Haldeman on Tuesday, April 11, 2006, when
Haldeman was being questioned by Svensson's counsel as to the information about the redactions concerning
male investment professionals in Putnam document PRM-01563-64, a copy of which is annexed as Exhibit "1" to
the Affidavit of Kevin F. Moloney ("Moloney Affidavit") , filed herewith, Putnam's counsel said, "[P]eople who
are not comparators of the claimant have been redacted. [Svensson is] not entitled to personnel information about
them, so whether or not there is a document, you're not getting it absent the court deciding that we are wrong in

2

is in stark contrast to the information in documents that Putnam has produced.  The issue of comparators

to Svensson, is the central, overriding issue on this motion to compel answers to Svenssons's

Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12.

By way of background, as set forth more particularly in ¶¶ 3-9 of the Svensson First Affidavit,

the investment teams and the research functions in the IMD, were not administered independently within

the IMD by team or function, as titles, compensation and other administrative matters concerning those

in the various Putnam divisions were decided within and by the respective divisions.[4]   For example, in

the IMD there was th███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████. Id.[5][6]

---

our assessment." (Emphasis added.) Excerpt from the Haldeman deposition., p. __, ll. _3-8 a copy of which is
annexed as Exhibit "2" to the Moloney Affidavit.
[4] In addition to the IMD that managed client portfolios, there were the Operations Division (services to customers
including answering client questions and mailing fund information); the Distribution Division, which marketed
and sold products to institutional and retail clients; and the Corporate Division, which supported the overall
business through activities such as corporate finance. Id.
[5] Putnam documents produced in this case confirm that there was a centralized structure for promotions and
demotions that applied across all levels of officers within the IMD.  For example, Putnam document PRM 1789-
1792 a copy of which in the redacted form in which it was produced by Putnam is annexed to the Moloney
affidavit as Exhibit "3") ████████████████████████████████████████████████████████████e
███████████████████████████████████. Putnam document PRM-1518, a copy of which in the redacted form in which
it was produced by Putnam is annexed to the Moloney affidavit as Exhibit "4," shows that th███████████
███████████████████████████████████████████████████████████████████████e
███████████████████████. Persons who were hired as, or promoted to, Managing Director in the periods when
Svensson was eligible for appointment to the position are, by definition, comparators of Ms. Svensson, a fact that
Putnam obviously recognized since Putnam documents, PRM-1792, PRM-1886-1887 and PRM 1891-1893,,
copies of which in the redacted form in which they were produced by Putnam are annexed to the Moloney
affidavit as Exhibits 5, 6 and 7, respectively, show that ██████████████████████████████████████████
████████████████████████████████.
Candidates for demotion to GER, to which Svensson was demoted in 2002, were selected from ███████
███████████████████████████████. Unredaction of Putnam document PRM 1691, a copy of which
in the redacted form in which it was produced by Putnam, is annexed to the Moloney affidavit as Exhibit "8,"
handwritten notes describing ██████████████████████████████████████████████████████████
██████, undoubtedly will identify others who were considered for demotion.  Putnam document PRM
1308-1309, a copy of which in the redacted form in which it was produced by Putnam, is annexed to the Moloney
affidavit as Exhibit "9," is a██████████████████████████████████████████████████████████el
█████, which shows that ███████████████████████████████████████████████████████████████
████████████████████. According to the document, ██████████████████████████████████████or
███████████████████████████████████████████████████████████████████████Lisa Svensson's
█████████████████████████. In this process, Putnam was comparing Svensson to ████████████
████████████████. Unredaction of the redacted portion of this document undoubtedly will identify
other persons with whom ██████ compared Svensson.

Any reliance by Putnam on <u>Jackson</u> v. <u>Harvard University</u>, 111 FRD 472 (D. Mass. 1986), in an attempt to equate the various independently managed and autonomous graduate schools of Harvard University to the management of the IMD, one of four division of Putnam, which is one of a number of subsidiaries of MMC, would be absurd.

As more particularly set forth below, the Putnam objections to Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12 are without merit and Svensson indeed had numerous male and female comparators, thus entitling Svensson to the information requested by the interrogatories

2.     <u>Putnam's "General Objections" Are Without Merit:</u>

2.1.   <u>Putnam's General Objection A</u> is as follows:

> ...Putnam...objects...[for]... failure to conform to...[L.R.] 26.1(C), which limits the number...to 25, including sub-parts. Presently, Svensson..[has]...16 Interrogatories, 10 of which constitute multiple Interrogatories do [sic] to the existence of numerous sub-parts.

<u>Svensson's response</u>: This objection is without merit as Interrogatory Nos. 3, 4, 5, 7 9, 10 and 12 comport with Local Rule 26.1(C), which provides that subparts, which are "logical extensions of the basic interrogatory" that seek "only to obtain specified additional particularized information with respect to the basic interrogatory shall not be counted separately...."

2.2.   <u>Putnam's General Objection B</u> is as follows:

> Putnam objects...to the extent that they ask...[for] ...information about complaints based on "marital status," or "women with children" which are not protected characteristics under federal or Massachusetts law.

Putnam is incorrect.  Svensson is not contending that "marital status," or "women with children" are by themselves protected characteristics under Federal or Massachusetts law.  She does contend that

---

Upon information furnished to Svensson and her belief, ~~at least one male Managing Director was considered for demotion to the position that Lisa Svensson in 2002 was forced to take~~. Based upon this alone, every ~~Senior Portfolio Manager and Managing Director~~ during the year of Svensson's demotion, whether or not demoted, is properly a comparator of Svensson.

[6] There was an ~~Operating Committee~~ at Putnam, the ~~members of which included the heads of each of the four~~ Putnam divisions as well as the head of Putnam Retail and Putnam's other financial officer. ~~The Operating Committee reported to the chief Lawrence J. Lasser ("Lasser") who knew the members of this committee. All the members of the Operating Committee were located at Putnam's Boston office~~. Svensson First Affidavit, ¶¶ 6-7.

4

Putnam discriminated in favor of males and against females on the basis of gender.  That the females

who were discriminated against were, in some cases, married females or, in other cases, married with

children, presents only subcategories of the protected class.  Thus, the objection is without merit.

2.3.    Putnam's General Objection C is as follows:

> Putnam objects to...requesting information relating to partner-level positions... [because
> it]...is neither relevant to the subject-matter of this litigation nor likely to lead to the
> discovery of admissible evidence.  Svensson has never alleged that Putnam failed to
> nominate or elect her to the position of partner on account of her gender.

> Svensson's response: Putnam is incorrect.  As Svensson's amended complaint, a copy of which

(without exhibits) is annexed hereto as Exhibit "A," asserts numerous allegations concerning Svensson

and Putnam partnership positions,[7] it is beyond dispute that she seeks information that is "relevant to the

subject matter of this litigation" and the information sought by her is "likely to lead to the discovery of

admissible evidence."  Indeed, the information sought is well within the scope of Fed. R. Civ. P. 26(b),

that, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim...of

any party,...  (Emphasis added.).  Accordingly, this objection should be overruled.

2.4.    Putnam's General Objection E is as follows:

> Putnam objects...to the extent that compliance...would be burdensome, impose an
> extreme hardship... or...result in the expenditure of unnecessary time and resources.

> Svensson's response:  This objection is without merit as Putnam has failed to establish by

deposition testimony or affidavit any factual basis for its conclusory claims that the discovery sought

would be "burdensome, impose an extreme hardship on Putnam, or...result in the expenditure of

unnecessary time and resources."[8]  Thus, this objection should be overruled.[9]

---

[7] See, for example, ¶ 24 of the complaint, which states, "In particular, Svensson...was denied promotion
to...Managing Director...in favor of male[s]..., despite a positive recommendation from her supervisor, thereby
preventing [her] from achieving the significantly-higher compensation, ascendant career path...to become one of the
partners..., for which becoming a Managing Director was...necessary.... (Emphasis added.) See also complaint,
Exhibit A, annexed, ¶¶ 27, 41, 101 and 103.
[8] Typically, courts consider on a claim of undue burden  (a) The amount of research and time required and costs
incurred...(b) The necessity for the information... (c) Whether the benefit gained by the requesting party
outweighs the burden placed on the responding party... (d) The extent to which answers to the questions prepare

2.5.    Putnam's General Objection F is as follows:

> Putnam objects...to the extent that they seek the disclosure of private and confidential information relating to third parties not subject to this suit or make inquiries about matters the disclosure of which is prohibited by statute, regulation or other applicable laws.

Svensson's response:  Since the assertion of this objection, the court has entered an agreed upon protective order concerning confidential information.  Thus, as long as the parties comply with that order, this objection has no merit.  Moreover, Putnam has failed to identify in any respect the "statutes, regulations, or other applicable laws" that it claims prohibit the obtaining of the information sought.  As this objection has no merit, it should be overruled.

2.6.    Putnam's General Objection G is as follows:

> Putnam objects to...Interrogatory in which [she] has not offered a definition of a term used...and where the lack a definition has rendered the Interrogatory vague, ambiguous, uncertain or difficult to understand.  Subject to this objection, where possible, Putnam has attempted to respond to each Interrogatory as written.

