UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LISA SVENSSON,<br><br>                Plaintiff,<br><br>v.<br><br>PUTNAM INVESTMENTS LLC, f/k/a<br>PUTNAM INVESTMENTS, INC. and<br>LAWRENCE J. LASSER,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>     CIVIL ACTION<br>     NO. 04-12711 PBS |

## OPPOSITION OF DEFENDANT PUTNAM INVESTMENTS, LLC TO MOTION OF PLAINTIFF LISA SVENSSON FOR AN ORDER COMPELLING ANSWERS TO INTERROGATORY NOS. 3, 4, 5, 7, 9, 10 AND 12

Defendant, Putnam Investments, LLC ("Putnam"), opposes plaintiff's ("Ms. Svensson") motion for an order compelling answers to Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12.[1]

## I.    INTRODUCTION

Thirteen months after discovery commenced, five months after receiving Putnam's objections to her interrogatories, four months after this Court heard and ruled on her motion to compel production of documents, after twice requesting an extension of the discovery deadline, and only a few weeks before discovery closes, Ms. Svensson seeks to compel answers to interrogatories, thereby effecting a broad expansion of her discovery.  Ms. Svensson seeks detailed personnel information concerning *91* investment professionals currently or formerly employed by Putnam, characterized by Ms. Svensson as her "comparators" for purposes of her

---

[1] Putnam's Opposition to Plaintiff's Motion for an Order Compelling Answers to Interrogatories is supported by the affidavits of the following: Mary G. McNamee, Putnam Human Resources representative ("McNamee Aff."), Richard B. Tibbetts, Putnam's Chief of Human Resources ("Tibbetts Aff."), and Louis A. Rodriques, Putnam's counsel, ("Rodriques Aff.").  Portions of the transcript of the deposition of Charles "Ed" Haldeman, Putnam's Chief Executive Officer and Josh Brooks, Ms. Svensson's former supervisor, are attached to the Rodriques Aff., as Exhibits 1 and 2, respectively.

gender discrimination and retaliation claims. Ms. Svensson first designated these 91 individuals as her comparators in her supplemental answers to interrogatories, served on April 7, 2006, five months after testifying under oath that she could think of only 18 comparable employees, and two months after amending her interrogatories to state that she could identify only 32 comparators. Moreover, in her supporting affidavits, Ms. Svensson asserts that the 91 employees are comparable on the basis of fanciful criteria that Putnam does not employ and that the courts do not recognize as relevant. She includes among her comparators two of her bosses; individuals managing wholly different investment products in wholly different business units; senior management personnel multiple levels higher in the organization than she; a junior analyst who reported to her; and 24 women who cannot possibly support a claim that similarly situated males were treated better than she. Strikingly, Ms. Svensson does not identify as comparable the male whom she replaced in 2002, who occupied the very same position that she occupied at the time of her termination, who she worked alongside, who was paid less than she, and who, like Ms. Svensson, was not promoted to Managing Director and eventually terminated. Ms. Svensson's motion to compel should be denied.

## II.    FACTUAL BACKGROUND

In 2003, Ms. Svensson was an Associate Director of Research at Putnam, supervising four analysts. That summer, Ms. Svensson contacted Mary McNamee ("McNamee") of Putnam's Human Resources ("HR") department with highly critical comments about one of her otherwise well-regarded subordinates, Chris O'Malley ("O'Malley"). Surprised by Ms. Svensson's comments, McNamee and Josh Brooks ("Brooks"), the head of Putnam's Global Equity Research ("GER") Department, the department in which Ms. Svensson worked, investigated Ms. Svensson's claims about O'Malley. Brooks concluded that key statements made by Ms. Svensson about O'Malley were false. Brooks and McNamee also learned that another highly-regarded analyst was resigning in significant part due to Ms. Svensson's management style. O'Malley also was contemplating resignation for the same reason. Brooks concluded that Ms. Svensson should no longer function as a manager. Brooks offered to retain

Ms. Svensson as an Associate Director of Research at the same salary and benefits, but without managerial responsibilities. Ms. Svensson declined that offer and refused Putnam's alternative proposals that she (a) seek employment elsewhere at Putnam or (b) leave Putnam with a severance package that provided benefits valued in excess of $800,000. Instead, Ms. Svensson demanded a promotion to Managing Director and guaranteed compensation of $1 million per year for two years. Faced with these demands, Brooks concluded that he had no choice but to terminate Ms. Svensson's employment. Putnam hired a female to assume Ms. Svensson's coverage responsibilities.

### III.    PROCEDURAL BACKGROUND

The gravamen of Ms. Svensson's amended complaint is that Putnam (a) terminated her and failed to promote her to Managing Director because of her gender; (b) compensated her less than similarly situated male counterparts; and (c) retaliated against her for filing her charge of gender discrimination and for complaining about internal business practices of Putnam by refusing to repurchase her Putnam equity and failing to pay her certain deferred compensation payments allegedly due her. Ms. Svensson demands damages of $25 million.

A scheduling conference occurred on May 2, 2005, after which the parties were free to commence discovery. On June 8, 2005, Ms. Svensson served her first set of interrogatories. She propounded 32 interrogatories (many of which contained multiple subparts), in excess of the number permitted by Local Rule 26.1(c). Putnam promptly asked Ms. Svensson to designate which 25 interrogatories it should answer. Ms. Svensson ignored this request, forcing Putnam to object. On October 20, 2005, Ms. Svensson re-served virtually the same interrogatories, collapsing the 32 interrogatories into 25 interrogatories with subparts. Putnam filed its answers and objections to these interrogatories on November 18, 2005.

Meanwhile, Putnam objected to Ms. Svensson's first document request that, like her interrogatories, requested documents concerning every Putnam employee and issues having nothing to do with her claims. On November 4, 2005, Ms. Svensson moved to compel production of documents. On December 20, 2005, this Court (per Magistrate Judge Bowler)

- 3 -

largely denied Ms. Svensson's motion (which requested substantially the same information sought here) and ordered a limited further production by Putnam by January 6, 2006. Putnam complied with this Order. On January 13, 2006, Ms. Svensson sought a six-month extension of the discovery deadline but this Court extended the discovery deadline only to April 30, 2006. In late March 2006, Ms. Svensson requested, and Putnam agreed to, a second 30-day extension of the discovery deadline to accommodate the parties scheduling of additional depositions. Discovery is now scheduled to close on May 30, 2006.

From November 18, 2005 (when Putnam answered her interrogatories) to date, Ms. Svensson has obtained thousands of pages of documents and deposed her two supervisors, the HR representative responsible for her business unit, one of her former colleagues at Putnam, one of the analysts who reported to her and who resigned largely due to her mismanagement of him, and Putnam's current Chief Executive Officer ("CEO"). Ms. Svensson has scheduled (or is in the process of scheduling) depositions of Putnam's former CEO, Putnam's Chief of Human Resources, and a former co-head of Putnam's Investment Division.

On April 7, 2006, Ms. Svensson supplemented her answers to Putnam's interrogatories and identified 91 individuals as her alleged comparators for purposes of her claims. (Ms. Svensson had identified only 18 such comparators when she was deposed in November 2005, and only 32 such comparators in her February 2006 amendment to her interrogatory answers.) On April 14, 2006, Ms. Svensson's counsel asked whether Putnam would withdraw all of its objections to her interrogatories. When Putnam's counsel declined Ms. Svensson's counsel responded, "I guess we've conferred then." Ms. Svensson's counsel offered to limit the interrogatories to all Investment Division professionals. When Putnam's counsel asked how all such professionals were relevant to Ms. Svensson's claims, and offered to discuss each interrogatory one at a time, Ms. Svensson's counsel declined and filed the present motion 14 days later. Rodriques Aff., ¶ 4.

