UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * * * * | Civil Action No. 04-12711-PBS |
| * | |
| LISA SVENSSON * | |
| * | BBO No. 351000 |
| Plaintiff, * | |
| * | Reply Memorandum |
| v. * | of |
| * | Plaintiff Lisa Svensson |
| PUTNAM INVESTMENTS, * | to the Opposition of Defendant |
| LLC and LAWRENCE * | Putnam Investments, LLC, |
| LASSER, * | to Svensson's Motion |
| * | Pursuant to Fed. R. Civ. P. |
| Defendants. * | 37(a)(2), for an Order Compelling |
| * | Putnam to Answer Interrogatory |
| * * * * * * * * * * * * * * * * | Nos. 3, 4, 5, 7, 9, 10 and 12 and, |
| | Pursuant to Fed. R. Civ. P. 37(a)(2)(4), |
| | for an Award of Attorneys' Fees |
| | and Expenses. |

1.    <u>Introduction</u>.

        Plaintiff Lisa Svensson ("Svensson") submits this memorandum in reply to the opposition

("Opposition") of Putnam Investments, LLC ("Putnam") to Svensson's "Motion, Pursuant to Fed. R.

Civ. P. 37(a)(2) for an Order Compelling Putnam to Answer Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12."

This reply is necessary and appropriate because, in its Opposition, Putnam misstates and misrepresents

the relevant facts of this case, misstates this court's prior orders and the parties' positions, and

misinterprets applicable case law.

        Putnam's refusal to answer Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12 is part of its overall effort

to avoid discovery relevant to Svensson's claims in this case.  Putnam's overall strategy, apparent in its

Opposition, is to avoid discovery by announcing conclusions based upon what it claims to be evidence

from its employment files to show that Svensson has not identified sufficiently similar comparators,

while simultaneously denying Svensson access to the very employment information which she needs in

order to contest Putnam's conclusory assertions and to establish at trial that her proposed comparators

are similarly situated.  The court should not allow Putnam to manipulate the system in this egregious manner.

2.      <u>Facts</u>.

        Svensson relies upon the facts set forth in her memorandum in support, as supplemented herein.

        The Mary McNamee Affidavit ("McNamee Affidavit"), filed by Putnam May 11, 2006, states (¶ 7) that  the Putnam portfolio managers "are all managed in separate groups and are compensated differently, in both the marketplace and at Putnam.  They are also not interchangeable."  However, Exhibits 7 and 8, which accompany the Fourth Affidavit of Lisa Svensson, filed herewith, provide a factual analysis of the transfers among teams of the 91 comparators.   The summary at the end of each exhibit shows that 30 of the 67 identified males (45%) made at least one transfer over this period and that eight of the 24 female comparators (33%) made at least one transfer.  <u>Id</u>.

        The McNamee Affidavit (¶ 7) states that "A value manager does not generally switch to managing in a growth style, and visa versa [sic].  A quantitative manager generally does not switch to a fundamental style of managing equities.  Nor does a fixed income manager all of a sudden switch to managing equities."  This is incorrect.  The above referred to Exhibits 7 and 8 show that these changes did occur.

        The data also show that 13% of the male comparators and 4% of the female comparators transferred between portfolio management style teams of various types, including transfers between growth and core styles, as well as transfers between large cap, mid cap and small cap, and between international and domestic; that one male comparator moved from the quantitative team to the large cap growth team; and that other comparators (one male, two female) transferred from fixed income to equities.  <u>Id</u>.

3.      <u>Argument</u>.

    3.1    <u>This court's order of December 13, 2005, concerning Svensson's motion to compel production of documents, does not preclude Svensson's motion to compel answers to interrogatories, because Magistrate Judge Bowler's ruling was: (1) expressly without prejudice; and, (2) based upon Putnam's misrepresentation that the facts of this case, including Putnam's corporate structure, were on all fours with Jackson v. Harvard University, 111 F.R.D. 472 (D. Mass. 1986).</u>

In its Opposition (p. 7), Putnam argues that the December 13, 2005, ruling from the bench (Bowler, U.S.M.J.) on Svensson's motion to compel production of documents settled the issues raised by, and effectively precludes, Svensson's motion to compel answers to Interrogatory Nos. 3, 4, 5, 7 and 12. In so arguing, Putnam grossly misinterprets the court's order.

In general, Svensson's Request for Production of Documents ("RPOD") Category No. 2, which was ruled upon at the December 13, 2005, hearing, and Interrogatory Nos. 3, 4, 5, 7 and 12, now at issue, sought information concerning adverse employment actions against other Putnam employees since 1994. Svensson has now agreed to limit the interrogatories to the years 1999 to date and to the investment professionals identified in her motion to compel. The parties' argument and the court's decision with regard to RPOD Category No. 2 appears at pp. I-6 through I-8 of the transcript of December 13, 2005, hearing, excerpts from which are annexed hereto as Exhibit "A". At the hearing Putnam's counsel urged the court to rely upon <u>Jackson</u> v.<u>Harvard University</u>, 111 F.R.D. 472 (D. Mass. 1986). and <u>Whittingham</u> v. <u>Amherst College</u>, 164 F.R.D. 124 (1995), for the proposition that,

> typically you don't look outside of the group in which the employee is employed; that is, you look at the decisions by the same decision maker. We cited those cases in our opposition to the motion to compel, and Mr. Weir doesn't cite any contrary authority. Yet the case is pretty clear, both the Jackson case and the Whittingham case, that decisions by other people in other parts of the company aren't probative on the question of whether or not there was discrimination in her unit.

Transcript, pp. I-6 through I-7. Ruling upon the motion, Magistrate Bowler made clear that she was denying the motion to compel RPOD No. 2 without prejudice, stating that the denial was "as to those

individuals <u>at this time</u>."  (Emphasis added.)  Putnam has not explained why it now seeks to rely on an order issued without prejudice as the basis for preclusion.

