UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| * * * * * * * * * * * * | * | Civil Action No. 04-12711-PBS |
| | * | |
| LISA SVENSSON | * | |
| | * | BBO No. 351000 |
|     Plaintiff, | * | |
| | * | Plaintiff's Memorandum |
| v. | * | in Support of her Motion, |
| | * | Pursuant to Fed. R. Civ. P. |
| | * | 37(a), for Orders Compelling |
| PUTNAM INVESTMENTS, | * | Deposition Witnesses Richard |
| LLC f/k/a PUTNAM INVEST- | * | Tibbetts and Stephen |
| MENTS, INC. and LAWRENCE | * | Oristaglio to Resume Their |
| J. LASSER, | * | Deposition Testimony to |
| | * | to Answer Questions that |
|     Defendants. | * | Their and Putnam's Counsel |
| | * | Directed Them not to Answer and |
| * * * * * * * * * * * * | * | to Give Further Testimony |
| | | Concerning the Subject Matters |
| | | Thereof; and for Other Appropriate |
| | | Relief Including an Award of |
| | | Costs, Including Attorneys' Fees |

1. <u>Introduction</u>.

Plaintiff Lisa Svensson ("Svensson") has moved the court, pursuant to Fed. R. Civ. P. 37(a), to enter orders:

    A.   Compelling deposition witnesses Richard Tibbetts ("Tibbetts"), defendant Putnam's head of its Human Resources Department, and Stephen Oristaglio ("Oristaglio"), former co-head of Putnam's Investment Management Division, to resume their depositions to answer questions their counsel (who also represents Putnam in this case) directed them not to answer, and to testify further concerning the subject matters thereof; and,

    B.   Entering sanctions against Putnam, Tibbetts, Oristaglio and their counsel, including, without limitation, an

award of costs and attorneys' fees incurred in the obtaining of the orders.

The grounds for this motion are as follows:

2. <u>Facts</u>.

Plaintiff Lisa Svensson's complaint in this case alleges, among other things, that defendants Putnam Investments, LLC ("Putnam") and its former Chief Executive Officer, defendant Lawrence Lasser ("Lasser"), unlawfully discriminated against her based on gender in failing to compensate her equally as an investment professional in Putnam's Investment Management Division ("IMD"), failing since 1997 to promote her to the position of Managing Director, demoting her in 2002 and terminating her employment on September 15, 2003. Putnam and Lasser deny Svensson's claims contending that Putnam's actions concerning Svensson were not unlawful and that the termination of her employment on September 15, 2003, was the result of alleged defects in Svensson's "management style."[1]

In her answers to Putnam's interrogatories and in her Fourth Affidavit of Lisa Svensson, Svensson contends that one Omid Kamshad ("Kamshad") and one Justin Scott ("Scott"), also investment professionals in the IMD, are among her comparators for one or more of her claims concerning the Putnam employment actions against her.

---

[1] Putnam memorandum, filed November 22, 2005, p. 2.

As part of her case, Svensson contends that Putnam discriminated against in that, among other things, her employment by Putnam was terminated on September 15, 2003, for alleged defects in "management style," while Putnam and Lasser, since at least 2000 had known of, and allowed, certain male investment professionals to engage in conduct of a far more serious nature than that alleged of Svensson.  For example, Svensson contends that Kamshad and Scott violated their fiduciary duties by participating in the improper behavior known as "market timing"[2] to profit at the expense of long-term

---

[2] According to the Securities and Exchange Commission:

"Market timing of mutual fund shares, sometimes called "trading on stale prices" or "time zone arbitrage," refers to a strategy in which a trader attempts to profit when a mutual fund's (its price per share) does not reflect the fair value of the fund's portfolio.  For international mutual funds, market timing works as follows: Mutual funds calculate NAV once a day as of 4:00 pm Eastern Time based on the most recent market price of the portfolio's securities. If portfolio securities have not traded for a period of time before net asset value is calculated because the foreign market in which they trade is closed, the market price of those portfolio securities may be "stale". The longer the time period, the more stale the price. For example, fund that invests entirely in Japanese securities will have prices that are determined at the of the Tokyo Stock Exchange, which closes at 1:00 a.m. Eastern Time. The NAV of the mutual fund will be computed 15 hours later at 4:00 p.m. Eastern Time. These prices will be 15 hours stale. A market timer makes a decision to buy or sell mutual fund shares when events occurring during the 15 hours between 1:00 a.m. and 4:00 p.m. indicate that the true value of the mutual fund is more or less than the fund's NAV.

