UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA SVENSSON,                          )
                                        )
                      Plaintiff,        )
                                        )
          v.                            )
                                        )    CIVIL ACTION
PUTNAM INVESTMENTS LLC, f/k/a           )    NO. 04-12711-PBS
PUTNAM INVESTMENTS, INC. and            )
LAWRENCE J. LASSER,                     )
                                        )
                      Defendant.        )

**PUTNAM INVESTMENT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DEPOSITION WITNESSES RICHARD TIBBETTS AND STEPHEN ORISTAGLIO TO RESUME THEIR DEPOSITION TESTIMONY**

Defendant, Putnam Investments LLC("Putnam"), opposes the Plaintiff's

Motion to Compel Deposition Witnesses Richard Tibbetts and Stephen Oristaglio to

Resume Their Deposition Testimony (the "Motion"). Over the course of nine

depositions, Putnam's counsel directed these witnesses to refrain from answering

three questions about (1) documents for which Putnam previously has asserted an

objection; and (2) topics, which as a matter of law, are outside the scope of this

litigation.

## I.    INTRODUCTION

Plaintiff Lisa Svensson ("Ms. Svensson"), seeks to circumvent the rules of this

Court by compelling a deponent to testify about a document for which Putnam has

asserted an objection, rather than challenging Putnam's redaction of that document

by filing a motion to compel. Ms. Svensson also seeks discovery into matters that

are outside the scope of this lawsuit, and to inquire into matters that are irrelevant, and violate Fed.R.Civ.P. 26(d)(4)'s admonition against deposing a witness "in bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the deponent or party."

Ms. Svensson seeks to re-open discovery -- which closed more than a month ago after two extensions to the discovery deadline -- without any indicia that the information she seeks is relevant or will lead to the discovery of admissible evidence. Putnam requests this Court deny her motion.

## II.    FACTUAL BACKGROUND

In 2003, Ms. Svensson was an Associate Director of Research, supervising four analysts. That summer, Ms. Svensson contacted Mary McNamee ("McNamee") of Putnam's Human Resources ("HR") department with highly critical comments about one of her otherwise well-regarded subordinates, Chris O'Malley ("O'Malley"). Surprised, McNamee and Josh Brooks ("Brooks"), the head of Putnam's Global Equity Research ("GER") Department, the department in which Ms. Svensson worked, investigated Ms. Svensson's claims about O'Malley. Brooks concluded that key statements made by Ms. Svensson about O'Malley were false. Brooks and McNamee also learned that another highly-regarded analyst was resigning in significant part due to Ms. Svensson's management style. O'Malley also was contemplating resignation for the same reason. Brooks concluded that Ms. Svensson should no longer function as a manager. Brooks offered to retain Ms. Svensson as an Associate Director of Research at the same salary and benefits, but

LITDOCS/646815.1

without managerial responsibilities.  At no time did Brooks say that the change in responsibility would result in a diminution of her compensation, which was then $650,000 a year.  Ms. Svensson declined that offer and refused Putnam's alternative proposals that she (a) seek other employment while remaining at Putnam or (b) leave Putnam with a severance package that provided benefits valued in excess of $800,000.  Instead, Ms. Svensson demanded a promotion to Managing Director and guaranteed compensation of $1 million per year for two years.  Ms. Svensson's employment thereupon was terminated.  Putnam hired a female to assume Ms. Svensson's coverage responsibilities.

## III.    PROCEDURAL BACKGROUND

The gravamen of Ms. Svensson's amended complaint is that Putnam (a) terminated her and failed to promote her to Managing Director because of her gender; (b) compensated her less than similarly situated male counterparts; and (c) retaliated against her for filing her charge of gender discrimination and for complaining about internal business practices of Putnam by refusing to repurchase her Putnam equity and failing to pay her certain deferred compensation payments allegedly due her.  Ms. Svensson demands damages of $25 million.

On June 8, 2005, Ms. Svensson served her first set of interrogatories and first request for production of documents.  Putnam objected to Ms. Svensson's first document request on the ground, among others, that, like her interrogatories, Ms. Svensson requested documents concerning *every* Putnam employee and about issues having nothing to do with her claims.  On November 4, 2005, Ms. Svensson moved to compel.  More than half a year ago, on December 13, 2005, this Court (per

- 3 -

Magistrate Judge Bowler) substantially denied Ms. Svensson's motion, but ordered a limited further production by Putnam by January 6, 2006. Putnam complied. On January 13, 2006, Ms. Svensson sought a six-month extension of the discovery deadline. This Court extended the discovery deadline to April 30, 2006. In March 2006, Ms. Svensson requested, and Putnam assented to, a second 30-day extension of the discovery deadline to accommodate the parties scheduling of additional depositions. Discovery closed on May 31, 2006. The last two depositions, those of Richard Tibbetts ("Mr. Tibbetts") Putnam's head of Human Resources and Stephen Oristaglio ("Mr. Oristaglio"), the former Chief of Investments (but now no longer employed by Putnam), were taken on June 8 and 13, respectively.

