UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * *   *   Civil Action No. 93-11255-NG
                                *
LISA SVENSSON,                  *   BBO No. 351000
                                *
            Plaintiff,          *
                                *   Plaintiff Svensson's
v.                              *   Response to Putnam
                                *   Investments, LLC's
                                *   Motion Requesting a
PUTNAM INVESTMENTS, LLC         *   Scheduling and Status
et al.,                         *   Status Conference
                                *
            Defendants.         *
                                *
* * * * * * * * * * * * * * *   *
```

Plaintiff Lisa Svensson ("Svensson") files this response to the motion of defendant Putnam Investments LLC ("Putnam") "Requesting a Scheduling and Status Conference" not because Svensson believes that such a conference is inappropriate but because, as set forth in more detail below, Putnam's motion sets forth an incomplete and entirely misleading presentation of the events in this case and fails to request the court to include in a revised schedule all events necessary for a fair and proper trial on the merits.[1]

The Putnam motion states,

3.    Between April 26 and 28, 2006, the Plaintiff served her Second Request for the Production of Documents and Things, seeking 76 categories of documents; noticed for deposition Putnam's former Head of Investments, Stephen Oristaglio,

---

[1] Svensson notes at the outset that Putnam's motion was filed in violation of Local Rule 7.1(a)(2) as it does not include a certificate as to compliance with that rule.

and current Head of Human Resources, Richard
Tibbetts; and noticed a Fed. R. Civ. P. 30(b)(6)
deposition, containing 34 topics upon which she
sought to depose Putnam. The documents were due
on the last day of the extended discovery period
and these depositions were noticed for the end
of the period.

4.    On July 17, 2006, -- 47 days after discovery
closed -- the Plaintiff filed a motion for leave
to take additional depositions of Konstantin
Stoev and Ellis Eckland.  On August 16, this
Court allowed the Plaintiff to depose Mr. Stoev,
and that deposition took place on August 24,
2006.

5.    Plaintiff filed several other discovery motions
after the close of discovery.

This is misleading in the extreme as Putnam's motion fails

to disclose:

1.    That Magistrate Judge Bowler since June 1, 2006,
has held four hearings in this case -- on June
21, 2006; July 11, 2006, July 31, 2006; and
August 28, 2006[2] on three motions by Svensson and
one by Putnam;

2.    That the extension of discovery from May 1 to
June 1 was ordered by the court (Bowler,
U.S.M.J.) because Putnam's counsel had advised
that he was unavailable for this case due to his
involvement in other matters;

3.    That Putnam's having asserted for many months
that Svensson has no comparators even for
discovery purposes, required Svensson on April
20, 2006, to file a motion to compel Putnam to
answer her interrogatories[3];

---

[2] Accompanying this response as Exhibits "A" and "B" are copies of,
respectively, the typed transcripts of the June 21, 2006, and July 11, 2006,
hearings before Magistrate Judge Bowler.  Typed transcripts of the hearings
held by the magistrate judge on July 31, 2006, and August 28, 2006, have been
ordered and, although not yet received, are incorporated herein by reference.
[3] Docket Nos. 53-58 and 60-64.

4.   That on April 28, 2006, Putnam served its second
     request for production, which required Svensson
     to serve a response by May 28 -- four days before
     the June 1, 2006, the then end of discovery date;

5.   That it was not until the July 11, 2006,
     continuation of the June 21, 2006, hearing before
     Magistrate Judge Bowler on Svensson's motion to
     compel answers to interrogatories, that Putnam
     finally agreed to change its position and to
     respond in discovery as to the 67 males and 24
     females in the Putnam Investment Management
     Division, who Svensson contends are her
     comparators;

6.   That having changed its position as to discovery
     as to the 91 comparators, Putnam represented to
     the court on July 11, 2006, that it would answer
     Svensson's interrogatories that Svensson has
     modified somewhat;

7.   That, as Magistrate Judge Bowler has been advised
     by the parties, Putnam's answers to the Svensson
     interrogatories are by agreement to be served by
     August 31, 2006, and that Putnam also by
     agreement is to produce in unredacted form
     numerous of the hundreds of pages that it
     produced in redacted form insofar as information
     concerning Svensson's 91 comparators is
     concerned;

8.   That Putnam's agreement to respond in discovery
     by answering interrogatories and production of
     unredacted documents concerning the 91
     comparators was only because of the views
     expressed by Magistrate Judge Bowler during the
     June 21 and July 11, 2006, hearings;

9.   That, per the direction of Magistrate Judge
     Bowler at the July 11, 2006, hearing, Svensson's
     Rule 30(b)(6) deposition of Putnam is to be held,
     notwithstanding Putnam's motion to quash the
     notice for that deposition filed June 6, 2006,
     2006,[4] but the parties have not concluded
     negotiations as to a reduced in scope list of

---

[4] Docket No. 71.  Svensson's opposition papers are Docket Nos. 74-78.

topics for the deposition, which Magistrate Judge
Bowler has indicated is required for that
deposition[5];

10.   That during the Svensson depositions of Richard
Tibbetts, head of Putnam's Human Resources
Department, and Stephen Oristaglio, former co-
head of its Investment Management Division, on
June -- and June _-, respectively, their counsel
who also is Putnam's counsel in this case,
directed them on a claim of lack of relevance not
to answer certain questions and would not allow
the witnesses to answer subject to an objection;

11.   That on August 28, 2006, Magistrate Judge Bowler
on Svensson's motion to compel answers and for
orders to resume the depositions[6], ordered both
deponents within 30 days to resume their
depositions and to answer not only the questions
the witnesses had been directed not to answer but
also to answer follow up questions.[7]

Moreover, plaintiff's expert as to disparate impact issues,
whose report originally was due June 1, but by the extension of
the fact discovery period to June 1, was due July 1, 2006, has
been unable even to begin his analysis due to the facts that
Putnam has not yet answered interrogatories, has not yet
produced unredacted documents and has not yet testified in the
Rule 30(b)(6) deposition.

In recognition of the number of discovery issues then
pending before her, Magistrate Judge Bowler indicated that a

---

[5] Transcript, July 11, 2006, Exhibit B hereto, p. 20, ll. 11-17.
[6] Docket Nos.87 and 90. The Putnam opposition is No. 94 and Svensson's
reply memorandum is No. 100.
[7] See the transcript of the August 28, 2006, hearing. The
magistrate judge reserved the issue of attorneys' fees and costs
as an additional sanction to a later date. Id.

"joint motion" to change the dates for the filing of expert reports and change in the schedule should be filed with the district court judge.  Transcript, June 21, 2006, Exhibit A hereto, p. 14, l. 1.

In addition, as two months of negotiations as to the documents requested by Svensson in her Second Request for Production and Putnam's objections thereto have not resulted in agreement, the schedule, in Svensson's view, also must allow sufficient time for the filing, briefing and a hearing on a Svensson motion to compel production; and to the extent production of such documents is ordered by the court, also sufficient time for Svensson's counsel and her expert to analyze them and for the expert to complete and file his report.

