Exhibit A
Part 1 of 2



□ **FILE**

RECEIVED

DEC 0 4 2006

K.F.M.

# Svensson
## vs.
# Putnam Investments

# Putnam Investments by Richard Tibbetts

## Volume 1

November 29, 2006
pp 1-210

**JonesReporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com



Page 1

```
 1                          Volume:  I

 2                          Pages:  1-210

 3                          Exhibits:  1-5

 4           UNITED STATES DISTRICT COURT

 5           DISTRICT OF MASSACHUSETTS

 6    Civil Action No. 04-12711-PBS

 7    - - - - - - - - - - - - - - - - - - - - - - - -

 8    LISA SVENSSON,

 9                  Plaintiff,

10        v.

11    PUTNAM INVESTMENTS, LLC, f/k/a PUTNAM

12    INVESTMENTS, INC., and LAWRENCE J. LASSER,

13                  Defendants.

14    - - - - - - - - - - - - - - - - - - - - - - - -

15              Rule 30(b)(6) Deposition of

16              Putnam Investments, LLC

17           By Richard B. Tibbetts, Designee

18           Wednesday, November 29, 2006

19              10:14 a.m. to 4:00 p.m.

20              Barron & Stadfeld, P.C.

21              100 Cambridge Street

22              Boston, Massachusetts

23

24           Reporter:  Daria L. Romano, RPR/CRR
```

Putnam Investments by Richard Tibbetts

Page 2

1  A P P E A R A N C E S:
2      BARRON & STADFELD, P.C.
3      (by Kevin F. Moloney, Esq.)
4      100 Cambridge Street
5      Boston, Massachusetts 02114
6      (617) 723-9800
7      kfm@barronstad.com
8      for the Plaintiff.
9
10     JOHN K. WEIR LAW OFFICES, LLC
11     (by John K. Weir, Esq.)
12     300 Park Avenue, Suite 1700
13     New York, New York 10022
14     (212) 572-6374
15     johnweir47@aol.com
16     for the Plaintiff.
17
18     PUTNAM INVESTMENTS
19     (by Jason A. Tucker, Esq.)
20     One Post Office Square
21     Boston, Massachusetts 02109
22     (617) 760-1977
23     jason_tucker@putnam.com
24     for Putnam Investments, LLC.

Page 3

1      BINGHAM McCUTCHEN, LLP
2      (by Louis A. Rodriques, Esq.
3      and Allyson Kurker, Esq.)
4      150 Federal Street
5      Boston, Massachusetts 02110
6      louis.rodriques@bingham.com
7      (617) 951-8000
8      for Putnam Investments, LLC.
9
10     NIXON PEABODY, LLP
11     (by Carrie Campion, Esq.)
12     100 Summer Street
13     Boston, Massachusetts 02110
14     (617) 345-1000
15     ccampion@nixonpeabody.com
16     for Lawrence J. Lasser.
17
18     ALSO PRESENT:
19     Lisa Svensson
20
21
22
23
24

Page 4

1                    I N D E X
2      Deposition of:         Page
3      RICHARD TIBBETTS
4      By Mr. Weir           5
5
6
7
8
9                    E X H I B I T S
10     No.                    Page
11     1  Documents Bates stamped PRM 5729
12        to PRM 5732                    14
13     2  Partners 1999-2003             47
14     3  Performance ratings of 91 Comparators
15        1992-2004                      62
16     4  Documents bearing document numbers
17        PRM 00846 to PRM 00853        109
18     5  Document capturing the guarantees
19        from the years 1999 through 2004
20        for the 91 people             128
21
22     *Original exhibits retained by Mr. Moloney
23
24

Page 5

1              P R O C E E D I N G S
2
3              RICHARD TIBBETTS
4
5  a witness called for examination by counsel for
6  the Plaintiff, being first duly sworn, was
7  examined and testified as follows:
8
9              DIRECT EXAMINATION
10  BY MR. WEIR:
11     Q.   State your full name for the record.
12     A.   Richard Bowen Tibbetts. And Bowen is
13  spelled B-O-W-E-N.
14     Q.   And, Mr. Tibbetts, you are the witness
15  that has been designated by Putnam for the
16  purpose of the 30(b)(6) notice of deposition?
17     A.   I am.
18     Q.   And do you understand what a 30(b)(6)
19  deposition is? Has that been explained to you?
20     A.   Yes.
21     Q.   Okay. I'd like to just read into the
22  record just so that there's no ambiguity the
23  provisions of Rule 30(b)(6) of the Federal Rules
24  of Civil Procedure: "A party may in the party's

2 (Pages 2 to 5)

Putnam Investments by Richard Tibbetts

Page 6

1  notice and in the subpoena name as the deponent
2  a public or private corporation or a partnership
3  or association or governmental agency and
4  describe with reasonable particularity the
5  matters on which examination is requested.
6       "In that event the organization so
7  named shall designate one or more officers,
8  directors or managing agents or other persons
9  who consent to testify on its behalf and may set
10 forth for each person designated the matters on
11 which the person will testify.
12      "A subpoena shall advise a nonparty
13 organization of its duty to make such a
14 designation. The person so designated shall
15 testify as to matters known or reasonably
16 available to the organization.
17      "This subdivision (b)(6) does not
18 preclude taking a deposition by any other
19 procedure authorized in these rules."
20      Did you undertake -- strike that.
21      Did you review the 30(b)(6) notice of
22 deposition?
23    A.  Yes.
24    Q.  Did you review the various categories

Page 7

1  of subject matters of the testimony that you're
2  to give here today?
3    A.  Yes.
4    Q.  And with respect to the various
5  categories, did you seek to obtain from others
6  within Putnam knowledge with respect to the
7  various categories?
8    A.  Yes.
9    Q.  And from whom did you seek such
10 knowledge?
11    A.  I met with several members of my staff
12 in the human resources department.
13    Q.  And who were they?
14    A.  Mary MacNamee, Michelle Juergens, and
15 Beth Nelson.
16    Q.  Did you meet with anyone outside of
17 the human resources department?
18    A.  The only other people I met with were
19 counsel.
20    Q.  Did you have occasion to meet with
21 Mr. Brooks concerning the 30(b)(6) deposition?
22    A.  No.
23    Q.  Did you have occasion to meet with
24 Mr. Haldeman concerning the 30(b)(6) deposition?

Page 8

1    A.  No.
2    Q.  Did you have occasion to meet with
3  anyone within the investment division outside of
4  human resources?
5    A.  No.
6    Q.  Did you review any documents in
7  connection with your testimony here today?
8    A.  Yes.
9    Q.  And did you review any documents other
10 than documents that have been produced to the
11 plaintiff?
12    A.  Yes.
13    Q.  Can you tell us what documents you
14 reviewed?
15    A.  I reviewed depositions from previous
16 Putnam officers that were deposed, and I had my
17 staff prepare documents that we felt were
18 responsive to the subjects included in the
19 request.
20    Q.  What was the subject matter or subject
21 matters of those documents that you asked your
22 staff to produce?
23    A.  Well, they were in the -- they were in
24 the request, so they covered things such as the

Page 9

1  partner information that you were looking for,
2  the compensation information that you were
3  looking for, the performance ratings that you
4  were looking for. I guess that's what comes to
5  my mind.
6    Q.  Do you have those documents with you
7  here today?
8    A.  I do not, no.
9        MR. WEIR:  Counsel, do you have
10 those documents?
11       MR. RODRIQUES:  We do.
12       MR. WEIR:  Would you produce them?
13       MR. RODRIQUES:  At the appropriate
14 time, sure.
15       I ought to clarify.  These documents
16 were produced to help Rick prepare for
17 deposition.  They were produced for us.  Much of
18 the information in the documents is information
19 you already have in another format.
20       If we get to a point in the deposition
21 where it makes sense to facilitate the
22 deposition to produce documents that were
23 otherwise produced for us, then we'll consider
24 doing that.

3 (Pages 6 to 9)

Page 10

1    MR. MOLONEY: We are entitled to
2 review any documents that the witness uses to
3 prepare himself for a deposition, whether it's a
4 30(b)(6) deposition or not. So your position is
5 untenable.
6    MR. RODRIQUES: We have one or two
7 people taking this deposition?
8    MR. MOLONEY: We have one person
9 taking the deposition.
10    MR. RODRIQUES: Then I'm responding
11 to Mr. Weir.
12    The documents are work product
13 documents produced for us by Rick and his staff
14 to help him prepare.
15    As I said, if we get to a point in the
16 deposition where there's information --
17 producing those documents is the most efficient
18 way to conduct the deposition, we're happy to
19 consider producing them, obviously without
20 waiving any privilege.
21    MR. WEIR: Well, I call for the
22 production of the documents, and I call for
23 production of them now.
24    MR. RODRIQUES: Okay. You can keep

Page 11

1 asking questions.
2    MR. WEIR: So you're instructing
3 him not to produce the documents?
4    MR. RODRIQUES: There is no
5 question.
6    MR. WEIR: You are not going to
7 produce the documents?
8    MR. RODRIQUES: There's no
9 question. I'm not instructing anyone not to
10 answer.
11    MR. WEIR: You are not going to
12 produce the documents at this time?
13    MR. RODRIQUES: They're work
14 product documents.
15    I said I'm happy to produce them if we
16 get to a point where you're asking for
17 information that's on the documents that you
18 don't otherwise have that Rick can't recall.
19    MR. WEIR: Your position is noted.
20    MR. RODRIQUES: Okay.
21 BY MR. WEIR:
22    Q. I'm going to start with item number 10
23 on the 30(b)(6) notice. That was the matter of
24 the Peers tuition reimbursement obligation.

Page 12

1    Did you undertake to investigate the
2 circumstances regarding reimbursement of Mr. --
3 or obtaining payment of Mr. Peers's tuition
4 reimbursement?
5    A. I did not directly. I asked Mary
6 MacNamee to.
7    Q. And did she report back to you
8 concerning that subject?
9    A. She did.
10    Q. And what did she report?
11    A. She reported to me that we had a
12 ledger notation of that repayment, of that
13 receivable and that repayment by Darren Peers
14 and a cancelled check.
15    Q. Is it Putnam's understanding that
16 Mr. Peers had an obligation to pay to them upon
17 his departure 100 percent of the tuition that
18 Putnam had given to him to go to business
19 school?
20    A. Let me try to state what I think it is
21 because I'm not sure I follow exactly how you
22 said that.
23    We advanced and paid for tuition
24 expenses associated with business school. And

Page 13

1 he signed a note that if he left before a
2 certain period of time, then he would have to
3 repay part or all of that expense back to us.
4 And if he had worked for a certain period of
5 time, he would no longer be obligated to
6 reimburse us for any of those monies.
7    Q. And did he work for that period of
8 time?
9    A. No.
10    Q. So he had the obligation upon his
11 departure to reimburse Putnam?
12    A. Yes.
13    Q. Okay. And are you able to tell us at
14 what point in time Mr. Peers departed Putnam?
15    A. I don't know that exact time off the
16 top of my head, no.
17    Q. Okay. Do you know the month?
18    A. I do not.
19    Q. Do you know whether there was a period
20 of time which elapsed between when Mr. Peers
21 departed and when he made his obligation -- he
22 fulfilled his obligation to repay Putnam?
23    A. Yes. There was a time period between
24 his termination and the time of repayment, yes.

