Exhibit A
Part 2 of 2

Putnam Investments by Richard Tibbetts

Page 110

1    A.   This was the general performance
2   review form that was used at Putnam but was
3   customized for various roles.  So this was a
4   form that was used, it appears, for investment
5   associates.
6        I don't recall this specifically for
7   investment associates, but it appears to
8   correlate, but one might have been different for
9   the quantitative analyst or portfolio manager or
10  a trader.
11   Q.   Okay.  But there was a document, a
12  form entitled Performance and Development
13  Planning and Review which was distributed to
14  managers of investment professionals in the time
15  frame of 1999 to 2003?
16       MR. RODRIQUES:  Objection.
17   A.   I guess without the customization
18  that's in here, like investment associate, the
19  time period and the specific items identified
20  within the business goals, that would have been
21  the form that was made available to managers to
22  use for documenting performance.
23   Q.   And you don't know what customization
24  was done with respect to this document that

Page 111

1   would make it different, if at all, from the
2   performance and development planning and review
3   form utilized for investment professionals?
4    A.   Well, again, this captures specific
5   business goals that appear to have been
6   customized for investment associates.
7        I would expect different categories or
8   business goals for different types of investment
9   professionals.
10       So for a trader, new coverage would
11  not be something that would be applicable.  It
12  would be this generic form without those
13  customized goals.
14   Q.   Okay.  And this document, which I had
15  referred to earlier as a PDPR, as customized for
16  investment professionals was a document in which
17  the managers gave their ratings of investment
18  professionals under their supervision?
19       MR. RODRIQUES:  Objection.
20   A.   Some managers used this form to
21  document performance, not all.  And they
22  obviously used different formats for different
23  types of investment professionals.
24   Q.   Okay.  Now, this document relates to

Page 112

1   the January to June 2003 period.  Were there
2   mid-year evaluations undertake of investment
3   professionals?
4    A.   We did have a process where we
5   encouraged managers to have mid-year updates
6   with their staff members.  Not all did.  That
7   was true throughout the entire organization but
8   also true within the investment division.  And
9   so some did have a mid-year review within the
10  investment division, but not all.
11   Q.   And was that left at the discretion of
12  the individual manager, as to whether or not to
13  undertake a mid-year review of an investment
14  professional?
15   A.   Yes.  That was not a process that was
16  mandated.
17   Q.   And there was no instructions to do it
18  or not to do it?
19   A.   There was no specific mandate to say
20  that managers had to do it.  But the tools, the
21  performance ratings and other things were, in
22  fact, made available to managers.
23   Q.   Were ratings provided for the mid-year
24  review?

Page 113

1    A.   When managers did them, they often
2   would have a rating, yes.
3    Q.   Okay.  And did they apply the same
4   ratings range and ratings criteria that we've
5   talked about earlier in conducting the mid-year
6   reviews?
7    A.   The generic process was to use the
8   same format.  Did everyone use the same format?
9   I don't believe so.
10       When they used the form, the
11  definitions were the same whether it was applied
12  for the mid-year, because it was the same form,
13  or whether it was the year end.
14   Q.   Okay.  When they were done, how were
15  the mid-year reviews utilized?
16   A.   They would be the basis for which a
17  manager would sit down and have an update
18  discussion with staff members about performance.
19   Q.   Okay.  So if I understand you
20  correctly, the purpose was then to bring to the
21  attention of the investment professional in
22  question issues which if continued might carry
23  on into the review at the end of the year, is
24  that fair to say?

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 114

1    A.   No, I don't think so.  I think that it
2  was not just to identify issues, it was to
3  assess performance, both strength and
4  opportunities for improvement.  It was not just
5  on issues.  It was assessing the complete
6  performance and giving people feedback.
7    Q.   And to whom would -- once prepared, to
8  whom would these evaluations go?
9    A.   Well, sometimes they would come into
10  human resources and we would take them and image
11  them.  Sometimes we would never see the review
12  forms in the human resources group.
13         And sometimes, as I said, they weren't
14  done -- I would say the majority of the time,
15  the investment division, the mid-years, it was
16  not used.  It was not a process that was used.
17    Q.   Were there any rules or guidelines
18  with respect to whether and under what
19  circumstances mid-year reviews were to go to
20  human resources?
21    A.   No.  It was a standard ongoing
22  practice that if you had a performance review
23  form, that you would share those with the
24  individuals and then share them with the human

Page 115

1  resources for inputting into their personnel
2  files.
3    Q.   And in those instances where you did
4  receive a mid-year review, what, if anything,
5  did human resources do with the evaluations?
6    A.   It varied from group to group and from
7  manager to manager and from individual review to
8  individual review.
9    Q.   Well, how about with respect to the
10  research department in 2003, after Mr. Brooks
11  assumes control of that department?
12    A.   I don't know about specifics with
13  respect to the mid-year review process in the
14  research department in the investment division
15  in 2003.
16    Q.   Do you know whether any mid-year
17  reviews were received of the investment
18  professionals in the research department in 2003
19  by human resources?
20    A.   I do not.
21    Q.   I'm going to show you what's been
22  marked as Oristaglio Exhibit 29 for
23  identification and ask you if you can identify
24  that document?

Page 116

1         (Pause)
2         MR. RODRIQUES:  I think you've got
3  an internal E mail here.
4    A.   I believe you asked if I recognize
5  this.  It's very hard to read on some of these
6  pages.
7    Q.   I agree.
8    A.   But if you look on some of them, it
9  appears to be as listing of people within the
10  investment division that captures 2001 ratings
11  and sorts them in various ways, the first by
12  group, the second by rating, the third by
13  alphabetical order.
14    Q.   My question is whether this was a
15  document -- this relates, of course, to the 2001
16  time frame, bearing a date of January 16, 2002.
17         Is this a type of document that was
18  considered in these various meetings in which
19  the management sat around and tried to determine
20  the compensation arrangements for investment
21  professionals?
22         MR. RODRIQUES:  Are you asking him
23  whether this type of document?  You said this
24  type of document.

Page 117

1         MR. WEIR:  Yes.
2         MR. RODRIQUES:  Or this document?
3         MR. WEIR:  Well, if he has a
4  recollection of this specific document, but I'm
5  more interested in whether there were documents
6  presented at these meetings that presented the
7  information that is reflected on this particular
8  document.
9         MR. RODRIQUES:  As opposed to this
10  particular document?
11         MR. WEIR:  Yes.
12         MR. RODRIQUES:  As opposed to this
13  particular document, that's the question.
14    A.   This looks like a type of document
15  that was presented and reviewed as part of the
16  performance review process.  Whether this was
17  part of the compensation process, I can't say
18  specifically.
19    Q.   I want to show you what's been marked
20  as Oristaglio Exhibit 30 for identification.
21  And I'd ask you if you could tell me whether
22  that is also a document which was considered or
23  the type of document which was considered in
24  connection with the performance review process

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 118

1  for investment professionals?
2          MR. RODRIQUES: You are asking
3  him -- which of those two questions are you
4  asking him? Whether this type of document or
5  this specific document?
6          MR. WEIR: I'm asking --
7          MR. RODRIQUES: I only want him to
8  answer accurately what you're asking.
9          MR. WEIR: I'm asking the second
10  part, is this type of document, but if he has a
11  recollection that this specific document was
12  reviewed, then I would like him to also indicate
13  that.
14          MR. RODRIQUES: As long as you're
15  clear what you're answering, that's all.
16      A.  This is the type of document that was
17  shared and used in reviewing compensation as
18  part of the year-end process.
19          Specifically was this used for
20  performance review process? I don't believe so.
21  Was this specific document used? I believe this
22  specific document was used in the determination
23  of the 2001 compensation awards, yes.
24      Q.  Okay. Do you see the notation down at

Page 119

1  the lower-right-hand corner Kelly Morgan
2  question mark?
3      A.  Yes.
4      Q.  Do you recall in connection with the
5  2001 compensation arrangements the discussion of
6  Kelly Morgan's compensation?
7      A.  I do not.
8      Q.  Okay. Let me show you what's been
9  marked as Oristaglio 31 for identification and
10  ask you if you can -- ask you if you would take
11  a look at that and let me know whether that was
12  a document which was also reviewed in connection
13  with either discussions of performance ratings
14  or discussions of compensation for investment
15  professionals.
16          (Pause)
17      A.  This appears to be the kind of
18  document that we did use to discuss compensation
19  for the 2002 calendar year.
20      Q.  Directing your attention to the third
21  page, it's 4021. Do you see the entry for Lisa
22  Svensson at the bottom?
23      A.  Yes.
24      Q.  And it indicates a manager's rating of

Page 120

1  it looks to be 3.50?
2      A.  Yes.
3      Q.  And then next to it there's a 3.20 --
4      A.  Mm-hmm.
5      Q.  -- under the column overall investment
6  performance rating?
7      A.  Mm-hmm.
8      Q.  Can you explain the difference between
9  the manager rating of 3.50 and the 3.20 in the
10  column next to it?
11      A.  Yes.
12      Q.  What is the basis for that
13  differentiation?
14      A.  The manager rating is the manager
15  rating, as we've discussed before, what the
16  manager established as the overall rating on
17  that one-through-five scale.
18          And the investment performance ratings
19  there's multiple columns. There's a long-term
20  column, a short-term column and a trend column.
21          And that 3.2 was a calculated
22  long-term investment performance rating score.
23  That would have been calculated based on the
24  metrics established at the time for the

Page 121

1  investment performance.
2          So that would have been part of the
3  quantitative score of the overall rating that
4  the manager used. Remember there was a
5  quantitative rating and then qualitative
6  ratings. This would have been one of the
7  quantitative ratings.
8      Q.  Now, LT stands for long-term?
9      A.  Yes.
10      Q.  ST stands for short term?
11      A.  Yes.
12      Q.  And trend is what?
13      A.  How performance was trending.
14      Q.  And who prepared these figures? Who
15  did prepare the document for review by the
16  managers considering compensation?
17          MR. RODRIQUES: Objection. That's
18  two different questions.
19          MR. WEIR: Okay.
20          MR. RODRIQUES: Who prepared the
21  document may be different than who prepared the
22  figures.
23  BY MR. WEIR:
24      Q.  Who prepared the document?

31 (Pages 118 to 121)

Putnam Investments by Richard Tibbetts

Page 122

1    A.  I don't recall specifically, but this
2   would have been a document either prepared by
3   the human resources group or the chief
4   administrative officer's group within the
5   investment division.  Sometimes it was also done
6   collaboratively.
7    Q.  And who determined the figures for
8   inclusion in the document?
9    A.  Well, the figures, I'm assuming you're
10  talking about the ratings?
11   Q.  The LT, the ST and the trend.
12   A.  Those would have been calculated by
13  either the administrative officer's office or
14  the performance analytics group within the
15  investment division.
16   Q.  There doesn't appear to be for Lisa
17  Svensson a rating for short term or for trend.
18  Is there some reason for that?
19   A.  I can't -- it is hard to read.  I
20  agree with you there does not appear to be a
21  rating for short term, and I do not have a
22  specific explanation for that.  There certainly
23  are others that also do not have the short-term
24  rating.

