UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | | Civil Action No. 04-12711-PBS |
| * | | |
| * | | |
| LISA SVENSSON * | | |
| * | | |
| Plaintiff, * | | Plaintiff Lisa Svensson's |
| * | | Memorandum in Support of: |
| v. * | | (1) Her Opposition to |
| * | | Defendant Putnam's Motion to |
| * | | Terminate Discovery; |
| PUTNAM INVESTMENTS, * | | and, |
| LLC, et al., * | | (2)(A) Her Cross Motion, |
| * | | Pursuant to Fed. R. Civ. P. |
| Defendants. * | | 37 for Sanctions |
| * | | Against Putnam and Counsel for |
| * | | Violation of the October 26, 2006, |
| * * * * * * * * * * * * * * * * * * * * | | Order for Production and of the |
| | | Court's Series of Directions to |
| | | Engage in Negotiations and |
| | | Exchanges of Information as to |
| | | Svensson's Second Request for |
| | | Production; and, |
| | | (2)(B) Her Renewed Motion for Orders Compelling Production of Certain Items of her Second Request for Production[1] |
| | | |
| | | and |
| | | Request for Hearing and Oral Argument |

1.      Introduction.

In its motion to terminate discovery, Putnam makes both the preposterous claim that

Svensson "has used a second request [for production of documents] as a mechanism to insure

---

[1] Except to the extent actually produced, categories where Putnam claims no documents exist and a sworn statement to that effect (9 items) will be accepted, 9, 10, 11, 13, 14, 27, 28, 49; Categories re: email issues (31 items): 2, 3, 4, 5, 6, 12, 13, 15, 16, 17, 18, 19, 38, 39, 45, 46, 47, 48, 49, 56, 57, 58, 59, 60, 66, 67, 68, 69, 71, 72, 73; Categories requesting discrete documents where there is no email issue (33 items):7, 8, 12, 23, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 43, 44, 50, 51, 52, 53, 54, 61, 62, 63, 64, 65, 70, 74, 75, 76, including the request for the "PDPRs" which was ruled upon by the court but upon a misrepresentation of fact by Putnam.

that discovery never closes," and the false statement that Putnam has "produced" all of the documents ordered to be produced by the court at the October 26, 2006 hearing ("at that hearing, this Court ordered certain documents produced) which Putnam has since done)").

As set forth in detail in the schedule filed herewith as Exhibit "A," Putnam has not produced any of the five sworn statements ordered and directed by the court to be furnished to Svensson; and has failed to produce, among other things, all of the 360s ordered by the court for production to Svensson.

The Putnam motion also would have the court believe that Svensson has not made "a serious attempt at discovery but [has provided] a mechanism to insure that hundreds of thousands (if not millions) of e-mails are reconstructed, retrieved and reviewed--a task that...Ms. Svensson knows is unreasonable, irrational and more than unduly burdensome and time consuming." The Putnam motion misleads the court.

The facts concerning the history of discovery in this case are set forth in detail in the schedules annexed hereto as, among others, Exhibit B ( Discovery Requests and "Side Letter" negotiations) and Exhibit C ( Court action required to obtain answers to interrogatories and unredaction of documents) . And the history of discovery in this case makes it very clear that Putnam has engaged in a conscious effort to stall, to consume discovery time, to pretend to engage in negotiations, to fail to offer a counter proposals to Svensson's numerous attempts to negotiate matters, and otherwise engaging in the type of conduct that is best described as "What's mine is mine and what's yours is negotiable."

Moreover, the Putnam record in discovery in this case is replete with misrepresentations of fact to the court (see Exhibit D filed herewith) and service of answers to interrogatories that

are contradicted by Putnam's own documents or the testimony of its own witnesses.  See Exhibit E, filed herewith.

In the period since the end of the discovery period last May, Svensson has not sought, and does not seek, any documents or information that she did not on a timely basis attempt to obtain by proper discovery requests within that discovery period; and, in fact, in her motion papers for the motion to compel concerning the Second Request for Production, she is seeking far less than she originally sought.

