UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * * * * | Civil Action No. 04-12711-PBS |
| * | |
| LISA SVENSSON * | |
| * | BBO No. 351000 |
| Plaintiff, * | |
| * | Objections, |
| v. * | Pursuant to Fed. R. Civ. P. 72(a) |
| * | and Magistrates Local Rule 2(b) |
| PUTNAM INVESTMENTS, * | of |
| LLC, et al., * | Plaintiff Lisa Svensson |
| * | to |
| Defendants. * | (1) The January 9, 2007, Order of |
| * | the Magistrate Judge That Granted |
| * | Defendant Putnam Investments, LLC's |
| * * * * * * * * * * * * * * * * | "Motion for a Protective Order |
| | Terminating Further Discovery," |
| | and, |
| | (2) The January 17, 2007, Order |
| | of the Magistrate Judge insofar as it |
| | "Den[ied]" |
| | Svensson's Motion, filed October 10, 2006, |
| | to |
| | Compel Production of the Documents |
| | Requested by her Second Request for |
| | Production |
| | and her Related Cross and Renewed Motions |
| | and |
| | Request for Hearing and Oral Argument |

Because the rulings in this case entered by the Magistrate Judge (Bowler, M.J.) on

January 9, 2007 and January 17, 2007, are, as set forth in detail below, both clearly erroneous in

fact and contrary to law, plaintiff Lisa Svensson ("Svensson"), pursuant to Fed. R. Civ. P. 72(a)

and Magistrates Local Rule 2(b), objects to the rulings and Svensson requests the District Judge

to vacate the rulings and to grant the other relief requested on pp. 19-20, infra.  The rulings at

issue are:

1. The January 9, 2007, order of the Magistrate Judge granting the motion of
   defendant Putnam Investments, LLC. ("Putnam") "for a Protective Order
   Terminating Further Discovery" and insofar as that order, in effect, denied
   Svensson's "Cross-Motion...for Sanctions...for Violation of the October 26,
   2006,  Order for Production and of the Court's...Directions to Engage in
   Negotiations and Exchanges of Information as to Svensson's Second Request

for Production;" and Svensson's "Renewed Motion for Orders Compelling Production of Certain Items of her Second Request for Production"; and,

2. The January 17, 2007, Order of the Magistrate Judge insofar as it "den[ied]" Svensson's motion, filed October 10, 2006, "for Orders Compelling Production of Documents...in her Second Request for Documents...and for Sanctions...and...Other Relief...." and her related Cross-Motion and Renewed Motion.

1. <u>Introduction</u>.

In this action, Svensson seeks to prove at trial single plaintiff disparate treatment and disparate impact claims for damages for gender discrimination in violation of, <u>inter alia</u>, Title VII of the U.S. Code and relevant Massachusetts statutes. To do so, Svensson must obtain information about Putnam's treatment of Svensson and other present and former Putnam employees, both to prove at trial that Svensson, because of her gender, was treated less favorably than similarly situated male employees, and to establish through evidence of Putnam's mistreatment of other females, the existence of a discriminatory atmosphere and discriminatory motivation at Putnam, making it more likely that Putnam also discriminated against Svensson on the basis of her gender. Obviously, such information concerning Putnam's treatment of other employees, both male and female, is highly relevant, within the meaning of Fed. R. Civ. P. 26(b)(1), to Svensson's claims.

Perhaps understanding the importance and potential negative impact of such evidence, Putnam has undertaken a concerted effort to prevent Svensson from discovering relevant information necessary to her case. Putnam's most recent attempts to avoid its obligation to make discovery were its December 13, 2006, motion "for a Protective Order Terminating Further Discovery" and its refusal to produce the documents requested by Svensson's Second Request for Production of Documents the "Second Request"), served April 28, 2006, are parts of that larger effort.

2. <u>Facts and procedural background</u>.

2

A subsidiary of the publicly held Marsh & McLennan Companies, Inc. ("MMC"), Putnam, worth up to $3.9 billion, is a nationally known investment firm.[1]  It was Svensson's employer from July 1994 to September 15, 2003.  Before her Putnam employment, Svensson, a resident of Newton, who holds a Bachelor of Science degree in petroleum engineering from Texas A&M University and the MBA degree from Cornell University, had had seven years of sophisticated investment experience in New York, New York.[2]  Soon after joining Putnam, Svensson served in its Investment Management Division ("IMD") as Senior Vice-President, Supervisory Analyst in Putnam's Global Equity Research ("GER") Department. Id.  In 1997, Putnam promoted Svensson to Senior Vice President, Portfolio Manager, for the Putnam Global Growth Fund in the Putnam IMD. Id.  In this position, Svensson was responsible for, among other things, the performance of Putnam's Large Cap International Growth products such as Putnam Global Growth Fund, International Large Cap Growth Equity, and Global ex-Japan. Id.[3] About five years later, in March 2002, Putnam demoted Svensson from her portfolio management position back to a position in the GER Department and, on September 15, 2003, she was fired.[4]

---

[1]  Boston Globe, December 30, 2006, p. 5B, "Sale of Putnam is close. Canadian suitor may pay $3.9b for Boston fund firm".

[2]  See Svensson's resume, a copy of which is annexed as Exhibit "1" to both the Second Affidavit of Lisa Svensson ("Svensson Second Affidavit") and the Third Affidavit of Lisa Svensson ("Svensson Third Affidavit"), each of which were filed April 20, 2006.

[3]  Also in this position, Svensson helped develop the investment process, including development of quantitative screening, portfolio construction and risk management techniques; she recruited and trained numerous junior investment professionals, including development of their coverage plans and evaluation of their performance; and she helped to design marketing materials and participated in new business development and ongoing client service initiatives.  Id.

[4]  Prior to terminating Svensson's employment, Putnam, on August 28, 2003, acting through Joshua Brooks ("Brooks"), a male hired by Putnam from the outside approximately five months earlier, offered Svensson three options: (1) to be demoted to an entry level analyst position with no chance to earn more money or to be promoted; (2) to accept a severance package consisting of 18 weeks of her base pay and half of her prior year's bonus, which, she later learned was subject to her signing a release of all of her legal rights with respect to her position as a member of a protected class under Title VII; and, (3) to pretend to work as an analyst for Putnam while she sought employment elsewhere, with the explicit statement that she would leave Putnam by a date to be agreed upon, but without any severance payment.[4]  Putnam did not offer Svensson the option to seek employment elsewhere within Putnam.  Id.

It is Svensson's position, among others in this case, that Putnam's failure to pay her equally with males, its failure to promote her to the position of Managing Director and her demotion and ultimate termination were the result of unlawful discrimination by Putnam on the basis of her gender.

Svensson contends that the male and female investment professionals who were employed from time to time in the Putnam IMD in the period 1994-2003 are her male and female comparators. Yet Putnam has taken the startling and incredible position that, during Svensson's entire nine years of employment as an investment professional in the IMD, Svensson, regardless of the employment actions taken against her, had no comparators. However, the Putnam position that Svensson had, and has, no comparators not only is belied by facts but also is in stark contrast to the information contained in documents that Putnam itself has produced. [5 6 7 8]  Moreover, as set forth in the accompanying Exhibit "A," an excerpt from Svensson's Reply Memorandum, filed October 25, 2006, Docket No. 126, Putnam's claim is based on entirely incorrect

---

[5]    The investment teams and the research functions in the IMD, were not administered independently within the IMD by team or function, as titles, compensation and other significant employment and administrative matters concerning those in the various Putnam divisions were decided within and by the respective divisions. Candidates for demotion to the GER Department, to which Svensson was demoted in March 2002, were selected from across the same broad range of portfolio teams in the IMD. In this process, Putnam was comparing Svensson to other persons from a number of investment teams. Putnam documents PRM 2991-2992 identify other persons with whom Miller compared Svensson; and PRM 2878-2880) evidences a meeting of Putnam officials from across the entire IMD at which the candidacies of various persons, including Svensson,, for promotion to Managing Director were discussed. Putnam document PRM-1886 shows that this centralized structure for promotions applied across all levels of officers in the IMD, including also Quant, Fixed Income Trading, Currency and GAA. Persons who were hired as, or promoted to, Managing Director in the periods when Svensson was eligible for appointment to the position are, by definition, comparators of Svensson, a fact that Putnam obviously recognized since Putnam document PRM-1792  and PRM 1891-1893 show that Svensson was included with others in the various promotion pools for Managing Director.

[6]    Putnam document PRM 3038, handwritten notes describing another meeting with Brett Browchuk during which the demotion of Lisa Svensson was discussed, identifies others who were considered in demotion discussions. Putnam documents PRM 2991-2992) a January 30, 2003, e-mail from Chief Investment Officer of Specialty Growth, Daniel Miller,shows that management decisions were being made by a broader range of officials than those assigned only to the GER Department..

[7]    See ¶¶ 3-9 of the First Affidavit of Lisa Svensson ("First Svensson Affidavit"). Docket No. 62.

[8]    In addition to the IMD that managed client portfolios, there were the Operations Division (services to customers including answering client questions and mailing fund information); the Distribution Division, which marketed and sold products to institutional and retail clients; and the Corporate Division, which supported the overall business through activities such as corporate finance. Id.

interpretations of the holdings and reasoning of <u>Jackson</u> v. <u>Harvard University</u>, 111 F.R.D. 472 (D. Mass. 1986), <u>Whittingham</u> v. <u>Amherst College</u>, 164 F.R.D. 124 (1995) and <u>Conward</u> v. <u>The Cambridge School Committee</u>, 171 F.3d 12, 19 (1st Cir.1999).  Thus, the issue of Svensson's comparators, and the Putnam decision-making processes in regard to her comparators are critical issues in this case, and have been, and still are, the major focus of the discovery that Putnam so desperately has sought to avoid.

The originally scheduled the end of fact discovery was extended from February 1, 2006, to May 1, 2006, by order entered on January 20, 2006 (Bowler, M.J) (on Svensson's motion) and, on March 9, 2006 (Saris, D.J.), to June 1, 2006, on a joint motion but based upon a representation of Putnam's counsel of engagement in another litigation matter.  On September 15, 2006, as the result of a series of hearings, orders and directions from the court (Bowler, M.J.) in June through August 2006, and events resulting therefrom, the court (Bowler, M. J.) on September 15, 2006, extended the fact discovery period to December 31, 2006.

Because the Putnam responses to Svensson's interrogatories failed to include any information concerning any Putnam employees other than Svensson and its production of documents in response to her First Request for Production was for the most part in redacted or partially redacted form, Svensson was handicapped in taking depositions.  For example, when asked in deposition about one of the redacted Putnam documents, defendant Lasser, who until late 2003 was Putnam's Chief Executive Officer, testified, "<u>You showed me a bunch of blank pages</u>, so it's hard to remember."[9] (Emphasis added.)

On April 28, 2006, Svensson served her Second Request for Production of Documents, Exhibit "B," hereto, the responses to which were due prior to the end of the discovery period on

---

[9]     Lasser deposition transcript, p. 11, ll. 5-6.

May 28, 2006.[10]  Putnam response, a copy of which is filed herewith as Exhibit "C," objected to
virtually every category of the request.

It was only because the court (Bowler, M.J.) had held hearings on June 21, 2006, and
July 11, 2006, [11] on Svensson's April 20, 2006, motion to compel Putnam to answer Svensson's
Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12, that Putnam served on September 1, 2006, answers to
those interrogatories and produced in unredacted form (as to 67 male and 27 female investment
professionals in the IMD) documents that, in response to Svensson's First Request for
Production, had been produced prior to June 1, 2006, only in redacted form.[12]

In response to the directions from the court at the June 21 and July 11 hearings, among
others, to negotiate discovery issues, Svensson initiated telephonic and e-mail discussions as to
her Second Request for Production in late June, and continuing into late July 2006.  On August
4, 2006, in response to Putnam's counsel's July 27 request for further modifications, Svensson's
counsel sent the following e-mail:

> ...I have reviewed.[the] second document request...[to]...provid[e]you with a
> proposal to resolve our...dispute...without Court intervention.  The
> following...represents the minimum Plaintiff believes necessary...to prove her
> case....

(Emphasis added.)  In a reply e-mail on August 11, 2006, Putnam's counsel made no counter
proposal, inviting instead the filing of a motion to compel:[13]  In an e-mail on August 31, 2006,

---

[10]  Putnam served its Second Request for Production by Svensson the same day.

[11]  Copies of the transcripts of those hearings are filed herewith as Exhibit "D" and "E," respectively.

[12]  Also on July 11, 2007, while the court allowed Putnam's motion to quash Svensson's Rule 30(b)(6)
notice for a deposition of Putnam, it did so without prejudice to Svensson's serving a retailored set of
deposition subject matters, which Svensson served on October 10, 2006.  Putnam, on October 19,
2006, again moved to prevent a Rule 30(b)(6) deposition but the court, by order entered October 26,
2006, denied Putnam's second attempt to prevent the deposition

[13]  We are disappointed in your proposals.... We had hoped that...you instead would have...
narrow[ed] your requests to a smaller list of discrete documents that you really need.  As it
now stands, even as narrowed...the requests would call for a monumental, time-consuming
and expensive production process by Putnam when it is not at all obvious that that process
will produce anything even marginally relevant.  This is especially true with respect to your
requests for emails... so it does not look like we will be able to resolve this short of your
filing a motion....  (Emphasis added.)

6

Svensson's counsel made a final attempt to resolve the matter by agreement[14] but there being no response from Putnam, Svensson, per the schedule as amended on September 15, 2006, filed on October 10, 2006, her motion to compel production.[15]  Svensson's Reply Memorandum, filed October 25, 2006, Docket No. 124, sets out in order and in one document all of the parties' positions on each of the categories as set forth in their respective prior filings.

     Notably, the Svensson motion to compel sought production far smaller in scope than her original Second Request served April 28, 2006.  In tracking her counsel's August 4, 2006, compromise proposal, Svensson for the October 26, 2006, hearing, requested orders compelling production of far fewer documents than requested in April.  This is particularly true of the categories that include e-mails, as Svensson's motion reduced the number of e-mail boxes to be searched to ten identified decision-makers for communications concerning the four employment actions in this case.  For example, on April 28, 2006, Category No. 6 of the Second Request sought production of the following:

> In regard to [any of the 91Comparators] who were not promoted from
> within...but were hired as a Managing Director or Portfolio Manager...from

---

[14] I have further considered your email of August 11th ...
    1) <u>After 2 months of telephone negotiations</u> concerning the second request for production..., <u>I agreed to your request...to reduce the scope of our request...to only those documents necessary to prove Plaintiff's case at trial;</u>
    2) <u>My August 4, 2006 email represented a significant compromise...by...reducing the 91 comparators...to far more manageable numbers</u> for purposes of the...request;
    3) <u>While you invited us to further reduce...our compromise proposal, you...provided no counterproposal..., failed to deal with the discrete documents sought..., and failed to offer to provide a single document beyond the..[unredaction of previously produced redacted documents];</u>
    4) <u>You offered some numbers concerning the volume of emails...to be searched (which appear...wildly inflated), but did not advise us as to the methods utilized in making these calculations, nor did it offer us an opportunity to have the search undertaken by our own representatives;</u> and
    5) <u>Your response</u> must be seen as <u>part of an overall effort by Putnam since last Fall to thwart legitimate efforts at obtaining relevant discovery in this case, while speciously arguing that it is Plaintiff who is seeking to delay the orderly completion of the discovery process.</u>
    Accordingly, <u>I hereby decline your suggestion that I further dilute Plaintiff's second document request, and will proceed with the motion to compel....  I urge you to revisit Plaintiff's 8/04/06 compromise proposal (which you had requested)...</u>
(Emphasis added.)
[15] Docket Nos. 112 (motion) and 114 (memorandum), copies of which are Exhibits "K" and "L," hereto.

another entity...since January 1, 1999, all documents and things prepared or received by...the persons participating in the decision making process as to who should be so elected or appointed, and which concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to Svensson [or any of the 91 Comparators]....

In sharp contrast, the Svensson October 10, 2006, motion to compel stated that,

> ...Svensson will limit the scope of this category to documents prepared or received by the above-named ten decision makers (Steve Oristaglio, Jack Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks, Brett Browchuk, Dan Miller and Justin Scott) concerning any of the 91 Comparators...brought in from the outside....  This should not require search of e-mail accounts of any comparators, but rather review of files and e-mails of only the above referred to ten decision makers.

(Emphasis added.)  In like manner, while Category No. 15 as originally served in April sought production of,

> All documents and things concerning the actual criteria used by Putnam for deciding whom of Svensson [and/or any of the 91 Comparators] should...or would be demoted in the period since January 1, 2002: (A) From Portfolio Manager to any other professional position; (B) From ADR to any other professional position ...; (C) From CIO to any other professional position ...; (D) From ADR to Analyst...; and/or, (E)From CIO to ADR....,

Svensson's motion to compel requested much less by reducing the number of comparators for this category from 91 to 22:

> ...Svensson will limit the scope of this request to...22 of the 91 comparators: 16 males: Mark Bogar, Richard Cervone, Steve Dexter, Nathan Eigerman, Peter Hadden, Shigeki Makino, David Gerber, David King, Jeff Lindsey, Dan Miller, Mike Mufson, Dave Santos, Tino Sellito, Brian DeChristopher, Hugh Mullin, Manuel Weiss, and six females: Beth Cotner, Lauren Allansmith, Debbie Farrell, Carmel Peters. Margaret Smith and Jeanne Mockard....

(Emphasis added.)

Svensson's Second Request also sought some discrete documents such as (by Category No. 74) the "personnel files" of "[Lauren] Allansmith, [Brian] DeChristopher, [Christopher] O'Malley, [Darren] Peers and [Paul] Warren," Category No. 74, which also were one of the subjects of Svensson's motion to compel, "to show in comparison to the treatment of Svensson,

8

1.      The treatment of DeChristopher who, according to [Putnam document] PRM 4026, had "<u>poor three years performance record</u>" and a "<u>volatile personality</u>" yet was promoted in 2003 while Svensson was terminated;

2.      The treatment of [Lauren] Allansmith <u>who was fired and had been demoted while on maternity leave</u>;

3.      The treatment of [Christopher] O'Malley, <u>who complained about Svensson</u>, and whose complaints, at least in part, <u>according to Putnam, provoked her termination and later received a promotion and took over some of her responsibilities</u>; and,

4.      The treatment of [Paul] Warren's behavior. [<u>"the conduct of Paul Warren</u>, one of the 91 Comparators, described in the letter referred to (see McNamee deposition p. 357 ("...And "what" bad behavior over the years did it allege Paul Warren had [engaged in]? <u>That he frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers excessively and accepted gifts from brokers excessively"</u>)) and at pp. 18-2 (<u>"They were talking about a --someone leaving the group and that would leave a hole in the work...and he stood up and grabbed his crotch and said, "You could fill it with this"</u>) is relevant to show the nature of the conduct of this person and to be able to compare his conduct in the workplace to that alleged of Svensson, and to determine if there has been any gender discrimination in the treatment of Svensson and the females among the 91 Comparators.

(Emphasis added.)

Other discrete documents sought by both the original April 28, 2006, Second Request and by the motion to compel concerned, among other things, Putnam's actions concerning Konstantin Stoev, who worked in the IMD as an investment professional under Svensson's supervision until her termination on September 15, 2003, and who praised Svensson's management skills in his August 2006, deposition, but who was fired by Putnam in 2004.  Putnam, which thought so well of Stoev in 2003 that it assisted him in obtaining a "green card" so that the Immigration Service would allow him to stay in the U.S. and continue working for Putnam, terminated him a year later.  Category No. 34 of the Svensson Second Request sought "All documents and things concerning the 'green card' application for Stoev that [Putnam's Kelly] Morgan filled out." Svensson's motion papers explained the relevance.[16]

---

[16]    ...Production of the documents requested may well enable the court and the jury to determine

To respond to Putnam objections as to e-mails (highly inflated, conclusion filled and speculative rhetoric in Svensson's view), Svensson's motion papers brought to the attention of the court that the new e-discovery amendments to Fed. R. Civ. P. 26 officially would be taking effect on December 1:

> If the court is unwilling to decide that Putnam's e-mail claims are meritless without further input <u>on the facts</u> from the parties, <u>Svensson suggests that the court adopt for this case...the new e-discovery rules...effective on December 1,...which, among other things, would require Putnam to furnish...accurate information as to Putnam's computer systems, search capabilities and other matters so that the parties could work out...e-mail search issues by agreement based upon ...facts rather than over-heated rhetoric, recognizing that under the new e-discovery rules the burden is on the responding party to establish that it does not have to produce the requested information.</u>

(Emphasis added.)

At the October 26 hearing, as shown by the transcript, Exhibit "F," hereto, Svensson's counsel elaborated on the fact that the new e-discovery rules, to become effective in about five weeks, should be applied to enable the court to resolve the e-mail issues and that Putnam should be required by the court to share information about its systems and capabilities, and the court appeared to accept Svensson's suggestion that the substance provided by the amendments should be followed. Tr., pp 7-8, 17, 23  The court then began to hear arguments on the specific categories of the Second Request in order, starting with Category No. 1.  Tr., p. __.  In doing so, the court directed that Putnam furnish sworn statements from authorized officials if Putnam claimed

---

if what Putnam told the government in 2003 about Stoev to assist in his staying in the U.S. and working for Putnam, is consistent with what its deposition witnesses have testified to about Stoev, and whether it is consistent with what Putnam told Stoev directly concerning termination of his employment at Putnam....

Svensson is entitled to know if Stoev's high opinion of Svensson and her management skills, based upon Svensson's supervision of Stoev while at Putnam, had any effect on Putnam's decision to terminate Stoev.

Moreover what Putnam...represented to the government in its efforts to [it] issue...a "green card"...is highly relevant.  Production...may well enable the court and the jury [to] determine if what Putnam told the government in 2003 about Stoev...is consistent with what its deposition witnesses have testified to about Stoev and whether it is consistent with what Putnam told Stoev directly concerning his termination.

requested documents do not exist[17] and ordered Putnam to produce the annual reviews known as

"360s."[18]  However, after ruling on Category No. 14 and without considering any of the

remaining 58 categories,[19] the court ended the hearing on the motion to compel, declaring the

matter "tedious" and directing the parties "to discuss the rest."

> THE COURT: Enough. Time. We've gone this far.  My ruling today
> will reflect that I've allowed it to the extent stated on the record...
> As to everything remaining and the E issues, I want you to sit
> down...and see what you can work out because let me tell you I'm
> not about to allow much more.  Eight weeks left, the time is
> narrow....
>
> THE COURT: Sit down, discuss the rest.
> MR. MOLONEY: Yes, Your Honor.....
> THE COURT: Because it's really getting--...
> THE COURT: --tedious.[20]

(Emphasis added.)  Thus, the October 26, 2006, hearing resulted not in orders resolving any but

the first 14 categories of the Second Request for documents, but only with a direction to "sit

down" and "discuss the rest."

On November 17, 2006, Svensson's counsel sent to Putnam's counsel a questionnaire, a

copy of which was filed as an Exhibit to the Affidavit of Nicole M. Panos (the "Panos

Affidavit"), Docket No. ___, copies of the Panos Affidavit and the questionnaire are Exhibits

"G" and "H," hereto, respectively, seeking basic information about Putnam's computer and e-

mail capabilities:

> The attached [questionnaire] sets out the information that will help us move
> forward with discussion of the e-mail issues Putnam has raised.  Please let me

---

[17] Yet Putnam has failed to furnish any of the five sworn statements as per the court's directions at the
hearing.  See Affidavit of Kevin F. Moloney, filed herewith, as the court reporter has advised that due to
technical problems of the recording system at the court, it is impossible to produce a transcript of the
January 4, 2007, hearing.

[18] Yet Putnam has produced 360s for only some of the years in question and for one of the produced years
failed to include the "comments" section, taking the position via an e-mail from Attorney Kurker that 360s
for the other years did not exist, only to admit, when presented with evidence from Putnam's own documents
that they did exist, Putnam counsel advised that they were looking for them.

[19] Of the 76 original categories of the Second Request, as the court ruled upon 14, and Svensson had
waived four, there were 58 categories not ruled upon

[20] Tr., pp. 49-50

know if Putnam will supply the information requested... so that we might discuss this matter on a more informed basis.

But, on November 21, 2006, Putnam's counsel responded, not with any of the answers to the questionnaire, but with a question as to one item, No. 5 (of 19) thereof, and requesting, despite the prior identification of them in Svensson's motion papers, a "list of individuals whose e-mail boxes you propose to have searched." The next day, November 22, 2006, Svensson's counsel replied:

> As you know, the questionnaire I sent over to you folks (copy attached) requests, in the spirit of the new e-discovery rules as discussed with Judge Bowler, basic information needed to help us understand Putnam's computer systems and capabilities as they may affect resolution of the e-mail discovery issues in this case. Thus, I was disappointed to see that the Putnam response so far consists only of questions about one of the 19 categories rather than the information requested.
>
> Nonetheless, in regard to Putnam's question about Item No. 5 of the questionnaire, Item No. 5 was intended as an inquiry as to the search terms that Putnam has used and./or would propose to use to obtain the information; but we have no problem in presenting to Putnam some possible search terms that we have developed. They are set out in the other attachment. Of course, we reserve the right to make refinements, additions and changes without prejudice.
>
> In response [to] your other e-mailed question, wherever in our reply memorandum in regard to the Second Request for Production the term "decision-makers" is used in regard to e-mail or the following are named as such such decision-makers in regard to e-mail, we are seeking the e-mails to or from any one or more of the following ten decision-makers: Steve Oristaglio, Jack Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks, Brett Browchuk, Dan Miller and Justin Scott and, as appears to be the case of at least defendant Lasser, persons sending and/or receiving e-mail on behalf of any such persons, which e-mails concern one or more of the employees or lateral hires named in the respective categories of the Second Request for Production discussed in our reply memorandum.[21]

(Emphasis added.) Attached to that e-mail was another copy of the November 17, 2006 questionnaire and a list of Svensson's proposed search terms.

Putnam waited for almost three weeks until on December 12, 2006, to respond (without answering the November 17 questionnaire) announcing that,

---

[21] Putnam's counsel had represented (incorrectly) to the court on December 13, 2005, that Lasser "never used e-mail." Tr., p. 14, l. 11.

> We have.. <u>concluded t</u>hat the process... is prohibitively expensive and unreasonably burdensome...[it] will take several weeks, to say nothing of the strain it will put on Putnam's IT department and will cost, using the services of an unidentified "vendor" roughly $200,000.00.

(Emphasis added.)  Thus, Putnam advanced to Svensson the conclusion it wanted the court to reach, but did so without providing the subsidiary information necessary to enable the making of an informed judgment as to the Putnam claim.  As set forth in the Panos Affidavit,

> Based upon my education, training and experience, <u>it is impossible to analyze and evaluate the propriety, integrity and legitimacy of the Putnam contentions as to time and expense and the other issues set out in Attorney Rodrigues' e-mail</u> of December 12, 2006..., <u>without first having obtained, analyzed and evaluated in the light of the technological issues and the varying conditions of the market place concerning vendors, the answers to the questions set out in the November 17 e-discovery questionnaire;</u>

<u>and,</u>

> ...<u>the cost and time estimations from vendors for tape restoration and searching, for example, has ranged from days to weeks and from one-hundred dollars per tape to one-thousand dollars per tape based on the vendor and the type of tape. These...issues can be resolved with open discovery exchange.</u>

(Emphasis added.)

About a month after announcing its December 12 "conclusion" on e-mail issues, Putnam, on December 13, 2006, even though the court had ruled on only the first 14 categories of the Second Request, and without Putnam answers to the e-discovery questionnaire and without any response from Putnam to Svensson's efforts to conduct negotiations after the court's October 26 admonition hearing to "sit down" and "discuss the rest," Putnam moved "for a Protective Order Terminating Further Discovery."  Docket No. 130.  Putnam also moved, Docket No. 128, to prevent resumption of the November 29, 2006, Rule 30(b)(6) deposition of Putnam, which it unilaterally had terminated with over two of the allowed seven hours of deposition time left, but the motion was denied on January 9, 2007.

Notably, the seven page Putnam motion for a protective order failed to include any specific arguments or discussion of any of the discrete items and non-e-mail issues that had not

been decided by the court on October 26, except to assert, without any facts based on affidavits or otherwise, that the documents requested would be irrelevant and burdensome to produce, concentrating only on e-mail issues.  The Putnam motion "summarize[ed]" its contentions this way:

> To summarize, Ms. Svensson seeks to restore and search the email boxes of 10 former and current employees for these 27 commonly used words, *and the names of up to 91 other employees* - - a task that would cost Putnam hundreds of thousands of dollars, and that could never be completed with the less than three weeks remaining during the discovery period,

(emphasis in original text) but the "summary" completely ignores the fact that, in Svensson's motion papers for the October 26 hearing, Svensson had reduced the number of in-boxes to be searched to those of only ten identified decision-makers for communications concerning very few of the 91 comparators.  Striking in their omission from the motion was: (1) Any reference to the new e-discovery rules that had become effective two weeks earlier on December 1; 2006; and, (2) Any discussion of any case law concerning e-mail issues or what is required for motions for protective orderss.

Svensson filed her opposition on December 27, 2006, including both a cross motion "...for Sanctions...for Violation of the October 26, 2006, Order for Production and of the...Directions to Engage in Negotiations and Exchanges of Information as to [the] Second Request..." and a "Renewed Motion for Orders Compelling Production of Certain Items of her Second Request" [22] with supporting exhibits.  The Svensson opposition included a thorough review of the history of Putnam failures and refusals throughout the discovery phase of the case to make discovery and why the decisions of the court and orders to Putnam in the June-August

---

[22] Seeking,"[e]xcept to the extent actually produced, categories where Putnam claims no documents exist and a sworn statement to that effect (9 items) will be accepted, 9, 10, 11, 13, 14, 27, 28, 49; Categories re: email issues (31 items): 2, 3, 4, 5, 6, 12, 13, 15, 16, 17, 18, 19, 38, 39, 45, 46, 47, 48, 49, 56, 57, 58, 59, 60, 66, 67, 68, 69, 71, 72, 73; Categories requesting discrete documents where there is no email issue (33 items):7, 8, 12, 23, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 43, 44, 50, 51, 52, 53, 54, 61, 62, 63, 64, 65, 70, 74, 75, 76, including the request for the "PDPRs" which was ruled upon by the court but upon a misrepresentation of fact by Putnam.

period were necessary, see excerpt, Exhibit "I," hereto.  It also included an analysis of the new e-discovery amendments to Rule 26 and a detailed survey of relevant e-discovery case law from "the scope of e-discovery" through to the subject of "cost shifting," which is excerpted in Exhibit "J," hereto.

At a hearing on January 4, 2007, the court (Bowler, M.J.) heard arguments of counsel on Putnam's motion for a protective order to terminate discovery and its motion to prevent resumption of the deposition of Putnam.  On the motion for a protective order to terminate discovery, the court had before it only the Panos Affidavit and two affidavits from Putnam, one from an in-house Putnam employee (Bento) and the other from an in-house employee at the office of Putnam's counsel (Breen).  Svensson's counsel argued to the court that it was impossible for the court to make an informed decision on the e-mail issues, without, as the Panos Affidavit states, the answers to the November 17th questionnaire, particularly when the opposing affidavits were wither replete with hearsay (Breen) or filled with speculative possibilities ("could reside on as many as 100 separate back-up tapes" "take three and possibly up to five...business days")(Bento).

Svensson's counsel made the point that the court was entitled to have before it a proper factual basis upon which to make an informed judgment, and that the way to obtain the proper factual basis would be to appoint from a list to be agreed upon of 3-5 "neutrals," an expert who would examine into the facts of the e-mail issues and report to the court.  See the Affidavit of Kevin F. Moloney, filed herewith as the court reporter has advised that due to technical problems of the recording system at the court, it is impossible to produce a transcript.  Svensson offered to pay one half of the cost for the neutral. Id.

The court then closed the hearing and, on January 9, 2007, without disclosing its reasoning or the subsidiary facts it relied upon, granted the motion for a protective order terminating discovery; not for lack of relevancy or reason other than as "unduly burdensome and

15

expensive; and, on January 17, 2007, while ordering resumption of the 30(b)(6) deposition but only for a few minutes more than two hours, entered an order the effect of which was to deny, to the extent previously not ruled upon, Svensson's motion to compel and her cross and renewed motions.

3.  The standards for the granting of a protective order.

A district court reviewing a magistrate's entry of a protective order under the clearly erroneous/contrary to law standard must determine if before the magistrate there had been "a substantial basis for a finding of "good cause" to support such an order under Fed. R. Civ. P. 26(c) and that the magistrate did not abuse her discretion in framing an appropriate order." Doe v. Meachum, 126 F.R.D. 437, 438-39 (D. Conn. 1988).  See also Calphalon Corp. v. Meyer Corp., 2006 WL 2474282, *2 (E.D. Cal. 8/25/06).

The courts of the First Circuit have held that a magistrate (or district court judge) can properly find the good cause required by Rule 26(c) only when "based on a particular factual demonstration of potential harm, not on conclusory statements."  Anderson v. Cryovac, 805 F.2d 1, 7 (1st Cir. 1986).  See also In re Stone & Webster, Inc. Securities Litigation, 2006 WL 2818489, *2 (D. Mass. 9/29/06) (same); Cohen v. Brown University, 2000 WL 1499494, * 2 (D.N.H. 5/12/00) (magistrate had "clearly erred" in granting protective order where moving party had failed to support request with specific evidence that it would suffer serious injury); Prozina Shipping Co. Ltd v. Thirty-Four Automobiles, 179 F.R.D. 41, 47-48 (D.Mass. 1998) (party seeking protective order must demonstrate particular and specific facts); St. Hilaire and Assoc., Inc. v. F.D.I.C., 1994 WL 575773, *2 (D.N.H. 10/13/94) (" a movant must articulate a real and specific harm and not just 'stereotyped and conclusory statements.' "); Baker v. Liggett Group, Inc., 132 F.R.D. 123, 125-26 (D. Mass. 1990) (denying motion for protective order because of failure to make particularized showing of good cause.  "A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements.");

16

<u>Beals</u> v. <u>General Motors Corp.</u>, 1989 WL 384829, *1-2 (D. Mass. 12/4/89) (denying protective

order, stating that "[a] finding of good cause must be based on a particular factual demonstration

of potential harm, not on conclusory statements."). [23]

It is <u>not</u> sufficient for the moving party, as in the present case, simply to allege that the

discovery in question would cause burden or expense.  <u>St. Hilaire</u>, 1994 WL 575773, *2.  <u>See

also</u> <u>McLeod, Alexander</u>, 894 F.2d at 1485 (5th Cir. 1990) (holding that objections to discovery

which merely stated: "overbroad" and "propounded with the intent to harass, delay, and abuse"

"irrelevant," "privileged" or were "Overbroad; irrelevant; privileged. Propounded with the intent

to harass, delay and abuse" or "overly-broad, not specific, and creates a hardship on the

producing party" were insufficient basis for entry of protective order).  In <u>Apco Oil Corp.</u> v.

<u>Certified Transportation, Inc.</u>, 46 F.R.D. 428, 430 (W.D.Mo. 1969), the court stated:

> Experienced counsel in this case are familiar with the consistent ruling of all active
> judges on this Court in connection with discovery in antitrust litigation. Those
> rulings are consistent with the following statement from 4 Moore's Federal
> Practice, ¶33.27, p. 2414:
>
> <u>General objections, such as the objection that the interrogatories</u> will require the
> party to conduct research and compile data, or that they <u>are unreasonably
> burdensome, oppressive, or vexatious, or that they seek information that is as
> easily available to the interrogating as to the interrogated party, or that they would
> cause annoyance, expense, and oppression to the objecting party without serving
> any purpose relevant to the action, or that they are duplicative of material already
> discovered through depositions, or that they are irrelevant and immaterial, or that
> they call for opinions and conclusions, are insufficient.</u>

(Emphasis added).  Particularly supportive of Svensson's position is a line of cases that hold that

"a determination of whether good cause does or does not exist must be based upon appropriate

testimony and other factual data, not the unsupported contentions and conclusions of counsel."

---

[23]  Other federal courts apply the same rule.  <u>Gulf Oil Co.</u> v. <u>Bernard</u>, 452 U.S. 89, 102 n.16, 101 S.Ct.
2193, 2201 n.16 (1981) ("To establish 'good cause' for a protective order under [Federal Rule of Civil
Procedure] 26(c), '[t]he courts have insisted on a particular and specific demonstration of fact, as
distinguished from stereotyped and conclusory statements···' "); <u>McLeod, Alexander, Powel & Apffel,
P.C.</u> v. <u>Quarles</u>, 894 F.2d 1482, 1485 (5th Cir. 1990); <u>Cipollone</u> v. <u>Liggett Group, Inc.</u>, 785 F.2d 1108,
1121 (3rd Cir. 1986); <u>General Dynamics Corp.</u> v. <u>Selb Mfg. Co.</u>, 481 F.2d 1204, 1212 (8th Cir. 1973);
<u>Cooper</u> v. <u>Welch Foods, Inc.</u>, 105 F.R.D. 4, 6 (W.D.N.Y. 1984); <u>Byrnes</u> v. <u>Jetnet Corp.</u>, 111 F.R.D 68,
73 (M.D.N.C. 1986) (noting the lack of affidavit evidence establishing good cause); <u>DeFelice</u> v.
<u>Consolidated Rail Corp.</u>, 124 F.R.D. 603, 604 (W.D.Pa. 1989).

