UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Lisa Svensson, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO.  04-12711-PBS |
| Putnam Investments LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PUTNAM INVESTMENTS' OPPOSITION TO THE PLAINTIFF'S
OBJECTIONS TO THE RULINGS OF MAGISTRATE BOWLER
AND REQUEST FOR ORAL ARGUMENT**

## I.    INTRODUCTION

Putnam Investments LLC ("Putnam") opposes plaintiff Lisa Svensson's ("Ms. Svensson") Objection to Magistrate Judge Bowler's January 9, 2007, order terminating discovery and January 17, 2007, order denying Ms. Svensson's Motion to Compel Documents (the "Objection").

Pursuant to Fed. R. Civ. P 72(a), Ms. Svensson must demonstrate that the Magistrate Judge clearly erred in granting Putnam's motion for a protective order terminating discovery.  The "clearly erroneous" standard is highly deferential to magistrate-judges, particularly when the magistrate judge has supervised closely a prolonged discovery period -- as Magistrate Judge Bowler did here.  Ms. Svensson has utterly failed to make the requisite showing, devoting a mere two paragraphs of her 20 page Objection to her "clearly erroneous" argument.  Nor can Ms. Svensson make the necessary showing in light of (1) the facts that  the Magistrate Judge had before her the affidavits of electronic discovery experts who attested to the burden and expense of Ms. Svensson's electronic discovery requests; (2) the discovery

history of this case including that the Magistrate Judge previously considered 37 discovery motions and conducted 11 hearings; (3) Putnam's production of over 5000 pages of documents and 11 witnesses for deposition; and (4) Ms. Svensson's disregard of the Magistrate Judge's explicit instructions to promptly narrow her late and overbroad discovery requests, and the Magistrate Judge's explicit warning to Ms. Svensson that discovery would end on December 31, 2006, come what may, some 21 months after this litigation commenced.

## II.    THE CLAIMS

Ms. Svensson's discovery requests can only be evaluated in the context of her actual claims in the litigation. This employment dispute involves a single plaintiff. Putnam employed Ms. Svensson beginning in July 1994, as a Vice President and analyst in its Global Equity Research Department ("GER"). She was promoted to Senior Vice President and, in 1997, became a Portfolio Manager on Putnam's Global Growth team. In 2001, the Global Growth team, after disastrous investment performance, was disbanded. Putnam terminated the male head of the team. Ms Svensson was not terminated, but permitted to rejoin GER in March, 2002. Thereafter, she was promoted to Associate Director of Research.

As an Associate Director of Research, Ms. Svensson supervised 4 junior analysts. In August, 2003 Putnam learned that Ms. Svensson had misrepresented certain facts about the performance of one of those analysts. Ms. Svensson's supervisor also learned that her management style resulted in another analyst (the highest ranking one in the group) seeking and obtaining employment elsewhere. Putnam decided that Ms. Svensson could keep her titles, and salary, but could no longer supervise the remaining analysts. Ms. Svensson refused to accept this change, instead demanding an immediate promotion to Managing Director and guaranteed compensation of $1 million per year for two years. Given her demands,

and her refusal to accept the change in her duties that Putnam deemed necessary, Putnam terminated Ms. Svensson's employment as of September 15, 2003.

The gravamen of the Amended Complaint is that Putnam discriminated against Ms. Svensson on account of her gender by (a) transferring her from a position on the Global Growth team to GER; (b) failing to promote her from Senior Vice President to Managing Director; (c) compensating her less than similarly situated male counterparts; (d) wrongfully terminating her, and; (e) retaliating against her for complaining about internal business practices of Putnam by refusing to repurchase her non-vested Putnam equity and failing to pay her non-vested deferred compensation amounts.

## III.    DISCOVERY BACKGROUND

Discovery commenced in May, 2005 and was scheduled to conclude on February 1, *2006.*  During that time, Magistrate Judge Bowler twice extended the discovery period at Ms. Svensson's request; entertained *37* discovery motions, oppositions, and replies, and conducted *11* hearings.  Discovery concluded December 31, 2006.[1]

During discovery, Putnam produced more than 5000 pages of documents and generated spreadsheets detailing the compensation (salary, bonus and equity), promotion, transfer, replacement, and termination histories of 91 present and former Putnam employees that Ms. Svensson alleges are her comparators, and reviewed over 100,000 emails to respond to Ms. Svensson's electronic discovery requests.  Additionally, Putnam produced 11 witnesses for deposition, and itself only deposed Ms. Svensson.

---

[1] In this Opposition, Putnam summarizes only the discovery issues relevant to the Plaintiff's Objection.

**A.    Ms. Svensson's First Request for Production of Documents and Electronic Discovery.**

Ms. Svensson served her initial request for production of paper and electronic documents in August, 2005, some 4 months after discovery commenced.  The parties were unable to agree on the appropriate scope of discovery, particularly with respect to the individuals who are Ms. Svensson's alleged comparators.[2]  Putnam also objected to Ms. Svensson's broad-ranging requests for documents on the ground that the requests were unhinged from any of her claims.

Magistrate Judge Bowler held a hearing on Ms. Svensson's first document request on December 13, 2005.  At the hearing, Putnam agreed to restore and search the electronic mail boxes of 14 former or current Putnam employees (selected by Ms. Svensson) for up to 5 years for any reference of Ms. Svensson and the employment actions at issue.  Putnam recovered, restored and reviewed some 100,000 emails for relevance and privilege, and produced responsive emails and other documents a year ago, in January 2006.

---

[2] Despite Ms. Svensson's assertions to the contrary, Putnam has never taken the "startling" position that Ms. Svensson has no comparators.  Putnam has made numerous offers to provide comparator information -- offers which Ms. Svensson has rejected.  For example, in its opposition to Ms. Svensson's first motion to compel documents, Putnam wrote: "Putnam has been, and remains willing to produce documents concerning *relevant comparators, including the other Portfolio Managers in Global Growth from 2000 and 2001, and the Analysts in GER in 2002.*  These are the departments of which Svensson was a member during the years in question." (emphasis added.)  At the hearing concerning the same, Putnam told the court, "We have offered to produce the information with respect to terminations, denials of promotions, etc with respect to the global growth group which is where she was in 2002 when she moved from global growth in to GER, and then we offered to produce information with respect to the people in GER which is where she was when she was terminated.  We did that in reliance on the Court's decisions in other cases that typically you don't look outside of the group in which the employee is employed; that is, you look at the decision by the same decision maker."  Ms. Svensson rejected all of these proffers by Putnam.

### B.    Ms. Svensson's Interrogatories

Ms. Svensson served interrogatories in October 2005, which sought detailed personnel information about every current and former exempt employee in Putnam's workforce (some 7000 strong during the relevant period).    Not surprisingly, Putnam objected to the obviously-overbroad nature of that request, and proffered comparator information about individuals who worked on the same team as Ms. Svensson and/or under the same decision-maker(s).   Ms. Svensson rejected that proffer and eventually insisted that she was entitled information about 91 individuals that she alleged were her comparators, despite the fact that most could not possibly be comparators as the law defines that concept.    For example, Ms. Svensson insisted upon information about:

- two of her bosses;
- individuals managing different investment products in different business units;
- senior management (e.g., officers  multiple levels senior to her), and;
- a junior analyst who reported to her.

Notably, Ms. Svensson did not include the male she replaced when he was terminated in 2002, who occupied the very same position that she occupied at the time of her termination, who was paid less than she, and who, like Ms. Svensson, was not promoted to Managing Director.

Unable to reach an agreement on the comparators issue, the parties sought a ruling from the Court.   Magistrate Judge Bowler urged the parties to "sit down together and to see if you can come up jointly with comparators . . . I would like to see if you could at least jointly agree at least on some of the issues." June 21, 2006 Hearing Transcript, at pp. 14-15, attached hereto as Exhibit A.  Solely for purposes of answering the interrogatories, and without conceding that the named individuals were appropriate comparators, Putnam thereafter voluntarily provided every item of information requested by Ms. Svensson concerning her cherry-picked 91 "comparators," including: name, department, officer title, job position, birth date,

gender, length of service at Putnam, termination type (if any), replacement (if any) base salary, bonus award and equity award.

### C.  Ms. Svensson's Second Request for Documents and Electronic Discovery.

After serving her initial document request in August 2005 and receiving the emails and documents by January, 2006, Ms. Svensson noticed and conducted the 10 depositions to which she was entitled under the Local Rules.  In April 2006, eight months after serving her first request she served a second request for documents -- 76 overly broad requests, timed so that Putnam's response would be due on the very last day of a twice-extended discovery period.  In May 2006, Putnam produced additional documents, but also objected to the overbroad nature of many of the 76 new categories (including yet more expansive electronic discovery).  Ms. Svensson waited more than 4 months, until October 10, 2006, to move to compel production of documents.

On October 26, 2006, Magistrate Judge Bowler held a hearing on Ms. Svensson's second document request, including its expansive e-discovery component.  At the hearing, having managed discovery in this case for a year and a half and having considered Ms. Svensson's requests, Magistrate Judge Bowler warned Ms. Svensson to narrow and focus her pending requests for production because this Court "is not about to allow much more."  October 26, 2006 Hearing Transcript at p. 50, attached hereto as Exhibit B.  The Magistrate also made explicit that discovery was to end before the January 4, 2007 status conference, no matter what, and that Ms. Svensson needed to tailor her requests so as to make that possible.  *Id.* at 32.

Concerning the requests for electronic discovery specifically, the Magistrate Judge instructed Ms. Svensson to disclose her proposed electronic discovery search terms.  Ms. Svensson declined.  *Id.* at 22.  The Magistrate Judge then instructed

Ms. Svensson's counsel to sit down with Putnam within a "few days" to narrow and focus her pending requests and admonished Ms. Svensson "it seems to me if you've asked for all the emails with her name in them, you know, this can get too far a field." *Id.* at 49.   Treating the Magistrate Judge's instruction as advisory, Ms. Svensson waited nearly a full month, and then proffered a "search list" of 27 common words, many of which likely could be found in *any* email on *any* subject. Ms. Svensson insisted that Putnam reconstruct email boxes for 10 individuals for a 5 year period and search for  words like, "make," "move," "take out," "change," "approve," "issue," "recommend," "separate." and "role."   At that point, Putnam moved for a protective order terminating further discovery.   With that motion, Putnam filed affidavits of two individuals involved and versed in electronic discovery and Putnam's email systems, who described the burden and expense of Ms. Svensson's electronic discovery requests.  *See,* Affidavits of Jerome Bento and Jeremy Breen, attached hereto as Exhibits C and D, respectively.  Ms. Svensson moved to strike the affidavit of Jeremy Breen on the grounds that the affidavit contained "hearsay" because Mr. Breen relied on both his own knowledge, and information shared with him by another electronic discovery expert.   Putnam opposed the motion to strike on the grounds that (1) Mr. Breen relied on his own knowledge and experience as a litigation technology specialist in formulating his opinions; and (2) Fed. R. Evid. 703, which permits affiants such as Mr. Breen, to consult with other experts in forming their opinions.   On January 9, 2007, Magistrate Judge Bowler denied Ms. Svensson's motion to strike.  Ms. Svensson has not appealed this decision (and the time to do so has passed).  Ms. Svensson never moved to strike the affidavit of Mr. Bento.

In a stunning understatement, Ms. Svensson's counter-affidavit admitted that Ms. Svensson's proposed search terms likely would result in "false-positive" hits ("the terms may result in false hits as they are *general terms used in everyday*

*conversations*, e.g. make, move, took out, take out") (emphasis added). Affidavit of Nicole Panos, at ¶ 3, attached hereto as Exhibit E.

On January 9, 2007, Magistrate Judge Bowler issued her order granting Putnam's motion for a protective order terminating discovery, "inasmuch as the discovery sought is unduly burdensome and expensive." Ms. Svensson filed her Objection to that January 9, 2007 order and the corollary January 17 order that denied Ms. Svensson's motion to compel her second request for the production of documents.

## IV.    ARGUMENT

Ms. Svensson argues that this Court should overturn the Magistrate's decision as being "clearly erroneous" and "contrary to law." No where in her appeal, however, does Ms. Svensson demonstrate specifically (i) the grounds on which the order clearly erred, or (ii) why she needs information that she has not already received.

A motion for reconsideration of a magistrate's non-dispositive discovery order is reviewed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed.R.Civ.P. 72(a), and Rules for United States Magistrates in the United States District Court for the District of Massachusetts 2(b). A district court should modify or set aside a magistrate's order only when it is found to be "clearly erroneous or contrary to law." *Jackson v. Harvard University*, 111 F.R.D. 472, 473 (D.Mass.,1986). The reviewing court must be "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001). The standard is "highly deferential," *Derthick v. Bassett-Walker Inc.*, 1992 WL 249951 (S.D.N.Y., Sept. 23, 1992), and "[t]he party seeking to reverse a Magistrate Judge's ruling concerning discovery bears a heavy burden, in part because the Magistrate Judge is afforded broad discretion in these matters." *Pullano v. USB/Paine Webber,* 2006 WL 2987739 (W.D.N.Y., June 29, 2006).

