UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * * * * | Civil Action No. 04-12711-PBS |
| * | |
| LISA SVENSSON * | |
| * | BBO No. 351000 |
| Plaintiff, * | |
| * | Memorandum of plaintiff |
| v. * | Lisa  Svensson in |
| * | Reply to the Opposition |
| PUTNAM INVESTMENTS, * | of  Defendant Putnam |
| LLC , ET AL., * | Investments, LLC to |
| * | Svensson's Objections |
| Defendants. * | to the Rulings of  the |
| * | Magistrate judge |
| * *    * * * * * * * * * * * *   *   * | |

## 1.    The claim, p. 1, that the discovery period in this case has been "prolonged" by acts of Svensson is not true.

The discovery period has not been "prolonged" due to any act or omission of Svensson.  To the contrary, virtually all of the court time since the close of the discovery period on June 1, 2006, has been taken up by motion practice initiated by Svensson for aid from the court in the face of failures and refusals of Putnam to respond in a proper manner to Svensson's discovery requests served timely within the discovery period.

The original fact discovery period as per the initial scheduling conference (until February 1, 2006) was extended once at Svensson's request, by three months, to May 1, 2006 by the Magistrate Judge.  It was extended by the court (Saris, D.J.) a second time, for a month, to June 1, 2006, on a joint motion on Putnam's counsel's representation that they were engaged in another litigation matter.  In the period since the June 1, 2006, close of discovery, Svensson has not sought any paper discovery that she had not timely requested during the discovery period.  Indeed, she has sought in the case of her Second Request for

Production far less.  <u>See</u> Svensson's Reply memorandum, filed October 25, 2006.  Docket No. 126.

Since June 1, 2006, the matters before the Magistrate Judge have been motions by Svensson: (1) to compel answers to interrogatories that had been served months before the end of the discovery period; (2) to compel production in unredacted form of documents produced in response to Svensson's First Request for Production in redacted form; (3) to compel production of documents requested by Svensson's Second Request for Production ("Second Request"), also served before the end of the discovery period; (4) for sanctions for improper conduct by Putnam counsel during depositions of Putnam related witnesses Richard Tibbetts and Stephen Oristaglio, resulting in orders to Putnam to resume the two depositions; (5) to compel Putnam to resume the 30(b)(6) deposition when Putnam counsel unilaterally terminated the deposition some two hours before it was due to be concluded, leading to an order to resume it; and, (6) for leave to take two additional depositions, resulting in an order allowing Svensson to depose Konstantin Stoev whom Svensson had supervised.  The court also heard two motions by Putnam (both denied) to prevent Svensson from taking a Rule 30(b)(6) deposition of Putnam, which Svensson had noticed prior to the end of the discovery period.  The final motion heard by the Magistrate Judge was the Putnam December 13, 2006, motion for a "Protective Order Terminating Further Discovery."

The Magistrate Judge also held a scheduling conference on September 15, 2006, the purpose of which was to establish a filing and briefing schedules for Svensson's motion to compel production of the documents requested by her Second Request for Production, and the second Putnam motion to quash Svensson's Rule 30(b)(6) deposition notice, at which the

Magistrate Judge said, pl 11, "Close of discovery December 31st.  Get it done by the end of the year or that's it."

The setting of a December "close of discovery" date of December 31 "or that's it" had the consequence of encouraging and allowing Putnam to consume by delay the few weeks before that date and "run out the clock."  <u>See</u>, for example, Putnam's claim in its "Motion for a Protective Order Terminating Further Discovery," filed December 13, 2006, that the e-discovery sought by Svensson in her Second Request for Production served in April 2006, "could never be complied with the less than three weeks remaining in the discovery period."

**2.     The claim, p. 1, that the Magistrate Judge had an adequate factual basis for e-discovery decision-making based only on the Putnam affidavits is incorrect.**

In the presence of the sharp conflict between the affidavits of the Putnam in-house affiant (Bento), which was filled with conjecture and speculation and the in-house affiant (Breen) from Putnam's counsel's law firm, which was filled with hearsay, and the affidavit of plaintiff's expert Nicole Panos, the claim that court below had an adequate factual basis for e-discovery decision-making is incorrect, particularly the failure below to have appointed a neutral expert, as requested by Svensson[1] to investigate and resolve the conflict.  As the Panos affidavit states,

> ...it is impossible to analyze and evaluate the propriety, integrity and legitimacy of the Putnam contentions as to time and expense and the other issues...without first having obtained, analyzed and evaluated in the light of the technological issues and the varying conditions of the market place concerning vendors, the answers to the questions set out in the November 17 e-discovery questionnaire.[2]

---

[1] Supplementing Svensson's December 27, 2006, "Memorandum in Opposition to the Putnam Motion for a Protective Order Terminating Further Discovery," Svensson's counsel, at the January 4, 2007, hearing on that motion, said to the court, among other things on this point, ,  "...the neutral would be able to, for good or for bad for the parties' sake, but at least for good of the Court's sake, would be able to determine what the facts are....").  <u>See</u> p. I-23 of the partial transcript of that hearing annexed as Exhibit "A," to the Affidavit of Kevin F. Moloney, dated February 13, 2007, filed herewith.

[2] The November 17, 2006, questionnaire, an exhibit to the Panos Affidavit, also is Exhibit B hereto.

3

> In past projects I have consulted on, <u>the cost and time estimations</u> from vendors for tape restoration and searching, for example, <u>has ranged from days to weeks and from one-hundred dollars per tape to one-thousand dollars per tape based on the vendor and the type of tape,</u>
>
> <u>These...issues can be resolved with open discovery exchange.</u>

(Emphasis added.)

### 3.    <u>The claim, p. 2,  that the Magistrate Judge "considered 37 discovery motions" and "conducted 11 hearings" is incorrect.</u>

The Putnam claim is incorrect.  There were not "37 discovery motions," or "11 hearings" before the Magistrate Judge.  Even the Putnam opposition admits later, p. 3, that it reached that number of "37 discovery motions" by a counting pieces of paper rather than of motions.  The docket shows eight motion hearings[3] before, and two conferences with,[4] the Magistrate Judge.

### 4.    <u>The claim, p. 2, that the "Global Growth team" was "disbanded" is not true.</u>

Putnam's statement, p.2, that "the Global Growth team...was disbanded" is not true. In fact, the "team" was the "International Growth Equity" team, of which "Global Growth" was only one of the portfolios managed by that team.  Putnam's own witnesses have testified that the team was not "disbanded" but only "reorganize[ed]." Putnam's Head of HR has testified,

> ...I am <u>not sure what you mean by disbanding</u>.  <u>There was a reorganization</u>,....[Steve] Dexter continued to be part of that team and ...have a management role,...[and]...Nathan Eigerman.. remained as Portfolio Manager,[5]

and Stephen Oristaglio testified that he "reorganized" the team, deciding that Steve Dexter, who

---

[3] Hearings on December 12, 2005; January 20, 2006; June 21, 2006; July 11, 2006; August 8, 2006; August 28, 2006; October 26, 2006; and January 4, 2007.

