UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

```
* * * * * * * * * * * *   *    Civil Action No. 04-12711-PBS
                          *
LISA SVENSSON,            *
                          *    BBO No. 351000
          Plaintiff,      *
                          *
                          *    Memorandum of Plaintiff
v.                        *    Svensson in Response to
                          *    the Directions and Questions
                          *    of the Court (Saris, D.J.)
                          *    at the February 15, 2007,
PUTNAM INVESTMENTS LLC,   *    Hearing on Svensson's
et al.,                   *    Objections to the Rulings
                          *    of the magistrate Judge
          Defendants      *
                          *
* * * * * * * * * * * *   *
```

Plaintiff Lisa Svensson ("Svensson") submits this
memorandum in response to the directions and questions of the
court (Saris, D.J.) at the February 15, 2007, hearing ("February
15 hearing") on Svensson's Objections ("Objections") to the
rulings of the Magistrate Judge on January 9 and 17, 2007,

1.  <u>Introduction.</u>

Svensson's Objections concern production of the documents
requested by her in her April 28, 2006, Second Request for
Production of Documents ("Second Request"), as limited in scope
by Svensson in, and by, her October 10, 2006, motion to compel
production ("motion to compel production") and memorandum in
support, filed on October 10, the date set by the court (Bowler,
M.J.), as supplemented by, and further discussed in, Svensson's

October 25, 2006, Reply Memorandum ("October 25 Reply
Memorandum"), a copy of which, including Exhibits A and B
thereto, which has been marked to show more clearly the
separation between the contentions of the parties as to one
category of the Second Request for Production from the following
category, is filed herewith as Exhibit "1."  The October 25
Reply Memorandum includes in one document on a category-by-
category basis the original categories of the Second Request,
the reductions in scope made in the Svensson motion to compel
production, and the respective contentions and positions of each
party on each of the categories at issue as set forth in their
respective filings.  The Objections also concern the Svensson's
December 27, 2006, Opposition to the December 13, 2006, Putnam
Motion for a Protective Order Terminating Further Discovery,
which includes her cross-motion to compel production.  A copy of
Svensson's December 27, 2006, Opposition and Cross motion is
filed herewith as Exhibit "2."

At the October 26, 2006, hearing before the Magistrate
Judge on Svensson's motion to compel production, which sought
production reduced in scope from Svensson's original Second
Request, the court (Bowler, M.J.), as set out in the transcript
of the hearing, considered the first 14 of the 76 numbered
categories of the request (which no longer included Nos. 20 and
21 and Nos. 41 and 42), as Svensson had withdrawn them);

directed Putnam to produce certain documents such as the "360" reports requested in Category No. 7 ("on 21 identified males and 12 identified females," the Court: "To be produced for those individuals"), which were not completely produced, see § 7, p. 9, infra., and the "documents concerning the membership structure and jurisdiction of the [Putnam] operating committee," requested by No. 12, which, according to the court were "to be produced," but were not produced; and directed Putnam to serve a sworn statement of an authorized officer that the requested documents "do not exist" if that was the Putnam position as to any category requested; and instructed the parties to discuss the e-mail issues and the other categories not ruled upon. See § 6, p. 9, infra. Since the February 15 hearing, Svensson, given court ordered unredaction of certain documents and the obtaining of certain deposition testimony, Svensson has considered further Category Nos. 22-27(relating to payment of Darren Peers' graduate business school tuition), No. 44 (certain bonus worksheets), No. 55(certain salary and bonus information) and No. 64(amounts of the bonuses allocated) and, without waiving her position that e-mail documents should be produced, withdraws those categories insofar as they concern non e-mail documents.

At the February 15, 2007, hearing on the Objections, the court (Saris, D. J.) ruled that it would not order the

production of any further e-mail and inquired of Svensson's counsel as to the matters set forth below.

2.  <u>The documents presently before the court for decision</u>.

The requested documents presently before the court for rulings are the categories of non e-mail documents, which, with the exception of the request in Category No. 8 for production of the PDPRs ("Performance and Development Planning and Review" forms") were not ruled upon by the Magistrate Judge.[1]  In particular, given the court's February 15 ruling to exclude e-mail and Svensson's withdrawals of certain categories, the documents at issue, which are fully described in, and limited in scope by, Svensson's October 25 Reply Memorandum, are the non-e-mail documents of Category Nos. 15-19; Nos. 23-40; No. 43; Nos. 45-54; Nos. 56-63; and Nos. 65-76.  A copy of Svensson's October 25 Reply Memorandum, including Exhibits A and B thereto, which has been marked to show more clearly the separation between the contentions of the parties as to one category from the following category is Exhibit "1" hereto.

3.  <u>Svensson relies upon the arguments made in her October 25 Reply Memorandum, in her Objections and in her February 14, 2007, Reply Memorandum, and, in regard to the PDPRs ("Performance and Development Planning and Review" forms) that she requested in Category No. 8, Svensson relies in addition upon the arguments made in § 25, at pp. 16-17 thereof.</u>

_____

[1] Svensson contends that the Magistrate Judge's ruling denying production of the PDPRs was based upon a misrepresentation by Putnam to the court of the true nature of the PDPRs.  <u>See</u> p. 5 and note 2, <u>infra</u>.

For purposes of the rulings on the documents at issue, Svensson relies upon the arguments made in support of her motion to compel as set out in (1) her October 25 Reply Memorandum (Exhibit "1" hereto); her January 24, 2007, Objections (Exhibit "3" hereto) and in her February 14, 2007, Reply Memorandum (Exhibit "4" hereto). In particular, for Svensson's responses to Putnam's claims concerning relevance see pp. 1-5 of her October 25 Reply memorandum, and for a category-by-category comparison of the positions of the parties starting on p. 5 thereof; in regard to the PDPRs ("Performance and Development Planning and Review" forms) that Svensson requested in Category No. 8, which Svensson contends was denied to her upon a misrepresentation of fact to the court at the October 26, 2006, hearing as to the nature of the document by Putnam, Svensson relies additionally upon the arguments made in § 25, at pp. 16-17 of her February 14, 2007, Reply memorandum, a copy of which is Exhibit 4, hereto. A copy of § 25 set out in footnote 2, below.[2]

---

[2] "The PDPR ("Performance and Development Planning and Review Form") is a discrete document used, according to the Putnam 30(b)(6) deposition, to "provide an opportunity for managers and employees to discuss performance evaluations" and "shared with senior management."[2] Notably, the PDPR contains numerical and other ratings of the performance of investment professions at Putnam. A copy of a PDPR for Svensson (McNamee Dep. Exh.22) is filed herewith as Exhibit "C." However, at the October 26, 2006, hearing, Putnam counsel in opposing production of PDPRs for the Svensson comparators did not indicate to the court the true nature of the PDPRs; instead making it appear to the court

4.  <u>Svensson's comparators</u>.

    In response to the questions of the court at the February 15

hearing, the male investment professionals in Putnam's IMD who

Svensson contends are her comparators for purposes of Svensson's

disparate treatment claims, are by name and by employment action[3]

---

that the PDPRs were in nature the same as the on-going HR update
reports, production of which he also opposed.  Svensson's counsel said
to the court:

> The next on would be No. 8....  This is year end reviews,
> <u>documents called PVPR's [sic], which is a term of art</u>,
> performance reviews, investment division and ISD Human
> Resources updates.  <u>These are forms and things that they do
> at Putnam that evaluate the performance of people</u>.....  <u>And
> the reason we're asking for it is that we need to see
> how...Putnam evaluated...Ms. Svensson in relation to the
> Comparators...</u>,

and then Putnam's counsel, the court and Svensson's counsel said the
following:

> MR. KOCIUBES:  <u>This is really not a discreet group...</u>there was
> with respect to the Human Resources update what the various of
> the Human Resources, and it wasn't consistent throughout the time
> but what the various Human Resource officers did and remember at
> one point there are 7,000 employees-...<u>every week they would
> write effectively on a computer a memo with everything, it's a
> diary, everything they worked on</u>. The universe is 7,000
> employees..... And what happens a lot of times is week after
> week they're the same because there has been, nothing new has
> happened....(emphasis added)
> THE COURT: Denied.
> MR. MOLONEY: Your Honor, may I be heard on that just very
> briefly?
> THE COURT: No, I think I've heard enough on that one.
> Moving on."

(Emphasis added.)

    Thus, the denial of an order for production of the PDPRs was
based upon a misrepresentation of the nature of the documents, and the
court below did not allow Svensson's counsel to correct the record for
the court.  This court should order the PDPRs to be produced.

---

[3]     (1) Males first employed by Putnam as, or promoted by Putnam to,
       Managing Director between January 1, 2000, and September 15,
       2003; (2) Males not demoted from Portfolio Manager positions in
       2002;(3) Males with Higher compensation 2002-20034; and, (4) Males
       either (a) not removed from management, (b) not terminated or (c) not
       forced out in August-September 2003.

identified in Exhibit 3 to the Fourth Affidavit of Lisa
Svensson, filed June 8, 2006, a copy of which is filed herewith
as Exhibit "5" hereto; and the male and female investment
professionals in the Putnam IMD who Svensson contends are her
comparators for purposes of Svensson's disparate treatment
claims[4] are by name and by employment action identified in
Exhibit 4 to the Fourth Affidavit of Lisa Svensson, filed June
8, 2006, a copy of which is filed herewith as Exhibit "6"
hereto.

The factual bases for Svensson's contentions that the males
and females identified in Exhibits 5 and 6 hereto are her
comparators, are set out in Exhibits "1" and "2" to the Fourth
Affidavit of Lisa Svensson, filed June 8, 2006, copies of which
are filed herewith, respectively, as Exhibits "7" and "8"
hereto.

---

[4]       (1) Males and females first employed by Putnam as, or considered
       for promotion to, or promoted by Putnam to,  Managing Director
       between January 1, 2000, and September 15, 2003; (2) Males and
       females eligible to be demoted from Portfolio Manager positions in
       2002: (3) Males with higher compensation compared to females
       between  2002-2003: and,
       (4) Males and females either (a) not removed from
       management, (b) not terminated or (c) not forced out in August-
       September 2003.

5.    <u>Managing directors</u>.

In response to the court's question at the February 15 hearing concerning as to who became managing directors, the following, according to information in Putnam's answers to interrogatories, became managing directors for the years 1999 - 2003:

>    1999 Males (2): Mark Pollard; Paul Warren; Females (4):
>         Debbie Farrell, Pam Holding, Kelly Morgan, Debbie
>         Kuenstner.
>
>    2000 Males(4): Jeff Lindsey, Michael Mufson, Leo Smith,
>         Many Weiss; Females (3): Elizabeth MacElwee-Jones,
>         Rosemary Thomsen, Yumiko Sai.
>
>    2001 Males (6): John Boselli, Joshua Byrne, Tony
>         Elavia, Stephen Gorman, Hugh Mullin, William
>         Sullivan; Females (1): Margaret Smith.
>
>    2002 Males (6): Richard Block, Rob Bloemker, David
>         Hamlin, Jeff Knight, Andrew Matteis, James Prusko;
>         Females (0).
>
>    2003 Males (0); Females (0).

6.    The <u>"Sworn statement issue</u>."

At the October 26, 2006, hearing, the Magistrate Judge when told by Putnam counsel that certain documents "do not exist," directed Putnam to serve, where applicable, a sworn statement of an authorized office of the company to that effect. <u>See</u>, for example, transcript, p. 44. However, more than two months later, at noon on January 3, 2007, the day before the hearing of the Putnam motion for a protective order terminating discovery, Putnam served a statement but it was not the statement of non-

existence ordered by the court on October 26.  A copy of the

Putnam document, with emphasis added, is filed herewith as

Exhibit "9."  The phrases "produced all documents that it was

able to locate" and "has not discovered any documents or things"

and the numerous conditions set out on p. 4 thereof above the

signature[5] make it clear that Putnam has not complied with the

direction of the court.

7.    The "360' reports issue.

On October 26, 2006, the court ordered Putnam to produce

the annual review report forms known in the Putnam world as

"360s," but Putnam produced 360s for only some of the years in

question and for one of the produced years, failed to include in

the production the "comments" section; and it took the position

via an e-mail from Putnam counsel, that 360s for the other years

did not exist, only to admit, when presented with evidence from

Putnam's own documents, that they did exist for which Putnam was

looking.  Insofar as Svensson is able to determine, Putnam is

still looking.

LISA SVENSSON, plaintiff,

By her attorneys,

---

[5] ...The Sworn Statement set forth are based on, and therefore
necessarily limited by, either my own personal knowledge or the
records and information still in existence, presently recollected,
thus far discovered in the course of the preparation of these answers,
and currently available to Putnam.  Subject to the limitations set
forth herein, the foregoing Statements are accurate to the best of my
present knowledge....

BARRON & STADFELD, P.C.

/s/ Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
BARRON & STADFELD, P.C.
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: February 21, 2007

Certificate of Service.

     This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney

Dated: February 21, 2007

[387554.1]

EXHIBIT 1-1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \*
                     \*
LISA SVENSSON           \*

         Plaintiff,       \*
                     \*
v.                       \*
                     \*
PUTNAM INVESTMENTS,   \*
LLC f/k/a PUTNAM INVEST-   \*
MENTS, INC. and LAWRENCE   \*
J. LASSER,               \*
                     \*
         Defendants.      \*
                     \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

Civil Action No. 04-12711-PBS

BBO No. 351000

Reply Memorandum
of Plaintiff Lisa
Svensson to Defendant
Putnam Investments LLC's
Opposition to Svensson's
Motion to Compel Production
of the Documents and Things
Requested in her Second
Request for Production

FILE

Plaintiff Lisa Svensson submits this Reply Memorandum to the opposition of defendant Putnam Investments, LLC ("Putnam") to her motion to compel production of the document and things requested in her Second Request for Production ("Second RPOD") because in its opposition ("Opposition"), Putnam has asserted incorrect or improper objections; in some cases, has misstated the facts; in some cases, omitted other material facts; in some cases has mischaracterized Svensson positions and contentions; and in some cases has misstated applicable law.

Svensson also files this memorandum in reply to set out in one document on a category by category of the Second RPOD, the category of documents requested, the Putnam objections; the Svensson argument in support of her motion, the Putnam opposition to the motion and Svensson's reply.

As matters preliminary to the category by category discussion that begins on p. 5, infra, Svensson submits the following five points for consideration by the court:

1. Putnam is wrong in its objections that continue to claim that Svensson has no

comparators based upon <u>Jackson</u> v. <u>Harvard University</u>, 111 F.R.D. 472 (D. Mass. 1986). and

<u>Whittingham</u> v. <u>Amherst College</u>, 164 F.R.D. 124 (1995). As set forth more particularly in

Svensson's reply memorandum filed June 8, 2006 (<u>see</u> the excerpt in footnote 1 below), Putnam's

arguments are based upon misrepresentation of the facts and incorrect statements of the law and

neither case precludes Svensson from obtaining production of the document requested in the

Second RPOD.[1]

---

[1] "At the hearing [on December 13, 2005] Putnam's counsel urged the court to rely upon <u>Jackson</u> v.<u>Harvard University</u>, 111 F.R.D. 472 (D. Mass. 1986). and <u>Whittingham</u> v. <u>Amherst College</u>, 164 F.R.D. 124 (1995), for the proposition that "typically you don't look outside of the group in which the employee is employed; that is, you look at the decisions by the same decision maker. We cited those cases in our opposition to the motion to compel, and Mr. Weir doesn't cite any contrary authority. Yet the case is pretty clear, both the Jackson case and the Whittingham case, that decisions by other people in other parts of the company aren't probative on the question of whether or not there was discrimination in her unit. Transcript, pp. I-6 through I-7. Ruling upon the motion, Magistrate Bowler made clear that she was denying the motion to compel RPOD No. 2 without prejudice, stating that the denial was "as to those individuals <u>at this time</u>." (Emphasis added.) Putnam has not explained "why" it now seeks to rely on an order issued without prejudice as the basis for preclusion.

"Further, even if Magistrate Bowler's order was not expressly without prejudice, it was still interlocutory and can and should be revised because it was based on Putnam's factual misrepresentations. By citing <u>Jackson</u> and <u>Whittingham</u> for the proposition that the only valid comparators are those persons who worked on the same investment team as Svensson (a proposition which so far has resulted in the production of no documents or information as to any comparators of Svensson), not others holding similar positions on other teams in Putnam's Investment Management Division, Putnam's counsel clearly represented as fact to the court that the various investment teams within the Investment Management Division, one of at least four divisions of Putnam, was administered in the same autonomous manner as the various virtually independent graduate schools at Harvard with regard to employment decisions. To claim that such investment teams are analogous to the independently administered graduate schools at Harvard is absurd. A more apt analogy would be to compare the graduate schools of Harvard with the other corporate subsidiaries of Putnam's corporate parent, Marsh & McLennan Companies, Inc..

"Because Magistrate Bowler's December 2005 ruling with respect to RPOD Category No. 2 was expressly without prejudice, and in any event was based on Putnam's factual misrepresentations, it does not preclude consideration of Svensson's motion to compel answers to interrogatories....

"Putnam argues in its Opposition (p. 7) that the decision in <u>Whittingham</u>, denying a plaintiff's motion to compel production of employment files, also governs the present case. However, <u>Whittingham</u> is easily distinguished. Putnam cites <u>Whittingham</u> for the proposition that,"[P]ersonnel files contain perhaps the most private information about an employee within the possession of an employer. Nonetheless, Plaintiff requests the Court to order the Defendant to hand over entire files of employees without any particularized showing that any, let alone all, of the information therein is relevant to his claims. Again, while discovery is usually broad, Plaintiff has not demonstrated that the files he seeks, even if marginally relevant, outweigh the privacy interests of these individuals." <u>Id</u>. at 127-28. While that statement may be true so far as it goes, Putnam fails to disclose to the court other portions of

(2) There is no reason "why" Putnam should not make discovery in response to the Second RPOD as to the 91 persons Svensson contends are her comparators as the court required it do when, on September 1, 2006, it answered interrogatories and produced unredacted documents in regard to those comparators.

(3) Putnam is wrong in its objections that, based upon Conward v. The Cambridge School Committee, 171 F.3d 12, 19 (1st Cir.1999), the conduct of a comparator engaging in bad conduct must be "nearly identical." As set forth more particularly in Svensson's reply memorandum filed June 8, 2006 (see the excerpt in footnote 2 below), the correct standard applicable to the present case is whether the bad conduct of the comparator is as serious or more serious.[2] Conward does not preclude Svensson from obtaining discovery in regard to

---

Whittingham that strongly support Svensson's motion to compel in the present case. The language Putnam relies on appears in a section of Whittingham in which the court denied the plaintiff applicant for promotion within the college's office of admissions discovery of the "complete personnel files of [three former minority] deans in the Admissions Office...." The court did so because plaintiff,"has made no real showing that these three individuals suffered similar treatment and, without a showing of such relevance, Plaintiff is not entitled to discovery." Id. at 127. Thus, the Whittingham court focused on the fact that the plaintiff in that case had not shown that the personnel files sought pertained to persons who had suffered similar treatment. Had such a showing been made, the court would have allowed discovery.

"In the present case, unlike Whittingham, Svensson can show that the female Putnam investment professionals whose files she seeks were similarly situated and may well have suffered similar mistreatment. Therefore, under Whittingham, the files of those other women should be discoverable. Moreover, the files of males promoted by Putnam are discoverable under Whittingham. The Whittingham court distinguished Weahkee v. Norton, 621 F.2d 1080 (10th Cir. 1980), cited by the plaintiff in Whittingham, because Weahkee concerned the, "discoverability of personnel files of those who are 'hired or promoted' over the plaintiff...." In the present case, Svensson seeks exactly the type of information at issue in Weahkee but not at issue in Whittingham: the files of males who were hired or promoted over her into the Managing Director position.

"Of course, Putnam will argue that Svensson has not provided enough evidence to prove that the comparators she identifies actually were similarly situated and actually did suffer similar mistreatment or were hired or promoted over her. The court should decline to place Svensson in such a "Catch 22" situation. The very purpose of the discovery Svensson seeks is to obtain sufficient information to establish at trial that the comparators were similarly situated."

[2] Putnam asserts that Conward v. Cambridge School Committee, 171 F.3d 12 (1999) "makes clear that the misconduct at issue must be nearly identical." Notably, however, on p. 8 of its memorandum in opposition to Svensson's motion for an order requiring Tibbetts and Oristaglio to resume their depositions, Docket No. __, Putnam acknowledged, in contrast, that while the "alleged offenses do not need to be identical, [they] 'must be of comparable seriousness'." In the context of the instant case,

comparators engaging in bad conduct such as Scott, Kamshad and Paul Warren.

(4) Putnam's conduct in refusing until September 1 to unredact documents concerning comparators and answering interrogatories is the cause for the extension of the discovery period to December 31, 2006. The charts that are Exhibits "A" and "B" to this memorandum demonstrate in vivid terms the impact of Putnam's refusals to make discovery in a proper and timely manner.

(5) That Putnam has exaggerated any issue of searching e-mails is established by a comparison of its rhetoric when last December it opposed Svensson's initial request for production when the scope was the entire Putnam workforce and the years covered commenced with 1994 ("thousands" of e-mails) with, when the scope has been dramatically reduced in terms of years (only since January 1, 1999) and persons covered (mostly e-mails of only the decision-makers and in regard to some of the limited numbers of comparators), Putnam's current rhetoric of "millions" of e-mails. It is illogical to believe that as the scope has decreased, the number of e-mails to be searched has increased.

---

Putnam is incorrect in its interpretation of <u>Conward</u> as the facts of that case are easily distinguishable.
    "Unlike in <u>Conward,</u> the comparator conduct in the present case Warren is egregious and far more serious than that alleged of Svensson. The plaintiff's difficulty in <u>Conward</u> was that, as District Judge O'Toole put it, 1998 WL 151248, *3, ___ Conward had not established that the school committee had failed to terminate teachers "outside the protected class who engaged in misconduct <u>as serious or more serious than</u> Conward's." (Emphasis added.) In affirming Judge O'Toole's grant of summary judgment to the defendant school committee, the Court of Appeals did not disagree with this statement by the District Court. In fact, the First Circuit's analysis of the facts shows that the appellate court, like Judge O'Toole in the District Court, found the conduct the plaintiff in <u>Conward</u> relied upon, was  not "as serious or more serious" than Conward's.
    "In <u>Lynn</u> v. <u>Deaconess Medical Center-West Campus,</u> 160 F.3d 484 (8th Cir. 1998), cited by Svensson at p. 14 of her initial  memorandum in support of her motion for an order to Tibbetts and Oristaglio to resume their depositions, Docket No,. __, the United States Court of Appeals for the 8th Circuit said, "To require that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination. Common sense as well as our case law dictate that we reject such an approach."



If the court is unwilling to decide that Putnam's e-mail claims are meritless without further

input on the facts from the parties, Svensson suggests that the court adopt for this case at this

point the new e-discovery rules that are to become effective on December 1, 2006, which, among

other things, would require Putnam to furnish Svensson with accurate information as to Putnam's

computer systems, search capabilities and other matters so that the parties could work out any e-

mail search issues by agreement based upon knowledge of the facts rather than over-heated

rhetoric, recognizing that under the new e-discovery rules the burden is on the responding party

to establish that it does not have to produce the requested information.

Svensson's replies to the oppositions of Putnam on a category by category basis follow:

**Svensson Request No. 1:**



All documents and things concerning the criteria actually used by the persons participating in the decision making process in deciding whether to select Svensson or any of the identified males or identified females[3] for appointment to or election as a Managing Director or Portfolio Manager in the period since January 1, 1999, whether by promotion from within the Investment Management Division, another division of Putnam or as a lateral hire from another entity.

Putnam Response No. 1: [Putnam objects to the extent this Request seeks documents [that]...have been produced... [And] to the balance [as]...unduly vague and ambiguous, overbroad, and ...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the foregoing, Putnam will produce its Career Development Guide for Equity Portfolio Manager.

Svensson's Initial Argument
in Support of Motion to Compel:

The documents requested concerning the criteria used by Putnam should be

produced as they are highly relevant to the Putnam decision making process that is at the

heart of this case.  Plaintiff Svensson ("Svensson") will accept a statement from

defendant Putnam Investments, LLC ("Putnam") that it has produced all written criteria

---

[3] The phrase "91 comparators" refers collectively to the 91 identified males and identified females that Putnam and Svensson agreed at the July 11, 2006, hearing would be deemed comparators for discovery purposes, Putnam reserving the right to contest this characterization for purposes other than discovery.



concerning Managing Director and Portfolio Management positions since January 1,

1999, and will produce any criteria for Portfolio Management Managing or Director

positions that it has not already produced.

Putnam Opposition:

- A number of deponents have already testified concerning the criteria to become Managing Director and Portfolio Manager.

- Putnam has already produced all documents setting forth such written criteria concerning this title and position, respectively.

Svensson's Reply:  If the Putnam opposition is correct as to fact, Svensson will accept a

statement under oath from an authorized Putnam official that no documents other than to

be specified unredacted Bates numbered ("PRM___") documents exist for the Portfolio

Manager and Managing Director positions.

---

Svensson Request No. 2:

All documents and things concerning the results of the application of the criteria referred to in the immediately preceding category to [Svensson], any of the [91 comparators].

Putnam Response No. 2:

To the extent this Request...relat[es] to [Svensson], such documents [already] have been produced...  [Putnam] objects to the balance...[as] unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence...[and[... further objects [as] set forth in its Opposition to the Plaintiff's motion to compel further answers to her interrogatories ("Putnam's Opposition")....

Svensson's Initial Argument
in Support of Motion to Compel:

The documents requested concerning the results of the criteria actually used by

Putnam in deciding who should be appointed to Portfolio Management and Managing

Director positions should be produced as they are highly relevant to the Putnam decision

making process that is at the heart of this case.

6

However, Svensson will reduce the scope of this request for purposes of this category of this request to the following 22 of the 91 comparators: 16 males: Mark Bogar, Richard Cervone, Steve Dexter, Nathan Eigerman, Peter Hadden, Shigeki Makino, David Gerber, David King, Jeff Lindsey, Dan Miller, Mike Mufson, Dave Santos, Tino Sellito, Brian DeChristopher, Hugh Mullin, Manuel Weiss, and six females: Beth Cotner, Lauren Allansmith, Debbie Farrell, Carmel Peters. Margaret Smith and Jeanne Mockard. [4]

Putnam Opposition:

- Putnam has already produced all lists naming each of the 91 considered for Managing Director, along with a list of those elected for each of 1999 - 2003.

- With respect to documents concerning who should be appointed to Portfolio Manager, this request would require Putnam to search an indefinite number of email boxes for 22 individuals. The request would require Putnam to locate and review potentially hundreds of thousands of emails, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- With respect to requests for information about Portfolio Managers, Ms. Svensson fails to provide any basis to believe that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply: First, the "lists" referred to do not furnish the reasons for certain comparators obtaining promotions or appointments to PM or MD positions. The lists tell the "what" and not the "why"; and it is the "why" that is key to a determination as to whether Putnam engaged in gender discrimination. The "why" has not been furnished in the prior production or in the answers to interrogatories.

---

[4] By limiting the number of comparators for purposes of this or any other category of this request from the 91 Comparators to some of them, Svensson does not waive any contention on her part that all of the 91 Comparators are her comparators.

③

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails of the decision-makers in regard to the 22 comparators referred to, not the e-mails of the 22 comparators.

---

Svensson Request No. 3:

③

In regard to the...91 Comparators...who were not promoted from within Putnam to Portfolio Manager or Managing Director but were hired on a lateral basis from anther entity in the period since January 1, 1999, all documents and things concerning communication between or among those persons participating in the decision making process as to the persons who should be elected or appointed to th[ose] position[s], and which documents and things concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to any one or more of such persons.

Putnam Response No. 3: Putnam objects...unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence...[and] on the grounds set forth in Putnam's Opposition....[and] the Request is incomprehensible to the point that it is unclear "what" additional information the Plaintiff seeks.

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning communication among decision makers as to persons being brought in from outside of Putnam to fill positions that Svensson and the female comparators were qualified are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, Svensson will reduce the scope of this request to communications among the decision makers as to the following four male comparators who were brought into Putnam from the outside: Josh Brooks, Shigeki Makino, Colin Moore and Eric

Sorensen. Based on the deposition testimony and Putnam documents produced to date,

Svensson believes that some or all of the following individuals were decision makers:

Steve Oristaglio, Jack Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman,

Josh Brooks, Brett Browchuk, Dan Miller and Justin Scott.

Plaintiff is not aware of any female comparators who fall within the scope of this

request, but if any of the 24 female comparators were rejected for immediate Managing

Director or Portfolio Manager status upon first being hired by Putnam, Svensson requests

the court to require production of documents concerning these decisions.

Putnam Opposition:

- Ms. Svensson's argument fails to explain "why" employees hired laterally are relevant to one of her claims. Because, as Ms. Svensson has learned in discovery, there was no fixed number of Managing Directors, there is no basis for believing that any laterally hired male was given the title of Managing Director to the exclusion of Ms. Svensson.

- A search for any "communication" about decisions to elect or appoint these 4 individuals would require Putnam to restore and review potentially hundreds of thousands of emails without any basis for believing that relevant communications exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims

Svensson's Reply:

First, Svensson seeks to know not the "what" and but the "why" the four identified

males were brought in from the outside over Svensson and other females who had "paid

their dues" and were qualified for the positions. It is the "why" that is key to a

determination as to whether Putnam engaged in gender discrimination. The "why" has



not been furnished in the prior production or in the answers to interrogatories.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited to only the documents including e-mails to and from the ten identified decision-makers as to the four imports.

---

**Svensson Request No. 4:**

In regard to the [91 Comparators] who were not promoted from within Putnam but were hired as a Managing Director or Portfolio Manager...from another entity in the period since January 1, 1999, all documents and things prepared or received by or on behalf of any one or more of the persons participating in the decision making process as to the persons who should be so appointed or elected to Managing Director or Portfolio Manager, and which documents and things concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to any one or more of such persons.

Putnam Response No. 4 Putnam objects...unduly vague and ambiguous, overbroad,...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence....also...on the grounds set forth in Putnam's Opposition....[and]...the Request is incomprehensible to the point that it is unclear "what" additional information the Plaintiff seeks.

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning evaluations by decision makers as to persons being brought in from outside of Putnam to fill positions that Svensson and the female comparators were qualified are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, Svensson will reduce the scope of this request to documents concerning evaluations by the decision makers as to the following four male comparators who were brought into Putnam from the outside: Josh Brooks, Shigeki Makino, Colin Moore and Eric Sorensen. Based on the deposition testimony and Putnam documents produced to

date, Svensson believes that some or all of the following individuals were decision
makers: Steve Oristaglio, Jack Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed
Haldeman, Josh Brooks, Brett Browchuk, Dan Miller and Justin Scott.

Plaintiff is not aware of any female comparators who fall within the scope of this
request, but if any of the 24 female comparators were rejected for immediate Managing
Director or Portfolio Manager status upon first being hired by Putnam, Svensson requests
the court to require production of documents concerning these decisions.

Putnam Opposition:

- Ms. Svensson's argument fails to explain "why" employees hired laterally are
  relevant to one of her claims. Because, as Ms. Svensson has learned in
  discovery, there was no fixed number of Managing Directors, there is no basis
  for believing that any laterally hired male was given the title of Managing
  Director to the exclusion of Ms. Svensson.

- A search for any "communication" about decisions to elect or appoint these 4
  individuals would require Putnam to restore and review potentially hundreds
  of thousands of emails without any basis for believing that relevant
  communications exist, and thus is grossly overbroad and burdensome for the
  reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel
  Answers to Interrogatories, Putnam does not agree that these individuals are
  Ms. Svensson's legal comparators.

- This request fails to provide any basis to suggest that responsive documents
  exist that would be relevant to one of Ms. Svensson's claims.

Svensson's Reply:

First, Svensson seeks to know not the "what" but the "why" of the four identified
males being brought in from the outside over Svensson and other females who had "paid
their dues" and were qualified for the positions. It is the "why" that is key to a
determination as to whether Putnam engaged in gender discrimination. The "why" has
not been furnished in the prior production or in the answers to interrogatories.



Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. __ , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited to only the documents including e-mails to and from the ten decision-makers as to the four imports.

**Svensson Request No. 5:**



In regard to Svensson and the [91 Comparators] and the pools of persons for consideration for appointment or election as Managing Director or Portfolio Manager at any time in the period since January 1, 1999, all documents and things concerning communication between or among those persons participating in the decision making process as to who should be included in or excluded from such pools, and which documents and things concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard...to Svensson, any of the [91 Comparators] concerning inclusion in, or exclusion from, such pools.

Putnam Response No. 5: Putnam objects...unduly vague and ambiguous, overbroad ...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further states that this court, in response to Plaintiff's November 5, 2005 Motion to Compel Defendant's Production of Documents has already limited Putnam's obligation to produce communications between and among its personnel; and Putnam has already produced such information in accordance with this court's prior ruling.

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning communication by and among decision makers as to which persons should be included in or excluded from the pools of persons to be considered for appointment or election as Managing Director or Portfolio Manager are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, Svensson will limit the scope of this category to documents prepared or received by the above-named ten decision makers (Steve Oristaglio, Jack Morgan, Tim

Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks, Brett Browchuk, Dan

Miller and Justin Scott) concerning any of the 91 Comparators in regard to such inclusion

or exclusion. This should not require search of e-mail accounts of any comparators, but

rather review of files and e-mails of only the above referred to ten decision makers.

Putnam Opposition:

- Because Ms. Svensson's name appeared on a list of potential nominees to Managing Director for each of 1999 - 2003, that one or more of the 91 also appeared on that list is not relevant to any of her claims

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of 10 former or current Putnam employees, run 91 searches, and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist. Thus the request is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:

First, Svensson seeks to know not only the "what" but the "why" of the inclusion

in or exclusion from the pools at issue. It is the "why" that is key to a determination as to

whether Putnam engaged in gender discrimination. This information has not been

furnished in the prior production or in the answers to interrogatories.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-

discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the

documents required has been drastically limited to only the documents including e-mails



to and from the decision-makers not the 91 comparators.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Fifth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

Svensson Request No. 6:



> In regard to the [91 Comparators] who were not promoted from within Putnam but were hired as a Managing Director or Portfolio Manager on a lateral basis from another entity in the period since January 1, 1999, all documents and things prepared or received by or on behalf of any one or more of the persons participating in the decision making process as to who should be so elected or appointed, and which concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to Svensson [or any of the 91 Comparators]....

Putnam Response No. 6 Putnam objects...unduly vague and ambiguous, overbroad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects to the Request on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning communication by and among decision makers as to which persons should be brought in from the outside to be appointed as Managing Director or Portfolio Manager are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, Svensson will limit the scope of this category to documents prepared or received by the above-named ten decision makers (Steve Oristaglio, Jack Morgan, Tim

Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks, Brett Browchuk, Dan

Miller and Justin Scott) concerning any of the 91 Comparators in regard to being brought

in from the outside for such appointments. This should not require search of e-mail

accounts of any comparators, but rather review of files and e-mails of only the above

referred to ten decision makers.

Putnam Opposition:

- Ms. Svensson's argument fails to explain "why" employees hired laterally are relevant to one of her claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of 10 former or current Putnam employees, run 91 searches, and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist. Thus the request is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:

First, Svensson seeks to know not only the "what" but the "why" of the decisions.

It is the "why" that is key to a determination as to whether Putnam engaged in gender

discrimination. This information has not been furnished in the prior production or in the

answers to interrogatories.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p.2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-

discovery rules should be applied to this case. <u>See</u> pp.4-5, <u>supra</u>. The scope of the



documents required has been drastically limited to only  the documents including e-mails

to and from the ten identified persons as decision-makers.

Fourth, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner."  That

simply is an assertion without proof.  Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Fifth, this request does not  seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

**Svensson Request No. 7:**

All 360s prepared or received by any person at Putnam in or for any one or more of
the reporting periods since January 1, 1999, in regard to Svensson or any one or more of
the [91 Comparators]....

Putnam Response No. 7:  To the extent this Request seeks documents relating to the Plaintiff,
such documents [already]... produced....  Putnam objects to the balance...unduly vague
and ambiguous, overbroad, irrelevant and not reasonably calculated to lead to the
discovery of admissible evidence. Putnam further objects on the grounds set forth in
Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

The "360" reviews (everyone in the Investment Management Division reviewing

everyone else) in regard to the 91 Comparators are certainly highly relevant to the

Putnam decision making process that is at the heart of this case.

However, Svensson will limit the scope of this request to the requested documents

concerning the following 21 males and 12 females of the 91 Comparators: John Boselli,

Brian DeChristopher, Steve Dexter, Nathan Eigerman, Roland Gillis, Peter Hadden, Joe

Joseph, Omid Kamshad, Dave King, Jeff Lindsey, Saba Malak, Paul Marrkand, Paul

Warren, Hugh Mullin, Mike Nance, Justin Scott, Beth Cotner, Lauren Allansmith, Jeanne

Mockard, Margaret Smith, Carmel Peters, Jean Sievert, Karen Korn, Deborah Kuenstner,

Elizabeth McElwee-Jones, Fayval Williams and Erin Spatz.

