UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*          Civil Action No. 04-12711-PBS
                                         \*
LISA SVENSSON                            \*
                                         \*          BBO No. 351000
            Plaintiff,                   \*
                                         \*          Memorandum of Plaintiff Lisa
v.                                       \*          Svensson in Reply to the February 26,
                                         \*          2007, Memorandum of Defendant
PUTNAM INVESTMENTS,                      \*          Putnam Investments, LLC in Response
LLC, ET AL.,                             \*          to the February 15, 2006, Hearing on
                                         \*          Svensson's Objections to the Rulings
            Defendants.                  \*          of the Magistrate Judge
                                         \*
\* \*    \* \* \* \* \* \* \* \* \* \* \* \*  \*

Plaintiff Lisa Svensson ("Svensson") submits this memorandum in reply to the

February 26, 2007, memorandum filed by defendant Putnam Investments, LLC ("Putnam") in

response to the February 15, 2007, hearing before the court on Svensson's Objections to the

rulings of the Magistrate Judge (the "Putnam memorandum").[1] Svensson does so because in

regard to some categories of the documents at issue, the Putnam memorandum has misstated

the facts; in some cases, it has misstated Svensson's positions; in some cases, it is incorrect

on matters of law; and in some cases, it has raised new arguments not made in its papers

before the Magistrate Judge or the District Judge.

Except insofar as supplemented or noted herein, Svensson relies upon the facts and

arguments in her Objections, filed January 24, 2007, Docket paper No. 161; in her Reply

Memorandum filed February 14, 2007, Docket paper No. 166, and in her Response

---

[1] Oddly titled as "Defendant Putnam Investments' Response to the Plaintiff's Second Request for Documents and Things," the Putnam memorandum is not what its title says it is. Putnam served its response to Svensson's April 28, 2006, Second Request for Production on June 2, 2006, relevant portions of which, on a category-by-category basis, are included in Svensson's October 25, 2006, Reply Memorandum, which is Exhibit 1 to Svensson's Response Memorandum filed February 22, 2007.

Memorandum, filed February 22, 2007, Docket paper No. 168.

1.    **Putnam's claim that Svensson has "stipulated" that certain categories of Svensson's Second Request for Production are "moot" is incorrect and misleads the court.**

The Putnam memorandum asserts that many of the categories of documents not ruled upon by the Magistrate Judge, which are among those at issue before this court, have been made "moot' by a "stipula[tion]" that Putnam claims Svensson has made. [2] [3] These assertions are incorrect and by them, Putnam misleads the court.  In fact, no such waiver or "stipulate[ion]" ever was made by Svensson.  Her December 27, 2006, cross motion for orders compelling production did not render any of either the e-mail or non e-mail documents sought by her as moot.  Her cross motion, which requested orders compelling production to the extent the documents requested had not been produced, simply noted that they were in three general groups: (1) The documents as to which the Magistrate Judge, with Putnam's counsel's agreement expressed at the October 26, 2006, hearing, had directed Putnam to submit a "sworn statement" if Putnam claimed that the documents requested "do not exist"; (2) The documents requested that included the issue of production of e-mail (with no expression by Svensson of any waiver or "moot[ing]" out of any of the non e-mail documents that would be responsive to the respective requests); and, (3) The documents that did not involve the production of e-mail issue.

---

[2] Response to No. 16, at Putnam memorandum p. 4; Response to No. 17, at p. 4; Response to No. 18, at p. 5; Response to No. 19, at p. 6; Response to No. 38, at p. 13; Response to No. 39, at p. 14; Response to No. 45, at p. 17; Response to No. 46, at p. 17; Response to No. 47, at p. 18; Response to No. 48, at p. 18; Response to No. 49, at p. 19; Response to No. 56, at p. 22; Response to No. 57, at p. 22; Response to No. 58, at p. 23; Response to No. 59, at p. 23 Response to No. 60, at p. 24 Response to No. 66, at p. 26 Response to No. 67, at p. 27 Response to No. 68, at p. 28; Response to No. 69, at p. 28; Response to No. 71, at p. 29; Response to No. 72, at p. 30; and Response to No. 73, at p. 30

[3] Putnam claims: "Svensson...stipulated in fn. 1 of her Opposition...that this request calls for Putnam to conduct electronic discovery.  At the hearing on February 15, 2007, the court ruled that no further electronic discovery is to be conducted, rendering this request moot."

2

2.    **The Putnam claim that it "did not terminate Ms. Svensson's employment because she was a poor stock picker" makes the documents requested irrelevant are wrong.**

Putnam argues that many of the categories of documents not ruled upon by the Magistrate Judge that are among those at issue before this court, are not relevant because it claims that Putnam "did not terminate...Svensson's employment because she was a poor stock picker...." [4]  Whether Putnam's claim as to the real reason for Svensson's termination is true or not is, and will be at trial, a key fact issue in this case.  Insofar as discovery is concerned, Putnam's claim that Svensson was terminated for reasons other than she was a "poor stock picker" cannot operate as a bar to Svensson's legitimate discovery because, under Fed. R. Civ. P. 26(b)(1), Svensson is entitled as a matter of right to production of Putnam documents that are "relevant to" her "claim[s] or defense[s]" and, with the permission of the court, she also is entitled to those that are "relevant to the subject matter" of the litigation.  Svensson's claims in this case include claims based upon disparate impact and disparate treatment, and are for: (1) Putnam's failure to pay her equally, (2) Putnam's failure to promote her, (3) Svensson's demotion, and (4) Putnam's termination of her employment.

Categories 38 and 39 are two examples of the seven categories as to which Putnam relies upon its not "a poor stock picker" defense.[5]  In No. 38, Svensson seeks documents and things "concerning [a term defined by Local Rule 26.5 as " referring to, describing, evidencing, or constituting"] GER[6] Active Portfolio Performance in the period January 1, 1999, through September 15, 2003, for Svensson or any of the identified males and/or the identified females."  As limited by her October 25, 2006, Reply Memorandum, Svensson reduced the scope to an identified 20 of her 91 comparators.  In No. 39, Svensson seeks documents "concerning

---

[4] Response to No. 38, at p. 14 of the Putnam memorandum; Response to No. 39, at p. 14; Response to No. 45, at p. 17; Response to No. 46, at p. 17; Response to No. 47, at p. 18; Response to No. 48, at p. 18; and Response to No. 49, at p. 19.
[5] See note 4, supra.
[6] GER refers to Global Equity Research.

comparisons in work performance in the period January 1, 1999, through September 15, 2003,"
of Svensson [and] a similarly reduced number of her comparators.  Given that in addition to
improper termination, Svensson's claims include those for  failure to pay equally, failure to
promote and for demotion, the documents that establish how Svensson and her comparators
actually performed in the workplace are certainly relevant within the meaning of Rule 26(b)(1)
to Svensson's claims in this case.  Notably, at the hearing on February 15, 2006, when Putnam's
counsel picked, he said, at "random,"[7] and criticized Svensson for No. 39, the court (Saris, D.J.)
said, "Well, isn't that the issue, why they got up to managing director as opposed to someone
else?  Why isn't that relevant?..."[8]   .

Accordingly, Putnam's not "a poor stock picker" defense to Nos. 38 and 39 should be
overruled; and it also should be overruled as to the other categories, Nos. 45-49[9] to which
Putnam has asserted it (all of which categories, pursuant to Svensson's October 25, 2006, Reply
memorandum, have been reduced in scope to an identified 20 of her 91 comparators).

**3.      Nos. 16-19: documents concerning the results of the application of the criteria
[for demotion]..." (No. 16) and Nos. 17-19, concerning communication among
identified decision makers.**

If any of the non-mail documents requested by these categories have not been produced,
Svensson for the reasons set out in her October 25, 2006, Reply Memorandum, at pp.29-38,

---

[7] Transcript, February 15, 2007, p. 31, l. 22,
[8] Id., p. 32, ll. 14-16
[9] No. 45 ("reports, analyses, measurements and/or rankings of the types included in [Svensson
documents] LS-501, 503-506"), at Putnam memorandum p. 17; No. 46 ("...,reports, analyses,
measurements and/or rankings of the types included in document LS-502 for the fund referred to and for
the other Putnam funds, which were prepared...since January 1, 1999"), at [Putnam memorandum p. 17;
No. 47 ("...attribution reports of the type included in LS-507-512 for the fund referred to and any other
funds, which were prepared in the period since January 1, 1999..."), at [Putnam memorandum p. 18; No.
48 ("...sector level performance index ranks of the type included in LS-513-515 prepared...since January
1, 1999"), at Putnam memorandum p. 18; and No. 49 ("scorecards and second scorecards in regard to
O'Malley (the male supervised by Svensson who instigated the "investigation" of her), other MBAs and
any of the [20 identified males and females] prepared or maintained...since January 1, 1999." at Putnam,
memorandum p. 19.

seeks production of them.

**4.    Nos. 20 and 21 (withdrawn).**

**5.    Nos. 22-27 (documents concerning Darren Peers) (withdrawn insofar as concerns non e-mail documents).**

**6.    No. 28 (documents concerning the factual basis of any numerical or other rating, evaluation, analysis or score concerning Svensson).**

   If any of the documents requested by this category have not been produced, Svensson for

the reasons set out in her October 25, 2006, Reply Memorandum, pp. 47-48, seeks production of

them.

**7.    No. 29 (documents concerning terms and conditions offered to any of Svensson's comparators who left Putnam voluntarily or involuntarily) comparators those leaving Putnam.**

   Svensson relies on the facts and arguments set out in detail for this category in her

October 25, 2006, Reply Memorandum, at pp. 48-49.

**8.    Nos. 30-31.  The Putnam defense to Nos. 30 and 31 that the documents requested do not exist because it "has reviewed the [Putnam] trustee minutes for May - September 2003," is disingenuous and misleading.**

   The Putnam defense that the documents requested by Nos. 30 and 31 do not

exist because it "has reviewed the [Putnam] trustee minutes for May - September 2003," is

disingenuous and misleading.  In the months before she was fired, Svensson complained about

Putnam's practices in regard to directed brokerage commissions.  Given her termination

occurred within just weeks of having done so, Svensson seeks in No. 30 production of

documents "concerning any <u>notes</u>, minutes or <u>other document of or in regard to meetings or</u>

<u>decisions of the</u> Putnam <u>trustees</u> in the period May - September 2003 <u>concerning directed</u>

<u>brokerage commissions</u>"; and in No. 31, documents "concerning <u>communication between or</u>

<u>among, Haldeman [defendant Lasser's successor as Putnam's CEO], Lasser and any of the</u>

Putnam trustees in the period May -September 2003 concerning directed brokerage

commissions."  (Emphasis added.)

Putnam's defense is its claim that no such documents exist because it has

"review[ed]" the "minutes" of the meetings.  A review of only the minutes is insufficient.  A

review of the minutes is not a search for "notes" or "other documents of or in regard to

meetings or decisions of the Putnam trustees;" nor is it a sufficient search for documents

"concerning communication between or among, Haldeman, Lasser and any of the Putnam

trustees. (Emphasis added.)

Svensson also relies on the facts and arguments set out in detail for this category in

her October 25, 2006, Reply Memorandum, at pp. 49--51.

**9.     No. 32.  The Putnam defense to No. 32 that it "did not terminate [her] employment because [Svensson] had fewer stocks under her coverage" and that some of the coverage reports that Svensson seeks in No. 32 are for the post firing period 2003-2006 makes the coverage reports requested irrelevant, are wrong.**

Putnam argues that the documents Svensson seeks in No. 32, "coverage reports for

O'Malley" and, pursuant to her October 25, 3006, Reply memorandum, for the identified ten of her

91 comparators for the reporting periods 2002-2006, are not relevant because Putnam "did not

terminate...Svensson's employment "because she had fewer stocks under her coverage" and

because part of the period referred to is after her September 15, 2003, termination.  Putnam

is wrong on both counts.  First, whether Putnam's claim as to the real reason for Svensson's

termination is true or not is, and will be at trial, a key fact issue in this case.  Insofar as discovery is

concerned, Putnam's claim that Svensson was terminated for reasons other than that she "had fewer

stocks under her coverage" cannot operate as a bar to Svensson's legitimate discovery because, under

Fed. R. Civ. P. 26(b)(1), Svensson is entitled as a matter of right to production of Putnam documents

that are "relevant to" her "claim[s] or defense[s]" and, with the permission of the court, she also is

entitled to those that are "relevant to the subject matter" of the litigation. Svensson's claims in this case based upon disparate impact and disparate treatment, are for: (1) Putnam's failure to pay her equally, (2) Putnam's failure to promote her, (3) Svensson's demotion, and (4) Putnam's termination of her employment.

Category 32 seeks production of "coverage reports for O'Malley," a comparator who instigated the "investigation" of Svensson resulting in her termination, and, as reduced by her October 25, 2006, Reply Memorandum, for only an identified ten of her 91 comparators. Coverage reports at Putnam evidence the number and type of stocks of the companies that an investment professional at Putnam is responsible for researching. The more stocks and companies under a person's coverage, the more productive the person is and the more valuable to Putnam he or she becomes. Coverage reports provide a factual basis for analyzing the productivity and worth of one investment professional with another. Whether O'Malley and the others in the period 2002 to the date of Svensson's termination on September 15, 2003, had more or fewer stocks under coverage than Svensson, would be relevant to all four of Svensson's claims.

Second, coverage reports for the periods both before and after the date of Svensson's termination are equally relevant to her claims. Courts routinely look at employment actions against comparators over a significant time period, both before and after the actions against the plaintiff. The United States Court of Appeals for the First Circuit stated in Conway v. Electro-Switch Corp., 825 F.2d 593 (1st Cir. 1987) that,

> evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.

825 F.2d at 597. (Emphasis added.) In Conway, the court allowed the introduction of evidence of discriminatory statements made up to 22 months prior to the plaintiff's termination. In Jackson

v. <u>Harvard University</u>, 111 F.R.D. 472 (D.Mass. 1987), the District Court expanded the time

period for which the plaintiff was allowed to seek discovery as to tenure decisions in the Harvard

Business School from three to  ten years, including the seven years prior to the time tenure

consideration of the plaintiff had begun, stating,

> In the court's view, this three-year time period is unduly restrictive and
> contrary to the law governing the scope of permissible discovery. Fed. R. Civ.
> P. 26(b)(1)....  Accordingly, <u>a time frame which merely brackets the contested</u>
> <u>employment action would foreclose plaintiff from elucidating past practices or</u>
> <u>identifying a pattern which might suggest that defendants' reasons for denying</u>
> <u>plaintiff tenure are pretextual.</u>  Relevancy for discovery purposes is much
> broader than for admissibility purposes at trial.  If the information sought
> appears reasonably calculated to lead to the discovery of admissible evidence,
> it is within the limits set forth in Fed. R. Civ. P. 26(b)(1).  <u>Therefore, the court</u>
> <u>expands the time frame ordered by the magistrate from three years to ten,</u>
> <u>commencing June 1974 and ending June 1984.</u>

111 F.R.D. at 475. (Emphasis added.)[10]

Conduct occurring <u>entirely after</u> the discrimination complained of by plaintiff also is

relevant and admissible.  In <u>Brown</u> v. <u>Trustees of Boston University</u>, 891 F.2d 337 (1st Cir.

1989), the United States Court of Appeals for the First Circuit affirmed the admission of

statements made by the university president to another professor being considered for tenure, even

though those statements were made <u>after</u> the decision on plaintiff's tenure application had been

made.  According to the <u>Brown</u> court:

> <u>That the remarks occurred subsequent, rather than prior, to the allegedly</u>
> <u>discriminatory conduct does not alter their admissibility.</u>  The jury was entitled
> to infer that any discriminatory animus toward women manifested in 1982 and
> 1983 would have existed in 1980 and 1981, when President Silber acted on
> Brown's case.

891 F.2d at 350. (Emphasis added.)[11]

---

[10] <u>See</u> <u>also</u> <u>Briddell</u> v. <u>Saint Gobain Abrasives, Inc</u>., 233 F.R.D. 57, 60 (D. Mass. 2005)  (allowing
discovery as to other acts of discrimination for three year period including 14 months prior to any
discriminatory acts against the plaintiff.)

Accordingly, Putnam's not "fewer stock under coverage" and post termination time period defenses to No. 32 should be overruled.

Svensson also relies on the facts and arguments set out in detail for this category in her October 25, 2006, Reply Memorandum, at pp. 51-52.

**10.    Nos. 33-34.  The Putnam's defenses to Nos. 33 and 34 requesting documents "concerning communication...at Putnam in regard to the termination of Konstantin Stoev's employment and the stated reasons for it" and "concerning the 'green card' application for Stoev that [Kelly] Morgan filled out" are not relevant are completely without merit**.

Putnam purports to justify its refusals to produce the documents requested by No. 32,

(documents "concerning communication...at Putnam in regard to the termination of Konstantin Stoev's employment and the stated reasons for it") and by No. 33 (documents that "concern...the 'green card' application for Stoev that [Kelly] Morgan filled out") because: (1)  "Putnam has never asserted any mismanagement" by Svensson of Konstantin Stoev, and, 2)  because Putnam's "reasons for terminating" Stoev and "what Putnam may have said to" the U.S. Immigration and Naturalization Service regarding him in connection with Stoev's application for

---

[11] See also Briddell, 233 F.R.D at 60 (Court cited a case from the District of Kansas in which the time period extended two years after the discrimination alleged by the plaintiff); Ryder v. Westinghouse Electric Corp., 128 F.3d 128, 130-33 (3rd Cir. 1997) (allowing introduction of statements made one year after plaintiff's termination); Stumph v. Thomas & Skinner, Inc., 770 F.2d 93, 95, 97 (7th Cir. 1985) (allowing testimony of other employees as to discrimination they encountered after plaintiff was terminated); Cordova v. State Farm Ins. Companies, 124 F.3d 1145, 1149(9th Cir. 1997) (Mexican plaintiff, alleging that she was not promoted to trainee agent due to national origin discrimination, allowed to introduce evidence that after hiring decision had been made, manager made discriminatory comment about another Mexican employee); Stacks v. Southwestern Bell Yellow Pages, 27 F.3d 1316, 1327 n.5 (8th Cir. 1994) (in sexual harassment case, evidence that after plaintiff's termination a sexual video involving other female employees had been shown at a company function was relevant and admissible); Martinez v. Potter, 347 F.3d 1208, (10th Cir. 2003) (incidents of retaliation against plaintiff occurring after plaintiff filed Title VII complaint, as to which administrative remedies had not been exhausted, could still be introduced as background evidence to support exhausted claims set forth in complaint); Schindler v. Bierwirth Chrysler/Plymouth, 15 F.Supp.2d 1054, 1059 (D. Kan. 1998) (defendant's decisions to discharge two other 60+ year old employees months after plaintiff's termination "lend support to plaintiff's pretext argument"); Wilson v. Seven Seventeen HB Philadelphia Corp., 2003 WL 22709073, * 10 (E.D. Pa. 11/14/03) (allowing introduction of corporate memoranda and notes reflecting procedures in effect more than a year after plaintiff's termination).

green card status," has "no bearing whatsoever on...Svensson's claims...." Putnam is incorrect on both counts. First, whether Putnam's claim as to its real reason for Svensson's termination is true or not is, and will be at trial, a key fact issue in this case. Insofar as discovery is concerned, Putnam's claim that Svensson was terminated for reasons other than that she "never" "mismanage[ed]" Stoev, cannot operate as a bar to Svensson's legitimate discovery. Under Fed. R. Civ. P. 26(b)(1), Svensson is entitled as a matter of right to production of Putnam documents that are "relevant to" her "claim[s] or defense[s]" and, with the permission of the court, she also is entitled to those that are "relevant to the subject matter" of the litigation.

Second, Svensson anticipates that Putnam will call Kelly Morgan and Joshua Brooks as witnesses at trial to attack Stoev and his testimony because his testimony as set out in his deposition transcript, Exhibits "A.1" - "A.3," hereto, is very favorable to Svensson and her management of other persons. It is then no wonder that Putnam wishes to be able at trial to attack Stoev while keeping from Svensson, the court and the jury what Putnam, through Morgan, wrote to the INS about Stoev to urge the INS to issue him a green card to enable him to remain employed as an investment professional at Putnam, and what she and others at Putnam said at various times to, and about, Stoev in relation to, among other things, Svensson, her termination and Stoev's work performance until his 2004 termination. The documents requested by Nos. 32 and 33 are particularly relevant to a fair consideration by the jury of the credibility of Morgan and Brooks and the others.

Svensson also relies on the facts and arguments set out in detail for this category in her October 25, 2006, Reply Memorandum, at pp. 52-54.

**11**.    **Nos. 36-37. Putnam's defenses to Nos. 36 and 37 that documents concerning "communication between [Kelly] Morgan and [Lauren] Allansmith...2002-2004 concerning comments upon or other feedback as to Allansmith's work performance," and "communication between Morgan and McNamee, Scordato and/or Brooks concerning Svensson's or Allansmith's work performance or reasons or justifications for Svensson or Allansmith leaving Putnam's employment, are**

**without merit.**

Putnam purports to justify its refusal to produce the documents requested by Nos. 36 and 37 concerning "communication between [Kelly] Morgan and [Lauren] Allansmith... concerning comments upon or other feedback as to Allansmith's work performance," and "communication between Morgan and McNamee [of the HR Department], Scordato [of the HR Department] and/or Brooks concerning Svensson's or Allansmith's work performance or reasons or justifications for Svensson or Allansmith leaving Putnam's employment," because, Putnam claims, "one female's opinion (Morgan) about another female's work performance (Allansmith) has no relevance" to Svensson's claims.  Putnam is incorrect.  First, what the folks at Putnam said to, and about, Lauren Allansmith and what they did to her -- demoting her while she was on maternity leave and later forcing her out -- are matters that are relevant to Svensson's employment actions claims, which include not only disparate treatment but also disparate impact.

Second, the documents requested by Nos. 36 and 37 are particularly relevant to a fair consideration by the jury of the credibility of the probable Putnam trial witnesses, including Morgan who, according to Allansmith in her deposition, a mere five months before Morgan told Allansmith that she was fired, had congratulated and praised her for her work performance.

Svensson also relies on the facts and arguments set out in detail in her October 25, 2006, Reply Memorandum, at pp. 54-56.

12. **Nos. 38-39.  Putnam's defenses to document request Nos. 38 (for documents "...concerning GER Active Portfolio Performance...1999 through September 15, 2003, for Svensson or any of the identified males and/or the identified females") and to 39 (documents "...concerning comparisons in work performance in the period...1999, through September 15, 2003....") are meritless.**

As set out more particularly in § 2, at pp. 3-4, supra, there is no merit to Putnam's "not a poor

11

stock picker" defense, which also is asserted in defense to No. 38 (documents "...concerning GER Active Portfolio Performance...1999 through September 15, 2003, for Svensson or any of the identified males and/or the identified females") and No. 39 (documents "...concerning comparisons in work performance in the period...1999, through September 15, 2003...."). First, non e-mail documents showing how Svensson performed in relation to her comparators (which, in number, are reduced for purposes of these requests pursuant to Svensson's October 25, 2006, Reply Memorandum) are relevant to her claims concerning the employment actions taken against her.

Second, there is no merit to the defense based on Svensson's having "worked in GER" only for the "last 18 months of the time period at issue" as courts routinely look at employment actions against comparators over a significant time period, both before and after the actions against the plaintiff. See § 9, at pp. 7-9, supra.

Moreover, the additional Putnam defenses to No. 39 that Putnam "produced at deposition a spreadsheet evidencing the managers' ratings for each of her alleged 91 comparators for 1999 - 2003, to the extent those ratings were captured in the employees' personnel files" is an insufficient response and Putnam's claim that it "knows of no other documents that might compare work performance amongst investment professionals" is simply beyond belief. First, the production of a spreadsheet that Putnam has prepared for this case is not a substitute for production of the requested documents. Svensson should not be bound to the limits imposed by Putnam's spreadsheet.

Second, that Putnam's claim to lack of knowledge in defense is not worthy of belief is demonstrated by Exhibit No. 22 in the McNamee deposition, Putnam's "Performance and Development Planning and Review" ("PDPR") form that Svensson presented to the court at the

February 15, 2006, hearing.  A copy of that form also is Exhibit "B," hereto.  Given the information contained in the PDPRs and particularly in the "comments" sections, the PDPRs are documents "concerning comparisons in work performance."

Svensson also relies on the facts and arguments set out in detail for this category in her October 25, 2006, Reply Memorandum, at pp. 57-61.

**13.    No. 40.  Putnam's defenses to Request No. 40 for documents concerning any move or transfer of seven of Svensson's male comparators are without merit.**

Putnam's defenses to Request No. 40 (for documents concerning any move or transfer of seven of her male comparators) are without merit. First, the objection that because some of the documents sought are for a period during which Svensson did not work in GER is without merit, as courts routinely look at employment actions against comparators over a significant time period, both before and after the actions against the plaintiff.  See § 9, at pp. 7-9, supra.

Second, the defense that Svensson "never was 'transferred out' of GER, makes no sense given the Putnam move of Svensson from its research department to portfolio management in 1997.

Moreover, Putnam's preparation and production of statistical "job histories" is no substitute for production of the documents requested.

