## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>PUTNAM INVESTMENTS LLC, f/k/a<br>PUTNAM INVESTMENTS, INC. and,<br>LAWRENCE J. LASSER,<br><br>　　　　　　　　Defendants. | CIVIL ACTION NO. 04-12711 PBS |

### MEMORANDUM OF LAW IN SUPPORT OF LAWRENCE J. LASSER'S MOTION FOR SUMMARY JUDGMENT ON COUNT XII OF LISA SVENSSON'S AMENDED COMPLAINT

Of the twelve counts asserted in her Amended Complaint, Plaintiff Lisa Svensson ("Svensson") purports to assert a single unfounded count against Putnam Investment, LLC's f/k/a Putnam Investment, Inc.'s ("Putnam") former President and Chief Executive Officer, Lawrence J. Lasser ("Lasser"). More specifically, in Count XII of her Amended Complaint, Svensson brings both federal law and state law aiding and abetting claims under Title VII and M.G.L. c. 151B, §4(5), respectively, asserting that Lasser conspired with Putnam to treat her in a discriminatory manner due to her gender by: (1) depriving her of equivalent compensation compared to her male colleagues in 2002 and 2003; (2) transferring her in 2002; (3) depriving her of promotions to the officer title of managing director between 2000 and 2003; and (4) terminating her employment in 2003 (the "Alleged Adverse Employment Actions").[1]

Svensson's aiding and abetting claims are fatally flawed. First, Svensson is time barred from complaining about three of four of the Alleged Adverse Employment Actions. Second,

---

[1]　*See, e.g.,* Amended Complaint, ¶2; Svensson's Fourth Affidavit.

10844126.4

Svensson's federal law claims must be dismissed as a matter of law because individuals cannot be held liable under Title VII.  Last, Svensson's state law claims fail because despite three years of protracted litigation involving tens of thousands of documents and 15 depositions, Svensson has proffered no evidence whatsoever that Lasser played any role in the Alleged Adverse Employment Actions.  Instead of facts, Svensson relies solely on conclusory, unsupported allegations of Lasser's so-called "intimate" involvement with general Human Resources ("HR") matters, her general understandings of "how things worked" at Putnam, unsupported speculation, and hearsay.  Svensson has no evidence to support her beliefs and speculation regarding Mr. Lasser, or to rebut the <u>truth</u> which became apparent during discovery: Lasser, the President and CEO of a very large company with a sophisticated HR department, was simply not involved in the HR decisions made about Svensson's career at Putnam.  The evidence adduced during discovery makes that abundantly clear.  Because Svensson has no evidence of Lasser's involvement in the Alleged Adverse Employment Actions, she has no reasonable expectation of prevailing at trial, and summary judgment must be entered in Lasser's favor on Count XII of Svensson's Amended Complaint.

Putnam has also moved for summary judgment on the discrimination-related counts of the Amended Complaint which pertain to it.  Lasser joins in that motion, including the statute of limitations portions of that motion which are equally applicable to Lasser.  To the extent that this Court grants summary judgment to Putnam on Counts I and II of Svensson's Amended Complaint (Svensson's discrimination claims in main against Putnam), this Court must also necessarily enter judgment in Lasser's favor on Svensson's aiding and abetting claims, as the latter claims are entirely derivative of the former claims.  *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 122 (2000).  To avoid duplication of effort, Lasser joins and relies

upon those portions of Putnam's summary judgment motion seeking judgment in Putnam's favor on Counts I and II of Svensson's Amended Complaint.

# FACTS[2]

### A. Svensson's Speculations About Lasser's Involvement in Putnam's HR Matters

During Svensson's employment at Putnam, Svensson engaged in five conversations with Lasser that she deems amount to her personal observations of Lasser's "intimate" involvement with Putnam's HR matters.  The five conversations with Lasser constitute the totality of Svensson's first hand knowledge of Lasser's alleged involvement with HR matters.  Lasser Stmt., ¶1.  The five conversations are as follows:

- Lasser congratulated Svensson on her marriage when he encountered her in an elevator.  Lasser Stmt., ¶2(a);

- At a luncheon during which Lasser was meeting newer MBAs for the first time, Lasser turned to Svensson and said "Oh, Lisa and I, you know, we go way back…she was a maiden when she first came to Putnam."  Lasser Stmt., ¶2(b);

