**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| LISA SVENSSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04-12711 PBS |
| | ) | |
| PUTNAM INVESTMENTS LLC, f/k/a | ) | |
| PUTNAM INVESTMENTS, INC. and, | ) | |
| LAWRENCE J. LASSER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

<u>**CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF LAWRENCE J.**</u>
<u>**LASSER'S MOTION FOR SUMMARY JUDGMENT**</u>

Defendant Lawrence J. Lasser ("Lasser") hereby submits, pursuant to Local Rule 56.1, the following statement of material facts for which there is no genuine issue to be tried. Some of the facts included herein are for background only and are not material. Lasser does not concede that such facts are true for purposes of trial.

        **A.**      <u>**Svensson's Observations of Lasser's Involvement in Putnam's HR Matters**</u>

1. Lisa Svensson ("Svensson") engaged in five conversations with Lasser that she contends constitute her personal observations of Lasser's "intimate" involvement with Putnam's Human Resources ("HR") matters.

2. The five conversations with Lasser constitute the totality of her personal observations of Lasser's involvement with HR matters. Volume II of Deposition of Lisa Svensson ("*Svensson Depo. Vol. II*")[1], p. 78, ll. 1-24; p. 79, ll. 1-4. The five HR-related conversations are as follows:

---

[1] Excepts from *Svensson Depo. Vol. II* are attached hereto as <u>Exhibit 1</u>.

(a)  Lasser congratulated Svensson on her marriage when he
     encountered her in an elevator.  Exhibit 1, p. 25, ll. 13-24;

(b)  Later, at a luncheon during which Lasser was meeting newer
     MBAs, Lasser turned to Svensson and said "Oh, Lisa and I,
     you know, we go way back…she was a maiden when she first
     came to Putnam."  Exhibit 1, p. 28, ll. 14-24; p. 29, ll. 1-4;

(c)  Lasser cautioned Svensson to "be careful" after learning she
     had fallen down while she was pregnant.  Exhibit 1, p. 27, ll.
     11-21;

(d)  During a lunch with Lasser in which the two discussed 9/11,
     Lasser expressed to Svensson discomfort (in Svensson's view)
     with the fact that Svensson's husband was a stay at home
     father.  Exhibit 1, p. 18, ll. 6-24; p. 19, ll. 1-21.  Svensson
     quotes Lasser as stating "He's a stay-at-home father.  Wow,
     that's fascinating.  How does that make him feel?  I mean as a
     man, how does that make him feel?" Exhibit 1, p. 19, ll. 11-
     15; and

(e)  Svensson attended a luncheon with Lasser in 2002 in which
     she shared with Lasser her views on how Putnam should be
     hiring, training, and "bringing along" MBA's who were hired
     directly from business school.  Exhibit 1, p. 16, ll. 4-19.

## B.    Lasser's Alleged Participation in the Alleged Adverse Employment Actions

Svensson's Compensation (2002-2003)

3.      Svensson bases her claim of Lasser's participation in depriving her of equivalent

compensation compared to her male colleagues in 2002 and 2003 solely on what she claims she

heard from her supervisors.  Exhibit 1, p. 79, ll. 9-24; p. 80, ll. 1-10.  Svensson's  supervisors

told her such things as "Larry did this or Larry did that" or "there's not going to be this or that

this year, because Larry said this…"  Exhibit 1, p. 79, ll. 9-24; p. 80, ll. 1-10.

4.      Svensson's deposition testimony regarding Lasser's involvement in setting

compensation was as follows:

Q.     Was it your observation that Mr. Lasser micromanaged the raises as well as the diminutions in people's compensation?

A.     Well, you know, when you – when you said before, I can't say anything about anyone – anything anyone told me, if it's something that a boss of mine told me that [Lasser] did this or [Lasser] did that, I consider that to be my observation, not just heard through the grapevine, so…

Q.     Well, I'm really not interested in the grapevine.

*          *          *

A.     Discussions – discussions with my boss about, you know, there's not going to be this or that this year, because [Lasser] said this is my observation.

Q.     Okay.  And it's only, then, through what other people told you that Mr. – that your observations regarding Mr. Lasser micromanaging raises and diminution of employment –diminution of compensation were managed?

A.     What my supervisors told me, yes.

Exhibit 1, p. 79, ll. 9-20, 24; p. 80, ll. 1-10.

Svensson's Failed Promotions to Managing Director (2000-2003)

5.     Svensson bases her claim of Lasser's participation in Putnam's decisions not to promote her to managing director from 2000 to 2003 upon her observations of "the way things worked at Putnam."  Exhibit 1, p. 82, ll. 8-21; p. 105, ll. 1-24; p. 106, ll. 1-12.

6.     Specifically, Svensson's deposition testimony on the point was:

Q.     What facts, what specific facts can you tell me which would support the allegation that Mr. Lasser, on four separate occasions, determined that you would not be promoted to managing director?  Again, I'm interested, again, in what you now firsthand, not what other people told you.

[OBJECTION AS TO FORM]

- 4 -

> A.    I only know that the way Putnam worked, Larry was intimately involved in – especially promotions to this level and above.

> *    *    *

> Q.    Let me understand, what specific facts do you have that Mr. Lasser was responsible for the [decisions not to promote you to managing director]?  And again, I'm interested in your own personal observations, not what other people told you, but your own personal observations.  What did you see?  What did you read?  Your personal observation.

