UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON,<br><br>                  Plaintiff,<br><br>      v.<br><br>PUTNAM INVESTMENTS LLC, f/k/a PUTNAM INVESTMENTS, INC. and LAWRENCE J. LASSER,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CIVIL ACTION<br>NO. 04-12711 PBS |

**MEMORANDUM OF LAW IN SUPPORT OF
PUTNAM INVESTMENTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 1

ARGUMENT ............................................................................................................... 8

I.  SVENSSON'S CHAPTER 151B AND TITLE VII CLAIMS FAIL
    BECAUSE THEY ARE TIME-BARRED AND BECAUSE PUTNAM'S
    EMPLOYMENT DECISIONS WERE SEX-NEUTRAL ................................... 8

    A.  Svensson's Termination Claim Fails Because Putnam's
        Termination Decision Was Sex-Neutral ................................................... 9

        1.  Svensson Cannot Establish a Prima Facie Case of
            Discrimination;  She Was Terminated Because She Was
            Not Performing Her Job at an Acceptable Level and
            Because She Refused to Accept Her New Role............................ 9

        2.  Putnam Had a Legitimate, Non-Discriminatory Reason for
            Terminating Svensson................................................................. 10

        3.  Svensson Cannot Show that Putnam's Reason for
            Terminating Her Was Pretextual ................................................ 10

    B.  Svensson's Promotion, "Demotion," and Compensation Claims
        Are Time-Barred ...................................................................................... 12

        1.  Svensson's "Demotion" Claim Is Time-Barred.......................... 13

        2.  Svensson's Promotion Claims Are Time-Barred........................ 14

        3.  Svensson's Compensation Claims for 1999-2003 Are
            Time-Barred............................................................................... 14

    C.  Even if Not Time-Barred, Svensson's Promotion, Compensation
        and Demotion Claims Fail Because Putnam's Employment
        Decisions Were Sex-Neutral.................................................................... 15

        1.  Svensson's Promotion Claims Fail Because No Evidence
            Exists that Her Sex Played a Role in Putnam's Promotion
            Decisions.................................................................................... 15

            a.  Putnam had legitimate business reasons for electing
                other MDs ...................................................................... 15

            b.  Svensson cannot demonstrate that Putnam's reasons
                for not promoting her were pretextual ............................ 16

        2.  Svensson's 1999-2001 Compensation Claims Have Been
            Abandoned, Her 2003 Claim Fails Because She Was Not
            Entitled to a 2003 Bonus, and Her 2002 Claim Fails
            Because There Is No Evidence that Her Sex Played a Role
            in Setting Her Compensation ...................................................... 17

            a.  Svensson has abandoned her compensation claims
                for 1999-2001............................................................... 17

            b.  Svensson is not entitled to additional compensation
                for 2003 ........................................................................ 18

i

        c.    No evidence exists that sex played a role in determining Svensson's 2002 compensation ................... 18

           i.    Svensson cannot establish a prima facie case of compensation discrimination ........................... 18

           ii.    Putnam had legitimate, non-discriminatory reasons for any pay differentials with the three comparators ................................................ 21

           iii.    Svensson cannot demonstrate that Putnam's reasons for having pay differentials were pretextual .......................................................... 21

     3.    Svensson's "Demotion" Claim Fails Because No Evidence Exists that Sex Played a Role in Her Transfer ........................... 23

        a.    Svensson cannot make a prima facie showing of discriminatory demotion .................................. 23

        b.    Putnam had legitimate business reasons for transferring Svensson ...................................... 23

        c.    Svensson cannot demonstrate that Putnam's reasons for transferring her were pretextual .................... 24

II.    SVENSSON'S MASSACHUSETTS EQUAL RIGHTS ACT ("MERA") CLAIM IS PREEMPTED ...................................................................... 24

III.    SVENSSON'S MASSACHUSETTS EQUAL PAY ACT ("MEPA") CLAIM IS TIME-BARRED ...................................................................... 25

IV.    SVENSSON'S BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM IS PREEMPTED AND LEGALLY DEFECTIVE ....................................................................................... 25

V.    SVENSSON'S BREACH OF CONTRACT CLAIM IS PREEMPTED AND LEGALLY DEFECTIVE .......................................................... 26

VI.    SVENSSON'S RETALIATION CLAIMS FAIL BECAUSE PUTNAM SIMPLY ENFORCED TERMS OF APPLICABLE BENEFIT PLANS ............ 26

VII.    SVENSSON'S FRAUDULENT INDUCEMENT AND MISREPRESENTATION CLAIMS ARE PREEMPTED AND LEGALLY DEFECTIVE ................................................................. 28

VIII.    SVENSSON'S ERISA CLAIMS FAIL BECAUSE SVENSSON CANNOT DEMONSTRATE THAT PUTNAM TERMINATED HER TO DEPRIVE HER OF ERISA BENEFITS ........................................... 29

IX.    SVENSSON'S CONVERSION/UNJUST ENRICHMENT CLAIM FAILS BECAUSE SHE HAD NO RIGHT TO THE COMPENSATION SHE SEEKS ................................................................................ 29

## GLOSSERY OF ABBREVIATIONS

| Term | Abbreviation |
|---|---|
| Amended Complaint | Am. Compl. |
| Associate Director of Research | ADR |
| Associates and Principles Plan | A&P Plan |
| Chief Investment Officer | CIO |
| Equity Partnership Plan | EPP |
| Global Equity Research | GER |
| Human Resources | HR |
| Investment Division Management Committee | IDMC |
| Investment Management Division | IMD |
| Managing Director | MD |
| Marsh & McLennan Companies | MMC |
| Portfolio Manager | PM |
| Profit Growth Incentive Plan | Profit Growth Plan |
| Senior Portfolio Manager | SPM |
| Senior Vice President | SVP |

## INTRODUCTION

Plaintiff, Lisa Svensson ("Svensson"), joined Defendant, Putnam Investments, LLC ("Putnam") as a securities analyst in 1994. During her tenure at Putnam, Svensson was amongst the highest paid investment professionals on her teams. For example, her bonus of nearly $1.5 million in 2000 trailed only another female portfolio manager and the team's male manager. Svensson also received various promotions, both in her job function (to Portfolio Manager, Senior Portfolio Manager, and Associate Director of Research) and in her "officer title" (from Vice President to Senior Vice President). Svensson was considered for an officer promotion to Managing Director ("MD"), but each time the men and women responsible for selecting Senior Vice Presidents for promotion MD chose not to support her. Indeed, for the one year in which a formal voting record exists, 2000, none of the electors, male or female, voted for Svensson.

In September 2003, Svensson's manager concluded that she should no longer manage other analysts after learning that two of the four analysts who reported to her – two of Putnam's most highly-regarded analysts – could no longer tolerate working for her. Putnam offered Svensson several alternatives, including that she remain employed in her analyst role but that she not manage other analysts. Svensson refused the alternatives, and instead demanded immediate promotion to MD with guaranteed compensation of $1,000,000 per year, a nearly 50% increase over her prior year's pay. Putnam terminated Svensson and replaced her with another female analyst. Svensson then sued, alleging that she variously was terminated, demoted, not promoted, paid differentially, and retaliated against on account of her sex.

All but one of Svensson's sex discrimination claims are time-barred, and all are deficient because there is no evidence that gender played a role in any of Putnam's decisions regarding her. Svensson's ancillary claims are time-barred, preempted by Mass. Gen. Laws ch. 151B, or deficient factually and/or legally deficient.

## STATEMENT OF FACTS

Putnam manages money for individuals and institutional investors. Its investment products include mutual funds and separate accounts for 401(k) plans and other retirement plans.

During all relevant times, Putnam was a subsidiary of Marsh & McLennan Companies, Inc. ("MMC").  Tibbetts Aff. ¶ 2.[1]

Putnam's Structure and Practices.    Putnam was organized into several Divisions, including the Investment Management Division ("IMD"), Global Distribution and Marketing, Operations, and corporate administration.  Svensson was an investment professional in the IMD. The IMD was subdivided into multiple portfolio management teams and investment support teams.   Portfolio management teams were organized by asset class (*e.g.*, large cap equity, international equity, fixed income, and currency) and investment style (*e.g.*, value, core, and growth).  IMD also maintained support teams such as research teams and trading teams.  Some portfolio management teams relied on the services of separate research teams; others embedded research functions (Analysts and Senior Analysts) in the investment team itself.   Portfolio management teams were led by a Chief Investment Officer ("CIO"), and included analysts, portfolio managers ("PM"), and senior portfolio managers ("SPM").  Tibbetts Aff. ¶ 4.

