UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LISA SVENSSON,<br><br>     Plaintiff,<br><br>v.<br><br>PUTNAM INVESTMENTS LLC, f/k/a PUTNAM INVESTMENTS, INC. and LAWRENCE J. LASSER,<br><br>     Defendants. | CIVIL ACTION<br>NO. 04-12711 PBS |

## DEFENDANTS' LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, defendant, Putnam Investments, LLC ("Putnam"), submits the following Statement of Undisputed Material Facts.

1. Putnam manages money for individuals and institutional investors. Affidavit of Richard B. Tibbetts ("Tibbetts Aff.") at ¶ 2.

2. Plaintiff, Lisa Svensson ("Svensson"), was hired as an Analyst and Vice President in 1994 and served thereafter as an investment professional in Putnam's Investment Management Division ("IMD"). Tibbetts Aff. ¶ 3.

3. Svensson was hired as an at-will employee, and Putnam never changed her employment status. Tibbetts Aff. ¶ 40.

4. Investment professionals at Putnam often had officer titles (in addition to functional titles), such as Assistant Vice President, Vice President, Senior Vice President ("SVP") and Managing Director ("MD").

5. The Chief Investment Officer ("CIO") of each team nominated individuals to officer positions, such as MD, whom the CIO believed to be worthy of officer promotion.

IMD's senior management discussed officer promotion candidates in detail in "roundtable" meetings and selected for promotion to MD those individuals they considered appropriate, subject to final review by Putnam's senior management. MD is an organizational officer title and is not an "open position" to which employees applied.

6. Compensation of investment professionals consisted of base salary and incentive pay. Base salary was reviewed annually. Incentive compensation consisted of year-end discretionary incentive bonuses and potential discretionary grants of Putnam equity (restricted shares and options). Tibbetts Aff. ¶ 7.

7. Svensson participated in the Associates and Principals Incentive Compensation Plan ("A&P Plan"), which paid discretionary cash bonuses to participants. Tibbetts Aff. ¶ 8.

8. To be eligible for a bonus pursuant to the A&P Plan, an employee had to be employed on the date when bonuses were paid. The Plan gave Putnam discretion to make a payment in lieu of a bonus to an employee terminated other than for cause if the employee signed a release of all claims against Putnam. Putnam enforced this release requirement in each instance in which it made such payments to terminated employees. Tibbetts Aff. ¶¶ 8, 9, App. 1.[1]

9. Investment professionals also were eligible for special awards from Putnam's Profit Growth Incentive Compensation Plan ("Profit Growth Plan"). Svensson participated in the Profit Growth Plan, which deferred payment of bonus awards over several years. Individuals terminated other than for cause could continue to receive their deferred bonus payments, but only if they signed a release of all claims against Putnam. Putnam enforced this release requirement in all cases. Tibbetts Aff. ¶ 10, App. 2.

10. Investment professionals could also receive equity grants such as a non-cash incentive award under the Equity Partnership Plan ("EPP"), which vested over time. Svensson participated in the EPP. At the time of Svensson's termination, the EPP provided that unvested

---

[1] Documents that are attached to the Affidavit of Richard B. Tibbetts are found at the referenced tab ("App.") numbers (1-14) in the Appendix. The Appendix has been filed under seal.

2

grants vested for employees terminated without cause only if those terminated employees signed releases of all claims against Putnam. Putnam enforced this release requirement in all cases. Tibbetts Aff. ¶ 11, App. 3.

11. Putnam's compensation practices were as follows during the years relevant to this case: Each year, Putnam's senior management determined the size of the bonus pool for the entire firm. After the pool was set, Putnam's Chief Executive Officer and its division heads allocated a portion of the pool to each division, including IMD. IMD's management then allocated IMD's share of the pool among the IMD's various investment teams and support groups. The CIO of each team then set the bonus award for each individual on that team. A similar process was followed in making equity awards, although not all investment professionals received an equity award in a given year. Tibbetts Aff. ¶ 12.

12. Putnam informed investment professionals of their salary increases, bonus and equity awards no later than March 15 of each year (*e.g.*, they were informed no later than March 15, 2003, of the amount of their bonuses for 2002 (the previous year) and their salary for 2003 (the current year)). Tibbetts Aff. ¶ 13.

13. Putnam promoted Svensson from VP to SVP in 1995 (Deposition of Lisa Svensson ("Svensson Dep.") at 103-04) and offered her a portfolio manager ("PM") position in December 1997. Svensson Dep. at 104, App. 15.[2]

14. In 2000, Putnam promoted Svensson to Senior Portfolio Manager ("SPM"). Svensson Dep. at 105, App. 15.

15. From 1997 through 2002, Svensson served as PM and then SPM on the International Growth team (Am. Compl. ¶ 21), reporting to Robert Swift, the team's CIO. Svensson Dep. 109, App. 15.

