UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | * | Civil Action No. 04-12711-PBS |
| | * | |
| LISA SVENSSON | * | BBO No. 351000 |
| | * | |
| Plaintiff, | * | Memorandum |
| v. | * | of |
| | * | Plaintiff Lisa Svensson |
| PUTNAM INVESTMENTS, LLC | * | in Support of her Motion |
| et al., | * | to Compel Concerning |
| | * | Expert Deposition |
| Defendants. | * | and for Sanctions, |
| | * | Pursuant to Fed. R. Civ. P. 37(c) |
| * * * * * * * * * * * * * * * * | * | |

1.   Introduction.

Plaintiff Lisa Svensson ("Svensson") submits this memorandum in support of her Motion to Compel Concerning Expert Deposition and for Sanctions, Pursuant to Fed. R. Civ. P. 37(c).

In this action, Svensson seeks to prove her single plaintiff disparate treatment and disparate impact claims for gender discrimination. To do so, Svensson requires information about Putnam's treatment of other present and former employees, both to prove at trial that Svensson, because of her gender, was treated less favorably than similarly situated male employees, and to establish, through evidence of Putnam's mistreatment of other females, the existence of a discriminatory atmosphere and discriminatory motivation at Putnam, making it more likely that Putnam also discriminated against Svensson on the basis of her gender. Obviously, such information concerning Putnam's treatment of other employees is highly relevant to Svensson's claims.

Understanding the importance and potential negative impact of such evidence, Putnam undertook a concerted effort in this matter to prevent Svensson from discovering relevant information necessary to her case. Putnam's overall strategy was to avoid discovery by asserting conclusions based upon evidence from its employment files to show that Svensson has not identified sufficiently similar

comparators, while at the same time denying Svensson access to the very employment information which she needs in order to prove that her proposed comparators are similarly situated.

As shown in more detail below, after causing Svensson to incur enormous expense in litigating Putnam's spurious claim that she had no or virtually no comparators, and limiting the data and information available to her and her expert to only 91 of the hundreds of officer-level investment professionals employed by Putnam in its Investment Management Division ("IMD") during the relevant period, Putnam, after fact discovery had been terminated by the Magistrate Judge on motion by Putnam, made available to its expert for his consideration data as to <u>all of the hundreds of officer-level investment professionals in the division</u>, the very data that Svensson had sought. As to the data made available to him by Putnam but not supplied to Svensson, Putnam's expert testified,

> Well, if I didn't have access to that data, I wouldn't be sitting here offering an opinion.[1]

2.   <u>Facts and procedural background</u>.

Putnam, a nationally known investment firm, was, during the relevant period, one of a number of subsidiaries of Marsh & McLennan Companies, Inc.[2] Svensson, who holds a Bachelor of Science degree in petroleum engineering from Texas A&M and the MBA degree from Cornell, had seven years of sophisticated investment experience prior to her being employed by Putnam in 1994.[3] Shortly after becoming employed by Putnam in July 1994, Svensson served in its Investment Management Division ("IMD") as Vice President, Supervisory Analyst, in Global Equity Research ("GER" or the "research department"). <u>Id</u>. Then, starting in 1997, she served Putnam as a Senior Vice President, Portfolio Manager, for the Putnam Global Growth Fund. Part of the International Growth Equity team. <u>Id</u>. In this position, Svensson was responsible for, among other things, the performance of Putnam's Large Cap International Growth products: Putnam Global Growth Fund, International Large Cap Growth Equity,

---

[1] Bloom deposition transcript ("Bloom"), p. 173, ll. 16-17.
[2] First Affidavit of Lisa Svensson ("Svensson First affidavit"), filed April 20, 2006, ¶2.
[3] <u>See</u> Svensson's resume, a copy of which is annexed as Exhibit 1 to both the Second Affidavit of Lisa Svensson ("Svensson Second Affidavit") and the Third Affidavit of Lisa Svensson ("Svensson Third Affidavit"), each of which were filed April 20, 2006.

and Global ex-Japan. Id. Also, in this position, she helped develop the investment process, including development of quantitative screening, portfolio construction and risk management techniques; recruited and trained numerous junior investment professionals, including development of their coverage plans and evaluation of their performance; and she helped to design Putnam marketing materials and participated in new business development and ongoing client service initiatives. Id.

