UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LISA SVENSSON,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>PUTNAM INVESTMENTS, LLC and LAWRENCE<br>J. LASSER,<br><br>　　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)　　CIVIL ACTION<br>)　　NO.  04-12711-PBS<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL CONCERNING EXPERT DEPOSITIONS AND MOTIONS FOR SANCTIONS

Defendant, Putnam Investments, LLC, f/k/a Putnam Investments, Inc. ("Putnam"), opposes plaintiff, Lisa Svensson's ("Svensson") Motion to Compel Concerning Expert Deposition and two Motions for Sanctions.

## INTRODUCTION

Faced with Putnam's motion for summary judgment which demonstrates that Svensson's claims are time-barred, preempted and otherwise factually and legally deficient, Svensson filed motions to compel and for sanctions. Svensson asks this Court, without factual or legal predicate and without pointing to any discovery that she requested but has not received, or any Court Order that Putnam has violated, to dispense with the merits and either enter judgment in her favor or make preclusive rulings against Putnam on liability.

Although styled as a motion to compel concerning the deposition of Putnam's expert, Professor David Bloom (which occurred on December 19, 2007), the motion does not allege that Professor Bloom failed to answer any questions asked at his deposition. Nor does it allege that Svensson learned for the first time during Professor Bloom's deposition that he considered data

in forming his opinions that had not previously been disclosed to her. Nor does it allege that she does not have the data Professor Bloom considered. Instead, Svensson predicates her motion almost entirely on events that occurred *prior* to July 2007, thereby ignoring this Court's Order of July 10, 2007 that "there shall be no further discovery (fact or expert) and no motions to compel based on past events."

Svensson states that Professor Bloom considered data concerning investment professionals at Putnam that Svensson had long ago asked for, but that Putnam refused to produce. This simply is incorrect. Svensson neglects to tell this Court that Professor Bloom's report, *produced to Svensson nine months ago in April 2007*, disclosed that Professor Bloom considered the very data about which she now complains. She also neglects to mention that Putnam *produced* all of the data that Professor Bloom considered in November 2007, *before* the date *Svensson* proposed for an exchange of data considered by the parties' experts. Svensson conveniently omits that she did not produce the data that *her* expert considered on the agreed-upon date, but delayed her production until several weeks later.[1] Nowhere in either motion does Svensson explain why she waited nine months after receiving Professor Bloom's report to assert, incorrectly, that he considered data previously requested, but not produced in discovery.

Nor is it any accident that Svensson's motion to compel completely disregards Local Rule 37.1, which requires that, when filing such a motion to compel, a party's papers set forth the particular request at issue, the response refusing production, and the movant's arguments justifying the request. L.R. 37.1(B). The answer is simple: Svensson cannot follow this format because *she never made a discovery request for the data she now seeks to compel*. Instead, Svensson first requested information about a much broader group of employees, a request to

---

[1] Even though she is the plaintiff and Professor Bloom's testimony is in the nature of a rebuttal of her experts' opinions, Svensson confusingly insisted that Professor Bloom be deposed *before* her experts. Defendants accommodated that request.

which Putnam reasonably and seasonably objected.  In response to Putnam's objection, Svensson then insisted that Putnam produce information concerning 91, self-selected alleged comparators.[2]  Putnam produced that information *in the summer of 2006*.  All of this was reported to Magistrate Judge Bowler, on the record, in the summer of 2006.

Finally, Svensson's motion to compel and her companion motion for sanctions contain a litany of accusations about Putnam's conduct in discovery.  As the discussion below reveals, Svensson's accusations simply are a subterfuge.  Tellingly absent from her papers are (a) any claim that she did not yet received information that she specifically demanded in discovery; (b) any claim that Putnam violated any Court order; and (c) any explanation for filing the present motions when they might have been timely.  The reason for the latter failure is obvious: faced with Putnam's motion for summary judgment, Svensson now engages in a last-ditch effort to avoid judgment and keep her case alive by creating yet another discovery dispute.  Her present motions further demonstrate the reasons for, and wisdom underlying, this Court's July 10, 2007, Order that "there shall be no further discovery (fact or expert) and no motions to compel based on past events."

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The gravamen of Svensson's Amended Complaint was that Putnam treated her disparately based on her gender.  She served interrogatories and document requests in August 2005, which sought comparator-data about Putnam's *entire* exempt workforce (thousands of employees) for a *ten year* period.  *See, e.g.,* Svensson's First Set of Interrogatories (No. 3) and

---

[2] Svensson fought to receive information about her self-selected 91 comparators presumably because she thought that that grouping would most likely lead to a demonstration of statistically significant differences between men and women.  Svensson's problem, as can be seen from the summary judgment papers, is that her expert could not find statistically significant gender-based differences when he analyzed her 91 self-selected comparators.  Now, after summary judgment motions have been filed, Svensson wants to begin anew.

- 3 -

Svensson's First Document Requests (No. 2), attached hereto at Exhibit A. The parties were unable to agree upon the appropriate scope of discovery concerning the other Putnam employees. Motions to compel, oppositions, and hearings before the Magistrate Judge ensued. *See* Part I(B)(1), *supra*.

In support of her motion to compel answers to interrogatories, Svensson submitted her Fourth Affidavit. She modified her request for information about the entire exempt workforce and replaced it with 91 individuals whom she alleged were her legal comparators. Docket No. 75. Although disputing that these 91 individuals constituted a proper set of comparators, Putnam agreed in the summer of 2006 to provide data about the 91 for discovery purposes. *See* Part I(B)(1), *infra*. Contrary to Svensson's assertion in her present motion, and as set out below, Putnam has never taken the position that Svensson had "no or virtually no comparators." *See* Parts I(B) and I(C), *infra*. To the contrary, Putnam offered to negotiate a cohort of comparators consistent with First Circuit requirements and produce information about that group. Svensson rejected that offer and insisted that the correct universe was her self-selected 91. By pursuing this legal strategy, she thereby rejected much of the data she now claims she was denied. *See* Part I(B), *infra*.

Discovery was scheduled to conclude two years ago, on February 1, 2006. Joint Scheduling Order, Docket No. 12. At the very end of the twice extended discovery period, Svensson served *seventy-six* new document requests. Following Svensson's unwillingness to heed the Magistrate Judge's warning to focus her pending requests for production because this Court was "not about to allow much more" (Oct. 26, 2006 Hearing Transcript at 49, attached hereto at Exhibit B), the Magistrate Judge granted Putnam's motion for a protective order terminating discovery on January 9, 2007, ruling that "the discovery sought is unduly burdensome and expensive." The Magistrate Judge so ruled after conducting *11* discovery hearings. Svensson objected to the Magistrate Judge's ruling terminating discovery. Docket No.

- 4 -

161.  This Court granted Svensson some limited additional discovery, which Putnam has since produced.  However, on July 10, 2007, this Court also ordered that "there shall be no further discovery (fact or expert) and no motions to compel based on past events."  July 10, 2007 Order (Saris, J.).

Svensson produced her experts' reports on March 13, 2007, *unaccompanied by the data considered by them*.  Putnam produced its expert's report on April 13, 2007 (following suit, Putnam did not produce its expert's data with the report).  Svensson ultimately proposed an exchange of expert data on November 27, 2007.  Putnam agreed and produced the data considered by Professor Bloom on November 26, 2007, a day early.  Svensson, without explanation, delayed production of her expert data for several additional weeks.

In this single plaintiff employment case, Putnam has produced nearly 15,000 pages of paper and electronic documents, and generated spreadsheets detailing the compensation, promotion, transfer, replacement, and termination histories of 91 present and former Putnam employees whom Svensson alleged were her comparators.  Putnam has defended eleven depositions (of individuals) and two Fed. R. Civ. P. 30(b)(6) depositions.  Although accusing Putnam of "vexatious" litigation, Svensson fails to note that Putnam has deposed only Svensson and her two experts.

## I.     PUTNAM HAS PRODUCED ALL OF THE DATA CONSIDERED BY ITS EXPERT IN FORMING HIS OPINIONS, SOME OF WHICH SVENSSON DID NOT SEEK IN DISCOVERY.

In Svensson's motion to compel (and her companion motion for sanctions), Svensson seeks a finding of liability or preclusive rulings against Putnam without pointing to any discovery that was asked for but not provided, or even a single Order that Putnam has allegedly violated.  Instead, without complying with Local Rule 37.1, Svensson asserts that Putnam failed to furnish data considered by Professor Bloom; that she received the data considered by Professor Bloom late; and that she was entitled to this data earlier in the discovery process.  The

uncontroverted truth is that <u>all</u> data considered by Professor Bloom was produced to Svensson; it was produced *before* Professor Bloom's deposition; and it was produced before the date *suggested by Svensson* for an exchange of expert data. The parties agreed and reported to the Court *in July 2006* that the scope of comparator discovery would be confined to documents and information concerning Svensson's 91 self-selected comparators, and Putnam produced the requested information *that same summer*, even as it continued to argue to this Court and Svensson that Svensson's self-selected 91 were not a legally appropriate set of comparators (giving examples of arguably more appropriate comparators), and reserved its rights to challenge the legitimacy of the 91. Svensson steadfastly demanded data concerning the 91.

### A. Putnam Has Produced All Data Considered by Professor Bloom

In her motion to compel, Svensson identifies excerpts of Professor Bloom's deposition testimony to highlight the documents and information considered by Professor Bloom. Memorandum in Support of Motion to Compel ("Memo.") at 10-12. She argues that "[a]ny documents considered by the expert must be produced, even if the expert does not rely upon them." Memo. at 16.[3] Putnam is at a loss. Despite making this claim, Svensson *fails* to identify *any* data considered by Professor Bloom that has not been produced. The answer is simple: *she cannot do so*. All data and information considered by Professor Bloom was listed in Exhibit 4 of his *April 2007* report (annexed to Exhibit C), and subsequently produced to Svensson. *See* Deposition of David Bloom ("Bloom Dep.") at 27,[4] and email from Putnam to Svensson,

---

[3] The cases Svensson cites in her motion to compel (and for sanctions), *Suskind v. Home Depot*, 2001 WL 92183 (D. Mass. Jan. 2, 2001); *Eliasen v. Hamilton*, 111 F.R.D. 396, 400 n. 5 (N.D. Ill., 1986) (unpublished); *Fidelity National v. Intercounty National*, 412 F.3d 745 (7th Cir. 2005); *Ortiz-Lopez v. Sociedad Espanola*, 248 F.3d 29, 34-36 (1st Cir. 2001); and *Lugosch v. Congel*, 219 F.R.D. 220, 249 (N.D.N.Y. 2003), each stand for the proposition that a party is required to provide all of the data considered (compared to "relied upon") by its expert. Putnam has done so.

[4] Mr. Weir: "Does Exhibit 4 represent a complete list of the documents you have been provided with or are there updates?"

(Footnote Continued on Next Page.)

- 6 -

attaching "the data that Bloom considered in forming his opinions," dated November 26, 2007, attached hereto at Exhibits C and D respectively.[5]

**B.    Svensson Insisted Upon Production of Data Concerning 91 Alleged Comparators, and Putnam Produced the Requested Data in 2006.**

Although Putnam produced all of the data considered by Professor Bloom, Svensson next argues that she requested – yet did not receive – this data in discovery.  This position is puzzling.  *In the summer of 2006,* Svensson insisted upon defining (and so represented in open court) the scope of comparator discovery as her self-selected 91 individuals.  At no time between the summer of 2006 and January 2008, when she filed these present motions, did Svensson attempt to expand this universe.  Just the opposite, Svensson made clear to this Court, repeatedly, that the 91 individuals she selected defined the scope of her comparator discovery.  For example, this Court's April 2007 omnibus discovery ruling stated:

> Plaintiff contends that there are 91 comparators, a number which defendants did not dispute for discovery purposes only.  Plaintiff has winnowed down the number of comparators for the different employment actions, and has filed multiple memoranda withdrawing or modifying many categories of document requests.

April 10, 2007 Order (Saris, J.).  Svensson's positions on comparator discovery reveal the

---

(Footnote Continued from Previous Page.)

Professor Bloom:  "I believe Exhibit 4 is a complete list of all of the documents that I reviewed in connection with my report."  Bloom Dep. at 27, attached hereto at Exhibit C.

[5]  The only data or information in Svensson's motion that she argues Professor Bloom considered but which she claims was not produced ("partnership pool" data), results from a confusion caused by a compound question asked by Mr. Weir: "Did you undertake any discussion with Putnam or review of the partnership pool at the company?"  Professor Bloom responded that "[s]ome of it I think I may have picked up in documents and it probably was something I discussed with Mr. Tibbetts or Ms. McNamee."  Bloom Dep. 121-122, attached hereto at Exhibit C.  What Mr. Weir left undeveloped in his questioning was what documents, if any, Professor Bloom reviewed that may have contained information concerning the partnership pool and whether Svensson had those documents.  In any event, as Professor Bloom's testimony quoted in footnote 4 indicates, Professor Bloom's report identified *all* documents that Professor Bloom reviewed in connection with his report, and all such documents have been produced to Svensson. There are no documents to produce from Professor Bloom's discussions with Tibbetts or McNamee. *See* Exhibit C, Bloom Dep. at 27.

- 7 -

bankruptcy of her present motion.

