UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * * * | Civil Action No. 04-12711-PBS |
| LISA SVENSSON, * | BBO Bo. 351000 |
| * | |
| * | <u>ASSENTED TO</u> |
| Plaintiff, * | |
| * | Plaintiff Svensson's |
| * | Motion for Leave to File |
| v. * | a Reply to Putnam's |
| * | Opposition, Filed February 1, |
| * | 2008, to Svensson's Motion |
| * | to Compel Concerning |
| PUTNAM INVESTMENTS, LLC, et * | Expert Deposition and |
| al., * | for Sanctions |
| * | |
| Defendants. * | |
| * | |
| * * * * * * * * * * * * * * * | |

With the assent of defendant Putnam Investment, LLC ("Putnam"),[1] plaintiff Lisa Svensson ("Svensson") moves the court for leave to file a reply to the Putnam opposition, filed Friday, February 1, 2008, to Svensson's motions to compel concerning expert deposition and for sanctions, pursuant to Rule 37 and 28 U.S.C. § 1927.

The grounds for this motion for leave to file, as set forth more particularly in Svensson's reply memorandum, a copy of which is Exhibit "A," hereto, are that the Putnam opposition misrepresents relevant facts, omits relevant facts, misstates and misrepresents Svensson's positions and misstates the law.  Svensson believes that her reply memorandum is necessary for the proper presentation and consideration of the issues raised by Svensson's initial motion to compel and for sanctions.

LISA SVENSSON, plaintiff,

---

[1] Putnam's assent is to the granting of the relief sought and not to the reasons set out in the within motion for that relief or to the contents of the reply memorandum.

By her attorneys,

BARRON & STADFELD, P.C.


/s/ Kevin F. Moloney_____
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir_____
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: February 7, 2008

<u>Certificate of Service</u>.

   This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Kevin F. Moloney_____

Dated: February 7, 2008

[422093.1]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * *  * | Civil Action No. 04-12711-PBS |
| * | |
| LISA SVENSSON, * | BBO No. 351000 |
| * | |
| Plaintiff, * | |
| * | Plaintiff Svensson's |
| * | Memorandum in Reply |
| v. * | to Putnam's Opposition |
| * | Svensson's Motion |
| * | to Compel Concerning |
| PUTNAM INVESTMENTS, LLC, et * | Expert Deposition and |
| al., * | for Sanctions |
| * | |
| Defendants. * | |
| * | |
| * * * * * * * * * * * * * *  * | |

Plaintiff Lisa Svensson ("Svensson") submits this memorandum in reply to the opposition

of defendant Putnam Investments, LLC ("Putnam") to her motion to compel concerning expert

deposition and for sanctions.

This reply is necessary because, as set forth more particularly below, the Putnam

opposition misrepresents relevant facts, omits relevant facts, misstates and misrepresents

Svensson's positions and misstates the law.

1.    <u>Introduction</u>.

In response to her motion to compel and for sanctions under Rule 37 and her motion for

sanctions, pursuant to 28 U.S.C. § 1927, in which Svensson contends, among other things, that

Putnam improperly denied her access to relevant information about the hundreds of her

comparators employed by Putnam in its Investment Management Division ("IMD"), while at the

same time providing the information sought by Svensson to its own expert, Putnam claims that it

would have given Svensson all of the same data it gave its expert, if only she had asked for it. That not only is untrue, it is ridiculous.

Despite Putnam's knowledge (later disclosed in deposition testimony and produced documents) that it managed the IMD centrally and that it compared the hundreds of officers in the IMD with each other for purposes of promotion, compensation and other matters, Putnam continually represented to Svensson and to the court in this case that Svensson had no, or virtually no, comparators.  For example, in advance of the December 2005 hearing on Svensson's motion to compel Putnam to produce the documents requested in her First Request for Production, Svensson's counsel offered to reduce the scope of that request by "limit[ing]" the comparators to,

> ... the investment professionals in the Domestic or International Value, Core and Growth Teams [in the IMD] for the years 2000-2003 inclusive, and the Research Department professionals for the years 2002 and 2003....[1]

The response from Putnam counsel, Mr. Kociubes, was,

> We think this request is <u>still too broad</u>....

(Emphasis added.)

