UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| * * * * * * * * * * * * *  * | | Civil Action No. 04-12711-PBS |
| LISA SVENSSON, | * | BBO No. 351000 |
| Plaintiff, | * | |
| | * | Plaintiff Svensson's |
| | * | Memorandum in Support of |
| v. | * | Her Opposition to Defendant |
| | * | Lawrence J. Lasser's Motion |
| | * | for Summary Judgment |
| PUTNAM INVESTMENTS, LLC, et al., | * | |
| Defendants. | * | |
| * * * * * * * * * * * * * | | |

   Plaintiff Lisa Svensson ("Svensson") submits this memorandum in support of her opposition to the motion of defendant Lawrence J. Lasser ("Lasser") for summary judgment on Count XII of the Amended Complaint. As set forth more fully below, this court should deny Lasser's motion because there exist genuine issues of material fact and he is not entitled to judgment as a matter of law.

1.   Introduction.

   In Count XII of the Amended Complaint, Svensson alleges that Lasser aided and abetted defendant Putnam Investments, LLC ("Putnam") in its discriminatory conduct against her. In response, Lasser asks this court to believe that although he was Putnam's President and Chief Executive Officer and although he sat on the Putnam Board of Trustees and on the board of directors of Putnam's parent company Marsh & McLennan Corp. ("MMC"), he had no personal involvement in Putnam's discriminatory decisions not to promote Svensson, to demote her, to set her compensation and to terminate her.

   In denying any personal involvement, Lasser asks this court to ignore both documentary and testimonial evidence establishing that Lasser was intimately involved in Putnam's personnel and decisions relative to officers in Putnam's Investment management Division ("IMD"), including Svensson, that his approval was required for salary and bonus awards, that his approval was required for promotions,

that no major changes would be made in the IMD without "Larry's approval or at least knowledge," and that changes far more minor than Svensson's termination had required his personal approval. Lasser also invites this court to ignore evidence he was notified that Svensson's management responsibilities had been removed and was aware that Svensson was being terminated and of the terms that would be offered to her, prior to her termination.

This court should reject Lasser's implausible arguments and should deny his motion for summary judgment.

2.  Facts.

Svensson relies on the facts set forth in her "…Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment," her "… Response to Defendant Lasser's Local Rule 56.1 Statement of Fact" ("Svensson Response to Lasser Statement of Facts") and her "… Response to Defendant Putnam's Local Rule 56.1 Statement of Fact" ("Svensson Response to Putnam Statement of Facts"), all filed herewith.

The facts relevant to Lasser's motion for summary judgment include the following evidence of Lasser's pervasive control over Putnam's personnel and Human Resources decisions and his personal involvement in the discriminatory employment actions taken against Svensson:

2.1  Lasser was President and Chief Executive Officer ("CEO") of Putnam and he sat on both the Board of Trustees of the Putnam Funds and the MMC board of directors. Svensson Response to Lasser Statement of Facts, ¶1.

2.2  With regard to personnel or job responsibility changes in the IMD, Putnam's Rule 30(b)(6) witness Mary McNamee ("McNamee"), of Putnam's HR department, testified:

> Q. And did you have an understanding as of June of 2001 why Mr. Lasser's approval was necessary to make changes in the Specialty Growth management area?
> A. Well, <u>any time that there were any changes within the Investment Division, Larry was either given an opportunity to approve or not</u> or just told as an FYI if it was not a major decision but <u>they would not go ahead and make a change without an organization within the Investment Division or in a lot of the other divisions for that matter without Larry's approval or at least knowledge</u>.

2

Svensson Response to Lasser Statement of Facts, ¶1. (Emphasis added).

2.3     Lasser's approval was required before the promotions occurred.  The "in the round discussions" were preliminary to Lasser's approval.  Putnam document, PRM 4031, states that officer promotions were announced to senior management with the opening line: "Larry Lasser has approved all 2000 Officer / Managing Director nominations as submitted, effective April 1, 2000." Although they were approved that year as submitted, his approval was required and without it, promotions did not happen.  Svensson Response to Lasser Statement of Facts, ¶7.

2.4     Lasser's approval was required for changes in the managers of individual mutual funds.  In an e-mail on June 22, 2001, from Specialty Growth CIO Dan Miller to Head of Investments Tim Ferguson, PRM 9782-83, CIO Miller, described changes that were to be implemented on Miller's team, Specialty Growth: "I'll call you Monday to confirm Larry's approval...." The changes include changes of fund managers on several of the mutual funds managed by Miller's team ("Voyager 2: Add Dan Miller, and New Century: Add Steve Kirson"), as well as reassignment of Specialty Growth research coverage responsibilities ("Mike and Roland's modest industry coverage will be absorbed by other members of the team").  Svensson Response to Lasser Statement of Facts, ¶9.  Even though Ferguson was Head of Investments for Putnam, he still needed Lasser's approval for changes far less drastic than terminating Svensson.  Svensson Response to Lasser Statement of Facts, ¶9.

2.5     Lasser's approval was required for the "off cycle promotion of Paul Warren to MD [Managing Director]."  Svensson Response to Lasser Statement of Facts, ¶1.

