UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * *      Civil Action No. 04-12711-PBS
                            *
LISA SVENSSON,              *      BBO Bo. 351000
                            *
          Plaintiff,        *      Plaintiff Lisa Svensson's
                            *      Response to Defendant
                            *      Putnam Investments, LLC's
v.                          *      Local Rule 56.1 Statement of
                            *      Fact
                            *
PUTNAM INVESTMENTS, LLC, et *      DRAFT Revised 2008 02 15
                                   11 42 a.m.
al.,                        *
                            *
          Defendants.       *
                            *
* * * * * * * * * * * * * * *
```

Plaintiff Lisa Svensson responds to defendant Putnam

Investments, LLC ("Putnam")'s Local Rule 56.1 Statement of

Undisputed Material Facts as follows:

1.   Putnam statement: Putnam manages money for individuals and
     institutional investors. Affidavit of Richard B. Tibbetts
     ("Tibbetts Aff.") at ¶ 2.

          Svensson's response: Not disputed.

2.   Putnam statement: Plaintiff, Lisa Svensson ("Svensson"), was
     hired as an Analyst and Vice President in 1994

          Svensson's response:  Disputed.

          When, on behalf of Putnam he hired Svensson as an

     analyst and Vice-President, Patrick O'Donnell, then

     Director of Research in the Putnam Investment

     Management Divisions ("IMD"), promised on behalf of

     Putnam that he would help Svensson to become a

Portfolio Manager.  Svensson deposition transcript

("Svensson dep."), p. 80, l. 23 – p. 81, l. 4.

Continuation of Putnam statement No. 2: and she served
thereafter as an investment professional in Putnam's
Investment Management Division ("IMD"). Tibbetts Affidavit,
dated January 15, 2008, ¶ 3.

Svensson's response: Not disputed but see above

response.

3.    Putnam statement: Svensson was hired as an at-will
employee,

Svensson's response: Insofar as the statement is one

of fact, see response to No. 2, above.  Questions of

law are for the court to determine.

Continuation of Putnam statement No. 3: and Putnam never
changed her employment status. Tibbetts Aff. ¶ 40.

Svensson's response: Disputed.

While Svensson remained an at-will employee, she

was demoted in May 2002, and terminated on September

15, 2003.  Putnam document, PRM 8654,

"ERS_Job_Summary_By_Emplid," shows Svensson's job

status during her period of work at Putnam, including

dates of Svensson's demotion and termination.  See

also the response to No. 2, above.

4.    Putnam statement: Investment professionals at Putnam
often had officer titles (in addition to functional
titles), such as Assistant Vice President, Vice President,
Senior Vice President ("SVP") and Managing Director ("MD").

Svensson's response: Not disputed.

5.    Putnam statement: The Chief Investment Officer ("CIO") of each team nominated individuals to officer positions, such as MD, whom the CIO believed to be worthy of officer promotion.

       Svensson's response: Disputed.

       Members of senior management were involved in the process before nominations were made.  For example, on or about January 28, 2002, Sherrie Holder-Watts ("Holder-Watts"), a Putnam Human Resources Department ("HR") officer, gave Stephen Oristaglio ("Oristaglio"), a Senior MD and Deputy Head of Investments, who also was a member of the Operating Committee, the names of the officers in Domestic and International Growth who were to be nominated for Managing Director ("MD"). E-mail from Holder-Watts to Chief Operating Officer Brett Browchuk ("Browchuk") dated January 28, 2002, PRM-1897.  In this e-mail, Holder-Watts told Browchuk that "I suggested to the Growth CIO that they should share any nominations with Steve {Oristaglio] before your deadline.  I also gave Steve a heads up that the 3 nominations (England, Svensson, Dexter) were probably going to be made by Growth and that he should inform the managers if he did not wish them to make them."

Continuation of Putnam statement No. 5: IMD's senior

management discussed officer promotion candidates in detail in "roundtable" meetings.

Svensson's response:  Disputed.

The promotion of Paul Warren ("Warren") to MD occurred off cycle on January 3, 2000.  "ERS_Job_ Summary_ By_Emplid", PRM-8657.  There is no evidence that it was preceded by "roundtable" discussion. Instead, an e-mail exchange occurred between HR Chief Kathy Collman ("Collman"), CIO Justin Scott ("Scott"), and defendant  Lasser ("Lasser"), in which  Collman requests Lasser to "endorse" the recommendation that she was forwarding from  Scott to promote Paul Warren ("Warren") to MD "off-schedule." PRM 9514-9516. Joshua Brooks ("Brooks") testified in deposition that when he was hired by Putnam in "March" or "April" 2003 from outside of Putnam, he joined Putnam as Head of Research, with the title of MD.  Brooks deposition transcript ("Brooks dep."), p. 8, l. 14 – p. 9, l. 1. There is no evidence of any prior "round table" discussion concerning this appointment.

Continuation of Putnam statement No. 5: and selected for promotion to MD those individuals they considered appropriate, subject to final review by Putnam's senior management.

Svensson's response: Disputed.

See above response.  In addition, William Landes

("Landes"), predecessor of Brooks as head of Research,
expressed concern about "changing the [MD promotion]
process in midstream" after Lasser expressed concern
about "inflation in the promotions" and directed that
no promotions to MD be made in 2003. E-mail between HR
representative Richard Tibbetts ("Tibbetts") and
Landes, dated February 24, 2003, PRM 14236-37.

Continuation of Putnam statement No. 5: MD is an
organizational officer title and is not an "open position"
to which employees applied.

   Svensson's response: Disputed.

   Putnam hired investment professionals from
outside the firm into open positions in the IMD at the
level of MD.   Examples include Brooks, Brooks dep.,
p. 8, l. 20 – p. 9, l. 1;  Shigeki Makino, Putnam
document, "ERS_Job_Summary_By_Emplid", PRM 8615; Colin
Moore, Putnam document "ERS_Job_Summary_By_Emplid",
PRM 8627; Dirk Morris, Putnam document
"ERS_Job_Summary_By_Emplid", PRM 8630.  Internal
candidates were nominated for these positions unless
they took a different path such as Paul Marrkand
("Marrkand") who demanded appointment to the MD
position, proclaiming on his 2002 review form: "I
agree with Paul {warren}'s review [of my
performance]and expect to be made a Managing Director

in April, 2003."  Putnam document, last page of
Marrkand's PDPR manager review for 2002, PRM 7108.
There were no promotions to MD in 2003, but Marrkand
received the promotion to MD in 2004,
"ERS_Job_Summary_By_Emplid," PRM 8617-18, despite the
following comments in prior reviews:  "While he is
often accused of lacking humanity, he has been willing
to listen to his colleagues." Manager comment from
Marrkand's 2000 PDPR review, PRM 7096; "He is still
abrasive and needs to listen to others...." Manager
comment from Marrkand's 2001 PDPR review, PRM 7112;
"…It is very reassuring that the negative opinions of
Paul have now been replaced by very positive comments.
However, I believe there is further room for
improvement.  Paul needs to show leadership skills and
understand that within the team there is a difference
between challenging and confronting his colleagues
...." Manager comment from Marrkand's 2000 PDPR
review, PRM 7105.

6.    Putnam statement: Compensation of investment professionals
consisted of base salary and incentive pay.

          Svensson's response: Disputed.

          Compensation consisted of several elements: base
salary, cash bonus distribution from the appropriate pool

(either the Associates and Principles plan ("A and P Plan")
or the Partner's plan "Partner's Plan"), Profit Growth
plan, Putnam equity and options (as part of Equity
Partners' Plan), and Marsh & McLennan Cos. Inc. ("MMC")
restricted shares and options.  See Putnam document, "Plan
Year 2002-2003 Bonus History", PRM 14869-74.  When asked at
his deposition if incentive compensation included the value
of Putnam and MMC stock options, Lasser testified, "The
determination of the total was not limited to the cash
bonus but included the award of stock options." Tr.,
deposition of defendant Lasser ("Lasser dep."), p. 20, l.
21 – p. 21, l. 23.

Continuation of Putnam statement No. 6: Base salary was
reviewed annually.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 6: Incentive
compensation consisted of year-end discretionary incentive
bonuses

Svensson's response: Disputed.

Compensation that was used to reward, and to
provide incentives to, officers in the IMD, included,
as noted above, both year-end discretionary cash
bonuses and discretionary stock and/or option grants.
MMC restricted shares and options also were included
in compensation.  See "Plan Year 2002 Bonus History,"

PRM 14871.

<u>Continuation of Putnam statement No. 6</u>: and potential discretionary grants of Putnam equity (restricted shares and options). Tibbetts Aff. ¶ 7.

<u>Svensson's response</u>:  <u>Disputed</u>.

All compensation above base salary whether cash paid as a bonus, deferred, Putnam or MMC stock or options was discretionary.  See, for example, Exhibit A to Putnam's Answers to Interrogatories, at PRM 5728-39.  In this example, Erin Spatz, a female analyst in Global Equity Research ("GER") was given a zero bonus for 2001.  PRM 5735, "Svensson – 91 Comparators – 2001 Employment Details", and no stock compensation for 2001. Putnam document, "Plan Year 2001 Equity Grants," at PRM 5741.  According to Putnam, Spatz left for a "career growth opportunity" on May 10, 2002. Putnam document, "2002 Investment Terminations" table, PRM 14856.  Although Spatz was still an employee in good standing at the time of the March 2001 bonus payment, Putnam gave her no bonus, showing that the entire bonus, including cash, deferred and equity, is discretionary.

7.    <u>Putnam statement</u>: Svensson participated in the Associates and Principals Incentive Compensation Plan ("A&P Plan"),

<u>Svensson's response</u>: <u>Not disputed</u>.

