UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON, Plaintiff, v. PUTNAM INVESTMENTS, LLC, et al., Defendants. | Civil Action No. 04-12711-PBS<br>BBO Bo. 351000<br>Plaintiff Lisa Svensson’s Response to Defendant Lasser’s Local Rule 56.1 Statement of Fact |

Plaintiff Lisa Svensson responds to defendant Laurence J. Lasser (“Lasser”)’s Local Rule 56.1 Statement of Undisputed Material Facts as follows:

1. Lasser statement No. 1: Putnam Lisa Svensson ("Svensson") engaged in five conversations with Lasser that she contends constitute her personal observations of Lasser's "intimate" involvement with Putnam's Human Resources ("HR") matters.

Svensson’s response: Disputed.

Because Svensson was not employed in the Human Resources (“HR”) Department or was at a level in the company that allowed her to observe Lasser’s “intimate” involvement with Putnam’s Human Resources matters, that she did not personally observe his involvement does not mean he had none. That Lasser was President and Chief Executive Officer (“CEO”) was known to Svensson because he acted in

that capacity. He sat with the rest of top management on the 12th floor of Putnam's office building, he addressed the officers at the quarterly officers' meeting and the annual trustees' dinner as CEO, and he sat on both the Board of Trustees of the Putnam Funds and the MMC board of directors (Putnam Global Growth Fund prospectus, dated February 28, 2002, p. 43, Marsh & McLennan Corp. SEC Form 10-K for the year ended December 31, 2002, pp. 28-29). The purpose of both the A&P and Profit Growth Award compensation plans was to reward performance "at the discretion of the President ..." (PRM 1365; Putnam A1.) is strong evidence that Lasser, as President & CEO, had "intimate" involvement in those decisions. Further documents produced by Putnam after the Svensson deposition such as

1. an e-mail at PRM 9681-9684 dated 1/3/02 from Deputy Head of Investment Stephen Oristaglio to Head of Investments Tim Ferguson stating that "Larry judges how much action we have taken by how many people we have fired and hired." (PRM 9683)
2. an e-mail from HR Head Kathie Collman dated 11/15/99 to Lasser, requesting that he consider endorsing the off-cycle promotion of Paul Warren

to Managing Director. The promotion of Paul Warren ("Warren") to MD occurred off cycle on January 3, 2000, and the document confirming this promotion, PRM-8657.

3. a schedule titled "HR Investments Compensation/Performance Review Process" at PRM-9834-9836 showing Lasser's week-long "bonus recommendation review" along with an additional two week period for "approval."
4. an e-mail from HR representative Richard Tibbetts to Head of Research Bill Landes dated 2/24/03 stating that "All officer title promotions are currently on hold. Larry has asked for the process to be put on hold pending a complete review of the title nomenclature…" PRM-14236-14237.

establish Lasser's role in these decisions.

Deposition testimony also points to Lasser's involvement in employment decisions, such as the following:

1. Putnam Rule 30(b)(6) witness McNamee regarding "this exercise called the fifth quartile which Larry Lasser had charged everyone with kind of looking through their organization and divide employees into quartiles, that there would be a

fifth quartile that would be the outlier group which would be the people that needed to be managed out or weren't going to continue to work at Putnam." Rule 30(b)(6) dep. of Mary McNamee, P 14, ll. 17-23.

2. From Putnam Rule 30(b)(6) deposition of McNamee stating that Lasser's approval was needed "any time there were changes in the Investment Division":

> Q. And did you have an understanding as of June of 2001 why Mr. Lasser's approval was necessary to make changes in the Specialty Growth management area?
>
> A. Well, any time that there were any changes within the Investment Division, Larry was either given an opportunity to approve or not or just told as an FYI if it was not a major decision but they would not go ahead and make a change without an organization within the Investment Division or in a lot of the other divisions for that matter without Larry's approval or at least knowledge.
>
> Rule 30(b)(6) dep. of McNamee P 148 ll. 2-12.

2. <u>Lasser statement No. 2</u>: The five conversations with Lasser constitute the totality of her personal observations of Lasser's involvement with HR matters. Volume II of Deposition of Lisa Svensson ("Svensson Depo. Vol. II")1 , p. 78,11. 1-24; p. 79, 11. 1-4. The five HR-related conversations are as follows:

<u>Continuation of Lasser statement No. 2</u>:

(a) Lasser congratulated Svensson on her marriage when he encountered her in an elevator. Exhibit 1, p. 25, 11. 13-24;

Svensson's response: Not disputed.

