```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * *        Civil Action No. 04-12711-PBS
                          *
LISA SVENSSON             *
                          *      BBO No. 351000
Plaintiff,                *
                          *      Fifth Affidavit
v.                        *      of
                          *      Lisa Svensson
PUTNAM INVESTMENTS,       *
LLC f/k/a PUTNAM INVEST-  *      (Declaration pursuant
MENTS, INC. et.al,        *      to 28 U.S.C. §1746)
                          *
Defendants.               *
                          *
* * * * * * * * * * * * *
```

    1.   My name is Lisa Svensson. I am the plaintiff in this case. I was employed as an investment professional in the Investment Management Division of defendant Putnam Investments, LLC ("Putnam") from July 1994 through September 15, 2003. A copy of my resume is annexed to the Second Affidavit of Lisa Svensson ("Second Svensson Affidavit"), filed April 20, 2006, as Exhibit 1. I have personal knowledge of the facts set forth herein.

    2.   On April 22, 1998, Robert Swift ("Swift"), at the time CIO of International Growth, mentioned to me as he had on several prior occasions ("Swift") that he is worried that because I am pregnant people will think that I took it easy this year if I don't travel. He said that people think that, rightly or wrongly. I told him I felt that he was browbeating me on

this subject of travel and that I will be willing to travel again, but that trying to do it all this year is too much. He said he feels he is not being hard enough on me in some ways, rather than believing he is browbeating me. He asked if I am scared [about being pregnant]. He also asked if I am planning to nurse, and I said yes to both questions. He said that he believes that women are more loyal than men to jobs and that it was well worth it to be very nice to women when they're pregnant because a man, due to his testosterone, is likely to change jobs and leave where a woman will remember that you have been good to her and will stay.

    3.    On May 20, 1998, Swift made another statement that made me extremely uncomfortable. The subject of Carol McMullen came up, and Swift said that we (the women) haven't got any testicles to be torn off. He said he is currently having to have his sewn back on after last week. This was said in a room in which more than 50 % of persons there were women and I felt very uncomfortable.

    4.    On May 29, 1998, Swift mentioned having our own group meeting to talk about difficult client questions. Kelly Morgan and I did not like the idea and Swift immediately pantomimed a chopping motion at his crotch, as if we were castrating him.

    5.    On the evening of August 3, 1998, Swift drove me to an MBA reception at the John Hancock Observatory. On the way, he

mentioned that he wants to get another PM on the Japan accounts. I said I did not know why he thinks he needs another PM there since that is my job. He said "Let's face it once you have this baby, you won't want to travel." I felt like he was trying to push me out and it scared me.

    6.   On August 31, 1998, Swift, Kelly Morgan, Olivier Rudigoz and I were discussing our assistant, Cathy Grabiec. Swift was trying to explain why Cathy has a hard time talking to us when she has problems. He said that maybe it is because she hasn't worked for a woman before. I said that that line of discussion is not acceptable. He said that it certainly is acceptable because "working for a woman is different than working for a man." I said this is the USA in 1998 and he just can't use that line of reasoning and it's not ok. Finally he stopped.

    7.   On June 3, 1999, Quintin Price ("Price") made two remarks that made me feel uncomfortable. First, Cole Lannum started talking about one of his companies that makes birth control pills for the Japanese market. These pills have not been approved for use in Japan until now. Cole said something concerning his assumptions relating to "penetration" of the medicine into the Japanese market. Quintin guffawed and told Cole that "penetration" was "a poor choice of words" for that pill. Everyone laughed loudly, but I didn't and I felt

uncomfortable.  Then, later in the morning meeting, Price repeated a joke he had heard about the "size of the boat" not mattering, just the "motion in the ocean."  He was referring to penis size and sex based on his remarks.  Again I felt extremely uncomfortable.

    8.   When I was talking with Swift and David Blake on the morning of September 13, 2000, I asked Swift where Steve Dexter is today and he said that he is marketing at a final for Springs Industries in North Carolina.  I asked "why is Steve doing that final, since it is for our International Large Capitalization Growth institutional product and I had originally been scheduled for it?"  Swift said that I have been taken off the presentation because Frank Porcelli, Putnam's Chief of Institutional Sales and Client Service, had wanted me off because I am "too pregnant."  He said it would be tough to win when I will not be the PM on the account except for a few weeks, then off on maternity leave. Swift said Steve went because he could do it because "he's a man and he wouldn't be pregnant."

    9.   At a meeting of portfolio managers on September 21, 2000, Swift told Kelly in my presence that she was a "bloody woman using cheap emotional blackmail" against him.  He said this is in response to Kelly bringing up the new "values" initiative with respect to what we were talking about. Also in that meeting, Swift said that Erin Spatz could not go to the

4

International Core team because "she would be the wrong sex for that."

10. In our International team meeting in the morning of September 18, 2000, this a.m., Swift said that "they say when you have a baby you give birth to your brains" and he implied that this has been the case with his wife, Nicola, since she is so flaky since she had her kids. He said this jokingly in front of the other team members, all of whom were men.

