```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * * *     Civil Action No. 04-12711-PBS
                        *
LISA SVENSSON           *
                        *     BBO No. 351000
        Plaintiff,      *
                        *     Sixth Affidavit
v.                      *     of
                        *     Lisa Svensson
PUTNAM INVESTMENTS,     *
LLC f/k/a PUTNAM INVEST-*     (Declaration pursuant
MENTS, INC. and LAWRENCE*     to 28 U.S.C. §1746)
J. LASSER,              *
                        *
        Defendants.     *
                        *
* * * * * * * * * * * * *
```

1.  My name is Lisa Svensson. I am the plaintiff in this case. I was employed as an investment professional in the Investment Management Division of defendant Putnam Investments, LLC ("Putnam") from July 1994 through September 15, 2003. A copy of my resume is annexed to the Second Affidavit of Lisa Svensson ("Second Svensson Affidavit"), filed April 20, 2006, as Exhibit 1. I have personal knowledge of the facts set forth herein.

2.  I became employed by Putnam in July 1994 after I was recruited from the firm Lord Abbett & Co. in New York, New York, where I had had approximately seven years of experience as a Research Analyst.

3. When I joined Putnam, my boss, Patrick O'Donnell, stated that he would work toward placing me in a portfolio management position, after a period of several years. I agreed that initially I would be involved in O'Donnell's efforts to revitalize the Putnam Research Department, with a transition after this initial period to Portfolio Management. I understood portfolio management to be a much stronger career path than if I remained in Research.

4. In December 1997, due to the results of my work on energy stocks, and later on wireless stocks, I was asked to join the newly formed International Growth Equity team headed by the team's Chief Investment Officer, Robert Swift("Swift"). Although Swift promised that I would join the team as a Senior Portfolio Manager ("SPM"), at this time, I was appointed to the team as a Portfolio Manager ("PM") only.

5. I performed well in this new position and, by the end of 1998, the Global Growth Fund, to which I had been assigned, had surpassed Janus Worldwide Equity as the top performing fund in its competitive universe. The Global Growth Fund was in fact that only Putnam fund to have outperformed its Janus rival, and this was considered an accomplishment. As a result, despite having been on maternity leave at the end of 1998, I received increases in my compensation, and a stock grant, as a reward for my performance that year.

6. In 1999, I continued to produce excellent results, again beating Janus Worldwide, and my aggregate compensation package continued to increase but a very significant portion of my compensation was mandatorily deferred over five years.

7. The CIO of my team, Robert Swift ("Swift"), who was most familiar with my skills and work performance, nominated me to the position of Managing Director (MD) in early 2000. Putnam denied me this career advancement opportunity.

8. During the process of consideration of promotions to MD in early 2000, Putnam's senior management team considering this issue, deliberately altered my performance rating from 4.78 out of 5.0 to 3.0 for unexplained reasons. See my response to ¶¶ __ and __ to the Putnam Statement of Fact.

9. In 2000, the performance of the Global Growth Fund, as well as many other Putnam funds, turned negative, but my contributions remained strong. My compensation was increased to approximately $1.65 million (of which $750,000.00 was deferred over five years). Despite this, I again was denied promotion to MD by Putnam. When I inquired of Swift why I had not been promoted, he said that it was not a good year for me because I had been out on maternity leave and was "out of sight, out of mind."

10. In the summer of 2001, I approached Tim Ferguson, the Putnam Head of Investments, to ask why I was being denied promotional opportunities but he referred me to Stephen Oristaglio ("Oristaglio"), Deputy Head of Investments, and to Richard Tibbetts ("Tibbetts"), Sherrie Holder-Watts ("Holder-Watts") and Christine Scordato ("Scordato") of the Putnam Human Resources ("HR") department. I met with each of them. Oristaglio stated that people liked me and spoke highly of my performance and skills, but said that I lacked "that certain something," and that I had a "volatile nature," although he indicated to me that I had made "tremendous progress" and "should keep trying." Tibbetts and Ms. Scordato had little to say, although Scordato indicated that she had once heard that I "may not have been supportive enough of research", which contradicted the excellent reports as to my performance from supervisors and the excellent results that had been communicated to me at the time. I have learned in discovery in this case that the HR department was working behind the scenes as I was having these interviews to "set future expectations by telling [me] that while all these things would enhance [my] chances of promotion, there is no guarantee of promotion. [Tibbetts] explained that there are expectations of lower

4

numbers of promotions across the company next year." PRM-00658.

