RECEIVED
JAN 0 4 2008
K.F.M.

FILE

# Svensson
## vs.
# Putnam Investments

# David Bloom

Volume 1

December 18, 2007
pp. 1-213



Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 2

```
 1   APPEARANCES:
 2
 3
 4   JOHN K. WEIR LAW OFFICES, LLC
 5   By John K. Weir, Esquire
 6   300 Park Avenue, Suite 1700
 7   New York, New York 10022
 8   (212) 572-6374
 9   johnweir47@aol.com
10   on behalf of the Plaintiff.
11
12
13   NIXON PEABODY LLP
14   By Erika M. Collins, Esquire
15   100 Summer Street
16   Boston, Massachusetts 02110-2131
17   (617) 345-1203
18   ecollins@nixonpeabody.com
19   on behalf of Lawrence J. Lasser.
20
21
22
23
24
```

Page 4

```
 1              I N D E X
 2
 3   EXAMINATION OF:                    PAGE
 4   DAVID BLOOM
 5   By Mr. Weir                          5
 6
 7
 8          E X H I B I T S
 9   NO.                                PAGE
10   1     Report of David Bloom           5
11   2A-G  Spreadsheets                    5
12   3     Updated Curriculum Vitae       13
13   2H    Termination lists             103
14
15
16      *Original exhibits retained by Mr. Weir
17
18
19
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES:
 2
 3
 4   BINGHAM McCUTCHEN, LLP
 5   By Joseph L. Kociubes, Esquire
 6   Allyson Kurker, Esquire
 7   and Jennifer L. Holden, Esquire
 8   150 Federal Street
 9   Boston, Massachusetts 02110
10   (617) 951-8000
11   on behalf of Putnam Investments, LLC.
12
13
14   ALSO PRESENT: Lisa Svensson.
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1              PROCEEDINGS
 2           (Exhibit Nos. 1 and 2A through
 3           2G marked for identification.)
 4           DAVID BLOOM, having duly affirmed that his
 5   testimony would be the truth, the whole truth and
 6   nothing but the truth, testified as follows in answer
 7   to interrogatories by MR. WEIR:
 8      Q.   Could you state your full name for the
 9   record, sir?
10      A.   David Elliot Bloom.
11      Q.   And your present residence address?
12      A.   11 Winthrop Circle, Weston, Massachusetts.
13      Q.   And are you currently employed?
14      A.   Yes, I am.
15      Q.   By whom?
16      A.   Harvard University.
17      Q.   And in what capacity are you employed by
18   Harvard?
19      A.   I'm a member of the faculty.
20      Q.   Of any particular school of Harvard
21   University?
22      A.   The School of Public Health.
23      Q.   And are your jobs and responsibilities
24   principally related to teaching at the School of Public
```

David Bloom

| Page 194 | Page 196 |
|---|---|
| 1. the age distribution of your work force towards younger<br>2. ages and that's a possible explanation for why one sees<br>3. such a disproportionate number of professionals in the<br>4. Investment Management Division below age 60 or a<br>5. hundred percent below age 60 for these groups and, you<br>6. know, really also a disproportionate number below age<br>7. 50.<br>8.    Q.  Was analyst an entry level position at Putnam<br>9. as you understood it?<br>10.    A.  I think -- well, I don't know.  I think there<br>11. may have been several entry level positions at Putnam.<br>12.    Q.  Of which one was analyst?<br>13.    A.  Analyst could be an entry level position.  I<br>14. don't know that it always was.<br>15.    Q.  Did you undertake any analysis or discussion<br>16. with Putnam concerning the finding that of the 24<br>17. senior portfolio managers or associate directors 21<br>18. were below age 50 and none were over age 60?<br>19.    A.  Can I hear the question again, please?<br>20.    (Question was read back by the stenographer.)<br>21.    A.  I may have discussed it but I don't -- I<br>22. don't recall doing any specific analyses of those<br>23. numbers.  Again, these numbers were illustrative, meant<br>24. to be kind of the first thing one might naturally look | 1. that.  I think he assumes that.<br>2.    Q.  Do you disagree with his assumption?<br>3.    A.  The issue here isn't whether Miss Svensson<br>4. would or would not ever find a job in the financial<br>5. services industry.  The issue is really -- it really<br>6. has to do with her earnings capacity and the -- if she<br>7. could, what her earning capacity would be in that<br>8. industry and that's really the issue I have with Dr.<br>9. Siegel's assumption.  I don't see any basis in the<br>10. material that I've reviewed to think that Miss Svensson<br>11. could absolutely not find a job in the financial<br>12. services industry so the illustrative --<br>13.    Q.  What is the material you reviewed that led<br>14. you to the conclusion that she might be able to find a<br>15. job in the financial services industry?<br>16.    A.  Just material on her background, her special<br>17. skills, her record of performance in the industry.<br>18.    Q.  Did you undertake to determine whether at the<br>19. time you were writing your report Miss Svensson had<br>20. found a job in the financial services industry?<br>21.    A.  I did ask.<br>22.    Q.  Who?<br>23.    A.  I asked counsel.  I might have asked the<br>24. folks at Putnam as well if they knew. |

| Page 195 | Page 197 |
|---|---|
| 1. at to assess whether age 65 is appropriate or not and<br>2. on the basis of what I see here, I'm very hard-pressed<br>3. to think that 65 is appropriate.  I haven't seen<br>4. anything anywhere else to justify that.<br>5.    Q.  Did you determine whether the positions of<br>6. associate director or senior portfolio manager were<br>7. entry level positions?<br>8.    A.  To the best of my knowledge they're not entry<br>9. level positions.<br>10.    Q.  Same question with respect to your finding<br>11. that of 108 senior vice presidents, 99 are below age 50<br>12. and none were over age 60.  Did you undertake any<br>13. analysis with respect to that determination or as to<br>14. why that might be?<br>15.    A.  I did not do an organizational demographic<br>16. analysis for Putnam related to this.  I really didn't<br>17. think it was necessary given what I was trying to do<br>18. here.<br>19.    Q.  You determined in Paragraph 71 that Dr.<br>20. Siegel assumed that Miss Svensson will never find a job<br>21. in the financial services industry.  Did you disagree<br>22. with that conclusion?<br>23.    A.  It doesn't seem to me that it's offered as a<br>24. conclusion of Dr. Siegel.  I don't think he concludes | 1.    Q.  What was the --<br>2.    A.  What Miss Svensson was actually doing.<br>3.    Q.  What was the response?<br>4.    A.  And what her evenings were in fact.<br>5.    Q.  And what was the response you received to<br>6. those questions?<br>7.    A.  That the information wasn't available.<br>8.    Q.  Do you recall when you asked?<br>9.    A.  I think specifically what I asked was for<br>10. Miss Svensson's tax returns post 2003 and that's<br>11. specifically the information that I was told was not<br>12. available.<br>13.    Q.  Well, do you know as you sit here today<br>14. whether Miss Svensson has returned to the financial<br>15. services industry?<br>16.    A.  I don't know.<br>17.    Q.  Were you provided with any information<br>18. concerning the efforts that Miss Svensson had made to<br>19. return to the financial services industry?<br>20.    A.  I think I was provided with some information<br>21. about that.<br>22.    Q.  What type of information were you provided?<br>23.    A.  Just in discussion that perhaps -- or maybe<br>24. it was deposition testimony or something, some |

50 (Pages 194 to 197)