**Exhibit C 4**
to
**Affidavit of Kevin F. Moloney,**
**February 15, 2008**

**Excerpt(s)**
**McNamee deposition**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 04-12711 PBS


LISA SVENSSON,

       Plaintiff,

   VS.

PUTNAM INVESTMENTS, LLC,
F/K/A PUTNAM INVESTMENT,
INC. AND LAWRENCE J. LASSER,

       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

MARY McNAMEE


November 29, 2005
10:13 a.m.



Barron & Stadfeld, P.C.
100 Cambridge Street

Boston, Massachusetts





Ayako Odanaka, Notary Public, Certified Shorthand Reporter

and Registered Professional Reporter within

and for the Commonwealth of Massachusetts

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | . |
| 3 | ON BEHALF OF PLAINTIFF: |
| 4 | JOHN K. WEIR, ESQ. |
| 5 | John K. Weir Law Offices, LLC |
| 6 | 300 Park Avenue, Suite 1700 |
| 7 | New York, New York 10022 |
| 8 | 212.572.6374 |
| 9 | johnkweir47@aol.com |
| 10 | . |
| 11 | ON BEHALF OF LAWRENCE J. LASSER: |
| 12 | CARRIE J. CAMPION, ESQ. |
| 13 | Nixon Peabody, LLP |
| 14 | 100 Summer Street |
| 15 | Boston, Massachusetts 02110 |
| 16 | 617.345.1000 |
| 17 | . |
| 18 | . |
| 19 | . |
| 20 | . |
| 21 | . |
| 22 | . |
| 23 | . |
| 24 | . |

|  | Page 4 |
|---|---|
| 1 | EXAMINATION INDEX OF MARY McNAMEE |
| 2 | NOVEMBER 29, 2005 |
| 3 | . |
| 4 | EXAMINATION OF                     PAGE |
| 5 | . |
| 6 | MARY McNAMEE: |
| 7 | EXAMINATION BY MR. WEIR              5 |
| 8 | . |
| 9 | . |
| 10 | . |
| 11 | . |
| 12 | . |
| 13 | . |
| 14 | . |
| 15 | . |
| 16 | . |
| 17 | . |
| 18 | . |
| 19 | . |
| 20 | . |
| 21 | . |
| 22 | . |
| 23 | . |
| 24 | . |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | . |
| 3 | ON BEHALF OF PUTNAM INVESTMENTS, LLC: |
| 4 | JOSEPH L. KOCIUBES, ESQ. |
| 5 | LOUIS A. RODRIQUES, ESQ. |
| 6 | Bingham McCutchen, LLP |
| 7 | 150 Federal Street |
| 8 | Boston, Massachusetts 02110 |
| 9 | 617.951.8000 |
| 10 | joe.kociubes@bingham.com |
| 11 | louis.rodriques@bingham.com |
| 12 | AND |
| 13 | CHRISTOPHER S. FORTIER, ESQ. |
| 14 | Putnam Investments |
| 15 | One Post Office Square |
| 16 | Boston, Massachusetts 02109 |
| 17 | 617.760.4613 |
| 18 | christopher_fortier@putnam.com |
| 19 | . |
| 20 | . |
| 21 | ALSO PRESENT: |
| 22 | LISA SVENSSON |
| 23 | . |
| 24 | . |

|  | Page 5 |
|---|---|
| 1 | DEPOSITION OF MARY McNAMEE |
| 2 | NOVEMBER 29, 2005 |
| 3 | PROCEEDINGS: |
| 4 | MARY McNAMEE, the deponent, having |
| 5 | been satisfactorily identified and duly |
| 6 | sworn by the Notary Public, was examined |
| 7 | and testified as follows: |
| 8 | EXAMINATION |
| 9 | BY-MR. WEIR: |
| 10 | Q.  Would you state your full name for |
| 11 | the record, please? |
| 12 | A.  Mary McNamee. |
| 13 | Q.  Okay. And that's McNamee with an |
| 14 | M-C, capital N-A-M-E-E? |
| 15 | A.  N-A-M-E-E. |
| 16 | Q.  And your present residence address? |
| 17 | A.  31 Dix Street, D-I-X, in |
| 18 | Winchester, Massachusetts. |
| 19 | Q.  And are you presently employed? |
| 20 | A.  Yes. |
| 21 | Q.  By Putnam Investments? |
| 22 | A.  Yes. |
| 23 | Q.  And I see from your business card |
| 24 | that you're the senior human resources |

