**Exhibit C 6
to
Affidavit of Kevin F. Moloney,
February 15, 2008**

**Excerpt(s)
Oristaglio deposition**

# Svensson
## vs.
## Putnam Investments, et al.

## Stephen M. Oristaglio

Volume 1

June 13, 2006
pp. 1-242

**JonesReporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Stephen M. Oristaglio

Page 1

1   Volume:  I

2   Pages:   1-242

3   Exhibits: 1-24

4

5   UNITED STATES DISTRICT COURT

6   FOR THE DISTRICT OF MASSACHUSETTS

7

8   Civil Action No. 04-12711-PBS

9   - - - - - - - - - - - - - - - - - - - - - - - - - x

10  LISA SVENSSON,

11           Plaintiff,

12      v.

13  PUTNAM INVESTMENTS LLC, f/k/a

14  PUTNAM INVESTMENTS, INC., and LAWRENCE J. LASSER,

15           Defendants.

16  - - - - - - - - - - - - - - - - - - - - - - - - - x

17

18      DEPOSITION OF STEPHEN M. ORISTAGLIO

19          Tuesday, June 13, 2006

20          9:58 a.m. to 4:53 p.m.

21          BARRON & STADFELD, P.C.

22            100 Cambridge Street

23            Boston, Massachusetts

24      Reporter:  Marianne R. Wharram, CSR/RPR

Stephen M. Oristaglio

Page 2

```
 1   APPEARANCES
 2
 3        JOHN K. WEIR LAW OFFICES LLC
 4        (BY JOHN K. WEIR, ESQ.)
 5        300 Park Avenue, Suite 1700
 6        New York, NY  10022
 7        (212) 572-6374
 8        johnkweir47@aol.com
 9        Co-Counsel for the Plaintiff
10
11        BINGHAM McCUTCHEN, LLP
12        (BY JOSEPH KOCIUBES, ESQ.)
13        150 Federal Street
14        Boston, MA  02110-1726
15        (617) 951-8000
16        joe.kociubes@bingham.com
17        Counsel for the Defendant
18        Putnam Investments, LLC
19
20
21
22
23   Continued.
24
```

Page 3

```
 1   APPEARANCES, continued.
 2
 3        NIXON PEABODY, LLP
 4        (BY MELANIE GLICKSON, ESQ.)
 5        100 Summer Street
 6        Boston, MA  02110-2131
 7        (617) 345-1000
 8        mglickson@nixonpeabody.com
 9        Counsel for the Defendant Lawrence Lasser
10
11   ALSO PRESENT:
12
13        Lisa Svensson
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                 I N D E X
 2   DEPONENT      DIRECT CROSS REDIRECT RECROSS
 3   STEPHEN M. ORISTAGLIO
 4   (BY MR. WEIR)    8
 5   (BY MR. KOCIUBES)         --
 6   (BY MS. GLICKSON)         --
 7
 8                 E X H I B I T S
 9   NO.        DESCRIPTION              PAGE
10   1    Organizational Charts Bates Stamped    26
11        2753-2775
12   2    Organizational Charts Bates Stamped    28
13        2718 to 2752
14   3    Performance and Development Planning   46
15        And Review Form for Incentive
16        Eligible Employees Bates Stamped
17        PRM 00324 through 00333, 2244,
18        2257, 2252, 2265, 2559, and 2308
19   4    Performance and Development Planning   59
20        And Review Form for Managers Bates
21        Stamped PRM 00024 through 00032,
22        2601-2613, 2638, 2614-15, 2619-23,
23        2655, 2658, 2662, 2670, 2640, 2650, 2679
24   Continued.
```

Page 5

```
 1           E X H I B I T S, continued
 2   NO.        DESCRIPTION              PAGE
 3   5    Performance and Development Planning   77
 4        And Review Form for Managers Bates
 5        Stamped PRM 00040 through 00048, 2693,
 6        2531-32, 2134, 2119, 2123, 2487, 2512,
 7        2100, 2107, 2111, 2062, 2091, 2014,
 8        2023, 2026, 2008, 2019, 2549,
 9        2544, 2055, 2553, 2537
10   6    Performance and Development Planning   77
11        And Review Form for Incentive Eligible
12        Employees Bates Stamped PRM 00279-00284,
13        2418, 2840, 2033, 2479, 2475, 2043, 2481,
14        2812, 2075, 2835, 2423, 2857, 2077, 2865,
15        2461, 2037
16   7    Recommendation for Promotion of Lisa   144
17        Svensson to Senior Portfolio Manager
18        Bates Stamped 01337-01346
19   8    Handwritten Notes Bates Stamped        148
20        PRM 01789-01790
21   9    Officer Nominations Bates Stamped      151
22        PRM 01793-01794
23
24   Continued.
```

