**Exhibit C 7**
**to**
**Affidavit of Kevin F. Moloney,**
**February 15, 2008**

**Excerpt(s)**
**Peers deposition**

310-372-1111 SOUSA COURT REPORTERS 714-571-0111

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

☐ FILE          TRAVEL TRANSCRIPT

```
LISA SVENSSON,                          )
                                        )      RECEIVED
              PLAINTIFF,                )      MAY 0 5 2006
                                        )      K.F.M.
         VS.                            )   CASE NO. CIVIL ACTION
                                        )         04-12711 PBS
PUTNAM INVESTMENTS, LLC, F/K/A          )
PUTNAM INVESTMENTS, INC. AND            )
LAWRENCE J. LASSER                      )
                                        )
              DEFENDANTS.               )
                                        )
```

DEPOSITION OF DARREN PEERS

LOS ANGELES, CALIFORNIA

THURSDAY, APRIL 20, 2006

REPORTED BY:
PATRICIA E. NAKANO
C.S.R. NO. 5624
JOB NO. 1-546085

1

Page 2

1  THE DEPOSITION OF DARREN PEERS, TAKEN ON BEHALF OF
2  PLAINTIFF, AT 1925 CENTURY PARK EAST, SUITE 1150, LOS
3  ANGELES, CALIFORNIA, AT 11:18 A.M., THURSDAY, APRIL 20,
4  2006, BEFORE PATRICIA E. NAKANO, C.S.R. NO. 5624, A
5  SHORTHAND REPORTER FOR THE STATE OF CALIFORNIA, PURSUANT TO
6  SUBPOENA.
7             * * *
8  APPEARANCES OF COUNSEL:
9
10   FOR PLAINTIFF:
11       JOHN K. WEIR LAW OFFICES
12       BY: JOHN K. WEIR, ESQ.
13       300 PARK AVENUE
14       SUITE 1700
15       NEW YORK, NEW YORK 10022
16
17
18   FOR DEFENDANTS PUTNAM AND THE WITNESS:
19       BINGHAM MC CUTCHEN
20       BY: LOUIS A. RODRIGUES, ESQ.
21       150 FEDERAL STREET
22       BOSTON, MASSACHUSETTS 02110-1726
23
24
25

Page 3

1  APPEARANCES OF COUNSEL: (CONT.)
2
3  FOR DEFENDANT LASSER:
4      NIXON PEABODY, LLP
5      BY: CARRIE J. CAMPION, ESQ.
6      100 SUMMER STREET
7      BOSTON, MASSACHUSETTS 02110-2131
8      (PRESENT VIA SPEAKERPHONE)
9
10
11  ALSO PRESENT:
12      LISA SVENSSON
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1             I N D E X
2  WITNESS:
3  DARREN PEERS
4
5      EXAMINATION BY:           PAGE:
6
7      MR. WEIR                  5, 161
8      MR. RODRIGUEZ             156, 168
9
10
11            E X H I B I T S
12
13  PLAINTIFF'S                   PAGE:
14  1 - HANDWRITTEN DOCUMENTS, BATES NO. PRM 00358    63
15      THROUGH PRM 00367, 10 PAGES
16  2 - VARIOUS DOCUMENTS, BATES NO. LS-1722 THROUGH  130
17      LS-1751, 30 PAGES
18
19            UNANSWERED QUESTIONS
20              PAGE  LINE
21              134   5
22              141   25
23              165   15
24
25

Page 5

1  LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 20, 2006
2             11:18 A.M.
3
4             DARREN PEERS,
5      THE WITNESS HEREIN, HAVING BEEN FIRST
6      DULY ADMINISTERED THE OATH, WAS EXAMINED
7      AND TESTIFIED AS FOLLOWS:
8
9             EXAMINATION
10  BY MR. WEIR:
11      Q.  GOOD MORNING, MR. PEERS.
12      A.  GOOD MORNING.
13      Q.  WOULD YOU PLEASE STATE YOUR FULL NAME FOR THE
14  RECORD.
15      A.  IT'S DARREN THOMAS PEERS.
16      Q.  AND YOUR PRESENT RESIDENCE ADDRESS?
17      A.  575 11TH STREET, HERMOSA BEACH, CALIFORNIA.
18      Q.  AND ARE YOU PRESENTLY MARRIED?
19      A.  YES.
20      Q.  AND FOR HOW LONG HAVE YOU BEEN MARRIED?
21      A.  SINCE JULY, 2001.
22      Q.  DO YOU HAVE ANY CHILDREN?
23      A.  YES, TEN AND A HALF MONTHS, ONE.
24      Q.  ONE CHILD. OKAY. AND HOW OLD ARE YOU, SIR?
25      A.  33.

