**Exhibit C 8**
**to**
**Affidavit of Kevin F. Moloney,**
**February 15, 2008**

**Excerpt(s)**
**Putnam Rule 30(b)(6) deposition**
**(McNamee)**

RECEIVED

DEC 1 4 2007

K.F.M.

FILE

# Svensson
## vs.
# Putnam Investments

# Mary McNamee

## Volume 1

### November 15, 2007
### pp. 1-268

**JonesReporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 6

           E X H I B I T S
1
2   NO.                                PAGE
3   38  E-mail                         204
4   39  E-mail                         207
5   40  2002 Investment Terminations       209
6   41  Interim Review                 229
7   42  ERS Job Summary                229
8   43  Human Resources Update             233
9   44  Putnam Women's Leadership Forum        243
10  45  E-mail with attachment         248
11  46  E-mail with attachment         253
12  47  E-mail                         257
13  48  E-mail with attachment         259
14  49  E-mail with attachment         261
15  50  Handwritten document           262
16  51  E-mail                         263
17
18  *Original exhibits returned to Mr. Moloney
19
20
21
22
23
24

Page 7

1            P R O C E E D I N G S
2        MARY McNAMEE, having duly affirmed that her
3    testimony would be the truth, the whole truth and
4    nothing but the truth, testified as follows in answer
5    to interrogatories by MR. WEIR:
6        Q.   Would you state your full name for the
7    record?
8        A.   Mary McNamee, M-C-N-A-M-E-E.
9        Q.   And does your residence address remain the
10   same as at the time of your original deposition in this
11   case?
12       A.   Yes, it does.
13       Q.   And you remain employed by Putnam
14   Investments?
15       A.   No, I do not.
16       Q.   By whom are you employed?
17       A.   Oppenheimer Funds.
18       Q.   In what capacity are you employed by
19   Oppenheimer?
20       A.   Vice president human resources.
21       Q.   Do you have any current relationship with
22   Putnam?
23       A.   No.
24       Q.   When did you cease your employment with

Page 8

1    Putnam?
2        A.   The end of May of this year.
3        Q.   What occasioned your decision to leave
4    Putnam?
5        A.   A new opportunity.
6        Q.   Had you sought the new opportunity?
7        A.   No.  It was -- I was identified by a
8    headhunter.
9        Q.   And when did you become aware of the fact
10   that you were going to be designated as the 30(b)(6)
11   witness for Putnam at this deposition?
12       A.   About two weeks ago.
13       Q.   Who informed you of that?
14       A.   Lou Rodriques.
15            MR. WEIR:  Off the record.
16            (Discussion off the record.)
17       Q.   Mr. Rodriques, did he call you?
18       A.   Yes, he did.
19       Q.   When he called you, did he indicate that you
20   were going to testify at a deposition on behalf of
21   Putnam Corporation?
22       A.   He asked if I would be willing to do so.
23       Q.   Did you consent to do so?
24       A.   Yes, I did.

Page 9

1        Q.   Did you undertake any preparation after you
2    became aware of your being a 30(b)(6) witness?
3        A.   Yes, I did.
4        Q.   What preparation did you undertake?
5        A.   I read through my prior deposition, Rick
6    Tibbetts' deposition and various documents that were
7    produced during electronic discovery although it was
8    very difficult to try to identify what topics would be
9    relevant today and there were over 6,000 documents so I
10   couldn't review all of them.
11       Q.   Do you recall any specific ones that you did
12   review?
13       A.   Some memos, some spreadsheets and the like.
14       Q.   Memos as opposed to e-mails?
15       A.   E-mails.
16       Q.   E-mail?
17       A.   Mm-mm.
18       Q.   Do you recall what the spreadsheets were that
19   you reviewed?
20       A.   There were ones with performance ratings on
21   them.  There were some with -- they were like
22   succession planning documents.  Those are the ones that
23   come to mind.
24       Q.   What do you mean by succession planning

