**Exhibit C 11**
**to**
**Affidavit of Kevin F. Moloney,**
**February 15, 2008**

**Excerpt(s)**
**Svensson deposition Day One**

Lisa Svensson

```
 1                                   Volume:  I
                        ┌─┐
 2                      └─┘ FILE     Pages:  1-255

 3                                   Exhibits:  See Index

 4            UNITED STATES DISTRICT COURT

 5          FOR THE DISTRICT OF MASSACHUSETTS

 6

 7    * * * * * * * * * * * * * * *

 8    LISA SVENSSON,

 9                    Plaintiff,

10    vs.                    Civil Action No.  04-12711

11    PUTNAM INVESTMENTS LLC, f/k/a

12    PUTNAM INVESTMENTS, INC., and LAWRENCE J. LASSER,

13

14                    Defendants.

15    * * * * * * * * * * * * * * *

16           DEPOSITION OF LISA SVENSSON

17              Bingham McCutchen

18              150 Federal Street

19             Boston, Massachusetts

20                 10:04 a.m.

21         Wednesday, November 30, 2005

22      Court Reporter:  Mary C. Soldati CSR, RPR

23

24
```

Lisa Svensson                                                                11/30/2005

Page 2

```
1    APPEARANCES:
2       JOHN K. WEIR LAW OFFICES
3       By John K. Weir, Esquire
4       300 Park Avenue
5       Suite 1700
6       New York, New York  10022
7       (212) 572-6374
8       On Behalf of the Plaintiff
9
10      BINGHAM McCUTCHEN
11      By Joseph L. Kociubes, Esquire
12      and Louis A. Rodriques, Esquire
13      150 Federal Street
14      Boston, Massachusetts  02110-1726
15      (617) 951-8337
16      On Behalf of the Putnam Investments
17
18      NIXON PEABODY LLP
19      By Carrie Campion, Esquire
20      100 Summer Street
21      Boston, Massachusetts  02110-2131
22      (617) 345-1000
23      On Behalf of Lawrence Lasser
24   ALSO PRESENT:  Jason A. Tucker, Esquire
```

Page 3

```
1              I N D E X
2
3    DEPONENT:        DIRECT  EXAMINATION
4    LISA SVENSSON
5
6    By Mr. Kociubes          5
7
8            E X H I B I T S
9
10   NO.      DESCRIPTION           PAGE
11   1    Employment Agreement         5
12   2    Ms. Svensson's Journals      5
13   3    E-Mail Dated 9/3/03         33
14   4    Memo Dated 8/8/03           49
15   5    Performance Review 2000    102
16   6    360 Peer Review            111
17   7    Performance Review         114
18
19
20
21
22
23
24
```

Page 4

```
1          E X H I B I T S (Continued)
2    NO.        DESCRIPTION          PAGE
3    8    Memo Dated 3/12/02          130
4    9    Business Plan               132
5    10   2002 Review                 152
6    11   360 Peer Review 12/14/02    179
7    12   Document                    195
8    13   Letter Dated 9/15/03        227
9    14   Ms. Svensson's Notes        239
10
11   *Exhibits returned with transcript
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1              P R O C E E D I N G S
2          (Exhibit Nos. 1 and 2 marked for
3    identification.)
4              LISA SVENSSON,
5    a witness called for examination by counsel for the
6    Defendant, having been satisfactorily identified and
7    duly sworn by the Notary Public, was examined and
8    testified as follows:
9
10           DIRECT EXAMINATION
11   BY MR. KOCIUBES:
12      Q.  Would you state your full name, please.
13      A.  Lisa Heitman Svensson.
14      Q.  And where do you live, Ms. Svensson?
15      A.  54 Hull Street, H-U-L-L, Newtonville,
16   Massachusetts.
17      Q.  And am I correct that you started working in
18   Putnam in about July of 1994?
19      A.  Yes.
20      Q.  And what was your last day at Putnam?
21      A.  September 15, 2003.
22      Q.  And is that the last day you also went to
23   the office, that you were in the Putnam offices?
24      A.  Yes.
```

2 (Pages 2 to 5)

Lisa Svensson                                                11/30/2005

Page 14

1    Q.  Well, you say those were the main reasons.
2    Do you remember him giving you any other reasons?
3    A.  No.
4    Q.  You also, during that period, had
5    discussions with Mary McNamee?
6    A.  I had no discussions with Mary McNamee up
7    until the firing.  I had discussions with Mary
8    McNamee prior to the August 28th meeting.  But Mary
9    McNamee wouldn't answer of my e-mails or -- I did
10   have a hallway conversation where I was trying to
11   chase her down, but I had no discussions with Mary
12   McNamee.
13   Q.  You said on the 15th of September?
14   A.  Of September, she was there.
15   Q.  And did she give you any reasons that were
16   different from the reasons that Mr. Brooks gave you?
17   A.  No.
18   Q.  And when Mr. Brooks gave you those reasons
19   on September 28, 2003, did you take --
20        MR. WEIR:  August.
21   Q.  August, I'm sorry.  August 28, 2003.  Thank
22   you.  Did you take issue with any of them?
23   A.  Yes.
24   Q.  Which ones did you take issue with?

Page 15

1    A.  Well, the fact that Chris O'Malley had never
2    received negative feedback from portfolio managers.
3    I told him it wasn't true and that I'd had meetings
4    with every single member of the Value Team.
5         I said, I talked to all the portfolio
6    managers on the Value Team and I've talked to almost
7    all of the portfolio managers on the International
8    Core Team.  And these were the groups that had had
9    issues with him.  And I told him at that time, on
10   August 28th, that I had entries in my Lotus Notes.
11   And I also had handwritten notes in my files.  And
12   I'd be happy to go down to my office and bring
13   those, so I could verify those meetings that I had.
14   Q.  Okay.  So what happened on the 28th was that
15   Mr. Brooks, in substance, told you what he believed
16   he had found or discovered, correct?
17   A.  Yes.
18   Q.  And then he listened to you explain what it
19   was that your review was based -- or your draft
20   review was based on?
21   A.  Excuse me.  Listen to me.
22        MR. WEIR:  Mischaracterizes prior
23   testimony.  Objection.
24   Q.  You then explained to Mr. Brooks what you

Page 16

1    had done by way of review of Mr. Pierce?
2    A.  No.
3         MR. WEIR:  No foundation for that
4    testimony.
5    A.  I didn't say anything about Darren Pierce at
6    that point.
7    Q.  I'm sorry.  Mr. O'Malley.
8    A.  I refuted Mr. Brooks.  That's how I would
9    describe it.
10   Q.  And that happened in the meeting with Mr.
11   Brooks?
12   A.  On the 28th.
13   Q.  Okay.  And what else happened in that
14   meeting?
15   A.  Well, Mr. Brooks said, That won't be
16   necessary.  I don't really need to see that stuff,
17   because what I did next was I undertook a little
18   investigation on you across the team.  And what I
19   found were, that there are broad problems with your
20   management of the teams and, you know, generally --
21   I took a lot of detailed notes at the time.  I'd
22   like to see the notes if I could.
23   Q.  You will shortly.
24   A.  Okay.

Page 17

1    Q.  Because we're going to do this in some
2    detail.
3    A.  So maybe I should wait to give the total
4    complete answer as to exactly what he said, because
5    I wrote it down exactly at the time, not verbatim,
6    but my recollection was excellent on August 28th and
7    September 15th, and it's less excellent now.
8    Q.  Did Mr. Brooks raise the issue of your
9    gender during that meeting?
10   A.  No.
11   Q.  Did you raise the issue of your gender when
12   you spoke with Mary McNamee?
13   A.  No.  Well, wait a minute.  I didn't speak
14   with Mary McNamee.
15   Q.  On the 15th of September?
16   A.  On the 15th of September?
17   Q.  Yes.
18   A.  I raised the issue of my gender on the
19   meeting of September 12th with Mr. Brooks.
20   Q.  And what did he said?
21   A.  He said, I know you don't believe this but
22   gender had nothing whatsoever to do with this
23   decision.
24   Q.  And did you at any time between the 28th of

5 (Pages 14 to 17)

Lisa Svensson

11/30/2005

Page 18

1  August and September 15th submit any writing to
2  human resources or anything complaining about
3  treatment because of your gender?
4      A.  No.
5      Q.  Did you put anything down in writing to Mr.
6  Brooks or to anyone taking issue with the
7  allegations that he had made about your review
8  process of Mr. O'Malley?
9      A.  In writing?
10     Q.  Yes.
11     A.  No.
12     Q.  Was there -- let me give you what has been
13 marked as Svensson Exhibit 15th, which is a group of
14 documents bearing Bates numbers LS 31 through 273
15 Can you identify what Exhibit 2 is?
16     A.  These are my journals.
17     Q.  And when did you start taking journals of
18 your history with Putnam or your experiences at
19 Putnam?
20     A.  Well, they're all here, so April 23, 1998.
21     Q.  And do you recall what caused you to start
22 keeping a journal?
23     A.  Yes.  The first part of this journal is
24 during the time when I was working in the

Page 19

1  International Growth Equity Team for Robert Swift.
2  And we went out to lunch together.  I was pregnant
3  at the time.  And we went to lunch.  And he was
4  expressing dismay that I was not willing to go to a
5  trip to Hong Kong at the time that I actually
6  thought, from a business standpoint, wasn't
7  necessary.
8          But I was in the first trimester of my
9  pregnancy and I was also pretty sick.  So we were
10 talking about, you know, whether or not I would take
11 that one individual trip.  And he started asking me
12 some things that I thought were not exactly
13 appropriate, such as whether or not I planned to
14 nurse after I had the child.  And I just thought I
15 would want to write these things down.
16     Q.  So that starts in 1998?
17     A.  Mm-hmm.
18     Q.  Do you have notes of your discussions on
19 August 28, 2003 with Mr. Brooks, Page LS 62.
20     A.  I'm sure I do.
21         MR. WEIR:  What's the number?
22         MR. KOCIUBES:  62.
23     Q.  Do you have that?  And am I correct that
24 starting on Page 62 you've recorded, written down

