**Exhibit C 12
to
Affidavit of Kevin F. Moloney,
February 15, 2008**

**Excerpt(s)
Svensson deposition Day Two**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 04-12711

LISA SVENSSON,

    Plaintiff,

VS

PUTNAM INVESTMENTS, LLC,
F/K/A PUTNAM INVESTMENTS, INC.
AND LAWRENCE J. LASSER,

    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

LISA SVENSSON

February 1, 2006
10:11 a.m.

Nixon Peabody, LLC
100 Summer Street
Boston, Massachusetts

Laurie J. Driggers, Notary Public, Certified Shorthand Reporter,
Realtime Professional Reporter and Certified Realtime Reporter
within and for the Commonwealth of Massachusetts

Page 2

1           APPEARANCES:
2   ON BEHALF OF PLAINTIFF:
3   JOHN K. WEIR, ESQUIRE
4     John K. Weir Law Offices, LLC
5     300 Park Avenue, Suite 1700
6     New York, New York 10022
7     212.572.6374
8     Johnkweir4@aol.com
9   ON BEHALF OF PUTNAM INVESTMENTS, LLC:
10  JOSEPH L. KOCIUBES, ESQUIRE
11  LOUIS A. RODRIQUES, ESQUIRE
12    Bingham McCutchen LLP
13    150 Federal Street
14    Boston, Massachusetts 02110-1726
15    617.951.8890
16    Joe.kociubes@bingham.com
17    Louis.rodriques@bingham.com
18  ON BEHALF OF LAWRENCE J. LASSER:
19  DAVID S. ROSENTHAL, ESQUIRE
20    Nixon Peabody, LLC
21    100 Summer Street
22    Boston, Massachusetts 02110
23    617.345.6183
24    Drosenthal@nixonpeabody.com

Page 3

1           DEPOSITION OF LISA SVENSSON
2              FEBRUARY 1, 2006
3              PROCEEDINGS:
4         MR. ROSENTHAL: We're going
5   to just continue the deposition exhibit
6   numbers, even though this is a different
7   deposition. I figure that's the most
8   convenient way to do that. And I think
9   we went to 14.
10        So what I'd like to do, if we
11  could, is mark the Complaint as Exhibit
12  No. 15, the First Amended Complaint, and
13  the Charge filed by Miss Svensson at the
14  MCAD as Number 16.
15        (Exhibit-15, First Amended
16  Complaint and Jury Demand; Exhibit-16,
17  Charge filed at MCAD, premarked for
18  identification).
19        LISA SVENSSON, the deponent, having
20  been satisfactorily identified and duly
21  sworn by the Notary Public, was examined
22  and testified as follows:
23           EXAMINATION
24  BY MR. ROSENTHAL:

Page 4

1        Q. Miss Svensson, this is the
2   deposition, your deposition being taken by
3   the defendant, Lawrence Lasser in the case
4   which you've brought against Putnam and
5   Mr. Lasser.
6        I will be referring from time to
7   time to the transcript of the deposition
8   that was done by Putnam of you back on
9   November 30, 2005. If you have a copy of
10  that. If not, I'll -- I'll provide it to
11  you, and we can share and look on.
12       MR. WEIR: Well, let me
13  just state for the record that I don't
14  believe that we have received from
15  Putnam's counsel the original transcript of
16  that deposition. And so as far as the
17  original goes, I haven't -- haven't seen
18  it. We do, of course, have a copy of it.
19  We were provided with a copy of the
20  transcript. But my client has not had an
21  opportunity to review and sign the
22  original of that deposition.
23       MR. ROSENTHAL: Okay.
24       MR. KOCIUBES: Wait a

Page 5

1   minute. Let me just make sure I
2   understand, because normally the party
3   taking the deposition gets and keeps the
4   original.
5        My recollection was that you
6   ordered a copy; no?
7        MR. WEIR: Yes.
8        MR. KOCIUBES: You do have
9   a copy. So Ms. Svensson has had access
10  to a copy of her transcript?
11       MR. WEIR: We're not
12  disputing that.
13       MR. KOCIUBES: Okay.
14       MR. WEIR: Let's go off the
15  record.
16       (Off the record at 10:14
17  a.m.)
18       (Recess taken).
19       (Back on the record at 10:14
20  a.m.)
21  BY MR. ROSENTHAL:
22       Q. So I was saying that I'm going to
23  be referring from time to time, and I'll
24  show you a copy of the transcript of your

Page 46

1    BY MR. ROSENTHAL:
2    Q. I withdrew my question. You don't
3    need to make a long list of people.
4    A. Paul Warren. Omid Kamshad.
5        THE WITNESS: Would you mind
6    if I get more water?
7        MR. ROSENTHAL: Sure.
8    Please.
9        (Off the record at 10:57
10   a.m.)
11       (Recess taken).
12       (Back on the record at 10:58
13   a.m.)
14   BY MR. ROSENTHAL:
15   Q. Other than the congratulations that
16   you gave to Ms. Mullen, which you've just
17   described for us, did you have any other
18   conversations with her about her new
19   position?
20   A. I don't think so.
21   Q. Okay. So we were trying to -- I
22   was trying to get a list of people to
23   whom you reported during your tenure. We
24   talked about Mr. O'Donnell --

