UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON, <br><br>             Plaintiff, <br><br>       v. <br><br> PUTNAM INVESTMENTS, LLC and LAWRENCE J. LASSER, <br><br>             Defendants. | CIVIL ACTION <br> NO. 04-12711 PBS |

## PUTNAMS'S REPLY TO SVENSSON'S OPPOSITION TO PUTNAMS'S MOTION FOR SUMMARY JUDGMENT

Defendant, Putnam Investments ("Putnam"), submits this Reply Memorandum in connection with its motion for summary judgment dismissing plaintiff Lisa Svensson's ("Svensson") Amended Complaint.

## INTRODUCTION

In her opposition to Putnam's motion for summary judgment ("Opp."), Svensson undertakes no analysis at all of the factual basis for any of her claims, or any of Putnam's defenses. (Indeed, her Opposition does not even contain a Statement of Facts reciting her version of the events material to her claims). Instead, Svensson simply submits over 450 pages of material and then informs the Court that her evidence of pretext and gender animus can be found somewhere in that mass of material. For example, with respect to her termination claim (her only claim that is not time-barred or preempted), Svensson's opposition does not point to a single fact that contradicts that Putnam terminated her after she refused to accept her management's decision that she could no longer manage analysts (this after two of Putnam's most highly-regarded analysts threatened to quit rather than continue to work with her). Rather,

Svensson directs the Court to cull through her 450 pages of opposition material, asserting that evidence of pretext will be found somewhere therein. *See, e.g*, Opp. at 3, 5-6.

Svensson's approach in her opposition is itself grounds for granting summary judgment. *See Quinones v. Buick,* 436 F.3d 284 (1st Cir. 2006) (affirming summary judgment dismissing Title VII and c. 151B claims because plaintiff did not meet his burden of showing pretext).  In *Quinones*, the First Circuit agreed with the district court that plaintiff "had not met his burden at the third stage, stating particularly that 'his opposition memorandum is woefully deficient and that 'it is not the court's responsibility — let alone within its power — to cull the entire discovery record looking for facts which might convert such a bald assertion [of discrimination] into a triable issue.'" 436 F.3d at 290, citing district court opinion (2005 WL 1668195).  As in *Quinones,* Svensson asks this Court either to do the "culling" for her or, more likely, just to accept Svensson's conclusory assertions that evidence of a factual dispute exists in the papers. The Court should not be put to the burden of the former, nor can it do the latter.  Putnam's motion should be allowed.

## I.    SVENSSON'S DEMOTION, PROMOTION AND COMPENSATION CLAIMS UNDER TITLE VII AND CH. 151B ARE TIME-BARRED.

In her opposition, Svensson does not offer any evidence disputing that (other than her termination) the alleged adverse actions about which she complains occurred within the 300-day limitations period imposed by Title VII of the Civil Rights Act of 1964 ("Title VII") and Mass. Gen. Laws ch. 151B ("ch. 151B").[1]  Instead, she argues that her failure to file within the

---

[1] Throughout her opposition, without citation to the record, Svensson asserts in conclusory terms that discriminatory actions occurred within the limitations period. *See, e.g.,* Opp. at 10 ("[M]uch of the conduct on which Svensson relies occurred within the 300 days prior to March 1, 2004"); Opp. at 11 ("[M]any of Putnam's actions relative to her claims concerning promotion, demotion, termination, and compensation occurred within the 300 days prior to her filing of the MCAD charge").  Such conclusory generalizations are insufficient to defeat summary judgment. *See Gonzalez-Pina v. Rodriguez*, 407 F.3d 425, 431 (1st Cir. 2005) ("[S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") (citations and quotations omitted).

limitations period is saved by a "discovery rule" or the "systemic violation" doctrine, or because the alleged adverse actions were "equivocal.  None of these arguments has merit.

    **A.**    **A Discovery Rule Does Not Save Svensson's Untimely Claims**

        **1.**    **Because Svensson's Claims Are Based on Discrete Acts, the Discovery Rule Is Deemed Satisfied as a Matter of Law**

The First Circuit has declared that "[t]he rule in an employment discrimination case is that the limitations period begins to run when the claimant receives unambiguous and authoritative notice of the discriminatory act (*which is another way of saying that the period begins to run when the employee learns of the adverse employment action.*)." *Morris v. Gov't Dev. Bank of Puerto Rico,* 27 F.3d 746 (1st Cir. 1994) (emphasis added).  *See also Conners v. Maine Medical Center,* 42 F.Supp.2d 34, 51 (D.Me. 1999) ("Consistent with the discovery rule, the Court finds that a claim … accrues when a plaintiff receives final and definite notice of the allegedly discriminatory decision.").  Discrete employment actions – such as compensation, demotion, failure to promote and termination – are all accompanied by "definite notice" as a matter of law -- that is, they are actions that Svensson is deemed to have "known" could cause her harm as soon as they were communicated to her.  *See Morris,* 27 F.3d at 350 ("It is by now well established that, in employment discrimination actions, limitations periods normally start to run when the employer's decision is made and communicated to the affected employee."); *see also* Memorandum of Law in Support of Putnam Investments' Motion for Summary Judgment ("Putnam Memo") at 14.

Svensson thus is deemed to have "discovered" that she had a claim when the alleged adverse actions were communicated to her, and *not* at sometime thereafter when she claims she learned of any alleged discriminatory animus behind the actions.  In *Morris,* plaintiff's §1983 claim was dismissed as time-barred, based upon the date that the adverse employment action first was communicated to the plaintiff.  *Id.*  In looking to when the "clock began to tick," the First Circuit made clear that "the point in time at which the consequences of the act become hardest to bear – which may or may not coincide with the occurrence of the act itself – has no relevance for

A/72437350.4/0398860-0000312913

the purposes of framing the limitations period." *Id.* at 749. The court rejected plaintiff's argument that "his cause of action existed in what amounts to a state of suspended animation until he became aware of the racial and political motives behind the adverse employment decision." *Id.* at 749-750. This standard applies in all employment discrimination contexts. *See Comm. of Mass. v. Bull HN Info. Systems, Inc.,* 143 F.Supp.2d 134, 153 n.46 (D.Mass. 2001) ("[T]he First Circuit has since cited *Morris* as a 'categorical' statement of the standard for determining when the limitations period begins to run in the employment discrimination context.") (citing *American Airlines v. Cardoza-Rodriguez,* 133 F.3d 111, 123 (1st Cir. 1998)).[2] In short, the First Circuit flatly rejects Svensson's assertion that "a claim does not accrue until the plaintiff knows or reasonably should know <u>both</u> of the adverse employment actions <u>and</u> that such actions were discriminatory." Opp. at 11-12.[3]

---

[2] *Silvestris* does not alter the analysis for Svensson's compensation claims. As a preliminary matter, the "discovery rule" in *Silvestris* only addressed plaintiffs' *MEPA* claims, and not c. 151B or Title VII claims. Further, the SJC conceded that "[o]ne need not apprehend the full extent or nature of an injury in order for a cause of action to accrue," (847 N.E.2d at 337, citation omitted). Rather the limitations period begins to run when the plaintiff "knows, or should have known that she has been harmed by the defendant's conduct." Unlike Svensson, who asserts that she suspected that she was the victim of discriminatory conduct by Putnam since 1998 (Fifth Aff. ¶ 2 *et seq.*) and admits she had such knowledge at "the end of 2002" (Sixth Aff. ¶ 23), in *Silvestris* the plaintiffs did not even "beg[in] to suspect discriminatory payment of wages" until 1998, five years after receiving their first paycheck. 847 N.E.2d at 337.

[3] Svensson relies upon *Comm. of Mass. v. Bull HN Info. Systems, Inc.* There, the district court (Gertner, J.) concluded that the 300-day limitations period did not apply *at all* to the EEOC or the Commonwealth of Massachusetts. More importantly, the Court's entire discussion concerning the individual employees' knowledge of facts sufficient to alert them to the existence of a potential age claim was inextricably intertwined with her conclusion that Bull failed to comply with the informational requirements imposed by the Older Workers Benefit Protection Act in connection with the signing of releases of age discrimination claims. The district court concluded: "In this case, there is no evidence that terminated Bull employees were aware of any specific age-related qualifications for the company's RIFs. Further, at least with respect to Bull's 1994 Releases, the information provided to affected employees [by Bull pursuant to the OWBPA's informational requirements] was entirely inadequate to apprize them of any such qualifications. 143 F. Supp. 2d at 155-56. Nothing in *Bull* supports the general application of a discovery rule in a "discrete acts" case.

>    **2.     Even If a Discovery Rule Applied, Svensson Believed that She Was the Victim of Gender Discrimination Long Before the 300-Day Limitations Period Commenced.**

Svensson does not (and cannot) argue that she was unaware of each discrete allegedly discriminatory act (pay, demotion, and failure to promote) on the date that each act occurred and was communicated to her – in each case for more than 300 days before she filed her charge of discrimination with the MCAD.   Svensson's annual salary, bonus awards and equity compensation were communicated to her by March 15 of each year (Tibbetts Aff. ¶ 13); her transfer to GER was communicated to her in March 2002 (Svensson's Sixth Aff. ¶12); and the fact that she was not promoted to the MD position was made known to her by March of each year (Tibbetts Aff. ¶5).   The fact that she was not promoted to MD in 2002 (the last year during her employment when MD promotions occurred in the Investments Division) was communicated to her in "early 2002" (Svensson's Sixth Aff. ¶11).

Further, even if a discovery rule were to require that Svensson believe that the employment actions were discriminatory (which it does not), Svensson held that belief for more than 300 days before bringing her claims.   Although her opposition asserts, *again without any specific record citation*, that Svensson did not know she was the victim of gender discrimination, her affidavits, testimony and diary demonstrate the opposite.   Svensson's affidavits do not *say* that she was unaware of the existence of gender animus.   Moreover, even a cursory glance at the two affidavits that Svensson submitted with her opposition makes clear that Svensson has believed since 1998 that she was the victim of discrimination.   *See, e.g.,* Fifth Aff. of Lisa Svensson, ¶¶ 2 *et seq.*   Finally, Svensson has *always* believed that the specific, alleged adverse actions of which she *now* complains were the result of gender bias.   For example:

Promotion claim

- "In the *summer of 2001*, I approached Tim Ferguson … to ask why I was being denied promotional opportunities." She met with Mr. Oristaglio, Mr. Tibbetts, Ms. Holder-Watts, and Ms. Scordato to discuss why she was being denied promotional opportunities. Svensson Sixth Aff. at ¶10 (emphasis added).   She states that "*[i]n early 2002*, I again was not promoted to MD." Id. at ¶ 11 (emphasis added).

