UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON,<br><br>              Plaintiff,<br><br>v.<br><br>PUTNAM INVESTMENTS LLC, f/k/a PUTNAM INVESTMENTS, INC. and LAWRENCE J. LASSER,<br><br>              Defendants | CIVIL ACTION<br>NO. 04-12711 PBS |

## SUPPLEMENTAL AFFIDAVIT OF ALLYSON E. KURKER IN SUPPORT OF PUTNAM INVESTMENTS' REPLY

I, Allyson E. Kurker, being duly sworn, hereby depose and say:

1. I am an associate at the law firm of Bingham McCutchen LLP and am one of the attorneys representing defendant Putnam Investments, LLC in connection with this matter.

2. Attached at Exhibit A is a true and correct copy of excerpts the Deposition of Lisa Svensson ("Svensson Dep.").

3. Attached at Exhibit B is a true and correct copy of excerpts the Deposition of Kelly Morgan ("Morgan Dep.").

4. Attached at Exhibit C is a true and correct copy of an email from Louis Rodriques to Kevin Moloney (on which I was copied), dated November 26, 2007.

5. Attached at Exhibit D is a true and correct copy of excerpts the Deposition of Paul White ("White Dep.").

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 21, 2008.

/s/ Allyson E. Kurker, BBO #665231
Allyson E. Kurker

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants at identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated at non-registered participants on February 21, 2008.

/s/ Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com

# EXHIBIT A

78

1  objection.
2  Q. Were there some false pretenses that Mr.
3  Lasser used to trick you into accepting the offer?
4  A. Yes. The biggest false pretense was the
5  fact that it would be a place where women could
6  thrive and there wouldn't be a glass ceiling, and
7  that you could actually have a career as a woman
8  where you'd be able to, you know, thrive.
9  Q. And that's what you're referring to? I just
10  want to be clear what it is that we're talking
11  about.
12  A. On my ability to be treated on an equal
13  footing with males, in terms of promotions,
14  compensation and benefits. That's what I'm
15  referring to.
16  Q. And am I correct that -- well, at what point
17  in time do you say that you learned that your
18  treatment was not equal because of your gender?
19  A. Well, when I first was interviewing at
20  Putnam, there was a remark made in one of my
21  interviews by one of the people that I interviewed
22  with, not that my treatment was different, but, you
23  know, I said to him, you know, It's a good place for
24  women, right? Because they had given me an article

79

1  that said it was a good place for women.
2  And he said, Well, we have a problem,
3  not really. We have a problem because, you know, a
4  lot of women come, but they don't stay. We can't
5  get them to stay. And, you know, for whatever
6  reason, they leave. And I actually brought that up
7  with Patrick O'Donnell. And he said, you know, not
8  true. Like, listen to me. And he was hiring a lot
9  of women and a lot of people of color. And he
10  looked like he was putting together a team that was,
11  you know, was going to stay and was going to be
12  diverse.
13  Q. My question is a little bit more narrow than
14  that. At what point, if ever, did you conclude that
15  you were being treated differently because of your
16  gender?
17  MR. WEIR: She was trying to answer that
18  question in her testimony.
19  Q. Did you know it from the day you came?
20  A. No.
21  Q. I'm looking for a point in time.
22  A. It was, as I said, the entirety of my
23  experience at Putnam. So, you know, I looked at
24  Patrick O'Donnell, looked at the team he was putting

80

1  together, and I thought, well, this looks good.
2  Maybe this can work. And, you know, there were some
3  women there. Because of the glass ceiling, you see
4  some women rising, so that gives you some hope. And
5  it takes the nine years to see how systematically
6  one after another, they're all gone.
7  So, you know, suddenly, there's no woman
8  in the partnership. And when did I see that it
9  applied to me? It applied to me as I went.
10  Different remarks when I had my pregnancy, my second
11  pregnancy, when I was denied promotion the second
12  time. Robert Swift, my boss, said to me, It was a
13  bad year for your promotion because you were out on
14  your maternity leave. And I objected to that
15  statement directly.
16  So it was statements like that. It was
17  many, many things over the years. But that is one
18  example, for sure, where I can say I began to
19  believe it was gender.
20  Q. At what time did you -- time period or year
21  or group of years -- did you begin to believe it was
22  gender? That's all I'm trying to understand.
23  A. Well, even at the beginning when I was in
24  the research team, Patrick and I had worked out a

