UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LISA SVENSSON,<br><br>       Plaintiff,<br><br>  v.<br><br>PUTNAM INVESTMENTS, LLC and LAWRENCE J. LASSER,<br><br>       Defendants. | CIVIL ACTION<br>NO. 04-12711 PBS |

**DEFENDANT PUTNAM INVESTMENTS' OPPOSITION TO SVENSSON'S
EMERGENCY MOTION FOR AN ORDER CONTINUING
THE SUMMARY JUDGMENT HEARING**

Defendant Putnam Investments LLC ("Putnam") submits this Opposition to plaintiff Lisa Svensson's ("Svensson") emergency motion (filed after 9 p.m. on Friday, February 22, 2008) for an Order continuing the Summary Judgment Hearing scheduled for February 26, 2008. Putnam states the following in support of its opposition:

1. This Court has made clear that this is an old case. Trial of this matter is set for May 12, 2008, and the February 26, 2008 summary judgment hearing date has been set since July 9, 2007.

2. When this Court set the summary judgment schedule on July 9, 2007, it required that motions for summary judgment be filed by January 15, 2008 and oppositions by February 15, 2008. It also set hearing on summary judgment for February 26, 2008. Thus, all parties have long known that the total time within which both reply briefs (and any sur-replies) had to be filed was 11 days.

3. Putnam timely filed its Motion for Summary Judgment on January 15. Svensson timely filed her Opposition on February 15, leaving 11 days until the hearing. With her Opposition, Svensson filed some 450 pages of documents and incorporated four previously filed Svensson affidavits (replete with hearsay and speculation) plus two new Svensson affidavits, also containing inadmissible material, including hundreds of pages of unauthenticated documents.

A/72442794.3

Putnam filed its Reply three business days after Svensson filed her Opposition (President's Day weekend having occurred between the filing of Svensson's Opposition and Putnam's Reply.) In short, Putnam filed its Reply within 6 calendar days, leaving 5 days for Svensson to file any sur-reply.

4. To protect the record, Putnam moved to strike the inadmissible material filed by Svensson with her Opposition. The motion to strike was filed three business days (and 6 calendar days) after Svensson filed her Opposition. Svensson again was left 5 days to prepare and file an opposition to the motion to strike. Svensson offers no explanation why she could not file an opposition to the motion to strike before the scheduled hearing. (There, of course, is more than a touch of irony in Svensson's position. Having filed hundreds of pages of unauthenticated documents with her Opposition to summary judgment -- many of which she never cites in that Opposition -- Svensson now claims it is unfair to expect her to defend the admissibility of the documents *she* filed without being granted more time.)

5. Svensson's request for an extension of the summary judgment hearing date is simply her most recent attempt to avoid reaching the merits of this case, and should be denied. (Indeed, Svensson sought to compel further discovery and sanctions only *after* Putnam filed its summary judgment motion. Svensson asked the Magistrate Judge on February 11 to continue this Court's summary judgment hearing. That, of course, predated both Putnam's Reply and the motion to strike which Svensson now gives as the reasons for postponing the summary judgment hearing.)

6. Svensson seeks to postpone the summary judgment hearing, in part, on the ostensible ground that Magistrate Judge Bowler has not yet ruled on her motion to compel further expert discovery. The fact that Magistrate Bowler has not yet ruled on Svensson's motion provides no basis for extending the summary judgment hearing date, for several reasons.

    a.    First, to the extent that Svensson is contending that she needs additional expert or other discovery to oppose summary judgment (and therefore needs an extension of the hearing date), Svensson must comply with Fed. R. Civ. P. 56(f). Svensson has not made even a passing attempt to comply with the strict affidavit and other requirements of Rule

56(f) in connection with the present motion to postpone the summary judgment hearing, her opposition to Defendants' summary judgment motions, or even in the motion to compel being considered by Magistrate Judge Bowler. Her failure to do so is fatal to any request for additional delay. *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 109 (1st Cir.1997) ("Rule 56(f) of the Federal Rules of Civil Procedure specifically calls upon a litigant who feels prejudiced by too precipitate a demand for summary judgment to file a timely affidavit with the court asserting the need for further discovery. As we have held, *failure to resort to such first aid will ordinarily bar belated aid.*") (emphasis added).

b. Second, Svensson could not satisfy Rule 56(f) even if she attempted to do so. As detailed more fully in Putnam's opposition to the motion to compel pending before Magistrate Bowler (also referenced in Putnam's Reply Memorandum in connection with its Motion for Summary Judgment filed on February 21, 2008), Svensson has had all of the data considered by Putnam's expert (the subject of her motion to compel) since November 26, 2007, yet she has not even asked her expert witness to review or analyze that data. When Svensson's expert was asked at his deposition in December 2007 if he planned "on doing any additional work with the data considered by Putnam's expert," Svensson's expert replied "[w]e haven't been asked to do so." White Dep., 20-21, attached hereto at Exhibit A (authenticated by Supplemental Kurker Affidavit, Docket No. 249). Given that fact, Svensson cannot possibly satisfy the strictures of Rule 56(f).

c. Svensson never explains why the information she seeks in her motion to compel is critical to her summary judgment opposition, given that, as detailed in Putnam's summary judgment motion, all but one of her claims are preempted or time-barred, and her sole remaining claim (her termination claim) is wholly unrelated to the expert data that is the subject of her belated motion to compel. It is precisely these deficiencies that highlight Svensson's failure to comply with Rule 56(f)'s requirements.

  d. Finally, at the hearing before Magistrate Judge Bowler on February 11, 2008, in connection with Svensson's motion to compel, Svensson advised the Magistrate Judge of the summary judgment briefing and hearing schedule and specifically requested an extension of the time within which she must reply to defendants' summary judgment motions (again without attempting to comply with Rule 56(f)).  To date, the Magistrate Judge has not granted Svensson's request to delay this Court's hearing date, with the result that Svensson submitted her opposition papers on February 15, 2008.  Putnam submitted its reply memorandum on February 21, 2008.

