UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION |
| PUTNAM INVESTMENTS LLC, f/k/a PUTNAM ) | NO. 04-12711 PBS |
| INVESTMENTS, INC. and LAWRENCE J. LASSER, ) | |
| ) | |
| Defendants ) | |
| ) | |

**LAWRENCE J. LASSER'S REPLY TO
SVENSSON'S OPPOSITION TO
LASSER'S MOTION FOR SUMMARY JUDGMENT**

Defendant Lawrence J. Lasser submits this Reply Memorandum in further support of his Motion for Summary Judgment dismissing the single court (Count XII) of Plaintiff Lisa Svensson's Amended Complaint pertaining to Mr. Lasser.

## INTRODUCTION

Mr. Lasser's Motion for Summary Judgment (the "Motion") is based, in part,[1] on the fact that Ms. Svensson has no evidence to support her single claim for "aiding and abetting" alleged gender discrimination by Putnam Investments LLC ("Putnam"). Specifically, there is no evidence (and Ms. Svensson has come forth with none) that Mr. Lasser committed any separate and distinct wrongful act as to Ms. Svensson; that he harbored any discriminatory animus or

---

[1] The Motion is also premised on the fact that Ms. Svensson's claims are time barred (see pages 12-13 of Mr. Lasser's Memorandum of Law in Support of Lawrence J. Lasser's Motion for Summary Judgment on Count XII of Lisa Svensson's Amended Complaint ("Main Memo")), and that the aiding and abetting claim must be dismissed if the Chapter 151B gender discrimination claim against Putnam is dismissed (See page 16 of the Main Memo.). With respect to these points, Mr. Lasser joins in and relies on the arguments presented, and relies on the authorities cited, by Putnam in Putnam's primary brief and in its reply brief, and the supporting documents.

10916174.1

intent with respect to Ms. Svensson; or that he actively participated in any of the alleged Adverse Employment Actions *as to Ms. Svensson* on which her claims are premised:  (1) depriving her of equivalent compensation compared to her male colleagues in 2002 and 2003; (2) depriving her of promotion to the officer title of managing director between 2000 and 2003; (3) transferring her in 2002; and (4) terminating her employment in 2003.

During her depositions by Putnam and by Mr. Lasser, it was clear that Ms. Svensson had no evidence whatsoever on which to base her claims.  Now, on the eve of trial, after receiving 15,000 documents in discovery, and after thirteen (13) depositions, *she still has provided this Court with no evidence on which Mr. Lasser's individual liability can be predicated.*  Instead, her opposition papers largely contain repetitive quotes from documents and depositions which do not even concern Ms. Svensson or the Adverse Employment Actions, and thus do not establish (and are not evidence of) Mr. Lasser's wrongful acts, discriminatory intent or participation in the Adverse Employment Actions at issue in this case.  In many cases, these selective quotations are preceded or followed by other statements or testimony which entirely negate the point Ms. Svensson is attempting to make with her out-of-context quotation.  This flimsy presentation falls far short of the "specific facts" which Ms. Svensson was required to produce in order to survive summary judgment.  Fed. R .Civ. P. 56(e)(2).  Instead, the record is replete with testimonial and documentary evidence from the people who actually made the decisions about Ms. Svensson, and those individuals are clear that Mr. Lasser was simply not involved.  On this record, Mr. Lasser cannot be liable for aiding and abetting Putnam's alleged discrimination under G.L. c. 151B, §4(5).[2]

---

[2]  In her opposition, Ms. Svensson does not contest Mr. Lasser's argument – and the law which clearly holds – that there is no individual liability under Title VII.  See page 12 of Mr. Lasser's Main Memo.

    **A.    Ms. Svensson Has Not Presented This Court with Evidence of Mr. Lasser's Individual and Distinct Wrongful Acts or His Active Participation in the Alleged Adverse Employment Actions As To Her.**

            **1.    Ms. Svensson's Compensation in 2002 and 2003 Was <u>Not Set by Mr. Lasser.</u>**

In a vain attempt to establish that Mr. Lasser participated in setting her compensation during the years 2002 and 2003, Ms. Svensson quotes from the A&P and Profit Growth Award documents, which state, in relevant part, that

> The purpose of the Plan is to reward the contributions of selected senior professionals and other employees of the Putnam Companies at the discretion of the President . . .

