UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| * * * * * * * * * * * * | * | Civil Action No. 04-12711-PBS |
| | * | |
| LISA SVENSSON | * | |
| | * | BBO No. 351000 |
| Plaintiff, | * | |
| | * | Plaintiff Svensson's |
| v. | * | Supplemental Memorandum |
| | * | in Support of Her |
| PUTNAM INVESTMENTS, LLC, | * | Oppositions to the |
| et al., | * | Putnam and Lasser |
| | * | Motions for Summary |
| Defendants. | * | Judgment |
| | * | |
| * * * * * * * * * * * * | * | |

1.   Introduction.

   As authorized and directed by the court (Saris, D.J.) at the February 26, 2008, hearing on the motions of defendant Putnam Investments LLC ("Putnam") and Lawrence J. Lasser ("Lasser") for summary judgment, plaintiff Lisa Svensson ("Svensson"), submits this supplemental memorandum as to the factual bases of her oppositions to those motions.  In particular, Svensson submits the following facts and evidence, including statements of Putnam decision-makers and those with influence over decision-makers, proving gender discrimination by Putnam, aided and abetted by Lasser.  This evidence, under either the Price Waterhouse mixed motive test or the McDonnell Douglas pretext analysis, is sufficient to establish genuine issues of material fact requiring trial in regard to six categories of adverse employment actions taken against Svensson: (1) Termination (on September 15, 2003); (2) Failure to promote Svensson to the position of Managing Director in the years 2000-2003; (3) Involuntary transfer of Svensson in 2002 from portfolio management to the research department; (4) Failure to promote Svensson from the research department to positions in portfolio management in 2002 and 2003; (5) Violation of the Massachusetts Equal Pay Act, G.L. c. 149, §105A ("MEPA"); and (6) Violation of the

Massachusetts Equal Rights Act, G.L. c. 93, §102 ("MERA").  By this filing, Svensson also demonstrates that there is no time bar to her claims.[1]

2.   Termination Claim:

Svensson, a female and member of a protected class, has established a prima facie case for unlawful termination by showing that she was qualified for, and was performing, her job as Associate Director of Research ("ADR") in the research department of the Putnam Investment Management Division ("IMD") at a level that met Putnam's legitimate expectations; that, nevertheless, she was dismissed; and that, after her departure, Putnam assigned a male, Joshua Brooks ("Brooks"), who had roughly equivalent qualifications, to perform substantially the same work.[2]

2.1. Svensson was qualified for and was performing her job to Putnam's legitimate expectations.

Svensson has an accomplished record of education and 16 years of successful investment experience in research, analysis and portfolio management, including over nine years at Putnam.[3]  She was promoted by Putnam in January 2003, from analyst in the research department to ADR[4].  In the ADR position, approximately 30% of her time was required as manager of Putnam's Energy team and as manager of its Basic Materials team.[5]  Approximately 30% of her time was service as portfolio manager of Putnam's Global Natural Resources Trust, a $250,000,000 investment fund.[6]  Approximately 30% of her time was required to cover (i.e. analyze and make recommendations concerning) stocks of 12 non-U.S. integrated oil companies (France, Russia, Norway, United Kingdom, etc.).[7] [8]  Management of

---

[1] The parties agree that the limitations period is 300 days prior to the filing of Svensson's MCAD claim (on or after May 6, 2003), except that Svensson contends that the MEPA claim is subject to a one year limitations period.
[2] Feliciano de La Cruz v. El Conquistador Resort & County Club, 218 F.3d 1, 5 (1st Cir. 2000); Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 58 (1st Cir. 2005).
[3] Svensson's résumé is Exhibit "1" to her Second Affidavit, Filed April 20, 2006.
[4] E-mail from Landed to Oristaglio and Haldeman, January 17, 2003, PRM-2876.
[5] Seventh Affidavit of Lisa Svensson, filed herewith, ¶ 14.
[6] Id.
[7] An "integrated" oil company produces as well as refines oil and gas.
[8] Seventh Affidavit of Lisa Svensson, filed herewith, ¶ 14.

Putnam's Knowledge Management team for energy and basic materials required 10% of her time.[9] There is no evidence that her performance was anything but exemplary. Notably, at the time of her September 2003 termination, Svensson for the year to date in 2003 was first of 57 analysts for "alpha" per recommendation[10] ("Alpha" is a measure of the degree to which a stock outperforms the benchmark against which it is measured).[11]

2.2.    <u>Nevertheless, Svensson was dismissed</u>.

