**Exhibit A 4 of 8**

**Putnam dep.
Day One
excerpt(s)**



FILE

RECEIVED
DEC 0 4 2006
K.F.M.

# Svensson
## vs.
## Putnam Investments

## Putnam Investments by Richard Tibbetts

Volume 1

November 29, 2006
pp 1-210

**Jones Reporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 1

1                            Volume: I

2                            Pages: 1-210

3                            Exhibits: 1-5

4         UNITED STATES DISTRICT COURT

5           DISTRICT OF MASSACHUSETTS

6 Civil Action No. 04-12711-PBS

7 - - - - - - - - - - - - - - - - - - - - - - -

8 LISA SVENSSON,

9            Plaintiff,

10   v.

11 PUTNAM INVESTMENTS, LLC, f/k/a PUTNAM

12 INVESTMENTS, INC., and LAWRENCE J. LASSER,

13           Defendants.

14 - - - - - - - - - - - - - - - - - - - - - - -

15        Rule 30(b)(6) Deposition of

16          Putnam Investments, LLC

17      By Richard B. Tibbetts, Designee

18       Wednesday, November 29, 2006

19         10:14 a.m. to 4:00 p.m.

20          Barron & Stadfeld, P.C.

21          100 Cambridge Street

22          Boston, Massachusetts

23

24      Reporter: Daria L. Romano, RPR/CRR

Putnam Investments by Richard Tibbetts

Page 2

1  APPEARANCES:
2  BARRON & STADFELD, P.C.
3  (by Kevin F. Moloney, Esq.)
4  100 Cambridge Street
5  Boston, Massachusetts 02114
6  (617) 723-9800
7  kfm@barronstad.com
8  for the Plaintiff.
9
10  JOHN K. WEIR LAW OFFICES, LLC
11  (by John K. Weir, Esq.)
12  300 Park Avenue, Suite 1700
13  New York, New York 10022
14  (212) 572-6374
15  johnweir47@aol.com
16  for the Plaintiff.
17
18  PUTNAM INVESTMENTS
19  (by Jason A. Tucker, Esq.)
20  One Post Office Square
21  Boston, Massachusetts 02109
22  (617) 760-1977
23  jason_tucker@putnam.com
24  for Putnam Investments, LLC.

Page 3

1  BINGHAM McCUTCHEN, LLP
2  (by Louis A. Rodriques, Esq.
3  and Allyson Kurker, Esq.)
4  150 Federal Street
5  Boston, Massachusetts 02110
6  louis.rodriques@bingham.com
7  (617) 951-8000
8  for Putnam Investments, LLC.
9
10  NIXON PEABODY, LLP
11  (by Carrie Campion, Esq.)
12  100 Summer Street
13  Boston, Massachusetts 02110
14  (617) 345-1000
15  ccampion@nixonpeabody.com
16  for Lawrence J. Lasser.
17
18  ALSO PRESENT:
19  Lisa Svensson
20
21
22
23
24

Page 4

1               INDEX
2  Deposition of:           Page
3  RICHARD TIBBETTS
4  By Mr. Weir               5
5
6
7
8
9           EXHIBITS
10  No.                      Page
11  1 Documents Bates stamped PRM 5729
12    to PRM 5732             14
13  2 Partners 1999-2003      47
14  3 Performance ratings of 91 Comparators
15    1992-2004              62
16  4 Documents bearing document numbers
17    PRM 00846 to PRM 00853  109
18  5 Document capturing the guarantees
19    from the years 1999 through 2004
20    for the 91 people      128
21
22  *Original exhibits retained by Mr. Moloney
23
24

