**Exhibit A - Part 5 of 8**

**Putnam dep.
Day 3
excerpt(s)**

RECEIVED
DEC 0 4 2007
K.F.M.
FILE

# Svensson
## vs.
# Putnam Investments

## Mary McNamee

Volume 1

November 15, 2007
pp. 1-268

**JonesReporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Mary McNamee

Page 1

Volume: I

Pages: 1-268

Exhibits: 1-51

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12711-PBS

- - - - - - - - - - - - - - - - - - x

LISA SVENSSON,

           Plaintiff,

vs.

PUTNAM INVESTMENTS, LLC, f/k/a PUTNAM

INVESTMENTS, INC. and LAWRENCE J.

LASSER,

           Defendants.

- - - - - - - - - - - - - - - - - - x

RULE 30(b)(6) DEPOSITION OF PUTNAM INVESTMENTS, LLC BY

ITS DESIGNEE MARY McNAMEE

Thursday, November 15, 2007

Barron & Stadfeld

100 Cambridge Street

Boston, Massachusetts

10:05 a.m. to 6:26 p.m.

Reporter: Karen A. Morgan, CSR/RPR

JONES REPORTING COMPANY
617-451-8900

Mary McNamee

Page 2

```
 1  APPEARANCES:
 2  JOHN K. WEIR LAW OFFICES, LLC
 3  By John K. Weir, Esquire
 4  300 Park Avenue, Suite 1700
 5  New York, New York 10022
 6  (212) 572-6374
 7  johnweir47@aol.com
 8  on behalf of the Plaintiff.
 9
10  BARRON & STADFELD, P.C.
11  By Kevin F. Moloney, Esquire
12  100 Cambridge Street
13  Boston, Massachusetts 02114
14  (617) 723-9800
15  kfm@barronstad.com
16  on behalf of the Plaintiff.
17
18  NIXON PEABODY LLP
19  By Erika M. Collins, Esquire
20  100 Summer Street
21  Boston, Massachusetts 02110-2131
22  (617) 345-1203
23  ecollins@nixonpeabody.com
24  on behalf of Lawrence J. Lasser.
```

Page 3

```
 1  APPEARANCES:
 2
 3  BINGHAM McCUTCHEN, LLP
 4  By Louis A. Rodriques, Esquire
 5  Allyson Kurker, Esquire
 6  and Jennifer L. Holden, Esquire
 7  150 Federal Street
 8  Boston, Massachusetts 02110
 9  (617) 951-8000
10  on behalf of Putnam Investments, LLC.
11
12  PUTNAM INVESTMENTS
13  By Christopher S. Fortier, Esquire
14  One Post Office Square
15  Boston, Massachusetts 02109
16  (617) 760-4613
17  christopher_fortier@putnam.com
18  on behalf of Putnam Investments.
19
20  ALSO PRESENT: Lisa Svensson.
21
22
23
24
```

Page 4

```
 1              I N D E X
 2
 3  EXAMINATION OF:                        PAGE
 4  MARY McNAMEE
 5  By Mr. Weir                             7
 6
 7         E X H I B I T S
 8  NO.                                    PAGE
 9   1   Spreadsheet                        14
10   1A  Fifth Group Review                 20
11   2   E-mail with attachment             24
12   3   E-mail                        30
13   4   E-mail                        32
14   5   Memorandum                    35
15   6   MDs-SVPs for succession planning   38
16   7   E-mail with attachment             43
17   8   E-mail                        55
18   9   E-mail                        58
19  10   E-mail with attachment             61
20  11   E-mail                        84
21  12   E-mail with attachment             91
22  13   E-mail                       101
23  14   E-mail                       104
24  15   E-mail                       113
```

