**Exhibit A 6 of 8**

**Stoev dep. excerpt(s)**



RECEIVED
AUG 28 2006
K.F.M.

# Svensson
## vs.
# Putnam Investments, et al.

## Konstantin S. Stoev

Volume 1

August 24, 2006
pp. 1-152

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Konstantin S. Stoev

Page 1

```
 1                    VOL. 1, PAGES 1 - 152
 2            UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF MASSACHUSETTS
 4    Civil Action No. 04-12711-PBS
 5    ------------------------------------
 6    LISA SVENSSON,                          )
 7                 Plaintiff                  )
 8    v.                                      )
 9    PUTNAM INVESTMENTS LLC, f/k/a PUTNAM    )
10    INVESTMENTS, INC., and LAWRENCE J.      )
11    LASSER,                                 )
12                 Defendants                 )
13    ------------------------------------
14
15         DEPOSITION OF KONSTANTIN S. STOEV
16              Thursday, August 24, 2006
17               1:48 p.m. to 6:01 p.m.
18                Barron & Stadfeld, P.C.
19                 100 Cambridge Street
20              Boston, Massachusetts 02114
21
22                      *********
23
24      Reporter: Lauren M. Mitchell, CSR, RPR, CRR
```

Konstantin S. Stoev

Page 2

APPEARANCES:
John K. Weir Law Offices, LLC
John K. Weir, Esq.
300 Park Avenue, Suite 1700
New York, New York 10022
(212) 572-6374
johnkweir47@aol.com
-and-
Barron & Stadfeld, P.C.
Kevin F. Moloney, Esq.
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
kfm@barronstad.com
Counsel for the Plaintiff

Bingham McCutchen, LLP
Joseph L. Kociubes, Esq.
150 Federal Street
Boston, Massachusetts 02110-1726
(617) 951-8000
joe.kociubes@bingham.com
Counsel for Putnam Investments, LLC

Page 3

APPEARANCES (continued):
Nixon Peabody, LLP
Carrie Campion, Esq.
100 Summer Street
Boston, Massachusetts 02110-2131
(617) 345-1000
Counsel for Lawrence Lasser
ALSO PRESENT: Lisa Svensson

Page 4

INDEX

WITNESS                                  PAGE
KONSTANTIN S. STOEV
BY MR. WEIR:
BY MR. KOCIUBES:

EXHIBITS

Exhibit 1, deposition subpoena           6
Exhibit 2, signature page                6
Exhibit 3, E-mail dated 10/27/2003, to   70
Stoev from Lasser
Exhibit 4, E-mail, dated 9/19/2003, to   82
Stoev from Brooks
Exhibit 5, separation agreement          140
Exhibit 6, E-mail string, dated 9/17/2004  149


***EXHIBITS MARKED DURING THIS DEPOSITION
   ARE ATTACHED TO THE DEPOSITION TRANSCRIPT.

Page 5

           PROCEEDINGS
           KONSTANTIN S. STOEV,
a witness called for examination by counsel for the
Plaintiff, LISA SVENSSON, and having been
satisfactorily identified by the production of his
Massachusetts driver's license, was duly sworn by
the Notary Public and testified as follows:
           MR. KOCIUBES: Actually, before we get
started, since I gather this is intended to be a
trial deposition, I just want to make clear -- I'll
do it either way -- are we reserving objections as
to form, or do you want me to make them as we go
along?
           MR. WEIR: I think, since this is a
trial deposition, maybe you better make them as you
go along.
           MR. KOCIUBES: Okay.
EXAMINATION BY MR. WEIR:
    Q. Good afternoon, Mr. Stoev.
    A. Good afternoon.
    Q. My name is Jack Weir, and I'm the attorney
for Lisa Svensson in a legal action which she has
brought here in Boston against Putnam Investments.
           I'm going to be asking you a series of

Page 46

1   A. It was before it.
2   Q. How long before?
3   A. No, I don't recall. In terms of number of
4   days, for example, I don't recall.
5       I know it was before. And I think Josh
6   had encouraged me to talk to Lisa.
7       And then after that, Josh asked me if I
8   had spoken to Lisa. And I said yes, I had spoken to
9   Lisa, and she was very upset.
10      And that was it.
11  Q. Did you communicate to Josh Brooks what Lisa
12  Svensson had said?
13  A. No.
14      I think I -- I don't think I had any
15  further discussion with Josh about this, because I
16  basically felt -- I told him, look -- I don't recall
17  the exact words I used again, but it was something
18  like, look, as you said, I went to talk to Lisa
19  about it just to understand a little bit more about
20  the whole situation. And I found her upset about
21  it, and that obviously, she doesn't share your view.
22      And that was it, basically, because I
23  didn't have any other sense.
24      MR. KOCIUBES: Motion to strike.

Page 47

1   Q. You referred earlier to an announcement.
2       What announcement was made?
3   A. Every, I think it was every Thursday, global
4   equity research, the Global Equity Research Team had
5   a meeting at which we discussed a number of issues
6   that were of interest to the department, the equity
7   research group. It could be individual stocks. It
8   could be projects that are going on. It could be
9   structural or management issues that were developing
10  at Putnam. It could be market-related issues, a
11  number of topics.
12      And at that meeting, at that Thursday
13  meeting, I think it was Josh who announced that Lisa
14  will not manage the Energy and Basic Materials team,
15  and that Lisa has decided to leave Putnam, or
16  something to that effect.
17  Q. Do you recall when in relation to your
18  discussions with Mr. Brooks and with Lisa Svensson
19  about which you've testified that announcement
20  occurred?
21  A. In relation to my discussion with Josh, it
22  was after.
23      So, Josh basically came into my office
24  to prepare me for the announcement and talk to me

