**Exhibit A - Part 7 of 8**

**Svensson dep. excerpt(s)**

Lisa Svensson                                                11/30/2005

Page 1

```
 1                                    Volume:  I

 2          ☐ FILE                    Pages:  1-255

 3                                    Exhibits:  See Index

 4          UNITED STATES DISTRICT COURT

 5        FOR THE DISTRICT OF MASSACHUSETTS

 6

 7   * * * * * * * * * * * * * * *

 8   LISA SVENSSON,

 9               Plaintiff,

10   vs.                      Civil Action No.  04-12711

11   PUTNAM INVESTMENTS LLC, f/k/a

12   PUTNAM INVESTMENTS, INC., and LAWRENCE J. LASSER,

13

14               Defendants.

15   * * * * * * * * * * * * * * *

16           DEPOSITION OF LISA SVENSSON

17              Bingham McCutchen

18             150 Federal Street

19           Boston, Massachusetts

20                10:04 a.m.

21        Wednesday, November 30, 2005

22    Court Reporter:  Mary C. Soldati CSR, RPR

23

24
```

Lisa Svensson                                                              11/30/2005

**Page 2**

1  APPEARANCES:
2     JOHN K. WEIR LAW OFFICES
3     By John K. Weir, Esquire
4     300 Park Avenue
5     Suite 1700
6     New York, New York  10022
7     (212) 572-6374
8     On Behalf of the Plaintiff
9
10    BINGHAM McCUTCHEN
11    By Joseph L. Kociubes, Esquire
12    and Louis A. Rodriques, Esquire
13    150 Federal Street
14    Boston, Massachusetts  02110-1726
15    (617) 951-8337
16    On Behalf of the Putnam Investments
17
18    NIXON PEABODY LLP
19    By Carrie Campion, Esquire
20    100 Summer Street
21    Boston, Massachusetts  02110-2131
22    (617) 345-1000
23    On Behalf of Lawrence Lasser
24  ALSO PRESENT:  Jason A. Tucker, Esquire

**Page 4**

1      E X H I B I T S (Continued)
2  NO.        DESCRIPTION        PAGE
3  8     Memo Dated 3/12/02        130
4  '9    Business Plan            132
5  10    2002 Review              152
6  11    360 Peer Review 12/14/02    179
7  12    Document                 195
8  13    Letter Dated 9/15/03     227
9  14    Ms. Svensson's Notes     239
10
11  *Exhibits returned with transcript
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1           I N D E X
2
3  DEPONENT:        DIRECT  EXAMINATION
4  LISA SVENSSON
5
6  By Mr. Kociubes        5
7
8           E X H I B I T S
9
10 NO.        DESCRIPTION        PAGE
11 1     Employment Agreement        5
12 2     Ms. Svensson's Journals     5
13 3     E-Mail Dated 9/3/03        33
14 4     Memo Dated 8/8/03          49
15 5     Performance Review 2000    102
16 6     360 Peer Review            111
17 7     Performance Review         114
18
19
20
21
22
23
24

**Page 5**

1           P R O C E E D I N G S
2          (Exhibit Nos. 1 and 2 marked for
3  identification.)
4           LISA SVENSSON,
5  a witness called for examination by counsel for the
6  Defendant, having been satisfactorily identified and
7  duly sworn by the Notary Public, was examined and
8  testified as follows:
9
10          DIRECT EXAMINATION
11 BY MR. KOCIUBES:
12    Q.  Would you state your full name, please.
13    A.  Lisa Heitman Svensson.
14    Q.  And where do you live, Ms. Svensson?
15    A.  54 Hull Street, H-U-L-L, Newtonville,
16 Massachusetts.
17    Q.  And am I correct that you started working in
18 Putnam in about July of 1994?
19    A.  Yes.
20    Q.  And what was your last day at Putnam?
21    A.  September 15, 2003.
22    Q.  And is that the last day you also went to
23 the office, that you were in the Putnam offices?
24    A.  Yes.

2 (Pages 2 to 5)

Lisa Svensson                                                                          11/30/2005

Page 10

1    Q. When did you first consult with any attorney
2    about the subject matter of your lawsuit? Just a
3    date.
4    A. Well, it was when I called Jack Weir for the
5    first time and that was --
6         MR. WEIR: Just the date.
7         THE WITNESS: Right.
8         MR. WEIR: Just the date, if you recall.
9    A. It was some time between the 28th and the
10   15th of September.
11   Q. So before you had -- you had a meeting with
12   Mr. Brooks and Ms. McNamee, meetings on September
13   15th?
14   A. One meeting, yeah.
15   Q. So do I understand you correctly that before
16   that meeting you had consulted with counsel?
17   A. Correct.
18   Q. Do you remember whether it was a day before
19   or a week before?
20   A. Well, I remember that when I met with Josh
21   Brooks, not on the 28th, but after the 28th, the
22   next time I met with him was probably something like
23   in the range of September the 8th, around there.
24   And I believe I said to him at that time that I had

Page 11

1    consulted an attorney. So some time prior to that.
2    Q. So prior to September 8th even?
3    A. I think so.
4    Q. And can you tell us when it was that you
5    were terminated?
6    A. As of September 15, 2003.
7    Q. I'm not asking as of. When was it that you
8    were told you were being terminated?
9    A. The day that Josh Brooks gave me the
10   notification in writing that I was terminated,
11   September 15th.
12   Q. September 15th?
13   A. Mm-hmm.
14   Q. And am I correct that it was Mr. Brooks who
15   terminated you?
16   A. Yes.
17   Q. And did Mr. Brooks give you any reasons for
18   the termination?
19   A. Well, we had a discussion on August the
20   28th, and he gave me some reasons that I needed to
21   give up my job. And essentially, he gave me these
22   three options. So the termination was that I didn't
23   find any of the three options acceptable so,
24   therefore, they were terminating me.

Page 12

1    Q. We're going to do this in detail in a little
2    while. But am I correct that the one thing that you
3    are clear about is that Mr. Brooks indicated to you
4    that he was making the decision?
5    A. You know, that was always hard for me to
6    know. He said, you know, he had to remove me from
7    my job.
8    Q. But he talked about himself being the
9    decision-maker?
10   A. I don't really remember specifically.
11   Q. You do remember him telling you that he had
12   to remove you from the management of people?
13   A. He had to remove me from my job.
14   Q. And by job, what was your job that he said
15   he had to remove you from?
16   A. Management of people. And then the other
17   half of that was once he took away management of
18   people, he would then put me into a job where he
19   explicitly stated there was no chance of promotion
20   and no chance of making more money. So I'd be
21   really at a much more junior position, entry level
22   type of position.
23   Q. We're going to do that in some detail in a
24   little while. Let me just start here.

Page 13

1         Were you given any reasons as to why you
2    were being removed from management of people? We're
3    talking now about August 28th of 2003?
4    A. August 28th, yeah.
5    Q. And what reasons were you given?
6    A. Well, he gave me a reason that he had been
7    doing a little investigation on me and that he found
8    out that I was lying to the organization and that I
9    had not been receiving the feedback that I claimed
10   to have been receiving on Chris O'Malley. He didn't
11   say -- he did say Chris O'Malley.
12        But he also said as a result of this
13   investigation he'd done on me, he'd found that
14   basically I was not a good manager and people hated
15   me on my team so, therefore, he needed to remove me.
16   Q. And were there ever any other reasons that
17   Mr. Brooks gave you other than the constellation you
18   just testified to?
19        MR. WEIR: Is this the August 28th
20   meeting?
21   Q. Any time between August 28th and your last
22   day, September 15th.
23   A. Well, those were the main reasons that he
24   talked about.

