**Exhibit A - Part 8 of 8**

**Tibbetts dep. excerpt(s)**



**FILE**

RECEIVED
NOV 0 8 2006
K.F.M.

# Svensson
## vs.
## Putnam Investments, et al.

### Richard B. Tibbetts

Volume 2

September 26, 2006
pp. 229-303

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Richard B. Tibbetts

Page 229

1                                    Volume:   II

2                                    Pages:    229-303

3                                    Exhibits: 41-44

4

5            UNITED STATES DISTRICT COURT

6          FOR THE DISTRICT OF MASSACHUSETTS

7      Civil Action No. 04-12711-PBS

8      - - - - - - - - - - - - - - - - - - - - - - x

9      LISA SVENSSON,

10              Plaintiff,

11         v.

12     PUTNAM INVESTMENTS LLC, f/k/a

13     PUTNAM INVESTMENTS, INC., and LAWRENCE J. LASSER,

14              Defendants.

15     - - - - - - - - - - - - - - - - - - - - - - x

16

17          DEPOSITION OF RICHARD B. TIBBETTS

18             Tuesday, September 26, 2006

19               10:07 a.m. to 12:03 p.m.

20               BARRON & STADFELD, P.C.

21                100 Cambridge Street

22                Boston, Massachusetts

23

24        Reporter:  Marianne R. Wharram, CSR/RPR

Richard B. Tibbetts

Page 230

1  APPEARANCES
2
3      JOHN K. WEIR LAW OFFICES LLC
4      (BY JOHN K. WEIR, ESQ.)
5      300 Park Avenue, Suite 1700
6      New York, NY 10022
7      (212) 572-6374
8      johnkweir47@aol.com
9      Counsel for the Plaintiff
10
11     BINGHAM McCUTCHEN, LLP
12     (BY JOSEPH KOCIUBES, ESQ.)
13     150 Federal Street
14     Boston, MA 02110-1726
15     (617) 951-8000
16     joe.kociubes@bingham.com
17     Counsel for the Defendant
18     Putnam Investments LLC
19
20
21
22
23  Continued.
24

Page 231

1  APPEARANCES, continued.
2
3      NIXON PEABODY, LLP
4      (BY CARRIE CAMPION, ESQ.)
5      100 Summer Street
6      Boston, MA 02110-2131
7      (617) 345-1000
8      ccampion@nixonpeabody.com
9      Counsel for the Defendant
10     Lawrence Lasser
11
12  ALSO PRESENT:
13
14     LISA SVENSSON
15     JASON A. TUCKER, ESQ.
16
17
18
19
20
21
22
23
24

Page 232

1           INDEX
2  DEPONENT        DIRECT  CROSS  REDIRECT  RECROSS
3  RICHARD B. TIBBETTS
4  (BY MR. WEIR)    233
5  (BY MR. KOCIUBES)    --
6  (BY MS. CAMPION)    --
7
8           EXHIBITS
9  NO.        DESCRIPTION              PAGE
10 Exhibit 41   14-page Goodfellow Affidavit   258
11             Exhibit #4 Excerpted Materials
12 Exhibit 42   31-page Putnam Investments 2001   260
13             Total Compensation - Sorted High
14             To Low
15 Exhibit 43   8-page 2001E A&P Incentive   265
16             Compensation Projections -
17             Quartile sort
18 Exhibit 44   11-page 1999 Performance Profiles 279
19             Investment Division
20
21
22 *Original exhibits attached to original transcript.
23
24

Page 233

1           PROCEEDINGS
2      (Proceedings commenced at 10:07 a.m.)
3        RICHARD B. TIBBETTS,
4  a witness called on behalf of the Plaintiff,
5  having first been satisfactorily identified by the
6  production of his Massachusetts driver's license
7      and duly sworn by the Notary Public,
8      was examined and testified as follows:
9         RESUMED DIRECT EXAMINATION
10    Q. (BY MR. WEIR) Mr. Tibbetts, you understand
11 that you're under oath today, as well as at your
12 first deposition?
13    A. Yes.
14    Q. At that deposition, we had marked and
15 identified by you as Exhibit Number 10 a memorandum
16 dated February 18th, 2000, RE: Omid Kamshad. Do
17 you recall that, sir?
18    A. Yes.
19    Q. Let me show you the exhibit. I'd now like
20 to ask you a few questions concerning that
21 document, sir. Do you recall the conversation on
22 January 25th, 2000 with Omid Kamshad?
23    A. Generally, yes.
24    Q. Okay. At the time of the conversation, did

