# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON, <br><br> Plaintiff, <br><br> v. <br><br> PUTNAM INVESTMENTS LLC AND LAWRENCE J. LASSER, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CIVIL ACTION
NO. 04-12711 PBS

## PUTNAM INVESTMENTS' REPLY TO SVENSSON'S SUPPLEMENTAL MEMORANDUM OPPOSING PUTNAM'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

After the hearing on Defendants' motion for summary judgment, Plaintiff, Lisa Svensson ("Svensson") filed a Supplemental Memorandum in Support of Her Oppositions to the motions for summary judgment ("Supplemental Memorandum"). The Supplemental Memorandum fails to comply with the Court's instructions at the February 26, 2008 hearing, and Putnam has filed a separate motion to strike it and the materials filed with it. This response to the Supplemental Memorandum focuses initially upon the non-time barred claims in the format specified by this Court.

Section I analyzes the facts relevant to the termination claim. As demonstrated below, ultimately Svensson was terminated because she refused to accept a redefined role and forced a situation in which, in her words, her superior "needs to stand up and be a man and fire me." Section II examines the claims that (i) Putnam had a duty (of unspecified origin) to promote Svensson to Managing Director ("MD") between May 6 and September 15, 2003, even though *no one* was promoted to MD in that period, and, (ii) Svensson's non-promotion was on account of her gender. Section III analyzes Svensson's claim – now made for the first time after almost 4

years of litigation – that she was not transferred to a portfolio management position between May 6 and September 15, 2003 on account of her gender.  Svensson's Supplemental Memorandum fails to articulate the most basic *prima facie* elements of such a claim.

Since the lack of timeliness of the remaining claims has been fully briefed, Putnam shall not revisit those arguments.  On the assumption this Court does not dismiss those claims as being untimely filed, Putnam responds to the factual assertions relating to those claims which Svensson makes in her Supplemental Memorandum.  ("LS" citations herein refer to the contemporaneous employment diary maintained by Svensson, and authenticated at her deposition ("Svensson Dep.") at 18, Kurker Affidavit Tab ("Tab") 1.)[1]

I. **SVENSSON IDENTIFIES NO EVIDENCE THAT HER TERMINATION WAS ON ACCOUNT OF HER GENDER.**

A. **Alleged Adverse Action:** Termination.

B. **Decision maker:**  Joshua Brooks ("Brooks"), Director of Global Equity Research.[2]

C. **Reason for termination:**  Svensson was terminated because she refused to accept her redefined job description and insisted upon guaranteed compensation of $1,000,000 per year (which would have been approximately a 40% increase in her compensation) for 2 years and immediate election to Managing Director.  Svensson Dep. 37, (Putnam Appendix in Support of Motion for Summary Judgment ("Putnam App.") at 15).

---

[1]  In support of its reply, Putnam submits the Affidavit of Allyson Kurker ("Kurker Aff."), one of Putnam's attorneys, as Exhibit A.  Attached to the Kurker Affidavit are excerpts from the depositions of Lisa Svensson (Tab 1), Joshua Brooks (Tab 2) and Paul White (Tab 4), and excerpts from Svensson's employment diary (authenticated at Svensson's deposition) (Tab 3).

[2]  Brooks was hired and commenced working at Putnam in April 2003.  Deposition of Joshua Brooks, 8 (Tab 2).  Whatever Svensson asserts about any historical "culture" at Putnam, Brooks was not part of it.  In fact, a month *after* her termination, Svensson wrote that "Josh gave me tremendous encouragement throughout the months of May, June and early July.  He used me as an example of how to run a team as a true partnership at one of his Thursday lunch meetings in June….We were very much on the same page." LS 0077 (Tab 3).

**D.    Undisputed facts demonstrating that Putnam's reason for termination was not a pretext**

- Maria Drew was hired as an analyst and assumed management of Svensson's former supervisees.  ("… Maria Drew, the woman Josh hired to replace me.  All the team members apparently report to and are reviewed by her.")  LS 0133 (Tab 3).

- For the reasons stated below, Brooks concluded that Svensson should not manage the 4 junior analysts who reported to her.  Brooks Dep. 160 (Putnam App. 18).  Brooks offered Svensson three alternatives: (i) remain in GER in a non-managerial capacity; (ii) remain at Putnam for a transition period while looking for other opportunities; or (iii) leave Putnam with a severance package.  Brooks Dep. 231 (Exhibit 5) (Putnam App. 18).

- Svensson understood that Brooks "never wanted [her] to leave the firm, just to leave [her management] role."  LS 0301 (Tab 3).

- Svensson decided that "*Josh needs to stand up and be a man and fire me.*"  LS 0305-06 (Tab 3).

- On September 12, 2003, she rejected the options given her by Brooks, demanded that she be elected Managing Director and be guaranteed compensation of $1,000,000 per year for two years.  Svensson Dep. 37-38 (Putnam App. 15).

- Brooks then terminated Svensson on September 15, 2003.  (She insisted Putnam give her "a written document saying that [she was] fired," and Putnam did so.)  LS 307 (Tab 3).

- Svensson misleads the Court when she says that Brooks' decision to terminate her must have been gender-based because she should not have been terminated merely because two junior male subordinates complained about her.  It is undisputed that Svensson was terminated only after she responded to Brook's decision to restructure her role by demanding a substantial raise and an officer promotion, knowing full well that she was forcing Brooks, *in her words*, to "stand up and be a man and fire me."

Brooks removed Svensson's management responsibilities for legitimate business reasons, as set forth in Putnam's initial Memorandum in Support of its Motion for Summary Judgment ("Putnam's Initial Brief") (pp. 9-10).  In essence Brooks' reasons for restructuring her role were:

- Shortly after Brooks joined Putnam, Darren Peers ("Peers"), an Analyst in GER who reported to Svensson, told Brooks that he was troubled by Svensson's management of him, and that  he "was unhappy enough that [he had] started looking for work and ... was likely going to leave."  Peers Dep. 26, (Putnam App. 26).  At the time, Peers was

Putnam's most highly ranked analyst.  Putnam App. 9.  Indeed, Svensson had demanded that she manage Peers "because Darren [Peers] was clearly the best junior analyst of this team and the most likely to make me successful as a manager."  LS 0075 (Tab 3).

- Contemporaneously, Brooks learned that Svensson was preparing what, in Brooks's business judgment, was a one-sided review of another of her supervisees, Christopher O'Malley.  Brooks Dep. 164-165 (Putnam App. 18).  Svensson admitted that her review of O'Malley was not complete: "it was true, that I never even targeted the U.S./Global Core Team . . . because they never had any complaints about Chris O'Malley.  They never had any issues with him."[3]  Svensson Dep. 22 (Putnam App. 15).

- O'Malley told Brooks that he was considering leaving due to Svensson.  Brooks Dep. 199, (Putnam App. 18).

### E.    Svensson Does Not Point to Any Disputed Issue of Material Fact Sufficient to Justify a Trial on Pretext

In her Supplemental Memorandum at pages 8-9, Svensson offers three reasons why Brooks' reasons for terminating her were a pretext for gender discrimination:

- First, Svensson points to the testimony of Mary McNamee (an officer in Putnam's HR Department) that Svensson was terminated for "managerial dishonesty," and argues that that is inconsistent with Brooks' determination that Svensson's review of O'Malley was unfair and one-sided.  As noted above, Brooks deemed Svensson's review to be unfair and unbalanced, a conclusion hardly inconsistent with McNamee's belief that Brooks thought that the review reflected management dishonesty.  Of course, neither reason supports a reasonable inference of gender discrimination.

