UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * *<br><br>LISA SVENSSON<br><br>                   Plaintiff,<br><br>v.<br><br>PUTNAM INVESTMENTS,<br>LLC, et al.,<br><br>                Defendants.<br><br><br>* * * * * * * * * * * * * * * * * * * * | Civil Action No. 04-12711-PBS<br><br><br>BBO No. 351000<br><br>Objections,<br>Pursuant to Fed. R. Civ. P. 72(a)<br>and Magistrates Local Rule 2(b),<br>of<br>Plaintiff Lisa Svensson<br>to<br>(1) The March 11, 2008, Order of<br>the Magistrate Judge That Denied<br>in Part and Granted in Part Plaintiff<br>Svensson's "Motion to Compel<br>Concerning Expert Deposition and<br>for Sanctions, Pursuant to Rule 37(c);<br>and,<br>(2) The March 11, 2008, Order of the<br>Magistrate Judge that denied Svensson's<br>Motion for Sanctions, Pursuant to 28<br>U.S.C. § 1927<br><br><br>and<br>Memorandum in Support<br><br>and<br>Request for Hearing and Oral Argument |

Because the two rulings entered in this case on March 11, 2008, by the Magistrate Judge (Bowler, M.J.)

are, as set forth in detail below, clearly erroneous and contrary to law, plaintiff Lisa Svensson ("Svensson"),

pursuant to Fed. R. Civ. P. 72(a) and Magistrates Local Rule 2(b), objects to, and requests the District Judge to

vacate, those rulings and to grant the other relief requested on pp. 24-25, infra.  The rulings at issue are:

1. The March 11, 2008, order of the Magistrate Judge denying in part and allowing in part
   Svensson's Motion Concerning Expert Deposition and for Sanctions, Pursuant to Fed. R.
   Civ. P. 37(c); and,

2. The March 11, 2008, order of the Magistrate Judge denying Svensson's Motion for
   Sanctions, Pursuant to 28 U.S. C. § 1927

(Collectively the "Magistrate's Order").

1.     <u>Introduction</u>.

In this action, Svensson seeks to prove her single plaintiff disparate treatment and disparate impact claims for gender discrimination.  To do so, Svensson requires information about Putnam's treatment of other present and former employees, both to prove at trial that Svensson, because of her gender, was treated less favorably than similarly situated male employees, and to establish, through evidence of Putnam's mistreatment of other females, the existence of a discriminatory atmosphere and discriminatory motivation at Putnam, making it more likely that Putnam also discriminated against Svensson on the basis of her gender.  Obviously, such information concerning Putnam's treatment of other employees is highly relevant to Svensson's claims.

Understanding the importance and potential negative impact of such evidence, Putnam undertook a concerted effort in this matter to prevent Svensson from discovering relevant information necessary to her case. As shown in more detail below, Putnam caused Svensson to incur enormous expense in litigating Putnam's spurious claim that she had no or virtually no comparators. Putnam limited the data and information available to her and her expert to only 91 of the hundreds of officer-level investment professionals employed by Putnam in its Investment Management Division ("IMD") during the relevant period, representing to the Magistrate Judge and to Svensson that in requesting data and information as to 91 IMD officers, Svensson was seeking discovery that was not relevant as she was seeking information about too many persons rather than too few.

At the same time, however, "quite early" in the process after its expert's participation in the case began in July 2006, Putnam determined that data and information as to all of the hundreds of officer-level investment professionals in the IMD in the period 1998-2003 was relevant and, without supplementing its Rule 26(a) disclosures of the information to Svensson or amending its responses to her interrogatories and requests for production, made available to its expert for his consideration Putnam data as to all of the hundreds of officer-level investment professionals in the IMD, the very data that Svensson had sought.  As to the data he reviewed from the universe of data available to him, Putnam's expert testified,

> Well, if I didn't have access to that data, I wouldn't be sitting here offering an opinion.[1]

---

[1] Bloom deposition transcript ("Bloom"), p. 173, ll. 16-17.

As set forth more fully below, the Magistrate Judge's March 11, 2008, rulings were clearly erroneous and contrary to law because:

1.  The Magistrate Judge made facially inconsistent findings on the important issue whether Putnam, after agreeing in July 2006 to produce data as to 91 officer level investment professionals in Putnam's IMD, had reserved its right to argue that the true universe of Svensson's comparators was larger than the 91, first finding that Putnam had claimed it "was still free to argue a narrower scope of comparators" than the 91 (Magistrate's Order, p.9) but finding, later in the same March 11, 2008, Order, making the entirely unsupported finding that Putnam "never foreclosed the opportunity to argue that a larger universe of comparators was the legally appropriate set."  Magistrate's Order, p. 16, p. 11 n.8;

2.  The Magistrate Judge erroneously ruled that Putnam had not violated its automatic duty to supplement its answers and responses to Svensson's interrogatories and requests for production when, as early as July 2006, it determined that data concerning hundreds of Putnam IMD investment professionals (beyond the 91 persons as to whom data had been produced), was relevant and made such data available to its own expert Bloom, but failed to supplement its discovery responses by producing the same documents to Svensson as early as July 2006;

3.  The Magistrate Judge erroneously ruled that Putnam was not required to produce to Svensson data which it had made available to Bloom, and which he had "considered" but which he, with Putnam's help, had decided not to actually to review for his report;

4.  The Magistrate Judge erroneously found that the prejudice suffered by Svensson resulting from Putnam's delay in producing the data it ultimately produced on November 26, 2007, should be determined based only on the time between the date on which the Bloom expert report was served in April 2007 and the November 26, 2007, even though Putnam knew as early as July 2006, when it made such data available to Bloom "early on in the [expert report] process" that such documents were relevant and, therefore, should have produced the data to Svensson at that earlier time;

5.  The Magistrate Judge erroneously found that the prejudice to Svensson could be "mollified" by allowing her expert, Paul White, PhD., to consider and submit a supplemental report with additional information while having Putnam bear the reasonable cost and expense thereof;

6.  The Magistrate Judge erroneously found that there was little indication that Svensson had suffered any expense, including attorney's fees, as the result of Putnam's failure to produce documents; and,

7.  The Magistrate Judge erroneously found that Putnam's counsel had not violated 28 U.S.C. §1927, because the record is replete with misrepresentations, failures to disclose, failures to supplement and improper conduct during depositions, all of which caused Svensson great expense.

