UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA SVENSSON, <br><br> Plaintiff, <br><br> v. <br><br> PUTNAM INVESTMENTS, LLC, <br><br> Defendant. | CIVIL ACTION <br> NO. 04-12711-PBS |

### DEFENDAT PUTNAM INVESTMENTS' PRETRIAL MEMORANDUM

Pursuant to this Court's Pretrial Order dated April 8, 2008 (the "Order"), Putnam Investments LLC ("Putnam") submits its Pretrial Memorandum in the above-entitled action. Putnam is filing its own pretrial memorandum since the parties were unable to confer about the pretrial memorandum until the afternoon of April 30, 2008, by which time it was too late to generate a joint memorandum.

### I.    CONCISE SUMMARY OF THE EVIDENCE THAT WILL BE OFFERED.

   A.    **Plaintiff.**  To be supplied by plaintiff.

   B.    **Defendant**

Putnam manages money for individuals and institutional investors. Its investment products include mutual funds and separate accounts for 401(k) plans and other retirement plans. During all relevant times, Putnam was a subsidiary of Marsh & McLennan Companies, Inc. ("MMC").

Putnam's Structure and Practices.  Putnam was organized into several Divisions, including the Investment Management Division ("IMD"), Global Distribution and Marketing,

- 2 -

Operations, and corporate administration. Svensson was an investment professional in the IMD. The IMD was subdivided into multiple portfolio management teams and investment support teams. Portfolio management teams were organized by asset class (*e.g.*, large cap equity, international equity, fixed income, and currency) and investment style (*e.g.*, value, core, and growth). IMD also maintained support teams such as research teams and trading teams. Some portfolio management teams relied on the services of separate research teams; others embedded research functions (Analysts and Senior Analysts) in the investment team itself. Portfolio management teams were led by a Chief Investment Officer ("CIO"), and included analysts, portfolio managers ("PM"), and senior portfolio managers ("SPM"). In addition to functional titles (such as PM or Analyst), investment professionals typically had "officer titles" such as Assistant Vice President, Vice President, Senior Vice President ("SVP"), Managing Director ("MD"), and Senior Managing Director.

<u>Putnam's Compensation Practices</u>. Compensation of investment professionals consisted of base salary and incentive pay. Base salary was reviewed annually. Incentive compensation consisted of year-end discretionary incentive bonuses and potential discretionary grants of Putnam equity (restricted shares and options). Most investment professionals (including Svensson) participated in the Associates and Principals Incentive Compensation Plan ("A&P Plan"), which paid discretionary cash bonuses to participants. To be eligible for a bonus, the employee needed to be employed on the date when bonuses were paid. The A&P Plan provided Putnam with discretion to make a payment in lieu of a bonus to a terminated employee if the employee signed a release of legal claims. Putnam enforced this release requirement in each instance in which it made such payments to terminated employees.

Investment professionals also were eligible for special awards from Putnam's Profit Growth Incentive Compensation Plan ("Profit Growth Plan"). The Profit Growth Plan deferred payment of its bonus awards over several years. Individuals terminated without cause could continue to receive their deferred bonus payments, but only if they signed releases. Putnam enforced this release requirement in all cases. Finally, investment professionals could receive

- 2 -

equity grants as a non-cash incentive award under the Equity Partnership Plan ("EPP"), which vested over time. Unvested grants vested for employees terminated without Cause only if the terminated employee signed a release. Putnam also enforced this release requirement in all cases.

Each year, MMC and Putnam's senior management determined the size of the bonus pool for the entire firm. After the pool was set, Putnam's Chief Executive Officer and its division heads allocated portions of the pool to each division, including the IMD. IMD management allocated IMD's share of the pool among the various investment teams and support groups. The CIO of each team then set the bonus award for each individual on that team. A similar process was followed in making equity awards, although not all investment professionals received equity awards in all years. Putnam informed investment professionals of their salary increases and bonus and equity awards no later than March 15 of each year (*e.g.*, no later than March 15, 2003 for bonuses for 2002 and for salary increases for 2003.

