Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
LISA SVENSSON,             )
                           )
              Plaintiff    )
                           )
         -VS-              ) CA No. 04-12711-PBS
                           ) Pages 1 - 44
PUTNAM INVESTMENTS, et al, )
                           )
              Defendants   )
```

PRETRIAL CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 1, 2008, 3:30 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        KEVIN F. MOLONEY, ESQ. and ROGER T. MANWARING, ESQ.,
    Barron & Stadfeld, PC, 100 Cambridge Street, Suite 1310,
3    Boston, Massachusetts, 02114, for the Plaintiff.

4        JOHN K. WEIR, ESQ., John K. Weir Law Offices, LLC,
    300 Park Avenue, Suite 1700, New York, New York, 10022,
5    for the Plaintiff.

6        JOSEPH L. KOCIUBES, ESQ., LOUIS A. RODRIQUES, ESQ.,
    ALLYSON E. KURKER, ESQ., and JENNIFER L. HOLDEN, ESQ.,
7    Bingham McCutchen, LLP, 150 Federal Street, Boston,
    Massachusetts, 02110, for the Defendant, Putnam Investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2    THE CLERK:  The case of Lisa Svensson V. Putnam

3    Investments, et al, Civil Action 04-12711, will now be heard

4    before this Court.  Will counsel please identify themselves

5    for the record.

6    MR. MOLONEY:  Kevin F. Moloney, M-o-l-o-n-e-y.

7    With me is Roger T. Manwaring on my right, and on my left is

8    John Weir, admitted pro hac vice.

9    MR. KOCIUBES:  Good afternoon, your Honor.  Joe

10   Kociubes, Lou Rodrigues, Allyson Kurker, and Jennifer Holden

11   on behalf of Putnam.

12   THE COURT:  Good, okay.  So we start trial on the

13   12th, and the first thing I want to do is figure out how long

14   the trial will be because I have a number of cases backed up

15   behind it.  How long from the plaintiff's point of view do

16   you think -- given a 9:00-to-1:00 day, how many trial days

17   are we talking about?

18   MR. MOLONEY:  We tried to calculate it by witness,

19   by half day and by hours, which is on our disclosure and then

20   amended disclosure.  Having given it more thought, and

21   bearing in mind the --

22   THE COURT:  That just came in, so maybe I didn't --

23   MR. MOLONEY:  Sorry, your Honor.  It's one of the

24   exhibits to what I filed last night.  I think it's Exhibit A.

25   THE COURT:  I don't know that I've seen --

1    MR. MOLONEY:  Yes, it was a part of the --

2    THE COURT:  A lot of this came in last night, so --

3    MR. MOLONEY:  Our original disclosures were filed

4    on the 22nd, and we filed an amended disclosure as Exhibit A

5    yesterday.

6    THE COURT:  Pretrial disclosures on April 22?  No,

7    this is something else.

8    MR. MOLONEY:  The original ones were filed -- that

9    binder that came in this morning, the courtesy copy binder,

10    includes the filings by us on April 22.  It also includes

11    copies of what we filed over the last couple of days.

12    THE COURT:  But where's the part that breaks it out

13    by --

14    MR. MOLONEY:  It would be the last part --

15    THE COURT:  I see.

16    MR. MOLONEY:  -- which is the plaintiff's sections

17    of the pretrial memo, and I think it's Tab A to that.

18    THE COURT:  I'm seeing Tab A, but I'm not seeing

19    the -- these are all the exhibits.  You're saying somewhere

20    also there's -- oh, all right, I see, it's way at the end.

21    MR. MOLONEY:  Yes, it's way at the end, right.

22    THE COURT:  All right, I didn't even notice it.  So

23    how many days all together?

24    MR. MOLONEY:  Well, we put down our best estimate

25    by witness, so that's one estimate of time.  The other

1    estimate of time is --

2                THE COURT:  Yes, but how much is that total amount?

3                MR. MOLONEY:  It's over a week, your Honor.

4                THE COURT:  And that's for direct examination, not

5    for cross?

6                MR. MOLONEY:  Correct.

7                THE COURT:  So how many hours all together?

8                MR. MOLONEY:  Well, we're looking at -- well, let

9    me, if I may, answer the question this way.

10               THE COURT:  Yes.

11               MR. MOLONEY:  There are a large number of potential

12   exhibits, which we have indicated are potential exhibits

13   because they back up certain factual things that we think

14   ought not to be in dispute and aren't worthy of trial; for

15   example, SEC documents filed by Putnam, Morningstar reports

16   as to the performance of a certain fund.  It should not be

17   necessary to have trial days to decide that investment

18   officer A, B, C was on the X, Y, Z fund in 1999 to 2002.  If

19   we have to go through that and prove that, it's going to take

20   at least two weeks and maybe more.

21               THE COURT:  But can you just -- I just need a

22   simple answer.  When you add up all the hours that you have

23   right there --

24               MR. MOLONEY:  We're looking at between a week and

25   two.

1          THE COURT:  Yes, but that's without their case,

2    so -- is that wrong?

3          MR. MOLONEY:  Well, if we have to put in --

4          THE COURT:  Excuse me.  Just add this up for me.

5    How many hours is this at?  I can sit and add it myself.

6    It's two -- I mean, I don't want to sit here and add it --

7    two, three -- did you sit and add this all up?

8          MR. MOLONEY:  No.  What we did was try to make an

9    estimate based upon the number of witnesses, the number of

10   hours for direct, and the number of potential exhibits; and

11   we think it's going to take between a week and two weeks to

12   try the case.

13         THE COURT:  But is that all together?

14         What do you think it's going to be?

15         MR. KOCIUBES:  Your Honor, I don't see any -- a lot

16   of it will turn on evidentiary rulings that your Honor makes,

17   so let me -- that footnote aside, I don't see any prospect of

18   this going less than three weeks.  We're talking right now of

19   just the plaintiff's case of some 440 proposed exhibits, many

20   of which are not objectionable.  Many are.  They're

21   significant.  They've got probably a week to two weeks of

22   direct examinations.  I think we have probably three days,

23   maybe four days, plus or minus, of direct examination.

24         THE COURT:  I don't have -- let me just say, in the

25   three-week period following May 12, I will not be here on

1    May 15.  We have Memorial Day is part of it, okay.  I would

2    like to try the case, and I'm not -- if you assume that those

3    two days are out of the equation, that's thirteen trial

4    days.  It tends to take one day to impanel and do opening

5    statements, and you may get maybe a little bit of direct in

6    on the 9:00 to 1:00.  I would like to get this to the jury on

7    the Thursday of the third week.  In other words, on that

8    Thursday, do closing arguments and jury instructions, and

9    send it to them so they won't rush.  And typically they'll

10   want to not come back after the weekend.  So that if we have

11   multiple questions, they'll have at least Thursday afternoon

12   and Friday, hopefully, to resolve the case.

