IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


LISA SVENSSON,                    )
                                  )
                 Plaintiff        )
                                  )
         -VS-                     ) CA No. 04-12711-PBS
                                  ) Pages 4-1 - 4-156
PUTNAM INVESTMENTS, et al,        )
                                  )
                 Defendants       )



JURY TRIAL - DAY FOUR

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE







United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 16, 2008, 8:55 a.m.










LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 2

1    A P P E A R A N C E S:

2        KEVIN F. MOLONEY, ESQ. Barron & Stadfeld, PC,
     100 Cambridge Street, Suite 1310, Boston, Massachusetts,
3    02114, for the Plaintiff.

4        JOHN K. WEIR, ESQ., John K. Weir Law Offices, LLC,
     300 Park Avenue, Suite 1700, New York, New York, 10022,
5    for the Plaintiff.

6        JOSEPH L. KOCIUBES, ESQ., LOUIS A. RODRIQUES, ESQ.,
     ALLYSON E. KURKER, ESQ., and JENNIFER L. HOLDEN, ESQ.,
7    Bingham McCutchen, LLP, 150 Federal Street, Boston,
     Massachusetts, 02110, for the Defendant, Putnam Investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

 3    Lisa Svensson          4-9      4-90

 4    EXHIBITS                       PAGE

 5    Defendant's

 6    7                              4-125

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     P R O C E E D I N G S

2              MR. KOCIUBES:  Good morning, your Honor.

3              MR. MOLONEY:  Good morning, your Honor.

4              THE COURT:  Someone wanted to see me?

5              MR. RODRIQUES:  Yes, your Honor.

6              THE COURT:  I'm not sure if all the jurors are here

7    yet.  Robert is going to go check, so --

8              MR. RODRIQUES:  Shall we wait then, your Honor?

9              THE COURT:  No, no.  This came in late last night,

10   right?

11             MR. RODRIQUES:  Yes.  Well, the reason it came in

12   late last night, your Honor, is because we got a list late

13   last night as to what Mr. Moloney proposed to introduce

14   today, and what we wanted to do is raise that --

15             THE COURT:  I can't rule on it now.  I don't know

16   who they are.  As far as I'm concerned, there's enough

17   evidence to go in that the growth teams, for sure, are

18   comparators.  I think there's a bigger question in my mind

19   with respect to the whole Investment Management Division, but

20   it's not a foregone conclusion.  I want to hear the whole

21   case before I decide it.  So I think that's fair game at this

22   point.

23             MR. RODRIQUES:  And what is being proposed to be

24   offered today are 91 people, some of whom are on the growth

25   teams, some of whom are not on the growth teams.  And not

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1  only is there no foundation for that, but the proposal is to

2  introduce all of their compensation.

3          THE COURT:  Well, let me put it this way.  At some

4  point -- how long are you going to be? -- at some point the

5  jury is going to look at you and say, "Why is she still on

6  the stand?  It's taking forever."  And you only have 17

7  hours.  It keeps going on and on and on.  Pick your big

8  points and move on.  As far as comparators, don't forget,

9  she's going to be cross-examined for two days.  The jury is

10  going to look at me like, "Can't you manage a case, Saris?"

11  They're going to look at you, "Can't you get off the dime?"

12  That's just for starters.  We need to move on, so pick your

13  high points.

14          Now, on comparators, portfolio managers across the

15  Investment Management Division seem to be fair game, at least

16  at this stage.  I want to hear all your evidence to see if

17  there's enough.  But for you to talk in compensation about

18  managing directors which she never got, that's not fair, and

19  it's not fair to talk about compensation in terms of --

20  managing director is the key one.

21          MR. RODRIQUES:  There are chief investment officers

22  in the group which are two levels above her in the

23  organization, and that's the point of our motion.  There's no

24  foundation for the compensation testimony.

25          THE COURT:  Well, for the compensation, perhaps,

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1  because you can fairly argue that she should have been

2  there.  But at least for where she was, her whole consistent

3  testimony was, she should have been kept as a portfolio

4  manager.  And that's the compensation across the board that

5  should be compared because otherwise it is confusing.  Now,

6  you can argue she should have been promoted, fair game, but

7  you can't do the compensation for it.  I've never heard any

8  support that a portfolio manager gets the same as a CIO or

9  managing director.  That's fair.  But at least at this

10 point -- because I tried to take notes -- it went very

11 fast -- but what happened when they disbanded growth, where

12 did everyone go?  And they went to different areas of

13 investment management.  And at least -- and at some point

14 they merged them, and the two top guys and everyone's

15 reporting -- I think there's at least enough to compare

16 portfolio managers across the Investment Management Division.

17       MR. RODRIQUES:  And, your Honor, obviously we'll

18 take issue with that at the appropriate time, but the point

19 we're making today is that Mr. Moloney proposes to introduce

20 today compensation, other information regarding people that

21 are much broader than what you've just --

22       THE COURT:  Well, it may be appropriate to give

23 context, but the comparators, at least at this point, are the

24 portfolio managers, possibly the other people in the Research

25 Division.

1          MR. MOLONEY:  And Research when she went back.  Let

2    me, if I may, I had sent the list over proposing that there

3    be a ruling.  We're going to put in information that some of

4    the information that went to their expert, this background

5    information on people and the list of terminations --

6          THE COURT:  What?  I don't understand.  You're

7    going to put in what?

8          MR. MOLONEY:  What I told the other side is that we

9    were going to put in Putnam-prepared data, some of the data

10   that they gave to their expert, which includes name, rank,

11   and serial information about certain people and a list of

12   terminations.

13         THE COURT:  How are you going to put that in

14   through her?

15         MR. MOLONEY:  Well, I was just going to try to --

16         THE COURT:  No.  Finish her.  Finish, all right?

17   Finish.  It's been two full days on the stand.  She's got a

18   whole thing of cross.  We've got redirect, recross.  Finish,

19   focus, finish.

20         MR. MOLONEY:  I'll put it in through the Putnam

21   witnesses then.

22         THE COURT:  All right.  How much longer do you

23   think you'll be?

24         MR. MOLONEY:  I think about an hour.

25         THE COURT:  An hour sounds good.  I'm assuming,

1    even with an hour, you'll be spending most of today, if not

2    all.

3                MR. KOCIUBES:  Yes.

4                THE COURT:  If not, we'll do a filler with any

5    deposition, if you want to have that ready.

6                MR. MOLONEY:  I'm sorry, your Honor?

7                THE COURT:  My sense is, if it goes more quickly

8    than anticipated, you'll use as filler the deposition

9    testimony?

10               MR. MOLONEY:  Are you speaking today, your Honor?

11               THE COURT:  Yes.  I don't think it will be a

12   problem.

13               MR. MOLONEY:  I don't think we'll get there.

14               THE CLERK:  All rise for the jury.

15               (Jury enters the courtroom.)

16               THE COURT:  Good morning.

17               THE JURY:  Good morning.

18               THE COURT:  Did anyone speak about this case or see

19   anything in the press?  I find the jury has complied.

20               We've got another hour or so on direct, and then we

21   move into cross.

22

23

24

25

1                          LISA SVENSSON

2    having been previously duly sworn, was examined and testified

3    further as follows:

4    CONTINUED DIRECT EXAMINATION BY MR. MOLONEY:

5    Q.   Good morning, Mrs. Svensson.

6    A.   Good morning.

7    Q.   The other day you mentioned that you had three

8    children.  Can you just tell us their dates of birth and

9    their names, please.

10   A.   Yes.  They're three boys.  Scott is the oldest.  He's

11   nine.  He was born October 17, 1998.  Then my middle one is

12   Patrick.  He's seven, born December 18, 2000.  And my

13   youngest is Greg, who was born February 5, 2005.

14   Q.   So two of your three children were born during the time

15   that you worked at Putnam?

16   A.   Correct.

17   Q.   Now, and your husband's name is Marc?

18   A.   Marc.

19   Q.   When you and Marc had Scott, did you make a decision as

20   to how the children would be taken care of?

21   A.   Yes, we did.

22   Q.   What was that decision?

23   A.   Well, we hoped that we would be in a position and we

24   were fortunate enough to be in a position that one of us

25   could stay home with Scott, and we were hoping to have more

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   kids later.  So we made the decision while I was on maternity

2   leave that Marc would leave his job and become a stay-at-home

3   father.  We made the decision based on our comparative

4   incomes, and I had the better income of the two, so I went to

5   work, and he's been a stay-at-home father.

6   Q.   Okay.  Now, at some point did you -- oh, I'm sorry,

7   before I do that, do you know what Mr. Darren Peers's

8   investment performance was for the year 2002?

9   A.   Yes, I do.

10  Q.   What was it?

11  A.   On the same basis of comparison that I walked you

12  through a couple of days ago showing my own performance on

13  the same day, which was as of the 29th of August of 2003,

14  Mr. Peers was ranked 31 out of the 58 people.  I think it was

15  58.  It might have been 57.

16  Q.   And so in 2002, it was?

17  A.   He was the number one stock picker in 2002, so --

18  Q.   And in 2003?

19  A.   In 2003 for the year to date, as of August 29, he was

20  No. 31.

21  Q.   Okay.  Now, at some point during the progress of this

22  case did you identify any persons with whom you believed you

23  should be compared?

24  A.   Yes, I did.

25  Q.   And when did you do that?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1  A.   In the spring of 2006, I filed an affidavit in relation

2  to this case, and I listed the comparators at that time.

3  Q.   And did you identify such persons in relation to various

4  employment actions?

5  A.   Yes, I did.

6  Q.   And are you able to recall from memory the names of

7  those people as they were applied to the various employment

8  actions?

9  A.   Not from memory, no.

10  Q.   What would help to refresh your recollection?

11  A.   If I could see the list by employment action.

12       MR. MOLONEY:  May I approach, your Honor?

13       THE COURT:  Yes.

14  Q.   I'm showing you a document, Mrs. Svensson, and ask if

15  you recognize it.

16  A.   Yes, I do.

17  Q.   And can you tell us what it is?

18  A.   Yes.  These are the lists of individuals that I

19  identified as my comparators for my fourth affidavit in the

20  spring of 2006, listed by employment action, both for

21  disparate treatment and disparate impact.

22  Q.   Having looked at that list, are you able to --

23       THE COURT:  Excuse me.  This is a disparate

24  treatment case.

25

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 12

1  SIDE-BAR CONFERENCE:

2          THE COURT:  What are you talking about, disparate

3  impact?

4          MR. MOLONEY:  We have a disparate impact claim,

5  your Honor.  We have it in the complaint in this case, and

6  we've argued it for about --

7          THE COURT:  I don't remember that.  I don't

8  remember it being argued that way.  I thought you claimed she

9  was fired and men were not and that she got unequal

10  compensation.  What's the disparate impact?

11          MR. MOLONEY:  We have disparate impact on the

12  various employment actions on --

13          THE COURT:  You know what, you know what?  At this

14  point we're not going to deal with the legal thing.  I don't

15  want her to talk about it.  Just the comparators for point of

16  view.  I don't know what she's talking about, and it hasn't

17  been teed up to me this way.  And I'm not sure it applies,

18  more basically.

19          MR. KOCIUBES:  Could I be heard for a second, your

20  Honor --

21          THE COURT:  Yes.

22          MR. KOCIUBES:  -- on this very point?  This is the

23  foundation thing we've been bringing up over and over again.

24  This is the list.  It is self-picked.  It includes CIOs

25  and --

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 13

1          THE COURT:  You can't just put that in if it's

2     CIOs.  That's what we were talking about before, right?

3          MR. KOCIUBES:  These are her criteria.  This is the

4     issue --

5          THE COURT:  We're not putting all that in.

6          MR. MOLONEY:  Well, I've got to have her testify

7     about the names of the people.

8          THE COURT:  Right, so ask her, "Who were the

9     portfolio managers who were your comparators?"  It's a simple

10    way to do it.  And she can -- I mean, if she needs to refresh

11    her recollection, I don't expect she'll remember 91 people.

12         MR. MOLONEY:  No, but she needs the list to be able

13    to --

14         THE COURT:  Sure, fair enough, but we're not

15    putting the list in.  I just ruled it's the portfolio

16    managers and people in the Research Department, except the

17    head.  I mean, he's not a comparator, I forget his name,

18    Landes.  So is there somebody else in that equivalent, maybe

19    Brooks?

20         MR. KOCIUBES:  The issue is, your Honor, but for

21    foundation, we need the year because it will be different

22    people in different positions.

23         THE COURT:  Maybe, but you can go through that, but

24    that's how we'll do it.

25         MR. MOLONEY:  So that's what I'll do.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 14

1          (End of side-bar conference.)

2    Q.   Now, directing your attention, Mrs. Svensson, to what is

3    designated as Exhibit 3.

4    A.   Yes.

5    Q.   And do you see the section of it under "Disparate

6    Treatment" at Section No. 1?

7    A.   Yes.

8    Q.   And there's a list of names there?

9    A.   Yes.

10   Q.   And would you tell us --

11           THE COURT:  Let me just say to you, at some point,

12   you're going to have to make this fact-finding:  Who is

13   someone who's comparable to her for purposes of both the way

14   she was treated in various employment decisions and in terms

15   of her compensation?  Ultimately that's a fact question for

16   you.  So she's going to say who she believes was comparable

17   in the organization so you can make those comparisons.  It's

18   quite likely that Putnam will disagree with many of them, if

19   not all of them.  And so you should take down these names,

20   and you're going to be thinking if you've heard, you know,

21   who you think she should be compared with, and that's what

22   she's about to give you, but this is from your fact-finding.

23   Q.   Now, directing your attention to that Section 1 that

24   list of twenty-one names --

25   A.   Yes.

1    Q.    -- would you tell us, please -- and this is set out in

2    alphabetical order?

3    A.    Yes, it is.

4    Q.    Would you tell us, please, the names of the males who

5    held portfolio management positions or positions in the

6    Research Department in --

7             THE COURT:  No, distinguish.  First, start with

8    portfolio manager positions that you think were comparable,

9    and then you're going to do it differently so that you can

10   get this down, and that way we understand exactly whether

11   there's any comparison, whether it's apples and apples or

12   what.  Go ahead.

13            MR. KOCIUBES:  Can we have it by year because it

14   changes over time, your Honor?

15            THE COURT:  If she remembers, that's a good idea.

16            THE WITNESS:  Thank you, your Honor.

17            MR. KOCIUBES:  And note our objection.  If you want

18   to give me a standing objection, I won't -- I'll just keep --

19            THE COURT:  Well, on your big point, yes.  If there

20   are other subsidiary points --

21            MR. KOCIUBES:  Yes, of course.

22   Q.    Could you just read the caption, the title of that

23   section.

24   A.    Sure.  Section 1, "Males first employed by Putnam as or

25   promoted by Putnam to managing director between January 1,

Page 16

1  2000, and September 15, 2003."

2  Q.   Okay, now if you'd go down that list and identify the

3  persons who held portfolio management positions.

4  A.   Yes, sure.

5  Q.   And give the first name first.

6  A.   Okay, Joshua Byrne, Tony Elavia.

7       THE COURT:  When was he promoted to managing

8  director?  So help us because the thing is, it's confusing

9  for us.  Which group did they come from?  When were they

10 promoted?  You need to provide more background.  These names

11 don't mean anything to us, you know, unless you remember it

12 all from last week.  All right, so just start.  Who's Joshua

13 Byrne?

14       THE WITNESS:  Joshua Byrne is a comparator of mine

15 who started in the Research Department at the same time as I

16 did, moved out of the Research Department and moved into

17 Portfolio Management during the same time frame that I moved

18 in, in the sort of '96-'97 time frame.  And over time our

19 careers --

20       MR. KOCIUBES:  Objection.

21       THE COURT:  Overruled.

22       MR. KOCIUBES:  Your Honor --

23       THE COURT:  Overruled.  This is so far, okay?

24       MR. KOCIUBES:  There is a second point that I just

25 need for the record to direct your attention to.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1          THE COURT:  All right.

2     SIDE-BAR CONFERENCE:

3          THE COURT:  What's the issue?

4          MR. KOCIUBES:  This goes to a claim for some years

5     that your Honor has ruled are time-barred.

6          THE COURT:  Yes, that's right, but I also ruled

7     that it could come in as evidence of discrimination as a

8     pattern and practice, and so I will have to tell them.  And

9     if you want, I can say right now, "Some of these are

10    time-barred, but you can consider them."  I'm happy to do

11    that, but --

12         MR. MOLONEY:  Well, I think she's already said it

13    in her testimony over the last couple of days.

14         THE COURT:  But they don't know.

15         MR. KOCIUBES:  I need to preserve the issue, your

16    Honor.

17         THE COURT:  Do you want me to now say, "Some of

18    them are time-barred, but you can consider it as evidence"?

19         MR. KOCIUBES:  Yes.

20         THE COURT:  Okay, I'm happy to do that.

21         (End of side-bar conference.)

22         THE COURT:  Let me say this.  This is the second

23    point, which is well taken:  I ruled on several motions

24    before this case came to you that several of these claims are

25    time-barred, within the statute of limitations -- you

Page 18

1   probably heard that term in the law -- and that some of these

2   earlier promotions which she was claiming were discriminatory

3   when they got it and not her went way before the statute of

4   limitations.  So I am allowing many of the earlier claims --

5   I forget what the cutoff was.

6           MR. MOLONEY:  Early May of '03.

7           THE COURT:  May of '03, anything that happened

8   earlier was time-barred.  But you can consider them for

9   understanding what was happening across the organization in

10  deciding whether there was discrimination or not, and that's

11  their burden to prove.

12  Q.   Now, you were talking about Joshua Byrne?

13  A.   Yes.

14  Q.   And it's Byrne?

15  A.   B-y-r-n-e.  Mr. Joshua Byrne began his career at Putnam

16  maybe a year before I did, and he had come straight out of

17  business school.  And so I arrived at Putnam with seven years

18  experience, and we were together in the Research Department.

19  He moved out of the Research Department within a couple-year

20  time frame of the same period that I moved out of the

21  Research Department.  He went to the team that I described on

22  Wednesday, the International Core Team.  I went to the

23  International Growth Team.  And we both became over time

24  senior portfolio managers on our respective funds.

25           Mr. Byrne was promoted, and I'm having a hard time

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    recalling which year, your Honor, but it was in the 2000-2001

2    time frame, I believe.  He was promoted to managing director,

3    and yet, even as a managing director, again we were listed

4    similarly with the SEC filings, similar responsibilities; and

5    we were managing portfolios in different teams within Putnam,

6    again in different styles.

7            So I consider Mr. Byrne to be a portfolio manager,

8    although promoted to managing director, one who had a similar

9    set of responsibilities as I did.

10           Should I move to the next?

11   Q.   Yes.

12   A.   Okay.  Mr. Tony Elavia.

13   Q.   That's spelled E-l-a-v-i-a?

14   A.   E-l-a-v-i-a.  He also was promoted to managing director

15   in this period.  He had come from the quantitative side, and

16   he moved into a portfolio management role from the

17   quantitative side.  And it was a senior portfolio management

18   role that was available and filled by him after the period of

19   the Growth reorganization that I described on Wednesday.  So

20   he had a background that was quantitative, and yet moved into

21   the Large Cap Growth Team as a senior portfolio manager.  He

22   was hired in and promoted, and again the 2000-2001

23   promotions, it's hard for me to differentiate at this point

24   in time, but he was in this period.

25           The next one --

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 20

1       THE COURT:  When you say he was promoted, to what?

2       THE WITNESS:  From -- there are officer titles,

3  your Honor, and there's functional titles.  So he was a

4  senior vice president, as I was, and then he was promoted to

5  managing director.  And he, as I said, had come from the

6  quantitative team but moved into a senior portfolio manager

7  role on the Large Cap Growth Team after my departure from

8  Growth.

9  Q.   Next?

10 A.   Sure.  Moving down, we have Mr. Jeffrey Knight.

11 Mr. Knight and I started, again, in the same kind of time

12 frame at Putnam, and he started in I'd say the early '90s.

13 We have comparable investment experience and similar tenure.

14 I can't say to the day, but we both were at Putnam for, you

15 know, a long period.  And he moved into what's called the

16 Global Asset Allocation Team.  That's a team that takes

17 portfolio weightings.  They put a portfolio together that

18 comes from the stock side as well as the bond side, and they

19 put those together in a way that attempts to produce

20 performance from all these different sources of performance.

21       And, again, he and I had similar types of

22 backgrounds, investment tenure; and while it was slightly

23 different, I consider him to be a comparator in terms of the

24 fact that we were, again, listed on the SEC documents

25 similarly as portfolio managers, and although he's in a

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 21

1   different team, still managing money within his tenure at

2   Putnam and investment experience that was not dissimilar.

3   His tenure might have been longer than mine, but we were

4   close.

5           Mr. Jeffrey Lindsey --

6           THE COURT:  So what happened to him?

7           THE WITNESS:  He's still there.  He's a chief

8   investment officer.

9           THE COURT:  So I just want to know.  We just have

10  to understand the steps.  What are you saying happened to him

11  that didn't happen to you?  In other words, you have to be

12  clear about this.

13          THE WITNESS:  He became a managing director, and

14  then he became a chief investment officer.  These promotions,

15  even once you became a managing director, there were still

16  other promotions available to you on the functional title

17  side.

18          THE COURT:  When?

19          THE WITNESS:  What would help me, if it would be

20  possible, your Honor, is I have a couple of pieces of paper

21  over at my seat that actually have which year each person

22  made managing director, if I could look at them.

23          THE COURT:  Fine.  Do you want to go look at the

24  notes?

25          THE WITNESS:  I mean, I don't know if they have to

1    be evidence for me to look at them, but --

2              THE COURT:  No, go, if they remind you.  The other

3    side has a right to look, if you want to take a look over her

4    shoulder for a minute to see them.  Just go up to the stand.

