IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


LISA SVENSSON,            )
                          )
            Plaintiff     )
                          )
        -VS-              ) CA No. 04-12711-PBS
                          ) Pages 1 - 57
PUTNAM INVESTMENTS, et al, )
                          )
            Defendants    )



JURY TRIAL - DAY SIX - PART II

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 20, 2008, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

6-2

1    A P P E A R A N C E S:

2        KEVIN F. MOLONEY, ESQ. Barron & Stadfeld, PC,
     100 Cambridge Street, Suite 1310, Boston, Massachusetts,
3    02114, for the Plaintiff.

4        JOHN K. WEIR, ESQ., John K. Weir Law Offices, LLC,
     300 Park Avenue, Suite 1700, New York, New York, 10022,
5    for the Plaintiff.

6        JOSEPH L. KOCIUBES, ESQ., LOUIS A. RODRIQUES, ESQ.,
     ALLYSON E. KURKER, ESQ., and JENNIFER L. HOLDEN, ESQ.,
7    Bingham McCutchen, LLP, 150 Federal Street, Boston,
     Massachusetts, 02110, for the Defendant, Putnam Investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                              I N D E X

2    WITNESS                   DIRECT    CROSS    REDIRECT    RECROSS

3    Joshua Brooks               4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

e1f7d808-05e5-416f-9b6e-a1495ef39db2

1                   P R O C E E D I N G S.

2          THE COURT:  Your next witness?

3          MR. MOLONEY:  It's Mr. Brooks.

4          THE COURT:  Come on up, Mr. Brooks.

5                   JOSHUA BROOKS

6   having been first duly sworn, was examined and testified as

7   follows:

8          THE CLERK:  Would you please state your name and

9   spell it for the record.

10         THE WITNESS:  Joshua Brooks, J-o-s-h-u-a

11  B-r-o-o-k-s.

12  DIRECT EXAMINATION BY MR. WEIR:

13  Q.   Good morning, Mr. Brooks.

14  A.   Good morning.

15  Q.   Could you tell us your present residence address.

16  A.   248 Buckminster Road, Brookline, Massachusetts.

17  Q.   And was that your residence on September 15, 2003?

18  A.   No.

19  Q.   And where did you live at that time?

20  A.   5 Arlington Street, Boston, Massachusetts.

21  Q.   And your date of birth is, sir?

22  A.   11/10/1967.

23  Q.   And as of September, 2003, what was your marital status?

24  A.   September of 2003, I was single.

25  Q.   And in April of 2003, were you hired as Director of

1  Research for Putnam Investments?

2  A.   I was.

3  Q.   And in that capacity, were you the immediate boss of the

4  plaintiff in this case, Lisa Svensson?

5  A.   I was.

6  Q.   And on September 15, 2003, did you communicate to

7  Ms. Svensson that she was terminated in her then job with

8  Putnam?

9  A.   I did.

10  Q.   Indeed you said, sir, you delivered to her a letter

11  which said, "Your employment at Putnam Investments is

12  terminated as of today," is that correct?

13  A.   Yes.

14  Q.   Now, the title Director of Global Equity Research, that

15  was a title you got coming in the door at Putnam?

16  A.   Yes.

17  Q.   And in that capacity, were you responsible for the

18  management and supervision of the various investment analysts

19  in the Global Equity Research Department?

20  A.   Yes.

21  Q.   And you were also responsible for the management of the

22  Associate Director of Research in that department?

23  A.   Yes.

24  Q.   And Lisa Svensson was an Associate Director of Research,

25  correct?

Page 6

1    A.    Yes.

2    Q.    And when you arrived there, did you have an

3    understanding of what Lisa Svensson's duties and

4    responsibilities were?

5    A.    Yes.

6    Q.    And did you understand that Lisa Svensson was also, in

7    addition to being Associate Director of Research, also had

8    responsibility for the management, portfolio management of

9    the Global Natural Resources Fund?

10   A.    Along with the other members of her team, yes.

11   Q.    She was the main portfolio manager on that fund,

12   correct?

13   A.    Yes.

14   Q.    At the time of your hiring, sir, and that was in April

15   of 2003 -- do you recall the exact date that you came aboard?

16   A.    I don't.  I'm sorry.

17   Q.    It was in that month, though?

18   A.    Yes, March or April, yes.

19   Q.    And were you also given the title of Managing Director

20   coming in the door?

21   A.    Yes.

22   Q.    And was that a title that you had negotiated for, or was

23   that something that was just handed to you by Putnam?

24   A.    It wasn't something that I negotiated for.

25   Q.    So if Putnam had said that they didn't make any managing

e1f7d808-05e5-416f-9b6e-a1495ef39db2

1  directors in 2003, that wouldn't be quite right?

2  A.   Not of existing employees would be correct, but new

3  employees, some were hired as managing directors.

4  Q.   You got it, correct?

5  A.   Yes.

6  Q.   Did you also get any other titles coming in the door?

7  A.   No, I don't think so.

8  Q.   Were you made a partner?

9  A.   I was.

10  Q.   And that was also something that you hadn't negotiated

11  for?

12  A.   Had not negotiated for, correct.

13  Q.   Who told you that you were going to be a managing

14  director and a partner?

15  A.   I believe Rick Tibbetts of the Human Resources

16  Department at Putnam.

17  Q.   Now, let's go back a little bit about your earlier

18  career prior to Putnam.  You received a bachelor of arts

19  degree from Yale University in 1991?

20  A.   Yes.

21  Q.   And have you also received an MBA degree at some point

22  in time?

23  A.   I did, from the University of London in England in 1998.

24  Q.   And was that degree obtained while you were working for

25  one of your former employers prior to Putnam?

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 8

1    A.    Yes.

2    Q.    And when you graduated from the university and got your

3    graduate degree, did you go directly to work for a company,

4    or was there some interlude of time between your completion

5    of your education and your first job?

6    A.    I graduated from Yale in May or June of 1991, and I

7    started at Delaware Investments in July or August of that

8    year.

9    Q.    And that Delaware Management was a company in

10   Philadelphia?

11   A.    Yes.

12   Q.    And you started as an entry-level analyst?

13   A.    Yes.

14   Q.    And for what period of time did you remain an

15   entry-level analyst at Delaware Management?

16   A.    I remained an analyst in title until I moved to London

17   in 1995, and the London portion of Delaware Investments had a

18   different title structure, so my title changed at that point

19   to assistant portfolio manager, although my functional role

20   was exactly the same.

21   Q.    So even though you got a change of title, it was the

22   same job?  You were a stock picker?

23   A.    Yes.

24   Q.    And then at some point did you come back from London?

25   A.    I did, in March of 2000.

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 9

1    Q.    And when you got back from London, did you commence to

2    work for Mr. Ed Haldeman?

3    A.    I did.  He was the CEO of Delaware Investments at the

4    time.

5    Q.    Did you report directly to Mr. Haldeman?

6    A.    I did.

7    Q.    Now, Mr. Haldeman left Delaware Management in 2002; is

8    that correct?

9    A.    Yes, that's correct.

10   Q.    And he joined Putnam at that point in time?

11   A.    Yes.

12   Q.    And when Mr. Haldeman left, did you try to get his job?

13   A.    I didn't try to get his job, but he was CEO of Delaware

14   Investments, and I was one of the three people named in the

15   succession planning as potential candidates for that job.

16   Q.    They had done some sort of succession planning at

17   Delaware --

18   A.    Yes.

19   Q.    -- as to who would succeed whom --

20   A.    Exactly.

21   Q.    -- if a person left?  And were you successful?  Did you

22   get the job?

23   A.    No, I wasn't.

24   Q.    And did you find your position -- having not gotten the

25   job, it went to one of the other candidates, I assume?

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 10

1    A.    It did, yes.

2    Q.    Did you find your position difficult because you weren't

3    chosen to succeed Mr. Haldeman?

