Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


LISA SVENSSON,                )
                              )
              Plaintiff       )
                              )
        -VS-                  ) CA No. 04-12711-PBS
                              ) Pages 1 - 145
PUTNAM INVESTMENTS, et al,    )
                              )
              Defendants      )



JURY TRIAL - DAY EIGHT

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE








United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 22, 2008, 9:07 a.m.








LEE A. MARZILLI and DEBRA M. JOYCE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    A P P E A R A N C E S:

2         KEVIN F. MOLONEY, ESQ., Barron & Stadfeld, PC,
     100 Cambridge Street, Suite 1310, Boston, Massachusetts,
3    02114, for the Plaintiff.

4         JOHN K. WEIR, ESQ., John K. Weir Law Offices, LLC,
     300 Park Avenue, Suite 1700, New York, New York, 10022,
5    for the Plaintiff.

6         JOSEPH L. KOCIUBES, ESQ., LOUIS A. RODRIQUES, ESQ.,
     ALLYSON E. KURKER, ESQ., and JENNIFER L. HOLDEN, ESQ.,
7    Bingham McCutchen, LLP, 150 Federal Street, Boston,
     Massachusetts, 02110, for the Defendant, Putnam Investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                 DIRECT    CROSS   REDIRECT    RECROSS

3    Richard Tibbetts           8

4    Paul F. White             47       74       115

5    Richard Tibbetts         118

6

7    EXHIBITS                     PAGE

8    Plaintiff's

     276                          12
9
     461                          27
10
     462                          44
11
     95                          133
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:  There was, you said, a quick

3    evidentiary thing?

4         MR. RODRIQUES:  Yes, your Honor.  We don't have

5    counsel yet.  Sorry.

6         THE COURT:  Sorry.  Was there an issue, Mr. Weir?

7         MR. RODRIQUES:  We have an issue, your Honor.

8         THE COURT:  You have the issue.  All right, go.

9         MR. RODRIQUES:  We understand from Mr. Moloney and

10   Mr. Weir that before they rest, they propose to introduce

11   about 40 Morningstar reports.  They have produced them in

12   redacted form to us.  As your Honor knows, you've already

13   ruled on the hearsay objection, which we reserve with respect

14   to, but we also have objections to the specific reports.

15   Rather than wait till they come in, we thought we'd give you

16   those now in writing.

17        THE COURT:  No.  I'll reserve on it.  The jury is

18   out there.  What I'll do is, I'll take them for ID, and then

19   we'll work on it later.  They won't need it.  You know,

20   you're not going to show it.

21        MR. RODRIQUES:  We can still give you this at this

22   point, if you want.

23        THE COURT:  Oh, yes, yes.

24        MR. RODRIQUES:  That's all we're saying, so you'll

25   have it.  That's the only issue.

1          THE COURT:  That's fine.  Since I was grouchy when

2     I got it too late, that's fair game.

3          MR. RODRIQUES:  That's what we're trying to do,

4     your Honor.

5          THE COURT:  That's fair enough.  Fair enough.

6     Okay, so let's --

7          MR. MOLONEY:  Your Honor, I have a bit of a

8     problem.  I have a three-ring binder that's on its way here.

9     I thought I had it in one of my two boxes, and it didn't get

10    into the box last night.  I just talked to somebody --

11         THE COURT:  No, we've got to get going, though.  I

12    can't wait until it gets here.  Can't you wing it?

13         MR. MOLONEY:  I can do a couple of things, but --

14         THE COURT:  What's in it, your three-ring binder?

15         MR. MOLONEY:  Documents that I'm going to ask

16    questions about.

17         THE COURT:  I can't wait.  So why don't we just do

18    it, and when it shows up, you'll backfill.  Can't you do

19    that?  I mean -- in other words, I won't hurt you, I mean, in

20    terms of the way you present your documents.

21         MR. MOLONEY:  I wanted to use this time with

22    Tibbetts.  I've got White ready to go.

23         THE COURT:  Well, then put White on.

24         MR. MOLONEY:  I told him to be here at 9:30, so --

25         MR. KOCIUBES:  If it's a matter of fifteen minutes,

1    if there's more depositions, you can do fifteen minutes of

2    that.

3              THE COURT:  Yes, can I -- Tibbetts is here.  Just

4    you must remember some of it.  Are the questions in the

5    binder?  Is that what the problem is?

6              MR. MOLONEY:  Well, I've got the documents in the

7    binder.  I've got those documents highlighted, and I have my

8    notes on the highlighted copies.

9              THE COURT:  Do you have your questions with you?

10             MR. MOLONEY:  No.  They're in the binder.

11             THE COURT:  Oh.

12             MR. MOLONEY:  That's my problem.  So if White gets

13   here at 9:30, we can put him on.

14             THE COURT:  I don't want to kill twenty minutes.

15   They're off your clock if they are, and it's not worth it, so

16   pick something else to do.

17             MR. MOLONEY:  Can I have a moment, your Honor?

18             THE COURT:  Isn't there another deposition you had

19   wanted to read?

20             MR. MOLONEY:  Yes, we can keep on with that, right.

21             THE COURT:  It's devastatingly boring, but I'd

22   rather do that than waste the time.  Why don't you just get,

23   instead of with Tibbetts, get to the part that matters; in

24   other words, what happened on that day.

25             Are you Mr. Tibbetts?

1          MR. TIBBETTS:  I am.

2          THE COURT:  I didn't mean to use that personal to

3    you, but we were just reading depositions --

4          MR. TIBBETTS:  I learned a long time ago not to

5    take things personally, your Honor.

6          THE COURT:  Mr. Moloney, where's your office?

7          MR. MOLONEY:  At 100 Cambridge Street.  I talked to

8    the young woman.  She found the book, and I said, "I need it

9    here in a flash."  I said, "Who's going to do it?"  She said,

10   "I am."  I said, "Are you leaving now?"  She said "Yes."

11         THE COURT:  At what time?

12         MR. MOLONEY:  That was about five minutes ago.

13         THE COURT:  It will take twenty, twenty-five

14   minutes to get here.  So pick what you want to do.

15         MR. MOLONEY:  All right, we'll start with

16   Mr. Tibbetts, I guess.

17         THE COURT:  I mean, I won't prejudice you at all.

18         MR. MOLONEY:  No, I know that.

19         THE COURT:  Is this the woman, blond hair?

20         MR. MOLONEY:  No.  That's -- no.

21         THE COURT:  All right, let's bring Mr. Tibbetts

22   up.

23         So, Mr. Tibbetts, you have a personal crisis,

24   right, at this point?  So we're going to try and get you out

25   of here today, if we can.

1          (Jury enters the courtroom.)

2          THE COURT:  Good morning to everyone.

3          THE JURY:  Good morning.

4          THE COURT:  Did anyone speak to anyone else about

5     this case or see anything in the press?  I find the jury, as

6     always, has complied, and we're going to call the next

7     witness.  You remember we interrupted the deposition

8     testimony because we're trying, whenever we run out of live

9     witnesses, we're filling in with that, but now we have

10    somebody who's going to testify.

11          Go ahead.

12          MR. MOLONEY:  Mr. Tibbetts.

13                        RICHARD TIBBETTS

14    having been first duly sworn, was examined and testified as

15    follows:

16          THE CLERK:  Would you please state your name and

17    spell it for the record.

18          THE WITNESS:  My name is Richard Tibbetts.  Last

19    name is Tibbetts, T-i-b-b-e-t-t-s.

20    DIRECT EXAMINATION BY MR. MOLONEY:

21    Q.   And where do you live, Mr. Tibbetts?

22    A.   I live at 205 Partridge Lane in Concord, Massachusetts.

23    Q.   And by whom are you currently employed?

24    A.   Putnam Investments.

25    Q.   And your position there, sir, is what?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1  A.    I'm currently the head of Human Resources.

2  Q.    And you are the same Richard Tibbetts who testified on

3  two occasions as the Rule 30(b)(6) witness on behalf of

4  Putnam in this case?

5  A.    Yes.

6         THE COURT:  And don't forget, again, 30(b)(6) is

7  just a technical term.  It means that he's testified on

8  behalf of the entity, Putnam Investments.  That's what it

9  essentially means.

10  Q.    Mr. Tibbetts, I've put, I think it is, six or seven

11  booklets in front of you?

12  A.    Yes.

13  Q.    And would you look at them, sir, and tell me if you

14  recognize any of them.

15  A.    These look like the officer directories of Putnam

16  Investments from '96 to --

17  Q.    And are the dates on --

18  A.    Pardon?

19  Q.    Are the dates on the front covers?

20  A.    Yes.

21  Q.    And could you, starting with the earliest date, tell me

22  what the dates of those booklets are.

23  A.    June of 1996, August of 1997, May of 1998, December of

24  1999, July of 2000, July of 2001, July of 2002, and July of

25  2003.

Page 10

1  Q.    And are those published by Putnam Investments?

2  A.    Yes.  We produce them internally.

3  Q.    Okay.  And the purpose of the publication of those

4  documents is what?

5  A.    Well, they were distributed to all the officers for ease

6  in communicating and contacting each other during work hours

7  as well as nonwork hours.

8  Q.    And can you just pick any page at random and tell me

9  what kind of information is in the officer diary.

10  A.    Yes.  I took July of 2000, and it provides the name of

11  each officer, their officer title, their functional title.

12  So it would be, you know, like an analyst; then their home

13  address, who their assistant was by name, and then a home

14  phone number and a work phone number, an internal work

15  extension number for the assistant, and in some cases, cell

16  phone numbers or other home numbers.

17  Q.    Now, is that information presented in each of those

18  various officer directories in the same format that are

19  before you?

20  A.    The format, it was generically the same.  It may have

21  changed slightly in terms of layout, but that was the same

22  information.

23  Q.    So the substance of the information.  So there would be

24  the name, rank, and serial number, officer title and

25  functional title as well?

Page 11

1   A.   Yes.

2   Q.   Okay.  And so by reviewing, let's say, the officer

3   directory for 1996 and comparing it with the next one and

4   tracking the name, you'd be able to see whether or not in

5   that next publication of the volume, either the officer title

6   and/or the functional title had changed?

7   A.   Well, from those points in time, yes.

8   Q.   By comparing one with the other.  So if the functional

9   officer title had not changed, one would expect then that the

10  functional title in the second volume would be the same as in

11  the prior volume?

12  A.   I don't think that's correct.  I think it is possible

13  that functional titles may have changed at some point in time

14  during that twelve- or in somes cases, like, sixteen-month

15  period.

16  Q.   But the officer title and functional title as of the

17  date of the publication would be the then current officer

18  title and functional title, would it not?

19  A.   Right.  All I was trying to say was that it's possible,

20  because some of these were long gaps, that there might have

21  been some other title in between.

22  Q.   Was there any similar publication, if not in the same

23  format, made available generally to Putnam employees that

24  would fill in the gap, if you will?

25  A.   We introduced, I'm not sure exactly what year, in the

Page 12

1    second half of these books, approximately, an online phone

2    directory that had similar information.

3    Q.    But that wasn't a replacement for the officer directory?

4    A.    They were separate --

5    Q.    Separate publication of --

6    A.    Separate source of information, yes.

7            MR. MOLONEY:  Your Honor, could those be admitted

8    into evidence, please.

9            MR. KOCIUBES:  No objection.

10            THE COURT:  Yes.

11            (Plaintiff Exhibit 276 received in evidence.)

12            MR. KOCIUBES:  Can we just get the numbers, your

13    Honor?

14            MR. MOLONEY:  Let me just read them into the

15    record.  That might be simpler.

16            THE COURT:  Put them in as a group.

17            THE CLERK:  Put them in the envelope and label the

18    envelope.

19            MR. MOLONEY:  Do you want the dates on these?

20            THE CLERK:  Yes.  What were they again?

21            MR. MOLONEY:  June of 1996, August of 1997, May of

22    '98, December of 1999, July of 2000, July of 2001, July of

23    2002, and July of 2003.

24            THE CLERK:  So what number are you going to give

25    it?

1        MR. MOLONEY:  I have to look it up in my. . . that

2   would be No. 276, Tab 276, and that would be Exhibit 276.

3   Q.   Let me show you some other documents, Mr. Tibbetts, if I

4   may.  Would you look at that clipped set of papers that I put

5   before you, Mr. Tibbetts, and take as much time as you need.

6        (Witness examining documents.)

7   Q.   Do you recognize the documents?

8   A.   I'm not sure I've seen these specific documents before,

9   but they certainly look like reports from our human resource

10  information system detailing information about specific

11  employees.

12  Q.   Okay, if you look at the caption, it says

13  "ERS_Job_Summary_By_EMPLID"?

14  A.   Yes.

15  Q.   And can you tell me what that means?

16  A.   I can't actually, but it looks like what gets generated

17  as the name of a report.  When a report gets programmed and

18  run out of the computer system, a label like this typically

19  appears, and --

20  Q.   You're familiar with reports that look like this at

21  Putnam, are you not?

22  A.   Yes.

23  Q.   And what is the word or phrase that you use to describe

24  documents that are like this?

25  A.   I guess just --

Page 14

1    Q.   We've been calling them in this case, at least on our

2    side, EMPLID for the last few letters, but what do you call

3    the name?

4    A.   I would just call it a report.

5    Q.   Any particular kind of report?

6    A.   No.

7    Q.   Okay, a report.  Now, looking at the -- let me just put

8    all these up on the screen here.

9         MR. MOLONEY:  Robert, can you -- I need some help.

10   Q.   Now, can you see that Bates number page, it says 8575 in

11   the lower right-hand corner?

12   A.   On this piece of paper I can, yes.

13   Q.   And can you explain what the columns are and what

14   information routinely is put into forms like this by Putnam?

15   A.   I'm not sure about routinely.  I mean, we run reports

16   with all sorts of different information, but what is shown --

17   Q.   Well let me put it this way:  This is a report that has

18   been and is run by Putnam, is it not?

19   A.   This is not a report that I see on a regular basis, no.

20   Q.   Have you seen reports like this at any time while you've

21   worked at Putnam?

22   A.   I usually do not see a -- this appears to be a history

23   of people's title changes and so on, and this is not how I

24   would typically see it.  I mean, that's not a common format

25   for me, no.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1   Q.    Okay.  And have you seen documents like this during your

2   tenure at Putnam in the HR Department?

3   A.    Yes, I've seen them before, but this is not what I

4   normally see, no.

5   Q.    Okay, but you've reviewed documents like this for

6   identified employees at Putnam?

7   A.    Yes.

8   Q.    And you use it to obtain what kind of information?

9   A.    Well, this report appears to be a listing of the title

10  and department and officer title, history for specific

11  individuals.

12  Q.    Let me start at the left.  The first column is "Name"?

13  A.    Yes.

14  Q.    That would be the name of the employee?

15  A.    Yes.

16  Q.    Okay.  And then the "EFF Date," the second column, what

17  does that mean?

18  A.    Effective date.

19  Q.    And the next column, it says "Job Title"?

20  A.    Yes.

21  Q.    And would that be the job or the functional title?

22  A.    Yes.

23  Q.    And in this case, Mr. Bogar, analyst as of 1998, and

24  then as of 10/21/02 portfolio manager?

25  A.    Yes, and he may have actually been an analyst -- I

1    believe he was -- prior to '98.  The words "conversion" there

2    was representative of -- we had a previous HR system, and

3    when everybody got converted, the job title information could

4    not get transferred, so "conversion" was simply, he was in

5    the other system.

6    Q.    Okay, so he may have been an analyst in those places

7    where the word "conversion" is?

8    A.    Right.

9    Q.    And then if you look at 2/1/05, his position changed

10   from portfolio manager to analyst, sector team leader?

11   A.    Yes.

12   Q.    Okay.  And the effective date would be the effective

13   date of the change from one position to another?

14   A.    Yes.

15   Q.    Okay.  Now, under "DEPTname," what does that mean?

16   A.    That's the department name.

17   Q.    Within Putnam?

18   A.    Yes.

19   Q.    So the word "Equities" would mean that he was involved

20   in Equities?

21   A.    Yes.

22   Q.    And the term "Global Research Group," that would mean

23   that he was a member of the GER?

24   A.    Yes, the Global Equity Research Group.

25   Q.    And the words "Global Core" would mean that he was part

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 17

1    of the Core Group?

2    A.    Well, part of the Global Core Group, yes.

3    Q.    Now, the last column, it says "Officer" and then capital

4    C, lower case d.  What does that mean?

5    A.    That's the officer code or officer title.

6    Q.    So, for example, in the case of Mr. Bogar, looking at

7    the date of 8/10/98, running across, he was an analyst in

8    Global Research, and he was an assistant vice president?

9    A.    On 8/10, yes.

10   Q.    And, for example, on 5/15/2003, Mr. Bogar was a

11   portfolio manager in Global Core with a rise to senior vice

12   president?

13   A.    Yes.

14   Q.    And you would rely upon information in reports like this

15   to get basic information about, for example, Mr. Bogar's

16   career at Putnam?

17   A.    Yes.

18   Q.    Now, would you look at the next page, please.  That's

19   PRM 8576.  Do you have that in front of you?

20   A.    I do.

21   Q.    And the PRM, let's say 8576, that designates that it's a

22   document produced by Putnam in this case?

23   A.    That's my understanding, yes.

24   Q.    Now, if you'd look at the -- you can see the Bates

25   number at the bottom of the page?

Page 18

1    A.    I do.

2    Q.    And, now, can you see on the screen the rest of the page

3    for Mr. Boselli?

4    A.    If it's okay, I'll just keep on looking at this because

5    it's kind of blurry here.

6    Q.    Whichever you think is easier for you to read.

7    A.    Yes.

8    Q.    And I'm looking at this report for Mr. Boselli.  Again,

9    information is filled in under his name, the effective date,

10   job title, department name, officer code?

11   A.    Yes.

12   Q.    So that would be -- if I were to ask you the same

13   questions about Mr. Boselli that I asked you about Mr. Bogar

14   as to name, effective date, job title, department name, and

15   officer code, but for the specifics about each one, your

16   answers would be the same?

17   A.    Yes.

18   Q.    Now, if you'd look at in that package 8654.

19   A.    Is there a name on that?  I don't --

20   Q.    Svensson.

21   A.    That's not in here.

22         MR. KOCIUBES:  It's not in my copy either.

23   Q.    Let me show you what's been Bates stamped as PRM 8654,

24   and would you just look at that document, please.  Now,

25   that's the same report but for Ms. Svensson?

1    A.    Yes.

2    Q.    And is there any -- can you read her functional title

3    progression.

4    A.    Well, again, this is the same problem we were talking

5    about before, the conversion of the system.  So it says

6    conversion from July of '94 through '95 and then '96.  And

7    then in '97, her functional title in July of '97 when the

8    conversion occurred, it was analyst, and I believe it was

9    analyst during those conversions.

10   Q.    Okay, and then the officer code and the title on the

11   left-hand column?

12   A.    The officer title starts as senior vice president in

13   April of '95.

14   Q.    And then if you'd just tell us what the changes were and

15   the dates of functional title and officer code coming forward

16   from that date.

