Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


LISA SVENSSON,              )
                           )
              Plaintiff    )
                           )
        -VS-               ) CA No. 04-12711-PBS
                           ) Pages 1 - 141
PUTNAM INVESTMENTS, et al, )
                           )
              Defendants   )



JURY TRIAL - DAY NINE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE






United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 23, 2008, 9:15 a.m.






LEE A. MARZILLI and DEBRA M. JOYCE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

5136613a-5505-4158-904c-7cee74f62aa6

1  A P P E A R A N C E S:

2      KEVIN F. MOLONEY, ESQ. Barron & Stadfeld, PC,
   100 Cambridge Street, Suite 1310, Boston, Massachusetts,
3  02114, for the Plaintiff.

4      JOHN K. WEIR, ESQ., John K. Weir Law Offices, LLC,
   300 Park Avenue, Suite 1700, New York, New York, 10022,
5  for the Plaintiff.

6      JOSEPH L. KOCIUBES, ESQ., LOUIS A. RODRIQUES, ESQ.,
   ALLYSON E. KURKER, ESQ., and JENNIFER L. HOLDEN, ESQ.,
7  Bingham McCutchen, LLP, 150 Federal Street, Boston,
   Massachusetts, 02110, for the Defendant, Putnam Investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2   WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3   Richard Tibbetts       4        60

4   EXHIBITS                      PAGE

5   Plaintiff's

6   140                          13

7   115                          17

8   177                          21

9   178                          23

10  191                          29

11  206                          36

12  207, 210                     39

13  221                          41

14  228                          57

15  52                           102

16  59                           104

17  80                           108

18  5                            114

19  4                            124

20  3                            125

21

22

23

24

25

P R O C E E D I N G S

1

2       THE COURT:  Is the jury all here?  Why don't you go

3  and check if the jury is all here.  Did you need to see me on

4  anything?

5       MR. MOLONEY:  Not right now, your Honor.

6       THE COURT:  That's what I thought.

7       (Jury enters the courtroom.)

8       THE COURT:  Good morning.  Did anyone speak about

9  the case or see anything in the press?  I find the jury has

10  complied.

11       I think, Mr. Tibbetts, were you still on the stand,

12  I think?

13       THE WITNESS:  Yes, I was.

14                    RICHARD TIBBETTS

15  having been previously duly sworn, was examined and testified

16  further as follows:

17  CONTINUED DIRECT EXAMINATION BY MR. MOLONEY:

18  Q.   Good morning, Mr. Tibbetts.

19  A.   Good morning.

20       MR. MOLONEY:  Robert, can you turn this on, please

21       (Discussion off the record.)

22  Q.   This is Page PRM 645, Mr. Tibbetts, out of the manager

23  handbook.  There's a copy of what we were looking at

24  yesterday, the handbook, and the yellow sticker on it

25  indicates that from that particular copy, this Page 645 is

1    missing.  So I'm going to ask you just to look at the screen,

2    and we're going to replace that incomplete copy by virtue of

3    that one page with a complete copy including that page when

4    it comes time to mark that as an exhibit.

5          So if you could just look at the information on the

6    screen above Page 645.  Do you recognize this as being a part

7    of the Putnam handbook?

8    A.    The manager handbook, yes.

9    Q.    Yes, okay.  And speaking of the manager handbook, you

10   indicated yesterday that for some period of time it was

11   published in paper format and then thereafter electronically?

12   A.    Yes.

13   Q.    Okay.  And am I correct in understanding that the paper

14   handbook or the electronic version of it is the same, and

15   that the provisions and policies and directions in the

16   handbook, whether in paper or electronic format, were

17   applicable at Putnam in the period 1997 through September of

18   '03?

19   A.    Generally that's true.  Throughout that time period,

20   there were edits and modifications made to the handbook.

21   What those specifically were, I don't know.  But this was

22   published, the paper copy, in 19 -- I think '97 was the

23   letter covering this.  And so I know that there were many

24   changes.  I don't know exactly when and what those specific

25   changes were.  When it was in paper, it was a published

1  piece.  When it was electronic, just minor changes were made

2  as they were needed, so I don't know when those changes were.

3  Q.   Were there any changes of substance, or was it just

4  editing or formatting?

5  A.   There may have been some changes that were substantive,

6  you know, but I don't think they were around the corrective

7  process, okay.  I think they were, you know, holiday changes

8  sort of things.

9  Q.   Okay, and would I be correct in understanding that the

10  questions I asked of you and the answers that you gave

11  yesterday in connection with this handbook were as to

12  directions and policies that were applicable in the period

13  1997 to September of '03?

14  A.   Yes.

15  Q.   Okay.  And so we're looking now on Page 645 at the

16  Employee Corrective Process?

17  A.   Yes.

18  Q.   Okay, and there were, like, four steps:  a verbal

19  warning, meaning an oral warning.  I think you testified

20  yesterday to that?

21  A.   Yes.

22  Q.   Okay, and then a written warning stage, a final written

23  warning stage, and then a separation stage; is that correct?

24  A.   Yes.

25  Q.   Now, let me just read along, and you correct me if I'm

1    reading this incorrectly:  "In administering the Employee

2    Corrective Process --" that's under the word highlighted

3    "Separation" -- "you should be guided by the following," and

4    then I'll read the bullet points:  "Ensure employees have a

5    clear understanding of the company policies and procedures."

6            Next bullet point:  "Employees should always be

7    given a chance to discuss their performance or conduct

8    problems with you before they enter the formal disciplinary

9    process."

10           Next bullet point:  "Discipline cannot be

11   selective.  If you're working on a performance or conduct

12   problem with one employee through the Employee Corrective

13   Process, you should be sure that other employees in your work

14   group with similar problems are being treated in a like

15   manner."

16           Next bullet point:  "Employees should not

17   experience any surprises.  Any form of performance or conduct

18   discrepancy should be addressed in a timely manner in order

19   to ensure that the employee has the opportunity to remedy the

20   performance/conduct discrepancy as soon as possible.  Your

21   failure to do so may imply tacit approval of the employee's

22   unsatisfactory conduct/performance."

23           Next bullet point:  "During the informal counseling

24   sessions, you must work with the employee to develop a

25   written action plan to improve performance."

5136613a-5505-4158-904c-7cee74f62aa6

1    Next bullet point:  "Employees can only be placed

2  on one warning at any given time that must encompass all

3  existing violations.  Every warning must include the

4  following language:  'Failure to adhere to all company

5  policies may lead to further disciplinary action up to and

6  including termination.'"

7    Next bullet point:  "Persistent performance or

8  conduct problems should be worked through the successive

9  steps in the Employee Corrective Process.  Steps should be

10  bypassed only when the offense is very serious (see section

11  on major offenses) or when the employee repeats unacceptable

12  performance or behavior for which he/she has already been

13  warned."

14    Next bullet point:  "Putnam supports a dual role

15  for the Human Resources representative.  Your Human Resources

16  representative serves both you and your employee in the

17  Employee Corrective Process.  It is expected that the Human

18  Resources representative will assist both of you in

19  presenting your viewpoints and will see that the progressive

20  steps of this process are applied fairly and consistently."

21    Did I read all that correctly?

22  A.   It was tough to read from this, but I followed along,

23  yes.

24  Q.   Okay.  And then the next section sets out the formal

25  steps, and under "Verbal Warning" -- and we understand that

1    to be an oral communication, is that correct?

2    A.    Yes.

3    Q.    "The verbal warning is the first step in the Employee

4    Corrective Process and is used when counseling discussions

5    have not been successful in correcting the problem.  Prior to

6    placing an employee on verbal warning, you must consult your

7    Human Resources representative to review the situation.  Only

8    minimal documentation describing the nature of the discussion

9    is needed.  The period of verbal warning may be as short as

10   30 or as long as 90 calendar days, depending on

11   circumstances.  While on verbal warning, the employee is not

12   eligible for merit increases and/or transfers.  If an

13   employee's performance problem is due to insufficient skills

14   to do his/her job, transfer to a position requiring skills

15   that the employee possesses may be considered."

16            And then the next part is "Written Warning."

17            "Written warning is the second step in the

18   Employee Corrective Action Process.  It is used when the

19   performance/conduct problem has not been corrected during the

20   verbal warning period.  Prior to placing an employee on

21   written warning, you must consult your Human Resources

22   representative to review the situation and to prepare formal

23   documentation (see sample warning attached).  Depending on

24   the circumstances, the period of written warning may be as

25   short as 30 or as long as 90 calendar days."

1    THE COURT:  You know, maybe if you just had it up

2    there and we'll all read it to ourselves.

3        MR. MOLONEY:  Okay.  I'll just pop it up on the

4    screen.

5        THE COURT:  Just state what you're putting up there

6    and you want us to read.

7        MR. MOLONEY:  Okay, this is Page 647.  You can see

8    on the --

9        THE COURT:  And you'll have all this in the jury

10    room.

11        MR. MOLONEY:  You can see there in the lower

12    right-hand corner, and this is Page 647.  The rest of what I

13    had just been reading is at the top of the page, and if you

14    could read the first four lines at the top of the page and

15    then read what's under "Final written warning, separation,"

16    which is that highlighted paragraph, and then there is a

17    listing of the major offenses that was referred to on the

18    prior page.

19        (Witness examining document.)

20        MR. MOLONEY:  I'll turn the page when everybody's

21    ready.

22        THE COURT:  All right, go ahead.

23        MR. MOLONEY:  Should I turn it now?  This is the

24    very next page.  It's No. 648.  You can see that in the lower

25    right-hand corner.  And the top of the page with those bullet

1    points starting with "Insubordination" is the rest of the

2    list of the major offenses that began the definitions on the

3    prior page, and I'd ask you to read that bullet point list of

4    the rest of the major offenses, and then read the highlighted

5    paragraphs under the word "Suspension" that's also

6    highlighted in yellow just below.

7              (Witness examining document.)

8              MR. MOLONEY:  I have one more page in this book,

9    your Honor, when everybody's ready.

10             THE COURT:  Okay, go ahead.

11   Q.   Could you turn, Mr. Tibbetts, to Page 519, please.  It's

12   the PRM number page document.

13             MR. KOCIUBES:  And there's a relevance objection to

14   this, your Honor.

15             THE COURT:  To what?

16             MR. KOCIUBES:  This section.

17             THE COURT:  The one on sexual harassment?

18             MR. KOCIUBES:  Yes.

19             THE COURT:  Yes, sustained.

20             MR. MOLONEY:  Your Honor, may I be heard on that?

21             MR. KOCIUBES:  Could we take it down while it's --

22             THE COURT:  Take it down, yes.

23   SIDE-BAR CONFERENCE:

24             THE COURT:  What are you doing here?

25             MR. MOLONEY:  I want to read their policy that

Page 12

1  defines -- well, there's equal opportunity.  That I think

2  ought to come in.  And then there's a definition of this

3  which includes -- let me just turn the --

4          THE COURT:  There's been no evidence of sexual

5  harassment.

6          MR. MOLONEY:  Well, we're not contending that there

7  is.  This one here:  "Subjecting others to --"  All right.

8  "Using offensive language in a situation where," and so

9  forth.  Now, there's been testimony that --

10          THE COURT:  Under 403, the objection is sustained,

11  but you can talk about the equal employment opportunity

12  section.

13          MR. KOCIUBES:  Fold the page over, as opposed to

14  showing the jury --

15          THE COURT:  They're not dumb.  They know this isn't

16  about sexual harassment.

17          (End of side-bar conference.)

18          THE COURT:  Let me just say, this case has nothing

19  to do with sexual harassment.  He's doing it for the equal

20  employment opportunity section at the top, and that's what

21  you should be reading.

22  Q.   Do you have that page in front of you, Mr. Tibbetts?

23  A.   Yes.

24  Q.   Page 519, let me just read that matter that's

25  highlighted at the top on the equal employment opportunity:

Page 13

1    "Putnam has a strong commitment to providing equal

2    employment opportunity.  Specifically, it is our policy to

3    higher, promote, and maintain terms, conditions, and

4    privileges of employment in a manner that does not

5    discriminate unlawfully on the basis of age, race, creed,

6    color, religion, national origin, ancestry, sex, marital

7    status, sexual orientation, citizenship status, disability or

8    veteran status.  Our Human Resources policies and practices

9    comply with both the letter and the spirit of Title VII of

10   the Civil Rights Act of 1964 and all other applicable

11   federal, state, and local legislation.  We encourage you to

12   bring any perceived violation of this policy to our attention

13   immediately.  Please contact your Human Resources

14   representative with your concerns."

15          Did I read that correctly?

16   A.   Yes.

17          MR. MOLONEY:  Your Honor, I move that the handbook

18   be admitted as the next exhibit.

19          THE COURT:  Allowed.  What number?

20          MR. MOLONEY:  I think we need that from Mr. Alba.

21   No, I'm sorry.  It's No. 140.

22          (Plaintiff Exhibit 140 received in evidence.)

23   Q.   I'm showing you a document, Mr. Tibbetts, and ask you to

24   look at it and tell me if you recognize the document.

25          (Witness examining document.)

1    MR. KOCIUBES:  Can we just be told what the

2    document is, your Honor, by reference to the number?

3    MR. MOLONEY:  Oh, it's No. 115.

4    (Witness examining document.)

5    A.   I don't remember this document specifically, but it

6    certainly looks like, you know, one of our year-end

7    performance ratings spreadsheets, an Excel document.  The

8    heading is missing on this, so I don't -- there's three

9    different reports.  It looks to be similar information sorted

10   by group, and then by rating, and then in alpha order.

11   Q.   Okay, so there are three parts to this package:  a group

12   sort, a final rating sort, and an alphabetical sort?

13   A.   Yes, and this appears to be for the year 2001.

14   Q.   Okay.  And there is a date on the first page, PRM 3360,

15   of 1/16/02?

16   A.   Yes.

17   Q.   Okay, so these would be a group rating and an

18   alphabetical sorts of officers in the Investment Division

19   looking back from the point of view of January, '02, to the

20   calendar year '01?

21   A.   It appears very, very short for everybody in the

22   Investment Division because there's only one, two, three

23   pages, so --

24   Q.   Well, there are a number of redactions.

25   A.   Well, yeah, unless there's a page missing, it doesn't

1    look like it's the whole division is all I'm trying to say.

2    Q.   Okay.  And does this indicate that people were analyzed

3    alphabetically and by group and by rating across teams in the

4    Investment Division?

5    A.   I don't think so, no.  I mean, what -- what these

6    reports -- we had collected data, you know, performance

7    ratings or compensation information, and it was very common

8    for us to sort it a lot of different ways for ease of finding

9    people, not necessarily really for comparison purposes.  So

10   alpha was for ease of finding someone.  Group might be to,

11   okay, so we could go to a specific group.  These were

12   primarily generated in Human Resources for our use when

13   talking with managers or talking with senior management.

14   Q.   Well, the group sort includes people in Large Cap Value,

15   for example, if you look on Page 3362?

16   A.   Yes.

17   Q.   And U.S. Core?

18   A.   Yes.

19   Q.   Small Cap Core?

20   A.   Yes.

21   Q.   Global Core

22        (Witness examining document.)

23   A.   Well, you said -- there's an International Core.  Is

24   that what you're saying?

25   Q.   Well, there's an International Core, and then there's

1    some folks in Global Core just below it, Mr. --

2    A.    Oh, I'm sorry, there's one person there, yes.

3    Q.    Mr. Makino and then Mr. England and Mr. Anthony Sellitto

4    on Page 3362, Large Cap Growth?

5    A.    That's Large Cap Growth, yes.

6    Q.    Right, okay.  And then on the next page on 3363, there

7    are some folks from International Growth?

8    A.    Yes.

9    Q.    Mrs. Svensson, Mr. Dexter, and Mr. Hadden are listed

10   there?

11   A.    Yes, Hadden, Dexter, and Svensson, yes.

12   Q.    Okay.  So the HR folks used reports like this for what

13   purpose, sir?

14   A.    Well, as I said, it's for working with the managers in

15   finalizing their ratings, making sure we have that input into

16   the system.  We would use these spreadsheets to upload

17   information into the human resource system.  We would also

18   use this when turning around reports for the managers when

19   they made their compensation recommendations.

20   Q.    And would these reports be given or made available to

21   those various managers?

22   A.    Yes.

23          MR. MOLONEY:  Your Honor, I move that that be

24   admitted as No. 115.

25          MR. KOCIUBES:  Objection as to relevance, your

Page 17

1    Honor.

2              THE COURT:  Overruled.

3              (Plaintiff Exhibit 115 received in evidence.)

4              MR. MOLONEY:  Next would be No. 177.

5    Q.   I'm showing you some other documents, Mr. Tibbetts,

6    No. 177, and ask if you recognize that.

7              (Witness examining documents.)

8    A.   Yes, I do.

9    Q.   And can you tell us what it is?

10   A.   Yes.  There are two different reports in this document

11   as well --

12             MR. KOCIUBES:  Objection, your Honor.  May we be

13   heard before it's used or shown?

14             THE COURT:  It's different from the last

15   objection?

16             MR. KOCIUBES:  Yes, and I think if you see it,

17   you'll understand the issue.

18   SIDE-BAR CONFERENCE:

19             THE COURT:  So I think his objection here is that

20   there are partners that are mentioned.

21             MR. KOCIUBES:  Partners, CIOs, their compensation,

22   they're not comparators.

23             THE COURT:  But are there other people in here that

24   are comparators?

25             MR. MOLONEY:  Oh, yes.  Oh, yes.

5136613a-5505-4158-904c-7cee74f62aa6

1    THE COURT:  Then overruled, and I'll tell them that

2    they are not.  But, listen, is this all for purposes of the

3    expert?  It's just the foundation for his damage thing?

4    MR. MOLONEY:  And on the compensation claim and

5    damages.

6    MR. KOCIUBES:  This expert does not use this stuff,

7    your Honor.  And to show them big numbers of partners and

8    then tell them to ignore it --

9    MR. MOLONEY:  We don't care about the partners.

10    You've ruled those out.

11    THE COURT:  Yes, but don't put it on the screen.

12    Just admit it, and you'll then black them out.  But we've got

13    to pick up the speed here, you know?

14    MR. MOLONEY:  Can I just point out where she is on

15    this list, what number?

16    THE COURT:  Yes, and then black out the partners.

17    MR. KOCIUBES:  This is where she is on her list of

18    91.

19    (End of side-bar conference.)

20    THE COURT:  Let me say again -- I feel like I'm

21    repeating myself -- there are a lot of people on this list

22    who I've ruled are not comparators, and that's what he's

23    objecting to fairly, in that some of those are partners, and

24    she wasn't a partner.  All right, so we're going to black out

25    those names, but it does include a lot of people who

5136613a-5505-4158-904c-7cee74f62aa6

1    plaintiff is contending is a comparator, and they disagree,

2    and you're going to have to make that decision.  So that was

3    what the objection was.  So we're going to black out the

4    names of people who aren't, you know, where she is, but leave

5    in people, for example, in the various teams for her claim of

6    unfair compensation.

