Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


LISA SVENSSON,              )
                           )
              Plaintiff    )
                           )
      -VS-                  ) CA No. 04-12711-PBS
                           ) Pages 1 - 176
PUTNAM INVESTMENTS, et al, )
                           )
            Defendants     )



JURY TRIAL - DAY TEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 27, 2008, 9:15 a.m.




LEE A. MARZILLI and DEBRA M. JOYCE

OFFICIAL COURT REPORTERS

United States District Court

1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

10114079-c30b-44a9-a20c-9515595e0091

1    A P P E A R A N C E S:

2         KEVIN F. MOLONEY, ESQ. and ROGER T. MANWARING, ESQ.,
     Barron & Stadfeld, PC, 100 Cambridge Street, Suite 1310,
3    Boston, Massachusetts, 02114, for the Plaintiff.

4         JOHN K. WEIR, ESQ., John K. Weir Law Offices, LLC,
     300 Park Avenue, Suite 1700, New York, New York, 10022,
5    for the Plaintiff.

6         JOSEPH L. KOCIUBES, ESQ., LOUIS A. RODRIQUES, ESQ.,
     ALLYSON E. KURKER, ESQ., and JENNIFER L. HOLDEN, ESQ.,
7    Bingham McCutchen, LLP, 150 Federal Street, Boston,
     Massachusetts, 02110, for the Defendant, Putnam Investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10114079-c30b-44a9-a20c-9515595e0091

1                        I N D E X

2     WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3     Richard A. Siegel        5       19

4     Steve Oristaglia        45      130       140

5     EXHIBITS                        PAGE

6     Plaintiff's

7     199                             18

8     233                             42

9     464                             44

10    Defendant's

11    18                              67

12    19                              87

13

14

15

16

17

18

19

20

21

22

23

24

25

10114079-c30b-44a9-a20c-9515595e0091

1                    P R O C E E D I N G S

2              THE COURT:  I think the jury is all here, and

3     nobody wanted to see me, so why don't we -- who's on the

4     witness stand?

5              MR. MOLONEY:  Dr. Siegel.

6              THE COURT:  Okay.  So you gave me a proffer.  Did

7     you move in those charts?

8              MR. MOLONEY:  I'm sorry, your Honor?

9              THE COURT:  You gave me a proffer as I requested

10    about promotions that were timely in the 2003 time period.

11             MR. MOLONEY:  Yes, right.

12             THE COURT:  Are those in evidence?

13             MR. MOLONEY:  Not yet, your Honor.

14             THE COURT:  So is he going to be testifying based

15    upon that at all?

16             MR. MOLONEY:  No, your Honor.

17             THE COURT:  All right, fine.  Let's go.

18             (Jury enters the courtroom.)

19             THE COURT:  Good morning to everyone.  Hope you had

20    a great weekend.  It was certainly beautiful weather.  Did

21    anybody speak about the case or see anything in the press?  I

22    find the jury has complied.

23             You're next and, am I right, your last witness?

24             MR. MOLONEY:  The next witness, your Honor, is

25    Dr. Siegel.

1           THE COURT:  Dr. Siegel.

2               RICHARD A. SIEGEL

3  having been first duly sworn, was examined and testified as

4  follows:

5           THE CLERK:  Would you please state your name and

6  spell it for the record.

7           THE WITNESS:  My name is Richard Alan Siegel,

8  S-i-e-g-e-l.

9  DIRECT EXAMINATION BY MR. MOLONEY:

10  Q.   And, Dr. Siegel, where do you reside?

11  A.   I reside in Brookline.

12  Q.   And your current occupation is what, sir?

13  A.   I'm an economist.  I have a firm.  I go under the name

14  of Applied Economics, Incorporated, and I'm the president and

15  sole employee of that firm.

16  Q.   And what kind of a profession are you and that company

17  involved in?

18  A.   Well, the primary work is in a field called forensic

19  economics, which is an analysis of economic loss, always in

20  conjunction with a lawsuit.  Now, that loss might be lost

21  wages and benefits, as it is in this case.  It could be lost

22  business profits if one business is suing another.  But it's

23  always taking a plaintiff and a defendant who are in a

24  dispute and then figuring out what loss may be involved,

25  almost always by the plaintiff but by the -- but I testify

1    for defendants too.

2           I have another area of practice, which is assisting

3    labor unions in collective bargaining negotiations.  I've

4    done considerable work for firefighters and police in that

5    respect where they're going into arbitration over the wages

6    and benefits.

7    Q.    Can you tell us about your education.

8    A.    Yes.  I have three degrees from the University of

9    California at Los Angeles, which most people know as UCLA.  I

10   received a bachelor's degree there in 1954, a master's degree

11   in industrial relations in the business school in 1959, and a

12   Ph.D. in industrial relations in 1961 with fields in

13   industrial relations, economic theory, labor economics, and

14   others.

15   Q.    Now, after your formal education ended, did you become

16   employed?

17   A.    Yes, I did.

18   Q.    And if you could take us just chronologically through

19   that, please, if you would.

20   A.    Well, the first thing I did was what many young Ph.Ds

21   do; I taught.  I went to the state University of York at

22   Buffalo, and I taught in the economics department there for

23   about three years.  I taught introductory economics,

24   intermediate theory, labor economics, money and banking; you

25   know, wide variety of courses in the field of economics.

1  That work went on for, oh, about three years.

2          I left the university in the summer of 1964, and I

3  went back out to California where I came from and joined the

4  economics department of the Bank of America.  At that time

5  the Bank of America was the world's largest bank in terms of

6  assets, and they had a good size staff of people in the

7  economics department.  My work there primarily was to do

8  long-range forecasts, look ten, fifteen, twenty years into

9  the future to where various industries in the state were

10 heading in terms of production and employment.  For example,

11 I did a study, a 20-year projection of the output of the

12 Redwood Forest industries in Northern California.  At that

13 time, there was a great deal of controversy about the Redwood

14 Forests, and the bank wanted to analyze various scenarios

15 that might emerge.  They were thinking of making a very large

16 park in that area, Redwood Park.

17         THE COURT:  I think we need to move on to the

18 issues here.

19 Q.   And at some point, did you return to Massachusetts?

20 A.   Yes, I did.  I returned to Massachusetts in 1968, and I

21 went to work for a consultant firm, Arthur D. Little in

22 Cambridge.  I worked for them about two and a half years, and

23 then in the '70s I went off as an independent consultant

24 under the name Richard Siegel Associates.

25         Towards the end of that period, about 1978, I began

1    to do work in this field, forensic economics.  That field

2    grew, and I formed Applied Economics in 1983, and I've been

3    doing that work ever since.

4    Q.   Have you testified as an expert witness in any federal

5    or state courts?

6    A.   Yes, I have.

7    Q.   Can you tell us, give us some examples of that?

8    A.   Well, I testified in all the superior courts in

9    Massachusetts with the exception of the Cape and Islands; the

10   Federal Courts here in Boston, the Federal Court in

11   Springfield, the Federal Court in Brooklyn, New York, the

12   Federal Court in New Hampshire.  I testified in state courts

13   in New York, Rhode Island, Vermont, New Hampshire, probate

14   courts.  A wide variety of venues.

15   Q.   Now, at some point were you asked to review and analyze

16   any data for purposes of this case?

17   A.   Yes, I was.

18   Q.   And can you tell us about when that was?

19   A.   Oh, that would be in the middle of 2006.

20   Q.   And can you tell us what data and information you

21   reviewed at that time?

22   A.   Well, my job was to do an estimate of the economic loss,

23   the loss of money and the value of benefits that Ms. Svensson

24   may have developed as a result of her departure from Putnam.

25   The data that -- well, first, we had a long interview,

1   Ms. Svensson and I with the attorneys, and the primary data I

2   reviewed were her income tax returns.  She had W-2s which

3   provided a lot of information about the elements of her

4   compensation.  So the analysis really -- really in large part

5   was looking at those W-2s very carefully, making an estimate

6   of -- well, not an estimate -- taking how much money she --

7   the money plus the value of the benefits that she earned each

8   year, and then making a projection of what she may have

9   earned had she remained at Putnam up until age sixty-five.

10          Then if we had to continue, the question is -- when

11   you do that, by the way, when you take a person, supposing

12   she had been at Putnam, stayed at Putnam, or at something

13   like that working as a comparable nature and going on in that

14   industry, a comparable position up to age sixty-five, we call

15   that the normal projection; normally what would have happened

16   had no controversy occurred, she had kept right on on her

17   career track, that's called the normal projection.

18          Well, that's one road on the Y, so to speak.

19   There's another road on the Y intersection, and that's what

20   her career may be like now that she's not doing that anymore,

21   not working in the investment industry.  And that we call the

22   alternative projection, and for that I had talked to her at

23   length to see what was on her mind, what her opportunities

24   were, what she had been trying to do.  And she told me that

25   probably teaching is what she would go into.  So the

1    alternative track, the career she might develop was as a

2    teacher, a Massachusetts teacher.  That's the broad outline

3    of the work that I did.

4    Q.   And did you come to any conclusions and opinions after

5    your review?

6    A.   Yes, I did.

7    Q.   And can you tell the Court and jury what that was.

8    A.   Well, yes.  We take this normal projection, what she

9    would have earned had she continued on, and subtract from

10   that what she may earn.  I took teacher as the alternative

11   because that was what was on her mind.  The base for the

12   normal projection was how much she earned in money plus the

13   value of the benefits at Putnam for the years 2001, 2000 and

14   2001.  Those were normal years for her.  She was demoted in

15   2002.

16             MR. KOCIUBES:  Objection, your Honor.

17             THE COURT:  Overruled.

18   A.   And the average for 2000 -- this is the money income,

19   salary plus the value of the benefits, the stock options and

20   everything like that -- she earned an average in those two

21   years, 2000 and 2001, $1,387,000.  I projected normally

22   forward on the basis of $1,387,000 going up a little bit

23   every year up until age sixty-five.  I subtracted from that

24   an average teacher in Massachusetts, assuming she had begun

25   teaching in 2005, the average salary of a teacher then was

Page 11

1    $53,600.  If you subtract teacher from work in the investment

2    industry, you get a total up to age sixty-five -- this is

3    every year now beginning in 2003.  She left Putnam in

4    September of 2003.  If you start 2003 all the way out to age

5    sixty-five, the loss, the loss in income and benefits total

6    is $38,343,250.  That's $38,343,250.

7            But that's not the end of it.  That's the total.

8    If she were to receive that money now and put it to work at

9    interest or something, she'd be overcompensated because she'd

10   not only have the original loss but money she could earn.  So

11   you have to do another calculation, and that's called

12   present-value calculation, which I did.  Technically

13   speaking, this calculation is the amount of money which if

14   she received it on the date this litigation commenced in

15   December of 2004, plus earning interest at the rate of

16   1.6 percent a year, would just bring her back up to the

17   $38,353,000 plus.  And that total is $32,133,973.

18   $32,133,973.

19           Then there's a further calculation, back pay and

20   front pay.

21   Q.  And can you tell us about the front pay and back pay.

22   A.  Well, there's two elements of this present-value

23   calculation.  How much up till now, beginning from the time

24   that she left up until now, that's back pay; and from now up

25   to the future, we separate that 32 million plus number into

Page 12

1    those two parts.  Up till now -- and I did it as of today

2    because I made the calculation over the weekend -- the back

3    pay would be $6,591,369.  That's $6,591,369.  And from now

4    on, up till age sixty-five, the loss is $25,542,605.

5    $25,542,605.

6            Now, that's a net taking the -- subtracting the

7    teacher from the investment career, and that's my opinion.

8    Q.   And that would be as of September 15 of '03?

9    A.   Yes.  That's when I began.

10   Q.   Did you do an alternative calculation as of August 28,

11   2003?

12   A.   Yes, I did, but that's a different job, you know.  As an

13   alternative calculation, if Putnam, I guess, had offered her

14   the ability to stay on as a research analyst, and if she

15   accepted that offer as of the 28th of August, 2003, and

16   stayed on in the Research Department, I took as a base pay --

17   there was just base pay offered with no real benefits except,

18   you know, health insurance --

19           MR. KOCIUBES:  Objection, your Honor.

20           THE COURT:  Overruled.

21   A.    I took as a base $155,000, which was her salary because

22   her salary was $155,000, projected that forward.  That's the

23   new alternative projection, subtracted that from the old

24   normal --

25           THE COURT:  Actually, can I see you at side bar for

1    a moment.

2    SIDE-BAR CONFERENCE:

3            THE COURT:  Excuse me.  I understand there's a

4    debate about whether there was growth potential in the new

5    research analyst position that she was put in, but I don't

6    think he ever said she wouldn't get a bonus.

7            MR. MOLONEY:  Well, her testimony, your Honor, as I

8    recall it, was that she could stay, but she would not get any

9    increase in her income.

10           THE COURT:  Right, but she was at 6 something.

11           MR. MOLONEY:  Well, that included a bonus, but

12   there's no evidence that they were willing to --

13           THE COURT:  No, no, no, I think that would be

14   misstating it.  I don't remember them saying she would be at

15   $155,000.

16           MR. MOLONEY:  Well, they didn't say $155,000, but

17   it would be --

18           THE COURT:  That's what he's doing, $155,000.  I

19   don't think that's right.  I mean, I don't know -- he's got

20   some objections about averaging, and that's for the jury, but

21   the -- you know, he's preserved his objection.  I think the

22   objection was it averaged three years, but I don't think we

23   ever heard $155,000.  Does he have alternative figures at

24   $655,000?

25           MR. MOLONEY:  He's done the calculation based on

Page 14

1    the salary, your Honor, not on the 6 --

2              THE COURT:  I don't think we've heard that, even

3    from her.  She said she had no growth and no hope for --

4    she's claiming that in general about the research analyst

5    position, you know, less status, less growth; but I don't

6    think she ever said she'd go down to $155,000.

7              MR. MOLONEY:  Well, the $155,000 was not

8    mentioned.  What she said was that she could stay but with no

9    chance to increase her income.

10             THE COURT:  Right, but I don't think --

11             MR. MOLONEY:  And the bonus is entirely

12   discretionary.

13             THE COURT:  I sustain the objection if that's what

14   it was.  I mean, if you want to do it based on $655,000 going

15   forward, I'm happy to have him do those calculations right

16   now.

17             MR. MOLONEY:  Well, I don't think he can do that

18   right off the top of his head.  He needs a calculator to do

19   the present value of those numbers.

20             THE COURT:  Doesn't he have one?  He lives this.

21   He can probably do it in his sleep.  Let's just ask.

22             MR. KOCIUBES:  You correctly stated the objection.

23   There was an earlier one, your Honor, which was to his

24   characterization of there being a demotion.

25             THE COURT:  I know, but that's his -- I mean, he's

1    made those assumptions.

2            (End of side-bar conference.)

3            THE COURT:  Let me tell you what the whispering was

4    about, what my side bar was about.  Obviously there are many

5    things that the parties are disagreeing and agreeing about

6    here, and so, for example, he objected because he doesn't

7    agree that it was a demotion.  You'll have to decide whether

8    that was what it was.  The issue that he's now talking to him

9    about is if he has his little calculator here.  I think

10   Dr. Siegel was making projections forward based on a base

11   salary of $155,000, and I think he's going to do it based on

12   the income she was roughly at at the point that Mr. Brooks

13   made his employment decision, so --

14           MR. MOLONEY:  Your Honor, if he could just have a

15   few minutes to do that, I have a few pages off a 30(b)(6) I

16   could read in, I could take up that time while he does that

17   and then come back.

18           THE COURT:  Yes.  In other words, I think -- well,

19   you're going to have to evaluate the credibility of it, and

20   your memory controls and not mine, but at some point

21   Mrs. Svensson I think testified he said, "And you can never

22   make more than that," or, "You can't make more than what

23   you've got now."  It depends on whether you credit that, but

24   I'm not sure I remember any testimony that went down to

25   $155,000.  So he's going to do it as of the income she was at

Page 16

1    at the time of that thought process.

2         I think I'm capturing what our side bar was, is

3    that right?  As opposed to the average of the three years,

4    you see.  And it will be your call as to how to do this, if

5    you even, you know, get to the damage piece, but you need to

6    hear it all at some point, okay?  So he's going to sit here

7    and crunch away with those numbers.

8         Are you going to read in the 30(b)(6) at this

9    point?

10        MR. MOLONEY:  Just a few moments, your Honor.

11        (Pause.)

12        THE WITNESS:  Okay.

13        MR. MOLONEY:  Your Honor, Dr. Siegel is ready on

14   this number.

15        THE COURT:  All right, go ahead.

16   Q.   Go ahead, Dr. Siegel.

17   A.   Well, on the basis of the $655,000 salary, the present

18   value -- and that's the only number I did just now, no back

19   pay or front pay -- the present value is $10,659,007.

20   Q.   And have you divided that into front pay and back pay?

21   A.   No, I didn't.

22   Q.   Can you do that?

23   A.   Well --

24   Q.   Do you need a few minutes?

25   A.   Yes.

Page 17

1    Q.    Okay.

2          MR. MOLONEY:  Your Honor, this is from the 30(b)(6)

3    day three at Page 55.

4          (Discussion off the record between attorneys.)

5          THE COURT:  I don't need to see it if you want to

6    be just reading it in.

7          MR. MOLONEY:  This is a question beginning on

8    Page 55 at Line 23 of the third day of the Rule 30(b)(6)

9    deposition, and Ms. Mary McNamee was the witness on behalf of

10   Putnam.

11         "Question:  Can you identify this document?

12   Answer:  This is an e-mail from Kelly Morgan to Josh Brooks

13   on September 16, 2003, subject matter Lauren, which I would

14   assume was Lauren Allensmith.  Question:  Okay, and it

15   relates to a meeting between Kelly Morgan and Josh Brooks on

16   September 16, 2003?  Answer:  No.  It relates to a meeting

17   with Kelly Morgan and Lauren Allen-Smith, and Kelly is just

18   sending an e-mail to Josh Brooks with some questions.

19   Question:  Okay, do you see the second question that Lauren

20   Allensmith had?  Answer:  Yes.  Second statement.  Question:

21   Second paragraph?  Answer:  It is a statement, second bullet

22   point.  Question:  What do the words, quote, her angle and

23   concern was that she was at risk mean?  Answer:  Lauren was

24   concerned when she heard that Lisa had left the firm, that

25   Lauren also was concerned that she, Lauren, was at risk to be

10114079-c30b-44a9-a20c-9515595e0091

1    terminated.  Question:  Did she express the reason why she

2    felt she was at risk?  Answer:  No, but in the next statement

3    it says, I told her it wasn't a performance issue but

4    management dishonesty, and so I think Lauren was concerned at

5    the time that she had performance issues.  Question:  Do I

6    understand that Kelly Morgan told Lauren Allensmith on

7    September 16, 2003, that Lisa Svensson's termination was not

8    a performance issue?  Answer:  Yes.  Question:  And that

9    instead it was management's dishonesty?  Answer:  Yes.

10   Question:  Do you know whether Mr. Brooks followed through on

11   Kelly Morgan's suggestion that he, Brooks, talk to Lauren

12   Allensmith?  Answer:  I don't know if he did.  Question:  Do

13   you know whether any other employees were told that Lisa

14   Svensson's termination was provoked by management

15   dishonesty?  Answer:  No, I do not."

16           Your Honor, I move that this e-mail be admitted as

17   the next exhibit as No. 199.

18           MR. RODRIQUES:  No objection.

19           THE COURT:  All right.

20           (Plaintiff Exhibit 199 received in evidence.)

21           MR. MOLONEY:  I think Dr. Siegel is ready, your

22   Honor.

23           THE COURT:  Okay.

24   A.   On the basis -- should I go forward?

25   Q.   Yes, go ahead.

Page 19

1    A.   Well, the loss, if she went forward at $655,000 rather

2    than $155,000, the loss, as I just said, in total, the

3    present value was $10,659,007.  Of that, back pay would be

4    $2,753,227.  That's $2,753,227.  And front pay would be

5    $7,905,780.  $7,905,780.

6         MR. MOLONEY:  I have nothing further, your Honor,

7    on Dr. Siegel.

8    CROSS-EXAMINATION BY MR. KOCIUBES:

9    Q.   Good morning, Dr. Siegel.

10   A.   Good morning.

11   Q.   I wonder if we can just stay with this very last point

12   for a second.  You tried to compute just now, I take it, the

13   value or the present value of Mrs. Svensson's job, assuming

14   she remained at $655,000 a year?

15   A.   That's correct.

16   Q.   With no increase ever?

17   A.   No, no.  That would be going forward a little bit,

18   1.5 plus inflation.

19   Q.   And for how many years in total did you compute the

20   number?  Twenty-four years?

21   A.   Well, that would be beginning in 2003 going up to age

22   sixty-five, which would be about twenty-four years.

23   Q.   About twenty-four years?  And I take it that you didn't

24   include the value of any benefits on that side of the

25   equation --

Page 20

1    A.    That's correct.

2    Q.    -- for the twenty-four years, correct?

3    A.    Right.  Just health insurance, 401K contribution.

4    Q.    Oh, you did include that?

5    A.    Yes.

6    Q.    Okay, so what's the number that you started with before

7    you multiplied just a couple seconds ago?

8    A.    Well, see, basically I used the old projection

9    including -- it's all a matter of ratios, it's all a matter

10   of ratios.  The old projection had benefits in it.  I took

11   the ratio of $655,000 to $155,000, and that's how I did it.

12   Q.    Well, let me just sort of try to understand your math,

13   sir.  You started just now, I mean, you used $655,000 a year

14   for twenty-four years?

15   A.    Yes, uh-huh.

16   Q.    And then rather than a dollar figure for what the

17   benefits were worth, you used some kind of ratio, and what

18   was that ratio?

19   A.    Well, it would be 12.4 percent.  The benefits that I

20   calculated in the first projection were about 12 percent of

21   base salary.

22   Q.    Okay, so would you do me a favor and add the 12 percent

23   to the $655,000.  What's the new total for the one year?

24   A.    Well, it's in my opinion already.

25   Q.    So what is that total?  $655,000 plus 12 percent, just

10114079-c30b-44a9-a20c-9515595e0091

1   give us the numbers.

2   A.   You want me to multiply $655,000 by 12 percent?

3   Q.   Well, adding the 12 percent to it.

4        (Witness using calculator.)

5   A.   12 percent of $655,000 is $78,600.

6   Q.   So would you total the $78,000 and the $655,000 for me.

7   Just add them together for me, sir, if you've got a

8   calculator.

9        (Witness using calculator.)

10  A.   $733,600.

11  Q.   And did Mrs. Svensson tell you that in her last full

12  year, she received $128,000 worth of stock in addition to

13  $655,000?

14  A.   In her last full year?

15  Q.   Yes, at Putnam.

16  A.   Well, if it was on the W-2s, I would have known it,

17  yes.  It's not what she told me.  It's on her W-2s.

18  Q.   Well, you understand that there is a lag between the

19  award and the W-2s, and the tax returns?

20  A.   Oh, absolutely I understand that, uh-huh.

21  Q.   Okay.  Did you notice that there was a stock award that

22  was given to her for 2002?  That's her last full year?

23  A.   Yes.  It was on the W-2.  It's in my calculations.

24  Q.   And did you increase the $655,000 by the $128,000?

25  A.   You asked me to do a calculation.  First of all, I

1    started at $155,000.  I was initially asked to do a

2    calculation on the basis of only salary, no benefits except

3    health insurance and 401K, and that's what I did.  That was

4    my assignment, and that's what I did.  The $655,000 added

5    just an addition, a proportional addition.

6    Q.    Let me give you a new assignment then.  How about you

7    add in the $128,000 worth of stock she got.  Can you add that

8    to your total?

9    A.    To what?

10    Q.    To the -- we're now at $733,600.

11    A.    How much was that?

12    Q.    $128,000.

13          MR. MOLONEY:  Objection, your Honor.

14          THE COURT:  What are you adding that to?  I'm

15    confused.

16          MR. KOCIUBES:  Mrs. Svensson testified that for

17    2002 she also received a stock award worth $128,000.

18          MR. MOLONEY:  Your Honor, the objection is based on

19    the fact that there's no evidence that she would be getting

20    anything in addition going forward.

21          THE COURT:  You've just heard it play out right

22    here, okay?  So if you get to the issue of damages, there's a

23    dispute on this point, so each side is presenting their

24    alternative way of calculating what she would have gotten if

25    plaintiff prevails, and you'll have to decide as you go

Page 23

1    through, so --

2            MR. KOCIUBES:  May I continue, your Honor?

3            THE COURT:  So if you found that there was an

4    improper decision but that she would have been continuing to

5    get stock, this is an alternative way of thinking about

6    damages, so -- if you can do it.

7    Q.   Would you add the $128,000 to the $733,600.

8    A.   $861,600.

9    Q.   $861,000?

10   A.   600.

11   Q.   600.  And, sir, would you then with your calculator

12   multiply that times twenty-four years.

