```
               IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


LISA SVENSSON,                )
                              )
               Plaintiff      )
                              )
          -VS-                ) CA No. 04-12711-PBS
                              ) Pages 1 - 199
PUTNAM INVESTMENTS, et al,    )
                              )
               Defendants     )



               JURY TRIAL - DAY ELEVEN

     BEFORE THE HONORABLE PATTI B. SARIS
          UNITED STATES DISTRICT JUDGE
```

```
                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    May 28, 2008, 9:10 a.m.
```

```
          LEE A. MARZILLI and DEBRA M. JOYCE
               OFFICIAL COURT REPORTERS
             United States District Court
             1 Courthouse Way, Room 3205
                  Boston, MA  02210
                    (617)345-6787
```

1    A P P E A R A N C E S:

2        KEVIN F. MOLONEY, ESQ. Barron & Stadfeld, PC,
     100 Cambridge Street, Suite 1310, Boston, Massachusetts,
3    02114, for the Plaintiff.

4        JOHN K. WEIR, ESQ., John K. Weir Law Offices, LLC,
     300 Park Avenue, Suite 1700, New York, New York, 10022,
5    for the Plaintiff.

6        JOSEPH L. KOCIUBES, ESQ., LOUIS A. RODRIQUES, ESQ.,
     ALLYSON E. KURKER, ESQ., and JENNIFER L. HOLDEN, ESQ.,
7    Bingham McCutchen, LLP, 150 Federal Street, Boston,
     Massachusetts, 02110, for the Defendant, Putnam Investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8876984a-77fb-40a6-aa35-02ce08446ed4

1                          I N D E X

2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3    Stephen Dexter         10        28        42          53

4    Mary McNamee           53       115       128

5    Lisa Svensson         158       165

6

7    (Darren Peers Deposition, P. 132)

8

9    EXHIBITS                    PAGE

10   Defendant's

11   82                          10

12   73                          20

13   75                          26

14   36                          91

15   83-85

16   Plaintiff's

17   465-468                     30

18   468

19   359

20   469

21   470-473

22

23

24

25

8876984a-77fb-40a6-aa35-02ce08446ed4

1              P R O C E E D I N G S

2         THE COURT:  The last juror just came.  So somebody

3   wanted to see me.  I understand that all the issues on the

4   deposition have been worked out?

5         MR. MOLONEY:  Yes, your Honor.

6         MR. RODRIQUES:  We wanted to talk to you about the

7   proffer that came in last night, your Honor, at

8   9:00 o'clock.  There was a proffer both on promotions and on

9   compensation, and we don't think that either proffer is

10   adequate, and we would like to address that with you for a

11   few minutes, if we can.  I don't know if you've had a chance

12   to look at the proffer.

13         THE COURT:  Barely.  Do we need to deal with it

14   right now?

15         MR. RODRIQUES:  Well, Mr. Kociubes can speak to

16   this also, your Honor, but the problem is that we have a

17   witness, and if the matter is -- if the promotion and

18   compensation claims are in the case because these are

19   adequate comparators, we either have to address it through

20   that witness or call another witness if they're not --

21         THE COURT:  I don't know because I haven't heard

22   argument.  This was flagged yesterday.  I've got serious

23   problems on McDonnell Douglas on the promotions, but I

24   haven't heard their argument yet.  But the evidence can come

25   in.  It's relevant, the stuff, but whether it will support a

1  separate claim is another story altogether, because it

2  supports their claim that in fact you were going to make more

3  money in Growth and Core than you were going to make in

4  Research, and it supports -- so, in other words, that one

5  career track is going to be more lucrative than another

6  career track -- and it also supports the issue of that she

7  wasn't actually ever really considered for these other

8  things.

9          Now, that's different from whether it can support a

10  separate claim for promotion.  I don't know anything about

11  these people, so I doubt it.  Let me just be clear, I doubt

12  it because I can't do McDonnell Douglas, and also it's a

13  little unfair to be doing this at 9:00 o'clock the night

14  before we're resting.

15         Now, on compensation claims, that's been fair game

16  all along.  I mean, that's been part of the issue, and we've

17  left that open, and I'll rule on it as a matter of law at the

18  close of all the case.  I don't know anything about these

19  numbers.  That's been fully and squarely here, no surprises.

20         MR. KOCIUBES:  The issue, your Honor, is that these

21  now come in at a late moment without foundation.  CIOs are

22  included.  There is no information about, for example,

23  performance of those people.  If the issue is, could somebody

24  in Portfolio Management make more money than somebody in

25  Research or vice versa, your Honor, there needs to be some

1    indication of how these people are selected.  We know it's

2    not statistically significant.

3            THE COURT:  Excuse me.  You can explain away.  I

4    mean, I said -- are there CIOs in here with their

5    compensation?

6            MR. MOLONEY:  There may be people who later on

7    became CIOs.

8            THE COURT:  But is this the compensation for CIOs,

9    or is this the compensation for when they were portfolio

10   managers?

11           MR. MOLONEY:  PMs, your Honor.

12           MR. RODRIQUES:  That's not true, your Honor.

13           THE COURT:  Well, then we're going to have to go

14   through it because categorically I've ruled the CIOs are not

15   in it.

16           MR. RODRIQUES:  Mr. Davis was a CIO, Mr. Dexter was

17   a CIO in 2003, which is the --

18           THE COURT:  Excuse me.  Well, this should be a

19   simple answer.  We will find out.  For the 2003, if it's the

20   bad numbers, they come out.  You're not going to submit this

21   thing to a jury.

22           MR. MOLONEY:  No.

23           THE COURT:  All right, it's not coming in.

24           Now, I have a serious problem on the promotion

25   claims -- I'll hear you out on it -- as I was thinking about

1  it last night after I left on how I'm ever at this late stage

2  in the game even going to think about doing

3  McDonnell Douglas.  I've vaguely heard one or two of these

4  names.  They've hardly been focused on.  It's unfair to

5  them.  I've been pressing from the beginning about what's the

6  promotion claim.  We flagged it in our summary judgment

7  motion.  As you saw from the first draft I got you, I was

8  under the misimpression it was Brooks's job.  So that's

9  unfair, and I'm likely to strike out the promotion claim.

10      But looking to you on the compensation claim, I may

11  think there's insufficient evidence at the close of all the

12  case because of all the issues you've just talked about; but

13  it's been fully and squarely in play from the beginning.  So

14  that's where we're at.

15      MR. RODRIQUES:  May I just make one last point,

16  your Honor?

17      THE COURT:  Yes.

18      MR. RODRIQUES:  The proffer lists compensation only

19  for 2003.  Can we have an order at this point that 2002 is

20  waived?

21      MR. KOCIUBES:  Or directed.

22      THE COURT:  No, I'm not doing anything right now.

23      MR. RODRIQUES:  These are only numbers for 2003.

24      THE COURT:  I'm not doing anything right now.  The

25  jury is here.  I haven't ruled at all.  You've made me the

1  proffer on promotion.  Those issues may well come up as

2  evidence.  You can ask, but that's different from -- it's not

3  fair to either me or the defendant at this point to come up

4  with three names that really we haven't ever focused on.  And

5  they got it at 9:00 o'clock last night.  I thought maybe we'd

6  see Dexter or something, the people we've been focusing on,

7  Mr. Dexter, but not people that we don't know anything

8  about.  So I don't know.  So let's just bring this jury in.

9          That sounds scary, right, people talking about

10  you?  At least we've been hearing about you.

11          So I understand, though, that on the deposition of

12  Peers, there's no objections?

13          MR. MOLONEY:  We have worked out -- they're going

14  to read what they designated, and they've agreed to read what

15  we designated last night because it's just a little bit.

16          THE CLERK:  All rise for the jury.

17          (Jury enters the courtroom.)

18          THE COURT:  Good morning to everyone.  Did anyone

19  speak about this case or see anything in the press?  I find

20  the jury has complied.  And we have a new witness coming on?

21          MR. KOCIUBES:  We do, your Honor.  Just there's

22  about 60 seconds' worth of stuff first, if I could.  One is,

23  I would like to read Paragraph 23 from Lisa Svensson's sixth

24  affidavit, the one dated February 15, 2008, filed before

25  you.  "During the time of my participation --"

1          THE COURT:  So wait.  Let me just explain.  So this

2     is a statement made by the plaintiff, so you can consider

3     this as a statement by her that you can consider.  In other

4     words, it's evidence in the case.

5          MR. MOLONEY:  Your Honor, may I have a moment to

6     find my copy of that?  We didn't know that this was going to

7     happen.

8          MR. KOCIUBES:  I can read so he can look over my

9     shoulder if he'd like.

10          THE COURT:  Yes.

11          MR. KOCIUBES:  The complete text, your Honor, of

12     Paragraph 23 of Mrs. Svensson's affidavit is, "During the

13     time of my participation in bonus discussions for junior

14     analysts and MBAs at the end of 2002, I learned that males

15     who had been my contemporaries in GER originally, but who had

16     been transferred out of GER and into portfolio management

17     positions, were not demoted and were receiving compensation

18     as a result at a much higher level than I was."

19          And then the other thing, your Honor, is, I would

20     offer for the limited purpose of establishing the date the

21     cover letter signed by Mr. Weir to the MCAD filing

22     Mrs. Svensson's MCAD complaint.  The cover letter is dated

23     February 27, 2004, and it's stamped received as March 1,

24     2004, just for establishing the date.

25          THE COURT:  All right.

1    MR. KOCIUBES:  That would be Defendant's 82, your

2  Honor.

3    THE COURT:  Well, I'm not sure this needs to go to

4  a jury, but we're marking it anyway.

5    MR. KOCIUBES:  Yes, I don't know what your Honor is

6  going to end up sending or not, so I just need a record.  And

7  with that, your Honor, we call Mr. Dexter.

8    (Defendant Exhibit 82 received in evidence.)

9                    STEPHEN DEXTER

10  having been first duly sworn, was examined and testified as

11  follows:

12    THE CLERK:  Would you please state your name and

13  spell it for the record.

14    THE WITNESS:  Yes.  It's Stephen Dexter,

15  S-t-e-p-h-e-n D-e-x-t-e-r.

16  DIRECT EXAMINATION BY MR. KOCIUBES:

17  Q.   Mr. Dexter, where do you live?

18  A.   Boston.

19  Q.   And what is your business address, sir?

20  A.   1 Post Office Square, Boston.

21  Q.   What is your occupation?

22  A.   I'm a chief investment officer and senior portfolio

23  manager for Putnam Investments.

24  Q.   And would you, and we'll come back to your duties in a

25  moment -- well, tell us what your current duties are.

Page 11

1    A.    As chief investment officer, I lead the team that runs

2    all the Global and International Growth portfolios at Putnam.

3    Q.    All right.  Would you tell us, sir, summarize your

4    educational background for us.

5    A.    Sure.  I graduated high school 1976, I graduated

6    undergraduate college in 1980, and graduated from graduate

7    school, a master's of business administration, in 19 --

8    Q.    What schools?

9    A.    -- 1983.  Both of the colleges were University of

10   Wisconsin.

11   Q.    All right.  And at some point did you enter the

12   investment or money management field?

13   A.    As soon as I graduated from my final days of college, I

14   went right into the money management field.

15   Q.    And just sort of very briefly sketch starting with the

16   first year, give us the first year so that we know, sketch

17   your history in the investment field.

18   A.    I was a fundamental analyst, meaning analyzing

19   companies, beginning in 1983 when I graduated college, and I

20   continued in that role for two different firms into 1989.

21   Q.    What firms were those?

22   A.    Sears Investment Management, the pension arm of the

23   large retailer; and then I moved from Sears to Kemper

24   Financial Services, a unit of a large insurance company.

25   Q.    And you were an analyst for both?

Page 12

1    A.    Both.

2    Q.    And where did you go thereafter?

3    A.    I moved into portfolio management at Kemper, and I

4    was --

5    Q.    What year?

6    A.    That began in 1989, and ten years later in 1999, I

7    joined Putnam Investments here in Boston.

8    Q.    And can I assume then, since 1989 through the present,

9    you've been involved in money management?

10   A.    Correct.

11   Q.    Now, let me focus your attention on, say, the years 2000

12   and 2001.  What were you doing at Putnam those years?

13   A.    I was a portfolio manager for the Global Growth Team.

14   Q.    And who headed that team?

15   A.    It was Robert Swift.

16   Q.    And what is it you were primarily doing for Mr. Swift's

17   team?

18   A.    My main job was, I was a lead portfolio manager for the

19   International Growth funds, which included the Putnam

20   International New Opportunities mutual fund.

21   Q.    And I wonder if I can -- well, let me ask you about a

22   number of names, if I could.  Did you at that time -- I'm

23   talking about 2000, 2001 -- did you know Mrs. Svensson?

24   A.    Yes.

25   Q.    And do you recall what her primary responsibilities

Page 13

1    were?

2    A.    Primarily she worked on the Global Growth mutual funds

3    and the institutional versions thereof.

4    Q.    And do you remember Kelly Morgan?

5    A.    Yes.

6    Q.    And do you recall what she worked on?

7    A.    Global Growth moved and the institutional versions

8    thereof.

9    Q.    And were there additional professionals that you can

10   recall in the 2000 -- money management professionals I'm

11   referring to -- in the 2000-2001 time period that were

12   working on Mr. Swift's teams?

13   A.     It was really Robert Swift, myself, Kelly, and Lisa.

14   They would be the key individuals.

15   Q.    Do you recall an individual by the name of Manny Weiss?

16   A.    Manny, yes.

17   Q.    What was he doing, if anything?

18   A.    He was also working on the Global Growth portfolios.

19   Q.    Did he have some specialty?

20   A.    He knew the domestic stocks, the non-international

21   stocks best.

22   Q.    And do you remember an individual by the name of Nathan

23   Eigerman?

24   A.    Yes.

25   Q.    What was he doing, if anything, on that team?

1    A.    Well, Nathan joined us as a quantitative portfolio

2    manager.

3    Q.    What was he doing?  What does that mean?

4    A.    Quantitative portfolio manager is a portfolio manager

5    that focuses mostly on quantitative models that operate on

6    the portfolios, and these are computer-generated models that

7    are used to help select stocks for the portfolios.

8    Q.    And do you remember a woman by the name of Denise

9    Seldon?

10    A.    Yes.

11    Q.    And did she have a role on Mr. Swift's team in

12    2000-2001?

13    A.    Yes.

14    Q.    And what was her role at the time?

15    A.    She was called an institutional portfolio manager, so

16    she was a portfolio manager but wore a marketing hat mostly.

17    Q.    And when you say "institutional," can I infer from that

18    that she was interacting with the various international

19    clients of that team?

20    A.    Yes.

21    Q.    And I think we've had some explanation earlier, but when

22    you refer to institutional clients as opposed to, say, the

23    mutual funds, can you just tell us what the difference is?

24    A.    Sure.  Mutual funds are aimed at what I would say is the

25    man on the street.  You go to your broker for financial

8876984a-77fb-40a6-aa35-02ce08446ed4

1    advice, and he or she will guide you to what they feel is a

2    correct mutual fund for you to invest in to expose you to the

3    stock market.

4              Institutional investors tend to be large

5    organizations.  It might be the pension funds of a

6    corporation.  It might be the endowment for a university.  We

7    term those institutional investors.

8    Q.   All right.  And I wonder if we could pull up

9    Defendant's 73.  And do you recognize the schematic that's in

10   front of you?

11   A.   Yes.

12   Q.   All right, and I wonder if we can work through it.

13   International Growth, that was Mr. Swift's unit or team?

14   A.   Correct.

15   Q.   Okay.  And do you recall what his title was at the

16   time?

17             MR. MOLONEY:  Objection, your Honor.  The basis for

18   the objection, your Honor, is that the chart that

19   Mr. Kociubes is showing is not dated with an effective date.

20             THE COURT:  Overruled.

21             MR. KOCIUBES:  I'll ask the question then.

22             THE COURT:  You'll lay the foundation for it.

23   Q.   Mr. Dexter, let me direct your attention to -- we've

24   heard testimony about a reorganization in March-April of

25   2002, and do you recall that there were changes made around

1   that time?

2   A.   Yes, there were.

3   Q.   All right, let me focus you on the period immediately

4   before the changes, so that the beginning of 2002 but before

5   the changes were made in March and April, okay?  And in that

6   context, do you recognize what's before you?

7   A.   Yes, I do.

8   Q.   Okay.  And is that what at least a portion of the team

9   looked like before the reorganization?

10  A.   Yes, that's correct.

11  Q.   Some of the names that we've been talking about are not

12  on this schematic, correct?

13  A.   Correct.

14  Q.   Okay.  Now, do you recall Robert Swift's title at the

15  time?

16  A.   He was Chief Investment Officer.

17  Q.   Okay.  And then let's go, first of all, to the right

18  side, and do you see there's reference there to Small Cap

19  International?  Do you see that?

20  A.   Yes.

21  Q.   And just, first of all, tell us what that was.

22  A.   Small Cap International was an asset, a very, very tiny

23  fund that we call an "incubator fund" that you put a little

24  money in to try to build a longer-term track record.  And if

25  you build a successful track record, then you launch the

Page 17

1   product for institutional or retail consumption.

2   Q.   Was there a mutual fund in this Small Cap International?

3   A.   There was a mutual fund version, not offered to the

4   public.

5   Q.   Okay, so this was only institutional money?

6   A.   Correct.

7   Q.   Okay.  And tell us who was responsible for managing that

8   fund.

9   A.   So Robert Swift as the leader of the team, he also

10  oversaw the management of Small Cap International; and with

11  him was David Blake, who was a junior PM at the time, and

12  Peter Hadden.

13  Q.   And what was Mr. Hadden's rank?  Was he a senior or a

14  junior person?

15  A.   He was a junior PM at the time.

16  Q.   Now, you said there were two junior people on this with

17  Mr. Swift?

18  A.   Correct.

19  Q.   Why is that?

20  A.   It's not uncommon, you have one senior person leading

21  the fund, and then you have junior PMs that you're basically

22  trying to teach and bring up the learning curve.

23  Q.   Now, with respect to this Small Cap Institutional funds,

24  in relative terms, can you tell us how big it was compared to

25  the other two boxes across from it?

1  A.   Well, it was by far the smallest.  I mean, I would use

2  the term "tiny" relative to the other two major boxes.

3  Again, it was being incubated, so it had a very, very small

4  amount of assets in it.

5  Q.   All right, let's go to the box to the left of it,

6  International New Opportunities.  And were there both a

7  mutual fund and institutional accounts there?

8  A.   Funds of both kinds.

9  Q.   Now, when within sort of one box there's both

10  institutional and mutual funds, do the two tend to be run the

11  same way in the sense of the same kinds of stocks?

12  A.   Typically they're identical.

13  Q.   Okay.  And tell us about the people who were primarily

14  managing the International New Opportunities Fund.

15  A.   Well, once again, it would be Robert as CIO and myself.

16  Q.   Now, again, in the relative sizes of the three boxes

17  here, where did International New Opp fit?

18  A.   Well, pre the reorganization, it would be our second

19  largest pool of money within the team.

20  Q.   And can you give us relative size compared to Small Cap

21  and then Global Growth?  Were they close in size, or were

22  there significant differences?

23  A.   Yes, the -- I'm doing this from memory, but to gauge the

24  relative sizes, I would think on a basis of 100.  Global

25  Growth would possibly be 75, International New Opps roughly

Page 19

1   25, and Small Cap International less than one.

2   Q.    Okay, let's now go to the box on the left, Global

3   Growth.  And am I correct that it had both a mutual fund and

4   institutional accounts?

5   A.    That's correct.

6   Q.    And, again, in terms of sort of primarily responsible

7   for managing it, who did that?

8   A.    Again, the CIO, Robert Swift, Ms. Kelly Morgan, and

9   Mrs. Svensson.

10  Q.    Now, when I say primarily responsible for managing, does

11  that mean that, for example, you would never have any input

12  into decisions of that team?

13  A.    No.  It's important to note that all of the funds were

14  team managed, so I would absolutely have influence on the

15  funds, and the arrows go both ways.  It's truly team managed.

16  Q.    Now, as we get to 2002, for example, do you recall the

17  relative compensation of Mr. Hadden?

18  A.    In 2002?

19  Q.    Yes.

20  A.    Peter, Peter would have had a base salary of on the

21  order of $125,000 and a bonus of something similar, as memory

22  serves.

23              MR. MOLONEY:  Objection, your Honor.

24              THE COURT:  Well, is that an estimate or a guess?

25              THE WITNESS:  It's my estimate.

Page 20

1        THE COURT:  Overruled.

2        MR. MOLONEY:  The language your Honor is "He would

3    have had."  I mean, "would have had" is speculation.

4        THE COURT:  Overruled, overruled.

5    Q.   Now, let us, if we could, pull up --

6        MR. KOCIUBES:  First of all, let me offer that

7    chart, your Honor.

8        MR. MOLONEY:  Objection.

9        THE COURT:  Overruled.

10        MR. KOCIUBES:  And that would be Defendant's 73.

11        (Defendant Exhibit 73 received in evidence.)

12    Q.   And do you recall that there were what we refer to as

13    changes or reorganization?  There were some dramatic

14    significant happenings in March and April of 2002 that

15    affected this team?

16    A.   That's correct.

17    Q.   And tell us, first of all, generally, and then we'll get

18    into the specifics, sort of what you recall happening.

19    A.   Well, Putnam had decided to reorganize their mutual fund

20    lineup, and that would affect us greatly because one of the

21    largest mutual funds at Putnam was one that we ran, which was

22    the Global Growth Equity Mutual Fund.  We were told that that

23    fund was being pulled away from the team and was going to be

24    rolled into another mutual fund called the Global Equity Fund

25    that was run by another team at Putnam.

8876984a-77fb-40a6-aa35-02ce08446ed4

1  Q.   And the Global Equity Team into which the Global Growth

2  was being rolled, do you recall that as a Core team?

3  A.   That was the Core team.

4  Q.   And tell us what you can recall of the performance, just

5  sort of again very generally at the moment -- the jurors had

6  specific testimony -- of the performance of the Growth teams

7  as of early 2002.

8  A.   The performance was very poor.

9  Q.   And so you said the mutual fund, Global Growth Mutual

10 Fund, was pulled away and given to Core.  And do you remember

11 what their performance was like at the time?

12 A.   Their performance was also probably suffering, but the

13 Growth area of Putnam was suffering the most.

14 Q.   Okay.  And do you recall what had been happening to

15 assets under management of Mr. Swift's team?

16 A.   Yes.  Assets had been flowing out, so we had been

17 shrinking.

18 Q.   All right.  And let me sort of put up another chart, if

19 we could, and ask if you recognize this as post-

20 reorganization.

21 A.   Yes, that's correct.

22 Q.   So now we're sort of in late April or May of 2002?

23 A.   Correct.

24 Q.   And let's, if we could, sort of work through this one.

25 After the reorganization, you became initially the director

Page 22

1    of this team?

2    A.    Correct.

3    Q.    And then let us focus, first of all, on the Small Cap

4    International Team.  Do you see that?

5    A.    Yes.

6    Q.    And tell us, was that still institutional?

7    A.    Yes, it was.

8    Q.    And was it still a tiny incubator?

9    A.    Yes.

10   Q.    And who was running that one?

11   A.    Well, Robert Swift had left the firm at this point, and

12   so he was no longer on this fund.  So as part of my

13   reorganization of the team, I --

14   Q.    Actually, let me stop you right there.

15   A.    Okay.

16   Q.    Swift is gone?

17   A.    Yes.

18   Q.    Tell us what happened to you.

19   A.    Okay, well, when Robert left the firm, the management

20   came to me and asked me if I would step up and take over

21   leadership of the team that he had been running.

22   Q.    What was left of it?

23   A.    What was left of it.

24   Q.    What was the relative, in terms of assets, size of the

25   team that you were being asked to take over compared to what

Page 23

1   Mr. Swift had been running?

2   A.   Well, it was greatly diminished because of the large

3   mutual fund being pulled away from us.

4   Q.   Okay.  So you are now the director of this team, and

5   does that mean that you're the one that gets to make staffing

6   decisions for the team?

7   A.   Yes.

8   Q.   Okay, so let's talk about the staffing decisions that

9   you decided to make, and let's start with the International

10  Small Cap.  I think you said it was still tiny and an

11  incubator fund?

12  A.   Correct.

13  Q.   And this time it shows you and Mr. Hadden on it?

14  A.   That's correct.

15  Q.   And tell us why you organized that piece of the team

16  that way.

17  A.   So Peter Hadden had already been working on the fund, so

18  he was intimately familiar with it.  Again, we team managed,

19  so I knew what was in the fund as well.  And I had a

20  background in small cap stocks as well early in my career, so

21  I felt that he and I would be good teammates to lead that

22  product.

23  Q.   All right, so you essentially left him in place?

24  A.   Yes.

25  Q.   But with your own involvement?

Page 24

1    A.    Correct.

2    Q.    All right, now we go to the International New

3    Opportunities Fund, and I think you said you had been

4    managing that before the reorg?

5    A.    That's correct.

6    Q.    And that one was left in place?

7    A.    I changed nothing there.

8    Q.    Okay, so you had been managing it before, and you

9    continued to manage it afterwards?

10   A.    Correct.

11   Q.    Okay, now, let's talk about Global Growth.  The decision

12   to take the mutual fund and give it to International Core,

13   did you make that decision?

14   A.    No.  I had no say in that.

15   Q.    All right, do you recall it was Mr. Oristaglio who was

16   involved in that?

17   A.    Correct.

18   Q.    Okay, so that's a decision that you inherited?  You

19   didn't make any decision there?

20   A.    Correct.

21   Q.    Okay.  Now, what had happened to the institutional

22   accounts that had been managed by the Global Growth Team?

23   A.    Well, the institutional accounts were still remaining.

24   They needed a lead manager.

25   Q.    And can you give us sort of a, again, just even an

1    estimate of magnitude if before all of this happened you had

2    the mutual fund and you had these institutional accounts.

3    What percentage of the total were the institutional accounts?

4    A.    Within the Global Growth category?

5    Q.    Yes, right.

6    A.    I think the mutual fund would have been 80 percent of

7    the assets.

8    Q.    So that what got left here, what Mr. Oristaglio left

9    were about 20 percent, and these were institutions?

10    A.    Correct.

11    Q.    Okay.  And then did it fall to you to make a decision as

12    to who was going to manage this remaining 20 percent?

13    A.    Yes.

14    Q.    And who did you decide to manage it?

15    A.    I brought Denise Seldon, who was already on the team, I

16    brought her into the role of lead manager for the Global

17    Growth Institutional accounts.

18    Q.    And tell us why you chose Denise Seldon for that.

19    A.    Well, Denise, she actually preceded me on the team.  I

20    joined the team in 1999.  Denise was already on the team in

21    1998.  She was intimately familiar with our processes.  She

22    knew how we went about picking stocks.  She sat in on our

23    stock selection meetings, portfolio construction meetings.

24    She knew the clients because one of her jobs was to interface

25    between the clients and the team, and she had thirty years

Page 26

1    experience in the industry.