Svensson's response:  All of the words used in the interrogatories at issue are common words found in dictionaries.  For example, the word "relating," used in Interrogatory No. 7 to which the instant objection is made, means "showing or establishing a logical or causal connection between" two matters; "having a relationship with or a connection to" a matter.  See Merriam-Webster Online Dictionary, http://www.m-w.com.  Indeed, Putnam itself has used the word "relating" in its objections C, F and K; in its other objections to Interrogatory Nos. 3-6 and in its answers to Interrogatory Nos. 8 and 14.

However, to resolve any doubt, Svensson will agree to substitute for the word "relating" the word "concerning" as used in Local Rule 26.5, Uniform Definitions in Discovery Requests.

2.7.    Putnam's General Objection H is as follows:

> Putnam objects to each...Interrogatory to the extent [they] are overbroad, vague, argumentative, unduly burdensome, unreasonable, cumulative, duplicative, seek information obtainable from more convenient sources, including Svensson's own

---

the case of the requesting party; and (e) Whether the information was sufficiently disclosed in responses to other discovery requests. See Haydock & Herr, Discovery Practice, 4th Ed., ch. 23, p. 23-6 and cases cited.

[9] See also Svensson's response to Putnam Objection H, p.6, infra.

knowledge, or otherwise seek information beyond the scope of discovery permitted by the Federal Rules of Civil Procedure.

Svensson's response:  This objection also is without merit.  Putnam has not set forth in what respects how any one or more of the interrogatories are as Putnam claims.  There is no affidavit setting out the factual basis of any of them.  The burden under Rule 26 is on the objecting party to show the validity of the objection.  Haydock & Herr, Discovery Practice, 4th Ed., ch. 23, p.23-8.[10]  As there was no factual basis proffered for the objection, Putnam has failed even to begin to establish any basis for its conclusory objections. [11]

2.8.    Putnam's General Objection I is as follows:

> Putnam objects...to the extent that they seek...not discoverable due to the attorney-client privilege, the attorney work-product doctrine, confidential communications ...between or among Putnam agents, representatives and/or employees made subsequent to the occurrence upon which this matter is based, information protected by the common interest or joint defense privilege, and information ... privileged under [Fed. R. Civ. P.], the common law or applicable statutes.

Svensson's response:  Svensson recognizes that, in a proper case, Putnam may invoke the work product doctrine and the attorney-client or other privilege recognized under Federal law.  However, it is Putnam's duty under Fed. R. Civ. P. 26(b)(5) to submit a privilege log concerning each of the communications or documents to which Putnam claims privilege or work product protection so that Svensson may test the claims and allow the court to rule upon them.  To the extent that any of the interrogatories request information that could have been but was not added to a privilege log, the protections have been waived and the claims fail.  Moreover, as there is no privilege protecting from disclosure alleged "confidential communications passing between or among Putnam agents...made subsequent to the occurrence upon which this matter is based," and since the court has entered a

---

[10] Thus, Putnam has the burden to show that the discovery sought in this case is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive" (emphasis added), and to show that the burden or expense "outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake..., and the importance of the proposed discovery in resolving the issues." Fed. R. Civ. P. 26 (b)(2).

[11] See also, Svensson's response to Putnam Objection E, p. 5, supra.

protective order concerning confidential information, there is no basis for non-disclosure of the

information sought.

2.9. <u>Putnam's General Objection J</u> is as follows:

> Putnam objects to any Interrogatory to the extent it seeks detail concerning oral
> communications over a period of time on the grounds that such requests are unduly
> burdensome and an interrogatory is not the appropriate discovery tool for obtaining
> information concerning such communications.

<u>Svensson's response</u>: This objection is without merit as none of the interrogatories at issue on

this motion seek "detail concerning oral communications over a period of time."

2.10. <u>Putnam's General Objection K</u> is as follows:

> Putnam objects to...requesting information relating to persons or events...prior to
> January 1, 1999,...[because it is]...unrelated to the instant litigation and/or not
> reasonably calculated to lead to the discovery of admissible evidence.

<u>Svensson's response</u>: This objection is without merit.  First, Putnam itself recognizes that the

relevant period covers all of the years (1994-2003) Svensson worked at Putnam.  <u>See,</u> for example,

Putnam's response to Interrogatory No. 13 ("Throughout her career at Putnam").  Moreover, the facts

alleged in the complaint include Svensson's entire Putnam career.  Thus the information sought is well

within the scope of Rule 26(b), in that it is "relevant" to the claims of Svensson in this case.  In any

event, Svensson will substitute January 1, 1999, for January 1, 1994, as the start date of the period

inquired about.

3. <u>Putnam's Other Objections  to Interrogatory Nos. 3, 4, 5, 7 and 12</u>:

In addition to General Objections A, B E, F, H and K, Putnam  has objected to Interrogatory

Nos. 3, 4, 5, 7 and 12, "on the additional ground that [they] seek...information relating to employees who

are not similarly situated to Svensson."

As originally propounded, Nos. 3, 4, 5, 7 and 12 are set forth below.  However, Svensson is

willing to limit each of the interrogatories by reducing by five years the start date of the period inquired

about from January 1, 1994, to January 1, 1999; and by limiting the scope of the employees involved

from Putnam's "entire exempt employment force" to investment professionals in the Putnam Investment

Management Division, and more particularly to the male comparators identified in Exhibit 2 to the

Svensson Second Affidavit and the female comparators identified in Exhibit 2 to the Svensson Third

Affidavit.

Prior to the reduction in time and the limit in scope discussed above, as originally served

Interrogatory Nos. 3, 4, 5, 7 and 12 stated as follows:

No. 3: With respect to Putnam's entire exempt employment force, please state:

     a.     The name of each job category and subcategory from January 1, 1994 to date;
     b.     The duties performed and responsibilities fulfilled by employees in each job category and subcategory,
     c.     The names and number of female employees within each job category and subcategory each year from January 1, 1994 to date.
     d.     The names and number of female employees with children within each job category and subcategory each year from January 1, 1994 to date.

No. 4: For each employee identified in answer to Interrogatory No.3, who was terminated during the period from January 1, 1994 to the present, state:

     a.     The name and gender of the employee;
     b.     The job category or subcategory in which the employee worked;
     c.     The nature of the termination, e.g. as layoff, voluntary quit, discharge for cause, discharge without case, etc.
     d.     A statement of any transfer offered to the employee prior to his/her termination as an alternative to termination.
     e.     The age and marital status of each such employee at the time of termination;
     f.     The years of service of the employee at the time of termination;
     g.     The years of service of all other employees remaining in the terminated employee's place of business or other working areas at the time of termination (stated in such a manner as can be correlated with the answers to subparagraph f),
     h.     The name and gender of the replacement, if any, or person assuming the job duties for each such terminated employee;
     i.     The years of service of the replacement for each terminated employee;
     j.     A statement of each and every reduction in pay, or downgrading in job position, experienced by the terminated employee within five years prior to the date of his or her termination.

No.: 5 For each employee identified in answer to Interrogatory No. 3, who was denied promotion demoted or had other adverse employment action taken against them, state:

     a.     The name and gender of the employee;

b.     The job category or subcategory in which the employee worked;
c.     The nature of the adverse employment action taken;
d.     The age and marital status of each such employee;
e.     The year of service of the employee at the time of the adverse employment action;
f.     A statement of each and every reduction in pay, or downgrading in job position experienced by the employee against whom the adverse employment action was taken.

No. 7   Has Putnam or any of the Putnam's supervisory personnel ever received knowledge of internal complaints or statements relating to any employee's gender, gender bias, or stereotypical comments, ridicule, or joking in the workplace respective any employer's gender? If yes, please state:

a.     The acts or circumstances involved;
b.     The dates of their occurrence;
c.     The names and job titles of those involved;
d.     The names and job titles of those responsible for investigating the acts and/or circumstances;
e.     The date and description of the actions taken by management in response to each such charge or circumstance;
f.     Whether the actions continued after management's response to each such charge or circumstance.
g.     Attach a copy of each and every written report of investigation of any such internal complaints, or state the substance thereof.

No. 12:  Please identify the gender makeup of Putnam's workforce at the time of the Plaintiff's termination on September 15, 2003, as follows:

a.     Total employees on a full-time equivalency basis;
b.     By department;
c.     Employees at the level of Managing Director and above;
d.     Employees who performed Portfolio Management responsibilities;
e.     Persons who were designated by Putnam as "Partners".

In regard to No. 12, Putnam also objected that the information is sought is "not probative" of Svensson's claims and that the employees were from Putnam "departments" of which Svensson was not a member.

Svensson's response:  First, Svensson is willing to reduce the start of the period of inquiry by five years, by substituting January 1, 1999, for January 1, 1994.  Second Svensson also is willing to limit the scope of enquiry from "exempt workforce" to professional positions in Putnam's Investment Management Division, and more particularly to the specific male and female comparators identified in

Exhibit 2 to the Second Svensson Affidavit and in Exhibit 2 to the Third Svensson Affidavit, respectively.

Moreover, Svensson recognizes that whether a proposed comparator is "similarly situated" is a highly fact specific issue and that proof that a comparator is so situated requires an examination of "performance, qualifications and conduct" and the absence of "differentiating or mitigating circumstances that would distinguish their situations." Benham v. Lenox Savings Bank, 118 F.Supp.2d 132, 147 (D. Mass. 2000)[12] "Exact correlation is neither likely nor necessary, but the cases must be fair congeners." Conward v. Cambridge School Committee, 171 F.3d 12, 19 (1st Cir. 1999), quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989). See also Thomas v. Eastman Kodak Co., 183 F.3d 38, 63 (1st Cir. 1999). "In other words, apples should be compared with apples." Conward, 171 F.3d at 19, quoting Dartmouth Review, 889 F.2d at 19; Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997).

"Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." Conward, 171 F.3d at 19. See also Kosereis v. State of Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir. 2001); Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999). "The test is whether a prudent person, looking objectively..., would think them roughly equivalent and the protagonists similarly situated." Conward, 171 F.3d at 19, quoting Dartmouth Review, 889 F.2d at 19. See also Goodman v. Bowdoin College, 380 F.3d 33, 45 (1st Cir. 2004); Rathbun v. Autozone, Inc., 361 F.3d 62, 76 (1st Cir. 2004); Thomas, 183 F.3d at 63; Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999)..

---

[12]. See also Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (no differentiating facts); Traux v. City of Portsmouth, 2001 WL 716120, *15 (D.N.H. 6/18/01) (without differentiating facts); Cardona v. U.P.S., 79 F.Supp.2d 35, 43 (D.P.R. 2000) (without differentiating facts); Griel, 71 F.Supp.2d at 12 ("performance, qualifications and conduct"); Matthews, 426 Mass. at 130 ("The plaintiff must identify other employees to whom he is similarly situated in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations."(internal quotation marks omitted)).

A court will look beyond the similarity, or difference, in job title, to determine whether the plaintiff and the comparator are actually performing the same employment duties and stand in the same situation. In <u>City of Boston</u> v. <u>MCAD</u>, 47 Mass. App. Ct. 816 (1999), the Massachusetts Appeals Court upheld the MCAD's position that,

> [similarly] situated employees, for purposes of disparate treatment analysis, need not hold identical job descriptions or tenure. What counted, in the MCAD's view, was the "actual job performance and content--not job titles, classifications or descriptions."

<u>Id</u>. at 822, citing <u>Equal Employment Opportunity Commn.</u> v. <u>Sears, Roebuck & Co.</u>, 839 F.2d 302, 344 (7th Cir. 1988). <u>See also</u> <u>Carey</u> v. <u>Mt. Desert Island Hospital.</u>, 156 F.3d 31, 38 (1st Cir. 1998) (holding that plaintiff vice president and comparator managers were similarly situated despite the comparators having different positions, were the comparators, like the plaintiff, were senior managers who served on management committee); <u>Benham</u>, 118 F.Supp.2d at 148-49 (plaintiff was similarly situated to comparators despite fact that they were her subordinates, where all were senior bank officers and all had authority to approve loans).

Courts in the First Circuit also have held that persons holding different positions or, notably, persons holding similar positions in different divisions of the same company, <u>are</u> similarly situated (or not similarly situated for a reason other than that they served in different divisions). In <u>Nakai</u> v. <u>Wickes Lumber Co.</u>, 906 F. Supp. 698, 704-05 (D. Me. 1995), the court held that the plaintiff in an ADEA suit had submitted sufficient evidence of pretext based partly on a comparison of the plaintiff store manager to managers of other area stores. In <u>Swallow</u> v. <u>Fetzer Vineyards</u>, 46 Fed.Appx. 636, 648-49 (1st Cir. 2002), the court held that the plaintiff division manager was not similarly situated to comparator managers of different divisions, but not because they were in different divisions. The <u>Swallow</u> court relied on the fact that the complaints that had been made against plaintiff were more numerous and more serious than those made against the other managers, implicitly acknowledging that, in the absence of such complaints, the other managers would have been valid comparators.

Although there are some First Circuit cases in which courts have indicated that comparators would have to report to the same supervisor as the plaintiff,[13] those cases do not prevent Svensson from using as comparators other investment professionals within the IMD, the one Putnam division at issue in this case.  In regard to promotions to Managing Director, Svensson and others in the same pool of investment professionals in the IMD competed with each other for selection for promotion to Managing Director.  Therefore, with regard to promotions to Managing Director, they all had the same supervisor -- the committee that made the decisions.[14]  In <u>Rossiter</u> v. <u>IBM Corp.</u>, 2005 WL 2722929, *10 (D. Mass. 10/24/05), the court stated, with regard to the admissibility of statistical evidence:

> Since the focus of a disparate treatment claim is on how an individual was treated compared to her similarly situated coworkers [, only] ... statistical <u>analyses that compare coworkers who competed directly against each other to receive a benefit, here selection for retention, are appropriate</u>.

<u>Id</u>. (Emphasis added, internal quotation marks omitted.)  The same principle applies for the other adverse employment actions taken against Svensson.  The decisions not to pay her as much as the male investment professionals were paid, to demote her when male investment professionals were not demoted, and to terminate or force her out of Putnam when male investment professionals were not so treated, all were made by the officials who, Putnam's own documents show, considered for employment actions investment professionals throughout the entire IMD, including Managing Directors. [15]

---

[13] <u>Mejias Miranda</u> v. <u>BBII Acquisition Corp.</u>, 120 F.Supp.2d 157, 165 n.7 (D.P.R. 2000) ("The Court finds that they were similarly situated.  Plaintiff meets the 'same supervisor test' enunciated in <u>Mitchell v. Toledo Hospital</u>, 964 F.2d 577, 583 (6th Cir. 1992) ('[T]o be deemed "similarly situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.').  Both women were given supervisory responsibilities, were Senior Accountants, had the same training and experience and reported to the same Accounting Manager at the time, Elsie Pastor.")

[14] <u>See</u> notes 4-6, p. 3 et seq.

[15] <u>Id.</u>.

Quite relevant to the present case are two cases from other circuits in which courts explicitly or implicitly have held in discrimination cases against investment houses, that it was appropriate for the plaintiff executive to use as comparators others holding the same position but in different divisions of the company. Of course, in the present case, Svensson seeks comparator information about investment professionals in only one of the four Putnam divisions, the Putnam Investment Management Division. In Diamond v. T. Rowe Price Assoc., Inc., 852 F.Supp. 372 (D. Md. 1994), the female plaintiff portfolio manager was denied a position as a Managing Director. The court expressly allowed her to use as comparators other portfolio managers who had been promoted to Managing Director, despite the fact that they managed a range of funds in different areas of the company. While the court ultimately held that the plaintiff and the other fund managers were dissimilar for other reasons (relating to the actual scope of their duties), that does not alter the fact that they would have been similarly situated despite working in different departments of T. Rowe Price and managing different kinds of funds. The portfolio managers whom the Diamond court allowed Ms. Diamond to use as comparators, were not limited to those managing small company growth funds of the kind she managed. Their funds ran the gamut from large company stocks to tax free bonds. The Diamond court rejected them as comparators not due to these differences, but only because the actual day-to-day duties performed by the other managers, and the scope of their responsibilities, differed significantly from Diamond's.

In Sobol v. Kidder Peabody & Co., 49 F.Supp.2d 208 (S.D.N.Y 1999), the plaintiff investment banker was forced to resign her position as head of the utilities finance group. She brought an age discrimination claim, and proffered as comparators the heads of other departments within the company. Like Diamond, the court rejected her comparators, but not because they managed different divisions. Instead, the court based its decision on the very dissimilar duties of the other managers. Id. at 219.

3.2. Putnam's Additional Objections to Interrogatory No. 7:

Putnam also objected to Interrogatory No. 7 "on the ground that it seeks information that Putnam does not retain, that it cannot obtain without unreasonable effort, and/or that is not

14

probative of Svensson's claims."

Svensson's response: This additional objection to No. 7 is without merit. Putnam is required by Rule 26(b) to furnish in its answers to Svensson's interrogatories "such information as is available" to Putnam. If the information sought is not "available" within the meaning of that rule, Putnam is not under a duty by Rule 26(b) to furnish it, but if it is available, Putnam must furnish it. The burden is on Putnam to set forth the factual basis of its objection. Given its failure to have proffered an affidavit establishing the factual basis of its objection, the objection is without merit. Moreover, for the reasons set forth in § 1 and 3-3.2, supra, the information sought will be probative of Svensson's claims.

3.3. Putnam's Additional Objections to Interrogatory No. 12:

Putnam also objects to Interrogatory No. 12 to the extent that it seeks information with respect to "employees who were not similarly situated to Svensson or with respect to departments of which Svensson was not a member."

Svensson's response: This additional objection to No. 12 is without merit. As set forth in more detail in §§ 1 and 3-3.2, supra and in the First Svensson affidavit, ~~the investment teams and the research~~ ~~functions in IMD were separate departments."~~ ~~They were each administered separately~~ ~~within the IMD by team function, or titles, compensation and other administrative matters concerning~~ ~~the investment team site with decisions making in IMD through its direct reporting management~~ ~~structure to the ... which made decisions for all of the IMD concerning ... who things,~~ ~~bonuses and promotions.~~ Id.[16][17] Any reliance by Putnam on Jackson v. Harvard University, 111 FRD 472 (D. Mass. 1986) in an attempt to equate the separate nature of the various independently managed graduate schools of Harvard University to the centrally managed investment teams and research functions within the IMD, one of the four divisions at Putnam, would be absurd.

3.4.    Putnam's Response to Interrogatory No. 9:

---

[16] See notes 4-6, p. 3 et seq.
[17] Id.