## IV.   ARGUMENT

**A.   Ms. Svensson's Motion to Compel Should Be Denied with Respect to Interrogatory Nos. 3, 4, 5, 7 and 12 Because, as the Court Has Already Ruled, She Has Failed to Establish the Relevance of the Information She Seeks.**

The text of Interrogatory Nos. 3, 4, 5, 7 and 12 is as follows:

INTERROGATORY NO. 3

With respect to Putnam's entire exempt employment force, please state:

a.   The name of each job category and subcategory from January 1, 1994 to date;

b.   The duties performed and responsibilities fulfilled by employees in each job category and subcategory,

c.   The names and number of female employees within each job category and subcategory each year from January 1, 1994 to date.

d.   The names and number of female employees with children within each job category and subcategory each year from January 1, 1994 to date.

INTERROGATORY NO. 4

For each employee identified in answer to Interrogatory No. 3, who was terminated during the period from January 1, 1994 to the present, state:

a.   The name and gender of the employee;

b.   The job category or subcategory in which the employee worked;

c.   The nature of the termination, e.g. as layoff, voluntary quit, discharge for cause, discharge without case, etc.

d.   A statement of any transfer offered to the employee prior to his/her termination as an alternative to termination.

e.   The age and marital status of each such employee at the time of termination;

f.   The years of service of the employee at the time of termination;

g.   The years of service of all other employees remaining in the terminated employee's place of business or other working areas at the time of termination (stated in such a manner as can be correlated with the answers to subparagraph f),

h.   The name and gender of the replacement, if any, or person assuming the job duties for each such terminated employee;

i.   The years of service of the replacement for each terminated employee;

j.   A statement of each and every reduction in pay, or downgrading in job position, experienced by the terminated employee within five years prior to the date of his or her termination.

INTERROGATORY NO. 5

For each employee identified in answer to Interrogatory No. 3, who was denied promotion demoted or had other adverse employment action taken against them, state:

a.   The name and gender of the employee;
b.   The job category or subcategory in which the employee worked;
c.   The nature of the adverse employment action taken;
d.   The age and marital status of each such employee;
e.   The year of service of the employee at the time of the adverse employment action;
f.   A statement of each and every reduction in pay, or downgrading in job position experienced by the employee against whom the adverse employment action was taken.

INTERROGATORY NO. 7

Has Putnam or any of the Putnam's supervisory personnel ever received knowledge of internal complaints or statements relating to any employee's gender, gender bias, or stereotypical comments, ridicule, or joking in the workplace respective any employer's gender? If yes, please state:

a.   The acts or circumstances involved;
b.   The dates of their occurrence;
c.   The names and job titles of those involved;
d.   The names and job titles of those responsible for investigating the acts and/or circumstances;
e.   The date and description of the actions taken by management in response to each such charge or circumstance;
f.   Whether the actions continued after management's response to each such charge or circumstance.
g.   Attach a copy of each and every written report of investigation of any such internal complaints, or state the substance thereof.

INTERROGATORY NO. 12

Please identify the gender makeup of Putnam's workforce at the time of the Plaintiff's termination on September 15, 2003, as follows:

a.   Total employees on a full-time equivalency basis;
b.   By department;
c.   Employees at the level of Managing Director and above;
d.   Employees who performed Portfolio Management responsibilities;
e.   Persons who were designated by Putnam as "Partners".

In April 2006, five months after receiving Putnam's objections, Ms. Svensson offered to limit these interrogatories to the years 1999 to date, and to all investment professionals at Putnam. Ms. Svensson now proposes to limit these interrogatories to the 91 people identified as comparators in her motion. Because Ms. Svensson has not met her burden of establishing the legitimacy of her comparators and the relevance of the information she seeks, her motion to

- 6 -

compel should be denied.

**1.    In order to overcome the privacy interests of the subject employees, Ms. Svensson bears the burden of establishing the legitimacy of her comparators and the relevance of the information she seeks.**

Before becoming entitled to discovery concerning the private personnel information of other employees, Ms. Svensson bears the burden of establishing that such information is relevant and sufficiently necessary to her case that her interest in production outweighs the privacy interest of the employees about whom she seeks information. *Whittingham v. Amherst College*, 164 F.R.D. 124, 127-28 (D. Mass. 1995). In *Whittingham, supra*, plaintiff sought the complete personnel files of certain former minority deans in Amherst's admissions office. Denying plaintiff's motion to compel these documents, the court stated:

> [P]ersonnel files contain perhaps the most private information about an employee within the possession of an employer. Nonetheless, Plaintiff requests the Court to order the Defendant to hand over entire files of employees without any particularized showing that any, let alone all, of the information therein is relevant to his claims. Again, while discovery is usually broad, Plaintiff has not demonstrated that the files he seeks, even if marginally relevant, outweigh the privacy interests of these individuals.

*Whittingham, supra*, 164 F.R.D. at 127-128.    As set forth below, like the plaintiff in *Whittingham*, Svensson has failed to meet her burden.

**2.    This Court has already rejected Ms. Svensson's request for substantially the same information.**

Precisely because Ms. Svensson failed to satisfy her burden under *Whittingham*, this Court already has rejected Ms. Svensson's effort to compel production of documents containing substantially the same information she now seeks.  Ms. Svensson's Document Request No. 2 sought:

> All documents and records concerning Putnam's terminations, denials of promotion, and demotions of employees from January 1, 1994 to the present, including names, addresses, job titles, job descriptions, seniority and gender of the person affected by each such adverse employment decision.

At the December 2005 hearing on Ms. Svensson's motion to compel production of documents responsive to Request No. 2, after Ms. Svensson failed to explain why the requested documents were relevant to her claims, this Court sustained Putnam's objection to the above request and

LITDOCS/639029.1

ordered only that Putnam produce documents establishing "who went where and why" in Putnam's 2002 reorganization of Global Growth. *See* transcript of hearing on December 13, 2005 (Exhibit A hereto) at 8. Ms. Svensson now seeks to obtain the same information via interrogatories with no better justification than she offered in December.

### 3. Ms. Svensson has failed to explain the relevancy of the information she seeks in Interrogatory Nos. 3, 4, 5, 7 and 12.

As was the case at the December 2005 hearing, in her motion Ms. Svensson fails to make the required "particularized showing" of relevance of the private personnel information she seeks. *Whittingham, supra*. Ms. Svensson asserts that she suffered four adverse employment actions because of her gender: (a) her alleged 2002 "demotion" from portfolio manager in Global Growth to Analyst in Global Equity Research; (b) Putnam's failure to promote her to Managing Director; (c) Putnam's alleged decision to pay her less; and (d) her termination in September 2003. Although Ms. Svensson expends considerable energy explaining why the 91 investment professionals are "comparable" in some platonic sense, she never explains why the information she seeks about them is legally relevant to her particular claims. Thus, without explanation of its relevance, Ms. Svensson seeks a detailed description of the employment histories of all 91 professionals, including every adverse employment action they experienced, a detailed description of the reasons for their terminations (if any), every reduction in pay or job duties that they experienced, as well as personal information such as their age and marital status. Like the plaintiff in *Whittingham, supra*, Ms. Svensson simply asserts that the information is relevant because she would like to have it.

Similarly, Ms. Svensson persists in seeking information concerning the "marital status" of the 91 alleged comparators, justifying her quest simply by saying (without supporting authority) that "the females who were discriminated against were, in some cases married females or, in other cases, married with children," which she characterizes as "subcategories of the protected class." Ms. Svensson cites no authority for this assertion, ignoring both (a) the clear authority that marital status is not a protected class under Title VII or Mass. Gen. Laws ch. 1518

(*Fontneau v. Town of Sandwich*, 251 F.Supp. 2d 994 (D. Mass. 2003)), and (b) this Court's earlier ruling that discovery of information concerning alleged marital status discrimination was not permissible. *See* Exhibit A at 15-16. In Interrogatory No. 7, Ms. Svensson seeks information for a 5-year period concerning any statement anyone at Putnam ever made about anyone's gender, any gender related jokes ever told, or any "stereotypical" comments ever made. Since Ms. Svensson has no claim for sexual harassment, has not filed such a claim, and offers no justification for Interrogatory No. 7, the requested information has no relevance to this case.[2] Finally, in Interrogatory 12, Ms. Svensson seeks information regarding the gender make up of Putnam's workforce at the time of her termination. Putnam has already produced such information at PRM 00755 - 00758, as indicated in Putnam's initial response to this interrogatory. Ms. Svensson has failed to explain the insufficiency of this already-produced information or what further information she seeks and why.