Further, even if Magistrate Bowler's order was not expressly without prejudice, it was still interlocutory and can and should be revised because it was based on Putnam's factual misrepresentations.  By citing <u>Jackson</u> and <u>Whittingham</u> for the proposition that the only valid comparators are those persons who worked on the same investment team as Svensson (a proposition which so far has resulted in the production of no documents or information as to any comparators of Svensson), not others holding similar positions on other teams in Putnam's Investment Management Division, Putnam's counsel clearly represented as fact to the court that the various investment teams within the Investment Management Division, one of at least four divisions of Putnam, was administered in the same autonomous manner as the various virtually independent graduate schools at Harvard with regard to employment decisions.  To claim that such investment teams are analogous to the independently administered graduate schools at Harvard is absurd.  A more apt analogy would be to compare the graduate schools of Harvard with the other corporate subsidiaries of Putnam's corporate parent, Marsh & McLennan Companies, Inc.. [1]

 Because Magistrate Bowler's December 2005 ruling with respect to RPOD Category No. 2 was expressly without prejudice, and in any event was based on Putnam's factual misrepresentations, it does not preclude consideration of Svensson's motion to compel answers to interrogatories.

3.2     <u>Putnam's reliance on Whittingham is misplaced</u>.

Putnam argues in its Opposition (p. 7) that the decision in <u>Whittingham</u>, denying a plaintiff's motion to compel production of employment files, also governs the present case.  However, <u>Whittingham</u> is easily distinguished.

Putnam cites <u>Whittingham</u> for the proposition that,

---

[1] <u>Whittingham</u> is also distinguishable from the present case, as set forth in §3.2, <u>infra</u>.

> [P]ersonnel files contain perhaps the most private information
> about an employee within the possession of an employer.
> Nonetheless, Plaintiff requests the Court to order the Defendant to
> hand over entire files of employees without any particularized
> showing that any, let alone all, of the information therein is
> relevant to his claims. Again, while discovery is usually broad,
> Plaintiff has not demonstrated that the files he seeks, even if
> marginally relevant, outweigh the privacy interests of these
> individuals.

Id. at 127-28.  While that statement may be true so far as it goes, Putnam fails to disclose to the court

other portions of Whittingham that strongly support Svensson's motion to compel in the present case.

The language Putnam relies on appears in a section of Whittingham in which the court denied the

plaintiff applicant for promotion within the college's office of admissions discovery of the "complete

personnel files of [three former minority] deans in the Admissions Office...."  The court did so because

plaintiff,

> has made no real showing that these three individuals suffered
> similar treatment and, without a showing of such relevance,
> Plaintiff is not entitled to discovery.

Id. at 127.  Thus, the Whittingham court focused on the fact that the plaintiff in that case had not shown

that the personnel files sought pertained to persons who had suffered similar treatment.  Had such a

showing been made, the court would have allowed discovery.

In the present case, unlike Whittingham, Svensson can show that the female Putnam investment

professionals whose files she seeks were similarly situated and may well have suffered similar

mistreatment.  Therefore, under Whittingham, the files of those other women should be discoverable.

Moreover, the files of males promoted by Putnam to Managing Director are discoverable under

Whittingham.  The Whittingham court distinguished Weahkee v. Norton, 621 F.2d 1080 (10th Cir. 1980),

cited by the plaintiff in Whittingham, because Weahkee concerned the, "discoverability of personnel files

of those who are 'hired or promoted' over the plaintiff...."  In the present case,  Svensson seeks exactly

the type of information at issue in Weahkee but not at issue in Whittingham: the files of males who were

hired or promoted over her into the Managing Director position.

Of course, Putnam will argue that Svensson has not provided enough evidence to prove that the comparators she identifies actually were similarly situated and actually did suffer similar mistreatment or were hired or promoted over her.  The court should decline to place Svensson in such a "Catch 22" situation.  The very purpose of the discovery Svensson seeks is to obtain sufficient information to establish at trial that the comparators were similarly situated.

3    Svensson has the right to obtain discovery to determine if Putnam has followed its announced policy that it does not discriminate on the basis of "sex" or of "marital status."

Putnam in its Opposition (p. 8) complains of Svensson's requesting information as to marital status of her comparators.  That criticism is not well founded.  Putnam's announced policy is that it does not discriminate on the basis of "sex" or "marital status."  In particular, the Putnam "Employee Handbook" states,

> It is our policy to hire promote and maintain terms conditions and privileges of employment in manner <u>that does not discriminate on the basis of</u> age, race, creed, color, religion, national origin, ancestry, <u>sex, marital status,</u> sexual orientation, citizenship status ,disability or veteran status or any other characteristic protected by law.....

Putnam document PRM-00418. (Emphasis added.)

Given that announced policy that Putnam does not discriminate on the basis of "sex" or "marital status," Svensson has the right to obtain discovery to determine if the announced policy of Putnam has been followed.  Svensson should be allowed to obtain discovery as to Putnam's corporate state of mind or discriminatory atmosphere.  <u>Conway</u> v. <u>Electro-Switch Corp</u>., 825 F. 2d 593 (1st Cir. 1987).  For example, Svensson should be allowed to obtain discovery as to whether married female investment professionals in the Investment Manager Division who had or expected to have children were treated the same as married males in that division who had or expected to have children

4.    Interrogatory No. 7, seeking information as to whether Putnam or its supervisory personnel "received knowledge of internal complaints or statements relating to any employee's gender, gender bias, or stereotypical comments, ridicule or joking in the workplace respective of any employee's gender," seeks relevant information.

Putnam argues (Opposition, p. 9) that the information sought by Interrogatory No. 7 is not relevant because Svensson does not allege sexual harassment. Interrogatory No. 7 seeks information about whether Putnam or its supervisory personnel "received knowledge of internal complaints or statements relating to any employee's gender, gender bias, or stereotypical comments, ridicule or joking in the workplace respective of any employee's gender." Yet such evidence clearly is relevant to establishing the existence of a discriminatory atmosphere at Putnam, relevant to Svensson's proof that Putnam's adverse employment actions against her were motivated by discrimination. Cummings v. Standard Register Co., 265 F.3d 56, 63 (1st Cir. 2001), citing Conway v. Electro Switch Corp., 825 F.2d 593, 596-98 (1st Cir. 1987); Koster v. Trans World Airlines, 181 F.3d 24, 33-34 (1st Cir. 1999); Carey v. Mt. Desert Island Hospital, 156 F.3d 31, 37-38 (1st Cir. 1998). Such evidence is routinely admitted in gender discrimination cases.