"Market timing is inconsistent with the interests of other fund shareholders.  When market timer buys fund shares that are undervalued or sells shares that are overvalued, the timer dilutes the value of the mutual fund. In short, the gain realized by the market timer is paid for by all of the other fund shareholders. This is because the investments of the other fund shareholders had paid for the assets

investors, and that this conduct had been on-going at Putnam for many years.

There is strong evidence that since at least February of 2000, Putnam, including Tibbetts and Lasser, knew that this unlawful conduct was occurring. For example, in a memorandum to "File" on February 18, 2000, with copies to, among others, Scott, Tibbetts deposition Exhibit No. 10 (the "Tibbetts Memorandum"), Tibbetts wrote of a conversation he had had with Kamshad,

> On January 25th, 2000, I had a conversation with Omid Kamshad, Managing Director, International Growth, regarding large and frequent movement of deferred compensation... <u>I confirmed our concerns about large amounts of money being moved within short time frames, particularly in incubated portfolios was inconsistent with our belief in investing over long-term as well and more importantly inconsistent with our tolerances of standard mutual fund clients</u>....

(Emphasis added.)

Svensson contends, as does the S.E.C. in the S.E.C. Action, that despite this discussion and the Tibbetts Memorandum, Kamshad and Scott continued their improper behavior.

It was only after Putnam's termination of Svensson's employment on September 15, 2003, when the market timing activities of Kamshad and Scott later became a public scandal,

---

that were responsible for the increase in the fund's value." <u>S.E.C</u>. v. <u>Scott, et al</u>., United States District Court, District of Massachusetts, Civil Action No. 03-12082-EFH (the "S.E.C. Action"), Joint Pretrial Memorandum, filed June 20, 2006, pp. 4-5.

4

that Putnam, under pressure from the S.E.C. and the Commonwealth of Massachusetts, took action against them.

As a result of the scandal, in February 2005, Putnam settled with the S.E.C. and the Commonwealth by,

> ...agree[ing] to reimburse shareholders a total of $153.5 million for damages with the <u>total regulatory cost of the case to Putnam of $193.5 million,</u> including both restitution for damages resulting from improper trading and penalties the company agreed to pay to federal and state regulators.

<u>Boston Globe</u>, February 4, 2005, p. C-1. (Emphasis added.)

As a further result of the scandal, Putnam investors withdrew over $100 billion from Putnam management, which <u>"result[ed] in lost revenue to Putnam of hundreds of millions of dollars</u>." <u>Id</u>. (Emphasis added.) The S.E.C. Action against Scott and Kamshad is awaiting trial in this court before Senior Judge Harrington.[3]

In Svensson's deposition of Tibbetts on June 8, 2006, Svensson's counsel tried to inquire of Tibbetts as to the Tibbetts Memorandum and Kamshad's market timing activities but Kamshad's counsel, Attorney Kociubes, who also is counsel to Putnam, instructed Tibbetts not to answer the questions. Asserting that the subject matter of the questions was not "relevant," Attorney Kociubes did not allow Tibbetts to answer subject to the objection; nor did he give the instruction to

---

[3] <u>See</u> Docket, Civil Action No. 03-12082-EFH.