During the course of more than seven hours of deposition testimony, Putnam's attorney instructed Mr. Tibbetts not to answer *two* questions: one which was intended to embarrass and was outside the scope of this case[1]; and another which related to a redacted document as to which Putnam had asserted an objection (attached herein at Exhibit A.)[2] During the deposition of Mr. Oristaglio, counsel instructed the witness not to answer a *single* question about certain wholly

---

[1] In late 2003, Putnam terminated several investment professionals, including Omid Kamshad and Justin Scott, two Chief Investment Officers, following allegations of "market-timing." Ms. Svensson neither reported to nor supervised any of these individuals.

[2] This document is an email between two Putnam employees discussing promotions to Managing Director for 2003. First, Putnam elected no Managing Directors in 2003, so the inquiry is irrelevant on those grounds. Second, Putnam redacted the names of current and former employees on this document before Ms. Svensson had identified alleged comparators. Finally, Ms. Svensson has never alleged that some of the people whose names were redacted are her comparators.

irrelevant market-timing allegations involving other employees of Putnam.

## IV.    ARGUMENT

### A.    MS. SVENSSON'S MOTION SHOULD BE CONSIDERED IN THE CONTEXT OF HER CONDUCT OF DISCOVERY.

During the 14 month discovery period, Ms. Svensson has deposed nine Putnam employees, with most depositions lasting approximately the seven hours permitted by Fed.R.Civ.P 30(d)(2).  Instead of using all of this time to develop her case, Ms. Svensson has  harassed and attempted to embarrass current and former Putnam employees.  (She also has attempted to circumvent the rules of this Court, which require a party seeking information about a redacted document to bring a motion to compel, by asking a deponent to reveal information about which Putnam previously had asserted an objection.)   Examples of each type of inappropriate discovery behavior follow:

Scandalous inquiries: without any pretense of having a basis for the question, Ms. Svensson asked her former supervisor whether he was having an affair with the woman who replaced Ms. Svensson.  (He was not).[3]  Pages of  transcript were consumed in asking Putnam's former CEO, Larry Lasser ("Mr. Lasser") questions about his personal life.  Mr. Lasser, for example, was asked if he was married; whether this marriage was his first; how long he had been married; how many children he had in his first marriage; how long he remained single following his divorce; when did he remarry:, and whether he had any children with his second

---

[3] See excerpts from the *Brooks depo.* at pp. 240-242, attached as Exhibit B.

LITDOCS/646815.1

wife.[4]

    <u>Irrelevant, tedious and annoying discovery:</u>  Ms. Svensson appears obsessed with discovering the current and historic incomes of past and present Putnam employees, many of whom Ms. Svensson does not and cannot suggest are comparators.  For example, Mr. Oristaglio, the Former Chief of Investments, was asked his "salary prior to the time that you were -- became a consultant for Putnam."[5]  The current CEO, Charles "Ed" Haldeman, ("Mr. Haldeman"), was asked, "[w]hen you came to Putnam, what was your compensation package?"[6]  The former CEO, Mr. Lasser was asked, "were you involved in the determination of the compensation package for Ed Haldeman . . . And do you recall what that compensation package consisted of?"  The same questions were posed to Mr. Lasser with respect to Putnam's former Chief of Investments, Tim Ferguson: "Were you involved at all in the hiring, the promotion, or determination of compensation package for Tim Ferguson?"  Mr. Lasser was questioned about his salary during the last 10 months of his  tenure at Putnam: "And do you recall what your salary was at that point in time. . .  And do you recall what your bonus was in the preceding year?"[7]

    Against this back drop, counsel for Putnam finally instructed the last two witnesses, Messrs. Tibbetts and Oristaglio, not to answer questions that were

---

[4] See excerpts from the *Lasser depo.* at pp. 169-171, attached as Exhibit C.
[5] See excerpt from the *Oristaglio depo.* at p. 12, attached as Exhibit D.
[6] See excerpt from the *Haldeman depo.* at p. 32, attached as Exhibit E.
[7] See excerpts from the *Lasser depo.* at pp. 75 (Haldeman compensation); 76

(Footnote Continued on Next Page.)

completely outside any boundary of the claims raised by Ms. Svensson and instructed Mr. Tibbetts not to disclose redacted information in a document as to which Putnam previously had asserted an objection.