Given the numerous issues as set forth above, Svensson is in agreement that there should be a status and scheduling conference with the court and she requests that the amended schedule include:

1.  A deadline for the serving by Putnam of its answers to interrogatories and the production of the above referred to unredacted documents to the extent not answered or produced as per the parties' agreement by August 31, 2006;

2.  A briefing and hearing schedule for Svensson's motion to compel production;

3.  A deadline for the production of any documents ordered by the court to be produced in response to Svensson's Second Request for Production;

4.  Sufficient time after the answering of interrogatories and the production of any documents ordered to be produced by the court, for Svensson to take the Rule 30(b)(6) deposition of Putnam and the prior resolution by the court of any dispute as to the scope of the topics for that deposition if not resolved by agreement;

5.  Sufficient time for plaintiff's disparate impact expert to review and analyze the documents, Putnam's Rule 30(b)(6) deposition testimony and other information produced or to be produced by Putnam in response to Svensson's discovery requests, agreements of the parties or orders of the court, and for the preparation and filing of any plaintiff's expert reports and defendants' expert reports;

6.  A briefing and hearing schedule for any dispositive motions; and,

7.  A schedule for the pretrial conference and the trial start date.

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.


s/ Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and


/s/ John K. Weir
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: August 30, 2006

Certificate of Service.

    This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney

Dated: August 30, 2006

[369046.1]

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA SVENSSON                    .        CIVIL ACTION NO. 04-12711-PBS
    Plaintiff              .
                           .
       V.                  .        BOSTON, MASSACHUSETTS
                           .        JUNE 21, 2006
PUTNAM INVESTMENTS, et al         .
    Defendants             .
                           .

.  .  .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:        John K. Weir, Esquire
                          John K. Weir Law Offices, LLC
                          300 Park Avenue
                          Suite 1700
                          New York, NY 10022
                          212-572-6374

                          Kevin F. Moloney
                          Barron & Stadfeldt PC
                          100 Cambridge Street
                          Suite 1310
                          Boston, MA 02114
                          617-723-9800

For the defendant:        Joseph L. Kociubes, Esquire
                          Louis A. Rodriques, Esquire
                          Bingham McCutchen LLP
                          150 Federal Street
                          Boston, MA 02110
                          617-951-8000

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1                          <u>**I n d e x**</u>

2    Proceedings                                        3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2  (Court called into session)

3           THE CLERK:  The Honorable Marianne B. Bowler

4  presiding.  Today is June 21st, 2006 in the case of Svensson v.

5  Putnam Investments, Civil Action No. 04-12711 will now be

6  heard.

7           Will counsel please identify themselves for the

8  record.

9           MR. MOLONEY:  Good afternoon, Your Honor, Kevin

10  Moloney from Barron & Stadfeldt in Boston.  With me is Mr. John

11  Weir from New York--

12           THE COURT:  Thank you.

13           MR. MOLONEY:  --co-counsel.

14           MR. WEIR:  Good afternoon, Your Honor.

15           MR. KOCIUBES:  Good afternoon, Your Honor, Jose

16  Kociubes and Louis Rodriques from Bingham McCutchen for the

17  defendant.

18           THE COURT:  Thank you, very much.  Well, we're here

19  for a hearing on two motions, docket entry numbers 53 and 71,

20  and I will start with number 53, the Motion to Compel.

21           MR. MOLONEY:  Yes, Your Honor.  We brought this

22  Motion to Compel Answers to Interrogatories because in

23  reviewing the questions and looking at the responses, I won't

24  call them answers, Putnam has declined respectfully to answer

25  virtually none of them.  The overriding issue it appears on

1  this motion and it has been throughout the experience of

2  this case since we were last before you in January is who are

3  the proper comparators to plaintiff, Lisa Svensson.  The

4  defendant seems to argue insistently that she has none, never

5  had any, has none now, never had any, notwithstanding her

6  record of achievement before she got to Putnam, which involves

7  seven years of sophisticated investment experience in New York,

8  hired by Putnam in 1994 in the research department, was

9  promoted from the research department into portfolio management

10 in 1997 and achieved what they say stellar comments as to her

11 performance, not only in numerical grades, but on the comments

12 of people with whom she was compared.  In 2002, she was demoted

13 from portfolio management back to research--

14         THE COURT:  Okay.  I know the facts.

15         MR. MOLONEY:  Okay, Your Honor.

16         THE COURT:  Let's go right to the Motion to Compel

17 and let's go to the individual interrogatories.  My style is to

18 go through these one by one, make a ruling and than, rather

19 than take something under advisement and you wait several

20 weeks.

21         MR. MOLONEY:  No, I understand, Your Honor.  If I may

22 just to set a little bit more of the facts for background.

23         THE COURT:  Sure.

24         MR. MOLONEY:  As I said, Putnam takes the position

25 that there are no comparators, number one.  They take the

I-5

1   position that the Court has already ruled on that issue.

2   Both of those contentions are incorrect.  The fact of the

3   matter is not only based upon Ms. Svensson's affidavit, there

4   are four on the current record, but also on Putnam's own

5   documents and in the deposition testimony of Mr. Oristaglio

6   former co-head of the investment division and Mr. Tibetts, head

7   of the human research division, it appears beyond question that

8   people were compared within the investment division, investment

9   professionals with investment professionals.  This investment

10  division was one of four divisions in Putnam,  Putnam as a

11  subsidiary of Marsh & McLellan, companies called MMC, one of

12  several, so we're looking at not the holding company, not of

13  all the subsidiaries, not all of Putnam Investments, but one

14  division inside of Putnam.  The Oristaglio deposition makes it

15  very clear that investment professionals, whether they were

16  assigned the research, assigned to a value team, assigned to

17  international growth, whatever team they were assigned to, were

18  compared with each others, at least for purposes of

19  compensation and bonus.  The documents that we cite in

20  footnotes four, five and six or our memorandum, documents that

21  came from the Putnam file, show that in other employment

22  actions people were compared across teams throughout the

23  division, whether it was for promotion tools to managing

24  director, whether it was for purposes of demotion.  We have set

25  forth in the exhibits to the fourth affidavit the names of the

I-6

1  67 males and the 24 females which we say are comparators of

2  Ms. Svensson and we have apportioned them into smaller groups

3  based upon the four key employment acts in said issue, failed

4  to pay equally, failed to promote to managing director,

5  demotion and then termination.

6          Now, with respect to the interrogatories in

7  particular, the other side takes the position that based upon

8  the events of the hearing in December, the Court has already

9  ruled.  Well, that is not true.  The transcript shows that the

10 Court on ruling on one of those requests for production said

11 not at this time.  Now, that was in a context where Putnam's

12 counsel had urged the Court to follow *Jackson v. Harvard* and

13 *Woodingham v. Amherst*.  The statements were made to the Court

14 that the international growth team was disbanded and the 10 or

15 15 people on that team were sent away to other places in the

16 company.  Well, that's not true because both Mr. Oristaglio in

17 his deposition on the 13th of June and Mr. Tibetts, I'm sorry,

18 Mr. Oristaglio on the 13th, Mr. Tibetts on the 8th, made it clear

19 that that team was re-organized.  It wasn't disbanded.  It was

20 made smaller and guess who lost out, Ms. Svensson, while the

21 males stayed or were given a career advancement.  The analogy

22 was made to the *Jackson* case and the Court knows the *Jackson*

23 case, and in the *Jackson* case, the district court judge decided

24 that the plaintiff would not be entitled to information about

25 librarians and others in the various other graduate schools at

1    Harvard where the administrative unit in question was the

2    Harvard Business School.  That makes great sense, and if we

3    were comparing Harvard University and its graduate school to

4    MMC and its various subsidiaries of which Putnam was one, it

5    might make some sense.  It makes absolutely no sense to cite

6    *Jackson* and say that Ms. Svensson cannot as a matter of law be

7    compared to other investment professionals within the

8    investment division, one of four divisions, when the fact of

9    the matter is that for years while she was there, she was

10   compared with other people, other investment professionals in

11   the investment division.  We have limited the scope of the

12   interrogatories.  Initially, they started out talking about the

13   workforce.  We have limited it to the investment division.  We

14   next limited it to investment for professionals within the

15   investment division and we have now reduced the scope of that

16   even further for purposes of this motion to what we call the

17   identified males and the identified females; that is the 67

18   males and the 24 females who are identified in the exhibits to

19   our fourth affidavit.  So for a variety of reasons, number one,

20   the Court did not rule with finality.  The Court said not at

21   this time.  Even if the Court had ruled with finality, the

22   Court is well within its rights to reverse that ruling, when

23   particularly there were representations made that the facts of

24   this case were very close to the facts of *Jackson* when the

25   exact opposite is true.  And thirdly, the past practice of

1    Putnam itself, comparing Ms. Svensson to other people,

2    whether they were in research, whether they were on the value

3    team, whether they were international growth, they were all

4    compared the same.