4 (Pages 10 to 13)

Putnam Investments by Richard Tibbetts

Page 14

1    Q.   Do you recall the span of that time
2    period?
3    A.   I do not.
4         MR. WEIR:  Let me mark as Putnam 1
5    for identification a multi-page document bearing
6    document numbers PRM 5729 to 5733.
7         (Exhibit 1 marked
8         for identification)
9    BY MR. WEIR:
10    Q.   Can you tell us what Putnam Exhibit 1
11    is?
12        MR. RODRIQUES:  Do we have copies
13    of these or no?
14        MR. WEIR:  I don't have extra
15    copies.
16        MR. RODRIQUES:  Go ahead.  I just
17    need to keep a record.  Since I don't have a
18    copy, I don't know what the document is, unless
19    we get a copy at some point.
20        MR. WEIR:  Okay.  I just want to
21    note for the record we didn't have these
22    produced until just a day or two ago.
23        MR. RODRIQUES:  I'm not taking
24    issue.  I'm only saying if you're putting the

Page 15

1    document in front of him and if you don't have a
2    copy, I need to be able to get one so I can know
3    what the exhibit is.
4         MR. MOLONEY:  We'll get you copies
5    with the stamps on them.
6         (Discussion off the record
7         from 10:27 a.m. to 10:28 a.m.)
8    BY MR. WEIR:
9    Q.   The question, back on the record, is
10    can you identify all or any portion of the
11    Exhibit Number 1?
12    A.   Yes.
13    Q.   Can you take us page by page and tell
14    us what each page is?
15    A.   Yes.  The first page is PRM 5729 which
16    is a printout from the accounting system of the
17    general entry items, accounts receivable and the
18    repayment of that tuition balance from Darren
19    Peers.
20        The second page, PRM 5730, is a copy
21    of the actual check from Darren Peers to Putnam.
22        The third, fourth and fifth pages, PRM
23    5731 through PRM 5733, is the Putnam MBA
24    Financial Assistance Plan promissory note

Page 16

1    document.
2         MR. RODRIQUES:  And just for the
3    record, 5730, PRM 5730 has a redacted stamp on
4    it.  This is a screen shot of the check, the
5    Darren Peers check.  The portions redacted are
6    screen shots from other checks from other
7    receivables.  They have nothing to do with this.
8    They were all on one screen.
9    BY MR. WEIR:
10    Q.   Let me ask you a question about that
11    check.
12        I don't see any indication of -- you
13    referred to it as a cancelled check, but I don't
14    see any indication that it was cancelled.  Is
15    there a reverse side to the check that would
16    indicate that?
17    A.   I wasn't specifically thinking about a
18    cancelled check.  I maybe misused that term.  I
19    was thinking a copy of the check that we had
20    received.
21    Q.   Putnam does have in its files an
22    indication that this check was, in fact,
23    deposited into its account?
24    A.   Well, yes.  That's exactly what I

Page 17

1    believe page one is, which is actually having
2    received that against that accounts receivable,
3    and it's in the general ledger of the firm.
4    Q.   Looking at page one, is that -- what's
5    a FAP reimbursement?
6    A.   That's the reference to the Financial
7    Assistance Plan.
8    Q.   Okay.  And under the -- in the second
9    box on 5729 there's an indication that there was
10    a portion of the reimbursement from Mr. Peers
11    that was prepaid.  Do you see that reference,
12    sir?
13    A.   Well, yes.  It's prepaid other, and
14    then the other item is tuition reimbursement,
15    yeah.
16    Q.   And what does the prepaid other refer
17    to?
18    A.   The amounts advanced to people in the
19    Financial Assistance Plan covered both actual
20    tuition and other related expenses.  So it
21    included, you know, lab fees and books and in
22    some cases laptops and other things that were
23    required as part of the program so that the
24    repaid is the nontuition part.

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 18

1    Q.   So if I understand your testimony, the
2    tuition amount is the $71,180, and the other
3    expenses amounted to $22,220?
4    A.   Correct.
5    Q.   Was any money ever reimbursed or
6    rebated to Mr. Peers after November 20, 2003 in
7    connection with this tuition?
8    A.   From Putnam?
9    Q.   Yes.
10   A.   No.
11   Q.   Do you know whether anybody else
12   reimbursed him?
13   A.   I don't.
14   Q.   And did you ever receive any
15   indication that anyone else had reimbursed
16   Mr. Peers?
17   A.   I did not, no.
18   Q.   If I were to tell you that documents
19   produced in this case indicated that Mr. Peers's
20   effective date of departure from Putnam was
21   October 6th of 2003, do you have any explanation
22   for why it was that this reimbursement didn't
23   take place until November 20th?
24   A.   No.  There's just a logistical time

Page 19

1    period.
2    Q.   Putnam did not insist on the repayment
3    at the time of his departure?
4    A.   Putnam did talk with him about that at
5    the time of his exit interview.  And this is,
6    you know, a very short period of time for that
7    reimbursement.
8    Q.   Who conducted that exit interview?
9    A.   I believe Mary MacNamee.
10   Q.   And do you know the substance of the
11   discussion with Mr. Peers during that exit
12   interview concerning his tuition reimbursement?
13   A.   Only the general terms that it was an
14   obligation that he was responsible for repaying
15   and just at that level.
16   Q.   Do you know whether Mary MacNamee
17   discussed with Mr. Peers in providing any
18   assistance to them in connection with the Lisa
19   Svensson termination?
20        MR. RODRIQUES:  Objection.  Are you
21   talking about his exit interview?
22        MR. WEIR:  Yes.
23        MR. RODRIQUES:  Okay.
24   A.   I didn't know.

Page 20

1    Q.   Do you know whether Mary MacNamee
2    discussed with him at the exit interview
3    provision of certain notes which Mr. Peers had
4    kept during his time at Putnam or a portion of
5    his time at Putnam?
6    A.   I did not.
7    Q.   If Mr. Peers had testified under oath
8    that NWQ, his employer subsequent to Putnam, had
9    assumed the obligation to repay Putnam, that
10   testimony would have been inaccurate; is that
11   correct?
12        MR. RODRIQUES:  Objection.
13   A.   I think his testimony is his
14   testimony.  I don't have any --
15   Q.   Well, that's not your understanding,
16   is it?
17   A.   My understanding is that he wrote a
18   check to Putnam.
19   Q.   Now I'd like to turn to the discussion
20   of the Putnam partnership, which is item one of
21   the 30(b)(6) subjects.
22        MR. RODRIQUES:  Objection.
23        MR. WEIR:  Do you want me to read
24   it into the record?

Page 21

1        MR. RODRIQUES:  No.
2        MR. WEIR:  What's the basis of your
3    objection?
4        MR. RODRIQUES:  Just use of the
5    term partnership, that's all.
6        MR. WEIR:  Okay.
7        MR. RODRIQUES:  It's a form
8    objection, Jack.
9    BY MR. WEIR:
10   Q.   Do you understand that there was at a
11   certain point in time an entity within Putnam
12   called the Putnam Partnership?
13        MR. RODRIQUES:  Objection.
14   A.   No.
15   Q.   And was there a document called a
16   Putnam Partnership Plan?
17   A.   No.  I believe the item you're
18   referring to is the Partners Incentive
19   Compensation Plan.
20   Q.   That is the document I'm referring to.
21        And what is the -- what was the
22   purpose of the Putnam Incentive -- Partners
23   Incentive Compensation Plan?
24   A.   It was to have a structured incentive

6 (Pages 18 to 21)

Putnam Investments by Richard Tibbetts

Page 22

1  compensation plan that funded a cash
2  compensation pool that would be awarded to
3  participants in the plan.
4      Q.  When was it created?
5      A.  I don't know the exact date that it
6  was first created.
7      Q.  When you first arrived at Putnam, was
8  there a Partners Incentive Compensation Plan in
9  effect at that time?
10     A.  Yes.
11     Q.  And do you know who created the plan?
12         MR. RODRIQUES:  Objection.
13         You can answer.
14     A.  Are you talking about who was
15 responsible for the drafting of the plan?
16     Q.  Whose idea was it, this concept?
17     A.  The concept was a combination of two
18 people, Larry Lasser and Bob Burke.
19     Q.  And what was the purpose of the plan?
20     A.  The purpose of the plan, as I said,
21 was to establish a formal structured incentive
22 compensation arrangement that would establish a
23 funding arrangement for a bonus pool that would
24 be awarded to plan participants.

Page 23

1      Q.  And how would the plan participants be
2  determined?
3      A.  The plan participants were identified,
4  nominated by their managers and then reviewed by
5  the human resources team, and then Larry Lasser
6  made the ultimate decision as to who would be a
7  participant in the plan.
8      Q.  And what were the -- were there any
9  benefits other than being able to participate in
10 an additional bonus pool for a partner?
11     A.  Well, I should clarify, it wasn't
12 really an additional bonus pool.  If you were an
13 incentive-eligible employee at the firm, you
14 were identified to participate to in one of the
15 various plans.  And so there was a partnership
16 plan, and there were other plans, so if you were
17 in the Partners Incentive Compensation Plan,
18 that was your primary plan that you participated
19 in.
20     Q.  When you say "primary plan," did
21 partners participate at all in the A and P
22 Incentive Compensation Plan?
23     A.  No.
24     Q.  So once you became a partner, you had

Page 24

1  a separate pool from which to draw your bonus
2  money?
3      A.  Yes.
4      Q.  And at that point you ceased to
5  participate in the A and P bonus plan?
6      A.  Correct.
7      Q.  And I take it that there was a certain
8  aggregate amount of money that was available for
9  the Partners Compensation Plan in each year?
10     A.  Yes.
11     Q.  And was that determined on a
12 year-to-year basis?
13     A.  Yes.
14     Q.  And who made that determination?
15     A.  Well, it was a joint process.  There
16 was actually a funding range that was defined
17 within the plan.  And then that was submitted by
18 Larry Lasser as part of the budget for the firm
19 to the parent company Marsh & McLennan.  And in
20 the setting in establishing of an overall budget
21 for the firm, the bonus pool funding levels were
22 established.
23     Q.  Okay.  And do you know who at Marsh
24 Mack was responsible for making the or okaying

Page 25

1  the amount of money for the partners' pool at
2  Putnam?
3      A.  Well, the people changed, but the
4  roles were consistent, which were the CFO of
5  Marsh & McLennan and the president and/or
6  chairman, depending upon who was there at the
7  time, approved the budget and as such was making
8  that decision.
9      Q.  Okay.  And once that decision was made
10 as to the appropriate amount of money in a given
11 year to be included in the partners' pool, how
12 were the allocations of each partner's share
13 made?
14     A.  Well, there was sort of two decision
15 points around the allocation.
16         The first early on in the year or just
17 at the end of the prior year, a partnership
18 interest was assigned to a plan participant.
19 That was a percentage of the pool that was
20 assigned to them, and that would produce a
21 portion that was fixed and automatically then
22 would receive, and then there was a portion of
23 that that was discretionary.  So the first part
24 was establishing this partnership interest.

7 (Pages 22 to 25)

Putnam Investments by Richard Tibbetts

Page 26

1     And then the second piece was at the
2  end of the year, when the final profits of the
3  firm were determined and the actual funding in
4  dollars were determined as part of the year-end
5  compensation process, individual award
6  recommendations were finalized and approved as
7  part of the year-end process, and so the final
8  allocation was determined at that time.
9     Q.  And who would make the decision?
10  Would that be Mr. Lasser?
11     A.  Well, the -- if there were some
12  participants in the plan who were direct reports
13  to Mr. Lasser, there were others who were not
14  direct reports.
15     So the supervisor, manager of those
16  individuals would make recommendations.
17  Ultimately Larry would be the one who would
18  finalize those.  And then formal approval of all
19  of those would be made by MMC management and
20  then formally approved by the MMC Compensation
21  Committee.
22     Q.  Okay.  Now, was the partners' pool all
23  cash, or were there other components to the
24  compensation?

Page 27

1     MR. RODRIQUES:  Objection.
2     A.  The Partners Plan pool was cash
3  compensation.  Part of it was current cash and
4  part of it was deferred cash, but it was all
5  cash.
6     Q.  Now, who made the determination as to
7  what the aggregate amount of current cash versus
8  the aggregate amount of deferred cash would be
9  in any given year?
10     A.  The plan did.  It was a pre set
11  percentage that was paid in current year, and
12  then the balance was paid out over a period of
13  years.
14     Q.  Okay.  But in any given year who would
15  make the determination as to what percentage of
16  the total compensation from the partners' pool
17  given to an individual partner would be current
18  cash and what portion would be deferred?
19     MR. RODRIQUES:  Objection.  Asked
20  and answered.
21     A.  No individual did.  The plan dictates
22  what portion was going to be cash and what
23  portion would be deferred.
24     Q.  And the plan did not change from year

Page 28

1  to year in that respect?
2     A.  It did not.
3     Q.  In the years 2000 to 2003, those four
4  years, do you know what the aggregate amount of
5  the partners' pool was?
6     A.  I don't know that off the top of my
7  head, no.
8     Q.  Can you give us a ballpark figure?
9     A.  I can't off the top of my head, no.
10     Q.  Was Mr. Lasser a participant in the
11  partners' pool?
12     A.  No.
13     Q.  Was Mr. Haldeman a participant in the
14  partners' pool?
15     A.  Yes.
16     Q.  Was Mr. --
17     MR. RODRIQUES:  Objection.  Could
18  we just clarify?  Do you mean at any time,
19  right?
20     MR. WEIR:  At any time.
21     MR. RODRIQUES:  Because it may not
22  have been at all times.
23     MR. WEIR:  I understand that.
24  We'll get to that.