Page 123

1        And for trend, it appears that no one
2   has a rating.
3    Q.  Now, with respect to the figures under
4   2002 incentives, who prepared those numbers?
5   Who inputted those numbers?
6    A.  Who inputted the numbers into this
7   actual spreadsheet?
8    Q.  Okay.  How were the numbers determined
9   to be what they were and inputted into this
10  document?
11       MR. RODRIQUES:  Again, those could
12  be two separate questions.
13   A.  So let me try to take them apart.
14       The numbers, historical numbers,
15  because this is a document that was generated in
16  early 2003, the historical numbers of 2000
17  incentives and 2001 incentives would have been
18  pulled from the human resources system that
19  tracked what the compensation was for
20  individuals in previous years.
21   Q.  Okay.
22   A.  So that would have been pulled from
23  the system.
24       In terms of the 2002 information, that

Page 124

1   was also pulled from the system but would have
2   originated from managers coming up with those
3   compensation recommendations.
4        As I said, I don't know where this was
5   in that process, but it was an iterative
6   process.  So whether this was the original
7   manager's number or whether this was the final
8   number, I don't know, because I don't know where
9   this was in that stage, but that is where the
10  source would have come.
11   Q.  And how about the comments --
12   A.  Do you want me to answer the other
13  question about who prepared this?
14   Q.  Okay.
15   A.  So these documents which would have
16  consolidated all this information would have
17  been prepared by someone in the human resources
18  group, and that would be either someone in the
19  investment human resources team or someone in
20  the compensation group.
21       So who specifically did this in early
22  '03 for 2002, I don't know, but this type of
23  document would have originated from human
24  resources.

Page 125

1    Q.  With respect to the comments section,
2   how would that information -- the information
3   contained in that column be inputted into the
4   document Oristaglio 31?
5    A.  Comments were originated by managers,
6   in many instances working with the human
7   resources professional that was supporting that
8   team who would record those comments and then
9   bring that back, and then that would have been
10  yet one more input that would have been
11  consolidated into this format and produced by
12  human resources.
13   Q.  Okay.  And do you have a recollection
14  in the time frame of early 2003 of considering
15  documents of the type of Oristaglio 31 in
16  connection with making decisions with respect to
17  compensation or career advancement?
18   A.  This is the kind of document that
19  would have been used for compensation
20  specifically, yes.
21   Q.  Okay.  Next subject.
22       Did Putnam have occasion to guarantee
23  a certain level of compensation to investment
24  professionals within the investment division?

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 126

1    A.   On some occasions, yes.
2    Q.   And do you recall specific instances
3  in which that occurred?
4    A.   Yes.
5    Q.   What instances do you recall or have
6  knowledge of?
7    A.   There's two broad sort of times or
8  instances where that would have happened.
9        The first and most common was when
10 someone would be typically coming to the firm,
11 often during the middle of the year or during
12 the course of a year, typically from another
13 firm, and we would commonly guarantee a
14 compensation level for someone or a certain
15 compensation amount often to either commit to a
16 specific compensation for that current year in
17 which they're coming for compensation that they
18 would have foregone because they would be
19 leaving the firm that they currently were with
20 and would not receive compensation for that year
21 and/or as part of that compensation that may
22 have been deferred and that individuals might be
23 forfeiting.
24       So at the time when people were coming

Page 127

1  on board, that was one specific kind of
2  instance.
3        The second would be much less common,
4  where someone might have occasion to have
5  received an offer from a competitor, and those
6  individuals either resigned, you know, or tried
7  to resign and we wanted to retain them, and we
8  made a counteroffer to commit to a certain
9  compensation level for those individuals and
10 have them -- you know, be able to retain those
11 individuals by guaranteeing them a certain
12 compensation level.
13   Q.   And do you remember instances in
14 which -- of the latter type of guarantee?
15   A.   Well, in preparation for today we
16 specifically asked about guarantees for the 91,
17 and I do remember one instance, which was for
18 Leo Smith, who is the director of trading,
19 equity trading at the time at Putnam, and a
20 counteroffer was made to him, and we
21 successfully retained him, and therefore, a
22 guarantee was put in place.
23   Q.   I should have asked you at the outset
24 of this discussion.  Did you consult with anyone

Page 128

1  concerning this subject; that is, guarantees?
2    A.   Yes.
3    Q.   With who?
4    A.   With Mary MacNamee and Beth Nelson.
5    Q.   And did you review any documents in
6  connection with this subject?
7    A.   Yes.
8    Q.   What documents did you review?
9    A.   I reviewed a document that they had
10 prepared that captured guarantees for the time
11 period of '99 through, I think it was either
12 2003 or 2004, I've forgotten now, but the time
13 period that you have indicated.
14   Q.   And do you have that document with you
15 today, sir?
16   A.   I don't.
17       MR. WEIR:  Do you have it, counsel?
18       MR. RODRIQUES:  I do.  You can have
19 it with the same stipulation we've had before.
20       MR. WEIR:  Yes.
21       Let's mark as Putnam 5 the document
22 that counsel has just provided to me.
23           (Exhibit 5 marked
24            for identification)

Page 129

1  BY MR. WEIR:
2    Q.   Let me show you what's been marked
3  Putnam 5 for identification, sir, and ask you if
4  you can identify this document?
5    A.   I can.
6    Q.   Can you identify it?
7    A.   Yes.
8    Q.   What is it?
9    A.   This is the document that was prepared
10 which captured the guarantees from years 1999
11 through 2004 for the 91 people.
12   Q.   Now, which of the individuals are the
13 guarantees related to coming from the outside
14 and being hired by Putnam and leading to attract
15 those individuals to Putnam?
16   A.   They are all guarantees for people
17 coming from the outside except for the one I
18 just mentioned, which is Leo Smith, in 1999.
19   Q.   Okay.  And I take it where there's a
20 carry over from one year to another of the same
21 person, that means that the guarantee was
22 extended beyond a year's time?
23   A.   Yes.  I think in the example there I
24 can think of is Eric Sorenson as an example who

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 130

1    is listed both in 2000 and 2001.
2          So sometimes -- particularly people
3    would come sort of in the second half of the
4    year, and it was almost like a year and a half
5    kind of guarantee as opposed to just one year.
6          Q.   Other than the individuals identified
7    on this list, are you aware of any other
8    guarantees which were of a certain level of
9    compensation which were made to Putnam
10   investment professionals in the time frame of
11   1999 to 2004?
12         A.   All that I'm aware of is what I
13   prepared for which were the guarantees for these
14   91 investment people.
15         Q.   Let me show you what was previously
16   marked as Oristaglio 32 for identification and
17   ask you if you recognize this document.
18              (Pause)
19         A.   This appears to be a document
20   capturing the 2002 compensation recommendations
21   for investment professionals for compensation
22   for 2002 that was prepared in early 2003.
23         Q.   It appears to have been prepared on or
24   about February 3rd of 2003; is that correct?

Page 131

1    A.   Yeah, that's correct.
2    Q.   And it was sent to Mr. Lasser at that
3    time; is that correct?
4    A.   I don't know that.
5    Q.   Well, directing your attention to the
6    top of the first page, "2002 investments A and
7    P, XLS for LJL, Feb 3.XLS."
8         Who's LJL?
9    A.   I would assume that's Larry Lasser.
10   Q.   And who prepared the document?
11   A.   I don't know specifically.  But this
12   certainly is the type of document in appearance
13   and in content that would have been prepared by
14   someone in the compensation group within human
15   resources.
16   Q.   And at the time of this document who
17   was in the compensation group of human
18   resources?  Who was the head of it?
19   A.   Mitch Schultz.  There were other
20   members in 2002 that included Beth Nelson.
21   Q.   Beth Nelson was not there at the time
22   of February of 2003?
23   A.   I just said that she was one of the
24   other members of the compensation department.

Page 132

1    Q.   You referred, though, to 2002 rather
2    than 2003.
3    A.   Sorry.  I was thinking about the 2002
4    compensation.  Yes, she was there at this time.
5    Q.   Okay.  And is she still there?
6    A.   She is still there, yes.
7    Q.   And Mr. Schultz is no longer there; is
8    that correct?
9    A.   Correct.
10   Q.   Was his departure from Putnam
11   voluntary?
12         MR. RODRIQUES:   Why is that
13   relevant, Jack?  It's not a topic on this.
14   There is no way in which this is a topic on the
15   30(b)(6).
16         MR. WEIR:   He very well may have
17   been the individual who prepared this document.
18         MR. RODRIQUES:   It doesn't matter
19   whether -- there's no way --
20         MR. WEIR:   Are you instructing him
21   not to answer?  Just give me a yes or no, and
22   we'll move on.
23         MR. RODRIQUES:   Can you explain the
24   relevance of how this is a topic --

Page 133

1          MR. WEIR:   I don't have to explain
2    the relevance.
3          MR. RODRIQUES:   Sure you do.
4          MR. WEIR:   I just did explain the
5    relevance.
6          MR. MOLONEY:   Not at a deposition.
7    You state your objection, and the question and
8    answers go.
9          MR. WEIR:   He's either going to
10   answer or he's not, so tell us.
11         MR. RODRIQUES:   Fine.  Answer the
12   question.
13   A.   The question was when did he leave?
14   Q.   Was his departure from Putnam
15   voluntary or not?
16   A.   Yes, it was voluntary.
17   Q.   And he initiated the discussions?
18   A.   No.
19   Q.   Who initiated the discussions?
20   A.   I did.
21   Q.   What was your purpose for initiating
22   discussions concerning his departure?
23         MR. RODRIQUES:   I'm instructing him
24   not to answer.  There is no way that this is

34 (Pages 130 to 133)

Page 134

1   within the scope of any topic on this list,
2   Jack.
3           MR. WEIR: You've instructed,
4   counsel. You don't have to explain it.
5           MR. MOLONEY: There's a case on
6   point that says you can't instruct a person not
7   to answer, that you have to seek a protective
8   order.
9           MR. RODRIQUES: Fine. Let's
10  suspend. Do you want to go see the magistrate?
11          MR. WEIR: I want to complete this
12  deposition as I'm being instructed by the
13  magistrate to do.
14          MR. RODRIQUES: The Rule 30(b)(6)
15  says that when I have a claim under the rule or
16  by privilege, I am entitled to instruct him not
17  to answer. It's not just privilege. That's
18  number one.
19          Number two, one person in the
20  deposition, please.
21          MR. WEIR: Let the record reflect
22  that counsel has instructed the witness not to
23  answer, and we'll move on.
24  BY MR. WEIR:

Page 135

1       Q.   Now, directing your attention to the
2   last page of Oristaglio 32. Do you see the
3   reference under the comments column to guarantee
4   for David Santos, Paul Marrkand,
5   M-A-R-R-K-A-N-D, and Manuel Wiess?
6       A.   On the last page?
7       Q.   Yes.
8       A.   No. Your page looks a little
9   different than my page.
10      Q.   Why don't you give me that one. I
11  thought it was the same, but maybe it's not.
12      A.   These are the same last pages.
13      Q.   Oh, I'm sorry. The second to last
14  page. Do you see that reference, sir?
15      A.   Okay. On the second to last page I
16  see two lines, yes, Manuel Wiess and Paul
17  Marrkand.
18      Q.   Do you see the indication that they
19  were to receive a guarantee for their
20  compensation for the 2002 performance year?
21          MR. RODRIQUES: Objection.
22      A.   I see under the comments column for
23  Paul Marrkand's line key player-guarantee and
24  for Manuel Wiess under the comments column