It was the intransigence of Putnam that forced Svensson to seek the aid of the court in the hearings held in this matter starting on June 21, 2006. For the detailed history, <u>see</u> Exhibit  F ( "Negotiations" re: the second request for production), filed herewith , filed herewith.  Attorney Kociubes described the Putnam strategy when he said in the deposition of Charles Haldeman, "(P)eople who are not comparators of the claimant have been redacted. (Svensson is) not entitled to personnel information about them, so whether or not there is a document. you're not getting it absent the court deciding that we are wrong."

Prior to the court hearings in June and July, Putnam did produce numerous pages of documents, but 89.7% of them were redacted.  This, of course, impeded Svensson's discovery, as defendant Lasser said in his deposition when asked about one of the redacted documents, "You showed me a bunch of blank pages, so it's hard to remember."  Putnam had maintained (and still, no doubt, continues to maintain) the incredible notion that there never has been a single investment professional at Putnam who was a comparator of Svensson as to any of her claims[2] for the adverse employment actions taken by Putnam against her.

It was only because of the action of the court on June 21 and July 11, 2006, when confronted with the inevitability of further court orders, that Putnam finally agreed to provide

---

[2] Failure to promote, failure to pay equally, demotion and termination.

3

answers to interrogatories concerning the 91 men and women who Svensson contends are her comparators; and, agreed to unredact the previously redacted documents.  Having represented to the court on July 11, 2006 that it would answer the interrogatories, it took Putnam 52 days before it served on September 1, 2006, the interrogatory answers and produced the unredacted versions of the documents

      Discussion as to the Second Request for production of documents, filed in April 2006, and the 30(b)(6) deposition notice began in late June (<u>see</u> Exhibits G (30(b)(6) )and F, referred to above, and filed herewith for the details and history).  But Putnam once again employed the strategy it had followed since the fall of 2005 of  unproductive negotiations.

      The Putnam strategy was and is to pretend to negotiate when in fact it did the opposite by, among other things, refusing to proffer counter proposals when Svensson made proposals designed to facilitate agreement on a reasonable basis without the need for further court activity.  For the history of the "negotiations," <u>see</u> Exhibits referred to above.

      There being no counter proposals for settlement of the issues from Putnam and faced with the rejection of her proposals for out of court resolution, Svensson was forced to file her motion to compel production of the documents requested in her Second Request for Production of Documents.  Prior to the hearing on October 26, 2006, as set forth in detail in her motion papers, Svensson made numerous reductions in the scope of the categories of that Second Request.  This is particularly true of the categories requesting discovery as to e-mails.  Svensson reduced the number of e-mail boxes to be searched to ten identified decision makers for communications concerning employment actions in regard to minimum numbers of  the total of 91 comparators .

      At the hearing on October 26, 2006, the court considered 14 of the 76 categories of the request before ending the hearing.  During the hearing the court directed that Putnam furnish

sworn statements from authorized officials if Putnam claimed that requested documents do not exist.  Putnam has failed to furnish any of the five sworn statements as per the courts directions at the hearing.  The court also ordered Putnam to produce the annual reviews known as "360s."  Putnam produced 360s for only some of the years in question but for one of the produced years failed to include  the "comments" section  and took the position via an e-mail from Attorney Kurker, that 360s for the other years did not exist, only to admit , when presented with evidence from Putnam's own documents that they did exist, Putnam counsel advised that they were looking for them.  Insofar as Svensson is able to determine, Putnam is still looking.

Moreover, having agreed in a conference call with Svensson's counsel when Svensson's counsel endeavored to engage Putnam's counsel in negotiations as the court had directed, concerning the discrete items not ruled upon at the hearing, Putnam's counsel agreed to consider Svensson's positions on those items and to get back to Svensson's counsel after considering them with Putnam's positions on those items.  Putnam's counsel has yet to advise Svensson as to the Putnam position on any of those items.

In particular regard to e-mail issues, the court at the hearing accepted Svensson's counsel's suggestion that even though the new e-discovery amendments to the Federal Rules of Civil Procedure would not be effective until December 1, 2006, the substance provided by the amendments should be followed and, without indicating whether Svensson or Putnam should be the initiating party, suggested the parties communicate to discuss matters within a week.  Putnam complains that it heard from Svensson's counsel on the eleventh day after the hearing, rather than on the seventh day.