Apco Oil, 46 F.R.D. at 432.  See also Simkins v. Wahnschaff Corp., 1986 WL 1551, 1 (E.D. Pa. 1/31/86); Willie Nelson Music Co. v. Comm. of Internal Revenue, 85 T.C. 914, 920 (1985); In re Mulhern, 45 B.R. 621, 623 (Bkrtcy. E.D.Pa. 1985); Davis v. Romney, 55 F.R.D. 337, 340 (E.D.Pa. 1972).

Given the requirement that a party seeking a protective order present, and the magistrate or court granting a protective  order find, specific facts supporting the order, it follows that a magistrate cannot properly grant a protective order where no such evidence has been presented and without making any factual findings.  See Saldana-Sanchez v. Lopez-Gerena, 256 F.3d 1, 8 (1st cir. 2001) ("an order denying or limiting discovery may not be upheld if it rests on an incorrect legal standard or a misapplication of the law to the relevant facts")  The court cited Trevino v. Celanese, 701 F.2d 397 (5th Cir. 1983) for the proposition that a protective order should be vacated where the district court "gave no explanation for its actions and appeals court could find no sound reason for granting the order).

4.  The orders of the court below were clearly erroneous and contrary to law.

In the present case, there was before the Magistrate Judge an insufficient factual basis upon which a court could find good cause for the entry of the January 9, 2007, protective order. On the non-e-mail issues in the 58 categories of the Second Request that had not been ruled upon on October 26, Putnam presented only a "laundry list" of conclusory objections.  See, for example, its objections to Category No. 34 (concerning the "green card application for [Konstantin] Stoev that [Putnam's] Morgan filled out"): "overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court."[24]  It would be absurd to conclude that production of these "green card" application documents ever could be "burdensome and expensive."  The same is true for all of the other

---

[24] See p.5, supra and Exhibit "A," hereto,  as to the of lack of merit in Putnam's claims in opposition to the motion to compel that Svensson never had any comparators

requests for discrete items such as, among other categories, Category No. 74, the "personnel files" of "Allansmith, DeChristopher, O'Malley, Peers and Warren."

On the facts concerning the e-mail issues, the court had before it only two conclusory affidavits from the Putnam and Bingham-McCutcheon in-house persons, on the one hand, and, on the other hand, the uncontroverted Panos Affidavit that it is impossible to determine the accuracy of the Putnam e-mail claims without at least the answers to the November 17 questionnaire. The court also was presented with a comprehensive analysis of the e-discovery rules amendments and relevant case law and was urged to appoint a neutral to report objectively to the court on the facts so that the court would have an appropriate factual basis upon which to rule. Yet the court, without any findings of subsidiary facts or statement of the legal standards it applied, concluded that that all the documents not ruled upon on October 26 whether or not discrete items, e-mail related or non-e-mail related, should not be produced as it would be "burdensome and expensive."

5. Conclusion and request for relief.

There being no adequate factual basis for the decisions of the Magistrate Judge, and the Magistrate Judge having failed to apply the proper standards for a protective order and for ruling on e-discovery, the orders of the court below were clearly erroneous and contrary to law.

Accordingly, Svensson requests the District Judge to:

1. Vacate the January 9 and January 17, 2007, orders of the Magistrate Judge; and,

2. Grant other appropriate relief, including,

    (a) Ordering Putnam, as requested in Svensson's cross and renewed motions, to produce the following categories of documents requested in the Second Request, as limited by her motion papers for the October 26, 2006, hearing:

    [e]xcept to the extent actually produced, categories where Putnam claims no documents exist and a sworn statement to that effect (9 items) will be accepted, 9, 10, 11, 13, 14, 27, 28, 49; Categories re: email issues (31 items): 2, 3, 4, 5, 6, 12, 13, 15, 16, 17, 18, 19, 38, 39, 45, 46, 47, 48, 49, 56, 57, 58, 59, 60, 66, 67, 68, 69, 71, 72, 73; Categories requesting discrete documents where there is no email issue

(33 items):7, 8, 12, 23, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 43, 44, 50, 51, 52, 53, 54, 61, 62, 63, 64, 65, 70, 74, 75, 76, including the request for the "PDPRs" which was ruled upon by the court [at the October 26, 2006, hearing] but upon a misrepresentation of fact by Putnam; and,

(b) Allowing Svensson such additional Rule 30(b)(6) deposition time as reasonably necessary for proper inquiry of Putnam concerning the documents ordered to be produced.

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.

/s/ KEVIN F. MOLONEY
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569
and

/s/ John K. Weir
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: January 24, 2007

Certificate of Service.
This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney

Dated: January 24, 2007

Exhibit A

1. Putnam is wrong in its objections that continue to claim that Svensson has no comparators based upon <u>Jackson</u> v. <u>Harvard University</u>, 111 F.R.D. 472 (D. Mass. 1986). and <u>Whittingham</u> v. <u>Amherst College</u>, 164 F.R.D. 124 (1995). As set forth more particularly in Svensson's reply memorandum filed June 8, 2006 (<u>see</u> the excerpt in footnote 1 below), Putnam's arguments are based upon misrepresentation of the facts and incorrect statements of the law and neither case precludes Svensson from obtaining production of the document requested in the Second RPOD.[1]

---

[1] "At the hearing [on December 13, 2005] Putnam's counsel urged the court to rely upon <u>Jackson</u> v.<u>Harvard University</u>, 111 F.R.D. 472 (D. Mass. 1986). and <u>Whittingham</u> v. <u>Amherst College</u>, 164 F.R.D. 124 (1995), for the proposition that "typically you don't look outside of the group in which the employee is employed; that is, you look at the decisions by the same decision maker. We cited those cases in our opposition to the motion to compel, and Mr. Weir doesn't cite any contrary authority. Yet the case is pretty clear, both the Jackson case and the Whittingham case, that decisions by other people in other parts of the company aren't probative on the question of whether or not there was discrimination in her unit. Transcript, pp. I-6 through I-7. Ruling upon the motion, Magistrate Bowler made clear that she was denying the motion to compel RPOD No. 2 without prejudice, stating that the denial was "as to those individuals <u>at this time</u>." (Emphasis added.) Putnam has not explained "why" it now seeks to rely on an order issued without prejudice as the basis for preclusion.

"Further, even if Magistrate Bowler's order was not expressly without prejudice, it was still interlocutory and can and should be revised because it was based on Putnam's factual misrepresentations. By citing <u>Jackson</u> and <u>Whittingham</u> for the proposition that the only valid comparators are those persons who worked on the same investment team as Svensson (a proposition which so far has resulted in the production of no documents or information as to any comparators of Svensson), not others holding similar positions on other teams in Putnam's Investment Management Division, Putnam's counsel clearly represented as fact to the court that the various investment teams within the Investment Management Division, one of at least four divisions of Putnam, was administered in the same autonomous manner as the various virtually independent graduate schools at Harvard with regard to employment decisions. To claim that such investment teams are analogous to the independently administered graduate schools at Harvard is absurd. A more apt analogy would be to compare the graduate schools of Harvard with the other corporate subsidiaries of Putnam's corporate parent, Marsh & McLennan Companies, Inc..

"Because Magistrate Bowler's December 2005 ruling with respect to RPOD Category No. 2 was expressly without prejudice, and in any event was based on Putnam's factual misrepresentations, it does not preclude consideration of Svensson's motion to compel answers to interrogatories....

"Putnam argues in its Opposition (p. 7) that the decision in <u>Whittingham</u>, denying a plaintiff's motion to compel production of employment files, also governs the present case. However, <u>Whittingham</u> is easily distinguished. Putnam cites <u>Whittingham</u> for the proposition that,"[P]ersonnel files contain perhaps the most private information about an employee within the possession of an employer. Nonetheless, Plaintiff requests the Court to order the Defendant to hand over entire files of employees without any particularized showing that any, let alone all, of the information therein is relevant to his claims. Again, while discovery is usually broad, Plaintiff has not demonstrated that the files he seeks, even if marginally relevant, outweigh the privacy interests of these individuals." <u>Id</u>. at 127-28. While that statement may be true so far as it goes, Putnam fails to disclose to the court other portions of

(2) There is no reason "why" Putnam should not make discovery in response to the Second RPOD as to the 91 persons Svensson contends are her comparators as the court required it do when, on September 1, 2006, it answered interrogatories and produced unredacted documents in regard to those comparators.

(3) Putnam is wrong in its objections that, based upon Conward v. The Cambridge School Committee, 171 F.3d 12, 19 (1st Cir.1999), the conduct of a comparator engaging in bad conduct must be "nearly identical." As set forth more particularly in Svensson's reply memorandum filed June 8, 2006 (see the excerpt in footnote 2 below), the correct standard applicable to the present case is whether the bad conduct of the comparator is as serious or more serious.[2] Conward does not preclude Svensson from obtaining discovery in regard to

---

Whittingham that strongly support Svensson's motion to compel in the present case. The language Putnam relies on appears in a section of Whittingham in which the court denied the plaintiff applicant for promotion within the college's office of admissions discovery of the "complete personnel files of [three former minority] deans in the Admissions Office...." The court did so because plaintiff,"has made no real showing that these three individuals suffered similar treatment and, without a showing of such relevance, Plaintiff is not entitled to discovery." Id. at 127. Thus, the Whittingham court focused on the fact that the plaintiff in that case had not shown that the personnel files sought pertained to persons who had suffered similar treatment. Had such a showing been made, the court would have allowed discovery.

"In the present case, unlike Whittingham, Svensson can show that the female Putnam investment professionals whose files she seeks were similarly situated and may well have suffered similar mistreatment. Therefore, under Whittingham, the files of those other women should be discoverable. Moreover, the files of males promoted by Putnam to Managing Director are discoverable under Whittingham. The Whittingham court distinguished Weahkee v. Norton, 621 F.2d 1080 (10th Cir. 1980), cited by the plaintiff in Whittingham, because Weahkee concerned the, "discoverability of personnel files of those who are 'hired or promoted' over the plaintiff...." In the present case, Svensson seeks exactly the type of information at issue in Weahkee but not at issue in Whittingham: the files of males who were hired or promoted over her into the Managing Director position.

"Of course, Putnam will argue that Svensson has not provided enough evidence to prove that the comparators she identifies actually were similarly situated and actually did suffer similar mistreatment or were hired or promoted over her. The court should decline to place Svensson in such a "Catch 22" situation. The very purpose of the discovery Svensson seeks is to obtain sufficient information to establish at trial that the comparators were similarly situated."

[2] Putnam asserts that Conward v. Cambridge School Committee, 171 F.3d 12 (1999) "makes clear that the misconduct at issue must be nearly identical." Notably, however, on p. 8 of its memorandum in opposition to Svensson's motion for an order requiring Tibbetts and Oristaglio to resume their depositions, Docket No. __, Putnam acknowledged, in contrast, that while the "alleged offenses do not need to be identical, [they] 'must be of comparable seriousness'." In the context of the instant case,

comparators engaging in bad conduct such as Scott, Kamshad and Paul Warren.

(4) Putnam's conduct in refusing until September 1 to unredact documents concerning comparators and answering interrogatories is the cause for the extension of the discovery period to December 31, 2006. The charts that are Exhibits "A" and "B" to this memorandum demonstrate in vivid terms the impact of Putnam's refusals to make discovery in a proper and timely manner.

(5) That Putnam has exaggerated any issue of searching e-mails is established by a comparison of its rhetoric when last December it opposed Svensson's initial request for production when the scope was the entire Putnam workforce and the years covered commenced with 1994 ("thousands" of e-mails) with, when the scope has been dramatically reduced in terms of years (only since January 1, 1999) and persons covered (mostly e-mails of only the decision-makers and in regard to some of the limited numbers of comparators), Putnam's current rhetoric of "millions" of e-mails. It is illogical to believe that as the scope has decreased, the number of e-mails to be searched has increased.

---

Putnam is incorrect in its interpretation of <u>Conward</u> as the facts of that case are easily distinguishable.

"Unlike in <u>Conward,</u> the comparator conduct in the present case Warren is egregious and far more serious than that alleged of Svensson. The plaintiff's difficulty in <u>Conward</u> was that, as District Judge O'Toole put it, 1998 WL 151248, *3, ___ Conward had not established that the school committee had failed to terminate teachers "outside the protected class who engaged in misconduct <u>as serious or more serious than</u> Conward's." (Emphasis added.) In affirming Judge O'Toole's grant of summary judgment to the defendant school committee, the Court of Appeals did not disagree with this statement by the District Court. In fact, the First Circuit's analysis of the facts shows that the appellate court, like Judge O'Toole in the District Court, found the conduct the plaintiff in <u>Conward</u> relied upon, was not "as serious or more serious" than Conward's.

"In <u>Lynn</u> v. <u>Deaconess Medical Center-West Campus</u>, 160 F.3d 484 (8th Cir. 1998), cited by Svensson at p. 14 of her initial memorandum in support of her motion for an order to Tibbetts and Oristaglio to resume their depositions, Docket No,. __, the United States Court of Appeals for the 8th Circuit said, "To require that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination. Common sense as well as our case law dictate that we reject such an approach."

Exhibit B

UNITED STATED DISTRICT COURT
District of Massachusetts

```
* * * * * * * * * * * * * * *     Civil Action No. 04-12711-PBS
                            *
                            *
LISA SVENSSON,              *     BBO No. 351000
                            *
            Plaintiff,      *
                            *     Plaintiff Svensson's
                            *     Second Request for the
v.                          *     Production of Documents
                            *     and Things by Defendant
                            *     Putnam Investments, LLC
                            *
PUTNAM INVESTMENTS, LLC     *
et al.,                     *
                            *
            Defendants.     *
                            *
* * * * * * * * * * * * * * *
```

     Pursuant to Fed. R. Civ. P. 26, 34, plaintiff Lisa Svensson

("Svensson") requests that defendant Putnam Investments, LLC

("Putnam"), utilizing the definitions set out below, and, within

the time required by Fed. R. Civ. P. 26, 34, produce at the

office of Svensson's counsel, Kevin F. Moloney, Barron &

Stadfeld, P.C., 100 Cambridge Street, Suite 1310, Boston,

Massachusetts 02114, for inspection and copying, unless Putnam

already has produced each of them in unredacted format, the

documents and tangible things described herein .

### DEFINITIONS.

1.   Communication: "communication" means the transmittal of
     information (in the form of facts, ideas, inquiries, or
     otherwise).

2.   Document: "document" is synonymous in meaning and equal in
     scope to the usage of this term in Fed. R. Civ. P. 34(a)
     ("...including writings, drawings, graphs, charts,
     photographs, phono-records, and other data compilations
     from which information can be obtained, translated, if
     necessary, by the respondent through detection devices into
     reasonably usable form...."), and a draft or non-identical
     copy is a separate document within the meaning of this
     term.  E-mail and film, video and digital recordings are
     included within the meaning of "document."

3.   Thing or tangible thing: "thing" and "tangible thing" are
     both synonymous in meaning and equal in scope to the usage
     of term, tangible thing, in Fed. R. Civ. P. 34(a).

4.   Identify (with respect to persons): When referring to a
     person, to "identify" means to give, to the extent known,
     the person's full name, present or last known address, and,
     when referring to a natural person, the present or last
     known place of employment.  Once a person has been
     identified in accordance with this subparagraph, only the
     name of that person need be listed in response to
     subsequent discovery requesting the identification of that
     person.

5    Identity (with respect to persons): When referring to a
     person, "identity" means, to the extent known, the person's
     full name, present or last known address, and, when
     referring to a natural person, the present or last known
     place of employment.  Once a person has been identified in
     accordance with this subparagraph, only the name of that
     person need be listed in response to subsequent discovery
     requesting the identification of that person.

6.   Identify (with respect to documents):  When referring to
     documents, to "identify" means to give, to the extent
     known, the

          (a)  type of document;
          (b)  general subject matter;
          (c)  date of the document; and,
          (d)  author(s), addressee(s), and
               recipient(s).

7.   Identity (with respect to documents):  When referring to
     documents, "identity" means, to the extent known, the

2

     (a)  type of document;
     (b)  general subject matter;
     (c)  date of the document; and,
     (d)  author(s), addressee(s), and
          recipient(s).

8.  <u>Parties</u>: plaintiff, defendant-in-counterclaim, defendant, plaintiff-in counterclaim, as well as a party's full or abbreviated name or a pronoun referring to a party means that party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries and affiliates.

9.  <u>Person</u>: "person" means any natural person or any business, legal, or governmental entity or association.

10.  <u>Concern and concerning</u>: "concern" and "concerning" mean, respectively, refer to, describe, evidence or constitute, and referring to, describing, evidencing, or constituting.

11.  <u>State the Basis</u>:  When an interrogatory calls upon a party to "state the basis" of or for a particular claim, assertion, allegation, or contention, the party shall,

    a.  identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

    b.  identify each and every communication that forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

    c.  state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place identifying the personal involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and,

    d.  state separately any other fact, which forms the basis of the party's information regarding the alleged facts

or conclusions, referred to in the interrogatory.

13. <u>Factual basis</u>: "factual basis" includes, without limitation,

    a.   the identity of each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to;

    b.   the identity of each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to;

    c.   the statement of the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place identifying the personal involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to; and,

    d.   the separate statement of any other fact that forms the basis of the party's information regarding the alleged facts or conclusions referred to.

14. <u>Affiliate</u>: "affiliate" means any person who or which directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, any other person.

15. <u>You, your, yourself</u>: "you," "your" and "yourself" mean the person(s) to whom or which the following interrogatories, request for production of documents or request for admissions, as the case may be, is directed and by whom they are to be answered or responded to, and any <u>Affiliate</u> thereof.

16. <u>Svensson</u>: "Svensson" means plaintiff Lisa Svensson.

17. <u>Putnam</u>: "Putnam" means defendant Putnam Investments, LLC.

18. <u>Lasser</u>: "Lasser: means defendant Lasser.

19. <u>Haldeman</u>: "Haldeman" means Putnam's present Chief

4

Executive Officer.

20.  <u>Morgan</u>: "Morgan" means Kelly Morgan.

21.  <u>Stoev</u>: "Stoev" means Konstantin Stoev.

22.  <u>McNamee</u>: "McNamee" means Mary McNamee.

23.  <u>Allansmith</u>: "Allansmith" means Lauren Allansmith.

24.  <u>O'Malley</u>: "O'Malley" means Christopher O'Malley.

25.  <u>Brooks</u>: "Brooks" means Josh Brooks.

26.  <u>Scordato</u>: "Scordato" mean Christine Scordato.

27.  <u>Tibbetts</u>: "Tibbetts" means Richard Tibbetts.

28.  <u>Landes</u>: "Landes" means William Landes.

29.  <u>Eckland</u>: "Eckland" means Ellis Eckland.

30.  <u>Oristaglio</u>: Oristaglio means Stephen Oristaglio.

31.  <u>Warren</u>: "Warren" means Paul Warren.

32.  <u>DeChristopher:</u> "DeChristopher" means Brian DeChristopher.

33.  <u>IMD</u>: "IMD" means Putnam's Investment Management Division.

34.  <u>IDMC</u>: "IDMC" means the Investment Division Management Committee at Putnam.

35.  <u>360</u>: "360" means the Putnam 360° Peer Feedback Survey as used at Putnam.

36.  <u>Year end review</u>: "year end review" means a document evidencing a review of a person's performance at Putnam for the year involved.

37.  <u>Performance review</u>: "Performance review" means a document evidencing a review of a person's performance at Putnam.

38.  <u>Investment Division & ISD Human Resources Updates</u>: "Investment Division & ISD Human Resources Updates" means a form of the same name as used at Putnam.

5

39. PDPR: "PDPR" means the Performance and Development Planning and Review form as used at Putnam.

40. Scorecard and second scorecard: "scorecard" and "second scorecard" mean the documents that Morgan, using those words, referred to in her deposition in this case.

41. Managing Director: "Managing Director" means the position of that name at Putnam.

42. MD: "MD" means Managing Director.

43. Partner: "partner" means the position of that name used at Putnam.

44. ADR: "ADR" means Associate Director of Research.

45. CIO: "CIO" means Chief Investment Officer.

46. Complaint: "complaint" means Svensson's complaint in this case as amended.

47. Putnam's answer: "Putnam's answer" means Putnam's answer filed in this case.

48. Lasser's answer: "Lasser's answer" means Lasser's answer filed in this case.

49. Identified males: "identified males" means the following persons:

    1.  Block, Richard;
    2.  Bloemker, Robert;
    3.  Brooks, Joshua;
    4.  Bogar, Mark;
    5.  Boselli, John;
    6.  Bukovac, R. J.;
    7.  Byrne, Joshua;
    8.  Cervone, Richard;
    9.  Clark, Dana;
    10.  Davis, Simon;
    11.  DeChristopher, Brian;
    12.  Dexter, Stephen;
    13.  Divney, Kevin;
    14.  Eigerman, Nathan;

15. Elavia, Tony;
16. England, Richard;
17. Geer, Bartlett;
18. Gorman, Stephen;
19. Gerber, David;
20. Gillis, Roland;
21. Graham, Andrew;
22. Greenleaf, Bradford;
23. Hadden, Peter;
24. Hamlin, David;
25. Haslett, Thomas;
26. Joseph, Joseph;
27. Kamshad, Omid;
28. King, David;
29. Knight, Jeffrey;
30. Lannum, Coleman;
31. Lindsey, Jeffrey;
32. Lode, Geirulv;
33. Makino, Shigeki;
34. Malak, Saba;
35. Marrkand, Paul;
36. Matteis, Andrew;
37. Mehta, Sandeep;
38. Melhuish, Nicholas;
39. Miller, Christopher;
40. Miller, Daniel;
41. Moore, Colin;
42. Moore, Gerald;
43. Morris, Dirk;
44. Mufson, Michael;
45. Mullin, Hugh;
46. Nance, Michael;
47. Norchi, Terrance;
48. Oler, Stephen;
49. O'Malley, Christopher;
50. Prusko, James;
51. Santos, Dave;
52. Scanlon, Paul;
53. Scott, Justin;
54. Sellito, Tino;
55. Shadek, Edward;
56. Simon, Sheldon;
57. Smith, Leo;
58. Sorensen, Eric;
59. Stack, Michael;
60. Stairs, George;

7

61.  Sullivan, William;
62.  Swift Robert;
63.  Weiss, Manuel;
64.  Wetlaufer, Eric;
65.  Warren, Paul;
66.  Wiess, James; and,
67.  Yogg, Michael.

50.  <u>Identified females</u>: "identified females" means the following persons:

1.  Allansmith, Lauren
2.  Burke, Andrea;
3.  Cotner, C. Beth;
4.  Drew, Maria;
5.  Farrell, Deborah;
6.  Holding, Pamela;
7.  Jones, Elizabeth;
8.  Kalus-Bystrycky, Ivka;
9.  Korn, Karen;
10. Kuenstner, Deborah;
11. Leichter, Jennifer;
12. McCormack, Susan;
13. McMullen, Carol;
14. Mockard, Jeanne;
15. Morgan, Kelly;
16. Parker, Margery;
17. Peters, Carmel;
18. Sievert, Jean;
19. Smith, Margaret;
20. Spatz, Erin;
21. Svensson, Lisa;
22. Thomsen, Rosemary;
23. Wheeler, Diane; and,
24. Williams, Fayval.

<u>THE DOCUMENTS AND THINGS REQUESTED</u>.

1.  All documents and things concerning the criteria actually used by the persons participating in the decision making process in deciding whether to select Svensson or any of the identified males or identified females for appointment to or election as a Managing Director or Portfolio Manager in the period since January 1, 1999, whether by promotion from within the IMD, another division of Putnam or as a lateral hire from another entity.

8

2.    All documents and things concerning the results of the
      application of the criteria referred to in the immediately
      preceding category to Svensson, any of the identified males
      or any of the identified females.

3.    In regard to the identified males and the identified
      females who were not promoted from within Putnam to
      Portfolio Manager or Managing Director but were hired on a
      lateral basis from another entity in the period since
      January 1, 1999, all documents and things concerning
      communication between or among those persons participating
      in the decision making process as to the persons who should
      be elected or appointed to the position of Managing
      Director or Portfolio Manager, and which documents and
      things concerned evaluation of, or action or decision made,
      taken or recommended or proposed to be made or taken, in
      regard to any one or more of such persons.

4.    In regard to the identified males and the identified
      females who were not promoted from within Putnam but were
      hired as a Managing Director or Portfolio Manager on a
      lateral basis from another entity in the period since
      January 1, 1999, all documents and things prepared or
      received by or on behalf of any one or more of the persons
      participating in the decision making process as to the
      persons who should be so appointed or elected to Managing
      Director or Portfolio Manager, and which documents and
      things concerned evaluation of, or action or decision made,
      taken or recommended or proposed to be made or taken, in
      regard to any one or more of such persons.

5.    In regard to Svensson and the identified males and
      identified females and the pools of persons for
      consideration for appointment or election as Managing
      Director or Portfolio Manager at any time in the period
      since January 1, 1999, all documents and things concerning
      communication between or among those persons participating
      in the decision making process as to who should be included
      in or excluded from such pools, and which documents and
      things concerned evaluation of, or action or decision made,
      taken or recommended or proposed to be made or taken, in
      regard to Svensson, any of the identified males and/or any
      of the identified females concerning inclusion in, or
      exclusion from, such pools.

6.   In regard to the identified males and the identified
     females and the pools for consideration for appointment or
     election as Managing Director or Portfolio Manager in the
     period since January 1, 1999, all documents and things
     prepared or received by or on behalf of any one or more of
     the persons participating in the decision making process as
     to who should be so elected or appointed, and which
     concerned evaluation of, or action or decision made, taken
     or recommended or proposed to be made or taken, in regard
     to Svensson, any one or more of the identified males and/or
     any of the identified females in such pools.

7.   All 360s prepared or received by any person at Putnam in or
     for any one or more of the reporting periods since January
     1, 1999, in regard to Svensson or any one or more of the
     identified males and/or any one or more of the identified
     females.

8.   All documents and things concerning year end reviews,
     performance reviews, Investment Division & ISD Human
     Resources Updates, PDPRs and other documents analyzing or
     evaluating work performance in the IMD, that were prepared
     or received by any person at Putnam in or for any one or
     more of the reporting periods since January 1, 1999, in
     regard to Svensson, any one or more of the identified males
     and/or any one or more of the identified females.

9.   All documents and things concerning the factual basis(es) of
     any numerical score in any 360s, year end reviews,
     performance reviews, Investment Division & ISD Human
     Resources Updates, PDPRs and/or other documents concerning
     analysis or evaluation of work performance in the IMD, that
     were prepared or received by any person at Putnam in or for
     any one or more of the reporting periods since January 1,
     1999, in regard to Svensson, any one or more of the
     identified males and/or any one or more of the identified
     females.

10.  All documents and things concerning the organizational
     structure and/or jurisdiction of the IMD as existing at any
     time or from time to time in the period since January 1,
     1999.

11.  All documents and things concerning the administrative
     reporting relationships within the IMD as existing at any
     time or from time to time in the period since January 1,

1999.

12. All documents and things concerning the membership, structure and/or jurisdiction of the Operating Committee as existing at any time or from time to time in the period since January 1, 1999.

13. All documents and things concerning the membership, structure and/or jurisdiction at any time or from time to time in the period since January 1, 1999, of the IDMC.

14. All documents and things concerning the membership, structure and/or jurisdiction of any committee or entity howsoever known or described, other than the IDMC or the Operating Committee, which had or has any administrative function or responsibility concerning Svensson, any of the identified males and/or any of the identified females in the IMD as existing at any time or from time to time in the period since January 1, 1999.

15. All documents and things concerning the actual criteria used by Putnam for deciding whom of Svensson, the identified males and/or the identified females should be or would be demoted in the period since January 1, 2002:

    A. From Portfolio Manager to any other professional position within the IMD;

    B. From ADR to any other professional position within the IMD;

    C. from CIO to any other professional position within the IMD;

    D. From ADR to Analyst within the IMD; and/or,

    E. From CIO to ADR within the IMD.

16. All documents and things concerning the results of the application of the criteria referred to in the immediately preceding category to Svensson, any of the identified males and/or any of the identified females who were Portfolio Managers, ADRs, CIOs or holders of other IMD investment professional positions.

17. In regard to Svensson, any of the identified males and/or

any of the identified females who were selected for
consideration for possible demotion to take place in the
period since January 1, 2002 (whether or not actually
demoted) from Managing Director or from Portfolio Manager or
other professional position in the IMD, all documents and
things concerning communication between or among the persons
participating at any time or from time to time in the
decision making process to so consider Svensson, any of the
identified males and/or any of the identified females, and
which communication concerned evaluation of, or action or
decision made, taken, recommended or proposed to be made or
taken, in regard to any of such persons.

18. In regard to Svensson, any of the identified males and/or
    any of the identified females who were considered for
    demotion to take place in the period since January 1, 2002
    (whether or not actually demoted) from Managing Director or
    from Portfolio Manager or other professional position in the
    IMD, all documents and things concerning communication
    between or among the persons participating in the decision
    making process to so consider Svensson, any of the
    identified males and/or any of the identified females, and
    which communication concerned evaluation of, or action or
    decision made, taken or recommended or proposed to be made
    or taken, in regard to, any of such persons.

19. In regard to Svensson, any of the identified males and/or
    any of the identified females who actually were demoted in
    the period since January 1, 2002, from Managing Director or
    from Portfolio Manager or other professional position in the
    IMD, all documents and things concerning communication
    between or among the persons participating in the decision
    making process as to who of Svensson, any of the identified
    males and/or any of the identified females actually would be
    demoted, and which communication concerned evaluation of, or
    action or decision made, taken or recommended or proposed to
    be made or taken, in regard to, any one or more of such
    persons.

20. All documents and things concerning the criteria actually
    used in the period since January 1, 1999, for selection of
    any of Svensson, any of the identified males and/or any of
    the identified females for appearances on television
    investment programs or interviews.

21. All documents and things concerning the appearances of

Svensson, any of the identified males and/or any of the identified females in the IMD on television investment programs or interviews.

22. All documents and things concerning the Putnam policy in the period since January 1, 1999, in regard to persons of the status and position of persons such as Darren Peers (Peers) concerning payment or reimbursement of tuition costs for the MBA degree.

23. All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment Management Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons) concerning Peers' leaving his employment at Putnam, compliance with, or satisfaction, fulfillment or other disposition of, the terms, provisions and/or conditions of Peers' employment at Putnam, or financial obligations to Putnam.

24. All documents and things concerning the payment to, or reimbursement of, any person concerning tuition costs of Peers' MBA degree.

25. All documents and things prepared or received by Putnam concerning the satisfaction, fulfillment or other disposition of the terms and conditions of Peer's employment in regard to the payment to, or reimbursement of, any person of tuition costs of Peer's MBA degree.

26. All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ, any affiliate of NWQ and/or any other persons concerning the making, maintaining and/or furnishing by Peers to, or receipt by, Putnam, of any diary, notes or other documents or things concerning Svensson or any of the identified males and/or any of the identified females prepared by Peers.

27. All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ, any affiliate of NWQ and/or any other person(s) concerning the testimony or possible testimony in a deposition or at trial in this case by Peers or by any of the identified males and/or any of the identified females who at the time of such communication were no longer in the employ of Putnam.

28. All documents and things concerning the factual basis of any

13

numerical or other rating, evaluation, analysis or score
concerning Svensson in connection with consideration of her
by Putnam in the period since January 1, 1999, for
promotion; demotion; salary or other compensation increase;
salary or other compensation decrease; and/or other
employment action.

29.  The terms and conditions offered by Putnam in the period
since January 1, 2002, to any of the identified males and/or
any of the identified females  in connection with leaving
the employ of Putnam by any of such persons, whether
voluntarily or involuntarily.

30.  All documents and things concerning any notes, minutes or
other document of or in regard to meetings or decisions of
the Putnam trustees in the period May - September 2003
concerning directed brokerage commissions.

31.  All documents and things concerning communication between or
among, Haldeman, Lasser and any of the Putnam trustees in
the period May - September 2003 concerning directed
brokerage commissions.

32.  All documents and things concerning coverage reports for
O'Malley and the identified males and/or the identified
females for each of the reporting periods in 2002, 2003,
2004, 2005 and 2006.

33.  All documents and things concerning communication between or
among Stoev and Morgan or other persons at Putnam in regard
to the termination of Stoev's employment and the stated
reasons for it.

34.  All documents and things concerning the "green card"
application for Stoev that Morgan filled out.

35.  All documents and things concerning calendar entry(ies)
(Lotus notes or otherwise) for Haldeman concerning any
communication with Peers.

36.  All documents and things concerning communication between
Morgan and Allansmith in the period 2002-2004 concerning
comments upon or other feedback as to Allansmith's work
performance.

37.  All documents and things concerning communication in the

14

period 2002-2004 between Morgan and McNamee, Scordato and/or
Brooks concerning Svensson's or Allansmith's work
performance or reasons or justifications for Svensson or
Allansmith leaving Putnam's employment.

38. All documents and things concerning GER Active Portfolio
Performance in the period January 1, 1999, through September
15, 2003, for Svensson or any of the identified males and/or
the identified females.

39. All documents and things concerning comparisons in work
performance in the period January 1, 1999, through September
15, 2003, of Svensson, any of the identified males and/or
any of the identified females.

40. All documents and things, including, without limitation
Human Resources Action Request and Requisition for Employee
documents, concerning the move or transfer of any of the
identified males out of GER in the period since January 1,
1999.

41. All documents and things concerning YTD Attribution Analysis
for the reporting periods between January 1, 1999 through
September 30, 2003, concerning any teams of which Svensson,
any of the identified males and/or identified females were
members.

42. All documents and things concerning all Trustee Fact Sheets
produced for the Putnam trustees on a quarterly basis in the
period since 1994 concerning the performance of the various
Putnam funds, including without limitation, the Putnam
Growth and Income Fund, New Value Fund and the Global Growth
Fund.

43. Putnam's Officers' Directories for the years 2003-2005.

44. All documents and things concerning bonus worksheets
prepared or maintained at any time or from time to time in
the period since January 1, 1999, in regard to the teams of
which Svensson, any of the identified males and/or any of
the identified females were members, including, without
limitation, Core International, Core Domestic, Core Growth
(later called Large Cap Growth), Value, Specialty Growth and
GER.

45. All documents and things concerning the reports, analyses,

measurements and/or rankings of the types included in
documents LS-501, 503-506 for any of the identified males
and any of the identified females, prepared in the period
since January 1, 1999.

46. All documents and things concerning the reports, analyses.
measurements and/or rankings of the types included in
document LS-502 for the fund referred to and for the other
Putnam funds, which were prepared in the period since
January 1, 1999.

47. All documents and things concerning attribution reports of
the type included in LS-507-512 for the fund referred to and
any other funds, which were prepared in the period since
January 1, 1999.

48. All documents and things concerning sector level performance
index ranks of the type included in LS-513-515 prepared in
the period since January 1, 1999.

49. All documents and things concerning scorecards and second
scorecards in regard to O'Malley, other MBAs and any of the
identified males and/or any of the identified females
prepared or maintained in the period since January 1, 1999.

50. The "notes" prepared by Tibbetts, which, " according to the
Putnam privilege log, concerned "female partners."

51. The "undated" "notes" by an "unknown" author to an
unidentified recipient, which, according to the Putnam
privilege log, concerns "Svensson employment history."

52. The 1998 "maternity leave summary" prepared, according to
the Putnam privilege log, by an "unknown" author for an
unidentified recipient.

53. The September 3, 2003, "e-mail re: litigation forwarded with
e-mail from [Attorney] Rodriques..." authored by McNamee and
sent to the recipient, Brooks, as referred to in the Putnam
privilege log but redacted so as to not disclose only the
words used by the author or Attorney Rodriques in a
"communication," within the meaning of U.S. v. United Shoe
Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950),
each other, but disclosing the other words and information
in either of the e-mails, including, without limitation, the
identity of the author, the identity of the recipient(s),

16

the date and time of the transmission and the words in the
subject line.

54. The August 27, 2003, "e-mail re: draft termination
agreement" from author Hadley to recipients McNamee and
Attorney Rodriques, as referred to in the Putnam privilege
log but redacted so as to not disclose only the words used
by the author or Attorney Rodriques in a "communication,"
within the meaning of U.S. v. United Shoe Machinery Corp.,
89 F. Supp. 357, 358-59 (D. Mass. 1950), with each other but
disclosing the other words and information in the e-mail,
including, without limitation, the identity of the author,
the identity of the recipient(s), the date and time of the
transmission, the words in the subject line and he
attachment.

55. All documents and things concerning the amounts and types of
compensation, including, without limitation, salary and
bonus, paid or payable to Svensson, the identified males and
the identified females for each of the years 1999 - 2004.