- 8 -

First, Ms. Svensson fails to articulate the specific grounds on which the Magistrate Judge's ruling was clearly erroneous, nor does she state how the information she has requested and has not received will help her prove her claims concerning transfer, compensation, promotion, termination and retaliation. The law does not recognize a "generic" disparate treatment or disparate impact discrimination case -- Ms. Svensson must demonstrate how the information she seeks is related to her claims. Instead, Ms. Svensson alleges, without any evidence to support her contention, that the Magistrate Judge relied solely on the affidavits of Messrs. Breen and Bento in granting Putnam's motion for a protective order, and that such reliance was clearly erroneous. For reasons detailed below, even if the Magistrate Judge relied on the Breen and Bento affidavits, such reliance was within her discretion.

Second, given the discovery record before the Magistrate Judge (and her plenary authority to manage discovery issues), her ruling was proper, and certainly not clearly erroneous. The discovery period had been extended twice, and by nearly one year, to accommodate Ms. Svensson's on-going discovery demands; Putnam had produced thousands of documents, reviewed 100,000 emails and presented 11 witnesses for deposition; Ms. Svensson's requests were overbroad and unhinged from her claims; and Ms. Svensson had refused to adhere to the Magistrate Judge's instruction that she narrow and focus her requests.

Finally, Ms. Svensson argues that the Magistrate Judge clearly erred by not following the new federal rules concerning electronic discovery. As a case filed before December 1, 2006, the Magistrate Judge had the discretion to decide whether to apply the amendments. Moreover, even if applied, the new rules would not help Ms. Svensson meet her burden that the Magistrate Judge clearly erred -- indeed, they support the propriety of the Magistrate Judge's order.

## A.    Magistrate Judge Bowler's Order Was Not Clearly Erroneous.

While Ms. Svensson's Objection mentions the "clearly erroneous" standard, most of her motion simply rehashes the parties' prior discovery disagreements (despite the fact that those disagreements were the subject of orders by the Magistrate Judge to which neither she nor Putnam objected). Ms. Svensson devotes a mere *two paragraphs* of her 20-page Objection to suggesting, without evidence or legal analysis to support her assertion, that the Magistrate Judge "clearly erred" by relying on speculative and hearsay evidence. Ms. Svensson's conclusory assertion, devoid of factual or legal support, does not meet this "deferential standard."

### 1.    A Magistrate Judge May Rely on Hearsay When Considering a Non-Dispositive Motion.

Ms. Svensson confuses the evidentiary standard of a non-dispositive discovery motion with the type of evidence admissible on summary judgment or at trial. Thus, while she argues that Mr. Breen's affidavit is inadmissible because it partly relied on hearsay, she cites no legal standard suggesting that this type information is improper for a magistrate judge to consider. Unlike Rule 56, Rule 26(c) gives the Court plenary authority to manage discovery through the issuance of protective orders, and nowhere imposes a requirement that the Court rely only on admissible evidence. Thus, even assuming that Mr. Breen's affidavit contained inadmissible hearsay and that Magistrate Bowler relied exclusively on Mr. Breen's affidavit in granting Putnam's protective order, she was not clearly erroneous in doing so.

### 2.    The Breen Affidavit Did Not Contain Inadmissible Hearsay.

Contrary to Ms. Svensson's assertion, Mr. Breen's affidavit did not contain inadmissible hearsay. First, Mr. Breen relied on his own knowledge and experience as an electronic discovery expert. Indeed, Mr. Breen states in his affidavit that the

LITDOCS/668873.1/0398860-0000312913

estimates he provided in subparagraphs 5 are "[b]ased on *my experience* working with vendors . . ."  *Id.* at ¶ 5 (emphasis added).

Second, Mr. Breen's conversation with electronic-discovery vendor David Deppe is not inadmissible hearsay within the meaning of Fed. R. Evid. 801(c) because it is data "reasonably relied upon by experts in the particular field in forming opinions or inference upon the subject," and such data may be "made known to the expert."  Fed. R. Evid. 703.  *See also,* Fed. R. Evid. 703 Advisory Committee Notes.

> Facts or data upon which expert opinions are based may, under the rule, be derived from three possible sources. . . The third source contemplated by the rule consists of *presentation of data to the expert outside of court and other than by his own perception. . . .* Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays (emphasis added).

Thus, the information Mr. Breen relied upon based on his conversation with Mr. Deppe is not inadmissible hearsay within the meaning of Fed. R. Evid. 801(c). Accordingly, even if the Magistrate Judge relied on Mr. Breen's affidavit in granting Putnam's motion for a protective order, her ruling cannot be described as "clearly erroneous."  Indeed, because the Magistrate Judge denied Ms. Svensson's motion to strike the affidavit of Mr. Breen on January 9, 2006 -- a ruling Ms. Svensson has not appealed -- she cannot now argue that the Magistrate Judge's reliance on the affidavit was improper.  Fed. R. Civ. P. 72(a) ("Within 10 days after being served with a copy of the magistrate judge's order [on a non-dispositive motion], a party may serve and file objections to the order; *a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made.*") *See also, Phinney v. Wentworth Hospital*, 199 F.3d 1, 3 (1st Cir. 1999) ("It is a firmly

settled rule that a party's appeal of a magistrate judge's order to the district court delimits his right to appellate review.")

Ms. Svensson also argues that the affidavit of Putnam's in-house technology expert, Jerome Bento, was conclusory.  First, Ms. Svensson never filed a motion to strike the affidavit of Mr. Bento and cannot now argue that the Magistrate Judge's reliance on the same was "clearly erroneous."  *Id.*  Furthermore, Mr. Bento's testimony in estimating the time and burden of retrieving and restoring the back up tapes was not "conclusory" -- it was his best estimate based on his knowledge and experience.  Mr. Bento's position at Putnam requires him to retrieve and restore electronic data on a regular basis.  His estimates were based on the various factors that would affect the time it would take to conduct the substantial e-discovery requested by Ms. Svensson, including the number of back up tapes that exist, and the number of days it might take to retrieve the data.  The undisputed fact is that retrieving the tapes and restoring the data would be unduly burdensome and expensive.  Given that Ms. Svensson never moved to strike the Bento affidavit, and that Mr. Bento relied on his knowledge and experience in providing his estimates, any suggestion that reliance on this affidavit was clearly erroneous is without support.

### 3.    The Magistrate Judge's Order Concerning the Non Email Requests was not Clearly Erroneous.

Ms. Svensson argues that the Magistrate Judge's order granting a protective order was clearly erroneous to the extent it denied Ms. Svensson's pending 27 categories of non-email requests.  Ms. Svensson identifies two categories and argues that these "discrete" requests cannot be described as "burdensome or expensive" to produce.  Ms. Svensson misses the point: at the October 26, 2006 hearing, the Magistrate Judge ordered her to narrow both her electronic and paper discovery requests and to "decide what you really need."  The Magistrate Judge made this

order in the context of the breadth of Ms. Svensson's requests and the overwhelming amount of discovery she already had received. In response, Ms. Svensson's counsel, in a conference with Putnam and at the hearing before the Magistrate Judge, proceeded to demand that Putnam produce each and every one of these 27 categories, not just the two that she now references in her Objection. The Magistrate Judge correctly ruled that the totality of Ms. Svensson's requests -- which she refused to narrow -- were burdensome and expensive.

Moreover, as she has failed to do throughout the course of this litigation, including in her papers before the Magistrate Judge, Ms. Svensson has failed to demonstrate how each and every *specific* discovery request she makes (e.g. her request for Mr. Stoev's green card application, her request for any email with the word "make" in it, etc.) has any relevance or bearing upon her claims concerning promotion, compensation, transfer and termination. Discovery is not "a fishing expedition" *Milazzo v. Sentry Ins.*, 856 F.2d 321 (1st Cir. 1988). Given the scope of discovery already produced by Putnam, Ms. Svensson's failure to justify the relevance of her discovery requests, and her refusal to comply with the Magistrate Judge's order to focus her requests, there is no viable argument that the Magistrate Judge's order was clearly erroneous.

**B.    Magistrate Judge Bowler's Order Granting Putnam's Motion for a Protective Order Terminating Discovery was Correct.**

Not only did Magistrate Bowler not clearly err in granting Putnam's motion for a protective order, but her ruling was proper. Ms. Svensson has never explained why the discovery she has already obtained (including over 5000 pages of documents and testimony from 11 deponents) is insufficient. Moreover, the Magistrate Judge had before her a discovery record that included the following:

- Discovery had been extended at Ms. Svensson's urging on two occasions, and by nearly a year, to permit Ms. Svensson additional opportunities to complete her discovery;

- 13 -

- Ms. Svensson had requested broad-ranging electronic discovery a year earlier, which required Putnam to restore 14 email boxes and review over 100,000 correspondence;
- Ms. Svensson served additional electronic discovery requests, timed to be due on the last day of the twice extended discovery period, and which required Putnam to restore 10 email boxes over a five year period, and search for up to 91 former or current Putnam employees and 27 common search terms;
- Ms. Svensson did not comply with the Magistrate Judge's directive on October 26, 2006, to narrow and focus her pending requests for production because this Court "is not about to allow much more";
- Ms. Svensson did not comply with the Magistrate Judge's instruction to narrow her electronic discovery requests, because "it seems to me if you've asked for all the emails with her name in them, you know, this can get too far a field";
- Ms. Svensson knowingly produced a list of search terms with common verbs and nouns such as "make," "move," "change," "approve," "issue," "recommend," "separate," and "role" that would result in an overwhelming number of "false-positive" results and make it impossible to conclude discovery by the December 31 discovery cut off ;
- Mr. Bento's affidavit established that Ms. Svensson's electronic discovery request would be burdensome and expensive;
- Mr. Breen's affidavit established that Ms. Svensson's electronic discovery requests would be burdensome and expensive;
- Ms. Svensson's own electronic discovery expert acknowledged that her proposed list of search terms would result in a huge number of false positives because they were "general terms used in everyday conversations."

A record such as this amply supports the Magistrate's order terminating discovery. *Pullano,* 2006 WL 2987739. In *Pullano,* the defendant moved for a protective order to keep the briefing schedule on track given the plaintiff's continued submission of discovery motions after the magistrate's order that "no further motions regarding discovery issues shall be filed with the Court." 2006 WL 2987739 at *1. The magistrate judge granted the defendant's motion for a protective order and the plaintiff appealed. The district court upheld the magistrate's ruling, stating "it appears that plaintiff is largely responsible for discovery having dragged on as long as it has in this action, and that [the Magistrate Judge] has been more than patient in attempting both to resolve the

numerous discovery disputes that have arisen and to keep the case moving forward." *Id.*  Likewise, Magistrate Judge Bowler had before her a record of Ms. Svensson's receipt of substantial discovery, her persistent attempts to prolong discovery, the expense and burden of her further demands, and her inability to articulate the relevance and necessity of her further requests.  On that record, the Magistrate's ruling cannot be characterized as "clearly erroneous."

## C.    Applicability of the Electronic Discovery Rules

Finally, Ms. Svensson argues that the Magistrate Judge clearly erred in failing to apply the electronic discovery amendments to Fed. R. Civ. P. 26, effective December 1, 2006.  This argument does not support a clearly erroneous finding.  First, Magistrate Judge Bowler was under no obligation to apply the amendments to Rule 26.  Indeed, the Rule states: "Actions shall take effect on December 1, 2006, and shall govern in all proceedings thereafter commenced and, *insofar as just and practicable, all proceedings then pending"* (emphasis added).  Thus, because this case was filed prior to December 1, 2006, the decision whether to apply the amendments was within the Magistrate Judge's discretion.

Second, the amendments, even if considered and applied, do not support a finding that the Magistrate Judge's order was clearly erroneous.  Indeed, the amendments support the Magistrate Judge's ruling.  Recognizing the burden and expense associated with electronic discovery, the amendments direct the parties to discuss issues relating to "electronically stored information" early in the discovery period.  *See,* F.R.C.P. 26(f) advisory committee notes.  Ms Svensson received substantial e-discovery in January 2006.  Ms. Svensson's eleventh hour request for additional, wide-ranging electronic discovery is exactly the scenario that the amendments were designed to avoid.

Moreover, F.R.C.P. 26(b)(2)(B) states that "a party need not provide discovery of electronically stored information from sources that the party identifies as not

reasonably accessible." The court only may order the production of inaccessible data upon the moving party's showing of "good cause." *Id.* Mr. Bento's affidavit clearly establishes that Putnam's electronically stored data for the years at issue (1999 - 2003) is stored on back-up tapes that reside at an off-site storage facility. Bento Affidavit at ¶ 5. As Ms. Svensson's Opposition to Putnam's motion for a protective order admits, data stored on backup tapes is considered inaccessible within the meaning of the e-discovery amendments:

> Whether electronic data is accessible or inaccessible turns largely on the media on which it is stored. [The] five categories of data, *listed in order from most accessible to least accessible*, are: (1) Active, online data; (2) Near-line data; (3) Offline storage/archives; (4) *Backup tapes*; and, (5) Erased, fragmented or damaged data. Ms. Svensson's Opposition to Putnam's Motion for a Protective Order Terminating Discovery, filed December 27, 2006, at p. 10 (internal citations omitted and emphasis added).

Ms. Svensson's own description of "backup tapes" states "the disadvantage of tape drives is that they are sequential-access devices, which means that to read any particular block of data, you need to read all of the proceeding blocks. As a result, the data on a backup tape are not organized for retrieval of individual documents or files because the organization of the data mirrors the computer's structure, not the human records management structure." *Id.* at fn. 8 (internal citations omitted).