[4] .There was a Scheduling Conference on September 15, 2006, and, after Svensson's objections were filed, a Status Conference on January 8, 2007, concerning the technical difficulty in producing a complete transcript of the January 4, 2007, hearing, and to clarify the orders entered by the court which are the subject of the Objections.

[5] Tibbetts deposition, p. 141-142

remained on the team, "would be best suited to manage the assets...."  While males were kept on the reorganized team to prosper, Svensson was demoted back to research

5.    **The claim,p. 2, that "Svensson misrepresented facts as to O'Malley is not true.**

The Putnam claim that "Svensson had misrepresented certain facts about the performance of [Christopher O'Malley] is not true.  As she has testified in her deposition, Svensson never misrepresented anything about O'Malley to the Putnam firm.  Rejecting a suggestion of portfolio manager Justin Scott in late 2002 that the team would be better off without O'Malley, Svensson, in early 2003, worked with O'Malley to improve his job performance in dealing with the various portfolio managers.  In this regard, Svensson conferred with the portfolio managers who had complained to her about O'Malley.  She did not inquire of the managers who had not complained about him.  Later in 2003, she sought the advice of the HR department in crafting a warning letter to O'Malley, as his performance had not improved to an adequate degree.  Svensson never represented to her then superior, Joshua Brooks, or to any one else that she had discussed complaints about O'Malley with all of the portfolio managers.

6.    **Putnam's claim, p. 3, that it produced "over 5,000" pages is misleading in the extreme**

The Putnam opposition fails to disclose that it was only as the result of the orders and directions of the court at the June 21, and July 11, 2006, hearings that Putnam, three months after the June 1, 2006, close of the discovery period unredacted the documents produced in heavily redacted form during the discovery period.  The Putnam strategy of redaction presented substantial difficulties in depositions, which had to be and were taken during the discovery period.  For example, when shown in deposition some of the numerous redacted documents Putnam produced

5

and asked about them, defendant Lasser, Putnam's former Chief Executive Officer, testified, at p.

11, "You showed me a bunch of blank pages, so it's hard to remember. (Emphasis added.)

Moreover, it was not until September 1, 2006, three months after, the close of the

discovery period, that Putnam answered interrogatories and produced unredacted documents.

Unredacting at this late date was very prejudicial to Svensson.  For example, Putnam document

PRM-1531, which stated in the redacted form in which it was produced,

> Christine had a good point about not posting some of these PM moves.
> Specifically, the Male move and back filling him.  I need to understand were [sic]
> Steve O is with regard to Lisa Svensson and if not her, I think we should post the
> job,"

(emphasis added) when produced on September 1 as PRM-5728, identified the name of the

"male" whose identity had been kept secret, as that of Tino Sellito, one of Svensson's 91

comparators.  Had the document been produced in unredacted form during the discovery period,

Svensson would have been able to request the production of Sellitto's personnel file in her

Second Request for Production.

**7.    The claim, p. 3, that Putnam "produc[ed] 11 witnesses" for deposition is incorrect.**

Putnam did not "produc[e] 11 witnesses for deposition."  It did not "produce"

former Putnam investment professional Lauren Allansmith who testified that she had been

demoted by Putnam while on maternity leave and later had been fired.  Nor did Putnam

produce Darren Peers, who was subpoenaed to a deposition in California where he works;

nor did it produce Konstantin Stoev, whose deposition was taken by Svensson only as the

result of a court order over the opposition of Putnam.

**8     The claim, p. 3, that the Magistrate Judge "explicit[ly] instruct[ed]... [Svensson]...to promptly narrow her late and overbroad discovery requests" is not true.**

The claim on p.3 that the Magistrate Judge, "explicit[ly] instruct[ed]...

[Svensson] ...to promptly narrow her late and overbroad discovery requests" is not true.  In

fact, the transcript of the October 26, 2006, hearing insofar as any "instructions" are

concerned show that the court was directing its comments to both parties:

> Page 24, THE COURT: Okay, then <u>sit down and confer</u> within one week...to <u>see if you can get together on this E discovery</u>...and I think what you better think long and hard about is coming to some resolution between yourselves because you might not like what I do.

> Page 32, THE COURT: Well <u>as to all the E issues I want you to sit down and meet and confer</u>.

> Page 32, THE COURT: No, <u>I want you to</u> sit down and try and see if you can narrow and figure out that whatever you're going to have to, you're going to do has to be done by January 4th.

> Page 51, THE COURT: Enough.  Time.  We've gone this far.  My ruling today will reflect that I've allowed it to the extent stated on the record...in open court. <u>As to everything remaining and the E issues, I want you to sit down</u>...<u>and see what you can work out</u> because let me tell you I'm not about to allow much more.  Eight weeks left, the time is narrow ....

> Page 52, THE COURT: <u>Sit down, discuss the rest</u>...  <u>Because it's really getting</u>... <u>tedious</u>.

(Emphasis added.)

**9.    <u>The claim, p. 4, that Putnam never took the position that Svensson has no comparators is not true and that it made numerous offers to provide information is disingenuous.</u>**

Putnam refused until September 1, 2006, three months after the close of the

discovery period and only as the result of the June 21 and July 11 hearings to produce

documents or answer interrogatories about any Putnam investment professionals other

than Svensson.  Its claims to have offered information as to "relevant' comparators were

attempts to get Svensson to settle for far less than she was and is entitled to.  For

7

example, in March 2003, when Svensson's counsel tried to negotiate a fair resolution of the comparator discovery issue, Putnam's counsel refused to negotiate, stating in a March 23, 2006, e-mail, "The new list of comparators...<u>will not</u>...<u>result in</u>..."<u>un-redacting" any additional, previously produced documents....</u>"(Emphasis added.)

**10.** **<u>Any claim, p. 4, of reliance by Putnam on the results of the December 13, 2005, hearing on the issue of comparators is misplaced.</u>**

Any reliance by Putnam on the results of the December 13, 2005, hearing on the issue of comparators is misplaced because the court below made clear that the denial was without prejudice ("as to those individuals <u>at this time."</u>) (Emphasis added.)

**11.** **<u>Putnam's criticism, p. 5, of some of Svensson's comparators is not based on fact.</u>**

Putnam's criticism at p. 5 of some of Svensson's 91 comparators "could not possibly be comparators" .is incorrect and disingenuous for the following reasons: (1) The "two bosses," one of whom (Brooks) was hired laterally, and the other of whom Swift, and also comparator Gorman who were promoted, to those positions, when promotion was denied to Svensson, had no more investment experience or tenure at Putnam than Svensson; (2)  persons "managing different investment products in different business units" is a false distinction as Putnam compared investment professionals across the Division.[6]  (3) Third, the members of "senior management" referred to were are comparators who either had been promoted above Svensson even though she had had similar investment experience and tenure or they had not been demoted despite their poor investment performance; (4) The "junior analyst" was O'Malley, who, shortly after Putnam, at the instigation of O'Malley, fired Svensson, became a

---

[6] <u>See</u> Oristaglio deposition, p. 96, Q....investment professionals within the investment division were compared with each other? A. They would need to be, <u>because the bonus pool was allocated to the Investment division and then it was the responsibility of the division to equitably distribute it among the various people...</u> (Emphasis added.)

portfolio manager responsible for the same fund that Svensson had managed; and, (5) Svensson did not include "the male she replaced [Falvey] when he was terminated in 2002" because Falvey's Putnam tenure (less than three years) was less than Svensson's.