Putnam Opposition:

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 33 former or current Putnam employees.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Ms. Svensson's argument fails to provide any basis to suggest that documents responsive to this request exist that would be relevant to one of her claims exist.

Svensson's Reply:

First, the "360s" are discrete documents that contain evaluations by top

management, Svensson's peers and comparators and those whom she supervised.

Second, Svensson has limited the scope to 21 males and 12 females.

Fourth, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam

Fifth, this request does not seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

17



Finally, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>.  <u>See</u>  p. 2 , <u>supra</u>.

EXHIBIT 1-2

---
**Svensson Request No. 8:**
---



> All documents and things concerning year end reviews, performance reviews, Investment Division & ISD Human Resources Updates, PDPRs and other documents analyzing or evaluating work performance in the [Investment Management Division], that were prepared or received by any person at Putnam in or for any one or more of the reporting periods since January 1, 1999, in regard to Svensson [and/or] any one or more of the [91 Comparators].

Putnam Response No. 8:  To the extent this Request seeks documents relating to the Plaintiff, such...have been produced.... Putnam objects to the balance...unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

The Year end reviews, performance reviews, Investment Division & ISD Human

Resources Updates, Performance Development and Planning Reviews (PDPRs) and

other documents analyzing or evaluating work performance in the [Investment

Management Division] are certainly highly relevant to the Putnam decision making

process that is at the heart of this case.

However, Svensson will limit the scope of this request

to the 91 Comparators.

Putnam Opposition

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- This request fails to provide any basis to suggest that responsive documents



exist that would be relevant to one of Ms. Svensson's claims.

Svensson's Reply:

First the reviews requested are discrete documents. They will show, for example,

if a male who was promoted or paid more received lower evaluations than Svensson

received when she was not promoted or was demoted.

Second, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam

Third, this request does not  seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.

---

**Svensson Request No. 9:**

All documents and things concerning the factual basis(es) of any numerical score in any 360s, year end reviews, performance reviews, Investment Division & ISD Human Resources Updates, PDPRs and/or other documents concerning analysis or evaluation of work performance in the Investment Management Division, that were prepared or received by any person at Putnam in or for any one or more of the reporting periods since January 1, 1999, in regard to Svensson [and/or] any one or more of the [91 Comparators]....

**Putnam Response No. 9:** The 360s and performance reviews are self-explanatory; and Putnam does not possess any document or other thing that provides a factual basis of any numerical score for any type of performance review. To the extent...seeks the underlying performance reviews of [Svensson], Putnam has provided those documents in response to the Plaintiff's first request for documents. To the extent this request seeks the underlying performance reviews of the identified males or females, Putnam objects ...overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the grounds set forth in



Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

> The documents concerning the factual bases of any numerical score in any 360s,
> year end reviews, performance reviews, Investment Division & ISD Human
> Resources Updates, PDPRs and/or other documents concerning analysis or evaluation
> of work performance are certainly highly relevant to the Putnam decision making
> process that is at the heart of this case.
>
> However, Svensson will limit the scope of this request to the requested
> documents concerning the following 21 males and 12 females of the 91 Comparators:
> John Boselli, Brian DeChristopher, Steve Dexter, Nathan Eigerman, Roland Gillis, Peter
> Hadden, Joe Joseph, Omid Kamshad, Dave King, Jeff Lindsey, Saba Malak, Paul
> Marrkand, Paul Warren, Hugh Mullin, Mike Nance, Justin Scott, Beth Cotner, Lauren
> Allansmith, Jeanne Mockard, Margaret Smith, Carmel Peters, Jean Sievert, Karen Korn,
> Deborah Kuenstner, Elizabeth McElwee-Jones, Fayval Williams and Erin Spatz.

Putnam Opposition

- As Putnam stated in its initial response to this request, no relevant documents
  exist.

Svensson's Reply: If the Putnam opposition is correct as to fact, Svensson will accept a statement
under oath from an authorized Putnam official that none of the requested documents
exist.

---

Svensson Request No. 10:



> All documents and things concerning the organizational structure and/or jurisdiction of the
> Investment Management Division as existing at any time or from time to time in the period
> since January 1, 1999.



**Putnam Response No. 10:** Putnam objects... unduly vague and ambiguous, overbroad,...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence...Putnam further objects to producing documents concerning the period after the Plaintiff's termination [as] such information is unrelated...and/or not reasonably calculated to lead to the discovery of admissible evidence. Without limiting the foregoing, Putnam will produce organizational charts responsive to the Request.

Svensson's Initial Argument
in Support of Motion to Compel:

Putnam's Tibbetts testified in deposition at p. 48, l. 8 – p. 49, l. 9, that after a

certain period, Putnam kept organizational charts on-line. If this testimony is accurate,

the organizational charts on-line which have not previously been produced for the period

after January 1, 1999, should now be produced. If the testimony is not accurate,

Svensson will accept a statement under oath that Putnam has already produced all

organizational charts for the relevant period, together with any document(s) that identify

changes to the organizational structure of IMD after the organizational charts ceased to

be prepared.

Putnam Opposition:

Putnam has previously produced all documents relevant to this request.

Svensson's Reply: If the Putnam opposition is correct as to fact, Svensson will accept a statement

under oath from an authorized Putnam official that none of the requested documents other

than to be specified unredacted Bates numbered ("PRM___"), exist.

Svensson Request No. 11:



All documents and things concerning the administrative reporting relationships within the Investment Management Division as existing at any time or from time to time in the period since January 1, 1999.

Putnam Response No. 11:

To the extent that the Plaintiff seeks information other than that contained in the organizational charts, Putnam objects on the grounds that the Plaintiff has failed to define "administrative



reporting relationship" and...vague, ambiguous, and difficult to understand. Without limiting the foregoing, Putnam will produce the organizational charts responsive to the Request in response to Svensson's Reply:

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

Putnam's Tibbetts testified in deposition at p. 48, l. 8 – p.49, l. 9, that after a

certain period, Putnam kept organizational charts on-line. If this testimony is accurate

the organizational charts on-line which have not previously been produced for the period

after January 1, 1999, should now be produced. If the testimony is not accurate,

Svensson will accept a statement under oath that Putnam has already produced all

organizational charts for the relevant period, together with any document(s) that identify

changes to the organizational structure of IMD after the organizational charts ceased to

be prepared.

**Putnam Opposition:**

Putnam has previously produced all documents relevant to this request.

**Svensson's Reply:** If the Putnam opposition is correct as to fact, Svensson will accept a statement

under oath from an authorized Putnam official that no documents other than to be

specified unredacted Bates numbered ("PRM___") documents exist for the Portfolio

Manager and Managing Director positions.

---

**Svensson Request No. 12:**



All documents and things concerning the membership, structure and/or jurisdiction of the Operating Committee as existing at any time or from time to time in the period since January 1, 1999.

**Putnam Response No. 12:** Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**Svensson's Initial Argument**

(13)

in Support of Motion to Compel:

      The membership, structure and/or jurisdiction of the Operating Committee are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

      However, Svensson will limit the scope of this request to documents that identify the membership and duties and responsibilities of the Operating Committee in regard to promotions, transfers, demotions, compensation or terminations of Svensson and/or any of the 91 Comparators in each year since January 1, 1999.

Putnam Opposition

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner.

- This request would require Putnam to restore the email boxes of scores of former and current employees, and run a searches with no outer limits. The request would require Putnam to locate and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

Svensson's Reply:

      First, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

      Second, obtaining the requested documents is not likely to involve search of e-mails.

Svensson Request No. 13:

23

(13)

All documents and things concerning the membership, structure and/or jurisdiction at any time or from time to time in the period since January 1, 1999, of the [Investment Division Management Committee].

Putnam Response No. 13: Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without limiting the foregoing, Putnam will produce documents responsive to the Request.

Svensson's Initial Argument
in Support of Motion to Compel:

The membership, structure and/or jurisdiction of the Investment Division Management Committee are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, Svensson will limit the scope of this request to documents that identify the membership and duties and responsibilities of the Investment Division Management Committee in regard to promotions, transfers, demotions, compensation or terminations of Svensson and/or any of the 91 Comparators in each year since January 1, 1999.

Putnam Opposition:

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of scores of former and present employees, and run 91 separate searches on each. The request would require Putnam to locate and review potentially hundreds of thousands of emails, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:



First, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Second, obtaining documents as to the identity of the "membership and duties and responsibilities" of the committee referred to "in regard to promotions, transfers, demotions, compensation or terminations" is not likely to involve search of e-mails.

Third, such a committee is relevant as it is a key to Putnam decision-making as it affected Svensson.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam

Fifth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, Putnam is wrong on Jackson and Whittingham. See p. __ , supra.

---

**Svensson Request No. 14:**



All documents and things concerning the membership, structure and/or jurisdiction of any committee or entity howsoever known or described, other than the IDMC or the Operating Committee, which had or has any administrative function or responsibility concerning Svensson, any of the [91 Comparators]...at any time or from time to time in the period since January 1, 1999.

Putnam Response No. 14: Putnam objects to this Request on the grounds that is unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the

discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

The membership, structure and/or jurisdiction of any committee or entity howsoever known or described, other than the IDMC or the Operating Committee, which had or has any administrative function or responsibility concerning Svensson, and/or any of the [91 Comparators]are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, Svensson will limit the scope of this request to documents that identify the membership and duties and responsibilities any such other group of decision makers for decisions in regard to promotions, transfers, demotions, compensation or terminations of Svensson and/or any of the 91 Comparators in each year since January 1, 1999.

Putnam Opposition:

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of scores of former and present employees, and run 91 separate searches on each. The request would require Putnam to locate and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:

First, it is not true that "Putnam has already provided all objective data



necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Second, obtaining documents as to the identity of the "membership and duties and responsibilities" of the committee referred to "in regard to promotions, transfers, demotions, compensation or terminations" is not likely to involve search of e-mails.

Third, such a committee is relevant as it is a key to Putnam decision-making as it affected Svensson.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam

Fifth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.

Svensson Request No. 15:



All documents and things concerning the actual criteria used by Putnam for deciding whom of Svensson [and/or any of the 91 Comparators] should be or would be demoted in the period since January 1, 2002:

    A.   From Portfolio Manager to any other professional position within the Investment Management Division;

    B.   From ADR to any other professional position within the Investment Management Division;

    C.   From CIO to any other professional position within the Investment

Management Division;

D.   From ADR to Analyst within the Investment Management Division;
     and/or,

E.   From CIO to ADR within the Investment Management Division.

Putnam Response No. 15: Putnam objects inasmuch as it did not "demote" Svensson.....
Putnam has already produced all documents with respect to any transfer of the
Plaintiff. Putnam objects to the balance...[as] unduly vague and ambiguous,
overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of
admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

The criteria used by Putnam in deciding upon the above referred to employment

actions are certainly highly relevant to the Putnam decision making process that is at the

heart of this case.

However, Svensson will limit the scope of this request to the comparators

identified in the argument sections to Nos. 1 and 2, above (22 of the 91 comparators: 16

males: Mark Bogar, Richard Cervone, Steve Dexter, Nathan Eigerman, Peter Hadden,

Shigeki Makino, David Gerber, David King, Jeff Lindsey, Dan Miller, Mike Mufson,

Dave Santos, Tino Sellito, Brian DeChristopher, Hugh Mullin, Manuel Weiss, and six

females: Beth Cotner, Lauren Allansmith, Debbie Farrell, Carmel Peters. Margaret Smith

and Jeanne Mockard).

Putnam Opposition:

• This request fails to provide any basis to suggest that responsive documents exist
  that would be relevant to one of Ms. Svensson's claims.

• Putnam has already provided all objective data necessary to determine if Putnam
  made decisions in a discriminatory manner. This request seeks to improperly try the
  gender discrimination cases of 22 former or current Putnam employees.

• This request would require Putnam to restore the email boxes of scores of former

and present employees, and run 22 separate searches on each. The request would require Putnam to locate and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

-

Svensson's Reply:

First, the subject matter of this request is highly relevant as bearing on why it was that Svensson was demoted back to research some years after she had been promoted from research to a PM position, and then fired, while males were not demoted but promoted.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p.2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails of decision-makers in regard to the 22 comparators referred to.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam. Putnam has produced no information as to the basis of the decisions referred to.

Fifth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

29





All documents and things concerning the results of the application of the criteria referred to in the immediately preceding category to Svensson, any of the identified males and/or any of the identified females who were Portfolio Managers, ADRs, CIOs or holders of other Investment Management Division investment professional positions.

Putnam Response No. 16:  Putnam objects inasmuch as it did not "demote" Svensson during the relevant time period. Putnam has already produced all documents with respect to any transfer of the Plaintiff. Putnam objects to the balance ...unduly vague and ambiguous, overbroad, and ...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

Svensson's Initial Argument
in Support of Motion to Compel:

The results of the application of the criteria used by Putnam in deciding upon the

above referred to employment actions are certainly highly relevant to the Putnam decision

making process that is at the heart of this case.

However, Svensson will limit the scope of this request to the comparators

identified in the argument sections to Nos. 1 and 2, above (22 of the 91 comparators: 16

males: Mark Bogar, Richard Cervone, Steve Dexter, Nathan Eigerman, Peter Hadden,

Shigeki Makino, David Gerber, David King, Jeff Lindsey, Dan Miller, Mike Mufson,

Dave Santos, Tino Sellito, Brian DeChristopher, Hugh Mullin, Manuel Weiss, and six

females: Beth Cotner, Lauren Allansmith, Debbie Farrell, Carmel Peters. Margaret Smith

and Jeanne Mockard).

Putnam Opposition:

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 22 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of scores of former and present employees, and run 22 separate searches on each. The request would require Putnam to locate and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:

First, the subject matter of this request is highly relevant as bearing on why it was that Svensson was demoted back to research some years after she had been promoted from research to a PM position, and then fired, while males were not demoted but promoted.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails of decision-makers in regard to the 22 comparators referred to.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam. Putnam has produced no information as to the basis of the decisions referred to.

Fifth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the



discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Svensson Request No. 17:



In regard to Svensson, any of the [91 Comparators]...who were selected for consideration for possible demotion to take place in the period since January 1, 2002 (whether or not actually demoted) from Managing Director or from Portfolio Manager or other professional position in the Investment Management Division, all documents and things concerning communication between or among the persons participating at any time or from time to time in the decision making process to so consider Svensson, any of the [91 Comparators] and which communication concerned evaluation of, or action or decision made, taken, recommended or proposed to be made or taken, in regard to any of such persons.

Putnam Response No. 17: Putnam objects...as it did not "demote" Svensson during the relevant period. Putnam has already produced all documents with respect to any transfer of the Plaintiff...objects to the balance...unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning communication among the decision makers as to persons selected as potential or possible demotes are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, as this request calls for decision maker documents only, Svensson will limit the scope of this category to the following decision makers: Steve Oristaglio, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks and Brett Browchuk, and the following of the 91 Comparators: Beth Cotner, Carmel Peters, Josh Byrne, Dana Clark, Steve Dexter, Nathan Eigerman, Richard England, Roland Gillis, Peter Hadden, Joe Joseph, Omid Kamshad, Dave King, Jeff Lindsey, Paul Marrkand, Dan Miller, Michael Mufson, David Santos, Tino Sellito, Paul Warren, Justin Scott, Manuel Weiss, Jean Sievert, Margaret Smith, Lauren Allansmith, Susan McCormack, Peter Hadden, Colin Moore, Eric Sorensen, and Michael Yogg.

Putnam Opposition:

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 29 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of 7 former and present employees, and run 29 separate searches on each. The request would require Putnam to locate and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:

First, the subject matter of this request is highly relevant as bearing on why it was that Svensson was demoted back to research some years after she had been promoted from research to a PM position, and then fired, while males were not demoted but promoted.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails in regard to the decision-makers referred to above and the limited number of comparators referred to above.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective

33

(18)

information is necessary to evaluate intent of Putnam. Putnam has produced no

information as to the basis of the decisions referred to.

Fifth, this request does not seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

**Svensson Request No. 18:**

(18)

In regard to Svensson [and/or] any of the [91 Comparators] who were considered for demotion to take place in the period since January 1, 2002 (whether or not actually demoted) from Managing Director of from Portfolio Manager or other professional position in the Investment Management Division, all documents and things concerning communication between or among the persons participating in the decision making process to so consider Svensson, any of the [91 Comparators] and which communication concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to, any of such persons.

Putnam Response No. 18: Putnam objects...as it did not "demote" Svensson...already produced all documents with respect to any transfer of the Plaintiff...objects to the balance...unduly vague and ambiguous, overbroad, and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning communication among the decision makers as to persons

who were considered for demotion are certainly highly relevant to the Putnam decision

making process that is at the heart of this case.

However, as this request calls for decision maker documents only, Svensson will

limit the scope of this category to the following decision makers: Steve Oristaglio, Tim

Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks and Brett Browchuk.

Putnam Opposition:

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of 7 former and present employees, and run 91 separate searches on each. The request would require Putnam to locate and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:

First, the subject matter of this request is highly relevant as bearing on why it was that Svensson was demoted back to research some years after she had been promoted from research to a PM position, and then fired, while males were not demoted but promoted.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails in regard to the decision-makers referred to above and the limited number of comparators referred to above.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam. Putnam has produced no

35



information as to the basis of the decisions referred to.

Fifth, this request does not  seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

**Svensson Request No. 19:**



> In regard to Svensson, any of the [91 Comparators] who actually were demoted in the period since January 1, 2002, from Managing Director or from Portfolio Manager or other professional position in the Investment Management Division, all documents and things concerning communication between or among the persons participating in the decision making process as to who of Svensson, any of the [91 Comparators] would be demoted, and which communication concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to, any one or more of such persons.

**Putnam Response No. 19:**

> Putnam objects...as it did not "demote" Svensson...already produced all documents with respect to any transfer of the Plaintiff...objects to the balance of this Request...unduly vague and ambiguous, overbroad, and ...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

Documents concerning communication among the decision makers as to persons who actually were demoted are certainly highly relevant to the Putnam decision making process that is at the heart of this case.

However, as this request calls for decision maker documents only, Svensson will limit the scope of this category to the following decision makers: Steve Oristaglio, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks and Brett Browchuk.

**Putnam Opposition:**

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of 7 former and present employees, and run 91 separate searches on each. The request would require Putnam to locate and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

Svensson's Reply:

First, the subject matter of this request is highly relevant as bearing on why it was that Svensson was demoted back to research some years after she had been promoted from research to a PM position, and then fired, while males were not demoted but promoted.

Second, Putnam is wrong on Jackson and Whittingham. See p. 2, supra.

Third, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails in regard to the decision-makers referred to above and the limited number of comparators referred to above.

Fourth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam. Putnam has produced no



information as to the basis of the decisions referred to.

Fifth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

**Svensson Request No. 20:**

Prior to filing her motion to compel, Svensson withdrew category No. 20.



**Svensson Request No. 21:**

Prior to filing her motion to compel, Svensson withdrew category No. 21.



**Svensson Request No. 22:**

All documents and things concerning the Putnam policy in the period since January 1, 1999, in regard to persons of the status and position of persons such as Darren Peers (Peers) concerning payment or reimbursement of tuition costs for the MBA degree.



Putnam Response No. 22:  Putnam objects...unduly vague and ambiguous, overbroad, and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without limiting the foregoing, Putnam will produce documents responsive to the Request.

Svensson's Initial Argument
in Support of Motion to Compel:

Whether Darren Peers' testimony in deposition and at trial was or will be affected by the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested, including, without limitation, any cancelled check, or other documents that identify the payor and the circumstances.

Putnam Opposition

(23)

- Putnam has previously produced a document responsive to this request, at PRM 2803, which shows NWQ's reimbursement of Peers' MBA tuition.

Svensson's Reply: Whether Darren Peers' testimony in deposition and at trial was or will be

affected by the circumstances of the payment by another of his obligation to reimburse

Putnam for Putnam's payment of Peer's business school tuition education leading to his

MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam

should be required to produce the documents requested, including, without limitation, any

cancelled check, or other documents that identify the payor and the circumstances.

Page: 39

[0]PRM 2803 is an accounting entry made November 28, 2003, for a credit, weeks after

Peers left Putnam, but it is not the check or other evidence of the payment or the identity

of the payor,  nor has  Putnam produced, as requested, documents concerning

"communication between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment

Management Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons)

concerning Peers' leaving his employment at Putnam, compliance with, or satisfaction,

fulfillment or other disposition of, the terms, provisions and/or condition of Peers'

employment at Putnam, or financial obligations."

**Svensson Request No. 23:**

(23)

All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment Management Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons) concerning Peers' leaving his employment at Putnam, compliance with, or satisfaction, fulfillment or other disposition of, the terms, provisions and/or condition of Peers' employment at Putnam, or financial obligations.

Putnam Response No. 23: Putnam objects...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. ...plaintiff has...deposed Mr. Peers on the subject of this request. Without limiting the foregoing, Putnam will produce responsive documents.

Svensson's Initial Argument

39

in Support of Motion to Compel:

> Whether Darren Peers' testimony in deposition and at trial was or will be affected by the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested, including, without limitation, any cancelled check, or other documents that identify the payor and the circumstances.

Putnam Opposition

> Putnam has previously produced a document responsive to this request, at PRM 2803, which shows NWQ's reimbursement of Peers' MBA tuition.

Svensson's Reply:

> Whether Darren Peers' testimony in deposition and at trial was or will be affected by the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested, including, without limitation, any cancelled check, or other documents that identify the payor and the circumstances.

> Page: 40

[0]PRM 2803 is an accounting entry made November 28, 2003, for a credit, weeks after Peers left Putnam, but, left Putnam, but it is not the check or other evidence of the payment or the identity of the payor, nor has Putnam produced, as requested, documents concerning "communication between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment Management Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons) concerning Peers' leaving his employment at Putnam, compliance with, or



satisfaction, fulfillment or other disposition of, the terms, provisions and/or condition of

Peers' employment at Putnam, or financial obligations."

---

Svensson Request No. 24:



All documents and things concerning the payment to, or reimbursement of, any person concerning tuition costs of Peers' MBA degree.

Putnam Response No. 24: Without limiting the foregoing, please See Putnam's response to Request 23.

Svensson's Initial Argument
in Support of Motion to Compel:

Whether Darren Peers' testimony in deposition and at trial was or will be affected by the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested, including, without limitation, any cancelled check, or other documents that identify the payor and the circumstances.

Putnam Opposition: Putnam has previously produced a document responsive to this request, at PRM 2803, which shows NWQ's reimbursement of Peers' MBA tuition.

Svensson's Reply: Whether Darren Peers' testimony in deposition and at trial was or will be affected by the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested, including, without limitation, any cancelled check, or other documents that identify the payor and the circumstances.

Page: 41

EXHIBIT 1-3



[0]PRM 2803 is an accounting entry made November 28, 2003, for a credit, weeks after

Peers left Putnam, but it is not the check or other evidence of the payment or the identity

of the payor, nor has Putnam produced, as requested, documents concerning

"communication between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment

Management Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons)

concerning Peers' leaving his employment at Putnam, compliance with, or satisfaction,

fulfillment or other disposition of, the terms, provisions and/or condition of Peers'

employment at Putnam, or financial obligations."

---

**Svensson Request No. 25:**

All document and things prepared or received by Putnam concerning the satisfaction, fulfillment or other disposition of the terms and conditions of Peers' employment in regard to the payment to, or reimbursement of, any person or tuition costs of Peers' MBA degree.

**Putnam Response No. 25:** Without limiting the foregoing, please
<u>See</u> Putnam's response to Request 23.

**Svensson's Initial Argument
in Support of Motion to Compel:**

Whether Darren Peers' testimony in deposition and at trial was or will be affected by

the circumstances of the payment by another of his obligation to reimburse Putnam for

Putnam's payment of Peer's business school tuition education leading to his MBA degree,

makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be

required to produce the documents requested, including, without limitation, any cancelled

check, or other documents that identify the payor and the circumstances.

**Putnam Opposition** Putnam has previously produced a document responsive to this request,

at PRM 2803, which shows NWQ's reimbursement of Peers' MBA tuition.

**Svensson's Reply:** Whether Darren Peers' testimony in deposition and at trial was or will be



affected by the circumstances of the payment by another of his obligation to reimburse

Putnam for Putnam's payment of Peer's business school tuition education leading to his

MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam

should be required to produce the documents requested, including, without limitation, any

cancelled check, or other documents that identify the payor and the circumstances.

Page: 43

[0]PRM 2803 is an accounting entry made November 28, 2003, for a credit, weeks after

Peers left Putnam, but it is not the check or other evidence of the payment or the identity

of the payor, nor has Putnam produced, as requested, documents concerning

"communication between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment

Management Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons)

concerning Peers' leaving his employment at Putnam, compliance with, or satisfaction,

fulfillment or other disposition of, the terms, provisions and/or condition of Peers'

employment at Putnam, or financial obligations."

---

**Svensson Request No. 26:**



All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ, any affiliate of NWQ and/or any other persons concerning the making, maintaining and/or furnishing by Peers to, or receipt by, Putnam, of any diary, notes or other documents or things concerning Svensson or any of the identified males and/or of the identified females prepared by Peers.

**Putnam Response No. 26:** Putnam represents Mr. Peers in connection with this litigation, and objects to this Request to the extent that it seeks documents protected by the attorney-client privilege and the work-product doctrine. Furthermore,...already produced all such information not covered by such privileges in response to the Plaintiff's first request....

**Svensson's Initial Argument
in Support of Motion to Compel:**

Whether Darren Peers' testimony in deposition and at trial was or will be affected by

the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested to the extent not previously produced, such as cancelled checks, or other documents that identify the payor, the amount and the circumstances.

To the extent claiming privilege due to an attorney-client relationship between Putnam and Peers, Putnam should be required to amend its privilege log as per the applicable discovery rules, so the court and Svensson may assess the propriety of the claim. Insofar as the documents requested t concern communications between Peers and Putnam prior to any such relationship, a claim of privilege is improper.

Putnam Opposition

- Putnam has previously produced a document responsive to this request, at PRM 2803, which shows NWQ's reimbursement of Peers' MBA tuition.

Svensson's Reply: Whether Darren Peers' testimony in deposition and at trial was or will be affected by the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested to the extent not previously produced, such as cancelled checks, or other documents that identify the payor, the amount and the circumstances.

To the extent claiming privilege due to an attorney-client relationship between Putnam and Peers, Putnam should be required to amend its privilege log as per the applicable discovery rules, so the court and Svensson may assess the propriety of the claim.



Insofar as the documents requested concern communications between Peers and Putnam prior to any such relationship, a claim of privilege is improper.

Svensson Request No. 27:



All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ, any affiliate of NWQ and/or any other persons(s) concerning the testimony or possible testimony in a deposition or at trial in this case by Peers or by any of the identified males and/or any of the identified females who at the time of such communication were no longer in the employ of Putnam.

Putnam Response No.27:  Putnam objects to this request on the grounds that it seeks disclosure of information that is not discoverable due to the attorney-client privilege and the attorney work-product doctrine.

Svensson's Initial Argument
in Support of Motion to Compel:

Whether Darren Peers' testimony in deposition and at trial was or will be affected by the circumstances of the payment by another of his obligation to reimburse Putnam for Putnam's payment of Peer's business school tuition education leading to his MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam should be required to produce the documents requested to the extent not previously produced, such as cancelled checks, or other documents that identify the payor, the amount and the circumstances.

To the extent claiming privilege due to an attorney-client relationship between Putnam and Peers, Putnam should be required to amend its privilege log as per the applicable discovery rules, so the court and Svensson may assess the propriety of the claim. Insofar as the documents requested t concern communications between Peers and Putnam prior to any such relationship, a claim of privilege is improper.

To the extent claiming privilege due to an attorney-client relationship privilege between Putnam and Peers, Putnam should be required to amend its privilege log as per the

applicable discovery rules, so the court and Svensson may assess the propriety of the claim.

Insofar as there documents requested that concern communication between Peers

and Putnam prior to any such relationship, a claim of privilege is improper.

Moreover, the category seeks documents concerning NWQ, Peers' subsequent and

present employer and concerning persons other than Peers or Putnam.

Putnam Opposition

- Putnam has previously produced a document responsive to this request, at PRM 2803, which shows NWQ's reimbursement of Peers' MBA tuition.

- No documents responsive to the remainder of this request exist.

Svensson's Reply: Whether Darren Peers' testimony in deposition and at trial was or will be

affected by the circumstances of the payment by another of his obligation to reimburse

Putnam for Putnam's payment of Peer's business school tuition education leading to his

MBA degree, makes the subject matter of Categories 23 - 27 highly relevant, and Putnam

should be required to produce the documents requested, including, without limitation, any

cancelled check, or other documents that identify the payor and the circumstances.

Page: 46

[0]PRM 2803 is an accounting entry made November 28, 2003, for a credit, weeks after

Peers left Putnam, but it is not the check or other evidence of the payment or identity of

the payor nor has Putnam produced, as requested, documents concerning "communication

between or among Putnam, any affiliate of Putnam, Peers, NWQ Investment Management

Company, LLC ("NWQ"), any affiliate of NWQ and/or any other persons) concerning Peers'

leaving his employment at Putnam, compliance with, or satisfaction, fulfillment or other

disposition of, the terms, provisions and/or condition of Peers' employment at Putnam, or

financial obligations."

46



If the Putnam opposition ("No documents responsive to the remainder of this request exist") is correct as to fact, Svensson will accept a statement under oath from an authorized Putnam official that no such documents exist.

---

Svensson Request No. 28:



All documents and things concerning the factual basis of any numerical or other rating, evaluation, analysis or score concerning Svensson in connection with consideration of her by Putnam in the period since January 1, 1999, for promotion; demotion; salary or other compensation increase; salary or other compensation decrease; and/or other employment action.

Putnam Response No. 28: Putnam objects...it is incomprehensible to the point that it is unclear...overbroad, burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition..... Putnam further objects Plaintiff's failure to define "numerical or other rating" has rendered the request vague, ambiguous, and difficult to understand. Plaintiff's performance reviews are self-explanatory; and Putnam does not possess any document or other thing that provides a factual basis of any numerical score for any type of performance review. To the extent ...seeks the underlying performance reviews of the Plaintiff, Putnam has provided those documents.... To the extent that the Plaintiff seeks information concerning her promotions, transfer, or any other employment action, Putnam has already produced such information in response to the Plaintiff's first request.... To the extent this Request seeks information relating to the Plaintiff's compensation, Putnam will produce responsive documents.

Svensson's Initial Argument
in Support of Motion to Compel:

To the extent the documents requested have not been produced or not produced in unredacted format, the court should order Putnam to produce in unredacted format the documents requested, including any documents concerning alteration of Plaintiff's numerical performance ratings between January 1, 1999, and September 15, 2003, the date of her termination.

Putnam Opposition

- Putnam has previously produced all documents relevant to this request in unredacted form.

Svensson's Reply: If the Putnam opposition is correct as to fact, Svensson will accept a statement



under oath from an authorized Putnam official that no documents that concern the change

in Svensson's rating of 4.8 out of 5.0 to a 3.0. other than to be specified unredacted Bates

numbered ("PRM___") documents, exist.

**Svensson Request No. 29:**



The terms and conditions offered by Putnam in the period since January 1, 2002, to any of
the [91 Comparators] in connection with leaving the employ of Putnam by any of such
persons, whether voluntarily or involuntarily.

Putnam Response No. 29:  Putnam objects...unduly vague and ambiguous, overbroad,...irrelevant
and not reasonably calculated to lead to the discovery of admissible evidence....also...on the
grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Whether and to "what" extent Putnam has required any of the 91 Comparators

who have left Putnam either voluntarily or involuntarily to agree to conditions that might

affect their testimony makes the subject matter of this category highly relevant, and

Putnam should be ordered to produce such documents.

Putnam Opposition:

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel
  Answers to Interrogatories, Putnam does not agree that these individuals are
  Ms. Svensson's legal comparators.

- Ms. Svensson fails to explain "why" the details of other employees' Separation
  Agreements are relevant to her claims. Putnam requires every employee
  leaving Putnam's employ on a voluntary or involuntary basis, and who
  receives a severance package, to sign a Separation Agreement waiving claims
  against the Company.

Svensson's Reply:

First, Putnam is wrong on Jackson and Whittingham.  See  p. 2 , supra.

Second, Svensson is entitled to know whether males were treated more favorably

than females and also to know the magnitude of the impact of the agreement that may



affect the willingness of the person involved to give candid and accurate testimony.

Svensson Request No. 30:

> All documents and things concerning any notes, minutes or other document of or in regard to meetings or decisions of the Putnam trustees in the period May - September 2003 concerning directed brokerage commissions.

Putnam Response No. 30:  Putnam objects... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence ...also...[as] set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

> That Svensson complained at Putnam as to Putnam's policies and practices as to directed brokerage commissions makes the subject matter of this category highly relevant. As her complaints may have affected the decision makers in dealing with Svensson, Svensson and the court should be informed by document production in this regard.

Putnam Opposition

- Ms. Svensson fails to provide any basis for believing that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

Svensson's Reply:

> The issue of "directed commissions" was very controversial at Putnam, pitting the trustees of the funds against top management of the company.  According to the Wall Street Journal, November 26, 2003, p. C1, "Putnam Ends Directed Commissions,"

> > The decision to stop the commission arrangement also came after an internal dispute at Putnam between the company and the trustees of the Putnam funds. [John} Hill [Chairman of the Board of Trustees] said the Putnam funds board of trustees argued with Putnam management for 12 to 18 months about ending the practice of rewarding favored brokers with commissions.

> Accordingly, Svensson is entitled to know what impact her complaints as to the brokerage



commission issue made just weeks before Putnam took action against her had on Putnam's decision-making.

---

Svensson Request No. 31:

> All documents and things concerning communication between or among, Haldeman, Lasser and any of the Putnam trustees in the period May - September 2003 concerning directed brokerage commissions.

Putnam Response No. 31: Putnam objects...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

> That Svensson complained at Putnam as to Putnam's policies and practices as to directed brokerage commissions makes the subject matter of this category highly relevant. As her complaints may have affected the decision makers in dealing with Svensson, Svensson and the court should be informed by document production in this regard.

Putnam Opposition

Putnam objects to this Request on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Reply: The issue of "directed commissions" was very controversial at Putnam, pitting the trustees of the funds against top management of the company. According to the Wall Street Journal, November 26, 2003, p. C1, "Putnam Ends Directed Commissions,"

> The decision to stop the commission arrangement also came after an internal dispute at Putnam between the company and the trustees of the Putnam funds. [John} Hill [Chairman of the Board of Trustees] said the Putnam funds board of trustees argued with Putnam management for 12 to 18 months about ending the practice of rewarding favored brokers with commissions.

(32)

Accordingly, Svensson is entitled to know what impact her complaints as to the brokerage commission issue made just weeks before Putnam took action against her had on Putnam's decision-making.

**Svensson Request No. 32:**

(32)

> All documents and things concerning coverage reports for O'Malley and the [91 Comparators] for each of the reporting periods in 2002, 2003, 2004, 2005 and 2006.

Putnam Response No. 32: Putnam objects...overbroad, burdensome ...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file....

Svensson's Initial Argument
in Support of Motion to Compel:

> As this category concerns only Global Equity Research, the comparators for this category are limited to R. J. Bukovac, Mark Bogar, Chris O'Malley, Saba Malak, Michael Yogg, Brian DeChristopher, John Boselli, Lauren Allansmith, Maria Drew, Jeanne Sievert and (if not already produced) Lisa Svensson.

Putnam Opposition

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Ms. Svensson does not craft any argument in response to Putnam's objection.

Svensson's Reply:

> First, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

> Second, the information contained in "coverage reports" will show whether or not one or more males in Global Equity Research had fewer stocks under coverage and thereby were less productive than Svensson. This information, with other documents and

51

33

evidence, will show that to the extent these males nonetheless were rewarded and not

demoted or fired, Putnam engaged in unequal treatment and gender discrimination.

Svensson Request No. 33:

33

All documents and things concerning communication between or among Stoev and
Morgan or other persons at Putnam in regard to the termination of Stoev's employment
and the stated reasons for it.

Putnam Response No. 33: Putnam objects...overbroad, burdensome... irrelevant and not reasonably
calculated to lead to the discovery of admissible evidence, and...[as]...set forth in Putnam's
Opposition.....

Svensson's Initial Argument
in Support of Motion to Compel:

Konstantin Stoev, who resides and works in Zurich, Switzerland, and whose

deposition was taken over the objection of Putnam, pursuant to an order of this court, will

be, through his deposition testimony, a witness for Svensson at the trial. The documents

requested are highly relevant as they may show that what was testified in depositions or

told to Stoev or others by Putnam officials differed from what they told Stoev, each other

or the Federal immigration authorities in regard to, among other things, Stoev's "green

card" and his termination.

Accordingly the documents requested should be produced.

Putnam Opposition

- Mr. Stoev's greencard application explains Putnam's basis for believing that Mr.
Stoev should be issued a green card. Mr. Stoev's greencard application thus has no
colorable relevance to any of the issues raised in the Plaintiff's Amended Complaint.