Svensson also relies on the facts and arguments set out in detail for this category in her October 25, 2006, Reply Memorandum at pp. 61-62.

**14.    Nos. 41 and 42: withdrawn**.

**15.    No. 43 (officer directories)**

For this category, Svensson relies upon her arguments in her October 25, 2006, Reply

memorandum and on the fact that Putnam did not seek protection of the directories under the

Confidentiality Order entered in this case.

**16**.    **No. 44 (concerning bonus worksheets) withdrawn insofar as concerns non e-mail documents.**

**17**.    **Nos. 45-49: Putnam's defenses to requests for document concerning in Nos. 45 ("...reports, analyses, measurements and/or rankings..."), 46 ("...reports, analyses, measurements and/or rankings of the types included in document LS-502...), 47 ("...attribution reports of the type included in LS-507-512...."), .48 ("...sector level performance index ranks of the type included in LS-513-515...") and 49 ("...scorecards and second scorecards in regard to O'Malley, other MBAs and any of the identified males...or... females), are without merit.**

For the reasons set out in detail in § 2, at pp. 3-4, <u>supra</u>, the not a "poor stock picker"

defense, and in § 12, at pp. 11-13, <u>supra</u>, for the production of a statistical spreadsheet defense

claim, the objections to Nos. 45-49 should be overruled.

Svensson also relies on the facts and arguments set out in detail for this category in

her October 25, 2006, Reply Memorandum at pp. 65-75.

**18**.    **Nos. 50-54, 61, 75, 76: As Putnam has failed to provide adequate information by which the court and Svensson may evaluate Putnam's claims for privilege or work product protection for the documents requested in Nos. 50-54, 61, 75, 76, Putnam's assertion that Svensson has provided no basis to believe that the documents at issue are not privileged, turns the rule as to the burden on these issues upside down; and in camera review, as requested by Svensson in her October 25, 2006, Reply memorandum is required.**

Putnam has claimed work product or privilege protection for the documents requested in

Nos. 50-54, 61, 75 and 76.[12]  Because, as set forth in detail in Svensson's October 25, 2006, Reply

---

[12] . 50-54: The "notes" prepared by Tibbetts, which, "according to the Putnam privilege log, concerned "female partners; the "undated" "notes" by an "unknown" author to an unidentified recipient, which, according to the Putnam privilege log, concerns "Svensson employment history"; the 1998 "maternity leave summary" prepared, according to the Putnam privilege log, by an "unknown" author for an unidentified recipient; the September 3, 2003, "e-mail re: litigation forwarded with e-mail from [Attorney] Rodrigues..." authored by McNamee and sent to the recipient, Brooks, as

Memorandum, at pp. 75-80, 97-98,120-23, Putnam has failed to provide adequate information in its privilege log for Svensson or the court to evaluate Putnam's claims of privilege and work product protection, Svensson has requested the court to require Putnam to furnish appropriate factual information and to review the requested documents in camera. Putnam's claim that Svensson has "provided no basis to believe that the documents at issue are not privileged," turns the rule as to the burden on these issues upside down. In camera review by the court should be required.

19.    **No. 55 (concerning amounts and types of compensation, including, salary and bonus worksheets) withdrawn insofar as concerns non e-mail documents.**

20.    **No. 56 (documents "identifying" comparators who "left Putnam" on a "voluntary" basis since 1999).**

Svensson relies upon the facts and arguments set forth for this category at pp.83-86 of her October 25, 2006, Reply Memorandum.

21.    **No. 57 (documents "concerning the circumstances and reasons for the voluntary terminations" since 1999).**

---

referred to in the Putnam privilege log but redacted so as to not disclose only the words used by the author or Attorney Rodrigues in a "communication," within the meaning of U.S. v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950), each other, but disclosing the other words and information in either of the e-mails, including...the identity of the author, the identity of the recipient(s), the date and time of the transmission and the words in the subject line; the August 27, 2003, "e-mail re: Draft termination agreement" from author Hadley to recipients McNamee and Attorney Rodrigues, as referred to in the Putnam privilege log but redacted so as to not disclose the words used by the author or Attorney Rodrigues in a "communication," within the meaning of U.S. v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950), with each other but disclosing the other words and information in the e-mail, including...the identity of the author, the identity of the recipient(s), the date and time of the transmission, the words in the subject line and the attachment; and (61) "concerning communication between or among Putnam... and Landes, Eckland and/or Oristaglio/or any other person(s) concerning [their] testimony or possible testimony in a deposition or at trial in this case...."); .and documents "concerning communication within Putnam in regard to the issue of "deprivation of [Svensson's] management responsibilities..."(No. 75) and " concerning communication within Putnam in regard to [that] issue…" (No. 76)

Svensson relies upon the facts and arguments set forth for this category at pp. 86-88 of her October 25, 2006, Reply Memorandum.

**22.    No. 58 (documents "identifying any of the identified males and any of the identified females who left on an involuntary basis" since 1999).**

Svensson relies upon the facts and arguments set forth for this category at pp.88-89 of her October 25, 2006, Reply Memorandum.

**23.    No. 59 (documents "concerning the circumstances and reasons for the involuntary terminations...")**

Svensson relies upon the facts and arguments set forth for this category at pp. 91-94 of her October 25, 2006, Reply Memorandum.

**24.    No. 60 (documents "severance package[s]...")**

Svensson relies upon the facts and arguments set forth for this category at pp. 94-97 of her October 25, 2006, Reply Memorandum.

**25.    No. 61 (documents "concerning communication between or among Putnam... and Landes, Eckland and/or Oristaglio/or any other person(s) concerning [their] testimony or possible testimony in a deposition or at trial in this case....")**

Svensson relies upon the facts and arguments set forth for this category at pp. 97-98 of her October 25, 2006, Reply Memorandum.  See also § 8, at pp. 14-15, supra.  In addition, the documents sought by this category are not listed in Putnam's February 2006 Amended Privilege Log.

**26.    Nos. 62-63 (documents "concerning identifying or stating the total bonus pool available to Putnam' for each year since January 1, 1999, and documents "concerning identifying or stating the total bonus pool available to the [Investment management Division] each year since January 1, 1999)**

Svensson relies upon the facts and arguments set forth for these categories at pp. 98-102 of her October 25, 2006, Reply Memorandum, including that the documents sought are relevant

because it is necessary to know both the total money available in "A&P" bonus pool for the

investment professionals as well as the additional money available in the bonus pool for partners

to determine if there has been any discrimination in the decision to divide up the funds available.

27.    **No. 64 (documents "concerning the amounts of the bonuses allocated for each year since January 1, 1999, to such of the identified males and the identified females persons receiving a bonus") withdrawn insofar as concerns non e-mail documents.**

28.    **Nos. 65-69: Putnam's defenses to the request (No. 65) for the "anonymous" letter, referred to at p. 357 of the McNamee deposition, concerning the conduct of Svensson comparator Paul Warren; for documents concerning the language used and/or the behavior of Warren of the type referred to at pp. 18-21 and 357 of the McNamee deposition (No. 66).and for documents concerning the investigation of Warren and his conduct (Nos. 67-69) are without merit;.**

Paul Warren is one of Svensson's 91 comparators in this case for all four of Svensson's

claims.  Svensson in these categories is requesting production of: (1) The letter that complains

about Warren's  conduct while employed as a Putnam investment professional, as testified to by

Putnam's McNamee in her deposition at p. 357 ("...That he frequented strip clubs...[a]nd that he

over -- he utilized entertainment from brokers excessively and accepted gifts from brokers

excessively"); (2) Documents concerning the language used and/or the behavior of Warren"

referred to by McNamee at pp. 18-2 ("They were talking about a --someone leaving the group

and that would leave a hole in the work...and he stood up and grabbed his crotch and said, "You

could fill it with this") (No. 66), and, (30 Documents concerning the investigation of Warren and

his conduct (Nos. 67-69).

Putnam's defenses that Warren at some point after Svensson was fired, was terminated for

"different reasons" than those Putnam claims it applied to Svensson, and because neither of them

supervised the other, are without merit.  See the facts and arguments set forth in detail for these

categories at pp. 103-111 of Svensson's October 25, 2006, Reply Memorandum, including that

the Putnam characterization of Conward v. The Cambridge, School Committee, 171 F.3d 12,

19 (1st Cir.1999).is incorrect -- the standard is not "nearly identical;" it is as serious or more serious (see discussion of Conward at p. 3 of the Svensson October 25, 2006, Reply Memorandum); that whether or not Warren was "terminated" is an issue of fact as Putnam in its answers to interrogatories described Warren's leaving of Putnam as "voluntary" (see Putnam document PRM 4134, furnished as part of its September 1, 2006, answers to the Svensson's Interrogatories); that even if it turns out that Warren's January 2004 departure from Putnam was involuntary, that does not mean that he was not a comparator of Svensson for compensation, promotion, demotion and termination purposes; and that the conduct of Warren is relevant also to show the workplace atmosphere tolerated and encouraged by Putnam.

Svensson also relies on the facts and arguments set out in detail for this category in her October 25, 2006, Reply Memorandum at pp. 103-111.

**29.    No. 70 (documents "concerning the compensation figures, studies and statistics referred to in the Allansmith deposition at pp. 88-90).**

Svensson relies upon the excerpt from the deposition and the facts and arguments set forth for this category at pp. 111-14 of her October 25, 2006, Reply Memorandum.

**30.    Nos. 71-73 (documents "concerning the Women's Leadership Forum (No. 71); studies, analyses and reports and the results thereof by the Forum (No. 72); and related documents (No. 73).**

Svensson relies upon the facts and arguments set forth for these categories at pp. 114-18 of her October 25, 2006, Reply Memorandum, including that documents concerning the Women's Leadership Forum, and the analyses, reports and other documents requested by these categories are relevant to show the concerns and complaints of women at Putnam and what, if anything, Putnam did in response to those complaints and concerns. That, if true, the Forum was formed after Svensson's termination is beside the point. Evidence as to actions and omissions even taking place after the Svensson termination are relevant, as courts routinely look at

employment actions against comparators over a significant time period, both before and after the actions against the plaintiff.  See § 9, at pp. 7-9, supra.

**31.    No. 74: Putnam's defense to the request for the production of the personnel files of Allansmith, DeChristopher, O'Malley, Peers and Warren, is without merit and misleads the court.**

Putnam defends against the request for production of the personnel files of four of Svensson's comparators because "Svensson neither supervised nor was supervised by" Allansmith, DeChristopher or Warren, and, in a startlingly incorrect fashion, asserts that "Svensson does not contend that these employees had anything to do with any of her claims"; that Svensson "does not explain why the content of the personnel files of...Peers and O'Malley is relevant to any of her claims," and [w]hy Peers' and O'Malley's files are relevant to this or any other issue is not explained.   This is utter nonsense.

Svensson explained in detail in her October 25, 2006, Reply Memorandum, the relevance of each of the personnel files of these four comparators, including that the files requested are relevant in order to show in comparison to the treatment of Svensson: (1) the treatment of Svensson's male comparator DeChristopher who, according to Putnam document PRM 4026, had "poor three years performance record" and a "volatile personality" yet was promoted in 2003 while Svensson was terminated; (2) the treatment of female comparator Lauren Allansmith who had been demoted while on maternity leave and later forced out of Putnam; (3) the treatment of male comparator O'Malley whose complaints about Svensson instigated her termination and shortly thereafter received a promotion and took over some of Svensson's responsibilities; and, (4) the treatment over many years of male comparator Paul Warren's conduct and behavior that McNamee testified about .  See discussion of Nos. 65-69 in § 28, at pp. 17-18, supra.  The Peers personnel file is relevant as he is the Svensson subordinate" who, according to Putnam, was a

"highly-valued analyst" who "quit" Putnam because of Svensson.

Svensson also relies on the facts and arguments set out in detail for this category in her October 25, 2006, Reply Memorandum, at pp. 118-120.

**32.    Nos. 75 and 76 documents "concerning communication within Putnam in regard to the issue of "deprivation of [Svensson's] management responsibilities..."(No. 75) and " concerning communication within Putnam in regard to [that] issue..." (No. 76)**

Putnam has claimed work product or privilege protection for the documents requested in Nos. 75 and 76 that it has not produced. Because, as set forth in detail in Svensson's October 25, 2006, Reply Memorandum, at pp. 120-23, Putnam has failed to provide adequate information in its privilege log for Svensson or the court to evaluate Putnam's claims of privilege and work product protection, Svensson has requested the court to require Putnam to furnish appropriate information and to review the requested documents in camera. Putnam's claim that Svensson has "provided no basis to believe that the documents at issue are not privileged," turns the rule as to the burden on these issues upside down. In camera review by the court should be required.

**33.    The "Sworn statement" issue.**

At the October 26, 2006, hearing, the Magistrate Judge when told by Putnam counsel that certain documents "do not exist," directed Putnam to serve, where applicable, a sworn statement of an authorized office of the company to that effect. See, for example, transcript, p. 44. However, more than two months later, at noon on January 3, 2007, the day before the hearing of the Putnam motion for a protective order terminating discovery, Putnam served a statement but it was not the statement of non-existence ordered by the court on October 26. A copy of the Putnam document, with emphasis added, is Exhibit 9 to Svensson's February 21, 2007, memorandum. The phrases "produced all documents that it was able to locate" and "has not discovered any documents or things" and the numerous conditions set out on p. 4 thereof above

the signature[13] make it clear that Putnam has not complied with the direction of the court.

**34.    The "360" reports issue.**

On October 26, 2006, the court ordered Putnam to produce the annual review report forms known in the Putnam world as "360s," but Putnam produced 360s for only some of the years in question and for one of the produced years, failed to include in the production the "comments" section; and it took the position via an e-mail from Putnam counsel, that 360s for the other years did not exist, only to admit, when presented with evidence from Putnam's own documents, that they did exist for which Putnam was looking.  Insofar as Svensson is able to determine, Putnam is still looking.

**35.    The "Performance and Development Planning and Review" ("PDPR") forms issue.**

The Putnam "Performance and Development Planning and Review Form," Exhibit 22 to the McNamee deposition, a copy of which is Exhibit B hereto, is a discrete document used, according to the Putnam 30(b)(6) deposition, to "provide an opportunity for managers and employees to discuss performance evaluations" and "shared with senior management." Notably, the PDPR contains numerical and other ratings of the performance of investment professions at Putnam. [14]

However, at the October 26, 2006, hearing, Putnam counsel in opposing production of PDPRs for Svensson's comparators did not indicate to the court the true nature of the PDPRs; instead making it appear to the court that the PDPRs were in nature the same as the on-going HR update reports, production of which he also opposed.  Svensson's counsel said to the court:

---

[13] "...The Sworn Statement set forth <u>are based on, and therefore necessarily limited by, either my own personal knowledge or the records and information still in existence, presently recollected, thus far discovered</u> in the course of the preparation of these answers, <u>and currently available</u> to Putnam.  <u>Subject to the limitations set forth herein,</u> the foregoing Statements are accurate to the best of my present knowledge...."

[14] Whether Putnam's Tibbetts himself uses the acronym PDPR to refer to the Performance and Development Planning and Review Form or not is of no moment.

The next on would be No. 8....  This is year end reviews, <u>documents called PVPR's [sic], which is a term of art</u>, performance reviews, investment division and ISD Human Resources updates.  <u>These are forms and things that they do at Putnam that evaluate the performance of people</u>.....  <u>And the reason we're asking for it is that we need to see how</u>...<u>Putnam evaluated</u>...<u>Ms. Svensson in relation to the Comparators</u>...,

and then Putnam's counsel, the court and Svensson's counsel said the following:

MR. KOCIUBES:  <u>This is really not a discreet group...</u>there was with respect to the Human Resources update what the various of the Human Resources, and it wasn't consistent throughout the time but what the various Human Resource officers did and remember at one point there are 7,000 employees-...<u>every week they would write effectively on a computer a memo with everything, it's a diary, everything they worked on</u>. The universe is 7,000 employees..... And what happens a lot of times is <u>week after week they're the same because there has been, nothing new has happened</u>....(emphasis added)

THE COURT: Denied.

MR. MOLONEY: Your Honor, may I be heard on that just very briefly?

THE COURT: No, I think I've heard enough on that one.   Moving on."

(Emphasis added.)

Thus, the denial by the Magistrate Judge at the October 26 hearing was based upon a misrepresentation of fact as to the nature of the documents, and the court below did not allow Svensson's counsel to correct the record for the court.  Svensson sought an order to produce the document in her cross motion filed December 27, 2006, because the facts had been misrepresented to the court.  Misrepresentation of fact to the court warrants reconsideration and the court has the power to reconsider and change an interlocutory decision if an error or mistake has been made or the interests of justice require.  In these circumstances, this court should order production of the "Performance and Development Planning and Review" forms.

**36. Conclusion.**

For all of the above reasons and those set forth in Svensson's prior memoranda

concerning her Objections to the rulings of the Magistrate Judge, the relief requested by

Svensson should be granted.

<div style="margin-left: 3em;">

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.

/s/ Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, Admitted PHV
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

</div>

<div style="text-align: center;">Certificate of Service.</div>
        This document, filed through the ECF system, will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing.

February 28, 2007                              /s/ Kevin F. Moloney

[388514.1]

Exhibit A-1



RECEIVED

AUG 2 8 2006

K.F.M.

# Svensson
## vs.
# Putnam Investments, et al.

# Konstantin S. Stoev

Volume 1

August 24, 2006
pp. 1-152

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Konstantin S. Stoev

1                    VOL. 1, PAGES 1 - 152

2            UNITED STATES DISTRICT COURT

3         FOR THE DISTRICT OF MASSACHUSETTS

4    Civil Action No. 04-12711-PBS

5    ------------------------------------------

6    LISA SVENSSON,                        )

7                 Plaintiff               )

8    v.                                    )

9    PUTNAM INVESTMENTS LLC, f/k/a PUTNAM  )

10   INVESTMENTS, INC., and LAWRENCE J.    )

11   LASSER,                               )

12               Defendants               )

13   ------------------------------------------

14

15        DEPOSITION OF KONSTANTIN S. STOEV

16           Thursday, August 24, 2006

17            1:48 p.m. to 6:01 p.m.

18            Barron & Stadfeld, P.C.

19             100 Cambridge Street

20          Boston, Massachusetts 02114

21

22                 * * * * * * * *

23

24      Reporter: Lauren M. Mitchell, CSR, RPR, CRR

Konstantin S. Stoev

Page 2

```
1   APPEARANCES:
2       John K. Weir Law Offices, LLC
3       John K. Weir, Esq.
4       300 Park Avenue, Suite 1700
5       New York, New York 10022
6       (212) 572-6374
7       johnkweir47@aol.com
8       -and-
9       Barron & Stadfeld, P.C.
10      Kevin F. Moloney, Esq.
11      100 Cambridge Street, Suite 1310
12      Boston, Massachusetts 02114
13      kfm@barronstad.com
14      Counsel for the Plaintiff
15
16      Bingham McCutchen, LLP
17      Joseph L. Kociubes, Esq.
18      150 Federal Street
19      Boston, Massachusetts 02110-1726
20      (617) 951-8000
21      joe.kociubes@bingham.com
22      Counsel for Putnam Investments, LLC
23
24
```

Page 3

```
1   APPEARANCES (continued):
2       Nixon Peabody, LLP
3       Carrie Campion, Esq.
4       100 Summer Street
5       Boston, Massachusetts 02110-2131
6       (617) 345-1000
7       Counsel for Lawrence Lasser
8   ALSO PRESENT:  Lisa Svensson
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1              I N D E X
2
3   WITNESS                      PAGE
4   KONSTANTIN S. STOEV
5   BY MR. WEIR:
6   BY MR. KOCIUBES:
7
8            E X H I B I T S
9
10  Exhibit 1, deposition subpoena        6
11  Exhibit 2, signature page             6
12  Exhibit 3, E-mail dated 10/27/2003, to    70
13  Stoev from Lasser
14  Exhibit 4, E-mail, dated 9/19/2003, to    82
15  Stoev from Brooks
16  Exhibit 5, separation agreement      140
17  Exhibit 6, E-mail string, dated 9/17/2004  149
18
19
20
21  ***EXHIBITS MARKED DURING THIS DEPOSITION
22     ARE ATTACHED TO THE DEPOSITION TRANSCRIPT.
23
24
```

Page 5

```
1              PROCEEDINGS
2          KONSTANTIN S. STOEV,
3   a witness called for examination by counsel for the
4   Plaintiff, LISA SVENSSON, and having been
5   satisfactorily identified by the production of his
6   Massachusetts driver's license, was duly sworn by
7   the Notary Public and testified as follows:
8          MR. KOCIUBES:  Actually, before we get
9   started, since I gather this is intended to be a
10  trial deposition, I just want to make clear -- I'll
11  do it either way -- are we reserving objections as
12  to form, or do you want me to make them as we go
13  along?
14          MR. WEIR:  I think, since this is a
15  trial deposition, maybe you better make them as you
16  go along.
17          MR. KOCIUBES:  Okay.
18  EXAMINATION BY MR. WEIR:
19      Q.  Good afternoon, Mr. Stoev.
20      A.  Good afternoon.
21      Q.  My name is Jack Weir, and I'm the attorney
22  for Lisa Svensson in a legal action which she has
23  brought here in Boston against Putnam Investments.
24          I'm going to be asking you a series of
```

2 (Pages 2 to 5)

Konstantin S. Stoev

Page 6

1   questions today.
2           And you understand that you are under
3   oath and are required to testify truthfully?
4       A. I understand that.
5           MR. WEIR:  Off the record.
6           (Discussion off the record.)
7           MR. WEIR:  I'd like to mark as Exhibit 1
8   for identification a copy of the subpoena served
9   responsible Mr. Stoev.
10          (Marked, Exhibit 1, deposition
11  subpoena.)
12      Q. Let me show you what has been marked as
13  Exhibit 1 for identification, and ask you if you've
14  been served with that subpoena to testify at this
15  deposition?
16      A. Yes, I was served with it.
17          I received it by E-mail at the end of
18  last week, and I signed it and returned it by
19  E-mail, as instructed.
20          MR. WEIR:  Let me mark as Exhibit 2 his
21  document indicating the signature page for
22  acceptance of service of the subpoena.
23          (Marked, Exhibit 2, signature page.)
24      Q. Let me show you what's been marked as

Page 7

1   Exhibit 2 for identification, Mr. Stoev, and ask you
2   if that is your signature under the acceptance of
3   service?
4       A. Yes, it is.
5       Q. And you accepted service on or about August
6   18 of 2006?
7       A. I received the subpoena, and I sent the
8   reply back at the beginning of this week.
9           So, I actually don't recall the exact
10  date on which I sent the subpoena.
11      Q. Okay. Can you state your full name for the
12  record?
13      A. Yes. My three names are Konstantin Stoykov
14  Stoev.
15          Middle name is spelled S-t-o-y-k-o-v.
16      Q. And your present residence address?
17      A. Scheuzer Strasse. That is spelled,
18  S-c-h-e-u-z-e-r, S-t-r-a-s-s-e, Scheuzer Strasse,
19  No. 18, Zurich, 8006, Switzerland.
20      Q. And of what country are you a citizen, sir?
21      A. Bulgaria.
22      Q. And are you married?
23      A. I am married.
24      Q. And when were you married?

Page 8

1       A. My wife's name?
2       Q. When were you married?
3       A. I was married on the 2nd of May, 2004.
4           MR. KOCIUBES:  I'm sorry.  I couldn't
5   hear the end of it.
6           THE WITNESS:  The 2nd of May, 2004.
7       Q. And do you have any children?
8       A. I have a daughter.
9       Q. And when was she born?
10      A. On the 19th of March, 2005.
11      Q. And what is your date of birth, sir?
12      A. 16 of February, 1972.
13      Q. Are you currently employed?
14      A. I am.
15      Q. By whom?
16      A. Swiss Reinsurance Company.  And the short
17  name is Swiss Re.
18      Q. And for what period of time, have you been
19  employed by Swiss Re?
20      A. Since the beginning of this year.  Since
21  January 1, 2006.
22      Q. And where are you employed by Swiss Re?
23      A. In Zurich, in Switzerland.
24      Q. And prior to becoming employed by Swiss Re,

Page 9

1   were you employed?
2       A. I was employed by a company called Credit
3   Agricole Cheuvreux, C-h-e-u-v-r-e-u-x.
4           So, Credit Agricole Cheuvreux.
5       Q. And when did you commence to become by
6   Credit Agricole Cheuvreux?
7       A. Cheuvreux, I do not recall the precise date,
8   but the contract, it was at or the beginning of
9   February of 2005.
10      Q. Okay. And in what capacity were you
11  employed by Credit Agricole Cheuvreux?
12      A. I was employed as a senior analyst covering
13  chemical companies.
14      Q. And how about with Swiss Re, in what
15  capacity are you employed by them?
16      A. I am employed at Swiss Re as an equity
17  research analyst.
18      Q. Okay. And prior to being employed by Credit
19  Agricole Cheuvreux, were you employed?
20      A. I was employed by Putnam Investments.
21      Q. And when did you commence your employment?
22      A. On the 20th of August, 2000, or 21st.  I
23  don't recall exactly.
24      Q. And when did you cease your employment?