- Lasser cautioned Svensson to "be careful" after learning she had fallen down while she was pregnant.  Lasser Stmt., ¶2(c);

- At a lunch with Lasser during which the two discussed 9/11, Lasser expressed to Svensson discomfort (in Svensson's view) with the fact that Svensson's husband was a stay at home father.  Lasser Stmt., ¶2(d)[3]; and

---

[2]   The facts set forth in this Memorandum are also contained in Lasser's Concise Statement of Material Facts in Support of Lawrence J. Lasser's Motion for Summary Judgment.  With respect to most facts, this Memorandum will simply refer to the corresponding paragraphs in Lasser's Concise Statement of Material Facts, hereinafter referred to as "Lasser Stmt."  Putnam has also submitted a Statement of Undisputed Material Facts, which Lasser hereby adopts and incorporates herein by reference.  Citations herein to Putnam's Statement of Undisputed Material Facts will be referred to as "Putnam Stmt."  Lasser also incorporates and relies upon the Affidavit of Richard B. Tibbetts in support of his motion.

[3]   Svensson quotes Lasser as stating "He's a stay-at-home father.  Wow, that's fascinating.  How does that make him feel?  I mean as a man, how does that make him feel?"  Lasser Stmt., ¶2(e).

- Svensson attended a luncheon with Lasser in 2002 at which she shared with Lasser her views on how Putnam should be hiring, training, and "bringing along" MBA's who were hired directly from business school.  Lasser Stmt., ¶2 (e).

(collectively, the "So-Called HR Conversations").  It is apparent on their face that none of these casual and benign conversations reflect Lasser's "intimate involvement" in Putnam's HR decisions.

      **B.**    <u>**Lasser's Alleged Participation in the Alleged Adverse Employment Actions**</u>

Based on the So-Called HR Conversations, Svensson's subjective beliefs and suppositions, and other obscure hearsay, Svensson seeks to hold Lasser liable for "aiding and abetting" Putnam's alleged perpetration of the Alleged Adverse Employment Actions. Svensson's evidence (or lack thereof) of Lasser's involvement in the each of the four Alleged Adverse Employment Actions is detailed below:

      **1.**    <u>**Svensson's Compensation (2002-2003)**</u>

Svensson bases her claim of Lasser's participation in setting her compensation at Putnam solely on general comments she claims she heard from her supervisors.  Lasser Stmt., ¶3. Svensson's deposition testimony regarding Lasser's involvement in setting compensation was as follows:

> Q.    Was it your observation that Mr. Lasser micromanaged the raises as well as the diminutions in people's compensation?
>
> A.    Well, you know, when you – when you said before, I can't say anything about anyone – anything anyone told me, if it's something that a boss of mine told me that [Lasser] did this or [Lasser] did that, I consider that to be my observation, not just heard through the grapevine, so…
>
> Q.    Well, I'm really not interested in the grapevine.

      \*    \*    \*

> A.   Discussions – discussions with my boss about, you know, there's not going to be this or that this year because [Lasser] said this is my observation.
>
> Q.   Okay. And it's only, then, through what other people told you that Mr. – that your observations regarding Mr. Lasser micromanaging raises and diminution of employment –diminution of compensation were managed?
>
> A.   What my supervisors told me, yes.

Lasser Stmt., ¶4. Svensson did not offer any testimony establishing that Lasser had any involvement in setting her compensation at Putnam during the years 2002 or 2003.

In fact, the evidence adduced during discovery from those who really knew about the compensation process, was that Lasser played <u>no</u> <u>role</u> in setting Svensson's compensation. Compensation of Putnam's investment professionals such as Svensson consisted of base salary and incentive pay. Putnam Stmt., ¶6. Putnam reviewed base salaries annually. Putnam Stmt., ¶6. Incentive compensation consisted of year-end discretionary bonuses and potential discretionary grants of Putnam equity (restricted shares and options). Putnam Stmt., ¶6. Each year, Putnam's senior management determined the overall size of the bonus pool. Putnam Stmt., ¶11. After the size of the pool was set, Lasser and its division heads allocated portions of the pool to each division, including the Investment Management Division ("IMD"), the division in which Svensson worked. Putnam Stmt., ¶11. IMD's management (not Lasser) then allocated IMD's share of the pool among various investment teams and support groups. Putnam Stmt., ¶11. The Chief Investment Officer ("CIO") of each team (not Lasser) then set the bonus award for each individual on that team. Putnam Stmt., ¶11. A similar process was followed with regard to making equity awards, with the exception that not all investment professionals received an equity award in a given year. Putnam Stmt., ¶11.