> [OBJECTION AS TO FORM]

> A.    Just consistent with my – As I've testified before, my personal observation of the way things worked at Putnam.

> Q.    Just generally the way things worked at Putnam?

> A.    And the fact that Larry was involved in all these decisions.

> *    *    *

> Q.    What you can [sic] point me to, a specific fact, which shows that Larry Lasser participated in the decision to deny you these opportunities?

> [OBJECTION AS TO FORM]

> A.    No specific facts –

> Q.    Okay.

> A.    --other than my observations.

Exhibit 1, p. 82, ll. 8-21; p. 105, ll. 1-18; p. 106, ll. 4-12.

7.    Lasser's limited role in promotion process was to: (1) occasionally require

nominations to be made within overarching restrictions that he imposed (*Deposition of Lawrence*

*J. Lasser* ("*Lasser Depo.*"), p. 102, ll. 9-16[2]); (2) review the book of individuals selected for promotion by the senior managers of the Investment Division (Exhibit 2, p. 104, ll. 9-15); and (3) rubber stamp the selections set forth in the book (*30(b)(6) Deposition of Mary McNamee* (*"McNamee 30(b)(6) Depo"*), p. 89, ll. 8-12[3]).

Svensson's Alleged "Demotion" (2002)

8.    Lasser played no role in what Svensson classifies as Putnam's demotion of her in 2002 from a portfolio management position to a research analyst position.  Exhibit 2, p. 92, ll. 6-10.

9.    Svensson testified at deposition that she did not have any documentary evidence implicating Lasser's involvement in her alleged demotion, but she believed that Lasser "controlled and determined virtually everything that went on [at Putnam]… I can assure you that he was intimately involved in those decisions."  Exhibit 1, p. 82, ll. 22-24; p. 83, ll. 1-24; p. 84, ll. 1-2.

10.    Specifically, Svensson testified at deposition:

> Q.    Well, what specific facts can you point to which would support the allegation that you would – instead of being promoted to managing director, would be demoted and sent back to the Research department in 2002?  Again, I'm interested in specific facts that you know firsthand, not what other people may have told you.
>
> [OBJECTION AS TO FORM]
>
> A.    I only know what I've observed.  I don't have a specific document or letter where [Lasser] said "Demote Lisa in 2002."  That's not the way it worked.

---

[2] Excepts from *Lasser Depo.* are attached hereto as Exhibit 2.

[3] Excepts from *McNamee30(b)(6) Depo.* are attached hereto as Exhibit 3.

- 6 -

> Q.     Well, tell me what you personally observed which would support the allegation that Mr. Lasser determined that you would be demoted and sent back to the Research department in 2002.  Your personal observations.
>
> [OBJECTION AS TO FORM]
>
> A.     Mr. Lasser controlled and determined virtually everything that went on in this company, and I don't have a personal observation responsive to that sentence in my hand that's a document.  But I can assure you that he was intimately involved in these decisions.

Exhibit 1, p. 82, ll. 22-24; p. 83, ll. 1-24; p. 84, ll. 1-2.

Svensson's Termination From Employment (2003)

11.     Lasser had no role in the events leading up to Svensson's termination from employment at Putnam or Svensson's termination from employment.

12.     Lasser only learned after-the-fact that Joshua Brooks ("Brooks"), Svensson's supervisor, had in some manner changed Svensson's job after it had been discovered during an exit interview and subsequent confidential conversations that Svensson's management style was abrasive.  Exhibit 2, p. 130, ll. 14-17, p. 131, ll. 1-10, ll. 21-24; p. 132, ll. 1-9; *Deposition of Joshua Brooks ("Brooks Depo.")*, p. 185, ll. 5-13.[4]

13.     Lasser was not aware that Putnam involuntarily terminated Svensson from her employment at the time he testified at his deposition in this matter.  Exhibit 2, p. 144, ll. 3-10.

14.     At her deposition, Svensson was unable to state any specific facts upon which she relies in alleging Lasser played a role in directing the confidential conversations that led to her termination from employment or the termination decision itself.

15.     With regard to Lasser's involvement in directing the confidential conversations, Svensson testified in a conclusory fashion that Lasser was "intimately involved in every aspect

---

[4] Excerpts from *Brooks Depo.* are attached hereto as Exhibit 4.

of human resources" and that the fact that Lasser had heard "what was happening to her" indicated that he "knew something about it."  <u>Exhibit 1</u>, p. 151, ll. 17-24; p. 152, ll. 1-8.

16.     With regard to Lasser's involvement in Brooks' decision to terminate Svensson, Svensson merely hypothesized that "no one in [ ] Brooks's position for only five months was in the position to make the decision to fire the most senior woman in the department who had a nine-year tenure, and it was ultimately [ ] Lasser's decision.  That is the way the organization worked."  <u>Exhibit 1</u>, p. 87, l. 24; p. 88, ll. 1-9.

17.     Brooks testified at deposition that the decision to terminate Svensson was made primarily by him with input from Kelly Morgan ("Morgan"), a female management-level employee, and the HR Department.  <u>Exhibit 4</u>, p. 219, ll. 8-22.

**LAWRENCE LASSER**
By his attorneys,


/s/ Erika M. Collins
David S. Rosenthal (BBO #429260)
Erika M. Collins (BBO# 657243)
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110
Tel:  (617) 345-1000


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").