In addition to functional titles (such as PM or Analyst), investment professionals typically had "officer titles" such as Assistant Vice President, Vice President, Senior Vice President ("SVP"), Managing Director ("MD"), and Senior Managing Director.    Officer elections occurred annually.  Only individuals who had been an SVP for at least one full year were eligible to be elected to MD.  The CIO of each team nominated individuals on that team whom the CIO believed to be worthy of officer promotion.  IMD's senior management, who participated in the Investment Division Management Committee ("IDMC"), discussed candidates in detail in "roundtable" meetings and selected for promotion those they considered appropriate, subject to final review by Putnam's senior management.  In some years, formal votes were taken

---

[1] In support of its motion for summary judgment, Putnam also submits an Appendix ("App.") containing the Affidavits of Richard B. Tibbetts ("Tibbetts Aff."), Putnam's Chief of Human Resources ("HR"), and the Affidavit of Allyson Kurker, one of Putnam's attorneys.  Attached to the Kurker Affidavit are: (1) excerpts of deposition testimony of Lisa Svensson, Steve Oristaglio, Mary McNamee, Darren Peers, Richard Tibbetts, Joshua Brooks, and Paul White; and (2) the expert reports of David Bloom and Paul White.  Throughout this memorandum, references to "App.__" indicate the Appendix tab at which the cited document is located.  The Appendix has been filed under seal.

and recorded while in other years decisions were reached by consensus. An officer promotion was not automatically accompanied by a change of job responsibilities, functional title, or compensation. The title was an organizational title only, akin to Vice President at a bank. Officer promotions were announced annually in March. Tibbetts Aff. ¶ 5.

Putnam's Compensation Practices. Compensation of investment professionals consisted of base salary and incentive pay. Base salary was reviewed annually. Incentive compensation consisted of year-end discretionary incentive bonuses and potential discretionary grants of Putnam equity (restricted shares and options). Most investment professionals (including Svensson) participated in the Associates and Principals Incentive Compensation Plan ("A&P Plan"), which paid discretionary cash bonuses to participants. To be eligible for a bonus, the employee needed to be employed on the date when bonuses were paid. The A&P Plan provided Putnam with discretion to make a payment in lieu of a bonus to a terminated employee if the employee signed a release of legal claims. Putnam enforced this release requirement in each instance in which it made such payments to terminated employees. Tibbetts Aff. ¶¶ 8, 9, App. 1.

Investment professionals also were eligible for special awards from Putnam's Profit Growth Incentive Compensation Plan ("Profit Growth Plan"). The Profit Growth Plan deferred payment of its bonus awards over several years. Individuals terminated without cause could continue to receive their deferred bonus payments, but only if they signed releases. Putnam enforced this release requirement in all cases. Tibbetts Aff. ¶ 10, App. 2. Finally, investment professionals could receive equity grants as a non-cash incentive award under the Equity Partnership Plan ("EPP"), which vested over time. Unvested grants vested for employees terminated without Cause only if the terminated employee signed a release. Putnam also enforced this release requirement in all cases. Tibbetts Aff. ¶ 11, App. 3.

Each year, MMC and Putnam's senior management determined the size of the bonus pool for the entire firm. After the pool was set, Putnam's Chief Executive Officer and its division heads allocated portions of the pool to each division, including the IMD. IMD management allocated IMD's share of the pool among the various investment teams and support groups. The

CIO of each team then set the bonus award for each individual on that team. A similar process was followed in making equity awards, although not all investment professionals received equity awards in all years. Tibbetts Aff. ¶ 12. Putnam informed investment professionals of their salary increases and bonus and equity awards no later than March 15 of each year (*e.g.*, no later than March 15, 2003 for bonuses for 2002 and for salary increases for 2003). *Id.* at ¶13.

Svensson's Employment History. Svensson joined Putnam as an Analyst, with a Vice President officer title, in 1994. Amended Complaint ("Am. Compl.") ¶ 21; Deposition of Lisa Svensson ("Svensson Dep") at 103, App. 15. Putnam promoted her to SVP in 1995 (Svensson Dep. 103-104) and offered her a PM position in December 1997 (*Id.* at 114). In 2000, Putnam promoted Svensson to Senior Portfolio Manager ("SPM"). *Id.* at 105. From 1997 through 2002, she served as a PM and SPM on the International Growth team (Am. Compl. ¶ 21), reporting to Robert Swift, the team's CIO (*Id.* at 109). Svensson's 1999 salary and bonus totaled $1,131,500. Tibbetts Aff. ¶ 15, App. 5. Her 2000 salary and bonus totaled $1,495,500. *Id.* In 2001, a year in which the performance of the International Growth Fund plummeted, her salary and bonus decreased to $655,000. *Id.* In all three years she was the third most highly-compensated team member, behind Swift (the team's CIO) and Kelly Morgan, a female SPM and Director. *Id.*

Svensson's Transfer to GER. In 2002, Putnam reorganized the International Growth team "given the [team's] performance issues and the dramatic decrease in asset[s under] management." Deposition of Stephen Oristaglio ("Oristaglio Dep.") at 123, App. 16. Putnam terminated Swift (the team's male CIO) (Svensson Dep. 96) and, in April 2002, offered Svensson an Analyst position in its centralized Global Equity Research ("GER") department (Tibbetts Aff. ¶ 17). Steve Dexter continued to manage what remained of the International Growth Fund because, according to Stephen Oristaglio, the co-Head of IMD, Dexter "was a conservative investment manager ... more diversified in combining fundamental and quantitative [skills], and I thought he had the edge among all the candidates that gave me the best probability . . . that group would be managed in the way that [] I specified and was looking for." Oristaglio Dep. 135-36, App. 16. Svensson wanted a PM position on another investment team, but "it was

4

challenging ... to find a group that would take Lisa" due to her "challenging personality." Deposition of Mary McNamee ("McNamee Dep.") at 236, <u>App. 17</u>. Oristaglio believed that Svensson could add value as an analyst. Oristaglio Dep. 135-136, <u>App. 16</u>. GER's Director, Bill Landes ("Landes"), agreed to offer Svensson an analyst position in GER, but did so "reluctantly" because "she had a history of being difficult to work with." McNamee Dep. 340, <u>App. 17</u>. Svensson accepted the Analyst position. Tibbetts Aff. ¶ 17.

For 2002, the year of her transfer to GER, Svensson's compensation was $655,000, *the exact amount* that she had earned in her last year as a PM in International Growth. Tibbetts Aff. ¶ 19. In 2002, she was the sixth most highly-compensated analyst in GER (of forty-five analysts), and was the eighth most highly-compensated employee of fifty investment professionals in all of GER (not including the group's director). *Id.* at ¶ 18, <u>App. 6</u>. In January 2003, Landes promoted Svensson to ADR. Am. Compl. ¶ 32.

<u>Svensson's Candidacy for Managing Director</u>. Svensson was considered for election to MD annually between 2000 and 2002. (In 2003, Putnam did not elect anyone to MD from the IMD. Tibbetts Aff. ¶ 34.) In 2000, the only year during this period in which a formal vote was taken and recorded, six men and four women were considered for election to MD. *Id.* at ¶ 31, <u>App. 7</u>. The IDMC selected three of four women and four of six men for promotion, and these selections were ultimately approved. *No one*, including the two female electors on the IDMC, supported Svensson. *Id.*

<u>Svensson's Termination</u>. In April 2003, Putnam hired Joshua Brooks ("Brooks") to replace Landes as Director of GER. Am. Compl. ¶ 32. Brooks quickly decided that the investment process in GER "needed to be improved." Deposition of Joshua Brooks ("Brooks Dep.") at 105, <u>App. 18</u>. He believed that analysts in GER were not encouraged to "stand away from the herd, stand away from consensus" (*Id.* at 106), and that "[i]n order to be comfortable taking a position that is away from the majority, you need, in my opinion, to work in an environment that is cooperative and supportive." *Id.* at 97. Brooks set out to rectify this situation.

5

In July 2003, shortly after Brooks arrived, Darren Peers ("Peers"), an Analyst in GER who reported to Svensson, (and who was Putnam's top stock picker in 2002, Tibbetts Aff. ¶ 36, App. 9), told Brooks that he had a problem with Svensson's "managerial style" and that he "was unhappy enough that [he] started looking for work and ... was likely going to leave." Deposition of Darren Peers ("Peers Dep.") at 26, App. 19. Peers testified that Svensson often made him feel "uncomfortable" and "demeaned." *Id.* at 53. Brooks' perception was that:

> [Svensson] felt that [Peers] was distracting attention away from her, that he was commenting on things that weren't the place of anybody but the team leader, that he was not toeing the line in terms of being subservient to her in the way that she was comfortable with. And [Peers] said that he was uncomfortable with his ability to do his job if subservience was being demanded of him.

Brooks Dep. 163, App. 18. This was precisely the kind of behavior that Brooks wanted to change.[2] *Id.* at 106.