---

[2] True and accurate copies of excerpts of depositions referenced herein are attached to the Affidavit of Allyson E. Kurker, and they can be found at the referenced tab ("App.") numbers (15-21) in the Appendix. The Appendix has been filed under seal.

16.     From 1999 through 2001, Svensson was the third most highly-compensated team member, behind Swift (the team's CIO) and Kelly Morgan, a female SPM and Director. Tibbetts Aff. ¶ 15, App. 5.

17.     In 2002, Putnam reorganized the International Growth team due to the team's poor investment performance. Deposition of Stephen Oristaglio ("Oristaglio Dep.") at 123, App. 16. As part of this reorganization, Putnam terminated Robert Swift. Svensson Dep. 96, App. 15.

18.     In April 2002, Putnam offered Svensson an Analyst position in GER. Svensson accepted the Analyst position in April 2002. Tibbetts Aff. ¶ 17.

19.     Steve Dexter was asked to manage what remained of the International Growth Fund. Oristaglio thought Dexter "was a conservative investment manager . . . more diversified in combining fundamental and quantitative signals … [and] had the edge among all the candidates that gave [him] the best probability … that group would be managed" the way Oristaglio needed and wanted it to be managed. Oristaglio Dep. 135-36, App. 16.

20.     In 2002, Svensson participated in Global Equity Research's ("GER") bonus pool. Bill Landes ("Landes"), the head of GER, made the ultimate compensation, management and performance decisions (subject to upper management review) concerning the employees in his group, including Svensson. Tibbetts Aff. ¶ 17.

21.     In 2002, Svensson was the sixth most highly-compensated analyst in GER (of forty-five analysts), and was the eighth most highly-compensated employee of fifty investment professionals in all of GER (not including the group's director). Thirty male analysts in GER were compensated *less* than Svensson that year. Tibbetts Aff. ¶ 18, App. 6.

22.     Of the sixty-six alleged compensation comparators for 2002 named by Svensson in the *Fourth Affidavit of Lisa Svensson,* Exhibit 3, Part 3, filed June 8, 2006 [Docket #75], nineteen were paid less than she in 2002. An additional eleven were paid less than she in 2002

4

either because they were not yet employed by Putnam or because they had left Putnam's employ before any award of bonus compensation was distributed. Tibbetts Aff. ¶ 22, App. 4.

23. Of the remaining thirty-three individuals selected by Svensson as compensation comparators for 2002, eight were CIOs. CIOs were responsible for entire investment teams and strategies, and for managing PMs, SPMs, and Analysts. Svensson was never a CIO. Tibbetts Aff. ¶ 23, App. 4.

24. Of the remaining twenty-five individuals selected by Svensson as compensation comparators for 2002, twelve were (a) "Directors" who had department level management responsibilities; (b) traders; or (c) served in wholly separate investment groups (such as Currency). Tibbetts Aff. ¶ 24, App. 4.

25. Of the remaining thirteen individuals selected by Svensson as compensation comparators for 2002, twelve were SPMs and one was a PM. Tibbetts Aff. ¶ 25, App. 4.

26. SPMs and PMs are primarily responsible for managing investment portfolios, and for making the decisions concerning securities held in those portfolios. An analyst's primary responsibility is to evaluate stocks and make recommendations to SPMs and PMs. Tibbetts Aff. ¶ 25.

27. Svensson (along with other GER analysts) participated in a different bonus pool from those of her "comparator" CIOs, Directors, SPMs and PMs. Tibbetts Aff. ¶ 25.

28. Putnam hired Terrance Norchi ("Dr. Norchi"), a medical doctor, as a health care analyst and guaranteed him a $1 million bonus for 2002. At the time that Dr. Norchi was hired and received his guarantee, health care analysts were in high demand. Tibbetts Aff. ¶ 27.

29. Putnam department heads awarded bonuses based on a number of factors, including individual performance. For the 2002 performance year, Landes (the head of GER) determined the amount of the bonus to be paid to each analyst in GER (subject to review by upper management) according to his assessment of the value, performance and contribution of each of them. Based on this assessment, Svensson was paid less than Messrs. Bukovac and Malak. Tibbetts Aff. ¶ 28.

30.     In January 2003, Putnam promoted Svensson to ADR.  Am. Compl. ¶ 32.

31.     In May 2003, Svensson expressed concerns she had about Putnam's directed brokerage commissions practice to Brooks.  Svensson Dep. 174, App. 15.  Brooks agreed with Svensson that the practice should change.  *Id.*  Subsequently, Putnam changed its practice. Deposition of Joshua Brooks ("Brooks Dep.") at 223, App. 18.