In or about March 2002, Svensson was demoted from this portfolio management position to a position in GER and, after receiving a promotion to Assistant Director of Research in January 2003, her employment was terminated abruptly nine months later when, on September 15, 2003, she declined to accept any of three options which Putnam, on August 28, 2003, acting through Joshua Brooks ("Brooks"), a male hired by Putnam from the outside approximately five months earlier, had offered Svensson as a way for her to remain employed. These three options were: (1) to be demoted to an entry level analyst position with no chance to receive future increase in compensation or to be promoted; (2) to leave immediately and accept a severance package consisting of 18 weeks of her base pay and half of her prior year's bonus (which, she later learned, was subject to her signing a release of all of her legal rights with respect to her position as a member of a protected class under Title VII); or, (3) to pretend to work as an analyst for Putnam for a brief additional period while she sought employment elsewhere, with the explicit statement that she would leave Putnam by a date to be agreed upon, but without any severance payment.[4] Putnam did not offer Svensson the option to seek employment elsewhere within Putnam.[5]

It is Svensson's position, among others in this case, that her demotion and ultimate termination were the result of unlawful discrimination by Putnam on the basis of her gender. Specifically, Svensson contends that the male investment professionals at Putnam, including those who were promoted to, or

---

[4] See Fourth Affidavit of Lisa Svensson, Docket No. 75, ¶ 14.
[5] Id.

were hired from the outside as, Managing Directors[6] are among her male comparators.[7] Svensson's contends that the female investment professionals she has identified[8] are among her female comparators.[9]

The strategy that Putnam adopted and followed throughout this case from its start in late December 2004, was to claim to Svensson, and represent to the Court, that Svensson had no or virtually no comparators. For example, in its Rule 26(a) initial disclosure on June 8, 2005, Putnam disclosed that it would use in its defense of Svensson's claims only two documents: "Ms. Svensson's personnel file" and her "360 Reviews." It did not disclose any documents concerning any other person, male or female, in the IMD.

In its response to Svensson's First interrogatories, seeking in Nos. 3, 4 and 5, information as to the Putnam workforce, Putnam refused to provide any answers, objecting on the grounds, among others, that discovery was sought as to "employees who are not similarly situated to Svensson." In its responses to Svensson's First Request for Documents, which requested production of documents concerning, among other things, "terminations, denial of promotions and demotions," Putnam objected, claiming that the documents sought were "unrelated" to the case, and "not reasonably calculated to lead to the discovery of admissible evidence."

On December 13, 2005, at a hearing before Magistrate Judge Bowler on Svensson's motion to compel production of the documents requested by Svensson First Request for Production, Putnam's counsel (Mr. Rodriques) took the position that Svensson had no or virtually no comparators, representing to the Magistrate Judge, as fact, that the teams in the Investment Division at Putnam were not under central, division-wide, management but that, instead, they were as autonomous from each

---

[6] They are identified in Exhibit 2 to the Second Affidavit of Lisa Svensson ("Second Svensson Affidavit"), filed April 20, 2006, Docket No. 57, and as restated and amended in Exhibit 1 to the Fourth Svensson Affidavit,
[7] For Svensson's reasons for identifying them, are stet forth in her affidavits, see note _-, supra.
[8] See Exhibit 2 to the Third Affidavit of Lisa Svensson ("Third Svensson Affidavit" and as restated and amended in Exhibit 2 to the Fourth Svensson Affidavit.
[9] For Svensson's reasons for identifying them, are set forth in her affidavits, see note 8, supra.

other as the various graduate schools are at Harvard University, a representation that simply is not true. He said to the Magistrate Judge:

> ... you look at the decisions by the same decision maker the case is pretty clear, both the <u>Jackson</u> case and the <u>Whittingham</u> case, that <u>decisions by other people in other parts of the company aren't probative on the question of whether or not there was discrimination in her unit.</u>[10]
>
> \*\*\*
>
> <u>Jackson</u> decides this issue, Your Honor, and says, <u>this stuff is not generally specifically relevant, particularly when it's claims outside of her own department</u>.[11]

(Emphasis added.)

There followed in early to mid 2006, numerous attempts by Svensson's counsel to obtain information about comparators, but Putnam refused to deviate from its strategy that Svensson had virtually no or virtually comparators, producing heavily redacted documents to prevent Svensson from obtaining any information about any other investment professionals at Putnam. For example, Putnam's counsel (Mr. Kociubes) announced during the deposition of Putnam's Chief Executive Officer Charles Haldeman, when Haldeman was questioned about redactions of information concerning male investment professionals in Putnam document PRM-01563-64, that Svensson is not entitled to that information:

> [P]eople who are not comparators of the claimant have been redacted. [<u>Svensson is] not entitled to personnel information about them</u>, so whether or not there is a document, <u>you're not getting it absent the court deciding that we are wrong</u>....[12]

(Emphasis added.)

This tactic of Putnam and its counsel of producing heavily redacted documents hampered Svensson in taking depositions. For example, when shown in deposition by Svensson's counsel some of the numerous redacted documents Putnam had produced and asked a question about them, defendant Lasser, Putnam's former Chief Executive Officer, testified that he could not answer the questions:

> 1    Q.   Okay. <u>Is it your testimony that</u> other

---

[10] Transcript, December 13, 2005, p. 7, ll. 4-7.
[11] <u>Id</u>., p. 15, ll. 3-6.
[12] Excerpt from the Haldeman deposition, p. 87, ll. 3-8, a copy of which is annexed as Exhibit 2 to the Affidavit of Kevin F. Moloney ("Moloney Affidavit"), filed April 20, 2006, Docket No. 56. A copy of PRM-01563-64 is annexed to the Moloney Affidavit as Exhibit 1.

```
2      than those documents, you have never seen these
3      other documents before?

4   A. No, I didn't say that. I said I don't
5      specifically recall. You showed me a bunch of
6      blank pages, so it's hard to remember.[13]
```

(Emphasis added.) Had Putnam and its counsel not utilized this document redaction tactic, production of unredacted documents would have provided Svensson on a timely basis with much of the information she sought about the other officers in the IMD

The Putnam position that Svensson had no or virtually no comparators not only is belied by the facts but also is in stark contrast to the information in documents that Putnam itself produced. The issue of comparators to Svensson is the central, overriding issue in this case, was a major focus of Svensson's discovery requests and will be a major focus of the trial.