> **1.    The Parties Agreed That the Scope of Discovery Would Be Limited to the 91 Comparators Insisted Upon By Svensson.**

In October 2005, Svensson served her first set of interrogatories which sought information about Putnam's *entire* exempt workforce from 1994 to date.  *See, e.g.,* Interrogatory No. 3 and Document Request No. 2, attached hereto at Exhibit A.  Putnam objected because the overwhelming majority of these (thousands of) employees were not, and could never be, Svensson's legal comparators.  Not surprisingly, there then followed negotiations concerning the scope of comparator discovery.  *As early as December 2005*, as part of those negotiations, Putnam suggested cohorts of former and current Putnam employees who arguably fell within the First Circuit's comparator rubric, at least for purposes of discovery.[6]    Svensson rejected

---

[6]  *See, e.g.,* Footnote 2 to Putnam's Response to Svensson's Objection to the Order Terminating Discovery, dated February 6, 2007 (Docket No. 165), which stated:

> Despite Ms. Svensson's assertions to the contrary, Putnam has never taken the "startling" position that Ms. Svensson has no comparators.  Putnam has made numerous offers to provide comparator information -- offers which Ms. Svensson has rejected.  For example, in its opposition to Ms. Svensson's first motion to compel documents, Putnam wrote: "Putnam has been, and remains willing to produce documents concerning *relevant comparators, including the other Portfolio Managers in Global Growth from 2000 and 2001, and the Analysts in GER in 2002.*  These are the departments of which Svensson was a member during the years in question." (emphasis added.)  At the hearing on this issue, Putnam told the Court, "We have offered to produce the information with respect to terminations, denials of promotions, etc with respect to the global growth group which is where she was in 2002 when she moved from global growth in to GER, and then we offered to produce information with respect to the people in GER which is where she was when she was terminated.  We did that in reliance on the Court's decisions in other cases that typically you don't look outside of the group in which the employee is employed; that is, you look at the decision by the same decision maker."

*See also,* December 13, 2005 Hearing Transcript at 6-7, attached hereto at Exhibit E. What makes Svensson's motion all the more ironic is that she argues that "Putnam in support of its motion for summary judgment, also utilizes data not supplied to Svensson as evidence," referring to spreadsheets concerning "Compensation data for the International Growth group" and "GER Compensation data." Memo. at 14.  The reason Svensson did not receive this information in discovery is simple: she insisted that her 91 were the proper comparators.

- 8 -

Putnam's approach.  In response, she insisted on data about 91 "identified males" and "identified females" who she claimed were her comparators.[7]  Putnam again emphasized its belief that these 91 were not Svensson's appropriate comparators.[8]  Putnam has never asserted (let alone "arrogantly" or "rigidly," Memo. at 7), that Svensson has "no" or "virtually no comparators."[9] Her arguments in the present motions to this effect are misleading.

On July 11, 2006, at one of 11 discovery hearings before the Magistrate Judge, Mr. Moloney clearly set forth Svensson's position concerning comparator discovery:

> We have set forth in the exhibits to the fourth affidavit the names of the *67 males and the 24 females which we say are comparators* of Ms. Svensson and we have apportioned them into smaller groups based upon the four key employment acts in said issue, failed to pay equally, failed to promote to managing director, demotion and then termination. … *We have picked objectively measured and objectively understood criteria for purposes of establishing that there are people in that division with whom she should be compared in this case….*"

---

[7]  *See* July 27, 2006 email from Svensson's counsel to Putnam's counsel, attached hereto at Exhibit F: "In furtherance of our recent and lengthy negotiating sessions, which focused mainly on the interrogatories, we are willing to discuss further with you to reach agreement on limiting the interrogatories in the ways we discussed. . . we are ready to discuss with you coming to agreement on the other issues that we discussed concerning the interrogatories; provided, however, that Putnam, without prejudice to its positions on the comparator issues, agrees for purposes of the interrogatories, *to respond to [the interrogatories] utilizing the 67 males and 24 females identified by Svensson as comparators*." (emphasis added).

[8]  Mr. Kociubes:  "*And so what she has done is she has cherry picked 91 names*, including twenty some females, and it's not obvious to me how they're comparators for purposes of a gender claim… *the way she comes up with her comparators ha[s] nothing to do with who is in the same unit or who is in the same department….*"  June 21, 2006 Hearing Transcript at 9 (emphasis added), attached hereto at Exhibit G.

[9]  Mr. Kociubes:  "So the issue, Your Honor, is not whether she should get comparators.  *We've never said that there are no comparators* other than with one claim, the termination claim, because she was terminated for a reason for which nobody else best we can tell has ever been terminated and we can talk about that, *but we've never said with respect to the other claims that they're no comparators*.  *What we have said is that she has never asked for them and we've taken that position since day one, and all she had to do was read the cases and ask by categories and she gets a response.  She's not interested in doing that.*  June 21, 2006 Hearing Transcript at 10 (emphasis added), attached hereto at Exhibit G.  *See also* footnote 10, *supra*.

June 21, 2006 Hearing Transcript at 5-6, 14 (emphasis added), attached hereto at Exhibit G.

Solely for purposes of moving forward with discovery, Putnam agreed to provide data

concerning the 91 individuals to Svensson:

> [W]e have been arguing since day one that this universe, it was 16,
> then 34, now 91 individuals are not within the guidelines of the
> First Circuit, the appropriate universe of comparators. *For
> purposes of trying to get beyond this dispute, Your Honor, or
> moving out as much of it as we can, we have agreed that we will
> answer the interrogatories with respect to the 91 which plaintiffs
> have chosen without in any way agreeing that that is the
> appropriate universe of comparators.*

July 11, 2006 Hearing Transcript at 5, Mr. Kociubes (emphasis added), attached hereto at Exhibit

H.  That Svensson understood that it was Putnam's intention to challenge her comparator analysis

is evident from Mr. Moloney's statements to Magistrate Bowler at the October 26, 2006,

discovery hearing:

> So we see no reason why [Putnam] should not continue
> maintaining obviously their right to contest at summary judgment
> stage or at trial that none of these folks are Comparators. But at
> least for discovery purposes we say that [the unredacting] should
> continue.

Oct. 26, 2006 Transcript, at 5.  In short, Putnam agreed to answer the interrogatories and parallel

document requests about the 91[10] which plaintiff insisted upon, even while emphasizing that

Putnam did not agree the 91 were legally appropriate comparators.  *Id*.  Putnam produced the

data sought by Svensson concerning these 91 individuals in the summer of 2006.  At no time

thereafter did the Putnam agree to produce, nor did Svensson request, data for employees other

than the 91.  As noted above, this history was recognized by this Court in its April 2007 omnibus

discovery ruling:

---

[10] Svensson's Second Request for the Production of Documents (served on April 28, 2006)
mirrored her interest in only the 91, asking for information about the 91 "identified females" and
"identified males."  *See, e.g.,*  Request Nos. 55-60, at Exhibit A.

A/72392722.12/0398860-0000312913

> Plaintiff contends that there are 91 comparators, a number which defendants did not dispute for discovery purposes only. Plaintiff has winnowed down the number of comparators for the different employment actions, and has filed multiple memoranda withdrawing or modifying many categories of document requests.

April 10, 2007 Order (Saris, J.).

**2.  Svensson's Expert Knew by the Summer of 2006 that Her Cohort of 91 "Comparators" Was Meaningless, Yet Svensson Continued to Insist Upon Production of Information Concerning the 91.**

In "the spring or late spring or summer of 2006," Svensson's own expert communicated to her what he needed as data to perform a meaningful statistical analysis.[11]  Deposition of Paul White ("White Dep.") at 65-66, attached hereto at Exhibit I.  Svensson knew that her own expert believed a meaningful analysis could not be performed on the self-selected 91.  She nevertheless

---

[11]  Mr. Kociubes: did there come a time when you told plaintiffs there were certain data or information that you wanted?

Dr. White:  Yes.

\*\*\*

Mr. Kociubes:  What data did you request?  What kinds of data?

Dr. White:  Ideally for these types of cases I would prefer to have a full work history of employees so that I knew a separate line of data for each event that happened to them so the first line would be when they were first hired by Putnam and another line that would include a raise or a change in job or a performance evaluation so that I know a full work history of where they started, what has happened to them, change in pay rates, etc. up until the present.  From that we can do, depending upon the fields that were in that data, we can do a lot of the analysis that would be needed for this type of case.

\*\*\*

Mr. Kociubes:  When you say you wanted full work history of the employees, which employees are you -- I'm talking about generic description.  Which employees are you talking about?

Dr. White:  *Ideally I wanted it for the entire Investment Division.*

White Dep. at 17-20 (emphasis added), attached hereto at Exhibit I.

\*\*\*

Mr. Kociubes:  Before I ask you any question about Appendix B, when did you ask for the data regarding the entire Investment Management Division?

Dr. White:  I expressed my desire to have that kind of data from one of our first meetings.

Mr. Kociubes:  Which means *somewhere in the spring or late spring or summer of 2006*?

Dr. White:  Yes.

Id. at 65-66 (emphasis added).

- 11 -

insisted on defining her comparators as the 91 and argued on court in July 2006 and thereafter that what she wanted was information about the 91 (presumably because she thought that an analysis of the 91 would give her the best chance of demonstrating statistically significant differences between men and women). However, as discussed in Putnam's motion for summary judgment, her expert could not find statistically significant differences to support her claims. Confronting summary judgment, Svensson now moves to compel:

- 18 or more months after disregarding her own expert's advice as to the cohort he wanted;
- 18 months after reporting to the Magistrate Judge that she had identified 91 comparators "with whom she should be compared in this case" (Exhibit G at 14) and that she and Putnam had agreed to limit production to the 91;
- 9 months after disclosure of Putnam's expert report; and,
- 5 months after this Court ordered that there be no further motions to compel with respect to matters which predated that Order.

Unable to explain her belated reversal of field concerning the scope of comparator discovery, Svensson deliberately misleads the Court concerning what Professor Bloom has done in his expert report. In his report, Professor Bloom (a) reviewed Svensson's 91 alleged comparators to determine, as a matter of labor economics, whether they are proper comparators; (b) analyzed statistical data produced to Svensson in the summer of 2006 about the 91 and concluded (*as did Svensson's expert*) that there was no statistically significant evidence of sex discrimination involving the 91; and, (c) analyzed a larger sample of the Investment Management Division (never requested in discovery, but in any event produced to Svensson in the exchange of expert data) to determine whether, if the cohort of 91 was expanded to all persons holding the same job titles as Svensson, statistical evidence of sex-animus existed (there was not).[12] There can be no conclusion but that Svensson, facing summary judgment, now wants

---

[12] What is perhaps most disingenuous about Svensson's motion is the relief she seeks. Her second request for relief asks this Court to determine that had "evidence with respect to all the officer-level investment professionals in the Investment Management Division at Putnam for the years 1999-

(Footnote Continued on Next Page.)

to recommence discovery and get a second chance to generate a helpful expert report.

###      3.      Putnam's Production of All Data Considered by Professor Bloom Was Timely; Svensson's Production Was Not.

Desperate to manufacture wrongdoing by Putnam, Svensson argues, finally, that even though she received Professor Bloom's data and received it *before* Professor Bloom's deposition, she received it "late."  Svensson conveniently omits that (a) she failed to produce *her* experts' data with their reports, and failed to produce the data on the date mutually agreed to by the parties; (b) Professor Bloom listed all the data that he considered in his April 2007 report; and (c) that Putnam unilaterally produced this data prior to the date *suggested by Svensson for a simultaneous exchange of data.  See* Exhibit D.[13]  Svensson neither moved to compel production of this data at any hearing after receiving the report in April 2007, whether before the Magistrate Judge or this Court, nor even raised the issue with this Court.  Ironically (and despite the fact it is Svensson's burden to establish sex animus), *Dr. White's data was not produced by the agreed upon date of November 27, 2007.*  Despite multiple requests,[14] Putnam did not receive the data considered by Dr. White until weeks later, well after Putnam had produced Professor Bloom's

_____

(Footnote Continued from Previous Page.)

2004 [ ] been produced by Putnam in discovery, [it would] have shown that Putnam discriminated on the basis of gender." Memo. at 18.  The simple facts are that Svensson never demanded production of this dataset, and Professor Bloom never considered data concerning all "officer-level investment professionals in the Investment Management Division at Putnam for the years 1999-2004."  Id.

[13] On November 20, 2007, Mr. Moloney wrote to Putnam's counsel that he was "expecting to get from Paul White by about next Tuesday [November 27] a CD with the documents that he relied upon, *which we are prepared to exchange for a similar production from Bloom at the same time*." (emphasis added), attached hereto at Exhibit J.

[14] On December 7, 2007, Mr. Kociubes wrote to Svensson's counsel: "[W]e agreed to provide you with the data Professor Bloom considered (which you have had for a couple of weeks now) in machine readable form if you agreed to provide us with your experts' data (which we have not yet received) in the same form ... [we] call upon you to produce your experts' data immediately."  Email attached hereto at Exhibit K at ¶ 3.  By email dated December 7, 2007, Mr. Weir responded, "I understand that Paul White will provide the plaintiff's "expert materials" to Plaintiff's counsel on Monday [December 10], and assuming that occurs, we will provide them to you on Tuesday morning [December 11]." Email attached hereto at Exhibit L, ¶ 3.

A/72392722.12/0398860-0000312913

data to Svensson.

## II. SVENSSON'S MISCELLANEOUS CLAIMS ALLEGING PUTNAM ENGAGED IN "VEXATOUS LITIGATION" ARE BOTH MERITLESS AND A TRANSPARENT ATTEMPT TO AVOID JUDGMENT

Svensson accuses Putnam of "deliberate efforts to thwart Svensson's reasonable discovery requests and its failure and refusal to have complied with its discovery obligations." Memo. at 18. Oblivious to the documented factual history, Svensson continues that "it was Putnam and its counsel who decided what data would be produced to Svensson," and that the "information for all the officers in the IMD" was "the very information that Putnam had withheld from Svensson." *Id.* These statements are not only misleading, but demonstrably false. As discussed in Part I(B) *supra*, *Svensson*, not Putnam, carefully selected the 91 individuals "*with whom she should be compared in this case* (Exhibit G at 14)," in Mr. Moloney's words, knowing full well that Putnam believed other individuals were proper comparators. Svensson's remaining contentions are equally meritless.