At the June 21, 2006, hearing before the Magistrate Judge, Putnam counsel, Mr. Kociubes, in arguing to the Magistrate Judge that she should not order Putnam to produce information about 91 of the hundreds of IMD officers, told the court that in regard to Svensson's termination,

> <u>There is no comparator to that claim</u>, your Honor[2]

---

[1] E-mail correspondence October 27, 2005.
[2] Transcript ("Tr.") hearing, June 21, 2006, p.11, ll. 24-25.

(emphasis added) and that, in regard to other of her claims, the comparators should be restricted

to the "handful" of portfolio managers on the International Growth team, adding that:

> There are <u>five or six comparators</u> there."[3]

(Emphasis added.)

At no point prior to the close of fact discovery, did Putnam ever acknowledge to

Svensson, or disclose to the court, that the hundreds of officers in the IMD were Svensson's

comparators.  Nor did Putnam ever claim to the court that Svensson was in error for requesting

documents and information about too few rather than too many of them. That now is the

unusual position that Putnam asserts in its opposition to Svensson's motion to compel and for

sanctions.

While Putnam works hard in its opposition to muddy the waters with a combination of

false statements and irrelevant arguments, the crux of Svensson's motion is clear.  From the

outset, Putnam obdurately has resisted Svensson's efforts to obtain discovery concerning

Putnam's treatment of the officer level employees in the IMD who were similarly situated to

Svensson during the relevant period.  Even after it agreed at the July 11, 2006, hearing (after

pressure from the Magistrate Judge at the June 21, 2006, hearing to produce information

concerning only 91 of the IMD officers[4]), Putnam, as shown in §§ 7 and 10, <u>infra</u>, continued to

maintain the position that Svensson had no or virtually no comparators.

Yet at the same time, without disclosing its doings to Svensson or to the court, Putnam, in

"July 2006,"[5] engaged an expert, David Bloom ("Bloom") and thereafter made available to him

---

[3] <u>Id</u>., p. 12, ll. 16-17.
[4] "THE COURT: I'm inclined to permit some discovery here, but what I'm suggesting is that I give you 14 days to sit down together and to see if you can come up jointly with comparators...." Tr., Hearing, June 21, 2006, p. 14, l. 23 – p. 15, l. 1.
[5] Tr., deposition of David Bloom ("Bloom dep."), p. 24, l. 18.

detailed information on its treatment of the hundreds of the IMD officers, the rest of the very comparator information that Putnam had claimed to the court should be denied to Svensson.

Putnam's conduct is grossly unfair and has violated the rules, has multiplied the proceedings in this matter unreasonably and vexatiously and has seriously impaired Svensson's ability to gather evidence sufficient to defeat Putnam's motion for summary judgment and to prepare for trial.

2. <u>Prior proceedings and factual background</u>.

Svensson relies upon and incorporates by reference her memorandum in support of her motion to compel and for sanctions, her prior memoranda submitted to the Magistrate Judge and her memorandum submitted to this court on January 24, 2007, Docket No. 161, and related filings, in support of her objections to the rulings of the Magistrate Judge.

3.    <u>The Putnam contention, opposition ("Opp."), p. 1 and 3, that Svensson has not "pointed to any discovery that [Svensson] requested but has not received" is incorrect</u>.

The discovery that Svensson has sought in this case is not a mystery.  Svensson sought information about the officers in the IMD from the very beginning of this case.  <u>See</u>, pp. 2-3, <u>supra</u>.[6]  She seeks relief in the present motion for the failure and refusal of Putnam to have disclosed on a timely basis, not only the information reviewed by Bloom but also the information he considered and decided not to use.  <u>See</u> § 6, pp. 6-10, <u>infra</u>.

4.    <u>The Putnam contention, Opp. pp. 1 and 3, that Svensson has not "point[ed] to ... any Court Order that Putnam has violated, is incorrect</u>.

The Putnam contention, Opp., p. 1, that its behavior cannot be sanctioned because Svensson has not "point[ed to ... any Court Order that Putnam has violated," is incorrect.  No court order for Rule 37 sanctions is necessary.  As set out in § 3, p. 14, <u>et seq</u>., of Svensson's

---

[6] <u>See also</u> Svensson's motion to compel production, Docket No.24, and related filings.

initial memorandum, the Rule 26 duties of disclosure and supplementation, have, under Rule

37(c), the force of court orders and violations of those duties can and should be sanctioned under

Rule 37(c)(1).