2.6     Lasser could and did order a halt to all officer promotions.  Svensson Response to Lasser Statement of Facts, ¶1.

2.7     A memo addressed from Mitch Schultz, the Head of Compensation, to the members of the Operating Committee, dated April 10, 2000, to at PRM 4031, verifies that Lasser's approval was required for promotions.  Svensson Response to Lasser Statement of Facts, ¶5.

2.8     The deposition testimony of McNamee as the Rule 30(b)(6) witness describes a process where all the officer nominations for every level were compiled in a book to be sent to Larry Lasser:

> At that point in 2001 there was a book that had firm wide by division a book of nominations. Now, I don't know whether that book was the final book that went to Larry or whether it includes every nomination. It may have been only the ones that were ultimately decided to move forward to Larry in the book.

Svensson Response to Lasser Statement of Facts, ¶5.

2.9     Moreover, Lasser testified at his deposition, that he "occasionally" imposed restrictions on MD promotions because he was concerned periodically about "title inflation." Svensson Response to Lasser Statement of Facts, ¶5.

2.10    Lasser was personally involved in, and his final approval was required for, all compensation decisions. Both the A&P Plan and the Profit Growth Incentive Plan establish that Lasser participated in compensation decisions. The Profit Growth Incentive Plan at Section 5.1, PRM 1372, states:

> The amounts and recipients of Awards <u>will be determined by the President</u>, in his sole discretion, after consultation with senior management and with the Compensation Committee of Putnam ....

and the A & P Plan, Putnam Motion for Summary Judgment Exhibit A1, states:

> The purpose of the Plan is to reward the contributions of selected senior managers and professional staff members of the Putnam Companies <u>at the discretion of the President</u>....

Svensson Response to Lasser Statement of Facts, ¶3. (emphasis in both quotes added).

2.11    Lasser also personally identified "Franchise Players" for additional compensation. In the Rule 30(b)(6) deposition of Putnam (Tibbetts as witness), p. 150, l. 14 – p. 151 l. 17, Tibbetts described a process in which Lasser had the last word on identifying "Franchise Players."

> Q.  What were the implications of an individual being named a franchise player?
>
> \*\*\*

4

> A. There were different ways and mechanisms to try to identify who were the key people within the organization, investment division, and more broadly that would be considered for other compensation.
>
> \*\*\*
>
> Q. What occasioned the transfer from the core[sic] tile system to the franchise player key player system?
>
> A. Larry's arbitrary discussion about how he wanted to try to identify people.

Svensson Response to Lasser Statement of Facts, ¶3.

    2.12    Lasser conducted a week long "bonus recommendation review," along with an additional two week period for "approval." Svensson Response to Lasser Statement of Facts, ¶1.

    2.13    Lasser knew in advance that Svensson was going to be terminated and was aware of the terms that were going to be offered to Svensson. Josh Brooks, Svensson's superior, testified:

> I remember once the decision had been made that we were going to offer Lisa these alternatives, I do remember that Larry mentioned to me he had heard about that. I assumed at the time he had heard it from HR, but I wasn't certain and I didn't ask.

Svensson Response to Lasser Statement of Facts, ¶12.

    2.14    Lasser personally harbored discriminatory animus toward women, as exemplified by the sexual stereotypes apparent in his conversation with Svensson, related in her deposition:

> A. ... And he asked me what my husband did for a living. I told him that my husband was a stay-at-home father. And at that point, Larry said to me -- he said, "He's a stay-at-home father. Wow, that's fascinating. How does that make him feel? I mean, as a man, how does that make him feel?" ... "Well, for example, if you're at a cocktail party, and someone says to him, What do you do for a living? How does that make him feel when he says, I'm a stay-at-home father?" ... And so I consider that, in a way, to be an HR matter. And the reason I consider it that is because he was expressing a fair amount of discomfort in that conversation with the concept that a man would be a stay-at-home father and not be upon a career track. And I considered him, as the head of the organization and setting the tone for the organization, to be really kind of saying to me, your family situation makes me uncomfortable and is not okay with me.
> Q. Of course, he didn't say "Your family situation makes me uncomfortable," did he?
> A. No. What he said was, "How does that make your husband feel as a man?"
> Q. He said, if I'm correct, and correct me if I'm wrong, he said, "Wow, that's fascinating. How does that make him feel?"

5

>       A. As a man.
>       Q. Mm-hmm.
>       A. Not just, "How does that make him feel?" As a man.

Svensson Response to Lasser Statement of Facts, ¶2.

    2.15    Lasser also was aware of the discriminatory practices occurring at Putnam. He knew that women were underrepresented in the Portfolio Manager ("PM") and higher officer levels at Putnam, knew of the disproportionate terminations women suffered at Putnam, and knew of the discriminatory compensation women received.

    3.    <u>Argument</u>.

    3.1    <u>This court should deny Lasser's motion for summary judgment because the evidence produced by Svensson, as more particularly set forth in Svensson's "… Response to Lasser's Statement of Facts," filed herewith, raises genuine issues of material fact as to Svensson's claims and Lasser is not entitled to judgment as a matter of law</u>.