Continuation of Putnam statement No. 7: which paid discretionary cash bonuses to participants. Tibbetts Aff. ¶ 8.

>    Svensson's response: Disputed.

> Svensson also participated in the Equity Partnership Plan ("EPP") and the MMC award plan ("MCC Award Plan") Svensson is shown as a participant in the EPP in the table, "Plan Year 1999 Equity Grants" at PRM 5735. Svensson is shown as a participant in the MMC Award Plan in the table, "Plan Year 2002 Bonus History" at PRM 14869. Typically, these awards were made in March at the time the bonus payments were made. Fifth Affidavit of Lisa Svensson ("Svensson Fifth Affidavit") filed herewith, ¶ __, and were considered part of compensation. For example, when asked at his deposition if incentive compensation included the value of Putnam and MMC stock options, Lasser testified, "The determination of the total was not limited to the cash bonus but included the award of stock options." Lasser dep. p.. 20, l. 21 – p. 21, l.23.

8.   Putnam statement: To be eligible for a bonus pursuant to the A&P Plan, an employee had to be employed on the date when bonuses were paid.

>    Svensson's response: Disputed.

>    Section 6.4 of the A and P incentive compensation

plan document, Putnam's Appendix A1 to its Motion for

Summary Judgment, states the following:

> 6.4. Involuntary Termination Not for Cause. The
> general rule set forth in Section 6.3 is modified as
> to a Participant whose employment with the Putnam
> Companies (a) terminates because he becomes Totally
> Disabled, Retires or dies or (b) is terminated at the
> instance of his employer for reasons other than his
> misappropriation of assets of Putnam, willful
> misconduct in the performance of the duties of his
> position, refusal to perform the duties of his
> position, violation of his Non-Solicitation Agreement
> or Confidentiality Agreement, violation of the Putnam
> Code of Ethics, breach of fiduciary duty or breach of
> trust, willful violation of an important Putnam policy
> or conviction of a felony, imprisonment for any crime,
> or any other action likely to bring substantial
> discredit to Putnam, if the President, with the
> approval of the Chairman of MMC, decides such payment
> shall be made.

(Emphasis added.)

Continuation of Putnam statement No. 8: The Plan gave
Putnam discretion to make a payment in lieu of a bonus to
an employee terminated other than for cause if the
employee signed a release of all claims against Putnam.

> Svensson's response: Disputed.

Svensson's experience differs. For example, on

August 28, 2003, in a meeting with Svensson, Brooks

presented three options to Svensson, stating that,

"This is just you and me talking. This is not HR here

in the room." Deposition of Lisa Svensson,

_____ ("Day One"), p. 219, l. 23 – p. 220, l.

7). The three options were: (1) Be demoted to an

analyst position with no chance for advancement or in

increase in compensation; (2) Leave immediately with 18 weeks of pay, a lump sum payment of $250,000 and her deferred balances that he could "get" for Svensson; or, (3) Stay for a short period while Svensson looks for work outside Putnam and leave with no severance. <u>Id</u>. Brooks made no mention of any of these payments being contingent upon Svensson's giving Putnam a release of all claims. Brooks did not mention a release until some days later and only after Svensson told him that she had consulted counsel and that she wanted the three options to be put in writing. What Brooks later wrote down, PRM 00356, differed in material respects from what he told Svensson in the August 28, 2003, meeting. Svensson Fifth Affidavit, ¶ __.

<u>Continuation of Putnam statement No. 8</u>: Putnam enforced this release requirement in each instance in which it made such payments to terminated employees. Tibbetts Aff. ¶¶ 8, 9, App.1.

<u>Svensson's response</u>:  <u>Disputed</u>.

See above.

9.    Investment professionals also were eligible for special awards from Putnam's Profit Growth Incentive Compensation Plan ("Profit Growth Plan").

<u>Svensson's response</u>: Not disputed.

<u>Continuation of Putnam statement No. 9</u>: Svensson participated in the Profit Growth Plan, which deferred

payment of bonus awards over several years.

Svensson's response:  Not disputed.

Continuation of Putnam statement No. 9: Individuals terminated other than for cause could continue to receive their deferred bonus payments, but only if they signed a release of all claims against Putnam.

Svensson's response: Disputed.

Svensson's experience differs.  See response to No. 8, above.

Continuation of Putnam statement No. 9: Putnam enforced this release requirement in all cases. Tibbetts Aff. ¶ 10, App. 2.

Svensson's response:  Disputed.

In addition to the above, there is other evidence that Putnam did not enforce it in "all cases."  For example, in an e-mail to Scott Needham on October 1, 2003, PRM 3034, Mitchell Shultz, the Director of Compensation, Benefits and Systems, discussed what to do with Svensson's $538,989 in Profit Growth money.  He wrote:

> At this time, do not forfeit the Profit Growth ... monies for Svensson – when this situation has finalized, I will let you know whether to then forfeit or to continue to hold the money.

Notably, Svensson continues to receive statements for this balance.  See Svensson's "Profit Sharing Retirement Account Statements" dated December 31,

2004, 2005, 2006 and 2007, copies of which,

collectively, are Exhibit A to the Svensson Fifth

Affidavit, ¶ __.

10. <u>Putnam statement</u>: Investment professionals could also receive equity grants such as a non-cash incentive award under the Equity Partnership Plan ("EPP"), which vested over time.

    <u>Svensson's response</u>: Not disputed.

<u>Continuation of Putnam statement No. 10</u>: Svensson participated in the EPP.

    <u>Svensson's response</u>: Not disputed.

<u>Continuation of Putnam statement No. 10</u>: At the time of Svensson's termination, the EPP provided that unvested grants vested for employees terminated without cause only if those terminated employees signed releases of all claims against Putnam.

    <u>Svensson's response</u>: <u>Disputed</u>.

       Putnam did not follow that provision.  For

example, Mary McNamee ("McNamee") of Putnam HR told

Svensson in a September 15, 2003, meeting that

Svensson's remaining shares would vest in March 2004.

Svensson dep., p. 215, ll. 2-13.

<u>Continuation of Putnam statement No. 10</u>: Putnam enforced this release requirement in all cases. Tibbetts Aff. ¶ 11, App. 3.

    <u>Svensson's response</u>: <u>Disputed</u>.

       Putnam did not enforce the release "requirement"

in addition to the above, Putnam

continued to pay dividends on Svensson's shares; she

was invited on December 3, 2004, to a shareholders
meeting that took place on December 10, 2004, and she
voted the proxy for her shares.  Dividend checks,
dated February 29, 2004, May 14, 2004, and August 8,
2004; Proxy vote form, dated December 7, 2004; letter,
dated March 14, 2005, from Lisa Svensson to Amrit
Kanwal, the Chief Financial Officer; letter, dated
March 22, 2005, from Richard Tibbetts, Chief of HR, to
Svensson, copies of which are annexed to the Fifth
Svensson Affidavit as Exhibit B.  Only after Svensson
filed her complaint in this case on December 27, 2004,
did the dividend payments stop. Id.

11.  Putnam's compensation practices were as follows during the
years relevant to this case: Each year, Putnam's senior
management determined the size of the bonus pool for the
entire firm.

Svensson's response: Disputed.

The bonus pool was determined by MMC, "formula-driven

without much judgment laid on top of it." Lasser dep., p.

14, l. 18 – p. 15, l. 9.

Continuation of Putnam statement No. 11: After the pool was
set, Putnam's Chief Executive Officer and its division
heads allocated a portion of the pool to each division,
including IMD.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 11: IMD's management
then allocated IMD's share of the pool among the IMD's
various investment teams and support groups.

Svensson's response: Disputed.

Section 5.1 of the Profit Growth Incentive Plan,

PRM 1365-1395) states, at PRM 1372, that,

> The amounts and recipients of Awards will be
> determined by the President, in his sole
> discretion, after consultation with senior
> management and with the Compensation
> Committee of Putnam....

(Emphasis added.)

Putnam's A and P Plan, Putnam Appendix A1, states

in ¶ 1 that,

> The purpose of the Plan is to reward the
> contributions of selected senior managers
> and professional staff members of the Putnam
> Companies at the discretion of the
> President....

(Emphasis added.)

Continuation of Putnam statement No. 11: The CIO of each
team then set the bonus award for each individual on that
team.

Svensson's response: Disputed.

Putnam's A and P Plan, Putnam Appendix A1, states in ¶

1 that,

> The purpose of the plan is to reward the
> contributions of selected senior staff
> members of the Putnam Companies at the
> discretion of the President....

(Emphasis added.)

Recommendations were given to the Investment

Division Management Committee ("IDMC").  See , for

example, Compensation/ Performance Review Process, 1999-2000, PRM 9834-36.  Lasser was directly involved in the review of recommendations and in the approval of bonuses.  Id. For example, in 2000, Lasser allocated a full week for his review of the bonus recommendations for calendar 1999.  Chief Investment Officers ("CIOs") participated in the reviews of members of teams they did not supervise.  For example, Dan Miller, CIO of the Specialty Growth team (not Svensson's team), gave opinions on what Svensson should be paid, and what other persons on other teams such as the US Core, Global Core, GER, Fixed Income, Quant, Currency, and Trading teams should be paid.  E-mail from Dan Miller to Brett Browchuck, dated January 30, 2003, PRM 2990-91.  Richard Liebovitch, head of Trading, made recommendations on the bonus to be paid to Svensson and bonuses to be paid to other persons on other teams such as the International Core, US Core, GER and Global Growth teams. E-mail from Richard Liebovitch to Tibbetts and Browchuck, dated January 30, 2003, PRM 2892.