Continuation of Lasser statement No. 2:

(b) Later, at a luncheon during which Lasser was meeting newer MBAs, Lasser turned to Svensson and said "Oh, Lisa and I, you know, we go way back... she was a maiden when she first came to Putnam." Exhibit 1, p. 28, 11. 14-24; p. 29, 11. 1-4;

Svensson's response: Not disputed.

Continuation of Lasser statement No. 2:

(c) Lasser cautioned Svensson to "be careful" after learning she had fallen down while she was pregnant. Exhibit 1, p. 27, 11. 11-21;

Svensson's response: Not disputed
.

Continuation of Lasser statement No. 2:

(d) During a lunch with Lasser in which the two discussed 9/11, Lasser expressed to Svensson discomfort (in Svensson's view) with the fact that Svensson's husband was a stay at home father. Exhibit 1, p. 18, 11. 6-24; p. 19, 11. 1-21. Svensson quotes Lasser as stating "He's a stay-at-home father. Wow, that's fascinating. How does that make him feel? I mean as a man, how does that make him feel?" Exhibit 1, p. 19, 11. 1115; and

Svensson's response: Disputed.

The quote is out of context. The actual exchange was as follows:

A. ... And he asked me what my

husband did for a living. I told him that my husband was a stay-at-home father. And at that point, Larry said to me -- he said, "He's a stay-at-home father. Wow, that's fascinating. How does that make him feel? I mean, as a man, how does that make him feel?" ... "Well, for example, if you're at a cocktail party, and someone says to him, What do you do for a living? How does that make him feel when he says, I'm a stay-at-home father?" ... And so I consider that, in a way, to be an HR matter. And the reason I consider it that is because he was expressing a fair amount of discomfort in that conversation with the concept that a man would be a stay-at-home father and not be upon a career track. And I considered him, as the head of the organization and setting the tone for the organization, to be really kind of saying to me, your family situation makes me uncomfortable and is not okay with me.

Q. Of course, he didn't say "Your family situation makes me uncomfortable," did he?

A. No. What he said was, "How does that make your husband feel as a man?"

Q. He said, if I'm correct, and correct me if I'm wrong, he said, "Wow, that's fascinating. How does that make him feel?"

A. As a man.

Q. Mm-hmm.

A. Not just, "How does that make him feel?" As a man.

Q. All right. And you consider that to be an HR matter?

A. I consider setting the tone in the organization about how people have families, how the family structure works out, an HR matter, yes. Svensson dep., Day Two, p. 19, l. 2 - p. 21 l. 16.

Continuation of Lasser statement No. 2:

(e) Svensson attended a luncheon with Lasser in 2002 in which she shared with Lasser her views on how Putnam should be hiring, training, and "bringing along" MBA's who were hired directly from business school. Exhibit 1, p. 16, 11. 4-19.

Svensson's response: Disputed.

This discussion occurred at the time that 2002 reviews were being conducted in advance of the 2002 bonus to be paid in 2003. The top MBA analysts, including Darren Peers, had had their bonuses cut in 2002 by Haldeman and Oristaglio without the knowledge or agreement of their managers, PRM 1507 and 1509, of which Svensson was one. Svensson approached Haldeman to request additional pay for Peers and the other top performers, PRM 1970-71, and Haldeman promised to get the extra money. Haldeman then approached Lasser, who refused to provide any additional money from the 2002 budget. PRM 1972-74. Instead, Lasser required that the extra be taken from 2003, a year when Putnam was already behind budget. Later in the spring, Josh Brooks asked Haldeman for an increase for the "good younger analysts in GER" and Haldeman replied "if we need to improve compensation for the younger analysts, we will." PRM 1485. Only Svensson was fired after trying to get more

compensation for the top performing MBA's.

3. Lasser statement No. 3: Svensson bases her claim of Lasser's participation in depriving her of equivalent compensation compared to her male colleagues in 2002 and 2003 solely on what she claims she heard from her supervisors. Exhibit 1, p. 79, 11. 9-24; p. 80, 11. 1-10.

Svensson's response: Disputed.

Both the A&P plan and the Profit Growth Plan establish that Lasser participated in compensation decisions. The Profit Growth Incentive Plan at Section 5.1, PRM 1372, states:

> The amounts and recipients of Awards will be determined by the President, in his sole discretion, after consultation with senior management and with the Compensation Committee of Putnam ....

and the A & P Plan, Putnam Motion for Summary Judgment Exhibit A1, states:

> The purpose of the Plan is to reward the contributions of selected senior managers and professional staff members of the Putnam Companies at the discretion of the President....