11. Bill Landes, at the time Head of the Putnam Global Investment Research, GAA, and Currency, called me in the evening of July 23, 2002, and asked me to stop by his office in the morning. When I met with him the next morning, he said that he wanted me to know that Sandy Mehta had left Putnam for Wellington and that I had been on the list to replace him on the Global Core team. In the end, he said they decided to go with someone more junior. I said they picked Mark Bogar "because he's a guy" and Bill agreed. I said I would not like to work with the Core team because "their treatment of women is outrageous and that I can't understand how Putnam can allow it to continue." Bill agreed with me, and added that the same team had treated Fayval Williams very badly two years ago. He said he doesn't like Justin Scott and Paul Warren and he has "problems with their ethics as well as the way they live their personal

5

lives." He said that he would not choose to work with them but it's not up to him.

12. I went to Bill Landes' office first thing in the morning of September 6, 2002. I wanted to talk about Konstantin Stoev's derivatives position as well as the fact that I had met for the first time with Paul Warren on the mechanics of running the Investors Sleeve for Basic Materials. I said that Paul had been bullying me, in my opinion. Bill said, "First of all, the U.S. Core team are assholes." "I think Paul Warren is a bully and an asshole and I believe there is evidence that he is anti-woman, although I can't prove it." He then went on to advise me to push back on some of his more aggressive statements, which Bill said thought I was doing.

13. On October 31, 2002, Ed Haldeman, the newly appointed Head of Investments, addressed the analyst group at Bill Landes' lunch. Haldeman had just started at Putnam on October 25, so this was the first time he had spoken to us. Saba Malak asked him what style of an investor he is. He said he would give us his own answer as Ed Haldeman. He said his "answer has not been vetted by the EEOC." He said "if my son asked me, in the privacy of my home, whether, not knowing anything else and with all things being equal, a 25 yr old woman or a 53 year old woman would be more attractive." Ed said, "All things being equal I would have a bias toward the 25 year old. But having said that,

6

we've been married 28 years and I'm 53 and you're not going to see me running around with any 25 year-olds." I looked over at Leah Graham, my 22 year old assistant, and she looked really uncomfortable. She was rolling her eyes.

    14. In September, 2001, Lauren Allansmith went on maternity leave with the title Associate Director of Research ("ADR"). When she came back, she was no longer an ADR. She had been demoted to analyst.

    15. In mid-September 2001, I had lunch with defendant Lawrence Lasser ("Lasser"), at the time the President and Chief Executive Office of Putnam. He asked me what my husband does, and I told him that he is a stay at home father. This seemed to make Lasser uncomfortable. He said, "How interesting. How does that make him feel as a man?" I said, "He feels fine." Then Lasser asked, "When people at a party ask your husband what he does, how does that make him feel as a man?" I thought it was troubling that the CEO of the company seemed so uncomfortable with the way my family was set up. He sets the tone for the organization, and it seemed to really bother him.

    16. One morning at 7:00 am, I went to the Putnam executive dining room for breakfast. I had already taken one maternity leave, so everyone knew I had one child at home. Across the room, I saw Tim Ferguson, the Head of Investments. I said "Hello" to him. He called out across the room, saying that I

7

must have "really good help" to be able to be there at that hour of the morning. It was embarrassing to me to have Tim yelling out his assumption that I would need to come in late every day because I have small children.

17. Women represented a tiny minority of the partnership group at Putnam. Over the years 1999 through 2003, the total partnership, including non-investment partners, never had more than six women at one time out of a total ranging from 36 to 42. The percentage of females among the total partners was approximately 10%. Among Investment division partners, the women fared far worse. Only two of the female partners were from the Investment Division at any one time out of a total investment division partners ranging from 19 to 23. In 2002 and 2003, there was only one female partner, representing just 5% of Investment Division partners in 2003. That number had dropped from two partners between 1999 and 2002. Both of these female partners were fired before being replaced by just one female investment partner, who herself left by "mutual consent" in 2004.

18. I participated in the Women's Advisory Group, which met monthly and whose mission was never really clear. At one point I asked if we could look at some real situations related to gender that were arising at Putnam, and I was told by the HR

representative, Christine Scordato, "That's not what this group is about." I never really knew what it was about.

18. When I first arrived at Putnam, there was no real maternity leave policy for the Investment Division, even though it was 1994 and most other companies had them. Karen Korn had her first child in 1995, and I remember that she had to push to get her leave clearly laid out. She told me what the time limits were, so when I was ready to go on leave three years later, I knew I was entitled to 12 weeks paid leave. However, when I checked with HR, I was told that I only could have six weeks. It took the intervention of my boss, Swift, to get HR to agree that I was entitled to 12 weeks.

19. Certain portfolio teams were off-limits to women. For example, the Core team, led by Paul Warren, had no women. The Specialty Growth team, led by Dan Miller, had one very low-ranked woman for a brief period in 1996 and then never any more until Margery Parker was moved into it in advance of her firing in 2003. Joe Joseph, who was promoted past me in Research, later led a small cap core team that had almost no females over his entire tenure. The International Core team had very few females. The Small Cap Value team had one female over the 1999-2003 period and she left part way through and was not replaced. The US Large Cap Growth team was a place led by a woman that had several females over the years. However, when growth

9

experienced poor performance in 2000 and 2001, the head of that team was demoted to Research and later fired, and the team was replaced by an all-male team led by a new male partner.