11. In early 2002, I again was not promoted to MD. Six males and no females became MD during that cycle. I was nominated during this period by Swift, who had nominated me before and who promised that he would do so again in 2002, but Swift was terminated at the time of the nominations. I learned in discovery that Holder-Watts gave Oristaglio a "heads up" that three nominations were being made in the Growth area, of which mine was one, "and that he should inform the managers if he did not wish them to make them." PRM 1897.

12. In March 2002, I was abruptly told that I was being "reassigned" back to the Research Department. Two females, Kelly Morgan ("K. Morgan") and I were reassigned to GER. The Global Growth Fund team was changed but all the males previously assigned to the Global Growth Fund remained in portfolio management positions and Stephen Dexter ("Dexter") who had less Putnam tenure and whose performance and evaluations were similar to mine with the exception of his management skills which were inferior, was made the new Director of International Growth Equity, replacing Swift.

13. After learning of my demotion to the research department, I met with Holder-Watts of HR and was told that there were no

portfolio management positions available to me, that my "opportunity" was in the Research Department, and that if I did not go back to Research, she would be having a "different kind of conversation" with me, which I understood to be a euphemism for, and meant, termination.

14. I also met with Oristaglio at this time (during the week of March 4, 2002). I asked him why I could not remain on the Growth team as a portfolio manager, since that was my career goal. He told me that the team needed "certain skills." I noted to him that my skills were better than the people they were keeping. Oristaglio told me that I needed to go back to Research, but he promised to consider me for PM jobs as they became available. The next week, on March 12, 2002, Oristaglio sent me an e-mail confirming this promise, stating "I will consider alternatives on an additive basis, especially if the large cap team or international growth team loses people to resignations, or if we underestimated the number of people required…" PRM-00661.

15. I learned in discovery that a number of opportunities arose in the first month after the growth "reorganization" where I could have been considered but I was not. PRM-05728, is an e-mail from Holder-Watts to Tibbetts, dated April 26, 2002, that discusses the fact that Tino Sellitto, a member

6

of the Large Cap Growth team, would be moving and HR was wondering about "back filling him" and in which Holder-Watts states, "I need to understand where Steve O is with regard to Lisa Svensson and if not her, think we should post the job." A second e-mail from Specialty Growth CIO Daniel Miller ("Miller") asks, "If Lisa is available, why wasn't she considered for the Large Cap Core PM position?...." PRM-10093.

16. In May 2002, I returned to the Research Department because of the threat of termination, despite being devastated by this decision. Almost immediately, I began to make inquiries as to whether there were other available positions such as on the Global Core Equity team that had taken over and renamed the Global Growth Fund that I had just left to Global Equity Fund, that needed to replace a departing portfolio manager, but I was told that there were none, despite the fact that there were portfolio management positions being given to males with lesser experience and lesser managerial ratings than I had received.

17. Once reassigned to GER, I attempted to perform, and did perform, my job duties in a competent, committed and enthusiastic manner. Despite these efforts, I repeatedly was denied the opportunity to cover certain top stocks in my proposed business plan, and when I inquired as to the

7

reason for this unfair treatment, I was told that it was because a male employee, James Falvey ("Falvey") would be "offended" and that I would have to give up on managing money because "Falvey would never agree" to a co-manager.

18. Despite being told that I would not be able to utilize the service of a certain junior investment associate in the Research Department, I performed my job in an effective and successful manner, and my performance compared favorably to the job performance of certain male employees who had not been demoted.

19. During the rest of 2002, I continued to seek positions in portfolio management.  When a position became available on the Global Core team, William Landes ("Landes", then Head of Global Investment Research, approached me to tell me about this opportunity, and to let me know that Putnam was promoting Mark Bogar because someone "more junior" was wanted.  When I stated that it was because "they wanted a guy," Landes agreed with my statement.  I then asked him whether, if I performed as per my business plan, my job could be seen as Managing Director level position, to which Landes replied that management would only promote and pay those that were at the top of the chart of Alpha generation.

20. At this time Landes told me that he wanted to promote Michael Yogg ("Yogg") to ADR but he was unsure if Yogg could do the job. Landes stated that he knew that I could do the job and that he wanted me to function as Yogg's right hand, performing all the people functions of the position. I asked him why I was being asked to do most of the work while a lesser performing and junior in Putnam tenure male would receive both the title and the credit. Landes did not reply and I declined the proposal.