Page 138

1   it. I would say upon reading those few
2   sections, that it would be a negative
3   reaction, a reflection on Lisa.
4       Q. Do you think it's inappropriate for
5   a team leader or an associate director of
6   research to make criticisms of bad calls
7   on particular stocks?
8       A. I think that there is -- that they
9   should be open dialogue to be able to give
10  positive and negative feedback on stock
11  positions, whether they're bad calls.
12      Q. Well, if there was a bad call made,
13  was it appropriate or inappropriate for
14  the associate director of research to
15  communicate that negative --
16      A. If they had --
17      Q. -- feedback to the individual
18  analyst?
19      A. If they -- if they have that
20  opinion, that's their right to be able to
21  communicate that opinion to their
22  subordinate.
23      Q. It's their job, isn't it?
24      A. Yeah.

Page 139

1       Q. You see the statement, "Lisa has
2   tendency to give negative feedback only"?
3       A. (Witness viewing document). Where
4   is that?
5       Q. Third --
6       A. (Witness viewing document). Oh.
7   Mm-hmm.
8       Q. Did you undertake to speak to Mr.
9   O'Malley concerning other instances of
10  negative feedback that he had received
11  from Lisa Svensson?
12      A. I did not speak to Chris directly
13  that I recall. I think it was Eric
14  Hutcherson that conducted that part of the
15  interview.
16      Q. Did you speak to Lisa Svensson
17  concerning any of the issues raised in
18  this section of the document?
19      A. No, I did not.
20      Q. Do you have a recollection of any
21  other issues that were discussed with you
22  by either Mr. Hutcherson or Mr. O'Malley
23  in the summer of 2003 concerning Lisa
24  Svensson's job performance, other than

Page 140

1   what's referenced in this --
2       A. I don't recall.
3       Q. -- McNamee 3?
4       A. I don't recall.
5           MR. KOCIUBES: If you're
6   moving to a different document, I'm
7   relatively indifferent, but tell me what
8   -- because my assumption is you're not
9   within half hour of finishing, so what do
10  you want to do about lunch?
11          MR. WEIR: What time have
12  we got?
13          MR. KOCIUBES: It's ten
14  after 1:00.
15          MR. WEIR: Why don't we
16  work till 1:30, and take a half hour then?
17  Is that all right?
18          THE WITNESS: Yes, that's
19  good.
20          MR. WEIR: Let me mark as
21  McNamee No. 4 a one-page document bearing
22  Document Number 00367.
23          (Exhibit-4, Handwritten Note
24  dated July '03, marked for identification).

Page 141

1       BY MR. WEIR:
2       Q. Let me show you what's been marked
3   McNamee 4 for identification and ask you
4   if you recognize that document.
5       A. (Witness viewing document).
6   Mm-hmm.
7       Q. What is it?
8       A. (Witness viewing document). I
9   think it's a portion of some comments
10  written by Darren Pierce.
11      Q. Whose -- Do you recognize that as
12  Darren Pierce's handwriting?
13      A. I think -- I believe so.
14      Q. And it was written in or about the
15  time frame of the date that it bears; that
16  is, July of '03?
17      A. I would assume so, based upon the
18  date at the top of the page.
19      Q. Did you have any discussions with
20  Mr. Pierce concerning Lisa Svensson in the
21  time frame of July '03?
22      A. I did not, no.
23      Q. Did you receive a document, this
24  document in or about July '03?

Page 166

1    A.  From my previous -- the previous
2    exhibit that talked about Chris referring
3    to Leah not having enough time to work
4    with him would be what I would have --
5    imagine was the disconnect with that
6    relationship.
7    Q.  Okay.  Did you -- Had you been
8    made aware of this problem prior to August
9    18th of 2003?
10   A.  Just from what Lisa had e-mailed me
11   prior to.
12   Q.  So Lisa had identified a problem
13   that Chris O'Malley was having with Leah
14   Graham?
15   A.  I guess.  It's in the document that
16   she sent to me, the bullet points.  I can
17   refer to that.
18   Q.  Did you undertake to speak to Leah
19   Graham concerning this issue?
20   A.  No, because she was an IA, and so
21   she was in early career program, and it
22   was Eric Hutcherson's responsibility.
23   Q.  Do you know if Eric Hutcherson
24   spoke to her?