JONES REPORTING COMPANY
617-451-8900

Stephen M. Oristaglio

Page 94

1  in HR, a group of people from HR, because they led
2  the process.
3       Q. Mm-hmm. And the meetings of the --
4  discussions within the managing directors group and
5  the partners group, was that all one meeting or was
6  it a series of meetings?
7       A. It would be a series of meetings, because
8  the process of trying to determine, you know, the
9  allocation of bonus and the -- and the ultimate --
10 in order to allocate bonus, you have to have some
11 kind of ultimate ranking. These forms that were
12 filled out were done in a little bit of a vacuum.
13 Robert, for instance, might have a context against
14 all the other people he did, but he didn't
15 necessarily have a context against what Justin was
16 doing or what Kevin Cronin was doing over in the
17 investment -- over in the fixed income division, so
18 his scores -- and I don't recall how scores got
19 changed, but what I do recall is that the scores
20 that he gave then had to be compared objectively
21 and subjectively, and there were subjective means.
22      There's categories here for, you know,
23 besides business goals, it's performance measures
24 and deliverables, and so if someone is scoring

Page 95

1  very, very high in a category, as I said before,
2  but they had very poor performance and the overall
3  feedback on the 360 peer reviews were poor, as
4  often the case with Lisa, okay, then Robert's
5  review had to be compared versus the 360 reviews
6  and the performance of the group and the
7  performance of Lisa. And we felt that the
8  collaborative effort as led by HR would help
9  determine whether or not, looking back at it, if
10 fixed income had a terrific performance and someone
11 had a very good 360 peer review and that manager
12 scored at a 3.3, and Robert scored Lisa at 3.3, but
13 she had very poor peer reviews and 360's, which she
14 had often, and the performance of the group was
15 poor, very poor, then there was something out of
16 kilter in the scores that Robert would put in that
17 HR felt a responsibility -- as led by Rick Tibbets,
18 Christine Scordato, Sherrie Holder-Watts, Cathy
19 Coleman, Rick Tibbets -- to try to more fairly try
20 to ask the questions.
21      And it was, again, done in a
22 collaborative way where we would go back and sit
23 down with Robert and say Robert, look, let's
24 compare this over there, and Kevin Cronin would be

Page 96

1  in the room or some of the managing directors would
2  be in the room. They'd say look, we've got these
3  scores and we've got these performance objectives.
4  That's the process that occurred. And I know it
5  all happened before it came up for a final stamp of
6  approval by Tim's direct reports.
7       Q. Okay. So if I'm understanding what you're
8  saying, that there was a -- that there were these
9  meetings and discussions held, and on a comparative
10 basis, investment professionals within the
11 investment division were compared with each other?
12      A. They would need to be, because the bonus
13 pool was allocated to the investment division and
14 then it was the responsibility of the division to
15 equitably distribute it among the various people
16 based on measures of performance and based on
17 measures of teamwork and other -- some of those
18 other criteria that were done through feedback,
19 peer reviews and assessments.
20      Q. I take it you have some recollection of
21 having reviewed Lisa Svensson's 360's in these
22 meetings?
23      A. No, I don't. I don't have any recollection
24 of seeing a 360 review. I do have a recollection

Page 97

1  of what the ups and downs of her peer reviews were.
2       Q. And do you know how you came by that
3  information?
4       A. Through summaries of these meetings of
5  which I was part of several of them, so that names
6  would come up in them, Robert would review them,
7  Robert and a group of people would review them, and
8  then HR would continually update us on an informal
9  and a formal basis, trying to give us feedback
10 about the various people in the division.
11      And I know from that feedback from
12 many, many different angles, Lisa went through some
13 ups and downs in terms of her peer assessment and
14 the -- we had many, many people, although we didn't
15 interact with all of them, where we would
16 understand through the various feedback of many,
17 many people that they were interacting with what
18 the general views were, and some of that was
19 formal. I don't have a recollection of seeing a
20 formal peer review of Lisa. I know I've looked at
21 many of them, but I don't have a recollection of
22 any of them.
23      Q. Do you recall what the ups were?
24      A. I do, yes.