Page 10

1  SUMMER, AND THE OTHER ONE WAS -- WELL, THE OTHER ONE WAS
2  THE DAY LISA WAS LET GO, ACTUALLY, WHATEVER DAY THAT
3  WAS.
4     Q.  IF I TOLD YOU THAT SHE WAS LET GO ON
5  SEPTEMBER 15, 2003 --
6     A.  THAT WOULD HAVE BEEN IT.
7     Q.  THAT WOULD HAVE BEEN THE DAY?
8     A.  YES.
9     Q.  SO YOU WERE ACTUALLY NOT PRESENT AT PUTNAM ON
10 THAT DAY?
11    A.  NO.
12    Q.  WHEN YOU SAY "THE MIDDLE OF THE SUMMER," DO YOU
13 RECALL -- JULY?  AUGUST?
14    A.  IT WAS EITHER LATE JULY OR EARLY AUGUST.
15    Q.  DID THAT INTERVIEW OCCUR IN CONNECTION WITH A
16 TRIP TO EXXON/MOBIL FOR PUTNAM?  DO YOU RECALL WHETHER
17 YOU COORDINATED INTERVIEWING?
18    A.  I DON'T BELIEVE SO.  IT WAS A VACATION.  I WAS
19 ON VACATION HERE WITH MY WIFE.
20    Q.  OKAY.  BY THE WAY, WHAT IS YOUR WIFE'S NAME?
21    A.  KELLY PEERS, K-E-L-L-Y.
22    Q.  AND IS SHE FROM THE LOS ANGELES AREA?
23    A.  SHE IS.
24    Q.  AND SHE HAS RELATIVES LIVING HERE?
25    A.  YES.

Page 11

1     Q.  DID THAT IN ANY WAY AFFECT YOUR DECISION TO
2  TAKE THE NWQ POSITION?
3     A.  IT AFFECTED THE DECISION -- IT AFFECTED THE
4  ULTIMATE DECISION.  IT DIDN'T AFFECT -- IT WASN'T THE
5  REASON WHY I WAS LOOKING.
6     Q.  OKAY.  IF I UNDERSTAND THAT QUESTION, ONCE YOU
7  GOT AN OFFER FROM NWQ, IT WAS A FACTOR THAT FAVORED YOUR
8  TAKING THAT OFFER; IS THAT CORRECT?
9     A.  YES.  I WAS PURSUING TWO OTHER OPPORTUNITIES,
10 PLUSES AND MINUSES FOR BOTH.  SO ULTIMATELY THE LOCATION
11 DID WEIGH INTO WHETHER -- ONE OPPORTUNITY WAS IN BOSTON,
12 ONE WAS IN CHICAGO.
13    Q.  DID THERE COME A TIME WHEN YOU DECIDED TO
14 ACCEPT THE NWQ POSITION?
15    A.  YES.
16    Q.  AND WHEN WAS THAT?  WHEN DID YOU REACH THAT
17 FINAL DECISION?
18    A.  WELL, IF WE SAY -- IF SEPTEMBER 15 WAS THE DAY
19 THAT LISA WAS LET GO, IT WAS WITHIN -- A WEEKEND WOULD
20 HAVE PASSED, AND THEN SOMETIME EARLY IN THE FOLLOWING
21 WEEK I MADE THE DECISION TO ACCEPT THE NWQ POSITION.
22    Q.  EITHER AT THE TWO INTERVIEWS HERE IN LOS
23 ANGELES OR THEREAFTER, DID THEY COMMUNICATE A
24 COMPENSATION PACKAGE TO YOU?
25    A.  THEY DID ON THE SEPTEMBER 15 MEETING.