JONES REPORTING COMPANY
617-451-8900

Mary McNamee

**Page 14**

1  Mr. Ferguson left, when he moved into a different role.
2  When he relinquished his responsibilities as head of
3  the Investment Division, his opinion was not as
4  considered.
5      MR. WEIR: I would ask to mark as Exhibit 1
6  at this deposition a spreadsheet bearing a date of
7  03/02/2001 and that's PRM document numbers 13511 to
8  13519.
9          (Exhibit No. 1 marked for
10         identification.)
11     Q.  Let me show you what has been marked as
12  Exhibit 1 for identification and ask you if you can
13  identify this document?
14     A.  This looks like a spreadsheet that was
15  probably created by Mitch Schultz representing at the
16  top of the heading it says fifth group and I believe
17  this was part of this exercise called the fifth
18  quartile which Larry Lasser had charged everyone with
19  kind of looking through their organization and divide
20  employees into quartiles, that there would be a fifth
21  quartile that would be the outlier group which would be
22  the people that needed to be managed out or weren't
23  going to continue to work at Putnam.
24     Q.  When you say Larry Lasser had charged

**Page 15**

1  somebody with doing this.
2      A.  Mm-mm.
3      Q.  What specifically did he say?
4      A.  Well, I think in the year -- what I remember
5  in the year 2001 specifically in March, it was just
6  prior to a layoff that took place in June of that year,
7  and because the performance of the firm had fallen off,
8  it was deemed appropriate for us to look very closely
9  at the individuals that were not really making it as
10  far as performance goes and the managers had to look
11  across their organization and identify those
12  individuals that were not going to be ones that should
13  continue on because the firm was in -- had suffered
14  performance issues.
15     Q.  Who prepared this particular document?
16     A.  I believe Mitch Schultz prepared this
17  particular document. He was head of compensation at
18  the time.
19     Q.  What leads you to believe that it was
20  Mr. Schultz who did this?
21     A.  Well, this is typical of his types of
22  documents that he would prepare. He was kind of the
23  Excel wizard in human resources and, you know, this is
24  a human resources document.

**Page 16**

1      Q.  And what do you mean by the fifth group?
2  What does that mean? Refer to.
3      A.  Well, if you look at quartiles, there are
4  four sections to a quartile. The fifth one is the
5  outlier and if you're ranking people on the top being
6  in the top quartile, you're talking about investment
7  funds generally. It referred to people that are the
8  best, second and as it goes down the line to the fourth
9  quartile, there were individuals that were not as --
10  the higher performers and then the fifth quartile were
11  those outliers that were even below the people that
12  fell into the fourth quartile. It was a concept not
13  that Larry created but I think Goldman Sachs had done
14  something similar and one of his associates or
15  colleagues from another firm had told him about the
16  exercise that they had done so he thought it was a good
17  idea for Putnam at the time to do the same.
18     Q.  And if I understand your testimony, what he
19  directed them to do was to establish a so-called fifth
20  quartile which would be composed of people who were
21  then employed by Putnam but who would be terminated by
22  Putnam?
23     A.  Potentially, yes.
24     Q.  Would this have been a document that would

**Page 17**

1  have been distributed to the direct managers?
2      A.  No. This document was I think prepared for
3  Irene Esteves who at the time was the CFO and they were
4  looking at potential savings, etc., across. What were
5  the financial numbers that would then drive, you know,
6  some savings for the firm. This was I would imagine,
7  which happened often, this was probably a working
8  document.
9      Q.  You mentioned terminations. Did it also
10  include demotions?
11     A.  On this cover sheet I don't see anything
12  about demotions.
13     Q.  If you take a look at the second page of the
14  spreadsheet.
15     A.  Yes.
16     Q.  Do you see the sheet that's headed operating
17  head Phillippe Morre?
18     A.  Yes.
19     Q.  Then under that do you see to be demoted in
20  next 12 months?
21     A.  Yes.
22     Q.  Would that lead you to conclude that in fact
23  demotions were being considered?
24     A.  Well, I think this was a template that was

5 (Pages 14 to 17)