Page 20

1  your -- made notes of your meeting with Mr. Brooks?
2      A.  Mm-hmm.
3      Q.  I'm sorry.  That's a yes?
4      A.  Yes.
5      Q.  And when did you make those notes?
6      A.  5:15 that day, on the 28th.
7      Q.  It says you had a meeting with Mr. Brooks at
8  5:15.  Were you making notes -- are these your notes
9  of the meeting with Mr. Brooks?
10     A.  Yes.
11     Q.  So you were writing as you were talking?
12     A.  No, that night.  That night when I went
13 home.
14     Q.  Okay.  And let me direct your attention to
15 sort of the last paragraph on that page.  That's
16 where you wrote, "So I went to see Josh today to
17 show him my draft."  Do you see that?
18     A.  Mm-hmm.
19     Q.  Yes?
20     A.  Yes.
21     Q.  And that's the draft of your review of Mr.
22 O'Malley?
23     A.  Yes.  At that point I had been trying to do
24 some drafts and that was that draft at that point in

Page 21

1  time, yes.
2      Q.  Okay.  And Mr. Brooks said to you, in
3  substance, and I'm referring to your notes on the
4  next page, that you and he have a problem?
5      A.  Yes.
6      Q.  Okay.  And tell us what it was, from your
7  notes, with the assistance of your notes refreshing
8  your memory, what it was that the problem was?
9          MR. WEIR:  You're asking her what Mr.
10 Brooks communicated the problem was?
11         MR. KOCIUBES:  Yes.
12         MR. WEIR:  Do you understand the
13 question?
14         THE WITNESS:  I think I understand it.
15     A.  And so he said, he said, You and I have a
16 problem.  And I said, Why don't you tell me about
17 our problem that we have.  And so he said that he
18 had started doing his own investigation of the
19 situation with Chris and that he was shocked, not at
20 what he found, but at what he didn't find.  And I
21 remember he said that.
22         So he said he started talking to
23 portfolio managers.  And it turned out I'd never
24 spoken to Paul Warren or Shegeki Makino or Mark

6 (Pages 18 to 21)

Lisa Syensson                                                                    11/30/2005

Page 22

1  Bogar and I said that's true. But that's what he
2  said our problem was. That was the beginning.
3      Q. But as to that statement that Mr. Brooks
4  made to you, you agreed with him that it was
5  accurate that you hadn't spoken to those portfolio
6  managers?
7      A. Yes. At the time I agreed with him.
8      Q. Okay. Let's keep going.
9      A. Okay. So I said it was true, that I never
10 even targeted the U.S./Global Core Team, which was
11 basically Paul Warren's team, because they never had
12 any complaints about Chris O'Malley. They never had
13 any issues with him. So I said to him, I never
14 represented to you that I even planned to discuss it
15 with them. I met with the Value and the Core IE
16 teams.
17     Q. So you had indicated to Mr. Brooks that you
18 were not targeting, for this review process of Mr.
19 O'Malley, the team that had no problems with him?
20     A. That is correct.
21     Q. And do you recall him saying anything in
22 response?
23     A. He didn't say anything in response that I
24 recall.

Page 23

1      Q. And then, I take it, you told him that you
2  did do interviews with the Value and Core teams?
3      A. Correct.
4      Q. Now -- and then Mr. Brooks went on to say
5  that as a result of the other information he had, he
6  then started checking about -- he talked to your
7  team?
8      A. Yeah, that was the next thing that he said
9  that he did.
10     Q. And what did he tell you that he found out?
11     A. What he found surprised him. The situation
12 was so critical that I had to be removed immediately
13 from my role as an ADR. He said across the team,
14 people felt that the situation was untenable. It's
15 so bad that several of them have gone as far as to
16 get several job offers.
17     Q. Did you ask him who had gotten a job offer?
18     A. I asked him, yes. Not who had gotten a job
19 offer, who is it that finds it untenable, that's
20 what I asked.
21     Q. Now, at the time there were four analysts on
22 your team?
23     A. Correct.
24     Q. Okay. And did you ask him which of the four

Page 24

1  had gotten job offers because the situation was
2  untenable?
3      A. I think I answered that question just now.
4      Q. I'm sorry, then, I missed it.
5      A. I didn't ask who got job offers. I asked
6  who are the people that say the situation is
7  untenable.
8      Q. And what did he say?
9      A. He said -- he said, I'd rather not answer
10 that. He said, you know, something like, you know,
11 I really don't want to go into that.
12     Q. And at any time, did you try to find out who
13 had gotten job offers?
14     A. In the conversation with him?
15     Q. Any time.
16     A. At any time?
17     Q. Yeah.
18         MR. WEIR: Objection as to form.
19     A. You know, I was sort of -- after this
20 conversation, it was so apparent to me that I was
21 being fired in this conversation that I wasn't that
22 concerned about who was getting job offers after
23 that. I was thinking about my own job offer
24 situation.

Page 25

1      Q. Okay. Now, you said you were being fired?
2      A. In this meeting, yes.
3      Q. Okay. And am I correct that, in fact, what
4  Mr. Brooks did is he laid out three alternatives?
5      A. Correct. But they were all completely crazy
6  alternatives. Ridiculous alternatives.
7      Q. Ridiculous in what sense?
8      A. In the sense that I had already had a big
9  demotion the prior year. I had already been asked
10 to go through the demotion with a good attitude and
11 continue to perform, which I had done. I had been
12 told that I would be eligible for a promotion, not
13 demotion, at the end of that period.
14         So the three alternatives that were
15 presented to me represented, you know, the same
16 thing I had just gone through a year-and-a-half
17 before when I delivered on everything they asked me
18 to.
19     Q. Did it come to your attention at any point
20 that the four analysts that you were managing, that
21 one was actively job hunting and another was
22 considering job hunting?
23     A. Well, I wrote that in the notes that, you
24 know, several of them have gone as far as to get job

LegaLink Boston
(617) 542-0039

Lisa Svensson                                                                                                11/30/2005

Page 26

1 offers.
2    Q. And am I correct that to this date, you have
3 no reason to believe that that's untrue?
4    A. You know, I have no opinion on whether or
5 not any of them got -- I know Darren Pierce got
6 another job. I don't know anything about anyone
7 else.
8    Q. On page -- the next page, LS 65, is that
9 where you recorded the three alternatives that
10 Mr. Pierce -- that Mr. Brooks laid out?
11    A. Yes.
12    Q. And in your words, the first was to go on
13 being an analyst and cover your stocks?
14    A. Mm-hmm.
15    Q. I'm sorry. That's a yes?
16    A. Yes. And also that you've got to combine
17 it, because he specifically, specifically said it
18 would not match my aspirations to become an MD, earn
19 more money or expand my managerial experience.
20       So, yes, it's going on being an analyst
21 with absolutely no possibility of achieving any
22 further goals.
23    Q. For the previous year, am I correct that
24 your total compensation was in the half million

Page 27

1 dollar range?
2    A. No. That wouldn't be correct. It was
3 $650,000.
4    Q. 650 for 2002?
5    A. Right.
6    Q. Okay.
7    A. It might have been 655.
8    Q. And did he say anything about cutting your
9 compensation?
10    A. My compensation had already been vastly
11 reduced.
12    Q. Did he say anything about cutting the
13 $655,000?
14    A. No.
15    Q. Did he say anything about stripping you of
16 the associate director of research title?
17    A. He said, specifically, I'm demoting you from
18 ADR immediately. I have to step in and do this.
19    Q. And do the managing?
20    A. He specifically said, As of now, you're no
21 longer an ADR.
22    Q. So that the option of staying as an analyst,
23 with having been paid in most recent year $655,000,
24 that was to you a ridiculous alternative?

Page 28

1    A. Yes. Well, well, analyst with no
2 possibility to earn more money or achieve any
3 additional career goal, that's a ridiculous career
4 goal, yes.
5    Q. Did he say there would be no possibility of
6 earning more money?
7    A. He specifically said that to me. He said it
8 wouldn't match my aspirations. I know your
9 aspirations are to earn more money and make MD. And
10 since in this new role that will not be possible,
11 I'm offering you, out of respect for you, two other
12 options. Out of respect for me, that's what he did.
13    Q. By the way, the issue of earning more money
14 or the possibility of earning more money, that's not
15 something that you recorded in your notes; is that
16 correct?
17    A. This would not many match my aspirations to
18 become an MD, earn more money and expand my
19 managerial experience. I think it is in my notes.
20    Q. Did you ever try to confirm that with Mr.
21 Brooks?
22    A. Yes, I did. I asked him to put it all in
23 writing.
24    Q. Okay. So we'll get to writing in a little

Page 29

1 while. And then you were given two other choices?
2    A. Yes.
3    Q. One was a severance package?
4    A. Yes.
5    Q. And then the third was, for some period of
6 time, to continue working as an analyst while you
7 job hunted, either internally or externally?
8    A. Yeah. I wrote keep working, but it was
9 basically not really -- you know, be there, pretend
10 to be working and over some agreed upon time frame
11 agree to be gone.
12    Q. And those were the three alternatives that
13 he gave you, correct?
14    A. Yes.
15    Q. And am I correct that in your mind, you saw
16 that as a demotion?
17    A. Yes, I did.
18    Q. And in your own mind, you saw it as
19 tantamount to a termination?
20    A. I saw it as a termination.
21    Q. You saw it at that moment as a termination
22 on the 28th?
23    A. Yes.
24    Q. Even though Mr. Brooks didn't say that he

8 (Pages 26 to 29)

Lisa Svensson                                                                11/30/2005

Page 34

1    A. Yes.
2    Q. And that he would take over the managerial
3 responsibilities for the team. Do you see that?
4    A. Mm-hmm.
5    Q. Is there anything in there about reduction
6 in pay or the possibility ever to be promoted?
7        MR. WEIR: Objection. The document
8 speaks for itself.
9    A. No, he didn't write that down.
10   Q. And then the second one was to remain at
11 Putnam for a transition period while you look for
12 other employment, correct?
13   A. Yes.
14   Q. And then the third one was to leave
15 immediately, execute a separate agreement, and get a
16 severance package that is outlined there. Do you
17 see that?
18   A. Yes.
19   Q. And when you read this e-mail, I take it you
20 still considered that what was going on was, in
21 effect, a demotion, if not worse?
22   A. I considered it to be a termination.
23   Q. Termination. Even though you had the three
24 options?