Page 47

1    A. Mm-hmm.
2    Q. -- who reported to Mr. Carman who
3    reported to Mr. Lasser.
4    A. Right.
5    Q. Who was the next person to whom you
6    reported directly?
7    A. Robert Swift.
8    Q. And what was Mr. Swift's position?
9    A. He was Chief Investment Officer of
10   International Growth Equity.
11   Q. And when did you begin reporting to
12   Mr. Swift?
13   A. December of '97.
14   Q. And that was when you left Research
15   and moved to -- moved to becoming part of
16   the International Growth Equity team?
17   A. As a portfolio manager, yes.
18   Q. By the way, did you consider that a
19   promotion?
20   A. That's interesting. What's very
21   interesting about that, I -- I was hired
22   in as a vice president and analyst in the
23   Research Department. I was promoted, in
24   1995, to senior vice president while I was

Page 48

1    still in the Research Department. I was
2    then given the opportunity to move into
3    International Growth Equity, having already
4    been a senior vice president for several
5    years.
6        And I very much wanted to become a
7    portfolio manager. I had expressed this
8    desire to Patrick O'Donnell on many, many
9    occasions. And Patrick had set, as his
10   goal, to establish a career path for
11   analysts that was equivalent to that of a
12   portfolio manager. And he reiterated his
13   goal many times. And so I considered it
14   a promotion to move into the International
15   Growth Equity team.
16       Patrick and Robert Swift and I had
17   a conversation, shortly before I moved
18   into that team, where Robert committed --
19   Patrick asked Robert, and Robert committed
20   to the fact that I would be moved into
21   this team and be at exactly the same level
22   as Kelly Morgan, who was, at the time, she
23   came in December of '96, she was a person
24   who was hired in from the outside. And

Page 49

1    her position at the time was senior vice
2    president, senior portfolio manager.
3        And Patrick O'Donnell said to
4    Robert Swift, "Lisa will be moving in as
5    senior vice president, senior portfolio
6    manager, same exact level as Kelly,
7    correct?" And Robert said, "Yes." And so
8    I moved into the team already as a senior
9    vice president.
10       I went to order my business cards,
11   and from the administrative assistant that
12   I ordered the business cards from, I found
13   out -- I asked for the title that I was
14   told, and she said, "Robert says that,
15   just to put 'Portfolio Manager' on it."
16       And so I went to Robert and said,
17   "Why am I not what you promised I was
18   going to be? So is that a promotion or
19   is it not a promotion?"
20       Patrick announced it as a lateral
21   move. I, myself, considered a portfolio
22   management job to be a promotion and to be
23   a better job. But either way, it wasn't
24   the job that was represented to me when I

Page 18

1   a lunch in 2002, with your team. Are
2   there any other conversations that you had
3   with Larry Lasser about what you would
4   consider HR matters during your entire
5   tenure at Putnam?
6       A.  Well, there was another lunch that
7   I had with Larry, and this was individual,
8   and it was sometime in the months after
9   September 11th, 2001. And we were -- we
10  had met up in the dining room, in the
11  corporate dining room.
12      And we began to discuss the issues
13  about 2000 -- about 9/11. He and I had a
14  bit of an ongoing conversation of how
15  traumatic it had been. He gave a voice
16  mail to the whole firm at that time which
17  touched me personally, and I responded to
18  him through an e-mail. And I told him
19  that what he had said on the group voice
20  mail to the firm had touched me. He
21  responded to me with a written note. And
22  so we began a dialogue shortly after
23  September 11th.
24      So one day we went in the dining

Page 19

1   room. We sat down and had lunch together.
2   And we started talking. And the subject
3   moved -- moved to me and to my family and
4   my family situation.
5       At this point in 2001, I had had
6   two pregnancies at Putnam. I had two
7   children. I was married. And he asked
8   me what my husband did for a living. I
9   told him that my husband was a
10  stay-at-home father. And at that point,
11  Larry said to me -- he said, "He's a
12  stay-at-home father. Wow, that's
13  fascinating. How does that make him feel?
14  I mean, as a man, how does that make him
15  feel?" And I -- I wasn't quite sure what
16  he meant.
17      And he said, "Well, for example, if
18  you're at a cocktail party, and someone
19  says to him, What do you do for a living?
20  How does that make him feel when he says,
21  I'm a stay-at-home father?
22      And so I said to him, you know, my
23  husband is quite an interesting individual.
24  He has a lot of interests. He knows a