A/72437350.4/0398860-0000312913

- In her deposition, Svensson was asked: "At what point, if ever, did you conclude that you were being treated differently because of your gender?" She responded: "It was, as I said, the entirety of my experience at Putnam. … And when did I see that it applied to me? It applied to me as I went. Different remarks when I had my pregnancy, my second pregnancy, *when I was denied promotion the second time [in 2002]*…" Svensson Dep. 79:13-80:12 (emphasis added), attached to the Supplemental Kurker Affidavit as <u>Exhibit</u> <u>A</u>.

Demotion claim:

- "*In March 2002*, I was abruptly told that I was being "reassigned" back to the Research Department,"  and "[a]fter learning of my demotion to the research department, I met with Holder-Watts of HR and was told that there were no Portfolio positions available to me… ." Sixth Aff. ¶ 12 (emphasis added).

- "*[A]t the end of 2002*, I learned that males who had been my contemporaries in GER originally, but who had been transferred out of GER and into portfolio management positions, were not demoted…" <u>Id</u>. at ¶ 23 (emphasis added).

Compensation claims:

- "I learned at the *end of 2002* that several male analysts were receiving compensation of well over $1,000,000 (while my compensation of approximately $1.65 million in 2000 and 2001 had been cut to approximately $650,000 in 2002). Sixth Aff. ¶ 22 (emphasis added). "*[A]t the end of 2002*, I learned that males who had been my contemporaries in GER originally … were receiving compensation…at a much higher level than I was." Sixth Aff. ¶ 23 (emphasis added).

All of these events occurred well before the May 6, 2003, start of the 300-day limitations period.

In addition to these admissions, as noted in Putnam's principal brief (Putnam Memo. at 13, n.3), in April 1998 – years before the expiration of the 300-day limitations period – Svensson began keeping a diary of work-related events because she believed she was being discriminated against and "just thought I would want to write these things down." Svensson Dep. at 18-19 (Putnam Brief, <u>Tab</u> <u>15</u>). Thus, even if the discrete nature of the allegedly discriminatory acts somehow is insufficient by itself to impute knowledge to Svensson on the date the acts occurred (which it is under applicable precedent), Svensson's actual belief that she was subject to discrimination triggers the statute of limitations. *See, e.g., Turner v. Correction Medical Services*, No. Civ. A. 03-048-SLR, 2003 WL 22037712, *2 (D. Del. Aug. 20, 2003) ("It is clear

from plaintiff's daily journal ... that he was aware of the alleged injuries" before the tolling of the statutory period.).  The discovery rule does not help Svensson.

### B.    The Systemic Violation Theory Does Not Save Svensson's Claims

Svensson attempts to resuscitate her claims by affixing the label: "systemic continuing violation."  She argues that she "has been harmed by the application to her of a general discriminatory policy at Putnam aimed at all women, which policy continued to exist into the limitations period."  (Opp. at 15).  Yet, Svensson's points to no specific *evidence* supporting the existence of a general Putnam *policy* of discriminating against women.  Instead, she cites only ¶ 23 of her Amended Complaint (Opp. at 17), despite the fact that a complaint's allegations cannot defeat summary judgment.  Fed. R. Civ. P. 56(e) ("when a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial"); *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 286 (1968).

Svensson's affidavits appear to contain only three conclusory and argumentative allegations that three females (of the many thousands then employed by Putnam) suffered discrimination.[4]  Such conclusory allegations cannot defeat Putnam's motion for summary

---

[4]    In Svensson's Fifth Affidavit, ¶ 9, she states "Swift said that Erin Spatz could not go to the International Core team because 'she would be the wrong sex for that'."  Svensson gives no context for these remarks.  For example, she offers no evidence that an opening actually existed in International Core, that Spatz was interested in or applied for any such opening, or who made the decision not to offer the Spatz the opening (if one existed and if Spatz was interested), or why.  Svensson quotes Swift, *Svensson's* supervisor in Global Growth, without evidence that he was a decisionmaker for International Core or even what the basis of his alleged remark was.  She deposed neither Swift nor Spatz.  On this record, Swift's alleged hearsay remark is nothing more than speculation by a non-decisionmaker, and would be insufficient to support the existence of gender animus if this case involved *Spatz's* claim, much less Svensson's claim.  *See Velazquez-Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 11 (1st Cir. 2007) (comment by non-decisionmaker incapable of supporting inference of pretext).

In Svensson's Fifth Affidavit, ¶14, she states "In September, 2001, Lauren Allansmith went on maternity leave with the title Associate Director of Research ("ADR").  When she came back, she was no longer an ADR.  She had been demoted to analyst."  It is unclear what one vignette in an organization with thousands of employees proves.  Moreover, Svensson again relies on her own belief as to what happened and why, offering no evidence of whether Allansmith was "demoted" (if she was), or why.

(Footnote Continued on Next Page.)

- 7 -

judgment.  *Ingram v. Brink's, Inc.,* 414 F.3d 222, 228-29 (1st Cir. 2005) ("summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.").  Svensson's self-serving affidavits are devoid of even a suggestion that women *generally* were subjected to a general "discriminatory policy."  Indeed, Svensson's own expert, Dr. Paul White, could find no statistically significant evidence of company-wide gender discrimination (*see, e.g.* White Report at 14 and testimony of Paul White, ("White Dep."), at 35-39, 50 and 83 (Putnam Memo, <u>Tab 21</u>, Putnam Memo. at 16-17, 19, 22, 24).  Without identifying a company-wide *policy* which discriminated against women, Svensson cannot resuscitate stale claims by invoking the phrase "systemic continuing violation."

What Svensson also misses is that, as a matter of law, "discrete discriminatory acts against an individual employee, even if repeated, do not constitute a general practice (and, therefore, do not constitute a systemic violation.)".  *Grotlisch v. General Dynamics Defense Systems, Inc.*, 28 Fed. Appx. 3, 2002 WL 253928, *5 (1st Cir. 2002).  In *Grotlisch, a case relied upon by Svensson*, the First Circuit refused to apply the systemic violation doctrine because the plaintiff did "not identify any *general* practice aimed at a class of employees as the predicate for [her] discrimination claims, but, rather, describe[d] discrimination arising solely from the employer's treatment of [her] alone." *Id.*  Grotlilsch, like Svensson, "boldly asserts that 'there was evidence that the policy was applied to others,'" but the First Circuit found that "[t]his [was] sheer persiflage. Our examination of the record reveals no such evidence, and the appellant

---

(Footnote Continued from Previous Page.)

Finally, in Svensson's Sixth Affidavit, ¶12, she states "In her March 2002, I was abruptly told that I was being 'reassigned' back to the Research Department. Two females, Kelly Morgan ("K. Morgan") and I were reassigned to GER."  Svensson is simply incorrect that Morgan was abruptly transferred to GER in March 2002; Morgan transferred from Global Growth to GER in the summer of 2001.  More importantly, Svensson offers no evidence that Morgan's transfer was due to her gender.  Lastly, Morgan testified that the transfer was *voluntary*.  Deposition of Kelly Morgan, 38-39, attached to the Supplemental Kurker Affidavit as <u>Exhibit B</u>.

- 8 -

identifies none." *Id.* Here, the record reveals no such evidence, and Svensson identifies none. *See also*, *Megwinoff v. Banco Bilbao Vizcaya,* 233 F.3d 73, 76 (1st Cir. 2000).

The other cases upon which Svensson relies offer her no help. In *Lynn Teachers Union Local 1037 v. MCAD*, 406 Mass. 515 (1990), the union adopted a *facially discriminatory policy* of requiring teachers to resign when they became pregnant. If the teacher later returned to work, she lost seniority credit for the years of teaching before the forced resignation (the so-called "refusal to credit" policy). The court held that the "refusal to credit" policy was a systemic continuing act of discrimination because the policy (which, unlike anything in this case, was an articulated, official policy) had "breath[ed] new life" into a prior illegal system. *Id.* at 522-523.

In *Ocean Spray v. MCAD,* a disability discrimination case also cited by Svensson, the court rejected application of the very doctrine that Svensson urges here. The court held that plaintiff's claims were time-barred because a "refusal to accommodate" claim is a discrete act *to which the systemic violation doctrine does not apply*. 441 Mass 632, 646, fn. 18. The SJC noted that an accommodation claim is "a determination made on a case-by-case basis," and thus is markedly different from *Lynn's* "refusal to credit" policy which "was the union's generally applicable, system-wide policy." *Id.* Svensson's reliance upon the systemic violation doctrine fails for the same reason it failed in *Ocean Spray:* the systemic violation doctrine is "inapplicable to discrete acts of discrimination against a specific individual." *Id.* Rather, it applies only to a general (typically facially discriminatory) system-wide *policy.* Svensson's conclusory and unsubstantiated assertions that Putnam "had a glass ceiling" or "a general discriminatory policy" do not satisfy her burden. *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 6 (1st Cir. 1998) ("an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason.").[5]

---

[5] Svensson also relies heavily on *Arroyo-Audifred v. Verizon Wireless*, Inc., 431 F.Supp.2d 215 (D.P.R. 2006). In *Arroyo-Audifred,* the district court denied defendant's *motion to dismiss* because the

(Footnote Continued on Next Page.)