**EXHIBIT B**

Page 38

1  final decision?
2      A. The -- the portfolio managers had the final
3  decision. There wasn't anyone above us. I mean,
4  they checked on us, but the ultimate decision was
5  yours.
6      Q. Who checked on it?
7      A. Well, Robert would. Um, there was a
8  process they called the 3P. I guess it was Tim
9  Ferguson's process where all the CIO's got together
10 and checked your performance and your process if
11 your performance had started to slip, and we went
12 through that.
13     Q. The three what?
14     A. 3P.
15     Q. What are the three P's?
16     A. Philosophy, process -- I forget. It later
17 became a 4P. I don't know.
18     Q. Okay.
19     A. All I know, it was a performance review.
20     Q. Did the performance of the global growth
21 fund in 2000 and 2001 in any way relate to your
22 decision to leave portfolio management and go back
23 to research?
24     A. Well, hmm. There was a couple of things

Page 39

1  behind that decision. First, I was always
2  interested in research. I was close with the
3  analysts. And second, I was always interested in
4  people management, because I had never been given a
5  shot at that. It was something I thought that I'd
6  be pretty good at, but I was told by others that
7  wouldn't be a good idea, so it was something I
8  wanted to try.
9      Q. Mm-hmm.
10     A. And to say the performance -- you know, I
11 would have stuck it out, but it definitely -- you
12 know, it wasn't -- it wasn't pleasant where I was,
13 and this was an interesting envi-- so yes, I guess
14 it was a consideration.
15     Q. Let me be a little more specific. Did you
16 anticipate that the performance of the global
17 growth fund in 2000 and 2001 had certain adverse
18 implications for you if you decided to remain in
19 portfolio management?
20     A. You mean would I be terminated because of
21 the poor performance?
22     Q. Or have any kind of adverse effect on your
23 job?
24     A. Oh, sure.

Page 40

1      Q. Well, what did you anticipate in that
2  regard?
3      A. Well, I assumed with a bad performance,
4  there'd be a compensation implication, which there
5  was, and I assumed there'd be -- that I could
6  potentially lose my job.
7      Q. Okay. Tell us about the adverse
8  implication for compensation.
9      A. Well, for the next couple of years,
10 compensation was cut.
11     Q. What were you earning in portfolio -- the
12 portfolio management on the global growth fund?
13     A. Well, 1999 was my biggest year. That was a
14 big year for all the growth managers. I'd be
15 guessing on the numbers. It was definitely my
16 biggest compensation year ever.
17     Q. Can you give us a ballpark figure?
18         MR. KOCIUBES: If you're not guessing.
19 If you have some sense of it, go ahead.
20     A. I think it was a million cash, a million
21 deferred, and then a million stock, and then from
22 there, I think it was half the next year and then
23 --
24     Q. (BY MR. WEIR) So it went from three to

Page 41

1  1.5?
2      A. Yeah, and then to one nine, something like
3  that. I could be off by a year or a little bit,
4  but that's basically that.
5      Q. And then when did it turn back up again?
6      A. Last year.
7      Q. Did you have a -- any interaction during
8  the time you were on the global growth fund with an
9  individual by the name of Paul Warren?
10     A. A little bit. We were in different areas.
11     Q. Okay. Do you know whether Mr. Warren was
12 nominated to be a managing director at the same
13 time that you were?
14     A. I think he was.
15     Q. Do you know whether Mr. Warren became a
16 managing director?
17     A. Yes, he did.
18     Q. Do you know anything with respect to the
19 process by which that came about?
20     A. No.
21     Q. Do you know whether Mr. Warren threatened
22 to resign as a result of your becoming a managing
23 director when he initially did not?
24     A. I had heard that rumor. You're right. So

11 (Pages 38 to 41)

# EXHIBIT C

### Kurker, Allyson E.

| | |
|---|---|
| **From:** | Rodriques, Louis A. |
| **Sent:** | Monday, November 26, 2007 4:14 PM |
| **To:** | 'Kevin F. Moloney'; john k. weir; Kociubes, Joseph L.; kfm @ h |
| **Cc:** | Holden, Jennifer L.; Kurker, Allyson E. |
| **Subject:** | RE: Expert depositions and scheduling |
| **Attachments:** | Scanned_.pdf |

Kevin:

Joe has asked that I reply to your email to him below since he is out of the office today.

Attached is the data that Bloom considered in forming his opinions. Per your email below, we'll expect your production of the data considered by both of your experts tomorrow.

As for the dates for the supplemental reports, we don't see why they need to be changed. Judge Saris set those dates as part of her order that we make additional discovery, so that your experts could supplement their reports in light of that discovery. You've had the additional production since October 19, and the dates for the supplemental reports were set with the October 19 production date in mind.