7. In short, summary judgment has been fully briefed and is ripe for hearing and decision.

## CONCLUSION

For the reasons stated above, Putnam prays that this Court deny Svensson's Motion for a Continuance of the Summary Judgment Hearing.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

/s/ Joseph L. Kociubes_____
Joseph L. Kociubes, BBO #276360
joe.kociubes@bingham.com
Louis A. Rodriques, BBO #424720
louis.rodriques@bingham.com
Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com
Jennifer L. Holden, BBO #663467
jennifer.holden@bingham.com
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: February 23, 2008

**CERTIFICATE OF SERVICE**

    I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 23, 2008.

                                    /s/ Allyson E. Kurker, BBO #665231
                                    allyson.kurker@bingham.com

# EXHIBIT A

Page 18

1  I knew a separate line of data for each event that
2  happened to them so the first line would be when they
3  were first hired by Putnam and another line that would
4  include a raise or a change in job or a performance
5  evaluation so that I know a full work history of where
6  they started, what has happened to them, change in pay
7  rates, etc. up until the present. From that we can do,
8  depending upon the fields that were in that data, we
9  can do a lot of the analysis that would be needed for
10 this type of case.
11     Q.  And when did you ask for that kind of
12 information?
13     A.  In one of the earliest meetings that we had I
14 described that type of data and I said that's the kind
15 that we prefer to work with.
16     Q.  When you say you wanted full work history of
17 the employees, which employees are you -- I'm talking
18 about generic description. Which employees are you
19 talking about?
20     A.  Ideally I wanted it for the entire Investment
21 Division.
22     Q.  And why would you want the full work history
23 for the entire Investment Division? What purpose would
24 you then do with it?

Page 19

1     A.  One would be to compare the rest of the
2  Investment Division to the 91 comparators that -- I
3  believe it is 91 that Miss Svensson selected.
4     Q.  When did you get -- you just referred I think
5  for the first time to 91 comparators Miss Svensson
6  selected. When were you first given that list?
7         MR. WEIR:  Objection. First time at this
8  deposition.
9     Q.  When were you first given the list of the 91?
10    A.  I was given an initial list somewhat early on
11 and then I don't remember the date of her fourth
12 affidavit but it was the fourth affidavit that was the
13 one we relied upon in the end.
14    Q.  Now, you said that what you ideally would
15 want was information about the entire Investment
16 Division in order to compare it to the 91?
17    A.  Right.
18    Q.  And what would be the purpose of making such
19 a comparison?
20    A.  I think it is a concern that Dr. Bloom raised
21 in his report. We wanted to see whether or not these
22 91 were similarly situated to Miss Svensson and whether
23 or not there would be perhaps people on the 91 who
24 maybe wouldn't be similarly situated and then also

Page 20

1  people elsewhere in the Investment Division who might
2  be similarly situated.
3     Q.  Were you also interested in checking whether
4  the 91 were representative of the Investment Division?
5     A.  That's kind of what I mean by that answer.
6     Q.  In other words whether it was a self-selected
7  or a random or meaningful sample?
8     A.  Right, right.
9     Q.  And were you able to do any of that kind of
10 work?
11    A.  No. We never got data, detailed data for the
12 Investment Division.
13    Q.  Are you doing that kind of work now?
14    A.  No, sir.
15    Q.  Have you been asked to do that kind of work
16 now?
17    A.  No, but we don't have the data to do it.
18    Q.  Have you since -- during the last three weeks
19 have you been given additional data of any kind?
20    A.  I received the backup for Dr. Bloom's report
21 in the PDF file.
22    Q.  And has that been analyzed?
23    A.  No, sir.
24    Q.  Has there been any work done on it?

Page 21

1     A.  We looked at it visually. We just scanned it
2  and looked to see if it was consistent with at least
3  for the people who were on both lists. We did a couple
4  of spot checks. That's all.
5     Q.  And are you planning on doing any additional
6  work with it?
7     A.  We haven't been asked to do so.
8     Q.  Other than what you have now testified to,
9  did you ask for any additional kinds of data?
10    A.  Generally speaking if there is data on -- let
11 me step back and try to organize my answer here. We
12 asked for data on the entire Investment Division.
13 Included in that would be data related to not only
14 their work history and their compensation. For the
15 entire Investment Division we would want to know
16 termination dates, reasons for termination. We would
17 want to know as detailed as possible the performance
18 measures of the entire Investment Division. We would
19 want to know education levels so additional fields for
20 people in the Investment Division we prefer to have.
21    Q.  You want that in order to control the various
22 variables?
23    A.  That's right. Not just for compensation but
24 for the other analysis as well.