Ms. Svensson cites to page PRM 01365 (attached to the Affidavit of David S. Rosenthal ("Rosenthal Aff.") as Exhibit 1). However, she neglects to cite to page 5 of the Profit Growth Award plan or to page 3 of the A&P plan,[3] both of which define the term "President" as "the President of Putnam Investments, Inc., *or his designee*" (emphasis supplied). Ms. Svensson's omission could not be more significant, since the record evidence is that the decisions with respect to individual awards under these plans were not made by Mr. Lasser at all, but by his "designee" – the CIO of each of the teams within the Investment Management Division ("IMD"). See paragraphs 8-12 of the Affidavit of Richard B. Tibbetts, submitted by Putnam in support of its summary judgment motion. ("The CIO of each team then set the bonus for each individual on that team."). This is typical of the quality of the so-called evidence relied upon by Ms. Svensson to support her contention that Mr. Lasser actively participated in the decisions made as to her compensation and the other Adverse Employment Actions.[4]

---

[3]    The language of the A&P and Profit Growth Award documents is identical, in pertinent part. (Rosenthal Aff. Ex. 2).

[4]    There is a very small universe of documents and deposition testimony to which Ms. Svensson refers, over and over again, in multiple sections of her Opposition. No matter how many times she refers to the same material,

*(Footnote continued on next page)*

Another example of this is Ms. Svensson's reference to PRM 14236-37 at pages 10 and 11 of her Response to Defendant Lasser's Local Rule 56.1 Statement of Fact ("Svensson's Response"). While this document concerns promotion to Managing Director, it is cited by Ms. Svensson in support of her contention that Mr. Lasser determined her compensation. In any event, the quotation from Mr. Tibbetts establishes that a decision was made by Mr. Lasser in 2003 that "all officer title promotions are currently on hold." The key word here, in this gender discrimination case, is "all." It is ludicrous to contend, as Ms. Svensson apparently does, that this decision to suspend "all" promotions in 2003 – for everyone, men and women – could somehow be evidence of gender discrimination by Mr. Lasser directed to her.[5]

Equally flawed is Ms. Svensson's argument concerning identification of "franchise players," to which she refers on page 10 of Svensson's Response. She cites to pages 150 and 151 of the Tibbetts deposition, but that testimony does not establish that Mr. Lasser chose the so-called "franchise players," or determined their compensation. In fact, on the very next page (page 152) of the transcript of Mr. Tibbett's deposition, Mr. Tibbetts made clear that others, not Mr. Lasser, made the determination as to their compensation:

> Larry allocated money or equity, as the case may be, to each of those senior managing directors, and then those senior managing directors worked with their human resources representatives and their managers to *distribute those awards.*

(Tibbetts Dep. 152: 13-18 (emphasis supplied), Rosenthal Aff. Ex. 3). Again, Ms. Svensson's selective quotations are entirely misleading, and do not provide any evidence of distinct

---

*(Footnote continued from previous page)*
    the material is still inadequate to show Mr. Lasser's active participation in the Adverse Employment Actions as to her.

[5]    The evidence in the record is that there were no promotions to MD during 2003 – no men, no women. (Tibbetts Aff. ¶ 34.)

discriminatory acts by Mr. Lasser or his active participation in the alleged Adverse Employment Actions as to her. Those decisions were simply not made by Mr. Lasser.

### 2. Mr. Lasser Did Not Participate In The Decisions To Not Promote Ms. Svensson to Managing Director.

Ms. Svensson relies principally on another selective quotation to support her contention that Mr. Lasser played a role in the decisions not to promote her to MD in 2000-2003. (Svensson's Resp. 14). This time, the out-of-context testimony comes from Mary McNamee. Ms. Svensson omits from her Response Ms. McNamee's testimony, at page 89 of the transcript of her deposition (Rosenthal Aff. Ex. 4), as follows:

> Q: Did there ever come a time when you or HR got input from Mr. Lasser concerning his conclusions after reading the book?
>
> A: Well, I think it was more just a *rubber stamp*. I don't recall any specific item in which he got the book and said, oh, take out this people or take out that person. *He generally let the managers go with who they recommended.*

(McNamee Dep. 89: 7-14 (emphasis supplied).)