Having received in late 2002 complaints from Omid Kamshad ("Kamshad"), Chief Investment Officer ("CIO") of the International Core team, and Justin Scott ("Scott"), CIO of the Global Core team, as to the performance of Christopher O'Malley ("O'Malley"), a member of Svensson's Basic Materials team and one of four male analysts reporting to her, and a suggestion from Scott that O'Malley be fired ("You've got a really good team and I can really envision it without Chris, so let's just think of the team without Chris"[12]), Svensson, rather than causing O'Malley to be fired, said to Scott that "I don't want to do that, but I would like to spend some time working with Chris."[13]

Putnam HR strongly encouraged managers to review their team members. "Indeed, as Putnam's HR strongly recommended that all managers do interim reviews to monitor performance, especially if the manager was having problems with anyone on the team, it was part of Ms. Svensson's job to monitor Mr. O'Malley's ongoing performance."[14]  By the time for O'Malley's 2003 mid-year review, Svensson had received additional complaints from some, but not all, of the portfolio managers whom O'Malley had been supporting with his research, that there were still issues regarding his performance.[15]  Svensson also

---

[9] <u>Id.</u>.
[10] LS-501, performance attribution sheet, "Svensson, Lisa Period from: 12/31/02 To: 08/29/03," LS-501.
[11] Svensson dep., Day One, p. 158, ll. 22-23.
[12] Svensson dep., Day One, p. 49, ll. 3-5
[13] Svensson dep., Day One, p. 49, ll. 9-10).
[14] Putnam 30(b)(6) Dep., Day Three, pp. 225-227.
[15] Svensson dep., Day One, P 22, ll. 15-16; notes of the meetings shown at LS 677-698, Exhibit "F" to Svensson's Fifth Affidavit.

learned that O'Malley had not been managing properly the two persons assigned to him assist him in his work, Leah Graham-Reid (an Investment Associate) and Austin Hawley (a Summer Intern).[16]

In August 2003, Svensson, having discussed O'Malley with the portfolio managers ("PMs") who had continued to complain about him, sought the assistance of Mary McNamee ("McNamee") of the Putnam Human Resources department ("HR") in putting into proper Putnam form a warning memorandum to O'Malley.[17] McNamee asked Svensson to set down her thoughts in "bullet point" form and promised Svensson that she would draft it into the proper format so that she and Svensson could discuss it after Svensson returned from a business trip in early August.[18]

When Svensson returned from the business trip in mid-August, McNamee did not answer Svensson's calls or e-mails inquiring about the draft memorandum,[19] leading Svensson to conclude that McNamee had not revised the draft.[20] Thus, Svensson revised the draft herself and sent her revision to McNamee for review.[21] Unknown to Svensson at the time, O'Malley, apparently having been informed of Svensson's inquiries about him, complained about Svensson to Brooks[22] who, only four months earlier, in April 2003, had been hired by Putnam as Director of Research.[23] Also unknown to Svensson at the time, Darren Peers ("Peers"), also a junior analyst reporting to Svensson (as a member of her Energy team), told Brooks that he had decided to leave Putnam.[24] According to Brooks, Peers cited his inability to work with Svensson as a reason for his decision.[25] Putnam's records, however, state that the basis Peers gave for his decision was "family reasons."[26] [27]

---

[16] Svensson dep., Day One, p 58 l. 23 - p 59, l. 2.
[17] Svensson dep., Day One, p.44 ll. 15-18.
[18] Id. p. 62 ll. 19-22.
[19] Id. p. 62 l. 23 – p.63 l.19-22.
[20] Id. p. 61 l. 24 – p.62 l.7.
[21] Id.
[22] Brooks dep., p.161 ll. 18-22
[23] PRM-8577.
[24] Brooks dep. p. 160, ll. 17-21.
[25] Id., p. 161, ll. 18-23.
[26] "2003 Investment Terminations," at PRM-14855,
[27] Peers and his wife moved to Los Angeles, California, where her family was from, to take a position there with another investment firm. Peers dep., p.10, ll. 20-25.

In early August, Svensson discussed with Brooks her concerns about O'Malley and Brooks told her that it sounded to him that we have a "laziness problem" on our hands.[28]

In a meeting with Svensson in his office on August 28, 2003, which Svensson had requested in order to review with Brooks her recommendations concerning O'Malley, Brooks announced to Svensson that he had been "doing an investigation" of her and claimed to Svensson that she had misrepresented what she had done in regard to the review of O'Malley. He said that he had determined that Svensson had not talked with certain of the PMs about O'Malley.[29] Svensson denied engaging in any dishonesty, explaining to Brooks that she had talked only to the PMs who had complained about O'Malley, and that she had not represented to anyone that she had done anything but talk to the team members of those who had complained about O'Malley.[30]

At this point, Svensson offered to return to her office and bring back to Brooks, for his review, her calendar entries and her notes of the meetings in regard to the complaints about O'Malley that would prove the accuracy of her statements.[31] Brooks, however, refused even to consider reviewing the documents, telling Svensson, "That won't be necessary."[32]

Brooks then told Svensson that he had interviewed her team members and learned that Svensson was not a good manager and that the people who worked for her did not like her.[33] Brooks said that they had gone so far as to get other jobs.[34] Svensson then asked which team members had obtained other jobs and complained about her, but Brooks refused to answer.[35] Notably, Konstantin Stoev ("Stoev"), another male analyst who also reported to Svensson as a member of her Basic Materials team, testified in deposition to the contrary, stating that Svensson had been an excellent manager:

---

[28] Svensson dep., Day One, p.59, ll. 6-9.
[29] Svensson dep., Day One, p.72, ll. 8-11.
[30] Svensson dep., Day One, p.15, ll. 5-9.
[31] Svensson dep., Day One, p.15, ll. 9-13.
[32] Svensson dep., Day One, p.59, ll. 15-16.
[33] Svensson dep., Day One, p.13, ll. 13-15.
[34] Svensson dep., Day One, p.23, ll. 14-16.
[35] Svensson dep., Day One, p.23, l. 24 – p. 24, l.10.