Page 5

1             PROCEEDINGS
2
3           RICHARD TIBBETTS
4
5  a witness called for examination by counsel for
6  the Plaintiff, being first duly sworn, was
7  examined and testified as follows:
8
9           DIRECT EXAMINATION
10  BY MR. WEIR:
11     Q.  State your full name for the record.
12     A.  Richard Bowen Tibbetts. And Bowen is
13  spelled B-O-W-E-N.
14     Q.  And, Mr. Tibbetts, you are the witness
15  that has been designated by Putnam for the
16  purpose of the 30(b)(6) notice of deposition?
17     A.  I am.
18     Q.  And do you understand what a 30(b)(6)
19  deposition is? Has that been explained to you?
20     A.  Yes.
21     Q.  Okay. I'd like to just read into the
22  record just so that there's no ambiguity the
23  provisions of Rule 30(b)(6) of the Federal Rules
24  of Civil Procedure: "A party may in the party's

2 (Pages 2 to 5)

Putnam Investments by Richard Tibbetts

Page 86
1  2001, correct?
2      A.  Yes.
3          MR. RODRIQUES: He's saying he
4  doesn't recall, Jack.
5  BY MR. WEIR:
6      Q.  Do you know whether it continued?
7      A.  I think I just said I don't know of
8  any other year.
9      Q.  That's part of the manager's
10 performance rating --
11     A.  For 2001.
12     Q.  -- which is a subject that was called
13 for in the 30(b)(6) notice.
14         MR. RODRIQUES: So what's your
15 point?
16     A.  I don't think so. I think that the
17 manager rating was the manager rating. Okay. I
18 don't know how many more times I have to answer
19 that, quite honestly.
20         MR. RODRIQUES: What's your point,
21 that he --
22         MR. WEIR: He should have been
23 prepared on it.
24         MR. RODRIQUES: Did you ask him

Page 87
1  whether there's anyone at Putnam who would know
2  this question? He only has to be prepared for
3  what he knows or what is reasonably knowable.
4          MR. WEIR: Well, we read the
5  definition of what he's required to do.
6          MR. RODRIQUES: That's right, which
7  is knows and is reasonably knowable.
8  BY MR. WEIR:
9      Q.  Do you have a system of core tile
10 manager ratings at Putnam at the present time?
11     A.  No.
12     Q.  Do you know whether it was
13 discontinued?
14     A.  There were -- there was only one thing
15 consistent the entire 18 years I've been at the
16 firm, and that is that every manager was
17 instructed and tried to come up with a
18 performance rating.
19         A whole host of systems were used from
20 division to division within the investment
21 divisions to determine what the ratings would
22 be. That's the only thing that was consistent
23 from year to year.
24         In 2001 a manager core tile process

Page 88
1  was used. Different processes were used in
2  different years. There is no such thing as a
3  consistent manager core tile rating.
4      Q.  And what does the term core tile mean?
5  What did it mean on Exhibit 43?
6      A.  Core tile means equal fours, that you
7  would rate your people evenly between first,
8  second, third and fourth core tiles.
9      Q.  And that was for purposes of
10 determination of compensation and career
11 advancement?
12     A.  In 2001 it was one of the factors used
13 in establishing the manager rating and
14 determining compensation, yes.
15     Q.  Let's take a look at 44, Tibbetts 44
16 for identification.
17         Now, my question regarding this
18 document is whether the handwritten alterations
19 of the performance ratings were in 1999 actually
20 implemented?
21         MR. RODRIQUES: Objection.
22     A.  I don't know what you mean by
23 implemented.
24     Q.  Well, the indication on the first page

Page 89
1  at the bottom is that Lisa Svensson had a rating
2  of 4.8 which accords with what Putnam 3 says was
3  her actual manager's rating in that year,
4  correct?
5      A.  I think Exhibit 3 says that her rating
6  was on the form a 4.78. On Exhibit 44, it
7  appears that the 4.78 was rounded to 4.8 on the
8  initial manager's rating.
9      Q.  Okay. That's not my question.
10 Whether it's 4.8 or 4.78, I take it that's just
11 a rounding?
12     A.  That's what I said, I think it's been
13 rounded to 4.8.
14     Q.  So the manager's performance rating
15 for Lisa Svensson in 1999 was 4.8 or 4.78
16 rounded to 4.8?
17     A.  Yes.
18     Q.  Tibbetts 44 has in a column under the
19 notation Jack handwritten changes to the
20 performance ratings. Do you see that, sir?
21     A.  I see a column that has Jack with
22 different numbers than some of the manager
23 ratings.
24     Q.  And for Lisa Svensson it's a three,