Page 5

```
 1         E X H I B I T S
 2  NO.                                    PAGE
 3  16   1999 Succession Planning          117
 4  17   2001 Succession Planning          120
 5  18   E-mail                       123
 6  19   E-mail                       125
 7  20   E-mail                       128
 8  21   E-mail                       133
 9  22   E-mail                       136
10  23   E-mail                       141
11  24   E-mail with attachment            147
12  25   E-mail with attachment            149
13  26   E-mail                       155
14  27   E-mail with attachment            159
15  28   E-mail with attachment            165
16  29   E-mail                       169
17  30   E-mail                       173
18  31   E-mail with attachment            175
19  32   E-mail                       181
20  33   E-mail with attachment            182
21  34   E-mail                       188
22  35   E-mail                       194
23  36   E-mail with attachment            198
24  37   E-mail with attachment            200
```

2 (Pages 2 to 5)

Mary McNamee

Page 162

1  or not.
2  Q. If you look over at the next page. We will
3  by the end of the first quarter hire a replacement for
4  Beth Cotner to run Large Cap Growth and possibly if we
5  can find the right person a head of all Growth?
6  A. Mm-mm.
7  Q. Was Beth Cotner considered one of the weak
8  links?
9  A. I think they were moving -- Beth was moving
10 into research as an associate director of research.
11 The entire Growth team had to be overhauled.
12 Q. Do you know whether Beth Cotner was
13 considered a weak link?
14 A. I think that they felt she was responsible
15 for bad performance because it was under her watch.
16 Q. The next paragraph refers to Omid. Is that
17 again Omid Kamshad?
18 A. Yes.
19 Q. Who will be running all of International
20 including International Growth?
21 A. Yes.
22 Q. Did that occur?
23 A. He was running all of International and I
24 don't know whether International Growth was part of his

Page 163

1  watch or not but it is now so I would assume it would
2  have been then.
3  Q. And who are the Dan and Roland that are
4  referred to in the next sentence?
5  A. Dan Miller and Roland Gillis who were
6  responsible for the Specialty Growth team.
7  Q. And what was Eric Wetlaufer's position?
8  A. Eric Wetlaufer was working I believe in
9  Specialty Growth with them.
10 Q. Do you understand the sentence Eric Wetlaufer
11 is very talented but several years away and more
12 aggressiveness needed to become more senior?
13 A. I see the sentence, yes.
14 Q. Do you understand that means?
15 A. Yes. What they are saying is he is several
16 years away of being able to be a CIO and he needs to
17 get more aggressive.
18 Q. What does aggressive mean?
19 A. They probably --
20 Q. How would one communicate that they were
21 aggressive in order to become more senior within the
22 organization?
23 A. I would say being more decisive, being more
24 willing to take risks and make decisions.

Page 164

1  Q. Do you understand the sentence that says,
2  quote, there are no magic formulas or heroes I hate to
3  remind Larry?
4  A. Yes.
5  Q. What does that mean?
6  A. That there's really no -- it's not going to
7  happen overnight. You can't just blink your eyes with
8  a magic wand and says things will be corrected, that it
9  takes time to rebuild a team.
10 Q. Was it contemplated that the Growth team
11 would be rebuilt?
12 A. Yes, it was and it was.
13 Q. And who was to make the decision as to how it
14 would be rebuilt?
15 A. That would be Steve O primarily because he
16 headed up all of Growth and then ultimately once Tim
17 moved, he and Tim would have helped as well and then
18 once when -- that continued through 2002 and Ed
19 Haldeman joined and became co-CIO with Steve, they
20 both, you know, I'm assuming would have handled that
21 charge together.
22 Q. Would Larry Lasser have played a role?
23 A. He would have played a role and he would have
24 wanted them to come up with the idea and the plan and

Page 165

1  then pass it by him for approval.
2     MR. WEIR: Next exhibit in order PRM 14147
3  and 14148.
4     (Exhibit No. 28 marked for
5     identification.)
6  Q. Let me show you what has been marked as
7  Exhibit 28 for identification and ask you if you can
8  identify it?
9  A. It's an e-mail from Denise Selden to Steve
10 Oristaglio copying Sandy Costa who was Steve's
11 assistant dated March 25, 2002, subject regarding
12 Equity org chart, Steve's version.
13 Q. And the second page of the document is the
14 org chart?
15 A. Okay.
16 Q. Is that correct?
17 A. Yes, it is because it's a forwarded e-mail
18 from Sandy Costa. Here it is Equity org chart for
19 Denise Selden.
20 Q. And how would this org chart have been
21 prepared?
22 A. It was probably prepared by Sandy Costa who
23 was Steve's admin.
24 Q. Did HR have any input into the determination