Page 48

1   individually as opposed to discuss it in a broader
2   forum first.
3       I don't recall when the announcement was
4   in relation to my going to Lisa's office and seeing
5   her after having been encouraged by Josh to go and
6   talk to her.
7   Q. Okay. Going back to the meeting with
8   Mr. Hutchinson --
9   A. Yes.
10  Q. -- do you recall any discussion from
11  Mr. Hutchinson as to what he was going to do with
12  the information that you provided to him in that
13  meeting?
14  A. Yes.
15      I recall, as I said, that Mr. Hutchinson
16  or Eric Hutchinson told me that Lisa was being
17  considered for a promotion. And that, in my view,
18  that meant he was collecting feedback for the people
19  who were considering the eventuality of that
20  promotion, and that he would relate my feedback to
21  those people.
22      And I don't -- he didn't mention
23  specifically who these people are, but I had the
24  feeling when we discussed it, the feeling that he

Page 49

1   conveyed to me was that Lisa --
2       MR. KOCIUBES: Objection.
3   A. -- was that Lisa was being considered for a
4   promotion.
5       And in my, you know, uneducated guess,
6   that was -- I mean, I felt good. I mean, I felt
7   that this is great that this is happening, that they
8   are considering Lisa finally for a promotion because
9   she's done such a great job of managing something
10  that was nearly unmanageable and pulling us out of
11  such a big hole, and in the meantime, being able to
12  present, together with the team, such great work
13  that was of benefit to the whole, the whole
14  department. And through all of this, never failing
15  to do her primary responsibilities about equity
16  coverage and portfolio management.
17      So, to me, that was, you know, it was
18  natural that this would happen. And I felt happy
19  that Eric had actually contacted me so that I can
20  give feedback that would be conveyed to people who
21  considered Lisa for promotion.
22      He didn't specify who the people were,
23  though.
24  Q. Okay. Did you have any discussions with Mr.

13 (Pages 46 to 49)

Konstantin S. Stoev

Page 66

1  company might do to damage the performance of the
2  funds that the investor has entrusted is what the
3  management company should not do.
4       And that therefore, if a management
5  company chose to direct commissions to brokers for
6  reasons other than the benefit of the investor, then
7  that practice was damaging the investor.
8       Again, this is a very non-technical
9  description of what I think, but I think it gives
10 you the flavor of what I think.
11    Q. Did you ever communicate your view on the
12 fiduciary duty to manage the money in the best
13 interests of the investor to persons up the chain of
14 command at Putnam?
15    A. Yes. On a different occasion.
16       That was, again, in 2003. That was in,
17 I think in October. I think I have that E-mail
18 actually somewhere here.
19       I sent an E-mail -- Putnam used to have
20 a ritual of quarterly officers' meetings. And
21 officers were, officers of the company are all the
22 individuals who hold the title of assistant
23 vice-president or higher.
24       So, this is the assistant

Page 67

1  vice-president, vice-president, senior
2  vice-president, managing director and whatever there
3  was above that.
4       Those officers' meetings were chaired by
5  the CEO of the company. And usually, the bulk of
6  the presentation would be carried out by the CEO and
7  the head of the investment division.
8       At the quarterly investment -- quarterly
9  officers' meeting in the fall of 2003, the CEO of
10 the company, the then CEO of the company made a
11 statement which I completely disagreed with.
12    Q. That was Mr. Lasser?
13    A. Yes.
14       He was talking about the ongoing
15 internal investigation of Putnam of practices in
16 certain funds where the portfolio managers had
17 traded in the funds that they had managed
18 themselves, taking advantage of expected direction
19 of equity markets and the correlation of their own
20 funds with those equity markets.
21       And Mr. Lasser was talking about this
22 issue, and he mentioned that it had been detected
23 first in 2000 and that -- I think his exact words
24 were that by the standards of the day, which is

Page 68

1  2003, they look more intolerable than they did in
2  2000.
3       And I strongly disagreed with that view.
4  And I wrote an E-mail to Mr. Lasser saying that, you
5  know, respectfully, sir, I disagree with what you
6  said today. And I quoted his words.
7       And I said, I think that the standards
8  of responsibility with which we are supposed to
9  manage money have not changed just because time has
10 passed. And I think they are the same as -- they
11 are now as they were trading when John Putnam first
12 passed the statement about what constitutes prudent
13 rules and also the responsibility of a person
14 managing other people's money.
15       I referred to that just because it was
16 in Putnam's culture to talk about this as one of the
17 pieces of rich heritage that the company has.
18       So, I wanted to make the point that just
19 because it was 2003 doesn't mean that something we
20 did in 2002 was more acceptable then than today.
21       MS. CAMPION: Objection. Move to
22 strike.
23       MR. KOCIUBES: Objection.
24    Q. Do you have a copy of that E-mail?

Page 69

1     A. I'm not sure.
2        (Pause.)
3     A. I'm sorry.
4        (Pause.)
5     A. No, I don't have my E-mail.
6        I do have the response I received, a
7  copy of the response I received from Mr. Lasser.
8     Q. And what is the date of Mr. Lasser's
9  response?
10    A. Just a second.
11       October 27.
12    Q. May I see it, please?
13       (Witness complies.)
14       MR. KOCIUBES: Before you go on, may we
15 see it, too?
16       MR. WEIR: Yes, sure.
17       (Pause.)
18    A. Again, I'm sure that Putnam retains E-mails
19 from that period. And you will be able to obtain it
20 if it's necessary in the context of what I wrote.
21       MR. WEIR: Would you mind if we marked
22 this as an exhibit?
23       THE WITNESS: Sure. If I could get a
24 copy.

18 (Pages 66 to 69)