4 (Pages 10 to 13)

Lisa Svensson                                                                      11/30/2005

Page 14

1    Q. Well, you say those were the main reasons.
2    Do you remember him giving you any other reasons?
3    A. No.
4    Q. You also, during that period, had
5    discussions with Mary McNamee?
6    A. I had no discussions with Mary McNamee up
7    until the firing. I had discussions with Mary
8    McNamee prior to the August 28th meeting. But Mary
9    McNamee wouldn't answer of my e-mails or -- I did
10   have a hallway conversation where I was trying to
11   chase her down, but I had no discussions with Mary
12   McNamee.
13   Q. You said on the 15th of September?
14   A. Of September, she was there.
15   Q. And did she give you any reasons that were
16   different from the reasons that Mr. Brooks gave you?
17   A. No.
18   Q. And when Mr. Brooks gave you those reasons
19   on September 28, 2003, did you take --
20        MR. WEIR: August.
21   Q. August, I'm sorry. August 28, 2003. Thank
22   you. Did you take issue with any of them?
23   A. Yes.
24   Q. Which ones did you take issue with?

Page 15

1    A. Well, the fact that Chris O'Malley had never
2    received negative feedback from portfolio managers.
3    I told him it wasn't true and that I'd had meetings
4    with every single member of the Value Team.
5        I said, I talked to all the portfolio
6    managers on the Value Team and I've talked to almost
7    all of the portfolio managers on the International
8    Core Team. And these were the groups that had had
9    issues with him. And I told him at that time, on
10   August 28th, that I had entries in my Lotus Notes.
11   And I also had handwritten notes in my files. And
12   I'd be happy to go down to my office and bring
13   those, so I could verify those meetings that I had.
14   Q. Okay. So what happened on the 28th was that
15   Mr. Brooks, in substance. told you what he believed
16   he had found or discovered. correct?
17   A. Yes.
18   Q. And then he listened to you explain what it
19   was that your review was based -- or your draft
20   review was based on?
21   A. Excuse me. Listen to me.
22        MR. WEIR: Mischaracterizes prior
23   testimony. Objection.
24   Q. You then explained to Mr. Brooks what you

Page 16

1    had done by way of review of Mr. Pierce?
2    A. No.
3        MR. WEIR: No foundation for that
4    testimony.
5    A. I didn't say anything about Darren Pierce at
6    that point.
7    Q. I'm sorry. Mr. O'Malley.
8    A. I refuted Mr. Brooks. That's how I would
9    describe it.
10   Q. And that happened in the meeting with Mr.
11   Brooks?
12   A. On the 28th.
13   Q. Okay. And what else happened in that
14   meeting?
15   A. Well, Mr. Brooks said, That won't be
16   necessary. I don't really need to see that stuff,
17   because what I did next was I undertook a little
18   investigation on you across the team. And what I
19   found were, that there are broad problems with your
20   management of the teams and, you know, generally --
21   I took a lot of detailed notes at the time. I'd
22   like to see the notes if I could.
23   Q. You will shortly.
24   A. Okay.

Page 17

1    Q. Because we're going to do this in some
2    detail.
3    A. So maybe I should wait to give the total
4    complete answer as to exactly what he said, because
5    I wrote it down exactly at the time, not verbatim,
6    but my recollection was excellent on August 28th and
7    September 15th, and it's less excellent now.
8    Q. Did Mr. Brooks raise the issue of your
9    gender during that meeting?
10   A. No.
11   Q. Did you raise the issue of your gender when
12   you spoke with Mary McNamee?
13   A. No. Well, wait a minute. I didn't speak
14   with Mary McNamee.
15   Q. On the 15th of September?
16   A. On the 15th of September?
17   Q. Yes.
18   A. I raised the issue of my gender on the
19   meeting of September 12th with Mr. Brooks.
20   Q. And what did he said?
21   A. He said, I know you don't believe this but
22   gender had nothing whatsoever to do with this
23   decision.
24   Q. And did you at any time between the 28th of

5 (Pages 14 to 17)

Lisa Svensson                                                                                          11/30/2005

Page 22

1  Bogar and I said that's true. But that's what he
2  said our problem was. That was the beginning.
3      Q. But as to that statement that Mr. Brooks
4  made to you, you agreed with him that it was
5  accurate that you hadn't spoken to those portfolio
6  managers?
7      A. Yes. At the time I agreed with him.
8      Q. Okay. Let's keep going.
9      A. Okay. So I said it was true, that I never
10 even targeted the U.S./Global Core Team, which was
11 basically Paul Warren's team, because they never had
12 any complaints about Chris O'Malley. They never had
13 any issues with him. So I said to him, I never
14 represented to you that I even planned to discuss it
15 with them. I met with the Value and the Core IE
16 teams.
17     Q. So you had indicated to Mr. Brooks that you
18 were not targeting, for this review process of Mr.
19 O'Malley, the team that had no problems with him?
20     A. That is correct.
21     Q. And do you recall him saying anything in
22 response?
23     A. He didn't say anything in response that I
24 recall.

Page 23

1      Q. And then, I take it, you told him that you
2  did do interviews with the Value and Core teams?
3      A. Correct.
4      Q. Now -- and then Mr. Brooks went on to say
5  that as a result of the other information he had, he
6  then started checking about -- he talked to your
7  team?
8      A. Yeah, that was the next thing that he said
9  that he did.
10     Q. And what did he tell you that he found out?
11     A. What he found surprised him. The situation
12 was so critical that I had to be removed immediately
13 from my role as an ADR. He said across the team,
14 people felt that the situation was untenable. It's
15 so bad that several of them have gone as far as to
16 get several job offers.
17     Q. Did you ask him who had gotten a job offer?
18     A. I asked him, yes. Not who had gotten a job
19 offer, who is it that finds it untenable, that's
20 what I asked.
21     Q. Now, at the time there were four analysts on
22 your team?
23     A. Correct.
24     Q. Okay. And did you ask him which of the four

Page 24

1  had gotten job offers because the situation was
2  untenable?
3      A. I think I answered that question just now.
4      Q. I'm sorry, then, I missed it.
5      A. I didn't ask who got job offers. I asked
6  who are the people that say the situation is
7  untenable.
8      Q. And what did he say?
9      A. He said -- he said, I'd rather not answer
10 that. He said, you know, something like, you know,
11 I really don't want to go into that.
12     Q. And at any time, did you try to find out who
13 had gotten job offers?
14     A. In the conversation with him?
15     Q. Any time.
16     A. At any time?
17     Q. Yeah.
18         MR. WEIR: Objection as to form.
19     A. You know, I was sort of -- after this
20 conversation, it was so apparent to me that I was
21 being fired in this conversation that I wasn't that
22 concerned about who was getting job offers after
23 that. I was thinking about my own job offer
24 situation.

Page 25

1      Q. Okay. Now, you said you were being fired?
2      A. In this meeting, yes.
3      Q. Okay. And am I correct that, in fact, what
4  Mr. Brooks did is he laid out three alternatives?
5      A. Correct. But they were all completely crazy
6  alternatives. Ridiculous alternatives.
7      Q. Ridiculous in what sense?
8      A. In the sense that I had already had a big
9  demotion the prior year. I had already been asked
10 to go through the demotion with a good attitude and
11 continue to perform, which I had done. I had been
12 told that I would be eligible for a promotion, not
13 demotion, at the end of that period.
14         So the three alternatives that were
15 presented to me represented, you know, the same
16 thing I had just gone through a year-and-a-half
17 before when I delivered on everything they asked me
18 to.
19     Q. Did it come to your attention at any point
20 that the four analysts that you were managing, that
21 one was actively job hunting and another was
22 considering job hunting?
23     A. Well, I wrote that in the notes that, you
24 know, several of them have gone as far as to get job

7 (Pages 22 to 25)