Richard B. Tibbetts

**Page 238**

1  had then gone back with Mark's help to identify who
2  within the deferred compensation plan had been
3  personally trading, and that Omid had been
4  identified. And it was in that meeting where it
5  was agreed that I would go and talk to Omid and
6  talk with him about his trading activity.
7     Q. Who -- did Mr. Ferguson direct you to do
8  that?
9     A. I'm not sure that it was one specific
10 person. My memory was that I was going to go talk
11 to him, so I don't know exactly who or whether that
12 was a group decision.
13    Q. Do you recall anything that Mr. Ferguson
14 said in that meeting?
15    A. Not specifically, no.
16    Q. Do you recall whether Mr. Ferguson approved
17 or disapproved of the activity that was being
18 identified to him?
19    A. My memory is a general one, and that was
20 that there was a concern that this type of frequent
21 trading was inconsistent with our general
22 philosophy of being an investor for the long term,
23 and that was something that we believed in and
24 talked within the marketplace as, you know, a buy

**Page 239**

1  and hold for the long term kind of philosophy, and
2  that this kind of trading was inconsistent with
3  that. And that in fact is what I was to then go
4  and talk with Omid about.
5     Q. Do you recall whether the group had
6  identified any others than Mr. Kamshad who had
7  engaged in this activity as of the time of your
8  meeting with Mr. Ferguson?
9     A. My memory is there was one other person we
10 talked specifically about, and that was Justin
11 Scott.
12    Q. Was it also determined that you would -- or
13 that someone else in the group would go to meet
14 with Mr. Scott?
15    A. Yes.
16    Q. Who met with Mr. Scott?
17    A. It was agreed that Tim would talk with
18 Justin.
19    Q. And do you know whether the --
20 Mr. Ferguson's discussion with Mr. Scott preceded
21 January 25th, 2000?
22    A. I don't know.
23    Q. The second paragraph of the memo references
24 the discussions that you had with Mr. Kamshad. Is

**Page 240**

1  it fair and accurate to the best of your
2  recollection?
3     A. Yes.
4     Q. Okay. So it would be fair to state that
5  Mr. Kamshad stated in the meeting that he had no
6  intention of market timing?
7     A. That's my memory, yes.
8     Q. What is market timing?
9     A. Well, I think that's a point of confusion
10 still. There is no real specific --
11    Q. Well, I'm asking for your -- what you --
12 when you wrote those words or reported on those
13 words what you understood it to mean.
14    A. Well, my understanding of it then is
15 dramatically different than my understanding of it
16 today. When I was writing this, I'm not sure that
17 I had any specific understanding, as I was trying
18 to capture what Omid was feeding back to me. I was
19 really speaking about frequent movement of monies,
20 and I did not have any kind of working, really,
21 definition at that time of market timing.
22    Q. I take it that Mr. Kamshad also said he
23 would cease this activity going forward?
24    A. That's what I wrote down, yes.

**Page 241**

1     Q. And did you undertake any process by which
2  to determine whether or not he had followed through
3  on that promise?
4     A. I did not.
5     Q. Do you know whether anyone else did?
6     A. Other than the monitoring that was already
7  going on with the Putnam mutual funds, there was
8  some monitoring that was going on I guess annually
9  by Mark Goodfellow where he put a process in place
10 to review trading activity within the deferred
11 compensation accounts.
12    Q. Is there some reason why your memo is
13 copied to Mr. Cassaro, Mr. Neary, Mr. Schultz and
14 Mr. Scott?
15       MR. KOCIUBES: I think it's Ms. Neary.
16    Q. (BY MR. WEIR) Ms. Neary. I'm sorry.
17    A. Was there a reason? Is that your question?
18    Q. Yes. Why did you do that?
19    A. Yes. Well, I was letting Joe Cassaro know
20 that I was following up and closing out the issue
21 that he had brought to my attention, and the same
22 for Mitch Schultz. Ellen Neary was someone who
23 worked for me and supported the equity organization
24 from a human resources standpoint, and I was