- Second, Svensson argues that O'Malley's performance *was* "sub-par," and thus that Brooks's assessment of her review of O'Malley must have been pretextual.  As discussed in Putnam's Initial Brief, p. 10, Svensson's disagreement with Brooks' judgment about the accuracy of her review of O'Malley is immaterial.  Similarly, whether Svensson or Brooks was right about O'Malley's actual performance is immaterial since it is neither

---

[3]  Ironically, Svensson herself admitted that O'Malley was a strong analyst.  She testified that he was a "good alpha generator."  Svensson Dep. 75 (Tab 1).

the province of the Court nor jury to second-guess Brooks' business judgments. Putnam's Initial Brief, p. 10.[4]

- Third, *for the first time in her summary judgment briefing*, Svensson compares herself to two male portfolio members whom Putnam allegedly did not summarily terminate as evidence that the reason for her termination is pretext: Omid Kamshad, who allegedly engaged in short-term trading for the funds he managed, and Paul Warren, who allegedly used inappropriate language. Svensson is wrong that the circumstances surrounding the terminations of these two males give rise to an inference that the reason for her termination was pretext:

> (1) *Svensson was not summarily terminated either.* Brooks terminated Svensson only after she responded to his decision to restructure her role by demanding a substantial raise and an officer promotion, knowing full well that she was forcing Brooks to "stand up and be a man and fire me."

> (2) Svensson does not, and cannot, allege that Kamshad and Warren reported to the same supervisor (Brooks) or that the offenses were comparable to Svensson's refusal to accept her redefined role coupled with her demands for promotion and compensation increases. The issue is not which offense Svensson thinks is *worse*. Rather, the offenses must be the same or so similar that the jury is entitled to infer that the reason for any treatment differential is gender animus. *Conward v. Cambridge School Comm.*, 171 F.3d 12, 21 (1st Cir. 1999) (affirming summary judgment for the defendant because "improper use of physical force, on one hand, and sexual harassment, on the other hand, are qualitatively different infractions.")

> (3) *Svensson neglects to mention that Kamshad, one of her alleged male comparators, also was terminated,* (Putnam App. 4) and that at least one other short-term trader was female, and she was terminated as well. *Id.* How any of this proves that the termination of Svensson was on account of her gender remains a mystery.

---

[4] Svensson acknowledges that Brooks had real concerns about the treatment of analysts generally. *One month after her termination,* Svensson recorded in her employment diary that, in the Spring of 2003, Brooks spent a "few weeks talking about how analysts have been paid and *treated like second class citizens*…[Josh] said…he and I should work together to make a change….[Josh] said [Putnam] would have to *change this culture* or he wouldn't stay." LS 107-108 (Tab 3). Brooks' concerns about analysts are entirely consistent with his reasons for removing Svensson from management of the four analysts.

## II.  SVENSSON OFFERS NO EVIDENCE THAT THE FAILURE TO PROMOTE HER TO MANAGING DIRECTOR BETWEEN MAY 6, 2003 AND SEPTEMBER 15, 2003 WAS GENDER-RELATED

**A.    Alleged Adverse Action:**  Failure to Promote Svensson to Managing Director between May 6, 2003 (the limitations cut-off date) and September 15, 2003.

**B.    Decision-maker:**  None, since *no* MD promotions (male or female) were made in the Investments Division in 2003.  Tibbetts Aff. ¶6 (Putnam App. A).

**C.    Reason:**  No promotions were made.

**D.    No Evidence of Pretext:**  Putnam did not make any MD promotions (male or female) in the Investments Division in 2003.  Tibbetts Aff. ¶6 (Putnam App. A).

- Despite that no promotions to MD were made during the relevant period, Svensson asserts, but offers no evidence, that Putnam's promotion decisions historically were gender-based.  In Exhibit H to her Seventh Affidavit, Svensson selects data from the report of her expert (Dr. Paul F. White) to try to show that the percentage of women in Putnam's total officer ranks declined between 2000-2002.  Svensson offers no *testimony* from Dr. White attesting to the accuracy of the data that she has cited or attesting to the statistical validity of *her* lay conclusions.

- Instead, Svensson cites only raw percentage data, which, without controlling or accounting for other variables, has no statistical significance.  *Hillstrom v. Best Western Hotel,* 354 F.3d 27 (1st Cir. 2003) (affirming summary judgment and holding plaintiff's evidence – that roughly 75% of all individuals terminated by [the decision-maker] were over 40 and that 87% of those terminated were male – invalid because "absent evidence of the characteristics of the universe of employees supervised by [the decision-maker], those figures are not probative.").  She also ignores her expert's conclusion that "when we did the promotion analysis among officer titles, we found that there was *no statistically significant disparity* between men and women."   White Dep. 39 (emphasis added) (Putnam App. 21).

- Finally and ironically, according to Svensson, the percentage of women in the MD ranks (the position she sought) was, at 21%, *higher* than the percentage of women in Putnam's officer ranks generally.  Svensson Exhibit H, p. 4 of 5.

**E.      Putnam Had No Affirmative Duty to Promote Svensson Between May and September 2003.**

Svensson argues that "Lasser, who made the decision *not to promote any women* to MD in 2003 had an affirmative duty to remedy the discrimination that existed as a result of prior years' promotion decisions." Supplemental Memorandum, p. 15 (emphasis supplied). Virtually everything in this statement is disingenuous. First, neither Lasser nor anyone at Putnam made any decision "not to promote any women to MD in 2003." The decision, as Svensson well knows, was to freeze *all* MD elections in 2003 (Sixth Svensson Affid., ¶30). Second, Svensson does not cite any legal authority (because none exists) for the proposition that Putnam had any such affirmative duty. Nor does Svensson explain why, even if such a duty existed, it obligated Putnam to promote *her* (as opposed to any other woman), or why Putnam was obligated to promote anyone to MD *between May 6, 2003, to September 15, 2003* (the only period for which she could have a timely claim), especially when it was not promoting *any men* during that period. Third, Svensson predicates her argument on the premise that discrimination in the election of MDs occurred in the past. Her expert disagreed, concluding that "there is no significant pattern of promotions adverse to females who hold officer titles." Exhibit A to Affidavit of Kevin Moloney, 2/15/03, p.14.

## III.      SVENSSON POINTS TO NO EVIDENCE THAT THE FAILURE TO OFFER HER A PORTFOLIO MANAGEMENT POSITION BETWEEN MAY 6, 2003 AND SEPTEMBER 15, 2003 WAS ON ACCOUNT OF HER GENDER.

**A.      Alleged Adverse Action:** Failure to offer Svensson a Portfolio Management position between May 6, 2003 and September 15, 2003.

**B.      Decision maker:** Svensson identifies none. *See* Svensson Seventh Affidavit, Exhibit G.[5]

---

[5] Svensson's failure to identify any decision-maker is not surprising since this is the first time in almost 4 years of litigation in which she identifies these portfolio management positions to which she now says she should have been transferred.

**C.    Reason:**    The people responsible for filling these positions chose the investment professionals they believed had the best experience and qualifications to manage these specific funds.

**D.    Undisputed facts demonstrating that Putnam's reason for termination was not a pretext**

- Svensson fails to identify the qualifications for each position, and thus does not and cannot show that she was qualified for each of the 6 positions. This is an element of her *prima facie* case. *Gu v. Boston Police Dep't.* 312 F.3d 6, 11 (1st Cir. 2002).

- Svensson does not show that she was as or more qualified than the person who obtained each position. This is an element of her *prima facie* case. *Id.* Svensson simply dumps on the Court hundreds of pages of unauthenticated resumés and asserts, in conclusory terms, that they demonstrate that she was qualified for the 6 positions. *See* Svensson Seventh Aff., Exhibits A and B. The assertion is the equivalent of a young lawyer in a litigation department asserting that she should have been hired for a tax department opening because both she and the candidate hired were law school graduates with comparable years of legal experience. It simply is not the province of any court or jury to review resumes and decide who was most qualified for a given position. Svensson's conclusory statements about her relative qualifications cannot establish pretext as a matter of law. Putnam's Initial Brief, p. 16.

- Since Svensson does not identify the decision-makers responsible for filling each PM position, she points to no evidence that any decision-maker was motivated by gender animus. Simply observing that each of the 6 positions was filled by a man, without more, proves nothing.