3

2.     Facts and procedural background.

It is Svensson's position, among others in this case, that her demotion and ultimate termination were the result of unlawful discrimination by Putnam on the basis of her gender.  Specifically, Svensson contends that the male investment professionals at Putnam, including those who were promoted to, or were hired from the outside as, Managing Directors[2] are among her male comparators.[3]  Svensson's contends that the female investment professionals she has identified[4] are among her female comparators.[5]

The strategy that Putnam adopted and followed throughout this case, from its start in late December 2004, was to claim to Svensson, and represent to the court, that Svensson had no or virtually no comparators.  For example, in its Rule 26(a) initial disclosure on June 8, 2005, Putnam disclosed that it would use in its defense of Svensson's claims only two documents: (1) "Ms. Svensson's personnel file"; and, (2) Svensson's "360 Reviews."  Putnam did not disclose any documents concerning any other persons, male or female, in the IMD.

In its response to Svensson's First interrogatories, seeking in Nos. 3, 4 and 5, information as to the Putnam exempt workforce (executive, administrative and professional employees who are not required to receive premium pay for working overtime), Putnam refused to provide any answers, objecting on the grounds, among others, that discovery was sought as to "employees who are not similarly situated to Svensson."  In its responses to Svensson's First Request for Documents, which requested production of documents concerning, among other things, "terminations, denial of promotions and demotions," Putnam objected, claiming that the documents sought were "unrelated" to the case, and "not reasonably calculated to lead to the discovery of admissible evidence."  Further, when, in advance of the December 13, 2005, hearing on Svensson's motion to compel Putnam to produce the documents requested in her First Request for Production, Svensson's counsel offered to Putnam counsel to reduce the scope of that request by "limit[ing]" the comparators to:

---

[2] They are identified in Exhibit 2 to the Second Affidavit of Lisa Svensson ("Second Svensson Affidavit"), filed April 20, 2006, Docket No. 57, and as restated and amended in Exhibit 1 to the Fourth Svensson Affidavit,
[3] For Svensson's reasons for identifying them, are set forth in her affidavits, see notes 4 and 6, supra.
[4] See Exhibit 2 to the Third Affidavit of Lisa Svensson ("Third Svensson Affidavit" and as restated and amended in Exhibit 2 to the Fourth Svensson Affidavit.
[5] For Svensson's reasons for identifying them, are set forth in her affidavits, see note 8, supra.

> ... the investment professionals in the Domestic or International Value, Core and
> Growth Teams [in the IMD] for the years 2000-2003 inclusive, and the Research
> Department professionals for the years 2002 and 2003....,

the response from Putnam counsel (Mr. Kociubes) was, We think this request is still too broad....

(Emphasis added.)

The Putnam position that Svensson had no or virtually no comparators not only is belied by the facts but also is in stark contrast to the information in documents that Putnam itself produced. Putnam's own documents prove that the investment teams and the research functions in the Putnam IMD were not administered independently within the IMD by team or function, as titles, compensation and other significant employment and administrative matters concerning those in the various Putnam divisions were decided within and by the respective divisions.[6][7] The Putnam produced documents confirm that there was a centralized decision-making body in regard to promotions, demotions and compensation that applied across all levels of officers within the IMD. For example, Putnam document PRM 1789-1792[8] evidences a meeting of Putnam officials from across the entire IMD at which the candidacies of various persons from across the entire IMD, including, among others, Svensson, for promotion to Managing Director, were discussed. Putnam document PRM-1518,[9] even in its redacted form as produced to Svensson, shows that this centralized structure for promotions applied to all officers in the IMD, including Svensson and others in International Growth Equity and Research as well as to officers in Quantitative, Fixed Income Trading, Currency and Global Asset Allocation.

Moreover, persons who were hired as, or promoted to, Managing Director in the periods when Svensson was eligible for appointment to the position, are, by definition, comparators of Svensson, a fact that Putnam obviously recognized since Putnam's documents[10] show that Svensson was included with others in the various promotion pools for Managing Director. Candidates for demotion to GER, to which Svensson was demoted in

---

[6] See ¶¶ 3-9 of the First Affidavit of Lisa Svensson ("First Svensson Affidavit"), filed previously.
[7] In addition to the IMD that managed client portfolios, there were the Operations Division (services to customers including answering client questions and mailing fund information); the Distribution Division (which marketed and sold products to institutional and retail clients); and the Corporate Division (which supported the overall business through activities such as corporate finance). Id.
[8] A copy in the redacted form in which it was produced by Putnam is annexed to the Moloney Affidavit as Exhibit 3,
[9] A copy in the redacted form in which it was produced by Putnam is annexed to the Moloney Affidavit as Exhibit 4.
[10] PRM-1792, PRM-1886-1887 and PRM 1891-1893. Copies in the redacted form in which they were produced by Putnam, are annexed to the Moloney Affidavit as Exhibits 5, 6 and 7, respectively.

2002, were selected from across the same broad range of portfolio teams in the IMD.[11]  A January 30, 2003, e-mail from Chief Investment Officer of Specialty Growth, Daniel Miller,[12]comparing Svensson to other persons from a number of investment teams, shows that management decisions at Putnam were being made by a broader range of officials than those assigned only to GER. [13] [14]

At the December 13, 2005, hearing before the Magistrate Judge, Putnam's counsel (Mr. Rodriques) again took the position that Svensson had no or virtually no comparators, representing to the Magistrate Judge, as fact, that the teams in the IMD at Putnam were not under central, division-wide, management but that, instead, they were as autonomous from each other as the various graduate schools are at Harvard University. This representation simply was not true.  He said to the Magistrate Judge:

> ... you look at the decisions by the same decision maker the case is pretty clear, both the <u>Jackson</u> case and the <u>Whittingham</u> case, that <u>decisions by other people in other parts of the company aren't probative on the question of whether or not there was discrimination in her unit.</u>[15]
>
> ***
>
> <u>Jackson</u> decides this issue, Your Honor, and says, <u>this stuff is not generally specifically relevant, particularly when it's claims outside of her own department.</u>[16]

(Emphasis added.)

The Magistrate Judge ordered Putnam to produce certain e-mail referring to Svensson and some additional documents as to 10-15 of the hundreds of officers in the IMD during the relevant period, otherwise denying the motion "at this time."