Svensson's Employment History. Svensson joined Putnam as an Analyst, with a Vice President officer title, in 1994. Putnam promoted her to SVP in 1995. In 2000, Putnam promoted Svensson to Senior Portfolio Manager ("SPM"). From 1997 through 2002, she served as a PM and SPM on the International Growth, reporting to Robert Swift, the team's CIO. Svensson's 1999 salary and bonus totaled $1,131,500. Her 2000 salary and bonus totaled $1,495,500. In 2001, a year in which the performance of the International Growth Fund plummeted, her salary and bonus decreased to $655,000. In all three years she was the third most highly-compensated team member, behind Swift (the team's CIO) and Kelly Morgan, a female SPM and Director. In all three years, Putnam's compensation decisions regarding Svensson were made without regard to her gender.

Svensson's Transfer to GER. In 2002, Putnam reorganized the International Growth team given the team's performance issues and the dramatic decrease in assets under management. Putnam terminated Swift (the team's male CIO) and, in April 2002, offered Svensson an Analyst position in its centralized Global Equity Research ("GER") department.

- 3 -

Steve Dexter continued to manage what remained of the International Growth team because, according to Stephen Oristaglio, the co-Head of IMD, Dexter was a more conservative investment manager and had a better mix of fundamental and quantitative investment skills. Oristaglio believed that Svensson could add value as an analyst in GER. GER's Director, Bill Landes ("Landes"), agreed to offer Svensson an analyst position in GER, but did so reluctantly because she had a history of being difficult to work with. Putnam's decision to transfer Svensson to GER had nothing to do with her sex.

For 2002, the year of her transfer to GER, Svensson's compensation was $655,000, the exact amount that she had earned in her last year as a PM in International Growth. In 2002, she was the sixth most highly-compensated analyst in GER (of forty-five analysts), and was the eighth most highly-compensated employee of fifty investment professionals in all of GER (not including the group's director). Putnam's compensation decisions with respect to Svensson in 2002 had nothing to do with her sex. In January 2003, Landes promoted Svensson to ADR.

<u>Svensson's Termination</u>. In April 2003, Putnam hired Joshua Brooks ("Brooks") to replace Landes as Director of GER. Brooks quickly decided that the investment process in GER needed to be improved. He believed that analysts in GER were not encouraged to state their minds freely. Brooks set out to rectify this situation. In July 2003, shortly after Brooks arrived, Darren Peers ("Peers"), an Analyst in GER who reported to Svensson, (and who was Putnam's top stock picker in 2002, told Brooks that he had a problem with Svensson's "managerial style" and that he was unhappy enough that he had started looking for work and was likely going to leave. Peers testified that Svensson often made him feel "uncomfortable" and "demeaned." *Id.* at 53. This was precisely the kind of behavior that Brooks wanted to change.

Meanwhile, on or about August 8, 2003, Svensson asked her HR manager, Mary McNamee ("McNamee"), for assistance in delivering a negative performance review of Chris O'Malley ("O'Malley") another well-regarded Analyst who reported to Svensson. Svensson Contemporaneously, O'Malley called Eric Hutcherson ("Hutcherson"), his HR manager, to

complain about Svensson's treatment of him. Brooks learned that O'Malley also was contemplating quitting rather than continuing to work for Svensson.

Concerned about these developments (which came on the heels of Peers' complaints), Brooks investigated Svensson's criticisms of O'Malley by speaking with various PMs with whom O'Malley interacted. Brooks concluded that not only had Svensson's description of her investigation of O'Malley's behavior, and the feedback she received about O'Malley, was inaccurate. Brooks concluded that Svensson should no longer manage analysts.

Brooks offered Svensson three alternatives: (i) remain in GER, but in a non-managerial capacity; (ii) remain at Putnam for a transition period while looking for other opportunities, or (iii) leave Putnam with a severance package. After reflection, and consulting counsel, Svensson rejected all three options, demanding instead immediate promotion to MD with guaranteed compensation of $1,000,000 per year for two years, a fifty percent increase over her prior year's pay. Given her refusal to accept any of his options, Brooks terminated Svensson on September 15, 2003. Putnam replaced Svensson with Maria Drew, who assumed coverage for the majority of Svensson's stocks. Putnam's decision to terminated Svensson had nothing to do with her sex.