13          So if you take three days, is what I'm going to say

14   is "on the house," out of the thirteen, that leaves ten trial

15   days, roughly three and a half hours a day, 9:00 to 11:00 and

16   11:30 to 1:00.  So if you have three and a half, that's 35

17   hours, or something along that line, and I divide it by two.

18   That's sort of the way I'm thinking right now.  And you can

19   all use it the way you want.  Does that make some sense?

20          So assuming 35 trial hours all together, right, ten

21   trial days by three and a half and divide it by two, it's

22   roughly what, 17, let's say, trial -- and you can do whatever

23   you want with it.  You can limit your cross so that you can

24   use it for your direct.  You can do what you want with it.

25          MR. MOLONEY:  One of the things that makes this, at

1    least from our side, a bit difficult is that we have a lot of

2    exhibits that really should not need to be exhibits.

3         THE COURT:  I understand.  Put that aside for a

4    minute.  I can't go through 350 exhibits right now.  So I'm

5    just simply saying, I'm going to allocate this three weeks.

6    But one of the days I'm gone, I'm in a conference in

7    Washington; and one of the days, as I got it, is Memorial

8    Day.  So it's very hard to get a jury willing to sit longer

9    than that, and plus this is a one-plaintiff case against

10   essentially what, just the company, right?  It's not against

11   multiple defendants.  So this should be triable within that

12   period of time.  And I've got to assume that we're going to

13   streamline this somewhat, so --

14        MR. MOLONEY:  That's why we filed our motion under

15   Rule 1006.

16        THE COURT:  So typically -- you did that

17   yesterday.  I don't even know if they've had a chance --

18   which is late.  I'm not saying I'm going to preclude it.  I'm

19   just simply saying they may not have had a chance yet, and I

20   don't know how you are going to propose we go through it.  My

21   thought is we will -- right now, if you assume that each side

22   is going to get 17 hours, okay, for testimony --

23        MR. KOCIUBES:  If we know the rule going in, your

24   Honor, we'll conform to it, obviously.

25        THE COURT:  You'll have to conform to it.  You had

1    all said two to three weeks.  That's puts us right into that

2    position.

3              MR. MOLONEY:  Your Honor, I think we could get this

4    case tried easily on the schedule that you're indicating,

5    provided, however, that we don't have to call the Putnam

6    keeper of the records and have him or her go through these

7    documents one by one.

8              THE COURT:  I can't know until I know the

9    documents.  I can't say in the abstract you have to agree to

10   everything.  I can't.  So every morning what we're going to

11   do is, we come in here at quarter of the hour, quarter to

12   9:00, and if there are any disputes, I'll go through them.

13   I've got to assume people will be reasonable about business

14   records.

15             MR. KOCIUBES:  Let me be clear about one thing,

16   your Honor.  To the extent we're talking about authenticating

17   Putnam documents, and the documents we produced have been

18   Bates numbered, and to the extent they're prospectuses, we

19   think a lot of them are irrelevant.  But in terms of the

20   issue of authenticating, they don't need to call a keeper of

21   the records to authenticate them.  There may well be to a lot

22   of them other kinds of objections because the two sides have

23   dramatically different notions of what is relevant, but

24   nobody's going to have to call keepers of the records to say

25   this is a prospectus that --

34058e02-d919-4b53-9cea-1df1d4831b7a

1          THE COURT:  Or a business record or anything --

2          MR. KOCIUBES:  Well, we will have different views,

3    I think, of what a business record is.

4          THE COURT:  Well, but, see, I don't want to do that

5    on the fly.  I don't want to have this be just completely

6    punched full of side bars.  So like what?

7          MR. KOCIUBES:  I'm not sure what it is that

8    Mr. Moloney is referring to.

9          MR. MOLONEY:  Well, I'm starting with documents

10   filed by Putnam with the SEC, a Putnam prospectus of this

11   fund, a Putnam --

12         THE COURT:  Well, all that stuff will be -- whether

13   he agrees to it is a different story on the grounds it's

14   relevant.

15         MR. KOCIUBES:  Right.

16         THE COURT:  But you're not going to dispute that --

17         MR. KOCIUBES:  Absolutely not.

18         THE COURT:  You don't have to call in the SEC, you

19   don't have to call in the keeper of the records --

20         MR. MOLONEY:  Another kind of series of documents

21   are Morningstar reports as to the performance of various

22   funds at various periods of time.  Those ought to be

23   admissible.

24         THE COURT:  Well, I don't know.  That's a

25   different --

1          MR. MOLONEY:  Well, relevancy, we still have the

2    relevancy.  But as a piece of evidence, it's a publication

3    nationally recognized that everybody relies on, and it ought

4    to go in on that basis, subject to irrelevancy or other

5    objection.  They cite the Morningstar.  They cite the Boston

6    Globe.  There are other publications, your Honor.  There will

7    be hearsay issues with some of that.  There will be

8    relevancy --

9          THE COURT:  What about the Morningstar or

10   whatever --

11         MR. MOLONEY:  Morningstar we do, of course.  That's

12   the --

13         THE COURT:  Excuse me.  I'm asking him.

14         MR. KOCIUBES:  It is both hearsay, and in many

15   cases, your Honor, there's a relevance issue.

16         THE COURT:  Well, put the relevance aside.

17         MR. KOCIUBES:  And a third issue, your Honor, quite

18   frankly, with respect to the Morningstars, some of those

19   apparently form the basis of some of what they call

20   summaries.  The problem is --

21         THE COURT:  All right, so you're objecting?

22         MR. KOCIUBES:  Yes.

23         THE COURT:  All right, he's objecting to

24   Morningstar.  So you're going to have to either call someone

25   in, but the big issue is, why isn't it hearsay?

1    MR. MOLONEY:  It comes in under an exception to the

2    hearsay rule.

3         THE COURT:  Which one?

4         MR. MOLONEY:  It comes in as a publication that

5    people rely on in the real world.

6         THE COURT:  That's not an exception here.

7         MR. MOLONEY:  Well, we think it comes in under an

8    exception, but if he wants to argue --

9         THE COURT:  You need to brief it if it's important

10   to you.

11        MR. MOLONEY:  All right, we'll brief it.  But the

12   point is --

13        THE COURT:  Excuse me, excuse me.  I don't know

14   what exception that falls under, now, unless it's the general

15   catchall.

16        MR. MOLONEY:  We'll submit a brief on the issue.

17        THE COURT:  If somebody has relied on that to

18   establish compensation, I could allow it in not for the truth

19   of the matters asserted but because it's the number that was

20   used by the company.  So if it's not being asserted for the

21   truth of the matter, it's possible it comes in.  If it's

22   being asserted for how did the fund do, one way is simply to

23   ask, let's say, someone from the company, "Well, how did the

24   fund do?" and you can impeach someone with it, but it doesn't

25   mean it comes in.