5    If he wants, he can just take a quick peek while you're

6    sitting up there.

7              MR. KOCIUBES:  Thank you, your Honor.

8              (Documents shown to Mr. Kociubes.)

9              THE WITNESS:  Thank you.  Okay, so Mr. Tony Elavia

10   was promoted to managing director in 2001.  Mr. Jeffrey

11   Knight was promoted to managing director in 2002.  Mr. Joshua

12   Byrne, the first one I described, was promoted to managing

13   director in 2001.  Now --

14   Q.   With regard to Mr. Knight, why do you say that he's a

15   comparator of yours?

16   A.   I thought I testified to that.  We started as --

17             THE COURT:  No, we're not going to go all -- yes,

18   she just described that.  Let's go on to No. 4.

19   A.   I'd like to read Mr. Lindsey.  Mr. Jeffrey Lindsey is

20   the next one, and he was promoted in 2000 to managing

21   director.  Mr. Lindsey and I started the same year in the

22   Research Department, and we both covered stocks side by

23   side.  Mr. Lindsey moved out of the Research Department to

24   the Large Cap Growth Team and became a portfolio manager

25   there.  We had very, very similar background, length of

1    investment experience, tenure.  And we had similar career

2    tracks, and I considered him to be my comparator.

3            Moving down the list --

4    Q.   And when was he promoted?

5    A.   He was promoted in 2000.

6            THE COURT:  From portfolio manager to managing

7    director?

8            THE WITNESS:  Well.  The thing is, your Honor,

9    there's two tracks on these promotions.  So there's a level

10   of promotion that's officer that starts at assistant vice

11   president and moves to vice president, senior vice president,

12   managing director.  Then there's another track parallel that

13   is what they call a functional title, and that's what you're

14   doing for a living, so analyst, portfolio manager, senior

15   portfolio manager, director, and chief investment officer.

16   So it is possible for someone to be a managing director and a

17   senior portfolio manager, or a person --

18           THE COURT:  Yes, but just tell us what he did.  I

19   just don't understand what he got.

20           THE WITNESS:  Mr. Lindsey was managing director and

21   senior portfolio manager, and I think he eventually became a

22   director of some kind of growth equity.

23           THE COURT:  Don't speculate.

24           THE WITNESS:  I'm not speculating, I'm sorry.

25   Okay, I won't speculate.  He was managing a portfolio, the

Page 24

1    Growth Opportunities Portfolio, and that I know.

2              The next one is Mr. Shigeki Makino, and Mr. Makino

3    was an outside hire at the level of managing director in

4    2000, which is one of the years that I was up for promotion

5    to managing director.  Mr. Makino came to Putnam, and he came

6    in August of 2000.  He joined the Core Team, the Global Core

7    Team, and this is the team that managed the Global Equity

8    Fund, which fund absorbed the Global Growth Fund.  When the

9    restructuring occurred, the Global Growth Fund, to which I

10   was assigned, moved to the Global Core Team, and Mr. Makino

11   began to manage that fund.

12             I consider him to be a direct comparator because he

13   took the large part of my responsibilities in that fund and

14   moved it into that team.  I also was up for managing director

15   the same year that he came and got a managing director spot.

16   We have similar investment experience.

17   Q.   Next?

18   A.   The next one moving down the list is Mr. Colin Moore,

19   and he came in, again, as a managing director in June of

20   2000, the same year I was up for managing director.  And he

21   came in to be in the International Value Group, so he was a

22   part of the Value Group, and he worked in international.  And

23   I'm forgetting his title.  I think he came as -- well, I

24   don't want to say, but he came in, he did come as a managing

25   director because he's on my managing director list.  He came

1  in June of 2000.  And, again, similar roles in terms of

2  managing portfolios, and his were international

3  value-oriented.

4          Next on the list, Mr. Michael Mufson.  Mr. Mufson

5  was on the -- oh, he was promoted to managing director in

6  2000.  He was a member of the Small and Emerging Growth Team,

7  which was also known as the Specialty Growth Team.  We had

8  similar portfolio management responsibilities.  He managed

9  the OTC and Emerging Growth Fund, which fund had also poor

10  performance in 2001.

11          Mr. Hugh Mullin is the next.  Mr. Mullin was a

12  manager in the Large Cap Value Team, and he was promoted to

13  managing director in 2001.  He had more experience at Putnam

14  than I did.  He arrived in the mid to late '80s, so the

15  investment experience was not dissimilar.  His tenure was

16  longer.  His responsibilities were the same.  He was a

17  managing director and a senior portfolio manager in the Large

18  Cap Value Team.

19  Q.   Next?

20  A.   Mr. Paul Warren.  Mr. Warren was promoted off-cycle to

21  managing director in 2000.

22  Q.   What do you mean by off-cycle?

23  A.   And I recall that.  Off-cycle, there was an annual

24  promotion cycle for officers and for functional titles.

25  Q.   At what time of year?

Page 26

1    A.    Excuse me?

2    Q.    At what time of year?

3    A.    It was in the spring.  It was usually announced by the

4    first of April or so.  It could be within late March to early

5    April.  And Mr. Warren was made a managing director at a

6    different time of year.  He started out as a senior portfolio

7    manager, and he ultimately rose to be the chief investment

8    officer of the U.S. and Global Core Team.  He came to Putnam

9    while I was at Putnam in the '96-'97 time frame as a

10   portfolio manager, and he was a named portfolio manager,

11   again, on the Global Equity Fund, which the Global Growth

12   Fund ultimately became.

13          And Mr. Manny Weiss, who I discussed on Wednesday

14   in my testimony, Mr. Weiss was made a managing director in

15   2000.  And he had longer tenure at Putnam than I did but was

16   a managing director and director in the Large Cap Growth

17   Team.  And we had similar investment responsibilities in

18   terms of being named managers and listed in the SEC filings

19   at a similar level of managing.  He had a Large Cap Growth

20   portfolio.

21   Q.    Now, is there anyone on that first section on that first

22   list that comes out of the Research Department in the 2003

23   period?

24   A.    Yes.  Excuse me, in the 2003 period?  Yes, Mr. Joshua

25   Brooks.  Mr. Brooks --

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 27

1        MR. KOCIUBES:  Note my objection, your Honor.

2        THE COURT:  Sustained.

3    A.   Mr. Brooks joined --

4        THE COURT:  No, sustained.

5        THE WITNESS:  Oh, I'm sorry.  Excuse me.

6        MR. MOLONEY:  May I be heard on that, your Honor,

7    for that one name?

8        THE COURT:  Can we move on and deal with it later?

9        MR. MOLONEY:  Okay.

10   Q.   Anyone else in Research in 2003 on that one?

11   A.   In 2003?

12   Q.   Right.

13   A.   No.

14   Q.   All right, now, Section 2, would you read the title for

15   that.

16   A.   Yes.  This is "Males not demoted from Portfolio Manager

17   positions in 2002."

18   Q.   Now, again, I first direct your attention to anyone on

19   the list who held the position of portfolio manager.

20       MR. KOCIUBES:  And note my objection, your Honor.

21       THE COURT:  Overruled.

22   Q.   There are names on this section of the list that you've

23   already discussed; namely, Mr. Joshua Byrne, Jeffrey Lindsey,

24   Michael Mufson, Hugh Mullin, and Paul Warren.  Are there any

25   others in that section that --

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 28

1    A.    Yes.

2    Q.    Okay, if you could add those other names.

3    A.    Mr. Dana Clark, Mr. Stephen Dexter, Mr. Nathan Eigerman.

4    Q.    E-i-g-e-r-m-a-n?

5    A.    Yes.

6          THE COURT:  Now, what's this category of people?

7          MR. MOLONEY:  Males not demoted from portfolio

8    manager positions in 2002, the year that she was demoted.

9          THE COURT:  Wait.  You need to put some context on

10   this.  Which groups were they in?

11         MR. MOLONEY:  Sorry, your Honor?  I'll ask.

12   Q.    You identified a Dana Clark?

13   A.    Yes.

14   Q.    Would you tell the Court and jury why you contend that

15   he's a comparator for the category of "Males not demoted from

16   Portfolio Manager positions in 2002."

17   A.    Sure.  Mr. Clark was a member of the Mid-Cap Growth

18   Team, and he was not demoted from the Growth Team during the

19   reorganization.  He was a senior portfolio manager on the

20   Growth Team.

21         THE COURT:  I think I should see you up at side bar

22   on this one.

23   SIDE-BAR CONFERENCE:

24         THE COURT:  I don't know what she's going to say,

25   but at least with respect to the demotions, it can't be the

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    whole Investment Management Division because that wasn't

2    the -- it's got to be just within the Growth Team.

3                MR. MOLONEY:  Well, we --

4                THE COURT:  So, I mean, you can't just because

5    that's not a fair comparison.  I mean, what happened is, they

6    just reorganized what, the Growth Team, right?

7                MR. MOLONEY:  They reorganized the growth group,

8    but in the core group, there were people who moved back and

9    forth between those two groups particularly.

10                THE COURT:  No, no, no.

11                MR. MOLONEY:  The value end was the one that was

12    least affected.

13                THE COURT:  Excuse me.  We're only going to talk

14    about people in the growth group because when the demotion

15    came, that's the only one that was reorganized, not the other

16    ones.

17                MR. MOLONEY:  The evidence will show, your Honor,

18    that in the Core Group, that there were people who left,

19    there were people who filled the blanks, there were people

20    who moved from the International, from Growth Group into the

21    Core Group, so --

22                THE COURT:  I see, but you're going to leave out

23    the Value?

24                MR. MOLONEY:  The Value one was the least affected

25    by that reorganization.

1          THE COURT:  All right, so leave off Value.

2          Now, while we're here, on Brooks, what's your

3   argument on Brooks?  That's a different situation.  It's

4   confusing to put it in the same category as managing

5   director.

6          MR. MOLONEY:  Brooks was brought in from the

7   outside to be the Director of Research.

8          THE COURT:  Excuse me.  But that's a different

9   category.  That's when you say she should have gotten it,

10  right?  But that's different from the promotion.  You've got

11  to have another category there, or they'll get confused.

12          MR. MOLONEY:  Okay.  Well, it's part of the failure

13  to promote.

14          THE COURT:  Except all the others were people who

15  were portfolio manager/senior vice president types who made

16  it up to managing director.  Brooks is a whole different

17  category, and I don't want you to lump it and confuse them.

18          MR. MOLONEY:  Can I treat him separately?

19          THE COURT:  Yes.

20          MR. KOCIUBES:  Your Honor, may I put my objection

21  on the record?  What we have done is, we have cherry-picked

22  specify names of people that she says were there and were not

23  demoted.  It is not an analysis of all people in certain

24  categories.  It is not women who were not demoted.  It is not

25  men who were fired.

Page 31

1          THE COURT:  Fine.  That's your job to put that in.

2          (End of side-bar conference.)

3          THE COURT:  Do you need more paper?

4          THE JUROR:  Personal need, your Honor.

5          THE COURT:  Personal need?  We value personal

6   needs.  We'll just stand and wait.

7          (Pause.)

8          MR. KOCIUBES:  Your Honor, while we're waiting,

9   could I just have a look at the notes here?

10         THE COURT:  Sure.  That's a good idea.

11         THE COURT:  If you don't feel well, just raise your

12  hand, and we'll recess, okay?  Sorry about that.  As a matter

13  of fact, do you want to switch seats?

14         THE JUROR:  I don't think it will be necessary,

15  your Honor.  Thank you very much.

16  Q.   Mrs. Svensson, you were beginning to tell us a bit about

17  why Dana Clark?

18  A.   Yes.  Mr. Dana Clark was a member of the Mid-Cap Growth

19  Team and was a portfolio manager on the Mid-Cap Growth Team.

20  Q.   And you've made reference to --

21         THE COURT:  Now, let me focus you because you're

22  thinking about comparators or not.  It's your fact

23  determination.  So the issue is, during the reorganization,

24  what happened to people.  So this is a different issue

25  because one of the claims that you're going to have to

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 32

1    resolve is whether she was unfairly demoted because of her

2    sex.  So that's the claim.  Remember that reorganization, and

3    what year was it?

4            THE WITNESS:  2002, your Honor.

5            THE COURT:  Okay, all right, go ahead.

6    Q.   And next?

7    A.   The next one is Mr. Stephen Dexter.  He was a senior

8    portfolio manager on the International Growth Team, the same

9    team that I was on.  In the reorganization, he remained on

10   the team.

11   Q.   And his experience and performance compared to yours?

12   A.   It was side by side.  He was listed on the same fund

13   that I was on.  He was also listed on a different fund,

14   International New Opportunities, both of which were in the

15   fourth quartile in 2001 in terms of performance.  The fourth

16   is the bottom quartile of performance.

17   Q.   Next on the list?

18   A.   Sure.  Mr. Nathan Eigerman.  Mr. Eigerman was a

19   portfolio manager coming from the quant. area, but was listed

20   on one of the portfolios within my team, the International

21   Growth Team, and he remained on the team.

22   Q.   So he was a part that Growth team and the Growth group

23   along with Mr. Dexter?

24   A.   He was assigned to the International New Opportunities

25   Fund.  At that time, prior to the reorganization, I believe

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   he was situated -- I'm not saying "I believe" -- he was

2   situated from the quantitative, Equity Quantitative Research

3   area as a portfolio manager and worked with us, but with a

4   quantitative orientation.

5   Q.   All right, next?

6   A.   Mr. Richard England.

7   Q.   And why Mr. England?

8   A.   Mr. England was a senior portfolio manager in the Large

9   Cap Growth area.  He had been in Research the same time frame

10  as me.  He left Research before I did, a year or two before I

11  did, to join the Large Cap Growth Team, was a senior

12  portfolio manager there.  During the reorganization,

13  Mr. England retained his portfolio management role and

14  transferred to the Core Team.

15  Q.   Next?

16  A.   Mr. Roland Gillis.

17  Q.   Why Mr. Gillis?

18  A.   Mr. Gillis was on the Small and Emerging Growth, also

19  known as Specialty Growth Team.  He was a portfolio manager.

20  Mr. Gillis had been a managing director for a while, yet was

21  listed in the same capacity with his fund that he managed as

22  I was with my fund, as a portfolio manager filed with the

23  SEC.  He was on the Growth Team, Specialty Growth, also

24  experienced poor performance in 2001.

25  Q.   Next?

1   A.   For the moment I'm going to stay with the Growth people

2   as I go down the list.   Mr. Peter Hadden was on the

3   International Growth Team, and he --

4   Q.   Why Mr. Hadden?

5   A.   He was retained on the International Growth Team.

6   Q.   What was his position?

7   A.   He was a portfolio manager on the International Growth

8   Team.

9         Mr. Jeffrey Lindsey got described before from the

10  Large Cap Growth Team, had started in Research, similar

11  tenure and investment experience, and stayed on the Large Cap

12  Growth Team.

13        Mr. Daniel Miller, Mr. Miller was on the Specialty

14  Growth Team.   He was the chief investment officer of the

15  Specialty Growth Team and retained his position --

16        MR. KOCIUBES:   Objection, your Honor.

17  A.   -- during the reorganization.

18        THE COURT:   Overruled.

19  A.   Mr. Michael Mufson, Mr. Mufson was also a portfolio

20  manager on the Specialty Growth Team and stayed on the

21  Specialty Growth Team during the reorganization.

22        Mr. David Santos, a portfolio manager on the Large

23  Cap Growth Team, stayed on the Large Cap Growth Team during

24  the reorganization.

25        Mr. Anthony Sellitto, a portfolio manager on the

Page 35

1   Large Cap Growth Team, he transferred to the Specialty Growth

2   Team during the period of the reorganization and took a

3   position there as a senior portfolio manager in both places.

4           Mr. Eric Wetlaufer was the chief investment officer

5   of the Mid-Cap Growth Team and stayed in the Mid-Cap Growth

6   Team.

7           MR. KOCIUBES:  Objection, your Honor.

8           THE COURT:  Overruled.

9   Q.   And your experience and qualifications compared to his?

10  A.   My experience and qualifications, my investment

11  experience was similar, and we were both listed as portfolio

12  managers on our respective funds.

13          Now, I've gone through the people on the list that

14  are part of the Growth Group.

15          MR. KOCIUBES:  Can we have a question, your Honor?

16  Q.   Are there people in the Core Group on that list?

17  A.   Yes, there are.

18          THE COURT:  On the what group?

19          MR. MOLONEY:  Core, C-o-r-e, your Honor.

20          THE COURT:  You just need to keep your voice up.  I

21  see you put your mike there.  I'm actually losing you more

22  than I'm losing the witness, so just put the mike up.

23  Especially since your back is to the jury, make sure that

24  they can hear you.

25          MR. KOCIUBES:  Can I just have a continuing

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 36

1    objection to the Core questions?

2          MR. MOLONEY:  Yes.

3    Q.   Okay, go ahead.

4    A.   Mr. Andrew Graham, Mr. Graham was on the Global Core

5    Small Cap Team as a portfolio manager.

6          Mr. Joseph Joseph, he was the chief investment

7    officer of the Global Core Small Cap Team.  Mr. Joseph and I

8    were both hired into Research almost the same time.  He came

9    later than me.  He was promoted out of Research and went to

10   the Core Team and ultimately became a chief investment

11   officer.  He was promoted to managing director prior to the

12   2000 time period, so I don't have a note of the year, but we

13   were side by side as analysts in the Research Department

14   early on in our tenures at Putnam.

15         Mr. Omid Kamshad, he was the head of the

16   International Core Team, the chief investment officer, also

17   listed as a portfolio manager on the International Growth

18   Fund, the same level as me on the International Growth Fund

19   as a portfolio manager filed with the SEC.

20   Q.   And your background and experience compared to his?

21   A.   Mr. Kamshad came to Putnam in 1996, and at the time that

22   he arrived he had ten years of investment experience.  I

23   arrived at Putnam in 1994 with seven years of investment

24   experience, so we had about a year's difference investment

25   experience.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   Q.   And then in the positions held?

2   A.   Mr. Kamshad joined in a portfolio management role and

3   ultimately became chief investment officer of the

4   International Growth Team -- I mean, excuse me -- the

5   International Core Team.

6   Q.   When did he become a portfolio manager?

7   A.   He came as a portfolio manager.

8   Q.   And the year again was?

9   A.   1996.

10  Q.   And when did you become a portfolio manager?

11  A.   1997, late '97.

12  Q.   Next on the list?

13  A.   Mr. David King.  Mr. David King is a portfolio manager

14  at Putnam, and he had -- he has been a managing director

15  longer than this 2000-2003 period.  He's been at Putnam

16  longer than I have.  He joined Putnam in the early '80s and

17  so was there when I arrived, has more investment experience

18  than me.  I came in the investment business in 1987, so he

19  predates me in investment experience and Putnam tenure.

20       Mr. King is on this list because when I was

21  thinking about individuals that could have been demoted for

22  periods of poor appearance, Mr. King came to mind.  He

23  managed a fund called the New Value Fund.  He's on the Large

24  Cap Value Team.  Mr. King experienced three years in the

25  fourth quartile, three years in a row from '97 through 1999

Page 38

1    on that fund, and yet retained his portfolio management

2    role.  So while we both were senior portfolio managers, I

3    experienced two years in the fourth quartile and was demoted.

4    Q.   Next on the list?

5    A.   Sure.  Also in the value team, Mr. Coleman Lannum.

6         MR. KOCIUBES:  We've drifted into Value now, your

7    Honor?  The last one was Value.  I would strike it.

8         THE COURT:  Excuse me.  Is this part of the claim

9    of demotion?

10        MR. MOLONEY:  Yes.

11        THE COURT:  Motion to strike is allowed.  At this

12   point, the demotion, the two areas we're talking about is

13   Growth and Core.  Remember those are the ones where people

14   shifted in and out.  Value, at least we haven't heard so far,

15   has been affected, so unless you lay that foundation.  So I

16   strike it.  What name came up?

17        MR. KOCIUBES:  King.

18        THE COURT:  King, just King.

19        THE WITNESS:  Sorry, your Honor.  I didn't

20   understand.

21        Okay, so with the Core Team, Mr. Geir Lode.

22   Q.   Can you spell his last name.

23   A.   L-o-d-e.

24   Q.   And his first name?

25   A.   It's G-e-i-r.

Page 39

1   Q.    And why Mr. Lode?

2   A.    Mr. Lode was a portfolio manager named to the Global

3   Equity Fund, which is the fund that the Global Growth Fund

4   which I managed merged into.  So Mr. Lode I believe was

5   compared with me by Putnam because they put him on the fund

6   that I had managed.  He's a portfolio manager.

7            MR. KOCIUBES:  Objection and motion to strike the

8   "I believe was compared to me" discussion, your Honor.

9            THE COURT:  Yes, just that one piece.

10           MR. MOLONEY:  About the replacement testimony.

11           THE COURT:  Yes.  Well, why don't you just ask it

12  so it comes out clearly.

13           MR. MOLONEY:  Okay.

14  Q.    Without including your belief in regard to that person,

15  would you explain why?

16  A.    Mr. Lode, Geir Lode, became a portfolio manager listed

17  on the Global Equity Fund, which would be replacing me

18  because that fund was where the Global Growth Fund merged

19  into.

20  Q.    As part of the reorganization?

21  A.    As part of the reorganization.

22  Q.    Okay.  Anyone else in Core on this list?

23  A.    Yes.  Mr. Paul Marrkand.

24  Q.    Why Mr. Marrkand?

25  A.    Mr. Marrkand is a member of the Growth Team, or was a

Page 40

1  member of the Growth Team, the U.S. Growth Team, and had

2  experienced a period of prior performance that had also been

3  poor and yet retained his portfolio management title.  He had

4  less investment experience than me, more Putnam tenure than

5  me, and we are comparators for that reason.