4    A.    Yes.

5    Q.    Indeed, one of the other unsuccessful candidates at

6    Delaware Management was fired at that point in time; isn't

7    that correct?

8    A.    Yes, that's correct.

9    Q.    And you were worried that that might also happen to you?

10   A.    It certainly seemed a possibility.

11   Q.    So you contacted Mr. Haldeman and asked him if you could

12   get a job at Putnam; isn't that right?

13   A.    I contacted him and asked him for advice, A, on my

14   situation at Delaware and whether, in his experience, he

15   thought my fears were unjustified; and then, B, asked his

16   advice relative to what I might think about doing next; and

17   in that context, we talked about Putnam, yes.

18   Q.    Did you also undertake a job search, send out resume's,

19   ask executive recruiters what might be available at that

20   time?

21   A.    Yes, I contacted a few executive recruiters.

22   Q.    And did you get any other offers besides the opportunity

23   to come to Putnam?

24   A.    I had other, let's say, indications of interest, but I

25   ultimately didn't take any of those to the point of getting

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 11

1    an offer.

2    Q.   Would it be fair to say that the Putnam offer was by far

3    the best offer that you got?

4    A.   Of those that I considered, yes.

5    Q.   And did you interview with Putnam?

6    A.   I did.

7    Q.   And did you interview with others than Mr. Haldeman?

8    A.   Yes.  Given our prior relationship, Mr. Haldeman told me

9    that he preferred not to be the decision-maker in terms of

10   whether I got hired, so I spent more of my time being

11   interviewed by Larry Lasser and Steve Oristaglio.

12   Q.   Okay, Mr. Lasser was the CEO of the company?

13   A.   Yes.

14   Q.   And Mr. Oristaglio's position at that time?

15   A.   Along with Mr. Haldeman, he was the co-head of

16   Investments at that time.

17   Q.   And did you have any discussions with Mr. Lasser or

18   Mr. Oristaglio concerning the duties that you would be

19   assuming if they extended an offer to you?

20   A.   Yes.

21   Q.   And you were told by Mr. Oristaglio that you would be

22   initially assigned as the Director of Global Equity Research?

23   A.   Correct.

24   Q.   Did Mr. Oristaglio or Mr. Lasser have any discussions

25   with you about your consideration for any other possible

Page 12

1   positions within Putnam?

2   A.   As I recall, we talked about my background as a value

3   investor and whether it would be appropriate for me to join

4   the Value Team at Putnam.

5   Q.   So they were saying, "Start in Research, and then after

6   a while, we'll see if there's a role for you to play on the

7   Putnam Value Teams"?

8   A.   No.   They were considering whether the Value Team was

9   the more appropriate place for me to enter the organization

10  or whether Research was the more appropriate place.

11  Q.   And ultimately you were offered the Global Equity

12  Research position?

13  A.   Yes.

14  Q.   Did you have any discussions with Mr. Oristaglio or

15  Mr. Lasser concerning the compensation that you would be paid

16  if you came to Putnam?

17  A.   Yes.

18  Q.   And you were told that you would be paid a --

19          MR. KOCIUBES:  Objection.

20          THE COURT:  Overruled.

21  Q.   You were told that you would be paid a base salary?

22  A.   Yes.

23  Q.   And you were told that you would be paid a bonus?

24  A.   Yes.

25  Q.   And did you negotiate with them for any monetary

1    compensation over and above salary and bonus?

2    A.    At Delaware Investments, I was an owner, a part owner in

3    a small way of that firm; and Putnam gave me a commensurate

4    amount of financial interest in Putnam to match what I was

5    leaving behind at Delaware.

6    Q.    Are you trying to say that you got some stock in Putnam?

7    A.    Yes.

8    Q.    And what was the amount of the base salary that you got

9    upon your arrival at Putnam?

10            MR. KOCIUBES:  Objection.

11            THE COURT:  Overruled.

12    A.    If I remember correctly, it was $200,000.

13    Q.    And what was the amount of the bonus that you got upon

14    your arrival at Putnam or that was agreed to be paid to you

15    upon your arrival at Putnam?

16            MR. KOCIUBES:  Objection.

17            THE COURT:  Overruled.

18    A.    I was guaranteed to be paid $1.8 million in bonus.

19    Q.    So salary plus bonus was $2 million?

20    A.    Yes.

21    Q.    And what was the value of the stock that you were given

22    at the time to compensate you for what you left behind at

23    Delaware?

24    A.    I was given options, whose value were entirely dependent

25    on what the stock price of what Putnam did.  So at the time I

Page 14

1    received them they were worth nothing, but they had the

2    potential to either continue to be worth nothing or to become

3    worth more, should the stock rise.

4    Q.   At the time that you were offered the options, they had

5    a value, didn't they?

6    A.   They had what is termed "time value," but --

7    Q.   What was the time value?

8    A.   Approximately a million dollars.

9    Q.   And were any of these amounts that you received, whether

10   in stock or options or salary or bonus, guaranteed to you,

11   sir?

12   A.   Yes.

13   Q.   And what period of time were they guaranteed?

14   A.   My base salary and bonus were guaranteed for my first

15   two years of employment.

16   Q.   So if I understand your testimony correctly, for 2003

17   you had guaranteed compensation of $2 million plus the

18   options which you valued at roughly $750,000?

19   A.   I said roughly a million for the options, but that

20   wouldn't have applied specifically to 2003.  Those were more

21   a long-term interest in the company.

22   Q.   When you came to Putnam, was there something called the

23   Operating Committee?

24   A.   I believe there was, yes.

25   Q.   And Mr. Lasser and Mr. Haldeman and Mr. Oristaglio were

Page 15

1  the heads of that Operating Committee, correct?

2  A.    I believe Mr. Lasser as chief executive officer sort of

3  was the head of that committee.

4  Q.    And as you understood it, the Operating Committee was

5  responsible for making all the business decisions of the

6  Investment Management Division of Putnam?

7  A.    I didn't have a clear view as to the role of the

8  Operating Committee.

9  Q.    Did you understand that they basically operated the

10  firm?

11  A.    Yes.

12  Q.    And coordinated the management of the various portfolio

13  teams and the Research Department and all of the different

14  departments and organizations, separate entities within

15  Putnam?

16  A.    Not at that level of detail.

17  Q.    And was there also a Human Resources Department at

18  Putnam?

19  A.    Yes.

20  Q.    And who was the head of that department when you join?

21  A.    Rick Tibbetts.

22  Q.    And was there a particular individual from Human

23  Resources that was assigned specifically to the Research

24  Department?

25  A.    Mary McNamee.

Page 16

1   Q.   In the time frame after you joined Putnam in April of

2   2003 up until September 15, did you ever receive any training

3   in proper procedures for terminating individuals?

4   A.   No.

5   Q.   Were you ever provided with any handbooks or manuals

6   that specified certain procedures by which you would

7   terminate individuals that were within the Research

8   Department?

9   A.   No.

10  Q.   Did you ever become aware that Putnam purported to have

11  an equal employment opportunity policy?

12  A.   Yes.

13  Q.   And how did you become aware of that?

14  A.   It was included in statements given to me when I joined

15  the firm.

16  Q.   And did you understand that Putnam's purported equal

17  opportunity policy required Putnam to give equal opportunity

18  to men and women in respect to promotions and demotions and

19  transfers and compensation?

20  A.   Yes.

21  Q.   And that male and female investment professionals had to

22  be treated fairly and not treated differently because of

23  their gender?

24  A.   Absolutely.

25  Q.   So you knew that almost from the very moment that you

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 17

1  arrived at Putnam?

2  A.    Certainly.

3  Q.    Would it also be fair to say, sir, that in the initial

4  months after your arrival at Putnam, you weren't terribly

5  familiar with the individuals that you were supervising

6  within the Research Department?