17   A.    Okay.  So the analyst functional title first appeared on

18   the board on July 1 of 1997.  And then in -- well, to be

19   thorough, I guess July 1 of '97 she was an analyst in Global

20   Research, the Central Research Group.  And then in December

21   of '97 she was an analyst but had moved to the Global Growth

22   Portfolio Management Team, and was a senior vice president

23   throughout this entire time period.  And then in January 1 of

24   1998, she became a portfolio manager, still within the Global

25   Growth Group.  That title remained in effect until April of

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 20

1    2000 when she, while still in the Global Growth Portfolio

2    Group, became a senior portfolio manager.  And then in May 16

3    of 2002, she moved to the Global Equity Research Group, back

4    to that Central Research Group, and was an analyst.  And then

5    the title here continues to say "analyst" through September

6    of 2003 in the Global Equity Research Group as a senior vice

7    president.

8    Q.    That document does not reflect her promotion to

9    Associate Director of Research, does it?

10   A.    It does not.

11   Q.    You are aware that she was promoted to the position of

12   Associate Director of Research as of January, 2003, are you

13   not?

14   A.    That's my understanding, yes.

15   Q.    Now, let me direct your attention back to the larger

16   package of papers.  So the information about Mr. Bogar is on

17   8575?

18   A.    Yes.

19   Q.    And the information about Mr. Boselli is on 8576?

20   A.    Yes.

21   Q.    Information about Mr. Joshua Brooks is on 8577?

22   A.    Yes.

23   Q.    Information about Ronald J. Bukovac, B-u-k-o-v-a-c-, is

24   on 8578?

25   A.    Yes.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1  Q.   Information about Joshua L. Byrne, B-y-r-n-e, is on

2  8580?

3           MR. KOCIUBES:  And here, your Honor, I'd like to be

4  heard for a second.  It will be a recurring issue.

5  SIDE-BAR CONFERENCE:

6           THE COURT:  What's the problem?

7           MR. KOCIUBES:  Bukovac comes up in a number of

8  cases.  I wanted to alert you now, since there's going to be

9  foundation individually.  There's a number, not all of them,

10  that we start dealing with CIOs, for example.

11           THE COURT:  As you pointed out, it depends what the

12  comparator is for.  I think it's appropriate to consider the

13  CIOs for purposes of how they reorganized the organization

14  but not for purposes of compensation, so it depends how

15  you're using it.

16           MR. MOLONEY:  Well, the CIOs typically also are

17  portfolio managers, your Honor, and there's been evidence --

18           THE COURT:  I haven't heard it.  What did you say?

19  I'm sorry.

20           MR. MOLONEY:  Some of the portfolio managers also

21  had the title of CIO, so CIOs were performing the function of

22  and had the title of portfolio managers.  And there's been

23  evidence --

24           THE COURT:  But weren't they the chiefs?  As you

25  drew the charts before, they were the heads of the divisions,

1   so my guess is, they got compensated differently.

2           Well, let me put it this way:  I haven't heard

3   anything to the contrary that a CIO would not be compensated

4   differently.  So at least right now, I think who was CIO and

5   who goes where was important to whether they got fungible

6   kinds of jobs in the reorganization, not for purposes of

7   compensation, not yet.

8           MR. KOCIUBES:  And my only point is, we have

9   somebody who can explain all of this, so that it can be

10  rectified.

11          THE COURT:  He can ask all these questions about

12  them, but I'm not yet calling them comparators.  I have not

13  heard the foundation yet for compensation purposes, if that's

14  what you're trying to do.  So you can ask these questions,

15  but that's it.

16          Now, let me ask you this:  I know you have to do

17  some of this, so please don't take it personally.  It is so

18  dry.  How much longer do you have with him?

19          MR. MOLONEY:  If I don't get stipulations, your

20  Honor, I have to do it.

21          THE COURT:  I understand.  How much longer do you

22  have with him?

23          MR. MOLONEY:  My book has arrived, so I can go

24  where I was intending to go first.

25          THE COURT:  Okay.  Can't you stipulate to some of

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 23

1    this?

2          MR. KOCIUBES:  These things are authentic.  There's

3    no need to authenticate them, but the issue is -- and some of

4    it can probably be done in bulk in terms of what the

5    different positions are and whether they're comparable --

6          THE COURT:  So why don't you try and -- you know,

7    just one by one, you could just die.  They don't even

8    understand what you're doing.

9          MR. MOLONEY:  I offered.  I said, "Can these go in,

10   and you can preserve your objection on the CIOs?" and the

11   answer was "No."  So what am I going to do?

12         MR. KOCIUBES:  Foundationally, we may not have any

13   objection.  If they simply come in and he's gone, then we may

14   have a problem.

15         THE COURT:  All right, so try and move them in.

16   Lay a foundation.

17         (End of side-bar conference.)

18   Q.   Now, Mr. Tibbetts, at Putnam in the years 1998 to 2003,

19   there was a functional title of portfolio manager?

20   A.   Yes.  The title was used.

21   Q.   Okay.  And your understanding of the duties and

22   responsibilities of the person holding that functional title?

23   A.   It varied from team to team and based on specialty, but

24   generically a portfolio manager was someone who was working

25   within a portfolio team.  We had those teams organized by

1  styles, so they were small working teams.  And they were

2  responsible for investing money in various securities for our

3  clients, either in mutual funds or institutional accounts.

4  Q.   Now, you spoke of a team.  Can you tell us the

5  understanding of team as you used it?

6  A.   Sure.  The way we were organized and continue to be

7  organized in the investment organization is by what we call

8  asset classes or types of securities.  So there's a fixed

9  income department, an equity department, and then those are

10  further subdivided into sort of types or styles of

11  investing.  So in fixed income, it's, you know, municipal

12  bonds versus, you know, junk bonds versus, you know,

13  international bonds or mortgages.  On the equity side, we're

14  organized by style, so somebody might be investing in a value

15  style versus a growth style; and then further divided within

16  those teams by typically sort of where you're investing, so

17  an international team versus a U.S. domestic team or a large

18  cap, so large firms you're investing in or small companies

19  you're investing in.  So those teams were based on style and

20  where they were investing.

21  Q.   Well, directing your attention to the teams in the

22  Growth Group and also directing your attention to the teams

23  in the Core Group, can you tell us what the functions and

24  duties were of portfolio managers who worked on those two

25  groups?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1  A.   Well, the same thing, in that they were responsible for

2  investing -- when you're saying Core and Growth, we're

3  talking specifically equity, so those are investing in

4  stocks.  And they're investing in either growth stocks, which

5  would be stocks that we think are going to grow rapidly or in

6  a growth mode.  And they again would be further divided into

7  either a U.S. team or an international team and would be

8  investing in those types of securities.  And the same thing

9  in Core.  And there was also a Small Cap Team, so teams just

10 investing in small stocks.

11 Q.   So when you say "teams," are those folks who assist the

12 portfolio manager in making buy and sell decisions?

13 A.    Yes.  Well, all their teams are different in terms of

14 size and makeup.  Typically there is a, you know, chief

15 investment officer who is in charge of that team, and then

16 there were portfolio managers in that team, and in some cases

17 analysts in those teams, and also in some cases junior

18 investment professionals that we would call investment

19 associates.  They would be coming straight out of sort of

20 undergraduate school.  And that would be the makeup of the

21 team.

22 Q.   And the phrase "senior portfolio manager," what did that

23 mean?

24 A.   Typically it meant that someone had more experience and

25 more proven investment record than a portfolio manager.

Page 26

1   Q.   So senior portfolio managers would make buy and sell

2   decisions?

3   A.   Well, it really varied by team.  You know, some teams

4   had different investment processes.  Some had multiple

5   products, where some only had one.  And so what would happen

6   was is that in some groups, a portfolio manager would make

7   those decisions on their own.  In other groups, it would be a

8   team decision.  Literally they would discuss the stocks and

9   decide to invest in those as a group rather than

10  individually.  So it varied by team.

11  Q.   Looking at the Growth Group, for example, did senior

12  portfolio managers make buy/sell decisions?

13  A.   I think it's the same thing I just said.  I mean, it's

14  going to depend upon the teams, and I'm not sure I even could

15  articulate specifically which team had specific, you know,

16  differences, but that's how they did it.  Some did it

17  individually, and some did it as a team.

18  Q.   Okay.  And would that also apply to the Core Group?

19  A.   Yes.

20  Q.   And chief investment officers, or CIOs, would make buy

21  and sell decisions?

22  A.   Again, either sometimes individually and sometimes as a

23  team, yes.

24  Q.   Okay, so portfolio managers sometimes individually and

25  sometimes as a team would make buy/sell decisions?

Page 27

1    A.    Yes.

2    Q.    And senior portfolio managers sometimes by themselves

3    and sometimes as a team member would make buy and sell

4    decisions?

5    A.    Yes.

6    Q.    And the same would be true for chief investment

7    officers, sometimes by themselves and sometimes as members of

8    a team?

9    A.    Yes.

10            MR. MOLONEY:  Your Honor, I move that the package

11    of documents that begins with 8575 that the witness earlier

12    testified about through 8662, plus the page that concerns

13    Ms. Svensson, be admitted as the next exhibit.

14            MR. KOCIUBES:  And just note the limited objection

15    on the grounds that I stated at side bar, your Honor.

16            THE COURT:  I'll allow those in, subject to a

17    motion to strike certain portions.

18            (Plaintiff Exhibit 461 received in evidence.)

19            THE WITNESS:  There are some missing too.  It's not

20    all consistent.

21            MR. MOLONEY:  Your Honor, the reference that

22    Mr. Tibbetts made to some missing I think was probably his

23    noting that the Bates numbers do not all run in sequence, and

24    that is because this package of documents was reduced in size

25    and scope from similar documents from a larger category.

Page 28

1            (Pause.)

2            (Witness examining document.)

3            THE COURT:  What are we doing here?

4            MR. MOLONEY:  Asking him if he recognizes the

5   document.

6   A.    I do.

7   Q.    And can you tell us what it is?

8   A.    Yes.  This is a report that was generated in 1998.

9   This, unlike the other report that was generated out of the

10  human resource system, this, I believe, is an Excel

11  spreadsheet where we would, you know, track and analyze

12  data.  And it has information that we would use in a year-end

13  review process, and it captures, you know, employee profile

14  information and then some performance profile information for

15  1999.

16  Q.    All right.  On the lower left-hand corner of that

17  page -- do you see the lower left-hand corner?

18  A.    Yes.

19  Q.    The date is 1999, is it, not 1998?

20  A.    It says -- I'm sorry --

21  Q.    Does the date in the tiny little print on the lower

22  left-hand corner include 1999?

23  A.    Yes.

24  Q.    And the caption at the top in the center of the page

25  "1999 Performance Profiles - Investment Division"?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page  29

1    A.    Yes.

2    Q.    Okay, you said 1998.

3    A.    Oh, I'm sorry.  If I did, I was meaning to say 1999.  I

4    must have misspoke.

5    Q.    Okay.  Now, reading the columns from left to right,

6    "Department" would mean?

7    A.    The department name.

8    Q.    International Growth, for example?

9    A.    Yes.

10   Q.    Okay.  And "Name" would be the name of the employee

11   involved?

12   A.    Yes.

13   Q.    "Off Title" would be the officer title?

14   A.    Yes.

15   Q.    "Job Title" would be the functional title?

16   A.    Yes.

17   Q.    "Hire Date" would be the first date the person was hired

18   or rehired?

19   A.    It would be the date that they were hired.

20   Q.    What if somebody worked there for a couple years and

21   then worked for somebody else for two years and then came

22   back?

23   A.    It's -- there is a hire date and then a service date.

24   The service date would reflect a different date than hire

25   date of someone who's rehired, and that date is not shown.

1    Q.    Okay, but Putnam kept track of employee's information in

2    terms of when they were hired and how long they worked until

3    they left, and they also tracked information about when they

4    started and when they left and when they came back, if they

5    did, until they left again?

6    A.    Yes.

7    Q.    And that was important information for Putnam?

8    A.    Yes.

9    Q.    Now, after the words "Hire Date" on the form, to the

10   right of that is "Plan."  What does plan mean?

11   A.    That was referring to the incentive compensation plan

12   that they participated in.

13   Q.    And were there more than one such plan?

14   A.    Yes.

15   Q.    Can you identify what those plans are, or were rather?

16   A.    Well, there were a lot of plans.  In 1999 there were

17   three core plans, and there were a whole bunch of sales plans

18   and so on that were tracked.

19   Q.    Just, if you would, let's confine it to the Investment

20   Management Division, and let's, if it's helpful, confine it,

21   at least for purposes of these questions, to the Growth Group

22   and the Core Group.

23   A.    Well, these would have applied to everybody in

24   Investments in those two groups or not, and so those were the

25   three core plans.  There was the performance bonus plan, the

Page 31

1   associate and principals plan, and the partners plan.

2   Q.   And the performance -- the first of those plans again

3   was what?

4   A.   The performance bonus plan.

5   Q.   And who was entitled to participate in the performance

6   bonus plan?

7   A.   Well, the performance bonus plan was -- I guess the

8   easiest way to describe that would be, everybody that wasn't

9   in the partners plan and the associates and principals plan,

10  so it captured everything from administrative assistants to

11  the junior investment professionals that were not yet in the

12  associates and principals plan.

13  Q.   Okay.  So the next step up was the A & P plan, the

14  associates and principals plan?

15  A.   Yes.

16  Q.   And what do the words "associates and principals plan"

17  mean?  Why was it called "associates and principals plan"?

18  A.   Well, no longer relevant in 1999, but when the plan was

19  first established in the late '80s, we modeled our plans and

20  the concepts after what actually had been in place at Goldman

21  Sachs because that's where HR came from.  And they had people

22  called partners, principals, and associates, and so we used

23  the same terminology.

24  Q.   Who was entitled to participate in the A & P plan?

25  A.   It was not a hard-and-fast criteria, but it typically

1    was sort of mid-level investment professionals up and higher

2    within the organization.

3    Q.    What are mid-level folks?

4    A.    Typically someone that was an MBA, A graduate school

5    analyst that we would have hired, and probably three years of

6    experience or four years of experience.

7    Q.    Let me just interrupt you, if I may.  Did you refer to

8    those folks as MBAs?

9    A.    Did I just now or --

10   Q.    No, no.  Did the phrase as used at Putnam of "MBAs"

11   refer to that group of folks?

12   A.    Sometimes, not always, but, yes, we often referred to

13   the people that just came in from school as MBAs, yes.

14   Q.    Who other than the MBAs would be entitled to participate

15   in the A & P plan?

16   A.    Well, just to clarify, it would not be -- if you were

17   still sort of called an MBA, you typically were not in the

18   associates and principals plan.  It was not until after three

19   or four years after graduate school that you sort of entered

20   the A & P plan.

21   Q.    Okay.  Was there a required officer title or functional

22   title to enable you to participate in the A & P plan?

23   A.    No.

24   Q.    Well, who then, either by functional title or officer

25   title, would have participated in the A & P plan in the years

1    1999 to 2003?

2    A.    It was analysts, portfolio managers, traders,

3    quantitative analysts, quantitative portfolio managers,

4    senior traders, heads of trading or directors of trading,

5    some chief investment officers.

6    Q.    Senior portfolio managers?

7    A.    Yes, senior portfolio managers, yes.

8    Q.    And some CIOs?

9    A.    And some CIOs, yes.

10   Q.    Did managing directors participate in the A & P plan?

11   A.    Yes.

12   Q.    I'm sorry, sir, I didn't hear you.

13   A.    Yes.

14   Q.    Okay.  Now, the other plan was the partners plan?

15   A.    Yes.

16   Q.    And who participated in the partners plan?

17   A.    I guess maybe the simplest way to describe it would be

18   the heads of all the major business groups or functions

19   within the company; and in the sort of noninvestment areas,

20   it was really just the most senior person typically.  But

21   within the investment area, it was not only the most senior

22   people but some of the, you know, second or third level of

23   people within Investment.  So it included more investment

24   professionals than the noninvestment professionals.

25   Q.    Now, looking at the document in front of you, there's

Page 34

1    some handwriting at the top of the page?

2    A.    Yes.

3    Q.    Is that your handwriting?

4    A.    That is.

5    Q.    And it's your initials, RBT-1/12-1/13/00?  Is that your

6    handwriting?

7    A.    Yes.

8    Q.    Okay.  The date or the dates of January 12 and 13 of

9    2000, what is the significance of the dates?

10   A.    Well, I think it's just -- it was not an uncommon

11   practice for me to write what day I was using the report.  I

12   think that's what it would mean.

13   Q.    So you were looking at this report not in its redacted

14   form, but you were looking at the complete unredacted form,

15   is that right, on these two dates?

16   A.    Yes.

17   Q.    Now, what is unredacted on this page is information

18   about Mrs. Svensson, is there not?

19   A.    It is, yes.

20   Q.    Okay.  Now, do you see where her name is, "Svensson,

21   Lisa, H"?  Do you see that?

22   A.    Yes, I do.

23   Q.    And then there's a little check mark?

24   A.    Yes.

25   Q.    What does the check mark to the right of her name in

1    that box mean?

2    A.    I have no idea.

3    Q.    Was that written by you?

4    A.    I don't know.

5    Q.    Okay.  And then under the "Job Title," it says

6    "portfolio manager."  Do you see that?

7    A.    Yes.

8    Q.    That would have been her functional position at the

9    time?

10   A.    Yes.

11   Q.    And then under "Hire Date," it says "1994-07-18"?

12   A.    Yes.

13   Q.    That would be her correct hire date at Putnam, would it

14   not?

15   A.    I believe so.

16   Q.    Now, under "Plan" it says "AP."  Does that refer to the

17   associates and principals plan?

18   A.    It does.

19   Q.    Meaning that she would be entitled, if the powers that

20   be made certain decisions, to receive a bonus from the pool

21   set aside for the A & P plan?

22   A.    Yes.  She participated in the plan.

23   Q.    Okay.  So anybody who participated in the A & P plan

24   would be competing one against the other and among each other

25   for bonus decisions being made, insofar as there was a pool

1  set aside for the A & P plan each year?

2  A.   I mean, I don't know what you mean by competing.  I

3  mean, it was the plan that was funded for people that were

4  participants of it, yes.

5  Q.   Okay.  And who made the decisions as to who would get

6  what typically in a year?  Let me strike that.  Looking at

7  this year that this form concerns, who were the people who

8  made the decisions as to what, for example, Mrs. Svensson

9  would receive, if anything, from the pool set aside for the

10  A & P plan?

11  A.   My memory is a little foggy about '99, but I believe in

12  '99 she was in the International Growth Team.  So it would

13  have been her CIO, her boss, that made the initial

14  recommendations, and so that was Robert Swift.  And then the

15  person who was in charge of all of Growth at that time was

16  Jack Morgan, so he would have participated in the process.

17  Q.   Was Jack his nickname, or was that his --

18  A.   His full name is John.

19  Q.   Okay.  But he was referred to as Jack?

20  A.   Yes.  And so he participated in that process.  We also

21  at that time had a -- I've forgotten the exact name, but it

22  was all of the senior people that were direct reports to the

23  head of Investments, and as a group would get together and

24  review both performance ratings and compensation

25  recommendations for the entire division.  So everybody that

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    was a direct report, so that included heads of other

2    investment areas, heads of trading and so on, heads of

3    research; and then Tim Ferguson, who at the time was the

4    chief investment officer for all of the investment areas.