7              MR. MOLONEY:  Thank you, your Honor.

8    Q.   Mr. Tibbetts, I can't quite remember if you told us what

9    this document is.

10   A.   I was just about to start.

11   Q.   Okay, go ahead.

12   A.   So that there are two different reports.  These are

13   reports that we used when we were doing that review with

14   Marsh & McLennan that I spoke about yesterday.  So in the

15   review process, there was a final review when we would go to

16   New York and we would share with the senior management team

17   the compensation levels for everybody at Putnam.  So

18   literally we would submit reports for everybody throughout

19   the entire company, all at that time 5,000 people for formal

20   approval.

21              And these were what I would call more summary

22   reports for more highly compensated people.  This captured, I

23   believe, all the people that were in the partners plan that

24   we talked about yesterday and the A & P plan, or the

25   associates and principals plan.  So for 2001, this detailed

Page 20

1   all 440 people, and this was sorted high to low for their

2   review.

3           And then the second report is the people that --

4   well, actually I should clarify.  This first report is for --

5   Q.   I don't mean to cut you off, but just for purposes of

6   helping us to understand report number one from report number

7   two, if you could just read the Bates number page it starts

8   at and ends at for report one, and then beginning and ending

9   Bates numbers for report number two.

10  A.   Sure.  So the first report -- there are actually two

11  different years here too, so the first one starts on

12  PRM 03196, and that is headed "Putnam Investments 2001 Total

13  Compensation Sorted High to Low."

14  Q.   And there's a date on the top right-hand corner of

15  8/8/2002?

16  A.   Yes.  I should clarify, all that means is the last time

17  this was printed, so it's not --

18  Q.   Okay.  And that ends on Bates page what?  It would be

19  3221?

20  A.   Let's see here.  PRM No. 03220.  And then the second

21  report begins on PRM 03221 and ends on PRM 03226.  And this

22  is also another kind of report that we would share with Marsh

23  & McLennan which captured the highest 100 paid people.  We

24  call it the top 100.  And so the heading was "2002 Top 100

25  Total Incentive Recipients."  This also says "without the

Page 21

1    operating heads," which were the very most senior people, as

2    they were detailed in another report.

3            And this also continues on saying "Includes value

4    of Putnam and MMC options," so this is including cash that we

5    spoke about yesterday, and it also includes the equity

6    grants, restricted stock as well as options.  And it was the

7    top 100 people in the organization, excluding the top about

8    ten people.

9            MR. MOLONEY:  Your Honor, I move that that be

10   admitted as No. 177, subject to the limitations.

11           THE COURT:  Yes, subject to the redactions, fine.

12           MR. KOCIUBES:  Just note the objection.

13           THE COURT:  Overruled, subject to the redaction of

14   people who aren't comparators.

15           (Plaintiff Exhibit 177 received in evidence.)

16           MR. MOLONEY:  And No. 178 is the next one.

17   Q.   I'm showing you some additional documents,

18   Mr. Tibbetts.  Would you look at those and tell me if you

19   recognize them.

20           (Witness examining documents.)

21   A.   I do.

22   Q.   And can you tell us, please, what it is.

23   A.   This was a report that was used within the Investment

24   Division when Human Resources was working with the chief

25   administrative officer in preparing for the allocation of the

5136613a-5505-4158-904c-7cee74f62aa6

Page 22

1  bonuses from the Investment Division allocation.  And what we

2  did was capture where individual employees were rated and how

3  people were positioned on an ordinal rank within their

4  groups.

5  Q.   And the period of time for which this document was

6  prepared is what, sir?

7  A.   Well, the dates appear January 11 of 2002, and the

8  heading is "2001 E," or estimated, I assume is what the E is,

9  "A & P Incentive Compensation Projections."  And this is a

10 quartile sort, so this is for the 2001 compensation paid in

11 early 2002.

12        MR. MOLONEY:  Your Honor, I'm not going to put this

13 up on the screen because even though it's redacted, there is

14 information about people on the Value Group.

15 Q.   But could you look to Page 3376 --

16        MR. KOCIUBES:  Hold on.  Just note the objection,

17 2001 comp.

18        THE COURT:  Overruled.

19 Q.   If you turn to Page 3376, Mr. Tibbetts, and do you see

20 Nos. 57 and 58 at the bottom of the page?

21 A.   Yes.

22 Q.   And 57 is Mr. Dexter?

23 A.   Yes.

24 Q.   Senior Vice President, International Growth, with a 2001

25 manager rating of 3.5?

Page 23

1    A.    Yes.

2    Q.    And below that is Mr. Peter Hadden, Senior Vice

3    President, International Growth, 3.5?

4    A.    Yes.

5    Q.    And if you turn the page to 3377, No. 64, Manuel Weiss,

6    manager rating of 3.5, correct?

7    A.    Yes.

8    Q.    Richard England, Large Cap Growth, rating of 3.5?

9    A.    Yes.

10   Q.    Lisa Svensson, Senior Vice President, International

11   Growth, rating 3.5?

12   A.    Yes.

13           MR. MOLONEY:   Your Honor, I move that that be

14   admitted subject to the limitations on the previous

15   document.

16           THE COURT:   All right.

17           MR. KOCIUBES:   No objection to the portions he

18   read.   There are objections to the other portion.

19           (Plaintiff Exhibit 178 received in evidence.)

20           MR. MOLONEY:   The next would be No. 191.

21   Q.    I'm showing you another document, Mr. Tibbetts, and let

22   me know if you recognize the document.

23           (Witness examining document.)

24   A.    I don't remember it specifically, but I recognize it as

25   an e-mail to me.

Page 24

1   Q.    And it's from Ms. Sherry Holder-Watts to you, Richard

2   Tibbetts?

3   A.    Yes.

4   Q.    And did you receive it on or about the date indicated,

5   04/26/2002?

6   A.    I don't remember, but I don't have any reason to believe

7   I didn't.  I just don't remember.

8   Q.    All right, let me put that up on the screen.  And

9   there's a yellow sticky showing to the right, which is just

10  intended to cover up a note I made on this copy of the

11  document.  The subject is "PM."  Does that stand for

12  portfolio manager in the world of Putnam?

13  A.    Yes.

14  Q.    And the subject is "PM," and it says "LG Cap Growth."

15  Is that portfolio manager in Large Cap Growth?

16  A.    Yes.

17  Q.    Okay.  And then it says "Christine --" who is Christine,

18  by the way?

19  A.    That's referring to Christine Scordato, who was also a

20  member of the Human Resources organization that was

21  supporting the investment team.

22  Q.    "Christine had a good point about not posting some of

23  these PM moves, specifically the Tino Sellitto move and

24  backfilling him.  I need to understand where Steve O is with

25  regard to Lisa Svensson, and if not her, think we should post

Page 25

1    the job."

2              THE COURT:  What number is this?

3              MR. MOLONEY:  This is No. 191, your Honor.

4    Q.   What does not posting some of these PM moves refer to?

5    A.   Well, we have a general policy of posting all open

6    positions, but certainly what happens and is common is that

7    a -- you know, within a certain team, you might move people

8    around and, you know, promote people or move people around

9    from different jobs.  And what this was referring to was

10   moves within Growth, within the subteams, as Steve O was in

11   the process of reorganizing the Growth Team.  And Christine

12   was saying that if we've already planned on specific moves,

13   it doesn't make sense to post a job if we've already got it

14   filled.

15             THE COURT:  So who was Tino Sellitto?  Where was

16   he, and where had he been moved to?

17             THE WITNESS:  Well, Tino Sellitto was Anthony

18   Sellitto.  I believe he was a portfolio manager in the Growth

19   Group, but I don't know exactly at this time in April of '02

20   where he was.

21             THE COURT:  And where was he moved to after the

22   reorganization?

23             THE WITNESS:  I don't know this specifically.

24             MR. MOLONEY:  If I may, your Honor?

25   Q.   Did he go from Large Cap to Small and Emerging Growth?

Page 26

1    A.    I don't know.

2    Q.    More specifically you don't remember?  I mean, you knew

3    at one time, I take it?

4    A.    Yes, I think back in 2002 I knew, yes.

5    Q.    But you just don't recall?

6    A.    I don't recall.

7             THE COURT:  So where was Lisa Svensson at this

8    point?

9             THE WITNESS:  I believe in April of 2002, this was

10   at the time where Steve Oristaglio was saying, okay, we've

11   got to do something based on performance of the Global Growth

12   Team or International Growth Team, and this is at the time

13   where we were firing the CIO, Robert Swift.

14            THE COURT:  So this was part of the

15   reorganization?

16            THE WITNESS:  Yes.

17            THE COURT:  So this e-mail was part of that

18   reorganization we've been hearing about?

19            THE WITNESS:  Well, I think this is tied to it, but

20   the reorganization was really occurring within International

21   Growth, what do we do?  And what this was referring to was

22   where -- you know, I need to understand where Steve

23   Oristaglio is with the reorganization is what the reference

24   to Steve O is here.

25   Q.    What does, in reference to Mr. Sellitto, what does

1  backfilling him mean?

2  A.   Well, that means filling his previous position.  So if

3  you move from, you know, one role to, you know, Role B, if

4  the person moves, do you refill Role A.

5  Q.   All right, so this refers to a movement of Mr. Tino

6  Sellitto from one position in growth to a different position,

7  therefore leaving a vacancy that --

8  A.   Well, that's, I think, specifically the point, is that

9  we don't always back -- it's not an automatic given that you

10  backfill a specific role.  It's very common to not always

11  backfill.

12  Q.   Well, the reference in the first sentence is, "Christine

13  had a good point about not posting some of these PM moves,"

14  which you said indicates a movement of somebody without

15  posting it.  And then she says, Ms. Sherry Holder-Watts says,

16  "Specifically the Tino Sellitto move and backfilling him."

17         So does that not mean that she's saying that

18  Christine Scordato of HR had a good point about not posting

19  some of these PM moves, including the Tino Sellitto move?

20  A.   Well, I think, yes, but if you read on --

21  Q.   Okay.  Then it says, "I need to understand where Steve O

22  is."  Does Steve O refer to Mr. Stephen Oristaglio?

23  A.   Yes.

24  Q.   And what was Mr. Oristaglio's position at Putnam on or

25  about April 26, 2002, the date of the e-mail?

1    A.    I don't know his exact title, but he was the deputy head

2    of Investments and was responsible for all Fixed Income and

3    all of Growth.

4    Q.    Okay.  So he's at least in the decision-making chain of

5    command at Putnam in the Investment Management Division?

6    A.    Yes.

7    Q.    Okay.  Now, "I need to understand where Steve O is with

8    regard to Lisa Svensson," what does that mean?

9    A.    Well, this is at the time when Steve was reorganizing

10   the International Growth Team and we were deciding what to

11   do, and it had been already made the decision that we were

12   going to fire the CIO, Robert Swift; and the question was,

13   were we also going to let Lisa go, or were we going to try to

14   find a different role for her?

15   Q.    Okay, so this is indicating uncertainty on the part of

16   at least Ms. Sherry Holder-Watts, but you hadn't heard as to

17   what decision Mr. Stephen Oristaglio was going to make about

18   whether or not Lisa Svensson was going to be kept on as a

19   portfolio manager or demoted, isn't it?

20   A.    Or fired.

21   Q.    Or fired?

22   A.    Yes.

23   Q.    And then she says, "And if not her," meaning if not Lisa

24   Svensson, "then we should post the job," correct?

25   A.    That's what it says, yes.

1  Q.   And that would imply, would it not, as you read this,

2  that if Steve O was nowhere with Lisa Svensson, and if she

3  were not going to be kept on as a PM, then you would post the

4  job, but that wouldn't be an invitation for Mrs. Svensson to

5  compete for the job, would it?

6  A.   Well, no, because --

7  Q.   Thank you.

8       MR. MOLONEY:   I move that that be admitted, your

9  Honor.

10      THE COURT:   Yes.

11      MR. MOLONEY:   That was 191.

12      (Plaintiff Exhibit 191 received in evidence.)

13  Q.   I'm going to show you Nos. 206 and 210 at the same

14  time.   They cover the same subject.   I've shown you three

15  series of documents, Tabs No. 206, No. 210, and 207.

16  A.   You also gave me 221.

17  Q.   Just put that aside because that will be coming up

18  next.   Why don't we just take a look at No. 206 first, and

19  when you're ready, just tell me if you recognize the

20  document.

21      (Witness examining document.)

22  A.   I do.

23  Q.   And can you tell us what No. 206 is, please.

24  A.   This is the 1999 succession planning process that we

25  went through.

Page 30

1   Q.   And does this document contain some information about

2   decisions in that regard?

3   A.   Well, it's really an exercise where we went through to

4   really identify individuals and what next roles would be, so

5   I'm not sure -- it wasn't really a specific -- there weren't

6   decisions specifically made.  It was really an assessment of

7   people.

8   Q.   Okay.  And was this prepared by the HR Department?

9   A.   The actual report was, but the content came from the

10  managers.

11  Q.   Okay.  And when it says "1999 Succession Planning," does

12  that mean planning for the year 1999 or planning in the year

13  1999 looking forward?

14  A.   It was during 1999.

15  Q.   But looking into the future?

16  A.   Well, this information captured sort of current status

17  and future.

18  Q.   Okay, so this reflected the current status of the

19  managing folks at Putnam on succession planning looking

20  forward for the next reasonable period of time?

21  A.   Yes.

22  Q.   Okay.  Would you turn to page PRM 14837, please.  And

23  while you do that, I'll just put the first page of the

24  document up on the screen, and then I'll put up Page 14837.

25  And if I could direct your attention to the center column,

Page 31

1    "Long-term job moves."  Do you see that on Page 14837?

2    A.   Yes.

3    Q.   And do you see where it says, and on the screen it's

4    highlighted, "Head of Global Growth"?

5    A.   Yes.

6    Q.   And there's a next column, "Successor"?

7    A.   Yes.

8    Q.   And under that is listed Steve Dexter, Lisa Svensson,

9    and Josh Byrne?

10   A.   That was Steve Dexter?

11   Q.   Yes, Steve Dexter, Lisa Svensson, and Josh Byrne?

12   A.   Yes.

13   Q.   And then to the right of that under "Lead time," it says

14   for Mr. Dexter, 2 years, Lisa Svensson, 3 years, Josh Byrne,

15   3 years.  And then to the right on "Succession Probability"

16   column, it says high, high, and medium.

17          Can you tell us what the 2 years and 3 years and

18   3 years meant as applied to Mr. Dexter, Mrs. Svensson, and

19   Mr. Byrne?

20   A.   Well, I don't know exactly what their thinking was

21   then.  So interpreting it today, it would mean that for this

22   job, the person that this was talking about, these were the

23   possible successors for that person, and the years --

24   Q.   This person would be the head of the Global Growth

25   Group?

5136613a-5505-4158-904c-7cee74f62aa6

Page 32

1    A.    No, I don't -- well, I don't think so.  I think that --

2    Q.    What did head of Growth Group mean at the time?

3    A.    Well, part of this report is not here.  So to the left

4    of this would have been the name of the individual we were

5    assessing, the role that they're currently in, and what their

6    areas for development were, what those specific suggestions

7    might be for those areas of development, where they would go

8    in a short-term move or where they would go in a long-term

9    move.  And then these three people that were successors were

10   identified as successors for the person that we were

11   evaluating.

12            MR. KOCIUBES:  Your Honor, could the jury be

13   shown --

14            THE COURT:  Yes, can you --

15            MR. KOCIUBES:  -- the left side of the document?

16            THE COURT:  That's true, if you just move it over a

17   little bit.

18            MR. MOLONEY:  Oh, sorry.

19            MR. KOCIUBES:  There's still --

20            THE WITNESS:  We're still missing several columns

21   to the left of this.

22            THE COURT:  Do you have those?  If you have those,

23   Mr. Kociubes, you could put them on.

24            MR. KOCIUBES:  Absolutely, unless Mr. Moloney has

25   it.

1          THE COURT:  Why don't you give it right there

2     rather than take the jury time.  I think that's appropriate

3     to see the whole spin across.

4     Q.    Can you see that?

5     A.    I'll struggle along.

6     Q.    Okay.  The name is set there to the left, and that

7     happens to be Kelly Morgan?

8     A.    Yes.

9     Q.    And then looking to the right, it says head of --

10          THE COURT:  So help us.  So you have Kelly Morgan

11    in mind.  She's a senior portfolio manager.  So is she being

12    considered for another job?  Is that what this is about?

13          THE WITNESS:  No.  This was an effort to go

14    throughout the organization, not just within the Investment

15    Division, but when we were in the Investment Division, it was

16    to look at people, see what their weaknesses were, what their

17    strengths were, and develop those weaknesses, where

18    appropriate; and then think about, okay, well, what kind of

19    jobs could they go to in the short term, the next couple of

20    years, and what would be a longer-term kind of move for them

21    that would match for those development needs?  And if they

22    were to leave into one of those other jobs or to leave the

23    firm, who could potentially replace them?

24          And part of this exercise was to identify, you

25    know, what we needed to do to develop people, but also,

1   should someone leave, voluntarily or involuntarily, who would

2   we have to replace them?  And if we didn't have people to

3   replace them, then that created potential actions to say we

4   should recruit some people or needed to develop people to get

5   them ready for those roles.

6   Q.    So does the information on this page mean that

7   Ms. Morgan's position was the one under consideration on this

8   line?

9   A.    For this set of boxes, yes.

10  Q.    Okay.  And then the other people like Steve Dexter,

11  2 years, high, Lisa Svensson, 3 years, high, Josh Byrne,

12  3 years, medium, were being focused on as successors for that

13  position?

14  A.    As potential successors, yes.

15  Q.    Okay.  And what does the period, the 2-year, 3-year,

16  3-year period, what does that mean?

17  A.    That's the time period that, as of the day we were doing

18  the report, the manager thought that those people would need

19  before they were ready to take that job.

20  Q.    And the ratings of high, high, and medium, what does

21  that mean?

22  A.    Well, it's referring to success probability.  So, you

23  know, for example, the Josh Byrne medium refers to, he was

24  more of a growth guy as opposed -- I mean, he was a core guy,

25  core investor as opposed to a growth investor.  So the

5136613a-5505-4158-904c-7cee74f62aa6

1   success of him moving from one style to the next might not be

2   as high as people that are already in the group.  And so both

3   Steve Dexter and Lisa Svensson were already in the group and

4   had a much higher success rate of being successful

5   successors.

6   Q.   Okay.  And the Morgan position was senior portfolio

7   manager?

8   A.   Yes.

9        THE COURT:  And so what happened to these folks

10  during the reorganization?  Do you remember?