13   A.   Okay.

14   Q.   And what do you get?

15   A.   $20,678,400.

16   Q.   And then I think you said you brought it back to present

17   value using a -- what is it, a 1.4 percent discount rate?

18   A.   1.6 percent.

19   Q.   1.6 percent.  So that we're consistent, go ahead and

20   apply that 1.6 percent to the $20,678,400.

21   A.   I can't do it.

22   Q.   You can't do that?

23   A.   I cannot do that.

24   Q.   And you cannot do that because you don't have the right

25   kind of calculator here?

Page 24

1    A.    I'd need a computer for that, sir.

2    Q.    Okay.  So the other calculations you did at home on a

3    computer?

4              THE COURT:  Could you estimate, or is there no way

5    of doing that?

6              THE WITNESS:  Well --

7              THE COURT:  All right, never mind.

8              MR. KOCIUBES:  I can maybe help him with that.

9    Q.    The initial damage analysis that you did, I think you

10   said -- you gave us two numbers, one before the discount and

11   one after the discount, correct?

12   A.    Right.

13   Q.    What was the number before the discount?

14   A.    For the. . .

15   Q.    For the total loss, the net total loss.

16             (Witness examining documents.)

17   A.    You know, that's already in my calculations.  Everything

18   was based on the present value.

19   Q.    I thought you said the total loss was about $38 million,

20   and the present value was about $32 million?

21   A.    No, no, no.  Bear with me a minute.  What I said was,

22   when I was asked to do this extra work on the basis of

23   $655,000 to $155,000, I used as the base numbers the present

24   value.

25   Q.    I thought you just said you can't do present value here

Page 25

1    without the computer.

2    A.    I'm just telling you now what I did.  I did it with the

3    present -- and I literally could not do a present value

4    calculation.

5    Q.    Okay, so the $20,678,000, that's the present value of

6    her job had she remained there?

7    A.    That's correct.

8    Q.    Okay.  Would it be your view, sir, that maybe somebody

9    ought to think twice before leaving a job with a $20 million

10   present value?

11              MR. MOLONEY:  Objection.

12              THE COURT:  What's the question again?

13              MR. KOCIUBES:  Would it be his view that someone

14   maybe ought to think twice before leaving a job with a

15   present value --

16              THE COURT:  Sustained.

17              MR. KOCIUBES:  -- of $20 million?

18   Q.    Now, am I correct, sir, that in doing your loss

19   analysis, there are implicit in it a number of assumptions

20   that you have made?

21   A.    Yes.

22   Q.    And among the assumptions, let's see if we can isolate

23   them.  One is, you assumed that she was going to continue as

24   a portfolio manager at Putnam for another twenty-four years?

25   A.    Well, not necessarily at Putnam.  She had achieved a

1    certain career, and it could have been another good firm,

2    but, yes.

3    Q.    A portfolio manager for another twenty-four years?

4    A.    Yeah, or something like that, yeah, uh-huh.

5    Q.    And with respect to the base number that you were using,

6    you were working off the average of her 2000 and 2001

7    compensation?

8    A.    That's correct.

9    Q.    Now, you know that for each of the years, the bonus is

10   awarded in early of the following year?  Her testimony was, I

11   think, March of the following year.

12   A.    Yes.

13   Q.    So that, for example, Mrs. Svensson's award for 2001

14   would become known and the bonus portion would be paid in

15   early of 2002?

16   A.    That's correct.

17   Q.    So that in terms of the tax return, the tax return would

18   pick up the amount of money when it was actually paid, so

19   that the bonus for 2001 would be paid in 2002, and that's

20   when the tax return would reflect it?

21   A.    That's correct.

22   Q.    The 2002 tax return would reflect a big chunk of the

23   award for 2001?

24   A.    Yes.

25   Q.    And am I also correct that Mrs. Svensson's actual award

1    for 2001 was $655,000?

2    A.    I'd have to look at the W-2, but I'll assume you're

3    correct.

4    Q.    All right.  You, however, in doing your calculations for

5    2001 didn't use $655,000.  You used -- tell us what number?

6    A.    The second calculation?

7    Q.    You came up with an average, right, for 2000 and 2001,

8    and then you projected that forward, correct?

9    A.    That was $1,038,000, yeah.

10    Q.    Okay, what number did you actually use for 2001?

11    A.    To make the average, you mean?

12    Q.    Yes, yes, sir.

13    A.    Well, let's see.  $1,675,283.

14    Q.    And that's the number that you used for 2001 as opposed

15    to her actual award for that year of $655,000?

16    A.    Well, that's the total of all of the elements of her

17    compensation.

18    Q.    That's correct.  And for 2000, am I correct that you

19    also knew that her 2000 compensation would be determined,

20    including the bonus, as of early 2001?

21    A.    No.  The 2000 is a total of her -- do you want me to

22    give you the total of her compensation?

23    Q.    No.  I'm just asking about methodology.

24    A.    Yes, okay.

25    Q.    You understood that the 2000 award would be made in

1    early 2001?

2    A.    Yes.

3    Q.    It lags?

4    A.    That's correct.

5    Q.    Okay.  And am I correct, sir, that what you effectively

6    ended up doing is using an average the way you've done it,

7    without accounting for the lag, of the two highest

8    compensation years that she ever had at Putnam?

9    A.    That's correct.

10   Q.    And you understood, did you not, that while she was

11   still a portfolio manager, her income had started coming

12   down?

13   A.    Well, I just took two years here.  The following year,

14   2003, after that we have a different scenario.  She was

15   demoted.  You know, she no longer had the same position.  Of

16   course her income came down.

17   Q.    Stick with my question.  Sir, did you in the course of

18   doing any research learn that the bonus rates of, say,

19   portfolio managers can be quite volatile?

20   A.    Oh, yes.

21   Q.    It can go up, and it can go down?

22   A.    That's correct.

23   Q.    And did you notice that for Mrs. Svensson's

24   compensation, that it went up and down?

25   A.    Well, I can look at the figures, but, yes, it does,

Page  29

1  sure.

2  Q.   And do you understand that among the factors which cause

3  the bonus, the compensation to go up and down, is the

4  performance of the team that the portfolio manager is on?

5  A.   Well, I imagine it does.  Why not?  Sure.

6  Q.   And would you also imagine that one of the factors that

7  would cause the bonus award to go up or down is the total

8  amount of bonus or profit available to be divided up by the

9  firm?

10  A.   Well, I'm not privy to the actual calculations Putnam

11  makes, but certainly what you describe is reasonable.

12  Q.   Well, let me ask you if this might influence your

13  judgment.

14        MR. KOCIUBES:  And can we pull up Defendant's 59.

15  And this has previously been admitted, your Honor.

16  Q.   Let me ask you to make the following assumption, sir.

17  Do you see 2000?

18  A.   Yes, I do.

19  Q.   And let me ask you to assume that for 2000 the total

20  bonus pool was some $335 million?

21  A.   Yes.

22  Q.   And let me ask you to assume that for 2001 it's now

23  $184 million?

24  A.   Yes.

25  Q.   And for 2002 it's $130 million?

1  A.    That's correct.

2  Q.    And given your history and expertise in labor economics,

3  you would expect that that kind of declining bonus pool would

4  have an impact on the bonus that the various people and the

5  officers in the Investment Management Division might get,

6  would you not?

7  A.    Yes.

8  Q.    And, by the way, take a look.  And if we assume that the

9  bonus pools continued thereafter to drift downward, that

10  would affect your assumption that she was going to continue

11  making slightly more and more and more and more money every

12  year had she stayed at Putnam?

13  A.    That's probably correct, yes, uh-huh.

14  Q.    Am I correct that one of the other assumptions that you

15  implicitly made was that not only would she remain a

16  portfolio manager for twenty-four years, not only would the

17  bonus pools not shrink, but that her performance or her

18  team's performance would continue at least to hold its own,

19  if not get better over time?

20  A.    Yes.

21  Q.    You made reference during your direct examination about

22  her demotion.  Do you recall that?

23  A.    Yes.

24  Q.    And am I correct that the only basis that you have for

25  referring to a demotion is what Mrs. Svensson herself told

Page 31

1    you?

2    A.    And her attorneys, yes.

3    Q.    Right, she and her attorneys.  You saw no organizational

4    charts or anything from Putnam that indicated that that

5    change in position was a demotion?

6    A.    That's correct.

7    Q.    You just took her and her attorney's words for it?

8    A.    Yes.

9    Q.    And you built that into your analysis then?

10    A.    Yes.

11    Q.    And then let me ask you about a couple of other

12    assumptions.  Am I correct that also you took no steps,

13    either of Putnam if you couldn't or industrywide, to try to

14    find out what's happened to compensation of portfolio

15    managers since 2002 or 2003 across the industry?

16    A.    That's correct.

17    Q.    So you don't know whether it's gone up or gone down?

18    A.    That's correct.

19    Q.    And did you do any work to determine the likelihood of a

20    portfolio manager, whether at Putnam or in the industry

21    generally, to make it in that position to age sixty-five?

22    A.    No.

23    Q.    Do one percent make it or ninety percent make it?

24    A.    I don't know.

25    Q.    Would that affect your thinking if it were, say, one

1    percent versus ninety percent?

2    A.   Well, if such data were available to me, I would

3    certainly include it in my calculations.  It wasn't

4    available.

5    Q.   And am I also correct that you did not attempt to

6    determine what actually happened to the size of the -- the

7    number of officers in the Investment Management Division at

8    Putnam since 2002 or 2003?

9    A.   That's correct.

10   Q.   And if I were to ask you to assume that it went from

11   approximately 300 to approximately 200 since 2003, would that

12   affect your assumption of the likelihood that Ms. Svensson

13   would continue in that position to age sixty-five?

14   A.   Well, that's a complicated question.  The market was

15   terrible during that period.  It's not surprising that the

16   personnel was reduced.  If the market improves, the personnel

17   would probably be increased.

18   Q.   And it's also not surprising, in your words, that since

19   the market is terrible and performance is down, that in

20   addition to the number of personnel going down, that there

21   probably would be turnover, even among the people who stayed?

22   A.   I don't know.  That's speculative.

23   Q.   You didn't check it out one way or the other?

24   A.   Well, I couldn't do it.

25   Q.   So that one of the things that you didn't factor in at

Page 33

1    all was the risk that Mrs. Svensson would lose her job,

2    whether because of ongoing performance or general sort of

3    shrinkage of the Investment Management Division at Putnam?

4    A.    Well, that's one side of the coin.  The other side of

5    the coin is --

6    Q.    Did you factor it in --

7              MR. MOLONEY:  May he finish his answer, your

8    Honor?

9              MR. KOCIUBES:  The question was, did he factor it

10   in, your Honor?

11             THE COURT:  Did you?

12             THE WITNESS:  No, nor the other side.  If there's a

13   boom, everything would have been much better.

14   Q.    Now, in addition, I'd asked you about whether you had

15   tried to do any research on the industry to see if portfolio

16   managers tended to survive to age sixty-five.  Did you do

17   such research to see whether they tended to survive to even

18   age sixty or fifty-five as portfolio managers?

19   A.    No.

20   Q.    And am I also correct that the analysis that you did

21   because you were asked to do it was to determine her damages

22   the way you've articulated it from her termination onward?

23   A.    Yes.

24   Q.    Okay.  And that's essentially the only analysis you did?

25   A.    Yes.

10114079-c30b-44a9-a20c-9515595e0091

1  Q.   Now, the last point, I think.  In terms of sort of --

2  you talked about present value, and, first, you've got to add

3  up the total amount that you think that she might have

4  earned, and then you have to bring it back to what those

5  dollars would -- the equivalent amount of dollars invested

6  today would give you that much over time?

7  A.   That's correct.

8  Q.   And so that's why the current dollars are always going

9  to -- the present value analysis is going to be smaller than

10 the face amount over twenty-four years?

11 A.   That's right.

12 Q.   Because if you get it all in a pool, you can invest the

13 money, and then your money will grow, so you have to account

14 for that?

15 A.   Yes.

16 Q.   And I think you said that you used a 1.6 percent

17 interest rate in doing that?

18 A.   A real interest rate, not an inflation consideration.

19 Q.   Okay.  And is that the number that you got from U.S.

20 Treasury notes or bills?

21 A.   Yes.

22 Q.   Which one, notes or bills?

23 A.   The one-year note.

24 Q.   So what you were doing in effect, I take it, was

25 comparing both Mrs. Svensson's twenty-four-year prospects --

1    well strike that, please.  Let me ask you this:  If I borrow

2    from the U.S. Treasury note, that's if I borrow from the

3    United States government for a one-year period of time, a

4    savings bond in effect, right?

5    A.    If you lend to them, yes.

6    Q.    If I lend to them, that's absolutely right.  I buy in

7    effect a savings bond, is how I think about it, that's due,

8    that the government pays me back in one year, correct?

9    A.    Yes.

10   Q.    It's sort of like a CD that I buy from the government,

11   correct?

12   A.    Yes.

13   Q.    A certificate of deposit.  Now, if I do that, if I lend

14   the government money for one year, the United States

15   government, the odds are overwhelmingly high that the

16   government is going to pay me back that money at the end of

17   the year?

18   A.    Yes.

19   Q.    And certainly I can't this century or last century, I

20   can't think of times when the U.S. government didn't pay

21   back.

22   A.    That's correct.

23   Q.    So that there isn't much risk that I'm not at the end of

24   one year going to not get my money back from the U.S.

25   government?

Page 36

1    A.    That's correct.

2    Q.    And that interest rate, the one that the U.S. government

3    has to pay on what essentially is a risk-free investment,

4    that's the rate that you were applying to Mrs. Svensson's

5    future earnings, the likelihood that she would continue to

6    keep her job and her compensation would continue to grow?

7    A.    Yes.

8              MR. KOCIUBES:  No further questions.

9              THE COURT:  So that's the 1.6?

10             THE WITNESS:  Yes, real, real interest rate.

11             MR. KOCIUBES:  No further questions, your Honor.

12             MR. MOLONEY:  I have no further questions, your

13   Honor, but I would like a side bar, if I may.

14             THE COURT:  Sure.  Okay, thank you.  I think that's

15   it.  He can go, right?

16             MR. MOLONEY:  It concerns Dr. Siegel, your Honor.

17             THE COURT:  Then stay two more minutes.

18   SIDE-BAR CONFERENCE:

19             MR. MOLONEY:  I'd like to get on the record his

20   answer to the question that you said he couldn't answer about

21   that calculation on the $155,000.

22             THE COURT:  Oh, a proffer.

23             MR. MOLONEY:  Yes.

24             THE COURT:  I don't know that you need him to make

25   the proffer.

1          MR. MOLONEY:  Well, I need him to articulate what

2    it is.

3          MR. WEIR:  He needs to articulate the number.

4          THE COURT:  Well, what is it?  You know it.

5          MR. MOLONEY:  Not off the top of my head.

6          THE COURT:  Well, bring him over here.

7          (Discussion off the record.)

8          (Witness at side bar.)

9          THE COURT:  Sorry.  There was a number that you

10   were going to spin forward with us on the $155,000 until she

11   was sixty-five.

12         THE WITNESS:  Yes.

13         THE COURT:  What was it?  Do you remember?

14         THE WITNESS:  I'll have to get my notes.

15         THE COURT:  You go get it, sure.  Thanks.

16         (Discussion off the record.)

17         THE WITNESS:  The present value is $28,711,371.

18         THE COURT:  Okay.

19         THE WITNESS:  Back pay you want?

20         THE COURT:  Yes.

21         THE WITNESS:  Back pay, $5,893,794; front pay,

22   $22,817,577.

23         THE COURT:  Okay, thank you.  Thank you.

24   Good-bye.

25         (End of side-bar conference.)

Page 38

1          (Witness excused.)

2          THE COURT:  Any more witnesses?

3          MR. MOLONEY:  I just have a few pages of the

4    30(b)(6), your Honor, to go.

5          THE COURT:  All right.

6          MR. RODRIQUES:  Your Honor, our objection to the

7    remainder of this has to do with the year 2005.

8          THE COURT:  I have no idea what you're talking

9    about.

10          MR. RODRIQUES:  I appreciate that.  I appreciate

11    that.

12          THE COURT:  What are you reading in?

13          MR. MOLONEY:  I'm reading in from page --

14          THE COURT:  That won't mean anything to me.  What's

15    it about?

16          MR. MOLONEY:  It's about the Women's Leadership

17    Forum, your Honor, and there's already been testimony on the

18    record from --

19          THE COURT:  I need to see you again.  I don't know

20    what you're talking about.  I'm sorry, I'm sorry.

21    SIDE-BAR CONFERENCE:

22          MR. RODRIQUES:  I think we gave you this the other

23    day, your Honor.

24          THE COURT:  Who's speaking, Mary McNamee?

25          MR. MOLONEY:  As the 30(b)(6) witness.

1          THE COURT:  And what is she talking about?

2          MR. RODRIQUES:  She's being asked questions about

3     presentations made in 2005 by the Women's Leadership Forum,

4     which is a group that was created to address women's issues

5     at Putnam.

6          THE COURT:  All right, the objection is overruled.

7     But let me just say this:  It's annoying to a jury to keep

8     coming back and forth, and that's why I'm here early

9     usually.  But the bigger issue is, I'm assuming you're going

10    to rest after this.

11         MR. MOLONEY:  Subject to just getting in some of

12    the exhibits that were --

13         THE COURT:  We're not going to do that in the

14    jury's presence, but you're going to rest as far as

15    exhibits.  You are going to say, "We want to file a motion."

16    I'm going to say, "It's timely," and then we're going to move

17    on to your witnesses, and then we'll argue it at some future

18    point.

19         MR. RODRIQUES:  Can we also, as long as we're at

20    side bar, your Honor had said in the pretrial that you'd take

21    judicial notice of the date of the filing of this complaint

22    as December 27, 2004.  That relates to the limitations

23    argument in the directed verdict of this action.

24         THE COURT:  Sure, sure.

25         MR. RODRIQUES:  If we could just have that

Page 40

1    officially on the record.

2            THE COURT:  Yes, yes, that's fair enough, but I

3    just don't want to keep -- because it's annoying to them.

4            (End of side-bar conference.)

5            MR. MOLONEY:  This is from Page 243 of the third

6    day of the Rule 30(b)(6) deposition of Putnam.  It's Mary

7    McNamee continuing to be the witness.

8            Question at Page 243, Line 7:  "Let me show you

9    what's been marked as Exhibit 44," in that deposition, "and

10   ask you if you can identify this document.  Answer:  This is

11   a PowerPoint presentation to the Putnam Women's Leadership

12   Forum.  Question:  Who created the PowerPoint presentation?

13   Answer:  I don't know who specifically created it, but I

14   would imagine it would be the Women's Advisory Committee.

15   Question:  Did you believe as of the time that the Women's

16   Leadership Forum was made companywide that women had greater

17   difficulty than men in terms of their career advancement --"

18           THE COURT:  Just slow down.  This is Mary

19   McNamee's --

20           MR. MOLONEY:  It's the corporate witness in the

21   30(b)(6) deposition.

22           THE COURT:  So she was testifying on behalf of

23   Putnam --

24           MR. MOLONEY:  Putnam.

25           THE COURT:  -- at this deposition, and he's reading

1    her comment in about -- so you just need to slow down, or no

2    one's going to get it.

3            MR. MOLONEY:   Okay.   That's a first.

4            "Did you believe as of the time that the Women's

5    Leadership Forum was made companywide that women had greater

6    difficulty than men in terms of their career advancement at

7    Putnam?  Answer:  Would you ask the question again.  (The

8    question was read back by the stenographer.)  Answer:  So

9    you're asking if my opinion is that, correct, my opinion as

10   to Putnam's opinion or my opinion as to --  Question:  I'm

11   asking your opinion.  Answer:  I think that in general women

12   have difficulty in career advancement at all firms,

13   especially in the asset management industry, and Putnam is no

14   different.  Question:  And do you have an opinion as to what

15   the reasons for that are?  Answer:  I would think, I would

16   speculate to say that it would have to do with the type of

17   work and the number of young people that are interested in

18   pursuing careers in investment management versus other

19   careers, just, you know --  Question:  Could you turn to

20   PRM 6000."  That's the page that's on the screen.  "Do you

21   believe that that page accurately reflects the women in

22   officer positions at Putnam as of September 15, 2005?

23   Answer:  I imagine that's probably correct.  Question:  Do

24   you consider that these figures reflect a problem for Putnam

25   in terms of the career advancement of women versus men?

1    Answer:  I don't know whether it's a problem.  It's something

2    that is an opportunity that could be affected to make it

3    better.  Question:  Do you believe these numbers are

4    acceptable?  Answer:  I would have to also know -- I would

5    like to also see the numbers of total populations of females

6    and males, and the ratios between the female officers to

7    total population of females, and total of male officers as to

8    the number of males in the population.  But if you look at

9    just the pure numbers, it's not great."

10            Your Honor, I move that that document be admitted

11   as No. 233.

12            MR. RODRIQUES:  There's no objection, your Honor.

13            THE COURT:  All right.

14            (Plaintiff Exhibit 233 received in evidence.)

15            MR. MOLONEY:  And then just two more brief quotes,

16   your Honor.  This is from Page 48 beginning at Line 16,

17   Exhibit No. 45 in the deposition:

18            "Can you identify this Exhibit 45?  Answer:  This

19   is an e-mail from Karen McCafferty to Thalia Meehan on

20   August 12, 2005, Subject:  WLF draft.  It looks like an

21   e-mail regarding whether or not they should do a salary

22   review or have a discussion about it.  Question:  And do you

23   know whether they did a salary review?  Answer:  I can't tell

24   from this e-mail whether they did or they didn't.  It says, I

25   question whether or not it's premature at this point, so I

1   would assume from this they have not done one.

2   Question:  This document references an August 25, 2005

3   meeting.  Do you know whether such a meeting was held?

4   Answer:  No, I don't.  Question:  I take it you weren't

5   there?  Answer:  No, I was not.  Question:  Do you believe

6   that as of 2005, there was at Putnam a major career to

7   culture that was supportive of the advancement of women and

8   career development, as referenced on PRM 6016?  Answer:  I

9   think it was important to create that culture.  I mean, if

10  you look at the first bullet, it says, 'Varied and diverse

11  perspectives provides better problem-solving than like-minded

12  groups.'  I think that goes beyond just women.  I think it

13  goes to races as well as other backgrounds.  It's very

14  important to have a diverse culture within a firm."

15          And then moving on to for the final at 260,

16  Line 15: "Question:  Do you know whether Mr. Haldeman was

17  asked to develop greater representation of women at the high

18  levels of the organization?  Answer:  I believe so.

19  Question:  Do you know what his response was?  Answer:  I

20  think he was quite supportive and enthusiastic about it.

21  Question:  Do you know what steps he took to try to ensure

22  that that might take place?  Answer:  I think he was open for

23  ideas and suggestions from the Women's Advisory Committee,

24  which is what this document was referring to.  Question:  And

25  do you know what steps have been taken since September of

Page 44

1    '05?  Answer:  No, I do not specifically."

2           That's the end of the 30(b)(6), your Honor, and I

3    move that that Exhibit 45 be admitted as No. -- I think we

4    need a number for that.

5           THE CLERK:  You want the next one?

6           MR. MOLONEY:  Yes.

7           THE CLERK:  464.

8           MR. RODRIQUES:  The same objection, your Honor.

9           THE COURT:  Overruled.

10          (Plaintiff Exhibit 464 received in evidence.)

11          THE COURT:  And so?

12          MR. MOLONEY:  Subject to putting in the exhibits,

13   your Honor, that we've been working with the other side on

14   redactions on, and subject to putting in the plaintiff

15   resume' and the Siegel resume', we would rest.

16          THE COURT:  You rest?

17          MR. RODRIQUES:  Your Honor, we have a motion for a

18   directed verdict.

19          THE COURT:  It's timely filed.  I'll deal with it

20   layer.  Put on your witnesses.

21          MR. RODRIQUES:  May I approach Mr. Alba to give him

22   copies of the filings?

23          THE COURT:  Yes.

24          MR. KOCIUBES:  May I go see if Mr. Oristaglio is in

25   the hall, your Honor?

10114079-c30b-44a9-a20c-9515595e0091

Page 45

1    THE COURT:  Yes.

2    (Pause.)

3    THE COURT:  You want to take a break?

4    A JUROR:  I'm very sorry.

5    (Juror excused.)

6    (Side-bar conference off the record.)

7                    STEVE ORISTAGLIO

8    having been first duly sworn, was examined and testified as

9    follows:

10    THE CLERK:  Would you please state your name and

11    spell it for the record.