2    Q.    She was not a novice?

3    A.    Thirty years in the industry.  She was a pro, and for

4    me, she was the best person that I could put in that role.

5    Q.    And then there's a second name there, Nathan Eigerman.

6    And what was it, if any, that Mr. Eigerman specialized in, or

7    what was his background?

8    A.    Well, again, he was a quantitative portfolio manager, so

9    he complemented her fundamental skills.  He focused on the

10   computer-driven modeling that looked at the universe that we

11   invested in.  She did the fundamental company-by-company work

12   as we looked to pick stocks for the portfolio.

13   Q.    And were Mr. Eigerman's quant. skills used by any of the

14   other people on this team?

15   A.    Yes.  We used Nathan to run quantitative models

16   essentially for all of our portfolios.

17             MR. KOCIUBES:  Let me first of all offer that, your

18   Honor.

19             MR. MOLONEY:  Objection.

20             THE COURT:  Overruled.

21             MR. KOCIUBES:  And that will be for the record,

22   your Honor, Defendant's 75.

23             (Defendant Exhibit 75 received in evidence.)

24   Q.    You mentioned just a moment ago Denise Seldon.  Had

25   there been some changes to this team, by the way, over time?

1    A.    Yes.  Over time we've had a few changes.  Peter Hadden

2    was recruited away from Putnam, so he's gone to work for a

3    competitor.  In his replacement, I hired an individual from

4    the outside, David Shea, who has joined me on the team.

5    Q.    And do you recall what year that is?

6    A.    That was about two years ago now.

7    Q.    Okay, so about 2006, roughly?

8    A.    Six, uh-huh.

9    Q.    Okay.  Mr. Eigerman?

10   A.    Mr. Eigerman left almost exactly one year after I

11   assumed leadership of the team.

12   Q.    That would be in 2003?

13   A.    Correct.

14   Q.    How about Denise Seldon?

15   A.    Denise is still on the team, still working with me.

16   Q.    And do you know what her title is currently?

17   A.    She is a senior portfolio manager.

18   Q.    And does she have an officer title?

19   A.    Managing director.

20   Q.    Just a last question or two.  In choosing these various

21   people that you were able to choose to have roles on the new

22   team -- this is Ms. Seldon, Mr. Eigerman, Mr. Hadden -- what,

23   if any, role did their gender play in your decision?

24   A.    None.

25              MR. KOCIUBES:  I have no further questions, your

Page 28

1    Honor.

2    CROSS-EXAMINATION BY MR. MOLONEY:

3    Q.   On the desk in front of you, Mr. Dexter, to your left,

4    there are some papers that are turned upside down.  Could you

5    turn those over, please.  And the first one I'd like you to

6    look at has in the lower right-hand corner the Bates

7    numbers PRM 6390.  Do you see that?

8    A.   I do.

9    Q.   And do you recognize the document?

10   A.   It looks familiar.  I have to look at it closely, but it

11   looks like a performance review.

12   Q.   Of you by Mr. Swift for the work year 1999?

13   A.   Right.

14   Q.   And would you turn, sir, to Page 6394.

15   A.   Okay.

16   Q.   And is your year-end rating set out there that Mr. Swift

17   gave you?

18   A.   Yes.

19   Q.   And what is it?

20   A.   It's a 3.

21   Q.   3.0?

22   A.   No.  3.35 exactly.

23   Q.   But if you look just below there, sir, to the year-end

24   rating --

25   A.   Yes.

1    Q.    -- what does it say?

2    A.    3.

3    Q.    Now, if you turn to the document that has the initial

4    Bates number PRM Page 6410.

5    A.    Yes.

6    Q.    Do you recognize that document, sir, as your review

7    form, the PDPR for the work year 2000?

8    A.    Yes.

9    Q.    And would you turn, sir, to Page 6415.

10   A.    Okay.

11   Q.    Is your year-end rating stated there by Mr. Swift a 4.0?

12   A.    That's correct.

13   Q.    Would you turn, sir, to the document that begins with

14   PRM 6400.

15   A.    Yes.

16   Q.    Do you recognize that as your review form for the work

17   year 2001?

18   A.    Yes.

19   Q.    And by Mr. Swift?

20   A.    Yes.

21   Q.    And if you turn, sir, to Page 6405, PRM 6405, do you see

22   your year-end rating there?

23   A.    Yes.

24   Q.    What does it say?

25   A.    3.5.

1    Q.    And you had a different reviewer in the following year,

2    did you not?

3    A.    Yes.

4    Q.    And that was Mr. Omid Kamshad?

5    A.    Correct.

6    Q.    And do you recognize the document beginning at 6419 --

7    A.    Yes.

8    Q.    -- as your review form for the year 2002 by Mr. Kamshad?

9    A.    Yes.

10   Q.    And if you'd turn, sir, to Page 6423, PRM 6423.

11   A.    Yes.

12   Q.    Mr. Kamshad gave you a rating of a 4.0?

13   A.    That's correct.

14         MR. MOLONEY:  Your Honor, I move that those four

15   review forms be admitted as the next exhibits.

16         MR. KOCIUBES:  No objection.

17         THE COURT:  All right.

18         (Plaintiff Exhibits 465-468 received in evidence.)

19   Q.    Now, Denise Seldon, you said she was an institutional

20   portfolio manager for how many years, sir?

21   A.    She was an IPM for four years for the team.

22   Q.    And before that, was she an institutional portfolio

23   manager?

24   A.    I don't know what she was doing exactly before.

25   Q.    You said she was a pro of many years experience, but you

Page 31

1   know she was an institutional portfolio manager for the

2   period you just mentioned?

3   A.    Yes.

4   Q.    And isn't that role, sir, a role where an institutional

5   portfolio manager in effect watches what's going on in the

6   teams in order to be able to interface with the clients, to

7   be able to answer client questions, and explain what she

8   thinks the people on the team are doing?

9   A.    Yes.

10  Q.    Not making any of the fundamental money decisions,

11  buying and selling stocks, correct?

12  A.    She doesn't write tickets, no.

13  Q.    "Doesn't write tickets" means what in the trade, sir?

14  A.    To buy and sell stock.

15  Q.    Okay.  Now, on the chart, --

16          MR. MOLONEY:  Your Honor, may we have the charts

17  put back up on the screen.

18          THE COURT:  Well, somebody's going to have to do

19  it.

20          MS. KURKER:  Which one?

21          MR. MOLONEY:  The first one.

22  Q.    Can you see that, Mr. Dexter?

23  A.    Yes.

24  Q.    Now, do you see Mr. Blake's name on the far right-hand

25  side?

Page 32

1   A.   Yes.

2   Q.   He was terminated from Putnam on April 12, '01, wasn't

3   he?

4   A.   I don't know the exact date, but I know he was

5   terminated.

6   Q.   Sometime in April of '01?  If you want -- well, you made

7   a motion, sir.  You didn't answer the question.

8   A.   I don't know exactly when he was terminated.

9   Q.   Was he terminated in '01, sir?

10  A.   Yes.

11  Q.   Okay.  And if you wanted to find the particular date in

12  '01 that he was terminated, you would go to the Putnam

13  business records, wouldn't you?

14  A.   If I had access to them.

15  Q.   Okay.  And you would as a senior official at Putnam

16  today, wouldn't you?

17  A.   I don't know that I would.  HR is very tight about

18  personal data.

19  Q.   A person of your standing at the firm couldn't call up

20  Mr. Tibbetts and say, "I want to know the date that Mr. Blake

21  left," and he wouldn't tell you?

22  A.   I could make the call.  I don't know that I'd get the

23  answer.

24  Q.   Okay.

25  A.   I'm sure he'd ask the relevance of the question.

Page 33

1   Q.   Okay.  Did you prepare this chart, sir?

2   A.   Did I?  No.

3   Q.   Okay.  Is there any place on the chart that cites any

4   Putnam business records to establish the completeness and

5   accuracy of the information on this chart?

6   A.   No.

7   Q.   And would your answer to the same questions be the same

8   if I add the second chart, the supposed after reorganization

9   chart in front of you?

10  A.   Yes.

11  Q.   You didn't do it, and you don't know what the source

12  information is for that, right?

13  A.   No, I did not write up the chart, no.

14  Q.   Okay.  And there's no source information stated on the

15  document, is there?

16  A.   No.

17  Q.   Now, wouldn't it be the fact, sir, that in terms of the

18  Global Growth Team prior to the reorganization, it was

19  managed by the following team members:  Mr. Swift, you, Kelly

20  Morgan, Lisa Svensson, and Anthony Sellitto?

21  A.   Yes, Tony Sellitto was a member of the team.

22  Q.   His name doesn't appear on Mr. Kociubes' chart, does it?

23  A.   No.

24  Q.   Isn't it true, sir, that prior to the reorganization,

25  the International New Opportunities Fund was managed by

Page 34

1   Swift, Dexter, and Hadden?

2   A.    Swift and Dexter were the main portfolio managers.

3   Q.    My question, sir, was it managed by Swift, Dexter, and

4   Hadden?

5   A.    It --

6   Q.    Yes or no, sir, or if your answer is "I don't know," say

7   that.

8   A.    It's an "I don't know."  We team manage.

9   Q.    You would rely on the International New Opportunities

10  prospectus filed by Putnam with the SEC for the correct

11  information?

12  A.    Sure.

13  Q.    Would it surprise you, sir, that Mr. Hadden along with

14  you and Mr. Swift was listed as managing that team on the New

15  International Opportunities prospectus dated January 30 of

16  '01?

17  A.    No, it would not.

18  Q.    Now, the Small Cap International had a mutual fund

19  called Global Aggressive Growth?

20  A.    Correct.

21  Q.    And it was managed, was it not, sir, by Roland Gillis,

22  Mr. Swift, you, Mr. Hadden, and Mr. Weed?  Isn't that true?

23  A.    The Global version, yes.

24  Q.    And we talked about Mr. Blake.  Now, would it be the

25  case that International Opportunities after the

1    reorganization was managed by Dexter, Eigerman, and Hadden?

2    A.    International New Opportunities, yes.

3    Q.    Okay.  And Global Growth was managed ultimately by Paul

4    Warren, Shigeki Makino, Geir Lode --

5              THE COURT:  You know, I think you need to put that

6    chart up again.  So at this point I'm trying to understand,

7    now that your memory has been refreshed, would you view the

8    International Growth before reorganization as an accurate

9    chart?

10              THE WITNESS:  Yes, for -- if the chart is the goal

11    of saying who are the lead --

12              THE COURT:  No.  If the goal is everybody who's on

13    those teams, is it accurate?

14              THE WITNESS:  Well, some names are missing then.

15    The problem is, it's a slice in time.  So if you take a

16    slice, it's not --

17              THE COURT:  All right, so what you're going to need

18    to do is, you're going to need to amend this chart for the

19    jury and add those names.

20              MR. KOCIUBES:  I'll do that on redirect.

21              MR. MOLONEY:  Can I move to strike it subject to

22    their correcting it, your Honor?

23              THE COURT:  Yes.  He'll correct this.

24              MR. MOLONEY:  Both charts.

25              THE COURT:  Well, I haven't heard the second chart

8876984a-77fb-40a6-aa35-02ce08446ed4

Page 36

1  yet, so why don't we put it up, the post-reorganization, and

2  see what happens there.

3          MR. MOLONEY:  Can you put that up.

4  Q.  Now, didn't the following team after the reorganization

5  manage the Global Growth Fund before it was named Global

6  Equity:  Mr. Paul Warren, Mr. Shigeki Makino, Mr. Geir Lode,

7  Mr. Mark Bogar, and Mr. Stephen Oler?

8  A.   I'm sorry.  You're asking me, did they manage what?

9  Q.   The Global Growth Fund before it became renamed as

10  Global Equity, was it managed by Mr. Paul Warren, Mr. Shigeki

11  Makino, Mr. Geir Lode, Mr. Mark Bogar, and Mr. Stephen Oler?

12  A.   No.

13  Q.   Sir, I take it then you disagree with the prospectus

14  filed by Putnam in that regard?

15  A.   Yes, because what you're --

16  Q.   Do you disagree with the prospectus filed by Putnam?

17          MR. KOCIUBES:  Can he answer?

18          THE COURT:  Excuse me, excuse me.  Did you finish

19  your sentence?

20          THE WITNESS:  What's being identified is -- the

21  funds were already moved.  The process of changing the name

22  with the federal government, that's what you're saying.  The

23  folks that you're listing did not actually manage those

24  moneys for a very long time under the title of Global

25  Growth.  It was during the transition time over to their

Page 37

1    team.  That's all I'm saying.

2              MR. MOLONEY:  I think that that needs to be

3    corrected as well, your Honor.

4              THE COURT:  Yes.

5    Q.   Now, Mr. Dexter --

6              MR. KOCIUBES:  Time, your Honor?

7              THE COURT:  He's going to finish up.

8    Q.   Okay, I just want you to take a look at a chart, it's

9    No. 15 in the book of charts.

10             MR. MOLONEY:  Your Honor, here's the --

11             THE COURT:  Yes, but you do need to wrap this up.

12             MR. KOCIUBES:  There is an objection to that chart,

13   your Honor.

14             THE COURT:  Well, I haven't seen the chart, so --

15             MR. MOLONEY:  It's No. 15 in the book, your Honor.

16             THE COURT:  Let me see you over here.

17   SIDE-BAR CONFERENCE:

18             MR. KOCIUBES:  First of all, it talks about --

19             THE COURT:  I'll let him ask it.  This won't be an

20   exhibit, though.  It will not be an exhibit.  This is at

21   best -- he needs to see it.  You can't just stick it up in

22   front of the jury.

23             MR. MOLONEY:  No, he has it.  He has a copy.

24             MR. KOCIUBES:  First of all, what is deceptive is,

25   she was terminated this year.  They have her comp as zero.

Page  38

1   They have his going up.

2          THE COURT:  You'll be able to redirect on it.  But

3   not as an exhibit.  This is a chalk.

4          (End of side-bar conference.)

5          MR. MOLONEY:  May I ask the jury if everybody can

6   see?

7          THE COURT:  Can you all see?  Now, that I've seen

8   it, you can pull it up closer to them, not that I can see it

9   anyway.  But you can't block him.

10         MR. MOLONEY:  It's No. 15.

11         THE COURT:  Right there is good.

12         MR. MOLONEY:  Is here okay?

13         THE COURT:  Yes.  I can't see anyway.  It's

14   irrelevant.

15         MR. MOLONEY:  Well, I wouldn't go that far.

16         THE COURT:  I mean, whether it's there or there

17   doesn't matter.

18         MR. MOLONEY:  Okay, thank you.

19   Q.   Now, Mr. Dexter, do you have the two charts in front of

20   you?

21   A.   Yes.

22   Q.   Do you have them both?

23   A.   No.  I have one.

24   Q.   Now, looking at what the jury sees as the top chart,

25   that's the one that has the vertical and horizontal lines, do

1    you have that in front of you?

2    A.    This one?

3    Q.    Yes, sir.

4    A.    Okay.

5    Q.    Now, do you see the kind of purple horizontal and

6    vertical lines?

7    A.    Yes.

8    Q.    And you came on board as a senior vice president and SPM

9    between July of '98 and December of '99 at Putnam?

10    A.    Yes.

11    Q.    And you continued on in that position as an SVP and SPM

12    until September of '02 or so?

13    A.    Yes.

14    Q.    And then you were promoted upstairs to SVP and director?

15    A.    Yes.

16    Q.    And that happened prior to January of '04?

17    A.    Yes.

18    Q.    And after January of '04, you went all the way up

19    vertically to managing director and CIO?

20    A.    Yes.

21    Q.    And do you see the red line there, sir --

22    A.    Yes.

23    Q.    -- representing Mrs. Svensson?

24    A.    Yes.

25    Q.    And does that show substantially accurately her career

Page 40

1    track?

2    A.    Well, I don't know any of --

3    Q.    Before you got there.

4    A.    Yes, I don't know any history.

5    Q.    Okay.  But looking at where the red vertical line

6    intersects with the horizontal purple line representing you

7    and coming forward in time, does that, based upon your

8    recollection of the events, substantially set forth your

9    career track and hers?

10   A.    I don't understand her -- the arrow heading down, so --

11   Q.    Well, you know that she was terminated on September 15

12   of '03, don't you?

13   A.    I don't know that she was terminated.

14   Q.    You know that she left Putnam on or about September 15

15   of '03, don't you?

16   A.    That I know.

17   Q.    Now, if you look at the other chart, sir -- and that's

18   on the bottom of the board facing the jury -- and do you see

19   the left-hand column "Total Annual Compensation in Millions"?

20   A.    Yes.

21   Q.    And again Svensson is represented by the red lines, and

22   you, Mr. Dexter, are represented by the purple lines.  Do you

23   see that?

24   A.    Yes.

25   Q.    Would you look at the changes in the purple line and

Page 41

1    tell me, if you would, sir, whether the purple line shown in

2    this compensation chart is substantially accurate?

3    A.   I don't think I've ever made that kind of money at

4    Putnam.

5    Q.   Well, sir, were you making between a half a million and

6    a million in 1999?

7    A.   Yes.

8    Q.   Were you making between a million and $1.5 million in

9    the year 2000?

10   A.   Yes.

11   Q.   Did you make a half a million in 2001?

12   A.   Yes.

13   Q.   Did you make between a million and $1.5 million in 2002?

14   A.   That, I'm not sure.

15   Q.   The Putnam records would indicate what you made,

16   wouldn't they?

17   A.   I don't know what's going into this.  Are you talking

18   cash, or are you talking stock?

19   Q.   Aggregate compensation.

20       THE COURT:  The whole thing.

21   A.   Yes, because I generally don't know what the stock

22   number is.

23   Q.   And so you don't know how much you made in '02?

24   A.   No.  And I'm not trying to be funny about it.  Part --

25   Q.   I wasn't suggesting you were, sir.  I'm just asking if

Page 42

1    you happen to remember how many millions --

2              THE COURT:  He says he doesn't, so you need to

3    finish.

4    Q.   In '03, sir, did you make between $2 million and

5    $2.5 million of aggregate compensation?

6    A.   I don't think so.

7    Q.   What did you make, aggregate compensation?

8    A.   I think it was more in the one to one and a half.

9    Q.   But if we looked at the Putnam records, we'd be able to

10   determine that, wouldn't we, sir?

11             MR. KOCIUBES:  Objection.

12   A.   We could.

13             MR. MOLONEY:  I have no further questions, your

14   Honor.

15             MR. KOCIUBES:  I've got some, your Honor.  Could we

16   pull up on the computer so maybe it's easier for everybody to

17   see that last chart.

18   REDIRECT EXAMINATION BY MR. KOCIUBES:

19   Q.   Can you see it, Mr. Dexter?

20   A.   Yes, I can.

21   Q.   And maybe we can just blow --

22             THE COURT:  I'm sorry.  I can't see the jury.  Take

23   down the chart.  I can't even see the jury.

24   Q.   Now, Mr. Dexter, you were just asked a series of

25   questions about compensation.

Page 43

1    THE COURT:  I'm just going to ask this question

2    from the jury.  The jury just asked a question:  "With 30

3    years of experience or more, is this the highest position

4    that Denise Seldon ever obtained?"

5    THE WITNESS:  Uhm, I believe she was a managing

6    director at Lehman Bros., and that would --

7    THE COURT:  No, no, at Putnam, I'm sure.

8    THE WITNESS:  Oh, only at Putnam?  Yes.

9    THE COURT:  And "Do you know whether she applied

10   for higher positions and got them or not?"  Do you know one

11   way or another yourself?

12   THE WITNESS:  I would not be aware that she applied

13   for anything higher than what she's currently at.

14   Q.   Could you take a look at the chart that's in front of

15   you, and do you see it purports to compare your compensation

16   with Mrs. Svensson's compensation for a number of years?

17   A.   Yes.

18   Q.   And do you see that for -- let's take them one year at a

19   time -- 1999, Mrs. Svensson made, it looks like considerably

20   more than you did?

21   A.   Yes.

22   Q.   Did you infer from that that she was being paid more

23   because she was female?

24   A.   No.

25   Q.   And let's go to the next year in 2000.  Am I correct

Page 44

1    that she made more than you did that year?

2    A.    It appears so.

3    Q.    And, again, with respect to your own compensation, would

4    you attribute that to her gender?

5    A.    No.

6    Q.    And then we go to 2001, and am I correct she's still

7    making more than you are?

8    A.    Yes.

9    Q.    And then in 2002, that's when you took over the team and

10   got additional responsibilities?

11   A.    That's correct.

12   Q.    And so out of the one, two, three, four years,

13   Mrs. Svensson was paid more than you were for three of the

14   years?

15   A.    Yes, it appears so.

16   Q.    Now, the chart then does something interesting.  It

17   shows Mrs. Svensson's compensation; it looks like a zero for

18   2003.  Do you see that?

19   A.    Yes.

20   Q.    Do you recall that the last full year that Mrs. Svensson

21   worked at Putnam was 2002?  Do you recall you said that she

22   left in September of 2003?

23   A.    Yes, I think she left in the year 2003.

24   Q.    And so do you recall that she would not -- do you recall

25   whether she -- do you have any knowledge that she got zero

Page 45

1    for 2003, that she got no salary the entire year?

2    A.    I have no such knowledge.

3    Q.    And, in any event, since you were at Putnam in the

4    spring or March of 2004, you would have been eligible for a

5    bonus, right?

6    A.    Correct.

7    Q.    So that beyond the line that I've drawn on this chart,

8    am I correct it appears to be comparing a partial -- there's

9    the big drop -- a partial year for Mrs. Svensson to a full

10   year for you?

11   A.    Yes.

12   Q.    And if we ignore that, it looks like she actually got

13   paid more three out of four years.

14   A.    Correct.

15   Q.    Can we go to the previous chart.  And, by the way,

16   there's a hierarchy on this side.  Do you know where that

17   hierarchy comes from?

18   A.    I do not.

19   Q.    And let's sort of continue on with the career track.  It

20   looks like it picks up when you join in 1999?

21   A.    Correct.

22   Q.    And then it looks like the two of you, it shows, had the

23   same title?

24   A.    Correct.

25   Q.    And then it shows a drop to SVP analyst.  And do you

8876984a-77fb-40a6-aa35-02ce08446ed4

1    know whether that sort of relative movement comes from any

2    kind of organizational chart at Putnam?

3    A.    No.  I've never seen a chart like this at Putnam.

4    Q.    Or whether that relative ranking is something that just

5    comes from Mrs. Svensson's head?  You don't know?

6    A.    No, I don't know.

7    Q.    But you've never seen this kind of chart?

8    A.    I've not seen this.

9    Q.    And then there are increases in position for you after

10   January of 2004.  Do you see that?

11   A.    Yes.

12   Q.    And, of course, at that point Mrs. Svensson was gone

13   already?

14   A.    Yes.

15   Q.    Okay.  Now, you were also asked a number of questions

16   about your reviews.  Do you recall that?

17   A.    Yes.

18        MR. KOCIUBES:  Let me ask if we could put on the

19   screen Defendant's 19.

20   Q.    And do you recall that in March-April, 2002, in

21   connection with the reorganization, a presentation was made

22   by Mr. Oristaglio?

23   A.    Yes.

24   Q.    And could we perhaps go to Page No. 4.  It's PRM 14114.

25   And am I correct, sir, that at the end of the day, what the

Page 47

1    field of money management is about is making money for your

2    clients and investors?

3    A.    Absolutely.

4    Q.    And let us take a look at the performance of the process

5    of making money as opposed to manager reviews, and does this

6    help your memory that for the one-year return on Lipper,

7    there was in fact a difference between the fund that you were

8    primarily responsible for and the one that Mrs. Svensson was

9    primarily working on?

10   A.    Yes.

11   Q.    You were in the 45th percentile, the top half?

12   A.    Correct.

13   Q.    And she was in the bottom 20 percent, the bottom fifth,

14   that fund was?

15   A.    Correct.

16   Q.    And even on a three-year basis, there's a difference?

17   A.    That's correct.

18   Q.    On a three-year basis for Growth Funds, I take it

19   nothing to write home about, but there's a 30 percentile

20   difference between the two, almost 25, about 30, I guess, 29,

21   right?

22   A.    That's correct.

23   Q.    You also talked about Core.  Could we go to the previous

24   page on that.  And do you recall, does this help you recall

25   how Core was doing?

Page 48

1    A.    Quite a good strong record.

2    Q.    And you were asked some questions about what happened to

3    the Global Growth Team, and you were asked about Mr. Warren

4    and Mr. Makino.    What team were they on?

5    A.    They were on the Core team.

6    Q.    And when Global Growth was moved by Mr. Oristaglio, he

7    moved it to this better-performing team?

8    A.    That's correct.

9    Q.    And you were asked the question about what was the

10   status of Global Growth before it was renamed.    Do you recall

11   that?

12   A.    Yes.

13   Q.    And there was a period, a short period of time when it

14   kept the name Global Growth after it was merged into Core?

15   A.    That's correct.

16   Q.    And then it took them a while to change the name?

17   A.    They have to file papers with the government.

18   Q.    All right, so when you're talking about Global Growth

19   being managed by Mr. Warren or Mr. Makino, what you're

20   talking about is after the transfer to Core?

21   A.    Yes.    It's really Core.

22   Q.    Now, in addition you were asked some questions about

23   the -- put the charts up.    While we're doing that, you --

24   well, let's go to the first chart.    And do you recall I asked

25   you whether there were additional people that worked for

1    Mr. Swift's team?

2    A.    Yes.

3    Q.    Okay, and so maybe we can list them.  Immediately prior

4    to the reorganization, tell us who all you recall on that

5    team.

6    A.    Denise Seldon was a member of the team.

7    Q.    And she would have been helping out on all of the units,

8    or was she assigned to one particular one?

9    A.    Mostly Global Growth because that's where we had the

10   most institutional client base.

11   Q.    Okay, now, she would not be listed on the SEC filings

12   because she was only working for the institutional side?

13   A.    Yes.

14   Q.    And not the mutual fund which registers?

15   A.    Correct, correct.

16   Q.    Okay.  So we've got Denise Seldon.  Who else?

17   A.    You know, for a time, Manny Weiss worked.

18   Q.    And what was Weiss's function?

19   A.    He was again, like Tino Sellitto, who also would be

20   mentioned, they were more focused on the U.S. piece of the

21   Global Fund, since Global incorporates both U.S. and non-U.S.

22   stocks.

23   Q.    Okay, who else?

24   A.    Let me think if I'm missing anyone here.

25   Q.    Was Mr. Eigerman helping before the reorg?

Page 50

1    A.    He was, yes.

2    Q.    And I think you said he was a quant. on the team?

3    A.    That is correct.

4    Q.    It's not so easy to write on this.  Okay, anybody else

5    that you recall?

6    A.    I think that's it.

7    Q.    And, by the way, with reference to the source, you were

8    on this team, right?

9    A.    Yes.

10   Q.    You are in fact the source?

11   A.    Right, right.

12            MR. KOCIUBES:  Do you want this printed out or not,

13   your Honor?

14            THE COURT:  It's up to you.

15            MR. KOCIUBES:  Why don't we print it out.  We can

16   decide whether to mark it later.