Interrogatory No. 9 is as follows:

> For each employee who was a) <u>denied promotion to Managing Director</u>; or b) <u>denied or refused a partner-level position</u> at Putnam for the period January 1, 1994 to the present, please state:
>
> a.    The name, position, department, salary, gender and marital status of each employee who was denied or refused said promotion or partnership; The criteria established at Putnam to select employees for promotion to Managing Director or Partner;
>
> b.    The date of each such denial;
>
> c.    The form and manner of communication of each such denial;
>
> d.    The reason for each such denial;
>
> e.    The name, job title, gender and marital status of the person(s) responsible for determining which employees were to receive promotions to Managing Director or Partner.
>
> f.    The names, job titles, gender and marital status of the person(s) who received such promotions at the time of each such denial.

To this interrogatory, Putnam stated as follows:

> Putnam objects to this Interrogatory for the reasons set forth in General Objections A, B, C, E, F, H, and J, which are incorporated herein by reference. Subject to these General Objections, Putnam responds that exempt, regular, active employees who had held the position of Senior Vice President for at least one full year were potentially eligible to be nominated to Managing Director. The nomination process was a matter of discussion and consensus-building. In any given year, many eligible employees were discussed and winnowed down to an elected group. Those individuals who participated in the process of considering promotions to Managing Director included members of senior management of the firm, along with representatives from Human Resources. Input was solicited from a wide range of individuals in each business unit. It is not possible to determine the identities of everyone who participated in this process for any given year
>
> Putnam elected the following to Managing Director for the Years 1999 - 2003:
>
> *****
>
> Putnam directs Svensson to the threshold criteria it used in considering promotions to Managing Director, and, pursuant to Fed. R. Civ. P 33, produces documents labeled Bates PRM 00717 - 00753. In addition to these criteria, those participating in the promotion process considered a wide range of other issues, such as the performance of individuals, their interpersonal and team-building skills, the performance of their business unit and the firm, the number of other candidates, the governance implications of increasing the number of Managing Directors and other similar issues.

<u>Svensson's Response</u>:

> Putnam simply has not answered the question, which asks for information as to persons

who " a) [were] <u>denied promotion to Managing Director</u>; or b) [were] <u>denied or refused a</u>

16

partner-level position at Putnam....[18]  Putnam has given limited information and only as to

persons were promoted, not those who were "denied" or "refused" a promotion to Managing

Director or partner.  For the reasons set forth in §§ 1-3.2, supra, General Objections A, B, C, E,

F, H, and J, are without merit.  Moreover, even in the answer to the extent it gave one , Putnam

has failed to specify the criteria for evaluating "the performance of individuals, their

interpersonal and team-building skills, the performance of their business unit and the firm, the

number of other candidates, the governance implications of increasing the number of Managing

Directors;" nor has it identified the "other similar issues."  For all of the above reasons, the

response is improper.

### 3.5.   Putnam's Response to Interrogatory No. 10:

Interrogatory No. 10 is as follows:

Were other employees subject to termination based on the same factors that resulted in
Plaintiffs termination? If yes, please state:

   a.     The names, job titles, gender and marital status of employees
          terminated or laid off as a result of these factors;
   b.     The dates of their termination(s).
   c.     The dates of rehire, if any.

To this interrogatory, Putnam stated as follows:

> Putnam is unaware of any other employee in Global Equity Research
> ("GER") during the period between 1999 and 2003 who was terminated
> for precisely the same reason that Svensson was terminated.

Svensson's Response:

For the reasons set forth in §§ 1-2.10, supra, General Objections A, B, C, E, F, H, and J,

are without merit.  In particular, as set forth in §§ 1-3, supra, the area of inquiry should not be

limited to "employee[s] in [GER]," which was a ~~function in the PdP and not a separate~~

"department" or division, ~~as promotions, demotions, and other such matters were not~~

~~administered by GER separately and independently from the other functions in the PdP~~.  These

---

[18] As set forth above, Svensson will substitute January 1, 1999, for January 1, 1994.

~~matters were administered, if at all, the IMD by the IMD through the IMD.~~ Thus the scope of inquiry should include investment professionals in the IMD. Without the information requested for persons within the IMD, it is impossible for Svensson to present the facts and for the court to rule upon whether the Putnam contentions are true or not.

4. <u>Conclusion.</u>

All of the foregoing indicates that the issue of comparators is highly fact intensive and that plaintiff Svensson is entitled to the information requested in Interrogatory Nos. 3, 4, 5, 7, 9. 10 and 12, as limited in years covered and scope of employees inquired of. Neither Svensson nor the court should be prevented by Putnam from obtaining the information necessary to determine the truth or the lack of it in Putnam's claims that Svensson had virtually no comparators and that her termination was for valid circumstances, which were unique to her.

5. Relief Sought.

For all of the above reasons, Putnam's objections to Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12 should be stricken; Putnam should be ordered to serve forthwith full and responsive answers to each of these interrogatories; and Svensson should be awarded her attorneys' fees and costs pursuant to Fed. R. Civ. P. 37(a)(2)(4).

LISA SVENSSON, plaintiff

By her attorneys

BARRON & STADFELD, P.C.

/s/ Kevin F. Moloney
Kevin F. Moloney  BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, admitted PHV
JOHN K. WEIR LAW OFFICES, LLC

300 Park Avenue, Suite 1700
New York, New York 10022
Tel.: 212.572.6374

Dated: April 20, 2006.

Certificate of Service.

This document, in redacted format is filed through the ECF system, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

A copy of this document in unredacted format was delivered by messenger to counsel of record: Joseph L. Kociubes, Louis A. Rodriques, BINGHAM, MCCUTCHEN, LLP, 150 Federal Street, Boston, Massachusetts 02110 and David S. Rosenthal, NIXON PEABODY LLP, 100 Summer Street, Boston, Massachusetts 02110.

/s/ Kevin F. Moloney

Dated: April 20, 2006.

[354845.1]

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

```
*************************************
LISA SVENSSON,                       *
              Plaintiff,             *
                                     *
                                     *
                                     *
                                     *       CIVIL ACTION NO.
v.                                   *
                                     *
PUTNAM INVESTMENTS LLC, f/k/a        *
PUTNAM INVESTMENTS, INC. and         *
LAWRENCE J. LASSER                   *
              Defendants             *
*************************************
```

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Lisa Svensson (hereinafter "Plaintiff" or "Svensson"), by her attorneys John K. Weir Law Offices LLC and Barron & Stadfeldt P.C., alleges upon information and belief as follows:

## PRELIMINARY STATEMENT

1.  This Complaint concerns the unlawful actions of Defendants Putnam Investments LLC, f/k/a Putnam Investments Inc. (hereinafter "Putnam") and Lawrence J. Lasser, former Chief Executive Officer of Putnam (hereinafter "Lasser"), who directly aided and abetted Putnam in illegally and discriminatorily treating and ultimately terminating Svensson, after inducing her to accept their offer of employment by means of false pretenses and fraudulent and deceptive representations, only to renege on their promises relating to her expected career

path, and on her ability to be treated on an equal footing with males in terms of promotions, compensation and benefits.

2. Svensson alleges that Putnam, under Lasser's direction and control, unjustifiably and improperly created artificial barriers to the career advancement of women, and Svensson in particular; maintained gender-biased attitudes and created a male-dominated culture at Putnam, particularly at the levels of Managing Director and Partner; engaged in a double standard of evaluation for male and female employees; disparately treated males and females in terms of compensation; disparately implemented employment policies which had an adverse impact on female employees; and retaliated against females, and in particular Svensson, because she objected to such discriminatory and disparate treatment, and otherwise objected to the nefarious, illegal or unethical business practices engaged in by Putnam. As a direct result of said gender bias, disparate treatment, wrongful implementation of employment policies with a disparate impact on women, and retaliation, Svensson was willfully, deliberately and maliciously denied promotions, forced to accept demotions, reductions in compensation, and, on September 15, 2003, was abruptly and unceremoniously terminated when she refused to accept any further demotions, and instead insisted on her right to be compensated and otherwise treated fairly relative to her male colleagues at Putnam.

3. At the time of her termination, Svensson advised Putnam of her strong belief that their employment action against her was motivated by gender bias. Following her termination, Svensson advised Putnam of her intent to pursue legal

2

claims asserting her fundamental right to be treated fairly and on a non-discriminatory basis, and thereupon refused to accede to Putnam's outrageous demands that she cede all her legal rights against Putnam and Lasser by executing a release of all such claims. Upon becoming aware of her views and her intent to pursue legal claims, Putnam's response was to further retaliate against Svensson, by withholding from her deferred compensation and stock rights to which she had become entitled by virtue of longstanding service, outstanding performance of her job responsibilities, and significant contributions to Putnam's financial revenues and profits.

4.    Plaintiff's claims herein are premised upon the litany of unkept promises, the unmitigated gender bias practiced against her, disparate treatment of her compared to her male colleagues, wrongful treatment of her because of her stated objections to certain improper, illegal and unethical business practices, wrongful termination of her employment owing to an ingrained culture of chauvinism, and a long history of wrongful treatment of females, the maintenance of a "glass ceiling", and retaliation against her for asserting, or threatening to assert, her legal rights. Svensson, by way of this Complaint, seeks substantial monetary damages, including back pay, front pay in lieu of reinstatement, other compensatory damages as may be proven at trial, attorney's fees and costs, and a significant award of punitive damages against both Defendants, in an attempt to deter Putnam and Lasser from lining their own pockets at the expense, and to the detriment, of females in Putnam's workforce, including Svensson.