### 4. Ms. Svensson's comparator analysis is flawed.

The main part of Ms. Svensson's motion to compel is devoted to her argument that the 91 investment professionals whom she has selected and about whom she seeks discovery are relevant comparators for purposes of her discrimination claims. Her analysis makes no sense. The purpose of comparator analysis is to enable a plaintiff to establish (in a gender case) that similarly situated males received more favorable treatment in connection with the specific claim at issue. Thus, in a disparate treatment case, a plaintiff must "identify other employees to whom [s]he is similarly situated in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations." *Matthews v. Ocean Spray Cranberries, Inc.*, 40 F.3d. 11, 17 (1st Cir. 1994), *cert. denied* 514 U.S. 1108 (1995). "As with all comparative evidence, it is the plaintiff's burden to demonstrate that she is

---

[2] Ms. Svensson's only mention of Interrogatory No. 7 is to say that Putnam's failure to attach to its objections an affidavit attesting to the burden of replying to Interrogatory No. 7 is fatal to its objection. Of course, Rule 34 imposes no such requirement, and in any event the burden of complying with Interrogatory No. 7 as written is obvious.

comparing apples to apples." *Rathbun v. Autozone, Inc.*, 361 F.3d 62 (1st Cir. 2004). Ms. Svensson "must provide a suitable provenance for the evidence by showing that others similarly situated to [her] in all relevant respects were treated differently by [Putnam]." *Conward v. Cambridge School Committee*, 171 F.3d 12, 20 (1st Cir. 1999). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989). While "exact correlation is neither likely nor necessary, … the cases must be fair congeners." *Id.* at 17.

> **a.    Viewed generally, Ms. Svensson's 91 comparators are not fair congeners.**

Ms. Svensson attempts to justify her comparators first by inventing 19 criteria that *she* asserts, *ipse dixit*, are a reasonable basis for comparison, and by giving each employee a check mark for each criteria that Ms. Svensson thinks the employee satisfies. She then ranks each employee by adding the check marks. First, Ms. Svensson cites no authority (and there is none) for the proposition that this approach of totaling different, cherry-picked criteria is an appropriate basis for defining comparators. Her approach yields absurd results. For example, two individuals, each with 8 of Ms. Svensson's 19 criteria are comparable in her view even if none of their 8 criteria were the same.[3] A glance at the exhibits attached to Ms. Svensson's Second and Third Affidavits reveals just how different from Ms. Svensson – and indeed, from each other – Ms. Svensson's alleged comparators are. Of the 91 comparators, some satisfy as few as 2 of Ms. Svensson's 19 criteria, and others as many as 12. More importantly, all 91 comparators each have their own unique mix of Ms. Svensson's criteria, and *not a single comparator* has her

---

[3] This is to say nothing of the fact that Ms. Svensson weights all of her criteria equally such that a person who gets a point for "having managed people" is treated the same as a person who gets a point for "having been asked to appear on television," two of Ms. Svensson's criteria. Similarly, a person who manages one person would be treated the same as a person who manages 100. These parallels are nonsensical.

particular mix of criteria.[4]  Ms. Svensson's own affidavits are thus the best evidence that she totally misconceives comparator analysis.[5]

Second, even if the Court concluded that if Ms. Svensson's general approach made sense, her criteria are neither used by Putnam nor relevant to her particular claims.  For example, Ms. Svensson includes criteria such as (a) employee has been invited by Putnam to appear on television, (b) employee has children, (c) employee holds a CFA designation, (d) employee received management training at same time as Ms. Svensson, (e) employee took maternity leave, (f) employee made recommendations on a significant portion of the S&P 500 based on market cap or visibility, (g) employee is "held in high esteem," or (h) employee "complained to top management about unethical commission allocations."  Second Svensson Aff. Ex. 2.  How these criteria establish comparable employment positions is a mystery.  Putnam, of course, uses none of these criteria in making employment decisions (McNamee Aff., ¶ 5), and Ms. Svensson does not explain how they are relevant.  She employs other criteria, such as "similar tenure," "similar investment experience" or "appointed to position for which plaintiff was better qualified," without offering any factual basis for her assertion of similarity or better qualifications.[6]

---

[4] Ms. Svensson's confusion as to whom exactly she is comparable is revealed by the fact that she testified on deposition in November 2005 that she could identify only 18 comparators (only 15 of whom are on her current list of 91.)  In February 2006, without explanation, she amended her interrogatory answers to expand that list to 32.  Two months later she again expanded that list to the current 91.

[5] Ms. Svensson's analysis is also flawed because it assumes that all 91 comparators are comparable to her for all of her claims and for every year in the relevant period.  Yet, the 91 comparators occupied different positions at different times (McNamee Aff., ¶ 7), and the 91 comparators cannot possibly be comparators for all of her claims.  *See* discussion *infra*.

[6] The facts belie Ms. Svensson's assertions in any event.  For example, Ms. Svensson cites Eric Sorensen as a comparator in part on the basis of her assertion that he was "appointed from outside to fill a position for which [Ms. Svensson] had interest and qualifications."  Second Svensson Aff. Ex. 2.  This assertion is absurd.  Eric Sorenson was hired from Salomon Smith Barney (where he was Head of Global Quantitative Research, managing 50 people in NY, London, Tokyo and Singapore) to serve as Putnam's Director of Financial Engineering - in effect, Putnam's head of quantitative research.  Ms. Svensson had absolutely no professional quantitative experience and no similar management experience.  She also expressed no interest in the position for which Mr. Sorenson was hired, nor would she have been qualified to fill it.  McNamee Aff., ¶ 11.  Similarly, the persons designated by Ms. Svensson as having similar tenure and investment experience, in fact, vary widely in their tenure and experience.  McNamee Aff., ¶ 6.

- 11 -

Even when Ms. Svensson cites what might appear to be a superficially reasonable basis for comparison, she defines the criteria so broadly as to render them meaningless. For example, Ms. Svensson lists criteria such as "has managed people," but ignores the fact that many of her comparators managed substantially more people than she. McNamee Aff., ¶ 7. She identifies 21 males (of her 67 male comparators) who allegedly "held the same portfolio management position as plaintiff, as reported to the SEC." Second Svensson Aff. Ex. 2. Yet, these 21 "portfolio managers" managed entirely different portfolios in many different styles, had entirely different performance, and/or had additional management and other responsibilities differentiating them from Ms. Svensson. McNamee Aff., ¶ 7. When Ms. Svensson lists a very specific criteria, such as "appointed to position for which plaintiff was better qualified" *Id.*, she identifies only a single comparator. Ironically, she fails to list as a comparator the male employee with whom she worked and replaced in 2002, who did exactly the same job, who was paid less, and who also was not promoted to Managing Director.

> **b.**  **The 91 comparators are not fair congeners when viewed in light of Ms. Svensson's particular claims.**

Not only are Ms. Svensson's 91 comparators not comparable in a general sense, they are not fair congeners when considered in the context of her claims.

> **(1)**  **The termination claim.**

In *Matthews, supra*, 426 Mass. at 130 (internal quotations and citations omitted), the Supreme Judicial Court explained that a termination comparator must be substantially similar to the plaintiff in all material respects:

> [I]n order to establish that the defendant's stated reasons for terminating him were a pretext, the plaintiff must identify and relate specific instances where persons similarly situated in all relevant aspects were treated differently. The plaintiff must identify other employees to whom he is similarly situated in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish' their situations. Although the offenses of two employees need not be identical, the offenses must be of comparable seriousness. Employees are not similarly situated where one is disciplined pursuant to one policy and then seeks to be compared to coworkers who were not subject to that policy or were subject to a previous policy.