5.    Putnam documents, PRM 755-758, do not provide a sufficient answer to Interrogatory No. 12.

Putnam asserts that Putnam documents PRM 755-59 supply the answer to Interrogatory No. 12. These documents, copies of which accompany this memorandum as Exhibit "B," do not provide a sufficient answer to Interrogatory No. 12, which states,

> Please identify the gender makeup of Putnam's workforce at the time of the Plaintiffs termination on September 15, 2003, as follows:
>
>     a. Total employees on a full-time equivalency basis;
>     b. By department;
>     c. Employees at the level of Managing Director and above;
>     d. Employees who performed Portfolio Management responsibilities;
>     e. Persons who were designated by Putnam as "Partners".

First, even though Svensson has limited the scope of this and other interrogatories to investment professionals in the Investment Management Division, PRM 755-58 provide only a partial response to

12(b) in that the documents provide the information requested only as to the research function in the Investment Management Division and not as to the portfolio management positions in that division.

Second, PRM 755-58 provide only a partial response to 12(c) in that the documents provide the information requested as to "employees at the level of Managing Director and above" only in GER and not for the other portfolio management functions in the division.

Third, PRM 755-58 provide no response to 12(d) in that the documents do not provide the information requested as to "employees who performed portfolio management responsibilities."

Finally, PRM 755-58 provide no response to 12(e) in that the documents do not provide the information requested as to "persons who were designated by Putnam as `Partners'."

6.    <u>Svensson's comparator analysis is valid and the comparators identified are similarly situated in ways relevant to Svensson's claims</u>.

(a)    <u>Contrary to Putnam's assertion, Svensson has not identified an undifferentiated group of 91 comparators, but instead has divided the 91 total comparators into small groups of persons similarly situated to Svensson with respect to each of the four alleged adverse employment actions</u>.

Putnam asserts repeatedly that Svensson has identified 91 comparators, inviting the court to believe that Svensson is casting far too wide a discovery net. That is not the case, however. While Svensson has identified a total of 91 comparators, she has divided them into much smaller groups relevant to each of the four employment actions taken against her (failure to promote, failure to pay equally, demotion and termination). First, the comparators are divided by their gender, into 67 male and 24 female comparators. Within each gender group, only certain individuals are offered as comparators with regard any one of the four challenged adverse employment actions. <u>See</u> Fourth Affidavit of Lisa Svensson, which accompanies this reply memorandum.

(b)    <u>The criteria Svensson uses to identify similarly situated comparators are reasonable and relevant to her claims</u>.

Svensson identified similarly situated male and female comparators by comparing herself with each comparator on 19 criteria. Each of the criteria focuses on an employee attribute, which reasonably

would be regarded as relevant to determining the worth of an employee to Putnam and hence such employees' status with respect to promotions, demotions, compensation and other employment actions.

The criteria included "Held same portfolio management position as plaintiff ..."; "Held same research position as plaintiff ..."; "Manages or managed funds managed by plaintiff"; "Similar tenure"; "Similar investment experience"; in the same "Promotion pool"; "One of select few research analysts who were named portfolio managers on specific funds"; "Made recommendations on a significant portion of the S&P 500 ..."; "Held in high esteem within IMD as result of long-term performance and expertise"; "One of select few invited by IMD to make appearances on television investment programs"; "Has managed people"; "Holds the CFA designation";  "Complained to top management about unethical commission allocations."  Clearly, these criteria are relevant to Svensson's claims because they identify objective characteristics which would make persons more or less attractive to Putnam.  Indeed, some of the criteria focus on indications that a given employee was well regarded by Putnam (e.g. appearances on television, or being entrusted with fund management while a research analyst).

Putnam's argument against the method by which Svensson identified comparators lacks merit. First, Putnam argues that the criteria Svensson used are flawed because Putnam itself did not use the same criteria.  This claim is suspect to say the least.  Is Putnam really arguing that, in making employment decisions, it did not consider an employee's tenure or investment experience, and did not consider how that employee was regarded within the firm (as evidenced by Putnam previously having chosen that employee to represent it on television or to manage a fund of securities)?  If Putnam does not take such information into account in choosing fund managers, perhaps its investors should worry. Or is it that Putnam is admitting that it makes such decisions solely on the basis of gender?

Even accepting Putnam's claim that it did not use the criteria selected by Svensson, that is irrelevant.  Putnam appears to confuse the present issue regarding identification of comparators with an entirely different issue: whether Putnam's proffered non-discriminatory basis for its actions is pretextual.  The latter issue asks whether the reasons proffered by the employer are believable.  Straughn

v. <u>Delta Air Lines, Inc</u>., 250 F.3d 23, 35 (1st Cir. 2001) (Pretext can be established by showing "either that [plaintiff's] dismissal was (i) 'more likely motivated' by discrimination than by the explanation proffered by [the employer] or (ii) the proffered 'explanation [was] unworthy or credence' in circumstances where the suspect denial, taken together with other facts, suggests such a motivation.") Thus, the employees' evidence on pretext must focus on the particular justifications offered by the employer (in other words on the criteria the employer claims to have actually used in making the adverse employment decision).  <u>Clark</u> v. <u>Lincare, Inc</u>., 2005 WL 1721213, * 10 (D. Mass. 7/21/05)  ("In assessing pretext, a court must focus on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.")  If that were the issue before the court, Putnam might reasonably claim that Svensson's criteria were irrelevant because Putnam had not itself used those criteria.