preserve a privilege or to enforce a court order or adjourn the deposition in order to seek a protective order.  Instead, he refused to allow Tibbetts to answer the question.  The transcript of the Tibbetts deposition shows the following:

```
                                  108
              ***
   3       MR. WEIR:  .... Let
   4   me mark as Exhibit Number 10 a document that says
   5   To File from Richard B. Tibbetts dated February 18,
   6   2000.
              ***
   9       Q.  Let me show you what has been marked as
  10   Exhibit Number 10 for identification, Mr. Tibbetts,
  11   and ask you if you prepared this document?
  12       A.  Yes.
  13       Q.  You did so on or about February 18th of
  14   2000?
  15       A.  Correct.
  16       Q.  What occasioned your preparation of this
  17   document?
  18          MR. KOCIUBES:  Hold on.  Unless you
  19   can articulate some even remote measure of
  20   relevance of this document to this case I am
  21   instructing the witness not to answer.
  22          MR. WEIR:  I believe that this
  23   document is relevant to this case and we have
  24   already had references in the testimony to Omid

                                  109
   1   Kamshad who is the individual referenced in this
   2   document and there is presently before the court
   3   information with respect to his being a comparator
   4   of Miss Svensson, the plaintiff in this case, and I
   5   feel that I am entitled to ask questions about
   6   that.  In any event, your objections under the
   7   rules are reserved for the time of trial.  It is
   8   inappropriate for you to instruct the witness not
   9   to answer.
```

10          **MR. KOCIUBES:** Well, the rules don't
11  permit you to inquire into anything that you can
12  think about without relevance. If you want to
13  inquire about his duties or anything like that to
14  establish or attempt to establish his comparator I
15  won't cut that off, **otherwise I am going to**
16  **instruct the witness not to answer.**
17          MR. WEIR: I am going to go through
18  the questions in any event.
19     Q.  This document references a conversation
20  you had with an individual by the name of Omid
21  Kamshad on or about January 25th, 2000, is that
22  correct?
23          **MR. KOCIUBES:  Just yes or no.**
24     A.  Yes.

                                          110
1      Q.  Do you have a recollection of the
2  substance of that conversation?
3          **MR. KOCIUBES:  Again, just yes or**
4  **no.**
5      A.  Yes.
6      Q.  What was the substance of the
7  conversation that you had with Mr. Kamshad on
8  January 25th, 2000?
9          MR. KOCIUBES: **Unless it relates to**
10  **Miss Svensson I instruct you not to answer**.
11          MR. WEIR: I submit it does relates
12  to Miss Svensson.
13          MR. KOCIUBES: We will find out. **If**
14  **it relates to her you can answer. If it doesn't,** I
15  **would instruct you not to answer**.
16     A.  It doesn't relate to her.
17     Q.  This document indicates that this
18  information was brought to your attention by Mr.
19  Cassaro, the Chief Administrative Officer of the
20  Investment Division, is that correct?
21          MR. KOCIUBES: Objection. The
22  document says what it says. Go ahead. **Again, just**
23  **yes or no.**
24     A.  Yes.
                                          111

```
 1      Q.  As a result of your meeting with Mr.
 2   Kamshad did you communicate the substance of your
 3   discussion with him to anyone else?
 4           MR. KOCIUBES:  **Just yes or no**.
 5      A.  Yes.
 6      Q.  To whom?
 7           MR. KOCIUBES:  **Unless it was to or
 8   about or related to Miss Svensson I instruct you
 9   not to answer.**
10      A.  It wasn't related to Lisa.
11      Q.  Did you have such a discussion with the
12   individuals who are cc'd on the document apart from
13   Mr. Cassaro?
14           MR. KOCIUBES:  **Again, unless any of
15   those conversations in any way at all had anything
16   to do with Miss Svensson I instruct you not to
17   answer**.
18      A.  They had nothing to do with Lisa.
19      Q.  Did you have any discussions on this
20   subject with anyone other than the individuals who
21   are cc'd on the document?
22           MR. KOCIUBES:  **Same instruction**.
23      A.  Not related to Lisa.
24           MR. WEIR:  The question called for a
                              112
 1   yes or no answer.  **Are you still instructing him
 2   not to answer?**
 3           MR. KOCIUBES:  **I am**.
 4      Q.  Did you have a discussion with Mr. Larry
 5   Lasser concerning the subject referenced in your
 6   memo of February 18th, 2000?
 7           MR. KOCIUBES:  **Same instruction**.
 8           MR. ROSENTHAL:  Objection.
 9      A.  It had nothing to do with Lisa.
10      Q.  Did you have a discussion regarding the
11   subject of this memorandum with Mr. Ferguson?
12           MR. KOCIUBES:  **Same instruction**.
13      A.  It had nothing to do with Lisa.
14      Q.  Okay.  In what time frame were
15   individuals being considered for Managing Director
16   in the year 2000?
```

(Emphasis added.)