### B.    COUNSEL PROPERLY INSTRUCTED MR. TIBBETTS NOT TO ANSWER A QUESTION REGARDING A DOCUMENT FOR WHICH PUTNAM HAD PREVIOUSLY ASSERTED AN OBJECTION.

Mr. Tibbetts was asked to reveal the name of an employee whom Putnam was considering as Head of the International Growth Team.  Putnam objected (by redacting) when it responded to Ms. Svensson's first request for production of documents -- the very request on which Ms. Svensson had moved to compel.  Ms. Svensson -- despite having the redacted document for almost *six months* before the deposition, never filed any motion testing the redaction.  Instead, she simply asked for the information at the deposition, as though the objection had never been made.

Ms. Svensson's attempt to circumvent the rules by asking Mr. Tibbetts to reveal information to which Putnam had objected, and to which she had filed no motion, was inappropriate.  A party that seeks to challenge a discovery objection must file a motion to compel discovery.  Fed.R.Civ.P 37(a)(2); *Asian American Civic Association v. Chinese Consolidated Benevolent Association of New England, Inc.*, 43 Mass.App.Ct. 145 (1997).  The discovering party should not be permitted to circumvent the rules requiring a motion to compel as has been attempted here.  *See*

---

(Footnote Continued from Previous Page.)

(Ferguson compensation); 98 (Lasser compensation), attached as Exhibit F.

*Seaman v. Wyckoff Heights Medical Center, Inc.,* 807 N.Y.S.2d 409, 411 (2006) (ruling that the plaintiff was not entitled to an order compelling her former employer's witnesses to respond to deposition questions regarding documents that had been withheld on grounds of privilege.)

### C.    MS. SVENSSON HAS REPEATEDLY INQUIRED INTO TOPICS WHICH ARE WELL OUTSIDE THE SCOPE OF THIS LITIGATION.

During their depositions, each of Messrs. Tibbetts and Oristaglio was asked about alleged market-timing of two terminated investment professionals.[8]  Ms. Svensson argues that information surrounding the allegations of market-timing by these individuals somehow is relevant to her gender claims "if male investment professionals in the Putnam IMD engaged for a period of years in far more serious misconduct than what Svensson is alleged to have done, but who for years were not disciplined, demoted or terminated as she was."  Plaintiff's Motion at p. 15. Unfortunately, this position is inconsistent with well established First Circuit law.

For Ms. Svensson to compare her termination (or transfer) to male investment professionals for purposes of showing that Putnam treated males more favorably, Ms. Svensson must show that (1) she is a member of a protected class; (2) she was qualified for the job from which she was fired, and; (3) the misconduct for which she was discharged was *nearly identical* to that engaged in by an employee outside the protected class whom Putnam retained.  *Conward v. The Cambridge*

---

8. *See Tibbetts depo* at pp. 108-112 and *Oristaglio depo.* at p. 158-159, attached as Exhibits G and H, respectively.

LITDOCS/646815.1

*School Committee*, 171 F.3d 12, 19 (1st Cir.1999).  Two individuals are similarly situated for purposes of showing disparate treatment when a plaintiff can "identify and relate specific instances where persons similarly situated in all relevant aspect were treated differently."  *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass, 122, 129 (1997).  The alleged offenses do not need to be identical, but "must be of comparable seriousness."  *Id.* at 130.

Even assuming Ms. Svensson meets these first two criteria, she fails to meet the third, because she was not similarly situated to Mr. Kamshad and Mr. Scott "in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations."  *Smith v. Stratus Computer, Inc.* 40 F.3d 11, 17 (1 Cir.1994).  Indeed, the very case on which Ms. Svensson relies, *Conward v. The Cambridge School Committee*, makes clear that the misconduct at issue must be nearly identical.  171 F.3d at 19.  In *Conward*, the court held that for purposes of congener analysis, a black plaintiff who was terminated for sexually harassing a student could not compare himself to a white teacher who only had been reprimanded for physically assaulting a student.  *Id.* The court stated, "[t]he improper use of physical force, on one hand, and sexual harassment, on the other hand, are qualitatively different infractions.  They also create distinct problems in the school environment and present significantly different possibilities for remediation."  *Id* at 21.  *See also Swallow v. Fetzer Vineyards,* 46 Fed.Appx. 636 (1st Cir.2002) (unpublished), in which the First Circuit held that a female who was terminated for poor management of subordinates failed