5        THE COURT:  Okay.  Let's get to the meat of it.

6    Let's go interrogatory by interrogatory.

7        MR. MOLONEY:  We are seeking an order by the Court on

8    interrogatories number 3, 4, 5, 7, 9, 10 and 12.

9        THE COURT:  I know that.  Let's go one at a time.

10        MR. MOLONEY:  Okay.  Numbers 3, 4 and 5 are all

11   related to each other.  They originally asked about the entire

12   exempt employment force.  We have reduced that as I said to the

13   identified males and the identified females.  We think

14   certainly the information asked for in 3, 4 and 5, with that

15   limitation based upon that factual background is something that

16   should be answered and not just objected to and not answered.

17        THE COURT:  All right.  Why shouldn't I order it

18   produced--

19        MR.  KOCIUBES:  Thank you, Your Honor.

20        THE COURT:  --as to the 67 males and 24 females?

21        MR. KOCIUBES:  The answer to that I think is simple,

22   Your Honor, and that is that the way, I'm sure Your Honor

23   knows, comparator's work is it's by categories and that way

24   there's no cherry picking or anything else.  And it is by unit

25   under a same supervisor and that is the one thing that

I-9

 1    throughout the entire discovery process plaintiff has had no

 2    interest in discovering.  And so what she has done is she has

 3    cherry picked 91 names, including twenty some females, and it's

 4    not obvious to me how they're comparators for purposes of a

 5    gender claim and then wants all sorts of invasive information

 6    about them.  What I would urge Your Honor to do if you would

 7    with me, because this then cuts over to a whole number of

 8    categories, is go to plaintiff's documents and in the volumes,

 9    it's called corrected volume three of three, it got filed I

10    think within the past couple of days--

11              THE COURT:  Right.

12              MR. KOCIUBES:  --let's start with, if we could, with

13    tab number 2, Your Honor, and she starts listing the people and

14    the way she comes up with her comparators have nothing to do

15    with who is in the same unit or who is in the same department

16    or of anything that anybody uses.  So for example, there's a

17    category, has managed people.  By that kind of criteria, Your

18    Honor, a sergeant and a general are comparators, and then she

19    cherry picks the ones that she wants to talk about.  One of the

20    categories, she adds up the number of points that you have,

21    then that presumably is the best person.  One of the categories

22    is maternity leave.  Whatever else the significance of that is,

23    whether or not you're on maternity leave doesn't make you a

24    better stock picker or worse stock picker.  What that's got to

25    do with being a comparator for purposes of the various

1   categories or the claims that she talks about is unclear.

2   Some of the people on the list are her subordinates.  By

3   definition they're not comparators.  Some of the people on the

4   list are two or three levels above her.  By definition, they

5   can't be comparators.  So the issue, Your Honor, is not whether

6   she should get comparators.  We've never said that there are no

7   comparators other than with one claim, the termination claim,

8   because she was terminated for a reason for which nobody else

9   best we can tell has ever been terminated and we can talk about

10  that, but we've never said with respect to the other claims

11  that they're no comparators.  What we have said is that she has

12  never asked for them and we've taken that position since day

13  one, and all she had to do was read the cases and ask by

14  categories and she gets a response.  She's not interested in

15  doing that.  Let me give you a further example about her

16  categories here.  They're all mixed together.  In 2003 for the

17  year 2002, Putnam did not give anybody new the designation of

18  managing director.  No man, no woman.  What's the relevance of

19  the chart?  It's not broken out by year or anything else.  It

20  is a list of names.

21          THE COURT:  Well, is there any possibility that you

22  two can sit down and come to an agreement on who the

23  appropriate comparators are?

24          MR. MOLONEY:  We should be able to do so, Your Honor,

25  if the other side is willing to look objectively at the facts

1    of the matter.  May I just add a couple of--

2            THE COURT:  I mean, is it your position there are no

3    comparators?

4            MR. KOCIUBES:  I'll tell you what our position is,

5    no, that is not our position.  Let me give you a plain answer,

6    Your Honor, and let me, if you want, I will tell you that it's

7    what we've been saying throughout the case what the comparators

8    are.  With respect, you have to look at it by claim.  You have

9    to look at it by category and not by individuals that somebody

10   picks out.  So let's talk about the claims.  There are

11   basically three or four different kinds of claims that the

12   plaintiff has.  She has a termination claim.  She got

13   terminated as Your Honor knows from the papers because there

14   was a problem with her managing people.  She was told that she

15   could continue on.  Her salary wasn't being cut as an analyst

16   but she would not manage people.  She didn't want that option.

17   She was given two other options.  One was to stay and job hunt

18   and the third was to take a package and leave.  She thought

19   about it for a month, came back and said no, none of that is

20   acceptable, but I'll tell you what, I want to be made managing

21   director and I want a guaranteed a million dollars a year for

22   each of the next two years.  That not surprisingly was

23   unacceptable.  She refused to budge.  At that point they said,

24   okay, you're terminated.  There is no comparator to that claim,

25   Your Honor.  There's nobody else that was fired for similar

1  kinds of reasons.

2           Next claim, she says that she was transferred in 2002

3  from the international growth team that managed the portfolio

4  to research.  Okay.  Now we've got something that we can talk

5  about.  The male on the head of that team was fired.  The

6  reason for what happened to that team is that they had ridden

7  the internet bubble.  They lost monies for their investors by

8  the bushel load and so a decision was made to move people

9  around.  The head, the male head was fired.  Various of the

10  other people went different ways.  There was a decision made

11  about plaintiff that she would be most effective in research.

12  So they sent her to research.  It was not a cut in

13  compensation.  With respect to that, the last time the parties

14  were here, you said, one of the orders is tell them or give

15  them documents, that's the context, where the other portfolio

16  managers on that team went.  There are a handful.  We did that.

17  There are five or six comparators there.  That is something one

18  can talk about.  They reported to the same guy and she knows

19  their names.  So that's what the legal comparators for that

20  claim are.  But they're not interested in that.