Page 29

1     MR. RODRIQUES:  Okay.  Fine.
2  BY MR. WEIR:
3     Q.  And was Mr. Brooks a participant in
4  the partners' pool?
5     A.  Yes, he was.
6     Q.  So that neither Mr. Haldeman nor
7  Mr. Brooks participated in any other pools,
8  bonus pools other than the partners' pool?
9     MR. RODRIQUES:  Objection.
10     A.  No, they did.
11     Q.  What other pools did they participate
12  in?
13     A.  I believe they also participated in
14  the Equity Plan in those years, and that was it,
15  the Equity Plan.
16     Q.  And how about Mr. Lasser, did he
17  participate in the Equity Plan too?
18     A.  No.
19     Q.  If an investment professional were
20  terminated who was a partner that was terminated
21  during the course of the year, was that
22  individual paid any proportionate share of the
23  monies in the partners' pool at the end of the
24  year?

8 (Pages 26 to 29)

Putnam Investments by Richard Tibbetts

Page 30

1          MR. RODRIQUES: Objection.
2      A.   Let me make sure I just understand.
3   If somebody was in the Partners Plan?
4      Q.   Right.
5      A.   That was an investment professional?
6      Q.   That's correct.
7      A.   And they were terminated before the
8   end of the year?
9      Q.   That's correct.
10      A.   And so I got that part.  And so then
11   the question was --
12      Q.   The question is what happens to the
13   monies, the monies that would otherwise have
14   been their allocable share in the partners'
15   pool?
16      A.   I see.
17          The plan governed this, but I believe
18   the way that that worked was that in all cases
19   we would have entered into a separation
20   agreement with them and as part of that asking
21   them to sign a release, as standard practice.
22          And as part of that separation
23   agreement, it was not uncommon for them to
24   receive compensation that would have been

Page 31

1   prorated compensation that would be similar to
2   the money that they would have received in the
3   Partners Plan.
4      Q.   And if they were unwilling to sign the
5   separation agreement?
6      A.   They would have not received any
7   compensation.
8      Q.   Did it ever occur that a partner was
9   terminated or departed Putnam and did not agree
10   to sign the separation agreement?
11      A.   Not to my knowledge.
12      Q.   Do you know of any partners in the
13   period of 2000 to 2003 who departed Putnam
14   involuntarily?
15          MR. RODRIQUES: Objection.
16          You can answer.
17      A.   Yes.
18      Q.   That is, where the decision was
19   initiated by Putnam, not by the individual in
20   question?
21      A.   Yes, there were partners who were
22   terminated involuntarily.
23      Q.   Who were they?
24      A.   Well, one was Robert Swift, Carol

Page 32

1   McMullen.  Those are the two that come to my
2   mind.
3          MR. RODRIQUES: Jack, just for the
4   record, I don't know that this is anywhere on
5   the 30(b)(6) topics.  I don't mind Rick
6   answering to the best of his knowledge, but it's
7   not a subject -- partners leaving involuntarily
8   is not a subject to which he is prepared.  I
9   don't think it's within the scope of any
10   particular inquiry.
11          MR. WEIR: Okay.  Fair enough.  I
12   don't agree, but that's beside the point.
13          MR. RODRIQUES: Is there one that
14   you think --
15          MR. WEIR: The subject of the
16   partners and the compensation of partners is the
17   first item, and I believe that that would
18   include compensation upon departure of a
19   partner.
20          MR. RODRIQUES: I understand, but
21   you're asking him to remember who was terminated
22   involuntarily, and I don't think that that can
23   fairly be read as designation or anything on a
24   person or compensation paid to them.

Page 33

1          But I'm saying he can answer to the
2   best he can, it's just not a subject to which
3   he's prepared.
4          MR. WEIR: Okay.
5   BY MR. WEIR:
6      Q.   With respect to the two individuals
7   that you do remember, Mr. Tibbetts, do you
8   recall whether Mr. Swift and Ms. McMullen signed
9   a separation agreement?
10      A.   Yes.
11      Q.   And that included a release of legal
12   claims against Putnam?
13      A.   Yes.
14      Q.   And do you recall the amount of the
15   severance that was paid to either Mr. Swift or
16   Ms. McMullen?
17      A.   No, I do not.
18      Q.   Were there any -- other than
19   Mr. Lasser making the final decision regarding
20   who did or did not become a partner based upon
21   the recommendations he received, was there
22   any -- were there any job prerequisites for
23   becoming a partner?
24      A.   Well, I think the criteria was

9 (Pages 30 to 33)

Putnam Investments by Richard Tibbetts

Page 34

1 certainly job related, but there was broad
2 criteria, and job components was certainly part
3 of that.
4     Q.  Okay.  And what were those job
5 components?
6     A.  Well, I think there was broad criteria
7 and, you know, the role or job that one had was
8 one of those criteria elements.
9     Q.  Could you explain that a little bit,
10 what you mean by --
11     A.  The criteria that was used was just
12 that criteria with ultimately Larry making the
13 decision.
14         But the participants in the Partners
15 Plan were leaders, business leaders, those
16 charged with the responsibility for major units
17 within the firm.  And the participants in the
18 plan also included investment leaders.  So those
19 were the chief investment officers, if you will,
20 within the investment division.
21         So that the criteria, you know, had
22 these broad leadership criteria elements, and
23 part of that obviously was the job that one had.
24     Q.  So if I understand your testimony, for

Page 35

1 investment leaders, you had to be a CIO?
2     A.  No.  Not all CIOs were necessarily a
3 partner because there were multiple levels of
4 chief investment officers, as an example.
5         But those that were senior investment
6 leaders were certainly considered, and those
7 with proven experience and leadership roles
8 were, in fact, in the Partners Plan.
9     Q.  You said that you didn't have to be a
10 CIO in order to be a partner?
11         MR. RODRIQUES:  He said the
12 opposite.  If he were a CIO you weren't
13 necessarily a partner I think is what he said.
14 It's necessary but not sufficient.
15         MR. WEIR:  I'll accept that
16 representation.
17 BY MR. WEIR:
18     Q.  My question is really whether you had
19 to have any particular title or job status in
20 order to be a partner.
21     A.  There was not specific criteria that
22 outlined specific roles, no.
23     Q.  Specifically did you have to be a
24 managing director to be a partner?

Page 36

1     A.  There were no criteria that said you
2 needed to be, but no partners were -- all
3 partners were either managing directors or
4 senior managing directors.
5     Q.  Okay.  You're not aware of any
6 instance, you, Putnam, are not aware of any
7 instance in which an individual who had not
8 become either a managing director or a CIO was
9 nevertheless made a partner?
10         MR. RODRIQUES:  Objection.
11     A.  I think I was saying that in the
12 officer title status you either were managing
13 directors or senior managing directors, and only
14 managing directors and senior managing directors
15 were participants in the plan.
16     Q.  Can you cite any CIOs who weren't
17 partners during the time frame of 2000 to 2003?
18     A.  I'd have a hard time doing that right
19 off the top of my head.  There were multiple
20 levels of CIOs.  There was, you know, the senior
21 most investment leader, then they have direct
22 reports, and there were some others that were
23 CIOs.  So not all of the third level of CIOs
24 were in fact members of the Partners Plan.

Page 37

1     Q.  Okay.  Now, with respect to investment
2 professionals who were not partners, if they
3 left during the course of the year before the
4 awards of the bonuses from the A and P Plan,
5 what would happen to the money that they would
6 otherwise have gotten from the A and P bonus
7 pool?
8         MR. RODRIQUES:  Objection.
9     A.  The A and P Plan, the Associates and
10 Principals Plan, was a plan that is funded
11 similar to the Partners Plan on an aggregate
12 basis.  No one had an assigned percentage or
13 claim to any dollars within that plan until they
14 were actually awarded it at the end of the year.
15         So to say that if someone left, what
16 happened to their money?  They didn't have any
17 money to -- I don't have any money to say to you
18 that it went somewhere because I don't know what
19 their money was.
20     Q.  Okay.  If they had deferred
21 compensation from prior years, what would happen
22 to that money?
23         MR. RODRIQUES:  Objection.
24     A.  It would depend upon how they left the

10 (Pages 34 to 37)

Putnam Investments by Richard Tibbetts

Page 38

1  firm.
2      Q.   If they were fired from the firm, what
3  would happen to their money?
4      A.   If they were terminated for cause,
5  they would forfeit that money.  If they were
6  terminated involuntarily but not for cause, that
7  money would continue to be paid out to them
8  according to the deferred payout schedule that
9  the money was subject to.
10         And that was conditional upon signing
11 release, maintaining compliance with
12 nonsolicitation and confidentiality agreements
13 at the time of all those payments.
14     Q.   Okay.  And who made the determination
15 as to whether an investment professional was
16 being terminated for cause or not for cause?
17     A.   I don't think there was any one
18 specific individual, but that was the
19 combination of folks in the human resources
20 group along with the management of the
21 investment division.
22     Q.   And in the time frame of 2003, who
23 would you put into the category of the managers
24 in the investment division?

Page 39

1          MR. RODRIQUES:  Objection.
2      A.   I would say anybody that was a manager
3  in the investment division.
4      Q.   Well, let's talk about Lisa Svensson.
5          Who would have been responsible for
6  determining whether Lisa Svensson was terminated
7  for cause or not for cause?
8      A.   Well, at the time it was Josh Brooks
9  and Mary MacNamee is the two principal people
10 from human resources and from the investment
11 division.
12     Q.   And did they make a determination
13 whether it was for cause or not for cause?
14     A.   I believe so, yes.
15     Q.   And what was the determination?
16     A.   That it was not for cause.
17     Q.   And did that termination wind its way
18 into any written document?
19     A.   I don't know.
20     Q.   Well, was it Putnam's custom and
21 practice to note down in some written form
22 whether an individual's termination was for
23 cause or not for cause?
24     A.   Well, where that would typically be

Page 40

1  recorded is in the human resource information
2  system, the electronic recordkeeping system.
3      Q.   So if typical practice was followed in
4  Lisa Svensson's case, there would be a notation
5  somewhere within Putnam's electronic files as to
6  a determination as to whether her termination
7  was for cause or not for cause?
8      A.   Yeah, it would have -- yes, the system
9  would have her termination status.
10     Q.   And typically would it also include
11 any discussion or analysis of the determination
12 of for cause or not for cause?
13     A.   No.
14     Q.   So is it fair to state that when an
15 individual investment professional is
16 terminated, other than the actual designation of
17 for cause or not for cause, there's no
18 documentation with respect to the underlying
19 analysis?
20          MR. RODRIQUES:  Objection.
21     A.   There is no standard forms or
22 recording of that, no.
23     Q.   Thank you.
24          Now, with respect to the Partners

Page 41

1  Plan, was there any similar determination of for
2  cause or not for cause if a partner was
3  terminated?
4      A.   Yes.
5      Q.   And the same result, if a termination
6  was for cause, then there was no payment of
7  bonus monies or deferred compensation?
8      A.   Correct, there was no payment.
9      Q.   Has it ever occurred that a partner
10 was terminated for cause?
11     A.   Off the top of my head, I don't
12 believe so.
13     Q.   Okay.  Now, did there come a time when
14 the Partners Incentive Compensation Plan was
15 discontinued?
16     A.   Yes.
17     Q.   And when did that occur, sir?
18     A.   At the end of the year in 2003.
19     Q.   Who made the decision to terminate
20 that plan?
21     A.   Ed Haldeman.
22     Q.   What was the reason for the decision
23 to terminate the plan?
24     A.   I can't describe all of his specific

11 (Pages 38 to 41)

Putnam Investments by Richard Tibbetts

Page 42

1  reasons, but the broad concept was that we were
2  going to reposition the compensation, the
3  incentive compensation plans, and eliminate, you
4  know, separate pools and create one large pool
5  that would be allocated to each of the divisions
6  on a total pool basis rather than these sub
7  pools.
8      Q.  Okay.  Do you know whether Mr. Lasser
9  had departed Putnam at the time that decision
10 was taken?
11     A.  He was no longer at the firm.
12     Q.  Did Mr. Haldeman receive any input
13 from others concerning the decision to terminate
14 the --
15         MR. RODRIQUES:  Objection.
16     A.  I know that he received some because I
17 was one who provided input to him, but I don't
18 know what else he did besides mine.
19     Q.  Do you know whether Mr. Justin Scott
20 was a partner?
21     A.  He was a participant in the Partners
22 Plan, yes.
23     Q.  And how about Mr. Omid Kamshad?
24     A.  He was a participant also, yes.