Page 136

1   guarantee.
2       Q.   And how about with respect to the
3   column for Mr. David Santos under the Large Cap
4   Growth?
5       A.   Maybe you've got a better copy. Right
6   here (Indicating), that says Santos. I can't
7   read that. Are you talking about this shaded
8   thing here (Indicating)?
9       Q.   Yes.
10          By the way, do you know who did the
11  shading on the document?
12      A.   No.
13      Q.   Do you see the word guarantee under
14  the comments section for those three
15  individuals?
16      A.   Yes.
17      Q.   Do you know whether Mr. Santos,
18  Mr. Marrkand, and Mr. Wiess received guarantees
19  of a certain level of compensation in connection
20  with their compensation arrangements as
21  determined in early 2003 for the 2002
22  compensation year?
23      A.   I do not specifically know.
24      Q.   Do Mr. Santos, Mr. Marrkand, and

Page 137

1   Mr. Wiess appear on the list of guarantees in
2   Putnam 5 that you provided us today?
3       A.   No.
4       Q.   Okay. Do you have any information to
5   impart to us as to why there would be an
6   indication they were going to receive guarantees
7   on Oristaglio 32 and yet they are not on Putnam
8   5?
9           MR. RODRIQUES: Objection to the
10  characterization of the document saying that
11  they are going to receive guarantees. The
12  document says no such thing.
13      A.   I don't have an explanation for that,
14  no.
15      Q.   Do you know whether, in fact,
16  Mr. Santos, Mr. Marrkand, and Mr. Wiess were
17  provided with guarantees of a certain level of
18  compensation at any point during their careers
19  at Putnam?
20      A.   I do not know that, no.
21      Q.   I take it you wouldn't know if they
22  were, what the reason for that might be?
23      A.   No.
24      Q.   Do you recall in connection with the

Putnam Investments by Richard Tibbetts

Page 138

1  discussions held concerning compensation
2  arrangements for the 2002 year, whether there
3  was any discussion of guarantees for any
4  investment professional?
5      A.  Not specifically.  But certainly
6  people did -- some people did have guarantees in
7  that year, so I'm sure it was discussed.
8      Q.  With respect to the guarantees that
9  are reflected on Putnam 5, were these guarantees
10  that were initiated by the individual in
11  question; that is, the individual asked for a
12  guarantee?
13      A.  Well, I believe I said earlier that
14  all except for Leo Smith these were guarantees
15  as commitments to people when they came on board
16  the organization.  And so I don't know
17  specifically whether they were specifically
18  asking for it.
19          That's an iterative process where
20  recruiters from the HR department, managers,
21  search professionals from the third-party firm
22  are all working to do that.  So who initiated
23  the specific discussion around the guarantees, I
24  have no way of knowing.

Page 139

1      Q.  Messrs. Wiess, Marrkand and Santos,
2  they hadn't just come aboard, had they?
3      A.  No.
4      Q.  That is, as of the time of early 2003,
5  they had been there for some time?
6      A.  Yes.
7      Q.  Now, if you look at this time the last
8  page of the exhibit that is Oristaglio 32, do
9  you see the number 24 total guarantees?
10          MR. RODRIQUES:  Objection.
11      A.  I see the number 24, yes.
12      Q.  Do you know whether in fact 24
13  investment professionals received guarantees of
14  compensation in or about the time frame of early
15  2003?
16      A.  I do not.  In preparation for today I
17  focused specifically on the 91, so I don't know
18  that number.
19      Q.  And who would make the final
20  determination as to whether an individual would
21  or would not receive a guarantee of a certain
22  level of compensation?
23      A.  It depended upon the level of the
24  individual and the level of the guarantee.

Page 140

1  There were no specific guidelines that said a
2  certain amount then had to go to a different
3  person.  But if they were small guarantees, that
4  would often be approved by the managing director
5  within that organization, the human resources
6  representative or manager and the head of the
7  compensation group within human resources.
8      Q.  And a large guarantee?
9      A.  The large guarantees, all those
10  people, plus certainly the senior managing
11  director in charge of those groups, and in some
12  instances that would have included the
13  president, and in some instances, especially if
14  it was a stock guarantee, that would have to be
15  committed to as a recommendation that then would
16  have to be approved by the MMC Compensation
17  Committee.
18      Q.  Now, with respect to the guarantees
19  that you've identified on Putnam 5, were they
20  guarantees of cash, current cash?
21          MR. RODRIQUES:  Objection.
22      A.  I believe all of these guarantees were
23  for cash compensation, not deferred cash or for
24  equity.

Page 141

1      Q.  Did it occur that there were
2  guarantees made of deferred cash or equity?
3      A.  Ever?
4      Q.  Ever.
5      A.  Yes.
6      Q.  In what instances?
7          MR. RODRIQUES:  Among the 91, I
8  assume, since that's the only subject on the
9  list.
10          MR. WEIR:  Okay.
11      A.  Ever for the 91, not during this time
12  period.
13      Q.  Did there come a time when the
14  guarantees of compensation were stopped?
15      A.  For these 91, no.
16      Q.  Do you know whether any of the 91
17  currently have guarantees of compensation?
18      A.  Yes, I do know that.
19      Q.  Which ones?
20      A.  None of them.
21      Q.  Okay.  Are Mr. Santos, Mr. Wiess, and
22  Mr. Marrkand currently employed at Putnam?
23      A.  No.
24      Q.  Any of them?

Putnam Investments by Richard Tibbetts

Page 142

1    A.  Any of those three?
2    Q.  Yes.
3    A.  No.
4    Q.  Was there any discussion within Putnam
5    in the time frame of August, September 2003 of
6    Lisa Svensson's request for a guarantee of a
7    certain level of compensation?
8    A.  Was there a discussion about it?
9    Q.  Yes.
10   A.  Yes.
11   Q.  What was the discussion?
12   A.  The discussion was based on Lisa
13   refusing to accept the redefinition of her role,
14   to remain as an analyst within the firm but
15   without management responsibilities.
16        And her response back to that was to
17   demand that she be guaranteed compensation of a
18   million dollars for two years and be named a
19   managing director.
20        And it was in that context that it was
21   discussed and felt inappropriate and
22   inconsistent with the message that we were
23   communicating to her.
24   Q.  Who discussed it?

Page 143

1    A.  There were multiple discussions.  The
2    people that I'm aware of are Mary MacNamee, Josh
3    Brooks, myself.  I believe Ed Haldeman was made
4    aware of that request.
5    Q.  By whom?
6    A.  By Josh Brooks.  Those are the people
7    who I'm aware of.
8    Q.  And I take it that it was the view of
9    the group that the guarantee that Lisa Svensson
10   required would not be granted to her?
11   A.  I'm not sure what you mean by
12   required.  She was demanding to receive a
13   guaranteed level of compensation, a significant
14   increase in compensation, when, in fact, we were
15   asking her to remain with the firm as an analyst
16   without management responsibilities, not
17   typically a situation where we would go off and
18   give someone a guarantee.
19   Q.  Were there others at Putnam at the
20   time that were -- that had guarantees; that is,
21   as of August and September of 2003?
22        MR. RODRIQUES:  Among the 91, I
23   assume?
24        MR. WEIR:  Among the 91.

Page 144

1    A.  Yes.
2    Q.  And who were they?
3    A.  At that time it was Josh Brooks.
4    Q.  How about Mr. Haldeman?
5        MR. RODRIQUES:  He is not among the
6    91.
7        MR. WEIR:  I'll ask the question.
8        MR. RODRIQUES:  Jack, you are
9    forcing a controversy.  You know that he is only
10   supposed to testify about the subjects on the
11   list.
12       MR. WEIR:  Just instruct him not to
13   answer.  That's all I'm asking you.
14       MR. RODRIQUES:  You are forcing us
15   to suspend and go to see the magistrate.
16       How about you if save the question for
17   the end of the day, then we can suspend.
18       MR. WEIR:  Well, I've asked the
19   question already, and I'll expect an answer
20   before the end of the day.
21       (Witness and counsel confer)
22   BY MR. WEIR:
23   Q.  Let me ask this question --
24       MR. RODRIQUES:  I'll let him answer

Page 145

1    in his individual capacity, not for the
2    organization.
3    A.  I don't know.
4    Q.  So is it fair to say that at least one
5    of the individuals and perhaps more than one of
6    the individuals who were considering the subject
7    of what to do with Lisa Svensson in August and
8    September of 2003 had guarantees of their own
9    compensation?
10   A.  Yes.
11   Q.  Now, was there -- I know you've
12   produced Putnam 5 today, but was there any
13   official record of an actual guarantee of a
14   particular level of compensation?
15   A.  I'm not sure I understand.
16   Q.  In early 2003 or at any time during
17   the period '99 to 2004 when you sat around and
18   determined that an individual was going to get a
19   guarantee, how would that have been reflected in
20   the records of Putnam?
21   A.  Well, the place I turned to prepare
22   for Exhibit 5 is the only place I'm aware of,
23   which is the human resource information system,
24   and specifically in the compensation sections

37 (Pages 142 to 145)

Putnam Investments by Richard Tibbetts

Page 146

1  associated with the compensation fields for
2  those respective years.
3      Q.  Let me see if I understand that.
4          There is a document somewhere in
5  Putnam's files that one could go to in order to
6  determine whether someone was operating or being
7  compensated in accordance with a guarantee?
8          MR. RODRIQUES:  Objection.
9      A.  That's not what I said.  I believe
10  what I said, and I'll say it again, was that the
11  only source that I know of for that information,
12  that anybody would know of within the firm, is
13  turning to the human resource information
14  system.  So the computer systems, no hard copy,
15  the computer systems that actually track in the
16  various fields, the compensation and notations
17  such as guarantees.
18      Q.  But my question is as of with the
19  questions this morning, if a particular manager
20  wanted to know whether an investment
21  professional under his or her supervision was
22  or -- did or did not have a guarantee of a
23  certain level of compensation, that information
24  was accessible to the manager?

Page 147

1      A.  Yes.
2      Q.  You didn't try to restrict the
3  information to any particular group of people
4  within Putnam?
5      A.  No.
6      Q.  All right.  Next subject.  Key players
7  and franchise players.  Keep Oristaglio 32 in
8  front of you.
9          Did you consult with anyone concerning
10  this subject in preparation for your testimony
11  here today?
12      A.  Just my conversations with counsel.
13      Q.  Did you review any documents in
14  connection with your testimony here today?
15      A.  Yes.
16      Q.  What documents did you review?
17      A.  The documents that look very similar
18  to Exhibit 32.
19      Q.  Do you have a recollection that you
20  reviewed Exhibit 32?
21      A.  Well, it wasn't marked Exhibit 32, but
22  it looks like it.
23      Q.  And did you review other documents
24  besides Exhibit 32?