Putnam's motion fails to disclose the following important matters.  On November 17, 2006, Svensson's counsel sent to Putnam's counsel a questionnaire, a copy of which is filed

5

herewith as an Exhibit to the Affidavit of Nicole M. Panos seeking basic information about Putnam's computer and e-mail systems and capabilities. In the covering e-mail, counsel stated,

> The attached [questionnaire] sets out the information that will help us move forward with discussion of the e-mail issues Putnam has raised.
>
> Please let me know if Putnam will supply the information requested... so that we might discuss this matter on a more informed basis.

On November 21, 2006, Putnam's counsel responded, not with any of the answers to the items of the November 17 questionnaire, but with a question as to item number 5 (of 19) of the questionnaire. The e-mail also requested, despite the identification of such persons in Svensson's motion papers for the October 26, 2006, hearing, a "list of individuals whose e-mail boxes you propose to have searched."

On the next day, November 22, 2006, Svensson's counsel sent the following e-mail to Putnam's counsel:

> As you know, the questionnaire I sent over to you folks (copy attached) requests, in the spirit of the new e-discovery rules as discussed with Judge Bowler, basic information needed to help us understand Putnam's computer systems and capabilities as they may affect resolution of the e-mail discovery issues in this case. Thus, I was disappointed to see that the Putnam response so far consists only of questions about one of the 19 categories rather than the information requested.
>
> Nonetheless, in regard to Putnam's question about Item No. 5 of the questionnaire, Item No. 5 was intended as an inquiry as to the search terms that Putnam has used and./or would propose to use to obtain the information; but we have no problem in presenting to Putnam some possible search terms that we have developed. They are set out in the other attachment. Of course, we reserve the right to make refinements, additions and changes without prejudice.
>
> In response your other e-mailed question, wherever in our reply memorandum in regard to the Second Request for Production the term "decision-makers" is used in regard to e-mail or the following are named as such such decision-makers in regard to e-mail, we are seeking the e-mails to or from any one or more of the following ten decision-makers: Steve Oristaglio, Jack Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks, Brett Browchuk, Dan Miller and Justin Scott and, as appears to be the case of at least defendant Lasser,

6

>persons sending and/or receiving e-mail on behalf of any such persons, which e-mails concern one or more of the employees or lateral hires named in the respective categories of the Second Request for Production discussed in our reply memorandum.

(Emphasis added.) Attached to that e-mail was another copy of the November 17, 2006 questionnaire and a list of Svensson's proposed search terms.

Putnam did not respond for almost three weeks later, when in an e-mail on December 12, without answering the questions in the November 17 questionnaire, it announced that,

>We have reviewed your search terms and have spoken at length with Putnam personnel and e-discovery experts and have concluded that the process... is prohibitively expensive and unreasonably burdensome...[it] will take several weeks, to say nothing of the strain it will put on Putnam's IT department and will cost, using the services of an unidentified "vendor" roughly $200,000.00.

(Emphasis added.)  Thus, Putnam advanced to Svensson the conclusion it wants the court to reach, but did so without providing to either Svensson or the court the subsidiary information necessary to enable Svensson or the court to make an informed judgment as to the Putnam claim. As set forth in the Affidavit of Nicole M. Panos of Target Litigation Consulting, Inc., filed herewith,

>3. Based upon my education, training and experience, the draft search terms sent by Svensson's counsel to Putnam's counsel are reasonable as they are limited in number of search terms and the complexity of search.  Some of the terms may result in false hits as they are general terms used in everyday conversations (e.g. make, move, took out, take out).  I would suggest that those search terms be used in conjunction with other, relevant terms to yield a higher likelihood of responsive hits. The search methodology and terms may require modification depending upon the answers to the technological and other inquires set out in the questionnaire... that accompanied Attorney Moloney's November 17, 2006, e-mail to Attorney Rodriques....
>
>4. Based upon my education, training and experience, it is impossible to analyze and evaluate the propriety, integrity and legitimacy of the Putnam contentions as to time and expense and the other issues set out in Attorney Rodriques' e-mail of December 12, 2006..., without first having obtained, analyzed and evaluated in the light of the technological issues and the varying conditions of the market place concerning vendors, the answers to

7

> the questions set out in the November 17 e-discovery questionnaire.  In past projects I have consulted on, the cost and time estimations from vendors for tape restoration and searching, for example, has ranged from days to weeks and from one-hundred dollars per tape to one-thousand dollars per tape based on the vendor and the type of tape.  These types of issues can be resolved with open discovery exchange.