56. All documents and things identifying any of the identified
males and any of the identified females who left the employ
of Putnam on a voluntary basis in the period 1999 to date.

57. All documents and things concerning the circumstances and
reasons for the voluntary terminations referred to in the
immediately preceding category.

58. All documents and things identifying any of the identified
males and any of the identified females who left the employ
of Putnam on an involuntary basis in the period 1999 to
date.

59. All documents and things concerning the circumstances and
reasons for the involuntary terminations referred to in the
immediately preceding category.

60. All documents and things concerning any severance package
agreed to by Putnam and any of the identified males and/or
any of the identified females in regard to his or her
leaving the employ of Putnam (whether voluntarily or
involuntarily) in the period 1999 to date.

61. All documents and things concerning communication between or
among Putnam, any affiliate of Putnam, and Landes, Eckland

and/or Oristaglio /or any other person(s) concerning the
testimony or possible testimony in a deposition or at trial
in this case by Landes, Eckland and/or Oristaglio.

62.  All documents and things concerning identifying or stating
the total bonus pool available to Putnam for each year since
January 1, 1999.

63.  All documents and things concerning identifying or stating
the total bonus pool available to the IMD for each year
since January 1, 1999.

64.  All documents and things concerning the amounts of the
bonuses allocated for each year since January 1, 1999, to
such of the identified males and the identified females
persons receiving a bonus.

65.  The "anonymous" letter concerning Warren, which is referred
to at p. 357 of the McNamee deposition.

66.  All documents and things concerning the language used and/or
the behavior of Warren of the type referred to at pp. 18-21
and 357 of the McNamee deposition.

67.  All documents and things concerning communication between
Lasser or Haldeman and the Human Relations Department at
Putnam and/or any other person concerning the language used
by and/or behavior of Warren referred to at pp. 18-21 and
357 of the McNamee deposition.

68.  All documents and things concerning the investigation of
Warren by Tibbetts, which is referred to at p. 358 of the
McNamee deposition.

69.  If the "investigation" of Warren was not "handled" as the
McNamee deposition states, by Tibbetts, but was "handled" in
whole or in part by one or more other persons, all documents
and things concerning the investigation of Warren by such
other person or persons.

70.  All documents and things concerning the compensation
figures, studies and statistics referred to in the
Allansmith deposition at pp. 88-90.

71.  All documents and things concerning the Women's Leadership
Forum referred to at p. 180 of the Haldeman deposition.

18

72. All documents and things concerning studies analyses and
    reports and the results thereof by or on behalf of the above
    referred to Women's Leadership Forum.

73. All documents and things concerning communication from
    Haldeman to any other person and to Haldeman from any other
    person in regard to any one or more of the subject matters
    of the two immediately preceding categories.

74. The personnel files of Allansmith, DeChristopher, O'Malley,
    Peers and Warren.

75. All documents and things concerning communication within
    Putnam in regard to the issue of "deprivation of
    [Svensson's] management responsibilities,"[1] which
    communication took place in the period prior to the Brooks'
    presenting to Svensson on August 28, 2003, of a document
    with three options concerning the status of her employment.

76. All documents and things concerning communication within
    Putnam in regard to the issue of "deprivation of
    [Svensson's] management responsibilities" and/or termination
    of her employment, which communication took place in the
    period following the Brooks presentation to Svensson
    referred to in the immediately preceding category, and the
    termination of Svensson's employment on September 15, 2003.

                        LISA SVENSSON, plaintiff,

                        By her attorneys,

                        BARRON & STADFELD, P.C.


                        _____
                        Kevin F. Moloney    BBO No. 351000
                        100 Cambridge Street, Suite 1310
                        Boston, Massachusetts 02114
                        Tel.: 617.531.6569
Dated: April 28, 2006
                        Certificate of Service.
     A copy of the within document was delivered by messenger to
counsel of record: Joseph L. Kociubes, Louis A. Rodriques,
BINGHAM, MCCUTCHEN, LLP, 150 Federal Street, Boston,

_____
[1] As used in the Brooks deposition at p. 184.

                              19

Massachusetts 02110, and David S. Rosenthal, NIXON PEABODY LLP, 100 Summer Street, Boston, Massachusetts 02110.

_____
Kevin F. Moloney

Dated: April 28, 2006

[355992.1]

20

Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON,<br><br>               Plaintiff,<br><br>        v.<br><br>PUTNAM INVESTMENTS LLC, f/k/a PUTNAM<br>INVESTMENTS, INC. and LAWRENCE J. LASSER,<br><br>               Defendant. | )<br>)<br>)<br>)<br>)   CIVIL ACTION<br>)   NO. 04-12711 PBS<br>)<br>)<br>)<br>)<br>) |

## PUTNAM INVESTMENTS' RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant, Putnam Investment LLC, f/k/a Putnam Investments, Inc. ("Putnam") hereby responds to Plaintiff's Second Request for Production of Documents and Things as follows:

### GENERAL OBJECTIONS

1.    Putnam's responses shall not be deemed to constitute an admission that any particular document exists, is relevant, or is admissible as evidence or that any statement or characterization in the request is accurate or complete.

2.    Putnam objects to these requests to the extent that they seek documents protected by the attorney-client privilege, the work-product doctrine or are otherwise protected from disclosure.

3.    Putnam objects to any definition, request or instruction that purports to impose any obligation not expressly provided for in the Federal Rules of Civil Procedure.

4.    Putnam will produce the documents which it has agreed to produce in response to this request at a mutually-agreeable date, time and place.

5.    Putnam objects to these Requests to the extent they seek information concerning the 91 identified males and females who, as Putnam has argued in connection with Ms.

Svensson's pending motion to compel further answers to interrogatories, are not appropriate comparators in connection with Ms. Svensson's claims.

6.    Putnam objects to these Requests to the extent that they represent an eleventh hour attempt by Plaintiff to vastly expand the scope of discovery without explanation or to why Plaintiff did not seek or obtain the discovery earlier in the discovery period. Putnam further objects to the Requests to the extent that Plaintiff is reviewing discovery requests previously ruled on by the Court.

## SPECIFIC RESPONSES

REQUEST NO. 1

> All documents and things concerning the criteria actually used by the persons participating in the decision making process in deciding whether to select Svensson or any of the identified males or identified females for appointment to or election as a Managing Director or Portfolio Manager in the period since January 1, 1999, whether by promotion from within the IMD, another division of Putnam or as a lateral hire from another entity.

RESPONSE NO. 1

> To the extent this Request seeks documents relating to the Plaintiff, such documents have been produced in response to the Plaintiff's first request for the production of documents. Putnam objects to the balance of the Request on the grounds that it is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving the foregoing, Putnam will produce its Career Development Guide for Equity Portfolio Manager.

REQUEST NO. 2

> All documents and things concerning the results of the application of the criteria referred to in the immediately preceding category to Svensson, any of the identified males or any of the identified females.

RESPONSE NO. 2

> To the extent this Request seeks documents relating to the Plaintiff, such documents have been produced in response to the Plaintiff's first request for the production of documents. Putnam objects to the balance of the Request on the grounds that it is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably

2-

calculated to lead to the discovery of admissible evidence. Putnam further objects on the grounds set forth in its Opposition to the Plaintiff's motion to compel further answers to her interrogatories ("Putnam's Opposition") on file with the Court.

REQUEST NO. 3

In regard to the identified males and the identified females who were not promoted from within Putnam to Portfolio Manager or Managing Director but were hired on a lateral basis from anther entity in the period since January 1, 1999, all documents and things concerning communication between or among those persons participating in the decision making process as to the persons who should be elected or appointed to the position of Managing Director or Portfolio Manager, and which documents and things concerned evaluation of, or action or decision made, taken or recommended or proposed to be made to taken, in regard to any one or more of such persons.

RESPONSE NO. 3

Putnam objects to this Request on the grounds that it is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam also objects on the grounds set forth in Putnam's Opposition on file with the Court. Putnam further objects to this request on the grounds that the Request is incomprehensible to the point that it is unclear what additional information the Plaintiff seeks.

REQUEST NO. 4

In regard to the identified males and the identified females who were not promoted from within Putnam but were hired as a Managing Director or Portfolio Manager on a lateral basis from another entity in the period since January 1, 1999, all documents and things prepared or received by or on behalf of any one or more of the persons participating in the decision making process as to the persons who should be so appointed or elected to Managing Director or Portfolio Manager, and which documents and things concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to any one or more of such persons.

RESPONSE NO. 4

Putnam objects to this Request on the grounds that it is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam also objects on the grounds set forth in Putnam's Opposition on file with the Court. Putnam further objects on the grounds that the Request is incomprehensible to the point that it is unclear what additional information the Plaintiff seeks.

-3-

REQUEST NO. 5

In regard to Svensson and the identified males and identified females and the pools of persons for consideration for appointment or election as Managing Director or Portfolio Manager at any time in the period since January 1, 1999, all documents and things concerning communication between or among those persons participating in the decision making process as to who should be included in or excluded from such pools, and which documents and things concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regarding to Svensson, any of the identified males and/or any of the identified females concerning inclusion in, or exclusion from, such pools.

RESPONSE NO. 5

Putnam objects to this Request on the grounds that it is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further states that this court, in response to Plaintiff's November 5, 2005 Motion to Compel Defendant's Production of Documents has already limited Putnam's obligation to produce communications between and among its personnel; and Putnam has already produced such information in accordance with this court's prior ruling.

REQUEST NO. 6

In regard to the identified males and the identified females who were not promoted from within Putnam but were hired as a Managing Director or Portfolio Manager on a lateral basis from another entity in the period since January 1, 1999, all documents and things prepared or received by or on behalf of any one or more of the persons participating in the decision making process as to who should be so elected or appointed, and which concerned evaluation of, or action or decision make, taken or recommended or proposed to be made or taken, in regard to Svensson, any one or more of the identified males and/or any of the identified females in such pools.

RESPONSE NO. 6

Putnam objects to this Request on the grounds that it is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects to the Request on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 7

All 360s prepared or received by any person at Putnam in or for any one or more of the reporting periods since January 1, 1999, in regard to Svensson or any one or more of the identified males and/or any one or more of the identified females.

4-

RESPONSE NO. 7

> To the extent this Request seeks documents relating to the Plaintiff, such documents have been produced in response to the Plaintiff's first request for the production of documents. Putnam objects to the balance of this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 8

> All documents and things concerning year end reviews, performance reviews, Investment Division & ISD Human Resources Updates, PDPRs and other documents analyzing or evaluating work performance in the IMD, that were prepared or received by any person at Putnam in or for any one or more of the reporting periods since January 1, 1999, in regard to Svensson, any one or more of the identified males and/or one or more of the identified females.

RESPONSE NO. 8

> To the extent this Request seeks documents relating to the Plaintiff, such documents have been produced in response to the Plaintiff's first request for the production of documents. Putnam objects to the balance of this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks materials beyond the scope of discovery because they are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 9

> All documents and things concerning the factual basis(es) of any numerical score in any 360s, year end reviews, performance reviews, Investment Division & ISD Human Resources Updates, PDPRs and/or other documents concerning analysis or evaluation of work performance in the IMD, that were prepared or received by any person at Putnam in or for any one or more of the reporting periods since January 1, 1999, in regard to Svennson, any one or more of the identified males and/or any one or more of the identified females.

RESPONSE NO. 9

> The 360s and performance reviews are self-explanatory; and Putnam does not possess any document or other thing that provides a factual basis of any numerical score for any type of performance review. To the extent this Request seeks the underlying performance reviews of the Plaintiff, Putnam has provided those documents in response to the Plaintiff's first request for documents. To the extent this request seeks the underlying performance reviews of the identified males or females, Putnam objects to the

5-

Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 10

All documents and things concerning the organizational structure and/or jurisdiction of the IMD as existing at any time or from time to time in the period since January 1, 1999.

RESPONSE NO. 10

Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects to producing documents concerning the period after the Plaintiff's termination, on the ground that such information is unrelated to the instant litigation and/or not reasonably calculated to lead to the discovery of admissible evidence. Without limiting the foregoing, Putnam will produce organizational charts responsive to the Request.

REQUEST NO. 11

All documents and things concerning the administrative reporting relationships within the IMD as existing at any time or from time to time in the period since January 1, 1999.

RESPONSE NO. 11

To the extent that the Plaintiff seeks information other than that contained in the organizational charts, Putnam objects on the grounds that the Plaintiff has failed to define "administrative reporting relationship" and the lack of a definition has rendered the request vague, ambiguous, and difficult to understand. Without limiting the foregoing, Putnam will produce the organizational charts responsive to the Request in response to Request No. 10.

REQUEST NO. 12

All documents and things concerning the membership, structure and/or jurisdiction of the Operating Committee as existing at any time or from time to time in the period since January 1, 1999.

RESPONSE NO. 12

Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

6-

REQUEST NO. 13

All documents and things concerning the membership, structure and/or jurisdiction at any time or from time to time in the period since January 1, 1999, of the IDMC.

RESPONSE NO. 13

Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without limiting the foregoing, Putnam will produce documents responsive to the Request.

REQUEST NO. 14

All documents and things concerning the membership, structure and/or jurisdiction of any committee or entity howsoever known or described, other than the IDMC or the Operating Committee, which had or has any administrative function or responsibility concerning Svensson, any of the identified males and/or any of the identified females in the IMD as existing at any time or from time to time in the period since January 1, 1999.

RESPONSE NO. 14

Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 15

All documents and things concerning the actual criteria used by Putnam for deciding whom of Svensson, the identified males and/or the identified females should be or would be demoted in the period since January 1, 2002:

A.    From Portfolio Manager to any other professional position within the IMD;

B.    From ADR to any other professional position within the IMD;

C.    From CIO to any other professional position within the IMD;

D.    From ADR to Analyst within the IMD; and/or,

E.    From CIO to ADR within the IMD.

7-

RESPONSE NO. 15

Putnam objects inasmuch as it did not "demote" Svensson during the relevant time period. Putnam has already produced all documents with respect to any transfer of the Plaintiff. Putnam objects to the balance of this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 16

All documents and things concerning the results of the application of the criteria referred to in the immediately preceding category to Svensson, any of the identified males and/or any of the identified females who were Portfolio Managers, ADRs, CIOs or holders of other IMD investment professional positions.

RESPONSE NO. 16

Putnam objects inasmuch as it did not "demote" Svensson during the relevant time period. Putnam has already produced all documents with respect to any transfer of the Plaintiff. Putnam objects to the balance of this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 17

In regard to Svensson, any of the identified males and/or any of the identified females who were selected for consideration for possible demotion to take place in the period since January 1, 2002 (whether or not actually demoted) from Managing Director or from Portfolio Manager or other professional position in the IMD, all documents and things concerning communication between or among the persons participating at any time or from time to time in the decision making process to so consider Svensson, any of the identified males and/or any of the identified females, and which communication concerned evaluation of, or action or decision made, taken, recommended or proposed to be made or taken, in regard to any of such persons.

RESPONSE NO. 17

Putnam objects inasmuch as it did not "demote" Svensson during the relevant period. Putnam has already produced all documents with respect to any transfer of the Plaintiff. Putnam objects to the balance of this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

8-

REQUEST NO. 18

In regard to Svensson, any of the identified males and/or any of the identified females who were considered for demotion to take place in the period since January 1, 2002 (whether or not actually demoted) from Managing Director of from Portfolio Manager or other professional position in the IMD, all documents and things concerning communication between or among the persons participating in the decision making process so to consider Svensson, any of the identified males and/or any of the identified females, and which communication concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to, any of such persons.

RESPONSE NO. 18

Putnam objects inasmuch as it did not "demote" Svensson during the applicable period. Putnam has already produced all documents with respect to any transfer of the Plaintiff. Putnam objects to the balance of this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 19

In regard to Svensson, any of the identified males and/or any of the identified females who actually were demoted in the period since January 1, 2002, from Managing Director or from Portfolio Manager or other professional position in the IMD, all documents and things concerning communication between or among the persons participating in the decision making process as to who of Svensson, any of the identified males and/or any of the identified females actually would be demoted, and which communication concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to, any one or more of such persons.

RESPONSE NO. 19

Putnam objects inasmuch as it did not "demote" Svensson during the applicable period. Putnam has already produced all documents with respect to any transfer of the Plaintiff. Putnam objects to the balance of this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 20

All documents and things concerning this criteria actually used in the period since January 1,1999, for selection of any of Svensson, any of the identified males and/or any

9-

of the identified females for appearances on television investment programs or interviews.

RESPONSE NO. 20

Putnam objects to this Request on the grounds that it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court. Notwithstanding the foregoing, Putnam states that no such documents exist.

REQUEST NO. 21

All documents and things concerning the appearances of Svensson, any of the identified males and/or any of the identified females in the IMD on television investment programs or interviews.

RESPONSE NO. 21

Putnam objects to this Request on the grounds that it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, Putnam will produce responsive documents.

REQUEST NO. 22

All documents and things concerning the Putnam policy in the period since January 1, 1999, in regard to persons of the status and position of persons such as Darren Peers (Peers) concerning payment or reimbursement of tuition costs for the MBA degree.

RESPONSE NO. 22

Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without limiting the foregoing, Putnam will produce documents responsive to the Request.

REQUEST NO. 23

All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment Management Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons) concerning Peers' leaving his employment at Putnam, compliance with, or satisfaction, fulfillment or other disposition of, the terms, provisions and/or condition of Peers' employment at Putnam, or financial obligations.

10-

RESPONSE NO. 23

Putnam objects to this Request on the grounds that it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, the Plaintiff has already fully deposed Mr. Peers on the subject of this request. Without limiting the foregoing, Putnam will produce responsive documents.

REQUEST NO. 24

All documents and things concerning the payment to, or reimbursement of, any person concerning tuition costs of Peers' MBA degree.

RESPONSE NO. 24

Without limiting the foregoing, please see Putnam's response to Request 23.

REQUEST NO. 25

All document and things prepared or received by Putnam concerning the satisfaction, fulfillment or other disposition of the terms and conditions of Peers' employment in regard to the payment to, or reimbursement of, any person or tuition costs of Peers' MBA degree.

RESPONSE NO. 25

Without limiting the foregoing, please see Putnam's response to Request 23.

REQUEST NO. 26

All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ, any affiliate of NWQ and/or any other persons concerning the making, maintaining and/or furnishing by Peers to, or receipt by, Putnam, of any diary, notes or other documents or things concerning Svensson or any of the identified males and/or of the identified females prepared by Peers.

RESPONSE NO. 26

Putnam represents Mr. Peers in connection with this litigation, and objects to this Request to the extent that it seeks documents protected by the attorney-client privilege and the work-product doctrine. Furthermore, Putnam has already produced all such information not covered by such privileges in response to the Plaintiff's first request for the production of documents.

11-

REQUEST NO. 27

All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ, any affiliate of NWQ and/or any other persons(s) concerning the testimony or possible testimony in a deposition or at trial in this case by Peers or by any of the identified males and/or any of the identified females who at the time of such communication were no longer in the employ of Putnam.

RESPONSE NO. 27

Putnam objects to this request on the grounds that it seeks disclosure of information that is not discoverable due to the attorney-client privilege and the attorney work-product doctrine.

REQUEST NO. 28

All documents and things concerning the factual basis of any numerical or other rating, evaluation, analysis or score concerning Svensson in connection with consideration of her by Putnam in the period since January 1, 1999, for promotion; demotion; salary or other compensation increase; salary or other compensation decrease; and/or other employment action.

RESPONSE NO. 28

Putnam objects to this request on the grounds that it is incomprehensible to the point that it is unclear what additional information the Plaintiff seeks. Putnam also objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court. Putnam further objects to this request on the grounds that Plaintiff's failure to define "numerical or other rating" has rendered the request vague, ambiguous, and difficult to understand. Plaintiff's performance reviews are self-explanatory; and Putnam does not possess any document or other thing that provides a factual basis of any numerical score for any type of performance review. To the extent this request seeks the underlying performance reviews of the Plaintiff, Putnam has provided those documents in response to the Plaintiff's first request for documents. To the extent the Plaintiff seeks information concerning her promotions, transfer, or any other employment action, Putnam has already produced such information in response to the Plaintiff's first request for the production of documents. To the extent this Request seeks information relating to the Plaintiff's compensation, Putnam will produce responsive documents.

REQUEST NO. 29

The terms and conditions offered by Putnam in the period since January 1, 2002, to any of the identified males and/or any of the identified females in connection with leaving the employ of Putnam by any of such persons, whether voluntarily or involuntarily.

12-

RESPONSE NO. 29

Putnam objects to this Request on the grounds that it is unduly vague and ambiguous, overbroad, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam also objects on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 30

All documents and things concerning any notes, minutes or other document of or in regard to meetings or decisions of the Putnam trustees in the period May - September 2003 concerning directed brokerage commissions.

RESPONSE NO. 30

Putnam objects to this Request on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam also objects on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 31

All documents and things concerning communication between or among, Haldeman, Lasser and any of the Putnam trustees in the period May - September 2003 concerning directed brokerage commissions.

RESPONSE NO. 31

Putnam objects to this Request on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 32

All documents and things concerning coverage reports for O'Malley and the identified males and/or the identified females for each of the reporting periods in 2002, 2003, 2004, 2005 and 2006.

RESPONSE NO. 32

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

13-

REQUEST NO. 33

    All documents and things concerning communication between or among Stoev and Morgan or other persons at Putnam in regard to the termination of Stoev's employment and the stated reasons for it.

RESPONSE NO. 33

    Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 34

    All documents and things concerning the "green card" application for Stoev that Morgan filled out.

RESPONSE NO. 34

    Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 35

    All documents and things concerning calendar entry(ies) (Lotus notes or otherwise) for Haldeman concerning any communication with Peers.

RESPONSE NO. 35

    No such documents exist.

REQUEST NO. 36

    All documents and things concerning communication between Morgan and Allansmith in the period 2002-2004 concerning comments upon or other feedback as to Allansmith's work performance.

RESPONSE NO. 36

    Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

14-

REQUEST NO. 37

All documents and things concerning communication in the period 2002-2004 between Morgan and McNamee, Scordato and/or Brooks concerning Svensson's or Allansmith's work performance or reasons or justifications for Svensson or Allansmith leaving Putnam's employment.

RESPONSE NO. 37

With respect to the Plaintiff, Putnam has already produced communications between Morgan, McNamee, Scordato and/or Brooks, in response to the Plaintiff's first request for the production of documents. With respect to Ms. Allansmith, Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 38

All documents and things concerning GER Active Portfolio Performance in the period January 1, 1999, through September 15, 2003, for Svensson or any of the identified males and/or the identified females.

RESPONSE NO. 38

With respect to the Plaintiff, Putnam will produce documents responsive to this Request. With respect to the balance of the Request, Putnam objects on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 39

All documents and things concerning comparisons in work performance in the period January 1, 1999, through September 15, 2003, of Svensson, any of the identified males and/or any of the identified females.

RESPONSE NO. 39

Putnam has produced all of the Plaintiff's performance reviews in response to Plaintiff's first request for the production of documents. Putnam objects to the balance of the Request on the grounds it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

15-

REQUEST NO. 40

> All documents and things, including, without limitation Human Resources Action Request and Requisition for Employee documents, concerning the move or transfer of any of the identified males out of GER in the period since January 1, 1999.

RESPONSE NO. 40

> Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 41

> All documents and things concerning YTD Attribution Analysis for the reporting periods between January 1, 1999 through September 30, 2003, concerning any teams of which Svensson, any of the identified males and/or identified females were members.

RESPONSE NO. 41

> With respect to the Plaintiff, Putnam will produce documents responsive to this Request. With respect to the balance of the Request, Putnam objects on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 42

> All documents and things concerning all Trustee Fact Sheets produced for the Putnam trustees on a quarterly basis in the period since 1994 concerning the performance of the various Putnam funds, including without limitation, the Putnam Growth and Income Fund, New Value Fund and the Global Growth Fund.

RESPONSE NO. 42

> Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 43

> Putnam's Officers' Directories for the years 2003-2005.

RESPONSE NO. 43

The Putnam Officer's Directory is a listing of personal contact information for 1,296 officers of Putnam, and as such, this Request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 44

All documents and things concerning bonus worksheets prepared or maintained at any time or from time to time in the period since January 1, 1999, in regard to the teams of which Svensson, any of the identified males and/or any of the identified females were members, including, without limitation, Core International, Core Domestic, Core Growth (later called Large Cap Growth), Value, Specialty Growth and GER.

RESPONSE NO. 44

With respect to the Plaintiff, Putnam will produce documents concerning her bonus worksheets. With respect to the balance of the Request, Putnam objects on the grounds that it is overbroad, burdensome and seeks information that is irrelevant an not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 45

All documents and things concerning the reports, analyses, measurements and/or rankings of the types included in documents LS-501, 503-506 for any of the identified males and any of the identified females, prepared in the period since January 1, 1999.

RESPONSE NO. 45

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 46

All documents and things concerning the reports, analyses, measurements and/or rankings of the types included in document LS-502 for the fund referred to and for the other Putnam funds, which were prepared in the period since January 1, 1999.

RESPONSE NO. 46

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the

17-

discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 47

All documents and things concerning attribution reports of the type included in LS-507-512 for the fund referred to and any other funds, which were prepared in the period since January 1, 1999.

RESPONSE NO. 47

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 48

All documents and things concerning sector level performance index ranks of the type included in LS-513-515 prepared in the period since January 1, 1999.

RESPONSE NO. 48

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 49

All documents and things concerning scorecards and second scorecards in regard to O'Malley, other MBAs and any of the identified males and/or any of the identified females prepared or maintained in the period since January 1, 1999.

RESPONSE NO. 49

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 50

The "notes" prepared by Tibbetts, which, "according to the Putnam privilege log, concerned "female partners."

18-

RESPONSE NO. 50

Putnam objects to this Request on the grounds that such documents are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

REQUEST NO. 51

The "undated" "notes" by an "unknown" author to an unidentified recipient, which, according to the Putnam privilege log, concerns "Svensson employment history."

RESPONSE NO. 51

Putnam objects to this Request on the grounds these documents were created by Putnam's Human Resources Office at the request of outside counsel, Louis Rodriques, and thus, are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

REQUEST NO. 52

The 1998 "maternity leave summary" prepared, according to the Putnam privilege log, by an "unknown" author for an unidentified recipient.

RESPONSE NO. 52

Putnam objects to this Request on the grounds these documents were created by Putnam's Human Resources Office at the request of outside counsel, Louis Rodriques, and thus, are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

REQUEST NO. 53

The September 3, 2003, "e-mail re: litigation forwarded with e-mail from [Attorney] Rodriques..." authored by McNamee and sent to the recipient, Brooks, as referred to in the Putnam privilege log but redacted so as to not disclose only the words used by the author or Attorney Rodriques in a "communication," within the meaning of U.S. v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950), each other, but disclosing the other words and information in either of the e-mails, including, without limitation, the identity of the author, the identity of the recipient(s), the date and time of the transmission and the words in the subject line.

RESPONSE NO. 53

Putnam objects to this Request on the grounds that such documents are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

19-

REQUEST NO. 54

The August 27, 2003, "e-mail re:  Draft termination agreement" from author Hadley to recipients McNamee and Attorney Rodriques, as referred to in the Putnam privilege log but redacted so as to not disclose the words used by the author or Attorney Rodriques in a "communication," within the meaning of <u>U.S.</u> v. <u>United Shoe Machinery Corp.</u>, 89 F. Supp. 357, 358-59 (D. Mass. 1950), with each other but disclosing the other words and information in the e-mail, including, without limitation, the identity of the author, the identity of the recipient(s), the date and time of the transmission, the words in the subject line and the attachment.

RESPONSE NO. 54

Putnam objects to this Request on the grounds that such documents are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

REQUEST NO. 55

All documents and things concerning the amounts and types of compensation, including, without limitation, salary and bonus, paid or payable to Svensson, the identified females and the identified females for each of the years 1999-2004.

RESPONSE NO. 55

With respect to the Plaintiff, Putnam has already produced documents and things responsive to this Request in response to the Plaintiff's first request for the production of documents.  With respect to the balance of the Request, Putnam objects on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 56

All documents and things identifying any of the identified males and any of the identified females who left the employ of Putnam on a voluntary basis in the period 1999 to date.

RESPONSE NO. 56

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

20-

REQUEST NO. 57

All documents and things concerning the circumstances and reasons for the voluntary terminations referred to in the immediately preceding category.

RESPONSE NO. 57

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 58

All documents and things identifying any of the identified males and any of the identified females who left the employ of Putnam on an involuntary basis in the period 1999 to date.

RESPONSE NO. 58

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 59

All documents and things concerning the circumstances and reasons for the involuntary terminations referred to in the immediately preceding category.

RESPONSE NO. 59

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 60

All documents and things concerning any severance package agreed to buy Putnam and any of the identified males and/or any of the identified females in regard to his or her leaving the employ of Putnam (whether voluntarily or involuntarily) in the period 1999 to date.

21-

RESPONSE NO. 60

With respect to the Plaintiff, Putnam has already produced documents and things responsive to this Request in response to the Plaintiff's first request for the production of documents. With respect to the balance of this Request, Putnam objects on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court. Putnam further objects on the grounds that this request is duplicative of the documents sought in Request No. 29.

REQUEST NO. 61

All documents and things concerning communication between or among Putnam, any affiliate of Putnam, and Landes, Eckland and/or Oristaglio/or any other person(s) concerning the testimony or possible testimony in a deposition or at trial in this case by Landes, Eckland and/or Oristaglio.

RESPONSE NO. 61

Putnam objects to this request on the grounds that it seeks disclosure of information that is not discoverable due to the attorney-client privilege and the attorney work-product doctrine.

REQUEST NO. 62

All documents and things concerning identifying or stating the total bonus pool available to Putnam for each since January 1, 1999.

RESPONSE NO. 62

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 63

All documents and things concerning identifying or stating the total bonus pool available to the IMD for each year since January 1, 1999.

RESPONSE NO. 63

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

22-

REQUEST NO. 64

All documents and things concerning the amounts of the bonuses allocated for each year since January 1, 1999, to such of the identified males and the identified females persons receiving a bonus.

RESPONSE NO. 64

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 65

The "anonymous" letter concerning Warren, which is referred to at p. 357 of the McNamee deposition.

RESPONSE NO. 65

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 66

All documents and things concerning the language used and/or the behavior of Warren of the type referred to at pp. 18-21 and 357 of the McNamee deposition.

RESPONSE NO. 66

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 67

All documents and things concerning communication between Lasser or Haldeman and the Human Relations Department at Putnam and/or any other person concerning the language used by and/or behavior of Warren referred to at pp. 18-21 and 357 of the McNamee deposition.

23-

RESPONSE NO. 67

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 68

All documents and things concerning the investigation of Warren by Tibbetts, which is referred to at p. 358 of the McNamee deposition.

RESPONSE NO. 68

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 69

If the "investigation" of Warren was not "handled" as the McNamee deposition states, by Tibbetts, but was "handled" in whole or in part by one or more other persons, all documents and things concerning the investigation of Warren by such other person or persons.

RESPONSE NO. 69

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST NO. 70

All documents and things concerning the compensation figures, studies and statistics referred to in the Allansmith deposition at pp. 88-90.

RESPONSE NO. 70

The compensation figures, studies and statistics referenced in the Allansmith deposition were performed by Ms. Allansmith, and Putnam does not possess any documents concerning such information. Putnam further objects on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

24-

REQUEST NO. 71

All documents and things concerning the Women's leadership Forum referred to at p. 180 of the Haldeman deposition.

RESPONSE NO. 71

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the ground that the Women's Leadership Forum (referred to at p. 180 of the Haldeman deposition) was not formed until after the plaintiff's termination.

REQUEST NO. 72

All documents and things concerning studies, analyses and reports and the results thereof by or on behalf of the above referred to Women's Leadership Forum.

RESPONSE NO. 72

Putnam objects to this Request on the grounds that the Request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the ground that the Women's Leadership Forum (referred to at p. 180 of the Haldeman deposition) was not formed until after the plaintiff's termination.

REQUEST NO. 73

All documents and things concerning communication from Haldeman to any other person and to Haldeman from any other person in regard to any one or more of the subject matters of the two immediately preceding categories.

RESPONSE NO. 73

Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the ground that the Women's Leadership Forum (referred to at p. 180 of the Haldeman deposition) was not formed until after the plaintiff's termination.

REQUEST NO. 74

The personnel files of Allansmith, DeChristopher, O'Malley, Peers and Warren.

RESPONSE NO. 74

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

REQUEST NO. 75

All documents and things concerning communication within Putnam in regard to the issue of "deprivation of [Svensson's] management responsibilities,"[1] which communication took place in the period prior to the Brooks' presenting to Svensson on August 28, 2003, of a document with three options concerning the status of her employment.

RESPONSE NO. 75

Putnam has already produced non-privileged communications and documents responsive to this Request in response to the Plaintiff's first request for the production of documents. All privileged communications have been noted in Putnam's privilege log. Putnam further states that this court, in response to Plaintiff's November 5, 2005 Motion to Compel Defendant's Production of Documents has already limited Putnam's obligation to produce communications between and among its personnel; and Putnam has already produced such information in accordance with this court's prior ruling.

REQUEST NO. 76

All documents and things concerning communication within Putnam in regard to the issue of "deprivation of [Svensson's] management responsibilities" and/or termination of her employment, which communication took place in the period following the Brooks presentation to Svensson referred to in the immediately preceding category, and the termination of Svensson's employment on September 15, 2003.

RESPONSE NO. 76

Putnam has already produced non-privileged communications and documents responsive to this request in response to the Plaintiff's first request for the production of documents. All privileged communications have been noted in Putnam's privilege log. Putnam further states that this court, in response to Plaintiff's November 5, 2005 Motion to Compel Defendant's Production of Documents has already limited Putnam's obligation to produce communications between and among its personnel; and Putnam has already produced such information in accordance with this court's prior ruling.

---

[1] As used in the Brooks deposition at p. 184.

26-

PUTNAM LLC,

By its attorneys,

_Joseph L. Kociubes_, BBO #276360
Louis A. Rodriques, BBO #424720
Rachael Splaine Rollins, BBO #641972
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: June 2, 2006.

Louis A. Rodriques, BBO #424720
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

27-

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon plaintiff's counsel by email and First Class Mail on June 2, 2006.

Allyson E. Kurker

Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA SVENSSON            .     CIVIL ACTION NO. 04-12711-PBS
    Plaintiff            .
                       .
      V.             .     BOSTON, MASSACHUSETTS
                       .     JUNE 21, 2006
PUTNAM INVESTMENTS, et al  .
    Defendants          .
                       .

. . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:      John K. Weir, Esquire
                    John K. Weir Law Offices, LLC
                    300 Park Avenue
                    Suite 1700
                    New York, NY 10022
                    212-572-6374

                    Kevin F. Moloney
                    Barron & Stadfeldt PC
                    100 Cambridge Street
                    Suite 1310
                    Boston, MA 02114
                    617-723-9800

For the defendant:      Joseph L. Kociubes, Esquire
                    Louis A. Rodriques, Esquire
                    Bingham McCutchen LLP
                    150 Federal Street
                    Boston, MA 02110
                    617-951-8000

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

I-2

1                          I n d e x

2  Proceedings                                              3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I-3

```
 1                        P R O C E E D I N G S

 2    (Court called into session)

 3              THE CLERK:  The Honorable Marianne B. Bowler

 4    presiding.  Today is June 21st, 2006 in the case of Svensson v.

 5    Putnam Investments, Civil Action No. 04-12711 will now be

 6    heard.

 7              Will counsel please identify themselves for the

 8    record.

 9              MR. MOLONEY:  Good afternoon, Your Honor, Kevin

10    Moloney from Barron & Stadfeldt in Boston.  With me is Mr. John

11    Weir from New York--

12              THE COURT:  Thank you.

13              MR. MOLONEY:  --co-counsel.

14              MR. WEIR:  Good afternoon, Your Honor.

15              MR. KOCIUBES:  Good afternoon, Your Honor, Jose

16    Kociubes and Louis Rodriques from Bingham McCutchen for the

17    defendant.

18              THE COURT:  Thank you, very much.  Well, we're here

19    for a hearing on two motions, docket entry numbers 53 and 71,

20    and I will start with number 53, the Motion to Compel.

21              MR. MOLONEY:  Yes, Your Honor.  We brought this

22    Motion to Compel Answers to Interrogatories because in

23    reviewing the questions and looking at the responses, I won't

24    call them answers, Putnam has declined respectfully to answer

25    virtually none of them.  The overriding issue it appears on
```

I-4

1  this motion and it has been throughout the experience of

2  this case since we were last before you in January is who are

3  the proper comparators to plaintiff, Lisa Svensson.  The

4  defendant seems to argue insistently that she has none, never

5  had any, has none now, never had any, notwithstanding her

6  record of achievement before she got to Putnam, which involves

7  seven years of sophisticated investment experience in New York,

8  hired by Putnam in 1994 in the research department, was

9  promoted from the research department into portfolio management

10  in 1997 and achieved what they say stellar comments as to her

11  performance, not only in numerical grades, but on the comments

12  of people with whom she was compared.  In 2002, she was demoted

13  from portfolio management back to research--

14          THE COURT:  Okay.  I know the facts.

15          MR. MOLONEY:  Okay, Your Honor.

16          THE COURT:  Let's go right to the Motion to Compel

17  and let's go to the individual interrogatories.  My style is to

18  go through these one by one, make a ruling and than, rather

19  than take something under advisement and you wait several

20  weeks.