Accordingly, Ms. Svensson's argument that the Magistrate Judge clearly erred by not relying on the electronic discovery amendments fails because (1) as a case filed prior to December 1, 2006, the Magistrate had the discretion to determine whether to rely on the amendments; (2) the amendments themselves establish that Ms. Svensson erred by failing to submit her electronic discovery requests at the outset of the discovery period, and finally; (3) Ms. Svensson's own opposition establishes that the information she seeks, because it is stored on backup tapes, is

not discoverable absent a showing of "good cause," a burden Ms. Svensson that has failed to satisfy.

## V.     CONCLUSION

Based on the foregoing, Putnam respectfully requests that this Court deny Ms. Svensson's Objection to Magistrate Judge Bowler's order granting Putnam a protective order terminating discovery.

Request for Oral Argument
**PUTNAM INVESTMENTS, LLC,**

By its attorneys,


/s/ Joseph L. Kociubes, BBO #276360
Joseph L. Kociubes, BBO #276360
Louis A. Rodriques, BBO #424720
Allyson E. Kurker, BBO #665231
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: February 6, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 6, 2007.


/s/ Joseph L. Kociubes, BBO #276360

LITDOCS/668873.1/0398860-0000312913

**Exhibit A**

1   to examine as to whether that's true or not.  We have, we

2   believe set out some criteria, admittedly they are not the

3   criteria that Putnam claimed it used when it made decisions.

4   That's a separate issue.  That's determining whether their

5   reasons were pretext.  We are trying to establish that there

6   are some people within the hundreds of people employed, many of

7   them investment professionals in this division, that there are

8   some men and women who were comparators.  We have picked

9   objectively measured and objectively understood criteria for

10  purposes of establishing that there are people in that division

11  with whom she should be compared in this case because she was

12  compared with the very same people when they made the decision

13  to promote her initially, when they failed to promote her to

14  managing director, when she was demoted and when she was

15  terminated.  And for my good friend on the other side of the V.

16  on this case to say that she, to imply to the Court that she

17  was given some wonderful options, that is absolutely not true.

18  She was told if she gave up her rights to a Title 7 claim and

19  any other claim and signed a release, that would be fine with

20  them.  It wasn't fine with her.  She was told she could stay on

21  and get paid and hunt for a job and then she said she could

22  stay on and never ever get promoted.  That's not--

23        THE COURT:  I'm inclined to permit some discovery

24  here, but what I'm suggesting is that I give you 14 days to sit

25  down together and to see if you can come up jointly with

1    comparators, and if you can't, then I will come back and

2    we'll go, and if you can we'll go through these other

3    interrogatories, but I would like to see if you could at least

4    jointly agree at least on some of the issues.

5         MR. MOLONEY:  We will make every effort to do that

6    and we're ready to meet with them whenever is reasonably

7    agreeable to both sides.

8         THE COURT:  All right.

9         MR. KOCIUBES:  We have done it, Your Honor.  We will

10   obviously on Your Honor's request.  The one thing I want to be

11   clear about--

12        THE COURT:  Well, just be prepared to know that I'm

13   inclined to permit plaintiff to go in this direction, so it's

14   to your advantage to sit down and try and work together so

15   you'll be able to narrow it, otherwise it may be--

16        MR. KOCIUBES:  No, I understand it.

17        THE COURT:  --otherwise it may be much more far

18   reaching than you would certainly like.

19        MR. KOCIUBES:  No, I understand that, Your Honor. But

20   the point that I was going to make is that what you just heard

21   was the same bleeding from one category to another category.

22   So that for example we went from the termination claim for

23   which, there is nobody else anywhere.

24        THE COURT:  Well, you'll have to work through each

25   claim.  That's - now, what about the Motion for Protective

1

2

3

4

5

6

7

8

9

10

11

# **EXHIBIT B**

3

1                          **I N D E X**

2   Proceedings                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

**P R O C E E D I N G S**

1

2      (Court called into session)

3         THE CLERK:  The Honorable Marianne B. Bowler

4 presiding.  Today's October 26, 2006 in the case of Lisa

5 Svensson v. Putnam Investments, Civil Action No. 04-12711 will

6 now be heard.

7         Will counsel please identify themselves for the

8 record.

9         MR. MOLONEY:  Kevin Moloney, M-O-L-O-N-E-Y, Barron &

10 Stadfeld Boston for Ms. Svensson, and Mr. John K. Weir of New

11 York, co-counsel is with us today.

12         THE COURT:  Thank you.

13         MR. KOCIUBES:  Joe Kociubes and Allyson Kurker, Your

14 Honor, Bingham McCutchen for Putnam.

15         THE COURT:  Thank you very much.  Well, we're here

16 for a hearing on docket entry No. 12, which is the motion, 112,

17 which is the motion to compel.

18         MR. KOCIUBES:  I believe there are two matters, Your

19 Honor.  There's also--

20         THE COURT:  Well, we'll start with the first one and

21 we take them in the order in which they're filed.  All right?

22         MR. MOLONEY:  Yes, Your Honor.  I filed last night a

23 reply memorandum which the Court allowed the motion for leave.

24 Mr. Kociubes was good enough to assent to the granting of that

25 relief.  It is one document, Your Honor, on the computer that

1    lays out on a category by category basis the category of

2    documents requested, the response of Putnam, the initial

3    argument we made in our motion and memorandum to compel and

4    then our reply.  So the Court either on the computer, and I

5    have an extra paper copy, if it would--

6             THE COURT:  If you have an extra--

7             MR. MOLONEY:  --be more convenient--

8             THE COURT:  --extra paper copy.

9             MR. MOLONEY:  --for the Court to look at them one by

10   one.  Mr. Kociubes has a copy as well.

11   (Pause)

12            MR. MOLONEY:  Preliminarily, Your Honor, there are

13   some just general points I'd like to make very briefly that are

14   made in our papers and even more briefly than they're made in

15   the papers, and then we can proceed to the specifics of the

16   request.

17            First of all, Putnam continues, as it has a right to

18   do, its position that the case is controlled by *Jackson v.*

19   *Harvard* and the *Whittingham* case, and we point out in our

20   papers as we have in other papers to the Court, that the

21   application of *Jackson v. Harvard* depends upon an analogy of

22   Harvard University, its business school and the other

23   independently autonomous graduate schools in the Harvard world

24   that we say it cannot be applied to the various investment

6

1   teams within the investment division.  It can only apply to

2   Putnam itself.  So that's No. 1.

3          Number 2, because of the hearings before the Court on

4   June 21 and July 11 and so forth, through some negotiations and

5   at the orders and urgings of the Court, Putnam on September 1

6   answered modified interrogatories in regard to the 91 folks we

7   said were, contend are Comparators and the unredacted, the

8   previously redacted documents in connection with those 91.  So

9   we see no reason why they should not continue maintaining

10  obviously their right to contest at summary judgment stage or

11  at trial that none of these folks are Comparators.  But at

12  least for discovery purposes we say that should continue.

13         Secondly, in regard to the conduct of certain folks

14  that we say are Comparators, Mr. Scott, Mr. Kamshad and

15  Mr. Warren, they take the position under the First Circuit

16  case, *Conward v. Cambridge School Committee* that the conduct to

17  compare has to do nearly identical.  We say that's looking at

18  the wrong end of the telescope and the district judge at trial

19  in that case, Judge O'Toole, made it clear and the First

20  Circuit Court as I read the case did not disagree that the

21  conduct as applied to this case has to be as serious or more

22  serious.  So that's our position on that issue.

23         If you look at Exhibits A and B, Your Honor, there

24  are some color graphs and charts that try to display, and I

25  think they do display in very visual terms--

1          THE COURT:  What page?

2          MR. MOLONEY:  --why we are - it's Tab A and Tab B,

3    Your Honor.

4    (Pause)

5          MR. MOLONEY:  Putnam in its papers says well we've

6    given you thousands and thousands and thousands of pages of

7    documents and as one of their own witnesses whose deposition

8    Mr. Weir took, asked him to look at one of these redacted pages

9    and he said I can't answer any questions, it's all blank.  Well

10   we were dealing with all blanks except for documents as applied

11   only to Ms. Svensson up until September 1 when thanks to the

12   efforts of the Court they were unredacted.

13          The next quick point, Your Honor, is that there's an

14   email issue here which has been touched upon in front of the

15   Court but in some detail in the Putnam papers.  We have two

16   responses to that.  First of all is to observe that back in

17   December of `05 when our request for documents and

18   interrogatories, we're asking for information about all of the

19   Putnam work force.  The Court has led us to a position where we

20   have collapsed a number of years from `94 coming forward to

21   `99.  We have collapsed it even further to the investment

22   division.  Collapsed it even further to investment

23   professionals, collapsed it even further to the 91.  But as we

24   have taken the flat side of an isosceles triangle and brought

25   it down to this rifle shot point, amazingly and incredibly the

8

1    rhetoric on the Putnam side has grown.  This is a problem that

2    involves thousands of emails when it was this big universe and

3    now they're saying--

4              THE COURT:  The base of an isosceles triangle.

5              MR. MOLONEY:  Millions.

6              THE COURT:  Not the flat side.

7              MR. MOLONEY:  Well it's - math is but a long time

8    ago, Your Honor, and I majored in government and not in physics

9    so--

10             THE COURT:  I minored in physics.

11             MR. MOLONEY:  And took three languages in Latin

12   school and struggled with math, but be that as it may as the -

13   the focus gets narrower and sharper, the claim of millions of

14   emails arises.  And to make, I'm not a mathematician or a

15   statistician, it doesn't make any sense.  Number one.  The

16   second part of that is that there are new rules as the Court

17   knows on new discovery that take effect in a few weeks.  And

18   one of the keys to that it seems to me is that the rules are

19   now requiring that when this email problem arises,

20   contemplating at the beginning of the case I guess, that the

21   parties are to have a conference where information about what's

22   in the computer, what kind of computers, the whole system has

23   to be exchanged so that the parties using some experts, I guess

24   the rule contemplates, can kind of figure out are there real

25   problems or are there not.  So our suggestion is that the Court

1    apply those new rules now to this email problem.  Urging and

2    going beyond that, requiring the parties expeditiously to meet

3    and agree on that first conference so we can sort out and help

4    the Court ultimately to sort out whether this problem is real

5    or imagined.

6         One final thing on the email issue, in our reply and

7    in our motion we have restricted the coverage of documents to

8    documents to and from decision makers, concerning 14 people

9    here, 22 people here, which means an email search would be the

10   ins and outs of the decision makers, not email searches of the

11   ins and outs of the 22 or the 14 other people.  So it is indeed

12   further narrowed.  Anyway, those are the preliminary points

13   that we offer for the Courts consideration, and I'd be pleased

14   to start going through these one by one if the Court would like

15   to do that.

16        Number one, is documents things concerning criteria

17   actually used by people who participated in the decision making

18   process.  That's on page five of our reply memorandum.  And

19   basically Putnam makes two points, that there's been some

20   deposition testimony about it and they've already produced all

21   documents.  We would accept we don't have any more documents if

22   we are given a statement under oath by an authorized official

23   at Putnam that that is the case, so that we will have a

24   document which we can use at trial if necessary.  So--

25        THE COURT:  What's wrong with that, Mr. Kociubes?

1          MR. KOCIUBES:  We've represented to them in writing,

2    Your Honor, that they have everything there is.  This isn't an

3    interrogatory.  If they want it under oath, we'll give it to

4    them under oath, but the--

5          THE COURT:  All right.

6          MR. KOCIUBES:  --rules don't provide for it but we're

7    happy to do it.

8          THE COURT:  All right.

9          MR. MOLONEY:  That happens on several of these.  I

10   think it happens also on number--

11         THE COURT:  Well, let's see if we can do all that

12   are, fall in that category as a group.

13         MR. MOLONEY:  Okay.  That would be - as it happens,

14   Your Honor, I don't have these - I have them organized in

15   order.

16         THE COURT:  Okay, then go through them.

17         MR. MOLONEY:  But it'd be the same point and I won't

18   belabor it since we have reached agreement on the principal.

19   Svensson's request No. 2 on page six are documents and things

20   concerning the results of the application of criteria for

21   decision making.  And Putnam's opposition basically says, well

22   we've already given you lists naming the people and the

23   positions #2:12:28 informed and too.  Well that is true.  There

24   was the email issue and so forth, but it's not the what, only

25   the what.  It is the why.  If we have a list of John Jones and

11

1   Mary Smith were moved from this position to that positions and

2   Harry Jones was moved to this other position, well, that's

3   fine.  But the key to the case is why did Putnam make the

4   decisions that they made?  And so it's our view that the giving

5   of the list is not a sufficient response and that we should be

6   entitled in regard to the 22 of the 91 Comparators that we

7   refer to in that one at the top of page 7, that we should be

8   given documents concerning those 22 people.

9          THE COURT:  What about the 22, Mr. Kociubes?

10         MR. KOCIUBES:  This is a broader issue that I guess I

11  would like to be heard on if I'm permitted to do so--

12         THE COURT:  Sure.

13         MR. KOCIUBES:  --I think generally, Your Honor, in

14  response to what Mr. Moloney had said.