**12.    The claim, p. 5, that the "parties" sought a ruling from the Court is not true**.

The Putnam claim, p.5, that the "parties sought a ruling from the Court" (emphasis added) is not true.  The court below held hearings on June 21 and July 11, 2006, on Svensson's motion that resulted in answers to interrogatories and unredaction of documents as to comparators on September 1, 2006, three months after the discovery period had ended.

**13.    The claim, p. 6, that Svensson's serving of her Second Request for Production in April 2006, was not timely is incorrect and disingenuous.**

Putnam, at p. 6, criticizes Svensson for serving her Second Request for Production on April 28, 2006, as not timely.  This is incorrect as the Second Request was served within the discovery period that ended on June 1.  Notably, Putnam served its Second Request upon Svensson the very same day.

**14.    The claim, p. 6, that Svensson waited more than 4 months, until October 10, 2006, to move to compel production of documents is disingenuous and incorrect.**

As set out in detail in her Objections, Svensson's counsel began in June 2006 and continued for weeks thereafter what turned out yet again to be fruitless attempts to negotiate discovery issues with Putnam.  Because Putnam refused to offer even a counter proposal, Svensson had no choice but to file her motion to compel production.  In doing so, she substantially reduced the scope of virtually all categories of the request.[7]

Svensson filed her motion to compel on October 10, 2006, because that was the date that the Magistrate Judge on September 15 had ordered as the filing date.

---

[7] See Svensson's October 25, 2006, reply memorandum, which sets out category-by-category the positions of both parties as to the categories of the second Request.

**15.**     **The claim, p. 6, that at the time of the October 26 hearing, the Magistrate Judge had "managed discovery in this case for a year and a half, is incorrect.**

The claim, p. 6, that at the time of the October 26, 2006, hearing, the Magistrate Judge had "managed discovery in this case for a year and a half" is not correct.  The first order referring any matter in this case to Magistrate Judge Bowler was on November 28, 2005, Docket No. 29.  The October 26, 2006, hearing was 11 months, not "a year and a half" later.

**16.**     **The claim, p. 6, that directions of the Magistrate Judge on October 26, were "warnings" only to Svensson is not correct.**

The directions of the Magistrate Judge on October 26, on both e-mail and non-email issues, despite the Putnam claims on p.6 were for both sides to negotiate and work out the issues, not "warnings" only to Svensson.  See §§ 1-8, supra.

**17.**     **The claim, p. 6,  that Svensson at the hearing "declined" the "instruction" to "disclose her...search terms" is incorrect and disingenuous.**

Putnam's claim, p. 6, that Svensson "declined" the Magistrate Judge's "instruction" at the October 26 hearing to "disclose her proposed...search terms" is incorrect and disingenuous. When Svensson's counsel who urged the court to apply the new e-discovery rules was asked to state Svensson's e-mail search terms, said,

> ... If I thought that this would be something we would be doing at the courthouse today, I would have asked [the consultant] to be with us ...but that is not the case.  And I don't want to be in the position..of just shooting from the hip off the top of my head and coming out with a few words.  Mr. Kociubes...would, would seize upon those words and say that's your search term, take it or leave. That's not what the new [e-discovery] rules [amendments] contemplate. [The n]ew rules contemplate, as I read them, people sitting down, free exchange of information as to what the capabilities of the system is and trying to work together, work it out.... We haven't done that yet.

(Emphasis added.

18.   **The claim, p. 7,  that Svensson waited a month before complying with the wishes of the Magistrate Judge expressed at the October 26 is wrong.**

Putnam claims, p.7,  that Svensson "waited nearly a full month" after the October 26 hearing before complying with the wishes of the Magistrate Judge expressed at that hearing is not based on the facts as it fails to disclose the following important matters.  On November 8, 2006, Svensson's counsel had an approximately one hour with Putnam counsel because the court had directed counsel "to sit down and see what you can work out" as to the remaining categories of documents in the Svensson Second Request for Production that had not been ruled upon.[8]  In that conference, Svensson's counsel identified and discussed with Putnam's counsel the items of the Second Request that Svensson considered to be discrete documents as to which no e-mail issue was involved, and at the conclusion of the conference, Putnam's counsel said that they would get back to Svensson's counsel with Putnam's position on each.  Id.  A November 10, 2006, Putnam counsel e-mail states,

> ... we expect to...to produce the documents ordered.....next Monday or Tuesday. We should...be able to get back to you by then on the categories...enumerated in our call.....

(Emphasis added.)  On November 17, 2006, Svensson's counsel sent to Putnam's counsel a questionnaire (copy filed herewith as Exhibit "B" also an exhibit to the Panos Affidavit.  The covering e-mail states,

> The attached [questionnaire] sets out the information that will help us move forward with discussion of the e-mail issues.... Please let me know if Putnam will supply the information requested... so that we might discuss this matter on a more informed basis.

(Emphasis added.) On November 21, 2006, Putnam  responded, not with any  answers but with a question as to item No. 5, and despite the identification of such persons in Svensson's October 26 motion papers a "list of individuals whose e-mail boxes you propose to have searched."

---

[8] Affidavit of John K. Weir, dated February 13, 2007, filed herewith as Exhibit "A."

Svensson's counsel replied the next day:

> As you know, the questionnaire I sent over to you folks (copy attached) requests, in the spirit of the new e-discovery rules as discussed with Judge Bowler, basic information needed to help us understand Putnam's computer systems and capabilities as they may affect resolution of the e-mail discovery issues in this case. Thus, I was disappointed to see that the Putnam response so far consists only of questions about one of the 19 categories rather than the information requested. Nonetheless,...Item No. 5 was intended as an inquiry as to the search terms that Putnam has used and./or would propose to use to obtain the information; but we have no problem in presenting to Putnam some possible search terms that we have developed.  They are set out in the other attachment. Of course, we reserve the right to make refinements....  In response your other...question, wherever...the term "decision-makers" is used..., we are seeking the e-mails to or from any one or more of the following ten decision-makers:...[names]...which e-mails concern one or more of the employees or lateral hires named in the... categories ...discussed in our reply memorandum.

(Emphasis added.)  Attached to that e-mail was another copy of the November 17, 2006 questionnaire and a list of Svensson's proposed search terms.

Putnam did not respond for almost three weeks.  On December 12, 2006, without answering the questionnaire, it announced  Putnam's refusal to discuss production of any of the e-mails requested and, despite the direction from the court on October 26, 2006, to "sit down and see what you can work out," and the promises made by Putnam's counsel in the conference call on November 8 and in the November 10 e-mail, Putnam's counsel never got back to Svensson to discuss further or negotiate the discrete documents, waiting for a month until December 13, 2006, when Putnam  filed its "Motion for a Protective Order Terminating Further Discovery." Id.