Svensson's Reply: Konstantin Stoev, who resides and works in Zurich, Switzerland, and whose

deposition was taken over the objection of Putnam, pursuant to an order of this court, will

be, through his deposition testimony, a witness for Svensson at the trial.

Svensson is entitled to know if Stoev's high opinion of Svensson and her



management skills, based upon Svensson's supervision of Stoev while at Putnam, had any effect on Putnam's decision to terminate Stoev.

Moreover, Page: 53

[0]what Putnam stated and represented to the government in its efforts to have the Immigration Service issue Stoev a "green card" permitting him, a Bulgarian national, to stay in the U.S. and work at Putnam, is highly relevant.  Production of the documents requested may well enable the court and the jury determine if what Putnam told the government in 2003 about Stoev to assist in his staying in the U.S. and working for Putnam, is consistent with what its deposition witnesses have testified to about Stoev and whether it is consistent with what Putnam told Stoev directly concerning termination of his employment at Putnam.

Svensson Request No. 34:



All documents and things concerning the "green card" application for Stoev that Morgan filled out.

Putnam Response No. 34:  Putnam objects...overbroad, burdensome and... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and [as]... in Putnam's Opposition on file with the Court.

Svensson's Initial Argument
in Support of Motion to Compel:

Page: 53

[0]What Putnam stated and represented to the government in its efforts to have the Immigration Service issue Stoev a "green card" permitting him, a Bulgarian national, to stay in the U.S. and work at Putnam, is highly relevant.  Production of the documents requested may well enable the court and the jury determine if what Putnam told the government in 2003 about Stoev to assist in his staying in the U.S. and working for



Putnam, is consistent with what its deposition witnesses have testified to about Stoev and whether it is consistent with what Putnam told Stoev directly concerning termination of his employment at Putnam.

Putnam Opposition

Putnam objects to this Request on the grounds that it is overbroad, burdensome and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

Svensson's Reply: Konstantin Stoev, who resides and works in Zurich, Switzerland, and whose deposition was taken over the objection of Putnam, pursuant to an order of this court, will be, through his deposition testimony, a witness for Svensson at the trial.

Svensson is entitled to know if Stoev's high opinion of Svensson and her management skills, based upon Svensson's supervision of Stoev while at Putnam, had any effect on Putnam's decision to terminate Stoev.

Moreover, Page: 54

[0]what Putnam stated and represented to the government in its efforts to have the Immigration Service issue Stoev a "green card" permitting him, a Bulgarian national, to stay in the U.S. and work at Putnam, is highly relevant. Production of the documents requested may well enable the court and the jury determine if what Putnam told the government in 2003 about Stoev to assist in his staying in the U.S. and working for Putnam, is consistent with what its deposition witnesses have testified to about Stoev and whether it is consistent with what Putnam told Stoev directly concerning termination of his employment at Putnam.

Svensson Request No. 36:



All documents and things concerning communication between Morgan and Allansmith in the period 2002-2004 concerning comments upon or other feedback as to Allansmith's work performance.

Putnam Response No. 36: Putnam objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

The treatment of Svensson and other women at Putnam including Allansmith,

who were terminated or forced out, is highly relevant. The documents requested should

be produced.

Putnam Opposition

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that Ms. Allansmith is Ms. Svensson's legal comparator.

- Putnam has already provided all objective data necessary to determine if Putnam treated women in a discriminatory manner. Ms. Svensson is not a plaintiff in a class action lawsuit.

Svensson's Reply:

First, the documents requested are discrete documents concerning a female

comparator who was terminated and who was a deposition witness in this case.

Second, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.

Third, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Fourth, this request does not  seek to try any person's gender discrimination

case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant



to the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

**Svensson Request No. 37:**

All documents and things concerning communication in the period 2002-2004 between Morgan and McNamee, Scordato and/or Brooks concerning Svensson's or Allansmith's work performance or reasons or justifications for Svensson or Allansmith leaving Putnam's employment.

Putnam Response No.37: With respect to the Plaintiff, Putnam has already produced communications between Morgan, McNamee, Scordato and/or Brooks.... With respect to Ms. Allansmith, Putnam objects...overbroad, burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

The treatment of Svensson and other women at Putnam including Allansmith,

who were terminated or forced out, is highly relevant.  The documents requested should

be produced.

Putnam Opposition

- As Putnam stated in its initial response to this Request, it has already produced documents responsive to this request with respect to Ms. Svensson.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that Ms. Allansmith is Ms. Svensson's legal comparator.

- Putnam has already provided all objective data necessary to determine if Putnam treated women in a discriminatory manner. Ms. Svensson is not a plaintiff in a class action lawsuit

Svensson's Reply:

First, the documents requested are discrete documents concerning a female

comparator who was terminated and who was a deposition witness in this case.

Second, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.



Third, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Fourth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

**Svensson Request No. 38:**

All documents and things concerning GER Active Portfolio Performance in the period January 1, 1999, through September 15, 2003, for Svensson [and/or] any of the [91 Comparators].

**Putnam Response No. 38:** With respect to the Plaintiff, Putnam will produce documents responsive to this Request. With respect to the balance...Putnam objects...overbroad, burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

As the request relates to Global Equity Research, it is limited to Svensson and the following of the 91 Comparators: Bukovac, Bogar, O'Malley, Malak, Yogg, DeChristopher, Boselli, Allansmith, Drew, Sievert, Smith, Spatz, Williams, Korn, Kalus-Bystricky, Cervone, Lannum, Marrkand, Mehta and Norchi.

The performance in the work place of Svensson as compared to the others is highly relevant.

**Putnam Opposition**

- Putnam did not terminate Ms. Svensson because she was a poor "stock picker." It removed her supervisory responsibilities when it discovered that she was

mismanaging subordinates. Therefore, this request is not material to any of the issues raised in the Amended Complaint.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 20 former or current Putnam employees. This request would require Putnam to restore the email boxes of 20 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

Svensson's Reply:

First, the test for discovery under Fed. R. Civ. P. 26 is not whether the discovery requested is, in the trial context, evidence that is "material." The test under the rule is simply whether or not the discovery sought is "relevant to the claims or defenses of any party," with the court having the discretion to allow discovery that is "relevant to the subject matter" of the litigation. Whether evidence is material to any given issue at trial is a trial, not a discovery, issue.

Second, the documents sought in all likelihood will show that Putnam terminated the employment of Svensson, an extremely high-performing female investment professional and in doing so did not take into account her actual performance. Svensson was the No. 1 analyst out of 58 in terms of the "alpha per recommendation" measure that was stated at the time to be the most important measurement to Putnam.

Third, it is Svensson's position that her termination on the complaint of two male subordinates for her management "style" was and is pretext. Svensson is entitled to discover Putnam documents that she believes will show that when terminated she was a top performer in the research department. The documents sought will provide objective



data.

Fourth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra

---

**Svensson Request No. 39:**

All documents and things concerning comparisons in work performance in the period

January 1, 1999, through September 15, 2003, of Svensson,[and/or any of the 91

Comparators].

Putnam Response No. 39:  Putnam has produced all of the Plaintiff's performance reviews....
Putnam objects to the balance of ...overbroad, burdensome and irrelevant and not
reasonably calculated to lead to the discovery of admissible evidence, and on the grounds
set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

As the request relates to Global Equity Research, it is limited to Svensson and the

following of the 91 Comparators:  Bukovac, Bogar, O'Malley, Malak, Yogg,

DeChristopher, Boselli, Allansmith, Drew, Sievert, Smith, Spatz, Williams, Korn, Kalus-

Bystricky, Cervone, Lannum, Marrkand, Mehta and Norchi.

The performance in the work place of Svensson as compared to the others is

highly relevant.

Putnam Opposition

- Putnam did not terminate Ms. Svensson because she was a poor "stock picker." It
  removed her supervisory responsibilities when it discovered that she was
  mismanaging subordinates. Therefore, this request is not material to any of the
  issues raised in the Amended Complaint.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to
  Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's
  legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam

made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 20 former or current Putnam employees.

- This request would require Putnam to restore the email boxes of 20 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

Svensson's Reply:

First, the test for discovery under Fed. R. Civ. P. 26 is not whether the discovery sought is, in the trial context, evidence that is "material." The test under the rule is simply whether or not the discovery sought is "relevant to the claims or defenses of any party," with the court having the discretion to allow discovery that is "relevant to the subject matter" of the litigation. Whether evidence is material to any given issue at trial is a trial, not a discovery, issue.

Second, it is Svensson's position that her termination on the complaint of two male subordinates for her management "style" was and is pretext. Svensson is entitled to discover Putnam documents that she believes will show that when terminated she was a top performer. The documents sought will provide objective data.

Third, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Fourth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited to only 20 comparators in GER.

Fifth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

EXHIBIT 1-4



Sixth, this request does not seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

**Svensson Request No. 40:**



All documents and things, including, without limitation Human Resources Action Request and Requisition for Employee documents, concerning the move or transfer of any of the identified males out of GER in the period since January 1, 1999.

**Putnam Response No. 40:** Putnam objects...overbroad, burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds...in Putnam's Opposition on file...

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

Documents concerning the move or transfer of any of the males in the 91

Comparators is a highly relevant subject.

However, Svensson will limit the scope of the category to: Bogar, Bukovac,

Cervone, DeChristopher, Malak, Marrkand and Mehta.

**Putnam Opposition**

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made transfers in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 7 former or current Putnam employees.

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

**Svensson's Reply:**



First, the documents requested are discrete documents that are relevant to provide information as to Putnam decision-making as to transfers or moves of males from one position to another to be compared with those affecting Svensson and other females.

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Third, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Svensson Request No. 41:



Prior to filing her motion to compel, Svensson withdrew category No. 41.

Svensson Request No. 42:

Prior to filing her motion to compel, Svensson withdrew category No. 42.

Svensson Request No. 43:

Putnam's Officers' Directories for the years 2003-2005.

Putnam Response No. 43: The Putnam Officer's Directory is a listing of personal contact information for 1,296 officers of Putnam, and as such, this Request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

As there is a confidentiality order in place, Putnam's objections are meritless. The Directories provide highly relevant information as to the 91 Comparators in regard to their titles and job responsibilities, and enable the comparisons of one person to another and positions and responsibilities from one year to another. As Svensson has such Directories for some of the relevant periods, Svensson limits the scope of this request to the Directories for July-December 2003; July-December 2005; and 2004 through



December.

Putnam Opposition

- Ms. Svensson states she needs Officer Directories because they provide information with regard to the "titles and job responsibilities" of the 91. Ms. Svensson's argument ignores the fact that Putnam has already provided this information, (and much more) that enable Ms. Svensson to compare "one person to another and positions and responsibilities from one year to another."

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner. This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

Svensson's Reply:

First, Svensson is entitled to these Directories in order to determine the accuracy and completeness of other information furnished.

Second, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.

Third, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Fourth, this request does not  seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Svensson Request No.  No 44:

All documents and things concerning bonus worksheets prepared or maintained at any time



or from time to time in the period since January 1, 1999, in regard to the teams of which Svensson, any of the [91 Comparators] were members, including, without limitation, Core International, Core Domestic, Core Growth (later called Large Cap Growth), Value, Specialty Growth and GER.

Putnam Response No. 44: With respect to the Plaintiff, Putnam will produce documents concerning her bonus worksheets. With respect to the balance...Putnam objects...overbroad, burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Which of the 91 Comparators did or did not get bonuses in any of the relevant years and the size of bonuses if received are highly relevant matters to all claims of Svensson in this case, including, among others, the equal pay claim, as bonuses are obviously a significant part of total compensation. The documents requested concerning the 91 Comparators should be produced.

Putnam Opposition

- Putnam has already unredacted for the 91 previously produced bonus worksheets. Any additional search would be duplicative of Putnam's already extensive production.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 91 former or current Putnam employees.

Svensson's Reply:

First, is Putnam seriously contending that a comparison of bonus decisions as to males when compared to females is not relevant?

Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.



Third, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Fourth, this request does not  seek to try any person's gender discrimination

case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant

to the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

**Svensson Request No. 45:**



All documents and things concerning the reports, analyses, measurements and/or
rankings of the types included in documents LS-501, 503-506 for any of the [91
Comparators] prepared in the period since January 1, 1999.

Putnam Response No. 45: Putnam objects...overbroad, burdensome and... irrelevant and not
reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set
forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Documents such as reports, analyses, measurements and/or rankings are highly

relevant as they provide ways to compare one person from another.

Svensson limits the scope of this category to the following 20 of the 91

Comparators: Bukovac, Bogar, O'Malley, Malak, Yogg, DeChristopher, Boselli,

Allansmith, Drew, Sievert, Smith, Spatz, Williams, Korn, Kalus-Bystricky, Cervone,

Lannum, Marrkand, Mehta and Norchi.

Putnam Opposition

- This request would require Putnam to restore the email boxes of 20 former or current
  Putnam employees, review potentially hundreds of thousands or millions of
  emails without any basis for believing that relevant documents exist, and thus is



grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 20 former or current Putnam employees.

•

Svensson's Reply:

First, the request is limited to reports from decision-makers evaluating 20 people

Second, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra. The scope of the documents required has been drastically limited to only the documents including e-mails to and from the ten identified persons as decision-makers.

Third, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Fourth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

Svensson Request No. 46:

All documents and things concerning the reports, analyses, measurements and/or rankings of the types included in document LS-502 for the fund referred to and for the other Putnam funds, which were prepared in the period since January 1, 1999.

Putnam Response No. 46:  Putnam objects...overbroad, burdensome and...irrelevant and not
        reasonably calculated to lead to the discovery of admissible evidence, and on the grounds
        set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

        Documents such as reports, analyses, measurements and/or rankings are highly

    relevant as they provide ways to compare one investment professional to another.

        Svensson limits the scope of this category to the following 20 of the 91

    Comparators: Bukovac, Bogar, O'Malley, Malak, Yogg, DeChristopher, Boselli,

    Allansmith, Drew, Sievert, Smith, Spatz, Williams, Korn, Kalus-Bystricky, Cervone,

    Lannum, Marrkand, Mehta and Norchi.

Putnam Opposition

- This request would require Putnam to restore the email boxes of 20 former or current
  Putnam employees, review potentially hundreds of thousands or millions of
  emails without any basis for believing that relevant documents exist, and thus is
  grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to
  Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal
  comparators.

- Putnam has already provided all objective data necessary to determine if Putnam
  made decisions in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 20 former or
  current Putnam employees.

Svensson's Reply:

        First, the request is limited to reports from decision-makers evaluating 20 people

        Second, the claim as to the e-mails is exaggerated and meritless; and the new e-

    discovery rules should be applied to this case.  See pp. 4-5, supra.  The scope of the

    documents required has been drastically limited to only  the documents including e-mails



to and from the ten identified persons as decision-makers.

Third, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Fourth, this request does not  seek to try any person's gender discrimination

case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant

to the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

**Svensson Request No. 47:**

All documents and things concerning attribution reports of the type included in LS-507-12 for the fund referred to and any other funds, which were prepared in the period since January 1, 1999.

Putnam Response No. 47: Putnam objects. overbroad, burdensome and... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Documents such as the requested attribution reports are highly relevant as they

provide bases for comparing one investment professional with another.

Svensson limits the scope of this category to the following 20 of the 91

Comparators:  Bukovac, Bogar, O'Malley, Malak, Yogg, DeChristopher, Boselli,

Allansmith, Drew, Sievert, Smith, Spatz, Williams, Korn, Kalus-Bystricky, Cervone,

Lannum, Marrkand, Mehta and Norchi.

Putnam Opposition

- Putnam did not terminate Ms. Svensson because she was a poor "stock

picker." It removed her supervisory responsibilities when it discovered that she was mismanaging subordinates. Therefore, this request is not material to any of the issues raised in the Amended Complaint.

- This request would require Putnam to restore the email boxes of 20 former or current Putnam employees, review potentially hundreds or thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 20 former or current Putnam employees.

Svensson's Reply:

First, the test for discovery under Fed. R. Civ. P. 26 is not whether the discovery sought is, in the trial context, evidence that is "material." The test under the rule is simply whether or not the discovery sought is "relevant to the claims or defenses of any party," with the court having the discretion to allow discovery that is "relevant to the subject matter" of the litigation. Whether evidence is material to any given issue at trial is a trial not a discovery issue.

Second, the documents sought (attribution reports) in all likelihood will show that Putnam terminated the employment of Svensson, an extremely high-performing female investment professional and in doing so did not take into account her actual performance. Svensson was the No. 1 analyst out of 58 in terms of the "alpha per recommendation" measure that was the most important measurement to Putnam.

Third, it is Svensson position that her termination on the complaint of two male



subordinates for her management "style" was and is pretext. Svensson is entitled to

discover Putnam documents that she believes will show that when terminated she was a

top performer in the research department. The documents sought will provide objective

data.

Fourth, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Fifth, the claim as to the e-mails is exaggerated and meritless; and the new e-

discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the

documents required has been limited drastically.

Sixth, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Seventh, this request does not  seek to try any person's gender discrimination

case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant

to the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Svensson Request No. 48:



All documents and things concerning sector level performance index ranks of the type
included in LS-513-515 prepared in the period since January 1, 1999.

Putnam Response No. 48: Putnam objects...overbroad, burdensome and irrelevant and not
reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set
forth in Putnam's Opposition on file....

Svensson's Initial Argument
in Support of Motion to Compel:

Documents such as the requested sector level performance index ranks are highly

relevant as they provide bases for comparing one with another.

Svensson limits the scope of this category to the following 20 of the 91

Comparators: Bukovac, Bogar, O'Malley, Malak, Yogg, DeChristopher, Boselli,

Allansmith, Drew, Sievert, Smith, Spatz, Williams, Korn, Kalus-Bystricky, Cervone,

Lannum, Marrkand, Mehta and Norchi.

Putnam Opposition

- Putnam did not terminate Ms. Svensson because she was a poor "stock picker." It removed her supervisory responsibilities when it discovered that she was mismanaging subordinates. Therefore, this request is not material to any of the issues raised in the Amended Complaint.

- This request would require Putnam to restore the email boxes of 20 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 20 former or current Putnam employees.

Svensson's Reply:

First, the test for discovery under Fed. R. Civ. P. 26 is not whether the discovery

sought is, in the trial context, evidence that is "material." The test under the rule is

simply whether or not the discovery sought is "relevant to the claims or defenses of any

party," with the court having the discretion to allow discovery that is "relevant to the

subject matter" of the litigation. Whether evidence is material to any given issue at trial is

a trial not a discovery issue.



Second, the documents sought (sector level performance index ranks) in all likelihood will show that Putnam terminated the employment of Svensson, an extremely high-performing female investment professional and in doing so did not take into account her actual performance. Svensson was the No. 1 analyst out of 58 in terms of the "alpha per recommendation" measure that was the most important measurement to Putnam.

Third, it is Svensson position that her termination on the complaint of two male subordinates for her management "style" was and is pretext. Svensson is entitled to discover Putnam documents that she believes will show that when terminated she was a top performer in the research department. The documents sought will provide objective data.

Fourth, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Fifth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been limited drastically.

Sixth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Seventh, this request does not  seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Svensson Request No. 49:

All documents and things concerning scorecards and second scorecards in regard to O'Malley, other MBAs and any of the [91 Comparators] prepared or maintained in the period since January 1, 1999.

Putnam Response No. 49: Putnam objects...overbroad, burdensome and... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

If the documents referenced in Morgan's testimony at p. 95, l. 24 - p. 96, l. 6 are different from documents in the format of documents LS 503-506, then such documents should be produced as they enable comparisons between one person and another. They should be produced.

Svensson limits the scope of the category to the following of the 91 Comparators: Bukovac, Bogar, O'Malley, Malak, Yogg, DeChristopher, Boselli, Allansmith, Drew, Sievert, Smith, Spatz, Williams, Korn, Kalus-Bystricky, Cervone, Lannum, Marrkand, Mehta and Norchi.                                    ———

Putnam Opposition

- Putnam did not terminate Ms. Svensson because she was a poor "stock picker." It removed her supervisory responsibilities when it discovered that she was mismanaging subordinates. Therefore, this request is not material to any of the issues raised in the Amended Complaint.

- This request would require Putnam to restore the email boxes of 20 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators.

- Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 20 former or current Putnam employees.

Svensson's Reply:

First, the test for discovery under Fed. R. Civ. P. 26 is not whether the discovery sought is, in the trial context, evidence that is "material." The test under the rule is simply whether or not the discovery sought is "relevant to the claims or defenses of any party," with the court having the discretion to allow discovery that is "relevant to the subject matter" of the litigation. Whether evidence is material to any given issue at trial is a trial not a discovery issue.

Second, the documents sought (concerning scorecards and second scorecards) in all likelihood will show that Putnam terminated the employment of Svensson, an extremely high-performing female investment professional and in doing so did not take into account her actual performance. The document in all likelihood will sow that Svensson was one of the top performers.

Third, it is Svensson position that her termination on the complaint of two male subordinates for her management "style" was and is pretext. Svensson is entitled to discover Putnam documents that she believes will show that when terminated she was a top performer in the research department. The documents sought will provide objective data.

Fourth, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Fifth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been limited drastically.

74



Sixth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Seventh, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, If the Putnam opposition is correct as to fact, Svensson will accept a statement under oath from an authorized Putnam official that the documents described by Morgan do not exist.

---

**Svensson Request No. 50:**

The "notes" prepared by Tibbetts, which, "according to the Putnam privilege log, concerned "female partners."

**Putnam Response No. 50:**

Putnam objects to this Request on the grounds that such documents are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

Neither in its responses to Category Nos. 50-54 nor in its Amended Privilege Log has Putnam made the showings required to support the claims of attorney-client privilege or work product.

Accordingly Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the



court to assess the applicability of the claims. Svensson requests the court after the

disclosure of this information to review in camera the withheld documents to assist the

court in making its determinations as to these categories.

Putnam Opposition

- Putnam continues to respond that because these documents were either prepared for, or directed to, Putnam's counsel, they are within the protection of the attorney-client and work-product privileges.

Svensson's Reply:

Svensson requests the court first to order Putnam to disclose to Svensson and the

court the relevant information necessary to enable Svensson and the court to assess the

applicability of the claims. Svensson requests the court after the disclosure of this

information to review in camera the withheld documents to assist the court in making its

determinations as to these categories.

Svensson Request No. 51:

The "undated" "notes" by an "unknown" author to an unidentified recipient, which,
according to the Putnam privilege log, concerns "Svensson employment history."

Putnam Response No. 51: Putnam objects to this Request on the grounds these documents
were created by Putnam's Human Resources Office at the request of outside counsel,
Louis Rodrigues, and thus, are protected by the attorney-client privilege and the work-
product doctrines, as so noted in Putnam's privilege log.

Svensson's Initial Argument
in Support of Motion to Compel:

Neither in its responses to Category Nos. 50-54 nor in its Amended Privilege Log

has Putnam made the showings required to support the claims of attorney-client privilege

or work product.

Accordingly Svensson requests the court first to order Putnam to disclose to

Svensson and the court the relevant information necessary to enable Svensson and the



court to assess the applicability of the claims. Svensson requests the court after the

disclosure of this information to review in camera the withheld documents to assist the

court in making its determinations as to these categories.

**Putnam Opposition**

- Putnam continues to respond that because these documents were either prepared for, or directed to, Putnam's counsel, they are within the protection of the attorney-client and work-product privileges.

**Svensson's Reply:**

Svensson requests the court first to order Putnam to disclose to Svensson and the

court the relevant information necessary to enable Svensson and the court to assess the

applicability of the claims. Svensson requests the court after the disclosure of this

information to review in camera the withheld documents to assist the court in making its

determinations as to these categories.

---

**Svensson Request No. 52:**



The 1998 "maternity leave summary" prepared, according to the Putnam privilege log, by an "unknown" author for an unidentified recipient.

**Putnam Response No. 52:** Putnam objects to this Request on the grounds these documents were created by Putnam's Human Resources Office at the request of outside counsel, Louis Rodrigues, and thus, are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

**Svensson's Initial Argument
in Support of Motion to Compel:**

Neither in its responses to Category Nos. 50-54 nor in its Amended Privilege Log

has Putnam made the showings required to support the claims of attorney-client privilege

or work product.

Accordingly Svensson requests the court first to order Putnam to disclose to

Svensson and the court the relevant information necessary to enable Svensson and the

(53)

court to assess the applicability of the claims. Svensson requests the court after the

disclosure of this information to review in camera the withheld documents to assist the

court in making its determinations as to these categories.

Putnam Opposition

> Putnam objects to this Request on the grounds these documents were created by Putnam's
> Human Resources Office at the request of outside counsel, Louis Rodriques, and thus,
> are protected by the attorney-client privilege and the work-product doctrines, as so noted
> in Putnam's privilege log.

Svensson's Reply:

Svensson requests the court first to order Putnam to disclose to Svensson and the

court the relevant information necessary to enable Svensson and the court to assess the

applicability of the claims. Svensson requests the court after the disclosure of this

information to review in camera the withheld documents to assist the court in making its

determinations as to these categories.

Svensson Request No. 53:

(53)

The September 3, 2003, "e-mail re: litigation forwarded with e-mail from [Attorney]

Rodrigues..." authored by McNamee and sent to the recipient, Brooks, as referred to in

the Putnam privilege log but redacted so as to not disclose only the words used by the

author or Attorney Rodrigues in a "communication," within the meaning of U.S. v.

United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950), each other, but

disclosing the other words and information in either of the e-mails, including, without

limitation, the identity of the author, the identity of the recipient(s), the date and time of

the transmission and the words in the subject line.

Putnam Response No. 53:  Putnam objects to this Request on the grounds that such documents are

EXHIBIT 1-5



protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

Neither in its responses to Category Nos. 50-54 nor in its Amended Privilege Log has Putnam made the showings required to support the claims of attorney-client privilege or work product.

Accordingly Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the court to assess the applicability of the claims. Svensson requests the court after the disclosure of this information to review in camera the withheld documents to assist the court in making its determinations as to these categories.

**Putnam Opposition**

Putnam objects to this Request on the grounds that such documents are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

**Svensson's Reply:**

Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the court to assess the applicability of the claims. Svensson requests the court after the disclosure of this information to review in camera the withheld documents to assist the court in making its determinations as to these categories.

**Svensson Request No. 54:**



The August 27, 2003, "e-mail re: Draft termination agreement" from author Hadley to recipients McNamee and Attorney Rodrigues, as referred to in the Putnam privilege log but redacted so as to not disclose the words used by the author or Attorney Rodrigues in a



"communication," within the meaning of U.S. v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950), with each other but disclosing the other words and information in the e-mail, including, without limitation, the identity of the author, the identity of the recipient(s), the date and time of the transmission, the words in the subject line and the attachment.

**Putnam Response No. 54:** Putnam objects to this Request on the grounds that such documents are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log.

Svensson's Initial Argument
in Support of Motion to Compel:

Neither in its responses to Category Nos. 50-54 nor in its Amended Privilege Log has Putnam made the showings required to support the claims of attorney-client privilege or work product.

Accordingly Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the court to assess the applicability of the claims. Svensson requests the court after the disclosure of this information to review in camera the withheld documents to assist the court in making its determinations as to these categories.

Putnam Opposition

Putnam objects to this Request on the grounds that such documents are protected by the attorney-client privilege and the work-product doctrines, as so noted in Putnam's privilege log

Svensson's Reply: Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the court to assess the applicability of the claims. Svensson requests the court after the disclosure of this information to review in camera the withheld documents to assist the court in making its determinations as to these categories.

Svensson Request No. 55:

All documents and things concerning the amounts and types of compensation, including, without limitation, salary and bonus, paid or payable to Svensson [and the 91 Comparators] for each of the years 1999-2004.

Putnam Response No. 55: With respect to the Plaintiff, Putnam has already produced documents.... With respect to the balance ...overbroad, burdensome and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Total compensation paid or payable over time whether in cash, securities other things of value to Svensson and the 91 Comparators is highly relevant as, among other things, evidencing comparisons made by Putnam between and among the 91 Comparators. The information requested is relevant to, among others, the Svensson equal pay claim. The documents that should be produced in response to this category include documents evidencing the total compensation including bonus compensation paid or payable to any of the 91 Comparators whether he or she was a participant in the partners' pool, so-called, and/or in the A&P pool, so-called, plus any compensation derived from Putnam equity partnership units or stock options, or MMC restricted stock or stock options of the parent holding company ("MMC").

Putnam Opposition

- Putnam has already produced the salary and bonus information for each of the 91 for years 1999 - 2003. Ms. Svensson cannot have "a second bite at the apple" and now request compensation information, such as equity, that she did not initially request.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel Answers to Interrogatories, Putnam does not agree that these individuals are Ms. Svensson's legal comparators

Svensson's Reply:

First, Svensson's request for documents concerning total compensation when the

Putnam opposition admits that it previously produced only salary and bonus information

not including stock is not an improper "second bite at the apple." Svensson's request for

documents concerning total compensation was made within the discovery period.

　　While Putnam has furnished some information as to total compensation, strangely,

it appears to ask the court for permission to withhold all such information. On September

29, 2006, in her notice to Putnam, Svensson demonstrated the deficiencies as to total

compensation as follows:

> Total compensation needed in full for every year.
>
> "what" has been provided at PRM 4135-4144 is only salary and
> bonus for the 91. However, total compensation has not been
> furnished in all respects as Putnam has furnished total
> compensation information for only some years and for only for
> some of the 91. Complete production of this information for all
> concerned and for all years 1999 - 2003 is needed. "what" was
> provided is summarized as follows:
>
> 1999 (79 Comparators as of 12/31/99):
>
> > PRM 3192-3195
> > 29 Comparators given
> > "Top 50" Total Compensation
>
> 2000 (82 Comparators as of 12/31/00):
>
> > PRM 3937-3956
> > 66 Comparators given
> > Total Comp >400K, no
> > Partners included
>
> 2001 (81 Comparators as of 12/31/01):
>
> > PRM 3196-3220
> > 71 Comparators given
> > Total Compensation
> > Sorted High to Low
>
> 2002 (71 Comparators as of 12/31/02):



PRM 3221-3226
43 Comparators given
"Top 100" Total Incentive
Recipients

2003 (61 Comparators as of 12/31/03):

No documents

Second, Second, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

---

Svensson Request No. 56:



All documents and things identifying any of the [91 Comparators who] left the employ of

Putnam on a voluntary basis in the period 1999 to date.

Putnam Response No. 56:  Putnam objects to this Request on the grounds that it is overbroad,
burdensome and seeks information that is irrelevant and not reasonably calculated to lead to
the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on
file with the Court.

Svensson's Initial Argument
in Support of Motion to Compel:

Category Nos. 56-60 seek documents concerning the circumstances of and

reasons for any one or more of the 91 Comparators who left their employment at Putnam

whether on an involuntary or voluntary basis.  This is a highly relevant area of inquiry, as

the reasons and circumstances affecting Svensson must be compared to those affecting

others of the 91 Comparators who left Putnam, either "voluntarily" or "involuntarily."

Plaintiff will limit the respective category to any of the 91 Comparators who

departed Putnam during the period since January 1, 1999, and to those instances in which

the decision to depart was initiated by Putnam unless Svensson contends that the decision

was initiated by the comparator.

Svensson expects that included as investment professionals whose departure was

initiated by Putnam are, at least, the following of the 91 Comparators:  Allansmith,

Cotner, Farrell, MacElwee-Jones, Kuenstner, McMullen, Peters, Parker, Smith, Spatz,

Thomsen, Leichter, Wheeler and Williams. If Putnam contends otherwise, then Putnam

also must produce documents evidencing that the decision to depart was initiated by the

comparator.

Putnam Opposition

- Putnam has already produced worksheets detailing which of the 91 left Putnam's employ, and whether it was on a voluntary or involuntary basis.

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam terminated employees in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 14 former Putnam employees.

- This request would require Putnam to restore the email boxes of 14 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- Putnam notes the irony that Ms. Svensson only is concerned with females she believes were involuntarily terminated from Putnam, even though the list provided by Putnam names twice as many men among the 91 who were involuntarily terminated.

Svensson's Reply:

First, whether terminations were voluntary or involuntary is a question of fact.

Putnam has been neither consistent nor accurate in responding to discovery requests

about terminations. For example, on the one hand, Haldeman testified at p. 147, ll. 22-

24, that "Steve [Oristaglio] and I concluded that it would probably be best if Paul

[Warren] moved on and I was the one who decided that I would talk to him." On the

other hand, Putnam document PRM 4134 produced as part of its answers under oath to

Svensson's Interrogatories, states that Warren's departure was voluntary ("Vol").

Second, the "lists" referred to do not furnish the reasons for the terminations. The lists tell the "what" and not the "why"; and it is the "why" that is key to a determination as to whether Putnam engaged in gender discrimination. The "why" has not been furnished in the prior production or in the answers to interrogatories. The circumstances of the terminations of other females and of the males are relevant to showing whether or not Svensson was the victim of gender discrimination

Third, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.

Fourth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails of the decision-makers in regard to the comparators who left.

Fifth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Sixth, this request does not  seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, the issue is not absolute numbers, it is the percentage that counts. It is no surprise that in terms of absolute numbers there were more male terminations than of females since the males far outnumbered the females, when Putnam downsized after the

85



public scandal (which came to notice after Svensson was fired).

---

Svensson Request No. 57:

> All documents and things concerning the circumstances and reasons for the voluntary terminations referred to in the immediately preceding category.

Putnam Response No. 57: Putnam objects... overbroad, burdensome and ...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

> Category Nos. 56-60 seek documents concerning the circumstances of and reasons for any one or more of the 91 Comparators leaving of the employ of Putnam whether involuntary or voluntary. This is a highly relevant are of inquiry as the reasons and circumstances affecting Svensson must be compared to those affecting others of the 91 Comparators who left Putnam either "voluntarily" or "involuntarily."

> Plaintiff will limit the respective category to any of the 91 Comparators who departed Putnam during the period since January 1, 1999, and to those instances in which the decision to depart was initiated by Putnam unless Svensson contends that the decision was initiated by the comparator.

Svensson expects that included as investment professional whose departure initiated by Putnam are at least the following of the 91 Comparators: Allansmith, Cotner, Farrell, MacElwee-Jones, Kuenstner, McMullen, Peters, Parker, Smith, Spatz, Thomsen, Leichter, Wheeler and Williams. If Putnam contends otherwise, then Putnam also must produce documents evidencing that the decision to depart was initiated by the comparator.

Putnam Opposition

- Putnam has already produced worksheets detailing which of the 91 left Putnam's employ, and whether it was on a voluntary or involuntary basis.

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam terminated employees in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 14 former Putnam employees.

- This request would require Putnam to restore the email boxes of 14 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- Putnam notes the irony that Ms. Svensson only is concerned with females she believes were involuntarily terminated from Putnam, even though the list provided by Putnam names twice as many men among the 91 who were involuntarily terminated.

Svensson's Reply:

First, whether terminations were voluntary or involuntary is a question of fact. Putnam has been neither consistent nor accurate in responding to discovery requests about terminations. For example, on the one hand, Haldeman testified at p. 147, ll. 22-24, that "Steve [Oristaglio] and I concluded that it would probably be best if Paul [Warren] moved on and I was the one who decided that I would talk to him." On the other hand, Putnam document PRM 4134 produced as part of its answers under oath to Svensson's Interrogatories, states that Warren's departure was voluntary ("Vol").

Second, the "lists" referred to do not furnish the reasons for the terminations. The lists tell the "what" and not the "why"; and it is the "why" that is key to a determination as to whether Putnam engaged in gender discrimination. The "why" has not been furnished in the prior production or in the answers to interrogatories. The circumstances



of the terminations of other females and of the males are relevant to showing whether or not Svensson was the victim of gender discrimination

Third, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.

Fourth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra. The scope of the documents required has been drastically limited to only the documents the comparators who left.

Fifth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Sixth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, the issue is not absolute numbers, it is the percentage that counts. It is no surprise that in terms of absolute numbers there were more male terminations than of females since the males far outnumbered the females and especially when Putnam downsized after the public scandal (which came to notice after Svensson was fired).

---

**Svensson Request No. 58:**



All documents and things identifying any of the identified males and any of the identified females who left the employ of Putnam on an involuntary basis in the period 1999 to date.

Putnam Response No. 58: Putnam objects to this Request on the grounds that the Request is overbroad, burdensome and seeks information that is irrelevant and not reasonably

calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the Court.

Svensson's Initial Argument
in Support of Motion to Compel:

Category Nos. 56-60 seek documents concerning the circumstances of and reasons for any one or more of the 91 Comparators leaving of the employ of Putnam whether involuntary or voluntary. This is a highly relevant are of inquiry as the reasons and circumstances affecting Svensson must be compared to those affecting others of the 91 Comparators who left Putnam either "voluntarily" or "involuntarily."

Plaintiff will limit the respective category to any of the 91 Comparators who departed Putnam during the period since January 1, 1999, and to those instances in which the decision to depart was initiated by Putnam unless Svensson contends that the decision was initiated by the comparator.