3 (Pages 6 to 9)

Konstantin S. Stoev

Page 10

1    A. On the 31st of December, 2004.
2    Q. During that period of time you were employed
3  by Putnam, what capacity were you employed in,
4  capacity or capacities?
5    A. My functional responsibilities were
6  basically the same, equity research analyst.
7         My officer title with which I was
8  employed was assistant vice-president, and from
9  2003, vice-president.
10        My specific responsibilities at Putnam
11 included a number of assignments, including
12 portfolio management responsibilities.
13   Q. When did you have portfolio management
14 responsibilities?
15   A. Direct portfolio management
16 responsibilities, from, I think, October or November
17 2003 until the end of my employment.
18        And then, in effect, contributory member
19 to a portfolio team from, I guess from 2002 onwards.
20   Q. What portfolio management team were you on
21 from October 2003 until the end of your employment?
22   A. That was -- I was working together with two
23 other analysts to manage a sleeve, what is called a
24 sleeve. That is a portion of a big portfolio.

Page 11

1         The portfolio to which that sleeve
2  belonged is called Putnam International Equity Fund.
3  And the sleeve involved managing equities in a group
4  called Basic Materials.
5         And then my longer term, the one that I
6  described as a contributory member to a portfolio
7  team, that was with respect to the Global Natural
8  Resources Fund, also managed by Putnam.
9    Q. Who were the two other analysts who helped
10 you in managing the sleeve after October of 2003?
11   A. Ellis Eckland, E-l-l-i-s, Eckland,
12 E-c-k-l-a-n-d, and Christopher O'Malley.
13        And toward the end, it was -- sorry.
14 For some reason his last name escapes me. I'm
15 sorry. I've blanked out his last name. His first
16 name is John.
17        Maybe -- his father, I think, used to
18 work for Putnam.
19   Q. Would it be John Morgan?
20   A. Exactly. John Morgan.
21   Q. And then functionally, on this sleeve of the
22 Putnam International Equity Fund, to whom did you
23 report?
24   A. To the portfolio team of the Putnam

Page 12

1  International Equity Fund.
2    Q. Was there a particular person to whom you
3  reported?
4    A. The report was basically directly to the
5  team.
6         Putnam, at that time, was managing funds
7  in team fashion.
8         So, my understanding, and the
9  understanding of all the other team members, I
10 believe, was that we were reporting to the team, and
11 that the team existed of several senior portfolio
12 managers.
13   Q. Do you remember who the senior portfolio
14 managers were?
15   A. Yes. Josh Burns, Sam Davis. And I'm
16 absolutely sure about this.
17        The sole, the people who managed the
18 portfolio, the Putnam International Equity Fund,
19 although there were additional portfolio managers
20 who were responsible for managing parts of that
21 portfolio, as well in a similar fashion, either as
22 sleeves or as, I guess, junior portfolio managers,
23 for lack of a better description.
24   Q. Well, do you recall, were there any other

Page 13

1  senior portfolio managers who were responsible for
2  the management of your particular sleeve?
3         MR. KOCIUBES: Objection.
4         At what point in time?
5         MR. WEIR: At the point in time after he
6  joined the Putnam International Equity Fund in
7  October of 2003.
8    A. I'm sorry. Could you repeat the question?
9    Q. Yes. You testified earlier that you recall
10 senior portfolio managers Josh Burns and Sam Davis?
11   A. Yes.
12   Q. And now, my question is, do you recall any
13 other senior portfolio managers who were responsible
14 for or involved in the operation of your particular
15 sleeve of the Putnam International Equity Fund?
16        MR. KOCIUBES: Objection as to relevance
17 if you're asking after October of 2003.
18   Q. You can answer.
19   A. Okay. I will have to describe the way the
20 structure of the sleeves worked.
21        Putnam International Equity was a
22 sizeable fund. And the portfolio team that was
23 managing that fund decided in 2003, late -- I don't
24 know exactly when it was -- that they were going to

4 (Pages 10 to 13)

Konstantin S. Stoev

1  create sleeves for a part of the overall portfolio
2  that will be managed directly by the analysts, the
3  equity research analysts, who were part technically
4  of a separate group of employees at Putnam who
5  reported directly to another director.
6         The objective of that structure was to
7  create an additional opportunity for the analysts to
8  express their investment ideas directly to the fund,
9  to generate excess returns over the benchmarks that
10 the portfolio was targeting, subject to the risk
11 limits that the portfolio team had set. And in
12 addition, to communicate more directly to the
13 portfolio team what these best ideas were.
14        There were a number of these sleeves
15 that, again, comprised a portion of the portfolio.
16 And the sleeves were structured on a sector basis.
17        Sector is usually classified by index
18 organizations, such as the MSCI or Standard & Poors.
19 And Putnam employed sector classification which I
20 think is in the MSCI class, which is called the
21 Global Sector Classification, something, GSCI.
22        And that was, that involved a number of
23 sectors of which Basic Material was one, Basic
24 Materials was one.

1         Therefore, the three people who were
2  directly involved in the management of the sleeve
3  and those with the sole managers of the sleeves were
4  the three of us as I described it, Ellis Eckland,
5  Chris O'Malley and me.
6         Our input -- sorry. And toward the end,
7  John Morgan. John Morgan joined later, and he was
8  governing several companies that produced gold. And
9  his contribution was, therefore, somewhat limited.
10        The day-to-day operations of that sleeve
11 or the day-to-day investments, investment management
12 activities that were involved in that sleeve were
13 the responsibility of the three of us, and then
14 subsequently the four of us, including John.
15        Our actions had to be reported to the
16 senior management team of Putnam International
17 Equity, since, in effect, they were our sponsors.
18        And for example, before each trade that
19 we wanted to place in a fund, which involves either
20 a purchase or a sale of equities, we had to present
21 to the team, to the team that managed Putnam
22 International Equity and to describe the rationale
23 for our investment.
24        At that point, probably what you refer

1  as reporting, the reporting relationship occurred.
2  And at that point, we would interface in what you
3  might describe as a general meeting of the portfolio
4  managers.
5         Even though -- and I do not recall
6  exactly who are the people listed as portfolio
7  managers of Putnam International Equity Fund. That
8  can easily be found from public records, since these
9  things are published by Putnam, as the manager of
10 that fund, but, specifically, at the point when we
11 would present our investment ideas before the
12 meeting of portfolio managers of Putnam
13 International Equity Fund, there could be a number
14 of people present, including Sam Davis and Josh
15 Burns and, among others, Steve Omid and Joe Stayers,
16 Pam Holding and Pierre Graham. Those were the
17 people who were direct, from our perspective, the
18 people who would talk to you on a regular basis when
19 we presented our ideas.
20    Q. Okay. I take it that that structure
21 represented a change from that which had existed
22 prior to October of 2003?
23    A. Yes.
24        Prior to October 2003, the three of us

1  -- I don't recall if John Morgan was on that team as
2  well at that point -- together with Lisa and another
3  analyst whose name was Darren -- I think it was
4  Darren Peers -- I'm sorry. I'm not sure about his
5  last name. Maybe you will be able to help me with
6  that -- were managing, again, the sector sleeve of
7  that fund, which was, which was effectively Energy
8  plus Basic Materials.
9         And as I described it before that, I was
10 a member of a team that effectively managed a
11 portfolio called Global Natural Resources. I
12 continued to be a member of that team until I left
13 Putnam as well.
14        That is a separate track which we have
15 not talked about, but I will be happy to describe,
16 if you ask me.
17    Q. Yes. Please do. Please describe that
18 separate track.
19    A. Global Natural Resources is a separate fund
20 that was managed by Putnam. And it was managed by a
21 portfolio manager who was elected to that position.
22        The Global Natural Resources Fund -- and
23 again, you would find it stated more precisely in
24 public records or the prospectus of the fund --

Konstantin S. Stoev

| Page 18 | Page 20 |
|---|---|
| 1 invested in equities of primarily large | 1     Q. Fine. |
| 2 capitalization stocks that are in the Energy and | 2     A. As I say, I joined Putnam at the end of |
| 3 Basic Materials sectors. | 3 August 2000. I believe the specific date was the |
| 4     And it's -- at least since I joined | 4 20th, according to my contract. |
| 5 Putnam, it had been managed, as I said, by an | 5     I joined Putnam as an equity research |
| 6 appointed manager until, maybe until, yes, until | 6 analyst. And when I started, I understood that |
| 7 October 2003, at which point the fund was managed by | 7 Putnam would like me to cover equities of the |
| 8 a team. | 8 chemical companies. |
| 9     Before that, I think it was, at least in | 9     For example, these would be the public |
| 10 the public, in the prospectus, it was listed as | 10 equities of companies like Dupont, Dow Chemical, |
| 11 managed by a single manager. | 11 BASF. |
| 12     Q. Do you recall who the single manager was in | 12     I began covering the stocks effectively |
| 13 the time frame before October 2003? | 13 in, I think it was in early October 2000, with my |
| 14     A. Yes. | 14 first initiation report, and continued covering |
| 15     Until the end of 2002 or January of 2003 | 15 chemical stocks until I left Putnam in, on the 31st |
| 16 -- no. | 16 of December 2004. |
| 17     Actually, I would prefer that you check | 17     That was my responsibility that I had |
| 18 the public records on that one. | 18 with them at that time. |
| 19     Q. All right. | 19     Putnam, as a management company, at that |
| 20     A. Because I know the relationship as an | 20 time, was undergoing structural changes within the |
| 21 employee of Putnam, you know, from the inside, in | 21 teams. They had formed a group of people who were |
| 22 terms of how I did my job, but I do not recall how | 22 called the Global Equity Research Team, to which I |
| 23 the management responsibilities were described in | 23 belonged. And that Global Equity Research Team was |
| 24 the actual prospectus of the fund. And again, this | 24 doing the equity research with respect to specific |

| Page 19 | Page 21 |
|---|---|
| 1 is factual information that can easily be found, | 1 stocks. |
| 2 yes. | 2     And it helped in the management by |
| 3     Q. Prior to September of 2003, to whom did you | 3 giving advice to the portfolio managers, and only |
| 4 report in the context of the Global Natural | 4 internally to the portfolio managers, never |
| 5 Resources Fund? | 5 extending to clients or third parties. |
| 6     A. To Lisa Svensson for the period of, strictly | 6     By giving advice to the portfolio |
| 7 to Lisa Svensson from the period from, I believe, | 7 managers, these analysts were helping in the |
| 8 January 2003 until September or October -- | 8 management of the funds that Putnam managed. |
| 9 September, I think, 2003. | 9     At the time, the management of Putnam |
| 10     And before that, to Jim Falvey, who was | 10 had decided that it was necessary to achieve greater |
| 11 the manager of the fund from, if I believe well, the | 11 integration of the Global Equity Research Team with |
| 12 end of 2000 until the end of 2002, at least managing | 12 the portfolio teams, who were responsible for the |
| 13 in the sense that I described my, in the sense that | 13 management of the portfolios. |
| 14 I described to you as what I perceived to be the | 14     And one of the ways that the management |
| 15 person to go to when I had specific ideas to present | 15 decided that this would be achieved, that greater |
| 16 in terms of the investment of that fund. | 16 integration, was by creating what were known then as |
| 17     Q. Okay. And with respect to duties other than | 17 knowledge management teams. |
| 18 the Global Natural Resources Fund, did you have such | 18     And those knowledge management teams |
| 19 duties during the time frame prior to September of | 19 were essentially groups of people from global equity |
| 20 2003? | 20 research and the various portfolio management teams |
| 21     A. Yes. | 21 of the different styles of management that Putnam, |
| 22     I think it will be easier for me if I | 22 that Putnam employs, who had, who were looking at a |
| 23 just describe to you how I joined Putnam in 2000 and | 23 particular sector and trying to create ideas that |
| 24 what my responsibilities were and how they evolved. | 24 will be beneficial to the whole organization. |

6 (Pages 18 to 21)

Konstantin S. Stoev

**Page 22**

1    I, as a chemical analyst, was a member
2  of a knowledge management team, which was called, I
3  believe the name was Energy and Basic Materials
4  knowledge management team.  And that team consisted
5  of the global research analysts who covered energy
6  stocks and basic materials stocks, as well as
7  portfolio managers from various teams, reporting
8  management teams who had some expertise in either
9  energy or basic materials, or interest in our
10  specific mandate within their own specific portfolio
11  management team of covering that sector.
12    And I do not recall the exact proportion
13  in which the team consisted of portfolio managers
14  and analysts, but it tended to vary as certain
15  portfolio managers came in the team and then moved
16  on to other assignments.
17    That knowledge management team, as a
18  structure, continued -- it was already in place when
19  I joined Putnam.  And I think as an operational
20  unit, it continued until, I believe until about
21  September 2003, the Energy and Basic Materials
22  knowledge management team.
23    Q.  And who headed that team during the time
24  after you joined Putnam?

**Page 23**

1    A.  I will be glad to answer that question if
2  you just allow me to continue my expose about my
3  responsibilities at Putnam so that in the future,
4  any future questions, you will be able to direct
5  your questions more specifically.
6    MR. KOCIUBES:  Objection.
7    Go ahead.
8    THE WITNESS:  I'm sorry?
9    MR. KOCIUBES:  You can go ahead.
10    MR. WEIR:  Are you objecting to his
11  answer?
12    MR. KOCIUBES:  Yes.  To the question,
13  but go ahead.
14    THE WITNESS:  I will be happy to answer
15  the question, if that is --
16    Q.  Why don't you answer my question.
17    A.  All right.  The -- when I joined Putnam --
18    MR. MOLONEY:  Off the record.
19    (Discussion off the record.)
20    A.  When I joined Putnam, the person who was
21  heading the knowledge management team for Energy and
22  Basic Materials is Vincent Vliebergh.  That name is
23  Vincent, and the last name is V-l-i-e-b-e-r-g-h.
24    And at that time, Vincent Vliebergh was

**Page 24**

1  just transitioning out of covering chemical stocks
2  into what was expected to be a more management
3  responsibility within the Global Equity Research
4  Team.
5    As I said, prior to that, Vincent
6  Vliebergh had been just the chemical analyst.  And I
7  think for a brief period of time, he was also
8  looking at the energy stocks, because at that time,
9  Putnam did not have an analyst covering energy
10  stocks within global equity research.
11    Toward the end of 2000, if I remember
12  well, Jim Falvey joined Putnam.
13    Falvey is spelled F-a-l-v-e-y, if I
14  remember well.  And his full name, I think, is
15  James.
16    Jim Falvey joined Putnam as the analyst
17  who covered energy stocks.  Those would be companies
18  like Exxon, Chevron and Royal Dutch Shell.
19    And at that time, Jim assumed
20  responsibility for managing the knowledge management
21  team from Vincent, because Jim joined as a senior
22  analyst.
23    Jim remained the manager of the Energy
24  and Basic Materials team, knowledge management

**Page 25**

1  until -- I do not remember exactly the month in the
2  beginning of 2002.  I'm sorry.
3    Q.  It was some time in early 2002?
4    A.  2002, if I remember well, yes.
5    Q.  Okay.  Who succeeded to that position?
6    A.  At which point Lisa Svensson came in as the
7  leader, I think, nominally of the -- and Lisa can be
8  more specific about that, but Lisa, at that point,
9  began to lead the team of the Basic Materials
10  analysts.
11    Lisa was also responsible for covering
12  several energy names.  And effectively, she split
13  responsibilities for the team with Jim Falvey, with
14  Jim retaining responsibility or -- I actually do not
15  know exactly the way the management structure worked
16  from that point of view.
17    From my perspective, at that point, in
18  2002, the person I needed to talk to in the Energy
19  and Basic Materials teams, as my direct report and
20  also as the person overseeing the Energy -- sorry --
21  the Basic Materials coverage was Lisa Svensson.
22    Jim remained on the team and continued
23  to cover energy stocks, together with two analysts.
24    So, that was at that time Lisa and

7 (Pages 22 to 25)

Konstantin S. Stoev

Page 26

1  Darren Peers.
2       And I'm racking my brain, because this
3  other point I think escapes me about whether Lisa
4  was the manager of the whole team or whether she was
5  just managing the, if I remember well, three Basic
6  Materials analysts.
7       Q.  Who were, at that point in time --
8            MR. KOCIUBES:  Motion to strike.
9       Q.  At that point in time, who were the other
10 analysts on the team?
11      A.  Ellis Eckland, Chris O'Malley and me were
12 the analysts who covered basic materials stocks.
13      Q.  Okay.
14      A.  I answered your question.
15           And if you allow me so I can continue to
16 describe, and I will be brief.
17           So, I said --
18           MR. KOCIUBES:  Objection.  Go ahead.
19      A.  Then I will stop here and wait for your
20 question.
21      Q.  Go ahead with what you were saying.
22      A.  I do not understand what this means.
23      Q.  He is simply objecting for the record.
24           And you're free to give your answer.

Page 27

1       If you feel your answer to any question
2  was incomplete and you want to further elaborate,
3  you are free to do so over his, despite his
4  objection.
5       A.  Okay.
6           I can describe how I began my career at
7  Putnam covering chemical stocks and how the
8  structure at the time at Putnam involved me on the
9  Energy and Materials team.
10      Q.  I'd like you to address specifically the
11 period of time after you came to have a direct
12 report to Lisa Svensson.
13      A.  All right.
14           As I said, that, I think, began in early
15 2002, at which point, Lisa began, became my manager.
16           Again, just to put it in context, before
17 that, as a member of the Global Equity Research
18 Team, I was reporting to a manager of global equity
19 research, whose name was Steve Gorman.  And I was
20 involved, as I described, in the equity, in the
21 Energy and Basic Materials team, which was led by
22 another person.
23           And my functional responsibilities were
24 for covering chemical stocks.

Page 28

1       From 2002, from early 2002, Lisa
2  Svensson became my manager, as well as the person on
3  the Energy and Basic Materials team to whom I
4  reported.
5       So, both within the office structure, if
6  that's actually an expression, but in the hierarchy
7  of Putnam, I was reporting at that point to Lisa
8  Svensson and on a day-to-day basis as the person who
9  was driving the Energy -- the Basic Materials part
10 of the Energy and Basic Materials team, I would go
11 to Lisa Svensson.
12      Q.  Did you have occasion to be evaluated in
13 terms of your job performance by Lisa Svensson
14 during that period of time?
15      A.  Yes.
16           I was evaluated by Lisa according to the
17 schedule that Putnam mandated for evaluation of
18 performance.
19      Q.  And conversely, did you have occasion to
20 evaluate her performance as your manager?
21      A.  Yes.
22           At that time, Putnam had what's known as
23 360 performance, a peer review, in which any member
24 of the investment team could give feedback to, with

Page 29

1  respect to any other, to the performance of any
2  other team member in the investment division,
3  investment team.
4       Q.  Okay.  Let me show you a document that you
5  just pointed to that has previously been marked as
6  Svensson Exhibit 11, and ask you if that's the 360
7  review that you just referred to in your testimony?
8       A.  Yes.
9           That is the form of it, of the review,
10 as both I would see it and I think everybody else at
11 Putnam would see.
12      Q.  I'd ask you if you'd direct your attention
13 to the last two pages of that Svensson Exhibit 11.
14      A.  Yes.
15      Q.  Two pages that are entitled Comments.
16      A.  Yes.
17      Q.  I wonder if you could take a look at those
18 comments, and tell us if you recognize any of them
19 as your own?
20           (Pause.)
21      A.  I think this is mine, but let me read
22 through and be sure.
23           (Pause.)
24      A.  Yes, I recognize my comments.

8 (Pages 26 to 29)

Konstantin S. Stoev

Page 30

1  Q. Can you identify your comments by page
2  number and paragraph number?
3  A. Yes.
4      My comments are on Page 29 and Paragraph
5  2.
6  Q. Okay. And Page 29 is Bates No. LS-1751,
7  down in the lower right-hand corner?
8  A. Yes. The number is LS-1751.
9  Q. Okay. Could you read your comments into the
10  record, sir?
11  A. Yes.
12      Lisa's appointment to manage our KM --
13  KM is knowledge management -- was the best thing
14  that happened to the team this year. Drawing on her
15  talent and initiative, she reversed the degenerative
16  processes that had set in, inspired the members to
17  show excellent work and attracted new members. Lisa
18  has been very important to my development as an
19  investor, in other ways, too. She helped me frame
20  investment thesis succinctly but exhaustively. She
21  treated me as an equal in the management of a couple
22  of sleeves, and she encouraged me to do work of
23  broader significance to the team and the investment
24  division. As a manager and person, Lisa stands for

Page 31

1  the values that make Putnam different and special,
2  focus on performance, teamwork, openness to new
3  ideas and willingness to challenge respectfully.
4  Q. Do you have a recollection, sir, as to what
5  you meant by, quote, She reversed the degenerative
6  processes that had set in, close quote?
7  A. Yes.
8      Prior to Lisa joining the Energy and
9  Basic Materials team, the team had begun to
10  disintegrate under the management of Jim Falvey.
11      Jim Falvey had a peculiar way of dealing
12  with people that was not very constructive. He did
13  not listen. He had preconceived notions about what
14  works in investments, and not much could sway his
15  view.
16      And that, over time, alienated people
17  from the team.
18      And the specific dynamic that I
19  described as degenerative was that people who had
20  been on the team dropped out because they didn't
21  find it useful any more. They just stopped
22  attending meetings. Meetings got rarer.
23      So, occasionally, meetings that were
24  supposed to happen did not happen.

Page 32

1      And the, at least in my perception, the
2  quality of work that was created in the team was
3  deteriorating.
4  Q. And how did Lisa reverse these processes?
5  A. As I had stated here, by coming to the team,
6  she brought a lot of talent and great initiative.
7      Her talents were in covering the sectors
8  that she had covered for many years. She had great
9  experience in the coverage of energy equities and a
10  talent for knowing how to deal with people in a way
11  that encourages them to do their best.
12      The initiative consisted of just doing
13  what was necessary to fix the team, get us up and
14  running, and then making sure that the targets that
15  we set for ourselves are met and that the targets
16  that we set for ourselves are challenging and that
17  we produce great work that is of value to the whole
18  of Putnam.
19      And during Lisa's leadership of the team
20  -- I can speak about myself, and I describe it
21  here -- even in several brief months that she led
22  the team, and at least from my perspective, led the
23  team, and was my direct manager, she helped me
24  develop as an analyst, as an investor, something

Page 33

1  that before that had been -- you know, other
2  managers were not that concerned about.
3      I did not perceive, for example, that
4  Jim Falvey was very interested in how my investment
5  knowledge develops over time.
6      He would be interested to hear what I
7  think about, for example, PPG, which is a stock,
8  that I covered, but that would be it. He will not
9  be concerned about how I frame that, if that is, you
10  know, if that is a sound investment framework to
11  approach a stock, if I could then present it well,
12  and if my presentation would get traction with the
13  portfolio teams.
14      On the contrary, Lisa was very
15  interested in all of this.
16      So, initially, when she joined, she
17  scheduled meetings with all of us, the three
18  analysts who covered basic materials stocks.
19      And in my meetings, she would help me
20  work through an investment recommendation that I was
21  working on at the time.
22      For example, I had a couple of stocks
23  that I was bringing up on the coverage, which means
24  these are stocks that I am now, I have published

9 (Pages 30 to 33)

Konstantin S. Stoev

Page 34

1 opinion on and I'm responsible for covering,
2 tracking what happens with the companies and, again,
3 stating on a regular basis what the investment
4 attractiveness of these stocks are. That is the
5 nature of coverage.
6 So, I was about to begin coverage of
7 several stocks. And Lisa coached me through that
8 process, something that nobody else before that had
9 ever done on a systematic basis.
10 Before, Lisa did it, only for probably
11 about one or two months, somebody else, whose name
12 is Karen Korn, had helped me do, but Karen left
13 Putnam, if I remember well, the previous year or the
14 year prior to Lisa joining the Energy and Materials
15 team as the leader for the Basic Materials analysts.
16 So, that, to me, was a very valuable
17 experience because it is, as I've described it to
18 some of my colleagues who are portfolio managers, it
19 can get lonely as a global equity research analyst,
20 because you give a lot, you present ideas, but
21 sometimes, very often, you don't get a lot of
22 feedback. You don't know how well you presented.
23 You don't know how well people listen to what you
24 say.