## 2. Svensson Not Being Promoted to Managing Director (2000-2003)

Svensson bases her claim of Lasser's participation in Putnam's decisions not to promote her to the officer title of managing director from 2000 to 2003 solely on her observations of "the way things worked at Putnam." Lasser Stmt., ¶5. Despite being offered multiple opportunities to point to any facts showing that Lasser had any involvement in the managing director decisions as to her, Svensson was unable to provide any facts or evidence. Specifically, Svensson's deposition testimony on the point was:

> Q. What facts, what specific facts can you tell me which would support the allegation that Mr. Lasser, on four separate occasions, determined that you would not be promoted to managing director? Again, I'm interested, again, in what you now firsthand, not what other people told you.
>
> [OBJECTION AS TO FORM]
>
> A. I only know that the way Putnam worked, [Lasser] was intimately involved in – especially promotions to this level and above.
>
> \*   \*   \*
>
> Q. Let me understand, what specific facts do you have that Mr. Lasser was responsible for the [decisions not to promote you to managing director]? And again, I'm interested in your own personal observations, not what other people told you, but your own personal observations. What did you see? What did you read? Your personal observation.
>
> [OBJECTION AS TO FORM]
>
> A. Just consistent with my – As I've testified before, my personal observation of the way things worked at Putnam.
>
> Q. Just generally the way things worked at Putnam?
>
> A. And the fact that [Lasser] was involved in all these decisions.

\*   \*   \*

> Q. What you can [sic] point me to, a specific fact, which shows that Larry Lasser participated in the decision to deny you these opportunities?
>
> [OBJECTION AS TO FORM]
>
> A. No specific facts –
>
> Q. Okay.
>
> A. --other than my observations.

Lasser Stmt., ¶6.

Contrary to Svensson's suppositions, Lasser was not responsible for determining whether she (or any other employee for that matter) would be promoted to managing director during any given year. Instead, in the IMD, CIOs nominated individuals on their team whom the CIO believed to be worthy of officer promotion. Putnam Stmt., ¶5. After the CIO's completed their nominations, the IMD's senior management discussed candidates in "roundtable" meetings and promoted those they deemed appropriate. Putnam Stmt., ¶5. Lasser's limited role in the promotion process was to: (1) occasionally require nominations to be made within overarching restrictions that he imposed; (2) review the individuals selected for promotion by the senior management of the IMD; and (3) rubber stamping the promotion selections of the CIO's. Lasser Stmt., ¶7.

### 3. Svensson's Transfer (2002)

In 2002, Putnam reorganized its International Growth team (of which Svensson was a member) because of its poor investment performance. Putnam Stmt., ¶17. In connection with the reorganization, Putnam offered Svensson an Analyst position in its centralized Global Equity

10844126.4

Research ("GER") department.  Putnam Stmt., ¶18.  Svensson accepted the Analyst position in GER.  Putnam Stmt., ¶18.

Here, too, Svensson has no evidence to support her aiding and abetting claim against Lasser.  The evidence is that Lasser played no role in Putnam's transfer of Svensson in 2002 from a portfolio management position to a research analyst position.  Lasser Stmt., ¶8.  Svensson says she bases her claim of Lasser's involvement in the transfer on her alleged observations of Lasser's involvement in HR matters detailed in section A above, and her personal understanding of Lasser's role at Putnam.  Specifically, Svensson testified at deposition:

> Q.     Well, what specific facts can you point to which would support the allegation that you would – instead of being promoted to managing director, would be demoted and sent back to the Research department in 2002?  Again, I'm interested in specific facts that you know firsthand, not what other people may have told you.
>
> [OBJECTION AS TO FORM]
>
> A.     I only know what I've observed.  I don't have a specific document or letter where [Lasser] said "Demote Lisa in 2002."  That's not the way it worked.
>
> Q.     Well, tell me what you personally observed which would support the allegation that Mr. Lasser determined that you would be demoted and sent back to the Research department in 2002.  Your personal observations.
>
> A.     Mr. Lasser controlled and determined virtually everything that went on in this company, and I don't have a personal observation responsive to that sentence in my hand that's a document.  But I can assure you that he was intimately involved in these decisions.