/s/ Erika M. Collins
Erika M. Collins

# EXHIBIT 1

**Original Transcript**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 04-12711

LISA SVENSSON,

        Plaintiff,

    VS

PUTNAM INVESTMENTS, LLC,
F/K/A PUTNAM INVESTMENTS, INC.
AND LAWRENCE J. LASSER,

        Defendants.

**DEPOSITION OF**

**LISA SVENSSON**

February 1, 2006
10:11 a.m.

Nixon Peabody, LLC
100 Summer Street
Boston, Massachusetts

Laurie J. Driggers, Notary Public, Certified Shorthand Reporter,
Realtime Professional Reporter and Certified Realtime Reporter
within and for the Commonwealth of Massachusetts



**Jack Daniel**
**Court Reporting & Video Services** Inc.

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Fax: 617.557.0040
www.jackdanielreporting.com

16

1          There's ample evidence that Larry

2    was involved in every aspect of Human

3    Resources at Putnam.

4          Q.  Did you ever have a conversation,

5    yourself, with Mr. Lasser about HR

6    matters, either concerning yourself or

7    anyone else?

8          A.  About HR matters?

9          Q.  Yes.

10         A.  No.  Well, let me change that.  I

11   would call it an HR matter.  There was

12   one lunch that we had, it was in November

13   of 2002, where my team and I were invited

14   by Larry to have lunch with him.  And I

15   did spend some time talking to him about

16   my philosophy, about how the firm should

17   be hiring, training and bringing along the

18   MBAs who were hired out of -- fresh out

19   of the MBA school.

20         I did have a conversation with him

21   at length on that subject.

22         Q.  Was this one on one, or was this

23   in a group setting, this particular

24   conversation with Mr. Lasser?



**Jack Daniel**
**Court Reporting & Video Services**
Inc

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

18

1  a lunch in 2002, with your team.  Are

2  there any other conversations that you had

3  with Larry Lasser about what you would

4  consider HR matters during your entire

5  tenure at Putnam?

6      A.  Well, there was another lunch that

7  I had with Larry, and this was individual,

8  and it was sometime in the months after

9  September 11th, 2001.  And we were -- we

10  had met up in the dining room, in the

11  corporate dining room.

12      And we began to discuss the issues

13  about 2000 -- about 9/11.  He and I had a

14  bit of an ongoing conversation of how

15  traumatic it had been.  He gave a voice

16  mail to the whole firm at that time which

17  touched me personally, and I responded to

18  him through an e-mail.  And I told him

19  that what he had said on the group voice

20  mail to the firm had touched me.  He

21  responded to me with a written note.  And

22  so we began a dialogue shortly after

23  September 11th.

24      So one day we went in the dining



**Jack Daniel**
**Court Reporting & Video Services** Inc
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

19

1  room.  We sat down and had lunch together.

2  And we started talking.  And the subject

3  moved -- moved to me and to my family and

4  my family situation.

5        At this point in 2001, I had had

6  two pregnancies at Putnam.  I had two

7  children.  I was married.  And he asked

8  me what my husband did for a living.  I

9  told him that my husband was a

10  stay-at-home father.  And at that point,

11  Larry said to me -- he said, "He's a

12  stay-at-home father.  Wow, that's

13  fascinating.  How does that make him feel?

14  I mean, as a man, how does that make him

15  feel?"  And I -- I wasn't quite sure what

16  he meant.

17        And he said, "Well, for example, if

18  you're at a cocktail party, and someone

19  says to him, What do you do for a living?

20  How does that make him feel when he says,

21  I'm a stay-at-home father?

22        And so I said to him, you know, my

23  husband is quite an interesting individual.

24  He has a lot of interests.  He knows a



Jack Daniel
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

25

1     Q.   Was that the only time Mr. Lasser

2  was ever in your office?

3     A.   I think so.

4     Q.   Were you ever in his office?

5     A.   Never.

6     Q.   In the conversation that you

7  related to us in 2001 in which this -- in

8  which you discussed your husband's staying

9  at home, did you have any other

10  conversation about your family situation?

11     A.   With Larry?

12     Q.   With Larry, yes.

13     A.   Yes.  One time I ran into him --

14  this was a long time ago.  It was, I

15  would estimate, three months after my

16  wedding.  I got married in June of 1996.

17  So it was three or four months later.  My

18  wedding was announced with my photo in the

19  New York Times on the Sunday edition in

20  the wedding section.

21          And a long time later, several

22  months later, I stepped onto the elevator

23  and Larry was on the elevator, and he

24  said, "Congratulations."  And since it was



Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

27

1  gesture?

2      A.   Sure.

3      Q.   Did you tell anybody about that?

4      A.   Well, I know I would have told my

5  husband.  I don't know if I remember

6  telling people at Putnam about it or not.

7      Q.   Okay.  Did you have any other

8  communication with Mr. Lasser about your

9  family situation, other than the two

10  conversations that you've described for us?

11      A.   One day, when I was pregnant with

12  my first child, I was coming in to work,

13  and I was quite far along in the

14  pregnancy, and I fell down.  And I saw

15  Larry very shortly after that.  I don't

16  know if he saw me fall, but it was, you

17  know, pretty soon after.  And I think I

18  mentioned that I had fallen down.  And he

19  said, "Be careful."  And that's pretty

20  much it.  You know, You have to be

21  careful now; that kind of thing.

22      Q.   Are there any other conversations

23  that you had with Mr. Lasser at any time

24  about your family situation?



Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

28

1    A.   The lunch that I referred to

2 originally, the one that took place in

3 approximately November of 2002 with my

4 team.