Meanwhile, on or about August 8, 2003, Svensson asked her HR manager, Mary McNamee ("McNamee"), for assistance in delivering a negative performance review of Chris O'Malley ("O'Malley") another well-regarded Analyst (Tibbetts Aff. ¶ 36), who reported to Svensson. Svensson Dep. 134, App. 15. Contemporaneously, O'Malley called Eric Hutcherson ("Hutcherson"), his HR manager, to complain about Svensson's treatment of him. McNamee Dep. 63-64; 113 (Exhibit 3), App. 17. Brooks learned that O'Malley also was contemplating quitting rather than continuing to work for Svensson. Brooks Dep. 198-99, App. 18.

At Hutcherson's request, O'Malley sent Hutcherson an email describing his difficulties with Svensson's leadership and the functioning of their team. Tibbetts Aff. ¶ 37, App. 10; McNamee Dep. 112, App. 17. Hutcherson shared this email with McNamee (*id.* at 113), who turned to Brooks for guidance. *Id.* at 169. Brooks described the situation as follows:

---

[2] Peers resigned from Putnam at the end of September 2003. Although Peers' ultimate decision to leave Putnam was influenced by a number of factors, he testified that "I had started looking for work because I was unhappy [with Svensson], and once you start down that path ... ." Peers Dep. 62, App. 19

> I heard from Mary McNamee that Lisa had been endeavoring to complete what appeared to be a very negative review of ... Chris O'Malley in which Lisa described having sought feedback from all of the portfolio managers with whom Chris interacted, and that that feedback was universally negative.

Brooks Dep. at 164-165, <u>App.</u> <u>18</u>.  Concerned about these developments (which came on the heels of Peers' complaints), Brooks investigated Svensson's criticisms of O'Malley by speaking with various PMs with whom O'Malley interacted.  *Id.* at 167.  Brooks concluded that "not only had Lisa perhaps not investigated in the manner in which she suggested, but furthermore, that a decent amount of feedback was, in fact, the opposite of what she had suggested."  *Id.* at 168.  When confronted by Brooks, Svensson admitted that although she had spoken to some PMs, "it was true, that I never even targeted the U.S./Global Core Team . . . because they never had any complaints about Chris O'Malley.  They never had any issues with him."  Svensson Dep. 22, <u>App.</u> <u>15</u>.  Given Svensson's admission, and "what had occurred with Darren [Peers] in terms of his feedback relative to Lisa, [Brooks] became concerned that [he] might be seeing a pattern of someone who wasn't working in the best interests of the employees [she was] managing."  Brooks Dep. 166, <u>App.</u> <u>18</u>.  Brooks concluded that Svensson should no longer manage analysts.  *Id.* at 171.

Brooks offered Svensson three alternatives: (i) remain in GER, but in a non-managerial capacity; (ii) remain at Putnam for a transition period while looking for other opportunities, or (iii) leave Putnam with a severance package.  Brooks Dep. 231 (Exhibit 5), <u>App.</u> <u>18</u>.  After reflection, and consulting counsel (Svensson Dep. 10, <u>App.</u> <u>15</u>), Svensson rejected all three options, demanding instead immediate promotion to MD with guaranteed compensation of $1,000,000 per year for two years, a fifty percent increase over her prior year's pay.  *Id.* at 37-38.  Given her refusal to accept any of his options, Brooks terminated Svensson on September 15, 2003.  Brooks Dep. 247-248 (Exhibit 6), <u>App.</u> <u>18</u>.  Putnam replaced Svensson with Maria Drew, who assumed coverage for the majority of Svensson's stocks.  Tibbetts Aff. ¶ 39.

<u>Putnam's Severance Offer</u>.  Upon terminating her, Putnam offered Svensson a severance package that included eighteen weeks of pay, a one time payment of $250,000, and her deferred

compensation of $539,086.77 under the Profit Growth Plan, subject to that Plan's requirement that she execute a release. Tibbetts Aff. ¶ 38, App. 11. This offer included severance pay to which Svensson was not otherwise entitled. Tibbetts Aff. ¶ 38. She refused to sign the proposed agreement, and by the terms of the Profit Growth Plan and the EPP, her deferred awards and unvested equity were cancelled. She was ineligible for any 2003 bonus since she was no longer employed in March 2004. *Id.* In March 2004, Svensson attempted to "sell" her previously-unvested restricted shares back to Putnam, but Putnam informed her that her shares had been cancelled because she had not signed her severance agreement. *Id.* at ¶ 42, Apps. 13, 14.

Svensson filed a Charge with the MCAD on March 1, 2004 alleging discrimination on the basis of her sex. Am. Compl. ¶ 12. In December 28, 2004, Svensson filed her Complaint, and on January 5, 2005, she filed her Amended Complaint.

## ARGUMENT

**I.    SVENSSON'S CHAPTER 151B AND TITLE VII CLAIMS FAIL BECAUSE THEY ARE TIME-BARRED AND BECAUSE PUTNAM'S EMPLOYMENT DECISIONS WERE SEX-NEUTRAL**

In Counts I and II, Svensson claims that Putnam discriminated against her on account of her sex in violation of Title VII of the Civil Rights Act of 1964, 42. U.S.C. 2000e, *et seq.* ("Title VII") and Mass. Gen. Laws Ch. 151B ("Ch. 151B") by (i) terminating her employment in 2003, (ii) not electing her MD between 2000 and 2003, (iii) transferring her to GER in April 2002, and (iv) paying her less than similarly situated males between 1999-2002. *See, e.g.* Am. Compl. ¶ 2; Svensson's Fourth Affidavit, dated June 8, 2006 [Docket 75]. Svensson's claims fail because (i) they are untimely and (ii) no genuine issue of material fact exists as to her allegations that Putnam discriminated against her because of her sex.

Unlawful discrimination may be proven by direct or circumstantial evidence. *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 64 (1st Cir. 2002). Statements *by a decision-maker* that directly reflect an alleged animus in connection with the employment decision at issue constitute direct evidence of discrimination. *Id.* at 65. After fifteen days of

8

depositions and production of over 15,000 documents, Svensson has no such evidence.  Thus, she can only prevail by presenting sufficient circumstantial evidence of sex animus.

To survive summary judgment, "plaintiff bears the initial burden of establishing a *prima facie* case of sex discrimination."  *Smith v. Stratus Computer, Inc.,* 40 F.3d 11 (1st Cir. 1994); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  If successful, the burden of production shifts to the defendant to *articulate* (not prove) a legitimate, non-discriminatory reason for its decision.  *McDonnell Douglas,* 411 U.S. at 802.  If the defendant does so, the burden shifts back to the plaintiff to *prove* by a preponderance of the evidence that the defendant's proffered, non-discriminatory reason is a pretext for unlawful discrimination.  *Id.*

**A.    Svensson's Termination Claim Fails Because Putnam's Termination Decision Was Sex-Neutral.**

A terminated plaintiff establishes a *prima facie* case of discrimination by producing evidence that she is a member of a protected class; that she performed her job at an acceptable level; she was terminated; and that the employer sought to fill the position by hiring another individual with similar qualifications.  *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 823 (1st Cir. 1991); *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 41 (2005).

**1.    Svensson Cannot Establish a *Prima Facie* Case of Discrimination; She Was Terminated Because She Was Not Performing Her Job at an Acceptable Level and Because She Refused to Accept Her New Role.**

The undisputed evidence is that Putnam terminated Svensson only after she refused to accept her manager's decision to remove her responsibility for managing analysts.  Brooks made his decision after learning that (i) Putnam's most highly-regarded analyst (Peers) was looking for a new job due in large measure to an inability or unwillingness to work with Svensson (Peers Dep. 62, <u>App. 19</u>), (ii) Svensson proposed to give what Brooks thought was an unfair and unbalanced performance review to another well-regarded analyst (O'Malley) (Brooks Dep. 164, <u>App. 18</u>), who also was considering leaving Putnam rather than continue to work for Svensson (*Id.* at 199), and (iii) Brooks' belief that management styles like Svensson's were counterproductive (*Id.* at 106-107).  Instead of accepting Brooks' decision, Svensson demanded

an immediate officer promotion and guaranteed compensation of at least $1 million per year for two years.  Svensson Dep. 37-38, <u>App.</u> <u>15.</u>  Her refusal to accept her new role caused Brooks to terminate her.

### 2. Putnam Had a Legitimate, Non-Discriminatory Reason for Terminating Svensson.

Even if Svensson could establish a *prima facie* case, Putnam has articulated a legitimate, nondiscriminatory reason for terminating her: her refusal to accept Brooks' redefinition of her role.  Putnam's "reasons given for [its] decision may be, 'unsound or even absurd,' and the action may appear 'arbitrary or unwise,' nonetheless [Putnam] has fulfilled its obligation." *Matthews v. Ocean Spray Cranberries. Inc*., 426 Mass. 122, 128 (1997) (citations omitted); *Gunther v. Gap, Inc.,* 1 F. Supp.2d 73, 78 (D.Mass. 1998).  Putnam "does not have to persuade the trier of fact that it was correct in its belief."  *Tate v. Dept. of Mental Health*, 419 Mass. 356, 362 (1995); *Williams v. Raytheon Co.,* 220 F.3d 16, 19 (1st Cir. 2000).