32.     In 2000, six men and four women were considered for election to MD.  The Investment Division Management Committee ("IDMC") selected three of four women and four of six men for promotion, and these selections were ultimately approved.  Svensson received *no* votes of support from the IDMC, and was thus not selected for promotion.  Eight of the IDMC electors were men, and two were women.  Tibbetts Aff.  ¶¶ 30, 31, App. 7.

33.     Officer promotions for the years 1999-2002 generally were announced in March of each year.  As such, all promotions for all years 1999-2002 were announced prior to May 3, 2003. Tibbetts Aff. ¶ 6.  In 2003, Putnam did not elect anyone to MD from the IMD.  *Id*.

34.     In April 2003, Putnam hired Joshua Brooks ("Brooks") to replace Landes as Director of GER.  Am. Compl. ¶ 32.

35.     Brooks decided that the investment process in GER "needed to improve" because analysts had not been encouraged to "stand away from the herd, stand away from consensus," which was engendering poor investment performance.  Brooks Dep. 105-06, App. 18.

36.     In July 2003, Darren Peers, an Analyst in GER who reported to Svensson, told Brooks that he was considering leaving because of his difficulty working with Svensson. Deposition of Darren Peers at 53, App. 19.

37.     Chris O'Malley ("O'Malley") was an analyst who reported to Svensson. Svensson Dep. 44, App. 15.

38.     In August of 2003, Brooks learned that Svensson was endeavoring to give "a very negative review of ... Chris O'Malley in which [Svensson] described having sought feedback

6

from all of the portfolio managers with whom Chris interacted, and that that feedback was universally negative. . . ." Brooks Dep. 164-65, App. 18.

39. After interviewing portfolio managers to whom Svensson had spoken about O'Malley, and after speaking to Svensson, Brooks concluded that "not only had [Svensson] perhaps not investigated in the manner in which she suggested, but furthermore, that a decent amount of feedback [about O'Malley] was, in fact, the opposite of what she had suggested." Brooks Dep. 168, App. 18.

40. Brooks concluded that Svensson should no longer manage other analysts. Brooks Dep. 165, 171, App. 18.

41. Brooks offered Svensson three employment alternatives: (i) remain in GER, but in a non-managerial capacity; (ii) remain at Putnam for an agreed upon transition period while looking for other opportunities, or (iii) leave Putnam with a severance package. Brooks Dep. 231 (Exhibit 5), App. 18.

42. Svensson rejected the three options, and demanded an immediate promotion to MD with guaranteed compensation of $1,000,000 per year for two years. Svensson Dep. 37-38, App. 15.

43. Brooks terminated Svensson on September 15, 2003. Brooks Dep. 247-48 (Exhibit 6), App. 18.

44. Putnam offered Svensson a severance package that included eighteen weeks of pay, a one-time lump sum payment of $250,000, plus her deferred compensation of $539,086.77 under the Profit Growth Plan, subject to the requirement that she execute a release. Tibbetts Aff. ¶ 38, App. 11.

45. Pursuant to §7.3 of the Profit Growth Plan, §§ 6.2 and 6.3 of the A&P Plan, and §7(c)(ii) of the EPP, this offer included severance pay to which Svensson was not entitled unless she signed a release. Tibbetts Aff. ¶ 38, Apps. 1-3.

46. Svensson refused to sign the proposed agreement, and by the terms of the Profit Growth Plan and the EPP, her deferred awards and unvested equity were cancelled. She was

ineligible for any 2003 bonus because she was no longer employed in 2004, when bonuses for 2003 were awarded. Tibbetts Aff. ¶ 38.

47.     In March 2004, after Svensson attempted to "sell" her previously-unvested restricted shares back to Putnam, Putnam informed her that her shares had been cancelled because she had not signed the proposed severance agreement. Tibbetts Aff. ¶ 42, Apps. 13, 14.

48.     Svensson filed a Charge with the MCAD on March 1, 2004 alleging that Putnam discriminated against her on the basis of her sex. Am. Compl. ¶ 12.

49.     On December 28, 2004, Svensson filed her Complaint in this matter.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

/s/ Joseph L. Kociubes, BBO #276360
Joseph L. Kociubes, BBO #276360
joseph.kocuibes@bingham.com
Louis A. Rodriques, BBO #424720
Allyson E. Kurker, BBO #665231
Jennifer L. Holden, BBO #663467

BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: January 15, 2008

## **CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 15, 2008.

/s/ Allyson E. Kurker, BBO# 665231
allyson.kurker@bingham.com