By way of background, the investment teams and the research functions in the Putnam IMD were not administered independently within the IMD by team or function, as titles, compensation and other significant employment and administrative matters concerning those in the various Putnam divisions were decided within and by the respective divisions.[14] [15] Putnam documents produced in this case confirm that there was a centralized decision-making body in regard to promotions, demotions and compensation that applied across all levels of officers within the IMD. For example, Putnam document PRM 1789-1792[16] evidences a meeting of Putnam officials from across the entire IMD at which the candidacies of various persons from across the entire IMD, including, among others, Svensson, for promotion to Managing Director, were discussed. Putnam document PRM-1518,[17] even in its redacted

---

[13] Lasser deposition transcript, p. 11.
[14] See ¶¶ 3-9 of the First Affidavit of Lisa Svensson ("First Svensson Affidavit"), Docket No. __.
[15] In addition to the IMD that managed client portfolios, there were the Operations Division (services to customers including answering client questions and mailing fund information); the Distribution Division, which marketed and sold products to institutional and retail clients; and the Corporate Division, which supported the overall business through activities such as corporate finance. Id.
[16] A copy in the redacted form in which it was produced by Putnam is annexed to the Moloney Affidavit as Exhibit 3,
[17] A copy in the redacted form in which it was produced by Putnam is annexed to the Moloney Affidavit as Exhibit 4.

form as produced to Svensson, shows that this centralized structure for promotions applied to all officers in the IMD, including Svensson and others in International Growth Equity and Research as well as to officers in Quantitative, Fixed Income Trading, Currency and Global Asset Allocation.

Persons who were hired as, or promoted to, Managing Director in the periods when Svensson was eligible for appointment to the position, are, by definition, comparators of Svensson, a fact that Putnam obviously recognized since Putnam documents, PRM-1792, PRM-1886-1887 and PRM 1891-1893,[18] show that Svensson was included with others in the various promotion pools for Managing Director. Candidates for demotion to GER, to which Svensson was demoted in 2002, were selected from across the same broad range of portfolio teams in the IMD.[19] A January 30, 2003, e-mail from Chief Investment Officer of Specialty Growth, Daniel Miller,[20] comparing Svensson to other persons from a number of investment teams, shows that management decisions at Putnam were being made by a broader range of officials than those assigned only to GER. [21] [22]

Nonetheless, Putnam arrogantly and rigidly kept to its position that Svensson had virtually no comparators. For example, in its May 11, 2006, opposition[23] to Svensson's April 20, 2006, motion to compel answers to interrogatories,[24] Putnam claimed,

> The main part of Ms. Svensson's motion to compel is devoted to <u>her argument that the 91 investment professionals</u> whom she has selected and about whom she seeks discovery

---

[18] Copies in the redacted form in which they were produced by Putnam, are annexed to the Moloney Affidavit as Exhibits 5, 6 and 7, respectively.

[19] Later unredaction of Putnam document PRM 1691, a copy of which in the redacted form in which it was produced by Putnam, is annexed to the Moloney Affidavit as Exhibit 8 (handwritten notes describing another meeting with Brett Browchuk during which the demotion of Lisa Svensson was discussed) identified others who were considered for demotion.

[20] Putnam document PRM 1308-1309, a copy of which in the redacted form in which it was produced by Putnam, is annexed to the Moloney Affidavit as Exhibit 9.

[21] Unredaction of the redacted portion of this document identified other persons with whom Miller compared Svensson.

[22] Upon information furnished to Svensson and her belief, at least one male Managing Director was considered for demotion to the position that Lisa Svensson in 2002 was forced to take. Based upon this alone, every SVP/Senior Portfolio Manager and Managing Director during the year of Svensson's demotion, whether or not demoted, is properly a comparator of Svensson.

[23] Docket No. 66.

[24] Docket Nos. 53, 54.

<u>are relevant comparators</u> for purposes of her discrimination claims. <u>Her analysis makes no sense,</u>

and in its May 24, 2006, motion seeking a protective order to quash Svensson's Rule 30(b)(6) deposition notice,[25] Putnam claimed that,

> Some of <u>the ... proposed topics seek information concerning 91 individuals who, as Putnam has argued</u> in connection with Ms. Svensson's pending motion to compel further answers to interrogatories, <u>are not appropriate comparators</u>....

(Emphasis added.)