### A. Per the Parties' Agreement, Putnam Redacted Personnel Information Concerning Employees Other than the 91.

Svensson argues that Putnam "hampered Svensson in taking depositions" by "producing heavily redacted documents." Memo. at 5. First, Svensson obviously was aware of the redactions before and during the depositions, most of which occurred many months ago. For example, Svensson cites to testimony from the deposition of Putnam's former CEO, Lawrence Lasser, who, when shown a redacted page, could not testify as to what had been redacted. Memo. at 5. Svensson fails to tell this Court that she chose to depose Lasser in *May 2006 – before* the parties negotiated their agreement to produce documents responsive to Svensson's requests for the 91 (which resulted in many documents being unredacted).[15] Indeed, the whole

---

[15] Nor did Svensson ask the Court for relief or seek to re-depose Lasser based on redacted documents.

- 14 -

issue of redacted documents was addressed with Magistrate Judge Bowler in the summer of 2006. Svensson fails to advise this Court that at the July 11, 2006 hearing concerning redacted documents (among other issues), *Svensson* reported to the Magistrate Judge "that we've reached agreement on the 91, we're only asking for the Court to [un]redact the documents with respect to those 91. *Those are for at least discovery purposes the comparators.*" (emphasis added). Transcript at 19, attached hereto at Exhibit H. Worse still, Svensson ignores *her representation to the Magistrate Judge* on October 26, 2006, that "Putnam on September 1 answered modified interrogatories in regard to the 91 folks we said were, contend are Comparators and the unredacted, the previously redacted documents in connection with those 91." Transcript at 5, attached hereto at Exhibit B.

Given the record which repeatedly demonstrates Svensson's insistence upon information concerning her 91 and her insistence on focusing her "comparator" discovery on the 91 in order to obtain that information, Svensson's audacity in asserting that, by partially redacting certain documents, Putnam prevented "Svensson from obtaining any information about any other investment professionals at Putnam" is breathtaking. Memo. at 5. Svensson is the one engaged in vexatious litigation.

### B. Putnam Has Complied With Its Obligation to Supplement Its Initial Disclosures, Answers to Interrogatories, and Document Productions.

Svensson argues that Putnam was obligated to make initial disclosures that provided her with "a copy or a description by category and location, of all documents ... and tangible things that [Putnam] has in its possession, custody, or control and may use to support its claims or defenses," (Fed. R. Civ. P. 26(a)(2)) and to "supplement or correct" its initial disclosures, answers to interrogatories and production of documents." Fed. R. Civ. P. 26(e)(1)(A); Memo. at 15. This is exactly what Putnam has done, producing some 15,000 pages of documents, eleven witnesses for deposition (in their individual capacity), and two Fed. R. Civ. P. 30(b)(6) deponents (for fourteen hours of examination). Svensson elides over the remainder of Rule

- 15 -

26(e)(1)(A), which makes explicit that supplementation is required *only* "if the additional or corrective information has not been made known to the other parties during the discovery process or in writing."  As noted in the 1993 Advisory Committee Notes to Rule 26(e):

> The obligation to supplement disclosures and discovery responses applies whenever a party learns that its prior disclosures or responses are in some material respect incomplete or incorrect. *There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process.*

(emphasis added).  Tellingly, Svensson never articulates what she believes Putnam failed to produce or supplement.  Nor could she, for Putnam has fully complied with its obligation to supplement and correct its initial disclosures, answers to interrogatories, and production of documents.

## III.    GIVEN THE ABSENCE OF ANY WRONGDOING BY PUTNAM, SVENSSON'S MOTION FOR SANCTIONS IS NOTHING BUT A TRANSPARENT, LAST DITCH EFFORT TO AVOID SUMMARY JUDGMENT

As discussed above, there is simply no evidence that Putnam has engaged in any wrongdoing.  It is no coincidence, therefore, that Svensson filed her motions to compel and for sanctions on the heels of Putnam's summary judgment motion (which exposed the weaknesses in Svensson's stale and meritless claims).  Under this banner, Svensson asks this Court to invoke the following sanctions, among others: (i) strike Putnam's Answer and deny its motion for summary judgment; (ii) make a finding that the Investment Division evidence shows Putnam discriminated on the basis of gender, and thus, that Putnam discriminated against Svensson; and (iii) stay the proceedings, and require Putnam to fully unredact documents (which were unredacted in 2006 as to Svensson's 91 comparators by agreement with Svensson); produce data Professor Bloom considered and grant Svensson a third Rule 30(b)(6) deposition; allow Svensson's expert to prepare a supplemental report; strike the Bloom report; and impose costs and fees.  Memo. at 18-19.  Svensson's motivation is transparent, for her requests for relief

- 16 -

ignore the procedural and factual history of the case, and do not touch upon anything she learned at Professor Bloom's deposition. Rather, they ask this Court to ignore the (lack of) merits of her case and simply enter judgment in her favor. Svensson asks for sanctions under Federal Rules 37(c), for failure to supplement discovery, as well as under 28 U.S.C. §1927 for "unreasonably and vexatiously" multiplying the proceedings. The case law demonstrates that Svensson's motion for sanctions is factually inappropriate and legally unwarranted.

### A.    There Is No Basis for Any Rule 37 Sanctions.

Svensson does not and can not claim that Putnam has failed to comply with any court order (unlike Svensson, whose very motions disregard this Court's July 2007 Order that there shall be "no motions to compel based on past events"). Nor does Svensson predicate her motion upon an unanswered question at a deposition, an unanswered interrogatory, or an unanswered document request, as evidenced by the fact that nowhere does she actually quote any one of the above as a basis for her motion. Putnam has fully complied with production of information and documents in accordance with the parties' agreements (i.e. the 91 comparators) and the discovery rulings of this Court and Magistrate Judge. *See* Part I(B), *supra.* Putnam has produced all "data or other information considered by" Professor Bloom. *See* Part I(A)*, supra.* Fed. Rule 26(a)(B)(ii). Breathtakingly, on this record, Svensson seeks what amounts to judgment on liability. Svensson cites no case with facts even remotely parallel to these in which the sanctions she seeks have been imposed. In fact, the only cases cited by Svensson in support of her request for Rule 37 sanctions stand only for the proposition that all data considered by an expert must be produced. Memo. at 16-18; *see also* footnote 3, *supra.* Putnam has produced all such data. *See* Part I(A), *supra.* Svensson's request for Rule 37 sanctions should be denied.[16]

---

[16]    Plaintiff attempts to seek the majority of her relief under Rule 37(b) (entitled "For Not Obeying a Discovery Order"). Memo. at 18. Such drastic relief includes "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action," "prohibiting the disobedient party from … introducing designated matters in evidence," "striking

(Footnote Continued on Next Page.)

**B.    There Is No Basis for Any §1927 Sanctions.**

Sanctions are only appropriate under 28 U.S.C. § 1927 where "counsel's conduct has multiplied the proceedings and, in doing so, has been unreasonable and vexatious, in the sense of being harassing or annoying." *E.E.O.C. v. Tandem Computers Inc.*, 158 F.R.D. 224, 228 (D.Mass. 1994). In *Tandem Computers,* an analogous age discrimination case, defendant moved for summary judgment alleging that plaintiff's claims were time-barred. The court denied the motion, and the case proceeded to trial. Defendants twice more moved for judgment as a matter of law. The court denied the motion both times. Following the jury's verdict, defendants sought 28 U.S.C. § 1927 sanctions, alleging again that the claims were time-barred claims. The court denied defendant's motion for sanctions, *and* imposed Rule 11 sanctions against the defendants for bringing the § 1927 motion:

> In filing its motion, Tandem has presented absolutely nothing new; the issues had been repeatedly briefed, argued and decided in favor of the EEOC. The Court finds that the filing of the defendant's motion and request for attorney's fees, expenses and costs violated Rule 11(b)(1) in that it was presented either to harass or to cause needless increase in the cost of litigation or both.

*Id.* at 229. If anything, it is Svensson's motions, flying in the face of this Court's July 10 prohibition, that are vexatious in that they seek, in large measure, to revisit old adjudicated and resolved disputes. *See Petroleum Ins. Agency, Inc. v. Hartford Acc. & Indem. Co.* 106 F.R.D. 59, 68 (D.Mass. 1985) (refusing to award sanctions under 28 U.S.C. § 1927 because "[t]he statute requires a clear showing of bad faith ... or a showing of action 'lacking justification and *intended* to harass.'") (emphasis in original) (citations omitted); *An-Port, Inc. v. MBR Industries,*

---

(Footnote Continued from Previous Page.)

pleadings in whole or in part," or "staying further proceedings until the order is obeyed." Rule 37(b)(i)-(iv); Memo at 18. *Putnam has violated no order*, and therefore the relief requested is improper. *See Big Top USA, Inc. v. The Wittern Group,* 183 F.R.D. 331, 338 (D. Mass. 1998) ("a court order must be in effect, and then must be violated, before the enumerated sanctions can be imposed.") (citations and quotations omitted).

- 18 -

*Inc.*, 142 F.R.D. 47, 49 (D.P.R. 1992) (denying attorney's fees, noting that "the test for whether conduct is 'vexatious' under Section 1927 is whether it is objectively 'harassing or annoying' so that it reflects a 'serious and studied disregard for the orderly process of justice.'") (citations omitted). Svensson's motions are an additional "needless increase in the cost of litigation." *Tandem,* 158 F.R.D. at 227.

Svensson relies upon cases that do not support her motion seeking sanctions. See Memorandum of Svensson in Support of Sanction Under 28 U.S.C. §1927. None are analogous, as discussed in detail above, because (i) Svensson received the data considered by Putnam's expert, not only well in advance of trial, but before his deposition; (ii) Putnam has complied with all court orders; and (iii) the scope of discovery was defined and demanded by Svensson and so reported to the Court. *Compare Cruz v. Savage,* 896 F.2d 626 (1st Cir. 1990) (affirming sanctions after the *completion* of a trial, finding "the majority of plaintiffs' claims [were] frivolous, that is, either not well-grounded in fact or unwarranted by existing law") (emphasis added); *In re Lincoln North Assocs. Ltd. P'ship,* 163 F.R. 403 (Brktcy D. Mass. 1993) (sanctions due to disregard of "both the *orders of this Court* and *agreements made with the Debtor's counsel* concerning discovery") (emphasis added); *Fusco v. Medeiros,* 965 F.Supp.230 (D.R.I. 1996) (sanctions where plaintiffs "inflation of the claims in this matter was willful and continued; that it was the first note in a symphony of evasions, discovery abuses, and insults to this Court; and that the entire complaint was infected by her unsupportable claims."); *Perkins v. General Motors Corp.*, 965 F.2d 597 (8th Cir. 1992) (counsel sanctioned for "persistently pursuing unsupported factual allegations," signing "under oath attacks" for which there was "no factual basis to support," making a false statement in a motion to amend the complaint, failing to disclose a witness name until calling him at trial, and "filing a motion to recuse the judge three months after the judge decided the case and released his oral ruling to the parties, but before written findings were issued."); *Fulford v. Consolidated Rail Corp.,* 815 F.2d 703 (6th Cir. 1987)

- 19 -

(unpublished) (sanctions imposed after finding of "willful concealment or delay" due to intentional withholding of *documents not produced until after plaintiff had rested his case*) (emphasis added).

Putnam simply never engaged in any such conduct. Svensson's motions should be denied.

<u>**CONCLUSION**</u>

For the reasons stated above, Putnam respectfully requests that this Court deny the Plaintiff's motions to compel and for sanctions, and grant Putnam such other relief as is just.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

/s/ Joseph L. Kociubes
Joseph L. Kociubes, BBO #276360
joe.kociubes@bingham.com
Louis A. Rodriques, BBO #424720
louis.rodriques@bingham.com
Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com
Jennifer L. Holden, BBO # #663467
jennifer.holden@bingham.com
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: February 1, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 1, 2008.

/s/ Jennifer L. Holden
jennifer.holden@bingham.com

- 20 -

# EXHIBIT A

interrogatory as for the party served, it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries. A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

### *Definitions*

The words "Putnam" or "Defendant Corporation" include parents, subsidiaries, and corporate affiliates of Putnam Investments, LLC, f/k/a Putnam Investments, Inc., both before and after that particular relationship was established.

The word "document" refers to, and includes, but is not limited to, writings, drawings, graphs, charts, records, and every other type of data compilation, including all forms of computer storage and retrieval.

The words "during the relevant time period" shall mean the period of time from January 1, 1994 to the present.

## INTERROGATORIES

### INTERROGATORY NO. 1

Please state fully and completely each and every basis, reason, criteria, or factor which the Defendant Corporation alleges or contends was relied upon by Putnam for terminating the Plaintiff's employment, including the names, job title and gender of all persons who determined each basis, reason, criteria, or factor for her termination.

### INTERROGATORY NO. 2

Please state the Defendant Corporation's estimate of value of each element of the Plaintiff's compensation at the time of discharge, including salary, bonus, stock, stock options, life insurance, health insurance, and pension plan, and state the basis by which Defendant Corporation arrived at the value.

### INTERROGATORY NO. 3

With respect to Putnam's entire exempt employment force, please state:

a.    The name of each job category and subcategory from January 1, 1994 to date;

b.    The duties performed and responsibilities fulfilled by employees in each job category and subcategory,

c.     The names and number of female employees within each job category and subcategory each year from January 1, 1994 to date.

d.     The names and number of female employees with children within each job category and subcategory each year from January 1, 1994 to date.

## INTERROGATORY NO.4

For each employee identified in answer to Interrogatory No.3, who was terminated during the period from January 1, 1994 to the present, state:

a.     The name and gender of the employee;
b.     The job category or subcategory in which the employee worked;
c.     The nature of the termination, e.g. as layoff, voluntary quit, discharge for cause, discharge without case, etc.
d.     A statement of any transfer offered to the employee prior to his/her termination as an alternative to termination.
e.     The age and marital status of each such employee at the time of termination;
f.     The years of service of the employee at the time of termination;
g.     The years of service of all other employees remaining in the terminated employee's place of business or other working areas at the time of termination (stated in such a manner as can be correlated with the answers to subparagraph f),
h.     The name and gender of the replacement, if any, or person assuming the job duties for each such terminated employee;
i.     The years of service of the replacement for each terminated employee;
j.     A statement of each and every reduction in pay, or downgrading in job position, experienced by the terminated employee within five years prior to the date of his or her termination.