5.    The Putnam contention, Opp. p. 2, that the July 10, 2007, order prevents Svensson from
      seeking relief under Rule 37 and 28 U.S.C. § 1927 is incorrect.

The July 10, 2007, order that "there shall be no further discovery (fact or expert) and no

motions to compel based on past events" does not prevent Svensson from seeking relief under

Rule 37 and 28 U.S.C. § 1927.  Indeed, the schedule ordered by the court on September 24,

2007, specifically allowed the parties to file "[M]otions to compel concerning expert

depositions."

In any event, the instant motions are not requests for "further discovery" or "motions to

compel" within the meaning of the July 10 Order that would be served and filed where there was

no court order or equivalent in place.  The Rule 37 motion seeks relief for violations of the

equivalent of court orders, and the § 1927 motion seeks relief authorized by statute.

It is entirely unreasonable for Putnam to contend that the court on July 10, 2007, in effect

pre-judged and granted Putnam a pardon in advance.

6.    The Putnam contentions, Opp. pp. 2 and 5, that it produced "all" of the information
      "considered" by Bloom is incorrect.

On page 2 of its opposition, Putnam claims that, in November 2007, it produced to

Svensson "all of the data that Professor Bloom considered" in producing his report.  That simply

is not true.  While Putnam produced some of the information on which Professor Bloom relied in

November 2007, it failed to produce other evidence (lists of persons terminated in the years

2000–2003 and Putnam's descriptions and characterizations of the reasons) until the middle of

Svensson's deposition of Bloom on December 18, 2007, and <u>never produced</u> other important information that Bloom considered in connection with his report.

Looked at as a whole, Putnam's conduct with regard to document production forms a disturbing pattern. Bloom's testimony makes clear that Putnam made available to him a broad universe of data, including, at minimum, detailed information about the employment and compensation of all officer level employees of the IMD. After initial discussions with Putnam's counsel, Bloom requested that he be provided with some of the available data, or, after due consideration of its availability, decided that he did not need other types of data. While Putnam produced to Svensson in November 2007 some of the data on which Bloom actually relied, it improperly delayed producing other data which Bloom had requested and considered to Svensson until Bloom's deposition on December 18, 2007. Putnam also failed entirely to produce to Svensson important data which clearly was available to Bloom, and which he clearly considered but did not request from Putnam.

As set forth by Svensson in her initial memorandum, § 3, p. 14, <u>et seq</u>., Putnam was required by Rule 26 to produce any documents "considered" by Bloom, even if Bloom did not rely upon them in his report.

Bloom testified that in preparing his report, he relied in part on documents concerning persons who were officers in the Putnam IMD during the several year relevant period that Putnam had provided to him. They contained information on far more than the 91 comparators as to which Putnam grudgingly had agreed to give Svensson. While the number of officers in the IMD necessarily varied somewhat by year, Bloom admitted that in 2003 the population of officers in the IMD, what he referred to as the "at risk" population, numbered 344. Although Bloom's report was filed in April 2007, some of the information and data Bloom reviewed

(Bloom deposition Exhibits 2A-2G) was not provided to Svensson until November 26, 2007,[7] and the rest was not provided to Svensson until Bloom's deposition on December 18, 2007.

Bloom further testified that Putnam provided him, at his request, with data (at pages 14922-29 of Exhibit 2H of Bloom's deposition) showing officer terminations in the IMD for the years 2000, 2001, 2002 and 2003. Drawn from the universe of all IMD officers in the relevant years, these "Termination Lists" showed information about the officers who had left Putnam during the respective year. The data included each officer's identification number, name, officer position, job title, department name, effective date, termination date and, as an "action/reason" item, Putnam's unilateral characterization of why each officer had left Putnam. Bloom testified that he used that information to determine whether each officer had left voluntarily or involuntarily. Although he reviewed Termination Lists for 2000-2003, Bloom elected to base his termination analysis in his report only on the 2003 data. Contrary to its assertion, Putnam did not produce these lists to Svensson in November 2007, but only on December 18, 2007, in the middle of Bloom's deposition.