The court should deny Lasser's motion for summary judgment unless "the record demonstrates that there is no genuine issue of material fact and that...[Lasser is] entitled to judgment as a matter of law."[1] In determining whether a genuine issue of material fact exists, the court must review the record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor.[2]

"[C]ourts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." <u>Santiago-Ramos</u> v. <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 54 (1st Cir. 2000); <u>Dominguez-Cruz</u> v. <u>Suttle Caribe, Inc.</u>, 202 F.3d 424, 433 (1st Cir. 2000); <u>Harlow</u> v. <u>Potter</u>, 353 F.Supp.2d 109, 114 (D.Me. 2005). <u>See</u> <u>also</u> <u>Patrick</u> v. <u>Jansson Corp.</u>, 392 F.Supp.2d 49, 54 (D.Mass. 2005) ("[i]n Massachusetts, [s]ummary judgment is a disfavored remedy in the context of discrimination cases based upon disparate treatment. Thus, the issue of discriminatory intent in the great majority of cases is a question of fact." (internal quotation marks and citations omitted)); <u>Sullivan</u> v. <u>Liberty Mut. Ins. Co.</u>, 444 Mass. 34, 38 (2005) ("In cases involving claims of employment discrimination, a defendant employer faces a heavy burden if it seeks to obtain summary judgment: summary judgment is

---

[1] <u>Devlin</u> v. <u>WSI Corporation</u>, 833 F.Supp. 69, 73 (D. Mass. 1993). <u>See also</u>, <u>LeBlanc</u> v. <u>Great American Insurance Company</u>, 6 F.3d 836, 841 (1st Cir. 1993).
[2] <u>LeBlanc</u>, 6 F.3d at 841. <u>See</u> <u>also</u>, <u>Hayes</u> v. <u>Douglas Dynamics, Inc.</u>, 8 F.3d 88, 90 (1st Cir. 1993).

disfavored in discrimination cases based on disparate treatment because the question of the employer's state of mind (discriminatory motive) is elusive and rarely is established by other than circumstantial evidence." (internal quotation marks omitted)).

In the present case, the court should deny Lasser's motion for summary judgment because the evidence, as more particularly set forth in Svensson's "…Response to Lasser's Statement of Facts," filed herewith., raise genuine issues of material fact and Lasser is not entitled to judgment as a matter of law.

    3.2    <u>Svensson has presented sufficient evidence to establish the her underlying claims of discrimination against Putnam</u>.

Lasser asserts that if this court grants Putnam summary judgment on the c.151B and Title VII discrimination claims against it (Counts I and II of the Amended Complaint), Lasser is entitled to summary judgment on Count XII, which asserts that he is personally liable for aiding an abetting Putnam's discrimination. However, as set forth in Svensson's "… Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment," Svensson has presented sufficient evidence to establish the her underlying claims of discrimination against Putnam. <u>See</u> Svensson Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment, pp. 3-10.

    3.3    <u>Svensson's discrimination claims based on Putnam's conduct in failing to promote her, demoting her and in setting her compensation are not time barred</u>.

Lasser argues that he is entitled to summary judgment on Svensson's claim that he aided and abetted Putnam's discriminatory conduct in failing to promote her, demoting her and in setting her compensation because such claims are time barred. In support of this statute of his limitations defense, Lasser adopts the arguments set forth in Putnam's motion for summary judgment.

Putnam and Lasser's statute of limitations argument is fatally flawed for the reasons set forth in Svensson's Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment, filed herewith. First, much of the Putnam conduct on which Svensson relies occurred within 300 days prior to March 1, 2004, the date on which Svensson filed her charge with the Massachusetts Commission Against Discrimination ("MCAD"). Charges based on such conduct were, therefore, unquestionably

7

timely filed.  See Svensson Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment, p. 11.

Second, even to the extent Svensson's claims are based on Putnam conduct occurring more than 300 days prior to the MCAD filing, the statute of limitations is extended by application of the discovery rule because.  Although Svensson was aware of the adverse employment actions taken against her, she neither knew nor had reason to know of Putnam's discriminatory motivation for such actions until less than 300 days prior to filing her MCAD charge.  See Svensson Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment, p. 11-14.

Third, the statute of limitations does not bar Svensson's claims arising from failure to promote, demotion or compensation, because Putnam's discriminatory conduct was in accordance with and formed a part of its general policy and standard operating procedure of discriminating against women in promotions, demotions compensation and other employment matters.  Because that policy (as well as Putnam's discriminatory conduct against Svensson) continued into the period less than 300 days prior to Svensson's MCAD charge, Svensson has established a systemic continuing violation and her claims are timely.  See Svensson Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment, p. 14-18.

Finally, the limitations period applicable to Svensson's claims based upon her demotion to GER should be equitably tolled because Putnam's notice to Svensson of the demotion decision was equivocal as to whether the demotion was permanent or merely temporary until Putnam placed Svensson in another PM position.  See Svensson Memorandum in Support of Her Opposition to Putnam's Motion for Summary Judgment, p. 18-20.