Continuation of Putnam statement No. 11: A similar process was followed in making equity awards, although not all investment professionals received an equity award in a given year. Tibbetts Aff. ¶ 12.

Svensson's response: Disputed.

Defendant Lasser had significant input into the amount of equity to be awarded to an individual.  For example, when asked in deposition who would determine whether an individual would receive options of Putnam stock in addition to the cash bonus, he said,

> Typically the operating head in a
> recommendation approved by me.

Lasser dep., p. 22, ll. 17-18. (Emphasis added.) Putnam document "2002 Associates and Principals Incentive Compensation Plan," dated February 3, 2003, PRM 3312-3328, shows some investment professionals ranked as "franchise" players and others as "key" players.  Tibbetts testified for Putnam in the Rule 30(b)(6) deposition that "franchise" players were designated for additional "other compensation" such as stock, according to, as Tibbetts described it,

> [Lasser's] arbitrary discussion about how he
> wanted to try to identify people.

Rule 30(b)(6) deposition of Putnam (Tibbetts as witness), Day 1, ("Putnam dep., Day 1"), p. 151, ll. 5-17.

12.  Putnam informed investment professionals of their salary increases, bonus and equity awards no later than March 15 of each year (e.g., they were informed no later than March 15, 2003, of the amount of their bonuses for 2002 (the previous year) and their salary for 2003 (the current year)).

Tibbetts Aff. ¶ 13.

    <u>Svensson's response</u>:  Not disputed.

13.  Putnam promoted Svensson from VP to SVP in 1995
     (Deposition of Lisa Svensson ("Svensson Dep.") at 103-04)

    <u>Svensson's response</u>: Not disputed.

and offered her a portfolio manager ("PM") position in
December 1997. Svensson Dep. at 104, App. 15.

    <u>Svensson's response</u>: Not disputed.

14.  In 2000, Putnam promoted Svensson to Senior Portfolio
     Manager ("SPM"). Svensson Dep. at 105, App. 15.

    <u>Svensson's response</u>: Not disputed.

15.  From 1997 through 2002, Svensson served as PM

    <u>Svensson's response</u>: <u>Disputed</u>.

       Svensson obtained the title PM on January 1,

1998; was promoted to Senior Portfolio Manager ("SPM")

on April 1, 2000.  She was demoted to Analyst on May

16, 2002.  See Putnam document, "ERS_Job_Summary

_By_Emplid" at PRM 8654 showing Svensson's status

changes.

<u>Continuation of Putnam statement No. 15</u>: and then SPM on
the International Growth team (Am. Compl. ¶ 21),

    <u>Svensson's response</u>: <u>Disputed</u>.

After May 16, 2002, Svensson no longer served as SPM.

<u>Continuation of Putnam statement No. 15</u>: Reporting to
Robert Swift, the team's CIO. Svensson Dep. 109, <u>App. 15</u>.

    <u>Svensson's response</u>: <u>Disputed</u>.

Svensson reported to Swift in the period January 1,1998, to March 29, 2003, but her status and the applicable dates are set forth above.

16.  From 1999 through 2001, Svensson was the third most highly-compensated team member,

Svensson's response: Disputed

Disputed in the sense that Svensson was ranked third of four PMs in 1999, on the International Growth _team and third of five portfolio managers in 2000 and 2001 on the International Growth team, according to the Appendix, A.5.  Others included in Putnam's definition of "team" were not managing money, but were analysts. **Id.**

Continuation of Putnam statement No. 16: behind Swift (the team's CIO)

Svensson's response: Disputed.

Although Swift was a CIO, he was also listed as one of several "officers ... [who] have had primary responsibility for the day-to-day management of the fund...." Global Growth Fund Prospectus filed with the SEC, dated February 28, 2001, p. 8.  Managers of the Global Growth Fund were not differentiated by functional titles such as CIO, Director, and SPM. Id., p. 8

Continuation of Putnam statement No. 16: and Kelly Morgan,

a female SPM and Director. Tibbetts Aff. ¶ 15, App. 5.

Svensson's response: Disputed.

Kelly Morgan served as MD, SPM from April 1, 1999, to April 1, 2000, and as MD, Director Global Growth Equities, from April 1, 2000, through 2001. Putnam document, "ERS_Job_Summary_By_Emplid," at PRM 8629, shows Morgan's status changes...

17. In 2002, Putnam reorganized the International Growth team

Svensson's response: Disputed.

Putnam fired Swift, reassigned the International Growth team's largest and most profitable fund to the all-male Global Core team to be managed by male PMs Shigeki Makino, Mark Bogar, Gierulv Lode, Stepehn Oler,  and Paul Warren (SEC form N-1A dated February 27, 2003, Global Equity Fund Prospectus, p. 12 ansd p. 21, and sent the two female PMs on the team, Svensson and Morgan, to the research department. Putnam's document,  "ERS_Job_Summary_ By_Emplid," PRM 8654, shows Svensson's status changes.   Putnam document, "ERS_Job_Summary_By_Emplid," at PRM 8629, shows Morgan's status changes.

Tibbetts testified that Swift had been fired by Oristaglio and that Stephen Dexter ("Dexter") and

Nathan Eigerman ("Eigerman") remained on the team. Deposition of Tibbetts ("Tibbetts dep."), Day One, at p. 141 l. 21 – p. 144, l. 19,  The result of the changes was that only male PMs (Dexter and Peter Hadden ("Hadden")) remained on the team, which was still called "Global Growth," and Eigerman remained with the team as a PM assigned from the quantitative group, Structured Equity.  Putnam's documents, "ERS_Job_Summary_By_Emplid," at PRM 8586, PRM 8599, and PRM 8589 show the effects of the changes on Dexter, Hadden and Eigerman, respectively.  The Putnam document, at PRM 8586, shows that Dexter was promoted to MD on October 1, 2002, shortly after Svensson and Morgan were removed from the team.  Putnam document PRM 5743, "Plan Year 2002 Equity Plans," shows that Dexter's title, in its entirety, became "Director, International Equities."  Dexter, a male, who had had five years less experience at Putnam than Svensson, was promoted on October 1, 2002 to Director, International Growth and again promoted on August 1, 2003, to , CIO, International Growth.  On April 1, 2004, Dexter was promoted a third time to Managing Director..  See Putnam document "ERS_Job_Summary_By_Emplid," PRM 8586, and Putnam

documents PRM 5746, "Plan Year 2003 Equity Grants".
Hadden was promoted on April 1, 2002, to Senior PM
("SPM"). Putnam document,"ERS_Job_Summary_By_Emplid,
PRM 8599, and Eigerman remained as a PM.  Putnam
document, "ERS_Job_Summary_By_Emplid," PRM 8589.
Dexter, the only male SPM as of the time of the April
1, 2002, restructuring, was given  an increase in
compensation of $310,000 in 2002, while Svensson's
compensation remained flat and Morgan's was reduced.
Putnam document, "Svensson – 91 Comparators – 2001 and
2002 Employment Details", PRM –5734-5737, and Putnam
documents "Putnam Investments Plan Year 2001 and 2002
Equity Grants", PRM-5740-5745.  Base salary and bonus
are shown in Exhibit A to Putnam's Answers to
Interrogatories at PRM 5734-5737, entitled "Svensson –
91 Comparators – 2001 and 2002 Employment Details."
For equity awards, see Putnam document "Plan Year 2001
and 2002 Equity Grants," at PRM 5740 - 5745.

Continuation of Putnam statement No. 17: due to the team's
poor investment performance. Deposition of Stephen
Oristaglio ("Oristaglio Dep.") at 123, App.16.

Svensson's response: Disputed.

All Growth teams in the IMD had poor investment
performance in the 2000-2001 period.  Although the
teams and funds had been managed by males and some

females, the "restructuring" in early 2002 hit females
harder than males.  For example, three of four females
were removed from their roles managing money while
only two of 15 males suffered the same fate.  In
particular, the Putnam organizational charts, at PRM
2727-29, show the Growth teams that reported to
Oristaglio, Deputy Head of Investments and Head of
Growth as of November 28, 2001 and that the following
four females had portfolio responsibilities on the
Growth team at that time: Beth Cotner, Margery Parker,
Svensson and Morgan.  Exhibit A to Putnam's Answers to
Interrogatories, PRM 5728-5739, shows at PRM 5735 and
PRM 5737 Cotner's titles during 2001 and 2002.  She
was CIO, Large Cap Growth as part of the Large Cap
Growth portfolio team in 2001 and, after April 1,
2002, Cotner was transferred to Global Equity Research
as Associate Director of Research.  See Putnam
document,"ERS_Job_Summary_By_Emplid," at PRM 8583.
Cotner was terminated involuntarily by Putnam on
January 16, 2003.  See Putnam document, "Svensson – 91
Comparators – Background," part of Exhibit A to
Putnam's Answers to Interrogatories, at PRM 5729.
Parker's job status changes are shown in Putnam
document, "ERS_Job_Summary_By_Emplid," at PRM 8636. It

shows that she was transferred to the Small and
Emerging Growth team on May 16, 2002, and then
terminated involuntarily on March 8, 2003.  It also
shows,  at PRM 5729, that Parker's termination was
involuntary.  While two  male PMs in Growth and Value,
Richard England ("England") and Coleman Lannum
("Lannum") were considered by Browchuk,  Ferguson,
Oristaglio, Landes, Deborah Kuenstner ("Kuenstner),
Scott, Omid Kamshad ("Kamshad"), Warren and Tibbetts
for demotion to GER, only Svensson was demoted and
sent to Research while England and Lannum remained on
portfolio management teams.  See e-mail from Browchuk,
dated December 18, 2001, PRM 9755.  See Putnam
document, ("ERS_Job_Summary_By_Emplid"), PRM 8610,
8591, respectively for Lannum's and England's work
status. ("ERS_Job_Summary_By_Emplid") show they
remained a PM and SPM, respectively.