Continuation of Lasser statement No. 3: Svensson's supervisors told her such things as "Larry did this or Larry did that" or "there's not going to be this or that this year, because Larry said this..." Exhibit 1, p. 79, 11. 9-24; p. 80, 11. 1-10.

Svensson's response: Disputed.

The quote is out of context. Svensson's full response included the following:

> If it's something that a boss of mine told me, that Larry did this or Larry did that, I consider

that to be my observation, not just heard through the grapevine.

Svensson dep., Day Two, p. 79, ll. 15-18. Svensson had no reason to believe that what her superiors told her about Lasser's actions was not true. Every claim they made about Lasser's influence has been borne out in documents produced by Putnam such as e-mails and testimony, including:

Lasser Changes Svensson's Score

Q. "Okay. And am I correct that your year-end rating at this time had gone from 4 to 3.5?

A. Yeah. That was when Larry forced Robert to write everybody's reviews down.

***

Robert told me and gave me a form and told me that it was written down after the fact, and he was sorry about that, but Larry mandated that the entire growth division.... I think the average of the division had to be 3. It could not be higher than 3....

Svensson dep., Day One, p. 114 ll. 9-20)

Robert Swift complained, PRM 10098, of the after-the-fact changes to 2001 performance scores in an e-mail to HR's Sherrie Holder-Watts ("Watts")

> It would be dreadful if the employees thought they had achieved one score and were debriefed on that by the 'CIO' and then had actually to endure the burden of a different rating for posterity done by a committee. The scores clearly matter—I am disappointed by this!

Lasser Identifies "Franchise Players" for Additional

Compensation

In the Rule 30(b)(6) deposition of Putnam (Tibbetts as witness), p. 150, l. 14 – p. 151 l. 17, Tibbetts described a process in which Lasser had the last word on identifying "franchise players."

> Q. What were the implications of an individual being named a franchise player?
>
> **
> A. There were different ways and mechanisms to try to identify who were the key people within the organization, investment division, and more broadly that would be considered for other compensation.
>
> **
> Q. What occasioned the transfer from the core[sic] tile system to the franchise player key player system?
>
> A. Larry's arbitrary discussion about how he wanted to try to identify people.

Landes Reports Lasser's Decision to Delay Promotions

In February 2003, William Landes ("Landes"), at the time the Head of Global Investment Research, told Svensson that nominations for MD had been put "on hold" while Lasser looked at the issue of title inflation. When Brooks replaced Landes in April, Svensson approached Brooks to ask about the status of MD nominations. Brooks dep., p. 131 l. 19 - p. 134 l. 7. Putnam documents such as an e-mail from HR representative Richard Tibbetts to Landes, PRM 14237, dated February 24, 2003, confirms what Landes originally reported

to Svensson about Lasser:

> All officer title promotions are currently on hold. Larry has asked for the process to be put on hold pending a complete review of the title nomenclature. He has expressed a concern in the past and again earlier this year about the inflation in promotions. Until this is complete and a new direction is agreed upon we are on hold.

4. Svensson's deposition testimony regarding Lasser's involvement in setting compensation was as follows:

> Q. Was it your observation that Mr. Lasser micromanaged the raises as well as the diminutions in people's compensation?
>
> A. Well, you know, when you – when you said before, I can't say anything about anyone – anything anyone told me, if it's something that a boss of mine told me that [Lasser] did this or [Lasser] did that, I consider that to be my observation, not just heard through the grapevine, so...

Svensson's response: Disputed.

Although the quote is correct, the point the Lasser motion papers attempt to make is disputed. At the time of the deposition, February 1, 2006, only 1,783 documents had been produced, and all of them had been redacted to prevent disclosure of information in regard to anyone but Svensson. No documents from Lasser's files were produced until 57 pages from his files were produced on May 15, 2006, two days before his deposition.

Svensson was later able to confirm Lasser's involvement in compensation decisions through the Rule

30(b)(6) testimony referred to in the response to Lasser Statement No.3, above, where Tibbetts stated that "franchise players" and "key players" were designated through "Larry's arbitrary discussion about how he wanted to try and identify people." This statement is consistent with the facts that the A&P and Profit Growth Awards each state in their opening paragraphs that "the purpose of the Plan is to award the contributions of selected senior managers and professional staff members of the Putnam Companies at the discretion of the President...." It also is consistent with the statement in the Profit Growth Award Plan, PRM 1365, that,

> The amounts and recipients of Awards will be determined by the President, in his sole discretion, after consultation with senior management and with the Compensation Committee of Putnam....