20. Typically, awards for the Equity Partnership Plan and the MMC Awards plan were made in March at the time the bonus awards were made.

21. At my meeting with Joshua Brooks ("Brooks") on August 28, 2003, Brooks made no mention of these payments being contingent upon my giving Putnam a release of all claims. Brooks did not mention a release until some days later and only after I told him I had consulted counsel. What Brooks later wrote down differed in material respects from what he told me in my August 28, 2003 meeting.

22. I have received annually from Putnam statements evidencing my status as a member of the "Putnam investments Profit Sharing Retirement Plan" most recently as of December 31, 2005, 2006 and 2007.

23. I r4eceived dividend checks, dated February 13, 2004, May 14, 2004, and August 13, 2004; a Proxy vote form, dated December 7, 2004; materials related to the Special Meeting of the Shareholders of Putnam Investments Trust on December 10, 2004, including Proxy form (and I have retained a copy of my proxy vote for that meeting) and a letter, dated March 22, 2005, from Richard Tibbetts, Chief of HR, that he wrote to me in

10

response to my letter to Putnam, dated March 14, 2005, in which I requested to sell my remaining Putnam shares. Only after I filed my complaint in this case on December 27, 2004, did the dividend payments stop.

    24. Once the growth organization changes were announced, I met with Deputy Head of Investments Stephen Oristaglio during the week of March 4, 2002. At the meeting, I asked why I had to go to Research. I told him that I would prefer to stay in portfolio management and that it was my career goal. Oristaglio said, "There is no room for you on the Growth team." I said, "You are keeping other people. Why not me?" Oristaglio said, "We need people with certain skills." I said, "I have better skills than the people you are keeping." Oristaglio said again that there was "no room" for me and that I needed to go back to Research. At that meeting, Oristaglio promised to consider me for future portfolio management positions as they arose. On March 12, 2002, he followed up with an e-mail to me repeating the promise. His e-mail is produced at PRM-00661.

    25. SEC Form N-1A for the Putnam New Opportunities Fund, dated January 28, 2008, pp. 1-2 and 11, as per the SEC website (www.sec.gov) shows the names of the fund's managers as reported to the SEC.

    26. SEC Forms N-1A for the Putnam International Growth Fund, dated October 30, 1999, p. 2 and pp. 6-7, October 26,

2000, p. 1 and p. 8, and October 30, 2001, p. 1 and pp. 7-8 showing the officers listed as portfolio managers with the SEC.

27. To the best of my knowledge, by 2002, none of the analysts in GER had ever managed a multi-billion dollar diversified global fund on a fulltime basis. Furthermore, GER is considered the entry portal for most MBAs when first employed by Putnam, and the analyst position is frequently considered entry level. The performance of my investment recommendations placed me in the top quartile of analysts in 2002. As a result of my experience, performance and seniority, it would be highly unlikely that any analyst in 2002 would have had higher compensation than me.

28. SEC Forms N-1A, for the Putnam Global Growth Fund, dated February 28, 2001, pp. 7-8, and the Putnam Global Equity Fund, dated June 29, 2001, pp. 8-9, as per the SEC website (www.sec.gov) show the names of the fund's managers as reported to the SEC.

29. In late April 2003, I asked Brooks about the status of the promotions. I told him that Landes had told me in February that promotions were "on hold" and that Lasser would not be making a decision until July. Brooks told me he would find out what was going on and would get back to me. Later that day, Brooks called me to say that my information was correct.

30. In or about June 2003, I began the work of preparing midyear reviews for my team, which consisted of Konstantin Stoev, Ellis Eckland, Darren Peers, and Christopher O'Malley.

31. I was on vacation during the last part of July 2003.

32. At a meeting with Joshua Brooks on August 28, 2003, he told me that he had been doing an investigation on me, and that he was shocked not at what he found I'd done but at what he didn't find. He said he started talking to portfolio managers and it turned out I had never talked to Paul Warren or Shigeki Makino or Mark Bogar. I said that was true because I had specifically not targeted the U.S./Global core team because they had never complained about Chris. I said I did interviews with the Value and Core IE teams. Then he said I hadn't talked to Omid Kamshad, Pam Holding or George Stairs. I told Brooks that I had talked to Holding and Stairs, but that Kamshad had not been around and he had told me the prior December, when he wanted O'Malley fired, that I should talk to Joshua Byrne in his place. I interviewed Joshua Byrne.

33. At this meeting with Brooks, I offered to go to my office to get my notes from the meetings, as well as the calendar entries that would prove that the meetings took place. Brooks said, "That won't be necessary."

13

34. Although HR and Brooks investigated me in the summer of 2003, they never informed me of the existence of the investigation, nor did they seek to obtain my side of the story.

Signed under penalty for perjury this 15th day of February 2008.

_____
Lisa Svensson, plaintiff,

<u>Certificate of Service</u>.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
BARRON & STADFELD, P.C.
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

Dated: February 15, 2008

[423004.1]