21. From the outset of my return to GER, Falvey displayed a hostile and uncooperative attitude, stating that he did not want me in the energy team; that there was no way that I could manage the Global Natural Resources portfolio with him, and that he would "fight" me for the international stocks I proposed to cover. Despite Falvey's hostility, my recommendations on stocks and my overall job performance, put me in the top quartile for "alpha generation". (the degree that a stock outperforms a selected benchmark). Putnam measured the alpha generated by the analysts in GER on a daily basis, and Landes had said when I rejoined GER, that he would only promote and pay those who were at the top of the charts in alpha generation. I delivered top quartile alpha performance in 2002. PRM 9540. I had

numerous well-received presentations, and was praised highly for my innovative work and analysis.

22. Despite this high quality work, I learned at the end of 2002 that several male analysts were receiving compensation of well over $1,000,000.00 (while my compensation of approximately $1.65 million in 2000 and 2001 had been cut to approximately $650,000 in 2002).

23. During the time of my participation in bonus discussions for junior analysts and MBA's at the end of 2002, I learned that males who had been my contemporaries in GER originally, but who had been transferred out of GER and into portfolio management positions, were not demoted, and were receiving compensation as a result at a much higher level than I was.

24. In October, 2002, Charles Haldeman was made Putnam's Co-Head of Investments with Oristaglio.  See response to Putnam statement of Fact No. _____

25. At the beginning of 2003, Falvey was terminated by Putnam, and his fund, investment associate, and MBA analyst were put under my supervision.

26. I also received a promotion to Associate Director of Research ("ADR") but I received no adjustment of my compensation as a result, and Putnam continued to reflect my title as "analyst" in the company records.

27. In late February 2003, I was advised that Landes was leaving his job as Director of Research. Some time thereafter, I learned that Joshua Brooks ("Brooks"), a male who was a friend of Haldeman, and who had less investment research experience than I had, was being hired from the outside to replace Landes. Brooks joined Putnam in April, 2003.

28. After Brooks took over as Director, he stated to the Department's employees, including me, his view that the Research Department was "too young," and that all the turnover in the Department had hurt its performance. I thereafter approached Brooks about my concern for my future at Putnam and Brooks stated that I needed to separate "stock risk" from "career risk" and that "risk was OK." When I indicated that I was still very nervous about my situation, Brooks reassured me, stating that I would be the "last person to be fired," and that Putnam needed my experience and my ability to be a top alpha generator.

29. I also raised with Brooks my desire to be restored to significantly higher compensation, and that the Managing Director promotion was "really important" for me. Brooks responded that he did not believe in "titles," to which I replied that "titles" were really important to one's career advancement within Putnam.

11

30. After being advised in 2003 that promotions to MD would be "put on hold" until July so that Lasser, as President and CEO, had had an opportunity to "review the issues of titles," I was advised in August 2003 by Brooks that no MD appointments would be made in 2003 because there were already "too many" MDs, and that Lasser wanted to "rethink" all the titles.

31. In June and July 2003, because of my concern that Lasser was micro-managing the HR function, and that the arrivals of Mr. Haldeman and Brooks foretold an effort to "clean house," and thereby deprive female executives of career advancement opportunities and higher levels of compensation, and concerned about the role that the HR Department seemed to be playing in implementing employment policies at Putnam, I decided to recommend that the HR representative assigned to my team (of which I was Team Leader) not participate in internal management meetings that Brooks held with the ADRs.  I have learned in discovery in this case that immediately thereafter, HR (Eric Hutcherson, Mary McNamee) were separately conducting interviews with my colleagues in Research to "check up" on my performance.  While my colleagues told me that they had been told HR was evaluating me for a high-level position, I

12

believe that they were seeking to develop negative information to justify my termination.