Page 167

1    A.  I don't know.
2    Q.  Okay.  Do you see the paragraph
3    that relates to an issue with respect to
4    Peabody Energy?
5    A.  (Witness viewing document).
6    Mm-hmm.
7    Q.  Second to last paragraph?
8    A.  (Witness viewing document).
9    Mm-hmm.
10   Q.  Do you understand what the problem
11   with Peabody Energy was?
12   A.  Yes, that they needed a stock
13   offering and that Chris didn't mention it,
14   and she was concerned that he was not up
15   to speed on names that he was supposed to
16   be finished, as he said he would.
17   Q.  Okay.  Did you speak to Chris
18   O'Malley about this issue of Peabody
19   Energy?
20   A.  No, because Chris wasn't my person
21   to cover.
22   Q.  Do you know if Eric Hutcherson
23   spoke to Chris O'Malley --
24   A.  I don't --

Page 168

1    Q.  -- on this subject?
2    A.  I don't know.
3    Q.  Did you speak to Lisa Svensson
4    concerning the issue of Peabody Energy?
5    A.  No.
6    Q.  Did you speak to Josh Brooks on the
7    subject of that were raised on this --
8    A.  I may have --
9    Q.  -- e-mail of August 18th?
10   A.  I may have forwarded this to Josh
11   just as an FYI.
12       MR. WEIR:  Okay.  I'd like
13   to mark as McNamee 6 a one-page document
14   bearing Document Number B0018 for
15   identification.
16       (Exhibit-6, E-mail dated
17   8/18/03, Bates Stamped B0018, marked for
18   identification).
19       BY MR. WEIR:
20   Q.  Okay.  Let me show you what's been
21   marked as McNamee 6 for identification and
22   ask you if you recognize that document.
23   A.  (Witness viewing document).
24   Mm-hmm.

Page 169

1    Q.  What is it?
2    A.  I have responded to Lisa's e-mail
3    regarding her additional information on
4    Chris O'Malley that we should have an
5    induction plan for all the MBAs.  They're
6    in boot camp usually for the two weeks.
7    I was going on vacation.
8        The reason I said I was unable to
9    draft the bullet points we discussed on
10   Chris is I had already sat down with Josh
11   Brooks and had reviewed Lisa's bullet
12   points on Chris O'Malley as well as Chris
13   O'Malley's e-mail back, and at that --
14   between that time and this time Josh was
15   in the process of talking to the portfolio
16   managers that Lisa had spoken to regarding
17   Chris's performance, and Josh asked me to
18   avoid Lisa over this period until he's had
19   a chance to gather all the data for him
20   to make a decision on what to do.
21       And that's why I respond to Josh.
22   I tried to hold her off as best I could,
23   Let's discuss 8/25, because I was going on
24   vacation.

Page 178

1  Q. Okay.
2  A. It says, "75 percent of it --
3  Chris's time was spent with one group of
4  portfolio managers and 25 percent was
5  spent with two other, the -- Daniel and
6  Carmel."
7  Q. What was this -- what portfolio
8  managers was the 75 percent of it --
9  A. Shigeki Makino, Pam Holding, Bart
10 Geer, Dave King, Hugh Mullin. Debbie
11 Kuenstner was a CIO, so she ran over the
12 -- ran over values, so I don't know
13 whether he directly impacted her portfolios
14 or not, but they were team members, yes.
15 Q. Okay. And did you determine
16 whether Lisa had spoken to Shigeki Makino,
17 Bart Geer, Dave King or Hugh Mullin?
18 A. There was a mixed results that
19 either they said that she did speak to
20 them or she didn't speak to them.
21 Q. Some said they did and --
22 A. Some said they didn't.
23 Q. -- some said they didn't?
24 A. Yeah.

Page 179

1  Q. Okay. Was there any discussion
2  amongst the ones who did as to what the
3  -- what the response was?
4  A. Yes. They said that he was coming
5  along nicely; that he was a good analyst.
6  Pam Holding said that his thesis was sound
7  -- stocks thesis was sound.
8     Hugh thought that he was -- since
9  he covered -- had something that Hugh had
10 used to cover, that he thought he was
11 coming along well.
12 Q. And how about the 25 percent; who
13 was that?
14 A. Daniel and Carmel. They ran
15 emerging markets portfolios, and Chris had
16 a limited impact on those portfolios. And
17 they were not as happy with the attention
18 that he was giving them.
19 Q. That's Carmel Peters and Daniel --
20 A. Grana.
21 Q. Grana. Okay. Now, that's seven
22 people; is that correct?
23 A. Could be. I'm going off my memory,
24 so...