JONES REPORTING COMPANY
617-451-8900

Stephen M. Oristaglio

Page 102

1  to me and say look, you know, she can be disruptive
2  and I'm working on that. Robert would come to me,
3  since I had more contact with him in regard to Lisa
4  than anybody. He would give me that feedback.
5    Q. Do you recall any specifics of your
6  discussions with Robert Swift?
7    A. No, I don't.
8    Q. Do you recall any specifics of your
9  discussions with Eric Wetlaufer?
10   A. No, I don't.
11   Q. Do you recall any specifics of your
12  discussions with Debbie Farrell?
13   A. No.
14   Q. Do you recall any of the specifics of your
15  discussions with Christine Scordato?
16   A. Yes. Yes, Christine in HR, because I had a
17  more regular -- the ones that I mentioned would be
18  very intermittent. It would be through my
19  activities in the division. I would get feedback
20  from people in the division about lots of people,
21  including Lisa.
22       With HR, I had regular contact with
23  them, so Christine and Sherrie and Rick and
24  occasionally Cathy, because she used to keep tabs

Page 103

1  as the head of HR on all the people in the
2  investment division and try to work on smoothing
3  out and improving people's -- some of the more
4  softer issues of people's teamwork and
5  personalities, and I have, you know, memories of
6  sitting with the HR department and talking about
7  Lisa.
8    Q. And do you remember any of the specifics of
9  those discussions?
10   A. That she would be disruptive in meetings,
11  particularly with some of the younger ones, she
12  would be aggressive in not just addressing the
13  investment thesis, but she would be aggressive in
14  trying to make the person feel inadequate or that
15  they're -- she would be overly intimidating in a
16  personal nature in the way that she would talk to
17  them. She would oftentimes be dismissive, would
18  interrupt them or carry a discussion that was going
19  on in the investment division about a particular
20  thing that she didn't agree with in a way that
21  would be more shrill in terms of trying to be
22  dramatic in making people feel that the information
23  was not well-presented, it was -- it reflected
24  poorly on their capabilities as opposed to just

Page 104

1  keeping to the thesis of the -- I don't think this
2  is a good stock to own, and I think those kinds of
3  things were reported back on occasion, and I think
4  that she was talked to and coached and went through
5  periods where that would actually not be an issue.
6    Q. Do you recall what periods it was not an
7  issue?
8    A. When she moved to GER. I remember having a
9  personal conversation with Lisa and I remember Bill
10  Landes -- having heard of many of these, this
11  feedback, and having sat down with HR, because I
12  had personally asked Lisa to -- to take on an
13  important role within GER and had talked to her
14  about some of these issues, and Bill had -- when
15  Bill was evaluating her for her to take on that
16  important role, she sat down with Bill. And Bill
17  and I often communicated, and I think that -- I
18  think -- and I think HR did. I think we, through
19  the process of discussions with Lisa and feedback
20  with Lisa from those discussions, I think that she
21  made a nice improvement from the time she went into
22  GER which was very welcomed.
23   Q. Now, do you recall having any discussions
24  with anyone concerning employees other than Lisa

Page 105

1  Svensson, investment professionals other than Lisa
2  Svensson being disruptive or derogatory or
3  aggressive?
4    A. I do.
5    Q. Who do you recall?
6    A. Robert Swift.
7    Q. Okay. Anybody else?
8    A. Yeah. There were some, yes. There were
9  some. I'd have to go through my chart to think of
10  them more clearly.
11   Q. Please do.
12   A. But Robert Swift was someone that often had
13  issues with that type of -- that type of behavior.
14  Um, John Boselli in the research side -- let's see;
15  a number of others, not that many, but there were
16  some. Most of them we took action on; not all of
17  them. Mike Mufson.
18   Q. Anybody else?
19   A. Toward the end of his thing, Paul Warren.
20  That's a good list.
21   Q. Okay. Now, you said you took action on
22  these individuals. With respect to Robert Swift,
23  what action did you take?
24   A. Well, in respect to Robert Swift, the

27 (Pages 102 to 105)