Page 12

1     Q.  DO YOU RECALL WHAT THAT COMPENSATION PACKAGE
2  INCLUDED?
3     A.  IT WAS 150,000 BASE SALARY AND $150,000 BONUS
4  AFTER ONE YEAR, GUARANTEED FOR THAT ONE YEAR.
5     Q.  NOW, YOU SAID YOU WERE PURSUING A COUPLE OF
6  OTHER OPPORTUNITIES AS WELL?
7     A.  YES.
8     Q.  WHERE?
9     A.  WELLINGTON.  WELLINGTON -- THE FULL NAME IS
10 WELLINGTON INVESTMENT MANAGEMENT -- AND CITADEL, WHICH
11 IS A HEDGE FUND IN CHICAGO.
12    Q.  AND WHEN DID YOU COMMENCE -- PURSUE THOSE
13 OPPORTUNITIES?
14    A.  SHORTLY AFTER I SUBMITTED A RESUME TO NWQ.
15    Q.  SO IT'S FAIR TO SAY THAT IN THAT TIME FRAME OF
16 JUNE, YOU HAD, BASICALLY, DECIDED THAT YOU WERE GOING TO
17 PURSUE NOT ONLY THE NWQ OPPORTUNITY BUT OTHER
18 OPPORTUNITIES THAT CAME ALONG?
19    A.  YES.
20    Q.  AND HOW DID YOU BECOME AWARE OF THE WELLINGTON
21 AND CITADEL POSITIONS?
22    A.  THROUGH HEADHUNTERS, TWO SEPARATE HEADHUNTERS.
23    Q.  BOSTON HEADHUNTERS?
24    A.  ONE WAS IN BOSTON, AND ONE WAS IN NEW YORK.
25    Q.  DID YOU MEET WITH THE HEADHUNTERS?

Page 13

1     A.  THE NEW YORK ONE WAS CERTAINLY ONLY OVER THE
2  PHONE, AND I MUST HAVE MET WITH THE BOSTON WOMAN AT SOME
3  POINT, BUT I DON'T REMEMBER WHEN AND PROBABLY NOT PRIOR
4  TO ACTUALLY INTERVIEWING MY FIRST INTERVIEW AT
5  WELLINGTON.
6     Q.  HOW MANY INTERVIEWS DID YOU HAVE AT WELLINGTON?
7     A.  I WENT IN THERE TWO SEPARATE OCCASIONS, I
8  BELIEVE.
9     Q.  AND WHERE IS WELLINGTON LOCATED?
10    A.  ROUGHLY, WITHIN A COUPLE BLOCKS OF PUTNAM.
11    Q.  IT'S IN BOSTON?
12    A.  YES, BOSTON.
13    Q.  AND YOU SAID CITADEL IS LOCATED IN CHICAGO.
14       DID YOU HAVE INTERVIEWS WITH THEM?
15    A.  YES, ONE.
16    Q.  ONE INTERVIEW?
17    A.  YES.
18    Q.  CAN YOU TELL US THE FACTORS THAT LED YOU TO
19 ACCEPT THE NWQ POSITION IN PREFERENCE TO EITHER
20 WELLINGTON OR CITADEL?
21    A.  CITADEL IS PROBABLY THE EASIER TO TALK ABOUT
22 FIRST.  I DIDN'T SEE A VERY GOOD INVESTMENT FIT THERE.
23 THEIR HEDGE FUND, THEY'RE VERY AGGRESSIVE.  THAT'S NOT
24 MY INVESTMENT STYLE OR PHILOSOPHY.  I DIDN'T THINK IT
25 WOULD BE A GOOD FIT.

Page 34

1  TERMINATION OR AN INTENT TO TERMINATE HER?
2      A.  THE LATE AFTERNOON OF SEPTEMBER 15.
3      Q.  IN THE DISCUSSIONS THAT -- WITH MR. BROOKS
4  PRECEDING SEPTEMBER 15, 2003, DID HE INDICATE AN
5  INTENTION TO TERMINATE LISA SVENSSON?
6      A.  NO.
7      Q.  DID HE INDICATE AN INTENTION TO DEMOTE HER?
8      A.  NO.
9      Q.  DID HE INDICATE AN INTENTION TO DEPRIVE HER OF
10 HER MANAGEMENT RESPONSIBILITIES?
11     A.  NO.
12     Q.  I'M HAVING A LITTLE TROUBLE, MR. PEERS,
13 UNDERSTANDING WHAT TRANSPIRED IN THESE TWO TO TEN
14 MEETINGS THAT YOU HAD WITH MR. BROOKS CONCERNING YOUR
15 SITUATION AT PUTNAM AND WHETHER OR NOT YOU WERE GOING TO
16 STAY OR GO.
17     MR. RODRIGUEZ:  THAT'S NOT A QUESTION.
18 BY MR. WEIR:
19     Q.  DO YOU RECALL WHAT TRANSPIRED?
20     A.  NOT EXACTLY.  MY RECOLLECTION IS MOSTLY IT WAS
21 FOLLOW-UP TO SAY, "I'M STILL LOOKING INTO THIS.  I'M
22 HOPEFUL THAT WE CAN ARRIVE AT SOMETHING WHERE YOU DON'T
23 HAVE TO LEAVE."
24     Q.  OKAY.
25     A.  AND PART OF IT WAS MY GETTING BACK TO HIM WITH