Mary McNamee

1  web site, we had job posting book which was kept in HR
2  available to all employees to go and look. Any of the
3  positions that were VP and above generally were not,
4  quote unquote, posted but it was well-known and well
5  discussed at various meetings, for example Tim
6  Ferguson's direct meetings, whenever there was a
7  potential opening they would have offered it up to the
8  group and said who do you think would be good for this
9  and then have some discussion about suggesting other
10  people on the team who might be interested in that
11  position.
12      Q.  And did that process continue after Tim
13  Ferguson?
14      A.  I think not a formal process but in just a
15  general discussion way. I think people -- it wasn't a
16  huge organization so most everyone knew everyone.
17      Q.  So --
18      A.  There wasn't any formality.
19      Q.  Basically if someone were interested in let's
20  say a portfolio management position, that would have
21  been something that was known to the group of people
22  that were going to make the decision?
23      A.  Yes, and it was also incumbent upon the
24  employee if they had an interest in a particular area

1  to go and speak with the head of the hiring area to say
2  I'm very interested in the position.
3      Q.  When you say the head of the hiring area, you
4  mean the portfolio manager?
5      A.  CIO.
6          MR. WEIR:  Mark as Exhibit 24 a two-page
7  document bearing document numbers 09782 and 09783.
8          (Exhibit No. 24 marked for
9          identification.)
10      Q.  Can you identify Exhibit 24 for us?
11      A.  Yes. It's an e-mail from Dan Miller to Tim
12  Ferguson copied to Steve Oristaglio June 22, 2001,
13  subject Specialty Growth management change.
14      Q.  Do you see the second sentence of the text,
15  quote, I'll call you Monday to confirm Larry's
16  approval?
17      A.  Mm-mm.
18      Q.  And then I'll call Vinnie so that PRM can
19  develop a plan for the wholesalers?
20      A.  Mm-mm.
21      Q.  Larry I take it is Larry Lasser?
22      A.  Yes.
23      Q.  And Vinnie is who?
24      A.  Vinnie Esposito who was the manager of the

1  wholesalers in Putnam retail management.
2      Q.  And did you have an understanding as of June
3  of 2001 why Mr. Lasser's approval was necessary to make
4  changes in the Specialty Growth management area?
5      A.  Well, any time that there were any changes
6  within the Investment Division, Larry was either given
7  an opportunity to approve or not or just told as an FYI
8  if it was not a major decision but they would not go
9  ahead and make a change without an organization within
10  the Investment Division or in a lot of the other
11  divisions for that matter without Larry's approval or
12  at least knowledge.
13      Q.  And by changes that would mean both
14  promotions and demotions?
15      A.  Well, this change, it looks like the change
16  is about job responsibility. It doesn't talk about
17  promotions or demotion.
18      Q.  That's my question. Would Larry's approval
19  be customarily sought with respect to not changes in
20  job responsibilities but actually changes in the people
21  who would be functioning in those jobs?
22      A.  Yes. Larry would -- if it was, you know, a
23  wholesale change to how the organization was
24  structured, he would definitely weigh in on it.

1      Q.  Did that remain true throughout the period of
2  time that Larry Lasser was the CEO of Putnam?
3      A.  Yes.
4          MR. WEIR:  Exhibit 25 is a multi-page
5  document bearing document numbers 12572 to 12577.
6          (Exhibit No. 25 marked for
7          identification.)
8      Q.  Let me show you what has been marked as
9  Exhibit 25 for identification and ask you to identify
10  that one.
11      A.  Brian Lenhardt e-mail to Rick Tibbetts,
12  Sherrie Holder-Watts, Christine Scordato and cc'ing
13  Julie Malloy and Brett Browchuk dated August 15, 2002.
14  Potential MD evaluation matrix.
15      Q.  What is a potential MD evaluation matrix?
16      A.  This is exactly the same matrix that we saw
17  earlier when he was talking about gathering data on who
18  the various CIOs would recommend for managing director
19  and then had to -- this is probably one of the earlier
20  e-mails about the first pass at making some adjustments
21  to the template to evaluate proposed managing director
22  candidates and he's showing the latest version as
23  attached. Please give me back your comments. See if
24  the column descriptions are clear and attach more