Page 35

1    A. Correct.
2    Q. Okay. And what did you do in response?
3 Which option did you choose?
4    A. I didn't choose any of the options. Well,
5 in response, in this meeting, the day that he gave
6 me -- he had given me the options. Then I met with
7 him a few days later and asked for it in writing.
8        And as I said to you before, I told him
9 that I needed to have it in writing before I could
10 give any indication. So we didn't meet again for a
11 while, while I considered the options, once they
12 were in writing. So I didn't choose any option
13 right away.
14   Q. And let's sort of just continue it for a
15 moment. So he wrote it down for you, at your
16 request, so there wouldn't be any question about
17 what he was saying.
18        Am I correct, in the fourth paragraph he
19 writes that he explored your relationship with
20 members of your team and found that there were at
21 least two members who have explored other employment
22 opportunities and were thinking about leaving Putnam
23 based on their experience with you. Do you see
24 that?

Page 36

1    A. Yes.
2    Q. And did you do anything in response to
3 getting that information?
4    A. Anything in response?
5    Q. Yeah.
6    A. Not that I recall.
7    Q. Have any reason to believe it wasn't
8 accurate that two of the four people you were
9 supervising were thinking of leaving?
10   A. Well, I had been trying to get Darren Pierce
11 more money. And I would not be surprised if Darren
12 Pierce was trying to get another job. So I wasn't
13 surprised.
14        Chris O'Malley might have been the
15 other, because I was in the process of trying to
16 give him a review to ask him to change some things.
17 And it didn't surprise me that there might be two
18 looking for jobs.
19   Q. All right. Now, at some point you got
20 around to making a -- responding to the
21 alternatives, correct, with your own proposals?
22   A. Yes.
23   Q. And what response did you make to Mr.
24 Brooks?

Page 37

1    A. Well, that was at a meeting later. I
2 believe it was September the 12th, on a Friday, I
3 think. And I said that I had carefully considered
4 all three alternatives and I found none of them to
5 be acceptable to me.
6    Q. And did you make a counter-proposal?
7    A. He said, What would be acceptable to you?
8 And I said, I would need to have some kind of
9 written assurance from Putnam that my career could
10 be put back on track now that this has happened, so
11 I would need that.
12        And, you know, I need to be promoted, I
13 said -- what I asked for was to be promoted to
14 managing director. And just in order to continue on
15 in this role after this event had happened to me, in
16 order to stay here, these were the things that I
17 needed.
18   Q. Now, you had considered that Mr. Brooks was
19 terminating you, demoting and terminating you?
20   A. Yes, indeed.
21   Q. And then you went back to him with a
22 proposal that you be promoted. And you recall
23 telling him you wanted a guarantee of a million
24 dollars for two years?

10 (Pages 34 to 37)

Lisa Svensson
11/30/2005

**Page 42**

1 I mean, that's not much of a discussion when you
2 won't say who the people are that said these things
3 or anything, really.
4    Q. Stay with me here for a moment. The comment
5 here, "Without any explanation." That's not
6 accurate, is it? You were given the names of some
7 of the portfolio managers, were you not, on August
8 28th?
9    A. That didn't represent an explanation.
10    Q. I see. The fact that you were told that
11 your review of Mr. O'Malley was inconsistent with
12 what Mr. Brooks was hearing and the fact that you
13 were given names of some of the portfolio managers,
14 and fact that you were told that there were two of
15 the four people that you managed, who were either
16 job hunting or thinking about job hunting, none of
17 that constitutes, for you, an explanation?
18    MR. WEIR: Objection as to form.
19    A. No. I mean, if Josh Brooks had said to me,
20 I interviewed people in the marketing organization
21 and you hadn't talked to them, it doesn't match up
22 with what I was doing anyway.
23    It also says in here, "Without any
24 discussion." Discussion. So discussion would imply

**Page 43**

1 that I would be able to have feedback, which I
2 didn't have.
3    Q. Give me every reason that you have for
4 believing that the reasons given to you by Mr.
5 Brooks were not accurate?
6    A. Oh, well, that relates to my entire history
7 at Putnam, the history of gender discrimination that
8 I witnessed over my nine-year tenure there. I can
9 start at the beginning.
10    Q. So your history at Putnam is what led you to
11 concur that what Mr. Brooks is telling you was
12 inaccurate?
13    A. No. That, in part.
14    Q. Okay. Tell me what else, then.
15    A. The history, the context of it is I had that
16 history to start with. I had seen many, many women
17 have these so-called resignations, and it was --
18 it's a way to fire people and pretend like you're
19 not firing people. And I was being fired.
20    Q. By the way, did any men ever resign from
21 Putnam?
22    MR. WEIR: Resign?
23    MR. KOCIUBES: Yeah.
24    Q. Under similar kinds of circumstances where

**Page 44**

1 it was a questionable resignation, in your words?
2    MR. WEIR: Objection as to form.
3    A. Yes, but in far larger numbers among the
4 women.
5    Q. Now, let's go back to what Mr. Brooks told
6 you were the reasons for his taking away the
7 managerial responsibilities from you.
8    What I want to understand is every
9 reason you've got for thinking that Mr. Brooks was
10 not telling you the truth.
11    A. Well, it didn't add up the day that he did
12 it and it still doesn't add up now.
13    Q. It didn't make any sense to you? Is that
14 the reason?
15    A. Well, I had been making an effort to give a
16 warning letter, not to fire, but to warn Chris
17 O'Malley. I had sent bullet points, stream of
18 consciousness at the request of Mary McNamee. And I
19 was unaware that Mary McNamee was taking these and
20 sharing them with other people.
21    So when I found out in the meeting, on
22 August 28th, with Josh that he had already read
23 them, I was surprised. I found the entire situation
24 to be quite suspect based on the way it was handled,

**Page 45**

1 the way that it was done behind my back, no
2 opportunity for me to have any kind of feedback.
3    I also mentioned to him in the meeting,
4 you know, these are the same people that did a 360
5 on me, a special 360, this thing that was called a
6 profiler. And these people did this special 360 on
7 me just a few months ago around my promotion. And I
8 would like to go to my office and share with you the
9 feedback that they gave me. And he just said to me,
10 I'm not interested in any of that. So that made me
11 think that this was not the reason.
12    Q. So have you not told us all the reasons why
13 you think that what Mr. Brooks told you, that that
14 draft review you did on Mr. O'Malley was not honest,
15 was not the reason for your demotion?
16    MR. WEIR: She's already talked about
17 her entire history at Putnam.
18    MR. KOCIUBES: I'm making sure there's
19 nothing else.
20    A. You want me to start with the beginning, my
21 entire history with Putnam?
22    Q. No, no. You said your history, your 360.
23    A. Not my regular 360, the special 360.
24    Q. The special 360. And you found the

12 (Pages 42 to 45)

, Lisa Svensson

11/30/2005

**Page 46**

1  situation, Mary McNamee giving the draft bullet
2  points to Mr. Brooks suspicious. What else is
3  there, if anything?
4         MR. WEIR: Well, she has already
5  testified about her observations about what happened
6  to other women.
7         MR. KOCIUBES: What else is there other
8  than what she's testified to? I just want to make
9  sure she puts it all on the table.
10       A. Many, many remarks that were made over the
11  years, various remarks that would suggest, you know,
12  gender discrimination, essentially.
13        And there's one other really giant
14  issue. I had an idea it might be Darren that got
15  another job. And the reason was because Darren was
16  being wildly underpaid. And I had been working very
17  hard in the spring on trying to get him some more
18  money. It was not enough money to retain Darren.
19  And I said that to Josh Brooks in the August 28th
20  meeting.
21        So what I thought was, Darren was
22  leaving, you know, Chris wasn't happy that I gave
23  him a review he didn't like. And, you know, it was
24  not enough information being given to me right then

**Page 47**

1  to justify this action.
2         Q. When did Mr. Brooks become your superior?
3         A. April of 2003.
4         Q. So less than six months before this
5  happened?
6         A. Correct.
7         Q. And was he part of this long history at
8  Putnam?
9         A. No. But just even Josh Brooks' arrival was
10  part of the long history at Putnam.
11        Q. But with respect to Mr. Brooks himself, he
12  hadn't been at Putnam before April of 2003, had he?
13        A. Correct.
14        Q. Now, let's --
15        A. But he arrived as a partner, as a junior
16  male, with much less experience. And he was now
17  firing, I think, one of the most senior women in the
18  department. So that did fit in with my experience.
19        Q. What do you mean junior male?
20        A. Well, he was only there five months. And he
21  also had much less work experience, as well, in the
22  industry.
23        Q. Was there a practice to do semi-annual
24  review of the analysts that reported to you?

**Page 48**

1         A. Yes.
2         Q. Okay. And am I correct, then, that some
3  time in the summer of 2003, you set out to do
4  reviews of all four of your team members?
5         A. I was working on it.
6         Q. And did you generate any drafts of reviews
7  of anybody other than Mr. O'Malley?
8         A. In the case of Chris, Josh was very sketchy
9  about whether or not we should do reviews. And he
10  had had in mind to not do them. I liked to do
11  reviews of my teams. And I believe I did them
12  anyway, but I am sketchy on my memory, so I'd have
13  to look back at my files of reviews.
14        Q. Do you have drafts of reviews of anybody
15  that summer other than Mr. O'Malley?
16        A. Well, there was this issue with Chris that
17  had been brought up in December of '02, where Omid
18  Kanshad had told Bill Landis in a meeting, We don't
19  like Chris. And Kelly Morgan had communicated that
20  to me and asked me to follow up on it.
21        So I had a meeting, approximately
22  January of '02, with Omid and Justin Scott, where
23  Justin pretty much thought it would be a good idea
24  to have the team without Chris on it. And I said,

**Page 49**

1  I'm not willing to do that. I would like to, you
2  know, I just started with this team. And he would
3  say, You've got a really good team and I can really
4  envision it without Chris, so let's just think of
5  the team without Chris, because they wanted Chris
6  fired.
7         Q. Who said that to you?
8         A. Justin Scott, in the presence of Omid
9  Kanshad. So I said, I don't want to do that, but I
10  would like to spend some time working with Chris.
11        MR. KOCIUBES: Let's mark as this
12  exhibit, Svensson Exhibit 4, a memo dated August 8,
13  2003.
14        (Exhibit No. 4 marked for
15  identification.)
16        A. So. I didn't completely finish my answer.
17        Q. I'm sorry. Go ahead.
18        A. So this stream of consciousness bullet
19  points that I originally gave Mary, which was on
20  August the 8th, I guess you might be asking me if
21  that's what this is.
22        Q. I haven't yet, but go ahead. Can you
23  identify it as Exhibit 4?
24        A. In fact, it is.