Page 20

1   lot about music, art. He speaks another
2   language. People like to talk to him
3   about all kinds of things, not just what
4   he does for a living and they find him
5   fascinating.
6       And so I consider that, in a way,
7   to be an HR matter. And the reason I
8   consider it that is because he was
9   expressing a fair amount of discomfort in
10  that conversation with the concept that a
11  man would be a stay-at-home father and not
12  be upon a career track.
13      And I considered him, as the head
14  of the organization and setting the tone
15  for the organization, to be really kind of
16  saying to me, Your family situation makes
17  me uncomfortable and is not okay with me.
18      Q.  Of course, he didn't say "Your
19  family situation makes me uncomfortable,"
20  did he?
21      A.  No. What he said was, "How does
22  that make your husband feel as a man?"
23      Q.  He said, if I'm correct, and
24  correct me if I'm wrong, he said, "Wow,

Page 21

1   that's fascinating. How does that make
2   him feel?"
3       A.  As a man.
4       Q.  Mm-hmm.
5       A.  Not just, "How does that make him
6   feel?" As a man.
7       Q.  All right. And you consider that
8   to be an HR matter?
9       A.  I consider setting the tone in the
10  organization about how people have
11  families, how the family structure works
12  out, an HR matter, yes.
13      Q.  When did this conversation take
14  place?
15      A.  It was shortly after September
16  11th.
17      Q.  You said Mr. Lasser's e-mail
18  touched you. In what way did it touch
19  you?
20      A.  He said a lot of different things,
21  and one of the things he said was, "You
22  should kiss your children tonight." It
23  was the day after or the day of September
24  11th, one or the other. And that's what's

Page 78

1   I'm interested now in specific examples of
2   your observation, that is, what did you
3   see, what did you hear, what did you
4   touch, what did you feel, your personal
5   observation of Mr. Lasser being involved
6   in human resources issues.
7       I'm not interested in hearing about
8   what you learned from other people, nor am
9   I interested in your assumptions. I'm
10  asking specifically now about your
11  particular observations.
12          MR. WEIR:  Note my objection
13  to the form of the question.
14          BY MR. ROSENTHAL:
15  Q.  What did you see?  What did you
16  hear, directly from Mr. Lasser?  What did
17  you touch?  What did you feel?
18  A.  I testified earlier to most of the
19  conversations, I think every conversation I
20  had with him.
21  Q.  Yes, you did.
22  A.  So, you know, to the extent that my
23  testimony talks about HR issues, that is
24  the extent of my own personal observation

Page 79

1   of Mr. Lasser.
2   Q.  Okay.
3   A.  Live, in person.
4   Q.  All right.  Now, is it fair to say
5   that it was your observation that Mr.
6   Lasser micromanaged the promotions as well
7   as the demotions?
8   A.  Yes.
9   Q.  Was it your observation that Mr.
10  Lasser micromanaged the raises as well as
11  the diminutions in people's compensation?
12  A.  Well, you know, when you -- when
13  you said before, I can't say anything
14  about anyone -- anything anyone told me,
15  if it's something that a boss of mine told
16  me that Larry did this or Larry did that,
17  I consider that to be my observation, not
18  just heard through the grapevine, so...
19  Q.  Well, I'm really not interested in
20  the grapevine.
21  A.  Mm-hmm.
22  Q.  Okay.  Grapevine doesn't cut it in
23  a lawsuit.
24  A.  Discussions -- discussions with my

Page 80

1   boss about, you know, there's not going to
2   be this or that this year, because Larry
3   said this is my observation.
4   Q.  Okay.  And it's only, then, through
5   what other people told you that Mr. --
6   that your observations regarding Mr. Lasser
7   micromanaging raises and diminution of
8   employment -- diminution of compensation
9   were managed?
10  A.  What my supervisors told me, yes.
11  Q.  Okay.  And in this particular
12  instance, are we talking about Mr. Swift?
13  A.  There's more than one instance.
14  Q.  Okay.  And who besides Mr. Swift
15  are you referring to?
16  A.  Mr. Landes and Mr. Brooks.
17  Q.  Specifically, what did Mr. Brooks
18  tell you in this regard?
19          MR. WEIR:  "In this regard"
20  being?
21          MR. ROSENTHAL:  Hmm?
22          MR. WEIR:  "In this regard"
23  being?
24          MR. ROSENTHAL:  This,

Page 81

1   regarding Mr. Lasser's micromanaging
2   promotions, raises, diminution of
3   compensation.
4   A.  I believe I've testified in the
5   prior deposition about the situation when
6   Mr. Brooks arrived in our department, that
7   Larry had chosen not to make managing
8   director promotions in 2003.
9       So I mentioned that I had heard
10  that -- I had heard that from Mr. Landes,
11  and I mentioned to Mr. Brooks, and Mr.
12  Brooks then checked it out, got back to
13  me, and said I was correct.
14  Q.  Anything else that Mr. Brooks told
15  you in this regard?
16  A.  You're talking specifically about
17  promotions?
18  Q.  Promotions, raises, diminution of
19  compensation.
20  A.  Firings?
21  Q.  Okay.  Firings.  What else did Mr.
22  Brooks tell you about firings?
23  A.  Well, when I raised with Mr. Brooks
24  the issue of directed brokerage