Finally, Svensson cites *Muniz-Cabrero v. Ruiz*, in which the plaintiff brought a § 1983 claim alleging that his employer took an adverse employment action based on his political affiliation. 23 F.3d 607 (1st Cir.1994). The First Circuit affirmed summary judgment for the defendant, holding that the systemic violation doctrine could not save stale claims because the articulated practice, "a general political plot designed by defendants to harm and humiliate plaintiff," was "not enough." *Id.* Svensson's evidence is no better, with the result that her promotion, demotion, and compensation claims remain "discrete acts" and, therefore, *must* fall "within the appropriate time period." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 127 S.Ct. 2162, 2165 (2007).[6] Svensson concedes that she did not file her MCAD claim until May 2004 (Opp. at 10). As such, her Title VII and ch. 151B claims are time-barred.

## C.    Svensson Had Unequivocal Knowledge that She Had Been Transferred.

Svensson argues finally that the 300-day limitations period did not begin to run on her demotion claim when she was demoted because Putnam's notice to "Svensson of the demotion decision was equivocal as to whether the demotion was permanent or merely temporary until Putnam placed Svensson in another PM position." Opp. at 18. As is the case throughout her opposition, Svensson cites no record support for this assertion, leaving it to this Court to sift through her submissions. Svensson is wrong as a matter of fact and law.

Putnam transferred Svensson from Portfolio Manager in Global Growth to an analyst position in General Equity Research ("GER") in March 2002. Svensson offers no evidence that

---

(Footnote Continued from Previous Page.)

plaintiff articulated a policy that he believed constituted a systemic continuing violation. At the motion to dismiss stage, where discovery had not commenced, it remained to be seen whether plaintiff could adduce evidence of a system-wide discriminatory policy. At the summary judgment stage, Svensson's inability to adduce evidence of such a policy is fatal. Fed. R. Civ. P. 56(e); *First Nat. Bank of Ariz.,* 391 U.S. at 286.

[6] Svensson's promotion, demotion and compensation claims constitute "discrete acts." See Putnam's Memo at 12-14. Svensson concedes in her opposition that she is not pursuing a continuing violation theory based on these discrete acts. (Opp. p. 15).

- 10 -

the decision to transfer her to GER was equivocal, and any hope she had, unrequited or otherwise, that she might be promoted to Portfolio Manager in the future does not breathe life into a stale claim. *Delaware State College v. Ricks,* 449 U.S. 250, 258 (1980). In *Ricks,* a professor alleged national origin discrimination arising from the college's decision to deny him tenure. When the college notified Ricks that tenure had been denied, it gave him a final, one-year terminal contract. Ricks argued that the statute of limitations did not begin until the actual date of his termination -- not when he was notified that he had been denied tenure. The Supreme Court disagreed, ruling "the filing limitations periods []commenced at the time the tenure decision was made and communicated." *Id.* Svensson, like Ricks, may have hoped the situation would change -- but her unilateral hope does not toll the limitations requirements.

The cases on which Svensson relies are factually dissimilar to hers because they turn on the distinction between *notice* of a future adverse employment action and *effectuation* of that adverse employment action. In *Wheatley v. American Telephone and Telegraph Co.*, 418 Mass. 394, 399 fn. 8 (1994), the Superior Court granted summary judgment for the defendant employer, ruling that the plaintiff's age discrimination claims were time barred. On appeal, the SJC ruled that a letter received by the employee which informed him of his termination, but which also permitted him time in which to find other employment within company, did not trigger the running of statute of limitations. *Id.* The SJC explained that this limbo period – in which the employee still "held out the possibility of other employment within the company" – was insufficient notice that the termination decision was unequivocal. *Id*. at 398. Svensson's other cases are distinguishable for similar reasons. *See, e.g. Ross v. Raytheon Co.,* 2001 WL 1455863, *3 (Mass. Super. Nov. 1, 2001) (limitations period tolled during the "transition period" until the actual "date of [plaintiff's] termination"); *Hill v. Suntory Water Group, Inc*., 2003 WL 25278767, *2 (Mass. Super. Jan 30, 2003) ("sending Hill home" did not trigger the beginning of the statutory period for purposes of the handicap discrimination claim); *Harrison v. Kraft Foods, Inc.* 2007 WL 3232552, *3 (D.Mass., Oct 30, 2007) (termination equivocal where defendant told

- 11 -

plaintiff "that he would be reinstated when the DUI charges were resolved, either in his current position or a different position within the company.")

Putnam does not argue that the demotion limitations period began when Svensson received *notice* that she was being transferred to GER; arguably, until she was *actually* transferred the situation might have changed. Once Putnam *effectuated* the transfer in the spring of 2002 (over a year before the limitations period commenced), Svensson was on notice that her job responsibilities had unequivocally changed. Even if Putnam stated that it would try to find Svensson another portfolio management position, her demotion claim still would be untimely. *Adamczyk v. Augat, Inc.* 52 Mass.App.Ct. 717, 722 (Mass.App.Ct. 2001) (defendant's "statement that it would attempt to provide job opportunities cannot be construed as an equivocal termination notice."). Thus, Svensson's Title VII and c. 151B claims are time-barred.

## II.    SVENSSON HAS NOT DEMONSTRATED THAT PUTNAM'S PROFFERED REASONS ARE PRETEXTUAL

Assuming that Svensson's Title VII and c. 151B claims are not time-barred, Putnam argued in its principal brief that Svensson had no evidence that Putnam's reasons for its various employment actions were pretextual. In her opposition, Svensson attempts to overcome her failure to establish pretext by first arguing that she is trying her case on a "mixed motive" theory, and then by asserting in general terms, without any analysis of the record evidence, that something somewhere in her papers must demonstrate pretext. Whether Svensson tries to escape summary judgment under the *Price Waterhouse* "mixed motive" theory *or* under the traditional *McDonnell Douglas* pretext analysis, Svensson still must present strong evidence of discriminatory animus for each of the employment actions alleged to be discriminatory. Because she has not done so, Svensson's claims fail under both theories.

### A.    Svensson Has Failed to Adduce Evidence of Pretext, As Required By the McDonnell-Douglas Test.

Assuming that Svensson could demonstrate a *prima facie* case for each of her claims, Svensson cannot survive summary judgment because she fails to point to any record evidence sufficient to establish pretext. Unable to point to such evidence, or unwilling to analyze the

- 12 -

record relating to each of the alleged discriminatory employment actions, Svensson simply dumps over 450 pages of material on this Court and asks this Court to find evidence of a material factual dispute in her voluminous exhibits "filed herewith" and "previously filed," including her Statement of Facts, her First through Fifth Affidavits, and her expert's report.  In each case, Svensson asserts, *ipse dixit,* that in her pile of submissions, this Court will find "evidence [that] strongly supports an inference that the reasons proffered by Putnam … are mere pretexts for discrimination."  *E.g.* Opp. at 10.  *Nowhere* does Svensson analyze each of her claims and point the Court to the specific evidence that establishes pretext *for that claim*.

At the threshold, as noted in the Introduction to this memorandum, Svensson's entire approach is improper.  *See Quinones v. Buick,* 436 F.3d 284 (1st Cir. 2006) ("'it is not the court's responsibility — let alone within its power — to cull the entire discovery record looking for facts which might convert such a bald assertion [of discrimination] into a triable issue.'" 436 F.3d at 290, citing district court opinion (2005 WL 1668195).  *See also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones"); *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988) ("Judges are not expected to be mind readers," and "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal quotations omitted).

Svensson's problem is aggravated by the fact that much of the material in her submissions is inadmissible in a Rule 56 context (Putnam is filing a motion to strike portions of Svensson's submissions).  Other portions of her affidavits contain "stray remarks" or comments by non-decisionmakers which, as a matter of law, do not amount to proof of discriminatory animus.  *See, e.g., Wynn & Wynn, P.C. v. Massachusetts Com'n Against Discrimination*, 431 Mass. 665, 677 (Mass. 2000) ("Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden in these cases."), *overruled on other grounds by Stonehill College v. MCAD*, 808 N.E.2d 205 (Mass. 2004); *see*

*also Velazquez-Fernandez v. NCE Foods, Inc.,* 476 F.3d 6, 11 (1st Cir. 2007) (comment by non-decision maker incapable of supporting inference of pretext).[7]  Even when Svensson purports to dispute a material fact in an attempt to demonstrate pretext, she fails.  For example, in its moving papers, Putnam noted that Svensson was terminated after she refused to accept Putnam's decision that she should no longer manage analysts.  Svensson does not dispute this.  Putnam reached its conclusion after two of its highly-regarded analysts threatened to leave Putnam due to an inability to work with Svensson.  Putnam cited that one of those analysts (Darren Peers) informed Svensson's supervisor (Josh Brooks) that he (Peers) was looking for a new job because he could no longer work for Svensson.  Svensson purports to "dispute" this fact by citing to evidence that Peers may have had other motives for leaving Putnam.  Response to Putnam's Statement of Facts, ¶ 36.  Even if true, this fact does not contradict the undisputed fact that *Peers' told Brooks that his motive was to get away from working with Svensson*, *and that Brooks believed Peers.*  "The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."  *Little v. Republic Refining Co., Ltd*, 924 F.2d 93 (5th Cir. 1991).  Svensson's refusal to walk the Court through an analysis of each of her claims is designed to hide just such fatal flaws in her arguments.

### B.    Svensson Cannot Sustain a "Mixed Motive" Case Without First Establishing Evidence of Discriminatory Animus.

Svensson's mixed motive theory fares no better.  Mixed motive cases are "a rare class of cases . . . in which the plaintiff, armed with some strong (direct) evidence of discriminatory bias,

---

[7]  In her Opposition Swenson *does* cite conclusory testimony by her subordinate Konstantin Stoev that she was an excellent supervisor.  Opinions of other employees such as Stoev are immaterial on the issue of pretext.  Indeed, the First Circuit has held specifically  that an affidavit from plaintiff's supervisee attesting that plaintiff "was an excellent supervisor [and] ... that [plaintiff's] disciplinary warnings were unfounded" contained only "conclusory statements [that] did not demonstrate that the ... warnings were unfounded, nor that [the supervisor] who made the decision to fire [plaintiff] could not reasonably have believed that the disciplinary warnings were warranted."  *Ruiz v. Posadas de San Juan Associates*, 124 F.3d 243, 249 (1st Cir. 1997).