Lou


Louis Rodriques
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
Direct Dial: 617-951-8340
Direct Fax: 617-345-5050

*The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.*

*You should recognize that responses provided by means of this email are akin to ordinary telephone or face-to-face conversations and do not reflect the level of factual or legal inquiry or analysis which would be applied in the case of a formal legal opinion. A formal opinion could reach a different result. We would, of course, be happy to prepare such a definitive statement or formal opinion if you would like us to.*

**Exhibit D**

Paul F. White

Page 18

1  I knew a separate line of data for each event that
2  happened to them so the first line would be when they
3  were first hired by Putnam and another line that would
4  include a raise or a change in job or a performance
5  evaluation so that I know a full work history of where
6  they started, what has happened to them, change in pay
7  rates, etc. up until the present.  From that we can do,
8  depending upon the fields that were in that data, we
9  can do a lot of the analysis that would be needed for
10 this type of case.
11     Q.  And when did you ask for that kind of
12 information?
13     A.  In one of the earliest meetings that we had I
14 described that type of data and I said that's the kind
15 that we prefer to work with.
16     Q.  When you say you wanted full work history of
17 the employees, which employees are you -- I'm talking
18 about generic description.  Which employees are you
19 talking about?
20     A.  Ideally I wanted it for the entire Investment
21 Division.
22     Q.  And why would you want the full work history
23 for the entire Investment Division?  What purpose would
24 you then do with it?

Page 19

1     A.  One would be to compare the rest of the
2  Investment Division to the 91 comparators that -- I
3  believe it is 91 that Miss Svensson selected.
4     Q.  When did you get -- you just referred I think
5  for the first time to 91 comparators Miss Svensson
6  selected.  When were you first given that list?
7         MR. WEIR:  Objection.  First time at this
8  deposition.
9     Q.  When were you first given the list of the 91?
10    A.  I was given an initial list somewhat early on
11 and then I don't remember the date of her fourth
12 affidavit but it was the fourth affidavit that was the
13 one we relied upon in the end.
14    Q.  Now, you said that what you ideally would
15 want was information about the entire Investment
16 Division in order to compare it to the 91?
17    A.  Right.
18    Q.  And what would be the purpose of making such
19 a comparison?
20    A.  I think it is a concern that Dr. Bloom raised
21 in his report.  We wanted to see whether or not these
22 91 were similarly situated to Miss Svensson and whether
23 or not there would be perhaps people on the 91 who
24 maybe wouldn't be similarly situated and then also

Page 20

1  people elsewhere in the Investment Division who might
2  be similarly situated.
3     Q.  Were you also interested in checking whether
4  the 91 were representative of the Investment Division?
5     A.  That's kind of what I mean by that answer.
6     Q.  In other words whether it was a self-selected
7  or a random or meaningful sample?
8     A.  Right, right.
9     Q.  And were you able to do any of that kind of
10 work?
11    A.  No.  We never got data, detailed data for the
12 Investment Division.
13    Q.  Are you doing that kind of work now?
14    A.  No, sir.
15    Q.  Have you been asked to do that kind of work
16 now?
17    A.  No, but we don't have the data to do it.
18    Q.  Have you since -- during the last three weeks
19 have you been given additional data of any kind?
20    A.  I received the backup for Dr. Bloom's report
21 in the PDF file.
22    Q.  And has that been analyzed?
23    A.  No, sir.
24    Q.  Has there been any work done on it?

Page 21

1     A.  We looked at it visually.  We just scanned it
2  and looked to see if it was consistent with at least
3  for the people who were on both lists.  We did a couple
4  of spot checks.  That's all.
5     Q.  And are you planning on doing any additional
6  work with it?
7     A.  We haven't been asked to do so.
8     Q.  Other than what you have now testified to,
9  did you ask for any additional kinds of data?
10    A.  Generally speaking if there is data on -- let
11 me step back and try to organize my answer here.  We
12 asked for data on the entire Investment Division.
13 Included in that would be data related to not only
14 their work history and their compensation.  For the
15 entire Investment Division we would want to know
16 termination dates, reasons for termination.  We would
17 want to know as detailed as possible the performance
18 measures of the entire Investment Division.  We would
19 want to know education levels so additional fields for
20 people in the Investment Division we prefer to have.
21    Q.  You want that in order to control the various
22 variables?
23    A.  That's right.  Not just for compensation but
24 for the other analysis as well.

6 (Pages 18 to 21)

JONES REPORTING COMPANY
617-451-8900