This is completely consistent with the other record evidence, which establishes that in the IMD, the CIO nominated individuals on the team whom he believed to be worthy of officer promotion. The IMD's senior management discussed these nominations in roundtable meetings and promoted those persons whom they deemed appropriate. (Putnam Stmt. ¶5.)[6] Mr. Lasser's role in this process was extremely limited, and included "rubber stamping" the promotion selections made by the CIO, as Ms. McNamee explained at her deposition.[7]

---

[6]   As in the Main Memo, Mr. Lasser uses the shorthand "Putnam Stmt." to refer to Putnam's Local rule 56.1 Statement of Undisputed Facts, and "Lasser Stmt." to refer to Mr. Lasser's Statement of Material Facts in Support of Lawrence J. Lasser's Motion for Summary Judgment.

[7]   The document (PRM 4031) referenced by Ms. Svensson on page 14 of her Response, does not establish that Mr. Lasser's approval "was required" for promotions. The evidence is that his subordinates made the decisions, and he was just a rubber stamp. Indeed, consistent with the practice described by everyone who

*(Footnote continued on next page)*

In any event, there is absolutely no evidence that Mr. Lasser did anything to prevent her promotion. Indeed, the record evidence is that her nomination to MD was never approved by the senior managers in the IMD – the group charged with making the decisions about her promotion – so the decision regarding Ms. Svensson never would have even reached Mr. Lasser's desk. (Tibbetts Aff. ¶¶ 5, 29-31.)[8] The vote in 2000, for example, was 8 to 0 against her promotion; no one voted in her favor, and there was nothing for Mr. Lasser to do, pro or con, as far as Ms. Svensson was concerned. (Tibbetts Aff. ¶31; PRM 01792, Rosenthal Aff. Ex. 5.) And, of course, in 2003, no one, male or female, was considered for promotion to MD. (Tibbetts Aff. ¶34.)

### 3. Mr. Lasser Played No Role In Ms. Svensson's "Demotion" in 2002 from Portfolio Manager to Research Analyst.

Here, too, Ms. Svensson has provided the Court with no evidence to support her contention that Mr. Lasser participated in the decision to move Ms. Svensson to an Analyst's position in 2002. Instead, she cites to an email dated January 3, 2002 (PRM 9681-84, on page 18 of her Response) which says *nothing* about Ms. Svensson, and talks generally about Mr. Lasser's management style. She also cites to the deposition testimony of Mary McNamee (page 148, lines 5-12) in which Ms. McNamee says nothing about Ms. Svensson or the decision to move her to an Analyst's position. The context of this testimony was a discussion about a group within Putnam of which Ms. Svensson was not a member. Rather, Ms. McNamee testified that

---

*(Footnote continued from previous page)*
    testified about it, the decisions sent up to Mr. Lasser were "approved as submitted," according to this document.

[8] There is also nothing to Ms. Svensson's contention that her chances for promotion were dashed by Mr. Lasser's "pressuring" senior management personnel to "write down" her score. The documents Ms. Svensson refers to do not show any involvement or pressure by Mr. Lasser. Rather, the documents show that Jack Morgan wrote down the scores of several people, both men and women. (PRM 3548; Rosenthal Aff. Ex. 7.) There is no conceivable basis, on this record, to establish that Mr. Lasser was responsible for her not being promoted on account of her gender.

sometimes Mr. Lasser was given an opportunity to "approve or not" or was "just told as an FYI" about changes in the structure of the IMD.  In either case, it is clear from this testimony and the testimony cited below in the next paragraph, that others at Putnam were charged with making the decisions about restructuring the International Growth Team after its poor performance. (Putnam Stmt. ¶ 17.)

Indeed, at pages 164-165 of her deposition transcript (Rosenthal Aff. Ex. 6), Ms. McNamee confirmed this way of doing business when she testified about who made very key decisions about how to fix the poor performance of the Growth Team:

> Q: And who was to make the decision as to how it [the Growth Team] would be rebuilt?
>
> A: That would be Steve O primarily because he headed up all of Growth and then ultimately once Tim moved, he and Tim would have helped as well and then once when – that continued through 2002 and Ed Haldeman joined and became CIO with Steve, they both, you know, I'm assuming would have handled that change altogether.
>
> Q: Would Larry Lasser have played a role?
>
> A: He would have played a role and *he would have wanted them to come up with the idea and the plan and then pass it by him for approval* (emphasis supplied).