[Svensson did] such a great job of managing something that was nearly unmanageable and pulling us out of such a big hole, and in the meantime, being able to present, together with the team, such great work that was of benefit to the whole, the whole department. And through all of this, never failing to do her primary responsibilities about equity coverage and portfolio management.[36]

Rather than answering Svensson, Brooks told her that he was demoting her from her ADR position; that she no longer would be managing the Global Natural Resources Trust; and that she was immediately relieved of her management duties.[37] He then told her that he knew that her goals were to make more money and to be promoted to Managing Director ("MD"), but that those goals would be "unlikely to be achieved in this new position" so, "out of respect for" her, he had prepared three alternatives: (1) to remain employed but as an analyst with no chance of promotion or to make more money; (2) to stay at Putnam for an agreed-upon period of time while she looked for work elsewhere and leave at an agreed-upon date with no severance; and, (3) to accept a severance package of two weeks for every year she had worked at Putnam, amounting to 18 weeks, and a lump sum of $250,000 representing half of her prior year's bonus, which itself had been reduced by over 60%.[38]

Putnam documents produced in this case show that prior to Svensson's August 28, 2003, meeting with Brooks and no later than August 26, 2003, Putnam had prepared a draft of a termination letter to be sent to Svensson[39] and that, even earlier, on August 19, 2003, HR had requested information from the Putnam Compensation department concerning Svensson's deferred balances and stock award positions.[40]

Svensson next met with Brooks on September 3, 2003. At this time, she told Brooks that she had consulted counsel and that she would not be able to make a decision in regard to the three options unless they were presented in writing.[41] He sent an e-mail response to her that evening[42] in which Putnam, for

---

[36] Stoev dep., p. 49, ll. 9-16.
[37] Svensson dep., Day One, p.27, ll. 17-21.
[38] Svensson dep., Day One, p.28, l. 7 – p.29, l.11; p.219, l.23 – p. 220, l.3.
[39] E-mail, dated August 26, 2003 PRM-00969
[40] Putnam e-mail, August 19, 2003, PRM-1659-1660, Mitchell Schultz, Head of Compensation, Scott Needham requesting "our standard deferral/EPP sheets for Lisa Svensson"
[41] Svensson dep., Day One, p.32, ll. 11-21.
[42] PRM-00356

the first time, stated that Svensson would have to sign a release of all claims in order to obtain her compensation for prior years and the lump sum.

Because of an illness in her family, Svensson then had to travel to Texas. Upon her return, she met with Brooks on September 12, 2003, and advised him that she would not accept any of the three alternatives.[43] Brooks then inquired as to what she would accept[44] and Svensson told him that she would want the long promised Managing Director title and to be restored, on a guaranteed basis, to at least the level of compensation that her male comparators in portfolio management and some in the research department were receiving.[45] She told Brooks that she believed that gender discrimination was behind her unjustified treatment.[46]

On September 15, 2003, Brooks told Svensson that her terms were not acceptable to Putnam and that therefore she would be treated as if she had elected to resign.[47] She replied that she had not resigned and that, in fact, Putnam was terminating her.[48] She asked that the termination be put in writing and, within minutes, McNamee presented Svensson with a letter indicating that she had been terminated.[49]

In addition to McNamee and Brooks' involvement in the action taken against Svensson, deposition testimony of McNamee shows that Brooks' superiors, Oristaglio, and Haldeman, had been consulted, and, according to Brooks, Lasser had been "on board with the idea."[50]

  2.3. <u>After Svensson was fired, Putnam assigned a male, Brooks, who had roughly equivalent qualifications, to perform substantially the same work</u>.

After Svensson was fired, Putnam assigned 70% of what Svensson, as ADR, had been doing to Brooks as he took over Svensson's duties as Manager of the Energy and Basic Materials teams, the

---

[43] Svensson dep., Day One, p.37, ll. 1-5.
[44] Svensson dep., Day One, p.37, l. 7.
[45] Svensson dep., Day One, p.37, l. 12 – p. 38, ll. 6.
[46] Svensson dep., Day One, p.213, ll. 17-22.
[47] Svensson Sixth Affidavit, ¶37.
[48] Id.
[49] Id.
[50] Brooks dep., p. 185, ll. 9-11; p. 187, ll. 11-13.

Knowledge Management team and the running of the Putnam Natural Resources Trust.[51] Brooks' qualifications were roughly equivalent to those of Svensson. <u>See</u> Chart, Brooks v. Svensson Comparison, Exhibit "I" to Svensson's Seventh Affidavit.

      2.4    <u>Putnam's proffered non-discriminatory reasons for Svensson's termination</u>.