Putnam Investments by Richard Tibbetts

Page 90

1  correct?
2      A.  Correct.
3      Q.  Do you know whether there was an
4  alteration to the performance rating for Lisa
5  Svensson for 1999 from 4.8 to 3?
6      A.  I think I've answered this like three
7  times, so let me try to do it one final time.
8      Q.  Not to my satisfaction.
9      A.  Apparently.
10          The manager performance rating, okay,
11  that I prepared in preparation for today, it's
12  on Exhibit 3, shows that the manager rating was
13  4.78. That's what the manager rating was for
14  1999.
15      Q.  Right. Now I'm asking you --
16      A.  You're asking me if it was altered.
17  No. It was 4.78. I don't know how many more
18  times you need me to answer that.
19      Q.  So it's your testimony, sir, that the
20  performance rating of 3.0 for Lisa Svensson for
21  1999 was -- that change was never made, that's
22  your testimony?
23      A.  Your characterizing a column with
24  handwritten notes as a change to that

Page 91

1  performance rating. I think I've testified now
2  multiple times that her performance rating was
3  4.78 or 4.8.
4          That column, to be crystal clear since
5  you haven't asked that question, is Jack's
6  opinion of her performance rating, but the
7  manager's performance rating was 4.78 or 4.8.
8      Q.  Jack being Jack Morgan?
9      A.  Yes.
10      Q.  And this was a document that bears
11  your initials on it too, sir; is that correct?
12      A.  It does.
13      Q.  And my question to you is it bears
14  also a date of January 12-January 13, 2000, and
15  I take it that it was in that time frame that
16  you were considering this document; is that
17  correct?
18      A.  Considering by using it, yes.
19      Q.  That's why put your initials and the
20  notation of the date on it, correct?
21      A.  Yes.
22      Q.  And my question is whether there was
23  discussion on that date or on or around that
24  date as to alteration of performance ratings for

Page 92

1  any of the investment professionals that are
2  referenced on this document?
3          MR. RODRIQUES:  Objection.
4      A.  I don't know how many more times I
5  need to say this.
6          Yes, there was a process every year
7  where managers did their assessments. Those
8  assessments were reviewed -- were summarized and
9  then reviewed by their bosses and colleagues
10  across the division and performance was
11  discussed. That was the same basis on which
12  compensation was discussed. Those managers then
13  took that input and finalized the performance
14  ratings.
15          So that was the process for the last
16  18 years, and it's the process that was done in
17  1999.
18      Q.  Okay. And so in respect of Lisa
19  Svensson's performance rating for 1999, that --
20  after that discussion that you just referenced,
21  the performance rating for Lisa Svensson
22  remained at 4.8, correct?
23      A.  Well, the performance rating that was
24  actually on the form was 4.78, but 4.78, 4.8,

Page 93

1  that was the performance rating.
2      Q.  Right. And so for purposes of her
3  compensation and for purposes of her career
4  advancement, anyone who went to Putnam's records
5  after January of 2000 would have seen that she
6  had a 4.78 or 4.8 performance rating for the
7  prior year; that is, 1999?
8      A.  Yes, if they looked at her performance
9  rating on the performance review form, it was
10  4.78.
11      Q.  Okay. And so the same would be true
12  for Lisa Svensson in the year 2000; that is,
13  that she received a performance rating of 4.0?
14          MR. RODRIQUES:  Are you referring
15  to a document now, Jack?
16          MR. WEIR:  I'm referring to Putnam
17  3.
18          MR. RODRIQUES:  Just so he knows
19  what you're looking at.
20      A.  Her rating for 2000 was four, yes.
21      Q.  So anyone going to Putnam's records
22  during that period would have determined that
23  Lisa Svensson's performance rating for that year
24  2000 was 4.0?

24 (Pages 90 to 93)