42 (Pages 162 to 165)

JONES REPORTING COMPANY
617-451-8900

Mary McNamee

Page 166

1  of this org chart?
2      A. It's not clear at this stage whether HR had
3  input into it or whether HR had input after it. Maybe
4  this was a draft that was floated but I would think
5  that Rick Tibbetts would have had input into it.
6      Q. Is this the organization that was -- the
7  revised organization of Growth team as of March of
8  2002?
9      A. Just give me a minute to look it over.
10         (Witness perused document.)
11     A. I think this is a work in progress because
12 Beth ended up moving into research in 2002, mid 2002.
13 They also hired Brian O'Toole at some point to head up
14 Large Cap Growth and also hired Walt Pearson to work as
15 a PM within Growth. Dave Santos was on the team. Jeff
16 Lindsay left the firm I think in --
17     Q. I'm not asking you about changes after.
18     A. This was in -- I'm saying this was a work in
19 progress. This was not a final.
20     Q. This is not a final of the organization that
21 existed as of March 25, 2002?
22     A. Not that I'm aware.
23     Q. Okay.
24     A. I think this is preliminary.

Page 167

1      Q. Who do you know that was in a position in
2  2002 that is not referenced on this org chart?
3      A. Well, what I'm saying is I think that this is
4  Steve's attempt to kind of put an organizational chart
5  around some changes that had happened but I think this
6  was not the final organization ultimately. Maybe in
7  April of 2002 this may have looked quite different. So
8  I think it was a work in progress.
9      Q. How would it have been different in April of
10 2002 versus March 25th of 2002?
11     A. Well, sometime during mid 2002 Beth Cotner
12 was an associate director of research. She was not
13 heading up Large Cap Growth which it looks like from
14 this org chart.
15     Q. She moved from that position at Putnam's
16 behest?
17     A. It was kind of a mutual decision is my
18 understanding.
19     Q. Who was involved in that decision?
20     A. I believe Steve Oristaglio, Rick Tibbetts had
21 those conversations with her.
22     Q. And anybody else that is identified on this
23 list that shortly thereafter switch positions or got
24 fired?

Page 168

1      A. Most all of them are gone now.
2      Q. I'm talking about the time frame immediately
3  after March 25, 2002.
4      A. I'm not sure. I don't recall when Walt
5  Pearson and Brian O'Toole were hired into Growth.
6      Q. What positions did they take whenever it was
7  they were hired?
8      A. Brian O'Toole was CIO Growth and Walt Pearson
9  was a portfolio manager. I'm not sure. I can't
10 remember the date in which they were hired.
11     Q. Were they hired internally or externally?
12     A. Externally.
13     Q. How about in the Global Growth organization?
14 Does that --
15     A. That looks the same.
16     Q. Prior to the reorganization who had had the
17 position which Mr. Dexter had?
18     A. It was a combination of Lisa Svensson. Steve
19 Dexter I think had part of it. I think he had some
20 International Growth.
21     Q. Okay. So Lisa Svensson was moved out and
22 Mr. Dexter became the leader of that particular group?
23     A. And Robert Swift was terminated.
24     Q. And Robert Swift was terminated. And any

Page 169

1  other changes that were made to Global Growth after
2  March of 2002 or in March of 2002?
3      A. Not that I can tell from this org chart and
4  not from my memory either.
5      Q. So Peter Hadden, Denise Selden and Nathan
6  Eigerman were all in Global Growth before and after
7  March of 2002?
8      A. Well actually, this whole quantitative team
9  which starts with Tony Elavia and goes all the way
10 across to Nathan Eigerman that was a separate
11 quantitative portfolio management group and they were
12 kind of imbedded in the teams but they worked for Eric
13 Sorensen so they were actually -- I don't think they
14 were listed as portfolio members but maybe they were
15 but that was really kind of a separate group.
16     Q. Well, I still ask the question. Were Steve
17 Dexter, Peter Hadden, Denise Selden and Nathan Eigerman
18 involved in some respects at least in the Global Growth
19 team both before and after March of 2002?
20     A. I believe so.
21        MR. WEIR: Exhibit 29 PRM 09568.
22        (Exhibit No. 29 marked for
23        identification.)
24     Q. Can you identify this document?