Lisa Svensson                                                                    11/30/2005

| Page 26 | Page 28 |
|---|---|
| 1 offers. | 1    A. Yes. Well, well, analyst with no |
| 2    Q. And am I correct that to this date, you have | 2 possibility to earn more money or achieve any |
| 3 no reason to believe that that's untrue? | 3 additional career goal, that's a ridiculous career |
| 4    A. You know, I have no opinion on whether or | 4 goal, yes. |
| 5 not any of them got -- I know Darren Pierce got | 5    Q. Did he say there would be no possibility of |
| 6 another job. I don't know anything about anyone | 6 earning more money? |
| 7 else. | 7    A. He specifically said that to me. He said it |
| 8    Q. On page -- the next page, LS 65, is that | 8 wouldn't match my aspirations. I know your |
| 9 where you recorded the three alternatives that | 9 aspirations are to earn more money and make MD. And |
| 10 Mr. Pierce -- that Mr. Brooks laid out? | 10 since in this new role that will not be possible, |
| 11    A. Yes. | 11 I'm offering you, out of respect for you, two other |
| 12    Q. And in your words, the first was to go on | 12 options. Out of respect for me, that's what he did. |
| 13 being an analyst and cover your stocks? | 13    Q. By the way, the issue of earning more money |
| 14    A. Mm-hmm. | 14 or the possibility of earning more money, that's not |
| 15    Q. I'm sorry. That's a yes? | 15 something that you recorded in your notes; is that |
| 16    A. Yes. And also that you've got to combine | 16 correct? |
| 17 it, because he specifically, specifically said it | 17    A. This would not many match my aspirations to |
| 18 would not match my aspirations to become an MD, earn | 18 become an MD, earn more money and expand my |
| 19 more money or expand my managerial experience. | 19 managerial experience. I think it is in my notes. |
| 20        So, yes, it's going on being an analyst | 20    Q. Did you ever try to confirm that with Mr. |
| 21 with absolutely no possibility of achieving any | 21 Brooks? |
| 22 further goals. | 22    A. Yes, I did. I asked him to put it all in |
| 23    Q. For the previous year, am I correct that | 23 writing. |
| 24 your total compensation was in the half million | 24    Q. Okay. So we'll get to writing in a little |

| Page 27 | Page 29 |
|---|---|
| 1 dollar range? | 1 while. And then you were given two other choices? |
| 2    A. No. That wouldn't be correct. It was | 2    A. Yes. |
| 3 $650,000. | 3    Q. One was a severance package? |
| 4    Q. 650 for 2002? | 4    A. Yes. |
| 5    A. Right. | 5    Q. And then the third was, for some period of |
| 6    Q. Okay. | 6 time, to continue working as an analyst while you |
| 7    A. It might have been 655. | 7 job hunted, either internally or externally? |
| 8    Q. And did he say anything about cutting your | 8    A. Yeah. I wrote keep working, but it was |
| 9 compensation? | 9 basically not really -- you know, be there, pretend |
| 10    A. My compensation had already been vastly | 10 to be working and over some agreed upon time frame |
| 11 reduced. | 11 agree to be gone. |
| 12    Q. Did he say anything about cutting the | 12    Q. And those were the three alternatives that |
| 13 $655,000? | 13 he gave you, correct? |
| 14    A. No. | 14    A. Yes. |
| 15    Q. Did he say anything about stripping you of | 15    Q. And am I correct that in your mind, you saw |
| 16 the associate director of research title? | 16 that as a demotion? |
| 17    A. He said, specifically, I'm demoting you from | 17    A. Yes, I did. |
| 18 ADR immediately. I have to step in and do this. | 18    Q. And in your own mind, you saw it as |
| 19    Q. And do the managing? | 19 tantamount to a termination? |
| 20    A. He specifically said, As of now, you're no | 20    A. I saw it as a termination. |
| 21 longer an ADR. | 21    Q. You saw it at that moment as a termination |
| 22    Q. So that the option of staying as an analyst, | 22 on the 28th? |
| 23 with having been paid in most recent year $655,000, | 23    A. Yes. |
| 24 that was to you a ridiculous alternative? | 24    Q. Even though Mr. Brooks didn't say that he |

8 (Pages 26 to 29)

, Lisa Syensson                                                          11/30/2005

**Page 30**

1  was terminating you, even though he said that you
2  could stay as an analyst?
3      A.  Right.  That was a pattern that I had
4  observed with many, many other women at Putnam.  And
5  so I thought, oh, here now it's happening to me.
6      Q.  We may come around to that.  Now, did --
7  Mr. Brooks didn't tell you, did he, that you had to
8  make a decision on the spot?
9      A.  Oh, no.
10     Q.  He said you could think about it?
11     A.  Yeah, he did.  He said, you know, Take your
12  time, think about it, but get back to me.  I'll be
13  back next Wednesday.
14     Q.  Okay.  He didn't tell you that you had to go
15  clean out your desk, he wanted you gone?
16     A.  No.
17     Q.  And, in fact, you did take some time and you
18  thought about it, correct?
19     A.  Yes.
20     Q.  And consulted with counsel relatively
21  promptly?
22     A.  Yes.
23     Q.  And then in due course, you met with Mr.
24  Brooks again?

**Page 31**

1      A.  Yes.
2      Q.  And you met with Mr. Brooks again in
3  response to -- and within the organization he was
4  your superior, correct?
5      A.  Within the organization I reported to him.
6      Q.  Yes.  And in your mind, he had told you that
7  he was, in effect, terminating you, correct?
8      A.  In fact, he had terminated me.
9      Q.  And when you then met with him again about
10  the three alternatives that he had given you, did
11  you choose any one of the three alternatives?
12     A.  No, I did not.
13     Q.  What did you do instead?
14     A.  I -- let me go to my notes because I'm sure
15  that's written down.  They're somewhat out of order.
16  I know there's notes after September the 8th.  I
17  mean, you know, recording meetings and stuff.  I
18  just don't see them all.
19     Q.  Well, tell me what you remember.
20     A.  All right.  But I'd like to refer to the
21  originals, because they were somewhat out of order
22  in their original stamping.  And I'm not able to see
23  the additional notes that I made, you know, because
24  I made a lot of notes in that time frame.

**Page 32**

1      Q.  I had, in fact, asked that the originals be
2  present with you.  Hopefully, we can get them today,
3  but I can't control that.
4          MR. WEIR:  Off the record.
5          (Discussion off the record.)
6      Q.  Tell us what you recall your response was to
7  the alternatives that you were given.
8      A.  Well, the first thing that happened, in --
9  bearing in mind, I don't see the notes that I'm
10  searching for in what I have here.  So I could have
11  a more full recollection if I had my originals.
12         But the first thing that happened was I
13  went to Josh a few days later.  It was around
14  September, you know, in that -- the week of the 8th
15  or so.  And I said to him that I would like to have
16  -- I had spoken with an attorney and that I would
17  like to have the alternatives that he was offering
18  me in writing, and that I was not in a position at
19  that time, without seeing them in writing, to give
20  any indication of which of the three alternatives I
21  might wish to accept.
22         MR. KOCIUBES:  Can we mark as the next
23  exhibit an e-mail to Miss Svensson to Mr. Brooks
24  dated September 3, 2003.

**Page 33**

1          (Exhibit No. 3 marked for
2  identification.)
3      Q.  And is Exhibit 3 the e-mail that you asked
4  for, for Mr. Brooks putting your alternatives in
5  writing?
6      A.  Yes, it is.
7      Q.  Okay.  And am I correct that you got it on
8  or around September 3 of 2003?
9      A.  Yes.
10     Q.  And that was still a couple weeks before
11  your last day of September 15?
12     A.  Yes.
13     Q.  All right.  And am I correct that what Mr.
14  Brooks, when he spelled it out for you, indicated
15  that he was -- fifth paragraph -- that he was no
16  longer comfortable with your continuing in your
17  managerial capacity.  Do you see that?
18     A.  Yes.
19     Q.  And he said he wanted you to consider three
20  options.  Do you see that?
21     A.  Yes, I do.
22     Q.  And the first one was stay at Putnam as an
23  analyst covering loyal stocks as part of the energy
24  team?