4 (Pages 238 to 241)

Richard B. Tibbetts

Page 250

1   period, what year are we talking about?
2       MR. WEIR: After February 18th of 2000.
3       MR. KOCIUBES: At any time after
4   February 18th?
5       MR. WEIR: Yeah.
6       MR. KOCIUBES: Okay.
7    A. So I don't recall the exact time, but there
8   were several people in the investment division that
9   were brought to my attention to have follow-up
10  conversations with, and those individuals were
11  Geirulv Lode -- my gosh. There was an
12  administrative assistant, Heather. I'm forgetting
13  her last name. Who else was I asked to talk to?
14  Other names are not coming to my mind right now.
15  And then, there was some trading activity that was
16  brought to my attention in 2003 which included Omid
17  and Justin and -- Omid, Justin, Carmel Peters, Jim
18  Prusko. There were a couple of others, but those
19  are the ones that I remember right now.
20   Q. (BY MR. WEIR) Do you recall the time frame
21  of your becoming aware of the trading activities in
22  Geirulv Lode's account?
23   A. I don't.
24   Q. It was before 2003, I take it?

Page 251

1    A. Yes.
2    Q. And with respect to Jim Prusko, do you
3   recall when in 2003 you became aware of that
4   activity?
5    A. I don't.
6    Q. Do you know whether it was before September
7   15th of 2003?
8    A. I would generally say the fall, but I don't
9   know the specific time frame.
10   Q. Okay. And when you became aware of the I
11  guess continuing trading activities of Justin Scott
12  and Omid Kamshad, that was your -- your first
13  awareness that Mr. Kamshad had not carried through
14  on his promise to cease the type and level of
15  activity going forward as referenced in your memo?
16      MR. KOCIUBES: Objection to continue.
17  You may answer.
18   A. Well, he had said that he would cease that
19  type of trading. I'm not sure I took that as a
20  specific promise per se, but that's what he said;
21  and yes, it was brought to my attention in 2003
22  that he had traded frequently again.
23   Q. (BY MR. WEIR) But you had no prior
24  awareness to 2003 that he had traded again or had

Page 252

1   continued trading?
2    A. No.
3    Q. As you sit here today, do you know whether
4   he, Omid Kamshad, ceased trading at all in his
5   deferred compensation account after February 8th --
6   after January 25th of 2000?
7    A. Well, I should clarify that. I don't think
8   we were asking him to cease trading at all; I think
9   what we were asking him to do is cease frequent
10  movements as he had done and we had brought his
11  attention to in early 2000. So my general
12  understanding was that he did in fact continue to
13  trade in the deferred compensation account, but I
14  did not know any details, nor was it brought to my
15  attention until the fall of 2003.
16   Q. When you say frequent movements, what's the
17  frequency that you were discussing with him or
18  objecting to?
19   A. I don't recall the specific trading that I
20  was talking with him about other than it was
21  frequent movements into funds and out of funds, and
22  I don't recall the specific time periods, you know,
23  over which that occurred.
24   Q. Now, these monies in which these frequent

Page 253

1   movements occurred, that was in an individual's
2   deferred compensation account. Were these deferred
3   compensation accounts in the name of each
4   individual investment professional?
5    A. Well, I'm not sure I understand the
6   question.
7    Q. Well, whose name was on the account?
8    A. Well, the -- the actual mutual fund -- as I
9   tried to say before -- account was a Putnam
10  deferred compensation plan. You know, there was
11  the profit growth plan. There was a profit -- a
12  Putnam Investments profit growth plan account that
13  existed for the mutual fund, so that was the
14  account in the actual mutual fund. It was an
15  omnibus account for the organization in the plan
16  itself.
17   Q. Well, did you understand that if gains were
18  made in the account that the gains were income to
19  Putnam as opposed to the individual whose name was
20  identified in that account?
21   A. Yes, I understood that.
22   Q. Did you, or to your knowledge, anyone else
23  at Putnam ever have any discussions with Putnam's
24  board of trustees concerning these trading