- Svensson attempts to infer pretext from an alleged remark by William Landes, a former Director of Research, that Svensson was not given a Portfolio Management position *in 2002* because that team wanted a male, Mark Bogar. Landes's alleged remark did not concern any of the PM positions Svensson lists in Exhibit G, and Landes, *the Director of Research*, was not a decision-maker for *any* portfolio management position, including the 6 about which Svensson complains or the one about which he allegedly made his remark. In any event, Svensson makes no attempt to explain how Landes' remark about Bogar's move in 2002 proves discrimination by other managers in 2003. (Even if the Bogar "promotion" to PM in 2002 could form the basis for a timely claim, Svensson does not

- 8 -

allege that her failure to receive this position was an *adverse* employment action. As an analyst in GER, Svensson made more than $200,000 more than Bogar made as PM of Global Core. (Putnam App. 4).[6]

## IV.  EVEN IF SVENSSON'S PROMOTION, DEMOTION AND COMPENSATION CLAIMS ARE NOT TIME BARRED, SHE POINTS TO NO DISPUTED MATERIAL FACT WHICH WOULD ENTITLE HER TO A TRIAL.

Putnam relies upon the reasons given in its Memorandum in Support of its Motion for Summary Judgment (pp. 12-14), and its Reply in support of the same (pp. 2-12), for its position that Svensson's (i) 2000-2003 compensation claims[7]; (ii) 2000-2002 promotions claims; and (iii) 2002 demotion claim are time barred. Putnam here focuses on the merits of those claims.

---

[6]  In Exhibit G, a self-generated compilation by Svensson, she appears to assert that certain PM positions were available within the statute of limitations time period. In listing the "date [the] position [was] filled," Svensson refers to SEC filings (her Exhibit B) as the source for these dates, *but she gives no page references as to where to locate these dates.* Upon review of those materials, it is not obvious how one can determine when these positions were filled. Svensson's composite Exhibit G is also inexplicable in other respects. For example, she indicates that the 2003 compensation for Kevin Divney was $2,200,041 and the 2003 compensation for Daniel Miller was $2,750,029. No reference for these numbers is provided. In each case, she seems to overstate each of their compensations by at least $1,000,000. Compare the compensation. Putnam App. 4.

[7]  In her Supplemental Memorandum, Svennson apparently abandons her compensation claim under Title VII and ch. 151B, no doubt aware that all compensation decisions were made before May 6, 2003, the beginning of the 300 day limitations period. Instead, Svensson asserts that she has viable compensation claims under the Massachusetts Equal Pay Act ("MEPA), Supplemental Memorandum, p. 19, which has a one year statute of limitations. She then counts back from March 1, 2004, (when she filed her charge with the *MCAD*) and argues that since Putnam's 2003 compensation decisions were made in March 2003, they fall within MEPA's one year limitations period. The fallacy of this argument is that *the MCAD does not enforce MEPA and, therefore, Svensson filed no MEPA claim with the MCAD.* M.G.L. ch. 149, §105A (MEPA) provides that any "action to recover such liability [under MEPA] may be *maintained in any court* of competent jurisdiction…" (emphasis added), and that any MEPA claim shall be instituted within one year after the date of the alleged violation." Because MEPA is enforced by the courts (and not the MCAD), MEPA's one-year statute of limitations runs from the date on which Svensson filed *this action* – December 28, 2004 – not the date on which she filed her MCAD charge. Because Svensson was terminated on September 15, 2003, more than a year before the date she filed this action, her MEPA claims are time-barred. *See also* Putnam's Motion to Strike Svensson's Supplemental Memorandum [Docket 298] at p. 4.

### A.    Compensation

#### 1.    Alleged Adverse Action: Disparate Pay.

#### 2.    No Prima Facie Case

Svensson performs no *prima facie* case analysis at all concerning her compensation claims, once again simply directing the Court to the mass of new material that she has submitted. See Svensson Supplemental Memorandum, p. 19.

- Svensson fails to identify a single male comparator (either in her memorandum or Exhibit F, "Compensation Claim Facts"), who was paid more than she. This is an element of her *prima facie* case. Putnam's Initial Memorandum, p. 18.

- At the hearing on Putnam's motion for summary judgment, Svensson alleged that Nathan Eigerman was a comparator and was paid more than she. February 26, 2008 Hearing Transcript at 20, attached hereto as Exhibit B. In her supplemental filings, she makes no effort to perform a prima facie analysis for Eigerman or any other male who was paid more than she, perhaps because, contrary to her representations in open court, Eigerman was paid *less* than she. (Putnam App. 4).

#### 3.    Decision Maker: Svensson identifies none.

Svensson neither identifies the decision-makers for her compensation in each year nor offers any evidence to suggest that the specific decision-makers were motivated by gender animus in setting her compensation. Instead, in Exhibit F to her Seventh Affidavit, Svensson generates graphs comparing herself to some "average male comparator analyst" (whoever that may be and however she computed that "average"), an analysis completely outside the framework of the McDonnell Douglas analysis of compensation claims. See Putnam Initial Brief, p. 18. Regardless, page 3 of Exhibit F demonstrates that Svensson was paid slightly *more* than her "average male."

#### 4.    No Evidence of Pretext

- Even using the 66 cherry-picked male "comparators" that Svensson identified in her 4th Affidavit, Svensson's expert could find no statistically significant gender disparity in total compensation for 2002 or 2003 (the only years for which Svensson has asserted compensation claims). *See* Appendix B of White Report;(Putnam App. 21); White Dep.

- 10 -

50-53 *(Id.)* (for total compensation in 2002, "the difference … was not statistically significant," and for 2003, it was "correct" that "there was no statistical significance").

- Apparently, attempting to impeach the conclusions of her expert, Svensson, in her Seventh Affidavit (Exhibit G), performs a pseudo-statistical compensation analysis, allegedly drawing on data used by her expert. She offers no affidavit from Dr. White endorsing her analysis, methodology or conclusions, nor can she since her conclusions are at odds with his. She fails to demonstrate that her analysis accounts for non-gender related variables which can affect compensation (as her expert purported to do when he found no statistical evidence of gender animus). *See Hillstrom*, *supra*. Nor does Svensson demonstrate that her "analysis" is statistically significant, as required by law. *Hazelwood Sch. District v. United States*, 433 U.S. 299, 308 n.14 (1977) (as a general rule, statistical significance is shown when the difference between the expected value and the observed number is "greater than two or three standard deviations") (cited in White Report 5, (Putnam App. 21)). Even Svensson's expert conceded that sex animus could not be inferred unless a result was "statistically significant." White Dep. 51 (Tab 4).[8]

- Finally, even a cursory glance shows at Svensson's analysis reveals that *only* Chief Investment Officers ("CIO") were paid noticeably more than she was. It is undisputed that some CIOs were female, and that Svensson was never a CIO.

### B.    Promotion to Managing Director in 2000

    1.    **Alleged Adverse Action:** Failure to promote to Managing Director.

    2.    **Decision-makers:** Jack Morgan, Joe Cassaro, Brett Browchuk, Ed D'Alelio, Steve Oristaglio, Tim Ferguson, Justin Scott and Tom Reilly, Kathie Collman and Carol McMullen.

    3.    **Reason:** In 2000, six men and four women were considered for election to MD. The Investment Division Management Committee selected three of four women and

---

[8]    When asked whether statistical significance is required to account for factors other than sex animus may, Dr. White replied, "That's right. You can't rule out other factors." (White Dep. 51, Tab 4).

four of six men for promotion, and these selections were ultimately approved.[9]   Svensson received *no* votes from the IDMC, and was thus was not promoted.  Eight of the IDMC electors were men, and two were women.  Tibbetts Aff. ¶ 31 (Putnam App. A).