---

[11] Later unredaction of Putnam document PRM 1691, a copy of which in the redacted form in which it was produced by Putnam, is annexed to the Moloney Affidavit as Exhibit 8 (handwritten notes describing another meeting with Brett Browchuk during which the demotion of Lisa Svensson was discussed) identified others who were considered for demotion.
[12] Putnam document PRM 1308-1309, a copy of which in the redacted form in which it was produced by Putnam, is annexed to the Moloney Affidavit as Exhibit 9.
[13] Unredaction of the redacted portion of this document identified other persons with whom Miller compared Svensson.
[14] Upon information furnished to Svensson and her belief, at least one male Managing Director was considered for demotion to the position that Lisa Svensson in 2002 was forced to take.  Based upon this alone, every SVP/Senior Portfolio Manager and Managing Director during the year of Svensson's demotion, whether or not demoted, is properly a comparator of Svensson.
[15] Transcript, December 13, 2005, p. 7, ll. 4-7.
[16] <u>Id</u>., p. 15, ll. 3-6.

There followed in early to mid-2006, numerous attempts by Svensson's counsel to obtain information about comparators, but Putnam refused to deviate from its strategy of claiming that Svensson had virtually no or virtually comparators, producing heavily redacted documents to prevent Svensson from obtaining virtually any information other investment professionals in the IMD.  For example, Putnam's counsel (Mr. Kociubes) announced during the deposition of Putnam's Chief Executive Officer Charles Haldeman, when Haldeman was questioned about redactions of information concerning male investment professionals in Putnam document PRM-01563-64, that Svensson is not entitled to that information:

> [P]eople who are not comparators of the claimant have been redacted.  [Svensson is] not entitled to personnel information about them, so whether or not there is a document, you're not getting it absent the court deciding that we are wrong....[17]

(Emphasis added.)

Despite the facts shown by its own documents, Putnam arrogantly and rigidly kept to its position that Svensson had virtually no comparators.  For example, in its May 11, 2006, opposition[18] to Svensson's April 20, 2006, motion to compel answers to interrogatories,[19] Putnam claimed,

> The main part of ... [the] ...  motion ... devoted to her argument that the 91 investment professionals whom she has selected and about whom she seeks discovery are relevant comparators for purposes of her discrimination claims.  Her analysis makes no sense,

and, in its May 24, 2006, motion seeking a protective order to quash Svensson's Rule 30(b)(6) deposition notice,[20] Putnam claimed that,

> Some of the ... proposed topics seek information concerning 91 individuals who, as Putnam has argued in connection with Ms. Svensson's pending motion to compel further answers to interrogatories, are not appropriate comparators....

(Emphasis added.)

This tactic of Putnam and its counsel of producing heavily redacted documents hampered Svensson in taking depositions.  For example, when shown in deposition by Svensson's counsel some of the numerous

---

[17] Excerpt from the Haldeman deposition, p. 87, ll. 3-8, a copy of which is annexed as Exhibit 2 to the Affidavit of Kevin F. Moloney ("Moloney Affidavit"), filed April 20, 2006, Docket No. 56.  A copy of PRM-01563-64 is annexed to the Moloney Affidavit as Exhibit 1.
[18] Docket No. 66.
[19] Docket Nos. 53, 54.
[20] Docket No. 71.

redacted documents Putnam had produced and asked a question about them, defendant Lasser, Putnam's former

Chief Executive Officer, testified that he could not answer the questions:

> 1  Q.  Okay. <u>Is it your testimony that</u> other
> 2      than those documents, <u>you have never seen these</u>
> 3      other <u>documents before</u>?
>
> 4  A.  No, I didn't say that. I said I don't
> 5      specifically recall. <u>You showed me a bunch of</u>
> 6      <u>blank pages, so it's hard to remember</u>.[21]

(Emphasis added.)  Had Putnam and its counsel not utilized this document redaction tactic, production of

unredacted documents would have provided Svensson on a timely basis with much of the information she

sought about the other officers in the IMD

 At the June 21, 2006, hearing before the Magistrate Judge on Svensson's motion to compel Putnam to

answer her interrogatories, Putnam counsel (Mr. Kociubes), in arguing to the Magistrate Judge that she should

not order Putnam to produce information about 91 of the hundreds of IMD officers because what had happened

to them was not relevant to Svensson's claims, told the court that in regard to Svensson's termination claim that,

"There is <u>no comparator to that claim</u>, your Honor" (emphasis added) and that, in regard to Svensson's failure

to promote, equal pay and demotion claims, that the comparators should be restricted to only the "handful" of

portfolio managers on the International Growth team, adding that, There are <u>five or six comparators</u> there.

(Emphasis added.)  At the June 21, 2006, hearing, the Magistrate Judge said that she was "inclined to permit

some discovery," giving the parties "14 days to sit down together" to "come up jointly with comparators,"[22] and

requiring the hearing to resume on July 11, 2006.

 Thereupon, Putnam shifted its tactics, but did not change its strategy.  At the July 11, 2006, hearing,

Putnam announced an agreement that Putnam would produce information as to 91 officers in the IMD that

Svensson had identified, without prejudice to its ability to argue that one or more of the 91 were not

comparators to Svensson.  Putnam did not assert to the court then, or at any time later in fact discovery, that it

would be free after fact discovery had closed, or at any other time, to assert that what had happened to the

---

[21] Lasser deposition transcript, p. 11.
[22] Transcript, June 21, 2006, hearing, p.14, l. 23 – p. 15, l. 4.

hundreds of other officers in the IMD would be relevant or that they would be comparators of Svensson.  That the debate was between zero and 91 and not between 91 and hundreds more, was made expressly clear at the July 11, 2006, hearing, when Svensson's counsel said to the Magistrate Judge of the agreement by Putnam to make discovery as the 91 officers that,

> Putnam is still free to argue its original contentions <u>with respect to a narrower scope of comparators and our side is free to argue to the contrary</u>,

and Putnam counsel agreed, saying to the Magistrate Judge that the parties were in "<u>accord</u>."[23] (Emphasis added.)  At no time at the July 11, 2006, hearing or at any other time during fact discovery did Putnam claim to Svensson or argue to the court that Svensson was seeking too few comparators; Putnam always insisted that Svensson, in seeking discovery even as to the 91, was seeking discovery as to too many.