<u>Putnam's Severance Offer</u>. Upon terminating her, Putnam offered Svensson a severance package that included eighteen weeks of pay, a one time payment of $250,000, and her deferred compensation of $539,086.77 under the Profit Growth Plan, subject to that Plan's requirement that she execute a release. This offer included severance pay to which Svensson was not otherwise entitled. She refused to sign the proposed agreement, and by the terms of the Profit Growth Plan and the EPP, her deferred awards and unvested equity were cancelled. She was ineligible for any 2003 bonus since she was no longer employed in March 2004.

Svensson filed a Charge with the MCAD on March 1, 2004 alleging discrimination on the basis of her sex. On December 28, 2004, Svensson filed her Complaint, and on January 5, 2005, she filed her Amended Complaint.

Prior to and since the termination of Svensson, Putnam has experienced a dramatic decrease in the size of its work force and its assets under management.

II. **FACTS ESTABLISHED BY PLEADINGS OR BY STIPULATIONS OR ADMISSIONS OF COUNSEL.**

Putnam believes that the following basic facts are undisputed. Additional stipulations are under discussion:

- A. Putnam manages money for individuals and institutional investors.

- B. Putnam hired Svensson as an Analyst, with a Vice President officer title, in 1994.

- C. Putnam promoted Svensson to Senior Vice President in 1995.

- D. From 1997 through March 2002, Svensson served as a portfolio manager and, commencing in 2000, as a senior portfolio manager, on Putnam's International Growth team, reporting to Robert Swift, the team's Chief Investment Officer.

- E. In April 2002, as a result of a reorganization of the International Growth team, Svensson joined Putnam's Global Equity Research ("GER") team as an Analyst.

- F. In January 2003, Putnam promoted Svensson to Associate Director of Research in GER.

- G. Svensson's employment with Putnam terminated on September 15, 2003.

III. **CONTESTED ISSUES OF FACT.**

- A. **Plaintiff.** To be supplied by plaintiff.

- B. **Defendant**

    1. Whether Putnam's decision to transfer Svensson in 2002 from its International Growth team to its Global Equity Research team was on account of her sex.

    2. Whether Putnam's actions or statements in connection with its decision to transfer Svensson in 2002 from its International Growth team to its Global Equity Research team provide a basis for equitably tolling the statute of limitations.

    3. Whether Svensson suffered any damage on account of Putnam's decision to transfer Svensson in 2002 from its International Growth team to its Global Equity Research team.

    4. Whether, in 2002 or 2003 Putnam compensated less than similarly situated men on account of her sex and, if so, in what amount.

    5. Whether Svensson was aware prior to May 6, 2003 that Putnam was compensating less than similarly situated men.

    6. Whether Svensson is was entitled to receive a bonus for 2003 under the applicable bonus plan given that her employment was terminated on September 15, 2003, and, if so, in what amount.

7. Whether, during the period from May 6, 2003 to September 15, 2003, Putnam failed to offer Svensson a portfolio management position that it instead offered to a male who was as or less qualified than Svensson for the position.

8. Whether Putnam failed to offer Svensson any of the positions referred to in Question 7 above on account of her sex and, if so, what damage she sustained as a result.

9. Whether Putnam terminated Svensson's employment on account of her sex and, if so, what damages she sustained as a result.

10. Whether Svensson has properly mitigated any damages that she sustained as a result of her termination.

11. Whether any portion of Svensson's claimed back pay and whether her front pay damages are speculative.

### IV. JURISDICTIONAL QUESTIONS.

None

### V. QUESTIONS RAISED BY PENDING MOTIONS.

**A.** **Plaintiff**. To be supplied by plaintiff. Putnam notes that on April 29, 2008, a week after motions in limine were due, Svensson filed a motion in limine seeking to introduce 26 purported summaries of evidence that she proposes to introduce. *See* discussion in B below.