1          MR. MOLONEY:  I understand that, your Honor, but my

2    point is that we should not have to take up all of our time

3    to prove things that should not be in dispute.  That's all

4    I'm suggesting.  That will take up time.

5          THE COURT:  I agree, you'll have to talk it

6    through.  I can't force it on them.

7          MR. MOLONEY:  Okay.

8          THE COURT:  Okay?  So they're not going to object

9    on authenticity or whether or not something is a business

10   record, as I'm understanding it.  What they might object to

11   is that it's impermissible, it's irrelevant, or that there's

12   hearsay contained within.  In other words, you're not

13   objecting it's a business record of Morningstar.  You're just

14   saying it doesn't qualify under the business records

15   exception.

16         MR. KOCIUBES:  That's right.  It's not our business

17   record.  If it's any kind of business record, it's a

18   publication.

19         There's a second-level problem here.  We got a CD a

20   couple minutes ago.  The ones that they're purporting to rely

21   on which they want to incorporate in some charts, we still

22   don't have any designation.  We can't look at it yet.  I

23   mean, we got a CD, so we'll start plodding through them to

24   try to match up, but we just got --

25         THE COURT:  Well, see what you can agree on.  Every

1    morning I'll look at it, and I'll go "In, out, in, out, in,

2    out," because I won't do it at side bar.  That's how we'll

3    have to do it.

4              So right now, let me just be clear that you are not

5    being required to bring in any keepers of the records, and

6    you have to give them advanced notice of any issue where that

7    is.  This is all going to be, does it fall within a hearsay

8    exception, and is it relevant?  So that cleans up that,

9    right?

10             MR. KOCIUBES:  Both sides, with respect to the

11   documents that we propose to introduce, and in fact in the

12   pretrial, your Honor, designated objections.

13             THE COURT:  I know, but I'm not going to read 350

14   objections.  I don't even know the case yet.  I mean, I'm not

15   going to do that.  Every morning you'll go in, and both sides

16   will share at quarter of what documents they plan on using

17   that day and flag for me any objections.  So probably you all

18   should show up at 8:30 every morning, share documents.  And

19   then if there's an objection, I'll come in at quarter of, and

20   then we'll go through it before the jury comes in.

21             Okay, so let's just start going through the motions

22   in limine.

23             MR. KOCIUBES:  Is there a sequence, your Honor,

24   that --

25             THE COURT:  Not necessarily.  I think you filed

1    yours first, so do you want to start?

2          MR. KOCIUBES:  Let me start with the issue of

3    statistical significance, your Honor.  And there are several

4    different issues here, and it relates in fact to some of the

5    so-called summaries.  As your Honor knows, the issue of

6    statistical significance really is sort of a subset of

7    Daubert, and --

8          THE COURT:  But no one's filed a Daubert motion,

9    and I don't have time to do one now.

10         MR. KOCIUBES:  Well, it's the same issue, your

11   Honor, and we teed up the issue -- we're not asking you to

12   decide it in the abstract.  The motion is much more limited

13   than that, which is to say -- and we agree that there are

14   different devices, and your Honor has written about them,

15   different ways to prove statistical significance.  The point

16   of proving statistical significance, obviously, is to get out

17   the irrelevant, the non, in this case, gender factors to try

18   to get to something that's probative.

19         The issue that we are attempting to raise is that

20   until someone establishes that on the stand, appropriate

21   foundation that sort of lay averages, counting up numbers of

22   women and men in various --

23         THE COURT:  When it comes to who, what's his name,

24   the expert?

25         MR. KOCIUBES:  Ours is Dr. Bloom.  Theirs is

1    Dr. White.

2              THE COURT:  White.  So he'll be allowed to testify

3    about anything that's statistically significant.

4              MR. KOCIUBES:  Now, the reason for the motion is

5    that plaintiff herself has done all sorts of analysis about

6    the number of women this year, the number of women that year.

7              THE COURT:  That's okay, she can count.  She just

8    can't say that anything is statistically significant.  She

9    won't be permitted to do that because she's not a

10   statistician.  But if she just simply says, "In the year

11   2002, there were fifty men and three women," she can say

12   that.

13             MR. KOCIUBES:  The issue there that I would

14   suggest, your Honor, is those raw numbers -- and as your

15   Honor knows, there's First Circuit law on that -- the raw

16   numbers aren't probative of anything.  That's the issue.

17             THE COURT:  You know, they are probative.  They're

18   just not enough.  I'll let her do the -- she cannot do any

19   statistical analysis, none, but she can do the basic, "When I

20   was there in the Global Group, there were three women, and

21   they were in these positions."  I mean, I would be reversed

22   in ten seconds if I didn't let her do that.  "And there were

23   forty guys."  I don't even know how you think she can't say

24   that.  She certainly can count.

25             So I don't know what this issue is.  She can't do a

34058e02-d919-4b53-9cea-1df1d4831b7a

1    statistical analysis.  He can do the statistical analysis.

2    And I don't know how deeply she wants to go into it, but she

3    can do the raw counting:  "My peer group women were five of

4    them, and the peer group guys were eight of them, and this is

5    what happened to the peer group guys, and this is what

6    happened to the peer group women."  What they can't do is go

7    the next step and say, is that statistically significant?

8         MR. KOCIUBES:  If it's predicate to the subsequent

9    testimony, it's got to be tied to statistical significance,

10   and we don't have any problem with that, your Honor.

11        THE COURT:  Fine, okay, so that's that issue.

12        MR. KOCIUBES:  The second one, your Honor, is

13   the --

14        THE COURT:  Stray remarks.

15        MR. KOCIUBES:  -- stray remarks.  And the issue

16   here, your Honor, is not whether they ultimately come in or

17   don't, but that they stay out in the opening until there is a

18   foundation and your Honor rules that --

19        THE COURT:  Yes, so stay away from them in your

20   opening.  Most of them I think will come in under the case

21   law that he discussed, but I think you shouldn't be -- well,

22   some of them, truthfully, I know you think they're smoking

23   guns, but if Lasser says to her, "Well, how does your husband

24   feel?" I mean, that's a nothing.