6  Q.   Now, when you say poor performance, can you help us to

7  understand his performance in relation to your team's

8  performance and your performance.

9           MR. KOCIUBES:  Objection.  Foundation, your Honor.

10          THE COURT:  Overruled.  To the extent you observed

11  it or know the numbers.

12          THE WITNESS:  Yes, I observed it, that he was

13  managing -- he managed a number of different funds, but there

14  was a prior year when he managed the Tax Smart Equity Fund,

15  and it was in a lower quartile.  That's the best I can

16  remember.

17  Q.   When you say lower quartile, lower than?

18  A.   The bottom half, third or fourth.

19  Q.   Okay.  Anyone else on this list coming from Core?

20  A.   Yes, Mr. Sandeep Mehta.

21  Q.   And that's S-a-n-d-e-e-p?

22  A.   Yes.

23  Q.   And M-e-h-t-a for the last name?

24  A.   Yes.

25  Q.   Why Mr. Mehta?

1   A.    Mr. Mehta was a member of the Core Team, the Global Core

2   Team, and Mr. Meta became a portfolio manager, again, on the

3   Global Equity Fund, which was the fund that my fund, the

4   Global Growth Fund, was merged with, so he replaced me on the

5   fund.

6   Q.    Anyone else from Core on this list?

7   A.    Mr. Gerald Moore.

8   Q.    This is a different person?  The other one was Colin?

9   A.    Yes, Gerald Moore is a different person.

10  Q.    And why Mr. Gerald Moore?

11  A.    He was on the Global Core Small Cap Team.

12  Q.    And your situation as compared to his?

13  A.    We were both portfolio managers listed similarly in

14  filings and. . .

15  Q.    When you say filings, whose filings?

16  A.    SEC filings.

17  Q.    By Putnam?

18  A.    Yes.

19  Q.    Anyone else from Core on this list?

20  A.    Mr. Michael Nance.

21  Q.    N-a-n-c-e?

22  A.    Yes.

23  Q.    Why Mr. Nance?

24  A.    Mr. Nance was on the U.S. Core Team.  We had similar

25  length of tenure at Putnam.  I had more investment experience

Page 42

1    than Mr. Nance.  We were both listed as senior portfolio

2    managers on our respective funds.  We had both been in

3    Research, and he had moved out of Research approximately -- a

4    period of time before I did, within one to two years before I

5    did.

6    Q.    Anyone else?

7    A.    But we both had the Research background and a similar

8    start date at Putnam, although Mr. Nance had less investment

9    experience.

10   Q.    Anyone else from Core on this list?

11   A.    Mr. Stephen Oler.

12   Q.    O-l-e-r and Stephen with a p-h?

13   A.    Yes.

14   Q.    Why Mr. Oler?

15   A.    Mr. Oler was in the International Core Team.  He had had

16   a prior period of performance when he was working on the

17   Emerging Markets Fund, which it was also part of the Core

18   Team where he was; and that fund was merged into another

19   fund, basically went away, closed.  And I considered him as a

20   person who had had prior experience that was less than

21   successful as a portfolio manager and yet retained his

22   position as a portfolio manager.

23           MR. KOCIUBES:  Can we have time periods when some

24   of this was happening, your Honor?

25           THE WITNESS:  Can I answer?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1          THE COURT:  This is all part of the demotions

2     claim, right?

3          MR. MOLONEY:  Correct.

4          THE COURT:  So these are all 2002?

5          MR. MOLONEY:  Right.

6          THE WITNESS:  Well, your Honor, when I thought

7     about and made the complaint, I was thinking of people that

8     still got to stay even though they'd had years of

9     underperformance, so his underperformance --

10          THE COURT:  Excuse me.  We have to be clear to the

11     jury whom you're claiming are the comparators when the

12     department was reorganized, and some people got what you

13     would say -- and that's a fact question -- demoted and other

14     people got to keep their portfolio manager positions.  That's

15     all we're talking about right now.  Otherwise it gets too

16     confusing.  So are all these people in that category?

17          THE WITNESS:  Mr. Oler was on the International

18     Core Team at the time that that happened.  His Emerging

19     Markets experience was prior in 2001.

20          THE COURT:  So the answer is "yes," this is someone

21     who kept his position when you claim you were demoted?

22          THE WITNESS:  Yes.

23          THE COURT:  All right, just as long that's the

24     consistent claim here.

25     Q.   Anyone else from Core on this list?

1   A.    Mr. Justin Scott.

2   Q.    And why Mr. Scott?

3   A.    Mr. Scott had longer tenure at Putnam than I had, but

4   his investment experience was relatively similar.  Within a

5   few years of each other we had entered the industry, so it's

6   not exact but similar.  He rose to become the chief

7   investment officer of the Core Team, but, again, we had been

8   listed similarly on the SEC filings as portfolio managers.

9   Q.    And in terms of the male Scott not demoted in 2002, your

10  situation as compared to his?

11  A.    Well, he was a member of the Core Team.  I was a member

12  of the Growth Team.  The Growth Team in general had worse

13  performance in 2001.

14  Q.    Anyone else on from Core on this list?

15  A.    Yes, Mr. Michael Stack.

16  Q.    S-t-a-c-k?

17  A.    Yes.

18  Q.    Why Mr. Stack?

19  A.    Mr. Stack was a member of the Core Team, the U.S. Core

20  Team, and he was not demoted in that time frame.

21  Q.    And what position did he hold?

22  A.    He was a portfolio manager.

23  Q.    Anyone else on that?

24  A.    Yes.  Mr. Paul Warren, and Mr. Warren was the chief

25  investment officer of the Core Team.  He reported to

1  Mr. Scott who I mentioned earlier, and Mr. Warren was on the

2  Core Team and was the chief investment officer, as I

3  described earlier.

4  Q.   And anyone else?

5  A.   And one other thing.  Mr. Warren became a portfolio

6  manager listed in the SEC filings on the Global Equity Fund,

7  the same fund that my fund had merged into, so he replaced me

8  on the fund.

9  Q.   Anyone else?

10 A.   Yes, one more, Mr. James Wiess.

11 Q.   This is W-i-e-s-s?

12 A.   Yes.

13 Q.   Different than Mr. Manny Weiss?

14 A.   Yes.

15 Q.   And why Mr. James Wiess?

16 A.   Mr. Weiss was a member of the Core Team.

17 Q.   As a portfolio manager?

18 A.   As a portfolio manager.

19       MR. KOCIUBES:  And, your Honor, before he moves on,

20 just note my motion to strike the testimony of the list of

21 the CIOs.

22       THE COURT:  Yes.  The question is that -- I'll

23 instruct you later on as to how to think about who's an

24 appropriate comparator in that demotion, and I'll reserve on

25 that.

Page 46

1        MR. KOCIUBES:  Also, you granted the motion?

2        THE COURT:  No, I didn't.  I said I'm going to give

3   them instructions later on how to deal with that.

4   Q.   Now, directing your attention to the part of the list,

5   Section No. 3, would you read the caption on Section No. 3

6   please.

7   A.   "Males with higher compensation 2002-2003."

8   Q.   And first with respect to the Growth Group --

9        THE COURT:  Now, remember, you're limiting yourself

10  here to portfolio managers.

11        THE WITNESS:  Okay.

12        MR. KOCIUBES:  Your Honor, a side bar for ten

13  seconds on this one?

14        THE COURT:  No, let's just go through the portfolio

15  managers in the Growth Team.

16        MR. KOCIUBES:  She was in the Research Department

17  at that point.

18        MR. MOLONEY:  She was also undertaking portfolio

19  management responsibilities.  She had one sleeve --

20        THE COURT:  Not in front -- Mr. Kociubes is right,

21  I need to do this at side bar.

22  SIDE-BAR CONFERENCE:

23        THE COURT:  So I don't know how to deal with this.

24  That's a good point.  So at what point did she become a

25  portfolio manager of the Natural Resources?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1         MR. MOLONEY:  Well, she got what is called a

2    sleeve, which is a section of a portfolio, I think from

3    Mr. Kamshad, in the fall of '02.  Early January, January and

4    February of '03, she becomes Associate Director of Research,

5    and she becomes the portfolio manager of what was called the

6    Natural Resources Trust.  So from the time of January and

7    February of '03, she's a portfolio manager.

8         THE COURT:  I think you need to lay this foundation

9    to remind people of this, and I don't know, it's at least

10   enough in the ballpark.

11        MR. KOCIUBES:  I think her earlier testimony was,

12   was that various people in Research would sometimes manage

13   specified sleeves; you know, Natural Resources or something

14   else.  But they're in Research, and they're compared to

15   Research.  She's not comparing herself to portfolio managers.

16        THE COURT:  I don't know yet.  I'm going to let

17   this testimony in, and then I'm going to rule on it later.

18   But you need to lay the foundation because I didn't know

19   this.

20        MR. MOLONEY:  I think she testified about that --

21        THE COURT:  She did testify, but we didn't talk in

22   terms of compensation, so she needs to testify, not you,

23   about why there's a comparison, and then I'll hear whether

24   there's enough.

25        (End of side-bar conference.)

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 48

1           (Discussion off the record.)

2           THE COURT:  Let me just start again.  So the debate

3    is, it's up to you to decide what is a fair comparison.  And

4    at this point she's now talking about the period of 2002 when

5    she's in Research, and the point is going to be:  She has

6    multiple tasks at various points, so how do you think about

7    her compensation?  So we're now in the question, her claim of

8    unfair compensation compared to male comparators.  That's her

9    claim.

10          So why don't you ask that question and lay whatever

11   foundation, and it's hotly disputed, and that's what we were

12   just hearing about.

13   Q.   Now, in the year 2002, before the reorganization of the

14   Growth Team, what was your position?

15   A.   I was a senior vice president and senior portfolio

16   manager.

17   Q.   And what did you actually do?

18   A.   My entire job was to manage the Global Growth Fund plus

19   the Kokusai Fund, which was a fund for Japanese clients.  So

20   I spent all my time as a portfolio manager, as a senior

21   portfolio manager.

22   Q.   Now, after the reorganization, where were you sent?

23   A.   I was assigned to the Research Department.

24   Q.   And did you have any responsibilities for any kind of

25   portfolio management after you had been assigned to the

1    Research Department?

2    A.    I testified Wednesday about some certain sleeves that

3    were given to the Research Department by certain portfolio

4    teams.  So in the second half of 2002, I began to manage a

5    sleeve of the International Growth Fund, which is a fund that

6    came from the International Core Team, Mr. Omid Kamshad.  I

7    also played a role in managing a sleeve of the Investors Fund

8    for Mr. Paul Warren, and in 2003 I was named a manager of the

9    Global Natural Resources Fund, the manager of the Global

10   Natural Resources Fund.

11             THE COURT:  The portfolio manager?

12             THE WITNESS:  The portfolio manager.

13             THE COURT:  Not a sleeve?

14             THE WITNESS:  That was not a sleeve.  That was an

15   independent stand-alone fund called the Global Natural

16   Resources Fund.

17   Q.    And the size of that fund was approximately what?

18   A.    $250 million to $300 million.

19   Q.    And you maintained that position on that fund until you

20   were terminated?

21   A.    Yes, I did.

22   Q.    Now, with respect to that third category on the list,

23   "Males with higher compensation in 2002-2003" and directing

24   your attention to persons who held portfolio management

25   positions in the Growth Group first.

1    A.    Mr. Dana Clark, a member of the Mid Cap Growth Team.

2    Q.    That's the same Mr. Clark that you talked about before?

3    A.    Yes, I did.

4    Q.    And he was a portfolio manager?

5    A.    He was a portfolio manager.  Mr. Richard England.

6          THE COURT:  Now, these are people who all managed

7    full funds, not a sleeve, right?

8          THE WITNESS:  Correct.

9          THE COURT:  So this is for when you became he

10   manager of the full fund?

11         THE WITNESS:  So that would be 2003.

12         THE COURT:  Excuse me.  So that's the point of

13   comparison.

14   Q.    Well, I'd like you to think about when you answer these

15   questions about, if you name a person, was it his job in 2002

16   compared to your job as a portfolio manager in 2002?

17         MR. KOCIUBES:  Your Honor, objection.  Could we

18   have -- I think she testified that 30 percent of her time was

19   with the natural resources.  Could we have sort of an

20   indication of what percentage of these other people's time

21   was portfolio manager?

22         THE COURT:  You'll make that point on

23   cross-examination.  At this point we're talking about, just

24   to make sure it's apples and apples, in 2003 when you were

25   the manager of the portfolio fund, who were your

1  comparators?

2         MR. MOLONEY:  Your Honor, if I may, could I ask the

3  questions with her situation in 2002?

4         THE COURT:  When she had a sleeve.  You need to

5  make this clear for the jury.

6         MR. MOLONEY:  Right, I'm going to try to do that,

7  to have testify about what her position was coming into 2002

8  before the reorganization.

9         THE COURT:  I thought you just did that.

10         MR. MOLONEY:  I'm going to get into 2003.

11         THE COURT:  Yes.

12         MR. MOLONEY:  Okay?

13  Q.  Now, in 2002, before the reorganization, what was your

14  position?

15  A.  Senior portfolio manager, senior vice president and

16  senior portfolio manager.

17  Q.  And on what fund or funds?

18  A.  The Global Growth Fund.

19  Q.  Okay, now, directing your attention to the period of

20  2002 up until the time of the reorganization, are there on

21  this list males in the Growth Group whom you contend were

22  paid unequally?

23         MR. KOCIUBES:  And just note my objection.  If you

24  want me to have a continuing objection, your Honor --

25         THE COURT:  Overruled, overruled.  This is in the

Page 52

1    Global Growth Fund, what were you making and what were other

2    people making that you think was an unfair comparison?

3                THE WITNESS:  Mr. Dana Clark.

4                THE COURT:  First of all, what were you making?

5                THE WITNESS:  In 2002?  I was making $655,000,

6    which consisted of a base salary of $155,000 and a bonus of

7    $500,000.

8                THE COURT:  All right.

9    Q.   Okay, Mr. Clark?

10   A.   Mr. Dana Clark from the Mid Cap Growth Team, Mr. Stephen

11   Dexter --

12   Q.   And the dollar amount?

13   A.   I don't know that off the top of my head what Mr. Clark

14   earned.

15               MR. MOLONEY:  We'll be supplying evidence, your

16   Honor, in Putnam documents on this point.

17   Q.   Next on the list?

18   A.   Mr. Stephen Dexter.

19   Q.   And his position in 2002 before the reorganization?

20   A.   Senior portfolio manager, International Growth Team.

21   Q.   And do you know what he was making at the time?

22   A.   I don't.

23   Q.   Okay, next?

24   A.   Mr. Peter Hadden.

25   Q.   And without looking at documents, can you tell us what

Page 53

1    he was making?

2    A.   I can't recall.  Mr. Jeffrey Lindsey.

3    Q.   And without looking at documents, can you recall what he

4    was making?

5    A.   No.  I can't recall.  Mr. Daniel Miller.

6    Q.   And without looking at documents, can you recall?

7    A.   No, I can't.

8    Q.   Okay.

9    A.   Mr. Michael Mufson.

10   Q.   And without looking at documents, can you recall?

11            THE COURT:  You know, don't ask it every time.  Do

12   you remember what anybody made?

13            THE WITNESS:  Not really.  I remember what I made.

14            THE COURT:  All right.

15            (Witness examining document.)

16   A.   Mr. Michael Mufson I said, right?  Mr. David Santos.

17            THE COURT:  You need to give us, are these all

18   senior portfolio managers?

19            THE WITNESS:  They're senior portfolio managers.

20   He is on the Large Cap Growth Team.

21            Mr. Anthony Sellitto, he's a senior portfolio

22   manager on the Large Cap Growth Team.

23            Mr. Manny Weiss, he's a senior portfolio manager on

24   the Large Cap Growth Team.

25            Mr. Eric Wetlaufer is chief investment officer of

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 54

1    the Mid Cap Growth Team.

2            MR. KOCIUBES:  Objection and motion to strike.

3            THE COURT:  Sustained, sustained on that one.  So

4    only a comparison with the portfolio managers.

5    Q.   Now, the same question but with respect to Core.

6    A.   The Core Team, did you say?  I'm sorry, I didn't hear.

7    Q.   Core in the period up to and including 2002 to the time

8    of the reorganization.

9    A.   Okay.  Mr. Joshua Byrne, Mr. Simon Davis, Mr. David

10   Gerber, Mr. Andrew Graham, Mr. Thomas Haslett, Mr. Joseph

11   Joseph.

12           MR. KOCIUBES:  Can we have his title, your Honor?

13           THE WITNESS:  He's a chief investment officer.  So

14   it's not the chief investment officers, is that correct?

15           THE COURT:  No.

16           THE WITNESS:  Sorry.  Sorry, your Honor.  Mr. Geir

17   Lode, Mr. Shigeki Makino.  These are all portfolio managers.

18   Mr. Paul Marrkand, Mr. Sandeep Mehta, Mr. Nicholas Melhuish,

19   Mr. Gerald Moore, Mr. Michael Nance, Mr. Stephen Oler,

20   Mr. Michael Stack, Mr. James Wiess.

21   Q.   Now, directing your attention to the period on and after

22   the time of the reorganization when you started serving in

23   the Research Department, I'd like you to identify the persons

24   in the Research Department with whom you believe you should

25   be compared for purposes of the compensation claim.  And if

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    you identify persons, if you could give their title.

2    A.    Okay.  Mr. John Boselli, who's a managing director and

3    analyst.

4    Q.    In the Research Department?

5    A.    In the Research Department.

6                MR. KOCIUBES:  Objection, your Honor.  Motion to

7    strike.

8                THE COURT:  So what's this?  This is --

9                MR. MOLONEY:  These are people in the Research

10   Department in the period after the reorganization, the spring

11   of '02, your Honor.

12               THE COURT:  Overruled.  So why is he a comparator?

13               THE WITNESS:  Because he was in the Research

14   Department as a senior analyst, as an analyst.

15               THE COURT:  Do you know what he was making, or do

16   you know what Research was?

17               THE WITNESS:  No, I don't.

18               THE COURT:  All right so, that's coming in

19   differently.

20   Q.    In addition to Mr. Boselli, is there anyone else in that

21   period from the Research Department?

22   A.    Yes.  Mr. Ronald Bukovac.

23   Q.    Can you spell that?

24   A.    B-u-k-o-v-a-c.  Mr. Richard Cervone.

25   Q.    C-e-r-v-o-n-e?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 56

1    A.    Yes.  Mr. Brian DeChristopher.

2    Q.    And the titles of these folks?

3    A.    These are all analysts.  I believe -- well, I can't say

4    "I believe."  I can't recall their specific officer titles,

5    but they were analysts.

6    Q.    Functional title was analyst?

7    A.    Functional title was analyst in the Research

8    Department.  Mr. Saba Malak.

9    Q.    And do you know what he was making in this period?

10   A.    Yes.  He made $1.4 million.

11   Q.    And his functional title was?

12   A.    Analyst.

13              THE COURT:  What were you making?

14              THE WITNESS:  $655,000.

15   A.    Mr. Terrence Norchi.

16   Q.    That's N-o-r-c-h-i-e?

17   A.    Yes.

18   Q.    And do you know what Mr. Norchi was making?

19   A.    Yes, I recall.  $1.2 million.

20              THE COURT:  What was his title?

21              THE WITNESS:  He was a senior vice president and

22   analyst, as was Mr. Melhuish senior vice president and

23   analyst.

24              Mr. Christopher O'Malley, he was an AVP/analyst.

25   And Mr. Michael Yogg, and he was a senior vice

Page 57

1   president/analyst.

2   Q.    Now, looking at the same category for the period 2002

3   and 2003, are there on this list any persons serving in

4   portfolio management positions that you did not identify in

5   your earlier testimony on this subject that you believe

6   should be compared with you during the period of time that

7   you managed funds, even though you were in the Research

8   Department?

9           MR. KOCIUBES:  Objection.

10  Q.    And if you could tell the jury during what period of

11  time that was.

12          MR. KOCIUBES:  Objection, your Honor.

13          THE COURT:  Sustained.  Are we talking about

14  somebody who runs a fund?  Are we back at portfolio manager?

15          MR. MOLONEY:  Well, she testified that she --

16          THE COURT:  Well, let me see you

17  SIDE-BAR CONFERENCE:

18          THE COURT:  Who are you talking about?

19          MR. MOLONEY:  I just want to know if there's anyone

20  on the list that she did not include because of the time

21  period of the limited questions which dealt with portfolio

22  managers up until the time she stopped being a portfolio

23  manager in Growth and went into Research.  Now, she's covered

24  those people portfolio manager to portfolio manager.  Now

25  she's talk about people in the Research Department.

Page 58

1          THE COURT:  Right.

2          MR. MOLONEY:  And I just want to, you know, fill

3     the gap to see if there was anyone --

4          THE COURT:  No, no, that's just too broad, wide

5     open, and it's going to be confusing to the jury.  Now, the

6     one area that we haven't covered is portfolio manager once

7     she became the head of it or Natural Resources.

8          MR. MOLONEY:  That's what I'm trying to get at.

9          THE COURT:  Well, ask that because otherwise who

10    knows what she's going to say?

11         MR. MOLONEY:  Okay.

12         THE COURT:  Just very refined:  Once she became the

13    head of Portfolio Management for the Natural, whatever it's

14    called, the Natural Resources thing, who did she view as her

15    comparators?

16         MR. MOLONEY:  For the compensation.

17         THE COURT:  Yes.

18         MR. MOLONEY:  Okay.

19         (End of side-bar conference.)