7  A.    Yes, I think that would be fair to say.

8  Q.    And you weren't familiar with their performance

9  evaluations or their former managers' ratings, anything of

10 that nature?

11 A.    I chose deliberately to actually not look at that

12 information.  It was available to me, but I was asked to come

13 to Putnam to help make improvements and positive change

14 there, and I felt like starting afresh was more constructive

15 for both myself and the people that I worked with.

16 Q.    Did anyone ever tell you when you came to Putnam not to

17 look at the personnel files or the job evaluations or the

18 prior managers' ratings of people under your supervision?

19 A.    No, no one told me that.

20 Q.    But you didn't do it?

21 A.    Not in terms of qualitative evaluations as you've

22 described.  I certainly looked at people's performance

23 history, which was a more mathematical and unbiased group of

24 information.

25 Q.    We'll get to that in a minute.  Specifically, did you

Page 18

1    undertake when you arrived at Putnam to review Lisa

2    Svensson's personnel file?

3    A.    No.

4    Q.    Did you undertake to review any of her performance

5    evaluations?

6    A.    Again, statistical performance but nothing of a more

7    subjective written matter.

8    Q.    And in regard to Lisa Svensson specifically, did you

9    review any of the ratings of her previous managers?

10    A.    No.

11    Q.    Did you understand who her immediate preceding manager

12    was?

13    A.    Yes.

14    Q.    And who was that, sir?

15    A.    Bill Landes.

16    Q.    And did Mr. Landes, although your predecessor, did he

17    remain at Putnam for some period of time after you assumed

18    your duties?

19    A.    He did.

20    Q.    In fact he had an office right next to you; isn't that

21    correct?

22    A.    He did, yes.

23    Q.    So at any time that you wanted to, you could have gone

24    in to Mr. Landes and sought his views on Lisa Svensson or

25    anyone else that was under your supervision?

Page 19

1   A.   Yes.

2   Q.   Now, you referenced some statistical information.  What

3   statistical information were you looking at?

4   A.   Putnam had a system for tracking the effectiveness of

5   analysts' stock picks, and so I looked at the information

6   associated with analysts in that regard, and as well the

7   performance of Putnam's client portfolios, both in terms of

8   performance relative to industry benchmarks as well as to

9   industry peers, both in total but also by different sector.

10  Q.   And did you commence to do that immediately upon your

11  arrival at Putnam?

12  A.   Yes.  I had in fact begun to look at that sort of data

13  when considering whether to join Putnam.

14  Q.   And you formed the conclusion, did you not, that Putnam

15  wasn't doing very well in that regard?

16  A.   I did, yes.

17  Q.   And did you attribute that underperformance to the

18  research analysts that you had under your supervision?

19  A.   Coming in, I wasn't clear where to attribute that

20  performance, and certainly that was my greatest interest upon

21  arriving was to try and understand where the issue lay.

22  Q.   At some point after you arrived, did you come to the

23  conclusion that the analysts that you were supervising were

24  underperforming?

25  A.   I came to the -- in some regards, yes.

Page 20

1    Q.   So would it be fair to say that you decided that you

2    wanted to retain and promote the top analysts according to

3    statistics that you had available to you?

4    A.   I wanted to retain as many of the people that were there

5    when I arrived as I could.  Turnover of staff had been a

6    problem for Putnam previously, and I came to feel that that

7    turnover of staff was partly responsible for the results that

8    I thought needed to be improved.

9    Q.   So your interest was in keeping people?

10   A.   Yes.

11   Q.   Is that what you're saying?  Now, since you came to

12   Putnam or after you came to Putnam, you've had occasion to

13   terminate some people; is that correct?

14   A.   Ultimately I did, yes.

15   Q.   And was Lisa Svensson the very first person that you

16   terminated?

17   A.   Yes.

18   Q.   Now, when you assumed your duties as director, the

19   Research Department was broken down into separate teams?

20   A.   Yes, it was.

21   Q.   And one of those teams was Energy and Basic Materials?

22   A.   Yes.

23   Q.   And Lisa was the ADR for that particular group?

24   A.   Yes.  She was the leader of that team.

25   Q.   And she supervised when you arrived four male analysts

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 21

1    in that regard?

2    A.    Yes, that's correct.

3    Q.    And they were Konstantin Stoev?

4    A.    Yes.

5    Q.    Ellis Eckland?

6    A.    Yes.

7    Q.    Darren Peers?

8    A.    Yes.

9    Q.    And Chris O'Malley?

10   A.    Yes.

11   Q.    And among Lisa's duties was the duty to evaluate the job

12   performance of those four analysts?

13   A.    Yes.

14   Q.    And to provide feedback to them regarding any problems

15   that they were encountering?

16   A.    Yes.

17   Q.    And in addition to her management of the team, she also

18   had management responsibility with respect to the Global

19   Natural Resources Fund and the Knowledge Management Team; is

20   that correct?

21   A.    Yes, although by the time I arrived, the Knowledge

22   Management Team no longer existed.

23   Q.    Okay.  And, to the best of your knowledge, had she been

24   performing all of those duties in a competent manner?

25   A.    When I arrived --

Page 22

1    Q.    Prior to your arrival?

2    A.    When I -- yes, it appeared so to me.

3    Q.    And in the time frame of April, May, June, July of 2003,

4    you had occasion to observe Ms. Svensson and interact with

5    her on a daily basis, correct?

6    A.    I did, yes.

7    Q.    And did you believe in that initial period that Lisa

8    Svensson was performing her various responsibilities in a

9    competent manner?

10    A.    Up until June-July, yes.

11    Q.    Now, you may have referred to this earlier, sir, but was

12    there in place at Putnam during this April to September of

13    2003 period a system for keeping track of how the various

14    analysts were performing in terms of financial performance?

15    A.    Yes, the same system I've already referenced.

16    Q.    And did you review that on a regular basis?

17    A.    Let's say "yes."

18    Q.    So you knew in terms of stock pickers who the best stock

19    pickers were?

20    A.    I did over various time periods, yes, although some were

21    quite short and therefore not, in my opinion, not as

22    relevant.

23    Q.    And did you know, for example, that Lisa Svensson had

24    been in the top quartile for stock pickers in terms of her

25    performance in the year 2002?

Page 23

1   A.    I'm sure I was aware of that, yes.

2   Q.    And you knew, did you not, sir, that as of August 29 of

3   2003, she was the number one stock picker in Global Equity

4   Research?

5   A.    Along potentially one metric, that was true, although

6   that system involved several different metrics as a way --

7   any one metric can be flawed.  The aggregation of several

8   different metrics can hopefully give you a clearer picture.

9   And as I recall it, Lisa was doing fine but not -- not over

10  and above the best in the department, no.

11  Q.    She was doing fine.  You had access to this information

12  on a day-to-day basis?

13  A.    I did, yes.

14  Q.    Do you recall whether you accessed the information in

15  the time frame of your meeting with Lisa Svensson on

16  August 28 of 2003?

17  A.    I don't recall.

18  Q.    Would it be fair to say, sir, part of your

19  responsibility as Director of Research was to retain and

20  promote and compensate analysts, including ADRs, who had the

21  best stock-picking performance?

22  A.    It was my job to retain everyone I thought was

23  appropriate, yes.

24  Q.    Now, did you have occasion to attend a partners' annual

25  meeting in Montreal in June of 2003?

Page 24

1    A.    I did, yes.

2    Q.    And you made a presentation to the partners at that

3    time?

4    A.    I did, yes.

5    Q.    And that presentation was essentially "What I see is

6    wrong with Putnam"?

7    A.    Yes.  I had been at the firm approximately six weeks at

8    that point, and I was asked to share my perception of what

9    was going on within Research and Portfolio Management to some

10   extent at the firm.

11   Q.    And what was your perception at that time, the problems

12   that were going on at Putnam?