5    Then there was also participation by Human Resources in

6    facilitating the process and producing the reports and so

7    on.  So it was that team of people that did that.  And then

8    ultimately Larry Lasser, the president, reviewed all of the

9    recommendations.  And then --

10   Q.    I'm sorry, go on.

11   A.    Then at that time we were also owned by Marsh &

12   McLennan, our parent company, and we had to formally present

13   and submit all the bonus recommendations to Marsh &

14   McLennan's senior management team to approve as well.

15   Q.    Now, would that approval process be the same for the

16   partners plan?

17   A.    Yes.

18   Q.    The same people would make those decisions?

19   A.    Well, with the only exception that if in this case, as I

20   used the example, Robert Swift, he wouldn't make his own

21   recommendation.  It would start with Jack Morgan because he

22   was the participant, and then the rest was the same.

23   Q.    Okay.  And Mr. Lasser, did Mr. Lasser in his capacity as

24   president and CEO have veto power over recommendations coming

25   up from the committee?

1    A.    Yes.

2    Q.    Was that committee sometimes called the Investment

3    Division Management Committee?

4    A.    Yes.   Thank you.

5    Q.    And that committee was in existence for a certain period

6    of time?

7    A.    Yes.

8    Q.    And can you tell us what period of time?

9    A.    Well --

10   Q.    Approximate date, please.

11   A.    Yes, I don't know when it began formally, but it

12   certainly was in place in '99, and I think probably stopped

13   in, like, the 2001 time period.

14   Q.    And did the same folks, without the appellation of

15   Investment Division Management Committee, continue on making

16   those decisions?

17   A.    You mean after that time period?

18   Q.    Yes, sir.

19   A.    No.   That committee and structure changed a bit, and the

20   compensation process changed as well, so, no.

21   Q.    Can you explain what happened after -- what year was it?

22   A.    Yes, I think it was 2001, but I don't know the exact

23   time.

24   Q.    All right, let's assume for purposes of the question

25   2001 or 2002 or thereabouts.   What changed and how did it

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1   change, and if you direct your attention up through the end

2   of calendar 2003?

3   A.    I don't recall exactly, you know, what the timing was.

4   There were several things that occurred at that time.  One

5   was, we changed the senior leader of the Investment Division

6   and brought in, who is now our president, Ed Haldeman; and he

7   and Steve Oristaglio became the, I guess co-heads of

8   Investments.  And as part of that change, the management

9   structure changed a little bit, but one of the things was, we

10   were eliminating meetings and bureaucracy, as it were.  And

11   so that formal process that I described before in terms of

12   the team meeting all together, that really didn't happen.

13   The individual teams made their recommendations.  They were

14   shared with the other leaders outside or separate from the

15   group meeting.

16   Q.   Can you help the jury to understand who these others

17   were with whom that information would be shared?

18   A.    It was the people we talked about before, so in that

19   Growth area we were talking about, it would be Jack Morgan

20   who was the head of the Growth area; and then his

21   counterparts of the head of Value and the head of Core; and

22   then you also had like the head of Equity Trading, head of

23   Research, the chief administrative officer, and the head of

24   the Investment Group.  So it was all those leaders of each of

25   the different areas within investments.

Page 40

1    Q.    Did they actually meet?

2    A.    No.

3    Q.    Or was the information just shared and then comment

4    independently with each other?

5    A.    It was the latter.  It was shared independently, and

6    then any comments were either brought back to the chief

7    administrative officer or those heads directly.  They were

8    discussed, and then recommendations were finalized and then

9    presented as part of the overall company.

10   Q.    Presented to whom?

11   A.    Presented to Larry, Larry Lasser, the president, and

12   then presented to Marsh & McLennan for their review.

13   Q.    Okay.  And did the same work for the partners plan

14   essentially as well?

15   A.    Yes.

16   Q.    Now, directing your attention again to the document

17   that's on the screen and in front of you, there's a column

18   called "Performance Rating"?  Do you see that column?

19   A.    Yes.

20   Q.    Was that the manager's rating?

21   A.    Yes.

22   Q.    Okay.  And the words "Performance Trend," what do those

23   words mean?

24   A.    Well, all of these under that shaded box at the top,

25   what that is -- it's very, very hard to read -- it says

Page 41

1    "Performance Profile."  And so what was intended to try to

2    capture here was sort of a look at an employee.  And so the

3    performance rating was typically sort of a rating for the

4    current year, and the performance trend was, how is that

5    person trending?  Are they going sort of up in performance

6    and contribution?  Are they sort of going down in terms of

7    performance, or are they staying the same?

8          Do you want me to go on with the rest of the

9    columns?

10   Q.   Yes, that would be helpful.

11   A.   And then "Potential" talked about, you know, are they in

12   a position where they can go to a higher level, or are they

13   at the level that they probably will achieve within their

14   career, or interested in achieving in their career?

15         And then "Replacement Measure" was, how critical to

16   that specific team were they?  If we lost them, what kind of

17   impact would it have on the team?  In Investment teams, what

18   our shareholders and certainly institutional clients really

19   want is to have a team that's intact and consistent for the

20   entire time they've got the money with us.  So if someone was

21   going to potentially leave, how important or critical were

22   they to that team was captured there.

23   Q.   Now, to the right of the AP reference to the plan that

24   Mrs. Svensson belonged to at that point, there are some

25   numbers in handwriting, and then there's some numbers that

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 42

1    were typed or printed on the form, and then to the right of

2    that, there are some additional numbers typed or printed on

3    the form.  Do you see those?

4    A.    Yes.

5    Q.    Now, the 4.8 under "Performance Rating," that was

6    printed on the form, was it not?

7    A.    Yes.

8    Q.    And that would reflect Mrs. Svensson's manager's rating?

9    A.    Yes.

10   Q.    For the calendar year work of 1999?

11   A.    Yes.

12   Q.    Now, there's a little check mark to the left of the 4 in

13   the 4.8.  Do you see that?

14   A.    Yes.

15   Q.    Do you know whose handwriting that is?

16   A.    I don't.

17   Q.    And then there is some strikeouts or vertical or slanted

18   handwritten lines?  It looks like a 4 that may have been

19   stricken out?  Do you see that?

20   A.    Yes, I don't make out a 4, but I see the squiggly lines.

21   Q.    Okay.  And then to the left of that, there's a number?

22   A.    Yes.

23   Q.    3?

24   A.    Yes.

25   Q.    Is that a change that you made?

1   A.    It's not a change.   It is a note that -- that 3 does

2   look like my 3s, but this would have been a note that I would

3   have taken in that column.

4   Q.    Okay.   And the 3 that you noted in the column, what were

5   you noting?

6   A.    I don't remember this specific event and this action,

7   but what was common practice for me to do in those meetings

8   that we talked about where the entire senior management team

9   was together was to take notes based on the kinds of

10  discussion that people were having; and it was not uncommon

11  for more senior people and people outside of the specific

12  team that was being evaluated to have opinions that, you

13  know, some managers were way too easy and other managers were

14  way too hard in terms of graders.   And so it was a discussion

15  about where that rating was in relationship to other ratings.

16  Q.    Did this note of changing a 4.8 to a 3 reflect Mr. Jack

17  Morgan's view?

18  A.    I don't know if it was Jack's or the broader group.

19  Q.    So it could be, as far as you're concerned, either

20  Mr. Jack Morgan's personal opinion, or it could be a

21  recommendation by Mr. Morgan, or it could reflect a

22  consensus, but you don't know one way or the other?

23  A.    I don't.

24  Q.    Now, the numbers to the right, there are three 5s in a

25  row?

Page 44

1    A.    Yes.

2    Q.    And what do the 5s mean?

3    A.    I don't know.  There was a definition that was

4    established for each of those categories, but I don't know

5    specifically what the definitions were.

6              MR. MOLONEY:  Your Honor, I'd move that that be

7    admitted, please.

8              MR. KOCIUBES:  No objection.

9              (Plaintiff Exhibit 462 received in evidence.)

10             THE COURT:  How are you doing timewise?

11             MR. MOLONEY:  I have a way to go.  I'd like to

12   bring in Mr. White, if he's here, your Honor, and resume with

13   him after.

14             THE COURT:  Let me see you at side bar.

15   SIDE-BAR CONFERENCE:

16             THE COURT:  How much longer do you have?  I thought

17   you were only going to do twenty minutes, half an hour with

18   him.

19             MR. MOLONEY:  I have about forty-five minutes.

20             THE COURT:  Well, remember, he has an issue, which

21   is he has a terminally ill sister, so we have the finish with

22   him.

23             MR. MOLONEY:  I understand.  Well, we talked

24   yesterday about having him come here today with the

25   expectation, which I think Mr. Kociubes agreed with, that he

1   would be coming back tomorrow, but if there was some kind of

2   sudden change in the sister's condition, we'd have to come up

3   with a different solution.

4           THE COURT:  So do you want to suspend now and put

5   the expert on and then --

6           MR. MOLONEY:  If he's here, yes.  I just need to

7   check and make sure he's outside.

8           MR. KOCIUBES:  Mr. Tibbetts said, unless he gets a

9   call this afternoon, he will be here in the morning.

10          THE COURT:  Should I say something to the jury or

11  just leave it alone?

12          MR. MOLONEY:  I'd leave it alone right now.

13          THE COURT:  So you want to suspend on him and

14  then --

15          MR. MOLONEY:  Let me just make sure he's outside.

16  I told him to get here but not come in because the witnesses

17  are sequestered.

18          THE COURT:  Okay.

19          MR. KOCIUBES:  Your Honor, I guess I would ask that

20  you just make a comment that it's for various people's

21  schedules that you're doing this.

22          THE COURT:  Okay, that's fine.

23          (End of side-bar conference.)

24          THE COURT:  We have Dr. White who's going to be

25  talking about some of the statistics who's outside.  I think

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 46

1    he'll be any minute.  And what we were going to do is suspend

2    Mr. Tibbetts for a minute, put him on the stand, get him off

3    so he doesn't have to stay an extra day.  And then

4    Mr. Tibbetts himself has some family issues, so we're going

5    to try and then come back to Mr. Tibbetts and finish him off,

6    both with respect to plaintiff's case and defendant's case,

7    if we could possibly do it today.  Is he here?

8            MR. WEIR:  Yes, he is, your Honor.

9            THE COURT:  All right, so I'm sorry for trying to

10   juggle this, but I'm trying to deal with everybody's personal

11   schedules.  Okay?  So that's how we're going to do it.  Thank

12   you, Mr. Tibbetts.

13           (Witness excused.)

14                   PAUL F. WHITE

15   having been first duly sworn, was examined and testified as

16   follows:

17           MR. KOCIUBES:  Your Honor, do you want Mr. Tibbetts

18   to stay or --

19           THE COURT:  I don't care.  Do you care?

20           MR. MOLONEY:  No, I don't care, your Honor.

21           THE COURT:  Thank you for asking.

22           THE CLERK:  Would you please state your name and

23   spell it for the record, sir.

24           THE WITNESS:  Yes.  Paul F. White, W-h-i-t-e.

25

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    DIRECT EXAMINATION BY MR. MOLONEY:

2    Q.    Dr. White, can we have your full name.

3    A.    Yes, sir, Paul F. White.

4    Q.    And where do you reside, Dr. White?

5    A.    I reside in McLean, Virginia.

6    Q.    And are you currently employed?

7    A.    Yes, I am.

8    Q.    By whom?

9    A.    ERS Group.

10   Q.    And in any particular location?

11   A.    Yes.  I'm in the Washington, D.C. office.

12   Q.    Okay, what is the ERS Group?

13   A.    ERS Group is a consulting firm that does a lot of work

14   with statistics and economics.  We do a lot of different

15   types of projects, but one project that we work on is related

16   to the statistical examination of employer data to see if the

17   trends in the data are consistent with what a plaintiff is

18   claiming, consistent or inconsistent with what a plaintiff is

19   claiming in a discrimination lawsuit.

20   Q.    And your particular line of work at ERS Group is?

21   A.    I'm the director.

22   Q.    Of?

23   A.    Of the Washington, D.C. office.

24   Q.    As director of the Washington, D.C. office, what are

25   your duties and responsibilities?

1    A.    I have two general types of duties.  One is

2    administrative where I deal with business-related topics.

3    The other one has to do with these types of research

4    projects, where I would manage a team of people who look at

5    the data, who try to understand what the trends are in the

6    data in a lawsuit.

7    Q.    And can you tell us about your education and experience.

8    A.    Yes.  I have a --

9    Q.    If you could do that in a chronological fashion.

10   A.    Okay, sure.  I have a bachelor's degree in economics

11   from James Madison University in Virginia.  I got that degree

12   in 1989.  Right after undergraduate school, I went to

13   graduate school at North Carolina State University, where I

14   received a master's degree in economics in 1992, and a Ph.D.

15   degree in labor economics, and a Ph.D. minor in statistics in

16   1993.

17   Q.    And can you tell us about your work experience since.

18   A.    Sure.  Right after graduate school, I went to work at

19   the Tallahassee, Florida, office of ERS Group, which is our

20   home office, and the only office at the time, where I was a

21   research economist, where I did a lot of the computer

22   programming and a lot of the analysis into cases just like

23   this.

24             There I became a vice president, and five years ago

25   I moved from Tallahassee, Florida, to open up the Washington,

1    D.C. office of the ERS Group where I'm the director now.

2    Q.    Have you made presentations or given papers before

3    professional organizations and other groups?

4    A.    I have, yes.  I've been an invited speaker to

5    associations of economists, attorneys, human resource

6    professionals.

7    Q.    And is some of that information laid out in your CV?

8    A.    Yes, it is.

9    Q.    And are you what is referred to as a Professional

10    Journal Referee?

11    A.    Yes, I am.

12    Q.    Can you tell the Court and jury what a Professional

13    Journal Referee is.

14    A.    Sure.  A referee for a professional journal is somebody

15    who reads the manuscripts that other people submit, and you

16    read them over to determine whether they're of enough quality

17    to publish in the journal, so a peer-review process.

18    Q.    And for what groups or associations do you act as a peer

19    reviewer or Professional Journal Referee?

20    A.    There is a group called the National Association of

21    Forensic Economists, which is an association of economists

22    who do things like calculations of economic losses or the

23    statistical work behind alleged employment discrimination

24    cases, and they publish a journal called the Journal of

25    Forensic Economics, and that's one of the journals that I'm a

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    referee for.

2    Q.    And are you a referee for any others?

3    A.    Yes.  I've been a referee for a journal called the

4    Litigation Economics Review and also a journal called

5    Contemporary Economic Policy.

6    Q.    Now, have you published as well?

7    A.    I have.  I've published articles related to these

8    topics, the statistical analysis of employment

9    discrimination, as well as topics related to the calculation

10   of economic losses.

11   Q.    Those are set out in your CV?

12   A.    They are, yes, sir.

13   Q.    Can you just mention some examples so the jury will have

14   a general idea of what we're talking about.

15   A.    Sure.  The Journal of Forensic Economics, I published a

16   paper that dealt with the economic loss calculations in

17   employment discrimination cases.  I published a paper in the

18   Florida Bar Journal about the use of an economist in labor

19   and employment disputes; another article in the Journal of

20   Forensic Economics that dealt with statistical analysis of

21   employment discrimination.

22   Q.    And the others are laid out in your CV?

23   A.    They're all laid out in the CV, yes.

24   Q.    Now, have you acted as an expert witness in civil

25   litigation at all?

1    A.    Yes, sir, I have.

2    Q.    And have you been qualified for and have you given

3    expert testimony in your line of specialty in state or

4    Federal Courts?

5    A.    Yes, I have.

6    Q.    Can you give the jury some examples of where you

7    testified at the trial in a Federal District Court as an

8    expert.

9    A.    Sure.  I've testified in U.S. District Court in the

10   Western District of Louisiana.  I've testified in a Federal

11   Court in, I believe it's the Middle District of Florida.

12   I've testified in the Federal Court in Connecticut, the U.S.

13   District of Connecticut.

14   Q.    And have you testified as an expert in state trials as

15   well?

16   A.    I have, yes.

17   Q.    And do you testify for plaintiffs, or do you testify for

18   defendants?

19   A.    We testify for both.

20   Q.    Now, at some point were you engaged to make any kind of

21   study or analysis for purposes of this case?

22   A.    I was, yes.

23   Q.    And can you tell the Court and jury about when that was?

24   A.    We were first contacted around May of 2006.

25   Q.    And at some point thereafter, were you furnished with

1    any data for purposes of your analyzing it?

2    A.    We were.

3    Q.    And can you tell the Court and jury when that was?

4    A.    Not exactly.  I don't remember exactly when the original

5    data came in, and it came in in stages.

6    Q.    Okay, during what period of time?

7    A.    Starting in 2006.

8    Q.    Okay.  And can you describe for the Court and jury what

9    that data was?

10    A.    Sure.  The data contained the information on the

11    comparators identified by the plaintiff, and it would contain

12    information on the job titles they held, the compensation

13    levels that they had, and the performance ratings.

14    Q.    And for approximately how many people, do you recall?

15    A.    Originally it was 91 people.

16    Q.    And did that number reduce at all during the time that

17    you were analyzing the data?

18    A.    It reduced very recently, the last couple of days, my

19    understanding.

20    Q.    Okay.  And when did you revise the scope of the folks

21    that you would be looking at for purposes of this case?

22    A.    Oh, probably two days ago.

23    Q.    Okay.  And what was the cause of that review?

24    A.    It was my understanding that the Court had ruled that

25    the list of comparators that were applicable to this case is

Page 53

1  lower than the list that everybody -- that we had been

2  working on before.

3  Q.   Okay.  And so you undertook a review of the data that

4  you had had for purposes of your original review, but

5  reviewed it in line with your understanding of where the

6  Court is at this point on comparators?

7  A.   Yes, sir.

8  Q.   And can you tell us in English words the reduced scope

9  of the comparators that you then looked at in the last couple

10 of days?

11 A.   Sure.  The people that we're looking at now are the

12 portfolio managers in the Core and in the Growth areas, as

13 well as the experienced investment professionals.

14 Q.   And what analysis --

15        THE COURT:  What do you mean by experienced

16 investment professionals?

17        THE WITNESS:  The experienced analysts in the

18 Investment Division.

19        THE COURT:  Is that in the Research Group?

20        THE WITNESS:  I believe so, yes.

21        THE COURT:  In Global Equity Research?

22        THE WITNESS:  Yes, ma'am.

23        MR. MOLONEY:  Yes.

24 Q.   And what analyses did you undertake?

25 A.   We undertook some analyses for these people.  We looked

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    at their compensation levels.  We looked at their performance

2    evaluations.  We looked at their years of experience and

3    their years at Putnam as well as their years of investment

4    experience.

5    Q.    And the data that you were looking at in those regards

6    came from Putnam?