11       THE WITNESS:  Well, the CIO was fired.

12       THE COURT:  And Kelly Morgan?

13       THE WITNESS:  Kelly and Lisa went to Research and

14  sort of out of the organization, and Steve Dexter was asked

15  to take over the Global Growth Fund, I believe is what he

16  did, and I'm not sure what happened to the institutional

17  money.

18  Q.   What about Mr. Byrne?

19  A.   Josh Byrne was in another group and stayed in the other

20  group in International Core.

21       MR. MOLONEY:  May that be admitted, your Honor?

22       THE COURT:  What did you just mean when you said,

23  "I don't know what happened to the institutional money"?

24       THE WITNESS:  Well, there were multiple -- my

25  memory is that Steve Dexter took over the lead role for the

Page 36

1    Global Growth mutual fund, but there were other mutual funds,

2    one I think he was already managing and continued to; and

3    then there was money that we were managing for institutional

4    clients that wasn't in mutual funds.  And I believe that went

5    to -- or some of the mutual funds may have also gone to

6    International Core to be managed, where there was a group of

7    people with strong performance.

8            MR. MOLONEY:  Would you turn, if I may, your

9    Honor --

10           MR. KOCIUBES:  If that document was moved to

11   admission, your Honor, I have no objection, but I want the

12   complete document to come in.

13           THE COURT:  Yes.

14           MR. MOLONEY:  That's fine, your Honor.  It's a

15   matter of xerox in landscape as opposed --

16           THE COURT:  That's fine.  What number?

17           THE CLERK:  206.

18           MR. MOLONEY:  That was No. 206, your Honor.

19           (Plaintiff Exhibit 206 received in evidence.)

20   Q.   Turn to No. 210, Mr. Tibbetts, please, and let me know

21   when you have it.  The Bates numbers are PRM 12274 through

22   14795.

23           THE COURT:  How much longer do you have?

24           MR. MOLONEY:  I just have a few more of these

25   documents, your Honor?

5136613a-5505-4158-904c-7cee74f62aa6

1    A.    I have it started where you started, but mine ends at

2    PRM 12391?  Is that what you said?

3    Q.    Oh, sorry.  12391.  And can you tell us what this is?

4    A.    Well, this is -- it starts with an e-mail from someone

5    who's in the training and development area.

6    Q.    That's Jill Koontz?

7    A.    That's Jill Koontz.

8    Q.    K-o-o-n-t-z?

9    A.    Yes.

10   Q.    And you were among the copy of recipients?

11   A.    I don't know whether I was one of the to's or the

12   copies, but I received this.

13   Q.    It lists Richard Tibbetts, does it not?

14   A.    Yes.

15   Q.    And the subject is "2000 Succession Planning Process"?

16   A.    Yes.

17   Q.    Okay.  And the other pages in this package?

18   A.    Well, this is a cover e-mail that has several

19   attachments, and this appears to be one of the attachments,

20   which I believe is the last document, which is the beginning

21   of the 2000 process.

22   Q.    Okay.  And do you have in front of you Pages 14795 and

23   14796?

24   A.    No.  This is 12374 to 12391.

25   Q.    Included in there, are there Pages 14975 after that?

1    A.    Oh, is that the other exhibit?

2    Q.    Not the --

3    A.    Okay, what numbers did you say, 14 --

4    Q.    14795 and 14796.

5         MR. KOCIUBES:  I think that's Plaintiff's 207.

6         MR. MOLONEY:  Oh, sorry.  Yes, 207, I'm sorry.

7    A.    Yes, that's in the back of 207, yes.

8    Q.    Okay.  Do you recognize the document 14795?

9    A.    Okay, so there are multiple documents in this 207

10   exhibit, but the last couple of pages --

11   Q.    I just ask you to look at Pages 14795 and 14796.

12   A.    95 and 96, so these are -- this appears to be two pages

13   from the 2001 process.

14   Q.    Okay.

15   A.    Or partial pages of the --

16   Q.    If you look under 14795.

17   A.    Yes.

18   Q.    I'll just put that up.  And it says "Group head:  Robert

19   Swift"?

20   A.    Not on my exhibit.  I don't have anything on the left

21   side, so --

22         MR. MOLONEY:  Well, if I may, your Honor, approach

23   and let him look at this?

24         THE COURT:  Yes.

25         (Witness examining document.)

1  A.    So this is --

2  Q.    That's 14795.

3  A.    Okay, so this is Stephen and Lisa, okay.  Then this

4  is -- oh, this is the balance of Peter Hadden.  Okay, I see.

5  Okay, yes.

6  Q.    All right.  Now, directing your attention to the page

7  that is 14795, the group head is indicated as?

8  A.    The group head is Robert Swift.

9  Q.    And is Mr. Dexter listed on the left-hand column?

10  A.    Yes.

11  Q.    And the successor on the right-hand side?

12  A.    Is Peter Hadden.

13  Q.    And below Mr. Dexter's name on the left-hand side is the

14  name of?

15  A.    Is Lisa Svensson.

16  Q.    And the successor to her is indicated as?

17  A.    Steve Dexter.

18         MR. MOLONEY:  Your Honor, I'd move that those pages

19  of that 207 and No. 210 be admitted?

20         MR. KOCIUBES:  Again no objection, subject to all

21  the columns being shown.

22         (Plaintiff Exhibits 207 and 210 received in

23  evidence.)

24         THE COURT:  So we haven't seen these, right?

25         MR. MOLONEY:  Sorry, your Honor?  No.  That one did

Page 40

1  not go on the screen because I was showing him my highlighted

2  copy.

3  Q.   Do you have No. 221 there as well?

4  A.   Yes.

5  Q.   You do, okay.  Would you look at No. 221 and tell me if

6  you recognize it.

7        (Witness examining document.)

8  A.   I'm sorry.  What's the question now?

9  Q.   Do you remember the document?

10 A.   I don't actually remember this, but I recognize it as a

11 memo from me.

12 Q.   And this was from Richard B. Tibbetts on April 25, 2002,

13 to Putnam partners?

14 A.   Yes.

15 Q.   And the subject is "Current Investment Division open

16 positions"?

17 A.   Yes.

18 Q.   And can you read what you wrote in the first paragraph

19 of that memo.

20 A.   You want me to read it to myself or out loud?

21 Q.   No.  Read it out loud, if you would, please.

22 A.   "In follow-up to the discussion at last week's partners

23 meeting, Tim Ferguson has asked that I seek your thoughts on

24 potential candidate referrals for any of the open positions

25 within the Investment Division.  Putnam Executive Search, our

5136613a-5505-4158-904c-7cee74f62aa6

1    internal executive recruiting group, is working on all these

2    searches.  Recruiting top investment talent to Putnam is a

3    priority.  Consistently, personal referrals have been the

4    most productive source of candidates and long-term

5    contributors.  The chart below details the positions for

6    which we are currently recruiting."

7    Q.   Now, below that, does this memo that you wrote to the

8    partners indicate a position open as CIO, Large Cap Growth?

9    A.   Yes.

10   Q.   And Large Cap Growth, Steve Oristaglio would be the

11   decision-maker in regard to that job?

12   A.   Yes.

13   Q.   And senior portfolio manager, U.S. Core Growth, another

14   open position?

15   A.   Yes.

16   Q.   And Mr. Paul Warren would be the decision-maker in that

17   regard?

18   A.   Yes.

19          MR. MOLONEY:  Your Honor, I move that that be

20   admitted, please.

21          MR. KOCIUBES:  No objection.

22          (Plaintiff Exhibit 221 received in evidence.)

23   Q.   Now, in or around July, 2002, did Mr. Sandeep,

24   S-a-n-d-e-e-p, Mehta, M-e-h-t-a, leave Putnam?

25   A.   I don't know the timing of his departure.

Page 42

1   Q.   That would have been sometime in 2002?

2   A.   Off the top of my head, I don't recall the timing.

3   Q.   Okay.  Do you know if a Mr. David Gerber replaced him?

4   A.   Off the top of my head, I do not know that, no.

5   Q.   Okay, are you familiar with the name of Michael Stack?

6   A.   Yes.

7   Q.   And did he leave sometime in the summer of '02?

8   A.   I know he left.  I don't know what time he left.

9   Q.   Okay.  Are you familiar with James Yu, Y-u?

10  A.   The name sounds familiar, but I do not know him.

11  Q.   Do you know whether Mr. James Yu took the spot that

12  Mr. Michael Stack had in Core?

13  A.   I don't know that.

14  Q.   Are you familiar with a Mr. Thomas Haslett?

15  A.   Yes.

16  Q.   And was he your chief investment officer, Institutional?

17  A.   Well, my memory was that he had two roles.  One, he was

18  the CIO of Emerging Markets, and then he became the head of

19  the Institutional Portfolio Management Group, which was

20  basically a sales group that partnered with the Investment

21  teams.

22  Q.   And did he leave in 2002?

23  A.   I know he left, but I don't know when.

24  Q.   Okay, did Mr. Richard Cervone fill his slot?

25  A.   Not to my knowledge.

5136613a-5505-4158-904c-7cee74f62aa6

1    Q.    Mr. Cervone you would say was not promoted from an

2    analyst and portfolio manager position?

3    A.    To replace Tom Haslett?

4    Q.    Yes.

5    A.    No.  My understanding was he was -- Richard Cervone was

6    an analyst and a PM, and still is a portfolio manager, but I

7    don't think he ever did anything in Emerging Markets or

8    anything in the Institutional Marketing side.

9    Q.    Are you familiar with a Michael Arends?

10   A.    Yes.

11   Q.    He was a senior portfolio manager?

12   A.    I don't know his title.

13   Q.    You recognize him as a portfolio manager anyway?

14   A.    Yes.

15   Q.    Okay.  Did he leave sometime in '02?

16   A.    Again, I don't know when he left.  I know he left but.

17   Q.    Are you familiar with Mark Bogar?

18   A.    Yes.

19   Q.    And did he fill Mr. Arends' slot, do you know?

20   A.    I don't know that.

21   Q.    Are you familiar with Beth Cotner?

22   A.    Yes.

23   Q.    And she was a CIO, Large Cap Growth?

24   A.    Yes.

25   Q.    In '02?

Page 44

1  A.   I don't know the exact time frame, but, yes, she was a

2  Large Cap Growth.

3  Q.   Okay.  And she was gone at some point, right?

4  A.   Yes.

5  Q.   Did Mr. Brian O'Toole come in from the outside to take

6  her position?

7  A.   Yes.

8  Q.   Anthony Sellitto, that name has been mentioned, he was a

9  senior portfolio manager.  Did he leave the Large Cap Growth

10  in '02?

11  A.   I don't know when he left.

12  Q.   Are you familiar with Tony Elavia?

13  A.   Yes.

14  Q.   Was he moved into the Large Cap Growth Team in '02?

15  A.   I remember him as a quantitative portfolio manager, and

16  he worked in a couple of groups, but I don't know which

17  group.

18  Q.   So you don't know whether or not he backfilled Anthony

19  Sellitto?

20  A.   I would say -- my memory was that he was a quantitative

21  portfolio manager, and those were different roles, so --

22  Q.   But you don't know whether he backfilled on Tony

23  Sellitto?

24  A.   Well, he -- so there's two things we should talk about

25  backfilling.  One is a requisition or a head count that's in

Page 45

1    a team, and the job might be changed.  So, I mean, they did

2    different things.  So from a similar job, I don't think that

3    he took that same job.

4    Q.   But you'd recognize that he went into the Large Cap

5    Growth Group, right?

6    A.   I know he was working in Large Cap, but I don't remember

7    which group.

8    Q.   And you know that Mr. Brian O'Toole began to work in the

9    Large Cap Growth Team?

10   A.    In the U.S. Large Cap Growth Team, yes.

11   Q.   Okay.  And you know that Mr. Manny Weiss began to work

12   in the U.S. and Global Core?

13   A.   Well, my memory was he always was in U.S. Core.  He may

14   have also then started doing some work outside of the

15   U.S. Core Group.

16   Q.   So you're not sure whether Mr. Manny Weiss transferred

17   from Large Cap Growth to U.S. and Global Core?

18   A.   I think you might be using different department names

19   over a period of time.  My memory was that he was in U.S.

20   Large Cap Core, and that's where he always worked.  I didn't

21   think he changed.

22   Q.   Okay.  But you're not sure?

23   A.   I don't have any memory of him changing.

24   Q.   Okay, all right.  And Mr. England moved from Large Cap

25   Growth as a senior portfolio manager into U.S. and Global

1    Core; is that right?

2    A.    I remember him as being in Core.  I don't actually

3    remember him being in Growth, so I just don't remember.

4    Q.    All right, you don't know.  And Mr. David Gerber, do you

5    recognize that he began to work in the U.S. and Global Core?

6    A.    I don't know.  I don't know where he worked.

7    Q.    Do you recognize that he was promoted from portfolio

8    construction specialist to a position in the U.S. and Global

9    Core Team?

10   A.    I don't.

11   Q.    Do you know what portfolio construction specialist

12   means?

13   A.    What it means?

14   Q.    Yes, sir.

15   A.    What the job is?

16   Q.    At Putnam, right.

17   A.    Yes.  Well, so a portfolio construction specialist is

18   someone that typically has a much more quantitative

19   background and is responsible for a specific part of the

20   investment process, which is constructing a portfolio.  And

21   that is, you know, putting together all the different stocks

22   and weighing -- you know, weighting them, making some of

23   those investments larger or smaller based on the overall

24   investment process.  So it's a much more quantitative skill

25   set.

1   Q.   Okay.  Do you recognize that he became a portfolio

2   manager in U.S. and Global Core?

3   A.   I don't remember where he went.

4   Q.   Okay.  And do you recognize that Mr. James Yu came in

5   from the outside to become a portfolio manager in U.S. and

6   Global Core?

7   A.   I remember him coming from the outside, but I don't know

8   to which group.

9   Q.   Okay.  And Mr. Cervone, do you recognize that he began

10  to work on U.S. Global Core?

11  A.   I remember him going into U.S. Core, yes.

12  Q.   Okay.  And Mark Bogar, do you remember that he began to

13  work as a portfolio manager on U.S. and Global Core?

14  A.   I don't remember where he went.

15  Q.   Okay.  And do you recognize that Mr. Brian O'Toole

16  replaced Cotner, Beth Cotner?

17  A.   Yes.

18  Q.   Okay.  And do you recognize that Tony Elavia replaced or

19  filled for Anthony Sellitto?

20  A.   I think you've already asked me this as well as the last

21  one.  I don't know.

22  Q.   Okay.  And Walton, W-a-l-t-o-n, Pearson, are you

23  familiar with that name?

24  A.   Yes.

25  Q.   He was a new hire, was he not?

1    A.    He was.

2    Q.    As a senior portfolio manager?

3    A.    Yes.

4    Q.    And do you recognize Mr. Jeffrey Lindsey?

5    A.    Yes.

6    Q.    And he was a director of Concentrated Growth in '02?

7    A.    I don't know.

8    Q.    Do you recognize that Messrs. O'Toole, Elavia, and

9    Pearson began to work in Large Cap Growth in 2002 and 2003 as

10    portfolio managers or CIOs or directors?

11    A.    Well, I think you've just asked -- so I remember those

12    people.  I don't remember which specific groups they were

13    going into and at what time.

14    Q.    All right.  And Margery Parker, you know who she is,

15    don't you?

16    A.    Yes.

17    Q.    And she was a portfolio manager in Mid Cap Growth in

18    March of '03?

19    A.    I remember her as a portfolio manager in Mid Cap Growth,

20    but I don't know what time period.

21    Q.    And she was gone at some point?

22    A.    Yes.

23    Q.    And she was gone in '03 sometime?  You don't know, okay.

24    A.    I don't know.

25    Q.    All right, but you know that she was gone.  Are you

1  familiar with Kevin Divney?

2  A.   Yes.

3  Q.   And was he transferred from a position as a portfolio

4  manager in U.S. Core to the Mid Cap Growth Team that used to

5  be run by Marjery Parker?

6  A.   I know he went to that group.  I don't know when, but he

7  did go to that group, yes.

8  Q.   And Dana Clark, D-a-n-a C-l-a-r-k, do you recognize that

9  name?

10 A.   Yes.

11 Q.   And he left sometime in '03, did he not?

12 A.   I know he left.  I don't know what time it was.

13 Q.   Are you familiar with Paul Marrkand, M-a-r-r-k-a-n-d?

14 A.   Yes.

15 Q.   And who's Mr. Paul Marrkand?

16 A.   He was a portfolio manager -- well, he had been with the

17 firm for a long time, but he had been in Research and then

18 became a portfolio manager, I believe in the Mid Cap space,

19 Mid Cap core, I believe.

20 Q.   Do you recognize that he transferred from U.S. Core as a

21 senior portfolio manager on to the Mid Cap Growth spot

22 filled, previously filled by Mr. Dana Clark?

23 A.   I don't think that that -- my memory is, what happened

24 with that Mid Cap Growth Team was, we ended up firing because

25 of weak performance the CIO and many of the team members.

Page 50

1    Q.    That's just Margery Parker you fired?

2    A.    It was Dana Clark, it was Margery Parker, and it was

3    Eric Wetlaufer, the CIO.  And when those folks were removed,

4    my memory was that we actually took that Mid Cap asset base,

5    mutual funds and the institutional accounts, and asked that

6    top performing Core team to take over management of those.

7    Q.    All right, and that took place in 2002, 2003?

8    A.    Generally that time period, but I don't know the exact

9    time.

10   Q.    Okay.  And then Divney and Paul Marrkand were backfilled

11   into those positions?

12   A.    Well, again, we've talked about this backfilling.  My

13   memory is, we didn't really backfill.  They didn't move from,

14   you know, Position A to Position B.  They had a position, and

15   we asked them to take on additional responsibilities.

16   Q.    Okay.  Are you familiar with Mr. Christopher Crawford?

17   A.    I know the name.

18   Q.    And was he a new hire as a senior portfolio manager?

19   A.    I just recognize the name.  I don't know him.

20   Q.    You don't know whether he was in the organization or

21   came in from the outside?

22   A.    I don't.

23   Q.    Do you recognize that he held a portfolio manager

24   position in Global Core Small Cap in '03?

25   A.    I recognize the name.  I sort of recognize Small Cap,

5136613a-5505-4158-904c-7cee74f62aa6

1   but I don't remember where he was specifically.

2   Q.   And Mr. John McLanahan, M-c-L-a-n-a-h-a-n, do you

3   recognize that he moved on to the Global Core Small Cap,

4   being promoted from analyst in '03?

5   A.   My memory was that he was in that team both as an

6   analyst and a portfolio manager, but I don't know when those

7   kinds of changes would have been made.