12    THE WITNESS:  My name is Steve Oristaglio,

13    O-r-i-s-t-a-g-l-i-o.

14    MR. KOCIUBES:  All set?  Okay.

15   DIRECT EXAMINATION BY MR. KOCIUBES:

16   Q.   Mr. Oristaglio, where do you live?

17   A.   I live in the Back Bay here in Boston.

18   Q.   And do you have any college degrees, sir?

19   A.   I do.  I received a business degree from Bucknell

20   University, majoring in accounting, and then I received a

21   master's degree in agricultural economics at the University

22   of Delaware.

23   Q.   And would you just sort of briefly give us an overview

24   of your employment history, sir.

25   A.   After I graduated from University of Delaware, I took a

10114079-c30b-44a9-a20c-9515595e0091

Page 46

1    job as a broker for Conti Commodity Services, I think in the

2    year 1979.  I worked for them for a number of years.  Then I

3    moved over to work for a couple of regional banks, one of

4    them State Street Bank here in Boston, First National Bank of

5    Maryland.

6            Then I moved overseas, and I worked for UBS, two

7    main firms in the city of London, which is the financial

8    district in London, UBS, or Swiss Bank Corporation was the

9    name of it at the time, at Salomon Brothers.  At Salomon

10   Brothers, I ended up on the international bond desk and ran

11   the floating rate note desk and was a senior trader for that

12   area in financial markets.  At Swiss Bank Corporation, I

13   became the global head of all interest rate products, fixed

14   income, derivatives, things like that.

15   Q.   About what year was that that you became the head?

16   A.   I was at Salomon Brothers from, I believe, 1984 to

17   1988.  I was at Swiss Bank from 1988 to 1998.  A number of

18   those years I'd come back to Wall Street, 1994, so many of

19   the years over in London, but then the last few with Swiss

20   Bank in New York.  And then I took a job as the deputy head

21   of investments in 1998 with Putnam Investments.

22   Q.   All right.  And when you became the deputy head of

23   investments with Putnam in 1998, who at that time was the

24   head?

25   A.   Tim Ferguson.

Page 47

1   Q.   All right.   And let me bring you forward to the

2   2001-2002 time period.   Were you still with Putnam?

3   A.   Yes, I was.

4   Q.   And what was your position with Putnam at that point?

5   A.   I was still the deputy head of Investments up until

6   October of '02.   When Ed Haldeman joined, I became the

7   co-head of investments, but I was the deputy head of

8   Investments.   But my job had changed a little bit.   When I

9   first joined Putnam, I was responsible for all the nonequity

10  parts of the business; fixed income, currency, trading.   And

11  then I don't remember exactly the time frame, but at some

12  point in 2000 and 2001, I became responsible for the Growth

13  Equity Team, given some of the performance issues that they

14  were having.

15  Q.   I was just going to ask you.   It was around what, 2000

16  or 2001 that you picked up the Growth Equity teams?

17  A.   That's correct.

18  Q.   And how was it that you came to be or why was it, if you

19  know, you came to be appointed to take over the Growth Equity

20  teams?

21  A.   Well, there were a number of things.   John Morgan

22  retired, gave his notice, I think, in the early part of 2000,

23  and they didn't appoint anybody at the beginning.   They had

24  some time.   But as 2000 started to unfold, there came to be a

25  number of performance issues in the Growth Equity area; and

1    they felt that they needed, you know, someone to take a very

2    close look and to do a lot of work in trying to restore the

3    performance of Growth Equity, and I was chosen.

4    Q.   Now, there was in the 2000, 2001, 2002 time period also

5    the department Global Equity Research?

6    A.   Yes, there was.

7    Q.   Was there more than one Research Department in those

8    days?

9    A.   Yes, there were.  There was a Fixed Income Research

10   Department, there was a Quantitative Research Department, and

11   there was the Global Equity Research Department.  There may

12   have been other small ones, but they're the ones I remember.

13   Q.   And did you have any responsibilities with respect to

14   Global Equity Research?

15   A.   No, I did not.

16   Q.   Okay.  Now, with respect to your responsibilities, your

17   mission, what was your mission with respect to the Growth

18   Funds, the Growth area?

19   A.   Well, I became the head of the Growth area, and a number

20   of the CIOs that were responsible for the various pools of

21   money that they were investing started to report to me on a

22   day-to-day basis, those being -- the ones I recall in

23   particular would be Beth Cotner, Eric Wetlaufer, Dan Miller,

24   Robert Swift were the four key people that had previously

25   been reporting to Jack Morgan.

1    Q.    By the way, are any of those four still with Putnam?

2    A.    No, they're not.

3    Q.    Let me before we get into the details of the Growth

4    teams, do you recall whether in the 2000-2001 time period

5    there was any initiative to beef up the research departments?

6    A.    Well, yes, among my colleagues, Tim Ferguson, Bill

7    Landes, a number of the other senior executives, you know,

8    within the Investment Division, we had talked actively among

9    what makes good performance in the long run, what are some of

10    the ingredients?  You needed a strong series of portfolio

11    management teams, but if you looked at other models, one

12    right here in Boston, Wellington Management, Capital Research

13    based, I think, in a number of different places, but I think

14    their headquarters is in LA, we also know that a lot of very,

15    very successful asset management firms have very, very strong

16    research divisions, people that were highly experienced,

17    contributing in a very specialized way, the studying of

18    companies sector by sector and giving recommendations that

19    would then be used by the portfolio managers, who were more

20    generalists.  Their job was to actually pick stocks from an

21    assortment of different sectors, but to also pay attention to

22    other things; the diversification of the fund, the risks of

23    the fund, the types of companies, the correlation between the

24    ability of one company to grow and a related company.  You

25    wanted to have a lot of uncorrelated stocks in your

1    portfolio.  So the research department was a very critical

2    element in any asset management firm looking to achieve

3    long-term success, alongside other areas; of course the

4    portfolio management teams but also others like the trading

5    areas and the quantitative research area, et cetera.

6    Q.   And describe what, if any, initiative was under way in

7    sort of around 2000 and 2001, even in 2002, about research?

8    A.   I was involved in discussions with others about the need

9    to continue to put more and more emphasis on trying to take

10   experienced, talented people, and to in a sense to create the

11   balance of capability that we felt were key ingredients to

12   making good investment performance overall.  And so what we

13   did is, we tried to identify people that we think were very

14   suited, either through their past experience or through the

15   way in which they conducted their job on a day-to-day basis,

16   what were some of their specific skill sets?  And if they

17   demonstrate skills or experience or management capability

18   that was more specialized and focused, a high focus on

19   individual companies, analyzing the depth of the company, the

20   various divisions, studying the management team, their future

21   revenues potential, their ability to bring out products

22   successfully, over some of the other skills that I just

23   mentioned, whether it would be, you know, risk management or

24   portfolio construction.

25            Then we tried to tap into a number of key people.

1    I remember very specifically that we took Bill Landes, a very

2    senior executive at Putnam, who was running the Asset

3    Allocation area, among other jobs, and we actually tapped

4    him, asked him to become the global head of Equity Research.

5    We also asked --

6    Q.    Was that deemed to be within the organization a demotion

7    for him?

8    A.    No, absolutely not.

9    Q.    All right, continue with where you're going.

10   A.    We tapped other people, and I guess what we did, we

11   raised the awareness to talk among each other and to try to

12   identify others that would add depth and experience in that

13   particular type of function.  And we identified over time,

14   you know, a number of people, that some of them were

15   ex-portfolio managers.  Most of them were portfolio managers

16   at the time who then became asked, either on a halftime basis

17   at the beginning as we were, you know, unfolding the

18   initiative, to over time on a full-time basis, to spend their

19   time either in a senior management role within the Equity

20   Research or in a very important research analyst role where

21   you're making recommendations on a sector basis.

22   Q.    Do you remember Kelly Morgan?

23   A.    I do.

24   Q.    And do you recall whether she was asked to join --

25   A.    She was one of the first people that we asked.  She

1   actually raised her hand when she knew that we were looking

2   at such an initiative.  She was a portfolio manager in a

3   number of areas.  I think the last one was the Global Growth

4   area.  And what we did in the beginning was, we asked her to

5   take on what we called an ADR role, Associate Director of

6   Research within the Research Division.  While she in the

7   beginning retained some of her responsibilities in a

8   portfolio management role, over time she devoted her full

9   time to the research effort.  Colin Moore was another person

10  who had done the same thing.

11  Q.   And were those demotions for those people that were

12  asked to go to Research?

13  A.   Absolutely not.

14  Q.   Before we get into sort of what you decided to do with

15  the Growth teams, can you just give us a little bit of

16  overview of the structure of the Growth teams under your

17  purview and how they functioned.

18  A.   Well, as I recall, there were four Growth areas, pools

19  of -- teams of portfolio managers that managed mutual funds

20  or institutional portfolios.  The first one that I'm

21  recalling is what we call the U.S. Growth Team, Large Cap

22  Growth Team was run by Beth Cotner.

23  Q.   "Large cap" meaning large companies?

24  A.   That's right, large companies.  It tended to break

25  down.  The whole division tended to break down into, you

1   know, value companies that were more industrial conservative

2   companies that weren't growing.  What we called core was kind

3   of in the middle, and then growth, which were the fastest

4   growing companies.  That's how the industry generally broke

5   down.  I became responsible only for the Growth area, and

6   under the Growth area in the equities, there were four

7   divisions.  One was U.S. Large Cap Growth, which was large

8   companies.  It was run by Beth Cotner.  Then there was the

9   Mid Cap Team, U.S. Mid Cap Team under Eric Wetlaufer.  Then

10  we had the International -- well, let me just do it in

11  order.  Then what we called Specialty Growth, which was a

12  small limited cap U.S., with a lot of overlaps to what Eric

13  was doing.  But nevertheless, when I took it over, it was

14  under a separate area, and that was run by Dan Miller.  And

15  then the fourth area was International and Global Growth,

16  which was run which Robert Swift.  And each of those ran

17  pools of money related to those mandates.

18  Q.    And those four units that you've talked about, they're

19  each headed by a chief investment officer, a CIO?

20  A.    That's right, they were designated CIOs.

21  Q.    And was there a fair amount of movement of individual

22  portfolio managers from team to team in the pre-2001 period,

23  or from Growth to, say, Value or Core?

24  A.    No.  There would be -- if we found someone that had more

25  of an inkling, more of a disposition toward a different

10114079-c30b-44a9-a20c-9515595e0091

Page 54

1    style, we would consider moving them, but there was a modest

2    amount.

3    Q.   And let's sort of -- just one other issue there, I

4    guess, that I want to ask you about first is compensation.

5    And there's been testimony about compensation, but what was

6    the basis for awarding of bonuses?  How did that work?

7    A.   The bonus pool started at the very top.  I was on -- I

8    don't know whether it was called, I forget, maybe the

9    Executive Committee, but Larry Lasser's senior team would

10   discuss bonuses at the company level first.  We were a

11   subsidiary of Marsh & McLennan, and there was some kind of

12   formal arrangement between Putnam and Marsh & McLennan that

13   there would be a bonus pool that was mostly formulaic.  It

14   would be based on profitability of the company and other

15   performance measures.  Each division had different types of

16   performance measures.  Obviously within the Investment

17   Division, it was investment performance.

18          From there, Larry would take input and then award a

19   bonus pool.  Whatever the amount that came from Marsh &

20   McLennan would be awarded to various areas of the firm.  The

21   way I think about it was the operational areas of the firm,

22   the marketing areas of the firm, and the investment areas of

23   the firm.

24   Q.   They each got their own pool?

25   A.   They each were given a pool of money, and then the team,

1    the senior team would input from the bottom up.  There was a

2    tremendous amount of -- and HR would facilitate this in the

3    Investment Division -- a great deal of analysis and a great

4    deal of work done to determine how to distribute that pool.

5              Now, in the Investment Division, there were two

6    main performance measures that we looked at, and that was one

7    criteria for awarding both bonuses to the various units that

8    I just described, and also to individuals within that unit.

9    Q.   Well, let me just stop you there.  First of all, you

10   said there were four units that reported to you?

11   A.   That is right.

12   Q.   And then of the bonus pool that went to the Investment

13   Division, was it then further divided, at least by the time

14   it got to Growth, four different ways?

15   A.   Yes, it was.

16   Q.   So that what, each of those four units that reported to

17   you, for example, had its own bonus pool?

18   A.   Ultimately we would give a pool of money to each of the

19   teams, that's right.

20   Q.   Now, what about Value and Core?  Would those big units

21   have their own bonus pool as well?

22   A.   Yes, they would.

23   Q.   And then they would divide it up among their own units

24   within those divisions?

25   A.   That is correct.

1    Q.    Okay, so let's continue on the Growth side.    Then there

2    would be a pool that went to each of the four units that

3    reported to you?

4    A.    That's right.

5    Q.    And then just sort of trace through the rest of the

6    process.

7    A.    And those would be based -- well, there would be a lot

8    of discussion at various levels to try to determine what

9    those pools would be.    The criteria would generally be

10   investment performance, and we measure investment performance

11   two ways:    How are you doing?    How was your returns in the

12   fund or the products relative to some benchmark, the S&P 500

13   or some other type of benchmark?    Did you consistently beat

14   that benchmark in returns, or did you underperform it?

15          The second one was against competitors.    There were

16   a lot of companies that would rank firms within these

17   specific categories, Growth, Large Cap, International, Value,

18   et cetera, and you had a performance measure.    We used -- our

19   official status was with the trustees is, we used Lipper,

20   which is a company that would rank your performance relative

21   to competitors that did a similar thing.    And so those were

22   our two performance measures.

23   Q.    Let's talk about them one at a time.    You said the first

24   one was that performance would be measured against some

25   benchmark, and can you give us an example, within Growth, for

1    example, of a benchmark and how that worked.

2    A.    Well, some of the benchmarks were standard benchmarks.

3    Like Global Growth, it was the -- I think it was the

4    global -- some global comparable to the S&P.  I forget what

5    it was.

6    Q.    S&P is the Standard & Poor's 500?

7    A.    That's correct.  I think Morgan Stanley or some of these

8    other companies had these benchmarks where they just tracked

9    the performance of a bunch of stocks, and a fund would have

10   as its benchmark the goal of beating the performance of this

11   passive, what they call passive index, which is just a series

12   of stocks measured by some third party.

13   Q.    Now, as for the benchmark, did you use Morningstar?

14   A.    No.  We did -- well, we looked at Morningstar, but it

15   wasn't one of the official designates, so we would look at

16   Lipper in terms of performance.

17   Q.    All right, well, let's talk then about the competitors,

18   the universe that you looked at.  You said you would look at

19   Lipper, and we're going to come back to Morningstar, but

20   explain how that part of the process worked.

21   A.    Well, again, the two performance measures were, we would

22   measure the performance, the return of the fund relative to

23   some passive index, and we would also look at the ranking of

24   the fund relative to its competitors.  If it had a 10 percent

25   ranking, it means it beat 90 percent of its competitors.  If

1    it was in the top half, it would have somewhere between a one

2    or a 50 percent.  If it was below average, like 51 through

3    99, it meant that the performance of that fund relative to

4    competitors of the same type of fund was substandard and

5    below average.  And so we looked at both of those measures to

6    determine how well a fund was doing on a one-, a three-, and

7    a five-year basis.

8    Q.   Okay.  Now, you said that you used Lipper to measure as

9    the official measurement?

10   A.   Against competitors, that's correct.

11   Q.   And what is Lipper?

12   A.   Lipper is a company that services the financial --

13        THE COURT:  How do you spell that?

14        THE WITNESS:  I'm sorry.  Lipper.  Lipper is a

15   company.  Morningstar is another company.  They're

16   competitors.  But Lipper is a -- you know, for us, we decided

17   that it was a better measure.  They had more -- they divided

18   it into different time periods, one, three, and five and ten

19   years.  It was a third-party source that would -- you'd

20   submit your returns on a daily basis to them.  They would

21   measure it and put out these different categories and then

22   rank you within those categories.

23   Q.   Were there advantages or disadvantages?  Why did you

24   choose Lipper as opposed to, say -- officially choose Lipper

25   as opposed to, say, Morningstar?

1  A.   We looked at all of them, but I think with the

2  Morningstar star system, the methodology went back -- it was

3  just one number.  It went back many, many, many years, and we

4  determined -- and there were a lot of elements that

5  historical performance used to play -- well, played a big

6  role in that.  And when we looked at the makeup of the funds,

7  we wanted to have something that would gauge something closer

8  to the time period where someone was actually managing the

9  fund.  And with Lipper we were able to get a one-year number,

10  all right, and a three-year number, a five-year number, and a

11  ten-year number.

12        Now, the Morningstar just had this one number, and

13  it incorporated all of those things.  And in fact it was

14  heavily biased towards the longer term.  So if someone was

15  managing money for the last two years in a fund and it had a

16  star rating, we couldn't necessarily match it up to that

17  person or that team's performance because they were only

18  managing the fund for a couple of years.  And the Morningstar

19  rating went back and was weighted toward longer-term type of

20  numbers.  So it was more suited to people that had been

21  managing the same fund for a long, long time.

22        With Lipper, we had the advantage that we could

23  look at the one-year number via Lipper; and if somebody had

24  been managing for one year, we could look at a two-year

25  number, we could look at the three-year number, and more

Page 60

1    closely match the performance of the team to the competitive

2    performance in the industry.  And that's how I remember we

3    chose Lipper over Morningstar.

4    Q.    Okay.  Now, let's sort of start focusing on your mission

5    when you took charge of the Growth Funds, and let me sort of

6    orient you to the year 2000 forward.  Tell us what you did.

7    A.    Say that again?  I'm sorry.

8    Q.    You had a mission with respect to the Growth Funds, and

9    tell us once you got your mission what you set out to do.

10    A.    When I was asked to take over Growth, the Growth teams

11    were in the midst of having performance that had been very

12    good in the 1990s period, 1992 through 1999, only to see

13    performance dramatically tail off, both against benchmarks

14    with the S&P, or whatever the stated benchmark was, down

15    10 percent.  Many of our funds were down 15, 20 percent.  And

16    against competitors, we went from having an above-average

17    performance record in the Growth area to having one of the

18    worst records in the industry.  We were consistently, by the

19    time 2001 and 2002 had come around, we were consistently

20    finding ourselves in the bottom half of the bottom half of

21    the Lipper competitive rankings.  And my mission was to

22    change that.  Not only did it get a lot of publicity, we

23    started to see large pools of redemptions in the fund, a lot

24    of negative publicity, a lot of angry clients who had

25    entrusted us with their money.

10114079-c30b-44a9-a20c-9515595e0091

Page 61

1   Q.    Redemptions meaning?

2   A.    The client would put in an order to get out of the fund.

3   Q.    They'd take their money out?

4   A.    Take their money out.

5   Q.    All right.  And let me move you into early 2002.  Do you

6   recall doing an analysis for the leadership of Putnam about

7   your perception of what was going on in the Growth Funds and

8   what the problems were and what your plans were?

9   A.    I did.  I did a number of those, some on an informal

10  basis, but I remember into the 2002 period, I had made a

11  major presentation, first, to the Executive Committee at

12  Putnam and then to a broader group.  I think it was either

13  the Management Committee -- I forget the names of the groups

14  at this point.  And it was the result of a lot of analysis, a

15  lot of discussions with the team and other people in terms of

16  what we should be doing to correct the dramatic fall-off in

17  performance.

18  Q.    All right, let's take them one at a time, and if I might

19  approach the witness, your Honor.  Do you recognize the

20  document that I've just handed you?

21  A.    I do.

22  Q.    And would you tell the Court and jury what it is.

23  A.    Periodically, I believe it was once a quarter, Larry

24  Lasser would hold what was called an officers' meeting, and

25  each quarter we would review -- there were a number of people

Page 62

1    that would speak at it -- we would review the company's

2    status, other developments in the company, but there was

3    always a big chunk of time that was devoted to investment

4    performance.  We were an investment company.  And at that

5    point I was asked to speak on what became the formal changes

6    that were approved, that I had recommended to Tim and to the

7    rest of the Executive Board.

8    Q.   And this is the presentation, one of the presentations

9    you made?

10   A.   This is one of the presentations.  I believe what this

11   is is, you know, a copy of my notes for the speech that I

12   gave.

13           MR. KOCIUBES:  Could we pull up Defendant's 18.

14   Q.   And do you see on the screen the document that you have

15   in front of you that you've just identified?

16   A.   I do.

17           MR. KOCIUBES:  Let me first of all offer it, your

18   Honor.

19           THE COURT:  All right.

20           MR. MOLONEY:  Objection.  Hearsay, your Honor.

21   He's describing --

22           THE COURT:  Well, I don't know, so take it off the

23   screen.  Let's see it.

24   SIDE-BAR CONFERENCE:

25           THE COURT:  Well, let me just go through a

1    protocol, since we're now starting his case.  Have you told

2    him which exhibits you're objecting to?

3            MR. MOLONEY:  We said we'd send our objections

4    over, yes.

5            THE COURT:  And this was objected to?

6            MR. MOLONEY:  I believe so, yes.

7            THE COURT:  Then you can't throw it up on the

8    screen.  So she may not know that.  The young woman so

9    pleasant there, she probably didn't know that, so anyway --

10           MR. KOCIUBES:  The issue is, after her transfer,

11   what it was that he was doing and why he was doing it because

12   the issue ultimately gets to be is why he transferred her.

13           THE COURT:  When did he draft it?

14           MR. KOCIUBES:  2002.  This is contemporaneous with

15   the reorganization.

16           THE COURT:  I'm just going to have to read the

17   whole thing.  This is a six-page document, so right now I'm

18   not going to do it.  He'll say what he was thinking about,

19   and then I'll have to read it.  I don't know what's included

20   in here.

21           MR. KOCIUBES:  It's just his presentation.

22           THE COURT:  I haven't read it.  Are there any other

23   issues like this?

24           MR. KOCIUBES:  There are two companion documents

25   that he again showed people at the time as to why he was

Page 64

1   moving who where.

2          THE COURT:  I don't know.  You need to lay a

3   foundation.  I'll have to read it.  I don't know.

4          MR. MOLONEY:  And we'll have the same objection to

5   those as well.

6          MR. KOCIUBES:  Would you like an extra copy?

7          THE COURT:  I'd love it.  I'll try and read it

8   while --

9          (End of side-bar conference.)

10  Q.   Am I correct, sir, that you prepared the document in

11  front of you in order to explain what you were proposing to

12  do and why in April of 2002 with respect to the Growth

13  Division?

14  A.   I did.

15  Q.   And this was the presentation that at the time -- your

16  notes of the presentation that you made to senior management?

17  A.   To senior management, but this particular one was a

18  presentation that I gave to the officers' group, which is a

19  large body of people.

20  Q.   Okay.  And you were explaining to them what you were

21  going to do?

22  A.   Not only what we were going to do but what was approved

23  and we were in the beginning stages of executing.

24  Q.   All right, and let me take you sort of one step at a

25  time.  What were you approved to do and what were you going

10114079-c30b-44a9-a20c-9515595e0091

1    to do with respect to the Large Cap Growth Team?  And you may

2    refer to the document to refresh your memory if you want.

3    A.    The first thing that we did with regard to the Large Cap

4    Growth Team is, we looked at the types of funds that we were

5    managing, and some of the funds were aggressive funds in the

6    terms of -- an example would be looking at companies that

7    have very high growth rates -- Google would be an example of

8    that -- but you have to pay a high price for it.  There's a

9    large premium in order to buy that.  Then there are more

10   risky companies.  They can earn you a high rate of return,

11   but the downside is greater because you're paying up for

12   them.  And there were other mandates that were more

13   conservative mandates.

14           And what had happened is, because the team had been

15   managing both types of investments, all of the funds started

16   to be managed in this more aggressive style, and a big chunk

17   of the assets weren't meant to be.  So what we chose, given

18   that this Growth Team had migrated toward a very aggressive

19   style, we took those mandates that were benchmarked to a more

20   conservative benchmark, less aggressive in terms of growth,

21   and we moved the team that had been managing it under a new

22   management, under the Core Team, which had been exhibiting

23   very good performance throughout this period.

24   Q.    And let's stop there.  So that you said you took some of

25   the assets, meaning the mutual funds, for example?

1  A.    That's exactly right.

2  Q.    From what, just one of the Growth teams or more than

3  one?

4  A.    From more than one.  That was the first one on this

5  document.  That's where I started.

6  Q.    And you moved it to the Core Team?

7  A.    We moved it to the Core Team.

8  Q.    And the reason for that?

9  A.    Two reasons -- three reasons:  One, the performance had

10 been very poor under the Growth management.  Number two,

11 these particular funds had a more conservative benchmark.  In

12 other words, they were supposed to be managed in a more

13 conservative manner, more in keeping with what the Core Team

14 had already been managing.  And the third reason is because

15 the Core Team had displayed performance over that period that

16 was outstanding, and we thought it could be better entrusted

17 with that, with those mandates.

18 Q.    And you had said that there had been redemptions or

19 money flowing out of the Growth teams?