17            THE COURT:  Fine.

18            MR. MOLONEY:  I object, your Honor, because he

19   still has Mr. Blake on, who was gone, even out of this

20   witness's mouth, in '01.

21            MR. KOCIUBES:  That's a good point.

22            MR. MOLONEY:  And the records will show it's in

23   April of '01.

24   Q.    And let's assume that Mr. Blake was gone, so we'll cross

25   him out, so that it is Swift and Hadden on the Small Caps,

1    right?  You said that was the tiny incubator, okay?

2            MR. KOCIUBES:  Could we then print that out.

3            THE COURT:  You can keep going, though, while he's

4    doing it.  It takes a couple of key strokes.

5            MR. KOCIUBES:  Can we put a new chart up while he's

6    doing it, or will it erase it?  That's the question.

7            THE CLERK:  I don't know.

8            (Pause.)

9            THE COURT:  We're trying to finish this up.

10           MR. KOCIUBES:  I've only got the other chart to

11   clean up, your Honor.

12           THE CLERK:  All set.

13           MR. KOCIUBES:  All set?  Okay, can we pull up the

14   other chart then.

15   Q.  All right, now, just tell us, to the extent that you can

16   remember, sort of right after the reorg, sort of it would be

17   in the late April-May time period, do that snapshot in time,

18   who else do you recall working on this team?

19   A.   All right, so we had myself, Denise Seldon, Nathan

20   Eigerman, Peter Hadden.  Uhm. . .

21           THE COURT:  I think he's only asking for any

22   additions.

23           THE WITNESS:  Yes, I'm trying to think of any

24   additions.

25           THE COURT:  Why don't you mention someone.

Page 52

1      MR. KOCIUBES:  I'm not sure that there were.

2   Q.   Do you recall anybody else?

3   A.   No.

4   Q.   The team was smaller, in any event, right?

5   A.   Yes, that's the thing, we were downsized.

6   Q.   Okay.  Now, so last question there, and you sort of

7   touched on it.  Global Growth, I think you said the mutual

8   fund was merged into Global Equity Fund which was a Core

9   fund?

10  A.   Correct.

11  Q.   But for a while the Global Growth name was used down

12  here.  Do you recall that?

13  A.   Yes.

14  Q.   That's what happened.  The assets moved; the name didn't

15  change for a while?

16  A.   Correct.

17  Q.   And it moved to a Core team, one of those

18  high-performing teams?

19  A.   Yes.  It moved out of our team.

20       MR. KOCIUBES:  All right, I have no other

21  questions, your Honor.

22       THE COURT:  Okay, thank you.

23       MR. MOLONEY:  I just have two quick follow-ups,

24  your Honor.

25       THE COURT:  Stand right there, two questions.  Hold

1  on.  You can have follow-ups, two.

2  RECROSS-EXAMINATION BY MR. MOLONEY:

3  Q.   Now, you spoke about Ms. Seldon being on the team?

4  A.   Yes.

5  Q.   Prior to reorganization, she was on the team in a role

6  as institutional portfolio manager --

7          MR. KOCIUBES:  Objection.

8  Q.   -- and not a portfolio manager?

9          THE COURT:  Overruled.

10  A.   Correct.

11         MR. MOLONEY:  That's it.

12         THE COURT:  Thank you.  Good-bye.

13         (Witness excused.)

14         MR. KOCIUBES:  The next witness is Mary McNamee,

15  your Honor.

16                    MARY McNAMEE

17  having been first duly sworn, was examined and testified as

18  follows:

19         THE CLERK:  Would you please state your name and

20  spell it for the record.

21         THE WITNESS:  Mary McNamee, M-c-N-a-m-e-e.

22  DIRECT EXAMINATION BY MR. KOCIUBES:

23  Q.   Good morning, Ms. McNamee.

24  A.   Good morning.

25  Q.   Would you tell us where you live, please.

Page 54

1    A.    Winchester, Massachusetts.

2    Q.    And are you currently employed?

3    A.    Yes, I am.

4    Q.    By whom are you employed?

5    A.    Oppenheimer Funds.

6    Q.    And what location are you employed?

7    A.    Atlantic Avenue here in Boston.

8    Q.    What is your position with the Oppenheimer Funds?

9    A.    Vice president, human resources.

10   Q.    How long have you been with Oppenheimer?

11   A.    I've been with Oppenheimer since June 4 of 2007.

12   Q.    Okay.  And what is the nature of the business of

13   Oppenheimer?

14   A.    They're an investment management company, mutual fund

15   distribution company.

16   Q.    I wonder if you would be kind enough to outline, first

17   of all, your educational history for the Court and jury.

18   A.    I have a bachelor's of arts in theater.  I double

19   majored in theater and communications from Burnell College in

20   Gainesville, Georgia, and that's the most I completed, so --

21   Q.    And then you went to work?

22   A.    Yes, I went to work.  I went to work right out of

23   college in my hometown of Savannah, Georgia, in a museum for

24   about six months, and then decided to relocate to the Boston

25   area, where I eventually became employed by Xerox Corporation

1  in the role of a salesperson, where I then remained for a
2  couple of years.
3  Q.    And eventually did you drift into human resources?
4  A.    Yes.  After about fifteen years of employment, I decided
5  to look into a different area, tried to utilize what I was
6  really good at.  So I first ventured into sales training and
7  became a sales trainer at a small company that was part of
8  Times Merrick, and then eventually developed recruiting
9  skills, and then worked for various companies in a consulting
10  capacity as a human resources manager.
11  Q.    And along the way, did you get training in human
12  resources?
13  A.    Yes.  I have a variety of courses, seminars, but mostly
14  on-the-job training.
15  Q.    And at some point did you become familiar with or
16  professionally involved with Putnam corporation?
17  A.    Yes, I did.  I joined Putnam in June of 1996 as a
18  consultant in the Human Resources Department, not a regular
19  employee at that time.
20  Q.    And then at some point did you become a regular
21  employee?
22  A.    Yes.  In December of 1996 I was extended an offer to be
23  hired full time, which I accepted.
24  Q.    And between December of 1996 and when you joined
25  Oppenheimer in 2007, were you at Putnam continuously?

1   A.    Continuously, yes.

2   Q.    Okay.  And would you just sort of generally trace your

3   duties and career path at Putnam.

4   A.    Yes.  When I first joined, as I said, I was as a

5   consultant; and then when they extended the offer to me back

6   in December of 1996, I took on the HR manager role for mostly

7   the internal groups, for legal, accounting, property

8   management, and covered those groups in what they call a

9   generalist capacity.  That is, I did employee relations and I

10  did staffing.  And I was in that role until about March of

11  2000 -- no, excuse me -- 1997.  And then I took over a role

12  of HR manager for the Institutional Group, which was a sales

13  and distribution group, which I covered for five years.  And

14  then in June of 2002, I became the HR manager over half of

15  the Investment Division at Putnam, which included Global

16  Equity Research, Quantitative Research, and the like.

17  Q.    And did you then stay in that position until the time

18  that you left?

19  A.    Yes.  I was the HR manager for Investments.  I

20  eventually took over being the sole HR manager for

21  Investments and covered that group through the end of May of

22  2007.

23  Q.    And so am I correct that in the period of 2002 and 2003,

24  you had responsibilities for Investments?

25  A.    Yes, I did.

1    Q.    And during at least some, if not all, of that period,

2    included in those responsibilities were responsibilities for

3    Global Equity Research?

4    A.    Yes, I did.

5    Q.    Now, I take it you are familiar in your HR capacity with

6    the time periods when, in the Investment Division now, that

7    salaries and bonuses were announced?

8    A.    Yes, I was.

9    Q.    And what time of year would they actually be announced

10   to the employees in the Investment Division?

11   A.    All bonuses were announced and communicated in around

12   the March time frame for the previous year.

13   Q.    How about salary for the current year?

14   A.    Salary was also done around the same time, but then the

15   salary increases were retroactive to January 1.

16   Q.    But the employees would be notified in about March of

17   each year what their --

18   A.    February or March each year.

19   Q.    -- February-March what their current salaries were and

20   their bonuses for the previous year?

21   A.    Correct.

22   Q.    Let me focus your attention then, if I could, to the

23   2001-2002 period.  You're still working with the Investment

24   Management Division?

25   A.    In 2002, I took over in June of 2002.  Prior to that, I

1    was supporting an institutional group.

2    Q.    Okay.  And were you familiar, just from being in HR,

3    with what was happening to the performance in, say, 2001 of

4    the Growth Funds?

5    A.    Well, I was familiar with what was happening in the

6    Investment Division because the entire -- well, especially

7    the Growth Funds because they were having significant issues

8    around performance, and everyone was very frustrated because

9    their 401Ks were going down as well, so it was pretty well

10   known.

11   Q.    You were busy?

12   A.    Yes.

13   Q.    And do you recall that in the period of 2001, in 2002,

14   2003, that there were various portfolio managers who lost

15   their positions as a result of performance?

16   A.    Yes.

17   Q.    And, by the way, with respect to that, we heard

18   testimony the other day about a manager's handbook and

19   corrective action that needed to be taken.

20   A.    Yes.

21   Q.    And perhaps we could -- do we have that on the

22   computer?  Let me ask you generally, first of all,

23   Ms. McNamee, to describe sort of the corrective action

24   process.

25   A.    Corrective action being if there was an issue with an

1    employee?

2    Q.    Yes.

3    A.    There was certain guidelines that were put in place that

4    if there was an issue with an employee, that they would

5    have -- the manager would obviously consult their HR manager

6    and work in conjunction with them in putting that specific

7    employee on warning.  And that could take several forms.  It

8    could either be a verbal warning or a written warning or a

9    final written warning.  The guidelines that were set in place

10   that usually would be recommended as a guideline, start with

11   a verbal warning, escalate it to a written warning, and then,

12   finally, a final written warnings.  But these were only

13   guidelines, and at any period of time the manager could move

14   from the corrective action, could just jump into the final

15   written warning, or they could surpass any of that and go

16   right to termination if there was an issue.

17   Q.    Yes, I wanted to just sort of ask a specific question

18   about that.  Let me represent to you that Mr. Oristaglio

19   testified yesterday that he had let dozens of investment

20   professionals go for performance, investment performance

21   reasons.

22   A.    Yes.

23   Q.    And you were in HR for the Investment Division during

24   2002, 2003, 2004, correct?

25   A.    Right.

1    Q.   And this corrective process that you talk about when the

2    investment professionals, say the portfolio managers, were

3    being let go, did Putnam go through that in all those cases?

4             MR. MOLONEY:  Objection, your Honor.

5             THE COURT:  Overruled.

6    Q.   I'm sorry, Ms. McNamee?

7    A.   No, they do not.

8    Q.   Do you recall going through that in any of those cases?

9             MR. MOLONEY:  Objection.

10            THE COURT:  Overruled.

11   A.   Not specifically in those cases because if a portfolio

12   manager or an analyst had performance issues, it was very

13   clear.  And you've got to keep in mind, the portfolio

14   managers --

15            THE COURT:  No.  You need to just answer.  So

16   what's your next question?

17   Q.   Why, if you know, why was that process not followed with

18   respect to portfolio managers?

19   A.   It was very obvious what performance was with a

20   portfolio manager.  It was --

21   Q.   You mean investment performance?

22   A.   Investment performance.  It was clear, it was glaring,

23   it was every day.  And Putnam, as all investment management

24   firms, and portfolio managers are in charge of managing other

25   people's money, and it would be -- for a principal to go and

Page 61

1    allow a portfolio manager to continue to have performance

2    that would go down, and then the people that had investments

3    at Putnam would be losing money, that wouldn't be something

4    that would be very good.

5    Q.    All right, let's sort of focus a little bit on

6    International Growth Team.  Were you familiar with that in

7    2002?

8    A.    I was somewhat familiar with it, yes.

9    Q.    Mr. Swift's team?

10   A.    Yes.

11   Q.    And do you recall what their performance was like?

12   A.    It was pretty bad.

13           THE COURT:  So does it say somewhere that this book

14   doesn't apply to portfolio managers?

15           THE WITNESS:  It doesn't say it doesn't apply.

16   It's just a general guideline for all employees.

17           THE COURT:  So if something wasn't a performance

18   issue, was it followed?

19           THE WITNESS:  Well, let's say if someone was tardy

20   or they had consecutive absences, then you would obviously

21   put that person on warning; you know, "You must attend work

22   every day at 8:30," for example, if that was the time thing.

23   So it was something -- generally corrective action was if you

24   felt that the person could improve and they just need to be

25   managed and then guided through that, then those are the

1    times that you would put through corrective action.  But if

2    it was something that -- if it was investment performance,

3    you couldn't say, "You have to pick better stocks."  I mean,

4    they obviously knew that they had to do that.

5    Q.   Now, we were talking about Mr. Swift's International

6    Growth Team, and you were describing, you know, at least from

7    60,000 feet, what their performance was like as of early

8    2002.

9    A.   Well, I know that their performance had significantly

10   taken a downturn and that there were going to be changes on

11   the team, and Mr. Swift lost his job, and then other people

12   were shuffled around within the organization.

13   Q.   And do you recall what happened in connection with that

14   shuffling around with Mrs. Svensson?

15   A.   Well, in particular, because I joined -- I took over the

16   Research team in June of 2002, and my former colleague

17   Christine Scordato, who was the HR manager for that group,

18   had given me an overview of kind of where the group was, who

19   are the different people and who the analysts were,

20   et cetera.  And she had explained to me --

21            THE COURT:  She can't -- don't say what she said.

22   Q.   Yes, just tell us what happened to Ms. Svensson.

23   A.   Okay.  So Ms. Svensson had joined the Global Equity

24   Research team from the International Growth Team.

25   Q.   And the Global Equity Research team was one of the teams

1    that you were in charge of from the HR point of view?

2    A.    Yes.

3    Q.    You were interfacing with them?

4    A.    Yes.

5    Q.    All right.  Now, you understood that Ms. Svensson joined

6    that team in roughly April?

7    A.    Yes, April-May of 2002.

8    Q.    Okay.  And do you recall, say in the 2002-2003 period,

9    what Mrs. Svensson's responsibilities on that team were?

10   A.    Yes.  She was the co-manager for the Global Natural

11   Resources Mutual Fund, as well as she was an energy analyst.

12   Q.    And do you recall -- and I think she added a person --

13   do you recall that she was also managing some individuals?

14   A.    Yes.  She was managing a couple of junior analysts.

15   Q.    And do you recall -- you said she was an analyst -- do

16   you recall that she had -- originally was getting several

17   number of stocks under coverage?

18   A.    Yes.  She was covering energy stocks.

19   Q.    Do you recall whether there was any internal

20   announcement when Mrs. Svensson went to Global Equity

21   Research?

22   A.    I believe there was a memo that was sent out, a

23   memorandum that was sent out by Bill Landes welcoming her to

24   the team.

25   Q.    Okay.  Now, if we look at from your HR perspective

Page 64

1    Mrs. Svensson gets to Research in -- I'm just going to say

2    roughly April, if that's fair as far as --

3    A.    April-May, yes.

4    Q.    Okay, April-May.  Was it realistic that she was then

5    going to get transferred again within a matter of months?

6    A.    No.

7    Q.    Why not?

8    A.    Well, if you're covering -- if you're ramping up, what

9    they call ramping up on stock coverage, it takes a long

10   time.  You have to get to know the companies.  You have to

11   introduce yourself to the management of those companies.  You

12   have to go travel.  You have to go meet the companies, visit

13   with them, do an analysis of -- there's a lot of work that

14   needs to go into covering these stocks.  So it would be

15   unlikely that you would start all this activity and then

16   shift gears and then move to a different position, unless it

17   wasn't working out.

18   Q.    Now, does somebody else have to be introduced to the

19   companies?

20   A.    Yes.  Another analyst would have to be introduced to the

21   companies if that position changed.

22   Q.    Now, with respect to Global Equity Research, do you

23   recall whether there was any initiative to try to beef it up?

24   A.    Oh, absolutely.  Bill Landes believed that research was

25   key to investment performance, and he significantly added

8876984a-77fb-40a6-aa35-02ce08446ed4

1  additional analysts, more senior analysts to those ranks in
2  2002 and the beginning of 2003.
3  Q.   And what, if anything, from the HR perspective, would
4  be -- assuming somebody was performing well in Research --
5  would be the impact of moving them short term out of Research
6  back into a portfolio management position?
7  A.   Well, then those stocks that they were covering would be
8  not covered at that time.  If they left, then they would be
9  uncovered until another analyst could get up to speed, and
10 then you'd have ramp-up time again for the analyst to get up
11 to speed on those companies.
12 Q.   Do you recall internal discussion focus about beefing up
13 Research, both in terms of status and in terms of sort of
14 just the people there?
15 A.   Well, one of the things that was very important was the
16 parallel career path.  A lot of effort was put into place at
17 that time that, you know, you didn't have to be a portfolio
18 manager to be successful in the Investment Division, that
19 being an analyst was also equally important.  So it was a
20 dual career path, and so much so that, you know, they were
21 going to be compensated similarly.  They were going to be --
22 you know, they would just be reviewed upon as both very
23 important to the investment process.
24 Q.   And were these plans that were being made communicated
25 to the people in the Research area?

Page 66

A.    Yes, they were.

Q.    And what would be the impact if somebody goes to
Research and then two, three, four months transfers to a
portfolio management position on those plans, if any?

A.    Well, as I said, mentioned, if the stock is under
coverage -- let's say someone is covering Exxon, for
example -- and they get to know the company and they are
about to make recommendations to a portfolio manager or
choose it for their own portfolio, then, you know, they could
do that with a lot of knowledge at that time.  If they then
left that group, then that stock like Exxon would not be
covered, and another analyst would have to come over, be
brought up to speed to cover that stock.

Q.    Do you remember in Global Equity Research in the year
2002 a man by the name of James Falvey?

A.    Yes, I do.

Q.    Do you recall what he was doing?

A.    Jim Falvey was covering the Global Natural Resources.
He was the portfolio manager on the Global Natural Resources
Fund, and also covered energy stocks as well.

Q.    Those were some of the same things that Mrs. Svensson
was going to be doing?

A.    Yes.

Q.    And do you recall anything about Mr. Falvey's financial
performance as an analyst?  Was he a terrible analyst, a good

Page 67

1   analyst?

2   A.    I recall that he had a favorable reputation.

3   Q.    And at some point, as the HR person assigned to Global

4   Equity Research, did you learn of issues between Mr. Falvey

5   and Mrs. Svensson?

6   A.    Yes, I did.

7   Q.    And what did you learn of?

8          MR. MOLONEY:   Objection.

9          THE COURT:   Sustained.

10  Q.    Did your involvement -- were you involved in any issues

11  between Mrs. Svensson and Mr. Falvey?

12         THE COURT:   Yes or no.

13  A.    Yes.

14  Q.    And tell us what your involvement was.

15         MR. MOLONEY:   Objection.

16         THE COURT:   Just generally, not what one person

17  said or the other person said.

18  A.    I had been -- I had been asked for advice from Bill

19  Landes, who was the head of the Global Research Division.

20  Q.    And in terms of sort of what it was, the context in

21  which you were being asked for advice and only that purpose,

22  what was the context in which he was asking you advice?

23         MR. MOLONEY:   I'm not sure what that question is

24  really asking the witness to answer.

25         THE COURT:   Well, maybe I should see you at

1    side bar.  Always a good time to stretch.

2    SIDE-BAR CONFERENCE:

3            THE COURT:  What's the proffer?  What would you

4    say?

5            MR. KOCIUBES:  I'm trying to just get to the more

6    general point, that she understood there was conflict going

7    on, and as HR, that's part of her responsibility.

8            THE COURT:  Then just say, "Was there conflict

9    between the two?"

10           MR. MOLONEY:  That's clearly hearsay.

11           THE COURT:  I'll let, did you understand there was

12   conflict because of what he said?  Not what other people

13   said.  That's hearsay.

14           How long do you think you're going to be with her?

15   Do you think you'll finish her by the break or not?

16           MR. KOCIUBES:  It will be close.  It will be close.

17           THE COURT:  If we can, we can.  That would be great

18   because my goal would be to finish today.  It's clear we're

19   not going to the jury, as I mentioned yesterday, so that this

20   afternoon we can spend some more time together.

21           MR. MOLONEY:  I still have an objection, your

22   Honor, on the question that he wants to ask her.

23           THE COURT:  Overruled.

24           (End of side-bar conference.)

25   Q.  Did at some point in 2002, given your HR response for

Page 69

1    GER, did the issue that there was conflict between

2    Mrs. Svensson and Mr. Falvey come to your attention?

3    A.    Yes, it did.

4    Q.    And tell us what, if anything, you did.

5    A.    I didn't -- I didn't -- it was actually handled by Bill

6    Landes who was the --

7    Q.    Okay.  And did you in due course learn what happened to

8    Mr. Falvey?

9    A.    He was terminated.

10   Q.    And do you recall we were talking a little while ago

11   about this corrective action process that's in the HR

12   handbook?

13   A.    Yes.

14   Q.    Was that process gone through for Mr. Falvey?

15   A.    No, it was not.

16   Q.    Did you at some point then learn that Mrs. Svensson was

17   promoted to ADR, Associate Director of Research?

18   A.    Yes.

19   Q.    And do you recall roughly when that was?

20   A.    January of 2003.

21   Q.    All right.  And do you recall as of early 2003 what

22   Mrs. Svensson's responsibilities were at that point?

23   A.    She was an Associate Director of Research covering the

24   energy and natural resources stocks and managed several

25   analysts.

8876984a-77fb-40a6-aa35-02ce08446ed4

1    Q.   And do you recall in, say, early 2003 who the analysts

2    that she managed were?

3    A.   Chris O'Malley, Darren Peers, Konstantin Stoev, Ellis

4    Eckland, and then a couple of investment associates which

5    were junior employees.

6    Q.   And let's sort of take several of these one at a time.

7    With respect to stock selection analyst skills, how was

8    Mr. Peers doing?

9    A.   Mr. Peers was one of the top analysts.

10            MR. MOLONEY:  Can we have a date on that, your

11   Honor?  There's been testimony about varying success rates of

12   Mr. Peers.

13   Q.   As of early 2003.

14   A.   He was doing very well.

15   Q.   Do you recall that Mr. Landes once a year would have an

16   announcement of the best analysts for the previous year?

17   A.   Yes.

18   Q.   And do you recall that occurred in about January?

19   A.   Yes.

20   Q.   And the jury has seen a document there, so we'll not

21   pause over it, but your recollection of Mr. Peers's

22   performance was?

23   A.   Top performance.

24   Q.   How about Mr. O'Malley, do you recall whether he was a

25   top quartile?

1   A.    He was in the top 25.

2   Q.    And how about the other two, Eckland and Stoev?

3   A.    Konstantin Stoev was having issues on his performance.

4   He was having a lot of challenges being an analyst.  And then

5   Ellis Eckland was, I think, fair to mediocre.

6   Q.    Let's now sort of roll forward into 2003.  At some point

7   did you receive a communication from Mrs. Svensson about

8   Mr. O'Malley?

9   A.    Yes, I did.

10  Q.    And do you recall about when that happened?

11  A.    It was in the summer of 2003, and I had just left the

12  Global Equity Research weekly meeting, and she stopped me in

13  the hall and said that she was having issues with Chris

14  O'Malley, and that she was probably going to have to put him

15  on warning.

16  Q.    And was she specific, do you recall?

17  A.    No, because we were in the hallway.  So I suggested that

18  she write up some bullet points and send them to me via

19  e-mail so I could help her write up a warning.

20  Q.    And at that point did you have any view one way or the

21  other about any issues that might exist -- that Mrs. Svensson

22  might be having with Mr. O'Malley?

23  A.    I didn't have an opinion at the time because I didn't

24  see what the issues were.

25  Q.    I see.  She just told you she had issues?

Page 72

1  A.   Yes.

2  Q.   And you told her to write them up?

3  A.   Yes.

4  Q.   And why did you want them written up for you?

5  A.   So I could look at them and then help her formulate the

6  warning.

7  Q.   At some point, and perhaps we could show it to you, at

8  some point do you recall getting some what's been referred to

9  as bullet points about Chris O'Malley from Mrs. Svensson?

10 A.   Yes.

11       MR. KOCIUBES:  And if we could pull up

12 Defendant's 28.  It's already in, your Honor.

13 Q.   And just so we can get oriented, do you see -- was this

14 an e-mail, do you recall?

15 A.   Yes.

16 Q.   Okay.  And do you see the August 8 date?

17 A.   Yes.

18 Q.   And do you see it's from Mrs. Svensson?

19 A.   Yes.

20 Q.   And addressed to you?

21 A.   Yes, it is.

22 Q.   And do you recall whether you in fact received and read

23 the e-mail around August 8?

24 A.   Yes, I did.

25 Q.   Okay.  And am I correct here that she tells you this is

Page 73

1   her first pass of writing up a list of goals for Mr. O'Malley

2   to meet?  Do you see that?

3   A.   Yes.

4   Q.   And do you see the critique of Mr. O'Malley and his

5   relationships with portfolio teams?

6   A.   Yes.

7   Q.   And do you see Mrs. Svensson's comment that she's had

8   one-on-one meetings with the Value and Core IE team members?

9   A.   Yes.

10  Q.   All right, so on or about August 8, and it looks like

11  this is -- pull the top up again.  And am I correct that you

12  would have gotten it or received this e-mail, it would have

13  come in at the end of the day, almost quarter of 6:00?

14  A.   Yes.

15  Q.   All right, so you get this e-mail of bullet points.  Did

16  you read it?

17  A.   Yes, I did.

18  Q.   And did you react to it?

19  A.   Yes, I did.  I actually went to one of my colleagues,

20  Eric Hutcherson, who was the HR manager over what they called

21  the early career employees, which Chris O'Malley was one of

22  those.  He was a fairly junior analyst.  And I said, "Eric,

23  there's some problems with one of your analysts that I think

24  you probably need to be aware of."

25  Q.   Now, let me sort of pause here.  As of this point in

1   time when you're talking with Mr. Hutcherson, would this have

2   been a day or two of August 8?

3   A.    It was probably the next day.

4   Q.    Had you heard about any issues that Mr. Peers might be

5   having?

6   A.    Not at that point, no.

7   Q.    Okay, so Mr. Brooks had not communicated anything about

8   that to you?

9   A.    No.

10  Q.    Okay.  So all you know is, you go to Mr. Hutcherson to

11  alert Mr. Hutcherson that there might be a problem with

12  Mr. O'Malley?

13  A.    Yes.

14  Q.    All right.  And tell us, if you would, what happened.

15  A.    And Eric said "Really," he said, "I'm surprised at

16  that."  He said, "In fact, I have heard just the opposite,

17  that Chris has been having --"

18          MR. MOLONEY:  Objection.

19          THE COURT:  Sustained, sustained.  I strike it.

20          MR. KOCIUBES:  Some of this is for state of mind,

21  your Honor.

22          THE COURT:  I strike it.

23  Q.    Having had a conversation with Mr. Hutcherson, was there

24  a decision made between you and Mr. Hutcherson of what to do?