5.  Defendant's conduct constitutes unlawful gender discrimination under federal and state law, violation of equal pay provisions of federal and state law, retaliation, wrongful discharge in violation of public policy, breach of contract, breach of the covenant of good faith and fair dealing, violations of the ERISA statute, fraudulent inducement, misrepresentation, conversion and unjust enrichment.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over the matter pursuant to 28 USC § 1331 in that the Complaint asserts claims under federal law, and the amount in controversy is in excess of $75,000.

7.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367.

8.  Venue in this District is proper because the unlawful practices of which Plaintiff complains occurred within this District, as required by 28 USC § 1391, and Putnam maintains a place of employment for male and female employees in Boston, Massachusetts, and contracts a substantial part of its business in this District.  Venue in this District is proper as to the state law claims pursuant to 28 USC § 1391 (b), because a substantial number of the events or omissions giving rise to these claims occurred within this District.

## PARTIES

9.  Plaintiff Svensson is an individual currently residing at 68 Commonwealth Avenue, Boston, Massachusetts, and will be residing as of January, 2005 at 54 Hull Street, Newton MA 02460

4

10. Defendant Putnam is a Delaware limited liability company, with its principal place of business located at One Post Office Square, Boston, Massachusetts.

11. Defendant Lasser is an individual who, upon information and belief, resides at 342 Warren Street, Brookline, Norfolk County, Massachusetts.

<u>**EXHAUSTION OF ADMINISTRATIVE REMEDIES**</u>

12. Plaintiff Svensson duly and timely filed with the Massachusetts Commission Against Discrimination ("MCAD") a Charge of gender discrimination against Putnam on or about March 1, 2004, was permitted to amend said Charge to name Lasser as an additional Respondent in or about July, 2004, and also filed a separate Charge of Discrimination alleging post-termination retaliation in or about July, 2004. Both Charges were also filed with the Equal Employment Opportunity Commission ("EEOC").

13. By letter dated October 21, 2004 to Plaintiff's Counsel, MCAD issued a letter order (attached as Exhibit A) allowing Svensson to pursue a private civil action for said discrimination and retaliation under Massachusetts state law.

14. By letter dated December 7, 2004, and received by fax on December 8, 2004, EEOC issued a Notice of Right to Sue to Svensson, granting her request to commence a private civil action for said discrimination and retaliation under federal law. A copy of the Notices of Right to Sue are collectively attached hereto as Exhibit B.

15. Plaintiff Svensson has fulfilled all conditions precedent to the institution of this action, and has filed the Complaint within ninety (90) days from receipt of

the Notice of Right to Sue from the EEOC. Plaintiff has duly exhausted all

available administrative remedies, and hereby invokes her right to a trial by jury

with respect to her claims of gender discrimination and retaliation against Putnam,

her claim of "aider and abettor" liability for gender discrimination against Lasser,

and for various state law claims asserted herein.

## ALLEGATIONS COMMON TO ALL CLAIMS

16. Plaintiff Svensson is a female, and as such is a member of a protected

class under both federal and Massachusetts state discrimination laws.

17. Svensson, in 1994, was gainfully employed as an Analyst at Lord Abbett

& Co., in New York, with seven years of experience in the industry and

reasonable expectations for significant career advancement, promotions and

increased income potential.

18. In or about June, 1994, plaintiff was recruited away from this position

through promises made to her by Putnam, principally through Mr. Patrick O'

Donnell ("O'Donnell"), that, after an initial period of time during which Plaintiff

would be assigned to the Research Department, she would be transferred to the

Portfolio Management area, which, at Putnam, constituted a far more promising

career path, with significantly higher compensation and a better opportunity to

become a Managing Director, and ultimately a Partner, than would have existed

for an employee who had remained in the Research Department.

19. By offer letter from O'Donnell dated June 9, 1994, plaintiff was promised

an annualized salary of $125,000, guaranteed prorated bonuses for 1994 and 1995

of $150,000 each year, and eligibility, after one year of employment, for the

Putnam Profit Sharing Retirement Plan, as well as a broad array of employee benefit programs. Although she was admonished by a male with whom she interviewed that Putnam was not a good place for women to work, she relied upon Putnam's assurances as to her projected career path, and their statements that Putnam was implementing procedures, such as diversity groups for females and persons of color, to assure that gender-based discrimination would not be tolerated and would not be a hindrance to Svensson's advancement.

20. Acting in reliance on the promises respecting career advancement and non-discrimination made by Putnam, Plaintiff, on June 14, 1994, signed the offer letter and commenced a new career at Putnam, and thereby forsook her anticipated compensation and career path at Lord Abbett. Shortly after her arrival, Svensson joined, and began to participate in, a women's advisory committee formed for the purpose of discussing and resolving gender-based issues in the workplace.

21. From July, 1994 until her termination of employment on September 15, 2003, Svensson was employed by Putnam, initially in the Equity Research Department, then from December, 1997 until March, 2002 as a member of the newly-formed International Growth Equity Team. Throughout this entire period, Svensson received excellent annual performance evaluations, repeated praise from supervisors and colleagues, salary increases, bonuses, restricted stock grants and the opportunity to participate in various employee benefit programs, as well as stock plans, stock option plans, and deferred compensation plans.

22. In March, 2002, despite having received positive job performance evaluations from her supervisors, repeated praise from her colleagues, and having achieved financial performance results equal to or better than similarly-positioned male colleagues, Svensson was forcibly required by Putnam to return to the Global Equity Research Department ("GER"). This forced demotion was in breach of the express promises made to her at the outset of her employment by O'Donnell, and in breach of the implied promise to be free from pernicious gender discrimination, at a time when her male colleagues, despite lesser experience and inferior performance records, were allowed to remain in Portfolio Management positions, and thereby continued to enjoy extraordinarily high compensation with maintenance of their expected career paths.

23. Plaintiff's 2002 demotion, albeit abrupt, exacerbated a disturbing long-term trend at Putnam, by which highly-qualified, intelligent and experienced women, such as Svensson, were repeatedly and consistently denied promotional opportunities granted to male colleagues with lesser qualifications, experience and intelligence, particularly promotions to the level of Managing Director and Partner, at which levels women, who were significantly under-represented in all non-clerical and managerial employment at Putnam, were even more egregiously short-changed. This deliberate under-representation of women imposed a so-called "glass ceiling" on their career opportunities, especially married women with children or who had plans to have children, including Svensson. Many women denied such career advancement either left in disgust and sought employment elsewhere, or were demoted or terminated. The women's advisory

8

group withered and died as the direct result of these departures and the perception by those who stayed on that the situation was beyond repair.

24. In particular, Svensson, in 2000, 2001, 2002 and 2003, was denied promotion to the Managing Director level in favor of male employees with equivalent or lesser ability, intelligence and achievement, despite a positive recommendation from her supervisor, thereby preventing Svensson from achieving the significantly-higher compensation, ascendant career path within the organization, and opportunity to become one of the Partners at Putnam, for which becoming a Managing Director was a necessary prerequisite.

25. After Svensson was denied the Managing Director position in 2001, she inquired as to why she had not been selected, and was told that it was a bad year for her to get promoted because she had been out on maternity leave at the end of 2000. She approached Mr. Robert Swift to object to that response. When she then approached Mr. Steve Oristaglio to ask why she had not been promoted, she was instead advised that she lacked "that certain something", and had a "volatile" nature. Plaintiff thus became aware that, as a female, she was being held by Putnam to a higher standard for advancement than were her male colleagues, who, almost without exception, were deemed by management to have had "that certain something", and for whom volatility translated as much-admired, and financially rewarded, aggressiveness.

26. At the time of, and after, plaintiff's involuntary demotion and departure from the International Growth Equity Team in March, 2002, and her return to the Global Equity Research Department (GER), she repeatedly inquired of Putnam

whether there were other positions in Money Management, especially on the
Growth Teams, to which she could be transferred, and was told there were none.
However, similarly-situated but lesser-performing males were allowed to remain
in Portfolio Management positions, including on the Growth Teams, were not
demoted, and did not experience significant reductions in compensation, as
occurred to Svensson. When she brought this seemingly disparate treatment to
the attention of management, she was told there was "no room" on the Growth
Team for her. However, "room" had been found for a more junior male
employee. When she asked about a position on the Domestic Growth Team, she
was advised that Putnam wanted certain skills in that job, and when she responded
that she had equal or better skills than the males who were being retained in or
transitioned to Domestic Growth, she was told repeatedly by management that she
needed to "go back to GER", and was not even offered any interview
opportunities for alternative positions.

27. As a direct result of Putnam's willful demotion of Svensson and her forced
return to GER, plaintiff suffered a loss of compensation of approximately
$1,000,000 in 2002, and was put on a descendent career path, while similarly-
situated male colleagues were not so demoted, did not suffer any significant
declines in compensation, and were not put on descendent career paths, but
instead were permitted to become Managing Directors, and, in some cases,
Partners, in far greater numbers than their female colleagues, and particularly
compared to married female employees with children.

28. After her forced return to GER, Svensson continued to perform her job capably, while also continuing to seek out other job opportunities within Putnam more in line with her expected and promised career path. Despite these efforts, she was consistently denied these opportunities by Putnam and Lasser.