Applying this analysis, *Matthews* and other cases makes clear that a termination comparator must

first have the same or substantially similar job as the plaintiff. *Matthews, supra*, 426 Mass. at 122; *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994); *Jimenez v. Bancomerico de Puerto Rico*, 174 F.3d 36, 42 (1st Cir. 1999) (plaintiff's attempt at comparison to employees in different job category rejected); *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989) (plaintiff's attempt at comparison to employees in different job categories rejected). Of Ms. Svensson's 91 comparators, only 4 occupied the same position as Ms. Svensson at the time of her termination. McNamee Aff., ¶ 12. Yet, Ms. Svensson includes a number of Chief Investment Officers or their equivalents (who manage investment teams or business units); two of her bosses; employees who worked in the Fixed Income division; portfolio managers who managed wholly different and substantially larger portfolios or who managed funds in different business areas (*e.g.*, small cap, emerging markets) or using a different investment style (*e.g.*, value investing, quantitative methodology); traders; employees who reported to her; and employees outside the Investment Division. *Id.*, ¶ 7. All of these employees perform different jobs and were managed and compensated separately.[7] *Id.*

Second, the alleged comparators must have committed the same offense or behavior for which Ms. Svensson was terminated. *Matthews, supra*; *Smith, supra*, 40 F.3d at 11 (employee terminated for performance reasons not comparable to employees without performance issues); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992) ("Plaintiff produced no facts to establish that the two white employees she identified as not having been fired were similarly situated in all respects."); *Kanaji v. Phila. Child Guidance Center*, No. CIV-A-009378, 2001 WL 708898 at *1 (E.D. P.A. 2001) (limiting production to those terminated for similar misconduct). As Putnam has already indicated in response to Interrogatory No. 10, no employees in Ms. Svensson's department (GER) were terminated for the same reasons during the relevant period.

---

[7] Ironically, Ms. Svensson does not list the male comparator who she worked alongside and whom she replaced when he was terminated, who made less than Ms. Svensson and who also was not promoted to Managing Director. McNamee Aff., ¶ 8.

*See also* McNamee Aff., ¶ 12.   More to the point, terminated employees cannot logically be comparators for Ms. Svensson's termination claim since they are not similarly situated people who were treated differently - that is, *not* terminated. *Matthews, supra.*[8]

Finally, the alleged comparators must be in the same department reporting to the same supervisor. *Rodriguez-Cuervas v. WalMart Stores, Inc.*, 181 F.3d 15, 20-21 (1st Cir. 1999) (plaintiff cannot rely on comparators working at a different store for a different supervisor); *Champagne v. Servistar Corp.*, 138 F.3d 7, 13 (1st Cir. 1998) (discharged employee not comparable to employees who reported to different managers). This Court recognized this principle in limiting Ms. Svensson's document requests. Exhibit A at 12-14. Of Ms. Svensson's 91 comparators, only 4 served as Associate Directors of Research in GER when she was terminated, and another is her manager in GER who terminated her. McNamee Aff., ¶ 12.

Ms. Svensson attempts to sweep in all 91 comparators by arguing that all employment decisions in the Investment Division were made by the Investment Division Management Committee ("IDMC"). She offers no support for this assertion, which is simply false. Tibbetts Aff., ¶ 3. As Mr. Tibbetts, Putnam's Chief of Human Resource, explains, termination decisions and indeed promotion and compensation recommendations are made by an employee's business unit manager. *Id.*, ¶ 5. In Ms. Svensson's case, that was Josh Brooks, who testified that he made the decision to terminate Ms. Svensson. Brooks Depo. at 184 - 185. Indeed, the IDMC no longer held meetings at the time when Ms. Svensson was terminated. Tibbetts Aff., ¶ 4. So far-fetched is Ms. Svensson's assertion of the prominence of the IDMC that Ed Haldeman, Putnam's CEO and the head of its Investment Division at the time of her termination, testified (Haldeman Depo. at 169):

    Q.       Now, in the time frame of 2003, was there something called the investment division management committee at Putnam?

    A.       Investment division –

---

[8] Twenty-eight of the 91 comparators were also terminated. McNamee Aff., ¶ 8.

- 14 -

Q.     IDMC?

A.     Never heard that name before.

### (2)     The demotion claim

Ms. Svensson alleges that in 2002 she was demoted from a portfolio manager position in Global Growth to an Analyst position in GER. Putnam disbanded the entire Global Growth team in 2002 because its investment performance was poor, terminated the male head of the group, and reassigned the bulk of the male and female employees to other departments. As part of that process, Ms. Svensson was assigned to GER with continued money management responsibilities. McNamee Aff. ¶ 10. Ms. Svensson's 91 comparators are almost entirely irrelevant to her demotion claim. Only 3 of the comparators were in Global Growth in 2002. Ms. Svensson appears to be arguing that she somehow had the right to "bump" employees in other departments out of their jobs – a right granted to no other male or female member of Global Growth at the time. McNamee Aff., ¶ 10. This Court already rejected this precise argument in connection with Ms. Svensson's motion to compel production of documents. Exhibit A at 8.

### (3)     The promotion claim

In Interrogatory Nos. 5 (above) and 9 (quoted below), Ms. Svensson seeks information with respect to individuals denied promotion to Managing Director.

INTERROGATORY NO. 9

For each employee who was a) denied promotion to Managing Director; or b) denied or refused a partner-level position at Putnam for the period January 1, 1994 to the present, please state:

a.     The name, position, department, salary, gender and marital status of each employee who was denied or refused said promotion or partnership;

b.     The criteria established at Putnam to select employees for promotion to Managing Director or Partner;

c.     The date of each such denial;

d.     The form and manner of communication of each such denial;

e.     The reason for each such denial;

f.     The name, job title, gender and marital status of the person(s) responsible for determining which employees were to receive promotions to Managing Director or Partner.

g.     The names, job titles, gender and marital status of the person(s) who received such promotions at the time of each such denial.

Putnam already has provided information concerning the male and female employees actually promoted to Managing Director during the relevant period, including their identities and the criteria employed in deciding who was eligible for promotion.[9] Ms. Svensson now moves to compel information concerning people denied promotion. To establish her "failure to promote" claim, Ms. Svensson must show she is similarly situated to male employees who received the promotion that she sought. To be similarly situated, the comparator must hold the same or equivalent job as the plaintiff and must have been promoted. *Galvao v. Gillette Co.*, 121 F.3d 695, *2 (1st Cir. 1997) (denying the plaintiff's alleged comparators were similarly situated because "[t]he employees identified by Galvao either were not in the same grade as him, or they worked in different areas."); *Diamond v. T. Rowe Price Assoc., Inc.*, 852 F.Supp. 372, 407 (D. Md. 1994) (denying the plaintiff's alleged comparators were similarly situated because "each of these four individuals personally manages funds valued in excess of several hundred million dollars. [Plaintiff] cannot reasonably compare herself to these persons"). As discussed above, the 91 comparators cited by Ms. Svensson do not all occupy the same or equivalent positions. Many of the 91 comparators were hired as Managing Directors, many are women who were hired as or promoted to Managing Director, and many were never promoted to Managing Director and thus cannot be comparators. McNamee Aff., ¶ 14. More importantly, because she must compare herself to the individuals actually promoted (about whom she already has received information), Ms. Svensson cannot use as comparators people who have been denied promotions. *See, e.g., Diamond*, 852 F.Supp. at 407 (disregarding one of plaintiff's proposed comparators who was not promoted to managing director), a case cited by Ms. Svensson. Ms. Svensson cites no authority and offers no explanation as to how an individual denied a promotion can be a relevant comparator.[10]

---

[9] Ms. Svensson asserts incorrectly that Putnam has not produced the promotion criteria. Putnam has produced documents containing the criteria.