However, the identification of comparators presents an entirely different issue requiring a different analysis.  The focus is not on the criteria actually used by Putnam.  Instead, the question is simply whether the proffered comparators are objectively similarly situated in ways relevant to their employment and the employment actions complained of.  In defining what constitutes a valid comparator, the courts focus not on what the employer considered in taking the adverse employment action complained of, but on facts making it objectively reasonable to treat the plaintiff and the comparator as equivalent.  "Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances."[2]  "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."[3]  Proof that a comparator is similarly situated requires an examination of "performance,

---

[2] <u>Conward</u> v. <u>Cambridge Sch. Comm</u>., 171 F.3d 12, 19 (1st Cir. 1999).  <u>See also</u> <u>Kosereis</u> v. <u>State of Rhode Island</u>, 331 F.3d 207, 214 (1st Cir. 2003); <u>Straughn</u>, 250 F.3d at 44.
[3] <u>Conward</u>, 171 F.3d at 19, quoting <u>Dartmouth Review</u> v. <u>Dartmouth College</u>, 889 F.2d 13, 19 (1st Cir. 1989).  <u>See also</u> <u>Goodman</u> v. <u>Bowdoin College</u>, 380 F.3d 33, 45 (1st Cir. 2004).

qualifications and conduct" and the absence of "differentiating or mitigating circumstances that would distinguish their situations." Benham v. Lenox Savings Bank, 118 F.Supp.2d 132, 147 (D. Mass. 2000). None of the foregoing tests for identifying comparators asks what criteria the employer used.

Thus, any set of criteria objectively relevant to Svensson's employment and the positions she held or sought, or the characteristics of employees, which a reasonable employer would take into account in making employment decisions, is valid as a basis to identify likely comparators. While no single comparator shares the same set of criteria with Svensson or with any other comparator, that does not matter, so long as each shares sufficient criteria with Svensson to warrant further investigation through discovery.

While Putnam may claim that certain proposed comparators are not similar to Svensson, either on the criteria she identified, or because of other differentiating factors, it should not be allowed to make that argument without first having provided the information Svensson seeks. Putnam in this case selectively uses the information it has about its employees to argue that Svensson has no comparators, while simultaneously withholding the very information Svensson needs to establish similarities.

(c)    To be valid comparators, it is not necessary that other Putnam portfolio managers managed funds with the same portfolios or styles.

Putnam argues (Opposition, p. 12) that the male portfolio managers identified by Svensson are not valid comparators because, among other things, they "managed entirely different portfolios in many different styles...." Relying on the Affidavit of Mary McNamee ("McNamee Affidavit"), Putnam argues in its Opposition that the portfolio managers identified by Svensson as comparators were not valid comparators because they managed equity funds which utilized different investment styles (growth versus value) or methods (quantitative versus fundamental analysis) or which invested in fixed income instruments rather than equities. McNamee stated that managers do not switch between funds of such different styles, methods or portfolios. This is both factually untrue and legally irrelevant.

As set forth in Svensson's Fourth Affidavit, and in the factual section of this memorandum, many portfolio managers did switch between fund management teams utilizing different equity investing styles or focusing on different investment vehicles (e.g. equities versus fixed income).   See Fourth Affidavit of Lisa Svensson, which accompanies this reply memorandum, ¶ 10.

In any event, Putnam simply ignores the case law cited by Svensson which establishes that persons holding similar positions in other divisions of a company, and investment professionals managing funds of different types or styles, are valid comparators.  Svensson cited two cases involving investment management firms, in which courts made clear that other portfolio managers could be comparators despite the fact that they managed different funds with different portfolios and styles. Diamond v. T. Rowe Price Assoc., Inc., 852 F.Supp. 372 (D.Md. 1994)  (court allowed the plaintiff investment professional, who had been denied a promotion to Managing Director, to obtain information as to other portfolio managers who had been promoted to Managing Director, despite the fact that they managed a range of funds in different areas of the company); Sobol v. Kidder Peabody & Co., 49 F.Supp.2d 208 (S.D.N.Y 1999).  See also Nakai v. Wickes Lumber Co.,  906 F.Supp. 698, 704-05 (D. Me. 1995) (Plaintiff in an ADEA suit submitted sufficient evidence of pretext based partly on a comparison of the plaintiff store manager to managers of other area stores).

     (d)     <u>With regard to the termination claim, it is not necessary that the proposed comparators held the "same" position as Svensson at the time of her termination, nor that they committed the "same offense" or behavior for which Svensson was allegedly terminated, nor that they reported to the same supervisor.</u>

Putnam claims (Opposition, p. 13) that most of Svensson's proposed comparators are not valid because "only 4 occupied the <u>same position</u> as Ms. Svensson <u>at the time</u> of her termination."  (Emphasis added).  However, in order to be a valid comparator, it is not necessary that a person hold the "same" position as the plaintiff.  Proof that a comparator is similarly situated requires an examination of "performance, qualifications and conduct" and the absence of "differentiating or mitigating circumstances that would distinguish their situations."  Benham v. Lenox Savings Bank, 118 F.Supp.2d

132, 147 (D. Mass. 2000).[4] "Exact correlation is neither likely nor necessary, but the cases must be fair congeners." Conward v. Cambridge School Comm., 171 F.3d 12, 19 (1st Cir. 1999). "In other words, apples should be compared with apples." Conward, 171 F.3d at 19; Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997). Thus, Svensson is required only to identify other persons who held substantially similar positions.

Putnam takes the position in this case that no one other than Svensson was terminated for "precisely the same reason." Svensson certainly is entitled to discovery to determine whether this claim of Putnam is true. Moreover, Putnam is incorrect in claiming that the proposed comparators must have committed the "same offense" or behavior for which Svensson allegedly was terminated. The court in Matthews, on which Putnam relies, made this clear, stating that "although the offenses of two employees need not be identical, the offenses must be of comparable seriousness." 426 Mass. at 130.