Thereafter, Attorney Kociubes instructed Tibbetts not to identify by name the person who is referred to as "Head of International Growth." in an e-mail from Scott on April 25, 2003, Tibbetts deposition Exhibit No. 23, but whose name Putnam redacted prior to producing it.  Once again, Attorney Kociubes, claiming lack of relevancy, refused to allow Tibbetts to answer subject to the objection; nor did he give the instruction to preserve a privilege or to enforce a court order or to adjourn the deposition to seek a protective order.  Instead, he instructed Tibbetts not to answer.  The transcript shows the following:

                                                                182
                              ***
```
 2    Q.  Let me show you what has been marked as
 3  Exhibit Number 23 for identification and ask if you
 4  can identify that document?
```
                              ***
```
10    A.  I don't have a recollection of that but I
11  see that I am a recipient and I don't have any
12  reason to believe that I didn't.
13    Q.  Do you see the sentence, "The important
14  titles will be the MD title?"
15    A.  Yes.
16    Q.  And that relates to Managing Director?
17    A.  Yes.
18    Q.  There is indication of individuals
19  designated by male and female within the body of
20  that e-mail, do you see that?
21    A.  Yes.
22    Q.  With respect to the first male it says,
```

>    23   "We (Tim, Omid and I) gave him a commitment."  Who
>    24   is the Tim, Omid and I?
>                                                          183
>    1     A.  Tim is Tim Ferguson, Omid would be Omid
>    2   Kamshad and I is Justin Scott who is writing the
>    3   note.
>    4     Q.  Do you know what commitment was given to
>    5   the male individual here?
>    6     A.  Well, it would appear a commitment to
>    7   nominate him to a Managing Director.
>    8     Q.  Do you know the individual male's
>    9   identity?
>    10          MR. KOCIUBES:  Yes or no.
>    11    A.  I do not.
>    12    Q.  With respect to the second male it says
>    13  "Head of International Growth."  Do you know the
>    14  individual male being referred to there?
>    15          MR. KOCIUBES:  Again, yes or no.
>    16    A.  Yes.
>    17    Q.  Who is that individual?
>    18          **MR. KOCIUBES:  I would instruct you
>    19  not to answer**.

(Emphasis added.)

In the deposition of Oristaglio on June 13, 2006, Attorney Kociubes, representing both the witness and Putnam, once again when Svensson's counsel tried to inquire concerning Kamshad, instructed the witness not to answer.  He did not give the instruction to preserve a privilege or to enforce a court order; nor did he adjourn the deposition to seek a protective order. He instructed the witness not to answer.  The transcript shows the following:

                                        158
                         ***

```
14     A.  I do recall that, absolutely.  There was a
15  lot of discussions about Omid Kamshad.
16     Q.  I'm talking about the time frame before
17  Lisa Svensson's termination --
18     A.  See, I don't --
19     Q.  -- which is September 15th of 2003.
20     A.  Okay.  You know, the dates are really
21  mushy.  Since you've asked me the question about
22  Omid Kamshad, I do recall a lot of discussion in
23  regard to Omid Kamshad.
24           MR. KOCIUBES:  I'm going to instruct
                                                 159
 1  you, unless any of them relate to Ms. Svensson, not
 2  to get into any of those details.
```

(Emphasis added.)

3.  Argument.

3.1. Instructing a deposition witness not to answer a deposition question except only to preserve a privilege, to enforce a court order or to adjourn the deposition to seek a protective order, is a violation of Fed. R. Civ. P. 30.

Instructing a deposition witness not to answer a deposition question except only to preserve a privilege; to enforce a court order or to adjourn the deposition to seek a protective order, is a violation of Fed. R. Civ. P. 30.

> A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness.  There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and the witness to formulate answers.

Johnson v. Wayne Manor Apartments, 152 F.R.D. 56, 59 (E.D.Pa.,

11

1993). (Emphasis added.)