LITDOCS/646815.1

to show that certain male supervisors who had similar problems with management were comparators because their deficiencies "differed significantly in scope and quantity." *Id.* at 648. Likewise, the plaintiff in *Swallow* failed to demonstrate that another Division Manager at Fetzer, who was not terminated despite sexually harassing a colleague, was her comparator. Indeed, the court stated that "[w]e cannot reasonably compare Swallow's situation -- in which several employees were threatening to resign due to her demeaning treatment of them . . . to Tanksley's inappropriate and obnoxious behavior." *Id.*

Whether Mr. Kamshad's and Mr. Scott's market-timing misconduct was "far more serious" (Plaintiff's Motion at 15) than Ms. Svensson's mismanagement of her subordinates is not a relevant question: their alleged infractions are simply too dissimilar for "a prudent person, looking objectively at the incidents, [to] think them roughly equivalent." *Conward*, 171 F.3d at 20.

Furthermore, even if this court somehow were to find the misconduct of Ms. Svensson comparable to that alleged of Mr. Kamshad and Mr. Scott, they still are not comparators because Putnam terminated all three. A comparator necessarily is a person similarly situated to the plaintiff *for whom the adverse employment action was not taken. Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir.1994) ("for us to compare Smith's treatment with that of *terminated or transferred male executives* in a meaningful way, Smith would have to show that she was similarly situated to those men") (emphasis added).

Thus, as a matter of law, Mr. Kamshad and Mr. Scott were not -- and could

never be -- comparators of Ms. Svensson.  Putnam is left to assume that the only purpose for asking about the market-timing matter was to embarrass or harass Putnam over an unrelated matter. *See Banks v. Office of Senate Sergeant-at-Arms*, 233 F.R.D. 1 (D.D.C.,2005) (refusing to order answers to questions on deposition, even where counsel improperly asserted a privilege and instructed a deponent not to answer, because "the usefulness of the answers to the questions . . . would add nothing to the resolution of the claims in this lawsuit, especially in light of the time already spent on discovery and the expense and inconvenience that would be created by resuming the depositions.")

### C.     THIS IS NOT AN APPROPRIATE CASE IN WHICH TO AWARD SANCTIONS.

The two depositions at issue consumed the allotted 7 hours.  Thus, whether counsel stopped the deposition and sought a protective order, or allowed the deposition to resume (instructing the witness not to answer three wholly irrelevant questions) this dispute was going to require judicial intervention.  Given that the subject matter of the questions not answered were previously objected to, or wholly irrelevant, Putnam requests this Court deny the Plaintiff's motion to resume the depositions of Messrs. Tibbetts and Oristaglio, and deny Plaintiff's request for sanctions.  *Paparelli v. Prudential Insurance Co. of America,* 108 F.R.D. 727, 731 (D.Mass.1985) ( sanctions  inappropriate where "[p]laintiff's counsel's questions were improper because they went far beyond the subject matter of the deposition as listed in the 30(b)(6) deposition.")

V.    **CONCLUSION**

For the foregoing reasons, Putnam respectfully requests that Ms. Svensson's

motion be denied.

**Putnam Investments, LLC**
By its attorneys,

/s/ Joseph L. Kociubes
Joseph L. Kociubes, BBO #276360
Louis A. Rodriques, BBO #424720
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

July 13, 2006

EXHIBIT A



**Justin Scott /BOS/PutnamInv**
04/25/2003 06:52 PM

To  Sherrie Holder-Watts/BOS/PutnamInv@PUTNAM, Richard Tibbetts/BOS/PutnamInv@PUTNAM, Paul Warren/BOS/PutnamInv@PUTNAM, Omid Kamshad/BOS/PutnamInv@PUTNAM

cc

bcc

Subject  Officer Nomination Process: PLEASE READ

Sherri,

The important titles  will be the MD title.

There is no turning back the MD title inflation. I resisted for a long time(ask Paul) but whether we create a more senior title to distinguish some existing MDs if we like , or recognize seniority thru committees fact is we need to make a bunch of MDs this year :-

Incl :-
**Male**   ....We (Tim, Omid and I) gave him a committment.
**Male**   .....Head of Intl Grwth.
**Male**  /........We pushed back on widely held view that he shld be MD on arrival......He is clearly at least equiv of  **Male**
  **Male**  .. Core Growth.
  **Male**  i ... I know,Incredible but true....we want him to stay and take on Mid Cap Growth..its the currency that most matters to him...The single biggest
          angst for him has been seeing all his peers from research ( He was head of tech/ADR 4 years ago). recieve MD.
  **Female**  .... Similar to **Male** this is the year !