21           THE COURT:  What's your objection to that?

22           MR. MOLONEY:  To that, Your Honor?

23           THE COURT:  Uh-huh.

24           MR. MOLONEY:  It's because Putnam, and you can listen

25  to my brother as I have to him and his colleagues for months,

I-13

1   they have a very, very, narrow, narrow, narrow focus.  They

2   look only at the team she was on.  They don't look at any other

3   team.  They don't look across the division when in fact people

4   were compared not only within teams but across the division.

5   They want to narrow the time period of this to 2002 when she

6   was demoted, when the case law makes it absolutely clear that

7   evidence of things that happened after an event as in the BU

8   case are admissible and relevant and things that happened years

9   before the events are relevant, see the *Jackson* and the other

10  cases.  He talks about precisely the same reason.  Well, here

11  comes Putnam possessed of all of their evidence and all of

12  their documents and all of their testimony and says, well,

13  nobody was dismissed for precisely the same reason.  We are to

14  accept that.  The Court is to accept that without a fair chance

15  on our part to examine whether it's true.  They complain about

16  our talking about marital status.  Their own handbook says that

17  they are against discrimination on the basis of sex and they

18  are against discrimination on the basis of marital status.

19  That policy was confirmed by the head of the human resources

20  department just the other day.  That is our policy.  We don't

21  have a right on Ms. Svensson's behalf to compare women who are

22  married and women with children or women who expect to have

23  children and their treatment by Putnam with the treatment of

24  the males who had children, were expecting to have children.

25  They say we can't do that.  We say we have that we have a right

1   to examine as to whether that's true or not. We have, we

2   believe set out some criteria, admittedly they are not the

3   criteria that Putnam claimed it used when it made decisions.

4   That's a separate issue. That's determining whether their

5   reasons were pretext. We are trying to establish that there

6   are some people within the hundreds of people employed, many of

7   them investment professionals in this division, that there are

8   some men and women who were comparators. We have picked

9   objectively measured and objectively understood criteria for

10  purposes of establishing that there are people in that division

11  with whom she should be compared in this case because she was

12  compared with the very same people when they made the decision

13  to promote her initially, when they failed to promote her to

14  managing director, when she was demoted and when she was

15  terminated. And for my good friend on the other side of the V.

16  on this case to say that she, to imply to the Court that she

17  was given some wonderful options, that is absolutely not true.

18  She was told if she gave up her rights to a Title 7 claim and

19  any other claim and signed a release, that would be fine with

20  them. It wasn't fine with her. She was told she could stay on

21  and get paid and hunt for a job and then she said she could

22  stay on and never ever get promoted. That's not--

23          THE COURT: I'm inclined to permit some discovery

24  here, but what I'm suggesting is that I give you 14 days to sit

25  down together and to see if you can come up jointly with

1    comparators, and if you can't, then I will come back and

2    we'll go, and if you can we'll go through these other

3    interrogatories, but I would like to see if you could at least

4    jointly agree at least on some of the issues.

5              MR. MOLONEY:  We will make every effort to do that

6    and we're ready to meet with them whenever is reasonably

7    agreeable to both sides.

8              THE COURT:  All right.

9              MR. KOCIUBES:  We have done it, Your Honor.  We will

10   obviously on Your Honor's request.  The one thing I want to be

11   clear about--

12             THE COURT:  Well, just be prepared to know that I'm

13   inclined to permit plaintiff to go in this direction, so it's

14   to your advantage to sit down and try and work together so

15   you'll be able to narrow it, otherwise it may be--

16             MR. KOCIUBES:  No, I understand it.

17             THE COURT:  --otherwise it may be much more far

18   reaching than you would certainly like.

19             MR. KOCIUBES:  No, I understand that, Your Honor. But

20   the point that I was going to make is that what you just heard

21   was the same bleeding from one category to another category.

22   So that for example we went from the termination claim for

23   which, there is nobody else anywhere.

24             THE COURT:  Well, you'll have to work through each

25   claim.  That's - now, what about the Motion for Protective

1    Order on the 30(b)(6)?

2              MR. KOCIUBES:  That's my motion, Your Honor.

3              THE COURT:  I realize--

4              MR. MOLONEY:  Your Honor, can we suggest that that be

5    held in abeyance pending these meetings that hopefully will be

6    productive?  The same underlying issue runs very much through

7    that.

8              THE COURT:  Okay.

9              MR. MOLONEY:  And if that's agreeable with the Court,

10   may I suggest that we have a deadline to file expert reports in

11   basically the end of the month, and if we're going to spend two

12   weeks and hopefully a shorter period of time successfully

13   working this out, that just, those dates just kind of clash and

14   we'd like to put that in abeyance too.

15             THE COURT:  By agreement?  Was it set by me or was it

16   set by Judge Saris?

17             MR. MOLONEY:  I believe it was Judge Saris.

18             MR. KOCIUBES:  Judge Saris.

19             MR. MOLONEY:  Judge Saris.

20             THE COURT:  I'm a little, file a motion, file a

21   joint--

22             MR. MOLONEY:  Yes, Your Honor, we'll do that.

23             MR. KOCIUBES:  Yes, Your Honor, if it's going to

24   slip, everything should slip.  We don't have a dispute, we

25   don't have any--

1          THE COURT:  Yeah, file a joint motion because I

2    think I have this, she sends it to me piecemeal.

3          MR. MOLONEY:  Yes, Your Honor.

4       MR. KOCIUBES:  But there is sort of, there is a second

5    level of issue here, Your Honor.  It's a fundamental difference

6    over the case, and let me sort of explain.  Discovery ended on

7    May 31 after two extensions.  Here's what has happened so far

8    in the case.  The plaintiffs have taken nine depositions.  They

9    have had, they have inquired - let me, in terms of sort of

10   working this out because I think you need to know some of this

11   context, the current CEO of Putnam was deposed for an entire

12   day.  The former CEO was deposed for an entire day.  The ex

13   head of investments was, he didn't work for Putnam anymore, was

14   deposed for an entire day, and by day I'm talking about 10 to

15   six.  The head of HR who's responsible for thousands of

16   employees was deposed.  The supervising, the HR employee

17   officer who was responsible for plaintiff at the end was

18   deposed for an entire day.  Her supervisor who made the

19   termination decision was deposed for an entire day.  Another

20   female managing director was deposed.  A subordinate who left

21   because he couldn't work for her out in California has been

22   deposed and one of several thousand employees, a female who had

23   nothing to do with plaintiff in the sense supervising,

24   reporting to or anything else was deposed.  We've gone through

25   a discovery process, Your Honor, where the CEOs and most

1    everybody else were asked how much money they make here, how

2    much money they made at other jobs, as though that is relevant

3    to anything.  We've gone through where the head of HR was spent

4    being inquired about investment issues.  The head of

5    investments at the relevant time was given all sorts of HR

6    worksheets and comp worksheets that he had never seen before

7    and that he spent hours having to talk about.  We have seen

8    with respect to the CEO being asked how many times you're

9    married?  It was twice.  With whom did you have your children?