Page 43

1      Q.  And were Mr. Scott and Mr. Kamshad
2  terminated by Putnam?
3      A.  Yes.
4      Q.  Do you know whether they were
5  terminated for cause or not for cause?
6      A.  I do not.
7      Q.  Do you know whether any monies were
8  paid out to Mr. Scott or Mr. Kamshad out of the
9  pool or pools in which they participated by
10 Putnam?
11     A.  Do you mean the deferred compensation?
12     Q.  Any monies, whether for monies in the
13 year of -- for the year in which they were
14 terminated or monies that were deferred from
15 prior years.
16     A.  They did not receive any monies, no.
17     Q.  And what happened to the monies that
18 were deferred from prior years for Mr. Scott and
19 Mr. Kamshad?
20         MR. RODRIQUES:  Objection.
21     A.  I believe they are still sitting out
22 in the firm's general assets.
23     Q.  The firm's general?
24     A.  Assets.

Page 44

1      Q.  And with respect to the partners
2  bonuses that were paid out for 2003, did they
3  receive any allocation of bonus for that year?
4      A.  No.
5      Q.  Now, there's been prior testimony in
6  this case, by you, in fact, concerning the
7  market timing activities of those two
8  individuals, Mr. Scott and Mr. Kamshad.  Do you
9  recall that testimony, sir?
10     A.  I do.
11     Q.  Did Putnam make a determination that
12 those two individuals had made gains in
13 connection with their market timing activities?
14         MR. RODRIQUES:  Objection.  Where
15 is this in the 30(b)(6) notice?  And you've
16 already just acknowledge that he's testified
17 about this previously.
18         He is not here to testify about
19 anything that strikes your fancy, Jack.  He's
20 here to testify about the subject matters of the
21 notice.
22         MR. WEIR:  And I think it's part of
23 the --
24         MR. RODRIQUES:  Can you show me

Page 45

1  where?
2          MR. WEIR:  Item one.
3          MR. RODRIQUES:  "Designation or
4  naming of a person as a 'partner' at Putnam at
5  any time in the period 1999 through 2004, and
6  elements of, and aggregate totals of, total
7  compensation paid or payable to partners at
8  Putnam in those years"?
9          MR. WEIR:  Yes.
10         MR. RODRIQUES:  And how does
11 that --
12         MR. WEIR:  We're talking about the
13 compensation paid to Mr. Justin Scott and
14 Mr. Omid Kamshad who it's been testified to be
15 partners.
16         MR. RODRIQUES:  No, you're not.
17 He's answered that question.  They were paid
18 nothing.
19         You are now asking him whether they
20 made a decision that he engaged in excessive
21 short-term trading, something you've already
22 asked him already as an individual.
23         MR. WEIR:  I simply --
24         MR. RODRIQUES:  By rule he is not

12 (Pages 42 to 45)

Putnam Investments by Richard Tibbetts

Page 46

1  required to answer that question, and so he
2  won't.
3         MR. WEIR: Okay. That's good.
4  BY MR. WEIR:
5     Q.  As of September of 2003, do you know
6  how many partners there were at Putnam,
7  approximately?
8     A.  I would say about two dozen.
9     Q.  As of 2003, do you know how many
10 females were partners at Putnam?
11    A.  I don't off the top of my head.
12    Q.  Can you cite any?
13    A.  Irene Esteves.
14    Q.  Anyone else as of that time frame?
15         MR. RODRIQUES: Could we go off the
16 record? I don't mind him answering that
17 question, I'm just trying to facilitate his
18 answering the question, that's all.
19         MR. WEIR: That's fine.
20         MR. RODRIQUES: I'm not trying to
21 coach him.
22         (Counsel confer)
23         MR. RODRIQUES: We have a document
24 that lists the partners. I'm happy to produce

Page 47

1  the document. This is a document that was
2  prepared for us to assist him in preparing for
3  the deposition.
4         I'd like there to be an understanding
5  that we are not waiving any conversations or any
6  other claim of work product with respect to any
7  other documents or anything. I'm happy to
8  produce it if it would facilitate the
9  discussion.
10        MR. WEIR: It would. That's fine.
11        Let me mark as Putnam 2 a document
12 that counsel has now provided headed Partners
13 1999-2003.
14        (Exhibit 2 marked
15         for identification)
16 BY MR. WEIR:
17    Q.  Let me show you what's been marked as
18 Putnam Exhibit 2 for identification and ask you
19 if you can identify that document?
20    A.  Yes.
21    Q.  What is it, sir?
22    A.  This is a document that captures the
23 people who were in the Partners Incentive
24 Compensation Plan for years 1999 through 2003.

Page 48

1     Q.  Okay. And does it -- strike that.
2         Is this one of the documents that you
3  reviewed in connection with preparation for your
4  testimony here?
5     A.  It is.
6     Q.  This refreshes your recollection as to
7  the number of partners at Putnam in 2003?
8     A.  It does.
9     Q.  And how many were there, sir?
10    A.  36.
11    Q.  Okay. Do you know whether all 36 were
12 there at the time the partnership was
13 terminated?
14         MR. RODRIQUES: Take a moment and
15 look at it.
16    A.  Well, the plan was terminated in 2004.
17    Q.  Okay. I believe you said the decision
18 was taken at the end of 2003.
19    A.  Yes, but -- so you're asking?
20    Q.  Well, my question is was there a
21 period of time after the decision was taken
22 before the plan was actually terminated?
23    A.  I'm sorry, I'm confused. Can you
24 restate that?

Page 49

1     Q.  I'm confused too.
2         You stated earlier in your testimony
3  that the end of 2003 Mr. Haldeman made a
4  determination to discontinue the Partners
5  Incentive Plan.
6     A.  Right.
7     Q.  And my question is whether there was a
8  period of time beyond the end of 2003 before the
9  plan was actually terminated?
10    A.  Well, I'm not sure about the technical
11 aspects. What I'm thinking let me share with
12 you specifically, which is that the awards for
13 2003 weren't actually paid out until early 2004.
14 So there was a technical time, I guess, where
15 they were 2003 participants still receiving
16 compensation in early 2004 as was customary. So
17 that's what I was struggling with.
18    Q.  But there were no new partners made
19 after 2003?
20    A.  No.
21    Q.  And then to return to the question, at
22 the end of 2003, or whenever the decision was
23 taken not to continue with the plan, were all 36
24 of the partners identified on Exhibit 2

Putnam Investments by Richard Tibbetts

Page 50

1   participants in the bonuses that were paid out
2   in early 2004?
3          (Pause)
4       A.  All 36 of these people that were
5   participants in the plan were there at the time
6   of the '03 awards.
7       Q.  And does it also refresh your
8   recollection as to the number of female partners
9   who were partners at the time that the
10  Partnership Incentive Plan was terminated?
11      A.  Yes.
12      Q.  How many were there?
13         (Pause)
14      A.  Four.
15      Q.  And they were?
16      A.  Sandy Whiston, Ginny Papa, Virginia
17  Papa, Debbie Kuenstner, K-U-E-N-S-T-N-E-R, and
18  Irene Esteves, E-S-T-E-V-E-S.
19      Q.  And of those four, how many of them
20  are still at Putnam?
21      A.  One.
22      Q.  And which one is that?
23      A.  Sandy Whiston.
24      Q.  And has Sandy Whiston been

Page 51

1   continuously at Putnam since 2003?
2       A.  No.
3       Q.  Did she depart some time and then come
4   back?
5       A.  Yes.
6       Q.  Do you recall the time frame of her
7   departure?
8       A.  I do not.
9       Q.  Was it in 2004?
10      A.  I don't know the date.
11      Q.  Do you recall who conducted her exit
12  interview upon her initial departure?
13      A.  Yes.
14      Q.  Who did that?
15      A.  Peter Curran, C-U-R-R-A-N.
16      Q.  Do you know whether her departure was
17  initiated by Putnam or initiated by her?
18      A.  By her.
19      Q.  Do you know the period of time that
20  she was out of Putnam?
21      A.  I don't know the exact time, no.
22      Q.  And do you know with respect to Ginny
23  Papa, did she depart Putnam at Putnam's
24  initiative or at her initiative?

Page 52

1       A.  At Putnam's.
2       Q.  Do you recall when that occurred?
3       A.  I do not.
4       Q.  How about with respect to Debbie
5   Kuenstner, was her departure initiated by Putnam
6   or by her?
7       A.  It was mutual.
8       Q.  You're going to have to explain that a
9   little bit.  Who raised the subject first?
10          MR. RODRIQUES:  Objection.
11          Go ahead.
12      A.  I don't recall.
13      Q.  And how about Irene Esteves, was her
14  departure initiated by Putnam or by her?
15      A.  By her.
16      Q.  Do you recall when Debbie Kuenstner
17  left Putnam?
18      A.  I don't.
19      Q.  And do you recall when Irene Esteves
20  left Putnam?
21      A.  I don't.
22      Q.  With respect to Debbie Kuenstner, you
23  said it was a mutual decision.  Do you recall
24  what some of the issues were that Putnam raised

Page 53

1   with respect to her departure?
2       A.  Yes.
3       Q.  What were they?
4       A.  Performance, investment performance
5   within the Large Cap area, Large Cap Value area.
6   That was one of them.
7       Q.  Okay.  Any others that you recall?
8          MR. RODRIQUES:  Objection.  Any
9   other reasons, is that --
10         MR. WEIR:  Yes.
11         MR. RODRIQUES:  Sorry.
12      A.  That's the one I recall.
13      Q.  And how about with respect to Ginny
14  Papa, do you recall reasons why Papa initiated
15  discussions with her about leaving?
16      A.  Yes.
17      Q.  And what were they?
18      A.  There were operational issues and
19  concerns within the defined contribution
20  organization of which she was responsible for.
21      Q.  Were there any other individuals who
22  were involved in that defined contribution
23  operations?
24         MR. RODRIQUES:  Objection.

14 (Pages 50 to 53)

Putnam Investments by Richard Tibbetts

Page 54

1      A.  I'm not sure I -- there was a division
2  made up of the defined contribution
3  organization, so there was like a thousand
4  people involved in the DC operations.
5      Q.  So she was the head of that?
6      A.  She was one of the senior leaders
7  within that organization, yes.
8      Q.  Who were the other senior leaders?
9      A.  I don't recall who the other leaders
10  were.
11      Q.  How about Karnig Durgarian?
12      A.  She reported in to him.  But he was
13  responsible for a much broader group, so he
14  wasn't really one of the leaders specifically
15  within the defined contribution group.
16      Q.  I see that he was a partner.
17      A.  He was.
18      Q.  And he had been continuously a partner
19  throughout the period 1999 to 2003; is that
20  correct?
21      A.  Yes.
22      Q.  And was any consideration given to
23  initiating departure discussions with
24  Mr. Durgarian when these operational issues and

Page 55

1  concerns arose?
2      A.  Yes.
3      Q.  And who had such discussions with him?
4          MR. RODRIQUES:  I'm going to object
5  and just say I don't mind while you ask these
6  questions, I don't think this is fairly within
7  the scope of the 30(b)(6) in any topic here.
8          So he can testify from his memory as
9  an individual, but he can't speak for the
10  organization as he did not prepare on the
11  subject.
12      A.  I'm sorry, what was the question?
13          MR. RODRIQUES:  The question was
14  who had discussions with Karnig.
15  BY MR. WEIR:
16      Q.  Who had discussions with Karnig
17  Durgarian that you just referred to in your
18  testimony?
19      A.  Had discussions with him about his
20  termination?
21      Q.  About his possible departure from
22  Putnam.
23      A.  The only one that I know specifically
24  was Steven Spiegel.