Page 148

1      A.  I reviewed a document that was very
2  similar to this, but it was not this document.
3      Q.  Do you know whether that's a document
4  that has been produced in this litigation?
5      A.  I think it's this, all I'm saying is
6  the one I reviewed wasn't marked Exhibit 32,
7  that's all I'm saying.
8      Q.  Am I correct that this document again
9  relates to the early 2003 compensation
10  discussions for the 2002 year performance?
11      A.  Yes.
12      Q.  And do you see the designation under
13  the comments section of certain individuals as
14  key players and certain individuals as franchise
15  players?
16      A.  Yes.
17      Q.  What was a franchise player?
18      A.  This was an identification of people
19  as part of the year-end compensation process for
20  2002 performance year where we identified people
21  as critical to the business, that the Putnam
22  franchise would be hurt if they left.
23      Q.  Okay.  If I interpret the document
24  correctly, Mr. Shigeki Makino was designated a

Page 149

1  franchise player, correct?
2      A.  Yes.
3      Q.  Mr. Joshua Burn was a franchise
4  player?
5      A.  Yes.
6      Q.  Mr. Steven Dexter was a franchise
7  player?
8      A.  Are you trying to name everyone
9  because you skipped over one?
10      Q.  Okay.
11      A.  The bottom of the second page.
12      Q.  Simon Davis?
13      A.  Yes.
14      Q.  Steven Dexter, he was a franchise
15  player?
16      A.  Yes.
17      Q.  Rob Bloemkr?
18      A.  Yes.
19      Q.  James Prusko?
20      A.  Yes.
21      Q.  Paul Scanlon?
22      A.  Yes.
23      Q.  Jeffrey Knight?
24      A.  Yes.

38 (Pages 146 to 149)

Putnam Investments by Richard Tibbetts

Page 150

1  Q. Anybody else that I've missed?
2  A. That appears to be everybody on this
3  list, yes.
4  Q. And do you know as a result of the
5  discussions which took place in early 2003
6  whether each of those individuals actually
7  retained -- at the end of the discussion
8  retained their designation as franchise players?
9  A. I don't recall the specific
10  conversation.
11  In preparation for today, I looked to
12  this document as the list of who was the
13  franchise players.
14  Q. What were the implications of an
15  individual being named a franchise player?
16  A. What happened in early 2003 for the
17  2002 performance year was not dissimilar from
18  other years in that we would use our standard
19  performance rating process and then some kind of
20  other criteria in 2001, I think we referred to
21  them as a core tile ranking, and then in the
22  2002 performance year we identified franchise
23  players or key players.
24  There were different ways and

Page 151

1  mechanisms to try to identify who were the key
2  people within the organization, investment
3  division, and more broadly that would be
4  considered for other compensation.
5  Q. What compensation?
6  A. It ranged from some years being
7  incremental cash, other years deferred cash
8  compensation and in other years equity or
9  combinations of all of those.
10  Q. And was there a set level of
11  incremental increase for a franchise player?
12  A. Not that I'm aware of.
13  Q. What occasioned the transfer from the
14  core tile system to the franchise player key
15  player system?
16  A. Larry's arbitrary discussion about how
17  he wanted to try to identify people.
18  Q. Who did he give his instructions to?
19  A. I don't recall specifically.
20  Generically it was to the human resources staff
21  and to the senior executive group, which was
22  known as the operating committee.
23  Q. That would have been, as of this time
24  frame, Mr. Oristaglio and Mr. Haldeman?

Page 152

1  A. Within the investment division, yes.
2  Q. And who would make the determination
3  as to the magnitude of the incremental increase
4  in compensation if you were designated a
5  franchise player?
6  A. It differed by group, but ultimately
7  it was the senior most person in the group, the
8  senior managing directors of each of the
9  different business units, and that was driven
10  off of how much Larry had allocated to each of
11  those groups.
12  So after these individuals were
13  identified, Larry allocated money or equity, as
14  the case may be, to each of those senior
15  managing directors, and then those senior
16  managing directors worked with their human
17  resources representatives and their managers to
18  distribute those awards.
19  Q. Okay. And can you explain the
20  difference conceptually between a franchise
21  player and a key player?
22  A. Incrementally I guess is the way to
23  describe it, and that is that a franchise player
24  was truly someone should they leave the firm

Page 153

1  would have an impact on the business.
2  The key players, on the other hand,
3  were very important to, in this case, for
4  example, within the investment division,
5  investment processes that would impact the
6  investment process but not necessarily have a,
7  you know, really devastating impact on those
8  product niches or those product areas where they
9  were working.
10  Q. What about somebody that was not
11  designated either a franchise player or a key
12  player, what were the implications in terms of
13  their compensation or career advancement?
14  A. Again, this is really more around a
15  specific compensation process, so it was
16  compensation related, and it was that they would
17  not receive any incremental compensation beyond
18  what they had already been nominated for.
19  Q. Did there come a time when the
20  designation of franchise players and key players
21  ceased?
22  A. Yes.
23  Q. And when was that?
24  A. It was just used for this one year in

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 154

1  early 2003 for the 2002 performance year.
2      Q.   And who made the decision not to
3  continue with it?
4      A.   I'm not sure that it was a specific
5  decision not to continue as much as it was that
6  it was used -- it was created and envisioned for
7  use that one time. It was not we're putting in
8  this new system that's going to last forever.
9      Q.   Does Putnam have records with respect
10 to the incremental increase in compensation for
11 this year of the individuals who were designated
12 franchise players?
13     A.   No. It was an iterative process where
14 both, you know, awards for these individuals
15 were being finalized as well as those that
16 weren't necessarily on file as key players or
17 franchise players, so it was part of that whole
18 process. It was not a specific, you know,
19 amount that just, you know, an individual got.
20     Q.   Who came up with the terminology?
21     A.   I don't know.
22     Q.   Do you know whether Oristaglio 32
23 identifies for the year in question all of the
24 individuals among the 91 comparators who were

Page 155

1  designated as franchise players?
2      A.   I believe it does, yes.
3      Q.   And does it also designate all of the
4  individuals among the 91 comparators who were
5  designated as key players?
6      A.   Yes.
7          MR. RODRIQUES: Could we go off the
8  record for a second?
9          MR. WEIR: Let me just finish a
10 couple of questions.
11         MR. RODRIQUES: Sure.
12 BY MR. WEIR:
13     Q.   During the period of time that this
14 system was in place, was there ever -- were any
15 female investment professionals ever designated
16 as franchise players?
17     A.   I don't know.
18     Q.   You have no reason to believe that any
19 individuals other than what's on the document
20 were designated as --
21     A.   Well, I believe this is a redacted
22 document that does not cover -- the unredacted
23 part just covers the 91. So there were many
24 other investment professionals within the

Page 156

1  investment division than the 91, and all we have
2  is the information on the 91.
3          MR. RODRIQUES: Could we just go
4  off the record?
5          MR. WEIR: Just one question.
6          MR. RODRIQUES: Sure.
7  BY MR. WEIR:
8      Q.   Just to clarify this last bit the
9  testimony. Do you have a recollection as you
10 sit here today or based upon your designation as
11 a 30(b)(6) witness for this subject whether
12 there were in this time frame of 2002, 2003 a
13 designation of any females as franchise players,
14 female investment professionals?
15     A.   I don't. That was not something
16 that -- we just looked at the 91.
17         MR. WEIR: Okay. Do you want to
18 take a break?
19         (Witness and counsel confer)
20         (Recess taken 2:46 p.m.
21 to 2:54 p.m.)
22         MR. RODRIQUES: We didn't say
23 anything about stipulations at the beginning, so
24 I'm assuming we are operating under the same

Page 157

1  stipulations we've been operating under?
2          MR. WEIR: For every deposition.
3          MR. RODRIQUES: That's fine. Just
4  so it's official.
5  BY MR. WEIR:
6      Q.   Back on the record with respect to the
7  designation of key players and franchise
8  players.
9          Were any of the comparators who were
10 also market timers designated as key players or
11 franchise players?
12         MR. RODRIQUES: Objection.
13     A.   So by comparators you mean of the 91
14 people?
15     Q.   Those are the comparators who were
16 market timers and who were terminated by Putnam.
17         MR. RODRIQUES: Objection.
18 Obviously we don't agree that they're
19 comparators. The 91 people that you've
20 identified here.
21         MR. WEIR: Correct.
22     A.   I also don't think we agree that they
23 were market timers since there's no standard
24 definition or agreement by anybody, including

40 (Pages 154 to 157)

Putnam Investments by Richard Tibbetts

Page 158

1  the SEC and other regulatory bodies of the
2  United States government that can divine what
3  market timing is.
4      Q.  Was Mr. Scott a key player or a
5  franchise player?
6      A.  Mr. Scott at the time this process was
7  going on was in the Partners Plan.  He was a
8  participant in the Partners Plan.  And it's my
9  understanding that this was a process that was
10  done within the Associates and Principals Plan.
11      Q.  And were there designations of key
12  players or franchise players with respect to the
13  Partners Plan?
14      A.  I thought I just said that this was a
15  process that was done within the Associates and
16  Principals Plan.
17      Q.  Only?
18      A.  Yes.
19      Q.  Do you know whether Mr. Scott at any
20  time, whether the time frame of his being a
21  participant in the Partners Plan or the A and P
22  Plan, had a guarantee of a certain level of
23  compensation?
24      A.  I don't know that.

Page 159

1      Q.  How about with respect to Mr. Kamshad?
2          MR. RODRIQUES:  Just for the
3  record, I don't know when he joined, so all that
4  we've done in preparation for this is look at
5  guarantees for the years you specified.
6          Now, I don't mind him answering in his
7  individual capacity, to the extent he can
8  remember, but he is not prepared to answer for
9  any years outside of '99 to 2004.
10  BY MR. WEIR:
11      Q.  My question is in that five-year
12  period, 1999 to 2004, did Mr. Kamshad have a
13  guarantee of a certain level of compensation, or
14  was he designated as a key player or franchise
15  player?
16          MR. RODRIQUES:  Could we take those
17  one at a time?
18          MR. WEIR:  Yes.
19      A.  So the first question, did he have a
20  guarantee of compensation from 1999 to 2004?
21  No.  Was he identified as a franchise player?
22  No, because that process for identifying
23  franchise players and key players was within the
24  Associates and Principals Plan.

Page 160

1      Q.  How about with respect to Mr. Prusko?
2          MR. RODRIQUES:  Which of the two
3  questions are you asking?
4  BY MR. WEIR:
5      Q.  The first question is was he
6  designated as a key player or franchise player?
7      A.  He was identified as a franchise
8  player.
9      Q.  Okay.  And did he have a guarantee at
10  any time between the '99 to 2004 time frame?
11      A.  No, he did not have a guarantee.
12      Q.  Okay.  And with respect to Mr. Gier
13  Lode, was he ever a key player or a franchise
14  player?
15      A.  He was identified as a key player.
16      Q.  And did he have a guarantee?
17      A.  No, he did not have a guarantee.
18      Q.  I'd like to go back and ask you one
19  question with respect to the issue -- the
20  partners issue which we discussed this morning.
21          At your -- at one of your earlier
22  depositions in this case you were asked to
23  identify a document referenced in the amended
24  privilege log that was alleged that you were to

Page 161

1  have been the author of which is described as
2  notes prepared for counsel regarding female
3  partners.  Do you recall that, sir?
4      A.  Not specifically, no.
5      Q.  To the best of your recollection, did
6  you ever author any notes prepared regarding the
7  subject of female partners at Putnam?
8      A.  In general I remember working on this
9  subject with counsel, but I don't remember
10  specific documents.
11      Q.  Okay.  So do you have an understanding
12  as to what document is being referred to in the
13  amended privilege log as of February 28, 2006 as
14  notes prepared for counsel regarding female
15  partners?
16          MR. RODRIQUES:  I'm going to object
17  to this line of inquiry.  First, it's not on
18  the --
19          MR. WEIR:  Sure it is.
20          MR. RODRIQUES:  It is?  Where?
21          MR. WEIR:  Item two.
22          MR. RODRIQUES:  "Managers'
23  performance ratings for the" --
24          MR. WEIR:  No, partners.  Item one.