(Emphasis added.)

2.    Putnam has made none of the showings required of a party responding to e-discovery and even has failed and refused, despite the direction of the court, to provide the basic information needed to begin the analysis of the e-mail issues in this case.

2.1. The 2006 e-discovery rules amendments to the Federal Rules of Civil Procedure govern the present case.

The Federal statute that requires the United States Supreme Court to submit proposed rules of procedure to Congress. 28 U.S.C. § 2074, states, in relevant part:

> (a) The Supreme Court shall transmit to the Congress not later than May 1 of the year in which a rule prescribed under section 2072 is to become effective a copy of the proposed rule.  ...The Supreme Court may fix the extent such rule shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.

(Emphasis added.)  On April 12, 2006, the Supreme Court (Roberts, C.J.), submitted amendments of the Federal Rules of Civil Procedure to Congress.[3]  An order of the Supreme Court, also dated April 12, 2006,[4] states

> (3) That the foregoing amendments...shall take effect on December 1, 2006, and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending.

(Emphasis added).  Thus, the e-discovery rules amendments govern e-discovery in the present case.

---

[3] http://www.supremecourtus.gov/orders/courtorders/frcv06p.pdf
[4] Id.

2.2. <u>The scope of e-discovery</u>.

E-mail and other electronically stored information ("ESI") are generally subject to discovery under Fed. R. Civ. P. <u>Williams</u> v. <u>Mass. Mutual Life Ins. Co.</u>, 226 F.R.D. 144, 145-46 (2005). However, under Rule 26(b)(2)(C),

> [t]he frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: ... (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues....

Under the new e-discovery amendments, the responding party is not required to produce ESI that is stored in a manner that, "because of undue burden or cost" is not "reasonably accessible," but the responding party has the burden to show that ESI not produced is not reasonably accessible. Even upon such a showing, however, the court may order discovery from not reasonably accessible sources if the requesting party establishes good cause. Rule 26(b)(2)(B) states:

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the [responding] party...must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(Emphasis added.)

Whether information is "not reasonably accessible," is determined on a case-by-case basis. In general, "data that is 'accessible' is stored in a readily usable format that 'does not need to be restored or otherwise manipulated to be usable.'" <u>Quinby</u> v. <u>WestLB AG</u>, 2006 WL 2597900, *7 (S.D.N.Y. 9/5/06). In <u>Zubulake</u> v. <u>UBS Warburg LLC</u>, 217 F.R.D. 309 (S.D.N.Y.

9

2003), the leading case on e-discovery, the United States District Court for the Southern District of New York identified five types of information storage forming a continuum of from accessible to not accessible storage media, saying that,

> Whether electronic data is accessible or inaccessible turns largely on the media on which it is stored. Five categories of data, listed in order from most accessible to least accessible, are described in the literature on electronic data storage...

The five categories of data are: (1) Active, online data[5]; (2) Near-line data[6]; (3) Offline storage/archives[7]; (4) Backup tapes[8]; and, (5) Erased, fragmented or damaged data.[9]

> Of these, <u>the first three</u> categories <u>are</u> typically <u>identified as accessible</u>, and <u>the latter two as inaccessible. The difference between the two classes is easy to appreciate. Information deemed "accessible" is stored in a readily usable format. Although the time it takes to actually access the data ranges from milliseconds to days, the data does not need to be restored or otherwise manipulated to be usable.</u>

---

[5] "On-line storage is generally provided by magnetic disk. It is used in the very active stages of an electronic records [sic] life--when it is being created or received and processed, as well as when the access frequency is high and the required speed of access is very fast, *i.e.,* milliseconds." Examples of online data include hard drives."