21          MR. MOLONEY:  No, I understand, Your Honor.  If I may

22  just to set a little bit more of the facts for background.

23          THE COURT:  Sure.

24          MR. MOLONEY:  As I said, Putnam takes the position

25  that there are no comparators, number one.  They take the

I-5

1  position that the Court has already ruled on that issue.

2  Both of those contentions are incorrect.  The fact of the

3  matter is not only based upon Ms. Svensson's affidavit, there

4  are four on the current record, but also on Putnam's own

5  documents and in the deposition testimony of Mr. Oristaglio

6  former co-head of the investment division and Mr. Tibetts, head

7  of the human research division, it appears beyond question that

8  people were compared within the investment division, investment

9  professionals with investment professionals.  This investment

10  division was one of four divisions in Putnam,  Putnam as a

11  subsidiary of Marsh & McLellan, companies called MMC, one of

12  several, so we're looking at not the holding company, not of

13  all the subsidiaries, not all of Putnam Investments, but one

14  division inside of Putnam.  The Oristaglio deposition makes it

15  very clear that investment professionals, whether they were

16  assigned the research, assigned to a value team, assigned to

17  international growth, whatever team they were assigned to, were

18  compared with each others, at least for purposes of

19  compensation and bonus.  The documents that we cite in

20  footnotes four, five and six or our memorandum, documents that

21  came from the Putnam file, show that in other employment

22  actions people were compared across teams throughout the

23  division, whether it was for promotion tools to managing

24  director, whether it was for purposes of demotion.  We have set

25  forth in the exhibits to the fourth affidavit the names of the

1  67 males and the 24 females which we say are comparators of

2  Ms. Svensson and we have apportioned them into smaller groups

3  based upon the four key employment acts in said issue, failed

4  to pay equally, failed to promote to managing director,

5  demotion and then termination.

6       Now, with respect to the interrogatories in

7  particular, the other side takes the position that based upon

8  the events of the hearing in December, the Court has already

9  ruled.  Well, that is not true.  The transcript shows that the

10  Court on ruling on one of those requests for production said

11  not at this time.  Now, that was in a context where Putnam's

12  counsel had urged the Court to follow *Jackson v. Harvard* and

13  *Woodingham v. Amherst*.  The statements were made to the Court

14  that the international growth team was disbanded and the 10 or

15  15 people on that team were sent away to other places in the

16  company.  Well, that's not true because both Mr. Oristaglio in

17  his deposition on the 13th of June and Mr. Tibetts, I'm sorry,

18  Mr. Oristaglio on the 13th, Mr. Tibetts on the 8th, made it clear

19  that that team was re-organized.  It wasn't disbanded.  It was

20  made smaller and guess who lost out, Ms. Svensson, while the

21  males stayed or were given a career advancement.  The analogy

22  was made to the *Jackson* case and the Court knows the *Jackson*

23  case, and in the *Jackson* case, the district court judge decided

24  that the plaintiff would not be entitled to information about

25  librarians and others in the various other graduate schools at

I-7

1   Harvard where the administrative unit in question was the

2   Harvard Business School.  That makes great sense, and if we

3   were comparing Harvard University and its graduate school to

4   MMC and its various subsidiaries of which Putnam was one, it

5   might make some sense.  It makes absolutely no sense to cite

6   *Jackson* and say that Ms. Svensson cannot as a matter of law be

7   compared to other investment professionals within the

8   investment division, one of four divisions, when the fact of

9   the matter is that for years while she was there, she was

10  compared with other people, other investment professionals in

11  the investment division.  We have limited the scope of the

12  interrogatories.  Initially, they started out talking about the

13  workforce.  We have limited it to the investment division.  We

14  next limited it to investment for professionals within the

15  investment division and we have now reduced the scope of that

16  even further for purposes of this motion to what we call the

17  identified males and the identified females; that is the 67

18  males and the 24 females who are identified in the exhibits to

19  our fourth affidavit.  So for a variety of reasons, number one,

20  the Court did not rule with finality.  The Court said not at

21  this time.  Even if the Court had ruled with finality, the

22  Court is well within its rights to reverse that ruling, when

23  particularly there were representations made that the facts of

24  this case were very close to the facts of *Jackson* when the

25  exact opposite is true.  And thirdly, the past practice of

I-8

1   Putnam itself, comparing Ms. Svensson to other people,

2   whether they were in research, whether they were on the value

3   team, whether they were international growth, they were all

4   compared the same.

5          THE COURT:  Okay.  Let's get to the meat of it.

6   Let's go interrogatory by interrogatory.

7          MR. MOLONEY:  We are seeking an order by the Court on

8   interrogatories number 3, 4, 5, 7, 9, 10 and 12.

9          THE COURT:  I know that.  Let's go one at a time.

10         MR. MOLONEY:  Okay.  Numbers 3, 4 and 5 are all

11  related to each other.  They originally asked about the entire

12  exempt employment force.  We have reduced that as I said to the

13  identified males and the identified females.  We think

14  certainly the information asked for in 3, 4 and 5, with that

15  limitation based upon that factual background is something that

16  should be answered and not just objected to and not answered.

17         THE COURT:  All right.  Why shouldn't I order it

18  produced--

19         MR. KOCIUBES:  Thank you, Your Honor.

20         THE COURT:  --as to the 67 males and 24 females?

21         MR. KOCIUBES:  The answer to that I think is simple,

22  Your Honor, and that is that the way, I'm sure Your Honor

23  knows, comparator's work is it's by categories and that way

24  there's no cherry picking or anything else.  And it is by unit

25  under a same supervisor and that is the one thing that

1  throughout the entire discovery process plaintiff has had no

2  interest in discovering.  And so what she has done is she has

3  cherry picked 91 names, including twenty some females, and it's

4  not obvious to me how they're comparators for purposes of a

5  gender claim and then wants all sorts of invasive information

6  about them.  What I would urge Your Honor to do if you would

7  with me, because this then cuts over to a whole number of

8  categories, is go to plaintiff's documents and in the volumes,

9  it's called corrected volume three of three, it got filed I

10  think within the past couple of days--

11           THE COURT:  Right.

12           MR. KOCIUBES:  --let's start with, if we could, with

13  tab number 2, Your Honor, and she starts listing the people and

14  the way she comes up with her comparators have nothing to do

15  with who is in the same unit or who is in the same department

16  or of anything that anybody uses.  So for example, there's a

17  category, has managed people.  By that kind of criteria, Your

18  Honor, a sergeant and a general are comparators, and then she

19  cherry picks the ones that she wants to talk about.  One of the

20  categories, she adds up the number of points that you have,

21  then that presumably is the best person.  One of the categories

22  is maternity leave.  Whatever else the significance of that is,

23  whether or not you're on maternity leave doesn't make you a

24  better stock picker or worse stock picker.  What that's got to

25  do with being a comparator for purposes of the various

1  categories or the claims that she talks about is unclear.

2  Some of the people on the list are her subordinates.  By

3  definition they're not comparators.  Some of the people on the

4  list are two or three levels above her.  By definition, they

5  can't be comparators.  So the issue, Your Honor, is not whether

6  she should get comparators.  We've never said that there are no

7  comparators other than with one claim, the termination claim,

8  because she was terminated for a reason for which nobody else

9  best we can tell has ever been terminated and we can talk about

10 that, but we've never said with respect to the other claims

11 that they're no comparators.  What we have said is that she has

12 never asked for them and we've taken that position since day

13 one, and all she had to do was read the cases and ask by

14 categories and she gets a response.  She's not interested in

15 doing that.  Let me give you a further example about her

16 categories here.  They're all mixed together.  In 2003 for the

17 year 2002, Putnam did not give anybody new the designation of

18 managing director.  No man, no woman.  What's the relevance of

19 the chart?  It's not broken out by year or anything else.  It

20 is a list of names.

21         THE COURT:  Well, is there any possibility that you

22 two can sit down and come to an agreement on who the

23 appropriate comparators are?

24         MR. MOLONEY:  We should be able to do so, Your Honor,

25 if the other side is willing to look objectively at the facts

1  of the matter.  May I just add a couple of--

2         THE COURT:  I mean, is it your position there are no

3  comparators?

4         MR. KOCIUBES:  I'll tell you what our position is,

5  no, that is not our position.  Let me give you a plain answer,

6  Your Honor, and let me, if you want, I will tell you that it's

7  what we've been saying throughout the case what the comparators

8  are.  With respect, you have to look at it by claim.  You have

9  to look at it by category and not by individuals that somebody

10  picks out.  So let's talk about the claims.  There are

11  basically three or four different kinds of claims that the

12  plaintiff has.  She has a termination claim.  She got

13  terminated as Your Honor knows from the papers because there

14  was a problem with her managing people.  She was told that she

15  could continue on.  Her salary wasn't being cut as an analyst

16  but she would not manage people.  She didn't want that option.

17  She was given two other options.  One was to stay and job hunt

18  and the third was to take a package and leave.  She thought

19  about it for a month, came back and said no, none of that is

20  acceptable, but I'll tell you what, I want to be made managing

21  director and I want a guaranteed a million dollars a year for

22  each of the next two years.  That not surprisingly was

23  unacceptable.  She refused to budge.  At that point they said,

24  okay, you're terminated.  There is no comparator to that claim,

25  Your Honor.  There's nobody else that was fired for similar

I-12

1    kinds of reasons.

2            Next claim, she says that she was transferred in 2002

3    from the international growth team that managed the portfolio

4    to research.  Okay.  Now we've got something that we can talk

5    about.  The male on the head of that team was fired.  The

6    reason for what happened to that team is that they had ridden

7    the internet bubble.  They lost monies for their investors by

8    the bushel load and so a decision was made to move people

9    around.  The head, the male head was fired.  Various of the

10   other people went different ways.  There was a decision made

11   about plaintiff that she would be most effective in research.

12   So they sent her to research.  It was not a cut in

13   compensation.  With respect to that, the last time the parties

14   were here, you said, one of the orders is tell them or give

15   them documents, that's the context, where the other portfolio

16   managers on that team went.  There are a handful.  We did that.

17   There are five or six comparators there.  That is something one

18   can talk about.  They reported to the same guy and she knows

19   their names.  So that's what the legal comparators for that

20   claim are.  But they're not interested in that.

21            THE COURT:  What's your objection to that?

22            MR. MOLONEY:  To that, Your Honor?

23            THE COURT:  Uh-huh.

24            MR. MOLONEY:  It's because Putnam, and you can listen

25   to my brother as I have to him and his colleagues for months,

1    they have a very, very, narrow, narrow, narrow focus.  They

2    look only at the team she was on.  They don't look at any other

3    team.  They don't look across the division when in fact people

4    were compared not only within teams but across the division.

5    They want to narrow the time period of this to 2002 when she

6    was demoted, when the case law makes it absolutely clear that

7    evidence of things that happened after an event as in the BU

8    case are admissible and relevant and things that happened years

9    before the events are relevant, see the *Jackson* and the other

10   cases.  He talks about precisely the same reason.  Well, here

11   comes Putnam possessed of all of their evidence and all of

12   their documents and all of their testimony and says, well,

13   nobody was dismissed for precisely the same reason.  We are to

14   accept that.  The Court is to accept that without a fair chance

15   on our part to examine whether it's true.  They complain about

16   our talking about marital status.  Their own handbook says that

17   they are against discrimination on the basis of sex and they

18   are against discrimination on the basis of marital status.

19   That policy was confirmed by the head of the human resources

20   department just the other day.  That is our policy.  We don't

21   have a right on Ms. Svensson's behalf to compare women who are

22   married and women with children or women who expect to have

23   children and their treatment by Putnam with the treatment of

24   the males who had children, were expecting to have children.

25   They say we can't do that.  We say we have that we have a right

I - 14

1   to examine as to whether that's true or not.  We have, we

2   believe set out some criteria, admittedly they are not the

3   criteria that Putnam claimed it used when it made decisions.

4   That's a separate issue.  That's determining whether their

5   reasons were pretext.  We are trying to establish that there

6   are some people within the hundreds of people employed, many of

7   them investment professionals in this division, that there are

8   some men and women who were comparators.  We have picked

9   objectively measured and objectively understood criteria for

10  purposes of establishing that there are people in that division

11  with whom she should be compared in this case because she was

12  compared with the very same people when they made the decision

13  to promote her initially, when they failed to promote her to

14  managing director, when she was demoted and when she was

15  terminated.  And for my good friend on the other side of the V.

16  on this case to say that she, to imply to the Court that she

17  was given some wonderful options, that is absolutely not true.

18  She was told if she gave up her rights to a Title 7 claim and

19  any other claim and signed a release, that would be fine with

20  them.  It wasn't fine with her.  She was told she could stay on

21  and get paid and hunt for a job and then she said she could

22  stay on and never ever get promoted.  That's not--

23              THE COURT:  I'm inclined to permit some discovery

24  here, but what I'm suggesting is that I give you 14 days to sit

25  down together and to see if you can come up jointly with

I - 15

1   comparators, and if you can't, then I will come back and

2   we'll go, and if you can we'll go through these other

3   interrogatories, but I would like to see if you could at least

4   jointly agree at least on some of the issues.

5           MR. MOLONEY:  We will make every effort to do that

6   and we're ready to meet with them whenever is reasonably

7   agreeable to both sides.

8           THE COURT:  All right.

9           MR. KOCIUBES:  We have done it, Your Honor.  We will

10  obviously on Your Honor's request.  The one thing I want to be

11  clear about--

12          THE COURT:  Well, just be prepared to know that I'm

13  inclined to permit plaintiff to go in this direction, so it's

14  to your advantage to sit down and try and work together so

15  you'll be able to narrow it, otherwise it may be--

16          MR. KOCIUBES:  No, I understand it.

17          THE COURT:  --otherwise it may be much more far

18  reaching than you would certainly like.

19          MR. KOCIUBES:  No, I understand that, Your Honor.  But

20  the point that I was going to make is that what you just heard

21  was the same bleeding from one category to another category.

22  So that for example we went from the termination claim for

23  which, there is nobody else anywhere.

24          THE COURT:  Well, you'll have to work through each

25  claim.  That's - now, what about the Motion for Protective

I - 16

1    Order on the 30(b)(6)?

2             MR. KOCIUBES:  That's my motion, Your Honor.

3             THE COURT:  I realize--

4             MR. MOLONEY:  Your Honor, can we suggest that that be

5    held in abeyance pending these meetings that hopefully will be

6    productive?  The same underlying issue runs very much through

7    that.

8             THE COURT:  Okay.

9             MR. MOLONEY:  And if that's agreeable with the Court,

10   may I suggest that we have a deadline to file expert reports in

11   basically the end of the month, and if we're going to spend two

12   weeks and hopefully a shorter period of time successfully

13   working this out, that just, those dates just kind of clash and

14   we'd like to put that in abeyance too.

15            THE COURT:  By agreement?  Was it set by me or was it

16   set by Judge Saris?

17            MR. MOLONEY:  I believe it was Judge Saris.

18            MR. KOCIUBES:  Judge Saris.

19            MR. MOLONEY:  Judge Saris.

20            THE COURT:  I'm a little, file a motion, file a

21   joint--

22            MR. MOLONEY:  Yes, Your Honor, we'll do that.

23            MR. KOCIUBES:  Yes, Your Honor, if it's going to

24   slip, everything should slip.  We don't have a dispute, we

25   don't have any--

I-17

1        THE COURT:  Yeah, file a joint motion because I

2  think I have this, she sends it to me piecemeal.

3        MR. MOLONEY:  Yes, Your Honor.

4      MR. KOCIUBES:  But there is sort of, there is a second

5  level of issue here, Your Honor.  It's a fundamental difference

6  over the case, and let me sort of explain.  Discovery ended on

7  May 31 after two extensions.  Here's what has happened so far

8  in the case.  The plaintiffs have taken nine depositions.  They

9  have had, they have inquired – let me, in terms of sort of

10  working this out because I think you need to know some of this

11  context, the current CEO of Putnam was deposed for an entire

12  day.  The former CEO was deposed for an entire day.  The ex

13  head of investments was, he didn't work for Putnam anymore, was

14  deposed for an entire day, and by day I'm talking about 10 to

15  six.  The head of HR who's responsible for thousands of

16  employees was deposed.  The supervising, the HR employee

17  officer who was responsible for plaintiff at the end was

18  deposed for an entire day.  Her supervisor who made the

19  termination decision was deposed for an entire day.  Another

20  female managing director was deposed.  A subordinate who left

21  because he couldn't work for her out in California has been

22  deposed and one of several thousand employees, a female who had

23  nothing to do with plaintiff in the sense supervising,

24  reporting to or anything else was deposed.  We've gone through

25  a discovery process, Your Honor, where the CEOs and most

I - 18

1  everybody else were asked how much money they make here, how

2  much money they made at other jobs, as though that is relevant

3  to anything.  We've gone through where the head of HR was spent

4  being inquired about investment issues.  The head of

5  investments at the relevant time was given all sorts of HR

6  worksheets and comp worksheets that he had never seen before

7  and that he spent hours having to talk about.  We have seen

8  with respect to the CEO being asked how many times you're

9  married?  It was twice.  With whom did you have your children?

10  We have seen another supervisor asked about whether he had,

11  with no basis and he denied it, ever had an affair with the

12  woman who replaced the plaintiff?  It has been that kind of

13  discovery.  It has been discovery about everything other than

14  issues that are relevant to this case.  There has been

15  discovery and time has been taken up with, Your Honor will

16  remember that the market timing issues that hit the industry

17  not so long ago, they hit after plaintiff was gone.  Any time

18  there's anything in the plaintiff, in the newspaper about

19  Putnam it gets asked at a deposition, even if it post dated her

20  employment there.  There is nothing which is irrelevant.  So

21  what's happened, Your Honor, is that we have now had, plaintiff

22  has taken nine or 10 depositions, each one for virtually, at

23  least for seven hours, and now she finds herself at the end of

24  the process saying, but I need comparators and I need a

25  30(b)(6) deposition, which if you look at it, Your Honor, is

I - 19

1   essentially, there is no way to read it, but it's saying,

2   okay, now give me witnesses who will tell me everything that

3   Putnam knows about the plaintiff's claims, about their

4   defenses, about all of the witnesses.  That's not a 30(b)(6)

5   deposition and it is not something that will likely get

6   compromised.  And that has been the discovery here.  The

7   problem--

8           THE COURT:  I'm trying to get your colleague to relax

9   for a moment.

10          MR. KOCIUBES:  The problem, Your Honor, and that has

11  been when you're talking about these "comparators", it has been

12  the same kind of wandering around and who makes what kind of

13  money, whether it's a man or a woman or somebody else, without

14  reference to claim, without reference to category.  You heard a

15  second ago for example with respect to the transfer.  She

16  wasn't compared to people in other departments when she was

17  transferred.  There is no evidence to that affect.

18          THE COURT:  All right.  I've heard - Mr. Moloney,

19  briefly.

20          MR. MOLONEY:  Just very briefly, Your Honor.  Two

21  points, one is that we just agreed on the court order or the

22  Court accepted our agreement to postpone consideration of that

23  motion, yet my good friend, Mr. Kociubes, is trying to take up

24  the Court's time arguing the very same motion that's not - if

25  you took a look at the deposition transcripts, you would find

I - 20

1    Mr. Kociubes and Mr. Lasser's counsel directing the

2    witnesses not to answer, not because of privilege but because

3    they took the position that the questions and the answers given

4    would not be relevant.  Plain violations of the rules.  They

5    didn't adjourn the deposition for purposes of seeking a

6    protective order.  They wouldn't allow the witness to answer

7    the question over the objection.  They said, don't answer the

8    question.  It's leaving it up to us, which we don't have that

9    burden.  The burden is on them to show the propriety of those

10   things.  We're going to be bringing Motions to Compel answers.

11   When they produce documents and it's a plain piece of paper

12   that has the word redacted and we're supposed to figure this

13   case out, I don't think so.  One of their witnesses, I forget

14   now whether it was Mr. Lasser or Mr. Haldeman, said I can't

15   answer those questions.  You give me blank pages.  They gave us

16   the blank pages.

17            THE COURT:  Okay.  Fourteen days.  I don't like the

18   direction that this is going in.  I want you to work together

19   and see if you can come up with a common list of comparators

20   that you can agree on.

21            MR. MOLONEY:  Yes, Your Honor.

22            THE COURT:  If not, you know where I'm headed here.

23            All right, can we have a date, Mr. Duffy, in about

24   two weeks?  That takes us into the week of the 4th.  Counsel

25   around towards the end of that week or--

I-21

1          MR. KOCIUBES:  Which week, Your Honor?

2          THE COURT:  The week of the 4th?

3          MR. MOLONEY:  Your Honor, I just, on a case that has

4   a right to be advanced in the Middlesex Superior Court, just

5   agreed to move key depositions from Thursday and Friday of last

6   week in June to the 6th and 7th of that week, but certainly the

7   5th I'd be available and the following Monday and Tuesday, I

8   think, would be available.

9          MR. KOCIUBES:  Your Honor, I have a court hearing in

10  New York on the 9th which is I believe, no, the 7th is the Friday

11  of that week.  I have asked--

12         THE COURT:  All right, how about Monday the 10th?

13         MR. MOLONEY:  Monday the 10th is fine with us.

14         THE COURT:  In the afternoon, Mr. Duffy, what do we

15  have?

16         THE CLERK:  Well, Your Honor, we have a sentencing

17  hearing.

18         THE COURT:  Is that in the morning?

19         THE CLERK:  It's in the afternoon, 2:30.

20         THE COURT:  Okay.  No that's a complex.  That's going

21  to take some time.

22         MR. MOLONEY:  Can we do it at 4:00 then, Your Honor,

23  or do you think we'd need more time?

24         THE COURT:  What about the next day, the 11th?

25         THE CLERK:  That looks better, Your Honor.

I - 22

1              THE COURT:  What time is the sentencing hearing?

2              THE CLERK:  2:30, Your Honor.

3              THE COURT:  Well, I can do it on – no, I really

4    can't.  It's a criminal, it's a tough, tough case.  3:00 on the

5    11th.

6              MR. MOLONEY:  3:00 on the 11th, yes, Your Honor.

7              MR. KOCIUBES:  Yes, Your Honor.

8              THE COURT:  Work it out.

9              MR. KOCIUBES:  Thank you, Your Honor.

10             MR. MOLONEY:  Thank you, Your Honor.

11             THE COURT:  All right.

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

I - 23

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


_____          August 18, 2006

Maryann V. Young

Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA SVENSSON                    .      CIVIL ACTION NO. 04-12711-PBS
     Plaintiff                   .
                                 .
          v.                     .      BOSTON, MASSACHUSETTS
                                 .      JULY 11, 2006
PUTNAM INVESTMENTS, et al        .
     Defendants                  .
                                 .
.  .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:          John K. Weir, Esquire
                            John K. Weir Law Offices, LLC
                            300 Park Avenue
                            Suite 1700
                            New York, NY 10022
                            212-572-6374

                            Kevin F. Moloney
                            Barron & Stadfeldt PC
                            100 Cambridge Street
                            Suite 1310
                            Boston, MA 02114
                            617-723-9800

For the defendant:          Joseph L. Kociubes, Esquire
                            Louis A. Rodriques, Esquire
                            Bingham McCutchen LLP
                            150 Federal Street
                            Boston, MA 02110
                            617-951-8000

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

I-2

1                          I N D E X

2   | Proceedings                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2    (Court called into session)

3                 THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is July 11th, 2006 in the case of Lisa

5    Svensson v. Putnam Investments.  Civil Action No. 04-12711 will

6    now be heard.  Will counsel please identify themselves for the

7    record.

8                 MR. MOLONEY:  Yes, Your Honor, Kevin Moloney.  With

9    me is John Weir.  We represent the plaintiff.

10                THE COURT:  Thank you.

11                MR. KOCIUBES:  Joe Kociubes, Your Honor, with Luis

12   Rodriques for Putnam.

13                THE COURT:  Thank you, very much.

14                Well, counsel, bring me up to date.  Hopefully,

15   you've resolved some of what was problematic the last time you

16   were here because you--

17                MR. MOLONEY:  I'm going to answer that—

18                THE COURT:  --tested my patience the last time.

19                MR. MOLONEY:  Not wanting to do that again, I'm

20   afraid I do have to answer yes and no.  We spent close to four

21   plus hours last week in negotiations, Mr. Weir and I on some

22   telephones and my friends at defense side on other telephones,

23   spending most of that time discussing the issues arising from

24   the interrogatories, which was the first thing that Your Honor

25   paid attention to at the last hearing.  And I thought we made

I-4

1   great progress, and I think we're in agreement if I'm not
2   mistaken as to what the questions as realized by way of our
3   discussions should be in some cases and what the responses
4   might look like based upon those discussions.  For example, my
5   friends on the other side said that Putnam does not maintain
6   documentary records with respect to marital status or children,
7   and after discussing that for some minutes, Mr. Weir and I
8   agreed that we would not push that provided that we get a
9   representation from counsel on the other side to that affect.

10          We have also reduced the scope of coverage from 1994
11  coming forward to January of 1999, and in terms of comparators
12  for purposes of discovery only, Putnam is still free to argue
13  its original contentions with respect to a narrower scope of
14  comparators and our side is free to argue to the contrary.  We
15  have provided them with 91 names, sixty something of which are
16  males, twenty something of which are females and the scope of
17  our interrogatories were decreased in scope from the entire
18  workforce of the company to just the, what I call the
19  identified males and identified females.  There are a couple of
20  loose ends.  One question dealt with certain information.
21  Putnam had produced a document and we discussed our contention
22  that the document didn't fully answer the question, and I trust
23  that my friends on the other side will explore that a little
24  bit more and get back to us, but without it being written down,
25  it's my sense that we did reach an agreement at least on the

1    interrogatory issues.

2          MR. KOCIUBES:  If I could address that, Your Honor,

3    it is, I think we're in accord on all that.  Let me just

4    articulate all that just so there's a record of it.

5          There are two overarching issues, first of all, which

6    individuals, with respect to which individuals would

7    interrogatories be answered and then what kind of information

8    about those individuals.  With respect to the individual, we

9    have been arguing since day one that this universe, it was 16,

10   then 34, now 91 individuals are not within the guidelines of

11   the First Circuit, the appropriate universe of comparators.

12   For purposes of trying to get beyond this dispute, Your Honor,

13   or moving out as much of it as we can, we have agreed that we

14   will answer the interrogatories with respect to the 91 which

15   plaintiffs have chosen without in any way agreeing that that is

16   the appropriate universe of comparators.  Now, there are, that

17   leaves then I think four open matters of the kinds of universe,

18   two of which I think have now been resolved from what I heard

19   Mr. Moloney say.  We will in the course of answering the

20   interrogatories indicate that Putnam does not track either a

21   marital status or children.  People work at a place the status

22   of both changes over time.  People get married after they take

23   a job.  They get divorced.  They have children and so forth,

24   Your Honor.  It is not a category that relates to investment

25   performance that they keep track of.  So we will so represent

1   that, so that takes care of those two.  It then leaves two

2   other issues.  As I say, we will answer with respect to the 91,

3   but I want the record clear that there are two other matters

4   with which we cannot readily for the same reason as the marital

5   status and children answer, and those are these, Your Honor.

6   One of the interrogatories requests information on people who

7   were offered transfers, so the ability to move from one

8   department to another.  We have and will answer with respect to

9   people who did transfer from one department or another because

10  it is objective and it is tracked.  The problem we have with

11  the other is that you have a supervisor in one area saying to

12  an employee, gee, we'd like you to someday come to this area if

13  you ever think about it or the other way around.  Somebody

14  supervises, you know, you might be happier thinking about

15  moving there.  That's not the kind of thing which is tracked.

16  The transfers are tracked and we can answer in terms of the 91

17  with respect to that--

18          THE COURT:  Excuse me, Mr. Shapiro, the case was on

19  at 2:30.

20          MR. SHAPIRO:  Excuse me?

21          THE COURT:  The case was on at 2:30.

22          MR. SHAPIRO:  Right.

23          THE COURT:  So I suggest you contact Mr. Berman, Seth

24  Berman in the U.S. Attorney's Office and he can tell you what

25  transpired.

I-7

```
 1              MR. SHAPIRO:  Okay.  Thank you.  Sorry for the
 2   interruption.
 3              THE COURT:  And will you agree to exclude the time?
 4              MR. SHAPIRO:  Yes.
 5              THE COURT:  All right.
 6              Sorry for that.
 7              MR. KOCIUBES:  No problem, Your Honor.  So as I said,
 8   we will answer with respect to the objective data that we keep
 9   which is the transfer.  We don't have the other kind of data.
10   And then the last category, Your Honor, is interrogatory 7,
11   which asks, and maybe the easiest way for me simply to read it,
12   but--
13              THE COURT:  So it's agreed.  They don't have this
14   data on the transfer?
15              MR. MOLONEY:  They either have it or they don't and
16   we'll take what they have.
17              THE COURT:  I can't order them to produce what they
18   don't have.
19              MR. MOLONEY:  And we don't ask for them to do the
20   impossible.
21              THE COURT:  Okay.
22              MR. KOCIUBES:  The last issue there, Your Honor,
23   relates to interrogatory 7, and again, it's the same kind of an
24   issue.  The interrogatory asks, has Putnam or any of Putnam's
25   supervisory personnel, and recall we're going back to `99 to
```

I-8

1    2003, a lot of these people are not there anymore, has

2    Putnam or any of Putnam's supervisory personnel ever received

3    knowledge of internal complaints or statements relating to an

4    employees gender, gender by stereotypical comments, including

5    joking in the work place.  For the 91 people, to the extent

6    that there is a file of complaint, one can deal with that, but

7    to the extent that we're talking about an open-ended universe

8    relating to 91 people and did anybody ever hear out of the

9    plaintiff's presence a joke, we can't deal with that

10   interrogatory, Your Honor.

11          THE COURT:  That's reasonable I think.

12          MR. MOLONEY:  Your Honor, we discussed that at some

13   length, and I think one of counsel's main concerns was what you

14   might expect, and how do we explain to people in the HR

15   department what it is that we're looking for, and we discussed

16   that the typical kinds of remarks that are made in a case like

17   this distinguishes them from Mary Smith as a female and John

18   Smith as a male, some of those things, and I thought we made

19   some progress getting to where we agreed as what would be

20   looked for, and if there are things that the HR department can

21   find based on the documents, that's fine, but we're not going

22   to ask them to go beyond their file.

23          THE COURT:  All right.

24          MR. MOLONEY:  That was the, that was the yes part of

25   my answer.

1          THE COURT:  It was too good to be true.

2          MR. MOLONEY:  And the no part is that we just got

3   into discussing the 30(b)(6) issues on the latter part of the

4   second day, which was separated from the first day by a day of

5   I'm sure reflection on both sides.  And we got into those

6   issues, we were still hung up at that point on the scope of the

7   comparators.  We made a proposal to the other side that, and

8   further we thought of our agreements to try to limit the scope

9   of the 30(b)(6) by saying to the other side if you would just

10  produce the documents under the second request for production

11  that we filed a few weeks ago, and we will substitute the

12  subject matters of that second document request for the

13  original topics under the 30(b)(6).  We thought that that was a

14  limitation.  My friends on the other side didn't see it as much

15  of a limitation and scope as we did.  But we're now at the

16  point though where at least the purposes of discovery, both

17  sides reserving their legal rights and contentions on a

18  comparator.  If the other side would unredact the redacted

19  documents from the first request, except of course for valid

20  claims of privilege now that there also is a protective order

21  and confidentiality with regard to the 91, and they would

22  produce documents in the same fashion on the second request for

23  documents, again with respect to the 91, and we got those

24  documents, then if my good friends on the other side still had

25  some concern about the scope, would be in a far better position

I - 10

1    intelligently without detriment to our client's rights to

2    try to narrow it down.  Now, one of the points we made to them

3    which may not have been made in our papers was that on a

4    30(b)(6) deposition under Rule 32, such a transcript as the

5    Court knows can be used for any purpose.  We have taken

6    deposition testimony from the head of HR, a former chief

7    executive officer who is no longer such, and now the chief

8    executive officer who really wasn't there at the time.  So

9    those depositions as a general matter don't really suffice for

10   a 30(b)(6).  Having said that, we would be willing if those

11   documents are produced then to really go out trying to limit

12   the scope.  We have under preparation motions asking the Court

13   to order that.  We haven't yet filed them because we've been

14   concentrating on these other matters, but that may well speed

15   the finding of a way to get us out or the Court out of this

16   discovery predicament that we now find ourselves.

17           THE COURT:  What's your response?

18           MR. KOCIUBES:  A couple of things, Your Honor.  The

19   30(b)(6) motion is our motion for protective order so that I

20   would like to be heard on it because I think the issue is a

21   little bit different, Your Honor.

22           Let me--

23           THE COURT:  I'm just looking for the 30(b)(6) motion

24   on the docket because this has come to me sort of piecemeal.

25           MR. KOCIUBES:  It looks like it was filed--

1           THE COURT:  Can you tell me the day more or less?

2           MR. KOCIUBES:  May 24, Your Honor, is the stamp that

3    I have on the one that I'm looking at.

4           THE COURT:  Okay.  For the record, docket entry

5    number 71.  Okay.  That was referred on the following day.

6           MR. KOCIUBES:  Let me, Your Honor, if I could, just

7    respond to two comments which Mr. Moloney made and then I want

8    to, I would like to address the substance of the 30(b)(6)

9    motion.  One is that our essential dispute with respect to that

10   motion does not go to the nature of the 91 comparators.  It is

11   a different, it is a different issue.  We've attempted to

12   articulate it.  Secondly, the notion that there are I think

13   there are thirty something categories in the 30(b)(6) notice,

14   and you will see them in the body of our motion and I want to

15   address those and group them in a few moments, to say that it

16   is a compromise to okay, let's put those aside and look at a

17   document, the second document request which was served so that

18   the response, forget the documents, were due the last day of

19   the extended discovery period, that's some seventy-six

20   categories.  That's not a narrowing at all.  That's an

21   expansion and a dramatic expansion of discovery.  Our problem

22   with the 30(b)(6) notice is that in no meaningful sense to

23   virtually all of the categories, other than the one that had

24   testimony about already, can we respond to it.  And let me sort

25   of give Your Honor if I could the context.  This is a case

I-12

1  where the plaintiffs have taken nine out of their 10

2  depositions already.  They have deposed the, Mr. Lasser, the

3  former CEO.  They have deposed the current CEO.  They have

4  deposed the former head of the investment division in which

5  division the plaintiff worked.  They have deposed a supervisor

6  who gave her her alternatives which resulted in her separation

7  from the company.  They have deposed the head of human

8  resources.  They have deposed the human resource official who

9  was actually involved at the time of her leaving.  They have

10  deposed a senior female who was hired later than plaintiff was

11  and is a managing director.  They have deposed the young

12  analyst who is in LA who quit Putnam rather than to continue

13  working for her and then there's an additional deposition.

14  Most of those took seven hours.  With respect to sort of the

15  guts of the plaintiff's case, she's had ample opportunity of

16  all of them.  She reached her limits with respect to all of

17  them to ask them whatever it is she wanted to ask.  Why she's

18  no longer there, why she wasn't promoted and so forth.  If we

19  were on some of these topics doing a 30(b)(6), it would be the

20  same people.  The notion that a 30(b)(6) is somehow more

21  binding for purposes of trial, on Putnam, than an admission,

22  than testimony of the head of HR or the CEO simply isn't

23  realistic.  It's got to be the same testimony and assuming it's

24  relevant and so forth, presumably, I've never known any

25  superior court or federal court judge not to permit it, so

I-13

1    they've got that.

2            THE COURT:  What is it that you're looking for that

3    you don't have already?

4            MR. MOLONEY:  Well, Your Honor, let me just quote

5    from the deposition--

6            THE COURT:  Or that you couldn't have asked already?

7            MR. MOLONEY:  We have been asking, Your Honor, for

8    months, and until we finally reached agreement on the 91 for

9    purposes of discovery, we were getting nothing other than

10   information about plaintiff, Lisa Svensson.  For example, in

11   the deposition of defendant Lasser in this case, at page 11 of

12   his transcript, line one, question:  Okay.  Is it your

13   testimony that other than those documents you've never seen

14   these other documents before?  Answer:  No, I didn't say that.

15   I said I don't specifically recall.  You showed me a bunch of

16   blank pages so it's hard to remember.  We get page after page

17   after page of total redactions or partial redactions, and in

18   order to go through this, you had seven hours and you've spend

19   a lot of time and you don't get very far.

20           THE COURT:  But what can you tell me today to suggest

21   that there is someone who knows the answers to the questions

22   that you haven't had responses that are satisfactory to you?