15         Here's the issue, Your Honor, and it relates back to

16  the email issue that Mr. Moloney referred to.  Where we started

17  out is at a hearing last December where there were 15 email

18  boxes identified pursuant to Your Honor's determination that

19  were searched.  That was a massive search.  We produced all of

20  those documents.  Every document relating to Ms. Svensson that

21  had her name was produced.  These go back to the old Lotus

22  notes systems that they had, the email boxes 1999, 2000, 2001

23  up to 2003.  There is no intelligent way to search them in the

24  sense of searching by subject matter.  So that, for example,

25  one can type in Lisa Svensson and you will find every document

1    that has her name in the To line, in the From line, in the cc

2    or bcc line or in the text of the document.  With respect to

3    Ms. Svensson, it was easy, we just turned those over.  But if

4    Your Honor steps back for a second and thinks about if every

5    email that goes to everybody in the organization, for example,

6    she would be copied on.  Now when you start talking about 22

7    other people and they want to know sort of application of

8    criteria, it involves over a five year period of somebody

9    reading not about Ms. Svensson because those have been

10   produced, somebody's gone through all that, reading thousands

11   and to a moral certainty we can tell you hundreds of thousands

12   of documents.  The issue, the overriding issue, Your Honor, is

13   a little bit different.  If I could just take 10 seconds to

14   tell you how--

15            THE COURT:  Sure.

16            MR. KOCIUBES:  --we got here.  You remember at the

17   outset it was our position with respect to various of the

18   documents there were compensation worksheets and promotion and

19   so forth, that we were producing everything that related to the

20   plaintiff and as to other individuals we were redacting.  As a

21   result, as Mr. Moloney said, of hearings in front of Your Honor

22   actually teeing that up, Ms. Svensson produced some affidavits

23   and said these 91 people I deem are my Comparators and so I

24   want information about them.  We had arguments and it's

25   preserved for the trial judge that what we have is a cherry

1  picked list of, it is the equivalent of a sergeant saying I

2  want some information about those two generals and that

3  corporal and that major and five lieutenants and so forth,

4  under his claims.

5          In response to Your Honor's urging we did the

6  following, we said you know what, fine, we will do two things.

7  We'll go back to all of the documents that have been produced,

8  the worksheets and everything else, and to the extent that any

9  one of those 91 people appear we will unredact as to those 91,

10 so that there might be some sheets that would have two names

11 unredacted.  There might be another, you know, worksheet that

12 might have 50 names unredacted.  That we all turned over.

13         The second thing, since she's got a compensation

14 claim, the way we dealt with an interrogatory about these 91 is

15 we generated off the records and attached them under oath to an

16 interrogatory spreadsheets, which I can show you.  For each of

17 the 91 what we did was the following, Your Honor; we gave the

18 name of the individual, the age of the individual, the gender

19 of the individual, the date of hire of that individual, the, if

20 they left or were terminated, the termination date of the

21 individual.  They wanted to know if we could identify somebody

22 who had replaced them, the name and thus one could tell the

23 gender of the replacement, the officer title, i.e. senior vice

24 president, vice president, managing director and so forth, of

25 every one of those people, the job title or function, were you

14

1    running money or an analyst or something like that, the

2    department that you were in, the base salary for every one of

3    the 91 and the annual bonus for all of the 91.

4           So there you have it in one place, and I'm happy to

5    hand it up to you if you'd like to see it.  So that the issue

6    is, Your Honor, to the extent that what plaintiff wants to do

7    is say look, I can discern some pattern among these

8    Comparators.  Most of them were men.  I think about 20 were

9    woman.  I can discern a pattern in the people that I, the

10   plaintiff, say are my Comparators of either a lack of

11   promotion, promotion discrimination or a compensation

12   discrimination.  One can now do whatever statistical analysis

13   one wants to do with that, Your Honor.  That's the objective

14   way of getting there.  We've produced that for each one of five

15   years, 1999, 2000, 2001, 2002, 2003.  That was her last year

16   there.  So they've got all that.  The problem is, is that

17   doesn't discrimination.  That's the objective evidence.

18          So now what we're dealing with is, okay, we have that

19   and we can analyze it, but we now want you to search email

20   boxes and personnel files to see, for example, in 2000 why, you

21   know, if that person got a preliminary rating on a five point

22   scale of a 3.2 and that one of a 3.6, at the end of the day,

23   Your Honor, it is a massive amount of work and it doesn't go

24   anywhere because they were paid what they were paid and by

1    going job title from year to year you can see who was

2    promoted, the job title and the officer--

3              THE COURT:  They have that information?

4              MR. KOCIUBES:  Right.  That they all have.  So to go

5    back and look at the worksheets, I mean, they maybe good, they

6    maybe bad, it doesn't matter, at the end of the day the women

7    got paid what they got paid.  They either got promoted or they

8    didn't get promoted.  The men got paid what they got paid and

9    they either got promoted or didn't.  And if you think there's a

10   pattern they have all that stuff.  So now the notion, and this,

11   Your Honor, cuts through, this cuts through an awful lot of the

12   requests to go back and try to reconstruct that other stuff, it

13   doesn't go anywhere.  They've got the best evidence which is

14   what the actual final decisions were.

15              Now with respect to request No. 2, for example in

16   your question, the all documents concerning the result of the

17   application of the criteria.  Well the results of the

18   application of the criteria is what somebody got paid each year

19   and whether or not somebody got promoted each year.  To go back

20   and search email documents of people, cause there is no sort of

21   - maybe they can tell us a key word they want us to put in, but

22   there's not like there's a key word that we can go search--

23              THE COURT:  I mean can't, I mean--

24              MR. KOCIUBES:  That's the issue.

25              THE COURT:  How many emails are we talking about?

16

1      MR. MOLONEY:  Your Honor, if I - I didn't mean to

2  object--

3      MR. KOCIUBES:  I can--

4      MR. MOLONEY:  --to Mr. Kociubes' presentation, and

5  I'll wait until he's finished but I'd like to answer that

6  question.

7      MR. KOCIUBES:  If, Your Honor--

8      MR. MOLONEY:  If that, if I'm supposed to answer the

9  question, I'd be happy to get up there.

10      MR. KOCIUBES:  I don't know how he would know.

11      MR. MOLONEY:  Well that's part of the problem.  We

12  have the Court and we have two lawyers who are not, at least

13  I'm not a computer geek, although I use the computer a lot.

14      THE COURT:  I'm pretty good.

15      MR. MOLONEY:  But that's why we are suggesting, Your

16  Honor, the application of the new rules.  One thing that I have

17  learned, I talked to one E consultant very recently about this,

18  and I was told by her that there is a program that this

19  consultant has that can take the CC mail, this old program that

20  Putnam says it had, and convert that into Outlook.

21      THE COURT:  We had it to.

22      MR. MOLONEY:  They can convert that into Microsoft

23  Outlook.  And this company is very experienced in working on

24  law cases and picking the search terms and whatnot to do it.

25  So that's my first suggestion.

17

1          Secondly, Mr. Kociubes I think got off into salary,

2    bonus and total compensation issues which I'll mention in a

3    moment, but if you look at our reply on No. 2 and No. 3, we are

4    asking for emails only of decision makers which is a discreet

5    seven, eight or nine people, concerning--

6          THE COURT:  Well can we name those nine people?

7          MR. MOLONEY:  We have.

8          THE COURT:  All right.

9          MR. MOLONEY:  We have.  We have.  Let me, if I may,

10   Your Honor, on this objective of evidence and the salary

11   business.

12         THE COURT:  Well, let's just say emails of these nine

13   individuals – is that what it is?

14         MR. MOLONEY:  They were, I'm sorry, they were

15   decision makers which I think, for example, on number, category

16   No. 3 we identified 10 people, Your Honor, as the decision

17   makers and they're talking we want emails to and from them

18   concerning the four people who are brought in from the outside.

19         MR. WEIR:  It's the same for that.

20         MR. KOCIUBES:  Your Honor--

21         MR. MOLONEY:  I'm sorry?

22         MR. WEIR:  It's the same for 2.

23         MR. MOLONEY:  And the same on No. 2.  It's those--

24         MR. WEIR:  We're talking about a max of 10 people.

18

1        MR. KOCIUBES:  I'm looking at request 3 they aren't

2   10 people identified, but let's assume there are 10 people.

3        MR. MOLONEY:  And if you look, Mr. Kociubes, at the

4   top of page nine of our reply memo which includes our initial

5   argument on our motion, based, "based on the deposition

6   testimony of Putnam documents produced to date Svensson

7   believes that some or all of the following individuals were

8   decision makers, Oristalio, Morgan, Ferguson, Lasser, Landis,

9   Holderman, Brooks, Broocher, Miller and Scott."  That one is

10  asking for information concerning the four people like Brooks

11  who were brought in from the outside.  And the same decision

12  makers would be on No. 2 as well.  So it's really very, very

13  limited.

14        Now if the Court has some concerns about this that's

15  why I suggested the new rules.

16        THE COURT:  Well I'll consider it but I just don't

17  want some huge, huge undertaking.  I mean we've--

18        MR. MOLONEY:  We don't either.

19        THE COURT:  --granted a lot of discovery in this case

20  already--

21        MR. KOCIUBES:  Your Honor--

22        THE COURT:  --and there's a point at which we have to

23  be reasonable.

24        MR. MOLONEY:  That's why, Your Honor--

25        MR. KOCIUBES:  Your Honor, may I respond?

19

1          THE COURT:  All right, let me hear Mr. Kociubes.

2          MR. KOCIUBES:  It's--

3          MR. MOLONEY:  All right, and then if I may on the

4    salary and the compensation issue, Your Honor, respond?

5          MR. KOCIUBES:  It is 10 people.  The bulk of the list

6    that you just gave were individuals who were all deposed, so

7    they had an opportunity to ask what they wanted of those

8    individuals.

9          MR. MOLONEY:  That, that's--

10         MR. KOCIUBES:  But it's--

11         MR. MOLONEY:  That's incorrect, Your Honor.

12         THE COURT:  Just a minute.  One at a time.

13         MR. KOCIUBES:  It is 10 people.  They wanted about 20

14   people so that each of the 10 you're looking for a sub-tree of

15   20.  Some of those people were there for the five years, some

16   less.  You can start doing that math and then when you get to

17   the system, Your Honor, which only does it by name, and this

18   goes back to the problem I mentioned earlier, if you searched

19   one of the 20 in somebody's box, you're going to get, you'll

20   get some substantive email, a lot of them, about - remember

21   this is an investment house, about investment, about

22   organization.  These are, about there's a bake sale next

23   Tuesday, the cafeteria is going to close earlier on Wednesday.

24   When you think about the cc's, the names would show up--

25         THE COURT:  Well can it be limited by word search?

20

1    MR. KOCIUBES:  Well that's what we can't - there are

2  two things and I have a suggestion.  There are two things.  The

3  answer is we've never been given any words of these 20 to try

4  and do an electronic search of.  If there is a particular word

5  that at least would give us something to do - it's fine for

6  them to say let's apply the rules now but it's tantamount five

7  months after discovery is over to starting a whole new

8  discovery process, one of which they keep telling us, Your

9  Honor, we've gone through this on the 14, 15 rather, they keep

10  telling us it's not that big a deal.  We've gone through it

11  once.  I'm not hearing them offer to pay for this process if

12  it's so vital to them.  And there is a way to deal with this

13  issue.

14    MR. MOLONEY:  When I talked to that computer

15  consultant, she was good enough to give me a sample of their

16  tools or their techniques.  And it does involve somebody

17  substantively, the lawyers and the clients with the expert,

18  coming up with the search trees and whatnot.  The simple thing,

19  the most amazing thing was that this old fashion cc can be

20  converted by software into Outlook and the search capability in

21  Outlook, based least in my experience, is pretty good.  And we

22  are trying to work to--

23    THE COURT:  Well, who is going to pay for this?

24    MR. MOLONEY:  Well, first of all, Your Honor, I think

25  that we need to have the conference that the new rules suggest

21

1   so that we can figure out what's involved here before we leap

2   too quickly without knowing what, if there is a real problem

3   here.  And that's why we'd urge the Court to require us to do

4   that and we'll do our best to do it.  And we will engage

5   somebody to give us some expert advice.  I mean, we have been

6   at this case, Your Honor, since 2004.

7           THE COURT:  Yeah, and it's going to come to end

8   pretty soon.

9           MR. MOLONEY:  And we have been fighting about

10  redacted, redacted, I'm not going to give it to you, I will not

11  send over a document until you get a court order to do it.

12  This case has been time consuming for the lawyers as you know

13  and exceedingly expensive.  And we have no interest in

14  prolonging this or increasing the costs, which are enormous at

15  this point.

16          MR. KOCIUBES:  Your Honor?

17          MR. MOLONEY:  Now if--

18          MR. KOCIUBES:  If I could just respond to that sort

19  of confer about words.  If this is a bonafide discovery issue

20  as opposed to for a back door and opening brand new discovery,

21  there's been nothing that's prevented Mr. Moloney from either

22  calling or emailing us the following four or five or eight

23  words is what we would like searched from these X boxes.

24          THE COURT:  Why can't we just decide that right now?

25  Is that so complicated?

22

1              MR. MOLONEY:  Which, Your Honor?

2              THE COURT:  The key words.

3              MR. MOLONEY:  Well, it--

4              THE COURT:  I mean, I can't believe that it's--

5              MR. MOLONEY:  I can't, I'm not in a position, Your

6    Honor, to in effect shoot from the hip on that.  I mean--

7              THE COURT:  Well, surely if you've already talked to

8    a computer expert you have in your mind what it is you're

9    looking for?

10             MR. MOLONEY:  I have talked to a computer expert,

11   Your Honor.  First of all to see if you can convert their old

12   system into something that we all have today.  I was told yes.