**19.    The claim, p. 7, that the Panos Affidavit "admitted" that Svensson's "search terms would result in "false-positive" hits" is not true.**

Putnam would have the court believe that the Panos Affidavit "admitted" that all of Svensson's "proposed search terms likely would result in "false-positive" hits."  This is not true.  In fact, it expressly states that Svensson's search terms are "reasonable as they are limited

in number and complexity of search."  Noting that only "some" of the terms "may" result in false

hits, the Panos affidavit states, that those search terms be used in conjunction with other, relevant

terms to yield a higher likelihood of responsive hits, noting also that,

> The search methodology and terms may require modification depending upon the
> answers to the technological and other inquires set out in the
> questionnaire....(emphasis added).

**20.    Putnam, at pp. 8 and 14, fails to disclose that the facts of Pullano v. USB/Paine
Webber, upon which it relies, distinguish Pullano from the present case.**

Putnam, pp. 8 and 14, relies heavily upon Pullano v. USB/Paine Webber, 2006 WL

2987739 (W.D.N.Y., June 29, 2006) in which the court dealt with an order of a Magistrate Judge

that "no further motions regarding discovery issues shall be filed with the Court" but Putnam fails to

disclose key points that distinguish Pullano .  First, the Putnam claim, p. __, that Pullano "upheld

the  magistrate's ruling" is wrong. The court "modified" the ruling.  Moreover, there is no

statement in Pullano of the facts that led the to the statement that the plaintiff was "largely

responsible" for discovery "dragg[ing] on."  In the present case, it has been Putnam's refusals to

make discovery that has taken the time of the court since the June 1, 2006, close of the

discovery period.

**21.    The claim, p. 12, that Svensson was ordered "to narrow both her electronic and
paper discovery requests" and to "decide what you really need," is wrong.**

Putnam claims, p. 12,  that on October 26, the court below "ordered [Svensson] to

narrow both her electronic and paper discovery requests" and to "decide what you really need.

" This is incorrect.  First, the transcript shows that that Magistrate Judge at the October 26

hearing never said that Svensson was to "decide what you really need."  Moreover,  as shown

above, the court's remarks in this regard were to both parties to "sit down...and see what you can

work out." (Emphasis added.)

**22    There is nothing in the record upon which the Magistrate Judge could have made a finding that production of the non-email documents categories would be too "burdensome and expensive' to produce.**

At no point during or before the January 4, 2007, hearing on Putnam's motion for a protective order terminating further discovery, did Putnam by affidavit or otherwise place into the record any facts upon which the court properly could conclude that that production of the non-email documents categories would be too "burdensome and expensive' to produce. Moreover, on October 26, , having said after ruling on Category 14 that the mater had become "tedious," the court did not hear argument on any of the other discrete items at issue, directing the parties to "see what you can work out."  Notably, virtually all of the Putnam memorandum in support of its protective order motion and what its counsel said at the hearing, was devoted to e-discovery issues and not the non-e-mail items.

Significantly, the orders at issue, both as originally entered and as clarified January 8, 2006, t makes clear that the Magistrate Judge, having failed to do so at the October 26 hearing, did not consider at or after the January 4 hearing the issues and arguments involved in regard to the non-e-mail issues.  In fact, the docket shows that the denial of the cross motion was only "implied" being "otherwise denied in light of this court's allowance of the motion for a protective order....

**23.    The claim, p. 12, that Svensson has conceded that production of the non-e-mail documents would be "burdensome or expensive" to produce is wrong.**

Putnam, p. 12, would have the court believe that in "identify[ying] two categories [of discrete document] and argu[ing] that these requests cannot be described as "burdensome or expensive" to produce, Svensson has conceded that all of the discrete non-e-mail documents at issue would be burdensome and expensive to produce.  This is entirely incorrect as a

reading of her contentions set out in her October 25, 2006, Reply Memorandum makes clear.

The following are two additional <u>examples</u> of what the Magistrate Judge did not consider.

First, it would be entirely unreasonable for any court to conclude that producing the

personnel files of the five investment professionals identified in Category No. 74 for

Allansmith, DeChristopher, O'Malley and Peers, for the reasons stated at p. 118 of

Svensson's Reply memorandum,[9] and for Paul Warren, at, among others, p. 110,[10] would be

burdensome or expensive.  Nor could any court reasonably conclude that production of the

document requested by Category No. 65 ("the 'anonymous' letter concerning [Paul] Warren [a

comparator of Svensson], which is referred to at p. 357 of the McNamee deposition"[11] would be

burdensome or expensive.

24.    **The claim, p. 13, that "Svensson...failed to demonstrate how each...discovery**
       **request she makes... has any relevance..." is not true.**

Putnam claims, p. 13, that "Svensson...failed to demonstrate how each and every

specific discovery request she makes... has any relevance..."  This is entirely incorrect.  In

regard to each and every non-e-mail and e-mail category of requested documents, Svensson, as

set out in detail in her October 25, 2006, Reply Memorandum shows for each and every one of

them, why the documents sought, are, within the meaning of Rule 26 relevant to here claims.

---

[9] "The files requested are relevant in order to show in comparison to the treatment of Svensson (1) the treatment of DeChristopher who, according to PRM 4026, had "poor three years performance record" and a "volatile personality" yet was promoted in 2003 while Svensson was terminated; (2) the treatment of Allansmith who was fired and had been demoted while on maternity leave; (3) the treatment of O'Malley, who complained about Svensson, and whose complaints, at least in part, according to Putnam,  provoked her termination and later received a promotion and  took over some of her responsibilities..."

[10] "... That he frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers excessively and accepted gifts from brokers excessively") and "They were talking about a -- someone leaving the group and that would leave a hole in the work...and he stood up and grabbed his crotch and said, "You could fill it with this"

[11] . <u>See</u> note 10, <u>supra</u>.

For two examples concerning the relevance of the non-e-mail categories, see the discussion, including the footnotes, in the immediately preceding § 24.  As an example of the relevance of the various e-mail categories, Svensson's Reply Memorandum concerning category No. 15,[12] which states, in part,

> The criteria used...deciding upon the...employment actions are ... relevant to the Putnam decision making process ....  Svensson will limit the scope ...to the comparators identified in the argument sections to Nos. 1 and 2, above (22 of the 91 comparators: 16 males...[names] and six females:[names]....  The subject matter... is... relevant as bearing on why it was that Svensson was demoted...years after she had been promoted from research to a PM position, and then fired, while males were not demoted but promoted.