Svensson expects that included as investment professional whose departure initiated by Putnam are at least the following of the 91 Comparators: Allansmith, Cotner, Farrell, MacElwee-Jones, Kuenstner, McMullen, Peters, Parker, Smith, Spatz, Thomsen, Leichter, Wheeler and Williams. If Putnam contends otherwise, then Putnam also must produce documents evidencing that the decision to depart was initiated by the comparator.

Putnam Opposition

- Putnam has already produced worksheets detailing which of the 91 left Putnam's employ, and whether it was on a voluntary or involuntary basis.

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam terminated employees in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 14 former Putnam employees.

- This request would require Putnam to restore the email boxes of 14 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- Putnam notes the irony that Ms. Svensson only is concerned with females she believes were involuntarily terminated from Putnam, even though the list provided by Putnam names twice as many men among the 91 who were involuntarily terminated.

Svensson's Reply:

First, whether terminations were voluntary or involuntary is a question of fact. Putnam has been neither consistent nor accurate in responding to discovery requests about terminations. For example, on the one hand, Haldeman testified at p. 147, ll. 22-24, that "Steve [Oristaglio] and I concluded that it would probably be best if Paul [Warren] moved on and I was the one who decided that I would talk to him." On the other hand, Putnam document PRM 4134 produced as part of its answers under oath to Svensson's Interrogatories, states that Warren's departure was voluntary ("Vol").

Second, the "lists" referred to do not furnish the reasons for the terminations. The lists tell the "what" and not the "why"; and it is the "why" that is key to a determination as to whether Putnam engaged in gender discrimination. The "why" has not been furnished in the prior production or in the answers to interrogatories. The circumstances of the terminations of other females and of the males are relevant to showing whether or not Svensson was the victim of gender discrimination

Third, Putnam is wrong on Jackson and Whittingham. See p. 2 , supra.

Fourth, the claim as to the e-mails is exaggerated and meritless; and the new e-

(59)

discovery rules should be applied to this case. See pp. 4-5, supra. The scope of the

documents required has been drastically limited. Svensson seeks in this category only

the e-mails limited to the comparators who left.

Fifth, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Sixth, this request does not seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, the issue is not absolute numbers, it is the percentage that counts. It is no

surprise that in terms of absolute numbers there were more male terminations than of

females since the males far outnumbered the females when Putnam downsized after the

public scandal (which came to notice after Svensson was fired).

---

**Svensson Request No. 59:**

(59)

All documents and things concerning the circumstances and reasons for the involuntary terminations referred to in the immediately preceding category.

Putnam Response No. 59: Putnam objects...overbroad, burdensome and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

Svensson's Initial Argument
in Support of Motion to Compel:

Category Nos. 56-60 seek documents concerning the circumstances of and

reasons for any one or more of the 91 Comparators leaving of the employ of Putnam

whether involuntary or voluntary. This is a highly relevant are of inquiry as the reasons and circumstances affecting Svensson must be compared to those affecting others of the 91 Comparators who left Putnam either "voluntarily" or "involuntarily."

Plaintiff will limit the respective category to any of the 91 Comparators who departed Putnam during the period since January 1, 1999, and to those instances in which the decision to depart was initiated by Putnam unless Svensson contends that the decision was initiated by the comparator.

Svensson expects that included as investment professional whose departure initiated by Putnam are at least the following of the 91 Comparators: Allansmith, Cotner, Farrell, MacElwee-Jones, Kuenstner, McMullen, Peters, Parker, Smith, Spatz, Thomsen, Leichter, Wheeler and Williams. If Putnam contends otherwise, then Putnam also must produce documents evidencing that the decision to depart was initiated by the comparator.

Putnam Opposition

- Putnam has already produced worksheets detailing which of the 91 left Putnam's employ, and whether it was on a voluntary or involuntary basis.

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam terminated employees in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 14 former Putnam employees.

- This request would require Putnam to restore the email boxes of 14 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- Putnam notes the irony that Ms. Svensson only is concerned with females she believes were involuntarily terminated from Putnam, even though the list provided by Putnam names twice as many men among the 91 who were involuntarily terminated.

Svensson's Reply:

First, whether terminations were voluntary or involuntary is a question of fact. Putnam has been neither consistent nor accurate in responding to discovery requests about terminations. For example, on the one hand, Haldeman testified at p. 147, ll. 22-24, that "Steve [Oristaglio] and I concluded that it would probably be best if Paul [Warren] moved on and I was the one who decided that I would talk to him." On the other hand, Putnam document PRM 4134 produced as part of its answers under oath to Svensson's Interrogatories, states that Warren's departure was voluntary ("Vol").

Second, the "lists" referred to do not furnish the reasons for the terminations. The lists tell the "what" and not the "why"; and it is the "why" that is key to a determination as to whether Putnam engaged in gender discrimination. The "why" has not been furnished in the prior production or in the answers to interrogatories. The circumstances of the terminations of other females and of the males are relevant to showing whether or not Svensson was the victim of gender discrimination

Third, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2, <u>supra</u>.

Fourth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails limited to the comparators who left.

Fifth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That

93



simply is an assertion without proof.  Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Sixth, this request does not  seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, the issue is not absolute numbers, it is the percentage that counts. It is no surprise that in terms of absolute numbers there were more male terminations than of females since the males far outnumbered the females and  especially when Putnam downsized after the public scandal (which came to notice after Svensson was fired).

---

Svensson Request No. 60:



All documents and things concerning any severance package agreed to buy Putnam and any of the [91 Comparators] in regard to his or her leaving the employ of Putnam (whether voluntarily or involuntarily) in the period 1999 to date.

Putnam Response No. 60:   With respect to the Plaintiff, Putnam has already produced documents....  With respect to the balance ...overbroad, burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds...in Putnam's Opposition....and duplicative of the documents sought in Svensson's Reply:

Svensson's Initial Argument
in Support of Motion to Compel:

Category Nos. 56-60 seek documents concerning the circumstances of, and reasons for, any one or more of the 91 Comparators leaving of the employ of Putnam, whether on a voluntary or involuntary basis.  This is a highly relevant area of inquiry as the reasons and circumstances affecting Svensson must be compared to those affecting others of the 91 Comparators who left Putnam either "voluntarily" or "involuntarily."

Plaintiff will limit the respective categories to any of the 91 Comparators who

departed Putnam unless Putnam contends that the decision was initiated by the comparator.

Svensson expects that included as comparators whose leaving was initiated by Putnam are at least the following of the 91 Comparators: Allansmith, Cotner, Farrell, MacElwee-Jones, Kuenstner, McMullen, Peters, Parker, Smith, Spatz, Thomsen, Leichter, Wheeler and Williams. If Putnam contends otherwise, then Putnam also should be ordered to produce documents evidencing that the decision to depart was initiated by the comparator.

Putnam Opposition

- Putnam has already produced worksheets detailing which of the 91 left Putnam's employ, and whether it was on a voluntary or involuntary basis.

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

- Putnam has already provided all objective data necessary to determine if Putnam terminated employees in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 14 former Putnam employees.

- This request would require Putnam to restore the email boxes of 14 former or current Putnam employees, review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist, and thus is grossly overbroad and burdensome for the reasons stated in this Introduction.

- Putnam notes the irony that Ms. Svensson only is concerned with females she believes were involuntarily terminated from Putnam, even though the list provided by Putnam names twice as many men among the 91 who were involuntarily terminated.

- 

Svensson's Reply:

First, whether terminations were voluntary or involuntary is a question of fact. Putnam has been neither consistent nor accurate in responding to discovery requests

about terminations. For example, on the one hand, Haldeman testified at p. 147, ll. 22-24, that "Steve [Oristaglio] and I concluded that it would probably be best if Paul [Warren] moved on and I was the one who decided that I would talk to him." On the other hand, Putnam document PRM 4134 produced as part of its answers under oath to Svensson's Interrogatories, states that Warren's departure was voluntary ("Vol").

Second, the "lists" referred to do not furnish the reasons for the terminations. The lists tell the "what" and not the "why"; and it is the "why" that is key to a determination as to whether Putnam engaged in gender discrimination. The "why" has not been furnished in the prior production or in the answers to interrogatories. The circumstances of the terminations of other females and of the males are relevant to showing whether or not Svensson was the victim of gender discrimination

Third, Putnam is wrong on <u>Jackson</u> and <u>Whittingham</u>. <u>See</u> p. 2 , <u>supra</u>.

Fourth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>. The scope of the documents required has been drastically limited. Svensson seeks in this category only the e-mails limited to the comparators who left.

Fifth, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Sixth, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the



discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, the issue is not absolute numbers, it is the percentage that counts. It is no

surprise that in terms of absolute numbers there were more male terminations than of

females since the males far outnumbered the females and especially when Putnam

downsized after the public scandal (which came to notice after Svensson was fired).

**Svensson Request No. 61:**



All documents and things concerning communication between or among Putnam, any
affiliate of Putnam, and Landes, Eckland and/or Oristaglio/or any other person(s) concerning
the testimony or possible testimony in a deposition or at trial in this case by Landes, Eckland
and/or Oristaglio.

Putnam Response No. 61:  Putnam objects...not discoverable due to the attorney-client privilege
        and the attorney work-product doctrine.

Svensson's Initial Argument
in Support of Motion to Compel:

Neither in its response to this category nor in its Amended Privilege Log has

Putnam made the showings required to support the claims of attorney-client privilege or

work product.

Accordingly Svensson requests the court first to order Putnam to disclose to

Svensson and the court the relevant information necessary to enable Svensson and the

court to assess the applicability of the claims.  Svensson requests the court after the

disclosure of this information to review in camera the withheld documents to assist the

court in making its determinations as to this category.

Putnam Opposition:

- Putnam continues to respond that because these documents were either
  prepared for, or directed to, Putnam's counsel, they are within the protection
  of the attorney-client and work-product privileges.

- Messrs. Landes, Eckland and Oristaglio are no longer in Putnam's employ.



Therefore, this request calls for Putnam to restore and search each of its 3000 employees electronic mailboxes to find documents (that may or may not exist) that may be responsive. So far as Putnam is aware, no one from the Company has communicated with Messrs. Eckland or Landes regarding testifying on deposition or at trial. Any communication with Mr. Oristaglio was either a logistical email to arrange for his testimony, or a substantive email that rendered legal advice.

Svensson's Reply:

First, Svensson has reason to believe that the above contention that there has been no contact with Eckland as to testifying is not true.

Second, Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the court to assess the applicability of the claims. Svensson requests the court after the disclosure of this information to review in camera the withheld documents to assist the court in making its determinations as to this category.

Svensson Request No.62:

All documents and things concerning identifying or stating the total bonus pool available to Putnam for each year since January 1, 1999.



Putnam Response No.62: Putnam objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

The information sought is relevant because it is necessary to know the total bonus pool available for each year in order to enable the court and the jury at trial to determine if Putnam acted lawfully in its decisions to divide up the bonus pool among the 91 Comparators, and to know if there was any additional money or anything of value available from the total that might have been or should have been distributed to one or more of the 91 Comparators.



Putnam Opposition

- Putnam has already provided all objective data necessary to determine if Putnam awarded bonuses in a discriminatory manner.

- This request seeks to improperly try the gender discrimination cases of 91 present and former Putnam employees.

- This request fails to provide any basis to suggest that responsive documents exist would be relevant to one of Ms. Svensson's claims. Ms. Svensson fails to explain how the total dollar amount of the bonus pool is relevant to proof of discrimination against her.

Svensson's Reply:

First, the documents sought are relevant because it is necessary to know both the total money available in "A&P" bonus pool for the investment professionals as well as the additional money available in the bonus pool for partners to determine if there has been any discrimination in the decision to divide up the funds available.

Second, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Third, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

EXHIBIT 1-6

Svensson Request No. 63.

All documents and things concerning identifying or stating the total bonus pool available to the Investment Management Division for each year since January 1, 1999.



Putnam Response No. 63:  Putnam objects... overbroad, burdensome... irrelevant and not reasonably

calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

> The information sought is relevant because it is necessary to know the total bonus pool available for each year in order to be enable the court to determine if Putnam acted lawfully in its decisions to divide up the bonus pool among the 91 Comparators.

Putnam Opposition

- Putnam has already provided all objective data necessary to determine if Putnam awarded bonuses in a discriminatory manner.
- This request seeks to improperly try the gender discrimination cases of 91 present and former Putnam employees.
- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.
- Ms. Svensson fails to explain how the total dollar amount of the bonus pool is relevant to proof of discrimination against her.

Svensson's Reply:

> First, the documents sought are relevant because it is necessary to know both the total money available in "A&P" bonus pool for the investment professionals as well as the additional money available in the bonus pool for partners to determine if there has been any discrimination in the decision to divide up the funds available.

> Second, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

> Third, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to



the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

**Svensson Request No. 64:**



All documents and things concerning the amounts of the bonuses allocated for each year since January 1, 1999, to such of the [91 Comparators] receiving a bonus.

Putnam Response No. 64: Putnam objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

The information sought is relevant because it is necessary to know the total bonus

pool available for each year in order to be enable the court to determine if Putnam acted

lawfully in its decisions to divide up the bonus pool among the 91 Comparators.

Putnam Opposition

- Putnam has already provided all objective data necessary to determine if Putnam awarded bonuses in a discriminatory manner.
- This request seeks to improperly try the gender discrimination cases of 91 present and former Putnam employees.
- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claims.

Svensson's Reply:

First, the documents sought are relevant because it is necessary to know both the

total money available in "A&P" bonus pool for the investment professionals as well as

the additional money available in the bonus pool for partners to determine if there has

been any discrimination in the decision to divide up the funds available.

Second, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

[REPEAT OF 64]

simply is an assertion without proof.  Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Third, this request does not  seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

---

Svensson Request No. 64:                                               [REPEAT OF 64]

All documents and things concerning the amounts of the bonuses allocated for each year
since January 1, 1999, to such of the [91 Comparators] receiving a bonus.

Putnam Response No. 64

Putnam objects to this Request on the grounds that the Request is overbroad,
burdensome and seeks information that is irrelevant and/or not reasonably calculated
to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's
Opposition on file with the Court.

Svensson's Initial Argument
in Support of Motion to Compel:

The information sought is relevant because it is necessary to know the total bonus

pool available for each year in order to be enable the court to determine if Putnam acted

lawfully in its decisions to divide up the bonus pool among the 91 Comparators.

Putnam Opposition

- Putnam has already provided all objective data necessary to determine if Putnam
  awarded bonuses in a discriminatory manner. This request seeks to improperly try
  the gender discrimination cases of 91 present and former Putnam employees.

- This request fails to provide any basis to suggest that responsive documents exist
  that would be relevant to one of Ms. Svensson's claims.

Svensson's Reply:

First, the documents sought are relevant because it is necessary to know both the

102



65

total money available in the "A&P" bonus pool for the investment professionals as well as the additional money available in the bonus pool for partners to determine if there has been any discrimination in the decision to divide up the funds available.

Second, it is not true that "Putnam has already provided all objective data necessary to determine if Putnam made decisions in a discriminatory manner." That simply is an assertion without proof. Moreover, even if true (it is not), the subjective information is necessary to evaluate intent of Putnam.

Third, this request does not seek to try any person's gender discrimination case other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to the claims" she has made as to disparate treatment and disparate impact and, with the discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Svensson Request No. 65:

65

The "anonymous" letter concerning Warren, which is referred to at p. 357 of the McNamee deposition.

Putnam Response No. 65: Putnam objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

The conduct of Paul Warren, one of the 91 Comparators, described in the letter referred to (see McNamee deposition p. 357 ("...And "what" bad behavior over the years did it allege Paul Warren had [engaged in]? That he frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers excessively and accepted gifts from brokers excessively")) is relevant to show the nature of the conduct of this person and to be able to compare his conduct in the workplace to that alleged of Svensson.

Putnam Opposition

- Mr. Warren, like Ms. Svensson, was terminated. By definition, therefore, Mr. Warren is not a legal comparator of Ms. Svensson.

- The conduct for which Putnam discharged Ms. Svensson must be nearly identical to that engaged in by an employee outside the protected class whom Putnam retained. Conward v. The Cambridge, School Committee, 171 F.3d 12, 19 (1st Cir.1999). Because mismanaging subordinates and the behavior of Mr. Warren were not "nearly identical" this request is not legally relevant.

Svensson's Reply:

First, the Putnam characterization of <u>Conward</u> is incorrect. The standard is not "nearly identical;" it is as serious or more serious. <u>See</u> discussion of <u>Conward</u> at p. 3, <u>supra</u>.

Second, whether or not Warren was "terminated" is an issue of fact as Putnam in its answers to interrogatories has described Warren's leaving of Putnam as "voluntary." <u>See</u> Putnam document PRM 4134, furnished as part of its September 1, 2006, answers to the Svensson's Interrogatories.

Third, even if it turns out that Warren's January 2004 departure from Putnam (a year and a quarter after Svensson's) was involuntary, that does not mean that he was not a comparator of Svensson for compensation, promotion, demotion and termination purposes.

Fourth, the conduct of Warren is relevant also to show the workplace atmosphere tolerated and encouraged by Putnam. [0]

Svensson Request No. 66:

All documents and things concerning the language used and/or the behavior of Warren of the type referred to at pp. 18-21 and 357 of the McNamee deposition.

Putnam Response No. 66: Putnam objects...overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument
in Support of Motion to Compel:

      The conduct of Paul Warren, one of the 91 Comparators, described in the letter referred

to (see McNamee deposition p. 357 ("...And "what" bad behavior over the years did it

allege Paul Warren had [engaged in]? That he frequented strip clubs...[a]nd that he over -

- he utilized entertainment from brokers excessively and accepted gifts from brokers

excessively")) and at pp. 18-2 ("They were talking about a --someone leaving the group

and that would leave a hole in the work...and he stood up and grabbed his crotch and

said, "You could fill it with this") is relevant to show the nature of the conduct of this

person and to be able to compare his conduct in the workplace to that alleged of

Svensson.

Putnam Opposition

- Mr. Warren, like Ms. Svensson, was terminated. By definition, therefore, Mr. Warren is not a legal comparator of Ms. Svensson.

- The conduct for which Putnam discharged Ms. Svensson must be nearly identical to that engaged in by an employee outside the protected class whom Putnam retained. Conward v. The Cambridge, School Committee, 171 F.3d 12, 19 (1st Cir.1999). Because mismanaging subordinates and the behavior of Mr. Warren were not "nearly identical" this request is not legally relevant.

- This request would require Putnam to restore and review email boxes of an indefinite number of former and present Putnam employees for information or communications about Mr. Warren's behavior.

Svensson's Reply:

      First, Putnam's characterization of <u>Conward</u> is incorrect. <u>See</u> discussion of

<u>Conward</u>, p.3, supra.

      Second, whether or not Warren was "terminated" is an issue of fact as Putnam in

its answers to interrogatories has described Warren's leaving of Putnam as "voluntary."



<u>See</u> Putnam document PRM 4134, furnished as part of its September 1, 2006, answers to

the Svensson's Interrogatories.

Third, even if it turns out that Warren's January 2004 departure from Putnam (a

year and a quarter after Svensson's) was involuntary, that does not mean that he was not a

comparator of Svensson for compensation, promotion, demotion and termination

purposes.

Fourth, the conduct of Warren is relevant also to show the workplace atmosphere

tolerated and encouraged by Putnam.

Finally, the claim as to the e-mails is exaggerated and meritless; and the new e-

discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>.

---

**Svensson Request No. 67:** 

All documents and things concerning communication between Lasser or Haldeman and the
Human Relations Department at Putnam and/or any other person concerning the language
used by and/or behavior of Warren referred to at pp. 18-21 and 357 of the McNamee
deposition.

**Putnam Response No. 67:** Putnam objects... overbroad, burdensome... irrelevant and not reasonably
calculated to lead to the discovery of admissible evidence.

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

Communication at Putnam concerning the conduct of Paul Warren, one of the 91

Comparators, described in the letter referred to (see McNamee deposition p. 357 ("...And

"what" bad behavior over the years did it allege Paul Warren had [engaged in]? That he

frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers

excessively and accepted gifts from brokers excessively")) and at pp. 18-2 ("They were

talking about a --someone leaving the group and that would leave a hole in the work...and

he stood up and grabbed his crotch and said, "You could fill it with this") is relevant to

show the nature of the conduct of this person and to be able to compare his conduct in the workplace to that alleged of Svensson, and to determine if there has been any gender discrimination in the treatment of Svensson and the females among the 91 Comparators.

Putnam Opposition

- Mr. Warren, like Ms. Svensson, was terminated. By definition, therefore, Mr. Warren is not a legal comparator of Ms. Svensson.

- The conduct for which Putnam discharged Ms. Svensson must be nearly identical to that engaged in by an employee outside the protected class whom Putnam retained. Conward v. The Cambridge, School Committee, 171 F.3d 12, 19 (1st Cir.1999). Because mismanaging subordinates and the behavior of Mr. Warren were not "nearly identical" this request is not legally relevant.

- This request would require Putnam to restore and review email boxes of an indefinite number of former and present Putnam employees for information or communications about Mr. Warren's behavior.

Svensson's Reply:

First, Putnam's characterization of <u>Conward</u> is incorrect. The conduct must be "as serious or more serious." <u>See</u> discussion of <u>Conward</u>, p. 3, <u>supra</u>.

Second, whether or not Warren was "terminated" is an issue of fact as Putnam in its answers to interrogatories has described Warren's leaving of Putnam as "voluntary." <u>See</u> Putnam document PRM 4134, furnished as part of its September 1, 2006, answers to the Svensson's Interrogatories.

Third, even if it turns out that Warren's January 2004 departure from Putnam (a year and a quarter after Svensson's) was involuntary, that does not mean that he was not a comparator of Svensson for compensation, promotion, demotion and termination purposes.

Fourth, the conduct of Warren is relevant also to show the workplace atmosphere tolerated and encouraged by Putnam.



Finally, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra.



**Svensson Request No. 68:**



All documents and things concerning the investigation of Warren by Tibbetts, which is referred to at p. 358 of the McNamee deposition.

**Putnam Response No. 68:** Putnam objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**Svensson's Initial Argument
in Support of Motion to Compel:**

Documents concerning the investigation at Putnam concerning the conduct of Paul Warren, one of the 91 Comparators, described in the letter referred to (see McNamee deposition p. 357 ("...And "what" bad behavior over the years did it allege Paul Warren had [engaged in]? That he frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers excessively and accepted gifts from brokers excessively")) and at pp. 18-2 ("They were talking about a --someone leaving the group and that would leave a hole in the work...and he stood up and grabbed his crotch and said, "You could fill it with this") is relevant to show the nature of the conduct of this person and to be able to compare his conduct in the workplace to that alleged of Svensson, and to determine if there has been any gender discrimination in the treatment of Svensson and the females among the 91 Comparators.

**Putnam Opposition**

- Mr. Warren, like Ms. Svensson, was terminated. By definition, therefore, Mr. Warren is not a legal comparator of Ms. Svensson.
- 
- The conduct for which Putnam discharged Ms. Svensson must be nearly identical to that engaged in by an employee outside the protected class whom Putnam retained. Conward v. The Cambridge, School Committee, 171 F.3d 2, 19 (1st Cir.1999). Because mismanaging subordinates and the

behavior of Mr. Warren were not "nearly identical" this request is not legally relevant.

- This request would require Putnam to restore and review email boxes of an indefinite number of former and present Putnam employees for information or communications about Mr. Warren's behavior.

- As these requests recognize, Ms. Svensson has already deposed Ms. McNamee and Mr. Tibbetts at length about this subject matter.

Svensson's Reply:

First, Putnam's characterization of <u>Conward</u> is incorrect. The conduct must be "as serious or more serious." <u>See</u> discussion of <u>Conward</u>, p. 3, <u>supra</u>.

Second, whether or not Warren was "terminated" is an issue of fact as Putnam in its answers to interrogatories has described Warren's leaving of Putnam as "voluntary." <u>See</u> Putnam document PRM 4134, furnished as part of its September 1, 2006, answers to the Svensson's Interrogatories.

Third, even if it turns out that Warren's January 2004 departure from Putnam (a year and a quarter after Svensson's) was involuntary, that does not mean that he was not a comparator of Svensson for compensation, promotion, demotion and termination purposes.

Fourth, the conduct of Warren is relevant also to show the workplace atmosphere tolerated and encouraged by Putnam.

Fifth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>.

Finally, although there may have been some deposition testimony, it was taken without the benefit of the documents requested, and cannot properly be an excuse for not producing the documents.



**Svensson Request No. 69:**

> If the "investigation" of Warren was not "handled" as the McNamee deposition states, by Tibbetts, but was "handled" in whole or in part by one or more other persons, all documents and things concerning the investigation of Warren by such other person or persons.

**Putnam Response No. 69:** Putnam objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**Svensson's Initial Argument**
**in Support of Motion to Compel:**

> Documents concerning the investigation at Putnam concerning the conduct of Paul Warren, one of the 91 Comparators, described in the letter referred to (See McNamee deposition p. 357 ("...And "what" bad behavior over the years did it allege Paul Warren had [engaged in]? That he frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers excessively and accepted gifts from brokers excessively")) and at pp. 18-2 ("They were talking about a --someone leaving the group and that would leave a hole in the work...and he stood up and grabbed his crotch and said, "You could fill it with this") is relevant to show the nature of the conduct of this person and to be able to compare his conduct in the workplace to that alleged of Svensson, and to determine if there has been any gender discrimination in the treatment of Svensson and the females among the 91 Comparators.

**Putnam Opposition**

- Mr. Warren, like Ms. Svensson, was terminated. By definition, therefore, Mr. Warren is not a legal comparator of Ms. Svensson.

- The conduct for which Putnam discharged Ms. Svensson must be nearly identical to that engaged in by an employee outside the protected class whom Putnam retained. Conward v. The Cambridge, School Committee, 171 F.3d 2, 19 (1st Cir.1999). Because mismanaging subordinates and the behavior of Mr. Warren were not "nearly identical" this request is not legally relevant.

110

70

- This request would require Putnam to restore and review email boxes of an indefinite number of former and present Putnam employees for information or communications about Mr. Warren's behavior.

Svensson's Reply:

First, Putnam's characterization of <u>Conward</u> is incorrect. The conduct must be "as serious or more serious." <u>See</u> discussion of <u>Conward</u>, , p. 3, <u>supra</u>.

Second, whether or not Warren was "terminated" is an issue of fact as Putnam in its answers to interrogatories has described Warren's leaving of Putnam as "voluntary." <u>See</u> Putnam document PRM 4134, furnished as part of its September 1, 2006, answers to the Svensson's Interrogatories.

Third, even if it turns out that Warren's January 2004 departure from Putnam (a year and a quarter after Svensson's) was involuntary, that does not mean that he was not a comparator of Svensson for compensation, promotion, demotion and termination purposes.

Fourth, the conduct of Warren is relevant also to show the workplace atmosphere tolerated and encouraged by Putnam.

Fifth, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. <u>See</u> pp. 4-5, <u>supra</u>.

Svensson Request No. 70:

70

All documents and things concerning the compensation figures, studies and statistics referred to in the Allansmith deposition at pp. 88-90.

Putnam Response No. 70:   The compensation figures, studies and statistics referenced in the Allansmith deposition were performed by Ms. Allansmith, and Putnam does not possess any documents concerning such information. Putnam further objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Svensson's Initial Argument

in Support of Motion to Compel:

Assuming for the sake of argument that Putnam was correct in representing in June and July to Svensson and the court that it did not keep statistics on which males and females had children, it simply cannot be that Putnam "does not possess any documents concerning (which, as per Local Rule 26.5, means "referring to, describing, evidencing, or constituting". [the] other information referred to by Ms. Allansmith in her deposition, which includes, as more particularly set forth in the excerpt from the Allansmith deposition, Exhibit "A" to this memorandum, the following from her testimony:

89

4 ... Almost
5 all men were promoted. The number of
6 terminations -- even though women made up
7 a quarter or less of the department,
8 almost all of the terminations in that
9 five-year period were 100 percent women.
10 I think only two men were terminated. I
11 also had some compensation figures and I
12 ran some statistics on those as well.
13 ...I'm not sure "what" violates my
14 severance agreement with Putnam so I'm
15 going to remain quiet on the results of
16 those.
17 Q. "what" was the group, was that the
18 class of 2000?
19 A. For which?
20 Q. For your study. I mean, "what" group y
21  were you using?
22 A. I did extensive statistics. I used
23 the class of 2000 and tracked them. I
24 tracked the department for every year. I

90

1 tracked senior analysts and "what" happened
2 to those. I tracked junior analysts and
3 "what" happened to them. I mean, I did --



4 you know, I'm an analyst.
5 Q. Did you retain hard copies of those
6 studies?
7 A. Yes
8 Q. Do you still have them?
9 A. I do

\*\*\*

22 ...the penalties are quite
23 severe if I violate [my Putnam severance] agreement.

The documents requested are relevant and Putnam should be required to produce

them

## Putnam Opposition

- Putnam has already provided all objective data necessary to determine if Putnam treated females in a discriminatory manner.

- Ms. Svensson's "argument" does not respond to Putnam's objection, and states only that the documents are "relevant" and "Putnam should be required to produce them."

- This request fails to provide any basis to suggest that responsive documents exist that would be relevant to one of Ms. Svensson's claim.

- Putnam restates its initial objection.

## Svensson's Reply:

First, the documents requested are relevant to show the treatment and decision-

making of Putnam as affecting females as compared to males.

Second, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Request No. 71:

All documents and things concerning the Women's leadership Forum referred to at p. 180



of the Haldeman deposition.

Putnam Response No. 71: Putnam objects... overbroad, burdensome... irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Putnam further objects on the ground that the Women's Leadership Forum (referred to at p. 180 of the Haldeman deposition) was not formed until after the plaintiff's termination.

Svensson's Initial Argument
in Support of Motion to Compel:

> Documents concerning the Women's Leadership Forum at Putnam are relevant to
>
> show the concerns and complaints of women at Putnam and "what", if anything, Putnam
>
> did in response to those complaints and concerns. That, if true, the Forum was formed
>
> after Svensson's termination is beside the point. Evidence as to actions and omissions
>
> even taking place after the Svensson termination are relevant. [5]

---

[5] Case law from the First Circuit and elsewhere also makes clear that evidence of an employer's discriminatory conduct towards other similarly situated employees is relevant even if such conduct took place well before or after the conduct giving rise to the plaintiff's action. The United States Court of Appeals for the First Circuit stated in the Conway case that, "evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment. 825 F.2d at 597. (Emphasis added.) See also Carey, 156 F.3d at 37. In Conway, the court allowed the introduction of evidence of discriminatory statements made up to 22 months prior to the plaintiff's termination. In Jackson, the District Court expanded the time period for which the plaintiff was allowed to seek discovery as to tenure decisions in the Harvard Business School from three to 10 years, including 7 years prior to the time tenure consideration of the plaintiff had begun, stating, "In the court's view, this three-year time period is unduly restrictive and contrary to the law governing the scope of permissible discovery. Fed. R. Civ. P. 26(b)(1).... Accordingly, a time frame which merely brackets the contested employment action would foreclose plaintiff from elucidating past practices or identifying a pattern which might suggest that defendants' reasons for denying plaintiff tenure are pretextual. Relevancy for discovery purposes is much broader than for admissibility purposes at trial. If the information sought appears reasonably calculated to lead to the discovery of admissible evidence, it is within the limits set forth in Fed. R. Civ. P. 26(b)(1). Therefore, the court expands the time frame ordered by the magistrate from three years to ten, commencing June, 1974 and ending June, 1984. 111 F.R.D. at 475. And in Hernandez, the District Court noted that "a variety of courts 'have held that prior discriminatory conduct is recognized as probative in an employment discrimination case on the issue of motive or intent.'" 190 F.Supp.2d at 271-72. (italics in original). See also Briddell, 233 F.R.D at 60 (allowing discovery as to other acts of discrimination for three year period including 14 months prior to any discriminatory acts against the plaintiff.).
Conduct occurring entirely after the discrimination complained of by plaintiff also is relevant and admissible. In Brown, the United States Court of Appeals for the First Circuit admitted statements made by the university president to another professor being considered for tenure, even though those statements

Putnam Opposition

- The cases relied upon by Ms. Svensson to suggest that evidence of a corporate state of mind or a discriminatory atmosphere is relevant beyond the time period of the plaintiff's employment are inapposite. The cases Ms. Svensson relies upon concern situations where there was direct evidence of discrimination. As for the plaintiff's termination, no such evidence exists, nor will pouring through every document mentioning the Women's Leadership Forum likely provide such evidence.

- This request would require Putnam to restore the email boxes of scores of former or current Putnam employees who may have been involved with the Women's Leadership Forum, and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist; thus the request is grossly overbroad and burdensome for the reasons stated in this Introduction.

Svensson's Reply:

First, assuming for the sake of argument, that Putnam's argument might be applicable to a trial context, the present case is in discovery and Svensson is entitled to have discovery as to matters that are relevant to her claims. It is certainly relevant to

---

were made after the decision on plaintiff's tenure application had been made. According to the Brown court:

"That the remarks occurred subsequent, rather than prior, to the allegedly discriminatory conduct does not alter their admissibility. The jury was entitled to infer that any discriminatory animus toward women manifested in 1982 and 1983 would have existed in 1980 and 1981, when President Silber acted on Brown's case. 891 F.2d at 350. See also Briddell, 233 F.R.D at 60 (Court cited a case from the District of Kansas in which the time period extended two years after the discrimination alleged by the plaintiff); Ryder, 128 F.3d at 130-33 (allowing introduction of statements made one year after plaintiff's termination); Stumph, 770 F.2d at 95, 97 (allowing testimony of other employees as to discrimination they encountered after plaintiff was terminated); Cordova v. State Farm Ins. Companies, 124 F.3d 1145, 1149(9th Cir. 1997) (Mexican plaintiff, alleging that she was not promoted to trainee agent due to national origin discrimination, allowed to introduce evidence that after hiring decision had been made, manager made discriminatory comment about another Mexican employee); Stacks v. Southwestern Bell Yellow Pages, 27 F.3d 1316, 1327 n.5 (8th Cir. 1994) (in sexual harassment case, evidence that after plaintiff's termination a sexual video involving other female employees had been shown at a company function was relevant and admissible); Martinez v. Potter, 347 F.3d 1208, (10th Cir. 2003) (incidents of retaliation against plaintiff occurring after plaintiff filed Title VII complaint, as to which administrative remedies had not been exhausted, could still be introduced as background evidence to support exhausted claims set forth in complaint); Schindler v. Bierwirth Chrysler/Plymouth, 15 F.Supp.2d 1054, 1059 (D. Kan. 1998) (defendant's decisions to discharge two other 60+ year old employees months after plaintiff's termination "lend support to plaintiff's pretext argument"); Wilson v. Seven Seventeen HB Philadelphia Corp., 2003 WL 22709073, * 10 (E.D. Pa. 11/14/03) (allowing introduction of corporate memoranda s reflecting procedures in effect more than a year after plaintiff's termination).

(72)

know if the establishment of the forum was the result of, or was undertaken by Putnam to

attempt to deal with discriminatory treatment of females and whether Svensson's refusing

to relinquish her rights played a part.

Second, the claim as to the e-mails is exaggerated and meritless; and the new e-

discovery rules should be applied to this case. See pp. 4-5, supra.

---

Svensson Request No. 72:

(72)

All documents and things concerning studies, analyses and reports and the results thereof
by or on behalf of the above referred to Women's Leadership Forum.

Putnam Response No. 72: Putnam objects... overbroad, burdensome... irrelevant and not reasonably
calculated to lead to the discovery of admissible evidence. Putnam further objects on the
ground that the Women's Leadership Forum (referred to at p. 180 of the Haldeman deposition)
was not formed until after the plaintiff's termination.

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning the Women's Leadership Forum at Putnam are relevant to

show the concerns and complaints of women at Putnam and "what", if anything, Putnam

did in response to those complaints and concerns. That, if true, the Forum was formed

after Svensson's termination is beside the point. Evidence as to actions and omissions

even taking place after the Svensson termination are relevant.[6]

Putnam Opposition

- The cases relied upon by Ms. Svensson to suggest that evidence of a corporate
  state of mind or a discriminatory atmosphere is relevant beyond the time
  period of the plaintiff's employment are inapposite. The cases Ms. Svensson
  relies upon concern situations where there was direct evidence of
  discrimination. As for the plaintiff's termination, no such evidence exists, nor
  will pouring through every document mentioning the Women's Leadership
  Forum likely provide such evidence.

- This request would require Putnam to restore the email boxes of scores of
  former or current Putnam employees who may have been involved with the

---

[6] See note 4, supra.

-

73

Women's Leadership Forum, and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist; thus the request is grossly overbroad and burdensome for the reasons stated in this Introduction.

Svensson's Reply:

First, assuming for the sake of argument, that Putnam's argument might be applicable to a trial context, the present case is in discovery and Svensson is entitled to have discovery as to matters that are relevant to her claims. It is certainly relevant to know if the establishment of the forum was the result of, or was undertaken by Putnam to attempt to deal with discriminatory treatment of females and whether Svensson's refusing to relinquish her rights played a part.

Second, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra.

EXHIBIT 1-7

Svensson Request No. 73:

All documents and things concerning communication from Haldeman to any other person and to Haldeman from any other person in regard to any one or more of the subject matters of...categor[y] [Nos. 71 and 72, above].