Page 35

1 You might see some feedback in certain
2 teams, but in other teams, you get just a blank
3 response.
4 Q. Did you feel that Lisa Svensson gave you
5 that feedback?
6 A. Absolutely.
7 That was a crucial thing that helped me,
8 together with, I think together with the other
9 members of the team, to gain more confidence in
10 presenting our investment ideas, to go to more
11 people, to not be intimidated when asked questions,
12 to gain confidence in actually putting money to work
13 as portfolio managers, because as I state here, she
14 effectively managed the sleeve of the Basic
15 Materials, the Basic Materials portion of the Global
16 Natural Resources and of the sleeve that was
17 assigned to us from Putnam International Equity as
18 if we were equal with her, even though she was
19 technically our manager.
20 Those were all very valuable things that
21 nobody else had given me before. And for that, I
22 was very grateful to Lisa.
23 And I felt Lisa cared for me. And that
24 is a feeling that I've had with only very few people

Page 36

1 at Putnam. Probably I can count them on the fingers
2 of one hand.
3 And Lisa cared for, cared for me in the
4 sense that she cared how I did as a professional,
5 how I developed as a professional.
6 I was not just, you know, a rank and
7 file global equity research who would churn whatever
8 he or she churns. And you know, the portfolio
9 manager would always pass judgment on that, but
10 never constructively engage.
11 Q. Other than making these comments in the 360
12 review, did you have occasion to communicate the
13 views that you've just testified about to anyone
14 else at Putnam?
15 A. Yes, I have.
16 Q. To whom?
17 A. I think I communicated that to Steve Gorman.
18 And I felt that I could speak to Steve
19 Gorman. Steve Gorman was my previous manager.
20 Steve was a great, again, very talented
21 individual. He and I were able to relate because he
22 and I both had interest in the technical aspects of
23 valuation. And I worked, together with him, in
24 setting up the Putnam valuation system from late

Page 37

1 2001 into 2002.
2 So, on a number of occasions, you know,
3 I had chances to interact with him. And I think
4 that experience allowed me to feel comfortable
5 talking to him.
6 I think I related to him how happy I was
7 that Lisa had joined the team. And I also -- and I
8 think that was in August 2003, July or August of
9 2003. I do not remember exactly which month, but it
10 was in the summer of 2003.
11 I told so to Eric Hutchinson. And Eric
12 is -- Eric worked in HR, in human resources for
13 Putnam.
14 I do not know exactly the title that he
15 held, but he was the HR manager who we saw as
16 investment professionals in global equity research.
17 Q. Was that a personal meeting?
18 A. It was a meeting that Eric Hutchinson called
19 me to. Eric Hutchinson invited me to a meeting.
20 And at that meeting, he asked me questions about
21 Lisa.
22 Q. Did he indicate why he was asking questions
23 about Lisa?
24 A. Yes.

Konstantin S. Stoev

Page 38

1    He indicated to me that Lisa was being
2 considered for a promotion.
3    Q. Did he indicate to what position she was
4 being considered for promotion?
5    A. No.
6    Q. Do you recall what you stated to
7 Mr. Hutchinson on that occasion?
8    A. In the spirit of what I have said here, plus
9 I think I explicitly said to Eric that, I think the
10 exact words that I used was that Lisa cares for her
11 people in a sense. And I think what I meant was
12 that Lisa cares about the people who she manages.
13    And that was in response to Eric's
14 question about, questions about Lisa's management,
15 Lisa's performance as a manager and Lisa's
16 capabilities as a manager.
17    Q. Was anyone else present at this meeting --
18    A. No.
19    Q. -- other than you and Mr. Hutchinson?
20    A. No.
21    Q. Did Mr. Hutchinson take any notes during the
22 course of the meeting?
23    A. Yes, he did.
24    Q. Did you ever have an opportunity to see

Page 39

1 those notes?
2    A. No.
3    Q. Had Mr. Hutchinson or anyone from HR on any
4 prior occasion come to you to discuss Lisa Svensson?
5    A. No. I do not recall.
6    Q. Did you ever have any discussions with
7 Mr. Josh Brooks concerning Lisa Svensson's job
8 performance?
9    A. No.
10    In the sense that I -- actually, let me
11 think about it.
12    I did not have discussion with Josh
13 prior to his announcing that Lisa will not manage
14 the team.
15    Q. Okay.
16    A. And at that time -- actually, I don't
17 remember the exact sequence, but I think that the
18 day when he announced it to the whole organization
19 or maybe a day or two before that -- I don't
20 remember exactly the whole sequence, but Josh came
21 into my office, and he asked me or basically he
22 asked me if I had a few minutes. And I said, yes,
23 sure.
24    And then he said that, I want to tell

Page 40

1 you something about Lisa. And he proceeded to tell
2 me that Lisa will no longer manage the team.
3    And I did not understand why that would
4 happen. And I told Josh so. And I said -- and I
5 asked him what his, you know, what his, why this
6 decision.
7    Actually, I was shocked, and I didn't --
8 I don't recall all of his rationale or the way he
9 stated it, but what he described to me was that they
10 had decided -- and they, I don't know who they were
11 -- that Lisa was not managing the team well, that --
12 I'm trying to recall that -- that there had been
13 complaints by other members of the team.
14    And you have to bear in mind, at that
15 time, the knowledge management team was not only
16 Basic Materials. That was already Energy and Basic
17 Materials, because Jim had left.
18    So, that included not only the Basic
19 Materials analysts but other analysts.
20    So, that means Lisa, Darren Peers and
21 probably John by that time.
22    And he said that there had been
23 complaints by others about Lisa's management style.
24 And he said -- I don't remember exactly what example

Page 41

1 he used to substantiate that.
2    As I said, I just, I found this
3 discussion shocking, but my feedback to Josh was
4 that -- he must have given me a really startling
5 example from my perspective, because my response to
6 Josh -- and again, I think people recall more of
7 their own responses than other people's comments.
8 Just memory works that way, but my own response to
9 Josh was that either I have not known Lisa -- if
10 you're telling me this and this is true about Lisa,
11 either I have not known anything about Lisa or
12 somebody lied to you.
13    And I think, I mean, I think Josh
14 understood well that my view of Lisa was totally
15 different to what he was describing as his view of
16 Lisa's performance. And that's why he found it
17 necessary to come to my office and talk to me about
18 it.
19    Q. Okay.
20    A. And subsequent to that, another member of
21 the investment team came to my office to tell me
22 about this. And that was Dave King.
23    Q. Dave King?
24    A. David. David, I think, L. King.

11 (Pages 38 to 41)

Konstantin S. Stoev

Page 42

1    And he wanted to know how I felt after I
2  had heard from Josh about the changes.
3    And Dave asked me -- I don't remember --
4  well, basically, he asked me how I felt. And I
5  described to him how I felt, that this was a very
6  big surprise to me, that I -- it was shocking that
7  things were happening that way. And I did not
8  understand the rationale.
9    Dave did not talk to me about the
10  rationale of the decision. I think at the end, Dave
11  basically asked me a question. And I don't remember
12  exactly his words, but the spirit of it was, can I
13  -- well, I think he actually put it in plural, but
14  I'm not absolutely sure, but he was saying something
15  like, should we worry that we will lose you, in
16  other words, that I will leave.
17    Q. Because of Lisa's --
18    A. Because of the decision to not have Lisa
19  managing, manage the team.
20    Q. Okay. Do you recall with respect to your
21  discussion with Mr. Brooks, do you recall when you
22  suggested the possibility that he might have been
23  lied to what his response was?
24    A. I think his -- as I said, unfortunately,

Page 43

1  memories dull for other people's comments and very
2  strong for your own comments.
3    So, I do not recall his exact words, but
4  I think the nature and the spirit of what he said
5  was that --
6    MR. KOCIUBES: Objection.
7    Finish your answer.
8    A. -- was that he had received information from
9  a number of sources that made him feel comfortable
10  that he was not being lied to.
11    Q. Do you recall the, when in relation to your
12  meeting with Mr. Hutchinson this discussion with
13  Mr. Brooks took place?
14    A. It was after Mr. -- after I talked Eric
15  Hutchinson.
16    Q. Okay. Do you know whether any of the other
17  members of the team that were supervised by Lisa
18  were visited by Mr. Hutchinson?
19    A. I don't know.
20    Q. Did you ever have any discussions with any
21  of the other team members concerning Lisa's being
22  deprived of the management of that team?
23    A. And when you say team members, you mean
24  Ellis Eckland, Chris O'Malley, John Morgan, Darren

Page 44

1  Peers?
2    Q. Yes.
3    A. No, I did not have any discussion.
4    Q. Okay.
5    A. And -- yes, I did not have any discussion.
6    Q. Did you ever -- after you had your
7  discussion with Mr. Brooks, did you discuss it with
8  Lisa Svensson?
9    A. Discuss what?
10    Q. Discuss what had happened during the Brooks
11  meeting.
12    A. I don't recall.
13    Those were very emotional days.
14    I did go to Lisa's office when the
15  announcement came. And I think Lisa was upset.
16    So, we couldn't talk about much, but I
17  wanted to hear what she was thinking.
18    And I don't recall exactly what we were
19  talking, I don't recall if I related to Lisa all of
20  my conversation with Josh or if I simply said that
21  Josh told me that you were not going to manage the
22  team any more.
23    No, I don't recall the specifics.
24    I recalled it afterwards, actually.

Page 45

1    MR. KOCIUBES: Objection.
2    Q. Go ahead.
3    A. I recall that, actually, Josh had encouraged
4  me to talk to Lisa.
5    Q. About?
6    A. And I think that's why I went to Lisa's
7  office.
8    Josh had encouraged me to talk to Lisa
9  just to talk to her to see what her point of view
10  is, because at that point, I think it was clear that
11  Lisa would leave Putnam.
12    And I didn't understand --
13    Q. What in your mind made it clear that Lisa
14  was going to leave Putnam?
15    A. Josh did.
16    Q. Oh, Josh made it clear?
17    A. Yes.
18    Q. How did he make it clear, do you recall?
19    A. I think in our conversation, he did. He
20  said that she's not going to manage the team, and
21  she's decided to leave Putnam.
22    Q. Do you recall when that discussion with Mr.
23  Brooks took place in relation to the, Lisa
24  Svensson's actual departure from Putnam?

12 (Pages 42 to 45)

Konstantin S. Stoev

Page 46

1   A. It was before it.
2   Q. How long before?
3   A. No, I don't recall. In terms of number of
4   days, for example, I don't recall.
5       I know it was before. And I think Josh
6   had encouraged me to talk to Lisa.
7       And then after that, Josh asked me if I
8   had spoken to Lisa. And I said yes, I had spoken to
9   Lisa, and she was very upset.
10      And that was it.
11  Q. Did you communicate to Josh Brooks what Lisa
12  Svensson had said?
13  A. No.
14      I think I -- I don't think I had any
15  further discussion with Josh about this, because I
16  basically felt -- I told him, look -- I don't recall
17  the exact words I used again, but it was something
18  like, look, as you said, I went to talk to Lisa
19  about it just to understand a little bit more about
20  the whole situation. And I found her upset about
21  it, and that obviously, she doesn't share your view.
22      And that was it, basically, because I
23  didn't have any other sense.
24      MR. KOCIUBES: Motion to strike.

Page 47

1   Q. You referred earlier to an announcement.
2       What announcement was made?
3   A. Every, I think it was every Thursday, global
4   equity research, the Global Equity Research Team had
5   a meeting at which we discussed a number of issues
6   that were of interest to the department, the equity
7   research group. It could be individual stocks. It
8   could be projects that are going on. It could be
9   structural or management issues that were developing
10  at Putnam. It could be market-related issues, a
11  number of topics.
12      And at that meeting, at that Thursday
13  meeting, I think it was Josh who announced that Lisa
14  will not manage the Energy and Basic Materials team,
15  and that Lisa has decided to leave Putnam, or
16  something to that effect.
17  Q. Do you recall when in relation to your
18  discussions with Mr. Brooks and with Lisa Svensson
19  about which you've testified that announcement
20  occurred?
21  A. In relation to my discussion with Josh, it
22  was after.
23      So, Josh basically came into my office
24  to prepare me for the announcement and talk to me

Page 48

1   individually as opposed to discuss it in a broader
2   forum first.
3       I don't recall when the announcement was
4   in relation to my going to Lisa's office and seeing
5   her after having been encouraged by Josh to go and
6   talk to her.
7   Q. Okay. Going back to the meeting with
8   Mr. Hutchinson --
9   A. Yes.
10  Q. -- do you recall any discussion from
11  Mr. Hutchinson as to what he was going to do with
12  the information that you provided to him in that
13  meeting?
14  A. Yes.
15      I recall, as I said, that Mr. Hutchinson
16  or Eric Hutchinson told me that Lisa was being
17  considered for a promotion. And that, in my view,
18  that meant he was collecting feedback for the people
19  who were considering the eventuality of that
20  promotion, and that he would relate my feedback to
21  those people.
22      And I don't -- he didn't mention
23  specifically who these people are, but I had the
24  feeling when we discussed it, the feeling that he

Page 49

1   conveyed to me was that Lisa --
2       MR. KOCIUBES: Objection.
3   A. -- was that Lisa was being considered for a
4   promotion.
5       And in my, you know, uneducated guess,
6   that was -- I mean, I felt good. I mean, I felt
7   that this is great that this is happening, that they
8   are considering Lisa finally for a promotion because
9   she's done such a great job of managing something
10  that was nearly unmanageable and pulling us out of
11  such a big hole, and in the meantime, being able to
12  present, together with the team, such great work
13  that was of benefit to the whole, the whole
14  department. And through all of this, never failing
15  to do her primary responsibilities about equity
16  coverage and portfolio management.
17      So, to me, that was, you know, it was
18  natural that this would happen. And I felt happy
19  that Eric had actually contacted me so that I can
20  give feedback that would be conveyed to people who
21  considered Lisa for promotion.
22      He didn't specify who the people were,
23  though.
24  Q. Okay. Did you have any discussions with Mr.

13 (Pages 46 to 49)

Exhibit A-2

Konstantin S. Stoev

Page 50

1  Brooks after Lisa's termination from Putnam
2  concerning Lisa Svensson?
3      A. I'm sorry. I am not clear about your
4  question.
5          Do you mean -- I don't know when Lisa --
6      Q. Let me rephrase it.
7          There's been prior evidence in this case
8  which indicated that Lisa Svensson's employment was
9  terminated on September 15 of 2003.
10         So, my question is directed to the
11 period after that termination occurred.
12         Did you have any discussions about Lisa
13 Svensson or about Lisa Svensson's job performance or
14 your evaluation of her job performance with Mr.
15 Brooks after she had left Putnam?
16     A. Well, after she had left Putnam, no.
17         I think after Lisa had left Putnam, I
18 have not had any discussions with Josh Brooks.
19         I am racking my brain because I remember
20 having a discussion -- not a discussion, but just an
21 exchange of a couple of sentences with Kelly Morgan,
22 but that was at the -- that was on our way to -- no.
23         I was thinking whether that was in
24 Josh's office.

Page 51

1          No, I don't recall. Unfortunately, I
2  don't recall any.
3      Q. Tell me about this discussion with Kelly
4  Morgan.
5      A. We were -- at the time, that was in 2003, I
6  think, either late October or early November. My
7  visa status in the U.S. was temporary. In other
8  words, I could be employed in the U.S. on an H1B
9  visa, but that only lasted so many years. And then
10 following the expiration of the second H1B visa, the
11 alien, which is me, either departs the U.S. or
12 enters a process to obtain permanent residence in
13 the U.S., the green card.
14         And at that time, Putnam decided -- Josh
15 asked me if I was committed to work at Putnam, and
16 if I wanted to or whether I wanted to go back to my
17 home country or some other place, because they were
18 considering whether to begin the green card process.
19         And I said, yes, I'm committed to
20 Putnam, and I would like to continue my employment
21 here.
22         And he said, then we will proceed with
23 the green card process, and Kelly will take care of
24 that, because Kelly, at that point, was appointed as

Page 52

1  the manager of the Basic Materials, the Energy and
2  Basic Materials team.
3          So, Kelly and I prepared the application
4  for my -- I think it's called a labor authorization.
5  And we were on our way to a lawyer's office to
6  discuss with the lawyer the next steps about the
7  application, or about the whole process.
8          And we were on the street just walking
9  up to the office, and I think I mentioned, we were
10 talking in general about Putnam. And I think I
11 mentioned that the only shocking experience that
12 I've had was what had happened with Lisa, and that I
13 couldn't believe, I even then could not believe what
14 I had heard about her.
15         And I think Kelly said, yes, I've known
16 Lisa for many years. I don't remember how many
17 years. For some reason I have the number 13 in my
18 mind. I've known Lisa for many years. And I --
19 what did she say -- and I think she said, I think
20 she said that she had not known Lisa, effectively,
21 or something like that, even though she's known her
22 for a long time, but in fact, she couldn't believe
23 Lisa would be able, would do something like the one
24 that cost her the position of leading the manager of

Page 53

1  the Energy and Basic Materials team.
2          And again, I have no idea what she
3  meant, but -- because I don't know exactly what it
4  was that led to Lisa being, as you described it,
5  terminated, because that was never discussed in an
6  open forum.
7          The only allusion to it was in that
8  Thursday meeting when Dave King mentioned something
9  that, I think he said that some -- I think it would
10 be, that Putnam would not tolerate a manager who
11 undermines another analyst. I think that was what
12 Dave King said in that meeting, in effect.
13         And that was the only precise statement
14 that I have ever heard within Putnam about what led
15 to Lisa's termination, as you described it.
16     Q. Okay. Now, you said earlier that Lisa
17 Svensson had given you a performance evaluation?
18     A. Yes.
19     Q. That was at the end of 2002?
20     A. I don't remember the exact calendar
21 structure, but I believe it must have been the end
22 of 2002, because bonuses were typically paid in the
23 spring. And I think the performance reviews were
24 done by the end of the previous year, but Lisa had

14 (Pages 50 to 53)

Konstantin S. Stoev

Page 54

1 also -- the scheduled performance evaluation at
2 Putnam was that you would get performance
3 evaluation, sort of a midterm performance
4 evaluation, sort of in the middle of the year, about
5 meeting your goals, and then there would be a final
6 evaluation that was at the end of the year.
7     Q. And did you receive a mid-year evaluation in
8 2003?
9     A. Yes, I believe so. I believe I received a
10 mid-year evaluation in 2002 and 2003.
11         Actually, I might be able to check that
12 if you give me a second. I think I -- I brought a
13 copy of my file as it was given to me by Putnam when
14 I left. I would be able to check, if you are
15 interested.
16     Q. If you would.
17         (Pause.)
18         MR. KOCIUBES: May I see the 360 while
19 he's doing that?
20     A. I don't have it here, but I believe that
21 Lisa gave me a midterm evaluation in 2002, a
22 full-year evaluation in 2002 and a mid-year in 2003.
23     Q. Okay. And did you continue to receive
24 performance evaluations after Lisa Svensson's

Page 55

1 termination?
2     A. As an employee of Putnam, you mean?
3     Q. Yes.
4     A. Yes.
5     Q. So, you received an evaluation at the end of
6 2003?
7     A. Yes.
8     Q. And did you receive a mid-term evaluation in
9 2004?
10     A. No. I don't recall a mid-term evaluation.
11     Q. You testified earlier that Kelly Morgan
12 assumed the management responsibilities of the Basic
13 Materials, Energy and Basic Materials team --
14     A. Yes.
15     Q. -- after Lisa's departure?
16     A. Yes.
17     Q. Who assumed the responsibilities for the
18 Natural Resources Fund?
19     A. According to the prospectus, the fund was
20 team-managed. And the team was listed in the
21 prospectus.
22         Again, you will find the specific names
23 as they were listed, but I believe, I know my name
24 was in it, in the list of people who are managing it

Page 56

1 as team members.
2         And the -- again, you will have to check
3 who was listed as the key or the primary portfolio
4 manager.
5     Q. I'm trying to understand whether anybody
6 other than Kelly Morgan evaluated you after Lisa
7 Svensson's departure.
8     A. No, nobody else.
9         And I did not sign the evaluation that
10 Kelly Morgan gave me, because it was factually
11 incorrect. And I brought that to her attention, and
12 she accepted that I would not sign it.
13     Q. Okay. In what respect was it factually
14 incorrect?
15         MR. KOCIUBES: Objection.
16         You can go ahead.
17     A. Kelly had -- I have to find the specific
18 document in order to be able to point to you line by
19 line, because I described it to her in an E-mail
20 what I considered to be factually incorrect.
21         And I'm sure that Putnam can provide
22 that E-mail to you. And since that E-mail is so
23 much more recent to the events that happened then
24 than my deposition now, I think that E-mail would

Page 57

1 be -- clearly, that would give you the most precise
2 answer.
3     Q. Do you retain in your file a copy of that
4 E-mail?
5     A. I have to look through what I have here, but
6 I'm not sure. It is possible that I have it.
7         Unfortunately, when we were moving to
8 Switzerland, a number of -- actually, one of our
9 boxes did not arrive.
10     Q. Do you recall the general subject matter of
11 this E-mail?
12     A. Yes.
13         I basically stated, Kelly, I cannot sign
14 my evaluation as you've provided it to me because I
15 disagree with a number of the points that you have
16 made here. And some of these points were about
17 specific instances when she was discussing my
18 involvement or communication with our portfolio
19 teams.
20         And I pointed to very specific feedback
21 that I had received that was available to her from
22 other people, and also the fact that I had been
23 entrusted with even more responsibility by the teams
24 that she was mentioning as not being satisfied.

15 (Pages 54 to 57)

Konstantin S. Stoev

Page 58

1    So, to me there was a factual
2    inconsistency between what she was saying in the
3    evaluation and what the people who were giving me
4    the money were doing. And you know, between words
5    and deeds, I always go with deeds. And I tried to
6    point that out to her.
7    In addition, she stated something about
8    an investment recommendation that I had made that
9    took about nine months to come to fruition. And in
10   her view, I had done that inappropriately, even
11   though we ended up making money, a substantial
12   amount of money in that recommendation, but her
13   point was something that I considered totally
14   ridiculous, that you should wait and buy the stock
15   at the lowest possible price.
16   So, she said that I had made an
17   investment recommendation knowing that the stock
18   might go down a little bit before it recovers. And
19   I think this is -- if you have a value inclination
20   or a value approach, you would recognize that this
21   is always possibility, but if you believe in the
22   intrinsic value of a particular stock, you are able
23   to tolerate a downside in the expectation of the
24   upside.

Page 59

1    I tried to explain that to her in the
2    E-mail as well. And I pointed specific -- I think
3    she was referring to a couple of the teams that I,
4    the portfolio teams that I had very much input into
5    because of the nature of their style, that was value
6    and international equity. And I pointed to her that
7    there had been a number of instances where people
8    had spoken very favorably about what I had done. I
9    gave her the name, the names of the people who she
10   could contact in that team who were all senior
11   managers, who could give her the specific feedback.
12   I pointed to her the specifics of my
13   managing the fund on behalf, managing money on
14   behalf of one of those teams as an evidence of
15   recognition and as an evidence of trust on their
16   behalf.
17   So, there were some things in what she
18   said that were factually incorrect. And the tone of
19   the evaluation was not constructive. You know, I
20   felt like she was totally unfair.
21   And I actually addressed the E-mail to
22   her and to Josh Brooks, because Josh was still, I
23   mean, he was the head of the department.
24   Kelly was my manager. And I addressed

Page 60

1    it in the spirit of, look, Kelly has only been my
2    manager for two months and before -- having to give
3    me a performance evaluation. And none of the prior
4    feedback that had been given to me seems to be
5    reflected in this performance evaluation.
6    And Josh's response, which was verbal,
7    one late evening when I was in the office and
8    copying something -- sorry -- printing something, on
9    his way out, he said, basically, I read your E-mail.
10   You have to work it out with Kelly.
11   So, that was it.
12   MR. KOCIUBES: Motion to strike.
13   Q. I take it that -- strike that.
14   Was your end-of-year 2002 evaluation by
15   Lisa, did you consider it to be a positive
16   evaluation?
17   A. It was a fair evaluation which was factual,
18   which was substantiated. It had a number of points
19   -- it was positive in the sense that it reflected,
20   you know, what I perceived to be the nature of my
21   performance that year. And also, it was positive in
22   the sense that it indicated ways in which I could
23   improve my performance going forward.
24   So, being both fair and constructive to

Page 61

1    me is positive.
2    Q. Did you consider your mid-year evaluation
3    2003 to be a fair and constructive evaluation?
4    MR. KOCIUBES: Objection.
5    A. Yes.
6    Q. Okay. Did Kelly Morgan provide any response
7    to you when you pointed out that she had only been
8    your supervisor for two months?
9    MR. KOCIUBES: Objection.
10   A. I did not -- I think I did not say to Kelly
11   Morgan directly, look, Kelly, you have been -- I did
12   not write it in the E-mail, I don't think. I don't
13   remember.
14   No, I didn't write it in the E-mail,
15   look, Kelly, you have been manager for a very short
16   period of time.
17   Q. Did Kelly Morgan every provide you with a
18   response to your E-mail?
19   MR. KOCIUBES: Objection.
20   A. No.
21   In the sense --
22   MR. KOCIUBES: Objection.
23   A. -- Kelly Morgan did not provide me with a
24   written response to my E-mail.

16 (Pages 58 to 61)

Konstantin S. Stoev

Page 62

1    Q. Did she provide you with a verbal response?
2         MR. KOCIUBES: Objection.
3    A. On the advice of Josh Brooks, I went to
4    Kelly to talk to her to work it out, as Josh said,
5    to tell her, again, to restate once again what my,
6    what I had said in the E-mail, and to understand
7    why, you know, her views were the way they were.
8         And she said, well, I'm fine with your
9    not signing the -- if you don't want to sign your --
10   it was, I think it was Putnam's standard procedure
11   that both the manager and the employee have to sign
12   the performance evaluation.
13        And that was in the spirit that I wrote
14   that E-mail, saying that, Kelly, I disagree with you
15   as my evaluating manager, that you are writing this,
16   and that, therefore, I will not sign the performance
17   evaluation.
18        And she said, well, okay. I'm fine with
19   your not signing the performance evaluation. In the
20   future, somebody else will do your performance
21   evaluation anyway.
22        So, that was it.
23   Q. Okay. Have you ever had any discussions
24   with Chris O'Malley concerning Lisa Svensson?