Lasser Stmt., ¶10.

### 4.     Svensson's Termination from Employment (2003)

The evidence adduced during discovery shows that the events leading up to Svensson's termination from employment began in July 2003, when Darren Peers ("Peers"), a highly

regarded junior Analyst who reported to Svensson, told Joshua Brooks ("Brooks"), Svensson's supervisor, that he was strongly considering leaving Putnam because of his difficulty working with Svensson. Putnam Stmt., ¶36. Soon thereafter, around August 8, 2003, Svensson sought to deliver a very negative performance review of Chris O'Malley ("O'Malley"), another Analyst who reported to her. Putnam Stmt., ¶38.

Concerned about this development (which came on the heels of Peers' complaints), Brooks investigated Svensson's criticisms of O'Malley by speaking with various individuals with whom O'Malley interacted. Putnam Stmt., ¶39. Brooks learned that "not only had [Svensson] perhaps not investigated in the manner in which she suggested, but furthermore, that a decent amount of feedback [about O'Malley] was, in fact, the opposite of what she had suggested." Putnam Stmt., ¶39.

The one-sided nature of Svensson's review of O'Malley caused Brooks to question whether Svensson should continue to manage analysts. Ultimately, Brooks decided that she should not, and after Svensson rejected several alternatives Brooks presented to her and instead demanded an immediate promotion to managing director with a guarantee of compensation of at least $1,000,000 per year for two years, Brooks terminated her employment. Putnam Stmt., ¶¶40-43. Brooks testified at deposition that the decision to terminate Svensson was made primarily by him with input from Kelly Morgan, a female senior management-level employee, and the HR Department. Lasser Stmt., ¶17.

Accordingly, Lasser had no role in the events leading up to Svensson's termination from employment at Putnam, or in Svensson's actual termination from employment. Lasser recalls learning only after-the-fact that Brooks had in some manner changed Svensson's job after it had been discovered during an exit interview and subsequent confidential conversations that

10844126.4

Svensson's management style was abrasive. Lasser Stmt., ¶12. Lasser was not even aware that Putnam involuntarily terminated Svensson from her employment at the time he testified at his deposition in this matter. Lasser Stmt., ¶13.

At her deposition, Svensson was unable to state any specific facts upon which she relies in alleging Lasser played a role in directing the investigation that led to her termination from employment or the termination decision itself. Lasser Stmt., ¶14. With regard to Lasser's involvement in directing the confidential conversations, Svensson testified in a conclusory fashion that Lasser was "intimately involved in every aspect of human resources" and that the fact that Lasser had heard "what was happening to her" indicated in her mind that he "knew something about it." Lasser Stmt., ¶15. With regard to Lasser's involvement in Brooks' decision to terminate Svensson, Svensson speculated that "no one in [ ] Brooks's position for only five months was in the position to make the decision to fire the most senior woman in the department who had a nine-year tenure, and it was ultimately [ ] Lasser's decision. That is the way the organization worked." Lasser Stmt., ¶16. Like all of her allegations, Svensson cannot point to any specific facts in the evidence to support her speculations.

## LEGAL ARGUMENT

### A.  Summary Judgment Standard

Fed. R. Civ. P. 56(c) provides that summary judgment should be granted when there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *See Sparks v. Fidelity Nat'l Title Ins. Co*, 294 F.3d 259, 265 (1st Cir. 2002). The Supreme Court has ruled that "[s]ummary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Cleveland v. Policy Mgm't*

*Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (internal quotation marks and citation omitted). In deciding a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side over the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Even in cases where elusive concepts such as motive and intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Stephenson v. State Street Bank & Trust Co.*, 924 F. Supp. 1258, 1272 (D. Mass.1996), *quoting Lehman v. Prudential Ins. Co. of America*, 74 F.3d 323, 327 (1st. Cir. 1996); s*ee also Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 127, 686 N.E. 2d 1303, 1308 (1997) (summary judgment appropriate in Chapter 151B action where plaintiff is unable to offer admissible evidence of defendant's discriminatory intent, motive or state of mind sufficient to carry plaintiff's burdens and support a judgment in plaintiff's favor). It is Svensson's burden, in opposing Lasser's Motion for Summary Judgment, to come forward with "specific facts" sufficient to create a triable issue of fact. Her subjective beliefs are insufficient to carry that burden. *Triangle Trading Co. v. Robroy Indus.,* 200 F.3d 1, 2 (1st Cir. 1999) ("To defeat [a] Motion for Summary Judgment, [the non-moving party] is required to produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trial worthy issue …") (internal citations omitted). Because Svensson has no specific facts, and relies only upon her subjective beliefs, conclusory allegations, and unsupported speculation, Lasser is entitled to summary judgment dismissing him from this action.