5    Q.   I'm sorry.   What was the date?

6    A.   I think it was November of '02.

7 It was late '02.

8    Q.   Okay.

9    A.   The one with me and my team that I

10 originally talked about --

11    Q.   Uh-huh.   Mm-hmm.

12    A.   -- where I brought my team in?

13    Q.   Yeah.

14    A.   He was going around the table

15 introducing himself, because some of the

16 team had never met with Larry before.

17 Some of them were some of the newer MBAs.

18        And so Larry would speak to each of

19 them individually and say -- have them say

20 something about their background or he

21 would say something about the school that

22 they went to.   And I was the last person

23 that he got to at the table as he went

24 around.


Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

29

1    And he stopped with me and he said,

2    "Oh, Lisa and I, you know, we go way

3    back."  And he said, "Well, she was a

4    maiden when she first came to Putnam."

5    So I don't know if you'd describe

6    that as a family situation or not.  I

7    thought it was a little odd, actually.

8    Q.  Did he say it with a smile on his

9    face?

10    A.  Larry never said much with a smile

11    on his face.

12    Q.  In that particular instance, did he

13    say it with a smile on his face?

14    A.  Not that I recall.

15    Q.  Did you laugh when you heard it?

16    A.  Sure, nervously.

17    Q.  Did other people in the room laugh?

18    A.  I don't remember that.  I don't

19    remember anybody laughing other than --

20    Q.  Any other conversations that you

21    can recall in which Mr. Lasser and you

22    discussed your family situation?

23    A.  No.  I think that covers it.

24    Q.  Okay.  In the conversation that --


Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

78

1  I'm interested now in specific examples of

2  your observation, that is, what did you

3  see, what did you hear, what did you

4  touch, what did you feel, your personal

5  observation of Mr. Lasser being involved

6  in human resources issues.

7            I'm not interested in hearing about

8  what you learned from other people, nor am

9  I interested in your assumptions.  I'm

10 asking specifically now about your

11 particular observations.

12            MR. WEIR:  Note my objection

13 to the form of the question.

14      BY MR. ROSENTHAL:

15      Q.  What did you see?  What did you

16 hear, directly from Mr. Lasser?  What did

17 you touch?  What did you feel?

18      A.  I testified earlier to most of the

19 conversations, I think every conversation I

20 had with him.

21      Q.  Yes, you did.

22      A.  So, you know, to the extent that my

23 testimony talks about HR issues, that is

24 the extent of my own personal observation



Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

79

1  of Mr. Lasser.

2      Q.  Okay.

3      A.  Live, in person.

4      Q.  All right.  Now, is it fair to say

5  that it was your observation that Mr.

6  Lasser micromanaged the promotions as well

7  as the demotions?

8      A.  Yes.

9      Q.  Was it your observation that Mr.

10 Lasser micromanaged the raises as well as

11 the diminutions in people's compensation?

12     A.  Well, you know, when you -- when

13 you said before, I can't say anything

14 about anyone -- anything anyone told me,

15 if it's something that a boss of mine told

16 me that Larry did this or Larry did that,

17 I consider that to be my observation, not

18 just heard through the grapevine, so...

19     Q.  Well, I'm really not interested in

20 the grapevine.

21     A.  Mm-hmm.

22     Q.  Okay.  Grapevine doesn't cut it in

23 a lawsuit.

24     A.  Discussions -- discussions with my



**Jack Daniel**
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

80

1  boss about, you know, there's not going to

2  be this or that this year, because Larry

3  said this is my observation.

4      Q.  Okay.  And it's only, then, through

5  what other people told you that Mr. --

6  that your observations regarding Mr. Lasser

7  micromanaging raises and diminution of

8  employment -- diminution of compensation

9  were managed?

10      A.  What my supervisors told me, yes.

11      Q.  Okay.  And in this particular

12  instance, are we talking about Mr. Swift?

13      A.  There's more than one instance.

14      Q.  Okay.  And who besides Mr. Swift

15  are you referring to?

16      A.  Mr. Landes and Mr. Brooks.

17      Q.  Specifically, what did Mr. Brooks

18  tell you in this regard?

19            MR. WEIR:  "In this regard"

20  being?

21            MR. ROSENTHAL:  Hmm?

22            MR. WEIR:  "In this regard"

23  being?

24            MR. ROSENTHAL:  This,



**Jack Daniel**
**Court Reporting & Video Services** Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

82

1  commissions, Mr. Brooks said he had -- he

2  was talking to Larry about this very

3  subject.

4    Q.  And you've testified to that

5  already.

6    A.  Correct.

7    Q.  Okay.  I don't need to rehash that.

8       What facts, what specific facts can

9  you tell me which would support the

10  allegation that Mr. Lasser, on four

11  separate occasions, determined that you

12  would not be promoted to managing

13  director?  Again, I'm interested, again,

14  in what you know firsthand, not what other

15  people told you.

16          MR. WEIR:  Objection as to

17  form.

18    A.  I only know that the way Putnam

19  worked, Larry was intimately involved in

20  -- especially promotions to this level and

21  above.

22    Q.  Well, what specific facts can you

23  point to which would support the

24  allegation that you would -- instead of



Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

83

1  being promoted to managing director, would

2  be demoted and sent back to the Research

3  department in 2002?  Again, I'm interested

4  in specific facts that you know firsthand,

5  not what other people may have told you.

6                MR. WEIR:  Objection as to

7  form.