### 3. Svensson Cannot Show that Putnam's Reason for Terminating Her Was Pretextual.

Putnam having articulated its reason for terminating her, the burden shifts to Svensson to "adduce sufficient evidence to support a finding that [Putnam's] stated reason was not only a pretext, but that it was a pretext for illegal sex discrimination."  *Smith,* 40 F.3d at 16.  Svensson must not only offer "specific facts which would enable a jury" to conclude that Putnam's explanation was a "sham," but she must also produce evidence showing that it was "a sham intended to cover up the employer's real motive," namely, sex discrimination.  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  To establish pretext, Svensson's "evidence must be of such strength and quality as to permit a reasonable finding that the … [challenged action] was obviously or manifestly unsupported."  *Martin v. Wellesley Coll.*, 51 F.Supp. 2d 32, 35 (D.Mass. 1999), citing *Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8, 13 (1st. Cir. 1998).

Svensson cannot carry this burden.  She does not deny that she refused to accept any of the three options offered to her by Brooks, including the option to remain at Putnam.  Brooks

Dep. 231, <u>App. 18</u>. She does not dispute that she was terminated only after this refusal and her subsequent demand for promotion and guaranteed compensation. Svensson Dep. 37-38, <u>App. 15</u>. The record is also clear that Brooks presented his three alternatives to Svensson only after he concluded that she was preparing what he considered to be an unfair and unbalanced review of one subordinate, and after learning that another of her subordinates opted to job hunt rather than continuing to work for her. Brooks, who had arrived at Putnam only a couple of months earlier, testified that he made his decision in the context of what he saw as a culture that "needed to be improved." Brooks Dep. 105, <u>App. 18</u>. Brooks' explanation is consistent with his conclusion that, while Svensson was a good analyst, she should not manage other analysts. *Shorette*, 155 F.3d at 15 (rejecting plaintiff's evidence because it was "entirely compatible with the nondiscriminatory rationale offered by [the defendant]"). Finally, Putnam replaced Svensson with Maria Drew (Tibbetts Aff. ¶ 39), another female – hardly evidence of sex animus.

Svensson can only assert that, *in her opinion*, Brooks' criticisms of her were unwarranted and motivated by sex animus, and that in fact she was a good manager. Svensson's beliefs about Brooks' management decisions and her assessment of her own performance cannot defeat summary judgment. In *Dávila v. Corporación de Puerto Rico Para La Difusión Pública,* the First Circuit ruled that plaintiff, who had been discharged for poor performance, failed to show that his employer's proffered reason for discharge was pretextual. 498 F.3d 9, 17 (1st Cir. 2007). In granting defendant summary judgment, the court held that Dávila's opinion that his performance was "unfairly evaluated" was immaterial. *Id.* at 16. As long as the defendants "believed that the appellant's performance was not up to snuff, and the appellant has presented no evidence suggesting that management thought otherwise, it is not our province to second-guess a decision to fire him as a poor-performer." *Id.; see also Shorette,* 155 F.3d at 15 (Plaintiff's "personal opinion regarding his own job qualifications is not sufficiently probative on the issue of pretext.").

Similarly, Svensson's *belief* that Brooks' rationale was somehow a pretext for gender animus does not defeat summary judgment. *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 6 (1st

Cir. 1998) ("an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason."). The issue is *not* whether, in the minds of the Court she was an adequate manager, but whether *Putnam believed* she was. *Martin*, 51 F.Supp. 2d at 34 ("in the pretext analysis ... the focus is on whether the employer believed that its proffered reason was credible"). The record is clear that Brooks did not believe that Svensson was an adequate manager. Courts do not "sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." *Mesnick,* 950 F.2d at 825. Because Svensson cannot establish pretext, her termination claim must be dismissed.

### B.     Svensson's Promotion, "Demotion," and Compensation Claims Are Time-Barred.

Svensson also alleges in Counts I and II that Putnam violated Title VII and ch. 151B by (i) failing to promote her to MD between 2000 and 2003, (ii) transferring her from International Growth to GER in April 2002, and (iii) paying her less than similarly situated males between 1999 and 2003. Each claim is time-barred.

A charge of discrimination under Title VII and/or ch. 151B must be filed with the EEOC or MCAD within 300 days of the alleged discriminatory act. Title VII, 42 U.S.C. 2000e-§5(e); Ch. 151B, §5; *Ingram v. Brink's, Inc.,* 414 F.3d 222, 229 n. 8 (1st Cir. 2005). Each "discrete act" of discrimination, including discrimination in "'termination, failure to promote, denial of transfer, [or] refusal to hire,'" *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 127 S.Ct. 2162, 2165 (2007), *quoting  National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002), "constitutes a separate actionable unlawful employment practice" that "starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. Each such discrete act must have "'occurred' within the appropriate time period." *Id.* at 14. The Supreme Court has held the discrete act "'occurred' on the day that it 'happened,'" and a plaintiff "must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." *Id.* at 110.

Svensson filed her MCAD charge on March 1, 2004 (Am. Compl. ¶ 12), which means that the only ripe claims are those predicated on acts that occurred within the preceding 300-day limitations period. Because all of the adverse actions complained of by Svensson (other than her termination) occurred *before* May 3, 2003, the date which is 300 days before she filed her Charge, her claims are time-barred.

### 1.    Svensson's "Demotion" Claim Is Time-Barred.

Svensson claims that she suffered a discriminatory transfer (which she calls a "demotion") in April 2002, when, following the reorganization of International Growth due to the team's poor investment performance, she was offered a position as an analyst in GER. This discrete act required her to file a charge within 300 days. *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 6 (1st Cir. 2007) ("the limitations period for [plaintiff's] claim began *on the date of his demotion*" and that "[t]here is simply no support for [his] argument that this date ought to be suspended until he learned the discriminatory motives behind the discrete act") (emphasis added); *Miller v. New Hampshire Dept. of Corr.,* 296 F.3d 18, 21-22 (1st Cir. 2002) ( a "*transfer is a discrete act*" and plaintiff is "not entitled to the benefits of the continuing violation doctrine") (emphasis added); *Jorge v. Rumsfeld,* 404 F.3d 556, 561 (1st Cir. 2005) (dismissing ADEA claim because "the cause of action *accrued at the time of the involuntary transfer*" and plaintiff did not file within the ADEA's two year statute of limitations) (emphasis added). *See also Morrison v. Northern Essex Cmty. Coll.,* 56 Mass.App.Ct. 784, 794 (2002). Because Svensson's transfer occurred in April 2002, more than a year before the May 3, 2003 cut-off date, her "demotion" claim is time-barred.[3]

---

[3] Even if the continuing violation doctrine could resuscitate the staleness of these discrete acts (it does not), Svensson cannot invoke that doctrine because at all times she believed that she was the victim of discrimination. *Vesprini v. Shaw Industries, Inc.,* 21 F.Supp.2d 44, 54 (D.Mass. 2002) ("even a continuing violation theory will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against") (internal citations omitted). For example, starting in 1998 – years before the expiration of the 300-day limitations period – Svensson began keeping a diary of work-related events because she believed she was being discriminated against and "just thought I would want to write these things down." Svensson Dep. at 18-19. *See, e.g., Turner v. Correction Medical Services,* No. Civ. A. 03-048-SLR, 2003 WL 22037712, *2 (D. Del. Aug. 20, 2003) ("It is clear from plaintiff's daily journal ... that he was aware of the alleged injuries" before the tolling of the statutory period.).

### 2.     Svensson's Promotion Claims Are Time-Barred.

Svensson's claim that Putnam discriminated against her by failing to "promote" (*i.e.*, elect) her to MD between 2000 and 2003 is untimely.  A failure to promote is a discrete act which "commence[s] at the time the tenure decision was made and communicated." *Delaware State College v. Ricks*, 449 U.S. 250, 251 (1980); *see also Marrero-Gutierrez*, 491 F.3d at 5-6 ("A claimant is deemed to 'know' or 'learn' of a discriminatory act at the time of the act itself and not at the point that the harmful consequences are felt"); *Andujar v. Nortel Networks, Inc.,* 400 F.Supp.2d 306, 330 (D.Mass. 2005) ("Each failure to promote is deemed a separate act, with the statute beginning to run on that date"); *Morrison,* 56 Mass.App.Ct. at 794.  Putnam announced MD elections each March.  Thus, Putnam's MD decisions for 2000, 2001, 2002 and 2003 all were made 300 days before Svensson filed her MCAD Charge.  Tibbetts Aff. ¶ 6.