After a hearing on June 21, 2006, at which the Magistrate Judge said that she was "inclined to permit some discovery," giving the parties "14 days to sit down together" to "come up jointly with comparators,"[26] Putnam shifted its tactics, but did not change its strategy. On July 11, 2006, Putnam's counsel (Mr. Kociubes), at a hearing before the Magistrate Judge, said to the court:

> 8.   ... <u>we</u>
> 9    <u>have been arguing since day one that this universe</u>, it was 16,
> 10   then 34, <u>now 91 individuals are not within the guidelines of</u>
> 11   <u>the First Circuit, the appropriate universe of comparators</u>.
> 12   For purposes of trying to get beyond this dispute, Your Honor,
> 13   or moving out as much of it as we can, we have agreed that <u>we</u>
> 14   <u>will answer the interrogatories with respect to the 91</u> which
> 15   plaintiffs have chosen <u>without in any way agreeing that that is</u>
> 16   <u>the appropriate universe of comparators.</u> [27]

Thereafter, Putnam continued to insist that Svensson had no or virtually no comparators. For example, in its opposition, filed October 19, 2006,[28] to Svensson's October 10, 2006, motion to compel production of the documents requested in her April 28, 2006, Second Request for Production, Putnam stated,

> <u>Putnam continues to assert</u> its position <u>that these 91 are not Ms. Svensson's legal comparators</u>. For example, among Ms. Svensson's 91 comparators are her boss, a subordinate who reported to her, people who worked at different times in wholly different departments, individuals whose tenure at Putnam never overlapped with hers, people performing different jobs, and people reporting to wholly different supervisors.

---

[25] Docket No. 71.
[26] Transcript, June 21, 2006, hearing, p.14, l. 23 – p. 15, l. 4.
[27] Transcript, July 11, 2006, hearing, p. 5, ll. 8-16.
[28] Docket No. 117.

> Solely in an effort to resolve discovery disputes and keep the discovery process moving, Putnam agreed to provide certain information about these individuals in response to Ms. Svensson's interrogatories.  Putnam also agreed to unredact previously produced documents with respect to those 91,

adding that,

> At no time, however, has Putnam conceded -- for purposes of discovery or otherwise -- that these individuals are Ms. Svensson's legal comparators. Putnam made this clear at the July 11, 2006 hearing on Ms. Svensson's Rule 30(b)(6) Notice....

(Emphasis added.)

The Putnam strategy had two immediate results: (1) preventing Svensson from obtaining and utilizing in Rule 30(b)(6) and other depositions, information about all of the other approximate 253 officer-level investment professionals in the IMD and (2) causing Svensson to incur enormous costs for expenses and attorneys' fees in litigating for more than a year over Putnam's claim that Svensson had no or virtually no comparators.  The attorneys for plaintiff Svensson have had to spend hundreds of hours of time in preparing and litigation numerous motions, conducting discovery concerning the information supplied as to the limited number of officer-level investment professionals in the IMD and for three renewed depositions that were required by the Magistrate Judge solely because Putnam's attorneys decided to terminate them thereby requiring court intervention.

The Putnam strategy provided another significant result after the Magistrate Judge, on Putnam's motion, ordered discovery closed.[29]  This result was that in January 2007, Svensson's expert, Paul F. White, PhD. ("White") for purposes of his analysis and report, had available to him Putnam-supplied information and documents as to only 91 of the approximate 344 officer-level investment professionals in the IMD during the relevant period.

Thereafter, in early 2007, Putnam engaged David E. Bloom ("Bloom") as an expert to testify on behalf of Putnam to:

---

[29] See correcting docket entry on February 8, 2007 ("... in light of this court's allowance of the motion for a protective order to terminate discovery....").

<u>review and analyze documents and data related to compensation, promotion, demotion, and termination decisions at Putnam corresponding to Ms. Lisa Svensson's allegations of gender discrimination</u> and to offer an independent expert opinion as to whether or not these data provide evidence of discrimination on the basis of gender.[30]

(emphasis added) and, having successfully limited the information that Svensson's expert could analyze and report upon, Putnam made available to Bloom not only the data and information that it had provided to Svensson but also the data and information it refused to provide to Svensson. In sharp contrast to what was furnished to Svensson, Putnam, according to Bloom, made available to him information and data concerning <u>all</u> of the hundreds of officer-level investment professionals in the IMD for each of the years 1999-2004, not just the 91. For the year 2003, for example, according to Bloom's deposition testimony and data supplied to him by Putnam, there were 344 officers in the IMD. Bloom explained, at p. 107, that the number 344,

```
 9.     ... represents the number of Putnam officers
10      in the investment management division at the end of
11      2002 or who were hired into the investment management
12      division at the -- during 2003 and were still there ...
```

(emphasis supplied), adding that the 344 officers included all of the Chief Investment Officers ("CIO") and all directors. At his December 18, 2007, deposition, Bloom testified that:

- He requested Putnam and its counsel to provide him with "appropriate data to analyze"[31];