## INTERROGATORY NO.5

For each employee identified in answer to Interrogatory No. 3, who was denied promotion demoted or had other adverse employment action taken against them, state:

a.     The name and gender of the employee;
b.     The job category or subcategory in which the employee worked;
c.     The nature of the adverse employment action taken;
d.     The age and marital status of each such employee;
e.     The year of service of the employee at the time of the adverse employment action;
f.     A statement of each and every reduction in pay, or downgrading in job position experienced by the employee against whom the adverse employment action was taken.

## INTERROGATORY NO.6

Please state whether the Defendant has ever received a complaint of a) sexual harassment or b) discrimination based on gender, or marital status. If yes, please state:

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

```
**************************************
LISA SVENSSON,                       *
                   Plaintiff,        *
                                     *
                                     *
                                     *        CIVIL ACTION NO. 04-12711PBS
                                     *
v.                                   *
                                     *
                                     *
PUTNAM INVESTMENTS LLC, f/k/a        *
PUTNAM INVESTMENTS, INC. and         *
LAWRENCE 1. LASSER                   *
                   Defendants        *
                                     *
                                     *
**************************************
```

PLAINTIFF, LISA SVENSSON'S FIRST REQUEST FOR PRODUCTION OF
DOCUMENTS TO THE DEFENDANT, PUTNAM INVESTMENTS LLC, f/k/a
PUTNAM INVESTMENTS, INC.

Pursuant to Fed.R.Civ.Proc.26 and 34, Plaintiff Lisa Svensson, ("Svensson"),
requests Defendant Putnam Investments, LLC, f/k/a Putnam Investments, Inc.
("Putnam") respond to the following request for production of documents within the time
prescribed by the rules.

Definitions and Instructions

1.1 In responding to this discovery request, you are required to comply with the
applicable provisions of Fed.R.Civ.P. 26-37 which, in pertinent part, are as follows:

1.1.1. Fed.R.Civ.P. 26; General Provisions Governing Discovery: Duty of
Disclosure;...(b) Discovery Scope and Limits. Unless otherwise limited by order of the
court in accordance with these rules, the scope of discovery is as follows:

1

The part submitting the request may move for an order under Rule 37(a) with respect to any objection or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested.

A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

## Definitions

The word "Putnam" includes parents, subsidiaries, and corporate affiliates, of Putnam Investments, LLC, f/k/a Putnam Investments, Inc. both before and after that particular relationship was established.

The word "document" refers to, and includes, but is not limited to, writings, drawings, graphs, charts, records, and every other type of data compilation, including all forms of computer storage and retrieval.

The words "during the relevant time period" shall mean the period of time from January 1, 1994 to the present.

REQUEST NO.1

Plaintiff s complete employment file or files.

REQUEST NO.2

All documents and records concerning Putnam's terminations, denials of promotion, and demotions of Putnam employees from January 1, 1994 to the present including names, addresses, job titles, job descriptions, seniority and gender of the persons affected by each such adverse employment decision.

REQUEST NO.3

All documents and records reflecting all information relevant in any way to Putnam's decision to terminate Plaintiff's employment.

REQUEST NO.4

All policies and guidelines for the prevention of gender discrimination, sexual harassment or denial of equal pay to females in the Putnam workplace.

3

REQUEST NO. 20

Any and all documents prepared by, signed by, sent to Plaintiff by, given to Plaintiff by, or received from any employee or former employee of Putnam concerning Plaintiff's job duties or job performance while in Putnam's employ.

REQUEST NO. 21

Any and all documents which relate to any complaints or criticisms of Plaintiff at anytime during Plaintiff's employment with Putnam.

REQUEST NO. 22

Any and all documents that relate to any communications between Putnam and present or former employees or agents of Putnam which relate to Plaintiff during the period of her employment with Putnam.

Respectfully submitted,
The Plaintiff,
By her attorneys,

John K. Weir, Esq.
John K. Weir Law Offices LLC
300 Park Avenue
New York, NY 10022
212.572.6374

Denise L. Page, Esq.
BBO No. 119415
Nancie L. Edgren, Esq.
BBO No. 648665
BARRON & STADFELD, P.C.
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
617.723.9800

Dated: August 9, 2005
[330749]

UNITED STATED DISTRICT COURT
District of Massachusetts

```
* * * * * * * * * * * * * * * *        Civil Action No. 04-12711-PBS
                               *
                               *
LISA SVENSSON,                 *        BBO No. 351000
                               *
            Plaintiff,         *
                               *        Plaintiff Svensson's
                               *        Second Request for the
v.                             *        Production of Documents
                               *        and Things by Defendant
                               *        Putnam Investments, LLC
                               *
PUTNAM INVESTMENTS, LLC        *
et al.,                        *
                               *
            Defendants.        *
                               *
* * * * * * * * * * * * * * * *
```

Pursuant to Fed. R. Civ. P. 26, 34, plaintiff Lisa Svensson ("Svensson") requests that defendant Putnam Investments, LLC ("Putnam"), utilizing the definitions set out below, and, within the time required by Fed. R. Civ. P. 26, 34, produce at the office of Svensson's counsel, Kevin F. Moloney, Barron & Stadfeld, P.C., 100 Cambridge Street, Suite 1310, Boston, Massachusetts 02114, for inspection and copying, unless Putnam already has produced each of them in unredacted format, the documents and tangible things described herein .

<u>DEFINITIONS</u>.

1.   <u>Communication</u>: "communication" means the transmittal of
     information (in the form of facts, ideas, inquiries, or
     otherwise).

the date and time of the transmission and the words in the subject line.

54. The August 27, 2003, "e-mail re: draft termination agreement" from author Hadley to recipients McNamee and Attorney Rodriques, as referred to in the Putnam privilege log but redacted so as to not disclose only the words used by the author or Attorney Rodriques in a "communication," within the meaning of U.S. v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950), with each other but disclosing the other words and information in the e-mail, including, without limitation, the identity of the author, the identity of the recipient(s), the date and time of the transmission, the words in the subject line and he attachment.

55. All documents and things concerning the amounts and types of compensation, including, without limitation, salary and bonus, paid or payable to Svensson, the identified males and the identified females for each of the years 1999 - 2004.

56. All documents and things identifying any of the identified males and any of the identified females who left the employ of Putnam on a voluntary basis in the period 1999 to date.

57. All documents and things concerning the circumstances and reasons for the voluntary terminations referred to in the immediately preceding category.

58. All documents and things identifying any of the identified males and any of the identified females who left the employ of Putnam on an involuntary basis in the period 1999 to date.

59. All documents and things concerning the circumstances and reasons for the involuntary terminations referred to in the immediately preceding category.

60. All documents and things concerning any severance package agreed to by Putnam and any of the identified males and/or any of the identified females in regard to his or her leaving the employ of Putnam (whether voluntarily or involuntarily) in the period 1999 to date.

61. All documents and things concerning communication between or among Putnam, any affiliate of Putnam, and Landes, Eckland

72. All documents and things concerning studies analyses and reports and the results thereof by or on behalf of the above referred to Women's Leadership Forum.

73. All documents and things concerning communication from Haldeman to any other person and to Haldeman from any other person in regard to any one or more of the subject matters of the two immediately preceding categories.

74. The personnel files of Allansmith, DeChristopher, O'Malley, Peers and Warren.

75. All documents and things concerning communication within Putnam in regard to the issue of "deprivation of [Svensson's] management responsibilities,"[1] which communication took place in the period prior to the Brooks' presenting to Svensson on August 28, 2003, of a document with three options concerning the status of her employment.

76. All documents and things concerning communication within Putnam in regard to the issue of "deprivation of [Svensson's] management responsibilities" and/or termination of her employment, which communication took place in the period following the Brooks presentation to Svensson referred to in the immediately preceding category, and the termination of Svensson's employment on September 15, 2003.

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.

_____
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.531.6569

Dated: April 28, 2006
                    Certificate of Service.
    A copy of the within document was delivered by messenger to counsel of record: Joseph L. Kociubes, Louis A. Rodriques, BINGHAM, MCCUTCHEN, LLP, 150 Federal Street, Boston,

_____
[1] As used in the Brooks deposition at p. 184.

19

# EXHIBIT B

1                          P R O C E E D I N G S

2          (Court called into session)

3          THE CLERK:  The Honorable Marianne B. Bowler

4   presiding.  Today's October 26, 2006 in the case of Lisa

5   Svensson v. Putnam Investments, Civil Action No. 04-12711 will

6   now be heard.

7          Will counsel please identify themselves for the

8   record.

9          MR. MOLONEY:  Kevin Moloney, M-O-L-O-N-E-Y, Barron &

10  Stadfeld Boston for Ms. Svensson, and Mr. John K. Weir of New

11  York, co-counsel is with us today.

12         THE COURT:  Thank you.

13         MR. KOCIUBES:  Joe Kociubes and Allyson Kurker, Your

14  Honor, Bingham McCutchen for Putnam.

15         THE COURT:  Thank you very much.  Well, we're here

16  for a hearing on docket entry No. 12, which is the motion, 112,

17  which is the motion to compel.

18         MR. KOCIUBES:  I believe there are two matters, Your

19  Honor.  There's also--

20         THE COURT:  Well, we'll start with the first one and

21  we take them in the order in which they're filed.  All right?

22         MR. MOLONEY:  Yes, Your Honor.  I filed last night a

23  reply memorandum which the Court allowed the motion for leave.

24  Mr. Kociubes was good enough to assent to the granting of that

25  relief.  It is one document, Your Honor, on the computer that

1    teams within the investment division.  It can only apply to

2    Putnam itself.  So that's No. 1.

3              Number 2, because of the hearings before the Court on

4    June 21 and July 11 and so forth, through some negotiations and

5    at the orders and urgings of the Court, Putnam on September 1

6    answered modified interrogatories in regard to the 91 folks we

7    said were, contend are Comparators and the unredacted, the

8    previously redacted documents in connection with those 91.  So

9    we see no reason why they should not continue maintaining

10   obviously their right to contest at summary judgment stage or

11   at trial that none of these folks are Comparators.  But at

12   least for discovery purposes we say that should continue.

13             Secondly, in regard to the conduct of certain folks

14   that we say are Comparators, Mr. Scott, Mr. Kamshad and

15   Mr. Warren, they take the position under the First Circuit

16   case, *Conward v. Cambridge School Committee* that the conduct to

17   compare has to do nearly identical.  We say that's looking at

18   the wrong end of the telescope and the district judge at trial

19   in that case, Judge O'Toole, made it clear and the First

20   Circuit Court as I read the case did not disagree that the

21   conduct as applied to this case has to be as serious or more

22   serious.  So that's our position on that issue.

23             If you look at Exhibits A and B, Your Honor, there

24   are some color graphs and charts that try to display, and I

25   think they do display in very visual terms--

1          Okay--

2          MR. KOCIUBES:  Does Mr. Moloney really think there's

3   a "actual criteria" somewhere in that which says--

4          THE COURT:  All right.

5          MR. KOCIUBES:  --promote your friends?

6          THE COURT:  Enough.  Time.  We've gone this far.  My

7   ruling today will reflect that I've allowed it to the extent

8   stated on the record--

9          MR. MOLONEY:  Right.

10         THE COURT:  --in open court.  As to everything

11  remaining and the E issues, I want you to sit down.

12         MR. MOLONEY:  Okay.

13         THE COURT:  I want you to sit down and see what you

14  can work out because let me tell you I'm not about to allow

15  much more.  Eight weeks left, the time is narrow.  And I also

16  want to know that given the scope of this discovery and the

17  intensity with which you are both pointing out this case has

18  there been any talk of settlement?

19         MR. MOLONEY:  We are waiting for an offer that we

20  can't refuse, Your Honor.

21         THE COURT:  Well have you made a demand?

22         MR. MOLONEY:  I believe we did.

23         MR. WEIR:  We had a mediation, Your Honor, in this

24  case back in January.

25         THE COURT:  Before?

1          MR. WEIR:  Magistrate Judge Alexander.

2          THE COURT:  Why didn't you have it here?

3          MR. WEIR:  Judge Saris made that decision.

4          THE COURT:  I mediated 37 cases this year, I've

5    settled 33.

6          MR. WEIR:  Your Honor, we're happy to--

7          THE COURT:  My statistics--

8          MR. WEIR:  We're happy to have it mediated before

9    Your Honor.

10          THE COURT:  --are better than even Dave Mazzone's

11    were.

12          MR. MOLONEY:  He was pretty good.

13          THE COURT:  He was very good.  I learned everything

14    from him.

15          MR. MOLONEY:  No, we're happy to sit on--

16          THE COURT:  But--

17          MR. MOLONEY:  --the email problem.  We're happy to--

18          THE COURT:  Sit down, discuss the rest.

19          MR. MOLONEY:  Yes, Your Honor.  Thank you.

20          THE COURT:  Because it's really getting--

21          MR. MOLONEY:  But if Your Honor--

22          THE COURT:  --tedious.

23          MR. MOLONEY:  I've spent, Your Honor, most of my

24    waking hours since last Friday working on this problem.