With regard to Svensson's compensation related claims, Bloom again had available to him a wide universe of information about person who were officers in the IMD during the several year period. However, he elected to use in his report only data from 2002. Further, Bloom decided to omit from the 2002 compensation data (but not from the 2003 termination data) persons who held the titles of Chief Investment Officer ("CIO"), managing director ("MD"), partners, and assorted other positions, which, in Bloom's opinion, were too high ranking or otherwise not suitable for comparison with Svensson.

---

[7] The lists are included in Exhibit 2H to the Bloom deposition transcript. They were not provided to Svensson until during the Bloom's deposition on December 18, 2007.

While he limited his report to 2002 compensation data, and omitted those high ranking employees, the inescapable conclusion is that Bloom considered the data for the other years involved  and other officers omitted (CIO, MD, partner, etc.) before deciding not to use it.  His deposition testimony makes that though process clear both as to the Termination List data (where he focused only on 2003) and the compensation data (where he decided to focus only on 2002):

117

14    Q.  I come back to an earlier question I'm not
15  sure I have gotten an answer to.  That 344 at risk
16  officer total, does that comprise all of the officers
17  for the time frame that you looked at in connection
18  with preparing this exhibit, all of the officers who
19  were in the Investment Division or are there
20  exclusions?
21    A.  I apologize if I didn't answer this clearly
22  before, but again, the 344 consists of all officers who
23  were in the Investment Division, Investment Management
24  Division of Putnam at the end of 2002 or who were in

118

1  the Investment Management Division at Putnam at the end
2  of 2003, okay, because some people might have been
3  hired in the interim and stayed on or who actually were
4  hired during 2003 but not there at the end of 2003
5  because they terminated or hired or retired during 2003
6  in fact but weren't there at the end because they
7  terminated and I inferred that last part from the
8  termination spreadsheets that we just went over,
9  whatever are these in this Exhibit 2H.  That is what
10   the 344 represents.  That's the algorithm or the recipe
11   I used to create the at risk sample for that analysis
12   and no one that's inside that definition should be
13   excluded.
14    Q.  So that all CIOs are included?
15    A.  That includes -- that's all officers.
16    Q.  Okay.?  Is there some reason why they are
17  included for purposes of this analysis but excluded
18  from other analyses
19    A.  Well, you see in Exhibit 8 they're excluded
20  from the analysis on the bottom panel that said it
21  looks at senior portfolio managers and associate
22  directors or the middle panel looks at just senior vice
23  presidents although -- no.  Actually, there may be some

24   in there as <u>well but what I endeavored to do here is</u>

119

1   <u>just look at the data in different ways that I thought</u>
2   <u>were reasonable and to see whether the results all</u>
3   <u>point in the same direction or not and in the case of</u>
4   <u>the analyses I did of involuntary termination, they all</u>
5   <u>point in the same direction that there are no gender</u>
6   <u>disparities</u>.  If they didn't point in the same
7   direction, I would have noted that or explored further.
8       Q.   <u>I understood you to say earlier in your</u>
9   testimony that <u>they were excluded from the compensation</u>
10   analyses.
11       A.   <u>I did not include them in the compensation</u>
12   analyses.
13       Q.   <u>Yet you include them in the termination</u>
14   analyses?
15       A.   <u>I include them in one of the termination</u>
16   analyses.
17       Q.   <u>Okay.  Why</u> did you include them in this
18   termination analysis but exclude them in the
19   compensation analysis?
20       A.   <u>They could have been included in the</u>
21   <u>compensation analyses, too.  I didn't think it was</u>
22   <u>necessary at the time that I devised the analyses.  I</u>
23   <u>was looking for a tighter comparison given that I was</u>
24   <u>going to do a regression analysis.  It could have been</u>

120

1   <u>included and I could have put in controls for them as</u>
2   <u>well.  I'm not claiming in preparing this report I</u>
3   <u>conducted an exhaustive set of all possible analyses.</u>
4   <u>I did the ones that I thought were most meaningful</u>
5   based on what I understood about Putnam and what I
6   understand about labor economics and sort of employment
7   and earnings determination and these are the ones I
8   did.  <u>These are the ones I reported</u>.  Given that all
9   the results point in the same direction it seems
10   appropriate to leave it at that.