> 3.4  Svensson has presented evidence sufficient to create at least a genuine issue of material fact as to whether Lasser aided and abetted Putnam's discrimination against Svensson in violation of Massachusetts G.L. c. 151B, §4(5) or interfered with Svensson's exercise or enjoyment of her c.151B rights in violation of c.151B §4(4A).

The evidence presented by Svensson establishes (or at least and warrants at least an inference) that Lasser was personally and actively involved in Putnam's discriminatory decisions not to promote her, in

8

demoting her, in terminating her and in setting her compensation. This active involvement is sufficient to render Laser liable under c.151B, §§4(4a) and 4(5). Further, even if Lasser was not actively involved in some of those decisions, his knowledge of Putnam's discriminatory acts and failure even to investigate, much less take action to prevent, Putnam's discrimination against Svensson, renders him personally liable.

Sections 4(4A) and 4(5) state:

> It shall be an unlawful practice:
>
> \*\*\*
>
> 4A. <u>For any person</u> to coerce, intimidate, threaten, or <u>interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter</u>, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.
>
> 5. <u>For any person</u>, whether an employer or an employee or not, <u>to aid, abet</u>, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

(Emphasis added). These sections impose personal liability on corporate officers like Lasser. <u>Beaupre</u> v. <u>Cliff Smith & Assoc.</u>, 50 Mass. App. Ct. 480, 738 N.E.2d 753, 764-65 (2000).[3]

### 3.4.1  Lasser is personally liable because he was actively involved in Putnam's discriminatory acts.

As Lasser admits in his brief (p.13 note 6), a corporate officer can be held personally liable for discrimination where the officer was actively involved. <u>See</u> <u>e.g.</u> <u>Anderson</u> v. <u>Smartbargains, Inc.</u>, 2006 WL 760303, *2 (Mass. Super. 1/10/06) ("Appellate decisions make clear that where a corporation is the employer, the individuals who are allegedly actively involved in the decisions and actions forming the basis of the claim of employer discrimination may also be individually liable for, <u>inter alia</u>, aiding and

---

[3] <u>See also</u>  <u>Anthony</u> v. <u>Busby</u>, 2005 WL 3440644, *2 (D. Mass. 12/15/05); <u>Luciano</u> v. <u>Coca-Cola Enterprises, Inc.</u>, 307 F.Supp.2d 308, 324 n.31 (D.Mass. 2004); <u>Lemire</u> v. <u>Silva</u>, 104 F.Supp.2d 80, 92-93 (D.Mass. 2000); <u>Meara</u> v. <u>Bennett</u>, 27 F.Supp.2d 288, 291 (D. Mass. 1998); <u>Morehouse</u> v. <u>Berkshire Gas Co.</u>, 989 F.Supp. 54, 61-62 (D. Mass. 1997); <u>Anderson</u> v. <u>Smartbargains, Inc.</u>, 2006 WL 760303, *2 (Mass. Super. 1/10/06); <u>Frederick</u> v. <u>Richardson Electronics, Ltd.</u>, 2005 WL 2542929, *7 (Mass. Super. 9/19/05); <u>Gerrie</u> v. <u>Karl Storz Endovision, Inc.</u>, 2003 WL 22700364, *1 (Mass. Super. 7/15/03).

abetting the corporate employer's discrimination. G.L. c. 151B, § 4(5)."). As set forth in the factual section of this memorandum, the evidence establishes that Lasser was personally and actively involved in personnel matters relating to IMD officers like Svensson, including promotions, compensation, demotions/transfers and terminations. In fact, the final decision on such matters was his alone. His approval was required for promotions. Even the Tim Ferguson, the Head of Investments for Putnam, had to obtain Lasser's approval before altering the management of individual mutual funds or reassigning research responsibilities. The bonus plans at Putnam expressly made awards subject to Lasser's approval.

The evidence also shows that Lasser was personally aware of Svensson's impending termination, and the terms that would be offered to her, before its occurrence.

In view of the evidence that Lasser was intimately involved in all IMD promotions, compensation, demotions/transfers and terminations, the only reasonable inference is that he also was actively involved in decisions concerning Svensson's promotion, compensation, demotion and termination. In addition, given his intimate knowledge of Putnam's IMD personnel decisions, and pervasive control over such decisions, the only reasonable inference is that Lasser was aware of the discriminatory manner in which Putnam treated women and that he shared Putnam's discriminatory animus. His use of sexual stereotypes in his conversation with Svensson concerning her husbands "stay-at-home father" status is further evidence of his discriminatory animus.

As an active participant in the discrimination against Svensson, Lasser is personally liable.[4]

    3.4.2   <u>Even if Lasser was not actively involved in Putnam's discrimination against Svensson, he still is personally liable for his failure to take action to prevent the discrimination</u>.

Even assuming, for the sake of argument, that Lasser took no affirmative action to aid Putnam's discriminatory treatment of Svensson, he is nevertheless personally liable for his failure to act to stop the discrimination, in deliberate disregard of Svensson's rights.