Continuation of Putnam statement No. 17: As part of this
reorganization, Putnam terminated Robert Swift. Svensson
Dep. 96, App.15.

Svensson's response: Disputed.

Swift was terminated but the fact is that Swift
had been in conflict with his superior, Oristaglio,
over Swift's behavior. See Oristaglio dep., p. 104, l.
23 - p. 105, l. 13.

18.   In April 2002, Putnam offered Svensson an Analyst position
      in GER.

            Svensson's response:   Disputed.

                  Svensson who was told by Oristaglio on or about

            March 10, 2002 that there was no room for her on the

            Large Cap Growth team, Svensson dep., Day One, P 131,

            ll. 1-8, which by then consisted only of males), was

            demoted to GER in May 2002.   In early March 2002,

            Holder-Watts told Svensson that going to GER was her

            "opportunity" and that if she did not want that

            "opportunity," they would have to have a "different

            kind of conversation."   Svensson dep., Day One, p.

            140, ll. 1-6.   Based on her experience at Putnam,

            Svensson concluded that the words "different kind of

            conversation" was a euphemism for, and meant,

            termination.   Svensson dep., Day One, P 140, ll. 1-9.

      Continuation of Putnam statement No. 18: Svensson accepted
      the Analyst position in April 2002. Tibbetts Aff. ¶ 17.

      Svensson's response: Disputed.

            Svensson's move to GER in an analyst position was not

      voluntary; it was under duress.   See above response.

19.   Putnam statement No. 19: Steve Dexter was asked to manage
      what remained of the International Growth Fund.

            Svensson's response: Disputed.

                  Dexter and Hadden were male PMs who remained

after both females (Svensson and Morgan) on the
International Growth team had been banished to
research and Swift terminated.  Exhibit  TO PUTNSAM
nsers to Interrogastories, PRM 5736-37.  Dexter
continued to manage the International Large Cap Growth
Institutional Product and the Putnam International New
Opportunities Mutual Fund, which he had been doing
since 1999.  See Exhibit C to Svensson Fifth Affidavit
, ¶ __ (SEC Form N-1A fund prospectus International
New Opportunities Fund, January 28, 2008, p. 11.
Dexter had never managed the International Growth
Fund.  See Exhibit D to Svensson Fifth Affidavit,
Putnam prospectus for its International Growth Fund,
filed with the SEC, dated October 30, 1999, pp. 6-7;
dated October 26, 2000, p. 9; dated October 20, 2001,
p. 9.  Nor were his duties diminished by the
"reorganization."  ERS_Job_Summary_By_Emplid, PRM 8586

Continuation of Putnam statement No. 19: Oristaglio thought
Dexter "was a conservative investment manager . . . more
diversified in combining fundamental and quantitative
signals ... [and] had the edge among all the candidates
that gave [him] the best probability ... that group would
be managed" the way Oristaglio needed and wanted it to be
managed. Oristaglio Dep. 135-36, App. 16.

Svensson's response: Disputed.

While Oristaglio made no reference to Dexter's
personal style of engagement and interaction as an

important element of his performance, in evaluating

Svensson's performance, Oristaglio referred to

Svensson as "shrill," "aggressive," "overly

intimidating," and "dismissive."  Oristaglio dep., p.

103, ll. 10-21.

20.  In 2002, Svensson participated in Global Equity Research's
("GER") bonus pool.

Svensson's response: Disputed.

GER had a share of the IMD's bonus pool, not its

own pool.  **Tibbetts dep., p. 28, ll. 12-15.**

**Q. You said bonus pools. Was there more
than one bonus pool?**

**A. No. There was one bonus pool and there
were multiple pools created by the allocation.**

**Oristaglio dep., p. 96, ll. 12-19.**

**A. They would need to be, because the bonus
pool was allocated to the Investment division and
then it was the responsibility of the division to
equitably distribute it among the various people
based on measures of performance and based on
measures of teamwork and other -- some of those
other criteria that were done through feedback,
peer reviews and assessments.**

Continuation of Putnam statement No. 20: Bill Landes
("Landes"), the head of GER, made the ultimate
compensation, management and performance decisions (subject
to upper management review) concerning the employees in his
group, including Svensson. Tibbetts Aff. ¶ 17.

Svensson's response: Disputed.

See responses to No. 11, above. Section 5.1 of the

Profit Growth Incentive Plan, PRM 1372, states:

> The amounts and recipients of Awards will be
> <u>determined by the President, in his sole
> discretion</u>, after consultation with senior
> management and with the Compensation Committee of
> Putnam....

(Emphasis added.)  According to Morgan's deposition

testimony, compensation, management and performance

decisions were made using,

> a very strange black box process ... where Bill
> [Landes] came to the table with the other Chief
> Investment Officers and they haggled out
> compensation.  So I would just make initial
> recommendation, then he'd come back to me and say
> you need to cut.

Deposition of Kelly Morgan ("Morgan dep."), p. 59, ll. 15-

22. Notably, Morgan's recommendations were altered after

these "black box" sessions, not before.  <u>Id</u>, p. 59, ll. 15-

22.

21. <u>Putnam statement No. 21</u>: In 2002, Svensson was the sixth
most highly-compensated analyst in GER (of forty-five
analysts),

> <u>Svensson's response</u>:  Not disputed.

<u>Continuation of Putnam statement No. 21</u>: and was the eighth
most highly-compensated employee of fifty investment
professionals in all of GER (not including the group's
director).

<u>Svensson's response</u>:  Not disputed.


<u>Continuation of Putnam statement No. 21</u>: Thirty male
analysts in GER were compensated *less* than Svensson that
year. Tibbetts Aff. ¶ 18, App. 6.

> <u>Svensson's response</u>:  <u>Disputed</u>.

None of the analysts in GER to which the Putnam
statement refers, had run a multi-billion dollar
diversified global fund on a fulltime basis as Svensson
had. GER is considered the entry portal for MBAs when
first employed by Putnam and the analyst position is
considered entry level in GER. Svensson Fifth Affidavit, ¶
___. For that reason, junior analysts with the title AVP
participated in a different bonus pool than the more
senior analysts participated in. Id. Kelly Morgan
testified at her deposition, p. 97, ll. 11-17, as follows:

> There was a separate pool from our pool, so
> I believe it was proposed by HR, because it
> was a very tight range.  The MBAs, it wasn't
> quite as differentiated as the broader
> analyst pool.  So the idea was early in a
> career, performance numbers don't matter
> much.

According to the testimony of Putnam's expert, Bloom,
"Analyst could be an entry level position....  To the best
of my knowledge [associate director and senior portfolio
manager positions] were not." Bloom dep., p. 194, l. 8 -
p. 195, l. 9.

By definition, the GER analysts referred to were
junior to Svensson.  Svensson Affidavit, ¶ ___. Fifteen of
the 30 male analysts cited in statement number 21 were too
junior to participate in the A and P bonus program, as
noted in Morgan's testimony cited above. Id.  Their

bonuses were awarded on seniority.  <u>Id</u>.  Darren Peers

testified: "all analysts in the research department should

be compensated on their perceived value  ... not based on

a seniority level." Peers dep., p. 37, ll. 10-13.

Based on this organizational structure and

compensation scheme, it would have been highly unlikely

for any analyst in 2002 to have had higher compensation

than Svensson.  Svensson Affidavit, ¶ __.

22. Of the sixty-six alleged compensation comparators for
2002 named by Svensson in the *Fourth Affidavit of Lisa
Svensson,* Exhibit 3, Part 3, filed June 8, 2006 [Docket
#75], nineteen were paid less than she in 2002.

<u>Svensson's response</u>: <u>Disputed</u>.

In fact, 22 of the 66 males referred to were paid

less than Svensson was paid in 2002.  See Exhibit A to

Putnam's Answers to Interrogatories, at PRM 5736 - 5737,

"Svensson - 91 Comparators - 2002 Employment Details,"

and  Putnam document, "Plan Year 2002 Equity Grants," at

PRM 5743-45

<u>Continuation of Putnam statement No. 22</u>: An additional
eleven were paid less than she in 2002

<u>Svensson's response</u>: <u>Disputed</u>.

Nine individuals were not employed at Putnam at the

time of the 2002 bonus payment. See Exhibit A to Putnam's

Answers to Interrogatories, "Svensson - 91 Comparators -

2002 Employment Details," PRM 5736 - PRM 5737, and Putnam

documents, "Plan Year 2002 Equity Grants," at PRM 5743-45.

Continuation of Putnam statement No. 22: either because they were not yet employed by Putnam

    Svensson's response: Not disputed.

Continuation of Putnam statement No. 22: or because they had left Putnam's employ before any award of bonus compensation was distributed. Tibbetts Aff. ¶ 22, App. 4.

    Svensson's response: Not disputed. Same as above.

23.  Of the remaining thirty-three individuals selected by Svensson as compensation comparators for 2002, eight were CIOs.

      Svensson's response: Disputed.

    Thirty-five of them remained, and 8 were CIOs. See

Exhibit A to Putnam's Answers to Interrogatories, "Svensson

– 91 Comparators – 2002 Employment Details," at PRM 5736-

37.

    Continuation of Putnam statement No. 23: CIOs were responsible for entire investment teams and strategies, and for managing PMs, SPMs, and Analysts.