<u>Continuation of Lasser statement No. 4</u>:

> Q. Well, I'm really not interested in the grapevine.
>
> ***
>
> A. Discussions – discussions with my boss about, you know, there's not going to be this or that this year, because [Lasser] said this is my observation.

<u>Svensson's response</u>: <u>Disputed</u>.

See response to Lasser statement No. 3, above. In addition, the Rule 30(b)(6) deposition of Putnam (McNamee

witness) on November 15, 2007, at p. 148, ll. 2-12, provides additional information concerning Lasser's involvement in the promotion process, succession planning, and every type of change:

> Q. And did you have an understanding as of June of 2001 why Mr. Lasser's approval was necessary to make changes in the Specialty Growth management area?
>
> A. Well, any time that there were any changes within the Investment Division, Larry was either given an opportunity to approve or not or just told as an FYI if it was not a major decision but they would not go ahead and make a change without an organization within the Investment Division or in a lot of the other divisions for that matter without Larry's approval or at least knowledge.

Continuation of Lasser statement No. 4:

> Q. Okay. And it's only, then, through what other people told you that Mr. – that your observations regarding Mr. Lasser micromanaging raises and diminution of employment –diminution of compensation were managed?
>
> A. What my supervisors told me, yes.
>
> Exhibit 1, p. 79,11. 9-20, 24; p. 80, 11. 1-10.

Svensson's response: Disputed.

> See above.

5. Lasser statement No. 5: Svensson bases her claim of Lasser's participation in Putnam's decisions not to promote her to managing director from 2000 to 2003 upon her observations of "the way things worked at Putnam." Exhibit 1, p. 82, 11. 8-21; p. 105, 11. 1-24; p. 106, 11. 1-12.

Svensson's response: Disputed.

Svensson bases her claim of Lasser's participation in the decisions not to promote her on her experience over nine years at Putnam, as well as documents produced by Putnam such as the memo addressed from Mitch Schultz, the head of compensation, to the members of the Operating Committee dated April 10, 2000 to at PRM 4031, verifies that Lasser's approval was required for promotions.

The deposition testimony of Mary McNamee as the Rule 30(b)(6) witness, at p. 87 ll. 13-18, describes a process where all the officer nominations for every level were compiled in a book to be sent to Larry Lasser:

> At that point in 2001 there was a book that had firm wide by division a book of nominations. Now, I don't know whether that book was the final book that went to Larry or whether it includes every nomination. It may have been only the ones that were ultimately decided to move forward to Larry in the book.

Moreover, Lasser testified at his deposition, p. 102, ll. 12-16, that he "occasionally" imposed restrictions on MD promotions because he was concerned periodically about "title inflation."

Lasser created an atmosphere where, due to the pressure imposed by him, scores were changed by Operating Committee members, who reported directly to him, without the knowledge of the CIOs. These scores were the building

blocks of the "in the round" discussions of promotions as well as compensation. For promotions, PRM 12595-97 is an e-mail from Chief Operating Officer Brett Browchuk's assistant Julie Malloy to Browchuk, dated August 10, 2001, containing "the MD nomination evaluation matrix." This matrix contains the column "last rating" on PRM 12596 which is a place to enter the performance score. PRM 3058 shows a table titled "Officer's Nominations", again with a column for "Rating". The bonus discussions similarly used the scores from the performance reviews. The table at PRM 3246-3249, dated January 22, 2002, has the title "2001E A&P Incentive Compensation Projections – Tier Sort". This table shows the level of historical incentives compared to the estimated 2001 incentives under two differing scenarios, and it includes the Manager Rating. In the 2000 promotion vote, Svensson's score was reduced by Operating Committee member Jack Morgan from 4.8 (out of a possible 5.0) to 3.0 PRM 3548, hand-dated "RBT 1/12-1/13/00" by Richard Tibbetts, thus tainting the MD nomination process for the 2000 vote. Her actual score was never used by the IDMC, whose 2/17/00 vote is recorded at PRM 1792 in a table titled "Investment Division Officer Nominations IDMC Meeting February 17, 2000". The table titled "Officer Nominations", dated 2/24/00, PRM 1793-1794 shows that

Svensson's "rating" was listed as 3.0 over a month after Tibbetts made the handwritten changes at PRM 3548. As a result, she was not selected. Similarly, in 2002, Robert Swift was "disappointed" to find that scores were changed "without our knowledge" by a committee and he complained to Sherrie Holder-Watts about the practice. PRM 10098

6. Lasser statement No. 6: Specifically, Svensson's deposition testimony on the point was:

> Q. What facts, what specific facts can you tell me which would support the allegation that Mr. Lasser, on four separate occasions, determined that you would not be promoted to managing director? Again, I'm interested, again, in what you now firsthand, not what other people told you.
>
> [OBJECTION AS TO FORM]
>
> A. I only know that the way Putnam worked, Larry was intimately involved in – especially promotions to this level and above.