32. Upon my return in early August 2003 from vacation in late July, I asked to meet with Brooks on August 28, 2003 to discuss a review and warning that I had been preparing for O'Malley, who had not been meeting his agreed upon performance goals concerning his stock coverage and communication.  At that meeting, Brooks told me that he had been "doing an investigation" of me, and that he was shocked not at what he found I had done but at what he had not found.  He said that he had started talking to portfolio managers and that it turned out I had never talked to Paul Warren or Shigeki Makino or Mark Bogar.  I said that was true because I had specifically not targeted the U.S./Global core team because they had never complained about O'Malley.  I said I did interviews with the Value and Core IE teams.  Then he said I had not talked to Omid Kamshad, Pam Holding or George Stairs.  I told Brooks that I had talked to Holding and Stairs, but that Kamshad had not been around and Kamshad had told me the prior December, when he told me that he wanted O'Malley fired, that I should talk to Joshua Byrne in his place.  I interviewed Joshua Byrne. I then offered to Brooks to go to my office to get my notes from the meetings, as well as the calendar

13

entries that would prove that the meetings took place. Brooks said, "That won't be necessary." Although HR and Brooks investigated me in the summer of 2003, they never informed me of the existence of the investigation, nor did they seek to obtain my side of the story.

33. As a result of his investigation, Brooks said that he had gone to my team and learned that I was not a good manager and the people who worked for me did not like me. He said they had gone as far as to get other jobs. I asked which team members had obtained other jobs and complained. Brooks refused to give me any information. Instead, he said that I was no longer an ADR and I would no longer be managing the Global Natural Resources Trust. He said he needed to immediately relieve me of my management duties for the good of the team. At this point, Brooks stated that he knew my goals were to make more money and to be promoted to MD. He clearly said that those goals would be "unlikely to be achieved in this new position," so "out of respect for me" he had prepared some alternatives. The first was to remain an analyst with no chance of promotion or to make more money. The second was to stay at Putnam for an agreed-upon period of time while I looked for work and to leave at an agreed-upon date with no severance. The third choice was to accept a severance package of two weeks

14

for every year I had worked at Putnam, amounting to 18 weeks, a lump sum of $250,000 representing half of my prior year's bonus, which itself had been reduced by over 65%, and Brooks stated he could "get" my deferred. He said, "This is not HR in the room, this is just you and me talking." At no time in this discussion did Brooks mention that this offer was contingent on my signing a release of all claims against Putnam.

34. During discovery in this case, I have learned that prior to the meeting on August 28, 2003, Putnam had prepared a draft termination letter for me. E-mail, dated August 26, 2003 PRM 00969. Even before that date, on August 19, 2003, another e-mail to the head of compensation shows that Putnam had requested a printout of my deferred balances and stock award positions. PRM-1659-1660.

35. I met again with Brooks on September 3. I told him at that time that I had consulted counsel, and that I was not able to make a decision on the three options that he had offered me, and that I would need to have them in writing. He sent me an e-mail later that evening. PRM-00356. For the first time, Putnam mentioned that it would require that I sign a release of all claims in order to obtain my compensation from prior years and the lump sum.

15

36. Because of an illness in my family, I was forced immediately after this meeting to travel to Texas. Upon my return, I met with Brooks on September 12, 2003 and advised him that I did not find any of the options acceptable to me. When he inquired about what I would accept, I asked to be given the long promised Managing Director title, and to be restored, on a guaranteed basis, to at least the level of compensation I knew my male comparators in portfolio management, and some in GER, were receiving. I also raised with Brooks my belief that gender discrimination was behind my unjustified treatment. Brooks gave no lawful explanation for Putnam's decision to offer me only the three options, but stated that he would communicate my proposal for resolution of the matter with his supervisors, and would get back to me.

37. On September 15, 2003, I was informed by Brooks that my proposal for resolution would not be accepted by Putnam, and that I therefore would be treated as if I had elected to resign. I stated that I did not resign from Putnam, and that in fact Putnam was terminating me. I asked that the termination be put in writing. McNamee said "Whatever. You are getting a severance package, so why don't I go over it?" She then proceeded to read the severance agreement, and to review with me my balances of compensation earned in

prior periods, as well as my stock positions. McNamee indicated that my stock would vest on schedule in March 2004. At this point, Brooks and McNamee indicated that it was time for me to leave. I reminded them that they had not yet given me my termination in writing, so Brooks told me that he would get me a letter in twenty minutes, during which time I waited in my office. After twenty minutes, McNamee came to my office and presented me with a letter indicating that I had been terminated.

Signed under penalty for perjury this 15th day of February 2008.

_____
Lisa Svensson, plaintiff

### Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/Kevin F. Moloney
Kevin F. Moloney BBO No. 351000
BARRON & STADFELD, P.C.
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

Dated: February 15, 2008

[423006.1]