Page 180

1  Q. I've got Shigeki Makino, Bart Geer,
2  Dave King, Hugh Mullin, Pam Holding,
3  Daniel Grana and Carmel Peters.
4  A. (Witness nodding).
5  Q. And you're saying that Chris
6  O'Malley spent a hundred percent of his
7  time interfacing with those people in some
8  combination?
9  A. It was my understanding.
10 Q. And how did you get that
11 understanding?
12 A. I believe that -- it was my
13 understanding that he worked with the
14 International Group as well as the Value
15 team, and that those individuals -- or the
16 Global team, I should say, which is
17 Shigeki -- and Emerging Markets is also
18 International.
19 Q. So these were responsibilities
20 other than as part of the energy and
21 materials group?
22 A. Well, no. They covered -- the
23 energy materials group covered stocks and
24 that certain -- certain industries or

Page 181

1  certain stocks are in certain portfolios.
2     For example, if you're covering,
3  let's say, a big industrial company, you
4  wouldn't be calling on the growth team.
5  But if you covered technology stocks, you
6  would be calling on the growth team.
7     So there's certain teams you would
8  communicate with on a regular basis, and
9  there are other teams that you wouldn't
10 communicate with really at all.
11 Q. And who made the determination that
12 you would communicate with a particular
13 team and would not communicate with
14 another team?
15 A. It probably would be done in
16 conjunction with your manager, another plan
17 of who you would --
18 Q. So this would have been something
19 that would have been directed by Lisa
20 Svensson?
21 A. I would assume so.
22 Q. And how did you come up with these
23 percentages, the 75 and 25 split?
24 A. I don't remember.

Mary McNamee                                                November 29, 2005

**Page 218**

1   Q. Okay. So it would have been your
2   expectation --
3   A. Whoever the head of investments
4   was, it would have been communicated as an
5   FYI.
6   Q. And if the head of investments was
7   Mr. Haldeman in conjunction with Mr.
8   Oristaglio --
9   A. Yeah.
10  Q. -- you would have expected Mr.
11  Brooks to run the decision by those two
12  individuals --
13  A. As an FYI, not as any kind of veto
14  power or anything else like that.
15  Q. Do you have actual knowledge as to
16  whether he did that or not?
17  A. No. But in general, he's pretty
18  good about that.
19  Q. Because he's done that in other
20  instances?
21  A. Mm-hmm.
22  Q. What other instances has he -- what
23  major employment decisions has he run --
24  A. In Sep --

**Page 219**

1   Q. -- that by Haldeman and Oristaglio?
2   A. In September of 2004, when he let
3   -- when they did the downsizing in
4   Research, he would have told Ed Haldeman
5   and Steve Oristaglio.
6   Q. Okay.
7   A. So it must have been Tim in 2003,
8   I would think, because Tim I think was
9   still there then. Sorry. It's just there
10  were so many changes within that period of
11  time --
12  Q. There sure were.
13  A. -- it's tough to remember.
14  Q. Had you ever been involved while at
15  Putnam in a situation where a manager was
16  offering these kinds of employment
17  alternatives or end of employment
18  alternatives to an associate director of
19  research or anyone at the associate
20  director level?
21  A. Well, I know in 2000 -- in
22  September of 2004, some of the people that
23  we downsized we did offer the majority of
24  them the option of either staying on

**Page 220**

1   through the end of the year and looking
2   for a job, you stay employed at Putnam by
3   looking for a job internally as well as
4   externally, and then leaving by the end of
5   the year or taking a package and leaving
6   immediately. So those individuals were
7   offered that option at that time.
8       I'm trying to think. I can't think
9   of anyone else in 2003 that was given
10  options.
11  Q. How about ever? Ever recall a
12  situation in which an employee was
13  mandated to relinquish her management role
14  but remain at Putnam?
15      MR. KOCIUBES: And you're
16  differentiating just terminations, because
17  you've already had testimony.
18      I'm just trying to understand how
19  expansive you want her to testify.
20  Example about Mr. Falvey, you want to hear
21  that again or --
22      MR. WEIR: No, no, no.
23      Off the record.
24  .

**Page 221**

1       (Off the record at 3:23
2   p.m.)
3       (Discussion off the record).
4       (On the record at 3:24 p.m.)
5   BY MR. WEIR:
6   Q. Let me rephrase the question.
7   A. Okay.
8   Q. During the time that you've been at
9   Putnam in the human resources department,
10  have you ever become aware of a situation
11  in which an employee, whether as one of
12  several options or as a sole option, was
13  required to relinquish his or her
14  management role but would be allowed to
15  remain at Putnam in a lesser role?
16  A. Well, I think there have been times
17  in which teams have been broken up and
18  responsibilities have changed, people have
19  been redeployed in other roles within the
20  organization rather than saying goodbye to
21  them.
22      I think the first option is to what
23  other roles would this person be
24  appropriate for, you know, what are they