Page 35

1  WHAT MY TIME LIMIT WAS.  HE KNEW I WAS IN PROCESS AND
2  HAD A NUMBER OF PLACES, AND I TOLD HIM THAT, YOU KNOW,
3  "LIKELY, IF I CROSS THE FINISH LINE," SO TO SPEAK, "THEN
4  I'LL HAVE A DECISION TO MAKE."
5      Q.  DID YOU COMMUNICATE A TIMELINE TO HIM?
6      A.  PROBABLY NOTHING MORE SPECIFIC THAN I WAS IN
7  LATE-STAGE INTERVIEWS.
8      Q.  IN THE COURSE OF THESE TWO TO TEN MEETINGS, DID
9  MR. BROOKS EVER MAKE A SPECIFIC PROPOSAL CONCERNING YOUR
10 STAYING AT PUTNAM?
11     A.  NOT THAT I RECALL.
12     Q.  NOW, YOU TESTIFIED A LITTLE EARLIER ABOUT THIS
13 OBLIGATION TO REPAY THE TUITION FOR BUSINESS SCHOOL IF
14 YOU LEFT WITHIN THREE YEARS.
15     YOUR DEPARTURE WAS WITHIN THAT THREE-YEAR
16 PERIOD; IS THAT CORRECT?
17     A.  RIGHT.
18     Q.  AND DID YOU REPAY THE LOAN, THE OBLIGATION?
19     A.  YES, NWQ ASSUMED THAT OBLIGATION FOR A TWO-YEAR
20 COMMITMENT TO NWQ.
21     Q.  OKAY.  DO YOU KNOW WHETHER THEY ACTUALLY MADE
22 PAYMENT?
23     A.  I BELIEVE THEY DID.
24     Q.  AND I TAKE IT THAT THEY DIDN'T IN ANY WAY
25 CHARGE BACK AGAINST YOUR COMPENSATION, THE $80,000 THEY

Page 36

1  WERE OBLIGATED TO PAY?
2      A.  NO.
3      Q.  DID YOU NEGOTIATE WITH NWQ ABOUT PAYING OFF
4  THAT OBLIGATION?
5      A.  YES.
6      Q.  AND THAT WAS WITH MR. BOSSE?
7      A.  YES.
8      Q.  DID YOU BELIEVE, SIR, THAT IN THE TIME FRAME OF
9  EARLY TO MID 2003, THAT YOU WERE UNDERCOMPENSATED AT
10 PUTNAM?
11     A.  THAT WASN'T AN ISSUE FOR ME.  I HAD AN
12 UNDERSTANDING, I THINK, OF THE PROGRESSION OF SALARY AND
13 TOTAL COMPENSATION FOR AN ANALYST AT PUTNAM THAT I WAS
14 COMFORTABLE WITH.
15     Q.  SPECIFICALLY, DID YOU HAVE ANY DISCUSSIONS IN
16 THAT TIME FRAME CONCERNING THE ADEQUACY OF YOUR BONUS?
17     MR. RODRIGUEZ:  A CONVERSATION WITH ANYONE?
18     MR. WEIR:  YES.
19     MR. RODRIGUEZ:  HIS WIFE?  HIS KIDS?
20     MR. WEIR:  HIS SUPERIORS AT PUTNAM.
21     MR. RODRIGUEZ:  OKAY.  THAT'S ALL.
22 BY MR. WEIR:
23     Q.  INCLUDING LISA SVENSSON.
24     A.  I DON'T RECALL.  I HAD A BELIEF AT THE TIME,
25 AND STILL DO, THAT THE YOUNG ANALYSTS -- THE ANALYSTS IN