38 (Pages 146 to 149)

Mary McNamee

Page 222

1    Q.   So if we look at 2003 for Lisa Svensson, the
2  reason that is identified is involuntary-poor
3  performance.
4    A.   Correct.
5    Q.   And do you know specifically within HR who
6  inputted that particular reason into the document?
7    A.   It would have been me and it was originally
8  mutual consent but then when Lisa Svensson refused to
9  sign the separation agreement, which happens to any
10  employee that refuses to sign a separation agreement,
11  it would revert to involuntary-poor performance.
12    Q.   So automatically if someone doesn't sign the
13  separation agreement, you would change mutual consent
14  to involuntary-poor performance?
15    A.   Correct.
16    Q.   Are there any others on the list for 2002 or
17  2003 for whom that occurred?
18         (Witness perused document.)
19    A.   Some people got involuntary-poor performance
20  because they weren't even offered separation
21  agreements.  For example, Sergei Tishchenko.  He was on
22  a performance warning and was terminated based upon his
23  poor performance.  He was not even offered a separation
24  agreement.  Another one is Yumiko Matsubara who was a

Page 223

1  Japanese analyst and she was terminated for poor
2  performance and was not offered a separation agreement.
3    Q.   Who made the determination as to whether a
4  separation agreement was or was not going to be
5  offered?
6    A.   It would depend on the circumstances and it
7  would be up to the manager and --
8    Q.   Who made it?
9    A.   HR manager and the manager of the person.
10    Q.   So for Lisa Svensson that would have been you
11  and Josh Brooks.
12    A.   Correct.
13    Q.   Do you see the entry termination reason for
14  Margaret Smith?
15    A.   Mutual consent.
16    Q.   And that means that she signed a separation
17  agreement?
18    A.   Yes, she did.
19    Q.   She was terminated involuntarily?
20    A.   That I don't know.  I think it was truly a
21  mutual consent.  She wanted to leave is my
22  understanding.
23    Q.   When it says career growth opportunity, what
24  does that mean?

Page 224

1    A.   It means they left on their own to pursue.
2    Q.   That's a voluntary?
3    A.   That's a voluntary.
4    Q.   And how about the termination reason for
5  Darren Peers?  Who was responsible for entering that
6  one into the document database?
7    A.   That would have been me or my assistant
8  actually.
9    Q.   What was the entry there, that's family
10  reasons?
11    A.   Family reasons.
12    Q.   What does that mean?
13    A.   He relocated to the west coast ultimately.
14    Q.   That was the reason why he was terminated?
15    A.   That's what he had selected in the exit
16  interview.  He selected several.  We had to pick one.
17    Q.   So in the exit interview the terminated
18  employee whether voluntary or involuntary are given a
19  choice as to --
20    A.   Only if you're a voluntary employee.  You're
21  given -- we show the list and say circle as many as are
22  relevant because sometimes it says career growth
23  opportunity, higher compensation and then it goes to
24  the people up in Andover to Peoplesoft and then they

Page 225

1  actually do the entering into Peoplesoft from the exit
2  interview.
3    Q.   So he circled family reasons?
4    A.   As one of his reasons.
5    Q.   Do you know whether he circled any others?
6    A.   I don't recall but he could very well have.
7  Dissatisfied with supervision or something like.  That
8  he could have.
9    Q.   Do you know that he did that or are you just
10  surmising?
11    A.   That was in 2003.  I don't recall.
12    Q.   You do recall that he circled family reasons
13  because that's the one that's on the document?
14    A.   He obviously would have circled that if
15  that's on the document as one of his choices.
16    Q.   Okay.  Do you know if Josh Brooks has ever
17  been reviewed in writing at Putnam?
18    A.   No.  I have never seen a performance review
19  written up for Josh Brooks.
20    Q.   Do you know whether Maria Drew has ever been
21  reviewed at Putnam in writing?
22    A.   I don't recall seeing a performance review
23  for her either.
24    Q.   When someone is given a midyear or interim

57 (Pages 222 to 225)