13 (Pages 46 to 49)

Lisa Syensson                                                                11/30/2005

Page 54

1  remember?
2     A. Jean Mockard.
3     Q. And what did Mockard say?
4     A. Jean Mockard said that he had a buy rating
5  on Alcoa. And Alcoa had -- I think it had done
6  well. And so he had come to a meeting, but he had
7  been updating people on Alcoa. And he had said, As
8  you are all well aware, I have this buy rating. And
9  she expressed that she was not happy, and that she
10 had not owned the stock and she didn't know he had
11 this buy rating.
12        So as a manager, I considered that to be
13 kind of a real problem that that wasn't
14 communicated.
15    Q. So that's the feedback from Jean Mockard,
16 that she didn't know about the buy rating?
17    A. I remember that Jean didn't know about the
18 buy rating. And Bart Geer, Jean and Bart worked
19 together on the same products. And I believe Jean
20 is the one that didn't know about the Alcoa buy
21 rating.
22    Q. But that Bart Geer did?
23    A. I don't think he knew either. And I was
24 thinking to myself, wow, there's different parts of

Page 55

1  the value product and those two worked together on
2  one and they didn't know.
3     Q. Who else did you talk to?
4     A. Dave King.
5     Q. You got King, Kuenstner, Mockard, maybe
6  Lanham walked in on a meeting?
7     A. Hugh Mullen.
8     Q. And what did Mullen say?
9     A. Hugh Mullen was generally happy with Chris.
10    Q. And would there be a way I could figure that
11 out from your bullet points?
12    A. No.
13    Q. So, so far we've got King and Mullen are
14 generally happy, correct?
15    A. Correct.
16    Q. Who else did you talk to?
17    A. I got to count them. Well, I know I talked
18 to the Emerging Markets Team at the time, which was
19 Carmel Peters and Daniel Granna. And I'm trying to
20 remember if there are any value portfolio managers I
21 have forgotten. I can't think of any others on that
22 team. But I know I talked to Carmel Peters and
23 Daniel Granna.
24    Q. And when you were doing reviews on your team

Page 56

1  members, did you think it was appropriate to record
2  the good feedback as well as the negative?
3     A. Well, this was not a review. This was
4  bullet points that -- I was instructed by Mary
5  McNamee to write down my stream of consciousness.
6  She said specifically to me, It doesn't matter if
7  you're angry. Just write it down. We will put it
8  into a form that works. And my idea was to put it
9  into a form that was more review-like.
10       So, I mean, you're describing this as
11 the review, but it wasn't.
12    Q. How did you -- did Mary McNamee just
13 approach you one day and just bring up the subject
14 of Chris O'Malley?
15    A. No.
16    Q. How did that whole thing come up?
17    A. Well, the first thing that happened was
18 Kelly Morgan reported to me in December of '02 that
19 Bill Landis had told her that Omid came up to him
20 and said, We don't like Chris. So I said, Oh, wow.
21 That's surprising.
22       The very first thing that happened was,
23 when I first took over the group, a guy named Mike
24 Stack, he said, I don't think Chris gets it. And I

Page 57

1  said -- you know, I didn't agree with him. I was
2  brand new to the team, I don't agree.
3     So then Omid had said to Bill that we
4  don't like Chris. So I said, I'm going to go to
5  Bill and talk to him about it, so I did.
6     Q. What question are you answering?
7     A. Your question.
8     Q. What question do you think that is?
9     A. You said why did Mary McNamee talk to me
10 about Chris. Out of the blue, did she just randomly
11 talk to me about Chris.
12    Q. Did you approach Mary or did she approach
13 you?
14       MR. WEIR: She's giving you the answer
15 to that.
16    A. I'm not able to be finish the story of how
17 we came to be talking about Chris. So I had had
18 some complaints. I was working with Chris. And I
19 was giving him both positive and negative feedback
20 related to these subjects of communication with
21 portfolio managers.
22       And during the course of the first half
23 of the year, he made some improvement. But on
24 August 7th, which was a Thursday, I heard from Leah

15 (Pages 54 to 57)

Lisa Svensson                                                                11/30/2005

Page 58

1    Graham that -- she came to me and said, Please don't
2    put me back working with Chris. I've been working
3    for him for seven months and he has never spent any
4    time with me. He's never communicated with me.
5    I've learned nothing from him.
6           I was having to make a decision at that
7    point in time about how to allocate the IA's on the
8    team. And she had been working with Chris for a
9    long time. And then for only the prior six weeks,
10   she had been working with Konstantin. Konstantin
11   had spent time with her, had educated her, taught
12   her how to do a chemical model. And this was my
13   vision of how the new, younger people should be
14   mentored on my team.
15          So, when Leah Graham came to me and
16   said, I've got this problem, I don't want to work
17   for Chris. When you make the new assignments,
18   please don't put me back with him. Then I said to
19   myself, I've got to talk to Chris about this. This
20   is not acceptable. It's not okay.
21          So what I did was -- I mean, I think it
22   was August 7th. It was around that time frame,
23   because I also found out that he hadn't mentored his
24   summer guy, who was a guy named Austin Holly. And

Page 59

1    got that feedback from Eric Hutcherson in the course
2    of this whole period.
3           So I was not happy about it. And I had
4    a meeting with Chris. And I said, This is not
5    acceptable. And I was, you know, not happy. And so
6    I went to Josh. And I had been talking to Josh over
7    the summer about Chris. Josh had said to me earlier
8    in the summer, Sounds like we have a laziness
9    problem on our hands. And if that's the case, then
10   we may need to make a change.
11          So I went to Josh at that time and
12   said -- once I found out that Chris also had not
13   been communicating with his IA, I said, How far
14   would you go with that? And he said, you know, all
15   the way. You know, give him a warning if you need
16   to. And I talked to Kelly about it and she said,
17   Talk to HR. She said give him a warning. I said, I
18   don't know how to do that. I don't know the form
19   for that. And she said, Talk to HR.
20          So I called Mary McNamee. And I said,
21   This is what's happened. I'd like to give him a
22   warning. At that time, that's how Mary McNamee got
23   introduced to this.
24       Q. And so am I correct -- let's take it one at

Page 60

1    a time. So, in terms of Mr. Brooks and the
2    conversations earlier in the summer, those were
3    conversations you were having with Mr. Brooks about
4    Mr. O'Malley, correct?
5       A. Mm-hmm.
6       Q. And it was based on what you told Mr.
7    Brooks, that he commented something to the effect,
8    It appears we have a laziness problem, correct?
9       A. Yes, he did.
10      Q. And with respect to Ms. McNamee, her
11   reaction about doing the bullet points was also
12   based on what you told her --
13      A. Yes.
14      Q. -- about Mr. O'Malley. You said, If that's
15   the case, then write up the bullet points, correct?
16      A. Yes.
17      Q. And then you wrote up the bullet points,
18   correct?
19      A. Yes, which were simply bullet points.
20      Q. All right. My question to you about Exhibit
21   4 is: Is it accurate and complete?
22      A. They were bullet points that I wrote to her
23   at the time. I never meant for it to be accurate
24   and complete to be presented to Chris O'Malley

Page 61

1    because it was a draft.
2       Q. Did you tell Ms. McNamee anywhere that
3    Exhibit 4 was never meant by you to be accurate and
4    complete?
5       A. She said to me, I will help you draft it in
6    a proper way, just write down what's going on. So
7    she never said to me, Is it accurate and complete?
8    This is a draft.
9       Q. Did you ever volunteer to Ms. McNamee that
10   Exhibit 4 was neither accurate nor complete?
11          MR. WEIR: Objection. Asked and
12   answered.
13      A. I said to Mary that it was bullet points.
14      Q. Bullet points. But did you say that the
15   bullet points were not accurate and complete?
16          MR. WEIR: Objection. Asked and
17   answered.
18      A. I said they were bullet points. That's all
19   I said.
20      Q. You said nothing else other than they were
21   bullet points?
22      A. Yes. I needed her help in drafting it. I
23   wanted to soften it. That's what I told her.
24      Q. And then I take it there was a period of

16 (Pages 58 to 61)

Lisa Syensson                                                    11/30/2005

Page 62

1   time when you didn't get a response from Ms.
2   McNamee?
3       A.  Mm-hmm.
4       Q.  I'm sorry.  That's a yes?
5       A.  Yes.
6       Q.  And then did you generate another draft?
7       A.  Yes.
8       Q.  And you circulated it to a number of people,
9   correct?
10      A.  I think I generated two more drafts.  I'm
11  not sure which ones I circulated, but I'm pretty
12  sure, in my mind -- in my memory, I made three
13  drafts altogether.
14      Q.  To whom were you circulating these documents
15  about Mr. O'Malley?
16      A.  Well, I made the second draft -- and I
17  pretty much was -- I was trying to get help from
18  Mary.  Mary went on vacation or something, I don't
19  know.  I was on a business trip.  And we planned on
20  the 8th, that I wouldn't be back from the business
21  trip until the 15th, which was the following Friday.
22  I had to go to Houston.
23          So on my business trip she told me that
24  we would talk when I got back.  I then tried to

Page 63

1   contact her on the 15th and just couldn't really get
2   any response from her.
3          So this was going on for a while.  I
4   kept trying to contact her and I couldn't get
5   anything back.  So I was, at the time, being coached
6   by Linda Grace.  So I had my monthly meeting with
7   Linda Grace coming up.
8          So Linda Grace was the proper person to
9   help with the draft, I thought, since I couldn't get
10  a response from Mary.  So I sent it to Linda Grace
11  in an effort -- at my monthly meeting -- to go over
12  this.  Linda Grace -- by the way, all these things
13  that had been happening in December and January, I
14  was working with Chris.  And I was trying to get
15  Chris to take more of an interest in improving his
16  communication with the portfolio managers.
17          And in one of my monthly meetings, Linda
18  Grace said to me, The thing with Chris is, it seems
19  like you're more interested in Chris doing his job
20  than he is.  And at some point in time, you're going
21  to have to take a harder line with him.  And that
22  was proposed by Linda Grace in one of our monthly
23  meetings.  So he was aware of the situation.  So
24  when I couldn't hear from Mary, I decided, I'll see