A/72437350.4/0398860-0000312913

demonstrates that at least one factor motivating the employer's decision is illegitimate." *Wynn & Wynn, P.C*, 431 Mass. at 665.  A plaintiff proceeding down the mixed-motive path "must offer *strong evidence* that proscribed criteria played a motivating part in an employment decision." *Anderson v. Home Depot U.S.A.,* Civ. A. 02-11000-DPW, 2004 WL 42569, *5 (D. Mass. 2004) (emphasis added) (granting summary judgment, holding "[j]ust as the discriminatory remarks to which he points were not sufficiently tied to the decisional context to demonstrate animus for the purposes of the pretext analysis, neither do they constitute direct evidence of discriminatory intent for the purposes of a mixed-motive analysis.").  As discussed above, Svensson has not, and cannot, point to any "strong (direct) evidence of discriminatory bias" when attempting to show pretext under the *McDonnell Douglas* framework, and that failing is equally fatal to her mixed motive claim.[8]  Her attempt to avoid her burden by asking this Court simply to accept her conclusory allegation of evidence of gender bias exists in the record is improper and transparent.  Similarly, the stray remarks that Svensson recounts in her affidavits and deposition testimony simply do not amount to the "strong evidence" necessary to sustain a mixed motive theory.[9]

## III.   SVENSSON'S MERA CLAIM IS PREEMPTED BY CHAPTER 151(B) AND IS FACTUALLY DEFICIENT

In her opposition, Svensson notes correctly that *Gasior v. Massachusetts General Hospital,* 446 Mass. 645 (2006), does not itself hold that MERA is pre-empted by ch. 151B, but instead only noted that the lower court had so ruled.  The fact remains that Svensson cannot assert a MERA claim because "if a remedy under G.L. c. 151B is available to a plaintiff, [s]he may not pursue a remedy under G.L. c. 93, § 103. Accordingly, should a judge decide that G.L.

---

[8]  Svensson admits she must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that … sex … was a motivating factor" (Opp. at n. 6), that the "evidence must be 'strong'" (Opp. at 4), and "must demonstrate that at least one factor motivating the employer's decision is illegitimate." (Opp. at 4).

[9]  *See Johansen v. NCR Comten,* 30 Mass.App.Ct. 294, 302 (Mass.App.Ct. 1991) ("Stray remarks suggestive of impermissible bias do not constitute the sort of evidence that places a case in the mixed motive category").

- 15 -

c. 151B *is or was available* to the plaintiff, the plaintiff would have no viable c. 93, § 103 claim." *Agin v. Federal White Cement, Inc.,* 417 Mass. 669, 672, (1994) (emphasis added). Two years later, the SJC reiterated its holding in *Agin,* holding that "where, as here, c. 151B applies, its comprehensive remedial scheme is exclusive" and plaintiff's claims "under the civil rights act *and the equal rights act* are [] precluded." *Green v. Wyman-Gordon Co.,* 422 Mass. 551, 558 (1996) (emphasis added). This Court agrees: *Ahanoto v. Massachusetts Turnpike Authority*, 466 F.Supp. 2d 378, 388 (D.Mass. 2006) ("the Court advised the plaintiff that his MCRA and MERA claims were preempted by Chapter 151B and that they would be dismissed with prejudice if they were brought in the second amended complaint. The MCRA and MERA claims … will be dismissed with prejudice"); *Edsall v. Assumption College,* 367 F.Supp.2d 72, 81 (D.Mass. 2005) ("Chapter 151B, where it can be invoked, preempts a claim under MERA …. Chapter 151B unquestionably applies to the employment-discrimination allegations in this case, and therefore the MERA claim is barred."). *See also Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 582 (1994) ("The plaintiff contends that the equal rights act provides alternative remedies for employment discrimination in concert with c. 151B. We do not agree. We base our decision on the language of c. 151B, legislative intent, and our precedents interpreting its scope"); *Cargill v. Harvard University*, 60 Mass.App.Ct. 585, 604 (2004) ("MERA does not create an independent right to vindicate an alleged wrong that can otherwise be redressed under G.L. c. 151B").

*Rowe v. Town of North Reading*, 2001 WL 170655 (Mass. Super., Jan. 5, 2001) and the other superior court cases cited by Svensson, simply fly in the face of the holdings of the SJC, the Appeals Court and this Court, and are not good law. Indeed, *Rowe* reaches its conclusion by analogizing MERA to MEPA, despite the SJC's explicit ruling in *Green* that ch. 151B preempts MERA. For the same reason, the cases cited by Svensson in footnote 51 of her Opposition that concern other statutes are of no precedential value. In any event, even if MERA is not preempted by ch.151B, Svensson's MERA claims fail for the same reasons that her Title VII and ch. 151B claims fail – the absence of any evidence of gender animus.

- 16 -

## IV.  SVENSSON'S MEPA CLAIM IS TIME-BARRED AND FACTUALLY DEFICIENT

"Any action based upon or arising under [MEPA] shall be instituted within one year after the date of the alleged violation."  M.G.L. c. 149 §105A.   In her Opposition, Svensson asserts that "Putnam made discriminatory payments to Svensson within one year prior to the filing of this action," yet fails to direct the court to *any* record support for this conclusory statement.  Opp. at 22.  Because all bonus and equity decisions for the years 2003 and earlier were communicated to Svensson by March 15, 2003 (Tibbetts Aff. ¶ 13), and because Svensson did not file her MEPA claim until December 2004, her claims are untimely.

Svensson attempts to save her MEPA claim by asserting she "has established a systemic continuing violation" based on her presentation of "sufficient evidence to establish that Putnam had a general policy to discriminate against women, that the policy was applied to her, and that the policy continued into the limitations period."  Opp. at 22.  Because she cites no *evidence*, these remain naked, conclusory allegations.   Massachusetts' courts apply the continuing violation doctrine *only* to discriminatory acts *where the date of violation is unidentifiable*.  In *Silvestris v. Tantasqua Regional School District,* this Court held that the continuing violation approach "is not pertinent to an unequal compensation claim under G.L.c. 149, §105A, which is based on discrete acts."  446 Mass. 756, 769 (2006).  This Court explained that "expanding the continuing violation doctrine … to unequal wage claims brought under G.L.c. 149 §105A, would eviscerate the one-year statute of limitations set forth in § 105A."  *Id.*

Nor can a discovery rule save Svensson's claim.  *See* Part I.A, *infra*.  Svensson admits that a MEPA claim accrues, for example, when "plaintiffs ha[ve] reason to know of the starting salaries of male workers and their levels of experience and education."  Opp. at 22.  She then states *in conclusory terms and without citation to the record* that "she neither knew nor should have known how her pay and qualifications compared to those of similarly situated males until within the limitations period." Opp. at 22.  However, *in her Sixth Affidavit* Svensson states "I learned at the end of 2002 that several male analysts were receiving compensation of well over

$1,000,000 (while my compensation of approximately $1.65 million in 2000 and 2001 had been cut to approximately $650,000)."  Svensson's Sixth Aff. ¶ 22.

Even if not time-barred, Svensson's MEPA claim lacks a factual predicate.  See Part II(A), *infra*.  Svensson's opposition is devoid of any record citations for her claim that she suffered pay discrimination.  She fails to point the Court to any "similarly situated" men who were paid more than her, let alone that Putnam's reasons for any pay differential were pretextual. Her own expert concedes that he could find no evidence of pay discrimination at Putnam. (*see, e.g.* White Report, Appendix E and testimony of Paul White, ("White Dep."), at 35-39, 50 and 83, (Putnam Memo. at 16-17, 19, 22, 24 and Tab 21).  At best, Svensson says that she cannot imagine that, given her performance in 2002 (the year as to which she is claiming pay discrimination), Putnam would pay any male more than she.  Svensson Fifth Aff. ¶ 27.  Of course, Svensson's self-assessment is immaterial and insufficient to defeat summary judgment. *Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8, 15 (1st. Cir. 1998) (Plaintiff's "personal opinion regarding his own job qualifications is not sufficiently probative on the issue of pretext."); Putnam Memo. at 15.

## V.    ANY ATTEMPT TO REOPEN DISCOVERY SHOULD BE DENIED.

In light of the staleness of, and lack of merit to, her claims, Svensson makes a last-ditch effort pursuant to Fed. R. Civ P 56(f) to reopen a discovery period that commenced nearly three years ago so that she can do further analysis of the data considered by Putnam's expert.  As an initial matter, Svensson has made no effort to comply with Fed. R. Civ. P. 56(f)'s requirement that she submit an affidavit supporting her Rule 56(f) request that comports with the requirements of the Rule.  For this reason alone, her request should be denied.  *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 109 (1st Cir.1997) ("Rule 56(f) of the Federal Rules of Civil Procedure specifically calls upon a litigant who feels prejudiced by too precipitate a demand for summary judgment to file a timely affidavit with the court asserting the need for further discovery.  As we have held, *failure to resort to such first aid will ordinarily bar belated aid.*") (emphasis added).

- 18 -

Second, Putnam produced the data that its expert considered in November 2007.  See email from Putnam to Svensson, attaching "the data that Bloom considered in forming his opinions," dated November 26, 2007, attached as <u>Exhibit</u> <u>C</u> to the Supplemental Kurker Affidavit.  Svensson now invokes Fed. R. Civ. P. 56(f) despite the fact that she has never asked her expert to analyze that data.  Thus, when asked if he planned "on doing any additional work with the data considered by Putnam's expert," Svensson's expert replied "We haven't been asked to do so."  White Dep., 20-21, attached hereto at <u>Exhibit</u> <u>D</u>.  The short of it is that, despite the 15,000 documents which have been produced to Svensson and the thirteen depositions that she has taken, her expert has been unable to find *any* statistically significant evidence of gender animus.  Although Svensson may want additional time and discovery, she simply has provided no basis for any entitlement to it.

## <u>CONCLUSION</u>

For the reasons stated above, Putnam prays that this Court grant Putnam's Motion for Summary Judgment and dismiss the Amended Complaint with prejudice.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

_____

Joseph L. Kociubes, BBO #276360
joe.kociubes@bingham.com
Louis A. Rodriques, BBO #424720
louis.rodriques@bingham.com
Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com
Jennifer L. Holden, BBO #663467
jennifer.holden@bingham.com
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: February 21, 2008

- 19 -

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 21, 2008.