(McNamee Dep. 164: 13 to 165: 1).

Importantly, there is no evidence whatsoever that Mr. Lasser made any decision about Ms. Svensson's moving to an Analyst's position, and the undisputed *modus operandi* described in the record reflects that the specific decisions about her position were made by the leaders of the IMD who were tasked with improving the performance of the team for which they were responsible.

The confusion and lack of merit in Ms. Svensson's contention that Mr. Lasser was the omnipresent and all-controlling puppeteer responsible for the Adverse Employment Actions is

10916174.1

demonstrated by paragraph 31 of her Sixth Affidavit.  On the one hand, she makes the conclusory, unsupported assertion that Mr. Lasser was "micro-managing" the HR function. Then she writes about Ed Haldeman and Josh Brooks coming to Putnam to "clean house," and that the HR Department was playing a role in "implementing employment policies at Putnam" (as though that would somehow be a shocking thing for an HR department to do).  Thus, within this single paragraph she establishes that Mr. Lasser was not controlling everything.  On the contrary, Mr. Haldeman and Mr. Brooks, in her view, controlled the fate of IMD personnel, and Putnam's large and professional HR department was "implementing employment policy."  The problem with hyperbolic rhetoric is that it seldom stands up to factual scrutiny.

**4.  There is No Evidence That Mr. Lasser Played Any Role In The Decision To Terminate Ms. Svensson's Employment, Or In The Investigation Leading Up To <u>Her Termination.</u>**

There is absolutely no evidence of Mr. Lasser's participation in the events leading up to Ms. Svensson's termination, or in the termination decision itself.  All of the evidence regarding these events is consistent and uncontradicted, and none of it reflects involvement by Mr. Lasser. (Putnam Stmt. ¶¶ 36-41.)

Ms. Svensson suggests, at one point, that she may have been terminated because of a concern she raised about directed brokerage commissions.  Importantly, she raised this concern to Josh Brooks, her boss, not to Mr. Lasser.  (Svensson's Resp. 23-25.)  She then testified that she did not think that was the reason for the termination:

> Q: From these facts you infer that the real reason you got fired was because you raised the issue of directed commissions?
>
> A: No. I believed that raising the issue of directed commissions was yet another mark against me as an outspoken woman. I was already vulnerable on that.

Id. Her personal beliefs regarding her being "an outspoken woman," as they relate to Mr. Lasser, are completely without evidentiary support. There is no evidence in the record that Mr. Lasser regarded her that way, that he even knew that she had raised an issue about directed commissions, or that Mr. Lasser was disturbed by anyone raising this issue with him. Indeed, the testimony cited by Ms. Svensson on pages 23-25 of her Response reflects that a question about directed commissions had been raised by others <u>before</u> she even mentioned it to Mr. Brooks.[9]

    Equally specious is Ms. Svensson's contention that since Mr. Lasser allegedly knew about a change in her position before her departure, he participated in the decision to terminate her. There is no evidence to support such conjecture, even if the timing is as Ms. Svensson contends it is. Rather, the evidence is clear that Mr. Brooks and HR conducted an investigation of complaints about Ms. Svensson's management style; learned that she may have lied about a review of one of her subordinates; and *Mr. Brooks made the very understandable decision* that Ms. Svensson should not be managing other people. (Putnam Stmt. ¶¶ 36-41.) It is no more complicated than that. There is simply no evidence to contradict this record evidence, or to show

---

[9] There is also no evidence that she was regarded by anyone at Putnam as an "outspoken woman," or that this view of her (even if it existed) impacted her career. It is, however, interesting that Ms. Svensson chooses to view this conversation – her raising an issue with Josh Brooks about which he agreed with her – as creating an adversarial relationship between herself and Putnam. Her conclusion is completely illogical – Mr. Brooks agreed with her, and had already spoken to Mr. Lasser about the issue. Her inappropriate leap of logic reflects that Ms. Svensson viewed virtually *everything* through a prism which colored her interactions as reflecting gender discrimination. Another example of this skewed vision is her view that Mr. Lasser's asking her questions about her husband being a stay-at-home father, demonstrates that he harbored discriminatory animus directed to her. Ms. Svensson's subjective, skewed vision of Putnam generally, and Mr. Lasser in particular, do not constitute evidence sufficient to survive summary judgment. Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (plaintiffs subjective beliefs are insufficient to carry her summary judgment burden.)

that Mr. Lasser made or participated in the decision to terminate her employment.  Indeed, the quotation cited by Ms. Svensson (Svensson Resp. ¶16) shows that the decision to terminate her was made by Mr. Brooks, and he told Mr. Lasser about it *after* he (Mr. Brooks) made the decision:

> *I remember once the decision was made . . .*  I do remember that Larry mentioned to me he had heard about it.