Putnam has asserted that it terminated Svensson for two reasons: (1) Svensson was a bad manager and had alienated her team members; and, (2) She had been dishonest concerning her negative performance review of O'Malley.

As set forth below, both reasons were mere pretexts for Putnam's discrimination against Svensson on the basis of her gender.

      2.5    <u>Putnam's proffered reasons for terminating Svensson were pretexts</u>.

All of the actions and omissions of Putnam should be viewed in the light of the conduct of Putnam and Lasser set out in (1) Svensson's Fifth Affidavit (gender related comments and circumstances during Svensson's employment at Putnam, including statements by Lasser[52] and her Sixth Affidavit (a chronology of her employment at Putnam); (2) her respective responses to the Putnam and Lasser Local Rule 56.1 Statements of Fact; and, (3) the facts and circumstances set out in the following sections of this supplemental memorandum as to the factual bases of her other claims.

The record is replete with evidence that Putnam's proffered reasons for terminating Svensson are mere pretexts. First, Putnam's chosen representative at its own Rule 30(b)(6) deposition, McNamee admitted that Svensson was not terminated because of a "performance" issue, but only because of "management dishonesty." Putnam Rule 30(b)(6) Deposition, Day Three, November 15, 2007, pp. 56-57.

---

[51] Svensson dep., Day One, p.27, ll. 17-21; SEC forms 497 "Prospectus Supplement" to the global Natural Resources Fund, dated February 14, 2003, and September 30, 2003, as per SEC website, www.sec.gov.

[52] <u>See</u> Svensson's Fifth Affidavit, ¶15 ("In mid-September 2001, I had lunch with defendant Lawrence Lasser ("Lasser"), at the time the President Executive Office of Putnam. He asked me what my husband and I told him that he is a stay at home father. This make Lasser uncomfortable. He said, "How interesting. that make him feel as a man?" I said, - "He feels fine." Lasser asked, "When people at a party ask your husband does, how does that make him feel as a man?" I thought troubling that the CEO of the company seemed so uncomfortable with the way my family was set up. He sets the tone organization, and it seemed to really bother him.").

Second, Putnam claims that Brooks based his conclusion that Svensson was not a good manager in part on O'Malley's complaints about Svensson. This is not credible, however, because, as set forth above, Brooks knew in early August 2003, before receiving O'Malley's complaints, that O'Malley's own performance was subpar, and had suggested to Svensson that action might need to be taken against O'Malley for his "laziness problem." With this knowledge, it is not credible that Brooks blindly accepted as true O'Malley's complaints about Svensson's management skills. Thus, while it is not true that Svensson had been a "bad manager" or that "no one on her team liked her," even if these things had been true, they were not the actual reasons why Putnam terminated Svensson.

Nor, in fact, did Putnam terminate Svensson's employment due to "management dishonesty." As set forth below, both Brooks' conduct in his August 28, 2003, meeting with Svensson, and the very different manner in which Putnam responded to more serious misconduct by similarly situated males, lead to an inference, which, on summary judgment, should be drawn in Svensson's favor,[53] that the real reasons motivating Svensson's termination were discriminatory.

As set forth above, when O'Malley had complained about Svensson to Brooks, Brooks immediately conducted an investigation, not of O'Malley but of Svensson! And he did so behind her back, without informing her or soliciting her input as to the facts. In contrast, after accusing Svensson of dishonesty, and even though Svensson offered to provide him documents disproving that charge, Brooks refused to let the facts get in his way. The only reasonable inference is that Putnam, through Brooks, intended to use the O'Malley-Peers matters as a pretextual justification for Svensson's termination.

A comparison of Putnam's treatment of Svensson with its treatment of other similarly situated male investment officers accused of significantly more serious misconduct, also leads inescapably to the conclusion that Putnam's proffered reasons for Svensson's termination were pretextual.

The treatment of Svensson as set forth above, is in sharp contrast with the treatment of the misdeeds of Kamshad, a male portfolio manager, who, before market timing at Putnam became a public

---

[53] LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).

scandal in the fall of 2003, had been allowed by Putnam and Lasser, after a written warning in 2000, to continue to engage in those activities for years.[54] [55]

The treatment of Svensson also is in sharp contrast with Putnam's lenient treatment of Paul Warren, a male portfolio manager who was sanctioned only by a written warning[56] for conduct described as "frequent[ing] strip clubs...[a]nd that he over -- he utilized entertainment from brokers excessively and accepted gifts from brokers excessively"[57] and that "They were talking about a --someone leaving the group and that would leave a hole in the work...and [Warren] stood up and grabbed his crotch and said, "You could fill it with this").[58]

3. <u>Failure to Promote to Managing Director Claim</u>:

Svensson, a female and member of a protected class, has established a <u>prima</u> <u>facie</u> case for unlawful failure to promote her to the position of Managing Directors by showing that in each of the years 2000 - 2003 that she was qualified for an open position for which she was eligible or was considered; she was rejected, and that some one else possessing similar qualifications filled the position instead.[59]

    3.1. <u>Failure to promote to MD - 2000</u>.