43 (Pages 166 to 169)

Mary McNamee

Page 214

1  they could round up or how far they could round down?
2      A.  It would be to the nearest five point mark or
3  .5.
4      Q.  Are you aware of any circumstances in which
5  any employee was ever rounded up or rounded down more
6  than .5?
7      A.  Not that I recall.
8          MR. RODRIQUES: As part of Peoplesoft.
9      A.  As part if this Peoplesoft thing, no.  No.
10 But there are thousands of records and I haven't
11 reviewed thousands of records of people and
12 cross-compared them to performance reviews so I don't
13 know but there would be no reason that --
14     Q.  If someone were to have gotten a rating of
15 4.8 in a particular year, that customarily would be
16 rounded up to five as far as the Peoplesoft number?
17     A.  I could see where that could happen, yes.
18 It's closer to five than it is to 4.5.
19     Q.  Right.  Okay.  Now, what is a PDPR?
20     A.  I think that's an abbreviation of the
21 performance management form that we used.  I don't
22 remember what it stood for.
23     Q.  And those were prepared by the managers?
24     A.  Yes.

Page 215

1      Q.  Okay.  And they were asked to assign a rating
2  number to each of the investment professionals under
3  their management; correct?
4      A.  If they were investment professionals, yes.
5      Q.  And --
6      A.  Some did.  Some didn't.
7      Q.  Were there circumstances where individuals
8  would not receive a rating in a particular year?
9      A.  Yes.
10     Q.  What were those circumstances?
11     A.  Either the manager didn't feel like they
12 liked ratings.  Some managers said we want to have a
13 discussion but I don't like ratings so I'm not going to
14 give a rating.  We're going to talk about your
15 performance instead.
16     Q.  Okay.
17     A.  Some managers didn't do reviews at all.
18     Q.  Who didn't do reviews at all that you recall?
19     A.  It varied.  It varied from group to group.  I
20 can't recall specifically.
21     Q.  Do you remember any groups that did not do
22 reviews at all?
23     A.  It happened haphazardly so I don't recall
24 specifically and it varied from year to year.

Page 216

1      Q.  Do you recall any particular manager that
2  made a habit of not doing reviews?
3      A.  The senior managers were in particular worse
4  than the junior managers.
5      Q.  Who do you mean by the senior managers?
6      A.  Like I don't know whether Steve Oristaglio
7  wrote out a performance review for Ned Shadek for
8  example.  I don't think he wrote up anything for him.
9      Q.  And then in those circumstances the group
10 that was determining promotions and compensation, this
11 group that we looked at in several of these documents
12 today, that group would rely upon some oral
13 presentation?
14     A.  You mean in-the-round discussions?
15     Q.  Yes.
16     A.  Yes.
17     Q.  Would there be any documents that would be
18 looked at for an individual who had not been reviewed?
19     A.  There would be -- if they were investment
20 professionals, they would have performance numbers, the
21 quantitative scores which were maintained by Brian
22 Lenhardt.
23     Q.  But in terms of the more subjective
24 categories such as your people management skills, the

Page 217

1  group would rely upon the input from whomever was there
2  from the particular team or department that was
3  involved?
4      A.  Correct.  Let me also say when the
5  in-the-round discussions were prominently going on up
6  to and including plan year 2002.  So the discussions --
7  the last in-the-round meeting that I recall was in
8  January of 2003 for plan year 2002.  The managers were
9  strongly encouraged and almost not forced to do
10 performance reviews but when Ed Haldeman joined the
11 firm, he then stated he thought it was a waste time and
12 HR bureaucracy for managers to waste their time doing
13 these five-page performance reviews.  So not only did
14 in-the-round meetings cease but also managers doing
15 performance reviews on the form with ratings and so we
16 then went to a more customized user friendly one-page
17 performance review which may or may not have a score on
18 it and it was up to the individual CIO to decide
19 whether or not they would have an actual number rating
20 for their people.
21     Q.  At what point in time did that occur?  We
22 know Haldeman came at the end of October 2002.  Did
23 that happen after the beginning of the year 2003?
24     A.  Yes.