9 (Pages 30 to 33)

Lisa Svensson                                                                11/30/2005

Page 34

1   A. Yes.
2   Q. And that he would take over the managerial
3   responsibilities for the team. Do you see that?
4   A. Mm-hmm.
5   Q. Is there anything in there about reduction
6   in pay or the possibility ever to be promoted?
7       MR. WEIR: Objection. The document
8   speaks for itself.
9   A. No, he didn't write that down.
10  Q. And then the second one was to remain at
11  Putnam for a transition period while you look for
12  other employment, correct?
13  A. Yes.
14  Q. And then the third one was to leave
15  immediately, execute a separate agreement, and get a
16  severance package that is outlined there. Do you
17  see that?
18  A. Yes.
19  Q. And when you read this e-mail, I take it you
20  still considered that what was going on was, in
21  effect, a demotion, if not worse?
22  A. I considered it to be a termination.
23  Q. Termination. Even though you had the three
24  options?

Page 35

1   A. Correct.
2   Q. Okay. And what did you do in response?
3   Which option did you choose?
4   A. I didn't choose any of the options. Well,
5   in response, in this meeting, the day that he gave
6   me -- he had given me the options. Then I met with
7   him a few days later and asked for it in writing.
8       And as I said to you before, I told him
9   that I needed to have it in writing before I could
10  give any indication. So we didn't meet again for a
11  while, while I considered the options, once they
12  were in writing. So I didn't choose any option
13  right away.
14  Q. And let's sort of just continue it for a
15  moment. So he wrote it down for you, at your
16  request, so there wouldn't be any question about
17  what he was saying.
18      Am I correct, in the fourth paragraph he
19  writes that he explored your relationship with
20  members of your team and found that there were at
21  least two members who have explored other employment
22  opportunities and were thinking about leaving Putnam
23  based on their experience with you. Do you see
24  that?

Page 36

1   A. Yes.
2   Q. And did you do anything in response to
3   getting that information?
4   A. Anything in response?
5   Q. Yeah.
6   A. Not that I recall.
7   Q. Have any reason to believe it wasn't
8   accurate that two of the four people you were
9   supervising were thinking of leaving?
10  A. Well, I had been trying to get Darren Pierce
11  more money. And I would not be surprised if Darren
12  Pierce was trying to get another job. So I wasn't
13  surprised.
14      Chris O'Malley might have been the
15  other, because I was in the process of trying to
16  give him a review to ask him to change some things.
17  And it didn't surprise me that there might be two
18  looking for jobs.
19  Q. All right. Now, at some point you got
20  around to making a -- responding to the
21  alternatives, correct, with your own proposals?
22  A. Yes.
23  Q. And what response did you make to Mr.
24  Brooks?

Page 37

1   A. Well, that was at a meeting later. I
2   believe it was September the 12th, on a Friday, I
3   think. And I said that I had carefully considered
4   all three alternatives and I found none of them to
5   be acceptable to me.
6   Q. And did you make a counter-proposal?
7   A. He said, What would be acceptable to you?
8   And I said, I would need to have some kind of
9   written assurance from Putnam that my career could
10  be put back on track now that this has happened, so
11  I would need that.
12      And, you know, I need to be promoted, I
13  said -- what I asked for was to be promoted to
14  managing director. And just in order to continue on
15  in this role after this event had happened to me, in
16  order to stay here, these were the things that I
17  needed.
18  Q. Now, you had considered that Mr. Brooks was
19  terminating you, demoting and terminating you?
20  A. Yes, indeed.
21  Q. And then you went back to him with a
22  proposal that you be promoted. And you recall
23  telling him you wanted a guarantee of a million
24  dollars for two years?

10 (Pages 34 to 37)

Lisa Svensson                                                11/30/2005

Page 42

1  I mean, that's not much of a discussion when you
2  won't say who the people are that said these things
3  or anything, really.
4      Q. Stay with me here for a moment. The comment
5  here, "Without any explanation." That's not
6  accurate, is it? You were given the names of some
7  of the portfolio managers, were you not, on August
8  28th?
9      A. That didn't represent an explanation.
10     Q. I see. The fact that you were told that
11  your review of Mr. O'Malley was inconsistent with
12  what Mr. Brooks was hearing and the fact that you
13  were given names of some of the portfolio managers,
14  and fact that you were told that there were two of
15  the four people that you managed, who were either
16  job hunting or thinking about job hunting, none of
17  that constitutes, for you, an explanation?
18         MR. WEIR: Objection as to form.
19     A. No. I mean, if Josh Brooks had said to me,
20  I interviewed people in the marketing organization
21  and you hadn't talked to them, it doesn't match up
22  with what I was doing anyway.
23         It also says in here, "Without any
24  discussion." Discussion. So discussion would imply

Page 43

1  that I would be able to have feedback, which I
2  didn't have.
3      Q. Give me every reason that you have for
4  believing that the reasons given to you by Mr.
5  Brooks were not accurate?
6      A. Oh, well, that relates to my entire history
7  at Putnam, the history of gender discrimination that
8  I witnessed over my nine-year tenure there. I can
9  start at the beginning.
10     Q. So your history at Putnam is what led you to
11  concur that what Mr. Brooks was telling you was
12  inaccurate?
13     A. No. That, in part.
14     Q. Okay. Tell me what else, then.
15     A. The history, the context of it is I had that
16  history to start with. I had seen many, many women
17  have these so-called resignations, and it was --
18  it's a way to fire people and pretend like you're
19  not firing people. And I was being fired.
20     Q. By the way, did any men ever resign from
21  Putnam?
22         MR. WEIR: Resign?
23         MR. KOCIUBES: Yeah.
24     Q. Under similar kinds of circumstances where

Page 44

1  it was a questionable resignation, in your words?
2         MR. WEIR: Objection as to form.
3      A. Yes, but in far larger numbers among the
4  women.
5      Q. Now, let's go back to what Mr. Brooks told
6  you were the reasons for his taking away the
7  managerial responsibilities from you.
8         What I want to understand is every
9  reason you've got for thinking that Mr. Brooks was
10  not telling you the truth.
11     A. Well, it didn't add up the day that he did
12  it and it still doesn't add up now.
13     Q. It didn't make any sense to you? Is that
14  the reason?
15     A. Well, I had been making an effort to give a
16  warning letter, not to fire, but to warn Chris
17  O'Malley. I had sent bullet points, stream of
18  consciousness at the request of Mary McNamee. And I
19  was unaware that Mary McNamee was taking these and
20  sharing them with other people.
21         So when I found out in the meeting, on
22  August 28th, with Josh that he had already read
23  them, I was surprised. I found the entire situation
24  to be quite suspect based on the way it was handled,

Page 45

1  the way that it was done behind my back, no
2  opportunity for me to have any kind of feedback.
3         I also mentioned to him in the meeting,
4  you know, these are the same people that did a 360
5  on me, a special 360, this thing that was called a
6  profiler. And these people did this special 360 on
7  me just a few months ago around my promotion. And I
8  would like to go to my office and share with you the
9  feedback that they gave me. And he just said to me,
10  I'm not interested in any of that. So that made me
11  think that this was not the reason.
12     Q. So have you not told us all the reasons why
13  you think that what Mr. Brooks told you, that that
14  draft review you did on Mr. O'Malley was not honest,
15  was not the reason for your demotion?
16         MR. WEIR: She's already talked about
17  her entire history at Putnam.
18         MR. KOCIUBES: I'm making sure there's
19  nothing else.
20     A. You want me to start with the beginning, my
21  entire history with Putnam?
22     Q. No, no. You said your history, your 360.
23     A. Not my regular 360, the special 360.
24     Q. The special 360. And you found the

12 (Pages 42 to 45)

, Lisa Svensson                                                           11/30/2005