7 (Pages 250 to 253)

Richard B. Tibbetts

### Page 290

1  Q. What do you mean by an administrative
2  standpoint, sir?
3  A. I as the HR person for that team was
4  responsible for in some instances writing letters
5  to them explaining their status, or in some cases
6  responsible for communicating to them, getting
7  personal -- company property back from them, those
8  kinds of administrative things.
9  Q. Do you know who actually made the decision
10 to terminate those individuals?
11 A. Well, I know who told me, which was Ed
12 Haldeman.
13 Q. Well, based upon your understanding of the
14 leadership structure at Putnam at that time, do you
15 believe that it was Mr. Haldeman who made that
16 decision?
17 A. I don't think he made that solely, no, but
18 he was the one who told me that that was the
19 decision that had been made.
20 Q. Well, who else do you believe was involved
21 in the decision?
22      MR. KOCIUBES: Don't guess. Answer to
23 the extent of your knowledge and reasonable
24 inferences.

### Page 291

1  A. He is the one that I know was involved.
2  Q. (BY MR. WEIR) Okay. Do you know whether
3  the board of trustees of Putnam had directed that
4  these individuals be terminated?
5  A. No.
6  Q. You don't know or you do know that they did
7  not?
8  A. I don't know what they know, what they -- I
9  don't know what their involvement was.
10 Q. Okay. Do you know what was the basis for
11 the termination of the four individuals that we
12 just mentioned?
13 A. Yes.
14 Q. What was it?
15 A. It was for violation of the code of ethics.
16 Q. In connection with their trading
17 activities?
18 A. Uh, yes, it was in violation of their code
19 of ethics and breach of fiduciary duties according
20 to the code.
21 Q. How had those individuals violated the code
22 of ethics of Putnam?
23 A. Their personal -- as I understand it -- I
24 did not directly do the investigation, as we

### Page 292

1  talked -- but that their personal trading was
2  inconsistent with the code of ethics.
3  Q. And how was it determined that they had
4  breached their fiduciary duties to Putnam?
5  A. That was something that, you know, Ed
6  Haldeman and others, but -- discussed, as far as I
7  know, but Ed was the one who told me that that was
8  the decision.
9  Q. Do you know whether their trading
10 activities had resulted -- the revelation of their
11 trading activities that resulted in this conclusion
12 of the violation of the code of ethics and a breach
13 of their fiduciary duties, do you know how it came
14 to Putnam's attention?
15      MR. KOCIUBES: How the trading came to
16 Putnam's attention?
17      MR. WEIR: Mm-hmm.
18      MR. KOCIUBES: If you know.
19 A. Um, I don't recall.
20 Q. (BY MR. WEIR) Did you have any discussions
21 with anyone other than Mr. Haldeman about these
22 trading activities of the four individuals I've
23 mentioned in the fall of 2003?
24 A. Yes.

### Page 293

1  Q. With whom?
2  A. Talked with Mitch Schultz, Mark Goodfellow.
3  I talked with Brett Brawchuck. I spoke with Ed
4  Haldeman. I spoke with Steve Oristaglio, spoke
5  with Irene Esteves.
6  Q. Okay. Did those discussions indicate to
7  you that the activities in which Mr. Kamshad and
8  Mr. Scott had engaged were the same type of trading
9  activities that you had referenced in your memo of
10 February 18th, 2000?
11 A. Yes, it was the same type of trading.
12 Q. Okay. And was -- with respect to
13 Mr. Prusko and Mr. Lode, was it the same type of
14 trading activities that had been the subject of
15 your discussions with those two individuals in
16 2001?
17 A. Yes.
18 Q. I believe you answered this question at
19 least with respect to Mr. Kamshad, but I want to be
20 sure. Was it your understanding that Putnam first
21 became aware in the time frame of September of 2000
22 -- October/September, fall of 2003, that the
23 individuals who had earlier been determined to have
24 been engaged in these types of trading activities