### 4.    No Evidence of Pretext

- Svensson's expert, Paul White, concludes that "there is no statistically significant pattern of promotions adverse to females who hold officer titles."  White Dep. at 37-38 (Exhibit 1, "White Report" at 14), (Putnam App. 21).  Dr. White admitted "when we did the promotion analysis among officer titles we found that there was *no statistically significant disparity* between men and women."  White Dep. 39 (*id.*); White Report (*id.*) (emphasis added).

- Svensson asserts that Jack Morgan reduced her performance review from a 4.78 to a 3.0 (implying, but not proving, that he did so on account of her gender).  She ignores the undisputed evidence that Svensson's manager rating *was not actually* changed (Tibbetts Dep. (11/29/06) at 90-91 (Tab 5), and she offers no evidence that performance ratings were relied upon or even reviewed by the MD electors.  Worse, Svensson glides over the undisputed facts that *Morgan nominated her* for MD and *Morgan voted for the other three women (all of whom were elected) and against two of the male nominees.* Putnam App. 7.  How this record evidences gender discrimination (other than Svensson's *ipse dixit*) is unstated.

- Absent statistical evidence supporting Svensson's contention that Putnam disproportionately elected female officers, Putnam could not have an "affirmative duty" to right any purported historical imbalance of women in officer ranks, even if there were legal authority for such a proposition.

---

[9]   In her Supplemental Memo (p. 10), Svensson asserts that in 2000, 6 males and 3 females were nominated to MD.  As Tibbetts Aff. ¶ 31 (Putnam App. A) makes clear, *4* women were nominated to MD.  Svensson was the only one not elected.

A/72453394.9/0398860-0000312913

**C.**     **Promotion to Managing Director in 2001-2002**

**1.**     **Alleged Adverse Action:** Failure to promote to Managing Director.

**2.**     **Decision makers:** Svensson identifies 9 alleged decision makers for 2001 (Exhibit F, p. 6), and 21 alleged decision makers for 2002.

**3.**     **Reason:** Svensson was not elected MD because the electors concluded that she did not possess the qualifications necessary for election to MD, and thus did not vote for her.

**4.**     **No Evidence of Pretext**

- By Svensson's own admission, "[i]n 2000, the Global Growth Fund's performance turned negative. We spent the years 2000 and 2001 in the bottom of the fourth quartile." LS 72, (Tab 3). Given her team's disastrous performance in 2000 and 2001, it speaks volumes that she could not understand why she was not *promoted* in 2001 or 2002.

- Likewise, given that *none* of the ten male and female electors in 2000 voted for Svensson (even as they elected the other three women), how does she reasonably infer that her non-election the following year was on account of her gender?

- The comment allegedly made by Svensson's supervisor, Swift, that she was not promoted in 2001 because she had been on maternity leave is immaterial. Svensson concedes that Swift was not a decision-maker.

- As noted above, Svensson's expert concluded that "there is no statistically significant pattern of promotions adverse to females who hold officer titles." White Dep. 37-38 (Exhibit 1, "White Report") at 14, (Putnam App. 21).

**D.**     **"Demotion" from Portfolio Manager in 2002.**

**1.**     **Alleged Adverse Action:** Transfer to GER.

**2.**     **Decision maker:** Stephen Oristaglio.

**3.**     **Reasons**

- Putnam reorganized the International Growth team "given the [team's] performance issues and the dramatic decrease in asset[s under] management." Oristaglio Dep. 123 (Putnam App. 16). Putnam terminated Swift (the team's male CIO). Svensson Dep. 96 (Putnam App. 15).

- 13 -

- Steve Dexter continued to manage what remained of the International Growth Fund because, according to Stephen Oristaglio, the co-Head of IMD, Dexter "was a conservative investment manager ... more diversified in combining fundamental and quantitative [skills], and I thought he had the edge among all the candidates that gave me the best probability . . . that group would be managed in the way that [] I specified and was looking for." Oristaglio Dep. 135-36 (Putnam App. 16).

- Svensson was offered an analyst position in GER. (Putnam Initial Brief, p. 5).

### 4.    No Evidence of Pretext

- Svensson earned the same compensation in GER for 2002 that she was awarded in her last year as a PM in International Growth. Putnam promoted her to ADR in January 2003. Am. Compl. ¶ 32.

- Svensson's expert testified that a slightly higher (but not statistically significant) ratio of *men* was transferred from portfolio management than women. White Dep. 143-144 (Putnam App. 21). ("Mr. Kociubes: And do I then assume that fewer females were demoted from portfolio manager than you would have expected? Dr. White: Yes.").

- Svensson's Exhibit K (Demotion Claim Facts) purports to show that the reorganization of International Growth "disproportionately adversely affected female PM's." Svensson Supplemental Memo. at 17. A mere glance at Exhibit K, however, reveals that the chart contains no statistical or other analyses whatsoever. It is nothing more than an organizational chart which discloses where some team members landed following the reorganization of the team, and the compensation of some of them, without any evidence concerning the reasons for those decisions.[10]

---

[10] Exhibit J to Svensson's affidavit is yet another self-generated compilation lacking specific sourcing. Presumably, this exhibit is intended to show that Svensson was wrongfully demoted because "[a]ll portfolio managers on the Putnam Growth Team had poor performance in 2001 as the market for growth stocks imploded." See Exhibit J. Svensson's Exhibit J (insofar as it deals with fund performance) purports to be based upon her Exhibit D. Exhibit D contains unauthenticated excerpts of Morningstar reviews of various funds. The first fund listed on the chart in Exhibit J is Putnam Investors Fund (which was managed by a female, Beth Cotner). If one looks at the bottom of the first column of the Morningstar report on Putnam Investors A (in Exhibit D), Morningstar makes the following observation: "Through the funds 29% loss for the year to date through Nov. 2, 2001 might look startling, it's on par with its peers." Contrast that with the comment in the Morningstar report on Putnam Global Growth A (the fund in which Svensson was a Portfolio Manager), located at the bottom of the second column of the report:

(Footnote Continued on Next Page.)

- Svensson's other evidence of pretext is that, while "two male PMs…were considered…for demotion to the research department, only Svensson was demoted." Svensson Supplemental Memo. at 17.  Svensson neglects to inform this Court that her male superior was terminated as part of this same reorganization, and that, *following her "demotion,"* her compensation was *highe*r than the allegedly non-demoted males by more than $150,000.  Putnam App. 4.  She also claims that Peter Hadden was allowed to stay in portfolio management, neglecting to inform this Court that she made nearly $450,000 more than Hadden.  *Id.*

---

(Footnote Continued from Previous Page.)

"Therefore, the fund has plunged 41% for the trailing 12-month period through July 27, 2001 -- nearly twice as much as the typical world-stock offering."  Exhibit D.

A/72453394.9/0398860-0000312913

## CONCLUSION

For the reasons stated above, Putnam prays that this Court grant Putnam's Motion for Summary Judgment and dismiss the Amended Complaint with prejudice.

## REQUEST FOR ORAL ARGUMENT

Putnam requests an opportunity to be heard on those claims that Svensson alleges arose after May 6, 2003.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

/s/ Joseph L. Kociubes
Joseph L. Kociubes, BBO #276360
joe.kociubes@bingham.com
Louis A. Rodriques, BBO #424720
louis.rodriques@bingham.com
Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com
Jennifer L. Holden, BBO #663467
jennifer.holden@bingham.com
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: March 12, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 12, 2008.

/s/ Allyson E. Kurker, BBO #665231
Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com

A/72453394.9/0398860-0000312913

# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON,<br><br>      Plaintiff,<br><br>  v.<br><br>PUTNAM INVESTMENTS LLC, f/k/a PUTNAM<br>INVESTMENTS, INC. and LAWRENCE J. LASSER,<br><br>      Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 04-12711 PBS<br>)<br>)<br>)<br>)<br>) |

### SUPPLEMENTAL AFFIDAVIT OF ALLYSON E. KURKER
### IN SUPPORT OF PUTNAM INVESTMENTS' REPLY

I, Allyson E. Kurker, being duly sworn, hereby depose and say:

1.  I am an associate at the law firm of Bingham McCutchen LLP and am one of the attorneys representing defendant Putnam Investments, LLC in connection with this matter.