At the same time (July 2006), Bloom's participation as Putnam's expert began.[24]  His participation included meeting with Putnam counsel and Richard Tibbetts and Mary McNamee of the Putnam Human Resources department, follow-up conversations with Tibbetts and McNamee[25], and obtaining data and information from Putnam "quite early" in the process.[26]

In contrast to the data and information as to the 91 persons that Putnam produced to Svensson, Putnam made "appropriate data" concerning all of the investment professionals in the IMD for the years 1998-2003 available to Bloom for his consideration.  From the universe of available Putnam data, Bloom, according to his deposition testimony,[27] with in-put from Putnam,[28] decided to select from that available universe, and review for purposes of his report, only the following data: (1) compensation, including bonus, information, for 195 of the 302 officers in the IMD as of December 31, 2002, and for 193 of the 296 officers in the IMD as of

---

[23] Adding that, ... <u>we  have been arguing since day one that this universe, it was 16, then 34, now 91 individuals are not within the guidelines of the First Circuit, the appropriate universe of comparators</u>. For purposes of trying to get beyond this dispute, Your Honor, or moving out as much of it as we can, we have agreed that we will answer the interrogatories with respect to the 91 which plaintiffs have chosen without in any way agreeing that that is the appropriate universe of comparators. Transcript, July 11, 2006, hearing, p. 5, ll. 8-16.

[24] Bloom, p. 24, ll. 16-18.
[25] Bloom, p. 32, l. 24 – p. 33, l. 23.
[26] Bloom, p. 179, ll. 12-16.
[27] Bloom, p. 100, ll. 5-10.
[28] Bloom, p. 32, l. 24 – p. 33, l. 23.

December 21, 2003[29]; (2) "basic information" about all of the officers in the IMD for the years 1998-2003, which included name, hire date, sex, date of birth, status, job title and officer code[30]; and, (3) a list of all 344 IMD officers whom he determined to be "at risk" for termination during 2003, identifying those terminated between January 1 and December 31, 2003.[31]  Putnam furnished Bloom with the data that he decided to review in electronic format such that he was able to load the data into his computer in a "matter of minutes or less."

Bloom's deposition testimony made clear, however, that he considered other data in the data universe Putnam had made available to him, before deciding, on the basis of that consideration, <u>not</u> to review such additional data for his report.  For example, Bloom decided that he did not want to review available compensation data for persons who held the titles of Chief Investment Officer ("CIO"), managing director ("MD"), partners, and assorted other positions, although such data had been available to him, because, in Bloom's opinion, those positions, in his opinion, were too high ranking or otherwise not suitable for comparison with Svensson. [32]

In sharp contrast to what was furnished to Svensson, Putnam, according to Bloom, made available to him information and data concerning <u>all</u> of the hundreds of officer-level investment professionals in the IMD for each of the years 1999-2004, not just the 91.  For the year 2003, for example, according to Bloom's deposition testimony and data supplied to him by Putnam, there were 344 officers in the IMD.  Bloom explained, at p. 107, that the number 344,

> 9.       ...  represents <u>the number of Putnam officers</u>
> 10       <u>in the investment management division</u> at the end of
> 11       2002 or who were hired into the investment management
> 12       division at the -- during 2003 and were still there ...

(emphasis supplied), adding that the 344 officers included all of the Chief Investment Officers ("CIO") and all directors.  At his December 18, 2007, deposition, Bloom testified that:

- He requested Putnam and its counsel to provide him with "appropriate data to analyze" [33];

---

[29] Bloom, dep., Exhibit 2A.
[30] Bloom, dep., Exhibits 2B-2G.
[31] Bloom, dep., Exhibit 2H.
[32] Bloom, pp. 117-120.
[33] Bloom, p. 100, ll. 5-10.

- He received data that he incorporated into his report in response to the requests[34];

- He reviewed and analyzed in his report "basic employment information" about all officers in the Investment Division at Putnam at the end of 1998 through 2003[35] [36];

- He requested and received from Putnam and its counsel termination lists for 2000 through 2003 "for officer terminations in the Investment Division" for each of those years, which he reviewed[37];

- The total "at-risk" population of "344" (280 males, 64 females) represented the total number of Putnam officers who were in the Investment Division at the end of 2002, and who were still there at the end of 2003[38];

- He did not include data concerning Chief Investment Officers, department directors or team leaders in his compensation analyses because he decided that "they have sort of in the realm of management and leadership that differ from individuals in the positions that ... Svensson worked in as senior portfolio manager, assistant director of research and analyst ... and to ensure that I was looking at individuals who were similarly situated I limited my samples to the ones that are chosen here"[39];

- He used information relating to "general employment situations," as referenced in ¶ 11 of his report, which covered "employment status, are they active or otherwise, are they full year-full time, what department or department category were they in, what their functional position is which would be related to their duties and responsibilities," and information related to "their eligibility for different types of compensation", for determining who should fall into the relevant samples for each of the four employment actions I analyzed"[40];

- He utilized information supplied by Putnam concerning functional titles as a control for his analysis by stratifying the samples, and bonus information for the years 2002 and 2003[41];

- He was provided with information respecting the "partnership pool" at Putnam, but did not use the total amount of compensation available to individuals who were partners at Putnam[42];

---

[34] Id.
[35] Bloom deposition exhibits 2A - 2G.
[36] Bloom, p. 100, l. 20 - p. 101, l. 5; p. 101, l. 6 - p. 102, l. 14.
[37] Bloom, p. 102, l. 17 - p. 104, l. 21.
[38] Bloom, p. 107, l. 5 - p. 108, l. 24; p. 117, l. 24 - p. 120, l. 10.
[39] Bloom, p. 71, l. 13 - p. 73, l. 2.
[40] Bloom, p. 84, l. 8 - p. 89, l. 2.
[41] Bloom, p. 94, l. 2 - p. 95, l. 7; p. 99, l. 20 - p. 100, l. 4.
[42] Bloom, p. 121, l. 24 – p. 123, l. 9.

- He did not request performance ratings because he decided it was not necessary based upon the "results" he had seen, but if he had thought it necessary, he would have requested this information[43];

- He received termination spreadsheets from Putnam that had a field labeled "Action Reason," and used that information in connection with ¶ 49 of his report, especially in deciding whether a termination was voluntary or involuntary;[44]

If he had not had access to the data reflected in Exhibits 2A through 2H, he "wouldn't be sitting here offering an opinion."[45]

The Putnam strategy had two immediate results: (1) preventing Svensson from obtaining and utilizing in Rule 30(b)(6) and other depositions, information about all of the other approximate 253 officer-level investment professionals in the IMD; and, (2) causing Svensson to incur enormous costs for expenses and attorneys' fees in litigating for more than a year over Putnam's claim that Svensson had no or virtually no comparators. The attorneys for plaintiff Svensson have had to spend hundreds of hours of time in preparing and litigating numerous motions, conducting discovery concerning the information supplied as to the limited number of officer-level investment professionals in the IMD and for three renewed depositions that were required by the Magistrate Judge solely because Putnam's attorneys decided to terminate them thereby requiring court intervention.