**B.** **Defendant**

Defendant has filed several motions in limine, which seek rulings that:

1. the Court take judicial notice of the date on which Svensson commenced this lawsuit.

2. Svensson may not introduce statistical evidence that does not satisfy the legally-required standard of statistical significance.

3. Svensson may not introduce evidence of "stray remarks" that do not satisfy the relevance standard enunciated by the Courts in this Circuit.

4. Svensson may not introduce evidence concerning settlements by Putnam with regulators or former employees.

5. Svensson may not introduce evidence concerning Putnam's treatment of other employees, and/or or so-called "me-too" evidence, without first laying a foundation that the individual is a comparator using the standard

enunciated by the Courts in this Circuit, and that the so-called "me-too" evidence is relevant.

In addition, on April 29, 2008, a week after motion in limine were to be filed by he parties, and without having listed them on her exhibit list filed on April 22, 2008, Svensson filed a motion in limine seeking to introduce 26 purported "summaries" of evidence that she proposes to introduce at trial. Despite having filed her motion in limine, Svensson has not yet served the purported summaries on Putnam. As such, Putnam has not yet had an opportunity to review the summaries and consider its position concerning their admissibility.

## VI. ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS, TOGETHER WITH SUPPORTING AUTHORITY.

### A. **Plaintiff.** To be supplied by plaintiff.

### B. **Defendant**

As noted above, Putnam has filed five motions in limine seeking rulings that

1. the Court take judicial notice of the date on which Svensson commenced this lawsuit.

2. Svensson may not introduce statistical evidence that does not satisfy the legally-required standard of statistical significance. *Hillstrom v. Best Western Hotel,* 354 F.3d 27 (1st Cir. 2003).

3. Svensson may not introduce evidence of "stray remarks" that do not satisfy the relevance standard enunciated by the Courts in this Circuit. *McMillan v. Mass. Society for Prevention of Cruelty to Animals*, 140 F.3d 288, 301 (1st Cir. 1998).

4. Svensson may not introduce evidence concerning settlements by Putnam with regulators or former employees. *McInnis v. A.M.F., Inc.,* 765 F.2d 240, 247 (1st Cir. 1985).

5. Svensson may not introduce evidence concerning Putnam's treatment of other employees, and/or or so-called "me-too" evidence, without first laying a foundation that the individual is a comparator using the standard enunciated by the Courts in this Circuit, and that the so-called "me-too" evidence is relevant. *Goldman v. First National Bank*, 985 F.2d 1113, 1119-21 (1st Cir. 1993).

The law concerning each of these motions is discussed more fully in the motions.

In addition to the above, and to the basic law requiring that Svensson establish that Putnam's decisions regarding her were based on her sex, Putnam believes that the following issues of law are relevant to Svensson's claims:

- 8 -

     **6.**    Svensson's so-called demotion claim predicated on her transfer in 2002 is time-barred, and the statute of limitations is not equitably tolled. *Delaware State College v. Ricks,* 449 U.S. 250, 258 (1980)**;** *Adamczyk v. Augat, Inc.* 52 Mass.App.Ct. 717, 722 (Mass.App.Ct. 2001).

     **7.**    Svensson's 2002 and 2003 compensation claims are time-barred under all of Title VII, Mass. Gen. Laws ch. 151B and the Massachusetts Equal Pay Act. *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 127 S.Ct. 2162, 2165 (2007); *Silvestris v. Tantasqua Regional School District,* 446 Mass. 756, 769 (2006).

     **8.**    Svensson's claimed back pay and front pay damages are improperly speculative. *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 824 (1997).

Finally, on April 29, 2008, a week after motion in limine were to be filed by he parties, and without having listed them on her exhibit list filed on April 22, 2008, Svensson filed a motion in limine seeking to introduce 26 purported "summaries" of evidence that she proposes to introduce at trial. Despite having filed her motion in limine, Svensson has not yet served the purported summaries on Putnam. As such, Putnam has not had an opportunity to review the summaries and consider its position concerning their admissibility.