25        MR. WEIR:  That's not going to be mentioned in the

1    opening, your Honor, but I do think that we should be allowed

2    to advise the jury that the evidence on the case is going to

3    start with basically Ms. Svensson's being hired and being

4    hired under an understanding that Putnam had cleaned up its

5    gender problems.  That's the beginning of the story.  And as

6    we get closer to the end, we have Mr. Haldeman addressing a

7    meeting of analysts, both male and female, being asked the

8    question -- and this is Mr. Haldeman now when he was deposed,

9    the president and chief executive officer, speaking of the

10   time when he became co-head of Investments in October of

11   '02.  This is the question, if I may, from the deposition:

12            "Let me just read to you from Paragraph 31 of the

13   complaint in this case."  This is to Mr. Haldeman.  "In

14   October, '02, Mr. Charles M. Haldeman became Putnam's head of

15   investments reporting to Lasser.  At a meeting of analysts on

16   October 31, '02, two days after he assumed his new position,

17   Mr. Haldeman was asked what style of investor he was, and he

18   replied that he would give his own answer, which answer had

19   not been vetted by the EEOC, in quotes.  He said that if his

20   son asked him in the privacy of his own home whether -- not

21   knowing anything else, a 25-year-old woman or a 53-year-old

22   woman would be more attractive, and with all things -- all

23   other things being equal, he would have a bias in favor of

24   the 25-year-old, although at his age, 53, he was not going to

25   be running around with any 25-year-olds.  Do you recall that

1    meeting?  Answer:  I recall meeting with the GER."  It's the

2    research analyst people.  "I don't recall the questioning

3    specifically, but it certainly is -- is possible that I was

4    asked that question.  I have been at Delaware," his former

5    employer, "as well, similar kinds of things and in other

6    group meetings would have, so it's certainly possible that it

7    was exactly the way that was articulated, but I don't recall

8    it."

9          And then he goes on to talk about another story

10   with Mrs. Haldeman.  I think we should be able to comment on

11   that in the opening.

12         THE COURT:  I prefer that -- the one comment I

13   thought does have relevance is, "This isn't your year.

14   You're on maternity leave."  That's a direct statement about

15   her promotion, and that can come in in the opening if they

16   want.  I'm not as sure about all these comments.  You can ask

17   about them, I'm pretty sure, but until I actually hear it

18   play out, I --

19         MR. MOLONEY:  All right, so that's not in the

20   opening.

21         THE COURT:  Yes.  The maternity leave one is

22   directly relevant by someone who is -- it's directly relevant

23   to her and strikes me as evidence of the -- what do you call

24   it, the corporate --

25         MR. MOLONEY:  Atmosphere.

Page 20

1        THE COURT:  Atmosphere.

2        MR. MOLONEY:  State of mind.

3        THE COURT:  But this is all about openings.  A lot

4   of those are likely to come in if they are supervisors.

5        MR. KOCIUBES:  But that's the foundation that we

6   want, your Honor.  Then you have a context in which to rule.

7   That is the issue.

8        THE COURT:  All right, so what's the next one?

9        MR. KOCIUBES:  The next one is settlements of

10  unrelated matters, and that really relates to a couple

11  different things.  In this case, among the items that they

12  want to list are some complaints and periodical publications

13  having to do with some market timers at Putnam, and your

14  Honor may have read about that some years ago in the

15  newspaper.

16       THE COURT:  Did I have one of those cases, the

17  criminal cases?

18       MR. MOLONEY:  There was an SEC case against --

19       THE COURT:  Anyway, it's possible I even had one,

20  one of the people.  Is it possible?

21       MR. MOLONEY:  There was an SEC case against

22  Messrs. Scott and Kamshad that I think Judge --

23       THE COURT:  Maybe I didn't.  Maybe I had

24  another market kind of case.  But here's the issue that I've

25  been thinking about:  I doubt that the settlement itself will

34058e02-d919-4b53-9cea-1df1d4831b7a

1    be admissible, but the fact that -- what makes this case

2    unusual is, she was with the company a gazillion years, and

3    she gets fired because she gives a bad employment review to

4    two guys.  That's basically the -- and she's hard to work

5    with, and Brooks didn't like her, and he think it's objective

6    because she was driving out these two guys, as I understand

7    it.

8            Let's assume all that's true, okay?  It was an

9    unfair employment evaluation, she was too rough for them, and

10   the two of them were going to walk.  That's disputable, but

11   let's assume it's true.  I think part of her argument is,

12   "But you have these guys who are so much worse, and you ate

13   it."

14           MR. KOCIUBES:  The issue there, your Honor -- there

15   are two or three different issues there.  The controlling

16   law, I suggest to you, is the Conward case in the First

17   Circuit.

18           THE COURT:  The which case?

19           MR. KOCIUBES:  Conward, C-o-n-w-a-r-d.  I can

20   probably get you a cite before we go, but let me tell you

21   what the issue is there.  There the question was, an

22   African-American male teacher in one of the Cambridge schools

23   was terminated for sexually harassing students.  He claimed

24   it was gender-biased and wanted to compare himself to some

25   others, and so there were three comparators that he pointed

34058e02-d919-4b53-9cea-1df1d4831b7a

1    to.  One was another student who used physical force against

2    a student who was not terminated.  The First Circuit said

3    that those two are different offenses.

4           THE COURT:  Yes, because one is student on student

5    and one is teacher on student.

6           MR. KOCIUBES:  No, no.  Teacher sexually harassing

7    a student, teacher using physical force on student.  The

8    latter was white; the former is African-American, okay?  One

9    can argue which of the two is worse.  The First Circuit said

10   you can't compare the two; they are different, and they

11   implicate different policies, and they are qualitatively

12   different.  Those are a lot closer than what we have here.

13          The second comparator he had, your Honor, in that

14   case was a white female teacher who struck a student, and

15   again not comparable.  The third one was a white track coach.

16          THE COURT:  Are these on summary judgment?  I'll

17   read it.  Let me just say this:  I don't feel I know enough

18   about the guys.  My big issue is, was it at the same time?

19   What did they do?  I mean, my problem is, I don't have the

20   factual proffers from both people.  I don't think the issue

21   here is so much, am I going to allow the settlement in?  I

22   don't know that I'm going to let the settlement in.  The

23   issue is, can you bring them up as, "They treated these two

24   guys who did something so much worse better than they treated

25   me"?

34058e02-d919-4b53-9cea-1df1d4831b7a

1        MR. KOCIUBES:  The issue is, the "so much worse" is

2   a qualitative thing.  And indeed the issue of whether they

3   market timed or not they're proposing to prove from the fact

4   that there was a complaint and there was a settlement.  It

5   doesn't substantively prove that they did anything.

6        THE COURT:  Well, that's why I need to know the

7   facts.  I need to know the facts about what they did, when

8   they did it, and when Putnam knew about it, because when they

9   made the decision -- when was her termination?