20    Q.   Now, when did you become the portfolio manager on the

21    Global Natural Resources Fund?

22    A.   There was an SEC fund prospectus dated February 14 of

23    2003 that listed me as the portfolio manager of the fund.

24    Q.   Now, are there males on this Section 3 on the higher

25    compensation with whom you believe you should be compared

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 59

1   from and after the time you became the manager of that fund?

2   A.    Yes.

3          THE COURT:   What's Section 3?   What did you just

4   say?   Are there males -- you said Section 3.   Did I not hear

5   you right?

6          MR. MOLONEY:   No, I said Section 3.   It's just on

7   the exhibit she has in front of her.

8          THE COURT:   Oh, oh.   So who do you view as your

9   comparators when you were managing that fund?

10  Q.    For purposes of the compensation?

11  A.    Yes, your Honor.   Mr. Joshua Brooks.   Mr. Brooks became

12  the manager immediately after I left the fund.   He took over,

13  he replaced me on the fund.

14         MR. KOCIUBES:   Objection.   Motion to strike, your

15  Honor.

16         THE COURT:   Overruled.

17  A.    Mr. Terrence Norchi.   Mr. Norchi, although a research

18  analyst, was the manager of the Health Sciences Trust, which

19  was similar to the Global Natural Resources Fund, a second

20  fund managed from within the Research Department.

21  Mr. Michael Yogg.

22         THE COURT:   So what did they make, and what did you

23  make?

24         THE WITNESS:   Mr. Norchi made $1.2 million, and I

25  made $655,000.

Page 60

1    Q.    And Mr. Brooks?

2    A.    And Mr. Brooks made over $2 million.

3              MR. KOCIUBES:  Objection.

4              THE COURT:  Overruled.

5    Q.    And Mr. Yogg?

6    A.    Mr. Yogg made similar in the ranges as I did, but I

7    can't recall the number specifically.  And he managed the

8    Utilities Growth and Income Fund from within the Research

9    Department.

10   Q.    Now, with respect to Section 4 on your list, can you

11   read the category on your list.

12   A.    "Males either (a) not removed from management (b) not

13   terminated or (c) not forced out in August-September of

14   2003."

15   Q.    Now, with regard to the Growth Group, can you identify

16   persons on this list who were portfolio managers?

17             MR. KOCIUBES:  Objection, your Honor.

18             THE COURT:  Yes, sustained.

19             MR. MOLONEY:  I'm sorry, I didn't hear you.

20             THE COURT:  Sustained.

21             MR. MOLONEY:  May I have a moment, your Honor?

22             (Pause.)

23             MR. MOLONEY:  Your Honor, just for purposes of

24   understanding your ruling, I understand it to be that you

25   have ruled --

1        THE COURT:  Why don't we do this over here.

2   SIDE-BAR CONFERENCE:

3        THE COURT:  The issue is, in my view, it's fair

4   game to compare all the people who got promoted to managing

5   director and she didn't.  It's fair game to compare all the

6   people who had better compensation than she did, and it's

7   fair game to compare what happened in that reorganization.

8   The termination was sui generis.  There, that's the classic

9   McDonnell Douglas.  She was terminated.  Brooks took over at

10  least two of her roles, managing the other MBAs and the

11  fund.  I don't know about all of them.  One came with a

12  woman. . . splintered functions.  And then the question is

13  whether that was, you know, two guys bonding, or whether it

14  was because she was a bad manager of some sort.  But that's

15  different than a comparison.  That's a flat-out, straight-up

16  McDonnell Douglas, and I think it would confuse the jury to

17  go through other people who weren't fired.  That wasn't part

18  of that dynamic.

19        MR. MOLONEY:  Just so I understand, you would make

20  the same ruling with respect to any name on that section of

21  the list?

22        THE COURT:  I've never seen the section of the

23  list, but --

24        MR. MOLONEY:  It's just a series of names --

25        THE COURT:  Yes, I don't see this as a -- the

1    question is, why did he fire her?  Was it because of the guys

2    moving together, or was it because she was really a bad

3    manager?  And that's really going to be a straight, unique

4    issue for them.

5            MR. MOLONEY:  Okay.  What I think I'd like to do,

6    your Honor, is to have her go through some of the charts that

7    are in the books that you have.

8            THE COURT:  I don't know, but, you know, it's

9    10:20.  It's 10:20.

10            (End of side-bar conference.)

11            (Pause.)

12            MR. MOLONEY:  Your Honor, I'd like to put the easel

13    up so the jury can see the chart.  Mrs. Svensson has a copy.

14    The other side doesn't.  I believe the Court has a copy.

15            MR. KOCIUBES:  Before they're shown, though, could

16    your Honor make a ruling one by one.

17            THE COURT:  No.  There are twenty-three of these

18    things.  Which one are you putting up?

19            MR. MOLONEY:  I think we're starting with No. 2.

20            THE COURT:  Don't put it up until I've seen it.

21    What is it?

22            MR. MOLONEY:  No. 2, your Honor, Tab 2.

23            THE COURT:  What do you mean by "officers" here?

24            MR. MOLONEY:  Sorry, your Honor?

25            THE COURT:  This is the Investment Division,

Page 63

1    right?  Do you mean managing directors when you say

2    "officers"?  What do you mean?

3              MR. MOLONEY:  This is the Investment Division

4    officers, all officers, males versus females.

5              THE COURT:  Excuse me.  What does officer mean?

6              THE WITNESS:  It's people that have the officer

7    title of vice president, assistant vice president and above.

8    It's the population of the Investment Management Division

9    that Putnam supplied to me.

10             THE COURT:  That would have included you, right?

11             THE WITNESS:  Yes, I'm included.

12             THE COURT:  Because you were what, senior VP?

13             THE WITNESS:  I was a senior VP.

14             THE COURT:  All right, so this means assistant,

15   senior, managing director, and CIO?  Is that right?

16             THE WITNESS:  Yes.  And it has senior managing

17   directors, which is a very small group.

18             THE COURT:  Fine, just so we understand officers.

19   Yes, I'll allow this up.  And this is what we quaintly call a

20   "chalk," which means, in the old even days people used to

21   draw this on the blackboard; you know, when I used to sit

22   over in the superior court and we had these big blackboards

23   and someone would draw this out.  Now we have these

24   fancy-shmancy graphics.  But this is not an exhibit, but this

25   is a chalk, a demonstrative.

Page 64

1  Q.   Now, looking at the -- I'm going to call it the first

2  page in Tab 2, which is before the jury, can you explain what

3  is shown here on this chart, if you would, please.

4  A.   Sure.  There are a series -- this is called "Putnam

5  Investment Division Officers by Gender 1998," and by 1998,

6  I'm talking about 12/31/98, so the very end of the year of

7  1998.  And there's a series of figures on the chart.  There

8  are blue figures, which represent males, and red figures,

9  which represent females.

10 Q.   And the information on the left-hand side?

11 A.   The left-hand side just provides some counts of some

12 individuals.  So there were 207 males and 60 females, a total

13 of 267 individuals as of the end of the year 1998, or

14 3.5 males for every one female.

15 Q.   And the percentages of males versus females at that

16 time?

17 A.   78 percent males and 22 percent females.

18          MR. MOLONEY:  And this would be the second page of

19 that tab, your Honor.

20          THE COURT:  All right.

21          MR. MOLONEY:  As of 9/15/03.

22          THE COURT:  Excuse me.  You want to do what?

23          MR. MOLONEY:  It's the second one on the tab.

24          THE COURT:  Sure, yes, that's fine.

25          MR. KOCIUBES:  Are we on 2-B, your Honor?

Page 65

1           MR. MOLONEY:   The second page of Tab 2.

2    Q.    And what is shown on this chart, Mrs. Svensson?

3    A.    This is a similar count of Putnam Investment Division

4    officers broken out by gender as of the time of my

5    termination, September 15 of 2003.

6    Q.    And the blue figures on the gray background?

7    A.    They represent males.

8    Q.    And the red figures on the gray background?

9    A.    Represent females.

10   Q.    And the blue figures on the white background to the

11   right of the chart?

12   A.    Those represent the number of new male positions since

13   the previous chart at the end of 1998.

14   Q.    Okay.  And the white figures on the gray background at

15   the bottom of the chart represent?

16   A.    That represents the number of female positions that have

17   decreased since 1998.

18   Q.    And then the percentages of males versus females at this

19   time?

20   A.    Males are 82 percent, and females are 18 percent.

21   Q.    And the ratio of males to females?

22   A.    4.6 males for every one female.

23           MR. MOLONEY:  And then Tab No. 3, your Honor.  This

24   would be the first page of Tab No. 3.

25           THE COURT:  All right.

Page 66

1    Q.    And what does this chart show?

2          THE COURT:  Now, remember, these are not exhibits,

3    so these would not come with you into the jury room.

4          MR. MOLONEY:  May I proceed, your Honor?

5          THE COURT:  Yes.

6    Q.    What does this chart show, Mrs. Svensson?

7    A.    This chart shows the Putnam Investment Division managing

8    directors by gender as of the year end 2000.

9    Q.    And the percentage at that time was?

10   A.    75 percent male, 25 percent female.

11   Q.    And the ratio of males to female?

12   A.    Three males for every female.

13         MR. MOLONEY:  This would be the second page of that

14   same tab, your Honor.

15         THE COURT:  Yes, go on.

16   Q.    And what's the "as of" date on this chart?

17   A.    This is the same chart, as of September 15 of 2003.

18   Q.    And the blue figure on the white background at the top

19   right-hand corner?

20   A.    That represents an increase of one male.

21   Q.    And the white figures in the fourth row in the

22   right-hand corner of the figure portion?

23   A.    They represent the decrease in female representation.

24   Q.    There were five?

25   A.    There were five fewer positions.

1  Q.  And the ratio of males to females at this time became?

2  A.  85 percent male and 15 percent female.

3  Q.  And how many males per one female?

4  A.  There are now 5.7 males for every female.

5  Q.  And then Tab No. 4?

6       MR. KOCIUBES:  Objection, your Honor.

7       THE COURT:  Overruled.

8  Q.  By the way, Ms. Svensson, who prepared these charts?

9  A.  I prepared the charts along with my sister, Lynn

10 Heitman.

11 Q.  And who did the graphics, and who did the information?

12 A.  I gathered the information, and my sister did the

13 graphics.

14 Q.  Okay.  Now, directing your attention to the chart that's

15 presently in front of the jury and the Court.

16      THE COURT:  Which is this, number --

17      MR. MOLONEY:  This is Tab No. 4, your Honor.

18      THE COURT:  All right, I should see you at side bar

19 on this.  Why don't you take it down.

20 SIDE-BAR CONFERENCE:

21      THE COURT:  He may proffer that the

22 involuntary-voluntary is based on the interrogatories.  Is

23 that not accurate?

24      MR. MOLONEY:  It is accurate except for this one.

25 That's a characterization because their records --

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1          THE COURT:  Shh, shh.  What's your objection?  In

2     other words --

3          MR. MOLONEY:  This is something that --

4          THE COURT:  He makes a representation at the bottom

5     that they come off the interrogatories, so --

6          MR. KOCIUBES:  There are a couple of issues.

7     They've got the interrogatories.  They can introduce whatever

8     they want.  Some of these I think are just miscounting.

9     They're not accurate.  The source of that has not been put

10    into the record, so the jury right now is looking at charts

11    that are represented --

12         MR. KOCIUBES:  Excuse me.  We're only talking about

13    this one, your objection on this one.  So the question is,

14    the one thing I wanted to make sure that they represent that

15    this is consistent with the interrogatories.  So that would

16    be the only thing that would be prejudicial if that's not

17    accurate.

18         MR. MOLONEY:  The only one -- she will explain that

19    on this one, there's a characterization of the family reasons

20    information that's on a Putnam document.  All the others are

21    the characterization that Putnam put on on their answers to

22    interrogatories.

23         MR. KOCIUBES:  Well, it sounds like two of them are

24    not what's on the interrogatory.

25         THE COURT:  No, he's only referred to one.

1          MR. KOCIUBES:  I think they're mutual consents is

2    what were listed there.  But he can just show the

3    interrogatory.  I mean --

4          THE COURT:  No, I'm going to allow this chalk and

5    then -- but the issue really is, did she -- this is hearsay

6    other than it comes straight off of an interrogatory.  You're

7    saying it does?

8          MR. MOLONEY:  Yes, except for that --

9          MR. KOCIUBES:  Well, "except for" is the issue,

10   though.

11         THE COURT:  Well, what does it say on the

12   interrogatory on that?  What does it say?

13         MR. MOLONEY:  This comes from a different Putnam

14   document.

15         THE COURT:  What does it say?

16         MR. MOLONEY:  I think it talks about family

17   reasons.  It doesn't use the word "voluntary" or

18   "involuntary."

19         THE COURT:  So why don't you strike that and then

20   just say it says "family reasons," okay?

21            (End of side-bar conference.)

22         THE COURT:  With respect to that chart, when you

23   see it -- is it up there now?

24         MR. MOLONEY:  Yes, your Honor.

25         THE COURT:  It says "Reasons for Separation," those

Page 70

1    are something that she doesn't have personal knowledge of,

2    but it comes out of documents produced by Putnam.  So that's

3    the basis for that.

4    Q.    What does this chart show?  This is at Tab No. 4,

5    Mrs. Svensson.

6    A.    This chart shows the terminations of female managing

7    directors between 12/31/1999 and September 15 of 2003.

8    Q.    And the names of these people are on the left-hand

9    column?

10   A.    Yes.

11   Q.    And they are?

12   A.    Beth Cotner, Deborah Farrell, Jennifer Lechter, Carol

13   McMullen, Jennifer Murphy, and Margaret Smith.

14   Q.    Now, on the far right it says "Termination Type Putnam

15   Description"?

16   A.    Yes.

17   Q.    Can you tell us, please, of those on the right-hand

18   column, which came from the Putnam answers to

19   interrogatories?

20   A.    Sure.  Beth Cotner came from answers to

21   interrogatories.  Deborah Farrell, voluntary came from

22   answers to interrogatories.  Jennifer Lechter came from

23   answers to interrogatories.  Carol McMullen came from answers

24   to interrogatories, and Margaret Smith came from answers to

25   interrogatories.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 71

1    Q.   And the "voluntary" beside the name of Jennifer Murphy,

2    that came from a different Putnam document?

3    A.   Jennifer Murphy was in a different Putnam document, an

4    officer terminations list also produced by Putnam, and the

5    reason given was family reasons.

6    Q.   Would you turn to Tab No. 5, please.

7            MR. KOCIUBES:  Objection as to the partner

8    comparison, your Honor.

9            THE COURT:  What does "partner" mean?

10           THE WITNESS:  Your Honor, partner was -- you had to

11   be a managing director to become a partner, and it was still

12   another level of selection within the managing directors.

13   And so they had a separate bonus pool, and it was the next

14   level.

15           THE COURT:  I'll allow it.

16           MR. MOLONEY:  Thank you, your Honor.

17   Q.   What does the chart at Tab No. 5 show?

18   A.   It shows the number of male partners versus female

19   partners in the Investment Division between each year, 1999

20   until September 15, 2003.

21   Q.   And so the blue figures under "Putnam Investment

22   Division Partners" represent?

23   A.   Males.

24   Q.   And the red figures to the left of those respective blue

25   figures are?

1    A.    Females.

2    Q.    And the number of females goes from what to what over

3    the period '99 to 9/15/03 as shown on the chart?

4    A.    It goes from two to one.

5    Q.    And the males go from?

6    A.    They go from 15 to 18.

7    Q.    And the columns in the second portion of the chart at

8    the bottom?

9    A.    That's the percentage that the two figures down to one

10   figure of females represents.

11   Q.    Okay.  And so the percentage of females in '99 starts at

12   whatever that is until 9/15 became?

13   A.    Became 5.3 percent from 11.8 percent.

14   Q.    Tab No. 7, if you'd turn to that.

15         MR. KOCIUBES:  Objection, your Honor.  I would like

16   to be heard on that.

17         THE COURT:  Yes.  Don't put it up yet.

18   SIDE-BAR CONFERENCE:

19         THE COURT:  Yes, I do agree with this.  I think I

20   know what he's going to say.  I think it should only be with

21   respect to analysts and up to senior portfolio managers, if

22   this is a compensation comparison.

23         MR. KOCIUBES:  There's two other issues, your

24   Honor.  These will pick up some of the people that your Honor

25   has ruled in previous testimony were excluded.  This is the

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1  whole universe of 91.  You made her break it down.  And then

2  what it does is, it shows that --

3         THE COURT:  Excuse me.  I don't know if I broke it

4  down.  I can't remember with respect to compensation.  I did

5  with respect to --

6         MR. MOLONEY:  Well, but let me just, for

7  example --

8         THE COURT:  No, let him finish.

9         MR. KOCIUBES:  With respect to value, your Honor,

10 you excluded testimony.  When she went down the list --

11        THE COURT:  Excuse me.  I excluded Value for

12 purposes of the reorganization.  I didn't rule one way or

13 another with respect to compensation.

14        MR. KOCIUBES:  Yeah, I mean, there has not been

15 testimony that would cover all of these individuals.  And

16 then the second point here is, what it is is, she's

17 purporting to analyze the yellow, not analyze everybody in

18 red, and then draw averages just from the ones in yellow; and

19 I will represent to your Honor that not everybody, even in

20 yellow, are ones that there has been testimony about so far

21 because of the various rulings.

22        THE COURT:  Well, I can't rule on this right now,

23 so we're going to keep this chart off right now because you

24 couldn't possibly --

25        MR. MOLONEY:  It's without prejudice, though?

Page 74

1          THE COURT:  Yes, but I think this chart won't work,

2    or does work.  I don't want to take the jury time.

3          How much more longer do you have?

4          MR. MOLONEY:  I have a few more.

5          THE COURT:  Which ones so we'll stand up here?

6    Every single one has been objected to.

7          MR. KOCIUBES:  Actually, the first couple weren't.

8          THE COURT:  Fair enough, fair enough.  I take it

9    back.

10          MR. MOLONEY:  10.

11          MR. KOCIUBES:  10 is driven by 7.  That's what

12    that --

13          THE COURT:  Is it the same?

14          MR. KOCIUBES:  It's this universe from 7.

15          THE COURT:  Is that correct?

16          MR. MOLONEY:  I'm sorry, what?

17          THE COURT:  Is 10 derivative of 7, the one that we

18    said included some --

19          MR. MOLONEY:  Well, it's looking at everybody in

20    the females.

21          THE COURT:  Okay, objection sustained until we work

22    that out.  What's the next one?

23          MR. MOLONEY:  Okay, okay.  21.  This shows the --

24    21, your Honor, I think we're on.

25          MR. KOCIUBES:  We're going to want the source

Page 75

1   document put in, your Honor, because I think she's got the

2   wrong percentage per fund.

3           THE COURT:  Well, all right, that goes to weight.

4   You can attack it.  This one seems like it can come in.

5           MR. MOLONEY:  And then there's another following

6   that.

7           THE COURT:  Which one?

8           MR. MOLONEY:  It's the page behind it.  It's the

9   same tab but the page behind it.  No, Tab 21, your Honor,

10  there are two pages to it.  It's based upon the Morningstar

11  data.

12          THE COURT:  Okay.

13          MR. KOCIUBES:  This is based on documents, your

14  Honor, that aren't in, that may or may not come in.

15          THE COURT:  But I've allowed the Morningstar.  I've

16  said that that's appropriate, although you haven't actually

17  moved them in yet.  So if this is the underlying data, this

18  may be appropriate for 1006, but I'm not going to rule on

19  that right now as long as --

20          MR. MOLONEY:  Can I use the chart?

21          THE COURT:  Yes, these two you can.

22          MR. MOLONEY:  And then I have the reorganization

23  chart that shows the before and after and then --

24          THE COURT:  Fine, all right, let's just go.

25          (End of side-bar conference.)

1    MR. KOCIUBES:  And, your Honor, do you want me to
2    just register my objections to those now so I don't have to
3    interrupt?
4        THE COURT:  Sure.  So we're going to Chalk 21.
5        MR. MOLONEY:  Tab 21.
6        THE COURT:  Tab 21?
7    Q.  Mrs. Svensson, would you turn to Tab 21, please.
8    A.  Yes, I have it.
9    Q.  And what does this chart show?
10   A.  It shows a comparison of Putnam growth funds of all
11   funds of all companies in 2001 on a one-year basis as of
12   11/30/01.
13   Q.  So that's the November preceding the spring '02
14   reorganization?
15   A.  Yes.
16   Q.  And the different colors, there's white, light blue,
17   medium blue, and dark blue?
18   A.  Those represent the quartiles of performance.  So the
19   top quartile would be the top 25 percent of fund
20   performance.  The second quartile would be the second
21   25 percent of fund performance and moving on down.  So fourth
22   quartile is poor performance; the top quartile is good
23   performance.
24   Q.  Okay.  And then the information, the names in the last
25   row going from left to right in white with the black letters?

1   A.   Those are the names of the various Putnam growth funds

2   as of that time frame, 2001.

3   Q.   In the Growth Group?

4   A.   In the Growth Group.

5   Q.   And the names and the information and the percentages in

6   the dark blue band just above the names of the funds, what

7   does that information show?

8   A.   The percentages show exactly where within the fourth

9   quartile the fund falls.  So, for example, the Investors Fund

10  in the 88th percentile, that means --

11  Q.   That's the one on the far left?

12  A.   On the far left, Investors Fund, the 88th percentile

13  managed by portfolio managers listed, Beth Cotner, Manny

14  Weiss, and Richard England.  And the 88 means that 88 percent

15  of all funds of all companies performed better than the

16  Investors Fund.

17  Q.   And the next one, Growth Opportunities?

18  A.   The next one is Growth Opportunities.  The managers,

19  portfolio managers, were Jeff Lindsey, Mr. Jeffrey Lindsey

20  and Mr. Richard England; and they were in the 95th

21  percentile, meaning 95 percent of funds were better

22  performing.