13   A.    The way I described it at the time was that I came to

14   Putnam with a relatively simple equation in my head, which

15   was the quality of people or their talents times their effort

16   level equals their results.  And I could see that the results

17   weren't what they needed to be, so I assumed coming in that

18   there was an issue, either with the talent level of the

19   people or their effort level.  But upon relatively short

20   reflection, I felt that I was mistaken in my equation and

21   there was one more variable that was missing, and that was

22   the effectiveness of those people's effort.  So at that point

23   I believed that the analysts at Putnam were talented enough

24   to succeed, and, if anything, they were working too hard.

25   Just there was a lot of hours spent in the office.  But from

Page 25

1  there, unfortunately at the firm, there appeared to me to be

2  a culture of sort of simultaneously fear and selfishness that

3  was getting in the way of people being able to be effective

4  in their efforts.

5  Q.   And at the time that you made the presentation to the

6  partners in Montreal, did you believe that Lisa Svensson was

7  talented?

8  A.   Yes.

9  Q.   And did you believe that she was a hard worker?

10  A.   Yes.

11  Q.   And did you believe that she was effectively managing

12  her team?

13  A.   At that point, I knew nothing to the contrary.

14  Q.   Now, did you ever have any discussions with Lisa

15  Svensson concerning her desire to become a managing director

16  in 2003?

17  A.   Yes.  That was one of the first conversations Lisa had

18  with me upon my arrival at the firm.

19  Q.   And do you recall what you did, if anything, after you

20  had that conversation with her?

21  A.   Yes, I do.

22  Q.   What did you do?

23  A.   Let's say titles and how they worked at Putnam weren't

24  clear to me.  As I've already said, they weren't a part of my

25  thought process coming into the firm.  And so when Lisa told

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 26

1   me that she needed or wanted to be promoted, I didn't really

2   have a good answer for her as to how that might occur; and as

3   such, I went and talked to my boss, Steve Oristaglio, about

4   it.

5   Q.   Okay.  And did Mr. Oristaglio say that Lisa Svensson

6   would have an opportunity to become a managing director?

7   A.   I don't recall him saying that specifically, but in

8   regards to Lisa's specific question, I spoke to Steve and

9   then ultimately Larry Lasser and was told that the firm had

10  decided to not promote anyone that year, as they were doing a

11  review of the firm's title structure and whether it was

12  relevant to the business at that point.

13  Q.   And do you recall getting back to Lisa Svensson on that

14  subject?

15  A.   I do, yes.

16  Q.   And you told her that no one was going to be a managing

17  director in 2003?

18  A.   I told her that I was told that there would be no

19  promotions that year.

20  Q.   Now, did there come a time in the summer of 2003 where

21  you decided that you wanted to demote or terminate Lisa

22  Svensson?

23  A.   No.

24  Q.   Mr. Brooks, were you deposed in this case on

25  November 17, 2005?

1   A.   Yes, I was.

2   Q.   You were under oath at that time?

3   A.   I was, yes.

4   Q.   And --

5        MR. KOCIUBES:  May he have a copy of the

6   transcript, your Honor?

7            THE COURT:  Yes.  Do you have an extra one?

8            MR. MOLONEY:  If I have a moment, I'll get it.

9            MR. WEIR:  May I approach, your Honor?

10           THE COURT:  Yes.

11           THE WITNESS:  Thank you.

12  Q.   Let me direct your attention, sir, to Pages 159 and 160,

13  159, Line 21:  "Let's fast forward then to, did there come a

14  time when you decided that you wanted to terminate or demote

15  Lisa Svensson?  Answer:  Yes."  Do you see that testimony,

16  sir?

17  A.   I do, yes.

18  Q.   Was that untruthful?

19  A.   No.  The word that I'm focused on is the word "want,"

20  and perhaps in the deposition I should have focused on it as

21  well, but there was no point at which I wanted to terminate

22  Lisa Svensson.  I think I made it clear that I wanted her to

23  stay.

24  Q.   Okay.  But you began in that time frame of July and

25  August to consider the possibility of some sort of demotion

1   of Lisa Svensson?

2   A.    I considered in that period changing Lisa's

3   responsibility managing other analysts, but that didn't

4   include any change to her title, nor to her compensation, so

5   to me that was not necessarily a demotion.  It was just

6   trying to address problems on that team and retain other

7   employees.

8   Q.    Okay.  Well, you met with Lisa Svensson on August 28th

9   of 2003; is that correct?

10  A.    That is correct.

11  Q.    And you provided her with three options for her

12  continuing at Putnam?

13  A.    I did.

14  Q.    And the first option was the one that you just

15  described, that you would have her be only an analyst?

16  A.    Yes, to continue on with the most important parts, to

17  me, of her responsibilities, being an analyst and playing a

18  role managing the Natural Resources Fund.

19  Q.    And she wouldn't be managing anybody; is that correct?

20  A.    That was correct, yes.

21  Q.    And she also wouldn't be continuing in her role as the

22  portfolio manager on the Global Natural Resources Fund; is

23  that correct?

24  A.    No, I don't believe that is correct.  I explicitly

25  talked about her continuing her role as part of managing that

e1f7d808-05e5-416f-9b6e-a1495ef39db2

1    fund.

2    Q.    You were going to assume the portfolio management

3    position on that fund, weren't you, sir?

4    A.    I was going to assume a role coordinating the efforts of

5    the team members.

6    Q.    Well, you had to identify to somebody, did you not, that

7    there was a manager on that fund?

8    A.    Yes.

9    Q.    The SEC, isn't that correct?

10   A.    That is correct, yes.

11   Q.    And you were going to identify yourself, sir?

12   A.    I -- I don't specifically recall, but that wouldn't

13   surprise me.

14   Q.    It wouldn't surprise you.  Now, the other two options

15   that you offered to Lisa Svensson was to leave immediately

16   with a severance package, correct?

17   A.    That was the third option I laid out for her, yes.

18   Q.    And the second option was that she could stay on for a

19   period of some months, and then during that period she

20   wouldn't be functioning in any capacity for Putnam; she'd be

21   out looking for a job?  Isn't that correct?

22   A.    No, that's not.  My expectation was that Lisa would

23   continue to work as an analyst during that period, but that

24   it would be easier for her to find another job, potentially,

25   if she stayed on at Putnam, if she chose to leave.

Page 30

1    Q.    So she was going to be out looking for a job?  You

2    understood that, correct?

3    A.    Yes.

4    Q.    And then she would leave at the end of that period of

5    months with no severance?

6    A.    That wasn't explicitly discussed.  We didn't get far

7    enough into the discussions to --

8    Q.    So now you're saying, sir, that you wanted Lisa Svensson

9    to stay.  Yet you're giving her two out of the three options

10   by which she's going to leave; isn't that correct?

11   A.    Yes.

12   Q.    It's a curious way to encourage somebody to stay, isn't

13   it?

14   A.    No, I don't think so.  I think I was very clear with

15   Lisa verbally as to my hope that she would stay and continue

16   to play a role as an analyst and as a member of the Portfolio

17   Management Team.  From there, given that one of the very

18   first conversations she and I had had was about title and

19   hierarchy, I did understand that possibly for her the removal

20   of her management responsibilities would leave her unhappy at

21   Putnam, and I didn't want to have her there as an unhappy

22   person.  I assumed she wouldn't want to be there as an

23   unhappy person, so I tried to give her other ways in which,

24   if she wanted to, she could leave the firm.  But I think I

25   was very clear with her that I wanted her to stay at the

Page 31

1    firm.

2    Q.    If Ms. Svensson's job as you conceived it after

3    August 28, 2003, had been offered to you upon your arrival at

4    Putnam, would you have taken it?

5    A.    I wouldn't have taken that job specifically because I

6    don't have a background in analyzing energy companies at the

7    level Lisa has.