7    A.    Yes, they came from Putnam.  I'm sorry, let me specify.

8    I need to clarify that.  The compensation levels came from

9    Putnam.  The ratings information came from Putnam.  The

10   investment years of experience I believe came from the

11   plaintiff, and the years at Putnam I believe we obtained from

12   Putnam data.

13   Q.    Now, with respect to those folks, what kind of analysis

14   did you do?

15   A.    We did two types of analysis.  One type, we looked at

16   the males in this group, and we sorted them.  For example, in

17   total compensation, we sorted them from highest compensation

18   to lowest total compensation for the year 2002.  And then we

19   looked to see where Mrs. Svensson fell with respect to those

20   comparators.  You know, we sorted them from highest to

21   lowest, and then where in that range did Mrs. Svensson fall?

22   Q.    So this would be measuring Mrs. Svensson against a

23   number of males in those groups?

24   A.    Yes.

25   Q.    And did you come to any conclusions?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1  A.   I did.  For total compensation for 2002, we saw that

2  Mrs. Svensson was about right in the middle of those

3  comparators.  So, again, we sorted from highest to lowest,

4  and Mrs. Svensson was about in the middle.  So about

5  50 percent of those comparators had higher total compensation

6  than she did.

7  Q.   Any other conclusions?

8  A.   Sure.  Then we did the same thing with respect to the

9  years of experience, the years of investment experience.  We

10 sorted the males from highest to lowest, and then we saw

11 where Mrs. Svensson lies in relation to investment

12 experience.  And we saw that about only 30 percent of the

13 males had more investment experience than Mrs. Svensson.

14         And then we did the same thing with respect to

15 tenure at Putnam, how many years was somebody at Putnam?  So

16 again we went through the same process.  We sorted it from

17 the most seniority to the least seniority, and we looked to

18 see where Mrs. Svensson fell in that area.  And we saw that

19 about only 25 percent of the males had more seniority than

20 Mrs. Svensson at Putnam.

21         Two other analyses in this area.  We then did the

22 same for the final performance rating that we received from

23 Putnam, and we took the people with the highest rating and

24 sorted the data from highest to lowest, and where did

25 Mrs. Svensson fall with respect to that?  And we saw that

1  only about 18 percent of the males were ranked higher than

2  she was.

3          And then, finally, there's another performance

4  rating in the data called the manager rating, and we sorted

5  that again from highest to lowest to find out where

6  Mrs. Svensson fell, and about 47 percent of the males had a

7  higher rating than she did for the manager rating.

8  Q.   Now, that's a fair number of concepts and a fair number

9  of percentages.  Can you tell the Court and jury what general

10  conclusion, if any, that you drew, having determined those

11  percentages on those factors?

12  A.   Sure.  Based upon the data that we have, if somebody is

13  above average with respect to performance ratings or with

14  respect to seniority or with respect to investment

15  experience, then we would expect them, to the extent that

16  these factors determine compensation, we would expect that

17  person to also be above average with respect to total

18  compensation.  But what we're finding is, Mrs. Svensson is

19  about in the middle of the pack with respect to compensation;

20  yet she's above average with respect to all of those other

21  variables.

22  Q.   Now, did you perform a similar analysis with respect to

23  a different group of folks?

24  A.   We did.  The analysis I just described included the

25  people I mentioned, the portfolio managers in Core and Growth

1    as well as the experienced analysts.

2            We did another analysis where we took the

3    experienced analysts out, so we're just looking at the Core

4    and the Growth portfolio managers.

5    Q.   And did you perform any analysis on those?

6    A.   We did the same type of analysis on that group, and we

7    saw the similar things.  We saw that the plaintiff was about

8    in the middle of the pack with respect to total compensation,

9    but she was above the pack, above the middle of the pack, I

10   should say, with respect to investment experience, years at

11   Putnam, and the ratings.

12   Q.   And did you draw any general conclusion on that group

13   based upon those numbers?

14   A.   Yes, based upon those numbers, again, Mrs. Svensson was

15   about the middle of the pack with respect to total

16   compensation but higher than the middle with respect to these

17   other factors.

18   Q.   And did you analyze a different group of folks?

19   A.   We also analyzed the Core and Growth portfolio managers,

20   but in that group were some CIOs, chief investment officers.

21   So we took the CIOs out of that group, and we reran the

22   analysis.  So just to be clear, we're looking at the Core --

23            THE COURT:  So, remember, the chief investment

24   officers were the heads of those teams.  So just so they

25   remember.  And that's what you did yesterday, right?

1      THE WITNESS:  Well, it's been two days, yes, that's

2  right.

3      THE COURT:  Two days.  So that was what I had

4  instructed, just so you're clear, that with respect to

5  comparison for compensation, I instructed to take the chief

6  investment officers out of the pool.  All right, go ahead.

7  A.   Okay.  And so again we're looking at the portfolio

8  managers in the Core and Growth area, and we took the chief

9  investment officers out.  What we found was, Mrs. Svensson is

10  about 43 percent.  Only 43 percent of the comparators here

11  are greater than Mrs. Svensson, so she's a little bit above

12  the middle of the pack now.  We see that she's still pretty

13  far above the pack with respect to investment experience, so

14  only 21 percent of the comparators are above her.  For Putnam

15  tenure, about 29 percent of the comparators are above her.

16  For the final ratings, about 21 percent of the comparators

17  are above her; and for the manager rating, about 42 percent

18  of the comparators are above her.

19  Q.   And did you draw any general conclusion based upon those

20  subsidiary conclusions?

21  A.   Sure.  The general conclusion is that still, with

22  respect to these other factors, Mrs. Svensson is just a

23  little bit above the middle of the pack on total

24  compensation, but she's even higher than that with respect to

25  the investment experience and the Putnam experience and the

1    ratings.

2    Q.    Now, what type of analysis would you call it that you

3    did in analyzing these various groups of people?

4    A.    A general phrase for this type of analysis is just

5    called a "cohort analysis."

6    Q.    Can you spell that word, please?

7    A.    Sure, c-o-h-o-r-t.

8    Q.    And what is a cohort analysis?

9    A.    It's an analysis where you do some comparisons between

10   an individual and some comparators when you have either small

11   sample sizes or limited data on these individuals.

12   Q.    Have you given expert testimony in Federal Court based

13   upon a cohort analysis that you have done?

14   A.    I have, yes.

15   Q.    As an expert?

16   A.    Yes, I have.

17   Q.    And do you recall what court that was?

18   A.    That was the court that I mentioned earlier, the Western

19   District of Louisiana.

20   Q.    And what side, plaintiff or defendant, did you testify

21   about?

22   A.    I was working on the defendant's side in that case.

23   Q.    Now, were the subsidiary conclusions and your general

24   conclusions that you told the Court and jury about this

25   morning, were they consistent or inconsistent with any

1    conclusions or opinions you had come to after your analysis

2    of the original data?

3    A.    They were consistent with my analysis on the original 91

4    comparators.

5    Q.    Okay.  Now, did you do any analysis of information in

6    the various Putnam officer directories?

7    A.    Yes, I did.

8    Q.    And were those directories covering the period '98 to

9    2002?

10   A.    Let me verify to make sure.  Yes, sir.

11   Q.    And what was the purpose of your making such analyses?

12   A.    The purpose for doing those analyses were to address the

13   plaintiff's claim that there was a glass ceiling in the

14   Investment Division in Putnam, meaning that after a certain

15   level, females were not really promoted up into the higher

16   ranks.

17          They were also meant to address the plaintiff's

18   claim that females were disproportionately demoted within the

19   Investment Division at Putnam.  So more females were demoted

20   than expected, that was the claim.

21   Q.    And did you come to any conclusions with respect to your

22   analysis of the information in the officer directories for

23   those purposes?

24   A.    I did, yes.

25   Q.    And can you tell the Court and jury what those

1    conclusions were?

2    A.    Sure.  Let's start off with the promotion analysis.  In

3    the promotion analysis, I found that there was no

4    statistically significant difference between the number of

5    female promotions we would expect and the number of female

6    promotions we actually observed.  So it looked like from the

7    data that females were getting promoted in accordance with

8    the number of females that were in the work force and

9    possibly eligible for promotion, so I didn't see a pattern

10   there.

11   Q.    You used the term "statistically significant."  What did

12   you mean by the use of the term "statistically significant"?

13   A.    Yes, maybe the best way to describe statistical

14   significance is with an example.  Suppose we have -- we have

15   somebody who tosses a coin 100 times.  Since the coin is

16   fair, we would expect them to get heads 50 times and tails 50

17   times.  But we know that doesn't always happen.  Sometimes

18   you might flip a coin 100 times and you get maybe 45 heads or

19   55 heads.  So there is some randomness involved there.

20   There's some random chance that you're not going to always

21   get exactly what you would expect.

22            Statistical significance, statistics and the courts

23   have identified boundaries around that 50 percent mark.  And

24   so if you go outside of those boundaries, either higher or

25   lower, then it's deemed to be a statistically significant

1    result.

2            In the context of this case, let's just say,

3    suppose females made up 20 percent of the work force.  If

4    females make up 20 percent of the work force, then we would

5    expect that about 20 percent of the people who are promoted

6    would be female.

7            Now, the courts and statisticians recognize that

8    it's not going to always be 20 percent of the promotions

9    going to females because there are other factors that are

10   involved.  But suppose females only made up one percent of

11   all promotions.  Well, that's a little different.  Okay,

12   that's pretty far off.  If we expect 20 percent female

13   promotions and we only see one percent, that's pretty far

14   off.

15           On the other side, suppose females made up

16   20 percent of the population, and we see that 80 percent of

17   the promotions went to females.  So females were being

18   promoted at a rate much greater than what we would expect.

19           Statistics with guidance from the courts identify

20   where those boundaries are.  So as long as you're within that

21   boundary, either above or below the 20 percent mark in this

22   example, then you're within the acceptable range.

23           So getting back to my result on the promotions, we

24   see that the female promotions are within the acceptable

25   range.  So they're not too low and they're not too high,

1    given the representation of females in the work force.

2    Q.   And did you make an analysis in regard to demotions?

3    A.   We did, yes.

4    Q.   And what did you find?

5    A.   We found with respect to demotions -- excuse me, let me

6    get there.  We found with respect to demotions that there

7    were indeed more -- statistically significant more female

8    demotions than what we would expect.  Given the number of

9    demotions that we saw between 1998 and 2002, we would have

10   expected to have seen about seven female demotions.  What we

11   observed were thirteen female demotions, and that thirteen

12   was above the boundary of the acceptable range.  So that is a

13   statistically significant result, meaning that more females

14   were demoted than what we would have expected, given their

15   representation in the work force.

16   Q.   And did you make another analysis?

17   A.   We also looked at just the representation of females in

18   the Investment Division among the officers.

19   Q.   And did you come to any conclusions in that regard?

20   A.   I did, yes.  We saw that in 1998, females made up

21   22 percent of the Investment Division officers.  We compared

22   that with the number we observed in 2002 where females made

23   up 14 percent of the Investment Division officers, so

24   22 percent in 1998 and 14 percent in 2002.

25              THE COURT:  What titles do you consider are

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 64

1    officers?

2              THE WITNESS:  The titles that were in this analysis

3    were the assistant vice president, vice president, senior

4    vice president, managing director, and senior managing

5    director.

6              In comparing the 22 percent in 1998 with the

7    14 percent in 2002, we saw that that change was a

8    statistically significant difference.

9    Q.   And did you make a fourth analysis?

10   A.   The other analysis along these lines had to do with just

11   the senior vice presidents from 1998 to 2002.

12   Q.   And what did you study in that regard?

13   A.   Again we looked at the representation of females among

14   senior vice presidents.  In 1998 we saw that females made up

15   26 percent of the senior vice presidents, and in 2002 we saw

16   that females made up 12 percent of the senior vice

17   presidents, and that difference also is statistically

18   significant.

19   Q.   Now, did you also undertake any review, study, or

20   analysis of the report of Dr. Bloom engaged by Putnam in this

21   case?

22             MR. KOCIUBES:  Objection, your Honor.

23             THE COURT:  I'll allow that, yes or no.

24   A.   Yes, I did review Dr. Bloom's report.

25   Q.   And did you come to any conclusions following that

1    review or analysis?

2              MR. KOCIUBES:  Objection, your Honor.

3              THE COURT:  Sustained.

4              MR. MOLONEY:  May I approach, your Honor?

5              THE COURT:  Yes.

6    SIDE-BAR CONFERENCE:

7              MR. MOLONEY:  Dr. White and Dr. Bloom began at

8    other ends of the world but from different places with

9    different sets of data.  In the deposition of Dr. Bloom and

10   in his report, he criticizes Dr. White's approach of

11   limitations on data, the way he analyzed things and what

12   not.  We expect that Bloom is going to be called to --

13             THE COURT:  Is Bloom going to testify?

14             MR. KOCIUBES:  I don't know.  I honestly don't know

15   yet because some of this is going to get cut back in light of

16   his testimony.

17             THE COURT:  Here's the issue, which is, I don't

18   want to make them call him back again.  So normally this

19   would come in either as rebuttal or whatever.  If the report

20   is not going to come in, then he can't discuss it, but I

21   don't want to make them pay the money to bring him back.

22             MR. KOCIUBES:  I appreciate that, your Honor, but,

23   on the other hand, your Honor has made rulings.  He has over

24   the last night or two redone charts of his report that may

25   necessitate -- obviously I want to consult with

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    Professor Bloom.  There are portions of Professor Bloom's

2    report that, given the limitations of what he's done, that

3    for sure aren't going to get used.  And in that context, to

4    start rebutting what's really a straw man at this point is

5    simply unfair.

6         MR. MOLONEY:  The comments he's going to make are,

7    he's going to comment on what he believes to be a failure to

8    incorporate controls in Bloom's statistical analysis.

9         THE COURT:  Well, if Bloom's not going to --

10        MR. MOLONEY:  I'm between a rock and a hard place

11   because if they call Bloom, and if Bloom revises his report,

12   he's still going to try to unload on White.  And I'm going to

13   be left with no defense to that, and that's unfair.

14        THE COURT:  I understand that, I understand that.

15   Well, here's the issue:  If you can't decide right now, I

16   might make you pay the expenses of flying him here a second

17   time because I don't know what else to do.

18        MR. KOCIUBES:  We would do that, A.  But the

19   alternative is, when the jury is on break or otherwise, to do

20   some kind of proffer, which then could be used, the

21   transcript could be used, if it is relevant --

22        THE COURT:  Is Bloom in town?

23        MR. KOCIUBES:  Yes, yes.

24        MR. MOLONEY:  He teaches at the Harvard School of

25   Public Health.

1        THE COURT:  Well, let me put it this way:  At this

2   point I'll sustain the objection, but I will impose costs.

3   I'll expect Putnam to fly this guy and pay his expenses; not

4   to pay his expenses because the hourly rate you'd be into,

5   but just pay the expenses to fly him back.

6        MR. MOLONEY:  And the hotel and whatever.  Okay,

7   fine.

8        THE COURT:  Yes, I don't know how it --

9        MR. MOLONEY:  No, that's fine, that's fine.

10       (End of side-bar conference.)

11       THE COURT:  Yes?

12       A JUROR:  I have a question about the testimony.

13       THE COURT:  Well, then you need to write it down,

14   and I'll give it to them at the break, okay?

15       A JUROR:  Okay.  I have no spare paper, though.

16       THE COURT:  Don't worry.  Paper, we'll give you.

17   Uncle Sam is good for it.  Do you need more paper for notes?

18   Is that it?  We even have more notebooks.

19       A JUROR:  I have no unused page, but I'm reusing

20   the other side of the pages.

21       THE COURT:  A recycling guy.  Do you want to go

22   green, or do you want another notebook?

23       A JUROR:  I think I'm going to use --

24       THE COURT:  All right, all right.

25   Q.   Now, you've discussed the analyses that you did

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1   measuring Mrs. Svensson against males in that reduced scope

2   of the coverage.  Did you do any analysis of comparing males

3   versus females?

4   A.   Yes.  For that same group of individuals, we also

5   compared males versus females.

6   Q.   When you say the same group, what are you referring to?

7   A.   Again the Core and Growth portfolio managers and the

8   experienced analysts in Research.  Then we did another

9   analysis for just the Core and Growth portfolio managers, and

10  then again we took out the CIO from the Core and Growth

11  portfolio managers.

12  Q.   And did you come to any --

13          MR. KOCIUBES:  Could we have a year, your Honor,

14  that we're talking about?

15          THE COURT:  Did you look at a particular year?

16          THE WITNESS:  Yes, 2002.

17          THE COURT:  Thank you.

18          MR. KOCIUBES:  Thank you, your Honor.

19  Q.   And did you come to any conclusions?

20  A.   We did.

21  Q.   And can you tell us what they were?

22  A.   Sure.  For the Core and Growth portfolio managers and

23  analysts and experienced analysts, the very first group we

24  talked about, we saw that for total compensation, the average

25  male had a total --

1      MR. KOCIUBES:  Objection, your Honor --

2      THE COURT:  Overruled.

3      MR. KOCIUBES:  -- to the average.

4      THE COURT:  Overruled.  Now, just make sure that --

5 there are different claims here, so that the first part dealt

6 with who got what positions when.  This is about

7 compensation, so go ahead.

8 A.   The average total compensation for males was $1,437,000

9 in 2002.  The average total compensation for females in the

10 same year was $625,000.  So we've got a difference of about

11 $800,000, and we see that that difference is statistically

12 significant.

13      We also looked at, again, investment experience --

14      THE COURT:  So this was Core and Growth as well as

15 the Research analysts?

16      THE WITNESS:  Yes.  And just to clarify, this still

17 includes the CIO.

18      MR. KOCIUBES:  Motion to strike, your Honor.  It

19 would skew it completely.

20      THE COURT:  Well, do you have statistics without

21 the CIOs?

22      THE WITNESS:  Yes, I do.

23      THE COURT:  All right, so this is important.  I

24 ruled that with respect to the chief investment officers,

25 that the heads of each of the teams, remember, that for

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Case 1:04-cv-12711-PBS    Document 364    Filed 05/23/2008    Page 70 of 146

Page 70

1    purposes of compensation, at least at this point there was

2    not sufficient evidence to treat them -- remember I used the

3    term "comparators"?  So I'm going to tell you that this

4    average cannot be used by you unless I tell you otherwise,

5    unless there's additional evidence.  So as of right now, you

6    need to back out the CIOs.

7            THE WITNESS:  Okay.  Should I jump straight to

8    that?

9            THE COURT:  I don't know what's in between.

10           THE WITNESS:  That's a fair point.

11   Q.   Just go in order.

12   A.   Okay.

13           THE COURT:  The CIOs, at least for purposes of

14   compensation, at least right now, should not be compared to

15   Ms. Svensson, or other female analysts or portfolio managers.

16           THE WITNESS:  Okay, so we're still talking about

17   the group that includes the CIOs, and I'll get to the group

18   that --

19           THE COURT:  Is this for purposes of compensation?

20           THE WITNESS:  I was going to also talk about how

21   they compare with respect to years of experience and

22   performance ratings.