8   Q.   Do you recognize the name Steve Kirson, K-i-r-s-o-n?

9   A.   Yes.

10  Q.   And was he a senior portfolio manager on Small and

11  Emerging Growth?

12  A.   Yes.

13  Q.   And did he leave in or about March of '02?

14  A.   I don't know when he specifically left.

15  Q.   But he left in terms of the reorganization, did he not?

16  A.   You're talking about when we reorganized International

17  Growth?

18  Q.   Yes.

19  A.   I don't know if it was exactly that time, but there was

20  a bunch of different moves, and I don't know if it was

21  exactly then.

22  Q.   Okay.  But you'd recognize that he was gone sometime in

23  '02?

24  A.   That's my general understanding yes.

25  Q.   Okay.  And Mr. Craig Lewis, do you recognize that he

1  left in April of '02?

2  A.   I know the name, but I don't know him.

3  Q.   Do you recognize that he held a portfolio manager

4  position in Small and Emerging Growth?

5  A.   As I said, I don't know -- I recognize the name, but I

6  don't know.

7  Q.   Do you recognize the fact that both Mr. Kirson and

8  Mr. Lewis were gone at some point in '02?

9  A.   Well, Kirson I do, but Lewis I don't because I don't

10  really remember him.

11  Q.   Okay.  Are you familiar with a Matthew Griffin?

12  A.   No.

13  Q.   So you wouldn't know whether he was promoted from an

14  analyst position to a PM position in Small and Emerging

15  Growth?

16  A.   Well, no, and I'm not sure -- I'm not sure I also would

17  say that that's all automatically a promotion, analysts and

18  PMS, depending upon sort of where you were in your career and

19  so on, but we were trying to promote a dual career path kind

20  of concept, so these people then moved from an analyst

21  position to a portfolio management position, but I wouldn't

22  say it's automatically a promotion.

23  Q.   Where is the big money in the organization,

24  Mr. Tibbetts?

25  A.   Being the president.

5136613a-5505-4158-904c-7cee74f62aa6

1  Q.   And where is the next biggest amount of money in the

2  organization?

3  A.   One of his direct reports.

4  Q.   And who are they?

5  A.   Head of investments, heads of distribution, heads of

6  operations.

7  Q.   And who was next?

8  A.   Senior investors, chief investment officers.

9  Q.   And who was next?

10 A.   Analysts and portfolio managers.

11 Q.   So your position as head of HR is that analysts make the

12 same or can make the same amount of money as portfolio

13 managers and senior portfolio managers?

14 A.   Yes.

15 Q.   Did Mr. Justin Scott make more money than anybody in the

16 Research Department?

17          MR. KOCIUBES:  Objection, your Honor.

18          THE COURT:  Overruled.

19          MR. KOCIUBES:  He's a CIO.

20          THE COURT:  Well --

21          MR. MOLONEY:  He's taken the position, your Honor,

22 that --

23          THE COURT:  Excuse me.  Justin Scott, at what

24 time?  Did he have the position as portfolio manager?

25          THE WITNESS:  In the '80s and early '90s.

Page 54

1          THE COURT:  And then he was promoted to CIO?

2          THE WITNESS:  And then was a CIO.

3          THE COURT:  At what time?

4          THE WITNESS:  The mid-'90s, I would say.

5          MR. MOLONEY:  I'll withdraw that on Mr. Scott.

6    Q.   Mr. Omid Kamshad?

7          MR. KOCIUBES:  Objection.

8          THE COURT:  You need to lay the foundation as to

9    time period.

10   Q.   In the 2002-2003 period, Mr. Tibbetts, are you familiar

11   with a man by the name of Omid Kamshad?

12   A.   Yes.

13   Q.   And what position did he hold in those year?

14   A.   I don't know the specific positions.

15   Q.   Was he a portfolio manager?

16   A.   Well, I know at one point in time he was a portfolio

17   manager, but I know at one point in time he was also a CIO.

18   Q.   So you wouldn't be able to tell us whether or not

19   Mr. Kamshad was a portfolio manager in 2002, in 2003?

20   A.   Not without looking at some documents, no.

21   Q.   But the records of Putnam with respect to compensation

22   were maintained, were they not, by your office?

23   A.   Well, in Human Resources, yes.

24   Q.   Right, under your supervision?

25   A.   Well, in that time period, I wasn't the head of Human

1   Resources, so I only was responsible for part of the

2   organization, so it wasn't my --

3   Q.   Right, but if somebody asked you today to go to the

4   records in your office and find out what Mr. Kamshad's

5   position was in 2002, 2003, you would have records indicating

6   that, right?

7   A.   Yes.  You would go to the Human Resources system and

8   pull that information.

9   Q.   Okay.  And you could also pull out how much his total

10  compensation was for the years 2002, 2003?

11  A.   Yes.

12  Q.   And you could compare his compensation with the

13  compensation of the experienced analysts in the Research

14  Department and the Director of Research in those years?

15  A.   Yes.

16  Q.   From your records in HR?

17  A.   Yes.

18  Q.   Okay.  Would you look at Tab No. 228, please.

19         (Witness examining document.)

20  Q.   Do you have that?

21  A.   Yes.

22  Q.   Do you recognize it?

23  A.   I don't specifically, but it looks like a report from

24  our human resource system.

25  Q.   Okay.  And this is indicated as 2002 investment

Page 56

1    terminations and 2003 investment terminations on Pages 14856

2    and 14855?

3    A.   Yes.

4         MR. KOCIUBES:   Before this comes in, could we -- I

5    withdraw that.

6    Q.   Directing your attention --

7    A.   You're looking at which page?

8    Q.   Sorry.   14855.

9    A.   Okay, so 2003.

10   Q.   Yes, the 2003 investment terminations page.  And if you

11   count from the bottom, the fourth one from the bottom on the

12   left-hand side.

13   A.   Yes.

14   Q.   Is that Lisa Svensson?

15   A.   It is.

16   Q.   And indicating in the "Term date," the second-to-last

17   column on the right-hand side?

18   A.   Yes.

19   Q.   The date is 2003/09/15?

20   A.   Yes.

21   Q.   And "Termination reason," the last column, can you read

22   what Putnam records indicate for her.

23   A.   Yes.   "Involuntary, poor performance."

24   Q.   And if you just look up among the five or six or seven

25   or so, do you see reference to Mr. Darren Peers in the

Page 57

1    left-hand column?  It's about nine or ten up.  Do you have

2    it?

3    A.    Yes.

4    Q.    And his termination date is 2003/10/01?

5    A.    Yes.

6    Q.    And the Putnam records record his termination reason as?

7    A.    It says "Family reasons."

8    Q.    Was it the practice at Putnam, if someone declined to

9    sign a separation agreement, that the termination reason

10   would be stated as "involuntary, poor performance"?

11   A.    I don't believe so, no.

12         MR. MOLONEY:  Your Honor, I just had a couple more

13   things that I wanted to -- oh, yes, I want to move that, your

14   Honor, please.

15         MR. KOCIUBES:  No objection.

16         MR. MOLONEY:  And that was number --

17         THE CLERK:  228.

18         (Plaintiff Exhibit 228 received in evidence.)

19         (Witness examining documents.)

20   Q.    Let me show you what's been presented to you.  It's

21   marked as a series of exhibits, Bloom Exhibit 2-B, Bloom 2-G.

22   A.    It says actually -- is that 2-B?

23   Q.    Right, Exhibit 2-B through 2-G.  And is this data that

24   Putnam supplied to Dr. Bloom?

25   A.    I wasn't directly involved in that process, but this

Page 58

1    certainly looks like our reports, and it is an exhibit with

2    "Bloom," so I assume so.

3    Q.   Okay, you met with Dr. Bloom in connection with this

4    case?

5    A.   Yes, but I didn't -- I didn't do data specifically,

6    so --

7    Q.   But your office under your supervising presented data to

8    him?

9    A.   Yes.

10    Q.   Okay.  And then if you'd look at -- and did your office

11    also supply information about officer terminations to

12    Dr. Bloom?  And I'm showing you that document.

13               (Witness examining document.)

14    A.   This looks like a report from our human resource system,

15    but I don't know if this was given to him or not.  I mean,

16    there's no exhibit number or things like that.

17               MR. MOLONEY:  Okay, let me do this.  Let me move,

18    your Honor, the copies of what had been marked in the Bloom

19    deposition as 2-B to 2-G.

20               MR. KOCIUBES:  Could we be heard, your Honor?

21               THE COURT:  Yes.

22    SIDE-BAR CONFERENCE:

23               THE COURT:  You know, this is -- you thought you

24    were going to have another 20 minutes to a half an hour.  You

25    have 50 minutes left on your clock, 5-0, 5-0.  I don't know

1    what's happening here.  I think you told me 40 minutes ago

2    you only had 20 minutes left.

3                MR. MOLONEY:  I was wrong.

4                THE COURT:  How much longer do you have?

5                MR. MOLONEY:  I just want to get these documents

6    in.

7                THE COURT:  No, but how long?  Give me a time

8    frame.

9                MR. MOLONEY:  This will take about two minutes

10   minutes.

11               THE COURT:  Okay, that's it.

12               MR. MOLONEY:  I just want him to tell me what it is

13   and get it in.

14               THE COURT:  You're putting me in a terrible

15   position, where if you do your damages expert, there will be

16   no time to cross-examine, and then you're going to come to

17   me.  So --

18               MR. KOCIUBES:  This is another attempt to sneak in

19   CIO compensation.

20               THE COURT:  Well, we'll cross that out.

21               MR. MOLONEY:  No, this will be all crossed out.

22               THE COURT:  I'll allow it in and finish.

23               MR. MOLONEY:  Okay.  And, your Honor, just on this

24   one last document, this is just a termination section from

25   2-H.

Page 60

1       MR. KOCIUBES:  No problem.

2       THE COURT:  And we'll just cross out before you put

3  it in to the jury the CIO.

4       MR. KOCIUBES:  There's also names that your Honor

5  has not limited.

6       THE COURT:  All right, but, you know, we've dealt

7  with that through redaction.

8       (End of side-bar conference.)

9       THE CLERK:  463.

10      MR. MOLONEY:  Your Honor, I have no further

11 questions.

12      (Plaintiff Exhibit 463 received in evidence.)

13 CROSS-EXAMINATION BY MR. KOCIUBES:

14 Q.   Good morning, Mr. Tibbetts.

15 A.   Good morning.

16 Q.   Perhaps we could just sort of cover a couple of the

17 things first that Mr. Moloney covered this morning.

18      MR. KOCIUBES:  And, Mr. Alba, could we switch back

19 to the computer.

20 Q.   And I'm going to ask you to take a look at Plaintiff's

21 Exhibit 206, and that's the 1999 succession planning document

22 that you were shown?  Do you see that?

23 A.   Yes.

24 Q.   And I think you testified that this was sort of senior

25 management --

Page 61

1      MR. MOLONEY:  Your Honor, I don't mean to

2   interrupt, but the screen says "out of range" here.

3      THE COURT:  Well, in other words, yours doesn't

4   work?

5      MR. MOLONEY:  It's just flashing "out of range."

6      THE COURT:  Are all yours working?

7      THE JURY:  Yes.

8      THE COURT:  So is that one working on that table

9   for the time being?

10      MS. HOLDEN:  It's not on.

11      (Discussion off the record.)

12      MR. KOCIUBES:  May I continue, your Honor?  Thank

13   you.

14   Q.  Mr. Tibbetts, I think you had just oriented us.  I think

15   you had said that the purpose of this document was, senior

16   management was sort of thinking through that if somebody

17   either moved to a different position or left, who might be

18   ready to succeed them and when?

19   A.  Yes, as well as what we need to do to develop the people

20   in their existing roles.

21   Q.  Just to orient us, let's just go to the next page of the

22   document as an example of what's going on.  And so, for

23   example, this page deals with partners, right, and it shows

24   who was going to potentially be able to succeed them?

25   A.  Yes.

1    Q.    Okay.  Could we then go to a number of pages into the

2    document, specifically 14830.  And here now we've worked down

3    to a CIO level, specifically Mr. Robert Swift.  Do you see

4    that?

5    A.    Yes.

6    Q.    And Exhibit 206, this was the 1999 succession planning

7    document?

8    A.    Yes.

9    Q.    Okay.  And it lists Mr. Swift's strengths, for example?

10   A.    Yes.

11   Q.    "Experienced risk taker, driven for success"?

12   A.    Yes.

13   Q.    And there's some suggestions for him, and then it lists

14   potential successors for him.  Do you see that?

15   A.    I do.

16   Q.    And let's just blow this portion up so it's easier for

17   the jury to read.  And the potential successors for

18   Mr. Swift, it looks like sort of in order, are first Kelly

19   Morgan, who's of course a female, right?

20   A.    Yes.

21   Q.    And it says that she's ready now?

22   A.    Yes.

23   Q.    The judgment of senior management was that if Swift

24   disappeared the next day, she could take over his unit?

25   A.    Yes.

1    Q.   And the succession probability, the view in 1999 is that

2    it was high that she could take over Mr. Swift's team?

3    A.   Yes.

4    Q.   And then the next one down was Steve Dexter; am I right?

5    A.   Yes.

6    Q.   And they thought he was maybe two years away?

7    A.   Yes.

8    Q.   And the probability was sort of medium that he could

9    take over that team?

10   A.   Yes.

11   Q.   Okay.  And then the third name was Paul Warren.  Do you

12   see that?

13   A.   I do.

14   Q.   And the notion was that he would need two years lead

15   time?

16   A.   Yes.

17   Q.   And the judgment was that it would be a low probability

18   that he would take over Mr. Swift's team?

19   A.   Yes.

20   Q.   Okay.  Do you see Lisa Svensson's name on that page?

21   A.   No.

22   Q.   So that for Swift's job, the identified candidates, as

23   it were, were Kelly Morgan, Steve Dexter, Paul Warren?

24   A.   Yes.

25   Q.   Let us now, if we could, go to page in the same document

5136613a-5505-4158-904c-7cee74f62aa6

1    14837.  And here now we're talking about the person who would

2    potentially be replaced or would need to be replaced if she

3    left or got promoted is Kelly Morgan?

4    A.   Yes.

5    Q.   Correct?  She was one of the potential successors or the

6    first-ranked successor to Robert Swift, correct?

7    A.   Yes.

8    Q.   All right, and she at the time was a managing director

9    already?

10   A.   Yes.

11   Q.   And about her for strengths, it says "Self-directed,

12   global perspective, and team player."  Do you see that?

13   A.   I do.

14   Q.   All right.  And then it lists for "Successor, Lead time

15   and succession probability," it lists three names.  Do you

16   see that?

17   A.   Yes.

18   Q.   And the first name listed was Steve Dexter?

19   A.   Yes.

20   Q.   Do you see that?  And the judgment of senior management

21   was that he would be ready in two years --

22   A.   Yes.

23   Q.   -- to take over for Kelly Morgan, if she moved.  And the

24   second name ranked below Steve Dexter was Lisa Svensson?

25   A.   Yes.

5136613a-5505-4158-904c-7cee74f62aa6

Page 65

1    Q.    And the judgment was that it would take her another

2    three years to get ready?

3    A.    Yes.

4    Q.    And then lastly was Josh Byrne, and the notion was that

5    his was a medium probability, and he would need three years?

6    A.    Yes.

7    Q.    And was Byrne even on the team?

8    A.    No.

9    Q.    So was that sort of factored into the thinking?

10   A.    Yes.

11   Q.    All right.  If we could then pull up Plaintiff's 210.

12   Let's go to the next page actually.  And am I correct, this

13   one now is a year later, the 2000 succession planning

14   document?

15   A.    Yes.

16   Q.    And this is one of the documents that you were shown by

17   Mr. Moloney?

18   A.    Yes.

19   Q.    All right.  And could we go to Page -- and, by the way,

20   as of 1999 and beginning of 2000, the International Growth

21   Team was still doing pretty well, wasn't it?

22   A.    Yes.

23   Q.    All right, let's go to Page 12380.  Great, thank you.

24   And again we see that the person that you're worried about or

25   planning for, if he leaves or moves to a different position,

1    is Robert Swift, the CIO.  Do you see that?

2    A.    Yes.

3    Q.    And that was International Growth?

4    A.    Yes.

5    Q.    And then again there are three names mentioned the

6    following year as to people that were potential candidates,

7    people to be thought about replacing him if he moved on,

8    correct?

9    A.    Yes.

10   Q.    And can we just blow -- actually just blow this portion

11   up.  And the three people were, once again, Kelly Morgan, and

12   the management's view of her was that she was ready then,

13   correct?

14   A.    Yes.

15   Q.    And that there was a high probability that she could

16   take over that team, correct?

17   A.    Yes.

18   Q.    And then right below Kelly Morgan was once again Steve

19   Dexter?

20   A.    Yes.

21   Q.    And he was still two years away with a medium

22   probability that he would take over the team?

23   A.    Yes.

24   Q.    So that the following year those were still numbers one

25   and two?  The pecking order hadn't changed in the views of

1  senior management?

2  A.    Correct.

3  Q.    And then Paul Warren, was he on that team?

4  A.    He was on a different team.

5  Q.    Okay.  And the notion was it would take him two years,

6  and it was a low probability that he would be tapped to head

7  that team?

8  A.    Yes.

9  Q.    Okay.  But that if, for example, Morgan and Dexter and

10  Swift for some reason weren't around, he would be a potential

11  candidate?

12  A.    Right.

13  Q.    And then you were shown another document, a

14  Plaintiff's 221, and actually let's go to the next page of

15  that.  And this is from you, correct?

16  A.    Yes.

17  Q.    Again to the senior people at Putnam, correct?

18  A.    Yes.

19  Q.    With copies to the CEO and Mr. Oristaglio and

20  Mr. Ferguson?  They were heads of Investment?

21  A.    Well, Tim Ferguson was the head of Investments, and

22  Steve Oristaglio was the deputy head.

23  Q.    Okay.  Let's just show this portion, the text.  And I

24  think that Mr. Moloney asked you about the text at the top:

25  "In the follow-up discussion at last week's partners

1    meeting, Tim Ferguson has asked that I seek your thoughts on

2    potential candidate referrals for these open positions."  Do

3    you see that?

4    A.    I do.

5    Q.    And the first one was for a CIO of Large Cap Growth.  Do

6    you see that?

7    A.    Yes.

8    Q.    And this memo is now in April of 2002, correct?

9    A.    Yes.

10   Q.    And by that point the performance -- do you remember

11   whether the performance of International Growth had changed?

12   A.    Yes.  This is the time where we were doing the

13   reorganization.

14   Q.    All right.  And the skill set and experience for the CIO

15   Large Cap Growth position was "Strong investment performance

16   record"?

17   A.    Yes.

18   Q.    "Seasoned investor"?

19   A.    Yes.

20   Q.    "Philosophy and experience with disciplined investment

21   success (Sic), and leadership, investment and business"?