20 A.    Yes.

21 Q.    Do you remember what was happening with the Core teams?

22 Was money leaving, or was it coming in?

23 A.    Well --

24 Q.    And let me direct your attention to the --

25          THE COURT:  By the way, I allow the exhibit.

1        MR. KOCIUBES:  Then we can show it to the jury.

2   Thank you, your Honor.

3        THE COURT:  What number is it?

4        MR. KOCIUBES:  That's Defendant's 18, and if you

5   want, I can hand you the other two in this series so you can

6   look at it ahead of time.

7        THE COURT:  Yes.

8        (Defendant Exhibit 18 received in evidence.)

9        MR. MOLONEY:  We have the same objections to those

10  two.

11       THE COURT:  Overruled.  Well, I don't know.

12       MR. KOCIUBES:  Can you put Defendant's 18 then onto

13  the screen.  And just, first of all, just blow up the first

14  paragraph.

15  Q.   And do you see the sentence, "We want to share with you

16  our vision on how our investment platform is designed"?  Do

17  you see that?

18  A.   Yes.

19  Q.   And that you wanted to review current performance?  Do

20  you see that?

21  A.   Yes.

22  Q.   And who was the audience for this particular

23  presentation?

24  A.   It was what was called officers of the company, and I

25  don't recall exactly, but it was at some level of experience

1    that you became an officer.  And it was a big audience, and

2    it was actually even videoed so you could watch it in other

3    rooms.

4    Q.    So it would have included, for example, senior vice

5    presidents, such as Lisa Svensson would have been invited?

6    A.    I believe so, yes.

7    Q.    Okay.  Now, let's go -- put the full page back on, and

8    if we could pull this part up.  And you referenced there that

9    you were splitting the Large Cap Growth Team into two groups

10   to improve their focus.  Do you see that?

11   A.    I do.

12   Q.    And there's reference to the various benchmarks that

13   you've been talking about.  Do you see that?

14   A.    I do.

15   Q.    There are a couple of names that are mentioned there.

16   In the second bullet, you talk about moving certain products

17   as part of Justin Scott's Global Core Division?

18   A.    That is correct.

19   Q.    And what's that all about?

20   A.    Justin -- well, there were three main divisions within

21   the Equity area:  Value, which is the most conservative of

22   funds; Core, which is in the middle.  You buy both value

23   stocks and growth stocks, kind of a catchall area, and Justin

24   was in charge of Core.  And there was Growth.  And I became

25   the head of Growth, as previously described.  So Justin was

Page 69

1    the global head of all of the Core funds.

2    Q.   And so some of the mutual funds from under your purview

3    from Growth were being moved over to Mr. Scott's area?

4    A.   That is correct.

5    Q.   Okay, and we're going to come to that in a minute.  And

6    in the next bullet you reference that Richard England and

7    Manny Weiss will move from Growth to the Core Team, and why

8    were you moving those two people?

9    A.   They were responsible -- they were two of the people

10   that were responsible for the more conservative assets.  They

11   also, in analyzing their experience and skills, had

12   demonstrated more of this more conservative investment

13   management style.

14   Q.   All right.  And then there is reference to members of

15   Large Cap Growth Team:  "Jeff Lindsey, Dave Santos, Tino

16   Sellitto will now be better able to focus on Growth

17   investing."  And did they then remain on the Growth Team?

18   A.   They remained on the Growth Team.  They were now

19   managing more aggressive mandates that had a more aggressive

20   benchmark, buying, you know, growth companies only.  They had

21   demonstrated more of that type of preference in their

22   portfolio management style.

23   Q.   All right, can we go to the next page, and could we blow

24   this up.  And then you see you reference that you're unifying

25   the International Teams under Mr. Kamshad and the Core

1  Division.  Do you see that?

2  A.    That is correct.

3  Q.    And then, if you would, I'd like you to explain this.

4  You wrote, "Our International Core institutional product and

5  the International Growth Fund are best in class and have

6  grown from less than $5 billion to over $50 billion."  Do you

7  see that?

8  A.    I do.

9  Q.    Explain what that's all about.

10  A.    Well, our International Equity Funds became over the

11  course of the '90s and into 2002 as best in class.  They had

12  performance records against the two measures that I talked

13  about, beating their benchmark, which was some international

14  core benchmark, and being at the very top of the Lipper

15  categories.  The funds in the International Core area under

16  Omid Kamshad had demonstrated, both the mutual fund products

17  and the institutional separately managed products, to have

18  short- and long-term records that were one of the top in the

19  industry.

20  Q.    And so at this time period of 2002, I guess, when Growth

21  had been losing assets, Core was still growing?

22  A.    That's exactly right.

23  Q.    All right.  And then there is reference to strengthening

24  Research, and is that what you were testifying about earlier?

25  A.    It is.

10114079-c30b-44a9-a20c-9515595e0091

1  Q.   And then you talked about references to Mr. Landes,

2  Ms. Morgan, Ms. Cotner, and Mr. Moore as always experienced

3  portfolio managers going there?

4  A.   That is correct.

5  Q.   All right, can we go to the next page, and let's start

6  with the top two paragraphs.  And you see reference there to

7  "Portfolio management - ensuring the right combination of

8  risk/reward."  What was that judgment all about?

9  A.   It was my determination, with the support and analysis

10  from others who helped me, that experienced portfolio

11  managers needed a combination of skills, not just the ability

12  to pick stocks, particularly in the Growth area, aggressive

13  growth stocks, but also the ability to look at combinations

14  of risk and reward:  What is the downside if the company

15  doesn't meet its projected earnings?  Is there balance in the

16  portfolio?

17           At the time in the late '90s all through the 2000

18  period, these funds had built a high exposure to mainly

19  aggressive growth technology companies, and it was my

20  determination that a good, even in the Growth area, a good

21  portfolio and portfolio management skills needed to look at a

22  diversification.  You needed to get exposure to energy

23  companies, consumer companies, health care companies, and

24  technology companies, and to look at different types of

25  ownership; you know, buying stocks with different risk reward

Page 72

1  combinations, not just those that were growing aggressively,

2  but if something happened, the stock would fall precipitously

3  if they missed a quarterly report.

4  Q.   I take it from what you're saying is, being able to pick

5  individual stocks is not necessarily the same skill as being

6  a good portfolio manager?

7  A.   That's right.  I determined, with my experience and just

8  generally and the analysis that I'd done, that we needed

9  portfolio managers that had had this range of skills, from

10 being able to pick stocks across industries, working with the

11 research analysts, but also this management skills, portfolio

12 construction skills, some quantitative skills; the ability to

13 study the characteristics of the portfolio from a data

14 perspective, what was the statistical makeup of these

15 companies in terms of your revenues, in terms of the

16 divisions, their sources of income, and to be able to do that

17 type of analysis; the correlation of a stock versus another,

18 how does that stock move relative to another stock?  And if

19 they're all moving in the same direction, that wasn't

20 necessarily as good as buying stocks that had good upside but

21 they were uncorrelated; it didn't matter, one stock's

22 performance didn't impact another stock's performance.  And

23 these were some of the skills that I determined along with

24 others that were required to be a portfolio manager.

25 Q.   Could we go to the third page of that document.  Let's

Page 73

1   just do the whole thing.  Now, do you see at the top there,

2   there was reference to both quantitative and fundamental

3   inputs?

4   A.    That is correct.

5   Q.    And explain to the Court and jury what that's all about,

6   what you were trying to do there.

7   A.    Well, generally there was -- research could be broken

8   down into two types, you know, if you were to just summarize

9   them.  One, all it does quantitative, it just looks at the

10  numbers themselves.  You may not even know a lot about a

11  company, their management, what products they're in, who

12  their competition is.  You're studying statistical analysis

13  of their balance sheet and income statement.  You require

14  more mathematical skills, use of computers.  And you can do a

15  lot of regression analysis to try to determine, based on the

16  changes in the balance sheet and the income statement, does

17  that give you hints, can you predict whether a stock is going

18  to improve or go down?

19  Q.    Had Mrs. Svensson's background been in quantitative

20  analysis?

21  A.    No.

22  Q.    And let's look at the last paragraph there where you

23  wrote, "The 1990s were about going after fast growing

24  markets, being aggressive, and building share."  And then you

25  talked about, "The next decade presents different

1    challenges.  It will be about discipline, consistency, and

2    retention."  And what is it that was in your mind, and what

3    were you communicating there?

4    A.    What I was communicating was that, you know, the history

5    of the stock market and the economy goes through these

6    periods.  In the '90s there was this feeling that if you

7    bought companies that were growing, particularly in areas of

8    the market that were deemed to be kind of the future --

9    information technology, the build-out of the, you know, the

10   wireless networks -- that the more concentrated and

11   aggressive you were, it seemed the better performance you

12   had.  I think some of the risks were hidden.  But it was my

13   view and the views of some of the others that the 2000, the

14   next decade was going to be back to the balance, buying

15   companies, not just that had that great potential like Apple

16   or Google, but some of the companies that a Warren Buffett,

17   for instance, would look at; energy companies, consumer

18   companies.  They may not be growing as rapidly, they may not

19   have as popular products that people can read about, but they

20   were very important to the overall growth of the economy, and

21   over a decade's period needed to be in the portfolio because

22   they were going to provide performance.

23          THE COURT:  Is this a good time to break?

24          MR. KOCIUBES:  Oh, absolutely.  I lost track of the

25   time.

1          THE CLERK:  All rise for the jury.

2          (Jury excused.)

3          THE COURT:  Can I see folks at side bar on the

4     record.

5     SIDE-BAR CONFERENCE:

6          THE COURT:  Just one thing on the record because

7     I'm starting to read the directed verdict things as I'm

8     sitting there.  Well, two things.  First, I think all those

9     three records are admissible as business records and for

10    state of mind, so I'm going to allow those in.  He's

11    preparing them, he's creating foundation at about the time

12    that he made the decision, and they're relevant to his state

13    of mind.

14          Now, let me ask you this:  On the statute of

15    limitations issue, which I just am reading now for the first

16    time, so the question really is, you say -- and I've been

17    trying to find it on the transcript --

18          MR. KOCIUBES:  Which claim, your Honor?

19          THE COURT:  The compensation claim.  You say that

20    she said in her testimony something I don't remember.  She

21    said it, it doesn't mean anything, but if -- that she sat on

22    compensation committees at the tail end of 2002 and the

23    beginning of 2003, I don't remember that in the testimony.

24          MR. KOCIUBES:  Not "committees" plural.  That she

25    testified -- and I probably can find you a reference, your

Page 76

1   Honor -- that in the wake of being appointed ADR -- she got

2   that title in January -- she testified that in December

3   Mr. Landes let her participate in the comp decisions, since

4   she was going to be ADR.  And she then testified, in the

5   December 2002-January 2003 period, she participated in the

6   comp decisions with respect to GER.

7                    MR. WEIR:  Only.

8                    THE COURT:  Do you agree with that?

9                    MR. MOLONEY:  Yes.

10                   THE COURT:  So let me just say, I did some research

11  on this over the weekend.  There is a one-year statute of

12  limitations, but it's upon reasonable discovery.  So the

13  question is, would she have known then about the people who

14  might be considered her comparators?  Was that testimony --

15                   MR. KOCIUBES:  She testified that she saw that

16  Mr. Norchi and three other names, Mr. Malak she testified at

17  length, she saw they were making more than she was, and she

18  was upset.

19                   MR. MOLONEY:  They were in GER and only those

20  people.

21                   MR. KOCIUBES:  The GER people, that's correct.

22                   THE COURT:  Well, that's just the obvious

23  comparators, so why isn't that time-barred, assuming there's

24  a reasonable discovery rule?

25                   MR. MOLONEY:  Well, there are other comparators in

Page 77

1       the Portfolio Management side of it.

2              THE COURT:  Well, you're going to have to be a

3       whole lot more specific to me because I think those are

4       time-barred.  I just didn't remember that testimony.  But,

5       you know, assuming for a minute a one-year statute of

6       limitations which the statute says, assuming that Mass. law

7       is typically more liberal than federal law, so I think they

8       won't go along with the -- in fact, I think they've said

9       it -- with the SJC -- well, I think they'll have a liberal

10      reasonable discovery rule.  That's all I'm saying.  So that

11      at some point that bars everything that she saw if it's one

12      year, more than one year before she filed suit.  So if

13      everyone agrees on it, then it's gone.  I don't know what the

14      other position is.

15             MR. WEIR:  The position is, number one, that she

16      had -- her comparators included the portfolio managers,

17      number one.  And, number two, she had -- there were positions

18      that became available in a timely manner in Portfolio

19      Management that she wasn't offered and she didn't get.

20             THE COURT:  That may survive, but I don't know

21      about that, but the ones I've been -- Massachusetts law is so

22      liberal on comparators, but there is that one-year statute of

23      limitations.  So if she did know about the comparators more

24      than one year before, then they're gone.

25             MR. MOLONEY:  But that wouldn't apply to the

Page 78

 1    portfolio manager comparators.

 2            THE COURT:  No, no, no, I know, but the ones

 3    that --

 4            MR. KOCIUBES:  That's a promotion claim.

 5            THE COURT:  That's a promotion claim, arguably.

 6    Well, it could be.

 7            MR. WEIR:  Well, it's a compensation claim

 8    because --

 9            THE COURT:  It could also be compensation.  Let me

10    get to that later, we're all tired, but I at least wanted to

11    understand.  At least it's undisputed that she had access to

12    the research analyst, which I actually thought was a decent

13    claim on your part.  I don't know how many she found out

14    about.  This is why we have to be very specific when we give

15    it to the jury because I'm not knowing who they're comparing

16    it to.  That's the one I thought you were, the guys who were

17    making a ton more than she was in Research for similar jobs.

18    That's what I thought we were doing, but that may be

19    time-barred.

20            (End of side-bar conference.)

21            (A recess was taken, 11:10 a.m.)

22

23

24

25

1        (After recess.)

2        THE COURT:  So what I'm going to get you at 1:00

3  is a draft charge and jury verdict.  I've been working

4  on it upstairs, but I don't -- it's clearly a draft in

5  the sense that I haven't made final rulings, and I'd

6  want to hear the directed verdict arguments.  But I

7  think it's important for you to at least see how I'm

8  thinking about getting it to the jury.

9        MR. KOCIUBES:  That would be helpful.

10       MR. MOLONEY:  Your Honor, I explained to

11  Mr. Alba, I filed two things on Friday, the second thing

12  I filed turned out to be a duplicate of what I filed

13  earlier.

14       THE COURT:  I said, you know, as much as I like

15  Mr. Moloney I'm not going to do this side by side, there

16  must be a difference between the two and I cannot figure

17  out what it is.

18       MR. MOLONEY:  There isn't.  We're bringing paper

19  copies of what should have been, and we're going to try

20  to file that electronically today.

21       THE COURT:  I said there must be something

22  but --

23       MR. MOLONEY:  No.

24       THE CLERK:  All rise for the jury.

25       (Jury entered the courtroom.)

1        THE COURT:  All set there?  Good.

2        MR. KOCIUBES:  Thank you, your Honor.  We were

3   working on Defendants' 18, I think, at the break.  If we

4   could pull up the last page.

5   BY MR. KOCIUBES:

6   Q.   Do you have it, Mr. Oristaglio?  It's the notes of

7   the office meeting that you were testifying about.

8   A.   Yes.

9   Q.   And perhaps we could blow up this portion of it.

10       And do you see you reported that Growth had been

11  a driver in 1999?

12  A.   Yes.

13  Q.   And then you wrote that going forward that what they

14  were doing was not sustainable?

15  A.   That's correct.

16  Q.   And then some bullet points.

17       Would you explain what that's all about to the

18  Court and jury?

19  A.   I think, as I was describing before we broke, the

20  '90s was a high growth period in the economy, and there

21  was a lot of excitement about particularly technology

22  companies that were growing very rapidly.  But if you

23  did some of the math on the necessary growth rates that

24  would be required to be sustained, and a concentration,

25  namely, in just technology companies, it was ignoring

Page 81

1   the fact that the economy may not continue to grow and

2   that the prices that were paid for a lot of these stocks

3   required a continuation of that for a period that you

4   had never seen.

5          It was my belief, and that of some of the other

6   people that I trusted, that this decade was going to be

7   more about balance, getting back to investing where you

8   look at conservative stocks, consumer stocks, taking a

9   more -- I used Warren Buffet as an example, because he

10  likes to buy stocks that are cheap, that are going to be

11  just turn-around situations, not just stocks like Google

12  that you pay a large price for, that have sustained

13  growth rates.  I thought that that balance and that type

14  of analyses and that type of risk management and that

15  type of assessment of the variety and diversity was

16  going to be what was required going forward from the

17  portfolio managers.

18  Q.   You reference in the bullet points in that first

19  paragraph about what happened was home-run focused.

20  What was the reference to?

21  A.   Because there had been a lot of stocks like Dell,

22  Microsoft, others, can't think of them, that had -- if

23  you paid, you know -- if you paid $50,000 in their first

24  few years of when they appeared on the scene, over 10,

25  15 years those stocks grew enormously.  And so what had

Page 82

1    happened is that type of excitement started to infuse a

2    lot of portfolio managers to be looking just for those

3    type of stocks.  And you would pay up, pay a large

4    premium for them, hoping that you would capture some of

5    these home runs, stocks that would go up sixtyfold, as

6    opposed to other types of companies that just compound

7    every year.  They may go up 10, 15 percent a year, but

8    in the long run, those -- the stock market has averaged,

9    you know, single-digit returns compounded annually, not,

10    you know, 30, 40, 50 percent.  And in the long run, we

11    needed to be looking at kind of the steady stocks in

12    addition to occasionally finding one that had that

13    exciting upside.

14    Q.   And you wrote in the second bullet there, what

15    happens, they weren't focused on risks or evaluations.

16    That's the same part you were just testifying about a

17    minute ago?

18    A.    If you had a portfolio of stocks that were all in

19    technology, all in fast-growing stocks, you were paying

20    a high price for them.  If the economy slowed or if the

21    products didn't deliver or the whole technology sector

22    saw a slowdown in spending, every one of those stocks

23    had a far way to fall.  And that's exactly what happened

24    to Putnam in that Aggressive Growth area, where we had

25    very high concentrations of aggressive growth stocks,

1    the economy slowed, technology spending slowed, and our

2    performance dropped far greater than any benchmark or

3    any index or against almost all -- most of our

4    competitors.

5    Q.    And that's -- and I take it that was your reference

6    to "this situation has led to our poor performance

7    today"?

8    A.    That is correct.

9    Q.    And then you're talking about going forward.  Is

10   this what you just had been talking about, to develop a

11   more balanced product line?

12   A.    Well, it also related to the product line, you know,

13   how many funds in each of the areas did we have that

14   were aggressive funds versus more balanced funds?  And I

15   noticed that in the Value area, which is the most

16   conservative, there were only a few funds, and they were

17   mainly kind of mainstream type of funds.  The same in

18   the Core, there were a few funds, and they were all kind

19   of mainstream balanced funds.

20        In the Growth area, almost all of the funds

21   migrated to this aggressive growth style, and we needed

22   to, A, consolidate the number of funds, because it was

23   difficult to see the difference between some of them,

24   New Century Growth versus OTC, they were both focused on

25   high tech.  And there was just so many of them and

1    almost all of them were aggressive growth funds.

2            THE COURT:  What's OTC?

3            THE WITNESS:  I think it's an acronym for

4    over-the-counter, referring to the small cap, small

5    stock -- it was a fund that Putnam managed in the

6    period, and I didn't see any difference between that

7    fund and the New Century Growth Fund and many other

8    funds that were in the Growth area.

9            So the goal was to consolidate the number of

10   funds, to actually merge them together under one

11   management group, and to move some of them to a more

12   balanced, more conservative -- even within the Growth

13   area, a more conservative Growth style.

14   BY MR. KOCIUBES:

15   Q.   So as you were talking about consolidation, I take

16   it you weren't looking to adding lots of Growth

17   managers?

18   A.   That's correct.  But also keep in mind the area had

19   seen a large number of redemptions, investors were

20   asking for their money back in a large amount.  The

21   performance was poor, we were losing assets in the

22   Growth area in a large amount over that period.  So

23   under -- it wasn't practical or desired to have -- we

24   weren't in a growth mode in terms of adding people, we

25   were in a consolidation mode.

1    Q.    And then before we leave this page, the point number

2    three, "better use of risk management and portfolio

3    construction terms."  Do you see that?

4    A.    I do.

5    Q.    And actually, below that it talks about quantitative

6    support for risk management?

7    A.    That is correct.

8    Q.    And what -- what are you referring to there?

9    A.    Again, the best way to describe that is as opposed

10    to talking about a company and its products and its

11    potential, it's talking about an assortment of stocks

12    and what those -- and looking at the upside and the

13    downside of those stocks.  How has the stock performed

14    over a five-year history?  Is it a very volatile stock

15    that's gone up and down dramatically?  Has its

16    revenue -- you know, one year its revenue growth is 25

17    percent, then 20, but the next year you can see negative

18    growth?  There's a lot of tools that just does, as I

19    described before, quantitative analysis or risk

20    management analysis, looking at the overall stock

21    portfolio.  What's the volatility of the fund?  What's

22    the volatility of a set of stocks?  How much does it go

23    up and down on a daily basis?  How much industry

24    representation is there?  Is there balance between the

25    various sectors of the market of which you own stocks in

1  the portfolio or is it highly concentrated?  And there's

2  some of the things that a mathematical or statistical

3  analysis will -- and what we call risk management, where

4  you're studying those types of things, disciplines that

5  were required to -- into helping build these portfolios.

6  Q.   And so there would be people that were expert in

7  those disciplines that you hope to have on some of these

8  portfolio manager teams?

9  A.   There were people who are specialized in those type

10  of skills, yes.

11  Q.   So you can't simply by going by, say, title

12  portfolio manager, I take it that doesn't tell whether

13  it's one of these specialized people who was put there

14  for a specialized purpose or for something else?

15  A.   Or even if you were a portfolio manager, one of the

16  jobs that I felt I needed to assess was as a portfolio

17  manager, even if you were weren't a specialized

18  quantitative analyst, what skills did you draw upon in

19  your general knowledge and in your general experience?

20  Were you someone who was highly focused on individual

21  stock selection but didn't necessarily consider the

22  portfolio as a whole or look at some of this analysis,

23  even if it was presented by a quantitative specialist?

24  Or were you somebody that did do that, that had that

25  balance, that focused some of your meetings and some of

Page 87

1  your analysis on risk management and downsize versus

2  other portfolio managers that just liked to pick stocks,

3  and the collection of stocks at the end of all the

4  picking wasn't as paid attention to, kind of looking at

5  the forest from the trees.

6  Q.   All right.  You should have on your -- on the table

7  in front of you, sir, a -- some bullet points called

8  "Investment Division Update."

9  A.   I do.

10  Q.   And can you just identify that for us?

11  A.   Identify it --

12  Q.   What is it?

13  A.   It is just an update on the performance of the

14  various funds within the investment division.

15  Q.   Are these some slides you made in the spring of 2002

16  in connection with the reorganization you were

17  undertaking?

18  A.   It is, yes.

19       MR. KOCIUBES:  Let me offer that, your Honor.

20       THE COURT:  All right.

21       MR. KOCIUBES:  It's Defendants' 19.

22       MR. MOLONEY:  Objection, your Honor, same basis.

23       THE COURT:  Overruled.

24       (Exhibit 19 received into evidence.)

25  BY MR. KOCIUBES:

1    Q.    That's the cover sheet of these slides that you were

2    using at the time?

3    A.    Yes.

4    Q.    And is this part of a presentation that you made?

5    A.    It was also part -- these notes that you refer to

6    wasn't presented, these were my talking notes.  I think

7    these were the ones that were --

8    Q.    These were actually shown --

9    A.    -- shown during that talk.

10    Q.    -- to the auditorium or big meeting of people?

11    A.    That is correct.

12    Q.    Okay.  Let's go to the second page.  And there you,

13    I take it, had a discussion about the keys to successful

14    investment products?

15    A.    This was a setup.  This was just to remind the

16    audience and the people that my view, and the view of my

17    colleagues, of what was required to retain superior

18    competitive performance over the long run.

19    Q.    And you mentioned, quote, the quantitative and

20    fundamental research abilities.  Do you see that?

21    A.    I do.

22    Q.    And then am I correct that what you got in the other

23    boxes or what you hoped to achieve which was strong,

24    consistent performance?

25    A.    These were all the headings of elements that were

1    believed to be important ingredients to delivering good

2    performance.

3    Q.   All right.  Could we go to the next page?

4         And now here am I correct you're talking about

5    the overall performance trends?

6    A.   That's right.

7    Q.   And it says they're positive where initiatives have

8    been applied.  What does that mean?