25  A.    I was going to go talk to Mr. Brooks.

1   Q.   And tell us why you were going to talk to Mr. Brooks.

2   A.   Because there seemed to be some issues going on between

3   Chris O'Malley and Lisa Svensson.

4   Q.   Okay.  Did you and Mr. Hutcherson decide, in addition to

5   your talking to Mr. Brooks, did you two decide to do anything

6   further, or you were just going to talk to Mr. Brooks?

7   A.   I was going to talk to Mr. Brooks.

8   Q.   Okay, now, why were you going to talk to Mr. Brooks?

9   A.   Because he was the manager over the entire group.

10  Q.   So you were taking the problem to the next level?

11  A.   Yes.

12  Q.   And after you had this -- and Mr. Brooks has already

13  testified about what he did -- after you had the

14  conversation -- and did you have the conversation with

15  Mr. Brooks?

16  A.   Yes, I did.

17  Q.   Okay.  And after having the conversation with

18  Mr. Brooks, what, if anything, did you do?

19  A.   Well, Eric Hutcherson requested --

20        MR. MOLONEY:  Objection.  The question is what did

21  she do, and she's talking about Mr. Hutcherson.

22        THE COURT:  Yes, yes.

23  A.   I waited to get the response from Eric Hutcherson

24  regarding Chris O'Malley's feedback.

25  Q.   And at some point did feedback come from Mr. O'Malley?

8876984a-77fb-40a6-aa35-02ce08446ed4

Page 76

1   A.    Yes, it did.

2   Q.    All right.  And so that am I correct, there came a time

3   when you had then the bullet points, written feedback from

4   Mrs. Svensson, the bullet points?

5   A.    Yes.

6   Q.    And then you had written feedback from Mr. O'Malley with

7   his version of what was going on?

8   A.    Yes.

9   Q.    Okay.  Once you had the two versions then, what then

10  happened next?

11  A.    I met with Mr. Brooks.

12  Q.    All right.  And tell us what, if anything, you recall

13  telling Mr. Brooks.

14  A.    Well, we reviewed both the documents, and then he

15  decided on --

16           MR. MOLONEY:  Objection.

17           THE COURT:  Both which documents?

18           THE WITNESS:  The bullet points that Lisa Svensson

19  had sent me regarding Chris O'Malley, plus written feedback

20  from Chris O'Malley regarding issues he was having with

21  Mrs. Svensson.

22           MR. MOLONEY:  The question, your Honor, was what

23  was said.

24           THE COURT:  Overruled.  So go ahead.

25  Q.    The two of you reviewed the two documents?

1    A.    Yes.

2    Q.    And then tell us what, if anything, was said or what

3    instructions you may have been given.

4    A.    Josh said that we'd need to look into the matter and

5    that he wanted to investigate, and could I help him by

6    talking to a couple of the portfolio managers.

7    Q.    And, by the way, let's just talk about your own thought

8    process at the time.  Did you disagree with the need to

9    investigate?

10   A.    Absolutely not.  I think we should have.

11   Q.    Okay.  And so the decision was made to investigate?

12   A.    Yes.

13   Q.    And you were going to talk to some individuals yourself?

14   A.    Yes.

15   Q.    All right.  And did you do that?

16   A.    Yes, I did.

17   Q.    And do you recall who you talked to?

18   A.    I talked to Pam Holding, who was a portfolio manager in

19   Value.  I talked to, I believe, Debbie Kuenstner in Value.  I

20   talked to a couple of others on the Emerging Markets Team.  I

21   can't recall all of them right now.

22   Q.    Do you recall that at least with respect to some of the

23   individuals, you then afterwards jotted down some notes for

24   yourself?

25   A.    Yes, I did.

Page 78

1          MR. KOCIUBES:  Let me ask if I might approach, your

2    Honor?

3          THE COURT:  Is this to refresh her recollection?

4          MR. KOCIUBES:  It's her notes, yes.

5          THE COURT:  Is this to refresh her recollection?

6          MR. KOCIUBES:  Yes.

7          THE COURT:  Do you have these notes?

8          (Notes shown to Mr. Moloney.)

9          THE COURT:  So just read them to yourself right now

10   to see if that helps you remember.

11         (Witness examining document.)

12   A.   Yes.

13   Q.   Now, do you recall that you had divided up the universe

14   into the teams that Mr. O'Malley interacted with a lot and

15   the ones that he was going to interact less?

16   A.   Yes.

17   Q.   Describe that for us.

18   A.   Seventy-five percent of his time was devoted to

19   portfolio managers within the Core and Value Group, and then

20   25 percent of his time he was shared with the Emerging

21   Markets team.

22   Q.   And do you recall why that allocation was that way?

23   A.   Because Chris covered specific stocks.  I think they

24   were mining stocks.  And in the Emerging Markets space, it

25   would be within those countries that were considered emerging

1    countries, not global countries necessarily.  So the bulk of

2    his time impacted portfolios in the Value -- what was

3    considered the Value space.

4    Q.   Okay.  So you had determined that 75 percent of his time

5    was with Value and Core?

6    A.   I did not determine that.  It was determined that that

7    was how his time was allotted by, I assume, his manager.

8    Q.   Okay.  Now, with respect to the teams that, you know,

9    were taking up 75 percent of his time, as best you can

10   recall, tell us who you yourself spoke with.

11   A.   I wrote down their names:  Pam Holding, George Stairs,

12   Dave Gerber, Shigeki Makino, Dave King, and Hugh Mullin.

13   Q.   And tell us what it was that having spoken to these

14   people that you learned.

15   A.   Some of the comments that I wrote down --

16          MR. MOLONEY:  Objection.

17          THE COURT:  Well, all right, now, this is not for

18   the truth of the matter asserted.  What did you do with this

19   information?

20          THE WITNESS:  I compiled the notes, and then I

21   debriefed with Josh Brooks.

22          THE COURT:  Did you tell him what was in your

23   notes?

24          THE WITNESS:  Yes, I did.

25          THE COURT:  All right, so this is not for the truth

1    of it.  These people for the most part aren't here, they're

2    not subject to cross-examination, but it's what she told

3    Mr. Brooks who was the decision-maker.  And so I want you not

4    to necessarily tell us what they told you but what you told

5    Mr. Brooks.

6    A.   Well, I would have quoted from my notes directly to him

7    that this is what --

8    Q.   Okay, so go ahead and tell us as best you can

9    remember --

10   A.   Because I took notes to be able to clearly articulate

11   what people said.

12   Q.   All right, so tell us the best you can recall what you

13   said to Mr. Brooks.

14            THE COURT:  What you said to Mr. Brooks.

15            MR. MOLONEY:  Objection.

16            THE COURT:  Overruled.

17   A.   Okay, what I said to Mr. Brooks is, "I spoke to these

18   portfolio managers, and they told me quite a different story

19   from what I had seen in Lisa Svensson's notes, bullet points

20   to me."

21            THE COURT:  Now, were these people the same people

22   she had talked to?

23            THE WITNESS:  Supposedly, yes.

24   Q.   Now, do you recall whether you were more specific with

25   Mr. Brooks about what it is they told you?

1  A.   I provided him with exact quotes from the people that I

2  talked to.

3  Q.   And as best you can recall, I mean, if you can recall,

4  what quotes did you provide Mr. Brooks?

5          MR. MOLONEY:  Objection.

6          THE COURT:  Overruled.

7  A.   Well, these quotes I read directly from my notes.

8  Q.   Tell us what they were.

9          MR. MOLONEY:  Objection.

10          THE COURT:  Overruled.

11  A.   "Chris was a money-maker.  His analysis is strong.  He

12  knows his companies and his industries.  He knows what's in

13  the portfolios.  He's always responsible and makes good

14  comments.  Great work.  He had a great investment thesis and

15  always tested it."

16  Q.   And that's what you told Mr. Brooks that you found

17  out --

18  A.   Yes.

19  Q.   -- from the people that you named?

20  A.   Yes, I did.

21  Q.   And, by the way, when you went off to interview these

22  people, had Mr. Brooks sort of subtly or otherwise made any

23  suggestions to you about how he wanted your investigation to

24  come out?

25  A.   No, he did not.

1    Q.   Now, the people that you have just been talking about,

2    those are the ones with whom Mr. O'Malley's job was

3    75 percent of his time?

4    A.   Yes, it was.

5    Q.   Now, did you also talk to any of the people in the

6    25 percent portion?

7    A.   Yes, I did.

8    Q.   And did you report on those conversations with

9    Mr. Brooks as well?

10   A.   Yes, I did.

11   Q.   And, again, as best as you can recall, and you can use

12   your notes, what did you tell Mr. Brooks?

13   A.   That I spoke with Carmel Peters and Daniel Grana, the

14   two portfolio managers in the Emerging Markets space, and

15   they told me that Chris had not done in-depth work on the

16   companies, or the models were not up to speed for them, and

17   they were not getting any insights on the stocks in which he

18   covered on their behalf.

19   Q.   So that Mr. Grana and Ms. Peters, who were on teams that

20   Mr. O'Malley was supposed to spend 25 percent, those two were

21   not happy?

22   A.   Correct.

23   Q.   The other ones you talked to apparently were?

24   A.   Yes.

25   Q.   All right.  And you reported all of that feedback to

Page 83

1   Mr. Brooks?

2   A.   Yes, I did.

3   Q.   And was there some decision then that was communicated

4   to you or directions that were given to you by Mr. Brooks?

5   A.   No, because he said he wanted to talk to other people as

6   well.

7   Q.   Okay.  And so he was then going to go talk to people

8   himself?

9   A.   Yes.

10  Q.   And at some point, did he let you know that he had

11  finished talking to people?

12  A.   Yes.

13  Q.   All right.  And at that point, did you meet with

14  Mr. Brooks or talk to Mr. Brooks again?

15  A.   Yes, I did.

16  Q.   And with respect to that conversation, do you recall if

17  there were any decisions communicated to you or instructions

18  given to you?

19  A.   I instructed him actually, too, that he should have a

20  conversation with Ms. Svensson and to ask her about all these

21  results that we had uncovered.

22  Q.   And do you know whether a conversation occurred on or

23  about August 28?

24  A.   I believe he did have a conversation with Ms. Svensson

25  about this matter.

Page 84

1    Q.   And did he report back to you after that conversation?

2    A.   Yes, he did.

3    Q.   Okay.  And before we get there, do you know whether

4    going into the conversation or if you had discussions with

5    Mr. Brooks about potentially giving Mrs. Svensson some

6    alternatives?

7    A.   Yes.

8    Q.   And what were the alternatives that she was going to be

9    given?

10        MR. MOLONEY:  Objection.  He's asking her to

11   conclude about Mr. Brooks rather than asking her what she may

12   have said, if anything.

13        THE COURT:  Yes, you need to --

14        MR. KOCIUBES:  I'll put it differently.

15   Q.   Did Mr. Brooks consult with you about possible

16   alternatives?

17   A.   Yes, because he felt that it wasn't going to go --

18        MR. MOLONEY:  Objection.

19        THE COURT:  I will sustain that.

20   Q.   And did you give input to Mr. Brooks?

21   A.   Yes, I did.

22   Q.   And did you express any disagreement to Mr. Brooks?

23   A.   No, I did not.

24   Q.   Did you agree with what he was about to do?

25   A.   Yes, I did.

1    MR. MOLONEY:  Objection.

2    THE COURT:  Overruled.

3  Q.  And, by the way, in all of these conversations that

4  you've had with Mr. Brooks, did you detect any hint that

5  Mrs. Svensson's gender was influencing him?

6    MR. MOLONEY:  Objection.

7    THE COURT:  Sustained.

8  Q.  Did he say anything to you about her gender?

9  A.  No, he did not.

10  Q.  Now, did you learn that after the conversation, that

11  Mr. -- you knew that Mr. Brooks had a conversation on or

12  about the 20th of August with Mrs. Svensson?

13  A.  Yes, I did.

14  Q.  And did he consult with you thereafter?

15  A.  Yes, he did.

16  Q.  And did you express any disagreement at all with what he

17  was doing?

18  A.  No, I did not.

19  Q.  Did you counsel him to do anything differently?

20  A.  No, I did not.

21  Q.  Did you say in words or substance to him, "You know,

22  there's this corrective action procedure in the manager's

23  manual.  Maybe we should trigger it"?

24  A.  No, I did not.

25  Q.  Why not?

1    A.    He had -- the reason I didn't, a lot of times when

2    situations become so egregious, and in this case it was felt

3    that this was an egregious situation of a manager basically

4    trumping up charges against an employee, that that

5    necessitated the need to avoid the corrective action and just

6    go immediately to a decision to change the situation.

7    Q.    And that was your view in August after you spoke to

8    various portfolio managers?

9    A.    Yes, it was.

10    Q.    And that was your view that you in general communicated

11    to Mr. Brooks?

12    A.    Yes, it was.

13    Q.    Now, do you recall that Mr. Brooks then sent the options

14    to Mrs. Svensson in writing?

15    A.    Yes.

16         MR. KOCIUBES:    And can we pull up Defendant's 36.

17    Q.    Do you recall whether Mr. Brooks then sent you a copy of

18    what he sent to Mrs. Svensson?

19    A.    Yes, he did.

20         MR. KOCIUBES:    Just do the top, first of all.

21    Q.    And do you recall that this is a copy that Mr. Brooks,

22    it looks like he said sent the previous night to -- an e-mail

23    that he sent to Mrs. Svensson?

24    A.    Yes.

25         MR. KOCIUBES:    Okay, can we pull up the text of it

1   then.  Now, let me first of all offer the substantive

2   document as previously, and this just has the forwarding it

3   to Mrs. McNamee, your Honor.

4           THE COURT:  Excuse me?

5           MR. KOCIUBES:  I'm offering the document.

6           THE COURT:  Any objection?

7           MR. MOLONEY:  Yes, your Honor.

8           THE COURT:  Well, maybe I should see you, and you

9   should take it down.

10  SIDE-BAR CONFERENCE:

11          THE COURT:  Here's the issue, which is, you need to

12  be louder and pop up and object.  And you can't put this

13  stuff up on the screen unless we know that it's not objected

14  to.  So we need to do that better.

15          MR. KOCIUBES:  This is all in the record already.

16  The only part that's not in the record is where he forwards

17  it to Mrs. McNamee.

18          MR. MOLONEY:  And we had an objection to this

19  anyway, and we still object to this coming in.

20          THE COURT:  Can I read it?

21          MR. MOLONEY:  Yes.

22          THE COURT:  Is this in evidence already?

23          MR. KOCIUBES:  Yes, it's the -- remember she asked

24  for the options in writing.  It came in through

25  Mrs. Svensson.

Page 88

1          THE COURT:  Oh, allowed.  But still the point is --

2     okay.  How much longer do you think you have?

3          MR. KOCIUBES:  I'm not going to finish by the

4     break, but --

5          THE COURT:  Why don't we take our break right now.

6          THE CLERK:  All rise for the jury.

7          (Jury excused.)

8          THE COURT:  Thank you.  You can step down.  Just

9     don't talk to anyone during the break.  Okay, let me just see

10    folks at side bar on scheduling.

11         (Side-bar conference off the record.)

12         (A recess was taken, 11:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (After recess.)

2          (Jury entered the courtroom.)

3          MR. KOCIUBES:  Continue, your Honor?

4          Thank you.

5    BY MR. KOCIUBES:

6    Q.   Ms. McNamee, before the break, I was getting ready

7    to show you a document.

8          Actually, before I do that, let me take you back

9    for a moment to the interviews that you did with the

10   various portfolio managers that Chris O'Malley was

11   supposed to interact with.

12   A.   Yes.

13   Q.   I think you said one of the people you talked to was

14   Pam Holding?

15   A.   Yes.

16   Q.   Do you recall what Ms. Holding's title or position

17   was at the time?

18   A.   She was a senior portfolio manager for one of the

19   Value portfolios.

20          THE COURT:  You need to keep your voice up or

21   we'll never get it.

22   A.   Senior portfolio manager for one of the Value

23   portfolios.

24   Q.   And I think you mentioned a Ms. Kuenstner?

25   A.   Yes.

1    Q.    And do you have a recollection of having spoken with

2    her?

3    A.    Yes.

4    Q.    What was her position at the time?

5    A.    Chief Investment Officer, CIO, of Value.

6    Q.    Value.

7          Let me ask you these sort of other questions

8    also.  I take it in your career, at least at Putnam,

9    you've been involved in giving tough messages a lot of

10   times?

11   A.    Quite a few.

12   Q.    And you've worked with various managers in

13   fashioning those messages?

14   A.    Yes.

15   Q.    Do you ever disagree with the managers?

16   A.    Sometimes.

17          (Discussion off the record.)

18   Q.    And when you've disagreed with what a manager was

19   doing, did you so advise the manager?

20   A.    Yes, I did, always.

21          MR. KOCIUBES:  Now, let's, if we could, pull up

22   Defendants' 36.

23          I think your Honor had ruled right before the

24   break it was admissible, so I would just submit it.

25          THE COURT:  Yes.

Page 91

1          (Exhibit 36 received into evidence.)

2    BY MR. KOCIUBES:

3    Q.    And first of all, let's just go back to the top for

4    a moment.

5          And it looks like that Mr. Brooks had sent it to

6    Mrs. Svensson at just a couple of minutes before 6:00 in

7    the evening on September 3.

8    A.    Yes.

9    Q.    And then first thing in the morning, early in the

10   morning, at 8:15, he forwarded a copy to you?

11   A.    Yes.

12   Q.    Let's pull up the text, then.

13         And do you see the reference in the two

14   paragraphs there about contradictory feedback on the

15   performance of Chris O'Malley?

16   A.    Yes.

17   Q.    And were you part -- were you involved in

18   determining whether there was such feedback?

19   A.    Yes.

20   Q.    And is that an accurate statement, based on at least

21   what you found?

22   A.    Yes, it is.

23   Q.    And by September 3, had you received any information

24   about issues with at least two members of the teams?

25   A.    At that point, yes.

Page 92

1    Q.    And you believe that to be accurate?

2    A.    Yes.

3    Q.    And then do you see that there were three options

4    given to Mrs. Svensson?

5    A.    Yes.

6    Q.    And had Mr. Brooks discussed those options with you?

7    A.    Yes, he had.

8    Q.    And had you expressed to Mr. Brooks any disagreement

9    about giving her those options?

10   A.    No, I did not.

11   Q.    And with respect to the first option, which was to

12   stay as an analyst in GER, do you see that?

13   A.    Yes, I do.

14   Q.    And continue to cover her stocks.  Do you recall

15   whether there were other analysts that had lost

16   management responsibilities?

17   A.    Yes.

18   Q.    Can you name one?

19   A.    Michael Yogg.

20   Q.    And how recently in the past had that happened?

21   A.    That happened, I believe, in earlier 2003.

22   Q.    And do you recall Mr. Yogg's title?

23   A.    Associate Director of Research, ADR.

24   Q.    And what happened to Mr. Yogg after he lost his

25   management responsibilities?

1    A.   He remained covering the stocks in the utilities

2    sector.

3    Q.   And as of at least the time that you left in 2007,

4    where was Mr. Yogg?

5    A.   Still with the Global Equity Research department.

6    Q.   And the second option, which was to remain for a

7    transition period and look for other opportunities --

8    A.   Yes.

9    Q.   And again, that was an option that you discussed

10   with Mr. Brooks?

11   A.   Yes.

12   Q.   And what was -- as far as you were concerned, what

13   was the point of giving her that option?

14   A.   In case she did not want to remain at Putnam, it

15   would afford her the opportunity to remain gainfully

16   employed while she was looking for opportunities on the

17   outside.

18   Q.   And then the third option, which was to leave and

19   execute -- do you see that -- execute a separation

20   agreement.  Do you see that?

21   A.   Yes.

22   Q.   And receive a severance package.  Do you see that?

23   A.   Yes.

24   Q.   And when people received, at that point at Putnam,

25   severance packages, did they execute agreements for

1    them?

2    A.    In order to receive the payments, yes, they would

3    have to execute a separation agreement.

4    Q.    And was this something that was unique that was

5    being invented for Mrs. Svensson?

6    A.    No, it was done for every employee that was offered

7    separation.

8    Q.    Prior to this September 3 or even the August 28

9    meeting, had you done any work to pull together what

10   Mrs. Svensson's separation package might look like?

11   A.    Yes, I did.

12   Q.    Tell us what you did.

13   A.    It oftentimes takes a long time to get the materials

14   together, so I asked the people that had been in charge

15   of the deferred compensation plans to pull together the

16   detail as to what she would get under the -- her

17   severance agreement for her stock, and then I pulled

18   together the severance package numbers, including

19   severance amounts, et cetera, and then also drafted a

20   separation agreement that -- so Josh, Mr. Brooks, would

21   understand what was outlined in the plan.  And if

22   Ms. Svensson asked at the time of the meeting what would

23   that option look like, I wanted to be able to give

24   something to Mr. Brooks to be able to share with her.

25   Q.    Had Mr. Brooks asked you to prepare such a document?

1  A.   No, I volunteered to prepare it.

2  Q.   And is that something you did differently in the

3  case of Mrs. Svensson than you had done previously?

4  A.   No, because I believe in being prepared and having

5  managers prepared for all those discussions, and if it

6  might go that way, they need to be prepared to answer

7  those questions.

8  Q.   I take it from your answers, as of September 3 you

9  didn't know which of the options that Mrs. Svensson

10  might choose?

11  A.   No, I did not .

12  Q.   At least through September 3, did you ever hear in

13  words or substance Mr. Brooks say to you that he hoped

14  Mrs. Svensson would leave?

15  A.   No, he did not.

16  Q.   Now, after September 3, when Mrs. Svensson was given

17  this document, did she contact you or to your knowledge

18  anybody at HR to ask for clarification of any of these

19  points?

20  A.   No, she did not.

21  Q.   So she never asked you what it might mean -- say,

22  option one might mean for her future compensation?

23  A.   No, she did not.

24  Q.   Or chances in the future for promotion?

25  A.   No, she did not.

8876984a-77fb-40a6-aa35-02ce08446ed4

1   Q.   Prior to giving her the options, why, at least from

2   your HR vantage point, did you not go through this

3   corrective action procedure?

4   A.   The corrective action procedure is a guideline, and

5   it's usually given to -- it's a very large company, so

6   it goes anywhere from operational administrative staff

7   all the way up to senior management.  And when you rise

8   to certain ranks within an organization, generally you

9   don't follow -- a lot of times you don't follow those

10  steps because you've got a whole level -- different

11  level of responsibility.  So, also, when you're in the

12  investment division, your performance is something

13  that's showcased every single day, so a lot of times

14  those guidelines are not followed.

15  Q.   You had described earlier this morning that those

16  procedures weren't used, for example, when Mr. Falvey

17  was terminated?

18  A.   Correct.

19  Q.   He was the one that was in conflict with

20  Mrs. Svensson?

21  A.   Correct.

22  Q.   Let me direct your attention back to this

23  investigation that you, and apparently Mr. Brooks -- did

24  Mr. Hutcherson participate, too, or did he not?

25  A.   I believe he did.

Page 97

1    Q.   Okay, that was done with respect to Mrs. Svensson's

2    management.   How did that compare to any kind of

3    investigation that was done with respect to Mr. Falvey,

4    say?

5    A.   There was not really an investigation with

6    Mr. Falvey.

7    Q.   What happened with Mr. Falvey?

8    A.   Well, Mr. Falvey --

9         THE COURT:  Well, were you personally involved?

10        THE WITNESS:  Yes, I was.

11   A.   Mr. Falvey and Ms. Svensson were not getting along,

12   the relationship was breaking down and Lisa even

13   complained to me that she was having difficulty getting

14   along with him and he complained to me he was having

15   difficulty getting along with her.

16   Q.   Was he given an option of remaining at the company

17   and in a revised position?

18   A.   No.

19   Q.   Now, after, I think you said on September 3, it

20   appears from the document that Mrs. Svensson had the

21   three alternatives put on paper.   At any time between

22   the 3rd -- let's say between August 28, say, and

23   September 15, to your knowledge, did she communicate

24   with you or anybody in HR asking for any kind of

25   clarification?

1   A.    Not to me, no.

2   Q.    Or proposing any kind of changes or anything?

3   A.    No, she did not.

4   Q.    All right.  Let me sort of fast-forward then, if we

5   can, to September 12.  Do you recall that there was a

6   meeting with the -- that involved Mrs. Svensson and

7   Mr. Brooks?

8   A.    I don't remember the exact date, but I know there

9   was a meeting with Ms. Svensson, Mr. Brooks, and then I

10  was called into the meeting later.

11  Q.    Okay.  Now, let's talk about what happens once you

12  got called into the meeting.

13  A.    Okay.

14  Q.    Tell us -- so there was some stuff that happened

15  before you got there?

16  A.    Correct.

17  Q.    Okay.  What was going on when you got there and once

18  you were there?

19  A.    What I recall was I brought a copy of the separation

20  agreement to share with Lisa her options, that final

21  option, because the meeting was not going well.  As I

22  understand, she had demanded --

23        MR. MOLONEY:  Objection.  She's testifying about

24  things she doesn't say --

25        THE COURT:  Yes, sustained.

8876984a-77fb-40a6-aa35-02ce08446ed4

1    BY MR. KOCIUBES:

2    Q.    Go ahead.

3    A.    The purpose of me to go -- to walk Ms. Svensson

4    through the separation agreement.

5    Q.    All right.

6          MR. KOCIUBES:  And can we pull up -- it's been

7    previously offered, admitted, your Honor, as Defendants'

8    38.

9          Let's leave the text there.

10   Q.    Do you recognize -- there are a couple of pages, but

11   do you recognize the document?

12   A.    Yes, I do.

13   Q.    And is that the document that you had had prepared

14   for discussion with Mrs. Svensson?

15   A.    It was probably an earlier draft, because this date

16   is September 15th, and I think I had a draft -- multiple

17   drafts of this.  It was probably one exactly like this

18   but a different date.

19   Q.    Okay.  And did you hand it to her and tell her to

20   read it?

21   A.    Yes, I did.

22   Q.    Did you discuss portions with her?

23   A.    Yes, I did.

24   Q.    And tell us how -- just tell us how it worked.  What

25   happened?

1    A.    What I would do would be I walked her through the

2    paragraph 1, which actually outlines the amount of money

3    that she would be receiving if she did execute the

4    agreement.  And then the other key points would be the

5    payment of her vacation days that she accrued but had

6    not taken, and then throughout -- what I would do is

7    highlight all the major sections of the document, which

8    included not only the payments that she would be

9    receiving, but also that she had a right to consult an

10   attorney and then, ultimately, that she would have to

11   sign a general release in order to receive the monies as

12   a condition of the agreement.

13   Q.    All right.  Let's talk about the first paragraph.

14   Do you see at the bottom there, you wrote, Effective

15   upon execution of this agreement and subject to the

16   provisions of paragraph 6, Putnam will pay you a

17   one-time payment of $250,000 minus withholdings.  Do you

18   see that, on October 30?

19   A.    Yes.

20   Q.    First of all, putting the amount of money aside, the

21   execution of this agreement, you said it contains a

22   release.  Was that something that was in any way unique

23   to Mrs. Svensson?