29. On one occasion in 2002, Svensson was advised of an available position as Portfolio Manager on The Global Core Team, but was told by Mr. Bill Landes ("Landes") that the job was being given to a younger male because they wanted someone "more junior" than Svensson. When Svensson indicated to Landes her belief that it was because "they wanted a guy", Landes admitted that her statement was true.

30. On another occasion in 2002, Svensson was advised by Landes that they wanted to promote a more junior male to become Associate Director of Research, but he was unsure whether this male employee could do the job, and he knew Plaintiff could do it, and thus wanted Svensson to function as the male's "right-hand person", and actually perform all the people management aspects of the job. Although Svensson inquired as to why she was being asked to do most of the work, while a less capable, more junior male was being offered the title, the credit and the enhanced compensation, Putnam failed to come forward with any response.

31. In October, 2002, Mr. Charles "Ed" Haldeman became Putnam's Head of Investments, reporting to Lasser. At a meeting of analysts on October 31, 2002, two days after he assumed his new position, Mr. Haldeman was asked what style of investor he was, and he replied that he would give his own answer, which

11

answer had not been "vetted by the EEOC". He said that, if his son asked him in

the privacy of his own home whether, not knowing anything else, a 25 year-old

woman or a 53 year-old woman would be more attractive, and with all other

things being equal, he would have a bias in favor of the 25 year old, although at

his age (53) he was not going to be "running around" with any 25 year-olds.

Because this was Svensson's first meeting with Mr. Haldeman, because defendant

Lasser had long tolerated, and even promoted, a hostile work environment for

women at Putnam, particularly married women with children, and because

Haldeman had a reputation for mass firings earned at his previous employer

(where he was known as "The Sweeper"), plaintiff Svensson became extremely

concerned about this remark, which she felt was highly discriminatory toward

women employees, particularly those older than 25, as was Plaintiff.

32.    In January, 2003, after receiving highly-positive performance evaluations

in her annual review, Svensson was appointed by Landes as the Associate

Director of Research, a month before his own departure. However, although

Svensson was fully qualified, experienced and able to assume Landes' own

position as Director of Research upon his departure, Putnam and Lasser decided

to pass on Svensson, and other qualified females, and instead went outside the

company to hire a male, Joshua Brooks, ("Brooks") as Director of Research.

Brooks commenced his responsibilities in April 2003, and thereby became

Plaintiff Svensson's new boss, with compensation, upon information and belief,

far exceeding that of Svensson.

33. Although Svensson continued to search for money management opportunities within Putnam after Haldeman's arrival and Brooks' ascendancy, she never received any available opportunities, while more junior male analysts and Portfolio Managers with lesser performance records, obtained or retained such promotions or transfers, and were allowed to earn or retain compensation approximating, or in some instances far exceeding, $1 million.

34. Upon information and belief, after Brooks' arrival in April, 2003, Lasser, Haldeman and Brooks conspired to further discriminate against females, and especially married females with children, by denying them promotional opportunities, demoting them and, in Svensson's case, by concocting a scheme to force her to quit Putnam.

35. In the late spring and summer of 2003, plaintiff, on a number of occasions raised with Brooks significant concerns which she had about the allocation of brokerage commissions on the "buy" side to reserve shelf space, believing that this business practice was a breach of Putnam's fiduciary duties to its clients, and thereby, quite possibly, illegal or, at the least, unethical and improper, and that it was only a matter of time until the SEC started to investigate. Brooks stated that he would report Plaintiff's concerns to Lasser, but never reported back to Plaintiff on Lasser's reaction.

36. Very shortly thereafter, and in furtherance of the scheme concocted by Lasser, Haldeman and Brooks, Human Resources personnel began conducting interviews of Plaintiff's colleagues in GER to "check up" on her performance, in the stated guise of evaluating her for a higher-level position, but in reality, they

13

were seeking to develop negative information sufficient to justify her termination. No similar interviews were conducted with respect to similarly-situated male employees at Putnam at this time. Upon information and belief, the Human Resources persons performing the interviews were instructed to engage in this discriminatory conduct by Brooks, Haldeman and/or Lasser.

37. Without any discussion of the results, or even the existence, of the aforementioned interviews, and without any other explanation, on August 28, 2003, Svensson was informed by Brooks that she would be summarily removed from her position as Associate Director of Research, and that she was being given three options: 1) Continue employment as an analyst, a significant demotion with no long term career opportunities, and with the explicit statement that she would not be able to make any more money or be eligible for future promotion; or 2) Accept a severance package of 18 weeks of salary, half of her 2002 bonus, and her accumulated deferred compensation, with no bonus for 2003, while providing for a release of all legal claims she might assert against Putnam; or 3) continue employment at Putnam for a limited period of time in the lesser capacity, during which time she would be expected to search out alternative employment, with no severance package and a "voluntary" resignation at the end of the brief period of continued employment.

38. On September 12, 2003, Svensson met with Brooks in his office, and advised Brooks that none of the three proposed options for continued employment were acceptable to her, that she would instead need some type of written assurance that her career at Putnam could be put back "on track", and that her

14

future promotions and compensation would be based on her contributions, and not impacted by her gender. Brooks stated that he would see what he could do.

39. On September 15, 2003, Plaintiff Svensson met with Brooks and Ms. Mary McNamee ("McNamee") of Human Resources. Brooks stated that Svensson had made demands that Putnam could not meet, and that therefore Putnam had unilaterally determined that Svensson had elected the third option. Svensson objected that she had not chosen this option and instead was being fired, and stated that she wanted a document to this effect. McNamee thereupon presented to and reviewed with Svensson a letter outlining a severance package, and incorporating a release of all legal claims against Putnam. She also presented a separate document which stated that there would be no problem with the proceeds from the stock sale Svensson had recently submitted, and that the final 750 shares would vest on schedule, and that Svensson would also get stock options, but that the stock needed to be held for at least 6 months before she could sell it.

40. Approximately 15 minutes after the meeting ended, McNamee presented Svensson with a revised document, this time indicating that Putnam was indeed terminating Svensson's employment. After her termination, Plaintiff refused to accept the written severance agreement because it provided for a complete release of all her legal claims, and offered her paltry compensation as consideration for same, particularly given Putnam's promise relating to the stock and stock options as well as the deferred compensation to which she had already become legally entitled.

15

41. Her gender, female, and her status as a married female with children, were substantial motivating factors in Putnam's overall treatment of Svensson, in their unwarranted denials of promotions to her, in their unwarranted reductions in her compensation, in their refusals to compensate her in accordance with the compensation packages received by her male colleagues, in their inexplicable and unjustifiable demotions of her, in their refusals to allow her even to interview for positions outside of GER, and in their decision to mandate her invidious and unlawful termination.

42. At all times relevant herein, Putnam consistently treated women less favorably than men, especially married women with children or with plans to have children, particularly with respect to those women who sought promotion to, or who wished to remain at, the Managing Director level or above. After the arrivals of Haldeman and Brooks, and continuing after Svensson's termination, the rate of non-promotions, demotions and forced departures of women accelerated.

43. Similarly, upon information and belief, of the approximately fifty Partners at Putnam between 1999 and 2003, only six were women, with no more than three at any one time. The disparity in the number of males versus females in the highly secretive Partnership occurred as a direct result of the failure and refusal by Putnam and Lasser to promote Svensson and other qualified female employees to the position of Managing Director, and the conscious maintenance of a "glass ceiling" or, alternatively, the conscious maintenance of facially neutral

employment policies which had, and continue to have, a disparate impact upon women at Putnam.

44.  Defendant Lasser participated in, and helped to sustain, a corporate culture at Putnam that fostered gender discrimination. Lasser aided and abetted Putnam directly in the gender discrimination which was perpetrated against Svensson by his participation in the decision-making process which led to denial of promotions, denial of equivalent pay, demotions and, ultimately, Svensson's termination. Upon information belief, his conspiratorial conduct, as herein set forth, led directly to Svensson's termination of employment, and was undertaken because of his desire to reduce the number of females, and especially married females with children, within the Putnam workforce, and to prevent their accession to top management.

45.  At the time of Svensson's termination, she possessed a portfolio of significant Putnam stock options and grants, as well as a significant sum in the deferred compensation plan at Putnam.

46. Following her termination and despite the promises made by McNamee at the time of her departure, Svensson's stock portfolio remained in Putnam's possession and control; nevertheless, Svensson continued to receive periodic dividend statements and dividends on the stocks in her portfolio.

47. On November 12, 2003, Svensson, through her attorney, wrote to Putnam's then General Counsel and notified Putnam in writing of her intention to prosecute her claims of gender discrimination and violations of state and federal law.

48. On or about March 1, 2004, Svensson, by letter of her counsel dated February 27, 2004, filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination, which Charge was thereafter also filed with the Equal Employment Opportunity Commission in early March, 2004.

49. Through correspondence sent to Putnam on March 5, 2004, Svensson instructed Putnam to sell her shares of Putnam stock in her portfolio.

50. On March 10, 2004, Putnam informed Svensson by return correspondence that it had retroactively divested Svensson of the 750 shares of Putnam stock promised to her by McNamee, and on which she had been receiving dividends and dividend statements, because Svensson had decided not to execute a Separation Agreement incorporating a release of all legal claims against Putnam.

51. Putnam further has continuously maintained custody and control of Plaintiff's deferred compensation account, and since becoming aware of Plaintiff's claims of gender discrimination, has continuously failed to pay the monies in said account to Plaintiff.