[10] Ms. Svensson also persists in her request for information about denials of promotion to "partner" level

(Footnote Continued on Next Page.)

- 16 -

### (4)  The compensation claim

Ms. Svensson's interrogatories do not ask for, nor does she now seek to compel, compensation information concerning the 91 professionals. In any event, the alleged 91 comparators are not appropriate congeners for purposes of her compensation claim as Ms. Svensson appears to recognize since she has not moved to compel compensation information concerning her 91 alleged comparators. Under the Massachusetts Equal Pay Act, Ms. Svensson must establish that the comparable employees are performing comparable jobs (*i.e.*, jobs having important common characteristics) that entail comparable skill, effort, responsibility and working conditions. *Jancey v. School Comm. Of Everett*, 427 Mass. 603, 604 (1998). Similarly, under Title VII, Ms. Svensson must establish that her job was substantially similar in skill, effort, responsibility and the general complexity of the work before she can even begin to compare herself to other employees. *Rodriquez v. Smith-Kline Beecham Pharmaceutical, Puerto Rico, Inc.*, 62 F.Supp 2d 74 (D. Puerto Rico 1999), *aff'd.* 224 F.2d 1 (1st Cir. 2000). In general, comparisons should only be made within the employee's department or specific discipline. *Soble v. Univ. of Maryland*, 778 F.2d 164, 167 (4th Cir. 1985). As noted above, the overwhelming majority of the 91 comparators perform substantially different jobs in different departments (McNamee Aff., ¶ 7), and Ms. Svensson makes no effort to explain how they are comparable in terms of their specific job duties, skill, effort, responsibility, performance or other factors that drive compensation decisions.

---

(Footnote Continued from Previous Page.)

position at Putnam. First, there was no job called "partner" at Putnam. Instead, "partners" generally were heads of business units and a very few senior, respected investment professionals who participated in a separate incentive bonus plan referred to as the Partners Incentive Compensation Plan (The "Partner Plan"). Participants in the Partner Plan were colloquially referred to as "partners." Thus, no one was "refused or denied" "promotion" to a partner-level position at Putnam. Indeed, an employee who became eligible to participate in the Partner Plan did not necessarily change his or her job at all, and two individuals could occupy identical positions at Putnam with only one of them participating in the Partners Plan. Ms. Svensson - like the overwhelming majority of male and female investment professionals at Putnam - never was considered for participation in the Partners Plan. Tibbetts Aff., ¶ 9. In any event, as discussed above, individuals denied a "promotion" are not relevant comparators.

- 17 -

**B.    Ms. Svensson Is Not Entitled to a Further Response to Interrogatory No. 10.**

Interrogatory No. 10 asked:

> Please give the identities by name, job title and gender of all persons who
> participated in the decision to terminate the Plaintiff's employment, or who were
> consulted regarding the decision to terminate the Plaintiffs employment.

Putnam responded by stating that no other employees in GER were terminated during the relevant period for the same reasons as Ms. Svensson. Ms. Svensson now moves to compel a further response, arguing that the relevant business unit is not GER – where Ms. Svensson worked – but the entire Investment Division. She predicates this request entirely on her unsupported assertion that the Investment Division Management Division made all termination decisions. As discussed above, this argument is both factually and legally incorrect – both generally and with respect to her termination in particular. Nor, as discussed above, are terminated employees relevant comparators for Ms. Svensson's termination claim. Ms. Svensson is thus not entitled to the information she seeks.[11]

---

[11] Ms. Svensson devotes nearly 6 pages of her motion to a discussion of Putnam's General Objections without discussing them in the context of the particular interrogatories as to which Putnam asserted them. Putnam did not withhold any information in reliance on General Objections A, G or H, which were asserted to preserve Putnam's objection. All but one of the remaining General Objections is discussed in connection with the particular interrogatories as to which Ms. Svensson seeks further responses. Finally, as to General Objection I (attorney-client and work product privilege), the Court has not yet ruled on the scope of permitted discovery, so there has, as yet, been nothing withheld for Putnam to log.

LITDOCS/639029.1

### B.    Ms. Svensson Is Not Entitled to a Further Response to Interrogatory No. 10.

Interrogatory No. 10 asked:

> Please give the identities by name, job title and gender of all persons who
> participated in the decision to terminate the Plaintiff's employment, or who were
> consulted regarding the decision to terminate the Plaintiffs employment.

Putnam responded by stating that no other employees in GER were terminated during the relevant period for the same reasons as Ms. Svensson. Ms. Svensson now moves to compel a further response, arguing that the relevant business unit is not GER – where Ms. Svensson worked – but the entire Investment Division. She predicates this request entirely on her unsupported assertion that the Investment Division Management Division made all termination decisions. As discussed above, this argument is both factually and legally incorrect – both generally and with respect to her termination in particular. Nor, as discussed above, are terminated employees relevant comparators for Ms. Svensson's termination claim. Ms. Svensson is thus not entitled to the information she seeks.[11]

## V.    CONCLUSION

For the foregoing reasons, Ms. Svensson's motion to compel should be denied, and Putnam should be awarded its reasonable attorneys' fees and expenses.

---

[11] Ms. Svensson devotes nearly 6 pages of her motion to a discussion of Putnam's General Objections without discussing them in the context of the particular interrogatories as to which Putnam asserted them. Putnam did not withhold any information in reliance on General Objections A, G or H, which were asserted to preserve Putnam's objection. All but one of the remaining General Objections is discussed in connection with the particular interrogatories as to which Ms. Svensson seeks further responses. Finally, as to General Objection I (attorney-client and work product privilege), the Court has not yet ruled on the scope of permitted discovery, so there has, as yet, been nothing withheld for Putnam to log.

PUTNAM INVESTMENTS LLC, f/k/a
PUTNAM INVESTMENTS, INC.,

By its attorneys,


/s/ Rachael Splaine Rollins

_____
Joseph L. Kociubes, BBO #276360
Louis A. Rodriques, BBO #424720
Rachael Splaine Rollins, BBO #641972
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

May 11, 2006

LITDOCS/639029.1

**<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12711-PBS

LISA SVENSSON
    Plaintiff

       v.

PUTNAM INVESTMENT, et al
    Defendants

. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON DECEMBER 13, 2005

APPEARANCES:

For the plaintiff:  John K. Weir, Esquire, John K. Weir Law Offices, LLC, 300 Park Avenue, Suite 1700, New York, NY 10022, 212-572-6374.

Nancie Edgren, Esquire, Barron & Stadfield PC, 100 Cambridge Street, Suite 1310, Boston, MA 02114, 617-723-9800.

For the Defendant:  Louis A. Rodriques, Esquire, Bingham McCutchen LLP, 150 Federal Street, Boston, MA 02110, 617-951-8340.


Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

_____

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

I-2

1                              <u>**I N D E X**</u>

2   Proceedings                                                          3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            P R O C E E D I N G S

2    (Court called into session)

3               THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is December 13, 2005 in the case of Lisa

5    Svensson v. Putnam Investments.  Civil Action No. 04-12711 will

6    now be heard.  Will counsel please identify themselves for the

7    record.

8               MR. WEIR:  John Weir, Your Honor, appearing pro hac

9    vice.

10              MS. EDGREN:  Good afternoon, Your Honor, Nancie

11   Edgren for the plaintiff, Lisa Svensson.

12              THE COURT:  Thank you.  You've paid your $50?

13              MR. WEIR:  I have, I believe, Your Honor.

14              THE COURT:  That's very important.

15   Good afternoon, Your Honor, Lou Rodriques from Bingham

16   McCutchen for Putnam Investments, and with me is Allison Kirper

17   (ph), my colleague.

18              THE COURT:  Thank you very much.  Well, we're here

19   for a hearing on docket entry number 24, which is the motion to

20   compel.  So I'll hear the moving party.