Nor need the proposed comparators have held those similar positions at the same time as Svensson was terminated, as Putnam claims. (Opposition, p. 13). Courts routinely look at employment actions against comparators over a significant time period, both before and after the actions against the plaintiff. The United States Court of Appeals for the First Circuit stated in Conway that,

> evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.

825 F.2d at 597. (Emphasis added).[5] In Conway, the court allowed the introduction of evidence of discriminatory statements made up to 22 months prior to the plaintiff's termination. In Jackson, the District Court expanded the time period for which the plaintiff was allowed to seek discovery as to tenure

---

[4] See also Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (no differentiating facts); Traux v. City of Portsmouth, 2001 WL 716120, *15 (D.N.H. 6/18/01) (without differentiating facts); Cardona v. U.P.S., 79 F.Supp.2d 35, 43 (D.P.R. 2000) (without differentiating facts); Griel v. Franklin Medical Center, 71 F.Supp.2d 1, 12 (D.Mass. 1999); ("performance, qualifications and conduct"); Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 130 (1997) ("The plaintiff must identify other employees to whom he is similarly situated in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations."(internal quotation marks omitted)).
[5] See also Carey, 156 F.3d at 37.

decisions in the Harvard Business School from three to 10 years, including 7 years prior to the time

tenure consideration of the plaintiff had begun, stating,

> In the court's view, this three-year time period is unduly restrictive and
> contrary to the law governing the scope of permissible discovery. Fed. R.
> Civ. P. 26(b)(1)....  Accordingly, a time frame which merely brackets the
> contested employment action would foreclose plaintiff from elucidating
> past practices or identifying a pattern which might suggest that defendants'
> reasons for denying plaintiff tenure are pretextual.  Relevancy for
> discovery purposes is much broader than for admissibility purposes at
> trial.  If the information sought appears reasonably calculated to lead to
> the discovery of admissible evidence, it is within the limits set forth in
> Fed. R. Civ. P. 26(b)(1).  Therefore, the court expands the time frame
> ordered by the magistrate from three years to ten, commencing June, 1974
> and ending June, 1984.

111 F.R.D. at 475. (Emphasis added.)[6]

Conduct occurring entirely after the discrimination complained of by plaintiff also is relevant and

admissible.  In Brown v. Trustees of Boston University, 891 F.2d 337 (1st Cir. 1989), the United States

Court of Appeals for the First Circuit affirmed the admission of  statements made by the university

president to another professor being considered for tenure, even though those statements were made after

the decision on plaintiff's tenure application had been made.  According to the Brown court:

> That the remarks occurred subsequent, rather than prior, to the allegedly
> discriminatory conduct does not alter their admissibility. The jury was
> entitled to infer that any discriminatory animus toward women manifested
> in 1982 and 1983 would have existed in 1980 and 1981, when President
> Silber acted on Brown's case.

891 F.2d at 350. (Emphasis added.)[7]  Thus, Svensson's proposed comparators need not have worked in

similar positions at the time of Svensson's terminations.

---

[6] See also Briddell v. Saint Gobain Abrasives, Inc., 233 F.R.D. 57, 60 (D. Mass. 2005)  (allowing discovery as to
other acts of discrimination for three year period including 14 months prior to any discriminatory acts against the
plaintiff.)
[7] See also Briddell, 233 F.R.D at 60 (Court cited a case from the District of Kansas in which the time period
extended two years after the discrimination alleged by the plaintiff); Ryder v. Westinghouse Electric Corp., 128
F.3d 128, 130-33 (3rd Cir. 1997) (allowing introduction of statements made one year after plaintiff's termination);
Stumph v. Thomas & Skinner, Inc., 770 F.2d 93, 95, 97 (7th Cir. 1985) (allowing testimony of other employees as
to discrimination they encountered after plaintiff was terminated); Cordova v. State Farm Ins. Companies, 124
F.3d 1145, 1149(9th Cir. 1997) (Mexican plaintiff, alleging that she was not promoted to trainee agent due to
national origin discrimination, allowed to introduce evidence that after hiring decision had been made, manager

Putnam is also incorrect in claiming that the proposed comparators must have reported to the same supervisor.   (Opposition, p. 14).  Cummings, 265 F.3d at 63 (admitting in evidence the deposition testimony of two other employees concerning age discrimination they had suffered despite the fact that one of the other employees held the same position as the plaintiff but at a different location with a different supervisor, and the other worked at the same location as plaintiff but held a different position and had a different supervisor).  See also Baggett v. Program Resources, Inc., 806 F.2d 178, 181-82 (8th Cir. 1986) (allowing evidence as to actions of different supervisor vis-a-vis other employees).

In her memorandum in support, Svensson cited Rossiter v. IBM, Corp., 2005 WL 2722929, *10 (D. Mass. 10/24/05) (coworkers who compete directly against each other for promotion are valid comparators), for the proposition that even if comparators must have the same supervisor as the plaintiff, in the present case, employment decisions for all investment professionals in the Investment Management Division were made by the same group of persons.  Notably, in the present case, employment decisions for all investment professionals at Putnam were made not by a single "supervisor" but by a group of numerous individuals from across the Investment Management Division who made compensation, promotion and other significant employment decisions concerning investment professionals throughout the division regardless of which team the investment professional was assigned to.[8]  See First Affidavit of Lisa Svensson , ¶¶ 6-8.  See also, transcript, deposition of Kelly Morgan, p. 62, l. 2 - p. 63, l. 3.