Fed. R. Civ. P. 30(c) requires that deposition testimony shall be taken "subject to" any objections. In particular, Rule 30(c) states,

> Examination and cross-examination of witnesses may proceed as permitted at the trial.... All objections made at the time of the examination to...any...aspect of the proceedings shall be noted...upon the record ...; but <u>the examination shall proceed, with the testimony being taken subject to the objections</u>....

(Emphasis added.)

Rule 30(d)(1) forbids an attorney to instruct a witness not to answer a deposition question except only in three instances: (1) to preserve a privilege; (2) to enforce a court order; or, (3) to adjourn the deposition to seek a protective order. The rule states,

> Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. <u>A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)</u>.

(Emphasis added.)

But during the Tibbetts and Oristaglio depositions in the instances set out above, Attorney Kociubes engaged in the conduct criticized by the court in <u>Johnson</u>. He did not allow Tibbetts and Oristaglio to testify subject to objection; he did not instruct them not to answer in order to preserve a privilege, to enforce a court order or to adjourn to seek a

12

protective order. Instead, arrogating to himself or to the witness the role of the court, he acted as an intermediary, interpreted questions, decided which questions should be answered, requested the witness to determine if the questions "related" to Svensson and outright refused to allow Tibbetts and Oristaglio to answer. This conduct in each of the instances set forth above was in clear violation of the rules.

The courts enforce Rules 30(c) and (d) by entering orders compelling the witness to resume the deposition and by awarding to the interrogating party costs, including the attorneys fees incurred in obtaining the order. American Hangar, Inc. v. Basic Line, Inc., 105 F.R.D. 173, 1 Fed.R.Serv.3d 1086 (D. Mass. 1985). Writing for this court in American Hanger, Magistrate Judge Hollings said,

> ...counsel for the defendant acted improperly in instructing his witnesses not to answer questions at the deposition and that his opposition to the motion to compel answers to those questions was not "substantially justified" because the instructions were improper regardless of the merits of the reasons for the instructions. Nor do I find any circumstances making an award of expenses unjust. During the deposition, counsel for the defendant could have moved for a protective order or moved for an order pursuant to Rule 30(d)....

(Emphasis added.) See also Calzaturficio S.C.A.R.P.A. S.P.A., v. Fabiano Shoe Company, Inc., 201 F.R.D. 33 (D. Mass. (2001); Paparelli v. The Prudential Insurance Company of America, 108 F.R.D. 727 (D. Mass. 1985).

Accordingly, Svensson requests the court to order Tibbetts and Oristaglio to resume the depositions and to answer the questions at issue including those concerning Kamshad's and Scott's engaging in "market timing" at Putnam; and to require Putnam, Tibbetts, Oristaglio and their counsel to pay to Svensson her costs including attorneys' fees incurred in obtaining the order.

3.2 <u>Attorney Kociubes' claims that the subject matter of the questions to Tibbetts and Oristaglio was not relevant were without merit</u>.

In any event, Attorney Kociubes' claims that the subject matter of the questions to Tibbetts and Oristaglio was not relevant were without merit.

In a deposition, a party may inquire as to,

> ...<u>any matter, not privileged, that is relevant to the claim or defense of any party</u>, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

Fed. R. Civ. P. 26(b)1).[4] (Emphasis added.)  That rule provides further that,

> For good cause, <u>the court may order discovery of any matter relevant to the subject matter involved in the action</u>. Relevant information need not be admissible at the trial if the discovery appears reasonably

---

[4] That rule provides further: "For good cause, <u>the court may order discovery of any matter relevant to the subject matter involved in the action</u>. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." (Emphasis added.)

14

>   calculated to lead to the discovery of admissible evidence.

(Emphasis added.)

The instructions to Tibbetts and Oristaglio not to answer the questions at issue, upon a claim that the subject matter of those questions was not "relevant" or if, in the opinion of the witness, the subject matter did not "relate to" Svensson, must be taken to be the assertion by Attorney Kociubes that the subject matter of the questions was not "relevant" within the meaning of Rule 26(b)(1) to any "claim" of Svensson in this case. Such an assertion is meritless.