During their desperate encirclement and ultimately succesful defense in the battle of the Bulge, the 101st airborne made dozens of field commissions....we lost $1.3bn of net outflows last month in a up month for the industry....time for field commissions !

Regards,

Justin

PS We shiuld  not delay the MDs for more than a coup[le of weeks.

----- Forwarded by Justin Scott/BOS/PutnamInv on 04/25/03 06:24 PM -----

REDACTED

EXHIBIT B

240

1  A.  It would have been held at some
2  point post being relatively clear that
3  Darren might leave or once he had already
4  declared his desire to leave, but actually
5  I don't remember talking to Frank in any
6  great detail about coming to Putnam.
7  Q.  That was because you didn't think
8  Mr. Morris was going to leave Delaware
9  Management.
10  A.  Yeah, that was part of it.  Also,
11  actually when I left Delaware Management,
12  I didn't -- I felt I had the potential to
13  hire a lot of people from that
14  organization and I didn't want to cripple
15  it so I decided I wouldn't hire anyone
16  from that organization that didn't ask to
17  be hired first.  And Frank never asked to
18  be hired so I never would have broached
19  the topic.
20  Q.  How about Maria Drew?
21  A.  She did ask to be hired.  Well,
22  maybe I should say that differently.  I'm
23  sorry.  She called me around that same
24  time, so let's say August of 2003, to say

241

1  she had decided to leave Delaware and to
2  ask my opinion whether that was the right
3  thing to do and to ask whether I knew of
4  any opportunities, more particularly in New
5  York or London.  If I remember correctly,
6  at the time she was living in New York.
7  And again, around that time, Darren it had
8  decided to leave, so...
9  Q.  Did you have your discussion with
10  Mr. Morris before you had this discussion
11  with Maria Drew?
12  A.  Yeah.  Again, I don't really -- I
13  don't really remember a discussion with
14  Frank, so...
15  Q.  You said former colleagues at
16  Delaware Management.  I'm just trying to
17  find out who those are.
18  A.  Yeah.  Certainly, we can say Maria
19  because obviously I ultimately hired her.
20  Whether I talked to Frank about coming to
21  work at Putnam, I'm pretty sure I didn't.
22  Q.  So who are the others?
23  A.  Let me be more specific.  A former
24  colleague at Delaware.  I may well have

242

1  actually, though, talked to Frank about
2  who he knew in the industry that might be
3  available and that seems entirely likely
4  to me that I would have done that.
5  Q.  Did he give you any names?
6  A.  I don't know.  He might well have.
7  I certainly talked to more than just
8  Maria.  I don't remember, though.
9  Q.  Have Maria Drew worked for you at
10  Delaware Management?
11  A.  She was part of the team I was
12  responsible for, yeah.  She reported to
13  Frank, though.
14  Q.  Did you have a romantic
15  relationship with Maria Drew?
16  A.  Nice.  No.
17     MR KOCIUBES:  As much as
18  your client apparently wants to turn this
19  into a mud-wrestling contest, we are not
20  going to go very far on matters other than
21  related to her claims.  It's nonsense.
22  Anyway, you have your answer.
23     BY MR. WEIR:
24  Q.  Anybody else that you recall that

243

1  you talked to?
2  A.  Not in specific, no.
3  Q.  How long after you had your
4  discussion with Maria Drew did she get
5  hired?
6  A.  We would have talked in probably
7  August, and she, I don't believe,
8  overlapped with Lisa so that means she
9  would have been -- she would have come to
10  Putnam sometime after September, but I
11  don't remember specifics.
12  Q.  When you met with Lisa, did she
13  communicate willingness to accept one of
14  those alternatives?
15  A.  No.
16  Q.  What did she say?
17  A.  Again, I don't remember how many
18  times we talked about it, but her response
19  -- and I believe it was more than once,
20  and I remember her responses to be
21  anywhere from no response whatsoever to,
22  at one point, demanding that she be as, I
23  remember it, promoted to managing director
24  and guaranteed incentive compensation, I

EXHIBIT C

169

1     Q.  I take it, therefore, you would not be
2  able to vouch for the accuracy or inaccuracy of
3  the information contained in the documents?
4     A.  Correct, I would not be able to.
5     Q.  Let me just ask a couple of personal
6  questions, sir.
7         Are you married?
8     A.  Yes.
9     Q.  And is this your first marriage?
10    A.  No.
11    Q.  And when were you married previously?
12  During what period of time were you --
13        MR. KOCIUBES:  What difference does
14  it make to this case?
15        MR. ROSENTHAL:  Come on.  We have
16  been here all day long.  Let's just deal with
17  what this case is about already.
18        MR. WEIR:  It is about that.
19        MR. ROSENTHAL:  Because he was
20  married once, he hates women, is that the
21  notion?  That's your theory?  Have you gone to
22  that length?
23        MR. WEIR:  This is total background
24  information.  If you want --