10   We have seen another supervisor asked about whether he had,

11   with no basis and he denied it, ever had an affair with the

12   woman who replaced the plaintiff?  It has been that kind of

13   discovery.  It has been discovery about everything other than

14   issues that are relevant to this case.  There has been

15   discovery and time has been taken up with, Your Honor will

16   remember that the market timing issues that hit the industry

17   not so long ago, they hit after plaintiff was gone.  Any time

18   there's anything in the plaintiff, in the newspaper about

19   Putnam it gets asked at a deposition, even if it post dated her

20   employment there.  There is nothing which is irrelevant.  So

21   what's happened, Your Honor, is that we have now had, plaintiff

22   has taken nine or 10 depositions, each one for virtually, at

23   least for seven hours, and now she finds herself at the end of

24   the process saying, but I need comparators and I need a

25   30(b)(6) deposition, which if you look at it, Your Honor, is

I-19

1   essentially, there is no way to read it, but it's saying,

2   okay, now give me witnesses who will tell me everything that

3   Putnam knows about the plaintiff's claims, about their

4   defenses, about all of the witnesses.  That's not a 30(b)(6)

5   deposition and it is not something that will likely get

6   compromised.  And that has been the discovery here.  The

7   problem--

8           THE COURT:  I'm trying to get your colleague to relax

9   for a moment.

10          MR. KOCIUBES:  The problem, Your Honor, and that has

11  been when you're talking about these "comparators", it has been

12  the same kind of wandering around and who makes what kind of

13  money, whether it's a man or a woman or somebody else, without

14  reference to claim, without reference to category.  You heard a

15  second ago for example with respect to the transfer.  She

16  wasn't compared to people in other departments when she was

17  transferred.  There is no evidence to that affect.

18          THE COURT:  All right.  I've heard - Mr. Moloney,

19  briefly.

20          MR. MOLONEY:  Just very briefly, Your Honor.  Two

21  points, one is that we just agreed on the court order or the

22  Court accepted our agreement to postpone consideration of that

23  motion, yet my good friend, Mr. Kociubes, is trying to take up

24  the Court's time arguing the very same motion that's not - if

25  you took a look at the deposition transcripts, you would find

1    Mr. Kociubes and Mr. Lasser's counsel directing the

2    witnesses not to answer, not because of privilege but because

3    they took the position that the questions and the answers given

4    would not be relevant.  Plain violations of the rules.  They

5    didn't adjourn the deposition for purposes of seeking a

6    protective order.  They wouldn't allow the witness to answer

7    the question over the objection.  They said, don't answer the

8    question.  It's leaving it up to us, which we don't have that

9    burden.  The burden is on them to show the propriety of those

10   things.  We're going to be bringing Motions to Compel answers.

11   When they produce documents and it's a plain piece of paper

12   that has the word redacted and we're supposed to figure this

13   case out, I don't think so.  One of their witnesses, I forget

14   now whether it was Mr. Lasser or Mr. Haldeman, said I can't

15   answer those questions.  You give me blank pages.  They gave us

16   the blank pages.

17          THE COURT:  Okay.  Fourteen days.  I don't like the

18   direction that this is going in.  I want you to work together

19   and see if you can come up with a common list of comparators

20   that you can agree on.

21          MR. MOLONEY:  Yes, Your Honor.

22          THE COURT:  If not, you know where I'm headed here.

23          All right, can we have a date, Mr. Duffy, in about

24   two weeks?  That takes us into the week of the 4th.  Counsel

25   around towards the end of that week or--

1         MR. KOCIUBES:  Which week, Your Honor?

2         THE COURT:  The week of the 4th?

3         MR. MOLONEY:  Your Honor, I just, on a case that has

4    a right to be advanced in the Middlesex Superior Court, just

5    agreed to move key depositions from Thursday and Friday of last

6    week in June to the 6th and 7th of that week, but certainly the

7    5th I'd be available and the following Monday and Tuesday, I

8    think, would be available.

9         MR. KOCIUBES:  Your Honor, I have a court hearing in

10   New York on the 9th which is I believe, no, the 7th is the Friday

11   of that week.  I have asked--

12        THE COURT:  All right, how about Monday the 10th?

13        MR. MOLONEY:  Monday the 10th is fine with us.

14        THE COURT:  In the afternoon, Mr. Duffy, what do we

15   have?

16        THE CLERK:  Well, Your Honor, we have a sentencing

17   hearing.

18        THE COURT:  Is that in the morning?

19        THE CLERK:  It's in the afternoon, 2:30.

20        THE COURT:  Okay.  No that's a complex.  That's going

21   to take some time.

22        MR. MOLONEY:  Can we do it at 4:00 then, Your Honor,

23   or do you think we'd need more time?

24        THE COURT:  What about the next day, the 11th?

25        THE CLERK:  That looks better, Your Honor.

I-22

1          THE COURT:  What time is the sentencing hearing?

2          THE CLERK:  2:30, Your Honor.

3          THE COURT:  Well, I can do it on – no, I really

4  can't.  It's a criminal, it's a tough, tough case.  3:00 on the

5  11th.

6          MR. MOLONEY:  3:00 on the 11th, yes, Your Honor.

7          MR. KOCIUBES:  Yes, Your Honor.

8          THE COURT:  Work it out.

9          MR. KOCIUBES:  Thank you, Your Honor.

10          MR. MOLONEY:  Thank you, Your Honor.

11          THE COURT:  All right.

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____          August 18, 2006_____

Maryann V. Young_____

Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA SVENSSON                    .      CIVIL ACTION NO. 04-12711-PBS
    Plaintiff                   .
                                .
       V.                      .      BOSTON, MASSACHUSETTS
                                .      JULY 11, 2006
PUTNAM INVESTMENTS, et al         .
    Defendants                  .
                                .

. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:        John K. Weir, Esquire
                          John K. Weir Law Offices, LLC
                          300 Park Avenue
                          Suite 1700
                          New York, NY 10022
                          212-572-6374

                          Kevin F. Moloney
                          Barron & Stadfeldt PC
                          100 Cambridge Street
                          Suite 1310
                          Boston, MA 02114
                          617-723-9800

For the defendant:        Joseph L. Kociubes, Esquire
                          Louis A. Rodriques, Esquire
                          Bingham McCutchen LLP
                          150 Federal Street
                          Boston, MA 02110
                          617-951-8000

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

1                           **I N D E X**

2  Proceedings                                              3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2  (Court called into session)

3          THE CLERK:  The Honorable Marianne B. Bowler

4  presiding.  Today is July 11th, 2006 in the case of Lisa

5  Svensson v. Putnam Investments.  Civil Action No. 04-12711 will

6  now be heard.  Will counsel please identify themselves for the

7  record.

8          MR. MOLONEY:  Yes, Your Honor, Kevin Moloney.  With

9  me is John Weir.  We represent the plaintiff.

10         THE COURT:  Thank you.

11         MR. KOCIUBES:  Joe Kociubes, Your Honor, with Luis

12  Rodriques for Putnam.

13         THE COURT:  Thank you, very much.

14         Well, counsel, bring me up to date.  Hopefully,

15  you've resolved some of what was problematic the last time you

16  were here because you--

17         MR. MOLONEY:  I'm going to answer that—

18         THE COURT:  --tested my patience the last time.

19         MR. MOLONEY:  Not wanting to do that again, I'm

20  afraid I do have to answer yes and no.  We spent close to four

21  plus hours last week in negotiations, Mr. Weir and I on some

22  telephones and my friends at defense side on other telephones,

23  spending most of that time discussing the issues arising from

24  the interrogatories, which was the first thing that Your Honor

25  paid attention to at the last hearing.  And I thought we made

I-4

1   great progress, and I think we're in agreement if I'm not

2   mistaken as to what the questions as realized by way of our

3   discussions should be in some cases and what the responses

4   might look like based upon those discussions.  For example, my

5   friends on the other side said that Putnam does not maintain

6   documentary records with respect to marital status or children,

7   and after discussing that for some minutes, Mr. Weir and I

8   agreed that we would not push that provided that we get a

9   representation from counsel on the other side to that affect.