Page 56

1      Q.  I take it that a decision was taken
2  not to initiate such departure discussions after
3  Mr. Spiegel and Karnig Durgarian spoke?
4      A.  No, that's not accurate.
5      Q.  How did it come to pass that
6  Mr. Durgarian was not terminated by Putnam?
7          MR. RODRIQUES:  Objection.
8      A.  Mr. Durgarian was terminated.
9      Q.  Okay.  And did that occur at the same
10  time that Ginny Papa was terminated?
11      A.  Yes.  I don't know if it was the exact
12  day, but yes.
13          MR. RODRIQUES:  Can we take a
14  five-minute break?  It's been over an hour.  If
15  you're in the middle of something, Jack --
16          MR. WEIR:  We're just about at the
17  end of that subject, but that's okay.  Maybe if
18  I could ask one more or two more questions, and
19  then we'll be at the end of the subject.
20          MR. RODRIQUES:  Sure.
21  BY MR. WEIR:
22      Q.  I note that Beth Cotner was also a
23  partner in 1999 through 2001.  Was Beth Cotner
24  terminated by Putnam?

Page 57

1      A.  No.  She retired.
2      Q.  Did she initiate the retirement
3  discussions or did Putnam?
4          MR. RODRIQUES:  Objection.
5      A.  Yes, she initiated the retirement
6  discussions.
7      Q.  And Beth Cotner at the time was
8  eligible to retire?
9          MR. RODRIQUES:  Objection.
10      A.  Yes, she was eligible to retire, yes.
11      Q.  Now, did her taking retirement at that
12  time involve the payment of compensation that
13  would have been different than someone who was
14  not eligible for retirement?
15      A.  I'm not sure I understand the
16  question.
17      Q.  She's a partner.  You said she's
18  eligible for retirement.  And I'm simply asking
19  if someone else were a partner but not eligible
20  for retirement, would that have involved
21  different compensation arrangements upon
22  departure?
23          MR. RODRIQUES:  Objection.  Let me
24  just clarify.  Are you asking as a partner or

15 (Pages 54 to 57)

Putnam Investments by Richard Tibbetts

Page 58

1   under any other benefit plan?  In other words,
2   there may be retirement benefits that anybody
3   who retires is eligible for whether they're a
4   partner or not.
5           MR. WEIR:  I'm simply trying to
6   ascertain what the designation of her as being
7   retired, what financial implications that would
8   have for an investment professional.
9           MR. RODRIQUES:  Whether or not they
10  were a partner?  That's all I'm asking, because
11  if you're focusing on the benefits of retirement
12  as a partner, that's different from maybe
13  generally.
14          MR. WEIR:  Yes, if there was any
15  difference based upon their status as a partner,
16  then that's what I would like to know.
17          MR. RODRIQUES:  Do your best with
18  that.
19      A.  Well, I guess all I can -- I am
20  confused by that, but let me see if I can make
21  this statement, which is that if one retires
22  from the firm and one is terminated not for
23  cause, the same treatment would apply to
24  deferred compensation.

Page 59

1           The only difference would be if you're
2   eligible for retirement, not eligible for
3   retirement if your terminated for cause.  So
4   there was no difference if you're leaving not
5   for cause and if you're retiring.
6       Q.  And were any of the departures of
7   Debbie Kuenstner, Beth Cotner, Ginny Papa, were
8   any of those for cause?
9       A.  I'm sorry, so -- can you go through
10  each one of those names again?
11      Q.  Debbie Kuenstner, Beth Cotner --
12          MR. RODRIQUES:  One at a time.
13      A.  Debbie Kuenstner was not terminated
14  for cause.  She was not terminated for cause.
15      Q.  Beth Cotner?
16      A.  Was not terminated for cause.
17      Q.  And Ginny Papa?
18      A.  Was terminated for cause.
19      Q.  And was Mr. Durgarian terminated for
20  cause?
21      A.  Yes.
22      Q.  So if I understand your testimony,
23  sir, then the same types of compensation
24  arrangements were made for Beth Cotner as were

Page 60

1   made for the other individuals where the
2   discussion was initiated by Putnam?
3           MR. RODRIQUES:  Objection.  I think
4   he said deferred compensation.  I think that's
5   what he said.
6           MR. WEIR:  There --
7           MR. RODRIQUES:  I'm just trying to
8   clarify.
9           There are benefit plans that may have
10  consequences for retirement, and those may be
11  different from a termination not for cause or
12  retirement, that's all.
13          He's answering.  He's trying to answer
14  the cash deferred compensation piece.
15          MR. WEIR:  That's what I'm asking.
16          MR. RODRIQUES:  That's fine.
17      A.  So I'm not sure what your specific
18  question is, I'm sorry.
19      Q.  With respect to her cash and her
20  deferred compensation arrangements, was there
21  any difference in those arrangements based upon
22  whether someone did -- an investment
23  professional did or did not take retirement?
24      A.  So within the Partners Plan, the

Page 61

1   partners' cash compensation, the deferred cash
2   compensation was treated similarly whether you
3   were terminated not for cause or whether you
4   were retired.
5           MR. WEIR:  Okay.  I think that's
6   a --
7           MR. RODRIQUES:  We can just take a
8   short break?
9           MR. WEIR:  Yes.
10          (Recess taken from
11          11:39 a.m. to 11:46 a.m.)
12  BY MR. WEIR:
13      Q.  Okay, next subject, "Managers'
14  performance ratings for the 91 Comparators 1999
15  through 2004 (whether or not any one or more of
16  the 91 Comparators were 'partners'), including
17  any alterations of managers' performance ratings
18  by one or more members of top management or by
19  any other person at Putnam."
20          Did you consult with anyone in
21  connection with that subject, sir?
22      A.  Yes.
23      Q.  With whom?
24      A.  With Mary MacNamee, Michelle Juergens.

16 (Pages 58 to 61)

Putnam Investments by Richard Tibbetts

Page 62

1    Q.  And did you review any documents in
2  connection with that subject?
3    A.  Yes.
4    Q.  What documents did you review?
5    A.  They put together a summary
6  spreadsheet that included the performance
7  ratings for those 91 people.
8    Q.  Is that a document which has been
9  produced to us?
10    A.  No.
11       MR. WEIR:  Is that a document that
12  you have available today, sir, Mr. Rodriques?  I
13  would ask if you would produce it.
14       MR. RODRIQUES:  Same agreement, the
15  production of it is not -- even though it was
16  produced for us in connection with --
17       MR. WEIR:  It's not a waiver.
18       MR. RODRIQUES:  It's not a waiver
19  of anything.
20       MR. WEIR:  Let me mark as Putnam
21  Exhibit 3 for identification the documents --
22  the document that has just been produced to us
23  by counsel.
24       (Exhibit 3 marked

Page 63

1       for identification)
2    Q.  Let me show you what's now been marked
3  as Putnam Exhibit 3 for identification.  And
4  tell us what it is, sir.
5    A.  It's the document that I reviewed in
6  preparation for today with respect to the 91
7  people and their performance ratings for the
8  years '99 through 2004.
9    Q.  Okay.  And can you take it column by
10  column and indicate what the column headings
11  refer to?
12    A.  Yes.  The first column is the employee
13  name.  And then the next series of columns, two
14  for each year, indicate the performance rating
15  and who the manager was of the individual for
16  that year.  And those two columns appear for
17  calendar year '99, 2000, 2001, 2002, 2003, and
18  2004.
19       And then the final column is a notes
20  column providing clarification about the
21  information that was referenced in the earlier
22  columns for each of the calendar years.
23    Q.  And when you say "the notes column,"
24  does that indicate whether there were

Page 64

1  alterations made to a performance rating?
2    A.  Yes.
3       (Witness and counsel confer)
4  BY MR. WEIR:
5    Q.  We'll get back to this in just a bit,
6  but I'd like to have an understanding as to the
7  managers' ratings system at Putnam.  I'd like to
8  ask you a few questions about that.
9       Were managers given instructions as to
10  the ratings to be given to investment
11  professionals under their supervision?
12       MR. RODRIQUES:  Objection.
13    A.  I'm not sure what you mean by
14  instructions.
15       There certainly were guidelines and
16  general criteria that were used consistently
17  throughout the investment division.
18    Q.  And what were those general criteria?
19    A.  Well, all investment professionals had
20  performance ratings determined for them based on
21  multiple components.  And all investment
22  professionals had these consistent components,
23  and those broad components were quantitative
24  investment ratings and then a broad qualitative

Page 65

1  rating.
2       Those qualitative ratings had
3  different criteria within them depending upon
4  your role and your group that you were working
5  in.
6    Q.  And were the managers given any
7  instructions with respect to the range of
8  numerical ratings that could be given to an
9  investment professional?
10    A.  Yes, there were several, I guess,
11  additional definitions.
12       First was that there was a rating
13  system throughout all of Putnam but also
14  applicable within the investment division where
15  performance ratings were determined on a
16  one-through-five basis.  And the performance
17  review forms had definitions of what each one of
18  those ratings were and how those numbers should
19  be derived ultimately into rounded numbers of
20  half steps.  So one through five were the broad
21  categories, but then there were, you know,
22  rounding guidelines to three to three and a half
23  to four.
24    Q.  And were there any guidelines given

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 66

1  with respect to what a rating of, let's say,
2  three and a half might represent?
3      A.  I believe the only descriptors were
4  for the broad one-through-five numerics they
5  have scores but do not have a definition on the
6  form.
7          And how one would get a half score
8  would be that -- the general criteria was that
9  you would assign a weighting to the quantitative
10 score and weightings to the individual
11 components of the qualitative score, and through
12 math that would come out to be a certain number,
13 and then you were instructed to round it to the
14 whole numbers or the half numbers.
15     Q.  And was there a designation given to
16 the form that was filled out by the manager?  Is
17 there a title to the document?
18     A.  Certainly during '99 through 2004
19 there have been different types of performance
20 review documents.  The generic title was
21 performance review form.
22         Back in '99 there were multiple
23 versions of those forms and all the way through
24 2004 that were customized for each of the

Page 67

1  different groups and teams.
2          Within the investment organization
3  there were multiple forms that were used
4  depending upon the different groups that you
5  were in.
6      Q.  Do you know what a PDPR is?
7      A.  Not off the top of my head, no.
8      Q.  Okay.  Do you know whether the forms
9  for which the managers gave ratings to their
10 employees at any point during the period 1999 to
11 2003 was designated as a PDPR?
12     A.  That's a term I'm not familiar with.
13     Q.  Okay.  And these various forms that
14 were distributed to managers, the instructions
15 were to rate the investment professional in
16 question in the range of one to five?
17     A.  Yes.
18     Q.  One being the poorest rating and five
19 being the best rating?
20     A.  Yes.
21     Q.  Okay.  And once the form had been
22 prepared, comments made and the rating given,
23 what was the manager in question instructed to
24 do with the form?

Page 68

1      A.  Well, let me see if I can just try to
2  describe the general process because it did
3  change from year to year in terms of the timing.
4      Q.  Okay.
5      A.  And from group to group people adopted
6  slightly different versions of this, but the
7  general practice was that managers would
8  complete a performance review form that would
9  have the individual rated.
10         Those would be shared with their
11 managers and in some instances with human
12 resources representatives, managers.
13         And then those ratings would be
14 summarized along with compensation information
15 and rolled up for review with the senior
16 management of the respective divisions.
17         That was a process where feedback was
18 given by managers of the direct supervisors or
19 managers as well as from human resources, and
20 then those review forms would be finalized and
21 then ultimately delivered in a performance
22 review discussion to the employees by the
23 manager, the direct manager or supervisor.
24     Q.  And how were the -- were the forms

Page 69

1  utilized in the determination of compensation to
2  be paid to an investment professional?
3      A.  In some years the actual forms were
4  used and shared.  More broadly, in other years
5  just the rating from the form was included and
6  incorporated into that process.  It did change
7  from year to year.
8      Q.  Do you recall whether it changed from
9  providing the forms from the people determining
10 the compensation to not providing, or was it
11 vice versa during that period between '99 and
12 2003?
13     A.  It was my memory that in '99 and 2000
14 the performance review forms within the
15 investment division were shared broadly within
16 the management team within the investment
17 division and not thereafter.
18     Q.  And who made the decision to
19 discontinue sharing the forms with the people
20 determining compensation?
21     A.  Ultimately it was Tim Ferguson.
22     Q.  You say "ultimately".  Who else
23 participated?
24     A.  It was a subject that was discussed.