41 (Pages 158 to 161)

Putnam Investments by Richard Tibbetts

Page 162

1       MR. RODRIQUES: You're using item
2   one to try and go back over a subject about
3   which he's already testified as to which there's
4   already been a motion and a ruling.
5       You also then had an opportunity to
6   question him for two hours. He's already
7   testified in his individual capacity. And you
8   are now saying you get to ask him again?
9       MR. WEIR: That's exactly right.
10      MR. RODRIQUES: Is that clear for
11  the record? What's the pending question?
12      THE WITNESS: I'm not sure now.
13  BY MR. WEIR:
14      Q.   Do you know what document is being
15  referred to in the amended privilege log that
16  you're alleged to be the author of?
17      A.   I don't understand what an amended
18  privilege log is. If there's a document or
19  something, I don't know what you're talking
20  about, so.
21      Q.   Take a look at the first item there.
22  Do you understand the reference?
23      A.   No, I don't.
24      Q.   Did you author a document, to your

Page 163

1   recollection, on the subject of female partners
2   at Putnam?
3       A.   I have prepared so many documents and
4   spent so much time preparing for this, I don't
5   remember any specific thing. I don't recall
6   anything specific.
7       It looks like there was a note that
8   said that I did it. I don't have any --
9       Q.   You recall having discussions on the
10  subject of female partners at Putnam?
11      A.   The only thing that's fresh in my mind
12  is the stuff that I went through in preparation
13  for today. So I don't have any specific
14  recollection about documents for counsel about
15  female partners specifically, no.
16      Q.   Next subject. The investigation of
17  Lisa Svensson in the summer of 2003.
18      Did the human resources department
19  undertake an investigation of Lisa Svensson in
20  the summer of 2003?
21      MR. RODRIQUES: Objection.
22      A.   There was a series of discussions that
23  occurred in and around that time that I believe
24  I've already spoken about that Mary and Josh

Page 164

1   Brooks -- Mary MacNamee and Josh Brooks have
2   already spoken about under deposition process
3   that have outlined what that process was.
4       Q.   Well, who participated in the
5   investigation?
6       A.   There were several people who worked
7   collaboratively on that whole process, which
8   included Josh Brooks, Mary MacNamee, Eric
9   Hutcherson. Others were consulted as well. I
10  was a part of that process, Ed Haldeman was a
11  part of that process, and I believe counsel,
12  outside and inside counsel, was involved in that
13  process.
14      Q.   By inside counsel, you mean
15  Mr. Wolverson?
16      A.   No.
17      Q.   Who do you mean by inside counsel?
18      A.   I mean members of the internal --
19  inside legal department.
20      Q.   And who specifically in the inside
21  legal department was involved?
22      A.   I don't know specifically.
23      Q.   Well, you just stated that there was
24  somebody involved, and now you're saying you

Page 165

1   don't know?
2       A.   I remember that there was someone from
3   legal involved. I don't remember who.
4       Q.   Do you know a Steve Vandersen?
5       A.   I'm not familiar with that name.
6       Q.   How did it come to be that an
7   investigation of Lisa Svensson was undertaken?
8       A.   In and around that time there were
9   several analysts that reported in to Lisa.
10      There was concern raised by those
11  individuals to Eric Hutcherson in the human
12  resources group as to how they were being
13  managed and expressing concern to include as
14  much as that they were thinking about leaving
15  the firm.
16      Q.   Who expressed that to Mr. Hutcherson?
17      A.   I don't know specifically.
18      Q.   Well, how did you become aware that
19  any individuals had expressed an intention to
20  leave the firm to Mr. Hutcherson?
21      A.   I believe Mary MacNamee is the person
22  who brought it to my attention.
23      Q.   And what, if anything, did you
24  instruct Ms. MacNamee to do?

42 (Pages 162 to 165)

Putnam Investments by Richard Tibbetts

Page 166

1    A.  I don't recall specific instructions.
2  My memory is a general one where she, Mary, was
3  bringing to my attention the concerns that were
4  raised by the analysts, the concerns that were
5  being raised by Josh as to the impact on
6  top-performer analysts in the research
7  department and that she was going to go off with
8  Josh and Eric and gather more facts and
9  understand the situation and what be would be
10  the most appropriate action.
11       So the initial conversation I had with
12  her was one of information, not me giving her
13  instructions.
14    Q.  Who were the top-performing analysts
15  in the research department that you're referring
16  to?
17    A.  Well, Darren Peers specifically is the
18  person I have in mind when I'm saying that.
19    Q.  In the time frame of 2003 do you have
20  any understanding of how Darren Peers performed
21  compared to that of Lisa Svensson?
22    A.  Generally, yes.
23    Q.  How did he compare?
24    A.  That he was a higher performer than

Page 167

1  she was.
2    Q.  Okay.  And what was the basis of that
3  understanding?  How did you determine that?
4    A.  I didn't determine that.  I guess
5  there were two sources for that understanding
6  that I had back then.
7       My memory was that Darren was very
8  highly regarded by people within the research
9  organization and also in the investment teams
10  and that there were rankings of investment
11  research analysts' performance and that he was
12  always very highly ranked on those performance
13  lists, and that mirrored that general
14  understanding and perception.
15    Q.  Did the compensation discussions that
16  you held in the early 2003 time frame, the
17  documents that we looked at, did they encompass
18  Mr. Peers?
19       MR. RODRIQUES:  Objection.
20    A.  I'd have to go back and look at the
21  documents and see if he was on the list.
22    Q.  I'm asking if you have a recollection
23  as to whether or not you had discussions about
24  Mr. Peers's compensation?

Page 168

1    A.  I don't remember a specific
2  conversations back in early 2003 off the top of
3  my head, no.
4    Q.  Well then how did you become aware of
5  these evaluations of Mr. Peers's performance as
6  being at the very top of the analysts in the
7  research department?
8       MR. RODRIQUES:  Objection.  Asked
9  and answered.
10       THE WITNESS:  Does that mean I
11  answer?
12       MR. RODRIQUES:  Yes.
13    A.  It's a general perception that I have.
14  People would talk about and describe Darren as a
15  top performer, both within --
16    Q.  What people?
17       MR. RODRIQUES:  Can you let him
18  finish his answer, please.
19    A.  People within the research
20  organization, peers as well as more senior
21  leaders, managers within the organization and
22  investment professionals in the various
23  investment teams that he interacted with.
24    Q.  Can you cite to me a single solitary

Page 169

1  name of an individual?
2    A.  I don't recall a specific conversation
3  with a specific individual about Darren Peers.
4    Q.  Who else?  You said analysts were
5  threatening to leave.  Who else was threatening
6  to leave?
7    A.  Darren was the specific one that I was
8  referring to when I said that he was so troubled
9  and concerned that he was thinking of leaving.
10    Q.  Well, did you obtain any information
11  to the effect that anybody else was threatening
12  to leave?
13       MR. RODRIQUES:  He personally?
14       MR. WEIR:  Yes.
15    A.  No.
16    Q.  So is there any other motivation for
17  initiating this investigation of Lisa Svensson
18  in the summer of 2003?
19    A.  There were -- along with that issue
20  that was being raised to Eric Hutcherson's
21  attention, Lisa had also gone to --
22  simultaneously had gone to Mary MacNamee and
23  suggested that she needed to work with Mary on
24  preparing and reviewing Chris O'Malley's

43 (Pages 166 to 169)

Putnam Investments by Richard Tibbetts

Page 170

1  performance and was so concerned about that that
2  she was turning to Mary for help in terminating
3  Chris O'Malley.
4      Q.  She said to Mary that she wanted to
5  terminate Chris O'Malley?
6      A.  Right.
7      Q.  And you learned of that because that's
8  what Mary MacNamee told you?
9      A.  Yes.
10     Q.  And did you ever determine what the
11 specific natures of the criticisms of Chris
12 O'Malley were?
13     A.  I was not directly involved in this
14 activity.  This was Mary MacNamee as the lead
15 servicing the research organization and Josh
16 Brooks who did this.
17     Q.  At the time you were head of the human
18 resources department for the investment
19 division, is that correct, sir?
20     A.  That's correct.
21     Q.  So you took a hands-off approach, is
22 that what your testimony is?
23         MR. RODRIQUES:  Objection.
24     A.  No.  Let me try to answer the

Page 171

1  question.
2      Q.  Sure.  I wish you would.
3         MR. RODRIQUES:  Jack, knock it off.
4         MR. MOLONEY:  Since when were you
5  appointed the judge of this case?
6         THE WITNESS:  Can I ask who you
7  are?
8         MR. MOLONEY:  I'm co-counsel to the
9  plaintiff.
10        THE WITNESS:  Okay.  Can you
11 introduce yourself to me?
12        MR. MOLONEY:  My name is Kevin
13 Moloney.
14        THE WITNESS:  Okay.  Thanks.
15     A.  There were several things that were
16 going on, brought to my attention through Mary
17 who was lead on this, who you've already
18 deposed, and Josh you've already deposed who
19 were much more informed about the details that
20 you're asking about than I am.
21     Q.  Did you consult with Mary MacNamee on
22 this subject prior to your deposition here
23 today?
24        MR. RODRIQUES:  For the record, we

Page 172

1  are perfectly happy to accept Mary MacNamee's
2  testimony and to accept -- no, let me finish
3  what I have to say -- and to accept Josh
4  Brooks's testimony as what happened back then
5  for purposes of 30(b)(6) binding Putnam or
6  otherwise.
7         But for this witness to sit here and
8  repeat, try to memorize their testimony, because
9  that's all he would have to do, and repeat it
10 back makes no sense, Jack.
11        MR. WEIR:  Let me continue, please.
12 BY MR. WEIR:
13     Q.  Did you consult with Mary MacNamee in
14 connection with your preparation for your
15 testimony here today as a 30(b)(6) witness on
16 behalf of Putnam?
17     A.  On some of these items, yes.
18     Q.  On this subject?
19     A.  No.
20     Q.  Did you consult with Josh Brooks on
21 this subject?
22     A.  No.
23     Q.  Did you consult with Eric Hutcherson
24 on this subject?