[6] "This typically consists of a robotic storage device (robotic library) that houses removable media, uses robotic arms to access the media, and uses multiple read/write devices to store and retrieve records. Access speeds can range from as low as milliseconds if the media is already in a read device, up to 10-30 seconds for optical disk technology, and between 20-120 seconds for sequentially searched media, such as magnetic tape." Examples include optical disks.

[7] "This is removable optical disk or magnetic tape media, which can be labeled and stored in a shelf or rack. Off-line storage of electronic records is traditionally used for making disaster copies of records and also for records considered 'archival' in that their likelihood of retrieval is minimal. Accessibility to off-line media involves manual intervention and is much slower than on-line or near-line storage. Access speed may be minutes, hours, or even days, depending on the access-effectiveness of the storage facility."

[8] "A device, like a tape recorder, that reads data from and writes it onto a tape. Tape drives have data capacities of anywhere from a few hundred kilobytes to several gigabytes. Their transfer speeds also vary considerably ... The disadvantage of tape drives is that they are sequential-access devices, which means that to read any particular block of data, you need to read all the preceding blocks." As a result, "[t]he data on a backup tape are not organized for retrieval of individual documents or files [because] ... the organization of the data mirrors the computer's structure, not the human records management structure."

[9] "When a file is first created and saved, it is laid down on the [storage media] in contiguous clusters ... As files are erased, their clusters are made available again as free space. Eventually, some newly created files become larger than the remaining contiguous free space. These files are then broken up and randomly placed throughout the disk."

> "Inaccessible" data, on the other hand, <u>is not readily usable.  Backup tapes must be restored</u> ...fragmented data must be de-fragmented, and <u>erased data must be reconstructed, all before the data is usable.  That makes such data inaccessible</u>.

<u>Id</u>. at 318-20. (Emphasis added, footnotes omitted.).

If the parties do not agree on whether the non-produced information is reasonably accessible, on motion to compel, <u>the responding party must provide enough information about the information claimed to be not reasonably accessible to enable the requesting party (and the court) to test that claim</u>.  Thus, the court may allow the requesting party to conduct discovery concerning the nature of the responding party's computer and information storage systems.  The Committee Notes to Rule 26, as now amended, state:

> Under this rule, <u>a responding party should produce electronically stored information that is relevant, not privileged, and reasonably accessible</u>, subject to the (b)(2)(C) limitations that apply to all discovery. The responding party <u>must also identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing</u>.  The identification should, to the extent possible, <u>provide enough detail to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources</u>.
>
> \*\*\*
>
> If the parties cannot agree whether, or on what terms, sources identified as not reasonably accessible should be searched and discoverable information produced, ...the responding party must show [to the court] that the identified sources of information are not reasonably accessible because of undue burden or cost.  <u>The requesting party may need discovery to test this assertion</u>.  Such discovery might take the form of <u>requiring the responding party to conduct a sampling of information contained on the sources identified as not reasonably accessible;</u> <u>allowing</u> some form of <u>inspection</u> of such sources; <u>or taking depositions of witnesses knowledgeable about the responding party's information systems</u>.

(Emphasis added.)

Even where the responding party proves that the ESI is not reasonably accessible, the courts will require production if the requesting party shows good cause.  This involves a balancing of the benefits and the costs of the discovery ought.  Committee Note to Rule 26(b)(2).

11

The Committee Notes set forth a seven-factor test to be applied by the court in determining whether good cause exists:

> Appropriate considerations may include: (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.
>
> Because knowledge of the responding party's computer system, and of the types of information that a search of inaccessible parts of that system might reveal, is essential to the good cause analysis, the requesting party may be entitled to additional discovery concerning these matters.
>
> The good-cause determination, however, may be complicated because the court and parties may know little about what information the sources identified as not reasonably accessible might contain, whether it is relevant, or how valuable it may be to the litigation.  In such cases, <u>the parties may need some focused discovery</u>, which may include <u>sampling of the sources, to learn more about what burdens and costs are involved in accessing the information, what the information consists of, and how valuable it is for the litigation in light of information that can be obtained by exhausting other opportunities for discovery</u>.