23           MR. MOLONEY:  We are dealing with a very

24   sophisticated, relevantly large, internationally known manager

25   of other people's money.  They have very confident people

I-14

1   working for them.  It is up to the company to whom that

2   notice is given to produce witnesses who are either the

3   managing director or whatnot as the rule says--

4           THE COURT:  Yes, but you've had--

5           MR. MOLONEY:  --or educate other people.

6           THE COURT:  If you've had all these people in all of

7   these positions and you haven't gotten what you want, what

8   makes you think there is somebody else who has that

9   information, and the fact that you haven't gotten what you

10  want, you'll be able to use that at trial as a weapon?

11          MR. WEIR:  If I may respond to that, Your Honor.  In

12  the complaint, Your Honor, we were trying to **impled** a both a

13  disparate treatment and a disparate impact case based upon

14  gender.  Both of those claims require establishing with respect

15  to comparators that there are, either that the females were

16  disparate investment professionals, were disparately treated

17  based upon, vis-à-vis, the male comparators or the so-called

18  facially neutral employment policies had a disparate impact

19  upon female investment professionals.  Now, to this very

20  moment, we have not gotten information, documentary

21  information, answers to interrogatories or deposition testimony

22  in some significant part with respect to those comparators.  So

23  right now as it stands, it's very, very difficult to prove our

24  claim.  A 30(b)(6) notice--

25          THE COURT:  But who are you going to get in this

I - 15

1  30(b)(6) notice that you haven't had already?  That's what I

2  want to know.

3         MR. MOLONEY:  Well, we don't know the answer to that

4  question because that's a question only Putnam can answer.  If

5  they do put up a witness and maybe it might on or more of

6  people who testified in their individual capacity, they would

7  be testifying about matters that they didn't or weren't allowed

8  to testify to before by virtue of instructions from counsel and

9  their positions on the scope of the comparators.  We have asked

10 questions in depositions and we have not been able to get

11 answers about anybody basically but Lisa Svensson.  We are we

12 believe entitled to ask questions and get discovery from the

13 employer of the people we contend are comparators.  We now for

14 purposes of discovery have reduced it to the measure,

15 sixty-something and twenty-something.

16        THE COURT:  Mr. Kociubes, who would you produce in

17 response to this?

18        MR. KOCIUBES: The only way I can address that if

19 you'll permit me, Your Honor, is to, because the argument you

20 just heard doesn't have anything to do with the 30(b)(6).

21 There I think have been three questions on which a, the

22 opposition isn't yet due, a Motion to Compel Answers if the

23 deposition had been filed.  That's a separate matter.  Out of

24 the nine depositions, we got three questions I think.

25        Let me give you a couple of groupings and I think,

I - 16

1  just hearing you you understand what our problem is.  Item

2  20, any one or more of the identified females.  Item 19, any

3  one or more of the identified males.  What do they want a

4  witness about?  How do I prepare somebody or get somebody up

5  to, let me just run through it, you know, on anything that

6  somebody may think to ask about any one of 91 people over a

7  four year period of time.

8         THE COURT:  It has to be more specific.

9         MR. WEIR:  Your Honor, I don't disagree that it be

10  more - let me give you one example of--

11         THE COURT:  Well, it's not giving me, it's giving him

12  the example so he knows exactly who you want.

13         MR. WEIR:  We had a document production in very early

14  June from Putnam, and in that document production they produced

15  documents which identified something called a performance

16  rating, and on one of the documents Lisa Svensson's

17  information, which was the only information provided on that

18  document, her performance rating, which had been a 4.8, was

19  reduced to a 3.0, and--

20         THE COURT:  One at a time.

21         MR. MOLONEY:  --there were then two depositions which

22  ensued and all of, I asked questions about how that came to be,

23  and one of the witnesses, Mr. Oristaglio, indicated that that

24  was done for a lot of people.  Now, I don't have the

25  information and didn't at the time of the depositions.  I

1   didn't have the information regarding whether in fact Mr.

2   Oristaglio's statement was true, whether performance ratings of

3   other people were reduced or whether it was just Lisa Svensson

4   or perhaps just the female investment professionals whose

5   performance ratings were reduced.

6           THE COURT:  Well, did you ask further questions?

7           MR. WEIR:  I did, but because the document was blank,

8   there were no, there was no information with respect to anybody

9   that I could point to.  I couldn't point to somebody else and

10  say, wasn't so and so's performance rating reduced Or wasn't so

11  and so's performance rating kept the same while Lisa Svensson's

12  was reduced?

13          MR. KOCIUBES:  Your Honor--

14          THE COURT:  Well, what I fear is that if I allow this

15  deposition to go forward, they will produce somebody, You will

16  ask questions, that person won't have the information and it

17  will be a false start, and--

18          MR. WEIR:  Well, Your Honor--

19          MR. KOCIUBES:  Your Honor, can I just - again, just

20  so you that you understand that we're dealing with.  These are

21  paragraphs 31 and 32.  What they want is a witness under

22  30(b)(6) who can testify about any witness who had been deposed

23  in this case, about any matter referred to in either the

24  question or answer in any of the nine depositions he took.  How

25  do I prepare - all that is going to be is another motion to

I - 18

1    compel when somebody says, you know, it's 1,000 pages of

2    deposition.  How do I deal - I mean, if they've go it--

3           THE COURT:  I'll permit a deposition if you can

4    identify a person who you think has information that you

5    haven't been able to get so far relevant to this case, but so

6    far, I mean, the way it's, it's present form I'm not satisfied.

7           MR. MOLONEY:  Your Honor, if we could get a hold of

8    the documents with respect to, the unredacted documents that

9    is, we could narrow the scope of--

10          THE COURT:  What's your position on the unredacted

11   documents?

12          MR. KOCIUBES:  There's two positions, Your Honor.

13   Let me tell you first of all why they were, actually, second,

14   why they were redacted, but to the extent there are particular

15   documents that he thinks should or should have been unredacted,

16   he can file a motion on that.  That's how you deal with that

17   issue.  Documents were redacted for one of three reasons.  One,

18   it was about individuals for whom they never asked that were

19   not part of the 91.  There is no theory that gets him that kind

20   of information.  One of the things that last time you were

21   given a big book for example that every week HR sort of writes

22   a running log of what it is they worked on so if they dealt

23   with one individual, it might be good, it might be bad, it

24   might be somebody referred to some training.  The next week

25   they don't change that.  The next week they'll add a sentence

I-19

1    on it.  We, for example, produce everything there was on

2    that for Lisa Svensson.  Whenever you do that, Your Honor, the

3    counsel are put to a choice as we were in this case, do you

4    simply give them the relevant pages or do you give them

5    everything else that, including stuff they've never asked for

6    that's redacted so they can see what the total thing looks like

7    so that we've got, we've got things that have been redacted

8    because they've never asked for them.  We've got other things

9    that were redacted because they show up any privilege log

10   because they're privileged.  Those are the kind of things we're

11   talking about.  They have a right to challenge it, and if they

12   think we didn't give them enough description of generically

13   what's on that so they can bring the challenge in front of Your

14   Honor, that is something we can deal with them about.  But the

15   fact, the mere fact of redaction doesn't tell Your Honor

16   anything other than the fact that we were scrupulous in not

17   simply producing the one page that related, that we say related

18   to the case, but letting them see what the entire document

19   would have looked like.  But that again has got nothing to do

20   with the 30(b)(6).

21           MR. WEIR:  Your Honor, now that we've reached

22   agreement on the 91, we're only asking for the Court to redact

23   the documents with respect to those 91.  Those are for at least

24   discovery purposes the comparators.

25           MR. MOLONEY:  Your Honor, if I may just add one other

I - 20

1    thing.  We are complaining basically about four employment

2    actions, failure to pay equally, failure to promote, a demotion

3    and then as they call it, a deprivation of your management

4    duties, or as they ultimately agreed with us, it was a

5    termination.  Those are the four actions.  So it's not

6    impossible to produce a witness to testify about one or more of

7    the 91 in relation to those four specific things.

8           THE COURT:  So you have to retailer your request.

9           MR. MOLONEY:  Well, we will do that.

10          MR. WEIR:  We'll do that.

11          THE COURT:  All right.  So at this point, the docket

12   entry number 71, the Motion for a Protective Order, is allowed,

13   and you are directed to retailer your request narrowing it to

14   those four categories as you've just stated them.

15          MR. MOLONEY:  May the docket show that that's without

16   prejudice for us to redo that?

17          THE COURT:  Yes.  Yes.

18          MR. MOLONEY:  Your Honor, those are the Motions to

19   Compel Production of the Second documents and to unredact the

20   first, those, as I said, those motions are under preparation

21   and we'll be filing those as soon as possible.  I wonder if

22   those could be heard at the same time that the other motion

23   that has just been referred to you might be heard.

24          THE COURT:  Well, I'll talk to Judge Saris because

25   this case is coming to me piecemeal rather than just being

I - 21

1    referred for all pretrial management and if she wants to do

2    that, then I can tackle everything.

3              MR. MOLONEY:  Okay.  All right.  Yes, Your Honor.

4              THE COURT:  All right.  From defendants, satisfied?

5              MR. KOCIUBES:  Yes, we are, Your Honor.

6              THE COURT:  All right.

7              MR. KOCIUBES:  Thank you, very much.

8              THE COURT:  All right, you're welcome.

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

I - 22

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____          August 18, 2006

Maryann V. Young_____

Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA SVENSSON                    .        CIVIL ACTION NO. 04-12711-PBS
        Plaintiff               .

        V.                       .        BOSTON, MASSACHUSETTS
                                 .        OCTOBER 26, 2006
PUTNAM INVESTMENTS, et al        .
        Defendants               .

. . . . . . . . . . . . . .      .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:          Kevin F. Moloney, Esquire
                            Barron & Stadfeld, PC
                            100 Cambridge Street
                            Suite 1310
                            Boston, MA 02114
                            617-723-9800

                            John Weir, Esquire
                            John K. Weir Law Offices, LLC
                            300 Park Avenue
                            Suite 1700
                            New York, NY 10022
                            212-572-6374

For the defendant:          Joseph L. Kociubes, Esquire
                            Allyson Kurker, Esquire
                            Bingham McCutchen LLP
                            150 Federal Street
                            Boston, MA 02110
                            617-951-8000

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

2

1                    **I N D E X**

2    Proceedings                                            3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                           P R O C E E D I N G S

2          (Court called into session)

3              THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today's October 26, 2006 in the case of Lisa

5    Svensson v. Putnam Investments, Civil Action No. 04-12711 will

6    now be heard.

7              Will counsel please identify themselves for the

8    record.

9              MR. MOLONEY:  Kevin Moloney, M-O-L-O-N-E-Y, Barron &

10   Stadfeld Boston for Ms. Svensson, and Mr. John K. Weir of New

11   York, co-counsel is with us today.

12             THE COURT:  Thank you.

13             MR. KOCIUBES:  Joe Kociubes and Allyson Kurker, Your

14   Honor, Bingham McCutchen for Putnam.

15             THE COURT:  Thank you very much.  Well, we're here

16   for a hearing on docket entry No. 12, which is the motion, 112,

17   which is the motion to compel.

18             MR. KOCIUBES:  I believe there are two matters, Your

19   Honor.  There's also--

20             THE COURT:  Well, we'll start with the first one and

21   we take them in the order in which they're filed.  All right?

22             MR. MOLONEY:  Yes, Your Honor.  I filed last night a

23   reply memorandum which the Court allowed the motion for leave.

24   Mr. Kociubes was good enough to assent to the granting of that

25   relief.  It is one document, Your Honor, on the computer that

4

1    lays out on a category by category basis the category of

2    documents requested, the response of Putnam, the initial

3    argument we made in our motion and memorandum to compel and

4    then our reply.  So the Court either on the computer, and I

5    have an extra paper copy, if it would--

6            THE COURT:  If you have an extra--

7            MR. MOLONEY:  --be more convenient--

8            THE COURT:  --extra paper copy.

9            MR. MOLONEY:  --for the Court to look at them one by

10   one.  Mr. Kociubes has a copy as well.

11   (Pause)

12           MR. MOLONEY:  Preliminarily, Your Honor, there are

13   some just general points I'd like to make very briefly that are

14   made in our papers and even more briefly than they're made in

15   the papers, and then we can proceed to the specifics of the

16   request.

17           First of all, Putnam continues, as it has a right to

18   do, its position that the case is controlled by *Jackson v.*

19   *Harvard* and the *Whittingham* case, and we point out in our

20   papers as we have in other papers to the Court, that the

21   application of *Jackson v. Harvard* depends upon an analogy of

22   Harvard University, its business school and the other

23   independently autonomous graduate schools in the Harvard world

24   that we say it cannot be applied to the various investment

25   teams within the investment division.  It can only apply to

5

1 | Putnam itself.  So that's No. 1.

2 |      Number 2, because of the hearings before the Court on
3 | June 21 and July 11 and so forth, through some negotiations and
4 | at the orders and urgings of the Court, Putnam on September 1
5 | answered modified interrogatories in regard to the 91 folks we
6 | said were, contend are Comparators and the unredacted, the
7 | previously redacted documents in connection with those 91.  So
8 | we see no reason why they should not continue maintaining
9 | obviously their right to contest at summary judgment stage or
10 | at trial that none of these folks are Comparators.  But at
11 | least for discovery purposes we say that should continue.

12 |      Secondly, in regard to the conduct of certain folks
13 | that we say are Comparators, Mr. Scott, Mr. Kamshad and
14 | Mr. Warren, they take the position under the First Circuit
15 | case, *Conward v. Cambridge School Committee* that the conduct to
16 | compare has to do nearly identical.  We say that's looking at
17 | the wrong end of the telescope and the district judge at trial
18 | in that case, Judge O'Toole, made it clear and the First
19 | Circuit Court as I read the case did not disagree that the
20 | conduct as applied to this case has to be as serious or more
21 | serious.  So that's our position on that issue.

22 |      If you look at Exhibits A and B, Your Honor, there
23 | are some color graphs and charts that try to display, and I
24 | think they do display in very visual terms--

25 |      THE COURT:  What page?

6

1           MR. MOLONEY:  --why we are - it's Tab A and Tab B,

2 Your Honor.

3 (Pause)

4           MR. MOLONEY:  Putnam in its papers says well we've

5 given you thousands and thousands and thousands of pages of

6 documents and as one of their own witnesses whose deposition

7 Mr. Weir took, asked him to look at one of these redacted pages

8 and he said I can't answer any questions, it's all blank.  Well

9 we were dealing with all blanks except for documents as applied

10 only to Ms. Svensson up until September 1 when thanks to the

11 efforts of the Court they were unredacted.

12           The next quick point, Your Honor, is that there's an

13 email issue here which has been touched upon in front of the

14 Court but in some detail in the Putnam papers.  We have two

15 responses to that.  First of all is to observe that back in

16 December of `05 when our request for documents and

17 interrogatories, we're asking for information about all of the

18 Putnam work force.  The Court has led us to a position where we

19 have collapsed a number of years from `94 coming forward to

20 `99.  We have collapsed it even further to the investment

21 division.  Collapsed it even further to investment

22 professionals, collapsed it even further to the 91.  But as we

23 have taken the flat side of an isosceles triangle and brought

24 it down to this rifle shot point, amazingly and incredibly the

25 rhetoric on the Putnam side has grown.  This is a problem that

7

1  involves thousands of emails when it was this big universe and

2  now they're saying--

3           THE COURT:  The base of an isosceles triangle.

4           MR. MOLONEY:  Millions.

5           THE COURT:  Not the flat side.

6           MR. MOLONEY:  Well it's - math is but a long time

7  ago, Your Honor, and I majored in government and not in physics

8  so--

9           THE COURT:  I minored in physics.

10          MR. MOLONEY:  And took three languages in Latin

11  school and struggled with math, but be that as it may as the -

12  the focus gets narrower and sharper, the claim of millions of

13  emails arises.  And to make, I'm not a mathematician or a

14  statistician, it doesn't make any sense.  Number one.  The

15  second part of that is that there are new rules as the Court

16  knows on new discovery that take effect in a few weeks.  And

17  one of the keys to that it seems to me is that the rules are

18  now requiring that when this email problem arises,

19  contemplating at the beginning of the case I guess, that the

20  parties are to have a conference where information about what's

21  in the computer, what kind of computers, the whole system has

22  to be exchanged so that the parties using some experts, I guess

23  the rule contemplates, can kind of figure out are there real

24  problems or are there not.  So our suggestion is that the Court

25  apply those new rules now to this email problem.  Urging and

8

1   going beyond that, requiring the parties expeditiously to meet

2   and agree on that first conference so we can sort out and help

3   the Court ultimately to sort out whether this problem is real

4   or imagined.

5           One final thing on the email issue, in our reply and

6   in our motion we have restricted the coverage of documents to

7   documents to and from decision makers, concerning 14 people

8   here, 22 people here, which means an email search would be the

9   ins and outs of the decision makers, not email searches of the

10  ins and outs of the 22 or the 14 other people.  So it is indeed

11  further narrowed.  Anyway, those are the preliminary points

12  that we offer for the Court's consideration, and I'd be pleased

13  to start going through these one by one if the Court would like

14  to do that.

15          Number one is documents, things concerning criteria

16  actually used by people who participated in the decision making

17  process.  That's on page five of our reply memorandum.  And

18  basically Putnam makes two points, that there's been some

19  deposition testimony about it and they've already produced all

20  documents.  We would accept we don't have any more documents if

21  we are given a statement under oath by an authorized official

22  at Putnam that that is the case, so that we will have a

23  document which we can use at trial if necessary.  So--

24          THE COURT:  What's wrong with that, Mr. Kociubes?

25          MR. KOCIUBES:  We've represented to them in writing,

9

1    Your Honor, that they have everything there is.  This isn't an

2    interrogatory.  If they want it under oath, we'll give it to

3    them under oath, but the--

4              THE COURT:  All right.

5              MR. KOCIUBES:  --rules don't provide for it but we're

6    happy to do it.

7              THE COURT:  All right.

8              MR. MOLONEY:  That happens on several of these.  I

9    think it happens also on number--

10             THE COURT:  Well, let's see if we can do all that

11   are, fall in that category as a group.

12             MR. MOLONEY:  Okay.  That would be - as it happens,

13   Your Honor, I don't have these - I have them organized in

14   order.

15             THE COURT:  Okay, then go through them.

16             MR. MOLONEY:  But it'd be the same point and I won't

17   belabor it since we have reached agreement on the principal.

18   Svensson's request No. 2 on page six are documents and things

19   concerning the results of the application of criteria for

20   decision making.  And Putnam's opposition basically says, well

21   we've already given you lists naming the people and the

22   positions from and to.  Well that is true.  There was the email

23   issue and so forth, but it's not the what, only the what.  It

24   is the why.  If we have a list of John Jones and Mary Smith,

25   were moved from this position to that positions and Harry Jones

10

1   was moved to this other position, well, that's fine.  But the

2   key to the case is why did Putnam make the decisions that they

3   made?  And so it's our view that the giving of the list is not

4   a sufficient response and that we should be entitled in regard

5   to the 22 of the 91 Comparators that we refer to in that one at

6   the top of page 7, that we should be given documents concerning

7   those 22 people.

8           THE COURT:  What about the 22, Mr. Kociubes?

9           MR. KOCIUBES:  This is a broader issue that I guess I

10  would like to be heard on if I'm permitted to do so--

11          THE COURT:  Sure.

12          MR. KOCIUBES:  --I think generally, Your Honor, in

13  response to what Mr. Moloney had said.

14          Here's the issue, Your Honor, and it relates back to

15  the email issue that Mr. Moloney referred to.  Where we started

16  out is at a hearing last December where there were 15 email

17  boxes identified pursuant to Your Honor's determination that

18  were searched.  That was a massive search.  We produced all of

19  those documents.  Every document relating to Ms. Svensson that

20  had her name was produced.  These go back to the old Lotus

21  notes systems that they had, the email boxes 1999, 2000, 2001

22  up to 2003.  There is no intelligent way to search them in the

23  sense of searching by subject matter.  So that, for example,

24  one can type in Lisa Svensson and you will find every document

25  that has her name in the To line, in the From line, in the cc

11

1   or bcc line or in the text of the document.  With respect to

2   Ms. Svensson, it was easy, we just turned those over.  But if

3   Your Honor steps back for a second and thinks about it every

4   email that goes to everybody in the organization, for example,

5   she would be copied on.  Now when you start talking about 22

6   other people and they want to know sort of application of

7   criteria, it involves over a five year period of somebody

8   reading not about Ms. Svensson because those have been

9   produced, somebody's gone through all that, reading thousands

10  and to a moral certainty we can tell you hundreds of thousands

11  of documents.  The issue, the overriding issue, Your Honor, is

12  a little bit different.  If I could just take 10 seconds to

13  tell you how--

14          THE COURT:  Sure.

15          MR. KOCIUBES:  --we got here.  You remember at the

16  outset it was our position with respect to various of the

17  documents there were compensation worksheets and promotion and

18  so forth, that we were producing everything that related to the

19  plaintiff and as to other individuals we were redacting.  As a

20  result, as Mr. Moloney said, of hearings in front of Your Honor

21  actually teeing that up, Ms. Svensson produced some affidavits

22  and said these 91 people I deem are my Comparators and so I

23  want information about them.  We had arguments and it's

24  preserved for the trial judge that what we have is a cherry

25  picked list of, it is the equivalent of a sergeant saying I

12

1   want some information about those two generals and that

2   corporal and that major and five lieutenants and so forth,

3   under his claims.

4        In response to Your Honor's urging we did the

5   following, we said you know what, fine, we will do two things.

6   We'll go back to all of the documents that have been produced,

7   the worksheets and everything else, and to the extent that any

8   one of those 91 people appear we will unredact as to those 91,

9   so that there might be some sheets that would have two names

10  unredacted.  There might be another, you know, worksheet that

11  might have 50 names unredacted.  That we all turned over.

12       The second thing, since she's got a compensation

13  claim, the way we dealt with an interrogatory about these 91 is

14  we generated off the records and attached them under oath to an

15  interrogatory spreadsheet, which I can show you.  For each of

16  the 91 what we did was the following, Your Honor; we gave the

17  name of the individual, the age of the individual, the gender

18  of the individual, the date of hire of that individual, the, if

19  they left or were terminated, the termination date of the

20  individual.  They wanted to know if we could identify somebody

21  who had replaced them, the name and thus one could tell the

22  gender of the replacement, the official title, i.e. senior vice

23  president, vice president, managing director and so forth, of

24  every one of those people, the job title or function, were you

25  running money or an analyst or something like that, the

13

1   department that you were in, the base salary for every one of

2   the 91 and the annual bonus for all of the 91.

3         So there you have it in one place, and I'm happy to

4   hand it up to you if you'd like to see it.  So that the issue

5   is, Your Honor, to the extent that what plaintiff wants to do

6   is say look, I can discern some pattern among these

7   Comparators.  Most of them were men.  I think about 20 were

8   woman.  I can discern a pattern in the people that I, the

9   plaintiff, say are my Comparators of either a lack of

10  promotion, promotion discrimination or a compensation

11  discrimination.  One can now do whatever statistical analysis

12  one wants to do with that, Your Honor.  That's the objective

13  way of getting there.  We've produced that for each one of five

14  years, 1999, 2000, 2001, 2002, 2003.  That was her last year

15  there.  So they've got all that.  The problem is is that

16  doesn't discriminate.  That's the objective evidence.

17        So now what we're dealing with is, okay, we have that

18  and we can analyze it, but we now want you to search email

19  boxes and personnel files to see, for example, in 2000 why, you

20  know, if that person got a preliminary rating on a five point

21  scale of a 3.2 and that one of a 3.6, at the end of the day,

22  Your Honor, it is a massive amount of work and it doesn't go

23  anywhere because they were paid what they were paid and by

24  going job title from year to year you can see who was promoted,

25  the job title and the officer--

14

1           THE COURT:  They have that information?

2           MR. KOCIUBES:  Right.  That they all have.  So to go

3  back and look at the worksheets, I mean, they maybe good, they

4  maybe bad, it doesn't matter, at the end of the day the women

5  got paid what they got paid.  They either got promoted or they

6  didn't get promoted.  The men got paid what they got paid and

7  they either got promoted or didn't.  And if you think there's a

8  pattern they have all that stuff.  So now the notion, and this,

9  Your Honor, cuts through, this cuts through an awful lot of the

10  requests to go back and try to reconstruct that other stuff, it

11  doesn't go anywhere.  They've got the best evidence which is

12  what the actual final decisions were.

13           Now with respect to request No. 2, for example in

14  your question, the all documents concerning the result of the

15  application of the criteria.  Well the results of the

16  application of the criteria is what somebody got paid each year

17  and whether or not somebody got promoted each year.  To go back

18  and search email documents of people, cause there is no sort of

19  - maybe they can tell us a key word they want us to put in, but

20  there's not like there's a key word that we can go search--

21           THE COURT:  I mean can't, I mean--

22           MR. KOCIUBES:  That's the issue.

23           THE COURT:  How many emails are we talking about?

24           MR. MOLONEY:  Your Honor, if I - I didn't mean to

25  object--

15

1      MR. KOCIUBES:  I can--

2      MR. MOLONEY:  --to Mr. Kociubes' presentation, and

3  I'll wait until he's finished but I'd like to answer that

4  question.

5      MR. KOCIUBES:  If, Your Honor--

6      MR. MOLONEY:  If that, if I'm supposed to answer the

7  question, I'd be happy to get up there.

8      MR. KOCIUBES:  I don't know how he would know.

9      MR. MOLONEY:  Well that's part of the problem.  We

10  have the Court and we have two lawyers who are not, at least

11  I'm not a computer geek, although I use the computer a lot.

12      THE COURT:  I'm pretty good.

13      MR. MOLONEY:  But that's why we are suggesting, Your

14  Honor, the application of the new rules.  One thing that I have

15  learned, I talked to one E consultant very recently about this,

16  and I was told by her that there is a program that this

17  consultant has that can take the cc mail, this old program that

18  Putnam says it had, and convert that into Outlook.

19      THE COURT:  We had it to.

20      MR. MOLONEY:  They can convert that into Microsoft

21  Outlook.  And this company is very experienced in working on

22  law cases and picking the search terms and whatnot to do it.

23  So that's my first suggestion.

24      Secondly, Mr. Kociubes I think got off into salary,

25  bonus and total compensation issues which I'll mention in a

16

1  moment, but if you look at our reply on No. 2 and No. 3, we

2  are asking for emails only of decision makers which is a

3  discreet seven, eight or nine people, concerning--

4        THE COURT:  Well can we name those nine people?

5        MR. MOLONEY:  We have.

6        THE COURT:  All right.

7        MR. MOLONEY:  We have.  We have.  Let me, if I may,

8  Your Honor, on this objective of evidence and the salary

9  business.

10        THE COURT:  Well, let's just say emails of these nine

11  individuals - is that what it is?

12        MR. MOLONEY:  They were, I'm sorry, they were

13  decision makers which I think, for example, on number, category

14  No. 3 we identified 10 people, Your Honor, as the decision

15  makers and they're talking we want emails to and from them

16  concerning the four people who are brought in from the outside.

17        MR. WEIR:  It's the same for that.

18        MR. KOCIUBES:  Your Honor--

19        MR. MOLONEY:  I'm sorry?

20        MR. WEIR:  It's the same for 2.

21        MR. MOLONEY:  And the same on No. 2.  It's those--

22        MR. WEIR:  We're talking about a max of 10 people.

23        MR. KOCIUBES:  I'm looking at request 3.  There

24  aren't 10 people identified, but let's assume there are 10

25  people.

17

1          MR. MOLONEY:  And if you look, Mr. Kociubes, at the

2    top of page nine of our reply memo which includes our initial

3    argument on our motion, based, "based on the deposition

4    testimony of Putnam documents produced to date Svensson

5    believes that some or all of the following individuals were

6    decision makers, Oristalio, Morgan, Ferguson, Lasser, Landis,

7    Holderman, Brooks, Broocher, Miller and Scott." That one is

8    asking for information concerning the four people like Brooks

9    who were brought in from the outside. And the same decision

10   makers would be on No. 2 as well. So it's really very, very

11   limited.

12          Now if the Court has some concerns about this that's

13   why I suggested the new rules.

14          THE COURT:  Well, I'll consider it but I just don't

15   want some huge, huge undertaking. I mean we've--

16          MR. MOLONEY:  We don't either.

17          THE COURT:  --granted a lot of discovery in this case

18   already--

19          MR. KOCIUBES:  Your Honor--

20          THE COURT:  --and there's a point at which we have to

21   be reasonable.

22          MR. MOLONEY:  That's why, Your Honor--

23          MR. KOCIUBES:  Your Honor, may I respond?

24          THE COURT:  All right, let me hear Mr. Kociubes.

25          MR. KOCIUBES:  It's--

18

1    MR. MOLONEY:  All right, and then if I may on the

2  salary and the compensation issue, Your Honor, respond?

3    MR. KOCIUBES:  It is 10 people.  The bulk of the list

4  that you just gave were individuals who were all deposed, so

5  they had an opportunity to ask what they wanted of those

6  individuals.

7    MR. MOLONEY:  That, that's--

8    MR. KOCIUBES:  But it's--

9    MR. MOLONEY:  That's incorrect, Your Honor.

10    THE COURT:  Just a minute.  One at a time.

11    MR. KOCIUBES:  It is 10 people.  They wanted about 20

12  people so that each of the 10 you're looking for a sub-tree of

13  20.  Some of those people were there for the five years, some

14  less.  You can start doing that math and then when you get to

15  the system, Your Honor, which only does it by name, and this

16  goes back to the problem I mentioned earlier, if you searched

17  one of the 20 in somebody's box, you're going to get, you'll

18  get some substantive email, a lot of them, about - remember

19  this is an investment house, about investment, about

20  organization.  These are, about there's a bake sale next

21  Tuesday, the cafeteria is going to close earlier on Wednesday.

22  When you think about the cc's, the names would show up--

23    THE COURT:  Well can it be limited by word search?

24    MR. KOCIUBES:  Well, that's what we can't - there are

25  two things and I have a suggestion.  There are two things.  The

1  answer is we've never been given any words of these 20 to try

2  and do an electronic search of.  If there is a particular word

3  that at least would give us something to do - it's fine for

4  them to say let's apply the rules now but it's tantamount five

5  months after discovery is over to starting a whole new

6  discovery process, one of which they keep telling us, Your

7  Honor, we've gone through this on the 14, 15 rather, they keep

8  telling us it's not that big a deal.  We've gone through it

9  once.  I'm not hearing them offer to pay for this process if

10  it's so vital to them.  And there is a way to deal with this

11  issue.

12         MR. MOLONEY:  When I talked to that computer

13  consultant, she was good enough to give me a sample of their

14  tools or their techniques, and it does involve somebody

15  substantively, the lawyers and the clients with the expert,

16  coming up with the search trees and whatnot.  The simple thing,

17  the most amazing thing was that this old fashion cc can be

18  converted by software into Outlook and the search capability in

19  Outlook, based at least in my experience, is pretty good.  And

20  we are trying to work to--

21         THE COURT:  Well, who is going to pay for this?

22         MR. MOLONEY:  Well, first of all, Your Honor, I think

23  that we need to have the conference that the new rules suggest

24  so that we can figure out what's involved here before we leap

25  too quickly without knowing what, if there is a real problem

20

1    here.  And that's why we'd urge the Court to require us to do

2    that and we'll do our best to do it.  And we will engage

3    somebody to give us some expert advice.  I mean, we have been

4    at this case, Your Honor, since 2004.

5              THE COURT:  Yeah, and it's going to come to end

6    pretty soon.

7              MR. MOLONEY:  And we have been fighting about

8    redacted, redacted, I'm not going to give it to you, I will not

9    send over a document until you get a court order to do it.

10   This case has been time consuming for the lawyers as you know

11   and exceedingly expensive.  And we have no interest in

12   prolonging this or increasing the costs, which are enormous at

13   this point.

14             MR. KOCIUBES:  Your Honor?

15             MR. MOLONEY:  Now if--

16             MR. KOCIUBES:  If I could just respond to that sort

17   of confer about words.  If this is a bonafide discovery issue

18   as opposed to for a back door and opening brand new discovery,

19   there's been nothing that's prevented Mr. Moloney from either

20   calling or emailing us the following four or five or eight

21   words is what we would like searched from these X boxes.

22             THE COURT:  Why can't we just decide that right now?

23   Is that so complicated?

24             MR. MOLONEY:  Which, Your Honor?

25             THE COURT:  The key words.

21

1          MR. MOLONEY:  Well, it--

2          THE COURT:  I mean, I can't believe that it's--

3          MR. MOLONEY:  I can't, I'm not in a position, Your

4    Honor, to in effect shoot from the hip on that.  I mean--

5          THE COURT:  Well, surely if you've already talked to

6    a computer expert you have in your mind what it is you're

7    looking for?

8          MR. MOLONEY:  I have talked to a computer expert,

9    Your Honor.  First of all to see if you can convert their old

10   system into something that we all have today.  I was told yes.

11   And then I was told that there are ways of developing search

12   terms and search methods, but you need to have the computer

13   person give you some assistance in doing that.  If I thought

14   that this would be something we would be doing at the

15   courthouse today, I would have asked her to be with us and to

16   do the work on this but that is not the case.  And I don't want

17   to be in the position, Your Honor, of just shooting from the

18   hip off the top of my head and coming out with a few words.

19   Mr. Kociubes, as any good lawyer would, would seize upon those

20   words and say that's your search term, take it or leave.

21   That's not what the new rules contemplate.

22          New rules contemplate, as I read them, people sitting

23   down, free exchange of information as to what the capabilities

24   of the system is and trying to work together, work it out.

25          THE COURT:  Mr.--

22

1             MR. MOLONEY:  We haven't done that yet.

2             THE COURT:  Mr. Duffy, do we have a final status

3    conference in this case for January 4?

4    (Pause)

5             MR. MOLONEY:  I think there's early January,

6    Mr. Duffy.

7             THE COURT:  January 4th, yeah.

8             MR. KOCIUBES:  I think that's right.

9    (Pause)

10            MR. KOCIUBES:  While he's looking, Your Honor--

11            THE CLERK:  Absolutely, Your Honor.

12            THE COURT:  It's on the docket.  In September we said

13   we would gather here on January 4th.  The docket happens to say

14   2006, but it--

15            MR. MOLONEY:  It's 7, yeah.

16            THE COURT:  --clearly means 2007.

17            MR. KOCIUBES:  Your Honor, this--

18            THE COURT:  You know, I'm just looking at the

19   timeframe here and I want that to be the final status

20   conference.

21            MR. MOLONEY:  We are not asking for any changes in

22   any of those dates, Your Honor.

23            THE COURT:  Well, the--

24            MR. MOLONEY:  All I can tell you is that I am

25   committed as is Mr. Weir and Ms. Svensson to getting this case

23

1   done.

2          THE COURT:  Okay, then sit down and confer within one

3   week--

4          MR. MOLONEY:  Okay, Your Honor.  Thank you.

5          THE COURT:  --to see if you can get together on this

6   E discovery--

7          MR. MOLONEY:  Okay.

8          THE COURT:  --and I think what you better think long

9   and hard about is coming to some resolution between yourselves

10  because you might not like what I do.

11         MR. MOLONEY:  I understand, Your Honor.  We'd be

12  happy to do that.  Could I, Your Honor, just move on to - there

13  are some other issues in this request for documents that are

14  not email related.  And while I think of it here, Mr. Kociubes

15  did have his client, because of the activities of the Court,

16  give us information about salary and bonus.  What we don't have

17  yet is total compensation, and total compensation is stock

18  securities.  And if you take a look as Ms. Svensson has done

19  and Mr. Weir and I have done, at the salary plus bonus numbers

20  of a given individual for a given year and then you compare it

21  to what the *Wall Street Journal* and the *Boston Globe* reported

22  about how much these people were making, there is a, multiples

23  of seven figures difference.

24         THE COURT:  Doesn't everybody, did anybody ever tell

25  you not believe everything you read in the paper?

24

1           MR. MOLONEY:  But, that is true, Your Honor, but

2    when Mr. Kamshad or Mr. Scott or some of these other people,

3    and Mr. Holderman says I'm happy to have what I make put out in

4    the newspapers, it gives us reason to believe that the whole

5    picture is not given by the salary and bonus.

6           MR. KOCIUBES:  Your Honor--

7           THE COURT:  So we're simply asking for total

8    compensation on that issue.

9           THE COURT:  As to which individuals?

10          MR. MOLONEY:  Well that's, there's - on the

11   Comparators, Your Honor.  They've given us for example, and I

12   included it in our papers, on September 29 I sent a notice, as

13   the Court said we should, a notice if we thought it was

14   appropriate to do it, a notice over to the other side pointing

15   out specifically and it's here in our memorandum which I--

16          THE COURT:  Well, why don't you just ask the simple

17   question first of all, whether or not the Comparators had any

18   additional compensation that hasn't been listed so far?