13   And then I was told that there are ways of developing search

14   terms and search methods, but you need to have the computer

15   person give you some assistance in doing that.  If I thought

16   that this would be something we would be doing at the

17   courthouse today, I would have asked her to be with us and to

18   do the work on this but that is not the case.  And I don't want

19   to be in the position, Your Honor, of just shooting from the

20   hip off the top of my head and coming out with a few words.

21   Mr. Kociubes, as any good lawyer would, would seize upon those

22   words and say that's your search term, take it or leave.

23   That's not what the new rules contemplate.

23

1          New rules contemplate, as I read them, people

2   sitting down, free exchange of information as to what the

3   capabilities of the system is and trying to work together, work

4   it out.

5          THE COURT:  Mr.--

6          MR. MOLONEY:  We haven't done that yet.

7          THE COURT:  Mr. Duffy, do we have a final status

8   conference in this case for January 4?

9   (Pause)

10          MR. MOLONEY:  I think there's early January,

11  Mr. Duffy.

12          THE COURT:  January 4th, yeah.

13          MR. KOCIUBES:  I think that's right.

14  (Pause)

15          MR. KOCIUBES:  While he's looking, Your Honor--

16          THE CLERK:  Absolutely, Your Honor.

17          THE COURT:  It's on the docket.  In September we said

18  we would gather here on January 4th.  The docket happens to say

19  2006, but it--

20          MR. MOLONEY:  It's 7, yeah.

21          THE COURT:  --clearly means 2007.

22          MR. KOCIUBES:  Your Honor, this--

23          THE COURT:  You know, I'm just looking at the

24  timeframe here and I want that to be the final status

25  conference.

24

```
 1        MR. MOLONEY:  We are not asking for any changes in
 2   any of those dates, Your Honor.
 3        THE COURT:  Well, the--
 4        MR. MOLONEY:  All I can tell you is that I am
 5   committed as is Mr. Weir and Ms. Svensson to getting this case
 6   done.
 7        THE COURT:  Okay, then sit down and confer within one
 8   week--
 9        MR. MOLONEY:  Okay, Your Honor.  Thank you.
10        THE COURT:  --to see if you can get together on this
11   E discovery--
12        MR. MOLONEY:  Okay.
13        THE COURT:  --and I think what you better think long
14   and hard about is coming to some resolution between yourselves
15   because you might not like what I do.
16        MR. MOLONEY:  I understand, Your Honor.  We'd be
17   happy to do that.  Could I, Your Honor, just move on to - there
18   are some other issues in this request for documents that are
19   not email related.  And while I think of it here, Mr. Kociubes
20   did have his client, because of the activities of the Court,
21   give us information about salary and bonus.  What we don't have
22   yet is total compensation, and total compensation is stock
23   securities.  And if you take a look as Ms. Svensson as done and
24   Mr. Weir and I have done, at the salary plus bonus numbers of a
25   given individual for a given year and then you compare it to
```

25

1  what the *Wall Street Journal* and the *Boston Globe* reported

2  about how much these people were making, there is a, multiples

3  of seven figures difference.

4          THE COURT:  Doesn't everybody, did anybody ever tell

5  you not believe everything you read in the paper?

6          MR. MOLONEY:  But, that is true, Your Honor, but when

7  Mr. Kamshad or Mr. Scott or some of these other people, and

8  Mr. Holderman says I'm happy to have what I make put out in the

9  newspapers, it gives us reason to believe that the whole

10  picture is not given by the salary and bonus.

11          MR. KOCIUBES:  Your Honor--

12          THE COURT:  So we're simply asking for total

13  compensation on that issue.

14          THE COURT:  As to which individuals?

15          MR. MOLONEY:  Well that's, there's – on the

16  Comparators, Your Honor.  They've given us for example, and I

17  included it in our papers, on September 29 I sent a notice as

18  the Court said we should a notice if we thought it was

19  appropriate to do it, a notice over to the other side pointing

20  out specifically and it's here in our memorandum which I--

21          THE COURT:  Well why don't you just ask the simple

22  question first of all, whether or not the Comparators had any

23  additional compensation that hasn't been listed so far?

24          MR. MOLONEY:  We now that, Your Honor.  And in fact

25  what we did on September 29 was send a notice on a year by year

26

1   basis to my good friends on the other side, pointing out the

2   specific document with Bates Number.  Let's say, for example,

3   Your Honor, there were 71 of the 91 Comparators were employed

4   in let's say 2000.  We pointed out specifically how many of

5   those 71 we were given total compensation for.  And we got it

6   for some, but not for others.  In one year we didn't get any of

7   it.  So on the one hand they say we're not entitled to it, you

8   should be satisfied with salary and bonus.  On the other hand,

9   they've given partial information but not complete information.

10  And how in God's name can we have an expert or ask the jury to

11  believe that our presentation on the equal pay claim is a fair

12  presentation of the claim when we are saying salary and bonus

13  but we know that there was additional compensation and we

14  haven't included that.  That doesn't make any sense at all.

15  And in fact, they've given us total compensation for some

16  people for some years, but not for all of the Comparators who

17  were there for all of the years.  What's the big deal?

18              THE COURT:  Mr. Kociubes?

19              MR. KOCIUBES:  Can I address that, Your Honor?

20              THE COURT:  You may.

21              MR. KOCIUBES:  What's interesting about that

22  presentation is that its unhinged from any document request or

23  interrogatory.  The interrogatory that triggered this, Your

24  Honor, was a request to provide salary information.  The

25  plaintiff here was a senior vice president of this company.

1    She knows how compensation works, didn't even ask for bonus

2    information.  In responding to that interrogatory we gave them

3    a column that showed salary and we gave them gratuitously a

4    column that showed bonus.  They had never asked for the other

5    stuff.  To this day there's no outstanding interrogatory asking

6    for it.  They got what they asked for and they got more than

7    what they asked for.

8           Two, as to the incompleteness, they have complete

9    charts.  When we got this motion my partner, Mr. Rodriques,

10   tried to call Mr. Moloney a couple times to explain that

11   situation to him.  We never got a return call because the

12   agenda is a motion.  That's fine.  Let me give you some

13   examples of why it is apparently not complete.  Bonuses are

14   typically awarded to people who are there at year end so that

15   if somebody either left or was terminated before year end on

16   the spreadsheets that we gave them, they would show that they

17   had been there that year and the termination date is there but

18   they wouldn't get a bonus.  So the bonus column would be empty.

19   There are other things that go through like that.  We have

20   given them a complete set of data.  To the extent that there

21   are holes in the data it's because there is no data there, Your

22   Honor.  And I don't know – we could file 15 motions but it's

23   not going to change that.

24          THE COURT:  Well, I can't ask him to produce what he

25   doesn't have.

28

1          MR. MOLONEY:  Well, Your Honor, they have it.

2   Mr. Kociubes is correct, I think, although we have disputed

3   about it, but lest assume he was correct in saying we didn't

4   ask for bonus but asked for only - I mean, total conversation

5   we didn't use those terms, we used just salary and bonus.

6   First of all as I pointed out in our motion and memorandum we

7   had a disagreement as to whether the deal that was cut back in

8   July including total compensation or not.  Mr. Kociubes and

9   Mr. - Mr. Rodriques called me up and said that I was wrong.

10  We just believed that we had agreed that we were going to get

11  the total but we didn't.  We are asking for the documents

12  concerning total compensation in this document request.

13          Now, it cannot be, Your Honor, that only, that they

14  can find information about some of these folks about stock and

15  they can't find information or it doesn't exist for the rest of

16  them.  That makes absolutely no sense.  Mr. Kociubes did not

17  tell you that we didn't ask for total compensation in our

18  request for documents and in fact we did.

19          MR. KOCIUBES:  We believed, Your Honor, between--

20          MR. MOLONEY:  It can't be true that Putnam, one of

21  the oldest and until recently one of the most prestigious

22  investment houses on God's earth who pays some of its top

23  people bazillions of dollars a year in cash, deferred

24  compensation and securities, cannot find how many millions of

25  dollars in addition to salary and bonus Mr. Scott or Mr. Warren

1    or Mr. O'Malley or any of these other characters at Putnam

2    got.  That makes absolutely no sense.  The government makes

3    them keep the records.  And these people over there who work

4    there what they think of most of the time is how many millions

5    did you get and how many millions did he get.  And to say they

6    don't have it, that makes absolutely no sense.  And we have

7    asked for it in the second request for documents.

8            MR. KOCIUBES:  We don't say they don't have it, Your

9    Honor.  What we say is there is, in this argument there is

10   bleeding back and forth between the interrogatories, which ask

11   the question and which we answered more fully than what it

12   asked and the document request, Your Honor, which asked us to

13   unredact documents.  With respect to the 91, we unredacted the

14   documents with respect to the 91.  The information that's there

15   is there.  We didn't redact anything with respect to the 91.

16   Where the issue of this, of the other compensation is relevant,

17   if anywhere, is in response to an interrogatory where they

18   never asked it.  In the document request what we hear and what

19   they're complaining about is it's not on the documents that

20   were produced.  That's right.  We didn't generate the

21   documents, we gave them the documents unredacted for the 91 and

22   whatever is on any particular page is on there.  That was the

23   thing that I said to you at the beginning with respect to the

24   various documents.  Some of them might have 50 of the 91, some

25   of the emails might have three of the 91.  Of course they don't

30

1   all have all of the 91, but in response to a document request

2   we can only give them what's there.  If they've got a problem

3   with an interrogatory, that motion they haven't made yet.

4          MR. MOLONEY:  Your Honor, what Mr. Kociubes is

5   artfully doing is deflecting I think the attention from where

6   it should be.  He's criticizing the wording in our first

7   interrogatories.  He's criticizing the wording of our first

8   request for documents.  I mentioned the document production

9   that he did make only to establish to the Court that they have

10  information of total compensation, the second request for

11  documents, despite what may have been in the first request and

12  despite what may have been in the interrogatories, ask for

13  documents on total compensation.  He's now admitted, as well he

14  should, that Putnam has the information.  It's asked for in the

15  second document request.

16         THE COURT:  Can you provide it, Mr. Kociubes?

17         MR. KOCIUBES:  Of course we can provide it, Your

18  Honor.  I've never said that we couldn't provide it.  What my

19  problem has been is that it was never asked for in the

20  interrogatories where you could get the information.  As to the

21  documents were unredacted, the documents are what the documents

22  are.  We didn't cover up some of the information.

23         MR. MOLONEY:  I'm not accusing him of covering it up.

24         THE COURT:  No, no, no.  To be produced.

25         MR. KOCIUBES:  And, Your Honor--

1          MR. MOLONEY:  Your Honor, moving on--

2          MR. KOCIUBES:  --just so that we're all on the same

3    page, I just want to be clear what it is that you've indicated

4    to be produce--

5          THE COURT:  Information on total compensation.

6          MR. KOCIUBES:  Okay.  For the 91?

7          THE COURT:  Right.

8          MR. MOLONEY:  Your Honor, moving on to No. 4, again

9    it's similar to No. 3.  This deals, a subject matter dealing

10   with people who weren't promoted from within but were brought

11   in.  Again, it's a similar one to the early ones.  We're asking

12   only of identify decision makers with regard to specified

13   people.  So I would think that the same answer for No. 4 would

14   be as what we had on the earlier two or three.

15         No. 5 and our reply is on pages 13 and 14 of the

16   memorandum, this deals with pools of persons who were

17   considered for appointment or election as managing director or

18   portfolio managers.  And again, this is not the issue of only

19   the what, but it is of the why and lists of the fact as to what

20   happened isn't enough and we need to know the why.  And then we

21   say that we should be given the documents on that one, and that

22   is dealing with communications among the people who made the

23   decisions as to who's in the pool or not.  So again, it's

24   limited.

25         No. 6--

32

1          MR. KOCIUBES:  Can I respond before we get too far.

2          MR. MOLONEY:  Go ahead.

3          MR. KOCIUBES:  Then I'll only respond to that last

4    one because that's the email issue.  And in terms of--

5          THE COURT:  Well as to all the E issues I want you to

6    sit down and meet and confer.

7          MR. KOCIUBES:  Okay.

8          MR. MOLONEY:  All right.

9          MR. KOCIUBES:  I just wanted to be clear about that

10   because what they do have is on those spreadsheets they have

11   they've got the titles year to year so they can figure out who

12   got promoted.

13         THE COURT:  No, I want you to sit down and try and

14   see if you can narrow and figure out that whatever you're going

15   to have to, you're going to do has to be done by January 4th.

16         MR. MOLONEY:  Your Honor, we will do that.  I'll try

17   not to prolong this with the email business.  One of the other

18   objections that my good friends have made on behalf of Putnam

19   is that they say that we're trying to try a class action case

20   or we're trying to try 29 or 30 or 14 other cases.  We're not

21   doing that all.  We have a disparate treatment claim, we have a

22   disparate claim, and we think that we're entitled to discovery

23   generally as to what happened to other females and males either

24   before or after Ms. Svensson was filed abruptly in September of

25   2003.

33

1        Let me move on to No. 7, Your Honor, which is set

2   out on page 16 and the positions of the parties are on 16 and

3   17.   This deals with a document called a 360.   In the Putnam

4   world, we have learned that 360 is a report that assembles in

5   one place about one person what everybody else in the building

6   of the company thinks of that person.   And these are used by

7   the Putnam people to make judgments about demotions,

8   promotions, salary, bonuses and extra compensation of Putnam,

9   and so these are discreet documents.   If you ask somebody at

10  Putnam what a 360 is they know what a 360 is.   So there's no

11  problem there.   And we have limited it for purposes of No. 7 as

12  we point out on page 17 about halfway down, we're limiting this

13  one to 21 identified males and 12 identified females which is

14  about as far as we can go without hurting our case on that.   So

15  we think that on that limited basis that we should, we should

16  be entitled to these 360's.