**25..    The PDPR ("Performance and Development Planning and Review Form") documents requested for production in Svensson's December 27, 2006, cross motion should be ordered produced because the denial of that request at the October 26 hearing was obtained upon a misrepresentation of fact by Putnam counsel as to the nature of the document and the court refused at that time to give Svensson's counsel an opportunity to present the facts to the court.**

The PDPR ("Performance and Development Planning and Review Form") is a discrete document used, according to the Putnam 30(b)(6) deposition, to "provide an opportunity for managers and employees to discuss performance evaluations" and "shared with senior management."[13] Notably, the PDPR contains numerical and other ratings of the performance of investment professions at Putnam.  A copy of a PDPR for Svensson (McNamee Dep. Exh.22)  is is filed herewith as Exhibit "C."  However, at the October 26, 2006, hearing, Putnam counsel in opposing production of PDPRs for the Svensson comparators did not indicate to the court the true nature of the PDPRs; instead making it appear to the court that the PDPRs were in nature the same

---

[12] "All documents and things concerning the actual criteria used by Putnam for deciding whom of Svensson [and/or any of the 91 Comparators] should be or would be demoted in the period since January 1, 2002: A. From Portfolio to any other professional position...; B. From ADR to any other professional position...; C. From CIO to any other professional position...; D. From ADR to Analyst...; E.  From CIO to ADR...."

[13] Rule 30(b)96) deposition, pp. 2276-78.

as the on-going HR update reports, production of which he also opposed.  Svensson's counsel said

to the court,

> The next on would be No. 8....  This is year end reviews, <u>documents called PVPR's</u>
> <u>[sic], which is a term of art</u>, performance reviews, investment division and ISD
> Human Resources updates.  <u>These are forms and things that they do at Putnam that</u>
> <u>evaluate the performance of people</u>.....  <u>And the reason we're asking for it is that we</u>
> <u>need to see how</u>...<u>Putnam evaluated</u>...<u>Ms. Svensson in relation to the Comparators</u>...,

and then Putnam's counsel, the court and Svensson's counsel said the following:

> MR. KOCIUBES:  <u>This is really not a discreet group...</u>there was with respect to the
> Human Resources update what the various of the Human Resources, and it wasn't consistent
> throughout the time but what the various Human Resource officers did and remember at
> one point there are 7,000 employees-...<u>every week they would write effectively on a</u>
> <u>computer a memo with everything, it's a diary, everything they worked on</u>. The universe
> is 7,000 employees..... And what happens a lot of times is week after week they're the
> same because there has been, nothing new has happened....(emphasis added)

> THE COURT: Denied.

> MR. MOLONEY: Your Honor, may I be heard on that just very briefly?

> THE COURT: No, I think I've heard enough on that one.   Moving on.
(Emphasis added.)

Thus, the denial of an order for production of the PDPRs was based upon a

misrepresentation of the nature of the documents, and the court below did not allow Svensson's

counsel to correct the record for the court.  This court should order the PDPRs to be produced.

## 26.    The claim, p. 15, that the Magistrate Judge "was under no obligation to apply the amendments to Rule 26," is not correct.

The Putnam claim, p. 15, that the Magistrate Judge "was under no obligation to

apply the amendments to Rule 26," is not correct; nor is its contention that the court below

was free in unguided discretion to apply or not apply the new rules.  The rule expressly states

that the amendments, effective December 1, 2006, "<u>shall govern</u> ...insofar as just and

practicable, all proceedings then pending." (Emphasis added.)  Despite Putnam's

contentions, there must be in the record an adequate factual basis for a finding and an express finding made by the court, neither of which is present in the instant case, that for reasons stated in the record, it is not "just and practicable" to apply the amendments. The court below made no such findings, nor would the record before the court support any such finding.

Even if this court were to conclude that e new amendments do not apply, the relevant case law set out in Svensson's December 27, 2007, memorandum, which is Exhibit J to the Objections, supports Svensson's position that the court below did not have an adequate factual basis before it for any e-discovery decision-making.

**27.** **Putnam's contention, p. 15, that the Magistrate Judge's granting of the motion for protective order insofar as concerns e-discovery was not clearly erroneous or contrary to law, fails to take into account that there was no adequate factual basis for the courts decision and that the record is devoid of any finding of fact by the court below that would be necessary to support the order.**

Putnam's contention that the Magistrate Judge's granting of the motion for protective order insofar as concerns the e-discovery was not clearly erroneous or contrary to law, fails to take into account the facts (1) that there was no adequate factual basis in the record for the Magistrate Judge's decision to grant the motion for a protective and (2) that the record is devoid of any finding of fact by the court below that would be necessary to support the order.

Putnam would have this court not only accept at face value the less than reliable affidavits of Breen (hearsay) and Bento (speculation) but also would have the court ignore: (1) the entirety of Panos Affidavit, when, in fact, as shown in § 2, above, the affidavits on key points are in sharp conflict; (2) the fact that Putnam failed to provide the information requested in the November 17 questionnaire; and, (3) the fact that the court below rejected Svensson's request for a neutral expert to sort out the conflict and provide to the court an adequate factual

basis for e-discovery decision-making.

Even if this court were to conclude in the face of the unresolved conflicts in the Breen, Bento and Panos affidavits and the otherwise sparse, if not non-existent, record in the court below, that the e-mail related documents sought are as "inaccessible" as Putnam claims, that does not end the analysis. For the reasons set out in Svensson's analysis and survey of the case law, see exhibit J to the Objections, there are at least two other steps required. The first is that the documents must be produced if the requesting party shows good cause for the production. Svensson has done this in this case as shown in the prior sections of this memorandum and in her Reply memorandum filed October 25, 2006. The other step, if the court were to conclude that good cause has been shown, is the consideration of cost sharing. LISA SVENSSON,

> plaintiff,
>
> By her attorneys,
>
> BARRON & STADFELD, P.C.
>
>
> /s/ Kevin F. Moloney
> Kevin F. Moloney BBO No. 351000
> 100 Cambridge Street, Suite 1310
> Boston, Massachusetts 02114
> Tel.: 617.723.9800/531.6569
> and
> /s/ John K. Weir
> John K. Weir, Admitted PHV
> 300 Park Avenue, Suite 1700
> New York, New York, 10022
> Tel.: 212.572.5374

February 14, 2007

<u>Certificate of Service</u>.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