73

Putnam Response No. 73:

Putnam objects...overbroad, burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible evidence [and]...further [that] the Women's Leadership Forum (referred to at p. 180 of the Haldeman deposition) was not formed until after the plaintiff's termination.

Svensson's Initial Argument
in Support of Motion to Compel:

Documents concerning the Women's Leadership Forum at Putnam are relevant to

show the concerns and complaints of women at Putnam and "what", if anything, Putnam

did in response to those complaints and concerns. That, if true, the Forum was formed

after Svensson's termination is beside the point. Evidence as to actions and omissions

even taking place after the Svensson termination are relevant.[7]

**Putnam Opposition**

- The cases relied upon by Ms. Svensson to suggest that evidence of a corporate state of mind or a discriminatory atmosphere is relevant beyond the time period of the plaintiff's employment are inapposite. The cases Ms. Svensson relies upon concern situations where there was direct evidence of discrimination. As for the plaintiff's termination, no such evidence exists, nor will pouring through every document mentioning the Women's Leadership Forum likely provide such evidence.

- This request would require Putnam to restore the email boxes of scores of former or current Putnam employees who may have been involved with the Women's Leadership Forum, and review potentially hundreds of thousands or millions of emails without any basis for believing that relevant documents exist; thus the request is grossly overbroad and burdensome for the reasons stated in this Introduction.

- 

**Svensson's Reply:**

First, assuming for the sake of argument, that Putnam's argument might be applicable to a trial context, the present case is in discovery and Svensson is entitled to have discovery as to matters that are relevant to her claims. It is certainly relevant to know if the establishment of the forum was the result of, or was undertaken by Putnam to attempt to deal with discriminatory treatment of females and whether Svensson's refusing to relinquish her rights played a part.

Second, the claim as to the e-mails is exaggerated and meritless; and the new e-discovery rules should be applied to this case. See pp. 4-5, supra.

---

**Svensson Request No. 74:**

The personnel files of Allansmith, DeChristopher, O'Malley, Peers and Warren.



Putnam Response No. 74: Putnam objects...overbroad, burdensome and...irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds set forth in Putnam's Opposition....

---

[7] See note 4, supra.

Svensson's Initial Argument
in Support of Motion to Compel:

The files requested are relevant in order to show in comparison to the treatment

of Svensson (1) the treatment of DeChristopher who, according to PRM 4026, had "poor

three years performance record" and a "volatile personality" yet was promoted in 2003

while Svensson was terminated; (2) the treatment of Allansmith who was fired and had

been demoted while on maternity leave; (3) the treatment of O'Malley, who complained

about Svensson, and whose complaints, at least in part, according to Putnam, provoked

her termination and later received a promotion and took over some of her

responsibilities; and, (4) The treatment of Warren's behavior. See Nos. 65-69, supra.

Putnam Opposition

- This is not a class action lawsuit, and access to an employee's most private
  information is improper.

- Putnam has already provided all objective data necessary to determine if
  Putnam treated women in a discriminatory manner. This request seeks to
  improperly try the gender discrimination cases of other former or current
  Putnam employees to prove Ms. Svensson's case.

- For the reasons stated in its Opposition to Ms. Svensson's Motion to Compel
  Answers to Interrogatories, Putnam does not agree that these individuals are
  Ms. Svensson's legal comparators.

- Ms. Svensson offers no explanation concerning the relevance of these
  particular files.

-

Svensson's Reply:

First, these files are relevant for the reasons set out in Svensson's initial argument

above. Moreover, they may well provide information as to others making complaints

about Peers, DeChristopher, Warren and/or O'Malley.

Second, it is not true that "Putnam has already provided all objective data



necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

Third, this request does not  seek to try any person's gender discrimination case

other than Svensson's, who is entitled as of right under Rule 26 to discovery "relevant to

the claims" she has made as to disparate treatment and disparate impact and, with the

discretion of the court, to discovery "relevant to the subject matter" of this litigation.

Finally, it is not true that "Putnam has already provided all objective data

necessary to determine if Putnam made decisions in a discriminatory manner." That

simply is an assertion without proof. Moreover, even if true (it is not), the subjective

information is necessary to evaluate intent of Putnam.

---

Svensson Request No.75:

All documents and things concerning communication within Putnam in regard to the issue of "deprivation of [Svensson's] management responsibilities," as used in the Brooks deposition at p. 184), which communication took place in the period prior to the Brooks' presenting to Svensson on August 28, 2003, of a document with three options concerning the status of her employment.

Putnam Response No.75:  Putnam has already produced non-privileged communications and... All privileged communications have been noted in Putnam's privilege log [and]...further ... this court, in response to Plaintiff's November 5, 2005 Motion to Compel Defendant's Production of Documents has already limited Putnam's obligation to produce communications between and among its personnel; and Putnam has already produced such.....

Svensson's Initial Argument
in Support of Motion to Compel:

Neither in its responses to this Category nor in its Amended Privilege Log has

Putnam made the showings required to support the claims of attorney-client privilege or

work product.



Accordingly Svensson requests the court first to order Putnam to disclose to

Svensson and the court the relevant information necessary to enable Svensson and the

court to assess the applicability of the claims.  Svensson requests the court after the

disclosure of this information to review in camera the withheld documents to assist the

court in making its determinations as to these categories.

Putnam Opposition

- Putnam continues to respond that because these documents were either
  prepared for, or directed to, Putnam's counsel, they are within the protection of
  the attorney-client and work-product privileges.

Svensson's Reply:

Svensson requests the court first to order Putnam to disclose to Svensson and the

court the relevant information necessary to enable Svensson and the court to assess the

applicability of the claims.  Svensson requests the court after the disclosure of this

information to review in camera the withheld documents to assist the court in making its

determinations as to these categories.

Svensson Request No. 76:



All documents and things concerning communication within Putnam in regard to the issue
of "deprivation of [Svensson's] management responsibilities" and/or termination of her
employment, which communication took place in the period following the Brooks
presentation to Svensson referred to in the immediately preceding category, and the
termination of Svensson's employment on September 15, 2003.

Putnam Response No. 76:  Putnam has already produced non-privileged communications and
documents responsive to this request.... All privileged communications have been noted in
Putnam's privilege log [and] further...that this court, in response to Plaintiff's November
5, 2005 Motion to Compel... has already limited Putnam's obligation to produce
communications between and among its personnel; and Putnam has already produced such....

Svensson's Initial Argument
in Support of Motion to Compel:

Neither in its responses to this Category nor in its Amended Privilege Log has

Putnam made the showings required to support the claims of attorney-client privilege or work product.

Accordingly Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the court to assess the applicability of the claims. Svensson requests the court after the disclosure of this information, to review in camera the withheld documents to assist the court in making its determinations as to these categories.

Putnam Opposition

- Putnam continues to respond that because these documents were either prepared for, or directed to, Putnam's counsel, they are within the protection of the attorney-client and work-product privileges.
- 

Svensson's Reply:

Svensson requests the court first to order Putnam to disclose to Svensson and the court the relevant information necessary to enable Svensson and the court to assess the applicability of the claims. Svensson requests the court after the disclosure of this information to review in camera the withheld documents to assist the court in making its determinations as to these categories.

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.

s/Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: October 25, 2006

### Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney

Dated: October 25, 2006

[375508.1]

123

Exhibit A



Defendant's redaction pattern reduced effective pages per production, even as the total number of pages climbed.

1



*Putnam redacted far more **after** the entry of the protective order than **before***

**Number of Pages**

Pre-order: Produced 1783, Redacted 200

Post-order: Produced 1090, Redacted 959

■ Produced  ■ Redacted

2

**Defendant's redaction pattern reduced effective pages per production, even as the total number of pages climbed.**



3



*Due to Defendant's increasing rate of redaction, discovery could not move forward for a period of eleven months.*

| DATE | PAGES PRODUCED | PERCENT OF DOCUMENTS BEARING REDACTION STAMP |
|------|----------------|----------------------------------------------|
| 10/03/05 | 0001 - 0761 | 2.8% |
| 11/28/05 | 0762 - 1086 | |
| 12/06/05 | 1087 - 1528 | 3.4% |
| 01/06/06 | 1529 - 1783 | 12/13/05  Court orders additional documents |
| 02/28/06 | 1784 - 1935 | 02/23/06  Confidentiality order entered |
| 05/15/06 | 1936 - 1992 | |
| 06/14/06 | 1993 - 2873 | |

4

Exhibit B

*Discovery was scheduled to be completed by February 1, 2006. Due to Defendant's delay tactics, discovery is still ongoing on October 25, and Plaintiff has only recently begun to receive the information requested and promised.*

Discovery period per Court's 5/2/05 scheduling order

Actual discovery period including multiple delays by Defendant

542 Days and counting

May 1, 2005

6/1    7/1    8/1    9/1    10/1    11/1    12/1    1/1    2/1    3/1    4/1    5/1    6/1    7/1    8/1    9/1    10/1    Oct 25, 2006



## Comparator Delay (232 days)

*Defendant delayed answering the interrogatories with respect to comparators for a total of 231 days.*

- *98 days related to a confidentiality motion that had no effect on data production*
- *134 days related to an inappropriate comparison of the facts of this case to Jackson v. Harvard University.*

# Mediation Delay (61 Days)

Defendant delayed key depositions, forcing a 61-day delay in mediation, then opposed Plaintiff's motion to extend the discovery deadline.

ORIGINAL SCHEDULE

Jul 1, 2005 — 8/1 — 9/1 — 10/1 — 11/1 — 12/1 — 1/1 — Feb 1, 2006

**7/8** — Joint motion to reschedule; mediation set for 11/8

**7/8** — Court schedules mediation for 7/25, too soon given that no key depositions have been taken nor documents produced from either side.

**10/26** — First key witness (Mary McNamee) scheduled to be deposed

**10/28** — Second key witness (Joel Bruno) scheduled to be deposed

**11/8** — Mediation scheduled

Mediation Delay

11/8 – 1/11
Mediation Delay

Elapsed delay, 61 days

**1/13** — Plaintiff files motion to extend discovery deadline.

**1/17** — After agreeing to delay mediation into January, Defendant opposes Plaintiff's motion to extend discovery beyond 2/1 deadline

**2/1** — Discovery deadline per the original schedule

Area of Detail

287 Days

643 Days and counting



# Document Production Delay (243 Days)

**Defendant has delayed response to Plaintiff's requests for documents, using a strategy of stonewalling, redaction, and misinformation.**

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \*     \*     Civil Action No. 04-12711-PBS

LISA SVENSSON

   Plaintiff,

PUTNAM INVESTMENTS,
LLC, et al.,
   Defendants.

\* \* \* \* \* \* \* \* \* \* \* \*

  \*
  \* BBO No. 351000
  \*
  \* Plaintiff Lisa Svensson's
  \* Memorandum in Support of:
  \* (1) Her Opposition to
  \* Defendant Putnam's
  \* a Protective Order...";
  \* and,
  \* (2) Her Cross Motion for
    Orders and Sanctions

1. <u>Introduction</u>

  With two hours seven minutes of testimony time remaining

and several of the subjects on the 30(b)(6) deposition notice,

which the court had allowed for examination not yet discussed

with the witness, in-house counsel for defendant Putnam

Investments, LLC ("Putnam"), Jason A. Tucker ("Tucker"),

directed Attorneys Rodriques, Kurker, Campion and the witness to

leave the deposition room. "Let's go, let's go" he ordered, and,

turning toward plaintiff Lisa Svensson and looking at and only

to her, said,

   I hope you aren't paying these amateurs by the hour.
   It would be very, very expensive.[1]

  This arrogant, crude and unprofessional statement lays bare

the mind-set and intent of Putnam and its scorched earth, win at

any cost tactics to make discovery as needlessly difficult,

---

[1] Deposition Transcript, November 29, 2006 ("Tr."), a complete copy of
which is filed herewith as Exhibit "A, p. 207, ll. 18-23.

unproductive, time consuming and expensive for plaintiff
Svensson as Putnam possibly can make it.

    For this and the other reasons set forth particularly
below, Svensson opposes Putnam's motion for a protective order
to quash resumption of the 30(b)(6) deposition and cross moves
for orders: (1) Directing the resumption of the deposition for
the rest of the time remaining when the deposition was halted
(two hours seven minutes) plus, as authorized by Rule 30(d)(2), [2]
such additional time as the court finds warranted under the
circumstances; and, (2) Entering sanctions, including attorneys'
fees and costs, against Putnam and its attorneys for their
conduct.

2.    <u>There was no plot, plan or intent of Svensson counsel or
anyone else at Barron & Stadfeld to prevent Mr. Duffy's
calls from reaching the Conference room, and it is
scandalous and absurd of Putnam to claim otherwise</u>.

    The Putnam motion makes the bizarre contention that
Svensson's counsel concocted a plot to prevent any calls from
Courtroom Clerk Mark Duffy to reach Conference Room A at Barron
& Stadfeld, P.C. where the deposition was taking place.  Putnam
complains:

    <u>Mr. Moloney provided his firm's general phone number
rather than the direct number into the conference
room</u>...[and]...for reasons beyond Putnam's

---

[2] Fed. R. Civ. P. 30(d)(2) states, "Unless otherwise authorized by the
court or stipulated by the parties, a deposition is limited to one day
of seven hours. <u>The court must allow additional time</u> consistent with
Rule 26(b)(2) <u>if needed for a fair examination of the deponent or if
the deponent or another person, or other circumstance, impedes or
delays the examination</u>. (Emphasis added.)

> understanding, none of the Court's 4 attempts to
> call... were transferred into the conference room....

Putnam motion, p. 9.  (Emphasis added.)  The facts, however, are
as follows:

At the Barron & Stadfeld, P.C. office, whatever may be the
case at Ms. Kurker's firm, it always has been and is the
practice, when instructing others how to reach a participant in
a conference room deposition or meeting by telephone, to direct
the caller to dial the firm's main number, 617.723.9800, and,
when the receptionist answers the call, to request the
receptionist to transfer the call to "Conference Room ___."[3]
This is because <u>the telephone system at the firm does not
provide direct dial access to conference rooms</u>.[4]  Any calls to
the firm seeking a person in a conference room, must be dialed
to the main number and be transferred.[5]

The Moloney Affidavit states that after the second of
Mr. Duffy's four attempts to be transferred to Conference
Room A, failed to get through,

> <u>I left the conference room and went to the
> receptionist's desk in the area just outside
> Conference Room A to find out why transfer of the
> calls had failed.</u>

(Emphasis added.)  At the time, Heidi Moore, a Northeastern
University Co-op student, who works in the Barron & Stadfeld,

---

[3] Third Affidavit of Kevin F. Moloney ("Moloney Affidavit"), filed
herewith as Exhibit "B," p. 1, ¶2.
[4] <u>Id</u>.
[5] <u>Id</u>.

3

P.C. fileroom,[6] was filling in at reception.[7]  Moore told Moloney

that she did not know why Mr. Duffy's calls were not going

through as she was using the proper procedures to transfer the

calls.[8]

   At that point, Moloney concluded that a mechanical or

electrical problem with the telephone system was the cause of

the failed transfers.[9]  Thus, very soon after the Putnam forces

had left,

> I received a message that Mr. Duffy had called again
> and had requested that I call him back.  I called Mr.
> Duffy back and explained to him that there had been
> some kind of problem with the telephone system, which
> had caused his calls not to get through to the
> conference room.  I also told him, in response to his
> question, that there had been a disagreement during
> the deposition; that Putnam had left after announcing
> that it would be filing a motion; and that if Putnam
> filed a motion, Svensson would file an opposition.[10]

(Emphasis added.)

   The true cause of the failed transfers did not emerge until

the next day.  When she had tried to transfer Mr. Duffy's calls

to Conference Room A, Heidi Moore had used the button sequences

necessary to transfer calls to attorneys' offices when she

---

[6] Where her duties "include assisting in the File Room with document
copying, messenger services to other law firms and the various courts,
filing and related duties."  Affidavit of Heidi Moore ("Moore
Affidavit"), filed herewith as Exhibit "C," pp. 1-2, ¶¶ 2-3.

[7] Id.

[8] Id., Moloney Affidavit, pp.1-2, ¶3.

[9] Id.

[10] Id

4

should have used the different button sequence required to transfer calls to conference rooms.[11]

There was no plot, plan or intent of Svensson counsel or anyone else at Barron & Stadfeld to prevent Mr. Duffy's calls from reaching Conference Room A, and it is absurd and scandalous of Putnam and its attorneys to claim otherwise.

It was a simple matter of an inexperienced young person filling in for the receptionist and who was not aware of the correct procedure required to transfer calls to the conference room.

3.  <u>Putnam halted the deposition when there were two hour and seven minutes of testimony time remaining and several subjects, which the court on October 26, 2006, allowed for examination not yet discussed under oath with the witness</u>.

    3.1  <u>There were two hours seven minutes of testimony time remaining when Tucker and the other Putnam attorneys halted the deposition</u>.

The Putnam motion would have the court believe that when Attorney Tucker and his colleagues brought the 30(b)(6) deposition to a halt, its witness, Richard Tibbetts ("Tibbetts"), had reached the virtual end of the seven hours of testimony allowed by Rule 26.  "<u>After</u> 6 hours, Putnam suspended the deposition,...."  Putnam motion, p. 1.  (Emphasis added.) This is entirely incorrect and misleads the court.

The transcript shows that Svensson began the deposition at 10:14 a.m.,[12] and that Putnam halted the deposition at 4:00

---

[11] Moore Affidavit, pp. 1-2, ¶¶ 3-4; Moloney Affidavit, pp. 1-2, ¶ 3..

p.m.,[13] for a time difference of five hours 46 minutes. The
transcript also shows that during that time there had been six
breaks, including a recess for lunch, amounting to a total of 52
minutes of break time.[14] Thus, at 4:00 p.m. on November 29,
Tibbetts had not testified for more than six hours as claimed by
Putnam. In fact, as proved by the transcript, he had testified
for only four hours, 53 minutes, with the result that there were
two hour seven minutes of testimony remaining when Tucker
ordered the Putnam forces to leave.

    3.2. <u>Putnam's unilateral suspension of the deposition,</u>
       <u>prevented Svensson from obtaining testimony on several</u>
       <u>subject matters the October 26, 2006 order allowed</u>.

    Svensson's October 10, 2006, notice for the 30(b)(6)
deposition, a copy of which is filed herewith as Exhibit "E,"
listed 15 subjects to be discussed at the deposition. When
Tucker directed the witness and his three colleagues to leave
the deposition, Svensson had obtained testimony on six of the
subjects listed on the notice.[15] Thus, Putnam's action prevented
Svensson from obtaining that day any testimony at all on any of

---

[12] Tr., p. 1.
[13] Tr., p. 210.
[14] Tr., p. 15, "Discussion of the Record," 10:27-10:28 a.m. (1 minute);
Tr., p. 61, "Recess," 11:30 - 11: 46 a.m. (7 minutes); Tr. P. 108,
"Lunch Recess," 12:58 - 1:32 p.m. (34 minutes); Tr., p. 156, "Recess,"
2:46 - 2:54 p.m. (8 minutes); Tr., p. 192, "Fire Alarm," 3:42-3:43
p.m. (1 minute); and Tr., p. 200, "Discussion off the record," 3: 53 -
3:54 (1 minute); a total of 52 minutes of break time.
[15] Nos. 1 (Designation as and compensations of "partners" at Putnam); 2
(managers' performance ratings and changes of scores); 3 (compensation
guarantees); 4 ("key" and "franchise" players); 10 (payment of Darren
Peers's business school tuition costs); and, 11 (the "investigation"
of Svensson in summer 2003).

the other important subjects listed in the notice,[16] including,

among others, No. 7 (factual basis for Putnam's claim that not

one of the 91 identified males and females is a comparator of

Svensson); Nos. 6 and 8 (employment actions taken against other

female investment professionals by Putnam) and No. 13 (removal of

Svensson in March 2002 from portfolio management while retaining

males as such managers and promoting other males to those

positions)

As Rule 26 provides that a deposition as of right can be

seven hours long, and the court's October 26, 2006, order

---

[16] 5. ...deferred compensation...stock...options to...investment
professionals...including identities of decision makers, criteria
utilized and basis for awards...
6. All actions...to hire, promote, not to demote or transfer and/or
not to terminate the employment of female investment professionals
or deprive...of...management responsibilities.
7. The factual bases for any contentions...that any one or more of
the 91 Comparators in this case are not, in fact, comparators of
Svensson.
8. In regard to...females...terminations of or separations from
employment...demotions, transfers...identities of the decision
makers, the factual bases for...decision[s], ...persons who assumed
the responsibilities of any such...comparators, and the effect on
...compensation....
9. ...documents produced or ordered to be produced...as a result of
any decision by the court...on October 26, 2006,....
12. Communication between Putnam and...O'Malley...Eckland or...Peers
concerning Svensson...March 1, 2002, to December 31, 2003.
13. The factual basis for the decision to remove Svensson
from...Portfolio Management...while retaining male comparators
...and...promotions to [such] positions...March 1, 2002, to
September 15, 2003.
14. The decisions to deprive Svensson of her management
responsibilities and...to terminate her..., including the factual
bases for such decisions, the identities of all persons consulted
... whether and how any...written criteria for...terminations were
utilized, and the decision to draft a Termination Agreement...on or
about August 27, 2003.
15.    Authentication of documents and tangible things produced by
Putnam in this case unless agreed to by counsel or admitted in
response to requests for admission.

7

allowed the deposition to go forward on the subjects identified

by Svensson in the deposition notice, Svensson was and is

entitled to the remaining two hours and seven minutes of Rule

30(b)(6) testimony from Putnam on any of the designated

subjects, at a minimum.

4.    <u>In denying the motion to quash on October 26, 2006, the
      court rejected Putnam's arguments that depositions taken
      before the production of unredacted documents and answering
      of Svensson's interrogatories should preclude Svensson from
      obtaining Rule 30(b)(6) testimony and that the designated
      subject matters were too broad</u>.

     At and for the October 26, 2006, hearing of Putnam's motion

to quash the notice for the deposition, Putnam raised again the

argument the court on July 16 had rejected when the court

indicated that a 30(b)(6) deposition could be taken but on a

revised list of subject matters.  The argument the court

rejected was the contention that no Rule 30(b)(6) deposition

should be allowed because Svensson has taken the depositions of,

among others, Joshua Brooks, Svensson's boss when she was fired,

and Mary McNamee of the HR Department.  Putnam also claimed on

October 26 that even the reduced number of subjects on the

revised 30(b)(6) deposition list were too broad.

     It is no wonder that Putnam pushed yet again the first of

these arguments as Brooks (November 17, 2005) and McNamee

(November 29, 2005) were deposed <u>ten months</u>, and Lasser,

Haldeman and Tibbetts were deposed approximately <u>three months or

more</u>, <u>before</u> Putnam on September 1, 2006, at the direction of

8

the court, produced unredacted documents and served answers to

Svensson's interrogatories.

At the October 26 hearing, the court did not accept either

of Putnam's arguments:

> The motion to quash is denied.  One deposition.  One
> day.  You sit down with Mr. Kociubes in the next few
> days and decide who it's going to be and you better
> decide what areas you want to prioritize because you're
> only going to get one day and you may not get everything
> you want done.

Transcript, October 26, 2006, p. 101.  (Emphasis added.)

5.    The court's caution to Svensson to "prioritize" the subject
      matters of the deposition given the time limit imposed when
      the court "denied" the Putnam motion, did not require
      Svensson to obtain Putnam's pre-deposition approval either
      of the questions to be asked or of how she planned to use
      the deposition time the court had allowed; nor did the
      court in doing so re-write Rule 30(b)(6) to eliminate the
      requirement of an educated and prepared witness.

The court's statement to Svensson to "prioritize" the

subject matters listed on the notice, was simply and

directly a caution to Svensson to be very mindful at the

deposition that the court had said, "One deposition. One

day." It was a warning to spend the time wisely "because

...you may not get everything you want done."

Although as long ago as January 20, 2006, Attorney

Rodriques had represented to the court that in all

likelihood the Putnam 30(b)(6) witness would be Brooks or

McNamee, Putnam changed course and advised Svensson that

the witness would be Tibbetts.  By e-mail on November 7,

2006, three weeks before the November 29 deposition,
Svensson's counsel set out for Putnam Svensson's priorities
as to the subjects in the notice:

> ...in accordance with the Court's instruction that we
> "prioritize" the...areas of testimony, I hereby advise
> Putnam that priority will be given to the following
> areas: 1-5, 8, 10-11 and 13-14. As to the balance of
> the areas, Plaintiff will examine if time permits, and
> in no way is withdrawing these items as proper
> subjects of examination, as to which the 30(b)(6)
> witness is expected to be knowledgeable....

(Emphasis added.)

It would not be fair or reasonable to conclude from the
court's remarks following the announcement of the above ruling
"deny[ing]" the Putnam motion, that Svensson was being required
by the court to obtain Putnam's approval of the questions to be
asked at the deposition, or to obtain Putnam's assent to how
many minutes Svensson might devote to any given subject; nor
would it be reasonable to believe that, in permitting the
deposition to go forward, that the court in effect had re-
written Rule 30(b)(6) to eliminate the requirement of a witness
educated and prepared on each of the noticed subjects.[17]

6.  Despite Putnam's having had almost two months to prepare
    Tibbetts for his 30(b)(6) testimony, Tibbetts was not the
    educated and prepared witness the rules require.

---

[17] When, in response to Attorney Kociubes' attempt to re-argue the motion
after the court had announced its ruling, Svensson's counsel referred to the
requirement of Rule 30(b)(6) for an educated witness, the court said, "I
realize -- I know what the rule is." "And I know what the language says."
Tr., October 26, 2006, pp. 101-02.

Rule 30(b)(6) requires the person designated to testify in a deposition on behalf of an organization like Putnam, be prepaered and educated to "testify as to matters <u>known or reasonably available to the organization</u>." (Emphasis added.) In other words, the witness is to be prepared to testify as to the noticed subject matters not just from his or her own personal knowledge, if any, but, more significantly, as to the knowledge of the entire organization on matters "known or reasonably available" to it. This is important not only to discover the knowledge of the entity but also to obtain the entity's testimony that, under Rule 32, at trial, "may be used by an adverse party for any purpose."

Svensson's notice for the Putnam deposition,[18] served October 10, 2006, set a deposition date more than a month later, November 17, 2006. In a November 10 e-mail, Putnam requested additional witness "prepar[ation]" time. Svensson agreed, the parties settling on November 29 for the deposition date.

But despite the command of Rule 30(b)(6)() to present an educated and prepared witness, and the fact that prior to the actual deposition start on November 29, Putnam had had close to two months to prepare Tibbetts, Tibbetts in many significant respects was neither educated or prepared. Even though the subject matters of the deposition dealt with the goings on,

---

[18] A copy of the notice is filed herewith as Exhibit "D."

decisions and actions taken in the Investment Division, the

witness admitted that he had not prepared with, or obtained any

knowledge or information from, anyone in the Putnam Investment

Division. He testified,

6

    21        Did you review the 30(b)(6) notice of
    22    deposition?
    23        A.  Yes.
    24        Q.  Did you review the various categories
7
    1    of subject matters of the testimony that you're
    2    to give here today?
    3        A.  Yes.
    4        Q.  And with respect to the various
    5    categories, did you seek to obtain from others
    6    within Putnam knowledge with respect to the
    7    various categories?
    8        A.  Yes.
    9        Q.  From whom did you seek such knowledge?
    10       A.  I met with several members of my staff
    11    in the Human Resources Department.
    12       Q.  And who were they?
    13       A.  Mary McNamee, Michelle Juergens, and
    14    Beth Nelson.
    15       Q.  Did you meet with anyone outside of
    16    the Human Resources Department?
    17       A.  The only other people I met with were
    18    counsel.
    19       Q.  Did you ...meet with
    20    Mr. Brooks concerning the 30(b)(6) deposition?
    21       A.  No.
    22       Q.  Did you...meet with
    23    Mr. Haldeman concerning the 30(b)(6) deposition?
    24       A.  No.
8
    1        Q.  Did you... meet with
    2    anyone within the Investment Division outside of
    3    Human Resources?
    4        A.  No.

Incredibly, even on the subject of the Svensson termination, Tibbetts admitted that at no time in the two month preparation period did he have any discussion with Joshua Brooks, the Director of Global Equity Research and alleged sole decision-maker as to Svensson's termination.("Q Did you consult with Josh Brooks on this subject? A. No." [19]

Even his discussions with his staff in HR were inadequate. He testified that his preparation included discussing only "ssome" of the subject matters of the deposition with McNamee,[20] even though, he testified, she had been the "lead" HR person who had "service[ed] the research organization"[21] where Svensson in the months before here termination had been working, and, he admitted that his preparation had not included any discussions at all with McNamee concerning Lisa Svensson's termination.

That Tibbetts was so unprepared and uneducated was not a mistake; it was deliberate on the part of Putnam and its attorneys.  The best witness on this point is the statement of Attorney Rodriques when Svensson, at p. 183, l. 14-15, attempted to inquire at the deposition if Putnam had had "discussions internally regarding the termination of the employment of Lisa Svensson?":

> 15 Mr. Rodriques: objection. [Brooks]
> 16     and [McNamee] have already testified to all the

---

[19] Tr., p. 172, ll. 20-22.
[20] Tr., p.172, l. 17.
[21] Tr., p. 170, ll. 13-16.

13

```
17    discussions. He can testify to his personal
18    participation. He is not prepared and is not
19    proffered to testify about anything else.
20 By M. Weir:
21    Q. You can answer.
22    A. Well, so the only way I guess I can
23    answer that is did I personally have a role?
24    The role that I played, again, was hearing what...
```

(Emphasis added.)

Putnam and its attorneys deliberately flaunted the rules in an effort to prevent Svensson from obtaining the testimony the court had permitted her to obtain.

7.    <u>Putnam had no right to demand, and Svensson had no duty to agree to, Putnam's "stipulation."</u>

There is no rule that a party may not seek information about the same subjects from multiple sources. Indeed, multiple witnesses may have different information to offer about a given subject or occurrence, such that complete information can be obtained only by examining more than one witness. The courts have recognized that a Rule 30(b)(6) deposition properly may cover matters which also were the subject of other depositions or discovery. In <u>Tri-State Hospital Corp.</u> v. <u>U.S.</u>, 226 F.R.D. 118, 125-126 (D.D.C. 2005), the court stated:

<u>...I am aware of no principle of law that precludes a party from pursuing during a deposition a topic about which it has already received information via other discovery devices.</u>

<u>By its very nature, the discovery process entails asking witnesses questions about matters that have been the subject of other discovery.</u> There are, of course, only a finite number of pertinent events in

any lawsuit, and how they occurred is a topic that may be pursued by all forms of discovery, even though the information provided by one form of discovery repeats and duplicates information yielded by another. Thus, the fact that information has been provided to plaintiff concerning a particular category does not, in itself, make that category an impermissible subject of a 30(b)(6) deposition.[22] [23]

(Emphasis added.)

There is nothing in the discovery rules or any circumstance in this case that required Svensson to accept Putnam's proffer of its "stipulation." First, as shown in § 4, p. 8, supra, the prior testimony proffered as a part of the "stipulation" was taken many months before Putnam had served the court directed answers to Svensson's interrogatories and unredacted as the court also had directed, the previously redacted documents.

Moreover, the subject being discussed with the witness at the time of Putnam's unwarranted cessation of the deposition,

---

[22] Although the Tri-State court recognized that a court may enter a protective order to ensure that a Rule 30(b)(6) deposition is not used to waste the deponent's time, it also recognized that courts should not be involved in managing the Rule 30(b)(6) deposition or engaging pre-deposition in a topic-by-topic review. Id., at 126.

[23] Moreover, in earlier depositions, Putnam failed to provide adequate answers. In fact, Putnam has been consistently evasive and obstructive. For example, when shown by Svensson in deposition some of the numerous redacted documents Putnam produced and asked a question about them, defendant Lasser, Putnam's former Chief Executive Officer, testified that he could not answer the questions. He testified at p. 11:1

```
     Q.   Okay. Is it your testimony that other
     2        than those documents, you have never seen these
     3        other documents before?
     4   A.   No, I didn't say that. I said I don't
     5        specifically recall. You showed me a bunch of
     6        blank pages, so it's hard to remember.
```
(Emphasis added.)

No. 11, the "investigation" of Svensson in the summer of 2003,

was one of the subjects the court's October 26, 2006, order

"den[ying]" the Putnam motion to quash, had allowed for

testimony over the very argument that Putnam made at the

deposition and which it now makes to justify its hardball

tactics.[24] [25]

   Putnam's attempts at self help in violation of the rules

should not be rewarded.

8.   The rulings of the court in favor of Svensson as the
     result of the hearings on June 21, August 16 and ,
     August 28, 2006, amply demonstrate that Putnam is the

---

[24] One of the reasons for including the subject of the "investigation"
of Svensson is that there conflicts in the prior testimony of the
individual Putnam employees.  For example, Brooks and Tibbetts did not
agree on whether Brooks had consulted with Tibbetts during the
investigation.  Brooks testified that he did "not have a specific
recollection of talking to [Tibbetts] but [he] probably would have."
Brooks dep, p. 172, ll. 19-24; p. 173, ll. 1-6.  At his deposition,
Tibbetts said he did not remember whether he talked to Brooks or not
("I may have.  I just don't recall any specific conversations.")
Tibbetts dep., p. 210, ll. 3-8.  McNamee did not mention Tibbetts when
she testified about the investigation and how Putnam carried it out.
McNamee dep., p. 160, ll. 16-24; p. 161, ll. 1-15.
   Brooks and Tibbetts differed as well as to the options offered to
Svensson at the end of the investigation.  Brooks testified that he
gave Svensson the three options described in Brooks Deposition Exhibit
5, which does not include looking for another position within Putnam.
Brooks dep., p. 196, ll. 23-24.  In his deposition Tibbetts first said
that the three options did include looking within Putnam for another
position, p. 171, ll. 4-24, p. 172, ll. 1-2, but later in the
deposition he testified that the three options did not include looking
within Putnam.  Tibbetts dep., p. 212, ll. 10-24; p. 213, ll. 1-17.
[25] Putnam also complains that Svensson "repeatedly inquired into areas
outside the scope of the topics listed." Putnam motion p. 5.  Even assuming
for the sake of argument that Putnam's challenge of outside the scope or lack
of relevance to only six of the numerous questions during the four hours, 45
minutes of testimony (p. 32, l.3; p. 44, l. 14; p. 55, l.4; p. 132, l. 12; p.
133, l. 23; p. 145, l. 5; p. 161, l. 15) had any merit (and Svensson does not
concede that there was any merit to the objections), the issue had no adverse
effect on  the proper conduct of the deposition as each time the issue was
dealt with either by the witness answering the question as the corporate
representative, or by his answering as an individual or by Svensson's moving
on to another question.

<u>party in this case that has provoked discovery
disputes</u>.

The Putnam claim that Svensson has "prolong[ed]" discovery
"by generating discovery disputes," is laughable.  Surely,
Putnam must recall that it was only through the action of the
court at hearing held on June 21, July 11, and August 28, 2006,
that Putnam was forced to answer interrogatories and unredact
documents, to say nothing of being ordered to resume the
depositions of Oristaglio and Tibbetts because Attorney Kociubes
improperly had instructed them not answer deposition questions.
It was the improper conduct of Putnam that caused the need for
the hearings and the court's orders and directions to Putnam.

9. <u>Conclusion</u>.

For all of the above reasons, Svensson requests the court:

1.    To order resumption of the deposition for the

      rest of the time remaining when the deposition

      was halted (two hours seven minutes) plus, as

      authorized by Rule 30(d)(2), such additional time

      as the court finds warranted under the

      circumstances[26]; and,

2.    To enter sanctions against Putnam and its

      attorneys for its and their improper actions,

---

[26] Fed. R. Civ. P. 30(d)(2) states, "Unless otherwise authorized by the
court or stipulated by the parties, a deposition is limited to one day
of seven hours. <u>The court must allow additional time</u> consistent with
Rule 26(b)(2) <u>if needed for a fair examination of the deponent or if
the deponent or another person, or other circumstance, impedes or
delays the examination</u>. (Emphasis added.)

including Svensson's costs and attorneys' fees

incurred as the result of such conduct.