Page 63

1    A. No.
2    Q. Have you ever had any discussions with Ellis
3    Eckland concerning Lisa Svensson?
4    A. Not concerning Lisa Svensson, no.
5    Q. Have you ever had any discussions with
6    Darren Peers concerning Lisa Svensson?
7    A. No.
8    Q. Did there come a time when you became aware
9    of Darren Peers' intention to depart Putnam to take
10   another job?
11   A. I'm sorry?
12   Q. Did there ever come a time when you became
13   aware of Darren Peers' intention to leave Putnam to
14   take another job?
15   A. Could you restate the question?
16        Are you asking me if I became aware that
17   Darren was looking for a job before he left Putnam?
18   Q. Yes.
19        I'm directing you to when you first
20   became aware of Darren Peers' intention to leave
21   Putnam or that he was looking for a job.
22   A. I became aware that Darren would leave
23   Putnam at the time of the Thursday meeting when the
24   announcement was made. I think it was in a Thursday

Page 64

1    meeting, yes. And maybe it would have been the same
2    Thursday meeting. I don't recall, but it was in one
3    of those Thursday meetings when people said that --
4    it must have been Josh -- that Darren will leave
5    Putnam.
6    Q. Had you heard that he was looking for a job
7    prior to that Thursday meeting?
8    A. No.
9    Q. Did you ever have any discussions with Lisa
10   Svensson or anyone within the research department
11   concerning the issue of directed brokerage
12   commissions?
13   A. Yes.
14        I think Lisa mentioned it once as a
15   pernicious -- I'm searching for the words --
16   pernicious practice that only hurts the investors in
17   the fund.
18   Q. And was that a one-on-one discussion?
19   A. No.
20        I mean, Lisa did mention it in
21   discussions of the small team that we were, but I
22   think Lisa at least once might have spoken about it
23   in the Thursday meeting, because at that time, if
24   you remember well in 2003, the whole Spitzer

Page 65

1    investigation started into the funds that had
2    effectively hurt their own investors by allowing
3    market timers to come in and buy and sell the funds
4    on a very short-term basis.
5         And at that time, there was a whole brew
6    of issues that also were going on on Wall Street in
7    terms of the objectivity of the advice that Wall
8    Street analysts actually provide in their published
9    material.
10        And I think Lisa mentioned that there
11   were issues inherent to the mutual fund industry as
12   well that were not publicly discussed yet. And
13   among those is the directed brokerage.
14   Q. Okay. Did you have any views on the subject
15   of directed brokerage commissions?
16        MR. KOCIUBES: Objection.
17   A. I am -- my specialty is equity research.
18   And I do not have all the legal details that
19   underpin one view or another, but my view as an
20   investor was that a management company is, has a
21   fiduciary duty to manage the money on behalf of the
22   investor as if the investor is managing the money
23   his or herself, only better because they provide a
24   service, and that anything that the management

17 (Pages 62 to 65)

Konstantin S. Stoev

Page 66

1  company might do to damage the performance of the
2  funds that the investor has entrusted is what the
3  management company should not do.
4         And that therefore, if a management
5  company chose to direct commissions to brokers for
6  reasons other than the benefit of the investor, then
7  that practice was damaging the investor.
8         Again, this is a very non-technical
9  description of what I think, but I think it gives
10  you the flavor of what I think.
11     Q. Did you ever communicate your view on the
12  fiduciary duty to manage the money in the best
13  interests of the investor to persons up the chain of
14  command at Putnam?
15     A. Yes. On a different occasion.
16        That was, again, in 2003. That was in,
17  I think in October. I think I have that E-mail
18  actually somewhere here.
19        I sent an E-mail -- Putnam used to have
20  a ritual of quarterly officers' meetings. And
21  officers were, officers of the company are all the
22  individuals who hold the title of assistant
23  vice-president or higher.
24        So, this is the assistant

Page 67

1  vice-president, vice-president, senior
2  vice-president, managing director and whatever there
3  was above that.
4         Those officers' meetings were chaired by
5  the CEO of the company. And usually, the bulk of
6  the presentation be carried out by the CEO and
7  the head of the investment division.
8         At the quarterly investment -- quarterly
9  officers' meeting in the fall of 2003, the CEO of
10  the company, the then CEO of the company made a
11  statement which I completely disagreed with.
12     Q. That was Mr. Lasser?
13     A. Yes.
14        He was talking about the ongoing
15  internal investigation of Putnam of practices in
16  certain funds where the portfolio managers had
17  traded in the funds that they had managed
18  themselves, taking advantage of expected direction
19  of equity markets and the correlation of their own
20  funds with those equity markets.
21        And Mr. Lasser was talking about this
22  issue, and he mentioned that it had been detected
23  first in 2000 and that -- I think his exact words
24  were that by the standards of the day, which is

Page 68

1  2003, they look more intolerable than they did in
2  2000.
3         And I strongly disagreed with that view.
4  And I wrote an E-mail to Mr. Lasser saying that, you
5  know, respectfully, sir, I disagree with what you
6  said today. And I quoted his words.
7         And I said, I think that the standards
8  of responsibility with which we are supposed to
9  manage money have not changed just because time has
10  passed. And I think they are the same as -- they
11  are now as they were trading when John Putnam first
12  passed the statement about what constitutes prudent
13  rules and also the responsibility of a person
14  managing other people's money.
15        I referred to that just because it was
16  in Putnam's culture to talk about this as one of the
17  pieces of rich heritage that the company has.
18        So, I wanted to make the point that just
19  because it was 2003 doesn't mean that something we
20  did in 2002 was more acceptable than today.
21     MS. CAMPION: Objection. Move to
22  strike.
23     MR. KOCIUBES: Objection.
24     Q. Do you have a copy of that E-mail?

Page 69

1     A. I'm not sure.
2        (Pause.)
3     A. I'm sorry.
4        (Pause.)
5     A. No, I don't have my E-mail.
6        I do have the response I received, a
7  copy of the response I received from Mr. Lasser.
8     Q. And what is the date of Mr. Lasser's
9  response?
10     A. Just a second.
11        October 27.
12     Q. May I see it, please?
13        (Witness complies.)
14     MR. KOCIUBES: Before you go on, may we
15  see it, too?
16     MR. WEIR: Yes, sure.
17     A. Again, I'm sure that Putnam retains E-mails
18  from that period. And you will be able to obtain it
19  if it's necessary in the context of what I wrote.
20     MR. WEIR: Would you mind if we marked
21  this as an exhibit?
22     THE WITNESS: Sure. If I could get a
23  copy.

18 (Pages 66 to 69)

Konstantin S. Stoev

Page 70

1     MR. WEIR:  Let's take a break for a
2  couple of minutes.  I'll get copies for everybody.
3     (Marked, Exhibit 3, E-mail dated
4  10/27/2003, to Stoev from Lasser.)
5     Q.  Mr. Stoev, let me show you what's been
6  marked as Exhibit 3 for identification at your
7  deposition, and ask you if this is Mr. Lasser's
8  response to your E-mail which you've just testified
9  about?
10    A.  Yes.
11    Q.  And you received it on or about October 27,
12 2003?
13    A.  Yes.
14    Q.  Now, you've been looking through a number of
15 documents in a file.
16       What is that file?
17    A.  These things?
18    Q.  I'm sorry?
19    A.  Do you mean these papers?
20    Q.  Yes.  The entirety of the file that's out in
21 front of you.
22    A.  These are some of the things that I could
23 print that constitute either records of what I had
24 done specifically in the funds, for example, when

Page 71

1  we, in managing the sleeve, the specific trades that
2  I had done, or communication from the various people
3  at Putnam with regard to, you know, how I have been
4  doing, praise, comments, that sort of thing.
5     Q.  Okay.  Are there any documents in there that
6  are authored by Lisa Svensson, to the best of your
7  knowledge?
8     A.  I have to go through them to be able to tell
9  you precisely, but when I was looking for that
10 E-mail that I sent to Larry Lasser, I came across
11 this E-mail that is a response from Josh Brooks in
12 response to something I said.
13       Remember how you asked me if I had
14 talked to Josh in any respect about Lisa after Lisa
15 was terminated?
16    Q.  Uh-huh.
17    A.  It's difficult to talk about someone after
18 they've been terminated within an organization like
19 Putnam.
20       There was clearly a sense that when
21 somebody is about to leave or leaves, that person is
22 a persona non-grata.
23       And in a meeting subsequent to Lisa's
24 leaving, in a team meeting where we sat together,

Page 72

1  everybody that was in the Energy and Basic Materials
2  team and contributing to managing the Global Natural
3  Resources Fund, in a meeting that was presided by
4  Josh -- I think he was appointed as manager at that
5  point when Lisa left, within Putnam -- at that
6  meeting, there was discussion about the process, the
7  investment process that we were employing in terms
8  of selecting the stocks that go into the fund.
9       And at that meeting, there were, there
10 was an exchange of thinking.  Basically, Josh asked
11 every one of the analysts present there, team
12 members for the management of the fund, how we
13 perceived, what we perceived the process to be.
14       And I think one or two, one of the
15 responses basically was that, it was actually, I
16 felt, incorrectly described what we were doing.
17       One of the people -- and I don't
18 remember exactly who -- one of the people probably
19 said -- I don't remember what that person said.
20       I probably wrote it in my E-mail, in the
21 explanation to Josh, but the sense of what that
22 discussion was, that our process was not fully
23 fledged in the managing of the Global Natural
24 Resources.

Page 73

1       I reacted vehemently to that.  And I
2  said, no, Josh.  At that meeting, I kept insisting
3  these are the tools we use to identify the number of
4  stocks that are attractive, that we want to look at
5  as potential investments.  Here are the steps then
6  we take to go through them, and make sure that these
7  are really solid investments that we can put in the
8  fund.
9       I took pains to, again, describe in this
10 meeting this is the process.  This is how it's been
11 working, and this is how we have laid it out in
12 certain documents that are available, because I felt
13 that it was necessary to make that point.  It was
14 necessary in terms of just, you know, making sure
15 people know, Josh included, that we have been acting
16 professionally, with full responsibility for what
17 we're doing.  And that somebody who is sitting in
18 the room says differently doesn't mean so because
19 the facts point to a different conclusion.
20       So, I did that in that meeting because I
21 felt that at that meeting, I had spoken probably
22 more at length than the others.  I sent an E-mail to
23 Josh explaining why I had gone through the pains of
24 explaining at the meeting.

19 (Pages 70 to 73)

Konstantin S. Stoev

Page 74

1     And unfortunately, I don't have a copy
2  of that E-mail either, but I have a copy of Josh's
3  response, which is, I should not worry about being
4  the voice of reason.
5     And that's how I felt at that meeting.
6  At that meeting there were allegations, effectively,
7  that we were not doing a professional job as a team
8  before that running it, and they were not true.
9     Q. Do you recall who made the allegations?
10     MR. KOCIUBES:  Motion to strike.
11     Q. Do you recall who made the allegations?
12     A. I cannot recall, but again, the people who
13  were present at that meeting were Josh Brooks, Chris
14  O'Malley, Ellis Eckland, me. I don't remember if
15  Darren was there still, since Darren effectively, by
16  then, probably had given notice.
17     So, I don't remember. Maybe Darren was
18  there at the meeting as well.
19     And it is possible that also some of the
20  investment associates were in that meeting.
21     MR. KOCIUBES:  Motion to strike
22  everything after I don't remember.
23     A. Let me rephrase that.
24     MR. KOCIUBES:  Let's wait for a

Page 75

1  question.
2     THE WITNESS:  I'm sorry?
3     MR. WEIR:  He can elaborate.
4     MR. KOCIUBES:  Objection.
5     A. It is very likely that Darren Peers was also
6  present in that meeting, although I cannot be a
7  hundred percent sure.
8     And it is very, very likely that some of
9  the investment associates, who are people who help
10  the investment analysts, were also present at the
11  meeting, although I cannot be a hundred percent
12  sure.
13     Q. And do you recall whether, who it was
14  amongst those individuals who made these comments
15  critical of the investment process?
16     MR. KOCIUBES:  Objection.
17     A. I don't remember precisely. And I -- no,
18  unfortunately, I don't remember precisely, but
19  again, if you're able to ask Putnam for the original
20  E-mail that Josh gave response to, you would
21  probably -- there's probably some sort of inkling in
22  that about what was the problem that I was trying to
23  address with that E-mail response -- with my
24  response in that meeting.

Page 76

1     MR. WEIR:  I'd like to mark as Exhibit 4
2  for identification the Josh Brooks to Konstantin
3  Stoev E-mail that he's just testified about, bearing
4  the date of September 19, 2003.
5     THE WITNESS:  Could I continue with my
6  statement here?
7     Q. Well, let me ask a couple of questions.
8     A. I want to finish this one point, because I
9  think it's important for you to understand the
10  context in which all of us worked at Putnam.
11     MR. KOCIUBES:  Objection.
12     A. If somebody was terminated, it wasn't
13  uncommon for that person not to be visited in his or
14  her office by anybody else at Putnam.
15     And the standard expression that
16  described that, caught in a state of limbo between
17  being there and not being there, was that the person
18  was radioactive, in the sense that it was difficult
19  to -- it was difficult, although not impossible, to
20  understand the way you think things are if the
21  organization has decided differently.
22     And I point out this E-mail, because
23  again, in my mind, what I reacted to with my E-mail
24  to Josh and which he replied to saying that I

Page 77

1  sounded more like the voice of reason, was that
2  there was an attempt to rewrite the history exposed.
3  And I totally objected to that.
4     Q. And by the history, you mean the history of
5  Lisa's Svensson's management of the team?
6     MR. KOCIUBES:  Objection. Leading.
7     MR. WEIR:  Well, strike the question.
8     Q. What are you referring to, sir --
9     MR. KOCIUBES:  Objection.
10     Q. -- when you say that that when someone is
11  terminated, they become radioactive?
12     MR. KOCIUBES:  Objection.
13     A. I'm sorry. What is the question?
14     Q. What are you referring to in the context of
15  this memo when you stated earlier in your testimony
16  that if someone was terminated, they become
17  radioactive?
18     MR. KOCIUBES:  Objection.
19     A. As I said earlier, and it's probably already
20  recorded, that it was not unusual for a person who
21  is terminated not to be visited by anybody else in
22  his or her office simply because people will be
23  afraid for their own position within the company,
24  and that, you know, that state of potentially being

Konstantin S. Stoev

| Page 78 | Page 80 |
|---|---|
| 1 harmful to your fellow colleagues was what went by | 1 quoted or where the quotes appear. |
| 2 the moniker of radioactive. | 2 So, by tracking the NAV, you can see how |
| 3 Q. Okay. Well, let me -- | 3 the fund did over time, and that will be the |
| 4 A. And I provided that background to you just | 4 performance record, which you can compare then to |
| 5 to describe the context in which the organization | 5 whatever benchmarks you would like. |
| 6 operated, and also to give you the context of this | 6 The sleeves that were managed by the |
| 7 exchange in the meeting of the Energy and Materials | 7 team also were tracked for their performance, |
| 8 team at which some people started to question our | 8 because that was one of the metrics that the teams |
| 9 prior record of how we had done things, to which I | 9 who delegated us to manage these sleeves were very |
| 10 had vehemently reacted and had given the specific | 10 interested in seeing being maximized. |
| 11 examples that led Josh Brooks to think that what I | 11 So, the performance benchmark. |
| 12 was presenting was the voice of reason. | 12 So, for example, Putnam, the Putnam |
| 13 And I just didn't want people to rewrite | 13 International Equity Fund, when they mandated us to |
| 14 the history of how we had done things in Global | 14 manage the Energy and Basic Materials sleeve, which |
| 15 Natural Resources and in the Energy and Materials | 15 basically was forked into the Energy sleeve and the |
| 16 team simply because Lisa had left and simply because | 16 Basic Materials sleeve were tracking our performance |
| 17 the composition of the team had changed. | 17 and comparing it to the benchmark that they had set |
| 18 MR. KOCIUBES: Motion to strike. | 18 for us. |
| 19 Q. Did you -- were the processes changed as a | 19 Q. How did the performance of the sleeves |
| 20 result of this meeting? | 20 vis-a-vis the benchmarks compare from the period |
| 21 MR. KOCIUBES: Objection. | 21 before September 15 of 2003 to the period after |
| 22 A. No. Actually, I don't think so. | 22 September 15, 2003? |
| 23 Even after this meeting, we just | 23 MR. KOCIUBES: Objection. |
| 24 continued to do what we had done before, which is, | 24 A. You will have to obtain the records for that |

| Page 79 | Page 81 |
|---|---|
| 1 we were working from screens that helped us generate | 1 from Putnam. |
| 2 investment ideas. And individual analysts would | 2 Unfortunately, I do not have evidence to |
| 3 elaborate on these ideas and then bring them to the | 3 tell you what has happened. |
| 4 attention of the portfolio team, and then discuss | 4 I can give you my recollection. And |
| 5 them. And then these ideas might be implemented and | 5 also, I can give you the -- I have to use -- I mean, |
| 6 carried into the funds or any other portfolios that | 6 I have to caveat my statement in the sense that |
| 7 we were managing together as a team. | 7 after Lisa left -- while Lisa was leading the Energy |
| 8 And the only difference, you know, with | 8 and Materials team, Putnam International Equity had |
| 9 respect to what happened prior was that it wasn't | 9 given us money to manage in a single sleeve called |
| 10 Lisa on the team. It was somebody else on the team. | 10 Energy and Materials. |
| 11 Q. Did Putnam chart the performance of the | 11 After Lisa left, Putnam International |
| 12 team, how they did as a team? | 12 Equity, the team, decided to split the sleeve in two |
| 13 MR. KOCIUBES: Objection. | 13 and to have somebody manage the energy portion and |
| 14 A. That -- well, when you say chart, you mean | 14 somebody -- and the three of us, the three analysts, |
| 15 have a chart on the wall? | 15 Chris, Ellis and I manage the basic materials |
| 16 Q. Did they maintain any records with respect | 16 sleeve. |
| 17 to how the stocks that were being, which were under | 17 The reason for that was that energy, |
| 18 management, were performing? | 18 none of us were experts in energy. And with Lisa's |
| 19 MR. KOCIUBES: Objection. | 19 departure, there wasn't an expert to manage the |
| 20 A. Yes, they did. | 20 sleeve as an expert in covering energy stocks, |
| 21 Global Natural Resources is a | 21 because simultaneously, Darren left. |
| 22 publicly-traded fund. And the performance of that | 22 So, there wasn't an expert who would |
| 23 fund is a matter of public knowledge, because you | 23 take over the responsibility of covering an energy |
| 24 can find it in any financial service where it is | 24 sleeve. |

21 (Pages 78 to 81)

Konstantin S. Stoev

1    And therefore, the sleeve was being
2  managed by, I think, Josh Burns at the time, who is
3  a senior portfolio manager on the team.
4    So, effectively, it was managed by the
5  same team.  And Josh had previously had experience
6  covering energy stocks.
7    So, therefore, the comparability of the
8  records is not appropriate since the processes under
9  which energy might have been managed after Lisa left
10  would be different from the way it would have been
11  managed if Lisa had stayed.
12    MR. WEIR:  Off the record.
13    (Discussion off the record.)
14    MR. WEIR:  Back on the record.
15    I'd like to mark as Exhibit 4 the memo
16  from Josh Brooks to Konstantin Stoev, dated
17  September 19, 2003, about which he has testified
18  previously.
19    (Marked, Exhibit 4, E-mail, dated
20  9/19/2003, to Stoev from Brooks.)
21    Q.  Other than what you've testified to
22  previously, did you have any discussions with any
23  member of the management of Putnam concerning Lisa
24  Svensson or Lisa Svensson's termination or the

1  reasons for her termination either before or after
2  September 15 of 2003?
3    A.  Yes.
4    After it was announced that Lisa was
5  being terminated, I went to Eric Hutchinson to ask
6  him what had happened, given that he had interviewed
7  me and said that Lisa was being considered for
8  promotion and, instead, I'm finding out that Lisa is
9  being terminated.
10    And Eric's response was totally stone
11  cold.  I mean, basically, he said, wait, wait, wait.
12  What are you talking about, something like that.
13    And he basically acted very defensively.
14  And I felt that I should not be talking to him.
15    MR. KOCIUBES:  Motion to strike.
16    Q.  Do you recall any of the words that he said?
17    A.  I cannot recall the words, unfortunately,
18  but you know, people speak with words as well as,
19  you know, verbally.  And his communication, his
20  non-verbal communication was, look, I don't want to
21  talk about this.
22    And so, I took it.
23    MR. KOCIUBES:  Motion to strike.
24    MR. WEIR:  I don't think he's finished.

1    A.  And then the additional person, after Lisa
2  left and -- I don't remember if it was in October,
3  but at the time, I was working with Josh Burns as
4  well from Putnam International Equity.
5    Putnam International Equity had
6  requested of Lisa that I work with them part-time or
7  sort of my time was split between Energy and
8  Materials and Putnam International Equity, working
9  with Josh Burns on the concentrated sleeve that he
10  was managing.
11    And during that summer, Josh was ill.
12  And therefore, I was working with that sleeve
13  together with the team.  On a more direct basis, I
14  was more involved in it.
15    And Josh came back from his illness some
16  time in the fall, maybe in October or late
17  September.  And he said, You have to tell me what
18  happened to Lisa.
19    And I said, Josh, I don't know.
20    Those are the two that I recall --
21    Q.  Okay.
22    A.  -- in addition to what I have already talked
23  about.
24    Q.  I believe you testified earlier that you

1  left Putnam at the end of 2004?
2    A.  Yes.
3    December 31, 2004.
4    Q.  What occasioned your departure?
5    A.  I believe I'm not at liberty to discuss
6  that, but if you ask Putnam, they will be able to
7  tell you.
8    Q.  Oh, has somebody from Putnam instructed you
9  not to answer that question?
10    A.  I'm not at liberty to answer that question
11  either, as absurd as it may sound.
12    As I said, you have to talk to Putnam
13  about the circumstances of my departure.
14    Q.  Well, are you at liberty to discuss who told
15  you that?
16    MR. KOCIUBES:  Let's be clear here.  I'm
17  representing Putnam, and I'm not giving him any such
18  instruction.
19    MR. WEIR:  Okay.  There you go.
20    Q.  You can answer.  Putnam's attorney has
21  indicated that you are free to answer that question.
22    THE WITNESS:  Okay.
23    MR. MOLONEY:  Well, I think, may I
24  suggest that there are specific words from

22 (Pages 82 to 85)

Konstantin S. Stoev

Page 86

1  Mr. Kociubes to the witness so we don't have any
2  confusion as to what the direction by Mr. Kociubes
3  to this witness is.
4      MR. KOCIUBES: There's no confusion on
5  my part.
6      He is under oath and is free to testify
7  about his reasons for his leaving.
8      A. Could you give me just five minutes?
9      I need -- or two minutes. I need to
10  read through a document just to understand a little
11  bit better the circumstances, because I don't want
12  to do something I'm not supposed to do.
13      (Pause.)
14      A. Am I required by law to disclose my
15  separation from Putnam?
16      MR. KOCIUBES: Let me be clear about a
17  couple of things.
18      I don't represent Mr. Stoev.
19      So, I'm in no position to instruct him
20  as to what he's required or not required to do at a
21  deposition, but I want to be clear about Putnam's
22  position, that he is validly under oath, and
23  Mr. Weir is asking you questions. And as far as I'm
24  concerned, you're required to answer questions.

Page 87

1      MR. MOLONEY: Does that mean that you're
2  taking the position on the part of Putnam that if he
3  does answer under oath the questions that Mr. Weir
4  has, that Putnam will not seek to enforce any kind
5  of agreement or impose sanctions upon him?
6      MR. KOCIUBES: You know fully what the
7  rules are, but with respect to his termination, my
8  attitude is, he is entitled to, and indeed
9  obligated, to answer the questions.
10      MR. MOLONEY: Notwithstanding the
11  language of any kind of agreement?
12      MR. KOCIUBES: That is correct.
13      Q. Let me see if I can clear this up.
14      Mr. Stoev, did you sign an agreement
15  with Putnam at the time of your departure that you
16  would not provide information with respect to the
17  circumstances concerning your departure?
18      A. Yes, I did.
19      Q. And did you do so in exchange for a sum of
20  money that was provided by Putnam to you?
21      A. Yes.
22      Q. Do you know how much money was paid to you?
23      A. Yes.
24      Half of my performance bonus for the

Page 88

1  previous year, which was $62,500.
2      And the end of my employment on December
3  31, 2004 came because of a termination agreement
4  that I signed, that is dated November 5, 2004.
5      And that relates to a conversation that
6  I had on September 16, 2004 with Kelly Morgan and
7  Josh Brooks, at which time I was told that my job
8  could not be offered to me any more in the future.
9      Q. Did either Mr. Brooks or Ms. Morgan indicate
10  the reason why your job could not be offered to you
11  at any time in the future?
12      A. I do not recall the reasons.
13      Q. Okay.
14      A. And if they existed.
15      Q. Would it be fair to say that Lisa Svensson
16  was the best manager that you had during your tenure
17  at Putnam?
18      MR. KOCIUBES: Objection.
19      A. Yes.
20      MR. WEIR: I have no further questions.
21      MR. KOCIUBES: I'm going to try -- let's
22  go off the record.
23      (Discussion off the record.)
24      (Brief recess.)