10844126.4

**B.     Because Title VII Does Not Provide for Individual Liability, Svensson's Title VII Aiding and Abetting Claim Against Lasser Must Fail**

Svensson's Title VII aiding and abetting claim is fatally flawed because individuals cannot be held liable under Title VII. *Marchant v. Tsickritzis*, 506 F. Supp. 2d 63, 73 (D. Mass. 2007) (dismissing discrimination claims against individual defendants for failure to state a claim); *Baptista v. New Bedford Credit Union*, 2007 U.S. Dist. LEXIS 33559 (D. Mass. May 8, 2007) (granting summary judgment for individual defendant on discrimination claim on the grounds that Congress did not intend to impose individual liability upon agents of an employer); *Fantini v. Salem State College*, 2007 U.S. Dist. LEXIS 21688 (D. Mass. March 26, 2007) (holding that individuals cannot be held liable under Title VII); *Healy v. Henderson*, 275 F. Supp. 2d 40, 45 (D. Mass. 2003) (holding that Congress did not intend to impose individual liability under Title VII upon agents of an employer). Accordingly, Svensson's Title VII aiding and abetting claim must be dismissed.

**C.     A Majority of Svensson's State Law Aiding and Abetting Claims Are Time Barred**

In order to assert a timely claim under M.G.L. c. 151B, a complainant must file a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") within 300 days of the alleged discriminatory act. 804 CMR 1.10(2). Svensson filed her MCAD charge on March 1, 2004, Am. Compl. ¶ 12, which means that the only ripe claims are those predicated on acts that occurred within 300 days prior to March 1, 2004 – or prior to May 3, 2003. Because three of the four Alleged Adverse Employment Actions (denial of equivalent compensation in 2002 and 2003[4], transfer in 2002, and deprivation of promotion to officer title of managing

---

[4]     Putnam communicated bonus and equity awards annually by March 15 for the previous year's performance, and salaries for the current year were also announced by March 15 of each year. Putnam Stmt., ¶12. Svensson was not eligible for a bonus for 2003 (to be paid in 2004) because she was

*(Footnote continued on next page)*

director between 2000 and 2003[5]) all occurred *before* May 3, 2003 her aiding and abetting claims under M.G.L. c. 151B, §4(5) ("§4(5)") with respect to such actions are time-barred as a matter of law. The Court is respectfully referred to pages 12-15, 25 of Putnam's Memorandum of Law in Support of Putnam Investments' Motion for Summary Judgment, in which Mr. Lasser joins, as legal and factual support for this statute of limitations argument.

### D. Because Svensson Has No Evidence of Lasser's Involvement in Any of the Alleged Adverse Employment Actions, Her State Law Aiding and Abetting Claim Must Fail

Svensson cannot possibly prove that Lasser is liable for "aiding and abetting" under §4(5) because she has absolutely no evidence to meet the pertinent three-prong test for aiding and abetting liability under Massachusetts law. To prove that Lasser is liable under §4(5), Svensson is required to show, among other things, that: (1) Lasser engaged in a wrong "individual and distinct" from the wrongs she claims that Putnam perpetrated upon her; (2) Lasser shared with Putnam an intent to discriminate against her on the basis of her gender; and (3) Lasser knew of his supporting role in an enterprise designed to deprive Svensson of her rights under the Massachusetts Fair Employment Practices Act. *Beaupre v. Smith and Assocs*, 2000 Mass. App. LEXIS 990, fn. 18 (2000) (*citing Harmon v. Malden Hosp.*, 96 BEM 1146 (1997)).

In essence, Svensson claims that Lasser participated in Putnam's Alleged Adverse Employment Actions, not that he committed any "individual and distinct" wrong against her. For that reason alone, her aiding and abetting claim should fail.[6] *Ahanon v. Cerebral Palsy of*

---

*(Footnote continued from previous page)*

        terminated before the end of 2003. Putnam Stmt., ¶46. Thus, all claims concerning Svensson's compensation in 2003 arose prior to the May 3, 2003 limitations cutoff.