8      A.  I only know what I've observed.  I

9  don't have a specific document or letter

10  where Larry said, "Demote Lisa in 2002."

11  That's not the way it worked.

12     Q.  Well, tell me what you personally

13  observed which would support the allegation

14  that Mr. Lasser determined that you would

15  be demoted and sent back to the Research

16  department in 2002.  Your personal

17  observations.

18                MR. WEIR:  Objection as to

19  form.

20     A.  Mr. Lasser controlled and

21  determined virtually everything that went

22  on in this company, and I don't have a

23  personal observation responsive to that

24  sentence in my hand that's a document.



Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

84

1    But I can assure you that he was

2    intimately involved in these decisions.

3        Q.  Well, I don't have to have a

4    document.  I could -- I could -- I could

5    have a conversation that you had with Mr.

6    Lasser.  There could be a document that

7    you saw.  There could be an e-mail that

8    you read.  Those are personal

9    observations, things that you saw with

10   your own two eyes, or that -- or that Mr.

11   Lasser said to you directly.  Do you have

12   any of those which would support that

13   allegation?

14       A.  Well --

15                MR. WEIR:  Objection as to

16   form.

17       A.  Some of the documents that have

18   been produced in this litigation, for

19   example, one document that I've seen

20   relates to one of the years that I was

21   going to be put up for promotion.  My

22   understanding was I was put up for

23   promotion.  Putnam has stated in some of

24   its -- I think its mediation, confidential



Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

87

1  for a woman, don't you mean?"  And she

2  said nothing.

3      Because I personally observed that

4  there appeared to be openings for plenty

5  of men from my team to stay and remain in

6  portfolio management.

7      Q.  Have you completed your answer?

8      A.  Yes, I have.

9      Q.  Did you ever complain to Sherrie

10  Holder-Watts, as your HR representative,

11  about anything that -- about Larry Lasser?

12      A.  No.

13      Q.  Referring again to your answer to

14  Interrogatory Number 24, you state, under

15  the pains and penalties of perjury, that

16  "Mr. Lasser ultimately participated in the

17  decision to terminate Plaintiff's

18  employment on September 15, 2003."  Again,

19  I'd ask you for the specific facts on

20  which -- which you claim support the

21  notion that Mr. Lasser participated in the

22  decision to terminate your employment on

23  September 15, 2003.

24      A.  The specific fact is that no one in



Jack Daniel
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

88

1  Josh Brooks's position for only five

2  months was in a position to make the

3  decision to fire the most senior woman in

4  the department who had a nine-year tenure,

5  and it was ultimately Larry Lasser's

6  decision.  That is the way the

7  organization worked.

8      Q.  Have you completed your answer?

9      A.  Yes, I have.

10             THE WITNESS:  May I take a

11  bathroom break?

12             MR. ROSENTHAL:  Certainly.

13  Sure.  Any time you like.

14             (Off the record at 11:47

15  a.m.)

16             (Recess taken).

17             (Back on the record at 11:52

18  a.m.)

19      BY MR. ROSENTHAL:

20      Q.  Let me come back to a quick

21  question about your maternity leave or

22  your FMLA leave.

23             Were you paid for part of that

24  leave by Putnam?



**Jack Daniel**
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:       617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:     866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

105

1      Let me understand, what specific

2 facts do you have that Mr. Lasser was

3 responsible for the decisions that you

4 reference in Paragraph 28?  And again, I'm

5 interested in your own personal

6 observations, not what other people told

7 you, but your own personal observations.

8 What did you see?  What did you read?

9 Your personal observation.

10           MR. WEIR:   Objection as to

11 form.

12     A.   Just consistent with my -- As I've

13 testified before, my personal observation

14 of the way things worked at Putnam.

15     Q.   Just generally the way things

16 worked at Putnam?

17     A.   And the fact that Larry was

18 involved in all these decisions.

19     Q.   And do you have any specific facts,

20 which you can point me to, which show that

21 Mr. Lasser himself was personally involved

22 in the decisions not to promote you to a

23 money management position after 2002, when

24 you returned to --



Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Technologies you can use • Experience you can Trust

106

1    A.   Can you restate the question -- or

2    not restate it.   But can I hear it again?

3    Q.   Sure.   I will.

4        What you can point me to, a

5    specific fact, which shows that Larry

6    Lasser participated in the decision to

7    deny you these opportunities?

8            MR. WEIR:   Objection as to

9    form; as to "specific facts."

10   A.   No specific facts --

11   Q.   Okay.

12   A.   -- other than my observations.

13   Q.   You attended the deposition of

14   Lauren Allansmith; do you recall that?

15   A.   Yes, I do.

16   Q.   She testified about lunchtime

17   meetings with analysts.   Do you recall

18   that?

19   A.   Yes.

20   Q.   Okay.   Did you attend any of those

21   lunchtime meetings with analysts?

22   A.   Well, I testified earlier today,

23   earlier in this deposition, about the

24   lunchtime meeting with my team.   That



Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

151

1    Q.  And what facts, specific facts do

2  you have to support the allegation upon

3  information and belief that these human

4  resources persons were instructed to

5  conduct this investigation by Mr. Lasser?

6        Now again, I'm interested in

7  specific facts about Mr. Lasser, based on

8  your own observation.

9             MR. WEIR:  Note my objection

10 as to form, and asked and answered.