### 3.     Svensson's Compensation Claims for 1999-2003 Are Time-Barred.

Each of Putnam's alleged discriminatory compensation decisions occurred before May 3, 2003 – that is, more than 300 days prior to Svensson's filing of her MCAD charge on March 1, 2004.  Each compensation decision is a discrete act to which the continuing violation theory does not apply.  The 300-day limitations period commenced on the day when each compensation decision was made and communicated to Svensson.  *Ledbetter*, 127 S.Ct. at 2165 ("Because a pay-setting decision is a 'discrete act,' it follows that the period for filing an EEOC charge begins when the act occurs.").  Receipt of a paycheck reflecting a *prior* alleged discriminatory compensation decision does not save an otherwise untimely claim.  *Ledbetter,* 127 S.Ct. at 2164 (rejecting "'paycheck accrual rule' under which each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the plaintiff may properly challenge any prior discriminatory conduct that impacted that paycheck's amount, no matter how long ago the discrimination occurred.").  Therefore, "paychecks that were issued to [Svensson] during the [300] days prior to the filing of her EEOC charge do not provide a basis for overcoming that prior failure." *Id.* at 2169.

14

Putnam communicated bonus and equity awards annually no later than March 15 for the previous year's performance. Salaries for the current year were also announced no later than March 15 of each year. Tibbetts Aff. ¶ 13. Thus, all claims concerning Svensson's bonus or equity awards for 2002 or earlier or concerning her salary for years 2003 or earlier, arose prior to the May 3, 2003 limitations cutoff.[4]

### C. Even if Not Time-Barred, Svensson's Promotion, Compensation and Demotion Claims Fail Because Putnam's Employment Decisions Were Sex-Neutral.

#### 1. Svensson's Promotion Claims Fail Because No Evidence Exists that Her Sex Played a Role in Putnam's Promotion Decisions.

Svensson's 2003 promotion claim fails because Putnam did not elect *anyone* to be an MD from the IMD in 2003. Tibbetts Aff. ¶ 34. Thus, she cannot establish that Putnam treated her differently than men in 2003. Her pre-2003 promotion claims fare no better. Even if Svensson could articulate a *prima facie* promotion case, Putnam had a legitimate, non-discriminatory reason for not electing Svensson to MD, and there is no evidence that this reason is pretextual.[5]

##### a. Putnam had legitimate business reasons for electing other MDs.

Svensson was not elected MD because she simply did not receive enough support from the men and women who made election decisions, each of whom made his or her own assessment of the many SVPs eligible for election. *See, e.g.,* Tibbetts Aff. ¶¶ 30, 31, App. 7; *Gu v. Boston Police Dep't,* 312 F.3d 6, 12 (1st Cir. 2002) (defendants proffer non-discriminatory reason for promotion decision where "defendants claim simply that they hired the most qualified and appropriate person for the jobs in question.").

---

[4] As discussed in the Statement of Facts, *supra*, Svensson was not eligible for a bonus for 2003 (to be paid in 2004) because she was terminated before the end of 2003, and because the A&P Plan required that she be employed when the award was paid. Tibbetts Aff. ¶ 38, App. 1.

[5] "Managing Director" is an *officer title,* not a *job.* Election to MD is not automatically accompanied by a change in functional job responsibilities or compensation. MD was also not an "open position" to which one applied. Tibbetts Aff. ¶ 5.

**b.    Svensson cannot demonstrate that Putnam's reasons for not promoting her were pretextual.**

Svensson cannot show pretext simply by stating her *belief* that she was as or more qualified than males elected to MD. *Shorette*, 155 F.3d at 15 (plaintiff unable to show pretext because his "personal opinion regarding his own job qualifications is not sufficiently probative"). Nor should this Court consider whether Svensson deserved election, because "courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." *Mesnick,* 950 F.2d at 825. This is particularly so where the issue is one of relative qualifications. *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004) (absent "strong objective evidence (*e.g.*, test scores), proof of competing qualifications will seldom, in and of itself, be sufficient to create a triable issue of pretext" because "[q]ualifications are notoriously hard to judge and, in a disparate treatment case, more must be shown than that the employer made an unwise personnel decision by promoting 'X' ahead of 'Y.'").

Regardless, the undisputed evidence demonstrates that gender played no role in MD decisions:

- In 2000 (the one year for which a formal voting record exists), four women and six men were considered for MD. The IDMC selected three of the four women and four of the six men, and these selections were ultimately approved. Svensson alone did not receive a single vote of support from the IDMC's ten electors (eight males and two females). Tibbetts Aff. ¶ 31, App. 7.

- A statistical analysis by Putnam's expert witness, Professor David Bloom, of those eligible for nomination and election to MD reveals "no statistically significant sex disparities in 'promotion'" to MD and "therefore provide no support for plaintiff's allegation that Putnam discriminated on the basis of sex in 'Promotion to Managing Director'." Deposition of David Bloom ("Bloom Dep.") at 28-29 (Exhibit 1, "Bloom Report"), at ¶¶ 39 - 40, App. 20.

- Svensson's expert witness, Paul White, concludes that "there is no statistically significant pattern of promotions adverse to females who hold officer titles." Deposition of Paul White ("White Dep.") at 37-38 (Exhibit 1, "White Report") at 14, App. 21. Dr. White admitted "when we did the promotion analysis among officer titles we found that there was *no statistically significant disparity* between men and women." White Dep. 39, App. 21, White Report, Appendix J, App. 21. (emphasis added).

Svensson was one of literally dozens of investment professionals (male and female) eligible for (but *not* elected to) MD in each year during 2000 through 2002. Tibbetts Aff. ¶¶ 32, 33, App. 8. Thus, any suggestion that Putnam's reasons for not electing her are a cloak for discrimination is absurd. *Heard v. Comm. Of Mass.*, No. Civ. A. 02-12498-DPW, 2003 WL 21960726, *5 (D. Mass. Aug. 11, 2003) (where plaintiff was "but one of forty people denied consideration for the position of DC, any allegation that defendant's justification was a guise for intentional discrimination against him is problematic."). In fact, Putnam actually promoted Svensson several times: from VP to SVP in 1995; from Analyst to PM in 1997; from PM to SPM in 1999; and from Analyst to ADR in 2003. Tibbetts Aff. ¶ 35. This record hardly evidences a failure to promote Svensson on account of her sex.

2.    **Svensson's 1999-2001 Compensation Claims Have Been Abandoned, Her 2003 Claim Fails Because She Was Not Entitled to a 2003 Bonus, and Her 2002 Claim Fails Because There Is No Evidence that Her Sex Played a Role in Setting Her Compensation.**

Svensson claims that Putnam violated Title VII and ch. 151B by paying her less than similarly situated males between 1999 and 2003. Am. Compl. ¶¶ 55-67.

a.    **Svensson has abandoned her compensation claims for 1999-2001.**

As a threshold matter, Svensson's pay discrimination claims for 1999, 2000, and 2001 should be dismissed. Not only are they time-barred, *see* Part I.B3, *supra*, but Svensson has abandoned them. Her expert did not attempt to demonstrate the existence of sex bias in compensation in 1999-2001 because he also understood that Svensson does not claim pay discrimination in those years. White Dep. 35-36, 50, App. 21[6]; *see also* White Report at pages 11-12, App. 21 .[7]

---

[6]    "[W]e relied upon Miss Svensson's [Fourth] affidavit so I believe the time periods were in conjunction with the claims that she stated in her affidavit." White Dep. 35, App. 21.

[7]    The reason for Svensson's decision not to pursue claims for these years is obvious. Each year, she was the third most highly-compensated member of the International Growth team, trailing only the male CIO of the team and a female SPM and Director. Tibbetts Aff. ¶ 15, App. 5.

        **b.**        **Svensson is not entitled to additional compensation for 2003.**

Svensson's 2003 compensation claim fails because she was neither employed at the time of payment nor signed the required release. Section 6.3 of the A&P Plan (in which Svensson participated) *explicitly* provides that if a participant is terminated before bonuses are paid, the participant will "forfeit the right to any further payment." Tibbetts Aff. ¶ 9, <u>App. 1</u>. Section 6.2 of the A&P Plan provides that Putnam may pay a previously terminated employee an amount in lieu of bonus if the employee signs a release in favor of Putnam. *Id.* Putnam enforced this release requirement consistently, as Svensson conceded. Svensson Dep. 235, <u>App. 15</u>; Tibbetts Aff. ¶ 9, <u>App. 1</u>. Putnam offered Svensson a payment for 2003, but she declined to sign the required release. Am. Compl. ¶ 40. Thus, there is no evidence that Svensson's gender played any role in Putnam's decision not to pay her a bonus for the 2003 performance year.[8] *See Diamond v. T. Rowe Price Assocs., Inc.,* 852 F.Supp. 372, 393 (D. Md. 1994) (Plaintiff "cannot base her unequal wage claims on the failure to receive compensation that she had no right to receive.").