- He received data that he incorporated into his report in response to the requests[32];

- He reviewed and analyzed in his report "basic employment information" about all officers in the Investment Division at Putnam at the end of 1998 through 2003[33] [34];

- He requested and received from Putnam and its counsel termination lists for 2000 through 2003 "for officer terminations in the Investment Division" for each of those years, which he reviewed[35];

---

[30] Bloom's Report, dated 13, 2007 ("Bloom report").
[31] Bloom deposition transcript ("Bloom"), p. 100, ll. 5-10.
[32] <u>Id</u>.
[33] Bloom deposition exhibits 2A - 2G.
[34] Bloom, p. 100, l. 20 - p. 101, l. 5; p. 101, l. 6 - p. 102, l. 14.
[35] Bloom, p. 102, l. 17 - p. 104, l. 21.

- The total "at-risk" population of "344" (280 males, 64 females) represented the total number of Putnam officers who were in the Investment Division at the end of 2002, and who were still there at the end of 2003[36];

- He did not include Chief Investment Officers, department directors or team leaders in his compensation analyses because he decided that "they have sort of in the realm of management and leadership that differ from individuals in the positions that Miss Svensson worked in as senior portfolio manager, assistant director of research and analyst ... and to ensure that I was looking at individuals who were similarly situated I limited my samples to the ones that are chosen here"[37];

- He used information relating to "general employment situations," as referenced in ¶ 11 of his report, which covered "employment status, are they active or otherwise, are they full year-full time, what department or department category were they in, what their functional position is which would be related to their duties and responsibilities," and information related to "their eligibility for different types of compensation", for determining who should fall into the relevant samples for each of the four employment actions I analyzed"[38];

- He utilized information supplied by Putnam concerning functional titles as a control for his analysis by stratifying the samples, and bonus information for the years 2002 and 2003[39];

- He was provided with information respecting the "partnership pool" at Putnam, but did not use the total amount of compensation available to individuals who were partners at Putnam[40];

- He did not request performance ratings because he decided it was not necessary based upon the "results" he had seen, but if he had thought it necessary, he would have requested this information[41];

- He received termination spreadsheets from Putnam that had a field labeled "Action Reason," and used that information in connection with ¶ 49 of his report, especially in deciding whether a termination was voluntary or involuntary;[42]

- If he had not had access to the data reflected in Exhibits 2A through 2H, he "wouldn't be sitting here offering an opinion."[43]

---

[36] Bloom, p. 107, l. 5 - p. 108, l. 24; p. 117, l. 24 - p. 120, l. 10.
[37] Bloom, p. 71, l. 13 - p. 73, l. 2.
[38] Bloom, p. 84, l. 8 - p. 89, l. 2.
[39] Bloom, p. 94, l. 2 - p. 95, l. 7; p. 99, l. 20 - p. 100, l. 4.
[40] Bloom, p. 121, l. 24 – p. 123, l. 9.
[41] Bloom, p. 134, l. l. 3-22.
[42] Bloom, p. 149, l. 14 – p. 152, l. 13.
[43] Bloom, p. 172, l. 6 – p. 173, l. 17.

The data and information that Bloom relied upon for the analyses in his report was not disclosed to Svensson until November 26, 2007, when Putnam's counsel e-mailed pdf images of paper formatted data, not the data in the electronic format that Putnam actually had furnished to Bloom,[44] and which, Bloom testified, he was able to load into his computer in a "matter of minutes or less."[45] Putnam knew that presenting the data in pdf images rather than in the electronic format furnished to Bloom, would require as a preliminary matter an expensive and time consuming data entry project for Svensson's expert before the data would be usable. Notably, this production did not include the data that Putnam made available to Bloom, which he considered using but did not include in his analysis.

In addition to testifying concerning his own need for, and use of, information and data made available to him by Putnam concerning all of the officers in the Investment Division for the years 1999-2004, Bloom criticized (both in his Report and in his December 18, 2007, deposition testimony) Svensson's expert, White, faulting White for failure to have tested and analyzed the information for all the officers in the IMD, the very information that Putnam had withheld from Svensson and thereby from White. In particular, Bloom testified that,

- He "was very troubled by the fact that the sample here was basically established I think it was in affidavit four produced in this case or assigned in this case by Miss Svensson and there's no indication what the principles are, what that sample generalizes to, what population it refers to and without that statistically it's really not possible to make a meaningful statement based on that sample without knowing what it refers to...."[46]

- He was "very troubled" by the sample that White analyzed, noting that "the most fundamental flaw" was that he did not do any analysis of the "nature of the sample that he's analyzing", and that "often what we consider the gold standard if you will or ideal" is when you're looking at an "entire population" as opposed to a "selective sample which is prone to bias"[47];

- e was troubled by the fact that, among the 91 comparators used by White, there were many individuals who were not "similarly situated" to Svensson, in that they were "people who in the Putnam hierarchy would be considered superiors," including some "department directors and chief investment officers" and people with "different officer

---

[44] Bloom, p. 173, l. 24.
[45] Bloom p. 178, ll. 14-15.
[46] Bloom, p. 70, ll. 12 - 20.
[47] Bloom, p. 67, l.10 - p. 70, l:4.