25          THE COURT:  I can see that, Mr. Moloney.

# EXHIBIT C

David Bloom

Page 26

1    MR. WEIR:  That's not quite my question.
2    Q.  You have not produced the retention letter to
3  which you referred in your testimony; is that correct?
4    MR. KOCIUBES:  The record should reflect
5  that we got a notice of deposition I think about two
6  days ago and without subpoena on the witness but go
7  ahead.
8    A.  May I hear the question again?
9    (Question was read back by the stenographer.)
10    A.  I don't understand the question.
11    Q.  Did you produce -- in connection with this
12  case did you produce to your counsel the retention
13  letter that you just referred to in your testimony?
14    A.  I don't understand the question.  The reason
15  I don't understand it is because they provided me with
16  the letter so I'm not sure why I would need to produce
17  it to them.
18    Q.  Once you received the retention letter, did
19  you acknowledge it in some fashion?  Did you sign it?
20  Did you do anything with respect to the retention
21  letter?
22    A.  It was a long time ago.  If it indicated it
23  needed to be signed, I presume I did.
24    Q.  Okay.  Other than the retention letter were

Page 27

1  you provided by Putnam or Putnam's counsel with any
2  other documents in connection with your review and
3  analysis?
4    A.  Yes.
5    Q.  What other documents?
6    A.  These would be documents referred to in my
7  report in this matter.  They're referenced in
8  Exhibit 4.
9    Q.  Does Exhibit 4 represent a complete list of
10  the documents you have been provided with or are there
11  updates?
12    (Witness perused document.)
13    A.  I believe Exhibit 4 is a complete list of all
14  of the documents that I reviewed in connection with my
15  report.
16    Q.  Okay.
17    A.  The preparation of my report.
18    Q.  Have you been provided with documents by
19  Putnam or Putnam's counsel since the preparation of
20  your report?
21    A.  Nothing that I recall.
22    Q.  Now, have you read or reviewed all of the
23  documents that are listed on Exhibit 4?
24    A.  Yes, I have.

Page 28

1    Q.  And have you utilized all of those documents
2  in connection with the preparation of your report?
3    A.  I don't understand the question.
4    Q.  Did you utilize in some fashion in connection
5  with the preparation of your report all of the
6  documents that are referenced in Exhibit 4?
7    A.  By utilized if you mean did I review and
8  consider, the answer is yes.
9    Q.  I note that Exhibit 4 mentions officer
10  directories.  You were provided with copies of officer
11  directories; is that correct?
12    A.  As indicated on Exhibit 4, the Putnam officer
13  directory dated December 1999, the Putnam officer
14  directory dated July 2000, the Putnam officer directory
15  dated July 2001 and the Putnam officer directory dated
16  July 2002.
17    Q.  Do you recall whether you were provided with
18  any officer directories from Putnam after July of 2002?
19    A.  To the best of my recollection this is the
20  full set that I was provided.
21    Q.  Let me show you what has been marked as Bloom
22  Exhibit 1 for identification, sir, and ask you if you
23  can identify that document.
24    (Witness perused document.)

Page 29

1    A.  Yes, I can identify it.
2    Q.  What is it, sir?
3    A.  It appears to be the report that I submitted
4  in connection with this matter in April of 2007 with a
5  date stamp on it that was not on whatever I provided.
6    Q.  You mean on the first page the date was
7  not --
8    A.  What I submitted didn't have that date stamp.
9    Q.  The received date?
10    A.  Right, but I think that may be the only
11  difference.
12    Q.  Okay.  And did you prepare your report in any
13  draft form prior to April 13th of 2007?
14    A.  I don't understand the question.
15    Q.  Did you prepare a draft of the report?
16    A.  I drafted the report and revised the draft
17  which led up to this document if that's what you're
18  asking.
19    Q.  That's my question.
20    A.  Okay.  Yes.  That's what I did.
21    Q.  Did you retain a copy of the draft of the
22  report?
23    A.  The revisions I made were all embodied in
24  this report.

8 (Pages 26 to 29)

David Bloom

1  the Investment Management Division at Putnam at the end
2  of 2003, okay, because some people might have been
3  hired in the interim and stayed on or who actually were
4  hired during 2003 but not there at the end of 2003
5  because they terminated or hired or retired during 2003
6  in fact but weren't there at the end because they
7  terminated and I inferred that last part from the
8  termination spreadsheets that we just went over,
9  whatever are these in this Exhibit 2H.  That is what
10  the 344 represents.  That's the algorithm or the recipe
11  I used to create the at risk sample for that analysis
12  and no one that's inside that definition should be
13  excluded.
14    Q.  So that all CIOs are included?
15    A.  That includes -- that's all officers.
16    Q.  Okay.  Is there some reason why they are
17  included for purposes of this analysis but excluded
18  from other analyses?
19    A.  Well, you see in Exhibit 8 they're excluded
20  from the analysis on the bottom panel that said it
21  looks at senior portfolio managers and associate
22  directors or the middle panel looks at just senior vice
23  presidents although -- no.  Actually, there may be some
24  in there as well but what I endeavored to do here is

1  just look at the data in different ways that I thought
2  were reasonable and to see whether the results all
3  point in the same direction or not and in the case of
4  the analyses I did of involuntary termination, they all
5  point in the same direction that there are no gender
6  disparities.  If they didn't point in the same
7  direction, I would have noted that or explored further.
8    Q.  I understood you to say earlier in your
9  testimony that they were excluded from the compensation
10  analyses.
11    A.  I did not include them in the compensation
12  analyses.
13    Q.  Yet you include them in the termination
14  analyses?
15    A.  I include them in one of the termination
16  analyses.
17    Q.  Okay.  Why did you include them in this
18  termination analysis but exclude them in the
19  compensation analysis?
20    A.  They could have been included in the
21  compensation analyses, too.  I didn't think it was
22  necessary at the time that I devised the analyses.  I
23  was looking for a tighter comparison given that I was
24  going to do a regression analysis.  It could have been

1  included and I could have put in controls for them as
2  well.  I'm not claiming in preparing this report I
3  conducted an exhaustive set of all possible analyses.
4  I did the ones that I thought were most meaningful
5  based on what I understood about Putnam and what I
6  understand about labor economics and sort of employment
7  and earnings determination and these are the ones I
8  did.  These are the ones I reported.  Given that all
9  the results point in the same direction it seems
10  appropriate to leave it at that.
11    Q.  Did you make any determination as to whether
12  the decision making process was the same or different
13  for each of the different employment actions which you
14  analyzed?
15    A.  The decision making process?
16    Q.  For compensation, for promotions, for
17  demotions and for terminations.  Was the decision
18  making process that was utilized in making those
19  employment decisions the same for each type of
20  employment decision?
21    A.  I think they're fundamentally different.
22    Q.  In what way are they fundamentally different,
23  way or ways are they fundamentally different?
24    A.  Well, compensation is to -- typically the

1  motivation is to reward, retain and motivate
2  individuals.  That's not the goal of termination
3  decisions necessarily.
4    Q.  I'm not talking about the goal.  I'm talking
5  about the process.  Did you determine whether the
6  process, the decision making process was different as
7  between say terminations and promotions and
8  compensation?
9    A.  My impression is that or my recollection, and
10  it has been a while, but it's that a lot of these
11  decisions had a very decentralized nature.  A lot of
12  decisions were made at the level of departments and
13  teams, and the senior management of the team or the
14  department, the director or the chief investment
15  officer had a lot of say and then there was review
16  discussion perhaps at the level of division and
17  with respect to some decisions like that had to do with
18  the bonus pools or incentive pools.  Actually, there
19  was also some determination of how large those were
20  going to be companywide or division wide or what have
21  you at higher levels than the team as well although
22  decisions then were -- I understand weighed heavily on
23  information at the team level.
24    Q.  Did you undertake any discussion with Putnam

31 (Pages 118 to 121)

Page 122

1  or review of the partnership pool at the company?
2      A.   I recall some discussion trying to understand
3  it and --
4      Q.   With whom do you recall having that
5  discussion?
6      A.   Some of it I think I may have picked up in
7  documents and it probably was something I discussed
8  with Mr. Tibbetts or Ms. McNamee.
9      Q.   Did you factor into your analyses the
10  availability of monies from the partnership pool for
11  certain Investment Management Division officers?
12          MR. KOCIUBES:  Objection.
13      A.   I don't understand the question.
14      Q.   Well, did you utilize in any way in your
15  analysis whether or not a particular individual within
16  the Investment Management Division that's part of your
17  sample was able to obtain monies from the partnership
18  pool?
19      A.   The analyses that I report in Exhibit 5, the
20  compensation analyses, three of them or three sets of
21  them, analyses of bonus awards, incentive awards and
22  what I refer to as notional compensation, are focused
23  substantially on trying to use labor economics and
24  statistics to understand variations in the magnitudes

Page 123

1  of the awards that people received.
2      Q.   Does your Exhibit 5 incorporate the monies
3  that were available for the individuals who were
4  partners as of the time they were being looked at?
5      A.   It's based on the awards made to individuals
6  so in that sense it will reflect some information about
7  the total amount available but did I use anywhere the
8  number for the total amount available?  If that's what
9  you're asking, the answer is no.
10      Q.   Now, you incorporated into your report some
11  analyses with respect to the comparators that Lisa
12  Svensson had identified in the course of this
13  litigation, did you not, sir?
14      A.   That's correct.
15      Q.   What was your purpose in doing those
16  analyses?
17      A.   Those were the data that were analyzed by Dr.
18  White and what I wanted to do was to subject those data
19  to what I thought -- what I think are appropriate
20  analysis which I do not think Mr. White did and in the
21  end --
22      Q.   In what respects do you think his analyses
23  were inappropriate?
24      A.   Well, he doesn't run any regression analyses

Page 124

1  so he's not comparing individuals who are similarly
2  situated which is one of the fundamental requirements
3  for any test for discrimination and that requirement is
4  violated in his report.  So another fundamental
5  requirement for any data analysis is that we know
6  something about the nature of the sample.  Dr. White
7  undertook -- based on his report Dr. White doesn't seem
8  to have undertaken any analyses of the nature of the
9  sample.  He took list of named comparators just as
10  given without any, as I say, critical examination.  So
11  what I wanted to see is, well, if we looked at even
12  that list of potentially highly selected and biased
13  sample, and I potentially but having said that, if we
14  looked at that using appropriate tools, would there be
15  any indication of significant disparities so in
16  Exhibit 9 for example I looked at all of the named
17  comparators in 2002 and then separately in 2003 and I
18  ran the same specifications that I thought appropriate
19  for the analyses that I designed and implemented in the
20  earlier, I think it was Exhibit 5, and as you can see,
21  I concluded that there is no evidence when you look at
22  similarly situated individuals of gender disparities in
23  base salary, bonus award, incentive award or notional
24  compensation either in 2002 or 2003.  So even if one

Page 125

1  were to accept a sample as meaningful that we have no
2  basis for reaching that conclusion, that sample doesn't
3  contain any systematic indication of gender disparities
4  in compensation or any of the components of
5  compensation in either of these years that is related
6  to gender.
7      Q.   Did your analysis include some of the 91
8  comparators that were utilized by Dr. White?
9      A.   I endeavored to include as many as possible
10  and I presume although I think I mentioned earlier this
11  morning I wasn't able to replicate Dr. White's analysis
12  and so I don't know exactly what he included or what he
13  did but I presume that the analyses overlap.
14      Q.   Well, in terms of your compensation analysis
15  how many comparators were there?  How many individuals
16  were there analyzed in your report?
17      A.   Well, of the 91 individuals and I think
18  comparators, named comparators if I recall correctly
19  from I think it was affidavit four that referred to
20  both 2002 and 2003.  My recollection is that there
21  were -- in terms of end of year snapshot there were 82
22  at the end of 2002 and I believe if I recall correctly
23  that perhaps ten were not there at the end of 2003 and
24  then maybe one person joined in 2003 so the 82 minus

32 (Pages 122 to 125)

Documents and Data Reviewed

Order Governing Discovery of Confidential Information - February 2006

First Amended Complaint and Jury Demand - January 5, 2005

First Affidavit of Lisa Svensson - April 20, 2006

Second Affidavit of Lisa Svensson - April 20, 2006

Third Affidavit of Lisa Svensson - April 20, 2006

Fourth Affidavit of Lisa Svensson - June 8, 2006

Documents Subject to Plaintiff Svensson's Motion to Impound, Filed June 8, 2006 (Volume 3 of 3)

Transcript of Lisa Svensson Deposition - November 30, 2005

Transcript of Lisa Svensson Deposition - February 1, 2006

Plaintiff Svensson's Second Request for the Production of Documents and Things by Defendant Putnam Investments, LLC - April 28, 2006

Putnam Organization Chart for 1999

Job descriptions for various positions such as Portfolio Manager and Analyst (PRM 04043-04131)

Transcript of Mary McNamee Deposition - November 29, 2005

Transcript of Joshua H. Brooks Deposition - November 17, 2005

Transcript of Richard B. Tibbetts Deposition - June 8, 2006

Transcript of Richard B. Tibbetts Deposition - September 26, 2006

Transcript of Richard B. Tibbetts Deposition - November 29, 2006

Transcript of Richard B. Tibbetts Deposition - February 9, 2007

Transcript of Stephen M. Oristaglio Deposition - June 13, 2006

Transcript of Stephen M. Oristaglio Deposition - September 26, 2006

Transcript of Lawrence J. Lasser Deposition - May 17, 2006

Transcript of Lauren Allansmith Deposition - August 31, 2005

Transcript of Charles Edgar Haldeman, Jr. Deposition - April 11, 2006

Transcript of Kelly A. Morgan Deposition - April 6, 2006

Transcript of Konstantin S. Stoev Deposition - August 24, 2006

Putnam Officer Directory, December 1999

Putnam Officer Directory, July 2000

Putnam Officer Directory, July 2001

Putnam Officer Directory, July 2002

Discovery Documents LS003-0392

Discovery Documents LS1359, and PRM 00130, 02875, 02881-2, 02885, 02983, 02985-02989, 03024, 04028-9, 03602, 03559-60

EXHIBIT 4

Documents and Data Reviewed

| |
|---|
| "Analysis of the Investment Division Workforce at Putnam Investments 1998-2003" - Report by Dr. Paul F. White, March 14, 2007 |
| "Analysis of Lost Compensation Lisa Svensson" - Report by Dr. Richard A. Siegel, February 16, 2007 |
| McLagan Partners, "Compensation and Performance Surveys", 2002 |
| Data on Plaintiff's Named Comparators, including personal data, job-related data, base salary, and bonus award data |
| Equity data on Plaintiff's Named Comparators |
| End-of-year personal and job-related data for Investment Division Officers, 1998 - 2003 |
| Compensation data for Investment Division Analysts, Senior Analysts, Portfolio Managers, Senior Portfolio Managers, and Associate Directors, 2002 - 2003 |
| List of Investment Division Officers terminated, 2000 - 2003 |

# EXHIBIT D

## Kurker, Allyson E.

| | |
|---|---|
| **From:** | Rodriques, Louis A. |
| **Sent:** | Monday, November 26, 2007 4:14 PM |
| **To:** | 'Kevin F. Moloney'; john k. weir; Kociubes, Joseph L.; kfm @ h |
| **Cc:** | Holden, Jennifer L.; Kurker, Allyson E. |
| **Subject:** | RE: Expert depositions and scheduling |
| **Attachments:** | Scanned_.pdf |

Kevin:

Joe has asked that I reply to your email to him below since he is out of the office today.