(Emphasis added.)

While Bloom obviously considered compensation data for years other than 2002, and

considered data for officers he decided to omit from his 2002 compensation analysis, Putnam,

other than in regard to the 91 officers, has never produced to Svensson <u>any</u> of that important data

9

concerning the hundreds of the other IMD officers in the other years of the relevant period.[8]  It

not only is a violation warranting sanction but it is highly unfair, then, for Putnam in its motion

for summary judgment now to criticize Svensson's expert, Paul F. White, PhD., for failing to

produce termination and compensation analyses that required the very data which Putnam should

have, but failed and refused, to provide.

7.    <u>The Putnam contention, Opp., p. 4, that it "never has taken the position that Svensson had no or virtually no comparators" is not true.</u>

The Putnam contention, Opp., p. 4, that it "never has taken the position that Svensson

had no or virtually no comparators" is not true. Until the filing of its expert report, the Putnam

position on the comparator issue was that Svensson had no or virtually no comparators. For

example, in advance of the December 2005 hearing on Svensson's motion to compel Putnam to

produce the documents requested in her First Request for Production, Svensson's counsel offered

to Putnam counsel to reduce the scope of that request by "limit[ing] the comparators to,

> ... the investment professionals in the Domestic or International
> Value, Core and Growth Teams [in the IMD] for the years 2000-
> 2003 inclusive, and the Research Department professionals for the
> years 2002 and 2003....[9]

The response from Putnam counsel, Mr. Kociubes, was,

> We think this request is <u>still too broad</u>....

(Emphasis added.)

At the June 21, 2006, hearing before the Magistrate Judge, Putnam counsel, Mr.

Kociubes, in arguing to the Magistrate Judge that she should not order Putnam to produce

---

[8] Unless the data happened to concern one of the 91 comparators as to which Putnam agreed to produce information.
[9] E-mail correspondence on October 27, 2005.

information about 91 of the hundreds of IMD officers, told the court that in regard to Svensson's

termination,

There is <u>no comparator to that claim</u>, your Honor[10]

(emphasis added) and that, in regard to other of her claims, the comparators should be restricted

to the "handful" of portfolio managers on the International Growth team, adding that,

There are <u>five or six comparators</u> there.[11]

(Emphasis added.)

8.    <u>The Putnam contentions throughout its Opposition that its production of the information</u>
<u>reviewed by Bloom was timely and that Svensson waited too long before filing her</u>
<u>motions are incorrect.</u>

Putnam would have the court believe that its production of expert related data on

November 26, 2007, was timely and that Svensson waited too long before filing the instant

motions.  Putnam is wrong.  As a preliminary matter, as pointed out, <u>supra</u>, at p. 7, n.  the

Termination Lists were not produced until during the Bloom deposition on December 18.

Moreover, Rule 26(e)(1)(A) require that supplementation of the Rule 26(a) disclosures be

"timely" and that, in particular, the disclosure of expert related data, not only the data reviewed

but also the data considered, take place at the time required for the filing of the expert report.

In the present case, by at least at some point between July 2006 when it engaged Bloom

and April 2007, when it filed Bloom's report, Putnam knew that the relevant comparator

information concerned all officers in the IMD through the several years of the relevant period,

and knew that it had made available to Bloom all of that data for all of that several year period.

Yet, despite Svensson's several requests for the data, Putnam delayed (conveniently enough for

Putnam purposes) until after the court ordered resumption of the Rule 30(b)(6) deposition on

---

[10] Transcript ("Tr.") hearing, June 21, 2006, p.11, ll. 24-25.
[11] <u>Id</u>., p. 12, ll. 16-17.

11

November 15, 2006, before turning over on November 26, some, but not all, of the data actually reviewed.

Svensson did not sit idly by.  By e-mail on June 30, 2007, Svensson's counsel complained to Putnam counsel that Putnam had furnished data and information to Bloom that Putnam had not supplied to Svensson:

> Please advise re: the below items.....  It appears that Bloom's report used the data not provided to plaintiff and her expert....