---

[4] While Lasser claims that his conduct was not "individual and distinct" from Putnam's, that is not relevant. Even if distinctness were otherwise a requirement, Lasser admits that courts have not required it when the defendant officer was actively involved in the discrimination. Lasser Brief, p. 13 n.6.

Under either §4(4A) or 4(5), a corporate officer can be personally liable for non-feasance.

      (a)      <u>Interference under G.L. c. 151B §4(4A)</u>.

In determining whether to hold a corporate officer personally liable for interference under §4(4A), Massachusetts courts and the MCAD follow the rule set forth in <u>Woodason</u> v. <u>Town of Norton School Committee</u>, 2003 WL 554332, *4 (MCAD 2/19/03), where the full Commission stated:

> Thus, we conclude that in order for an individual to be held liable for a violation of M.G.L. c. 151B he must have, at the very least, "interfered" with another's rights in a manner that was in deliberate disregard of those rights.
>
> Starting from this premise we hold that complaints alleging violations of M.G.L. c. 151B, § 4(4A) may appropriately name individual employees as respondents in the following circumstances:
>
> 1. Where the individuals are alleged perpetrators of unlawful harassment (sexual and otherwise), they may be named as individual respondents, without regard to whether they are supervisors or co-workers. Such individuals may be charged with "interfering with one's exercise or enjoyment of the right to a non-discriminatory, harassment free, workplace."
>
> 2. Where there is direct evidence of discrimination and the alleged perpetrator of discrimination was in a supervisory position in which he or she had direct control over complainant's employment, the individual may be named as acting in deliberate disregard of complainant's rights.
>
> 3. Where there is only circumstantial evidence of discrimination, <u>employees may be named if</u>:
>
>     a. <u>They had the authority or the duty to act on behalf of the employer</u>;
>
>     b. <u>Their action or failure to act implicated rights under the statute</u>; and
>
>     c. <u>There is evidence articulated by the complainant that the</u> action or *failure to act* <u>was in deliberate disregard of the complainant's rights allowing the inference to be drawn that there was intent to discriminate</u> or interfere with complainant's exercise of rights.

<u>Id</u>. at *4. (Underlining and italics added). <u>See</u> also <u>Beasley</u> v. <u>Adamark Uniform and Career Apparel, Inc.</u>, 430 F.Supp.2d 8, 14 (D. Mass. 2006); <u>Poore</u> v. <u>Town of Harwich High School</u>, 2004 WL 2997699, *29-30 (MCAD 3/31/04); <u>Ackerman</u> v. <u>Donald Swartz M.D.</u>, 2004 WL 304416, *9 (MCAD 2/9/04).

Under the foregoing test, a corporate officer may be held liable not just for discrimination in which the officer was personally involved, <u>but also for failure to act to stop discrimination by others</u>. The test

11

speaks of "action or failure to act." Such nonfeasance is actionable if the officer failed to act to stop discrimination by others in "deliberate disregard" of the plaintiff's rights. It is that disregard which justifies an inference that the defendant officer had discriminatory intent.

To show such disregard, the plaintiff must establish that the defendant officer had knowledge that discrimination was occurring, was in a position to stop it, and had a duty to do so. See discussion of similar requirement under §4(5), below.

(b)  Aiding and abetting under G.L. c. 151B §4(5).

The standard of liability for aiding and abetting under §4(5) is similar to that for interference under §4(4A), in that aiding and abetting may be based on nonfeasance where the defendant officer knows of the discrimination, has the authority and the duty to act, fails to act in deliberate disregard of the plaintiff's rights, and the failure to act harms the plaintiff. According to the court in Mayo v. Dalbar, Inc., 2002 WL 1020725 (Mass. Super. 4/19/02):

> Where, as here, the plaintiff does not allege facts to support the individual defendants' participation in the harassment, but rather alleges a failure to intervene, the plaintiff must show that the individual defendants: (1) had knowledge of ongoing sexual harassment but failed to act; and (2) the failure to act caused injury to the plaintiff..... As discussed in Morehouse, however, implicit in the court's analysis in Chapin is a recognition that in the case of a failure to intervene the plaintiff must show that the situation required action by the individual defendant.... Thus, the plaintiff in this case must also show that the individual Defendants were: (1) required to act under the circumstances; and (2) in a position to discipline the harassers and stop the misconduct.

Id. at *3. In Morehouse, the court, citing Chapin v. University of Massachusetts at Lowell, 977 F.Supp. 72 (D. Mass. 1997), stated:

> A similar argument that an individual's "nonfeasance" precludes his liability under chapter 151B was recently rejected in Chapin v. University of Massachusetts, 977 F.Supp. 72 (D.Mass.1997). Chapin held that a female police officer stated an actionable claim against the police chief for aiding and abetting sexual harassment under Mass. Gen. Laws ch. 151B, § 4(5), where the officer alleged that the chief had knowledge of ongoing sexual harassment but failed to act, and where that failure to act caused injury to the officer. Id. at 80. The court noted that in situations where the nonfeasance results from "deliberate indifference" and not mere inattention or negligence, such nonfeasance "is not 'mere inaction,' but a designed and willful act of forbearance in a situation where action is required." Id. at 79....