      Svensson's response: Disputed.

    CIOs were responsible for investment teams but they

also were identified by Putnam as portfolio managers on

specific funds in Putnam's SEC filings.  For example,

before the Global Growth Fund was taken out of the

International Growth Equity Team and merged with the

Diversified Equity Trust in the Core team, the Putnam

filings with the SEC for 2001 identified the following as

"officers of Putnam Management [who] have had primary
responsibility for the day-to-day management of the
fund....":

    <u>Global Growth Fund</u>:

        Robert Swift
        Stephen Dexter
        Kelly Morgan
        Lisa Svensson
        Manuel Weiss.

    <u>Global Equity Fund</u>:

        Omid Kamshad
        Shigeki Makino
        Justin Scott
        Paul C. Warren
        Michael K. Arends
        Michael P. Stack

Putnam Prospectus for the Global Growth Fund, dated
February 28, 2001, p. 8; Putnam Prospectus for the Global
Equity Fund, dated June 30, 2001.  Collectively, Exhibit E
Svensson Fifth Affidavit filed herewith.  Swift, Kamshad
and Scott were CIOs but they were identified by Putnam as
investment team members in the respective prospectus
filings with the SEC. <u>Id</u>.

<u>Continuation of Putnam statement No. 23</u>: Svensson was never
a CIO. Tibbetts Aff. ¶ 23, App. 4.

    <u>Svensson's response</u>: Not disputed.

24. Of the remaining twenty-five individuals selected by Svensson
as compensation comparators for 2002, twelve were (a)
"Directors" who had department level management
responsibilities;

Svensson's response: <u>Disputed</u>.

Twenty-seven remained.  Of those, ten had the
functional title "Director."  Exhibit to Putnam Answers to
Interrogatories, PRM 5736-37

<u>Continuation of Putnam statement No. 24</u>: (b) traders;

Svensson's response: <u>Disputed</u>.

Two of the twenty-seven functioned as traders, but one
of those had a functional title of Director, Derivatives
Trading, and is thus grouped with the Directors in the
group of ten above.

<u>Continuation of Putnam statement No. 24</u>: or (c) served in
wholly separate investment groups (such as Currency).
Tibbetts Aff. ¶ 24, App. 4.

<u>Svensson's response</u>: <u>Disputed</u>.

Members of all of the portfolio teams, the fixed
income and equity research teams, currency, and traders
were compared with each other regardless of team assignment
for purposes of determining compensation.  Oristaglio dep.,
p. 96, ll. 7-19.  For example, Dan Miller ("Miller"), CIO
of the Specialty Growth team (not Svensson's team), gave
opinions on what Svensson should be paid, and what other
persons on other teams such as the US Core, Global Core,
GER, Fixed Income, Quant, Currency, and Trading teams
should be paid.  E-mail from Miller to Browchuck, dated
January 30, 2003, PRM 2990-91.  Richard Liebovitch

("Liebovitch"), head of Trading, made recommendations on the bonus to be paid to Svensson and bonuses to be paid to other persons on other teams such as the International Core, US Core, GER and Global Growth teams. E-mail from Liebovitch to Tibbetts and Browchuck, dated January 30, 2003, PRM 2892.

25. Putnam statement No. 25: Of the remaining thirteen individuals selected by Svensson as compensation comparators for 2002, twelve were SPMs and one was a PM. Tibbetts Aff. ¶ 25, App. 4.

Svensson's response: Disputed.

Sixteen remained.  Of those, 13 were SPMs and three were Analysts. See Exhibit A to Putnam's Answers to Interrogatories at PRM 5736 through PRM 5737, "Svensson – 91 Comparators – 2002 Employment Details."

26. Putnam statement No. 26: SPMs and PMs are primarily responsible for managing investment portfolios,

Svensson's response: Not disputed.

Continuation of Putnam statement No. 26: and for making the decisions concerning securities held in those portfolios.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 26: An analyst's primary responsibility is to evaluate stocks and make recommendations to SPMs and PMs. Tibbetts Aff. ¶ 25.

Svensson's response: Disputed.

Although all analysts made recommendations to the portfolio teams, Svensson and three other analysts also

were portfolio managers for mutual funds that were managed
in the research department.  Fund prospectuses filed with
the SEC for the following funds document the three analysts
in addition to Svensson named by Putnam as mutual fund
managers:  Putnam Utilities Growth and Income Fund, dated
February 228, 2003, P 8; Putnam Health Sciences Trust,
dated December 30, 2002, and supplement to the Putnam
Global Natural Resources Trust, dated February 14, 20003,
p. 2.  Moreover, 11 analysts shared fund management
responsibilities with portfolio teams on the larger funds.
Putnam documents, PRM-00783-85.

27.  <u>Putnam statement No. 27</u>: Svensson (along with other GER
analysts) participated in a different bonus pool from those
of her "comparator" CIOs, Directors, SPMs and PMs. Tibbetts
Aff. ¶ 25.

   <u>Svensson's response</u>: <u>Disputed</u>.

   Tibbetts testified that there was only one pool: as

follows

      "Q:  You said Bonus pools.  Was there more than one
      bonus pool?

      A:  No.  There was one bonus pool and there were
      multiple pools created by the allocation."

         ***

      ... there was a pool allocated to each of the
      investment style or class of investment teams and
      there was a pool for each team.

Tibbetts dep., p. 28, ll. 12-15.  Oristaglio testified that

a single pool was distributed among all members of the

Investment Division.

> Q.   Okay. So If I'm understanding what
>      you're saying, ... that there were these
>      meetings and discussions held, and on a
>      comparative basis, investment
>      professionals within the investment
>      division were compared with each other?
>
> A.   They would need to be, because the bonus
>      pool was allocated to the investment
>      division and then it was the
>      responsibility of the division to
>      equitably distribute it among the various
>      people....

Oristaglio dep., p. 96, ll. 7-19.

28.   Putnam statement No. 28: Putnam hired Terrance Norchi ("Dr. Norchi"), a medical doctor, as a health care analyst and guaranteed him a $1 million bonus for 2002.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 28: At the time that Dr. Norchi was hired and received his guarantee, health care analysts were in high demand. Tibbetts Aff. ¶ 27.

Svensson's response: Not disputed.

29.   Putnam statement No. 29: Putnam department heads awarded bonuses based on a number of factors, including individual performance.

Svensson's response:  Disputed.

Putnam department heads were overruled frequently by

the IMDC and its successor, the Operating Committee, or by

defendant Lasser. For example, Swift made this clear in an

e-mail to Holder-Watts on January 8, 2002, PRM 10098,

complaining that the scores the CIOs gave the employees
were being changed:

> It would be dreadful if the employees thought
> they had achieved one score and were debriefed on
> that by the 'CIO' and then had actually to endure
> the burden of a different rating for posterity
> done by a committee.  The scores clearly matter—I
> am disappointed by this!

That document is not the only evidence that the Operating
Heads overruled the department heads.  In the Putnam
document "1999 Associates and Principals Incentive
Compensation Plan Recommendation Sheet", dated January 19,
2000, PRM-3567-3574, there is a column containing the
"Revised Rating," which in Svensson's case was a revised
"3.0."  The revision had been made by Operating Committee
member Jack Morgan ("J. Morgan") on January 11-12, 2000, at
PRM 3548.  Tibbetts confirmed that the revised score of 3.0
represented J. Morgan's opinion.  Tibbetts (230)(b)(6), Day
One p. 91, ll. 5-6, but Svensson's score as per her manager
(Swift), prior to J. Morgan's write-down was 4.78. Id., l.
7.

> According to 5.1 of the Profit Growth Award, PRM 1372,
>
> The amounts and recipients of Awards will be
> determined by the President, in his sole
> discretion, after consultation with senior
> management....

Continuation of Putnam statement No. 29: For the 2002
performance year, Landes (the head of GER) determined the
amount of the bonus to be paid to each analyst in GER

(subject to review by upper management) according to his assessment of the value, performance and contribution of each of them.

Svensson's response: Disputed.

According to Morgan, compensation, management and

performance decisions were made using,

a very strange black box process . . . where Bill came to the table with the other Chief Investment Officers and they haggled out compensation.

Morgan dep., p. 59, ll. 15-20.  (Emphasis added.)

Typically, Morgan's recommendations were altered after

these black box sessions, not before.  Morgan dep. p. 59

ll. 21-22.

Section 5.1 of the Profit Growth Award plan document

states:

The amounts and recipients of Awards will be determined by the President, in his sole discretion, after consultation with senior management....

(Emphasis added.)

Continuation of Putnam statement No. 29: Based on this assessment, Svensson was paid less than Messrs. Bukovac and Malak. Tibbetts Aff. ¶ 28.

Svensson's response: Disputed.

If performance had been the only basis for

determining the amount of the bonus, Svensson, Bukovac

and Malak would have been given equal bonuses.  E-mail

from Director of Research Landes to the IMD, Putnam

Appendix, Exhibit A.9, dated January 10m 2003, PRM

9540.  Like Bukovac and Malak, Svensson produced

individual stock performance for 2002 in the top

quartile. Id.  Svensson had more Putnam tenure than

either Bukovac or Malak. Exhibit A to Putnam's Answers

to Interrogatories, at PRM 5728-29.  Even though she

was promoted to ADR in January 2003, Svensson's pay

was less than either of them in 2002, and just 60% of

that of Malak. Id., PRM 5736-37; 5743-4530.

Putnam statement No. 30: In January 2003, Putnam promoted
Svensson to ADR. Am. Compl. ¶ 32.