Svensson's response: Disputed.

See response to No. 5, above.

Continuation of Lasser statement No. 6:

> ***
>
> Q. Let me understand, what specific facts do you have that Mr. Lasser was responsible for the [decisions not to promote you to managing director]? And again, I'm interested in your own personal observations, not what other people told you, but your own personal observations. What did you see? What did you read? Your personal observation.
>
> [OBJECTION AS TO FORM]

A. Just consistent with my – As I've testified before, my personal observation of the way things worked at Putnam.

Svensson's response: Disputed.

See response to No. 5, above.

Continuation of Lasser statement No. 6:

Q. Just generally the way things worked at Putnam?

A. And the fact that Larry was involved in all these decisions.

Svensson's response: Disputed.

See response to No. 5, above.

***

Q. What you can [sic] point me to, a specific fact, which shows that Larry Lasser participated in the decision to deny you these opportunities?

[OBJECTION AS TO FORM]

A. No specific facts -
Q. Okay.
A. --other than my observations.

Exhibit 1, p. 82, 11. 8-21; p. 105, 11. 1-18; p. 106, 11. 4-12.

Svensson's response: Disputed.

In the two years since the Svensson deposition, the depositions of the Putnam related witnesses have been taken and more of Putnam's documents have been produced. See also prior responses to Nos. 1-5, above.

7. Lasser statement No. 7: Lasser's limited role in promotion process was to: (1) occasionally require nominations to be made within overarching restrictions that he imposed (Deposition of Lawrence J. Lasser ("Lasser Depo."), p. 102, 11. 9-162); (2) review the book of individuals selected for promotion by the senior managers of the Investment Division (Exhibit 2, p. 104, 11. 9-15); and (3) rubber stamp the selections set forth in the book (30(b)(6) Deposition of Mary McNamee ("McNamee 30(b)(6) Depo."), p. 89, 11. 8-123).

Svensson's response: Disputed.

Lasser was not the "rubber stamp" figurehead that he wants the court in this case to believe he was. Lasser's approval was required before the promotions occurred. The "in the round discussions" steps were preliminary to Lasser's approval. Putnam document, PRM 4031, states that officer promotions were announced to senior management with the opening line: "Larry Lasser has approved all 2000 Officer / Managing Director nominations as submitted, effective April 1, 2000." Although they were approved that year as submitted, his approval was required and without it, promotions did not happen.

8. Lasser statement No. 8: Lasser played no role in what Svensson classifies as Putnam's demotion of her in 2002 from a portfolio management position to a research analyst position. Exhibit 2, p. 92, 11. 6-10.

Svensson's response: Disputed.

> In an e-mail, dated 1/3/02, PRM 9681-84, Oristaglio complained to Ferguson that Lasser's suggestion "that we are complacent is not accurate." He then goes on to justify all the "aggressive steps we have taken." On the third

page of the same e-mail, PRM 9683, Oristaglio states that

Larry judges how much action we have taken by how many people we have fired and hired.

**

We have fired a few weak links and are about to fire more. We are strategically thinking about a more efficient way to organize our talent across the various teams across Putnam.

McNamee's Rule 30(b)(6) testimony confirms it on P 148, ll. 5-12, as shown in statement number 1 above:

A. Well, any time that there were any changes within the Investment Division, Larry was either given an opportunity to approve or not or just told as an FYI if it was not a major decision but they would not go ahead and make a change without an organization within the Investment Division or in a lot of the other divisions for that matter without Larry's approval or at least knowledge.

9. Lasser statement No. 9: Svensson testified at deposition that she did not have any documentary evidence implicating Lasser's involvement in her alleged demotion, but she believed that Lasser "controlled and determined virtually everything that went on [at Putnam]... I can assure you that he was intimately involved in those decisions." Exhibit 1, p. 82, 11. 22-24; p. 83, 11. 1-24; p. 84, 11. 1-2.

Svensson's response: Disputed.