Page 37

1  THE FIRST THREE YEARS OUT OF BUSINESS SCHOOL HAD A
2  SEPARATE POOL THAT THEY WERE COMPENSATED FROM, AND I
3  DIDN'T -- I DIDN'T BELIEVE THAT THAT WAS THE RIGHT WAY
4  TO DO THAT, AND I MAY HAVE MADE THAT THOUGHT KNOWN TO
5  OTHERS.
6      Q.  WHAT DID YOU BELIEVE WAS THE RIGHT WAY TO DO
7  IT?
8      A.  I THOUGHT --
9      Q.  THAT IS, TO COMPENSATE THE JUNIOR ANALYSTS.
10     A.  I THOUGHT ALL THE ANALYSTS IN THE RESEARCH
11 DEPARTMENT SHOULD BE MEASURED ACCORDING TO THEIR
12 PERCEIVED VALUE -- HOWEVER YOU WANT TO MEASURE THAT --
13 NOT BASED ON A SENIORITY LEVEL.
14     Q.  WHO WOULD, IN YOUR VIEW, BE MAKING THE
15 DETERMINATION OF PERCEIVED VALUE?
16     A.  WELL, THE WAY IT WAS DONE AT THE TIME, WHICH I
17 THOUGHT WAS REASONABLE, IS THERE WAS A QUANTITATIVE
18 COMPONENT AND A QUALITATIVE COMPONENT.  THE QUALITATIVE
19 HAD INPUTS FROM THEIR MANAGER, OTHER ANALYSTS, OTHER
20 PORTFOLIO MANAGERS.  QUANTITATIVE WAS STRICTLY BASED ON
21 YOUR STOCK PICKING.
22     Q.  DID YOU COMMUNICATE YOUR VIEWS TO ANYONE UP THE
23 CHAIN OF COMMAND?
24     MR. RODRIGUEZ:  OBJECTION.
25     YOU CAN ANSWER.

Page 58

1   AFTERNOON SESSION
2   (WHEREUPON AT THE HOUR OF 1:42 P.M.
3   OF THE SAME DAY, AT THE SAME PLACE, THE
4   SAME PARTIES BEING PRESENT, THE TAKING OF
5   THE WITHIN DEPOSITION WAS RESUMED, AND THE
6   FOLLOWING PROCEEDINGS WERE HAD:)
7
8       DARREN PEERS,
9   HAVING BEEN PREVIOUSLY DULY SWORN, WAS
10  EXAMINED AND TESTIFIED FURTHER AS FOLLOWS:
11
12      EXAMINATION (RESUMED)
13  BY MR. WEIR:
14  Q.  BEFORE WE GET TO YOUR NOTES, MR. PEERS, I HAVE
15  JUST A FEW FOLLOW-ON QUESTIONS FROM YOUR TESTIMONY
16  BEFORE THE BREAK.
17      IN YOUR MEETING WITH MR. HALDEMAN, DID YOU HAVE
18  ANY DISCUSSION WITH HIM CONCERNING YOUR OPPORTUNITY AT
19  NWQ SECURITIES?
20  A.  I DID MENTION TO HIM THAT THAT WAS ONE OF THE
21  FIRMS THAT I WAS LOOKING AT.
22  Q.  AND DID HE HAVE ANY REACTION TO THAT?
23  A.  HE TOLD ME -- I FORGET WHAT THE RELATIONSHIP
24  WAS.  NWQ IS OWNED BY NUVEEN.  NUVEEN'S CHAIRMAN IS TIM
25  SCHWARTFEGER.  I BELIEVE HE KNEW TIM, AND I CAN'T

Page 59

1   REMEMBER EXACTLY WHAT THE RELATIONSHIP WAS.
2   Q.  DID YOU HAVE ANY SUBSEQUENT MEETINGS WITH
3   MR. HALDEMAN BEFORE YOU DECIDED TO ACCEPT THE NWQ
4   POSITION?
5   A.  NO.  I HAD ONE CONVERSATION WITH HIM AFTER I
6   HAD TOLD JOSH THAT I WAS RESIGNING.
7   Q.  WHILE WE'RE ON THAT SUBJECT, WHEN DID YOU TELL
8   JOSH BROOKS THAT YOU WERE RESIGNING FROM PUTNAM?
9   A.  WELL, I DON'T KNOW.  I CAN'T REMEMBER WHAT DAY
10  OF THE WEEK THAT LISA WAS LET GO, BUT I TOOK -- I HAD
11  RECEIVED AN OFFER FROM NWQ AT THAT SAME DAY.  I KNOW I
12  TOOK A WEEKEND TO THINK ABOUT THAT, AND SOMETIME EARLY
13  THE NEXT WEEK WOULD HAVE BEEN WHEN I RESIGNED FROM
14  PUTNAM.
15  Q.  OKAY.  IF SEPTEMBER 15, 2003, WAS A MONDAY, YOU
16  WOULD THEN HAVE RESIGNED AT SOME POINT DURING THE WEEK
17  OF SEPTEMBER 22, 2003?
18  A.  I THINK SO.  I DIDN'T REALIZE IT WAS A MONDAY.
19  IT IS POSSIBLE THAT IT WAS LATE THAT WEEK, BUT I KIND OF
20  THINK I TOOK A WEEKEND.
21  Q.  OKAY.  AND DURING THAT WEEKEND, DID YOU CONSULT
22  WITH ANYONE ABOUT YOUR DECISION?
23  A.  MY WIFE, CLOSE FRIENDS, UNRELATED TO PUTNAM.
24  THAT'S ALL I CAN RECALL.  I RECALL ONE CLOSE FRIEND THAT
25  I WENT TO SCHOOL WITH, AND MY WIFE.