Page 64

1   if Linda can help me soften this.
2       Q.  So you circulated bullet points to Mary
3   McNamee, you circulated some kind of draft to Linda
4   Grace, correct?
5       A.  Yes.
6       Q.  Anybody else?
7       A.  I don't remember anybody else.
8       Q.  Okay.  And do you recall sending Mr. Brooks
9   any e-mails of Mr. O'Malley?
10      A.  I sent him an e-mail saying I wanted to meet
11  with him.
12      Q.  And you recall that was also in August?
13      A.  The meeting on August 28th was the meeting
14  that I was setting up that I sent him an e-mail
15  about.
16      Q.  Was the draft that you sent to Ms. Grace
17  accurate and complete?
18      A.  I think the draft that I sent to Ms. Grace
19  was, you know, my -- either second or third draft.
20  I'm not sure I shared the second draft with anybody.
21  And the third draft, I was trying to soften it.
22          So by the time I sent it to Linda, it
23  was still a work in progress.  Even with Josh, it
24  was a work in progress.  My idea was to physically

Page 65

1   show it to Josh on August 28th.
2       Q.  Between the draft that you generated in late
3   August and the one on August 8, did you talk to
4   anymore portfolio managers?
5       A.  I don't think so.
6       Q.  Okay.  So whatever information you had, you
7   had by August 8th?
8       A.  I had more portfolio managers, by the way,
9   than what we listed.
10      Q.  We'll deal with that.
11      A.  So I had talked to, you know, the teams
12  where there had been, you know, issues.
13          MR. KOCIUBES:  Let me ask the reporter
14  to mark as Exhibit 5 a document which was yesterday
15  marked as McNamee -- actually, we don't need to mark
16  it.
17      Q.  Let me show you what was marked yesterday as
18  McNamee Exhibit 9.
19          Do you have McNamee Exhibit 9 in front
20  of you?
21      A.  Yes.
22      Q.  And can you identify it for us?
23      A.  Well, it's a series of e-mails with the
24  latest draft as of that date attached.  It's

17 (Pages 62 to 65)

. Lisa Svensson

11/30/2005

Page 70

1   A. It took place in December of '02.
2   Q. Nine months earlier?
3   A. Right. But he told me, I'm speaking from my
4   team. It bubbles up from the bottom, so please
5   speak with Josh in my place.
6   Q. Let me just ask you one question about that
7   second paragraph. Is it your testimony that what
8   you've written there in this paragraph, under
9   communication, is it a fair picture of the reviews
10  and reactions to Mr. O'Malley?
11          MR. WEIR: Are you talking about the
12  three paragraphs under the heading of communication?
13          MR. KOCIUBES: At the moment, I'm asking
14  about the one paragraph that starts with
15  communication.
16  A. "I have had one-on-one meetings with the
17  Value and Core IE team members. And several of the
18  team members, in each case, have different
19  impressions of the job Chris is doing than he has."
20  I would say that's accurate.
21  Q. How would I find out from this memo that
22  there were team members that were happy with the job
23  he was doing?
24  A. You would know because several of the team

Page 71

1   members have a different impression than he has. So
2   you would know that several are not happy and
3   several are happy.
4   Q. I see. So that's how you're supposed to
5   figure that out?
6   A. Right. Right.
7   Q. Okay. Did you come to find out that this
8   memo had been given to Mr. Brooks?
9   A. I learned about that in my August 28th
10  meeting, because I brought this memo and I put it at
11  his place at his desk, not his desk, but his
12  conference table. And I put them each down.
13  Because my goal was, since I couldn't get Mary to
14  help me, I decided, you know, I always wanted to
15  keep Josh in the loop on the things I was doing.
16  And he was totally in the loop on the Chris thing,
17  the whole time, by the way.
18          And since I couldn't get HR to help
19  me -- Mary to get back to me, I decided I would go
20  to Josh and get feedback from Josh. So I brought it
21  to him. And he immediately said to me, I don't need
22  to see that. I've already seen it. That was the
23  first I heard of that.
24  Q. And in that meeting -- and we've covered it

Page 72

1   a little bit already -- on the 28th with Mr. Brooks,
2   one of the things he told you he was unhappy about
3   was that what he discovered, in terms of the
4   accuracy or fairness of your draft reviews of Mr.
5   O'Malley, he thought they were dishonest, did he
6   not?
7           MR. WEIR: Objection as to form.
8   A. What he said was that I had lied to the firm
9   and that, in fact, I hadn't actually interviewed
10  portfolio managers about Chris. So, that's what he
11  discovered.
12  Q. Did he say you hadn't interviewed portfolio
13  managers or and hadn't interviewed all of them?
14  A. He said, You haven't interviewed portfolio
15  managers. And I said, That's not true. And I said
16  that I had notes and I had meetings. And then he
17  enumerated portfolio managers that I had not
18  interviewed, such as Paul Warren, such as Shegeki
19  Makino, which I said, Yeah, you're right. I didn't
20  interview them.
21  Q. By the way, when you were going around in
22  the summer talking to portfolio managers, did any of
23  them express criticisms of Mr. Eckland?
24  A. Mm-hmm.

Page 73

1   Q. They did?
2   A. Yes.
3   Q. How about Mr. Stoloff?
4   A. They had some criticisms. But see, the thing
5   was, that I hadn't had the issue of anyone coming to
6   me and saying, We don't like Ellis or we don't like
7   Konstantin. They need to be, you know, not on your
8   team. Nobody had ever said that.
9   Q. Do you recall if you talked to Pam Holding?
10  A. Pam Holding had been one of the people that
11  I talked to earlier in the year. Pam Holding and
12  this gentleman by the name of Nick Melhuish, used to
13  work next to each other in the International Core
14  Team. And they were two of the ones that in the
15  January time frame I interviewed them.
16          And Pam was extremely unhappy with Chris
17  O'Malley's, you know, communication with her at the
18  time, as was Nick.
19  Q. When did you talk to Ms. Holding?
20  A. It was in, like, January. It was the first
21  round of this. And so what happened was, I
22  established with Pam a working relationship where we
23  regularly updated each other on how Chris was doing.
24  So as a result of that, Pam felt that he was doing

19 (Pages 70 to 73)

, Lisa Svensson                                                    11/30/2005

Page 78

1  objection.
2      Q.  Were there some false pretenses that Mr.
3  Lasser used to trick you into accepting the offer?
4      A.  Yes.  The biggest false pretense was the
5  fact that it would be a place where women could
6  thrive and there wouldn't be a glass ceiling, and
7  that you could actually have a career as a woman
8  where you'd be able to, you know, thrive.
9      Q.  And that's what you're referring to?  I just
10  want to be clear what it is that we're talking
11  about.
12      A.  On my ability to be treated on an equal
13  footing with males, in terms of promotions,
14  compensation and benefits.  That's what I'm
15  referring to.
16      Q.  And am I correct that -- well, at what point
17  in time do you say that you learned that your
18  treatment was not equal because of your gender?
19      A.  Well, when I first was interviewing at
20  Putnam, there was a remark made in one of my
21  interviews by one of the people that I interviewed
22  with, not that my treatment was different, but, you
23  know, I said to him, you know, It's a good place for
24  women, right?  Because they had given me an article

Page 79

1  that said it was a good place for women.
2          And he said, Well, we have a problem,
3  not really.  We have a problem because, you know, a
4  lot of women come, but they don't stay.  We can't
5  get them to stay.  And, you know, for whatever
6  reason, they leave.  And I actually brought that up
7  with Patrick O'Donnell.  And he said, you know, not
8  true.  Like, listen to me.  And he was hiring a lot
9  of women and a lot of people of color.  And he
10  looked like he was putting together a team that was,
11  you know, was going to stay and was going to be
12  diverse.
13      Q.  My question is a little bit more narrow than
14  that.  At what point, if ever, did you conclude that
15  you were being treated differently because of your
16  gender?
17          MR. WEIR:  She was trying to answer that
18  question in her testimony.
19      Q.  Did you know it from the day you came?
20      A.  No.
21      Q.  I'm looking for a point in time.
22      A.  It was, as I said, the entirety of my
23  experience at Putnam.  So, you know, I looked at
24  Patrick O'Donnell, looked at the team he was putting

Page 80

1  together, and I thought, well, this looks good.
2  Maybe this can work.  And, you know, there were some
3  women there.  Because of the glass ceiling, you see
4  some women rising, so that gives you some hope.  And
5  it takes the nine years to see how systematically
6  one after another, they're all gone.
7          So, you know, suddenly, there's no woman
8  in the partnership.  And when did I see that it
9  applied to me?  It applied to me as I went.
10  Different remarks when I had my pregnancy, my second
11  pregnancy, when I was denied promotion the second
12  time.  Robert Swift, my boss, said to me, It was a
13  bad year for your promotion because you were out on
14  your maternity leave.  And I objected to that
15  statement directly.
16          So it was statements like that.  It was
17  many, many things over the years.  But that is one
18  example, for sure, where I can say I began to
19  believe it was gender.
20      Q.  At what time did you -- time period or year
21  or group of years -- did you begin to believe it was
22  gender?  That's all I'm trying to understand.
23      A.  Well, even at the beginning when I was in
24  the research team, Patrick and I had worked out a

Page 81

1  plan whereby he would work toward getting me into a
2  portfolio management job as they became available.
3  And it was this, you know, several-year plan that we
4  had put together.
5          And what I noticed at the beginning was
6  some portfolio management jobs were going to males,
7  I was not being considered for them, and a number of
8  males, even who were junior to me, were being moved
9  into those jobs that I was not considered for.
10          So, you know, over that period when I
11  was first working there I was thinking, Wow, why
12  isn't this happening?  Then, once there was a group
13  that I would describe as sort of safe for women,
14  that was the group that was formed by Robert Swift.
15  He was a person who was open to women and had women
16  and had hired women already.  This is a group that,
17  you know, I got to go into.  I got that offer.
18          I didn't get an offer to go into, you
19  know, into the Specialty Growth Group or the Core or
20  the international teams where you didn't see any
21  women.  That not where I got offered.  I got offered
22  the start-up team.  And the start-up team had very
23  few assets compared to the other teams, which
24  directly affects your ability to share in the

LegaLink Boston
(617) 542-0039

Lisa Svensson                                                          11/30/2005

Page 114

1    A. Yes.
2    Q. And international -- you were still in
3  international growth at that time with Mr. Swift as
4  your supervisor?
5    A. Right. This would have been done right
6  before he left.
7    Q. Okay. And am I correct that your year-end
8  rating at this time had gone from 4 to 3.5?
9    A. Yeah. That was when Larry forced Robert to
10  write everybody's reviews down.
11    Q. He was forced to write everybody's reviews
12  down?
13    A. Robert told me and gave me a form and told
14  me it was written down after the fact, and he was
15  sorry about that, but Larry mandated that the entire
16  growth division, because of the performances within
17  growth had to have -- the average according to this
18  thing, let's see. I think the average of the
19  division had to be three. It could not be higher
20  than three. So, therefore, they were actually told,
21  the managers, after the fact, what they had to write
22  them down to.
23    Q. Take a look at Page 2 of that review, would
24  you?