/s/ Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LISA SVENSSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| PUTNAM INVESTMENTS, LLC and LAWRENCE J. LASSER, | ) | NO.  04-12711 PBS |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## PUTNAMS'S REPLY TO SVENSSON'S OPPOSITION
## TO PUTNAMS'S MOTION FOR SUMMARY JUDGMENT

Defendant, Putnam Investments ("Putnam"), submits this Reply Memorandum in connection with its motion for summary judgment dismissing plaintiff Lisa Svensson's ("Svensson") Amended Complaint.

## INTRODUCTION

In her opposition to Putnam's motion for summary judgment ("Opp."), Svensson undertakes no analysis at all of the factual basis for any of her claims, or any of Putnam's defenses.  (Indeed, her Opposition does not even contain a Statement of Facts reciting her version of the events material to her claims).  Instead, Svensson simply submits over 450 pages of material and then informs the Court that her evidence of pretext and gender animus can be found somewhere in that mass of material.  For example, with respect to her termination claim (her only claim that is not time-barred or preempted), Svensson's opposition does not point to a single fact that contradicts that Putnam terminated her after she refused to accept her management's decision that she could no longer manage analysts (this after two of Putnam's most highly-regarded analysts threatened to quit rather than continue to work with her).  Rather,

Svensson directs the Court to cull through her 450 pages of opposition material, asserting that evidence of pretext will be found somewhere therein.  *See, e.g*, Opp. at 3, 5-6.

Svensson's approach in her opposition is itself grounds for granting summary judgment. *See Quinones v. Buick,* 436 F.3d 284 (1st Cir. 2006) (affirming summary judgment dismissing Title VII and c. 151B claims because plaintiff did not meet his burden of showing pretext).  In *Quinones*, the First Circuit agreed with the district court that plaintiff "had not met his burden at the third stage, stating particularly that 'his opposition memorandum is woefully deficient and that 'it is not the court's responsibility — let alone within its power — to cull the entire discovery record looking for facts which might convert such a bald assertion [of discrimination] into a triable issue.'" 436 F.3d at 290, citing district court opinion (2005 WL 1668195).  As in *Quinones,* Svensson asks this Court either to do the "culling" for her or, more likely, just to accept Svensson's conclusory assertions that evidence of a factual dispute exists in the papers. The Court should not be put to the burden of the former, nor can it do the latter.  Putnam's motion should be allowed.

## I.    SVENSSON'S DEMOTION, PROMOTION AND COMPENSATION CLAIMS UNDER TITLE VII AND CH. 151B ARE TIME-BARRED.

In her opposition, Svensson does not offer any evidence disputing that (other than her termination) the alleged adverse actions about which she complains occurred within the 300-day limitations period imposed by Title VII of the Civil Rights Act of 1964 ("Title VII") and Mass. Gen. Laws ch. 151B ("ch. 151B").[1]  Instead, she argues that her failure to file within the

---

[1] Throughout her opposition, without citation to the record, Svensson asserts in conclusory terms that discriminatory actions occurred within the limitations period. *See, e.g.,* Opp. at 10 ("[M]uch of the conduct on which Svensson relies occurred within the 300 days prior to March 1, 2004"); Opp. at 11 ("[M]any of Putnam's actions relative to her claims concerning promotion, demotion, termination, and compensation occurred within the 300 days prior to her filing of the MCAD charge").  Such conclusory generalizations are insufficient to defeat summary judgment. *See Gonzalez-Pina v. Rodriguez*, 407 F.3d 425, 431 (1st Cir. 2005) ("[S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") (citations and quotations omitted).

limitations period is saved by a "discovery rule" or the "systemic violation" doctrine, or because the alleged adverse actions were "equivocal. None of these arguments has merit.

### A.    A Discovery Rule Does Not Save Svensson's Untimely Claims

#### 1.    Because Svensson's Claims Are Based on Discrete Acts, the Discovery Rule Is Deemed Satisfied as a Matter of Law

The First Circuit has declared that "[t]he rule in an employment discrimination case is that the limitations period begins to run when the claimant receives unambiguous and authoritative notice of the discriminatory act (*which is another way of saying that the period begins to run when the employee learns of the adverse employment action.*)." *Morris v. Gov't Dev. Bank of Puerto Rico,* 27 F.3d 746 (1st Cir. 1994) (emphasis added). *See also Conners v. Maine Medical Center,* 42 F.Supp.2d 34, 51 (D.Me. 1999) ("Consistent with the discovery rule, the Court finds that a claim … accrues when a plaintiff receives final and definite notice of the allegedly discriminatory decision."). Discrete employment actions – such as compensation, demotion, failure to promote and termination – are all accompanied by "definite notice" as a matter of law -- that is, they are actions that Svensson is deemed to have "known" could cause her harm as soon as they were communicated to her. *See Morris,* 27 F.3d at 350 ("It is by now well established that, in employment discrimination actions, limitations periods normally start to run when the employer's decision is made and communicated to the affected employee."); *see also* Memorandum of Law in Support of Putnam Investments' Motion for Summary Judgment ("Putnam Memo") at 14.

Svensson thus is deemed to have "discovered" that she had a claim when the alleged adverse actions were communicated to her, and *not* at sometime thereafter when she claims she learned of any alleged discriminatory animus behind the actions. In *Morris,* plaintiff's §1983 claim was dismissed as time-barred, based upon the date that the adverse employment action first was communicated to the plaintiff. *Id.* In looking to when the "clock began to tick," the First Circuit made clear that "the point in time at which the consequences of the act become hardest to bear – which may or may not coincide with the occurrence of the act itself – has no relevance for

A/72437350.4/0398860-0000312913

the purposes of framing the limitations period." *Id.* at 749. The court rejected plaintiff's argument that "his cause of action existed in what amounts to a state of suspended animation until he became aware of the racial and political motives behind the adverse employment decision." *Id.* at 749-750. This standard applies in all employment discrimination contexts. *See Comm. of Mass. v. Bull HN Info. Systems, Inc.,* 143 F.Supp.2d 134, 153 n.46 (D.Mass. 2001) ("[T]he First Circuit has since cited *Morris* as a 'categorical' statement of the standard for determining when the limitations period begins to run in the employment discrimination context.") (citing *American Airlines v. Cardoza-Rodriguez,* 133 F.3d 111, 123 (1st Cir. 1998)).[2] In short, the First Circuit flatly rejects Svensson's assertion that "a claim does not accrue until the plaintiff knows or reasonably should know both of the adverse employment actions and that such actions were discriminatory." Opp. at 11-12.[3]

---

[2] *Silvestris* does not alter the analysis for Svensson's compensation claims. As a preliminary matter, the "discovery rule" in *Silvestris* only addressed plaintiffs' *MEPA* claims, and not c. 151B or Title VII claims. Further, the SJC conceded that "[o]ne need not apprehend the full extent or nature of an injury in order for a cause of action to accrue," (847 N.E.2d at 337, citation omitted). Rather the limitations period begins to run when the plaintiff "knows, or should have known that she has been harmed by the defendant's conduct." Unlike Svensson, who asserts that she suspected that she was the victim of discriminatory conduct by Putnam since 1998 (Fifth Aff. ¶ 2 *et seq.*) and admits she had such knowledge at "the end of 2002" (Sixth Aff. ¶ 23), in *Silvestris* the plaintiffs did not even "beg[in] to suspect discriminatory payment of wages" until 1998, five years after receiving their first paycheck. 847 N.E.2d at 337.

[3] Svensson relies upon *Comm. of Mass. v. Bull HN Info. Systems, Inc.* There, the district court (Gertner, J.) concluded that the 300-day limitations period did not apply *at all* to the EEOC or the Commonwealth of Massachusetts. More importantly, the Court's entire discussion concerning the individual employees' knowledge of facts sufficient to alert them to the existence of a potential age claim was inextricably intertwined with her conclusion that Bull failed to comply with the informational requirements imposed by the Older Workers Benefit Protection Act in connection with the signing of releases of age discrimination claims. The district court concluded: "In this case, there is no evidence that terminated Bull employees were aware of any specific age-related qualifications for the company's RIFs. Further, at least with respect to Bull's 1994 Releases, the information provided to affected employees [by Bull pursuant to the OWBPA's informational requirements] was entirely inadequate to apprize them of any such qualifications. 143 F. Supp. 2d at 155-56. Nothing in *Bull* supports the general application of a discovery rule in a "discrete acts" case.

> 2.    **Even If a Discovery Rule Applied, Svensson Believed that She Was the Victim of Gender Discrimination Long Before the 300-Day Limitations Period Commenced.**

Svensson does not (and cannot) argue that she was unaware of each discrete allegedly discriminatory act (pay, demotion, and failure to promote) on the date that each act occurred and was communicated to her – in each case for more than 300 days before she filed her charge of discrimination with the MCAD.    Svensson's annual salary, bonus awards and equity compensation were communicated to her by March 15 of each year (Tibbetts Aff. ¶ 13); her transfer to GER was communicated to her in March 2002 (Svensson's Sixth Aff. ¶12); and the fact that she was not promoted to the MD position was made known to her by March of each year (Tibbetts Aff. ¶5).  The fact that she was not promoted to MD in 2002 (the last year during her employment when MD promotions occurred in the Investments Division) was communicated to her in "early 2002" (Svensson's Sixth Aff. ¶11).

Further, even if a discovery rule were to require that Svensson believe that the employment actions were discriminatory (which it does not), Svensson held that belief for more than 300 days before bringing her claims.  Although her opposition asserts, *again without any specific record citation*, that Svensson did not know she was the victim of gender discrimination, her affidavits, testimony and diary demonstrate the opposite.  Svensson's affidavits do not *say* that she was unaware of the existence of gender animus.  Moreover, even a cursory glance at the two affidavits that Svensson submitted with her opposition makes clear that Svensson has believed since 1998 that she was the victim of discrimination.  *See, e.g.,* Fifth Aff. of Lisa Svensson, ¶¶ 2 *et seq.*  Finally, Svensson has *always* believed that the specific, alleged adverse actions of which she *now* complains were the result of gender bias.  For example:

Promotion claim

- "In the *summer of 2001*, I approached Tim Ferguson … to ask why I was being denied promotional opportunities." She met with Mr. Oristaglio, Mr. Tibbetts, Ms. Holder-Watts, and Ms. Scordato to discuss why she was being denied promotional opportunities.  Svensson Sixth Aff. at ¶10 (emphasis added).  She states that "*[i]n early 2002*, I again was not promoted to MD."  Id. at ¶ 11 (emphasis added).