(Brooks Dep. 185 (emphasis supplied); Rosenthal Aff. Ex. 7.)

Ms. Svensson would have the Court believe, without any evidence of his actual involvement, that Mr. Lasser was directly involved in every decision to compensate, promote, demote or terminate every employee in the very large and diverse Putnam organization, and that because of that, he must have made the decisions about Ms. Svensson in particular.  No CEO of an organization of that size can possibly do that.  Putnam had a large, professional HR staff.  The evidence shows that Mr. Lasser delegated HR functions and decisions – compensation, promotions, demotions – to them and to the senior people in the IMD and other divisions.  That is simple common sense.  Ms. Svensson is not entitled to an "inference" that Mr. Lasser was an active participant in these routine HR decisions affecting Ms. Svensson because there is no evidence to support such an inference, because that inference flies in the face of common sense, and because the record contains detailed evidence about how these decisions were made and by whom – *and it was not Mr. Lasser.*  Ingram v. Brink's, Inc., 414 F.3d 222, 229 (1st Cir. 2005) ("Summary judgment cannot be defeated by relying on improbable inferences. . . ").  Certainly, the selective and contradicted quotations on which she relies do not support such an inference.  Moreover, there is no evidence in the record that Mr. Lasser had any discriminatory animus directed to Ms. Svensson.

Because Ms. Svensson, even after protracted and voluminous discovery, has not sustained her burden of coming forward with specific, factual evidence of Mr. Lasser's separate and distinct discriminatory acts, or of his active participation in the Adverse Employment Action as to Ms. Svensson, Mr. Lasser is entitled to summary judgment dismissing Count XII of the Amended Complaint.

### B. The Cited Cases Establish That Summary Judgment Dismissing the Aiding and Abetting Claim Against Mr. Lasser Should Be Granted.

Ms. Svensson has asserted a claim for "aiding and abetting" under G.L. c. 151B, §4(5). (Amended Compl., Count XII.) She has never asserted a claim for "interference" under G. L. c. 151B, §4(4A), and this case must be adjudicated as plead – as an aiding and abetting claim against Mr. Lasser.

As explained in Mr. Lasser's Main Memo (pages 13-16), the Harmon v. Malden Hospital standard, as approved by the Massachusetts Appeals Court in Beaupre v. Smith & Assocs., 50 Mass. App. Ct. 480, n. 18 (2000), must be satisfied to hold Mr. Lasser individually liable. He is entitled to summary judgment because Ms. Svensson has not produced "specific facts" showing (a) "individual and distinct" wrongs committed by Mr. Lasser; (b) an intent to discriminate against Ms. Svensson on account of her gender; or (c) his knowledge that he was participating in an enterprise to deprive Ms. Svensson of her rights under Chapter 151(B).

Ms. Svensson instead argues that Mr. Lasser actively participated in the conduct of Putnam, and that such active participation is enough to hold Mr. Lasser liable for aiding and abetting Putnam. But the cases on which she relies do not assist her.

In section 3.4 of her Opposition brief, Ms. Svensson argues that she has presented evidence sufficient to create a genuine issue of material fact as to whether Mr. Lasser aided and abetted Putnam's alleged discrimination against her or interfered with her exercise or enjoyment

10916174.1

of Chapter 151B rights. However, the cases on which Ms. Svensson relies to prove this point are readily distinguishable from the facts of this case. The majority of the cases involve facts where the supervisor was actively involved in the employment decision at issue, was the primary harasser or discriminator, or received complaints directly from the plaintiff but failed to take action – all distinct from the facts of this case. Indeed, several of the cases that Ms. Svensson cites resulted in summary judgment awards *to the supervisor*.