In the year 2000, nine PMs and Research Analysts were nominated for promotion to MD – six males and three females, one of whom was Svensson.[60] Svensson had earned a performance rating from her direct supervisor, Robert Swift ("Swift") of 4.8 which, according to Putnam practice, would be

---

[54] Tibbetts testified at deposition that, as he understood it in 2000, when he issued a written warning to Kamshad, market timing was defined as "frequent movement of monies" in mutual funds, an activity that was "inconsistent with [Putnam's] general philosophy of being an investor for the long term," and a violation of the code of ethics. Tibbetts Dep., Day Two, p. 240, ll. 18-19, p. 238, ll. 21-22, p. 291, ll. 10-20.
[55] Tibbetts Dep., Day Two, p. 250, ll. 15-18. Stoev dep., p. 67 l. 14 through p. 68 l. 2 ("And Mr. Lasser … mentioned that [market timing] … had been detected  first in 2000 and that -- I think his exact words were that by the standards of the day, which is 2003, they look more intolerable than they did in 2000").
[56] McNamee dep., p. 21, ll. 5-14.
[57] McNamee dep., p. 358, ll. 9-14.
[58] McNamee dep. p. 18, ll. 17-23.
[59] <u>Ingram</u> v. <u>Brink's Inc.</u>, 414 F.3d 222, 230 (1st Cir. 2005), citing <u>Rathbun</u> v. <u>Autozone, Inc.</u>, 361 F.3d 62, 71 (1st Cir.2004).
[60] PRM-1793.

10

rounded up to the maximum rating of 5.0.[61] She had experience as both a Research Analyst and a Portfolio Manager.[62] Her Global Growth Fund was up 59.55% over the previous year, a performance that put her in the top quartile relative to all competitor companies' mutual funds.[63] She had been a Putnam Senior Vice President for over two years.[64] In addition to her duties as a Portfolio Manager ("PM"), she was also deeply involved in recruiting, hiring and developing recent businesses school graduates ("MBAs") into the International Growth Equity team.[65] According to Putnam HR, Svensson was "a 'model' for what an MBA manager should embody."[66]

Discovery in this case has disclosed that Svensson's performance rating was written down from 4.8 to 3.0 by Jack Morgan ("Jack Morgan"),[67] a Putnam executive who was senior to Swift.[68] The reduction in Svensson's score (1.8) was three times as large as changes to other nominees' scores.[69] Svensson was the only nominee with a real manager rating exceeding 4.0 who was not promoted.

The total number of MDs in the IMD after these decisions became 42.[70] Nine, or 21%, were female. One of the males (Colin Moore) included in the 42 MDs had been hired from outside[71], and one male (Paul Warren) included in the 42 had been promoted "off-cycle" after an appeal directly to defendant Lasser.[72] Two additional males (Makino and Sorensen) thereafter were hired from outside[73], bringing the total MDs to 44 as of August 2000.

The criteria for promotions, how well Svensson matched or exceeded the criteria, the names and scores of the nominees and the names of the decision-makers, the respective scores and other relevant

---

[61] PRM-328; Putnam Rule 30(b)(6) dep., Day Three, p. 214.
[62] PRM-8654.
[63] Morningstar reports.
[64] PRM-8654.
[65] PRM-1334.
[66] PRM-322.
[67] PRM-3548; Putnam Rule 30(b)(6) Dep., Day One, November 29, 2006, p. 91, ll. 5-6.
[68] PRM-2759.
[69] PRM-3548.
[70] Report of Paul White, Phd.
[71] PRM-8627
[72] PRM-8657, 9514-9516
[73] PRM-8615, 8649

information are set out in detail in the chart, failure to Promote to MD Claim Facts, Exhibit "E" to Svensson's Seventh Affidavit.

That the failure to promote Svensson was due to gender discrimination is demonstrated by, among other things, the following:

- Jeffrey Lindsey, Michael Mufson, and Lisa Svensson had the highest ratings in the promotion pool. Svensson's score was written down; Lindsey's and Mufson's were not. Lindsay and Mufson were promoted; Svensson was not.[74]

- Lindsey and Mufson had had experience as both Analyst and PM, as had Svensson. Lindsey and Mufson were promoted. Svensson was not.[75]

- Lindsey, Mufson, Manny Weiss and Svensson were all nominated from the high-performing Growth Team. Lindsey, Mufson and Weiss were promoted. Svensson was not.[76]

    3.2.    <u>Failure to promote to MD - 2001</u>.

No promotion pool information was produced in discovery by Putnam, only information as to promotions. According to that information, seven promotions to MD were made: Six males and one female. When Svensson questioned Swift about the process, he responded with a blatantly discriminatory explanation: it was not a good year for her to be considered since she'd been out on maternity leave. His comment to her was "out of sight, out of mind."[77]

The criteria for promotions, how well Svensson matched or exceeded the criteria, the names and scores of the nominees and the names of the decision-makers, the respective scores and other relevant information are set out in detail in the chart that is Exhibit "E" to Svensson's Seventh Affidavit.