55 (Pages 214 to 217)

Mary McNamee

Page 222

1    Q.   So if we look at 2003 for Lisa Svensson, the
2  reason that is identified is involuntary-poor
3  performance.
4    A.   Correct.
5    Q.   And do you know specifically within HR who
6  inputted that particular reason into the document?
7    A.   It would have been me and it was originally
8  mutual consent but then when Lisa Svensson refused to
9  sign the separation agreement, which happens to any
10 employee that refuses to sign a separation agreement,
11 it would revert to involuntary-poor performance.
12   Q.   So automatically if someone doesn't sign the
13 separation agreement, you would change mutual consent
14 to involuntary-poor performance?
15   A.   Correct.
16   Q.   Are there any others on the list for 2002 or
17 2003 for whom that occurred?
18        (Witness perused document.)
19   A.   Some people got involuntary-poor performance
20 because they weren't even offered separation
21 agreements. For example, Sergei Tishchenko. He was on
22 a performance warning and was terminated based upon his
23 poor performance. He was not even offered a separation
24 agreement. Another one is Yumiko Matsubara who was a

Page 223

1  Japanese analyst and she was terminated for poor
2  performance and was not offered a separation agreement.
3    Q.   Who made the determination as to whether a
4  separation agreement was or was not going to be
5  offered?
6    A.   It would depend on the circumstances and it
7  would be up to the manager and --
8    Q.   Who made it?
9    A.   HR manager and the manager of the person.
10   Q.   So for Lisa Svensson that would have been you
11 and Josh Brooks?
12   A.   Correct.
13   Q.   Do you see the entry termination reason for
14 Margaret Smith?
15   A.   Mutual consent.
16   Q.   And that means that she signed a separation
17 agreement?
18   A.   Yes, she did.
19   Q.   She was terminated involuntarily?
20   A.   That I don't know. I think it was truly a
21 mutual consent. She wanted to leave is my
22 understanding.
23   Q.   When it says career growth opportunity, what
24 does that mean?

Page 224

1    A.   It means they left on their own to pursue.
2    Q.   That's a voluntary?
3    A.   That's a voluntary.
4    Q.   And how about the termination reason for
5  Darren Peers? Who was responsible for entering that
6  one into the document database?
7    A.   That would have been me or my assistant
8  actually.
9    Q.   What was the entry there, that's family
10 reasons?
11   A.   Family reasons.
12   Q.   What does that mean?
13   A.   He relocated to the west coast ultimately.
14   Q.   That was the reason why he was terminated?
15   A.   That's what he had selected in the exit
16 interview. He selected several. We had to pick one.
17   Q.   So in the exit interview the terminated
18 employee whether voluntary or involuntary are given a
19 choice as to --
20   A.   Only if you're a voluntary employee. You're
21 given -- we show the list and say circle as many as are
22 relevant because sometimes it says career growth
23 opportunity, higher compensation and then it goes to
24 the people up in Andover to Peoplesoft and then they

Page 225

1  actually do the entering into Peoplesoft from the exit
2  interview.
3    Q.   So he circled family reasons?
4    A.   As one of his reasons.
5    Q.   Do you know whether he circled any others?
6    A.   I don't recall but he could very well have.
7  Dissatisfied with supervision or something like. That
8  he could have.
9    Q.   Do you know that he did that or are you just
10 surmising?
11   A.   That was in 2003. I don't recall.
12   Q.   You do recall that he circled family reasons
13 because that's the one that's on the document?
14   A.   He obviously would have circled that if
15 that's on the document as one of his choices.
16   Q.   Okay. Do you know if Josh Brooks has ever
17 been reviewed in writing at Putnam?
18   A.   No. I have never seen a performance review
19 written up for Josh Brooks.
20   Q.   Do you know whether Maria Drew has ever been
21 reviewed at Putnam in writing?
22   A.   I don't recall seeing a performance review
23 for her either.
24   Q.   When someone is given a midyear or interim