Page 46

1  situation, Mary McNamee giving the draft bullet
2  points to Mr. Brooks suspicious.  What else is
3  there, if anything?
4         MR. WEIR:  Well, she has already
5  testified about her observations about what happened
6  to other women.
7         MR. KOCIUBES:  What else is there other
8  than what she's testified to?  I just want to make
9  sure she puts it all on the table.
10    A.  Many, many remarks that were made over the
11 years, various remarks that would suggest, you know,
12 gender discrimination, essentially.
13        And there's one other really giant
14 issue.  I had an idea it might be Darren that got
15 another job.  And the reason was because Darren was
16 being wildly underpaid.  And I had been working very
17 hard in the spring on trying to get him some more
18 money.  It was not enough money to retain Darren.
19 And I said that to Josh Brooks in the August 28th
20 meeting.
21        So what I thought was, Darren was
22 leaving, you know, Chris wasn't happy that I gave
23 him a review he didn't like.  And, you know, it was
24 not enough information being given to me right then

Page 47

1  to justify this action.
2    Q.  When did Mr. Brooks become your superior?
3    A.  April of 2003.
4    Q.  So less than six months before this
5  happened?
6    A.  Correct.
7    Q.  And was he part of this long history at
8  Putnam?
9    A.  No.  But just even Josh Brooks' arrival was
10 part of the long history at Putnam.
11    Q.  But with respect to Mr. Brooks himself, he
12 hadn't been at Putnam before April of 2003, had he?
13    A.  Correct.
14    Q.  Now, let's --
15    A.  But he arrived as a partner, as a junior
16 male, with much less experience.  And he was now
17 firing, I think, one of the most senior women in the
18 department.  So that did fit in with my experience.
19    Q.  What do you mean junior male?
20    A.  Well, he was only there five months.  And he
21 also had much less work experience, as well, in the
22 industry.
23    Q.  Was there a practice to do semi-annual
24 review of the analysts that reported to you?

Page 48

1    A.  Yes.
2    Q.  Okay.  And am I correct, then, that some
3  time in the summer of 2003, you set out to do
4  reviews of all four of your team members?
5    A.  I was working on it.
6    Q.  And did you generate any drafts of reviews
7  of anybody other than Mr. O'Malley?
8    A.  In the case of Chris, Josh was very sketchy
9  about whether or not we should do reviews.  And he
10 had had in mind to not do them.  I liked to do
11 reviews of my teams.  And I believe I did them
12 anyway, but I am sketchy on my memory, so I'd have
13 to look back at my files of reviews.
14    Q.  Do you have drafts of reviews of anybody
15 that summer other than Mr. O'Malley?
16    A.  Well, there was this issue with Chris that
17 had been brought up in December of '02, where Omid
18 Kanshad had told Bill Landis in a meeting, We don't
19 like Chris.  And Kelly Morgan had communicated that
20 to me and asked me to follow up on it.
21        So I had a meeting, approximately
22 January of '02, with Omid and Justin Scott, where
23 Justin pretty much thought it would be a good idea
24 to have the team without Chris on it.  And I said,

Page 49

1  I'm not willing to do that.  I would like to, you
2  know, I just started with this team.  And he would
3  say, You've got a really good team and I can really
4  envision it without Chris, so let's just think of
5  the team without Chris, because they wanted Chris
6  fired.
7    Q.  Who said that to you?
8    A.  Justin Scott, in the presence of Omid
9  Kanshad.  So I said, I don't want to do that, but I
10 would like to spend some time working with Chris.
11        MR. KOCIUBES:  Let's mark as this
12 exhibit, Svensson Exhibit 4, a memo dated August 8,
13 2003.
14        (Exhibit No. 4 marked for
15 identification.)
16    A.  So. I didn't completely finish my answer.
17    Q.  I'm sorry.  Go ahead.
18    A.  So this stream of consciousness bullet
19 points that I originally gave Mary, which was on
20 August the 8th, I guess you might be asking me if
21 that's what this is.
22    Q.  I haven't yet, but go ahead.  Can you
23 identify it as Exhibit 4?
24    A.  In fact, it is.

13 (Pages 46 to 49)

Lisa Svensson                                                                                      11/30/2005

Page 58

1  Graham that -- she came to me and said, Please don't
2  put me back working with Chris. I've been working
3  for him for seven months and he has never spent any
4  time with me. He's never communicated with me.
5  I've learned nothing from him.
6          I was having to make a decision at that
7  point in time about how to allocate the IA's on the
8  team. And she had been working with Chris for a
9  long time. And then for only the prior six weeks,
10 she had been working with Konstantin. Konstantin
11 had spent time with her, had educated her, taught
12 her how to do a chemical model. And this was my
13 vision of how the new, younger people should be
14 mentored on my team.
15         So, when Leah Graham came to me and
16 said, I've got this problem, I don't want to work
17 for Chris. When you make the new assignments,
18 please don't put me back with him. Then I said to
19 myself, I've got to talk to Chris about this. This
20 is not acceptable. It's not okay.
21         So what I did was -- I mean, I think it
22 was August 7th. It was around that time frame,
23 because I also found out that he hadn't mentored his
24 summer guy, who was a guy named Austin Holly. And

Page 59

1  got that feedback from Eric Hutcherson in the course
2  of this whole period.
3          So I was not happy about it. And I had
4  a meeting with Chris. And I said, This is not
5  acceptable. And I was, you know, not happy. And so
6  I went to Josh. And I had been talking to Josh over
7  the summer about Chris. Josh had said to me earlier
8  in the summer, Sounds like we have a laziness
9  problem on our hands. And if that's the case, then
10 we may need to make a change.
11         So I went to Josh at that time and
12 said -- once I found out that Chris also had not
13 been communicating with his IA, I said, How far
14 would you go with that? And he said, you know, all
15 the way. You know, give him a warning if you need
16 to. And I talked to Kelly about it and she said,
17 Talk to HR. She said give him a warning. I said, I
18 don't know how to do that. I don't know the form
19 for that. And she said, Talk to HR.
20         So I called Mary McNamee. And I said,
21 This is what's happened. I'd like to give him a
22 warning. At that time, that's how Mary McNamee got
23 introduced to this.
24     Q.  And so am I correct -- let's take it one at

Page 60

1  a time. So, in terms of Mr. Brooks and the
2  conversations earlier in the summer, those were
3  conversations you were having with Mr. Brooks about
4  Mr. O'Malley, correct?
5      A.  Mm-hmm.
6      Q.  And it was based on what you told Mr.
7  Brooks, that he commented something to the effect,
8  It appears we have a laziness problem, correct?
9      A.  Yes, he did.
10     Q.  And with respect to Ms. McNamee, her
11 reaction about doing the bullet points was also
12 based on what you told her --
13     A.  Yes.
14     Q.  -- about Mr. O'Malley. You said, If that's
15 the case, then write up the bullet points, correct?
16     A.  Yes.
17     Q.  And then you wrote up the bullet points,
18 correct?
19     A.  Yes, which were simply bullet points.
20     Q.  All right. My question to you about Exhibit
21 4 is: Is it accurate and complete?
22     A.  They were bullet points that I wrote to her
23 at the time. I never meant for it to be accurate
24 and complete to be presented to Chris O'Malley

Page 61

1  because it was a draft.
2      Q.  Did you tell Ms. McNamee anywhere that
3  Exhibit 4 was never meant by you to be accurate and
4  complete?
5      A.  She said to me, I will help you draft it in
6  a proper way, just write down what's going on. So
7  she never said to me, Is it accurate and complete?
8  This is a draft.
9      Q.  Did you ever volunteer to Ms. McNamee that
10 Exhibit 4 was neither accurate nor complete?
11         MR. WEIR:  Objection. Asked and
12 answered.
13     A.  I said to Mary that it was bullet points.
14     Q.  Bullet points. But did you say that the
15 bullet points were not accurate and complete?
16         MR. WEIR:  Objection. Asked and
17 answered.
18     A.  I said they were bullet points. That's all
19 I said.
20     Q.  You said nothing else other than they were
21 bullet points?
22     A.  Yes. I needed her help in drafting it. I
23 wanted to soften it. That's what I told her.
24     Q.  And then I take it there was a period of

16 (Pages 58 to 61)