2.  Attached at Tab 1 is a true and correct copy of excerpts of the Deposition of Lisa Svensson ("Svensson Dep.").

3.  Attached at Tab 2 is a true and correct copy of excerpts of the Deposition of Joshua Brooks ("Brooks Dep.").

4.  Attached at Tab 3 is a true and correct copy of excerpts from the employment diary of Lisa Svensson, authenticated by her at Svensson Dep. 18.

5.  Attached at Tab 4 is a true and correct copy of excerpts the Deposition of Paul White ("White Dep.").

6.  Attached at Tab 5 is a true and correct copy of excerpts the Deposition of Richard B. Tibbetts ("Tibbetts Dep.").

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2008.

/s/ Allyson E. Kurker, BBO #665231
Allyson E. Kurker

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants at identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated at non-registered participants on March 11, 2008.

/s/ Allyson E. Kurker
Allyson E. Kurker BBO #665231
allyson.kurker@bingham.com

# Tab 1

1

27:26   1    CERTIFIED ORIGINAL      Volume:  I

2     LEGALINK BOSTON       Pages:  1-255

3                         Exhibits:  See Index

4          UNITED STATES DISTRICT COURT

5       FOR THE DISTRICT OF MASSACHUSETTS

6

7   * * * * * * * * * * * * * * *

8   LISA SVENSSON,

9             Plaintiff,

10   vs.             Civil Action No.  04-12711

11  PUTNAM INVESTMENTS LLC, f/k/a

12  PUTNAM INVESTMENTS, INC., and LAWRENCE J. LASSER,

13

14           Defendants.

15   * * * * * * * * * * * * * * *

16        DEPOSITION OF LISA SVENSSON

17          Bingham McCutchen

18          150 Federal Street

19        Boston, Massachusetts

20           10:04 a.m.

21      Wednesday, November 30, 2005

22   Court Reporter:  Mary C. Soldati CSR, RPR

23

24

Lisa Svensson                                    11/30/2005

18

| | | |
|---|---|---|
| 18:29 | 1 | August and September 15th submit any writing to |
| 10:18:32 | 2 | human resources or anything complaining about |
| 10:18:36 | 3 | treatment because of your gender? |
| 10:18:37 | 4 | A.  No. |
| 10:18:38 | 5 | Q.  Did you put anything down in writing to Mr. |
| 10:18:41 | 6 | Brooks or to anyone taking issue with the |
| 10:18:45 | 7 | allegations that he had made about your review |
| 10:18:48 | 8 | process of Mr. O'Malley? |
| 10:18:51 | 9 | A.  In writing? |
| 10:18:52 | 10 | Q.  Yes. |
| 10:18:53 | 11 | A.  No. |
| 10:19:08 | 12 | Q.  Was there -- let me give you what has been |
| 19:14 | 13 | marked as Svensson Exhibit 2, which is a group of |
| 10:19:22 | 14 | documents bearing Bates numbers LS 31 through 273. |
| 10:19:51 | 15 | Can you identify what Exhibit 2 is? |
| 10:20:11 | 16 | A.  These are my journals. |
| 10:20:14 | 17 | Q.  And when did you start taking journals of |
| 10:20:19 | 18 | your history with Putnam or your experiences at |
| 10:20:22 | 19 | Putnam? |
| 10:20:23 | 20 | A.  Well, they're all here, so April 23, 1998. |
| 10:20:26 | 21 | Q.  And do you recall what caused you to start |
| 10:20:32 | 22 | keeping a journal? |
| 10:20:37 | 23 | A.  Yes.  The first part of this journal is |
| 10:20:40 | 24 | during the time when I was working in the |

Lisa Svensson                                          11/30/2005

75

| | | |
|---|---|---|
| | 1 | ranked. |
| 11:28:53 | 2 | Q. And I take it you don't know where he |
| 11:28:55 | 3 | finished in 2003? |
| 11:28:56 | 4 | A. No, but he was doing well. His stock |
| 11:29:01 | 5 | selection was -- that was one of my issues when Mary |
| 11:29:02 | 6 | said, Do you want to give him 30, 60 or 90 days? I |
| 11:29:04 | 7 | was like, No, I think he's a good stock picker and I |
| 11:29:11 | 8 | think he's a good analyst. My problem is he's not |
| 11:29:13 | 9 | communicating that good alpha-generating information |
| 11:29:17 | 10 | to the teams, and that's not good for our customers. |
| 11:29:19 | 11 | Our clients need to get this data into their |
| | 12 | portfolios. |
| 29:23 | 13 | And my objection was never that he |
| 11:29:24 | 14 | wasn't, you know, a good analyst. Although, I will |
| 11:29:28 | 15 | say that, you know, from time to time we disagreed |
| 11:29:31 | 16 | on some stock calls, but I thought he was a good |
| 11:29:36 | 17 | alpha generator. And I told him that. |
| 11:30:24 | 18 | Q. Do you still have in front of you your |
| 11:36:01 | 19 | Complaint in this matter? |
| 11:36:05 | 20 | A. Yes. |
| 11:36:07 | 21 | Q. Turn, if you would, to Page 6. Do you see |
| 11:36:19 | 22 | Paragraph 19 there at the bottom of the page? |
| 11:36:21 | 23 | A. Yes. |
| 11:36:22 | 24 | Q. "By offer letter from O'Donnell, dated June |

# Tab 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 04-CV-12711(PBS)


LISA SVENSSON,

      Plaintiff,

VS.

PUTNAM INVESTMENTS LLC,
f/k/a PUTNAM INVESTMENTS,
INC, and LAWRENCE J. LASSER

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~


## DEPOSITION OF

### JOSHUA HUNTINGTON BROOKS


November 17, 2005
11:44 a.m.


Barron & Stadfeld, P.C.
100 Cambridge Street
Boston, Massachusetts


Amanda Stevens, Notary Public and
Professional Shorthand Reporter within and
for the Commonwealth of Massachusetts



Jack Daniel
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Fax: 617.557.0040
www.jackdanielreporting.com

**5**

1    DEPOSITION OF JOSHUA HUNTINGTON BROOKS
2         NOVEMBER 17, 2005
3              PROCEEDINGS:
4    JOSHUA HUNTINGTON BROOKS, the
5    deponent, having been satisfactorily
6    identified and duly sworn, by the Notary
7    Public, was examined and testified as
8    follows:
9         EXAMINATION
10   BY-MR.WEIR:
11   Q.   Could you state your full name for
12   the record, sir?
13   A.   Joshua Huntington Brooks.
14   Q.   And your present residence address?
15   A.   Five Arlington Street, Apartment 7,
16   Boston, Mass. 02116.
17   Q.   And for what period of time have
18   you resided at that location?
19   A.   Since August of 2003.
20   Q.   And do you reside with anyone?
21   A.   My wife.
22   Q.   And for how long have you been
23   married?
24   A.   For just about a year.

**7**

1    Q.   Do you know what those documents
2    were?
3    A.   If I remember, they were a couple
4    of pages from Lisa's diary and I believe a
5    couple of notes of e-mail that I sent to
6    Lisa during the period in question.
7    Q.   Let me show you some notes that
8    were previously produced in this litigation
9    bearing Numbers LS 0101 through LS 0119,
10   and ask you if those are the notes that
11   you reviewed in connection with your
12   preparation for today?
13   A.   (Witness viewing documents).  No, I
14   don't believe I've seen these before.
15   Q.   Who showed you the notes that you
16   referenced in your testimony that you
17   looked at?
18   A.   Counsel.
19   Q.   And when did that occur?
20   A.   Forgive me, I don't remember the
21   exact date, but within the least three
22   weeks or so.
23   Q.   Are you currently employed?
24   A.   Yes.