The Putnam strategy provided another significant result after the Magistrate Judge, on Putnam's motion, ordered in January 2007, discovery closed.[46] As a result, Svensson's expert, White, for purposes of his analysis and report, which was due March 17, 2007, had available to him Putnam-supplied information and documents as to only 91 of the approximate 344 officer-level investment professionals in the IMD during the relevant period.

In addition to testifying concerning his own need for, and use of, information and data made available to him by Putnam concerning all of the officers in the Investment Division for the years 1999-2004, Bloom criticized (both in his Report and in his December 18, 2007, deposition testimony) Svensson's expert, White,

---

[43] Bloom, p. 134, l. l. 3-22.
[44] Bloom, p. 149, l. 14 – p. 152, l. 13.
[45] Bloom, p. 172, l. 6 – p. 173, l. 17.
[46] See correcting docket entry on February 8, 2007 ("... in light of this court's allowance of the motion for a protective order to terminate discovery....").

faulting White for failure to have tested and analyzed the information for all the officers in the IMD, the very

information that Putnam had withheld from Svensson and thereby from White. In particular, Bloom testified

that,

- He "was very troubled by the fact that the sample here was basically established I think it was in affidavit four produced in this case or assigned in this case by Miss Svensson and there's no indication what the principles are, what that sample generalizes to, what population it refers to and without that statistically it's really not possible to make a meaningful statement based on that sample without knowing what it refers to...."[47]

- He was "very troubled" by the sample that White analyzed, noting that "the most fundamental flaw" was that he did not do any analysis of the "nature of the sample that he's analyzing", and that "often what we consider the gold standard if you will or ideal" is when you're looking at an "entire population" as opposed to a "selective sample which is prone to bias"[48];

- e was troubled by the fact that, among the 91 comparators used by White, there were many individuals who were not "similarly situated" to Svensson, in that they were "people who in the Putnam hierarchy would be considered superiors," including some "department directors and chief investment officers" and people with "different officer titles, higher officer titles, managing director officer titles", people who would be considered "reports" or who were "laterally connected," so I chose a sample that I believed was "relevant" in conducting my statistical analyses[49];

- He believed White's analyses were "inappropriate" in that White is not comparing individuals who are "similarly situated", and that he "just took lists" given to him by Svensson "without any critical examination of named comparators"[50];

- White could have undertaken to compare Svensson's 91 named comparators with all officers in the Investment Division to see whether they look "similar or different in terms of compensation, rates of promotion, rates of termination, rates of transition across categories, the distribution of functional titles as well as officer titles," and,

- The "grossest mishandling of data" by was that White did not incorporate any information on who was or was not promoted, who was or was not demoted, or who was or was not terminated."[51]

Yet it was Putnam and its counsel who decided what data would be produced to Svensson and what information

and data would be supplied to Bloom. Moreover, Bloom admitted that access to the data that Putnam had made

---

[47] Bloom, p. 70, ll. 12 - 20.
[48] Bloom, p. 67, l.10 - p. 70, l:4.
[49] Bloom, p. 70, l. 9 - p. 73, l. 2
[50] Bloom, p. 123, l. 22 - p. 127, l. 14
[51] Bloom, p. 167, l. 24 - p. 171, l. 23.

available to him was necessary for the preparation of an opinion and that without it, he would not have been

able to state any opinion.  Bloom testified,

> 13.    My question is do you consider it important in
> 14.    formulating your conclusions to have had access to the
> 15.    data that's reflected in 2A through 2H?
>
> 16.    A.  Well, if I didn't have access to that data, I
> 17.    wouldn't be sitting here offering an opinion.[52]

(Emphasis added.)

Putnam also used the data and information that it did not provide to Svensson, but which it did provide

to Bloom, as evidence in its summary judgment motion papers, filed January 15, 2008.[53]  For example, the

Putnam memorandum, utilizing the differences in the data made available to the respective experts, states,

> A statistical analysis by Putnam's expert witness, Professor David Bloom, of
> those eligible for nomination and election to MD reveals "no statistically
> significant sex disparities in 'promotion'" to MD and "therefore provide no
> support for plaintiff's allegation that Putnam discriminated on the basis of sex in
> 'Promotion to Managing Director'."[54]
>
> ***
>
> Professor Bloom opines that Svensson's "comparators" form an inappropriate
> basis for a statistical analysis of alleged sex discrimination as a matter of labor
> economics...."[55]
>
> ***
>
> Svensson self-selected Putnam employees with little apparent regard to the fact
> that individuals worked at different levels in the organization, had different
> lengths of service at Putnam in the industry, and participated in different bonus
> pools of differing sizes because they worked different investment teams.  Nor
> does Svensson select all participants in a given job category attempting to show
> discriminatory pay disparity, choosing instead to select those whom, presumably,
> thinks best weight the statistics in her favor. ... See Bloom Report at App. 20
> ("misleading results can emerge from the analysis of selected samples").[56]
>
> ***
>
> ... Bloom also found no statistically significant gender disparity in compensation
> when looking at GER as a whole, and at all Putnam PMs and analysts.[57]

---

[52] Bloom, p. 17, ll. 13-17.
[53] Docket Nos. 205-07.
[54] Putnam memorandum in support of its motion for summary judgment, Docket No. 206, p. 16.
[55] Id., p. 22.
[56] Id., p. 22, n. 15
[57] Id., pp. 22-23.

The Affidavit of Richard Tibbetts, also filed by Putnam in support of its motion for summary judgment, also utilizes as evidence data not supplied to Svensson. For example, Exhibit No. 5, "Compensation data for International Growth group (1999-2003), and Exhibit No. 6, "GER Compensation Data (2002)" to that affidavit include data and information on officers in the IMD who were not included in the Putnam production in regard to the 91.