## VII. REQUESTED AMENDMENTS TO THE PLEADINGS.

None.

## VIII. ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE ACTION.

None.

## IX. PROBABLE LENGTH OF THE TRIAL.

Plaintiff has not furnished an estimate of the probable length of trial. Given the amount of time designated by both parties for their direct examinations, and depending on the Court's evidentiary rulings, two weeks is not likely to be sufficient time for the trial of this matter.

## X. NAMES, ADDRESSES AND TELEPHONE NUMBERS OF WITNESSES TO BE CALLED.

    **A.**    **Plaintiff.**

In her Rule 26(a)(3) disclosures, Plaintiff designated a list of possible witnesses.

B. **Defendant**

Putnam reserves its right to call any or all of the following witnesses.

1. David Bloom, Harvard School of Public Health, 665 Huntington Avenue, Boston, MA 02115. 617 432-0866.

2. Joshua Brooks, 248 Buckminster Road , Brookline, MA 02445. 857.891-4584.

3. Stephen Dexter, Putnam Investments LLC, One Post Office Square, Boston, MA 02109. 617.760-1000.

4. Eric Hutcherson, 141 Round Hill Drive, Freehold, NJ 07728. 508.229-8876.

5. William Landes, 12 Wyndemere Dr. Southborough, MA 01772. 617.532-0200.

6. Brian Lenhardt Putnam Investments LLC, One Post Office Square, Boston, MA 02109. 617.760-1000.

7. Mary McNamee, OFI Institutional, 470 Atlantic Avenue, 11th Floor, Boston, MA 02210-2208. 617. 897-3609.

8. Kelly Morgan, 236 Beacon Street, Unit 4C, Boston, MA 02116. 617.262-1175.

9. Stephen Oristaglio, 287 Commonwealth Ave, Unit #4, Boston, MA 02115. 617.859-3088.

10. Christopher O'Malley, Eaton Vance Management Inc., 255 State St, Boston, 02110. 617.482-8260.

11. Darren Peers (by deposition).

12. Denise Seldon, Putnam Investments LLC, One Post Office Square, Boston, MA 02109. 617.760-1000.

13. Richard B. Tibbetts, Putnam Investments LLC, One Post Office Square, Boston, MA 02109. 617.760-1000.

XI. **PROPOSED EXHIBITS**

A. **Plaintiff**

In her Rule 26(a)(3) disclosures, Plaintiff designated a list of proposed exhibits.. Plaintiff's counsel has indicated an intention to revise and/or expand plaintiff's designations, but Putnam has not yet received any revised or expanded exhibit designations.

### B. Defendant

See Exhibit B. attached hereto.

### XII. PARTIES' RESPECTIVE POSITIONS ON ANY REMAINING OBJECTIONS TO THE EVIDENCE IDENTIFIED IN THE PRETRIAL DISCLOSURE REQUIRED BY FED. R. CIV. P. 26(A)(3).

Putnam's objections to the exhibits listed in plaintiff's Rule 26(a)(3) disclosures is attached as Exhibit C hereto. Putnam notes that plaintiff has indicated an intention to revise and/or expand her exhibit designations, but has not yet done so. Putnam reserves its right to respond to any such revised or expanded designations.

**PUTNAM INVESTMENTS, LLC,**

By its attorneys,

/s/ Joseph L. Kociubes
Joseph L. Kociubes, BBO #276360
joe.kociubes@bingham.com
Louis A. Rodriques, BBO #424720
louis.rodriques@bingham.com
Allyson E. Kurker, BBO #665231
allyson.kurker@bingham.com
Jennifer L. Holden, BBO #663467
jennifer.holden@bingham.com
**BINGHAM McCUTCHEN LLP**
150 Federal Street
Boston, MA 02110-1726
617.951.8000

Dated: April 30, 2008

- 12 -

## CERTIFICATE OF SERVICE

      I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 30, 2008.

      /s/ Jennifer L. Holden, BBO #663467
      jennifer.holden@bingham.com