10       MR. MOLONEY:  September 15, '03, your Honor.

11       THE COURT:  And was their alleged -- when did

12  Putnam find out about these two?

13       MR. MOLONEY:  There's a memo in early February of

14  the year 2000 from Mr. Tibbetts to various people, including

15  to the file of one these market timers.  A copy of it went to

16  the other market timer, where they had discovered that this

17  was going on and suggested, shall we say in frank terms, that

18  no one can continue.  That was in the year 2000.  It didn't

19  stop until the matter became a matter of public scandal when

20  the Journal, the Globe, the SEC --

21       THE COURT:  But excuse me.  We are not allowing all

22  that in.  That is more prejudicial than probative.  What is

23  relevant is when they knew, whether they knew -- and this is

24  where I need a proffer, and I'm not going to rule today --

25  what they knew and when they knew it about these two guys and

1    when the discipline took place.

2              MR. MOLONEY:  They knew about it in February, 2000.

3              THE COURT:  And then they told them to stop?

4              MR. MOLONEY:  Correct.

5              THE COURT:  And then when did they find out they

6    didn't?

7              MR. MOLONEY:  That they didn't, they let the store

8    be unminded until there was an investigation --

9              THE COURT:  When?

10             MR. MOLONEY:  After, that came to light after --

11             THE COURT:  When?

12             MR. MOLONEY:  In '03, early October, '03.

13             THE COURT:  10/03 they found out about these two

14   guys, that they were still doing it?

15             MR. MOLONEY:  That's when it became a matter of

16   public knowledge within Putnam and became a matter of public

17   knowledge to the public.

18             THE COURT:  And then what did they do to these two

19   guys?

20             MR. MOLONEY:  They did nothing to them.  They

21   confronted Mr. Lasser and didn't terminate these two

22   gentlemen until December of '03.

23             THE COURT:  But they did fire them.

24             MR. MOLONEY:  Ultimately they did.

25             MR. KOCIUBES:  Your Honor, not only did they fire

1    them, but the universe -- there were more than two, and one

2    of them was a female, and the female got treated exactly the

3    same way that the males did.

4            THE COURT:  This is why it's not whether they're --

5    I cannot decide whether or not it's going to be allowed in

6    till I find out a whole lot more about the situation, which I

7    do not have right now.

8            MR. MOLONEY:  Understand, if you would, your Honor,

9    that we're not offering the settlement to prove liability

10   issues.  It's only to prove the nature of the conduct and the

11   serious nature of the conduct.

12           THE COURT:  If it's more prejudicial than

13   probative, we're not getting into it.  However, if the two

14   gentlemen are comparators and were treated differently in the

15   same time period, which it is -- it's the 2003 year -- but

16   he's telling me they were fired, so why is that being treated

17   differently?

18           MR. MOLONEY:  Because since before the year 2000,

19   these two gentlemen were allowed to engage in conduct that

20   was --

21           THE COURT:  I thought they were told to stop.

22           MR. MOLONEY:  But they didn't.

23           THE COURT:  Let me put it this way:  Make a

24   proffer.  I'm thinking about this.  If in fact they were

25   fired, I don't know what the point is; but if in fact they

1  knew in 2000 that they didn't follow orders and didn't stop,

2  then I'll think about it.

3          MR. MOLONEY:  That's what the facts are.

4          THE COURT:  Just you're not mentioning it in the

5  opening, and I need proffers before I'm going to even let

6  something that's potentially so prejudicial in.

7          I do have to say to you, though, one of the things

8  why I think it gets past McDonnell Douglas, which is just

9  surprising here, is, she'd been there so long, new kid on the

10  block, and then they can her.  And so I think that there's at

11  least a plausible argument about whether they fired other

12  people for similar transgressions.

13          MR. KOCIUBES:  No, I understand what your Honor is

14  saying, but let me just make two observations.  One is, if

15  you look at the controlling First Circuit law, the offense

16  has to have two things:  It has to be nearly identical, and

17  it has to be egregious.  It is egregiousness or more

18  egregiousness --

19          THE COURT:  Right, we'll look up the case law.

20  I've got it.  I just have to understand the facts better.  It

21  sounds as if, as far as I can tell, they were fired, so I

22  don't understand what the --

23          MR. MOLONEY:  The point is, your Honor, they

24  engaged in this conduct for three years or more.  Putnam did

25  nothing to fire them or administratively do anything about

1   them, allowed them to continue.  You compare that with what

2   happened to Ms. Svensson, and --

3          THE COURT:  I'd have to know more about it, so

4   you're going to tell me.  It's a very important point, and I

5   will look at it.  I'm just not ruling right now.  I don't

6   know enough about it.

7          MR. MOLONEY:  May I just put into the mix, as long

8   as my good friend on the other side did, if you read

9   Judge O'Toole in the District Court in Conward, his language

10  was "in conduct as serious or more serious," and we cite

11  several other cases --

12         THE COURT:  Well, you did it in your memo, so we'll

13  look at it.

14         MR. KOCIUBES:  We went first, so we didn't respond

15  to that, your Honor.  If you look at Judge O'Toole's previous

16  sentence in the District Court case, it's the first of the

17  two requirements.  It's two requirements at the --

18         THE COURT:  I'll look at it, I'll look at it.  I

19  don't understand the facts.  That's why we do these motions

20  in limine.  Thank you for raising it.  I wouldn't have wanted

21  to deal with this on the fly.  We will look at the case law,

22  and that's one thing that I won't rule off the bench.

23         So what's the next one?

24         MR. KOCIUBES:  The other one is anecdotal evidence,

25  and that bleeds into who is a comparator and who is not a

34058e02-d919-4b53-9cea-1df1d4831b7a

1  comparator.  And it also bleeds into so-called what the

2  courts refer to sometimes as "me too" evidence.  There are

3  really two categories of that.  I think the easiest way to

4  think about that, your Honor -- and I don't think either of

5  the two briefs is divided this way -- is, the standards are

6  slightly different, both male and female.  With respect to

7  male, they have to be substantially similar positions.

8       THE COURT:  How can I decide this now?  You didn't

9  give me enough information to decide which of the twenty-four

10 were and which of the twenty-four weren't.

11      MR. KOCIUBES:  I suggest it's the other way

12 around.  We're alerting you to the issue.  It is part of the

13 plaintiff's burden to show that they are comparable.

14      THE COURT:  I know, but that will be what the trial

15 is.  I'm not going to start doing that now.  I mean, they'll

16 have to prove that they're comparators or not.  And at some

17 point, if I think that they're not, then I'm going to tell

18 the jury that.  But I can't do that now.  I can't do that in

19 advance.

20      MR. KOCIUBES:  We're not asking you to go

21 individual by individual.  I am trying to flag the issue.