23  Q.   And New Opportunities?

24  A.   New Opportunities managed by Mr. Daniel Miller,

25  Mr. Jeffrey Lindsey, and Mr. Rick Weed, and they were in the

Page  78

1    93rd percentile.

2    Q.    And Vista?

3    A.    Vista was managed by Mr. Eric Wetlaufer, Ms. Marjorie

4    Parker, Mr. Dana Clark, and Mr. Kenneth Door; and they were

5    in the 94th percentile of all funds.

6    Q.    OTC and Emerging Growth?

7    A.    OTC and Emerging Growth was managed by Mr. Stephen

8    Kirson and Mr. Michael Mufson.

9    Q.    What does OTC mean?

10   A.    Over the counter.

11   Q.    And Voyager 2?  Oh, I'm sorry, is there a percentage

12   figure on that one?

13   A.    They were in the 99th percentile.

14   Q.    Next?

15   A.    Voyager 2, managed by Mr. Roland Gillis and Mr. Jeffrey

16   Lindsey, was in the 93rd percentile.

17   Q.    And Global Growth?

18   A.    Global Growth managed by my team, Mr. Robert Swift,

19   Ms. Kelly Morgan, me, Mr. Manny Weiss, and Mr. Stephen

20   Dexter, in the 93rd percentile.

21   Q.    And International New Opportunities?

22   A.    International New Opportunities was also managed within

23   the International Growth Team by Mr. Robert Swift,

24   Mr. Stephen Dexter, and Mr. Peter Hadden, in the 93rd

25   percentile.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    Q.   Now, could you turn to the second page in that same tab,

2    please.  And this appears to be similar, but tell us what

3    this chart shows.

4    A.   This is a comparison of Putnam growth funds with funds

5    of other companies within category in 2001, and this is again

6    on a one-year basis as of the end of November, 2001.

7    Q.   And the white, the light blue, the medium blue, and the

8    dark blue also illustrate the same 25 percent quartile?

9    A.   Yes.

10   Q.   And the information, it's the same funds on the bottom?

11   A.   The same funds.

12   Q.   And the percentages going from left to right on those

13   respective funds?

14   A.   The Investors Fund was in the 55th percentile, which is

15   the third quartile; growth Opportunities in the 85th

16   percentile, fourth quartile; New Opportunities Fund in the

17   75th percentile, fourth quartile; the Vista Fund in the 80th

18   per aisle, which is the fourth quartile; the OTC and Emerging

19   Growth Fund in the 97th percentile, which is the fourth

20   quartile; the Voyager 2 Fund in the 78th percentile, which is

21   the fourth quartile; the Global Growth Fund in the 89th

22   percentile, fourth quartile; and the International New

23   Opportunities Fund in the 90th percentile, which is the

24   fourth quartile.

25   Q.   Now, if you turn to Tab No. 22, please.

Page 80

1        MR. MOLONEY:  May I proceed, your Honor?

2        THE COURT:  Yes.

3  Q.    Turning to Tab No. 22, can you tell us what this shows?

4  A.    This is an organizational chart that represents the four

5  teams within the Growth Group before reorganization, as of

6  December 31 of 2001.

7  Q.    Okay.  And the blue figures represent?

8  A.    The blue boxes are the males on the team.

9  Q.    And the red boxes?

10 A.    They are the females on the teams.

11 Q.    Okay.  And there are two boxes that are half blue and

12 half white?

13 A.    Yes.  That represents an individual who was a shared

14 resource who was doing work on both the Large Cap Growth Team

15 as well as the International Growth Team.

16 Q.    So Mr. Sellitto split his time on both?

17 A.    Yes.

18 Q.    And the top box at the very top of the chart?

19 A.    That's Mr. Stephen Oristaglio.  He was the senior

20 managing director and deputy head of Investments.

21 Q.    Okay.  And the folks on this chart shown as reporting to

22 him are?

23 A.    Those are the chief investment officers who report to

24 Mr. Oristaglio.

25 Q.    And if you could just give the last names of those, if

Page 81

1    you would, please.

2    A.    Cotner, Wetlaufer, Miller, and Swift.

3    Q.    And the information in the blue and red boxes shown as

4    reporting to them, that contained the information that you

5    gave in your testimony yesterday as to who was on the various

6    teams and so forth at this time?

7    A.    Yes.

8    Q.    Would you turn now to the second page of --

9              THE COURT:  So, actually, I think that might be

10   helpful, that organization chart for them to have.  I think

11   that should come in as an exhibit.  That's just the plain old

12   facts, so we'll put that in as an exhibit.  What number

13   should that be?

14             MR. MOLONEY:  Can it be a number to be designated

15   later, your Honor?

16             THE COURT:  Yes, you can designate it later.

17             MR. MOLONEY:  May I proceed?

18             THE COURT:  Yes.

19             MR. KOCIUBES:  What number is that, your Honor?

20             THE COURT:  What?

21             MR. KOCIUBES:  What number is the one that's coming

22   in?

23             THE COURT:  He doesn't have a number.  We'll put a

24   number on it later.

25   Q.    The second page in that tab, do you have that?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 82

1   A.    I do.

2   Q.    Now, what does this chart show?

3   A.    This chart represents the movement of the various Growth

4   Team members in the reorganization in 2002.

5   Q.    Now, directing your attention to the blue boxes and the

6   red boxes in the center portion of the chart, what do the red

7   and blue stand for?

8   A.    The blue boxes are males, and the red boxes are females.

9   Q.    And the information on the left-hand side of the chart?

10  A.    It shows the movement of the individuals that are on the

11  left-hand side of the chart in the Large Cap Growth Team.

12  Q.    Okay.  And then the information on the right-hand

13  portion of the chart?

14  A.    This shows the movement of the individuals from the

15  International Growth Team; if there was a change, where the

16  change occurred.

17  Q.    The next page in that tab, do you have that?

18  A.    I do.

19  Q.    And this is dated as of June 30, '02?

20  A.    Yes.  Yes, it is.

21  Q.    And what does it show?

22  A.    It shows the Growth Team after reorganization, or the

23  Growth Group after reorganization.

24  Q.    In terms of males and females?

25  A.    Yes.

1    Q.    And the blue boxes represent?

2    A.    Males.

3    Q.    And the one red box?

4    A.    Female.

5    Q.    And if you turn to the last page in that tab, what's the

6    date of this?

7    A.    This is March 31 of 2003.

8    Q.    And what does it show?

9    A.    It shows the Putnam Growth Group after reorganization as

10   of March 31 of 2003.

11   Q.    And all blue boxes?

12   A.    Yes.

13   Q.    Meaning all male?

14   A.    Yes.

15          MR. MOLONEY:  May I have a moment, your Honor?

16          (Pause.)

17          MR. MOLONEY:  I'm going to take these down.  I just

18   have a couple questions, your Honor.

19   Q.    Now, Ms. Svensson, do you contend in this case that you

20   should be compared with Mr. Joshua Brooks on any one or more

21   of your employment actions?

22   A.    Yes, I do.

23   Q.    And on what employment actions do you make that

24   contention in this case?

25   A.    On the equal pay employment action as well as the

Page 84

1  termination.

2  Q.   And the promotion claim?

3  A.   And the promotion claim, because he filled the position

4  that I was qualified for.

5  Q.   Okay, let's start with that, that position.  What

6  position are you talking about?

7  A.   The Director of Research position.

8  Q.   When were you appointed Associate Director of Research?

9  A.   In January of 2003.

10  Q.   And when did Mr. Brooks receive the appointment as

11  Director of Research?

12  A.   In April of 2003.

13  Q.   What is the factual basis of your contention that you

14  should be compared with him on that claim?

15  A.   Because Mr. Brooks came to fill a position for which I

16  had superior qualifications of investment experience, tenure,

17  experience managing people, and analytical experience.

18  Q.   Are you able to compare years of yours with years of

19  his?

20  A.   I am able to.

21  Q.   And you know that?

22  A.   Yes.

23  Q.   Can you do that?

24  A.   Sure.  Mr. Brooks had approximately twelve years of

25  investment experience, and I had sixteen years of investment

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 85

1    experience.  In terms of managing people, I had eight years

2    of experience managing people, which I started in 1995 at

3    Putnam, and Mr. Brooks had three years of managing people.  I

4    had twelve years as an analyst, analytical experience.

5    Mr. Brooks had six years.  I had more years of international

6    investment experience.  I had six years all together, and he

7    had four years.

8                And then in terms of managing people at Putnam, I

9    had, again, been managing people for the eight years at

10   Putnam, and Mr. Brooks at the time of my termination -- at

11   the time he came, he hadn't managed people at Putnam, and at

12   the time he terminated me, he had been there five months.

13   Q.   And on the compensation claim, what's the factual basis

14   of your contention that you should be compared with

15   Mr. Brooks?

16   A.   Because although I had superior qualifications, I wasn't

17   considered for that position, and so our compensation was

18   vastly difference.  Mr. Brooks earned quite a bit more than I

19   did, over $2 million.

20   Q.   Compared to?

21   A.   My $655,000.

22   Q.   And on the termination issue?

23   A.   Mr. Brooks replaced me in approximately 70 percent of my

24   job, and --

25   Q.   When you say 70 percent of your job, if you could tell

Page 86

1    us what the job was, and then apportion it in percentages and

2    explain what you just said, if you would.

3    A.    Sure.  My job consisted of several parts, as I've

4    previously testified.  I spent 30 percent of my time doing

5    analytical research work on a specific universe of non-U.S.

6    oil stocks, so that was about 30 percent of my job.

7              I spent 30 percent of my job managing the Energy

8    and Materials teams, and Mr. Brooks took over management of

9    those teams upon my termination.

10             I spent 30 percent of my job managing the Global

11   Natural Resources Fund.  Mr. Brooks took over and became the

12   manager of the Global Natural Resources Fund when I was

13   terminated.

14             And, finally, there was approximately 10 percent of

15   my time managing the Knowledge Management Team, which

16   Mr. Brooks took over.

17             MR. MOLONEY:  Your Honor, at this point I have no

18   further questions, but I would like to reserve the right to

19   bring Ms. Svensson back in rebuttal.

20             THE COURT:  Cross?

21             MR. KOCIUBES:  Yes, your Honor.

22             THE WITNESS:  Is it all right to go to the rest

23   room, by any chance?

24             THE COURT:  You know what?  Let's just take a break

25   right now.  We'll come back at twenty-five past.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 87

1          THE WITNESS:  Thank you.

2          THE CLERK:  All rise for the jury.

3          (Jury excused.)

4          THE COURT:  I'll just see you off the record for

5    one second.  See you back here at twenty-five past.

6          (A recess was taken, 10:55 a.m.)

7          (Resumed, 11:30 a.m.)

8          MR. MOLONEY:  One matter to bring to your

9    attention, Judge.  We had additional charts prepared.

10          THE COURT:  You know, it's impossible, you're so

11    soft-spoken.  So I don't want to put them all in now.

12          MR. MOLONEY:  No, no, I just wanted to give you a

13    heads-up.  There's a before and after on the three dates for

14    Core as we did for Growth, and I'm going to give Mr. Kociubes

15    copies so he can look at them over the weekend and bring them

16    back.

17          THE COURT:  That's fine, good.  All right, let's

18    bring this jury in.

19          MR. MOLONEY:  One other point, if I may, and that

20    is that now we know what your rulings is on the comparators.

21    We did have some exhibits prepared to go in today, but they

22    contain information about the people you've ruled out, so

23    we'd like to reformulate those.

24          THE COURT:  Yes, and maybe bring them back on

25    redirect or something?  That's fine.  So let's bring this

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 88

1    jury in.

2              You're quite correct, we just were checking, that

3    you refer to the word "impact" in your complaint, but it's

4    never really been briefed, and it always sounds like

5    treatment in terms of how you describe what the theory is.

6    So if you have some other theory, you need to spill it out

7    for us.  It has never really been briefed as an impact

8    claim.  It's, as you know, a completely different kind of

9    claim.  I'm not sure -- there was summary judgment on it, but

10   I'm not sure that the defendant understood it that way.  So

11   if it's just the compensation is systemically different, fair

12   enough, but we have to talk about that.

13             MR. MOLONEY:  Okay, okay.

14             THE COURT:  I have a question from a juror.  I'm

15   not sure I even remember the answer to this.  By the way, did

16   you have a problem with that one juror who was a librarian?

17             MR. MOLONEY:  No, we don't.

18             THE COURT:  All right, I forgot to ask you that.

19             "Question:  In testimony about males not demoted

20   from portfolio manager in 2002, some testimony was struck

21   about a David King.  Was all the testimony in this context

22   about David King struck or only portions?  If portions, which

23   portions of the testimony were struck and which stand?"

24             I think that's the one where -- is that the one

25   where you said "I believe"?

Page 89

1          MR. MOLONEY:  I think so.

2          THE WITNESS:  No.  He's in the Value team.  I

3    thought that was the reason.

4          THE COURT:  I don't remember.

5          MR. KOCIUBES:  Value.

6          THE COURT:  Value, then I say all of it, right?

7          MR. MOLONEY:  Yes, because Value, you've ruled on

8    Value.

9          THE WITNESS:  He's in Value.

10          THE COURT:  All right.  But let me just flag what

11    this issue says.  She's the only one, and I'm sure the folks

12    here from Putnam, who actually remembers where all these

13    people are.  So it's critical to get the lists straight.  So

14    I will say that all of it was struck.

15          MR. MOLONEY:  And I think maybe the context,

16    because it's on the Value Group, your Honor?

17          THE COURT:  Yes, I'm happy to do that.  Okay, all

18    right, bring them in.

19          (Jury enters the courtroom.)

20          THE COURT:  So somebody asked me a question, an

21    excellent question because this hasn't all been so clear,

22    asking about when I struck the testimony of David King, was

23    it struck in its entirety or just portions of it?  I was

24    trying to remember back when I exactly struck it, but at

25    least the way we remember it, there was a portion where he

Page 90

1   was listed as a comparator.  But he was part of the Value

2   Team as part of that -- this is in the context of the

3   demotion, and that he was part of the Value Team.  And the

4   reorganization came primarily between Growth and Core, so I

5   struck it as not an appropriate comparison because he was

6   part of a team which really wasn't affected, at least that

7   we've heard so far -- that may change -- in the

8   reorganization.  So the answer is "yes," in that context, it

9   was struck in its entirety.

10           MR. KOCIUBES:  May I begin, your Honor?

11           THE COURT:  Yes.

12           MR. KOCIUBES:  Thank you.

13   CROSS-EXAMINATION BY MR. KOCIUBES:

14   Q.  I guess it's still morning.  Good morning.  Do you

15   prefer to be called Ms. or Mrs. Svensson?

16   A.   Mrs. Svensson.

17   Q.   Mrs. Svensson, okay.  Now, Mrs. Svensson, Judge Saris

18   was kind enough, in connection with your testimony just a

19   little while ago this morning, to let you refer to some

20   notes.  Do you still have them with you?

21   A.   I do.  I have them here.

22   Q.   And one of the things that you give for the jury fairly

23   recently is, you gave them a list of names of people that you

24   say were male comparators who were promoted to managing

25   partner by Putnam between January of 2000 and September of

1   2003.  You recall that?

2   A.    I believe it was managing director.

3   Q.    Managing director?

4   A.    Yes.

5   Q.    Yes, you're correct.  And you had some notes that I was

6   able to with her Honor's permission to take a look at when

7   you had them.  And am I correct that in your notes you had a

8   list of the people, for example, in 2002 who were nominated

9   for managing director?  Do you see those?

10  A.    Yes, I do.

11  Q.    And am I correct that it appears that there were ten

12  people actually nominated?  That's what you have in your

13  notes?  In 2000 I'm talking about.

14  A.    Oh, in 2000?

15  Q.    Yes.

16  A.    I'm looking at 2002, sorry.

17  Q.    Yes, 2000.  I'm sorry.

18  A.    Yes, there are ten in 2000.

19  Q.    And am I correct that of those ten, six were men and

20  four were women?

21  A.    That is correct.

22  Q.    And am I correct that your name appears on that list?

23  A.    Yes, it does.

24  Q.    And am I also correct that of the four women who were

25  nominated for managing director, the other three women were

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    elected?

2    A.    Yes, they were.

3    Q.    And similarly there was one man who was not elected; the

4    other males were elected?

5    A.    No.    There were two males not elected.

6    Q.    Okay, so there were six men nominated and four elected?

7    A.    Correct.

8    Q.    There were four women nominated and three elected?

9    A.    That's correct.

10   Q.    Okay.    The only female not elected was you?

11   A.    That's right.

12   Q.    And am I also correct -- well, let me ask you.    You

13   spent some time the day before and also today testifying that

14   you, for various reasons that you stated, you felt yourself

15   as qualified as various of the men to hold various portfolio

16   positions and to be promoted and so forth.    Do you recall

17   that testimony?

18   A.    Yes, I do.

19   Q.    Were you as qualified as the other three women --

20          THE COURT:    Do you want to just hold for one second

21   just so we get this crew seated.

22          (Children entering the courtroom.)

23          THE COURT:    They keep coming.

24          MR. KOCIUBES:    This is a treat, your Honor.

25          THE COURT:    Where are you all from?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    FROM THE FLOOR:  Scituate.

2    THE COURT:  All right, so everyone's going to stay

3  very quiet, all right?

4    MR. KOCIUBES:  Thank you, your Honor.

5  Q.   And, Mrs. Svensson, were you as qualified as the other

6  three women, in your own view, to be elected managing

7  director?

8  A.   Yes, I was.

9  Q.   So that your view is, it's not just the men that you

10 were as qualified who got promoted, but you were as qualified

11 as the women who got promoted?

12 A.   Yes.

13 Q.   All right.  Now, similarly, and we're going to come back

14 to some of this, but toward the end of your testimony, you

15 testified about the various people that you wanted to compare

16 yourself to in Global Equity Research, in the Research

17 Department in 2002 and 2003.

18 A.   Yes.

19 Q.   Correct?  And I think your counsel asked you, and it may

20 have also been Judge Saris asked you, how much these people

21 made that you were comparing yourself, this whole list that

22 you had.  Do you recall that?

23 A.   As I understand it, I was speaking about people in 2003

24 that were in the Research Department and also managing these

25 portfolios.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 94

1    Q.   And am I correct, with the list of the people that you

2    compared yourself in Research, I think you said there were

3    two or three whose compensation you remembered.  You

4    remembered your boss's compensation, Mr. Brooks?

5    A.   Yes.

6    Q.   And I think there were two other people, two other men

7    whose compensation you remembered.  Do you recall that?

8    A.   Yes.

9    Q.   Dr. Norchi, he's a medical doctor, right, Dr. Norchi?

10   A.   Yes.

11   Q.   Okay.  And those three people, including your boss, made

12   more money than you did in 2002 and into 2003, right?

13   A.   I was testifying about 2003, as I recall, and they did,

14   yes.

15   Q.   Okay.  Now, in 2003, you weren't there for the whole

16   year?

17   A.   No.  I was terminated in September.

18   Q.   So you never got your bonus, had you stayed in 2003,

19   correct?

20   A.   That's correct.

21   Q.   So you don't know what your compensation would have been

22   in 2003?

23   A.   That's right.

24   Q.   Okay.  But the people that you remember are three

25   people, including your boss, who got paid more than you do,

1  correct?

2  A.   Yes.

3  Q.   You don't remember what any of the rest of them got

4  paid?

5  A.   Well, they weren't managing portfolios.  They were

6  sector portfolios in the Research Department.

7  Q.   With respect to your compensation in GER, would it come

8  as a surprise to you that they all got paid, these men, less

9  than you did?

10  A.   It wouldn't surprise me.  They weren't senior in the way

11  I was.

12  Q.   All right.  How about Michael Yogg, was he an Associate

13  Director of Research?

14  A.   He was.

15  Q.   And indeed he was, in terms of in the industry, much

16  more senior than you?

17  A.   Yes.

18  Q.   And he's a Ph.D. economist, he's in a senior position at

19  State Street for a long time?

20  A.   Yes.

21  Q.   Considerably older than you are?

22  A.   Yes.

23  Q.   He got paid less, correct?

24  A.   Within the range of what I was paid.

25  Q.   He got paid less?

Page 96

1    A.    Yes.

2    Q.    And he was in fact, I thought you said, managing a

3    sleeve, a utility sleeve?

4    A.    Not a sleeve.  A sector fund.

5    Q.    A sector fund, all right.  We'll come back to some of

6    this.  You've testified -- and correct me if I'm wrong,

7    obviously -- that your last day was September 15, 2003?

8    A.    Yes.

9    Q.    And you have a degree, is it in petroleum engineering?

10   A.    Yes, I do.

11   Q.    Okay.  And similarly you have an MBA, a master's in

12   business administration?

13   A.    Yes.

14   Q.    With a concentration, is that in finance?

15   A.    Yes.

16   Q.    And that's from Cornell University?

17   A.    Yes.

18   Q.    That has a terrific reputation, right?  One of the ivy

19   leagues?

20   A.    Yes.

21   Q.    And am I correct that despite your experience and your

22   academic credentials, in the balance of 2003 and 2004 and

23   2005 and 2006 and 2007 and 2008, no one has hired you?

24   A.    That is correct.

25   Q.    Now, how many years experience did you have in the

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    industry?

2    A.    Sixteen.

3    Q.    Sixteen.   And I take it most of those were as an

4    analyst; some of those were as a portfolio manager?

5    A.    Yes.   It was about -- it was close to five as a

6    portfolio manager, and the rest was an analyst.