8    Q.    Well, would you have been prepared, given your situation

9    at Delaware Management, to have considered the position that

10   Lisa Svensson was asked to take in August?  Would you have

11   considered it?

12                MR. KOCIUBES:  Objection.

13                THE COURT:  Overruled.

14   A.    I guess I -- I struggle to answer the question, but --

15   Q.    It's a simple "yes" or "no" question, sir.

16   A.    Then that job specifically?  No, because I wasn't

17   qualified for it.

18   Q.    Now, this meeting on August the 28th, did you have any

19   discussions with anyone prior to meeting with Lisa concerning

20   these three options that you were offering to her?

21   A.    Yes, I did.

22   Q.    And did you consult with Mr. Haldeman on that subject?

23   A.    I may have mentioned it in passing to Mr. Haldeman,

24   but -- actually, now that you ask the question, I think I

25   probably did ask for his perspective.

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 32

1   Q.   Okay.  And did he give you his perspective?

2   A.   I believe he did.

3   Q.   And his perspective was that this was the right way to

4   go?

5   A.   We went that way, so certainly I -- I would expect that

6   was his perspective.

7   Q.   And did you also discuss it with Mr. Oristaglio?

8   A.   Yes, I would have.

9   Q.   And was it his perspective that this was the right way

10  to go?

11  A.   Again, I -- I don't recall specifically, but I believe

12  he was in agreement.

13  Q.   And did you discuss it with anyone in the Human

14  Resources Department?

15  A.   Yes.

16  Q.   And with whom in Human Resources?

17  A.   I recall specifically discussing it with Mary McNamee,

18  but it wouldn't surprise me if Mary and I had also discussed

19  it with Rick Tibbetts as the head of Human Resources.

20  Q.   And was it the consensus view of the Human Resources

21  Department that the giving of these three options was the

22  right way to handle Lisa Svensson's future?

23  A.   I -- I -- I don't know, but I believe, yes.

24  Q.   Did you also consult with counsel prior to the

25  August 28, 2003 meeting with Lisa Svensson?

Page 33

1    A.    I don't recall specifically, but I -- I wouldn't be

2    surprised.

3    Q.    Did you ever prepare or cause to be prepared a draft of

4    a termination agreement for Lisa Svensson prior to August 28

5    of 2003?

6    A.    No, I don't think so.

7    Q.    So if that happens, there was a draft prepared, it

8    wasn't something that you were aware of?

9    A.    Not -- not that I recall, no.

10   Q.    And was there any discussion of the draft termination

11   agreement in these various meetings that you were talking

12   about?

13   A.    No, I don't think so.

14   Q.    Was it indeed your initial plan to terminate Lisa

15   Svensson and not offer her the three options?

16   A.    No, I don't remember that at all.

17   Q.    Prior to the August 28 meeting, did you do anything to

18   ascertain Lisa Svensson's people management skills?

19   A.    Yes.

20   Q.    Did you review any documentation regarding her people

21   management skills prior to your arrival at Putnam?

22   A.    Again, I -- I don't recall, but I don't believe so, no,

23   prior to my arrival.

24   Q.    And had you gotten some information from a Mr. Darren

25   Peers concerning issues that he had with Lisa Svensson?

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 34

1   A.   Yes, I did.

2   Q.   And Mr. Peers reported to Lisa Svensson, as you've

3   already testified?

4   A.   Yes.

5   Q.   And did you get some information with respect to a Chris

6   O'Malley and his evaluation of his boss's people management

7   skills?

8   A.   Yes, I did.

9   Q.   And did you get some evaluation of the people management

10  skills from an individual by the name of Konstantin Stoev?

11  A.   Yes, I did.

12  Q.   And did you do that before August 28 of 2003?

13  A.   Yes, I did.

14  Q.   You're sure of that?

15  A.   I'm not a hundred percent sure now five years later, but

16  I believe I did, yes.

17  Q.   Now, when you met with Lisa Svensson, you conveyed to

18  her these three options.  That was a personal meeting; is

19  that correct?

20  A.   It was, yes.

21  Q.   And did she appear visibly upset?

22  A.   As I recall, yes.

23  Q.   Did she cry?

24  A.   As I recall, yes.

25  Q.   And did you consider her tears to be phony?

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 35

1   A.    No.

2   Q.    You knew that she was not happy about this, correct?

3   A.    Yes, absolutely.

4   Q.    And did she indicate that this was not a happy moment

5   for her in her career?

6   A.    Yes.  It wasn't a happy moment for me either, but, yes.

7   Q.    And did she try to defend herself against the

8   accusations you were making against her?

9   A.    In that meeting, I don't believe we talked about it long

10  enough, although, again, through the amount of time that's

11  passed, I can't remember specifically.

12  Q.    Well, how long was that meeting, to your recollection?

13  A.    I remember it as not being very long.

14  Q.    So you just came in and talked about what you've decided

15  to do, and these are the three options you're going to give

16  her?  Is that your testimony?

17  A.    Lisa came to me, as I remember it, and we sat down, and

18  I told her that I found out some things on her team that were

19  quite negative; that she had been acting in a manner that had

20  led to other members of her team seeking other employment

21  outside of Putnam, and that she and I both had a problem that

22  we needed to address, and that I hoped the way we could

23  address it was that she would no longer manage those people;

24  we'd get them to stay at Putnam and that she herself would

25  stay at Putnam, and that we would continue on trying to

Page 36

1    improve the place and improve the investment results.

2    Q.   And these other people that have threatened to leave

3    people, who were they?

4    A.   Darren Peers and Chris O'Malley had both told me they

5    were seeking other employment.

6    Q.   Indeed, you knew at the time of the August 28 meeting

7    that Mr. Peers had taken another job, correct?

8    A.   I knew, I believe, at that point that he had been

9    offered another job.  I was still hoping that we would be

10   able to retain him, but -- but I knew that he did have

11   another option available to him.

12   Q.   Do you believe that by demoting or terminating Lisa

13   Svensson, that would have assisted you in retaining

14   Mr. Peers?

15   A.   I knew that there was no way I could retain Mr. Peers if

16   Lisa continued to manage him.  So in asking Lisa to continue

17   on with her investment responsibilities, I was hoping to

18   create a situation where she stayed at the firm and

19   potentially he stayed as well.

20   Q.   And the other individual was Mr. Chris O'Malley?

21   A.   Yes.

22   Q.   And you knew, sir, did you not, that Lisa Svensson had

23   been in the process of preparing a midyear evaluation of

24   Chris O'Malley?

25   A.   I had found that out from the Human Resources

Page 37

1  Department, yes.

2  Q.   And that wasn't unusual, was it, sir, come as a surprise

3  to you?

4  A.   Actually it was a bit of a surprise.  I hadn't asked for

5  any midyear reviews to be prepared, and when I heard about

6  it, I was mildly surprised, although given the transition

7  between myself and Mr. Landes, it didn't seem shocking that

8  someone maybe would have continued with the way they used to

9  do it.

10  Q.   You understood that midyear performance reviews had been

11  prepared in the past prior to your arrival?

12  A.   That was my understanding, yes.

13  Q.   And you understood that the purpose of those midyear

14  performance reviews was a heads-up to the individual in

15  question if there were any problems?

16  A.   Actually, I didn't really fully understand the purpose

17  of them.

18  Q.   You didn't say, "Stop the midyear performance reviews,"

19  did you?

20  A.   I believe I told the ADRs they weren't necessary.

21  Q.   You didn't stop them.  You didn't say, "Don't do it"?

22  A.   No.  I didn't say they shouldn't be done necessarily.

23  Q.   Had Mr. O'Malley also, prior to the August 28 meeting,

24  also voiced to you verbally or in writing criticisms of Lisa

25  Svensson?

Page 38

1    A.    He had, yes, voiced to me verbally that he was concerned

2    about his relationship with Lisa and how that was impacting

3    his ability to do his job.