23           THE COURT:  I would jump over that then.

24           THE WITNESS:  Okay.  All right, then let's go to

25   the Core and Growth portfolio managers without the CIO.  And

1  the average total compensation in 2002 for males is

2  $1,021,000.  The average compensation for females is

3  $876,000.  And that difference is about $144,000 and not

4  statistically significant.

5          And then we did the same with respect to investment

6  experience and Putnam tenure, the final ratings and the

7  manager ratings for this group, and again we're seeing no

8  statistical significance between men and women in 2002.

9  Q.   Any other analysis in that regard, or is that it?

10 A.   That's it for that population, yes.

11 Q.   Now, you've been looking at some data during this

12 testimony?

13 A.   Yes, sir.

14 Q.   And can you identify for me what the documents are with

15 data?

16 A.   These are tables we prepared once we received the new

17 list of comparators.

18 Q.   Can you identify them?

19 A.   Can I identify the tables?

20 Q.   Yes, sir.

21 A.   Sure.  There are two sets of tables.  Each one of them

22 has four pages.  The first table again is the first analysis

23 we talked about, comparing Mrs. Svensson to the male

24 comparators, and that table is the Core and Growth portfolio

25 managers and the experienced analysts.  The second table is

1    just the Core and Growth portfolio managers without the

2    analysts.  The third table, the Core and Growth portfolio

3    managers without the CIO.

4    Q.    So that's not including CIO?

5    A.    Not including CIO.  And then we also did one table on

6    the side for just the analysts.

7    Q.    And the caption on that document, the title of the

8    document?

9    A.    I'm sorry, on the --

10   Q.    The title of that document?

11   A.    I'm looking at my results here, so I just read off the

12   titles for each page.

13   Q.    And do you have other documents displaying other data

14   that you looked at in terms of these analyses?

15   A.    I do, yes.  I've got documents that I received that list

16   the individuals that we're talking about among the

17   comparators.

18   Q.    Okay.  And can you just identify for me the titles of

19   the various documents.

20   A.    Sure, two sets of documents.  One document is called

21   "Core and Growth Male Portfolio Managers and Experienced

22   Analysts."  So this list just the males among the new

23   comparators.  And then the second document is the same as the

24   first except it adds the females who are the comparators.

25   Q.    And the caption of that one is?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    A.    On the first page it says "Core and Growth Male and

2    Female Portfolio Managers and Experienced Analysts."

3    Q.    Any others?

4    A.    The only other one that I have not discussed, that I've

5    not mentioned when you're asking me to list the sources, is

6    the male versus female comparisons that I just talked about.

7    So we have four pages with that set of comparisons for each

8    of the four groups.

9            MR. MOLONEY:  Your Honor, I'd move that that data

10   be admitted along with Dr. White's CV.

11           MR. KOCIUBES:  No objection to the CV, your Honor.

12   With respect to -- and I may have just misheard -- with

13   respect to this data, it sounded to me, and maybe I can be

14   corrected, that at least some of those charts included CIOs,

15   and it also sounded to me like some of those --

16           THE COURT:  Wait.  Do any of them include CIOs?

17           THE WITNESS:  Yes.  Some of our analysis included

18   the CIOs.

19           THE COURT:  Well, we'll have to do it during the

20   break.  I'm not going to do this in front of the jury.  Why

21   don't you continue.

22           MR. MOLONEY:  I think I have no further questions

23   at this point.

24           MR. KOCIUBES:  I'm happy to get started, your

25   Honor.  Might I, your Honor, just see the list of names that

1    he was working off of?  I think he said he had it typed up.

2             THE COURT:  Sure.

3             THE WITNESS:  This is the one that has both the

4    males and the females.

5    CROSS-EXAMINATION BY MR. KOCIUBES:

6    Q.    Good morning, Dr. White.

7    A.    Good morning.

8    Q.    Dr. White, do I understand correctly that what you are

9    doing is, you are analyzing some numbers, people based on

10   numbers; is that correct?

11   A.    Yes, sir.

12   Q.    And, obviously, as somebody who is not working with Lisa

13   Svensson, I take it you make no comment one way or the other

14   as to whether anyone actually did anything to her because she

15   was a female?

16   A.    Right.  Statistics can't show intent, and so, no, I

17   can't say that these statistics show that they did anything

18   specifically to Ms. Svensson because she is a female.

19   Q.    And am I also correct that in doing your statistical

20   analysis, the notion of statistical significance, I think I

21   just heard you say, is pretty important?

22   A.    Yes, it is.

23   Q.    Because if you don't reach to statistical significance,

24   you can't count out just random occurrences, chance?

25   A.    That's right.  There may be other factors involved.

1   Q.   So that in your coin-flip example, if I flip a coin,

2   say, ten times, and it comes up heads six times or even seven

3   times, I can't infer that the coin was crooked from that?

4   A.   Just from that one observation, no, sir.

5   Q.   Right.  It would have to be enough coin flips and enough

6   difference to get to statistical significance?

7   A.   That's right.

8   Q.   And with respect to promotions, I think you said you

9   found no statistical significance?

10  A.   That's correct.

11  Q.   And am I also correct that you found when you factored

12  out -- in compensation, when you factored out the CIOs, you

13  found no statistically significant difference between men and

14  women?

15  A.   That's correct, yes.

16  Q.   And you found no statistically significant difference in

17  their experience?

18  A.   That's correct.

19  Q.   All right.  Now, with respect to experience, I think you

20  said that was one of the things that didn't come off -- that

21  you didn't get from Putnam?

22  A.   The years of investment experience was the one that I

23  don't believe I got from Putnam.

24  Q.   And how many total individuals did you use, the reduced

25  list?

1   A.    In the reduced list, I think it's around 43.  And you've

2   got my chart, so it would be listed on the chart.

3   Q.    Okay, approximately 43, and you can look at your chart

4   at the break, and we can correct the number if you're off.

5   A.    Okay.

6   Q.    And with respect to every one of those 43, you were

7   relying on Mrs. Svensson to give you the experience of each

8   of those people?

9   A.    The years of investment experience, correct.

10  Q.    Right.  And she gave you what she thought was their

11  years of experience at Putnam, their investment experience,

12  and their years of experience outside of Putnam?

13  A.    Total years of investment experience is my

14  understanding.

15  Q.    Now, is one of the things that she gave you any

16  indication of the investment performance of any of these

17  people?

18  A.    No.  Investment performance is something I would have

19  loved to have had in this case.

20  Q.    Because you know that's a huge variable, is it not?

21  A.    I would think so, yes.

22  Q.    And when you talk, for example, about the Core teams and

23  you analyzed people on the Core teams, did you make any

24  effort to go back, from public or other sources, to look at

25  the investment performance of those people on the Core teams

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    that you were analyzing?

2    A.    I tried to find the investment performance of not just

3    the Core team but all of the original 91 comparators, so we

4    looked for public information.  While we can find public

5    information on the performance of the funds, we don't know

6    exactly historically, we couldn't find, going back to these

7    earlier years, who was managing at what point in time.  So we

8    were not able to tie it to a specific individual.

9    Q.    So you were unable to -- I don't suggest you elected it,

10   but you were unable to factor in as one of the variables how

11   well these people had actually performed doing what they're

12   supposed to be doing, which is making money for their

13   investors?

14   A.    That's right, we were unable to do that.

15   Q.    And with respect even to experience levels, I take it

16   you just looked at number of years?

17   A.    We did, yes.

18   Q.    Now, if I'm not mistaken, it strikes me that you

19   yourself in your organization rose fairly quickly.

20   A.    I think so, yes.

21   Q.    And there are probably other people that did not rise as

22   quickly as you have?

23   A.    And some probably rose faster but some slower.

24   Q.    And by looking at only years of experience, for example,

25   comparing you with someone within your organization who had

1    the same or more experience but whose title is below you,

2    that's just another way of factoring out performance

3    differences?

4    A.    That's right, so we'd also want to consider performance.

5    Q.    But that was something else you hadn't been able to do?

6    A.    We weren't able to do that for financial performance.

7    We were able to do that with their ratings.

8    Q.    With their manager ratings only.  But, for example, how

9    many --

10   A.    I'm sorry.  And their final ratings.  We had two sets of

11   ratings.

12   Q.    The personnel forms is what you're talking about?

13   A.    I'm not sure what you're talking about in terms of

14   personnel forms, but we received some documents that had the

15   final ratings on them.

16   Q.    The numbers on a 1 to 5 scale?

17          THE COURT:  I think we should probably take our

18   break now, unless do you want to finish up this one line?

19          MR. KOCIUBES:  Oh, we're going to be a while.

20          THE COURT:  Yes, yes, okay.

21          THE CLERK:  All rise for the jury.

22          (Jury excused.)

23          THE COURT:  I think we do need to stay on the

24   record.  So can I just ask, maybe you can come up with your

25   charts and show us.

1    SIDE-BAR CONFERENCE:

2              THE COURT:  I've got Dr. White up here.  So here's

3    the problem:  I don't know what these charts are because I

4    haven't seen them, so --

5              MR. KOCIUBES:  Neither have we.

6              THE COURT:  You haven't shown them the charts?

7              MR. KOCIUBES:  No.

8              MR. MOLONEY:  We just got them.

9              THE COURT:  I know, but you were here this

10   morning.  You could have shown them before you walked in.  So

11   I don't know what to do with that.  I can't pop those into

12   the record.  I don't know what they look like.  I can't do

13   it.

14             Now, so you're going to have to talk.  I mean, to

15   the extent it was uncontroversial, I understand I ordered the

16   CIOs backed out, so I'm not going to preclude this testimony

17   at all.  I've ordered that based on the evidence I heard.  I

18   didn't have the foundation that CIOs were being compensated

19   in the same manner that people who were just portfolio

20   managers were.  That is the basis for that ruling.  If

21   information comes in later that changes that, so be it, but

22   I've got to go with what I've got now.

23             So I am certainly not going to preclude you from

24   changing your opinion.  You did exactly what I asked.  The

25   question I had is, I don't know how controversial any of this

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 80

1    is.  Certainly the charts with the CIOs in them shouldn't

2    still come in.  Maybe --

3             MR. KOCIUBES:  I guess I would ask you to just

4    defer on even some of the other stuff until after the cross

5    because then the cards will have been turned over, your

6    Honor.

7             THE COURT:  One of my problems is -- do you have an

8    extra set of these? -- I don't even know what they are.

9             MR. MOLONEY:  I think I have.

10            MR. KOCIUBES:  I would like a set as well.

11            THE COURT:  He needs an set as well so they can

12   look at it during the break.  But it's not clear to me, if

13   there's anything controversial at this point, that I'm going

14   to risk it by putting it in.

15            Okay, now, the second issue that I have -- you can

16   stay up here, it's not so special -- is these Morningstar

17   reports.  As I've ruled before, they are nonhearsay, on the

18   quantitative end as opposed to some of the comments.  Now

19   I've got objections on relevance which are impossible for me

20   to resolve.  I don't understand what they're talking about on

21   the objections.  I don't understand the differences.  I will

22   allow in any of the Morningstar reports that are used to

23   support that chart that we've all been using, but if there

24   are others, I don't know why they come in.

25            MR. MOLONEY:  What we tried to do, and I think we

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    did do, we had a stack of Morningstar reports, and it's now

2    been reduced to provide the information that backs up the

3    charts, and they are now redacted as per our discussions and

4    what not.

5            THE COURT:  I'm seeing too vigorous shakings of

6    heads back there.  So I don't know the answer to that.  I

7    don't want to spend two hours working through each one of

8    them.  I don't know that this matters because they're never

9    going to read them, so --

10           MR. KOCIUBES:  Well, it is a record, but included

11   within the pile are the backup for the chart.  Included

12   within the pile is a great deal of other stuff.  Those are

13   the objections.

14           THE COURT:  That may well be sustained on relevance

15   grounds.  I mean, we're now at a different basis for the

16   objection.  So I'm ruling right now that any of the backup

17   charts to that blue chart where the performance funds were

18   fall within the hearsay rule; otherwise reliable, have been

19   relied on by Putnam, and actually both sides have used them.

20   Anything else, you'd have to show me why they were relevant.

21           MR. MOLONEY:  Well, I think, your Honor, if

22   Mr. Kociubes could explain to us which ones he claims are now

23   relevant and why, then --

24           THE COURT:  Mr. Rodriques has given me a chart that

25   goes for pages.  We could spend hours this afternoon doing

Page 82

1   it, if you want to use your time that way.  However, I would

2   much --

3           MR. MOLONEY:  I haven't read it yet.  He handed it

4   to me and --

5           MR. KOCIUBES:  It's easy, your Honor.  In a sense,

6   I can summarize it.  On that blowup, there are listed, I

7   don't know, six or seven, eight different funds.  And, you

8   know, with our general objections your Honor has overruled,

9   those eight, as I understand your Honor's ruling, are coming

10  in.  Those are the ones that there are no further relevance

11  objections to.

12          With respect to all the rest of them, they're funds

13  that are not on that chart, and that's where the objections

14  are.  And some of those are later years --

15          THE COURT:  So maybe you can confer later, and I'm

16  not going to allow them in as a big packet.

17          MR. MOLONEY:  One chart, 21.1, is in as an

18  exhibit.  The other one was used as a chalk, used by both.

19          THE COURT:  I don't remember.  I just remember

20  there's one blue chart that everyone's been using, and that's

21  fully in, fully fair.  It would be even hard-pressed for them

22  to preserve an objection on appeal because they used it as

23  much as anyone did.

24          Now, I don't remember the other chalk.

25          MR. MOLONEY:  I should talk with Mr. Kociubes, see

1    if we can sort this out.

2            THE COURT:  See if you can sort it out.

3            MR. KOCIUBES:  I'm not going to do it now

4    because --

5            THE COURT:  No, we're not.  We all need to go take

6    a deep breath and go with this.  But one question I had for

7    the expert, actually, when you analyzed the compensation

8    differences, you did it by clumping together as a cohort both

9    the portfolio managers and the analysts, is that right?

10           THE WITNESS:  In one of our scenarios, yes, ma'am.

11           THE COURT:  Maybe I missed it.  You never separated

12   out?

13           THE WITNESS:  Yes.  We did --

14           THE COURT:  In other words, was your opinion that

15   there was no statistical difference the same in each of the

16   separate cohorts separately; in other words, no statistical

17   difference among the portfolio managers and then again no

18   statistical difference among the analysts?

19           THE WITNESS:  Yes, ma'am.  For example, in this

20   page we're looking at the Core and Growth portfolio managers

21   by themselves.

22           THE COURT:  Yes.

23           THE WITNESS:  Here we're looking at them without

24   the CIOs, so I think that's the one that you wanted me to

25   focus on in my testimony.

Page 84

1          THE COURT:  Well, it's up to you what to focus on,

2     but take out the CIOs, yes.

3          THE WITNESS:  Take out CIOs.  And then we did

4     another page with just the analysts.

5          THE COURT:  Just the analysts.

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  And was there any statistical

8     difference?

9          THE WITNESS:  No, ma'am, not for these two pages.

10          THE COURT:  Okay.  So I don't think that was really

11     clear from the testimony actually.

12          MR. MOLONEY:  You mean on the compensation side.

13          THE COURT:  On the compensation side of things,

14     that there was nothing statistically different on the

15     average, is that what it was, between the males and females?

16     If you look separately at portfolio managers, no statistical

17     difference, and if you look separately at the analysts, no

18     statistical difference?

19          THE WITNESS:  That's correct.

20          MR. KOCIUBES:  And I'll clarify that on the record.

21          THE COURT:  Okay, I may have missed it.  So the

22     only thing that was statistically different across the board

23     that you looked at was demotions and officers?

24          THE WITNESS:  And among the two officer analyses,

25     one was officers as a whole, and the other one was senior

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 85

1    vice presidents.

2              THE COURT:  But in terms of compensation, nothing?

3              THE WITNESS:  If you're not including the CIOs.

4              THE COURT:  If you're backing out the CIOs.  Thank

5    you, okay.

6              MR. KOCIUBES:  May I have a set of --

7              THE COURT:  Yes, yes, you do need one, okay.

8              MR. MOLONEY:  Let me just make sure.  Let's see

9    what he's got there.  I think I have copies.

10             (End of side-bar conference.)

11             (A recess was taken, 11:10 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 86

1        (After recess.)

2        THE COURT:  By the way, has there been an

3   agreement on these charts?

4        MR. KOCIUBES:  Not until cross is over, your

5   Honor.

6        MR. MOLONEY:  I'm sorry, your Honor, I didn't

7   hear your question.

8        THE COURT:  I'm sorry.  Is there agreement on

9   the charts that Dr. White was --

10       MR. MOLONEY:  I'm sorry, I thought you were --

11   oh, okay.

12       THE COURT:  I think I don't have them anymore.

13   Did you give me one or did I give mine to Mr. Kociubes?

14       MR. MOLONEY:  Let's see if I can put together

15   another set, your Honor.

16       THE COURT:  This is the question from that

17   juror.  All right.

18       "Dr. White testified about a statistically

19   significant pattern of demotions.  Since there has been

20   disagreement between plaintiffs and defense on what is

21   and what is not a demotion, I would like to know what

22   definition Dr. White used and how it was arrived at."

23       Good question.

24       MR. KOCIUBES:  And we're going to get there,

25   your Honor.

1    Unless you want to ask it to them when the jury

2  comes in.  I was going to do it in due course.

3    THE COURT:  I will ask it and then you can

4  amplify.  That was the juror's question.

5    (Jury entered the courtroom.)

6    THE CLERK:  Please be seated.

7    THE COURT:  Good.  So one of the jurors asked a

8  question, which I'm going to read now and ask the

9  witness.

10   I'm very pleased with this, because there's a

11 lot of technical information, and I sometimes pop in and

12 can a question if I'm not clear, but you should be able

13 to do that, too.  Not to ask it out loud, just in case

14 it's something inappropriate and I don't want it to tank

15 everything, but this was completely appropriate, a good

16 question.

17   So let me read it, and then I'll ask the expert

18 witness.

19   "Dr. White testified about a statistically

20 significant pattern of demotions.  Since there has been

21 disagreement between plaintiffs and defense on what is

22 and what is not a demotion, I would like to know what

23 definition Dr. White used and how it was arrived at."

24   So what's the definition?

25   THE WITNESS:  All right.  Here's the process by

1    which we defined a promotion.

2         We looked -- remember the data I discussed

3    before --

4         MR. KOCIUBES:  Promotion or demotion, your

5    Honor?

6         THE WITNESS:  I'm sorry, I said "promotion."

7         THE COURT:  I think it was demotion the juror

8    asked about.

9         THE WITNESS:  I'm sorry, I said "promotions."

10        Demotions.  We looked at the data, and from year

11   to year we could see what jobs people were in, and in

12   the -- the demotions came from the officer directory

13   data.  The officer directory data will have what's

14   called a functional job title as well as an officer job

15   title.

16        And what we did, once we had that database

17   built, we could look for a given person what job changes

18   they've had.

19        Well, there are a lot of different functional

20   job titles, very specific job titles that were there,

21   so, as I did here -- I don't know Putnam as well as the

22   plaintiff -- so what we did is we took all the job

23   movements from one job to the next and we condensed it

24   into a list, we took the names off, took the genders

25   off, just had an old job, new job list.  And we put that

1  into an Excel file and we e-mailed that to Mrs. Svensson

2  and we asked her to please identify these job movements,

3  which ones are demotions and which ones are promotions.