22   A.    Yes.

23   Q.    Now, you were in HR at the time.  Was Lisa Svensson

24   qualified for that position?

25               MR. MOLONEY:  Objection.

1        THE COURT:  Overruled?

2    A.   At that time, with a weak performance, we wouldn't have

3    considered her or anybody else in that senior leadership role

4    within the Large Cap Growth Team for the CIO job here.

5    Q.   Now, let's look at the next position, senior portfolio

6    manager in the U.S. Core Growth Team.  Do you see that?  And

7    do you see the first requirement, "Minimum of 5-10 years

8    portfolio management experience"?

9    A.   Yes.

10   Q.   Had Lisa Svensson been managing a portfolio for five to

11   ten years?

12   A.   I don't believe so.

13   Q.   And look at the next point:  "Valuation-driven and a

14   believer in discounted cash flow models," do you see that?

15   A.   I do.

16   Q.   And then the one below, "Proven track record in managing

17   large pools of assets combined with prior analyst

18   experience," and the last one, "Views quantitative inputs as

19   central."  And again, as the HR individual, was Lisa Svensson

20   qualified for that position?

21        MR. MOLONEY:  Objection.

22        THE COURT:  Overruled.

23   A.   Not from my understanding.  We were looking at --

24        THE COURT:  Well, wait a minute.  Do you know

25   directly, or is this all hearsay?

1    THE WITNESS:  My memory of Lisa was that she was

2  not a quantitative-oriented portfolio manager.

3  Q.   And then look at the last one on this page, "Core fixed

4  income."  Do you see that?

5  A.   Yes.

6  Q.   And the requirement is "Seasoned fixed income investor"?

7  A.   Yes.

8  Q.   To your knowledge, had Mrs. Svensson had any fixed

9  income experience at all?

10  A.   Not to my knowledge.

11  Q.   Let's go to the next page.  Just blow up the box.  And

12  the first position on the next page is for an analyst for

13  credit research.  And what department would that be?  Would

14  that be a Research Department?

15  A.   Right.  This was in the fixed income research

16  organization or the bond research organization.

17  Q.   And then the position below that also was for an

18  analyst, also in the fixed income department, a bond analyst?

19  A.   Yes.

20  Q.   And then the last one was for a senior trader in equity

21  trading with five to seven years experience as a trader.  Had

22  Mrs. Svensson been a trader?

23  A.   No.

24    MR. MOLONEY:  Your Honor, we don't contend that

25  Mrs. Svensson was qualified for those positions on the second

Page 71

1    page of that document, and I asked no questions about them.

2              THE COURT:  Is that an objection?

3              MR. MOLONEY:  I think I should have said

4    "objection," your Honor.

5              THE COURT:  I strike the comments.  I mean, it will

6    be clear during closing arguments what she's contending and

7    what she's not.

8              MR. KOCIUBES:  Your Honor, do you want me to start

9    a new document, or do you want to --

10             THE COURT:  I think we should probably just at this

11   point take our break.  So how much longer do you think you

12   have with him?  Well, we'll talk about it at side bar.

13             MR. KOCIUBES:  Okay.

14             THE CLERK:  All rise for the jury.

15             (A recess was taken, 11:00 a.m.)

16

17

18

19

20

21

22

23

24

25

Page 72

1          (After recess)

2          MR. MOLONEY:  I talked to Dr. Siegel, and I sent

3    him -- he's coming back on Tuesday morning.

4          THE COURT:  I didn't say to send him, I just

5    said he wasn't going to be done.

6          We're not going to use up all the time on him.

7          MR. MOLONEY:  Well, there's the Darren Peers

8    transcript.

9          MR. KOCIUBES:  My suspicion, your Honor, there

10   isn't going to be a lot of -- this may be a practical

11   issue that goes away.  I mean, it's up to Mr. Moloney,

12   but I think this is going to be a little while.

13         THE COURT:  Let's get the jury.  There's nothing

14   we can do now.

15         MR. KOCIUBES:  May I continue, your Honor?

16         THE COURT:  Yes.

17         MR. KOCIUBES:  Thank you.

18   BY MR. KOCIUBES:

19   Q.   Can you pull up on the screen Plaintiff's 207, which

20   was used this morning by Mr. Moloney.

21         And you recall, Mr. Tibbetts, being shown some

22   excerpts of the 2001 succession planning document?

23   A.   I do.

24   Q.   And can we go to page 14795?

25         We're now in 2001; we've looked at 1999, you

1  recall, and 2000?

2  A.   Yes.

3  Q.   And this is sort of the same kind of an exercise?

4  A.   Yes.

5  Q.   All right.  And do you see that we're talking about

6  Mr. Swift's team here?

7  A.   Yes.

8  Q.   Let's take these one at a time.

9       Do you see the person that's being discussed in

10  the top there is Mr. Dexter?

11  A.   Yes.

12  Q.   And below him, Mrs. Svensson?

13  A.   Yes.

14  Q.   And below her, Peter Hadden?

15  A.   Yes.

16  Q.   Am I correct, they're all senior vice presidents in

17  rank?

18  A.   In officer title, yes.

19  Q.   Perhaps, just so it's easier for the jury to read,

20  can we just sort of blow up this portion first?

21       Actually, let's show this portion.

22       (Discussion off the record.)

23  Q.   And you indicated that the first name there was

24  Mr. Dexter, and he was a senior vice president.  And do

25  you see there's a section for each of them for

1    strengths?

2    A.    Yes.

3    Q.    And this is sort of -- never mind.

4          And his first strength, do you see that,

5    empowering others?

6    A.    Yes.

7    Q.    And then it goes to influencing and negotiating?

8    A.    Yes.

9    Q.    And then building organizational relationships and

10   adaptability.  Do you see that?

11   A.    I do.

12   Q.    And then Mrs. Svensson has a different strength set.

13   Do you see that?

14   A.    I do.

15   Q.    Intellectual versatility, high impact delivery, and

16   driven for success.

17   A.    Yes.

18   Q.    And then Mr. Hadden has got his own:  Seasoned

19   judgment, adaptability, intellectual.  Do you see that?

20   A.    Yes.

21   Q.    And then each of them has development suggestions.

22   Do you see that?

23   A.    Yes.

24   Q.    And let's talk for a moment about Mrs. Svensson's.

25   I think the jury has seen some -- heard some of this

Page 75

1    before.

2         Listen and accept contrary opinions, relax in

3    situations of disagreement, and ask for input from other

4    groups.  Do you see that?

5    A.    I do.

6    Q.    Let's sort of bring the whole thing back up again.

7    If you can expand that.  Great.

8         And then there is the category of high

9    potential --

10   A.    Status.

11   Q.    Do you see that?

12        Why don't we blow up the second half so it will

13   be easier for the jury to read.

14        Thank you.

15        And do you see the high potential status?

16   A.    Yes.

17   Q.    And the first box was Mr. Dexter?

18   A.    Yes.

19   Q.    And the second one was Mrs. Svensson?

20   A.    Yes.

21   Q.    All right.  And for high potential status, the

22   judgment of management about Mr. Dexter -- this is now

23   in 2001 -- was high?

24   A.    Yes.

25   Q.    And Mrs. Dexter was medium --

5136613a-5505-4158-904c-7cee74f62aa6

Page 76

1           THE COURT:  Mrs. Svensson.

2   BY MR. KOCIUBES:

3   Q.   Mrs. Svensson was medium --

4           THE COURT:  It's been a long week.

5           MR. KOCIUBES:  It's been a very long week, your

6   Honor.

7   BY MR. KOCIUBES:

8   Q.   And Mr. Hadden was medium.  Do you see that?

9   A.   I do.

10   Q.   And as a potential successor to Mr. Dexter, do you

11   see who they've identified?

12   A.   Yes, Peter Hadden.

13   Q.   And as a potential successor to Mrs. Svensson, do

14   you see who they have identified?

15   A.   Yes, Steve Dexter.

16   Q.   Let's show the whole page again.

17           So that am I correct that Mr. Dexter was

18   identified as a potential successor to Robert Swift, but

19   they could also use him as a potential successor if

20   Mrs. Svensson left?

21   A.   Correct.

22   Q.   Mrs. Svensson, on the other hand, does not show up

23   as a potential successor, she shows up as medium for

24   Swift, correct?

25   A.   Well, I'm not sure this is specifically for Swift,

1  because that would have been on Swift's line.

2  Q.   Got it.  Okay.

3       But not as a potential successor for Mr. Dexter?

4  A.   Correct.

5  Q.   Okay.  Now, let me ask you -- actually, before we do

6  some of the organizational stuff, a name that keeps

7  coming up is Manny Weiss.  Do you recall you were asked

8  some questions about him today?

9  A.   Yes.

10 Q.   What exactly did he do?

11 A.   Well, he was a portfolio manager, but he was

12 specifically a quantitative-oriented manager.  So what

13 that practically meant was that he built the

14 quantitative models, manipulated the data, analyzed the

15 data, and worked in that portfolio construction process,

16 contributed to that as we were talking about before with

17 another person who had that portfolio construction

18 title.  So it was a quantitative skill set.

19 Q.   Do you recall whether he worked with more than one

20 team at various points in time building these models?

21 A.   I believe he started in the U.S. Core area, working

22 specifically in Large Cap Core.  My memory is he spread

23 and was a resource that was used throughout Core and

24 Growth.

25 Q.   Let me focus your attention, Mr. Tibbetts, on the

1   2000 to 2003 period in investment management.

2   A.    I think I just remembered what I just said.

3         I think I reversed it.  So I think I said he

4   started in Core and then went to Growth.  My memory was

5   that he actually started in Large Cap Growth and then

6   spread to Core.

7   Q.    Okay.

8   A.    Sorry.

9   Q.    Let me direct your attention to the 2000 to 2003

10  period at Putnam.  And could you just step back for a

11  moment and just -- I take it there were different

12  departments or units at Putnam?

13  A.    Yes.

14  Q.    And I just want to help, since you were in HR, get

15  oriented, what were the basic different units or

16  departments at Putnam?

17  A.    At the senior --

18  Q.    Yes, at the highest level.

19  A.    So there was investment organization; and then there

20  were sales and marketing organizations, there basically

21  were three of those, but they were broken down to

22  retail, selling mutual funds; institutional, selling to

23  institutional clients like pensions; and then the

24  international group was a third group.  So there was

25  this distribution organization; sales organization that

1    had three parts to it; and then there was operations,

2    which was all the shareholder transactions, the

3    telephone representatives, and so on.  And then the

4    other broad group was the corporate staff group, so like

5    human resources and finance and technology, so on.

6    Q.    All right.  Let's stay -- let's now -- the first

7    group you mentioned was the investment or the investment

8    management division?

9    A.    Yes.

10   Q.    All right.  Now, tell us, starting at the top and

11   working down, how it was organized in this 2000 to 2003

12   period.

13   A.    Well, so the basic structure has remained basically

14   the same, in that we have major groupings within the

15   investment division organized around types of investing.

16   So fixed income or bond would be one such group.  Then

17   you would have equities, and within equities there was

18   three major or --

19   Q.    Equities, meaning stocks?

20   A.    Stocks.  That was sort of Value, Core and Growth,

21   that was how you invested, styles of investing.  And

22   then there was also a Global Asset Allocation Group,

23   which was a group that did things on the economic basis

24   and ultimately invested in those bonds and stock groups.

25   And then there was a currency organization that invested

Page 80

1    in different currencies.  And then there was also a

2    research organization, and that organization had both

3    fundamental analysts, so looking at stocks and looking

4    at bonds from companies; and then there was also a

5    quantitative research group that built mathematical

6    models in the computer systems.

7    Q.   Okay.  Now, within each of these big groups -- and

8    just pick any one of them that you want -- were there

9    further breakdowns?

10   A.   Yes.  So Growth is obviously where we go, so I'll go

11   there.

12        So Growth was further broken down into sort of

13   styles or areas of investing, and the way you sort of

14   think about it is that these teams were smaller teams

15   that were broken down by investing in large cap

16   companies, so big cap companies or small capitalized

17   companies or very small companies.  And in some areas,

18   there was also even a midsized company, so it was a

19   large cap, mid cap, and small cap distinctions.  And

20   then there was also an International Growth team.  So

21   Growth was then further broken down into those four

22   different groups.

23   Q.   And within those groups, were there then separate

24   individual teams or not?

25   A.   Well, depended upon the teams.  It was different

5136613a-5505-4158-904c-7cee74f62aa6

1    from team to team.  Some were much larger than others.

2    We have within most of those teams both mutual funds or

3    retail clients and shareholders, as well as

4    institutional clients, so big pension plans.  And

5    sometimes teams are organized around those major groups

6    or, otherwise, sometimes they were, you know, subdivided

7    not necessarily that way, but divided into subteams.  So

8    it depended upon the group, how they were subdivided.

9    Q.   Am I correct, in some generic or 60,000-foot level,

10   everybody in the investment division was managing money?

11   A.   Ultimately --

12   Q.   Other than the analysts, I guess?

13   A.   Even analysts participated in the research fund and

14   so on, so on.  Everybody was certainly participating in

15   the money management responsibilities.

16   Q.   Okay.  Now, as you started filtering down into these

17   different groups, Value and Core and Growth, and then

18   those various big groups being divided into smaller

19   teams, were the various people doing the same thing?

20   A.   No.

21   Q.   What were the differences?

22   A.   Well, one basic difference were some people were

23   more fundamental-oriented versus quantitative-oriented.

24   So we were just describing Manny Weiss as an example

25   doing the quantitative modeling work.  We would have

Page 82

1    other people doing just portfolio construction

2    activities, and then you would also have other people,

3    you know, picking and selecting stocks, either as

4    analysts or you had portfolio managers who were

5    responsible for the overall process, they were the named

6    manager for a fund, they were responsible for the

7    securities selections in that fund.

8    Q.    Now, we've heard various discussions about CIOs or

9    chief investment officers.  Where -- where did they fit?

10   A.    Well, probably the simplest way to think about it is

11   that -- so we take these broad, big groups and then you

12   divide them up into these teams; they were basically the

13   leaders of the teams.  The way I -- the way I simply try

14   to describe it when I'm recruiting folks, they are the

15   leaders of those teams, and typically they are the ones

16   who have developed those investment processes and

17   investment style of approaching -- of investing, and

18   they lead the team in that activity.  And so they've

19   got, you know, portfolio managers or analysts or

20   quantitative resources as part of that team, and they

21   lead the entire process.

22   Q.    And are they doing the same thing or the same job as

23   a portfolio manager on their team?

24   A.    Well, some of their responsibilities would be the

25   same in terms of they might be named portfolio manager

5136613a-5505-4158-904c-7cee74f62aa6

Page 83

1    on a fund, as an example, but they are the ones that are

2    leading the overall team.  So typically there are

3    multiple funds and they'd be responsible for everything

4    that goes on in their group, and that includes, you

5    know, the management of the people, development of new

6    products, and ultimately responsible for the team.

7    Q.   During the period of 2000 to 2003, were you involved

8    in the external hiring of people?

9    A.   Yes.

10   Q.   And did the -- first of all, did the -- sort of the

11   background of people, the style of investors or the kind

12   of team they had worked on at a different place, did

13   that play any role in hiring decisions?

14   A.   Yes, it was --

15   Q.   Describe that.

16   A.   It was a major driver.  When you are filling a Large

17   Cap Growth position, you started by looking for people

18   in the marketplace who had proven investment records in

19   Large Cap Growth.

20   Q.   Why is that?

21   A.   It's -- I don't want to sound too simple, but they

22   are the ones who have proven they can do that job very

23   well, and they would have a reputation in the

24   marketplace as being successful in that, and having them

25   come work for us would help them -- help us to prove

Page 84

1  they could do it at Putnam, as well as, even more

2  importantly, with the clients, both retail side and

3  institutionally.  If you've got a record of someone who

4  is successful in that space, they're likely to keep

5  their assets if they're there or bring in new clients.

6  Q.   The clients, of course, know who the portfolio

7  managers are?

8  A.   Yes.

9  Q.   And the clients, of course, have access to the

10  records of the portfolio managers?

11  A.   The investment records, yes.

12  Q.   The investment records.

13       Was there some initiative under way in 2002,

14  2003 involving or bringing additional people in to

15  upgrade any departments?

16  A.   Yes.

17  Q.   Describe that for us.

18  A.   Well, I guess the context is that we as an

19  organization, particularly in equities, were

20  experiencing weaker performance, particularly in the

21  Growth area, and we were about -- going through a

22  process of working through each of the teams, and based

23  on performance, upgrading and replacing portfolio

24  managers.

25  Q.   Do you recall that Josh Brooks was brought in, in

1    early spring of 2003?

2    A.    Yes, and that was addressing a second issue, which

3    was that we were in the process under new leadership

4    with Steve Oristaglio and Ed Haldeman as the co-heads of

5    investments to bring about what I'll call sort of

6    cultural changes within the organization.   And Josh was

7    known to Ed from his previous company at Delaware, and

8    was, you know, a proven investor from his work at

9    Delaware in terms of his investment record and in terms

10   of the way he approached and thought about investing was

11   something Ed also had confidence in.   It was the

12   investment record and also sort of overall orientation

13   of how we were investing money.

14   Q.    You said Putnam was involved in trying to make some

15   cultural changes --

16   A.    Yes.

17   Q.    -- in the 2002, 2003 period.   Describe what you're

18   referring to.

19   A.    Well, the simplest way to do it is how Ed Haldeman

20   did it, which was to try to simply come up with

21   basically two messages.   The first one was the

22   terminology you were just using, managing money.   What

23   do we do?   We manage money.   No.   Ed wanted us to have a

24   different orientation on that, which is that we're

25   taking care of other people's money.   And it's not about

1   what we're doing, it's about what we're doing for other

2   people.  So the different orientation in approach about

3   how we think about what we are doing and we're mindful

4   every day that we're taking care of people's savings and

5   education savings and so on.  So that was one thing, to

6   change our mindset and orientation and be concerned

7   about the client more.

8          The second was that we had had some very good

9   performance and then we had some very bad performance.

10  This was something, you know, that he was particularly

11  concerned about, and what he said about is was

12  redescribing how we were going to be measuring

13  investment performance in the context of sort of three

14  labels:  The first was consistent, the second was

15  dependable, and the third was superior.  The consistent

16  message was that he wanted us to, from an investment

17  perspective, not worry about swinging for the fences in

18  this volatile performance.  You could have -- if you

19  took over a five-year period or ten-year period maybe

20  the same kind of performance, one way is to hit home

21  runs one year and then lose a lot of money the next

22  year, hit home runs and lose money, that type of

23  volatility he didn't want us to be doing.

24         The other way he wanted us to focus on was much

25  more consistent performance.  That was a metric to say

1    we never want to be in the bottom of the quartile of our

2    relative universes.