9    A.   It was my assessment, and those are of some of my

10   colleagues, that where we had focused on this balance

11   that you saw on the previous page: good product

12   planning, good quantitative and fundamental research,

13   proven portfolio management, risk control and

14   performance monitoring, efficient trade execution with a

15   strong technology and infrastructure, where those

16   initiatives, that balance of skills, were applied, it

17   was our perception that we were seeing more positive

18   types of performance trends in the division.

19   Q.   And let's -- you had testified earlier that Core's

20   performance was significantly better than Growth's

21   performance.  Do you recall that?

22   A.   That is correct.

23   Q.   And I see on the left side of the page you've got

24   two, four, five check marks, and there is no check mark

25   before Growth?

Page 90

1    A.    Yes.

2    Q.    What are the check marks?

3    A.    If you look at these numbers, these numbers are the

4    percentage of assets that the teams are managing that

5    are above average in performance.  So obviously, a

6    number like 85 or 96, if you look at the three-year --

7    if you look across the Core number, it's clear that

8    somewhere between 85 and 96 percent of the assets that

9    they were managing over a one- and three-year period and

10   previously, pre-2000, had been superior performance.

11   They were beating between 85 and 96 percent of their

12   competitors in terms of their performance results.

13   Whereas in the Growth area, previous to 2000, in '98 and

14   '99, all of the assets were above average.

15   Q.    Strong years?

16   A.    Those were the strong years, but it had dropped off

17   precipitously to having zero percentage of the assets

18   beating their competitors over a three-year period and

19   only eight percent -- so what had happened, this

20   aggressive style worked well when it was working and the

21   market was focused on it, but because it didn't have

22   balance when the market turned, all -- almost all of the

23   assets had this very, very precipitous drop where almost

24   none of the assets were performing well.  And it a was

25   severe, severe change, and obviously, it was noticed by

Page 91

1   the entire investment community.

2   Q.   And in early of 2002, if I read this correctly -- or

3   you tell us what that opposite Core, what that seven out

4   of ten refers to.

5   A.   The seven out of ten.  This just -- the first part

6   of it is percentage of assets, so it would be weighted

7   by if the fund had a large asset pool, it would get a

8   higher weight.  The last column is just how many of the

9   funds, didn't matter whether it was a small fund or big

10  fund, in terms of how big the asset base was, that's how

11  many of the funds were performing above average.

12  Q.   And when we look at Growth -- so Core had seven of

13  ten of their funds were above average?

14  A.   That's right.

15  Q.   And Growth had zero above average, zero of ten?

16  A.   That's in the 2002 period.

17  Q.   Right.  And I think you said that you moved some of

18  the mutual fund assets from Growth to Core.

19  A.   We did.

20  Q.   And the reason for that was?

21  A.   There were two reasons for that.  We moved those

22  funds that had a benchmark that was a more conservative

23  benchmark, it wasn't an aggressive growth benchmark, it

24  was, quote, more middle of the road, so we felt that

25  that would be a better place to have the assets managed

1    by this more balanced team.  The second reason is Core

2    had been performing very well over the period previous

3    2000 and post 2000.

4    Q.   All right.  Can we go to the next page?

5         Am I correct that this slide that you used at

6    the time shows the differences within Growth, within the

7    Growth area of the various funds?

8    A.   That's correct.

9    Q.   Now we're on a page -- these are all Growth funds?

10   A.   These are Growth funds, but I want to point out

11   these numbers say something different.  Here a low

12   number is better, because it says where you ranked as an

13   individual fund.  So if you ranked number one, one

14   percent, that means you were in the top percentile.

15   Q.   Top performers.

16   A.   Yes.  So here you have to reverse -- a low number is

17   good, versus the previous slide, a high number was good.

18   Q.   All right.  And let's talk about Global Growth and

19   we're going to talk about International Opportunities.

20   Do you recall as of 2001, 2002, or even 2000, what was

21   the management structure of the Global Growth team?

22   A.   The Global Growth team had a team of people under

23   the management of Robert Swift.

24   Q.   And who were the portfolio managers?

25   A.   There was Kelly Morgan, Lisa Svensson, Steve Dexter,

Page 93

1  Peter Hadden.

2  Q.   And do you remember --

3  A.   I don't remember everybody.

4  Q.   Okay.  And do you recall who -- I'm not talking

5  about the entire International Growth, Swift's total

6  team, but the Global Growth Mutual Fund, do you recall

7  who was primarily responsible for that?

8  A.   Kelly and Lisa were primarily responsible for the

9  Global Growth assets.

10  Q.   Do you recall there was another mutual fund under

11  Robert Swift called International New Opportunities?

12  A.   Yes.

13  Q.   And who was primarily responsible for that?

14  A.   Primarily it was Steve Dexter.

15  Q.   All right.  And am I correct that what we've got

16  here are results for Global Growth and for International

17  New Opportunities?

18  A.   That is correct.

19  Q.   Okay.  And on a one-year basis, am I correct there

20  seems to be sort of a pretty marked difference in the

21  performance of the two, or at least their ranking, I

22  should say?

23  A.   That's right.  Throughout the Growth area, as you

24  can see on the chart, over a one-year period, areas

25  under Dan Miller's and Eric Wetlaufer --

Page 94

1      THE COURT:  That's just hard for us to follow,

2  because people don't remember who is who, so just --

3      THE WITNESS:  I'm sorry.

4  A.   That is correct.  In the Global Growth area under

5  Robert Swift, the International New Opportunities Fund

6  managed mainly by Stephen Dexter had been performing

7  better over the previous year than the Global Growth

8  Fund managed primarily by Lisa and Kelly Morgan.

9  Q.   Because here we said you started number one is good,

10 so he's in the 45th percentile?

11 A.   That is correct.

12 Q.   And Global Growth for one year is still 82nd?

13 A.   That is correct.

14 Q.   And if you look at a three-year window, am I correct

15 that International New Opportunities, the one that

16 Dexter was primarily responsible for, it's still better?

17 A.   That is correct.

18 Q.   Now, let's, if we could, then, sort of move ahead as

19 to what you decided to do.  Having done your analysis,

20 having made your presentations, what did you decide to

21 do with the Growth area generally?  And then we're going

22 to talk about Mr. Swift's team.

23 A.   There were a few things.  Number one, as I stated

24 previously, those funds anywhere in the Growth area that

25 had more of a conservative benchmark we wanted to move

1  under the management of a Core team that had better

2  performance.  That was the first thing.  Secondly, there

3  were some people I felt we needed to terminate.

4  Thirdly, there were other -- I thought there was

5  consolidation needed, because we were moving a big chunk

6  of assets and it was trying to get the right people for

7  the right job.  I wanted to have people in the portfolio

8  management roles that were displaying throughout the

9  Growth area more of that portfolio management skill, the

10  balance between risk management, portfolio construction,

11  and stock selection.  They either had a history of that

12  or demonstrated over that period better results, talked

13  about it genuinely in more of that balance, although

14  there were people in that area that had come from a

15  research background, while we were simultaneously

16  looking to beef up our Research department, taking one

17  of our senior people, Bill Landes, and put him in charge

18  of it and a few others that had a good track record and

19  good experience.  We also were trying to identify people

20  that would be more suited to help beef up that area and

21  go into either an analyst role or even a more senior

22  role in terms of associate director of Research.

23  Q.   Can you estimate for us the number of portfolio

24  managers and CIOs that you ended up terminating?

25  A.   Well, over the period that I took over the Growth,

10114079-c30b-44a9-a20c-9515595e0091

1    it was dozens and dozens and dozens.

2    Q.    Dozens?

3    A.    Well, more than dozens.  Probably 50 to 75 people

4    over the course of a number of years because of the

5    performance record, because of the loss of assets that

6    we ended up -- and because of many of the

7    restructurings.  There were a lot of people that

8    ultimately lost their jobs in the Growth area and at

9    Putnam.

10   Q.    Could we pull up -- is it chart 21?  Plaintiff's 21,

11   that chart with the different funds.

12         The jury has seen this before.

13         Let me ask you about this chart.  Let me first

14   of all ask you, do you see it purports to compare Putnam

15   Growth funds with all funds of all companies in 2001?

16   Do you see that?

17   A.    I see that's what it says.

18   Q.    Is that a meaningful comparison?

19   A.    Well, not really, because, you know, that would mean

20   that you'd be comparing equity funds with fixed income

21   funds and money market funds.  Really, the comparison

22   has to be against a benchmark that you're asked to

23   perform against and against competitors in that specific

24   area, because you're comparing apples and oranges if you

25   just lump them all together.

Page 97

1   Q.   Can we go to the next page?

2        Now, this one purports to develop funds with

3   funds of other companies within categories.  Do you see

4   that?

5   A.   Yes.

6   Q.   Now, are all these funds in the same category?

7   A.   No, they're not.

8   Q.   Okay.  And let's sort of perhaps just blow this up

9   so that everybody can see it better.

10       Now, with respect to -- it looks like there's

11  one of these funds that was in the third quartile, it's

12  got Ms. Cotner, Mr. Weiss, and Mr. England.  Do you see

13  that?

14  A.   No -- yes.

15  Q.   Ms. Cotner and Mr. England there?

16  A.   No.

17  Q.   They're gone?

18  A.   All three of them are.

19  Q.   Let's go to Growth opportunities.  Mr. England you

20  already mentioned.  Mr. Lindsey.

21  A.   He's gone, too.  He was gone.

22       THE COURT:  When you say they're gone, what time

23  period --

24       THE WITNESS:  The time I was there.  I left in

25  '05.  Most of these people were either asked to leave

Page 98

1    Putnam or left Putnam by 2003, 2004 at the latest.

2         MR. MOLONEY:  Your Honor, could we have more

3    specificity than that?  Because people get new jobs,

4    better paying jobs, they quit, get fired.

5         THE COURT:  Be specific, because this chart --

6    and Robert can print out this chart afterwards so people

7    can follow it.  So just walk us through what happened to

8    each of these people.  What happened to Beth Cotner?

9         THE WITNESS:  She was asked to leave.  Manny

10   Weiss was asked to leave, Richard England was asked to

11   leave.

12        MR. MOLONEY:  Can we have dates, your Honor?

13        THE COURT:  Do you know when?  This is all

14   2003-ish?

15        THE WITNESS:  I'd say somewhere between 2001 and

16   2003 would be my estimate.

17   BY MR. KOCIUBES:

18   Q.   All right.  Let's go to Growth Opportunities, that's

19   Mr. Lindsey and Mr. England?

20   A.   Asked to leave.

21   Q.   Both of them?

22   A.   Dan Miller, Jeff Lindsey -- Jeff Lindsey left, but

23   it was because he wanted one side -- my first two

24   terminations were Beth Cotner and Robert Swift, the area

25   that had the worst performance within the Growth.  And

10114079-c30b-44a9-a20c-9515595e0091

Page 99

1    it left a blank within the Growth -- the U.S. Growth

2    area.  I told Jeff -- he lobbied for the job, and I said

3    that he was unlikely to get it and we're likely to go

4    outside.  So then he took a job elsewhere.

5            Rick Weed is still there.

6    Q.    Okay.  Lindsey and you said Miller are gone?

7    A.    Gone.

8    Q.    Did Miller get any honors from The New York Times?

9    Do you remember?

10   A.    Dan Miller had been cited by The New York Times as

11   one of the fund managers of the decade in the '90s.

12   Nonetheless, when performance issues persisted in the

13   2000 period, somewhere in the 2003, 2004 period, I don't

14   know exactly when, he was asked to leave.

15           MR. MOLONEY:  Your Honor, may that be stricken?

16           THE COURT:  No.

17   BY MR. KOCIUBES:

18   Q.    Let's go to the Vista fund.

19   A.    Eric Wetlaufer was asked to leave, Marjorie Parker

20   was asked to leave, Dan Clark was asked to leave, Ken

21   Doerr was asked to leave.

22   Q.    All right.  Let's go to OTC and Emerging Growth.

23   A.    Steve Kirkson and Mike Mufson were two of the people

24   asked to leave earliest, because they were having severe

25   performance problems.  So I would put them in the 2001,

Page 100

1    2002 category.

2    Q.    How about Mr. -- the Voyager II fund, Mr. Gillis,

3    Mr. Lindsey, I think you already testified about.

4    A.    Roland was asked to leave a little later.

5          If you look at this chart, their performance in

6    2002 was one of the ones above average.  As it

7    deteriorated further in the 2002, 2003 period, they were

8    asked to leave.

9    Q.    Okay.

10   A.    Roland was asked to leave.

11   Q.    Mr. Swift.

12   A.    He, as I reported, was one of the first people.

13   When I restructured based on this document, he was

14   somebody that was asked to leave and had been managing

15   Global Growth, of which where Lisa had been working.

16   Q.    And Manny Weiss you've already talked about.

17   Because he's over here as well.

18   A.    When I left Putnam, Kelly Morgan was still there.

19   In fact, she had been promoted.  We had moved -- she

20   didn't volunteer, but we moved her from a portfolio

21   management role to a portfolio management resource role

22   to a pure research role.  And she got promoted up

23   through the ranks and stayed on for a long period.  When

24   I left Putnam, she was still -- she was still at Putnam,

25   and in fact, had been taking on more portfolio

10114079-c30b-44a9-a20c-9515595e0091

Page 101

1   management again at some point in the future.

2   Q.   All right, Lisa Svensson.

3        THE COURT:  I can't believe you just cleared off

4   that whole thing.  I was going to have him print it.

5        MR. KOCIUBES:  Oh, hold on, I'll do it.  I

6   misunderstood, your Honor.

7   MR. KOCIUBES:

8   Q.   Did you say -- under New Opportunities, Mr. Weed

9   still there?

10  A.   Rick Weed is still there.

11  Q.   At least when you left?

12  A.   When I left.

13  Q.   On Vista, you said everybody?

14  A.   Everybody.

15  Q.   On OTC, everybody?

16  A.   Everybody.  Roland Gillis, but Jeff did leave --

17       THE COURT:  You're saying these people all

18  terminated as part of the reorganization?

19       THE WITNESS:  Not as part of this

20  reorganization, but I didn't -- over time -- this --

21       THE COURT:  This is just over time, not as part

22  of the reorganization?

23       THE WITNESS:  That's right.

24       THE COURT:  So we'll have to write that on the

25  top.

Page 102

1    BY MR. KOCIUBES:

2    Q.   Was there one reorganization?  Tell us --

3            THE COURT:  No, no, finish off this chart.

4            MR. MOLONEY:  I have an objection to this.

5    Because Mr. Kociubes has led Mr. Oristaglio down this

6    golden path --

7            THE COURT:  Strike all the comments.  You can't

8    have this debate in front of the jury.  We'll see you

9    later.

10           This is just how many people left in general,

11   and then you need to go back through and explain what

12   happened during the reorganization.

13           So this is not part of the reorganization that

14   you're going to be asked about, this is in general who's

15   left, and I will allow that.

16           MR. KOCIUBES:  Okay.

17   BY MR. KOCIUBES:

18   Q.   Mr. Gillis and Mr. Lindsey?

19   A.   Roland Gillis was asked to leave at some point, and

20   in 2003, 2004, I believe.  Jeff had already left, as I

21   described earlier.

22   Q.   All right.  And Swift, you said --

23   A.   He was asked to leave as part of the reorganization.

24   Q.   Okay.  And Weiss --

25   A.   Stayed on.

1       THE COURT:  What did you just do to Weiss?

2       THE WITNESS:  Manny was asked -- Manny was asked

3   to leave at some point in the future, 2003, 2004.

4   BY MR. KOCIUBES:

5   Q.  Now, Kelly Morgan you said -- what happened to her?

6   A.  She took on a senior role in the Research

7   department, ultimately became the deputy head of

8   Research under Josh Brooks and then ultimately took on

9   portfolio management responsibility at some point in the

10  future before I left and then subsequently to when I

11  left in '05.

12  Q.  And we know that you didn't terminate Mrs. Svensson.

13  What did you do with Mrs. Svensson?

14  A.  I had asked Lisa to move from her role as a

15  portfolio manager in Global Growth to be -- in

16  consultation with Bill Landes and others to become an

17  associate director of Research in the Research

18  department as a full-time --

19  Q.  We're going to come back to Mrs. Svensson.

20      What happened to Stephen Dexter?

21  A.  What happened --

22      THE COURT:  You know, you're mixing apples and

23  apples.  This is just what happened to these people in

24  general in the organization, then you can backfill and

25  talk about what happened in the reorganization.

Page 104

1   BY MR. KOCIUBES:

2   Q.   Okay.  Mr. Dexter, as far as you know, is still with

3   Putnam?

4   A.   As far as I know.

5   Q.   Mr. Swift, on the other side, you've already

6   covered.  Mr. Dexter, you just covered?

7   A.   I don't know if Peter is still there, I don't

8   remember.

9        THE COURT:  Okay.  So now, Robert, if you can

10  print this so they can see this, what happened to people

11  before you left, and then you can go back through and

12  explain what happened in the reorganization, which is

13  what you're going to be asked about on the verdict form.

14  We can print it.

15       (Pause.)

16       I've made all these great promises.

17       If it doesn't come out, we won't take the time,

18  and then we'll go back through and do the

19  reorganization, and hopefully, that will help you with

20  your thoughts back there.

21       MR. MOLONEY:  Your Honor, one of those charts

22  with the gradation of blue has already been admitted as

23  an exhibit.  We had the other one that --

24       THE COURT:  You know, we don't need the speech,

25  we'll deal with it later.  I just want to see if this

1    works.

2           (Discussion off the record.)

3           THE COURT:  All right.  So we'll clear this, and

4    then we'll let you walk through -- and this is just the

5    people -- we'll label it -- who have been terminated --

6           THE WITNESS:  Generally for performance issues

7    over the period I was in charge of the Growth team.

8           THE COURT:  All right.  So we're going to put

9    that in.  And now we're going to clear this.  If you can

10   figure that out -- perfect.

11          And now we're going to go through what happened

12   in that 2002 reorganization, which is a different issue,

13   because the one we just saw was over the whole span.  I

14   think that's what --

15   BY MR. KOCIUBES:

16   Q.  Let me sort of, if I could, back up a step.

17          There have been -- before you got here, there

18   was some testimony about a reorganization in one part or

19   two parts.  Perhaps, in your own words, you can tell us

20   what it was that started happening, you started doing in

21   2000 with respect to the Growth teams in personnel --

22   A.   In the Growth team, we started to see tremendous

23   performance degradation, as you saw in the chart.

24   Something happened between having 100 percent of the

25   assets above average to zero.  That's the period when I

10114079-c30b-44a9-a20c-9515595e0091

Page 106

1    started to focus most of my attentions on Growth, and in

2    attempting through any number of measures, study,

3    analyze, and decide, first, with little steps, how do

4    you improve performance ultimately leading to the first

5    major reorganization, of which there were several over

6    time?

7    Q.   Okay.  And tell us about what these several

8    reorganizations were and why there were several .

9         MR. MOLONEY:  Objection, your Honor.  The focus,

10   as I understood it, was the reorganization that took

11   place in '02 as opposed to other reorganizations.

12        MR. KOCIUBES:  We've had charts from the

13   plaintiff, your Honor --

14        THE COURT:  Excuse me.  So which reorganization

15   are you talking about now?

16        THE WITNESS:  This first major reorganization is

17   what I was referring to, the one that has these charts.

18        THE COURT:  And what year was that?

19        THE WITNESS:  This was April of 2002.

20        THE COURT:  That the one where Mr. Swift got

21   terminated?

22        THE WITNESS:  That's correct.

23        THE COURT:  All right.  So tell us what happened

24   in that reorganization.

25        THE WITNESS:  So there were a number of small

1   measures that were done continuously over the period.

2   We're always tweaking.  But I was asked to look at

3   something more comprehensively and more dramatic, which

4   I agreed with, and ultimately in this reorganization,

5   the first thing is that we decided that two of the four,

6   the heads, Beth Cotner and Robert Swift, those were the

7   areas that were performing the poorest over that time

8   period.  They were asked to leave Putnam.

9          There were other people asked to leave.  I don't

10  recall them all by name, but some of the people in this

11  chart were likely asked to leave during that period as

12  well, or in that reorganization.

13         THE COURT:  So why don't you put crosses next to

14  their two names.

15         THE WITNESS:  That's right.  Although I don't

16  know precisely which people were asked to leave as part

17  of this reorganization other than Robert and Beth.

18         Then there were a group of people, as I reported

19  earlier, again, this is refreshing my memory, but that

20  were asked to move from the Growth area to the Core

21  area, because Core was going to be managing those

22  assets.  And it was mainly the U.S. Core/Growth team.

23  Q.   How did you choose those people, and who were they?

24  A.   If I recall, it was Manny Weiss and Richard England.

25  If I recall correctly.  But what I definitely remember

Page 108

1    was these were people that were managing that specific

2    pool of assets, so they had familiarity with the mandate

3    and the stocks under management, it was a U.S. stocks

4    focus, and had demonstrated in their management --

5    portfolio management jobs, A, a balance of the skills

6    that I mentioned earlier, that they were able to not

7    just look at stock research, but look at risk

8    management, the portfolio construction, building a

9    diversified group of stocks, having representation and

10   interest in building stocks across many, many different

11   sectors, et cetera.  And those were the people that we

12   chose that would go along under the Core team, because

13   that's how the Core team had been managing the funds,

14   with that more balanced approach.

15        THE COURT:  So why don't you underline Weiss.

16   And who's that --

17        THE WITNESS:  Richard England.

18        THE COURT:  England, that they were --

19   BY MR. KOCIUBES:

20   Q.   They were transferred to Core, is that what

21   happened?

22   A.   That is correct.  And continued to manage the same

23   pool of funds, those specific funds that were

24   transferred to Core along with them.

25   Q.   Okay.  Anything else that you recall at that point

1    in time?

2    A.    The next thing that happened is we combined Eric

3    Wetlaufer and Dan Miller's teams together.  The pool --

4    the area they were managing was the U.S.-focused market

5    in the smaller and midsize company area in Growth.  I

6    thought there was a lot of overlap, and I believe Dan's

7    skills, which was a more aggressive growth style, was

8    more in line of Eric's skills, which was a more

9    conservative management style.  And I contemplated

10   terminating Dan as well, but their performance in a

11   number of their funds was better, and he had just been,

12   literally two years earlier, named one of the portfolio

13   managers of the decade.

14          So given those events, and it was a known name

15   in the area and some of the performance had been

16   improving, I decided rather that -- to improve the

17   balance of skills, to combine them with Eric Wetlaufer's

18   team, who had been demonstrating more of those skills.

19   Again, this was focused onto the U.S. side of the

20   market.  So we really combined the two teams, I believe,

21   I can't recall for certain whether part of this

22   reorganization, some of the people lost their jobs in

23   the consolidation, but over time, I know over time the

24   teams were made smaller, more concise, with greater

25   balance of skills that was injected.

10114079-c30b-44a9-a20c-9515595e0091

1    Q.   And I think you had said that your recollection was,

2    and correct me if I'm wrong, that Mr. Kirkson and

3    Mr. Mufson were gone even before Robert Swift?

4    A.   It could have been at that reorganization --

5              THE COURT:  Wait.  Before we move on, so Miller

6    and Wetlaufer were teams.  Did you keep everybody --

7              THE WITNESS:  I don't remember whether or not

8    anyone lost their jobs specifically because of the

9    reorganization.  I believe they did.  But I do know that

10   Kirkson and Mufson were gone by then.

11             MR. MOLONEY:  Objection.

12             THE COURT:  We're moving on.

13             So as far as those two teams, they were merged

14   but everyone was kept, as far as you remember?

15             THE WITNESS:  No, I seem to recall that people

16   lost their jobs.

17             THE COURT:  You don't remember who?

18             THE WITNESS:  I'm not sure.

19   BY MR. KOCIUBES:

20   Q.   Do you recall initially Miller and Wetlaufer became

21   the co-heads of that team?

22   A.   They did.  They became the co-heads of that area.

23   Q.   They were co-CIOs?

24   A.   Co-CIOs of U.S. Mid and Specialty Growth.

25             THE COURT:  Now we are onto the next one.  Sorry

Page 111

1    I interrupted you.  As far as you know, you just don't

2    remember who kept and who didn't keep their teams in

3    that merger.

4            THE WITNESS:  In that reorganization.

5            THE COURT:  How about OTC and Emerging Growth?

6            THE WITNESS:  That's part of -- that needs to be

7    part of the circle, because Steve Kirkson and Mike

8    Mufson reported to Dan Miller.  All the way over to

9    Roland Gillis.

10   BY MR. KOCIUBES:

11   Q.   So all of these teams were merged?

12   A.    All of those teams were merged, that's exactly

13   right.

14   Q.   I think I just asked you a second ago, were Kirkson

15   and Mufson gone before Lisa Svensson was transferred?

16   A.    I believe so, yes.

17   Q.   You already talked about Gillis and Lindsey that

18   from the other chart --

19           THE COURT:  Wait.  Did they get to stay as part

20   of this reorganization?