24   A.    No, it was not; it was in every single one of our

25   separation agreements.

1    Q.    Now, with respect to the $250,000, is that something

2    that you picked out of the air, or where does that

3    number come from?

4    A.    That number represented the pro rata portion of her

5    prior year's bonus.

6    Q.    So she was going to be there nine months, so it was

7    a portion of her --

8    A.    Correct.

9    Q.    Could we go to the next page?  Next page, please.

10   Just do the top.

11          And do you see there reference to the various

12   Putnam plans?

13   A.    Yes.

14   Q.    And why would you put that in there?

15   A.    Well, these plans have certain provisions that would

16   supersede this agreement as far as what was the original

17   agreement in which she received monies under those

18   plans.

19   Q.    And do you recall, for example, whether there were

20   release provisions for deferred amounts or unvested

21   amounts or --

22   A.    Yes, there were release provisions as well.

23   Q.    All right.  And can we go to the next page?

24          Let's go to paragraph 10.

25          And am I correct that paragraph 10 is what

1    contains the release?

2    A.    Yes, it is.

3    Q.    And you walked Mrs. Svensson through that?

4    A.    Yes, I did.

5    Q.    If I understood your testimony correctly.

6          And then can we go to LS 459?

7          Now, there's reference at the top to profit

8    sharing.  Do you see that?

9    A.    Yes, I do.

10   Q.    And the various amounts add up to $240,000?

11   A.    Yes.

12   Q.    And that says, "100 hundred percent vested."  Do you

13   see that?

14   A.    Yes.

15   Q.    What's the significance of that?

16   A.    Those, she was entitled to those monies.

17   Q.    So she was going to get that, period?

18   A.    She got that money.

19   Q.    She didn't have to sign anything?

20   A.    No, she did not.

21   Q.    And then there's the executive deferred compensation

22   plan?

23   A.    Yes.

24   Q.    And what's the significance of the language "1

25   installment in January following retirement"?

1    A.    This was an elective deferred compensation plan.

2    Employees at a certain level were allowed to defer a

3    portion of their bonus off so that they wouldn't have to

4    pay taxes during that plan year.

5    Q.    And what's the status of that amount?

6    A.    I believe that was paid out.

7    Q.    So she got that.  Again, that was something she was

8    just entitled to, she didn't have to sign any release

9    for?

10   A.    Correct.

11   Q.    And then there is something called the Profit Growth

12   Incentive Plan.  Do you see that?

13   A.    Yes.

14   Q.    It shows a series of annual payments.  Do you see?

15   A.    Yes.

16   Q.    With the first one due basically six months from

17   then, $255,000 in March 2004.  Do you see that?

18   A.    Yes.

19   Q.    Now, were those amounts vested?

20   A.    No, they were vesting on those dates.

21   Q.    I see.  So she would become eligible to receive

22   those amounts if she were there with respect to, say,

23   the first $255,000 in March of 2004?

24   A.    Yes.

25   Q.    And so that had she stayed, say, just the six

Page 104

1    months, that would have been her money?

2    A.   Correct.

3    Q.   She could have gotten -- how do these amounts work

4    with respect to the release?

5    A.   If she had executed the release, signed the release,

6    she would have been entitled to all of that money.

7    Q.   So that's another 539,000 that she would have, had

8    she made -- had the right to make a decision, that had

9    she opted for it, that she could have received?

10   A.   Yes.

11   Q.   And then, lastly -- and she could have received half

12   of it, almost, just by staying six months?

13   A.   Yes.

14   Q.   Without signing anything?

15   A.   Right, for her employment -- right, if her

16   employment had continued.

17   Q.   And then there is a voluntary -- Putnam Voluntary

18   Plan.  What's that all about?

19   A.   Once again, it's deferral -- it's elected --

20   something that she would have elected to do on her own.

21   Q.   And what happened to this money?

22   A.   I believe she received that money as well.

23   Q.   Regardless, that's something she waits or not,

24   that's something she's entitled to?

25   A.   Correct.

Page 105

1   Q.   And she wouldn't have to sign a release to get those

2   monies?

3   A.   Correct.

4   Q.   If we could, then, go to page LS 465.  Just sort of

5   blow up the text.

6        Do you see the reference to Equity Partnership

7   Plan?

8   A.   Yes, I do.

9   Q.   And tell us what that is.

10  A.   That's a stock ownership plan in Putnam Investments.

11  Q.   So this would represent stock in this case that

12  Mrs. Svensson would have been awarded over the years?

13  A.   Yes.

14  Q.   Did that also have a vesting feature or not?

15  A.   Most of them did.

16  Q.   And it's hard to read, but do you see reference -- I

17  think it says "shares granted," 33,000.  Is that shares

18  and options?

19  A.   Yes.

20  Q.   And then it says "shares" -- am I reading

21  correctly -- "unvested"?

22  A.   Yes.

23  Q.   1,500?

24  A.   Correct.

25  Q.   And then do you know what the next column is?

Page 106

1   A.   I can't make it out.

2   Q.   Let me show you my copy, see if you can read it on

3   this.  Is it "options vested"?

4        (Pause.)

5   A.   Yes, number of options vested.

6   Q.   Okay.  And am I correct that with respect to at

7   least the vested amounts, over a period of time

8   Mrs. Svensson had cashed them out and gotten her money

9   for it?

10  A.   Yes, she had.

11  Q.   And can we just blow up the second part?

12       And do you see reference to historical disposal

13  activity?

14  A.   That fourth column?

15  Q.   The heading.

16  A.   Oh, yes.

17  Q.   What does that refer to?

18  A.   This is showing when they're disposed.  It means

19  ones that she had cashed in.

20  Q.   Okay.  And the disposal value is the fourth column?

21  A.   Yes.

22  Q.   And that's the value as of the date of disposal?

23  A.   Yes.

24  Q.   And does that represent cash that she got for these

25  shares that she had been awarded along the way?

1    A.    Yes.

2    Q.    And am I correct that what she cashed out was a

3    total of 1,519,492?

4    A.    Yes.

5    Q.    So that's cash on top of her cash salary and bonus

6    that she was awarded over the years?

7    A.    Yes.

8    Q.    Okay.  Now, do you recall -- let me take you, then,

9    to the September 15 --

10   A.    Okay.

11   Q.    Do you remember that day?

12   A.    Yes.

13   Q.    And do you recall going to any meeting with

14   Mrs. Svensson?

15   A.    Yes, I do.

16   Q.    Okay.  And was Mr. Brooks there?

17   A.    Yes, he was.

18   Q.    Okay.  Tell us what you remember happened at that

19   meeting.

20   A.    Well, we were waiting on Lisa to come back to give

21   her response on her choices of what she decided to elect

22   of the three choices, and she came in and she said that,

23   obviously, you know -- I think she had demanded just

24   prior to that about -- there was a million dollars a

25   year for two years guaranteed, plus a promotion to

Page 108

1    managing director.  And since we were at an impasse,

2    since that wasn't going to work for Putnam and she

3    elected not to choose any one of the three options that

4    we offered to her, she said, Well, I demand to hear you

5    say that I'm fired.

6    Q.   Now, before we get to the demand to I'm fired, for

7    the words I'm fired, at least as of this point,

8    September 15, was there some thought to engaging in this

9    corrective action procedure?

10   A.   No.

11   Q.   Why not, at least as far as you were concerned?

12   A.   We had already gone down the road.  I mean, she

13   had -- it's basically she was given -- it was talked

14   about, the inconsistencies in what we felt was a very

15   egregious action on her part to have made --

16           MR. MOLONEY:  Objection.

17           THE COURT:  Sustained.

18   BY MR. KOCIUBES:

19   Q.   So you decided not to do it --

20           MR. MOLONEY:  May the answer be stricken, your

21   Honor?

22           THE COURT:  Excuse me?

23           MR. MOLONEY:  May the answer be stricken?

24           THE COURT:  Yes.

25   BY MR. KOCIUBES:

1    Q.    So you decided not to go through that -- that

2    action?

3    A.    Correct.

4    Q.    From your HR procedure, was a corrective action

5    procedure warranted at that point?

6    A.    No, it was not.

7            MR. KOCIUBES:  If we pull up Defendants' 40.

8            THE COURT:  How you doing timewise?

9            MR. KOCIUBES:  We're about to finish the story

10   and get to the names, your Honor.

11           (Discussion off the record.)

12           MR. KOCIUBES:  This has previously been

13   admitted.

14   BY MR. KOCIUBES:

15   Q.    And do you recall that in that meeting on the 15th

16   that she was given -- Mrs. Svensson was given a document

17   by Mr. Brooks?

18   A.    Yes, I do.

19   Q.    And had she -- had you seen this document ahead of

20   time?

21   A.    Had I seen this document?

22   Q.    Yes.

23   A.    I don't recall whether I saw it at that moment or

24   before.

25   Q.    All right.  And you testified a little while ago

1    that Mrs. Svensson at some point said she needed to hear

2    the words, I'm fired?

3    A.    Yes.

4    Q.    And do you recall whether that happened before or

5    after she got this document?

6    A.    After this.

7    Q.    Okay.  And do you recall that ultimately she got to

8    hear the words, "You're fired"?

9    A.    Yes.

10    Q.    Let me just ask you about some names of some

11    individuals that may or may not come up.  And I focus

12    you on 2003.  Do you remember the name of Simon Davis?

13    A.    Yes.

14    Q.    Do you recall what his position was?

15    A.    Co-CIO of International Core.

16    Q.    Core.  Do you recall what Mr. Dexter's position in

17    2003 was?

18    A.    I believe he was CIO of International Growth.

19    International Growth.

20    Q.    So he was a CIO.

21          Do you remember a Mr. Byrne, Joshua Byrne, is

22    it?

23    A.    Yes.

24    Q.    And again, that same time period, what was his

25    position?

1    A.    Co-CIO, International Core.

2    Q.    In Core?  I'm sorry.

3    A.    Core, mm-hmm.

4    Q.    By the way, these people that you are mentioning

5    with Core, do you recall what Core's performance was in

6    the 2002-2003 period?

7    A.    It was doing very well.

8    Q.    Mr. Makino?

9    A.    Yes.

10   Q.    Do you recall what his position was?

11   A.    CIO, Global Core.

12   Q.    Was he CIO or a portfolio -- senior portfolio

13   manager?  Do you remember?

14   A.    He got promoted to CIO around that time, so it may

15   have been senior portfolio manager.

16   Q.    Do you recall which unit or group he was in?

17   A.    Global Core.

18   Q.    So he was part of the strong performing?

19   A.    Yes, he was.

20   Q.    Did Core have its own pool, by the way?

21   A.    All the bonuses were divided up according to the

22   teams, so they dispersed their bonus pool based upon

23   their performance.  They got a certain amount of pool,

24   and then they divvied it up amongst themselves.

25   Q.    And a team, for example, with strong performance --

1   A.   Got more bonus dollars.

2   Q.   They got more money, okay.

3        Richard England?

4   A.   He was portfolio manager.

5   Q.   In what unit or team?

6   A.   I think he was on Core.

7   Q.   He was also Core?

8   A.   Yes.

9   Q.   Mr. Nance?

10  A.   Core, senior portfolio manager.

11       THE COURT:  What was he?

12       THE WITNESS:  Senior portfolio manager in Core.

13  BY MR. KOCIUBES:

14  Q.   Mr. Oler?

15  A.   He was senior portfolio manager in Emerging Markets.

16  Q.   And as Emerging Markets, can you place them in

17  Growth, Value, Core?

18  A.   This was in Core.

19  Q.   Core again?

20  A.   Yes, International Core.

21  Q.   Walter -- Walton Pierson?

22  A.   Yes.

23  Q.   Do you recall when he came?

24  A.   Yes, I do.

25  Q.   When did he come?

1    A.    He joined, I believe, around 2002, and he joined the

2    Growth team as a senior portfolio manager.

3    Q.    And do you recall anything about his background?

4    A.    I remember he was an African American gentleman,

5    great record, performance record, and we gave him, I

6    believe, a two-year guarantee.

7    Q.    And do you remember a Mr. -- I think you mentioned,

8    Mr. Sellitto?

9    A.    Tony Sellitto, yes.

10   Q.    What did he do?

11   A.    He was on the Growth team.  I think he was a

12   portfolio -- senior portfolio manager.

13   Q.    Did he have some specialty?

14   A.    He was more quantitatively oriented.

15   Q.    How about a Mr. James Weiss?

16   A.    Mr. James Weiss was a quantitative senior portfolio

17   manager in Core.

18   Q.    In Core?

19   A.    Core.

20   Q.    By the way, where was -- in 2003, do you remember

21   where Sellitto was?  Perhaps you said it, I didn't hear

22   it.

23   A.    He was in Core -- no -- I believe it was Core.

24   Q.    You're not sure --

25   A.    I'm not sure.

Page 114

1  Q.   -- off the top of your head?

2  A.   I'm not sure.  He left around that time.

3  Q.   Now, a couple of last questions.

4       When somebody leaves before the end of the year

5  and does not sign a -- the severance package, do they

6  get bonus --

7  A.   No, they do not.

8  Q.   -- within that year?

9       Is that a -- was that a policy that, again, was

10  made up for Mrs. Svensson.

11  A.   No, it was not, not a special policy for her, no.

12  It was a consistent policy that was throughout the firm.

13  Q.   All right.  And lastly, do you remember the name

14  Maria Drew?

15  A.   Yes, I do.

16  Q.   And can you tell us who Maria Drew is and what she

17  did?

18  A.   Maria Drew replaced Lisa Svensson at the -- I

19  believe it was the end of September or beginning of

20  October of 2003.

21  Q.   And do you recall if she was given a time period to

22  sort of ramp up?

23  A.   Yes.  She was covering energy stocks and she was not

24  named to the Global Natural Resources Fund immediately,

25  but was named later, after she had had a chance to ramp

1  up on her stocks.

2  Q.   And do you recall whether she assumed management of

3  any of the young analysts?

4  A.   Yes, she did.  She assumed management of Chris

5  O'Malley and Ellis Eckland and others that were on that

6  team at the time.

7          MR. KOCIUBES:  I have no other questions, your

8  Honor.

9                    CROSS-EXAMINATION

10 BY MR. WEIR:

11 Q.   Good morning, or I guess it's good afternoon,

12 Ms. McNamee.

13         Just a few questions before I get to the

14 termination of Lisa Svensson.

15         You testified that if someone had gone back to

16 Global Equity Research and had been there for only a

17 short period of time, that it wouldn't be appropriate

18 to, in your judgment, to move that person back into a

19 portfolio management role.  Was that your testimony?

20 A.   Yes.

21 Q.   And that was because you felt it might be

22 disruptive?

23 A.   Yes.

24 Q.   Wouldn't it be even more disruptive to take an

25 analyst who had been in Global Equity Research for a

Page 116

1    substantial period of time and have known the companies

2    and known the stocks that they were covering, to take

3    that person out of Global Equity Research and move them

4    into portfolio management?

5    A.    It would depend on the situation and at what point

6    that analyst was in their career.

7    Q.    Okay.  And did that occur?  Did it occur that in the

8    2002-2003 time frame that analysts were removed from

9    their roles in Global Equity Research and put into

10   portfolio management positions?

11   A.    I believe there were a couple that that happened to.

12   Q.    That happened to Mark Bogar, didn't it?

13   A.    Yes, it did.

14   Q.    And that happened to Rich Cervone, didn't it?

15   A.    Yes, it did.

16   Q.    But you didn't consider it disruptive for those two

17   individuals to be moved into portfolio management

18   positions; is that your testimony?

19   A.    I would say I don't recall at the time, but I'm sure

20   they worked it out.

21   Q.    Who worked it out?

22   A.    Bill Landes, who was in charge of the Global Equity

23   Research, he had moved coverage around.

24   Q.    Now, regarding this Putnam handbook, I'm trying to

25   understand your testimony.  Did you consider yourself

1    free to violate the pretermination procedures --

2            MR. KOCIUBES:  Objection, your Honor.

3    Q.   -- that are specified in that handbook at will?

4            THE COURT:  Overruled.

5    A.   I don't view that as violating.  Those were

6    guidelines.  Those were not hard and fast rules in which

7    to follow.  It's always up to the manager and HR's

8    discretion to escalate any of those steps and move

9    forward.

10           If I were to look back on all the terminations

11   I've had in my career --

12           THE COURT:  No, no, we we're on a time limit.

13   Let's go.

14   BY MR. WEIR:

15   Q.   There were certain major offenses in the handbook?

16   A.   Yes, there were.

17   Q.   In those instances, it was specified in the handbook

18   that you could move forward from the pretermination

19   procedures as specified?

20   A.   Those were examples.

21   Q.   And did you consider that there were -- that it was

22   a situation that presented itself in regard to Lisa

23   Svensson that justified her conduct being considered a

24   major offense?

25   A.   Yes, I did.

1  Q.   Okay.  Did you also consider yourself free, and

2  given the context of a particular situation, to violate

3  the equal opportunity statement that's specified in the

4  Putnam handbook?

5           MR. KOCIUBES:  Objection, your Honor.

6           THE COURT:  Sustained.

7           You don't have that much time, so why don't you

8  just move right on.

9  BY MR. WEIR:

10  Q.   Your first involvement with regard to Lisa

11  Svensson's termination came with the -- with your

12  receiving the first draft of her mid-year evaluation of

13  Mr. O'Malley?

14  A.   Could you ask that question again?

15  Q.   Yes.  Did you receive on or about August 8th of 2003

16  the first draft, bullet points regarding her --

17  A.   I received the first draft of the bullet points

18  regarding Chris O'Malley and her concern about his

19  performance, yes.

20  Q.   Okay.  And you knew at that time that although

21  Mr. Haldeman and Mr. Brooks were trying to discourage

22  midyear evaluations, it was still the policy of the

23  company to do that?

24  A.   It was also a guideline, it wasn't an enforced

25  policy.

Page 119

1    Q.   You understood that that was what was customarily

2    done at Putnam?

3    A.   Well, customarily done historically, yes, but

4    Mr. Haldeman, who was head of the division, didn't want

5    to tie up the portfolio managers' and investment

6    managers' time by conducting midyear performance

7    reviews, thought they were not -- you could do them if

8    you wanted to.

9    Q.   And Lisa came to you and asked you if -- for your

10   assistance in helping her do one on Chris O'Malley?

11   A.   Well, she didn't put it in the context of a midyear

12   performance review.  She indicated to me she was having

13   issues with Chris O'Malley's performance and she would

14   like to document it.

15   Q.   And she asked for your assistance in doing that?

16   A.   Yes, she did.

17   Q.   And at any time prior to September 15th of 2003 did

18   you ever provide any assistance to her in doing that

19   document?

20   A.   No, I did not.

21   Q.   No.  And in that time frame you also became -- in

22   addition to the evaluation of Mr. O'Malley, you became

23   aware that a Leah Graham had made some complaints

24   concerning Chris O'Malley?

25   A.   I recall that in Lisa's notes that Leah had issues

8876984a-77fb-40a6-aa35-02ce08446ed4

Page 120

1    around Chris' management of her as an IA.

2    Q.    And that if given the choice, she would drop Chris

3    O'Malley as one of the analysts that she supported?

4    A.    I don't recall that.

5    Q.    And did you do anything with respect to hearing

6    about this issue between Leah Graham and Chris O'Malley?

7    A.    Leah Graham fell under Eric Hutcherson's purview.

8    She was a junior -- she was an investment associate, and

9    Eric Hutcherson was the HR manager over the early career

10   individuals.

11   Q.    Then you went, as you've testified, that you've

12   spent some time with certain members of portfolio

13   management teams to get their views on Chris O'Malley,

14   correct?

15   A.    Yes.

16   Q.    And did you -- you thereafter reported the results

17   of these interviews to Mr. Brooks?

18   A.    Yes, I did.

19   Q.    And did you also have discussions with counsel

20   regarding that?

21   A.    I don't believe right at that time, no, but

22   eventually I did.

23   Q.    And you did before August the 28th, did you not?

24   A.    I probably did.

25   Q.    And did you ever go to Lisa Svensson to get her

1    version of the issues respecting Chris O'Malley?

2    A.    Well, she had sent me her bullets and I considered

3    that was her version.

4    Q.    You got some rebuttal from Mr. O'Malley, did you

5    not?

6    A.    That was part of the investigation that Mr. Brooks

7    asked me to do.

8    Q.    And after you got the rebuttal and you had the

9    bullet points and the rebuttal, did you go to Lisa

10   Svensson and ask her about her version of the conflict

11   between the two of them?

12   A.    I did not because it was Mr. Brooks' goal to

13   coordinate all the activity regarding the investigation.

14   Q.    So you didn't consider that your role as the HR

15   representative handling this issue?

16   A.    No, I deferred to the manager at that point.

17   Q.    Okay.  And did you ever go to Lisa Svensson to get

18   her version of any event that's relating to Mr. Darren

19   Peers?

20   A.    No, I did not.

21   Q.    Okay.  Did you ever go to Lisa Svensson to get her

22   understanding of what was going on with Leah Graham?

23   A.    She had outlined that in the bullet point for Chris

24   O'Malley, so I had her perspective.

25   Q.    But you never went back to her and asked her about

1    it?

2    A.    No, because Leah Graham was part of Eric

3    Hutcherson's role, not mine.

4    Q.    Now, you testified on direct that you were involved

5    in developing some deferred compensation statement and a

6    termination agreement, correct?

7    A.    Separation agreement, yes.

8    Q.    Separation agreement.  And you did that before

9    August 28th, correct?

10    A.    I may have.  I don't recall the exact date that I

11    pulled it together.

12    Q.    Okay.  And do you recall when the draft termination

13    or separation agreement was prepared, did you put in a

14    date for that --

15    A.    I may have used the date of that day, because it was

16    the date -- it was the day that I was preparing the

17    draft.

18    Q.    Would it be fair to say that you and Mr. Brooks and

19    counsel, by August the 28th --

20         THE COURT:  So what was the date on the

21    separation agreement?

22         THE WITNESS:  The ultimate date on the

23    separation agreement --

24         THE COURT:  What date did you put in when you

25    drafted it?

1        THE WITNESS:  Whatever date I was drafting was

2    the date I put in.

3        THE COURT:  I missed the date.

4        MR. WEIR:  Well, let me --

5        THE COURT:  I'm confused.

6        MR. WEIR:  Let me represent that Ms. McNamee was

7    sent a draft of a separation agreement on --

8        THE COURT:  Ms. McNamee?

9        MR. WEIR:  -- August 27th of 2003.

10       THE COURT:  Who was sent a draft of the

11   separation agreement?

12       MR. WEIR:  Ms. McNamee was.

13       MR. KOCIUBES:  Do we have testimony about that?

14       MR. RODRIQUES:  Do we have testimony or

15   evidence?

16       THE COURT:  Ask.

17       MR. WEIR:  Can I present it to her?

18       THE COURT:  Ask.  Yes.

19       THE WITNESS:  Thank you.

20   BY MR. WEIR:

21   Q.   Ms. McNamee, let me show you this document and ask

22   you if it refreshes your recollection concerning the

23   date on which you received a separation agreement for

24   Lisa Svensson?

25   A.   It's August 27, 2003 from one of the -- it looks

1    like the in-house counsel's at the time.

2    Q.   And would it be fair to say that as of that date,

3    which is the day before the August 28th meeting, you and

4    Mr. Brooks and counsel had reached a consensus that that

5    was at least one of the options that was going to be

6    offered to Lisa Svensson?

7    A.   It was one of the options that was being offered,

8    and I prepared this so in case Ms. Svensson asked to see

9    a copy of the draft, that we would have it ready for

10   her.

11   Q.   Okay.  And during this period, were you actually

12   trying to avoid having a discussion with Ms. Svensson?

13   A.   Yes, I was.

14   Q.   And your reason for that was because you knew that

15   Mr. Brooks was going to have a different kind of

16   conversation with her, correct?

17   A.   Mr. Brooks asked me not to -- Mr. Brooks asked me to

18   avoid her, that he wanted to collect his thoughts and be

19   able to have a meaningful discussion with her and did

20   not want me to get involved at that point.

21   Q.   Okay.  And you knew that she hadn't been given a

22   verbal warning by Mr. Brooks?

23   A.   Well, there was -- the purpose of the meeting at the

24   end of August was him to review everything that he had

25   uncovered in the investigation and to talk about the

1    solutions that he had to the situation.

2    Q.    You knew that he hadn't given her, prior to that

3    August 28th meeting, a verbal warning?

4         THE COURT:  Yes or no.

5    A.    There was no formal verbal warning, no.

6    Q.    And she hadn't been given a written warning?

7    A.    No, there was no written warning.

8    Q.    And you knew that the second option also involved

9    her leaving Putnam, but two to four months down the

10    road, correct?

11    A.    Correct, that she could look at other options.

12    Q.    So two of the three options involved her departure?

13    A.    Yes, it did.

14    Q.    Now, you've indicated that there were circumstances

15    where you felt you could depart from the -- look in the

16    pretermination procedures in the handbook, and what

17    circumstances did you find as of August the 28th that

18    allowed you to move to the termination stage at such an

19    early -- at that juncture?

20    A.    Well, we didn't move to the termination stage at

21    that juncture, we were still discussing the three

22    options with her, and one of those was her remaining

23    employed at Putnam.  But for the corrective action that

24    he was recommending of the three options that he was

25    providing to her, that that was escalated due to the

Page 126

1    fact that he felt, and we all felt, that Lisa had

2    overexaggerated the situation with Chris O'Malley, was

3    not -- had not followed through with all of the

4    portfolio managers that she said, so she was basically

5    trumping up those charges.  We thought that as egregious

6    enough to not warrant following --

7    Q.   At that point did you go back to Chris O'Malley with

8    the results of your investigation?

9    A.   No, we did not.

10   Q.   And do you know whether Mr. Brooks at the end of

11   2003 prepared a performance evaluation for Mr. O'Malley?

12   A.   No, I do not.

13   Q.   So you don't know whether he identified any

14   communications issues or any other issues in that

15   evaluation?

16   A.   No, I do not.

17   Q.   Now, as of August the 28th, you had an awareness of

18   issues, certain issues regarding Mr. O'Malley's

19   performance, correct?

20   A.   I had -- I was aware of the issues that Lisa had

21   highlighted in her bullet points to me.

22   Q.   And you were aware of conflicting reports from the

23   portfolio managers concerning Mr. O'Malley, correct?

24   A.   Yes, that -- I did.

25   Q.   Okay.  And were you aware as well that Mr. Peers was

Page 127

1    intending to leave Putnam?

2    A.   He had talked about how he was -- couldn't work for

3    Lisa any longer and he wanted to leave.

4            THE COURT:  Wait.  Is this something he told

5    you?

6            THE WITNESS:  I eventually did have a

7    conversation with him, yes.

8    BY MR. WEIR:

9    Q.   That was after --

10           THE COURT:  What are you asking about?  The

11   time --

12           MR. WEIR:  One final question, your Honor.

13           THE COURT:  No, no, when did he have the

14   discussion with you?

15           THE WITNESS:  It was sometime during that late

16   summer or early fall.