52. Putnam, through its agents, servants, or employees, thereby retaliated against Svensson for asserting her claims of gender discrimination at the time of her termination; for notifying Putnam of her intent to file, and thereafter filing, a claim of gender discrimination with the MCAD and EEOC; and for her decision not to sign the Separation Agreement, under which she would have released and relinquished important legal rights.

53. As a result of Svensson's non-promotions, demotions and her termination, she has suffered monetary damages, including loss of compensation, loss of raises

in compensation, loss of bonuses, loss of employee benefits and enhancements of
those benefits, loss of stock grants and stock options, loss of deferred
compensation, loss of the opportunity for further career advancement,
extraordinary damage to her business reputation, emotional distress damages and
other compensatory damages.

54. In addition thereto, Svensson is entitled to punitive damages because
certain of the Partners, officers, directors and members of the management of
Putnam, including but not limited to defendant Lasser, as former Chief Executive
Officer, acted deliberately, maliciously, and with conscious intent to discriminate
against women at Putnam, particularly married women with children, such as
Svensson; or, at the very least, were recklessly indifferent to the lawful rights of
female employees such as Svensson to equal opportunity in their employment.
Svensson is further entitled to punitive damages because of defendants' deliberate
and malicious acts in retaliating against Svensson because of her assertion of
gender discrimination claims, and other claims of legal wrongdoing or breaches of
ethical obligations, and because of their willful conversion, to their own account
and for their own financial benefit, of monies properly due and owing to Plaintiff.

## COUNT I
## SEX DISCRIMINATION (TITLE VII)

55. Plaintiff repeats and re-alleges the allegations contained in paragraph 1
through 54, as though fully set forth herein.

56. It is unlawful under Title VII of the Civil Rights Act of 1964, for any
covered employer to refuse to hire, to discharge, or to otherwise discriminate
against any person regarding promotions, demotions compensation or other terms

19

and conditions of employment because of said person's race, color, religion, sex or national origin, to pay male employees higher compensation for substantially equivalent work, or to retaliate against any person because they assert, or attempt to assert, Title VII rights.

57. Plaintiff Svensson in a member of a protected group under Title VII because she is a women. Defendant Putnam is a covered employer.

58. By the above described conduct, Defendant Putnam has discriminated against Svensson, because of her sex in the terms, conditions, and privileges of her employment, in violation of Title VII, 42 U.S.C. § 2000e-(5).

59. As a result of Putnam's gender discrimination, Svensson has suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs and other compensatory damages. Putnam is further obligated to pay to plaintiff punitive damages for said discrimination.

## COUNT II
### VIOLATION OF M.G.L.CH. 151B§ 4

60. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 59 above, as if set forth here in their entirety;

61. Under Massachusetts law, it is a violation of the Fair Employment Practices Law (M.G.L.CH. 151B) for an employer to refuse to hire, to discharge, or to discriminate against any individual in compensation or in terms, conditions, or privileges of employment, because of that individual's genetics, race, color, religious creed, national origin, sex, age, sexual orientation, or ancestry;

62. Plaintiff, Svensson is a member of a protected class under M.G.L.CH151B because she is a woman.

63. Putnam discriminated against Svensson due to her gender in their treatment and termination of her.

64. The above acts and practices of Putnam constitute unlawful discriminatory acts in violation of M.G.L.Ch. 151B §4.

65. Putnam's decision to target Svensson for demotions and termination, while less qualified, younger males were retained and promoted or not demoted, was willful, intentional and committed with reckless disregard for the rights of Plaintiff.

66. Svensson was, at all times relevant herein, fully qualified to perform her job, as well as the jobs to which she aspired or sought promotion, and which she was denied because of gender discrimination.

67. As a result of Putnam's discrimination, Svensson suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs, and other compensatory damages.

## COUNT III
## VIOLATION OF THE
## MASSACHUSETTS EQUAL RIGHTS ACT, M.G.L.Ch.93, §102

68. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 67 above as if set forth here in their entirety.

21

69. Pursuant to M.G.L.Ch.93,§102, all persons within the Commonwealth, regardless of sex, race, color, creed, or national origin, shall have, except as otherwise provided or permitted by law,  the same rights enjoyed by white male citizens, to make and enforce contracts; to inherit, purchase, lease, sell, hold and convey real and personal property; to sue, be parties to suits, give evidence in suits, and to enjoy the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

70. The above-recited acts and practices of Putnam constitute unlawful discriminatory acts in violation of M.G.L.C.93,§102;

71. Putnam's and Lasser's decision to target Svensson for demotions and termination, while less qualified, younger white males were retained, promoted or not demoted, was willful, intentional and committed with reckless disregard for Plaintiff's rights;

72. As a result of Putnam's discrimination, Svensson suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs, and other compensatory damages.  Svensson is further entitled to an award of punitive damages.

## COUNT IV
## VIOLATION OF THE
## MASSACHUSETTS EQUAL PAY ACT, M.G.L.Ch.149, §105A

73.  Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 72 above as if set forth here in their entirety;

74. Under the Massachusetts Equal Pay Act (MEPA), Putnam was required to pay, and Svensson was entitled to receive, equal wages from work "of like comparable character";

75. The above acts and practices of Putnam constituted unlawful discriminatory acts in violation of M.G.L.Ch.149, §105A;

76. Putnam's decision to refuse to promote Svensson, to target Svensson for demotion and termination, and to compensate Svensson at a considerably lower level than her male counterparts for the same or substantially equivalent work, was willful, intentional and committed with reckless disregard for Plaintiff's rights;

77. As a result of Putnam's discrimination, Svensson suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of business and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs, and other compensatory damages.  Svensson is further entitled to an award of punitive damages.

## COUNT V
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

78. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 77 above as if set forth herein their entirety;

23

79. There existed an implied covenant of good faith and fair dealing, which Putnam breached in its dealings with Svensson, by failing to promote her to various positions she sought at Putnam, and for which she was fully qualified; by demoting her without adequate reason while retaining or promoting, or not demoting, less qualified male employees in equivalent positions; and by terminating her from employment at Putnam on September 15, 2003;

80. The above acts and practices of Putnam, as more fully set forth herein, constitute a breach of the implied covenant of good faith and fair dealing;

81. As a result of Putnam's breach of the covenant of good faith and fair dealing, Svensson has suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs and other compensatory damages.

## COUNT VI
## BREACH OF CONTRACT

82. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 81 above, as if set forth here in their entirety;

83. By its actions as set forth above, Putnam has breached the implied contract it had with Svensson to promote her to available positions for which she was qualified based upon her performance; to compensate her for the work she had performed at a level substantially equivalent to the level of compensation of male employees performing the same work; not to demote her, or reduce her compensation, should she perform her job satisfactorily and achieve satisfactory

or better financial results for Putnam; and not to terminate her based upon contrived excuses when she attempted to assert important civil rights in the workplace.

84. As a result of Putnam's breach of contract, Svensson has suffered loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs and other compensatory damages.

**COUNT VII**
**RETALIATION FOR ALLEGING RIGHTS UNDER FEDERAL ANTI-DISCRIMINATION STATUTES**

85. Plaintiff repeats and re-alleges Paragraphs 1 through 84 above as if set forth herein in their entirely.

86. At the time of plaintiff's termination and thereafter, Plaintiff, directly or through her counsel, made verbal and written statements to Defendant Putnam, objecting to and opposing Putnam's actions as violative of federal anti-discrimination statutes, and refused to accede to Putnam's demand that she release her civil rights by signing Putnam's proposed Separation Agreement.

87. After Plaintiff objected to, and opposed, Putnam's actions, Putnam unlawfully withheld, and continues to withhold, monies due and owing to Plaintiff under Putnam's deferred compensation plans.

88. In further retaliation for complaining about Putnam's unlawful discrimination, defendant Putnam took action to prevent Plaintiff from trading certain stock grants which had been given to her as compensation for the

exceptional professional services she had consistently rendered throughout her career at Putnam, and as a reward for achieving outstanding financial results in the year preceding the year in which the stock was granted.

89. Putnam's wrongful withholding of Plaintiff's deferred compensation, and its interference with Plaintiff's exercise of her right to sell her stock, were undertaken in retaliation for Plaintiff's opposition to Putnam's discriminatory employment practices as set forth herein, and her refusal to release Putnam from legal liability in connection with said discrimination.

90. The aforementioned acts of Defendant constitute unlawful retaliation discrimination against Plaintiff.

91. As a result of Putnam's retaliatory conduct, Plaintiff is entitled to damages, for loss of employment, loss of substantial income, loss of valuable employee benefits, loss of stock, stock options and deferred compensation, emotional distress, attorney's fees and costs, all because of Putnam's outrageous and malicious conduct in retaliating against her for assertion of her civil rights. Plaintiff is further entitled to an award of punitive damages in an amount to be determined by the trier of fact.

## COUNT VIII
## RETALIATION UNDER MASS. GEN. LAW. CH 151B

92. Plaintiff repeats and re-alleges Paragraph 1 through 91 above as though fully and completely set forth herein.

93. The aforementioned acts of Defendant constitute unlawful retaliation discrimination against Plaintiff in violation of the Massachusetts anti-discrimination law.

94. As a result of Putnam's unlawful retaliatory actions, Svensson is entitled to monetary damages for loss of employment; loss of substantial income; loss of valuable employee benefits; loss of stock, stock options and deferred compensation; damages for emotional distress; attorney's fees and costs; prejudgment interest, other compensatory damages and punitive damages.