21              MR. WEIR:  Thank you, Your Honor, appearing for the

22   plaintiff, Lisa Svensson, we have moved to compel Putnam

23   Investments to produce documents in this case pursuant to our

24   notice that was dated August 9th of 2005.  We initially appeared

25   at a scheduling conference in this case back in the early part

I-4

1    of the summer, actually maybe late spring, and we agreed to

2    a scheduling order that provided for completion of discovery by

3    February 1, 2006, and we attempted very diligently, I believe,

4    to comply with that discovery order.  We have had so far two

5    depositions of Putnam and the plaintiff has been deposed.  We

6    have served, both sides have served and answered

7    interrogatories and both sides have produced some documents.

8    At the scheduling conference, Judge Saris asked that we take a

9    few of the critical depositions in the case and other discovery

10   that we deem necessary and set the case down for a mediation.

11   That mediation was originally scheduled for November and now

12   has been adjourned until January 11th.  So we're right up

13   against it as far as the, both the mediation and the fact

14   discovery is concerned.

15         As we've indicated in our motion papers, we've gotten

16   what we believe to be minimal production from Putnam.  We have

17   a number of causes of action in the complaint, including and

18   most importantly, I believe, gender discrimination, retaliation

19   and we critically need the documents that we have requested to

20   prove our case.  The complaint was very fact specific, alleges

21   specific events, specific individuals, and I think that we're

22   entitled to get the discovery that we need to prove those

23   allegations and at every turn have been thwarted--

24         THE COURT:  Well, let me tell you how I handle these.

25   I just go through them one by one.

I-5

1    MR. WEIR:  Okay.

2    THE COURT:  So go to it, tell me, we'll take the

3    first one, and then I'll ask the defendant why they don't want

4    to produce.

5    MR. WEIR:  The first one was request number two,

6    sought all documents and records concerning Putnam's

7    terminations, denials of promotion and demotions of Putnam

8    employees from January 1, 1994 to the present, including names,

9    addresses, job descriptions, seniority and gender of the

10   persons affected by each such adverse employment decision.  We

11   then had a, at the pre-motion conference, limited that in

12   certain respects to specific individuals.  Putnam wanted to

13   limit that to the comparators to a global gross department

14   which was where Ms. Svensson was before she got demoted and

15   we're okay with the various teams, the portfolio management

16   teams.  We don't want it limited just to one in which the

17   plaintiff was situated because she was eligible to be on any

18   one of the portfolio teams and she was, she wasn't, she didn't

19   choose to go to global growth.  She was assigned to global

20   growth and when global growth was disbanded, some of the other,

21   the males on that team were able to get to remain in portfolio

22   management on other teams.

23   THE COURT:  All right.  What's your objection?

24   MR. RODRIQUES:  The objection to request number 2

25   started, as you might suspect was the fact that it was an 11

1    year request for everybody.  Just contextually, Your Honor,

2    in 2000, which is about when the facts that gave rise to this

3    case began to happen, Putnam had--

4            THE COURT:  Just one second.

5    (Pause)

6            THE COURT:  Excuse me, but I don't want to hold

7    counsel here.

8            MR. RODRIQUES:  Okay.  In 2000 when the facts that

9    began to give rise to this complaint started to occur, Putnam

10   had 7,500 employees, Your Honor.  Today Putnam has about 3,000

11   employees.  So in the last three or four and half years or so,

12   it's lost 4,500 of the 7,500 employees, so when we first read

13   this request we said, this is ridiculously overbroad.  We have

14   had conversation.  The disagreement between us now is whether

15   terminations, promotions, denials of promotions outside of the

16   decision making unit in which Svensson was a participant are

17   relevant.  That is, we have offered to produce the information

18   with respect to terminations of denials of promotion, et

19   cetera, with respect to the global gross group which is where

20   she was in 2002 when she moved from global gross into global

21   equity research, and then we offered to produce information

22   with respect to the people in global equity research which is

23   where she was when she was terminated.  We did that in reliance

24   on the Court's decisions in other cases that typically you

25   don't look outside of the group in which the employee is

I-7

1    employed; that is, you look at the decisions by the same

2    decision maker.  We cited those cases in our opposition to the

3    motion to compel, and Mr. Weir doesn't cite any contrary

4    authority.  Yet the case is pretty clear, both the *Jackson* case

5    and the *Whittingham* case, that decisions by other people in

6    other parts of the company aren't probative on the question of

7    whether or not there was discrimination in her unit.

8           THE COURT:  I'm inclined to agree.

9           MR. WEIR:  Your Honor, the situation is this.  Lisa

10   Svensson was demoted in 2002 from portfolio management to

11   global gross group to the research department.  She didn't want

12   to go back to research.  She was told she had to go back to

13   research, and she consistently sought to return to portfolio

14   management after 2002 so that her comparators are not only the

15   people in the research department, but also those who were

16   allowed to remain in portfolio management and those who

17   received promotions to portfolio management during the period

18   of time after she went back to research.

19          MR. RODRIQUES:  Can I just, if you start with that

20   argument, if I can give you a picture, Your Honor.  The group

21   she was in consisted of about 10 to 15 portfolio managers.

22   This is in 2002.  That group was disbanded.  The boss of the

23   group was fired.  The other 10 to 15 people, including

24   Ms. Svensson, were parceled out to the rest of the

25   organization.  We're happy to give him information with respect

1    to those 10 or 15 people to see where they went and why, but

2    I don't think Mr. Weir is seriously arguing that Putnam had an

3    obligation to bump somebody in another job and put her there.

4              THE COURT:  No, as to those individuals at this time.

5              All right, next.

6              MR. WEIR:  Request number 7, all documents which

7    relate or support any of the admissions, denials, denials,

8    acknowledge or information or other allegations contained in

9    defendant's answer, then we limited that--

10             THE COURT:  It's pretty broad.

11             MR. WEIR:  I accept it was broad, Your Honor.  At the

12   pre-motion conference we limited that to the specific

13   paragraphs of the complaint which contained the events of which

14   are the guts of this lawsuit.

15             MR. RODRIQUES:  We have two objections to this, Your

16   Honor.  First, as Your Honor correctly points out, it's very

17   broad, and in the second objection, which is one that has been

18   approved by this Court in other cases, is to ask a request that

19   says produce all documents that support your denial, ask the

20   lawyer to produce documents and that in effect would be of the

21   mental impressions of counsel.  I can't give that

22   interrogatory, that document request to my client and say

23   produce those documents.  They're going to say to me, well,

24   which documents are, they and there are cases which we cite in

25   our brief which say that that request is improper.  This is

I-9

1    also the issue with respect to number 8.  What Mr. Weir has

2    said is that he is limited, he's limiting that now to the

3    allegations in the complaint.  The allegations in the complaint

4    obviously are very, very broad.  What we said we'd be willing

5    to do is to produce all documents that relate to the specific

6    employment actions taken against Mr. Svensson about which she

7    complains.  In other words--

8            THE COURT:  All right, so you'll produce those.

9            MR. RODRIQUES:  And that we've done.  That we've

10   done.  We want to--

11           MR. WEIR:  That's acceptable to us.  We're not

12   seeking any documents which constitute the mental impressions

13   of counsel.

14           THE COURT:  Okay.  He's produced them.

15           MR. RODRIQUES:  And that we've done with one

16   exception, Your Honor, which are emails, and I think those have

17   to be addressed separately.  I think we're going to come to

18   those when we get to communications.

19           THE COURT:  All right.  Next.

20           Mr. Shapiro, you were on for 2:00?

21           MR. SHAPIRO:  That was before Judge Saris.  I'm the

22   duty attorney for the day and--

23           THE COURT:  Okay.  Next time just have them give us a

24   call, but we'll get Mr. Berman and we'll proceed as soon as I

25   finish this.