---

made discriminatory comment about another Mexican employee); Stacks v. Southwestern Bell Yellow Pages, 27 F.3d 1316, 1327 n.5 (8th Cir. 1994) (in sexual harassment case, evidence that after plaintiff's termination a sexual video involving other female employees had been shown at a company function was relevant and admissible); Martinez v. Potter, 347 F.3d 1208, (10th Cir. 2003) (incidents of retaliation against plaintiff occurring after plaintiff filed Title VII complaint, as to which administrative remedies had not been exhausted, could still be introduced as background evidence to support exhausted claims set forth in complaint); Schindler v. Bierwirth Chrysler/Plymouth, 15 F.Supp.2d 1054, 1059 (D. Kan. 1998) (defendant's decisions to discharge two other 60+ year old employees months after plaintiff's termination "lend support to plaintiff's pretext argument"); Wilson v. Seven Seventeen HB Philadelphia Corp., 2003 WL 22709073, * 10 (E.D. Pa. 11/14/03) (allowing introduction of corporate memoranda and notes reflecting procedures in effect more than a year after plaintiff's termination).
[8] By way of background, as set forth more particularly in ¶¶ 3-9 of the First Affidavit of Lisa Svensson ("First Svensson Affidavit"), the investment teams and the research functions in the IMD, were not administered independently within the IMD by team or function, as titles, compensation and other significant employment and administrative matters concerning those in the various Putnam divisions were decided within and by the respective divisions.  (In addition to the IMD that managed client portfolios, there were the Operations Division

The court should not accept Putnam's claim that Joshua Brooks, a male of far lesser investment industry experience whom Putnam brought in from the outside to fill, in April 2003, a position that Svensson and other females were at least equally qualified for, made the decision all by himself without the participation of others to terminate her five months later, while at the same time withholding from

---

(services to customers including answering client questions and mailing fund information); the Distribution Division, which marketed and sold products to institutional and retail clients; and the Corporate Division, which supported the overall business through activities such as corporate finance. Id.) For example, in the IMD there was the Investment Division Management Committee ("IDMC"), which made decisions for all of the IMD concerning, among other things, bonuses and promotions. Id. (There was an Operating Committee at Putnam, the members of which included the heads of each of the four Putnam divisions as well as the head of Human Resources and Putnam's Chief Financial Officer. The Operating Committee reported to defendant Lawrence J. Lasser ("Lasser") who also was a member of this committee. All of the members of the Operating Committee were located at Putnam's Boston office. Svensson First Affidavit, ¶¶ 6-7.) Putnam documents produced in this case confirm that there was a centralized structure for promotions and demotions that applied across all levels of officers within the IMD. For example, Putnam document PRM 1789-1792, a copy of which in the redacted form in which it was produced by Putnam is annexed to the Affidavit of Kevin F. Moloney, filed April 20, 2006, as Exhibit 3 evidences a meeting of Putnam officials from across the entire IMD at which the candidacies of various persons, including, among others, Svensson, from across the entire IMD, for promotion to Managing Director were discussed. Putnam document PRM-1518, a copy of which in the redacted form in which it was produced by Putnam is annexed to the Moloney Affidavit as Exhibit 4, shows that this centralized structure for promotions applied across all levels of officers in the IMD, including also Quant, Fixed Income Trading, Currency and GAA. Persons who were hired as, or promoted to, Managing Director in the periods when Svensson was eligible for appointment to the position are, by definition, comparators of Svensson, a fact that Putnam obviously recognized since Putnam documents, PRM-1792, PRM-1886-1887 and PRM 1891-1893,, copies of which in the redacted form in which they were produced by Putnam are annexed to the Moloney affidavit as Exhibits 5, 6 and 7, respectively, show that Svensson was included with others in the various promotion pools for Managing Director.

Candidates for demotion to GER, to which Svensson was demoted in 2002, were selected from across the same broad range of portfolio teams in the IMD. Unredaction of Putnam document PRM 1691, a copy of which in the redacted form in which it was produced by Putnam, is annexed to the Moloney Affidavit as Exhibit 8, handwritten notes describing another meeting with Brett Browchuk during which the demotion of Lisa Svensson was discussed, undoubtedly will identify others who were considered for demotion. Putnam document PRM 1308-1309, a copy of which in the redacted form in which it was produced by Putnam, is annexed to the Moloney affidavit as Exhibit 9, is a January 30, 2003, e-mail from Chief Investment Officer of Specialty Growth, Daniel Miller, which shows that management decisions at Putnam were being made by a broader range of officials than those assigned only to GER. According to the document, Miller's input had been requested by Managing Director and Chief Operating Officer Brett Browchuk who was looking across a range of teams, of which Lisa Svensson's was one, for ways to cut salary burden. In this process, Putnam was comparing Svensson to other persons from a number of investment teams. Unredaction of the redacted portion of this document undoubtedly will identify other persons with whom Miller compared Svensson.

Upon information furnished to Svensson and her belief, at least one male Managing Director was considered for demotion to the position that Lisa Svensson in 2002 was forced to take. Based upon this alone, every SVP/Senior Portfolio Manager and Managing Director during the year of Svensson's demotion, whether or not demoted, is properly a comparator of Svensson.

There was an Operating Committee at Putnam, the members of which included the heads of each of the four Putnam divisions as well as the head of Human Resources and Putnam's Chief Financial Officer. The Operating Committee reported to defendant Lawrence J. Lasser ("Lasser") who also was a member of this committee. All of the members of the Operating Committee were located at Putnam's Boston office. Svensson First Affidavit, ¶¶ 6-7. 3

16

Svensson and the court the documents and information necessary to evaluate this and the other claims of Putnam claim are true or not.

       (e)     <u>There is no merit to Putnam's claim that only males who were not terminated can be valid comparators with respect to Svensson's termination claim</u>.

Putnam also makes the specious claim that Svensson cannot use any females as comparators for her termination claim because only male Putnam employees who were not terminated are valid comparators. Opposition, p. 14. This argument ignores the relevance of evidence that similarly situated females also were discriminated against by Putnam. Indeed, Fed. R. Evid. 404 authorizes the admission of evidence that other employees suffered discrimination by the defendant employer, not to prove that the employer acted the same way toward the plaintiff, but to establish the employer's state of mind or motive. Rule 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. <u>It may, however, be admissible for other purposes, such as proof of motive</u>, opportunity, <u>intent</u>....

(Emphasis added.)