Svensson has alleged disparate treatment and disparate impact claims in this case. It is certainly relevant to her claims if male investment professionals in the Putnam IMD engaged for a period of years in far more serious misconduct than what Svensson is alleged to have done, but who for years were not disciplined, demoted or terminated as she was. Such evidence is relevant and routinely is relied upon either to make out a <u>prima facie</u> case or to show that the employer's proffered legitimate non-discriminatory justifications for the adverse employment action.

A number of First Circuit cases have considered evidence that the employer failed to discipline other workers not within the plaintiff's protected class, for conduct of the same or a

15

more serious nature.  In Conward v. Cambridge School, 1998 WL 151248 (D. Mass. 3/24/98), the court said that in making a prima facie case,

> [t]he question is whether Conward has offered sufficient proof that the Cambridge Public Schools and Superintendent McGrath have not terminated teachers outside the protected class who engaged in misconduct as serious or more serious than Conward's.

1998 WL 151248, *3. (Emphasis added.)  See also Che v. MBTA, 342 F.3d 31, 38-39 (1st Cir. 2003); Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003); Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 447 (1995); Lopez v. Target Corp., 2005 WL 1812466, *4 (Mass. Super. 6/9/05); Davis v. Jenny Craig, Inc., 1998 WL 1181152, * 11 (Mass. Super. 11/30/98)(all considering evidence that others who engaged in conduct of comparable seriousness were not disciplined as severely).

Cases law from other federal circuits also establishes the relevance of evidence that more serious conduct by persons outside of the protected class went unpunished.  In Lynn v. Deaconess Medical Center-West Campus, 160 F.3d 484 (8th Cir. 1998), the United States Court of Appeals for the Eighth Circuit stated:

> As proof of pretext, Lynn presented evidence that Deaconess disciplined female nurses...less severely than he was disciplined for conduct that was more egregious than his.  Primarily, Lynn points to his supervisors' favorable treatment of another registered nurse in the Rehab Unit, Karen Mohr.  Instances of disparate treatment can support a claim of pretext,

16

>   but Lynn has the burden of proving that he and the
>   disparately treated female nurses were "similarly
>   situated in all relevant respects."...
>
>                              ***
>
>   <u>To require that employees always have to engage in the
>   exact same offense as a prerequisite for finding them
>   similarly situated would result in a scenario where
>   evidence of favorable treatment of an employee who has
>   committed a different but more serious, perhaps even
>   criminal offense, could never be relevant to prove
>   discrimination.</u>  Common sense as well as our case law
>   dictate that we reject such an approach. <u>We think that
>   Mohr's sleeping on the job was at least comparable to,
>   if not much more serious than, the misconduct alleged
>   against Lynn.  Under the circumstances, we find that
>   Lynn and Mohr were similarly situated</u>.

<u>Id</u>. at 487-88. (Emphasis added, footnotes omitted.)

In <u>McClain</u> v. <u>Northwest Community Corrections Center Judicial Corrections Board</u>, 440 F.3d 320 (6th Cir. 2006), the United States Court of Appeals for the Sixth Circuit stated:

>   ... <u>Mort's misconduct was arguably more severe than
>   McClain's misconduct</u>.... Mort, unlike McClain, was
>   not terminated for failure to meet legitimate
>   expectations.  With this evidence, a jury could
>   reasonably find that NorthWest's expectations for
>   McClain's job performance were not legitimate because
>   NorthWest did not fire another RSC who had problems
>   communicating and implementing the center's
>   philosophy.  <u>Therefore, summary judgment was not
>   warranted in favor of NorthWest with respect to
>   either of McClain's discrimination claims</u>.

<u>Id</u>. at 334. (Emphasis added.) According to the United States District for the District of Connecticut in <u>Dickinson</u> v. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc</u>., 2006 WL 1273734 (D. Conn. 5/5/06),

17

> ...there is a genuine question of fact as to whether the conduct for which Merrill Lynch terminated Dickinson was of comparable seriousness to the conduct in which Stango engaged-<u>and even whether Stango engaged in more serious conduct than the conduct for which Dickinson was fired</u>. ...<u>Because Stango was not disciplined at all, whereas Dickinson was terminated, she has made a prima facie showing that her termination was motivated by sex discrimination</u>.