170

1        MR. ROSENTHAL:  Come on.
2        MR. WEIR:  Are you going to
3  instruct him not to answer that question?
4        MR. ROSENTHAL:  It's personal
5  information.  Do you really need it?
6        MR. WEIR:  Yes.
7        MR. ROSENTHAL:  Do you mind
8  answering basic background information?
9        THE WITNESS:  No.
10    A.  I was married in 1967 -- no, 1968.
11  And what do you want to know?
12    Q.  For how long did you remain married?
13    A.  Until about 1981.
14    Q.  And did you have any children during
15  that period of time?
16    A.  One child.
17    Q.  And then for a period of time you were
18  not married?
19    A.  Correct.
20    Q.  And for how long did that last?
21    A.  About eight years.
22    Q.  So then you remarried in approximately
23  1989?
24    A.  Yes.

171

1     Q.  Did you have any children by the
2  second marriage?
3     A.  No.
4     Q.  Can you briefly describe your
5  educational background?
6     A.  I went to college.  I went to graduate
7  school.  I have an MBA.
8     Q.  Where did you get your MBA?
9     A.  Harvard.
10    Q.  And where did you go to college?
11    A.  Antioch College.
12    Q.  Do you have a BA degree?
13    A.  Yes.
14    Q.  During that did you take any courses
15  concerning human resources issues, either at
16  Antioch or Harvard Business School?
17    A.  At business school, yes.
18    Q.  And did you take any courses
19  specifically related to people management?
20    A.  The required first year course was
21  called organizational behavior, and it
22  encompassed all those issues, or human behavior
23  in organizations I think it was called.
24    Q.  After you got to Putnam, did you ever

EXHIBIT D

Oristaglio, Stephen M.  6/13/2006  9:58:00 AM

12

1    the official designation was of that.

2       Q.  Okay.  What was your compensation prior to

3    the time that you were -- became a consultant for

4    Putnam?

5       A.  My compensation?

6       Q.  Yes.

7       A.  Well, it varied over the years.

8       Q.  At that particular point in time; that is,

9    at the end of 2004?

10      A.  I don't remember exactly now, so I may be

11   wrong, but I think for the year 2004, I received --

12   I was on a salary and -- of -- I don't actually

13   know the exact numbers, but I'll give them to the

14   best of my knowledge; somewhere around 750,000, and

15   I received a bonus somewhere around four point

16   something million, so my total compensation was

17   somewhere around $5 million, thereabouts.

18      Q.  Now, when you retired at the end of

19   2004/beginning of 2005, did you receive your bonus

20   for the 2004 year?

21      A.  Yes, I did.  Yes.  They usually -- we

22   usually paid bonuses in February, and after I

23   received my bonus is when I gave my notice.

24      Q.  I see.

EXHIBIT E

1    to nine months, I probably began to feel that there

2    was some excess there.

3        Q.  That's six to nine months after November --

4        A.  Of '02.

5        Q.  -- of '02?

6        A.  Mm-hmm.

7        Q.  Now, you've testified earlier that you had

8    some discussions about -- about your compensation.

9    When you came to Putnam, what was your compensation

10    package?

11        A.  Um, well, I won't remember exactly, but --

12        Q.  That's fine.  Just give me some ballpark

13    numbers.

14        A.  Yeah.  I had options and equity stake in

15    Lincoln National Corporation which were in the

16    process of vesting.  There's always some that are a

17    tail that weren't vesting, and so they gave me

18    equivalents in Putnam stock and MMC stock that

19    would then vest over the next four years, which

20    continue to vest, and that kept me whole where I

21    was, and I don't have a recollection of what that

22    total was.  And then they looked at what my

23    compensation was at Lincoln National and Delaware,

24    and I think they might have given me a little bit

EXHIBIT F

75

1       12:03 p.m. to 12:10 p.m.)

2   BY MR. WEIR:

3       Q.  Mr. Lasser, were you involved in the

4   determination of the compensation package for Ed

5   Haldeman?

6       A.  Yes.

7       Q.  And do you recall what that

8   compensation package consisted of?

9       A.  No.

10      Q.  Do you recall who -- did you have

11  discussion with anyone else in terms of the

12  determination of what the compensation package

13  would be?