10          We have also reduced the scope of coverage from 1994

11  coming forward to January of 1999, and in terms of comparators

12  for purposes of discovery only, Putnam is still free to argue

13  its original contentions with respect to a narrower scope of

14  comparators and our side is free to argue to the contrary.  We

15  have provided them with 91 names, sixty something of which are

16  males, twenty something of which are females and the scope of

17  our interrogatories were decreased in scope from the entire

18  workforce of the company to just the, what I call the

19  identified males and identified females.  There are a couple of

20  loose ends.  One question dealt with certain information.

21  Putnam had produced a document and we discussed our contention

22  that the document didn't fully answer the question, and I trust

23  that my friends on the other side will explore that a little

24  bit more and get back to us, but without it being written down,

25  it's my sense that we did reach an agreement at least on the

I-5

1   interrogatory issues.

2           MR. KOCIUBES:  If I could address that, Your Honor,

3   it is, I think we're in accord on all that.  Let me just

4   articulate all that just so there's a record of it.

5           There are two overarching issues, first of all, which

6   individuals, with respect to which individuals would

7   interrogatories be answered and then what kind of information

8   about those individuals.  With respect to the individual, we

9   have been arguing since day one that this universe, it was 16,

10  then 34, now 91 individuals are not within the guidelines of

11  the First Circuit, the appropriate universe of comparators.

12  For purposes of trying to get beyond this dispute, Your Honor,

13  or moving out as much of it as we can, we have agreed that we

14  will answer the interrogatories with respect to the 91 which

15  plaintiffs have chosen without in any way agreeing that that is

16  the appropriate universe of comparators.  Now, there are, that

17  leaves then I think four open matters of the kinds of universe,

18  two of which I think have now been resolved from what I heard

19  Mr. Moloney say.  We will in the course of answering the

20  interrogatories indicate that Putnam does not track either a

21  marital status or children.  People work at a place the status

22  of both changes over time.  People get married after they take

23  a job.  They get divorced.  They have children and so forth,

24  Your Honor.  It is not a category that relates to investment

25  performance that they keep track of.  So we will so represent

I-6

1  that, so that takes care of those two.  It then leaves two

2  other issues.  As I say, we will answer with respect to the 91,

3  but I want the record clear that there are two other matters

4  with which we cannot readily for the same reason as the marital

5  status and children answer, and those are these, Your Honor.

6  One of the interrogatories requests information on people who

7  were offered transfers, so the ability to move from one

8  department to another.  We have and will answer with respect to

9  people who did transfer from one department or another because

10  it is objective and it is tracked.  The problem we have with

11  the other is that you have a supervisor in one area saying to

12  an employee, gee, we'd like you to someday come to this area if

13  you ever think about it or the other way around.  Somebody

14  supervises, you know, you might be happier thinking about

15  moving there.  That's not the kind of thing which is tracked.

16  The transfers are tracked and we can answer in terms of the 91

17  with respect to that--

18            THE COURT:  Excuse me, Mr. Shapiro, the case was on

19  at 2:30.

20            MR. SHAPIRO:  Excuse me?

21            THE COURT:  The case was on at 2:30.

22            MR. SHAPIRO:  Right.

23            THE COURT:  So I suggest you contact Mr. Berman, Seth

24  Berman in the U.S. Attorney's Office and he can tell you what

25  transpired.

1     MR. SHAPIRO:  Okay.  Thank you.  Sorry for the

2  interruption.

3          THE COURT:  And will you agree to exclude the time?

4          MR. SHAPIRO:  Yes.

5          THE COURT:  All right.

6          Sorry for that.

7          MR. KOCIUBES:  No problem, Your Honor.  So as I said,

8  we will answer with respect to the objective data that we keep

9  which is the transfer.  We don't have the other kind of data.

10  And then the last category, Your Honor, is interrogatory 7,

11  which asks, and maybe the easiest way for me simply to read it,

12  but--

13          THE COURT:  So it's agreed.  They don't have this

14  data on the transfer?

15          MR. MOLONEY:  They either have it or they don't and

16  we'll take what they have.

17          THE COURT:  I can't order them to produce what they

18  don't have.

19          MR. MOLONEY:  And we don't ask for them to do the

20  impossible.

21          THE COURT:  Okay.

22          MR. KOCIUBES:  The last issue there, Your Honor,

23  relates to interrogatory 7, and again, it's the same kind of an

24  issue.  The interrogatory asks, has Putnam or any of Putnam's

25  supervisory personnel, and recall we're going back to `99 to

1  2003, a lot of these people are not there anymore, has

2  Putnam or any of Putnam's supervisory personnel ever received

3  knowledge of internal complaints or statements relating to an

4  employees gender, gender by stereotypical comments, including

5  joking in the work place.  For the 91 people, to the extent

6  that there is a file of complaint, one can deal with that, but

7  to the extent that we're talking about an open-ended universe

8  relating to 91 people and did anybody ever hear out of the

9  plaintiff's presence a joke, we can't deal with that

10  interrogatory, Your Honor.

11            THE COURT:  That's reasonable I think.

12            MR. MOLONEY:  Your Honor, we discussed that at some

13  length, and I think one of counsel's main concerns was what you

14  might expect, and how do we explain to people in the HR

15  department what it is that we're looking for, and we discussed

16  that the typical kinds of remarks that are made in a case like

17  this distinguishes them from Mary Smith as a female and John

18  Smith as a male, some of those things, and I thought we made

19  some progress getting to where we agreed as what would be

20  looked for, and if there are things that the HR department can

21  find based on the documents, that's fine, but we're not going

22  to ask them to go beyond their file.

23            THE COURT:  All right.

24            MR. MOLONEY:  That was the, that was the yes part of

25  my answer.

1          THE COURT:  It was too good to be true.

2          MR. MOLONEY:  And the no part is that we just got

3    into discussing the 30(b)(6) issues on the latter part of the

4    second day, which was separated from the first day by a day of

5    I'm sure reflection on both sides.  And we got into those

6    issues, we were still hung up at that point on the scope of the

7    comparators.  We made a proposal to the other side that, and

8    further we thought of our agreements to try to limit the scope

9    of the 30(b)(6) by saying to the other side if you would just

10   produce the documents under the second request for production

11   that we filed a few weeks ago, and we will substitute the

12   subject matters of that second document request for the

13   original topics under the 30(b)(6).  We thought that that was a

14   limitation.  My friends on the other side didn't see it as much

15   of a limitation and scope as we did.  But we're now at the

16   point though where at least the purposes of discovery, both

17   sides reserving their legal rights and contentions on a

18   comparator.  If the other side would unredact the redacted

19   documents from the first request, except of course for valid

20   claims of privilege now that there also is a protective order

21   and confidentiality with regard to the 91, and they would

22   produce documents in the same fashion on the second request for

23   documents, again with respect to the 91, and we got those

24   documents, then if my good friends on the other side still had

25   some concern about the scope, would be in a far better position

I-10

1   intelligently without detriment to our client's rights to

2   try to narrow it down.  Now, one of the points we made to them

3   which may not have been made in our papers was that on a

4   30(b)(6) deposition under Rule 32, such a transcript as the

5   Court knows can be used for any purpose.  We have taken

6   deposition testimony from the head of HR, a former chief

7   executive officer who is no longer such, and now the chief

8   executive officer who really wasn't there at the time.  So

9   those depositions as a general matter don't really suffice for

10  a 30(b)(6).  Having said that, we would be willing if those

11  documents are produced then to really go out trying to limit

12  the scope.  We have under preparation motions asking the Court

13  to order that.  We haven't yet filed them because we've been

14  concentrating on these other matters, but that may well speed

15  the finding of a way to get us out or the Court out of this

16  discovery predicament that we now find ourselves.