18 (Pages 66 to 69)

Putnam Investments by Richard Tibbetts

Page 70

1   It was a very large process to have hundreds of
2   review forms copied and shared with everyone.
3   So it was the senior management, Tim Ferguson
4   and his direct reports within the investment
5   division that discussed that, but Tim was the
6   one who made the decision to stop sharing the
7   actual forms themselves.
8       Q.   Once the decision to stop sharing the
9   forms themselves was made, would the people
10  determining compensation for an investment
11  professional have access to the ratings for
12  prior years for the investment professional in
13  question?
14          MR. RODRIQUES: Objection.
15      A.   Let me see if I can try to describe
16  sort of what happened in the post 2000 time
17  period.
18          The ratings were shared, the
19  compensation recommendations were shared with
20  that senior investment management group and
21  performance was discussed, and sometimes that
22  included prior ratings and sometimes that did
23  not. That varied from year to year and from
24  individual to individual based on the

Page 71

1   conversation.
2       Q.   So in some instances the people
3   determining compensation would have access to
4   the ratings in prior years, and in other
5   instances they would not?
6       A.   I guess I should clarify.
7          They always had access to it if they
8   wanted to try to get that information. It was
9   not something that was necessarily provided.
10      Q.   Now, during that time period; that is,
11  1999 to 2003, did Putnam also have a 360-degree
12  review process in place?
13      A.   There was a process that was in place
14  within -- just within the investment division
15  where there were for several of the years, and I
16  don't recall the exact years, that it was
17  provided within the investment division as a
18  process to get a more formal documentation of
19  the input that managers were trying to get
20  informally previously.
21          And so that was an automated Internet
22  based kind of application where we were
23  capturing investment professionals' performance
24  feedback from other parts of the investment

Page 72

1   division as input to the managers as one of the
2   elements of their qualitative assessment of
3   performance.
4       Q.   So when the managers were filling out
5   their own forms and establishing the managers'
6   ratings, they would have access to the
7   360-degree ratings?
8       A.   Exactly. There were multiple inputs.
9   They would get the quantitative investment
10  scores to them by the individuals, they'd get
11  the 360 performance information as well.
12      Q.   And for how long a period of time did
13  the 360 review process continue?
14      A.   I believe it was three or four years.
15      Q.   And do you remember what three or four
16  years?
17      A.   I believe it was '99, 2000 and 2001,
18  but I don't know if it was before and then after
19  that.
20      Q.   And after 2001, were there 360-degree
21  performance reviews undertaken?
22          MR. RODRIQUES: Objection.
23      A.   I don't know what year it stopped. It
24  did continue within fixed income for a year

Page 73

1   longer than it did within equity, but I don't
2   recall which year that was.
3       Q.   Who made the decision to stop it?
4       A.   I guess ultimately it was Tim
5   Ferguson. But it was a similar, you know, group
6   kind of discussion as I had referenced before
7   with respect to actually sharing all the
8   performance documents.
9          It was a very large and cumbersome
10  process, demanding on all the investment
11  professionals, as well as a very voluminous
12  process, and so it was sort of a group
13  discussion but ultimately Tim making that
14  decision.
15      Q.   So the reason for it being stopped was
16  that it was too cumbersome?
17      A.   The final -- I can't speak necessarily
18  for Tim's specific decisions, but certainly some
19  of the criteria, some of the factors that were
20  considered were the benefit that was actually
21  extracted from the feedback that managers were
22  getting versus what they were already receiving
23  orally from those same, you know, internal
24  clients or colleagues within the investment

19 (Pages 70 to 73)

Putnam Investments by Richard Tibbetts

Page 74

1   division.
2       Q.  Okay.  Was it -- once the 360-degree
3   process was stopped, was there anything
4   undertaken in writing to get the views of one's
5   colleagues, peers, subordinates?
6       A.  There was no formal process.  It was
7   back to the informal process that had existed
8   prior to that where managers would go to clients
9   internally within the division, in some cases
10  outside the division, to get feedback on their
11  staff members.
12      Q.  Okay.  Now, did there come a time when
13  there was a decision taken by Putnam to alter
14  the performance ratings established by the
15  managers?
16          MR. RODRIQUES:  Objection.
17      A.  I'm not sure I understand the
18  question.
19      Q.  It's a simple question.  Did there
20  come a time when you decided to initiate a
21  process by which the people determining
22  compensation would be able to alter the
23  managers' rating on the performance review
24  document?

Page 75

1       A.  Let me try to answer it this way,
2   which is that there's always been a review
3   process of individuals' performance assessments
4   within the investment division and outside the
5   investment division where it was an iterative
6   process where managers were coming up with their
7   initial assessments.  Those ratings were shared
8   laterally but also with their -- you know, with
9   their respective bosses and got feedback as to
10  how their assessments of those individuals were
11  factored into those ratings.
12          It was also commonplace to look at
13  performance ratings across a broader group where
14  one manager may be a tougher grader, if you
15  will, than another manager, and some of that
16  sort of internal equity or equaling, if you
17  will, of the ratings scales would occur, and
18  that would occur through that iterative process.
19          That's always been in place as long as
20  I've been with the firm.
21      Q.  Okay.  And did Putnam provide any
22  guidelines with respect to the degree to which a
23  score performance rating could be altered?
24      A.  No.

Page 76

1       Q.  Okay.  Did it occur that there were
2   very substantial alterations?
3           MR. RODRIQUES:  Objection.
4       A.  I don't know what you mean by
5   substantial.  Manager ratings were modified
6   during that iterative process regularly.
7       Q.  And at the Putnam 3, would that
8   indicate the alterations which did take place
9   during the period of 1999 to 2004?
10      A.  These performance ratings captured in
11  this Exhibit 3 are the actual performance
12  ratings that were on the actual performance
13  review forms.  And the notes column captures
14  where those performance ratings were modified
15  from -- on the actual form.
16          So, for example, if I look at the
17  second line in the first note is Robert Bloemkr.
18  The note is for 2002.  The initial column says
19  3.7 and the manager being Kevin Cronin.  And the
20  note says for 2002, "Review change to a 3.5."
21  So that was the actual notation made on the
22  actual review form bringing that from a 3.7 to a
23  3.5.
24      Q.  Let me ask this question:  Were there

Page 77

1   alterations to performance ratings of investment
2   professionals during the period 1999 to 2004
3   which are not indicated on Putnam Exhibit 3?
4       A.  Well --
5       Q.  Remembering that there were -- the
6   subject of discussion here is for the 91
7   comparators.
8           MR. RODRIQUES:  Objection.
9       A.  Well, I guess I'm confused by the
10  question.
11          This is the -- these are the actual
12  review forms with the notations of what the
13  changes were for the 91 people.
14      Q.  Okay.  Directing you to the third page
15  of the document.  Do you see the entry for Lisa
16  Svensson?
17      A.  Yes.
18      Q.  Can you interpret the information with
19  respect to Lisa Svensson on this document for
20  me?
21          MR. RODRIQUES:  Objection.
22      A.  What this captures is for 1999, a
23  performance rating of 4.78, and the manager
24  identified for 1999 was Swift, that's Robert

20 (Pages 74 to 77)

Putnam Investments by Richard Tibbetts

Page 78

1   Swift.
2        For the columns of 2000 the rating was
3   a four, and the manager was Swift again.
4        And for 2001, this shows a rating of
5   3.5 with a manager of Swift.
6        And then for 2002, this shows a rating
7   of 3.5 and a manager of Gorman.
8        Q.  Do you know, sir, whether the ratings
9   for Ms. Svensson were or were not altered from
10  the original management performance form for
11  those years?
12       A.  These are the ratings that were on the
13  manager -- on the performance review forms
14  completed by the managers.
15       Q.  I see.  And do you know whether these
16  ratings were altered in any way up or down by
17  the people who determined compensation and who
18  were reviewing these forms?
19       A.  Well, as I've said before, this was an
20  iterative process where the managers would
21  complete the review forms and ratings, share
22  that with colleagues, with management team, with
23  HR in some instances, get feedback on that and
24  then finalize the review forms.

Page 79

1        So where and how changes were made or
2   specifically for the 91 were changed, other than
3   where it was actually written down on the
4   performance review form I don't have other than
5   when it was captured on the actual review form
6   which was reflected in the notes.
7        Q.  My question, leaving aside what the
8   information contained on this document is, do
9   you know whether in 1999 when Mr. Swift gave a
10  rating of 4.78, do you know whether that rating
11  was subsequently changed?
12       A.  The rating on the performance form was
13  4.78 and it still is.
14       Q.  But you don't know whether there were
15  any adjustments to that rating by the
16  individuals who were determining compensation,
17  is that your testimony?
18       A.  I think I'm saying that the rating was
19  4.78.  It was not changed.  It is and was 4.78
20  for 1999.
21       Q.  Okay.  And the same question with
22  respect to 2000, the rating was and is four and
23  was not altered, correct?
24       A.  There are no alterations after this.

Page 80

1   This was the performance review form that is on
2   record as the manager completed it.
3        Q.  And I take it that Putnam did not
4   undertake to make any changes to what was on the
5   review form?
6        A.  No.
7             (Witness and counsel confer)
8   BY MR. WEIR:
9        Q.  Let me show you what was previously
10  marked as Tibbetts 43 for identification, sir.
11            (Pause)
12       Q.  Do you see the reference to Lisa
13  Svensson in page 3374?
14       A.  Yes.
15       Q.  And do you see the column Brett, Rick
16  changes?
17       A.  Yes, I do.
18       Q.  And what is that column of Exhibit 43?
19       A.  It is a column on the spreadsheet that
20  has changes recorded.
21       Q.  And Brett is Brett Browchuk?
22       A.  Yes.
23       Q.  And Rick is Rick Tibbetts?
24       A.  Yes.

Page 81

1        Q.  And did you make changes to the
2   ratings of any of these individuals?
3        A.  I believe what this document was was a
4   work sheet in that discussion that we talked
5   about where initial performance ratings were
6   shared with the groups and peers as well as
7   bosses to review the performance ratings, look
8   at those and make comparable or try to make as
9   comparable as possible the rating standards.
10       And these were notes that -- a column
11  that was created for Brett and myself to take
12  notes on in that discussion.  So these reflect
13  the changes coming out of that discussion.
14       Q.  And who filled out the column manager
15  core tile?  How was that number determined?
16       A.  Well, I don't recall specifically what
17  the manager rating was used this year versus the
18  manager core tile.
19       Reading this, I make the assumption
20  that both the 2001 manager rating and the
21  manager core tile were those initial ratings
22  prepared by the direct managers.
23       Q.  Well, can you explain for me, sir --
24  take, for example, Mr. Prusko who is at the

21 (Pages 78 to 81)

Putnam Investments by Richard Tibbetts

Page 82

1  bottom of the first page. He has a 2001 manager
2  rating of 3.50 and the core tile's one. Do you
3  see that, sir?
4      A.  I do.
5      Q.  And Lisa Svensson for 2001 has a
6  manager rating of 3.50, and the designation for
7  her is core tile three. Can you explain how
8  that distinction occurred?
9      A.  I can tell you the process.
10         The process was that the managers came
11  up with initial ratings in that year as well as
12  core tile rankings, and those were then
13  submitted to Brett and myself for consolidation
14  and then reporting back out to the group.
15         How I believe in 2001 Robert Swift is
16  still the manager came up with that rating
17  specifically, I have no way of knowing
18  specifically.
19      Q.  And you don't know how it is that
20  Mr. Prusko's designated in core tile one and
21  Lisa Svensson's designated in core tile three
22  with the same performance rating?
23      A.  As was Bart Geer, G-E-E-R, and Sheldon
24  Simon, no, I don't know.