Page 173

1      A.  No.
2      Q.  Is Eric Hutcherson still at Putnam?
3      A.  No.
4      Q.  Now, how is it that -- strike that.
5         What did Putnam do with respect to
6  implementing the investigation of Lisa Svensson
7  in the summer of 2003?
8         MR. RODRIQUES:  Objection.  Putnam
9  did what Jack and Mary testified to.
10        MR. WEIR:  Counsel, you keep saying
11 that.  I'm entitled to get admissions from this
12 witness as a 30(b)(6) witness.
13        MR. RODRIQUES:  We'll stipulate
14 that they're admissions.
15        MR. WEIR:  That is not the function
16 of a 30(b)(6) witness.
17        MR. RODRIQUES:  I understand.
18        MR. WEIR:  Mary MacNamee is not an
19 officer, director or managing agent.
20        MR. RODRIQUES:  We'll stipulate
21 that her testimony binds the organization.
22        MR. WEIR:  I don't want that
23 stipulation.  I want testimony from a witness
24 who is an officer, director or managing agent as

44 (Pages 170 to 173)

Page 174

1  I'm entitled to get under Rule 30(b)(6).
2           MR. RODRIQUES: He is a designee,
3  and all he is going to do is tell you he doesn't
4  know anything more than the witnesses that have
5  already testified.
6           MR. MOLONEY: We are not interested
7  in your stipulation. You're wasting time.
8  BY MR. WEIR:
9      Q.  Did you assign Eric Hutcherson to the
10  task of pursuing interviews of other individuals
11  within the research department?
12      A.  I did not.
13      Q.  Do you know who did?
14      A.  I believe it was a joint decision
15  between Eric, Mary and Josh.
16      Q.  Do you know whether Eric Hutcherson
17  performed interviews of the individuals to whom
18  Lisa Svensson or who reported to Lisa Svensson?
19      A.  It's my understanding that he did
20  speak to some of the people who reported. I
21  don't know if it was all of them, but, yes, he
22  did speak with some of them.
23      Q.  And do you know whether he spoke to
24  Chris O'Malley?

Page 175

1      A.  I believe he did.
2      Q.  And do you know whether he spoke to
3  Darren Peers?
4      A.  I believe he did.
5      Q.  Do you know whether he spoke to Ellis
6  Eckland?
7      A.  I do not, no.
8      Q.  Do you know whether he spoke to
9  Konstantin Stoev?
10      A.  I do not, no.
11      Q.  Do you know whether he took any notes
12  of his discussions with any of the people that
13  he spoke to concerning Lisa Svensson?
14      A.  I do not know that.
15      Q.  Do you know whether Lisa Svensson's
16  interaction with Chris O'Malley in the summer of
17  2003 was in connection with a mid-year
18  performance evaluation?
19      A.  Can you say that again?
20      Q.  Do you know whether Lisa Svensson's
21  discussions about Chris O'Malley in the summer
22  of 2003 were in connection with a mid-year
23  performance evaluation for Mr. O'Malley?
24      A.  I don't know.

Page 176

1      Q.  Do you know whether he spoke to an
2  individual by the name of Leah Graham Reed?
3      A.  I do not know.
4      Q.  Do you know whether he spoke to an
5  individual by the name of Krista Chahorik?
6      A.  I don't know.
7      Q.  Did anyone else other than
8  Mr. Hutcherson interview any individuals who
9  were under the supervision of Lisa Svensson
10  about her job performance?
11      A.  I believe Josh spoke to some.
12      Q.  And do you know how it came to be that
13  it was divided up between Eric Hutcherson and
14  Josh Brooks?
15      A.  I don't know that it was divided up.
16  I believe that Josh spoke with people that Eric
17  did as well.
18      Q.  I see. And they were separate
19  interviews?
20      A.  They talked with them separately, I
21  believe, yes.
22      Q.  And do you know whether Mr. Brooks
23  took any notes?
24      A.  I do not.

Page 177

1      Q.  And did you ever have any discussions
2  of the results of those interviews?
3      A.  Yes.
4      Q.  What were the results of the
5  interviews?
6      A.  That there was an increasing number of
7  people who were concerned about how Lisa was
8  managing the team and them individually, that it
9  came out in those conversations that individuals
10  were so concerned about the environment that
11  they were thinking about leaving the firm.
12      Q.  Again, in the context of the
13  post-interview discussions, who was it that was
14  indicating they were leaving the firm?
15      A.  Again, the person that I believe --
16  that I have memory of was Peers.
17      Q.  Do you have any memory that anyone
18  other than Mr. Peers?
19      A.  That's all I remember.
20      Q.  And do you remember any discussion
21  with respect to any of the individuals who were
22  interviewed about Lisa Svensson giving positive
23  feedback?
24      A.  I don't know that, no.

45 (Pages 174 to 177)

Putnam Investments by Richard Tibbetts

Page 178

1    Q.  So do you know whether anybody gave
2    positive feedback as you sit here today?
3    A.  I believe there was some people --
4    there were some people who did give positive
5    feedback.
6    Q.  Okay.  Do you know whether Mr. Eckland
7    gave positive feedback?
8    A.  I don't know for sure.
9    Q.  Do you know whether Mr. Stoic gave
10   positive feedback?
11   A.  I personally do not know.
12   Q.  Do you know whether at the time you
13   had these post-interview discussions, whether
14   Mr. Peers had already announced his decision to
15   leave Putnam?
16   A.  I was not directly involved in these.
17   Again, this was Mary and Josh.  I was informed
18   about the progress of that and the outcomes, so
19   I do not know that.
20   Q.  Now, was there any file of the
21   investigation created?
22   A.  Not that I'm aware of.
23   Q.  Were there any notes taken of your
24   post-interview discussions?

Page 179

1    A.  The only notes that I'm aware of are
2    the ones that I believe have already been
3    produced that you reviewed with me in my
4    previous depositions.
5    Q.  Did you receive any written
6    documentation from Mr. O'Malley?
7    A.  I did not.
8    Q.  Do you know whether anyone else did?
9    A.  No.
10   Q.  Do you know whether Mr. O'Malley was
11   critical of Lisa Svensson?
12   A.  My general understanding is yes, but I
13   don't know specifically.
14   Q.  You don't know what specific
15   criticisms he had?
16   A.  No.
17   Q.  Do you know whether there was any
18   investigation to determine whether the
19   criticisms, if any, expressed by Mr. O'Malley
20   were accurate or not?
21   A.  That was what all those numerous
22   conversations were between Eric and those
23   members and Josh and those staff members.  And
24   it was their discussions of those interactions

Page 180

1    with staff that validate in their minds the
2    accuracy of those feedback.
3    Q.  And do you know whether there was an
4    investigation undertaken with respect to the
5    accuracy of any criticisms Lisa Svensson might
6    have regarding Chris O'Malley's job performance?
7    A.  The general understanding that I have
8    was that that was in Lisa's assessment and
9    comments about Chris O'Malley's performance was
10   dramatically inconsistent with the feedback that
11   Josh received directly from the portfolio
12   managers, the internal clients, if you will, for
13   Chris and the research organization.
14          MS. KURKER:  I got the courtroom
15   clerk Mark Duffy on the phone, and he's going to
16   talk to the magistrate and give us a call.
17   BY MR. WEIR:
18   Q.  Do you know the identity of the
19   portfolio managers that you reference in your
20   testimony?
21   A.  I do not.
22   Q.  Do you know whether all of the
23   portfolio managers who had any interaction with
24   Mr. O'Malley were interviewed?

Page 181

1    A.  I do the not.  Again, Josh and Mary
2    work directly on that.  I did not.
3    Q.  Do you know whether any of the
4    portfolio managers had ever expressed any
5    criticism of Chris O'Malley?
6    A.  I personally do not.
7    Q.  And do you remember whether any of the
8    portfolio managers expressed any criticism of
9    Lisa Svensson?
10   A.  I don't have any specific memory of
11   portfolio managers' feedback.
12   Q.  So you had these discussions after the
13   interviews were conducted.  And what happened
14   then?  What did you do then with respect to the
15   investigation of Lisa Svensson?
16   A.  Again, I didn't do anything
17   specifically.  This was something that --
18   Q.  Think of yourself as Putnam today,
19   sir.
20   A.  Okay.
21          MR. RODRIQUES:  He's already
22   testified about it.  Josh has already testified
23   about it.  Mary's already testified about it.
24   Their testimony is what it is.  He can't just

Putnam Investments by Richard Tibbetts

Page 182

1  sit and parrot their testimony. He was not
2  personally involved.
3      Q.  Go ahead. What did you do?
4      A.  Mary and Josh had a series of -- had a
5  conversation or multiple conversations about
6  what to do next.
7          Josh made the decision that he needed
8  to remove Lisa from management responsibilities
9  of staff members, wanted to give her an option
10  of continuing to work at Putnam, and they
11  figured out a way to do that, which would be a
12  way to continue to have her play a role as an
13  analyst without management responsibilities.
14          Josh informed Ed Haldeman of what he
15  was thinking about doing from a management
16  standpoint, and then Josh implemented that
17  decision in a conversation or a series of
18  conversations with Lisa.
19      Q.  Okay. And what, if any, role did the
20  human resources department play in any of these
21  decisions?
22      A.  Well, I guess the first role that the
23  HR staff provided was validating the input from
24  the staff members and the interviews that we

Page 183

1  previously discussed, supported Josh in trying
2  to figure out how best to implement the
3  decision.
4          But ultimately it was Josh's decision
5  to make, and our role was to facilitate and help
6  him execute the decision.
7      Q.  Did you have any discussion in the
8  time frame of the summer of 2003 regarding the
9  termination of the employment of Lisa Svensson?
10      A.  Did I, I'm sorry?
11      Q.  Did you participate in any discussions
12  or have any discussions, you Putnam have any
13  discussions internally regarding the termination
14  of the employment of Lisa Svensson?
15          MR. RODRIQUES: Objection. Josh
16  and Mary have already testified to all the
17  discussions. He can testify to his personal
18  participation. He is not prepared and is not
19  proffered to testify about anything else.
20  BY MR. WEIR:
21      Q.  You can answer.
22      A.  Well, so the only way I guess I can
23  answer that is did I personally have a role?
24  The role that I played, again, was hearing what

Page 184

1  Mary and Josh had done from a process
2  standpoint, you know, satisfied myself that they
3  had been thorough in their review of the matter
4  and that Mary was doing an appropriate job of
5  helping Josh implement that.
6      Q.  Let me show you what was marked as
7  Tibbetts 34 for identification. I again ask
8  you, do you know a Steve Vandersen?
9      A.  No, I do not.
10      Q.  Do you see the second page of the
11  document that is PRM 00965 going on through
12  00968?
13      A.  Yes.
14      Q.  Have you ever seen that document
15  before?
16      A.  The time I remember seeing this was in
17  my earlier deposition.
18      Q.  Do you know whether Mary MacNamee
19  received this document from Steve Vandersen on
20  or about August 27, 2003 at 12:32 p.m.?
21      A.  I do not know for sure, but that's
22  what this E mail seems to indicate happened.
23      Q.  And this document relates to an
24  August 27, 2003 separation from employment with

Page 185

1  Putnam letter, correct?
2          MR. RODRIQUES: Objection.
3      A.  This appears to be a draft letter, as
4  it says, to Lisa that would be in the form of a
5  typical separation agreement.
6      Q.  In connection with your preparation
7  for this deposition did you undertake to
8  determine whether there had been any discussions
9  within Putnam of the preparation of a separation
10  from employment letter for Lisa Svensson in
11  about the time frame of August 27, 2003?
12      A.  No.
13      Q.  And did you see the date in the first
14  paragraph of the draft letter, "Your employment
15  with Putnam has been terminated as of August 29,
16  2003."
17          Do you recall any discussion of having
18  Lisa Svensson's employment terminated as of
19  August 29, 2003?
20      A.  I don't remember that specific date,
21  no.
22      Q.  You do remember that there was
23  discussion of some date for Lisa Svensson's
24  termination of employment?