(Emphasis added.)

Where the court concludes that good cause has been shown, and some discovery of data that is not reasonably accessible is warranted, the court, in its discretion, may impose conditions limiting the extent of discovery and/or shifting to the requesting party part or all of the costs associated with that discovery.'

2.3  <u>Cost shifting</u>.

The presumption is that the responding party bears the costs of complying with discovery requests.  <u>Zubulake</u>, 217 F.R.D. at 317, citing <u>Oppenheimer Fund, Inc.</u> v. <u>Sanders</u>, 437 U.S. 340

(1978). However, the responding party may invoke the "district court's discretion under Rule 26(c) to grant orders protecting [it] from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery." Id.

The new rules indicate that a responding party cannot seek cost shifting for the production of ESI from accessible sources. It is only when production is made of not reasonably accessible ESI that cost shifting may come into play. Committee Notes to Rule 26(b)(2) ("The conditions [imposed by the court upon discovery] may also include payment by the requesting party of part or all of the reasonable costs of obtaining information from that are not reasonably accessible." (Emphasis added.)) Similarly, the court in Zubulake stated:

> [C]ost-shifting should be considered only when electronic discovery imposes an 'undue burden or expense' on the responding party.
> ***
> [W]hether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production).

217 F.R.D. at 318. (Emphasis in original text.) In addition, the United States District Court for the Southern District of New York has held that cost shifting is not available even where discovery is sought from inaccessible media, where the responding party converts the information to the inaccessible format at a time when it should have foreseen the possibility that it would be relevant to anticipated litigation. Quinby, 2006 WL 2597900, *7.

Commentators have identified three approaches to cost shifting: The "marginal utility" test; the eight-factor test of Rowe Entertainment, Inc. v. The William Morris Agency, Inc., 205 F.R.D. 421 (S.D.N.Y. 2002); and the seven factor test of Zubulake. See Litigation Management Handbook, §7:28. Under the marginal utility test,

13

> the more likely it is that the backup tape [or other inaccessible media] contains information that is relevant to a claim or defense, the fairer it is that the [responding party] search at its own expense. The less likely it is, the more unjust it would be to make the [responding party] search at its own expense. The difference is at the margin.

McPeek v. Ashcroft, 202 F.R.D. 31, 34 (D.D.C. 2001). The eight factors considered under the Rowe test, and apparently weighted equally, are:

> (1)  The specificity of the discovery requests; (2) the likelihood of discovering critical information; (3) the availability of such information from other sources; (4) the purposes for which the responding party maintains the requested data; (5) the relative benefits to the parties of obtaining the information; (6) the total cost associated with production; (7) the relative ability of each party to control costs and its incentive to do so; and (8) the resources available to each party.

Rowe, 205 F.R.D. at 429.

> The Zubulake seven factor test is a modification of the Rowe approach:
>
> (1) The extent to which the request is specifically tailored to discover relevant information; (2) The availability of such information from other sources; (3) The total cost of production, compared to the amount in controversy; (4) The total cost of production, compared to the resources available to each party; (5) The relative ability of each party to control costs and its incentive to do so; (6) The importance of the issues at stake in the litigation; and, (7) The relative benefits to the parties of obtaining the information.

217 F.R.D. at 322. [10] According to Zubulake, the first two factors encompass the "marginal utility" test discussed above.

Under the Zubulake approach, the seven factors are not equally weighted. Instead, they are weighted in descending order of importance. Zubulake, 217 F.R.D. at 323; Quinby, 2006 WL 2597900, *7. The factors form four groups.

---

[10] Research has not located a First Circuit case explicitly adopting any one of the three approaches to costs shifting. However, the United States District Court for the District of New Hampshire in Goss International Americas, Inc. v. Man Roland, Inc., 2006 WL 1134930 (D.N.H. 4/28/06) appears to have applied the Zubulake test.