19          MR. MOLONEY:  We know that, Your Honor.  And in fact

20   what we did on September 29 was send a notice on a year by year

21   basis to my good friends on the other side, pointing out the

22   specific document with Bates Number.  Let's say, for example,

23   Your Honor, there were 71 of the 91 Comparators were employed

24   in let's say 2000.  We pointed out specifically how many of

25   those 71 we were given total compensation for.  And we got it

25

1   for some, but not for others.  In one year we didn't get any

2   of it.  So on the one hand they say we're not entitled to it,

3   you should be satisfied with salary and bonus.  On the other

4   hand, they've given partial information but not complete

5   information.  And how in God's name can we have an expert or

6   ask the jury to believe that our presentation on the equal pay

7   claim is a fair presentation of the claim when we are saying

8   salary and bonus but we know that there was additional

9   compensation and we haven't included that.  That doesn't make

10  any sense at all.  And in fact, they've given us total

11  compensation for some people for some years, but not for all of

12  the Comparators who were there for all of the years.  What's

13  the big deal?

14          THE COURT:  Mr. Kociubes?

15          MR. KOCIUBES:  Can I address that, Your Honor?

16          THE COURT:  You may.

17          MR. KOCIUBES:  What's interesting about that

18  presentation is that it's unhinged from any document request or

19  interrogatory.  The interrogatory that triggered this, Your

20  Honor, was a request to provide salary information.  The

21  plaintiff here was a senior vice president of this company.

22  She knows how compensation works, didn't even ask for bonus

23  information.  In responding to that interrogatory we gave them

24  a column that showed salary and we gave them gratuitously a

25  column that showed bonus.  They had never asked for the other

26

1  stuff.  To this day there's no outstanding interrogatory

2  asking for it.  They got what they asked for and they got more

3  than what they asked for.

4         Two, as to the incompleteness, they have complete

5  charts.  When we got this motion my partner, Mr. Rodriques,

6  tried to call Mr. Moloney a couple times to explain that

7  situation to him.  We never got a return call because the

8  agenda is a motion.  That's fine.  Let me give you some

9  examples of why it is apparently not complete.  Bonuses are

10  typically awarded to people who are there at year end so that

11  if somebody either left or was terminated before year end on

12  the spreadsheets that we gave them, they would show that they

13  had been there that year and the termination date is there but

14  they wouldn't get a bonus.  So the bonus column would be empty.

15  There are other things that go through like that.  We have

16  given them a complete set of data.  To the extent that there

17  are holes in the data it's because there is no data there, Your

18  Honor.  And I don't know - we could file 15 motions but it's

19  not going to change that.

20         THE COURT:  Well, I can't ask him to produce what he

21  doesn't have.

22         MR. MOLONEY:  Well, Your Honor, they have it.

23  Mr. Kociubes is correct, I think, although we have disputed

24  about it, but lest assume he was correct in saying we didn't

25  ask for bonus but asked for only - I mean, total conversation

27

1   we didn't use those terms, we used just salary and bonus.

2   First of all as I pointed out in our motion and memorandum we

3   had a disagreement as to whether the deal that was cut back in

4   July including total compensation or not.  Mr. Kociubes and

5   Mr.  - Mr. Rodriques called me up and said that I was wrong.

6   We just believed that we had agreed that we were going to get

7   the total but we didn't.  We are asking for the documents

8   concerning total compensation in this document request.

9          Now, it cannot be, Your Honor, that only, that they

10  can find information about some of these folks about stock and

11  they can't find information or it doesn't exist for the rest of

12  them.  That makes absolutely no sense.  Mr. Kociubes did not

13  tell you that we didn't ask for total compensation in our

14  request for documents and in fact we did.

15         MR. KOCIUBES:  We believed, Your Honor, between--

16         MR. MOLONEY:  It can't be true that Putnam, one of

17  the oldest and until recently one of the most prestigious

18  investment houses on God's earth who pays some of its top

19  people bazillions of dollars a year in cash, deferred

20  compensation and securities, cannot find how many millions of

21  dollars in addition to salary and bonus Mr. Scott or Mr. Warren

22  or Mr. O'Malley or any of these other characters at Putnam got.

23  That makes absolutely no sense.  The government makes them keep

24  the records.  And these people over there who work there what

25  they think of most of the time is how many millions did you get

28

1  and how many millions did he get.  And to say they don't have

2  it, that makes absolutely no sense.  And we have asked for it

3  in the second request for documents.

4         MR. KOCIUBES:  We don't say they don't have it, Your

5  Honor.  What we say is there is, in this argument there is

6  bleeding back and forth between the interrogatories, which ask

7  the question and which we answered more fully than what it

8  asked and the document request, Your Honor, which asked us to

9  unredact documents.  With respect to the 91, we unredacted the

10  documents with respect to the 91.  The information that's there

11  is there.  We didn't redact anything with respect to the 91.

12  Where the issue of this, of the other compensation is relevant,

13  if anywhere, is in response to an interrogatory where they

14  never asked it.  In the document request what we hear and what

15  they're complaining about is it's not on the documents that

16  were produced.  That's right.  We didn't generate the

17  documents, we gave them the documents unredacted for the 91 and

18  whatever is on any particular page is on there.  That was the

19  thing that I said to you at the beginning with respect to the

20  various documents.  Some of them might have 50 of the 91, some

21  of the emails might have three of the 91.  Of course they don't

22  all have all of the 91, but in response to a document request

23  we can only give them what's there.  If they've got a problem

24  with an interrogatory, that motion they haven't made yet.

25         MR. MOLONEY:  Your Honor, what Mr. Kociubes is

29

1   artfully doing is deflecting I think the attention from where

2   it should be.  He's criticizing the wording in our first

3   interrogatories.  He's criticizing the wording of our first

4   request for documents.  I mentioned the document production

5   that he did make only to establish to the Court that they have

6   information of total compensation, the second request for

7   documents, despite what may have been in the first request and

8   despite what may have been in the interrogatories, ask for

9   documents on total compensation.  He's now admitted, as well he

10  should, that Putnam has the information.  It's asked for in the

11  second document request.

12          THE COURT:  Can you provide it, Mr. Kociubes?

13          MR. KOCIUBES:  Of course we can provide it, Your

14  Honor.  I've never said that we couldn't provide it.  What my

15  problem has been is that it was never asked for in the

16  interrogatories where you could get the information.  As to the

17  documents were unredacted, the documents are what the documents

18  are.  We didn't cover up some of the information.

19          MR. MOLONEY:  I'm not accusing him of covering it up.

20          THE COURT:  No, no, no.  To be produced.

21          MR. KOCIUBES:  And, Your Honor--

22          MR. MOLONEY:  Your Honor, moving on--

23          MR. KOCIUBES:  --just so that we're all on the same

24  page, I just want to be clear what it is that you've indicated

25  to be produce--

30

1          THE COURT:  Information on total compensation.

2          MR. KOCIUBES:  Okay.  For the 91?

3          THE COURT:  Right.

4          MR. MOLONEY:  Your Honor, moving on to No. 4, again

5    it's similar to No. 3.  This deals, a subject matter dealing

6    with people who weren't promoted from within but were brought

7    in.  Again, it's a similar one to the early ones.  We're asking

8    only of identify decision makers with regard to specified

9    people.  So I would think that the same answer for No. 4 would

10   be as what we had on the earlier two or three.

11          No. 5 and our reply is on pages 13 and 14 of the

12   memorandum, this deals with pools of persons who were

13   considered for appointment or election as managing director or

14   portfolio managers.  And again, this is not the issue of only

15   the what, but it is of the why and lists of the fact as to what

16   happened isn't enough and we need to know the why.  And then we

17   say that we should be given the documents on that one, and that

18   is dealing with communications among the people who made the

19   decisions as to who's in the pool or not.  So again, it's

20   limited.

21          No. 6--

22          MR. KOCIUBES:  Can I respond before we get too far.

23          MR. MOLONEY:  Go ahead.

24          MR. KOCIUBES:  Then I'll only respond to that last

25   one because that's the email issue.  And in terms of--

31

1        THE COURT:  Well as to all the E issues I want you
2   to sit down and meet and confer.

3        MR. KOCIUBES:  Okay.

4        MR. MOLONEY:  All right.

5        MR. KOCIUBES:  I just wanted to be clear about that
6   because what they do have is on those spreadsheets they have,
7   they've got the titles year to year so they can figure out who
8   got promoted.

9        THE COURT:  No, I want you to sit down and try and
10  see if you can narrow and figure out that whatever you're going
11  to have to, you're going to do has to be done by January 4th.

12       MR. MOLONEY:  Your Honor, we will do that.  I'll try
13  not to prolong this with the email business.  One of the other
14  objections that my good friends have made on behalf of Putnam
15  is that they say that we're trying to try a class action case
16  or we're trying to try 29 or 30 or 14 other cases.  We're not
17  doing that all.  We have a disparate treatment claim, we have a
18  disparate claim, and we think that we're entitled to discovery
19  generally as to what happened to other females and males either
20  before or after Ms. Svensson was fired abruptly in September of
21  2003.

22       Let me move on to No. 7, Your Honor, which is set out
23  on page 16 and the positions of the parties are on 16 and 17.
24  This deals with a document called a 360.  In the Putnam world,
25  we have learned that 360 is a report that assembles in one

32

1   place about one person what everybody else in the building of

2   the company thinks of that person.  And these are used by the

3   Putnam people to make judgments about demotions, promotions,

4   salary, bonuses and extra compensation of Putnam, and so these

5   are discreet documents.  If you ask somebody at Putnam what a

6   360 is they know what a 360 is.  So there's no problem there.

7   And we have limited it for purposes of No. 7 as we point out on

8   page 17 about halfway down, we're limiting this one to 21

9   identified males and 12 identified females which is about as

10  far as we can go without hurting our case on that.  So we think

11  that on that limited basis that we should, we should be

12  entitled to these 360's.

13          So, this again gets at the why versus the what.  The

14  list and the documents about the what is part of the picture.

15  The 360's will fill in the picture.  And we're not asking for

16  all the company, all the investment division or all the 91.  on

17  this one we're asking for the 360's on 21 identified males and

18  12 identified females.

19          MR. KOCIUBES:  It's more than that times five years,

20  so you can do the math on that, Your Honor.  The issue here is

21  the same thing that I started out with.  I may be misogynistic

22  or somebody may think I'm misogynistic, whether a particular

23  female who works for me has a claim is based on, if it's a

24  compensation claim, is whether I'm paying her less than a male

25  doing a comparable job.  If it's a promotion claim, it's

33

1  whether I'm promoting men but not the woman.  If it's, I'm

2  somehow harassing women then there's behavior aimed at them.

3  So going back to 360's of other individuals that is exactly

4  what we're going to do is try those 21 cases because then it

5  gets to be this person has a 3.2 different group.  This one or

6  Ms. Svensson has a 3.3 or 2.8 or 4.5.  What's the difference?

7  What matters here is the information we gave them.  They've got

8  her compensation.  We know what happened to her and her titles,

9  and they themselves choose 91 people to say these are the

10  Comparators and we've told them of the 91 who got promoted what

11  year or didn't get promoted, what their - you've now ordered in

12  addition to the salary and bonus, the other compensation so

13  they're going to get that.  The rest of this, Your Honor, is

14  opening a massive door to potential further discovery disputes

15  and anecdotally trying some different case.  If they want to

16  prove the case statistically that there's some discrimination

17  against women, it's harder for women to get promoted, they've

18  chosen their Comparators and they have that data.

19          MR. MOLONEY:  Your Honor, one example of what we're

20  trying to find, which we think we have a right to find even

21  under the now reduced relevant to claims of defenses of the

22  parties as I said before is the why.  One of the documents that

23  we did get in unredacted form only on September 1 was a

24  document that pointed out that one of the males who got very

25  favorable treatment had, "a volatile personality."  Same claim

34

1   was made against Ms. Svensson.  This fellow stays, gets more

2   money and gets promoted.  Ms. Svensson gets booted out of the

3   firm.  The 360's flush out the why.

4         They have agreed to give us discovery on 91 people.

5   Now they are complaining on the 360 review where the why will

6   be explained, where perhaps other people who have volatile

7   personalities or other psychological problems, but we're now

8   down to 21 males and 12 females.  That's 33 people where

9   they've agreed to give us discovery on three times as many

10  people.

11        THE COURT:  To be produced for those individuals.

12        MR. MOLONEY:  Thank you, Your Honor.  The next one

13  would be No. 8 on the top of page 18.  This is a similar

14  situation, Your Honor.  This is year end reviews, documents

15  called PVPR's, which is a term of art, performance reviews,

16  investment division and ISD Human Resources updates.  These are

17  forms and things that they do at Putnam that evaluate the

18  performance of people.  And we're asking that those documents,

19  which are discreet documents, they have to find them; they use

20  them, be produced for the 91 Comparators.  And the reason we're

21  asking for it is that we need to see how at the time of the

22  events how these people at Putnam evaluated Ms. Svensson in

23  relation to the Comparators bearing in mind our treatment and

24  disparate impact claims.

25        MR. KOCIUBES:  This is really not a discreet group,

35

1  Your Honor.  There was for a period of time there was with

2  respect to the Human Resources update what the various of the

3  Human Resources, and it wasn't consistent throughout the time

4  but what the various Human Resource officers did and remember

5  at one point there are 7,000 employees--

6          THE COURT:  Uh-huh.

7          MR. KOCIUBES:  --is every week they would write

8  effectively on a computer a memo with everything, it's a diary,

9  everything they worked on.  The universe is 7,000 employees.

10  We have produced those with respect to Ms. Svensson.  And what

11  happens a lot of times is week after week they're the same

12  because there has been, nothing new has happened.

13          With respect to the Comparator issue and there was

14  something that Mr. Moloney said, Your Honor, that is crucial

15  here, she wasn't - it's not that we're looking for somebody

16  with a volatile personality.  She wasn't terminated because she

17  had a volatile personality.  We've produced those for the

18  plaintiff.  We've produced - there have been witnesses deposed

19  for the plaintiff.  And all of the testimony and 100% of the

20  documents is that she was stripped of the ability to manage

21  people when she was caught essentially fabricating a review of

22  a subordinate.  We'll do comparables, but there isn't any other

23  comparable to it.  She was then given a choice you can stay but

24  for the time being not manage people.  And she was given other

25  options, one of which was leaving, and then she came back and

36

1  said, no, I want a promotion and a guaranteed million dollars

2  a year.  That's what resulted in the termination.  Now I can

3  represent to you there is no comparable to that.  And to go

4  through five years worth of sort of individual, in the HR

5  department--

6          THE COURT:  Denied.

7          MR. MOLONEY:  Your Honor, may I be heard on that just

8  very briefly?

9          THE COURT:  No, I think I've heard enough on that

10  one.  Moving on.

11          MR. MOLONEY:  Yes, Your Honor.  No. 9 is on page 19

12  and it asks for documents and things concerning the factual

13  basis of numerical scores in the 360's and year end reviews.

14  And, again, those are discreet things and if you look on page

15  20 of our memorandum, we have restricted the scope of the

16  request down to identify the 21 males and 12 females of the 91

17  and we've named the names.  This is particularly important,

18  Your Honor, since we have discovered in this case that

19  Ms. Svensson's score was, changed from in excess of four out

20  of, 4. something out of five down to--

21          MR. WEIR:  4.8.

22          MR. MOLONEY:  4.8, Mr. Weir correctly reminds me to a

23  3.--

24          MR. WEIR:  Zero.

25          MR. MOLONEY:  3.0 I take it it is.  But the scores

37

1    and how the scores were arrived at and whether they were

2    changed or not for under other circumstances is what we're

3    asking for.  There and again we've limited this one to as we

4    point out on page 22, 12 females we give the names, and 21

5    males.

6         MR. KOCIUBES:  Mr. Moloney didn't read the response.

7    The response was there are no such documents.  The reason, Your

8    Honor--

9         THE COURT:  All right, under oath.

10        MR. MOLONEY:  Under oath, yes, Your Honor.  Moving on

11   to No. 10.  This is a request for documents that are concerned

12   with the meaning of Local Rule 26.5, the organizational

13   structure and/or jurisdiction of the investment management

14   division.  Now, there has been some testimony in the case about

15   an investment management division committee and an operating

16   committee and conflicting testimony as to which committee under

17   what name was covering for what years and a committee of a

18   different name.  All we're looking for are the documents that

19   established the jurisdiction of it and the powers

20   responsibilities.  I think quite frankly that Putnam has

21   misread it where they raised the email and numerous documents

22   issues.  Again, it's very specifically Putnam was run with an

23   operating committee.  It was run by this other investment

24   division management committee.  These are the folks who made

25   decisions on money, promotions, promotions and whatnot, and

38

 1   we're asking just for documents that establish what's the name

 2   of the thing, what was its jurisdiction, who was on it for what

 3   period of time, and as I said I think that they have misread

 4   the nature of it.  We're just looking for the document that

 5   will tell us--

 6            MR. KOCIUBES:  And again he should--

 7            MR. MOLONEY:  --what those are.

 8            MR. KOCIUBES:  --have read the response, Your Honor.

 9   There've been a lot of deposition testimony.  Responses there

10   are no documents.

11            THE COURT:  Under oath.

12            MR. MOLONEY:  Yes, Your Honor.  It - well, I mean

13   it's, it cannot be that they don't have any documents that

14   establish the jurisdiction of these committees that ran the

15   place.

16            MR. KOCIUBES:  Your Honor, this they've got under

17   oath at depositions.  Various people who were head of the

18   investment division decided to have with their senior

19   management sort of a group that would get together and they

20   would meet.  There's no jurisdictional documents.  Some people

21   when they headed the division did it, others didn't do it.

22   They had deposition testimony.  They know why there are no

23   documents because it wasn't a formal procedure.

24            MR. MOLONEY:  If, Your Honor, if an authorized--

25            THE COURT:  Next.  Moving on.

39

1          MR. MOLONEY:  If they're going to say that under

2  oath, we'll draw whatever inferences are appropriate from that.

3  No. 11 is in the same ballpark.  It's documents that concern

4  the reporting relationships within the investment management

5  division since January 1 of `99.  That's at the bottom of page

6  21.  The, Tibbets had testified that Putnam had organizational

7  charts online.  We think that if they exist that we're entitled

8  to them and if they still insist that they don't exist, we'll

9  take the authorized officer's statement under oath.

10         MR. KOCIUBES:  And I suggest they read the response.

11  I don't know why we're going through this.  There are no

12  documents.  The reason he's asked for reporting relationships,

13  within the IMD, that's this informal group that some managers

14  had, some didn't, and again, they've had and did inquire of

15  numerous people at depositions and we've responded that there

16  aren't any documents.  I don't understand what that's subject

17  of a motion.

18         THE COURT:  All right, under oath, that's all there

19  is.  It's easy enough.

20         MR. MOLONEY:  The next one is No. 12 I think, Your

21  Honor, and that is documents concerning the membership

22  structure and jurisdiction of the operating committee.  And

23  their response doesn't indicate that there are no documents on

24  this one.  They claim that they've given us all objective data

25  but we're not into the why.  We're interested in the what and

40

1   that is what is the jurisdiction and the membership of the

2   operating committee which existed for most if not all of these

3   years.  And their apparent reason is or objection is it's not

4   relevant to any of our claims.  They've given us all objective

5   data.  We find that hard to believe, and then they go back into

6   the email issue.  This isn't an email issue.  This is just

7   documents that say who was on the operating committee for what

8   years and what was his duties?  Discreet documents, we think we

9   should get it.

10      MR. KOCIUBES:  This is for the very, this is sort of,

11  this is back again to the sergeant wanting to know who's at

12  various times been the joint chiefs.  This is sort of the

13  senior most committee, the membership of it changed.  How that

14  membership is relevant to anything in this case, Your Honor,

15  remains a mystery.  I mean we're we going with it?  I mean she

16  has the indicia she was either discriminated against in her

17  salary, promotion, or she wasn't.  Who's on the joint chiefs at

18  any given point, we're we going?  And the jurisdiction I don't

19  believe there are documents responsive to that piece because

20  that's not how the organization launched.

21      MR. MOLONEY:  Well, they didn't object to it on the

22  basis that there weren't any documents.  We have Mr. Lasser at

23  the top.  He's a defendant in this case.  They say well the

24  investment division management committee, they didn't have

25  anything to do, nothing in writing for these characters and by

41

1   the way it didn't last.  The operating committee is the

2   operating committee.  That's the way they ran the place.

3   That's the way they made decisions on who gets hired, who gets

4   fired, who gets demoted, who gets money, who gets the bonus,

5   who gets into the AMP pool and who gets into the partners'

6   pool.

7               MR. KOCIUBES:  That is a false statement.

8               MR. MOLONEY:  That's why it's relevant on--·

9               MR. KOCIUBES:  That is a falsehood.  Mr. Moloney

10  knows it's a falsehood.  It is inconsistent with every

11  deposition that there has been, Your Honor.  The operating

12  committee did big picture finances of the organization,

13  determinations of who was promoted, who was terminated, got

14  pushed down to the managers.  It was not done at that decision.

15  Every witness has so testified and Mr. Moloney, if he read the

16  depositions, I know he wasn't there most of them, would know

17  that.

18              MR. MOLONEY:  We have a disagreement and the jury's

19  going to sort out whether Putnam's view of Putnam is correct or

20  our view drawing the appropriate inferences, but let's get back

21  to the operating committee.  It's admitted it exists.  It's a

22  very powerful committee.  We disagree on the inferences to be

23  drawn as to how directly it affected Ms. Svensson and the other

24  one on, who are no longer there.  But we think we got to get it

25  and it cannot be that the jurisdiction of this committee that

42

1   ran the place is not relevant under Rule 26 to our claims.

2           THE COURT:  To be produced.

3           MR. MOLONEY:  Thank you, Your Honor.  No. 13 is at

4   the top of page 24.  It gets back to the investment division

5   management committee.  It's similar, but this is the committee

6   that was involved which Putnam says only for a limited period

7   or time.  And if you note, Your Honor, on page 24 about halfway

8   down we say, "However, Svensson will limit the scope of this

9   request to documents that identify the membership duties and

10  responsibilities of the investment division management

11  committee in regard to promotions, transfers, to the 91 since

12  January 1 of `99.  So they admit that this committee existed.

13  It was uncertain as to how many of the relevant years it did

14  exist, but again we say it should be produced for the same

15  reason on the operating committee.  This is a committee that

16  apparently if I understand the Putnam position, is somewhere

17  between Mr. Lasser and the operating committee at the top and

18  the worker bees like Ms. Svensson who's investment division

19  management committee.  We think we're entitled to that as well

20  for the same reason under Rule 26.

21          MR. KOCIUBES:  This is that same group we've now

22  addressed probably five times, Your Honor, an informal group

23  that sometimes existed, sometimes didn't exist.  The problem

24  with a request that's phrased in terms of concerning

25  memberships, structure and jurisdiction, there are no such

43

1   formal documents, but if anything that concerns it, now we're

2   back to searching for a five-year period all sorts of email

3   boxes to see if anybody mentions--

4               MR. MOLONEY:  That's--

5               THE COURT:  Hasn't this been discussed at deposition?

6               MR. MOLONEY:  Sorry, Your Honor?

7               MR. KOCIUBES:  It has, Your Honor, multiple times.

8               THE COURT:  Hasn't it been discussed at deposition?

9               MR. MOLONEY:  We have taken depositions of the Putnam

10  people so we are hearing the Putnam view of the world through

11  their present employees like Mr. Tibbets and defendant Lasser

12  and other people who work there, or alternatively people who

13  used to work there who got severance packages and all their

14  loyalties to Putnam.  I'm not saying that that's illegal, it's

15  just the facts.  So we ought to know where the information's

16  coming from.  Ms. Svensson was there and was able to observe

17  things from her perspective.  We had a disagreement as to how

18  long this investment division management committee was in

19  existence.  We thought it was for a longer period of time than

20  what they say it is.  But listening to people in depositions

21  when you don't have the documents to cross examine Mr. Tibbets

22  on for example is very difficult to get the whole picture.

23              Now if Mr. Kociubes and Putnam want to say there are

24  no documents and we get a statement under oath we will deal

25  with it and draw the inferences that we can from that.  On the

44

1   other hand, if they have discreet documents that tell us, show

2   us how long it has lasted and who was on it and what their

3   responsibilities were - and maybe this is the group, Your

4   Honor, that made the decisions on compensation and promotions

5   that Mr. Kociubes would have you believe the operating

6   committee didn't make.  He said they pushed it down.  Did they

7   not push it down to the investment division management

8   committee?

9          MR. KOCIUBES:  The problem, Your Honor, is there are

10  no - I've said this now multiple times, there are no formal

11  jurisdiction or any kind of documents.

12         THE COURT:  Well then put that in a statement under

13  oath.

14         MR. KOCIUBES:  Here's the issue with the way he's

15  asked it, Your Honor.  When he says concerning any of this

16  stuff, what we're now back into the world is of searching years

17  worth of email, all sorts of people to see if somebody mentions

18  hey, there's a meeting next--

19         THE COURT:  No.

20         MR. KOCIUBES:  --Tuesday.

21         THE COURT:  We have eight weeks left and we're not

22  going to be searching.

23         MR. MOLONEY:  We'll discuss the email aspects of

24  that, Your Honor.  But if he's otherwise going to take a

25  position that nothing exists on documents other than emails,

45

 1    we'll take the statement under oath from an authorized person.

 2            THE COURT:  All right.

 3            MR. MOLONEY:  But we'll discuss the issue in our

 4    conference next week.  Fifteen is on page 27, at the bottom of

 5    page 27 of our memo, Your Honor, and it deals with criteria use

 6    by Putnam for deciding who should be or would be demoted since

 7    January 1, 2002.  That date is well within the relevant period

 8    and we chose the January 2002 period because that's just

 9    shortly before Ms. Svensson was demoted.  And we'd like to know

10    and we think we have a right to know what is the criteria used

11    by Putnam on the why of that.  And if you note, Your Honor, on

12    page 28 about halfway down we say, "However, Svensson will

13    limit the scope of this request to the Comparators identified

14    in the argument sections to numbers one and two."  And that

15    goes back to the 22 people, Bogar, Servoney, Dexter, those

16    names, so that there are 16 males and 12 females.  So that's

17    what we're after there and certainly--

18            MR. WEIR:  Six females.

19            MR. MOLONEY:  I'm sorry, 16 males and their names are

20    there on page 28.  And so since Ms. Svensson was demoted and

21    taken away from her management responsibilities, put back into

22    research, the department from which she was promoted by these

23    characters back in 1997 I think it was, and we're looking for

24    what were the criteria?  How did you decide that?  And what was

25    your decision making with respect to these other limited number

46

1  of people?  And we think we're entitled to those documents,

2  Your Honor.  Certainly relevant to her claims and defenses.

3            MR. KOCIUBES:  Two or three things, Your Honor.

4  They've had tons of testimony about the reason for the transfer

5  from the international growth to global equity research.  The

6  team that she was on had disastrous financial performance.

7  They lost tons of money for their investors.  The head of the

8  team, a male, was fired.  Ms. Svensson rather than being

9  terminated was given the opportunity to go to Global Equity

10  Research, same title.  They know that's what happened.

11  Everybody has so testified.  There is no document or anything

12  inconsistent.  The problem here is when, again, it's the way

13  they word it.  When you talk about all documents and things

14  concerning the actual criteria used by Putnam to "demote" - and

15  I guess they count transfers as demotions and that's another

16  problem, the issue there, Your Honor, is I can't - it's back to

17  the email problem.  There are no formalized documents as the,

18  if an organization is downsizing there may or may not be

19  discussions between the managers, if you've got two

20  quantitative analysis, pick one not the other.  Are there

21  formal criteria for that, Your Honor, that's the issue.  The

22  only way to get any kind of hand on anything concerning it, it

23  again is to search email boxes of untold numbers of people to

24  see if anybody happened to mention that, gee, we think Bob has

25  better long term prospects than Jimmy.  Let's keep Bob.  About

47

 1  16 different people, there may or may not be anything there

 2  but it is a massive search.  We know if it relates to the

 3  plaintiff we've produced that because we searched for her name.

 4         MR. MOLONEY:  Your Honor, it's, Putnam doesn't inform

 5  the Court as to what really happened here.  We all agree that

 6  something happened to the market in 2000, 2001.  We all know

 7  that Ms. Svensson is demoted in 2002 and booted out of the

 8  place in 2003.  What really happened is that they changed the

 9  name of this team and surprisingly enough, Mr. Steven Dexter,

10  Mr. Nathan Eigerman, Mr. Peter Hadden and perhaps others, who

11  were on this team with Ms. Svensson, did not get put into

12  research or booted out of the firm.  They were given enlarged

13  responsibilities and promotions and more money.  So to have

14  Mr. Kociubes argue Putnam's view on this one, I don't think is

15  really fair.  We should, I think we're entitled under Rule 26

16  to find out why it was that the females disappear from Putnam

17  while the white boys stay at Putnam and get promoted and get

18  more money.  And then Ms. Svensson is told on the complaints of

19  two males, one of whom Mr. Pierce left for more money out in

20  California, and the other fellow, Mr. O'Malley, who stayed,

21  took over most of her responsibilities, got promoted and got

22  more money, stayed.  That's the essence of this case.  And to

23  have Putnam say we have no formal documents of the criteria,

24  the really world knows how these decisions are made.  George is

25  a pal of mine, oh, he's a good guy, I saw him at the country

48

1   club the other day.  Oh, Svensson, you can't count on her.

2   She was off being pregnant and having a baby a few years ago.

3   Aren't we entitled to know if that's in those documents?  Is

4   that not relevant to her claims on this case?

5           THE COURT:  Well, it seems to me if you've asked for

6   all the emails with her name in them, you know, this can get

7   too far a field, and I'm really--

8           MR. MOLONEY:  We agree, Your Honor, with that and

9   that is why we are willing and eager and are urging, and I

10  think they've agreed to sit down with us next week on these

11  email problems.

12          THE COURT:  All right, so you're going--

13          MR. MOLONEY:  Okay.  I just wanted the Court to

14  understand that we on this one had limited it to the 16 men and

15  6 women.

16          Okay--

17          MR. KOCIUBES:  Does Mr. Moloney really think there's

18  a "actual criteria" somewhere in that which says--

19          THE COURT:  All right.

20          MR. KOCIUBES:  --promote your friends?

21          THE COURT:  Enough.  Time.  We've gone this far.  My

22  ruling today will reflect that I've allowed it to the extent

23  stated on the record--

24          MR. MOLONEY:  Right.

25          THE COURT:  --in open court.  As to everything

49

 1    remaining and the E issues, I want you to sit down.

 2         MR. MOLONEY:  Okay.

 3         THE COURT:  I want you to sit down and see what you

 4    can work out because let me tell you I'm not about to allow

 5    much more.  Eight weeks left, the time is narrow.  And I also

 6    want to know that given the scope of this discovery and the

 7    intensity with which you are both pointing out this case has

 8    there been any talk of settlement?

 9         MR. MOLONEY:  We are waiting for an offer that we

10    can't refuse, Your Honor.

11         THE COURT:  Well have you made a demand?

12         MR. MOLONEY:  I believe we did.

13         MR. WEIR:  We had a mediation, Your Honor, in this

14    case back in January.

15         THE COURT:  Before?

16         MR. WEIR:  Magistrate Judge Alexander.

17         THE COURT:  Why didn't you have it here?

18         MR. WEIR:  Judge Saris made that decision.

19         THE COURT:  I mediated 37 cases this year, I've

20    settled 33.

21         MR. WEIR:  Your Honor, we're happy to--

22         THE COURT:  My statistics--

23         MR. WEIR:  We're happy to have it mediated before

24    Your Honor.

25         THE COURT:  --are better than even Dave Mazzone's

50

1   were.

2          MR. MOLONEY:  He was pretty good.

3          THE COURT:  He was very good.  I learned everything

4   from him.

5          MR. MOLONEY:  No, we're happy to sit on--

6          THE COURT:  But--

7          MR. MOLONEY:  --the email problem.  We're happy to--

8          THE COURT:  Sit down, discuss the rest.

9          MR. MOLONEY:  Yes, Your Honor.  Thank you.

10         THE COURT:  Because it's really getting--

11         MR. MOLONEY:  But if Your Honor--

12         THE COURT:  --tedious.

13         MR. MOLONEY:  I've spent, Your Honor, most of my

14  waking hours since last Friday working on this problem.

15         THE COURT:  I can see that, Mr. Moloney.

16         MR. MOLONEY:  Much to the distress of my wife and son

17  and grandchildren who tried to visit us over the weekend, I

18  just want you to understand that we want this case to reach an

19  end result and we're working--

20         THE COURT:  Of course.

21         MR. MOLONEY:  --very hard on it.

22         THE COURT:  Of course.

23         MR. MOLONEY:  And we - she doesn't have the resources

24  and Mr. Weir and I don't have the waking hours to put up any

25  more with why we're here today.  This stuff, this unredaction

51

1  of documents could and should have been turned over to us in

2  February.

3            THE COURT:  I don't need to hear anymore.  I have

4  said enough.

5            MR. MOLONEY:  Your Honor, could we have a date to

6  come back to you after our efforts of next week in case there

7  are things that you need to decide.

8            THE COURT:  What about this motion to quash?

9            MR. KOCIUBES:  It's - give me two or three minutes on

10 it, Your Honor, then you can decide whether you want to reserve

11 it or hear argument today.

12           This arises in the context of I think it was on last

13 June.  There was a 30(b)(6) deposition that was noticed for,

14 essentially for the very end of the discovery period.  What I

15 would suggest, Your Honor, the point of a 30(b)(6) deposition

16 is where you don't know the identity of a witness so that if

17 you don't know who's in charge of document retention--

18           THE COURT:  I know the purpose.

19           MR. KOCIUBES:  Okay.  Here you've got a plaintiff who

20 was an officer of the company.  She knows how it works and the

21 best evidence of that is they took their full 10 depositions

22 before they got to this.  And I think you know the sense, the

23 CEO, the ex-CEO, the head of investments, the head of HR, all

24 the way down, Your Honor.  What happened then is, and it's co-

25 workers, what, so - this is not a matter of not knowing who the

52

1   witnesses are.  What then happened is there was a very broad

2   30(b)(6) deposition.  We moved to quash.  We were before Your

3   Honor on it.  Your Honor noted that there were four issues in

4   the case and that it ought to be narrowed to the four issues

5   and that the plaintiffs should show where it's information that

6   they could not have otherwise obtained.  It's not a backdoor to

7   redo discovery.  That hearing, I'm sorry, was July 10 not June

8   16.

9           What we now have if you, a sense if one even looks at

10  it I think it really does speak for itself, is not a narrowing

11  where we've got a whole bunch of new categories, and I'm

12  prepared now or some other time to go one by one if you want,

13  it still doesn't meet the reasonable particularity requirement.

14  They, for example, want somebody to testify about--

15           THE COURT:  Are you over your 10 depositions?

16           MR. WEIR:  No, Your Honor.

17           MR. MOLONEY:  This will be the 10th.

18           MR. KOCIUBES:  This will be your last.

19           MR. MOLONEY:  Except for Mr. Stoev that Putnam

20  opposed and which Your Honor exercised her discretion and

21  allowed us to take, and we're very grateful for his testimony.

22  I'd put him in at trial.

23           MR. KOCIUBES:  The reasonable particularity is for

24  example, they've got categories here wanting to know somebody

25  who can testify about any basis of hiring, promoting, not to

53

1  demote, so sort of negative actions, transfer, not transfer,
2  terminate any female over a five-year period of time.  They had
3  that in head of HR.  They've had the woman who was in HR who
4  was responsible for the unit that the plaintiff was in.  They
5  know there was a downsizing where the company went from 7,000
6  to 3,000 people.  How is that reasonable particularity?  Other
7  than - and how do I prepare one witness or two witnesses or
8  three witnesses of a company that had between 7,000 and 3,000
9  employees and everyday their decision is made "not to transfer"
10  or "not to demote."  That's the issue, Your Honor.  Simply, I'm
11  happy to go category by category, but if you simply take a look
12  at it it jumps off the page.  This is at the end of the
13  discovery they essentially want to redo very broad general
14  discovery.  It's not a matter of one person or two people and
15  it's not a matter of being able to get one or two people up to
16  speed.  This is simply an invitation that if we produce one
17  person or two people that once this is done - and it took them
18  three months to modify it after Your Honor ruled in
19  mid-July - this is simply an invitation and a guarantee of
20  discovery disputes down the road because whatever we try to do
21  on this kind of record they're going to find somebody and say
22  what about, you know, John Smith's non-termination from this
23  other group.  And the person may or may not have been prepped
24  on it.  You can't prep on that kind of, that broad of thing,
25  and then we're going to be back here that we somehow didn't

54

1  comply.

2          MR. MOLONEY:  Your Honor--

3          THE COURT:  Mr. Weir?

4          MR. WEIR:  Number one, we announced back before Your

5  Honor in January of this year an attempt to take a 30(b)(6)

6  deposition and Mr. Rodriques who was here for that conference

7  at that time even announced that it was probable that Mr. Josh

8  Brooks would be the 30(b)(6) witness.  Number two, many of the

9  - he objects to the existence of reasonable particularity under

10  Rule 30(b)(6).  I think his problem is not with the fact that

11  the 30(b)(6) notice is not designated with reasonable

12  particularity.  He's now objecting to too much particularity.