17        So, this again gets at the why versus the what.   The

18  list and the documents about the what is part of the picture.

19  The 360's will fill in the picture.   And we're not asking for

20  all the company, all the investment division or all the 91.  on

21  this one we're asking for the 360's on 21 identified males and

22  12 identified females.

23        MR. KOCIUBES:   It's more than that times fives years,

24  so you can do the math on that, Your Honor.   The issue here is

25  the same thing that I started out with.   I may be misogynistic

1    or somebody may think I'm misogynistic, whether a particular

2    female who works for me has a claim is based on, if it's a

3    compensation claim, is whether I'm paying her less than a male

4    doing a comparable job.  If it's a promotion claim, it's

5    whether I'm promoting men but not the woman.  If it's, I'm

6    somehow harassing women then there's behavior aimed at them.

7    So going back to 360's of other individuals that is exactly

8    what we're going to do is try those 21 cases because then it

9    gets to be this person has a 3.2 different group.  This one or

10   Ms. Svensson has a 3.3 or 2.8 or 4.5.  What's the difference?

11   What matters here is the information we gave them.  They've got

12   her compensation.  We know what happened to her and her titles,

13   and they themselves choose 91 people to say these are the

14   Comparators and we've told them of the 91 who got promoted what

15   year or didn't get promoted, what their — you've now ordered in

16   addition to the salary and bonus, the other compensation so

17   they're going to get that.  The rest of this, Your Honor, is

18   opening a massive door to potential further discovery disputes

19   and anecdotally trying some different case.  If they want to

20   prove the case statistically that there's some discrimination

21   against women, it's harder for women to get promoted, they've

22   chosen their Comparators and they have that data.

23           MR. MOLONEY:  Your Honor, one example of what we're

24   trying to find, which we think we have a right to find even

25   under the now reduced relevant to claims of defenses of the

1    parties as I said before is the why.  One of the documents

2    that we did get in unredacted form only on September 1 was a

3    document that pointed out that one of the males who got very

4    favorable treatment had, "a volatile personality."  Same claim

5    was made against Ms. Svensson.  This fellow stays, gets more

6    money and gets promoted.  Ms. Svensson gets booted out of the

7    firm.  The 360's flush out the why.

8              They have agreed to give us discovery on 91 people.

9    Now they are complaining on the 360 review where the why will

10   be explained, where perhaps other people who have volatile

11   personalities or other psychological problems, but we're now

12   down to 21 males and 12 females.  That's 33 people where

13   they've agreed to give us discovery on three times as many

14   people.

15             THE COURT:  To be produced for those individuals.

16             MR. MOLONEY:  Thank you, Your Honor.  The next one

17   would be No. 8 on the top of page 18.  This is a similar

18   situation, Your Honor.  This is year end reviews, documents

19   called PVPR's, which is a term of art, performance reviews,

20   investment division and ISD Human Resources updates.  These are

21   forms and things that they do at Putnam that evaluate the

22   performance of people.  And we're asking that those documents,

23   which are discreet documents, they have to find them; they use

24   them, be produced for the 91 Comparators.  And the reason we're

36

1   asking for it is that we need to see how at the time of the

2   events how these people at Putnam evaluated

3   Ms. Svensson in relation to the Comparators bearing in mind our

4   treatment and disparate impact claims.

5              MR. KOCIUBES:  This is really not a discreet group,

6   Your Honor.  There was for a period of time there was with

7   respect to the Human Resources update what the various of the

8   Human Resources, and it wasn't consistent throughout the time

9   but what the various Human Resource officers did and remember

10  at one point there are 7,000 employees--

11             THE COURT:  Uh-huh.

12             MR. KOCIUBES:  --is every week they would write

13  effectively on a computer a memo with everything, it's a diary,

14  everything they worked on.  The universe is 7,000 employees.

15  We have produced those with respect to Ms. Svensson.  And what

16  happens a lot of times is week after week they're the same

17  because there has been, nothing new has happened.

18             With respect to the Comparator issue and there was

19  something that Mr. Moloney said, Your Honor, that is crucial

20  here, she wasn't – it's not that we're looking for somebody

21  with a volatile personality.  She wasn't terminated because she

22  had a volatile personality.  We've produced those for the

23  plaintiff.  We've produced – there have been witnesses deposed

24  for the plaintiff.  And all of the testimony and 100% of the

25  documents is that she was stripped of the ability to manager

1    people when she was caught essentially fabricating a review of

2    a subordinate.  We'll do comparables, but there isn't any other

3    comparable to it.  She was then given a choice you can stay but

4    for the time being not manage people.  And she was given other

5    options, one of which was leaving, and then she came back and

6    said, no, I want a promotion and a guaranteed million dollars a

7    year.  That's what resulted in the termination.  Now I can

8    represent to you there is no comparable to that.  And to go

9    through five years worth of sort of individual, in the HR

10   department--

11           THE COURT:  Denied.

12           MR. MOLONEY:  Your Honor, may I be heard on that just

13   very briefly?

14           THE COURT:  No, I think I've heard enough on that

15   one.  Moving on.

16           MR. MOLONEY:  Yes, Your Honor.  No. 9 is on page 19

17   and it asks for documents and things concerning the factual

18   basis of numerical scores in the 360's and year end reviews.

19   And, again, those are discreet things and if you look on page

20   20 of our memorandum, we have restricted the scope of the

21   request down to identify the 21 males and 12 females of the 91

22   and we've named the names.  This is particularly important,

23   Your Honor, since we have discovered in this case that

24   Ms. Svensson's score was changed from in excess of four out of,

25   four point something out of five down to--

38

```
 1            MR. WEIR:  4.8.

 2            MR. MOLONEY:  4.8, Mr. Weir correctly reminds me to a

 3   3.--

 4            MR. WEIR:  Zero.

 5            MR. MOLONEY:  3.0 I take it it is.  But the scores

 6   and how the scores were arrived at and whether they were

 7   changed or not for under other circumstances is what we're

 8   asking for.  There and again we've limited this one to as we

 9   point out on page 22, 12 females we give the names, and 21

10   males.

11            MR. KOCIUBES:  Mr. Moloney didn't read the response.

12   The response was there are no such documents.  The reason, Your

13   Honor--

14            THE COURT:  All right, under oath.

15            MR. MOLONEY:  Under oath, yes, Your Honor.  Moving on

16   to No. 10.  This is a request for documents that are concerned

17   with the meaning of local Rule 26.5, the organizational

18   structure and/or jurisdiction of the investment management

19   division.  Now, there has been some testimony in the case about

20   an investment management division committee and an operating

21   committee and conflicting testimony as to which committee under

22   what name was covering for what years and a committee of a

23   different name.  All we're looking for are the documents that

24   established the jurisdiction of it and the powers

25   responsibilities.  I think quite frankly that Putnam has
```

1    misread it where they raised the email and numerous documents

2    issues.   Again, it's very specifically Putnam was run with an

3    operating committee.   It was run by this other investment

4    division management committee.   These are the folks who made

5    decisions on money, promotions, promotions and whatnot, and

6    we're asking just for documents that establish what's the name

7    of the thing, what was its jurisdiction, who was on it for what

8    period of time, and as I said I think that they have misread

9    the nature of it.   We're just looking for the document that

10   will tell us--

11             MR. KOCIUBES:   And again he should--

12             MR. MOLONEY:   --what those are.

13             MR. KOCIUBES:   --have read the response, Your Honor.

14   There've been a lot of deposition testimony.   Responses there

15   are no documents.

16             THE COURT:   Under oath.

17             MR. MOLONEY:   Yes, Your Honor.   It - well, I mean

18   it's, it cannot be that they don't have any documents that

19   establish the jurisdiction of these committees that ran the

20   place.

21             MR. KOCIUBES:   Your Honor, this they've got under

22   oath at depositions.   Various people who were head of the

23   investment division decided to have with their senior

24   management sort of a group that would get together and they

25   would meet.   There's no jurisdictional documents.   Some people

40

1   when they headed the division did it, others didn't do it.

2   They had deposition testimony.  They know why there are no

3   documents because it wasn't a formal procedure.

4          MR. MOLONEY:  If, Your Honor, if an authorized--

5          THE COURT:  Next.  Moving on.

6          MR. MOLONEY:  If they're going to say that under

7   oath, we'll draw whatever inferences are appropriate from that.

8   No. 11 is in the same ballpark.  It's documents that concern

9   the reporting relationships within the investment management

10  division since January 1 of `99.  That's at the bottom of page

11  21.  The, Tibbets had testified that Putnam had organizational

12  charts online.  We think that if they exist that we're entitled

13  to them and if they still insist that they don't exist, we'll

14  take the authorized officer's statement under oath.

15         MR. KOCIUBES:  And I suggest they read the response.

16  I don't know why we're going through this.  There are no

17  documents.  The reason he's asked for reporting relationships,

18  within the IMD, that's this informal group that some managers

19  had, some didn't, and again, they've had and did inquire of

20  numerous people at depositions and we've responded that there

21  aren't any documents.  I don't understand what that's subject

22  of a motion.

23         THE COURT:  All right, under oath, that's all there

24  is.  It's easy enough.

1           MR. MOLONEY:  The next one is No. 12 I think, Your

2    Honor, and that is documents concerning the membership

3    structure and jurisdiction of the operating committee.  And

4    their response doesn't indicate that there are no documents on

5    this one.  They claim that they've given us all objective data

6    but we're not into the why.  We're interested in the what and

7    that is what is the jurisdiction and the membership of the

8    operating committee which existed for most if not all of these

9    years.  And their apparent reason is or objection is it's not

10   relevant to any of our claims.  They've given us all objective

11   data.  We find that hard to believe, and then they go back into

12   the email issue.  This isn't an email issue.  This is just

13   documents that say who was on the operating committee for what

14   years and what was his duties?  Discreet documents, we think we

15   should get it.

16          MR. KOCIUBES:  This is for the very, this is sort of,

17   this is back again to the sergeant wanting to know who's at

18   various times been the joint chiefs.  This is sort of the

19   senior most committee, the membership of it changed.  How that

20   membership is relevant to anything in this case, Your Honor,

21   remains a mystery.  I mean we're we going with it?  I mean she

22   has the indicia she was either discriminated against in her

23   salary, promotion, or she wasn't.  Who's on the joint chiefs at

24   any given point, we're we going?  And the jurisdiction I don't

42

1  believe there are documents responsive to that piece because

2  that's not how the organization launched.

3          MR. MOLONEY:  Well, they didn't object to it on the

4  basis that there weren't any documents.  We have Mr. Lasser at

5  the top.  He's a defendant in this case.  They say well the

6  investment division management committee, they didn't have

7  anything to do, nothing in writing for these characters and by

8  the way it didn't last.  The operating committee is the

9  operating committee.  That's the way they ran the place.

10 That's the way they made decisions on who gets hired, who gets

11 fired, who gets demoted, who gets money, who gets the bonus,

12 who gets into the AMP pool and who gets into the partners'

13 pool.

14         MR. KOCIUBES:  That is a false statement.

15         MR. MOLONEY:  That's why it's relevant on--

16         MR. KOCIUBES:  That is a falsehood.  Mr. Moloney

17 knows it's a falsehood.  It is inconsistent with every

18 deposition that there has been, Your Honor.  The operating

19 committee did big picture finances of the organization,

20 determinations of who was promoted, who was terminated, got

21 pushed down to the managers.  It was not done at that decision.

22 Every witness has so testified and Mr. Moloney, if he read the

23 depositions, I know he wasn't there most of them, would know

24 that.

43

1          MR. MOLONEY:  We have a disagreement and the jury's

2     going to sort out whether Putnam's view of Putnam is correct or

3     our view drawing the appropriate inferences.  But let's get

4     back to the operating committee.  It's admitted it exists.

5     It's a very powerful committee.  We disagree on the inferences

6     to be drawn as to how directly it affected

7     Ms. Svensson and the other one on, who are no longer there.

8     But we think we got to get it and it cannot be that the

9     jurisdiction of this committee that ran the place is not

10    relevant under Rule 26 to our claims.

11          THE COURT:  To be produced.

12          MR. MOLONEY:  Thank you, Your Honor.  No. 13 is at

13    the top of page 24.  It gets back to the investment division

14    management committee.  It's similar, but this is the committee

15    that was involved which Putnam says only for a limited period

16    or time.  And if you note, Your Honor, on page 24 about halfway

17    down we say, "however Svensson will limit the scope of this

18    request to documents that identify the membership duties and

19    responsibilities of the investment division management

20    committee in regard to promotions, transfers, to the 91 since

21    January 1 of `99.  So they admit that this committee existed.

22    It was uncertain as to how many of the relevant years it did

23    exist, but again we say it should be produced for the same

24    reason on the operating committee.  This is a committee that

25    apparently if I understand the Putnam position, is somewhere

44

 1    between Mr. Lasser and the operating committee at the top and

 2    the worker bees like Ms. Svensson who's investment division

 3    management committee.  We think we're entitled to that as well

 4    for the same reason under Rule 26.