> /s/ Kevin F. Moloney

Dated: February 14, 2007

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * *   *    Civil Action No. 04-12711-PBS
                          *
LISA SVENSSON             *
                          *    BBO No. 351000
        Plaintiff,        *
                          *    Affidavit
v.                        *    of
                          *    John K. Weir
PUTNAM INVESTMENTS,       *
LLC f/k/a PUTNAM INVEST-  *    (Declaration pursuant
MENTS, INC. and LAWRENCE  *    to 28 U.S.C. §1746)
J. LASSER,                *
                          *
        Defendants.       *              *
* * * * * * * * * * * *   *
```

1.   My name is John K. Weir.  I have been admitted PHV to
     practice in this court in this case and I am co-counsel for
     plaintiff Lisa Svensson ("Svensson").  I have personal
     knowledge of the facts set forth herein.

2.   On November 8, 2006, my co-counsel, Kevin F. Moloney and I
     had a conference call of approximately one hour in length
     with counsel for defendant Putnam Investments, LLC
     ("Putnam") concerning, as the court had directed, "to sit
     down and see what you can work out" as to the remaining
     categories of documents in the Svensson April 28, 2006,
     Second Request for Production that the court at the October
     26, 2006, hearing had not heard oral argument or ruled upon.
     In that conference, we identified and discussed with
     Putnam's counsel the items that plaintiff considered to be

discrete documents as to which no e-mail issue was involved.
At the conclusion of the conference, Putnam's counsel said
that they would get back to us with Putnam's position on
each of those items.  On November 10, 2006, Putnam's counsel
sent an e-mail stating in part,

> Lastly, we expect to be able to produce the
> documents ordered by Magistrate Bowler next
> Monday or Tuesday.  We should also be able to get
> back to you by then on the categories from the
> Second Request that you enumerated in our
> call.....

(Emphasis added.)

Despite the direction from the court on October 26, 2006,
to "sit down and see what you can work out," and the promises
made by Putnam's counsel in the conference call on November 8
and in the November 10 e-mail, Putnam's counsel never got back
to us to discuss the discrete documents, never attempted with
us to negotiate to "see what [we could] work out."  They
waited for a month, until December 13, 2006, when they filed
Putnam's "Motion for a Protective Order Terminating Further
Discovery," which followed an e-mail on December 12 in which
they announced Putnam's refusal to produce any of the e-mails
requested.

Signed under the penalty for perjury this 13th day of

2

February 2007.

/s/  John K. Weir

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.

/s/ Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

Dated: February 13, 2007

## Certificate of Service

    This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney

Dated: February 13, 2007

[386659.1]

3

Exhibit B

1.   Is there for the period January 1, 1999, through December
     31, 2004, a document retention policy ("DRP") in place?

     _____

2.   Is there for the period January 1, 1999, through December
     31, 2004, an e-mail retention policy in place?

     _____

3.   Is there a litigation hold in place? _____

4.   Where is the data being stored?

          Back Up Tapes _____

          Local Hard Drives _____

          Network Drives _____

          Blackberries _____

          Palm Pilots _____

          Flash Drives _____

          External Media
          (CD/DVD/Diskettes) _____

          Home Computers _____

          Cell Phones _____

          HR/Accounting/CRM Database(s) _____

          Internet Based e-mail Accounts _____

          In-House Instant Messaging_____

5.   Proposed Key Words/Search Terms?  Attach separate sheet)
     (to include, among other things, the named persons set out
     in the Svensson reply memorandum)

6.   What is the mail server and version being used?

          Microsoft Exchange 5.5 Service Pack 4 ___

_____

Lotus Notes R5 _____

Lotus Notes _____

Microsoft Exchange 5.5 _____

Lotus Domino _____

Microsoft Exchange 5.0 _____

Lotus CC: Mail _____

7.  Define Duplicate

Identical metadata and identical Custodian _____

Identical metadata and different Custodian _____

8.  What is the backup Software and version being used?

Arcserve 2000 _____

Backup Exec. 8.6 _____

NT Backup _____

Other _____

9.  What type of backup media is being used?

DLT IV (40/70/80GB) _____

A1T (A1T1, A1T2, A1T3) _____

DLT 11 (20GB) _____

DTF (DTF1, DTF2) _____

DAT (DDS2, DDS3, DDS40 _____

LTO (LTO1, LTO2, LT03 _____

10. What type of tape drives are being used?_____
_____

2

11.  How many tapes do you anticipate having? _____
     _____

12.  Are the tapes at capacity? _____

13.  What is the retention/recycle process for back up tapes?
     _____
     (daily, weekly, monthly, quarterly, incremental, full)

14.  How are the tapes labeled? - Organized/labeled by date,
     custodian, server, etc.?_____

     _____

15.  Earliest Dated Back Up Tape - Email? _____

16.  Earliest Dated Back Up Tape - NAS? _____

17.  Have there been any server/software/OS migrations? ____

          From What?    To What?  Date of Migration?

          _____

          _____

          From What?    To What?  Date of Migration?

          _____

          _____

18.  Review - What type of review tool do you propose to use?

     In House Software _____

     Online Review Tool _____

     Paper Review _____

19.  Production:

          Paper _____

          Native Files_____

          Tiff + Bates Number _____

3

Tiff + Metadata _____

Other: _____

CD _____

DVD _____

Hard Drive _____

[378224.1]

*453 – 80 – 8855*

# PUTNAM INVESTMENTS

# Performance and Development Planning and Review Form for Incentive Eligible Employees

*Employees in a structured incentive plan (i.e., Partners, Associates and Principals, and Salespersons)*

| | |
|---|---|
| **Name:**  **Lisa Svensson** | **Department/Division: International Growth** |
| **Job Title:**  **PM, SVP** | **Manager's Name:**  **R Swift** |
| **Review Period:**  **1999** | **Mid Year Review Date:** |
| **Time in Current Position:**  **2 years** | **Year End Review Date:**  **Dec 99** |

## PART I: PERFORMANCE PLANNING

### *GUIDELINES*

- *At the beginning of the review period, the manager and employee agree on all business goals, specific measures/deliverables and weightings.*
- *Business goals and/or key deliverables may be modified/adjusted if the employee's priorities change during the year.*
- *Prior to the mid year discussion, the manager completes the comments section and rates/scores performance results to date, before calculating a mid year score; the mid year rating is normalized to reflect year to date performance results only.*
- *During the mid year discussion, the manager and employee discuss performance to date for all business goals.*
- *At the end of the review period, the mid year process is repeated, but mid year ratings/scores are not calculated into year end ratings/scores.*
- *Supporting documentation and data may be attached, as needed.*
- *The following criteria should be used to rate performance:*

| Ratings | Criteria |
|---|---|
| 5.0 | Exceeds all goals and standards consistently at a superior level of excellence and significantly impacts performance results |
| 4.5 | Exceeds all goals and standards consistently and significantly impacts performance results |
| 4.0 | Exceeds all goals and standards consistently and contributes fully to performance results |
| 3.5 | Meets and often exceeds performance goals and standards |
| 3.0 | Meets performance goals and standards |
| 2.5 | Does not meet some performance goals and standards |
| 2.0 | Does not meet most performance goals and standards |
| 1.5/1.0 | Does not meet performance goals and standards |



**EXHIBIT**

*McNamee 22*
*11/29/05 A.D.*

*13*

PRM 00324

PART I: PERFORMANCE PLANNING, CONTINUED

*Business Goals – key business objectives/initiatives planned for the employee during the review period:*