> LISA SVENSSON, plaintiff,
>
> By her attorneys,
>
> BARRON & STADFELD, P.C.
>
> /s/ Kevin F. Moloney
> Kevin F. Moloney BBO No. 351000
> 100 Cambridge Street, Suite 1310
> Boston, Massachusetts 02114
> Tel.: 617.723.9800/531.6569
>
> and
>
> /s/ John K. Weir
> John K. Weir, Admitted PHV
> John K. Weir Law Offices, LLC
> 300 Park Avenue, Suite 1700
> New York, New York, 10022
> Tel.: 212.572.5374

Dated: December 18, 2006

### Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

> /s/ Kevin F. Moloney

Dated: December 18, 2006

[381124.1]

EXHIBIT 3



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *
                                       *
LISA SVENSSON                          *
                                       *
                  Plaintiff,           *
                                       *
v.                                     *
                                       *
PUTNAM INVESTMENTS,                    *
LLC, et al.,                           *
                                       *
                  Defendants.          *
                                       *
                                       *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

Civil Action No. 04-12711-PBS

BBO No. 351000

Objections,
Pursuant to Fed. R. Civ. P. 72(a)
and Magistrates Local Rule 2(b)
of
Plaintiff Lisa Svensson
to
(1) The January 9, 2007, Order of
the Magistrate Judge That Granted
Defendant Putnam Investments, LLC's
"Motion for a Protective Order
Terminating Further Discovery,"
and,
(2) The January 17, 2007, Order
of the Magistrate Judge insofar as it
"Den[ied]"
Svensson's Motion, filed October 10, 2006,
to
Compel Production of the Documents
Requested by her Second Request for
Production
and her Related Cross and Renewed Motions
and
Request for Hearing and Oral Argument

Because the rulings in this case entered by the Magistrate Judge (Bowler, M.J.) on

January 9, 2007 and January 17, 2007, are, as set forth in detail below, both clearly erroneous in

fact and contrary to law, plaintiff Lisa Svensson ("Svensson"), pursuant to Fed. R. Civ. P. 72(a)

and Magistrates Local Rule 2(b), objects to the rulings and Svensson requests the District Judge

to vacate the rulings and to grant the other relief requested on pp. 19-20, infra.  The rulings at

issue are:

    1.  The January 9, 2007, order of the Magistrate Judge granting the motion of
       defendant Putnam Investments, LLC. ("Putnam") "for a Protective Order
       Terminating Further Discovery" and insofar as that order, in effect, denied
       Svensson's "Cross-Motion...for Sanctions...for Violation of the October 26,
       2006, Order for Production and of the Court's...Directions to Engage in
       Negotiations and Exchanges of Information as to Svensson's Second Request

1

for Production;" and Svensson's "Renewed Motion for Orders Compelling Production of Certain Items of her Second Request for Production"; and,

2. The January 17, 2007, Order of the Magistrate Judge insofar as it "den[ied]" Svensson's motion, filed October 10, 2006, "for Orders Compelling Production of Documents...in her Second Request for Documents...and for Sanctions...and...Other Relief...." and her related Cross-Motion and Renewed Motion.

1. Introduction.

In this action, Svensson seeks to prove at trial single plaintiff disparate treatment and disparate impact claims for damages for gender discrimination in violation of, inter alia, Title VII of the U.S. Code and relevant Massachusetts statutes.  To do so, Svensson must obtain information about Putnam's treatment of Svensson and other present and former Putnam employees, both to prove at trial that Svensson, because of her gender, was treated less favorably than similarly situated male employees, and to establish through evidence of Putnam's mistreatment of other females, the existence of a discriminatory atmosphere and discriminatory motivation at Putnam, making it more likely that Putnam also discriminated against Svensson on the basis of her gender.  Obviously, such information concerning Putnam's treatment of other employees, both male and female, is highly relevant, within the meaning of Fed. R. Civ. P. 26(b)(1), to Svensson's claims.

Perhaps understanding the importance and potential negative impact of such evidence, Putnam has undertaken a concerted effort to prevent Svensson from discovering relevant information necessary to her case.  Putnam's most recent attempts to avoid its obligation to make discovery were its December 13, 2006, motion "for a Protective Order Terminating Further Discovery" and its refusal to produce the documents requested by Svensson's Second Request for Production of Documents the "Second Request"), served April 28, 2006, are parts of that larger effort.

2. Facts and procedural background.

2

A subsidiary of the publicly held Marsh & McLennan Companies, Inc. ("MMC"), Putnam, worth up to $3.9 billion, is a nationally known investment firm.[1]  It was Svensson's employer from July 1994 to September 15, 2003.  Before her Putnam employment, Svensson, a resident of Newton, who holds a Bachelor of Science degree in petroleum engineering from Texas A&M University and the MBA degree from Cornell University, had had seven years of sophisticated investment experience in New York, New York.[2]  Soon after joining Putnam, Svensson served in its Investment Management Division ("IMD") as Senior Vice-President, Supervisory Analyst in Putnam's Global Equity Research ("GER") Department. Id.  In 1997, Putnam promoted Svensson to Senior Vice President, Portfolio Manager, for the Putnam Global Growth Fund in the Putnam IMD. Id.  In this position, Svensson was responsible for, among other things, the performance of Putnam's Large Cap International Growth products such as Putnam Global Growth Fund, International Large Cap Growth Equity, and Global ex-Japan. Id.[3]  About five years later, in March 2002, Putnam demoted Svensson from her portfolio management position back to a position in the GER Department and, on September 15, 2003, she was fired.[4]

---

[1]  Boston Globe, December 30, 2006, p. 5B, "Sale of Putnam is close. Canadian suitor may pay $3.9b for Boston fund firm".

[2]  See Svensson's resume, a copy of which is annexed as Exhibit "1" to both the Second Affidavit of Lisa Svensson ("Svensson Second Affidavit") and the Third Affidavit of Lisa Svensson ("Svensson Third Affidavit"), each of which were filed April 20, 2006.

[3]  Also in this position, Svensson helped develop the investment process, including development of quantitative screening, portfolio construction and risk management techniques; she recruited and trained numerous junior investment professionals, including development of their coverage plans and evaluation of their performance; and she helped to design marketing materials and participated in new business development and ongoing client service initiatives. Id.

[4]  Prior to terminating Svensson's employment, Putnam, on August 28, 2003, acting through Joshua Brooks ("Brooks"), a male hired by Putnam from the outside approximately five months earlier, offered Svensson three options: (1) to be demoted to an entry level analyst position with no chance to earn more money or to be promoted; (2) to accept a severance package consisting of 18 weeks of her base pay and half of her prior year's bonus, which, she later learned was subject to her signing a release of all of her legal rights with respect to her position as a member of a protected class under Title VII; and, (3) to pretend to work as an analyst for Putnam while she sought employment elsewhere, with the explicit statement that she would leave Putnam by a date to be agreed upon, but without any severance payment.[4]  Putnam did not offer Svensson the option to seek employment elsewhere within Putnam.  Id.

It is Svensson's position, among others in this case, that Putnam's failure to pay her

equally with males, its failure to promote her to the position of Managing Director and her

demotion and ultimate termination were the result of unlawful discrimination by Putnam on the

basis of her gender.

Svensson contends that the male and female investment professionals who were

employed from time to time in the Putnam IMD in the period 1994-2003 are her male and female

comparators. Yet Putnam has taken the startling and incredible position that, during Svensson's

entire nine years of employment as an investment professional in the IMD, Svensson, regardless

of the employment actions taken against her, had no comparators. However, the Putnam position

that Svensson had, and has, no comparators not only is belied by facts but also is in stark contrast

to the information contained in documents that Putnam itself has produced. [5][6][7][8]   Moreover, as

set forth in the accompanying Exhibit "A," an excerpt from Svensson's Reply Memorandum,

filed October 25, 2006, Docket No. 126, Putnam's claim is based on entirely incorrect

[5]   The investment teams and the research functions in the IMD, were not administered independently within the IMD by team or function, as titles, compensation and other significant employment and administrative matters concerning those in the various Putnam divisions were decided within and by the respective divisions. Candidates for demotion to the GER Department, to which Svensson was demoted in March 2002, were selected from across the same broad range of portfolio teams in the IMD. In this process, Putnam was comparing Svensson to other persons from a number of investment teams. Putnam documents PRM 2991-2992 identify other persons with whom Miller compared Svensson; and PRM 2878-2880) evidences a meeting of Putnam officials from across the entire IMD at which the candidacies of various persons, including Svensson,, for promotion to Managing Director were discussed. Putnam document PRM-1886 shows that this centralized structure for promotions applied across all levels of officers in the IMD, including also Quant, Fixed Income Trading, Currency and GAA. Persons who were hired as, or promoted to, Managing Director in the periods when Svensson was eligible for appointment to the position are, by definition, comparators of Svensson, a fact that Putnam obviously recognized since Putnam document PRM-1792 and PRM 1891-1893 show that Svensson was included with others in the various promotion pools for Managing Director.
[6]   Putnam document PRM 3038, handwritten notes describing another meeting with Brett Browchuk during which the demotion of Lisa Svensson was discussed, identifies others who were considered in demotion discussions. Putnam documents PRM 2991-2992) a January 30, 2003, e-mail from Chief Investment Officer of Specialty Growth, Daniel Miller,shows that management decisions were being made by a broader range of officials than those assigned only to the GER Department..
[7]   See ¶¶ 3-9 of the First Affidavit of Lisa Svensson ("First Svensson Affidavit"). Docket No. 62.
[8]   In addition to the IMD that managed client portfolios, there were the Operations Division (services to customers including answering client questions and mailing fund information); the Distribution Division, which marketed and sold products to institutional and retail clients; and the Corporate Division, which supported the overall business through activities such as corporate finance. Id.

interpretations of the holdings and reasoning of <u>Jackson</u> v. <u>Harvard University</u>, 111 F.R.D. 472

(D. Mass. 1986), <u>Whittingham</u> v. <u>Amherst College</u>, 164 F.R.D. 124 (1995) and <u>Conward</u> v. <u>The</u>

<u>Cambridge School Committee</u>, 171 F.3d 12, 19 (1st Cir.1999). Thus, the issue of Svensson's

comparators, and the Putnam decision-making processes in regard to her comparators are critical

issues in this case, and have been, and still are, the major focus of the discovery that Putnam so

desperately has sought to avoid.

        The originally scheduled the end of fact discovery was extended from February 1, 2006,

to May 1, 2006, by order entered on January 20, 2006 (Bowler, M.J) (on Svensson's motion) and,

on March 9, 2006 (Saris, D.J.), to June 1, 2006, on a joint motion but based upon a

representation of Putnam's counsel of engagement in another litigation matter. On September

15, 2006, as the result of a series of hearings, orders and directions from the court (Bowler, M.J.)

in June through August 2006, and events resulting therefrom, the court (Bowler, M. J.) on

September 15, 2006, extended the fact discovery period to December 31, 2006.

        Because the Putnam responses to Svensson's interrogatories failed to include any

information concerning any Putnam employees other than Svensson and its production of

documents in response to her First Request for Production was for the most part in redacted or

partially redacted form, Svensson was handicapped in taking depositions. For example, when

asked in deposition about one of the redacted Putnam documents, defendant Lasser, who until

late 2003 was Putnam's Chief Executive Officer, testified, "<u>You showed me a bunch of blank</u>

<u>pages</u>, so it's hard to remember."[9] (Emphasis added.)

        On April 28, 2006, Svensson served her Second Request for Production of Documents,

Exhibit "B," hereto, the responses to which were due prior to the end of the discovery period on

---

[9]     Lasser deposition transcript, p. 11, ll. 5-6.

May 28, 2006.[10]  Putnam response, a copy of which is filed herewith as Exhibit "C," objected to virtually every category of the request.

It was only because the court (Bowler, M.J.) had held hearings on June 21, 2006, and July 11, 2006,[11] on Svensson's April 20, 2006, motion to compel Putnam to answer Svensson's Interrogatory Nos. 3, 4, 5, 7, 9, 10 and 12, that Putnam served on September 1, 2006, answers to those interrogatories and produced in unredacted form (as to 67 male and 27 female investment professionals in the IMD) documents that, in response to Svensson's First Request for Production, had been produced prior to June 1, 2006, only in redacted form.[12]

In response to the directions from the court at the June 21 and July 11 hearings, among others, to negotiate discovery issues, Svensson initiated telephonic and e-mail discussions as to her Second Request for Production in late June, and continuing into late July 2006.  On August 4, 2006, in response to Putnam's counsel's July 27 request for further modifications, Svensson's counsel sent the following e-mail:

> ...I have reviewed.[the] second document request...[to]...provid[e]you with a proposal to resolve our...dispute...without Court intervention.  The following...represents the minimum Plaintiff believes necessary...to prove her case....

(Emphasis added.)  In a reply e-mail on August 11, 2006, Putnam's counsel made no counter proposal, inviting instead the filing of a motion to compel:[13]  In an e-mail on August 31, 2006,

---

[10]   Putnam served its Second Request for Production by Svensson the same day.
[11]   Copies of the transcripts of those hearings are filed herewith as Exhibit "D" and "E," respectively.
[12]   Also on July 11, 2007, while the court allowed Putnam's motion to quash Svensson's Rule 30(b)(6) notice for a deposition of Putnam, it did so without prejudice to Svensson's serving a retailored set of deposition subject matters, which Svensson served on October 10, 2006.  Putnam, on October 19, 2006, again moved to prevent a Rule 30(b)(6) deposition but the court, by order entered October 26, 2006, denied Putnam's second attempt to prevent the deposition
[13]   We are disappointed in your proposals.... We had hoped that...you instead would have... narrow[ed] your requests to a smaller list of discrete documents that you really need.  As it now stands, even as narrowed...the requests would call for a monumental, time-consuming and expensive production process by Putnam when it is not at all obvious that that process will produce anything even marginally relevant.  This is especially true with respect to your requests for emails... so it does not look like we will be able to resolve this short of your filing a motion....  (Emphasis added.)

Svensson's counsel made a final attempt to resolve the matter by agreement[14] but there being no response from Putnam, Svensson, per the schedule as amended on September 15, 2006, filed on October 10, 2006, her motion to compel production.[15]  Svensson's Reply Memorandum, filed October 25, 2006, Docket No. 124, sets out in order and in one document all of the parties' positions on each of the categories as set forth in their respective prior filings.

Notably, the Svensson motion to compel sought production far smaller in scope than her original Second Request served April 28, 2006.  In tracking her counsel's August 4, 2006, compromise proposal, Svensson for the October 26, 2006, hearing, requested orders compelling production of far fewer documents than requested in April.  This is particularly true of the categories that include e-mails, as Svensson's motion reduced the number of e-mail boxes to be searched to ten identified decision-makers for communications concerning the four employment actions in this case.  For example, on April 28, 2006, Category No. 6 of the Second Request sought production of the following:

> In regard to [any of the 91 Comparators] who were not promoted from within...but were hired as a Managing Director or Portfolio Manager...from

---

[14] I have further considered your email of August 11th ...
  1) After 2 months of telephone negotiations concerning the second request for production..., I agreed to your request...to reduce the scope of our request...to only those documents necessary to prove Plaintiff's case at trial;
  2) My August 4, 2006 email represented a significant compromise...by...reducing the 91 comparators...to far more manageable numbers for purposes of the...request;
  3) While you invited us to further reduce...our compromise proposal, you...provided no counterproposal..., failed to deal with the discrete documents sought..., and failed to offer to provide a single document beyond the..[unredaction of previously produced redacted documents];
  4) You offered some numbers concerning the volume of emails...to be searched (which appear...wildly inflated), but did not advise us as to the methods utilized in making these calculations, nor did it offer us an opportunity to have the search undertaken by our own representatives; and
  5) Your response must be seen as part of an overall effort by Putnam since last Fall to thwart legitimate efforts at obtaining relevant discovery in this case, while speciously arguing that it is Plaintiff who is seeking to delay the orderly completion of the discovery process.
  Accordingly, I hereby decline your suggestion that I further dilute Plaintiff's second document request, and will proceed with the motion to compel....  I urge you to revisit Plaintiff's 8/04/06 compromise proposal (which you had requested)....
(Emphasis added.)
[15] Docket Nos. 112 (motion) and 114 (memorandum), copies of which are Exhibits "K" and "L," hereto.

> another entity...since January 1, 1999, all documents and things prepared or received by...the persons participating in the decision making process as to who should be so elected or appointed, and which concerned evaluation of, or action or decision made, taken or recommended or proposed to be made or taken, in regard to Svensson [or any of the 91 Comparators]....

In sharp contrast, the Svensson October 10, 2006, motion to compel stated that,

> ...Svensson will limit the scope of this category to documents prepared or received by the above-named ten decision makers (Steve Oristaglio, Jack Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks, Brett Browchuk, Dan Miller and Justin Scott) concerning any of the 91 Comparators...brought in from the outside.... This should not require search of e-mail accounts of any comparators, but rather review of files and e-mails of only the above referred to ten decision makers.

(Emphasis added.)  In like manner, while Category No. 15 as originally served in April sought

production of,

> All documents and things concerning the actual criteria used by Putnam for deciding whom of Svensson [and/or any of the 91 Comparators] should...or would be demoted in the period since January 1, 2002: (A) From Portfolio Manager to any other professional position; (B) From ADR to any other professional position ...; (C) From CIO to any other professional position ...; (D) From ADR to Analyst...; and/or, (E)From CIO to ADR....,

Svensson's motion to compel requested much less by reducing the number of comparators for

this category from 91 to 22:

> ...Svensson will limit the scope of this request to...22 of the 91 comparators: 16 males: Mark Bogar, Richard Cervone, Steve Dexter, Nathan Eigerman, Peter Hadden, Shigeki Makino, David Gerber, David King, Jeff Lindsey, Dan Miller, Mike Mufson, Dave Santos, Tino Sellito, Brian DeChristopher, Hugh Mullin, Manuel Weiss, and six females: Beth Cotner, Lauren Allansmith, Debbie Farrell, Carmel Peters. Margaret Smith and Jeanne Mockard....

(Emphasis added.)

Svensson's Second Request also sought some discrete documents such as (by Category No.

74) the "personnel files" of "[Lauren] Allansmith, [Brian] DeChristopher, [Christopher]

O'Malley, [Darren] Peers and [Paul] Warren," Category No. 74, which also were one of the

subjects of Svensson's motion to compel, "to show in comparison to the treatment of Svensson,

1.    The treatment of DeChristopher who, according to [Putnam document] PRM 4026, had "poor three years performance record" and a "volatile personality" yet was promoted in 2003 while Svensson was terminated;

2.    The treatment of [Lauren] Allansmith who was fired and had been demoted while on maternity leave;

3.    The treatment of [Christopher] O'Malley, who complained about Svensson, and whose complaints, at least in part, according to Putnam, provoked her termination and later received a promotion and took over some of her responsibilities; and,

4.    The treatment of [Paul] Warren's behavior. ["the conduct of Paul Warren, one of the 91 Comparators, described in the letter referred to (see McNamee deposition p. 357 ("...And "what" bad behavior over the years did it allege Paul Warren had [engaged in]? That he frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers excessively and accepted gifts from brokers excessively")) and at pp. 18-2 ("They were talking about a --someone leaving the group and that would leave a hole in the work...and he stood up and grabbed his crotch and said, "You could fill it with this") is relevant to show the nature of the conduct of this person and to be able to compare his conduct in the workplace to that alleged of Svensson, and to determine if there has been any gender discrimination in the treatment of Svensson and the females among the 91 Comparators.

(Emphasis added.)

Other discrete documents sought by both the original April 28, 2006, Second Request and by the motion to compel concerned, among other things, Putnam's actions concerning Konstantin Stoev, who worked in the IMD as an investment professional under Svensson's supervision until her termination on September 15, 2003, and who praised Svensson's management skills in his August 2006, deposition, but who was fired by Putnam in 2004. Putnam, which thought so well of Stoev in 2003 that it assisted him in obtaining a "green card" so that the Immigration Service would allow him to stay in the U.S. and continue working for Putnam, terminated him a year later. Category No. 34 of the Svensson Second Request sought "All documents and things concerning the 'green card' application for Stoev that [Putnam's Kelly] Morgan filled out." Svensson's motion papers explained the relevance.[16]

---

[16]    ...Production of the documents requested may well enable the court and the jury to determine

To respond to Putnam objections as to e-mails (highly inflated, conclusion filled and speculative rhetoric in Svensson's view), Svensson's motion papers brought to the attention of the court that the new e-discovery amendments to Fed. R. Civ. P. 26 officially would be taking effect on December 1:

> If the court is unwilling to decide that Putnam's e-mail claims are meritless without further input on the facts from the parties, Svensson suggests that the court adopt for this case...the new e-discovery rules...effective on December 1,...which, among other things, would require Putnam to furnish...accurate information as to Putnam's computer systems, search capabilities and other matters so that the parties could work out...e-mail search issues by agreement based upon ...facts rather than over-heated rhetoric, recognizing that under the new e-discovery rules the burden is on the responding party to establish that it does not have to produce the requested information.

(Emphasis added.)

At the October 26 hearing, as shown by the transcript, Exhibit "F," hereto, Svensson's counsel elaborated on the fact that the new e-discovery rules, to become effective in about five weeks, should be applied to enable the court to resolve the e-mail issues and that Putnam should be required by the court to share information about its systems and capabilities, and the court appeared to accept Svensson's suggestion that the substance provided by the amendments should be followed. Tr., pp 7-8, 17, 23  The court then began to hear arguments on the specific categories of the Second Request in order, starting with Category No. 1. Tr., p. __.  In doing so, the court directed that Putnam furnish sworn statements from authorized officials if Putnam claimed

---

if what Putnam told the government in 2003 about Stoev to assist in his staying in the U.S. and working for Putnam, is consistent with what its deposition witnesses have testified to about Stoev, and whether it is consistent with what Putnam told Stoev directly concerning termination of his employment at Putnam....

Svensson is entitled to know if Stoev's high opinion of Svensson and her management skills, based upon Svensson's supervision of Stoev while at Putnam, had any effect on Putnam's decision to terminate Stoev.

Moreover what Putnam...represented to the government in its efforts to [it] issue...a "green card"...is highly relevant.  Production...may well enable the court and the jury [to] determine if what Putnam told the government in 2003 about Stoev...is consistent with what its deposition witnesses have testified to about Stoev and whether it is consistent with what Putnam told Stoev directly concerning his termination.

requested documents do not exist[17] and ordered Putnam to produce the annual reviews known as

"360s."[18]  However, after ruling on Category No. 14 and without considering any of the

remaining 58 categories,[19] the court ended the hearing on the motion to compel, declaring the

matter "tedious" and directing the parties "to discuss the rest."

> THE COURT: Enough. Time. We've gone this far.  <u>My ruling today</u>
> <u>will reflect that I've allowed it to the extent stated on the record</u>...
> <u>As to everything remaining and the E issues, I want you to sit</u>
> <u>down...and see what you can work out</u> because let me tell you I'm
> not about to allow much more.  Eight weeks left, the time is
> narrow....
>
> THE COURT: <u>Sit down, discuss the rest</u>.
> MR. MOLONEY: Yes, Your Honor.....
> THE COURT: <u>Because it's really getting</u>--...
> THE COURT: --<u>tedious</u>.[20]

(Emphasis added.)  Thus, the October 26, 2006, hearing resulted not in orders resolving any but

the first 14 categories of the Second Request for documents, but only with a direction to "sit

down" and "discuss the rest."

On November 17, 2006, Svensson's counsel sent to Putnam's counsel a questionnaire, a

copy of which was filed as an Exhibit to the Affidavit of Nicole M. Panos (the "Panos

Affidavit"), Docket No. ___, copies of the Panos Affidavit and the questionnaire are Exhibits

"G" and "H," hereto, respectively, seeking basic information about Putnam's computer and e-

mail capabilities:

> The attached [questionnaire] sets out the information that will help us move
> forward with discussion of the e-mail issues Putnam has raised.  Please let me

---

[17] Yet Putnam has failed to furnish any of the five sworn statements as per the court's directions at the hearing.  <u>See</u> Affidavit of Kevin F. Moloney, filed herewith, as the court reporter has advised that due to technical problems of the recording system at the court, it is impossible to produce a transcript of the January 4, 2007, hearing.
[18] Yet Putnam has produced 360s for only some of the years in question and for one of the produced years failed to include the "comments" section, taking the position via an e-mail from Attorney Kurker that 360s for the other years did not exist, only to admit, when presented with evidence from Putnam's own documents that they did exist, Putnam counsel advised that they were looking for them.
[19] Of the 76 original categories of the Second Request, as the court ruled upon 14, and Svensson had waived four, there were 58 categories not ruled upon
[20] Tr., pp. 49-50

know if Putnam will supply the information requested... so that we might discuss
this matter on a more informed basis.

But, on November 21, 2006, Putnam's counsel responded, not with any of the answers to the

questionnaire, but with a question as to one item, No. 5 (of 19) thereof, and requesting, despite the

prior identification of them in Svensson's motion papers, a "list of individuals whose e-mail

boxes you propose to have searched."  The next day, November 22, 2006, Svensson's counsel

replied:

> As you know, the questionnaire I sent over to you folks (copy attached) requests,
> in the spirit of the new e-discovery rules as discussed with  Judge Bowler, basic
> information needed to help us understand Putnam's computer systems and
> capabilities as they may affect resolution of the e-mail discovery issues in this
> case. Thus, I was disappointed to see that the Putnam response so  far consists
> only of questions about one of the 19 categories rather than the  information
> requested.
>
> Nonetheless, in regard to Putnam's question about Item No. 5 of the
> questionnaire, Item No. 5 was intended as an inquiry as to the search terms that
> Putnam has used and./or would propose to use to obtain the information; but we
> have no problem in presenting to Putnam some possible search terms that we have
> developed. They are set out in the other attachment. Of course, we reserve the
> right to make refinements, additions and changes without prejudice.
>
> In response [to] your other e-mailed question, wherever in our reply
> memorandum in regard to the Second Request for Production the term "decision-
> makers" is used in regard to e-mail or the following are named as such such
> decision-makers in regard to e-mail, we are seeking the e-mails to or from
> any one or more of the following ten decision-makers: Steve Oristaglio, Jack
> Morgan, Tim Ferguson, Larry Lasser, Bill Landes, Ed Haldeman, Josh Brooks,
> Brett Browchuk, Dan Miller and Justin Scott and, as appears to be the case of at
> least defendant Lasser, persons sending and/or receiving e-mail on behalf of any
> such persons, which e-mails concern one or more of the employees or lateral
> hires named in the respective categories of the Second Request for Production
> discussed in our reply memorandum.[21]

(Emphasis added.)  Attached to that e-mail was another copy of the November 17, 2006

questionnaire and a list of Svensson's proposed search terms.

Putnam waited for almost three weeks until on December 12, 2006, to respond (without

answering the November 17 questionnaire) announcing that,

---

[21] Putnam's counsel had represented (incorrectly) to the court on December 13, 2005, that Lasser "never
used e-mail." Tr., p. 14, l. 11.

12

> We have.. concluded that the process... is prohibitively expensive and unreasonably
> burdensome...[it] will take several weeks, to say nothing of the strain it will put on
> Putnam's IT department and will cost, using the services of an unidentified "vendor"
> roughly $200,000.00.

(Emphasis added.) Thus, Putnam advanced to Svensson the conclusion it wanted the court to

reach, but did so without providing the subsidiary information necessary to enable the making of

an informed judgment as to the Putnam claim. As set forth in the Panos Affidavit,

> Based upon my education, training and experience, it is impossible to  analyze and
> evaluate the propriety, integrity and legitimacy of the Putnam  contentions as to time
> and expense and the other issues set out in Attorney Rodrigues' e-mail of December
> 12, 2006..., without first having obtained, analyzed and evaluated in the light of
> the technological issues and the  varying conditions of the market place
> concerning vendors, the answers to the questions set out in the November 17 e-
> discovery questionnaire;

and,

> ...the cost and time estimations from vendors for tape restoration and searching,
> for example, has ranged from days to weeks and from one-hundred dollars per
> tape to one-thousand dollars per tape based on the vendor and the type of tape.
> These...issues can be resolved with open discovery exchange.

(Emphasis added.)

About a month after announcing its December 12 "conclusion" on e-mail issues, Putnam,

on December 13, 2006, even though the court had ruled on only the first 14 categories of the

Second Request, and without Putnam answers to the e-discovery questionnaire and without any

response from Putnam to Svensson's efforts to conduct negotiations after the court's October 26

admonition hearing to "sit down" and "discuss the rest," Putnam moved "for a Protective Order

Terminating Further Discovery." Docket No. 130. Putnam also moved, Docket No. 128, to

prevent resumption of the November 29, 2006, Rule 30(b)(6) deposition of Putnam, which it

unilaterally had terminated with over two of  the allowed seven hours of deposition time left, but

the motion was denied on January 9, 2007.

Notably, the seven page Putnam motion for a protective order failed to include any

specific arguments or discussion of any of the discrete items and non-e-mail issues that had not

been decided by the court on October 26, except to assert, without any facts based on affidavits

or otherwise, that the documents requested would be irrelevant and burdensome to produce,

concentrating only on e-mail issues. The Putnam motion "summarize[ed]" its contentions this

way:

> To summarize, Ms. Svensson seeks to restore and search the email boxes
> of 10 former and current employees for these 27 commonly used words,
> *and the names of up to 91 other employees* - - a task that would cost Putnam
> hundreds of thousands of dollars, and that could never be completed with
> the less than three weeks remaining during the discovery period,

(emphasis in original text) but the "summary" completely ignores the fact that, in

Svensson's motion papers for the October 26 hearing, Svensson had reduced the number

of in-boxes to be searched to those of only ten identified decision-makers for

communications concerning very few of the 91 comparators. Striking in their omission

from the motion was: (1) Any reference to the new e-discovery rules that had become

effective two weeks earlier on December 1; 2006; and, (2) Any discussion of any case

law concerning e-mail issues or what is required for motions for protective orderss.

Svensson filed her opposition on December 27, 2006, including both a cross motion

"...for Sanctions...for Violation of the October 26, 2006, Order for Production and of

the...Directions to Engage in Negotiations and Exchanges of Information as to [the] Second

Request..." and a "Renewed Motion for Orders Compelling Production of Certain Items of her

Second Request" [22] with supporting exhibits. The Svensson opposition included a thorough

review of the history of Putnam failures and refusals throughout the discovery phase of the case

to make discovery and why the decisions of the court and orders to Putnam in the June-August

---

[22] Seeking,"[e]xcept to the extent actually produced, categories where Putnam claims no documents exist and a sworn statement to that effect (9 items) will be accepted, 9, 10, 11, 13, 14, 27, 28, 49; Categories re: email issues (31 items): 2, 3, 4, 5, 6, 12, 13, 15, 16, 17, 18, 19, 38, 39, 45, 46, 47, 48, 49, 56, 57, 58, 59, 60, 66, 67, 68, 69, 71, 72, 73; Categories requesting discrete documents where there is no email issue (33 items):7, 8, 12, 23, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 43, 44, 50, 51, 52, 53, 54, 61, 62, 63, 64, 65, 70, 74, 75, 76, including the request for the "PDPRs" which was ruled upon by the court but upon a misrepresentation of fact by Putnam.

period were necessary, <u>see</u> excerpt, Exhibit "I," hereto.  It also included an analysis of the new e-discovery amendments to Rule 26 and a detailed survey of relevant e-discovery case law from "the scope of e-discovery" through to the subject of "cost shifting," which is excerpted in Exhibit "J," hereto.

At a hearing on January 4, 2007, the court (Bowler, M.J.) heard arguments of counsel on Putnam's motion for a protective order to terminate discovery and its motion to prevent resumption of the deposition of Putnam.  On the motion for a protective order to terminate discovery, the court had before it only the Panos Affidavit and two affidavits from Putnam, one from an in-house Putnam employee (Bento) and the other from an in-house employee at the office of Putnam's counsel (Breen).  Svensson's counsel argued to the court that it was impossible for the court to make an informed decision on the e-mail issues, without, as the Panos Affidavit states, the answers to the November 17th questionnaire, particularly when the opposing affidavits were wither replete with hearsay (Breen) or filled with speculative possibilities ("<u>could</u> reside on <u>as many as</u> 100 separate back-up tapes" "take three and <u>possibly up to five</u>...business days")(Bento).

Svensson's counsel made the point that the court was entitled to have before it a proper factual basis upon which to make an informed judgment, and that the way to obtain the proper factual basis would be to appoint from a list to be agreed upon of 3-5 "neutrals," an expert who would examine into the facts of the e-mail issues and report to the court.  <u>See</u> the Affidavit of Kevin F. Moloney, filed herewith as the court reporter has advised that due to technical problems of the recording system at the court, it is impossible to produce a transcript.  Svensson offered to pay one half of the cost for the neutral. <u>Id.</u>

The court then closed the hearing and, on January 9, 2007, without disclosing its reasoning or the subsidiary facts it relied upon, granted the motion for a protective order terminating discovery; not for lack of relevancy or reason other than as "unduly burdensome and

15

expensive; and, on January 17, 2007, while ordering resumption of the 30(b)(6) deposition but only for a few minutes more than two hours, entered an order the effect of which was to deny, to the extent previously not ruled upon, Svensson's motion to compel and her cross and renewed motions.

3. The standards for the granting of a protective order.

A district court reviewing a magistrate's entry of a protective order under the clearly erroneous/contrary to law standard must determine if before the magistrate there had been "a substantial basis for a finding of "good cause" to support such an order under Fed. R. Civ. P. 26(c) and that the magistrate did not abuse her discretion in framing an appropriate order." Doe v. Meachum, 126 F.R.D. 437, 438-39 (D. Conn. 1988). See also Calphalon Corp. v. Meyer Corp., 2006 WL 2474282, *2 (E.D. Cal. 8/25/06).

The courts of the First Circuit have held that a magistrate (or district court judge) can properly find the good cause required by Rule 26(c) only when "based on a particular factual demonstration of potential harm, not on conclusory statements." Anderson v. Cryovac, 805 F.2d 1, 7 (1st Cir. 1986). See also In re Stone & Webster, Inc. Securities Litigation, 2006 WL 2818489, *2 (D. Mass. 9/29/06) (same); Cohen v. Brown University, 2000 WL 1499494, * 2 (D.N.H. 5/12/00) (magistrate had "clearly erred" in granting protective order where moving party had failed to support request with specific evidence that it would suffer serious injury); Prozina Shipping Co. Ltd v. Thirty-Four Automobiles, 179 F.R.D. 41, 47-48 (D.Mass. 1998) (party seeking protective order must demonstrate particular and specific facts); St. Hilaire and Assoc., Inc. v. F.D.I.C., 1994 WL 575773, *2 (D.N.H. 10/13/94) (" a movant must articulate a real and specific harm and not just 'stereotyped and conclusory statements.' "); Baker v. Liggett Group, Inc., 132 F.R.D. 123, 125-26 (D. Mass. 1990) (denying motion for protective order because of failure to make particularized showing of good cause. "A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements.");

16

Beals v. General Motors Corp., 1989 WL 384829, *1-2 (D. Mass. 12/4/89) (denying protective

order, stating that "[a] finding of good cause must be based on a particular factual demonstration

of potential harm, not on conclusory statements."). [23]

It is not sufficient for the moving party, as in the present case, simply to allege that the

discovery in question would cause burden or expense. St. Hilaire, 1994 WL 575773, *2. See

also McLeod, Alexander, 894 F.2d at 1485 (5th Cir. 1990) (holding that objections to discovery

which merely stated: "overbroad" and "propounded with the intent to harass, delay, and abuse"

"irrelevant," "privileged" or were "Overbroad; irrelevant; privileged. Propounded with the intent

to harass, delay and abuse" or "overly-broad, not specific, and creates a hardship on the

producing party" were insufficient basis for entry of protective order). In Apco Oil Corp. v.

Certified Transportation, Inc., 46 F.R.D. 428, 430 (W.D.Mo. 1969), the court stated:

> Experienced counsel in this case are familiar with the consistent ruling of all active
> judges on this Court in connection with discovery in antitrust litigation. Those
> rulings are consistent with the following statement from 4 Moore's Federal
> Practice, ¶33.27, p. 2414:
>
> General objections, such as the objection that the interrogatories will require the
> party to conduct research and compile data, or that they are unreasonably
> burdensome, oppressive, or vexatious, or that they seek information that is as
> easily available to the interrogating as to the interrogated party, or that they would
> cause annoyance, expense, and oppression to the objecting party without serving
> any purpose relevant to the action, or that they are duplicative of material already
> discovered through depositions, or that they are irrelevant and immaterial, or that
> they call for opinions and conclusions, are insufficient.

(Emphasis added). Particularly supportive of Svensson's position is a line of cases that hold that

"a determination of whether good cause does or does not exist must be based upon appropriate

testimony and other factual data, not the unsupported contentions and conclusions of counsel."

---

[23] Other federal courts apply the same rule. Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16, 101 S.Ct.
2193, 2201 n.16 (1981) ("To establish 'good cause' for a protective order under [Federal Rule of Civil
Procedure] 26(c), '[t]he courts have insisted on a particular and specific demonstration of fact, as
distinguished from stereotyped and conclusory statements···' "); McLeod, Alexander, Powel & Apffel,
P.C. v. Quarles, 894 F.2d 1482, 1485 (5th Cir. 1990); Cipollone v. Liggett Group, Inc., 785 F.2d 1108,
1121 (3rd Cir. 1986); General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1212 (8th Cir. 1973);
Cooper v. Welch Foods, Inc., 105 F.R.D. 4, 6 (W.D.N.Y. 1984); Byrnes v. Jetnet Corp., 111 F.R.D 68,
73 (M.D.N.C. 1986) (noting the lack of affidavit evidence establishing good cause); DeFelice v.
Consolidated Rail Corp., 124 F.R.D. 603, 604 (W.D.Pa. 1989).

Apco Oil, 46 F.R.D. at 432.  See also Simkins v. Wahnschaff Corp., 1986 WL 1551, 1 (E.D. Pa.