Page 89

1  EXAMINATION BY MR. KOCIUBES:
2      Q. Mr. Stoev, I take it from your work
3  experience in the United States that you understand
4  that personnel records are generally confidential?
5      MR. WEIR: Objection. No foundation.
6      Q. Do you know that or not?
7      A. What do you mean?
8      Q. Well, has it been your experience, for
9  example, that human resource departments will talk
10  to one employee about what's in the personnel file
11  of another employee?
12      MR. WEIR: Objection. No foundation.
13      A. Give me an example.
14      Q. Well, let me ask you this.
15      Were you surprised that, for example,
16  Mr. Hutchinson would not talk to you about the
17  circumstances of Ms. Svensson's leaving?
18      A. That was not -- sir, are you implying that I
19  actually asked him to do that?
20      Q. Yes.
21      I take it you didn't ask him to do that?
22      A. No.
23      Q. Okay. And do you recall any of the Putnam
24  employees telling you that Ms. Svensson, as with

23 (Pages 86 to 89)

Konstantin S. Stoev

Page 90

1  other employees, personnel matters were
2  confidential?
3      A. Can you repeat the question?
4      Q. Do you recall any Putnam employee telling
5  you that personnel matters, including Ms. Svensson's
6  personnel matters, were confidential?
7          MR. WEIR: Objection.
8      A. Could you give me an example?
9      Q. I'm just asking if you remember. If you
10 remember, you remember. If you don't, you don't.
11     A. No, but could you give me an example of what
12 you mean when you say a personnel --
13     Q. Do you recall, for example, asking
14 Mr. Brooks questions about why Ms. Svensson was not
15 going to be managing, and him telling you that he
16 could not talk about personnel matters with you?
17     A. I do not recall -- I'm sorry.
18         Could you repeat that last specific
19 question, because this is a little bit difficult for
20 me to parse?
21         MR. KOCIUBES: Would you read the
22 question back.
23         (Last question read back by Reporter.)
24     A. These are two questions, you understand.

Page 91

1          Can you ask me the question one by one?
2      Q. Did you ask Mr. Brooks why Ms. Svensson was
3  no longer going to be managing?
4      A. Yes.
5      Q. And do you recall him telling you that he
6  could not talk about personnel matters with you?
7      A. What are you referring to as personnel
8  matters?
9      Q. Why, for example, she would not be managing.
10     A. He actually discussed it with me.
11     Q. And did he discuss hypotheticals with you or
12 not?
13     A. What do you mean when you say hypotheticals?
14     Q. Well, let me ask you this, sir.
15         Did you know that Ms. Svensson was
16 keeping a journal of conversations she had with
17 various people, including you?
18         MR. WEIR: Objection.
19         Beyond the scope of the direct.
20         THE WITNESS: What does that mean?
21     Q. You're required to answer.
22     A. Okay. Could you repeat the question?
23     Q. Did you know that Ms. Svensson kept a
24 journal where she recorded conversations she had

Page 92

1  with various people, including you?
2      A. Could you be more specific?
3      Q. No.
4          Can you answer the question?
5          Do you know that she was keeping such a
6  journal or not?
7      A. You have to ask the question in terms of
8  time.
9          I don't recall -- no, I did not know
10 that Lisa was actually keeping a record of her
11 conversations with people --
12     Q. Okay. So, I take it --
13     A. -- when she was employed at Putnam
14 Investments.
15     Q. So, I take it she never told you that she
16 was recording things that you were telling her about
17 Putnam and other matters?
18     A. No.
19     Q. Okay. Now, let me, before we turn to
20 Putnam, you were asked about --
21     A. Sir, could you --
22     Q. Let me just put a question to you, sir.
23         MR. WEIR: Wait a minute. I'm not sure
24 he's finished his question.

Page 93

1      A. I didn't understand quite the answer that
2  you asked.
3          You ask these questions, but you're not
4  specific about -- somehow, your questions seem too
5  open-ended and not specific to anything.
6      Q. Well, if you can't answer the question, just
7  tell me that. If you can answer, you're obligated
8  to answer. If you don't understand the question or
9  you're incapable of answering it, just tell us that.
10     A. Okay. Could you repeat your last question,
11 because I'm not sure that I answered it correctly.
12 And I want to be sure that I answer it correctly.
13         MR. KOCIUBES: Want to repeat the last
14 question.
15         (Last question read back by Reporter.)
16     Q. That's the open-ended question you were
17 commenting about?
18     A. Yes.
19     Q. Okay. Are you capable of answering it or
20 not?
21     A. Could you read -- sorry. It's late in the
22 afternoon. I've been up since 5:30.
23         THE WITNESS: Could you repeat the
24 question again for my benefit?

JONES REPORTING COMPANY
617-451-8900

Konstantin S. Stoev

Page 94

1          (Last question read back by Reporter.)
2          MR. WEIR:  Note my objection to the
3  other matters.
4      Q.  Let's say Putnam-related matters.
5          MR. WEIR:  Objection.  Vague.
6      A.  I cannot answer that question.  It's just
7  too ambiguous.  Too many things you imply in it.
8          It means I cannot have any conversations
9  with Lisa about anything she was putting down on
10 paper.
11     Q.  Did she ever tell you she was recording any
12 of the conversations she was having with you, taking
13 notes of those conversations?
14         MR. WEIR:  Is it recording or taking
15 notes?
16         MR. KOCIUBES:  No, making notes.
17     A.  I could see she was making some notes of
18 conversations we've had since, you know, in my
19 relationship with her as an employee and a manager,
20 she had to keep track of certain things that I was
21 doing and certain, you know, performance-related
22 issues, you know, things that relate to how she
23 evaluates my performance.
24         And I think it's a matter of good

Page 95

1  practice that anybody, when they have a conversation
2  that is about facts, that they record something,
3  because otherwise, memory is fickle.  And you know,
4  some things escape.
5      Q.  Did she tell you she was making notes about
6  conversations she was having with you after she left
7  Putnam?
8      A.  I am sorry.
9          You are asking me if she, if she had
10 told me that when I spoke to her after she left
11 Putnam, she was making notes of what I told her?
12     Q.  Yes.
13     A.  I never asked her.
14     Q.  Okay.  And she never volunteered it?
15     A.  Yes.
16     Q.  By the way, am I correct that in addition to
17 being supervised by Ms. Svensson even after you left
18 Putnam, you and, on occasion, your wife would
19 socialize with her?
20     A.  Are you asking -- could you be more
21 specific?
22     Q.  Which part do you not understand?
23     A.  What do you mean, socialize?
24     Q.  Well, let's say, for example, have you and

Page 96

1  your wife ever been to her house for a meal?
2      A.  Yes.
3      Q.  And what year was that?
4      A.  Good question.
5          I don't remember if it was in -- it must
6  have been early 2005.
7      Q.  And how about you and your brother, have you
8  and your brother ever been to her house?
9      A.  Yes, we have.
10     Q.  And in addition to that, would you talk to
11 her on the telephone with some frequency after she
12 left Putnam?
13     A.  Yes.
14     Q.  And by the way, when you and your brother
15 went to her house, that was after she had left
16 Putnam?
17     A.  I think so.
18     Q.  And for example, when you were getting ready
19 to move to Zurich, you called her to tell her you
20 were going to Zurich?
21     A.  Yes, I did that.
22     Q.  And do you recall after she was gone from
23 Putnam, she continued to have your cell phone
24 number, she called you when you were in India?

Page 97

1      A.  I think my cell phone number was registered
2  in a book that was distributed widely among all
3  Putnam investment professionals.
4          And so, I would assume that she would
5  have it, as would anybody else who receives that
6  booklet.
7      Q.  And do you recall that you found out that
8  she was suing Putnam?
9      A.  Yes, I did find out.
10         I don't remember exactly when, though.
11     Q.  And do you recall when you had the various
12 conversations, for example, about her with
13 Mr. Hutchinson and Mr. Brooks, that you would then
14 report on those conversations to Ms. Svensson?
15     A.  I'm sorry.  Could you repeat that question?
16     Q.  You testified about various conversations
17 that you had with Mr. Brooks and Mr. Hutchinson
18 about Ms. Svensson.
19     A.  Yes.
20     Q.  And do you recall whether you then reported
21 on those conversations to Ms. Svensson?
22         MR. WEIR:  Objection as to reported on.
23     A.  What do you mean?
24     Q.  Just fill her in on those conversations.

25 (Pages 94 to 97)

Konstantin S. Stoev

**Page 98**

1    Did you tell her about the
2  conversations?
3    A. Did I tell her about the conversations?
4    Q. Yes.
5    Right after they happened, or shortly
6  after they happened.
7    A. Which one, right after they happened or
8  shortly after they happened?
9    Q. Any of them.
10    A. I'm sorry. I'm sorry.
11    Your questioning is not specific about
12  time, and you have to be specific about time.
13    Q. Within a day or two or three after they
14  happened.
15    A. I doubt it, because I don't think -- no.
16    In the specific time frame that you say,
17  it's unlikely.
18    Q. So that if Ms. Svensson would have recorded
19  some conversations with you in her journal about
20  those conversations, is it your testimony that they
21  likely would never have happened?
22    MR. WEIR: Objection.
23    A. No, that's not true.
24    You were asking me a specific question,

**Page 99**

1  say, for example, when I spoke to you, Mr. Eric
2  Hutchinson, when he interviewed me about Lisa being
3  promoted -- that's how I understood your question --
4  whether that, whether I reported or spoke to Lisa
5  about that conversation within a day or two of that
6  conversation having taken place.
7    Is that the question you asked me?
8    Q. Yes.
9    A. And the answer to that is no, because I
10  didn't speak to Lisa about that conversation with
11  Eric Hutchinson within a day or two after it
12  happened.
13    Q. And are you suggesting that you never spoke
14  to her or that you simply spoke to her maybe two or
15  three days later?
16    MR. WEIR: Or something else.
17  Objection.
18    A. Yes, I mean, again, you have to ask me the
19  specific question about when I could have spoken to
20  her about it.
21    Q. So, it doesn't help you unless I can give
22  you a specific date of the conversation?
23    A. Or approximate date.
24    Q. Okay. We may do that.

**Page 100**

1    Let's, before we get into that --
2    A. And similarly, when you, you asked me also
3  about Josh Brooks. You asked me whether I had
4  spoken to her immediately after my conversations
5  with Josh Brooks.
6    In one of those cases, as I described
7  it, to a previous question, I did speak to her
8  virtually immediately after that conversation simply
9  because Josh Brooks encouraged me to speak to her
10  about what had been going on.
11    That is one example when things are,
12  when I did speak to her almost immediately, but I am
13  afraid that the more general answer to your question
14  of whether I had spoken about anything, I had spoken
15  to anybody at Putnam with Lisa within a day or two
16  after I had spoken to them, unfortunately, the
17  answer to that is so highly unlikely that it is a
18  no.
19    Q. All right. We'll see if we can refresh your
20  memory in a minute, but before we go there, you said
21  you're currently employed by Swiss Re?
22    A. I am.
23    Q. And you've been there about eight months?
24    A. Yes.

**Page 101**

1    Q. What is your actual title there?
2    A. My actual title, you mean in terms of an
3  officer title?
4    Q. Yes.
5    A. Vice-president.
6    Q. And before you were at Swiss Re, you were at
7  Credit Agri Cheuvreux, you said?
8    A. Credit Agricole.
9    Q. Agricole Cheuvreux?
10    A. Cheuvreux.
11    Q. And am I correct that you were there about
12  10 or 11 months?
13    A. Yes.
14    Q. And what was your title there?
15    A. Senior analyst, chemicals.
16    Q. And at Putnam, you were about three and a
17  half years?
18    A. I was there from, as I said, the 20th of
19  August 2000 until the 31st of December, 2004.
20    Q. Am I correct then that's about three and a
21  half years, three years, eight months?
22    A. Actually, I think more. 2001, 2002, 2003,
23  that's four years.
24    Q. Four and a half years.

26 (Pages 98 to 101)

Exhibit A-3

Konstantin S. Stoev

Page 102

1    And am I correct Putnam was your longest
2  period of employment, professional employment?
3    A. Let's see. I had been employed at another
4  company before, but yes, I believe you're right.
5    Q. Now, you indicated that while at Putnam, you
6  were involved in managing a sleeve of a portfolio?
7    A. When I was at Putnam --
8    Q. Yes.
9    A. -- I was involved as a team member managing
10  the portfolio.
11    Q. And while you were at Putnam, was Ms.
12  Svensson also involved in managing a sleeve?
13    A. Yes.
14    We're referring to different time
15  frames.
16    So, you have to be more specific, again,
17  unfortunately.
18    Q. I'm saying in 2002 into 2003.
19    MR. WEIR: What is your question with
20  respect to that time period?
21    Q. Was Ms. Svensson also involved in managing a
22  sleeve?
23    A. I'm sorry.
24    At that time, I was not a managing, I

Page 103

1  was not managing a sleeve.
2    I was a member on a team that was given
3  the mandate to manage that sleeve. I did not
4  perceive myself as the manager of that sleeve, if
5  that's what you thought.
6    I was a member of a team that generated
7  that sleeve.
8    Q. Fair enough. Who else was on that team
9  from, say, March of 2002 through September of 2003
10  in managing that sleeve?
11    A. Actually, I don't remember when the sleeve
12  was set up at first. I don't know if it was set up
13  in 2002 or 2003.
14    You have to -- you have to ask Putnam
15  for that.
16    Q. At any time during that period.
17    A. Certainly, it existed in 2003.
18    Q. Okay. So, let's talk about 2003.
19    A. And at that time, it was called the Energy
20  and Basic Materials sleeve.
21    Q. And who was involved in managing --
22    A. This was a sleeve with Putnam International
23  Equity.
24    So, it was international equities, not

Page 104

1  U.S.
2    And the people involved in that sleeve
3  were the Energy and Basic Materials team.
4    Q. Give me the names.
5    A. Lisa Svensson, Darren Peers, Chris O'Malley,
6  Ellis Eckland and me.
7    Q. Okay. So, even when Ms. Svensson went over
8  to --
9    A. And it might have been toward the end of it.
10    So, maybe in the late summer 2003, it
11  was also John Morgan, but I think he had joined our
12  team by then to cover the gold stocks.
13    Q. Okay. So, even when Ms. Svensson came to
14  research, she continued to have some money
15  management responsibilities as part of that team?
16    A. After Lisa came to research, that was in
17  2002.
18    Q. Right.
19    And in 2003, you said that the team was
20  managing a sleeve?
21    A. Yes.
22    Q. Okay.
23    A. But there might have been a hiatus between
24  her coming into global equity research and the

Page 105

1  commencement of the sleeve.
2    In other words, the sleeve might have
3  been set up later than her coming to global equity.
4  You have to check that.
5    Q. But you remember the sleeve existed by 2003,
6  regardless?
7    A. It did.
8    Q. Okay.
9    A. And when you refer to the sleeve, I take it
10  you refer to the sleeve of Putnam International
11  Equity?
12    Q. Yes.
13    A. Okay.
14    Q. Now, you were -- at the very end of the
15  direct examination, Mr. Weir asked you some
16  questions about your leaving Putnam?
17    A. Yes.
18    Q. And am I correct that in response to his
19  questions, what you indicated is that you were
20  terminated by Putnam?
21    A. No.
22    I said that there is a termination
23  agreement -- sorry. There is an employment --
24    MR. WEIR: Note my objection.

27 (Pages 102 to 105)

Konstantin S. Stoev

| Page 106 | Page 108 |
|---|---|

**Page 106**

1    I think the prior testimony speaks for
2  itself.
3        A. I think I've answered that question already.
4        Q. Did you leave voluntarily?
5        A. No.
6        Q. Okay. And you were sufficiently upset at
7  Putnam that you consulted with a lawyer about suing
8  them?
9        A. No.
10       Q. Did you consult with a lawyer named Jim
11  Hartley?
12       A. Yes.
13       Q. At the law firm of Perkins, Smith & Cohen?
14       A. Yes -- sorry. It could have been.
15           Unfortunately, I don't have a record of
16  that person's name, but it sounds familiar.
17           I can tell you where their offices are,
18  roughly, but yes.
19       Q. And you consulted with him in connection
20  with your termination by Putnam?
21       A. Yes.
22       Q. Okay.
23       A. And I did that specifically because the
24  agreement says that I am entitled to speak to a

**Page 107**

1  lawyer about the agreement.
2           I did not talk to him about suing
3  Putnam. I want that clear on the table.
4        Q. And do you recall whether --
5        A. I specifically mentioned to that lawyer, and
6  I think he has records of that conversation, that I
7  do not intend to sue Putnam.
8        Q. Do you recall if you told Ms. Svensson that
9  you consulted a lawyer about suing Putnam?
10       A. Come on.
11          If I already told the lawyer I was not
12  going to sue Putnam, how would I -- could you repeat
13  your question?
14       Q. Do you recall whether you told Ms. Svensson
15  that you had consulted a lawyer about possibly suing
16  Putnam?
17           MR. WEIR: Objection.
18           It mischaracterizes his prior testimony.
19       A. Yes. I already said what I said.
20           I consulted the lawyer because the --
21       Q. I'm not asking why you consulted the lawyer.
22           I'm asking what you told, if
23  anything, Ms. Svensson about it.
24       A. I'm sorry. You know, when you have

**Page 108**

1  conversations with people about a number of things,
2  I don't keep a record of what I have said on the
3  phone or what I have said in person or, you know,
4  anything that's not written.
5           I don't recall precisely what I said,
6  but what I know is that the lawyer -- and I'm sure
7  that I can ask him for his notes, because he took
8  these notes -- that I specifically told him that I
9  was here to discuss the terms of the agreement, that
10  I did not have any intention of suing Putnam.
11           He took it down. And from that point
12  on, what we discussed is, point by point, the
13  termination -- the separation agreement.
14           And he gave me good advice about what I
15  wanted to convey back to Putnam and ask them for
16  additional information and ask them for an addendum
17  to the separation agreement. That was the advice
18  that the lawyer gave me.
19           It was worth the $300 that I paid for
20  the thing.
21       Q. Let's do this one step at a time. And I
22  want to be clear that I'm not asking what you and
23  the lawyer talked about.
24       A. Okay.

**Page 109**

1        Q. In any detail.
2           I'm trying to focus you -- and if you
3  don't remember, tell me -- whether you told Ms.
4  Svensson that you had consulted a lawyer about suing
5  Putnam.
6        A. Again, this simply -- I don't remember doing
7  that because it simply cannot be.
8        Q. All right.
9        A. Because I already had -- I did not have the
10  intention -- I had the intention not to sue Putnam.
11           In other words, I had the intention to
12  accept the separation agreement as it was, with some
13  modifications that the lawyer recommended.
14       Q. So that if there were some notes in Ms.
15  Svensson's journal about your having told her you
16  consulted a lawyer about the possibility of suing
17  Putnam, those would be in error?
18           MR. WEIR: Objection.
19       A. Look, I don't know what is in Lisa's
20  journal. I don't know if there is such a record.
21           And you are implying that there is such
22  a record, and you are implying that I am saying
23  something that I think I couldn't have said simply
24  because I never intended to do it, and because there

JONES REPORTING COMPANY
617-451-8900

Konstantin S. Stoev

Page 110

1 is another record with another person who knows that
2 I never intended to do it.
3 Q. I'm just asking -- if you don't remember
4 having said any such thing, that's all you need to
5 tell me.
6 A. But you're telling me also that there is a
7 record of that. And I have no idea whether there is
8 such a record.
9 Q. Now, let's focus --
10 A. You're implying I have actually discussed
11 this with Lisa, and I don't remember if I discussed
12 it. That's an implication that I do not accept.
13 Q. All right. Let's focus on the beginning of
14 2002.
15 Do you recall who was your manager at
16 that point?
17 A. Beginning of 2002?
18 Q. Yes.
19 A. My manager was Steve Gorman.
20 Q. And at some point, did you report or were
21 you managed by Mr. Falvey?
22 A. No.
23 Steve Gorman was my manager.
24 Q. Okay. You never reported to Mr. Falvey?

Page 111

1 A. No.
2 Jim and I were members of the same team,
3 and he was the leader of the team.
4 Q. Now, you testified earlier today about the
5 state of the team before Ms. Svensson arrived --
6 A. Yes.
7 Q. -- and assumed management.
8 And were you talking about Mr. Gorman's
9 management of that team or Mr. Falvey's management
10 of that team before Ms. Svensson became involved in
11 the management of that research team?
12 A. Mr. Gorman was -- you're implying Mr. Gorman
13 was a member of that team, and he wasn't.
14 Q. He was never a member of that team?
15 A. No.
16 Q. Okay. So, when you were testifying this
17 morning about the state of the team and the
18 management of that team --
19 A. Yes.
20 Q. -- about whom were you testifying?
21 MR. WEIR: Objection. Vagueness.
22 A. Yes, it's difficult to understand what
23 you're asking.
24 Q. Who was the leader of the team that let it

Page 112

1 deteriorate that you talked about this morning?
2 A. Jim Falvey.
3 Q. Okay. But you never reported to Mr. Falvey?
4 A. If you mean report in the sense of who
5 evaluates my performance?
6 Q. Right.
7 Who managed you?
8 Mr. Falvey never managed you?
9 A. Mr. Falvey did not evaluate my performance
10 as a manager.
11 My manager was Steve Gorman.
12 Q. All right. And so, when you were talking
13 about Mr. Falvey's management of the, of that
14 research team, you were doing so from the vantage
15 point of somebody who was not being supervised by
16 Mr. Falvey?
17 A. I was a member of the team.
18 Q. Okay. And so, you were able to see Mr.
19 Falvey's management style?
20 A. Yes.
21 Q. And in your mind, it was not an appropriate
22 management style, not an effective management style?
23 A. Which one, appropriate or effective?
24 Q. Well, let's say effective.

Page 113

1 A. As I stated, the team was in a condition
2 where meetings were being cancelled, meetings where
3 we discuss it.
4 Some meetings were not very substantive,
5 in the sense that not much was being talked about.
6 Team members were leaving the team or
7 not attending meetings, which means, in effect, I'm
8 not on this team any more.
9 And we were not producing quality work
10 that, you know, of general interest to the rest of
11 the organization that we could bring in on general
12 presentation and present and stir enough interest by
13 the organization.
14 To me, that was a description of a team
15 that was degenerating relative to what its role had
16 been.
17 Q. Who left the team as a result of Mr.
18 Falvey's management?
19 A. As I described it, the -- you have to go
20 back and --
21 Q. Just give me a name.
22 A. It was so far, it was so long ago that it
23 will be -- as I described it, leaving the team
24 formally means, I'm not going to be a member of this

Konstantin S. Stoev

Page 114

1 team any more. And somebody else might come in from
2 our -- as I described the knowledge management team,
3 there were knowledge management teams that comprised
4 analysts and portfolio managers that had similar
5 interest in coverage of a sector.
6          The analysts were a permanent fixture of
7 that team in the sense that we were the specialists
8 in a particular area. And the portfolio managers
9 were people from the portfolio teams who were not
10 specialists in that particular area but still had
11 interest in that area and prior history of covering
12 stocks in that area or have been given
13 responsibility by their own portfolio management
14 team of looking after these sectors of the
15 portfolio.
16          And you know, the people who would
17 attend our meetings at the knowledge management team
18 would be the analysts and these portfolio managers.
19          As I mentioned, the analysts were
20 permanently there just because simply the team would
21 not otherwise exist, lose its reason for existence.
22          The portfolio managers who had come in
23 and gone out or who were supposed to come in and
24 were not coming to the meetings to discuss ideas or

Page 115

1 who were supposed to contribute but were not
2 contributing might have been different people. And
3 among the people who were members of that team, I
4 remember Tina Solito. I remember Colin -- and his
5 last name escapes me. I'm sorry.
6          Lisa was on that team -- sorry -- a
7 representative from the portfolio managers. And it
8 might have been Bart Gear from value, yes.
9          And these were the people who would not
10 attend the meetings on a regular basis. And the
11 less frequently they came to the meetings, the less
12 effective one of the original goals of these teams
13 would be, which is to integrate the two teams,
14 equity research and portfolio managers, and convey
15 information about the sector back to the portfolio
16 teams in a more, in a more effective way, and also
17 to create presentations or just to present to people
18 across the organizations about what is going on in
19 the sectors and how, you know, things we observed
20 and the work we create could be evaluated.
21          So, when I was describing the issue of
22 degeneration, I am describing a situation where
23 meetings are less frequent.
24          So, therefore, the opportunity to create

Page 116

1 anything, any insight with shared information, as
2 knowledge management, by its name implies, is less.
3          If meetings are shorter and the
4 opportunity to share information. And to engage in
5 a discussion is more limited. If people are absent,
6 then the channels to communicate are broken.
7          And that, from the beginning, was not
8 the case. It was much more attendance. There was
9 much more input. There was much more interest.
10          And then over time, that degenerated.
11 Q. Mr. Stoev, can you give me the name of any
12 analyst who asked to transfer off of that team
13 because of Mr. Falvey's management?
14 A. No, I don't think -- I mean, sorry.
15          You're implying that I would actually
16 know if somebody asked.
17 Q. If you don't know, just tell me. If you
18 can't give me a name, just tell me.
19 A. I know what I know about me, but I don't
20 know about the other analysts.
21 Q. Can you give me the name of any analysts who
22 left Putnam because of Mr. Falvey's management of
23 the team?
24          MR. WEIR: Objection.