5      Putnam generally announced MD elections in March of each year. Putnam Stmt., ¶33.

6      Some Massachusetts courts have inexplicably failed to follow the *Harmon* standard, notwithstanding the fact that it was cited with approval by the Massachusetts Appeals Court in *Beaupre*. A common theme in each case straying from the *Harmon* standard is that "individuals who are allegedly <u>actively involved</u> in the

*(Footnote continued on next page)*

*Mass.*, 2005 Mass. Super. LEXIS 27, *17 (Mass. Super Ct. Jan. 31, 2005) (granting summary judgment for individual defendants on aiding and abetting claim where plaintiff failed to show that any of the individual defendants acted in a manner separate and distinct from their roles as the employer's agents); *MCAD v. Massachusetts State Police*, 2002 WL 31999186, *21 (2002) (finding no aiding and abetting liability because, among other things, alleged aider and abettor did not engage in any independent action to further discrimination); *cf. Murray v. Sharp Air Freight Servs., Inc.*, 2000 WL 33170935, *4 (Mass. Super. Dec. 5, 2000) (denying summary judgment for doctor in handicap discrimination action because while he was not in a position to refuse to rehire plaintiff, he was in a position to perform separate and distinct acts to further employer's decision).

Apart from the conceptual flaw in her case, Svensson's overriding problem is that she has no evidence that Lasser participated in any of the Alleged Adverse Employment Actions about which she complains, and, therefore she cannot meet any of the prongs of *Harmon's* triparate test for aiding and abetting liability under §4(5), nor can she prove that Lasser was "actively involved" in any of the Alleged Adverse Employment Actions. Indeed, Svensson's barebones

---

*(Footnote continued from previous page)*
decisions and actions forming the basis of the claim of employer discrimination may also be held individually liable for, *inter alia*, aiding and abetting the corporate employer's discrimination." *Anderson v. SmartBargains, Inc.*, 2006 Mass. Super. LEXIS 115, *7-8 (Mass. Super. Ct. Jan. 10, 2006) (emphasis added); *see also Johnson v. Verizon New England, Inc.*, 23 Mass.L.Rptr. 40, 2007 WL 2705850, *10 (Mass. Super. Ct. Aug. 22, 2007) (granting summary judgment for alleged aiders and abettors where record was devoid of any evidence that aiders and abettors affirmatively harassed or otherwise intended or enabled harassment of plaintiff); *Schutz v. Go Ahead Vacations, Inc.*, 10 Mass.L.Rptr. 573; 1999 WL 959681, *2 ( Mass. Super. Ct. Sept. 1, 1999) (denying summary judgment to alleged aider and abettors where one dictated to plaintiff a policy of discriminating against older workers, and other actually fired plaintiff, excluded women from key meetings, and told others plaintiff was "too old" for her job); *Vera v. Faust*, 26 MDLR 341, *29-30 (April 12, 2004) (finding individual respondent could be held individually liable as an aider and abettor where we he was the principal perpetrator of the unlawful acts and evidence made clear he encouraged and fostered a working environment hostile to women); *Hope v. San-Ran, Inc.*, 8 M.D.L.R. 1195, 1211 (1986) (finding two managers individually liable for aiding and abetting sex discrimination where they sought and acquiesced plaintiff's termination after she complained about sexual harassment).

testimony regarding Lasser's so-called involvement in the Alleged Adverse Employment Actions amounts to nothing more than conclusory allegations, subjective belief and speculation, set forth in vague hearsay, and tenuous interpretations of Lasser's benign statements to her. Namely, Svensson relies on only the following in support of her groundless §4(5) claim:

- The benign So-Called HR Conversations. Lasser Stmt., ¶2;

- Svensson's supervisors allegedly telling her such things as "[Lasser] did this or [Lasser] did that" or "there's not going to be this or that this year, because [Lasser] said this…" Lasser Stmt., ¶¶3-4;

- Svensson's general observations of "the way things worked at Putnam." Lasser Stmt., ¶¶5-6;

- Svensson's understanding that Lasser "controlled and determined virtually everything that went on [at Putnam]…" Lasser Stmt., ¶10;

- Svensson's understanding that Lasser was "intimately involved" in every aspect of HR. Lasser Stmt., ¶¶6, 10, 15; and

- Svensson's supposition that Brooks could not have been authorized to terminate her employment because he had been at Putnam for only five months and she was the most senior woman in her department at the time of her termination from employment. Lasser Stmt., ¶16.