11   A.  As I've stated before --

12   Q.  Just so -- To refer to your -- To

13 obviate your counsel's objection, at least

14 as to the latter part -- I'm now asking

15 about just these interviews and Mr.

16 Lasser.

17   A.  He was intimately involved in every

18 aspect of human resources.

19   Q.  So the same things that you've told

20 us previously?

21   A.  Sure.  That plus the fact that Josh

22 Brooks has testified that Larry Lasser

23 told him he'd heard what was happening

24 with me, so that sort of indicates to me



Jack Daniel
Court Reporting & Video Services Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

152

1    that Larry knew something about it.

2        Q.  Okay.  So is it your testimony that

3    the fact that Mr. Lasser heard about what

4    was going on with you is the same thing

5    as instructing the HR people to conduct

6    the investigation?

7        A.  Sure.  Because HR was operated as

8    an arm of Larry.  So, yeah.

9        Q.  Okay.  Now, in Paragraph 37, you

10   write in your complaint about the three

11   options that you were presented by Mr.

12   Brooks, correct?

13       A.  Yes.

14       Q.  Is it your contention that Mr.

15   Lasser participated in some way in

16   formulating these options?

17       A.  Because Mr. Lasser used HR as his

18   right arm, yes.

19       Q.  Okay.  And is that the only thing

20   that you can point me to by way of

21   specific facts -- not that I acknowledge

22   that that's a specific fact.  Strike that.

23           Are there any specific fact -- Are

24   there any specific facts which you can



Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

```
142:9 143:2          35:7                 115:22 150:1        42:4 44:1,8
143:20 144:6       ongoing              152:11,16          44:15 45:3
144:17,21          18:14 58:6           153:4              45:18 48:24
145:3 146:19        174:2              order              132:12,14
147:6,20          opened               49:10 70:15        134:3 135:10
148:11,22          62:14 188:18         132:2 161:2        135:17
149:11 152:2      opening              ordered            136:12
152:9,19           168:5,10,15          5:6 49:12           144:18 145:1
153:20,23           168:18             ordinary           outsider
155:16,24         openings             175:10             126:22,24
156:4,6,21         60:11,12,17        ordinary            133:22
157:1,20,24         61:14 86:23         10:3,5 20:14      O'Donnell
158:23 160:2        86:24 87:4          20:15 21:10        35:17,23
160:8,13,16         169:21              61:24 64:16         36:22 46:24
162:8,14            171:10              88:7 131:19         48:8 49:3
163:18 164:7        172:24 173:4        137:10 139:5       64:21 65:9
164:14 165:1      operated              167:19 168:6        108:1
165:10             15:8,11 152:7      original           O'Donnell's
166:17 169:5      operating            4:15,17,22         35:18 37:3
171:2,9            131:21,22           5:4 9:11          O'Malley
174:1,5             132:9              11:18 13:7         144:10 149:1
175:13            operation            185:15 186:3       O-L-E-R
176:10             172:11              186:18 187:3       170:16
179:10            opinion              187:21 188:5
185:21             23:11 56:22         188:6 192:16       _____P_____
186:17              145:4             originally         package
187:18            opinions            10:24 11:5,6       153:10 154:15
old                145:8               11:6 28:2,10      page
38:6 144:7        opportunities         94:18             7:6 9:17,22
Oler               62:19 63:2        Oristaglio          75:19 121:11
170:14,15          64:19 77:2          44:21 45:21        121:20 124:9
172:9 173:13        104:24 106:7        51:17 53:4        124:11,23
173:14            opportunity           54:14 85:8        125:24
183:16             4:21 48:2           85:10,21          126:13
Omid               60:4 62:10          97:24 98:23        143:12,21
46:4 119:7          62:14              99:13 102:23       153:21,22
143:23            opposed              130:4 136:20       157:11,11
145:14 146:1       165:15 186:3      ought              161:7 162:10
146:5,8,8,12        186:19             177:10             186:11 191:4
150:6,7             187:21            outcome            192:19,22
once              option               183:11 190:14     193:1,4,7,11
38:18 39:2         153:5,8 154:7     output             193:14,17,20
41:14 43:1        options             137:22             193:23
65:8               111:24 112:6      outside            pages
one-on-one                            outside            7:9 9:19
```



**Jack Daniel**
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

# EXHIBIT 2

Lawrence J. Lasser

1

1          Volume:  I

2          Pages:  1-175

3          Exhibits:  1-10

4          UNITED STATES DISTRICT COURT

5          DISTRICT OF MASSACHUSETTS

6    Civil Action No. 04-12711-PBS

7    - - - - - - - - - - - - - - - - - - - - - - - -

8    LISA SVENSSON,

9                      Plaintiff,

10        v.

11   PUTNAM INVESTMENTS, LLC, f/k/a PUTNAM

12   INVESTMENTS, INC., and LAWRENCE J. LASSER,

13                      Defendants.

14   - - - - - - - - - - - - - - - - - - - - - - - -

15         Deposition of Lawrence J. Lasser

16             Wednesday, May 17, 2006

17             10:10 a.m. to 3:24 p.m.

18             Barron & Stadfeld, P.C.

19              100 Cambridge Street

20             Boston, Massachusetts

21

22       Reporter:  Daria L. Romano, RPR/CRR

23

24

Lawrence J. Lasser

92

1    analyst in that period of time?

2        A.    No.

3        Q.    Did you know what positions or titles

4    Lisa Svensson held during that period of time?

5        A.    No.

6        Q.    Were you involved at all in the

7    decision to take Lisa Svensson out of the

8    portfolio management group and move her back

9    into research?