        **c.**        **No evidence exists that sex played a role in determining Svensson's 2002 compensation.**

        **i.**        **Svensson cannot establish a *prima facie* case of compensation discrimination.**

To establish a *prima facie* case of pay discrimination, Svensson must demonstrate that she was paid less than males with substantially similar or comparable job functions and responsibilities. *Rodriguez v. Smithkline Beecham Pharmaceutical, Puerto Rico, Inc.,* 62 F.Supp.2d 374, 382 (D.P.R. 1999), *aff'd,* 224 F.3d 1 (1st Cir. 2000) (granting summary judgment for Title VII wage claims where plaintiff failed to make a *prima facie* showing that she was paid

---

[8] If Svensson alleges compensation discrimination based upon her 2003 base salary, that claim is time-barred under *Ledbetter* because her 2003 salary was announced prior to May 3, 2003. *See* Part I.B3, *supra.* Finally, Svensson's expert (Dr. White), analyzing Svensson's cherry-picked "comparators," finds no statistically significant evidence of sex differences in "base salary" in 2003. White Dep. 54; Appendix B of White Report, <u>App. 21</u>.

less than a male employee for substantially equal work).[9]  In 2002, Svensson was an Analyst in GER.  For that performance year, her incentive compensation was based upon her job responsibilities and her performance in that role.  She participated in GER's bonus pool.  She reported to Steven Gorman, her direct manager, and to Bill Landes, the head of GER.  Svensson Dep. 135, App. 15.  Landes made ultimate compensation, management and performance decisions concerning the employees in his group, including Svensson, subject to upper management review.  Tibbetts Aff. ¶ 17.

Svensson has not identified a legally appropriate cohort of legal comparators whose "job functions and responsibilities were … substantially similar or comparable to" to hers in 2002.  *Rodriguez,* 224 F.3d at 8.  Svensson designates sixty-six "Males with Higher Compensation, 2002-2003."[10]  *Fourth Affidavit of Lisa Svensson,* Exhibit 3, filed June 8, 2006.  Of these sixty-six, however, sixty-three fall squarely outside of the definition of legal comparators:

| # of Named Comparators | Why Inappropriate as a Matter of Law |
|---|---|
| 19 | These individuals were paid *less* than Svensson in 2002 |
| 11 | These individuals also were paid *less* than Svensson in 2002, either because they were not yet employed by Putnam, or they had left Putnam's employ before 2002 bonus awards were made. *See* White Dep. 83, App. 21.[11] |
| 8 | These individuals served as CIOs in 2002, ultimately responsible for entire investment teams and strategies, and who managed multiple PMs, SPMs, and analysts.  Svensson never served as a CIO. |
| 12 | These individuals were either "Directors" who, unlike Svensson, had department level management responsibilities, and/or were traders, or served in wholly separate investment groups (such as Currency). |
| 13 | These individuals served as SPMs (12) or PMs (1). |
| Total: 63 | |

---

[9]  In *Rodriguez,* the First Circuit held that the *McDonnell Douglas* framework applies to Title VII compensation claims, just as it does to other Title VII claims.  62 F.Supp.2d at 382, *aff'd* 224 F.3d 1 (1st Cir. 2000).

[10]  These sixty-six males are a subset of Svensson's named ninety-one male and female comparators, as listed in Exhibits 1 and 2 of her Fourth Affidavit [Docket #75].

[11]  Mr. Kociubes:  [Svensson] thought they had all higher compensation but it turned out almost half had lower compensation for 2002.  Dr. White:  Total compensation 2002.  Yes.  White Dep. 83, App. 21.

As evidenced above, thirty of the named legal comparators (first two rows of chart above) fail to meet the most basic element of the *prima facie* case because they were paid less than Svensson. Tibbetts Aff. ¶¶ 22, App. 4. Thirty-three of the remaining individuals (remainder of the chart) are facially inappropriate as legal comparators because they performed different jobs or were employed in entirely different areas of Putnam, not in GER (with the result that they participated in different bonus pools).[12] *Id.* at ¶¶ 23-25, App. 4. In addition, both SPMs and PMs are primarily responsible for managing an investment portfolio, and for making all of the decisions concerning securities held in that portfolio. An analyst's primary responsibility, in contrast, is to evaluate stocks and make recommendations to SPMs and PMs. *Id.* at ¶ 25. GER analysts (like Svensson) and her chosen "comparator" PMs also participated in different bonus pools (*Id.* at ¶ 25), which Svensson's own expert concedes would affect bonus awards.[13] *See Rodriguez,* 62 F.Supp.2d at 383 (holding male not comparable to female under Title VII because, while they performed many of the same duties, the male had additional responsibilities).

Thus, at best only three of Svensson's sixty-six self-selected legal comparators are arguably legally appropriate. Terrance Norchi, R.J. Bukovac, and Saba Malak had job functions and responsibilities similar to Svensson's in 2002 because each was an analyst in GER

---

[12] *See Donnelly v. R.I. Bd. Of Governors,* 110 F.3d 2, 6 (1st Cir. 1997) ("To make out a *prima facie* case of salary discrimination under Title VII … a female claimant needs proof that *similarly situated* males were better paid") (emphasis in original). In *Donnelly,* the First Circuit stated that "appellants take the disparate impact theory beyond its logical boundaries when they suggest that faculty members in Tier B should be compensated at the same minimum rates as those in different academic disciplines embraced by Tier D." *Id.* at 5-6. The Court affirmed summary judgment for the defendant, holding that the "appellants in this case have failed to surmount [the] initial hurdle." *Id.* at 6.

[13] Mr. Kociubes:  A particular area may have had a stronger year than a different area?
Dr. White:  Right.  I don't know that that would affect your analysis for base pay.
Mr. Kociubes:  But it would for bonus potentially?
Dr. White:  I would think so.
Mr. Kociubes: And perhaps incentive compensation, other incentives?
Dr. White:  …I don't know that the bonus pool would affect base salary but the bonus pool might affect the total bonus amount so your model would not necessarily be the same from one compensation type to the next. White Dep. 160-161, App. 21.

participating in the same bonus pool as Svensson, and each received higher total compensation for 2002. However, even as to these three, Svensson's claim fails.

### ii. Putnam had legitimate, non-discriminatory reasons for any pay differentials with the three comparators.

Assuming that Svensson states a *prima facie* case as to these three analysts, Putnam "must merely provide a non-discriminatory reason for the pay disparity." *Rodriguez,* 62 F.Supp.2d at 382. Dr. Norchi was a medical doctor, hired as a health care analyst when health care analysts were in high demand. To recruit Dr. Norchi, Putnam offered him a guaranteed $1 million bonus for 2002. This guarantee, plus Dr. Norchi's educational background and experience, constitute the non-discriminatory reason for any pay disparity between Dr. Norchi and Svensson. Tibbetts Aff. ¶ 27.

Putnam department heads awarded bonuses based on a number of factors, including individual performance. Landes (the head of GER) determined the amount of the bonus to be paid to each analyst in GER according to his assessment of the value, performance and contribution of each of them. Tibbetts Aff. ¶ 28. Based on this assessment, Svensson was paid less than Messrs. Bukovac and Malak.

### iii. Svensson cannot demonstrate that Putnam's reasons for having pay differentials were pretextual.

Once Putnam articulates a nondiscriminatory reason, "the presumption of discrimination drops out of the picture … and the sole remaining issue is of discrimination vel non." *Zapata-Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 45 (1st Cir. 2002). Title VII does not prohibit paying one employee less than another of a different sex "for any reason – fair or unfair – so long as the decision … does not stem from a protected characteristic." *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 22 (1st Cir. 1999). Thus, Svensson must demonstrate that Putnam's proffered reasons are pretextual.[14]

---

[14] *See Booker v. Massachusetts Dept. of Public Health*, __ F.Supp.2d __, 2007 WL 4465426, *7 (D. Mass. Dec. 21, 2007) ("A plaintiff does not carry her burden of demonstrating pretext … where she provides merely sketchy evidence lacking a sufficient foundation for a legally relevant comparison of allegedly similarly situated employees") (quotations omitted).

No evidence suggests that Dr. Norchi received a guaranteed bonus because of his sex. Nor does Svensson have any evidence that Landes chose to compensate Malak and Bukovac more highly for reasons other than his assessment of their performance. Moreover, the undisputed record is that for 2002, Svensson was the sixth highest paid analyst in GER (of forty-five), and that thirty male analysts in GER were paid *less* than she that year. Tibbetts Aff. ¶ 18, <u>App.</u> <u>6</u>. Svensson was the eighth highest paid employee in the fifty person GER group, not including GER's Director. *Id*. This is "strong independent evidence that no discrimination occurred." *See Zapata-Matos,* 277 F.3d at 47.