> titles, higher officer titles, managing director officer titles", people who would be considered "reports" or who were "laterally connected," so I chose a sample that I believed was "relevant" in conducting my statistical analyses[48];

- He believed White's analyses were "inappropriate" in that White is not comparing individuals who are "similarly situated", and that he "just took lists" given to him by Svensson "without any critical examination of named comparators"[49];

- White could have undertaken to compare Svensson's 91 named comparators with all officers in the Investment Division to see whether they look "similar or different in terms of compensation, rates of promotion, rates of termination, rates of transition across categories, the distribution of functional titles as well as officer titles," and,

- The "grossest mishandling of data" by was that White did not incorporate any information on who was or was not promoted, who was or was not demoted, or who was or was not terminated."[50]

Yet it was Putnam and its counsel who decided what data would be produced to Svensson and what information and data would be supplied to Bloom. Moreover, Bloom admitted that access to the data that Putnam had made available to him was necessary for the preparation of an opinion and that without it, he would not have been able to state any opinion. Bloom testified,

```
13.    My question is do you consider it important in
14.    formulating your conclusions to have had access to the
15.    data that's reflected in 2A through 2H?

16.    A.  Well, if I didn't have access to that data, I
17.    wouldn't be sitting here offering an opinion.[51]
```

(Emphasis added.)

Putnam is using the data and information that it did not provide to Svensson but which it did provide to Bloom as evidence in its summary judgment motion papers, filed January 15, 2008.[52] For example, the Putnam memorandum, utilizing the differences in the data made available to the respective experts, states,

---

[48] Bloom, p. 70, l. 9 - p. 73, l. 2
[49] Bloom, p. 123, l. 22 - p. 127, l. 14
[50] Bloom, p. 167, l. 24 - p. 171, l. 23.
[51] Bloom, p. 17_, ll. 13-17.
[52] Docket Nos. 205-07.

13

> A statistical analysis by Putnam's expert witness, Professor David Bloom, of those eligible for nomination and election to MD reveals "no statistically significant sex disparities in 'promotion'" to MD and "therefore provide no support for plaintiff's allegation that Putnam discriminated on the basis of sex in 'Promotion to Managing Director'."[53]
>
> \*\*\*
>
> Professor Bloom opines that Svensson's "comparators" form an inappropriate basis for a statistical analysis of alleged sex discrimination as a matter of labor economics...."[54]
>
> \*\*\*
>
> Svensson self-selected Putnam employees with little apparent regard to the fact that individuals worked at different levels in the organization, had different lengths of service at Putnam in the industry, and participated in different bonus pools of differing sizes because they worked different investment teams.  Nor does Svensson select all participants in a given job category attempting to show discriminatory pay disparity, choosing instead to select those whom, presumably, thinks best weight the statistics in her favor. ... See Bloom Report at App. 20 ("misleading results can emerge from the analysis of selected samples").[55]
>
> \*\*\*
>
> ... Bloom also found no statistically significant gender disparity in compensation when looking at GER as a whole, and at all Putnam PMs and analysts.[56]

The Affidavit of Richard Tibbetts also filed by Putnam in support of its motion for summary judgment, also utilizes data not supplied to Svensson as evidence.  For example, Exhibit No. 5, "Compensation data for International Growth group (1999-2003), and Exhibit No. 6, "GER Compensation Data (2002)" to that affidavit include data and information on officers in the IMD who were not included in the Putnam production in regard to the 91.

3. <u>Because Putnam has violated its duties under the rules to supplement and correct its initial disclosures, its responses to interrogatories and its responses to requests for documents, and has filed to comply with the rules regarding disclosure and production of information and data considered by its expert, the court should enter sanctions pursuant to Rule 37(c).</u>

Rule 26(a)(1)(A)(ii) required defendant Putnam Investments, LLC ("Putnam") to make "initial disclosures," to Svensson , including providing her with,

---

[53] Putnam memorandum in support of its motion for summary judgment, Docket No. 206, p. 16.
[54] Id, p. 22.
[55] Id, p. 22, n. 15
[56] Id, pp. 22-23.

>   <u>a copy</u> - or a description by category and location - <u>of</u> <u>all documents</u> ... and tangible
>   things <u>that [Putnam] has in its possession, custody, or control and may use to support its
>   claims or defenses</u>, unless the use would be solely for impeachment.

(Emphasis added.)  Rule 26(a)(2) provides that "in addition to the disclosures required by Rule 26(a)(1)(B), a party's disclosure of an expert witness "<u>must be accompanied by a written report [,which]
must contain</u>:

>   (i)    a complete statement of all opinions the witness will express and the basis and reasons for them;
>   (ii)   <u>the data or other information considered by the witness in forming them</u>;
>   (iii)  <u>any exhibits that will be used to summarize or support them</u>; ....

(Emphasis added.)