Attached is the data that Bloom considered in forming his opinions. Per your email below, we'll expect your production of the data considered by both of your experts tomorrow.

As for the dates for the supplemental reports, we don't see why they need to be changed. Judge Saris set those dates as part of her order that we make additional discovery, so that your experts could supplement their reports in light of that discovery. You've had the additional production since October 19, and the dates for the supplemental reports were set with the October 19 production date in mind.

Lou

Louis Rodriques
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
Direct Dial: 617-951-8340
Direct Fax: 617-345-5050

*The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.*

*You should recognize that responses provided by means of this email are akin to ordinary telephone or face-to-face conversations and do not reflect the level of factual or legal inquiry or analysis which would be applied in the case of a formal legal opinion. A formal opinion could reach a different result. We would, of course, be happy to prepare such a definitive statement or formal opinion if you would like us to.*

**From:** Kevin F. Moloney [mailto:kfm@barronstad.com]
**Sent:** Tuesday, November 20, 2007 11:22 AM
**To:** john k. weir; Kociubes, Joseph L.; kfm @ h; Rodriques, Louis A.
**Subject:** Expert depositions and scheduling

Joe:

(1) The only days that can work for Paul White and Jack and me for the White deposition are December 19 or 20. We also are expecting to get from Paul White by about next Tuesday a CD with the documents that he relied upon, which we are prepared to exchange for a similar production from Bloom at the same time.

(2) It appears that the update date in the present schedule of December 3 no longer makes any sense. We should work out an agreement for updates after the depositions.


/s/ *Kevin F. Moloney*




100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569
Fax: 617.523.8359
e-mail: kfm@barronstad.com

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12711-PBS

LISA SVENSSON
    Plaintiff

       v.

PUTNAM INVESTMENT, et al
    Defendants

. . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON DECEMBER 13, 2005

APPEARANCES:

For the plaintiff:  John K. Weir, Esquire, John K. Weir Law
Offices, LLC, 300 Park Avenue, Suite 1700, New York, NY 10022,
212-572-6374.

Nancie Edgren, Esquire, Barron & Stadfield PC, 100 Cambridge
Street, Suite 1310, Boston, MA 02114, 617-723-9800.

For the Defendant:  Louis A. Rodriques, Esquire, Bingham
McCutchen LLP, 150 Federal Street, Boston, MA 02110, 617-951-
8340.

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

1  year request for everybody.  Just contextually, Your Honor,

2  in 2000, which is about when the facts that gave rise to this

3  case began to happen, Putnam had--

4          THE COURT:  Just one second.

5  (Pause)

6          THE COURT:  Excuse me, but I don't want to hold

7  counsel here.

8          MR. RODRIQUES:  Okay.  In 2000 when the facts that

9  began to give rise to this complaint started to occur, Putnam

10  had 7,500 employees, Your Honor.  Today Putnam has about 3,000

11  employees.  So in the last three or four and half years or so,

12  it's lost 4,500 of the 7,500 employees, so when we first read

13  this request we said, this is ridiculously overbroad.  We have

14  had conversation.  The disagreement between us now is whether

15  terminations, promotions, denials of promotions outside of the

16  decision making unit in which Svensson was a participant are

17  relevant.  That is, we have offered to produce the information

18  with respect to terminations of denials of promotion, et

19  cetera, with respect to the global gross group which is where

20  she was in 2002 when she moved from global gross into global

21  equity research, and then we offered to produce information

22  with respect to the people in global equity research which is

23  where she was when she was terminated.  We did that in reliance

24  on the Court's decisions in other cases that typically you

25  don't look outside of the group in which the employee is

1    employed; that is, you look at the decisions by the same

2    decision maker.  We cited those cases in our opposition to the

3    motion to compel, and Mr. Weir doesn't cite any contrary

4    authority.  Yet the case is pretty clear, both the *Jackson* case

5    and the *Whittingham* case, that decisions by other people in

6    other parts of the company aren't probative on the question of

7    whether or not there was discrimination in her unit.

8              THE COURT:  I'm inclined to agree.

9              MR. WEIR:  Your Honor, the situation is this.  Lisa

10   Svensson was demoted in 2002 from portfolio management to

11   global gross group to the research department.  She didn't want

12   to go back to research.  She was told she had to go back to

13   research, and she consistently sought to return to portfolio

14   management after 2002 so that her comparators are not only the

15   people in the research department, but also those who were

16   allowed to remain in portfolio management and those who

17   received promotions to portfolio management during the period

18   of time after she went back to research.

19             MR. RODRIQUES:  Can I just, if you start with that

20   argument, if I can give you a picture, Your Honor.  The group

21   she was in consisted of about 10 to 15 portfolio managers.

22   This is in 2002.  That group was disbanded.  The boss of the

23   group was fired.  The other 10 to 15 people, including

24   Ms. Svensson, were parceled out to the rest of the

25   organization.  We're happy to give him information with respect

# EXHIBIT F

**From:** kevin f. moloney [mailto:kfm@barronstad.com]
**Sent:** Friday, July 07, 2006 12:58 PM
**To:** Kociubes, Joseph L.; kfm @ h; Rodriques, Louis A.
**Cc:** john k. weir
**Subject:** In furtherance of our recent and lengthy negotiating sessions, which....

Joe and Lou:

In furtherance of our recent and lengthy negotiating sessions, which focused mainly on the interrogatories, we are willing to discuss further with you to reach agreement on limiting the interrogatories in the ways we discussed. For example, we would be willing to delete "marital status" and "children" upon representations from you that Putnam did not and does not maintain records evidencing such matters, and we are ready to discuss with you coming to agreement on the other issues that we discussed concerning the interrogatories; provided, however, that Putnam, without prejudice to its positions on the comparator issues, agrees for purposes of the interrogatories, to respond to them utilizing the 67 males and 24 females identified by Svensson as comparators; and provided further that we reach agreement on the following matters.

As a way to deal with the 30(b)(6) issues that arose out of our discussions of our proposal that we utilize the subject matters of the various categories of the Second Request for Production as substitutes for the topics we listed in the Rule 30(b)(6) deposition notice, we propose the following:

Recognizing that Putnam contends that it should not be required to produce the documents identified in one or more of the categories of the second request and that it contends that its response to date to the first request is

sufficient and that Putnam would contend to the court that it should not be required to produce witnesses to testify for Putnam in a Rule 30(b)(6) deposition on the subject matters of the Second Request for Production if they were to be substituted for the topics forth in the 30(b)(6) notice, we propose that Svensson and Putnam jointly request the court to continue the resumption of the hearing now scheduled for July 11 to a later date, so that: (1) Svensson can file  motion to compel production in unredacted format as to the "91" referred to above of the documents requested in the First Request and a motion to compel production in unredacted format as to the  "91" referred to above of the documents requested in the Second Request (we reserve the right to limit or delete categories or parts thereof from the scope of the motions); (2) Putnam can prepare and file briefs in opposition to the motions; and, (3) The court can hear oral argument, and make a decision, on those motions.

This agreement as to the way to proceed on the 30(b)(6) matters, would be based upon the agreement that the "91" referred to above concerning the answers to interrogatories also would be, for purposes of the document requests and the Rule 30(b)(6) deposition the comparators without prejudice to Putnam's contentions as to comparators.

We then would conduct the 30(b)(6) deposition of Putnam on the subject matters of the documents that are produced pursuant to any order of the court on the above motions; (B) the documents previously produced in response to the

second request for production unredacted as to the "91" referred to above; and,

(c) the termination of plaintiff's employment by Putnam.

Your thoughts?


/s/ Kevin F. Moloney

Kevin F. Moloney
Barron & Stadfeld, P.C.
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02130
Tel.: 617.723.9800/531.6569
Fax: 617.523.8359
e-mail: kfm@barronstad.com

Bingham McCutchen LLP Circular 230 Notice: To ensure compliance with IRS requirements, we inform you that any U.S. federal tax advice contained in this communication is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding any federal tax penalties. Any legal advice expressed in this message is being delivered to you solely for your use in connection with the matters addressed herein and may not be relied upon by any other person or entity or used for any other purpose without our prior written consent.

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA SVENSSON                    .    CIVIL ACTION NO. 04-12711-PBS
     Plaintiff                   .
                                 .
          V.                     .    BOSTON, MASSACHUSETTS
                                 .    JULY 11, 2006
PUTNAM INVESTMENTS, et al        .
     Defendants                  .
                                 .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff:        John K. Weir, Esquire
                          John K. Weir Law Offices, LLC
                          300 Park Avenue
                          Suite 1700
                          New York, NY 10022
                          212-572-6374

                          Kevin F. Moloney
                          Barron & Stadfeldt PC
                          100 Cambridge Street
                          Suite 1310
                          Boston, MA 02114
                          617-723-9800

For the defendant:        Joseph L. Kociubes, Esquire
                          Louis A. Rodriques, Esquire
                          Bingham McCutchen LLP
                          150 Federal Street
                          Boston, MA 02110
                          617-951-8000

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1   position that the Court has already ruled on that issue.

2   Both of those contentions are incorrect.  The fact of the

3   matter is not only based upon Ms. Svensson's affidavit, there

4   are four on the current record, but also on Putnam's own

5   documents and in the deposition testimony of Mr. Oristaglio

6   former co-head of the investment division and Mr. Tibetts, head

7   of the human research division, it appears beyond question that

8   people were compared within the investment division, investment

9   professionals with investment professionals.  This investment

10  division was one of four divisions in Putnam,  Putnam as a

11  subsidiary of Marsh & McLellan, companies called MMC, one of

12  several, so we're looking at not the holding company, not of

13  all the subsidiaries, not all of Putnam Investments, but one

14  division inside of Putnam.  The Oristaglio deposition makes it

15  very clear that investment professionals, whether they were

16  assigned the research, assigned to a value team, assigned to

17  international growth, whatever team they were assigned to, were

18  compared with each others, at least for purposes of

19  compensation and bonus.  The documents that we cite in

20  footnotes four, five and six or our memorandum, documents that

21  came from the Putnam file, show that in other employment

22  actions people were compared across teams throughout the

23  division, whether it was for promotion tools to managing

24  director, whether it was for purposes of demotion.  We have set

25  forth in the exhibits to the fourth affidavit the names of the

1   67 males and the 24 females which we say are comparators of

2   Ms. Svensson and we have apportioned them into smaller groups

3   based upon the four key employment acts in said issue, failed

4   to pay equally, failed to promote to managing director,

5   demotion and then termination.

6          Now, with respect to the interrogatories in

7   particular, the other side takes the position that based upon

8   the events of the hearing in December, the Court has already

9   ruled. Well, that is not true. The transcript shows that the

10  Court on ruling on one of those requests for production said

11  not at this time. Now, that was in a context where Putnam's

12  counsel had urged the Court to follow *Jackson v. Harvard* and

13  *Woodingham v. Amherst*. The statements were made to the Court

14  that the international growth team was disbanded and the 10 or

15  15 people on that team were sent away to other places in the

16  company. Well, that's not true because both Mr. Oristaglio in

17  his deposition on the 13th of June and Mr. Tibetts, I'm sorry,

18  Mr. Oristaglio on the 13th, Mr. Tibetts on the 8th, made it clear

19  that that team was re-organized. It wasn't disbanded. It was

20  made smaller and guess who lost out, Ms. Svensson, while the

21  males stayed or were given a career advancement. The analogy

22  was made to the *Jackson* case and the Court knows the *Jackson*

23  case, and in the *Jackson* case, the district court judge decided

24  that the plaintiff would not be entitled to information about

25  librarians and others in the various other graduate schools at

1  throughout the entire discovery process plaintiff has had no

2  interest in discovering.  And so what she has done is she has

3  cherry picked 91 names, including twenty some females, and it's

4  not obvious to me how they're comparators for purposes of a

5  gender claim and then wants all sorts of invasive information

6  about them.  What I would urge Your Honor to do if you would

7  with me, because this then cuts over to a whole number of

8  categories, is go to plaintiff's documents and in the volumes,

9  it's called corrected volume three of three, it got filed I

10  think within the past couple of days--

11           THE COURT:  Right.

12           MR. KOCIUBES:  --let's start with, if we could, with

13  tab number 2, Your Honor, and she starts listing the people and

14  the way she comes up with her comparators have nothing to do

15  with who is in the same unit or who is in the same department

16  or of anything that anybody uses.  So for example, there's a

17  category, has managed people.  By that kind of criteria, Your

18  Honor, a sergeant and a general are comparators, and then she

19  cherry picks the ones that she wants to talk about.  One of the

20  categories, she adds up the number of points that you have,

21  then that presumably is the best person.  One of the categories

22  is maternity leave.  Whatever else the significance of that is,

23  whether or not you're on maternity leave doesn't make you a

24  better stock picker or worse stock picker.  What that's got to

25  do with being a comparator for purposes of the various

1   categories or the claims that she talks about is unclear.