On July 2, 2007, Putnam's counsel replied:

> ... we're trying to reach David Bloom today, who is traveling overseas.  I will take this up with him ... when we track him down.

On July 17, 2007, Svensson's counsel sent the following e-mail to Putnam counsel:

> On July 2, you replied ... to my June 30 e-mail ... in regard to the differences in the information made available to the respective experts. Your e-mail states, in part, that "... we're trying to reach David Bloom today, who is traveling overseas.  I will take this up with him ...  when we track him down."
>
> What is the status?

On October 1, 2007, Svensson's counsel sent the following e-mail to Putnam counsel:

> On July 2, 2007, you advised in response to my June 30, 2007, e-mail request for data supplied to, and used by, Bloom but not furnished to us for our expert's consideration, that you were trying to "track [Bloom] down."  I trust that he is not still missing in action.
>
> It is way past the time that you folks should have produced to us what Bloom's report states was provided to him.
>
> Please supply the data forthwith.

On October 4, 2007, Svensson's counsel sent another e-mail to Putnam counsel:

> ... I do not see why you need to have a conference with your Mr. Bloom.  It is a simple matter.  Produce to us what you evidently

furnished only to Bloom and for the details of what we did not get, see the text of my June 30 e-mail....

to which, a week later, on October 11, 2007, Putnam counsel replied:

We are in the process of putting together the data that you have requested and should have it ready in the next few days.

On November 2, 2007, Svensson counsel sent the following e-mail to Putnam counsel

In regard to the White and Bloom reports, we propose that we exchange via electronic copy the things used to form the respective opinions; in other words, exchanging electronic copies of everything used to form the respective opinions, including the databases and computer codes used to conduct the respective statistical analyses, including any materials, programs, and data files that were used to generate the results reported, whether in the text of the report or in footnotes and any materials, programs, and data files relied upon in forming the respective opinions, including, without limitation, the following:

1.    Any programs (SAS, STATA, MATLAB, etc.) used to load data, build database and do analyses.

2.    The program log files which record the order of the programs and document the details of the programs.

3.    All data files received that actually were used in the analysis, including data files that may have been received previously in paper or PDF format but not in an electronic version, including
        (a)    All raw data files;
        (b)    All intermediate data files; and,
        (c)    All final data files.

4.    All files generated by any kind of software such as Excel, ACCESS, StatXact, etc, if used to build the database and/or do any kinds of analyses.

Also to be included are the "Interview notes" referred to by Bloom (Exhibit 3 to the Bloom report lists two Putnam  HR people "who were interviewed or provided business records) and the  files listed in  Exhibit 4 to the Bloom report such as the data files (the electronic versions)

Putnam replied:

> With respect to expert materials....  We are not prepared to go
> beyond the rule's requirements.

Putnam withheld even the data that, according to its October 11, 2007, e-mail was to have been supplied in the "next few days," until <u>after</u> the court ordered resumption of Svensson's Rule 30(b)(6) deposition of Putnam on November 15 had been completed, turning over some, but not all, of that data until November 26, 2007, (and only in pdf images of paper documents).

Without the data actually produced and without the testimony of Bloom in deposition, the time for which was set out in the Court ordered schedule, Svensson was not in a position to file the instant motions. The deposition of Bloom was necessary to discover if Bloom had had access to, and considered, data and information not referred to in his report; when he had been engaged; and if and to the extent he had accepted at face value Putnam's conclusions and characterizations.

9.    <u>The Putnam contention, Opp., p. 7, that Svensson "at no time" between the "summer of 2006" and "January 2008" did Svensson "attempt to expanded [the] universe' of hundreds of IMD officers, instead "insist[ing] upon production of data concerning" only 91 of then is as disingenuous as it is untrue.</u>

This claim by Putnam is not only untrue, it is disingenuous.  First, Svensson, as referred to in her initial memorandum and at pp. 2-3, <u>supra</u>, originally sought information and documents concerning the officers in the IMD.  Putnam, as shown by the events, orders, hearing transcripts and motion papers on the docket and in the record of this case, fought bitterly against her, producing documents carefully redacted to exclude any information about any IMD officer other than Svensson until after discovery was scheduled to close on June 1, 2006, and the fact depositions had been completed.  It was only after pressure from the Magistrate Judge that Putnam made the tactical decision to agree to produce information concerning 91 officers. In the whole debate since before the Magistrate's hearing in December 2005, it always was Putnam's

position that Svensson was claiming too many and that she had far fewer comparators than Svensson contended was the case. During the fact discovery period, It always was Putnam's position that Svensson had "no" comparators on the termination claim and only a "handful" on other of her claims.