12

989 F.Supp. at 61-62. (Emphasis in original). And in Gerrie, 2003 WL 22700364, the court said:

> Although the defendants are correct that no Massachusetts appellate decision directly addresses Boucher's individual liability for failing to act on the plaintiff's claims of harassment, there is substantial authority from this Court and the U.S. District Court holding that a supervisor who knows of workplace harassment in his department, has a duty and the authority to act, and fails to do so, may be liable as an aider and abetter.

Id. at *1. See also LeClerk v. Interstate Distributors Division of Hudson News Co., 2000 WL 33170694, *10 (Mass. Super. 8/31/00).

Discussing the type of conduct which satisfies the "deliberate indifference" standard, the United States District Court, in Chapin, explained that a plaintiff is entitled to an reasonable inference that the defendant officer's failure to act was due to deliberate indifference:

> A failure of an employer to act in the face of knowledge that sexual harassment is occurring in the workplace may result from one of two causes. It may result from inattention, that is from negligence; <u>but it also may result from a conscious act of the will, that is, from deliberate indifference</u>. ... In the latter case, the nonfeasance is not "mere inaction," but a <u>designed and willful act of forbearance in a situation where action is required</u>.
>
> The complaint here alleges that Rowe had actual or constructive knowledge of the harassment and other discrimination, but failed to take action even to investigate the plaintiff's grievances. Comp. ¶ 17. Indeed, the complaint alleges that discrimination and sexual harassment had existed in the UML Police Department from a time before Chapin began work there and that Rowe knew about, but did nothing to remedy, this wrongdoing. Comp. ¶ 16, 17. <u>From these allegations, a reasonable inference, to which the plaintiff is entitled, is that Rowe was deliberately indifferent to the plight alleged by the plaintiff, that his failure to act was not merely passive, but an affirmative condonation of the wrongdoing</u>....

977 F.Supp. at 79-80. (Emphasis added).

Thus, it is clear that a corporate officer who knows discrimination is occurring but still fails to take action to stop it, is personally liable

In the present case, the evidence presented by Svensson strongly supports a reasonable inference that Lasser was well aware of all personnel and compensation decisions affecting IMD officers, and well aware that Putnam was discriminating against women, including Svensson.

13

McNamee testified that no significant change could be made at Putnam without Lasser's approval or at least his knowledge.

Being aware that discrimination was occurring, and being in perfect position to stop it from occurring, Lasser had a duty to take action to prevent it. Yet, with deliberate indifference to the rights of Svensson and other women, he chose not to act, thereby tacitly condoning Putnam's discriminatory practices. His failure to act resulted in harm to Svensson. Therefore, Lasser is personally liable.[5]

---

[5] Lasser claims that his liability is determined by the test enunciated by the MCAD in Harmon v. Malden Hospital, 96 BEM 1146 (1997), under which, among other things, "The wrong must be separate and distinct from the claim in main.'" He argues that Svensson cannot prove that his conduct was separate and distinct from that of Putnam.

Even assuming that the Harmon is applicable, Lasser conveniently fails to advise the court that, under Massachusetts law, the requirement that personal liability be based on a "wholly individual and distinct wrong" is satisfied where, as here, a corporate supervisor, having knowledge that discrimination is occurring, and with intent to discriminate, fails to take action to stop the discriminatory conduct of others, under circumstances that evidence the supervisor's "deliberate disregard" of the plaintiff's rights. In Gledhill v. Univ. of Massachusetts Medical School, 23 Mass. L. Rep. 130, 2007 WL 3012904, *4-5 (Mass. Super. 9/17/07), the plaintiff claimed that various supervisors of an employee who had harassed her were liable for aiding and abetting due to their failure to take action. The Superior Court (Lemire, J.) quoted the Harmon test requiring "individual and distinct" conduct. With regard to that requirement, the court then cited with approval the MCAD decision in Hope v. San-Ran, Inc., 8 M.D.L.R. 1195, *17 (1986):

> In Hope v. San-Ran, Inc., 8 M.D.L.R. 1195, *17 (1986), the commission held a restaurant's general manager individually liable for his knowing acquiescing in another employee's discrimination. The complainant informed the general manager on numerous occasions that her direct supervisor was sexually harassing her, but he failed to undertake any action on her behalf. Id. at *5-7. Eventually, the complainant's supervisor fired her, and upon her further complaint to the general manager, he promised to look into the situation and get back to her shortly. Id. at *8. He never did so. Id. The Commission held that the general manager's "acquiesc[ence] in the termination of [the Complainant] when she refused to put up with and complained about sexual harassment" was a "separate, illegal act[ ] of aiding and abetting discrimination," which was sufficient to hold him personally liable. Id., at *17.