Svensson's response:  Not disputed.


31.  Putnam statement No. 31: In May 2003, Svensson expressed
concerns she had about Putnam's directed brokerage
commissions practice to Brooks. Svensson Dep. 174, App.15.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 31: Brooks agreed with
Svensson that the practice should change. Id.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 31: Subsequently,
Putnam changed its practice. Deposition of Joshua Brooks
("Brooks Dep.") at 223, App. 18.

Svensson's response:  Not disputed.

32.  Putnam statement No. 32: In 2000, six men and four women
were considered for election to MD.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 32: The Investment

Division Management Committee ("IDMC") selected three of
four women and four of six men for promotion, and these
selections were ultimately approved.

 Svensson's response: Disputed.

  Disputed as incomplete.  Lasser's approval was

necessary and was granted.  A memo from Mitch Schultz,

head of compensation, to the members of the Operating

Committee, dated April 10, 2000, at PRM 4031 shows

that Lasser approved the promotions.

Continuation of Putnam statement No. 32: Svensson received
*no* votes of support from the IDMC,

 Svensson's response: Disputed.

  Disputed as incomplete.  See response to No. 29,

above. In addition, Swift nominated Svensson for MD

and SPM on December 24, 1999, using the forms produced

at PRM 49-51, which he sent to his superior, Jack

Morgan ("J. Morgan"), an Operating Committee member.

J. Morgan, however, apparently did not wish to sponsor

the nomination.  Before the vote on January 12, 2000,

J. Morgan wrote down Svensson's performance score from

a well-above average 4.8 out of 5 to a score of 3.0 on

the performance table, "1999 Performance Profiles" at

PRM 3548.  This lower score of 3.0 was entered into

the form, "Officer Nominations" and the altered score,

together  with the result of the final vote is shown

in that matrix at PRM 1793.  "1999 Performance
Profiles Investment Division", PRM 3548, shows that
two males, Michael Mufson ("Mufson") and Jeffrey
Lindsay ("Lindsay"), each with a score 5.0, have those
scores shown in the Officer Nomination table. Putnam
document "Officer Nominations", PRM 1793. and both
were promoted to MD in 2000. Putnam document, As a
result of this alteration of Svensson's score, the
IDMC never considered Svensson's nomination in the
context of her CIO's actual recommendation.

Continuation of Putnam statement No. 32: and was thus not
selected for promotion.

Svensson's response: Disputed.

Svensson's nomination was tainted by the write-
down of her score from 4.8 to 3.0.  See No. 29, above.
This meant that her actual performance was never
presented to the IDMC.  Svensson's score was recued as
per J. Morgan on January 12, 2000. The table "Officer
Nominations" at PRM 1793, dated February 24, 2000,
shows that Svensson's lowered score was the score put
forward into the nomination process.  As a result, the
IDMC considered Svensson's reduced score of 3.0 in
comparison with the scores of males Lindsey and
Mufson, which had not been altered. Putnam document,

"Officer Nominations", PRM 1793.

Continuation of Putnam statement No. 32: Eight of the IDMC electors were men, and two were women. Tibbetts Aff. ¶¶ 30, 31, App. 7.

Svensson's response: Not disputed.

33.  Putnam statement No. 33: Officer promotions for the years 1999-2002 generally were announced in March of each year.

Svensson's response: Disputed.

Promotions in 2000 were announced on April 12, 2000.  See announcement memorandum from Ferguson, Head of Investments, at PRM 12415.  Promotions in 2001 were announced on May 9. Memorandum, dated May 9, 2001, from Ferguson to the IMD, at PRM 12669.

Continuation of Putnam statement No. 33:  As such, all promotions for all years 1999-2002 were announced prior to May 3, 2003. Tibbetts Aff. ¶ 6.

Svensson's response: Not disputed.

Continuation of Putnam statement No. 33:  In 2003, Putnam did not elect anyone to MD from the IMD. *Id.*

Svensson's response: Disputed.

In a February 24, 2003, e-mail, PRM 14237, Landes told Oristaglio and Haldeman that he planned to nominate Svensson in 2003 for promotion to MD ("For this year I will be nominating Saba Malak, Roger Sullivan, RJ Bukovac, Lisa Svensson, and Michael Yogg, in that order of preference.  I know there is little chance of getting five but these names reflect their

achievements and a lack of MD appointments in previous
years.")  As of February, 2003, the process was "on
hold," awaiting a decision by Lasser.  Series of e-
mails between Landes and Tibbetts, PRM 14236-14237.

On  April 28, 2003, Kamshad made his MD
nominations. E-mail from Kamshad to HR representative
Sherrie Holder-Watts, dated April 24, 2003, PRM 1895.
On the same page in a forwarded e-mail, dated April
25, 2003, Scott wrote to HR representative, Holder-
Watts and Tibbetts, and CIOs Warren and Kamshad,  that
"... We shiuld [sic] not delay the MDs for more than a
couple of weeks."  According to PRM 1518, "Investment
Division Officer Nominations" IMD officer nominations
were being received until at least "5/7/03".  The
announcement of officer promotions at the level of
AVP, VP and SVP was not made until May 29, 2003.
Memorandum to the Investment Division from Haldeman
and Oristaglio announcing Officer title promotions,
PRM 14512.  According to an e-mail, dated April 25,
2003, from Thomas Pulllano to the IMD managers, PRM
1896, "the nominations to Managing Director and
Partner levels...will be defer[ed] ... to allow us the
time to complete a review of Putnam's governance
structure."  The results of the "review" were that a

number of proposals were made to reduce the importance
of titles and the financial significance of the
Partners pool, as well as the deferred aspect of
compensation.  Two points of view were expressed
relative to whether titles should even be used, and
there was no clear recommendation made.  See September
4, 2003 Memorandum to Lasser re Titles and Governance,
PRM 14438-14440.  Tibbetts was an author of this
September 4, 2003, "review of Putnam's governance
structure" referenced in the e-mails on April 25,
2003.

        According to Brooks the decision was made after
May 3, 2003.  Brooks testified: "I had arrived in
April so by the time we would have talked about it, it
would have been May or June." Brooks dep., p. 133, l.
10 – p. 134, l. 7.  When, in late April 2003, Svensson
asked Brooks about the promotions and the fact that
she had heard that the decision would not be made
until July and that Lasser would be making it, Brooks
told her he would check it out and get back to her.
Later that day, Brooks told Svensson that her
information was correct.  Svensson Fifth Affidavit, ¶
—.

        The decision not to promote in 2003 perpetuated a

situation in which "the female representation of MDs

decreased from 21% to 13% over the 2000-2002 time

frame." White report, p. 8, ¶ 3, ll. 3-4

34. <u>Putnam statement No. 34</u>:  In April 2003, Putnam hired
Joshua Brooks ("Brooks") to replace Landes as Director of
GER. Am. Compl. ¶ 32.

    <u>Svensson's response</u>: not disputed

35. <u>Putnam statement No. 35</u>:  Brooks decided that the
investment process in GER "needed to improve" because
analysts had not been encouraged to "stand away from the
herd, stand away from consensus," which was engendering
poor investment performance. Brooks Dep. 105-06, App.  18.

    <u>Svensson's response</u>: Not disputed in that that is his
testimony.

36. <u>Putnam statement No. 36</u>:  In July 2003, Darren Peers, an
Analyst in GER who reported to Svensson, told Brooks that
he was considering leaving because of his difficulty
working with Svensson. Deposition of Darren Peers at 53,
App. 19.

    <u>Svensson's response</u>:  <u>Disputed</u>.

According to the deposition testimony of Putnam

witness  McNamee, at p.  224, ll. 4 -16,  in his exit

interview form, Peers circled "family reasons" rather

than "dissatisfaction with management" or "higher

compensation" as the reason for his resignation.

"Family reasons" was the only reason entered into

Putnam's "PeopleSoft" database, in the table, "2003

Investment Terminations," at PRM 14855.  Peers' wife

was from Los Angeles, California.  Peers dep., p. 10,

ll. 22-23.  Peers' compensation doubled when he became

employed by NWQ in Los Angeles, California after

leaving Putnam, Id., p. 12, ll. 1-4.

37.  <u>Putnam statement No. 37</u>:  Chris O'Malley ("O'Malley") was
an analyst who reported to Svensson. Svensson Dep. 44,
App. 15.

    <u>Svensson's response</u>:  Not disputed.

38.  <u>Putnam statement No. 38</u>:  In August of 2003, Brooks learned
that Svensson was endeavoring to give "a very negative
review of ... Chris O'Malley in which [Svensson] described
having sought feedback from all of the portfolio managers
with whom Chris interacted, and that that feedback was
universally negative. . . ." Brooks Dep. 164-65, App.18.

    <u>Svensson's response</u>: <u>Disputed</u>.

Svensson was not "endeavoring to give 'a very

negative review' to O'Malley of his performance."

However, had she had decided to do so, such an action

would have been justified based on his negative

performance as documented in two separate performance

reviews, at midyear and yearend 2002.  "Chris O'Malley

Mid-Year Review/Business Plan", dated July 25, 2002,

PRM 7457-7458, and "Performance and Development

Planning and Review Form" for Chris O'Malley, year end

review, dated 1/28/03, PRM 7463-7470.