In an e-mail on June 22, 2001, from Specialty Growth CIO Dan Miller to Head of Investments Tim Ferguson, PRM 9782-83, CIO Miller, described changes that were to be implemented on Miller's team, Specialty Growth: "I'll call

you Monday to confirm Larry’s approval....” The changes include changes of fund managers on several of the mutual funds managed by Miller’s team (“Voyager 2: Add Dan Miller, and New Century: Add Steve Kirson”), as well as reassignment of Specialty Growth research coverage responsibilities (“Mike and Roland’s modest industry coverage will be absorbed by other members of the team”). Id.

In the Rule 30(b)(6) deposition on November 15, 2007, (McNamee as witness), p. 147 l. 11 - p. 149 l. 3, that Lasser had involvement in approving who would fill the jobs at Putnam:

> “Q. And by changes that would mean both promotions and demotions?
>
> A. Well, this change, it looks like the change is about job responsibility. It doesn't talk about promotions or demotion.
>
> Q. That's my question. Would Larry's approval be customarily sought with respect to not changes in job responsibilities but actually changes in the people who would be functioning in those jobs?
>
> A. Yes. Larry would -- if it was, you know, a wholesale change to how the organization was structured, he would definitely weigh in on it.
>
> Q. Did that remain true throughout the period of time that Larry Lasser was the CEO of Putnam?
>
> A. Yes.

If Putnam worked the way Lasser claims, he would

not have needed to approve fund and stock coverage assignments taking place entirely within a team such as Specialty Growth that was managed by a CIO.

10. Lasser statement No. 10. Specifically, Svensson testified at deposition:

> Q.Well, what specific facts can you point to which would support the allegation that you would – instead of being promoted to managing director, would be demoted and sent back to the Research department in 2002? Again, I'm interested in specific facts that you know firsthand, not what other people may have told you.
>
> [OBJECTION AS TO FORM]
>
> A. I only know what I've observed. I don't have a specific document or letter where [Lasser] said "Demote Lisa in 2002." That's not the way it worked.

Svensson's response: Disputed.

On February 1, 2006, Svensson did not have a specific document. Documentary evidence produced after Lasser's and Oristaglio's depositions shows that Lasser had suggested that Ferguson and Oristaglio were "complacent" about the poor performance of the Growth group (see response to number 8, above). Ferguson and Oristaglio felt the need to respond at PRM 9683 to the note from Lasser (never produced) by stating that they had "fired a few weak links and [we]re about to fire more. [They were] strategically thinking about a more efficient way to organize ... talent across the

various teams across Putnam." This re-organization of talent involved the demotion of Svensson.

McNamee testified at the Rule 30(b)(6) deposition at p. 164 l. 23 through p. 165 l. 1, that "[Lasser] would have played a role [in the rebuilding of Growth] and he would have wanted them to come up with the idea and the plan and then pass it by him for approval."

Continuation of Lasser statement No. 10.

Q. Well, tell me what you personally observed which would support the allegation that Mr. Lasser determined that you would be demoted and sent back to the Research department in 2002. Your personal observations.

[OBJECTION AS TO FORM]

A. Mr. Lasser controlled and determined virtually everything that went on in this company, and I don't have a personal observation responsive to that sentence in my hand that's a document. But I can assure you that he was intimately involved in these decisions.

Exhibit 1, p. 82, 11. 22-24; p. 83, 11. 1-24; p. 84, 11. 1-2.

Svensson's response: Disputed.

As of February 1, 2006, when Lasser took Svensson's deposition, Svensson had not received responsive documents from Putnam and Lasser. However, subsequent to this deposition, but after the depositions of Lasser and Oristaglio, Putnam produced an e-mail from Oristaglio to Ferguson, PRM 9681-84 referred to in the response to No. 8,

above. In addition, Lasser's approval was required and sought for CIO Dan Miller to make portfolio manager and research coverage changes within his investment team. See e-mail from Miller to Ferguson, then Head of Investments, on June 22, 2001, PRM 9782-9783. This document suggests that even Ferguson did not have the authority to sign off on these changes within one CIO's team.

11. Lasser had no role in the events leading up to Svensson's termination from employment at Putnam or Svensson's termination from employment.

Svensson's response: Disputed.

Svensson complained in May 2003 about the practice of directed brokerage commissions (Am. Compl. Paragraph 35), stating that she believed it was a violation of Putnam's fiduciary duty. Svensson dep., Day One, p. 174, ll. 4-6. Brooks told Svensson that he had brought up the issue with Lasser. Svensson dep., Day One, p. 175, ll. 3-6. Three months later, Svensson was fired. Putnam was investigated by the SEC on the subject of directed brokerage commissions but did not halt the practice until January 1, 2004. In March 2005, Putnam settled with the SEC on the matter for $40 million, SEC form NSAR-B, dated December 28, 2005, p. 11 paragraph 2). In Day one of her deposition, Svensson stated:

Q. And you wrote about a lunch that you and

Josh Brooks had had in the executive dining room?