Page 60

1   Q.  WHO WAS THE CLOSE FRIEND YOU WENT TO SCHOOL
2   WITH?
3   A.  HIS NAME IS CHRIS WINSHIP.  HE LIVES -- HE'S
4   JUST A FRIEND.
5   Q.  ANYBODY ELSE THAT YOU RECALL DISCUSSING IT
6   WITH?
7   A.  THERE MAY HAVE BEEN, BUT THOSE ARE THE TWO THAT
8   STICK OUT IN MY MIND AS BEING CLOSE CONFIDANTS THAT I
9   TRUSTED THEIR OPINION.
10  Q.  AND DID THEY RECOMMEND YOU STAY AT PUTNAM OR
11  TAKE THE NWQ POSITION, OR DID THEY HAVE SOME OTHER
12  RECOMMENDATION?
13  A.  I DON'T RECALL WHAT THEIR RECOMMENDATIONS WERE.
14  I REMEMBER USING THEM MORE AS A SOUNDING BOARD TO WEIGH
15  THE PROS AND CONS, AND I KNOW BOTH FELT THAT IT WAS NOT
16  AN EASY DECISION BUT AT LEAST THAT I HAD CHOICES.
17  Q.  YOU SAID YOU CONSULTED WITH YOUR WIFE?
18  A.  UH-HUH.
19  Q.  WAS YOUR WIFE WORKING AT THE TIME?
20  A.  SHE WAS.
21  Q.  AND WITH WHOM WAS SHE WORKING?
22  A.  MERRILL LYNCH IN BOSTON.
23  Q.  HAD SHE ATTEMPTED TO LINE UP ANY ALTERNATIVE
24  POSITIONS?
25  A.  NO.

Page 61

1   Q.  DID YOUR WIFE RECOMMEND IN FAVOR OF THE MOVE OR
2   STAYING AT PUTNAM OR MAKE SOME OTHER RECOMMENDATION?
3   A.  SHE WAS SOMEWHAT -- I GUESS SOMEWHAT NERVOUS
4   ABOUT THE CHANGE.  ON ONE SIDE, SHE WAS -- I THINK SHE
5   SAW THE BENEFITS OF MOVING CLOSER TO HER FAMILY.  ON THE
6   OTHER SIDE, THIS WAS A MASSIVE CHANGE.  IT WASN'T CLEAR
7   WHAT SHE WOULD DO.  IT WASN'T CLEAR THAT THIS WAS
8   ULTIMATELY THE BEST OPPORTUNITY THAT I WOULD SEE AND
9   THAT MAYBE THIS WASN'T THE RIGHT TIME TO MOVE OUT TO THE
10  WEST COAST.  SO THOSE WERE SOME OF THE THINGS THAT WERE
11  IN THE MIX, SO TO SPEAK.
12  Q.  DID SHE ULTIMATELY COME DOWN ON ONE SIDE OR THE
13  OTHER?
14  A.  NO.
15  Q.  SO YOU TOOK THIS DECISION IN, ROUGHLY, A WEEK
16  AFTER SEPTEMBER 15, AND THEN COMMUNICATED YOUR DECISION
17  TO GO TO NWQ IN LOS ANGELES TO MR. BROOKS?
18  A.  YES.
19  Q.  YOU WALKED INTO HIS OFFICE?
20  A.  I DON'T RECALL THE EXACT CONVERSATION THAT I
21  HAD WITH HIM, WHERE IT TOOK PLACE OR THE TIME.  I
22  ACTUALLY RECALL VERY LITTLE ABOUT IT, BUT I KNOW -- I
23  KNOW THAT I TOLD HIM SOMEHOW.
24  Q.  DO YOU RECALL ANYTHING THAT HE SAID AT THE
25  TIME?