Page 115

1    A. Mm-hmm.
2    Q. Do you see under evaluation/comments, the
3  third line, "Lisa did tolerably within 2001 with
4  performance in the growth accounts that lagged the
5  benchmarks by 600 basis points."
6    A. Yes.
7    Q. Benchmarks would be other growth accounts?
8    A. No. The benchmarks -- each portfolio has
9  its own benchmark that it's measured against.
10    Q. And in this case, the benchmarks, the
11  equitable benchmarks were 600 basis points higher
12  than what your performance was for the year?
13    A. Correct, six percent better. That's why we
14  were in the fourth quartile.
15    Q. But in your mind, this is still, from Mr.
16  Swift, it's still a positive review, correct?
17    A. Yes.
18    Q. And, in fact, he still says he's going to
19  submit you for promotion, does he not, on Page 8?
20    A. I assume.
21    Q. And at this point you'd now been involved in
22  portfolio management for four or five years, since
23  1997?
24    A. Well, I started at the very end, like,

Page 116

1  December 15th of '97. So I don't really think we
2  can call '97. So '98, '99, 2000, 2001, so four
3  years.
4    Q. And do you remember when the market bubble
5  burst?
6    A. It started to burst in, I believe, the
7  second quarter of 2000.
8    Q. And do you remember that it hit tech stocks
9  and growth stocks particularly hard?
10    A. Oh, yeah.
11    Q. Hard to forget that, right?
12    A. I remember it well.
13    THE WITNESS: Would it be possible to
14  have another bathroom break?
15    MR. KOCIUBES: Absolutely. Whenever you
16  need a break just say so. We're going to take a
17  break in about five minutes for lunch.
18    (Break taken.)
19  BY MR. KOCIUBES:
20    Q. Let me ask you to go back to your notebook
21  to page LS 71. It's Exhibit 2. Do you have that?
22    A. Well, I will. I'm just -- I don't want to
23  mix up the exhibits.
24    Q. You tell me when you have it.

Page 117

1    A. LS 71?
2    Q. Yes.
3    A. Got it.
4    Q. Okay. Look at the second paragraph. When
5  you write -- and when were you writing these notes?
6    A. I dated them at the time.
7    Q. You wrote these in September of 2003?
8    A. It was around, like, after the information
9  of these options had been communicated to me after
10  my termination. Yeah. September the 8th of 2003.
11    Q. So in September of 2003 you were writing
12  back about some events that occurred in 1998; is
13  that correct?
14    A. Right. Before I forget them.
15    Q. And you wrote that you were pregnant in
16  1998. Do you see that?
17    A. Mm-hmm.
18    Q. And that the team achieved terrific results.
19    A. Mm-hmm.
20    Q. And then you wrote, "When I returned from
21  maternity leave, I was traumatized by the firing of
22  my best friend Tom Bogan."
23    A. Right.
24    Q. "He was unceremoniously dumped on January

30 (Pages 114 to 117)

Lisa Svensson                                                    11/30/2005

Page 122

1   that I have to get to.
2      Q. Okay.
3      A. The criteria is people who were males who
4   were available to fill managing director spots in
5   the same years that I was promoted, who were working
6   as portfolio managers and were similarly situated
7   and not demoted or asked to leave portfolio
8   management in the way that I was.
9      Q. So they were promoted. And what was the
10  second thing?
11     A. They may or may not have been promoted from
12  the spots where they were in 2002 when I was
13  demoted, but they got to stay as portfolio managers
14  and many of them were promoted.
15     Q. So everybody who, in 2002, was a portfolio
16  manager and then did not go back to research?
17     A. Who was a male.
18     Q. Who was a male. Were there women in that
19  category?
20     A. There were, like Beth Kottner, for example,
21  Kelly Morgan. They were asked to go back to
22  research. There was only one woman in the group
23  that I'm aware of who was not asked to go back to
24  research, who was Marjory Parker.

Page 123

1      Q. All of these men were not in the growth
2   team, right?
3      A. No.
4      Q. So give me comparable women.
5      A. I'm enumerating for you all the women that
6   were portfolio managers.
7      Q. Yeah.
8      A. Pam Holding, Jean Mockard, then I already
9   said Beth Kottner, me, Kelly Morgan, Marjory Parker
10  There were no women on the Specialty Growth Team
11  There were no women on the Global Core Team. I'm
12  not able to remember other women besides those.
13     Q. So your comparators are all portfolio
14  managers, regardless of who they reported to and
15  regardless of the team that they were on?
16     A. Right. And even some of these are in the
17  fixed income department. There are some women in
18  fixed income, I don't know them as well, though. I
19  don't know their names off the top of my head. So
20  Andrew Matteis here, he's a fixed income person.
21     Q. Now, you said there was one other thing you
22  wanted to amend?
23     A. Yes.
24     Q. Actually, before we do that -- well, go

Page 124

1   ahead. Amend it first.
2      A. Okay. The question that you were asking me
3   about, who on the core IE team of portfolio managers
4   did I speak to with regard to Chris O'Malley, I left
5   Sam Davis off that list.
6      Q. And what did Mr. Davis have to say?
7      A. Well, I was in a meeting with the whole core
8   IE team just, you know, shortly before. I can't
9   give you the date exactly, but not too long before
10  this whole incident with -- not even incident -- the
11  period of time when I was trying to get feedback on
12  Chris. So I would say that that was June of '03
13  period and July.
14     So prior to that, a couple of months or
15  a month prior to that or so, I had been in a meeting
16  with the overall core IE team and Sam Davis had
17  asked me, When is Chris going to finish the Japanese
18  steels? And I had weekly meetings with the people
19  that reported to me. And I had just, right before
20  that, had my meeting with Chris, like, a day or two
21  before that.
22     So that was fresh on my mind, because
23  Chris, who missed a lot of deadlines, had told me --
24  I had asked him that question and he said two weeks,

Page 125

1   in two weeks. So I said to Sam Davis, Chris says
2   two weeks, it's going to be in two weeks. And Sam
3   Davis just about took my head off. He said, Chris
4   has been saying that all year.
5      Meanwhile, the stocks are up 80 percent.
6   So I'd had that, I considered that to be feedback.
7   But I went back to Sam in the course of talking to
8   the people on the core IE team, and I --
9      Q. When was that?
10     A. I had a meeting with them, like I said, it's
11  in my notes, but it was in either June or July of
12  '03.
13     Q. And so that -- I take it that when you had
14  your discussion or discussions with Mr. Brooks at
15  the end of August and in early September, you
16  thought the review that he was giving you was
17  unfair?
18     A. I wasn't getting a review from Josh Brooks.
19  I was getting fired by Josh Brooks.
20     Q. And you thought that was unfair?
21     A. Yes.
22     Q. And you understood, among other things, him
23  to be criticizing your management style?
24     A. Mm-hmm.

32 (Pages 122 to 125)

Lisa Svensson

11/30/2005,

Page 130

1  Dexter was remaining on the team and continuing
2  managing money in that style as was Peter Haddon and
3  Nathan Eigerman.
4      Q.  There was a slimmed-down team?
5      A.  It was reduced.
6      Q.  And do you recall --
7      MR. KOCIUBES:  Let me ask the reporter
8  to mark as Exhibit 8 a memo of March 12, 2002,
9  e-mail.
10         (Exhibit No. 8 marked for
11  identification.)
12     Q.  You have Exhibit 8?
13     A.  Yes, I do.
14     Q.  And is that an e-mail you wrote to Mr.
15  Oristaglio on March 12, 2002?
16     A.  Yes, it is.
17     Q.  And you started out that, "I was not
18  entirely happy with the way I left our conversation
19  last week."  Do you know what that was all about?
20     A.  Yes.  That was the conversation with Steve
21  Oristaglio where I was seeking to remain on the
22  growth team.  And I went to Steve Oristaglio to
23  plead my case.
24     Q.  And what did he say to you?

Page 131

1      A.  He said that there was no room on the growth
2  team.  And I said, you know, I notice that other
3  people are being retained on the growth team.  And
4  I'd like to be considered for one of those
5  positions.  And he said, Sorry, but we need certain
6  skills.  And I said, I have better skills than the
7  people you're keeping.  And, you know, he said,
8  You've got to go back to research.  There's no room.
9      Q.  And did he tell you other than the research
10 skills that were needed in the slimmed-down team why
11 it was that you weren't going to be on that team?
12     A.  No.  It was very unclear.  That's how we
13 left it and that's why I wrote him the note.
14     Q.  Am I correct, in the last paragraph there,
15 you're thanking him for the bonus that he got for
16 you?
17     A.  Mm-hmm.
18     Q.  And what was your bonus for the year
19 preceding when they blew up that team?
20     A.  Didn't I give that testimony?
21     Q.  You may have.
22     A.  It was over a million.  I think it was 1.65
23 all together.
24     Q.  Now, you talked this morning, you testified

Page 132

1  this morning, about your initial conversations with
2  Mr. Landis before you went on to his group.  Do you
3  recall that?  And I think you said that you had
4  generated a plan of sorts that you had given him?
5      A.  Business plan.
6      MR. KOCIUBES:  Let's mark that, if we
7  could, as Exhibit 9.
8         (Exhibit No. 9 marked for
9  identification.)
10     Q.  And is Exhibit 9, or attached to Exhibit 9,
11 is that the plan that you formulated and gave to Mr.
12 Landis around March 14, 2002?
13     A.  Yes.
14     Q.  And I note that it's headed, for Senior
15 Analyst International Oils.  Do you see that?
16     A.  Yes.
17     Q.  And you testified earlier that, sort of, the
18 international oils group was the option that was
19 most appealing to you?
20     A.  Yes.
21     Q.  And was there a manager of that team in
22 place already?
23     A.  Steve Gorman was the manager of that.
24     Q.  Of the international oils?