- 5 -

- In her deposition, Svensson was asked: "At what point, if ever, did you conclude that you were being treated differently because of your gender?" She responded: "It was, as I said, the entirety of my experience at Putnam. … And when did I see that it applied to me? It applied to me as I went. Different remarks when I had my pregnancy, my second pregnancy, *when I was denied promotion the second time [in 2002]*…" Svensson Dep. 79:13-80:12 (emphasis added), attached to the Supplemental Kurker Affidavit as <u>Exhibit</u> <u>A</u>.

Demotion claim:

- "*In March 2002*, I was abruptly told that I was being "reassigned" back to the Research Department," and "[a]fter learning of my demotion to the research department, I met with Holder-Watts of HR and was told that there were no Portfolio positions available to me… ." Sixth Aff. ¶ 12 (emphasis added).

- "*[A]t the end of 2002*, I learned that males who had been my contemporaries in GER originally, but who had been transferred out of GER and into portfolio management positions, were not demoted…" <u>Id</u>. at ¶ 23 (emphasis added).

Compensation claims:

- "I learned at the *end of 2002* that several male analysts were receiving compensation of well over $1,000,000 (while my compensation of approximately $1.65 million in 2000 and 2001 had been cut to approximately $650,000 in 2002). Sixth Aff. ¶ 22 (emphasis added). "*[A]t the end of 2002*, I learned that males who had been my contemporaries in GER originally … were receiving compensation…at a much higher level than I was." Sixth Aff. ¶ 23 (emphasis added).

All of these events occurred well before the May 6, 2003, start of the 300-day limitations period.

In addition to these admissions, as noted in Putnam's principal brief (Putnam Memo. at 13, n.3), in April 1998 – years before the expiration of the 300-day limitations period – Svensson began keeping a diary of work-related events because she believed she was being discriminated against and "just thought I would want to write these things down." Svensson Dep. at 18-19 (Putnam Brief, <u>Tab</u> <u>15</u>). Thus, even if the discrete nature of the allegedly discriminatory acts somehow is insufficient by itself to impute knowledge to Svensson on the date the acts occurred (which it is under applicable precedent), Svensson's actual belief that she was subject to discrimination triggers the statute of limitations. *See, e.g., Turner v. Correction Medical Services*, No. Civ. A. 03-048-SLR, 2003 WL 22037712, *2 (D. Del. Aug. 20, 2003) ("It is clear

from plaintiff's daily journal ... that he was aware of the alleged injuries" before the tolling of the statutory period.).  The discovery rule does not help Svensson.

### B.    The Systemic Violation Theory Does Not Save Svensson's Claims

Svensson attempts to resuscitate her claims by affixing the label: "systemic continuing violation."  She argues that she "has been harmed by the application to her of a general discriminatory policy at Putnam aimed at all women, which policy continued to exist into the limitations period."  (Opp. at 15).  Yet, Svensson's points to no specific *evidence* supporting the existence of a general Putnam *policy* of discriminating against women.  Instead, she cites only ¶ 23 of her Amended Complaint (Opp. at 17), despite the fact that a complaint's allegations cannot defeat summary judgment.  Fed. R. Civ. P. 56(e) ("when a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial"); *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 286 (1968).

Svensson's affidavits appear to contain only three conclusory and argumentative allegations that three females (of the many thousands then employed by Putnam) suffered discrimination.[4]  Such conclusory allegations cannot defeat Putnam's motion for summary

---

[4]    In Svensson's Fifth Affidavit, ¶ 9, she states "Swift said that Erin Spatz could not go to the International Core team because 'she would be the wrong sex for that'."  Svensson gives no context for these remarks.  For example, she offers no evidence that an opening actually existed in International Core, that Spatz was interested in or applied for any such opening, or who made the decision not to offer the Spatz the opening (if one existed and if Spatz was interested), or why.  Svensson quotes Swift, *Svensson's* supervisor in Global Growth, without evidence that he was a decisionmaker for International Core or even what the basis of his alleged remark was.  She deposed neither Swift nor Spatz.  On this record, Swift's alleged hearsay remark is nothing more than speculation by a non-decisionmaker, and would be insufficient to support the existence of gender animus if this case involved *Spatz's* claim, much less Svensson's claim.  *See Velazquez-Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 11 (1st Cir. 2007) (comment by non-decisionmaker incapable of supporting inference of pretext).

In Svensson's Fifth Affidavit, ¶14, she states "In September, 2001, Lauren Allansmith went on maternity leave with the title Associate Director of Research ("ADR").  When she came back, she was no longer an ADR.  She had been demoted to analyst."  It is unclear what one vignette in an organization with thousands of employees proves.  Moreover, Svensson again relies on her own belief as to what happened and why, offering no evidence of whether Allansmith was "demoted" (if she was), or why.

(Footnote Continued on Next Page.)

A/72437350.4/0398860-0000312913

judgment.  *Ingram v. Brink's, Inc.,* 414 F.3d 222, 228-29 (1st Cir. 2005) ("summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.").  Svensson's self-serving affidavits are devoid of even a suggestion that women *generally* were subjected to a general "discriminatory policy."  Indeed, Svensson's own expert, Dr. Paul White, could find no statistically significant evidence of company-wide gender discrimination (*see, e.g.* White Report at 14 and testimony of Paul White, ("White Dep."), at 35-39, 50 and 83 (Putnam Memo, <u>Tab 21</u>, Putnam Memo. at 16-17, 19, 22, 24).  Without identifying a company-wide *policy* which discriminated against women, Svensson cannot resuscitate stale claims by invoking the phrase "systemic continuing violation."

What Svensson also misses is that, as a matter of law, "discrete discriminatory acts against an individual employee, even if repeated, do not constitute a general practice (and, therefore, do not constitute a systemic violation.)".  *Grotlisch v. General Dynamics Defense Systems, Inc.*, 28 Fed. Appx. 3, 2002 WL 253928, *5 (1st Cir. 2002).  In *Grotlisch, a case relied upon by Svensson*, the First Circuit refused to apply the systemic violation doctrine because the plaintiff did "not identify any *general* practice aimed at a class of employees as the predicate for [her] discrimination claims, but, rather, describe[d] discrimination arising solely from the employer's treatment of [her] alone." *Id.*  Grotlilsch, like Svensson, "boldly asserts that 'there was evidence that the policy was applied to others,'" but the First Circuit found that "[t]his [was] sheer persiflage. Our examination of the record reveals no such evidence, and the appellant

---

(Footnote Continued from Previous Page.)

Finally, in Svensson's Sixth Affidavit, ¶12, she states "In her March 2002, I was abruptly told that I was being 'reassigned' back to the Research Department. Two females, Kelly Morgan ("K. Morgan") and I were reassigned to GER."  Svensson is simply incorrect that Morgan was abruptly transferred to GER in March 2002; Morgan transferred from Global Growth to GER in the summer of 2001.  More importantly, Svensson offers no evidence that Morgan's transfer was due to her gender.  Lastly, Morgan testified that the transfer was *voluntary*.  Deposition of Kelly Morgan, 38-39, attached to the Supplemental Kurker Affidavit as <u>Exhibit B</u>.

- 8 -

identifies none." *Id.*  Here, the record reveals no such evidence, and Svensson identifies none.  *See also*, *Megwinoff v. Banco Bilbao Vizcaya,* 233 F.3d 73, 76 (1st Cir. 2000).

The other cases upon which Svensson relies offer her no help.  In *Lynn Teachers Union Local 1037 v. MCAD*, 406 Mass. 515 (1990), the union adopted a *facially discriminatory policy* of requiring teachers to resign when they became pregnant.  If the teacher later returned to work, she lost seniority credit for the years of teaching before the forced resignation (the so-called "refusal to credit" policy).  The court held that the "refusal to credit" policy was a systemic continuing act of discrimination because the policy (which, unlike anything in this case, was an articulated, official policy) had "breath[ed] new life" into a prior illegal system.  *Id.* at 522-523.

In *Ocean Spray v. MCAD,* a disability discrimination case also cited by Svensson, the court rejected application of the very doctrine that Svensson urges here.  The court held that plaintiff's claims were time-barred because a "refusal to accommodate" claim is a discrete act *to which the systemic violation doctrine does not apply*. 441 Mass 632, 646, fn. 18.  The SJC noted that an accommodation claim is "a determination made on a case-by-case basis," and thus is markedly different from *Lynn's* "refusal to credit" policy which "was the union's generally applicable, system-wide policy."  *Id.*  Svensson's reliance upon the systemic violation doctrine fails for the same reason it failed in *Ocean Spray:* the systemic violation doctrine is "inapplicable to discrete acts of discrimination against a specific individual."  *Id.*  Rather, it applies only to a general (typically facially discriminatory) system-wide *policy.*  Svensson's conclusory and unsubstantiated assertions that Putnam "had a glass ceiling" or "a general discriminatory policy" do not satisfy her burden.  *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 6 (1st Cir. 1998) ("an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason.").[5]

---

[5] Svensson also relies heavily on *Arroyo-Audifred v. Verizon Wireless*, Inc., 431 F.Supp.2d 215 (D.P.R. 2006).  In *Arroyo-Audifred,* the district court denied defendant's *motion to dismiss* because the

(Footnote Continued on Next Page.)

Finally, Svensson cites *Muniz-Cabrero v. Ruiz*, in which the plaintiff brought a § 1983 claim alleging that his employer took an adverse employment action based on his political affiliation. 23 F.3d 607 (1st Cir.1994). The First Circuit affirmed summary judgment for the defendant, holding that the systemic violation doctrine could not save stale claims because the articulated practice, "a general political plot designed by defendants to harm and humiliate plaintiff," was "not enough." *Id.* Svensson's evidence is no better, with the result that her promotion, demotion, and compensation claims remain "discrete acts" and, therefore, *must* fall "within the appropriate time period." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 127 S.Ct. 2162, 2165 (2007).[6] Svensson concedes that she did not file her MCAD claim until May 2004 (Opp. at 10). As such, her Title VII and ch. 151B claims are time-barred.