The cases that Ms. Svensson cites in her Opposition brief at footnote 3 (page 9) to support her position that sections 4(4A) and 4(5) of Chapter 151B impose personal liability "on corporate officers like Lasser" do not stand for that position; none involve the imposition of personal liability on a "corporate officer like Lasser." Summary judgment was granted to various defendant supervisors in half of the cases cited by Ms. Svensson in footnote 3. In these cases, summary judgment was granted because there was insufficient evidence of the requisite intent to discriminate, insufficient evidence of *any* acts of discrimination, or insufficient proof that the supervisor was even required to act. See Anthony v. Busby, No. 03-12423-RWZ, 2005 WL 3440644, at *2 (D. Mass. Dec. 15, 2005); Luciano v. Coca-Cola Enters., Inc., 307 F. Supp. 2d 308, 317, 324 (D. Mass. 2004) ("On these facts, construed in the light most favorable to [the plaintiff], it is somewhat surprising that [the supervisors] are named as defendants. [The plaintiff] does not appear to claim that they engaged in any acts of discrimination. The most that can be gleaned from the materials submitted by [the plaintiff] is that she was disappointed that [the supervisors] did not more energetically come to her defense."); Morehouse v. Berkshire Gas Co., 989 F. Supp. 54, 62 (D. Mass. 1997); Frederick v. Richardson Electronics, LTD., No. 0300928, 2005 WL 2542929, at *8 (Mass. Super. Sept. 19, 2005).

In Anthony v. Busby, this Court (Zobel, J.) granted summary judgment to plaintiff's supervisor on plaintiff's aiding and abetting claim, writing that "plaintiff must show that the

[supervisor] 'had the requisite intent to discriminate.'" Anthony, 2005 WL 3440644, at *2 (citing Beaupre, 50 Mass. App. Ct. at 494). As in Anthony, Ms. Svensson has no evidence of Mr. Lasser's intent to discriminate against her. It is simply silly to contend that Mr. Lasser's conversation with her about her husband shows discriminatory animus *as to her*. Lehman v. Prudential Ins. Co., 74 F.3d 323, 329 (1st Cir. 1996) ("Isolated, ambiguous remarks are insufficient, by themselves, to prove discriminatory intent."). And Ms. Svensson cannot infer discriminatory intent from Mr. Lasser's actual participation in the Adverse Employment Actions, since there is no evidence of such participation. As in Anthony and many of the other cases cited by Ms. Svensson, the aiding and abetting claim here cannot "survive summary judgment." See Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 431, (1st Cir. 2005) (summary judgment denied where the "nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation"); Wynn & Wynn, P.C. v. MCAD, 431 Mass. 665, 667 (2000) (statements made by decision makers "unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden in these cases.").

In the remaining cases cited by Ms. Svensson in footnote 3 where summary judgment for the defendant supervisors was denied, the evidence showed that the supervisor was the *primary harasser or discriminator*, was *actively involved* in the employment decision at issue, or *received complaints directly from the plaintiff* but failed to take action – none of which facts are present in this case with respect to Mr. Lasser. See Luciano, 307 F. Supp. 2d at 324; Lemire v. Silva, 104 F. Supp. 2d 80, 92-93 (D. Mass. 2000); Meara v. Bennett, 27 F. Supp. 2d 288, 291 (D. Mass. 1998); Morehouse, 989 F. Supp. at 62; Anderson v. SmartBargains, Inc., No. 035869E, 2006 WL 760303, at *2 (Mass. Super. Jan. 10, 2006); Gerrie v. Karl Storz Endovision, Inc., No. 992452, 2003 WL 22700364, at *1-2 (Mass. Super. July 15, 2003).

10916174.1

The cases that Ms. Svensson cites in section 3.4.2 of her Opposition brief (pages 10-15) to support the position that Mr. Lasser is personally liable for his alleged failure to take action to prevent Putnam's alleged discrimination against her also do not stand for that position. Summary judgment was also granted to various defendant supervisors in many of the cases cited by Ms. Svensson in this section. In these cases, summary judgment was granted to the supervisors because there was either insufficient evidence of the requisite intent to discriminate or insufficient proof that the supervisor was even required to act. See Woodason v. Town of Norton Sch. Comm., No. 98-BEM-0624, 2003 WL 554332, at *4 (MCAD Feb. 19, 2003); Beasley v. Aramark Uniform and Career Apparel, Inc., 430 F. Supp. 2d 8, 13-14 (D. Mass. 2006); Mayo v. Dalbar, Inc., No 996276, 2003 WL 1020725, at *3 (Mass. Super. 2002); Morehouse, 989 F. Supp. at 62; Gledhill v. Univ. of Mass. Med. Sch., No. 04-2021 C, 2007 Mass. Super. LEXIS 398, at *14 (Sept. 11, 2007).