John Boselli, one of the two males passed over in 2000, received his promotion in 2001 with a manager rating of 3.7.[78] Svensson's comparable management rating was 4.0.[79]

---

[74] See Chart, Failure to Promote to MD Claim Facts, Exhibit "E" to Svensson Seventh Affidavit.
[75] PRM-8612, 8631 and 8654.
[76] PRM-8612, 8631, 8654 and 8658.
[77] Svensson Sixth Affidavit, ¶9.
[78] PRM-6166.
[79] PRM-1572.

The total number of MDs in the IMD, taking into account departures, became 43, six, or 14% of whom, were female, representing a decline from 21% to 14% in the female MD population.[80]

The results for 2001, were tainted by gender discrimination because:

- When Svensson asked her manager, Swift, who had nominated her in 2000, if she had been considered, he told her that it was not a good year for her because she'd been out on maternity leave and because of that she was "out of sight, out of mind."[81]

- The percentage of female MDs in the IMD declined from the previous year (from 21% to 14%).[82]

- When Svensson asked Oristaglio in the summer of 2001 why she had not been promoted to MD, he said that she lacked "that certain something." No definition of "that certain something" was ever provided.[83]

- Oristaglio also told Svensson that she had made progress on the issue of "volatility," adding that "volatility in and of itself isn't a problem. In fact, I'm highly volatile and so is Larry Lasser, but you need to keep working on it, but you've made massive progress in this subject."[84]

- Svensson's year end review had not mentioned "volatility." The two males, Oristaglio and Lasser, had not been hindered by their "volatility."

3.3. <u>Failure to promote to MD - 2002</u>.

The promotion to MD process changed in 2002. For 2002, a promotion pool of 15 males and two females, one of whom was Svensson, was prepared. By some undisclosed process, the pool was reduced 11, all male, with the result that Svensson was excluded from consideration.

The criteria for promotions, how well Svensson matched or exceeded the criteria, the names and scores of the nominees and the names of the decision-makers, the respective scores and other relevant information are set out in detail in the chart that is Exhibit "E," to Svensson's Seventh Affidavit.

---

[80] Report of Paul White, Phd.
[81] Svensson Sixth Affidavit, ¶9.
[82] Report of Paul White, Phd.
[83] Svensson Sixth Affidavit, ¶10.
[84] Svensson dep., Day One, p. 112, ll. 20-24.

According to Putnam's answers to interrogatories, five males, including James Prusko, were promoted. His score, 3.5[85], was the same as Svensson's score[86], but she was not promoted.

The total number of MDs in the IMD became 47; only six, or 13%, female.

- The 2002 decisions on MD promotions were tainted by gender discriminating because: Those who voted and those who were promoted were all male.[87]

- The only two women considered, including Svensson, were eliminated during the final stages of the process for reasons that have not been disclosed in discovery.[88]

- Notably, HR representative Sherrie Holder-Watts in an email dated January 28, 2002, PRM-1897, advised Swift that he should let Oristaglio know in advance whom he will nominate for MD in case Oristaglio "does not wish [him] to make [the nomination]." [89]

- The percentage of female MDs in the Investment Division continued to decline.

3.4.    Failure to promote to MD - 2003

By 2003, the Growth Team had been "rebuilt" by Oristaglio and Lasser.[90] Svensson's Global Growth fund had been reassigned to the all-male Global Core team, headed by Warren, a male.[91] Shigeki Makino, a male, became a PM of the Global Growth fund, now renamed Global Equity.[92] The remaining assets of Global Growth were assigned to the males from Svensson's original group, headed by a male, Stephen Dexter ("Dexter").[93] Svensson and Kelly Morgan ("Kelly Morgan"), the other female on the fund, were transferred to the research department, where, prior to her involvement in portfolio management, Svensson had worked for the first three and a half years of her Putnam employment.[94] After asking to remain as a PM, Svensson was assured by Stephen Oristaglio, Deputy Head of Investments, that she

---

[85] PRM-7497
[86] PRM-00263
[87] Putnam Answers to Interrogatories, Answer No. 9.
[88] PRM-1922-1923.
[89] Id.
[90] Putnam Rule 30(b)(6) Dep., Day Three, November 15, 2007, pp. 164, 167. See also PRM-14126.
[91] PRM-14126.
[92] Id.
[93] PRM-14125
[94] PRM-8629, 8654

would be able to compete for any PM jobs that came available. In an e-mail, dated March 12, 2002, Oristaglio stated:

> I will consider alternatives on an additive basis, especially if the large cap team or international growth team loses people to resignations, or if we underestimated the number of people required....[95]

In February 2003, Svensson was again nominated for promotion to MD. After a long period of uncertainty that went on through the summer of 2003[96], and after the study of titles by Tibbetts of HR and others was sent to him on September 4, 2003, Lasser made the decision not to make any promotions to MD.