57 (Pages 222 to 225)

Mary McNamee

Page 226

1  review, and I'm talking about the time frame of 2003
2  and earlier.
3     A.  Okay.
4     Q.  If someone is given a midyear or interim
5  review, that's a decision that the manager of that
6  person makes as to whether or not to do a review?
7     A.  Yes.
8     Q.  And does it ever occur that human resources
9  would direct anyone to make a review on an interim or
10 midyear basis?
11       MR. RODRIQUES: Which of the documents that
12 have been produced since June does the midyear review
13 topic relate to?
14       MR. WEIR: Documents 8068 and 8069.
15    A.  Human resources will make recommendations to
16 managers if they feel that they have a performance
17 issue within an employee that they should probably
18 review all of their employees if they have some
19 problems with any one on the team and treat everyone
20 fairly. We strongly recommend that all managers do
21 reviews.
22    Q.  If an individual is identified at the end of
23 the prior year as having some performance issues, would
24 human resources recommend that that person be looked at

Page 227

1  with more frequency than once a year?
2     A.  Absolutely. They should be reviewed. If
3  they have below a three rating at the end of the year,
4  they should have a performance plan put in place and
5  should be monitored on 30, 60 or 90-day basis. At the
6  very least 30 days.
7     Q.  Whose responsibility would it be to ensure
8  that that was done?
9     A.  It is really the manager's responsibility to
10 do it but it's in the human resources role to suggest
11 that but it's not their job to dictate it.
12    Q.  Are instances of which you're aware in which
13 it was suggested to the manager and the manager did not
14 do it?
15    A.  All the time. Happens in every organization.
16    Q.  I'm speaking specifically of Putnam.
17    A.  No.
18    Q.  And in particular in the time frame 2002 to
19 2003.
20    A.  I don't remember any specific examples, no.
21    Q.  Do you remember whether Mr. Chris O'Malley
22 had received a favorable performance evaluation at the
23 end of 2002?
24    A.  I don't recall.

Page 228

1     Q.  Do you recall whether Mr. O'Malley's
2  performance was evaluated on a more frequent basis than
3  annually during the calendar year 2003?
4     A.  Well, I know that Lisa Svensson evaluated his
5  performance in the summer of 2003.
6     Q.  That's not my questions. Do you recall
7  whether there were any suggestions or instructions
8  issued to review his performance on a more frequent
9  basis?
10    A.  Not that I recall.
11    Q.  A number of the PDPRs that were produced to
12 us in this latest round of discovery while identifying
13 a manager were not actually signed by a manager. Does
14 Putnam have signed copies of these PDPRs?
15    A.  I would say it is probably inconsistent, that
16 some are signed and some are not because managers
17 forget. You know, they do the review. They didn't
18 sign them. They send an e-mail of the performance
19 review. Then say, well, I didn't get a copy of the
20 signed one or can't you just use the e-mail I sent you.
21 In light of not having anything in the employee record,
22 we then made a decision to image the reviews as they
23 were sent to us.
24       (A break was taken.)

Page 229

1        MR. WEIR: Mark this as the next exhibit in
2  order one-page document bearing document number 8068.
3        (Exhibit No. 41 marked for
4        identification.)
5     Q.  I show you what has been marked as Exhibit 41
6  for identification and ask if you can identify that
7  document?
8     A.  It looks like a midyear review for 2001 for
9  Lauren Allansmith.
10    Q.  Do you know who prepared the document?
11    A.  It doesn't have a name on it.
12    Q.  Do you know independently of the document who
13 prepared it based on the date or information contained
14 therein?
15    A.  No because I don't know who was her manager
16 in 2001.
17       MR. WEIR: Let's mark as Exhibit 42 for
18 identification a one-page document bearing document
19 number 8654.
20       (Exhibit No. 42 marked for
21       identification.)
22    Q.  Let me show you what has been marked as
23 Exhibit 42 for identification. Can you identify the
24 document?

58 (Pages 226 to 229)