Lisa Svensson                                                      11/30/2005

Page 70

1    A. It took place in December of '02.
2    Q. Nine months earlier?
3    A. Right. But he told me, I'm speaking from my
4    team. It bubbles up from the bottom, so please
5    speak with Josh in my place.
6    Q. Let me just ask you one question about that
7    second paragraph. Is it your testimony that what
8    you've written there in this paragraph, under
9    communication, is it a fair picture of the reviews
10   and reactions to Mr. O'Malley?
11        MR. WEIR: Are you talking about the
12   three paragraphs under the heading of communication?
13        MR. KOCIUBES: At the moment, I'm asking
14   about the one paragraph that starts with
15   communication.
16   A. "I have had one-on-one meetings with the
17   Value and Core IE team members. And several of the
18   team members, in each case, have different
19   impressions of the job Chris is doing than he has."
20   I would say that's accurate.
21   Q. How would I find out from this memo that
22   there were team members that were happy with the job
23   he was doing?
24   A. You would know because several of the team

Page 71

1    members have a different impression than he has. So
2    you would know that several are not happy and
3    several are happy.
4    Q. I see. So that's how you're supposed to
5    figure that out?
6    A. Right. Right.
7    Q. Okay. Did you come to find out that this
8    memo had been given to Mr. Brooks?
9    A. I learned about that in my August 28th
10   meeting, because I brought this memo and I put it at
11   his place at his desk, not his desk, but his
12   conference table. And I put them each down.
13   Because my goal was, since I couldn't get Mary to
14   help me, I decided, you know, I always wanted to
15   keep Josh in the loop on the things I was doing.
16   And he was totally in the loop on the Chris thing,
17   the whole time, by the way.
18        And since I couldn't get HR to help
19   me -- Mary to get back to me, I decided I would go
20   to Josh and get feedback from Josh. So I brought it
21   to him. And he immediately said to me, I don't need
22   to see that. I've already seen it. That was the
23   first I heard of that.
24   Q. And in that meeting -- and we've covered it

Page 72

1    a little bit already -- on the 28th with Mr. Brooks,
2    one of the things he told you he was unhappy about
3    was that what he discovered, in terms of the
4    accuracy or fairness of your draft reviews of Mr.
5    O'Malley, he thought they were dishonest, did he
6    not?
7        MR. WEIR: Objection as to form.
8    A. What he said was that I had lied to the firm
9    and that, in fact, I hadn't actually interviewed
10   portfolio managers about Chris. So, that's what he
11   discovered.
12   Q. Did he say you hadn't interviewed portfolio
13   managers or and hadn't interviewed all of them?
14   A. He said, You haven't interviewed portfolio
15   managers. And I said, That's not true. And I said
16   that I had notes and I had meetings. And then he
17   enumerated portfolio managers that I had not
18   interviewed, such as Paul Warren, such as Shegeki
19   Makino, which I said, Yeah, you're right. I didn't
20   interview them.
21   Q. By the way, when you were going around in
22   the summer talking to portfolio managers, did any of
23   them express criticisms of Mr. Eckland?
24   A. Mm-hmm.

Page 73

1    Q. They did?
2    A. Yes.
3    Q. How about Mr. Stoloff?
4    A. They had some criticisms. But see, the thing
5    was, that I hadn't had the issue of anyone coming to
6    me and saying, We don't like Ellis or we don't like
7    Konstantin. They need to be, you know, not on your
8    team. Nobody had ever said that.
9    Q. Do you recall if you talked to Pam Holding?
10   A. Pam Holding had been one of the people that
11   I talked to earlier in the year. Pam Holding and
12   this gentleman by the name of Nick Melhuish, used to
13   work next to each other in the International Core
14   Team. And they were two of the ones that in the
15   January time frame I interviewed them.
16        And Pam was extremely unhappy with Chris
17   O'Malley's, you know, communication with her at the
18   time, as was Nick.
19   Q. When did you talk to Ms. Holding?
20   A. It was in, like, January. It was the first
21   round of this. And so what happened was, I
22   established with Pam a working relationship where we
23   regularly updated each other on how Chris was doing.
24   So as a result of that, Pam felt that he was doing

19 (Pages 70 to 73)

. Lisa Svensson                                                                                11/30/2005

Page 110
1  up the team in 2000, okay? So the big bonus was
2  paid on 2002. 2002 is when they broke up the team.
3  On 2001 performance in March, sort of at the time
4  they were breaking up the team, that's when I got
5  that bonus.
6        The next bonus, the first bonus under
7  Mr. Landis was the next year's bonus. He didn't
8  have any input into that bonus as I understood it.
9        Q. By the way, what happened to the stock
10  market after 2001?
11        MR. WEIR: Objection.
12        Q. After 2000, do you remember?
13        A. There was a big decline.
14        Q. And do you remember what happened to the
15  value of assets under management at Putnam and a lot
16  of other money management firms?
17        A. It went down.
18        MR. KOCIUBES: Could we mark as Exhibit
19  6 a Putnam 360 Peer Review Survey, dated December 6,
20  2001.
21        (Exhibit No. 6 marked for
22  identification.)
23        Q. And do you recognize Exhibit 6?
24        A. Yes.

Page 111
1        Q. And is that your 360 Degree Peer Review --
2        A. Yes, it is.
3        Q. -- for 2000, performed in 2001?
4        A. I believe so, yes.
5        Q. And did you take any lessons away from this?
6        A. I'm sure I did. Because I always reviewed
7  these pretty carefully. But it was always in the
8  context and the time frame of the overall review,
9  the manager's review. So you know, I probably did.
10        Q. What was your overall ranking or score in
11  that review?
12        A. On this 360?
13        Q. Yeah.
14        A. 3.78.
15        Q. And that was slightly up from the 3.63 that
16  you had in the previous one?
17        A. Right.
18        Q. And on Page 15, it indicates the highest
19  gaps where you rated yourself higher than the people
20  reviewing you rated you? Do you see that page?
21        A. Yeah.
22        Q. And then there are a whole series of
23  categories where you rated yourself five out of
24  five?

Page 112
1        A. Yes.
2        Q. And categories like inspires trust as a
3  leader. Your overall ranking by your direct report
4  was 3.3. Do you see that?
5        A. Mm-hmm.
6        Q. And it goes down. Did you change any
7  behavior after reviewing this 360?
8        A. You know, I think I did. Because another
9  360 was done in early 2003 where these folks, these
10  direct reports, rated me actually higher on my
11  leadership stuff, so I guess I must have.
12        What I worked on continually over that
13  whole period was this issue of volatility in the
14  summer or 2001. And I talked to a lot of top
15  management about why I wasn't being promoted and I
16  worked on that.
17        Q. What issue of volatility?
18        A. You know, I consider the issue of volatility
19  to be yet another of these smoke screens for gender
20  discrimination, because Steve Oristaglio told me
21  that volatility in and of itself isn't a problem; In
22  fact, I'm highly volatile and so is Larry Lasser,
23  but you need to keep working on it, but you've made
24  massive progress in this subject.

Page 113
1        I never really knew exactly what they
2  were talking about, but I continued to try to be a
3  good team leader, be a good sport, try to promote
4  other people around me. You know, all that kind of
5  good team work.
6        Q. Who else talked to you about issues of
7  volatility?
8        MR. WEIR: Other than Oristaglio?
9        MR. KOCIUBES: Yeah, if anybody.
10        A. You know, this issue that you brought up in
11  my prior review from Robert, you know, that you just
12  brought up, is -- I considered that to be, you know,
13  of a piece with the volatility issue. He might not
14  have used that word, but it's the same kind of idea.
15  Try to sponsor free and open debate.
16        MR. KOCIUBES: Let me ask the reporter
17  to mark as Exhibit 7 a performance review for the
18  year 2001.
19        (Exhibit No. 7 marked for
20  identification.)
21        Q. Do you have it?
22        A. Mm-hmm.
23        Q. And you do you recognize it as your
24  performance review for 2001?