**6**

1    Q.   And your wife's maiden name?
2    A.   Schrodel, S-C-H-R-O-D-E-L.
3    Q.   And what is your date of birth,
4    sir?
5    A.   Tenth of November, 1967.
6    Q.   Have you ever had your deposition
7    taken before?
8    A.   No.
9    Q.   Has your counsel had an opportunity
10   to explain to you what this process is?
11   A.   Yes.
12   Q.   That I will be asking you a series
13   of questions and that you're under oath
14   and obligated to give truthful answers to
15   those questions?
16   A.   Yes.
17   Q.   And if at any time don't understand
18   a question, just let me know and I'll try
19   to rephrase it.
20   A.   Yeah.
21   Q.   Have you reviewed any documents in
22   connection with your preparation for this
23   deposition?
24   A.   I've looked at only a couple, yes.

**8**

1    Q.   And by whom are you employed?
2    A.   Putnam Investments.
3    Q.   And in what capacity are you
4    employed?
5    A.   I am head of large cap equities.
6    Q.   Do you have a job title?
7    A.   I do.  I have several, if you'll
8    forgive me.  My officer title is Senior
9    Managing Director and my operating titles
10   are Deputy Head of Investments and Chief
11   Investment Officer of Large Cap Equities.
12   Q.   For how long have you been employed
13   by Putnam?
14   A.   Since March of 2003 or April of
15   2003, one of the two.
16   Q.   And when you were hired, what
17   positions were you hired for?
18   A.   I was hired as Director of Global
19   Equity Research.
20   Q.   Did you also have a job title at
21   the time you were hired?
22   A.   An officer title, is that what you
23   are asking?
24   Q.   Yes, any title.



**Jack Daniel**
**Court Reporting & Video Services** Inc
Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

# Tab 3

know that Tom had been fired. She said that there would likely be litigation and she did not want me to be "dragged into it". So I shouldn't talk to Tom anymore.

In 1999, despite being traumatized by all the firings and personnel changes, my team again managed to produce fantastic results. Again we beat Jones. I was put up for MD in Spring 2000 following the 1999 performance. At this point, my comp was in the range of $1.50MM

In 2000, the Global Growth Fund's performance turned negative. We spent the years 2000 and 2001 in the bottom of the fourth quartile. It was a trying time because we had never had such bad performance. I was pregnant with my second child in 2000. The bonus in Spring 2001 based on 2000 performance was a positive surprise— my total comp went to $1.65MM, with $750K being deferred over 5 years. In Spring 2001, I was again put up for MD and again I was denied it. My boss, Robert Swift, told me at the time that I had been out on maternity leave, and that for this reason no one remembered me. He said it was a bad year for my promotion as a result of my being out on maternity leave.

LS-0072

**Time Since Rejoining GER**
**Written September 11, 2003**

In March 2002, Robert Swift was fired from Putnam. Steve Oristaglio announced it in a meeting with our team on Friday, March 8, and he told us that there were spots for all of us. He and Rick Tibbetts from HR told me that later that day I would learn about my opportunity. I waited all day long. Finally, around 4pm, I went up to Steve O's office to ask about it. I was told by Sandy Costa, Steve's assistant, that Steve was out all day at an offsite. She was nice enough to call Rick Tibbetts but was told that he was gone for the day. At this point, Sherrie Holder-Watts said she would talk to me before the weekend. She sat down with me and told me that my opportunity was in GER working for Bill Landes.

I was devastated. I had worked all my career to become a Portfolio Manager, and I had made the transition. Now they were saying I had to take a step back. I asked if there were any other spots available, something in the growth team, perhaps. Sherrie said no, there were not other positions. I said none for women anyway. She did not say anything in reply.

I went home for the weekend and called Debby Kuenstner to ask for help in keeping my job at Putnam. She put my mind at ease because she said that I was not being fired and that Putnam had decided that they needed better communication from the Energy area and that they were looking forward to my joining GER.

I decided to give it one more try to stay in portfolio management. I set up a meeting with Steve Oristaglio around March 11 late in the day. Steve said that they were not going to be using me as a PM. He said there was no room on the team for me. I said I did not know why there was room for Steve Dexter, who was newer to the team than me. I also asked why I was not being asked to join the domestic growth team. He said they needed certain skills. I said I had better skills than the people they were keeping on the domestic growth team. He just kept saying that I needed to go back to GER.

Because it looked like my only option and I wanted to give it my best, I decided to write a business plan for my work in GER and present it to Bill Landes. I thought this would be a way to give myself a positive start to this difficult task ahead of me. I wrote a plan that included the problem and proposed a solution. The plan included my covering the European and Russian integrated oils as well as managing the junior analysts in the energy and materials area. I proposed managing the following people: Ellis Eckland, Konstantin Stoev, Chris O'Malley and Darren Peers. Finally, I wanted to be a co-manager of the Global Natural Resources fund.

Bill liked the idea and said in that meeting that he could give me 90% of what I wanted. Later, however, Steve Gorman told me that this would not be possible. He said that they were worried that they would offend Jim Falvey who was currently managing the fund and covering some of the Europeans. Jim did not want to give up Royal Dutch, BP or Total. These were the major market cap stocks in my plan. Steve told me I would have to give up on managing money because Jim would never agree to a co-manager. Finally, Steve said that Darren was doing fine working with Jim and he would continue to report to Jim while I would have the others. This was despite the fact Jim had never shown any interest in or skill for training the junior analysts.

It was a downer that I did not get to manage Darren because Darren was clearly the best junior analyst of this team and the most likely to make me successful as a manager. But I had the "compromise" given to me and decided to make the best of it. My attitude at that time was that I was happy and grateful to have a job. I had produced strong great performance from 1994 through 1999, but the prior two years were weak for my team and I was glad they gave me the opportunity. I decided to do my best.

Around this time, the Global Core team needed another portfolio manager. This was a perfect job for me. Bill told me that they were taking Mark Bogar because they wanted someone more junior. I said they wanted a guy, and Bill agreed with me. At any rate, I was not allowed to return to money management and the message was that I would have to stay in GER. I asked Bill if I performed on my business plan was

In March I received my bonus and it was again half of Saba's and Terry's with no improvement. Bill Landes was pushed aside at that time as Director of Research. Josh Brooks started in early April. Josh is 36 years old and has 11 years of experience. He has worked for one firm for all those 11 years.

Josh came in telling us that we ought not be concerned that Ed would turn out to be the "sweeper" that the press claimed. He said that the department was too young and that all the turnover had hurt our performance. He kept saying that we needed to be able to separate stock risk from career risk and that we needed to know that it was OK to take risk. When I told him that people were still nervous anyway, and that I felt nervous, he said that I would be the last person to be fired. I had lots of experience, I was a to alpha generator, and they needed people like me. I told him that I would need to be making more money and that the MD promotion was really important to me. He said that titles did not matter to him and that he had just come from Delaware, where he never had a title at all. I told him that I was disappointed in that answer because at Putnam titles matter and I still wanted to be an MD even if it did not matter to him.

Josh gave me tremendous encouragement throughout the months of May, June and early July. He used me as an example of how to run a team as a true partnership at one of his Thursday lunch meetings in June. He responded to my request that he give more positive feedback to the analysts by giving it to them right away. We were very much on the same page. Through it all, he kept asking me to give him the information on what is wrong at Putnam, because that is the only way we will fix the place. I resisted and told him that I did not see my role as being his voice of negativity.

In July, I went on vacation for two weeks plus two days. While I was gone, I asked one of my team members, Ellis Eckland, to prepare the team for its Basic Materials industry review to be held August 5, just after my return. Kelly Morgan had asked our team in April if we would take on the training of two MBA interns. We agreed and I charged Ellis and Chris O'Malley with overseeing their progress.