The data and information that Bloom requested from Putnam and actually reviewed for his April 2007, report was not disclosed to Svensson until November 26, 2007, when Putnam's counsel e-mailed .pdf images of paper formatted data, not the data in the electronic format that Putnam actually had furnished to Bloom,[58] which, Bloom had testified, he was able to load into his computer in a "matter of minutes or less."[59]

Notably, the data produced on November 26, 2007, did <u>not</u> include all of the available Putnam data, which Bloom had considered using but did not request from Putnam or include in his analysis. That data has <u>never been produced</u> despite obviously being deemed relevant by Putnam (as evidenced by Putnam's making it available to Bloom). Such never produced data, which should have been given to Svensson as early as July 2006, includes compensation data for all IMD officers for the years 1999, 2000 and 2001, and compensation data for 2002 and 2003 for the CIOs, MDs, partners, and assorted other positions that Bloom decided not to obtain from Putnam and decided not to include in his report, all highly relevant to Svensson's claims.

3.      <u>Specific objections to the Magistrate's Order</u>.

In her March 11, 2008, Magistrate's Order (Docket Entry Nos. 212 and 214), the Magistrate Judge fundamentally misunderstands the facts of this discovery dispute, and the serious impact which Putnam's delay in producing many relevant documents, and continuing failure to produce other relevant documents at all, has had on Svensson's ability to depose witnesses (including Putnam's expert and Putnam's Rule 30(b)(6) representatives), produce an expert report, and oppose Putnam and Lasser's motions for summary judgment.

3.1      <u>The Magistrate Judge made facially inconsistent findings on the important issue whether Putnam, after agreeing in July 2006 to produce data as to 91 officer level investment professionals in Putnam's IMD, had reserved its right to argue that the true universe of Svensson's comparators was larger than the 91.</u>

---

[58] Bloom, p. 173, l. 24.
[59] Bloom p. 178, ll. 14-15.

The Magistrate Judge first found that Putnam had claimed that it "was still free to argue a narrower scope of comparators" than the 91.  Magistrate's Order, p. 9.  However, just a few pages later in the same March 11, 2008, Order, the Magistrate Judge made the diametrically opposite and entirely unsupported finding: that Putnam "never foreclosed the opportunity to argue that a larger universe of comparators was the legally appropriate set."  Magistrate's Order, p. 16, p. 11 n.8.

     3.2    <u>The Magistrate Judge erroneously ruled that Putnam had not violated its automatic duty to supplement its answers and responses to Svensson's interrogatories and requests for production when, as early as July 2006, it determined that data concerning hundreds of Putnam IMD investment professionals (beyond the 91 persons as to which data had been produced), was relevant and made such data available to its own expert Bloom, but failed to supplement its discovery responses by producing the same documents to Svensson until November 26, 2006.</u>

The Magistrate Judge failed to recognize that, regardless of whether Putnam and Svensson had agreed that Putnam would produce information about the 91 IMD investment professionals, and regardless of whether Svensson's discovery requests had sought data beyond the 91, Putnam remained obligated, by the self-executing provisions of Fed. R. Civ. P. 26(e), to supplement its automatic disclosures under Rule 26(a), and its answers to interrogatories and responses to requests for productions, as soon as it became aware that it had failed to disclose or produce information relevant to Svensson's claims or Putnam's defenses.  Putnam's obligation to supplement was different from, and in addition to, its duty under Rule 26(a)(2) to produce to Svensson the information considered by its expert in connection with the expert report.

The Magistrate Judge found, without any analysis of the facts or the requirements of Rule 26(e)(2) requiring, without a court order, "supplement[ation] or correct[ion] of disclosure[s] or response[s] to discovery requests," that  Putnam "did not violate any duty to supplement with respect to plaintiff's interrogatories and requests for documents," even though in making available to Bloom data as to all of the hundreds of officers in the IMD, it knew that its objection to Svensson's interrogatories and requests for production for requesting information as to more than the 91 was not relevant, was no longer a proper objection.[60]

---

[60] The Magistrate Judge noted later in her memorandum in the discussion of the expert issue, the self-executing features of Rule 26(e)

Recognition of Putnam's violation of its obligation to supplement is critical to determining the date on which Putnam should have produced to Svensson the information which it made available to Bloom for his consideration, and to determining the prejudice to Svensson caused by Putnam's failure timely to produce. As set forth in § 3.4, infra, had such data been timely produced, Svensson would have been able to conduct depositions more effectively, produce a different expert report, and, as a result, better oppose Putnam's motion for summary judgment.

> 3.3    The Magistrate Judge erroneously ruled that Putnam was not required to produce to Svensson data which it had made available to Bloom, and which he had "considered" but which he, with Putnam's input, decided not to actually review for his report.

The Magistrate Judge found that in November 2007, Putnam produced to Svensson "all of the documents" that Bloom "considered" in producing his report. That simply is not correct. While Putnam produced on November 26, 2007, the information that Professor Bloom reviewed for his April 2007 report, it never produced important information that Bloom considered but decided not to review.

Bloom's deposition testimony makes clear that Putnam made available to him a broad universe of data, including, at minimum, detailed information about the employment and compensation of all officer level employees of the IMD. After initial discussions with Putnam and counsel, Bloom requested that he be provided with some of the available data, or, after due consideration of its availability, decided that he did not need other types of the available data. Bloom decided to select from that available universe, and review for purposes of his report, only the following data: (1) compensation, including bonus, information, for 195 of the 302 officers in the IMD as of December 31, 2002, and for 193 of the 296 officers in the IMD as of December 21, 2003[61]; (2) "basic information" about all of the officers in the IMD for the years 1998-2003, which included name, hire date, sex, date of birth, status, job title and officer code[62]; and, (3) a list of all 344 IMD officers whom he determined to be "at risk" for termination during 2003, identifying those terminated between January 1 and December 31, 2003.[63]

---

[61] Bloom, Exhibit 2A.
[62] Bloom, Exhibits 2B-2G.
[63] Bloom, Exhibit 2H.

While Putnam produced to Svensson on November 26, 2007 (11 months after fact discovery had been ordered closed by the Magistrate Judge) the data that Bloom actually analyzed, Putnam failed entirely to produce, and has not yet produced to Svensson, important data which had been available to Bloom, and which he clearly considered but did not request from Putnam.