22 Someone simply coming in that "There are ninety-one people,

23 and here's what I conclude from them," misses the predicate

24 foundation, which is whether any or all are comparators or

25 whether they're comparators for what purpose.  Somebody might

1    be a compensation comparator and not a termination

2    comparator.  So that that foundation needs to be set.

3            THE COURT:  Maybe.  I just can't do anything with

4    it now.

5            MR. KOCIUBES:  No.  The point is that there will be

6    preliminary findings, really threshold questions that your

7    Honor will have to address.

8            THE COURT:  No, I won't.  What do you mean

9    preliminary?  How can I do it without hearing the trial?

10           MR. KOCIUBES:  During the course of the trial is

11   what I'm alluding to.

12           THE COURT:  Oh, sure, fair enough, fair enough.

13           MR. KOCIUBES:  That's all we're talking about.

14           THE COURT:  Fair enough.

15           MR. KOCIUBES:  And then the second group has to do

16   with females, and there the issue is different, which is to

17   say, this is an organization that went from about 7,000 to

18   about 2,500, or maybe even less now.  So there are a lot of

19   men gone; there are a lot of women gone.  The notion that,

20   and there are some witnesses, or two or three, that another

21   female comes in and says, "You know, I think I was

22   discriminated against too," you're not talking about a

23   three-week trial anymore.

24           THE COURT:  You didn't give me enough information

25   for me to be able to decide whether they were fairly

1    considered comparators.

2          MR. KOCIUBES:  Female is not going to be a

3    comparator because she couldn't have been discriminated

4    against vis-a-vis another female.  She can only be

5    discriminated against vis-a-vis another male.

6          THE COURT:  Right, right.

7          MR. KOCIUBES:  The issue with the female, your

8    Honor, is whether somebody is allowed to come in and say,

9    "Gee, I think I was discriminated against as well."

10         THE COURT:  Well, it depends who.

11         MR. KOCIUBES:  That triggers a whole new little

12   collateral trial as to whether --

13         THE COURT:  It depends.  It depends.  I don't know

14   who they are or what the claim is, and whether it was at the

15   same time time period and the similar supervisor, and what

16   are the circumstances.  I don't know.

17         So let me turn to you.  Who are you planning on

18   putting in?

19         MR. MOLONEY:  Your Honor, we have several women on

20   our disclosure list, your Honor.

21         THE COURT:  Yes, but who?  I don't know them.

22         MR. WEIR:  Oh, there's Margaret Smith is one name.

23         THE COURT:  Who is she?  So play it out.  Who's

24   Smith?

25         MR. MOLONEY:  She was another investment

1    professional that ended up out of Putnam.

2         THE COURT:  But help me.  When?  Was it the same

3    supervisor?  I don't know anything about these people.  I'm

4    not going to just allow people to come in and say, "I had a

5    bad rap."  I want to make sure --

6         MR. MOLONEY:  Well, that's the problem that we had

7    with the other side's motion.  He's asking you to rule as a

8    matter of law in a vacuum.

9         THE COURT:  I tell you what, anyone you want to do

10   the "me too," give me a proffer, just like you are with the

11   disparate -- with the two guys who were canned for market

12   timing, give me a proffer so I can have some basis on which

13   to decide.

14        MR. MOLONEY:  Well, we believe the evidence is

15   going to show that these women came in at a relatively low

16   rank, moved up to a certain point, and then they hit the

17   glass ceiling; and all of a sudden you're involuntarily

18   retired or you disappear or you get fired.  It happens all

19   the time over there.

20        THE COURT:  I tell you what, just give me a proffer

21   so that there's nothing unique about the person, and they can

22   respond, and then I'll make a decision.  It's the same

23   division?

24        MR. MOLONEY:  In the Investment Management

25   Division.

1          THE COURT:  Right.  See, I need to know, is it the

2    same time period?  Are the same supervisors involved?  I may

3    allow some of that.

4          MR. KOCIUBES:  The issue, your Honor, is, we're

5    not -- I want to be clear -- we're not asking you to rule in

6    the abstract.  We're trying to surface the issue so that

7    you're not blindsided at trial.

8          THE COURT:  Good.

9          MR. KOCIUBES:  We expect that there needs to be a

10   foundation, and either it will get laid or we don't think it

11   will, but your Honor will be in a position one way or the

12   other when you hear the foundation.  But again we come back

13   to whether --

14         THE COURT:  Excuse me.  But if I do it in front of

15   a jury once the person is on the stand, I'm going to let it

16   play out.  If you want to exclude it from the get-go, I need

17   to know enough about it.

18         MR. KOCIUBES:  We will respond to a proffer.  We

19   don't know what they're intending to offer.

20         THE COURT:  I thought you were moving in limine to

21   preclude any evidence on point.

22         MR. KOCIUBES:  I'm sorry, your Honor?  I couldn't

23   hear.

24         THE COURT:  I thought the reason you were moving

25   in limine is to prevent Mr. Moloney from even putting the

1    people on the stand.

2         MR. KOCIUBES:  No.  There are two things that we're

3    interested in.  One, again, has to do with the opening and

4    the jury being polluted with stuff that may never come in,

5    depending upon what your Honor --

6         THE COURT:  But I can't rule.  In other words, if

7    all you're doing is alerting me to a problem, fine.  The

8    woman will take the stand, then you'll cross-examine, and

9    then what do you want me to do in front of the jury?

10        MR. KOCIUBES:  Let me articulate what the issue is

11   so as you're thinking about it you'll know what it is.

12   Somebody comes in, hypothetically, in a different rank, in a

13   different position.  We know that there are several thousand

14   men who are gone, some of whom reached certain levels and

15   were gone too.  And a female comes in -- I don't know what

16   they're proffering so that I can't respond to it, but from

17   the discovery I can suspect what some of it is going to be --

18   and says, "You know what?  I think I got terminated because I

19   was a female," that kind of evidence.  Then we've got to try

20   that case to see if that happened.

21        THE COURT:  So if you want to play law school,

22   suppose the woman comes in and says, "At about the same time

23   I was an analyst in the Investment Division, and I had a

24   baby, and the guy says, 'Hey, you've been on maternity leave

25   too much, and, you know, why don't you go stay home,'" and

1    it's the same guy who's involved in her decision-making, that

2    would be admissible.

3            MR. KOCIUBES:  On a maternity claim, of which there

4    isn't one in this case here.

5            THE COURT:  No, but I'm simply saying that there

6    are circumstances that I would allow a "me too" in, there are

7    circumstances where I wouldn't, and I just don't know enough

8    to rule now.

9            MR. KOCIUBES:  But the thing I want to alert you to

10   is, the "me too" on a termination claim, there's got to be

11   some kind of comparable termination.