7    Q.    All right.   And am I also correct that you've worked at,

8    what is it in total, four different money management firms

9    prior to Putnam?

10   A.    I think it's three:   Alliance Capital, Lord Abbett, and

11   Putnam.   Smith Barney is not a money management firm.

12   Q.    Okay.   And during your years at those firms, I take it

13   you interacted with other analysts, with other portfolio

14   managers?

15   A.    Sure.

16   Q.    People senior to you and people junior to you, correct?

17   A.    Yes.

18   Q.    And I take it, as part of your job search, many of those

19   people are no longer at their present firms; isn't that

20   correct?

21   A.    That would be correct, yes.

22   Q.    And some of them continue to stay in the business.   Some

23   of them are, correct, money managers?   Some of them might be

24   working for endowments, some of them hedge funds or private

25   equity firms?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    A.    Yes.

2    Q.    And some are out of the business?

3    A.    (The witness nodded affirmatively.)

4    Q.    And am I correct that you've attempted to network with

5    those folks?  These are people that know you?

6    A.    To some extent, yes.

7    Q.    And am I also correct that with respect to a number of

8    those people, that you've asked them for help in your job

9    search?

10   A.    With some of them, I have, yes.

11   Q.    And you know, for example, that one of the people that

12   you supervised has apparently done well, Darren Peers, he's

13   out in a firm in California now?

14   A.    Yes.

15   Q.    And I think you said you were willing to go to

16   California to work?

17   A.    Yes.

18   Q.    Have you contacted Mr. Peers?

19   A.    No.

20   Q.    There are, among the people that you worked with over

21   the years, a number of them were female, correct?

22   A.    A few.

23   Q.    And have you tried to enlist their assistance in helping

24   you find a position?

25   A.    A few.

1    Q.    And am I correct that despite that effort, of people who

2    know you and who would know your background and your skills

3    and your personality and your track record, not a single

4    offer emerged from that search?

5    A.    Yes, that's correct.

6    Q.    And then I think you also said that in the course of

7    your search, that you'd contacted about 134 companies?

8    A.    Yes.

9    Q.    And within those 134, you've contacted about 180

10   individuals?

11   A.    Yes, a little bit more but in that range.

12   Q.    Is it an approximation?

13   A.    I think it's 186.

14   Q.    Okay, 186.  And, again, some of those would be people

15   that you knew from your Putnam days?

16   A.    Yes.

17   Q.    And am I correct in assuming that with respect to those

18   134 companies, there were at least some available positions

19   that you applied for?

20   A.    Yes.

21   Q.    And am I also correct in assuming that with respect to

22   those 134 companies, you also felt yourself fully qualified

23   for whatever positions they had that you were seeking?

24   A.    Yes.

25   Q.    And yet of those 134, not a one has extended an offer?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 100

1    A.    No.

2    Q.    And you felt yourself as qualified for those positions

3    as the ones at Putnam that you didn't get?

4    A.    Yes.

5    Q.    Now, in addition to sort of the classic money managers,

6    there are other institutions that manage money, are there

7    not?

8    A.    Sure.

9    Q.    Universities have endowments?

10   A.    Yes.

11   Q.    Insurance companies manage money?

12   A.    Yes.

13   Q.    Banks do, they have divisions that do?

14   A.    Yes.

15   Q.    Pension funds?

16   A.    Yes.

17   Q.    And we've talked about things like private equity and

18   hedge funds and things like that.

19   A.    Right.

20   Q.    And you have searched that universe as well?

21   A.    Not as thoroughly, but I have expended some efforts in

22   those areas.

23   Q.    Now, my knowledge of the financial sector, and you have

24   to forgive me, is somewhat limited, but have you filled up

25   your gas tank recently?

Page 101

1  A.    Yes.

2  Q.    What's the last price per gallon you paid?

3  A.    I don't recall.  It was high, however.

4  Q.    Approaching $4?

5  A.    It was in the high 3s.

6  Q.    And am I correct, my impression -- and tell me if I have

7  it wrong -- my impression is that this is the probably

8  greatest oil boom in at least my lifetime.

9  A.    Yes.

10  Q.    And your longest and deepest experience is as an oil

11  analyst?

12  A.    That's true.

13  Q.    Can I assume that there must be a demand for oil

14  analysts?

15  A.    I don't know the answer to that because, surprisingly,

16  there was not a huge demand when I first started, and there

17  seems to be more now.  But it was a very extended period when

18  the oil sector was, let's say, less attractive, more of a

19  value group, and now some of the more growth-oriented

20  managers have begun to turn toward having --

21  Q.    It's a boom now, right?   Whatever it was in 2003, we

22  know what's going on in the oil market now, correct?

23  A.    Yes.

24  Q.    And yet you've not found a position as an oil analyst?

25  A.    I haven't.

1   Q.   I think -- and again correct me -- did you indicate that

2   one of the things that's been in the back of your mind is

3   that, well, maybe you might want to teach?

4   A.   Well, once I've gotten to the point where I've realized

5   I'm probably not going to work in this business again, I've

6   started to think about what to do next, yes.

7   Q.   Now, it has been, what is it, four years, eight months,

8   approximately, since you left Putnam?

9   A.   Yes.

10  Q.   In any of your time since then, have you gotten a

11  teaching certificate?

12  A.   No, I haven't.

13  Q.   Have you applied for any teaching jobs?

14  A.   No.  I've been spending some time each week volunteering

15  in the school library, and I've also been investigating

16  some -- there are sort of lunch positions that are available

17  at my son's school, sort of to get my feet wet.  I've also

18  been investigating an education program that would allow me

19  to get a teaching certificate here in town at Lesley

20  University.  I was approached by somebody about it.  That's

21  where I got the idea.

22  Q.   Let me just ask you, four and three-quarters years

23  later, you have not done anything to get a teaching

24  certificate or apply for any teaching jobs --

25  A.   I've been busy looking --

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   Q.    -- whatever you're thinking about?

2   A.    I've been busy looking for a job, Mr. Kociubes.

3   Q.    Now, one of the things that you testified about is that

4   among the jobs you're looking for is -- obviously you'd like

5   a portfolio management job, but you're also looking for

6   analyst jobs?

7   A.    Sure.

8   Q.    But, of course, Josh Brooks offered you an analyst job.

9   A.    Well, I would like an analyst job where there would be a

10  possibility to earn more money or be promoted in the future,

11  and the job he offered me didn't have those options.

12  Q.    We're going to come to that, I promise you.  But you did

13  have the option of staying at Putnam as an analyst, correct?

14  A.    I did not consider that to be a real option.

15  Q.    You didn't like it?

16  A.    I didn't consider it to be true option.

17  Q.    Now, your MBA, your master's in business administration,

18  I think you said your concentration is in finance?

19  A.    Yes.

20  Q.    Now, I would have thought that might make you attractive

21  to a whole range of industries.

22  A.    Perhaps.

23          MR. MOLONEY:  Is that a question, your Honor?

24          THE COURT:  Well, if you want to object, just

25  object.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1       MR. MOLONEY:  I object.

2       THE COURT:  Sustained.

3   Q.   Now, in the past four and three-quarter years, am I

4   correct in understanding your testimony that when you've been

5   called back for interviews, you've told people that you were

6   fired and that you were engaged in litigation?

7   A.   I've briefly informed them, yes.

8   Q.   And let me, if we could -- you've prepared resume's,

9   obviously, that you've sent out?

10  A.   Yes.

11  Q.   And tell me, if you would, have you inquired of any of

12  those, say, current or former Putnam people that you worked

13  with if they would be your reference?

14  A.   Yes, I have.

15  Q.   And who are you using as references?

16  A.   Mr. Patrick O'Donnell, Ms. Karen Corn, Mr. Thomas Bogan,

17  Ms. Erin Spatz.  That's a group of the former Putnam people.

18  Q.   Okay, you have no shortage of references?

19  A.   No.  I have references also from Lord Abbett as well.

20  Q.   So that's not the issue.  Let's, if we could, sort of

21  run through your history a little bit.  I think you said you

22  were hired in 1994 at Putnam?

23  A.   Yes.

24  Q.   And at the time, am I correct you were approximately

25  thirty-two years old?  That was on your resume', I think.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    A.    Yes.  I don't think I put my age on my resume'.

2    Q.    Well, I don't think I made it up.  Let me just show it

3    to you.

4    A.    That's not my resume'.  That's from a search firm.  They

5    compiled it.

6    Q.    Oh, okay.  But you do see your age there on the bottom,

7    don't you?

8    A.    Right, but I didn't put it on.

9    Q.    Now, by the time that you were hired at Putnam, you had

10   worked for, I think you said Lord Abbett and Smith Barney?

11   A.    Yes.

12   Q.    They're in the financial services business.  And what

13   was the third one?

14   A.    Alliance Capital and very briefly for Drexel Burnham,

15   very briefly.

16   Q.    And am I also correct that when you were hired by

17   Putnam, as is not uncommon in the industry, you got a raise

18   from what you had received before, about ten percent?

19   A.    About a ten percent raise, yes.

20   Q.    And for the first two years, you got a guaranteed

21   minimum bonus?

22   A.    Yes, I did.

23   Q.    And that's not uncommon in this industry, that that's

24   sort of a -- I think of it as a signing bonus, but when

25   people are hired, it's not uncommon for the first year or two

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 106

1   they're guaranteed a certain amount?

2   A.    In my experience, that's what happened when I came to

3   Putnam.

4   Q.    Right, so you know about that.  By the way, when you

5   compared your compensation to Dr. Terry Norchi's

6   compensation, was he still within his guarantee period?

7   A.    I wouldn't -- I don't know personally.

8   Q.    Okay.  Now, you indicated that your first -- the

9   individual who ultimately hired you was Patrick O'Donnell?

10  A.    Yes.

11  Q.    And he hired you as a vice president?

12  A.    Yes.

13  Q.    And you had indicated to him that you hoped to be able

14  to manage money?

15  A.    Yes.

16  Q.    And I think you said that he laid out a plan.  He told

17  you that he would hope in four, five years, that he would

18  work with you with your skills to get you to a point where

19  you could be eligible for managing money, correct?

20  A.    Yes.

21  Q.    O'Donnell, by the way, did a pretty good job of hiring

22  women, did he not?

23  A.    He did.

24  Q.    And at the end of three, three and a half years in fact,

25  you were considered for a portfolio management job?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 107

1    A.    I was.

2    Q.    You got the opportunity you wanted, and that opportunity

3    came on the International Growth Equity Team, correct?

4    A.    Yes.

5    Q.    And at the time, that came in what, December, 1997?

6    A.    Yes.

7    Q.    It became official in January, is that how it worked?

8    A.    That's the way it worked.

9    Q.    Okay.  And at that point in time, the head of that team,

10   the individual who hired you was Robert Swift?

11   A.    Yes.

12   Q.    And he was the chief investment officer of that team?

13   A.    Yes, he was.

14   Q.    All right.  And by the time you joined that team, you

15   had become a senior vice president?

16   A.    I had.

17   Q.    You had been promoted at Putnam?

18   A.    Yes.

19   Q.    And you joined the team as a portfolio manager?  You

20   became a portfolio manager after you joined the team?

21   A.    My functional title changed to portfolio manager,

22   although I was assured I would join as a senior portfolio

23   manager.

24   Q.    Well, hold on, hold on.

25            MR. MOLONEY:  Objection, your Honor.  May she be

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    allowed to complete her answer?

2            THE COURT:  Were you done with your answer?

3            THE WITNESS:  I wasn't finished.

4            MR. KOCIUBES:  I asked her if she joined as a

5    portfolio manager.

6            THE COURT:  All right.

7    Q.   Now, am I correct that your first full year then on that

8    team was 1998?

9    A.   Yes.

10   Q.   Okay.  And am I also correct that by April of 1998 --

11   well, you testified yesterday or the day before, I guess,

12   that you had kept some kind of employment journal or notes?

13   A.   Yes.

14   Q.   It wasn't one document.  It was some notebooks and some

15   loose pages and things like that?

16   A.   Yes.

17   Q.   And you have a copy in front of you, do you not?

18   A.   I have a copy.

19   Q.   And am I correct that you started taking those notes

20   within about three months or four months of joining

21   Mr. Swift's team?

22   A.   Yes.

23   Q.   Your earliest entries go back to April of 1998?

24   A.   That's correct.

25   Q.   And at that point you started documenting comments that

1   you considered crude or words that Robert Swift made; is that

2   correct?

3   A.   Comments that I felt should be documented.

4   Q.   And with respect to those comments -- and I think you

5   told with respect to Swift, I don't know, it was three or

6   four or five stories.  You worked on that team for a little

7   better than four years?

8   A.   Yes.

9   Q.   Okay.  And with respect to those things that you thought

10   should be documented, did you tell any of them to the human

11   relations, to the HR department?

12   A.   No, I did not.

13   Q.   Did you complain to Mr. Swift to let him know that you

14   were writing this stuff down about him, documenting it

15   somehow?

16   A.   On a couple of occasions, I think I document in there

17   that I did complain to Mr. Swift.

18   Q.   And he took it reasonably, did he not?

19   A.   He made a joke.

20   Q.   Now, let's talk for an a second -- by the way, you know

21   Mr. Swift is in Australia now?

22   A.   I do.

23   Q.   Okay.  So he's not here to defend himself.  Let's talk

24   for a moment about what Mr. Swift actually did, what his

25   actions were with respect to you.  He hired you for the team,

Page 110

1    right?

2    A.    Yes, he did.

3    Q.    Kelly Morgan, another woman, was already on that team,

4    correct?

5    A.    Yes.

6    Q.    She was senior portfolio manager?

7    A.    Which I was assured I would be when I joined the team.

8    Q.    She was a senior portfolio manager?

9            THE COURT:  No, no, no.  Now, this is cross.

10   Listen to his questions, okay?

11   Q.    Am I correct, she was a senior portfolio manager?

12   A.    Yes.

13   Q.    Who had been at Putnam longer, you or Kelly Morgan?

14   A.    I had.

15   Q.    So that this other woman comes in, and she's got less

16   tenure than you, and she's a senior portfolio manager on the

17   team?

18   A.    That's right.

19   Q.    Okay.  Now, the team, Robert Swift's team, had several

20   different mutual funds and some institutional money that it

21   managed, correct?

22   A.    Yes.

23   Q.    And am I correct that the very biggest of the mutual

24   funds in terms of assets that it managed was Global Growth?

25   A.    That is correct.

Page 111

1    Q.    So that was the dominant fund on that team?

2    A.    Yes.

3    Q.    Most important, but by far and away the most money was

4    there, correct?

5    A.    Yes.

6    Q.    All right.  And with respect to the most important fund

7    on his team, he assigns Kelly Morgan and you to help manage

8    it, correct?

9    A.    Yes, yes.

10   Q.    All right, that's what Robert Swift did.  All right,

11   let's keep going.  1998 is your first full year, you said,

12   and is that the year that you were also on maternity leave?

13   A.    Yes, the first year.

14   Q.    And am I correct that at the end of that year, the

15   manager rating that Robert Swift gave you was a 4.25?

16   A.    Yes.

17   Q.    That's a very high rating, correct?

18   A.    Yes, it is.

19   Q.    Notwithstanding that you'd been out on maternity leave,

20   correct?

21   A.    Correct.

22   Q.    All right.  And do you remember what he paid you for

23   1998?

24   A.    It's very difficult for me to recall at this point.

25   Q.    Well, we can help you with that in a little while.  You

1   testified about some of the other years.  Let's go to 1999.

2   That year you were there a full year, correct?

3   A.    Yes.

4   Q.    Still managing with Swift and Ms. Morgan the largest,

5   most important mutual fund on that team, correct?

6   A.    Yes.

7   Q.    And at the end of that year, at the end of 1999, Robert

8   Swift on a 5-point scale gives you a 4.78?

9   A.    Yes.

10  Q.    Which you said under this system rounds off to 5.  It's

11  as high as you could get?

12  A.    Yes.

13  Q.    That's how Robert Swift treated you.

14  A.    It's very difficult to characterize treatment as one's

15  score, so in terms of score, that is what Robert Swift gave

16  me.

17  Q.    Okay, let's see how he treated you financially, all

18  right?  Am I correct that your base -- and I think you

19  testified about this -- your base salary that year was

20  $140,500?

21  A.    Yes.

22  Q.    And that on top of that, you got a $990,000 bonus?

23  A.    Yes.

24  Q.    On top of that, you got 2,500 shares of Putnam stock?

25  A.    Yes.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 113

1  Q.   On top of that, you got awarded 2,500 options of Putnam

2  stock?

3  A.   Yes.

4  Q.   You had never anywhere, anywhere that you worked, earned

5  anything near that kind of money, right?

6  A.   That's correct.

7  Q.   And you know there's a lot of financial documents that

8  have been produced to your counsel, and I assume you've

9  looked at some, you've testified about some of this.  Did you

10  notice that other than Robert Swift and Kelly Morgan, who was

11  a woman, you were the highest paid person of all of the

12  portfolio managers he had on all of his different units?  You

13  were number three?

14  A.   On all the different growth teams?

15  Q.   Well, on Robert Swift's various teams.  There were other

16  people that worked for Robert Swift, correct?

17  A.   There are maybe four or five people that were portfolio

18  managers on Robert Swift's team.  So other than Robert,

19  Kelly, and me, which would be three --

20  Q.   The other four or so you got higher than?

21  A.   Four?  I don't remember that many portfolios on Robert's

22  team at one time.

23  Q.   You don't?

24  A.   No.  Not at one time, no.

25  Q.   All right, and we will come back to that.  Let's go to

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    2000.  By the way, in 1999, and your lawyer introduced it, he

2    nominated you for managing director?

3    A.    Yes.

4    Q.    And my recollection of what was shown to the jury is

5    that was a glowing, glowing recommendation?

6    A.    Yes.

7    Q.    There were no qualifications in there at all, correct?

8    A.    I think he nominated me in 2000 for managing director,

9    and you said in 1999.

10   Q.    In December of '99 for 2000?

11   A.    It was a 2000 promotion, right.

12   Q.    Correct, okay.  Now, let's go into 2000, and am I

13   correct that for 2000, your base salary was still $140,500?

14   A.    I believe that -- that is correct.

15   Q.    And do I recall your testimony the other day correctly

16   that for that year, Mr. Swift awarded you $1,350,000 as a

17   bonus?

18   A.    Yes.

19   Q.    And on top of that, at this time he gave you 3,000

20   shares of Putnam stock?

21   A.    That is correct.

22   Q.    And on top of that, he gave you 3,000 Putnam options?

23   A.    Yes.

24   Q.    And that year, even though your compensation went up, do

25   you recall what your rating from him was?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    A.    That --

2    Q.    Do you recall --

3    A.    That was the year it was a 3. -- I can't recall.  We

4    went through it the other day.

5    Q.    Do you recall it was a 4.0?

6    A.    4.0.

7    Q.    Maybe we call up the review.

8          (Discussion off the record.)

9          MR. KOCIUBES:  Let me use the overhead, your Honor,

10   until that glitch gets resolved.

11   Q.    Do you see your review for 2000?  Maybe I can zoom in a

12   little bit.

13   A.    I see that, yes.

14   Q.    Oh, we have it on the other screen now.  Oh, no.  And if

15   we could, and you see that Mr. Swift is the individual who

16   gave you the review?

17   A.    Yes.

18   Q.    And if we go to third or fourth page, we can see the

19   year-end ranking.  Do you see that?

20   A.    Yes, I see that.

21   Q.    And am I correct that it's a 4.0?

22   A.    Yes.

23   Q.    All right.  So it's still awfully good.  We've gone from

24   a 4.78 to a 4.0.  You've gotten more money from Mr. Swift,

25   even though the review is a little bit -- it's gone down,

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 116

1    correct?

2    A.    Yes.

3    Q.    But Mr. Swift in his review also tries to caution you,

4    does he not?  And let me see if I read this correctly.  He's

5    cautioned you, "She, meaning you, correct, "can at times

6    appear confrontational, and this can make people either avoid

7    airing a contrary opinion or intimidated, neither of which

8    are conducive to an environment of risk-taking and

9    intelligent debate.  This is especially true of younger

10   analysts."  Do you see that?

11   A.    I see that he wrote it.  I'm not sure I describe it as

12   caution.

13   Q.    Well, is that the first time that kind of comment came

14   up --

15   A.    I don't recall.

16   Q.    -- in your reviews?

17   A.    I don't recall.

18   Q.    All right.  And did Mr. Swift that year nominate you

19   again for managing director?

20   A.    Well, that was the year that I was on maternity leave,

21   and he said "Out of sight, out of mind."

22   Q.    Did he nominate you?  We're talking about his behavior

23   at the moment.  Did he nominate you?

24   A.    I'm not aware.

25   Q.    Okay.  Was that the year you were promoted to senior

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 117

1   portfolio manager?

2   A.   In early 2000, yes, as a consolation for the managing

3   director.

4   Q.   All right, so that Mr. Swift appointed you that year to

5   senior portfolio manager, and that is the year that you got

6   the most money you've ever earned anywhere?

7   A.   Well, I don't know that Mr. Swift appointed me.  As I

8   have learned, as I understood it at the time, there is a

9   nominating and a promoting committee.  So I received an

10   appointment to senior portfolio manager that year.

11   Q.   You understood that your supervisor needed to recommend

12   you, or it wasn't going anywhere?

13   A.   I understood that there was recommendation involved.

14   Q.   And, by the way, all this time when you were complaining

15   about comments that Mr. Swift made and some of which related

16   to the pregnancy, he never transferred you off the team or

17   asked you to leave the team, correct?