4    Q.    And when you got these comments from Mr. Peers and

5    Mr. O'Malley, did you go to Lisa Svensson and say, "What's

6    going on here?"

7    A.    In terms of -- those happened at two slightly different

8    points.  In terms of my conversation with Mr. Peers -- and

9    please remember that I'd only just arrived at the firm, so I

10   didn't know any of these people particularly well -- one of

11   my first reactions in regards to Mr. Peers was to see if he

12   would be comfortable sitting down with Lisa and myself to

13   sort of talk things out, and he wasn't comfortable with that.

14   Q.    He wasn't comfortable?

15   A.    Yes.

16   Q.    Did you ask her whether she would be willing to do that?

17   A.    I did not because he had come to me in confidence, and

18   therefore I felt that I couldn't violate that confidence.

19   Q.    He had come to you in confidence?

20   A.    Yes.

21   Q.    So acting in confidence, did you go to Lisa Svensson and

22   speak to her in confidence?

23   A.    I did not.  I was first endeavoring to understand

24   whether it was possible what Mr. Peers had said was actually

25   going on, and then essentially right around then I heard

Page 39

1  about the midyear review of Chris O'Malley, and came to have

2  some significant questions about whether that was prepared in

3  full view of all opinions about Mr. O'Malley's work, which

4  concerned me significantly in and of itself, but even more in

5  conjunction with my discussions with Mr. Peers, and that's

6  what led to the August 28 meeting.

7  Q.   Okay.  As of the August 28 meeting, sir, had it ever

8  occurred to you that this might be a gender-related problem?

9  A.   No.

10  Q.   Did it ever occur to you that Mr. Peers's problems and

11  Mr. O'Malley's problems with Lisa, if there were problems,

12  was the result of two young males who didn't like working for

13  a female boss?

14  A.   It certainly didn't appear to me to be the case.

15  Q.   You did know, of course, that all the members of Lisa

16  Svensson's team were males, correct?

17  A.   I obviously knew that all of the analysts who reported

18  to her were males.  There were also two more junior members

19  of the team in position of investment associates, both of

20  whom were women.

21  Q.   But those were the juniors to the analysts, correct?

22  A.   Yes.

23  Q.   And did you ever on August 28 have a discussion with

24  Lisa concerning the specific criticisms of Mr. Peers and

25  Mr. O'Malley?

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 40

1    A.    I believe I would have discussed with her on the 28th

2    the issues regarding her review of Mr. O'Malley.  From there,

3    I would imagine, but I'm less certain, that we talked about

4    Mr. Peers and the issues between Lisa and Darren.

5    Q.    And do you recollect the response of Lisa Svensson

6    concerning the Chris O'Malley issue?

7    A.    As we've already discussed, what I remember most of that

8    is that Lisa was upset to hear that I had extremely

9    significant concerns about the way she was treating people.

10   Q.    Did you thereafter give Lisa Svensson some time to

11   consider which of these three options she would be willing to

12   accept, if any?

13   A.    I did, yes.

14   Q.    And that was right before the Labor Day weekend; isn't

15   that correct, sir?

16   A.    I think that's probably right, yes.

17   Q.    Okay, you went away for the Labor Day weekend?

18   A.    I think that's correct, yes.

19   Q.    And then at some point the following week, you decided

20   to put the three options into writing?

21   A.    No.  The following week Lisa asked me to put them into

22   writing, so I did.

23   Q.    And in the time frame between the August 28 meeting and

24   your putting these three options into writing, did you have a

25   discussion with anyone about the outcome of the August 28

Page 41

1    meeting?

2    A.    I'm sure I would have talked to Mary McNamee.  I would

3    assume I would have talked to Kelly Morgan, who was my, let's

4    say, partner in running the Research Department.  I may well

5    have talked to other people in terms of reporting back; i.e.,

6    Steve Oristaglio perhaps.

7    Q.    Do you recall whether you talked to Mr. Haldeman?

8    A.    I don't, but it wouldn't surprise me if I did.

9    Q.    Do you recall whether you talked to counsel?

10   A.    Again, I don't remember, but it wouldn't surprise me if

11   possibly I did.

12   Q.    Then do you recall, sir, a meeting on Friday, the 12th

13   of September, 2003, with Lisa Svensson?

14   A.    I recall a meeting around that time frame, yes.

15   Q.    And in that meeting, Lisa advised you, did she not, that

16   she was not going to accept any of the three options?

17   A.    Yes.

18   Q.    And that she wanted to become a managing director?

19   A.    Yes.  As I remember it, in hearing that she wasn't

20   interested in the three options, I asked if there was sort of

21   another path that she had figured out we could go down.

22   Q.    And that she wanted to be paid like the guys, correct?

23   A.    She told me that she wanted to be made a managing

24   director and to be paid -- guaranteed a million dollars a

25   year for two years.

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 42

1  Q.   Did she indicate that her interest in that figure was

2  tied to compensation that was then being paid to senior male

3  analysts in the Research Department?

4  A.   I don't remember it being equated with something related

5  to gender.  There were, as I recall it, potentially two

6  analysts in the department being paid in that zone, so --

7  Q.   Who were they, sir?

8  A.   Saba Malak and Terry Norchi.

9  Q.   And indeed you had been doing an analysis of

10 compensation of analysts in the Research Department, had you

11 not?

12 A.   I think I had, yes.

13 Q.   So you knew exactly who was being paid what?

14 A.   Yeah, I would have known that at that point, yes.

15 Q.   And you knew that at least Mr. Malak and Mr. Norchi were

16 being paid north of a million dollars, correct?

17 A.   Yes.

18 Q.   So you knew who Lisa was referring to, even though she

19 didn't mention specific names?

20 A.   Yes, although, again, the issue of gender wasn't one

21 that came necessarily to mind for me.

22 Q.   And you knew also, sir, that guarantees were possible

23 within Putnam, correct?

24 A.   For existing employees, I'd never seen that done before,

25 no.  For new hires, essentially protecting people against the

Page 43

1    volatility of changing companies and jobs, I certainly had

2    seen it, yes.

3    Q.   Well, you knew that guarantees were possible because you

4    had one?

5    A.   Yes.

6    Q.   Isn't that correct?

7    A.   Yes, associated with my changing employers, yes.

8    Q.   So you weren't surprised, sir, were you, when Lisa

9    Svensson indicated that she wanted equal pay with these

10   senior male analysts?

11   A.   Again, I didn't necessarily equate that request with pay

12   in association with anyone else.  I can remember most

13   strongly being disappointed, in that I knew Lisa knew I

14   couldn't promote anyone.  So I assumed her request to become

15   a managing director was a way of telling me that she wasn't

16   happy with any of the options, and she was giving me a task I

17   couldn't complete.

18   Q.   Do you recall what you said to her, sir, when she told

19   you that she wasn't going to take any of these three options?

20   A.   I believe I told her -- well, once she had -- when she

21   told me she wouldn't take any of the three options, I asked

22   her again what would -- whether she had thought of something

23   different we could do to resolve the situation.  And as we've

24   already discussed, she mentioned changing her title and

25   adding to her compensation, and at that point I told her I

Page 44

1    didn't think that would be possible.

2    Q.   Did you tell her that you would consider her request and

3    get back to her?

4    A.   I imagine I did, but I -- I -- I don't recall

5    specifically.

6    Q.   And did you consider her request after the meeting

7    ended?

8    A.   I imagine I did, although, again, I was aware I wouldn't

9    be able to promote someone; but given that it wasn't my place

10   to make those sort of decisions unilaterally, I am almost

11   certain that I would have discussed the outcome of that

12   meeting with the Human Resources Department and perhaps

13   Mr. Oristaglio and perhaps Mr. Haldeman.

14   Q.   Do you have a recollection that you did discuss it with

15   Mr. Oristaglio and Mr. Haldeman?

16   A.   At this point, not specifically, but, again, that would

17   have been sort of the appropriate thing to do, so I assume I

18   did.