4       THE COURT:  Can you give us an example of what

5  you deemed a demotion after relying on what you sent to

6  her?  Like what functional title went from what to what?

7  That's, I think, the gist of the question.

8       THE WITNESS:  I don't have the data in front of

9  me.

10       But, for example, if somebody went from a

11  director to a portfolio manager, then --

12       THE COURT:  From a managing director to a

13  portfolio manager?

14       THE WITNESS:  Well, I'm thinking about

15  functional titles, say, from a director functional title

16  to a portfolio manager functional title.

17       THE COURT:  So what does director mean, like a

18  CIO?  Do you know?

19       THE WITNESS:  My understanding is, is that a

20  director is below a CIO, but let's -- we can talk about

21  officer titles, if that might clear things up.

22       If somebody goes from a senior vice president to

23  a vice president, I'm sure that would have been

24  considered a demotion.

25       THE COURT:  And were there some like that?

1       THE WITNESS:  I'd have to look at the data.  I
2    don't recall.
3       THE COURT:  Well, how did you treat moving from
4    portfolio manager to a research analyst?
5       THE WITNESS:  Again, I'd have to look at the
6    data, but I would believe that that would be called a
7    demotion.
8       THE COURT:  And when you made those -- your
9    statistical analysis, you were essentially relying on
10   what Mrs. Svensson said was considered a demotion within
11   the organization?
12       THE WITNESS:  That's right.  That was our only
13   alternative at the time, given the access that we had.
14   BY MR. KOCIUBES:
15   Q.   Since we're on that topic, Dr. White, maybe we can
16   just spend a little bit of time on it.
17       But, as I understand your answer to Judge Saris'
18   questions, you essentially took the word of plaintiff as
19   to what constituted a demotion; you had her code it.
20   A.   We had her code it, and then we would review her
21   coding to see if any questions came up.
22   Q.   So if, for example, there were -- and you don't
23   remember if there were -- if someone went from senior
24   vice president to vice president, you could have a
25   strong inference that that looks like a demotion?

1    A.    Right.

2    Q.    Now, with respect to portfolio manager to senior

3    analyst, you didn't -- was there some -- there was no

4    organizational chart or anything else you relied upon

5    other than Mrs. Svensson's word that that constituted a

6    demotion.

7    A.    That's right.  We relied upon the plaintiff.

8    Q.    And what about -- did you inquire or attempt to find

9    out whether anybody ever voluntarily moved or asked to

10   be moved, whether on a half-time or other basis, from a

11   portfolio manager position to an analyst position?

12   A.    No, we didn't have that information.

13   Q.    So that when you were coding this, you don't know

14   how many of these moves may have been voluntary?

15   A.    That's correct.

16   Q.    And other than Mrs. Svensson, what you were working

17   off were the officers, directors, essentially the phone

18   books?

19   A.    Yes, sir.

20   Q.    And with respect to even on that, you initially, did

21   you not, compiled a chart that showed movements in

22   various categories?

23         Do you have your original report with you?

24   A.    Yes, sir, I do.

25   Q.    Okay, would you pull it out?

1    A.    Sure.

2          Okay, what page?

3    Q.    And would you go to tab, in your original report,

4    tab L, appendix L, the second page?

5    A.    The second page, okay.

6    Q.    Right.

7          And actually, on that page, you listed what you

8    thought were in 20 -- is it 2002 or is it a broader

9    period of time?

10   A.    That second page covers the entire time period, 1998

11   through 2002.

12   Q.    1998 until 2002, correct?

13   A.    Correct.

14   Q.    And during that period, you attempted to analyze the

15   number of men and the number of women who were, quote,

16   demoted from portfolio manager positions, correct?

17   A.    Yes.  Portfolio managers are on that table, yes.

18   Q.    And given the percentage of men and women in that

19   position, you would have expected to find less than one

20   female, almost three quarters of a female -- which, of

21   course, is impossible -- but a little bit less on

22   average of one female having been, quote, demoted from

23   portfolio manager that year, correct, that period?

24   A.    That -- yes, sir.

25   Q.    In fact, what you found was that there were four men

1  who were, on your analysis, demoted from portfolio

2  management positions?

3  A.    Yes, sir.

4  Q.    And how many women did you find who were demoted

5  during that time period, 1998 to 2002, from portfolio

6  management positions?

7  A.    There were no portfolio manager demotions.

8  Q.    So, if anything, what you found were fewer female

9  demotions than you would have expected.  There were no

10  female demotions from portfolio management positions

11  during that four-year period of time?

12  A.    That's correct.

13  Q.    Now, let's, if we could, go back to where we broke a

14  little while ago, and am I correct that -- and we should

15  break one of the things down.  You had said, correct me

16  if I've got it wrong, Dr. White, that when you looked at

17  2002 compensation, men versus women, of the people that

18  you had to analyze --

19  A.    Yes, sir.

20  Q.    -- excluding CIOs, what you found, no statistically

21  significant difference between men and women if you

22  combine both the portfolio managers and what you termed

23  experienced analysts, if you just lumped them all

24  together?

25  A.    That's correct.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    Q.    Okay.

2    A.    I did not find statistical significance.

3    Q.    Okay.  Let's break it apart.

4          You know that Mrs. Svensson was, and for most of

5    2002 she was a senior analyst at Global Equity Research?

6    A.    That's my understanding, yes.

7    Q.    And that would fall within your category of

8    experienced analyst?

9    A.    I didn't define who the experienced analysts were.

10   Q.    Oh, you didn't make that definition either?

11   A.    No, sir.

12   Q.    Where did that definition come from?

13   A.    We received that from the attorneys and

14   Mrs. Svensson.

15   Q.    So what you did was you got a list of people, they

16   were put in categories, you were unable to verify,

17   correct -- or you didn't verify?

18   A.    Right, I didn't -- I wasn't aware of the Judge's

19   ruling.

20   Q.    Well, I'm just talking about the issue of

21   experience.

22          Now, experienced analysts, the definition -- as

23   you sit here today, you don't know what the definition

24   of experienced analysts which is incorporated in your

25   data?

1          MR. MOLONEY:  Objection, your Honor.  I think

2     there's some confusion between the work on his original

3     report and the most recent.  I think it needs to be

4     clarified.

5          THE COURT:  Overruled.  The question is more

6     generic than that.

7     A.    Okay.  I asked Ms. Svensson how she defined

8     experienced analyst.  And her definition, paraphrasing

9     her, of course, she was looking for analysts who were

10    within three years of experience of her, either lower or

11    higher, and I think she also looked at people who were

12    managing portfolios or had some portfolio management

13    duties.

14    Q.    And did you do anything other than take her word for

15    that, that's the relevant criteria?

16    A.    That's the only information we had on these people.

17    Q.    Now, you're a labor economist?

18    A.    Right.

19    Q.    Did you do any kind of research or anything into

20    this industry to see if that's an appropriate cohort?

21    A.    I don't know what kind of research you would do into

22    the industry -- industry-wide research that would be

23    specific to the Court's ruling on this.

24    Q.    Okay.  So you got this list of people who were --

25    and you independently didn't verify whether the amount

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1  of experience they had were what Mrs. Svensson told you

2  or whether they had managed people was other than what

3  Mrs. Svensson told you?

4  A.   The investment experience, remember, we had -- these

5  were people who were originally part of the 91

6  comparators.  We had their data, we had the list of

7  individuals, and we brought in their data from that old

8  database.

9  Q.   Then, rather than deciding on your own what sort of

10 experience is comparable, you had Mrs. Svensson sort of

11 designate the people that she thought were comparable to

12 her?

13 A.   Right.  We relied upon Mrs. Svensson for that.

14 Q.   Now, relying on the people that Mrs. Svensson

15 decided should be deemed experienced analysts and,

16 therefore, comparable, if we look only at that universe,

17 just the experienced analysts as defined by

18 Mrs. Svensson, and we analyze the compensation of men

19 and women for 2002, there, also, you found no

20 statistically significant difference, correct?

21 A.   That's correct, nor would we expect to find any.

22 Q.   Okay.

23 A.   Because there was such a small sample size there.

24 Q.   But you found no statistically significant

25 difference, correct?

1    A.    That's correct.

2    Q.    And then you did a third run, and that was you

3    analyzed for 2002 the portfolio managers in a couple of

4    different departments, areas, I should say?

5    A.    Yes, sir.

6    Q.    Correct?  So that I'm clear, you started with a

7    universe of 91 --

8    A.    Early on in the case.

9    Q.    Right.

10   A.    Yes.  Not referring to the last couple of days.

11   Q.    Right.  And the original 91 was a list which was

12   handpicked by Mrs. Svensson?

13   A.    She identified -- they were identified by

14   Mrs. Svensson.

15   Q.    Okay.  And then Judge Saris made some rulings, and

16   you were asked to reduce that universe?

17   A.    Right.

18   Q.    But what you were reducing it from was from the list

19   which Mrs. Svensson had handpicked and told you these

20   are the people I want you to compare?

21   A.    That's right.  Mrs. Svensson identified these

22   individuals.

23   Q.    And so when you testify about other portfolio

24   managers in Growth -- in the Growth teams or the Core

25   teams, you don't know whether you were analyzing all of

1    the portfolio managers on those teams?

2    A.   Right, going back to the original --

3    Q.   Hold on.  Just answer my questions.

4         And you don't know --

5         MR. MOLONEY:  May he be allowed to answer the

6    question?

7         THE COURT:  Well, was it in response to his

8    question?

9         THE WITNESS:  Yes, I think so.

10        THE COURT:  All right, go ahead.

11   A.   He said I wasn't allowed -- I don't know whether

12   it's all the portfolio managers.

13        We asked for data from the entire investment

14   division at the beginning of this case.

15        THE COURT:  All right.  No, we're going to --

16        THE WITNESS:  Okay.

17   MR. KOCIUBES:

18   Q.   And with respect to those -- the original 91, as it

19   got boiled down, you don't know whether Mrs. Svensson

20   left off any high-paid females?

21   A.   That's right.  We had relied upon Mrs. Svensson to

22   identify these people.

23   Q.   Or added -- or low-paid females, I should say,

24   because that would bring the female average down?

25   A.   That's correct.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Q.   And you don't know whether she loaded it up with

highly successful, highly compensated males so as to

skew that average, correct?

A.   Again, we relied upon Mrs. Svensson to identify

these individuals.

Q.   And did nothing independently -- strike that.

     Let's then continue on the other issue that we

were talking about right before we broke.

     Remember you said you did a cohort analysis,

correct?

A.   Yes.

Q.   So that although for compensation on any one of

these three bases you couldn't come up with a

statistically significant -- you tried to put

Mrs. Svensson, ranking her within a group of other

people, of people, correct?

A.   Correct, yes.

Q.   And again, this would be a subset of the people that

Mrs. Svensson gave you to analyze?

A.   That's correct.

Q.   She chose the names?

A.   She did, yes.

Q.   The criteria you said, I think, were three:  It

was -- tell me what the three factors were.

A.   Generally speaking, it was total compensation,

1    investment experience, years at Putnam, and performance

2    ratings, of which there were two ratings.

3    Q.   Okay.  And we won't cover it again, but before the

4    break, I think you said one of the things you didn't

5    look at was their actual investment experience because

6    you didn't have that kind of data?

7    A.   That's correct.

8    Q.   So whether they were hitting home runs or singles or

9    making outs, you didn't have that kind of data?

10   A.   Right.  We tried to get that but were not able to

11   get it.

12   Q.   And the other kind of data that you didn't have is

13   when you looked at investment experience, for example,

14   am I correct that -- let's just take two hypothetical

15   people and let's say they were each -- before they came

16   to Putnam, they each had ten years of experience.

17   A.   Of investment experience.

18   Q.   Of investment experience.  Are you with me?

19   A.   Yes.

20   Q.   Let's say during the ten years one of them had been

21   promoted at this other firm one time.  Okay?

22   A.   Okay.

23   Q.   And another one at their firm had been promoted

24   four, five times, appeared to be a superstar.

25   A.   Right.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    Q.    Okay?

2    A.    Okay.

3    Q.    And maybe were in the office of the CEO, right-hand

4    man to the CEO, okay?

5    A.    Okay.

6    Q.    Now, if the only metric you're using here is years

7    of investment experience, that just completely drops

8    out?

9    A.    What do you mean, it drops out?

10   Q.    Well, the one who had a much higher position before

11   they ever got to Putnam.

12   A.    That's right.  And we would -- I don't want to open

13   up a can of worms, but we would try to get their work

14   history for these individuals.  And we asked for that

15   information; it was not provided by Putnam.

16   Q.    Well --

17   A.    And that would have --

18   Q.    Hold on.

19   A.    That would have captured that.

20   Q.    It was -- you know that there was -- did you get

21   some data last November?

22   A.    Yes, I did.

23   Q.    Okay.  Now, in addition -- by the way, when you were

24   doing these particular compensation and other analyses,

25   did Mrs. Svensson give you information for how much --

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1   let's say 2002 -- bonus money was allocated per team to

2   divide up?

3   A.   I don't remember getting that information.

4   Q.   And would you agree with me that if a certain team

5   got more bonus money to divide up than another team, it

6   was likely that at least some of the people on team A

7   would get bigger bonuses than at least some of the

8   people on team B?

9   A.   Right.  We would like to have controlled for that.

10  Q.   And you were not able to?

11  A.   We asked for that type of information; we were not

12  able to get it.

13  Q.   And I take it you also did not control for the

14  performance of what the Core teams were in 2002?

15  A.   When you say "performance," you mean financial --

16  Q.   Investment performance.

17  A.   Again, we tried to get that, and we asked for it,

18  but it was not provided.

19  Q.   Now, in addition to that, when you did your cohort

20  analysis, I think you said you used -- one of the

21  metrics you used were manager ratings.

22  A.   Yes, sir.

23  Q.   Now, let's just -- just so that I can maybe have a

24  chance of thinking about it, let's just use a military

25  analogy for a moment.  And I don't know, but let's

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    assume that enlisted people and officers are rated at

2    the end of a year on a five-point scale.

3    A.    Okay.

4    Q.    Okay?  Would you agree with me that if I'm a

5    sergeant, I'm going to get reviewed at the end of the

6    year, and say I get a 3.5.

7    A.    Okay.

8    Q.    Okay?  Let's assume somebody else is a colonel,

9    okay?

10   A.    Okay.

11   Q.    And she at the end of the year gets a 3.5.  Okay?

12   A.    Okay.

13   Q.    Now, we've each gotten a 3.5, correct?

14   A.    Correct.

15   Q.    But you know that we're not doing the same thing?

16   A.    Absolutely.

17   Q.    And so to measure my 3.5 as a sergeant against a

18   colonel's 3.5 doesn't tell me anything.

19   A.    That's -- well, I wouldn't say that it doesn't tell

20   you anything --

21   Q.    You're correct.  It tells you that I'm doing okay as

22   a sergeant, she's doing okay as a colonel.

23   A.    That's right.

24   Q.    Okay.  But in terms of comparison to each other, it

25   doesn't tell you very much?

1   A.   If we were doing statistics on that, we would want

2   to control for the job that somebody is in.

3   Q.   So if I wanted to say or try to present a case that,

4   look, there is a female, there is a woman who's getting

5   paid more than I am, look, I got a 3.5, I'm a sergeant,

6   she's a colonel, she got a 3.5, you as a labor economist

7   would tell me that's not a good comparison?

8   A.   And I would say let's look at other factors.

9   Q.   Right, because there's an obvious difference in that

10  case that would account for the difference if there were

11  a difference in pay; namely, difference in rank?

12  A.   Difference in rank, difference in experience.  I

13  would want to look at a lot of different factors.

14  Q.   Right.  So that when we talk about it, and you use

15  manager ratings, we would need to know, among other

16  things, were the responsibilities of the people being

17  compared similar?

18  A.   Right.

19  Q.   If they were managing money, were they, for example,

20  managing the same amount of money?  Was somebody's

21  portfolio four times bigger than the other person's?

22  A.   That's right.

23  Q.   Was somebody's manager an easier grader than

24  somebody else's manager?

25  A.   That's a possibility, too.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    Q.    And there are a whole host of other factors?

2    A.    Yes, there are.

3    Q.    Okay.  Now, even on that basis, with all of those

4    sort of unstated variables, you did a cohort analysis, I

5    think you said, to figure out where Mrs. Svensson --

6    what percentile in compensation Mrs. Svensson was

7    among -- not the entire research department, but just

8    the list of names she chose?

9    A.    The list of names she believed were responsive to

10   the Court's order.

11   Q.    Well, you never had a list of the entire Global

12   Equity Research department, right?

13   A.    We asked for the entire investment division.

14   Q.    But you never had -- you never worked off the entire

15   research department.  You started out with a subset that

16   was chosen by Mrs. Svensson, correct?

17   A.    That's correct.

18   Q.    And then what you did is you narrowed that -- that

19   subset chosen by Mrs. Svensson, you narrowed it somewhat

20   to be in compliance with the Court -- what you

21   understood the Court's order to be?

22   A.    That's correct.

23   Q.    But the original universe that you were working from

24   and which you narrowed was chosen by Mrs. Svensson?

25   A.    And early on in the case we asked for data.

1      THE COURT:  Can I see you at sidebar?

2      (At sidebar on the record.)

3      THE COURT:  I obviously was not handling the

4  immediate discovery issues, because it was handled by

5  the magistrate judge; but is it, in fact, true that

6  initially you asked for everything in the investment

7  management division and we required her to list

8  comparators?

9      MR. MOLONEY:  What he's trying to do --

10      THE COURT:  No, no.  Let me start with you.  Did

11  you ask for everything in the investment management

12  division?

13      MR. MOLONEY:  Yes, early on we did, back in '05.

14      MR. KOCIUBES:  No, what they asked for was the

15  entire company.

16      MR. MOLONEY:  No, we didn't; we changed, we

17  changed it to the --

18      THE COURT:  Excuse me.  And then what happened

19  when we boiled it down to investment management

20  division, you said, get me the comparators, right?

21      MR. KOCIUBES:  We had a hearing before Judge

22  Bowler -- some of this was referred to you.  Your Honor

23  has in papers given to you on an appeal from --

24      THE COURT:  Maybe.

25      MR. KOCIUBES:  No, no.  But the way it worked,

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    your Honor, is there was an objection to what we deemed

2    to be an overbroad request.  There was, then, a dispute

3    over 91 that they chose.  We at every step of the way

4    screamed to the magistrate judge that it was the wrong

5    universe, they were not appropriate comparators, and

6    some of that you may recall.  They insisted on the 91.

7    We then resolved that by saying, okay, here are the 91.

8            They've had the entire universe since November,

9    in any case.

10           MR. MOLONEY:  That's entirely misleading.

11           THE COURT:  Excuse me.  Did you have everything

12    from the investment management division, portfolio

13    managers?

14           MR. MOLONEY:  What happened was we asked

15    originally for a lot.  Before the December 13th hearing,

16    it was reduced to exempt people, cutting out hundreds of

17    people.