3           And then in dependable, that was that what we

4    wanted to do was to be -- I'm sorry, reverse this.  That

5    was dependable.

6           Consistent was to be sort of at or above median

7    every year of the universe.  So that you're consistently

8    there; you don't have to be in the top every year, but

9    you certainly don't want to be in the bottom, you're

10   being a steady, consistent performer.  The steady was

11   you never want to be in the bottom, that was the

12   swinging concept.

13          The third would be if you do those things over

14   time and if you're consistent, you'll deliver superior

15   performance.

16          So it was changing this mindset about how we

17   wanted to invest, not taking huge bets, concentrating

18   what we were doing as we were achieving, but rather

19   managing things on a more consistent basis.

20   Q.   And was there some initiative under way to try to

21   identify people who could sort of function in that --

22   within that kind of philosophy?

23   A.   I'm not sure I would describe it as a very specific

24   initiative.  The initiative, if there was one, was

25   specifically geared around where we had performance and

Page 88

1    where we didn't have performance in terms of good

2    investment performance and where we didn't have good

3    investment performance and understand why and how that

4    performance got delivered.  And if it was volatile, that

5    was a concern.  And the other was to talk about, you

6    know, do we have collaboration working across the

7    organizations in terms of the different teams helping

8    each other?  Do we have an orientation toward more

9    quantitative tools?  Because particularly Steve

10   Oristaglio felt that was a way that we could deliver

11   this more consistent approach, rather than just sort of

12   picking stocks.

13        And so we were looking for people that had not

14   only knowledge and skills in quantitative areas, but

15   also those that accepted and believed that that could be

16   and should be part of an investment process.

17   Q.   All right.  Now, let me sort of move to a slightly

18   different subject.

19        You described the organization, at least in the

20   investment management division, the organizational

21   structure going all the way down to the teams that were

22   headed by CIOs.  Tell us how compensation worked in

23   those years for the investment management division.

24        MR. MOLONEY:  Objection, your Honor, to the

25   question.  It's already ambiguous.

1    BY MR. KOCIUBES:

2    Q.    First of all, tell us what the elements of -- the

3    pieces of compensation were.

4    A.    Okay, so people -- we're talking about investment

5    professionals.

6    Q.    Yes.

7    A.    So people would have a base salary, typically a cash

8    bonus, and then, in some instances, a deferred cash

9    award, where they were awarded cash but not paid it

10   currently, it was paid out over time.

11        We also had an equity plan where people were

12   granted stock in Putnam.

13        In addition to that, we also had benefit

14   programs, obviously, which were retirement plan and

15   health insurance, so on.

16   Q.    Now, the salary portion of it, I take it that

17   would -- how was that paid out?

18   A.    Twice a month.

19   Q.    Okay.  And when would you know your -- say if it's

20   year 2003, when would you know your salary for 2003?

21   A.    I believe we were having -- well, we didn't do lots

22   of salary raises in that sort of time period, but if you

23   were eligible, it was -- for the investment

24   professionals, it would have been February 1st --

25   Q.    Okay.

1   A.    -- effective date of change.

2   Q.    You said there were these other pieces, bonus,

3   deferred, so on.  Let's for a moment stick with bonus.

4   If there were going to be a bonus, when were the bonuses

5   announced?

6   A.    They were basically announced the second half of

7   January.  So it wasn't an exact day, it was the last

8   couple of weeks in January.

9   Q.    Would some of those continue be to announced or were

10  there years they were announced as late as March, or

11  typically earlier?

12  A.    In this time period, the 2002-2003 time period, we

13  were determining bonuses in January and paying them out

14  at the end of January.

15  Q.    And the bonuses would be -- the salary would be for

16  the current year but the bonus is for the previous year,

17  is that how it worked?

18  A.    Well, the salary stayed the same, unless you got an

19  increase.  If you did get an increase, that would be

20  communicated to you in January with an effective date of

21  February 1.

22  Q.    Say you got a bonus in January of 2001, for what

23  year were you given the bonus?

24  A.    For the prior year.

25  Q.    Take us through how the bonus allocation process

1    worked, sort of starting at the highest, coming down to
2    the team and individual.
3    A.    Okay.  Well, starting at the playing level or --
4    Q.    The highest level you can go.
5    A.    That's the organization level.  So how our bonus
6    pools funded were presented to the approval process.
7    And that pool was created based on a percentage funding
8    that was established at the beginning of the year.  And
9    that money was, you know, accounted for throughout the
10   course of a year, but then at the end of the year was
11   subdivided into each of those major business groups that
12   we were talking about.  So a portion would get allocated
13   to investments, a portion allocated to the sales
14   organizations and a portion to the operations
15   organization and so on.
16         And then within investments, the pool was
17   further divided into those teams.  So those teams were
18   then allocated -- if you sort of remember, we worked our
19   way -- there was Fixed Income, then there was Equities,
20   which had then another tier of groups which was --
21   Q.    Let me just stop you there.  So for example, Fixed
22   Income as a group would get a certain amount of dollars
23   to divide up?
24   A.    Yes.
25   Q.    In the whole stock universe, all the stock teams,

1    they would get, in the aggregate, a certain amount of

2    dollars to divide up?

3    A.    At that time, I believe how that was done was there

4    was a group given -- a pool given for Growth.

5    Q.    Okay.

6    A.    Because Steve Oristaglio had that as a separate

7    group, and somebody else had Value.

8    Q.    Okay.  But there was a pool of money that was

9    awarded in the aggregate to, for example, Value, another

10   pool to Growth?

11   A.    Correct.

12   Q.    Okay.  Let's sort of follow down, say, on the Growth

13   side.

14   A.    So then there was a pool for Growth, and then in

15   this time period it was Steve Oristaglio would further

16   take that pool and then allocate money to each of the

17   different teams.  So --

18   Q.    Give us some examples.

19   A.    It was those four teams we were talking about

20   before.  So Large Cap Growth, Mid Cap Growth, Small Cap

21   Growth and International Growth.

22   Q.    Okay.  So each one of them would have their own

23   pool?

24   A.    Correct.

25   Q.    Once International Growth got its own, what then

1  happened?

2  A.   The CIOs, the managers of each of the teams, would

3  make recommendations for their team members and

4  submit -- you know, say Here are my recommendations for

5  each of the people.

6  Q.   Now, what would drive the sort of the pool that

7  would be awarded to, say, International Growth or Large

8  Cap Growth?

9  A.   Typically how it was done was that the -- there are

10  multiple levels of CIO, but the CIO in this case, Steve

11  Oristaglio, would allocate it to each of the teams using

12  very simple ranking of where each of the teams were from

13  an investment performance standpoint, so who was the

14  best performing team and who was the weakest performing

15  team, and would allocate money based on the investment

16  performance.

17  Q.   And at that level, he's not, I take it, evaluating

18  or making allocations to any individual?

19  A.   Correct.  No, it's just the teams.

20  Q.   Would the size of the team have any impact?

21  A.   Yes.  So if somebody had two people and somebody had

22  ten people, the group with the ten typically was larger

23  than the group with two.

24  Q.   All right.  Let me ask then this question:  Let's

25  say that there was a portfolio manager on, say -- I'll

1    just use letter -- team A, who had sort of comparable

2    years of experience, and maybe a comparable manager

3    rating as a portfolio manager on team B, would they

4    expect to get the same amount of bonus in any given

5    year?

6    A.    Well, no, because the thing you didn't talk about

7    was the investment performance.  So the investment

8    performance was absolutely the driver of whether

9    somebody was going to be up or somebody was going to be

10   down or flat.

11   Q.    And the initial investment performance they were

12   looking at would be the amount of the money the team got

13   to divide to begin with?

14   A.    Correct.

15   Q.    So some teams got more money to divide up, some

16   teams got less money to divide up?

17   A.    Absolutely.

18   Q.    During the period, say, 2001-2002, what was the

19   performance of the Growth teams?

20   A.    Not good.

21   Q.    What was the performance of the Core teams?

22   A.    Very good.

23   Q.    And did that effect the amount of money that each of

24   those teams that had -- those units had to divide up?

25   A.    Absolutely.

Page 95

1    Q.    Let me ask if we could pull up on the computer, on

2    the monitor, Defendants' 23.

3          And while Ms. Kurker is doing that, do you

4    recall that Ms. Svensson went from International Growth

5    to Global Equity Research in about March or April of

6    2002?

7    A.    Yes.

8    Q.    Okay.  And let me just, first of all, just to get

9    you oriented, if we can blow the top up, the jury has

10   seen this before.

11         And am I correct that this is a document that --

12   do you recall seeing this at the time?

13   A.    I don't recall seeing this.  I mean, this is

14   something I certainly would have seen, but I don't

15   remember seeing this specifically.

16   Q.    Okay.  You would have seen it.

17         Let's blow up the text.  You see from the

18   subject line -- yes.

19         And you see the subject line is "best stock

20   pickers"?

21   A.    Yes.

22   Q.    And let's -- and you see for 2002, am I correct that

23   Mrs. Svensson's name appears on there, top quartile?

24   A.    Yes.

25   Q.    That was the year that Darren Peers was number one,

Page 96

1   correct?

2   A.   Yes.

3   Q.   But let's look at the next paragraph for the moment.

4   And that's who were the top pickers for the last two or

5   more years.  Do you see that?

6   A.   Yes.

7   Q.   And Mr. Peers and Mr. O'Malley both made that list.

8   Do you see that?

9   A.   Yes.

10  Q.   They were still relatively young, correct?

11  A.   Yes.

12  Q.   Now, let me ask you about some other people.

13       Do you see Mr. Bukovac's name?

14  A.   I do.

15  Q.   Do you see Saba Malak's name?

16  A.   I do.

17  Q.   And do you see the overall top is Roger Sullivan's

18  name?

19  A.   I do.

20  Q.   And you had talked a little while ago about sort of

21  sustained performance?

22  A.   Mm-hmm.

23  Q.   Tell us how that fits, if at all, with this e-mail

24  that you're looking at?  What's the significance of the

25  second paragraph?

1  A.   Well, I guess a lot of people like to say one year

2  doesn't make an investor, it's multiple years.  So the

3  whole point is that if you can do it in one year, you've

4  got to be able to do it over a long period of time.  And

5  that's also sort of in line with the concepts that Ed

6  Haldeman was talking about, which was we don't want the

7  volatility, we want somebody to be consistent, and if

8  you're consistent over time, it will lead to superior

9  performance.

10 Q.   And among those, apparently, that at least in GER

11 that had demonstrated that consistency were Mr. Malak

12 and Mr. Sullivan and Mr. Bukovac?

13 A.   Yeah.

14      MR. KOCIUBES:  All right.  Let's pull up

15 Defendants' 52, and let me, with your Honor's

16 permission, give the witness a copy.

17      THE COURT:  Yes.

18 BY MR. KOCIUBES:

19 Q.   And do you recognize, sir, the document in front of

20 you?

21 A.   Yes.

22 Q.   Would you tell the Court and jury what it is?  It's

23 multiple pages, two pages, right?

24 A.   Yes.

25 Q.   We've got on the screen the first page.  Tell the

1    Court and jury what this is.

2    A.    Well, this a ranking or a listing of the analysts

3    and associate directors in Global Equity Research, the

4    central equity or stock group for the year 2002, ranking

5    them high to low based on their compensation.  And

6    that's what that last column is, which is some act

7    award, with a summary of their actual awards.

8    Q.    The first column tells you it's GER?

9    A.    Yes.

10   Q.    And then the second one tells you that it's 2002,

11   right?

12   A.    Yeah.

13   Q.    And then we see the name of the individual?

14   A.    Yes.

15   Q.    Ultimately, the job title, or is that the

16   functional?

17          And officer title and compensation rate and

18   summary compensation award?

19   A.    Yes.

20   Q.    And let's just -- we're going to come back to this

21   page, but let's just go to the next page so the jury

22   gets a sense of the names.

23          And these are additional names.  This is sorted

24   by compensation from top to bottom, correct?

25   A.    Yes.

Page 99

1    Q.   Let's go back to that first page.

2         And am I correct that it appears that year that

3    the highest paid was a man by the name of Terrence

4    Norchi?

5    A.   Yes.

6    Q.   It looks like he got paid more than two managing

7    directors, a male and female.  Do you see that?

8    A.   Yes.

9    Q.   Do you recall why Mr. Norchi was at that level, why

10   he was the highest paid?

11   A.   Well, he was hired in 2002, and he had a guarantee

12   for that year, that's why it was at that rate.

13   Q.   Do you recall whether he was a medical doctor?

14   A.   He had been a medical doctor, yes.

15   Q.   And then we get to the second-highest paid person in

16   the department, and that's Kelly Morgan?

17   A.   Yes.

18   Q.   And she had -- for 2002 was an ADR?

19   A.   In 2002, yes.

20   Q.   Right.  That shows her title?

21        And then we get to another ADR, this time was a

22   man, it looks like the same, actually, a little bit less

23   than Ms. Morgan because the salary is slightly

24   different.  Do you see that?

25   A.   Yes.

1    Q.    Then we get to Saba Malak.  Do you see that?

2    A.    I do.

3    Q.    Do you recall from Defendants' 23 I just showed you

4    that he was on -- among the top analysts for two years

5    or more?

6    A.    I do.

7    Q.    What was his field?

8    A.    I believe he was in technology.

9    Q.    And do you recall what happened to technology

10   starting late 1990s but continuing into 2000, 2001,

11   2002?

12   A.    The infamous tech bubble burst.

13   Q.    Tech bubble burst.  Even with the tech bubble

14   bursting, this technology group still had one of the

15   best performances?

16   A.    Yes.

17   Q.    Top quartile, I should say?

18   A.    Yeah.

19   Q.    And then there's another individual, Mr. Bukovac --

20   A.    Yes.

21   Q.    -- was a drop off.  Do you recall whether he turned

22   up on the top quartile for two years or more?

23   A.    He was also on the list, yes.

24   Q.    Then we get to Mr. Sullivan.  And he had

25   demonstrated success as an analyst for two years or

Page 101

1    more?

2    A.   Yes.  I think he had gotten the highest ranking.

3    Q.   He was number one for two years or more?

4    A.   Yes.

5    Q.   Do you recall whether he was a novice in the

6    industry or not?

7    A.   No, he was a very, very experienced analyst.

8    Q.   Give us an order of magnitude.  How long had he been

9    in the industry?

10   A.   I don't know exactly, but I'd say 25 to 30 years.

11   Q.   Okay.  And then we get to -- is that a female?

12   A.   Yes.

13   Q.   Preeti Sayana?

14   A.   Sayana, yes.

15   Q.   I notice she was only a vice president.

16   A.   Yes.

17   Q.   How did she come to get paid so much?

18   A.   Well, she had a very good investment record and she

19   was rewarded with it, by it.

20   Q.   All right.  And then the very next one down, if I'm

21   counting correctly, is it the eighth one in?

22   A.   Yes.

23   Q.   The eighth one down.  That's Mrs. Svensson?

24   A.   Yes.

25   Q.   And that's her, $655,000 total?

Page 102

1  A.    Yes.

2  Q.    Some people got stock as well; is that correct?

3  A.    Yes, this represents -- the salary is the comp rate,

4  sum act award column is the cash award bonus, some

5  people also got MMC stock options that year.

6  Q.    What's MMC?

7  A.    Marsh & McLennan, sorry, our parent company.

8  Q.    They were a publicly traded company?

9  A.    Publicly traded company.

10 Q.    And do you recall whether Mrs. Svensson in addition

11 to this $655,000 got -- was awarded stock that year?

12 A.    She was.

13 Q.    Okay.  And on all of the other analysts, including

14 one who's a male associate director of research, Michael

15 Yogg, got paid less than she did?

16 A.    Yes.

17        MR. KOCIUBES: All right.  I offer that, your

18 Honor.

19        MR. MOLONEY:  No objection.

20        THE COURT:  What number is that?

21        MR. KOCIUBES:  Defendants' 52, your Honor.

22        THE COURT:  That's 2002, right?

23        MR. KOCIUBES:  2002.

24        (Exhibit 52 received into evidence.)

25 BY MR. KOCIUBES:

1    Q.   Do you recall during the period of sort of starting

2    1998 to bringing it up to, say, 2006 what was happening

3    to the total bonus pools at Putnam?

4    A.   I think you said -- you said 1998 to 2006?

5    Q.   Right.  Right.

6         MR. MOLONEY:  Objection, your Honor, the date.

7         MR. KOCIUBES:  Something I'm going to offer at

8    least de bene if we could see you for ten seconds.

9         THE COURT:  I just didn't hear it.

10        (Pause.)

11        THE COURT:  Overruled.

12   BY MR. KOCIUBES:

13   Q.   Tell us from that period of time what was happening

14   to the sort of total bonus pools that were available to

15   be divided up.

16   A.   Well, between '98 through 2000, they were growing

17   significantly, and from 2001 through 2006, they had been

18   shrinking dramatically.

19        MR. KOCIUBES:  Let me ask Ms. Kurker to pull up

20   Defendants' 59.

21   Q.   And do you recognize Defendants' 59?

22   A.   Yes.

23   Q.   What is it?

24   A.   This is a detailing of the bonus pool for the

25   investment division from 1998 to 2006.

1          MR. KOCIUBES:  Let me, first of all, offer it,

2      your Honor.

3          THE COURT:  All right.

4          MR. MOLONEY:  No objection.

5          MR. KOCIUBES:  59.

6          (Exhibit 59 received into evidence.)

7      BY MR. KOCIUBES:

8      Q.   And you testified a moment ago that from 1998 to

9      2000, the bonus pools were growing?

10     A.   Yes.

11     Q.   It looks like they almost doubled, or I guess more

12     than doubled, between 1998 and 2000?

13     A.   Correct.

14     Q.   Times were pretty good?

15     A.   They were very good.

16     Q.   Then between 2000 and 2001, am I correct it looks

17     like it gets cut in half?

18     A.   Yes.

19     Q.   And --

20     A.   Almost half.

21     Q.   The fact that the total bonus pool got cut in half,

22     how did that affect people's bonuses?

23     A.   Almost everybody went down.

24     Q.   And then between 2001 and 2002, what happens?

25     A.   It went down again.

1    Q.   By the way, between 2001 and 2002, when the bonus

2    pool was going from 184 million to 130 million, what

3    happened to Lisa Svensson's compensation?

4    A.   It actually went up.

5    Q.   That was the year that she went to Global -- 2002

6    was when she went to Global Equity Research?

7    A.   Yes.

8    Q.   All right.  And then just in terms of sort of the --

9    then we've got these sort of other years.  Do you see

10   that?

11   A.   Yes.

12   Q.   All right.  But I take it, at least through 2006,

13   you never come back anywhere near the 1999, 2000 levels?