21           THE WITNESS:  Who is that?

22           THE COURT:  Gillis and Lindsey.

23           THE WITNESS:  Gillis stayed.

24           Lindsey, he stayed on for a little while, when

25   he lobbied to take over the area under Beth when Beth

Page 112

1    was asked to leave, I said no, that I'm going to be

2    looking to the outside, and so he found another job.

3          THE COURT:  So that was voluntary.  But as far

4    as your reorganization went --

5          THE WITNESS:  Gillis stayed on as well.

6          THE COURT:  Gillis and Lindsey stayed.  So now

7    we're on to the next line.

8    BY MR. KOCIUBES:

9    Q.   All right.  You testified about what happened to

10   Swift's team, right?  Mr. Swift was gone?

11   A.    Robert was asked to leave.  Kelly went from half

12   job where she was half portfolio manager and half

13   Research to a full-time Research position.  Lisa was

14   asked to go onto a full-time Research position as an

15   associate director of Research.  And a big chunk of the

16   assets were moved over to the Core team, all Global

17   Growth, the fund that Kelly and Lisa had been

18   managing --

19   Q.   The mutual fund?

20   A.   The mutual fund moved.  It was actually transferred,

21   that fund was transferred over to the Core team.  There

22   was an adequate number of people in the Core team, so

23   they became the portfolio managers of that fund along

24   with another couple of funds that they had been

25   managing.

1    Q.    The reason you moved the mutual fund away from

2    Ms. Morgan and Ms. Svensson to the Core group was what?

3    A.    Ask that question again.

4    Q.    Why did you move the mutual fund over to Core?

5    A.    We moved the mutual fund because it had a more

6    conservative benchmark that was a Core benchmark, and

7    secondly, the Core team had been exhibiting very good

8    performance, as we just showed here, and the Global

9    Growth team had exhibited very poor performance.

10        THE COURT:  Just so I understand it, so Swift is

11   fired, Morgan and Svensson go to Research, Weiss and

12   Dexter go over to the Core.

13        MR. KOCIUBES:  No.

14        THE WITNESS:  Not Weiss and Dexter?

15        MR. KOCIUBES:  Weiss went to Core, I think you

16   said.

17        THE WITNESS:  Weiss went to Core, and what

18   assets were left in the area --

19        THE COURT:  I see.

20        THE WITNESS:  -- were already managed by Steve

21   Dexter and a couple of people.  It was a small pool of

22   assets, he had already been managing it, and he also

23   demonstrated a better improvement in performance, as I

24   reported, his fund, the fund that he was primarily

25   responsible for was above average.

Page 114

1    Q.    What was the name of that fund?

2    A.    International New Opportunities.

3    Q.    And what was the relative size of International New

4    Opportunities to Global Growth?

5    A.    It was a small pool of assets.

6    Q.    All right.  I think a few moments ago in one of

7    other charts, they were the 45th percentile roughly for

8    the one year --

9    A.    Which is above average for one year.

10   Q.    And Global Growth was in the 82nd or in the 80s?

11   A.    That is correct.

12   Q.    So what was the decision you made with respect to

13   Mr. Dexter?

14   A.    We decided to do that, that he would now be in

15   charge of what was left of the Global Growth team, the

16   small pool of assets, although we would not designate

17   him a chief investment officer.

18   Q.    Why didn't you give him that title?

19   A.    It was a small pool of assets, felt it was reserved

20   for someone managing a larger pool and managing, you

21   know, more complex level of assets and people.  It just

22   didn't warrant it, in my view.

23   Q.    All right.  And was there any issue in terms of

24   keeping him or not keeping him, about his receptiveness

25   to quantitative skills?

1    A.   Well, Steve has had a long history in the asset

2    management field.  He was an analyst for a number of

3    years, but then he was also a portfolio manager and had

4    been at Putnam demonstrating more of this balance.  And

5    in discussions with him, looking at performance and

6    talking with others, the fact that, A, he was actually

7    managing the pool of money that stayed; B, was managing

8    it with great improvement since it was above average;

9    and C, since he had been demonstrating his use of these

10   other tools, both quantitative tools, risk management

11   analysis, I felt that that was appropriate in a lesser

12   titled role but for him to continue to maintain his lead

13   role in that area.

14   Q.   And do you remember Peter Hadden?  Was he a --

15   A.   He was -- I believe he was part of that group, too.

16           THE COURT:  So what happened to him?

17           THE WITNESS:  Well, he definitely stayed on

18   then.  I don't know whether Peter at some point was

19   asked to leave, I don't recall, but at that point he was

20   asked to stay on as well.

21   BY MR. KOCIUBES:

22   Q.   You left him there with Dexter?

23   A.   Because he was actually part of the team managing

24   that.

25           We also -- there was a woman Denise Seldon, who

1    had been in kind of a middle role, what's called an

2    institutional portfolio manager, more of a client

3    service role for the institutional money.  They weren't

4    mutual funds, these were other accounts that we managed.

5    And we moved her from that institutional portfolio

6    manager role to a full portfolio management role because

7    she had been working on those specific assets, the

8    institutional assets that were managed under Steve

9    Dexter.

10   Q.   And do you recall that she ended up managing the

11   institutional side of Global Growth?

12   A.   I don't know if it was Global Growth.  I remember

13   she was managing institutional money within the Global

14   Growth area.

15        MR. KOCIUBES:  Now, I was going to ask some

16   other questions, I don't know if you wanted to print out

17   this work of art or not?

18        THE COURT:  Yes, we do.

19   BY MR. KOCIUBES:

20   Q.   Now, Mr. Dexter --

21        THE COURT:  These would be more like chalks,

22   because they're his description, but it's helpful for me

23   to see them so I'm thinking it might be for all of you.

24   BY MR. KOCIUBES:

25   Q.   Let's now focus on Mrs. Svensson, if we could.

1    Tell us why it was you decided not to keep her

2    in this shrunken down International Growth that

3    Mr. Swift had managed before.

4    A.    There were a few reasons.  Number one, the assets

5    that she had been part of, the bulk, the bulk of the

6    assets that she was primarily responsible for, together

7    with Kelly, had been moved over to the Core area.

8    Secondly, Steve Dexter had already been managing the

9    pool of money that was left and primarily responsible

10   for those assets.  And thirdly, we were looking to beef

11   up the Research department, and Lisa had a long history

12   of -- in a role as a research analyst in the energy

13   area, both at Putnam and previous to Putnam.  Given that

14   it was our desire to move experienced people with such a

15   background, I thought it would be a good addition, along

16   with Kelly, along with Colin Moore, along with Bill

17   Landes, to take on an important senior role in the

18   Research department.

19   Q.    Given all the people that were let go in Global

20   Growth, was there consideration by you given to letting

21   Mrs. Svensson go at that point?

22   A.    Well, there was consideration looking at everyone,

23   given the very poor performance, but in the end, we

24   determined that she had an important role to play.  She

25   could greatly help Putnam, but in this more specialized

10114079-c30b-44a9-a20c-9515595e0091

1   role, which was the bulk of her career.  She started

2   managing -- she became a portfolio manager in 19 -- I

3   believe in 1998 at Putnam.  And so I think we considered

4   everyone, given the zero percent of the assets were

5   above average.  But I think we felt happy and delighted

6   that she had that background that could greatly help us

7   in a very important part of what makes good performance

8   for our asset base.

9   Q.   And do you recall whether you had a -- in due

10  course, had a conversation with Mrs. Svensson about her

11  moving?

12  A.   I did.  I think she approached me and we talked, and

13  I told her -- I think it was at that meeting where I

14  asked her to take on that role, and we had a talk about

15  it.

16  Q.   Do you recall whether she was happy about it or not?

17  A.   She wasn't.  She had a preference to stay in the

18  Portfolio Management area, and we discussed -- I gave

19  her my reasons why I thought this was an important step

20  that we had to take, given all the considerations of the

21  assets move, the performance issues, but also our need

22  to greatly try to find this right balance of skills

23  between the various departments.

24  Q.   Did you tell her in words or substance that she was

25  just going there on some interim or temporary basis?

1  A.   No.  In fact, in discussions with Bill Landes, I was

2  aware and made reference to the fact that --

3       MR. MOLONEY:  Objection, move to strike.

4       THE COURT:  Yes, sustained.

5  BY MR. KOCIUBES:

6  Q.   Just tell us what went into your thought process.

7  What were you thinking?

8       MR. MOLONEY:  Can we have a day, time, and

9  circumstance?

10      THE COURT:  Yes.

11 BY MR. KOCIUBES:

12 Q.   This is right around the time when you've asked Mrs.

13 Svensson to go to Research.

14      MR. MOLONEY:  Again, the subject matter of his

15 interior thoughts is not mentioned yet by Mr. Kociubes.

16      THE COURT:  I strike the comments.

17      MR. KOCIUBES:  I'm trying to get to a state of

18 mind.

19      THE COURT:  What's the question?

20 BY MR. KOCIUBES:

21 Q.   All right.  Did you have some discussion with

22 Mrs. Svensson -- let's do it that way -- whether this

23 was an interim -- her going to Research was an interim

24 or temporary or short-term move of some kind?

25 A.   It was not an interim move, it was not a short-term

Page 120

1    move.

2          MR. MOLONEY:  Objection, your Honor.  He's not

3    answering --

4          THE COURT:  Overruled.

5    A.   It was intended she would become an associate

6    director of Research with a number of people that she

7    would be managing, and based on that, it was pretty

8    explicit to her, both by Bill Landes and myself, that

9    this was a job we wanted her to have.

10         THE COURT:  What words did you use to her?

11         THE WITNESS:  I can't recall exactly the words.

12         THE COURT:  Substantially.

13         THE WITNESS:  Substantially the conversation

14   that we would like you to take on a senior role in the

15   Research department, associate director of Research in

16   charge of the energy area.  There are a number of people

17   that are going to be reporting to you, and there's a

18   number of resources that will be made available to you.

19   You should have those discussions with Bill and try to

20   iron out what you think the requirements are, which she

21   did, and it was agreed upon between her and Bill that --

22   I guess the details of the job.

23         And we talked afterwards, and we talked on a

24   number of occasions, and the idea that this was an

25   important role that we wanted her to fill, it was not a

Page 121

1    short-term move, it was something that we wanted her to

2    take on.  And in fact, great research departments at

3    other firms, I specifically remember mentioning firms

4    like Wellington and firms like Capital Research, where

5    industry analysts are highly valued, but it requires

6    experience, time in a position, and that it was

7    something that we thought was an important step for

8    Putnam, to continue to improve its overall performance.

9    BY MR. KOCIUBES:

10   Q.   Did you tell her in words or substance that never,

11   ever, ever could she be considered for going back to

12   portfolio management?

13   A.   Well, she specifically asked whether or not she

14   could be considered for such a role in the future.  And

15   I basically said, yes, we would consider -- we had done

16   it before, it wasn't something that we were looking to

17   do imminently or over short-term period, but over time,

18   as we started to see these improvements and as she

19   demonstrated her capabilities, we certainly would

20   contemplate her, if there were openings that were

21   appropriate to her skills on an additive basis, I would

22   consider her in such a position at some point in the

23   future.

24   Q.   What do you mean, "on an additive basis"?

25   A.    Well, I believed that the Core portfolio management

1    role, as I described, required this kind of generalist

2    balance of skills between risk management, portfolio

3    selection, and stock selection, to summarize.  There's

4    more, but let's just use that as a summary.  I believe

5    that each of the portfolio team leaders needed to have

6    those core skills, but sometimes as the assets grew in

7    an area, you sometimes add on these additive --

8    specialized, more specialized skills.  They may have a

9    particular skill in a number of sectors that become an

10   important part in that particular mandate or series of

11   mandates.  And that's what I mentioned to her.

12   Q.   So you weren't closing the door forever?

13   A.   I wasn't closing the door forever.

14        MR. KOCIUBES:  All right.  I don't know whether

15   that's printed out, but I was going to go to another --

16        THE CLERK:  All set.

17        MR. KOCIUBES:  So we can take that down?

18        THE COURT:  Yes.

19   BY MR. KOCIUBES:

20   Q.   A document that's previously been offered, I think

21   it's Plaintiff's 7.

22        (Discussion off the record.)

23        MR. KOCIUBES:  Can we blow this portion up?

24   BY MR. KOCIUBES:

25   Q.   And do you see on just sort of the second e-mail, do

1   you see there an e-mail to you from Mrs. Svensson?

2   A.   I do.

3   Q.   Dated March 14 of 2001?

4   A.   Yes.

5   Q.   No, no, it's the wrong one.  It's 2002.

6        (Discussion off the record.)

7   Q.   You see an e-mail to you from Mrs. Svensson in March

8   of 2002?

9   A.   Mm-hmm.

10  Q.   With the subject being "Thank you."

11  A.   Yes.

12  Q.   Do you see that?

13       And do you recall whether this was an e-mail

14  that you got from Mrs. Svensson after you had that

15  conversation in which you say she wasn't happy going to

16  Research?

17  A.   I do.

18  Q.   And at least as of this point, she says that she's

19  willing to do whatever is needed, including going into

20  Research and possibly covering energy; she didn't want

21  to give you a hard time about the decision; and thank

22  you for the bonus.  Do you see that?

23  A.   I do.

24  Q.   As of at least sort of with respect to

25  Mrs. Svensson, is that sort of where things, then -- as

Page 124

1   far as you were concerned, where things stood as of

2   middle of March 2002?

3   A.    That is correct.

4   Q.    All right.  Let's move ahead a year at this point.

5   Do you recall into the next year -- do you recall who

6   Michael Yogg was?

7   A.    I have a recollection.

8   Q.    Do you recall he was an assistant director of

9   Research?

10  A.    Yes.

11  Q.    And can we bring on the screen, also, a document

12  that's previously been introduced as Defendants' 24?

13       And let me just, first of all, so we can see who

14  it's to.  And do you see there an e-mail from Mr. Landes

15  and others to you?

16  A.    Yes.

17  Q.    Also to Mr. Tibbetts?

18  A.    Yes, I do.

19  Q.    And it's in January of 2003?

20  A.    Okay.

21  Q.    Let's see if we can bring up the whole page.

22       And this is what's been referred to earlier as

23  the "Wow, what a week" e-mail from Mr. Landes.  Do you

24  see that?

25  A.    Yes.

10114079-c30b-44a9-a20c-9515595e0091

Page 125

1    Q.    And he reports on several different things that he's

2    intending to do.   Do you see that?

3    A.    Yes.

4    Q.    Including some downsizing in the Global Equity

5    Research.   And he also reports that he's going to

6    promote Mrs. Svensson.   Do you see that?

7    A.    Yes.

8    Q.    To ADR?   Do you see that?

9    A.    I do, yes.

10   Q.    And that's what you were testifying to a little

11   while ago, that the plan was for her to become an ADR?

12   A.    Well, to be fair, I don't have great recollection of

13   when she became an ADR.   I know she became an ADR.

14   Q.    Okay.   And then there is a bullet point about he's

15   going to make a change in Michael Yogg's role.   Do you

16   see that?

17   A.    I do.

18   Q.    He's a good analyst, but a poor leader.

19   A.    Yes.

20   Q.    And do you recall that Mrs. Yogg's management

21   responsibilities were removed from him in early 2003?

22   A.    I do, yes.

23   Q.    And do you recall whether he stayed?

24   A.    I don't.

25   Q.    Okay.   There's been some testimony on that.

1    Let's forward to the spring of 2003.  Do you

2    recall there was some work under way to bring in a new

3    head of GER?

4    A.    That is correct.

5    Q.    And tell us what happened.

6    A.    Well, first, the important event was that Ed

7    Haldeman joined the firm.  Ed had been the CEO of

8    Delaware Investments.  He was a 20-some year veteran of

9    the industry, all in the asset management field.  I had

10   spent some of my career on Wall Street; he was an equity

11   specialist during his period there.  And we became the

12   co-heads of investment, I think, in the year 2002, but

13   late in the year.  And we were charged -- as we were

14   continuing to have performance issues in the equity

15   area, many of the other areas of Putnam were performing

16   well.  So we became highly focused.  We became the

17   co-heads of the overall investment division, but it was

18   clear that we needed to focus in onto the equity part of

19   the business.

20        And one of the first things that Ed introduced

21   and that we talked about very actively was, you know,

22   the need to think about the research area as being a key

23   element of success for turning it around.  And we looked

24   at people in the area, and then thought it was also

25   probably necessary, given how bad performance was, to

1   start looking at people outside the firm in a number of

2   roles, and Ed thought this would be a good place where

3   that type of fresh, outside experience would be helpful.

4   Q.   Did you consider anybody who was already in Research

5   as the new head?

6   A.   We looked at people, but not just from Research

7   department, but also from the portfolio management.

8   Josh Brooks was a portfolio manager at Delaware, and

9   again, I saw the roles as just trying to get the best

10   people with the skill sets, whether they came from

11   portfolio management -- but in the end, we decided there

12   wasn't anybody appropriate internally that we felt could

13   make the type of impact that we thought, given some of

14   the performance issues and some of the history.

15   Q.   Now, you had at least three ADRs in Research, do you

16   recall, Steve Gorman, Kelly Morgan and Michael Yogg, and

17   at least at the beginning of the year, Lisa Svensson?

18   A.   Yes.

19   Q.   She was the most junior in terms of length of time

20   in the ADR positions?

21   A.   We thought about all of them, and there were some

22   portfolio management people we thought about.  In the

23   end, we decided we really wanted to go outside.

24   Q.   Why was it important to go outside?  Why did you

25   decide to go outside?

10114079-c30b-44a9-a20c-9515595e0091

1  A.   Fresh perspective.  We were looking for cultural --

2  someone that maybe didn't come internally, from a

3  cultural standpoint that could give us a fresh look,

4  give us some practices that maybe they had perfected

5  outside.  We were having a lot of performance issues, it

6  was bringing down morale.  We thought maybe we needed

7  somebody that came from an area that was performing

8  well, kind of a fresh start.

9  Q.   You testified a little while ago about the various

10  moves you made on the -- changes you made to the Growth

11  team, people being moved, people being let go, people

12  being transferred, so forth.  What, if any, role did the

13  gender of those people play in your decision-making?

14  A.   Absolutely no role.

15  Q.   One of the things that has sort of come up, that's

16  sort of whether the investment division officers at

17  Putnam are sort of divided 50/50 among men and women.

18  We know that they're not.  At least during your tenure

19  at Putnam, was there an interest in having women work

20  there?

21  A.   Absolutely.

22  Q.   What was the problem?

23  A.   Well, I don't know if it was a Putnam problem, more

24  of -- you know, if you looked at the breakdown of the

25  industry, there were way more men in the industry than

Page 129

1  there were women.  I remember Larry Lasser in regard to

2  both women and minorities felt that we should do

3  everything we can to make sure that we're a company that

4  was looking very closely and making sure that we were an

5  equal opportunity company.  But, you know, I don't know

6  the reason for it.  I do know that many more people --

7  many more men were applying for jobs at Putnam.  I know

8  in the school, the business schools that I attended and

9  that friends attend, there were many more men that

10  were -- that -- majoring in those subjects during that

11  period.  It improved over time in terms of the number of

12  women, the number of minorities that were -- applied --

13  that went into the schools and then applied to the

14  industry.  I just know that there were way more majority

15  of men in the industry at large and at Putnam, although

16  that moved up over time.

17  Q.   What's your current position, sir?  What are you

18  currently doing?

19  A.   I'm the managing partner for a small investment

20  firm, TRI Asset Management.

21  Q.   So you're no longer at Putnam?

22  A.   I'm no longer at Putnam.

23       MR. KOCIUBES:  No further questions.

24

25

1          CROSS-EXAMINATION

2    BY MR. MOLONEY:

3    Q.   Mr. Oristaglio, did you say you became in charge of

4    Growth in 2000 or 2001?

5    A.   I'm not precisely sure.  I know that Jack Morgan was

6    asked -- announced his retirement in 2000.

7    Q.   And so you followed him after he retired?

8    A.   I did.  He stayed on until the end of 2000, but I do

9    recall that the announcement was made in 2000, and so

10   there was some hand-over period.

11   Q.   Now, Mr. Kociubes asked you to read an e-mail from

12   Mrs. Svensson, did he not, just a few minutes ago?

13   A.   Yes, he did.

14   Q.   And the question, as I recall it, is that where you

15   left it?  And I think your answer was in the

16   affirmative?

17   A.   Well --

18   Q.   That's where things were left as far as you were

19   concerned.  That was the substance of his question, and

20   you acknowledged that, didn't you?

21   A.   And I responded to her e-mail.

22   Q.   But Mr. Kociubes didn't ask you to read your

23   response to her e-mail, did he?

24   A.   No, he didn't.

25   Q.   Would you look, sir, on the desk in front of you and

1    pick out your e-mail response to her?

2          Do you have that this front of you?

3    A.    I do have it in front of me.

4    Q.    And there's an exhibit sticker on the bottom of that

5    document?

6    A.    Yes, there is.

7    Q.    Can you tell the jury and Court what number it is?

8    A.    There's a lot of numbers.

9    Q.    The yellow sticker.

10   A.    There's a written number 105 --

11   Q.    That's it.

12   A.    Okay.

13   Q.    Now, this is an e-mail you sent on what date, sir?

14   A.    It says March 12, 2002.

15   Q.    And you did on March 12 of 2002 send an e-mail to

16   Mrs. Svensson, and that's the e-mail that you have in

17   front of you, isn't it?

18   A.    I believe so.

19   Q.    And let me just read along, and you tell me if I'm

20   reading this incorrectly.

21          "Thanks for your message.  But rest assured, I

22   was happy that you were willing to talk frankly and

23   bluntly.  I respect that enormously because I get the

24   real story on how you are feeling.  I appreciate your

25   willingness to make the adjustment and I meant what I

1    said.  I will consider alternatives on an additive

2    basis, especially if the large cap team or the

3    international growth team loses people to resignations,

4    or if we underestimated the number of people required or

5    the valuation disciplines required on the various

6    teams."

7          Did I read that correctly?

8    A.    You did.

9    Q.    And you meant what you said when you wrote it?

10   A.    I did.

11   Q.    Because that's your habit, routine, practice, to

12   write down accurately what you intend to write down as

13   being what you were thinking and feeling at the time?

14   A.    That is correct.

15   Q.    Now, since the sending of that e-mail to her, you

16   talked today about vacancies and opportunities in the

17   Putnam Investment Management Division?

18   A.    That is correct.

19   Q.    And numerous of those positions became vacant, did

20   they not, in the period after March of '02 until even

21   after September of '03; is that correct?

22   A.    It is correct.

23   Q.    And some became vacant in '02 and some became vacant

24   in '03, correct?

25   A.    Yes.

1    Q.    Did you ever notify Mrs. Svensson that she should

2    consider herself a candidate for any of those positions?

3    A.    I believe --

4    Q.    No, you didn't, did you, sir?

5    A.    No, I believe I did.

6    Q.    Oh, you did.  When did you do that?

7    A.    Well, Lisa and I would talk occasionally.

8    Q.    When did you do that, sir?  When did you offer one

9    of those open positions?

10   A.    I said I would consider the positions.

11   Q.    When did you offer, sir --

12          THE COURT:  Wait a minute.  So you said you'd

13   consider.  He has a separate question.  Did you offer

14   any of those positions?

15          THE WITNESS:  No, we considered --

16   BY MR. MOLONEY:

17   Q.    Did you offer, her, sir, any of those positions?

18   A.    I did not offer.

19   Q.    So you offered none in '02, correct?

20   A.    That is correct.

21   Q.    And none in '03?

22   A.    That is correct.

23   Q.    Now, do you think that the males who were involved

24   in this reorganization possessed all the investment

25   skill and wisdom?

Page 134

1    A.    Absolutely not.

2    Q.    So the women also shared the wisdom and investment

3    skill, did they not?

4    A.    Absolutely.

5    Q.    And you, sir, were in charge, as you put it in your

6    deposition, as a senior executive.  As you said, sir, on

7    page 309 of your deposition, "I was responsible for

8    reviewing and overseeing everything in the division."

9    A.    At some point, yes.

10   Q.    Was that in -- when was that, sir?

11   A.    In -- when Ed Haldeman came to Putnam, I believe,

12   you know, October or so of '02 I became the co-head of

13   investments.

14   Q.    So you were co-head with him, responsible for

15   reviewing and overseeing everything in the division as

16   of October '02 when he came in?

17   A.    That is correct.

18   Q.    But in terms of the International Growth group and

19   the Core group, were you responsible for reviewing and

20   overseeing everything in both of those, Core and Growth?

21   A.    Starting when I became co-head of investments, yes.

22   Q.    Okay.  What -- were you responsible for overseeing

23   everything in the Growth group as of the end of 2000,

24   beginning of '01?

25   A.    That is correct.

1   Q.   So all of the moves in terms of the International

2   Growth group and all of the moves in terms of the Core

3   group were moves that were made either directly or

4   indirectly by you, sir; is that correct?