17           THE COURT:  So it was after she left?

18           THE WITNESS:  I don't recall whether it was

19   after she left or not.

20   BY MR. WEIR:

21   Q.   So as of September 15th, and you became aware that

22   Lisa Svensson was not going to take the position that

23   was option number one, correct?

24   A.   That was around September 15th, right.

25   Q.   Okay.  You then decided to move to the resignation

Page 128

1    option?

2    A.    What I did is I drafted the separation agreement

3    dated September 15th.

4    Q.    Okay.  And you knew at that time, did you not, that

5    Mrs. Svensson was the top stock picker based on alpha

6    generation in the Research department?

7    A.    I never recall her having that top spot, no.

8    Q.    Okay.  Did you ever seek to determine where she

9    ranked as a stock picker?

10   A.    Not at that point.

11   Q.    And so you undertook the termination on September

12   15th basically to save the employment of one man, Mr.

13   Chris O'Malley; isn't that correct?

14   A.    No, that's not correct.

15   Q.    Okay.  And --

16        MR. WEIR:  I don't think I have any further

17   questions.

18        THE COURT:  Anything?

19        MR. KOCIUBES:  Two or three minutes.

20                  REDIRECT EXAMINATION

21   BY MR. KOCIUBES:

22   Q.    A name came up earlier in the cross-examination; two

23   actually, I guess.  Mark Bogar?

24   A.    Yes.

25   Q.    I think you were asked the question about whether he

1    moved -- at some point after Mrs Svensson got to

2    Research, whether he moved to a portfolio team?

3    A.    Yes, he did.

4    Q.    Describe how junior or senior that individual was.

5    A.    He was quite junior.

6    Q.    Where, for example, compared to Ms. Svensson's

7    compensation was his?

8    A.    I believe his total compensation was probably in the

9    low 200s at that time; she was in the mid sixes.

10   Q.    And when he moved to a portfolio team, so what kind

11   of position did he move to?

12   A.    Just a portfolio manager role.

13   Q.    And was it a senior position on that team?

14   A.    No, it was not.

15   Q.    And did his compensation as a result of the move

16   bump up?

17   A.    It may have, I don't recall.

18   Q.    Eventually?

19   A.    Eventually, it did.

20   Q.    Now, do you recall whether they were looking for a

21   junior or more senior person for that team?

22   A.    I think they were looking for a junior portfolio

23   manager to complement the other portfolio managers who

24   were on the team.

25   Q.    You were asked a series of questions about the

Page 130

1   warning and/or the absence of a warning.  At any point

2   from, say, August 8 on did you tell or advise Mr.

3   Brooks -- that was your function, I take it, was

4   helping, advising Mr. Brooks?

5   A.   Yes, it was.

6   Q.   Did you advise Mr. Brooks that a written warning

7   would be appropriate?

8   A.   No, I did not.

9   Q.   Why not?

10  A.   I had suggested that he have a discussion with Lisa

11  Svensson about the situation.

12  Q.   And by the way, you were just asked some questions

13  about two of the three options given had to do with

14  termination?

15  A.   Yes.

16  Q.   And that mathematically is correct.  Were you

17  encouraging Ms. Svensson to leave?

18  A.   No, I was not.

19  Q.   Did you hear Mr. Brooks encourage her to leave?

20  A.   No.

21  Q.   And had Ms. Svensson chosen option one, would she

22  have been terminated?

23  A.   No, she wouldn't.

24  Q.   With respect to Mr. Peers, he was still in the early

25  career stage?

1    A.    He was considered an early career analyst, yes.

2    Q.    And by the way, who -- which of the HR people would

3    be interfacing with him most heavily?

4    A.    It would have been Eric Hutcherson.

5    Q.    All right.

6          MR. KOCIUBES:  No further questions.

7          THE COURT:  Okay.  Thank you.

8          THE COURT:  Any other live witnesses?

9          MR. KOCIUBES:  No, your Honor.

10         THE COURT:  So what are you doing next?

11         MR. KOCIUBES:  Peers.

12         THE COURT:  Who's going to read it?

13         MS. HOLDEN:  I am.

14         THE COURT:  So once again, Mr. Peers, I forget

15   where he is --

16         MR. KOCIUBES:  California.

17         THE COURT:  California.  So he's beyond subpoena

18   power of the court.  We're going to have certain

19   portions of his deposition read into evidence, and then

20   the evidence will close, other than some documents I'll

21   work on later.

22         Actually, there's going to be --

23         MR. MOLONEY:  There's rebuttal.

24         THE COURT:  There's a brief rebuttal.

25         How long will this take?

1        MS. HOLDEN:  Twenty to 30 minutes.

2        MS. KURKER:  Page 5, line 13.

3        (Reading deposition of Darren Peers.)

4   Q.   Would you please state your full name for the

5   record?

6   A.   It's Darren Thomas Peers.

7   Q.   And your present residence address?

8   A.   575 11th Street, Hermosa Beach, California.

9   Q.   And are you presently married?

10  A.   Yes.

11  Q.   And for how long have you been married?

12  A.   Since July 2001.

13  Q.   Do you have any children?

14  A.   Yes, ten-and-a-half months, one.

15  Q.   One child.  Okay.

16       And how old are you, sir.

17  A.   Thirty-three.

18       MS. KURKER:  Page 6.

19  Q.   Could you please give us a summary of your

20  educational background?

21  A.   Sure.  My undergraduate college was Dartmouth

22  College, graduated in 1996.  I have an MBA from the

23  Tufts School of Business at Dartmouth, graduated in

24  2001.

25  Q.   Okay.  And are you currently employed?

1  A.   Yes.

2  Q.   By whom?

3  A.   NWQ Investments.

4  Q.   And in what capacity are you employed by NWQ?

5  A.   I'm an equity analyst.

6  Q.   Do you have any title?

7  A.   Senior vice president.

8  Q.   And when did you come to NWQ Investments?

9  A.   It was September of 2003, September -- I apologize.

10  It may have been October, my start date.

11  Q.   It was either September or October?

12  A.   Yes.

13       MS. KURKER:  Page 46, line 3.

14  Q.   And then in January 2003, did you commence to report

15  to Lisa Svensson?

16  A.   Yes.

17  Q.   Had you prior to that time had any direct

18  interaction with Lisa Svensson?

19  A.   Yes.

20  Q.   What was the nature of that interaction?

21  A.   I was a member of the Natural Resources team, as was

22  she, so we attended Natural Resources team meetings

23  together.  We -- there were -- there were presentations

24  that the team had to make to the entire investment

25  division, so there was a collaborative effort, if you

8876984a-77fb-40a6-aa35-02ce08446ed4

Page 134

1    can call it that, on those -- I believe -- so those

2    types of interactions.

3    Q.   What were your duties on the Natural Resources team?

4    What were you supposed to do on a day-to-day basis?

5    A.   My coverage was -- this is prior it Jim departing --

6    was oil field service stock exchange and Canadian

7    exploration and production stocks.  Those were my direct

8    and most important responsibilities.

9         MS. KURKER:  Page 52, line 10.

10   Q.   Now, in January of 2003, you commenced a direct

11   report to Lisa Svensson?

12   A.   Yes.

13   Q.   And how long thereafter did these issues arise?

14   The issues that he testified about earlier concerning

15   Lisa Svensson and your impression of her

16   interpersonal -- her interrelationship with you?

17   A.   Yes, well, I know that I was sufficiently

18   uncomfortable with Lisa's managerial style with the

19   working relationship that I began taking some notes in,

20   I believe it was, late February.

21   Q.   Can you describe what you mean by managerial style?

22   What was, in your view, Lisa Svensson's managerial

23   style?

24   A.   Well, some specific examples are -- first of all,

25   this was coming from a backdrop where her and Jim Falvey

Page 135

1    were not talking at all or were speaking very

2    infrequently and were very -- and were combative.  And I

3    tried to maintain a fairly neutral position on that, but

4    that was an uncomfortable situation.

5    Q.    I understood that, but I understood that at that

6    point in time it was Jim Falvey and not Lisa Svensson

7    who was your direct report.  So my question is addressed

8    to the time frame after you commenced to report to Lisa

9    Svensson.

10   A.    So there were instances where meetings with the

11   Natural Resources team were held where I felt I wasn't

12   made aware of them, which concerned me that it would

13   reflect poorly on the quality of my work; there were

14   instances where comments were made in the context of

15   larger groups that made me feel uncomfortable or made me

16   feel demeaned; and I guess overall I just felt that we

17   weren't communicating very well or that perhaps I wasn't

18   a valuable part of the Natural Resources team, part of

19   the team.

20            MS. KURKER:  Page 15, line 4.

21            THE COURT:  Page what?

22            MS. KURKER:  Page 15, line 4.

23            THE COURT:  We went backwards?

24            MS. KURKER:  Yeah, we're trying to tell the

25   story chronologically.

Page 136

1    Q.    Okay.  Is it fair to say that as of September 15,

2    2003 you hadn't made a final decision to go anywhere?

3    A.    That's true.

4    Q.    So if someone had said that weeks or months earlier

5    than September 15, 2003 you were irretrievably lost to

6    Putnam, that would have been an inaccurate statement,

7    correct?

8    A.    To say "irretrievably," that might be too strong a

9    statement, but, like I said to Josh when I went to him

10   to discuss that I was looking, that once you start

11   looking, it's oftentimes very difficult to go back.

12   Q.    Josh, I assume you mean Josh Brooks?

13   A.    Correct.

14   Q.    When did you go to Josh Brooks and tell him you were

15   looking?

16   A.    I don't recall the exact date, but I certainly had

17   interviewed at Wellington, Citadel and NWQ, felt

18   comfortable, I suppose, I could get employment

19   elsewhere, and I felt that -- so it was sometime after I

20   had interviewed at those places.

21   Q.    Did we establish --

22   A.    I'd assume it was probably early July, late June,

23   early July.

24   Q.    That you interviewed at --

25   A.    So --

8876984a-77fb-40a6-aa35-02ce08446ed4

1    Q.    -- at Wellington or Citadel?

2    A.    Yes.  What the date was?

3    Q.    Yes.

4    A.    Yes, I think it was sometime in late June, early

5    July when my first interview with Wellington and my

6    interview with Citadel, but I can't be totally certain,

7    it would have been a little bit later than that.

8    Q.    Okay.  You say you went to Josh Brooks in that time

9    frame to have a conversation with him?

10   A.    Um-hmm.

11   Q.    Was anyone else present?

12   A.    No.  I actually went to Ed Haldeman first and then

13   to Josh.

14   Q.    Why don't you tell me what you recollect about your

15   meeting with Ed Haldeman.

16   A.    Sure.  Ed was still getting to meet a lot of people

17   within the investment division.  I had a meeting, kind

18   of meet-and-greet set up with him.  So at that time we

19   talked about Putnam, talked a little bit.  We both went

20   to Dartmouth College.  We talked a little bit about

21   that.

22        I guess I had come to the conclusion that I was

23   likely going to leave Putnam, and I felt that because

24   Putnam had treated me well over the years, that I owed

25   it to him, and ultimately to Putnam, to at least not

Page 138

1    completely shock them and just resign, give two weeks'

2    notice, but to give them a bit of a heads up and at

3    least express some of my concerns and reasons.  And so

4    that is what -- that did come up with -- in the meeting

5    with him, that I was unhappy and likely going to leave.

6            MS. KURKER:  Page 22, line 19.

7    Q.   Okay.  Let's get back to the meeting with Ed

8    Haldeman.  When you spoke to Mr. Haldeman, did he have

9    any reaction, either visible or did he say something, in

10   response to your telling him that you were thinking of

11   leaving?

12   A.   He said I should talk to Josh, Josh Brooks.

13   Q.   Okay.

14   A.   I was left with the impression that he -- he took an

15   appropriate serious -- seriousness tone.  He didn't

16   disregard what I had to say, and I was left with the

17   impression that ultimately it wouldn't be his

18   responsibility to follow up on my concerns or address

19   them, but it would be Josh's.  That's why I should speak

20   to Josh, which --

21   Q.   Are you finished with your answer?

22   A.   Yes.

23   Q.   Did he encourage you to stay at Putnam?

24   A.   I don't recall.

25   Q.   Did he offer you any inducements to stay at Putnam?

Page 139

1    A.    No.

2    Q.    Had you had prior contact before this meeting with

3    Mr. Haldeman?

4    A.    Not really.  I had heard him speak.  I don't believe

5    I had.  I'm almost sure that I hadn't sat down and spoke

6    with him before.  This was our first face-to-face

7    meeting, one-on-one meeting.

8    Q.    So this was kind of a meet-and-greet meeting in

9    addition to --

10   A.    Yes.

11   Q.    And so at the meet-and-greet meeting, you're telling

12   him you're thinking of leaving?

13   A.    Yes.

14   Q.    Anything else that you recall that was said at the

15   Ed Haldeman meeting, either by you or by him?

16   A.    No.

17   Q.    Did you have any discussion with Mr. Haldeman

18   concerning the reasons why you were thinking of leaving?

19   A.    Oh, well, yes.  I told him that I was somewhat

20   uncomfortable in my situation with how I was being

21   managed, and ultimately, I wasn't sure how that would be

22   resolved, and I thought maybe it would be best that I

23   look for work elsewhere.  I shared with him that

24   basically I was uncomfortable with being managed by

25   Lisa.

1    Q.    Is that the word you used, "uncomfortable"?

2    A.    I can't remember.

3    Q.    And did Mr. Haldeman say anything in response?

4    A.    Well, I didn't -- I mean, what I remember is he was

5    concerned with what I had to say, felt that it needed to

6    be looked at, and that the appropriate person to look at

7    that was Josh Brooks, and subsequent to that, I believe

8    that same day, I sat down with Josh.

9    Q.    How did he express the concern that you just

10   testified about?

11   A.    Well, my memory is a little vague.  I was left with

12   the impression that he took my concerns seriously and

13   that they would be followed up on.

14   Q.    Well, did he say anything with respect to, you know,

15   we'll try to rectify the situation?

16   A.    I don't recall exactly what he said.  What I know is

17   that Josh called me within an hour or two of me meeting

18   with him.  So certainly I had a positive feedback -- I

19   had positive feedback that he was concerned with what I

20   had to say.

21   Q.    So Josh called you to set up the meeting; is that

22   what you're saying?

23   A.    Well, I actually went down to Josh's office and

24   talked to his secretary and I told his secretary that I

25   was going to need to meet with Josh and at the same time

1    Ed had called down.  So I was standing there when a call

2    came down from Ed to speak with Josh.

3    Q.    Okay.  Did you hear Haldeman's portion of the call?

4    A.    No.

5    Q.    Did you schedule a meeting with Josh Brooks?

6    A.    Josh called me back to schedule a meeting.

7    Q.    And that meeting was held later that same day?

8    A.    Yes.

9          MS. KURKER:  Page 84, line 6.

10         MS. HOLDEN:  I think this still goes to 26.

11         MS. KURKER:  Sorry about that.

12   Q.    Tell me about your meeting with Josh Brooks.

13   A.    So I sat down with Josh and expressed I was having

14   two issues with Lisa, one was on her managerial style,

15   and one was on the quality of her work.  I told him that

16   I was unhappy enough that I had started to looking for

17   work and that I was likely going to leave and that I

18   was -- again, because I was very adamant to tell him

19   this, because Putnam had treated me well, I felt that

20   rather than just up and quit that I would at least tell

21   them in advance, and if they couldn't rectify it or we

22   could find some solution, great, maybe there's a chance

23   I could stay; and if not, then, fine, we can just part

24   ways and that would be that.

25   Q.    And how did Mr. Brooks respond to that suggestion?

Page 142

1    A.   Well, my impression was that he would take some

2    time, do his own analysis, fact-finding.  I think he

3    told me that he would get back to me in pretty short

4    order, and I believe I took that to be within a week or

5    so, and he asked me to think about what a range of

6    acceptable solutions would be.

7              MS. HOLDEN:  Top of page 27.

8              MS. KURKER:  Yes.

9    Q.   And did you consider a range of acceptable

10   solutions?

11   A.   Yes.

12   Q.   And did you communicate your acceptable solutions to

13   Josh Brooks?

14   A.   Yes.

15   Q.   What did you communicate to Mr. Brooks concerning

16   the acceptable solutions as far as you were concerned?

17   A.   Well, I think I outlined that the range would be

18   everything from me leaving, Lisa leaving, some sort of

19   different managerial -- perhaps me having a different

20   boss, me being moved to a different part of Putnam, and

21   I did tell him that I was a little uncomfortable

22   suggesting that.  I was a little uncomfortable

23   suggesting that Lisa be fired simply because, one, it

24   wasn't my place to make that decision, and I guess my

25   conscience, I call it a conflict of conscience.  I

Page 143

1    didn't feel that I wanted to be responsible for saying

2    the only way I'm going to stay is if Lisa is fired.

3    Q.    Did you say that --

4    A.    So that's what I was trying --

5    Q.    -- whether you were uncomfortable about it or not?

6    A.    So that's what I was trying to make sure, that --

7    that I was not saying that.  I didn't -- I wanted to be

8    very clear to Josh that this isn't going to be either

9    Lisa goes or I go, but --

10   Q.    But the question was only what you said as to the

11   range of acceptable solutions.

12   A.    Sorry.  So that was the range.

13   Q.    So I understood from your testimony that one of

14   those solutions was that Lisa go?

15   A.    Yes.

16   Q.    And you said that?

17   A.    Yes.

18   Q.    And you understood that Lisa, if that were the

19   decision, would not be going voluntarily?

20   A.    Yes.

21   Q.    So at least as far as you were concerned, one of the

22   acceptable solutions for your situation was that Lisa

23   Svensson be terminated, correct?

24   A.    Yes.

25   Q.    And you further indicated that another one was that

Page 144

1    if she weren't going to be terminated, you were going to

2    leave?

3    A.    Yes.

4    Q.    Now, just so I'm clear, you made those suggestions

5    to Josh Brooks but not to Ed Haldeman?

6    A.    That's right.

7    Q.    Do you know whether Mr. Brooks communicated the

8    range of acceptable alternatives that you proposed to

9    Mr. Haldeman --

10   A.    I don't know.

11   Q.    -- at some subsequent point?

12   A.    I don't know.

13   Q.    Anything else that you recall about your discussion

14   with Josh Brooks in terms of what you stated to him?

15   A.    I think I've covered the meat of it.

16   Q.    Did you suggest to Mr. Brooks any particular

17   alternative posts that you would be comfortable with?

18   A.    No, I don't believe I did.

19   Q.    Did you communicate to Mr. Brooks any other part of

20   Putnam that you would feel particularly comfortable

21   with?

22   A.    I don't recall.

23   Q.    How did Mr. Brooks respond to your suggestions?

24   A.    I'm not sure that he made up his mind that there

25   was -- that my concerns were valid yet.

Page 145

1  Q.   Did he say anything else in response to your

2  suggesting a range of acceptable solutions?

3  A.   I'm sure he said something, but I'm not sure he gave

4  me an indication of what he felt was acceptable.

5  Q.   How did you leave it with Mr. Brooks?

6  A.   We left it that he needed to think about my

7  concerns, do his own due diligence analysis, and he'd

8  have to get back to me.

9  Q.   Is it fair to say that as of the conclusion of your

10  meeting with Mr. Brooks, if Putnam were able to

11  implement one of the so-called acceptable solutions from

12  your standpoint, that you were prepared to consider

13  remaining at Putnam?

14  A.   Yes.

15  Q.   Do you recall whether these meetings with Haldeman

16  and Brooks preceded the interviews that you had with the

17  alternative employers that you testified about earlier?

18  A.   They were after.

19       MS. KURKER:  Are we going on to the top of 31?

20  Q.   Did there come a time when Mr. Brooks got back to

21  you concerning his review of the situation?

22  A.   We had a -- we had follow-up meetings.

23  Q.   How many?

24  A.   I don't recall.

25  Q.   More than two?

Page 146

1    A.    Perhaps.  Well, I think more than two, less than

2    ten.

3    Q.    Okay.  Were they always one-on-one with Mr. Brooks?

4    A.    No, I don't believe so.  I can't recall exactly, but

5    I believe there may have been a meeting with Josh Brooks

6    and Kelly Morgan, but my memory is a little vague.

7    Q.    Okay.  At these follow-up meetings -- let's take

8    them sequentially.  Do you recall what transpired at the

9    second meeting with Mr. Brooks?

10    A.    Well, I really -- I can't -- I really don't remember

11    meetings as clearly after the first.  I remember being

12    left with the impression that Josh was somewhat

13    concerned about -- about my criticisms and was trying to

14    work to something that would be an acceptable solution.

15    Q.    Well, did he indicate whether he had -- whether --

16    whether he had -- he proposed to accept any of your

17    acceptable solutions?

18    A.    No, and I wasn't -- I wasn't clear what would be

19    acceptable to me either, so --

20    Q.    Well, you communicated --

21    A.    I had a proposed range of solutions.  I don't know,

22    a range of solutions, but I was still pretty vague on

23    what would be acceptable to me.  I was actually still

24    working under the impression that the most acceptable

25    solution for me was to leave.

Page 147

1    Q.   In the time frame of these two to ten meetings with

2    Mr. Brooks, perhaps also with Kelly Morgan, I take it

3    those meetings all preceded the actual extension of the

4    job offer from NWQ; is that correct?

5    A.   Yes, I suppose.  I mean, when I returned from

6    California on September 15 or whatever the day I

7    returned after the September 15th interview that I had,

8    I had to meet with Josh, and there was a meeting where I

9    told him that I was resigning.

10   Q.   Okay.

11   A.   I don't know if you can consider that as part of the

12   meetings.

13   Q.   Do you recall whether you had -- had had all of your

14   meetings with Josh Brooks before September 15, 2003?

15   A.   I'm sorry, can you say that again?

16   Q.   Do you recall whether you had all of these series of

17   meetings with Josh Brooks before September 15, 2003?

18   A.   Yes.

19   Q.   And do you recall by the time these meetings had

20   been concluded whether you had had -- whether Mr. Brooks

21   or Ms. Morgan or anyone else at Putnam had communicated

22   to you whether they were prepared to go along with any

23   alternative solutions to your leaving?

24   A.   Nothing had been communicated to me.  I guess I was

25   unsure what the resolution -- I was unsure that -- if

Page 148

1    they were to propose a solution, I certainly wasn't

2    aware of what the -- what it might be.

3         MS. KURKER:  Page 84, line 6.

4    Q.   Are any of the matters referenced in these notes the

5    subject of any of your specific discussions with Josh

6    Brooks?

7    A.   When I sat down with Josh on our initial meeting

8    where I told him I was having some issues, I told him I

9    had two broad issues with Lisa, one was on -- one was on

10   the quality of her work, and one was on her managerial

11   style, the way we were interacting.  I believe I gave

12   him a couple of concrete examples in each case, and I

13   would have referenced my recollection from some of these

14   notes.

15        MS. HOLDEN:  Page 85, line 25.

16   Q.   And so you --

17        MS. HOLDEN:  I think you want to keep reading on

18   page 84.

19        MR. MOLONEY:  Line 17.

20        MS. KURKER:  Okay.

21   Q.   Did you have the notes with you in the meeting?

22   A.   No, he was unaware that I had notes.

23   Q.   Do you recall what the specific examples that you

24   gave were?

25   A.   No.

1  Q.   Did you identify to Mr. Brooks that you had these

2  notes?

3  A.   No.

4  Q.   And this may have been implicit in your earlier

5  testimony, but prior to your actually leaving Putnam,

6  did you identify to anyone that you had these notes?

7  A.   To anyone?  Well, I identified it to my wife.

8  Q.   I mean to others at Putnam, anybody else at Putnam?

9  A.   I don't recall.  If I did, it would have been to a

10 close confidant.

11 Q.   One of the individuals you talked about before?

12 A.   Maybe, but I'm not sure I discussed it.  I kind of

13 think I didn't discuss that with anyone.

14 Q.   Is there some reason that you didn't present the

15 notes to Mr. Brooks?

16 A.   Well, the reason that I was keeping them initially

17 was that -- this is going back to -- Lisa and Jim had

18 quite a power struggle.  There was a number of

19 behavioral patterns that made me concerned.  I was

20 concerned enough that I was afraid that at some point my

21 career -- I may be subject to a power struggle, you

22 know, Lisa may want to have me fired, and you know, now

23 that I was --

24 Q.   So you were --

25 A.   Now that I was looking for work, you know, if I

8876984a-77fb-40a6-aa35-02ce08446ed4

1    actually took work elsewhere, notes were irrelevant, I

2    didn't need them to hold onto my job.

3    Q.   And so you viewed your meeting with Mr. Brooks as

4    kind of a preemptive strike?

5    A.   Preemptive strike?  I went to Josh to make him aware

6    that I was looking for work because I felt I owed it to

7    him and to Putnam not to just up and leave, give them

8    two weeks' notice.  I figured it was an honorable thing

9    to do, to tell him that I do, in fact, have issues here,

10   here's what I'm doing, I'm looking for work, you can try

11   and solve them if you think that's appropriate or not.

12   And I just felt that that was an honorable way to handle

13   it.  I actually -- I honestly was not sure if after I

14   told him this if he'd tell me you have your two weeks,

15   and it was very plausible to me that he would have fired

16   me right there because I disclosed to him that I'm

17   looking for work.  If you don't want to work here, maybe

18   I'll fire you.

19           MS. HOLDEN:  Page --

20           MR. RODRIQUES:  Keep going.

21           MS. KURKER:  Keep going ?

22   Q.   He didn't say that, though?

23   A.   No, that crossed my mind, so --

24   Q.   My question is:  He did not say that to you?

25   A.   Oh, no.

1      MR. WEIR:  Your Honor.  This portion wasn't

2  designated.

3      MS. HOLDEN:  You counterdesignated that.  Right?

4      MR. WEIR:  Only lines 19 to 22.

5      Okay.

6  Q.   He didn't say that, though?

7  A.   Oh, no.

8      MS. KURKER:  Page 156, line 3.

9  Q.   Mr. Peers, you spoke with Mr. Brooks for the first

10 time to tell him that you were in the process of looking

11 for another job, I believe you said, in the late June

12 early July time frame?

13 A.   Yes.

14 Q.   And at that time, did you tell him it was likely you

15 were leaving?

16 A.   I said that was -- yes.  I said there's a strong --

17 I don't know how I phrased it, but there was a strong

18 possibility that I would likely leave.

19 Q.   Did you tell him that you would not have been

20 looking for a job but for the difficulties you were

21 having with Lisa?

22 A.   Yes.

23 Q.   And I believe you testified that the two issues that

24 you had were issues with her managerial style and issues

25 with her job performance, correct?  And I believe you

8876984a-77fb-40a6-aa35-02ce08446ed4

1   also testified that you gave him some examples of each?

2   A.   Yes, that's correct.

3   Q.   Were the examples that you gave him either a subset

4   of or similar to the examples that were listed in your

5   notes that you went over with Mr. Weir earlier today?

6   A.   Yes.

7   Q.   Did you tell Mr. Brooks that if Putnam terminated

8   Lisa, you would stay?

9   A.   No.

10  Q.   Did you tell Mr. Brooks that if Putnam did not

11  terminate Lisa, you would leave?