## COUNT IX
## FRAUDUALENT INDUCEMENT AND MISREPRESENTATION

95.    Plaintiff repeats and re-alleges Paragraph 1 through 94 above as though fully and completely set forth herein.

96.    During Putnam's aggressive recruitment efforts, Putnam's representatives made certain material representations to Svensson concerning the terms and conditions of her employment to induce her to leave Lord Abbett in New York, to move to Boston and to join Putnam.

97.    In reasonable and intended reliance on the representations made by Putnam's representatives, Plaintiff left her employment with Lord Abbett & Co., and accepted a position with Putnam as an Analyst with a base compensation of One Hundred Twenty-Fifty Thousand Dollars ($125,000), with a guaranteed bonus of at least $150,000, valuable employment benefits, with promises of long-term employment in a specified career path, with significant enhancements of base compensation, bonuses and benefits, and with promised opportunities for females to work, and to succeed, in a non-discriminatory working environment.

98.    Plaintiff thereafter relocated herself to Boston, purchased a home in Boston, entering into a long-term financing arrangement for this purchase, all in reliance on Putnam's assurances of long-term employment pursuant to a specified

career path in a non-discriminatory environment, accepting of females and receptive to their promotion to top positions within the organization based solely on merit.

99.    Defendant Putnam possessed superior knowledge as to matters to which its material representations related, and Plaintiff reasonably relied on their superior knowledge in believing these representations to be true.

100.   The material representations made by Defendant Putnam to induce Plaintiff to take a position with Putnam were false, and were known by Putnam to be false at the time they were made, in that defendant Putnam never intended to fulfill its promises respecting the advancement of women, including Svensson, up the corporate ladder, and instead intended to impose a "glass ceiling" on her advancement within the organization, and on the advancement of other females.

101.   In particular, Putnam's representations were false in that Plaintiff was not given the opportunity to remain in Putnam's Portfolio Management business, was not given the opportunity to become a Managing Director or a Partner, and was instead forcibly demoted, inequitably compensated, and ultimately terminated without any justification, and without payment of earned, but deferred, compensation. Moreover, Putnam's representations in 1997 that Plaintiff would be granted valuable stock were false, and known to be false when made.

102.   Plaintiff reasonably relied to her detriment on Putnam's representations and has incurred substantial monetary damages as a result thereof, including, but not limited to, the loss of her Analyst position at Lord & Abbett & Co., the loss of the opportunity for advancement within that organization, the disruption of her

personal and family life, the expenses related to the purchase of a home in Boston,

the diminution (and ultimately complete loss) of earned income associated with

her position at Putnam, and loss of business reputation because of her

unwarranted termination.

103.  Defendant Putnam, by acting as described herein, did so knowingly, or in

such a reckless manner as to constitute a fraud and deceit upon the Plaintiff, and

fraudulently induced her to perform valuable services for Putnam based upon

false promises, in exchange for compensation of substantially lesser value than

had been promised to her, or which was paid to male employees for equivalent

work.

104.  In particular, at the time Putnam's misrepresentations were made, they

were aware that Svensson would not ultimately be allowed to advance to the

levels of Managing Director or Partner, would not be able to remain in Portfolio

Management, would not be paid equivalent compensation to males, and would

instead be demoted or terminated, thereby allowing Putnam to reap substantial

financial benefit through its fraud, deceit and misrepresentation of the true facts.

105.  In reasonable and intended reliance on Putnam's representations, and

ignorant of the true and complete facts, Plaintiff continued her performance of

services for Putnam, until September 15, 2003, at which time Putnam abruptly

terminated Plaintiff, and attempted to deprive her of valuable compensation and

stock.

## COUNT X
## (VIOLATION OF § 510 OF ERISA, 29 U.S.C. § 1140)

106. Plaintiff repeats and re-alleges Paragraphs 1 through 105 above as though fully and completely set forth herein.

107. Defendant Putnam wrongfully terminated Plaintiff's certain employment on September 15, 2003. Putnam's decision to terminate Plaintiff was, in part, motivated by its desire to avoid paying Plaintiff employee benefits of significant value, and in particular medical benefits, and was thereby intended to interfere with Plaintiff's attainment of employee benefits and rights.

108. By reason of the foregoing, Putnam has violated Section 510 of ERISA, and Plaintiff is entitled to damage sin accordance with the provisions of that statute.

## COUNT XI
## CONVERSION / UNJUST ENRIICHMENT

109. Plaintiff repeats and re-alleges Paragraph 1 through 108 above as though fully and completely set forth herein.

110. Defendant Putnam granted bonuses, stock, stock options and the right to participate in Putnam's deferred compensation plans to Plaintiff, in exchange for the valuable services rendered by Plaintiff to the financial benefit of Putnam, and represented that the bonuses, stock, stock options and right to deposit monies into the deferred compensation plans were valuable, and thereby induced Plaintiff to continue to perform said valuable services for Putnam through remaining employed at the company.

111. As a result of Defendants' unlawful conduct, Plaintiff has been, and is being, prevented from receiving a bonus for 2003, and Putnam has retained stock and monies in Plaintiff's deferred compensation account, and has thereby converted said monies and stock for its own use and benefit, and has been unjustly enriched to Plaintiff's detriment.

112. By reason of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, representing the value of the 2003 bonus, plus interest; the value of the stock in Plaintiff's account as of September 15, 2003, plus interest; the value of the deferred compensation in Plaintiff's account as of September 15, 2003, plus interest; attorney's fees and costs, and other compensatory and punitive damages.

## COUNT XII
## AIDING AND ABETTING DISCRIMINATION IN VIOLATION OF TITLE VII AND M.G.L.CH 151B

113. Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 112 as though fully and completely set forth herein.

114. As more fully described elsewhere herein, defendant Lasser aided and abetted Putnam's discriminatory agenda in deliberately (and with specific discriminatory intent) creating or fostering a work environment hostile to women; in conspiring to deprive Svensson of promotional opportunities; in conspiring to deprive Svensson of equivalent compensation compared to her male colleagues; in conspiring to repeatedly demote her; and in conspiring to effect her termination because of her gender, in violation of Title VII and M.G.L.Ch.151B, and because

31

of her legitimate inquires concerning Putnam's illegal or unethical business

practices.

115. As a direct and proximate result of Lasser's conduct as described herein,

Svensson was caused to suffer loss of employment, loss of substantial income,

loss of valuable employee benefits, loss of personal and professional

opportunities, loss of business reputation, emotional distress, attorney's fees and

costs, and other compensatory damages. Plaintiff is further entitled to an award of

substantial punitive damages because of the willful, deliberate and malicious

nature of Lasser's conduct, or his reckless indifference to Plaintiff's civil rights.

WHEREFORE, Plaintiff Lisa Svensson respectfully prays that this Court
award the following relief:

1. that Defendant Putnam be found liable for damages on Count I in an
   amount to be determined at trial, and believed to be excess of
   $25,000,000, plus punitive damages;

2. that Defendant Putnam and Lasser be found liable for damages on
   Count II in an amount to be determined at trial, and believed to be in
   excess of $25,000,000, plus punitive damages;

3. that Defendant Putnam be found liable for damages on Count III in
   an amount to be determined at trial, and believed to be in excess of
   $25,000,000, plus punitive damages;

4. that Defendant Putnam be found liable for damages on Count IV in
   an amount to be determined at trial, and believed to be in excess of
   $25,000,000, plus punitive damages;

5. that Defendant Putnam be found liable for damages on Count V in
   an amount to be determined at trial, and believed to be in excess of
   $25,000,000, plus punitive damages;

6. that Defendant Putnam be found liable for damages on Count VI in
   an amount to be determined at trial, and believed to be in excess of
   $25,000,000, plus punitive damages;

7.  that Defendant Putnam be found liable for damages on Count VII in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

8.  that Defendant Putnam be found liable for damages on Count VIII in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

9.  that Defendant Putnam be found liable for damages on Count IX in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

10. that Defendant Putnam be found liable for damages on Count X in
    an amount to be determined at trial, and believed to be in excess of
    $15,000,000, plus punitive damages;

11. that Defendant Putnam be found liable for damages on Count XI in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

12. that Defendant Putnam be found liable for damages on Count XII in
    an amount to be determined at trial, and believed to be in excess of
    $25,000,000, plus punitive damages;

13. that plaintiff be awarded interest, attorney's fees and costs, as
    appropriate;

14. that, because an award of monetary damages to Plaintiff in this
    lawsuit will not prove sufficient to fully and adequately redress the
    harm caused to current and former female employees of Putnam by
    the aforesaid acts of gender discrimination and retaliation, and by the
    ongoing hostile environment toward women at Putnam, Plaintiff
    hereby petitions the Court to grant appropriate injunctive or
    declaratory relief, in such form as the Court may deem just and
    proper in the circumstance

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury.

Respectfully submitted,
Lisa Svensson,
By Her Attorneys,

Denise L. Page, Esq., BBO #119415
Nancie L. Edgren, Esq., BBO #648665
BARRON & STADFELD, P.C.
100 Cambridge Street
Boston, MA 02114
(617) 723-9800

and

John K. Weir Law Offices LLC
300 Park Avenue - Suite 1700
New York, NY 10022
(212) 572-6374

Dated: January 5, 2005

310648/file no. 21312-1

34