I-10

1          MR. SHAPIRO:  I apologize.

2          THE COURT:  You're welcome.

3          MR. WEIR:  Request number 8, all documents which

4    relate to support any of the affirmative defenses asserted in

5    Putnam's answers.

6          THE COURT:  Again, very general.

7          MR. RODRIQUES:  And the same mental impressions

8    issue, and again to the extent this goes to – in our answer we

9    said we are producing documents that would be responsive to

10   this in response to other requests.  Our objection is saying,

11   here are all, this pile of documents support our affirmative

12   defense.  There's no way to do that without--

13         THE COURT:  All right, I agree.

14         MR. RODRIQUES:  --without our expressing our view of

15   the case obviously.

16         THE COURT:  Next.

17         MR. WEIR:  Request number 10, any and all documents

18   concerning plaintiff's employment with Putnam including without

19   limitation job descriptions, manuals, handbooks, performance

20   reviews and evaluations, warnings, documents concerning job

21   performance, company policies and documents concerning denial

22   of promotions to plaintiff, demotions of plaintiff, transfers

23   of plaintiff and the termination of plaintiff on September 15th,

24   2003.

25         THE COURT:  Sounds acceptable.

I-11

1           MR. RODRIQUES:  I honestly don't know why we have,

2    there's a motion on this one.  Our regional objection was all

3    documents concerning her employment, which literally includes

4    all the work she did and things of that sort.  Mr. Weir doesn't

5    want that, I don't think.  He wants documents with respect to

6    the actions taken against her.  We're happy to produce all of

7    that.  I don't know--

8           THE COURT:  All right.

9           MR. RODRIQUES:  --and except for the email issue

10   which we're going to come to, I think we have produced all

11   that.

12          THE COURT:  All right.  Next.

13          MR. WEIR:  Request number 11, documents concerning

14   any and all meetings, communications and conversations between

15   Putnam's management and any former or current employee of

16   Putnam relating in any manner to the issues raise in

17   plaintiff's complaint.  Again, after the pre-motion conference,

18   this was limited to specific events on specific individuals.

19          THE COURT:  And have they been produced?

20          MR. RODRIQUES:  We produced some, and this gets to

21   the email communication issue which is what I wanted to raise

22   with Your Honor.  Our initial objection to this was, literally

23   it was any communication between Putnam and any of its

24   employees regarding any issue in the complaint, which I think

25   we've managed to agree now relates to the decisions taken

I-12

1  against Lisa Svensson.  The only issue that we had with this

2  was the fact that most of the communications to the extent they

3  occurred were by email.  Now, as I mentioned earlier, Putnam

4  has 7,500 employees.  The email goes back many years.  The

5  process of restoring an individual email box for many years can

6  take up to two weeks.  What we propose, and there's no simply

7  way to search the emails.  That is, if we were to say put - for

8  example, Your Honor, we want any email that mentions the word

9  Lisa, we're going to get an email to any employee of Putnam

10  that has Lisa as a name, regardless of whether it's

11  Ms. Svensson or not.  If we, so what we proposed to Mr. Weir is

12  that we produce all emails to Lisa Svensson, from Lisa Svensson

13  or that mention the name Svensson in the body of the email,

14  screening out things that are obviously irrelevant, which I

15  don't think Mr. Weir has an objection to.  So that for example

16  Lisa Svensson gets an email that says the bake sale is

17  happening in the lobby, we're not producing those.  I don't

18  think he's looking for those.  So we did a search, we've done a

19  search and we're working through the various email boxes of the

20  relevant people that, to find all emails to Lisa, from Lisa or

21  that mention Lisa.

22     Now, we have a little bit of a disagreement over

23  whose email boxes should be searched.  We proposed all her

24  supervisors, the HR people that had anything to do with her.

25  We were about to go farther than that.  I think we can probably

I-13

1    agree on narrowing that down.  The biggest concern I have--

2            THE COURT:  Who else, Mr. Weir?

3            MR. WEIR:  I'm sorry, Your Honor?

4            THE COURT:  Who else?

5            MR. WEIR:  Well, we've provided a list of names in

6    the email exchange after--

7            THE COURT:  Well, how many other people are we

8    talking about?

9            MR. RODRIQUES:  We're agreeable to that list of

10   names.  We only had two objections to the list as he proposed

11   it.  He tacked on the end anyone in HR.  HR had 95 people in

12   it.

13           MR. WEIR:  That's okay.

14           THE COURT:  Okay.  So--

15           MR. WEIR:  The people in HR who dealt with Lisa

16   Svensson--

17           MR. RODRIQUES:  Not a problem.

18           MR. WEIR:  --and he's identified in their own

19   disclosures--

20           MR. RORIQUEZ:  No problem.

21           THE COURT:  All right.

22           MR. RODRIQUES:  And then the other question we had

23   was all members of the operating committee.  The operating

24   committee think of as the most senior members of the management

25   team.  Most of these people had absolutely nothing to do with

I-14

1  Lisa Svensson.  What we proposed was the people on the

2  operating committee who were in her line of command as opposed

3  to people on the operating generally.

4           THE COURT:  All right.

5           MR. WEIR:  As the operating committee is the group

6  that ran Putnam and as long as that list, I don't know what

7  this, the individuals on the operating committee he's referring

8  to, but as long as that list includes Mr. Holderman and

9  Mr. Lasser and Mr. Lasser is there, I don't really think that's

10  a problem.

11           MR. RODRIQUES:  Mr. Lasser never used email.

12  Mr. Holderman rarely uses email.

13           THE COURT:  Harvard Business School, I'm surprised.

14           MR. RODRIQUES:  But to the extent that Mr. Holderman

15  used email, yes, we include Mr. Holderman.  Mr. Lasser didn't

16  use email, but we'll confirm that fact.

17           THE COURT:  All right.

18           MR. RODRIQUES:  What we're talking about are people

19  who are the heads of the other business units that she didn't

20  participate in.

21           THE COURT:  All right.  Resolved.  Anything else?

22           MR. WEIR:  There are a few more, Your Honor.  Request

23  number 12, this is documents concerning any litigation,

24  complaints or charges involving gender discrimination, marital

25  status discrimination, sexual harassment or denial of equal pay

I-15

1   claims by female employees and the defendant from January 1,

2   1994 to the present.

3          MR. RODRIQUES:  *Jackson* decides this issue, Your

4   Honor, and says, this stuff is not generally specifically

5   relevant, particularly when it's claims outside of her own

6   department.  I will make two other points beside that.  I just

7   direct Your Honor to *Jackson*.

8          THE COURT:  I know *Jackson*.

9          MR. RODRIQUES:  The case says it specifically.  I

10  would make two other points, there is the inclusion of marital

11  status discrimination, which is not a protected category either

12  under Title 7 or Chapter 151(B), and we said that.  I'm not

13  sure that there has ever been a marital status claim against

14  Putnam.  It's just that I don't want to lose that objection

15  obviously.

16         And the second is sexual harassment.  This was not

17  pled to the NCAD as a sexual harassment claim.  It's not pled

18  here as a sexual harassment claim.  Mr. Weir may want to

19  introduce evidence of remarks that were made in the workplace

20  as evidence of that.  that's fine, but it's not a sexual

21  harassment claim itself.

22         THE COURT:  I have to agree with defendant on this.

23         MR. WEIR:  Well, Your Honor, one of our perceptual

24  discrimination claims, gender discrimination, as far as marital

25  status goes, our claim is that Putnam treats female investment

I-16

1  professionals who are married less favorably than male

2  investment professionals who are married.  That's a form of

3  gender discrimination.  That's not marital status.

4         MR. RODRIQUES:  What he forgot to mention is that he

5  also alleges that they treat women who are not married better

6  than women who are married.  That's why it's not a gender case.