In <u>Conway</u>, the United States Court of Appeals for the First Circuit held that the female plaintiff employee, in support of her gender discrimination claim, could introduce testimony by another employee as to discriminatory statements made to her by a corporate officer, which did not concern the plaintiff, as evidence of corporate state of mind or discriminatory atmosphere, even though the statement had been made 22 months prior to plaintiff's termination:

> ...<u>As this court has ruled, circumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add "color" to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.</u> ... Thus, we cannot say that the district court erred in permitting [the] testimony as [it] tend[s] to highlight the atmosphere and institutional state-of-mind present at Electro Switch during the plaintiff's period of employment.

> \*\*\*

> It is our view, however, that evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment. The rationale underlying the admission of such evidence militates against its exclusion on those grounds. Evidence of institutional state-of-mind may be presented for the consideration of the trier-of-fact because an employer's willingness to consider impermissible factors such as race, age, sex, national origin, or religion while engaging in one set of presumably neutral employment decisions-in this case, pay scales-might tend to support an inference that such impermissible considerations may have entered into another area of ostensibly neutral employment decisions-here, an employee's termination. While this court has recognized that "proof of a general atmosphere of discrimination is not the equivalent of proof of discrimination against an individual," it may be one indication that the reasons given for the employment action at issue were "implicitly influenced" by the fact that the plaintiff was of a given race, age, sex or religion.

825 F.2d at 596-98.  (Emphasis added.).[9]

    (f)    With respect to Svensson's demotion claim, Putnam incorrectly seeks to limit comparators to persons on the International Growth Equity team (incorrectly referred by Putnam as "Global Growth Team) when Svensson was demoted.

On page 15 of its Opposition, Putnam claims that, with regard to Svensson's demotion from the International Growth Equity Team (incorrectly referred to by Putnam in its Opposition as "Global Growth Team") to the analyst position in GER, the only valid comparators are the persons who managed one of the several funds of the funds of the International Growth Equity team, the Global Growth Fund, at the time of Svensson's demotion.  This is wrong.  First, as set forth above, comparators need not be employed in the same team or group so long as they held sufficiently similar positions and has sufficiently similar job duties.  Under applicable law, when Putnam elected to disband the International Growth Equity team in 2002, it was required to  compare Svensson with other portfolio manages employed by other Putnam investment teams within the Investment Management Division, and to demote

---

[9] See also Cummings, 265 F.3d at 63; Jay Edwards, Inc. v. New England Toyota Distributor, Inc., 708 F.2d 814, 824 (1st Cir. 1983); Koster v. Trans World Airlines, 181 F.3d 24, 33-34 (1st Cir. 1999); Carey, 156 F.3d at 37-38; Brennan v. GTE Government Systems Corp., 150 F.3d 21, 27-28 (1st Cir. 1998); Brown, 891 F.2d 337 (1st Cir. 1989); Briddell, 233 F.R.D. at 59-61; Hernandez v. Universidad Metropolitana, 190 F.Supp.2d 268, 271-72 (D.P.R. 2002); United States v. Massachusetts Industrial Finance Agency, 162 F.R.D. 410 (D. Mass. 1995).

whoever was least deserving.  Therefore, valid comparators include all similarly situated portfolio managers within the Investment Management Division.

Second, even if the pool of valid comparators were limited to those employed by the International Growth Equity team, it would not be limited to those employed in 2002.  As set forth above, comparators may have been employed over a time period extending both before and after the adverse actions against the plaintiff.

        (g).    <u>With regard to Svensson's failure to promote claim, valid comparators include females not promoted</u>.

On page 16 of its Opposition, Putnam again asserts that valid comparators include only males promoted to Managing director, not females denied such a promotion.  Yet, as set forth above, Putnam ignores the relevance of its discriminatory treatment of other similarly situated females.  Such evidence establishes Putnam's motive and shows a discriminatory atmosphere pervading Putnam in the years immediately before or after the employment decisions Svensson complains of.

        (h).    <u>Putnam's claim that comparators for Svensson's equal pay claims must have worked in the same position in the same team as Svensson is wrong</u>.

With regard to Svensson's equal pay claims, Putnam again argues that Svensson's proposed comparators are valid only if they worked in the same "department or specific discipline."  (Opposition, p. 17).  This appears to be yet another version of Putnam's oft repeated but incorrect argument that Svensson can compare herself only to other investment professionals on the International Growth Equity team or in the GER.  For the reasons previously set forth, that is wrong.

        7.    <u>Putnam's argument with respect to Interrogatory No. 10 does not in fact, relate to Interrogatory No. 10 or to any other Interrogatory subject to Svensson's motion to compel</u>.

On page 18 of its Opposition, Putnam argues that Svensson is not entitled to the information sought by "Interrogatory No. 10".  However, the interrogatory, which the Putnam memorandum asserts is "No. 10" appears nowhere in Svensson's interrogatories which are the subject to her motion to compel. Therefore, as Putnam's argument makes no sense,  Svensson cannot respond to it.

8. <u>Conclusion</u>.

For all of the above reasons, and those stated in Svensson's memorandum in support, Putnam's objections to Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12 should be stricken; Putnam should be ordered to serve forthwith full and responsive answers to each of these interrogatories; and Svensson should be awarded her attorneys' fees and costs pursuant to Fed. R. Civ. P. 37(a)(2)(4).

<div style="margin-left: 40%;">

LISA SVENSSON, plaintiff

By her attorneys

BARRON & STADFELD, P.C.

/s/ Kevin F. Moloney
Kevin F. Moloney     BBO No. 351000
Roger T. Manwaring   BBO No. 548041
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, admitted PHV
JOHN K. WEIR LAW OFFICES, LLC
300 Park Avenue, Suite 1700
New York, New York 10022
Tel.: 212.572.6374

</div>

Dated: June 8,  2006

<div style="text-align: center;"><u>Certificate of Service</u>.</div>

This document, in redacted format is filed through the ECF system, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

A copy of this document in unredacted format was delivered by messenger to counsel of record:

<div style="margin-left: 40%;">

/s/ Kevin F. Moloney

</div>

Dated: June 8, 2006

[360503.1]

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



Civil Action No. 04-12711-PBS

LISA SVENSSON
    Plaintiff       .

           v.         .      RECEIVED

PUTNAM INVESTMENT, et al  .     FEB 13 2006
    Defendants        .
                    .     K.F.M.
                    .

. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON DECEMBER 13, 2005

APPEARANCES:

For the plaintiff:  John K. Weir, Esquire, John K. Weir Law
Offices, LLC, 300 Park Avenue, Suite 1700, New York, NY 10022,
212-572-6374.

Nancie Edgren, Esquire, Barron & Stadfield PC, 100 Cambridge
Street, Suite 1310, Boston, MA 02114, 617-723-9800.

For the Defendant:  Louis A. Rodriques, Esquire, Bingham
McCutchen LLP, 150 Federal Street, Boston, MA 02110, 617-951-
8340.


Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

I-2

1                              **I N D E X**

2   Proceedings                                              3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I-3

1                       P R O C E E D I N G S

2  (Court called into session)

3            THE CLERK:  The Honorable Marianne B. Bowler

4  presiding.  Today is December 13, 2005 in the case of Lisa

5  Svensson v. Putnam Investments.  Civil Action No. 04-12711 will

6  now be heard.  Will counsel please identify themselves for the

7  record.

8            MR. WEIR:  John Weir, Your Honor, appearing pro hac

9  vice.

10           MS. EDGREN:  Good afternoon, Your Honor, Nancie

11 Edgren for the plaintiff, Lisa Svensson.

12           THE COURT:  Thank you.  You've paid your $50?

13           MR. WEIR:  I have, I believe, Your Honor.

14           THE COURT:  That's very important.

15 Good afternoon, Your Honor, Lou Rodriques from Bingham

16 McCutchen for Putnam Investments, and with me is Allison Kirper

17 (ph), my colleague.

18           THE COURT:  Thank you very much.  Well, we're here

19 for a hearing on docket entry number 24, which is the motion to

20 compel.  So I'll hear the moving party.

21           MR. WEIR:  Thank you, Your Honor, appearing for the

22 plaintiff, Lisa Svensson, we have moved to compel Putnam

23 Investments to produce documents in this case pursuant to our

24 notice that was dated August 9th of 2005.  We initially appeared

25 at a scheduling conference in this case back in the early part

I-6

1    year request for everybody.  Just contextually, Your Honor,

2    in 2000, which is about when the facts that gave rise to this

3    case began to happen, Putnam had--

4            THE COURT:  Just one second.

5    (Pause)

6            THE COURT:  Excuse me, but I don't want to hold

7    counsel here.

8            MR. RODRIQUES:  Okay.  In 2000 when the facts that

9    began to give rise to this complaint started to occur, Putnam

10   had 7,500 employees, Your Honor.  Today Putnam has about 3,000

11   employees.  So in the last three or four and half years or so,

12   it's lost 4,500 of the 7,500 employees, so when we first read

13   this request we said, this is ridiculously overbroad.  We have

14   had conversation.  The disagreement between us now is whether

15   terminations, promotions, denials of promotions outside of the

16   decision making unit in which Svensson was a participant are

17   relevant.  That is, we have offered to produce the information

18   with respect to terminations of denials of promotion, et

19   cetera, with respect to the global gross group which is where

20   she was in 2002 when she moved from global gross into global

21   equity research, and then we offered to produce information

22   with respect to the people in global equity research which is

23   where she was when she was terminated.  We did that in reliance

24   on the Court's decisions in other cases that typically you

25   don't look outside of the group in which the employee is

1   employed; that is, you look at the decisions by the same

2   decision maker. We cited those cases in our opposition to the

3   motion to compel, and Mr. Weir doesn't cite any contrary

4   authority. Yet the case is pretty clear, both the *Jackson* case

5   and the *Whittingham* case, that decisions by other people in

6   other parts of the company aren't probative on the question of

7   whether or not there was discrimination in her unit.

8           THE COURT: I'm inclined to agree.

9           MR. WEIR: Your Honor, the situation is this. Lisa

10  Svensson was demoted in 2002 from portfolio management to

11  global gross group to the research department. She didn't want

12  to go back to research. She was told she had to go back to

13  research, and she consistently sought to return to portfolio

14  management after 2002 so that her comparators are not only the

15  people in the research department, but also those who were

16  allowed to remain in portfolio management and those who

17  received promotions to portfolio management during the period

18  of time after she went back to research.

19          MR. RODRIQUES: Can I just, if you start with that

20  argument, if I can give you a picture, Your Honor. The group

21  she was in consisted of about 10 to 15 portfolio managers.

22  This is in 2002. That group was disbanded. The boss of the

23  group was fired. The other 10 to 15 people, including

24  Ms. Svensson, were parceled out to the rest of the

25  organization. We're happy to give him information with respect

1    to those 10 or 15 people to see where they went and why, but

2    I don't think Mr. Weir is seriously arguing that Putnam had an

3    obligation to bump somebody in another job and put her there.

4                THE COURT:  No, as to those individuals at this time.

5                All right, next.

6                MR. WEIR:  Request number 7, all documents which

7    relate or support any of the admissions, denials, denials,

8    acknowledge or information or other allegations contained in

9    defendant's answer, then we limited that--

10               THE COURT:  It's pretty broad.

11               MR. WEIR:  I accept it was broad, Your Honor.  At the

12   pre-motion conference we limited that to the specific

13   paragraphs of the complaint which contained the events of which

14   are the guts of this lawsuit.

15               MR. RODRIQUES:  We have two objections to this, Your

16   Honor.  First, as Your Honor correctly points out, it's very

17   broad, and in the second objection, which is one that has been

18   approved by this Court in other cases, is to ask a request that

19   says produce all documents that support your denial, ask the

20   lawyer to produce documents and that in effect would be of the

21   mental impressions of counsel.  I can't give that

22   interrogatory, that document request to my client and say

23   produce those documents.  They're going to say to me, well,

24   which documents are, they and there are cases which we cite in

25   our brief which say that that request is improper.  This is