<u>Id</u>. at *9. (Emphasis added.)[5]

Thus, any claims by Attorney Kociubes that the subject matter of the questions at issue was not "relevant" within the

---

[5] <u>See also</u> <u>Dickson</u> v. <u>Labcorp</u>, 396 F.Supp.2d 1298, 1305-06 (M.D. Ala. 2005). (Where plaintiff's "threat was reported while the actual physical altercation between Morgan and Gates was not," and defendant has "failed to adequately explain the reason for this disparate treatment of white employees...., a reasonable fact-finder could find that the different treatment was 'because of' Dickson's race and LabCorp's proffered reason is pretextual"; <u>Zarke</u> v. <u>Nordeutsche Landesbank Girozentrale</u>, 396 F.Supp.2d 483, 511 (S.D.N.Y. 2005) ("The allegation that Nord/LB has disciplined Zakre for conduct for which no men are disciplined, while refusing to discipline Gajano for far worse conduct, are also issues of fact relating to bias."); <u>Palmer</u> v. <u>Stewart County School District</u>, 2005 WL 1676701, *9 (M.D. Ga. 2005) ("A reasonable jury could conclude that by giving Ledford multiple warnings and the opportunity to correct her behavior before being terminated-while Plaintiff received none-could be evidence that Defendants treated Plaintiff less favorably than her white comparator.)"; <u>Wallace</u> v. <u>Georgia DOT</u>, 2005 WL 2031111, *8 (M.D.Ga. 2005) ("[E]vidence that a white employee was not disciplined for engaging in...worse behavior than that in which [plaintiff] engaged and for which he was disciplined," presents prima facie case for disparate treatment in discipline.); <u>Hill</u> v. <u>Airborne Freight Corp</u>., 212 F.Supp. 2d 59, 67 (E.D.N.Y. 2002) ("As for Tyson, his claim is even more compelling since he was fully terminated for accruing only category B violations; hence, he was treated more harshly than the five white employees who engaged in more serious violations."); <u>Reynolds</u> v. <u>Alabama DOT</u>, 4 F.Supp.2d 1068, 1086 (M.D. Ala. 1998) ("...suspension...without taking any disciplinary action against white employees who also violated the department's racial harassment policy and who...engaged in comparable, and even worse, conduct, reflects that the...action against Reynolds was racially motivated."); <u>Westfall</u> v. <u>GTE North Inc</u>. 956 F.Supp. 707, 719 (1996) (Genuine issue of material fact presented where female plaintiff "presents evidence that male co-workers were not as severely disciplined for similar or more egregious conduct.").

18

meaning of Fed. R. Civ. P. 26 (b)(1) or that the subject matters thereof did not "relate" to Svensson were completely without merit.

4. <u>Conclusion</u>.

For all of the above reasons, the conduct of Putnam, Tibbetts, Oristaglio and their counsel during the depositions as set forth above, were highly improper and their conduct violated the rules.

Consequently, Svensson requests the court to enter orders:

A.  Compelling Tibbetts and Oristaglio to resume their deposition testimony, to answer the questions at issue and to testify further concerning the subject matters thereof, including Kamshad's and Scott's market timing activities while at Putnam; and,

B.  Requiring Tibbetts, Oristaglio, Putnam and their counsel to pay to Svensson her costs, including attorneys' fees, incurred in the obtaining of the orders, in such amount as the court, upon consideration of appropriate affidavits to be submitted by Svensson, may determine.

        LISA SVENSSON, plaintiff,

        By her attorneys,

        BARRON & STADFELD, P.C.

        /s/ Kevin F. Moloney_____
        Kevin F. Moloney BBO No. 351000
        BARRON & STADFELD, P.C.
        100 Cambridge Street, Suite 1310
        Boston, Massachusetts 02114
        Tel.: 617.723.9800/531.6569

        and

/s/ John K. Weir_____
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: June 29, 2006

Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney_____

Dated: June 29, 2006

[362768.1]