14      A.  I'm sure I discussed it with Mitch

15  Schultz.

16      Q.  By the way, is Mitch Schultz still at

17  Putnam, if you know?

18      A.  No.

19      Q.  Do you know where he is?

20      A.  AmVescap in Atlanta.

21      Q.  Have you spoken to Mr. Schultz since

22  your own departure from Putnam?

23      A.  Yes.

24      Q.  How many times?

Lasser, Lawrence  5/17/2006  10:10:00 AM

76

1     A.  Several.

2     Q.  Were those phone discussions or

3  personal meetings?

4     A.  I believe both.

5     Q.  Do you recall whether you determined

6  in those discussions whether Mr. Schultz's

7  departure from Putnam was voluntary or

8  involuntary?

9     A.  I didn't determine.

10     Q.  Do you recall what was discussed with

11  Mr. Schultz?

12     A.  Helping him get a new job.

13     Q.  Okay.  Did you have any role to play

14  in the determination of the compensation package

15  to be offered to Josh Brooks?

16     A.  Not that I recall.

17     Q.  Whose responsibility was that?

18     A.  Ed Haldeman working with HR.

19     Q.  Ed Haldeman alone or Ed Haldeman and

20  Steve Oristaglio?

21     A.  Presumably together.  I don't know.

22     Q.  Were you involved at all in the

23  hiring, the promotion, or determination of

24  compensation package for Tim Ferguson?

98

1    A.  Correct.

2    Q.  Did you have any title?

3    A.  No.

4    Q.  And for what period of time did you

5  remain?

6    A.  Until calendar year end.

7    Q.  And did you continue to have the same

8  compensation arrangements as you had had when

9  you were CEO?

10    A.  I earned my salary.  I was, as it

11  turned out, not paid a bonus for the 10 months I

12  worked.

13    Q.  And do you recall what your salary was

14  at that point in time?

15    A.  Yeah.  It's public record.  It was a

16  million dollars.

17    Q.  And do you recall what your bonus was

18  in the preceding year?

19    A.  I don't recall specifically, but it's

20  all in proxy statements.

21    Q.  During your time as CEO, were you

22  involved in or aware of something called the

23  Equity Product Line Review Group?

24    A.  I don't remember what it was called,

EXHIBIT G

108

1        AFTERNOON SESSION
2            (1:55 o'clock p.m.)
3        MR. WEIR:  Back on the record.  Let
4    me mark as Exhibit Number 10 a document that says
5    To File from Richard B. Tibbetts dated February 18,
6    2000.
7        (The document was marked Deposition
8    Ex. No. 10.)
9        Q.  Let me show you what has been marked as
10   Exhibit Number 10 for identification, Mr. Tibbetts,
11   and ask you if you prepared this document?
12       A.  Yes.
13       Q.  You did so on or about February 18th of
14   2000?
15       A.  Correct.
16       Q.  What occasioned your preparation of this
17   document?
18       MR. KOCIUBES:  Hold on.  Unless you
19   can articulate some even remote measure of
20   relevance of this document to this case I am
21   instructing the witness not to answer.
22       MR. WEIR:  I believe that this
23   document is relevant to this case and we have
24   already had references in the testimony to Omid

109

1    Kamshad who is the individual referenced in this
2    document and there is presently before the court
3    information with respect to his being a comparator
4    of Miss Svensson, the plaintiff in this case, and I
5    fell that I am entitled to ask questions about
6    that.  In any event, your objections under the
7    rules are reserved for the time of trial.  It is
8    inappropriate for you to instruct the witness not
9    to answer.
10       MR. KOCIUBES:  Well, the rules don't
11   permit you to inquire into anything that you can
12   think about without relevance.  If you want to
13   inquire about his duties or anything like that to
14   establish or attempt to establish his comparator I
15   won't cut that off, otherwise I am going to
16   instruct the witness not to answer.
17       MR. WEIR:  I am going to go through
18   the questions in any event.
19       Q.  This document references a conversation
20   you had with an individual by the name of Omid
21   Kamshad on or about January 25th, 2000, is that
22   correct?
23       MR. KOCIUBES:  Just yes or no.
24       A.  Yes.

110

1        Q.  Do you have a recollection of the
2    substance of that conversation?
3        MR. KOCIUBES:  Again, just yes or
4    no.
5        A.  Yes.
6        Q.  What was the substance of the
7    conversation that you had with Mr. Kamshad on
8    January 25th, 2000?
9        MR. KOCIUBES:  Unless it relates to
10   Miss Svensson I instruct you not to answer.
11       MR. WEIR:  I submit it does relates
12   to Miss Svensson.
13       MR. KOCIUBES:  We will find out.  If
14   it relates to her you can answer.  If it doesn't, I
15   would instruct you not to answer.
16       A.  It doesn't relate to her.
17       Q.  This document indicates that this
18   information was brought to your attention by Mr.
19   Cassaro, the Chief Administrative Officer of the
20   Investment Division, is that correct?
21       MR. KOCIUBES:  Objection.  The
22   document says what it says.  Go ahead.  Again, just
23   yes or no.
24       A.  Yes.