17          THE COURT:  What's your response?

18          MR. KOCIUBES:  A couple of things, Your Honor.  The

19  30(b)(6) motion is our motion for protective order so that I

20  would like to be heard on it because I think the issue is a

21  little bit different, Your Honor.

22          Let me--

23          THE COURT:  I'm just looking for the 30(b)(6) motion

24  on the docket because this has come to me sort of piecemeal.

25          MR. KOCIUBES:  It looks like it was filed--

I-11

1    THE COURT:  Can you tell me the day more or less?

2    MR. KOCIUBES:  May 24, Your Honor, is the stamp that

3    I have on the one that I'm looking at.

4    THE COURT:  Okay.  For the record, docket entry

5    number 71.  Okay.  That was referred on the following day.

6    MR. KOCIUBES:  Let me, Your Honor, if I could, just

7    respond to two comments which Mr. Moloney made and then I want

8    to, I would like to address the substance of the 30(b)(6)

9    motion.  One is that our essential dispute with respect to that

10   motion does not go to the nature of the 91 comparators.  It is

11   a different, it is a different issue.  We've attempted to

12   articulate it.  Secondly, the notion that there are I think

13   there are thirty something categories in the 30(b)(6) notice,

14   and you will see them in the body of our motion and I want to

15   address those and group them in a few moments, to say that it

16   is a compromise to okay, let's put those aside and look at a

17   document, the second document request which was served so that

18   the response, forget the documents, were due the last day of

19   the extended discovery period, that's some seventy-six

20   categories.  That's not a narrowing at all.  That's an

21   expansion and a dramatic expansion of discovery.  Our problem

22   with the 30(b)(6) notice is that in no meaningful sense to

23   virtually all of the categories, other than the one that had

24   testimony about already, can we respond to it.  And let me sort

25   of give Your Honor if I could the context.  This is a case

I-12

1  where the plaintiffs have taken nine out of their 10

2  depositions already.  They have deposed the, Mr. Lasser, the

3  former CEO.  They have deposed the current CEO.  They have

4  deposed the former head of the investment division in which

5  division the plaintiff worked.  They have deposed a supervisor

6  who gave her her alternatives which resulted in her separation

7  from the company.  They have deposed the head of human

8  resources.  They have deposed the human resource official who

9  was actually involved at the time of her leaving.  They have

10 deposed a senior female who was hired later than plaintiff was

11 and is a managing director.  They have deposed the young

12 analyst who is in LA who quit Putnam rather than to continue

13 working for her and then there's an additional deposition.

14 Most of those took seven hours.  With respect to sort of the

15 guts of the plaintiff's case, she's had ample opportunity of

16 all of them.  She reached her limits with respect to all of

17 them to ask them whatever it is she wanted to ask.  Why she's

18 no longer there, why she wasn't promoted and so forth.  If we

19 were on some of these topics doing a 30(b)(6), it would be the

20 same people.  The notion that a 30(b)(6) is somehow more

21 binding for purposes of trial, on Putnam, than an admission,

22 than testimony of the head of HR or the CEO simply isn't

23 realistic.  It's got to be the same testimony and assuming it's

24 relevant and so forth, presumably, I've never known any

25 superior court or federal court judge not to permit it, so

1   they've got that.

2           THE COURT:  What is it that you're looking for that

3   you don't have already?

4           MR. MOLONEY:  Well, Your Honor, let me just quote

5   from the deposition--

6           THE COURT:  Or that you couldn't have asked already?

7           MR. MOLONEY:  We have been asking, Your Honor, for

8   months, and until we finally reached agreement on the 91 for

9   purposes of discovery, we were getting nothing other than

10  information about plaintiff, Lisa Svensson.  For example, in

11  the deposition of defendant Lasser in this case, at page 11 of

12  his transcript, line one, question:  Okay.  Is it your

13  testimony that other than those documents you've never seen

14  these other documents before?  Answer:  No, I didn't say that.

15  I said I don't specifically recall.  You showed me a bunch of

16  blank pages so it's hard to remember.  We get page after page

17  after page of total redactions or partial redactions, and in

18  order to go through this, you had seven hours and you've spend

19  a lot of time and you don't get very far.

20          THE COURT:  But what can you tell me today to suggest

21  that there is someone who knows the answers to the questions

22  that you haven't had responses that are satisfactory to you?

23          MR. MOLONEY:  We are dealing with a very

24  sophisticated, relevantly large, internationally known manager

25  of other people's money.  They have very confident people

 1   working for them.  It is up to the company to whom that

 2   notice is given to produce witnesses who are either the

 3   managing director or whatnot as the rule says--

 4             THE COURT:  Yes, but you've had--

 5             MR. MOLONEY:  --or educate other people.

 6             THE COURT:  If you've had all these people in all of

 7   these positions and you haven't gotten what you want, what

 8   makes you think there is somebody else who has that

 9   information, and the fact that you haven't gotten what you

10   want, you'll be able to use that at trial as a weapon?

11             MR. WEIR:  If I may respond to that, Your Honor.  In

12   the complaint, Your Honor, we were trying to **impled** a both a

13   disparate treatment and a disparate impact case based upon

14   gender.  Both of those claims require establishing with respect

15   to comparators that there are, either that the females were

16   disparate investment professionals, were disparately treated

17   based upon, vis-à-vis, the male comparators or the so-called

18   facially neutral employment policies had a disparate impact

19   upon female investment professionals.  Now, to this very

20   moment, we have not gotten information, documentary

21   information, answers to interrogatories or deposition testimony

22   in some significant part with respect to those comparators.  So

23   right now as it stands, it's very, very difficult to prove our

24   claim.  A 30(b)(6) notice--

25             THE COURT:  But who are you going to get in this

I-15

1    30(b)(6) notice that you haven't had already?  That's what I

2    want to know.

3           MR. MOLONEY:  Well, we don't know the answer to that

4    question because that's a question only Putnam can answer.  If

5    they do put up a witness and maybe it might on or more of

6    people who testified in their individual capacity, they would

7    be testifying about matters that they didn't or weren't allowed

8    to testify to before by virtue of instructions from counsel and

9    their positions on the scope of the comparators.  We have asked

10   questions in depositions and we have not been able to get

11   answers about anybody basically but Lisa Svensson.  We are we

12   believe entitled to ask questions and get discovery from the

13   employer of the people we contend are comparators.  We now for

14   purposes of discovery have reduced it to the measure,

15   sixty-something and twenty-something.