Page 83

1      Q.  Who makes the determination which core
2  tile an investment professional is to be placed
3  in?
4         MR. RODRIQUES: Objection. You are
5  speaking as if it's an ongoing process. So far
6  we know it happened in 2001, that's all.
7         MR. WEIR: Right.
8      A.  Again, there was a general process
9  that occurred every year, different elements,
10  but that the managers would come up with initial
11  ratings. Those would be consolidated by myself
12  and human resources or others in human resources
13  or the investment division, CAO's department.
14         We would then report those back out
15  and share those with the investment division
16  management group for review and input.
17         And then those inputs would go back to
18  the managers for finalization of the reviews.
19      Q.  So the investment division management
20  group, that would have been the ones who would
21  have indicated that Mr. Prusko belonged in core
22  tile one and Svensson belonged in core tile
23  three for 2001?
24      A.  No, I don't think that's what I just

Page 84

1  said. I think what I just said was that the
2  managers came up with these ratings for 2001
3  manager rating and for the manager core tile
4  rating.
5      Q.  Okay. So the manager would be the one
6  who would make the core tile determination?
7      A.  In this year there was in addition to
8  the manager rating a core tile rating that was
9  established.
10         Since it's labeled the manager core
11  tile, I don't remember this exact process, but
12  if it followed the normal process, the
13  manager-related columns would have been
14  determined by the direct manager and then rolled
15  up and then shared and reviewed as a groom.
16      Q.  And what is the implications of being
17  in the first manager core tile versus the third
18  manager core can tile?
19      A.  I have no memory at all of what
20  happened in 2001 with respect to --
21      Q.  Did it have any effect on one's
22  compensation?
23      A.  I can only assume that it was part of
24  the assessment process, and therefore, there was

Page 85

1  some correlation between what the ratings were
2  and so on.
3         But clearly we had a manager's ratings
4  every year, but, you know, we did not always
5  have a manager core tile rating. There were
6  different systems used in different years
7  depending upon how people were trying to work.
8         What was done within the investment
9  division also differed from might have been done
10  in the operations organization or the finance
11  organization.
12      Q.  So this was better for Mr. Prusko in
13  2001 in terms of compensation and career
14  advancement that he was designated in the first
15  core tile rather than being designated in the
16  third core tile as was Lisa Svensson?
17         MR. RODRIQUES: Objection.
18      A.  I don't know what you mean by better.
19  It certainly is a higher rating.
20      Q.  Now, did these designations of core
21  tiles continue beyond 2001?
22      A.  I don't recall any manager core tile
23  ratings in any specific year.
24      Q.  Well, you can see that it happened in

22 (Pages 82 to 85)

Putnam Investments by Richard Tibbetts

Page 86

1   2001, correct?
2       A. Yes.
3           MR. RODRIQUES: He's saying he
4   doesn't recall, Jack.
5   BY MR. WEIR:
6       Q. Do you know whether it continued?
7       A. I think I just said I don't know of
8   any other year.
9       Q. That's part of the manager's
10  performance rating --
11      A. For 2001.
12      Q. -- which is a subject that was called
13  for in the 30(b)(6) notice.
14          MR. RODRIQUES: So what's your
15  point?
16      A. I don't think so. I think that the
17  manager rating was the manager rating. Okay. I
18  don't know how many more times I have to answer
19  that, quite honestly.
20          MR. RODRIQUES: What's your point,
21  that he --
22          MR. WEIR: He should have been
23  prepared on it.
24          MR. RODRIQUES: Did you ask him

Page 87

1   whether there's anyone at Putnam who would know
2   this question? He only has to be prepared for
3   what he knows or what is reasonably knowable.
4           MR. WEIR: Well, we read the
5   definition of what he's required to do.
6           MR. RODRIQUES: That's right, which
7   is knows and is reasonably knowable.
8   BY MR. WEIR:
9       Q. Do you have a system of core tile
10  manager ratings at Putnam at the present time?
11      A. No.
12      Q. Do you know whether it was
13  discontinued?
14      A. There were -- there was only one thing
15  consistent the entire 18 years I've been at the
16  firm, and that is that every manager was
17  instructed and tried to come up with a
18  performance rating.
19          A whole host of systems were used from
20  division to division within the investment
21  divisions to determine what the ratings would
22  be. That's the only thing that was consistent
23  from year to year.
24          In 2001 a manager core tile process

Page 88

1   was used. Different processes were used in
2   different years. There is no such thing as a
3   consistent manager core tile rating.
4       Q. And what does the term core tile mean?
5   What did it mean on Exhibit 43?
6       A. Core tile means equal fours, that you
7   would rate your people evenly between first,
8   second, third and fourth core tiles.
9       Q. And that was for purposes of
10  determination of compensation and career
11  advancement?
12      A. In 2001 it was one of the factors used
13  in establishing the manager rating and
14  determining compensation, yes.
15      Q. Let's take a look at 44, Tibbetts 44
16  for identification.
17          Now, my question regarding this
18  document is whether the handwritten alterations
19  of the performance ratings were in 1999 actually
20  implemented?
21          MR. RODRIQUES: Objection.
22      A. I don't know what you mean by
23  implemented.
24      Q. Well, the indication on the first page

Page 89

1   at the bottom is that Lisa Svensson had a rating
2   of 4.8 which accords with what Putnam 3 says was
3   her actual manager's rating in that year,
4   correct?
5       A. I think Exhibit 3 says that her rating
6   was on the form a 4.78. On Exhibit 44, it
7   appears that the 4.78 was rounded to 4.8 on the
8   initial manager's rating.
9       Q. Okay. That's not my question.
10  Whether it's 4.8 or 4.78, I take it that's just
11  a rounding?
12      A. That's what I said, I think it's been
13  rounded to 4.8.
14      Q. So the manager's performance rating
15  for Lisa Svensson in 1999 was 4.8 or 4.78
16  rounded to 4.8?
17      A. Yes.
18      Q. Tibbetts 44 has in a column under the
19  notation Jack handwritten changes to the
20  performance ratings. Do you see that, sir?
21      A. I see a column that has Jack with
22  different numbers than some of the manager
23  ratings.
24      Q. And for Lisa Svensson it's a three,

23 (Pages 86 to 89)

Putnam Investments by Richard Tibbetts

Page 90

1   correct?
2       A.  Correct.
3       Q.  Do you know whether there was an
4   alteration to the performance rating for Lisa
5   Svensson for 1999 from 4.8 to 3?
6       A.  I think I've answered this like three
7   times, so let me try to do it one final time.
8       Q.  Not to my satisfaction.
9       A.  Apparently.
10          The manager performance rating, okay,
11  that I prepared in preparation for today, it's
12  on Exhibit 3, shows that the manager rating was
13  4.78. That's what the manager rating was for
14  1999.
15      Q.  Right. Now I'm asking you --
16      A.  You're asking me if it was altered.
17  No. It was 4.78. I don't know how many more
18  times you need me to answer that.
19      Q.  So it's your testimony, sir, that the
20  performance rating of 3.0 for Lisa Svensson for
21  1999 was -- that change was never made, that's
22  your testimony?
23      A.  Your characterizing a column with
24  handwritten notes as a change to that

Page 91

1   performance rating. I think I've testified now
2   multiple times that her performance rating was
3   4.78 or 4.8.
4           That column, to be crystal clear since
5   you haven't asked that question, is Jack's
6   opinion of her performance rating, but the
7   manager's performance rating was 4.78 or 4.8.
8       Q.  Jack being Jack Morgan?
9       A.  Yes.
10      Q.  And this was a document that bears
11  your initials on it too, sir; is that correct?
12      A.  It does.
13      Q.  And my question to you is it bears
14  also a date of January 12-January 13, 2000, and
15  I take it that it was in that time frame that
16  you were considering this document; is that
17  correct?
18      A.  Considering by using it, yes.
19      Q.  That's why put your initials and the
20  notation of the date on it, correct?
21      A.  Yes.
22      Q.  And my question is whether there was
23  discussion on that date or on or around that
24  date as to alteration of performance ratings for

Page 92

1   any of the investment professionals that are
2   referenced on this document?
3           MR. RODRIQUES:  Objection.
4       A.  I don't know how many more times I
5   need to say this.
6           Yes, there was a process every year
7   where managers did their assessments. Those
8   assessments were reviewed -- were summarized  and
9   then reviewed by their bosses and colleagues
10  across the division and performance was
11  discussed. That was the same basis on which
12  compensation was discussed. Those managers then
13  took that input and finalized the performance
14  ratings.
15          So that was the process for the last
16  18 years, and it's the process that was done in
17  1999.
18      Q.  Okay. And so in respect of Lisa
19  Svensson's performance rating for 1999, that --
20  after that discussion that you just referenced,
21  the performance rating for Lisa Svensson
22  remained at 4.8, correct?
23      A.  Well, the performance rating that was
24  actually on the form was 4.78, but 4.78, 4.8,

Page 93

1   that was the performance rating.
2       Q.  Right. And so for purposes of her
3   compensation and for purposes of her career
4   advancement, anyone who went to Putnam's records
5   after January of 2000 would have seen that she
6   had a 4.78 or 4.8 performance rating for the
7   prior year; that is, 1999?
8       A.  Yes, if they looked at her performance
9   rating on the performance review form, it was
10  4.78.
11      Q.  Okay. And so the same would be true
12  for Lisa Svensson in the year 2000; that is,
13  that she received a performance rating of 4.0?
14          MR. RODRIQUES:  Are you referring
15  to a document now, Jack?
16          MR. WEIR:  I'm referring to Putnam
17  3.
18          MR. RODRIQUES:  Just so he knows
19  what you're looking at.
20      A.  Her rating for 2000 was four, yes.
21      Q.  So anyone going to Putnam's records
22  during that period would have determined that
23  Lisa Svensson's performance rating for that year
24  2000 was 4.0?

24 (Pages 90 to 93)

Putnam Investments by Richard Tibbetts

Page 94

1   A.  Yes.
2   Q.  And that rating was never altered,
3  changed by anyone?
4   A.  The rating that would appear is this
5  rating that was on her performance review form,
6  which is a four.
7   Q.  And the same for 2001, the rating
8  which Mr. Swift gave Lisa Svensson in 2001 was
9  3.5?
10   A.  Correct.
11   Q.  And that was not altered in any
12  documentation maintained by Putnam?
13   A.  The performance review form that was
14  on the -- the performance rating on the
15  performance review form is, was and would be
16  reviewed by anybody as 3.5.
17   Q.  Okay. And the same is true in 2002,
18  the performance ratings she was given was 3.5?
19   A.  Yes.
20   Q.  And that was not altered in any way?
21   A.  No. The performance review form is
22  the performance review form, and it's 3.5.
23   Q.  And I take it that Lisa Svensson was
24  not rated in 2003?