Putnam Investments by Richard Tibbetts

Page 186

1    A.   Yes.
2    Q.   And do you recall -- without having
3  seen the letter, do you recall discussions of
4  the arrangements that are referenced in the
5  first paragraph of the letter PRM 00965?
6    A.   Okay.
7        (Telephone interruption)
8    A.   There was a question about the first
9  paragraph?
10   Q.   Do you recall a discussion of the
11 matters that are referenced in the first
12 paragraph of --
13       MS. KURKER:  This is Mark Duffy,
14 Magistrate Bowler's courtroom clerk.  She is
15 going to call and do a conference call with us
16 today at quarter of four.  We need the number
17 that she can reach us at.
18       MR. MOLONEY:  783-9800, Conference
19 Room A.
20 BY MR. WEIR:
21   Q.   Is it fair to state that Putnam had
22 decided by August 27, 2003 to terminate Lisa
23 Svensson?
24       MR. RODRIQUES:  Objection.

Page 187

1    A.   No, I don't think so.  I think that
2  what we had presented to her, and I don't know
3  the exact dates, but my memory is the general
4  one around this, where we offered to have Lisa
5  continue her employment without management
6  responsibilities as an analyst within the
7  research organization.
8        She then refused to accept that new
9  job structure, came back and demanded to
10 continue to have management responsibilities for
11 staff, demanded to have a million dollar
12 guarantee for two years, demanded to be made a
13 managing director immediately.  And that was
14 something that was unacceptable to the firm.
15   Q.   In point of fact, sir, she was
16 presented with three options; was she not?
17   A.   I believe Josh did speak with her
18 about three general options, yes.
19   Q.   What were the other two besides
20 remaining at Putnam in the analyst position with
21 no prospect of additional compensation?
22       MR. RODRIQUES:  Objection.  That's
23 not the testimony.  That wasn't the testimony.
24   A.   I believe what was offered to her was

Page 188

1  for her to continue to work as an analyst.
2        When she rejected that, there were
3  three options presented to her.  One was to
4  continue with that first option, which was
5  continue to work as an analyst within the
6  research organization without management
7  responsibility; a second was to look for other
8  opportunities within the firm; and the third was
9  to leave the firm.
10   Q.   Okay.  And do you have a specific
11 recollection that she was offered the
12 opportunity to look for other opportunities;
13 that is, other employment within the firm?
14   A.   I believe that was offered as one of
15 the options, yes.
16   Q.   And the third option was what?
17   A.   Was for her to leave the firm if
18 that's what she chose.
19   Q.   And would she leave with or without a
20 severance package?
21   A.   She would have left with a
22 severance -- a separation -- a severance under
23 the separation agreement which called for not
24 only receiving the compensation but also signing

Page 189

1  release which was standard and customary
2  practice for anybody that would be leaving the
3  firm with a severance arrangement.
4    Q.   Let me show you what's previously been
5  marked as Brooks 5 for identification and ask
6  you if that is the document to which -- which
7  references the three options that you've just
8  referred to in your testimony?
9    A.   I believe that fairly describes the
10 three categories, yes.
11   Q.   Where in the document does it state
12 that Lisa Svensson will have an opportunity to
13 look for other employment opportunities within
14 Putnam?
15   A.   This doesn't specifically.  It refers
16 broadly to look for other opportunities.  And
17 whenever we've offered that to employees, it has
18 always meant that they had an opportunity to
19 look for employment opportunities within the
20 firm or outside the firm.
21   Q.   Okay.  So your interpretation of this
22 document is that Lisa could look for other
23 opportunities within Putnam in the two- to
24 four-month period that's referenced in paragraph

JONES REPORTING COMPANY
617-451-8900

Putnam Investments by Richard Tibbetts

Page 190

1  number two?
2      A.  Yes.
3      Q.  And did you undertake to advise her as
4  to where to look?
5      A.  I don't think anybody got that far
6  because she indicated that those terms were not
7  acceptable, and she demanded to continue to have
8  a management job within the research
9  organization and to receive a million dollar
10  guarantee for two years and demanded to have a
11  managing director title.
12      And that was not, obviously, one of
13  the three options that was outlined here.
14      Q.  And just so I'm clear, you were
15  telling this person that you felt it was
16  necessary to deprive her of her management
17  responsibilities, that she should nevertheless
18  be able to look for other opportunities within
19  Putnam?
20      MR. RODRIQUES:  Objection.
21      A.  First of all, I don't think deprive is
22  a fair description.  Deprive inspires thoughts
23  of entitlement, et cetera.  No one's entitled to
24  anything.

Page 191

1      This was the management decision that
2  Josh determined was the appropriate and the best
3  thing for the research organization.
4      The first choice was for her to stay
5  in the group as an analyst without management
6  responsibilities.  That was our first choice and
7  suggestion as defined here within this memo.
8      Q.  Did you have any input into the
9  wording of this document?
10      A.  I did not personally, no.
11      Q.  Do you know whether anyone other than
12  Mr. Brooks had anyone put into the wording of
13  this document?
14      A.  I do not.
15      Q.  Do you know whether Mr. Brooks
16  presented this document to Lisa Svensson
17  personally?
18      A.  I do not.
19      Q.  Did Mr. Brooks ever report any
20  discussions that he had with Lisa Svensson
21  concerning this document?
22      A.  I'm not personally familiar with those
23  conversations.
24      Again, Mary was working directly with

Page 192

1  Josh on this, so I only have a general
2  understanding of this.  The specifics of what
3  you're asking for, I would not know that.  Mary
4  or Josh would be the most informed parties.
5      Q.  Did you have any role to play in
6  connection with the determination as to whether
7  any of the employment actions that were taken
8  against Lisa Svensson were in compliance with
9  the human resources policies of Putnam?
10      (Fire alarm sounds
11      3:42 p.m. to 3:43 p.m.)
12      A.  You were asking about whether this
13  followed Putnam -- what was the question?
14      (Record read)
15      A.  The role I personally played was,
16  again, just really a general one, with Mary
17  taking the lead, working with Josh.  So she
18  represented the human resources interest in that
19  process.
20      I was consulted about it, and the
21  employment practices you talk about are really,
22  I believe, referring to things we've already --
23  that you've already covered with me in my
24  earlier depositions.  But those were general

Page 193

1  guidelines about how one would receive feedback
2  and how one should be receiving warnings for
3  performance, et cetera.
4      This was not a situation where someone
5  with -- senior level within the organization
6  receiving high level of compensation would be
7  treated like someone who is a receptionist tardy
8  for work on a regular basis.  This is a crisis
9  kind of situation where employees --
10  top-performing employees were threatening to
11  leave because of the situation that they were
12  finding themselves in, and this was not the kind
13  of thing you would give a warning about.
14      So the management process would say do
15  the right management decision and make sure that
16  you're treating the employees fairly, and that's
17  what we did.
18      Q.  So you feel that the investigation and
19  the results of the investigation as reflected in
20  the three options that were offered to Lisa
21  Svensson after that investigation was concluded
22  constituted a fair treatment of her?
23      A.  Yes.
24      Q.  You keep referring to analysts,

Putnam Investments by Richard Tibbetts

Page 194

1  plural, threatening to leave, and I'm still
2  waiting to hear who besides Mr. Peers you
3  contend threatened to leave.
4          MR. RODRIQUES:  Is there a question
5  pending?
6          MR. WEIR:  Yes.
7          MR. RODRIQUES:  He's answered this
8  question several times.
9          MR. WEIR:  I'm just wondering why
10  he uses the plural all the time.
11      A.  Because I think I said before already
12  that my general understanding is that there were
13  multiple analysts.  The only one that I have
14  specific knowledge of is Darren Peers.
15      Q.  And the first option on Brooks 5
16  indicates that Mr. Brooks himself was going to
17  take over the management of the Natural
18  Resources Fund?
19      A.  I'm sorry, where are you reading this?
20      Q.  Paragraph numbered one on Brooks 5.
21      A.  You said that it states what?
22      Q.  The sentence states, "In this
23  scenario, I will take over the managerial
24  responsibility for the team and for the

Page 195

1  organization of the portfolio management process
2  or the Natural Resources Fund."
3          Do you see that?
4      A.  I do.
5      Q.  Is that what actually occurred after
6  Lisa Svensson was terminated?
7      A.  I do not know that.
8      Q.  Who would know that?
9      A.  Josh Brooks.
10      Q.  Do you know other employees who were
11  offered options of the nature that were offered
12  to Lisa Svensson in Brooks 5?
13      A.  Do I know of other people?
14      Q.  Yes.
15      A.  I don't know of anybody else that was
16  offered these options, no.
17      Q.  Do you know whether Beth Cotner was
18  offered any similar options when she left
19  Putnam?
20          MR. RODRIQUES:  Objection.
21      A.  Yes, I do know.
22      Q.  She was not?
23      A.  She was not offered these options, no.
24      Q.  She was not offered any options?