> The first two factors-- comprising the marginal utility test--are the most important. These factors include: (1) The extent to which the request is specifically tailored to discover relevant information and (2) the availability of such information from other sources. The substance of the marginal utility test....
>
> ***
>
> The second group of factors addresses cost issues: "How expensive will this production be?" and, "Who can handle that expense?" These factors include: (3) the total cost of production compared to the amount in controversy, (4) the total cost of production compared to the resources available to each party and (5) the relative ability of each party to control costs and its incentive to do so. The third "group"--(6) the importance of the litigation itself--stands alone, and as noted earlier will only rarely come into play. But where it does, this factor has the potential to predominate over the others. Collectively, the first three groups correspond to the three explicit considerations of Rule 26(b)(2)(iii). Finally, the last factor--(7) the relative benefits of production as between the requesting and producing parties--is the least important because it is fair to presume that the response to a discovery request generally benefits the requesting party.

217 F.R.D. at 323.

Like the new rules, which provide for discovery by the requesting party concerning the responding party's information storage systems, the Zubulake court stressed that if the cost-shifting analysis is to be based on more than mere speculation, some examination of the inaccessible media is required. Only by doing so can the parties determine the likelihood that the inaccessible information is likely to be relevant and discoverable. The court stated:

> [B]ecause the cost-shifting analysis is so fact-intensive, it is necessary to determine what data may be found on the inaccessible media. Requiring the responding party to restore and produce responsive documents from a small sample of the requested backup tapes is a sensible approach in most cases.

Id. at 324.[11]

---

[11] It also said: "Requiring the responding party to restore and produce responsive documents from a small sample of backup tapes will inform the cost-shifting analysis laid out above. When based on an actual sample, the marginal utility test will not be an exercise in speculation--there will be tangible evidence of what the backup tapes may have to offer. There will also be tangible evidence of the time and cost required to restore the backup tapes, which in turn will inform the second group of cost-shifting factors. Thus, by requiring a sample restoration of backup tapes, the entire cost-shifting analysis can be grounded in fact rather than guesswork." Id.

A December 14, 2006, article in the <u>New York Law Journal On-Line</u>, on e-discovery issues[12] concludes that cost shifting is "rarely invoked" as,

> The presumption that the producing party will shoulder its own costs is strong and will only be overcome with a particularized showing that the cost of the requested discovery is disproportionate to its value. ...{A] party seeking to shift the costs of production...must be able to show that the costs of the discovery outweigh its benefits and that it has not contributed to the expense that it seeks to shift to its adversary.
>
> Even where cost-shifting is ordered, the requesting party often will not be required to pay more than a small percentage. In <u>Zubulake</u>, the requesting party was ordered to pay 25%, while in <u>Quinby</u> a 30% contribution was required. The <u>Quinby</u> court explained,
>
> Even where cost shifting is granted, <u>the defendant must still pay for the majority of the production because of the presumption that the responding party pays for its discovery costs</u>.... In addition, shifting a share that is too costly may chill the rights of litigants to pursue meritorious claims.

2006 WL 2597900, * 16. (Emphasis added.)

2.4  <u>In the present case, Putnam has made none of the showings required and has failed and refused to provide the basic information needed to begin the analysis of the e-mail issues in this case</u>.

As set forth in § 1, above, Putnam has not made any of the showings required of a responding party even failing and refusing to provide the basic information needed to begin the analysis of the e-mail issues in this case

3.   Conclusion.

For all of the above reasons, Svensson requests the court to deny the motion to terminate discovery, to impose sanctions upon Putnam for its failures to produce the items as ordered by the court on October 26, 2006, and for its failure to have complied with the orders and directions of the court to engage in negotiations and exchanges of information as the to the e-mail issues

---

[12] HTTP://www.nylj.com

and the discrete items not ruled upon by the court on October 26,l 2006, as to the Second Request for Production; and for orders compelling, except to the extent produced production of the documents requested by the second request for production, which are referred to in note 1 on p. 1 hereof.

Request for Hearing and Oral Argument

Svensson requests a hearing and oral argument

        LISA SVENSSON, plaintiff,

        By her attorneys,

        BARRON & STADFELD, P.C.

        /s/ Kevin F. Moloney_____
Kevin F. Moloney  BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir_____
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: December 27, 2006

Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney_____

Dated: December 27, 2006