13  And we have designated certain categories.

14          Just a couple of examples, the manager's performance

15  ratings is one of the subjects on which we wanted to get some

16  testimony.  We discovered when the documents were produced on

17  September the 1st of this year that we discovered for the very

18  first time that these, the performance ratings that were given

19  to the Comparators plus there were alterations to these

20  performance ratings.  And, indeed, Ms. Svensson's performance

21  rating in the 2000 timeframe was changed from 4.8 to 3.0 on a

22  five scale.  And then in September we got the, there appear to

23  be some alterations with respect to other performance ratings,

24  but we haven't had a fair opportunity to examine anybody about

25  that issue.  And it's certainly germane that if Ms. Svensson's

55

1    performance rating was dropped by a factor of 1.8 and other

2    male Comparators did not have such precipitous changes in their

3    performance ratings, that's an issue that's very pertinent to

4    this case. Let me give you, can I give you another one?

5            THE COURT: No. I've heard enough.

6            MR. KOCIUBES: Can I just--

7            THE COURT: The motion to quash is denied. One

8    deposition. One day. You sit down with Mr. Kociubes in the

9    next few days and decide who it's going to be and you better

10   decide what areas you want to prioritize because you're only

11   going to get one day and you may not get everything you want

12   done.

13           MR. KOCIUBES: Your Honor--

14           MR. MOLONEY: Yes, Your Honor.

15           MR. KOCIUBES: --I understand the ruling, but I just

16   think it's conceivable we're going to be back here. I just

17   want you to understand what my difficulty is because it will be

18   the same difficulty in providing a witness for one day. For

19   example, with respect to what Mr. Weir just said, they just

20   want the managers, that's topic two and let me just tell you

21   what it is. Manager's performance ratings for the 91

22   Comparators.

23           MR. MOLONEY: Simply, Your Honor, is Mr. Kociubes

24   going to reargue?

25           MR. KOCIUBES: Well, can I finish, Your Honor?

56

1          MR. WEIR:  I thought you've made a ruling?

2          THE COURT:  I've made a ruling.  And what you both

3    have to do is to sit down and prioritize it as what you want

4    because you're only going to get one witness and you're only

5    going to get one day, and if one person only knows about one

6    area that's, all you're going to get.