 5              MR. KOCIUBES:  This is that same group we've now

 6    addressed probably five times, Your Honor, an informal group

 7    that sometimes existed, sometimes didn't exist.  The problem

 8    with a request that's phrased in terms of concerning

 9    memberships, structure and jurisdiction, there are no such

10    formal documents, but if anything that concerns it, now we're

11    back to searching for a five year period all sorts of email

12    boxes to see if anybody mentions--

13              MR. MOLONEY:  That's--

14              THE COURT:  Hasn't this been discussed at deposition?

15              MR. MOLONEY:  Sorry, Your Honor?

16              MR. KOCIUBES:  It has, Your Honor, multiple times.

17              THE COURT:  Hasn't it been discussed at deposition?

18              MR. MOLONEY:  We have taken depositions of the Putnam

19    people so we are hearing the Putnam view of the world through

20    their present employees like Mr. Tibbets and defendant Lasser

21    and other people who work there, or alternatively people who

22    used to work there who got severance packages and all their

23    loyalties to Putnam.  I'm not saying that that's illegal, it's

24    just the facts.  So we ought to know where the information's

25    coming from.  Ms. Svensson was there and was able to observe

45

1    things from her perspective.  We had a disagreement as to how

2    long this investment division management committee was in

3    existence.  We thought it was for a longer period of time than

4    what they say it is.  But listening to people in depositions

5    when you don't have the documents to cross examine Mr. Tibbets

6    on for example is very difficult to get the whole picture.

7          Now if Mr. Kociubes and Putnam want to say there are

8    no documents and we get a statement under oath we, will deal

9    with it and draw the inferences that we can from that.  On the

10   other hand, if they have discreet documents that tell us, show

11   us how long it has lasted and who was on it and what their

12   responsibilities were – and maybe this is the group, Your

13   Honor, that made the decisions on compensation and promotions

14   that Mr. Kociubes would have you believe the operating

15   committee didn't make.  He said they pushed it down.  Did they

16   not push it down to the investment division management

17   committee?

18         MR. KOCIUBES:  The problem, Your Honor, is there are

19   no – I've said this now multiple times, there are no formal

20   jurisdiction or any kind of documents.

21         THE COURT:  Well then put that in a statement under

22   oath.

23         MR. KOCIUBES:  Here's the issue with the way he's

24   asked it, Your Honor.  When he says concerning any of this

25   stuff, what we're now back into the world is of searching years

1    worth of email, all sorts of people to see if somebody

2    mentions hey, there's a meeting next--

3              THE COURT:  No.

4              MR. KOCIUBES:  --Tuesday.

5              THE COURT:  We have eight weeks left and we're not

6    going to be searching.

7              MR. MOLONEY:  We'll discuss the email aspects of

8    that, Your Honor.  But if he's otherwise going to take a

9    position that nothing exists on documents other than emails,

10   we'll take the statement under oath from an authorized person.

11             THE COURT:  All right.

12             MR. MOLONEY:  But we'll discuss the issue in our

13   conference next week.  Fifteen is on page 27, at the bottom of

14   page 27 of our memo, Your Honor, and it deals with criteria use

15   by Putnam for deciding who should be or would be demoted since

16   January 1, 2002.  That date is well within the relevant period

17   and we chose the January 2002 period because that's just

18   shortly before Ms. Svensson was demoted.  And we'd like to know

19   and we think we have a right to know what is the criteria used

20   by Putnam on the why of that.  And if you note, Your Honor, on

21   page 28 about halfway down we say, "However Svensson will limit

22   the scope of this request to the Comparators identified in the

23   argument sections to numbers one and two."  And that goes back

24   to the 22 people, Bogar, Servoney, Dexter, those names, so that

1   there are 16 males and 12 females.  So that's what we're after

2   there and certainly--

3            MR. WEIR:  Six females.

4            MR. MOLONEY:  I'm sorry, 16 males and their names are

5   there on page 28.  And so since Ms. Svensson was demoted and

6   taken away from her management responsibilities, put back into

7   research, the department from which she was promoted by these

8   characters back in 1997 I think it was, and we're looking for

9   what were the criteria?  How did you decide that?  And what was

10  your decision making with respect to these other limited number

11  of people?  And we think we're entitled to those documents,

12  Your Honor.  Certainly relevant to her claims and defenses.

13           MR. KOCIUBES:  Two or three things, Your Honor.

14  They've had tons of testimony about the reason for the transfer

15  from the international growth to global equity research.  The

16  team that she was on had disastrous financial performance.

17  They lost tons of money for their investors.  The head of the

18  team, a male, was fired.  Ms. Svensson rather than being

19  terminated was giving the opportunity to go to Global Equity

20  Research, same title.  They know that's what happened.

21  Everybody has so testified.  There is no document or anything

22  inconsistent.  The problem here is when, again, it's the way

23  they word it.  When you talk about all documents and things

24  concerning the actually criteria used by Putnam to "demote" -

25  and I guess they count transfers as demotions and that's

48

1    another problem, the issue there, Your Honor, is I can't -

2    it's back to the email problem.  There are no formalized

3    documents as the, if an organization is downsizing there may or

4    may not be discussions between the managers, of if you've got

5    two quantitative analysis, pick one not the other.  Are there

6    formal criteria for that, Your Honor, that's the issue.  The

7    only way to get any kind of hand on anything concerning it, it

8    again is to search email boxes of untold numbers of people to

9    see if anybody happened to mention that, gee, we think Bob has

10   better long term prospects than Jimmy.  Let's keep Bob.  About

11   16 different people, there may or may not be anything there but

12   it is a massive search.  We know if it relates to the plaintiff

13   we've produced that because we searched for her name.

14          MR. MOLONEY:  Your Honor, it's, Putnam doesn't inform

15   the Court as to what really happened here.  We all agree that

16   something happened to the market in 2000, 2001.  We all know

17   that Ms. Svensson is demoted in 2002 and booted out of the

18   place in 2003.  What really happened is that they changed the

19   name of this team and surprisingly enough, Mr. Steven Dexter,

20   Mr. Nathan Argumen, Mr. Peter Hadden and perhaps others, who

21   were on this team with Ms. Svensson, did not get put into

22   research or booted out of the firm.  They were given enlarged

23   responsibilities and promotions and more money.  So to have

24   Mr. Kociubes argue Putnam's view on this one, I don't think is

25   really fair.  We should, I think we're entitled under Rule 26

1    to find out why it was that the females disappear from Putnam

2    while the white boys stay at Putnam and get promoted and get

3    more money.  And then Ms. Svensson is told on the complaints of

4    two males, one of whom Mr. Pierce left for more money out in

5    California, and the other fellow, Mr. O'Malley, who stayed,

6    took over most of her responsibilities, got promoted and got

7    more money, stayed.  That's the essence of this case.  And to

8    have Putnam say we have no formal documents of the criteria,

9    the really world knows how these decisions are made.  George is

10   a pal of mine, oh, he's a good guy, I saw him at the country

11   club the other day.  Oh, Svensson, you can't count on her.  She

12   was off being pregnant and having a baby a few years ago.

13   Aren't we entitled to know if that's in those documents?  Is

14   that not relevant to her claims on this case?

15          THE COURT:  Well, it seems to me if you've asked for

16   all the emails with her name in them, you know, this can get

17   too far a field, and I'm really--

18          MR. MOLONEY:  We agree, Your Honor, with that and

19   that is why we are willing and eager and are urging, and I

20   think they've agreed to sit down with us next week on these

21   email problems.

22          THE COURT:  All right, so you're going--

23          MR. MOLONEY:  Okay.  I just wanted the Court to

24   understand that we on this one had limited it to the 16 men and

25   6 women.

1          Okay--

2          MR. KOCIUBES:  Does Mr. Moloney really think there's

3  a "actual criteria" somewhere in that which says--

4          THE COURT:  All right.

5          MR. KOCIUBES:  --promote your friends?

6          THE COURT:  Enough.  Time.  We've gone this far.  My

7  ruling today will reflect that I've allowed it to the extent

8  stated on the record--

9          MR. MOLONEY:  Right.

10          THE COURT:  --in open court.  As to everything

11  remaining and the E issues, I want you to sit down.

12          MR. MOLONEY:  Okay.

13          THE COURT:  I want you to sit down and see what you

14  can work out because let me tell you I'm not about to allow

15  much more.  Eight weeks left, the time is narrow.  And I also

16  want to know that given the scope of this discovery and the

17  intensity with which you are both pointing out this case has

18  there been any talk of settlement?

19          MR. MOLONEY:  We are waiting for an offer that we

20  can't refuse, Your Honor.

21          THE COURT:  Well have you made a demand?

22          MR. MOLONEY:  I believe we did.

23          MR. WEIR:  We had a mediation, Your Honor, in this

24  case back in January.

25          THE COURT:  Before?

51

1            MR. WEIR:  Magistrate Judge Alexander.

2            THE COURT:  Why didn't you have it here?

3            MR. WEIR:  Judge Saris made that decision.

4            THE COURT:  I mediated 37 cases this year, I've

5    settled 33.

6            MR. WEIR:  Your Honor, we're happy to--

7            THE COURT:  My statistics--

8            MR. WEIR:  We're happy to have it mediated before

9    Your Honor.

10           THE COURT:  --are better than even Dave Mazzone's

11   were.

12           MR. MOLONEY:  He was pretty good.

13           THE COURT:  He was very good.  I learned everything

14   from him.

15           MR. MOLONEY:  No, we're happy to sit on--

16           THE COURT:  But--

17           MR. MOLONEY:  --the email problem.  We're happy to--

18           THE COURT:  Sit down, discuss the rest.

19           MR. MOLONEY:  Yes, Your Honor.  Thank you.

20           THE COURT:  Because it's really getting--

21           MR. MOLONEY:  But if Your Honor--

22           THE COURT:  --tedious.

23           MR. MOLONEY:  I've spent, Your Honor, most of my

24   waking hours since last Friday working on this problem.

25           THE COURT:  I can see that, Mr. Moloney.

52

1           MR. MOLONEY:  Much to the distress of my wife and

2   son and grandchildren who tried to visit us over the weekend.

3   I just want you to understand that we want this case to reach

4   an end result and we're working--

5           THE COURT:  Of course.

6           MR. MOLONEY:  --very hard on it.

7           THE COURT:  Of course.

8           MR. MOLONEY:  And we - she doesn't have the resources

9   and Mr. Weir and I don't have the waking hours to put up any

10  more with why we're here today.  This stuff, this unredaction

11  of documents could and should have been turned over to us in

12  February.

13          THE COURT:  I don't need to hear anymore.  I have

14  said enough.

15          MR. MOLONEY:  Your Honor, could we have a date to

16  come back to you after our efforts of next week in case there

17  are things that you need to decide.

18          THE COURT:  What about this motion to quash?

19          MR. KOCIUBES:  It's - give me two or three minutes on

20  it, Your Honor, then you can decide whether you want to reserve

21  it or hear argument today.

22          This arises in the context of I think it was on last

23  June.  There was a 30(b)(6) deposition that was noticed for,

24  essentially for the very end of the discovery period.  What I

25  would suggest Your Honor, the point of a 30(b)(6) deposition is

53

1    where you don't know the identity of a witness so that if you

2    don't know who's in charge of document retention--

3                THE COURT:  I know the purpose.

4                MR. KOCIUBES:   Okay.  Here you've got a plaintiff who

5    was an officer of the company.  She knows how it works and the

6    best evidence of that is they took their full 10 depositions

7    before they got to this.  And I think you know the sense, the

8    CEO, the ex-CEO, the head of investments, the head of HR, all

9    the way down, Your Honor.  What happened then is, and it's

10   co-workers, what, so - this is not a matter of not knowing who

11   the witnesses are.  What then happened is there was a very

12   broad 30(b)(6) deposition.  We moved to quash.  We were before

13   Your Honor on it.  Your Honor noted that there were four issues

14   in the case and that it ought to be narrowed to the four issues

15   and that the plaintiffs should show where it's information that

16   they could not have otherwise obtained.  It's not a backdoor to

17   redo discovery.  That hearing, I'm sorry, was July 10 not June

18   16.

19               What we now have if you, a sense if one even looks at

20   it I think it really does speak for itself, is not a narrowing

21   where we've got a whole bunch of new categories, and I'm

22   prepared now or some other time to go one by one if you want,

23   it still doesn't meet the reasonable particularity requirement.

24   They, for example, want somebody to testify about--

25               THE COURT:  Are you over your 10 depositions?

54

1        MR. WEIR:  No, Your Honor.

2        MR. MOLONEY:  This will be the 10th.

3        MR. KOCIUBES:  This will be your last.

4        MR. MOLONEY:  Except for Mr. Stoev that Putnam

5   opposed and which Your Honor exercised her discretion and

6   allowed us to take, and we're very grateful for his testimony.