| BUSINESS GOALS<br><br>Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | MEASURES/DELIVERABLES<br><br>Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | %<br>Weighting<br><br>(All Business Goals must total 100%) | Mid Year<br>(Rate only performance results to date) | | Year End<br>(Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| | | | Rating<br>(1-5) | Score<br>(% Weight-ing X Rating) | Rating<br>(1-5) | Score<br>(% Weight-ing X Rating) |
| Investment Related<br><br>1.  Establish Global ex Japan Growth product for NAMCO/Putnam JV<br><br>     Take lead PM role and define product | Performance relative to benchmarks<br>Client and asset growth<br>Investment process stabilized<br><br>Assimilation and involvement of Core Growth and IPM teams | 30% | | | 4.5 | 1.35 |

Evaluation/Comments:

Significant outperformance of client benchmarks continues. Rank in the top decile of competitors, since inception.

Assimilation of IPM team into client relationship accomplished. Manny Weiss integrated into sleeveless structure. Clear and sensible stock selection methodology developed and implemented.

Clients in product at 50 versus 28 at beginning of year. No client losses, and quality of assets high, with no benchmark exceptions.

| BUSINESS GOALS<br><br>Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | MEASURES/DELIVERABLES<br><br>Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | %<br>Weighting<br><br>(All Business Goals must total 100%) | Mid Year<br>(Rate only performance results to date) | | Year End<br>(Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| | | | Rating<br>(1-5) | Score<br>(% Weight-ing X Rating) | Rating<br>(1-5) | Score<br>(% Weight-ing X Rating) |
| 2.  Contribute to International growth product performance and definition Contribute to Putnam performance, and marketing | Work as an active and contributing team member on Global, EAFE and aggressive growth mandates.<br><br>Participate at rebalances, and various meetings where appropriate. Eg morning meeting; IPC | 40% | | | 5 | 2 |

PRM 00325

## PART I: PERFORMANCE PLANNING, CONTINUED

**Evaluation/Comments:**

All products are in the top decile of institutional lists over 1,3 years. Both mutual funds have 5 star ratings. Lisa is a critical member of a $20 bn team

Lisa argues forcefully and provides insight at investment meetings. Two examples need highlighting for 1999. First, in the second quarter she was vocal and articulate on why the Global Growth group should not chase Value stocks -- a major contributor to performance this year. Second, her observations at the January IPC on why Putnam should raise exposure to Japanese equities, and in July, her advocacy for tech stocks in the USA.

She markets well in both retail and institutional environments. She has supported Cisalpina well.

I do like the fact that she is decisive and consistent, never suffering from revisionism.

One of the risks of being a tight team member is the degree of exclusivity or exclusion, which results. I think Lisa should think about extending her terms of reference when she needs opinions on portfolios and stocks and currencies.

I think she could sometimes appear more open to alternate viewpoints. I would like to see people feel they can approach Lisa for investment opinions. She has been absolutely right in the last 2 years about which stocks and industries to own. I think she is very open and can accept contrary opinions, she just doesn't come across that way -- occasionally.

| BUSINESS GOALS

Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | MEASURES/DELIVERABLES

Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | %
Weighting

(All Business Goals must total 100%) | Mid Year
(Rate only performance results to date) | | Year End
(Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| | | | Rating (1-5) | Score (% Weight -ing X Rating) | Rating (1-5) | Score (% Weight -ing X Rating) |
| 3. Widen investment knowledge | Develop knowledge on multiple countries and sectors.

Develop insights on currencies, and risk management tools.

Learn more about and implement quantitative tools | 15% | | | 4.5 | .68 |

**Evaluation/Comments:**

Significant increase in country and sector knowledge has resulted from Lisa's assiduous travel and research agendas. She now possesses knowledge on a very wide range of sectors, and countries. She is able to comment on many investment topics in a succinct manner.

Lisa has been a strong contributor at the quant. meetings. Her progress in this respect, and in developing her presentation skills, make her a senior investment professional, capable of representing the group and Putnam.

1999 was a volatile year, and the best evidence that I have that Lisa is a senior investment professional, is that she didn't get sucked into buying value stocks or pressed into changing the investment process.

See attached comments from Rick Harris in Sales, and Ann Marie Lydon

| BUSINESS GOALS

Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | MEASURES/DELIVERABLES

Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | %
Weighting

(All Business Goals must total 100%) | Mid Year
(Rate only performance results to date) | | Year End
(Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| | | | Rating (1-5) | Score (% Weight -ing X Rating) | Rating (1-5) | Score (% Weight -ing X Rating) |

PRM 00326

## PART I: PERFORMANCE PLANNING, CONTINUED

| 3.<br>Mentor MBAs; identify talent | | | | | | |
|---|---|---|---|---|---|---|
| | Integrate Jason Kritzer into Putnam Investments.<br><br>Provide stimulating and challenging internship for MBA candidates<br><br>Interview and uncover MBA talent.<br>Lead the Cornell MBA campus effort | 15% | | | 5 | 0.75 |

**Evaluation/Comments:**

Jason Kritzer, Stephen Ikle, Allison Thacker all contributed positively in 1999. We enticed Steven Ikle to join Putnam, competing with Capital, Fidelity, and other top names.

Jason Kritzer is now contributing enormously, and in a team-oriented fashion — ie enhancing rather than duplicating other groups' research work. See attached comment from Kim Nauen for contribution to MBA hiring and mentoring

| BUSINESS GOALS<br><br>Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | MEASURES/DELIVERABLES<br><br>Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | %<br>Weighting<br><br>(All Business Goals must total 100%) | Mid Year<br>(Rate only performance results to date) | | Year End<br>(Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| | | | Rating<br>(1-5) | Score<br>(%<br>Weight<br>-ing X<br>Rating) | Rating<br>(1-5) | Score<br>(%<br>Weight<br>-ing X<br>Rating) |
| 4. | • | | | | | |

**Evaluation/Comments:**

PRM 00327

**PART II: DEVELOPMENT PLANNING**

| | | |
|---|---|---|
| Calculate a mid year rating as follows:<br><br>If 100% of the goals are rated, add the scores for a total rating; OR<br><br>If less than 100% of the goals are rated, add the scores and divide the total by the percentage of goals/deliverables being evaluated at mid year.  Example: total mid year score of 2.45 ÷ 70% (.70 of goals) = 3.5 | Mid<br>Year<br>Rating: | |
| Total the year end scores of all goals/deliverables to calculate a year end rating. | | Year<br>End<br>Rating:    4.78 |
| Final mid year and year end performance ratings must be rounded up or down to the nearest whole number or .5 decimal, e.g., 3.2 ≻3.0, 3.3 ≻3.5; do not calculate the mid year rating into the year end rating. | Mid Year Rating: | Year End Rating:    4.78 |

PRM 00328

## PART II: DEVELOPMENT PLANNING

### *GUIDELINES*

- *At the beginning of the review period*, the manager and employee:
  - Discuss the competencies below; identify additional competencies, if needed.
  - Select three (3) strengths and three (3) areas for development.
  - Develop an action plan to leverage the employee's strengths and improve areas for development.
- *During the mid year discussion,* the manager and employee provide examples and discuss the employee's progress to date, as it relates to the competencies selected as strengths and areas for development.
- *At the end of the review period,* the manager completes the ratings, provides examples of progress against the plan, and discusses this section with the employee.

| COMPETENCY | DEFINITION |
|---|---|
| 1. Seasoned Judgment | Applies broad knowledge when addressing complex issues; defines strategic issues clearly; makes timely, tough decisions. |
| 2. Strategic Thinking | Keeps abreast of global trends and has a clear, long-term vision for the business; translates broad strategies into specific objectives and action plans. |