1/31/86); Willie Nelson Music Co. v. Comm. of Internal Revenue, 85 T.C. 914, 920 (1985); In re

Mulhern, 45 B.R. 621, 623 (Bkrtcy. E.D.Pa. 1985); Davis v. Romney, 55 F.R.D. 337, 340

(E.D.Pa. 1972).

    Given the requirement that a party seeking a protective order present, and the magistrate or

court granting a protective order find, specific facts supporting the order, it follows that a

magistrate cannot properly grant a protective order where no such evidence has been presented

and without making any factual findings.  See Saldana-Sanchez v. Lopez-Gerena, 256 F.3d 1, 8

(1st cir. 2001) ("an order denying or limiting discovery may not be upheld if it rests on an

incorrect legal standard or a misapplication of the law to the relevant facts")  The court cited

Trevino v. Celanese, 701 F.2d 397 (5th Cir. 1983) for the proposition that a protective order

should be vacated where the district court "gave no explanation for its actions and appeals court

could find no sound reason for granting the order).

4.  The orders of the court below were clearly erroneous and contrary to law.

    In the present case, there was before the Magistrate Judge an insufficient factual basis

upon which a court could find good cause for the entry of the January 9, 2007, protective order.

On the non-e-mail issues in the 58 categories of the Second Request that had not been ruled upon

on October 26, Putnam presented only a "laundry list" of conclusory objections.  See, for

example, its objections to Category No. 34 (concerning the "green card application for

[Konstantin] Stoev that [Putnam's] Morgan filled out"): "overbroad, burdensome and seeks

information that is irrelevant and not reasonably calculated to lead to the discovery of

admissible evidence, and on the grounds set forth in Putnam's Opposition on file with the

Court."[24]  It would be absurd to conclude that production of these "green card" application

documents ever could be "burdensome and expensive."  The same is true for all of the other

---

[24] See p.5, supra and Exhibit "A," hereto,  as to the lack of merit in Putnam's claims in opposition to the motion to compel that Svensson never had any comparators

requests for discrete items such as, among other categories, Category No. 74, the "personnel

files" of "Allansmith, DeChristopher, O'Malley, Peers and Warren."

On the facts concerning the e-mail issues, the court had before it only two conclusory

affidavits from the Putnam and Bingham-McCutcheon in-house persons, on the one hand, and,

on the other hand, the uncontroverted Panos Affidavit that it is impossible to determine the

accuracy of the Putnam e-mail claims without at least the answers to the November 17

questionnaire. The court also was presented with a comprehensive analysis of the e-discovery

rules amendments and relevant case law and was urged to appoint a neutral to report objectively

to the court on the facts so that the court would have an appropriate factual basis upon which to

rule. Yet the court, without any findings of subsidiary facts or statement of the legal standards it

applied, concluded that that all the documents not ruled upon on October 26 whether or not

discrete items, e-mail related or non-e-mail related, should not be produced as it would be

"burdensome and expensive."

5. Conclusion and request for relief.

There being no adequate factual basis for the decisions of the Magistrate Judge, and the

Magistrate Judge having failed to apply the proper standards for a protective order and for ruling

on e-discovery, the orders of the court below were clearly erroneous and contrary to law.

Accordingly, Svensson requests the District Judge to:

1. Vacate the January 9 and January 17, 2007, orders of the Magistrate Judge; and,

2. Grant other appropriate relief, including,

    (a) Ordering Putnam, as requested in Svensson's cross and renewed motions,
    to produce the following categories of documents requested in the Second
    Request, as limited by her motion papers for the October 26, 2006,
    hearing:

    [e]xcept to the extent actually produced, categories where Putnam claims no
    documents exist and a sworn statement to that effect (9 items) will be accepted, 9,
    10, 11, 13, 14, 27, 28, 49; Categories re: email issues (31 items): 2, 3, 4, 5, 6, 12,
    13, 15, 16, 17, 18, 19, 38, 39, 45, 46, 47, 48, 49, 56, 57, 58, 59, 60, 66, 67, 68, 69,
    71, 72, 73; Categories requesting discrete documents where there is no email issue

(33 items):7, 8, 12, 23, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 43, 44, 50, 51, 52, 53, 54, 61, 62, 63, 64, 65, 70, 74, 75, 76, including the request for the "PDPRs" which was ruled upon by the court [at the October 26, 2006, hearing] but upon a misrepresentation of fact by Putnam; and,

(b) Allowing Svensson such additional Rule 30(b)(6) deposition time as reasonably necessary for proper inquiry of Putnam concerning the documents ordered to be produced.

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.

/s/ KEVIN F. MOLONEY
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569
and

/s/ John K. Weir
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: January 24, 2007

Certificate of Service.
This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney

Dated: January 24, 2007

EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*          Civil Action No. 04-12711-PBS
                                        \*
LISA SVENSSON                           \*
                                        \*    BBO No. 351000
            Plaintiff,                  \*
                                        \*    Memorandum of plaintiff
v.                                      \*    Lisa  Svensson in
                                        \*    Reply to the Opposition
PUTNAM INVESTMENTS,                     \*    of  Defendant Putnam
LLC , ET AL.,                           \*    Investments, LLC to
                                        \*    Svensson's Objections
            Defendants.                 \*    to the Rulings of  the
                                        \*    Magistrate judge
\* \*   \* \* \* \* \* \* \* \* \* \* \*   \*    \*

## 1. The claim, p. 1, that the discovery period in this case has been "prolonged" by acts of Svensson is not true.

The discovery period has not been "prolonged" due to any act or omission of

Svensson.  To the contrary, virtually all of the court time since the close of the discovery

period on June 1, 2006, has been taken up by motion practice initiated by Svensson for aid

from the court in the face of failures and refusals of Putnam to respond in a proper manner

to Svensson's discovery requests served timely within the discovery period.

The original fact discovery period as per the initial scheduling conference (until

February 1, 2006) was extended once at Svensson's request, by three months, to May 1,

2006 by the Magistrate Judge.  It was extended by the court (Saris, D.J.) a second time, for a

month, to June 1, 2006, on a joint motion on Putnam's counsel's representation that they

were engaged in another litigation matter.  In the period since the June 1, 2006, close of

discovery, Svensson has not sought any paper discovery that she had not timely requested

during the discovery period.  Indeed, she has sought in the case of her Second Request for

Production far less. <u>See</u> Svensson's Reply memorandum, filed October 25, 2006. Docket No. 126.

Since June 1, 2006, the matters before the Magistrate Judge have been motions by Svensson: (1) to compel answers to interrogatories that had been served months before the end of the discovery period; (2) to compel production in unredacted form of documents produced in response to Svensson's First Request for Production in redacted form; (3) to compel production of documents requested by Svensson's Second Request for Production ("Second Request"), also served before the end of the discovery period; (4) for sanctions for improper conduct by Putnam counsel during depositions of Putnam related witnesses Richard Tibbetts and Stephen Oristaglio, resulting in orders to Putnam to resume the two depositions; (5) to compel Putnam to resume the 30(b)(6) deposition when Putnam counsel unilaterally terminated the deposition some two hours before it was due to be concluded, leading to an order to resume it; and, (6) for leave to take two additional depositions, resulting in an order allowing Svensson to depose Konstantin Stoev whom Svensson had supervised. The court also heard two motions by Putnam (both denied) to prevent Svensson from taking a Rule 30(b)(6) deposition of Putnam, which Svensson had noticed prior to the end of the discovery period. The final motion heard by the Magistrate Judge was the Putnam December 13, 2006, motion for a "Protective Order Terminating Further Discovery."

The Magistrate Judge also held a scheduling conference on September 15, 2006, the purpose of which was to establish a filing and briefing schedules for Svensson's motion to compel production of the documents requested by her Second Request for Production, and the second Putnam motion to quash Svensson's Rule 30(b)(6) deposition notice, at which the

Magistrate Judge said, pl 11, "Close of discovery December 31st. Get it done by the end of the year or that's it."

The setting of a December "close of discovery" date of December 31 "or that's it" had the consequence of encouraging and allowing Putnam to consume by delay the few weeks before that date and "run out the clock." See, for example, Putnam's claim in its "Motion for a Protective Order Terminating Further Discovery," filed December 13, 2006, that the e-discovery sought by Svensson in her Second Request for Production served in April 2006, "could never be complied with the less than three weeks remaining in the discovery period."

2.    **The claim, p. 1, that the Magistrate Judge had an adequate factual basis for e-discovery decision-making based only on the Putnam affidavits is incorrect.**

In the presence of the sharp conflict between the affidavits of the Putnam in-house affiant (Bento), which was filled with conjecture and speculation and the in-house affiant (Breen) from Putnam's counsel's law firm, which was filled with hearsay, and the affidavit of plaintiff's expert Nicole Panos, the claim that court below had an adequate factual basis for e-discovery decision-making is incorrect, particularly the failure below to have appointed a neutral expert, as requested by Svensson[1] to investigate and resolve the conflict. As the Panos affidavit states,

> ...it is impossible to analyze and evaluate the propriety, integrity and legitimacy of the Putnam contentions as to time and expense and the other issues...without first having obtained, analyzed and evaluated in the light of the technological issues and the varying conditions of the market place concerning vendors, the answers to the questions set out in the November 17 e-discovery questionnaire.[2]

---

[1] Supplementing Svensson's December 27, 2006, "Memorandum in Opposition to the Putnam Motion for a Protective Order Terminating Further Discovery," Svensson's counsel, at the January 4, 2007, hearing on that motion, said to the court, among other things on this point, , "...the neutral would be able to, for good or for bad for the parties' sake, but at least for good of the Court's sake, would be able to determine what the facts are...."). See p. I-23 of the partial transcript of that hearing annexed as Exhibit "A," to the Affidavit of Kevin F. Moloney, dated February 13, 2007, filed herewith.

[2] The November 17, 2006, questionnaire, an exhibit to the Panos Affidavit, also is Exhibit B hereto.

3

> In past projects I have consulted on, <u>the cost and time estimations</u> from vendors for tape restoration and searching, for example, <u>has ranged from days to weeks and from one-hundred dollars per tape to one-thousand dollars per tape based on the vendor and the type of tape,</u>
>
> <u>These...issues can be resolved with open discovery exchange</u>.

(Emphasis added.)

3.  **<u>The claim, p. 2, that the Magistrate Judge "considered 37 discovery motions" and "conducted 11 hearings" is incorrect.</u>**

The Putnam claim is incorrect. There were not "37 discovery motions," or "11 hearings" before the Magistrate Judge. Even the Putnam opposition admits later, p. 3, that it reached that number of "37 discovery motions" by a counting pieces of paper rather than of motions. The docket shows eight motion hearings[3] before, and two conferences with,[4] the Magistrate Judge.

4.  **<u>The claim, p. 2, that the "Global Growth team" was "disbanded" is not true</u>.**

Putnam's statement, p.2, that "the Global Growth team...was disbanded" is not true. In fact, the "team" was the "International Growth Equity" team, of which "Global Growth" was only one of the portfolios managed by that team. Putnam's own witnesses have testified that the team was not "disbanded" but only "reorganize[ed]." Putnam's Head of HR has testified,

> ...I am <u>not sure what you mean by disbanding</u>. <u>There was a reorganization</u>,....[Steve} Dexter continued to be part of that team and <u>...have a management role</u>,...[and]...<u>Nathan Eigerman.. remained as Portfolio Manager,</u>[5]

and Stephen Oristaglio testified that he "reorganized" the team, deciding that Steve Dexter, who

---

[3] Hearings on December 12, 2005; January 20, 2006; June 21, 2006; July 11, 2006; August 8, 2006; August 28, 2006; October 26, 2006; and January 4, 2007.
[4] .There was a Scheduling Conference on September 15, 2006, and, after Svensson's objections were filed, a Status Conference on January 8, 2007, concerning the technical difficulty in producing a complete transcript of the January 4, 2007, hearing, and to clarify the orders entered by the court which are the subject of the Objections.
[5] Tibbetts deposition, p. 141-142

4

remained on the team, "would be best suited to manage the assets...." While males were kept on

the reorganized team to prosper, Svensson was demoted back to research

**5.    The claim,p. 2, that "Svensson misrepresented facts as to O'Malley is not true.**

The Putnam claim that "Svensson had misrepresented certain facts about the

performance of [Christopher O'Malley] is not true. As she has testified in her deposition,

Svensson never misrepresented anything about O'Malley to the Putnam firm. Rejecting a

suggestion of portfolio manager Justin Scott in late 2002 that the team would be better off

without O'Malley, Svensson, in early 2003, worked with O'Malley to improve his job

performance in dealing with the various portfolio managers. In this regard, Svensson

conferred with the portfolio managers who had complained to her about O'Malley. She did

not inquire of the managers who had not complained about him. Later in 2003, she sought

the advice of the HR department in crafting a warning letter to O'Malley, as his

performance had not improved to an adequate degree. Svensson never represented to her

then superior, Joshua Brooks, or to any one else that she had discussed complaints about

O'Malley with all of the portfolio managers.

**6.    Putnam's claim, p. 3, that it produced "over 5,000" pages is misleading in the
extreme**

The Putnam opposition fails to disclose that it was only as the result of the orders and

directions of the court at the June 21, and July 11, 2006, hearings that Putnam, three months after

the June 1, 2006, close of the discovery period unredacted the documents produced in heavily

redacted form during the discovery period. The Putnam strategy of redaction presented substantial

difficulties in depositions, which had to be and were taken during the discovery period. For

example, when shown in deposition some of the numerous redacted documents Putnam produced

5

and asked about them, defendant Lasser, Putnam's former Chief Executive Officer, testified, at p.

11, "You showed me a bunch of blank pages, so it's hard to remember. (Emphasis added.)

Moreover, it was not until September 1, 2006, three months after, the close of the

discovery period, that Putnam answered interrogatories and produced unredacted documents.

Unredacting at this late date was very prejudicial to Svensson.  For example, Putnam document

PRM-1531, which stated in the redacted form in which it was produced,

> Christine had a good point about not posting some of these PM moves.
> Specifically, the Male move and back filling him.  I need to understand were [sic]
> Steve O is with regard to Lisa Svensson and if not her, I think we should post the
> job,"

(emphasis added) when produced on September 1 as PRM-5728, identified the name of the

"male" whose identity had been kept secret, as that of Tino Sellito, one of Svensson's 91

comparators.  Had the document been produced in unredacted form during the discovery period,

Svensson would have been able to request the production of Sellitto's personnel file in her

Second Request for Production.

7.    **The claim, p. 3, that Putnam "produc[ed] 11 witnesses" for deposition is incorrect.**

Putnam did not "produc[e] 11 witnesses for deposition."  It did not "produce"

former Putnam investment professional Lauren Allansmith who testified that she had been

demoted by Putnam while on maternity leave and later had been fired.  Nor did Putnam

produce Darren Peers, who was subpoenaed to a deposition in California where he works;

nor did it produce Konstantin Stoev, whose deposition was taken by Svensson only as the

result of a court order over the opposition of Putnam.

8     **The claim, p. 3, that the Magistrate Judge "explicit[ly] instruct[ed]... [Svensson]...to promptly narrow her late and overbroad discovery requests" is not true.**

The claim on p.3 that the Magistrate Judge, "explicit[ly] instruct[ed]...

[Svensson] ...to promptly narrow her late and overbroad discovery requests" is not true.  In

fact, the transcript of the October 26, 2006, hearing insofar as any "instructions" are

concerned show that the court was directing its comments to both parties:

> Page 24, THE COURT: Okay, then <u>sit down and confer</u> within one week...to <u>see if
> you can get together on this E discovery</u>...and I think what you better think
> long and hard about is coming to some resolution between yourselves because
> you might not like what I do.

> Page 32, THE COURT: Well <u>as to all the E issues I want you to sit down and meet
> and confer.</u>

> Page 32, THE COURT: No, <u>I want you to</u> <u>sit down and try and see if you can
> narrow and figure out that whatever you're going to have to, you're going to do
> has to be done by January 4th</u>.

> Page 51, THE COURT: Enough.  Time.  We've gone this far.  My ruling today
> will reflect that I've allowed it to the extent stated on the record...in open court.
> <u>As to everything remaining and the E issues, I want you to sit down</u>...<u>and see
> what you can work out</u> because let me tell you I'm not about to allow much
> more.  Eight weeks left, the time is narrow ....

> Page 52, THE COURT: <u>Sit down, discuss the rest</u>...  <u>Because it's really getting</u>...
> <u>tedious</u>.

(Emphasis added.)

9.     **The claim, p. 4, that Putnam never took the position that Svensson has no
comparators is not true and that it made numerous offers to provide information
is disingenuous.**

Putnam refused until September 1, 2006, three months after the close of the

discovery period and only as the result of the June 21 and July 11 hearings to produce

documents or answer interrogatories about any Putnam investment professionals other

than Svensson.  Its claims to have offered information as to "relevant' comparators were

attempts to get Svensson to settle for far less than she was and is entitled to.  For

7

example, in March 2003, when Svensson's counsel tried to negotiate a fair resolution of

the comparator discovery issue, Putnam's counsel refused to negotiate, stating in a March

23, 2006, e-mail, "The new list of comparators...<u>will not</u>...<u>result in</u>..."<u>un-redacting" any additional,

previously produced documents.</u>..."(Emphasis added.)

10.    **<u>Any claim, p. 4, of reliance by Putnam on the results of the December 13, 2005,
        hearing on the issue of comparators is misplaced</u>.**

        Any reliance by Putnam on the results of the December 13, 2005, hearing on the

issue of comparators is misplaced because the court below made clear that the denial was

without prejudice ("as to those individuals <u>at this time."</u>) (Emphasis added.)

11.    **<u>Putnam's criticism, p. 5, of some of Svensson's comparators is not based on fact</u>.**

        Putnam's criticism at p. 5 of some of Svensson's 91 comparators "could not possibly be

comparators" .is incorrect and disingenuous for the following reasons: (1) The "two bosses,"

one of whom (Brooks) was hired laterally, and the other of whom Swift, and also comparator

Gorman who were promoted, to those positions, when promotion was denied to Svensson,

had no more investment experience or tenure at Putnam than Svensson; (2) persons

"managing different investment products in different business units" is a false distinction as

Putnam compared investment professionals across the Division.[6] (3) Third, the members of

"senior management" referred to were are comparators who either had been promoted above

Svensson even though she had had similar investment experience and tenure or they had not

been demoted despite their poor investment performance; (4) The "junior analyst" was

O'Malley, who, shortly after Putnam, at the instigation of O'Malley, fired Svensson, became a

---

[6] <u>See</u> Oristaglio deposition, p. 96, Q....investment professionals within the investment division were
compared with each other? A. They would need to be, <u>because the bonus pool was allocated to the
Investment division and then it was the responsibility of the division to equitably distribute it among
the various people...</u> (Emphasis added.)

portfolio manager responsible for the same fund that Svensson had managed; and, (5) Svensson

did not include "the male she replaced [Falvey] when he was terminated in 2002" because

Falvey's Putnam tenure (less than three years) was less than Svensson's.

12.    **The claim, p. 5, that the "parties" sought a ruling from the Court is not true**.

The Putnam claim, p.5, that the "parties sought a ruling from the Court" (emphasis

added) is not true.  The court below held hearings on June 21 and July 11, 2006, on

Svensson's motion that resulted in answers to interrogatories and unredaction of documents

as to comparators on September 1, 2006, three months after the discovery period had ended.

13.    **The claim, p. 6, that Svensson's serving of her Second Request for Production in
April 2006, was not timely is incorrect and disingenuous**.

Putnam, at p. 6, criticizes Svensson for serving her Second Request for Production on

April 28, 2006, as not timely.  This is incorrect as the Second Request was served within the

discovery period that ended on June 1.  Notably, Putnam served its Second Request upon

Svensson the very same day.

14.    **The claim, p. 6, that Svensson waited more than 4 months, until October 10, 2006, to
move to compel production of documents is disingenuous and incorrect**.

As set out in detail in her Objections, Svensson's counsel began in June 2006 and

continued for weeks thereafter what turned out yet again to be fruitless attempts to

negotiate discovery issues with Putnam.  Because Putnam refused to offer even a counter

proposal, Svensson had no choice but to file her motion to compel production.  In doing

so, she substantially reduced the scope of virtually all categories of the request.[7]

Svensson filed her motion to compel on October 10, 2006, because that was the

date that the Magistrate Judge on September 15 had ordered as the filing date.

---

[7] See Svensson's October 25, 2006, reply memorandum, which sets out category-by-category the
positions of both parties as to the categories of the second Request.

15. **The claim, p. 6, that at the time of the October 26 hearing, the Magistrate Judge had "managed discovery in this case for a year and a half, is incorrect.**

The claim, p. 6, that at the time of the October 26, 2006, hearing, the Magistrate Judge had "managed discovery in this case for a year and a half" is not correct. The first order referring any matter in this case to Magistrate Judge Bowler was on November 28, 2005, Docket No. 29. The October 26, 2006, hearing was 11 months, not "a year and a half" later.

16. **The claim, p. 6, that directions of the Magistrate Judge on October 26, were "warnings" only to Svensson is not correct.**

The directions of the Magistrate Judge on October 26, on both e-mail and non-email issues, despite the Putnam claims on p.6 were for both sides to negotiate and work out the issues, not "warnings" only to Svensson. See §§ 1-8, supra.

17. **The claim, p. 6, that Svensson at the hearing "declined" the "instruction" to "disclose her...search terms" is incorrect and disingenuous.**

Putnam's claim, p. 6, that Svensson "declined" the Magistrate Judge's "instruction" at the October 26 hearing to "disclose her proposed...search terms" is incorrect and disingenuous. When Svensson's counsel who urged the court to apply the new e-discovery rules was asked to state Svensson's e-mail search terms, said,

> ... If I thought that this would be something we would be doing at the courthouse today, I would have asked [the consultant] to be with us ...but that is not the case. And I don't want to be in the position..of just shooting from the hip off the top of my head and coming out with a few words. Mr. Kociubes...would, would seize upon those words and say that's your search term, take it or leave. That's not what the new [e-discovery] rules [amendments] contemplate. [The n]ew rules contemplate, as I read them, people sitting down, free exchange of information as to what the capabilities of the system is and trying to work together, work it out.... We haven't done that yet.

(Emphasis added.

10

18.  **The claim, p. 7, that Svensson waited a month before complying with the wishes of the Magistrate Judge expressed at the October 26 is wrong.**

Putnam claims, p.7, that Svensson "waited nearly a full month" after the October 26 hearing before complying with the wishes of the Magistrate Judge expressed at that hearing is not based on the facts as it fails to disclose the following important matters.  On November 8, 2006, Svensson's counsel had an approximately one hour with Putnam counsel because the court had directed counsel "to sit down and see what you can work out" as to the remaining categories of documents in the Svensson Second Request for Production that had not been ruled upon.[8]  In that conference, Svensson's counsel identified and discussed with Putnam's counsel the items of the Second Request that Svensson considered to be discrete documents as to which no e-mail issue was involved, and at the conclusion of the conference, Putnam's counsel said that they would get back to Svensson's counsel with Putnam's position on each.  Id.  A November 10, 2006, Putnam counsel e-mail states,

> ... we expect to...to produce the documents ordered.....next Monday or Tuesday. We should...be able to get back to you by then on the categories...enumerated in our call.....

(Emphasis added.)  On November 17, 2006, Svensson's counsel sent to Putnam's counsel a questionnaire (copy filed herewith as Exhibit "B" also an exhibit to the Panos Affidavit.  The covering e-mail states,

> The attached [questionnaire] sets out the information that will help us move forward with discussion of the e-mail issues.... Please let me know if Putnam will supply the information requested... so that we might discuss this matter on a more informed basis.

(Emphasis added.)  On November 21, 2006, Putnam responded, not with any answers but with a question as to item No. 5, and despite the identification of such persons in Svensson's October 26 motion papers a "list of individuals whose e-mail boxes you propose to have searched."

---

[8] Affidavit of John K. Weir, dated February 13, 2007, filed herewith as Exhibit "A."

11

Svensson's counsel replied the next day:

> As you know, <u>the questionnaire I sent over to you</u> folks (copy attached) <u>requests, in
> the spirit of the new e-discovery rules as discussed with Judge Bowler, basic
> information needed to help us understand Putnam's computer systems and
> capabilities as they may affect resolution of the e-mail discovery issues in this case.</u>
> Thus, <u>I was disappointed to see that the Putnam response so far consists only of
> questions about one of the 19 categories rather than the information requested.</u>
> Nonetheless,...<u>Item No. 5 was intended as an inquiry as to the search terms that
> Putnam has used and./or would propose to use to obtain the information</u>; but we have
> no problem in presenting to Putnam some possible search terms that we have
> developed.  They are set out in the other attachment. Of course, we reserve the right
> to make refinements....  In response your other...question, wherever...the term
> "decision-makers" is used..., we are seeking the e-mails to or from any one or more
> of the following ten decision-makers:...[names]...which e-mails concern one or more
> of the employees or lateral hires named in the... categories ...discussed in our reply
> memorandum.

(Emphasis added.)  Attached to that e-mail was another copy of the November 17, 2006

questionnaire and a list of Svensson's proposed search terms.

Putnam did not respond for almost three weeks.  On December 12, 2006, without answering

the questionnaire, it announced  Putnam's refusal to discuss production of any of the e-mails

requested and, despite the direction from the court on October 26, 2006, to "sit down and see what

you can work out," and the promises made by Putnam's counsel in the conference call on November

8 and in the November 10 e-mail, Putnam's counsel never got back to Svensson to discuss further or

negotiate the discrete documents, waiting for a month until December 13, 2006, when Putnam  filed

its "Motion for a Protective Order Terminating Further Discovery." <u>Id.</u>

**19.    <u>The claim, p. 7, that the Panos Affidavit "admitted" that Svensson's "search
         terms would result in "false-positive" hits" is not true</u>.**

Putnam would have the court believe that the Panos Affidavit "admitted" that all of

Svensson's "proposed search terms likely would result in "false-positive" hits." This is not

true.  In fact, it expressly states that Svensson's search terms are "reasonable <u>as they are limited</u>

in number and complexity of search." Noting that only "some" of the terms "may" result in false

hits, the Panos affidavit states, that those search terms be used in conjunction with other, relevant

terms to yield a higher likelihood of responsive hits, noting also that,

> The search methodology and terms may require modification depending upon the
> answers to the technological and other inquires set out in the
> questionnaire....(emphasis added).

**20.    Putnam, at pp. 8 and 14, fails to disclose that the facts of Pullano v. USB/Paine
Webber, upon which it relies, distinguish Pullano from the present case.**

Putnam, pp. 8 and 14, relies heavily upon Pullano v. USB/Paine Webber, 2006 WL

2987739 (W.D.N.Y., June 29, 2006) in which the court dealt with an order of a Magistrate Judge

that "no further motions regarding discovery issues shall be filed with the Court" but Putnam fails to

disclose key points that distinguish Pullano . First, the Putnam claim, p. __, that Pullano "upheld

the magistrate's ruling" is wrong. The court "modified" the ruling.  Moreover, there is no

statement in Pullano of the facts that led the to the statement that the plaintiff was "largely

responsible" for discovery "dragg[ing] on."  In the present case, it has been Putnam's refusals to

make discovery that has taken the time of the court since the June 1, 2006, close of the

discovery period.

**21.    The claim, p. 12, that Svensson was ordered "to narrow both her electronic and
paper discovery requests" and to "decide what you really need," is wrong.**

Putnam claims, p. 12,  that on October 26, the court below "ordered [Svensson] to

narrow both her electronic and paper discovery requests" and to "decide what you really need.

" This is incorrect.  First, the transcript shows that that Magistrate Judge at the October 26

hearing never said that Svensson was to "decide what you really need."  Moreover,  as shown

above, the court's remarks in this regard were to both parties to "sit down...and see what you can

work out." (Emphasis added.)

13

22     **There is nothing in the record upon which the Magistrate Judge could have made a
finding that production of the non-email documents categories would be too
"burdensome and expensive' to produce.**

At no point during or before the January 4, 2007, hearing on Putnam's motion for a

protective order terminating further discovery, did Putnam by affidavit or otherwise place into

the record any facts upon which the court properly could conclude that that production of the

non-email documents categories would be too "burdensome and expensive' to produce.

Moreover, on October 26, , having said after ruling on Category 14 that the mater had become

"tedious," the court did not hear argument on any of the other discrete items at issue, directing

the parties to "see what you can work out."  Notably, virtually all of the Putnam memorandum in

support of its protective order motion and what its counsel said at the hearing, was devoted to e-

discovery issues and not the non-e-mail items.

Significantly, the orders at issue, both as originally entered and as clarified January 8,

2006, t makes clear that the Magistrate Judge, having failed to do so at the October 26 hearing,

did not consider at or after the January 4 hearing the issues and arguments involved in regard to

the non-e-mail issues.  In fact, the docket shows that the denial of the cross motion was only

"implied" being "otherwise denied in light of this court's allowance of the motion for a protective

order....

23.     **The claim, p. 12, that Svensson has conceded that production of the non-e-mail
documents would be "burdensome or expensive" to produce is wrong.**

Putnam, p. 12, would have the court believe that in "identify[ying] two categories [of

discrete document] and argu[ing] that these requests cannot be described as "burdensome or

expensive" to produce, Svensson has conceded that all of the discrete non-e-mail documents

at issue would be burdensome and expensive to produce.  This is entirely incorrect as a

14

reading of her contentions set out in her October 25, 2006, Reply Memorandum makes clear.
The following are two additional <u>examples</u> of what the Magistrate Judge did not consider.
First, it would be entirely unreasonable for any court to conclude that producing the
personnel files of the five investment professionals identified in Category No. 74 for
Allansmith, DeChristopher, O'Malley and Peers, for the reasons stated at p. 118 of
Svensson's Reply memorandum,[9] and for Paul Warren, at, among others, p. 110,[10] would be
burdensome or expensive. Nor could any court reasonably conclude that production of the
document requested by Category No. 65 ("the 'anonymous' letter concerning [Paul] Warren [a
comparator of Svensson], which is referred to at p. 357 of the McNamee deposition"[11] would be
burdensome or expensive.

**24.**   <u>The claim, p. 13, that "Svensson...failed to demonstrate how each...discovery</u>
   <u>request she makes... has any relevance..." is not true.</u>

Putnam claims, p. 13, that "Svensson...failed to demonstrate how each and every
specific discovery request she makes... has any relevance..." This is entirely incorrect. In
regard to each and every non-e-mail and e-mail category of requested documents, Svensson, as
set out in detail in her October 25, 2006, Reply Memorandum shows for each and every one of
them, why the documents sought, are, within the meaning of Rule 26 relevant to here claims.

---

[9] "The files requested are relevant in order to show in comparison to the treatment of Svensson (1)
the treatment of DeChristopher who, according to PRM 4026, had "poor three years performance
record" and a "volatile personality" yet was promoted in 2003 while Svensson was terminated; (2)
the treatment of Allansmith who was fired and had been demoted while on maternity leave; (3) the
treatment of O'Malley, who complained about Svensson, and whose complaints, at least in part,
according to Putnam, provoked her termination and later received a promotion and took over some
of her responsibilities..."
[10] "... That he frequented strip clubs...[a]nd that he over -- he utilized entertainment from brokers
excessively and accepted gifts from brokers excessively") and "They were talking about a --
someone leaving the group and that would leave a hole in the work...and he stood up and grabbed
his crotch and said, "You could fill it with this"
[11] . <u>See</u> note 10, <u>supra</u>.

For two examples concerning the relevance of the non-e-mail categories, <u>see</u> the discussion,

including the footnotes, in the immediately preceding § 24.  As an example of the relevance of

the various e-mail categories, Svensson's Reply Memorandum concerning category No. 15,[12]

which states, in part,

> The criteria used...deciding upon the...employment actions are ... relevant to the Putnam
> decision making process ....  Svensson will limit the scope ...to the comparators
> identified in the argument sections to Nos. 1 and 2, above (22 of the 91 comparators:
> 16 males...[names] and six females:[names]....  The subject matter... is... relevant as
> bearing on why it was that Svensson was demoted...years after she had been
> promoted from research to a PM position, and then fired, while males were not
> demoted but promoted.

**25.. <u>The PDPR ("Performance and Development Planning and Review Form") documents
requested for production in Svensson's December 27, 2006, cross motion should be
ordered produced because the denial of that request at the October 26 hearing was
obtained upon a misrepresentation of fact by Putnam counsel as to the nature of the
document and the court refused at that time to give Svensson's counsel an opportunity
to present the facts to the court.</u>**

The PDPR ("Performance and Development Planning and Review Form") is a discrete

document used, according to the Putnam 30(b)(6) deposition, to "provide an opportunity for

managers and employees to discuss performance evaluations" and "shared with senior

management."[13] Notably, the PDPR contains numerical and other ratings of the performance of

investment professions at Putnam.  A copy of a PDPR for Svensson (McNamee Dep. Exh.22)  is is

filed herewith as Exhibit "C."  However, at the October 26, 2006, hearing, Putnam counsel in

opposing production of PDPRs for the Svensson comparators did not indicate to the court the true

nature of the PDPRs; instead making it appear to the court that the PDPRs were in nature the same

---

[12] "All documents and things concerning the actual criteria used by Putnam for deciding whom of
Svensson [and/or any of the 91 Comparators] should be or would be demoted in the period since
January 1, 2002: A. From Portfolio to any other professional position...; B. From ADR to any other
professional position...; C. From CIO to any other professional position...; D. From ADR to
Analyst...; E.  From CIO to ADR...."
[13] Rule 30(b)96) deposition, pp. 2276-78.

as the on-going HR update reports, production of which he also opposed.  Svensson's counsel said

to the court,

> The next on would be No. 8....  This is year end reviews, <u>documents called PVPR's
> [sic], which is a term of art</u>, performance reviews, investment division and ISD
> Human Resources updates.  <u>These are forms and things that they do at Putnam that
> evaluate the performance of people</u>.....  <u>And the reason we're asking for it is that we
> need to see how</u>...Putnam evaluated...Ms. Svensson in relation to the Comparators...,

and then Putnam's counsel, the court and Svensson's counsel said the following:

> MR. KOCIUBES:  This is really not a discreet group...there was with respect to the
> Human Resources update what the various of the Human Resources, and it wasn't consistent
> throughout the time but what the various Human Resource officers did and remember at
> one point there are 7,000 employees-...<u>every week they would write effectively on a
> computer a memo with everything, it's a diary, everything they worked on</u>. The universe
> is 7,000 employees..... And what happens a lot of times is week after week they're the
> same because there has been, nothing new has happened....(emphasis added)

> THE COURT: Denied.

> MR. MOLONEY: Your Honor, may I be heard on that just very briefly?

> THE COURT: No, I think I've heard enough on that one.   Moving on.
> (Emphasis added.)

Thus, the denial of an order for production of the PDPRs was based upon a

misrepresentation of the nature of the documents, and the court below did not allow Svensson's

counsel to correct the record for the court.  This court should order the PDPRs to be produced.

**26.    The claim, p. 15, that the Magistrate Judge "was under no obligation to apply
the amendments to Rule 26," is not correct.**

The Putnam claim, p. 15, that the Magistrate Judge "was under no obligation to

apply the amendments to Rule 26," is not correct; nor is its contention that the court below

was free in unguided discretion to apply or not apply the new rules.  The rule expressly states

that the amendments, effective December 1, 2006, "<u>shall govern</u> ...insofar as just and

practicable, all proceedings then pending." (Emphasis added.)  Despite Putnam's

contentions, there must be in the record an adequate factual basis for a finding and an

express finding made by the court, neither of which is present in the instant case, that for

reasons stated in the record, it is not "just and practicable" to apply the amendments. The

court below made no such findings, nor would the record before the court support any such

finding.

Even if this court were to conclude that e new amendments do not apply, the relevant

case law set out in Svensson's December 27, 2007, memorandum, which is Exhibit J to the

Objections, supports Svensson's position that the court below did not have an adequate

factual basis before it for any e-discovery decision-making.

27.    **Putnam's contention, p. 15, that the Magistrate Judge's granting of the motion for protective order insofar as concerns e-discovery was not clearly erroneous or contrary to law, fails to take into account that there was no adequate factual basis for the courts decision and that the record is devoid of any finding of fact by the court below that would be necessary to support the order.**

Putnam's contention that the Magistrate Judge's granting of the motion for protective

order insofar as concerns the e-discovery was not clearly erroneous or contrary to law, fails to

take into account the facts (1) that there was no adequate factual basis in the record for the

Magistrate Judge's decision to grant the motion for a protective and (2) that the record is devoid

of any finding of fact by the court below that would be necessary to support the order.

Putnam would have this court not only accept at face value the less than reliable

affidavits of Breen (hearsay) and Bento (speculation) but also would have the court ignore: (1)

the entirety of Panos Affidavit, when, in fact, as shown in § 2, above, the affidavits on key

points are in sharp conflict; (2) the fact that Putnam failed to provide the information requested

in the November 17 questionnaire;  and, (3) the fact that the court below rejected Svensson's

request for a neutral expert to sort out the conflict and provide to the court an adequate factual

basis for e-discovery decision-making.