Page 117

1          How would he know.
2 A. Again, you're asking me something I have no
3 way of knowing.
4 Q. By the way, what happened to Mr. Falvey?
5 A. Sorry. I don't know what happened to Mr.
6 Falvey.
7 Q. Was he still with Putnam when you left?
8 A. No.
9 Q. Was he still with Putnam when Ms. Svensson
10 left?
11 A. No.
12 Q. What happened to his responsibilities when
13 he -- do you remember when he left?
14 A. He left in -- and I'm not -- I cannot be
15 specific about the month, but it was at the
16 beginning of 2002, either January or February, but I
17 don't remember exactly when.
18 Q. 2002 or 2003?
19 A. 2003. You're right.
20 Q. And did anybody tell you how or why he came
21 to leave?
22 A. There was -- in the regular Thursday meeting
23 that we have of the whole management -- sorry -- the
24 whole global equity research group, the then

30 (Pages 114 to 117)

Konstantin S. Stoev

Page 118

1  director of research, Bill Landes, said that Jim
2  will leave Putnam, and that his responsibilities
3  will transfer over to Lisa, who will continue to
4  manage the team.
5        And so, that is how I found out about
6  Jim's departure.
7     Q.  So, all you know is that he departed.
8        They took the responsibilities that that
9  male had had previously and transferred it to a
10  female, Ms. Svensson?
11    A.  I'm sorry.
12       What I know is what I stated, which is
13 that Bill Landes made the statement that Jim Falvey
14 was leaving the organization, and that Lisa was
15 going to continue to manage the team and take over
16 the responsibilities for, the responsibility for
17 managing the Global Natural Resources Fund.
18    Q.  Now, you testified this morning that there
19 came a point, I think in August of 2003, when
20 Mr. Hutchinson came and talked to you about Ms.
21 Svensson?
22    A.  Mr. Hutchinson talked to me, and I think --
23 I don't recall the exact month.  And I said it might
24 be July or August 2003.

Page 119

1     Q.  Okay.  And when he talked to you about Ms.
2  Svensson, you recall that he didn't criticize Ms.
3  Svensson in front of you?
4     A.  Not at all.
5        MR. WEIR:  Objection.
6     Q.  And he asked for your views of Ms. Svensson
7  as a manager?
8     A.  Wait a second.
9        I'm sorry.  I have answered that
10 question already.
11       Mr. Hutchinson --
12       MR. WEIR:  Exactly my point.
13    A.  -- asked me -- yes, I've answered this
14 question already.
15       Mr. Hutchinson invited me to give
16 feedback about Lisa to specific questions that he
17 asked me.  And I answered these questions.
18       And he stated at the beginning of the
19 conversation that Lisa was being considered for a
20 promotion.
21    Q.  And you gave your feedback?
22    A.  Yes, I gave my feedback.
23    Q.  Okay.  You were allowed to say what your
24 views were?

Page 120

1     A.  Yes.
2        Mr. Hutchinson at no point in that
3  conversation stated any characterization, any
4  judgment or anything about Lisa.
5     Q.  Now, do you know whether Mr. Hutchinson also
6  interviewed Mr. Peers?
7     A.  You're asking me if I knew --
8     Q.  Do you know?
9     A.  No, I didn't.
10    Q.  And you never talked to Mr. Peers about
11 whether he had any conversations with Hutchinson or
12 anybody else about Ms. Svensson?
13    A.  No, I didn't -- I'm sorry.
14       Can you repeat your question, because it
15 started with Mr. Hutchinson and ended up with
16 anybody else.  And I need to be -- I'm sorry.  I
17 cannot focus on your question.
18    Q.  I take it you don't know whether
19 Mr. Hutchinson interviewed Mr. Peers about Ms.
20 Svensson, about that same time, July, August?
21    A.  Yes.  I -- I'm sorry.
22       I don't know if Mr. Hutchinson has
23 interviewed Mr. Darren Peers about anything.
24    Q.  Okay.  And so, by definition, you don't know

Page 121

1  what Mr. Peers reported in terms of how he perceived
2  Ms. Svensson's management?
3     A.  Yes.
4        The implication of what I just said is
5  if I don't know that there was any conversation, I
6  couldn't what his --
7     Q.  Did you have any conversation with
8  Mr. O'Malley about whether he was interviewed by
9  Mr. Hutchinson or Mr. Brooks about Peers --
10 about Ms. Svensson?
11       I'm sorry.
12    A.  No.  I think the simple answer is no.
13       I'm just racking my brain to make
14 absolutely sure that it is no.
15       Yes, I think the answer is no.
16    Q.  Okay.  So, here again, you also don't know
17 what, if anything, Mr. O'Malley may have commented
18 to Putnam management about Ms. Svensson's management
19 style, correct?
20    A.  But did Mr. O'Malley comment anything?
21    Q.  Well, you don't know whether he even did, do
22 you?
23    A.  I have no idea.
24    Q.  All right.  Do you even know whether

31 (Pages 118 to 121)

Konstantin S. Stoev

Page 122

1    Mr. Eckland was interviewed about this same time
2    about Ms. Svensson?
3        A. I'm sorry. I don't remember.
4            Your question was if I knew if
5    Mr. Eckland was also interviewed around that time?
6        Q. Yes. July, August, 2003.
7        A. And you're asking me if I knew -- are you
8    implying that he was interviewed then?
9        Q. I'm not implying anything.
10           I'm just asking if you knew one way or
11   the other.
12       A. At the time -- I mean, the implication of
13   your question now is that he was interviewed, but --
14   I'm sorry.
15           At the time, around July, August 2003, I
16   don't recall talking to either Ellis, Chris, Darren
17   or anybody else about my interview or anybody else's
18   interview with Mr. Hutchinson.
19       Q. Did you at any time after July or August of
20   2003 talk to Mr. Eckland or Mr. Peers or
21   Mr. O'Malley about any interviews that they may have
22   had on the subject of Ms. Svensson?
23       A. I'm sure I didn't talk to Darren, because he
24   would have left.

Page 123

1            I'm sure that I have not talked to
2    Chris.
3        Q. Chris is O'Malley?
4        A. Chris O'Malley -- I'm sure -- yes.
5            I don't think I have talked to anybody.
6    I mean, I have not asked anybody about being
7    interviewed by Mr. Hutchinson about Lisa Svensson.
8        Q. Okay. And did you, when you talked to
9    Mr. Hutchinson, did you ask him who else he was
10   going to be talking to?
11       A. I don't recall doing that.
12       Q. And you don't recall him volunteering who
13   else he was going to be talking to?
14       A. No.
15       Q. Okay. Do you recall whether Mr. Brooks
16   participated in the discussion you had with
17   Mr. Hutchinson?
18       A. Josh Brooks was not in that meeting.
19       Q. It was just you and Hutchinson?
20       A. Yes.
21       Q. Okay. And I think you testified earlier
22   today also that Mr. Brooks went and visited you in
23   your office to tell you that Ms. Svensson was going
24   to be leaving?

Page 124

1        A. I'm sorry. Is that the question?
2        Q. In September, yes.
3            Do I recall your testimony accurately?
4        A. Can you repeat the question?
5            I'm sorry.
6        Q. Did Mr. Brooks come and visit you in advance
7    of a Thursday meeting to tell you that Ms. Svensson
8    was going to be leaving Putnam?
9        A. Yes, he did.
10       Q. Okay. And do you recall whether that was on
11   or about September 12?
12       A. I'm sorry. I don't remember the date.
13       Q. Okay. Let me represent to you for reference
14   at the moment that Ms. Svensson's last day, I think,
15   was September 15.
16           Do you recall whether your meeting with
17   Mr. Brooks was within a few days of when she left?
18       A. I'm sorry. I don't remember.
19       MR. WEIR: Objection.
20       A. And a reference point like that is
21   completely random.
22       Q. Do you recall Mr. Brooks telling you that he
23   did not want Ms. Svensson to leave?
24       A. I'm sorry. I'm trying to remember the

Page 125

1    conversation.
2            I think he mentioned to me that he
3    wanted, he wanted Lisa to relinquish her
4    responsibilities as a manager of the team, and that
5    he wanted her to continue on with her
6    responsibilities as an energy analyst. I think
7    that's what he mentioned.
8        Q. And do you recall then talking with Ms.
9    Svensson about that conversation you had with
10   Mr. Brooks?
11       A. As I said, yes. Josh encouraged me to talk
12   to Lisa about, you know, about my conversation with
13   Josh, as well as about her leaving the company.
14       Q. Now, you testified earlier today about how
15   when people were going to leave the company, they
16   were treated, I think your word was as radioactive?
17       A. Yes.
18           That was the moniker that was used. And
19   when I say -- I think -- I mean, I said something,
20   and it's already in the record.
21           So, you can read it again and check what
22   I said.
23           What I said specifically to describe the
24   situation is when somebody is about to leave Putnam,

32 (Pages 122 to 125)

Konstantin S. Stoev

Page 126

1  I think I said it was not uncommon that people would
2  just not visit that person any more in his or her
3  office.
4      Q.  But in your case, Mr. Brooks affirmatively
5  encouraged you actually to go talk to Ms. Svensson?
6      A.  Yes, he did.
7      Q.  And when you talked to Ms. Svensson, she
8  told you that she had been given three choices?
9      A.  I don't recall that.  I'm sorry.
10     Q.  Do you recall her telling you she didn't
11 like any of the choices?
12     A.  I don't recall that.
13     Q.  You don't recall that?
14         Do you recall her telling you that Josh
15 needs to stand up and be a man and fire me?
16     A.  I'm sorry.  I do not recall that.
17     Q.  You don't recall that either?
18     A.  It was, again, as I mentioned in my prior
19 testimony, it was a very emotional period of time.
20 And it is possible that I just don't recall
21 everything, because when you go into a person's
22 office and that person is upset, as I testified
23 already, it's difficult to remember anything, at
24 least for me, it's difficult for me to remember

Page 127

1  anything but the strong emotion.
2          And I'm sorry.  You're quoting details,
3  I don't even if they -- words, if they were ever
4  said.  I'm sorry.  I don't know.
5      Q.  Do you recall whether Ms. Svensson said to
6  you that you ought to be taking notes of your
7  conversations with Mr. Brooks?
8      A.  You mean at that time, when I went to her
9  office?
10     Q.  Right.  In September, right.  Mid-September.
11     A.  That is too broad.  It could have been
12 after.
13         If you're asking me about that specific
14 meeting, I would say no.
15     Q.  Do you recall Ms. Svensson ever advising you
16 to take notes of your conversations with Mr. Brooks?
17     A.  You mean specifically Josh Brooks?
18     Q.  Yes.
19     A.  Could you be more specific?
20         I just don't understand the question.
21 I'm sorry.
22     Q.  Which part don't you understand?
23     A.  If you repeat it, I will figure it out.
24         MR. KOCIUBES:  Okay.  Could you read it

Page 128

1  back, please.
2          (Last question read back by Reporter.)
3      A.  When you say ever, you mean any time since
4  the existence of time?
5      Q.  That's what ever means.
6      A.  I'm sorry.
7          THE WITNESS:  Can you read it back?
8          (Last question read back by Reporter.)
9      A.  Yes.
10     Q.  And when, as best as you can, when do you
11 recall her telling you that?
12     A.  It would have been -- I'm sorry.  You know
13 -- if I want to be specific -- I mean, I can be as
14 specific as saying it would have been in
15 conversations that Lisa and I have had after she was
16 terminated.
17     Q.  And did she tell you why you should be
18 taking notes?
19     A.  I think -- you will see that I have not
20 taken notes.
21         Otherwise, I would know, but I think --
22 you're asking me to guess, to recall something that
23 I actually do not recall.  I'm sorry.
24     Q.  If you don't remember, just tell us you

Page 129

1  don't remember.  And I take it from what you said,
2  you can't remember.
3      A.  I don't remember the reasons.
4      Q.  Okay.  And I take it from your comment a
5  second ago, you never actually took notes of any
6  conversations with Mr. Brooks?
7      A.  No.
8          I don't recall.  I don't recall making
9  notes of any conversations that I have had with
10 Mr. Brooks, except as I would have documented in an
11 E-mail, an internal E-mail in the Putnam system,
12 such as the one that you saw.
13         You know, for example, the conversation
14 that we had that I described in -- sorry -- about
15 which I talked and you saw the response from Josh,
16 that was a conversation with Josh.  And effectively,
17 in my E-mail response to him, I had related some of
18 the things that we had said.
19         If that constitutes taking notes, then
20 that's taking notes, but otherwise, no.
21     Q.  And do you recall at some point after Ms.
22 Svensson left your asking Mr. Brooks if it was okay
23 if you stayed in touch with her?
24     A.  Yes, I do recall that.

33 (Pages 126 to 129)

Konstantin S. Stoev

Page 130

1    I actually asked him, I asked him that
2 when he told me that Lisa would leave.
3    Q. And he told you that, do whatever you want
4 in terms of either being in touch or not being in
5 touch with her?
6    A. Yes.
7    Q. By the way, why did you ask him for
8 permission to stay in touch with somebody else?
9    A. I mean, isn't it clear from what I already
10 talked about people being radioactive?
11    Q. That was your concern, so that on both
12 occasions, once he encouraged you to go talk to her,
13 and the other time, he told to you do whatever you
14 wanted to do in terms of staying in touch with Ms.
15 Svensson?
16    A. I needed more than one reassurance from Josh
17 Brooks in order to feel comfortable that I could
18 speak to Lisa Svensson even after she left Putnam
19 and at the same time, not endanger my position at
20 Putnam.
21    Q. And he gave it to you?
22    A. He said I can go ahead and speak to Lisa --
23 I'm sorry. It's my decision about what I can do.
24    He encouraged me to speak to her after

Page 131

1 he delivered the news.
2    And you know, I just wanted to -- yes.
3    Q. Now, am I correct that by November of 2003,
4 a new oil team had been formed?
5    A. It could have been November. Let me see.
6    Q. Say late 2003.
7    A. In late 2003, yes, a new oil analyst was
8 already at Putnam.
9    That was Maria Drew, Maria Eleanor Drew.
10    I don't remember when she joined Putnam.
11 I remember when, as members of the team that she
12 would prospectively join, interviewing her. I
13 remember interviewing any other candidates.
14    We interviewed her --
15    Q. But you recall Maria Drew was on the team by
16 the end of that year?
17    A. Yes.
18    Q. And do you remember Krista Jahorich was on
19 that team?
20    A. Jahorich.
21    Yes, Krista had been on the team since
22 she joined Putnam as an investment associate.
23    Q. And those were females, and there were two
24 males, you and Mr. Eckland?

Page 132

1    A. What?
2    Q. On that team.
3    A. Which team?
4    Q. Oil.
5    A. No. I was not on oil.
6    Q. You weren't on that at all?
7    A. You are saying something that was not true.
8    Q. So, it was Mr. Eckland and two females?
9    A. No, no, no.
10    You have the -- you don't have the
11 record correct. I'm sorry. I don't think so.
12    And again, you're asking me something
13 that other people can answer better than I can. You
14 could go to anybody at Putnam, and they will tell
15 you who was on that team, but what I can tell you is
16 that the Ellis Eckland at that time covered some
17 energy stocks. Maria covered many energy stocks.
18 She was the primary energy analyst.
19    And John Morgan was covering some energy
20 stocks, or began to cover some energy stocks around
21 that time frame.
22    And Krista was the investment associate,
23 which means the person who is junior in the team and
24 who helps the analysts in the coverage.

Page 133

1    The other person in the team who was,
2 again, an investment associate, was Leah -- I don't
3 remember her last name. I'm sorry. Leah -- was it
4 grant. I'm sorry. I can't remember.
5    And Leah had been also an investment
6 associate. Leah had been working with Lisa before,
7 and she continued to be a member of the team until
8 she left Putnam I think some time in 2004. I don't
9 remember exactly when.
10    Q. After Ms. Svensson left --
11    A. And again, my recollection, again, can be
12 checked and verified with things that exist at
13 Putnam.
14    So, you're better off also talking to
15 other people to make sure that this is, this all is
16 coming together.
17    Q. After Ms. Svensson left, was it Ms. Morgan
18 that supervised you, that managed you?
19    A. Yes. Kelly Morgan was appointed the manager
20 responsible for the Basic Materials analysts.
21    So, that's Chris, Ellis and me and, I
22 guess, John Morgan.
23    (Brief recess.)
24    A. I just want to finish a thought that,

34 (Pages 130 to 133)

Konstantin S. Stoev

Page 134

1  unfortunately, I couldn't finish during the earlier
2  question when you were asking me about that
3  radioactive issue.
4          I just wanted to point --
5          MR. KOCIUBES: Okay. For the record,
6  just note my objection, since there's no question
7  pending, but given it's a deposition, go ahead.
8          MR. WEIR: Let the record reflect my
9  objection to your objection.
10     A.  I'm trying to elaborate on an earlier
11 question that you had asked me, but remember what I
12 was telling you about the conversation, or telling
13 the other attorneys about a conversation that the
14 team had had after Lisa had left.
15         It was basically a regrouping team
16 saying how we were going to manage the portfolios
17 after Lisa had left, and how there had been an
18 attempt to reconstruct the history, and I had
19 reacted to that.
20         I just wanted to put that in the context
21 of why I needed to ask assurance of Josh Brooks that
22 I could continue to speak to Lisa, that I could feel
23 comfortable talking to her even after she was
24 terminated. I needed that assurance because, as the

Page 135

1  later example proved, there were attempts to change
2  the way things happened. And at the first attempt
3  of that, I reacted, again, very strongly. And I
4  reacted very strongly to Josh.
5          Josh remembers it quite well. And he
6  wrote back to me and said that what I said was
7  reasonable.
8          So, that was the reason why I felt
9  compelled when Josh broke the news to me to ask him
10 for his okay that I continue to speak to Lisa.
11     Q.  But there again, in this meeting where you
12 thought history was being rewritten and you spoke
13 up -- and I take it you sent Mr. Brooks an E-mail
14 about it?
15     A.  Yes.
16     Q.  And Mr. Brooks, as has already been marked,
17 responded to you that you're the voice of reason?
18     A.  You can read it.
19     Q.  He didn't criticize or threaten you in any
20 way, did he?
21     A.  No.
22         I actually accepted it as a form of
23 endorsement from him that he said I should never
24 worry about being the voice of reason.

Page 136

1      Q.  And I take it you don't recall who it was
2  you thought was rewriting history in the meeting?
3      A.  I'm sorry. I cannot point specifically to
4  who that person is.
5          I could have vague recollections, but
6  these are probably not good enough.
7      Q.  Don't speculate.
8      A.  Exactly.
9      Q.  Now, you continued to work at Putnam for
10 another year until September of 2004 -- actually,
11 until December 31, 2004?
12     A.  Yes. Another year relative to --
13     Q.  About a year and a quarter after Ms.
14 Svensson left?
15     A.  Yes.
16     Q.  Okay. And there came a point in 2004 when
17 you were told, I think in your words, there wasn't
18 going to be a long-term job for you there?
19     A.  Sorry.
20         There came a point, as you say, in 2004
21 when Kelly Morgan, in the presence of Josh Brooks,
22 basically told me in a meeting that I was called
23 into that they could not offer me my job in the
24 future.

Page 137

1      Q.  And do you recall --
2      A.  My current job in the future.
3      Q.  And do you recall whether during 2004 other
4  people were being let go as well?
5          MR. WEIR: Objection.
6      A.  I'm sorry. You can check that with Putnam.
7  I mean, my recollections versus the official records
8  of Putnam, it would know.
9      Q.  You don't remember one way or the other?
10     A.  No.
11         I do remember people were being let go.
12     Q.  Okay. Do you remember talking about it with
13 Terry Norki in the elevator that he was one of the
14 people who was being let go?
15     A.  No -- I'm sorry.
16         Terry Norki, you're referring to -- I'm
17 sorry. Ask your question -- whether I recall
18 speaking to Terry Norki in the elevator whether he
19 was being let go?
20         The answer to that is no.
21         However, you have to be more specific.
22         If Terry Norki ever told me he was being
23 let go.
24     Q.  Did he?

Konstantin S. Stoev

Page 138

1    A. He did.
2    Q. Okay. So, he was one of those people?
3    A. But that was after he was let go.
4    Q. Okay. Now --
5    A. And you know, when Terry Norki and I rode
6  the elevator on that fateful day when both of us
7  were told that our jobs did not exist any more,
8  Terry and I did ride the elevator down. And it was
9  at that point, I remember it very vividly.
10        It was a meeting that Kelly had
11  initiated, and it said mandatory. And I didn't, you
12  know, I didn't pay attention to that meeting
13  because -- too much attention, because I would have
14  a regular meeting with Kelly, as well as other teams
15  would have regular meetings with Kelly. Regular
16  meaning probably every once -- I don't remember
17  exactly the regularity, but it was not out of the
18  ordinary that Kelly, as my manager at the time,
19  asked me to have a meeting.
20        I had no idea what the meeting was
21  about.
22        And it happened on that day, at
23  lunchtime, I was going to meet my wife to go out for
24  lunch. And Terry and I rode the elevator down.

Page 139

1        And he was asking me how my day was
2  going. And I said, it's going fine. I'm, you know,
3  I have a little bit more work to do before I have a
4  meeting with Kelly at the end of the day, and then
5  I'm going, then I'm heading home, hopefully early,
6  which in Putnam terms, early is a very, you know, it
7  could mean 7:00. It could mean 8:00, whatever, in
8  terms of how I worked at Putnam.
9        And then Terry said something like, Is
10  your meeting one of those mandatory meetings?
11        And I said, Yes, it's a mandatory
12  meeting.
13        And I think he probably then said
14  something like, I have one of those, too, and I'm
15  wondering if I'm going to be let go.
16        And you know, it was -- you know, to me,
17  it was just a shocker at that point riding the
18  elevator. And I just didn't understand why he would
19  say that.
20        So, that was the conversation that I had
21  with Terry Norki in the elevator, riding, you know,
22  down to lunch. That's what I remember.
23    Q. So the record is clear, Norki is a male?
24    A. Yes.

Page 140

1        MR. WEIR: We'll so stipulate.
2    Q. Terry is an ambiguous, could be either.
3        And Kelly Morgan, of course, is female?
4    A. Kelly Morgan is a female, yes.
5    Q. Now, let me show you a document, and ask if
6  you recognize it.
7        Do you recognize that document?
8    A. That is a copy of the separation agreement I
9  have with Putnam.
10        MR. KOCIUBES: Let me ask the reporter
11  to --
12    A. I'm sorry. Just a second. Let me check.
13        (Pause.)
14    A. Okay.
15        MR. KOCIUBES: Let me ask the reporter
16  to mark that document as the next exhibit.
17        (Marked, Exhibit 5, separation
18  agreement.)
19    Q. With respect to Exhibit 5, Mr. Stoev, let me
20  direct your attention to, on the first page, the
21  paragraph numbered one?
22    A. Yes.
23    Q. Do you see the second sentence, it says that
24  you were given the option of either taking a

Page 141

1  separation agreement and accepting separation pay or
2  remaining at Putnam until December 31?
3    A. I mean, I can read the sentence, yes.
4    Q. And do you recall whether, in fact, you were
5  given such an option?
6    A. Yes.
7        In that discussion with Kelly and Josh,
8  they told me that I had two options. One was to
9  effectively leave immediately and take, yes, and
10  take a lump-sum payment, or stay on at Putnam until
11  the end of the year and then leave.
12        And the options were elaborated for me
13  in a discussion with the human resources
14  representatives. Specifically, Mary McNamee and
15  Jennifer.
16    Q. In those discussions that you're referring
17  to, am I correct they occurred in September of 2004?
18    A. Yes, they did.
19    Q. Okay. And am I also correct that you then
20  elected to remain at Putnam until the end of the
21  year rather than taking a lump-sum payment in
22  September?
23    A. Yes, I did.
24    Q. And did you do that because you thought it

36 (Pages 138 to 141)

Konstantin S. Stoev

Page 142

1    would be easier to job hunt while you were at
2    Putnam?
3        A. Sir, at the time, my wife was pregnant. It
4    was a difficult pregnancy.
5        We had just got confirmation that our
6    baby was doing well, but she would have to have
7    continuous care, continuous monitoring.
8    Effectively, ultrasound every two weeks, at that
9    time, and then subsequently, every month.
10       And at the same time, I received news
11   from Putnam that my job was not going to be offered
12   to me any more without much explanation.
13       And if I had taken the separation
14   agreement with the money that was being offered, I
15   would have to leave the country within two weeks,
16   with a pregnant wife, in a risky pregnancy.
17       Continue to be forced to stay at Putnam,
18   continue to stay until the end of the year, and take
19   a separation at the end.
20       If you were in my situation, what would
21   you choose?
22       Q. So, that was your request, and it was
23   honored?
24       A. I was given two options, and I chose the one

Page 143

1    that was better for my family.
2        Q. Okay. Now, in addition, you were given the
3    option to receive a one-time payment that was equal
4    to half your previous year's bonus?
5        MR. WEIR: Objection.
6        A. You can read what it says.
7        Q. Okay. And you received that payment?
8        A. I received the payment.
9        Q. Okay. And you understood that in order to
10   receive the payment, that you were signing a
11   release?
12       That's in Paragraph 10.
13       A. I signed the agreement, as you see it. And
14   I have the original here.
15       Q. Okay. And it was an agreement --
16       A. And I assume that it is word for word the
17   same as the original that I have.
18       Q. Okay. And it was an agreement that you
19   reviewed with counsel before you signed it?
20       A. I did.
21       Q. And I think you said there were some changes
22   made at your request, or some additions?
23       A. Yes. Including the Exhibit B that you see
24   here.