With only the above vague allegations and suppositions to rely on, Svensson cannot possibly prove at a trial that Lasser engaged in any discriminatory wrong against her, harbored discriminatory intent against her on the basis of her gender, or was aware he was playing a supporting role in Putnam's alleged enterprise to discriminate against her. *See Johnson*, 2007 WL 2705850, \*10 (granting summary judgment for alleged aiders and abettors where record was devoid of sufficient evidence to show intent or enablement of harassment); *Valls v. Geon Engineered Films, Inc.*, 2005 Mass. Super. LEXIS 101, \*14 (Mass. Super. Ct. Mar. 25, 2005)

10844126.4

Case 1:04-cv-12711-PBS    Document 203    Filed 01/15/2008    Page 16 of 17

- 16 -

(granting summary judgment for alleged aiders and abettors where plaintiff had no evidence that a Human Resources director shared the intent of the employer in its alleged discriminatory act); *Ahanon*, 2005 Mass. Super. LEXIS 27 at *18 (granting summary judgment for an individual defendant where plaintiff failed to demonstrate evidence of an intent to discriminate); *Massachusetts State Police*, 2002 WL 31999186, at *21 (finding no aiding abetting liability where Complainant lacked sufficient evidence to support claim that alleged aider and abettor took any action to further discrimination or acted with a discriminatory motive).  Accordingly, summary judgment should enter in Lasser's favor on Svensson's baseless §4(5) claim.

E.     **To the Extent this Court Enters Judgment in Favor of Putnam on Svensson's Discrimination Claims in Main (Counts I and II), It Must Necessarily Enter Judgment for Lasser on Svensson's Aiding and Abetting Claims (Count XII)**

Aiding and abetting claims are wholly derivative of discrimination claims because if no discrimination existed, there is simply nothing to "aid and abet."  Accordingly, if this Court enters judgment in Putnam's favor on Count I of Svensson's Amended Complaint, it must also enter judgment in Lasser's favor on Count XII.  *Abramian*, 432 Mass. at 122 (where new trial was granted on discrimination claim, new trial was also required on aiding and abetting claim because it was "entirely derivative of the discrimination claim"); *DiLuca v. Communications and Power Indus.*, 2003 Mass. Super. LEXIS 224, *22 (Mass. Super. Ct. July 28, 2003) (claim for aiding and abetting is premised on existence of underlying occurrence of discrimination, as a threshold to raising question of another's individual liability for aiding and abetting); *Guthrie v. Raytheon Co.*, 2002 Mass. Super. LEXIS 243, *18 (Mass. Super. Ct. July 12, 2002) (same).

## CONCLUSION

"Over time, summary judgment has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce resources in more

10844126.4

beneficial ways." *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st. Cir. 1991). To survive summary judgment, and ultimately prevail at trial, Svensson must produce "specific facts" and evidence showing Lasser's culpability for aiding and abetting Putnam's alleged gender discrimination in accordance with the *Harmon* standard or the "active involvement" line of cases. Because Svensson's claim against Lasser is not based on facts or evidence, she cannot sustain her burden in opposing Lasser's Motion for Summary Judgment. Lasser never should have been sued and his dismissal from this case is long overdue.[7] Because Svensson cannot win at trial, and for the foregoing reasons, Lasser respectfully requests that this Court grant his Motion for Summary Judgment on Count XII of Svensson's Amended Complaint.

**LAWRENCE J. LASSER**
By his attorneys,

/s/ Erika M. Collins
David S. Rosenthal (BBO #429260)
Erika M. Collins (BBO# 657243)
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110
Tel:  (617) 345-1000

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

/s/ Erika M. Collins
Erika M. Collins

---

[7] Suing Lasser, the former CEO and President of the corporate defendant, was clearly a litigation tactic, and an afterthought at that. Lasser was not named as a Respondent in Svensson's original MCAD Charge of Discrimination. Indeed, Svensson only named Lasser after she read in the newspaper that Lasser had reached a multi-million dollar settlement with Putnam in connection with his own departure from Putnam in November of 2004. There was no factual basis for his late addition to the claim when she added him, and protracted discovery has not added anything to Svensson's specious claim.

10844126.4