10       A.    No.

11       Q.    Do you know who made that decision?

12       A.    No.

13       Q.    Do you know whether Mr. Oristaglio was

14    the head of investments at that time?  And by

15    that time I mean March of 2002.

16       A.    No.  Tim Ferguson would have been head

17    of investments.

18       Q.    Okay.  Had you directed or recommended

19    any overall restructuring of the portfolio

20    management teams in the time frame of the first

21    quarter of 2002?

22       A.    Not specifically, no.

23       Q.    That was a decision that would have

24    been left to the individual head of investments?

Lawrence J. Lasser

102

1    my next question.

2         A.   Oh, of course not.

3         Q.   Now, we talked a little bit earlier

4    about the title of managing director.  And I

5    take it that that title was in place at Putnam

6    in the time frame of 1994 and 2003?

7         A.   Some time around there it began, maybe

8    earlier.

9         Q.   Okay.  And what was the process for

10   determining whether one did or did not become a

11   managing director of Putnam during that period?

12        A.   It was a recommendation of the

13   department overseen by HR but occasionally

14   within overall restrictions that I imposed

15   because I was concerned periodically that we

16   were undergoing title inflation.

17        Q.   What restrictions do you recall

18   imposing?

19        A.   I don't recall specifically, but it

20   would be that we weren't going to have more than

21   a certain percentage of our employees in each

22   category.

23        Q.   And do you recall when you imposed

24   that restriction?

Lawrence J. Lasser

104

1    made a managing director from coming from

2    outside Putnam directly?

3         A.    Oh, I'm sure they could have.

4         Q.    Was there any time limitation; that

5    is, did one have to be at Putnam a certain

6    number of years before they would be considered

7    for managing director?

8         A.    I don't recall.

9         Q.    Would you be presented with a list of

10   individuals who had been selected?

11        A.    Yes.

12        Q.    And who would provide that list to

13   you?

14        A.    Typically the HR representative for

15   that area of the company.

16        Q.    And did you understand as to whether

17   or not this was the product of a vote?

18        A.    No.  It may have been done differently

19   in different departments.

20        Q.    We talked earlier about the

21   partnership.  And, again, in the this frame of

22   2000 to 2003, how many or approximately how many

23   partners were there at Putnam?

24        A.    Approximately 40.

Lawrence J. Lasser

130

1    to respond to them or to deal with them?

2        A.    Of course.  It was my job.

3        Q.    And typically what would you do?

4        A.    I would sit with the head of HR, who

5    was wise and experienced, and often the

6    department head, and we'd figure out together

7    the best resolution we could.

8        Q.    Okay.  Did you ever receive any

9    complaints or have any problems identified to

10   you concerning Lisa Svensson?

11       A.    No.

12       Q.    And that question relates to any time

13   between 1994, July '94 and 2003.

14       A.    I never recall anything about Lisa.  I

15   was told that Lisa's job was being changed, this

16   was an after-the-fact conversation, which may --

17   you may have meant to include in your question.

18       Q.    Let me see if I understand.

19             When did this take place?

20       A.    I don't remember the date, but it was

21   after Darren Peers had left.

22       Q.    So after Darren Peers had left, you

23   had you a discussion with someone concerning

24   Lisa Svensson?

Lawrence J. Lasser

131

1      A.    Somebody told me that Lisa's job was

2  being changed because it had come out in an exit

3  interview with Darren Peers that her management

4  style was abrasive and had caused this

5  outstanding young man to leave Putnam.  So it

6  had already been handled, but I was told about

7  it.

8      Q.    Do you recall who the someone who told

9  you was?

10     A.    I think it was Josh.

11     Q.    Okay.  So just so I understand, Josh

12 Brooks came to you and said that Lisa's job was

13 being changed because Darren Peers had left the

14 company?

15            MR. KOCIUBES:  That's not what he

16 said.

17            MR. ROSENTHAL:  That's not what he

18 said.

19     A.    That's not what I meant to say.

20     Q.    Okay.

21     A.    First of all, when you begin by saying

22 Josh came to me, I don't recall that Josh came

23 to me to tell me that.  I think Josh had a

24 periodic meeting with me, and on his list of

Lawrence J. Lasser

132

1    things to tell me about was that Darren Peers

2    had left, that he learned in his conversation

3    with Darren what I just described about Lisa's

4    management style, and that he had taken that and

5    had other confidential conversations and learned

6    that Darren's opinion was widely held, and he

7    felt that Lisa was not suitable to manage people

8    and that they were going to change that

9    arrangement.

10        Q.    Did you respond in any way?

11        A.    No.  I mean, I responded really

12   focusing on Darren because he was one of the

13   young people that I actually knew and thought

14   very, very highly of.  I was quite disappointed.

15        Q.    How did you come to know Darren Peers?

16        A.    He was what was called a post-college

17   pre-business school intern.  I've forgotten the

18   name we gave to it.

19             And there would be a competition.  The

20   most outstanding of those people would receive

21   MBA tuition paid by Putnam.  And I interviewed

22   the finalists, and I came to know him in that

23   way.

24             So when he came back to Putnam after

Lawrence J. Lasser

144

1              MR. ROSENTHAL:  Objection.

2        A.   No.

3        Q.   Well, did you become aware at some

4   point that Lisa Svensson had been terminated?