In an unusual convergence, *both* parties' experts agree that they could find no evidence of pay discrimination at Putnam in 2002 or 2003, the two years at issue. Even using her cherry-picked "comparators," Svensson's expert finds no statistically significant gender disparity in total compensation for 2002 or 2003. *See* Appendix B of White Report, <u>App.</u> <u>21</u>.; White Dep. 50-53 <u>App.</u> <u>21</u>, (for total compensation in 2002, "the difference … was not statistically significant," and for 2003, it was "correct" that "there was no statistical significance"). Professor Bloom opines that Svensson's "comparators" form an inappropriate basis for a statistical analysis of alleged sex discrimination as a matter of labor economics, and Svensson's expert apparently agrees. *See* White Dep. 62, <u>App.</u> <u>21</u> ("I was concerned about doing any statistics on that group of 91 and trying [to] generalize that to the entire investment division at Putnam").[15] Professor Bloom also agrees with Dr. White that an analysis of even these hand-picked comparators shows *no* statistically significant differences in pay for men and women. Finally, Professor Bloom also found no statistically significant gender disparity in compensation when looking at GER as a

---

[15] Svensson self-selected Putnam employees with little apparent regard to the fact that these individuals worked at different levels in the organization, had different lengths of service at Putnam and in the industry, and participated in different bonus pools of differing sizes because they worked on different investment teams. Nor does Svensson select *all* participants in a given job category when attempting to show discriminatory pay disparity, choosing instead to select those whom, presumably, she thinks best weight the statistics in her favor. *See* White Dep. 62, <u>App.</u> <u>21</u>; *See* Bloom Report at ¶ 58, <u>App.</u> <u>20</u> ("misleading results can emerge from the analysis of selected samples").

whole, and at *all* Putnam PMs and analysts. *See* Bloom Report ¶¶ 34, 60 and Exhibits 5 and 9, App. 20.

> ### 3. Svensson's "Demotion" Claim Fails Because No Evidence Exists that Sex Played a Role in Her Transfer
>
> #### a. Svensson cannot make a *prima facie* showing of discriminatory demotion.

To establish a *prima facie* case of demotion discrimination, Svensson must demonstrate that she is a member of a protected class; her employer took an adverse action against her; she was meeting her employer's legitimate expectations; and her position remained open or was filled by a person with similar qualifications. *Rodriguez-Cuervos*, 181 F.3d at 19.

Svensson asserts in conclusory terms that she was meeting Putnam's legitimate expectations, was demoted, and was more qualified than Steven Dexter, the employee who continued to manage the International Growth fund. Am. Compl. ¶ 22. The undisputed evidence is that performance of the fund was laggard and as a result of such poor performance, Putnam reorganized the International Growth group. It terminated the male CIO of International Growth, but offered Svensson the opportunity to join another team. No other portfolio team offered Svensson a position. However, Oristaglio, the co-Head of IMD, believed that Svensson could add value as an analyst, and Landes offered her an Analyst position in GER. Dexter was asked to manage what remained of the International Growth fund because Oristaglio believed that Dexter's investment approach better suited the new direction of the International Growth Fund being set by Oristaglio. Oristaglio Dep. 135-36, App. 16.

> #### b. Putnam had legitimate business reasons for transferring Svensson.

Putnam has articulated a legitimate, non-discriminatory reason for transferring Svensson to GER. As discussed above, Oristaglio concluded that Svensson's skills were best suited for detailed analysis of individual companies and research and that Dexter's skills – primarily his conservative investment approach and willingness to value both fundamental and quantitative inputs – better suited the new direction of the International Growth Fund.

### c. Svensson cannot demonstrate that Putnam's reasons for transferring her were pretextual.

No evidence exists that Putnam's reasons for transferring Svensson were pretextual.[16] Putnam's reasons for choosing Dexter to manage International Growth and for transferring her are described above. Putnam's treatment of Svensson after her transfer also reveals no sex bias. She earned the same compensation in GER for 2002 that she had earned in her last year as a PM in International Growth, and Putnam promoted her to ADR in January 2003. Am. Compl. ¶ 32.

Attempting to show pretext, Svensson alleges in conclusory terms that she was "forcibly required by Putnam to return to GER . . . at a time when her male colleagues, *despite lesser experience and inferior investment performance*, were allowed to stay in Portfolio Management positions." Am. Compl. ¶ 22 (emphasis added). Svensson's "evidence" of pretext is her *belief* that she was more qualified than Dexter to remain on the International Growth team. Svensson's *belief* is immaterial. *Shorette,* 155 F.3d at 15.

Nor can Svensson establish pretext simply by disagreeing with Putnam's assessment of her performance relative to that of her peers. *Id.* Finally, Svensson was not the only portfolio manager to have been transferred out of portfolio management. Svensson's own expert testified that a slightly higher (but not statistically significant) ratio of men were transferred from portfolio management than women. White Dep. 143-144, App. 21.[17]

## II. SVENSSON'S MASSACHUSETTS EQUAL RIGHTS ACT ("MERA") CLAIM IS PREEMPTED.

Count III asserts claims under MERA, G.L. ch. 93, § 102. Chapter 151B completely preempts MERA, except where ch. 151B is unavailable (*e.g.*, an employer with fewer than six employees). *Gasior v. Massachusetts Gen. Hosp.,* 446 Mass. 645, 646 (2006) ("MERA claim

---

[16] *See Booker* 2007 WL 4465426, *7 (granting summary judgment where plaintiff "has failed to show that the defendants' actions, however insensitive or self-interested, were motivated by racial discrimination.")

[17] Mr. Kociubes: And do I then assume that fewer females were demoted from portfolio manager than you would have expected? Dr. White: Yes. White Dep. 143-144, App. 21.

was barred by the exclusivity provision of G. L. c. 151B.").  Because Svensson *can* assert a claim under ch. 151B, she has no MERA claim as a matter of law.

## III.  SVENSSON'S MASSACHUSETTS EQUAL PAY ACT ("MEPA") CLAIM IS TIME-BARRED.

Svensson's MEPA claim (Count IV) is untimely.  "Any action based upon or arising under [MEPA] shall be instituted within one year after the date of the alleged violation."  M.G.L. c. 149 §105A.  Since Putnam informed employees of their new salaries and their incentive pay for the previous year no later than March 15, all salary, bonus and equity decisions concerning Svensson for years 2003 and earlier were communicated to her no later than March 15, 2003. Tibbetts Aff.¶ 13.  Because Svensson did not file her MEPA claim until December 28, 2004,[18] her claims for 1999 through 2002 are untimely.[19]

## IV.  SVENSSON'S BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM IS PREEMPTED AND LEGALLY DEFECTIVE.

Count V alleges that Putnam breached the covenant of good faith and fair dealing by failing to promote Svensson and by demoting and terminating her on account of her sex.  Am. Compl. ¶ 79.  Chapter 151B preempts Svensson's claim for breach of an implied covenant of good faith and fair dealing based on sex discrimination.  *Carroll v. Xerox Corp.*, 294 F.3d 231, 242 n. 10 (1st Cir. 2002) ("To the extent that Carroll's breach-of-contract claim reduces to an alleged violation of the implied covenant of good faith and fair dealing implicit in an at-will employment agreement, such a claim would clearly be barred by the exclusive discrimination remedy of Chapter 151B.").

Even if not preempted, Svensson's claim fails.  To establish a breach of the covenant in the employment context, Svensson must show that Putnam terminated her with the intent to

---

[18] Svensson did not file a MEPA claim with the MCAD, and, in any event, the MCAD has no jurisdiction over MEPA.

[19] Any MEPA claim for 2003 fails for the same reason a Title VII compensation claim for 2003 fails: Svensson's salary for 2003 was communicated to her in March 2003, and is thus time-barred. Svensson was not entitled to bonus or equity for 2003 because her employment terminated before the end of 2003.  *See* discussion, *supra,* Part I.B.3.

deprive her of compensation already earned, but not yet paid on account of past services. *Raffaele v. Ryder Dedicated Logistics, Inc.*, 931 F.Supp. 76, 79 (D.Mass. 1996) (dismissing good faith and fair dealing claim because plaintiff failed to establish that his termination was "motivated by an intent to deprive the employee of earned compensation."). No evidence exists that Putnam terminated Svensson to deprive her of any earned income. *See* Part I.A, *supra,* and Part VI*, infra; Christensen v. Kingston Sch. Comm.,* 360 F.Supp.2d 212, 227 (D.Mass. 2005) (motion to dismiss granted because plaintiff "simply has not alleged that [defendant]'s actions were motivated by a desire to destroy or injure [plaintiff]'s right to receive the fruits of the ... agreement.") (citations omitted).

## V.    SVENSSON'S BREACH OF CONTRACT CLAIM IS PREEMPTED AND LEGALLY DEFECTIVE.

Count VI alleges that Putnam breached an implied promise to promote Svensson to positions for which she was qualified, to compensate her commensurately with males, not to demote her should she perform satisfactorily, and not to terminate her for asserting important civil rights in the workplace. Am. Compl. ¶ 83. Svensson's "breach of contract . . . claims . . . [are] barred by the exclusivity of the remedy for discrimination of C. 151B." *Carroll,* 294 F.3d at 241 (quotations omitted); *Reidy v. Travelers Ins. Co.,* 928 F. Supp. 98, 106 (D.Mass. 1996). In any event, Svensson was an at-will employee (Tibbetts Aff. ¶ 40, <u>App.</u> <u>12</u>), and an at-will employment relationship may be altered by either party at any time, for any reason, except in violation of clearly articulated public policy. *Rosenberg v. City of Everett,* 328 F.3d 12 (1st Cir. 2003). Svensson does not have any common law contract claim for promotion, demotion, pay or termination. *Carroll*, 294 F.3d at 242 (summary judgment granted where plaintiff "failed to allege any employment contract with Xerox beyond an at-will employment relationship.").