Under Rule 26(e)(1)(A), Putnam had the duty "timely" to "supplement or correct" its initial disclosures and its answers to interrogatories and its production of documents, if it,

>   <u>learns</u> that in some material respect <u>the disclosure or response is incomplete or incorrect</u>, and if the additional or corrective information has not otherwise been made known ...; or
>
>   (B) as ordered by the court.

(Emphasis added.)

Rule 37(c)(1) provides remedies for failures to disclose or to supplement as required by Rule 26(a) or 26(e):

>   If a party fails to provide information ... as required by Rule 26(a) or 26(e), the <u>party is
>   not allowed to use that information</u> ... <u>to supply evidence on a motion, at a hearing, or at
>   a trial</u>, unless the failure was substantially justified or is harmless.  <u>In addition to or
>   instead of this sanction, the court</u>, on motion and after giving an opportunity to be heard:
>
>   (A) <u>may order payment of</u> the reasonable <u>expenses, including attorney's fees, caused by
>   the failure</u>;
>
>   (B) <u>may inform the jury</u> of the party's failure; <u>and</u>
>
>   (C) may <u>impose other appropriate sanctions, including any of the orders listed in Rule
>   37(b)(2)(A)(i)-(vi)</u>,

which provide that the court "may issue further just orders that "may include":

>   (i) <u>directing that the matters embraced in the order or other designated facts be taken as
>   established</u> for purposes of the action, <u>as the prevailing party claims</u>;

    (ii) <u>prohibiting</u> the disobedient party from <u>supporting or opposing designated claims or defenses, or</u> from <u>introducing designated matters in evidence</u>;

    (iii) <u>striking pleadings</u> in whole or in part;

    (iv) <u>staying further proceedings</u> until the order is obeyed;

    \*\*\*

    (vi) <u>rendering a default judgment</u> against the disobedient party....

(Emphasis added.)

Any documents considered by the expert must be produced, even if the expert does not rely upon them. In <u>Suskind</u> v. <u>Home Depot Corp.</u>, 2001 WL 92183 (D. Mass. 1/2/01) (Collings, Ch.M.J.), the court, citing <u>Eliasen</u> v. <u>Hamilton</u>, 111 F.R.D. 396, 400 n. 5 (N.D. Ill., 1986). stated:

> The issue framed by the motions to compel is simply stated but less easily resolved. The question is whether the duty of disclosure of expert testimony mandated by Rule 26(a)(2)(B), Fed. R. Civ. P., includes the duty to disclose materials provided to the expert by the party's attorney which were "considered" by the witness in forming his or her opinions but which would also contain "mental impressions, conclusions, opinions or legal theories of an attorney" protected from discovery pursuant to Rule 26(b)(3), Fed. R. Civ. P.….
>
> …I shall allow both motions to compel and direct that all materials furnished to a testifying expert, including those composed by the attorney who retained the expert, which the expert received and read in connection with the instant case be disclosed to opposing counsel….
>
> \*\*\*
>
> ... under the present version of Rule 26(b)(4), a party may depose another party's expert, and that deposition may concern that which was required to be disclosed in the expert's report.... This is the plain import of ... Rule 26(b)(4) which prohibits the taking of the expert's deposition until the expert's report is provided.
>
> It follows that as part of the required disclosure, counsel must disclose, <u>inter alia</u>, not only "... a complete statement of all opinions to be expressed and the basis and reasons therefor; [but also] the data or other information considered by the witness in forming the opinions..."Rule 26(a)(2)(B). And "<u>the data or other information considered by the witness" includes any material which was furnished to the witness by the attorney who retained him</u> even though that material in other contexts must be considered core attorney work product.

16

> \*\*\*
>
> Given that a party cannot withhold "the data and other information considered by the witness" which is required to be disclosed under Rule 26(a)(2)(B) on grounds of privilege or the work product protections, at a deposition held pursuant to Rule 26(b)(4)(A), the expert witness may be required to produce such materials and submit to questioning about them. The materials may not be withheld at a deposition on the ground that they are core work product simply because discovery under Rule 26(b)(4) is not subject to any of the provisions of Rule 26(b)(3).
>
> ... it is improper to restrict disclosure to only those materials relied on by the expert witness. The word is "considered" and encompasses those materials which the witness was furnished and read but which the witness rejected….

Id. at \*1, 4. (Emphasis added.)

In the American Bar Associations ALI-ABA Course of Study entitled "Some Current Issues on Expert Depositions and Discovery", SM060 ALI-ABA 11 (2007), the author states,

> … Rule 26(a)(2)(B) states ... that the expert report 'shall contain … the data or other information considered by the witness in forming the opinions….' … The federal courts have universally interpreted Rule 26(a)(2)(B) as requiring the expert report to contain information 'considered,' e.g. 'taken into account' by the expert, rather than limiting the report to information 'relied' upon by the expert. A sanction, albeit extreme, for violating this rule can include barring the expert from testifying.