2   Some of the people on the list are her subordinates.  By

3   definition they're not comparators.  Some of the people on the

4   list are two or three levels above her.  By definition, they

5   can't be comparators.  So the issue, Your Honor, is not whether

6   she should get comparators.  We've never said that there are no

7   comparators other than with one claim, the termination claim,

8   because she was terminated for a reason for which nobody else

9   best we can tell has ever been terminated and we can talk about

10  that, but we've never said with respect to the other claims

11  that they're no comparators.  What we have said is that she has

12  never asked for them and we've taken that position since day

13  one, and all she had to do was read the cases and ask by

14  categories and she gets a response.  She's not interested in

15  doing that.  Let me give you a further example about her

16  categories here.  They're all mixed together.  In 2003 for the

17  year 2002, Putnam did not give anybody new the designation of

18  managing director.  No man, no woman.  What's the relevance of

19  the chart?  It's not broken out by year or anything else.  It

20  is a list of names.

21          THE COURT:  Well, is there any possibility that you

22  two can sit down and come to an agreement on who the

23  appropriate comparators are?

24          MR. MOLONEY:  We should be able to do so, Your Honor,

25  if the other side is willing to look objectively at the facts

1   to examine as to whether that's true or not.  We have, we

2   believe set out some criteria, admittedly they are not the

3   criteria that Putnam claimed it used when it made decisions.

4   That's a separate issue.  That's determining whether their

5   reasons were pretext.  We are trying to establish that there

6   are some people within the hundreds of people employed, many of

7   them investment professionals in this division, that there are

8   some men and women who were comparators.  We have picked

9   objectively measured and objectively understood criteria for

10  purposes of establishing that there are people in that division

11  with whom she should be compared in this case because she was

12  compared with the very same people when they made the decision

13  to promote her initially, when they failed to promote her to

14  managing director, when she was demoted and when she was

15  terminated.  And for my good friend on the other side of the V.

16  on this case to say that she, to imply to the Court that she

17  was given some wonderful options, that is absolutely not true.

18  She was told if she gave up her rights to a Title 7 claim and

19  any other claim and signed a release, that would be fine with

20  them.  It wasn't fine with her.  She was told she could stay on

21  and get paid and hunt for a job and then she said she could

22  stay on and never ever get promoted.  That's not--

23          THE COURT:  I'm inclined to permit some discovery

24  here, but what I'm suggesting is that I give you 14 days to sit

25  down together and to see if you can come up jointly with

# EXHIBIT H

1                    P R O C E E D I N G S

2    (Court called into session)

3              THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is July 11th, 2006 in the case of Lisa

5    Svensson v. Putnam Investments.  Civil Action No. 04-12711 will

6    now be heard.  Will counsel please identify themselves for the

7    record.

8              MR. MOLONEY:  Yes, Your Honor, Kevin Moloney.  With

9    me is John Weir.  We represent the plaintiff.

10             THE COURT:  Thank you.

11             MR. KOCIUBES:  Joe Kociubes, Your Honor, with Luis

12   Rodriques for Putnam.

13             THE COURT:  Thank you, very much.

14             Well, counsel, bring me up to date.  Hopefully,

15   you've resolved some of what was problematic the last time you

16   were here because you--

17             MR. MOLONEY:  I'm going to answer that—

18             THE COURT:  --tested my patience the last time.

19             MR. MOLONEY:  Not wanting to do that again, I'm

20   afraid I do have to answer yes and no.  We spent close to four

21   plus hours last week in negotiations, Mr. Weir and I on some

22   telephones and my friends at defense side on other telephones,

23   spending most of that time discussing the issues arising from

24   the interrogatories, which was the first thing that Your Honor

25   paid attention to at the last hearing.  And I thought we made

1    interrogatory issues.

2              MR. KOCIUBES:  If I could address that, Your Honor,

3    it is, I think we're in accord on all that.  Let me just

4    articulate all that just so there's a record of it.

5              There are two overarching issues, first of all, which

6    individuals, with respect to which individuals would

7    interrogatories be answered and then what kind of information

8    about those individuals.  With respect to the individual, we

9    have been arguing since day one that this universe, it was 16,

10   then 34, now 91 individuals are not within the guidelines of

11   the First Circuit, the appropriate universe of comparators.

12   For purposes of trying to get beyond this dispute, Your Honor,

13   or moving out as much of it as we can, we have agreed that we

14   will answer the interrogatories with respect to the 91 which

15   plaintiffs have chosen without in any way agreeing that that is

16   the appropriate universe of comparators.  Now, there are, that

17   leaves then I think four open matters of the kinds of universe,

18   two of which I think have now been resolved from what I heard

19   Mr. Moloney say.  We will in the course of answering the

20   interrogatories indicate that Putnam does not track either a

21   marital status or children.  People work at a place the status

22   of both changes over time.  People get married after they take

23   a job.  They get divorced.  They have children and so forth,

24   Your Honor.  It is not a category that relates to investment

25   performance that they keep track of.  So we will so represent

1  on it.  We, for example, produce everything there was on

2  that for Lisa Svensson.  Whenever you do that, Your Honor, the

3  counsel are put to a choice as we were in this case, do you

4  simply give them the relevant pages or do you give them

5  everything else that, including stuff they've never asked for

6  that's redacted so they can see what the total thing looks like

7  so that we've got, we've got things that have been redacted

8  because they've never asked for them.  We've got other things

9  that were redacted because they show up any privilege log

10  because they're privileged.  Those are the kind of things we're

11  talking about.  They have a right to challenge it, and if they

12  think we didn't give them enough description of generically

13  what's on that so they can bring the challenge in front of Your

14  Honor, that is something we can deal with them about.  But the

15  fact, the mere fact of redaction doesn't tell Your Honor

16  anything other than the fact that we were scrupulous in not

17  simply producing the one page that related, that we say related

18  to the case, but letting them see what the entire document

19  would have looked like.  But that again has got nothing to do

20  with the 30(b)(6).

21          MR. WEIR:  Your Honor, now that we've reached

22  agreement on the 91, we're only asking for the Court to redact

23  the documents with respect to those 91.  Those are for at least

24  discovery purposes the comparators.

25          MR. MOLONEY:  Your Honor, if I may just add one other

# EXHIBIT I

Page 14

1  of results and we met a lot in person so we would look
2  at those results and they would be on our network in
3  electronic form so we would know where to go to look for
4  the results of their statistical analysis.
5      Q.  Do those files still exist?
6      A.  Yes, sir.
7      Q.  Okay.  How much, best you can estimate it,
8  how much time in terms of hours by ERS has been spent
9  on this assignment?
10     A.  I don't know in terms of hours.
11     Q.  Give us your best estimate.
12     A.  Certainly more than a hundred.
13     Q.  Is your billing practice to bill monthly?
14     A.  Yes.
15     Q.  I assume that ERS is working on an hourly
16 basis?
17     A.  Yes.
18     Q.  All right.  I assume you're current?
19     A.  I'm sorry?
20     Q.  I assume you're current with the plaintiff in
21 this matter in terms of your billing?
22     A.  Yes.  She has been getting updated bills
23 consistently, yes.
24     Q.  And have they been paid?

Page 15

1      A.  She is paying them consistently.  We are not
2  up to the total outstanding balance but she has been
3  paying.
4      Q.  And can you give us your best estimate of the
5  amount paid to date?
6      A.  No.  I don't recall.
7      Q.  Now, since the report which you prepared in
8  this case which you recall was prepared in March 2007?
9      A.  Right.
10     Q.  Since then has ERS continued to spend
11 additional time on this engagement?
12     A.  We spent some time reviewing the report of
13 Dr. Bloom and we spent some time just recently
14 preparing for the deposition.
15     Q.  And has there been any -- other than those
16 two things have there been any other activities that
17 you have engaged in since your report in connection
18 with this matter?
19     A.  I think the only other thing that I can
20 recall that I would add would be to prepare our
21 databases which were turned over.
22     Q.  What databases did you turn over?
23     A.  There were two files that I sent the
24 plaintiff's attorneys.  One related to the named

Page 16

1  comparators.  One related to the officer directory
2  data.
3      Q.  And when did you send those files?
4      A.  I don't remember the exact date but it was
5  within the last three weeks.
6      Q.  Was it this week?
7      A.  No, it wasn't this week.
8      Q.  When you say you don't remember the exact
9  date.
10     A.  Right.
11     Q.  Can I assume it was closer to three weeks
12 ago?
13     A.  I said three weeks but I think it's probably
14 somewhere in the middle.  I would say a week and a
15 half, maybe two.
16     Q.  In what format did you send it to plaintiff's
17 counsel?
18     A.  It was an e-mail with Excel file attachments.
19     Q.  And did you do that at somebody's request or
20 was that something that you did on your own?
21     A.  I did it at their request.
22     Q.  And to whom did you send those files?
23     A.  Mr. Weir, Mr. Moloney and Miss Svensson.
24     Q.  And within those files would it be possible

Page 17

1  to determine for example the names of the individuals
2  that you analyzed for purposes of the demotion claims?
3      A.  Yes, it would be.
4      Q.  Would it be possible to determine the names
5  of the people you analyzed for the termination claim?
6      A.  Yes.
7      Q.  Similar for the compensation claim?
8      A.  Right.
9      Q.  So if somebody wanted to replicate your work,
10 those would be the files one would look at?
11     A.  Yes.  That would be the starting point for
12 sure.
13     Q.  When you were first -- after you were engaged
14 or before, did there come a time when you told
15 plaintiffs there were certain data or information that
16 you wanted?
17     A.  Yes.
18     Q.  And did you communicate that orally or in
19 some kind of writing?
20     A.  Certainly orally.
21     Q.  What data did you request?  What kinds of
22 data?
23     A.  Ideally for these types of cases I would
24 prefer to have a full work history of employees so that

5 (Pages 14 to 17)

Page 18

```
1   I knew a separate line of data for each event that
2   happened to them so the first line would be when they
3   were first hired by Putnam and another line that would
4   include a raise or a change in job or a performance
5   evaluation so that I know a full work history of where
6   they started, what has happened to them, change in pay
7   rates, etc. up until the present.  From that we can do,
8   depending upon the fields that were in that data, we
9   can do a lot of the analysis that would be needed for
10  this type of case.
11      Q.  And when did you ask for that kind of
12  information?
13      A.  In one of the earliest meetings that we had I
14  described that type of data and I said that's the kind
15  that we prefer to work with.
16      Q.  When you say you wanted full work history of
17  the employees, which employees are you -- I'm talking
18  about generic description.  Which employees are you
19  talking about?
20      A.  Ideally I wanted it for the entire Investment
21  Division.
22      Q.  And why would you want the full work history
23  for the entire Investment Division?  What purpose would
24  you then do with it?
```

Page 19

```
1       A.  One would be to compare the rest of the
2   Investment Division to the 91 comparators that -- I
3   believe it is 91 that Miss Svensson selected.
4       Q.  When did you get -- you just referred I think
5   for the first time to 91 comparators Miss Svensson
6   selected.  When were you first given that list?
7           MR. WEIR:  Objection.  First time at this
8   deposition.
9       Q.  When were you first given the list of the 91?
10      A.  I was given an initial list somewhat early on
11  and then I don't remember the date of her fourth
12  affidavit but it was the fourth affidavit that was the
13  one we relied upon in the end.
14      Q.  Now, you said that what you ideally would
15  want was information about the entire Investment
16  Division in order to compare it to the 91?
17      A.  Right.
18      Q.  And what would be the purpose of making such
19  a comparison?
20      A.  I think it is a concern that Dr. Bloom raised
21  in his report.  We wanted to see whether or not these
22  91 were similarly situated to Miss Svensson and whether
23  or not there would be perhaps people on the 91 who
24  maybe wouldn't be similarly situated and then also
```

Page 20

```
1   people elsewhere in the Investment Division who might
2   be similarly situated.
3       Q.  Were you also interested in checking whether
4   the 91 were representative of the Investment Division?
5       A.  That's kind of what I mean by that answer.
6       Q.  In other words whether it was a self-selected
7   or a random or meaningful sample?
8       A.  Right, right.
9       Q.  And were you able to do any of that kind of
10  work?
11      A.  No.  We never got data, detailed data for the
12  Investment Division.
13      Q.  Are you doing that kind of work now?
14      A.  No, sir.
15      Q.  Have you been asked to do that kind of work
16  now?
17      A.  No, but we don't have the data to do it.
18      Q.  Have you since -- during the last three weeks
19  have you been given additional data of any kind?
20      A.  I received the backup for Dr. Bloom's report
21  in the PDF file.
22      Q.  And has that been analyzed?
23      A.  No, sir.
24      Q.  Has there been any work done on it?
```

Page 21

```
1       A.  We looked at it visually.  We just scanned it
2   and looked to see if it was consistent with at least
3   for the people who were on both lists.  We did a couple
4   of spot checks.  That's all.
5       Q.  And are you planning on doing any additional
6   work with it?
7       A.  We haven't been asked to do so.
8       Q.  Other than what you have now testified to,
9   did you ask for any additional kinds of data?
10      A.  Generally speaking if there is data on -- let
11  me step back and try to organize my answer here.  We
12  asked for data on the entire Investment Division.
13  Included in that would be data related to not only
14  their work history and their compensation.  For the
15  entire Investment Division we would want to know
16  termination dates, reasons for termination.  We would
17  want to know as detailed as possible the performance
18  measures of the entire Investment Division.  We would
19  want to know education levels so additional fields for
20  people in the Investment Division we prefer to have.
21      Q.  You want that in order to control the various
22  variables?
23      A.  That's right.  Not just for compensation but
24  for the other analysis as well.
```

6 (Pages 18 to 21)

Page 62

1  for the entire Investment Division.
2      Q.  Let me see if I understand because the
3  question I thought I had asked you -- let me ask a
4  question.  Was there a facially neutral policy that you
5  were attempting to analyze to see if it had a disparate
6  impact on women or were you unable to do that?
7      A.  With the data that we had, I don't know that
8  a specific policy -- I don't know that a specific
9  policy could be garnered out of the data that we had.
10     Q.  So that there was no specific facially
11 neutral policy that you were endeavoring to
12 statistically analyze?
13     A.  What I was trying to do and I think part of
14 it after I read my report again I was thinking that I
15 didn't call these reports the right thing.  It is
16 really more of a cohort analysis or a cohort type of
17 analysis for the disparate impact comparators or the
18 disparate treatment comparators.  I was concerned
19 about, like apparently Dr. Bloom, about self-selection
20 bias.
21     Q.  By self-selection you mean selection by the
22 plaintiff?
23     A.  Right.  I was concerned about doing any
24 statistics on that group of 91 and trying generalize

Page 63

1  that to the entire Investment Division at Putnam.
2      Q.  Let's take the second step.  Again based on
3  your experience as a labor economist in at least your
4  last 15 years of history, I assume you've encountered
5  the term disparate treatment before?
6      A.  Yes.
7      Q.  And what does disparate treatment mean to
8  you?
9      A.  I always associate disparate treatment as a
10 policy that has the intent to favor one group over
11 another.
12     Q.  Okay.  So that I just make a distinction
13 between two people where I award a male more than I
14 will a female for doing the same thing?
15     A.  Right.
16     Q.  That's closer it sounds to me like
17 intentional discrimination.
18     A.  That's the way I always refer to it, yes.
19     Q.  Now, in your conclusions you don't simply use
20 the terms disparate impact or disparate treatment but
21 you carefully I think use the term disparate impact
22 comparators named by the plaintiff or disparate
23 treatment.  Well, let's just take the first one.
24 Disparate impact comparators named by the plaintiff.