More particularly, the untruth of the claim that Svensson never between "the summer of 2006" and "January 2008" did Svensson "attempt to expanded [the] universe" of the hundreds of IMD officers, instead "insist[ing] upon production of data concerning" only 91, is made clear by the series of written requests that Svensson counsel sent to Putnam counsel in the period June to October 2007, which are set out in detail in § 8, pp. 11-9, <u>supra</u>.

10.    <u>The Putnam contention, Opp., p. 8, that the parties "agreed that the scope of discovery would be limited to the 91 comparators insisted upon by Svensson," is incorrect and disingenuous</u>.

The record in this case is clear that the July 11, 2006, agreement by Putnam that it would produce information as to the 91 officers, was without prejudice to its ability to argue that one or more of the 91 were not comparators to Svensson. There was no mention made then or at any later time that Putnam's position was or would be that the hundreds of other officers in the IMD also were comparators. At the July 11, 2006, hearing, Svensson counsel said to the Magistrate Judge of the agreement by Putnam to make discovery as the 91 officers that,

> <u>Putnam is still free to argue its original contentions with respect to a narrower scope of comparators</u> and our side is free to argue to the contrary,

(emphasis added) and, representing to the court that the parties were in "accord," Putnam counsel also said,

> ... With respect to the individual[s], we have been arguing since day one that this universe, it was 16, then 34, now 91 individuals are not within the guidelines of the First Circuit, the appropriate universe of comparators. For purposes of trying to get beyond this

dispute ... we have agreed that we will answer the interrogatories
with respect to the 91 ... <u>without in any way agreeing that that is
the appropriate universe of comparators.</u>

(Emphasis added.)

Putnam confirmed that the comparator debate that had raged was only between zero and

91.  In its memorandum filed October 19, 2006, Docket No. 117, p. 2, n. 1, Putnam took pains to

advise the court that,

> <u>Putnam continues to assert its position that these 91 are not Ms.
> Svensson's legal comparators.</u> For example, <u>among Ms. Svensson's
> 91 comparators are her boss, a subordinate who reported to her,
> people who worked at different times in wholly different
> departments, individuals whose tenure at Putnam never overlapped
> with hers, people performing different jobs, and people reporting
> to wholly different supervisors</u>. Solely in an effort to resolve
> discovery disputes and keep the discovery process moving, Putnam
> agreed to provide certain information about these individuals in
> response to Ms. Svensson's interrogatories. Putnam also agreed to
> unredact previously produced documents with respect to those 91.

> <u>At no time, however, has Putnam conceded</u> -- for purposes of
> discovery or otherwise -- <u>that these</u> individuals <u>are Ms. Svensson's
> legal comparators</u>. Putnam made this clear at the July 11, 2006,
> hearing....

(Emphasis added.)

There never was any agreement by Svensson to accept information only as to 91 officers,

leaving Putnam free to change its position and to contend that that the 91 are only some, but not

all, of the hundreds of IMD officers who were her comparators. Such a contention is ridiculous.

11.  <u>The Putnam contention, Opp., p. 12, that in the late Spring and Summer of 2006,
Svensson's expert knew that "a meaningful analysis could not be performed on the self-
selected 91" and that Svensson argued to the court that what "she wanted was information
about the 91(presumably because she thought that an analysis of the 91 would give her
the best chance of demonstrating statistically significant differences between men and
women)" is false</u>.