(Emphasis added). A supervisor's nonfeasance in the face of known discrimination, is an affirmative act distinct from the conduct of the corporation or the persons directly discriminating. Chapin v. Univ. of Massachusetts at Lowell, 977 F.Supp. 72, 79-80 (D. Mass. 1997) ("The complaint here alleges that Rowe had actual or constructive knowledge of the harassment and other discrimination, but failed to take action even to investigate the plaintiff's grievances….From these allegations, a reasonable inference, to which the plaintiff is entitled, is that Rowe was deliberately indifferent to the plight alleged by the plaintiff, that his failure to act was not merely passive, but an affirmative condonation of the wrongdoing….Furthermore, a failure to act on complaints of sexual harassment-whether the result of design or of inattention-may have a discernible impact in a hostile environment case. A deaf ear from management may contribute to and encourage the hostility of the workplace, creating an impression that employees may engage in sexual harassment or discrimination with impunity. In this sense, inaction on the part of a

      3.5    <u>If this court would otherwise grant Lasser's motion for summary judgment based on a finding that Svensson has not presented evidence creating a genuine issue of material fact as to Putnam's liability on Counts I and II of the Amended Complaint, it should instead defer ruling on the motion pursuant to Fed. R. Civ. P. 56(f) until Svensson has had the opportunity to conduct additional necessary discovery</u>.

If this court would otherwise grant Lasser's motion for summary judgment based on a finding that Svensson has not presented evidence creating a genuine issue of material fact as to Putnam's liability on Counts I and II of the Amended Complaint, this court should instead defer ruling on the motion until Svensson has had the opportunity to conduct additional necessary discovery.

Fed.R.Civ.P. 56(f) states,

> When affidavits are unavailable.  Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In <u>Bird</u> v. <u>Continental Insurance Company</u>, 1993 WL 485781 (1st Cir. 12/1/93), the Court of Appeals stated,

> Rule 56(f) offers an "'escape hatch'" to a party opposing a summary judgment motion who "genuinely requires additional time to marshal 'facts essential to justify its opposition'".

---

high official in management-someone like Rowe-may be an affirmative link to conduct that violates ch. 151B § 4(5)." (Emphasis added))).  In the alternative, the quoted language from <u>Chapin</u> indicates that a supervisor's nonfeasance in the face of known discrimination is affirmative conduct, thus constituting active involvement in the discrimination and rendering any distinctness requirement inapplicable.  <u>See</u> note 4, <u>supra</u>.

The <u>Gledhill</u> court reiterated that "non-action by a supervisory employee, with knowledge that sexual harassment or other prohibited discrimination is occurring in the workplace, is actionable by a victim of the wrongdoing as aiding and abetting." <u>Id</u>. at *5, citing <u>Chapin</u>, 977 F.Supp. at 80 (finding that Massachusetts appellate courts would require a plaintiff to prove that a supervisor knew of sexual harassment, failed to act on it, and that the failure caused injury to the plaintiff).  As the court of Appeals in <u>Beaupre</u> v. <u>Smith & Assoc.</u>, 50 Mass. App. Ct. 480, 495 n.24 (2000), made clear, "nonharassing supervisory corporate employees can be held, as they have uniformly been, individually liable under the aiding and abetting provision for failing to report or remedy, or for acquiescing in, sexual harassment by other employees").  <u>See also</u> <u>Gerrie</u> v. <u>Karl Storz Endovision, Inc.</u>, 2003 WL 22700364, *1 (Mass. Super. 7/15/03) ("there is substantial authority from this Court and the U.S. District Court holding that a supervisor who knows of workplace harassment in his department, has a duty and the authority to act, and fails to do so, may be liable as an aider and abetter.", citing <u>Morehouse v. Berkshire Gas Co.</u>, 989 F.Supp. 54, 61-63 (D.Mass.1997); <u>Chapin v. University of Massachusetts at Lowell</u>, 977 F.Supp. 72, 80 (D.Mass.1997, Lindsay, J.); <u>Mayo v. Dalbar, Inc.</u>, 14 Mass. L. Rptr. 493, 2002 WL 1020725 (Mass.Super.; Houston, J.); <u>LeClerc v. Interstate Distributors Div. of Hudson News Co.</u>, 2000 WL 33170694 (Mass.Super .; Mulligan, J.).

Id. at *6, quoting Mattoon v. City of Pittsfield, 980 F.2d 1, 7 (1st Cir. 1992), which quoted Patterson-Leitch Co. v. Massachusetts Municipal Whole Sale Electric Co., 840 F.2d 985, 988 (1st Cir. 1988).