O'Malley received a mixed review from Svensson at

midyear 2002.  Her positive comments about O'Malley

included "Chris is adding alpha for the year so far";

"Chris has strong analytical skill"; "Chris has a
solid and developing understanding of the metals and
mining stocks."  Svensson also gave him constructive
comments on his performance to help him improve.  The
comments included that "he projects a lack of
intensity"; "he is slow in picking up stocks"; and
"shows up late to meetings."  She also gave him
specific goals for the last half of the 2002,
including "complete the coverage list on schedule,"
which list included Nippon Steel. "Chris O'Malley Mid-
Year Review/Business Plan", dated July 25, 2002, PRM
7457-7458. O'Malley signed his review without comments
and it was filed with HR. PRM 7458.

In December 2002, Svensson received negative
comments about O'Malley's performance from the Core IE
team.  Svensson testified,

> A.    Well, there was this issue with Chris
> that had been brought up in December of '02,
> where Omid Kamshad had told Bill Landes in a
> meeting, We don't like Chris. And Kelly
> Morgan had communicated the to me and asked
> me to follow up on it. So I had a meeting,
> approximately January of '02, with Omid and
> Justin Scott, where Justin pretty much
> thought it would be a good idea to have the
> team without Chris on it. And I said, I'm
> not willing to do that. I would like to, you
> know, I just started with this team. And he
> would say, You've got a really good team and
> I can really envision it without Chris, so
> let's just think of the team without Chris,

because they wanted Chris fired.

Q.    Who said that to you?

A.    Justin Scott, in the presence of Omid Kanshad. So I said, I don't want to do that, but I would like to spend some time working with Chris.

(Svensson dep., Day Two, P. 48, l. 16 – p. 49, l. 10.

Believing that it was important for O'Malley to become aware of the comment, Svensson stated in the review of O'Malley that, "Chris has gotten less positive feedback from the Core IE team where his visibility has been too low"; "Chris scores below the rest of Putnam on the parts of the 360 that relate to KM and teamwork".

At this time (December 2002), O'Malley had not initiated coverage on Nippon Steel stock, which in his prior review at mid-year he had committed to doing (PRM 7458). This was the basis for Svensson's comment in the review that, "Chris is inhibited by his tendency to procrastinate on his coverage initiations." PRM 7466. O'Malley failed to pick up coverage of Nippon Steel for the next six months into June 2003, during which time its stock appreciated 80%. Svensson dep., Day One, p. 124, l. 14 – p. 125, l. 5.

Svensson included positive comments about
O'Malley in the review, including, "Chris has done a
good job developing his models and learning what
factors drive his stocks"; "his calls have been value-
added and they have been based on solid, fundamental
work"; "he is clear and concise in his writing and his
voice-mails"; and "the feedback indicates that his
industry thinking has gained respect."  She also said
in the review,

> I have personally observed that Chris cares
> deeply about understanding his industry and
> getting his stocks right.

For the 2002 year-end review, O'Malley scored
3.5, which was average for his group. "Performance and
Development Planning and Review Form" for Chris
O'Malley, year end review, dated Jahnuary 28, 2003,
PRM 7463-7470.  The e-mail at PRM 00894 from HR
representative Eric Hutcherson to the GER Associate
Directors of Research, dated February 7, 2003, shows
that O'Malley was in the second tier for his group,
which was considered in the mid-range for that year's
bonus.

Brooks was hired on April 7, 2003, Exhibit A to
Putnam's Answers to Interrogatories, at PRM 5728, and
began work at Putnam as Director of Research on the

same day.  PRM 5728.  In or about June 2003, Svensson
began the work of preparing midyear reviews for her
team, which consisted of Konstantin Stoev, Ellis
Eckland, Peers and O'Malley.  Svensson Fifth
affidavit, ¶ __. By this point, O'Malley had shown
little progress in his performance as he was still
missing deadlines, procrastinating on initiating
coverage, and, based on Svensson's discussions with
Leah Graham-Reid, his investment associate, and HR
representative, Eric Hutcherson, mismanaging his
summer intern who was named Austin Hawley.. Svensson
dep., Day One, P 58 l. 15 through P 59, l. 7.  As part
of preparing the reviews, Svensson visited with
portfolio managers in the Value and Core IE teams who
had complained about O'Malley.  Svensson dep., Day
One, P 22, ll. 15-16.  The evaluations of O'Malley's
performance were mixed as shown in Svensson's notes
and files concerning the meetings.  LS 676-698,
Exhibit "F," to Svensson Fifth Affidavit.

Svensson went on vacation in late July.  Svensson
Fifth Affidavit, ___.  When Svensson returned from
vacation, Graham-Reid came to Svensson and requested
that she not be re-assigned to O'Malley.  Svensson
dep., Day One, p 58, ll. 15-18.  Svensson also

received comments from Hutcherson that O'Malley had not been managing Austin Hawley, the summer intern assigned to him, very well. Svensson dep., Day One, p 58 l. 23 through p 59, l. 2.

On August 7 or 8, 2003, Svensson met with Brooks who suggested that Svensson give O'Malley a written warning. Svensson dep., Day One, p. 58, l. 15 – p. 59, l. 16. In the course of researching the proper Putnam procedure for giving a warning to an employee, Svensson spoke with Mary McNamee in HR, who suggested that she write "stream of consciousness" bullet points memorandum describing the issues with O'Malley's performance. Svensson dep., Day One, P 56 ll. 3-5. Svensson did so. Svensson dep., Day One, P 60 ll. 17-19. See Svensson's memorandum with the bullet points, dated August 8, 2003, at PRM 347-48. McNamee promised Svensson that she would review the memorandum and prepare a draft of a proper warning to O'Malley for Svensson by the time Svensson returned from a business trip. Svensson dep., Day One, p. 61, ll. 5-6.

Upon her return from the business trip, Svensson tried repeatedly through telephone calls and e-mails to make contact with McNamee but McNamee did not return the calls nor did she reply to the e-mails.

Svensson dep., Day One, P 62, l. 24 through P 63 l. 5. Instead, and unbeknownst to Svensson, McNamee had been communicating directly with Brooks, saying to him that she "tried to hold [Svensson] off as best [she] could." PRM 00814; McNamee dep., p. 169, ll. 8-20. In the absence of any of the promised McNamee suggestions, Svensson decided to prepare a mid-year review and action plan for O'Malley from the contents of the bullet points memorandum. Svensson dep., Day One, P 61 l. 24 through P 62 l. 7.  She prepared a draft, shown at PRM 349-52.  Svensson dep., Day One, P 64 ll. 18-21.

She then requested a meeting with Brooks to review her draft review of O'Malley's performance. When Svensson met with Brooks on August 28, 2003, and tried to review the draft with Brooks, Brooks told Svensson that he already had been given a copy by McNamee, and that he had a "problem" with Svensson. Svensson dep., Day One, p. 71, ll. 7-23, and Svensson dep., Day One, p. 20, l. 14 - p. 21, l. 5.

39.  Putnam statement No. 39: After interviewing portfolio managers to whom Svensson had spoken about O'Malley,

Svensson's response: Disputed.

Lisa to substitute new para

Continuation of Putnam statement No. 39: and after speaking to Svensson,

    Svensson's response: Disputed.

       See above.  Moreover, Putnam document, PRM 1659-1660, an e-mail on August 19, 2003,  from head of compensation Mitch Schultz to Scott Needham requesting "our standard deferral/EPP sheets for Lisa Svensson", shows that the Putnam paperwork to implement her termination had been in process even before Svensson's first discussion with Brooks on August 28, 2003, had ever taken place.  A second, related request was made at PRM 00969 In an e-mail on  August 26, 2003, from HR representative McNamee to Chris Hadley of Putnam's compensation department,  stated that she had to "draft a termination letter for [the review of Attorney ] Rodriques."

Continuation of Putnam statement No. 39: Brooks concluded that "not only had [Svensson] perhaps not investigated in the manner in which she suggested,

    Svensson's response: Disputed.

       See above. Moreover, in the meeting with Brooks on August 28, 2003, Svensson offered to go to her office to obtain her notes and calendar entries concerning her interviews, LS 676-98, and to show them to him but Brooks said "that won't be necessary.  I

don't really need to see that stuff...." and ignored

her request and offer.  Svensson dep., Day One, P 16,

ll. 15-16.

Continuation of Putnam statement No. 39: but furthermore,
that a decent amount of feedback [about O'Malley] was, in
fact, the opposite of what she had suggested." Brooks Dep.
168, App. 18.

   Svensson's response: Disputed.

     Svensson had not been instigating negative

comments on O'Malley's performance but only following

up on unsolicited negative comments she had received

from the Core IE team the previous December, Svensson

dep., Day One, p. 48, l. 16 - p. 49, l. 10.  The

comments she received in June 2003 were consistent

with the comments of the prior year.  As a result,

Svensson decided to consult with the Value team,

another of the teams that O'Malley was required to

support with research. McNamee dep., p. 180, l. 5 - p.

181, l. 20.  The Value team comments were similar to

the Core IE team comments as shown in Svensson's notes

from the meetings at LS 676-698..

     Before Svensson was able to consult with members

of the other teams for which O'Malley was responsible,

she received information from Investment Associate

Leah Graham-Reid and HR representative Eric Hutcherson

that O'Malley had been mismanaging his team members. Svensson dep., Day One, p. 58, l. 15 - p. 59, l. 2. At this point, Svensson went to Brooks to ask for direction. Svensson dep., Day One, p. 59, ll. 5-6. Brooks suggested to Svensson that she give O'Malley a warning. Svensson dep., Day One, p. 59, ll. 11-16.

40. <u>Putnam statement No. 40</u>: Brooks concluded that Svensson should no longer manage other analysts. Brooks Dep. 165, 171, App. 18.

<u>Svensson's response</u>:  <u>Disputed</u>.