A. That's what I was looking for, yes.

Q. Tell me if I've got it right. You said, "We started talking about the subject of allocations of commissions on the buy side in exchange for shelf space."

A. Correct.

Q. Then you wrote, "I told Josh that this was a violation of our fiduciary duties."

A. Yes, in those words.

Q. What did he say to you?

A. He said, I hear ya, and we're on the same page about that.

Q. He expressed no anger that you were raising the issue?

A. No.

Q. And, in fact, you recorded some of his comments on the next page of your notes? At some point you cut an article out of the newspaper and gave it to Mr. Brooks on this commission issue?

A. Yeah, it was, like, the very next week.

Q. And Mr. Brooks had already responded to you that he had already given a copy to Mr. Lasser?

A. He either had, or I think I said, I think he had just had the meeting. I wasn't 100 percent sure of that as I recollected it at the time.

Q. And Mr. Brooks said to you, "I'm right there with you."

A. Yes, he did say that.

Q. And he also said to you that both he and Debbie Kuenstner agreed with you?

A. Yes. The two of them were going to go to Larry.

Q. So the fact that you talked to Mr. Brooks about directed commissions and Mr. Brooks said he agreed with you, Mr. Brooks said Debbie Kuenstner agreed with you, and Mr. Brooks said that he talked to Mr. Lasser about the subject and then some months later, he gave you the three choices which resulted in termination?

A. Not many months later.

Q. Well, the conversation was in May, right?

A. Yup.

Q. And the fact that you then, at the end of August, were told that you essentially lied in a review about Mr. O'Malley?

A. Right. Which was a trumped-up charge and not true.

Q. From those facts you infer that the real reason you got fired was because you raised the issue of directed commissions?

A. No. I believed that raising the issue of directed commissions was yet another mark against me as an outspoken woman. I was already vulnerable on that.

Svensson dep., Day One, p. 173, l. 20 - p. 177, l. 6.

12. Lasser statement No. 12:Lasser only learned after-the-fact that Joshua Brooks ("Brooks"), Svensson's supervisor, had in some manner changed Svensson's job after it had been discovered during an exit interview and subsequent confidential conversations that Svensson's management style was abrasive. Exhibit 2, p. 130, 11. 14-17, p. 131, 11. 1-10, 11. 21-24; p. 132, 11. 1-9; Deposition of Joshua Brooks ("Brooks Depo."), p. 185,11. 5-13.4

Svensson’s response: Disputed.

The exit interview referred to is that of Darren Peers ("Peers") but Brooks testified that Peers had spoken to him about his unhappiness in his job in July 2003, not at an "exit" interview. Brooks dep., p. 161, ll. 14-22. In addition, Brooks testified at p. 185, ll. 7-11 that

> I remember once the decision had been made that we were going to offer Lisa these alternatives, I do remember that Larry mentioned to me he had heard about that. I assumed at the time he had heard it from HR, but I wasn't certain and I didn't ask.

Given that Peers announced his resignation after Svensson's termination on September 15, 2003(Peers dep., p. 59, ll. 7-14), anything learned in his exit interview would have been subsequent to Svensson's departure. Therefore, Brooks' testimony above shows that Lasser knew about the termination of Svensson before it happened.

13. Lasser statement No. 13: Lasser was not aware that Putnam involuntarily terminated Svensson from her employment at the time he testified at his deposition in this matter. Exhibit 2, p. 144, 11. 3-10.

Svensson's response: Disputed.

The complaint in this case states that Svensson was terminated involuntarily. Lasser knew that Svensson had been terminated at least by the time the complaint was served. He testified, at p. 155, ll. 21-22, that "I saw something. Maybe it was that [the complaint] that I saw." See above statement number 12.

Oristaglio complained to Ferguson at PRM 9683 that "Larry judges how much action we have taken by how many people we have fired and hired." Lasser approved officer promotions at all levels (PRM 4031), and he had an "arbitrary discussion about how he wanted to try to identify people" for additional pay (Rule 30(b)(6) dep. by Tibbetts, p. 150 l. 24 through p. 151 l. 17). Lasser needed to approve a portfolio manager and research coverage change that CIO Dan Miller was proposing for his own team (PRM 9782-9783), and testimony from Rule 30(b)(6) witness McNamee confirmed that "Larry would -- if it was, you know, a wholesale change to how the organization was structured, he would definitely weigh in on it" (Rule 30(b)(6) deposition of McNamee, p. 148 ll. 22-24).