Page 133

1      A.  No.  The international oils was not a team.
2  The international oils was part of a knowledge
3  management team and a performance team that was --
4  there were two teams that were managed by Steve
5  Gorman, energy and basic materials.
6      So there was an analyst in energy.  And
7  I proposed adding myself as an additional analyst in
8  energy and also being a part of basic materials.
9      Q.  But also managing the four MBA's on that
10 team?
11     A.  Yes.
12     Q.  Were they being managed at the time?
13     A.  I believe Jim Falvey might have been,
14 F-A-L-V-E-Y, and they weren't very much being
15 managed in my view.  In fact, Robert Swift
16 recommended that I manage those people because I was
17 a good manager.  I proposed it based on his
18 recommendation.
19     Q.  And so the notion was that you were going to
20 take over management of those four people for Mr.
21 Falvey?
22     A.  I think this is before I came to that team.
23 So I believe that those three that were on basic
24 materials were directly managed by Steve Gorman and

34 (Pages 130 to 133)

Lisa Svensson                                                                 11/30/2005,

---

Page 138

1    Q. Would it refresh your memory if I suggested
2  that you met with Mr. Landis for about
3  two-and-a-half hours before he took you on the team?
4    A. It's possible. I don't remember it being
5  that long. I remember meeting with him, but I don't
6  remember it being two-and-a-half hours.
7    Q. Do you recall him telling you that if he
8  took you on the team you couldn't be a distraction?
9    A. No, I don't recall that.
10    Q. Do you recall him telling you that your
11  personality kept getting in the way of your
12  progress?
13    A. No, I don't recall that.
14    Q. None of that?
15    A. No.
16    Q. But you do recall doing the business plan,
17  correct?
18    A. I do.
19    Q. Now, by then, I take it you'd had the
20  experience managing money and you had the experience
21  being an analyst?
22    A. And I had experience managing people.
23    Q. And you were now being, in your mind,
24  demoted, correct?

---

Page 139

1    A. Yes.
2    Q. Did you job hunt?
3    A. At that time?
4    Q. Yeah.
5    A. I did.
6    Q. And did you get some terrific offers you
7  turned down?
8    A. I actually got some interviews, but I didn't
9  get any offers.
10    Q. Nobody else snapped you up to manage money,
11  given your track record?
12    A. No, because of those two years in the fourth
13  quartile. When I say some interviews, some
14  interviews was one firm. We've got to be clear
15  about that.
16    Q. Who was that firm?
17    A. Wellington.
18    Q. Did you apply anywhere else?
19    A. No.
20    Q. And were there men working at any of those
21  firms who, in your parlance, were junior in the
22  sense that they were less experienced than you were
23  in the industry?
24    A. I don't know anything about men in the other

---

Page 140

1  firms. But I made a decision at the time -- this
2  was all communicated to me by Sherry Holder-Watts,
3  and, like, the way she communicated it to me was, If
4  you don't like this option, then we're going to have
5  another kind of conversation. So it was
6  communicated to me, Take this or leave it. And I
7  had to mentally make a decision. I'm going to take
8  this, it's not what I want, but I'm going to do my
9  best.
10      I do remember Bill Landis telling me
11  that the best people are the ones that can turn
12  around and come back from adversity, look at my own
13  career.
14    Q. So you decided to try to do that?
15    A. Yeah.
16    Q. How soon before you started complaining
17  about Mr. Falvey?
18    A. After I prepared the business plan, I did
19  not want to -- I showed it to Bill, but I didn't
20  want to do anything until Jim had seen it, because I
21  didn't want to interfere on his turf and I wanted to
22  make sure we were all on board.
23      So I went to Jim sometime after one of
24  these meetings, probably this meeting, and I said, I

---

Page 141

1  want to show you this business plan I'm proposing.
2  And so I showed him the business plan and he said,
3  You know, this is great and everything. I feel real
4  sorry for you. I'm sorry about what's happening to
5  you, losing your job and all, but to tell you the
6  truth, I don't like it. I don't want you. You're
7  not coming. You're not taking my stocks and I'm
8  going to fight you for them. So I pretty much had a
9  complaint at that point.
10    Q. So part of your proposal was to take some
11  stocks from Falvey that he had been following?
12    A. Well, following is really an issue. He had
13  them officially under coverage, but I was in the
14  Global Growth Team and I was using his research and
15  I was aware that they were not being closely
16  covered, the ones that I wanted to pick up that were
17  foreign.
18    Q. Would you go back to your notes, Exhibit 2,
19  and look at page LS 54. Do you have that page?
20    A. Yes.
21    Q. And am I correct that page is dated April
22  29, 2002?
23    A. Mm-hmm.
24    Q. And how long had you now been part of Mr.

---

36 (Pages 138 to 141)

Lisa Svensson                                                                     11/30/2005

**Page 170**

1  A. If that was my best review.
2  Q. Is that the most money you made?
3  A. In the year 2000?
4  Q. Yeah, for the year 2000.
5  A. Didn't for the year 2001 I make more than in
6  2000? In those two years were the best.
7  Q. And your second child was born in the year
8  2000?
9  A. Yes. And those were also the years I was
10  denied my managing director. So you're comparing me
11  with me. And I don't think that's a fair
12  comparison. Because, yes, I made the most money I
13  ever made, but what were the males making?
14  Q. So let's go back to 34. The evidence you
15  have of a conspiracy in and after April of 2003
16  between Lesser, Haldeman and Brooks, is that in
17  2004, eight people -- there was a downsizing of
18  eight people, four of whom were women, four of whom
19  were men?
20  A. No. That's not the only piece. The other
21  piece is telling me that I could do Michael Yogg's
22  job and he would get the title and credit.
23  Q. Did Mr. Brooks tell you that?
24  A. Well, sorry.

**Page 171**

1  Q. Did Mr. Brooks tell you that?
2  A. No, he didn't.
3  Q. Did Mr. Haldeman tell you that?
4  A. No.
5  Q. Did Mr. Lasser tell you that?
6  MR. WEIR: Well, wait a minute. Let her
7  finish her answer, counsel, before you ask another
8  question.
9  The question was: Did Mr. Haldeman tell
10  her, she said no. She wanted to continue her
11  answer.
12  Q. Tell us from the beginning of time.
13  A. You know, after their arrival in 2003, I
14  saw, beginning with myself, the same trend, only
15  even accelerating beyond myself. I was -- remember,
16  Josh Brooks testified just the other day, that I
17  was, like, the only one that he fired in 2003. So,
18  you know, as time went own on, I noticed, from my
19  reading of the newspaper, Irene Estevez was gone
20  from Putnam. She was a very high-ranking female.
21  Sandra Wiston was gone from Putnam over time. The
22  four females and four males were gone from the
23  research department, a 50 percent demographic where
24  the department didn't match that. Elizabeth

**Page 172**

1  McElway-Jones was gone. There were a series of
2  these. It just continued and it appeared to me to
3  accelerate.
4  Q. How many senior men were gone? Did you
5  track that?
6  A. You know, I did see that senior men such as
7  Paul Warren and, of course, the perpetrators of the
8  market timing were gone.
9  Q. Anybody else?
10  A. A lot of people were gone.
11  Q. Let's go to Paragraph 35. "In the late
12  spring and summer of 2003, plaintiff, on a number of
13  occasions, raised with Brooks significant concerns
14  which she had about the allocation of brokerage
15  commissions on the buy side to reserve shelf space."
16  Do you see that?
17  A. Yes, I do.
18  Q. What did Mr. Brooks say to you in response?
19  A. Well, what I said to him was, we were having
20  lunch together in the executive dining room. And I
21  think it was on May the 16th of 2003. And I said to
22  him -- can I look at my notes so I can have the
23  exact --
24  Q. Sure. After you filed the claims; is that

**Page 173**

1  when you made those recollections?
2  A. I didn't file any claim on October 12th, no.
3  It was prior to filing a claim.
4  Q. Tell me what pages you're looking at.
5  A. I'm looking for it. I haven't found it yet.
6  I think I wrote it down.
7  Q. Tell me what you're looking for and maybe I
8  can help you.
9  A. I'm looking for a lunch that I had with Josh
10  Brooks where I addressed the issue of -- and it's
11  possible that I didn't write it down in my
12  recollections, but I remember it quite well, where
13  this lunch that you're asking me about. There it
14  is.
15  Q. When did you make the notes on LS 120?
16  A. January 24th of '04.
17  Q. And you wrote down about a business trip in
18  May of 2003?
19  A. Yes.
20  Q. And you wrote about a lunch that you and
21  Josh Brooks had in the executive dining room?
22  A. That's what I was looking for, yes.
23  Q. Tell me if I've got it right. You said, "We
24  started talking about the subject of allocations of

44 (Pages 170 to 173)

. Lisa Svensson                                                                11/30/2005

Page 174

1    commissions on the buy side in exchange for shelf
2    space."
3       A. Correct.
4       Q. Then you wrote, "I told Josh that this was a
5    violation of our fiduciary duties."
6       A. Yes, in those words.
7       Q. What did he say to you?
8       A. He said, I hear ya, and we're on the same
9    page about that.
10      Q. He expressed no anger that you were raising
11   the issue?
12      A. No.
13      Q. And, in fact, you recorded some of his
14   comments on the next page of your notes?
15            At some point you cut an article out of
16   the newspaper and gave it to Mr. Brooks on this
17   commission issue?
18      A. Yeah, it was, like, the very next week.
19      Q. And Mr. Brooks had already responded to you
20   that he had already given a copy to Mr. Lasser?
21      A. He either had, or I think I said, I think he
22   had just had the meeting. I wasn't 100 percent sure
23   of that as I recollected it at the time.
24      Q. And Mr. Brooks said to you, "I'm right there