## C.    Svensson Had Unequivocal Knowledge that She Had Been Transferred.

Svensson argues finally that the 300-day limitations period did not begin to run on her demotion claim when she was demoted because Putnam's notice to "Svensson of the demotion decision was equivocal as to whether the demotion was permanent or merely temporary until Putnam placed Svensson in another PM position." Opp. at 18. As is the case throughout her opposition, Svensson cites no record support for this assertion, leaving it to this Court to sift through her submissions. Svensson is wrong as a matter of fact and law.

Putnam transferred Svensson from Portfolio Manager in Global Growth to an analyst position in General Equity Research ("GER") in March 2002. Svensson offers no evidence that

---

(Footnote Continued from Previous Page.)

plaintiff articulated a policy that he believed constituted a systemic continuing violation. At the motion to dismiss stage, where discovery had not commenced, it remained to be seen whether plaintiff could adduce evidence of a system-wide discriminatory policy. At the summary judgment stage, Svensson's inability to adduce evidence of such a policy is fatal. Fed. R. Civ. P. 56(e); *First Nat. Bank of Ariz.,* 391 U.S. at 286.

[6] Svensson's promotion, demotion and compensation claims constitute "discrete acts." See Putnam's Memo at 12-14. Svensson concedes in her opposition that she is not pursuing a continuing violation theory based on these discrete acts. (Opp. p. 15).

the decision to transfer her to GER was equivocal, and any hope she had, unrequited or otherwise, that she might be promoted to Portfolio Manager in the future does not breathe life into a stale claim. *Delaware State College v. Ricks,* 449 U.S. 250, 258 (1980). In *Ricks*, a professor alleged national origin discrimination arising from the college's decision to deny him tenure. When the college notified Ricks that tenure had been denied, it gave him a final, one-year terminal contract. Ricks argued that the statute of limitations did not begin until the actual date of his termination -- not when he was notified that he had been denied tenure. The Supreme Court disagreed, ruling "the filing limitations periods []commenced at the time the tenure decision was made and communicated." *Id.* Svensson, like Ricks, may have hoped the situation would change -- but her unilateral hope does not toll the limitations requirements.

The cases on which Svensson relies are factually dissimilar to hers because they turn on the distinction between *notice* of a future adverse employment action and *effectuation* of that adverse employment action. In *Wheatley v. American Telephone and Telegraph Co.*, 418 Mass. 394, 399 fn. 8 (1994), the Superior Court granted summary judgment for the defendant employer, ruling that the plaintiff's age discrimination claims were time barred. On appeal, the SJC ruled that a letter received by the employee which informed him of his termination, but which also permitted him time in which to find other employment within company, did not trigger the running of statute of limitations. *Id.* The SJC explained that this limbo period – in which the employee still "held out the possibility of other employment within the company" – was insufficient notice that the termination decision was unequivocal. *Id.* at 398. Svensson's other cases are distinguishable for similar reasons. *See, e.g. Ross v. Raytheon Co.,* 2001 WL 1455863, *3 (Mass. Super. Nov. 1, 2001) (limitations period tolled during the "transition period" until the actual "date of [plaintiff's] termination"); *Hill v. Suntory Water Group, Inc*., 2003 WL 25278767, *2 (Mass. Super. Jan 30, 2003) ("sending Hill home" did not trigger the beginning of the statutory period for purposes of the handicap discrimination claim); *Harrison v. Kraft Foods, Inc.* 2007 WL 3232552, *3 (D.Mass., Oct 30, 2007) (termination equivocal where defendant told

plaintiff "that he would be reinstated when the DUI charges were resolved, either in his current position or a different position within the company.")

Putnam does not argue that the demotion limitations period began when Svensson received *notice* that she was being transferred to GER; arguably, until she was *actually* transferred the situation might have changed. Once Putnam *effectuated* the transfer in the spring of 2002 (over a year before the limitations period commenced), Svensson was on notice that her job responsibilities had unequivocally changed. Even if Putnam stated that it would try to find Svensson another portfolio management position, her demotion claim still would be untimely. *Adamczyk v. Augat, Inc.* 52 Mass.App.Ct. 717, 722 (Mass.App.Ct. 2001) (defendant's "statement that it would attempt to provide job opportunities cannot be construed as an equivocal termination notice."). Thus, Svensson's Title VII and c. 151B claims are time-barred.

## II.    SVENSSON HAS NOT DEMONSTRATED THAT PUTNAM'S PROFFERED REASONS ARE PRETEXTUAL

Assuming that Svensson's Title VII and c. 151B claims are not time-barred, Putnam argued in its principal brief that Svensson had no evidence that Putnam's reasons for its various employment actions were pretextual. In her opposition, Svensson attempts to overcome her failure to establish pretext by first arguing that she is trying her case on a "mixed motive" theory, and then by asserting in general terms, without any analysis of the record evidence, that something somewhere in her papers must demonstrate pretext. Whether Svensson tries to escape summary judgment under the *Price Waterhouse* "mixed motive" theory *or* under the traditional *McDonnell Douglas* pretext analysis, Svensson still must present strong evidence of discriminatory animus for each of the employment actions alleged to be discriminatory. Because she has not done so, Svensson's claims fail under both theories.

### A.    Svensson Has Failed to Adduce Evidence of Pretext, As Required By the McDonnell-Douglas Test.

Assuming that Svensson could demonstrate a *prima facie* case for each of her claims, Svensson cannot survive summary judgment because she fails to point to any record evidence sufficient to establish pretext. Unable to point to such evidence, or unwilling to analyze the

- 12 -

record relating to each of the alleged discriminatory employment actions, Svensson simply dumps over 450 pages of material on this Court and asks this Court to find evidence of a material factual dispute in her voluminous exhibits "filed herewith" and "previously filed," including her Statement of Facts, her First through Fifth Affidavits, and her expert's report.  In each case, Svensson asserts, *ipse dixit,* that in her pile of submissions, this Court will find "evidence [that] strongly supports an inference that the reasons proffered by Putnam … are mere pretexts for discrimination."  *E.g.* Opp. at 10.  *Nowhere* does Svensson analyze each of her claims and point the Court to the specific evidence that establishes pretext *for that claim*.

At the threshold, as noted in the Introduction to this memorandum, Svensson's entire approach is improper.  *See Quinones v. Buick,* 436 F.3d 284 (1st Cir. 2006) ("'it is not the court's responsibility — let alone within its power — to cull the entire discovery record looking for facts which might convert such a bald assertion [of discrimination] into a triable issue.'" 436 F.3d at 290, citing district court opinion (2005 WL 1668195).  *See also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones"); *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988) ("Judges are not expected to be mind readers," and "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal quotations omitted).

Svensson's problem is aggravated by the fact that much of the material in her submissions is inadmissible in a Rule 56 context (Putnam is filing a motion to strike portions of Svensson's submissions).  Other portions of her affidavits contain "stray remarks" or comments by non-decisionmakers which, as a matter of law, do not amount to proof of discriminatory animus.  *See, e.g., Wynn & Wynn, P.C. v. Massachusetts Com'n Against Discrimination*, 431 Mass. 665, 677 (Mass. 2000) ("Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden in these cases."), *overruled on other grounds by Stonehill College v. MCAD*, 808 N.E.2d 205 (Mass. 2004); *see*

*also Velazquez-Fernandez v. NCE Foods, Inc.,* 476 F.3d 6, 11 (1st Cir. 2007) (comment by non-decision maker incapable of supporting inference of pretext).[7]  Even when Svensson purports to dispute a material fact in an attempt to demonstrate pretext, she fails.  For example, in its moving papers, Putnam noted that Svensson was terminated after she refused to accept Putnam's decision that she should no longer manage analysts.  Svensson does not dispute this.  Putnam reached its conclusion after two of its highly-regarded analysts threatened to leave Putnam due to an inability to work with Svensson.  Putnam cited that one of those analysts (Darren Peers) informed Svensson's supervisor (Josh Brooks) that he (Peers) was looking for a new job because he could no longer work for Svensson.  Svensson purports to "dispute" this fact by citing to evidence that Peers may have had other motives for leaving Putnam.  Response to Putnam's Statement of Facts, ¶ 36.  Even if true, this fact does not contradict the undisputed fact that *Peers' told Brooks that his motive was to get away from working with Svensson, and that Brooks believed Peers.*  "The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."  *Little v. Republic Refining Co., Ltd*, 924 F.2d 93 (5th Cir. 1991).  Svensson's refusal to walk the Court through an analysis of each of her claims is designed to hide just such fatal flaws in her arguments.