In the remaining cases cited in section 3.4.2 where summary judgment for the defendant supervisors was denied, the supervisor was the *primary harasser* or discriminator, was *actively involved in or the primary decision maker* for the employment decision at issue, *or received complaints directly from the plaintiff* (or another alleged victim) but failed to take action – again, none of which remotely resemble Mr. Lasser's involvement in this case. See Poore v. Town of Harwich High Sch., No. 98-BEM-1091, 2004 WL 2997699, at *30 (MCAD Nov. 12, 2004); Ackerman v. Schwartz, No. 96-BEM-2125, 2004 WL 304416 (MCAD Feb. 9, 2004); Morehouse, 989 F. Supp. at 62; Chapin v. Univ. of Mass. at Lowell, 977 F. Supp. 72, 80 (D. Mass. 1997); Gerrie, 2003 WL 22700364, at *1-2; LeClerc v. Interstate Distrib. Div. of Hudson News Co., No. 9702008, 2000 WL 33170694, at *9 (Aug. 31, 2000); Gledhill, 2007 Mass. Super. LEXIS 398, at *15; Hope v. San-Ran, Inc., 8 MDLR 1195, at *17-18 (MCAD Aug. 15, 1986).

On page 13 of her Opposition brief, Ms. Svensson writes that "it is clear that a corporate officer who *knows* discrimination is occurring, but fails to take action to stop it, is personally liable." (Emphasis supplied). This principle has no application to Mr. Lasser, for several reasons. First, there was no discriminatory conduct by Putnam. The moving and reply briefs submitted by Putnam, and on which Mr. Lasser relies as well, make this conclusion inescapable. If Putnam did not violate Chapter 151B, the derivative aiding and abetting claim against Mr. Lasser must fail. (Main Memo 16.)

Second, if there was no discrimination, logically Mr. Lasser could not have had knowledge of it, and there would have been nothing for Mr. Lasser to stop.

Third, there is no evidence that Mr. Lasser had "knowledge" of any discrimination with respect to the Adverse Employment Actions. As explained in Point A of this brief, Ms. Svensson has produced no evidence that Mr. Lasser actively participated in any of the decisions about which Ms. Svensson complains. The record evidence is that the HR decisions at issue here were made by senior management of the IMD and the HR professionals at Putnam. Even after the extensive discovery in this case, Svensson has come up with no evidence that the legitimate non-discriminatory reasons for the decisions made by these people were pretextual. (Putnam Reply Brief 12-15.)

This is simply not a case like <u>Chapin</u>, <u>Gerrie</u> or <u>LeClerc</u>, in which the employee complained directly to a senior manager, and that manager ignored the complaint and did nothing to investigate or stop the harassment. Ms. Svensson had a number of interactions with Mr. Lasser, but she never complained to him about alleged gender discrimination, or, for that matter, about any of the decisions others had made about her career. These facts are not disputed, and, on these undisputed facts, Ms. Svensson cannot establish knowledge and culpable indifference on the part of Mr. Lasser. Her theory about Mr. Lasser's pervasive control of every

10916174.1

HR decision has been shown to be entirely fallacious by the extensive testimonial and documentary discovery in this case.  And there is simply no evidence to support Ms. Svensson's rank speculation about a company-wide policy of gender discrimination created or fostered by Mr. Lasser.  (Putnam Reply Brief 7-8.)  See also Santiago v. Canon U.S.A., 138 F.3d 1, 6 (1st Cir. 1998) ("It is well settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion. . .").

## CONCLUSION

Based on the undisputed facts and on the authorities cited by Mr. Lasser and Putnam, it is respectfully submitted that Mr. Lasser's Motion for Summary Judgment should be allowed.

LAWRENCE J. LASSER

By his attorneys,

/s/David S. Rosenthal
David S. Rosenthal (BBO No. 429260)
Renee M. Jackson (BBO No. 669594)
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110
(617) 345-1000
(617) 345-1300 (FAX)

Dated: February 25, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

/s/ David S. Rosenthal
David S. Rosenthal

10916174.1