The 2003 decisions were tainted by gender discrimination because:

- Females had declined as a percentage of MDs at Putnam for during the prior three years. Between 2000 and 2003, the number of females had declined 44% (from 9 to 5).[97]

- Meanwhile, the number of males had increased from 33 in 2000 to 41 in 2003, an increase of 24%.[98]

- Lasser, who made the decision not to promote any women to MD in 2003[99] had had an affirmative duty to remedy the discrimination that existed as a result of the prior years' promotion decisions.[100]

- While Svensson was terminated in September 2003, Michael Yogg who, although nominated but not promoted to MD in prior years, was promoted to MD in 2004.[101]

- The total number of MDs in the IMD was 41. Only five, or 12%, were female.[102]

3.5    <u>No statute of limitations bar to the claim in regard to the issue of 2003 MD promotions</u>.

---

[95] PRM-00661
[96] PRM-14438-14440
[97] Report of Paul White, Phd.
[98] Id.
[99] Email, dated February 24, 2003, Tibbetts to Landes. PRM-14236-37.
[100] Chart, Affirmative Duty Claim Facts, Exhibit "H" to Svensson Seventh Affidavit.
[101] PRM-8663.
[102] PRM-5729

15

As the Putnam decision-making as to the MD promotions for 2003 continued past May 6, 2003, 300 days from her MCAD filing on March 1, 2003, there is no statute of limitations bar to Svensson's claim in regard to 2003.

Further, the evidence establishes a systemic continuing violation in that Putnam had a general policy to discriminate against women with regard to MD promotions, that Svensson was harmed by application of that policy to her, and the policy continued in force until within 300 days prior to Svensson MCAD filing. For evidence establishing that Putnam had a general policy of discriminating against women with regard to MD promotions, see Chart, Affirmative Duty Claim Facts, Exhibit "H" to Svensson's Seventh Affidavit.

Even if the statute of limitations has run on Svensson's claims for gender discrimination occurring in prior years, the evidence of gender discrimination at Putnam, including that with respect to the MD promotions in the prior years is relevant and admissible.

4. Demotion claim

Svensson, a female and member of a protected class, has established a prima facie case for unlawful demotion by showing that until her demotion to the research department in the spring of 2002, she was performing her job as a Senior PM at a level that met Putnam's legitimate expectations; she nevertheless was demoted; and Putnam sought someone of roughly equivalent qualifications to perform substantially the same work after the demotion.[103]

In particular, in April of 2002, as part of a Putnam "rebuilding" of the Global Growth team, the only two females on that team, Svensson and Kelly Morgan, were demoted/transferred from portfolio management positions on that team to positions in the research department[104], while males, whose qualifications and performance results were the same or inferior to those of Svensson, (see Chart,

---

[103] Gonzalez Lartigue v. West, 124 F.Supp.2d 125, 130 (D.P.R. 2000), citing Feliciano de La Cruz v. El Conquistador Resort & County Club, 218 F.3d 1, 5 (1st Cir.2000); Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir.1996).

[104] PRM-14125, 2727-2730

Demotion Claim Facts, Exhibit "K" to Svensson's Seventh Affidavit) were not transferred; but instead were allowed to remain in portfolio management.[105] For a comparison of the qualifications and performance of the males who remained in portfolio management with Svensson's qualifications and performance, see Chart, Demotion Claim Facts, Exhibit "K" to Svensson's Seventh Affidavit.

The record supports an inference that Putnam's proffered reasons for demoting Svensson are mere pretexts for discrimination. The "rebuilding" disproportionately adversely affected female PM's, while their male colleagues were largely unaffected. All Growth teams in the IMD had poor investment performance in the 2000-2001 period. Although the teams and funds had been managed by males and some females, the "rebuilding" in early 2002 hit females harder than males. For example, three of four females were removed from their roles managing money, while only two of 15 males suffered the same fate.[106] While two male PMs in Growth and Value, Richard England (England") and Coleman Lannum ("Lannum") were considered by Browchuk, Ferguson, Oristaglio, Landes, Deborah Kuenstner ("Kuenstner), Scott, Omid Kamshad ("Kamshad"), Warren and Tibbetts for demotion to the research department, only Svensson was demoted and sent to Research while England and Lannum remained on portfolio management teams.[107] Putnam document, ("ERS_Job_Summary _By _Emplid"), PRM-8610 and 8591, respectively, show they remained a PM and SPM. Id. Steve Dexter and Peter Hadden were males who remained PM's on the International Growth team after both females (Svensson and Kelly Morgan) on the team had been banished to research.[108]

    4.1    <u>No statute of limitations bar to the demotion claim.</u>

There is no statute of limitations bar to the demotion claim because the nature of the transfer in regard to Svensson was equivocal, as it appeared, based on the representations of Oristaglio, the then Deputy Head of Investments, that the transfer was just for a brief time while a PM position was identified

---

[105] See Chart, Demotion Claim Facts, Exhibit "K" to Svensson Seventh Affidavit.
[106] Svensson's "... Responses to Defendant Putnam Investments ... Local Rule 56.1 Statement of Facts", at pp. 22-26.
[107] See e-mail from Browchuk, dated December 18, 2001, PRM-9755;
[108] PRM-8629, 8654.