29 (Pages 110 to 113)

Lisa Svensson                                                                              11/30/2005

---

Page 114

1    A. Yes.
2    Q. And international -- you were still in
3  international growth at that time with Mr. Swift as
4  your supervisor?
5    A. Right. This would have been done right
6  before he left.
7    Q. Okay. And am I correct that your year-end
8  rating at this time had gone from 4 to 3.5?
9    A. Yeah. That was when Larry forced Robert to
10 write everybody's reviews down.
11   Q. He was forced to write everybody's reviews
12 down?
13   A. Robert told me and gave me a form and told
14 me it was written down after the fact, and he was
15 sorry about that, but Larry mandated that the entire
16 growth division, because of the performances within
17 growth had to have -- the average according to this
18 thing, let's see. I think the average of the
19 division had to be three. It could not be higher
20 than three. So, therefore, they were actually told,
21 the managers, after the fact, what they had to write
22 them down to.
23   Q. Take a look at Page 2 of that review, would
24 you?

---

Page 115

1    A. Mm-hmm.
2    Q. Do you see under evaluation/comments, the
3  third line, "Lisa did tolerably within 2001 with
4  performance in the growth accounts that lagged the
5  benchmarks by 600 basis points."
6    A. Yes.
7    Q. Benchmarks would be other growth accounts?
8    A. No. The benchmarks -- each portfolio has
9  its own benchmark that it's measured against.
10   Q. And in this case, the benchmarks, the
11 equitable benchmarks were 600 basis points higher
12 than what your performance was for the year?
13   A. Correct, six percent better. That's why we
14 were in the fourth quartile.
15   Q. But in your mind, this is still, from Mr.
16 Swift, it's still a positive review, correct?
17   A. Yes.
18   Q. And, in fact, he still says he's going to
19 submit you for promotion, does he not, on Page 8?
20   A. I assume.
21   Q. And at this point you'd now been involved in
22 portfolio management for four or five years, since
23 1997?
24   A. Well, I started at the very end, like,

---

Page 116

1  December 15th of '97. So I don't really think we
2  can call '97. So '98, '99, 2000, 2001, so four
3  years.
4    Q. And do you remember when the market bubble
5  burst?
6    A. It started to burst in, I believe, the
7  second quarter of 2000.
8    Q. And do you remember that it hit tech stocks
9  and growth stocks particularly hard?
10   A. Oh, yeah.
11   Q. Hard to forget that, right?
12   A. I remember it well.
13      THE WITNESS: Would it be possible to
14 have another bathroom break?
15      MR. KOCIUBES: Absolutely. Whenever you
16 need a break just say so. We're going to take a
17 break in about five minutes for lunch.
18      (Break taken.)
19 BY MR. KOCIUBES:
20   Q. Let me ask you to go back to your notebook
21 to page LS 71. It's Exhibit 2. Do you have that?
22   A. Well, I will. I'm just -- I don't want to
23 mix up the exhibits.
24   Q. You tell me when you have it.

---

Page 117

1    A. LS 71?
2    Q. Yes.
3    A. Got it.
4    Q. Okay. Look at the second paragraph. When
5  you write -- and when were you writing these notes?
6    A. I dated them at the time.
7    Q. You wrote these in September of 2003?
8    A. It was around, like, after the information
9  of these options had been communicated to me after
10 my termination. Yeah. September the 8th of 2003.
11   Q. So in September of 2003 you were writing
12 back about some events that occurred in 1998; is
13 that correct?
14   A. Right. Before I forget them.
15   Q. And you wrote that you were pregnant in
16 1998. Do you see that?
17   A. Mm-hmm.
18   Q. And that the team achieved terrific results.
19   A. Mm-hmm.
20   Q. And then you wrote, "When I returned from
21 maternity leave, I was traumatized by the firing of
22 my best friend Tom Bogan."
23   A. Right.
24   Q. "He was unceremoniously dumped on January

---

30 (Pages 114 to 117)

, Lisa Svensson                                                                11/30/2005

**Page 158**

1  and didn't give me the energy level I thought we
2  should see for communication. And Darren because
3  he'd been part of this relationship with Jim.
4      Q. I didn't ask you about the performance. But
5  I take it from your answer that you did share with
6  Linda Grace that you had a personality conflict with
7  Pierce and O'Malley?
8      MR. WEIR: Objection.
9      A. I did not share that I had a personality
10 conflict with those people. I viewed those as my
11 most difficult relations with my direct report.
12     Q. Did you tell Ms. Grace that Mr. Stoev was
13 the weakest performer?
14     A. In terms of alpha-generation, I think he
15 was.
16     Q. By alpha-generation, what do you mean?
17     A. Well, that was the primary measurement that
18 Bill Landis had notified me he would pay and promote
19 for, would be being on the top of that
20 alpha-generation list.
21         Alpha is out-performance of your stock
22 picks relative to your benchmark. So if you pick,
23 you know, Exxon Mobil and it goes up 10 percent but
24 all the energy stocks go up 15 percent, then you've

**Page 159**

1  actually under-performed. So alpha is that
2  different -- you've under-performed by five percent.
3      Q. So on that criteria, Mr. Stoev was your
4  weakest performer?
5      A. He was the lowest ranked among the
6  alpha-generation.
7      Q. Did you write him up in the summer of 2003?
8      A. No. Because he was, first of all, splitting
9  half, he was 50 percent my analyst at that point and
10 50 percent of time he was in the core IE team.
11         Bill had said to me when I took on this
12 team back in -- when I first, or maybe it was in
13 December of '02. I think it was in December of '02
14 time-frame. He had said to me, Now, that
15 Konstantin, his alpha's low and we're going to give
16 him about one more year. And if he can't turn it
17 around, we're going to fire him. So I was alarmed,
18 because in terms of teamwork, in terms of the way
19 that he approached his job, his communication, his
20 thoroughness of his models, he was excellent. And I
21 wanted to, you know, see if I could save him,
22 basically.
23         So partway through the year, Josh Burn
24 and Omid Kanshad approached me, because Omid had

**Page 160**

1  remarked to me in these notes that I have where I
2  met with the PMs, Omid, in that meeting, had said
3  that he viewed him as like an emerging star, or
4  something like that, in the department. He had put
5  favorable remarks. I'm sorry, not Omid.
6          Some time when I met with Omid, it must
7  have been the December of '02, he felt highly. And
8  this was the conversation with Justin, where Justin
9  said, I'd like to imagine your team without Chris.
10 He said, at that time, and I don't think I have
11 notes on this. He said, at that time, that he
12 viewed -- Omid viewed Konstantin as an emerging, you
13 know, powerful analyst in the department.
14         So I welcomed the opportunity to move
15 half of Konstantin's time into the core IE team,
16 because I knew those were people that really
17 appreciated him. In the meantime, you know, the
18 alpha was less than I would have liked, but I
19 thought he was so strong in so many areas he could
20 keep improving.
21     Q. Putnam is a money management firm, right?
22     A. Correct.
23     Q. And Mr. Stoev was an emerging star who just
24 happened to pick stocks not very well?