Kelly Morgan told me not to meet with these interns until the final week's pre-launch so that Ellis and Chris could gain some experience managing. I was uncomfortable with leaving them to their own devices for the whole summer, so I met with them every two weeks or so. I also asked Ellis to include their stock initiations in the August 5 Industry Review. Kelly did not like that idea because her view of how to manage summer analysts was to have them do a huge model and then launch the very last week that they were here. I disagreed with that way of managing the summer analysts because I felt that it gave them and the firm a less than complete picture of how they were likely to do on a permanent basis once they had to cover stocks and actually live with the outcomes of their recommendations.

Before I left on vacation, I asked the summer MBAs to make industry presentations to our team. They appeared to be developing their investment thinking in an orderly fashion. While I was on vacation, ellis called me to say that Kelly and Josh had stepped in with our summer analysts and had decided that they would not be ready to make the presentation August5. I did not understand why they were interfering with my team. When I returned, Kelly told me that they were just "bad" and that Josh agreed. I then spoke to Josh who said that he felt the analysts had been unable to answer basic questions, but that upon meeting with them individually he found that they had a better understanding of their stocks than he had originally thought. I then checked back with Kelly who insisted that Josh thought they were "bad".

I did not worry much about any of this, since Kelly told me that none of them were getting permanent offers anyway. Only the returning Ias who had received financial aid would be offered jobs, plus perhaps one more. When I asked the summer interns, Ellis and their HR representative Eric Hutcherson what the deal was, I got differing answers. Eric said that Chris O'Malley had not done a good job with his intern (Austin Hawley), while Ellis said that Geoff Smith (his intern) had said that he was disappointed that they did not get as much exposure to high level peole like Kelly and Saba as the analysts in the tech team did.

Geoff Smith himself told me that he had complained to Eric while I was out because he was worried about hic ounterpart that worked for Chris O'Malley, Austin. Goeff said that Austin had seemed to be at loose ends and that Chris was not spending time with him, although he acknowledged that Ellis had spent plenty of time with Geoff.

The next week at his Thursday lunch, he mentioned that I had said he needed to give more praise, and then he singled out a couple of people to praise. Afterword, I told him I appreciated the fact that he heard me.

In Mid May, I took an 11 Day trip around Europe. It was quite a long trip and I was away from my family over a weekend. I traveled to Milan, Paris, London and Madrid. I wanted to fly business class, and I asked Travel for a business class ticket. They quoted me a price of $5500, well within my budget. I booked the ticket, but when it came back its price changed had been $4100. I could not find out why it had changed.

While I was gone, all my flights went smoothly until the last one from Madrid to London. I was with associates from Goldman Sachs, and everyone was flying business when the airline told me I couldn't go to the business class lounge because I had a coach ticket. I said there had to be a mistake, but there wasn't. I began to suspect that Travel had slipped in coach tickets to save money. This wouldn't be a big deal, except I was flying home from London the next day and I wanted that flight to be in business class.

LS-0107

My secretary called Travel & couldn't find out much about what had happened and why they hadn't booked what I asked for.

I called Josh to see if he could help. He wasn't around, but his secretary Heidi called the special Travel Department that MD's get to use, and they explained what had happened. It turns out that Larry Lasser had decreed that no one can fly from London in business class, so all flights automatically get downgraded. If I had flown directly from Madrid to Boston as I had originally planned, I could have flown business. But making the decision to have one more meeting in Madrid, then going to London to have dinner with Morgan Stanley, made me automatically a candidate for Coach class. So I flew coach home.

When I got back, I had lunch with Josh. This was late May, after he had been spending the prior few weeks talking about how analysts have been paid and treated like second class citizens. I explained what had happened to me and he listened. He said it was clear to him that "some people count around here" and that partners seem to be the ones that count. He did not see why that should be, and that he and I should work together to make a change.

3/18/04

Konstantin called me tonight. We haven't spoken in awhile, so it was great to hear from him. He said Kelly has still not been named Research Director, although she is effectively doing the job. He says he is now reporting to Maria Drew, the woman Josh hired to replace me. All the team members apparently report to and are reviewed by her. He said Ellis is "running around like a chicken" to which I said "like a chicken with his head cut off?" and he said "yes!" Konstantin said Ellis is clearly overwhelmed by all the new stocks + industries he is covering.

I mentioned the new subpoenas from the SEC related to directed brokerage commissions. Konstantin said "I remember you talked about that when you were at Putnam." I told him I had also

LS-0133

Josh then said: "Do you have any sense of what would be acceptable to you?"

I said that I would need some type of written assurance that my career could be put back on track in this organization. This assurance should include a proper title as well as some indication that my promotions and compensation would be based on my contribution and without being impacted by my gender.

Josh immediately said "I understand why you might think this decision is based on gender but I have to tell you that gender played no role in this decision." We then said that he had to act to keep people from leaving. He further said that he never wanted me to leave the Firm, just to leave the ADR role.

I said that my position is that I have

LS-0301

there were problems with my management of the team, and that there were people about to leave, so Josh had to step in.

Konstantin said "This is bullshit." He told me that he told Josh I was an excellent boss and that he "may be out of it, but I never observed any dynamic like you describe" on the team. He said to Josh "I don't believe you." He also asked what kind of team they were supposed to have with this going on.

I told Konstantin that I am being fired and that I was given three lousy choices. I said that I had rejected all the choices and that Josh is supposed to get back to me. I told him that Josh needs to

LS-0305

stand up and be a man and fire me.

Konstantin asked what I think about Josh
now, given all that has happened. I said
that Josh may or may not be the one
doing this. I said it did not speak
well of him either way.

I told Roger Sullivan that I am expecting
to be fired Monday. He was shocked
and could not believe it. He asked what he
could do for me. I said I would
appreciate it if he would keep me in
mind if he hears of any jobs. He said
he would be happy to, that he has
known me a long time, and that he
has a lot of respect for me. I asked
him not to believe the spin when he
hears it, that Josh is telling my team
that I'm quitting, and that it is not true.

LS-0306

9/15/03

I was just fired by Josh Brooks and Mary McNamee. Josh called a meeting for 2 p.m. He said I had made demands that they could not meet so therefore I had chosen Option 3. I said I had not chosen Option 3, but that they had decided to fire me. He gave Mary a look and they said that was a small matter. They said they'd get back to me within 24 hours. I said I have to have it in writing that they fired me. I said I couldn't leave without a written document saying that I am fired.

Then Mary began to go through the severance package. She took me through all the pages of the termination letter, including the deferred, both voluntary and involuntary, COBRA, release of claims, salary, lump sum bonus, having an attorney review it, and the confidentiality and non-solicitation agreements I have signed over the years.

LS-0307

# Tab 4

Page 1

1                                              Volume:  I

2                                              Pages:  1-198

3                                              Exhibits:  1-4

4

5                    UNITED STATES DISTRICT COURT

6                    DISTRICT OF MASSACHUSETTS

7        Civil Action No. 04-12711-PBS

8        - - - - - - - - - - - - - - - - - - - x

9        LISA SVENSSON,

10                        Plaintiff,

11       vs.

12       PUTNAM INVESTMENTS, LLC, f/k/a PUTNAM

13       INVESTMENTS, INC. and LAWRENCE J.

14       LASSER,

15                        Defendants.

16       - - - - - - - - - - - - - - - - - - - x

17

18                    DEPOSITION OF PAUL F. WHITE

19                    Wednesday, December 19, 2007

20                        Bingham McCutchen

21                        150 Federal Street

22                    Boston, Massachusetts

23                    10:03 a.m. to 3:38 p.m.