With regard to Svensson's compensation related claims, Bloom again had available to him a wide universe of information about person who were officers in the IMD during the several year period.  However, he elected to focus on data from 2002 but decided to omit from the 2002 compensation data (but not from the 2003 termination data) persons who held the titles of Chief Investment Officer ("CIO"), managing director ("MD"), partners, and assorted other positions, which, in Bloom's opinion, were too high ranking or otherwise not suitable for comparison with Svensson.

The inescapable conclusion is that Bloom considered the data for the other years involved and the data for the other officers omitted (CIO, MD, partner, etc.) before deciding not to use it.  His deposition testimony makes that thought process clear both as to the Termination List data (where he focused only on 2003) and the compensation data (where he decided to focus only on 2002):

                                                         117
        14     Q.  I come back to an earlier question I'm not
        15  sure I have gotten an answer to.  That 344 at risk
        16  officer total, does that comprise all of the officers
        17  for the time frame that you looked at in connection
        18  with preparing this exhibit, all of the officers who
        19  were in the Investment Division or are there
        20  exclusions?
        21     A.  I apologize if I didn't answer this clearly
        22  before, but again, the 344 consists of all officers who
        23  were in the Investment Division, Investment Management
        24  Division of Putnam at the end of 2002 or who were in
                                                         118
         1  the Investment Management Division at Putnam at the end
         2  of 2003, okay, because some people might have been
         3  hired in the interim and stayed on or who actually were
         4  hired during 2003 but not there at the end of 2003
         5  because they terminated or hired or retired during 2003
         6  in fact but weren't there at the end because they
         7  terminated and I inferred that last part from the
         8  termination spreadsheets that we just went over,
         9  whatever are these in this Exhibit 2H.  That is what
        10   the 344 represents.  That's the algorithm or the recipe

11  I used to create the at risk sample for that analysis
12  and no one that's inside that definition should be
13  excluded.
14      Q.  So that all CIOs are included?
15      A.  That includes -- that's all officers.
16      Q.  Okay.? Is there some reason why they are
17  included for purposes of this analysis but excluded
18  from other analyses
19      A.  Well, you see in Exhibit 8 they're excluded
20  from the analysis on the bottom panel that said it
21  looks at senior portfolio managers and associate
22  directors or the middle panel looks at just senior vice
23  presidents although -- no.  Actually, there may be some
24  in there as well but what I endeavored to do here is

                                                    119
1  just look at the data in different ways that I thought
2  were reasonable and to see whether the results all
3  point in the same direction or not and in the case of
4  the analyses I did of involuntary termination, they all
5  point in the same direction that there are no gender
6  disparities.  If they didn't point in the same
7  direction, I would have noted that or explored further.
8      Q.  I understood you to say earlier in your
9  testimony that they were excluded from the compensation
10  analyses.
11      A.  I did not include them in the compensation
12  analyses.
13      Q.  Yet you include them in the termination
14  analyses?
15      A.  I include them in one of the termination
16  analyses.
17      Q.  Okay.  Why did you include them in this
18  termination analysis but exclude them in the
19  compensation analysis?
20      A.  They could have been included in the
21  compensation analyses, too.  I didn't think it was
22  necessary at the time that I devised the analyses.  I
23  was looking for a tighter comparison given that I was
24  going to do a regression analysis.  It could have been

                                                    120
1  included and I could have put in controls for them as
2  well.  I'm not claiming in preparing this report I
3  conducted an exhaustive set of all possible analyses.
4  I did the ones that I thought were most meaningful
5  based on what I understood about Putnam and what I
6  understand about labor economics and sort of employment
7  and earnings determination and these are the ones I
8  did.  These are the ones I reported.  Given that all
9  the results point in the same direction it seems

                                                    19

10   appropriate to leave it at that.

(Emphasis added.)

While Bloom obviously considered compensation data for years other than 2002, and considered data for officers he decided to omit from his 2002 compensation analysis, Putnam, other than in regard to the 91 officers, has never produced to Svensson any of that important data concerning the hundreds of the other IMD officers in the other years of the relevant period.   It not only is a violation warranting sanction but it is highly unfair, then, for Putnam in its motion for summary judgment now to criticize Svensson's expert, White, for failing to produce termination and compensation analyses that required the very data which Putnam  failed and refused to provide to Svensson.

3.4   The Magistrate Judge erroneously found that the prejudice suffered by Svensson resulting from Putnam's delay in producing the data it ultimately produced on November 26, 2007, should be determined based only on the time period between the date on which the Bloom expert report was served in April 2007 and November 26, 2007, even though Putnam knew as early as July 2006, when it made such data available to Bloom "early on in the [expert report] process" that such documents were relevant and, therefore, should have produced the data to Svensson at that earlier time.

The Magistrate Judge, focusing only on Putnam's duty to disclose information considered by its expert, incorrectly identified the date when Putnam should have disclosed information to Svensson, as April 2007, the date of Bloom's report.  A correct analysis, however, would have taken into account Putnam's obligation to supplement under Rule 26(e).  Putnam should have disclosed all of the information which it made available to Bloom (including that which, after consideration, he did not request), as early as July 2006, when it deemed such data relevant to Bloom's report.

3.5   The Magistrate Judge erroneously found that the prejudice to Svensson could be "mollified" by allowing her expert, to consider and submit a supplemental report with additional information while having Putnam bear the reasonable cost and expense thereof.

The Magistrate Judge erred in finding that the prejudice which Putnam's failure to disclose had caused Svensson could be "mollified" simply by allowing Svensson's expert, White, to file a supplemental report after reviewing the information produced by Putnam on November 26, 2007.  This was wrong because (1) it ignores the fact, discussed in §3.3, supra, that Putnam has never produced at all some of the relevant data which was

considered by its expert; (2) is based on the incorrect finding that Putnam was obligated to disclose only beginning in April 2007, rather than as early as July 2006, as set forth in §3.4; and, (3) fails to take into account the serious prejudice Putnam's failure to disclose caused Svensson, including its interference with Svensson's taking of depositions, the production of her expert report, and her use of discovery to oppose summary judgment.

By failing to disclose all information considered by Bloom when Putnam, as early as July 2006, knew such information was relevant, Putnam caused Svensson the following prejudice: (1) Svensson was deprived of relevant information for purposes of her November 29, 2006, Rule 30(b)(6) deposition of Putnam and her December 2007 deposition of Bloom; and, (2) Svensson's expert, White, was limited to data for only 91 of the hundreds of IMD officers in the relevant period**.**

3.6   The Magistrate Judge erroneously found that there was little indication that Svensson had suffered any expense, including attorney's fees, as the result of Putnam's failure to produce documents.