12           THE COURT:  Maybe.  It could just be bad language

13   from somebody who's made a decision.  But you're going to

14   do -- I'm not ruling now.  You're going to do a proffer for

15   me on any "me too" testimony so I can at least understand it.

16           MR. MOLONEY:  May I just bring two matters to your

17   attention?

18           THE COURT:  We don't have all day, and we've got a

19   lot to go through.

20           MR. MOLONEY:  The other side's brief doesn't

21   mention Sprint/United Management Co. V. Mendelsohn from the

22   Supreme Court this year, which says "me too" is up to the

23   discretion of the judge.

24           THE COURT:  Yes, exactly.

25           MR. MOLONEY:  Okay, which is consistent with the

Page 35

1    First Circuit.

2         THE COURT:  But, you know, we don't have time.

3    We're through this.

4         MR. MOLONEY:  Number two, number two, Mr. Kociubes

5    continues to misrepresent the universe of what we're talking

6    about.  He's talking about thousands of men.  We're talking

7    about the Investment Management Division of Putnam, which

8    changed from 267 nonexempt, you know, professional people in

9    1998 to 296 in 2003.  We're not talking about thousands and

10   thousands of people who come anywhere near this case.

11        THE COURT:  Thank you.  Can I say this?  It is now

12   ten past 4:00, and we have a lot to go through, and I want to

13   get to settlement at the end.  So let me -- we're reserving

14   on the "me too" till I hear more about it.  I have the

15   discretion to allow it in.  I have to know what it is before

16   I can exercise the discretion.  I'm just a little confused

17   because I thought your motion in limine was to bar it before

18   the person got on the stand.  It may --

19        MR. KOCIUBES:  When do you want the proffers, your

20   Honor?

21        THE COURT:  Well, he's going to make the -- well, I

22   don't know.  I'll get to that.  But what's the last issue?

23   Is there any more?

24        MR. KOCIUBES:  The other one I think is not

25   opposed.  Just if your Honor could take judicial notice of

34058e02-d919-4b53-9cea-1df1d4831b7a

1    the date of the filing of the complaint in this action.

2            THE COURT:  That's fine, that's fine.  Okay, okay.

3            Now, let me ask you this:  What is the compensation

4    claim?

5            MR. MOLONEY:  You mean the damages, the economic

6    loss?

7            THE COURT:  No.  What exactly is it?  For what?

8    Unfair, unjust compensation for what, the bonus?

9            MR. MOLONEY:  Well, 70 percent, your Honor, of the

10   compensation of these people is made up by the bonus, part of

11   which is paid in cash, part of it's deferred, part of it's

12   equity.

13           THE COURT:  For the year 2000, isn't that what

14   White talked about, that there was a disparity --

15           MR. MOLONEY:  Right.

16           THE COURT:  So that's the only compensation issue

17   at trial?

18           MR. MOLONEY:  2002 and coming forward, yes.

19           THE COURT:  Okay.  And it's about bonus and what

20   else?  I just don't really understand it.

21           MR. MOLONEY:  Well, what the evidence will be, your

22   Honor, is, these people made large but relatively, for them,

23   small salaries of $100,000 or $200,000, $300,000.  Most of

24   their compensation in the prospectuses that they filed with

25   the SEC continually indicate that 70 percent of the

1   compensation is not from the salary but is from cash and

2   stock, stock in Putnam, some of which is deferred.  But

3   there's a formula that Putnam has to value it.  That's where

4   the big dollars are.

5           THE COURT:  Okay, but just to understand it,

6   because of the statute of limitations as well as your expert

7   report, at this point, so we can focus on it for the jury,

8   the issue is the bonus for 2002 and 2003?

9           MR. MOLONEY:  Right.

10          THE COURT:  Just so that we're not all off

11  somewhere else.  Fine, that's helpful.

12          Now, you filed a ton of these things last night,

13  the charts.

14          MR. MOLONEY:  Yes.

15          THE COURT:  I will allow them in as chalks, but in

16  terms of whether they're evidence or not, have you even had a

17  chance to look at them?

18          MR. KOCIUBES:  Yes, your Honor, and even as chalks,

19  if you want to address it now, I can just point out several,

20  for example, to you.  If you look at the very last one, let's

21  start there --

22          THE COURT:  Number what?

23          MR. KOCIUBES:  26.

24          THE COURT:  26?

25          MR. KOCIUBES:  Yes.  This isn't a chalk.  It's

1    testimony.  It's testimony based on things like complaints,

2    not judgments, an SEC complaint, assorted other hodgepodge.

3    And this goes to the market timing issue that you've reserved

4    on.  This is not a chalk.  It is not a summary.  It is not

5    any of that kind of stuff.

6          THE COURT:  Well, if I exclude the settlements,

7    this for sure won't come in.

8          MR. KOCIUBES:  All right, then let me not belabor

9    that point.  There are other issues --

10         MR. MOLONEY:  Let me, if I may, your Honor, each

11   one of these has at the bottom citations to Putnam documents

12   and other documents.  We believe that everything that's on

13   display visually will be in evidence, and under Rule 611,

14   this kind of thing and summaries of the evidence and

15   commentaries on the evidence and visualizations on the

16   evidence come in.

17         THE COURT:  I know, it's up to me.  But let me just

18   say this:  Obviously if the underlying piece of it, like the

19   fact that there was settlement at the SEC, is not allowed in,

20   then you can't put it in even as a chalk.

21         MR. MOLONEY:  Well, I would just ask you to reserve

22   on that because we don't know what your ruling is going to

23   be.

24         THE COURT:  I understand that.

25         MR. MOLONEY:  And you may allow evidence as to the

1    fact of the settlement, and you may allow evidence as to what

2    happened as a result of the claims, like Mr. Lasser being

3    forced out, Mr. Kamshad being fired, and so forth.

4           THE COURT:  I'm quite sure that will not come in

5    unless it goes to impeaching a particular witness for a bias

6    or prejudice.

7           MR. MOLONEY:  All I'm saying, your Honor, is

8    that --

9           THE COURT:  You don't want a mistrial on this case

10   because you put too much into it; it's been too expensive to

11   try.

12          MR. MOLONEY:  I'd rather settle it, but I'd rather

13   try it once.

14          THE COURT:  That's exactly right.  So the market

15   timing piece shall not be mentioned unless you get permission

16   first.

17          MR. MOLONEY:  Okay, I'm just asking for fair

18   consideration, that's all.

19          THE COURT:  Okay.  Now, let me just go through

20   this.  You haven't had a chance yet.  I just flipped through

21   these.  Most of them looked fine, at least as far as chalks.

22   He's seeking to put them in as summaries, so you need to sort

23   of go through them, and one by one just give me what you

24   object to and what you agree to under 1006.  And if there's

25   something like that last one you showed me where it's just

1    objection to even show it to a jury, you know, you'll flag it

2    for me.  I don't need to do that now.  I know you just saw

3    it.