18   A.   That's correct.

19   Q.   So even though in the case of Swift, Robert Swift, he's

20   paid you more than a million dollars a couple of times, he's

21   given you stellar reviews, he's nominated you for managing

22   director, he's recommended you for senior portfolio manager,

23   a position you got, you see fit to come here when he's in

24   Australia to besmirch his reputation, correct?

25         MR. MOLONEY:  Objection, your Honor.

Page 118

1      THE COURT:  Sustained, sustained.

2   Q.   Well, let me ask it this way.  After you left Putnam --

3   and Robert Swift left Putnam before you left Putnam, correct?

4   A.   Yes, he did.

5   Q.   After you left Putnam, did you stay in touch with Robert

6   Swift?

7   A.   On occasion, yes.

8   Q.   And in fact did you ask him to help you with your job

9   search?

10  A.   Well, he offered, and he sent me a couple of contacts,

11  at least one I can think of.

12  Q.   And did you go visit him in 2004 in his office after you

13  were terminated?

14  A.   Oh, I think I did, yes.

15  Q.   And did you in fact go to him and talk to him about your

16  job search, and you even told him about your lawsuit?

17  A.   Yes.

18  Q.   Did you tell him how you were going to be using him in

19  the lawsuit?

20  A.   I wouldn't really describe it as using him, so I

21  wouldn't have said that, no.

22  Q.   Do you recall at one point in early 2004 contacting

23  somebody named Thomas Kurey, K-u-r-e-y?

24  A.   Yes.

25  Q.   And is that a contact you got through Robert Swift?

1   A.   No.   I mean, perhaps the contact information, but I knew

2   Tom Kurey before.   He was at Putnam.

3   Q.   I see.   Do you recall writing to him that Robert Swift

4   suggested that you contact him?

5   A.   Yes, it's possible.

6   Q.   And do you recall, after you were gone and after he was

7   gone, giving Robert Swift what you referred to as your

8   "secret" e-mail address?

9   A.   Yes.   That's so I don't get spammed.

10   Q.   We're now, it looks like, in April of 2004?

11   A.   Yes.

12   Q.   And you're writing him, "Hi Robert:   Yes, this reached

13   me.   You have my secret address."   Do you see that?

14   A.   Yes.

15   Q.   And then there's some small talk about his family and

16   your family and your vacation.   Do you see that?

17   A.   Yes.

18   Q.   And at the top, he writes back to you:   "A friend at

19   SSGA asked me if I had anyone to pitch in for the following

20   job.   Interested?   Will send a description in e-mail."

21           Do you see that?

22   A.   Yes.

23   Q.   So even into 2004, Robert Swift is -- he's gone, you're

24   gone -- he's still attempting to help you?

25   A.   Yes.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 120

1    Q.    Then we get to sort of the second part of 2000, correct,

2    and the performance of not just Global Growth but all of

3    Robert Swift's and a lot of other teams started coming down?

4    A.    All the growth funds especially.

5    Q.    And in 2001, did you understand that Robert Swift

6    nominated you for managing director again?

7    A.    I believed it at the time.

8    Q.    And I take it your expectation is, notwithstanding the

9    fact that performance was coming down in the funds, you

10   thought that you should still be elected managing director?

11   A.    Yes.

12   Q.    Okay.  And that year, for the year of -- let's go into

13   2001 now.  By now, the market is coming down, correct?

14   A.    Oh, yes.

15   Q.    And that year you recall Robert Swift gives you a rating

16   of 3.5.  Do you remember that?

17   A.    I believe I testified at deposition that he told me as

18   he handed it to me that he would have given me a 4 but was

19   required to write it down.

20   Q.    Do you recall that the grade was a 3.5?

21   A.    The grade was a 3.5.

22   Q.    Because your counsel had marked, I think as

23   Plaintiff's 51, the review for 2001.  Do you see that?

24   A.    Yes.

25   Q.    And do you see the ranking there of 3.5?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 121

1    A.    Yes, I do.

2    Q.    And, of course, as you're supposed to in a review, he

3    had a comments section.

4          MR. KOCIUBES:  For some reason it's not picking it

5    up.

6          THE COURT:  Sometimes if you fold it over.  It has

7    something to do with how it's positioned.

8    Q.    And do you see there in the comments section, he has

9    written, "Lisa did tolerably in 2001 with performance in the

10   growth accouns that lagged the benchmarks by 600 basis

11   points.  Most of this occurred in January, and Lisa spent the

12   rest of the year trying to catch up"?  Do you see that?

13   A.    Yes.

14   Q.    And then he wrote at the end there, "I believe she could

15   benefit from spending more time getting behind the alphas,

16   and using optimizer and risk model as more active tools than

17   mere steps in a process."  Do you see that?

18   A.    Yes.

19   Q.    Now, the issue of collaboration came up in that review

20   as well, did it not?

21   A.    I don't recall.

22   Q.    Let me just show it to you.  Do you see he wrote, "Lisa

23   should travel more widely in 2002, and I look to her to

24   collaborate with other team members to produce better alphas

25   within her sectors"?  Do you see that?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 122

1  A.   Yes.   I don't know if I'd describe it as an issue, but,

2  yes.

3  Q.   Now, in terms of the evaluation trajectory, you've now

4  starting in 1999, which is, I think, where you direct

5  started, you've gone from a 4.78 to a 4 to a 3.5 in 2001,

6  correct?

7  A.   Yes.

8  Q.   And am I correct that in 2001, it was not simply a

9  matter of a year of bad performance, but what actually

10  happened is that the value of some of these funds, including

11  the ones you were helping manage, just collapsed?

12  A.   That's the same as bad performance.   It's the same

13  thing.

14  Q.   There's bad performance, and there's disastrous

15  performance, correct?

16  A.   Well, you just described 600 basis points behind the

17  benchmark.   That's bad performance.   That means the value of

18  the funds collapsed more than 6 percent than what the

19  benchmark would have done.

20  Q.   So we are now in 2001.   You're 600 basis points behind

21  the benchmark?

22  A.   Correct.

23  Q.   And compensation, you know, because you've seen some of

24  the numbers, throughout Putnam, and especially on the growth

25  teams, was being slashed, bonuses were down?

Page 123

1   A.   Bonuses were down.

2   Q.   They were down for lots of people?

3   A.   Yes.

4   Q.   And for 2001, your total compensation ended up being

5   about $655,000?

6   A.   That's correct.

7   Q.   And Swift's compensation came down, and Kelly Morgan's

8   came down, and other people on the team came down?  You know

9   that?

10  A.   Yes.

11  Q.   There are still by now additional people on the team.

12  There are Steve Dexter and other people on the team, correct?

13  A.   Steve Dexter joined in June of 1999.

14  Q.   All right.  And you're still number three, trailing only

15  your boss, Kelly Morgan, and then you are the next highest on

16  the Swift team?

17  A.   I don't recall specifically but -- I can't recall

18  specifically.

19  Q.   All right.  Now, am I correct then that the decrease in

20  your compensation didn't occur when you were transferred to

21  the Research Department?  It occurred while you were still a

22  portfolio manager?

23  A.   Well, the bonus was paid at the exact same time that I

24  was being transferred to the Research Department, so they all

25  were together.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    Q.    The bonus was for the previous year?  That's how it

2    worked, correct?

3    A.    Yes, but the money arrives basically at the same time we

4    were being reorganized.

5    Q.    Salary you get on a biweekly basis?  Is it biweekly?

6    A.    Does that mean every two weeks?

7    Q.    That means every two weeks.

8    A.    Yes.

9    Q.    You get that?

10   A.    I think it was twice a month.

11   Q.    Twice a month, okay, twice a month, and that's the

12   roughly $140,000, $150,000, correct?

13   A.    It was $155,000 by that time.

14   Q.    And that you're getting paid out two times a month?

15   A.    Yes.

16   Q.    And then the firm doesn't know about profitability until

17   the end of the year, correct?

18   A.    That's right.

19   Q.    And that's when they set the bonus pools?

20   A.    I don't have that much personal knowledge of that,

21   but --

22   Q.    But you do know that what happens in the early part of

23   the following year, what you get is your bonus for the

24   previous year?

25   A.    March 15, yes.

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   Q.   Let's now stay, if we could, within 2001.  And am I

2   correct that at the beginning of 2001 is when you came back

3   from a maternity leave?

4   A.   Yes.

5   Q.   And when you did that, among other things, you checked

6   in with Steve Oristaglio?

7   A.   I did.

8   Q.   And he was the co-head of the entire Investment

9   Division?

10  A.   I believe at that time he was not co-head.  I believe he

11  was deputy head of Investments under Mr. Tim Ferguson.

12  Q.   Okay.  And am I correct -- let me show you a document

13  and see if you can recognize it for us.  Is this a copy of an

14  e-mail, the bottom half at least, that you sent to

15  Mr. Oristaglio on -- it looks like March 14, 2001?

16  A.   Yes, with the misspelled words.

17           MR. KOCIUBES:  Let me offer that, your Honor.

18           THE COURT:  All right.

19           MR. MOLONEY:  No objection.

20           THE COURT:  What number is it?

21           MR. KOCIUBES:  It should be Plaintiff's 7 (Sic).

22           (Defendant Exhibit 7 received in evidence.)

23           MR. KOCIUBES:  While that's being pulled out,

24  perhaps we could just focus on the document a little bit.

25           MR. MOLONEY:  Your Honor, Mr. Kociubes said

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 126

1    Plaintiff's 7.  He may have misspoke.

2            THE COURT:  So is that Plaintiff's 7?

3            MR. KOCIUBES:  Defendant's 7.  If I said

4    Plaintiff's 7, I misspoke.  Let me try to set the focus of

5    this a little bit better.  I hope everybody can read it.

6    Q.   And am I correct that what you wrote to Mr. Oristaglio,

7    deputy head, you said, of the entire division?

8    A.   He was the deputy head of Investments.

9    Q.   So he would be above Robert Swift?

10   A.   He was Robert Swift's direct boss, yes.

11   Q.   Okay.  And you started out by writing, "I just wanted to

12   let you know that I am back from my maternity leave."  Do you

13   see that?

14   A.   Yes.

15   Q.   And then at the bottom of that paragraph, you wrote the

16   sentence, "Now that I'm back, I'm looking forward to working

17   on improving performance one step at a time."  Do you see

18   that?

19   A.   Yes.

20   Q.   And then you also wrote to Mr. Oristaglio, "I also want

21   to thank you for your efforts on behalf of my bonus.  I was

22   pleased with the outcome, and Robert says that you were very

23   supportive of our group during the bonus discussions.  I hope

24   that we can acknowledge your support with a better year in

25   2001."  Did I read that correctly?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 127

1    A.    Yes.

2              THE COURT:  Why don't you just wait one second.

3              (Children leaving the courtroom.)

4              THE COURT:  Okay, they're gone.

5    Q.    And the performance of your fund had actually started

6    turning negative the previous year in 2000; is that correct?

7    A.    That was true of all the growth funds.

8    Q.    We'll get to some of the other ones.  Let's for the

9    moment focus on your fund.  Am I correct that it turned

10   negative, meaning going down, in 2000?

11   A.    Yes.

12   Q.    And am I also correct that you spent the years 2000 and

13   2001 in the bottom of the fourth quarter of comparable funds?

14   A.    I don't recall 2000 specifically, but I do know 2001 we

15   were.

16   Q.    Now, you have your journal or your notes -- how did you

17   refer to that?

18   A.    I called them either my journal or my diary, either one.

19   Q.    All right, if I refer to it as your journal, is that

20   acceptable?

21   A.    That's fine.

22   Q.    Okay, would you go to page Bates numbered 72.

23   A.    Yes.

24   Q.    All right, and do you see in the middle of the page you

25   begin a paragraph, and tell me if I'm reading this

1    correctly:  "In 2000 the Global Growth Fund's performance

2    turned negative.  We spent the years 2000 and 2001 in the

3    bottom of the fourth quartile"?  Do you see that?

4    A.    Well, there you have it.

5    Q.    "Quartile" refers, it's just a quarter, right?

6    A.    The bottom 25 percent, yes.

7    Q.    Then about three or four lines below that you

8    observed -- and you wrote this at the time?

9    A.    I think this was looking back, and let me see when it

10   was because it was some recollections I put together.  The

11   date of it seems to be on LS 68, and it would be September 8

12   of 2003.

13   Q.    Okay.  So these journal notes were not made in 2000 and

14   2001 or even 2002, but these were recollections you were

15   writing down when you were expecting to be fired?

16   A.    It was subsequent to the August 28 meeting, yes.

17   Q.    So even with that knowledge, let's see what you wrote

18   there.  If you go to the middle of that paragraph, do you see

19   you wrote, "The bonus in spring 2001 based on 2000

20   performance was a positive surprise"?

21   A.    Yes.

22   Q.    "My total comp went from $1.68 million, $1,650,000," do

23   you see that?

24   A.    Yes.

25   Q.    And then you wrote, "In the spring of 2001 I was again

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 129

1    put up for MD."  Do you see that?

2    A.    Yes.

3    Q.    Did you determine, by the way, how much money your

4    investors in the Global Growth Fund lost in 2000?

5    A.    In 2000, I don't recall.

6    Q.    Did you figure it out for 2001?

7    A.    Yes.

8    Q.    How much did they lose?

9    A.    Wait a second, hang on.  No.  I only know it relative to

10   the benchmark.  I know -- I believe it was down 29.83 percent

11   in 2001, as reported by Putnam in the SEC filings.

12   Q.    And you can't translate that into how many --

13   A.    Well, if you had $10, you would have lost $3.33 of it.

14   Q.    A third of it?

15   A.    Yes.

16   Q.    Okay.  And am I also correct that one of the things you

17   testified about is that you never understood why you didn't

18   make managing director?  You never got a good explanation?

19   A.    I never got a good explanation.

20   Q.    And at various points in time, you in fact went around

21   and talked to people about that, did you not?

22   A.    In the summer of 2001.

23   Q.    And among the people you talked to was Rick Tibbetts?

24   Do you recall that?

25   A.    I did.

Page 130

1  Q.   And do you recall he met with you, and you sent him a

2  follow-up e-mail?

3  A.   Yes.

4  Q.   And let me show it to you, see if you recognize it.  And

5  is that an e-mail that you sent to Mr. Tibbetts?

6  A.   Yes, in the summer of 2001.

7  Q.   It looks like July 13, 2001?

8  A.   Yes.

9  Q.   And I take it there must have been some feedback he gave

10 you because about four lines down, you wrote, "I have set up

11 an appointment with Kevin Maloney to begin work on portfolio

12 construction"?

13 A.   Yes.

14 Q.   And that's how to sort of get the right mix of stock and

15 the right mix of risk within a portfolio?

16 A.   Using certain quantitative measures, yes, which he did

17 have that meeting.

18 Q.   And that's the feedback that you got from, among the

19 other feedback -- I don't mean all of it necessarily -- but

20 that's part of the feedback that you got from Mr. Tibbetts?

21 A.   Well, it was suggestions of things I could do going

22 forward, is the way I describe it, ideas he gave me.

23 Q.   And am I also correct that while you were on this Global

24 Growth Team, it had the reputation of being the most

25 dysfunctional team in all of Putnam?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   A.   I don't know.  I can't speak to reputation.  I don't

2   know.  We -- we --

3   Q.   Well, let me ask you to do this.

4        MR. MOLONEY:  Objection, your Honor.  Could she

5   finish her answer?

6        THE COURT:  Excuse me.  No.  She said she didn't

7   know what it was.

8        MR. MOLONEY:  Then after the period, she said "we,"

9   and then Mr. Kociubes --

10       THE COURT:  No.

11  Q.   Would you take a look at your journal and go to Bates

12  Page 370.

13  A.   Yes.

14  Q.   And do you see in the -- I guess it's the second

15  paragraph on that page, and tell me if I read it correctly.

16  This is in your own handwriting, correct?

17  A.   Yes.

18  Q.   And when did you make this note?

19  A.   I have to look at the date.  It's another recollection.

20  This was December 27 of '03.

21  Q.   Okay, so this was even after you were terminated?

22  A.   Yes.

23  Q.   And you wrote, "When I worked on the Global Growth Team

24  for Robert Swift, our team had the reputation as the most

25  dysfunctional team at Putnam.  However, we had great

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1  numbers."  Do you see that?

2  A.    Yes.

3  Q.    And by 2002, the great numbers were gone, correct?

4  A.    They were gone, yes.

5  Q.    They were gone in 2001, as a matter of fact?

6  A.    Yes, along with all the growth teams, all of them.

7  Q.    So now you're left with the most dysfunctional team that

8  doesn't have great numbers anymore?

9  A.    But that wasn't true, so. . .

10  Q.    It's what you recorded in your own handwriting?

11  A.    I recorded that there was a reputation to that extent.

12  I also recorded something further about that, about saying

13  that it was a bad rap, and it came from the fact that we

14  asked direct questions and frequently openly challenged and

15  disagreed with each other.

16  Q.    So this is one other thing, even though you wrote it

17  down, that you disagree with, just as you disagreed with the

18  various hiring decisions or transferring decisions that got

19  made?

20  A.    I don't understand your question.

21  Q.    Well, let me put another one to you.  By 2001, not only

22  was the value of Global Growth -- and it was still the

23  biggest, it was the dominant fund on Robert Swift's team,

24  right?

25  A.    On Robert Swift's team, yes.

1  Q.   Not only was the value coming down, but investors were

2  pulling their money out?

3  A.   The same as throughout the Growth division, all the

4  growth funds.

5  Q.   They were pulling it out of the fund that you were

6  managing?  No question about that, is there?

7  A.   No, there's no question.

8  Q.   How much money flew out of that fund in 2001?

9  A.   I don't know the answer to that.

10  Q.   You didn't think that was significant?

11  A.   Just I was working on managing to the benchmark.  That

12  was my goal.

13  Q.   Now, one of the things that you did know is that when

14  money flows out of a fund, if it continues, it's likely there

15  will be fewer people working the fund.

16  A.   I don't know.  Is that a question?  I'm not sure.

17  Q.   You understood that that was a consequence of money

18  leaving not just your fund, but if money leaves a fund, you

19  may well have a downsizing in terms of number of people

20  working there?

21  A.   Well, what happened with that fund was, it got

22  transferred, and another team managed it, and in fact more

23  people were moved onto it.

24  Q.   I'm asking under your management.  You seem to want to

25  talk about everybody else but yours.

Page 134

1    A.    I'm talking about what happened to that team.

2    Q.    Right, when you were managing it.  And am I correct

3    that --

4    A.    But they didn't downsize the number of people managing

5    it while I managed it.

6    Q.    I'm asking you about a general observation that as

7    assets tend to get pulled out, the number of people involved

8    in managing those assets will tend to shrink?

9    A.    I just can't make that general observation.

10              MR. MOLONEY:  Objection.

11              MR. KOCIUBES:  May I approach and give her a copy

12   of her transcript, your Honor?

13              THE COURT:  Yes.

14   Q.    Ms. Svensson, would you take a look at Page -- do you

15   recall that you -- I guess it's been a couple years

16   now.  Well, you know there have been a number of people that

17   showed up at either your lawyer's office or my office and

18   took the oath to tell the truth, and they were asked

19   questions, and a court reporter took it down?

20   A.    Yes.

21   Q.    And one of the people who was deposed was you; is that

22   correct?

23   A.    Yes.

24   Q.    And you were deposed several years ago, 2005.  Do you

25   see that?

Page 135

1    A.    This one says February 1, 2006.

2    Q.    I may have given you the wrong one.  I'm going to let

3    you look over my shoulder here.

4              MR. KOCIUBES:  With your Honor's permission?

5              THE COURT:  Sure.

6    Q.    And do you recall -- and I'm not yelling at you, but I'm

7    just trying to make sure the jury hears -- and do you recall

8    I asked you the question on Page 167, "And what tends to

9    happen to the number of people --"

10             MR. MOLONEY:  May I have a moment to find it,

11   please.

12   Q.    "And what tends to happen to the number of people that

13   are involved in managing, the assets under management

14   shrink?"  Do you see that question I asked you?

15   A.    I do.

16   Q.    And am I reading your answer correctly:  "Well, of

17   course they shrink.  There's less people managing the

18   assets"?  Do you see that?  Is that the answer you gave at

19   that time?

20             MR. MOLONEY:  That's not what the transcript shows,

21   your Honor.

22             THE COURT:  Is there another line you want to read

23   in?

24             MR. MOLONEY:  No.  He read the line incorrectly.

25             THE COURT:  All right.

1    Q.    "Well, of course they shrink.  There's less people

2    managing as the assets shrink," was that your answer?

3    A.    That's what you're reading from the transcript, so,

4    yes.

5    Q.    In fact, that's not a particularly controversial point,

6    is it, Mrs. Svensson?

7    A.    Uhm, no, not necessarily.

8    Q.    Now, you testified -- I think it was the day before

9    yesterday when we were last here -- is that as we got to the

10   spring, sort of March, April of 2002, you talked about a

11   reorganization.  Do you recall that?

12   A.    Yes.

13   Q.    And you talked about phase one and phase two?

14   A.    Yes.

15   Q.    What was the date of phase two?

16   A.    March 31, 2003.

17   Q.    So what you're talking about phase three is a whole year

18   later?

19   A.    Yes.

20   Q.    And in fact what happened is as Putnam -- the number of

21   people were being reduced at Putnam?  The downsizing is what

22   you were referring to as the reorganization?

23   A.    You're talking about the overall number of people at

24   Putnam?

25   Q.    Yes, yes.

1   A.   Because the number of people on the Growth Team between

2   phase two and phase three stayed pretty constant, I think.

3   Q.   Well, we'll get to those numbers.  And there were a

4   number of things that the management of the Investment

5   Management Division, the IMD, then decided to do, including

6   some that affected Robert Swift's team, correct?

7   A.   Yes.

8   Q.   And let's sort of go through those for a moment.  Am I

9   correct that Robert Swift was fired?  He was gone is what you

10  knew?