19   Q.   And did Mr. Haldeman or Mr. Oristaglio indicate to you

20   that this wasn't going to be possible?

21   A.   Again, I'm sorry, I don't recall specifically, but --

22   but whether it was them or in conjunction with the Human

23   Resources Department, it became clear it wasn't possible.

24   Q.   But some combination of the group came to the conclusion

25   that it wasn't going to be possible to give Lisa Svensson

Page 45

1    what she was asking for?

2    A.    Yes.

3    Q.    And did you on the same day as you had met with Lisa

4    Svensson, that September 12, did you have occasion to meet

5    with the analysts on her team?

6    A.    I don't recall specifically, but I would imagine by then

7    I was trying to keep them informed as to, let's say,

8    development.

9    Q.    And did you have your meetings, what I think you've

10   testified you think you had or would have likely have had

11   with Mr. Oristaglio and Mr. Haldeman and HR, before you met

12   with the staff?

13   A.    I don't remember.  It's certainly possible, yes.

14   Q.    And did you communicate to the staff that Lisa had been

15   relieved of her responsibilities and would be leaving Putnam

16   immediately?

17   A.    I don't remember that, and that doesn't seem likely to

18   me, no.

19   Q.    That was Friday, September 12, 2003.  Did you have any

20   discussions over the weekend with anyone concerning Lisa

21   Svensson and what to do with her?

22   A.    I don't remember that I did, no.

23   Q.    Did you go away for that weekend?

24   A.    I don't remember that I did.

25   Q.    And did you have occasion to meet with Lisa Svensson on

Page 46

1    Monday, the 15th of September?

2    A.    Yes, I did.

3    Q.    And you told her at that time, did you not, sir, that

4    since she wasn't accepting any of your options, Putnam was

5    electing the option of having her resign?

6    A.    I believe I told her that given that she wasn't willing

7    to discuss any of the three options I had given her, nor any

8    reasonable permutation of them, that I assumed she was

9    telling me she was quitting.

10   Q.    Did you consider it to be a voluntary quit?

11   A.    At that point, to be honest, I think I was a little

12   confused as to why Lisa wasn't willing to enter into a

13   substantive discussion of it.  But from there, certainly I

14   had asked her to consider these options, so in that regard,

15   it wasn't voluntary on her part to out of the blue decide to

16   leave, no.

17   Q.    And you knew, sir, that the resignation option that had

18   been in your document was going to allow her to stay for a

19   period of months while she was going to go look for another

20   job, correct?

21   A.    Yes.

22   Q.    And when you told her on the 15th that she was

23   essentially being told that she was electing the resignation

24   option, you didn't offer her the opportunity to stay for a

25   period of months, did you?

e1f7d808-05e5-416f-9b6e-a1495ef39db2

Page 47

1    A.   I don't recall, but at that point I don't think so, but

2    if she had brought it up, I would have certainly been open to

3    it.

4    Q.   Indeed Lisa Svensson wanted the opportunity to stay to

5    the following day because she wasn't resigning?

6    A.   I don't recall that, no.

7    Q.   You don't recall that.  Didn't Ms. McNamee say to Lisa

8    Svensson on the 15th of September in your presence that she

9    had to leave that day?

10   A.   I don't -- I don't recall, but I do recall Lisa in that

11   discussion saying to Mary and myself that she, as I remember

12   it, needed us to fire her, needed to hear those words.  So

13   shortly after the end of that discussion, I sent Lisa a note

14   summarizing our discussion and saying that she was indeed

15   terminated.

16   Q.   And that was in the context of your saying that she was

17   going to be treated as if she was resigning, correct?

18   A.   Again, the specific words weren't -- weren't material to

19   me.  What I was trying to do was create a situation where

20   Lisa would stay as an analyst.  She didn't seem open to that,

21   nor did she seem open to discussing any of the other

22   possibilities, which left me, regardless of what words we may

23   choose, in kind of a tough spot to manage through.

24   Q.   Did you ever, either on the 15th or at any point before,

25   seek to bridge this gap between what Lisa Svensson wanted and

Page 48

1  what Putnam was offering her in terms of the three options?

2  A.   I don't remember specifically, but I would imagine in

3  our discussion --

4          THE COURT:  Well, don't guess.

5  Q.   You don't remember specifically, sir; isn't that

6  correct?

7  A.   I don't remember specifically.

8          THE COURT:  How much longer do you think you have?

9          MR. WEIR:  About five minutes, maybe less.

10  Q.   And after Lisa Svensson indicated that she needed to

11  have a document that said she was terminated, you went out

12  and prepared such a document?

13  A.   I did, yes.

14  Q.   And did you discuss it with anyone before you delivered

15  it to Lisa Svensson?

16  A.   I'm sure I discussed it with Mary McNamee, at least.

17  Q.   Do you recall whether you discussed it with

18  Mr. Oristaglio or Mr. Haldeman?

19  A.   I don't recall.

20  Q.   After Lisa was terminated, did you take over the

21  management responsibilities for the Energy and Basic

22  Materials Team?

23  A.   For a period of time, yes.

24  Q.   And did you also take over the portfolio management

25  responsibilities for the Natural Resources Fund?

Page 49

1    A.    I took over oversight of the investment process, yes.

2    Q.    And did you also seek to persuade Mr. O'Malley to stay

3    on at Putnam since Lisa was now terminated?

4    A.    I was already in the process of trying to keep him,

5    regardless of the outcome of my discussions with Lisa.

6    Q.    And Mr. O'Malley did stay; is that correct?

7    A.    He did, yes.

8    Q.    And did he later get promoted?

9    A.    I don't recall, but I would imagine his title changed,

10   yes.

11   Q.    And did he also receive increases in his compensation?

12   A.    Yes, I believe he did.

13   Q.    And at the end of 2004, did you receive a promotion,

14   become deputy head of Investments at Putnam?

15   A.    Yes.

16   Q.    You skipped right over the portfolio management teams?

17   You were never on those teams?

18   A.    I took over management of both the Research and Core

19   portfolio management teams at the end of 2003, and then we

20   brought the Value and Growth portfolio management teams into

21   that structure at the end of 2004.  But when you say skipped

22   over, it makes it sound as if there was a progression from

23   Research to Portfolio Management, and in my view, that didn't

24   really exist.

25   Q.    You went from Director of Research directly to Deputy

Page 50

1   Head of Investments; isn't that correct?

2   A.   No.   I went from Director of Research to being Director

3   of Research and Chief Investment Officer for Core Equities;

4   and then after a year in that dual role, I became head of

5   Large Cap Equities and Deputy Head of Investments.

6   Q.   And when did you become the CIO for Core Equities?

7   A.   I believe it was in January of 2004.

8   Q.   Okay, so about three and a half months after Lisa was

9   terminated?

10   A.   Something like that, yes.

11   Q.   And when you went to this CIO position from head of

12   Research, did you receive any enhancement of your

13   compensation?

14          MR. KOCIUBES:  Objection.

15          THE COURT:  Overruled.

16   A.   Not explicitly, although my compensation did rise from

17   2004 versus 2003.

18   Q.   Okay, what was it in 2004, aggregate compensation?

19          MR. KOCIUBES:  Objection.

20          THE COURT:  Overruled.

21   A.   I believe it was approximately $2.5 million.

22   Q.   And when you went to become Deputy Head of Investments

23   at the end of 2004, did you also receive an enhancement of

24   your compensation at that time?

25          MR. KOCIUBES:  Objection.

1            THE COURT:  Sustained at this point.

2            MR. WEIR:  I don't believe I have any further

3   questions, subject to redirect, your Honor.

4            MR. KOCIUBES:  What's your preference here?

5            THE COURT:  It's five of, so why don't we --

6   there's no way you're going to do this in five minutes or ten

7   minutes, right?