18           Putnam took the position that Mrs. Svensson had

19    virtually no comparators, trying to analogize the

20    investment --

21           THE COURT:  Right, they took too narrow, you

22    took too broad, and I narrowed --

23           MR. MOLONEY:  Because they were holding back, we

24    identified some comparators; they reserved the right to

25    disagree with the comparators.

1     THE COURT:  All right.  I think I understand.

2     (End of discussion at sidebar.)

3     MR. KOCIUBES:  There are transcripts on some of

4     this stuff, your Honor.

5     THE COURT:  As I understand it, the discovery

6     disputes -- before trial, you get an opportunity to ask

7     for documents from the other side.  And, as I understand

8     it, because there's a magistrate judge who is another

9     kind of judge who handled this discovery dispute -- and

10    I was just trying to understand here what happened.

11    There was a broad request for many documents from the

12    investment management division, and there was a back and

13    forth with Putnam saying it was too broad, and the

14    magistrate judge went back and forth and then narrowed

15    it.

16    So that's what he's referring to, that he had

17    asked for more and didn't get it.  It is, in fact, true

18    that the 91 or so comparators were given because a

19    magistrate judge basically told Putnam to -- excuse me,

20    Mrs. Svensson to narrow the people that she designated.

21    Just so you understand what happened back and

22    forth.  They don't totally agree on their memories of

23    what happened, and I wasn't there, so I just wanted you

24    to understand what he's talking about.  He asked for a

25    certain amount of documents, they said no, no, way too

1  broad.  They asked -- wanted to give a narrow piece and

2  went back and forth, and this how the magistrate judge

3  handled it.

4       Maybe you all can give me some documents later

5  on to refine it, but I just want you to understand what

6  he means when he says, We asked Putnam for, so you can

7  understand this both with his credibility and the basis

8  for his decision.

9       MR. MOLONEY:  We'll supply whatever you need,

10  your Honor.

11       MR. KOCIUBES:  As will we.

12  BY MR. KOCIUBES:

13  Q.   Dr. White, we were talking about the cohort analysis

14  you did among the universe of analysts in GER whose

15  compensation you looked at.  Do you recall just that

16  conversation a moment ago?

17  A.   Yes, sir.

18  Q.   All right.  And did I hear your testimony correctly

19  that within that selected as refined cohort or just

20  listing of people, that Mrs. Svensson was at the 50

21  percentile mark in total compensation?

22  A.   Among the analysts themselves.

23  Q.   Analysts?

24  A.   Yes, sir.

25  Q.   That's where she was working in 2002?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    A.    Yes, sir.

2    Q.    Okay.  And meaning that -- and I'm rounding off by a

3    percent, obviously, but half of the people that she was

4    being compared to made more money and half of the people

5    she was being made -- comparing herself to made less

6    money?

7    A.    That's correct.

8    Q.    And how many total people were you comparing her to?

9    A.    Total people in this instance was, I believe, eight.

10   Q.    Okay.  So that was the universe.  It wasn't 57, it

11   was eight?

12   A.    Eight analysts, yes.

13   Q.    And of those eight, she made -- she was right smack

14   in the middle?

15   A.    Exactly.

16   Q.    Fiftieth percentile?

17   A.    Exactly in the middle, yes.

18   Q.    And am I also correct that among the -- there are a

19   couple of people, I guess, that didn't have managers

20   ratings, but of the ones who had managers ratings, when

21   you lined her up, she was at exactly the 50th percent?

22   A.    She was, yes.

23   Q.    She was at 50 percent for compensation and 50

24   percent for manager rating among the analysts?

25   A.    That's correct, yes.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    Q.    And from that data, of course, I take it you drew no

2    conclusion one way or the other?

3    A.    No, I just let the numbers speak for themselves.

4    Q.    Okay.  You said you did a representation of the

5    females in the investment management division?

6    A.    Yes, sir, I did.

7    Q.    And again, that -- as per what Judge Saris just

8    indicated, that started originally with a universe of

9    91, and then was sort of refined further in light of her

10    Honor's ruling?

11    A.    No, sir.  That one, I believe, came from the officer

12    directory data.

13    Q.    So you didn't make allowances for titles or anything

14    else in that one?

15    A.    Let's make sure we're talking about the same

16    analysis.  Can you be more specific on which one you're

17    asking about?

18    Q.    I'm asking about your testimony.  And you said you

19    did an analysis, you testified -- I thought I heard you

20    -- about the representation of females in the investment

21    management division?

22    A.    Female officers in the investment management

23    division, yes, sir.

24    Q.    And you did this refined analysis over the last day

25    or two?

1    A.   No, sir, this was one that was for my report.

2    Q.   That was one that never changed?

3         THE COURT:  So you should know, I simply said

4    for the purposes of compensation, not for the other

5    issues in this case; that for purposes of compensation,

6    he shouldn't consider the CIO.

7    BY MR. KOCIUBES:

8    Q.   Now, let me get your original report out.

9         When you did that -- and you gave us some

10   percentages of what happened between 1998 and 2002, was

11   it?

12   A.   Yes, sir.

13   Q.   And am I correct -- did you make any allowance

14   either for men or women for voluntary departures?

15   A.   Again, the data that's in the officer directory, as

16   you correctly referred to it, was essentially a phone

17   book.  If somebody drops out of that, we don't have the

18   information on why they dropped out.

19   Q.   Okay.

20   A.   Again, we asked for that from Putnam, and we weren't

21   provided.

22   Q.   And am I correct that the only place you found

23   between 1998 and 2002 a statistically significant

24   decrease was among the senior vice president ranks?

25   A.   That's the only officer title that had a

Page 113

1  statistically significant decrease.

2  Q.   Okay.  And am I also correct --

3       MR. MOLONEY:  Your Honor, I don't think he was

4  through with his answer.

5       THE COURT:  Were you done?

6       THE WITNESS:  No, ma'am.

7       THE COURT:  All right, go ahead.

8  A.   There were a couple of other officer titles that had

9  a decrease, and they would have also contributed to the

10  statistically significant decrease we saw across all the

11  officers.

12  Q.   But with respect to the individual categories,

13  associate -- AVP, vice president, senior vice president,

14  managing director, the only place by itself where you

15  saw a statistically significant decrease is in the

16  senior vice president ranks?

17  A.   That is correct.

18  Q.   Okay.  And am I correct that during the entire time

19  period, 1998 through 2002, Mrs. Svensson was a senior

20  vice president?

21  A.   That's my understanding.

22  Q.   So that in her case, she never lost that title and

23  at that point, at least, she hadn't left?

24  A.   I don't know about the early and the late years, but

25  it's been my understanding that she was a senior vice

1  president during most, if not all, that time.

2  Q.   And am I correct that when you did your report on

3  this subject, you added -- you added a caveat?

4  A.   Yes, I did.

5  Q.   On page 9 of that original report?

6  A.   Yes.

7  Q.   And am I correct that you recognized that the

8  representation rates of females are the combined effects

9  of various employment decisions made by both management

10  and the employee, such as hires; promotions; demotions,

11  both voluntary and involuntary; terminations, both

12  voluntary and involuntary; and lateral transfers?

13  A.   That's correct.  If we're looking at the percent

14  female in a group, the percent of a group in this case,

15  investment division officers who are female, from year

16  to year, again, we didn't have the reason why the

17  numbers changed from year to year, and so all we can

18  observe is that the percentage decreased over time.  We

19  don't know if it's because of promotions or demotions or

20  terminations, or new hires can effect that percentage as

21  well.

22          MR. KOCIUBES:  I have no other questions, your

23  Honor.

24          MR. MOLONEY:  I just have a few, your Honor.

25

1              REDIRECT EXAMINATION

2    BY MR. MOLONEY:

3    Q.   Dr. White, the date of your submission of your

4    original report in this case was what?

5    A.   March 14, 2007.

6    Q.   And at some point thereafter did you obtain some

7    additional data that Putnam provided?

8    A.   I did, yes.

9    Q.   And do you recall when that was?

10   A.   It was towards the end of 2007, November, December.

11   Q.   And so when you said data was not provided, you were

12   indicating that it had been asked for by our side but

13   not provided by the other side?

14   A.   That's right.  At least I had asked for it; we had

15   never received it.  And even the data we received in

16   November, December of 2007 didn't address a lot of the

17   questions that I was just asked, why people left, you

18   know, whether something was deemed by Putnam as a

19   promotion or demotion.  So even that supplemental

20   information didn't provide the information I was looking

21   for.  It didn't have investment performance.  So it was

22   really just the same type of information but maybe for

23   more people.

24   Q.   When you said, "the same type of information", you

25   mean the same type of information that it provided for

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

Page 116

1   the magic 91, but this was the same type of information

2   just with some more people?

3   A.   It's my recollection, yes.  Like job title and

4   compensation levels.

5   Q.   Now, if someone went from analyst to associate

6   director of research, would you consider that a

7   promotion?

8          MR. KOCIUBES:  Objection.

9          THE COURT:  I'll sustain that as phrased.

10         I'll allow him to discuss why he treated things

11  one way or another.

12  BY MR. MOLONEY:

13  Q.   Did you treat a position change from an analyst to

14  associate director of research as a promotion or a

15  demotion?

16  A.   Again, I would have to see the data to see, A, if

17  that ever happened; and, B, how we treated it.  On the

18  surface it sounds like it would be a promotion.

19  Q.   And if one went from performing the job of associate

20  director of research and managing people and doing

21  research and went to a position where the work only was

22  that of an analyst, would you deem that would be a

23  demotion?

24         MR. KOCIUBES:  Objection.

25  A.   Same answer.

1    THE COURT:  Overruled.

2  A.   I'd have to look at the data to see how we treated

3  that, if it happened.  But on the surface, it sounds

4  like it would be a demotion.

5    MR. MOLONEY:  Nothing further, your Honor.

6                  RECROSS-EXAMINATION

7  MR. KOCIUBES:

8  Q.   Did you take any steps to try to figure out whether

9  going from managing people to analyst was within the

10  organization treated as a demotion?

11  A.   I don't recall whether we looked at -- we looked at

12  the data that we were provided to see if there was any

13  support for that being a demotion, for example, a

14  substantial change in pay.

15  Q.   That's what you would look for, right, would be like

16  changes in pay and perhaps change in officer title?

17  A.   Right, change in officer title would be one.

18  Although I don't recall seeing any decreases in officer

19  title.

20    MR. KOCIUBES:  No further questions.

21    THE COURT:  Thank you.

22    THE WITNESS:  Thank you.

23    THE COURT:  I think at this point we were going

24  to put Mr. Tibbets back?

25    MR. MOLONEY:  Yes, your Honor.

1          THE COURT:  Is that right?

2          Thanks.  You're still under oath.

3          RICHARD TIBBETTS having been previously duly

4     sworn by the Clerk, was further examined and testified

5     as follows:

6                   CONTINUED DIRECT EXAMINATION

7     BY MR. MOLONEY:

8     Q.   Mr. Tibbets, I'm going to put this document that we

9     were looking at, you and I, before we broke for

10    Dr. White, back up, just so that all of us can kind of

11    remember where we were.

12         Can you see that on the screen or do you need

13    the original?

14    A.   Well, I think I can see it.

15    Q.   We went over this in some detail, but I just wanted

16    to reorient us back to where we were before the break.

17         Now, let me just quickly, and correct me if I'm

18    wrong, the top right-hand corner with the arrow pointing

19    left to right, heading down is your initials with the

20    dates January 12, 13th of 2000?

21    A.   Yes.

22    Q.   And the information about Mrs. Svensson is shown on

23    this somewhat redacted document?

24    A.   Yes.

25    Q.   Okay.  And this would be looking back on her work in

1    the calendar year 1999; is that correct?

2    A.    1999, that's correct.

3    Q.    Okay.  And the numbers on the bottom proceeding from

4    the far right, it's a five, it's a five, it's a five,

5    printed, and then it comes to a 4.8 printed?

6    A.    From the right, yes.

7    Q.    And then proceeding to the left, there are some

8    handwritten strikeouts and the number three.

9    A.    Yes.

10   Q.    Okay.

11            (Pause.)

12   Q.    Let me show you this document, if you will.

13            I'm showing you some pages of a document and ask

14   if you, despite the redactions on it, if you could tell

15   us what it is?

16            (Pause.)

17            MR. KOCIUBES:  Your Honor, can we know what the

18   witness is looking at, your Honor?

19            THE COURT:  You can go up and look if you want.

20            MR. MOLONEY:  It's 144.

21            MR. KOCIUBES:  144?  Thank you.

22   A.    There's actually two different documents here, it

23   looks like, two different reports.  Did you mean to do

24   that?  Is that --

25   Q.    Well, let me come over there and take a look.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1   A.    These are similar, and that's --

2         (Discussion off the record.)

3   Q.    Now, I understand, Mr. Tibbetts, that you recognize

4   some of the pages in that document?

5   A.    I don't remember them specifically, but it certainly

6   is very consistent to the look and makeup of documents

7   that were spreadsheets.  This doesn't have at least

8   those PRM kind of numbers, so I don't know --

9   Q.    Well, there's a -- if I may, there's not a document

10  number that begins with the sequence PRM, but there are

11  numbers, for example, on the first page, 2380.

12  A.    Right.  So that's the same thing.

13  Q.    It's a number without a letter prefix.

14  A.    Okay.

15  Q.    And just in case you're shown a document with an LS

16  prefix, LS prefix would indicate a document produced by

17  Mrs. Svensson.

18  A.    Okay, okay.

19  Q.    I think that's a number that also was used by Putnam

20  to identify documents produced by Putnam.

21        Now, this document is considerably redacted, is

22  it not?

23  A.    Yes.

24  Q.    Okay.  And a redaction means hiding the information

25  that -- hiding some of the information that was on the

1    original --

2        MR. KOCIUBES:  Objection to characterization,

3    your Honor.

4        THE COURT:  Sustained.

5    BY MR. MOLONEY:

6    Q.   Do you see the word "redacted" there, Mr. Tibbetts?

7    A.   Yes.

8    Q.   What's your understanding of that word?

9    A.   That there's some information that's not being

10   shown.

11   Q.   Okay.  Now, sir, if you look at -- is there a date

12   in the top right-hand corner in a tiny little print?

13   A.   Yes.

14   Q.   What is the date?

15   A.   Two, or February 10th of 2000.

16   Q.   Now, if you'd look at the next page, which would be

17   number 2381.  Do you see that page?

18   A.   I do.

19   Q.   And is there some information reported there with

20   respect to any then-Putnam employee?

21   A.   Yes.

22   Q.   What Putnam employee is there information about?

23   A.   Lisa Svensson.

24   Q.   And she's designated as a portfolio manager?

25   A.   Her functional title is, yes.

Page 122

1    Q.    Senior vice president?

2    A.    That's her officer title, yes.

3    Q.    Hire date, July 18, 1994?

4    A.    Yes.

5    Q.    Superior investment performance?

6    A.    Yes.

7    Q.    And revised rating, what is that number?

8    A.    Three.

9    Q.    Now, you said that some of the pages in that package

10   of documents don't belong with the others.  Can you

11   identify the numbers of the pages that do belong

12   together and the numbers of pages, on the other hand,

13   that do not belong in that document?

14   A.    Well, so the first one is the same that we just

15   looked at, and then 238 -- the second page -- 2381, the

16   second page of that report, to 2382, 2383, 2384, 2385,

17   2386, 2387 all the way to 2389 is this report that's

18   recommend sheets sorted by incentives, sorted by total

19   incentives.

20   Q.    Now, on the pages you said belong together running

21   from 2380 to 2389, the information is redacted for

22   everybody but Mrs. Svensson?

23   A.    Yes.

24   Q.    And how is this document, pages 2380 to 2389, in its

25   unredacted form utilized by and at Putnam?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    A.    I don't know about this report specifically.  I

2    don't have a specific memory of this report.  This is --

3    we produced a lot of reports during the year-end

4    compensation review process that look like this, but I

5    don't remember this report specifically.  But how we use

6    these kind of reports was to look at investment

7    performance or investment professionals' performance, I

8    should say, and determine what the compensation awards

9    would be.

10   Q.    Utilizing the information that's on the form?

11   A.    This form and multiple other reports, yes.

12   Q.    Okay.  So some of the information that you would

13   have used were the comments about her investment

14   performance?  That would have been some of the

15   information that would enter the decision-making

16   process?

17   A.    Well, what I was -- what I was just referring to, I

18   was referring to this kind of report.  The other report

19   that we looked at before that had the profile

20   information.  And we would actually look at reports that

21   are similar to the ones which are on the back of this,

22   which had compensation history.

23   Q.    Okay.  But the one we're talking about right now,

24   that would be part of the pool of information that would

25   be looked at to make a decision?

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    A.    Yes.

2    Q.    And they would rely on it, would they not, for

3    information about her hire date, what her functional

4    title was?

5    A.    Yes.

6    Q.    And for whether she had superior investment

7    performance or below-par investment performance?

8    A.    Yes.

9    Q.    And for what her manager's rating was?

10    A.    Yes.  All of those things were factors.

11    Q.    Okay.

12         THE COURT:  Can I see you at sidebar just one

13    second?

14         (At sidebar on the record.)

15         THE COURT:  I received another note from the

16    jurors, and I was kind going to wait to give it to you

17    at the lunch break, but it occurred to me they may be

18    referring to this guy, which is basically whether or not

19    the Putnam personnel has looked at the list of

20    comparators.

21         MR. KOCIUBES:  The answer is we have seen them.

22    I have not seen the revised list before I started

23    cross-examination.

24         THE COURT:  The revised list is just knocking

25    out the CIOs.

1          MR. KOCIUBES:  Yes, we saw the 90.

2          MR. MOLONEY:  Yes, we gave them information

3    about it.

4          THE COURT:  Excuse me.  He's asked this

5    question, so the question is how you want to handle it.

6          (Discussion off the record.)

7          MR. MOLONEY:  Yeah, sure.

8          MR. KOCIUBES:  The answer is yes.

9          THE COURT:  So I think I'll answer that.

10         MR. MOLONEY:  Yes.

11         THE COURT:  Rather than focus on it.  I think --

12    it's just gotten a little confusing here.

13         MR. KOCIUBES:  Sure.

14         MR. MOLONEY:  Okay.

15         (End of discussion at sidebar.)

16         THE COURT:  So another juror asked a question.

17         "Was the list of comparators which was provided

18    by Svensson to Dr. White reviewed by Putnam personnel?"

19         Yes is the short answer.  I conferred with them

20    to make sure that's completely correct.

21         That's part of that pretrial process where, you

22    know, one side wants the universe of documents, the

23    other side wants to give a little bit, so the magistrate

24    judge tried to come up with a fair solution, and they

25    had full access, both sides, to the 91 proposed

Page 126

1   comparators.

2           And when I say 91, let me just say that, as you

3   know by now, for purposes of compensation, at least

4   based on what I've heard so far, I knocked out the chief

5   investment officers, because I hadn't heard enough that

6   they should be apples and apples comparing.

7   BY MR. MOLONEY:

8   Q.   Let me show you another document, Mr. Tibbetts, it's

9   tab 95; it will be Exhibit 95 if admitted.  The Bates

10  number page is PRM 1793.