14   A.   Our total pools are less than that.

15   Q.   The total for the whole company, you mean?

16   A.   Yes.

17   Q.   Or even for the 2001 levels?

18   A.   Correct.

19   Q.   All right.  There's also been some testimony about

20   the number of officers in the investment management

21   division between 1998 and 2003.  What's happened to

22   those -- and I'm just asking you about officers in the

23   investment management division -- what's happened since

24   2003?

25   A.   The numbers have gone down.

1  Q.   And can you give us an order of magnitude?

2  A.   I don't know the exact numbers, but probably the

3  high 200s to around 200 or less.

4  Q.   And in addition to the absolute numbers being

5  reduced, has there been turnover of investment

6  professionals within the investment management division?

7  A.   Yes.

8  Q.   And can you sort of describe, again, sort of the --

9  what's happened there?

10  A.   In the 2003 to --

11  Q.   Yes.

12  A.   Well, we've had both voluntary, but we've also had a

13  fair amount of involuntary terminations as well.

14  Q.   And some of those people have been replaced?

15  A.   Some, but --

16  Q.   Even with the head count coming down?

17  A.   Some, but not all, yes.

18  Q.   There has also been testimony about the Growth

19  teams, not just International Growth but the Growth

20  teams overall, I think you said their performance by

21  2001 wasn't very good.  It wasn't just one Growth team,

22  it was a number of them or all of them?

23  A.   Pretty much all of them did not have --

24  Q.   We've heard some testimony already about changes

25  that happened in 2002, 2003, maybe even continuing.

Page 107

1    What happened to the bulk of the Growth managers?

2    A.    All but a very few are all gone.

3         MR. KOCIUBES:  If we could pull up Plaintiff's

4    426.

5         (Discussion off the record.)

6    Q.    Do you remember you were shown this -- we are going

7    to blow up the bottom of it in a minute.  Remember you

8    were shown this document that had your initials on it?

9    A.    Yes.

10   Q.    It was the 1999 performance profiles?

11   A.    Yes.

12   Q.    Let's just blow up the bottom.

13        (Discussion off the record.)

14   Q.    Do you see that there's an entry for Mrs. Svensson?

15   A.    Yes.

16   Q.    And there was some testimony that you gave about it

17   looks like there was some handwriting there?

18   A.    Yes.

19   Q.    All right.  Let me ask Ms. Kurker to pull up

20   Defendants' 80, which I think is a more complete version

21   of the same thing.

22        Do you recognize that?  Do you see

23   Mrs. Svensson is at the last line there with that

24   notation?

25   A.    Yes, I do.

Page 108

1    MR. KOCIUBES:  All right.  Let me, first of all,

2    offer that, your Honor.

3    THE COURT:  All right.

4    MR. MOLONEY:  No objection.

5    THE COURT:  What number is that?  Wait one

6    second, Mr. Alba had to run out for one second.

7    MR. KOCIUBES:  While I'm getting it, for the

8    record, it will be Defendants' 80.

9    (Exhibit  80 received into evidence.)

10    THE COURT:  Don't wait.  Just put it down there;

11    we'll do it afterwards.

12    MR. KOCIUBES:  Fabulous.  Thank you.

13    THE COURT:  We're going to finish him today,

14    so --

15    BY MR. KOCIUBES:

16    Q.  And am I correct, sir -- and let's just first of all

17    blow this portion up.

18    It looks like it wasn't only with respect to

19    Mrs. Svensson that there was handwriting, there was

20    handwriting and, apparently, commentary on a number of

21    people.  Do you see that?

22    A.  Almost everyone, yes.

23    Q.  Do you see the reference to Jack?

24    A.  Yes, I do.

25    Q.  Is this your handwriting, by the way?

5136613a-5505-4158-904c-7cee74f62aa6

Page 109

1    A.    It certainly is my handwriting.

2    Q.    What is it you were recording?

3    A.    I was recording comments and discussions that were

4    in that senior meeting, and this left column looks like

5    it was Jack's comments.

6    Q.    It looks like -- we'll bring the whole document back

7    in a minute, but it looks like there was a 3 that went

8    to a 2, a 4 that went to a three, a 4 that went to a 3.

9    Here's one that got raised.  Here's a 3.4 that went to a

10   3, a 4.8 that went to a 4, and a 4.0 that went to a 3.

11   Do you see that?

12   A.    Yes.

13   Q.    Let's sort of show the Court and the jury the entire

14   document again.  Let's actually start here first,

15   because it might be easier to read.

16         And the bottom there, the last name was

17   Mrs. Svensson.  Do you see that?

18   A.    Yes.

19   Q.    And that was the handwriting you got asked about

20   yesterday.

21   A.    Yes.

22   Q.    And she had a 4.8; it looks like you had written a 3

23   there?

24   A.    Yes.

25   Q.    And the name above her, by the way, is Kelly Morgan?

1    A.   Yes.

2    Q.   And do I infer from this that Mr. Swift had given

3    her a manager rating of 4.8 as well?

4    A.   Yes.

5    Q.   And hers was reduced, or there's a new notation, but

6    not as much as Mrs. Svensson's?

7    A.   Correct.

8    Q.   And the name above that was Mr. Dexter?

9    A.   Yes.

10   Q.   Am I correct that his was also reduced from a 3.4,

11   in this case, to a 3?

12   A.   Yes.

13   Q.   All right.  And then there were these other columns

14   that you got asked about with respect to Mrs. Svensson.

15   So let's just blow it up so the jury can see what the

16   columns are.

17        And you see the one there says "performance

18   trend"?

19   A.   Yes.

20   Q.   And Mrs. Svensson got a 5.  You see that?

21   A.   Yes.

22   Q.   And Ms. Morgan got a 4?

23   A.   Yes.

24   Q.   Am I in the wrong --

25   A.   In trend -- I think trend was next.

5136613a-5505-4158-904c-7cee74f62aa6

1    Q.    A 5 and a 3?

2    A.    Correct.

3    Q.    And if -- you apparently participated in these

4    discussions.  Why was Ms. Morgan having a lower

5    performance trend rating than Ms. Svensson,

6    Mrs. Svensson?

7              THE COURT: I can't remember.  Which one was

8    hers?

9              MR. KOCIUBES:  Let's just show the whole line.

10             You're absolutely right, your Honor, we'll just

11   show the whole line.

12             THE COURT:  If you can.

13             MR. KOCIUBES:  We were trying to get a caption.

14   A.    What was the question, I'm sorry?

15   Q.    Wait until we get a document up.

16             All right.  Do you see "performance trend"?

17   A.    Yes.

18   Q.    And do you see that Ms. Morgan got a 3?

19   A.    Yes.

20   Q.    And that Ms. Svensson got a 5?

21   A.    Yes.

22   Q.    What is performance trend?

23   A.    Well, as I was trying to describe, I think, earlier,

24   it is how your performance compares to prior years.  So

25   is it trending up?  So are you improving your

1  performance or is it consistent and staying at the same

2  level or is your performance going down?

3  Q.   And in the case of Ms. Morgan, what does the 3

4  signify?  How do we read this code?

5  A.   I don't recall the exact definitions, but the higher

6  the rating, it means your performance was going up; 3,

7  in the middle meant your performance was the same; and

8  you know, a lower or 1 would mean it was trending down.

9  Q.   So if she had been doing very well and got a 3, it

10  meant she continued doing well?

11  A.   If your rating was high, yes.

12  Q.   And the next column is potential?

13  A.   Yeah.

14  Q.   And I see that Ms. Morgan got a 3?

15  A.   Correct.

16  Q.   Actually, it's a 4.

17  A.   No, it's a 3.  No, 4, yes.

18  Q.   She got a 4?

19  A.   Yes.

20  Q.   And Ms. Svensson got a 5.  And what's the

21  significance of that?  What does it mean?

22  A.   Well, again, I don't remember the exact definitions

23  for each of the numbers, but again, this was in the

24  context of, you know, actually where you were within the

25  organization and how much potential, i.e., how many

Page 113

1    levels you could sort of go.  You know, if you were the

2    president, you wouldn't be able to go anywhere, so you

3    were sort of at your level.

4    Q.   So your number wasn't going to be high because there

5    was no place else you could go?

6    A.   So the higher you were in the organization, it was

7    more difficult to go multiple levels.

8         So someone, you know, that was more senior might

9    have a 4, in this case Kelly, because there's less

10   potential.  And then a 5 would mean that you've got, you

11   know, more potential, i.e., more places or opportunity

12   to go.

13   Q.   All right.  Now you were also shown a document -- we

14   can pull that down.

15        You were also shown a document, I think

16   yesterday, by Mr. Moloney that talked about the early

17   2000 officer elections and nominations for 19 -- after

18   the end of 1999.  Do you recall that?

19   A.   I remember talking about it, but I don't recall the

20   specific documents.

21   Q.   Let me show you, sir, another document and ask if

22   you can identify it for us.  It's Defendants' 5.

23        Do you recognize that, sir?

24   A.   Yes.

25   Q.   And tell the Court and jury what it is.

5136613a-5505-4158-904c-7cee74f62aa6

1  A.   This is a record of the discussions and votes or

2  endorsements, if you will, from the IDMC, that was the

3  senior group of managers, leaders within the investment

4  division, so the investment division management

5  committee, and they were discussing the officer

6  nominations in early 2000.  And this is specifically the

7  endorsements or votes for the managing director

8  nominations.

9  Q.   And 1999 was still a good year for International

10  Growth, correct?

11  A.   Correct.

12       MR. KOCIUBES:  Let me, first of all, offer that,

13  your Honor.

14       THE COURT:  All right.

15       MR. MOLONEY:  No objection.

16       MR. KOCIUBES:  It's Defendants' 5.

17       (Exhibit 5 received into evidence.)

18  BY MR. KOCIUBES:

19  Q.   And let's just take these one at a time.  The first

20  name is John Boselli?

21  A.   Correct.

22  Q.   Before we do that, let me ask who these people are

23  who seem to be voting.  Jack Morgan?

24  A.   So he was the person in charge of all -- all of the

25  Growth teams.

Page 115

1    Q.    Joe -- is it Cassaro?

2    A.    Cassaro, yes.  He was the chief administrative

3    officer.

4    Q.    Brett Browchuk?

5    A.    He was the chief operating officer, so he had all of

6    administration and some other groups, including Trading.

7    Q.    I'm having trouble reading the next one.

8    A.    Ed Daleliou.

9    Q.    Who was he?

10   A.    He was the head of Fixed Income.

11   Q.    Kathie Collman?

12   A.    My boss at the time, head of human resources.

13   Q.    Steve Oristaglio, we've heard his name.

14   A.    He was the deputy head of Investments.

15   Q.    Tim Ferguson?

16   A.    Was the head of Investments.

17   Q.    Tom Reilly?

18   A.    He was the CIO in charge of all of Value.

19   Q.    The next one is Carol, is that Carol McMullen?

20   A.    Yes, she was the head of Research.

21   Q.    And the last one was Justin Scott?

22   A.    Right.  He was the head of Core.

23          THE COURT:  What were you just reading from?

24   Not what's on the screen.

25          MR. RODRIQUES:  The names are across the top.

1          THE COURT:  Across the top.  I see.

2    BY MR. KOCIUBES:

3    Q.   Now, the first name mentioned there is John Boselli.

4    Do you see that?

5    A.   Yes.

6    Q.   It looks like Mr. Morgan, he wasn't ready to be a

7    managing director?

8    A.   That's correct.

9    Q.   Kathie Collman thought he wasn't?

10   A.   Correct.

11   Q.   Tim Ferguson thought he wasn't?

12   A.   Correct.

13   Q.   Steve Oristaglio thought he wasn't?

14   A.   Correct.

15   Q.   Tom Reilly thought he wasn't?

16   A.   Correct.

17   Q.   And do you recall whether he got elected?

18   A.   He did not get nominated.

19   Q.   You needed a majority of these people?

20   A.   Yes.

21   Q.   Okay.  So he did not make it.

22   A.   He did not.

23   Q.   Next one is Jeff Lindsey.

24   A.   Correct.

25   Q.   And I see a lot of yeses across for his name.

5136613a-5505-4158-904c-7cee74f62aa6

1  A.    Correct.

2  Q.    And so do I infer that he did get elected?

3  A.    He did become a managing director.

4  Q.    And the next one is a woman named Elizabeth

5  McElwee-Jones.  Do you see that?

6  A.    Yes.

7  Q.    It looks to me like I see all yeses, except maybe

8  one no?

9  A.    Correct.

10  Q.    Did she get elected?

11  A.    She did.

12  Q.    All right.  And the next name I see is Michael

13  Mufson?

14  A.    Mufson, yes.

15  Q.    Mufson.  And I see two nos, but the rest yeses?

16  A.    Correct.

17  Q.    And did he get elected?

18  A.    He did.

19  Q.    And the next name --

20       THE COURT:  You know, I don't think you need to

21  read it all.

22       MR. KOCIUBES:  Okay.

23       THE COURT:  Do you need to focus on one?

24  BY MR. KOCIUBES:

25  Q.    Okay.  Am I correct it appears there were six males,

1    six men who were nominated that year?

2         (Pause.)

3    A.    Yes.

4    Q.    And am I correct that of the six, there were two who

5    were not elected, Michael Yogg and John Boselli?

6    A.    Correct.

7    Q.    All right.  And am I also correct that there were

8    four women who were nominated?

9    A.    Yes.

10   Q.    And of the four women, how many were elected?

11   A.    Three.

12   Q.    And with respect to Mrs. Svensson that year, how

13   many affirmative votes did she get?

14   A.    Six.

15   Q.    Affirmative votes?  Mrs. Svensson, I'm asking about.

16   A.    I'm sorry, I was reading the Rosemary line.  Sorry.

17        None.

18   Q.    And that includes from Carroll McMullen and Kathie

19   Collman?

20   A.    Yes.

21   Q.    Now, let me fast forward to 2003.  Do you recall

22   whether there were discussions about whether anybody was

23   going to be elected to managing director in 2003?

24   A.    Yes, there were.

25   Q.    All right.  Let me, first of all, show you a

1    document, Defendants' 26.  And I believe it was

2    introduced under a different number by Mr. Moloney

3    yesterday.

4          Just blow it up so they can read it.

5          And am I correct that you were sent a copy of

6    this?

7    A.   Well, there's two e-mails, you're talking about the

8    bottom part?

9    Q.   Let's start with the bottom, we'll get to the top.

10         It looks like -- can you tell us the date?

11   A.   February 24th of 2003, from Bill Landes.

12   Q.   And it's from?

13   A.   Bill Landes.

14   Q.   Okay.  And am I correct that he's talking about,

15   still in February, the people that he would nominate for

16   managing director?  Do you see that?

17   A.   Yes, I do.

18   Q.   And he says Saba Malak, Roger Sullivan, RJ Bukovac,

19   and those were three of the people that had this high

20   performance for more than one year?

21   A.   Correct.

22   Q.   And then Lisa Svensson?

23   A.   Yes.

24   Q.   And then Michael Yogg?

25   A.   Yes.

Page 120

1    Q.   And then he adds, "in that order of preference"?

2    A.   Yes.

3    Q.   Do you see that?

4    A.   I do.

5    Q.   All right.  And was there a decision, in fact, made

6    about whether anybody was going to make managing -- be

7    elected managing director?

8    A.   At that time -- well, as highlighted in the note

9    above, everything was on hold.

10   Q.   And the Rick in the note above, who's that?

11   A.   That's me.

12   Q.   And there you reported to Landes that the officer

13   title promotions are on hold?

14   A.   Correct.

15   Q.   And with respect to managing director, did they stay

16   on hold at least through September 15 of 2003?

17   A.   Yes.

18        MR. KOCIUBES:  The document we've been looking

19   at, your Honor, for the record, that had been introduced

20   previously is Plaintiff's 454.

21        MS. KURKER:  Or maybe 455.  There were two

22   e-mails on the same date.

23        MR. KOCIUBES:  All right, we'll clean that up.

24   BY MR. KOCIUBES:

25   Q.   Let's, if we could, just focus a little bit --

Page 121

1    actually, before we do that -- do you recall yesterday

2    and then today you were shown a manager's handbook?

3    A.    Yes.

4    Q.    And let me -- and it had various procedures,

5    corrective procedures?

6    A.    Yes.

7            MR. KOCIUBES:  Could we -- it's Plaintiff's 140.

8    Could we pull it up?

9            And could we go to page 645?

10           THE COURT:  What was that e-mail I just saw up

11   there?

12           MR. KOCIUBES:  That this --

13           THE COURT:  Did you want -- what was just up

14   there?  Did you want to introduce that?

15           MR. KOCIUBES:  It was introduced yesterday by

16   Mr. Moloney.  I was referring to the number, or trying

17   to, that it was introduced under.  But that one is in

18   evidence.

19           THE COURT:  All right.

20           MR. KOCIUBES:  As is this employee handbook,

21   your Honor.  It's Plaintiff's 140.

22   BY MR. KOCIUBES:

23   Q.    Now, you recall that Mr. Moloney walked you through

24   the various steps for corrective action?

25   A.    Yes.

1    Q.    But at the top here, it actually states what the

2    policy is.  Do you see that?

3    A.    I do.

4    Q.    And am I correct that the policy includes the --

5    it's only two sentences long, right?

6    A.    Yes.

7    Q.    And it includes the sentence, or three sentences, I

8    guess, The following are guidelines for you to use in

9    this process.  In any instance, Putnam may use

10   discretion.  Do you see that?

11   A.    I do.

12   Q.    In what kind of purposes might a manager or HR use

13   discretion?

14   A.    Well, certainly, as was noted when we went through

15   the process, if there was a major offense, that would be

16   something that you would say I'd use my discretion and

17   not necessarily follow the process.  Or it would be in

18   a, you know, emergency or crisis kind of situation, you

19   might not follow that process.

20   Q.    All right.  Let's go to page 648.

21         And do you see at that top of that page the list

22   of major offenses?  Do you want to see the previous

23   page?

24   A.    Well -- I think it started off on the other page.

25   Q.    Let's go to the other page.

1    And do you see the heading "major offenses in"?

2  A.   Yes.

3  Q.   And there are several that are listed on that page.

4  Do you see that?

5  A.   Yes.

6  Q.   Can we go to the next page?

7    And do you see that the first one on that second

8  page is "insubordination"?

9  A.   Yes.

10  Q.   Now, do you know whether HR was involved in the

11  events leading to Ms. Svensson's termination or

12  separation from Putnam?

13  A.   Yes, we were.

14  Q.   And do you remember who specifically was most

15  involved?

16  A.   Mary McNamee.

17  Q.   Do you know why the corrective process was not

18  utilized --

19    THE COURT:  Do you have firsthand knowledge, by

20  the way?