5   A.   Only the Core after October of '02.

6   Q.   You, sir, did you not testify that at least by March

7   of '02 you had made some decisions about what was going

8   to happen to International Growth in the Growth group?

9   A.   I did, yes.

10  Q.   And you were the one who made all of those decisions

11  as to what would happen to those people?

12  A.   On the International Growth team, that's incorrect.

13  But when we moved people to other areas, I had to do

14  that in consultation with my other partners.

15  Q.   Okay.  With whom did you consult in terms of moving

16  people out of the Growth group and into the Core group

17  in the reorganization that took place in the spring of

18  '02?

19  A.   Well, Tim Ferguson, my boss, I had to get it

20  approved by him.  I had to get the sign-off by Bill

21  Landes, who became the director of Research.  I had to

22  get the sign-off, and Tim mostly did that, but I was

23  present at meetings with Justin Scott and Omid Kamshad,

24  who did not report to me during that period.  So this

25  was -- I was responsible for the Growth team and -- but

1    in order to make the types of moves that involved some

2    of the other areas, I had to work in partnership with

3    the others.

4    Q.    And you got the okay of all of those people?

5    A.    I did, yes.

6    Q.    And you were the driving force to make those

7    changes, were you not?

8    A.    I was the driving force to make the changes in

9    Growth but -- I'd like to finish the --

10        THE COURT:  You can finish the sentence.

11   A.    But --

12        MR. MOLONEY: It's a yes and a no and he's making

13   a speech.

14   A.    Well the answer, then, is no.  Because the answer to

15   what happened in Research and what happened in Core

16   required not just my driving force but the driving force

17   of the others as well.

18   Q.    Okay.  But you all agreed?

19   A.    We did agree.

20   Q.    Okay.  And you didn't disagree.

21        Now, you talked about the high tech business.

22        THE COURT:  You need to wrap it up in a minute.

23        MR. MOLONEY:  Your Honor --

24   BY MR. MOLONEY:

25   Q.    You talked about high tech and the bubble bursting

Page 137

1    and that type of thing.  Mrs. Svensson's expertise was

2    in oil and gas, was it not?

3    A.    I believe so.

4    Q.    And isn't it true that the prospectuses that they

5    issue to the public and they send to the SEC, don't they

6    refer not only to Lipper but to Morningstar?

7    A.    Morningstar is mentioned, yes, but we didn't use

8    Morningstar.

9    Q.    Sir, is Morningstar mentioned in the prospectuses?

10   A.    Yes, it is.

11   Q.    And Lipper is mentioned in the prospectuses, and

12   Putnam invites the investing public to consult both of

13   them; is that true?

14   A.    I don't know if that's true.

15   Q.    Did you ever know whether it was true or not?

16   A.    Well, I know that given that you're asking the

17   questions.  I knew that everyone at Putnam knew that

18   with the trustees and evaluating performance --

19         THE COURT:  Excuse me, you know what, we're to

20   get you out of here today.

21         THE WITNESS:  I understand.

22         Performance against a benchmark in Lipper were

23   the key components --

24         THE COURT:  You know what, you're not answering

25   his question.

10114079-c30b-44a9-a20c-9515595e0091

1    MR. MOLONEY:  I'm asking about the prospectuses.

2    BY MR. MOLONEY:

3    Q.   Did Putnam, in the prospectus documents filed with

4    the SEC, refer to both Lipper and Morningstar?

5    A.   Yes, they did.

6        THE COURT:  Yes or no?

7        Yes.

8        All right.  A couple of more questions, then we

9    have to move it on.

10   MR. MOLONEY:

11   Q.   Now, the decision in terms of Mrs. Svensson in

12   August and September of '03, now, that was presented to

13   Mr. Haldeman and you, was it not?

14   A.   Yes, it was.

15   Q.   And it was -- you were involved in the sense that it

16   was presented to you?

17   A.   Yes, it was presented to me.

18   Q.   And you could have said no, couldn't you have?

19   A.   I could have.

20   Q.   And weren't the managing director lists run by you?

21   A.   I was part of the team that would review them, yes.

22   Q.   And the list was always run by you, wasn't it?

23   A.   I was part of the team, that's correct.

24   Q.   And with respect to Mrs. Svensson, yet again, you

25   put it this way, did you not, that Mr. Haldeman and you

Page 139

1    were in the room hearing about the issues that Mr. Josh

2    Brooks was bringing to your attention?

3    A.    Yes, we were.

4    Q.    And it was the consensus between you and

5    Mr. Haldeman that Josh would look into it; is that

6    correct?

7    A.    That is correct.

8    Q.    And you don't recall any specific complaints that

9    Mr. Darren Peers had, do you?

10   A.    I don't have any specific complaints that he

11   brought.

12   Q.    You don't recall any of those, do you?

13   A.    I recall what was said to me by Josh, but not

14   directly by Darren, that's correct.

15   Q.    In your deposition, sir, at page 220, line 15, the

16   question was:

17           "Well, do you recall ever becoming aware of what

18   specific complaints Mr. Peers was making?

19           "A.    Not -- I don't recall.  I don't now recall

20   any -- the nature exactly of the complaints, no.

21           "Q.    Okay.  Did you ever ask that any record of

22   Mr. Peers' complaint be made.

23           "A.    I don't recall whether I ever did that."

24           THE COURT:  All right.  You need to wrap up now.

25           MR. MOLONEY:  One more question, your Honor.

Page 140

1      THE COURT:  One.  We need to get him out of

2  here.

3  BY MR. MOLONEY:

4  Q.  Do you recall somebody presenting a study -- it's

5  just -- it's a legal --

6      THE COURT:  Finish.

7  BY MR. MOLONEY:

8  Q.  Do you recall whether there was any action taken as

9  a result of the executive committee's review of a study

10  of the status of women at Putnam?

11      MR. KOCIUBES:  Objection.

12      THE COURT:  Sustained.  That's the end.

13      MR. KOCIUBES:  Sixty seconds?

14      THE COURT:  Yes.

15                  REDIRECT EXAMINATION

16  BY MR. KOCIUBES:

17  Q.  Mr. Oristaglio, don't keep us in suspense.  Why in

18  the months after March or April of 2002 did you not

19  offer any portfolio management positions to Lisa

20  Svensson?

21  A.  Because she had just taken this new role, and, you

22  know, I think it was pretty clear that given the

23  resources that were given, given the changes that we

24  were looking to make, we were looking for her to perform

25  in that role over the coming years.

Page 141

1   Q.   And in your judgment, by the way, was she a Core

2   investor?

3   A.   No, she wasn't.

4   Q.   Why not?

5   A.   Well, she didn't demonstrate during the period she

6   was at Putnam co-managing the Global Growth some of the

7   characteristics that I described.  The types of

8   companies that would be in that portfolio had a heavy

9   bias toward aggressive growth companies, not some of the

10  balance of companies in some of the value stocks and

11  consumer and many of the other sectors.  So she was

12  deemed by myself and others to be an aggressive growth

13  manager.

14          MR. KOCIUBES:  No other questions.

15          THE COURT:  Thank you.

16          See you tomorrow.

17          Now, let me just talk to you about the progress

18  of this case.

19          I'm not exactly sure -- there is still going to

20  be some evidence tomorrow.  I'm quite sure the case will

21  go to you on Thursday.  There's an off chance for

22  tomorrow.  So just to give you a sense, this case is

23  going exactly as on schedule and I need you to, just in

24  case, block tomorrow afternoon just in case we can get

25  it to you, but definitely by Thursday.

Page 142

1      All right.  We stand in recess.  Thank you.

2      (Jury left the courtroom at 12:59 p.m.)

3      THE COURT:  So let's just come up to sidebar for

4  one second.

5      (At sidebar on the record.)

6      THE COURT:  So I am giving you right now a draft

7  of a verdict form and instructions.  It's a preliminary

8  draft, trying to put together what everyone has sent me,

9  and obviously, I haven't heard argument on the directed

10  verdict motion.  So what I'm going to do is hear

11  argument on directed verdict this afternoon.  I will --

12  not be granting directing verdict on some of it, like

13  demotion and termination claim.  I want to think about

14  the three compensation claims under Title 7, 151B and

15  MEPA, Massachusetts Equal Pay Act.  I'm thinking about

16  that.

17      I also need to understand very specifically what

18  positions there are for promotion and how one would

19  think about damages, since he didn't really provide

20  that.

21      So I'm just flagging it.  I'm going to give this

22  to you.  I will have directed verdict on the record --

23  if you could tell Lee that -- but then I will do the

24  jury instructions off the record.  My guess is we'll

25  have to do a quick supplemental charge after the close

1    of all the testimony.  It's so complicated.  It's

2    actually unusually complicated, because there's so many

3    different decision points.  So I thought we'd at least

4    have the conversation start today, and if we're mostly

5    done, maybe we'll go to the jury tomorrow; if we're not,

6    we'll continue on the charge conference.  Why don't we

7    go off the record.

8             (Discussion off the record.)

9             (Court recessed at 1:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 144

1           (Resumed, 2:40 p.m.)

2           THE COURT:  All right, so we're in directed verdict

3    mode, so have you had a chance to read what they submitted?

4           MR. MOLONEY:  Just once, your Honor, yes.

5           THE COURT:  Excuse me?

6           MR. MOLONEY:  Yes, once.

7           THE COURT:  Okay, same here.  So let me just start

8    off with the one I never really did put my stake in the

9    ground on because it came up to me in an awkward way, which

10   is this employment compensation claim.  So can I just start

11   from the beginning?  What are you bringing the employment

12   compensation claim under, what statutes?

13          MR. MOLONEY:  We're bringing them under the MEPA

14   and 151(b) both.

15          THE COURT:  Not Title VII?

16          MR. MOLONEY:  Well, and Title VII.

17          THE COURT:  Okay, I just wanted to understand

18   because they all have different statute of limitations.

19          Now, with respect to the broadest statute, which is

20   the Equal Pay Act under Massachusetts law, there's a one-year

21   statute of limitations, and I think the discovery rule

22   applies.  But what the directed verdict motion brought to my

23   attention, which I hadn't focused on, was that she knew in

24   December or January, December of 2002 or January of 2003,

25   what the compensation were of the people I would consider her

1    comparators in the Research area.  Is that right?

2         MR. MOLONEY:  That's what the testimony is on the

3    Research people in that -- I think there were two mentioned.

4         THE COURT:  So at least for the Massachusetts Equal

5    Pay Act for the research analysts, it's time barred, right?

6         MR. MOLONEY:  But only for those folks, it's our

7    position.

8         THE COURT:  Yes, if you don't speak up, I won't be

9    able to hear you at all.  You know that he can't hear you, I

10   can't hear you.  It's just been a persistent issue, so you've

11   got to belt it out there, all right?  So --

12        MR. MOLONEY:  All right, and I will slow down if I

13   can at this point.

14        THE COURT:  So at least for the MEPA claims for the

15   research analysts, they're time barred?

16        MR. MOLONEY:  Yes.

17        THE COURT:  Okay, now, with respect to -- help me

18   out.  Who else would the comparators be under the Equal Pay

19   Act, the broadest of all definitions?

20        MR. MOLONEY:  Portfolio managers in Growth and

21   Core.

22        THE COURT:  Who?  And how would a jury go about

23   finding out -- let me back up and say, for the record, that I

24   find based on this record, based on everything plaintiff and

25   defendant, Mr. Oristaglio said as well, that it is a jury

1    question with respect to Growth and Core, and there is

2    substantial evidence that would support a verdict that those

3    were similarly situated and comparable people.  I've heard

4    nothing about Value.  Value goes out.  When she's in

5    Research, the comparable people are the people in Research.

6    When you think about portfolio managers, they're the

7    comparable portfolio managers.  And I find as a matter of law

8    that the chief investment officers, managers, directors and

9    partners are not comparable people.  So we're talking either

10   about research analysts when she's in Research or portfolio

11   managers with respect to the portion of her compensation

12   which is attributable to being a portfolio manager.  So just

13   for the record so that we're just --

14           MR. MOLONEY:  That's our understanding, your Honor.

15           THE COURT:  All right, and it's clear now.  I mean,

16   it was so confusing to me when it came up through summary

17   judgment, et cetera, but it is now crystal clear to me that

18   that's the case.

19           Now, on Title VII -- so name me the people who are

20   comparable because if I don't know at this point, the jury

21   doesn't know.

22           MR. MOLONEY:  I'll have to get to the charts, your

23   Honor.

24           THE COURT:  You are.  And how will the jury, since

25   I heard no evidence from Dr. Siegel, how would the jury put

Page 147

1    together damages for comparable people?

2          MR. MOLONEY:  The identification of the people,

3    there are three charts on the Growth Group that we have in

4    evidence now, and there are three charts for the Core Group

5    that are in evidence now.  And in evidence --

6          THE COURT:  So give me the names of the people you

7    think that should be comparable to her.  Of course, under

8    Title VII, she's doomed on the statute of limitations back

9    to, what's it, three years?  What is it?  Isn't that --

10         MR. RODRIQUES:  300 days, your Honor.

11         THE COURT:  300 days, but they did file within 300

12   days, right?  Of what?  So they filed within 300 days of --

13         MR. RODRIQUES:  They filed within 300 days of her

14   termination, but they did not file within 300 days of the

15   pay-setting decision which was in March of '02.

16         THE COURT:  So under Title VII it means any

17   comparable positions -- this will be brutal for this jury to

18   find out.  So under Title VII it's 300 days, so that's May

19   something, right?

20         MR. RODRIQUES:  May 6, 2003.

21         THE COURT:  May 6, 2003, so it would be any

22   comparable positions after May 6, 2003, for purposes of

23   compensation under Title VII.  And is that true for 151(b) as

24   well?

25         MR. MOLONEY:  No.  We take the position that it's

1    not that short statute of limitations because Ledbetter

2    doesn't -- that's a federal U.S. Supreme Court decision, and

3    the Massachusetts law is different.

4         THE COURT:  Okay, but that's still not a continuing

5    rule under Sylvester, so that's got to be basically a

6    reasonable discovery rule, right?

7         MR. MOLONEY:  Correct.

8         MR. RODRIQUES:  Yes.  And if I may, your Honor, the

9    problem, what we're getting confused about here is, the

10   pay-setting decision for 2003 was made -- I'm sorry -- for

11   the 2002 bonus year, okay, was made in March of 2003.  Her

12   salary for 2003 was set in March of 2003, no later than March

13   of 2003.  That's the evidence.  So all of that is prior to

14   May 6.  So unless there is some way to extend the statute of

15   limitations, that claim is time-barred.

16        THE COURT:  Well, under state law there's the

17   reasonable discovery rule.

18        MR. RODRIQUES:  Sylvester is a MEPA claim.

19        THE COURT:  I understand, but there's no doubt in

20   my mind that they would apply a reasonable discovery rule, at

21   least on the state law.  If they applied it under Sylvester,

22   they're going to do it under 151(b).

23        MR. RODRIQUES:  And then you go back, your Honor,

24   to the same problem that she has with respect to the MEPA

25   claim, which is she admits that insofar as all the GER

1    analysts are concerned, she knew in December of '02 --

2           THE COURT:  I completely agree.  She's out of the

3    ballpark on the research analysts, but now we've got the

4    portfolio managers, and there's the discovery rule.  You know

5    what, I've just got to understand.  It's a mess.  It's a

6    mess.  So I want to first understand who he thinks are her

7    comparators.  Am I right that you're out of the ballpark with

8    respect to the research analysts because she knew?

9           MR. MOLONEY:  Right.

10          THE COURT:  So now we're at portfolio managers.

11   Who do you think?

12          MR. MOLONEY:  Well, I just direct your Honor's

13   attention to these charts of -- the first one sets up the

14   Growth Team before reorg as of December 31 --

15          THE COURT:  I understand, but let me be clear.

16   Excuse me.  Do you have compensation for them so that we know

17   that there's a difference?

18          MR. MOLONEY:  It's in the record.  What is in the

19   record are what are called -- we refer to them as EMPLIDs --

20   these printouts by name and when their position changed.  We

21   have compensation data of base salary, bonuses, and equity

22   for all of the people.  We had it in from their records they

23   supplied us for the 91, now reduced.

24          THE COURT:  And who do you say was making more

25   money than she was for a comparable job on the portfolio

Page 150

1    manager when she was a portfolio manager, not when she was in

2    GER, when she was a portfolio manager?

3            MR. MOLONEY:  We say that the men got paid more,

4    and the evidence of that is in the record.

5            THE COURT:  So let me -- you know what, you guys,

6    and I understand that, just if I don't tell the jury, they

7    will get confused because I'm confused.

8            MR. MOLONEY:  I know that.

9            THE COURT:  So the names -- and maybe you have the

10   document right in front of you -- you can tell me exactly who

11   you say was making more money than she was for a comparable

12   position under the 151(b) and MEPA.

13           MR. RODRIQUES:  While they're looking at that, your

14   Honor, can I just make one point, which is 2002 was a hybrid

15   year for her.  There's no one on this chart who had a full

16   year.  She did not have a full year in Portfolio Management;

17   she did not have a full year in Research.  All of these

18   people had a full year in Portfolio Management.  So

19   automatically we're comparing her to somebody who doesn't

20   look like her.

21           THE COURT:  I don't know.  That's what I want to

22   see because that, as far as I'm concerned, is the demotion

23   claim.

24           MR. RODRIQUES:  Well, that may be a damages

25   argument but not a comp argument.

1          THE COURT:  But I want to understand who you

2     consider comparable and what the figure is and where it comes

3     from.

4          MR. MOLONEY:  Well, I can tell you the folks that

5     we feel are comparable, not only for compensation but for the

6     other purposes, are the people who are identified on this

7     Growth Before Reorganization chart that's dated December 31,

8     2001.  This is in evidence.

9          THE COURT:  I understand you -- I have a demotion

10    claim fully vetted for you.  I totally understand that.  I

11    actually also understand for the first time ever the

12    promotion claim.  There are three or four people in that

13    chart, which I'm assuming you're going to offer at some

14    point, whom you claim she should have been promoted to.  But

15    I'm now talking about something else, which is salary,

16    comparing apples with apples, comparable people.

17         MR. MOLONEY:  For the jury to decide that question,

18    they would look to a chart like this for the names and

19    positions.

20         THE COURT:  Like what?  Give me one example.

21         MR. MOLONEY:  Well, let's take Jeffrey Lindsey.

22         THE COURT:  All right, Jeffrey Lindsey.  Now, what

23    did he do?

24         MR. MOLONEY:  He's a portfolio manager on the Large

25    Cap Growth Team.

Page 152

1        THE COURT:  All right, and how much was he making?

2        MR. MOLONEY:  I can't tell you off the top of my

3   head.

4        THE COURT:  But just get the document.  You must

5   have it.  When she was in Growth, for example, which is the

6   last full year that she was doing Growth --

7        MR. RODRIQUES:  He was terminated that year.  He

8   made no bonus that year.  He made $165,000 total that year.

9        THE COURT:  See, this is what needs to be done, and

10  I just don't feel as if I know it.

11        MR. MOLONEY:  No, I know that.

12        MR. KOCIUBES:  There is a second prejudicial issue,

13  your Honor.  We're virtually at the end of the case, and we

14  don't know who they --

15        MR. MOLONEY:  No, your Honor, if I may.

16        THE COURT:  Excuse me, just tell me.  Who made more

17  money than she did who's a guy who she thought was a

18  comparable position when you're trading apples and apples?

19  Like, I guess the year would have to be 2001 was the last

20  time they were both working at the same time in the same kind

21  of position.

22        MR. WEIR:  Stephen Dexter.

23        THE COURT:  Stephen Dexter was making how much?

24        MR. WEIR:  According to --

25        THE COURT:  In 2001?

10114079-c30b-44a9-a20c-9515595e0091

1          MR. WEIR:  Oh, in 2001?

2          THE COURT:  Well, in 2002 everything switched.  You

3     can't really compare them.  Well, or maybe you can explain

4     why I can, but -- because she switches halfway through.

5          MR. WEIR:  But for compensation purposes, your

6     Honor, wouldn't the relevant time frame be 2003?

7          MR. MOLONEY:  You're asking for --

8          THE COURT:  No, because -- well, possibly because

9     she did a third of a portfolio manager position.  So you

10    would have to compare whether her third, if you multiplied by

11    three, whether that was similar.

12         MR. RODRIQUES:  I think also, your Honor, while

13    they're looking, your Honor in pretrial proceedings ruled

14    that the only relevant years, based on asking the plaintiff,

15    were 2002 and 2003, were the only two years that they

16    indicated they were pressing a claim for.

17         THE COURT:  And I don't remember why I ruled that,

18    but it was obviously based on some --

19         MR. RODRIQUES:  Statute of limitations, I believe.

20         THE COURT:  Yes, but it may have been wrong.

21         MS. KURKER:  They abandoned it.

22         THE COURT:  They abandoned it, was that the reason?

23         MS. KURKER:  Yes, it was abandoned.  It was not

24    briefed in summary judgment, and --

25         MR. RODRIQUES:  And you asked them what years they

Page 154

1  were pressing for, and they responded 2002 and 2003.

2           THE COURT:  Oh, is that why?  I didn't remember.

3           MR. WEIR:  I'll give you the figures for all the

4  years for Mr. Dexter.  2001, $175,000 base salary and

5  $350,000 bonus.

6           MR. RODRIQUES:  Less than the plaintiff.

7           THE COURT:  Right.  So that was in 2001.  Go ahead.

8           MR. WEIR:  2002, Mr. Dexter, $175,000 base,

9  $660,000 bonus.

10          THE COURT:  Now, she made what?

11          MR. WEIR:  $655,000.

12          MR. RODRIQUES:  Plus the salary.

13          MR. WEIR:  Well, so did he plus salary.

14          MR. RODRIQUES:  I don't know that.

15          MR. MOLONEY:  Well, that's your data.

16          THE COURT:  But what's the total that he made

17  versus she made?  So he made $835,000 in cash, and she made

18  $655,000 on the switch year.

19          MR. WEIR:  Right, on the switch year.  And then

20  going to 2003 --

21          THE COURT:  Now, is he right?  I couldn't remember

22  why I stopped it at 2002.  Is that because that's all you

23  were pressing it for?  I just don't remember.  I think you

24  limited yourself to 2002 and 2003, right?

25          MR. MOLONEY:  Right, the 2002 work year including

Page 155

1    the bonus paid in March of --

2           THE COURT:  All right, so that's fine.  I just want

3    to understand.  All right, so now I'm remembering that's

4    because you waived anything earlier.  So that's helpful

5    because I couldn't remember why I ruled that.  All right, so

6    you limited yourself to 2002, 2003.  So the one person who

7    would be a comparator would be Stephen Dexter, whom you say,

8    at least in cash, he made $835,000, and she made $655,000.

9           Okay, so now your comeback is, it's not apples and

10   apples because she switched midway through, right?

11          MR. RODRIQUES:  That's correct.  We don't think

12   those numbers are right either.

13          MR. WEIR:  I'm just reading off your document.

14          THE COURT:  So you'll tell me.  Who else is a

15   comparator that made --

16          MR. WEIR:  Well, because our argument is that Lisa

17   Svensson, had she stayed in Portfolio Management, would have

18   made --

19          THE COURT:  Listen, listen, listen, listen, okay?

20   If you're confusing me, you're confusing a jury.  I've now

21   given you the questionnaire form, right?  There's a demotion

22   claim.  There's a promotion claim.  There's a termination

23   claim.  If you want me to just give those, I'm happy to give

24   those.  But you also have a compensation claim which has got

25   to be different.  So, okay, I agree, if they find that she

1  was unfairly demoted, they can consider all this.  I agree.

2  If she was canned improperly, they can consider all this.

3  Possibly, however, they're going to say she wasn't demoted

4  unfairly, she wasn't not promoted; and all you have left is

5  the compensation claim.  So we've got Dexter, fine, one guy.

6          MR. WEIR:  All I'm trying to do is to give you the

7  information with respect to Mr. Dexter for 2003.

8          THE COURT:  Okay, that's fine.  All right, 2003

9  is?

10          MR. WEIR:  Dexter, 2003, $175,000 base, $975,000

11  bonus.

12          THE COURT:  Now, what was she making?  $150,000

13  base, right.

14          MR. WEIR:  She made $155,000 base.

15          THE COURT:  Yes.

16          MR. WEIR:  And she didn't get a bonus because she

17  was gone by the end of the year.

18          THE COURT:  What would she have made, though?

19  That's not fair.

20          MR. WEIR:  If she had stayed --

21          THE COURT:  No, no, no, no.  What would she have

22  made, do we know?

23          MR. WEIR:  Well, it would have been the same, which

24  is $500,000 and $155,000, $655,000.

25          MR. RODRIQUES:  There's no evidence of that at all.

1          THE COURT:  Excuse me.  There was some evidence of

2     what her severance package would have been, which was what?