12  A.   No.

13  Q.   At any time prior to September 15, did you tell

14  Mr. Brooks that if Putnam terminated Lisa, you would

15  stay?

16  A.   No, I never said that if you terminate Lisa, I will

17  stay.

18  Q.   And in fact, on September 15th, you learned that

19  Putnam terminated Lisa, and you left anyway, correct?

20  A.   Yes.

21  Q.   At any time did you tell Mr. Brooks that if Putnam

22  did not terminate Lisa, you would leave?

23  A.   No.

24  Q.   Was compensation a factor in your decision to start

25  looking for work?

1   A.    No.

2   Q.    At the time when you told Mr. Brooks that you were

3   looking and that it was likely you would leave, had you

4   received any financial offers from anyone?

5   A.    No.

6   Q.    At the time when you accepted NWQ's offer, was it

7   your assumption that you would earn more money over the

8   long term at NWQ than you would earn at Putnam?

9   A.    No, it was very unclear.

10  Q.    Why?

11  A.    NWQ was a -- I suppose a higher risk proposition.

12  If we had stayed at 10 million in assets, it was likely

13  that my compensation could actually go down from what I

14  was brought in at.  At Putnam I had a fairly clear idea

15  of what an average and good analyst could make over

16  their career, so there was some risk I was willing to

17  assume when I moved to NWQ.

18        MS. KURKER:  Next page, 159 line 16.

19  Q.    At the time when you spoke to Mr. Brooks in the

20  June-July time frame and indicated that it was likely

21  that you would be leaving, you had -- had you made a

22  decision that you were moving back to the west coast?

23  A.    No.

24  Q.    In fact, after that conversation with Mr. Brooks,

25  you interviewed at firms in both Boston and Chicago,

Page 154

1  correct?

2  A.   Yes.

3  Q.   At any time prior to accepting NWQ's offer, did you

4  tell anyone at Putnam, not just Mr. Brooks, that you

5  would stay if Lisa was terminated?

6  A.   No.

7  Q.   And a similar question:  At any time prior to

8  accepting NWQ's offer, did you tell anyone at Putnam

9  that you would certainly leave unless Lisa were

10  terminated?

11  A.   No.

12       MS. KURKER:  Page 10, line 20.

13  Q.   Okay.  By the way, what is your wife's name?

14  A.   Kelly Peers, K-e-l-l-y.

15  Q.   And is she from the Los Angeles area?

16  A.   She is.

17  Q.   And she has relatives living there?

18  A.   Yes.

19  Q.   Did that in any way affect your decision to take the

20  NWQ position?

21  A.   It affected the decision -- it affected the ultimate

22  decision.  It didn't affect -- it wasn't the reason why

23  I was looking.

24       MS. KURKER:  Page 31.  Line 2.

25  Q.   Did there come a time when Mr. Brooks got back to

Page 155

1    you concerning his review of the situation?

2         MS. HOLDEN:  I think we might have already done

3    this.

4         MS. KURKER:  Sorry.  So we're just about at the

5    end.

6         Page 61, line 15.

7    Q.  So you took this decision in roughly a week after

8    December 15 and then communicated your decision to go to

9    NWQ in Los Angeles to Mr. Brooks?

10   A.  Yes.

11   Q.  And you walked into his office?

12   A.  I don't recall the exact conversation that I had

13   with him, where it took place, or the time.  I actually

14   recall very little about it, but I know -- I know that I

15   told him somehow.

16   Q.  Do you recall anything that he said at that time?

17   A.  No, very little.

18   Q.  Do you recall whether he had any visible reaction?

19   A.  No.

20   Q.  Do you recall whether Lisa Svensson's name was

21   mentioned?

22   A.  No.

23   Q.  I take it that any issue that you had with Lisa

24   Svensson was at this point -- had been removed from

25   consideration?

1   A.   Yes, and -- but like I had told Josh previously, I

2   had started looking for work because I was unhappy, and

3   once you start down that path, I had tried to prepare

4   him for the fact that regardless of what decisions he

5   made, I may leave, I may leave regardless, regardless of

6   anything he could possibly do.

7   Q.   Well, had you made a decision to leave, regardless,

8   prior to September 15th?

9   A.   No, but I wanted to prepare him.  I wanted to

10  prepare him that I may -- I may, in fact -- now that I'm

11  looking, I may, in fact, find something that I see as a

12  more attractive opportunity.

13        MS. KURKER:  Page 148, line 19.

14  Q.   Did you ever advise Lisa Svensson that you had

15  communicated the substance of your criticisms to

16  Mr. Brooks?

17  A.   No.

18        MS. KURKER:  Page 150, line 11.

19  Q.   Do you think that your difficulties with Lisa

20  Svensson, your lack of interaction, had anything to do

21  with the fact that she is of a different gender than

22  you?

23  A.   No, I don't think it had anything to do with it.

24  Q.   So you believe that you would have reacted in the

25  same way to a male boss?

1    A.    Yes.

2          MS. KURKER:  Next page, 151, line 2.

3    Q.    To a male boss with whom you had the same issues?

4    A.    Yes.

5    Q.    You cut off the last, it was just a funny -- sorry.

6          And do you know who replaced you?

7    A.    Yes.

8    Q.    Who?

9    A.    Maria Drew.

10         MS. KURKER:  Thank you.

11         THE COURT:  Who am I looking at?

12         MR. KOCIUBES:  We rest and renew the motion,

13   your Honor.

14         THE COURT:  All right.

15         MR. MOLONEY:  We have some rebuttal.

16         THE COURT:  All right.

17         Come on up, Mrs. Svensson.

18         Brief rebuttal, and then I'm hoping to finish

19   the testimony today and have this case go to you

20   tomorrow.

21         MR. MOLONEY:  These are just copies of the

22   charts.

23         THE COURT:  I have these.

24         THE WITNESS:  Am I still under oath from the

25   first time?

8876984a-77fb-40a6-aa35-02ce08446ed4

1          THE COURT:  Yes, yes.

2          LISA SVENSSON, having been previously duly sworn

3    by the Clerk, was further examined and testified as

4    follows:

5                      DIRECT EXAMINATION

6    BY MR. MOLONEY:

7    Q.   Now, Mrs. Svensson, do you have in front of you in

8    that folder a copy of your notes?

9    A.   Yes, I do.

10   Q.   And can you identify the document?

11   A.   Sure.  These are my notes that I took when I -- in

12   the summer of 2003, my notes and my calendar entries

13   that I took as I was trying to put together feedback for

14   Mr. Chris O'Malley to put into his midyear review, as

15   well as the rest of the members of my team:  Mr. Ellis

16   Eckland, Mr. Konstantin Stoev, and Mr. Darren Peers.

17          MR. MOLONEY:  Your Honor, I'm asking her to

18   identify the document because in looking at the exhibits

19   on the desk in front of the clerk, I did not see that

20   document.  I believe it was admitted during her direct

21   examination, but in case it wasn't, I want to move it at

22   this time.

23          THE COURT:  Was it her notes?

24          MR. MOLONEY:  Yes, your Honor.

25          MR. KOCIUBES:  It's hearsay.

1      THE COURT:  The objection is overruled.

2  BY MR. MOLONEY:

3  Q.  And there's another document in front of you and

4  that's --

5      THE COURT:  There may be portions -- I don't

6  know what's in all of those notes, but to the extent

7  it's the notes that went back and forth with respect to

8  O'Malley --

9      MR. MOLONEY:  It's her notes of her talking

10  to --

11      THE COURT:  Not the whole extensive array she's

12  taken over the years?

13      MR. MOLONEY:  No, no, this is just in June and

14  July of '03, your Honor.  There was testimony about this

15  during the direct examination.

16  BY MR. MOLONEY:

17  Q.  And the other document, Mrs. Svensson?

18  A.  The other document is my performance page that

19  indicates my performance as of -- for year-to-date as of

20  August 29th of 2003, and it covers the period 12/31/01

21  to August 29th of '03.

22      MR. MOLONEY:  Again, your Honor, I think that

23  was admitted during the first week, but in case it

24  wasn't technically, I move to admit it.

25      THE COURT:  We don't have that much time.  Have

8876984a-77fb-40a6-aa35-02ce08446ed4

Page 160

1    you had a chance to confer?

2            MR. KOCIUBES:  I think the answer to your

3    question is no, but I do think that document is in.

4            THE COURT:  All right.

5            MR. MOLONEY:  Just to make sure.

6    BY MR. MOLONEY:

7    Q.   Now, after the meeting that you had on August 28,

8    after you left Mr. Brooks' office, what did you do?

9    A.   Well, I was very upset, and so I had to go from his

10   office down all the way to the other end of the hall to

11   my office, and I was in tears, so I decided to go as

12   fast as I could down the hall, basically, and hope I

13   didn't see anybody.  I went into my office and I shut

14   the door and the first thing I did was I tried to

15   contact my husband to tell him what had happened, and I

16   couldn't find him.  He was at the playground with my

17   kids.  So I called my sister, and -- and she -- I was

18   crying, and I told her what had happened, and so she

19   said --

20           MR. KOCIUBES:  Objection.

21           THE COURT:  Sustained.  Not what she said.

22   BY MR. MOLONEY:

23   Q.   Keep going.  After you talked to your sister --

24   A.   After I talked to my sister, I -- I wanted to go

25   under my desk in the fetal position, that was my plan,

1   and just stay there for a while.  And --

2   Q.   What did you do?

3   A.   I didn't do that.

4   Q.   What did you do?

5   A.   I didn't do that.  I had -- I had a meeting that

6   night with the incoming chairman of Exxon Mobil, it was

7   a small group meeting that I was scheduled to attend,

8   and I had to be there at about 6:30, so it was very

9   soon.  I had to go across town and have dinner.

10          So I went to the meeting, and I was upset the

11  whole way over to the meeting, and then I pulled it

12  together and sat there with dinner for a few hours, at

13  dinner for a few hours and listened to what Exxon Mobil

14  had to say.  And then afterwards, I made a voicemail

15  message to the firm at Putnam, because that was my job

16  as an analyst, was to report, through a large general

17  voicemail system, information I had learned in company

18  meetings.

19          So I went through the dinner, and then I did my

20  voicemail, and then I walked home.  And by the time I

21  got home, I was upset again.  Once I finished the job

22  part, I got very sad again.  And so it was about 9:30,

23  and I went home and I got into my house, and my husband

24  was there with my two kids, they were all up because

25  they had learned about my --

1    MR. KOCIUBES:  Objection.

2    THE COURT:  Overruled.

3  A.   They were up because they knew what had happened,

4  and I hadn't been able to reach them, but they knew.

5  And my kids were there, they were four years and two

6  years old, and they were -- I was upset, I was crying,

7  and so -- so they were sad.  And they still talk about

8  That's the day mommy cried.  And that's it, what's

9  happened.

10  Q.   On the 12th of September in your discussion with Mr.

11  Brooks, did you explain to him why you asked for the

12  guarantee?

13  A.   I did.

14  Q.   What did you say?

15  A.   I said to Mr. Brooks on that day, "I require a

16  guarantee, because after this event, I need to have some

17  assurance that you are not going to give me a zero bonus

18  because I don't trust you after you've done this to me,

19  I do not trust you not to give me a zero bonus."

20    MR. MOLONEY:  Your Honor, I'd just like to have

21  her -- just explain the charts and show them --

22    THE COURT:  The what?

23    MR. MOLONEY:  I'd just like to have her identify

24  these three charts, similar to the ones on Mr. Dexter,

25  and just have her talk about them as chalks.

1          THE COURT:  As chalks or as exhibits?

2          MR. MOLONEY:  Chalks.

3          MR. KOCIUBES:  Which ones are those, your Honor?

4          THE COURT:  Which three?

5          MR. MOLONEY:  It's going to be -- they've seen

6     Davis, it would be Dexter -- sorry, they've seen Dexter,

7     this would be Davis number 14, Makino number 17 --

8          THE COURT:  Let me see them.  Let's go.  We're

9     trying to finish this up, not redo the whole case.

10    Let's go.

11          (At sidebar on the record.)

12          MR. KOCIUBES:  This is going to trigger a long

13    cross.

14          THE COURT:  This one was already a chalk, you

15    can ask her about this.

16          MR. RODRIQUES:  These are different.

17          MR. MOLONEY:  These are three different people.

18          THE COURT:  No, no.  We're not starting with

19    something brand new.  Just not.  This is rebuttal on

20    things that were said that she can rebut, not new stuff.

21          Five -- three minutes.

22    BY MR. MOLONEY:

23    Q.  If you will look at chart number one in the book,

24    please?

25    A.  Yes.

1    MR. MOLONEY:  Your Honor, it's number one.

2    A.   I have number one, yes.

3    Q.   And was this chart prepared by you?

4    A.   Yes, along with the assistance of my sister.

5    Q.   She did the graphics, you assembled the information?

6    A.   Yes.

7    Q.   The information and sources are indicated on the

8    bottom of them?

9    A.   Yes, they are.

10   Q.   If I can just put that up.

11        Okay.  Now, the top part of this chart,

12   Mrs. Svensson, shows --

13   A.   Total Putnam employees between the years 1998 and

14   2003 as reported to the SEC in the Marsh & McLennan

15   Annual Report on --

16   Q.   It goes from in 1998, 5,300 --

17   A.   Yes.

18   Q.   -- to 6,100 in 2000?

19   A.   Yes.

20   Q.   And 5,300 in 2003?

21   A.   Yes.

22   Q.   Now, the bottom part of the chart, what does that

23   show?

24   A.   That shows the number of investment division

25   officers over the same time frame as reported in the

Page 165

1    Putnam documents that were supplied in November of 2007.

2    Q.    That went from 267 in 1998 --

3    A.    Yes.

4    Q.    -- to 312 in 2001?

5    A.    Yes.

6    Q.    And to 296 in 2003?

7    A.    Yes.

8          MR. MOLONEY:  I have no further questions, your

9    Honor.

10         MR. KOCIUBES:  About two or three, your Honor.

11         THE COURT:  Okay.

12                    CROSS-EXAMINATION

13   BY MR. KOCIUBES:

14   Q.    Did I understand you correctly, Mrs. Svensson, that

15   in your meeting with Mr. Brooks, I think you said on the

16   12th -- is that the date you were talking about?

17   A.    Just a minute ago?

18   Q.    Just a minute ago.

19   A.    Yes, on the 12th.

20   Q.    And you said you told Mr. Brooks, in essence, that

21   you couldn't trust him because you were worried that you

22   were going to get a zero bonus?

23   A.    Yes.

24   Q.    And your way of dealing with your fear that you

25   would get a zero bonus was to demand a $1 million bonus

1    for each of the next two years?

2    A.    I wished to be paid consistent with my performance.

3    Q.    A $1 million bonus for each of the next two years is

4    what you commanded, right, correct?

5    A.    I asked to be paid a million dollars for the

6    two-year period, yes, that's correct.

7              MR. KOCIUBES:  No further questions.

8              THE COURT:  Thank you.

9              MR. MOLONEY:  Your Honor, can I have a sidebar?

10              THE COURT:  Yes.

11              (At sidebar on the record.)

12              MR. MOLONEY:  Yesterday with Dr. Siegel, we had

13    a proffer because of the state of the record as you

14    understood it at the time with respect to whether or not

15    she believed she was just going to get a salary or

16    whether there would be a bonus.  And then we made a

17    proffer.

18              Now, there is testimony that she gave here

19    today, and I think she said so in direct a couple of

20    weeks ago, that she asked for the bonus because she did

21    not trust that -- she asked --

22              THE COURT:  What do you want me to do right now?

23              MR. MOLONEY:  We'd like to put the evidence in

24    the record that Dr. Siegel gave in the proffer.

25              THE COURT:  No, no.

1          (End of discussion at sidebar.)

2          THE COURT:  Thank you.

3          MR. KOCIUBES:  And we renew the motion for the

4     record, your Honor.

5          THE COURT:  Do you rest?

6          MR. MOLONEY:  Yes, your Honor, subject to

7     getting those exhibits in.

8          MR. KOCIUBES:  And then we renew the motion,

9     your Honor.

10          THE COURT:  Do you rest?

11          MR. KOCIUBES:  Yes.

12          THE COURT:  The evidence is done.

13          So tomorrow, this is what you're going to

14     expect:  First of all, in civil trials, there are no

15     alternates, so you're all in it.  In criminal trials

16     sometimes people get confused, because we exclude some

17     people as alternates.  Here in civil trials in federal

18     court, we don't exclude anyone.  You're all here, you'll

19     all be part of the deliberations.

20          Tomorrow morning we will have closing arguments.

21     The way it will go is the defense first, and then the

22     plaintiff, then I will give the instructions of law.

23          It will be a long morning, but basically about

24     an hour for each of the closing arguments, roughly an

25     hour for the charge.  You know, roughly.

8876984a-77fb-40a6-aa35-02ce08446ed4

1    So then you will start deliberating.  We will

2    provide you not only with a snack, but with lunch, but

3    you stay until 5:00.  And then that will be true on

4    Friday, if you don't reach a verdict, and until you do

5    reach a verdict.  We treat you with TLC, we feed you,

6    but starting around 1:00 tomorrow, this is yours.

7    So get a good night's sleep, we'll see you

8    tomorrow morning.

9    THE CLERK:  All rise for the jury.

10    (Jury left the courtroom.)

11    THE COURT:  Now.  Okay.  So I have a sentence at

12    2:00.  You are probably all tired right now.  My sense

13    as to what should happen is that -- I don't know, when

14    does it make sense?  I probably won't be done until 2:30

15    at the very earliest.  Let's say 2:30.  I don't know if

16    there's a way now for you to start going through the

17    exhibits, maybe over the lunch break, start organizing

18    them, and then have lunch, and then maybe you can take

19    the pile while I'm there.

20    Alternatively, we can have the supplemental

21    arguments and then you can just spend the rest of the

22    afternoon on the exhibits.

23    I leave it up to you.  In any event, I won't be

24    able to get to you until 2:30, and then we have

25    something at 4:00, so that's going to have to be -- I

1  primarily, I think whatever is left on these jury

2  charges is incremental and not significant or at least

3  not significantly difficult.

4        What's difficult is what I'm going to do on the

5  promotion and compensation claims, that's really where I

6  plan on focusing my time.

7        Okay.  They, the plaintiffs, filed comments on

8  the jury instructions.  You may not have had a chance to

9  read them.

10       MR. KOCIUBES:  I have not seen them, yes.

11       THE COURT:  I haven't really spent much time

12 with them myself.  When you look at them, I think for

13 the most part they're not cosmic issues.  The cosmic

14 issues are promotion and compensation in terms of how

15 you prepare your closings tomorrow.  None of the other

16 things I think will affect how you give your closing

17 arguments.

18       MR. MOLONEY:  There was one that I'd like to be

19 heard on about.

20       THE COURT:  I'm not doing anything right now.

21 I'll see you at 2:30.

22       MR. MOLONEY:  Okay.

23       THE COURT:  See you.

24       (Court recessed at 1:06 p.m.)

25

1          (Resumed, 2:45 p.m.)

2          THE COURT:  As is my practice, I'm going to ask Lee

3    to stay for the continuation of the directed verdict at the

4    close of all the evidence argument.  So, as you know, I am

5    most interested at this point in the promotion and

6    compensation claims.  I find as a matter of law that there is

7    sufficient evidence to go to the jury on the demotion and the

8    termination claims, so I --

9          MR. MOLONEY:  Could you start that again, your

10   Honor?  I couldn't hear you.

11         THE COURT:  I'm sorry.  I find as a matter of law

12   that there is sufficient evidence to go to a jury on the

13   demotion and the termination claims.  So what is being

14   debated right now is the promotion and compensation claims.

15         With respect to the promotion claims, as I

16   mentioned yesterday, my concern is that it all came up so

17   late with so little focus in the evidence and so little

18   vetting by me, or anyone, that I'm not sure I can even do

19   McDonnell Douglas on it.  And so you made a proffer with

20   respect to three gentlemen, and that's what I need you to

21   address first.

22         MR. MOLONEY:  Well, your Honor, we have presented

23   in that proffer three, I think it was, positions that became

24   open after May 6 of '03.  The proffer that we filed talked

25   about there were five positions that opened up in that

1    period.  The information about those people, their names,

2    their backgrounds --

3              THE COURT:  Now, start from the basics, since

4    almost no one's talked about this.  This is the problem.  And

5    I know you tried to do it in the rebuttal case, but it was

6    too late.  So the five positions that opened up are, for the

7    record, which ones?

8              MR. MOLONEY:  They are the ones that are identified

9    on that original proffer that I filed with that heading --

10             THE COURT:  Yesterday or two days ago?

11             MR. MOLONEY:  Two days ago, I think.  It had the

12   color charts on Pages 4 to 10, and the positions are

13   identified by the positions that have a specific month and

14   day of the month in 2003.  There are five of those.  There

15   were two or three other positions dated 2003 but not with a

16   specific month or day, and that's because the information

17   that supplied the specific, like let's say July 1, 2003, for

18   Person A, was just not available, and we couldn't tell when

19   in 2003.  So we took --

20             THE COURT:  So the five positions that you say that

21   were opened up that she should have received were whose?

22             MR. MOLONEY:  The positions are the ones that are

23   identified --

24             THE COURT:  Well, give them to me.  I mean, in

25   other words, you've got to go through McDonnell Douglas on

Page 172

1    each of them.

2            MR. MOLONEY:  Okay, I can't do that off the top of

3    my head.  I need to --

4            THE COURT:  Well, if you can't, I can't.  That's

5    the issue.  Let me put it this way:  Do I think Lisa

6    Svensson -- let's assume for a minute there was an opening,

7    right?  Let's assume I'll deem her having applied because she

8    told Mr. Oristaglio she wanted it, so I'll deem her to have

9    applied.  I will deem it to be true that the man got it

10   because you have five males in those positions.

11           MR. MOLONEY:  Right.

12           THE COURT:  Then I get to prong four, and I stop

13   dead in my tracks because I don't know anything about the

14   positions.  I don't know how junior they are, how senior they

15   are, who made them, how qualified she was with her background

16   to take the positions in those various funds, all of which

17   mesh -- well, "mesh" isn't even the right word -- mush

18   together in my mind.  But I'm sure in this world there are

19   very special kinds of expertise that are necessary.  She

20   knows oil stocks, natural resources, energy.  That's her

21   shtick.  What if these were in mostly pharmaceuticals?  I

22   don't know, you know, and I've been waiting.

23           MR. MOLONEY:  What I can tell you is this:  In the

24   evidence are the positions that became open.  We can know the

25   background and history.  The resume's and the PDPRs, those

1    review forms of those people are in the record, the amount of

2    money.

3              THE COURT:  But they're not in my record because I

4    haven't seen them yet.

5              MR. MOLONEY:  I know, but they're --

6              THE COURT:  Well, so tell me about them.  This is

7    what I'm asking you right now.

8              MR. MOLONEY:  You know, I can't off the top of my

9    head recreate the professional history of these people who

10   got the jobs.  What I can say is that in this record in the

11   evidence, and part of what took a long time about getting

12   that stuff in, is the position, how much it paid, who got it,

13   on what team, and what the background of those people are

14   compared to what her background is.  It's there.

15             THE COURT:  I direct it out.  It's not enough for

16   me right now to do this analysis.  I'm given no help on it.

17   I've been meticulous in going through this.  She's made her

18   showing in the demotion and termination claim, in my

19   opinion.  She's made it enough to meet the whatever, the

20   nononerous burden.  It shifted to them.  There's evidence in

21   the record that would support your claim that it was

22   gender-based, but I can't guess, so promotion is out.

23             So now let's go to compensation.  You can argue, by

24   the way, and understanding the general pattern in this firm,

25   that she had asked, and she was never really being considered

Page 174

1    anyway, and they put one guy into another, and they never

2    asked her, blah-blah-blah.  You can make the argument.

3              MR. MOLONEY:  This is just where there's a claim

4    for damages on that.

5              THE COURT:  That's right.  You can argue pattern

6    and practice, but there can't be a separate claim for a

7    promotion for those five positions because I can't do the

8    work for you --

9              MR. MOLONEY:  Okay.

10             THE COURT:  I can't right now, which is what I said

11   was D-Day, and if I can't, they can't.  And we can't have

12   them guess, so that's gone.

13             Now, let's go to compensation.  The concern I have

14   about compensation actually is, I actually thought she made

15   some decent comparable claims, but they're time-barred.

16   That's the real thing that I'm -- they're brutal, just brutal

17   statute of limitations laws that come involved in this.  So

18   there's a one-year statute of limitations with respect to the

19   Massachusetts Employment Practice Act, and she knew in late

20   2002 or early 2003 what the story was with respect to those

21   comparable people in Research.  That was a decent claim

22   actually, but it wasn't filed within a year.

23             MR. MOLONEY:  No, I understand.

24             THE COURT:  So gone.  So now we've got the issue

25   of --

1     MR. MOLONEY:  But what is not made gone by those

2   circumstances is her measured up against people in Portfolio

3   Management.

4     THE COURT:  Okay, so, now, help me through this

5   one.  So as I understand it under the law, you have to file

6   within 300 days, even if we're working under 151(b) or

7   Title VII, right?

8     MR. MOLONEY:  Yes, but then there's the --

9     THE COURT:  Discovery rule.

10     MR. MOLONEY:  The discovery rule.

11     THE COURT:  And so he, meaning Mr. Kociubes, your

12   friend, reads me the stipulation of this affidavit, the sixth

13   affidavit of Lisa Svensson this morning, and really more for

14   me than for them.  They didn't understand why he was reading

15   that.  But it says that she knew in 2002 about comparable --

16   I keep wanting to say prime minister -- portfolio manager.

17   And I don't know, isn't that enough for the reasonable

18   discovery rule under --

19     MR. MOLONEY:  No, because there are three

20   categories of people.

21     THE COURT:  Okay, so this is where you've got to

22   help me.

23     MR. MOLONEY:  The first category of people are

24   people like, as my good friend Mr. Kociubes calls him,

25   Dr. Norchi with the medical degree, and the other one was

1    Saba Malak.

2          THE COURT:  They both are good claims.

3          MR. MOLONEY:  People in the Research Department,

4    okay?  Then the second category of people are people who used

5    to be in the Research Department but went into Portfolio

6    Management, and what he read dealt with the second category.

7          There's a third category of people, people in

8    Portfolio Management, didn't come out of the Research

9    Department.  So of the three categories of people, you could

10   find that she was charged with knowledge about category one,

11   you could find that she was charged with knowledge about

12   category three, but I don't think that you can rule that

13   she's out of the box on category three.  If I said "three," I

14   meant two.  Maybe out of the box on one, maybe out of the box

15   on two --

16         THE COURT:  Which is people who are analysts who

17   then went over to Portfolio Management.

18         MR. MOLONEY:  But we have all these other people

19   who don't fit that category.  That's a jury issue.

20         THE COURT:  Well, let me ask.  Is it money that was

21   in the same ballpark?  In other words, the people who went

22   over were making less?