7         THE COURT:  All right, denied.  Next.

8         MR. WEIR:  16, any and all documents prepared by any

9  Putnam employee that relate to each and every personnel

10  decision made with respect to plaintiff by Putnam, including

11  but not limited to all documents reflecting the reasons for or

12  circumstances surrounding such personnel decisions.  And then

13  again, this was limited following the discovery conference to

14  certain individuals and those are set forth in the email

15  exchange that we have attached to the motion.

16         THE COURT:  And what's your response?

17         MR. RODRIQUES:  As originally drafted, we object to

18  the use of the phrase every personnel decision.  We didn't know

19  exactly what was meant by that.  If it's limited to the

20  particular things we've talked about, the termination, the

21  demotion in 2002, we have no issue with this and we made that

22  clear in the discovery conference.

23         THE COURT:  Can you limit it to that at this time?

24         MR. WEIR:  I think, Your Honor, for purposes of this

25  initial request without necessarily committing to what we--

I-17

1        THE COURT:  Exactly.

2        MR. WEIR:  --do down the road, I would be willing to

3   limit it to the timeframe of 2000, which is the first event

4   that--

5        THE COURT:  Without prejudice to seeking additional

6   information.

7        MR. WEIR:  That would be acceptable, Your Honor.

8        MR. RODRIQUES:  As long as we're clear, Your Honor,

9   that when you mean, when he means personnel decision, he means

10  a distinct personnel action against her.  I mean, you're not

11  talking about somebody decides that she can't go to a meeting

12  or something.

13       THE COURT:  No, I'm clear.  I'm clear.

14       MR. RODRIQUES:  That's what we were concerned about.

15  The only other issue that was raised here was more names were

16  added to the list of the email boxes here, and we had some

17  objection to those.  I don't know that this is something that

18  we can't work out.  For example, one of the names that was

19  added was Patrick O'Donnell.  Patrick O'Donnell was terminated

20  by Putnam, was employed by Putnam, hired in a sense in 1994.

21  He left Putnam in `97 and `98.  To do his email restore will be

22  nearly impossible because it's on an entirely previous email

23  system to the one that Putnam uses.

24       MR. WEIR:  Your Honor, as I just indicated, for the

25  purposes of this document request--

I-18

1          THE COURT:  You will waive it without prejudice to

2    renew it.

3          MR. RODRIQUES:  The earlier request is fine, and

4    that's fine, Your Honor.

5          THE COURT:  All right.  Are we set?

6          MR. WEIR:  Couple more, Your Honor.  Request number

7    18, plaintiff's pay stubs, pay roll records, earnings records

8    and other documents reflecting any and all sources and/or

9    amounts of income earnings or other remuneration from Putnam

10   obtained during the period from the commencement of plaintiff's

11   employment with Putnam to the present.  We basically want her

12   pay records.

13         THE COURT:  Any problem.

14         MR. RODRIQUES:  I think we've given everything.

15         THE COURT:  All right.

16         MR. RODRIQUES:  I don't know what is missing here and

17   we said so in our opposition.

18         THE COURT:  All right.  Take a look at what you have

19   and if you don't have everything contact counsel.

20         MR. WEIR:  Okay.  19, statements or other

21   communications from financial institutions reflecting stock

22   brands or stock opposition, whether vested or unvested,

23   provided the plaintiff in the commencement of her employment

24   with Putnam to the present, including but not limited to

25   plaintiff's monthly statements earned or stated period.  Again,

1    that stock is part of her--

2            THE COURT:  Yeah.

3            MR. RODRIQUES:  And again, Your Honor, I don't know

4    why there's a motion to compel here.  I think we've produced

5    all of the documents that we have that are responsive to

6    showing her stock earnings.  I mean, if there is something you

7    want, Jack, we're happy to look for it.

8            MR. WEIR:  Yeah, definitely in this area--

9            THE COURT:  Okay.  Well, take a look at what you

10   have.  It sounds to me like you don't have a total grip on

11   exactly what you have.  Take a look.  If there is something you

12   think is missing, contact your brother.  If you can't resolve

13   it, come back.

14           MR. WEIR:  I do have a handle, Your Honor, on what is

15   missing and that is--

16           THE COURT:  Well, what is missing in that category?

17           MR. WEIR:  Well, I'm looking for memos between Putnam

18   top management concerning the deferred compensation and the

19   stock that was paid to or given to the plaintiff.  I'm not just

20   looking for--

21           THE COURT:  All right.  Will you attempt to look for

22   those?

23           MR. RODRIQUES:  I don't know exactly what you mean,

24   but, or why any such documents would exist, but if you're,

25   you're looking for memos between top management about the award

1 | to Lisa Svensson?

2 |        MR. WEIR: Yes.

3 |        MR. RODRIQUES: If any such documents exist, we'll

4 | produce them.

5 |        THE COURT: To the extent that they exist, produce

6 | them.

7 |        MR. RODRIQUES: Sure.

8 |        MR. WEIR: Request number 20, documents prepared by,

9 | signed by, sent to plaintiff or given to plaintiff by or

10 | received from any employee or former employee of Putnam

11 | concerning plaintiff's job duties or job performance while in

12 | Putnam's employ. I want essentially a complete set of

13 | performance evaluations and other documents to the extent they

14 | exist relating to her job performance.

15 |        MR. RODRIQUES: And he has a complete set of

16 | performance evaluations so far as we know. The only concern -

17 | so far as we've been able to locate. The only concern we had

18 | about this which is what led to our conference was, again,

19 | emails; that is, there may be emails in which somebody praised

20 | her performance. To the extent that we find them and we have

21 | found some, we've produced them. And to the extent we do the

22 | email search we talked about earlier, to Svensson, from

23 | Svensson, regarding Svensson and they turn up criticisms or

24 | praise, we'll produce them.

25 |        MR. WEIR: Your Honor, I served this request on

1   August the 9th, and now they're here in December talking

2   about, you know, they have produced some and they have some

3   emails that they haven't yet really looked at and need some

4   more time to look at.

5           THE COURT:  To be produced within the month.

6           MR. WEIR:  Okay.  And then the final one, Your Honor,

7   22, documents that relate to any communications between Putnam

8   and present or former employees or agents of Putnam which

9   relate to plaintiff during the period of her employment with

10  Putnam, and, again, we limited it to the specific events

11  alleged in the complaint.

12          MR. RODRIQUES:  And again, the only issue here was

13  the emails, and if we have the same protocol for that, we have

14  no issue, Your Honor.

15          THE COURT:  All right, so produce?

16          MR. RODRIQUES:  Yes.

17          THE COURT:  Produce it all by the end of the month.

18          MR. RODRIQUES:  By the end of the month or you said

19  within the - within the end of this month?

20          THE COURT:  Well, yeah, December 31st.  Can it be

21  done?

22          MR. RODRIQUES:  I'll do - well, Your Honor, I'll do

23  my best.  It's, the holidays is the issue and the email

24  searches take a substantial amount of time for each one.

25          THE COURT:  Well, you can do it in phases.

I-22

1      MR. RODRIQUES:  Well, that's what we've been

2 doing.

3      THE COURT:  Whatever you have, produce, and do your

4 best.  All right?

5      MR. WEIR:  Your Honor, we have this mediation on

6 January 11th.  I'd like to be able to see any additional

7 documents before that time.

8      MR. RODRIQUES:  What I propose, Your Honor, is we'll

9 undertake to get them done within the month--

10      THE COURT:  Everything to be produced at the latest

11 by January the 6th.  That's the Friday before.

12      MR. RODRIQUES:  That's fine, Your Honor.

13      THE COURT:  Okay.

14      MR. RODRIQUES:  Thank you.

15      THE COURT:  All right.  The docket will reflect the

16 motion was allowed in part and denied in part as stated on the

17 record in open court.

18      MR. RODRIQUES:  Thank you, Your Honor.

19      MS. EDGREN:  Thank you, Your Honor.

20      MR. WEIR:  Thank you.

21      THE COURT:  All right, moving on to criminal

22 business.

23 //

24 //

25 //

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____                    February 9, 2006
Maryann V. Young