111

1        Q.  As a result of your meeting with Mr.
2    Kamshad did you communicate the substance of your
3    discussion with him to anyone else?
4        MR. KOCIUBES:  Just yes or no.
5        A.  Yes.
6        Q.  To whom?
7        MR. KOCIUBES:  Unless it was to or
8    about or related to Miss Svensson I instruct you
9    not to answer.
10       A.  It wasn't related to Lisa.
11       Q.  Did you have such a discussion with the
12   individuals who are cc'd on the document apart from
13   Mr. Cassaro?
14       MR. KOCIUBES:  Again, unless any of
15   those conversations in any way at all had anything
16   to do with Miss Svensson I instruct you not to
17   answer.
18       A.  They had nothing to do with Lisa.
19       Q.  Did you have any discussions on this
20   subject with anyone other than the individuals who
21   are cc'd on the document?
22       MR. KOCIUBES:  Same instruction.
23       A.  Not related to Lisa.
24       MR. WEIR:  The question called for a

1  yes or no answer.  Are you still instructing him

2  not to answer?

3      MR. KOCIUBES:  I am.

4      Q.  Did you have a discussion with Mr. Larry

5  Lasser concerning the subject referenced in your

6  memo of February 18th, 2000?

7      MR. KOCIUBES:  Same instruction.

8      MR. ROSENTHAL:  Objection.

9      A.  It had nothing to do with Lisa.

10     Q.  Did you have a discussion regarding the

11  subject of this memorandum with Mr. Ferguson?

12     MR. KOCIUBES:  Same instruction.

13     A.  It had nothing to do with Lisa.

14     Q.  Okay.  In what time frame were

15  individuals being considered for Managing Director

16  in the year 2000?

17     A.  Traditionally it was in the first

18  quarter.  I don't know specifically the time for

19  2000 but we often looked at officer titles in the

20  first quarter.

21     Q.  Do you have recall that it has ever

22  happened that individuals who have achieved the

23  level of Managing Director are thereafter demoted

24  or deprived of that office or position?

EXHIBIT H

158

1    Mr. Kamshad?

2        A.  No, I don't recall any discussions in that

3    period.

4        Q.  In that period, I'm talking about in the

5    time frame between the beginning of 2000 and

6    September of 2003.

7        A.  September of 2003?  I have to think of when

8    -- of when Ed joined and when the obvious issue

9    occurred.

10        MR. KOCIUBES:  Haldeman joined in

11    October of 2002.

12        A.  And he became head of -- COO in --

13        Q.  (BY MR. WEIR)  November of 2003.

14        A.  I do recall that, absolutely.  There was a

15    lot of discussions about Omid Kamshad.

16        Q.  I'm talking about the time frame before

17    Lisa Svensson's termination --

18        A.  See, I don't --

19        Q.  -- which is September 15th of 2003.

20        A.  Okay.  You know, the dates are really

21    mushy.  Since you've asked me the question about

22    Omid Kamshad, I do recall a lot of discussion in

23    regard to Omid Kamshad.

24        MR. KOCIUBES:  I'm going to instruct

159

1    you, unless any of them relate to Ms. Svensson, not

2    to get into any of those details.

3        A.  Okay.  Just trying to answer the question,

4    yes, I do recall discussions about Omid Kamshad in

5    the period up to 2003, end of 2003.

6        Q.  (BY MR. WEIR)  And do you recall the time

7    frame of those discussions?

8        A.  I don't, no.

9        Q.  Okay.

10        MR. WEIR:  Let me mark as Exhibit 11

11    for identification a one-page document bearing

12    document number PRM 01489.

13        (Exhibit 11 marked for identification.)

14        Q.  (BY MR. WEIR)  Do you recognize this

15    document, sir?

16        A.  I do.  I do recall it.

17        Q.  Okay.  And can you tell what it is?

18        A.  It's an e-mail from Lisa Svensson to Kelly

19    referencing an e-mail from Lisa Svensson to me in

20    March of 2001.

21        Q.  Okay.  And did you --

22        A.  I recall, obviously, the one that I saw,

23    not the one that went to Kelly.

24        Q.  Right.  I understand that.  Did you receive

Putnam_Svenson                    None                    Page  158 - 159