16          THE COURT:  Mr. Kociubes, who would you produce in

17   response to this?

18          MR. KOCIUBES: The only way I can address that if

19   you'll permit me, Your Honor, is to, because the argument you

20   just heard doesn't have anything to do with the 30(b)(6).

21   There I think have been three questions on which a, the

22   opposition isn't yet due, a Motion to Compel Answers if the

23   deposition had been filed.  That's a separate matter.  Out of

24   the nine depositions, we got three questions I think.

25          Let me give you a couple of groupings and I think,

I-16

1   just hearing you you understand what our problem is.  Item

2   20, any one or more of the identified females.  Item 19, any

3   one or more of the identified males.  What do they want a

4   witness about?  How do I prepare somebody or get somebody up

5   to, let me just run through it, you know, on anything that

6   somebody may think to ask about any one of 91 people over a

7   four year period of time.

8            THE COURT:  It has to be more specific.

9            MR. WEIR:  Your Honor, I don't disagree that it be

10  more - let me give you one example of--

11           THE COURT:  Well, it's not giving me, it's giving him

12  the example so he knows exactly who you want.

13           MR. WEIR:  We had a document production in very early

14  June from Putnam, and in that document production they produced

15  documents which identified something called a performance

16  rating, and on one of the documents Lisa Svensson's

17  information, which was the only information provided on that

18  document, her performance rating, which had been a 4.8, was

19  reduced to a 3.0, and--

20           THE COURT:  One at a time.

21           MR. MOLONEY:  --there were then two depositions which

22  ensued and all of, I asked questions about how that came to be,

23  and one of the witnesses, Mr. Oristaglio, indicated that that

24  was done for a lot of people.  Now, I don't have the

25  information and didn't at the time of the depositions.  I

1   didn't have the information regarding whether in fact Mr.

2   Oristaglio's statement was true, whether performance ratings of

3   other people were reduced or whether it was just Lisa Svensson

4   or perhaps just the female investment professionals whose

5   performance ratings were reduced.

6           THE COURT:  Well, did you ask further questions?

7           MR. WEIR:  I did, but because the document was blank,

8   there were no, there was no information with respect to anybody

9   that I could point to.  I couldn't point to somebody else and

10  say, wasn't so and so's performance rating reduced Or wasn't so

11  and so's performance rating kept the same while Lisa Svensson's

12  was reduced?

13          MR. KOCIUBES:  Your Honor--

14          THE COURT:  Well, what I fear is that if I allow this

15  deposition to go forward, they will produce somebody, You will

16  ask questions, that person won't have the information and it

17  will be a false start, and--

18          MR. WEIR:  Well, Your Honor--

19          MR. KOCIUBES:  Your Honor, can I just - again, just

20  so you that you understand that we're dealing with.  These are

21  paragraphs 31 and 32.  What they want is a witness under

22  30(b)(6) who can testify about any witness who had been deposed

23  in this case, about any matter referred to in either the

24  question or answer in any of the nine depositions he took.  How

25  do I prepare - all that is going to be is another motion to

I-18

1   compel when somebody says, you know, it's 1,000 pages of

2   deposition.  How do I deal - I mean, if they've go it--

3               THE COURT:  I'll permit a deposition if you can

4   identify a person who you think has information that you

5   haven't been able to get so far relevant to this case, but so

6   far, I mean, the way it's, it's present form I'm not satisfied.

7               MR. MOLONEY:  Your Honor, if we could get a hold of

8   the documents with respect to, the unredacted documents that

9   is, we could narrow the scope of--

10              THE COURT:  What's your position on the unredacted

11  documents?

12              MR. KOCIUBES:  There's two positions, Your Honor.

13  Let me tell you first of all why they were, actually, second,

14  why they were redacted, but to the extent there are particular

15  documents that he thinks should or should have been unredacted,

16  he can file a motion on that.  That's how you deal with that

17  issue.  Documents were redacted for one of three reasons.  One,

18  it was about individuals for whom they never asked that were

19  not part of the 91.  There is no theory that gets him that kind

20  of information.  One of the things that last time you were

21  given a big book for example that every week HR sort of writes

22  a running log of what it is they worked on so if they dealt

23  with one individual, it might be good, it might be bad, it

24  might be somebody referred to some training.  The next week

25  they don't change that.  The next week they'll add a sentence

1    on it.  We, for example, produce everything there was on

2    that for Lisa Svensson.  Whenever you do that, Your Honor, the

3    counsel are put to a choice as we were in this case, do you

4    simply give them the relevant pages or do you give them

5    everything else that, including stuff they've never asked for

6    that's redacted so they can see what the total thing looks like

7    so that we've got, we've got things that have been redacted

8    because they've never asked for them.  We've got other things

9    that were redacted because they show up any privilege log

10   because they're privileged.  Those are the kind of things we're

11   talking about.  They have a right to challenge it, and if they

12   think we didn't give them enough description of generically

13   what's on that so they can bring the challenge in front of Your

14   Honor, that is something we can deal with them about.  But the

15   fact, the mere fact of redaction doesn't tell Your Honor

16   anything other than the fact that we were scrupulous in not

17   simply producing the one page that related, that we say related

18   to the case, but letting them see what the entire document

19   would have looked like.  But that again has got nothing to do

20   with the 30(b)(6).

21          MR. WEIR:  Your Honor, now that we've reached

22   agreement on the 91, we're only asking for the Court to redact

23   the documents with respect to those 91.  Those are for at least

24   discovery purposes the comparators.

25          MR. MOLONEY:  Your Honor, if I may just add one other

I-20

1  thing.  We are complaining basically about four employment

2  actions, failure to pay equally, failure to promote, a demotion

3  and then as they call it, a deprivation of your management

4  duties, or as they ultimately agreed with us, it was a

5  termination.  Those are the four actions.  So it's not

6  impossible to produce a witness to testify about one or more of

7  the 91 in relation to those four specific things.

8           THE COURT:  So you have to retailer your request.

9           MR. MOLONEY:  Well, we will do that.

10          MR. WEIR:  We'll do that.

11          THE COURT:  All right.  So at this point, the docket

12  entry number 71, the Motion for a Protective Order, is allowed,

13  and you are directed to retailer your request narrowing it to

14  those four categories as you've just stated them.

15          MR. MOLONEY:  May the docket show that that's without

16  prejudice for us to redo that?

17          THE COURT:  Yes.  Yes.

18          MR. MOLONEY:  Your Honor, those are the Motions to

19  Compel Production of the Second documents and to unredact the

20  first, those, as I said, those motions are under preparation

21  and we'll be filing those as soon as possible.  I wonder if

22  those could be heard at the same time that the other motion

23  that has just been referred to you might be heard.

24          THE COURT:  Well, I'll talk to Judge Saris because

25  this case is coming to me piecemeal rather than just being

1    referred for all pretrial management and if she wants to do

2    that, then I can tackle everything.

3              MR. MOLONEY:  Okay.  All right.  Yes, Your Honor.

4              THE COURT:  All right.  From defendants, satisfied?

5              MR. KOCIUBES:  Yes, we are, Your Honor.

6              THE COURT:  All right.

7              MR. KOCIUBES:  Thank you, very much.

8              THE COURT:  All right, you're welcome.

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


_____          August 18, 2006

Maryann V. Young_____