Page 95

1   A.  That's correct.
2   Q.  Would you consider a rating of 4.78 or
3  4.8 to be an above-average rating?
4   A.  Yes. The definition for an average
5  rating was a three.
6   Q.  And would you consider a four
7  therefore to be above average?
8   A.  Yes.
9   Q.  Would you consider 3.5 to be above
10  average?
11   A.  I would consider it around average.
12   Q.  An average was three; is that correct?
13   A.  Again, I described to you that there
14  was only broad definitions for the whole
15  numbers. So if you were a three, there was a
16  definition for threes, but there was no
17  definitions specifically for half scores. So I
18  would interpret a three, 3.5 all to be around
19  average.
20   Q.  What was the definition for a four?
21   A.  I don't recall the specific language
22  around it. Generically it was above average.
23   Q.  All right. Now, if you'd look at
24  Putnam 3, in the notes column there are

Page 96

1  indications that certain of these ratings in
2  certain years were changed. Can you describe
3  the process which resulted in those changes
4  occurring?
5   A.  Generally, yes. Specifically for each
6  one I do not know, but I can describe the
7  general process.
8   Q.  Please do.
9   A.  Let me use the example that I was
10  using before, Robert Bloemkr.
11   The note says, "2002 review change to
12  3.5." So that references the columns 2002 which
13  had a performance rating of 3.7. So this is the
14  actual writing on the performance review form
15  that's in the image files, summary rating would
16  have said 3.75. That number was crossed out and
17  registered as 3.5. That's what that note
18  references.
19   That rounding would have occurred by
20  several people. It would have either occurred
21  by the manager taking those numerical ratings
22  that they had come up with using the
23  quantitative scores, the multiple subsections of
24  qualitative scores, multiplied those by the

Page 97

1  weightings of each those and come up with a
2  number such as 3.7.
3   As I had given testimony before, the
4  performance review forms called for a whole
5  number or a half number to be used and only a
6  whole number or half number. So in this case
7  that number was rounded down to 3.5, it looks
8  like. And that was done either by the manager
9  doing that or by someone in human resources
10  looking at that and reviewing that.
11   Those would be the two sources for
12  that rounding to occur.
13   Q.  And what does the reference additional
14  in the comment under the notes refer to?
15   A.  Where is that?
16   Q.  Well, take, for example --
17   A.  David Hamlin here?
18   Q.  David Hamlin has an additional five in
19  2001 and I think Jeff Knight, 1999, additional
20  four.
21   A.  Okay. So the first one where you
22  reference David Hamlin for 2001, the rating that
23  was on the form was a four given to him by
24  Jacobs. The note says, "2001 additional five."

25 (Pages 94 to 97)

Putnam Investments by Richard Tibbetts

Page 98

1   These additional comments were
2   referring to one of two things, either a note
3   where the rating was crossed off and in this
4   case a five could have been written in, or a
5   second review form was done rating that person a
6   five.
7       So, for example, about halfway down on
8   first page of Exhibit 3, Roland Gillis, an
9   actual second review form for the calendar year
10  2001 was done, so there were two performance
11  review forms actually completed. So in this
12  case for Roland Gillis there was one completed
13  by Miller which had a 3.5 rating and then there
14  was a second performance review form on file
15  that had been completed by Oristaglio for 2001
16  with an overall rating of 2.75.
17      So those additional comments referred
18  to two things, either an additional actual
19  document or where the number had been crossed
20  off and changed to another rating.
21  Q.   Did Mr. Oristaglio review all of the
22  investment professionals in the investment
23  division?
24  A.   Well, at varying degrees, yes.

Page 99

1       MR. RODRIQUES: You mean by prepare
2   review forms for, is that what you mean, because
3   he may mean review in a higher-level sense.
4       MR. WEIR: Well, he's talked about
5   Mr. Oristaglio doing a second review, if I
6   understand it correctly, for this individual.
7   I'm wondering whether that was a more general
8   process, did he have a review role to play with
9   respect to other investment professionals
10  besides Roland Gillis.
11  A.   He had really two roles specifically.
12  The first role was as a deputy head of
13  investments, he was responsible for part of the
14  overall review process and reviewing other
15  managers' ratings and so on.
16      The other was that he was directly
17  responsible for some of the functional teams,
18  investment teams.
19      In this case in 2001 and 2002 -- I'm
20  sorry, in 2001 he had done an additional review
21  for Roland and -- Roland Gillis, and that review
22  was something that was not a standard practice
23  but had a different view and assessment than Dan
24  Miller did of Roland Gillis.

Page 100

1   Q.   Now, do you know whether
2   Mr. Oristaglio did that for other individuals?
3   A.   That was not a standard practice. The
4   only review forms that he would have done on a
5   regular basis would have been the reviews that
6   he was specifically doing for those that
7   reported directly to him.
8   Q.   Do you know whether Mr. Oristalgio did
9   a review of Lisa Svensson during any of the
10  years in question?
11  A.   He did not.
12  Q.   And just so I'm clear, Tibbetts 44 was
13  a document which was in the room on or about
14  January 12th or 13th of 2000 --
15      MR. RODRIQUES: Objection.
16  Q.   -- when these ratings and so forth
17  were being discussed?
18  A.   I don't know what you mean in a room.
19      There was a time where there was
20  performance reviews discussed where I had this
21  document when we were discussing performance
22  reviews.
23  Q.   Right. And I'm asking you whether you
24  shared it with the group?

Page 101

1   A.   I don't recall what was shared with
2   the rest of the group in that meeting.
3   Q.   Do you know how the views of Mr. Jack
4   Morgan were determined? Did you do it?
5   A.   They were in Jack's --
6   Q.   Did you have a meeting with Mr. Morgan
7   and get his views on the subject of what he
8   thought the performance ratings should be?
9   A.   Every year there was a meeting where
10  there was a sharing of the performance ratings
11  by the direct managers.
12      In this case in 1999 the meetings for
13  reviewing those included Jack Morgan and some of
14  the other senior leaders within the investment
15  division. And it was in that meeting where Jack
16  shared his views.
17  Q.   And he shared them both verbally and
18  in writing on the document?
19  A.   No, he shared them verbally.
20  Q.   Well, my question remains then how did
21  the views of Mr. Morgan get onto Tibbetts 44?
22  A.   I wrote them down.
23  Q.   So you were -- as he was sharing them
24  verbally, you were writing down his views in the

26 (Pages 98 to 101)

Putnam Investments by Richard Tibbetts

1  column under Jack?
2      A.  Yes.
3      Q.  Before we leave this document.  Is
4  there a reference to a Mr. Steve Dexter on
5  Tibbetts 43?
6      A.  44, you mean?
7      Q.  44.
8      A.  Yes.
9      Q.  Where is that, sir?
10     A.  On the first page.
11     Q.  And Mr. Dexter's rating for 1999 was a
12  3.4?
13         MR. RODRIQUES:  On this form?
14         MR. WEIR:  I'm looking at Tibbetts
15  44 now.
16     A.  Yes, 3.4.
17     Q.  And Mr. Morgan thought it should be a
18  three?
19     A.  That was his view of his performance.
20     Q.  And then with reference to
21  Mr. Dexter's reference on Putnam 3, it appears
22  that Mr. Morgan's view was adopted, correct?
23     A.  The form completed by Robert Swift
24  reflected a three.

1      Q.  Do you understand how it is that
2  Mr. Dexter in 1999 got a 3.0 performance rating,
3  yet on Tibbetts 44 in 1999, performance profiles
4  for the investment division, it's indicated that
5  he has a 3.4?
6      A.  Yes.  The same process I described now
7  a dozen times, which is that managers came up
8  with initial performance ratings.  Those were
9  discussed in the round.  That was given back as
10  input to the managers.  And then managers
11  finalized the performance ratings.
12         How specifically Robert decided to
13  factor that in I can't tell you.
14     Q.  And with respect to Mr. Dexter, he
15  received a rating of four in 2000, correct?
16     A.  Yes, he did.
17     Q.  3.5 in 2001?
18     A.  Yes.
19     Q.  And how about in 2002?
20     A.  He received a rating of four.
21     Q.  And how about 2003?
22     A.  We do not have a rating on record for
23  him in 2003.
24     Q.  Is there some reason for that?

1      A.  There was no performance review form
2  in his image file.
3      Q.  And is that true for -- there are very
4  few individuals who have any indication of a
5  2003 performance rating.  I see Mr. Andrea Burke
6  appears to be the only one.
7         Is there some reason for that, sir?
8      A.  That's the only one on record in the
9  image files for 2003.
10     Q.  Well, would the performance ratings,
11  did they continue to be kept in 2003?
12     A.  They did.  But in 2003, Ed Haldeman
13  did not want to mandate performance review forms
14  to be completed for everyone.  And within the
15  investment division many people did not actually
16  have performance review forms completed for
17  them.
18     Q.  And did Mr. Haldeman express a reason
19  for discontinuing the performance review forms?
20     A.  He thought that our existing practice
21  was bureaucratic and cumbersome and that it was
22  just more effective to have managers have
23  conversations with their staff members directly.
24     Q.  And did the meetings concerning the

1  discussion of an individual's performance and
2  the effect of their career advancement, did they
3  continue after the forms were discontinued?
4      A.  Yes.
5      Q.  How about, if you'd look at Tibbetts
6  43 again, what was the role of Mr. Brett
7  Browchuk in connection with this document?
8      A.  Brett and I were the facilitators of
9  that manager review performance discussion in
10  2001 as he was the chief administrative officer
11  or chief operating officer, I do not recall the
12  exact title, for the investment division at the
13  time.
14     Q.  So he was one of the participants in
15  these meetings?
16     A.  His primary role was to facilitate the
17  discussion along with me, but he did
18  participate, yes.
19     Q.  And did he ever suggest any changes to
20  performance ratings?
21     A.  I don't recall specific suggestions by
22  Brett.
23     Q.  Well, there are -- on the document
24  there are Brett, Rick changes that are

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 106

1  referenced in the far right-hand column. Do you
2  see that, sir?
3      A.  I do.
4      Q.  And I want to know, were these changes
5  proposed by you, by Brett Browchuk, or by both
6  of you?
7      A.  They were proposed by neither of us.
8  Those were used, as I said before, as a column
9  for us to create our ability to notate what was
10 being said and described by other people so that
11 we could capture that and record it.
12     Q.  I see.
13         Were there any forms distributed after
14 2002 for managers to provide comments or
15 evaluations of investment professionals under
16 their supervision?
17     A.  By distribute, I assume you mean forms
18 made available for managers to actually use?
19     Q.  Yes.
20     A.  The way we shared that information was
21 to have available via either E mail in terms of
22 direct response to people or through access to
23 various parts of the human resources Intranet
24 site or on the broader Putnam Intranet site are

Page 107

1  where they could access review forms.
2          And those forms were in multiple
3  shapes and sizes, the full-blown sort of
4  historical documents which were used which were
5  six to eight pages long, to sort of customized
6  one-, two-page forms that were done for each of
7  the different groups, and those were made
8  available in 2003 for managers' use.
9      Q.  And how about the written forms that
10 had been prepared by managers for earlier years,
11 were they accessible in the time frame of 2003
12 and thereafter?
13     A.  For managers' access, yes.  It was not
14 something we shared in response to requests for.
15     Q.  And where were they kept, the actual
16 performance evaluation documents?
17     A.  They were -- the ones we had were
18 imaged into the human resources system.
19     Q.  Did you keep hard copies at all?
20     A.  Only to image them, and then they were
21 discarded after they had been imaged.
22     Q.  And who made the decision to discard
23 them after they had been imaged?
24     A.  I don't know specifically.  It was a

Page 108

1  process we established, when we would image
2  documents, we would get rid of the actual
3  physical copies and keep the electronic copies.
4      Q.  At the time frame of August and
5  September of 2003, were there -- was it possible
6  for a manager to access these imaged documents
7  if he or she chose to do so?
8      A.  Yes.
9      Q.  And was there any process of --
10 directed by human resources with respect to
11 whether an individual manager would or would not
12 be granted access to the imaged documents?
13     A.  No.  If managers wanted to review
14 forms, they could see and review forms.
15     Q.  They had the right to --
16     A.  Just ask to see the forms, and they
17 would get the forms.
18     Q.  All right.  Next subject.
19         MR. RODRIQUES:  Can we take a
20 break?  It's one o'clock.
21         MR. WEIR:  Okay.
22         (Lunch recess taken from
23         12:58 p.m. to 1:32 p.m.)
24

Page 109

1          AFTERNOON SESSION
2          MR. WEIR:  Let me mark as Putnam 4
3  for identification a multi-page document bearing
4  document numbers PRM 00846 to PRM 00853.
5          (Exhibit 4 marked
6          for identification)
7  BY MR. WEIR:
8      Q.  Let me show you what's been marked as
9  Putnam 4 for identification, sir, and ask you if
10 you can identify that document?
11         (Pause)
12     A.  Yes.
13     Q.  What is it, sir?
14     A.  It is a performance review form for --
15 it looks like a generic, uncompleted performance
16 review form that was customized for investment
17 associates in the global equity research group
18 for the time period January -- for the first
19 half of 2003, from January to June of 2003.
20     Q.  Is this the type of form that was used
21 at Putnam to get input from the managers
22 concerning the performance of investment
23 personnel under their supervision?
24         MR. RODRIQUES:  Objection.