Page 196

1      A.  She retired from the firm.
2      Q.  How about Debbie Kuenstner?
3      A.  She was not offered these options, no.
4      Q.  And she retired from the firm too?
5      A.  No.
6      Q.  What happened to Debbie Kuenstner?
7      A.  She left.  She left the firm.
8      Q.  Did Putnam initiate the discussions
9  with Debbie Kuenstner?
10      A.  Again, I believe I gave testimony
11  already on why she left.  That was a mutual
12  decision about when she left.
13      Q.  How about Elizabeth MacElwee Jones,
14  was she offered any options at the time of her
15  departure?
16      A.  She was not offered options like this,
17  no.
18      Q.  And how about Rosemary Thompson?
19      A.  Rosemary Thompson was not offered
20  options like this, no.
21      Q.  And what was the reason for offering
22  the three alternatives to Lisa Svensson?
23      A.  Josh wanted to try to make sure he was
24  treating Lisa fairly.  He knew that in order to

Page 197

1  do that, he wanted to give her as much time as
2  possible to decide whether staying at the firm
3  was something that she wanted to do.
4          If she wanted to leave, he wanted to
5  try to support her as she looked for other
6  opportunities either within the firm or outside
7  the firm.
8          And so this was, you know, well beyond
9  normal process, but it was a way to try to
10  assist Lisa in whatever career decisions she was
11  going to choose.
12      Q.  I guess my question is why weren't
13  similar options offered to other individuals
14  when it came to be determined that they were no
15  longer appropriate for the position that they
16  held at Putnam?
17      A.  People weren't being as kind as Josh
18  was in terms of offering multiple scenarios and
19  options for people.
20      Q.  In connection with terminations of
21  personnel at Putnam in the time frame of 2003,
22  did you have a process of providing verbal or
23  written warnings to individuals whose
24  performance in one respect or another was being

50 (Pages 194 to 197)

Putnam Investments by Richard Tibbetts

Page 198

1  questioned?
2         MR. RODRIQUES:  Is that within the
3  scope of the topics on this list?
4         MR. WEIR:  Yes.
5         MR. RODRIQUES:  Which one?
6         MR. WEIR:  It's within the topic of
7  the termination, for one thing.
8         MR. RODRIQUES:  The termination of
9  Lisa Svensson?
10        MR. WEIR:  Yes.
11        MR. RODRIQUES:  Really?
12        MR. WEIR:  Yes.
13        MR. RODRIQUES:  So he was supposed
14 to prepare every other warning that's ever been
15 issued to anyone?
16        MR. WEIR:  No, no.  That's not the
17 question.  You didn't hear the question, as
18 usual.
19        THE WITNESS:  Could you read back
20 the question?
21        (Record read)
22        MR. RODRIQUES:  So the question is
23 at any time -- he's supposed to know whether at
24 any time in the four-year period --

Page 199

1         MR. WEIR:  I didn't say anything
2  about the four-year period.  I said in 2003, at
3  the time Lisa Svensson was terminated.
4         MR. RODRIQUES:  At the very same
5  time she was terminated?
6  BY MR. WEIR:
7     Q.   At that time did you have a policy in
8  providing verbal or written warnings to persons
9  that were being considered for termination or
10 demotion or other job actions, adverse job
11 actions?
12    A.   Are you asking about whether I had a
13 policy or whether I had input into?
14    Q.   Did Putnam have a policy?
15    A.   There were guidelines that existed in
16 the handbook about giving feedback and
17 establishing performance warnings, yes.
18    Q.   And were those guidelines, as you've
19 described them, followed in connection with Lisa
20 Svensson's termination?
21    A.   As I've already said --
22        MR. RODRIQUES:  Several times.
23    A.   -- that was not followed because that
24 was not anywhere appropriate or reasonable given

Page 200

1  the situation we found ourselves in.
2         Were we supposed to warn her about
3  her --
4         (Telephone interruption)
5     A.   -- do not -- no longer make these
6  demands or which grounds you would agree to be
7  employed?  I don't know how that warning would
8  work.
9     Q.   I'm talking about with respect to the
10 proposal that she stay as an analyst but not
11 have any managerial responsibilities.
12    A.   Giving her an option to stay as an
13 analyst in the research department had nothing
14 to do with the warning.  It was giving her a job
15 opportunity to continue to stay employed within
16 the firm.  So that wasn't a warning.  It was
17 giving her very specific option to continue to
18 stay within the firm.
19        MR. RODRIQUES:  Could we take a
20 break?  It's been a while.
21        MR. WEIR:  All right.
22        (Discussion off the record
23        from 3:53 p.m. to 3:54 p.m.)
24        MR. RODRIQUES:  Let's suspend and

Page 201

1  go to court.
2         MR. MOLONEY:  Can you tell us what
3  the issue is?
4         MR. RODRIQUES:  Yeah, the issue is
5  that you're in noncompliance with the Rule
6  30(b)(6), the fact that you're taking an
7  absolutely unreasonable position with respect to
8  the examination on certain of these topics.
9         If you want to hear what I have to
10 say, I'll tell you.
11        Magistrate Bowler's indicated you get
12 one witness for one day.  You were supposed to
13 within two or three days, were her words, call
14 us to talk about the topics.  You did not do so.
15 You were supposed to prioritize your topics.
16 You didn't do so until we contacted you two
17 weeks later and demanded that you do so.
18        MR. MOLONEY:  Well, you're wrong.
19 You're wrong.
20        MR. RODRIQUES:  Kevin, Kevin, you
21 just --
22        MR. MOLONEY:  Don't try to recreate
23 history.
24        MR. RODRIQUES:  I'm not trying to

51 (Pages 198 to 201)

Putnam Investments by Richard Tibbetts

Page 202

1    recreate history.
2         MR. MOLONEY: We prioritized our
3    subjects. She ruled upon them.
4         MR. RODRIQUES: No, no.
5         MR. MOLONEY: She ruled upon them.
6    She denied your motion, told us to prioritize.
7         MR. RODRIQUES: Kevin, what
8    happened was I sent an E mail -- we sent an E
9    mail saying will you prioritize your topics.
10   Jack wrote back and said --
11        MR. MOLONEY: What's the
12   difference? So what?
13        MR. RODRIQUES: Jack wrote back and
14   said we don't have to do so. We cited the
15   transcript, then you prioritized.
16        Okay. Now, as to those topics, you're
17   asking this witness to simply parrot the
18   testimony.
19        MR. MOLONEY: No, no.
20        MR. RODRIQUES: Yes, you are.
21        MR. MOLONEY: That's not her
22   ruling. She said we are entitled to a Rule
23   30(b)(6) deposition. We made reference to the
24   rule. She said I understand the rule.

Page 203

1         There is a difference, sir, between
2    getting the personal knowledge or lack thereof
3    of individual witnesses and getting the
4    corporate testimonies from this witness.
5         And this witness, out of his own
6    mouth, is not prepared, not prepared. No talk
7    to Brooks, no talk to anybody else. And he's
8    here to testify? Come on.
9         MR. RODRIQUES: That's why I'm
10   suspending.
11        MR. MOLONEY: You want to fight
12   this one on those grounds, on whether he's
13   prepared or not?
14        MR. RODRIQUES: I do.
15        MR. MOLONEY: You're welcome to the
16   fight.
17        MR. RODRIQUES: Well, let's go.
18        MR. MOLONEY: We're going to
19   continue here. That's what we want to do.
20        MR. RODRIQUES: Not without a
21   witness you're not.
22        MR. MOLONEY: Is that on the
23   record?
24        MR. WEIR: Yeah, let the record

Page 204

1    reflect that Mr. Rodriques --
2         MR. RODRIQUES: We're exercising
3    our right to suspend and go to court. That's
4    what you told us we're supposed to do when we
5    have a disagreement, suspend and go to court.
6         MR. WEIR: I believe that this
7    deposition should go forward now --
8         MR. RODRIQUES: I understand you
9    do.
10        MR. WEIR: -- without further
11   delay.
12        But I also believe that this witness
13   should have been prepared, particularly with
14   respect to the last two items that I've been
15   discussing, should have been prepared to inform
16   himself with respect to matters which he clearly
17   did not inform himself.
18        MR. RODRIQUES: Jack, there are
19   three people who know about this topic remaining
20   at Putnam. You've deposed them all, him twice.
21   There's no one else to testify any differently.
22        MR. WEIR: Then you should have
23   designated one of the three people as your
24   30(b)(6) witness.

Page 205

1         MR. RODRIQUES: No. You get one
2    witness. That's what the judge said, one
3    witness.
4         MR. MOLONEY: So?
5         MR. RODRIQUES: So you got your
6    one.
7         MR. MOLONEY: We are entitled on
8    the rule to get an educated witness, educated
9    witness. Read the rule.
10        MR. RODRIQUES: I'll read the
11   judge's order. Do you want me to read the
12   judge's order?
13        MR. MOLONEY: I've read it several
14   times. Your motion to quash is denied.
15        MR. RODRIQUES: "Because you're
16   only going to get one witness and you're only
17   going to get one day, and if one person only
18   knows about one area, that's all you're going to
19   get."
20        MR. MOLONEY: That's not what her
21   ruling is. That makes absolutely no sense.
22        You did not include the part of the
23   transcript where I said in substance that we are
24   entitled to an educated witness under the rule,

52 (Pages 202 to 205)

Putnam Investments by Richard Tibbetts

Page 206

1   and she says, I am acquainted with the rule.
2           MR. RODRIQUES:  We'll file a motion
3   for a protective order properly.
4           MR. MOLONEY:  When are we going to
5   get it?
6           MR. RODRIQUES:  As soon as we can.
7       I will make one last offer before we
8   walk out.  I am happy, as I've said before, to
9   accept the testimony of Josh Brooks and Mary
10  MacNamee and Rick Tibbetts in their individual
11  capacities as binding the organization for
12  30(b)(6) purposes, okay, because they are the
13  only people at the entity who know anything
14  about this.  There's nothing more to do, Jack.
15          MR. WEIR:  I am entitled to get
16  from Putnam the corporate knowledge with respect
17  to Putnam.  There are inconsistencies between
18  the testimony --
19          MR. RODRIQUES:  But they're not
20  going to be resolved.  There is no one else to
21  resolve them.
22          MR. WEIR:  -- and I want to know
23  what Putnam's position is with respect to the
24  matters that are referenced on the 30(b)(6)

Page 207

1   notice.
2           MR. RODRIQUES:  To the extent that
3   there are inconsistencies, it is what it is.
4   There's no way to resolve it.
5           MR. MOLONEY:  No.  It's up to
6   Putnam to pick and choose, my friend.  Putnam
7   has a position, it should have a position.
8           MR. RODRIQUES:  And our position is
9   that there is no material --
10          MR. MOLONEY:  It's on the one hand
11  and then it's on the other hand?
12          MR. RODRIQUES:  No.  Our position
13  is that there's no material inconsistencies
14  between --
15          MR. MOLONEY:  You want to represent
16  Putnam has no position on the issue because you
17  can't pick and choose.
18          MR. TUCKER:  Let's go.  Let's go.
19          MR. RODRIQUES:  We would like an
20  expedited copy, please.
21          MR. TUCKER:  I hope you aren't
22  paying these amateurs by the hour.  It would be
23  very, very expensive.
24          MR. WEIR:  Put that comment on the

Page 208

1   record, please.
2           (Whereupon the deposition was
3   suspended at 4:00 p.m.)

Page 209

1               C E R T I F I C A T E
2       I, RICHARD TIBBETTS, do hereby certify that
3   I have read the foregoing transcript of my
4   testimony, and further certify that it is a true
5   and accurate record of my testimony (with the
6   exception of the following corrections):
7   Page   Line            Correction
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16
17       _____
18              RICHARD TIBBETTS
19
20       Sworn to and subscribed before me this
21  day of          , 2006.
22  Notary Public
23
24  My commission expires:

53 (Pages 206 to 209)

Putnam Investments by Richard Tibbetts

Page 210

```
 1   COMMONWEALTH OF MASSACHUSETTS)
 2   SUFFOLK, SS.              )
 3
 4       I, Daria L. Romano, RPR, CRR and Notary
 5   Public in and for the Commonwealth of
 6   Massachusetts, do hereby certify that there came
 7   before me on the 29th day of November, 2006, at
 8   10:14 a.m., the person hereinbefore named was
 9   duly sworn by me and that such deposition is a
10   true record of the testimony given by the
11   witness.
12       I further certify that I am neither related
13   to nor employed by any of the parties or counsel
14   to this action, nor am I financially interested
15   in the outcome of this action.
16       In witness whereof, I have hereunto set my
17   hand and seal this 4th day of December, 2006.
18
19
20            _____
21            Notary Public
22            My Commission Expires
23            March 15, 2013
24
```

54 (Page 210)