7          MR. MOLONEY:  Your Honor, if I may?  Under the rule

8    if they're going to produce one witness to testify about all

9    matters, that witness must be an educated witness and the

10   testimony under 30(b)(6) and Rule 32 it has to be an educated

11   witness.  To limit us to one day--

12         THE COURT:  I realize - I know what the rule is.

13         MR. MOLONEY:  Okay.

14         THE COURT:  And I know what the language says.

15         MR. KOUCIBES:  Your Honor, for just 10 seconds if I

16   could just finish what I was saying.  Looking it at in terms of

17   giving them a witness, and one witness one day, we have no

18   problem with, manager's performance ratings for the 91

19   Comparators from 1999 to 2004, what about them?  Is somebody

20   supposed to have memorized all of that stuff?  The--

21         THE COURT:  Sit down, talk about it.  Work it out.

22         MR. MOLONEY:  Yes, Your Honor.

23         THE COURT:  Enough.  We stand in recess.

24   //

25   //

57

## CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____         November 1, 2006
Maryann V. Young

Exhibit G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * *    Civil Action No. 04-12711-PBS
                        *
                        *    BBO No. 351000
LISA SVENSSON           *
                        *    Affidavit
        Plaintiff,      *    of
                        *    Nicole M. Panos
v.                      *
                        *
                        *    (Declaration Pursuant
PUTNAM INVESTMENTS,     *    to 28 U.S.C. § 1746)
LLC, et al.,            *
                        *
        Defendants.     *
                        *
                        *
* * * * * * * * * * * *  *
```

1.    My name is Nicole M. Panos.  I am Director of Client
Development for Target Litigation Consulting, Inc. ("Target") of
268 Summer Street, Boston Massachusetts, which is engaged in
litigation support and electronic discovery services for law
firms and corporate clients.  Prior thereto I swerved as
Target's Sr. Technical Consultant/Project Manager.  Before my
service with Target, I had five years of large law firm
experience in e-discovery and computer related litigation issues
in both civil and criminal matters with Palmer & Dodge and Brown
Rudnick Berlack & Israels, both of Boston.  My resume is filed
herewith as Exhibit "1."  I have personal knowledge of the facts
set forth herein.

2.    I have reviewed the contentions of both plaintiff Lisa
Svensson ("Svensson") and defendant Putnam Investments, LLC
("Putnam") as to the e-mail issues in this case, which are
included in Svensson's Reply Memorandum, filed October 25, 2006.
I also have reviewed the four e-mails (and attachments as
applicable) between Attorney Moloney for Svensson and Attorney
Rodriques for Putnam concerning the e-mail discovery issues,
copies of which are filed herewith as Exhibits 2-5, and which
are dated, respectively, November 17, 2006 (Moloney to
Rodriques, Exhibit 2), November 21, 2006 (Rodriques to Moloney,
Exhibit 3), November 22, 2006 (Moloney to Rodriques, Exhibit 4)
and December 12, 2006 (Rodriques to Moloney, Exhibit 5).

3.    Based upon my education, training and experience, the draft
search terms sent by Svensson's counsel to Putnam's counsel are
reasonable as they are limited in number of search terms and the
complexity of search.  Some of the terms may result in false
hits as they are general terms used in everyday conversations
(e.g. make, move, took out, take out).  I would suggest that
those search terms be used in conjunction with other, relevant
terms to yield a higher likelihood of responsive hits. The
search methodology and terms may require modification depending
upon the answers to the technological and other inquires set out
in the questionnaire ("November 17 e-discovery questionnaire")

2

that accompanied Attorney Moloney's November 17, 2006, e-mail to Attorney Rodriques (Exhibit 2).

4.    Based upon my education, training and experience, it is impossible to analyze and evaluate the propriety, integrity and legitimacy of the Putnam contentions as to time and expense and the other issues set out in Attorney Rodriques' e-mail of December 12, 2006 (Exhibit 5), without first having obtained, analyzed and evaluated in the light of the technological issues and the varying conditions of the market place concerning vendors, the answers to the questions set out in the November 17 e-discovery questionnaire.  In past projects I have consulted on, the cost and time estimations from vendors for tape restoration and searching, for example, has ranged from days to weeks and from one-hundred dollars per tape to one-thousand dollars per tape based on the vendor and the type of tape. These types of issues can be resolved with open discovery exchange.

Signed under the penalty for perjury this 27th day of December 2006,

*Nicole M. Panos*

_____

Nicole M. Panos


Certificate of Service.


3

    This document, filed through the ECF system, will be sent
electronically to the registered participants as identified on
the Notice of Electronic Filing.

                        /s/ Kevin F. Moloney

Dated: December 27, 2006

Exhibit H

1.  Is there for the period January 1, 1999, through December 31, 2004, a document retention policy ("DRP") in place?

    _____

2.  Is there for the period January 1, 1999, through December 31, 2004, an e-mail retention policy in place?

    _____

3.  Is there a litigation hold in place? _____

4.  Where is the data being stored?

        Back Up Tapes _____

        Local Hard Drives _____

        Network Drives _____

        Blackberries _____

        Palm Pilots _____

        Flash Drives _____

        External Media
        (CD/DVD/Diskettes) _____

        Home Computers _____

        Cell Phones _____

        HR/Accounting/CRM Database(s) _____

        Internet Based e-mail Accounts _____

        In-House Instant Messaging_____

5.  Proposed Key Words/Search Terms?  Attach separate sheet)
    (to include, among other things, the named persons set out
    in the Svensson reply memorandum)

6.  What is the mail server and version being used?

        Microsoft Exchange 5.5 Service Pack 4 ___

_____

Lotus Notes R5 _____

Lotus Notes _____

Microsoft Exchange 5.5 _____

Lotus Domino _____

Microsoft Exchange 5.0 _____

Lotus CC: Mail _____

7.   Define Duplicate

Identical metadata and identical Custodian _____

Identical metadata and different Custodian _____

8.   What is the backup Software and version being used?

Arcserve 2000 _____

Backup Exec. 8.6 _____

NT Backup _____

Other _____

9.   What type of backup media is being used?

DLT IV (40/70/80GB) _____

A1T (A1T1, A1T2, A1T3) _____

DLT 11 (20GB) _____

DTF (DTF1, DTF2) _____

DAT (DDS2, DDS3, DDS40 _____

LTO (LTO1, LTO2, LT03 _____

10.  What type of tape drives are being used?_____
_____

2

11. How many tapes do you anticipate having? _____
    _____

12. Are the tapes at capacity? _____

13. What is the retention/recycle process for back up tapes?
    _____
    (daily, weekly, monthly, quarterly, incremental, full)

14. How are the tapes labeled? - Organized/labeled by date,
    custodian, server, etc.?_____

    _____

15. Earliest Dated Back Up Tape - Email? _____

16. Earliest Dated Back Up Tape - NAS? _____

17. Have there been any server/software/OS migrations? _____

          From What?    To What?  Date of Migration?

          _____

          _____

          From What?    To What?  Date of Migration?

          _____

          _____

18. Review - What type of review tool do you propose to use?

    In House Software _____

    Online Review Tool _____

    Paper Review _____

19. Production:

          Paper _____

          Native Files_____

          Tiff + Bates Number _____

3

Tiff + Metadata _____

Other: _____

CD _____

DVD _____

Hard Drive _____

[378224.1]

4

Exhibit I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | | Civil Action No. 04-12711-PBS |
| | * | |
| | * | |
| LISA SVENSSON | * | |
| | * | |
| Plaintiff, | * | Plaintiff Lisa Svensson's |
| | * | Memorandum in Support of: |
| v. | * | (1) Her Opposition to |
| | * | Defendant Putnam's Motion to |
| | * | Terminate Discovery; |
| PUTNAM INVESTMENTS, | * | and, |
| LLC, et al., | * | (2)(A) Her Cross Motion, |
| | * | Pursuant to Fed. R. Civ. P. |
| Defendants. | * | 37 for Sanctions |
| | * | Against Putnam and Counsel for |
| | * | Violation of the October 26, 2006, |
| * * * * * * * * * * * * * * * * * * * * | Order for Production and of the |
| | Court's Series of Directions to |
| | Engage in Negotiations and |
| | Exchanges of Information as to |
| | Svensson's Second Request for |
| | Production; and, |
| | (2)(B) Her Renewed Motion for Orders Compelling |
| | Production of Certain Items of her Second Request |
| | for Production[1] |

and
Request for Hearing and Oral Argument

1.    Introduction.

In its motion to terminate discovery, Putnam makes both the preposterous claim that

Svensson "has used a second request [for production of documents] as a mechanism to insure

---

[1] Except to the extent actually produced, categories where Putnam claims no documents exist and a sworn statement to that effect (9 items) will be accepted, 9, 10, 11, 13, 14, 27, 28, 49; Categories re: email issues (31 items): 2, 3, 4, 5, 6, 12, 13, 15, 16, 17, 18, 19, 38, 39, 45, 46, 47, 48, 49, 56, 57, 58, 59, 60, 66, 67, 68, 69, 71, 72, 73; Categories requesting  discrete documents where there is no email issue (33 items):7, 8, 12, 23, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 43, 44, 50, 51, 52, 53, 54, 61, 62, 63, 64, 65, 70, 74, 75, 76, including the request for the "PDPRs" which was ruled upon by the court but upon a misrepresentation of fact by Putnam.

that discovery never closes," and the false statement that Putnam has "produced" all of the documents ordered to be produced by the court at the October 26, 2006 hearing ("at that hearing, this Court ordered certain documents produced) which Putnam has since done)").

As set forth in detail in the schedule filed herewith as Exhibit "A," Putnam has not produced any of the five sworn statements ordered and directed by the court to be furnished to Svensson; and has failed to produce, among other things, all of the 360s ordered by the court for production to Svensson.

The Putnam motion also would have the court believe that Svensson has not made "a serious attempt at discovery but [has provided] a mechanism to insure that hundreds of thousands (if not millions) of e-mails are reconstructed, retrieved and reviewed--a task that...Ms. Svensson knows is unreasonable, irrational and more than unduly burdensome and time consuming." The Putnam motion misleads the court.

The facts concerning the history of discovery in this case are set forth in detail in the schedules annexed hereto as, among others, Exhibit B ( Discovery Requests and "Side Letter" negotiations) and Exhibit C ( Court action required to obtain answers to interrogatories and unredaction of documents) . And the history of discovery in this case makes it very clear that Putnam has engaged in a conscious effort to stall, to consume discovery time, to pretend to engage in negotiations, to fail to offer a counter proposals to Svensson's numerous attempts to negotiate matters, and otherwise engaging in the type of conduct that is best described as "What's mine is mine and what's yours is negotiable."

Moreover, the Putnam record in discovery in this case is replete with misrepresentations of fact to the court (see Exhibit D filed herewith) and service of answers to interrogatories that

2

are contradicted by Putnam's own documents or the testimony of its own witnesses. See Exhibit E, filed herewith.

In the period since the end of the discovery period last May, Svensson has not sought, and does not seek, any documents or information that she did not on a timely basis attempt to obtain by proper discovery requests within that discovery period; and, in fact, in her motion papers for the motion to compel concerning the Second Request for Production, she is seeking far less than she originally sought.

It was the intransigence of Putnam that forced Svensson to seek the aid of the court in the hearings held in this matter starting on June 21, 2006. For the detailed history, see Exhibit F ( "Negotiations" re: the second request for production), filed herewith , filed herewith.  Attorney Kociubes described the Putnam strategy when he said in the deposition of Charles Haldeman, "(P)eople who are not comparators of the claimant have been redacted. (Svensson is) not entitled to personnel information about them, so whether or not there is a document. you're not getting it absent the court deciding that we are wrong."

Prior to the court hearings in June and July, Putnam did produce numerous pages of documents, but 89.7% of them were redacted.  This, of course, impeded Svensson's discovery, as defendant Lasser said in his deposition when asked about one of the redacted documents, "You showed me a bunch of blank pages, so it's hard to remember."  Putnam had maintained (and still, no doubt, continues to maintain) the incredible notion that there never has been a single investment professional at Putnam who was a comparator of Svensson as to any of her claims[2] for the adverse employment actions taken by Putnam against her.

It was only because of the action of the court on June 21 and July 11, 2006, when confronted with the inevitability of further court orders, that Putnam finally agreed to provide

---

[2] Failure to promote, failure to pay equally, demotion and termination.

answers to interrogatories concerning the 91 men and women who Svensson contends are her

comparators; and, agreed to unredact the previously redacted documents. Having represented

to the court on July 11, 2006 that it would answer the interrogatories, it took Putnam 52 days

before it served on September 1, 2006, the interrogatory answers and produced the unredacted

versions of the documents

     Discussion as to the Second Request for production of documents, filed in April 2006,

and the 30(b)(6) deposition notice began in late June (see Exhibits G (30(b)(6) )and F, referred to

above, and filed herewith for the details and history). But Putnam once again employed the

strategy it had followed since the fall of 2005 of unproductive negotiations.

     The Putnam strategy was and is to pretend to negotiate when in fact it did the opposite

by, among other things, refusing to proffer counter proposals when Svensson made proposals

designed to facilitate agreement on a reasonable basis without the need for further court activity.

For the history of the "negotiations," see Exhibits referred to above.

     There being no counter proposals for settlement of the issues from Putnam and faced with

the rejection of her proposals for out of court resolution, Svensson was forced to file her motion

to compel production of the documents requested in her Second Request for Production of

Documents. Prior to the hearing on October 26, 2006, as set forth in detail in her motion papers,

Svensson made numerous reductions in the scope of the categories of that Second Request. This

is particularly true of the categories requesting discovery as to e-mails. Svensson reduced the

number of e-mail boxes to be searched to ten identified decision makers for communications

concerning employment actions in regard to minimum numbers of the total of 91 comparators .

     At the hearing on October 26, 2006, the court considered 14 of the 76 categories of the

request before ending the hearing. During the hearing the court directed that Putnam furnish

sworn statements from authorized officials if Putnam claimed that requested documents do not exist. Putnam has failed to furnish any of the five sworn statements as per the courts directions at the hearing. The court also ordered Putnam to produce the annual reviews known as "360s." Putnam produced 360s for only some of the years in question but for one of the produced years failed to include the "comments" section and took the position via an e-mail from Attorney Kurker, that 360s for the other years did not exist, only to admit, when presented with evidence from Putnam's own documents that they did exist, Putnam counsel advised that they were looking for them. Insofar as Svensson is able to determine, Putnam is still looking.

Moreover, having agreed in a conference call with Svensson's counsel when Svensson's counsel endeavored to engage Putnam's counsel in negotiations as the court had directed, concerning the discrete items not ruled upon at the hearing, Putnam's counsel agreed to consider Svensson's positions on those items and to get back to Svensson's counsel after considering them with Putnam's positions on those items. Putnam's counsel has yet to advise Svensson as to the Putnam position on any of those items.

In particular regard to e-mail issues, the court at the hearing accepted Svensson's counsel's suggestion that even though the new e-discovery amendments to the Federal Rules of Civil Procedure would not be effective until December 1, 2006, the substance provided by the amendments should be followed and, without indicating whether Svensson or Putnam should be the initiating party, suggested the parties communicate to discuss matters within a week. Putnam complains that it heard from Svensson's counsel on the eleventh day after the hearing, rather than on the seventh day.

Putnam's motion fails to disclose the following important matters. On November 17, 2006, Svensson's counsel sent to Putnam's counsel a questionnaire, a copy of which is filed

5

herewith as an Exhibit to the Affidavit of Nicole M. Panos seeking basic information about

Putnam's computer and e-mail systems and capabilities. In the covering e-mail, counsel stated,

> The attached [questionnaire] sets out the information that will help us move forward with discussion of the e-mail issues Putnam has raised.
>
> Please let me know if Putnam will supply the information requested... so that we might discuss this matter on a more informed basis.

On November 21, 2006, Putnam's counsel responded, not with any of the answers to the

items of the November 17 questionnaire, but with a question as to item number 5 (of 19) of the

questionnaire. The e-mail also requested, despite the identification of such persons in

Svensson's motion papers for the October 26, 2006, hearing, a "list of individuals whose e-mail

boxes you propose to have searched."

On the next day, November 22, 2006, Svensson's counsel sent the following e-mail to

Putnam's counsel:

> As you know, the questionnaire I sent over to you folks (copy attached) requests, in the spirit of the new e-discovery rules as discussed with Judge Bowler, basic information needed to help us understand Putnam's computer systems and capabilities as they may affect resolution of the e-mail discovery issues in this case. Thus, I was disappointed to see that the Putnam response so far consists only of questions about one of the 19 categories rather than the information requested.
>
> Nonetheless, in regard to Putnam's question about Item No. 5 of the questionnaire, Item No. 5 was intended as an inquiry as to the search terms that Putnam has used and./or would propose to use to obtain the information; but we have no problem in presenting to Putnam some possible search terms that we have developed. They are set out in the other attachment. Of course, we reserve the right to make refinements, additions and changes without prejudice.
>
> In response your other e-mailed question, wherever in our reply memorandum in regard to the Second Request for Production the term "decision-makers" is used in regard to e-mail or the following are named as such such decision-makers in regard to e-mail, we are seeking the e-mails to or from any one or more of the following ten decision-makers: Steve Oristaglio, Jack Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks, Brett Browchuk, Dan Miller and Justin Scott and, as appears to be the case of at least defendant Lasser,

6

> persons sending and/or receiving e-mail on behalf of any such persons, which e-
> mails concern one or more of the employees or lateral hires named in the
> respective categories of the Second Request for Production discussed in our reply
> memorandum.

(Emphasis added.) Attached to that e-mail was another copy of the November 17, 2006

questionnaire and a list of Svensson's proposed search terms.

Putnam did not respond for almost three weeks later, when in an e-mail on December 12,

without answering the questions in the November 17 questionnaire, it announced that,

> <u>We have</u> reviewed your search terms and have spoken at length with Putnam
> personnel and e-discovery experts and have <u>concluded</u> that the process... is
> prohibitively expensive and unreasonably burdensome...[it] will take several
> weeks, to say nothing of the strain it will put on Putnam's IT department and will
> cost, using the services of an unidentified "vendor" roughly $200,000.00.

(Emphasis added.) Thus, Putnam advanced to Svensson the conclusion it wants the court to

reach, but did so without providing to either Svensson or the court the subsidiary information

necessary to enable Svensson or the court to make an informed judgment as to the Putnam claim.

As set forth in the Affidavit of Nicole M. Panos of Target Litigation Consulting, Inc., filed

herewith,

> 3. Based upon my education, training and experience, <u>the draft search terms sent
> by Svensson's counsel to Putnam's counsel are reasonable as they are limited
> in number of search terms and the complexity of search</u>. Some of the terms
> may result in false hits as they are general terms used in everyday
> conversations (e.g. make, move, took out, take out). I would suggest that
> those search terms be used in conjunction with other, relevant terms to yield
> a higher likelihood of responsive hits. <u>The search methodology and terms
> may require modification depending upon the answers to the technological
> and other inquires set out in the questionnaire... that accompanied Attorney
> Moloney's November 17, 2006, e-mail to Attorney Rodriques</u>....

> 4. Based upon my education, training and experience, <u>it is impossible to
> analyze and evaluate the propriety, integrity and legitimacy of the Putnam
> contentions as to time and expense and the other issues set out in Attorney
> Rodriques' e-mail of December 12, 2006..., without first having obtained,
> analyzed and evaluated in the light of the technological issues and the
> varying conditions of the market place concerning vendors, the answers to</u>

> the questions set out in the November 17 e-discovery questionnaire.  In past
> projects I have consulted on, the cost and time estimations from vendors for
> tape restoration and searching, for example, has ranged from days to weeks
> and from one-hundred dollars per tape to one-thousand dollars per tape based
> on the vendor and the type of tape.  These types of issues can be resolved
> with open discovery exchange.

(Emphasis added.)

Exhibit A

## Exhibit A:  October Hearing Compliance-Status

**Defendant has not complied with the Court's orders at the October 26 hearing on the second document request.**

| Request Number | To Be Provided Per Court's Order: | Status as of 12/15/06 |
|---|---|---|
| 1 | Statement under oath | Not Produced |
| 2 | Emails negotiated under the new rules | Not Produced |
| 3 | Emails negotiated under the new rules | Not Produced |
| 4 | Emails negotiated under the new rules | Not Produced |
| 5 | Emails negotiated under the new rules | Not Produced |
| 6 | Emails negotiated under the new rules | Not Produced |
| 7 | To be produced for 28 comparators | Incomplete Production |
| 8 | Denied based on defendant's misrepresentation | Not Produced |
| 9 | Statement under oath | Not Produced |
| 10 | Statement under oath | Not Produced |
| 11 | Statement under oath | Not Produced |
| 12 | To be produced | Not Produced |
| 13 | Statement under oath | Not Produced |
| 55 | To be produced | Produced |

Exhibit B

Case 1:04-cv-12711-PBS    Document 145    Filed 12/27/2006    Page 1 of 5

**Exhibit B**

## Putnam's Stalling Tactics Implement a Strategy to Impede Svensson's Discovery

| Date | Elapsed Days | Event | Document Reference |
|------|--------------|-------|--------------------|
| 8/9/2005 | | Plaintiff serves the original interrogatories August 9, due within 30 days. | |
| 10/1/2005 | 53 | After a 30-day extension, Putnam refuses on Oct 1, to answer any interrogatories because Svensson served "too many." | |
| 10/20/2005 | 72 | Svensson reduces the number of interrogatories to 16, and Putnam agrees to answer this new list within one week. | |
| 11/17/2005 | 100 | Putnam files motion for protective order of confidentiality . | |
| 11/18/2005 | 101 | Putnam answers only 9 of 16 interrogatories and refuses to answer the other seven. | |
| 1/20/2006 | 164 | Hearing on confidentiality motion results in Court's instruction to negotiate an agreement. | |
| 2/8/2006 | 183 | Agreement on confidentiality is reached, containing a side letter in which Putnam agrees to: | |

1

Case 1:04-cv-12711-PBS    Document 145    Filed 12/27/2006    Page 2 of 5

## Exhibit B

| Date | Elapsed Days | Event | Document Reference |
|---|---|---|---|
| 2/23/2006 | 198 | ▪ Unredact previously redacted documents that were redacted solely for confidentiality reasons.<br><br>▪ Provide unredacted portions of previously redacted documents that relate to persons Svensson believes to be her comparators as long as Svensson provides that list, together with a list of claims to which those comparators relate.<br><br><br>Confidentiality order entered. Unredacted documents due from Putnam in 5 days, per side letter agreement.<br><br>Svensson directs Putnam to the first | "Per our discussion, within five (5) business days after the later of (a) entry of the protective order of the court, or (b) your provision of the list of comparators and claims described below, we will produce those portions of previously redacted documents that were redacted solely for confidentiality reasons - that is, solely for due to the fact that the protective order was not in place."<br><br>"In addition, **if you provide us with a list of persons who Svensson believes to be her comparators (together with some indication as to the specific claims to which those comparators relate), we will produce unredacted portions of the previous redacted documents that relate to those comparators (with respect to those claims) to the extent that a.) such redacted information was previously the subject of a document request, and b.) we believe that a reasonable case can be made that the individual comparator in question is a comparator for purposes of the identified claims."**<br><br>*Source: Side letter agreement, dated February 8, 2006*<br><br><br>*Source: e-mail from Moloney to Rodriques* |

2

Case 1:04-cv-12711-PBS    Document 145    Filed 12/27/2006    Page 3 of 5

**Exhibit B**

| Date | Elapsed Days | Event | Document Reference |
|------|--------------|-------|--------------------|
| 2/28/2006 | 203 | Putnam requests clarification on which comparators relate to which claims. | "However, the list in the interrogatories does not indicate which people are comparators for which claims, as the side letter specifically contemplated. Instead, Ms. Svensson has identified the list of similarly situated people referred to in various paragraphs of the Amended Complaint. The problem is that those paragraphs often refer to multiple claims (see, e.g., answers to interrogatory 17), and the answers do not indicate which of the people listed are comparators for which claim. As a result, it is impossible for us to decide whether we agree that a given individual is a comparator for a given claim for side letter purposes."<br><br>*Source: e-mail from Rodriques to Moloney* |
| | | supplemental answers to interrogatories for the list of comparators required by the side letter. | |
| | | | Documents from Putnam arrive on schedule per side letter agreement but **despite Putnam's commitment, the documents provided are 89.7% redacted.** |

3

Case 1:04-cv-12711-PBS    Document 145    Filed 12/27/2006    Page 4 of 5

## Exhibit B

| Date | Elapsed Days | Event | Document Reference |
|------|--------------|-------|--------------------|
| 3/2/2006 | 205 | Svensson provides list of employment actions by paragraph from the complaint, and maps each of the comparators to the appropriate employment action. | "All of this information was provided to you by my e-mail to you on February 23. There was no legitimate reason for Putnam, as appears to have been the case, to have been deliberately obtuse in its reading of the e-mail, the supplement to the answers to interrogatories and the respective paragraphs and counts of the amended complaint. Putnam, having made the agreement set out in the side letter, which was intended to assist in moving this case along, now appears to be looking for excuses not to live up to its agreements and to delay our preparation of our case."<br><br>Source: e-mail from Moloney to Rodriques, March 3, 2006 |
| 3/3/2006 | 206 | Putnam acknowledges that Svensson provided the list of comparators by claim as requested, but for the first time raises the additional requirement to sort the list based on claims and counts. The additional request was never included in the side letter agreement. Putnam declares its document production obligation complete despite having produced no additional documents as to comparators. | "Our position with respect to the recent production is clearly set forth in my letter of February 28. You undertook to provide us with relevant comparators with respect to each of Ms. Svensson's discrimination claims (e.g., promotion, termination, demotion, etc.), not the counts in her complaint. As you are aware, several of her counts involve multiple claims (the comparators for which are necessarily different), and for many of her counts the whole concept of comparators is inapposite. Your email reflects Ms. Svensson's continued misunderstanding of the comparators concept. If you have specific questions with respect to our production, I would be happy to try to answer them. Otherwise, we have produced the documents that we agreed to produce."<br><br>Source: e-mail from Rodriques to Moloney; march 3, 2006 |

4

## Exhibit B

| Date | Elapsed Days | Event | Document Reference |
|---|---|---|---|
| 3/14/2006 | 217 | In further attempt to respond to Putnam's request, Svensson provides another list of comparators, this one a list of names grouped by employment action taken. | "Please reply with Putnam's response to the attached as per the requirements of the Side Letter and within the time limits set forth therein." <br><br> Source: e-mail from Moloney to Rodriques; March 14, 2006 |
| 3/23/2006 | 226 | Over two hundred days after the original interrogatories were served, and five months after the reduced number of interrogatories were served and lengthy negotiation of a confidentiality agreement and side letter, and hours of discussion over the list of comparators, Putnam claims that no one on the list is a comparator and refuses any additional production. This sequence of events raises questions as to the Putnam's true motivation in the negotiation: whether to find compromise or simply cause delay. | "The new list of comparators that you have provided will not, consistent with the criteria in our side letter, result in our 'un-redacting' any additional, previously-produced documents or portions thereof." <br><br> Source: e-mail from Rodriques to Moloney; March 23, 2006 |

Exhibit C

## Exhibit C

**Answers to Interrogatories and Unredaction of Produced but Redacted Documents Concerning any Comparators Only After Court Acts on June 21 and July 11, 2006, but Answers and Unredacted Documents Not Received Until September 1, 2002, 52 Days Later.**

| Date | Elapsed Days | Event | Documentation (bold/emphasis added) |
|---|---|---|---|
| 6/21/2006 | | After over 200 days of fruitless discussion and negotiation, Svensson files motion to compel answers to interrogatories. At the hearing on June 21, the Court gives the parties 14 days to negotiate a list of comparators. | Court states, "Okay. Fourteen days. I don't like the direction that this is going in. I want you to work together and see if you can come up with a common list of comparators that you can agree on."<br><br>Source: Transcript, Hearing June 21, 2006, p. I-20, II, 17-20 |

Case 1:04-cv-12711-PBS     Document 146     Filed 12/27/2006     Page 2 of 6

## Exhibit C

| Date | Elapsed Days | Event | Documentation (bold emphasis added) |
|------|--------------|-------|--------------------------------------|
| 6/22/2006 | 1 | Svensson proposes using categories rather than names in developing comparator list to avoid "cherry-picking." | "Any identification by name of individuals for comparators by either side in this case is likely to produce claims by the other side of 'cherry picking.'<br><br>To avoid such arguments, it seems to me not only better and simpler but also **fair to both sides** to do the following on comparator issue insofar as it is a discovery matter and given the protective order concerning confidentiality:<br><br>1. **On the pay issue,** all persons in the IMD who.... were participants in the Putnam Associates and Partners Incentive Compensation Plan...;<br>2. **On the failure to promote issue,** all persons in the IMD who...were Senior Vice-Presidents plus any person hired in by Putnam from the outside during that period as Managing Director and/or Partner;<br>3. **On the demotion issue,** any portfolio manager on any team in the IMD.... and any such person who, in that period, was demoted or voluntarily or involuntarily transferred from one team or function to another; and,<br>4. **On the termination issue,** all persons in the IMD who...held the rank of Senior Vice President or above."<br><br>Source: e-mail from Moloney to Rodriques; June 22, 2006<br><br>"What is it – generally at least – that you want about each person given that the proposed universe of people is large?"<br><br>Source: e-mail from Kociubes to Moloney, June 22, 2006 |
|  |  | Putnam's response 20 minutes later fails to respond to the proposal. |  |

2

Case 1:04-cv-12711-PBS    Document 146    Filed 12/27/2006    Page 3 of 6

## Exhibit C

| Date | Elapsed Days | Event | Documentation (bold emphasis added) |
|---|---|---|---|
| 6/23/2006 | 2 | Putnam follows up the next day with more questions about the precise number of proposed comparators, once again failing to respond to the proposal put forward by Svensson to avoid cherry picking.<br><br>Svensson's analysis shows a difference of 2 names: 89 on the interrogatories and 91 on the subsequent list. This information along with reconciliation is passed along in the June 28, 2006 conference call. | "...In the meantime, **we are confused** about something. In Lisa's 4th affidavit, and at the hearing, you referred to her 91 comparators - those that both of us briefed. In the amended interrogatory answers that Lisa filed on June 16, Lisa lists more than 91 distinct people as "similarly situated." The ints list close to 100 distinct individuals. Some of the 91 are not in the int answers and vice versa. Some of those on the int answers are not in Investments, and a number left Putnam before 1999. It would be helpful if, before we meet, we could get a definitive list of who the comparators are - that is, about whom are you seeking discovery."<br><br>Source: e-mail from Rodriques to Moloney; June 23, 2006 |
| 6/28/2006 | 7 | Two plus hour conference call with Attorneys Moloney and Weir and Kociubes and Rodriques re: interrogatories and 30(b)(6). | |

3

## Exhibit C

| Date | Elapsed Days | Event | Documentation (bold emphasis added) |
|---|---|---|---|
| 6/30/2006 | 9 | Approximate 1-hour continuation of June 28 conference call with Attorneys Moloney and Weir and Kociubes and Rodriques re: interrogatories and first document request, second request for documents, and 30(b)(6). **Positions:** <u>Interrogatories and document requests</u> • **Putnam:** Documents provided-to-date constitute s a sufficient response to both first and second requests if unredacted. • **Svensson:** Entitled to unredacted documents from both the first and second requests and answers to interrogatories on all 91 comparators, including total compensation. <u>Rule 30(b)(6) deposition</u> • **Putnam:** Svensson is not entitled to both documents and 30(b)(6) witnesses on the same topics. • **Svensson:** Svensson is entitled to both and should not have to barter one for the other. | Source e-mail from Moloney to Rodriques, July 7, 2006 |

4

Case 1:04-cv-12711-PBS    Document 146    Filed 12/27/2006    Page 5 of 6

## Exhibit C

| Date | Elapsed Days | Event | Documentation (bold emphasis added) |
|---|---|---|---|
| 7/7/2006 | 16 | After lengthy negotiations, Svensson makes the following offer to Putnam:<br><br>**Svensson agrees to accept Putnam's representation that it does not keep records on "marital status" and "children."**<br><br>Because Putnam does not agree that Svensson is entitled to any documents responsive to the second request, Svensson offers to ask the court to continue the hearing so Svensson can make motions on the comparator issues for both document requests.<br><br>**Svensson offers to conduct the Rule 30(b)(6) on a vastly reduced scope** (3 topics instead of 34); the topics being documents the court orders, documents the Putnam unredacts that have previously been produced (both requests), and termination of Svensson.<br><br>**Putnam's response to Svensson's offer:**<br><br>Interrogatories/Document Production: **Agrees to answers interrogatories regarding the 91 comparators** (Svensson understands this to include total compensation). Document production not addressed.<br><br>Rule 30(b)(6) deposition: The scope of the Rule 30(b)(6) is still too broad, that **a reduction from 34 to 3 topics does not constitute "meaningful progress," and the Magistrate should decide the issue.** | Source e-mail from Moloney to Rodriques, July 7, 2006<br><br>"As we said when we spoke a week ago, we would be prepared to answer the interrogatories as propounded with respect to your alleged 91 comparators to the extent that Putnam can do so, subject to the caveats outlined in our conversation and your letter. We outlined our concerns about the 30(b)(6) deposition, and you and Jack agreed to try to narrow the topics in a way that make it possible to conduct a 30(b)(6) examination. We don't seem to be making meaningful progress on that issue, so it makes sense to just go ahead and present that issue to the Magistrate on Tuesday."<br><br>Source: e-mail from Rodriques to Moloney July 7, 2006 |

Case 1:04-cv-12711-PBS     Document 146     Filed 12/27/2006     Page 6 of 6

## Exhibit C

| Date | Elapsed Days | Event | Documentation (bold emphasis added) |
|------|-------------|-------|-------------------------------------|
| 7/11/2006 | 20 | **Parties announce agreement on the 91 comparators for purposes of interrogatory answers** No agreement reached on either of the two document requests.<br><br>Court orders Svensson to "retailor" the Rule 30(b)(6) topics. | |
| 9/1/2006 | 72 | **52 days after the July 11 hearing Putnam serves answers to interrogatories and produces unredacted versions of previously produced but redacted documents.** | |

6

Exhibit D

## Exhibit D

## Putnam Repeatedly has Made Misrepresentations of Fact to the Court.

| Item | Date | Attorney | Statement to the Court (bold emphasis added) | Facts |
|---|---|---|---|---|
| 1 | 12/13/2005 | Rodriques | Represents to the Court that **Putnam Investment Division investment teams are as independently administered as the various autonomous graduate schools of Harvard University.** "I just direct your honor to <u>Jackson</u>." <br><br> Source: Transcript, December 13, 2005, hearing, p. l-15, ll. 6-7 | Unlike Harvard's graduate schools, Putnam's Investment Division is administered centrally. <br><br> Former co-head of the Investment Division Stephen Oristaglio testified. <br><br> "Q: ...investment professionals within the investment division were compared with each other? <br><br> A: They would need to be, because the bonus pool was allocated to the investment division..." <br><br> Source: Stephen Oristaglio dep., p. 96, ll. 10-19 |
| 2 | 12/13/2005 | Rodriques | **"Mr. Lasser never used e-mail."** <br><br> Transcript, December 13, 2005, hearing, p.l-14, l. 11 | • At his deposition, Konstantin Stoev produced an e-mail from defendant Lasser that Lasser sent to Stoev through a surrogate <br><br> Source: Stoev dep, Exhibit 3 |
| 3 | 12/13/2005 | Rodriques | **"The group she was in consisted of about 10 to 15 portfolio managers."** <br><br> Source: Transcript, December 13, 2005, hearing, p.l-7, ll 20-21 | There were seven portfolio managers on the International Growth Equity team as of March 2002 <br><br> Source: Oristaglio dep., Exh 2 and Putnam SEC filings |

Case 1:04-cv-12711-PBS    Document 147    Filed 12/27/2006    Page 2 of 5

## Exhibit D

| Item | Date | Attorney | Statement to the Court (bold emphasis added) | Facts |
|---|---|---|---|---|
| 4 | 12/13/2005 | Rodriques | "[T]hat group was disbanded." | But, according to Richard Tibbetts: "Q: Were you involved at all in the disbanding of something called the Global Growth Team? A: Well, I am not sure what you mean by disbanding. There was a reorganization, if that is what you are referring to." and, in his deposition, Oristaglio stated "I knew I wanted to make the team smaller", and "once I decided that Steve Dexter was going to be the person to lead this effort how many did we need." |
| | | | Source: Transcript, December 13, 2005, hearing.; p. l-7, l. 22 | Sources: Tibbets dep., p. 141, ll. 18-23;  Oristaglio dep., p. 122, ll. 21-22;  p. 128, ll 6-8 |
| 5 | 5/11/2006 | Rodriques/ Kociubes | Putnam counsel file **affidavit** of Putnam HR's Mary McNamee concerning **transfers by members of investment teams**: "These portfolio managers are all **managed in separate groups** and are compensated differently, in both the marketplace and at Putnam. **They are also not interchangeable.**" | But according to head of Putnam HR, Tibbetts: "Q: ...were [there] circumstances where individuals would have the opportunity to and did move from one department or team within the Investment Division to another? A: Was I aware of people moving?  Yes, people moved. Q: Does that occur with some frequency? A: A fair amount, yes." |
| | | | Source: Affidavit of Mary McNamee, May 11, 2006, p.3, ll.12-15 | Source Tibbetts dep., p. 49, ll 18 – p. 50, l.2. |

Case 1:04-cv-12711-PBS    Document 147    Filed 12/27/2006    Page 3 of 5

## Exhibit D

| Item | Date | Attorney | Statement to the Court (bold emphasis added) | Facts |
|------|------|----------|-----------------------------------------------|-------|
| 6 | 8/28/2006 | Kociubes | Arguing against Svensson's motion to resume the Tibbetts and Oristaglio depositions, Putnam counsel makes the following statements regarding the Tibbetts deposition: <br><br>" . . . [the instruction not to answer] comes in a context where **we were at 6:00**, once that genie is out of the bottle it is out of the bottle. There's no choice of going to the court at that point." (13) <br><br>" . . . here we have had sort of an intent to inquire at a point where **seven hours were used up anyway,** into an area that has nothing and no conceivable relevance the plaintiff's claim." (14) <br><br>" . . . this witness having been there till **6:00, after six when we finally shut it down because more than the seven hours had elapsed, we closed it."** (15) <br><br>Source: (Transcript, August 28, 2006, hearing; p. 9, ll. 14-16; p. 10, l.22 – p. 11, l. 1; p. 11, ll. 6-8 | The transcript of the Tibbetts deposition shows that: (1) Attorney Kociubes' instructions not to answer first occurred on p.109 of a 226 page transcript; and, (2) The lunch recess was taken from 1:20 to 1:55 pm.  Since the deposition resumed after lunch at p. 108, the first instruction not to answer occurred not at 6:00 p.m. but just after lunch, at approximately 1:55 p.m.  The deposition ended that day four hours later at 6:00 pm at p. 226. <br><br><br> (16) Tibbetts dep., p. 141, ll. 18-23 |
| 7 | 10/26/2006 | Kociubes | "[T]he bulk of the list [of decision makers] that you just gave were individuals who were all deposed." <br><br>Source: Transcript, October 26, 2006, hearing; p.19, ll. 9-10 | Only four of the ten decision-makers had been deposed, and they were deposed before Putnam produced unredacted documents on September 1, 2006, and Oristaglio's deposition, as per the court order, resumed for two hours subsequent to the September 1, 2006, production of unredacted documents. |

3

Case 1:04-cv-12711-PBS    Document 147    Filed 12/27/2006    Page 4 of 5

## Exhibit D

| Item | Date | Attorney | Statement to the Court (bold emphasis added) | Facts |
|------|------|----------|----------------------------------------------|-------|
| 8 | 10/26/2006 | Kociubes | Arguing against Svensson's motion to compel production of documents requested in her 2d RPOD in regard to discrete documents, Putnam counsel likens the Performance and Development Planning and Review Form ("PDPR") to the Human Resources Update, an on-going non-discrete document: **"This is really not a discrete group, your honor."** Source: Transcript, October 26, 2006, hearing; p. 36, ll. 10-11 | But according to the Putnam 30(b)(6) witness, the PDPR is a discrete document, as it is "the form that was made available to managers to use for documenting performance." Source: Transcript 30(b)(6) dep., p. 110, ll. 20-22 |
| 9 | 10/26/2006 | Kociubes | **"Ms. Svensson rather than being terminated was given the opportunity to go to GER, same title ...Everybody has so testified. There is no document or anything that is inconsistent."** Source: Transcript, October 26, 2006, hearing; p. 47, ll. 20-22 | The functional title was a demotion from "Senior Portfolio Manager" to "Analyst." Source: Putnam document, PRM 1750, cost center title change |
| 10 | 12/4/2006 | Kociubes | The Putnam motion to quash resumption of the 30(b)(6) deposition, repeatedly represents to the Court that 6 hours of testimony has been given at the Rule 30(b)(6) deposition: "After 6 hours, Putnam suspended the deposition." "Mr. Tibbetts testified extensively for 6 hours on many of the noticed topics. " "...in the 6 hours during which Mr. Tibbetts did testify... " Source: Putnam motion to quash Rule 30(b)(6), p. 1, § II, ll. 2-3; p. 7, ¶ 2, l2; p. 10, ll. 7-8 | The transcript shows that while the deposition began at 10:14 a.m. and ended at 6:00 p.m.(approximately 5 hours and 46 minutes) after the breaks and recesses are taken into account)' the witness actually testified for only 4 hours and 53 minutes of the full seven hours allowed under the rules. |

4

Case 1:04-cv-12711-PBS     Document 147     Filed 12/27/2006     Page 5 of 5

## Exhibit D

| Item | Date | Attorney | Statement to the Court (bold emphasis added) | Facts |
|------|------|----------|----------------------------------------------|-------|
| 11 | 12/4/2006 | Kociubes | In the same motion, Putnam states, **"Putnam extended considerable efforts to prepare Richard B. Tibbetts...to serve as its Rule 30(b)(6) witness."**<br><br>Source: Putnam motion to quash; p. 5, ¶ C, ll. 2-4 | Mr. Tibbetts testified that he had not met with anyone in the investment division in preparation for his testimony (26).<br><br>"Q: Did you...meet with Mr. Brooks concerning the 30(b)(6) deposition?<br>A: No.<br>Q: Did you...meet with Mr. Haldeman concerning the 30(b)(6) deposition?<br>A: No.<br>Q: Did you...to meet with anyone within the Investment Division outside of Human Resources?<br>A: No."<br><br>(26) Transcript, 30(b)(6) deposition, p. 7, l. 20 - p. 8, l. 5 |
| 12 | 12/13/2006 | Kociubes | In its December 13, 2006 motion to terminate discovery, Putnam **states falsely** that the documents ordered by the Court on October 26, 2006, have been produced **(" . . . this Court ordered certain documents produced (which Putnam has since done) . . .").**<br><br>Source: Putnam motion to terminate discovery, p. 1, ll. 10-11 | As of December 27, 2006, incomplete production of the "360's"; six statements under oath have not been produced; information re: the Operating Committee has not been produced; court directed negotiations as to the discrete items of the 2d RPOD are at a standstill since Putnam has failed and refused even to advise Svensson counsel of the Putnam positions on production of the discrete items; and court directed negotiations as to e-mail issues are also at a standstill due to Putnam's refusal to provide requested e-discovery information as to its computer and e-mail systems .<br><br>Source: Exhibit ___ October 26 Hearing - Status of Compliance |

5

Exhibit E

Case 1:04-cv-12711-PBS    Document 148    Filed 12/27/2006    Page 1 of 1

**Exhibit E**

**Putnam's Answers to Interrogatories Differ From Its Witnesses' Deposition Testimony.**

| Item | Employee Referenced | Deposition Testimony | Answers to Interrogatories |
|---|---|---|---|
| 1 | Paul Warren | "A: ...and Steve [Oristaglio] and I concluded ...probably be best if Paul [Warren] moved on, and I...decided I would talk to him."<br><br>Source: Charles Haldeman dep., p. 147, ll. 22-24 | But according to Putnam answers to interrogatories: Termination type: Voluntary<br><br>Source: Putnam answers to Interrogatories |
| 2 | Beth Cotner | "Q: Was Beth Cotner terminated...?<br>A: No. She retired."<br><br>Source: Putnam 30(b)(6) dep; p. 56, ll. 23 - p. 57, l. 1 | But according to Putnam answers to interrogatories: Termination type: Involuntary<br><br>Source: Putnam answers to interrogatories |
| 3 | Deborah Kuenstner | "Q: " ...[was] Debby Kuenstner['s]... departure initiated by Putnam or by her?<br>A: It was mutual."<br><br>Source: Putnam 30(b)(6) dep; p. 52, ll. 4-7 | But according to Putnam answers to interrogatories: Termination type: Voluntary<br><br>Source: Putnam answers to interrogatories |
| 4 | Lisa Svensson | "Q: " ...it appears...it was your plan to yourself take over the managerial responsibility for Lisa's team and the organization of the portfolio management process....<br>A: It certainly appears that way."<br><br>Source: Joshua Brooks dep., p. 235, l. 19 - p. 236, l. 1 | But according to Putnam answers to interrogatories: Svensson's replacement was Maria Drew<br><br>Source: Putnam Answers to Interrogatories |

Exhibit F

Exhibit F

**Putnam's Refusal To Accept or to Make any Counter-proposal to Svensson's August 4, 2006, Revised Scope of her Second Document Request Evidences Putnam's True Intent:  To Consume Time and Resist Discovery**

| Date | Elapsed Days | Event (bold emphasis added) | Documentation (bold emphasis added) |
|---|---|---|---|
| 7/18/2006 | | Conference call with Attorneys Weir and Moloney and, Kociubes and Rodriques -- discussions of document requests that remain outstanding after the July 11, 2006, hearing.  During the call, Putnam requests Bates numbers of redacted documents that Svensson wants unredacted as to the 91 comparators | |
| 7/24/2006 | 6 | Svensson provides the requested list of Bates numbers. | " ... Denise Whitlock of my office will be sending to you, in furtherance of our discussions as to resolving the RPOD issues, a list of the Bates numbered pages that Putnam has produced redacted in whole or in part that we seek unredaction of as to one or more of the '91' ..." <br><br> "The following is a list of Bates numbered pages relative to the matter described in Atty. Moloney's email of 07/21/06...." <br><br> Source: e-mail from Moloney to Kociubes and Rodriques; July 21, 2006; e-mail from paralegal Denise Whitlock to Kociubes and Rodriques, July 24, 2006 |

Case 1:04-cv-12711-PBS    Document 149    Filed 12/27/2006    Page 2 of 5

Exhibit F

| Date | Elapsed Days | Event (bold emphasis added) | Documentation (bold emphasis added) |
|---|---|---|---|
| 7/27/2006 | 9 | Conference call continues with Attorneys Weir, Kociubes and Rodriques. After reviewing the Bates numbers, Putnam agrees to unredact previously redacted documents re: the 91 comparators, given the court's directions and the agreement at the July 11, 2006, hearing regarding interrogatory answers. Parties acknowledge the agreement covers documents already produced. | |
| 8/4/2006 | 17 | Based on discussions in conference calls, Svensson sends a substantially revised proposal that greatly limits the scope of the second request for production. Except for information as to total compensation, not one of the categories as revised asks for documents as to more than 27 of the 91 comparators, with some of the categories covering as few as seven comparators. The e-mail requests are now limited to e-mails to or from only ten identified decision-makers. For the categories as to which Putnam claims no documents exist, Svensson offers to accept sworn statements to that effect. The proposal is submitted to Putnam with request to respond by August 11, 2006. | "Pursuant to your request during our July 27, 2006 conference call, I have reviewed Plaintiff's second document request . . . For the purpose of providing you with a proposal to resolve our discovery dispute...without court intervention. The following proposal represents the minimum Plaintiff believes necessary in order to prove her case . . ." <br><br> Source: e-mail from Weir to Kociubes and Rodriques, August 4, 2006 |
| 8/11/2006 | 24 | Putnam rejects Svensson's August 4 proposal, refuses to make a counter-proposal, and indicates that it will produce none of the documents requested by the Svensson in the Second RPOD absent a court order. | "You indicated in your e-mail that your proposal is [Svensson's] bottom-line position. We take you at your word, so it does not look like we will be able to resolve this short of your filing a motion." <br><br> Source: e-mail from Kociubes to Weir; August 11, 2006 |

Case 1:04-cv-12711-PBS    Document 149    Filed 12/27/2006    Page 3 of 5

Exhibit F

| Date | Elapsed Days | Event (bold emphasis added) | Documentation (bold emphasis added) |
|---|---|---|---|
| 8/31/2006 | 44 | Svensson responds to Putnam. | "I have further considered your email of August 11th responding to my 8/04/06 email proposal for resolution of the anticipated motion to compel with respect to the second request for production of Putnam documents. I note for the record as follows: |
| | | | 1) **After 2 months of telephone negotiations concerning the second request for production of documents, I agreed to your request during the July 27, 2006 discussion to reduce the scope of our request for production to only those documents necessary to prove Plaintiff's case at trial;** |
| | | | 2) **My August 4, 2006 email represented a significant compromise, e. g. by significantly reducing the 91 comparators in this case to far more manageable numbers for purposes of the second document request;** |
| | | | 3) While you invited us to further reduce the scope of our compromise proposal, your August 11, 2006 response provided no counterproposal whatsoever, failed to deal with the discrete documents sought by Plaintiff in response to certain of the requests, and failed to offer to provide a single document beyond those which you are supposedly producing tomorrow; |
| | | | 4) **You offered some numbers concerning the volume of emails which would have to be searched (which appear to us to be wildly inflated), but did not advise us as to the methods utilized in making these calculations, nor did it offer us an opportunity to have the search undertaken by our own representatives; and** |

3

Case 1:04-cv-12711-PBS     Document 149     Filed 12/27/2006     Page 4 of 5

Exhibit F

| Date | Elapsed Days | Event (bold emphasis added) | Documentation (bold emphasis added) |
|------|--------------|------------------------------|---------------------------------------|
| | | | 5) **Your response must be seen as part of an overall effort by Putnam since last Fall to thwart legitimate efforts at obtaining relevant discovery in this case, while speciously arguing that it is Plaintiff who is seeking to delay the orderly completion of the discovery process.** Accordingly, I hereby decline your suggestion that I further dilute Plaintiff's second document request, and will proceed with the motion to compel as soon as I have determined whether your document production tomorrow fully unredacts all previously-produced documents with respect to all 91 comparators. Source: e-mail from Weir to Kociubes, August 29, 2006 |
| 9/1/2006 | 45 | Putnam provides answers to interrogatories and unredacted versions of documents previously produced per the agreement reached at and in connection with the hearing on July 11, 2006, 52 days earlier. | |
| 9/29/2006 | 73 | In the process of researching items missing from the September 1 document production, Svensson discovers that Putnam made production of total compensation information for only some of the comparators for some of the years in question; produced incomplete ratings information for 2003, and incomplete manager ratings for partners. Svensson includes these on the list of Information/Documents Not Produced provided to Putnam on September 29, 2006. | Source; e-mail from Moloney to Kociubes, September 29, 2006 |

4

Case 1:04-cv-12711-PBS    Document 149    Filed 12/27/2006    Page 5 of 5

Exhibit F

| Date | Elapsed Days | Event (bold emphasis added) | Documentation (bold emphasis added) |
|------|--------------|------------------------------|--------------------------------------|
| 10/4/2006 | 78 | **Attorney Rodriques claims that he is "confused" by** Svensson's September 29 list of missing items/information. | Source: voicemail message from Rodriques to Moloney |
| 10/10/2006 | 84 | Plaintiff files motion to compel production of documents.<br><br>Putnam's failure to have provided even one counter proposal and the ensuing three month delay call into question once again the true motive behind its negotiation posture | |

5

Exhibit G

**Exhibit G**

**Putnam ignored the Court's orders related to the 30(b)(6) Deposition.**

| Date | Elapsed Days | Plaintiff | Defendant | Court |
|---|---|---|---|---|
| 4/26/2006 | | Plaintiff serves first 30(b)(6) notice for 34 items to be taken on 5/31/06 | | |
| 5/24/2006 | 28 | | Defendant files motion to quash 30(b)(6) deposition | |
| 7/11/2006 | 76 | | | **Hearing on motion to quash**<br>• Court asks Plaintiff to "re-tailor" the request |
| 9/1/2006 | 128 | | After 52-day delay, Defendant produces unredacted versions of documents previously produced with respect to the 91 comparators (for discovery purposes), allowing plaintiff to narrow the initial request | |
| 10/10/2006 | 167 | Plaintiff serves second 30(b)(6) notice for 15 items to be taken on November 17 | | |
| 10/19/2006 | 176 | | Defendant files second motion to quash 30(b)(6) deposition | |
| 10/26/2006 | 183 | | | **Hearing on motion to quash**<br>• Court denies motion<br>• Specifies one witness for one day, in accordance with the rules requiring an educated witness |
| 11/10/2006 | 198 | | Defendant asks to delay the deposition by twelve days in order to prepare the witness | |
| 11/29/2006 | 217 | | **Deposition Taken**<br>• Witness admits he has not spoken with any person outside of Human Resources in preparation for the deposition<br>• Defense counsel instructs witness not to answer question related to Mitch Schultz<br>• Defendant leaves the deposition after approximately five hours, and before Plaintiff has finished questioning<br>• Defendant insults and threatens Plaintiff before leaving deposition | |
| 12/4/2006 | 222 | | Defendant files third motion to quash the 30(b)(6) deposition | |

Case 1:04-cv-12711-PBS     Document 150     Filed 12/27/2006     Page 2 of 2

**Exhibit G**

**Putnam ignored the Court's orders related to the 30(b)(6) Deposition.**

Exhibit J

2.    <u>Putnam has made none of the showings required of a party responding to e-discovery and even has failed and refused, despite the direction of the court, to provide the basic information needed to begin the analysis of the e-mail issues in this case.</u>

2.1. <u>The 2006 e-discovery rules amendments to the Federal Rules of Civil Procedure govern the present case.</u>

The Federal statute that requires the United States Supreme Court to submit proposed

rules of procedure to Congress. 28 U.S.C. § 2074, states, in relevant part:

> (a) The Supreme Court shall transmit to the Congress not later than May 1 of the year in which a rule prescribed under section 2072 is to become effective a copy of the proposed rule. ...<u>The Supreme Court may fix the extent such rule shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice</u>, in which event the former rule applies.

(Emphasis added.)  On April 12, 2006, the Supreme Court (Roberts, C.J.), submitted amendments

of the Federal Rules of Civil Procedure to Congress.[3] An order of the Supreme Court, also dated

April 12, 2006,[4] states

> (3) That the foregoing amendments...shall take effect on December 1, 2006, <u>and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending.</u>

(Emphasis added).  Thus, the e-discovery rules amendments govern e-discovery in the present

case.

---

[3] http://www.supremecourtus.gov/orders/courtorders/frcv06p.pdf
[4] <u>Id.</u>

2.2.  The scope of e-discovery.

E-mail and other electronically stored information ("ESI") are generally subject to

discovery under Fed. R. Civ. P. Williams v. Mass. Mutual Life Ins. Co., 226 F.R.D. 144, 145-46

(2005).  However, under Rule 26(b)(2)(C),

> [t]he frequency or extent of use of the discovery methods otherwise permitted
> under these rules and by any local rule shall be limited by the court if it
> determines that: ... (iii) the burden or expense of the proposed discovery
> outweighs its likely benefit, taking into account the needs of the case, the amount
> in controversy, the parties' resources, the importance of the issues at stake in the
> litigation, and the importance of the proposed discovery in resolving the issues....

Under the new e-discovery amendments, the responding party is not required to produce

ESI that is stored in a manner that, "because of undue burden or cost" is not "reasonably

accessible," but the responding party has the burden to show that ESI not produced is not

reasonably accessible.  Even upon such a showing, however, the court may order discovery from

not reasonably accessible sources if the requesting party establishes good cause.  Rule 26(b)(2)(B)

states:

> A party need not provide discovery of electronically stored information from
> sources that the party identifies as not reasonably accessible because of undue
> burden or cost.  On motion to compel discovery or for a protective order, the
> [responding] party...must show that the information is not reasonably accessible
> because of undue burden or cost.  If that showing is made, the court may
> nonetheless order discovery from such sources if the requesting party shows
> good cause, considering the limitations of Rule 26(b)(2)(C).  The court may
> specify conditions for the discovery.

(Emphasis added.)

Whether information is "not reasonably accessible," is determined on a case-by-case

basis.  In general, "data that is 'accessible' is stored in a readily usable format that 'does not

need to be restored or otherwise manipulated to be usable.'"  Quinby v. WestLB AG, 2006 WL

2597900, *7 (S.D.N.Y. 9/5/06).  In Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y.

2003), the leading case on e-discovery, the United States District Court for the Southern District

of New York identified five types of information storage forming a continuum of from

accessible to not accessible storage media, saying that,

> Whether electronic data is accessible or inaccessible turns largely on the media on
> which it is stored. Five categories of data, listed in order from most accessible to
> least accessible, are described in the literature on electronic data storage...

The five categories of data are: (1) Active, online data[5]; (2) Near-line data[6]; (3) Offline

storage/archives[7]; (4) Backup tapes[8]; and, (5) Erased, fragmented or damaged data.[9]

> Of these, the first three categories are typically identified as accessible, and the
> latter two as inaccessible. The difference between the two classes is easy to
> appreciate. Information deemed "accessible" is stored in a readily usable format.
> Although the time it takes to actually access the data ranges from milliseconds to
> days, the data does not need to be restored or otherwise manipulated to be usable.

---

[5] "On-line storage is generally provided by magnetic disk. It is used in the very active stages of
an electronic records [sic] life--when it is being created or received and processed, as well as
when the access frequency is high and the required speed of access is very fast, *i.e.*,
milliseconds." Examples of online data include hard drives."

[6] "This typically consists of a robotic storage device (robotic library) that houses removable
media, uses robotic arms to access the media, and uses multiple read/write devices to store and
retrieve records. Access speeds can range from as low as milliseconds if the media is already in
a read device, up to 10-30 seconds for optical disk technology, and between 20-120 seconds for
sequentially searched media, such as magnetic tape." Examples include optical disks.

[7] "This is removable optical disk or magnetic tape media, which can be labeled and stored in a
shelf or rack. Off-line storage of electronic records is traditionally used for making disaster
copies of records and also for records considered 'archival' in that their likelihood of retrieval is
minimal. Accessibility to off-line media involves manual intervention and is much slower than
on-line or near-line storage. Access speed may be minutes, hours, or even days, depending on
the access-effectiveness of the storage facility."

[8] "A device, like a tape recorder, that reads data from and writes it onto a tape. Tape drives have
data capacities of anywhere from a few hundred kilobytes to several gigabytes. Their transfer
speeds also vary considerably ... The disadvantage of tape drives is that they are sequential-
access devices, which means that to read any particular block of data, you need to read all the
preceding blocks." As a result, "[t]he data on a backup tape are not organized for retrieval of
individual documents or files [because] ... the organization of the data mirrors the computer's
structure, not the human records management structure."

[9] "When a file is first created and saved, it is laid down on the [storage media] in contiguous
clusters ... As files are erased, their clusters are made available again as free space. Eventually,
some newly created files become larger than the remaining contiguous free space. These files are
then broken up and randomly placed throughout the disk."

> "Inaccessible" data, on the other hand, <u>is not readily usable.  Backup tapes must</u>
> <u>be restored ...fragmented data must be de-fragmented</u>, and <u>erased data must be</u>
> <u>reconstructed, all before the data is usable.  That makes such data inaccessible.</u>

<u>Id</u>. at 318-20. (Emphasis added, footnotes omitted.).

If the parties do not agree on whether the non-produced information is reasonably

accessible, on motion to compel, <u>the responding party must provide enough information about</u>

<u>the information claimed to be not reasonably accessible to enable the requesting party (and the</u>

<u>court) to test that claim</u>.  Thus, the court may allow the requesting party to conduct discovery

concerning the nature of the responding party's computer and information storage systems.  The

Committee Notes to Rule 26, as now amended, state:

> Under this rule, <u>a responding party should produce electronically stored</u>
> <u>information that is relevant, not privileged, and reasonably accessible</u>, subject to
> the (b)(2)(C) limitations that apply to all discovery. The responding party <u>must</u>
> <u>also identify, by category or type, the sources containing potentially responsive</u>
> <u>information that it is neither searching nor producing.  The identification should</u>,
> to the extent possible, <u>provide enough detail to enable the requesting party to</u>
> <u>evaluate the burdens and costs of providing the discovery and the likelihood of</u>
> <u>finding responsive information on the identified sources.</u>
>
> ***
>
> If the parties cannot agree whether, or on what terms, sources identified as not
> reasonably accessible should be searched and discoverable information produced,
> ...the responding party must show [to the court] that the identified sources of
> information are not reasonably accessible because of undue burden or cost. <u>The</u>
> <u>requesting party may need discovery to test this assertion</u>.  Such discovery might
> take the form of <u>requiring the responding party to conduct a sampling of</u>
> <u>information contained on the sources identified as not reasonably accessible;</u>
> <u>allowing</u> some form of <u>inspection</u> of such sources; <u>or taking depositions of</u>
> <u>witnesses knowledgeable about the responding party's information systems.</u>

(Emphasis added.)

Even where the responding party proves that the ESI is not reasonably accessible, the

courts will require production if the requesting party shows good cause.  This involves a

balancing of the benefits and the costs of the discovery ought.  Committee Note to Rule 26(b)(2).

The Committee Notes set forth a seven-factor test to be applied by the court in determining

whether good cause exists:

> Appropriate considerations may include: (1) the specificity of the discovery
> request; (2) the quantity of information available from other and more easily
> accessed sources; (3) the failure to produce relevant information that seems likely
> to have existed but is no longer available on more easily accessed sources; (4) the
> likelihood of finding relevant, responsive information that cannot be obtained
> from other, more easily accessed sources; (5) predictions as to the importance and
> usefulness of the further information; (6) the importance of the issues at stake in
> the litigation; and (7) the parties' resources.

Because knowledge of the responding party's computer system, and of the types of

information that a search of inaccessible parts of that system might reveal, is essential to the

good cause analysis, the requesting party may be entitled to additional discovery concerning

these matters.

> The good-cause determination, however, may be complicated because the court
> and parties may know little about what information the sources identified as not
> reasonably accessible might contain, whether it is relevant, or how valuable it
> may be to the litigation. In such cases, the parties may need some focused
> discovery, which may include sampling of the sources, to learn more about what
> burdens and costs are involved in accessing the information, what the information
> consists of, and how valuable it is for the litigation in light of information that can
> be obtained by exhausting other opportunities for discovery.

(Emphasis added.)

Where the court concludes that good cause has been shown, and some discovery of data

that is not reasonably accessible is warranted, the court, in its discretion, may impose conditions

limiting the extent of discovery and/or shifting to the requesting party part or all of the costs

associated with that discovery.'

2.3  Cost shifting.

The presumption is that the responding party bears the costs of complying with discovery

requests. Zubulake, 217 F.R.D. at 317, citing Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340

(1978). However, the responding party may invoke the "district court's discretion under Rule 26(c) to grant orders protecting [it] from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery." Id.

The new rules indicate that a responding party cannot seek cost shifting for the production of ESI from accessible sources. It is only when production is made of not reasonably accessible ESI that cost shifting may come into play. Committee Notes to Rule 26(b)(2) ("The conditions [imposed by the court upon discovery] may also include payment by the requesting party of part or all of the reasonable costs of obtaining information from that are not reasonably accessible." (Emphasis added.)) Similarly, the court in Zubulake stated:

> [C]ost-shifting should be considered only when electronic discovery imposes an 'undue burden or expense' on the responding party.
>
> ***
>
> [W]hether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production).

217 F.R.D. at 318. (Emphasis in original text.) In addition, the United States District Court for the Southern District of New York has held that cost shifting is not available even where discovery is sought from inaccessible media, where the responding party converts the information to the inaccessible format at a time when it should have foreseen the possibility that it would be relevant to anticipated litigation. Quinby, 2006 WL 2597900, *7.

Commentators have identified three approaches to cost shifting: The "marginal utility" test; the eight-factor test of Rowe Entertainment, Inc. v. The William Morris Agency, Inc., 205 F.R.D. 421 (S.D.N.Y. 2002); and the seven factor test of Zubulake. See Litigation Management Handbook, §7:28. Under the marginal utility test,

.

> the more likely it is that the backup tape [or other inaccessible media] contains
> information that is relevant to a claim or defense, the fairer it is that the
> [responding party] search at its own expense. The less likely it is, the more unjust
> it would be to make the [responding party] search at its own expense. The
> difference is at the margin.

McPeek v. Ashcroft, 202 F.R.D. 31, 34 (D.D.C. 2001). The eight factors considered under the

Rowe test, and apparently weighted equally, are:

> (1)     The specificity of the discovery requests; (2) the likelihood of discovering
> critical information; (3) the availability of such information from other sources;
> (4) the purposes for which the responding party maintains the requested data; (5)
> the relative benefits to the parties of obtaining the information; (6) the total cost
> associated with production; (7) the relative ability of each party to control costs
> and its incentive to do so; and (8) the resources available to each party.

Rowe, 205 F.R.D. at 429.

> The Zubulake seven factor test is a modification of the Rowe approach:

> (1) The extent to which the request is specifically tailored to discover relevant
> information; (2) The availability of such information from other sources; (3) The
> total cost of production, compared to the amount in controversy; (4) The total cost
> of production, compared to the resources available to each party; (5) The relative
> ability of each party to control costs and its incentive to do so; (6) The importance
> of the issues at stake in the litigation; and, (7) The relative benefits to the parties
> of obtaining the information.

217 F.R.D. at 322. [10] According to Zubulake, the first two factors encompass the "marginal

utility" test discussed above.

Under the Zubulake approach, the seven factors are not equally weighted. Instead, they

are weighted in descending order of importance. Zubulake, 217 F.R.D. at 323; Quinby, 2006

WL 2597900, *7. The factors form four groups.

---

[10] Research has not located a First Circuit case explicitly adopting any one of the three
approaches to costs shifting. However, the United States District Court for the District of New
Hampshire in Goss International Americas, Inc. v. Man Roland, Inc., 2006 WL 1134930 (D.N.H.
4/28/06) appears to have applied the Zubulake test.

The first two factors-- comprising the marginal utility test--are the most important. These factors include: (1) The extent to which the request is specifically tailored to discover relevant information and (2) the availability of such information from other sources. The substance of the marginal utility test....

\*\*\*

The second group of factors addresses cost issues: "How expensive will this production be?" and, "Who can handle that expense?" These factors include: (3) the total cost of production compared to the amount in controversy, (4) the total cost of production compared to the resources available to each party and (5) the relative ability of each party to control costs and its incentive to do so. The third "group"--(6) the importance of the litigation itself--stands alone, and as noted earlier will only rarely come into play. But where it does, this factor has the potential to predominate over the others. Collectively, the first three groups correspond to the three explicit considerations of Rule 26(b)(2)(iii). Finally, the last factor--(7) the relative benefits of production as between the requesting and producing parties--is the least important because it is fair to presume that the response to a discovery request generally benefits the requesting party.

217 F.R.D. at 323.

Like the new rules, which provide for discovery by the requesting party concerning the responding party's information storage systems, the Zubulake court stressed that if the cost-shifting analysis is to be based on more than mere speculation, some examination of the inaccessible media is required. Only by doing so can the parties determine the likelihood that the inaccessible information is likely to be relevant and discoverable. The court stated:

[B]ecause the cost-shifting analysis is so fact-intensive, it is necessary to determine what data may be found on the inaccessible media. Requiring the responding party to restore and produce responsive documents from a small sample of the requested backup tapes is a sensible approach in most cases.

Id. at 324.[11]

---

[11] It also said: "Requiring the responding party to restore and produce responsive documents from a small sample of backup tapes will inform the cost-shifting analysis laid out above. When based on an actual sample, the marginal utility test will not be an exercise in speculation--there will be tangible evidence of what the backup tapes may have to offer. There will also be tangible evidence of the time and cost required to restore the backup tapes, which in turn will inform the second group of cost-shifting factors. Thus, by requiring a sample restoration of backup tapes, the entire cost-shifting analysis can be grounded in fact rather than guesswork." Id.

15

A December 14, 2006, article in the <u>New York Law Journal On-Line</u>, on e-

discovery issues[12] concludes that cost shifting is "rarely invoked" as,

> The presumption that the producing party will shoulder its own costs is
> strong and will only be overcome with a particularized showing that the
> cost of the requested discovery is disproportionate to its value. ...{A} party
> seeking to shift the costs of production...must be able to show that the costs
> of the discovery outweigh its benefits and that it has not contributed to the
> expense that it seeks to shift to its adversary.

Even where cost-shifting is ordered, the requesting party often will not be required to pay

more than a small percentage. In <u>Zubulake</u>, the requesting party was ordered to pay 25%, while

in <u>Quinby</u> a 30% contribution was required. The <u>Quinby</u> court explained,

> Even where cost shifting is granted, <u>the defendant must still pay for the majority
> of the production because of the presumption that the responding party pays for
> its discovery costs</u>.... In addition, shifting a share that is too costly may chill the
> rights of litigants to pursue meritorious claims.

2006 WL 2597900, * 16. (Emphasis added.)

2.4    <u>In the present case, Putnam has made none of the showings required and has failed and
refused to provide the basic information needed to begin the analysis of the e-mail issues
in this case.</u>

As set forth in § 1, above, Putnam has not made any of the showings required of a responding

party even failing and refusing to provide the basic information needed to begin the analysis of

the e-mail issues in this case

Exhibit K



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

```
* * * * * * * * * * * * *    *    Civil Action No. 04-12711-PBS
                            *
LISA SVENSSON,              *
                            *    BBO No. 351000
          Plaintiff,       *
                            *    Motion of Plaintiff
v.                          *    Svensson for Orders
                            *    Compelling Production
                            *    of Documents and Things in her
                            *    Second Request for Documents
PUTNAM INVESTMENTS LLC,     *    and Things and for Sanctions,
et al.,                     *    Including Attorneys' Fees and
                            *    for Other Relief as to
                            *    the Putnam Responses to
                            *    her First Interrogatories and
          Defendants       *    First Request for Production.
                            *    and
                            *    Request for Hearing and
* * * * * * * * * * * * *    *    Oral Argument

                                 and
                                 Certificate as to
                                 Compliance with Local
                                 Rule 37.1(a)
```

<u>MOTION.</u>

Plaintiff Lisa Svensson ("Svensson") moves the court to enter orders compelling production of documents and things requested in the various categories of her Second Request for Production by defendant Putnam Investments, LLC ("Putnam"), for other relief s to the Putnam responses to Svensson's First Interrogatories and First Request for Production, and for sanctions against Putnam, including an award of attorneys' fees.

The categories that are subject to this motions and the

grounds therefor are set forth in her accompanying memorandum in

support of this motion. The issues in regard to the First

Interrogatories and the First Request for Production follow.

<u>REQUEST FOR HEARING AND ORAL ARGUMENT</u>.

Svensson requests a hearing and oral argument.

<u>CERTIFICATE AS TO COMPLIANCE WITH LOCAL RULE 37.1(a)</u>.

As described by Svensson's counsel at the last hearing

before the court in this matter, the parties have not agreed as

to the relief sought in this motion.

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.


/s/ Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
BARRON & STADFELD, P.C.
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: October 10, 2006


<u>Certificate of Service</u>.
This document, filed through the ECF system, will be sent
electronically to the registered participants as identified on

the Notice of Electronic Filing.

/s/ Kevin F. Moloney

Dated: October 10, 2006
[_____.1]

[_____.1]

-                                              3