7   I'd put him in at trial.

8        MR. KOCIUBES:  The reasonable particularity is for

9   example, they've got categories here wanting to know somebody

10  who can testify about any basis of hiring, promoting, not to

11  demote, so sort of negative actions, transfer, not transfer,

12  terminate any female over a five-year period of time.  They had

13  that in head of HR.  They've had the woman who was in HR who

14  was responsible for the unit that the plaintiff was in.  They

15  know there was a downsizing where the company went from 7,000

16  to 3,000 people.  How is that reasonable particularity?  Other

17  than – and how do I prepare one witness or two witnesses or

18  three witnesses of a company that had between 7,000 and 3,000

19  employees and everyday their decision is made "not to transfer"

20  or "not to demote."  That's the issue, Your Honor.  Simply, I'm

21  happy to go category by category, but if you simply take a look

22  at it it jumps off the page.  This is at the end of the

23  discovery they essentially want to redo very broad general

24  discovery.  It's not a matter of one person or two people and

25  it's not a matter of being able to get one or two people up to

55

1   speed.   This is simply an invitation that if we produce one

2   person or two people that once this is done - and it took them

3   three months to modify it after Your Honor ruled in

4   mid-July - this is simply an invitation and a guarantee of

5   discovery disputes down the road because whatever we try to do

6   on this kind of record they're going to find somebody and say

7   what about, you know, John Smith's non-termination from this

8   other group.   And the person may or may not have been prepped

9   on it.   You can't prep on that kind of, that broad of thing,

10  and then we're going to be back here that we somehow didn't

11  comply.

12          MR. MOLONEY:   Your Honor--

13          THE COURT:   Mr. Weir?

14          MR. WEIR:   Number one, we announced back before Your

15  Honor in January of this year an attempt to take a 30(b)(6)

16  deposition and Mr. Rodriques who was here for that conference

17  at that time even announced that it was probable that Mr. Josh

18  Brooks would be the 30(b)(6) witness.   Number two, many of the

19  - he objects to the existence of reasonable particularity under

20  Rule 30(b)(6).   I think his problem is not with the fact that

21  the 30(b)(6) notice is not designated with reasonable

22  particularity.   He's now objecting to too much particularity.

23  And we have designated certain categories.

24          Just a couple of examples, the managers performance

25  ratings is one of the subjects on which we wanted to get some

1   testimony.  We discovered when the documents were produced on

2   September the 1st of this year that we discovered for the very

3   first time that these, the performance ratings that were given

4   to the Comparators plus there were alterations to these

5   performance ratings.  And, indeed, Ms. Svensson's performance

6   rating in the 2000 timeframe was changed from 4.8 to 3.0 on a

7   five scale.  And then in September we got the, there appear to

8   be some alterations with respect to other performance ratings,

9   but we haven't had a fair opportunity to examine anybody about

10  that issue.  And it's certainly germane that if Ms. Svensson's

11  performance rating was dropped by a factor of 1.8 and other

12  male Comparators did not have such precipitous changes in their

13  performance ratings, that's an issue that's very pertinent to

14  this case.  Let me give you, can I give you another one?

15              THE COURT:  No.  I've heard enough.

16              MR. KOCIUBES:  Can I just--

17              THE COURT:  The motion to quash is denied.  One

18  deposition.  One day.  You sit down with Mr. Kociubes in the

19  next few days and decide who it's going to be and you better

20  decide what areas you want to prioritize because you're only

21  going to get one day and you may not get everything you want

22  done.

23              MR. KOCIUBES:  Your Honor--

24              MR. MOLONEY:  Yes, Your Honor.

57

1    MR. KOCIUBES:  --I understand the ruling, but I just

2    think it's conceivable we're going to be back here.  I just

3    want you to understand what my difficulty is because it will be

4    the same difficulty in providing a witness for one day.  For

5    example, with respect to what Mr. Weir just said, they just

6    want the managers, that's topic too and let me just tell you

7    what it is.  Managers performance ratings for the 91

8    Comparators.

9    MR. MOLONEY:  Simply, Your Honor, is Mr. Kociubes

10   going to reargue?

11   MR. KOCIUBES:  Well can I finish, Your Honor?

12   MR. WEIR:  I thought you've made a ruling?

13   THE COURT:  I've made a ruling.  And what you both

14   have to do is to sit down and prioritize it as what you want

15   because you're only going to get one witness and you're only

16   going to get one day, and if one person only knows about one

17   area that's, all you're going to get.

18   MR. MOLONEY:  Your Honor, if I may?  Under the Rule

19   if they're going to produce one witness to testify about all

20   matters, that witness must be an educated witness and the

21   testimony under 30(b)(6) and Rule 32 it has to be an educated

22   witness.  To limit us to one day--

23   THE COURT:  I realize - I know what the rule is.

24   MR. MOLONEY:  Okay.

25   THE COURT:  And I know what the language says.

58

```
 1              MR. KOUCIBES:  Your Honor, for just 10 seconds if I
 2  could just finish what I was saying.  Looking it at in terms of
 3  giving them a witness, and one witness one day, we have no
 4  problem with, managers performance ratings for the 91
 5  Comparators from 1999 to 2004, what about them?  Is somebody
 6  supposed to have memorized all of that stuff?  The--
 7              THE COURT:  Sit down, talk about it.  Work it out.
 8              MR. MOLONEY:  Yes, Your Honor.
 9              THE COURT:  Enough.  We stand in recess.
10  //
11  //
12  //
13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
```

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


_____          November 1, 2006

Maryann V. Young_____

**Exhibit C**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LISA SVENSSON,

                Plaintiff,

    v.

PUTNAM INVESTMENTS, LLC,

                Defendant.

CIVIL ACTION
NO. 04-12711-PBS

## AFFIDAVIT OF JEROME BENTO
## IN SUPPORT OF PUTNAM'S MOTION FOR A PROTECTIVE ORDER
## TERMINATING ANY FURTHER DISCOVERY

I, JEROME BENTO, being first duly sworn, deposes and says:

1. I am a Vice President and Manager of Production Services at Putnam, LLC ("Putnam"), the Defendant in the above-captioned matter.

2. I have been employed by Putnam for nine years, and in this capacity for three years.

3. I have worked in production services for more than thirty years.

4. As a Manager of Production Services, I, among other things, oversee the daily operation that transfers all of Putnam's electronic information to back up media.

5. I understand that Plaintiff seeks to have the electronic mailboxes of ten current and former Putnam employees restored over a five year time period. Since this effort will require Putnam to restore information from back-up tapes located at an off-site storage facility and will require data to be converted from an old electronic mail system into a format readable by Putnam's current electronic mail system, I estimate that the Plaintiff's request will take several weeks to complete.

6.  The following steps are necessary in order to comply with Plaintiff's request:

>   **A.**  I need to identify the electronic mail servers that each of these individuals used during the relevant time period and retrieve the back-up tapes for these servers from Putnam's off-site storage company. The back-up tapes are monthly tapes and there are multiple monthly tapes per server.  Given the span of five years requested by the Plaintiff, it is likely that responsive electronic mail could reside on as many as 100 separate back-up tapes.  After identifying the relevant tapes, I must order their retrieval from the storage facility.  This requires storage facility personnel to search through individual files in order to pull all of the tapes.  Once gathered, the tapes will then need to be shipped to me.  Based on my experience, this process will likely take three and possibly up to five (depending on the number of tapes that need to be retrieved) business days.

>   **B.**  After receiving the tapes, I must restore the information in the tapes onto a hard disk and then import the data into Putnam's electronic mail archiving tool.  This process requires me to "spin" each of the relevant tapes to filter out the ten mailboxes in question.  The data must then be "re-indexed" to insure that it is searchable.  Since Putnam used a different electronic mail system for part of the time period in question, the restore effort requires me to convert that data to a format that is searchable using Putnam's current electronic mail system.  This whole process will take approximately eleven to fourteen business days.

7.  Only after this process is completed can the restored electronic mail for these ten current and former Putnam employees be searched.

Signed under the pains and penalties of perjury this 12th day of December, 2006.

/s/ Jerome Bento

Jerome Bento

**Exhibit D**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PUTNAM INVESTMENTS, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

CIVIL ACTION
NO. 04-12711-PBS

**AFFIDAVIT OF JEREMY T. BREEN
IN SUPPORT OF PUTNAM'S MOTION FOR A PROTECTIVE ORDER
TERMINATING ANY FURTHER DISCOVERY**

**JEREMY T. BREEN**, being first duly sworn, deposes and says:

1. I am a litigation technology specialist at Bingham McCutchen LLP, the law firm representing the defendant Putnam Investments LLC f/k/a Putnam Investments, Inc. ("Putnam") in connection with this matter.

2. I have been employed by Bingham McCutchen in this capacity since July 2005.

3. I have worked in the litigation technology industry for approximately 5 years.

4. As a litigation technology specialist, I serve as a liaison between attorneys and electronic-discovery vendors, and assist with collecting data, constructing databases; writing database search queries, and training attorneys to use the application software to perform electronic discovery. In addition, I negotiate contracts with electronic discovery vendors on a daily basis.

5. On December 7, 2006, I spoke with David Deppe, the founding partner at Focus Legal Solutions, a litigation support company, about the Plaintiff's request for electronic discovery. Based on my experience working with vendors, and my conversation with Mr. Deppe in particular, I state that:

A.   Corporate employees typically send and receive between 1,000 and 1,200 emails per month, for a total of some 12,000 to 14,400 emails per year.

B.   This number of emails translates into approximately 2-3 gigabytes of email per year.

C.   Estimating that each of the ten custodians whose email boxes Plaintiff seeks to have restored generated 2.5 gigabytes of email per year, over the five year period in question, Plaintiff's request calls for Putnam to restore 250 gigabytes of emails.

D.   Focus Legal Solutions, like the vendors with whom I have worked on electronic discovery matters, claim to process a maximum of about 50 gigabytes per week. Thus, processing 250 gigabytes of data will normally require approximately 5 weeks.

E.   Focus Legal Solutions, like other vendors with whom I have worked on electronic discovery matters, typically charge $1000 per gigabyte to process emails.

F.   Thus, the going-rate to process 250 gigabytes, at $1000 per gigabyte, approximates $250,000.

G.   After the emails are loaded onto a database, Focus Legal Solutions, or a similar company, would run a search for the names of the former and current employees and 27 search words Plaintiff seeks. This process typically costs an additional $150 per hour.

6. These estimates do not account for the time attorneys or paralegals subsequently must spend reviewing responsive emails for relevance and privilege.

Signed under the pains and penalties of perjury this 12th day of December, 2006.

/s/ Jeremy T. Breen _____

Jeremy T. Breen

**Exhibit E**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \*     Civil Action No. 04-12711-PBS

                                  \*
                                  \*     BBO No. 351000
LISA SVENSSON                     \*
                                  \*     Affidavit
        Plaintiff,               \*     of
                                  \*     Nicole M. Panos
v.                                \*
                                  \*
                                  \*     (Declaration Pursuant
PUTNAM INVESTMENTS,               \*     to 28 U.S.C. § 1746)
LLC, et al.,                      \*
                                  \*
        Defendants.              \*
                                  \*
                                  \*
\* \* \* \* \* \* \* \* \* \* \* \* \*

    1.   My name is Nicole M. Panos.  I am Director of Client

Development for Target Litigation Consulting, Inc. ("Target") of

268 Summer Street, Boston Massachusetts, which is engaged in

litigation support and electronic discovery services for law

firms and corporate clients.  Prior thereto I swerved as

Target's Sr. Technical Consultant/Project Manager.  Before my

service with Target, I had five years of large law firm

experience in e-discovery and computer related litigation issues

in both civil and criminal matters with Palmer & Dodge and Brown

Rudnick Berlack & Israels, both of Boston.  My resume is filed

herewith as Exhibit "1."  I have personal knowledge of the facts

set forth herein.

2.    I have reviewed the contentions of both plaintiff Lisa

Svensson ("Svensson") and defendant Putnam Investments, LLC

("Putnam") as to the e-mail issues in this case, which are

included in Svensson's Reply Memorandum, filed October 25, 2006.

I also have reviewed the four e-mails (and attachments as

applicable) between Attorney Moloney for Svensson and Attorney

Rodriques for Putnam concerning the e-mail discovery issues,

copies of which are filed herewith as Exhibits 2-5, and which

are dated, respectively, November 17, 2006 (Moloney to

Rodriques, Exhibit 2), November 21, 2006 (Rodriques to Moloney,

Exhibit 3), November 22, 2006 (Moloney to Rodriques, Exhibit 4)

and December 12, 2006 (Rodriques to Moloney, Exhibit 5).

3.    Based upon my education, training and experience, the draft

search terms sent by Svensson's counsel to Putnam's counsel are

reasonable as they are limited in number of search terms and the

complexity of search.  Some of the terms may result in false

hits as they are general terms used in everyday conversations

(e.g. make, move, took out, take out).  I would suggest that

those search terms be used in conjunction with other, relevant

terms to yield a higher likelihood of responsive hits. The

search methodology and terms may require modification depending

upon the answers to the technological and other inquires set out

in the questionnaire ("November 17 e-discovery questionnaire")

2

that accompanied Attorney Moloney's November 17, 2006, e-mail to Attorney Rodriques (Exhibit 2).

4.    Based upon my education, training and experience, it is impossible to analyze and evaluate the propriety, integrity and legitimacy of the Putnam contentions as to time and expense and the other issues set out in Attorney Rodriques' e-mail of December 12, 2006 (Exhibit 5), without first having obtained, analyzed and evaluated in the light of the technological issues and the varying conditions of the market place concerning vendors, the answers to the questions set out in the November 17 e-discovery questionnaire.  In past projects I have consulted on, the cost and time estimations from vendors for tape restoration and searching, for example, has ranged from days to weeks and from one-hundred dollars per tape to one-thousand dollars per tape based on the vendor and the type of tape. These types of issues can be resolved with open discovery exchange.

Signed under the penalty for perjury this 27th day of December 2006,

*Nicole M. Panos*

_____

Nicole M. Panos

Certificate of Service.

3