| 3. Financial Acumen | Understands key financial indicators and uses financial analysis to evaluate strategic options and opportunities. |
| 4. Intellectual Versatility | Performs well on conceptually complex and difficult tasks; grasps and integrates new information and ideas rapidly. |
| 5. Driving Execution | Assigns clear authority and accountability; monitors results; tackles problems directly and within a timely manner. |
| 6. Fundamental Business Thinking | Understands and is driven by both the company's and customer's needs and expectations; practices continuous improvement and experimentation with that in mind. |
| 7. Attracting and Developing Talent | Attracts high caliber talent; accurately appraises and provides feedback to develop staff; develops successors. |
| 8. Empowering Others | Creates a climate that fosters personal involvement; gives people the opportunity to grow and achieve; promotes teamwork. |
| 9. Influencing and Negotiating | Promotes ideas and proposals persuasively; shapes opinions; works through conflicts; negotiates win/win situations. |
| 10. Leadership | Adapts style and approach to match the needs of different individuals and teams; encounters tough situations with tenacity but knows when to move on. |
| 11. Building Relationships | Cultivates an active network of relationships inside and outside the organization; develops trust and treats all individuals fairly and with respect; maintains high standards of integrity. |
| 12. High Impact Delivery | Delivers clear, convincing, and well-organized presentations; projects credibility and confidence. |
| 13. Drive for Success | Sets and pursues aggressive goals; demonstrates a strong commitment to the organization's success. |
| 14. Entrepreneurial Risk Taking | Champions new ideas and initiatives; identifies new business opportunities and makes them a reality. |
| 15. Building on Differences | Recognizes differences as potentially complementary; uses differences to gain broader perspectives; values and seeks out a wide array of views |

**Development Plan** – *key developmental opportunities to be leveraged and/or enhanced during the review period:*

| STRENGTHS TO LEVERAGE | ACTION PLAN/TIMELINES (including new ways to use or teach the strength, as applicable) | RATING (High, Solid, Low) | EXAMPLES OF PROGRESS AGAINST PLAN |
|---|---|---|---|
| 1. High Impact delivery | • Continue to expand marketing role | High | • Finals wins and feedback from Sales. |
| 2. Attracting and Developing talent | • Work with Tom Kurey to introduce him to PM role<br>• Continue work with MBAs | High | • Speed with which Tom adapts to new role |
| 3. Seasoned Judgement | • Increase the assets Lisa manages<br>• Extend Lisa's product responsibilities | High | • Group performance |

PRM 00329

**PART II: DEVELOPMENT PLANNING, CONTINUED**

| AREAS FOR DEVELOPMENT | ACTION PLAN/TIMELINES (Including on-the-job learning, stretch assignments, coaching opportunities, formal education, etc., as applicable) | RATING (High, Solid, Low) | EXAMPLES OF PROGRESS AGAINST PLAN |
|---|---|---|---|
| 1.  Building Relationships | • Extend further into Core Growth and Specialty growth, but also other teams. Through 2000. | Solid | • |
| 2.  Leadership | • Take various roles at stock and portfolio meetings. Through 2000. | Solid | |
| 2.  Influencing and Negotiating | • Take "devil's advocate role" in portfolio meetings<br>• Devise and introduce a better portfolio construction method to the group in 2000 | Solid | • |

**PART III: MANAGERS' SIGNATURE AND ADDITIONAL COMMENTS**

Reviewing Manager: __Robert Swift__                                    Date: __12/23/99__

General Comments:

recommend Lisa Svensson be promoted to "Senior Portfolio Manager"

Lisa works in the International large cap growth team, responsible for $15bn of assets in a variety of mandates.

Lisa is the lead portfolio manager on the global ex Japan accounts. These represent 10% of the Putnam / Namco asset base and their performance is a critical issue in the joint venture.

**Investment Skills**

Lisa has been an investment professional for 12 years. This experience has been gained in first class sell side, and buy side companies.

The Putnam Global Growth team has built a 1 & 3-year, first quartile performance record for all global and EAFE products. Lisa has been a key, contributing member of the team that is responsible for this track record. Given the performance and competitive positioning, we believe these products will become major franchises for Putnam. Lisa has been fully involved in every stage of the development of this new business and should be recognized for her crucial role.

Lisa has been involved in portfolio management for many years. Prior to joining the Global Growth Team, Lisa developed and managed research funds. She pioneered the development of Lord Abbott's research fund in 1993. Later at Putnam, she was an integral member of the team that developed and launched Putnam's successful research product.

She has an enormous replacement cost.

Lisa's research efforts have not terminated as she transferred to portfolio management. She is responsible for finding and modeling many of the important foreign positions in our portfolio. This represents an exemplary way to work and collaborate with the analyst teams.

Her convictions about Mannesmann and the changing nature of its business, prompted a change in analyst coverage from the engineering team to the telecom. team – this made Putnam clients a huge amount of money. Her work on FSAS and Hikari in Japan have been particularly fruitful, and her convictions on these companies have encouraged other portfolio teams to buy the stocks – again making Putnam clients huge amounts of money. Other noteworthy research efforts, illustrating the diversity of her skills, were Elan, an Irish pharmaceutical, Ito En, the Japanese producer of green tea drinks, Sidel, a specialized French machinery company, and Securitas, a Swedish securities services company. Currently, she is developing, with our Investment Associate, a more robust framework for analyzing internet related companies such as the free ISP in the

PRM  00330

**PART II: DEVELOPMENT PLANNING, CONTINUED**
U.K., FREESERVE.

Team Management

The portfolio management team for Global mandates, is a cross group team, and Lisa provides clear, sound and driving leadership in the relevant meetings. She has developed a separate and commercial process and identity for the portfolios.
There are over 40 institutional clients in the product – already one of the largest institutional client bases at Putnam.
This is a key role in a critical product for Putnam, and is one of our best performing.

Personal Development as a Senior Investment professional

She has already done extensive "finals" marketing and client service work in Japan, and North America.  Lisa is now an experienced presenter. She has been an integral member of the team that has presented three times to Frank Russell.  Lisa has presented EAFE growth to CALPERS, State of Illinios, and Father Flanagan.
(For further reference, please contact Ann Marie Lydon, Manny Weiss, Frank Porcelli, and Rick Harris).

She has passed on best ideas to Specialty Growth who have benefited enormously from her Japanese buy recommendations and her UK sell recommendations.
At the end of the year, she is liasing with GER to help out, in the absence of any oil analysts.

Lisa has a CFA, and MBA, from Cornell. She gained a Conoco scholarship to Texas A&M.

**PART II: DEVELOPMENT PLANNING, CONTINUED**

Senior Manager Approval: _____     Date: _____

**PART IV: EMPLOYEE'S SIGNATURE AND COMMENTS**

Employee: _____     Date: 1/25/00

A signature means performance results have been reviewed and discussed with the employee; it in no way implies the employee agrees with the contents of the performance appraisal as documented. This space is provided for the employee to comment on his/her performance appraisal and/or to clarify his/her perception of the performance documentation.

09/30/99                    PDPR Form for Incentive Eligible Employees                    10

PRM 00332

**PART II: DEVELOPMENT PLANNING, CONTINUED**

Comments:

The performance management system is a desirable paradigm, but not one that will necessarily be followed in every case

PRM 00333