Even if this court were to conclude in the face of the unresolved conflicts in the Breen, Bento and Panos affidavits and the otherwise sparse, if not non-existent, record in the court below, that the e-mail related documents sought are as "inaccessible" as Putnam claims, that does not end the analysis. For the reasons set out in Svensson's analysis and survey of the case law, see exhibit J to the Objections, there are at least two other steps required. The first is that the documents must be produced if the requesting party shows good cause for the production. Svensson has done this in this case as shown in the prior sections of this memorandum and in her Reply memorandum filed October 25, 2006. The other step, if the court were to conclude that good cause has been shown, is the consideration of cost sharing. LISA SVENSSON,

> plaintiff,
>
> By her attorneys,
>
> BARRON & STADFELD, P.C.
>
>
> /s/ Kevin F. Moloney
> Kevin F. Moloney BBO No. 351000
> 100 Cambridge Street, Suite 1310
> Boston, Massachusetts 02114
> Tel.: 617.723.9800/531.6569
> and
> /s/ John K. Weir
> John K. Weir, Admitted PHV
> 300 Park Avenue, Suite 1700
> New York, New York, 10022
> Tel.: 212.572.5374

February 14, 2007

### Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney

19

Dated: February 14, 2007

EXHIBIT 5

COMPARATORS BY EMPLOYMENT ACTION TAKEN.
Relevant to Disparate Treatment Claims

1.   Males first employed by Putnam as, or promoted by Putnam
     to, Managing Director between January 1, 2000, and
     September 15, 2003:

        1.   Block, Richard;

        2.   Bloemkr, Robert;

        3.   Boselli, John;

        4.   Brooks, Joshua;

        5.   Byrne, Joshua;

        6.   Elavia, Tony;

        7.   Gorman, Stephen;

        8.   Hamlin, David;

        9.   Knight, Jeffrey;

       10.   Lindsey, Jeffrey;

       11.   Makino, Shigeki;

       12.   Matteis, Andrew;

       13.   Moore, Colin;

       14.   Mufson, Michael;

       15.   Mullin, Hugh;

       16.   Prusko, James;

       17.   Smith, Leo;

       18.   Sorensen, Eric;

       19.   Sullivan, William;

       20.   Warren, Paul; and,

21.  Weiss, Manuel.

2.  Males not demoted from Portfolio Manager positions in 2002:

1.  Byrne, Joshua;

2.  Clark, Dana;

3.  Dexter, Stephen;

4.  Eigerman, Nathan;

5.  England, Richard;

6.  Gillis, Roland;

7.  Graham, Andrew;

8.  Hadden, Peter;

9.  Joseph, Joseph;

10.  Kamshad, Omid;

11.  King, David;

12.  Lannum, Coleman;

13.  Lindsey, Jeffrey;

14.  Lode, Geirulv;

15.  Marrkand, Paul;

16.  Mehta, Sandeep;

17.  Melhuish, Nicholas;

18.  Miller, Christopher;

19.  Miller, Daniel;

20.  Moore, Gerald;

21.  Mufson, Michael;

22.  Mullin, Hugh;

23.  Nance, Michael;

24.  Oler, Stephen;

25.  Santos, David;

26.  Scott, Justin;

27.  Sellitto, Tino;

28.  Shadek, Edward;

29.  Simon, Sheldon;

30.  Stack, Michael;

31.  Stairs, George;

32.  Warren, Paul;

33.  Wetlaufer, Eric; and,

34.  Wiess, James.

3.  <u>Males with Higher compensation 2002-2003</u>:

1.  Block, Richard;

2.  Bloemkr, Robert;

3.  Bogar, Mark;

4.  Boselli, John;

5.  Brooks, Joshua;

6.  Bukovac, Ronald;

7.  Byrne, Joshua;

8.  Cervone, Richard;

9.  Clark, Dana;

10. Davis, Simon;

11. DeChristopher, Brian;

12. Dexter, Stephen;

13. Divney, Kevin;

14. Eigerman, Nathan;

15. Elavia, Tony;

16. England, Richard;

17. Geer, Bartlett;

18. Gerber, David;

19. Gillis, Roland;

20. Gorman, Stephen;

21. Graham, Andrew;

22. Hadden, Peter;

23. Hamlin, David;

24. Haslett, Thomas;

25. Joseph, Joseph;

26. Kamshad, Omid;

27. King, David;

28. Knight, Jeffrey;

29. Lannum, Coleman;

30. Lindsey, Jeffrey;

31. Lode, Geirulv;

32. Makino, Shigeki;

33. Malak, Saba;

34.  Marrkand, Paul;

35.  Matteis, Andrew;

36.  Mehta, Sandeep;

37.  Melhuish, Nicholas;

38.  Miller, Christopher;

39.  Miller, Daniel;

40.  Moore, Colin;

41.  Moore, Gerald;

42.  Morris, Dirk;

43.  Mufson, Michael;

44.  Mullin, Hugh;

45.  Nance, Michael;

46.  Norchi, Terrance;

47.  Oler, Stephen;

48.  O'Malley, Christopher;

49.  Prusko, James;

50.  Santos, David;

51.  Scanlon, Paul;

52.  Scott, Justin;

53.  Sellitto, Tino;

54.  Shadek, Edward;

55.  Simon, Sheldon;

56.  Smith, Leo;

57.  Sorensen, Eric;

58.  Stack, Michael;

59.  Stairs, George;

60.  Sullivan, William;

61.  Swift, Robert;

62.  Warren, Paul;

63.  Weiss, Manuel;

64.  Wetlaufer, Eric;

65.  Wiess, James; and,

66.  Yogg, Michael.

4.  **Males either (a) not removed from management, (b) not terminated or (c) not forced out in August-September 2003**:

1.  Block, Richard;

2.  Bloemkr, Robert;

3.  Bogar, Mark;

4.  Brooks, Joshua;

5.  Bukovac, Ronald;

6.  Byrne, Joshua;

7.  Cervone, Richard;

8.  Davis, Simon;

9.  DeChristopher, Brian;

10.  Dexter, Stephen;

11.  Divney, Kevin;

12.  Eigerman, Nathan;

13.  Elavia, Tony;

14. England, Richard;

15. Geer, Bartlett;

16. Gerber, David;

17. Gillis, Roland;

18. Gorman, Stephen;

19. Graham, Andrew;

20. Hadden, Peter;

21. Hamlin, David;

22. Joseph, Joseph;

23. Kamshad, Omid;

24. King, David;

25. Knight, Jeffrey;

26. Lannum, Coleman;

27. Lindsey, Jeffrey;

28. Lode, Geirulv;

29. Makino, Shigeki;

30. Malak, Saba;

31. Marrkand, Paul;

32. Matteis, Andrew;

33. Mehta, Sandeep;

34. Melhuish, Nicholas;

35. Miller, Christopher;

36. Miller, Daniel;

37. Moore, Gerald;

38. Morris, Dirk;

39. Mufson, Michael;

40. Mullin, Hugh;

41. Nance, Michael;

42. Norchi, Terrance;

43. Oler, Stephen;

44. O'Malley, Christopher;

45. Prusko, James;

46. Santos, David;

47. Scanlon, Paul;

48. Scott, Justin;

49. Sellitto, Tino;

50. Shadek, Edward;

51. Sorensen, Eric;

52. Stairs, George;

53. Sullivan, William;

54. Warren, Paul;

55. Weiss, Manuel;

56. Wetlaufer, Eric;

57. Wiess, James; and,

58. Yogg, Michael.

[360460.1]

EXHIBIT 6

<u>COMPARATORS BY EMPLOYMENT ACTION TAKEN</u>.
<u>Relevant to Disparate Impact Claims</u>

1.    <u>Males and females first employed by Putnam as, or</u>
<u>considered for promotion to, or promoted by Putnam to,</u>
<u>Managing Director between January 1, 2000, and September</u>
<u>15, 2003</u>:

          1.    Block, Richard;

          2.    Bloemkr, Robert;

          3.    Boselli, John;

          4.    Brooks, Joshua;

          5.    Bukovac, RJ;

          6.    Byrne, Joshua;

          7.    Davis, Simon;

          8.    Dexter, Stephen;

          9.    Elavia, Tony;

          10.    England, Richard;

          11.    Gorman, Stephen;

          12.    Hamlin, David;

          13.    Knight, Jeffrey;

          14.    Lindsey, Jeffrey;

          15.    Makino, Shigeki;

          16.    Malak, Saba;

          17.    Marrkand, Paul;

          18.    Matteis, Andrew;

          19.    Moore, Colin;

20. Mullin, Hugh;

21. Mufson, Michael;

22. Nance, Michael;

23. Oler, Stephen;

24. Prusko, James;

25. Smith, Leo;

26. Sorensen, Eric;

27. Sullivan, William;

28. Warren, Paul;

29. Weiss, Manuel;

30. Yogg, Michael;

31. Allansmith, Lauren;

32. Jones, Elizabeth;

33. Mockard, Jeanne;

34. Peters, Carmel;

35. Smith, Margaret;

36. Svensson, Lisa, and;

37. Thomsen, Rosemary.


2.   <u>Males and females eligible to be demoted from Portfolio</u>
     <u>Manager positions in 2002:</u>

1. Byrne, Joshua;

2. Clark, Dana;

3. Dexter, Stephen;

4.  Eigerman, Nathan;

5.  England, Richard;

6.  Gillis, Roland;

7.  Graham, Andrew;

8.  Hadden, Peter;

9.  Joseph, Joseph;

10. Kamshad, Omid;

11. King, David;

12. Lannum, Coleman;

13. Lindsey, Jeffrey;

14. Lode, Geirulv;

15. Marrkand, Paul;

16. Mehta, Sandeep;

17. Melhuish, Nicholas;

18. Miller, Christopher;

19. Miller, Daniel;

20. Moore, Gerald;

21. Mufson, Michael;

22. Mullin, Hugh;

23. Nance, Michael;

24. Oler, Stephen;

25. Santos, David;

26. Scott, Justin;

27. Sellitto, Tino;

28. Shadek, Edward;

29. Simon, Sheldon;

30. Stack, Michael;

31. Stairs, George;

32. Warren, Paul;

33. Weiss, Manuel;

34. Wetlaufer, Eric;

35. Wiess, James;

36. Cotner, Beth;

37. Holding, Pamela;

38. Mockard, Jeanne;

39. Morgan, Kelly;

40. Parker, Margery;

41. Svensson, Lisa.

3. <u>Males with higher compensation compared to females between 2002-2003</u>:

1. Block, Richard;

2. Bloemkr, Robert;

3. Bogar, Mark;

4. Boselli, John;

5. Brooks, Joshua;

6. Bukovac, Ronald;

7. Byrne, Joshua;

8. Cervone, Richard;

9.   Clark, Dana;

10.  Davis, Simon;

11.  DeChristopher, Brian;

12.  Dexter, Stephen;

13.  Divney, Kevin;

14.  Eigerman, Nathan;

15.  Elavia, Tony;

16.  England, Richard;

17.  Geer, Bartlett;

18.  Gerber, David;

19.  Gillis, Roland;

20.  Gorman, Stephen;

21.  Graham, Andrew;

22.  Hadden, Peter;

23.  Hamlin, David;

24.  Haslett, Thomas;

25.  Joseph, Joseph;

26.  Kamshad, Omid;

27.  King, David;

28.  Knight, Jeffrey;

29.  Lannum, Coleman;

30.  Lindsey, Jeffrey;

31.  Lode, Geirulv;

32.  Makino, Shigeki;

33. Malak, Saba;

34. Marrkand, Paul;

35. Matteis, Andrew;

36. Mehta, Sandeep;

37. Melhuish, Nicholas;

38. Miller, Christopher;

39. Miller, Daniel;

40. Moore, Colin;

41. Moore, Gerald;

42. Morris, Dirk;

43. Mufson, Michael;

44. Mullin, Hugh;

45. Nance, Michael;

46. Norchi, Terrance;

47. Oler, Stephen;

48. O'Malley, Christopher;

49. Prusko, James;

50. Santos, David;

51. Scanlon, Paul;

52. Scott, Justin;

53. Sellitto, Tino;

54. Shadek, Edward;

55. Simon, Sheldon;

56. Smith, Leo;

57.  Sorensen, Eric;

58.  Stack, Michael;

59.  Stairs, George;

60.  Sullivan, William;

61.  Swift, Robert;

62.  Warren, Paul;

63.  Weiss, Manuel;

64.  Wetlaufer, Eric;

65.  Wiess, James;

66.  Yogg, Michael;

67.  Allansmith, Lauren;

68.  Burke, Andrea;

69.  Cotner, C. Beth;

70.  Holding, Pamela;

71.  Jones, Elizabeth;

72.  Kuenstner, Deborah;

73.  McCormack, Susan;

74.  Mockard, Jeanne;

75.  Morgan, Kelly;

76.  Parker, Margery;

77.  Peters, Carmel;

78.  Sievert, Jean;

79.  Smith, Margaret;

80.  Spatz, Erin;

81.   Svensson, Lisa;

82.   Thomsen, Rosemary, and;

83.   Williams, Fayval.


4.    <u>Males and females either (a) not removed from
      management, (b) not terminated or (c) not forced out in
      August-September 2003</u>:

            1.   Block, Richard;

            2.   Bloemkr, Robert;

            3.   Bogar, Mark;

            4.   Brooks, Joshua;

            5.   Bukovac, Ronald;

            6.   Byrne, Joshua;

            7.   Cervone, Richard;

            8.   Davis, Simon;

            9.   DeChristopher, Brian;

            10.  Dexter, Stephen;

            11.  Divney, Kevin;

            12.  Eigerman, Nathan;

            13.  Elavia, Tony;

            14.  England, Richard;

            15.  Geer, Bartlett;

            16.  Gerber, David;

            17.  Gillis, Roland;

18.  Gorman, Stephen;

19.  Graham, Andrew;

20.  Hadden, Peter;

21.  Hamlin, David;

22.  Haslett, Thomas;

23.  Joseph, Joseph;

24.  Kamshad, Omid;

25.  King, David;

26.  Knight, Jeffrey;

27.  Lannum, Coleman;

28.  Lindsey, Jeffrey;

29.  Lode, Geirulv;

30.  Makino, Shigeki;

31.  Malak, Saba;

32.  Marrkand, Paul;

33.  Matteis, Andrew;

34.  Melhuish, Nicholas;

35.  Miller, Christopher;

36.  Miller, Daniel;

37.  Moore, Colin;

38.  Moore, Gerald;

39.  Morris, Dirk;

40.  Mufson, Michael;

41.  Mullin, Hugh;

42.  Nance, Michael;

43.  Norchi, Terrance;

44.  Oler, Stephen;

45.  O'Malley, Christopher;

46.  Prusko, James;

47.  Santos, David;

48.  Scanlon, Paul;

49.  Scott, Justin;

50.  Sellitto, Tino;

51.  Shadek, Edward;

52.  Simon, Sheldon;

53.  Smith, Leo;

54.  Sorensen, Eric;

55.  Stack, Michael;

56.  Stairs, George;

57.  Sullivan, William;

58.  Warren, Paul;

59.  Weiss, Manuel;

60.  Wetlaufer, Eric;

61.  Wiess, James;

62.  Yogg, Michael;

63.  Allansmith, Lauren;

64.  Burke, Andrea;

65.  Holding, Pamela;

66.  Jones, Elizabeth;

67.  Kuenstner, Deborah;

68.  McCormack, Susan;

69.  Mockard, Jeanne;

70.  Morgan, Kelly;

71.  Peters, Carmel;

72.  Sievert, Jean;

73.  Svensson, Lisa, and;

74.  Thomsen, Rosemary.


[360455.1]

EXHIBIT 7

**Exhibit 1**
**Restated and Amended Analysis of Male Comparators**

| | Name | Same PM Job (SEC: Held same portfolio management position as plaintiff, as reported to the SEC) | Same GER (Held same research position as plaintiff in Putnam's IMD) | Same fund (Manages or managed funds managed by plaintiff) | Qualified (Appointed to position for which plaintiff was better qualified) | From outside (Appointed from outside to fill a position for which plaintiff had interest and qualifications) | Tenure (Similar tenure) | Inv Exp (Similar investment experience) | Promo pool | Demotion pool (Eligible for demotion based on poor growth fund performance in 2002 or other funds in a prior year) | GER Sleeve (One of select few research analysts who were named portfolio managers on specific funds) | Coverage (Made recommendations on a significant portion of the S&P 500 based on market cap or visibility) | Esteem (Held in high esteem within IMD as result of long-term performance and expertise) | Coaching (Received training in management techniques at same time as plaintiff) | TV (One of select few invited by the MD to make appearances on television investment programs) | Managed (Has managed people) | Kids (Has children) | CFA (Holds the CFA designation) | Mom (Maternity Leave) | Unethical (Complained to top management about unethical commission allocations) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Malak, Saba | 1 | 1 | 1 | | | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | | 1 | | | | | 34 | 9 |
| 2 | Marrkand, Paul | 1 | 1 | | | | 1 | 1 | 1 | 1 | | | 1 | | | 1 | 1 | | | | 35 | 9 |
| 3 | England, Richard | 1 | 1 | | | | 1 | 1 | 1 | 1 | | | | | | 1 | 1 | 1 | | | 16 | 9 |
| 4 | Gorman, Stephen /1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | 1 | | | | | | 1 | 1 | | | 20 | 8 |
| 5 | Joseph, Joseph | 1 | | | | | 1 | 1 | 1 | 1 | | | 1 | | | | 1 | 1 | | | 26 | 8 |
| 6 | Kamshad, Omid | 1 | | | | 1 | 1 | 1 | | 1 | | | 1 | | 1 | | 1 | 1 | | | 27 | 8 |
| 7 | Lindsey, Jeffrey | 1 | | | | | 1 | 1 | 1 | 1 | | | | | | | 1 | 1 | | | 31 | 8 |
| 8 | Miller, Daniel | 1 | | | | | 1 | 1 | 1 | 1 | | | | 1 | | | 1 | 1 | | | 40 | 8 |
| 9 | Oler, Stephen | 1 | | 1 | | | 1 | 1 | 1 | 1 | | | 1 | | | | 1 | 1 | | | 48 | 8 |
| 10 | Scott, Justin | 1 | | 1 | | | 1 | 1 | 1 | 1 | | | | | | 1 | 1 | 1 | | | 53 | 8 |
| 11 | Shadek, Edward | 1 | 1 | | | | 1 | 1 | 1 | 1 | | | 1 | | 1 | | 1 | 1 | | | 55 | 8 |
| 12 | Swift, Robert | 1 | 1 | | | | 1 | 1 | 1 | 1 | | 1 | | | | | 1 | 1 | | | 62 | 8 |
| 13 | Weitlaufer, Eric | 1 | 1 | | | | 1 | 1 | 1 | 1 | | 1 | | | | | 1 | 1 | | | 65 | 8 |
| 14 | Yogg, Michael | 1 | 1 | | | | 1 | 1 | 1 | 1 | 1 | 1 | | | | | 1 | 1 | | 1 | 67 | 8 |
| 15 | Brooks, Joshua | 1 | | | 1 | | 1 | | 1 | 1 | | | | | | | 1 | 1 | | | 5 | 7 |
| 16 | Bukovac, R.J. | 1 | | | | | | 1 | | 1 | 1 | 1 | | | | | 1 | 1 | | | 6 | 7 |
| 17 | King, David /2 | | 1 | 1 | | | | 1 | | 1 | | 1 | 1 | | | | 1 | 1 | | | 28 | 7 |
| 18 | Stairs, George | 1 | | | | | 1 | | 1 | 1 | 1 | 1 | | | | 1 | 1 | 1 | | | 61 | 7 |
| 19 | Warren, Paul | 1 | | 1 | | | 1 | | 1 | 1 | | | 1 | | | | 1 | 1 | | | 63 | 7 |
| 20 | Weiss, Manuel | 1 | | | | | 1 | | 1 | 1 | | | | | | | 1 | 1 | | | 64 | 7 |
| 21 | Bogar, Mark | 1 | 1 | | | | | 1 | | | | | | | | | 1 | 1 | | | 3 | 6 |
| 22 | Boselli, John | 1 | 1 | | | | 1 | 1 | | | | 1 | | | | | 1 | 1 | | | 4 | 6 |
| 23 | Byrne, Joshua | 1 | 1 | | | | | 1 | | 1 | | | | | | | 1 | 1 | | | 7 | 6 |
| 24 | Haslett, Thomas | 1 | | | | | 1 | | | 1 | | | | | | | 1 | 1 | | | 25 | 6 |
| 25 | Lannuan, Coleman | 1 | | | | | 1 | 1 | | 1 | | | | | | | 1 | 1 | | | 30 | 6 |
| 26 | Moore, Colin | 1 | | | | | | 1 | 1 | 1 | | | | | | 1 | 1 | | | | 41 | 6 |
| 27 | Mutson, Michael | 1 | | | | | | 1 | 1 | 1 | | | | | | | 1 | 1 | | | 44 | 6 |
| 28 | Mullin, Hugh | 1 | | | | | | | 1 | 1 | | | | | | | 1 | 1 | | | 45 | 6 |
| 29 | Simon, Sheldon | 1 | | | | | | | 1 | 1 | | | | | | 1 | 1 | | | | 56 | 6 |
| 30 | Stack, Michael | 1 | | | | | 1 | 1 | | 1 | | | 1 | | | | 1 | 1 | | | 59 | 6 |
| 31 | Cervone, Richard | 1 | 1 | | | | 1 | 1 | | | | | | | | | 1 | | | | 8 | 5 |
| 32 | Clark, Dana | 1 | 1 | | | | 1 | 1 | | | | | | | | | 1 | | | | 9 | 5 |
| 33 | Davis, Simon | 1 | | | | | | | 1 | 1 | | | | | | | 1 | 1 | | | 10 | 5 |
| 34 | DeChristopher, Brian | 1 | | | | | | | | | 1 | | | | | 1 | 1 | 1 | | | 11 | 5 |
| 35 | Dexter, Stephen | 1 | | 1 | | | | 1 | | | | | | | | | 1 | 1 | | | 12 | 5 |
| 36 | Eigerman, Nathan | 1 | | | | | 1 | 1 | | | | | | | | | 1 | 1 | | | 14 | 5 |
| 37 | Gerber, David | 1 | | | | | 1 | 1 | | | | | | | | | 1 | 1 | | | 18 | 5 |
| 38 | Gillis, Roland | 1 | | | 1 | | 1 | | | 1 | | | | | | | 1 | | | | 19 | 5 |
| 39 | Hedden, Peter | 1 | | | | | 1 | | | 1 | | | | | | | 1 | 1 | | | 23 | 5 |
| 40 | Knight, Jeffrey | 1 | | | | | | | | | | 1 | 1 | | | 1 | 1 | | | | 29 | 5 |
| 41 | Mehta, Sandeep | | 1 | | | | | | | | | | | | | | 1 | 1 | | | 37 | 5 |
| 42 | Nance, Michael | 1 | 1 | | | | | 1 | | | | | | | | | 1 | 1 | | | 46 | 5 |
| 43 | O'Malley, Christopher | | 1 | | | | | | | | | | | | | | 1 | 1 | | | 49 | 5 |
| 44 | Olveny, Kevin | 1 | | | | | | 1 | 1 | 1 | | | | | | | | 1 | | | 13 | 4 |
| 45 | Hanish, David | 1 | | | | | | 1 | 1 | | | | | | | | 1 | 1 | | | 24 | 4 |
| 46 | Makino, Shigeki | 1 | 1 | | | | | | | | | | | | | | 1 | | | | 33 | 4 |

Exhibit 1
Restated and Amended Analysis of Male Comparators

| # | Name | Same PM Job: Held same portfolio management position as plaintiff, as reported to the SEC | Same GER: Held same research position as plaintiff in Putnam's IMD | Same fund: Manages or managed funds managed by plaintiff | Qualified: Appointed to position for which plaintiff was better qualified | From outside: Appointed from outside to fill a position for which plaintiff had interest and qualifications | Tenure: Similar tenure | Inv Exp: Similar investment experience | Promo pool: Promotion pool | Demotion pool: Eligible for demotion based on poor growth fund performance in 2002 or other funds in a prior year | GER Sleeve: One of select few research analysts who were named portfolio managers on specific funds | Coverage: Made recommendations on a significant portion of the S&P 500 based on market cap or visibility | Esteem: Held in high esteem within IMD as result of long-term performance and expertise | Coaching: Received training in management techniques at same time as plaintiff | TV: One of select few invited by the IMD to make appearances on television investment programs | Managed: Has managed people | Kids: Has children | CFA: Holds the CFA designation | Mom: Maternity Leave | Unethical: Complained to top management about unethical commission allocations | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | Methuish, Nicholas | 1 | | | | | | | | | | | | | | | | | | | 4 | 38 |
| 48 | Miller, Christopher | 1 | | | | | | | | | | | | | | | 1 | 1 | | | 4 | 39 |
| 49 | Moore, Gerald | 1 | | | | | 1 | | | | | | | | | 1 | | | | | 4 | 42 |
| 50 | Norchi, Terrance | | 1 | | | | 1 | | | | 1 | 1 | | | | | 1 | 1 | | | 4 | 47 |
| 51 | Santos, Dave | 1 | | | | | | | | | | | | | | | 1 | | | | 4 | 51 |
| 52 | Sallito, Tino | | | 1 | | | | | | | | | | | | | 1 | 1 | | | 4 | 54 |
| 53 | Sorensen, Eric | | | | | | | 1 | 1 | 1 | | | | | | | 1 | 1 | | | 4 | 58 |
| 54 | Weiss, James | 1 | | | | | | | | | | | 1 | | | 1 | | 1 | | | 4 | 66 |
| 55 | Bloemker, Robert | | | | | | | | | 1 | | | | | | 1 | | | | | 3 | 2 |
| 56 | Elavia, Tory | | | | | | | 1 | 1 | | | | | | | | 1 | | | | 3 | 15 |
| 57 | Greenleaf, Bradford | 1 | | 1 | | | | | | 1 | | | | | | | | 1 | | | 3 | 22 |
| 58 | Lode, Genuly | 1 | | 1 | | | | | | | | | 1 | | | | | | | | 3 | 32 |
| 59 | Morris, Dirk | | | | | | | | | 1 | | | | | | 1 | 1 | | | | 3 | 43 |
| 60 | Scanlon, Paul | 1 | | | | | | 1 | | | | | | | | | | 1 | | | 3 | 52 |
| 61 | Block, Richard | 1 | | | | | | | | | | | | | | | | | | | 2 | 1 |
| 62 | Geer, Bartlett | 1 | | | | | | | 1 | 1 | | | | | | | | 1 | | | 2 | 17 |
| 63 | Graham, Andrew | 1 | | | | | | | | | | | | | | 1 | | | | | 2 | 21 |
| 64 | Mattais, Andrew | | | | | | | | 1 | 1 | | | | | | | 1 | | | | 2 | 36 |
| 65 | Prusko, James | | | | | | 1 | | 1 | | | | | | | | 1 | | | | 2 | 50 |
| 66 | Smith, Leo | | | | | | | | | | | | | | | 1 | | | | | 2 | 57 |
| 67 | Sullivan, William | | | | | | | | 1 | | | | | | | | | | | 1 | 2 | 60 |
| | | 52 | 24 | 13 | 3 | 2 | 30 | 21 | 30 | 35 | 7 | 7 | 14 | 1 | 6 | 28 | 45 | 38 | | 1 | 5 | avg |

1   Was given one of the seven MD positions available in 2001 for which plaintiff was qualified and considered; Worked on the same level; reported directly to same supervisor
2   Was actively considered for the demotion that was ultimately given to the plaintiff in late 2001/early 2002

EXHIBIT 8

**Exhibit 2**
**Restated and Amended Analysis of Female Comparators**

Average excludes Lisa Svensson

| # | Name | Same PM Job — Held same portfolio management position as plaintiff, as reported to the SEC | Same GER — Held same research position as plaintiff in Putnam's IMD | Same fund — Manages or managed funds managed by plaintiff | Qualified — Appointed to position for which plaintiff was better qualified | From outside — Appointed from outside to fill a position which plaintiff had interest and qualifications | Tenure — Similar tenure | Inv Exp — Similar investment experience | Promo pool — Promotion pool | Demotion pool — Eligible for demotion based on poor growth fund performance in 2002 or other funds in a prior year | GER Sleeve — One of select few research analysts who were named portfolio managers on specific funds | Coverage — Made recommendations on a significant portion of the S&P 500 based on market cap or visibility | Esteem — Held in high esteem within IMD as result of long-term performance and expertise | Coaching — Received training in management techniques at same time as plaintiff | TV — One of select few invited by the IMD to make appearances on television investment programs | Managed — Has managed people | Kids — Has children | CFA — Holds the CFA designation | Mom — Maternity Leave | Unethical — Complained to top management about unethical commission allocations | avg |
|---|------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Svensson, Lisa | 1 | | | | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 1 | | | | | 1 | 12 |
| 2 | Holding, Pamela | 1 | | | | | | | | | | | | | | | | | | | 6 |
| 3 | Kupsiner, Deborah | 1 | | | | | | | | | | | | | | | | | | | 9 |
| 4 | Spatz, Erin | | | | | | | | | | | | | | | | | | | | 20 |
| 5 | Allansmith, Lauren | | 1 | | | | 1 | 1 | | | | | | | 1 | | 1 | | | | 1 |
| 6 | Cother, C. Beth | 1 | 1 | | | | | | 1 | | | | | | 1 | 1 | 1 | | | | 8 |
| 7 | Morgan, Kelly | 1 | | 1 | | | | | | 1 | | | | 1 | | 1 | 1 | | | | 8 |
| 8 | Smith, Margaret | | 1 | | | | | | | 1 | 1 | 1 | | 1 | | | 1 | | | | 15 |
| 9 | Thomsen, Rosemary | 1 | | 1 | | | 1 | 1 | | | | | 1 | | | 1 | 1 | | | | 19 |
| 10 | Mockard, Jeanne | 1 | | | | | 1 | 1 | 1 | 1 | | | 1 | | | 1 | 1 | 1 | 1 | | 22 |
| 11 | Peters, Carmel | 1 | | | | | 1 | 1 | 1 | 1 | 1 | | 1 | | | 1 | 1 | 1 | 1 | | 8 |
| 12 | Williams, Fayval | 1 | | 1 | | | 1 | 1 | 1 | 1 | 1 | 1 | | | | 1 | 1 | 1 | 1 | | 24 |
| 13 | Drew, Maria | 1 | | | | | | 1 | | | 1 | 1 | | | | 1 | 1 | | | | 7 |
| 14 | Korn, Karen | 1 | | | | | 1 | 1 | | | | | | | | 1 | 1 | | | | 7 |
| 15 | Leichter, Jennifer | | 1 | | | | | | | | | | | | | | | | | | 6 |
| 16 | McMullen, Carol | 1 | | | 1 | | 1 | 1 | | | | | 1 | | | 1 | 1 | | 1 | | 6 |
| 17 | Farrell, Deborah | 1 | | | | | 1 | 1 | 1 | | | 1 | | | | 1 | 1 | 1 | | | 9 |
| 18 | Jones, Elizabeth | 1 | | | | | 1 | 1 | 1 | | | | | | | 1 | 1 | 1 | 1 | | 9 |
| 19 | Parker, Margery | 1 | | | | | | 1 | | 1 | | | | | | 1 | 1 | | 1 | | 13 |
| 20 | Sievert, Jean | | 1 | | | | 1 | 1 | | | | | | | | | 1 | | | | 5 |
| 21 | Wheeler, Diane | 1 | | | | | 1 | 1 | | | | | | | | | 1 | | | | 5 |
| 22 | McCormack, Susan | 1 | | | | | 1 | 1 | | | | | | | | | 1 | 1 | | | 7 |
| 23 | Burke, Andrea | 1 | | | | | 1 | 1 | | | | | | | | | | | | | 16 |
| 24 | Kalus-Byslnycky, Ivka | | 1 | | | | | 1 | | | | | | | | | 1 | | | | 18 |
| | **Total** | **15** | **11** | **3** | **1** | **0** | **14** | **17** | **7** | **7** | **5** | **5** | **6** | **2** | **3** | **15** | **16** | **12** | **10** | **2** | **6** |

EXHIBIT 9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| PUTNAM INVESTMENTS LLC, f/k/a PUTNAM | ) |
| INVESTMENTS, INC. and LAWRENCE J. LASSER, | )) |
| Defendant. | ) |
| | ) |
| | ) |

PUTNAM INVESTMENTS' SWORN STATEMENT CONCERNING
CERTAIN OF PLAINTIFF'S REQUESTS FOR THE PRODUCTION OF
DOCUMENTS

REQUEST NO. 1

All documents and things concerning the criteria actually used by the persons
participating in the decision making process in deciding whether to select Svensson or
any of the identified males or identified females for appointment to or election as a
Managing Director or Portfolio Manager in the period since January 1, 1999, whether by
promotion from within the IMD, another division of Putnam or as a lateral hire from
another entity.

SWORN STATEMENT

Based on a reasonable search of its files, Putnam has heretofore produced **all documents
that it was able to locat**e that are responsive to this request.

REQUEST NO. 9

All documents and things concerning the factual basis(es) of any numerical score in any
360s, year end reviews, performance reviews, Investment Division & ISD Human
Resources Updates, PDPRs and/or other documents concerning analysis or evaluation of
work performance in the IMD, that were prepared or received by any person at Putnam in
or for any one or more of the reporting periods since January 1, 1999, in regard to
Svensson, any one or more of the identified males and/or any one or more of the
identified females.

SWORN STATEMENT

Based on a reasonable search of its files, Putnam **has not discovered any documents or things** concerning the factual basis(es) of any numerical score in any 360s.

REQUEST NO. 10

All documents and things concerning the organizational structure and/or jurisdiction of the IMD as existing at any time or from time to time in the period since January 1, 1999.

SWORN STATEMENT

Based on a reasonable search of its files, Putnam **has heretofore produced all documents that it was able to locate** that are responsive to this request.

REQUEST NO. 11

All documents and things concerning the administrative reporting relationships within the IMD as existing at any time or from time to time in the period since January 1, 1999.

SWORN STATEMENT

Based on a reasonable search of its files, Putnam **has heretofore produced all documents that it was able to locate** that are responsive to this request.

REQUEST NO. 13

All documents and things concerning the membership, structure and/or jurisdiction at any time or from time to time in the period since January 1, 1999, of the IDMC.

SWORN STATEMENT

Based on a reasonable search of its files, **Putnam has heretofore produced all documents that it was able to locat**e that are responsive to this request.

REQUEST NO. 14

All documents and things concerning the membership, structure and/or jurisdiction of any committee or entity howsoever known or described, other than the IDMC or the Operating Committee, which had or has any administrative function or responsibility concerning Svensson, any of the identified males and/or any of the identified females in the IMD as existing at any time or from time to time in the period since January 1, 1999.

SWORN STATEMENT

Based on a reasonable search of its files, **Putnam has heretofore produced all documents that it was able to locate** that are responsive to this request.

REQUEST NO. 27

All documents and things concerning communication between or among Putnam, any affiliate of Putnam, Peers, NWQ, any affiliate of NWQ and/or any other persons(s) concerning the testimony or possible testimony in a deposition or at trial in this case by Peers or by any of the identified males and/or any of the identified females who at the time of such communication were no longer in the employ of Putnam.

SWORN STATEMENT

Based on a reasonable search of its files, Putnam **has heretofore produced all documents that it was able to locate** that are responsive to this request.

REQUEST NO. 28

All documents and things concerning the factual basis of any numerical or other rating, evaluation, analysis or score concerning Svensson in connection with consideration of her by Putnam in the period since January 1, 1999, for promotion; demotion; salary or other compensation increase; salary or other compensation decrease; and/or other employment action.

SWORN STATEMENT

Based on a reasonable search of its files, Putnam **has heretofore produced all documents that it was able to locate** that are responsive to this request.

REQUEST NO. 49

All documents and things concerning scorecards and second scorecards inregard to O'Malley, other MBAs and any of the identified males and/or any of theidentified females prepared or maintained in the period since January 1, 1999.

SWORN STATEMENT

Based on a reasonable search of its files, Putnam **has heretofore produced all documents that it was able to locate** that are responsive to this request.

I, Mary McNamee, depose and state that I am duly authorized on behalf of Putnam to sign this sworn statement concerning Ms. Svensson's Second Request for the Production of Documents. The Sworn Statements set forth **are based on, and therefore necessarily limited by, either my own personal knowledge or the records and information still in existence, presently recollected, thus far discovered** in the course of the preparation of these answers, **and currently available** to Putnam. **Subject to the limitations set forth herein,** the foregoing Statements are accurate to the best of my present knowledge. Signed under pains and penalties of perjury this 3rd day of January, 2007.

\    a    ^    ^

Mary McNamee                    _____

PUTNAM INVESTMENTS, LLC,
By its attorneys,

Joseph L. Kociubes,                    0#
276360 Louis A. Rodrigues, BBO# 424720 Allyson
E. Kurker, BBO# 6465231 BINGHAM
MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

Dated: January 3, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon plaintiff's counsel by electronic mail on January 3, 2007.


/s/ Allyson E. Kurker _____
Allyson E. Kurker

[387551.1]