Page 144

1        Q. Which is the reference?
2        A. Yes.
3        MR. KOCIUBES: I have no other
4    questions.
5        MS. CAMPION: I have no questions.
6        MR. WEIR: I have just a couple.
7    EXAMINATION BY MR. WEIR:
8        Q. Who prepared this Exhibit B to the November
9    5, 2004 --
10       A. I drafted it, and I sent it to -- sorry.
11       I drafted it and I sent it to, if I
12   remember well -- sorry -- Mary McNamee.
13       MR. MOLONEY: Why don't we take a break.
14   The witness is obviously reacting to Mr. Kociubes's
15   questioning of a deeply personal matter and needs a
16   moment or two to gather himself.
17       (Brief recess.)
18       A. I drafted the exhibit, the text of the
19   exhibit, and I submitted it to Mary McNamee by
20   E-mail with the request that she talk to Kelly
21   Morgan and, if possible, include it in the
22   separation agreement.
23       MR. WEIR: I have no further questions.
24       (Discussion off the record.)

Page 145

1        THE WITNESS: And I did that because I
2    didn't have any explanation for why I was
3    terminated.
4        And there was no way I could explain to
5    people who sit across the table from me while I am
6    job hunting why I was terminated.
7        And I wanted some evidence from Putnam
8    about my standing with Putnam at the time when I was
9    terminated, what they thought of me, that if I
10   asked, if I'm asked a question across the table, why
11   did you leave Putnam, that I can say for me, knowing
12   that I am at liberty to say very limited things
13   about it, that I can put forward this statement and
14   say, here is what my employer can say about me.
15       And Kelly also personally told me that
16   if somebody would need to talk to Putnam about my
17   performance, that she will take the call.
18       MR. WEIR: Thank you, Mr. Stoev.
19       (Discussion off the record.)
20       MR. KOCIUBES: The witness has requested
21   that the record be opened because he wants to say
22   something else, he wants to volunteer something else
23   about the separation agreement.
24       Note my objection.

37 (Pages 142 to 145)

Konstantin S. Stoev

Page 146

1       THE WITNESS: As you will see on the --
2  I was notified that I would not have my job any more
3  on September the 16. The separation agreement is
4  dated November the 5th. And it was signed by me on
5  November 22.
6       At the time when I spoke to the lawyer,
7  he basically said you don't have to sign this
8  agreement because somebody, in his words, word for
9  word -- I'm sorry I will have to use them -- screwed
10 up, that they didn't give you the separation
11 agreement to sign on the date when they told you.
12      I nevertheless signed it because I
13 wanted to be protected for the period of time under
14 the separation agreement until the end of December,
15 plus the terms of that agreement. I could not
16 possibly risk anything, and I want you to know that.
17      I didn't have to sign this piece of
18 paper.
19      (Discussion off the record.)
20      MR. KOCIUBES: Mr. Stoev has yet another
21 addition to his last answer, I guess.
22      And again, since it's a deposition,
23 noting my objection, we're going to let Mr. Stoev
24 say whatever he wants to say.

Page 147

1       THE WITNESS: On September 16, when I
2  was presented with the options that are outlined
3  here in the separation agreement, I was not offered
4  this agreement to sign.
5       In an E-mail to Kelly Morgan on the next
6  day, I confirmed that I was going to take the option
7  of staying until the end of the year and receiving a
8  lump-sum compensation.
9       As I say, I was not required by Putnam
10 at that point to sign the separation agreement in
11 order to do that. And I have evidence of that in an
12 E-mail.
13      I could have stayed at Putnam based on
14 that evidence, as the attorney said, and through the
15 end of the year, and received all the terms that are
16 here in the sense that I would receive the -- I will
17 be paid until the end of the year, and I will
18 receive half of my previous year's performance bonus
19 if I left Putnam at that time without signing the
20 separation agreement simply because I had indicated
21 that without being asked to sign this separation
22 agreement.
23      When I was asked to sign it, which is a
24 month and a half afterwards, more than that, the

Page 148

1  reason I did it is not because I had to.
2       It was because I wanted to be absolutely
3  sure that I will not take any downside. I could not
4  risk, given what has happened to me, that people at
5  Putnam would decide differently and endanger me, my
6  family, financially endanger my family, endanger me
7  by asking me to do something that I didn't want to
8  do on the 5th of November, which was, I didn't want
9  to take the risk that they would say, well, if you
10 don't sign it, you're not signing this agreement,
11 then you should go right away.
12      And I would be happy to give you a copy
13 of that E-mail. If you will just allow me one
14 minute to rummage through this, I think I have it
15 somewhere here, or if I don't have it, I'm sure I
16 have it somewhere at home in Zurich.
17      The point of what I was trying to say is
18 that, I burdened myself with something I didn't have
19 to burden myself with simply because I wanted to
20 protect my family.
21      And that explains also why I signed it.
22 I'm sorry. I'm repeating myself.
23      Would you like me to find that E-mail
24 that I sent to Kelly confirming that I'm choosing

Page 149

1  the option, or would you need it?
2       Would anybody need it?
3       MR. KOCIUBES: There's been no question
4  pending for quite a while.
5       THE WITNESS: Okay.
6       I'm answering and elaborating on an
7  earlier question that you asked me.
8       So, I feel like I'm giving you
9  additional information that you didn't have before,
10 and that I think is relevant to the answer of the
11 question that you asked me. And I just need to
12 answer it fully.
13      I'm sorry if it's taken me a little
14 while, but you touched on a piece of me that I
15 cannot talk about it completely rationally, I mean
16 completely, with full composure. I'm sorry.
17      And here's the E-mail, which is dated
18 the 17th of September.
19      So, the day after.
20      (Pause.)
21      MR. WEIR: Let me just mark that as
22 Stoev Exhibit 6.
23      (Marked, Exhibit 6, E-mail string, dated
24 9/17/2004.)

38 (Pages 146 to 149)

Konstantin S. Stoev

| Page 150 |
|---|
| 1    MR. KOCIUBES:  These are all being |
| 2  marked for identification only. |
| 3         (6:01 p.m.) |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

Page 152

1  Commonwealth of Massachusetts)
2  Suffolk, ss.              )
3      I, Lauren M. Mitchell, Registered
4  Professional Reporter and Notary Public in and
5  for the Commonwealth of Massachusetts, do hereby
6  certify that KONSTANTIN S. STOEV came before me on
7  Thursday, August 24, 2006, the deponent herein, who
8  was duly sworn; the examination was reduced to
9  printing under my direction and control; and the
10  within transcript is a true record of the testimony
11  given at said deposition.
12      I FURTHER CERTIFY that I am neither attorney
13  or counsel for, nor related to or employed by any of
14  the parties to the action in which this deposition
15  is taken; and, further, that I am not a relative or
16  employee of any attorney or counsel employed by the
17  parties hereto, or financially interested in the
18  outcome of the action.
19      IN WITNESS WHEREOF I have hereunto set my
20  hand and affixed my seal of office this 25th day of
21  August, 2006, at Boston.
22
23         Lauren M. Mitchell, Notary Public
24         My Commission expires:  6/25/2010

Page 151

1      E R R A T A   S H E E T
2      I, KONSTANTIN S. STOEV, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the corrections listed below):
7  Page   Line      Correction
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19
20  Signed under the pains and penalties of perjury this
21  _____ day of _____, 2006.
22
23         _____
24         KONSTANTIN S. STOEV

39 (Pages 150 to 152)

Exhibit B

453 - 80 - 8855

# PUTNAM INVESTMENTS

# Performance and Development Planning and Review Form for Incentive Eligible Employees

*Employees in a structured incentive plan (i.e., Partners, Associates and Principals, and Salespersons)*

| | |
|---|---|
| **Name:** Lisa Svensson | **Department/Division:** International Growth |
| **Job Title:** PM, SVP | **Manager's Name:** R Swift |
| **Review Period:** 1999 | **Mid Year Review Date:** |
| **Time in Current Position:** 2 years | **Year End Review Date:** Dec 99 |

**PART I: PERFORMANCE PLANNING**

*GUIDELINES*

- *At the beginning of the review period,* the manager and employee agree on all business goals, specific measures/deliverables and weightings.
- *Business goals and/or key deliverables may be modified/adjusted if the employee's priorities change during the year.*
- *Prior to the mid year discussion,* the manager completes the comments section and rates/scores performance results to date, before calculating a mid year score; the mid year rating is normalized to reflect year to date performance results only.
- *During the mid year discussion,* the manager and employee discuss performance to date for all business goals.
- *At the end of the review period,* the mid year process is repeated, but mid year ratings/scores are not calculated into year end ratings/scores.
- *Supporting documentation and data may be attached, as needed.*
- *The following criteria should be used to rate performance:*

| Ratings | Criteria |
|---|---|
| 5.0 | Exceeds all goals and standards consistently at a superior level of excellence and significantly impacts performance results |
| 4.5 | Exceeds all goals and standards consistently and significantly impacts performance results |
| 4.0 | Exceeds all goals and standards consistently and contributes fully to performance results |
| 3.5 | Meets and often exceeds performance goals and standards |
| 3.0 | Meets performance goals and standards |
| 2.5 | Does not meet some performance goals and standards |
| 2.0 | Does not meet most performance goals and standards |
| 1.5/1.0 | Does not meet performance goals and standards |



**EXHIBIT**

McNamee 22
11/29/05 A.D.

13

PRM 00324

## PART I: PERFORMANCE PLANNING, CONTINUED

*Business Goals - key business objectives/initiatives planned for the employee during the review period:*

| BUSINESS GOALS<br><br>Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | MEASURES/DELIVERABLES<br><br>Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | %<br>Weighting<br><br>(All Business Goals must total 100%) | Mid Year<br>(Rate only performance results to date) | | Year End<br>(Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| | | | Rating<br>(1-5) | Score<br>(%<br>Weight<br>-ing X<br>Rating) | Rating<br>(1-5) | Score<br>(%<br>Weight<br>-ing X<br>Rating) |
| <u>Investment Related</u><br><br>1.　Establish Global ex Japan Growth product for NAMCO/Putnam JV<br><br>　　　Take lead PM role and define product | Performance relative to benchmarks<br>Client and asset growth<br>Investment process stabilized<br><br>Assimilation and involvement of Core Growth and IPM teams | 30% | | | 4.5 | 1.35 |

Evaluation/Comments:

Significant outperformance of client benchmarks continues. Rank in the top decile of competitors, since inception.

Assimilation of IPM team into client relationship accomplished. Manny Weiss integrated into sleeveless structure. Clear and sensible stock selection methodology developed and implemented.

Clients in product at 50 versus 28 at beginning of year. No client losses, and quality of assets high, with no benchmark exceptions.

| BUSINESS GOALS<br><br>Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | MEASURES/DELIVERABLES<br><br>Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | %<br>Weighting<br><br>(All Business Goals must total 100%) | Mid Year<br>(Rate only performance results to date) | | Year End<br>(Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| | | | Rating<br>(1-5) | Score<br>(%<br>Weight<br>-ing X<br>Rating) | Rating<br>(1-5) | Score<br>(%<br>Weight<br>-ing X<br>Rating) |
| 2.　Contribute to International growth product performance and definition Contribute to Putnam performance, and marketing | Work as an active and contributing team member on Global, EAFE and aggressive growth mandates.<br><br>Participate at rebalances, and various meetings where appropriate. Eg morning meeting; IPC | 40% | | | 5 | 2 |

PRM 00325

**PART 1: PERFORMANCE PLANNING, CONTINUED**

**Evaluation/Comments:**

All products are in the top decile of institutional lists over 1,3 years. Both mutual funds have 5 star ratings. Lisa is a critical member of a $20 bn team

Lisa argues forcefully and provides insight at investment meetings. Two examples need highlighting for 1999. First, in the second quarter she was vocal and articulate on why the Global Growth group should not chase Value stocks -- a major contributor to performance this year. Second, her observations at the January IPC on why Putnam should raise exposure to Japanese equities, and in July, her advocacy for tech stocks in the USA.

She markets well in both retail and institutional environments. She has supported Cisalpina well.

I do like the fact that she is decisive and consistent, never suffering from revisionism.

One of the risks of being a tight team member is the degree of exclusivity or exclusion, which results. I think Lisa should think about extending her terms of reference when she needs opinions on portfolios and stocks and currencies.

I think she could sometimes appear more open to alternate viewpoints. I would like to see people feel they can approach Lisa for investment opinions. She has been absolutely right in the last 2 years about which stocks and industries to own. I think she is very open and can accept contrary opinions, she just doesn't come across that way -- occasionally.

| BUSINESS GOALS | MEASURES/DELIVERABLES | % Weighting (All Business Goals must total 100%) | Mid Year (Rate only performance results to date) | | Year End (Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | | Rating (1-5) | Score (% Weight -ing X Rating) | Rating (1-5) | Score (% Weight -ing X Rating) |
| 3. Widen investment knowledge | Develop knowledge on multiple countries and sectors.<br><br>Develop insights on currencies, and risk management tools.<br><br>Learn more about and implement quantitative tools | 15% | | | 4.5 | .68 |

**Evaluation/Comments:**

Significant increase in country and sector knowledge has resulted from Lisa's assiduous travel and research agendas. She now possesses knowledge on a very wide range of sectors, and countries. She is able to comment on many investment topics in a succinct manner.

Lisa has been a strong contributor at the quant. meetings. Her progress in this respect, and in developing her presentation skills, make her a senior investment professional, capable of representing the group and Putnam.

1999 was a volatile year, and the best evidence that I have that Lisa is a senior investment professional, is that she didn't get sucked into buying value stocks or pressed into changing the investment process.

See attached comments from Rick Harris in Sales, and Ann Marie Lydon.

| BUSINESS GOALS | MEASURES/DELIVERABLES | % Weighting (All Business Goals must total 100%) | Mid Year (Rate only performance results to date) | | Year End (Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | | Rating (1-5) | Score (% Weight -ing X Rating) | Rating (1-5) | Score (% Weight -ing X Rating) |

PRM 00326

## PART I: PERFORMANCE PLANNING, CONTINUED

| 3. Mentor MBAs; identify talent | Integrate Jason Kritzer into Putnam Investments. | 15% | | | | 5 | 0.75 |
|---|---|---|---|---|---|---|---|
| | Provide stimulating and challenging internship for MBA candidates | | | | | | |
| | Interview and uncover MBA talent. Lead the Cornell MBA campus effort | | | | | | |

**Evaluation/Comments:**

Jason Kritzer, Stephen Ilde, Allison Thacker all contributed positively in 1999. We enticed Steven Ilde to join Putnam, competing with Capital, Fidelity, and other top names.

Jason Kritzer is now contributing enormously, and in a team-oriented fashion — ie enhancing rather than duplicating other groups' research work. See attached comment from Kim Nauen for contribution to MBA hiring and mentoring

| BUSINESS GOALS | MEASURES/DELIVERABLES | % Weighting (All Business Goals must total 100%) | Mid Year (Rate only performance results to date) | | Year End (Rate performance results for the entire review period) | |
|---|---|---|---|---|---|---|
| Use this section to document up to five (5) business goals for the review period; identify key objectives/initiatives to meet business needs and/or perform responsibilities more effectively, and use additional space, if needed. | Describe below how each business goal will be measured (e.g., outcomes of service and/or product delivery, deadlines, degree of compliance or quality, sales or expense targets, etc.); break out into specific deliverables, as applicable. | | Rating (1-5) | Score (% Weight -ing X Rating) | Rating (1-5) | Score (% Weight -ing X Rating) |
| 4. | | | | | | |

**Evaluation/Comments:**

PRM 00327

**PART II: DEVELOPMENT PLANNING**

| Calculate a mid year rating as follows:<br><br>If 100% of the goals are rated, add the scores for a total rating; OR<br><br>If less than 100% of the goals are rated, add the scores and divide the total by the percentage of goals/deliverables being evaluated at mid year.  Example: total mid year score of 2.45 + 70% (.70 of goals) = 3.5 | Mid<br>Year<br>Rating: |  |
|---|---|---|
| Total the year end scores of all goals/deliverables to calculate a year end rating. |  | Year<br>End<br>Rating:    4.78 |

| Final mid year and year end performance ratings must be rounded up or down to the nearest whole number or .5 decimal, e.g., 3.2 >3.0, 3.3 >3.5; <u>do not</u> calculate the mid year rating into the year end rating. | Mid Year Rating: | Year End Rating:   4.78 |
|---|---|---|

PRM 00328

## PART II: DEVELOPMENT PLANNING

### GUIDELINES

- *At the beginning of the review period, the manager and employee:*
  - *Discuss the competencies below; identify additional competencies, if needed.*
  - *Select three (3) strengths and three (3) areas for development.*
  - *Develop an action plan to leverage the employee's strengths and improve areas for development.*
- *During the mid year discussion, the manager and employee provide examples and discuss the employee's progress to date, as it relates to the competencies selected as strengths and areas for development.*
- *At the end of the review period, the manager completes the ratings, provides examples of progress against the plan, and discusses this section with the employee.*

| | COMPETENCY | DEFINITION |
|---|---|---|
| 1. | Seasoned Judgment | Applies broad knowledge when addressing complex issues; defines strategic issues clearly; makes timely, tough decisions. |
| 2. | Strategic Thinking | Keeps abreast of global trends and has a clear, long-term vision for the business; translates broad strategies into specific objectives and action plans. |
| 3. | Financial Acumen | Understands key financial indicators and uses financial analysis to evaluate strategic options and opportunities. |
| 4. | Intellectual Versatility | Performs well on conceptually complex and difficult tasks; grasps and integrates new information and ideas rapidly. |
| 5. | Driving Execution | Assigns clear authority and accountability; monitors results; tackles problems directly and within a timely manner. |
| 6. | Fundamental Business Thinking | Understands and is driven by both the company's and customer's needs and expectations; practices continuous improvement and experimentation with that in mind. |
| 7. | Attracting and Developing Talent | Attracts high caliber talent; accurately appraises and provides feedback to develop staff; develops successors. |
| 8. | Empowering Others | Creates a climate that fosters personal involvement; gives people the opportunity to grow and achieve; promotes teamwork. |
| 9. | Influencing and Negotiating | Promotes ideas and proposals persuasively; shapes opinions; works through conflicts; negotiates win/win situations. |
| 10. | Leadership | Adapts style and approach to match the needs of different individuals and teams; encounters tough situations with tenacity but knows when to move on. |
| 11. | Building Relationships | Cultivates an active network of relationships inside and outside the organization; develops trust and treats all individuals fairly and with respect; maintains high standards of integrity. |
| 12. | High Impact Delivery | Delivers clear, convincing, and well-organized presentations; projects credibility and confidence. |
| 13. | Drive for Success | Sets and pursues aggressive goals; demonstrates a strong commitment to the organization's success. |
| 14. | Entrepreneurial Risk Taking | Champions new ideas and initiatives; identifies new business opportunities and makes them a reality. |
| 15. | Building on Differences | Recognizes differences as potentially complementary; uses differences to gain broader perspectives; values and seeks out a wide array of views |

*Development Plan – key developmental opportunities to be leveraged and/or enhanced during the review period:*

| STRENGTHS TO LEVERAGE | ACTION PLAN/TIMELINES (including new ways to use or teach the strength, as applicable) | RATING (High, Solid, Low) | EXAMPLES OF PROGRESS AGAINST PLAN |
|---|---|---|---|
| 1. High impact delivery | • Continue to expand marketing role | High | • Finals wins and feedback from Sales. |
| 2. Attracting and Developing talent | • Work with Tom Kurey to introduce him to PM role<br>• Continue work with MBAs | High | • Speed with which Tom adapts to new role |
| 3. Seasoned Judgement | • Increase the assets Lisa manages<br>• Extend Lisa's product responsibilities | High | • Group performance |

PRM 00329

## PART II: DEVELOPMENT PLANNING, CONTINUED

| AREAS FOR DEVELOPMENT | ACTION PLAN/TIMELINES (including on-the-job learning, stretch assignments, coaching opportunities, formal education, etc., as applicable) | RATING (High, Solid, Low) | EXAMPLES OF PROGRESS AGAINST PLAN |
|---|---|---|---|
| 1.   Building Relationships | • Extend further into Core Growth and Specialty growth, but also other teams. Through 2000. | Solid | • |
| 2.   Leadership | • Take various roles at stock and portfolio meetings. Through 2000. | Solid | • |
| 2.   Influencing and Negotiating | • Take "devil's advocate role" in portfolio meetings<br>• Devise and introduce a better portfolio construction method to the group in 2000 | Solid | • |

## PART III: MANAGERS' SIGNATURE AND ADDITIONAL COMMENTS

Reviewing Manager: **Robert Swift**                                    Date: **12/23/99**

General Comments:

recommend Lisa Svensson be promoted to "Senior Portfolio Manager"

Lisa works in the International large cap growth team, responsible for $15bn of assets in a variety of mandates.

Lisa is the lead portfolio manager on the global ex Japan accounts. These represent 10% of the Putnam / Namco asset base and their performance is a critical issue in the joint venture.

### Investment Skills

Lisa has been an investment professional for 12 years. This experience has been gained in first class sell side, and buy side companies.

The Putnam Global Growth team has built a 1 & 3-year, first quartile performance record for all global and EAFE products. Lisa has been a key, contributing member of the team that is responsible for this track record. Given the performance and competitive positioning, we believe these products will become major franchises for Putnam. Lisa has been fully involved in every stage of the development of this new business and should be recognized for her crucial role.

Lisa has been involved in portfolio management for many years. Prior to joining the Global Growth Team, Lisa developed and managed research funds. She pioneered the development of Lord Abbott's research fund in 1993. Later at Putnam, she was an integral member of the team that developed and launched Putnam's successful research product.

She has an enormous replacement cost.

Lisa's research efforts have not terminated as she transferred to portfolio management. She is responsible for finding and modeling many of the important foreign positions in our portfolio. This represents an exemplary way to work and collaborate with the analyst teams.

Her convictions about Mannesmann and the changing nature of its business, prompted a change in analyst coverage from the engineering team to the telecom. team – this made Putnam clients a <u>huge</u> amount of money. Her work on FSAS and Hikari in Japan have been particularly fruitful, and her convictions on these companies have encouraged other portfolio teams to buy the stocks – again making Putnam clients <u>huge</u> amounts of money. Other noteworthy research efforts, illustrating the diversity of her skills, were Elan, an Irish pharmaceutical, Ito En, the Japanese producer of green tea drinks, Sidel, a specialized French machinery company, and Securitas, a Swedish securities services company. Currently, she is developing, with our Investment Associate, a more robust framework for analyzing internet related companies such as the free ISP in the

PRM 00330

**PART II: DEVELOPMENT PLANNING, CONTINUED**
U.K., FREESERVE.

<u>Team Management</u>

The portfolio management team for Global mandates, is a cross group team, and Lisa provides clear, sound and driving leadership in the relevant meetings. She has developed a separate and commercial process and identity for the portfolios.
There are over 40 institutional clients in the product – already one of the largest institutional client bases at Putnam.
This is a key role in a critical product for Putnam, and is one of our best performing.

<u>Personal Development as a Senior Investment professional</u>

She has already done extensive "finals" marketing and client service work in Japan, and North America.  Lisa is now an experienced presenter. She has been an integral member of the team that has presented three times to Frank Russell.  Lisa has presented EAFE growth to CALPERS, State of Illinios, and Father Flanagan.
(For further reference, please contact Ann Marie Lydon, Manny Weiss, Frank Porcelli, and Rick Harris).

She has passed on best ideas to Specialty Growth who have benefited enormously from her Japanese buy recommendations and her UK sell recommendations.
At the end of the year, she is liasing with GER to help out, in the absence of any oil analysts.

Lisa has a CFA, and MBA, from Cornell. She gained a Conoco scholarship to Texas A&M.

PRM 00331

**PART II: DEVELOPMENT PLANNING, CONTINUED**

Senior Manager Approval: _____ Date: _____

**PART IV: EMPLOYEE'S SIGNATURE AND COMMENTS**

Employee: _____ Date: _i/25-/oo_

A signature means performance results have been reviewed and discussed with the employee; it in no way implies the employee agrees with the contents of the performance appraisal as documented. This space is provided for the employee to comment on his/her performance appraisal and/or to clarify his/her perception of the performance documentation.

PRM 00332

**PART II: DEVELOPMENT PLANNING, CONTINUED**

Comments:

The performance management system is a desirable paradigm, but not one that will necessarily be followed in every case

PRM 00333