5              MR. ROSENTHAL:  Objection.

6   BY MR. WEIR:

7        Q.   As opposed to this change in her job

8   responsibilities?

9        A.   I don't know to this minute that she

10  was terminated.

11       Q.   With respect to the matter of deferred

12  compensation, did Putnam have in place any plan

13  to defer all or a portion of an investment

14  professional's compensation?

15       A.   For some, yes.

16       Q.   And who determined that, who would be

17  eligible to defer compensation?

18       A.   There were several different programs

19  at different points of time, some voluntary,

20  some mandatory.

21       Q.   Let's talk about the 2000, 2003 time

22  frame.

23       A.   There may have still been a voluntary

24  deferred compensation plan, where you could opt

**EXHIBIT 3**

Mary McNamee

1

1    Volume:  I

2    Pages:  1-268

3    Exhibits:  1-51

4

5             UNITED STATES DISTRICT COURT

6             DISTRICT OF MASSACHUSETTS

7    Civil Action No. 04-12711-PBS

8    - - - - - - - - - - - - - - - - - - x

9    LISA SVENSSON,

10              Plaintiff,

11   vs.

12   PUTNAM INVESTMENTS, LLC, f/k/a PUTNAM

13   INVESTMENTS, INC. and LAWRENCE J.

14   LASSER,

15              Defendants.

16   - - - - - - - - - - - - - - - - - - x

17   RULE 30(b)(6) DEPOSITION OF PUTNAM INVESTMENTS, LLC BY

18              ITS DESIGNEE MARY McNAMEE

19              Thursday, November 15, 2007

20                 Barron & Stadfeld

21                100 Cambridge Street

22                Boston, Massachusetts

23              10:05 a.m. to 6:26 p.m.

24         Reporter:  Karen A. Morgan, CSR/RPR

Mary McNamee

89

1    assistants in putting a book together for Larry and

2    then at the time I was part of covering the

3    institutional business so I was responsible for putting

4    the book together for the institutional business.

5        Q.    And once compiled the book would then be

6    delivered to Larry Lasser's office?

7        A.    Yes, and he could review it.

8        Q.    Did there ever come a time when you or HR got

9    input from Mr. Lasser concerning his conclusions after

10   reading the book?

11       A.    Well, I think it was more just a rubber stamp

12   at that point.  I don't recall any specific time in

13   which he got the book and said, oh, take out this

14   people or take out that person.  He generally let the

15   managers go with who they recommended.

16       Q.    Do you know whether he had any conversations

17   with Mr. Oristaglio concerning any conclusions that he

18   formulated after reading the book?

19       A.    That I don't know.

20       Q.    Do you know whether Mr. Lasser ever made any

21   comments respecting the nomination of Lisa Svensson to

22   the managing director?

23       A.    In 2001?

24       Q.    At any time.

# EXHIBIT 4

**Copy of Transcript**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 04-CV-12711(PBS)

LISA SVENSSON,

      Plaintiff,

VS.

PUTNAM INVESTMENTS LLC,
f/k/a PUTNAM INVESTMENTS,
INC, and LAWRENCE J. LASSER

      Defendants.

**DEPOSITION OF**

**JOSHUA HUNTINGTON BROOKS**

November 17, 2005
11:44 a.m.

Barron & Stadfeld, P.C.
100 Cambridge Street
Boston, Massachusetts

Amanda Stevens, Notary Public and
Professional Shorthand Reporter within and
for the Commonwealth of Massachusetts



**Jack Daniel**
**Court Reporting & Video Services** Inc

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Fax: 617.557.0040
www.jackdanielreporting.com

185

1  discussed it with Kelly and Mary McNamee,

2  but I don't recall.  I would imagine I

3  also would have discussed it with Steve

4  Oristaglio and potentially Ed Haldeman.

5      Q.  Do you recall ever having a

6  discussion with Larry Lasser?

7      A.  I remember once the decision had

8  been made that we were going to offer Lisa

9  these alternatives, I do remember that

10  Larry mentioned to me he had heard about

11  that.  I assumed at the time he had heard

12  from HR, but I wasn't certain and I didn't

13  ask.

14      Q.  Was this a face-to-face meeting or

15  a telephone discussion?

16      A.  No, it would have been face to

17  face.

18      Q.  Do you remember the context?

19      A.  It was, I believe, at the end of a

20  regular meeting I would have had with Ed,

21  Steve and Larry, the purpose of which was

22  to discuss progress on research, how

23  things were going, et cetera.

24      Q.  Was this a regular meeting?



Jack Daniel

Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

219

1  decision after the fact.

2     Q.  "Faced with the fact that promising

3  analysts on Ms. Svensson's team were

4  choosing to resign rather than to continue

5  to work with her (a fact that suggested

6  strongly that Ms. Svensson's interpersonal

7  issues continued to compromise her

8  management abilities) Putnam concludes that

9  it had no choice but to offer Ms. Svensson

10 the choice of accepting a nonsupervisory

11 role or leaving Putnam."   When that

12 sentence refers to Putnam, that your

13 decision and your decision alone.

14    A.  Well, the decision that -- as I've

15 already said, was taken in conjunction

16 with Kelly Morgan, with HR, but yeah,

17 ultimately --

18    Q.  Ultimately, if you said do it, it

19 was done.  And if you said we're not

20 going to do this, it wasn't going to be

21 done.

22    A.  Yeah, I think that's fair.

23    Q.  Do you recall any discussion with

24 Lisa Svensson concerning the ethical



Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114