## VI.    SVENSSON'S RETALIATION CLAIMS FAIL BECAUSE PUTNAM SIMPLY ENFORCED TERMS OF APPLICABLE BENEFIT PLANS

Counts VII and VIII allege that Putnam retaliated against Svensson for engaging in protected activity under Title VII and ch. 151B by withholding unvested, deferred compensation and not permitting her to sell her unvested Putnam equity after she filed her MCAD charge. Am.

26

Compl. ¶¶ 89, 93.[20]  To establish a *prima facie* case of retaliation, plaintiff must show that (i) she engaged in protected conduct; (ii) she was thereafter subjected to an adverse action; and, (iii) a causal connection existed between the protected conduct and the adverse action. *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 177 (1st Cir. 2003); *Moos v. Hampshire Coll.*, 1999 WL 377259, *6 (D.Mass. 1999).  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason.  *McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 309 (1st Cir. 1998).  If the defendant does so, plaintiff must show that defendant's proffered reason was not the real reason, but was the result of retaliatory animus.  *Id.*

Svensson cannot satisfy the third prong of her *prima facie* case.  The Profit Growth Plan (governing Svensson's deferred compensation) provided that as a terminated employee Svensson could receive her deferred awards *only* in exchange for signing a release.  Tibbetts, Aff. ¶ 10, App. 2.  Similarly, the EPP (which governed Svensson's equity) provided her unvested equity would vest *only* if she executed a release.  *Id.* at ¶ 11, App. 3.[21]  There is simply no evidence that Putnam's proffered reason (Svensson's refusal to sign a release) is pretextual: Svensson has admitted as much, testifying that she does not know of a single terminated employee – male or female – who received their unvested deferred compensation without signing a release.

---

[20]  Svensson also alleges that Putnam terminated her after she expressed concern about certain brokerage commission practices to her boss, Josh Brooks, although she asserts no separate claim predicated on this allegation.  Am. Compl. ¶ 35.  To the extent that Svensson means to assert a common law "whistleblower claim," the claim fails.  First, to be actionable, an internal whistleblower claim must be premised upon an employee's report of *criminal activity* to her employer.  *Clark v. Lincare, Inc.,* No. C.A. 03-30199-MAP, 2005 WL 1721213, *5 (D.Mass. 2005).  Svensson did not complain internally about criminal activity, but characterized her report as concerning fiduciary duties.  Svensson Dep. 174, App. 15; *see id.* at *5 ("Massachusetts courts have *not* left the door open for expansion of the public policy exception ... to include complaints about ethical, non-criminal matters").  Second, even if Svensson could prove she made an internal report of criminal activity, she cannot establish a nexus between that report and her termination.  Svensson testified that when she raised the issue in May 2003, that her boss agreed with her views (Svensson Dep. 174, App. 15).  Subsequently Putnam changed its practice. (Brooks Dep. 223, App. 18).

[21]  *See also Eigerman v. Putnam Investments, Inc.,* SJC-09854, 2007 WL 4415058, *4 (Mass. Dec. 20, 2007) (holding Putnam's equity plan a valid contract as a matter of law, and denying employee's claim where "[t]he plaintiff, who was professionally employed in the investment industry, must have been fully aware of the restrictive language in the plan.")

Svensson Dep. 235, <u>App</u>. <u>15</u>.  Such release requirements cannot be the basis for a retaliation claim because the employee has no entitlement to benefits *except* on the conditions in the Plans. *See*, *e.g.*, *Cathey v. Fallon Clinic, Inc.*, 13 Mass.L.Rptr. 325, 2001 WL 801638, *5, *6 (Mass.Super. 2001):

> Since Cathey voluntarily refused to sign the agreement, he cannot claim that he was entitled to receive the benefits offered.  The offer was expressly conditioned on his signing of the agreement as well as on his release of claims pursuant to signing the agreement, and because Cathey subsequently refused to sign the agreement, his claim that filing an MCAD complaint triggered the withdrawal of the offer fails.  Moreover, Fallon's withdrawal of the severance offer in accordance with the express conditions of the severance agreement shows no evidence of retaliatory conduct on Fallon's part.

*See also Cabán Hernández v. Philip Morris USA, Inc.* 486 F.3d 1, 10-11 (1st Cir. 2007) (upholding validity of Title VII release where plaintiffs decided whether "to sign the proffered releases and receive extra benefits or to pursue legal action over the loss of their jobs.").

## VII.    SVENSSON'S FRAUDULENT INDUCEMENT AND MISREPRESENTATION CLAIMS ARE PREEMPTED AND LEGALLY DEFECTIVE.

Count IX asserts fraud and misrepresentation claims based on Svensson's allegation that "[i]n reasonable and intended reliance on the representations made by Putnam's representatives, Plaintiff left her employment [in 1994] … with promises of long-term employment in a specified career path, with significant enhancement of base compensation, bonuses and benefits, and with promised opportunities for females to work*, and to succeed, in a non-discriminatory working environment.*"  Am. Compl. ¶ 97 (emphasis added).  These claims fail because ch. 151B provides the exclusive remedy for any sex discrimination claim.   *Reidy,* 928 F. Supp. at 106 ("Massachusetts courts will not create a new common law action based upon the public policy expressed in [ch. 151B]").  To the extent her claim is not preempted, it is worth noting that Svensson received significant compensation increases, benefits, and several promotions during her tenure at Putnam.  *See* Tibbetts Aff. ¶ 35.  Even so, Svensson "cannot establish reasonable reliance where the promise at issue [is] too vague to be enforced." *Armstrong v. Rohm and Haas*

*Co., Inc.*, 349 F. Supp. 2d 71, 75.  Finally, Svensson can succeed only if she proves that Putnam had no intention of carrying out its promises at the time they were made (1994).  *See Stevens v. Nagel,* 64 Mass. App. Ct. 136, 138 (2005) ("A viable claim for fraud" does not lie unless the promisor makes "the promises knowing that he had no intention of carrying them out").  Svensson has no such evidence, and thus her fraud and misrepresentation claims fail.

## VIII. SVENSSON'S ERISA CLAIMS FAIL BECAUSE SVENSSON CANNOT DEMONSTRATE THAT PUTNAM TERMINATED HER TO DEPRIVE HER OF ERISA BENEFITS.

Count X alleges that Putnam wrongfully terminated Svensson "in part, motivated by its desire to avoid paying Plaintiff employee benefits of significant value, and in particular medical benefits…."  Am. Compl. ¶ 107.  No evidence exists that Putnam terminated Svensson to deprive her of benefits under any ERISA plan.  *See* Part I.A *supra.*  With respect to the only specific plan (health insurance) that she identifies, Putnam's decision to terminate Svensson could not deprive her of access to medical benefits because had the right to elect continued coverage in Putnam's health insurance plans pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA").  Tibbetts Aff. ¶ 41, App. 11.

## IX. SVENSSON'S CONVERSION/UNJUST ENRICHMENT CLAIM FAILS BECAUSE SHE HAD NO RIGHT TO THE COMPENSATION SHE SEEKS .

Count XI alleges that Putnam's refusal to offer Svensson her unvested equity and deferred compensation (despite her failure to sign the required release), or to pay her a bonus for 2003 (despite her termination in September 2003), constitutes a claim for conversion or unjust enrichment.  Am. Compl. ¶ 111.  Conversion requires a showing that "at the time of the alleged conversion [Svensson] had either actual possession or the right to immediate possession or control of the property in question."  *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1358 (1st Cir. 1992); *see also Mechanics Nat'l Bank of Worcester v. Killeen*, 377 Mass. 100, 115 (1979).  As discussed above, the plans governing these awards required Svensson to sign a release.  Svensson declined to do so, and she therefore has no such right to this compensation.

## <u>CONCLUSION</u>

For the reasons stated above, Putnam prays that this Court grant Putnam's Motion for Summary Judgment and dismiss the Amended Complaint with prejudice.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

/s/ Joseph L. Kociubes, BBO #276360
Joseph L. Kociubes, BBO #276360
joseph.kocuibes@bingham.com
Louis A. Rodriques, BBO #424720
Allyson E. Kurker, BBO #665231
Jennifer L. Holden, BBO #663467

BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: January 15, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 15, 2008.

<u>/s/ Allyson E. Kurker, BBO# 665231</u>
<u>allyson.kurker@bingham.com</u>

31