(Emphasis added). In Fidelity National title Insurance Company of New York v. Intercounty National title Insurance Company, 412 F.3d 745 (7th Cir. 2005), the court sated:

> A litigant is required to disclose to his opponent any information "considered" by the litigant's testifying expert, Fed. R. Civ. P. 26(a)(2)(B) … and the sanction for violating this rule can include barring the expert from testifying. Fed. R. Civ. P. 37(c)(1); … Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 34-36 (1st Cir.2001)….
>
> … The rule does not require merely that the party disclose data that it happens to have retained; it must disclose all the data that an expert that it retained to testify at trial "considered," implying that it must retain those data, as otherwise it could not disclose them…. A testifying expert must disclose and therefore retain whatever materials are given him to review in preparing his testimony, even if in the end he does not rely on them in formulating his expert opinion, because such materials often contain

17

> effective ammunition for cross-examination. Committee Notes to 1993
> Amendments to Fed. R. Civ. P. 26(a)(2) ….

Id. at 750-51 (Emphasis added).  See also Lugosch v. Congel, 219 F.R.D. 220, 249 (N.D.N.Y. 2003).

In light of Putnam's deliberate efforts to thwart Svensson's reasonable discovery requests and its failure and refusal to have complied with its discovery obligations under Fed. R. Civ. P. 26, 30, 33 and 34, Svensson requests the Court to impose sanctions as specifically authorized under Rules 37(c)(1) and 37(b)(2)(A)(i)-(iv), as follows:

1. The entry of an order striking defendant Putnam's Answer to the complaint, denying Putnam's motion for summary judgment, and setting this case for trial in May 2008 on the issue of the quantum of Svensson's damages; or,

2. If that relief be denied, the entry of an order denying Putnam's motion for summary judgment, and the entry of a finding that the evidence with respect to all the officer-level investment professionals in the Investment Management Division at Putnam for the years 1999-2004, had it been produced by Putnam in discovery, would have shown that Putnam discriminated on the basis of gender with respect to promotions, demotions, compensation and terminations in that division for each of the years in question, and informing the jury of the Court's order and instructing them that they are entitled to conclude, based upon Putnam's conduct in withholding such evidence from Svensson, that Putnam discriminatorily treated Ms. Svensson in regard to each of the above referred to employment actions; or,

3. If that relief be denied, the entry of an order staying all proceedings in this case, requiring Putnam to produce fully unredacted documents and tangible things that are: (a) responsive to any of Svensson's discovery requests by interrogatory or request for production; and, (b), that were provided to, or discussed with, Putnam's expert; and directing Putnam thereafter to produce a Rule 30(b)(6) witness for deposition testimony not subject to the day and hour limit of Rule 30(d)(2), concerning any matter raised by the documents (or information contained therein) that are to be produced in unredacted form or by the Bloom expert report, and directing that Svensson's expert, White, be permitted to prepare a supplemental Report within a reasonable time after the Rule 30(b)(6) deposition transcript has been prepared, and directing that the Bloom report, dated April 13, 2007, be stricken, and imposing all costs, including reasonable attorneys' fees, occasioned by this additional discovery and trial preparation upon Putnam.

Irrespective of which of the above-stated sanctions, all of which are authorized expressly by Rule 37, are ordered by the Court, Svensson requests the Court to enter the following additional relief:

1. The entry of an order, pursuant to Rule 37(c)(1)(A), imposing monetary sanctions upon Putnam in the full amount of Svensson's costs, including reasonable attorneys' fees, occasioned by Putnam's repeated failures and refusals to have

    provided relevant and necessary discovery to Svensson, including, without limitation, the costs and fees incurred by Svensson in excessive and burdensome motion practice, futile negotiations, depositions based upon limited information, and renewal of such depositions based upon Putnam's unilateral decisions to terminate depositions or to instruct witnesses not to answer relevant questions, all of which were directly associated with Putnam's failures and refusals to comply with its obligations under the discovery rules between November, 2005, and the date of this motion;

2.   The entry of an order, pursuant to Rule 37(c)(1)(A), directing that the full cost incurred by Svensson for White's January 2007 Report be borne by Putnam; and,

3.   The entry of an order granting such other and further relief as may be appropriate in the circumstances.

                              LISA SVENSSON, plaintiff,

                              By her attorneys,

                              BARRON & STADFELD, P.C.

                              /s/ Kevin F. Moloney_____
                              Kevin F. Moloney  BBO No. 351000
                              100 Cambridge Street, Suite 1310
                              Boston, Massachusetts 02114
                              Tel: 617.723.9800/531.6569

                              and

                              /s/ John K. Weir_____
                              John K. Weir, admitted PHV
                              JOHN K. WEIR LAW OFFICES, LLC
                              300 Park Avenue, Suite 1700
                              New York, New York 10022
                              Tel.: 212.572.6374

Dated: January 18, 2008

<u>Certificate of Service</u>.

    This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                              /s/ Kevin F. Moloney

Dated: January 18, 2008

[420981.1]

Case 1:04-cv-12711-PBS     Document 211     Filed 01/18/2008     Page 20 of 20