Page 64

1  Is there a reason you used that phrase?
2      A.  Because that's the group of people we
3  analyzed.
4      Q.  And did you give the plaintiff at some point
5  a definition of disparate impact and ask her for what
6  the policy might be, the facially neutral that she was
7  concerned with?
8      A.  At the very beginning when we were talking
9  about glass ceiling, when we were talking about
10 promotions, we were talking demotions and terminations,
11 my first thought and my first request -- one of my
12 first requests was I need the data for the entire
13 Investment Division in order to make conclusions about
14 disparate impact.  Of course I asked for it.  I asked
15 for work history data.  It hasn't come.  Absent that,
16 then I felt like the only thing I could really do with
17 these 91 is to do a cohort type of analysis because I
18 didn't want to do an analysis for these 91 and then try
19 to opine on a general statement about the entire
20 Investment Division.
21     Q.  Because you couldn't do that.  You couldn't
22 offer an opinion about the entire division?
23     A.  I didn't have the data to do that.
24     Q.  When you say a cohort analysis, tell me what

Page 65

1  you're referring to.
2      A.  Again, the two different ways I did it, once
3  we narrowed the list of the named plaintiffs -- excuse
4  me.  The named comparators, two ways I thought we could
5  look at the characteristics.  We could look to see how
6  females in that group compared to males and we could
7  also see how Miss Svensson looks compared to her named
8  male comparators for the treatment claims so in writing
9  the report, I called them disparate impact analysis,
10 disparate treatment analysis but after reading it, I
11 thought it's not the best way to describe it.  I think
12 it's more like these cohort types of analysis for
13 various employees.
14     Q.  Now the cohort analysis, if I'm correct,
15 doesn't control for any other variables?
16     A.  No, it does not.
17     Q.  Okay.  Let's talk about your cohort analysis
18 and take me to the tables or appendices where you do
19 the cohort analysis.
20     A.  Well, we have actually been talking about
21 them starting at Appendix B.
22     Q.  Before I ask you any question about Appendix
23 B, when did you ask for the data regarding the entire
24 Investment Management Division?

17 (Pages 62 to 65)

Page 66

1    A.  I expressed my desire to have that kind of
2  data from one of our first meetings.
3    Q.  Which means somewhere in the spring or late
4  spring or summer of 2006?
5    A.  Yes.
6    Q.  Okay.  We were talking about your cohort
7  analysis.  I think you said table Appendix B to your
8  report is more properly called a cohort analysis as
9  opposed to a disparate impact analysis?
10    A.  Yes.  If I see something like this, I
11  typically think of it more along the lines of a cohort
12  analysis.
13    Q.  And that's because you're not really
14  controlling for enough of the variables?
15    A.  It's really just a straight comparison males
16  versus females.  Now, of course the option is that we
17  could control -- for example in this compensation
18  analysis in Appendix B, we could certainly control for
19  the other factors that are listed there but I couldn't
20  make any generalizations to the Investment Division as
21  a whole nor do I think I have enough data to fully know
22  what's going on with their compensation so it's
23  certainly something that could be done.  I think Dr.
24  Bloom did some of that but even then I don't think it

Page 67

1  is an accurate model.
2    Q.  Let's continue if we could.  Where else have
3  you done cohort analysis?
4    A.  Well, if you take Appendix B through Appendix
5  I.
6    Q.  All right.  Let's go to Appendix C then, the
7  next one.  That's the one you had entitled disparate
8  impact analysis promotion to managing director?
9    A.  Right.
10    Q.  And there once again you mean it's a cohort
11  analysis of some sort?
12    A.  I think that's a better title for it, yes.
13    Q.  Where you can't control for a lot of the
14  variables.  Now in that one, this cohort analysis am I
15  correct this doesn't give me any information about the
16  likelihood of a female versus a male to be promoted to
17  managing director?
18    A.  Which is why we did the analysis on the
19  officer directories because I wanted to address that
20  throughout the whole division.
21    Q.  Let's just take it one at a time.
22    A.  Okay.
23    Q.  Because we will get to the other tables but
24  this one again focuses on compensation; correct?

Page 68

1    A.  It focuses on compensation but then the next
2  pages have the other variables that we've talked about.
3    Q.  It's the same as the previous chart in terms
4  of the variables?
5    A.  The categories are the same.  The years are a
6  little different.
7    Q.  Okay.  Now, but as I say, coming back to, if
8  we just stay with this one, again it doesn't show me
9  that women or men for that matter are more or less
10  likely to be promoted from senior vice president to
11  managing director in any of these years you looked at?
12    A.  No, but it does allow you to look at the
13  compensation or the experience of males versus females
14  to the extent that a judge or jury wants to discuss the
15  named comparators from Miss Svensson.
16    Q.  Now here you have a much smaller universe.
17    A.  Right.
18    Q.  Of Miss Svensson's named comparators.  Just
19  stay at the top line.  2000.  Seven females and 28
20  males.
21    A.  Right.
22    Q.  And what was this universe, this subset?
23    A.  These would be the disparate impact promotion
24  comparators that Miss Svensson listed in her fourth

Page 69

1  affidavit.
2    Q.  But you don't have 91 or even anywhere near
3  91.  What's the subset of the 91 you have chosen?  I'm
4  looking at 2000 initially.
5    A.  Right.  That is because in her fourth
6  affidavit I believe she listed roughly 35 people who
7  were her disparate impact promotion comparators.
8    Q.  And what you've shown here, if I'm reading
9  correctly, is that for 2000 in total -- I won't go
10  through all of them but let me just go through some to
11  make sure we understand.  In 2000 for total
12  compensation, that's the box; right?
13    A.  Right.
14    Q.  There is no statistical significance male
15  versus females?
16        MR. WEIR:  Objection as to form.
17    A.  Actually, I think there is.  Now I'm in
18  Appendix C.
19    Q.  Yes.  I'm looking at the negative.  Let me
20  ask you what does the negative refer to under
21  significant?
22    A.  That means that females have a lower average
23  and it means that that average is lower by more than
24  two standard deviations.

18 (Pages 66 to 69)

# EXHIBIT J

**From:** Kevin F. Moloney [mailto:kfm@barronstad.com]
**Sent:** Tuesday, November 20, 2007 11:22 AM
**To:** john k. weir; Kociubes, Joseph L.; kfm @ h; Rodriques, Louis A.
**Subject:** Expert depositions and scheduling

Joe:

(1) The only days that can work for Paul White and Jack and me for the White deposition are December 19 or 20. We also are expecting to get from Paul White by about next Tuesday a CD with the documents that he relied upon, which we are prepared to exchange for a similar production from Bloom at the same time.

(2) It appears that the update date in the present schedule of December 3 no longer makes any sense. We should work out an agreement for updates after the depositions.


/s/ *Kevin F. Moloney*



100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569
Fax: 617.523.8359
e-mail: kfm@barronstad.com

# EXHIBIT K

**From:** Kociubes, Joseph L.
**Sent:** Friday, December 07, 2007 9:35 AM
**To:** kfm@barronstad.com
**Cc:** johnkweir47@aol.com; Rodriques, Louis A.
**Subject:** Svensson v Putnam

Kevin:

We may save ourselves needless activity if we simply communicate clearly.

1)  Do you intend to pay the time charges for Dr. Bloom's deposition or not?  We have previously stated that we would pay the time charges of your experts for their depositions.

2)  You are, and have been, obligated to produce the materials considered by your experts. Plaintiff's reports were due first, and plaintiffs normally go first.  You ultimately proposed that the parties exchange the material their experts considered on November 27.  On November 26, we delivered the material Dr. Bloom relied upon to you.  To date, you have delivered nothing to us. It's a binary question again:  Do you intend to provide us with the material considered by plaintiff's experts or not?  We are not going to bargain with you about material you are obligated to deliver to us.  If you are not going to provide the material at issue, just say so.  (By the way, your email of November 20 also represented that you were expecting a CD with the material considered by Dr. White the following week.)

3)   In response to your request, we agreed to provide you with the data Dr. Bloom considered (which you have had for a couple of weeks now) in machine readable form if you agreed to provide us with your experts' data  (which we have not yet received) in the same form.   Your email continues to equivocate on that issue, so at this point we will simply leave our production as is and call upon you to produce your experts' data immediately.

4)  Plaintiff's experts normally are deposed first since defendant's experts inherently are responsive to plaintiff's case.  We agreed some weeks ago to December 18 for Dr. Bloom's deposition.  Curiously, only thereafter did you tender dates for the depositions of your experts, and the only days tendered  are the two days *following* Dr. Bloom's deposition.  (This, of course, is reminiscent of plaintiff insisting the Lauren Allensmith be deposed before documents were produced based upon the representation that Ms. Allensmith had to be deposed quickly because she was moving from the jurisdiction.  At her deposition, she, of course, indicated she was not going anywhere for at least 6 months.)

 In your email of November 20, you indicated that Dr. White, Jack Weir and you are all available for Dr. White's deposition on "December 19 or 20".  You now insist that Dr. White be deposed on December 20 -- 2 days after Dr. Bloom.  That is not acceptable.  In an effort to get past this issue, we are prepared, assuming the expert materials are provided immediately, to proceed with Dr. White on December 19.

Joe

**From:** ]
**Sent:** Thursday, December 06, 2007 4:52 PM

**To:** Kociubes, Joseph L.; kfm @ h; Rodriques, Louis A.
**Cc:** john k. weir
**Subject:** Experts, etc.

Lou:

   (1) Please confirm that you will be taking the depositions of Richard Siegel and Paul White on December 19 and 20, respectively

   (2) We will provide the data reviewed by Paul White in the form he received it provided Putnam simultaneously provides the data that Bloom reviewed and the related Excel spreadsheet that your e-mail referred to. We also will provide copies of documents supplied to Siegel in paper format. The tax return copies will be in redacted form so as not to produce information that Siegel did not consider in doing his analysis

   (3) Insofar as cost for expert depositions is concerned, we will comply with the rules. Please confirm that Putnam will do the same

/s/ *Kevin F. Moloney*



100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569
Fax: 617.523.8359
e-mail: kfm@barronstad.com

# EXHIBIT L

**From:** JohnKWeir47@aol.com [mailto:JohnKWeir47@aol.com]
**Sent:** Friday, December 07, 2007 7:36 PM
**To:** Kociubes, Joseph L.
**Cc:** Rodriques, Louis A.; kfm@barronstad.com
**Subject:** Re: Svensson v Putnam

Joe:

As Kevin has been out of the office all day, I will undertake to respond to your email of this morning. While I would love to save "needless activity" (of which there has been far too much in this case) by communicating clearly, I do believe that Kevin's 12/6/07 email was clear in respect of our position, which remains as follows:

1) Plaintiff has been waiting since the 30(b)(6) deposition to hear from your side concerning your firm intention to take the depositions of Paul White and Dick Siegal on December 19 and 20, 2007. Until this morning, however, we had heard nothing from you on this subject, and even now I am unclear as to your intentions respecting Mr. Siegal's deposition. Should I infer that you will take his deposition on December 20?

2) As to the order of expert depositions, there is no automatic priority under the federal Rules, and the "normal" procedure in fact varies all over the lot. In any event, I understand your email to request that the deposition of Paul White be moved to 12/19/07, which is acceptable to us and to the witness, although it would still be our preference to do the deposition of Mr. Siegal on 12/19 and Dr. White on 12/20.

3) As to the "binary question" concerning the "expert materials" referenced in your email, I understand that Paul White will provide the plaintiff's "expert materials" to Plaintiff's counsel on Monday, and assuming that occurs, we will provide them to you on Tuesday morning.

4) As to the question of fees, Rule 26(b)(4)(C) provides that "unless manifest injustice would result", the party seeking the expert's deposition shall pay a "reasonable fee for time spent in responding to discovery". Accordingly, as Kevin's email previously advised you, Plaintiff will agree to pay Dr. Bloom a reasonable fee for his time incurred in providing the deposition. Likewise, Putnam must agree to pay a reasonable fee to Dr. White and to Mr. Siegal. Please confirm that you will do so. Neither party is obligated to agree to pay unreasonable or excessive fees, and Plaintiff reserves the right to contest an exhorbitant or excessive fee from Dr. Bloom in Court.

5) I believe that it is in the best interest of all parties to complete the expert discovery on time, in order that we can move on to the next phase of the case. In this respect, I find the tone of your email to Kevin, particularly the inaccurate and gratuitous discussion of the Allansmith deposition, to be extraordinarily unhelpful. There will be plenty of opportunity for these kinds of ad hominem attacks on the Rule 37 motion, and I would urge that such "needless activity" cease, at least for the time being. I hope that I am "communicating clearly", and anticipate your civil response. Jack Weir

Check out AOL Money & Finance's list of the hottest products and top money wasters of 2007.