Putnam's allegation, Opp. p. 12, that, in the "late Spring and Summer of 2006,"
Svensson's expert, Paul F. White, PhD., knew that "a meaningful analysis could not be
performed on the self-selected 91," yet Svensson argued to the court in July 2006 and thereafter
that what "she wanted was information about the 91(presumably because she thought that an
analysis of the 91 would give her the best chance of demonstrating statistically significant
differences between men and women)" is demonstrably false.  It continues a disturbing pattern of
misrepresentations by Putnam to this court.  In fact, Dr. White, using a statistical technique
known as cohort analysis, specifically concluded in his Report, dated March 14, 2007, at p. 13,
as follows:

> Termination 2003: Appendix I of this report provides the detailed
> calculations for the comparison between the plaintiff and her male
> named comparators for the plaintiff's termination claim.  As can be
> seen from the table, most of the male named comparators are
> above the plaintiff with respect to total compensation, but below
> the plaintiff with respect to base salary.  Most male named
> comparators are below the plaintiff for the final ratings but slightly
> more than half are above the plaintiff for the manager rating.  Most
> of the male named comparators are below the plaintiff with respect
> to investment experience and Putnam tenure.

Moreover, Dr. White testified at his deposition on December 19, 2007, that he had
concluded that Bloom's report was neither complete nor sufficient because Bloom had not
controlled for performance results or ratings for any of the "at-risk" IMD officers, in an industry
in which "performance is king"[12] and did not apply "key features of Putnam's organizational
structure and human resource processes."[13]  Dr. White noted that the "ideal" would have been to
have the information for the whole of the IMD, and that is what he communicated to Svensson in
the "late Spring or Summer" of 2006.  However, it is not true that Dr. White ever concluded that,
if he had had access to the information respecting the "at risk" population in the IMD, it would

---

[12] Deposition of Paul F. White ("White dep."), p. 176, ll. 8-23.
[13] Id., p. 190, ll. 15-24.

have yielded any different results or conclusions than those that he set out on page 13 of his report.

Due to Putnam's conduct throughout this case, through wholesale redaction of relevant documents and misrepresentations to Svensson and the court, Svensson and Dr. White were never given access to information that would have allowed them to test his conclusions on all of the officers in the IMD in each of the relevant years. Yet Putnam now claims the right to use the very information that it withheld throughout the entire fact discovery period in order to argue that Svensson's case should be dismissed for failure on the part of Dr. White to have analyzed the information Putnam had provided to its expert but failed and refused to provide to Svensson. That position is preposterous on its face.

12.   <u>The Putnam contention, Opp., p. 41, that Svensson should not have deposed Lasser and others until after the July 11, 2006, agreement by Putnam to disclose information about the 91 officers, is ridiculous.</u>

This claim of Putnam is "blame the victim." After the December 2005 hearing before the Magistrate Judge, Putnam produced only documents that had been heavily redacted to prevention disclosure of information about any officer in the IMD other than Svensson. The time for fact discovery, as per the court approved amended schedule, was to close June 1, 2006. Until it agreed on July 11, 2007, after pressure from the Magistrate Judge at the hearing on June 21, 2006, to disclose information as to 91 comparators (which actually did not occur until September 1, 2006), Svensson had no other documents. But had Svensson not taken the Lasser and other fact depositions within the allowed time, when it was unknown if the court would order, or Putnam would agree to make further discovery disclosures, is there any doubt that Putnam would have taken the position that Svensson had waived her right to take depositions?

The court should not encourage the "blame the victim" approach.

13. <u>Conclusion and relief requested</u>.

     For the above reasons and those set forth in her initial memorandum, the relief requested by Svensson in that initial memorandum for relief and sanctions under Rule 37 and for the sanctions authorized by 28 U.S.C. § 1927, should be granted.

                      LISA SVENSSON, plaintiff,

                      By her attorneys,

                      BARRON & STADFELD, P.C.

                      /s/ Kevin F. Moloney_____
                      Kevin F. Moloney    BBO No. 351000
                      Roger T. Manwaring BBO No. 548614
                      100 Cambridge Street, Suite 1310
                      Boston, Massachusetts 02114
                      Tel.: 617.723.9800/531.6569

                      and

                      /s/ John K. Weir_____
                      John K. Weir, Admitted PHV
                      John K. Weir Law Offices, LLC
                      300 Park Avenue, Suite 1700
                      New York, New York, 10022
                      Tel.: 212.572.5374

Dated: February 7, 2008

<u>Certificate of Service</u>.

     This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                      /s/ Kevin F. Moloney_____

Dated: February 7, 2008

[422447.1]

19