The general rule in the First Circuit is that a court should grant a Rule 56(f) motion where the party seeking discovery submits a Rule 56(f) affidavit showing: (1) a plausible basis for the belief that specified discoverable material facts exists which are not yet in evidence; (2) a realistic prospect that the additional facts can be obtained within a reasonable time; (3) that the additional facts will create a trial-worthy issue which is both genuine and material; and (4) good cause to explain why the party seeking discovery did not conduct discovery earlier.[6]

Finally, it is settled law in the First Circuit, and elsewhere, that a court should liberally apply Rule 56 where the interests of justice would be served, Patterson-Leitch, 840 F.2d at 989; Hebert v. Wicklund, 744 F.2d 218, 222 (1st Cir. 1984), and Rule 56(f) motions should be granted routinely where the party moving for summary judgment has sole possession of the facts needed to oppose the motion.[7]

The present case cries out for application of Rule 56(f). As set forth more fully in Svensson's memorandum in support of her "Motion to Compel Concerning Expert Deposition and for Sanctions, Pursuant to Fed. R. Civ. P. 37(c)" and her memorandum in support of her "Motion .. for Sanctions Pursuant to 28 U.S.C. §1927," evidence of Putnam's treatment of Svensson's comparators, officers in Putnam's IMD, is essential to Svensson's proof of her discrimination claims. Putnam resisted Svensson's efforts to obtain discovery concerning Putnam's treatment of the officer level employees in the IMD who were similarly situated to Svensson during the relevant period. Even after it agreed at the July 11, 2006, hearing (after pressure from the Magistrate Judge at the June 21, 2006, hearing to produce information

---

[6] Bird, 1993 WL 485781, *6; Mattoon, 980 F.2d at 7-8; Bank One Texas, N.A. v. A. J. Warehouse, Inc., 968 F.2d 94, 100 (1st Cir. 1992); Nestor, Colon, Medina & Sucessores, Inc. v. Custodio, 964 F.2d 32, 38 (1st Cir. 1992); Price v. General Motors Corporation, 931 F.2d 162, 164 (1st Cir. 1991); Patterson-Leitch, 840 F.2d at 988-990; Strahm v. WSI Corporation, 1993 WL 540566, *9 (D. Mass. May 14, 1993).
[7] Hebert, 744 F.2d 222 n.4, citing Ward v. United States, 471 F.2d 667, 670 (3rd. Cir. 1973); Concord Laboratories, Inc. v Concord Medical Center, 552 F.Supp. 549, 554 (N.D. Ill. 1982). See also, International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1267 (5th Cir. 1991); Strahm, 1993 WL 540566, *6; C-B Kenworth, Inc. v. General Motors Corporation, 118 F.R.D. 14, 16-17 (D. Me. 1987) ("continuances under Rule 56(f) are particularly appropriate where the cause of action is complex, and where the facts essential to the opposing party's affidavit are within the other party's exclusive control.").

concerning only 91 of the IMD officers[8]), Putnam, continued to maintain the position that Svensson had no or virtually no comparators.

Yet at the same time, without disclosing its doings to Svensson or to the court, Putnam, in "July 2006,"[9] engaged an expert, David Bloom ("Bloom") and thereafter made available to him detailed information on its treatment of the hundreds of the IMD officers, the rest of the very comparator information that Putnam had claimed to the court should be denied to Svensson. Putnam's conduct is grossly unfair and has violated the rules, and has seriously impaired Svensson's ability to gather evidence sufficient to defeat Putnam's motion for summary judgment.

Given the importance of the comparator data improperly withheld by Putnam to Svensson's proof of her discrimination claims, and the fact that such information is entirely within the control of, and readily available to Putnam, there is no doubt that (1) there is a plausible basis for the belief that specified discoverable material facts exists which are not yet in evidence; (2) a realistic prospect exists that the additional facts can be obtained within a reasonable time; (3) that the additional facts will create a trial-worthy issue which is both genuine and material; and (4) that Svensson has shown good cause (Putnam's improper conduct) to explain why she did not obtain the information earlier via discovery.

The same grounds that support the application of Rule 56(f) to Putnam's motion for summary judgment also warrant Rule 56(f) relief as to Lasser's motion if the ground for granting Lasser's motion is that Svensson has not satisfied her summary judgment burden on Counts I and II against Putnam.

3. <u>Conclusion</u>.

For all of the foregoing reasons, this court should deny Lasser's motion for summary judgment or, if the motion is not denied, should defer ruling on the motion pursuant to Fed. R. Civ. P. 56(f) until

---

[8] "THE COURT: I'm inclined to permit some discovery here, but what I'm suggesting is that I give you 14 days to sit down together and to see if you can come up jointly with comparators...." Tr., Hearing, June 21, 2006, p. 14, l. 23 – p. 15, l. 1.
[9] Tr., deposition of David Bloom ("Bloom dep."), p. 24, l. 18.

17

Svensson has had the opportunity to conduct additional necessary discovery.

        LISA SVENSSON, plaintiff,

        By her attorneys,

        BARRON & STADFELD, P.C.

        /s/ Kevin F. Moloney_____
        Kevin F. Moloney BBO No. 351000
        Roger T. Manwaring BBO No. 548614
        100 Cambridge Street, Suite 1310
        Boston, Massachusetts 02114
        Tel.: 617.723.9800/531.6569

        and

        /s/ John K. Weir_____
        John K. Weir, Admitted PHV
        John K. Weir Law Offices, LLC
        300 Park Avenue, Suite 1700
        New York, New York, 10022
        Tel.: 212.572.5374

Dated: February 15, 2008

<u>Certificate of Service</u>.

  This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

        /s/ Kevin F. Moloney_____

Dated: February 15, 2008

[422714.1]