See above.  Moreover, in her deposition, McNamee agreed that if one of the analysts Svensson managed had made a bad call on a stock, it was Svensson's job as an ADR to communicate that opinion to her subordinate.  McNamee dep., p. 138, ll. 12-24. Svensson had simply done her job as a manager by evaluating O'Malley's performance, gathering evaluations whether positive or negative from his PM clients, and conveying the information to him through the firm's standard performance review process. Giving a warning to a nonperforming team member, as she tried to do with O'Malley, was also part of Svensson's role as a manager and ADR.  Her goal was to improve O'Malley's performance, improve her team's performance, and to provide a better product to the

PMs she and her team, including O'Malley, served.

Svensson dep., Day One, p. 44, ll. 15-17.

41.    Putnam statement No. 41: Brooks offered Svensson three
employment alternatives: (i) remain in GER, but in a non-
managerial capacity; (ii) remain at Putnam for an agreed
upon transition period while looking for other
opportunities, or (iii) leave Putnam with a severance
package. Brooks Dep. 231 (Exhibit 5), App. 18.

Svensson's response: Disputed.

In a meeting with Svensson on August 28, 2003,

Brooks, saying to her that, "This is just you and me

talking.  This is not HR here in the room," Svensson

dep., p. 219, l. 23 – p. 220, l. 7, presented Svensson

with three options: (1) Be demoted to an analyst

position with no chance for advancement or in increase

in compensation; (2) Leave immediately with 18 weeks

of pay, a lump sum payment of $250,000 and her

deferred balances that he could "get" for her; or, (3)

Stay for a short period while she looks for work

outside Putnam and leave with no severance.  Brooks

made no mention of any of these payments being

contingent upon Svensson's giving Putnam a release of

all claims.  Svensson dep., p. 220, ll. 8-10.  Brooks

did not mention a release until some days later and

only after Svensson told him that she had consulted

counsel and that she wanted the three options to be

put in writing. Id. Putnam did not offer Svensson the

option to seek employment elsewhere within Putnam. Id.

Brooks told Svensson that he knew her goal was to

make more money and to be promoted to Managing

Director but that would not be possible in the new

role as analyst with no managerial or money management

responsibilities. Svensson dep., p. 28, ll. 1-12.

42. Putnam statement No. 42: Svensson rejected the three
    options,

    Svensson's response: Not disputed.

    Continuation of Putnam statement No. 42: and demanded an
    immediate promotion to MD with guaranteed compensation of
    $1,000,000 per year for two years. Svensson Dep. 37-3 8,
    App. 15.

    Svensson's response: Disputed.

    Svensson also asked for "some kind of written

    assurance that my career could be put back on track

    now that this has happened." Svensson dep., Day One,

    p. 37, ll. 8-10.

43. Putnam statement No. 43: Brooks terminated Svensson on
    September 15, 2003. Brooks Dep. 247-48 (Exhibit 6), App.
    18.

    Svensson's response: Disputed.

    Putnam terminated Svensson on September 15, 2003.

    Brooks was not the only decision-maker. McNamee

    stated in her deposition, at p. 218, ll. 3-5, that

    "whoever the head of investments was, it would have

been communicated as an FYI." The evidence that has
been produced indicates that the direct manager does
not have the authority to make employment decisions
alone. For example, the e-mail from Holder-Watts to
Browchuk on January 28, 2002 states that Operating
Committee member Oristaglio should "inform the
managers if he did not wish them to make [MD
nominations]." PRM 3548 shows Operating Committee
member J. Morgan altering the scores of individuals
within CIO teams, and the memo addressed from Mitch
Schultz, the head of compensation, to the members of
the Operating Committee, dated April 10, 2000, PRM
4031, shows that Lasser approved promotions. This is
strong evidence that a manager at the level of Josh
Brooks, with only five months' tenure, could not have
made the decision to fire Svensson without approval
from his superiors

44. <u>Putnam statement No. 44</u>: Putnam offered Svensson a
severance package that included eighteen weeks of pay, a
one-time lump sum payment of $250,000, plus her deferred
compensation of $539,086.77 under the Profit Growth Plan,
subject to the requirement that she execute a release.
Tibbetts Aff. ¶ 38, App. 11.

   <u>Svensson's response</u>: <u>Disputed</u>.

    See above.

45. <u>Putnam statement No. 45</u>: Pursuant to § 7.3 of the Profit
Growth Plan, §§ 6.2 and 6.3 of the A&P Plan, and §7(c)(ii)

of the EPP, this offer included severance pay to which
Svensson was not entitled unless she signed a release.
Tibbetts Aff. ¶ 38, Apps. 1-3.

      Svensson's response: <u>Disputed</u>.

        Section 6.4 of the A & P Plan, Putnam's Appendix

A1, states that an exception to the eligibility rule

can be made for an individual terminated other than

for cause at the discretion of the president with

approval by the chairman of MMC.  The fact that

Svensson continued to receive dividend payments, was

invited to a shareholder meeting, and voted her proxy

throughout 2004 (as documented in statement number 10,

above) led her to believe that McNamee had been

correct in her termination meeting and that the shares

were hers. Only after her complaint was filed on

December 27, 2004, did Putnam purport to cancel the

shares.  See response to No. 10, above.  Svensson

continues to receive statements of her Profit Growth

balances. See response to No. 9, above.

46.  <u>Putnam statement No. 46</u>: Svensson refused to sign the
proposed agreement,

      Svensson's response:  Not disputed.

<u>Continuation of Putnam statement No. 46</u>: and by the terms
of the Profit Growth Plan and the EPP, her deferred awards
and unvested equity were cancelled.

Svensson's response:  <u>Disputed</u>.

See Item 45.

<u>Continuation of Putnam statement No. 46</u>: She was ineligible for any 2003 bonus because she was no longer employed in 2004, when bonuses for 2003 were awarded. Tibbetts Aff. ¶ 38.

<u>Svensson's response</u>: <u>Disputed</u>.

Section 6.4 of the A & P Plan states that:

<u>The general rule set forth in Section 6.3 is modified</u> as to a Participant whose employment with the Putnam Companies … is terminated at the instance of his employer for reasons other than his misappropriation of assets of Putnam, willful misconduct in the performance of the duties of his position, refusal to perform the duties of his position, violation of his Non-Solicitation Agreement or Confidentiality Agreement, violation of the Putnam Code of Ethics, breach of fiduciary duty or breach of trust, willful violation of an important Putnam policy or conviction of a felony, imprisonment for any crime, or any other action likely to bring substantial discredit to Putnam, <u>if the President, with the approval of the Chairman of MMC, decides such payment shall be made</u>.

(Emphasis added)

Svensson was ranked first of 58 analysts in terms of "alpha per recommendation" as shown on the performance attribution sheet at LS 501 titled "Svensson, Lisa Period from:  12/31/02 To: 08/29/03" as of the time of her being fired.  She had been promoted in 2003 to Associate Director of Research.

By September 15, she had worked for three quarters of

the year and was entitled to compensation for the time

she worked and the performance she delivered.

47. <u>Putnam statement No. 47</u>: In March 2004, after Svensson
attempted to "sell" her previously-unvested restricted
shares back to Putnam,

    <u>Svensson's response</u>: <u>Disputed</u>.

McNamee told Svensson at her termination that she

could sell her shares back. Svensson dep., Day One, p.

215, ll. 2-13.

<u>Continuation of Putnam statement No. 47</u>: Putnam informed
her that her shares had been cancelled because she had not
signed the proposed severance agreement. Tibbetts Aff. ¶ 42,
Apps. 13, 14.

    <u>Svensson's response</u>: <u>Disputed</u>.

McNamee stated to Svensson on September 15, 2003,

that Svensson's remaining shares would vest March 15,

2004.  Svensson Dep., Day One, p. 215, ll. 9-13.

Svensson asked again and McNamee reaffirmed that the

shares would vest March 15, 2004. <u>Id</u>.  The shares

continued to pay dividends between September 2003 and

September 2004 as shown by the dividend check stubs.

See response to No. 10, above. In December 2004,

Svensson was invited to the shareholder meeting and

asked to vote a proxy on a corporate action, and she

voted.  See response to No. 10, above.

48.  Svensson filed a Charge with the MCAD on March 1, 2004
     alleging that Putnam discriminated against her on the basis
     of her sex. Am. Compl. ¶ 12.

          Svensson's response: <u>Not disputed</u>.

49.  On December 28, 2004, Svensson filed her Complaint in this
     matter.

          Svensson's response: <u>Disputed</u>.

          The docket shows that the complaint was filed on

     December 27, 2004 ("12/27/2004").


                         LISA SVENSSON, plaintiff,

                         By her attorneys

                         BARRON & STADFELD, P.C.


                         /s/ Kevin F. Moloney_____
                         Kevin F. Moloney   BBO No. 351000
                         Roger T. Manwaring BBO No. 548041
                         100 Cambridge Street, Suite 1310
                         Boston, Massachusetts 02114
                         Tel.: 617.723.9800/531.6569

                         and

                         /s/ John K. Weir_____
                         John K. Weir, admitted PHV
                         JOHN K. WEIR LAW OFFICES, LLC
                         300 Park Avenue, Suite 1700
                         New York, New York 10022
                         Tel.: 212.572.6374
                         Dated: August 31, 2007
Dated: February 15, 2008

                   <u>Certificate of Service</u>.

     This document is filed through the ECF system and will be
sent electronically to the registered participants as identified
on the Notice of Electronic Filing (NEF).

/s/ Kevin F. Moloney

Dated: February 15, 2008


[422989.1]