14. Lasser statement No. 14: At her deposition, Svensson was unable to state any specific facts upon which she relies in alleging Lasser played a role in directing the confidential conversations that led to her termination from employment or the termination decision itself.

Svensson's response: Disputed,

See preceding and following responses. See also response to Putnam statement and Svensson affidavits 1-6.

15. Lasser statement No. 15: With regard to Lasser's involvement in directing the confidential conversations, Svensson testified in a conclusory fashion that Lasser was "intimately involved in every aspect of human resources" and that the fact that Lasser had heard "what was happening to her" indicated that he "knew something about it." Exhibit 1, p. 151, 11. 17-24; p. 152, 11. 1-8.

Svensson's response: Disputed.

Brooks testified:

> I remember once the decision had been made that we were going to offer Lisa these alternatives, I do remember that Larry mentioned to me he had heard about that. I assumed at the time he had heard it from HR, but I wasn't certain and I didn't ask.

Brooks dep., P 185, ll. 7-11.

Lasser testified:

> Somebody told me that Lisa's job was being changed because it had come out in an exit interview with Darren Peers that her management style was abrasive and had caused this outstanding young man to leave Putnam. So it had already been handled, but I was told about it.
>
> Q. Do you recall who the someone who told you was?
>
> A. I think it was Josh.

Lasser dep., p. 130, l. 14 - p. 131 l. 10.

16. Lasser statement No. 16: With regard to Lasser's involvement in Brooks' decision to terminate Svensson, Svensson merely hypothesized that "no one in [ ] Brooks's position for only five months was in the position to make the decision to fire the most senior woman in the department who had a nine-year tenure, and it was ultimately [ ] Lasser's decision. That is the way the organization worked." Exhibit 1, p. 87, 1. 24; p. 88, 11. 1-9.

Svensson's response: Disputed.

At the time of the deposition, Svensson had not received appropriate production of documents and disclosure of information. However, there is evidence

that Brooks did not have the authority to make a change of this magnitude. For example, in an e-mail on June 22, 2001, from Specialty Growth CIO Dan Miller to Head of Investments Tim Ferguson, PRM 9782-83, CIO Miller, described changes that were to be implemented on Miller’s team, Specialty Growth: “I’ll call you Monday to confirm Larry’s approval....” The changes included changes of fund managers on several of the mutual funds managed by Miller’s team (“Voyager 2: Add Dan Miller, and New Century: Add Steve Kirson”), as well as reassignment of Specialty Growth research coverage responsibilities (“Mike and Roland’s modest industry coverage will be absorbed by other members of the team”). Id. This e-mail shows that even Ferguson, the Head of Investments, did not have the authority to make changes within a team without approval from Lasser.

17. Lasser statement No. 17: Brooks testified at deposition that the decision to terminate Svensson was made primarily by him with input from Kelly Morgan ("Morgan"), a female management-level employee, and the HR Department. Exhibit 4, p. 219, 11. 8-22.

Svensson’s response: Disputed.

Brooks’ deposition testimony is contradictory.

> Q. Was the idea to offer Lisa the opportunity to depart the firm in lieu of accepting this

deprivation of her management responsibilities, was that your idea alone?

A. I remember it as -- I don't know whether it was my idea alone, but I certainly remember it as a part of my thinking to try and endeavor to give Lisa as many options in trying to resolve the situation as I could.

Q. Okay. Do you recall anyone else having input into that idea?

A. Certainly, I think I would have discussed it with Kelly and Mary McNamee, but I don't recall. I would imagine I also would have discussed it with Steve Oristaglio and potentially Ed Haldeman.

Brooks dep., p. 184, l. 11 - p. 185, l. 4.

LISA SVENSSON, plaintiff,

By her attorneys

BARRON & STADFELD, P.C.

/s/ Kevin F. Moloney______________
Kevin F. Moloney BBO No. 351000
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, admitted PHV
JOHN K. WEIR LAW OFFICES, LLC
300 Park Avenue, Suite 1700
New York, New York 10022
Tel.: 212.572.6374

Dated: February 15, 2008

Certificate of Service.

This document is filed through the ECF system and will be sent electronically to the registered participants as identified

on the Notice of Electronic Filing (NEF).

/s/ Kevin F. Moloney

Dated: February 15, 2008

[423049.1]