Page 175

1    with you."
2       A. Yes, he did say that.
3       Q. And he also said to you that both he and
4    Debbie Kuenstner agreed with you?
5       A. Yes. The two of them were going to go to
6    Larry.
7       Q. Who at Putnam told you they disagreed with
8    you?
9       A. I didn't really bring it up a lot of times,
10   because it was the practice at Putnam and it was,
11   you know, a well, let's say well-protected practice
12   that I always thought was not a good practice.
13      Q. And is it your testimony that Mr. Brooks
14   somehow set out to get you fired as a result of your
15   talking to him about directed commissions?
16      A. No. It's my testimony that this is another
17   piece of the mosaic that I'm putting together here
18   that I was an outspoken woman that had opinions.
19            Josh took an opinion on a subject that
20   was most likely a pretty touchy subject, because,
21   well, after all, the company did end up paying out
22   40 million dollars to settle on this subject.
23            And I mentioned it pretty early on
24   before the investigation was investigating. And I

Page 176

1    said it was a fiduciary duty issue and it was a
2    violation of it and that that money rightfully
3    belonged to the client and we didn't have any right
4    to use it to grow our business.
5            And then just a few months later, I was
6    fired. So my view was, you know, maybe Josh brought
7    it up too. He was right there with me, but he
8    didn't get fired, I got fired.
9       Q. So the fact that you talked to Mr. Brooks
10   about directed commissions and Mr. Brooks said he
11   agreed with you, Mr. Brooks said Debbie Kuenstner
12   agreed with you, and Mr. Brooks said that he talked
13   to Mr. Lasser about the subject and then some months
14   later, he gave you the three choices which resulted
15   in termination?
16      A. Not many months later.
17      Q. Well, the conversation was in May, right?
18      A. Yup.
19      Q. And the fact that you then, at the end of
20   August, were told that you essentially lied in a
21   review about Mr. O'Malley?
22      A. Right. Which was a trumped-up charge and
23   not true.
24      Q. From those facts you infer that the real

Page 177

1    reason you got fired was because you raised the
2    issue of directed commissions?
3       A. No. I believed that raising the issue of
4    directed commissions was yet another mark against me
5    as an outspoken woman. I was already vulnerable on
6    that.
7       Q. Has anybody said that to you, that raising
8    the issue of directed commissions in any way
9    impacted anything that happened?
10            MR. WEIR: Anybody said that?
11      A. Anybody?
12      Q. Anybody at Putnam.
13      A. At the time that I left Putnam, there was no
14   thought that -- it was never communicated in any way
15   that it was something they were even going to be
16   prepared to discuss as to whether or not it was a
17   good thing or a bad thing or whether or not saying
18   something about it meant anything.
19      Q. So this is an assumption that you're making
20   or an inference that you yourself are drawing?
21      A. I think it's reasonably probable.
22      Q. Now, prior to the 28th of August, 2003, did
23   you have any problems with Mr. Brooks?
24      A. None that I was aware of.

45 (Pages 174 to 177)

.Lisa Svensson                                                    11/30/2005

**Page 214**

1  what you were referring to. The phrase, "Retaliated
2  against females because they objected to" -- I
3  thought you said you considered yourself sort of
4  being terminated on the 28th of August?
5      A. Right.
6      Q. And what retaliation did Mr. Brooks do on
7  September 12th?
8      A. I didn't say he retaliated on September
9  12th. I said, you know, I raised the issue of
10 gender with him on September 12th.
11     Q. I'm trying to understand the portion of your
12 Complaint here that says Putnam retaliated against
13 females, including you, because you objected to
14 discriminatory and dispirit treatment.
15     A. Well, I have a retaliation claim.
16     Q. I know you have a retaliation claim. I'm
17 trying to understand when Putnam retaliated against
18 you in response to what you say it retaliated.
19     A. My retaliation claim, I think, speaks for
20 itself.
21     Q. Well, you lived through it, so why don't you
22 just help me.
23     A. Okay.
24     Q. Tell us the statement and how they

**Page 215**

1  retaliated.
2      A. They took away my stock after paying me
3  dividends for 15 months on the stock and, you know,
4  I tried, when I was in the September 15th meeting
5  with Mary McNamee wherein she outlined the severance
6  package. She held up a piece of paper that was a
7  summary of the stock plan. And she said to me,
8  There will be no problem with the stock. And I
9  said, You mean the stock I put in to sell today?
10 And she said, Yes, and rest will vest in March,
11 March 15th. And you need to hold the stock for six
12 months. And I said, That stock is going to vest
13 March 15th? And she said, Yes.
14         So March 15th rolled around, the window
15 period in March, after the 15th, and I wrote a
16 letter to Putnam and said, Could I please sell my
17 stock? And I was responded to -- which is all in
18 the Complaint -- by Mitch Schultz saying, you know,
19 It's not your stock, whatever. You didn't sign the
20 separation agreement releasing us from our legal
21 claims, from the legal claims, which I consider to
22 be denying me my legal right to assert my civil
23 rights as a woman.
24         And they continued to pay -- this was

**Page 216**

1  when I just had the MCAD Complaint, the lawsuit
2  wasn't filed until December. And it was in December
3  in another letter, I think this time from Rick
4  Tibbetts, that they said that they had cancelled all
5  my stock as of, you know, after that claim was
6  filed.
7      Q. So the reference in Paragraph 2 to
8  retaliation against females, and in particular, you,
9  has to do with what is then alleged in Paragraph 3,
10 that you didn't get various of your unvested stock.
11 Is that the retaliation against females that you're
12 talking about?
13     A. Hang on. It's hard for me to understand
14 this question. In Paragraph 2 this allegation
15 relates to Paragraph 3?
16     Q. Paragraph 2 talks about retaliation against
17 females, including you, who object to discriminatory
18 treatment. You then explained to me that you didn't
19 get your unvested stock; is that correct?
20     A. Well, that's my retaliation claim that I
21 made.
22     Q. That's what is referred to in Paragraph 3;
23 is that correct? I'm trying to make sure I
24 understand your allegation, that's all.

**Page 217**

1      MR. WEIR: No. I think that's an
2  incorrect reading of Paragraph 3.
3      MR. KOCIUBES: Well, let's have the
4  witness testify.
5      MR. WEIR: Well, note my objections. I
6  think it mischaracterizes the allegations of those
7  two paragraphs.
8      A. Am I allowed to confer with my lawyer before
9  I put this testimony on so that I can understand it?
10     Q. I'd prefer that you answer it and then if
11 you want to talk to your lawyer, go ahead. I'd like
12 to get your answer, not counsel's.
13     MR. WEIR: Note my objection.
14     A. I don't feel good about that.
15     Q. If you can't answer it, just tell me and we
16 will move on.
17     A. I'm reading. Well, there's the matter of my
18 deferred compensation, which they've continued to
19 hold on to and continue to send me statements on.
20     Q. And that's compensation which isn't due to
21 be paid yet for a while, right?
22     A. It was vested.
23     Q. So, we'll do that one at a time, then.
24     A. All the ones --

55 (Pages 214 to 217)

Lisa Svensson                                                              11/30/2005,

Page 218

1    Q. What you're referring to in Paragraph 2 are
2  things that happened around your termination; is
3  that correct?
4         MR. WEIR: At her termination? Is that
5  the question?
6    A. I'm having a hard time with this. I am
7  having a hard time understanding your question. So
8  I guess the answer is, I can't answer this right now
9  because I can't understand this question.
10   Q. I'm having a hard time understanding that
11  allegation. I apologize.
12        Go back to Exhibit 3, then, Mr. Brooks'
13  memo of September 3.
14   A. Mm-hmm.
15   Q. And I think we've talked about options one
16  and two, correct?
17   A. Mm-hmm.
18   Q. And option 3 was that you would leave
19  immediately and execute a separation agreement,
20  correct?
21   A. Okay.
22   Q. And that's what you were told on September
23  3, correct?
24   A. Yes.

Page 220

1  can offer you a severance package and it would
2  include 18 weeks and a lump sum payment of $250,000
3  and I can get you your deferred. And I was like, my
4  deferred? That's part of it, you know, or something
5  like that and he said, Yes. This is just you and me
6  talking. This is not HR here in the room. And this
7  is what he outlined.
8         So when he discussed it with me, he
9  didn't say anything about I wasn't entitled to it or
10  something else. And my view of that deferred is
11  that that deferred is money that I earned, that I
12  was told it was compensation at the time that I
13  earned it.
14   Q. You've been in the financial services
15  industry for a number of years, right?
16   A. Yes.
17   Q. How many years experience did you have?
18   A. At the time I left?
19   Q. Or as of today.
20   A. 16.
21   Q. 16 years. And as a financial professional
22  with 16 years experience, you understand the
23  difference between vested and unvested; do you not?
24   A. Yes, I understand the difference.

Page 219

1    Q. Okay. And you understood, did you not, that
2  if you didn't execute the separation agreement, you
3  wouldn't get the voluntary payments; did you not?
4    A. Say that again. I understood that I --
5    Q. Let me put it this way: You had no contract
6  which guaranteed you 18 weeks of separation pay, did
7  you?
8    A. This was their offer.
9    Q. Okay.
10   A. This was their offer.
11   Q. And you had no contract that gave you a
12  right to a lump sum payment of $250,000 upon
13  separation, correct?
14   A. No. I don't believe I had a contract, no.
15   Q. And similarly, you had no right, you
16  understood at this time, to various parts of
17  compensation which had not vested?
18   A. Well, my view, and I asked for that these
19  parts of compensation that had not vested that
20  you're talking about are my deferred, which I
21  consider and have always considered to be
22  compensation paid to me.
23        And the way that he presented this to me
24  verbally before he wrote this down was, you know, I

Page 221

1    Q. That's not a foreign concept to you,
2  correct?
3    A. No, it's not a foreign concept.
4    Q. And by September 3 of 2003, you were already
5  talking with counsel; were you not?
6    A. Yes.
7    Q. So that you had the ability to, if you chose
8  to exercise it, to get advice?
9    A. Yes.
10   Q. And you if you didn't know what vested or
11  unvested or any of that meant you had the ability,
12  if you choose, to exercise it to get advice?
13   A. Yes.
14   Q. And Putnam, when you got this September 3
15  memo, didn't tell you you had 12 seconds to make a
16  decision, right?
17   A. No.
18   Q. And then you still, as of September 15th, as
19  of the beginning of the day, you still hadn't
20  accepted one of the three and you were still at
21  Putnam, right?
22   A. Mm-hmm.
23   Q. I'm sorry. Yes?
24   A. As of September 3rd, I was still at Putnam.

56 (Pages 218 to 221)