**B.    Svensson Cannot Sustain a "Mixed Motive" Case Without First Establishing Evidence of Discriminatory Animus.**

Svensson's mixed motive theory fares no better.  Mixed motive cases are "a rare class of cases . . . in which the plaintiff, armed with some strong (direct) evidence of discriminatory bias,

---

[7]  In her Opposition Swenson *does* cite conclusory testimony by her subordinate Konstantin Stoev that she was an excellent supervisor.  Opinions of other employees such as Stoev are immaterial on the issue of pretext.  Indeed, the First Circuit has held specifically  that an affidavit from plaintiff's supervisee attesting that plaintiff "was an excellent supervisor [and] ... that [plaintiff's] disciplinary warnings were unfounded" contained only "conclusory statements [that] did not demonstrate that the ... warnings were unfounded, nor that [the supervisor] who made the decision to fire [plaintiff] could not reasonably have believed that the disciplinary warnings were warranted." *Ruiz v. Posadas de San Juan Associates*, 124 F.3d 243, 249 (1st Cir. 1997).

demonstrates that at least one factor motivating the employer's decision is illegitimate." *Wynn & Wynn, P.C*, 431 Mass. at 665. A plaintiff proceeding down the mixed-motive path "must offer *strong evidence* that proscribed criteria played a motivating part in an employment decision." *Anderson v. Home Depot U.S.A.,* Civ. A. 02-11000-DPW, 2004 WL 42569, *5 (D. Mass. 2004) (emphasis added) (granting summary judgment, holding "[j]ust as the discriminatory remarks to which he points were not sufficiently tied to the decisional context to demonstrate animus for the purposes of the pretext analysis, neither do they constitute direct evidence of discriminatory intent for the purposes of a mixed-motive analysis."). As discussed above, Svensson has not, and cannot, point to any "strong (direct) evidence of discriminatory bias" when attempting to show pretext under the *McDonnell Douglas* framework, and that failing is equally fatal to her mixed motive claim.[8] Her attempt to avoid her burden by asking this Court simply to accept her conclusory allegation of evidence of gender bias exists in the record is improper and transparent. Similarly, the stray remarks that Svensson recounts in her affidavits and deposition testimony simply do not amount to the "strong evidence" necessary to sustain a mixed motive theory.[9]

## III.    SVENSSON'S MERA CLAIM IS PREEMPTED BY CHAPTER 151(B) AND IS FACTUALLY DEFICIENT

In her opposition, Svensson notes correctly that *Gasior v. Massachusetts General Hospital,* 446 Mass. 645 (2006), does not itself hold that MERA is pre-empted by ch. 151B, but instead only noted that the lower court had so ruled. The fact remains that Svensson cannot assert a MERA claim because "if a remedy under G.L. c. 151B is available to a plaintiff, [s]he may not pursue a remedy under G.L. c. 93, § 103. Accordingly, should a judge decide that G.L.

---

[8]    Svensson admits she must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that … sex … was a motivating factor" (Opp. at n. 6), that the "evidence must be 'strong'" (Opp. at 4), and "must demonstrate that at least one factor motivating the employer's decision is illegitimate." (Opp. at 4).

[9]    *See Johansen v. NCR Comten,* 30 Mass.App.Ct. 294, 302 (Mass.App.Ct. 1991) ("Stray remarks suggestive of impermissible bias do not constitute the sort of evidence that places a case in the mixed motive category").

A/72437350.4/0398860-0000312913

c. 151B *is or was available* to the plaintiff, the plaintiff would have no viable c. 93, § 103 claim." *Agin v. Federal White Cement, Inc.,* 417 Mass. 669, 672, (1994) (emphasis added).  Two years later, the SJC reiterated its holding in *Agin,* holding that "where, as here, c. 151B applies, its comprehensive remedial scheme is exclusive" and plaintiff's claims "under the civil rights act *and the equal rights act* are [] precluded." *Green v. Wyman-Gordon Co.,* 422 Mass. 551, 558 (1996) (emphasis added).  This Court agrees: *Ahanoto v. Massachusetts Turnpike Authority*, 466 F.Supp. 2d 378, 388 (D.Mass. 2006) ("the Court advised the plaintiff that his MCRA and MERA claims were preempted by Chapter 151B and that they would be dismissed with prejudice if they were brought in the second amended complaint.  The MCRA and MERA claims … will be dismissed with prejudice"); *Edsall v. Assumption College,* 367 F.Supp.2d 72, 81 (D.Mass. 2005) ("Chapter 151B, where it can be invoked, preempts a claim under MERA …. Chapter 151B unquestionably applies to the employment-discrimination allegations in this case, and therefore the MERA claim is barred.").  *See also Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 582 (1994) ("The plaintiff contends that the equal rights act provides alternative remedies for employment discrimination in concert with c. 151B. We do not agree.  We base our decision on the language of c. 151B, legislative intent, and our precedents interpreting its scope"); *Cargill v. Harvard University*, 60 Mass.App.Ct. 585, 604 (2004) ("MERA does not create an independent right to vindicate an alleged wrong that can otherwise be redressed under G.L. c. 151B").

*Rowe v. Town of North Reading*, 2001 WL 170655 (Mass. Super., Jan. 5, 2001) and the other superior court cases cited by Svensson, simply fly in the face of the holdings of the SJC, the Appeals Court and this Court, and are not good law.  Indeed, *Rowe* reaches its conclusion by analogizing MERA to MEPA, despite the SJC's explicit ruling in *Green* that ch. 151B preempts MERA.  For the same reason, the cases cited by Svensson in footnote 51 of her Opposition that concern other statutes are of no precedential value.  In any event, even if MERA is not preempted by ch.151B, Svensson's MERA claims fail for the same reasons that her Title VII and ch. 151B claims fail – the absence of any evidence of gender animus.

## IV.  SVENSSON'S MEPA CLAIM IS TIME-BARRED AND FACTUALLY DEFICIENT

"Any action based upon or arising under [MEPA] shall be instituted within one year after the date of the alleged violation."  M.G.L. c. 149 §105A.   In her Opposition, Svensson asserts that "Putnam made discriminatory payments to Svensson within one year prior to the filing of this action," yet fails to direct the court to *any* record support for this conclusory statement.  Opp. at 22.  Because all bonus and equity decisions for the years 2003 and earlier were communicated to Svensson by March 15, 2003 (Tibbetts Aff. ¶ 13), and because Svensson did not file her MEPA claim until December 2004, her claims are untimely.

Svensson attempts to save her MEPA claim by asserting she "has established a systemic continuing violation" based on her presentation of "sufficient evidence to establish that Putnam had a general policy to discriminate against women, that the policy was applied to her, and that the policy continued into the limitations period."  Opp. at 22.  Because she cites no *evidence*, these remain naked, conclusory allegations.   Massachusetts' courts apply the continuing violation doctrine *only* to discriminatory acts *where the date of violation is unidentifiable*.  In *Silvestris v. Tantasqua Regional School District,* this Court held that the continuing violation approach "is not pertinent to an unequal compensation claim under G.L.c. 149, §105A, which is based on discrete acts."  446 Mass. 756, 769 (2006).  This Court explained that "expanding the continuing violation doctrine … to unequal wage claims brought under G.L.c. 149 §105A, would eviscerate the one-year statute of limitations set forth in § 105A."  *Id.*

Nor can a discovery rule save Svensson's claim.  *See* Part I.A, *infra.*  Svensson admits that a MEPA claim accrues, for example, when "plaintiffs ha[ve] reason to know of the starting salaries of male workers and their levels of experience and education."  Opp. at 22.  She then states *in conclusory terms and without citation to the record* that "she neither knew nor should have known how her pay and qualifications compared to those of similarly situated males until within the limitations period." Opp. at 22.  However, *in her Sixth Affidavit* Svensson states "I learned at the end of 2002 that several male analysts were receiving compensation of well over

- 17 -

$1,000,000 (while my compensation of approximately $1.65 million in 2000 and 2001 had been cut to approximately $650,000)."  Svensson's Sixth Aff. ¶ 22.

Even if not time-barred, Svensson's MEPA claim lacks a factual predicate.  See Part II(A), *infra.*  Svensson's opposition is devoid of any record citations for her claim that she suffered pay discrimination.  She fails to point the Court to any "similarly situated" men who were paid more than her, let alone that Putnam's reasons for any pay differential were pretextual.  Her own expert concedes that he could find no evidence of pay discrimination at Putnam. (*see, e.g.* White Report, Appendix E and testimony of Paul White, ("White Dep."), at 35-39, 50 and 83, (Putnam Memo. at 16-17, 19, 22, 24 and Tab 21).  At best, Svensson says that she cannot imagine that, given her performance in 2002 (the year as to which she is claiming pay discrimination), Putnam would pay any male more than she.  Svensson Fifth Aff. ¶ 27.  Of course, Svensson's self-assessment is immaterial and insufficient to defeat summary judgment.  *Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8, 15 (1st. Cir. 1998) (Plaintiff's "personal opinion regarding his own job qualifications is not sufficiently probative on the issue of pretext."); Putnam Memo. at 15.

## V.    ANY ATTEMPT TO REOPEN DISCOVERY SHOULD BE DENIED.

In light of the staleness of, and lack of merit to, her claims, Svensson makes a last-ditch effort pursuant to Fed. R. Civ P 56(f) to reopen a discovery period that commenced nearly three years ago so that she can do further analysis of the data considered by Putnam's expert.  As an initial matter, Svensson has made no effort to comply with Fed. R. Civ. P. 56(f)'s requirement that she submit an affidavit supporting her Rule 56(f) request that comports with the requirements of the Rule.  For this reason alone, her request should be denied.  *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd*., 133 F.3d 103, 109 (1st Cir.1997) ("Rule 56(f) of the Federal Rules of Civil Procedure specifically calls upon a litigant who feels prejudiced by too precipitate a demand for summary judgment to file a timely affidavit with the court asserting the need for further discovery.  As we have held, *failure to resort to such first aid will ordinarily bar belated aid.*") (emphasis added).

- 18 -

Second, Putnam produced the data that its expert considered in November 2007. See email from Putnam to Svensson, attaching "the data that Bloom considered in forming his opinions," dated November 26, 2007, attached as <u>Exhibit C</u> to the Supplemental Kurker Affidavit. Svensson now invokes Fed. R. Civ. P. 56(f) despite the fact that she has never asked her expert to analyze that data. Thus, when asked if he planned "on doing any additional work with the data considered by Putnam's expert," Svensson's expert replied "We haven't been asked to do so." White Dep., 20-21, attached hereto at <u>Exhibit D</u>. The short of it is that, despite the 15,000 documents which have been produced to Svensson and the thirteen depositions that she has taken, her expert has been unable to find *any* statistically significant evidence of gender animus. Although Svensson may want additional time and discovery, she simply has provided no basis for any entitlement to it.

<u>**CONCLUSION**</u>

For the reasons stated above, Putnam prays that this Court grant Putnam's Motion for Summary Judgment and dismiss the Amended Complaint with prejudice.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

/s/ Joseph L. Kociubes
Joseph L. Kociubes, BBO #276360
joe.kociubes@bingham.com
Louis A. Rodriques, BBO #424720
louis.rodriques@bingham.com
Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com
Jennifer L. Holden, BBO #663467
jennifer.holden@bingham.com
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: February 21, 2008

A/72437350.4/0398860-0000312913

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 21, 2008.


/s/ Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com