for her.  For example, in early March 2002, Svensson met with Oristaglio and asked him why she could not remain on the Growth team as a portfolio manager, since that was her career goal.[109]  When he responded by telling her that the team needed "certain skills," she told him that her skills were better than the people they were keeping.[110]  Indicating that she had to move to research, Oristaglio promised to consider her for PM jobs as they became available.[111]  A few days later, on March 12, 2002, Oristaglio sent Svensson an e-mail confirming this promise, stating,

> I will consider alternatives on an additive basis, especially if the large cap team or international growth team loses people to resignations, or if we underestimated the number of people required....[112]

Accordingly, Svensson neither knew nor had reason to know of the discriminatory motivation for Putnam's failure to promote her to MD in 2000, 2001 or 2002 until within 300 days prior to filing her MCAD claim.  This supports application of the discovery rule.

Further, the evidence establishes a systemic continuing violation in that Putnam had a general policy to discriminate against women with regard to transfers and demotions, that Svensson was harmed by application of that policy to her, and the policy continued in force until within 300 days prior to Svensson MCAD filing.  For evidence establishing that Putnam had a general policy of discriminating against women with regard to MD promotions, see Chart, Affirmative Duty Claim Facts, Exhibit "H" to Svensson's Seventh Affidavit.

Moreover, the evidence of gender discrimination at Putnam, including that with respect to the other claims in this case is relevant and admissible.

5.    Failure to Promote to Portfolio Manager position - 2002-2003.

Svensson, a female and member of a protected class, has established a prima facie case for unlawful failure to promote her to the position of Portfolio Manager by showing that in 2002 and 2003

---

[109] Svensson Sixth Affidavit, ¶ 14_.
[110] Id.
[111] Svensson Sixth Affidavit, ¶14.
[112] PRM-00661

that she was qualified for open PM positions for which she was eligible or was considered; she was rejected, and that males possessing similar or lesser qualifications filled those positions instead.[113]

Discovery in this case has disclosed that numerous PM positions for which Svensson was qualified became open after Oristaglio's March 2002 promise to Svensson.[114] However, Svensson was not selected. Instead the six positions that opened up after May 6, 2003 were filled by six males. These positions are identified in the chart attached as Exhibit "G," to Svensson's Seventh Affidavit.

For the reasons advanced previously herein, most notably the direct evidence of discrimination embodied in the admissions of Mr. Landes (Director of Research) to Svensson that the Putnam Global Core team had picked mark Bogar rather than Svensson for a PM position "because he's a guy"[115] and that "their treatment of women is outrageous,"[116] the selection process for these positions both before and after May 6, 2006, was tainted by gender discrimination.

5.1.    There is no statute of limitations bar to the failure to promote to PM claim.

There is no statute of limitations bar to this failure to promote to PM claims insofar as concerns the positions that opened up on and after May 6, 2003.

Moreover, the evidence of gender discrimination at Putnam, including that with respect to the MD and PM positions prior to May 6, 2003, is relevant and admissible.

6. Equal pay claim.

Svensson has made out a prima facie case for violation of MEPA. See Chart, Compensation Claim Facts, Exhibit "F" to Svensson's Seventh Affidavit. There is no statute of limitations bar to this claim for, among other things, disparity in bonus payments in March 2003, as the statute of limitations period for Svensson's MEPA claim is one year prior to March 1, 2004.

7.    The MERA claim.

---

[113] Ingram v. Brink's Inc., 414 F.3d 222, 230 (1st Cir. 2005), citing Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir.2004).
[114] See Chart, Failure to Promote to PM Claim Facts, Exhibit "G" to Svensson Seventh Affidavit.
[115] Svensson Fifth Affidavit, ¶11.
[116] Id.

The facts set forth previously herein to establish Svensson's discrimination claims also establish her MERA claims.[117]

8.  Conclusion.

For all of the foregoing reasons, and for the reasons set forth in Svensson's Opposition to the Putnam and Lasser motions for summary judgment and her Response to Putnam's reply memorandum, this court should deny Putnam's motion for summary judgment or, if the motion is not denied, should defer ruling on the motion pursuant to Fed. R. Civ. P. 56(f) until Svensson has had the opportunity to conduct additional necessary discovery.

        LISA SVENSSON, plaintiff,

        By her attorneys,

        BARRON & STADFELD, P.C.

        /s/ Kevin F. Moloney_____
        Kevin F. Moloney  BBO No. 351000
        100 Cambridge Street, Suite 1310
        Boston, Massachusetts  02114
        Tel.: 617.723.9800/531.6569

        and

        /s/ John K. Weir_____
        John K. Weir, Admitted PHV
        John K. Weir Law Offices, LLC
        300 Park Avenue, Suite 1700
        New York, New York, 10022
        Tel.: 212.572.6374

Dated: March 4, 2008.

Certificate of Service.

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

        /s/ Kevin F. Moloney_____

Dated: March 4, 2008.
[424299.1]

---

[117] McDonnell v. Certified Engineering & Testing Co., Inc., 899 F.Supp. 739 (D.Mass. 1995).