**Page 161**

1      A. No, that was a total mischaracterization.
2  He had terrific alpha-generation in his
3  international stock picks. His problem was the
4  stock Monsanto, which was a domestic value-oriented
5  stock, which the way that they calculate
6  performance, if you get one stock wrong and it does
7  a huge move, it can make your whole overall alpha
8  score not look good. And that's why they liked him,
9  by the way.
10     Q. Take a look at Paragraph 33 of your
11 Complaint. Now, I think we've established that Mr.
12 Haldeman arrived in October of 2002; is that
13 approximately right?
14     A. October of '02, yes.
15     Q. And Mr. Brooks arrived, was it April of
16 2003?
17     A. Yes.
18     Q. Now, in Paragraph 33 -- so you only overlap
19 with Mr. Brooks by what? Four months? Five months?
20     A. I think it was five-and-a-half months.
21     Q. Paragraph 33, "Although Svensson continued
22 to search for money management opportunities within
23 Putnam after Haldeman's arrival and Brooks'
24 ascendancy, she never received any available

41 (Pages 158 to 161)

Lisa Svensson                                                                11/30/2005,

Page 210

1     And what I tell people is I'm anxious to
2 contribute to portfolios, whether as an analyst or a
3 manager. I'm interested in getting in a position
4 where I can contribute to portfolios.
5     Q. And have you told anybody what the minimum
6 compensation level is that you would accept?
7     A. Well, I'm trying to get somebody to give me
8 a job, so I'm trying to gage. And I don't tell
9 them, no, that's absolutely -- forget it, you know,
10 minimum, forget it. I haven't done that.
11     Q. And have any of these entities, other than
12 the couple you just mentioned, talked to you about
13 what compensation levels that they are paying at?
14     A. Yeah. For example, one that I spoke with,
15 also, in June, said, Oh, wow. I can't get anywhere
16 near that. But he did indicate an interest in
17 having me come down and interview for some more. He
18 gave me a range and it was just extraordinarily low
19 compared to what I was making. But, you know, I'm
20 looking for a job, so.
21     Q. And what range did he give you?
22     A. 250,000.
23     Q. And I take it you would have been prepared
24 to accept an offer at that level had it been

Page 211

1 forthcoming?
2     A. You know, what I would need to do is look at
3 the offer once I got it and see what was included in
4 the offer. I would like to be working again. I
5 would like to be back in the industry. I guess it
6 would partly depend on if I thought there was any
7 potential for improvement on that. I think it's
8 going to be hard to get back to my prior level, but
9 there are firms that can do it.
10     Q. Why do you think it would be hard to get
11 back to your prior levels?
12     A. Because there's not that many firms. And,
13 you know, it's hard to find it. And I've been
14 damaged. I've been damaged by this action.
15         I mean, interviews that I got for jobs,
16 there was one interview that cropped up after this
17 August 28th. And it was a high, you know, sounding
18 job, still the compensation was harder. But like
19 from before Putnam did this and after Putnam did
20 this, it seems to me that the opportunities are
21 different.
22     Q. Other people have been let go by Putnam over
23 the years, right?
24     A. Other people haven't had their lawsuit come

Page 212

1 out in the newspaper.
2     Q. But that was a decision you made, right?
3     A. No.
4     Q. To file a lawsuit?
5     A. Filing the lawsuit, but I didn't solicit any
6 kind of publicity or anything.
7     Q. But the decision about what you wanted to
8 do, for example, a lawsuit or not a lawsuit, take
9 severance package or not severance package, those
10 were decisions that you made.
11     A. The decision that I made was that I wanted
12 to tell the truth about what happened. Yes, that's
13 a decision I made. The other things flowed from it.
14     Q. Do you still have Exhibit 3 in front of you?
15 It's the March 3, 2003 e-mail from Mr. Brooks to you
16 with the three options.
17     A. I must. Here it is.
18     Q. I want you to keep that in front you, but
19 actually also pull out the Complaint. Go to
20 Paragraph 2 of the Complaint on Page 2.
21         Do you see in the middle of that
22 paragraph it says that Putnam, where you allege
23 Putnam retaliated against the females and in
24 particular Svensson because she objected to such

Page 213

1 discriminatory and dispirit treatment?
2     A. I'm looking for the line. I'm having a hard
3 time finding the line.
4     Q. About nine lines down. Do you see that?
5     A. Yes.
6     Q. And to whom did you complain about this
7 discriminatory and dispirit treatment?
8         MR. WEIR: Objection. Asked and
9 answered.
10     A. I already mentioned I complained to Sherry
11 Holder-Watts and -- well, I already answered it. To
12 Robert I complained.
13     Q. And this is the 2002 episode that you're
14 still talking about?
15     A. Mm-hmm.
16     Q. Is that the episode that you refer to here?
17     A. Hang on. Because I also complained to Josh
18 Brooks before he actually terminated me on the
19 September 12th meeting. I think that was the one
20 where I said that I didn't accept any of those. And
21 I said gender played a factor, so I complained
22 there.
23     Q. I'm just trying to understand what the
24 reference is. I don't mean to cut you off. Tell us

54 (Pages 210 to 213)

Lisa Svensson                                                    11/30/2005.

Page 218

1     Q. What you're referring to in Paragraph 2 are
2   things that happened around your termination; is
3   that correct?
4         MR. WEIR: At her termination? Is that
5   the question?
6     A. I'm having a hard time with this. I am
7   having a hard time understanding your question. So
8   I guess the answer is, I can't answer this right now
9   because I can't understand this question.
10    Q. I'm having a hard time understanding that
11  allegation. I apologize.
12        Go back to Exhibit 3, then, Mr. Brooks'
13  memo of September 3.
14    A. Mm-hmm.
15    Q. And I think we've talked about options one
16  and two, correct?
17    A. Mm-hmm.
18    Q. And option 3 was that you would leave
19  immediately and execute a separation agreement,
20  correct?
21    A. Okay.
22    Q. And that's what you were told on September
23  3, correct?
24    A. Yes.

Page 219

1     Q. Okay. And you understood, did you not, that
2   if you didn't execute the separation agreement, you
3   wouldn't get the voluntary payments; did you not?
4     A. Say that again. I understood that I --
5     Q. Let me put it this way: You had no contract
6   which guaranteed you 18 weeks of separation pay, did
7   you?
8     A. This was their offer.
9     Q. Okay.
10    A. This was their offer.
11    Q. And you had no contract that gave you a
12  right to a lump sum payment of $250,000 upon
13  separation, correct?
14    A. No. I don't believe I had a contract, no.
15    Q. And similarly, you had no right, you
16  understood at this time, to various parts of
17  compensation which had not vested?
18    A. Well, my view, and I asked for that these
19  parts of compensation that had not vested that
20  you're talking about are my deferred, which I
21  consider and have always considered to be
22  compensation paid to me.
23        And the way that he presented this to me
24  verbally before he wrote this down was, you know, I

Page 220

1   can offer you a severance package and it would
2   include 18 weeks and a lump sum payment of $250,000
3   and I can get you your deferred. And I was like, my
4   deferred? That's part of it, you know, or something
5   like that and he said, Yes. This is just you and me
6   talking. This is not HR here in the room. And this
7   is what he outlined.
8         So when he discussed it with me, he
9   didn't say anything about I wasn't entitled to it or
10  something else. And my view of that deferred is
11  that that deferred is money that I earned, that I
12  was told it was compensation at the time that I
13  earned it.
14    Q. You've been in the financial services
15  industry for a number of years, right?
16    A. Yes.
17    Q. How many years experience did you have?
18    A. At the time I left?
19    Q. Or as of today.
20    A. 16.
21    Q. 16 years. And as a financial professional
22  with 16 years experience, you understand the
23  difference between vested and unvested; do you not?
24    A. Yes, I understand the difference.

Page 221

1     Q. That's not a foreign concept to you,
2   correct?
3     A. No, it's not a foreign concept.
4     Q. And by September 3 of 2003, you were already
5   talking with counsel; were you not?
6     A. Yes.
7     Q. So that you had the ability to, if you chose
8   to exercise it, to get advice?
9     A. Yes.
10    Q. And you if you didn't know what vested or
11  unvested or any of that meant you had the ability,
12  if you choose, to exercise it to get advice?
13    A. Yes.
14    Q. And Putnam, when you got this September 3
15  memo, didn't tell you you had 12 seconds to make a
16  decision, right?
17    A. No.
18    Q. And then you still, as of September 15th, as
19  of the beginning of the day, you still hadn't
20  accepted one of the three and you were still at
21  Putnam, right?
22    A. Mm-hmm.
23    Q. I'm sorry. Yes?
24    A. As of September 3rd, I was still at Putnam.

56 (Pages 218 to 221)