24            Reporter:  Karen A. Morgan, CSR/RPR

Page 50

1    Q.   Take us to that data.
2    A.   Okay.  This bullet talks about the disparate
3    impact comparators.  So start off at Appendix B.  First
4    page of Appendix B.
5    Q.   Yes.
6    A.   The first column talks about the category
7    that we're analyzing starting with total compensation,
8    ending with manager rating and as the table shows, what
9    I'm doing is comparing the average values for male
10   versus the average values for female, taking the
11   difference between the average.  The next to the last
12   column called the T value is whether or not these
13   differences are statistically significant.
14   Q.   Let me ask you if I could some questions
15   about that table to make sure I've got it.
16   A.   Sure.
17   Q.   For year 2002 and you chose -- you looked at
18   2002, 2003 in this table; correct?
19   A.   Correct.
20   Q.   And again, you chose those years because you
21   understood that to be what plaintiff was claiming based
22   on her fourth affidavit?
23   A.   Correct.
24   Q.   Okay.  For 2002 in the total compensation

Page 51

1    received by males and females, am I correct you found
2    no statistical significant difference?
3    A.   That's correct.  The difference was about
4    $400,000 but the difference was not statistically
5    significant so that last column tells you whether or
6    not we are seeing significance.
7    Q.   And when we talk about -- correct me if I'm
8    wrong because I want to understand this but I had
9    thought that when we talk about statistically
10   significant it's a threshold, is it not, that if you
11   don't reach statistical significance, there may be
12   other factors that account for the difference other
13   than the one you're testing for.  You can't rule them
14   out.
15   A.   That's right.  You can't rule out other
16   factors.
17   Q.   Now let's look at the other year you tested
18   2003.  Am I correct there -- and these were among the
19   comparators -- you're working among the comparators
20   identified, self-selected by the plaintiff?
21   A.   With a couple of exceptions.
22   Q.   With the deletions you made?
23   A.   The deletions we made.  We also found some
24   instances where some people might not have had a

Page 52

1    department field in their data so they may not have
2    made it to the analysis.
3    Q.   You couldn't use them.
4    A.   Couldn't use them.  The other difference
5    between the counts, and I think this is something that
6    came up in Dr. Bloom's report, the counts of the people
7    in Miss Svensson's affidavit versus the counts of the
8    people we're using in each of those analysis, certain
9    people may not have been in this example fully employed
10   both years 2002 to 2003 so it's those three reasons why
11   there would be differences between our counts in these
12   analysis and Miss Svensson's counts in her affidavit.
13   Q.   At what point in time were you looking as to
14   whether they were employed?
15   A.   We only had the data for these people that
16   was provided to us by Putnam so we had them in these
17   annual snapshots and if we had data for them, we used
18   them, and if not, we couldn't of course.
19   Q.   Now, with respect to let's just stay on 2002,
20   the top line there, the total comp.  You looked at 17
21   females and 63 males; am I correct?
22   A.   Yes.
23   Q.   And I take it from what you just said you
24   took steps to make sure that those 17 and 63 actually

Page 53

1    were employed in 2002 by Putnam?
2    A.   Right.
3    Q.   Okay.  Now, with respect to -- we just talked
4    about 2002 that there was no statistical significance
5    in the compensation of males versus females.  The total
6    compensation.  When we go to the other year you looked
7    at 2003 am I correct that again with respect to total
8    compensation there was no statistical significance
9    between male and female?
10   A.   That is correct.  I would like to add,
11   getting back to one of your earlier questions about
12   other factors, it's not the case that just because we
13   don't have significance here that if we added other
14   factors significance may appear.
15   Q.   Right.  It may or may not.  You don't know?
16   A.   It may or may not.  Exactly.
17   Q.   Based on the analysis you did and the data
18   available to you, you saw no statistical significance?
19   A.   No.  That's correct.
20   Q.   Okay.  And then you further broke total
21   compensation down into its various elements; am I
22   correct?
23   A.   That's correct.
24   Q.   You broke it into total incentives, base

14 (Pages 50 to 53)

# Tab 5

1

1       Volume:  I

2       Pages:  1-210

3       Exhibits:  1-5

4       UNITED STATES DISTRICT COURT

5       DISTRICT OF MASSACHUSETTS

6       Civil Action No. 04-12711-PBS

7       - - - - - - - - - - - - - - - - - - - - - -

8       LISA SVENSSON,

9               Plaintiff,

10      v.

11      PUTNAM INVESTMENTS, LLC, f/k/a PUTNAM

12      INVESTMENTS, INC., and LAWRENCE J. LASSER,

13              Defendants.

14      - - - - - - - - - - - - - - - - - - - - - -

15      Rule 30(b)(6) Deposition of

16      Putnam Investments, LLC

17      By Richard B. Tibbetts, Designee

18      Wednesday, November 29, 2006

19      10:14 a.m. to 4:00 p.m.

20      Barron & Stadfeld, P.C.

21      100 Cambridge Street

22      Boston, Massachusetts

23

24      Reporter:  Daria L. Romano, RPR/CRR

90

1    correct?

2        A.  Correct.

3        Q.  Do you know whether there was an

4    alteration to the performance rating for Lisa

5    Svensson for 1999 from 4.8 to 3?

6        A.  I think I've answered this like three

7    times, so let me try to do it one final time.

8        Q.  Not to my satisfaction.

9        A.  Apparently.

10       The manager performance rating, okay,

11   that I prepared in preparation for today, it's

12   on Exhibit 3, shows that the manager rating was

13   4.78.  That's what the manager rating was for

14   1999.

15       Q.  Right.  Now I'm asking you --

16       A.  You're asking me if it was altered.

17   No.  It was 4.78.  I don't know how many more

18   times you need me to answer that.

19       Q.  So it's your testimony, sir, that the

20   performance rating of 3.0 for Lisa Svensson for

21   1999 was -- that change was never made, that's

22   your testimony?

23       A.  Your characterizing a column with

24   handwritten notes as a change to that

91

1    performance rating.  I think I've testified now

2    multiple times that her performance rating was

3    4.78 or 4.8.

4        That column, to be crystal clear since

5    you haven't asked that question, is Jack's

6    opinion of her performance rating, but the

7    manager's performance rating was 4.78 or 4.8.

8        Q.  Jack being Jack Morgan?

9        A.  Yes.

10       Q.  And this was a document that bears

11   your initials on it too, sir; is that correct?

12       A.  It does.

13       Q.  And my question to you is it bears

14   also a date of January 12-January 13, 2000, and

15   I take it that it was in that time frame that

16   you were considering this document; is that

17   correct?

18       A.  Considering by using it, yes.

19       Q.  That's why put your initials and the

20   notation of the date on it, correct?

21       A.  Yes.

22       Q.  And my question is whether there was

23   discussion on that date or on or around that

24   date as to alteration of performance ratings for

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LISA SVENSSON,                    )
                                  )
            Plaintiff             )
                                  )
      -VS-                        ) CA No. 04-12711-PBS
                                  ) Pages 1 - 60
PUTNAM INVESTMENTS, et al,        )
                                  )
            Defendants            )

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 26, 2008, 2:10 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    Judge Bowler and really represented as a matter of fact that

2    Ms. Svensson had no or virtually no comparators, wanting and

3    urging Magistrate Judge Bowler to believe that Putnam was

4    organized in the Investment Management Division as --

5         THE COURT:  Can I just say, don't shoot up their

6    theory yet.  I just want to hear your theory.  What is your

7    theory of the person that she should have been receiving the

8    same salary as?

9         MR. MOLONEY:  In terms of comparators, that she

10   ought to be judged, we believe, by the people who were year

11   by year performing basically the same functions she was

12   performing.

13        THE COURT:  Like who?  Give me a name.

14        MR. MOLONEY:  Stephen Dexter for one.

15        THE COURT:  All right, Stephen Dexter, what did he

16   do for a living?

17        MR. MOLONEY:  He picked stocks on the same team

18   that Ms. Svensson picked stocks.

19        THE COURT:  And how much was he making?

20        MR. MOLONEY:  I can't give you that off the top of

21   my head.

22        THE COURT:  Was it more than her?

23        MR. MOLONEY:  It was more than her.  Let me just

24   tell you what happened.  They reorganized and changed that

25   particular team after the stock market went down in 2001.