In addition to the prejudice to Svensson's ability to conduct meaningful discovery and to litigate her case, Putnam's discovery violations greatly increased the expenses Svensson incurred for both her expert and attorney's fees. For example, as shown by the Affidavit of Paul F. White, PhD., filed herewith, had the data ultimately turned over on November 26, 2007, been disclosed in 2006, the cost savings for inputting and formatting of data would have been approximately $119,000, and the docket in this case is filled with evidence of the hours and hours of attorneys' time spend litigating the numbers of comparators and related issues.

3.7   The Magistrate Judge erroneously found that Putnam's counsel had not violated 28 U.S.C. §1927, because the record is replete with misrepresentations, failures to disclose, failures to supplement and improper conduct during depositions, all of which caused Svensson great expense.

The Magistrate Judge found that "[c]ontrary to plaintiff's belief, Putnam has not acted obstreperously or committed a series of discovery violations"; and that "throughout discovery Putnam's counsel did not in any manner act unreasonably and vexatiously," as he "simply vigorously and studiously defended his client." This finding is not supported by the contents of the record in this case. The facts in the record are that the Magistrate Judge allowed Svensson's motions seeking sanctions for improper conduct by Putnam and counsel during the

Oristaglio, Tibbetts and the Rule 30(b)(6) depositions, ordering the resumption of the three depositions, and that

the discovery period record is replete, as set forth above in § 2, supra, with Putnam's misrepresentations,

failures to disclose, failures to supplement and improper conduct.

4.      Conclusion and request for relief.

For the above reasons, Svensson requests the court to overrule the Magistrate Judge, vacate her findings

and rulings, and to order the relief requested by Svensson in the two motions at issue:

A.  Motion to Compel Concerning Expert Deposition and for Rule 37 Sanctions:

1.      The entry of an order striking defendant Putnam's Answer to the complaint, denying Putnam's
motion for summary judgment, and setting this case for trial in May 2008 on the issue of the
quantum of Svensson's damages; or,

2.      If that relief be denied, the entry of an order denying Putnam's motion for summary judgment,
and the entry of a finding that the evidence with respect to all the officer-level investment
professionals in the Investment Management Division at Putnam for the years 1999-2004, had it
been produced by Putnam in discovery, would have shown that Putnam discriminated on the
basis of gender with respect to promotions, demotions, compensation and terminations in that
division for each of the years in question, and informing the jury of the Court's order and
instructing them that they are entitled to conclude, based upon Putnam's conduct in withholding
such evidence from Svensson, that Putnam discriminatorily treated Ms. Svensson in regard to
each of the above referred to employment actions; or,

3.      If that relief be denied, the entry of an order staying all proceedings in this case, requiring
Putnam to produce fully unredacted documents and tangible things that are: (a) responsive to any
of Svensson's discovery requests by interrogatory or request for production; and, (b), that were
provided to, or discussed with, Putnam's expert; and directing Putnam thereafter to produce a
Rule 30(b)(6) witness for deposition testimony not subject to the day and hour limit of Rule
30(d)(2), concerning any matter raised by the documents (or information contained therein) that
are to be produced in unredacted form or by the Bloom expert report, and directing that
Svensson's expert, White, be permitted to prepare a supplemental Report within a reasonable
time after the Rule 30(b)(6) deposition transcript has been prepared, and directing that the Bloom
report, dated April 13, 2007, be stricken, and imposing all costs, including reasonable attorneys'
fees, occasioned by this additional discovery and trial preparation upon Putnam; and,

Irrespective of which of the above-stated sanctions, all of which are authorized expressly by Rule 37, are

ordered by the Court, Svensson requests the Court to enter the following additional relief:

4.      The entry of an order, pursuant to Rule 37(c)(1)(A), imposing monetary sanctions upon Putnam
in the full amount of Svensson's costs, including reasonable attorneys' fees, occasioned by
Putnam's repeated failures and refusals to have provided relevant and necessary discovery to
Svensson, including, without limitation, the costs and fees incurred by Svensson in excessive and
burdensome motion practice, futile negotiations, depositions based upon limited information, and
renewal of such depositions based upon Putnam's unilateral decisions to terminate depositions or
to instruct witnesses not to answer relevant questions, all of which were directly associated with

Putnam's failures and refusals to comply with its obligations under the discovery rules between November, 2005, and the date of this motion;

5.      The entry of an order, pursuant to Rule 37(c)(1)(A), directing that the full cost incurred by Svensson for White's January 2007 Report be borne by Putnam; and,

6.      The entry of an order granting such other and further relief as may be appropriate in the circumstances.

B.  Motion for sanctions, pursuant to 28 U.S.C. § 1927:

1.      The entry of an order imposing monetary sanctions in the full amount of Svensson's costs, including reasonable attorneys' fees, occasioned by Putnam's repeated failures and refusals to have provided relevant and necessary discovery to Svensson, including, without limitation, the costs and fees incurred by Svensson in excessive and burdensome motion practice, futile negotiations, depositions based upon limited information, and renewal of such depositions based upon Putnam's unilateral decisions to terminate depositions or to instruct witnesses not to answer relevant questions, and the cost incurred by Svensson for her expert's January 2007 Report, all of which were directly associated with, and caused by, the failures and refusals to comply with Putnam's obligations under the discovery rules between November  2005 and the date of the filing of Svensson's motion for § 1927 sanctions; and,

2.      The entry of an order granting such other and further relief as may be appropriate in the circumstances.

REQUEST FOR HEARING AND ORAL ARGUMENT

Svensson requests a hearing and oral argument.

LISA SVENSSON, plaintiff,

By her attorneys,

BARRON & STADFELD, P.C.

s/Kevin F. Moloney
Kevin F. Moloney          BBO No. 351000
Roger T. Manwaring        BBO NO. 548614
100 Cambridge Street, Suite 1310
Boston, Massachusetts 02114
Tel.: 617.723.9800/531.6569

and

/s/ John K. Weir
John K. Weir, Admitted PHV
John K. Weir Law Offices, LLC
300 Park Avenue, Suite 1700
New York, New York, 10022
Tel.: 212.572.5374

Dated: March 25, 2008

<u>Certificate of Service</u>.

    This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>/s/ Kevin F. Moloney</u>

Dated: March 25, 2008

[426173.1]