4              MR. KOCIUBES:  Let me -- okay, you want me to just

5    save everything else?

6              THE COURT:  Yes, yes.

7              MR. KOCIUBES:  Okay.

8              THE COURT:  What were the other issues that you

9    raised?  Was there anything else?

10             MR. MOLONEY:  No.  We had the -- the chalk issue

11   came in in our opposition, and we had the motion under

12   Rule 1006.

13             THE COURT:  Yes, that's about it, right?

14             MR. MOLONEY:  There were five, five motions, four

15   by them and one by us.

16             THE COURT:  Yes, okay, perfect.  So that's done.

17   Now, let me just go off the record for a minute.

18             (Discussion off the record.)

19             THE COURT:  Okay, so that's it.  I don't think

20   there's anything else I need to deal with.  The only thing I

21   will say is, these proffers, what you need to do is get them

22   to me before the trial starts, like, say, the Friday before

23   the trial starts or the Thursday before the trial starts,

24   because if you can't, fair enough, but then you can't put

25   them in your opening statement, okay?

1          MR. MOLONEY:  I had a couple of things looking at

2     the trial.  We are thinking very seriously of reading

3     excerpts from 30(b)(6) deposition testimony in as part of our

4     case.  There were three days of 30(b)(6) testimony, a day and

5     a half by Mr. Tibbetts, and one, a third day was a full day,

6     and that was Ms. McNamee.  They propose to call these people

7     as part of their case.  We're trying to think about how do we

8     handle our cross-examination of those individuals as

9     individuals when they come on as part of their case, and it

10    would seem to us that when they put them on, we should be

11    able to cross-examine them without regard to the scope, as

12    opposed to having to, you know, call them back.

13         THE COURT:  That's the beauty of giving you a

14    limited time period.  Use it.  If you want to take your time

15    to do that, you can.  It just excludes something else, okay?

16    And the other thing, what, an hour each for openings?

17         MR. KOCIUBES:  Yes.  I would think even forty-five

18    minutes even.

19         MR. MOLONEY:  A half an hour, forty-five minutes.

20         THE COURT:  Good.

21         MR. KOCIUBES:  Just one other just logistical

22    thing.  The plaintiff, as they have a right to, has

23    subpoenaed several former Putnam employees and several senior

24    current Putnam employees, and they'll obviously be produced.

25    They've all been subpoenaed for the 12th, and they've all

1    agreed to make themselves available.

2              THE COURT:  Do they all live around here?

3              MR. KOCIUBES:  The ones that have been subpoenaed

4    do.

5              THE COURT:  All right, so we'll just give them fair

6    notice.

7              MR. KOCIUBES:  Yes, I just want to know, if they

8    didn't show up by the 12th, to cool their heels for a couple

9    days, that's all.

10             THE COURT:  No, I don't want to do that.

11             MR. MOLONEY:  I think our subpoena said you don't

12   have to show up if you give us assurance that you show up on

13   a phone call.

14             THE COURT:  Yes, just give them 24-hour notice or

15   something like that.  Anything else?

16             MR. MOLONEY:  I had a couple of other issues, your

17   Honor, that is dealing with the experts' reports and

18   curriculum vitae and list of publications.

19             THE COURT:  Well, I usually allow the CV to go in

20   but not the reports.

21             MR. MOLONEY:  Okay.

22             THE COURT:  The reports -- unless you both want to

23   agree, but --

24             MR. KOCIUBES:  No.  It's hearsay, your Honor.

25             MR. MOLONEY:  And then there's underlying data.

1    Both sides on the papers indicate they want to put it in.

2    Our view is that the expert gets over there and talks, the

3    report doesn't go in, and his list of publicatios doesn't go

4    in, and his underlying data --

5            THE COURT:  I said his CV does go in.

6            MR. MOLONEY:  The CV is one thing, but he's got 300

7    or more publications, all in areas that have absolutely

8    nothing to do with his testimony.

9            THE COURT:  I'm not going to -- it's twenty-five of

10   5:00.  I'm not going to go through this right now.  I mean, I

11   don't know whether the underlying data comes in.  I just

12   don't know.  My guess is, under 403, I'm not going to want

13   bushels of paper going to the jury.  In general, I prefer

14   not, but sometimes there's a challenge to the reliability

15   because the data is bad, and then I can't rule now.

16           MR. MOLONEY:  I'm not asking you to rule now.  I'm

17   just --

18           THE COURT:  In general, I prefer not.

19           MR. MOLONEY:  We didn't file a motion in limine.

20   I'm just raising it as something that's going to happen

21   probably.

22           THE COURT:  Anything else?

23           MR. MOLONEY:  As I mentioned, we're going to object

24   to Dr. Bloom testifying critiquing Mr. Segal.

25           THE COURT:  You haven't filed a Daubert motion.

Page 44

1    You haven't filed a motion in limine.

2              MR. MOLONEY:  No, I know that, and I --

3              THE COURT:  I don't want to deal with these things

4    then.

5              MR. MOLONEY:  I'm not asking you to deal with it.

6              THE COURT:  But I'm just telling you, you can't pop

7    these things on me.  You can't suddenly challenge it under

8    Daubert as he's about to take the stand because I'm not going

9    to wait.

10             MR. MOLONEY:  All right.

11             THE COURT:  So, okay, great, this is good.  Maybe

12   I'll see you; maybe I won't.  If you were a betting person, I

13   actually think we're going to be at trial, but I think it's

14   worth the effort.  Thank you.  This will be interesting.

15   Everybody's interested in employment discrimination.

16             MR. KOCIUBES:  Thank you, your Honor.

17             THE CLERK:  Court is in recess.

18             THE COURT:  Can I just say off the record that --

19             (Discussion off the record.)

20             (Adjourned, 4:37 p.m.)

21

22

23

24

25

1                        C E R T I F I C A T E

2


3
     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5


6


7


8              I, Lee A. Marzilli, RPR, CRR, do hereby certify

9    that the foregoing transcript, Pages 1 through 44 inclusive,

10   was recorded by me stenographically at the time and place

11   aforesaid in Civil Action No. 04-12711-PBS, Lisa Svensson v.

12   Putnam Investments, et al, and thereafter by me reduced to

13   typewriting and is a true and accurate record of the

14   proceedings.

15             In witness whereof I have hereunto set my hand this

16   3rd day of May, 2008.

17

18

19

20

21             /s/ Lee A. Marzilli
               _____
22             LEE A. MARZILLI, RPR, CRR
               OFFICIAL COURT REPORTER
23

24

25