11  A.   My understanding is, he was gone from Putnam.

12  Q.   And as far as you know -- and you've been in touch with

13  him since you've gone -- he wasn't given any second chance?

14  He was just gone?

15  A.   I don't know.

16  Q.   Okay.  And Kelly Morgan the year earlier had gone

17  halftime as an Assistant Director of Research into the GER

18  department as an ADR, correct?

19  A.   Yes, she had.

20  Q.   And then in that spring she went full time to ADR?

21  A.   Yes.

22  Q.   And the next person down on this biggest of the mutual

23  funds that was being managed was you?

24  A.   I don't know what you mean.

25  Q.   Swift or you?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    A.    What do you mean by "down."  I don't know what that

2    means.  We were a team.

3    Q.    Well, let's just put it this way:  The third person was

4    you?

5    A.    Yes.

6    Q.    Okay.  The third portfolio manager, although your title

7    at that point was, am I correct, senior portfolio manager?

8    A.    Yes.

9    Q.    The same as Kelly Morgan?

10    A.    Yes, and Mr. Dexter was also on the fund.

11    Q.    And am I correct that you in fact, that performance was

12    such that you in fact were worried that you were going to be

13    fired along with Swift?

14    A.    Sure.

15    Q.    And you were sufficiently worried that you called

16    another senior person, a woman named Debbie Kuenstner, over

17    the weekend to try to get her to help you keep your job?

18    A.    I did.

19    Q.    And she in fact told you, "Don't worry about it.

20    They're going to try to keep you," correct?

21    A.    I think she said that they needed my skills -- actually,

22    she probably said that, but I remember her saying that I

23    would be with the Research in the energy area, I think.  This

24    is a while back.

25    Q.    Well, let's see if we can refresh your memory.  Go to

1   Page 75 of your journal, and tell me when you're there

2   Mrs. Svensson.  I'm sorry?

3   A.    Yes, I'm there.

4   Q.    Now, this page is typed; am I correct?

5   A.    Yes.

6   Q.    And am I correct it's got a date of September 11, 2003?

7   A.    Yes.

8   Q.    So this would have been just a couple days before that

9   last conversation you and Mr. Brooks had?

10  A.    It was one day before our last conversation and a few

11  days before I was fired.

12  Q.    So at this point you were expecting that you were likely

13  going to be leaving Putnam?

14  A.    I wasn't going to accept the options that were being

15  offered.

16  Q.    Okay.  And you then wrote some notes of some of your

17  history at Putnam; is that correct?

18  A.    The title is "Time since rejoining GER," so I think I

19  made notes about that period.

20  Q.    Okay.  And am I correct, in the third paragraph what you

21  wrote is, "I went home for the weekend and called Debbie

22  Kuenstner to ask for help in keeping my job at Putnam.  She

23  put my mind at ease because she said that I was not being

24  fired, and that Putnam had decided that they needed better

25  communication from the energy area, and that they were

1  looking forward to my joining GER"?  That's the Research

2  area?

3  A.   Yes.

4  Q.   And that's in fact what she reported to you?

5  A.   Yes.

6  Q.   And she also told you that, did she not, that they all

7  thought that you had good research skills and thought you

8  could make a contribution there?

9  A.   Yes.

10  Q.   And so the situation then as of, say, March-April, as of

11  when Robert Swift was terminated, is you had been in the

12  industry since 1987?

13  A.   Yes.

14  Q.   Out of school?

15  A.   Yes.

16  Q.   At that point, if my math is right, is that fifteen

17  years, approximately?

18  A.   Yes.

19  Q.   And of those fifteen years, at that point you had spent

20  approximately eleven as an analyst?

21  A.   I think I was a portfolio manager for four years and a

22  half or so.

23  Q.   Okay, so ten and a half, plus or minus, years?

24  A.   Yes.

25  Q.   And four, four and a half years as a portfolio manager?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 141

1    A.    Yes.

2    Q.    The portfolio management experience had ended unhappily

3    in the sense that the fund was all the way at the bottom?

4    A.    Unhappily.  You know, it had -- my portfolio manager

5    experience ended when I was transferred off the team.

6    Q.    Let's say the fund unhappily for investors for sure,

7    right?

8    A.    Yes.

9    Q.    On the other hand, you had had ten, ten and a half years

10   of experience, and, I take it, doing pretty well as an

11   analyst?

12   A.    I had done well as an analyst.

13   Q.    And in fact you had, even before you became an analyst,

14   you had oil industry experience?

15   A.    Yes.

16   Q.    And so in due course you learned that you were going to

17   go back to the GER, to the Global Equity Research area?  That

18   was going to be the offer, the opportunity they were going to

19   give you?  I understand you didn't like it.

20   A.    I didn't think of it as an opportunity, but, yes.

21   Q.    You were in fact, in sports parlance, you were a

22   "free agent," right?  You didn't have to stay?

23   A.    I didn't have to stay.

24   Q.    And in fact did you not poke around a little bit outside

25   of Putnam for another job at that point?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 142

1    A.    I did.

2    Q.    Did you come up with anything?

3    A.    I didn't come up with anything.

4    Q.    And so you decided that you will take the offer?

5    A.    I did.

6    Q.    And with respect to the mutual fund, I think you've

7    already said -- what actually happened to Robert Swift's team

8    or the Global Growth Team -- let me talk about that -- that

9    was Swift, Kelly Morgan, and you, and you say Dexter?

10    A.    Yes, Steve Dexter was a listed portfolio manager on the

11    fund.

12    Q.    With respect to that fund, which was the big dominant

13    one in Swift's little tiny corner of the world that was on

14    the retail side, the mutual fund was just transferred to

15    another group that was managing a different and consolidated

16    into a different mutual fund, right?

17    A.    Yes, they merged it to another fund.

18    Q.    And did you check the performance of that other fund

19    that it got merged into?

20    A.    I did.

21    Q.    They were doing significantly better, were they not?

22    A.    I believe they were down 22 percent that year, so

23    relative to their benchmark, they did better, but it was

24    still not brilliant.

25    Q.    It was a different style of fund.  They were

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 143

1    significantly better compared to their benchmark than your

2    fund was to your benchmark, right?

3    A.    They were, but still overall down.

4    Q.    Okay, so the mutual fund goes there.  That only left the

5    institutional money, correct?

6    A.    There was -- no, the International New Opportunities

7    fund was there.

8    Q.    I'm just talking about Global Growth for a moment.

9    A.    There was also the Kokusai Project.

10   Q.    So that just left the Kokusai Project, and that was just

11   a piece of the overall what Global Growth was doing?

12   A.    There might have been some other institutional as well,

13   small.

14   Q.    With respect to this Global Growth Team, there wasn't

15   any reorganization.  It essentially got disbanded.  Swift is

16   fired, Kelly Morgan is in Research, you're in Research?

17   A.    Mr. Stephen Dexter remained.

18   Q.    And the funds are gone?

19   A.    And the funds are gone.

20   Q.    Mr. Dexter remained.  We're going to get to Mr. Dexter,

21   and the jury may hear from Mr. Dexter.  With respect to those

22   institutional funds, the Kokusai, the Japanese fund and what

23   other institutional funds, within a month or two, you know

24   who the portfolio manager of that was, don't you?  It was

25   Denise Seldon?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 144

1   A.   Well, Denise Seldon was not listed on any Putnam

2   documents as being in the Investment Division as of 2002,

3   12/31, so I don't think -- I didn't know that, and I --

4   Q.   You didn't know that she took over management?  Because

5   these are not ones -- these are offshore funds, institutional

6   funds, so they're not SEC funds.  You didn't know that she

7   took over?

8           THE COURT:  Wait, wait.  You'd better ask her.

9   Q.   Let me just ask you this question:  Do you know whether

10  she became the portfolio manager for these institutional

11  funds, including this Japanese Kokusai Fund that you've been

12  talking about?

13  A.   No, I don't know that.  She was a marketing person.

14  Q.   Now, you stayed at Putnam for another, what is it,

15  eighteen months after this change?

16  A.   Let's see.  Approximately, yes.

17  Q.   And you never found out who was managing the

18  institutional funds that were part of Global Growth?

19  A.   I don't recall investigating that.

20  Q.   Did you not at about this time and thereafter

21  periodically go visit Denise Seldon in her office?

22  A.   I did.

23  Q.   To ventilate and discuss and get advice?

24  A.   I used to visit with Denise Seldon.  She was a friend.

25  Q.   And yet you don't know that she was assigned to take

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   over the institutional money?

2   A.   She was an institutional portfolio manager, which is a

3   marketing function, so as far as I knew, she was continuing

4   to interface with clients but not make investment decisions.

5   Q.   Did her title change just to straight portfolio manager

6   at this time?

7   A.   I recall it changing in 2003 when she became a portfolio

8   member on the International New Opportunities Fund.

9   Q.   Now --

10  A.   And also I checked that against Putnam documents, and

11  her title -- she's not in the Investment Division as of the

12  end of 12/02.

13  Q.   As of the end of 12/02, okay.

14  A.   Yes.  So her title didn't change at that time, or if it

15  did, it must have changed in some other division.

16  Q.   You don't remember her title changing before then.  Just

17  hold on, maybe we'll have some testimony about it, somebody

18  who was there.  In fact, your attitude after learning that

19  there was going to be an opportunity in Global Equity

20  Research is that you were pleased?

21  A.   I decided that I would take the opportunity and do the

22  best with it that I could, and I began to enjoy it.

23  Q.   Let me ask you a question.

24        MR. MOLONEY:  Objection, your Honor.

25        THE COURT:  No, you need to answer his question.

1    Q.    You recall writing down that you were grateful and happy

2    to have a job?

3    A.    I do.  I felt that way.

4    Q.    And you recall writing that in your journal?

5    A.    I think so.

6    Q.    Do you want to take a look at if you're unsure, Page 75?

7    A.    Where on Page 75?

8    Q.    If you look at the next-to-the-last paragraph, tell me

9    if I read this correctly:  "I have produced some great

10   performance from '94 through 1999."  Do you see the last

11   sentence?

12   A.    Yes.

13   Q.    "But the prior two years were weak for my team, and I

14   was glad they gave me the opportunity."

15   A.    Yes.

16   Q.    "I had decided to do my best."

17   A.    Right.

18   Q.    By the way, at this point in time, you were also told

19   pretty unequivocally that you were going to be staying, at

20   least for the time being, in GER, right?

21   A.    No, I don't agree with that.  Mr. Oristaglio had told me

22   he was going to be considering me for other positions as they

23   came up.

24   Q.    Stay on Page 75, and do you see in the fourth paragraph

25   you talk about a meeting with Mr. Oristaglio?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 147

1    A.    Uh-huh.

2    Q.    Do you see that?

3    A.    Uh-huh.

4    Q.    And you in fact testified about that meeting the other

5    day on direct examination, that you were remaining a

6    portfolio manager.  Do you recall that?

7    A.    Yes.

8    Q.    And you wrote, "I decided to give it one more try to

9    stay in Portfolio Management.  I set up a meeting with Steve

10   Oristaglio around March 11 late in the day.  Steve said they

11   were not going to be using me as a PM.  He said there was no

12   room on the team for me.  I said I did not know why there was

13   room for Steve Dexter, who was newer to the team than me."

14          By the way, Steve Dexter had been a portfolio

15   manager longer than you had, correct?

16   A.    In his prior job, yes.  I don't know if it was longer

17   than me.  He came as a portfolio manager.

18   Q.    Okay.  "I also asked why I was not being asked to join

19   the Domestic Growth Team.  He said they needed certain

20   skills.  I said I had better skills than the people they were

21   keeping on the Domestic Growth Team.  He just kept saying I

22   needed to go back to GER."

23          That was the message that Oristaglio gave you,

24   correct?

25   A.    Well, in the meeting he also said to me that he would

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 148

1    consider me for other opportunities as they came up, as you

2    know I confirmed with him.

3    Q.    Sure, at some undefined time in the future.

4    A.    Well, he said he was going to be reassessing, and if it

5    turned out that they had incorrectly estimated what they

6    needed, or if they had departures, which they did, that he

7    would be considering me.

8    Q.    Now, they were going to be making an investment in you

9    in the Research Department, correct?  It was going to take

10   you a while to get up to speed on your stocks?

11   A.    Some time.

12   Q.    Start building models.  We're going to talk about this

13   in a second.  You wanted to manage some specific individuals?

14   A.    Yes.

15   Q.    The portfolio managers were presumably going to come to

16   rely on you for your stocks?

17   A.    Yes.

18   Q.    And one of the things that Mr. Oristaglio made clear to

19   you is, when he talked about certain skills, is that he

20   thought you had a good skill set for Global Equity Research

21   and could make a meaningful contribution there?

22   A.    That's what he said.

23   Q.    Now, by the way, you mentioned Wednesday, I think,

24   several individuals who at the time were not transferred out

25   of Portfolio Management back to Research.  Do you recall that

1    testimony?

2    A.    I recall in essence.  I'm not sure if I'm going to

3    recall word for word.

4    Q.    That's fair enough, but you recall that one of the

5    people that you mentioned was an Anthony or Tino Sellitto?

6    A.    I believe I mentioned him.

7    Q.    And do you recall at the time you were making $655,000?

8    A.    I was.

9    Q.    And you said he got to stay in Portfolio Management?

10   A.    Right.

11   Q.    Do you recall that he was making $370,000, just a little

12   more than half of what you were making?

13   A.    I didn't recall that at the time.  I've learned it

14   subsequent in discovery.  But I've also learned that he went

15   back over $1 million.

16   Q.    Just answer my question.  Another name you mentioned was

17   Peter Hadden.  He got to stay on what had been the leftover

18   of Robert Swift's team, and I believe you said he was fairly

19   junior?

20   A.    He was.

21   Q.    And he got to stay, and he worked on a small unit of

22   money on that team that was nowhere near as big as what you

23   had been managing, correct?

24   A.    Right, right.

25   Q.    And do you recall for that year his compensation was

Page 150

1    about $205,000, not even half of what you made?

2    A.    That's possible.

3    Q.    That's a job that you would have been interested in?  Is

4    that your testimony to the jury?

5    A.    To stay in Portfolio Management, yes.

6    Q.    And you mentioned Mr. England?

7    A.    Yes.

8    Q.    Now, Mr. England was the head of Research in 1994 when

9    you were hired, right?

10   A.    Yes.

11   Q.    He was one of the people who interviewed you?

12   A.    Yes.

13   Q.    So obviously he had been at Putnam longer than you had?

14   A.    I believe he joined in '92 or so.

15   Q.    And with respect to Mr. England, he was one of the names

16   that you mentioned, correct, that got to stay in Portfolio

17   Management?

18   A.    That I mentioned on Wednesday?

19   Q.    Yes.

20   A.    I think so.

21   Q.    And he got paid less than you did?

22   A.    In that year, the year of the big downturn, yes, other

23   people in Growth made less money.

24   Q.    All right.  Now, after you had I think what you

25   described as your conversation with Mr. Oristaglio about you

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1   were going back to Research -- I take it it was somewhat of a

2   difficult conversation?

3   A.   I kept saying that I wanted to stay on the Growth Team,

4   and he kept saying there was no room.  So it wasn't an easy

5   conversation.  I mean, we weren't yelling or anything like

6   that.  I was just expressing my desire to stay on the team.

7   Q.   But in due course, you, I take it, calmed down, and you

8   wrote him an e-mail?

9   A.   Like I said, I wasn't really yelling at him, so I didn't

10  really calm down, but I thought about it, I reflected on it.

11  Q.   And I think it was introduced yesterday as

12  Plaintiff's 104.  Do you see it in front of you there?

13  A.   Yes.

14  Q.   And that's your e-mail to Mr. Oristaglio on March 12 of

15  2002?

16  A.   Right.

17  Q.   And do you see there you wrote, "I was not entirely

18  happy with the way that I left our conversation last week"?

19  Do you see that?  So presumably the conversation was the

20  previous week, correct?

21  A.   Right, right.

22  Q.   And then if you go a couple of sentences down, you

23  wrote, "If the firm has decided that I could make the most

24  valuable contribution in Research, then I'm willing to do

25  whatever is needed."

Page 152

1  A.    Yes.

2  Q.    "That includes going into Research and possibly covering

3  energy."  And you wrote to him, "I do not want to give you a

4  hard time about the decision."  And then you added the

5  sentence, the last sentence, "Also, thank you for the bonus

6  that you got for me.  I appreciate your efforts on my behalf

7  in this difficult year."

8  A.    Yes.

9  Q.    And that was heartfelt?

10  A.    It was.  I've been grateful every year for the bonuses

11  I've been lucky enough to receive.

12  Q.    So that's the status as of sort of the beginning of

13  March.  The firm, Putnam, has asked you and told you there's

14  an opportunity in Research.  You haven't been terminated.

15  And then you develop a business plan, I think you referred to

16  it the other day; is that correct?

17  A.    Yes, upon being offered some options from Mr. Landes, I

18  developed a business plan.

19  Q.    You said you had a meeting with Mr. Landes, you thought

20  on the 1th or 13th?

21  A.    I don't remember what I testified, but it was -- it was

22  in this range, this time range.

23  Q.    And that you sent him a business plan on, it looks like

24  it's dated -- let me show it to you -- on the 14th of March,

25  2000 (Sic)?

1    A.    Yes, that's the date.

2    Q.    And that in this business plan, you told him there were,

3    among other things -- I don't mean to exclude any others --

4    but there were at least four things that you were proposing

5    to do.  Is that correct?

6    A.    It's hard for me to see, but I think so.

7    Q.    Let me try to -- let me see if we can fold it over.

8    A.    I still can't see the bottom.  You're talking about the

9    highlighted four things?

10   Q.    Hold on.  I'm going to try to get it clearer focused.

11   There, do you see it now?

12   A.    Yes.

13   Q.    Okay.  And the first thing that you were proposing was

14   to "Cover fourteen large cap international oils."  Do you see

15   that?

16   A.    Yes, I do.

17   Q.    And in the second sentence you wrote, "The four of that

18   group of fourteen that are currently covered would be

19   transferred from Jim Falvey to me."  Do you see that?

20   A.    Yes.

21   Q.    I don't imagine you'd spoken with Mr. Falvey at this

22   point?

23   A.    I had in fact.

24   Q.    Okay.  And then No. 2 was to "Manage the Energy and

25   Materials Team"?

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

Page 154

1    A.    Yes.

2    Q.    Knowledge Management Team?

3    A.    No.  I think -- oh, yes, KM, Knowledge Management, yes.

4    I didn't see that.

5    Q.    And then 3 was "Manage and develop four MBAs"?

6    A.    Yes.

7    Q.    Konstantin Stoev, Darren Peers, Ellis Eckland, and Chris

8    O'Malley?

9    A.    Right.

10   Q.    And then the fourth one was to "Manage the Natural

11   resources sleeve and/or sleeves being managed by the Research

12   team as a named portfolio manager."  Do you see that?

13   A.    Yes, yes.

14   Q.    And I think you testified that Mr. Landes told you that

15   he could give you maybe 90 percent of what you wanted?

16   A.    That's what he told me, yes.

17   Q.    And then you met with Mr. Gorman, Steve Gorman, who was

18   going to be your supervisor.  He was an Assistant Director of

19   Research, correct?

20   A.    Associate Director of Research.

21   Q.    Associate.  And I think you testified the other day that

22   what he told you was that you couldn't have all of it, and I

23   think you said you found out you were only going to get 45 to

24   50 percent of what you wanted, correct?  I'm trying to

25   understand the math.  With respect to the fourteen large cap

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1  oils, how many of them did you get?

2  A.   Oh, well, I got whatever, ten of them?  I'm just going

3  by this.

4  Q.   Ten or eleven?

5  A.   I think -- I don't remember, but the ones that I didn't

6  get were the largest caps, so they represented, you know,

7  70 percent of this capitalization.

8  Q.   I see, that's how you do it.  So you got ten out of the

9  fourteen stocks or eleven out of the fourteen?

10  A.   Actually, I got like 150 below or something like that of

11  the market cap.

12  Q.   And then they gave you, did they not, initially three of

13  the four analysts?

14  A.   Correct, 5 percent of that, right.

15  Q.   And did you manage the KM, the Knowledge Management

16  Team?

17  A.   I did.

18  Q.   And did you within that year get to manage or co-manage

19  the Global Natural Resources Fund?

20  A.   No, I did not.

21  Q.   When did you get to manage that?

22  A.   That I didn't get listed as a manager or be allowed to

23  manage it until February 14 of '03, a whole year later.

24  Q.   So it took a year to give you that?

25  A.   I was told at that time by Mr. Gorman it wasn't going to

7a3e3d43-30ef-4b44-b876-0f49acedd3e7

1    happen.

2    Q.   Okay.  Now, let's take these one at a time.  With

3    respect to --

4              THE COURT:  Would this be a good point to --

5              MR. KOCIUBES:  Absolutely, your Honor.

6              THE COURT:  Okay, see you Monday morning.  Thank

7    you.

8              THE CLERK:  All rise for the jury.

9              (Jury excused.)

10             (Adjourned, 1:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7

8        I, Lee A. Marzilli, RPR, CRR, do hereby certify

9  that the foregoing transcript, Pages 4-1 through 4-156

10 inclusive, was recorded by me stenographically at the time

11 and place aforesaid in Civil Action No. 04-12711-PBS, Lisa

12 Svensson V. Putnam Investments, et al, and thereafter by me

13 reduced to typewriting and is a true and accurate record of

14 the proceedings.

15       In witness whereof I have hereunto set my hand this

16 18th day of May, 2008.

17

18

19

20

21          /s/ Lee A. Marzilli
            _____
22          LEE A. MARZILLI, RPR, CRR
            OFFICIAL COURT REPORTER
23

24

25