8            MR. KOCIUBES:  I promise I can't do it in five

9   minutes.

10           THE COURT:  Yes, I thought that, so I'll see you

11  tomorrow morning.

12           THE CLERK:  All rise for the jury.

13           (Jury excused.)

14           THE COURT:  Good.  So I'll see counsel on the

15  record on scheduling at side bar.  You can step down.  I'll

16  see you tomorrow morning.

17  SIDE-BAR CONFERENCE:

18           THE COURT:  So how long do you think you have of

19  Mr. Brooks?

20           MR. KOCIUBES:  Forty-five minutes.

21           THE COURT:  Forty-five?  So let's say he's out of

22  here by 10:00.  Then what happens?

23           MR. MOLONEY:  Mr. Haldeman.

24           THE COURT:  Live or on deposition?

25           MR. MOLONEY:  Live and on deposition.

Page 52

1          THE COURT:  No, no, we're not doing that.

2          MR. MOLONEY:  He's in deposition.

3          THE COURT:  You're not calling him as a witness?

4          MR. MOLONEY:  We're going to --

5          MR. WEIR:  We're going to read his deposition.

6          THE COURT:  Are you going to call him as a witness

7    as well?

8          MR. MOLONEY:  In addition to that?  No.

9          THE COURT:  Okay.  Are you calling him as a

10   witness?

11          MR. KOCIUBES:  No.

12          THE COURT:  No, all right, so deposition.  All

13   right, so I'll go through that in one second.  And then

14   what?

15          MR. MOLONEY:  30(b)(6).

16          THE COURT:  For how long?

17          MR. MOLONEY:  An hour maybe, maybe an hour or less.

18          THE COURT:  All right, so we're now at about

19   12:00.  Then what?

20          MR. MOLONEY:  Tibbetts will be live next.

21          MR. KOCIUBES:  And we just found out a couple

22   minutes ago.

23          MR. RODRIQUES:  We just found out a couple minutes

24   ago --

25          MR. KOCIUBES:  Can we do part of this off the

Page 53

1   record on scheduling?  There's personal issues, health

2   issues.

3           THE COURT:  Well, if there's health issues, you'll

4   tell me about it later.  So he can't be here?

5           MR. KOCIUBES:  He can be here the following day.

6           THE COURT:  So who else would you want live?  When

7   is your expert coming?  You're running out of time is one of

8   your big problems.

9           MR. WEIR:  I think we're going to get the experts

10  on.

11          THE COURT:  So have the expert here tomorrow.

12          MR. MOLONEY:  Well, one of them is in Washington,

13  your Honor.

14          MR. WEIR:  The expert from Washington, your

15  Honor --

16          THE COURT:  I tell you what, let's go off the

17  record so she's not doing this.

18          (Discussion off the record.)

19          THE COURT:  Let's go on the record on Haldeman.

20          MR. MOLONEY:  Can I get my copy of the --

21          THE COURT:  Yes, yes.  How much time is --

22          THE CLERK:  Plaintiffs have used 10 hours and 38

23  minutes.  Defendants have used 4 hours and 39 minutes.

24          THE COURT:  Here's the question.

25          MR. MOLONEY:  What page are you on?

1    THE COURT:  This came in awkwardly -- this is their

2  first objection on Page 51 -- because you're reading from the

3  complaint, which you typically can't do.  This is the EEOC

4  comment.  Did that come in through someone else?

5    MR. MOLONEY:  Yes, when Lisa Svensson testified.

6    THE COURT:  I couldn't remember where it is.  So

7  I'm going to allow it up till Line 15, but then I'm not going

8  to allow the issue about the woman and the joke and the sex.

9  Okay, that's not in.

10    MR. MOLONEY:  Well, wait a minute, your Honor.  If

11  I may on that, this is important for his credibility.  He

12  goes on and makes the speech about all his degrees, and he

13  makes this joke, and he wants people to think that he's a

14  common garden variety, you know, normal person and not the

15  arrogant person that basically he admits that he is.  I think

16  that that can come in for his credibility.

17    THE COURT:  The objection is sustained, but I do

18  allow in the EEOC piece of it.

19    MR. MOLONEY:  Okay.

20    THE COURT:  Under 403, I should say.  So --

21    MR. MOLONEY:  What page?

22    THE COURT:  It's on Page 83.

23    MR. RODRIQUES:  We had started to confer about this

24  at the break, your Honor.

25    THE COURT:  I mean, that seems like it should be

Page 55

1   able to come in.  I don't want to rule on those things.

2   That's overruled.  I mean, it seems like it makes -- it's --

3          MR. MOLONEY:  What page?

4          THE COURT:  And when he has a green, just add it

5   in, just so that we don't have to come back on it.

6          MR. RODRIQUES:  Yes, I'll give you a copy.  It's

7   just counters.

8          THE COURT:  Objection is overruled.  I mean, this

9   is stuff I was --

10         MR. MOLONEY:  Page 29?

11         MR. RODRIQUES:  On this, your Honor, he just

12  testified he doesn't even know whether he got the document.

13  I don't know what the basis for putting it in is.

14         THE COURT:  This is why it's impossible for me to

15  rule, so why don't you confer tonight.

16         MR. MOLONEY:  We agreed that we're going to look at

17  the exhibits.

18         THE COURT:  Okay, so you'll look tonight on all

19  this because it's impossible for me to read.

20         So now I've got the 30(b)(6) issue which may come

21  up tomorrow.  Are there objections to that?

22         MR. RODRIQUES:  There are.  You need to let me know

23  whether you're cutting them back.

24         THE COURT:  But I can't be in the position I was in

25  today, so tomorrow morning early you'll give it to me, and

Page 56

1    I'll sit and while he's doing the cross, I'll read and see

2    what I can figure out after you've had a chance to confer.

3    Or if there are big issues, I can try and deal with it before

4    I come in in the morning.  At this point they've given you

5    designations, right?

6            MR. RODRIQUES:  Yes.  We're just trying to not use

7    your Honor's time if they're going to withdraw material that

8    we've objected to.

9            THE COURT:  Right, you need to confer, but the

10   worst of all worlds is what happened, as far as I'm

11   concerned, today because I can't rule in an effective manner,

12   okay?  So I just need to have it keyed up tomorrow.  You

13   know, I'll get in, you know, as I always do at quarter to,

14   and I'll work them through.

15           Now, going off the record.

16           (Discussion off the record.)

17           THE COURT:  Are you pressing mixed motive?

18           MR. MOLONEY:  You asked us that question the other

19   day, and we're looking into that.  I can't answer that

20   question right now because I've got somebody helping us on

21   our research.

22           THE COURT:  Yes, but here's the thing:  It's really

23   hard, okay?  It's really hard legally as to what it takes to

24   get you to mixed motive, and I don't want to do it on the

25   seat of my pants, and you pretty much know what your case

Page 57

1    is.  So when are you going to know?

2              MR. MOLONEY:  When we're not --

3              THE COURT:  I understand.  Just it can't be dumped

4    on me at the last minute.

5              MR. MOLONEY:  We're not going to do that.

6              THE COURT:  Okay, all right.

7              (Adjourned, 1:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7

8          I, Lee A. Marzilli, RPR, CRR, do hereby certify

9   that the foregoing transcript, Jury Trial Day 6, Part II,

10  Pages 1 through 152 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 04-12711-PBS, Lisa Svensson V. Putnam Investments,

13  et al, and thereafter by me reduced to typewriting and is a

14  true and accurate record of the proceedings.

15          In witness whereof I have hereunto set my hand this

16  23rd day of May, 2008.

17

18

19

20

21          /s/ Lee A. Marzilli
            _____
22          LEE A. MARZILLI, RPR, CRR
            OFFICIAL COURT REPORTER
23

24

25