11          And my question is whether you recognize that

12  document?

13          (Pause.)

14  A.   Yes, I do recognize this.

15  Q.   Let me just get it on the screen so that the Court

16  and the jury can -- well, I'll move the document so that

17  whatever part we're talking about will be on the screen.

18  Just doesn't quite all fit.

19          You recognize this document as what, sir?

20  A.   It was a listing of the officer nominations within

21  the investment division, and I believe this was in early

22  2000, based on that date in the bottom left corner.

23  Q.   The 2/24/00?

24  A.   Correct.

25  Q.   And again, this is partially redacted?  It's got the

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    word "redacted" there.

2    A.    Yes.

3          MR. KOCIUBES:  Your Honor, can we just see you

4    for a moment?

5          THE COURT:  This is on --

6          MR. KOCIUBES:  There's an unredacted version of

7    some of these that's been produced.

8          THE COURT:  Well, you can produce it later

9    rather than take the time now, if you want to

10   substitute.

11         MR. MOLONEY:  If there's -- we don't object to

12   the unredacted.

13         THE COURT:  Sure, so we'll substitute it later.

14         MR. MOLONEY:  If that's the case.

15   BY MR. MOLONEY:

16   Q.    Now, it says "officer nominations" at the top of the

17   page, Mr. Tibbetts?

18   A.    Yes.

19   Q.    Okay.  And on the left, there's a column that's

20   indicated with "name" and below that "managing

21   director."  Do you see that?

22   A.    Yes.

23   Q.    All right.  What's the significance of the words

24   "managing director" under "name"?

25   A.    Well, I believe -- I don't know for certain, but my

Page 128

1   assumption, based on this report and how we have

2   historically done things, is that this was the group

3   that was being nominated for manager director.  In the

4   sections it looks that's unredacted would have been the

5   senior vice president recommendations and the vice

6   president --

7   Q.   Okay, that's all right.

8        So this would have been a process that began

9   after the first of the year 2000 and continuing into

10  February?

11  A.   That's correct.

12  Q.   Reflecting back on the year and the work done in

13  calendar year in 1999?

14  A.   Yes, although the officer nomination process was a

15  little bit -- I guess the tail end of the compensation

16  or recognition process, where we paid bonuses and made

17  salary adjustments typically in either the -- typically

18  February at this time, or March; and then in April, we

19  made officer, new officer promotions.  So this was the

20  tail end of that process.

21  Q.   And so this document would indicate that, among

22  others, Ms. Svensson was in the pool for decision-making

23  as to whether she'd be elected or appointed managing

24  director at this time?

25  A.   Well, all senior vice presidents, I guess, were

1    certainly in the pool, but this specifically was a list

2    of people that were being nominated by their managers.

3    Q.    Okay.  So it's a total of ten people of which she

4    was one?

5    A.    That were being nominated, yes.

6    Q.    That were being nominated.

7          And not all that were nominated were ultimately

8    directed or appointed, were they?

9    A.    Not this year, no.

10   Q.    You see the words "no," "no," and "no"?

11   A.    I do.

12   Q.    Those are in handwriting, are they not?

13   A.    They are.

14   Q.    Do you know whose handwriting it is?

15   A.    It looks like mine.

16   Q.    And the column that says "promotion to" for these

17   ten folks, they include Mr. Boselli, Mr. Jeffrey

18   Lindsey, Ms. Elizabeth MacElwee Jones, Michael Mufson,

19   Yomiko Sai, Leo Smith, Lisa Svensson, Rosemary Thomsen,

20   Manny Weiss and Michael Yogg, correct?

21   A.    That's correct.

22   Q.    And there were three nos on there, no to Boselli, no

23   to Svensson and no to Yogg; is that right?

24   A.    That's correct.

25   Q.    Now, there's a circle -- well, let me start it this

1    way:  There's a rating column?

2    A.    Yes.

3    Q.    And there's a circle around -- there's a circle

4    around 3.0 for Ms. Svensson.  Is that circle your

5    handwriting?

6    A.    On this original document I don't have a circle --

7    oh, it's over here.  Okay.  I don't know.

8    Q.    The nos are yours, though, in your handwriting?

9    A.    It looks like my handwriting.

10   Q.    Okay.  And the numbers under the column rating would

11   indicate that was the manager rating information that

12   was sent in for the decision makers; is that correct?

13   A.    Well, I think that would have been the overall

14   rating.

15   Q.    Not the manager's rating?

16   A.    Correct.

17   Q.    What is the overall rating?

18   A.    Well, sometimes we collected information -- remember

19   that other category we had where we had multiple

20   ratings, we had a manager rating, we had trend and --

21   Q.    Right, and Ms. Svensson had five, five, five, and

22   five going from left to right?

23   A.    She did, that's correct.  So there was that

24   information, plus there was also investment performance

25   ratings, and that then was rolled up to an overall

1    rating.

2    Q.   So you're drawing a distinction between manager

3    rating and the rating on this sheet?

4    A.   Yes.  This doesn't say manager rating.  Typically if

5    it was manager rating it would have said manager rating.

6    If it was just rating, my assumption would be it was the

7    overall rating.

8         THE COURT:  So what year was this?

9         THE WITNESS:  This was in early 2000, so it

10   would have been the overall ratings for '99.

11        THE COURT:  So explain to me again how she has

12   3.0 here but 5, 5, 5 for her other ratings.  Do you

13   know?

14        THE WITNESS:  I don't know.  There are -- there

15   are multiple inputs into the process, and I don't recall

16   what happened in early 2000, eight years ago.

17        THE COURT:  All right, you don't know.

18        THE WITNESS:  Right.  I mean the process, how it

19   could have happened was there was a process we went

20   through where the group took a look at the overall

21   ratings, looked at manager ratings, and we did that

22   comparison across the groups, so looking at the easy

23   graders and tough graders and sometimes adjusted scores

24   and rolled that up also with the investment performance

25   ratings and came up with the overall ratings.  So it is

1    not unusual to have a different number for the manager

2    rating and then the overall rating.

3    Q.    You told us, did you not, that the rating on the

4    Exhibit Number 144 was the manager rating, did you not?

5    A.    I don't know what -- what was Exhibit 144?

6    Q.    That was the document that was redacted numerous

7    pages that had the --

8    A.    The one we were just looking at here?

9    Q.    Right.  It had the information only about

10   Ms. Svensson?

11   A.    All of them have had that.

12          So the one I just looked at had a three and the

13   one we were looking at before had the manager rating, I

14   think, of 4.8.

15   Q.    And the -- on page 2381, the rating is a three?

16   A.    Yes.  And this says "revised rating" in the column

17   that says a three.

18   Q.    I thought you had testified before that that was the

19   manager rating.

20   A.    I -- this a revised rating.  I thought the manager

21   rating you were talking about before was on that --

22   where we did the performance profile, where it had

23   multiple ratings, that clearly said manager rating, then

24   it talked about trend and --

25   Q.    Right, 5, 5, 5 and there was a 4.8 or 4.78?

1  A.   Right, that was the manager rating.

2  Q.   All right.  Thank you.

3        MR. MOLONEY:  Your Honor, I move that this

4  document with the PRM 1793 that the witness has been

5  looking at be admitted.

6        MR. KOCIUBES:  No objection to the document, but

7  there is a circle that's not on the original.

8        THE COURT:  I'll allow it in and you can

9  substitute it.

10        THE WITNESS:  This one doesn't have it, so if

11  this is the one --

12        MR. MOLONEY:  Your Honor, the problem here is

13  the unredacted document doesn't have the "nos" on it,

14  the handwriting.

15        THE COURT:  We'll figure it out later.  It's in.

16  We'll figure out what it is.

17        We'll move on, try to finish.  Do you think you

18  can finish him by the break?

19        What number, Robert, 145?

20        THE CLERK:  No.

21        MR. MOLONEY:  I think it was 95.

22        THE COURT:  All right.  95.  Let's try to pick

23  up some steam here.

24        (Exhibit  95 received into evidence.)

25  BY MR. MOLONEY:

1    Q.    Let me show you another document, it's number 140.

2          I'm showing you a package of documents,

3    Mr. Tibbetts.  Take as much time as you need so you can

4    tell me if you recognize the document.

5          (Pause.)

6    A.    Okay.

7    Q.    Do you recognize it?

8    A.    Yes.

9    Q.    Can you tell the Court and jury what it is?

10   A.    This is the copy of the Putnam Manager Handbook from

11   November of 1997.

12   Q.    And this was the -- this is a paper document,

13   correct?

14   A.    Yes; it was at that time, correct.

15   Q.    At some later point the document was not distributed

16   in paper but was available on computer electronically?

17   A.    Right, it was out on the internet.

18   Q.    Okay.  Now, did human resources play any part in the

19   drafting of this document?

20   A.    Yes.

21   Q.    And did you play any personal role in the drafting

22   of this document, in either by drafting or supervising

23   or assisting in some other manner?

24   A.    Well, I know that I didn't supervise it back in '97.

25   I may have participated in some of the policy reviews,

1    but I don't recall any specific activity.

2    Q.   Okay.  And in '97 your position was what?

3    A.   I think in '97 I was -- I think at that time I was

4    still the director of compensation and benefits and HR

5    systems.

6    Q.   And your position changed at some point after that?

7    A.   Yes.

8    Q.   To what and when?

9    A.   I'm fuzzy on the dates here, but after that I became

10   the senior HR representative for the investment

11   division.

12   Q.   When was that, sir?

13   A.   I don't know the exact dates of that.

14   Q.   Well, your best memory of that date.

15   A.   I probably would say like '98.

16   Q.   Okay.

17   A.   And then after that -- well, actually, first it was

18   not just the investment division, it was a broader group

19   that I was also doing recruiting for, in addition to

20   servicing the investment organization.  I was

21   responsible for recruiting people at more senior levels

22   across the company.

23        And then I just focused exclusively on the

24   investment organization as the HR representative for the

25   investment division.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1      And then in 2004 I became the head of human

2  resources.

3  Q.   Okay.  But in those various capacities, you have

4  from time to time reviewed the contents of the Putnam

5  Manager Handbook?

6  A.   Yes.

7  Q.   Okay.  Now, if you would -- no, if you'd turn to the

8  page that's marked PRM 00574, please, that's within the

9  document.

10      Do you see that page?

11  A.   I do.

12  Q.   And that concerns termination of employment?

13  A.   Yes.

14  Q.   And let me read what's written underneath the word

15  "policy,"  and you correct me if I read this

16  incorrectly.

17      "Employment with Putnam has no specified term or

18  length, employees are free to resign at any time.

19  Alternatively, Putnam may terminate employment for

20  reasons permissible by law.  The process outlined below

21  describes Putnam's termination process for both

22  voluntary and involuntary terminations."

23      Did I read that correctly?

24  A.   Yes.

25  Q.   Now, there's a highlighted paragraph among the

1    paragraphs under "things you need to know."    And let me

2    read that paragraph, and you correct me if I read this

3    incorrectly.   It's the second paragraph that's

4    highlighted in yellow.

5              "In the event of involuntary termination, you

6    MUST" -- and must is in all caps -- "consult with human

7    resources prior to terminating an employee.   The

8    employee's supervisor must submit a recommendation to

9    his/her manager and then to human resources describing

10   the specific reasons for the termination.   The human

11   resources representative will investigate the situation

12   to make sure those reasons are valid.   In most cases,

13   with the exception of situations viewed as Major

14   offenses -- and that's initial cap on major and initial

15   cap on offenses -- the Employee Corrective Process

16   should be followed before making a decision to

17   terminate.   See the previous section for a full

18   description of the Employee Corrective Process."

19             Did I read that correctly?

20   A.   Yes.

21   Q.   Now, if you would turn, please, to page 00590?

22   A.   59?

23   Q.   00590.

24             Do you have that page in front of you?

25   A.   I do.

1    Q.    Directing your attention to the fourth paragraph

2    from the bottom of the page.

3          Do you have that in front of you?

4    A.    Yes.

5    Q.    Let me read -- go along with me to make sure I read

6    it correctly.

7          "The code of conduct" -- that's in the second

8    paragraph -- "The code of conduct is intended to inform

9    employees at all levels about professional behaviors and

10   acceptable conduct to which each of us will be held

11   accountable at Putnam.  Below are listed some of

12   Putnam's standards for appropriate business conduct.

13   Adherence to these standards will help us create a

14   positive and productive work environment.

15         "Employees are expected to treat each other with

16   professional courtesy, dignity and mutual respect.

17   Specifically, employees are expected to use language and

18   behave in a manner that is appropriate for a business

19   setting.  The use of profanity, off-color jokes, or

20   harmful references to physical characteristics, gender,

21   race, age, personal lifestyle, sexual preference, or

22   ethnic background is unacceptable and will not be

23   tolerated ."

24         Did I read that correctly?

25   A.    Yes.

1    Q.    "You are expected to treat your colleagues, peers,

2    and subordinates in a courteous and respectful manner at

3    all times.  Putnam will not tolerate unlawful harassment

4    of any nature.

5              "This includes verbal abuse, physical abuse

6    and/or sexual harassment."

7              Did I read that correctly?

8    A.    Yes.

9    Q.    Now, if you turn, sir, to page 00597.

10             Do you have that?

11   A.    Yes.

12   Q.    There's a section called "performance reviews."

13             Do you see that?

14   A.    Yes.

15   Q.    Let me read the paragraph under "performance

16   reviews" and before policy, and correct me if I read

17   this incorrectly.

18             "Performance reviews help to ensure that

19   everyone is working toward the same end.  They are

20   vehicles for conveying the mission and goals of the

21   company to your employees.  Once everyone understands

22   these goals, you may evaluate his or her performance

23   against those goals and the standards established within

24   your department.  Performance reviews can also be used

25   to effectively plan for the department goals of the

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1    future.  An employee is more likely to succeed when he

2    or she is clear about the expectations and has the

3    necessary tools."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   Now, under the word "policy," let me read this.

7         "Putnam employees should receive a formal

8    performance review at least annually, but you are urged

9    to conduct informal performance discussions on a more

10   regular basis.  Your division may recommend more

11   frequent written appraisals as well.  Newly hired

12   non-exempt employees will receive a formal performance

13   review six months from their date of hire.  (See salary

14   administration for information on salary increases.)"

15        What does the reference to non-exempt employees

16   mean?

17   A.   That's people that are eligible for overtime.

18   Q.   Okay.  And investment professionals in the

19   investment management division would be called exempt

20   employees?

21   A.   Yes.

22   Q.   Because they wouldn't be entitled for overtime?

23   A.   They are not entitled --

24   Q.   They are paid for 24/7, 365?

25   A.   They are not eligible.

1    Q.    Are they paid for 24/7?

2    A.    No.

3    Q.    Nineteen?

4          You don't have to answer.

5          Let me turn to the section of the document

6    that's called "Employee Corrective Process" --

7          THE COURT:  So why don't you do this and then

8    we'll break until tomorrow.

9          MR. MOLONEY:  I'm coming to the end of this

10   document, your Honor, would be a good point.

11   BY MR. MOLONEY:

12   Q.    You see page 645?  It will be toward the end of that

13   package, actually.

14   A.    Yes.

15   Q.    And this is called the "Employee Corrective

16   Process"?

17   A.    Yes.

18   Q.    And it indicates, does it not -- do you see where I

19   have the yellow highlighting?

20   A.    Yes.

21   Q.    And those are what are referred to in the manual or

22   the handbook "the steps in the formal process are the

23   following."  Do you see that?

24   A.    Yes.

25   Q.    So the first step is a verbal warning?

Page 142

1    A.    Yes.

2    Q.    Does that mean having a conversation with somebody,

3    oral?

4    A.    Yes.

5    Q.    Okay.  Using words, but oral, not writing it down?

6    A.    Yes.

7    Q.    Okay.  And then the next step after that would be a

8    written warning?

9    A.    Yes.

10   Q.    And that would be writing something down, an e-mail,

11   a letter or a memo?

12   A.    Yes.

13            THE COURT:  Can I ask, is this just for

14   discharge or is it also for other employment actions?

15            THE WITNESS:  It's intended for all types of

16   purposes, so both -- improving a specific performance

17   issue, it could be everything from attendance to

18   performance.

19   BY MR. MOLONEY:

20   Q.    And the third step in this sequence is final written

21   warning?

22   A.    Yes.

23   Q.    Now, if you turn the page to 646.  And the -- that's

24   the formal steps in the Employee Corrective Process?

25   A.    Yes.

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2

1  Q.   And this is further elaboration on the use of verbal

2  or oral warnings, second phase are written warnings,

3  third phase are final written warning and separation?

4  A.   Yes.

5  Q.   And this gives details and instructions for the

6  appropriate officials at Putnam to deal with these

7  issues?

8  A.   Yes.

9  Q.   Now, if you turn, sir, to page 647, and that

10  includes additional detail for the final written warning

11  and separation?

12  A.   Yes.

13  Q.   And if you turn to page 649, can you tell us what

14  that page gives information about?

15  A.   It's an example of a written warning.

16  Q.   So the Putnam handbook includes a model written

17  warning for use by them to carry out the instructions in

18  the Employee Corrective Process?

19  A.   Yes.

20       MR. MOLONEY:  Thank you.

21       THE COURT:  Okay.  See you tomorrow.

22       THE CLERK:  All rise for the jury.

23       (Jury left the courtroom at 1:03 p.m.)

24       THE COURT:  I'll see counsel at sidebar on the

25  record.

1          (At sidebar on the record.)

2          THE COURT:  At some point you're going to have

3    to recap for me what the claims are that you have in and

4    which claims are out.

5          MR. MOLONEY:  We understand we have to do that.

6          THE COURT:  Because I'm trying to write

7    instructions and I'm having an incredibly difficult

8    time.

9          Is there any general breach of contract claim

10   still in here?

11         MR. RODRIQUES:  No, your Honor.

12         MR. MOLONEY:  I don't think so, no.

13         THE COURT:  And is there still a failure to

14   promote claim?

15         MR. MOLONEY:  Yes, your Honor, for the positions

16   that came open on or after May 6th of whatever.

17         THE COURT:  Anyway, you're going to let me know

18   all of these things when?  Monday -- by tomorrow?

19         MR. MOLONEY:  No, we're going to get the amended

20   or revised supplemental jury instructions in hopefully

21   this afternoon.  We have a draft, we just have to look

22   at it.

23         THE COURT:  Okay.

24         MR. MOLONEY:  We'll give you a memo on those

25   other points.

1           THE COURT:  Okay, that's great.  Why don't we go

2      off the record.

3           (Court adjourned at 1:05 p.m.)

4

5                 - - - - - - - - - - - -

6                     CERTIFICATION

7           We certify that the foregoing is a correct

8      transcript of the record of proceedings in the

9      above-entitled matter to the best of our skill and

10     ability.

11

12     /s/ Lee A. Marzilli

13     Lee A. Marzilli, RPR, CRR

14

15     /s/Debra M. Joyce

16     Debra M. Joyce, RMR, CRR

17

18

19     Official Court Reporters

20     May 22, 2008

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

b66c86cb-63fe-4ae2-aa93-7b7e23f8edf2