21    THE WITNESS:  Do I have firsthand knowledge --

22    THE COURT:  Were you involved yourself?

23    THE WITNESS:  Well, Mary was -- Mary was the

24  lead on it, and I was her boss and was aware of -- and

25  received updates from her.

1  BY MR. KOCIUBES:

2  Q.   We'll do it in this fashion.

3       Let me just put several documents in that we

4  will need in the record.  If I might approach the

5  witness.

6       Do you recognize the document that I'm handing

7  you, sir?

8  A.   Yes.

9  Q.   And would you tell us -- would you identify it for

10 us?

11 A.   Let me see what it is here.

12      (Pause.)

13      (Discussion off the record.)

14 A.   This is the associate and principal's incentive

15 compensation plan.

16      MR. KOCIUBES:  I offer it, your Honor.

17      MR. MOLONEY:  No objection.

18      MR. KOCIUBES:  And it's Defendants' 4.

19      (Exhibit 4 received into evidence.)

20      THE COURT:  I just want to make sure you're done

21 by five of, because -- in case there's a need for

22 redirect.

23 BY MR. KOCIUBES:

24 Q.   Let me show you a second document and ask if you can

25 identified that for us?

Page 125

1      (Pause.)

2  A.    Yes.  This is the profit growth incentive

3  compensation plan or it was the deferred cash

4  compensation.

5          MR. KOCIUBES:  I'd offer it, your Honor.

6          MR. MOLONEY:  No objection.

7          MR. KOCIUBES:  Defendants' 3.

8          (Exhibit 3 received into evidence.)

9  BY MR. KOCIUBES:

10  Q.    Do you recall that in the HR coding system that

11  terminations would be coded as to whether they were for

12  cause or not for cause?

13  A.    Yes.

14  Q.    At Putnam what was the significance one way or the

15  other?  Do you recall?

16  A.    Yes.  The -- the significance of being terminated

17  not for cause would typically mean that if you have

18  deferred cash or equity, that you potentially would be

19  eligible to receive that deferred compensation.

20  Q.    And do you recall whether in order to be eligible

21  for it, employees were required to sign releases?

22  A.    They were required to sign releases.

23  Q.    Was that part of the standard package?

24  A.    Yes.

25  Q.    And were men and women treated any different with

Page 126

1  respect to that?

2  A.   No.

3         MR. KOCIUBES:  I have no other questions, your

4  Honor.

5                 REDIRECT EXAMINATION

6  BY MR. MOLONEY:

7  Q.   Mr. Tibbetts, Mr. Kociubes asked you some questions

8  concerning in about the time of that best stock picker

9  memo?

10 A.   Yes.

11 Q.   Do you remember that, that had several names and

12 Mrs. Svensson was in the top quartile and made reference

13 to Darren Peers and Roger Sullivan over a three-year

14 period?

15 A.   Yes, I recall.

16 Q.   And that was talking about 2002, was it not?

17 A.   Yes.

18 Q.   And how many months in the research department did

19 Mrs. Svensson spend in 2002?

20 A.   I don't know the exact, but it was eight --

21 Q.   Somewhere between May and December, whatever those

22 months are, it's about seven months, isn't it?

23 A.   Or April, I think.

24 Q.   Seven or eight months?

25 A.   Yeah.

1  Q.   And all the other people had been there at least all

2  throughout '02, and, of course, Mr. Sullivan was there

3  for three years at least, right?

4  A.   Are you talking about the people on the memo that

5  were there at that time?

6  Q.   Yes, sir.

7  A.   And Mr. Sullivan was there.  I'm sorry.

8  Q.   He was the one there over the three-year period?

9  A.   It was two or more.

10  Q.   So he was there for two or more years, and everybody

11  else was there for more than the seven or eight months

12  that Mrs. Svensson was, correct?

13  A.   I'd have to look at the list, but I think that's

14  correct, yes.

15  Q.   Okay.  All right.

16       Now, in terms of the changes in the scores in

17  the grades and the rankings, do you remember Mr.

18  Kociubes asked you some questions about that and

19  pointing out where there was some adjustments to other

20  numbers?

21  A.   Yes.

22  Q.   Correct?

23  A.   Yes.

24  Q.   And he made mention of the fact that on that

25  document, Mr. Dexter had been reduced from 3.4 to 3?

Page 128

1    A.    I believe that's right.

2    Q.    Okay.  So that's a .4 difference, isn't it?

3    A.    Yes.

4    Q.    And Mrs. Svensson's score was reduced from 4.8 to

5    3.0, wasn't it, on that document?

6    A.    Yes.

7    Q.    And that's a reduction of 1.8?

8    A.    Yes.

9    Q.    No other adjustment of any score on that document

10   was of 1.8 or more, was it, other than hers?

11   A.    I have to look at the document, but -- I mean, I

12   have no reason to believe you're not saying -- telling

13   the truth.

14   Q.    All right.  Now, let me just put up on the screen

15   some answers to interrogatories in this case from

16   Putnam.

17         Now, Mr. Kociubes spent some time with you

18   having you talk about males and females who were elected

19   managing directors for purposes of the year 2000.  Do

20   you recall that?

21   A.    Yes.

22   Q.    Now, this is page 11 of the sworn answers to

23   interrogatories filed by Putnam in this case.  And if

24   you look on page 17 that we're showing right now, it's

25   signed under oath by Mary McNamee, correct?

5136613a-5505-4158-904c-7cee74f62aa6

Page 129

1    A.    Yes.

2    Q.    That's the same Mary McNamee that works -- that

3    worked for you at the relevant period of time?

4    A.    Yes.

5    Q.    Now, would you take a look at the election results

6    for 2001, please?  It's highlighted in yellow.  I've put

7    an M 6 and F 1 to the right-hand margin.  And correct my

8    mathematics if I'm wrong, but I count that six males and

9    one female were elected in 2001; namely, males John

10   Boselli, Joshua Byrne, Tonya Lafia, Steven Gorman, Hugh

11   Mullin, William Sullivan, and one female was elected,

12   Margaret Smith.  Do you see that?

13   A.    I do.

14   Q.    That comes up to six males and one female.  Correct?

15   A.    Yes.

16   Q.    What happened to Margaret Smith?

17   A.    She got promoted --

18   Q.    After this election, what happened to her?  Wasn't

19   she demoted?

20   A.    I don't recall a demotion for Margaret Smith, no.

21   Q.    Okay.  And did she leave Putnam?

22   A.    She did.  I don't know when she left, though.

23   Q.    You don't know why she left, do you?  Right?

24   A.    Pardon me?

25   Q.    You don't know why she left, either?

5136613a-5505-4158-904c-7cee74f62aa6

1    A.    I don't recall why she left.

2    Q.    Okay.  But the Putnam business records would

3    indicate whether she had been demoted, would they not,

4    and the time and circumstances of her leaving?  That's

5    true, isn't it?

6    A.    The records will show what her titles were, yes.

7    Q.    And they will show when she left and whatever the

8    reason was for her leaving; isn't that true?

9    A.    Yes.

10   Q.    So we could look at the documents and find out when

11   and why; isn't that true?

12   A.    Yes.

13   Q.    The records maintained by your department?

14   A.    Yes.

15   Q.    Would you look, now, for 2002.  My math has six

16   males elected; namely, Richard Block, Rob Bloemker,

17   David Hamlin, Jeff Knight, Andrew Matteis, James Prusco.

18   I add that up to six, correct?

19             And no females?

20   A.    And no females in the investment division.

21   Q.    Now, in your deposition, do you recall testifying

22   about Mr. Waldman?

23   A.    In my deposition?

24   Q.    Do you recall testifying about a Mr. Waldman?

25   A.    Here?

5136613a-5505-4158-904c-7cee74f62aa6

1  Q.   In this case.  Not in this courtroom, but in your

2  deposition?

3  A.   About Mr. Waldman, no.

4  Q.   As having been relieved of management

5  responsibilities?

6  A.   I may have.  I don't remember that.

7  Q.   Okay.  You recall a Mr. Waldman?

8  A.   Yes.

9  Q.   Okay.  And his management -- he was an investment

10 professional at Putnam, was he not?

11 A.   He was.

12 Q.   And he was relieved of management responsibilities,

13 wasn't he?

14 A.   Well, he --

15 Q.   Was he relieved of management responsibilities?

16 A.   My memory, no, he went from one management job to

17 another management job.

18      MR. MOLONEY:  May I approach the witness, your

19 Honor, please?

20      THE COURT:  Yes.

21 BY MR. MOLONEY:

22 Q.   You recall that you were deposed in this case,

23 Mr. Tibbetts, weren't you?

24 A.   Multiple times, yes.

25 Q.   Okay.  And let me come around to the side of where

Page 132

1    you're sitting, if I may, and ask you some questions.

2    I'm showing you, sir, is a copy of the transcript of

3    your deposition.  You see your name here, Thursday, June

4    8, 2006, took place at my office?

5    A.    Yes.

6    Q.    And I'm directing your attention, sir, to page 39 of

7    the deposition transcript.  And the parts that I am

8    going to ask you to take a look at have some yellow

9    highlighting and black brackets on it.

10   A.    Yes.

11   Q.    Now, let me just say this is on page 39, line 18.

12          "Q.  Have you been involved at any point in time

13   in circumstances involving an investment professional's

14   demotion within the organization?

15          "A.  Not that I specifically recall, no.

16          "Q.  Have you ever been involved in an

17   individual being deprived of or having removed

18   management responsibilities?

19          "A.  Within the investment division you're

20   talking about?

21          "Yes.

22          "I have not been directly involved in that, no.

23   Indirectly -- well" --

24          THE COURT:  Slow down.  She's got to get it

25   down.

Page 133

1    BY MR. MOLONEY:

2         "A.  Well, sometimes there have been other

3    activities that my staff has been involved in.

4         "Q.  Do you recall a specific instance?

5         "A.  Well, one, which is Lisa.

6         "Q.  Anyone other than Lisa Svensson?

7         "A.  There was another one David Waldman,

8    W-a-l-d-m-a-n.  Those are the two that come to mind.

9         "Q.  When did that occur with David Waldman?

10        "A.  I don't know the exact time.

11        "Q.  Before or after Lisa Svensson?

12        "A.  It would have been before.

13        "Q.  Do you recall" --

14        THE COURT:  You know, she has to get it down.

15        MR. MOLONEY:  Sorry.

16        THE COURT:  So you just need to slow down.

17    She's good, but you know --

18        MR. MOLONEY:  Okay.

19        THE COURT:  -- she's got to be able to get it

20    down.

21        MR. MOLONEY:  We'll give her the transcripts so

22    that she can --

23        Let me go back.

24        "Q.  When did that occur with David Waldman?

25        "I don't know the exact time.

Page 134

1    "Q.  Before or after Lisa Svensson?

2    "A.  It would have been before.

3    "Do you recall how long before?

4    "I don't.

5    "Do you remember whether it was during the IDMC

6  period?"

7  Q.  That's the Investment Division Management Committee,

8  IDMC, Mr. Tibbetts?

9  A.  Yes.

10  Q.  Okay.

11    I lost my place.

12    Thank you.

13    "Do you remember whether it was during the IDMC

14  period?

15    "A. It would have been, yes.  The reason why I'm

16  saying that is because that happened when Tim Ferguson

17  was head of investments, but I don't recall the time

18  period.

19    "Q.  Where did David Waldman work?

20    "A.  He was part of the Fixed Income

21  organization and was the CIO of the Taxable Fixed Income

22  Group.

23    "Q.  What happened to David Waldman?

24    "A.  He was removed from that leadership role

25  and put into an individual contributor role, officially

5136613a-5505-4158-904c-7cee74f62aa6

Page 135

1   in the Quantitative Research Group within Fixed Income.

2           "Q.  Do you recall what occasioned that move

3   being undertaken?

4           "A.  There was, I guess, a general agreement,

5   including David, I guess, that the broader leadership

6   role was not his strength and that his strength was

7   really in the quantitative research portfolio

8   construction area and that was a better fit for his

9   skills and a way for him being able to make a

10  contribution to the firm.

11          "So he agreed with that move?

12          "A.  Yes.

13          "Are there any other instances that you can

14  recall in which an individual, leaving Lisa Svensson

15  aside for the moment, was deprived of management

16  responsibilities during the time that you have been at

17  Putnam?

18          "A.  Those are the only two that I remember that

19  had leadership roles that did no longer have them.

20          "Is that right up to the present time?

21  Q.   Answer -- your answer, sir, was?

22  A.   "Yes."

23          THE COURT:  Thank you very much.  Anything on

24  re --

25          MR. KOCIUBES:  One, two more questions.

1        If I could borrow the answers to interrogatories

2   Mr. Moloney was using.

3        MR. MOLONEY:  Yes.

4                   RECROSS-EXAMINATION

5   BY MR. KOCIUBES:

6   Q.   Am I correct, Mr. Tibbetts, that some years there

7   were more men elected managing directors and less and

8   some years there were more women and some years there

9   were fewer?

10  A.   Yes.

11  Q.   So for example, in 1999, how many men were elected?

12  A.   One.

13  Q.   And how many women were elected?

14  A.   Three.

15  Q.   It bounced around?

16  A.   It did.

17       MR. KOCIUBES:  No further questions.

18       THE COURT:  Thank you.  See you on Tuesday.

19  Have a wonderful Memorial Day weekend.

20       (Discussion off the record.)

21       THE COURT:  I'm going to read the question.  Do

22  you want to -- so the question is:  Mr. Tibbetts was

23  asked if refusing to sign a separation agreement was

24  usually coded as involuntary poor performance.  He wants

25  to ask you whether there were any other instances of

1   employees refusing to sign separation agreements, and if

2   so, how frequent it was.

3           THE WITNESS:  Well, everybody that was leaving

4   involuntarily from the organization was asked to sign a

5   separation agreement, and they would receive severance

6   as part of that agreement.

7           THE COURT:  So did anyone -- the question was:

8   Did anyone else refuse to sign a separation agreement?

9           THE WITNESS:  Some have, yes.

10          THE COURT:  About how many?

11          THE WITNESS:  It's literally handfuls.  I don't

12  know the exact number, though.

13          THE COURT:  Under ten?

14          THE WITNESS:  I mean, over what time period?  I

15  mean -- it's a very -- maybe on a percentage basis would

16  be the best way to answer it.  I would say certainly

17  less than three or four percent of the population in

18  that group would refuse to sign.

19          THE COURT:  Okay.  Thank you.

20          See you on Tuesday.

21          THE CLERK:  All rise for the jury.

22          (Jury left the courtroom at 1:00 p.m.)

23          (Discussion off the record.)

24          THE COURT:  One thing quickly on the record.

25          I still have a fundamental problem in reading

1    what your supplement is, which is I don't understand

2    what the promotion issue is.  What position are we

3    talking about?

4           MR. MOLONEY:  We're talking about portfolio

5    management positions that were available and filled

6    primarily virtually exclusively all by males.

7           THE COURT:  When?

8           MR. MOLONEY:  After May.

9           THE COURT:  When did we hear about that?  I

10   didn't hear about any of them.  So this is -- let me put

11   it this way:  As far as I'm concerned, there has been no

12   testimony about open managing director positions that

13   were filled in the relevant time period.

14          MR. MOLONEY:  I'm not talking about managing

15   director positions.

16          THE COURT:  What are you talking about?

17          MR. MOLONEY:  I'm talking about portfolio

18   manager positions.  And those are shown by some of the

19   documents that we have put in.  They were portfolio

20   manager --

21          THE COURT:  I'll tell you what, you make a

22   proffer to me, because I'm really reluctant to have --

23   here's my issue:  My issue is, I don't know if you call

24   that a promotion.  Now I'm understanding it, let me make

25   a ruling, there is no evidence about any open managing

1  director position, except for Josh Brooks.  I think

2  there was a problem why he was considered without

3  considering her, but it's not in the time period.  You

4  can argue about that, but it's not in the time period.

5       So now we're at the issue of whether there are

6  any available portfolio manager positions?  I'm just not

7  sure who you're talking about.  And if you -- I

8  understand that claim, but which positions you say came

9  open that she wasn't put into, and so when you're doing

10 damages, you have to be very specific -- I don't want

11 them guessing, because we've heard all these other

12 positions which are all red herrings now, in the sense

13 they may be relevant to the pattern of discrimination,

14 but they're not going to get that.

15      So I need specifically whose position --

16      MR. MOLONEY:  When I was asking Mr. Tibbetts

17 about Mr. Lafia and Mr. Oristaglio moving into those

18 slots.  I was working on charts that were based on

19 interrogatories and other data that showed these slots

20 were open.

21      THE COURT:  Can I tell you that it's not that

22 you're right or wrong, it's hopelessly confusing.

23      MR. MOLONEY:  I have the chalks.

24      THE COURT:  What you're going to have to do is a

25 proffer.  I don't want the expert offering testimony

Page 140

1    about compensation she would have received if she had

2    moved over to portfolio manager without being very

3    specific as to what the position is.

4        She definitely has a termination claim, she has

5    a demotion claim.  I'm going to have to think about who

6    are comparables for an unfair compensation under the

7    Mass. law.  I'd have to think about.  But you've been

8    unclear to me on promotions, because my whole focus has

9    been managing director, so I don't think of the other

10   portfolio manager positions as promotions, but as

11   potentially positions with higher growth potential.

12       MR. MOLONEY:  Exactly.

13       THE COURT:  So I would have to know who you're

14   talking about before I'm going to let in any expert

15   testimony on it, okay?  So you're just going to have

16   give me a proffer on Tuesday.

17       MR. MOLONEY:  It's in the book --

18       THE COURT:  I'm not going to find it.  Just give

19   me a proffer on just whose positions are we talking

20   about?  Okay, specifically.  And then, hopefully, we'll

21   have -- if necessary, you'll segment out his damages

22   testimony, so if I knock it out, I knock it out.

23       MR. MOLONEY:  Okay.

24       THE COURT:  Good.  I'll see you -- I hate to say

25   this, but have a nice weekend.

1          MR. KOCIUBES:  You, too, your Honor.

2          THE COURT:  Tuesday you'll get at least a rough

3     draft of a charge and verdict form, including both

4     motive, that it is the determinative motivator or a

5     determinative motivator, and a mixed motive.  I'm going

6     to have both, I think.

7          MR. MOLONEY:  Okay, thanks.

8          (Court adjourned at 1:05 p.m.)

9

10              - - - - - - - - - - - -

11                    CERTIFICATION

12          We certify that the foregoing is a correct

13     transcript of the record of proceedings in the

14     above-entitled matter to the best of our skill and

15     ability.

16

17     /s/ Lee A. Marzilli

18     Lee A. Marzilli, RPR, CRR

19     Official Court Reporter

20

21     /s/Debra M. Joyce
       Debra M. Joyce, RMR, CRR
22     Official Court Reporter

23

24     May 23, 2008

25

1

5136613a-5505-4158-904c-7cee74f62aa6