3     They promised to give it to her if she signed away all her

4     rights.  How much was the --

5          MR. RODRIQUES:  But it wasn't her bonus, your

6     Honor.

7          THE COURT:  I don't remember what it was.

8          MR. RODRIQUES:  It was her deferred money from

9     prior years.  It was severance pay.  It was not her bonus for

10    the year.

11         THE COURT:  So we don't know what her bonus would

12    have been?

13         MR. MOLONEY:  Your Honor, is a better to proceed --

14    I mean, it might be better from our point of view -- is for

15    us to make a filing with these names and the numbers?

16         THE COURT:  I think so.

17         MR. MOLONEY:  Can we do that?

18         THE COURT:  I think so because I --

19         MR. MOLONEY:  Then we'll do that.

20         THE COURT:  Because if I don't know, they won't

21    know, and I can't have them guessing.

22         MR. MOLONEY:  No, I don't want them to guess.

23         THE COURT:  So we now agree we're limited to 2002

24    and 2003, and it's going to be any portfolio management

25    position in Growth and Core that you think is comparable and

1 that she was not being paid comparably to for the entire

2 package, including base, bonus, and stock equity, right?

3          MR. MOLONEY:  Yes, we'll do that.

4          MR. RODRIQUES:  But, your Honor, I mean, just to

5 reiterate Mr. Kociubes' point, this filing is coming in as

6 we're about to rest.  I don't know how we're supposed to put

7 on a defense.

8          THE COURT:  Excuse me.  This has been pressed all

9 along.  It's been pressed all the way through.

10          MR. RODRIQUES:  But there's no evidence in the

11 record at this point, your Honor.

12          THE COURT:  There may not be any.  I don't know.

13 You all kept shoveling in lists of numbers.  I don't know if

14 there's enough in the record.  If there isn't, I will throw

15 it out.  You know, so basically what we're talking about is

16 at most, assuming for a minute she was properly terminated,

17 we're talking about at most a year and a half worth of

18 comparable pay, if I understand it.

19          MR. RODRIQUES:  If I could just speak to 2003 for

20 one second, the right way to think about 2003 is damages for

21 her termination.  She's fired in September of 2003.  The

22 bonus plan is in the record.  It says, if you're fired, if

23 you leave for any reason, you don't get a bonus.  That's what

24 the plan says.

25          Now, she's got an argument, to be sure, that if she

1  were terminated on account of her gender, she would have

2  earned X.  That's a termination damages claim.

3         THE COURT:  No, but what if -- but let me take you

4  one step farther.  I agree with everything you just said, but

5  let's assume they say she improperly was terminated because

6  of her gender, but she was also unfairly improperly

7  compensated.  So it would be whatever the comparable male

8  would have made.  So, in other words, it isn't just what she

9  would have made; it would have been what a comparable male

10  would have made, like what Dexter was making.

11         MR. RODRIQUES:  Not unless they also find that they

12  fired her improperly.

13         THE COURT:  I agree, I agree.

14         MR. RODRIQUES:  Because otherwise she's not there

15  to get the comp, and the plans says she doesn't get the comp.

16         THE COURT:  I agree.  But what happens if she's

17  improperly terminated, and she also was improperly

18  compensated while she was there because she made less than

19  the comparable guy?

20         MR. RODRIQUES:  That would be fine for 2002, but

21  for 2003, right, the fact that she's terminated means you

22  can't figure out what she would have been properly

23  compensated.

24         THE COURT:  Well, they will have to make a

25  reasonable estimate if it was improper.  If it was proper,

Page 160

1    you're out of the ballpark.  You've lost almost everything if

2    it's improper.  I mean, you know, you only have small cap

3    damages beforehand.

4            MR. KOCIUBES:  This is also, your Honor, the apples

5    to apples issue.

6            THE COURT:  Right.

7            MR. KOCIUBES:  Which is to say that Dexter, there

8    was evidence today, continued as a PM.  His performance went

9    up.

10           THE COURT:  That's a good argument for you, okay?

11   And you'll argue that.  So that's the apples to apples.  But

12   I need to know who the apples are.

13           MR. MOLONEY:  We will give you the list.

14           THE COURT:  And who actually made more when you

15   look at the entire compensation package.  And the

16   complicating factor is, she left halfway through in 2002.

17   That's something that for the first time has been focused on,

18   so I don't know what I do with that, whether -- I don't

19   understand how I handle that because in fact, if your claim

20   is correct that it was actually a demotion, she probably did

21   make less.  I mean, as I understand, her big concern is that

22   the portfolio managers got paid more and had more chance for

23   advancement.  So if in fact she was demoted properly so she

24   no longer was a PM, you can't then compare her with a PM.

25           So this is why this is so hard, and I remind you of

10114079-c30b-44a9-a20c-9515595e0091

1    that basic maxim, KISS.  Have you ever heard of the KISS

2    principle, K-I-S-S?

3           MR. MOLONEY:  I think I have to answer the question

4    "no" so you'll tell me.

5           THE COURT:  "Keep it simple," and then the comment

6    at the end, which I don't mean about, you is "stupid."  I

7    mean, basically it's hard to figure out all the permutations.

8           MR. MOLONEY:  Can I make it less simple?  And that

9    is, she goes, contrary to what Mr. Oristaglio said, into

10   Research in March to May as an analyst.  And in January, then

11   she becomes an ADR, but she's also given portfolio management

12   responsibilities for the Natural Resources Fund.  So just

13   because she goes into Research doesn't mean --

14          THE COURT:  Yes, but she gets a third of a sleeve,

15   as she called it.  I remember asking her specifically, a

16   third of her time or something, right?

17          MR. MOLONEY:  That's not a third of a sleeve.

18          THE COURT:  Excuse me.  Thirty percent of her time

19   she gets a sleeve, and she's only doing that half a year,

20   right?

21          MR. MOLONEY:  It's not a sleeve, your Honor.  She

22   was in charge of the Natural Resources Fund.  That's a fund.

23   A sleeve is a little section or a slice of a fund.

24          THE COURT:  How many months did she do it?

25          MR. MOLONEY:  She started, I think it was like

Page 162

1    January of '03, and she was there until she was canned.

2            MR. RODRIQUES:  Your Honor's memory is correct,

3    though.  She testified she spent 30 percent of her time and

4    then 100 percent of the time.  They're different in that

5    respect.

6            THE COURT:  This is what I need:  I need your

7    proffer.

8            MR. MOLONEY:  Here we go again, but we'll do it.

9            THE COURT:  It was very helpful on the other,

10   actually, it was really helpful, because now we're going to

11   list those three positions and we're going to ask them.

12           MR. MOLONEY:  And I want to include in moving those

13   charts.

14           THE COURT:  That's the part that I'm finding really

15   hard.

16           MR. MOLONEY:  No, I understand.  I understand.

17           THE COURT:  And so now let's go back to you.

18   Assuming for a minute he comes up with a couple of apples to

19   compare with, okay, that make some sense in understanding it,

20   just on the compensation.

21           MR. RODRIQUES:  Can we stay with compensation

22   first?

23           THE COURT:  Yes.

24           MR. RODRIQUES:  Okay, so let's start with MEPA.

25   Your Honor noted at side bar earlier and again here that the

Page 163

1   GER analysts are out on the time bar.  We would submit to you

2   that all of the portfolio managers are also out.  There is a

3   discovery rule under MEPA.  That's clear.  But the Court in

4   Sylvester makes clear that you don't need to know everybody

5   that you are paid less than in order to have the statute

6   start running.  Otherwise, you always find out something in

7   discovery.  You always find out later that there's another

8   person who got paid more or less, or you may find out.

9       What Sylvester says is, you have to know enough to

10  know that you're being discriminated against.  She knew

11  that.  So our position is that without regard to whether it's

12  an analyst in GER, or a portfolio manager outside of GER, she

13  believed -- that was her testimony -- in December of 2002,

14  January of 2003, that she was being discriminated against.

15  That's when the statute started running.

16      A related point --

17      THE COURT:  Okay, I'm going to deny it on that

18  basis.  I think that's a jury question, whether you would

19  have known based on whatever she saw in Research what was

20  going on in the rest of the division.

21      So what's the next one?  But you preserved it, so

22  what's the next one?

23      MR. RODRIQUES:  The second point -- I won't try

24  your Honor's patience.  The second point is, the other reason

25  why the statute has run is, she was terminated on

1    September 15, 2003.  She filed September 7, 2004.  That's

2    more than a year later.  The statute has to run from the time

3    she's terminated.  Otherwise it's open-ended, it's

4    indefinite.  It could be ten years later, and somebody

5    mentions to her at a cocktail party, "You were paid less than

6    Joe Jones," and now she has a cause of action.

7              So our position is the statute, it certainly would

8    make sense while she's there.  But to say that once she's

9    terminated, it's essentially open-ended forever until she

10   finds --

11             THE COURT:  So she's terminated 9/15/03.

12             MR. RODRIQUES:  That's correct.

13             THE COURT:  And when does she file with the --

14             MR. RODRIQUES:  12/27/04, so that's more than a

15   year later.  That's why we asked your Honor to take judicial

16   notice of the date of filing of this action.

17             THE COURT:  So you say she had to have filed --

18             MR. RODRIQUES:  Within a year of her termination

19   regardless.  Otherwise it's essentially an open-ended statute

20   of limitations.

21             The last point we would make --

22             THE COURT:  That's a good point.

23             MR. MOLONEY:  I don't think it's a very good point

24   at all because what he's trying to do, they fire her and put

25   her out in the street, and somehow she's going to be able to

Page 165

1    find out what's going on?  The fact of the matter is that she

2    didn't find out until we got discovery in this case.

3             THE COURT:  I don't know the answer to that.

4             MR. MOLONEY:  It's a fact question.

5             THE COURT:  Excuse me, excuse me.  Has anyone found

6    a case on a termination, what you'd do with the reasonable

7    discovery rule on a compensation claim?  I actually don't

8    know the answer to that.

9             MR. RODRIQUES:  Well, we'll try to find you one

10   this afternoon, your Honor, but I will say --

11            THE COURT:  I don't know because the reasonable

12   discovery rule applies under state law, so that's something I

13   might send to them if there's no case directly on point and

14   then take away later if I agree with you.  But, in any event,

15   on the 151(b) and Title VII, certainly the question is

16   whether or not she filed with MCAD within the 300 days.  She

17   did, right?  So why wouldn't the 151(b) and Title VII claims

18   go with respect to at least in 2003?

19            MR. RODRIQUES:  Remind me not to lose my other

20   thought about MEPA, your Honor, but going to Title VII and

21   Chapter 151(b), certainly under Title VII we know that

22   Ledbetter governs, so that claim has to be gone because the

23   pay-setting decisions were made in March of 2003, which is

24   before May 6 of 2003, which is the cutoff date.

25            THE COURT:  No, I think -- I don't know that

1    Ledbetter says it's the decision.  It's the --

2         MR. RODRIQUES:  No, it's absolutely the decision,

3    your Honor.

4         THE COURT:  It's the paycheck, I thought.  You just

5    couldn't go before that.

6         MR. RODRIQUES:  That's what Ledbetter rejects.

7    Ledbetter rejects the paycheck rule and says, it's when the

8    pay decision is announced and communicated to the employee.

9    Ms. Svensson knew what her salary was for '03 in March of

10   '03.  She acknowledged that.  She knew what her bonus was

11   for '02 in March of '03 because that's when it's paid.  So

12   Ledbetter should knock out the Title VII claim.  Now --

13        THE COURT:  When does she know of the decision with

14   respect to her bonus?

15        MR. RODRIQUES:  March of '03.  There's no dispute

16   about that because all decisions were made by March of '03

17   for the prior bonus year and for salary for that year.

18        THE COURT:  And so she's got to file within 300

19   days of that, which is what you say she's missed?

20        MR. RODRIQUES:  She's because she filed -- she

21   filed such that the cutoff date is May 6, and the decision

22   was made in March, okay?  Under 151 --

23        THE COURT:  May 6 of?

24        MR. RODRIQUES:  2003.

25        THE COURT:  You say she has to file by then.

1           MR. RODRIQUES:  No, no.  No, I'm sorry, I'm being

2  unclear.  She filed March 1 of '04.  If you count back 300

3  days from March 1 of '04, the cutoff date is May 6 of '03.

4  And the pay decisions that we're talking about were made in

5  March, so they were made before the 300-day cutoff date.

6           THE COURT:  But when were they communicated to

7  her?

8           MR. RODRIQUES:  In March.  There's no dispute about

9  that.  She testified to that.  Putnam testified to that.

10          THE COURT:  All right, so if you're right -- and I

11 hadn't remembered Ledbetter that way -- I thought it was a

12 different point -- but, anyway, assuming you're right, 151(b)

13 is --

14          MR. RODRIQUES:  Well, we would argue two things

15 about 151(b).  One is, the SJC says it follows federal law

16 until it rules otherwise, so we would say it obviously will

17 follow Ledbetter.  Your Honor may have a different view about

18 that.  The second point --

19          THE COURT:  All right, so put it this way:  I'd

20 leave that to either certifying it to the court or letting

21 the First Circuit rule on it.  There's no case law that would

22 say that, and they went a different route.

23          MR. RODRIQUES:  The second point I would make is,

24 under 151(b), even employing a discovery rule, you're back to

25 the same point that we made earlier, which is, she knew about

1    the analysts; and under the case law, she doesn't have to

2    know about everything in order to be obligated to bring

3    suit.  So we would say, on that basis, all of her comp claims

4    are barred.

5           The one additional thought I wanted to make about

6    MEPA, if I can get it out, is that our view is that MEPA is

7    not a statute that prohibits the same kind of conduct that

8    Chapter 151(b) and Title VII prohibit.  MEPA is a pay scheme

9    statute.  It says that --

10          THE COURT:  I agree with that.

11          MR. RODRIQUES:  -- women as a group, women as a

12   group have to be paid on a different basis than men as a

13   group for comparable jobs.  Jancey, which is the leading case

14   in this area, is --

15          THE COURT:  I agree with you.  You don't need to

16   debate.  We don't need to spend any time on it.

17          MR. RODRIQUES:  Okay, so this is not a case where

18   Ms. Svensson is arguing that women as a group were paid using

19   a different pay scheme.  She's saying --

20          THE COURT:  No, no, I think you're overstating.  I

21   think that MEPA is supposed to be a broader statute than

22   151(b) because MEPA is strict liability, and 151(b) is

23   intentional.

24          MR. RODRIQUES:  I agree with that.  I agree with

25   that.  That's why it's a pay scheme case, because if the

1    plaintiff is right, you can't have a discretionary bonus

2    situation under MEPA.  You can't, because you have two men,

3    two first-year or third-year associates, one male, one

4    female.  We think Ms. Kurker does better work than

5    Ms. Holden.  We give her a bigger bonus.  Now, if Ms. Kurker

6    is a male, does Ms. Holden have a claim?  They're doing the

7    same job.

8         THE COURT:  Well, I've heard in some companies have

9    said, "Well, he needs more money because he's supporting his

10   kids."

11        MR. RODRIQUES:  Well, there's been no evidence of

12   that in this case, your Honor.

13        THE COURT:  I understand that.  But if you were to

14   have a claim like that, it's not systemic; it's one by one.

15        MR. RODRIQUES:  But that's the case here is what

16   we're arguing.  That is, the expert's testimony was, there

17   was no evidence of statistically significant pay disparities

18   among men and women.  They're using the same scheme --

19        THE COURT:  I agree that's incredibly hurtful.  I

20   agree with that.  But, anyway, I understand your point, so I

21   don't want to take any more time on it.

22        Was there anything else on -- I find the

23   compensation area confusing to me because I don't know who

24   we're talking about, so we're going to get that.  And I think

25   some of your legal points are great.  Is there any other

Page 170

1    across-the-board kind of issue like that?

2            MR. RODRIQUES:  Nothing across-the-board legal

3    argument.  Your Honor knows we briefed the issue of whether

4    there's enough evidence in the record for compensation

5    discrimination, but that's not a pure legal point.  That's a

6    factual point also.

7            THE COURT:  That's a sufficiency point.  Okay,

8    thank you.  And I don't know who we're talking about yet, so

9    that's fine.

10            MR. RODRIQUES:  Right, that's compensation.

11            THE COURT:  Okay.  Yes, but what about directed

12    verdict?  Anything else you want to --

13            MR. RODRIQUES:  Oh, yes.  The second is demotion.

14    You know our position is that this is a time-barred

15    decision.  Demotion is unquestionably under both federal and

16    state law subject to the rule --

17            THE COURT:  Right, I agree, but that's a completely

18    jury issue.  So what's the next issue?

19            MR. RODRIQUES:  Can I just make the point just for

20    the record, your Honor?

21            THE COURT:  Yes.  You've made all your points on

22    the written thing, and I really want to get to the jury

23    instructions.  Do you need to put in something else other

24    than what's what's on your brief?

25            MR. RODRIQUES:  No.

1          THE COURT:  Okay, so what's the next one?

2          MR. RODRIQUES:  Promotion.  The issue here is, we

3    have no record -- the elements of the cause of action are,

4    you have to show that there was a promotion, it was open, a

5    male got it, that the male -- that she was as or more

6    qualified than the male, and that the reason why the male got

7    it was because of his gender.  We don't even know what jobs

8    we're talking about, much less whether men got them, much

9    less whether the qualifications of the men who got them were

10   better or worse or the same as Ms. Svensson's

11   qualifications.  There's literally no evidence in the record

12   other than that there was a job at some point open, and the

13   plaintiff was or wasn't considered for that job.  But there's

14   absolutely nothing in the record that supports at this point

15   going to the jury on the question of whether or not there's

16   been gender disparity in awarding promotions after May 6,

17   2003, which is again the relevant period.

18          MR. MOLONEY:  The charts that we're moving to have

19   admitted to summarize the very information that comes from

20   Putnam's own documents in that proffer that we did, and we'd

21   like to have those charts --

22          THE COURT:  But let me just say this:  It is true

23   that you've pinpointed three or four positions that came open

24   in the --

25          MR. MOLONEY:  I think there were at least five,

1    right, and there were some we weren't sure of.

2            THE COURT:  Excuse me, excuse me.  And you've got

3    the names that they're males, but I don't have enough to do

4    McDonnell Douglas for them.

5            MR. MOLONEY:  Well, if you look at what happened,

6    you have Mr. Oristaglio promising he's going to consider

7    her.  I mean, he doesn't notify her about any of these

8    positions, and you take a look at what happens.  There are

9    twenty-one positions.  There's a net increase of one female,

10   a net increase of seven males, and virtually all of these

11   jobs are filled by males.  I mean, what other answer is there

12   other than there's something wrong going on here?

13           THE COURT:  So you're relying purely on statistics,

14   because I don't know anything about these guys.  Yes, I know

15   in demotion what happened.  Essentially for the most part the

16   men were retained in Portfolio Management positions, and the

17   two women were moved to Research.  They view that as the

18   graveyard shift.  Putnam disagreed.  They're trying to beef

19   up the division.  Fair game for a jury, fair game.  And one

20   woman was terminated, two were moved into Research, and most

21   of the guys kept their jobs, okay?  Well, I don't know if

22   they moved up, but they kept their jobs with the exception of

23   the head guy, Swift, okay?  So I saw that.  I could see that

24   play out.

25           On the termination claim, I know exactly who made

Page 173

1     the decision.  The jury has the full thing, and

2     McDonnell Douglas is met because Mr. Brooks takes over her

3     positions, both with respect to the Natural Resources and

4     with respect to the three MBAs.  You're comeback is, of

5     course, it was short-term, they eventually hired a woman, and

6     on and on.

7            At least I know enough to understand

8     McDonnell Douglas on the two key claims.  I know nothing

9     about promotions.  I am unlikely to let the promotions go

10    unless you show me something in the record about these men

11    who got it and who made the decisions.

12            MR. MOLONEY:  We'll file something.  We'll make

13    another proffer.

14            THE COURT:  At least in the current record, not

15    something else that goes in.  As far as I'm concerned, you've

16    rested.

17            MR. MOLONEY:  Well, part of what we've rested

18    subject to are the charts in that proffer and answers to

19    interrogatories and a few other things that are being

20    redacted.

21            THE COURT:  It's a little dangerous to have done

22    this before you were completely done, but I don't expect 300

23    documents to be coming in at this point.

24            MR. MOLONEY:  Well, what we had agreed to at the

25    very beginning, and it was the resume's of the 91.  That's

1   now been reduced.  We have the SEC documents.  That was

2   agreed to coming in.  We have the redacted Morningstar

3   documents that are coming in.

4              THE COURT:  Sure.

5              MR. MOLONEY:  We have the PDPRs, those review

6   forms.

7              THE COURT:  Are the comparators the four or five in

8   those open vacancy positions?

9              MR. MOLONEY:  I'm sorry, your Honor?

10             THE COURT:  Are the comparators in -- among the 91,

11  do those include the five people who got the open portfolio

12  manager positions?

13             MR. MOLONEY:  I think there are some.  I can't

14  answer that off the top.

15             THE COURT:  Because that's all we're talking about

16  for timeliness.

17             MR. MOLONEY:  We're talking about the post-May 6,

18  '03 people.

19             THE COURT:  So you're going to make a proffer for

20  me on that too, but I think the point is incredibly well

21  taken, but I don't know very much about those positions.  It

22  was almost an afterthought, actually.  So you did raise it in

23  your complaint, but I've heard almost nothing about them.

24             MR. MOLONEY:  Just, your Honor, on the stuff that

25  hasn't formally been allowed in --

1          THE COURT:  Excuse me.  Yes?

2          MR. MOLONEY:  What I was talking about is resume's

3    which they have and they're reviewing.  We're talking about

4    the PDPRs for the now reduced from the 91 to the comparators

5    that you've talked about.  Those are the review forms.  We're

6    talking about the SEC filings as to which the Morningstar --

7          THE COURT:  The ones that underpin that one chart.

8          MR. MOLONEY:  Well, there are two different sets of

9    charts that have been allowed in.

10          THE COURT:  I don't remember.  The ones that

11    underpin the charts that have been allowed in.

12          MR. MOLONEY:  Right, yes, the blue, the shades of

13    blue.

14          THE COURT:  And what else?  Okay, in any event, is

15    there anything else on a motion?  We've got to just move this

16    along.  Is there anything else?

17          MR. KOCIUBES:  Yes.  The only thing for the record,

18    your Honor --

19          MR. MOLONEY:  The job search log and the job

20    search (Inaudible) redacted, which we have redacted, and

21    they're reviewing that.

22          MR. KOCIUBES:  Just so that the record is clear,

23    your Honor, I want to underscore again that we have been on

24    this claim litigating a phantom.  I mean, they should have

25    known --

Page 176

1          THE COURT:  On the promotions.

2          MR. KOCIUBES:  Yes, because how do we rebut it?  We

3     still don't know the names.

4          THE COURT:  Well, yes, you do.  You knew it as of

5     this morning.  The proffer was this morning.  You do know

6     the --

7          MR. KOCIUBES:  But there are no names on the

8     proffer.

9          MR. RODRIQUES:  It just says there are five jobs

10    open.  Can you write them down?  Can you give us the names,

11    Counselor?

12         THE COURT:  Excuse me.  Not right now.  I thought

13    he did that in his proffer this morning, so --

14         MR. RODRIQUES:  He just gave us the charts, but he

15    didn't tell us which names on the charts are the ones that he

16    claims are comparable.

17         THE COURT:  All right.  So is that it for the

18    motion for directed verdict?

19         MR. RODRIQUES:  Those are the only points I needed

20    to make that we haven't already briefed.

21         THE COURT:  Sure.  All right, so I'm denying it on

22    the demotion claim.  I'm denying it on the termination

23    claim.  I'm reserving on the compensation and promotion

24    claims.  I think that's it.

25         So, now, let's just -- can we start with the

Page 177

```
 1   verdict form?

 2            (Adjourned, 3:15 p.m.)

 3            (Charge conference held off the record.)

 4                 C E R T I F I C A T E

 5


 6
     UNITED STATES DISTRICT COURT )
 7   DISTRICT OF MASSACHUSETTS     ) ss.
     CITY OF BOSTON                )
 8


 9


10

11            We do hereby certify that the foregoing transcript,

12   Pages 1 through 176 inclusive,was recorded by us stenographically at the time and

13   place aforesaid, in Civil Action No. 04-12711-PBS, Lisa Svensson V.

14   Putnam Investments, et al, and thereafter by us reduced to

15   typewriting and is a true and accurate record of the

16   proceedings.

17            In witness whereof we have hereunto set our hand this

18   27th day of May, 2008.

19


20


21


22

23            /s/ Lee A. Marzilli and Debra M. Joyce

24            _____

25            LEE A. MARZILLI, RPR, CRR, DEBRA M. JOYCE, RMR, CRR
```

Page 178

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10114079-c30b-44a9-a20c-9515595e0091