23         MR. MOLONEY:  No.  They were getting, you know, in

24   that bigger ballpark of portfolio managers.

25         THE COURT:  So didn't that put her on notice that

1   she was being -- I'm thinking in my mind the proverbial

2   term -- being "unfairly compensated"?

3            MR. MOLONEY:  We found out -- I mean, Mr. Weir and

4   I found out at the same time she found out, and that was when

5   we were trying to get information out of Putnam after this

6   case got going.

7            THE COURT:  I thought she found out in 2002 that

8   there'd be people working --

9            MR. MOLONEY:  There are three categories:  the

10  people that she found out about in the Research Department.

11           THE COURT:  And how much were they making when they

12  went over?  What did she find out about?  They were making

13  one point something, one plus, right?

14           MR. MOLONEY:  The people in the Research Department

15  she found out, yes.

16           THE COURT:  Were making one plus when they went

17  over there.

18           MR. MOLONEY:  And then the second category of

19  people are people who were in the Research Department and

20  went to Portfolio Management.  And the part of the affidavit

21  that Mr. Kociubes read could take her out of the box on that

22  one, but it doesn't cover the --

23           THE COURT:  But didn't that put her on notice that

24  they were all making more than she was?

25           MR. MOLONEY:  No.  It puts her on notice as to

1    those two categories of people.  There's nothing in the

2    record, nothing came up in discovery or anything that puts

3    her on notice about category three.

4            THE COURT:  All right, what do you say about

5    category three?  You're the statute of limitations guy?

6            MR. KOCIUBES:  Well, one of us needs to know some

7    law, your Honor.

8            THE COURT:  Trap for the unwary, these difficult

9    laws?  Yeah.

10            MR. RODRIQUES:  The law --

11            THE COURT:  The law is the law.

12            MR. RODRIQUES:  The law is the law, and your Honor

13    cited it in your summary judgment opinion in this very case,

14    which is, she just needs to be on notice that she's been the

15    victim of discrimination.  In Mr. Moloney's world, unless she

16    knows absolutely everyone who is being paid more than she,

17    then she knows nothing to start the statute of limitations

18    running.  And Sylvester, which is the case under MEPA, also a

19    151(b) case, says exactly the opposite.  It says, once she

20    knows that she is being discriminated against at all, that's

21    enough.  The obligation is not for -- her right is not to sit

22    on her hands and wait until she has every piece of

23    information in discovery and say, "Well, now there's four

24    more people.  I didn't know about those, so I can now bring

25    suit about those."  Once she's on notice, she's on notice.

1          THE COURT:  All right, thank you.  I've heard

2     enough.  The claims are, A, time-barred, and, B, I'm not

3     convinced under the evidence that I've heard that it's

4     comparing apples and apples as opposed to apples and oranges

5     because she had this very odd amalgamated job, which was not

6     of her desire, but it was she was partly in charge of stock

7     and partly in charge of MBAs and partly an Associate Director

8     of Research, and it was just too hard to compare what they

9     are.  So for those two reasons, I direct out those two

10    claims.

11          However, the evidence is completely relevant for

12    two or three grounds.  One is, it's relevant because it

13    supports her claim that Research was a demotion as opposed to

14    Portfolio Management, in the sense that your amount that you

15    could be compensated and your career advancement were

16    substantially greater if you were in Portfolio Management

17    than if you were in Research.  It supports her:  As soon as

18    these analysts went from one spot to another, they were

19    making more money.  So you can argue that.

20          Second is, it supports her claim for damages

21    because if in fact she was discriminated against by being

22    demoted or terminated, they can consider what her salary

23    would have been.  Those are relevant numbers.

24          So I am allowing you to put that all into

25    evidence.  You can argue it because of the time bar and

Page 180

1    apples-and-apples argument in the compensation area.  And as

2    far as in promotion, I just don't know enough.  So those are

3    the two big issues.

4          Now, we need to move on if we're going to do this

5    on the record.  Are there any documents that are in dispute

6    that we can work out now so I'm not doing it at quarter of

7    9:00 in the morning?

8          MR. MOLONEY:  We didn't have a chance to discuss

9    with the other side.  What we were looking at, your Honor,

10   during the lunch break was some comments on the draft jury

11   instructions.  We just need some time to be able to sit

12   down --

13         THE COURT:  Yes, but I don't want to do it tomorrow

14   at quarter of 9:00 as they're walking in the door.  Are there

15   any big issues between you?

16         MR. MOLONEY:  I've got to say I don't think so.  We

17   were talking about some categories of documents as to which

18   there wasn't any objection or authenticity or anything else,

19   as I recall, and it's a matter of redacting, and we think

20   we've redacted.

21         THE COURT:  So with respect to any CIOs, either

22   you're to redact it out or you put "CIO" next to it so they

23   fully understand, because sometimes it might be relevant as

24   to what happened to someone, like their career progression,

25   but it may not be relevant in terms of their compensation.

Page 181

1    So those kinds of nuances I'm hoping you're going to work

2    out.  This case is not going to rise and fall on that, so --

3              MR. KOCIUBES:  Well --

4              THE COURT:  I don't want to do it at quarter of, so

5    I could at this point -- what do we have at 4:00 o'clock?

6              (Discussion off the record.)

7              THE COURT:  I basically have the rest of the

8    afternoon, unfortunately for you.  So why don't we -- we have

9    a little scheduling conference coming in.  So we could do

10   this:  I could hear any specific -- we can go off the record

11   now so Lee can have a break.

12             (Discussion off the record.)

13             (A recess was taken, 3:15 p.m.)

14             (Resumed, 5:50 p.m.)

15             THE COURT:  It's now ten of 6:00, so we're going to

16   focus quickly because I have to leave.  So what are the

17   issues?

18             MR. MOLONEY:  We need -- there is some -- let me

19   start off.  These are the growth charts, your Honor.  These

20   are the first ones that I put up.

21             THE COURT:  I thought I allowed those in.

22             MR. MOLONEY:  You did.

23             THE COURT:  Fine, fine.  He's agreeing to those.  I

24   thought you conferred.

25             MR. MOLONEY:  All right, so we need --

Page 182

1          THE COURT:  So what's in dispute?

2          MR. MOLONEY:  Well, I thought that was in dispute.

3   We just need numbers on those.

4          THE CLERK:  The next?

5          MR. MOLONEY:  Any numbers.

6          THE CLERK:  470, 471, and 472.

7          THE COURT:  In.

8          (Plaintiff Exhibits 470, 471, and 472 received in

9   evidence.)

10         THE COURT:  What's in dispute?

11         MR. RODRIQUES:  Those your Honor is holding are

12  apparently in dispute.

13         THE COURT:  These chalks are in dispute.  All

14  right, so let me just say this:  There's one of these which

15  is D-84 where he crosses out who's no longer there.  I'm

16  going to allow that in because that's clear.  These two

17  others are impossible to read.  Because it's difficult to

18  read, I do not allow in D-85.  And it's impossible to read

19  this D-83, so if somebody can make sure -- this was, I think,

20  the one that Mr. Dexter went through.  If someone can just

21  type in what he said, I will allow those in.  Okay?

22         MR. RODRIQUES:  Okay.

23         (Defendant Exhibit 84 received in evidence.)

24         THE COURT:  So that's done.  What else do we need

25  to do?

1          MS. HOLDEN:  Can you say that one more time?

2          THE COURT:  I'm sorry.  I sustain the objection to

3    D-85 because it's impossible to figure out what -- it's just

4    too complicated to understand the scrawls.  I sustain the

5    objection to D-83 because it's impossible to read and figure

6    out exactly what I think Mr. Kociubes is trying to do because

7    it's an awkward thing, but I will allow you to type in the

8    correct names that Mr. Dexter added to the list.  But I do

9    think it's easy to figure out and was very helpful, at least

10   to me, and I think the jury.  So I allow in D-84, which is in

11   all these teams how many people had been terminated, and I

12   will allow that in.  That's D-84 I allow in.

13         So, now, what else?  Anything else?

14         MS. KURKER:  Thank you.  We'll correct those.  Why

15   don't I take those.

16         THE CLERK:  Put that away.  And this one, just have

17   somebody print those names legibly, and we're good.

18         THE COURT:  What else?

19         MR. MOLONEY:  This is the comparison chart that I

20   was questioning Mrs. Svensson on, and remember I corrected

21   that when it was up on the easel, and this went in, and

22   that's No. 448.

23         THE COURT:  So that's in.  So what's disputed?

24         THE CLERK:  Do I have that already, 448?

25         MR. RODRIQUES:  We said we don't have any

1    objections to that.

2           THE COURT:  I'm not taking time now.  If there's no

3    dispute, I don't want to take the time right now.  What are

4    the disputes?

5           MR. MOLONEY:  This is No. 469.  We used it as a

6    chalk.

7           THE COURT:  469 we've used a thousand times.  How

8    could there be an objection to that?

9           MR. RODRIQUES:  There is none.  I've said there is

10   no objection to that.

11          THE COURT:  All right.

12          MS. HOLDEN:  The issue is that it hadn't been

13   marked.

14          THE COURT:  I tell you what, I'm -- excuse me.  Let

15   me look at you.  As far as you're concerned, it's in.  It's

16   in.  So what are the disputes?

17          MR. MOLONEY:  One other dispute was on the -- they

18   objected to the PDPR of Mr. Robert Swift.

19          MR. RODRIQUES:  No.  We object to all the PDPRs

20   other than Core and Growth.

21          THE COURT:  I sustain the objection to Swift.

22          MR. MOLONEY:  But, your Honor, if I may, I don't

23   think you heard why I --

24          THE COURT:  Why do you need it?

25          MR. MOLONEY:  This was done on January 2 of '02

Page 185

1    shortly before Mr. Oristaglio fired Mr. Swift.  It's

2    Mr. Oristaglio's review of Mr. Swift, and it has some very

3    complimentary things to say about the Growth group and team.

4    It's relevant to Mrs. Svensson's performance at that time.

5            THE COURT:  Well, if it says something about the

6    Growth team and her performance, then it is relevant.

7            MR. RODRIQUES:  I've not seen it.

8            (Document shown to Mr. Rodriques.)

9            MR. RODRIQUES:  Can you show me what you're

10   referring to?

11           MR. MOLONEY:  "Within this team, Robert has made

12   progress in bringing them together and creating a tightly

13   knit --"

14           THE COURT:  Don't read it out loud because then Lee

15   has to take it down, and you're reading it fast.

16           MR. RODRIQUES:  I mean, there's nothing about

17   Ms. Svensson.  It's just saying that the --

18           MR. MOLONEY:  The team, she was on the team.

19           THE COURT:  You know what?  If it says something

20   about the team, I allow it in.  Okay, what's the next one?

21           MS. KURKER:  What's the exhibit number?

22           MR. MOLONEY:  We need a number.

23           MS. KURKER:  470, is that the next one?

24           THE CLERK:  No, no.  470, 471, and 472 are all

25   charts.  That's these three charts here, these Growth before

Page 186

1    and after reorganization.

2         THE COURT:  What's the number for Swift's resume'

3    and evaluation?

4         MS. HOLDEN:  473.

5         THE COURT:  473.

6         (Plaintiff Exhibit 473 received in evidence.)

7         THE COURT:  Is that it?

8         MR. MOLONEY:  No.  There are a couple of others.

9         THE CLERK:  May I have that, Kevin, please?

10        MR. MOLONEY:  Yes.  I believe I offered these, and

11   that was the CV of Siegel and the CV of White.

12        THE COURT:  Yes, they come in.

13        MR. RODRIQUES:  I have no objection to that.

14        MR. MOLONEY:  Well, 241 I put on White because that

15   was where it was in our book, so we need a number for Siegel.

16        MS. KURKER:  And that's White's CV?

17        THE COURT:  Excuse me.  You're using my time really

18   poorly.

19        MR. MOLONEY:  I --

20        THE COURT:  No.  If there is no objection, they

21   come in, and you can mark them later.  I need to walk out of

22   here.  I have eight people coming to my home for dinner at

23   7:00 o'clock.  I am being pressed.  I thought you were going

24   to see me at 5:00 o'clock, so don't --

25        MR. MOLONEY:  I would --

8876984a-77fb-40a6-aa35-02ce08446ed4

1            THE COURT:  No.  I don't want to hear anything

2       that's not disputed.  Mark them later.  What's disputed?

3            MR. RODRIQUES:  Are you done, Kevin, with your

4       disputed issues?

5            MR. MOLONEY:  Well, no.  I've got these other

6       documents I'm not ready to talk to the Court about.

7            THE COURT:  But if they're disputed, what else is

8       there?

9            MR. MOLONEY:  There are their answers to

10      interrogatories where they claim we haven't redacted enough.

11           THE COURT:  Well, show it to me.  What?

12           MR. RODRIQUES:  Are you referring to this?

13           MR. MOLONEY:  Yes, the -- no, this is the -- yes,

14      this.

15           MR. RODRIQUES:  Yes, and we provided a list of --

16           THE COURT:  Show it to me.  What's the dispute?

17           MR. RODRIQUES:  The dispute is, this document lists

18      people and the compensation of people who are CIOs,

19      directors, and Value --

20           THE COURT:  Delete the compensation of everyone but

21      the portfolio managers and the Global Research people.

22      That's fine.  That's my ruling.  Otherwise it comes in.

23           MR. MOLONEY:  Okay.

24           THE COURT:  What's the next thing?

25           MS. KURKER:  Your Honor, can I just clarify.  Is

1   that PMs just in Core and Growth?

2            THE COURT:  Yes.

3            MR. MOLONEY:  And then we have the PDPRs.

4            THE COURT:  What are those?

5            MR. RODRIQUES:  Performance reviews.

6            THE COURT:  For whom?

7            MR. RODRIQUES:  For all 91 of the 91 original

8   comparators.

9            MR. MOLONEY:  No, no, no.  That is a reduced PDPRs

10  for the people who came --

11           THE COURT:  You know, for those of us who haven't

12  lived it as much as you, PDPR, performance reviews of who?

13           MR. MOLONEY:  In that right now is the reduced

14  number pursuant to your ruling about keeping out Value and

15  doing Core and doing Growth.

16           MR. RODRIQUES:  And it includes CIOs, correct?

17           MR. MOLONEY:  Well, there were some people who

18  became CIOs --

19           THE COURT:  Excuse me.  If at some point they were

20  portfolio managers and then moved up to CIO, they can be in

21  there.

22           MR. RODRIQUES:  Regardless of when, your Honor?

23  That is, if they were CIO --

24           THE COURT:  If it's a performance review of someone

25  when they were a portfolio manager, it doesn't matter that

1    they subsequently became a CIO.  But if it's a performance

2    review while they were a CIO, it's irrelevant.

3            MR. RODRIQUES:  Yes, and there are performance

4    reviews while they were CIOs.

5            THE COURT:  Well, then those come out.

6            MS. KURKER:  And the same limitations, the

7    performance reviews of the PMs on Core and Growth and

8    analysts in GER?

9            THE COURT:  Right, they all come in, but not the

10   performance reviews of CIOs.

11           MR. MOLONEY:  When he or she was a CIO?

12           THE COURT:  When he or she is a CIO.

13           MR. MOLONEY:  Now, there's another category

14   floating around called director.  Those are not CIOs.

15           THE COURT:  I eliminated managing directors in

16   terms of -- unless they're also portfolio managers.

17           MR. MOLONEY:  I agree, I agree.  A director is a

18   different animal from a managing director.

19           THE COURT:  Huh.

20           MR. MOLONEY:  Lower down on the food chain.

21           THE COURT:  I have no idea because I never really

22   heard much about them.

23           MR. RODRIQUES:  Right, and our position is, that

24   shouldn't come in without evidence, your Honor.

25           THE COURT:  If they were portfolio managers,

Page 190

1    they'll come in.

2         MR. MOLONEY:  We had submissions on the redacted

3    Morningstars, but I think we've got that resolved.

4         MR. RODRIQUES:  Yes.

5         MR. MOLONEY:  The SEC filings, I think we have that

6    resolved, which include the Putnam and MMC.

7         MR. RODRIQUES:  I don't want to make a big issue

8    about this, your Honor, but there are a bunch of new ones

9    that we've just been given.  Some of these are funds we have

10   no idea what the relevance of them is, such as Health

11   Sciences.  There's been no testimony about those funds.

12   There's no dispute that these are Putnam prospectuses.

13        THE COURT:  Excuse me, excuse me.  We don't need

14   the prospectuses of all these funds.  It just clutters the

15   record.  We're not going to have the whole -- just put in the

16   prospectuses with respect to the funds that are at issue in

17   this case.

18        MR. MOLONEY:  Okay.  One of them particularly --

19        THE COURT:  If you care that much, you take the

20   time to cull it out.  Who cares?  If you want to do it,

21   fine.  It's a question of just cluttering the record.  It's

22   not clear who that hurts more or helps more.

23        MR. RODRIQUES:  That's right, your Honor.

24        THE COURT:  As long as the one guiding thing is,

25   market timing shouldn't be part of this.

1       MR. RODRIQUES:  It's not.  The Health Sciences, it

2  proves the point about Norchi.  That's all.

3       And then we have the job logs and the job letters.

4       MR. RODRIQUES:  If you represent you've deleted all

5  the market timing things, we don't care.

6       MR. MOLONEY:  Okay, all right, market timing is

7  out.  The job logs and letters?

8       MR. RODRIQUES:  The same.  I just answered that.

9  If you've deleted all the market timing references, we don't

10  care.

11       THE COURT:  Thank you.

12       MR. MOLONEY:  Okay.

13       THE CLERK:  What are they coming in as?  Do you

14  have numbers?

15       MR. MOLONEY:  I had numbers in my --

16       THE COURT:  He's going to give you the numbers.

17       THE CLERK:  Mark them all.  You've got to mark them

18  all.

19       THE COURT:  Mark them as a clump.

20       MR. MOLONEY:  They're on my list of exhibits under

21  one number.

22       THE COURT:  Yes, but you're going to help Robert

23  with this because he doesn't know.

24       So anything else in dispute?  That's how you use my

25  time.

Page 192

1          MR. RODRIQUES:  I want to make sure he's done, and

2    then I'll tell you what my issues are.

3          THE COURT:  All right, what's your dispute?

4          MR. RODRIQUES:  Your Honor will recall a number of

5    exhibits were admitted that had compensation or other

6    information regarding the 91 people, some of which include

7    CIOs, some of which include Value, et cetera, and we said

8    they were admitted subject to later redaction.  What I'd like

9    the record to note is what those exhibits are.  And our

10   position is, all people should be eliminated if they are

11   Core, Growth, or CIOs, their compensation and their reviews,

12   consistent with your ruling --

13         THE COURT:  I've just overruled that, right?  I've

14   said what comes in are Core, Growth, portfolio managers, and

15   CIOs with respect to what happened to everyone, but the

16   compensation of the CIOs should be deleted.

17         MR. RODRIQUES:  And I think you also said the

18   reviews while they were CIOs should be deleted.

19         THE COURT:  And the reviews.  I just ruled on that.

20         MR. RODRIQUES:  That's right, and this contains --

21   these documents contain information that's inconsistent with

22   that ruling, is what I'm saying.

23         THE COURT:  Right, we agreed he's going to have to

24   delete all that.

25         MR. RODRIQUES:  Okay, so can we just note for the

1   record what those exhibit numbers are so we're clear?  It's

2   460, 458.

3            THE CLERK:  Are these already in?

4            MR. RODRIQUES:  Yes, subject to later redaction.

5   177.

6            THE COURT:  Just take a black pen through them.

7            MR. RODRIQUES:  115, 178, 463, 461, 459, and 457.

8            THE COURT:  Anything else?  That wasn't disputed.

9   That was something I've already ruled on.

10           MR. MOLONEY:  I just need to take these out of the

11  courthouse so that somebody can do it tonight.

12           THE COURT:  Yes, you can have them.  All right,

13  now, what else?

14           MR. RODRIQUES:  One last issue from our side, your

15  Honor, which is, Mr. Moloney indicated before we broke

16  earlier that he wants to use four charts, chalks in his

17  closing.

18           THE COURT:  All right.

19           MR. RODRIQUES:  Three of those chalks -- one those

20  chalks he used with the jury, and we have no objection.  Your

21  Honor already made a ruling on that.  Three of those chalks

22  are ones he showed you at side bar in rebuttal that your

23  Honor said he could not use, so --

24           THE COURT:  Well, they were brand-new, so I didn't

25  even look at them.

1          MR. RODRIQUES:  So if we can just take a moment to

2     show you.

3          THE COURT:  What are they?

4          MR. RODRIQUES:  Do you have them so we can show the

5     Court?

6          MR. MOLONEY:  It's the same thing like in Dexter,

7     only --

8          THE COURT:  If it's already in evidence --

9          MR. RODRIQUES:  No, these were not admitted.

10         THE COURT:  Excuse me.  I meant the underlying

11    information, maybe.  Who is this?

12         MR. RODRIQUES:  This is Shigeki Makino.

13         THE COURT:  Who is he?

14         MR. RODRIQUES:  There's nothing in the record about

15    him.

16         THE COURT:  Who is he?

17         MR. RODRIQUES:  It's already in your answers to

18    interrogatories.

19         THE COURT:  Who is he?

20         MR. RODRIQUES:  He's a portfolio manager.

21         THE COURT:  Okay, that's all I wanted to know.  And

22    where is the information?  Is it in the interrogatory answers

23    that you --

24         MR. MOLONEY:  Yes, it's in the --

25         THE COURT:  You know I've eliminated the promotion

Page 195

1    claim.

2              MR. MOLONEY:  Right.

3              THE COURT:  Okay, so this is for what compensation

4    he made for purposes of damages?

5              MR. MOLONEY:  Well, very simply, it shows you some

6    of the background information that we say is relevant, and it

7    shows you the difference between working Research and working

8    in Portfolio Management.

9              THE COURT:  All right, so if the predicate is in,

10   why can't he use it?

11             MR. RODRIQUES:  Because your Honor has already

12   ruled he can't use it.

13             THE COURT:  I did not rule he couldn't use it.  I

14   said he couldn't introduce brand-new information in a

15   rebuttal case.  That's what I ruled, okay?

16             MR. MOLONEY:  The others are similar.

17             MR. RODRIQUES:  Except that these are both CIOs.

18   Simon Davis is a CIO of Core, and Josh Byrne is a --

19             MR. MOLONEY:  But this just shows the career track;

20   senior vice president, director, senior vice president,

21   and --

22             THE COURT:  But what does it have on it?  It has

23   the compensation on it, so I will allow that.  I mean, but

24   you've got to stop.  You can't say that she can get the

25   compensation of a CIO.

8876984a-77fb-40a6-aa35-02ce08446ed4

Page 196

1           MR. MOLONEY:  That's not what we're going to put it

2      in for.

3           MR. RODRIQUES:  But that's what this is showing,

4      the compensation of CIOs.

5           THE COURT:  So let me understand this.  Where does

6      it show where it stops when he was a portfolio manager?

7           MR. MOLONEY:  He becomes an MD at this point, which

8      is January '04.

9           THE COURT:  So you cannot argue from that about any

10     money once he became a CIO.  I'm just not going to make them

11     redo the graphics.  I'm not going to make them redo it.

12          MR. RODRIQUES:  It's very prejudicial, your Honor.

13     It shows his comp after he's a CIO.

14          MR. MOLONEY:  But I'm not going to argue that.

15          MR. RODRIQUES:  But You don't have to argue --

16          THE COURT:  Put a yellow sticky over it.  I'm not

17     making him -- I mean, they're not made out of money.  Just

18     put a sticky over it because the money when he was a CIO is

19     irrelevant.  Put something over it.

20          THE CLERK:  Mark it out with a marker?

21          THE COURT:  Mark it out with a marker because the

22     money is irrelevant once he becomes a CIO, but we do not have

23     time to make him redo the graphics.

24          (Discussion off the record.)

25          MR. MOLONEY:  This is where she gets terminated.

8876984a-77fb-40a6-aa35-02ce08446ed4

1    This is at about the same time.  And this is when he gets to

2    be put up to managing director.

3          THE COURT:  But listen, listen to me.  I don't have

4    time.  I've never seen these charts before.  You are allowed

5    to say what her money would have been as a portfolio manager

6    if she hadn't been demoted or if she hadn't been -- well, I

7    guess if she hadn't been demoted is really where that goes.

8          So the issue is, you cannot compare the salary to a

9    CIO because we don't know that she would have made CIO.  So

10   block out any of the money.  That's what I've been saying

11   consistently.  Just take a black marker and cross it out.

12         MR. MOLONEY:  May I cross this out?

13         THE COURT:  I don't know because I'm not -- I can't

14   see that well, but I'm not going to sit and micromanage it.

15   Just get rid of the money when she was a managing director.

16         MR. MOLONEY:  It's down here.

17         THE COURT:  Excuse me, excuse me.  I don't know.

18   You two work it out, okay?  I don't know.  Just any money

19   once he became a CIO or a managing director should come out

20   because they are not comparators.  But you can show what he

21   was making as a portfolio manager, and you can point out that

22   he, you know, was making a lot more.

23         MR. RODRIQUES:  He was a managing director.

24         (Discussion off the record between attorneys.)

25         MR. RODRIQUES:  That's not what the other evidence

1   shows.

2          THE COURT:  I'm not getting into it.  What's the

3   next one?

4          MR. MOLONEY:  They're all basically the same thing.

5          THE COURT:  So you'll just --

6          MR. MOLONEY:  What I will do is, I'll try to put

7   some paper over anything after the date that she --

8          THE COURT:  Yes.

9          MR. RODRIQUES:  Just to be clear, for example,

10  Exhibit 461 shows he's a managing director since 2001.

11         MR. MOLONEY:  No, but there's a difference between

12  your document here and your answers to interrogatories.

13         THE COURT:  Well, show him later on the answer to

14  interrogatories.  If there's something supporting it, it

15  comes in.

16         MR. MOLONEY:  Okay.

17         THE COURT:  So that's it.

18         MR. RODRIQUES:  Do we have any other issues?  I

19  think we're okay, your Honor.

20         THE COURT:  Thank you very much, Lee.  Tomorrow

21  morning -- this can be off the record.

22         (Adjourned, 6:10 p.m.)

23

24

25

1                C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    ) ss.

6    CITY OF BOSTON               )

7

8

9

10        We, Lee A. Marzilli and Debra M. Joyce, do hereby

11   certify that the foregoing transcript, Pages 1 through 199

12   inclusive, was recorded by us stenographically at the time

13   and place aforesaid in Civil Action No. 04-12711-PBS, Lisa

14   Svensson V. Putnam Investments, et al, and thereafter by us

15   reduced to typewriting and is a true and accurate record of

16   the proceedings.

17        In witness whereof we have hereunto set our hand

18   this 28th day of May, 2008.

19

20          /s/ Lee A. Marzilli

21          /s/ Debra M. Joyce

22          _____

23          LEE A. MARZILLI, RPR, CRR

24          DEBRA M. JOYCE, RMR, CRR

25          OFFICIAL COURT REPORTERS

Page 200

1

2

3

4

5

6

7

8

9

10

8876984a-77fb-40a6-aa35-02ce08446ed4