UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

LISA SVENSSON,

        Plaintiff,     Civil Action
                      No. 04-12711-PBS

V.

                      May 29, 2008, 9:07 a.m.
PUTNAM INVESTMENTS LLC, et al,  Pages 1-159

         Defendants.

_____

TRANSCRIPT OF JURY TRIAL DAY 12

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR
LEE A. MARZILLI, RPR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA  02210

1    APPEARANCES:

2

    FOR THE PLAINTIFF:
3    KEVIN F. MOLONEY, ESQ.
    Barron & Stadfeld, PC
4    100 Cambridge Street
    Suite 1310
5    Boston, MA  02114

6

7    JOHN K. WEIR, ESQ.

8    John K. Weir Law Offices, LLC

9    300 Park Avenue, Suite 1700

10   New York, New York  10022

11

    FOR THE DEFENDANTS:
12

    JOSEPH P. KOCIUBES, ESQ.
13   LOUIS A. RODRIQUES, ESQ.
    ALLYSON E. KURKER, ESQ.
14   JENNIFER L. HOLDEN, ESQ.
    Bingham McCutchen, LLP
15   150 Federal Street
    Boston, MA  02110

16

17

18

19

20

21

22

23

24

25

I N D E X

CLOSING ARGUMENTS:                    PAGE

By Mr. Kociubes:                        14

By Mr. Moloney:                         58


CHARGE BY THE COURT:                   100


VERDICT:                               157

1                    P R O C E E D I N G S

2                (The following proceedings were held in open

3     court before the Honorable Patti B. Saris, United States

4     District Judge, United States District Court, District

5     of Massachusetts, at the John J. Moakley United States

6     Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

7     May 29, 2008.

8                THE COURT:  Good morning.  Our last juror

9     just arrived.

10               I understand there are a couple of issues.

11               MR. RODRIQUES:  Yes, your Honor.

12               THE COURT:  Have you had a chance to flip

13    through the verdict form?

14               MR. MOLONEY:  Yes.  We're not going to

15    object to that.

16               MR. KOCIUBES:  It's okay.

17               THE COURT:  So that's fine.

18               We're redoing the jury instructions

19    upstairs, somewhat to take into account -- I do agree as

20    I reread the statute of limitations, it wasn't clear

21    what you had to find.  So I'm going to pick up this

22    concept that she had to have been lulled through May

23    2003.  I think I didn't explain that clearly.  I don't

24    know if it's exactly what you gave me because I'm moving

25    fast, but we'll pick up that concept.

1          MR. RODRIQUES:  We tried to get that idea

2     across.

3          THE COURT:  I wanted to make sure you knew

4     that before I went through the charge.  There were

5     certain other things.  I cherry-picked through your

6     instructions; as you know, we went through that charge

7     conference that I have adopted.  The big question is

8     whether you wanted to skim it before you went into your

9     closings.  But I don't think anything is going to be

10    Super surprising.  But I will -- you'll have a chance to

11    get it in writing as soon as she's done with it.

12          Is there anything else that we need to

13    address?

14          MR. RODRIQUES:  I have some issues, your

15    Honor.

16          THE COURT:  Okay.

17          MR. RODRIQUES:  And they concern chalks, a

18    couple of which we talked about last night, some of

19    which I just discovered Mr. Moloney was going to use

20    this morning.

21          THE COURT:  I didn't hear what you said.

22          MR. KOCIUBES:  Some of the chalks we

23    discussed last night, and some I've just learned this

24    morning Mr. Moloney plans to use.  If I can just show

25    you one thing.

1          You'll recall that we talked about having

2    these chalks --

3          THE COURT:  So for the record, what are we

4    talking about?  What numbers are they?  Are they

5    anything?

6          MR. RODRIQUES:  No, they're not marked.

7          MR. MOLONEY:  They're marked on the backs.

8          THE COURT:  Just call them Career Track

9    Comparison With Franchise Player, Lisa Svensson v.

10   Dexter, v. Makino, v. Davis, and v. Byrne.

11         MR. RODRIQUES:  We talked about these last

12   night.  The issue, you recall, is whether they showed

13   compensation for CIOs.  You suggested to Mr. Moloney

14   they block out any compensation for CIOs.  What they've

15   done is simply put a piece of blue tape over it, which

16   shows the blue line.  What we had suggested that masks

17   it more so you can't tell where the line goes.  It shows

18   where the comp goes, it just shows it with a blue line

19   instead of a red line.

20         THE COURT:  It's irrelevant.  You cannot

21   argue it, you cannot discuss it, it's not going into the

22   jury room, enough.  It's irrelevant.

23         Move it back a little so they have a -- they

24   won't be able to track it.

25         It's not the key issue here.  You're making a

1  mountain of a molehill.

2        What's the next issue?

3        MR. RODRIQUES:  If I can approach, your

4  Honor, there are just a few other charts that we just

5  learned they propose to use.

6        They are, going backwards, number 25, which

7  is the comparison of professional experience of Svensson

8  v. Josh Brooks.  Originally this was offered for the

9  purpose of showing that she should have gotten his job.

10 I don't know what the relevance of it is, given your

11 Honor's rulings, at this stage to compare his experience

12 as her manager with her experience.

13       MR. MOLONEY:  Here's a guy who comes in from

14 the outside, Putnam decides not to appoint either of the

15 two women who are associate directors, and they give

16 this guy a guarantee, they give them a PM position, and

17 he gets three --

18       THE COURT:  I'll let them argue it.  That's

19 really his case.  I mean, it's not a separate claim

20 because it's time-barred is the basic gist of the thing,

21 but he's allowed to argue that it was unfair.

22       MR. RODRIQUES:  He also didn't appoint

23 either of the two men.

24       THE COURT:  Are you doing the closing?

25       MR. RODRIQUES:  Mr. Kociubes is.

1    THE COURT:  He'll make it brilliantly.

2    MR. RODRIQUES:  The problem is --

3    MR. KOCIUBES:  These charts come in after I

4    argue, some of them the jury has never seen before.

5    THE COURT:  Therefore, they probably won't

6    spend much time with them because they're not going back

7    into the jury room.

8    All right.

9    MR. RODRIQUES:  Second one --

10    THE COURT:  But that is the heart of his

11    case, which is -- his big case is this young guy comes

12    in out of the blue, cans her, sides with the two guys.

13    That's the case.  He can make it as complicated as he

14    wants, but that's the case.

15    MR. MOLONEY:  I don't want to make it

16    complicated, that's his job.

17    THE COURT:  That's his case, is that chart,

18    I mean, basically.

19    MR. RODRIQUES:  Second chart, and our

20    concern here is just confusing the jury.  Second chart

21    is showing movement positions that were filled between

22    September of 2002 and 2003.  As you know, most of that

23    is time-barred.

24    MR. KOCIUBES:  And some were not filled.

25    Remember the testimony about backfilled, that there were

1  consolidations.

2          THE COURT:  So what do you want?

3          MR. RODRIQUES:  Well, we just think the

4  chart --

5          THE COURT:  Is it inaccurate?

6          MR. KOCIUBES:  Yes --

7          MR. RODRIQUES:  There was testimony, for

8  example, included within these numbers are jobs that

9  were not given to someone new.  What happened is they

10 consolidated portfolio manager positions and they gave

11 the assets managed by one portfolio manager to somebody

12 else who already had assets, he just took on additional

13 assets.

14         MR. MOLONEY:  What this is, your Honor, is

15 this is a summary of the information that's shown on the

16 subsequent pages.  I'm not going to show all of the

17 subsequent pages, but this is --

18         THE COURT:  Why don't you show the

19 subsequent pages which show exactly what happened?

20         MR. KOCIUBES:  This is all in terms of

21 veracity stuff that should have been used with a witness

22 and subject to cross-examination verification, your

23 Honor.

24         THE COURT:  We saw a lot of these.  This is

25 exactly what we heard about.

1    So you do the ones that are more accurate

2  which go blow-by-blow which people did testify about at

3  length.

4    So that's fine --

5    MR. RODRIQUES:  Including with the three red

6  ones.

7    MR. MOLONEY:  Sure.  We'll do the good and

8  the bad.

9    MR. RODRIQUES:  One last one, which is this

10  document, which is a comparison of the career track of

11  Dexter and Svensson.  This is not an apples-to-apples

12  comparison at this point; that is, Dexter is ranked

13  second comparing his management of his mutual fund to

14  all mutual funds.  She's ranked first as a research

15  analyst, that's her testimony.

16    MR. MOLONEY:  That's what the records of

17  Putnam show, first in alpha, 57.

18    MR. RODRIQUES:  Kevin, I'm just making the

19  point, it doesn't compare -- here they're compared as

20  portfolio managers, portfolio manager to analyst, and

21  there's no testimony -- this hadn't been used with a

22  witness, so there's no testimony that explains that

23  comparison.

24    MR. MOLONEY:  It's all backed up by this

25  stuff here.  It's all in the record.  He was second in

Page 11

1   his score, and she was first in her score.

2                THE COURT:  Overruled.  You argue it.

3                MR. RODRIQUES:  We don't have any objection

4   to the other chalks.

5                THE COURT:  The bottom line is you have an

6   hour apiece, so --

7                MR. KOCIUBES:  Could I induce you, maybe,

8   for an extra five or six minutes, given the extra new

9   charts?

10               THE COURT:  No, we don't have time.  That

11  takes us three hours, that takes us right through lunch.

12  I have to give them a half an hour break; my charge is

13  at least an hour; I have to go through the verdict form

14  with them.  As soon as the verdict form is downstairs,

15  I'm going to give it to them and walk it through with

16  them.  Hopefully it will be down in ten seconds.

17               (Discussion off the record.)

18               (Jury entered the courtroom.)

19               THE COURT:  Good morning to everyone.

20               So as I mentioned, today we will be having

21  closing arguments, and we will also be giving you the

22  instructions of law.

23               I've just handed you a special verdict form,

24  and I'm going to want you to spend a couple of seconds

25  reading through it, because these are the questions that

1    the attorneys will be addressing in their closing

2    arguments.

3            Let me just sort of give the geography of

4    this verdict form, if you will, so it won't look too

5    intimidating.

6            So there are three big sections here.  The

7    first section is, you see I've called the 2002 decision,

8    and that involves the question of whether or not there

9    was gender discrimination with respect to the decision

10   to move Mrs. Svensson from the International Growth team

11   to the Global Equity Research team.  And there are a

12   number of questions, as you've seen.  And question one

13   is one that you've heard alluded to, but there is a

14   statute of limitations question that you will have to

15   resolve, and I'll give you jury instructions on this,

16   but the counsel will address it.

17           And then there are a number of questions

18   about what happened with respect to that move, whether

19   it was an adverse decision, that's contested, and what

20   the basis for that decision was.

21           And then -- I'm going to give you a few

22   seconds to read it.

23           And then you'll see section B is about the

24   job decision in 2003 made by Mr. Brooks, and that,

25   again, asked certain questions about whether or not

1  plaintiff has proven that gender was the cause of that

2  decision.

3           And you'll see how I've worded it as you go

4  through question B 1, 2, 3, and there are various

5  damages questions, and that's, of course, because we

6  give you the instructions and the closing arguments all

7  at one time.  It isn't supposed to say to you you've got

8  to reach damages; you may decide not to, but the reality

9  is, this is going to give you each of those decisions in

10  those questions.

11           And then the last section is one on punitive

12  damages for the same reason, which is, we give you the

13  instructions and the verdict all at one time, not

14  sequentially, so it's an A, B, and C.

15           And why don't you take a few minutes and

16  read how I've worded it, it's very carefully worded, and

17  also -- you don't have to focus right now on how you get

18  from one to another, because I'm going to give you very,

19  very detailed jury instructions later on about it.

20           So just read it so you'll at least have a

21  sense what they're talking about, what are the issues

22  they're addressing.

23           (Pause.)

24           THE COURT:  Just look up when you're done.

25           You can keep these, take notes on these.  I'm

1    going to give you a final, very clean one that's going

2    to be the official verdict form, so you should all take

3    notes on these, actually.

4            Do you all have enough notebooks, by the

5    way?  Anyone need another notebook or another pen?

6            I would encourage you, if you take notes on

7    the closing arguments, you remember these are closing

8    arguments, they're not a substitution for the evidence,

9    and there's a certain etiquette, which is, people don't

10   pop up and object to what the other side is saying, or

11   everyone would be objecting the whole time.  So it's

12   pretty rare there's an objection.

13           It's each an hour.  At about 55 minutes, I'm

14   going to give a five-minute warning, and at 60 minutes,

15   the hook.

16           There we go.  We're going to do the reverse

17   order of opening statements, so defense, Mr. Kociubes, I

18   think, will be going first.

19           MR. KOCIUBES:  Thank you, your Honor.

20           Yes.  For the last time in this trial, good

21   morning, ladies and gentlemen.

22           Let me, first of all, thank you very much on

23   behalf of myself, our colleagues here, and our client,

24   Putnam Investments.  We appreciate a trial, especially

25   one that's a couple of weeks, is terribly disruptive of

1  people's lives.  You have come, been attentive, and we

2  are very grateful for it.

3          Juries are sort of one of the most important

4  parts of our system of self-governance, and the

5  sacrifice you make in coming here is appreciated by all

6  of us, and we all thank you.

7          With respect to the trial, let me suggest

8  that there -- they are divided into subissues, but there

9  are two essentially basic issues that you are going to

10  be confronting.  One is, was Lisa Svensson transferred

11  from Portfolio Management to Research because she was a

12  female?  She calls it demotion, Putnam calls it a

13  transfer, we'll deal with it.  At the end of the day,

14  the issue is, did it happen because she was a female or

15  did it happen because of performance issues?

16          The second sort of group of issues revolves

17  around the September 15, 2003 termination.  And again,

18  it's a parallel issue.  Did that happen to her because

19  she was a female, or did it happen to her for other

20  reasons?

21          I suggest to you that what the evidence in

22  the case shows is that Mrs. Svensson was given

23  opportunity after opportunity.

24          You've now heard stories and histories of a

25  great -- names of a great many individuals.  And I ask

1  you to think about whether you can name any other

2  individual that you've heard about at Putnam who was

3  given more opportunities than Mrs. Svensson was.  I

4  suggest there wasn't such a person, at least that came

5  up in this trial.

6      You may recall that when I first spoke to

7  you in the opening, I suggested to you that what the

8  evidence would prove is that the reason Mrs. Svensson

9  was transferred was because of the disastrous, the

10  disastrous performance that she and her team had in

11  Portfolio Management.  They lost billions of dollars of

12  their investment money.  I suggest to you now, and we'll

13  look at it in some detail, that the evidence holds that

14  out.

15      The evidence will also show she was given an

16  opportunity to resurrect her career, an opportunity that

17  a lot of the other Growth managers, both male and

18  female, were not given; they were terminated.

19      The second thing I said to you in the

20  opening is that the termination and the events around

21  the termination is that she did everything in her power

22  to make sure that her manager said the words "You're

23  fired," until -- kept upping the ante until eventually

24  he finally said that.

25      I also indicated to you there were problems

1  on her team which sort of led up to that, and there was

2  an investigation, and I suggest to you that the evidence

3  demonstrates that.

4          Before we look at the specific evidence, let

5  me sort of make a couple of general observations,

6  because we heard a lot of sort of individual facts, but

7  the question is -- let's step back for a moment -- what

8  evidence was there in the record that anybody did

9  anything adverse to Mrs. Svensson because of her gender?

10 Where was the that evidence?

11         What we heard was, you know, look, I am

12 female.  That's accurate.  I was transferred.  That's

13 also accurate.  Men were fired at the same time, but

14 never mind that.

15         I'm female.  I was terminated or my

16 management responsibilities were taken away.  That

17 literally is also true, that collection of facts.

18         I'm female.  Men in other teams,

19 particularly if I get to choose them in the Core team

20 which was performing well, got paid more than I did.

21 Again, that's true, especially if you disregard the

22 notion of performance.

23         But what these are, are nothing more than

24 observations.  Nothing more and nothing less.

25         I washed my car this past Monday.  Tuesday

1   it rained.  What's missing from that is any kind of

2   causal connection that one of these things is related to

3   the other, that one caused the other.

4            And so here we are now, after three weeks of

5   trial.  And you saw that Mrs. Svensson had access to

6   Putnam documents, she had access to deposing,

7   questioning people before trial, she was able to

8   subpoena witnesses at trial.  You heard the names of a

9   great many former Putnam employees plus current Putnam

10  employees.  You heard the names of current and former

11  senior women at Putnam.  Where was the -- and you heard

12  the names of some former Putnam employees with whom she

13  is still friendly.  How do we know that?  Remember, she

14  told me she used them as references in her job hunt.

15           With respect to that whole universe, we know

16  that witnesses exist.  Where was there even one

17  individual, one individual who took the stand, took the

18  oath and looked you in the eye and said, yes, this event

19  happened to Mrs. Svensson because she was a female?

20  Where was there one witness, man or woman, current

21  employee or former employee, who suggested that?  Yes,

22  she was transferred, and I'll be darned, I can't think

23  of any reason for that other than she's a female.  Or,

24  yes, she was terminated, and it had to have been because

25  she was a female for the following reason.  Where was

1  that witness?  That hole, that hole is a cavern, and it

2  lies at the very heart of her case.

3          What we did hear is Mrs. Svensson say over

4  and over again that she thought she was as qualified as

5  anybody to assume certain positions.  And nobody should

6  criticize somebody's self-confidence, but the fact that

7  I think I'm qualified for something doesn't mean I'm

8  entitled to the position, and it doesn't mean that if I

9  don't get it, someone is discriminating against me.  It

10 simply means I have confidence in my abilities, and it

11 proves literally nothing else.

12          And actually, the one thing as she sort of

13 talked about with respect to all of this that sort of

14 got pushed aside was the notion that her team had lost

15 billions of dollars.  Recall that in 18 months that

16 Global Growth gave back ten years' worth of investor

17 gains, ten years' worth of investor gains.

18          If, then, the Core teams, the teams that were

19 performing very well, that were making money for their

20 investors, if they didn't take her on the team, that was

21 because she was female?  Where is that connection?

22 Isn't there a more obvious connection?

23          And let's think about the investors.  Think

24 about -- you heard a lot that the proxy statements get

25 filed and so forth that list who the managers are.

1   Think about what that announcement to the investors

2   would look like.  Good news, ladies and gentlemen, the

3   management of your team has been making money for you;

4   we've just decided, however, to add a manager who has

5   lost billions of dollars.  Life doesn't work like that.

6   Nobody wants their money managed like that.

7           So she was given an opportunity to reinvent

8   herself, to re-establish herself.  You cannot lose

9   billions of dollars of other people's money and then say

10  I can't think of any reason that another investment team

11  who's doing well wouldn't want me except for the fact

12  that I'm female.  That simply makes no sense.

13          This is no different than the baseball

14  player -- and I don't know if any of you are fans or

15  not -- who hits .200 and can't understand why he doesn't

16  get Manny Ramirez' job.  There's a reason for that, it's

17  called performance.  And this business works exactly the

18  same way.  And I want to be clear about one thing:  I

19  think all of us can agree that there is discrimination

20  in this world.  There is way too much discrimination in

21  this world, there's no question about that, and we

22  should never minimize the discrimination in this world,

23  but nor should we exploit it either.

24          The issue in this case is whether the

25  various things that happened to Mrs. Svensson happened

Page 21

1    as a result of her gender or whether there were other

2    reasons.

3           The one thing that we know that was proven

4    in this case is that this business is a tough, tough,

5    tough business.  It is tough for men, it is tough for

6    women.  You can make lots and lots of money, but you're

7    like an athlete without a guaranteed contract.  If you

8    don't perform, you're gone.  And you heard

9    Mr. Oristaglio talk about he had to get rid of dozens of

10   managers because the performance was down.

11          You can't hit .200, or in this business lose

12   billions of dollars, and then complain that the reason

13   your options are limited must be because of your status,

14   in this case, because you're a female.

15          The issue is to make money for your clients,

16   for your investors.  They have to trust you with their

17   money.  They are under no obligation to keep letting you

18   manage it.  And if they pull their money out, everybody

19   agrees there are consequences, and that's what happened

20   in this case.

21          And against that backdrop, let us review

22   sort of the history of what I think the evidence shows.

23   And I think the history will demonstrate that Putnam

24   gave Mrs. Svensson opportunity after opportunity, and

25   the history will demonstrate opportunities squandered.

1    She's hired in 1994, we know.  Robert

2  O'Donell hires her for research.  She's given an

3  opportunity by Putnam.  Mr. O'Donell promotes her to

4  senior vice president.  He's promised within four or

5  five years he's going to help get her skills so she can

6  be considered for money management.  Putnam gives her an

7  opportunity to do that in little more than three years.

8  She's got an opportunity.  Is he acting against her

9  because she's a woman?  She testified she still uses him

10  as a reference to this day.

11    Her next manager, Robert Swift.  Mr. Swift

12  takes her on for his team, officially January 1998; it

13  looks like she started transitioning a few weeks

14  earlier.  He gives her the opportunity she says that she

15  always wanted.  She wanted an opportunity to manage

16  money.  What does Swift do?  He puts her with another

17  woman helping him manage the Global Growth Fund.  Of all

18  of Mr. Swift's funds in that entire team -- remember

19  what Mr. Dexter told you yesterday: Global Growth

20  constituted about 75 percent of the assets, it dominated

21  it.  It was the most important fund.  He has now

22  literally, Mr. Swift, bet his career, as it turned out,

23  on the management of that fund by Ms. Kelly and

24  Ms. Morgan.  Is that evidence of gender bias by

25  Mr. Swift?  He's bet his career.  And how does he treat

Page 23

1    her?  In 1999, her second year on that team, she gets

2    her $140,500 salary, he gives her a $990,000 bonus, and

3    she's awarded 2,500 shares in options in stock. And it

4    was more than anybody on the team, except for

5    Ms. Morgan, another woman, and Mr. Swift himself.  Is

6    that evidence of gender bias?

7            And recall, he nominates her for managing

8    director, and he gives her and Ms. Morgan a 4.78 out of

9    a 5-point scale for manager's ratings.  Is that evidence

10   of gender bias?

11           There's a little side show a couple of days

12   ago about whether in some -- in a round meeting there

13   were handwritten notations -- remember Mr. Tibbetts

14   testified that some of them were adjusted or

15   Mr. Tibbetts wrote it down?  What we know from that --

16   you'll have the entire sheet -- all three people that

17   were on the sheet for Mr. Swift's team, Dexter, Morgan,

18   and Mrs. Swift (sic.), were all written down.

19   Apparently he was a high grader.  But in terms of

20   gender, both Ms. Morgan and Ms. Svensson started at

21   4.78.  Ms. Morgan ended up at a 4, Ms. Svensson at a

22   3.5.

23           What you will see from the sheet, some people

24   were higher, some people lower, but there's no gender

25   pattern there.  There's no gender pattern there.  We

1  know that because we have at least one other woman from

2  the team.

3          So now we get early in the year 2000.  The

4  performance is still strong, Mr. Swift nominates

5  Ms. Svensson for managing director.  We know what the

6  vote was.  Three other women made it that year, three --

7  there were only four nominated, Ms. Svensson was the

8  fourth; six men nominated, four of the men made it, two

9  of the men didn't.  Ms. Svensson didn't get a single

10  vote, even from the two women who were voting.  Is that

11  evidence of gender discrimination?

12          That year, for 2000, when it ended, she

13  still gets her $145,500 salary.  Her bonus is now up to

14  $1,350,000, plus 300 shares and options.  Nobody ever

15  paid her what Swift did; nobody ever gave her the kind

16  of reviews that Swift gave her.  Remember, those shares

17  and options turned into real money; she ultimately

18  cashed them out for a little bit better than $1,500,000.

19  The bottom line is, she did way better than those

20  investors whose money she was managing.

21          We get into 2000, 2001.  Global Growth is

22  bleeding money.  It is losing money for the investors by

23  the truckload.  It is a disaster.  And what happens in

24  that year?  The bonus pools -- and they weren't the only

25  ones, remember what happened to the bonus pools for

1  2000, the total Putnam bonus pool was $335 million;

2  2001, it had come down almost in half, $184 million.  So

3  that year, while she was still a portfolio manager, her

4  compensation came down, she was making less money.  For

5  2001, $655,000, counting her bonus.

6           Now, what happens thereafter?  By the way,

7  with respect to Mr. Swift, he treated her so badly that

8  after they were both gone, remember, she gave him her

9  secret e-mail address, and he still helped her attempt

10  to find other jobs.  But even under the Swift regime,

11  there were warnings of what was to come.  Remember what

12  happened to her manager, Swift, performance ratings.

13  They go from a 4.78 to a 4 to a 3.5 in consecutive

14  years.  And in the 2000 review, and you will have it in

15  the jury box, he warns her, puts in a comment about she

16  has to be careful about how she's treating younger

17  professionals.  It pops up as early as 2000.  And

18  remember what Mrs. Svensson said when she was on Global

19  Growth, that mutual fund she was helping manage, it was

20  when they were managing it, had a reputation, she

21  said -- she disagreed with it -- a reputation as the

22  most dysfunctional team in the entire Putnam.  But they

23  had good performance for two years.  Once that

24  performance was gone, you were left with a dysfunctional

25  team with no performance.  And that was the situation in

1    2001.

2              And let me pause here for a second, because

3    you heard from witness after witness, although not from

4    Mrs. Svensson, that the point of the game is to manage

5    other people's money wisely.  And think about the

6    testimony of Mrs. Svensson.  She knew or knows to the

7    penny how much certain other people got paid, but when

8    asked how much money did she lose for her investors, no

9    idea until she confronted it.  No idea.  It's like that

10   was irrelevant.  It's like the issue is what she was

11   getting paid, never mind what it was causing out in the

12   real world.

13             We know there were several Global Growth --

14   remember she said A and B, there was a chart with just

15   one of them.  We know its assets went from just under $6

16   billion to just under $3 billion, almost in just that

17   one slice a $3 billion loss.  They were the 95th

18   percentile, all the way at the bottom of all mutual

19   funds.

20             So enter Steve Oristaglio.  What is

21   Mr. Oristaglio' mission?  Fix Growth.  It is a disaster.

22   Not just Mrs. Svensson's team, it is a disaster, these

23   funds are performing terribly.

24             What evidence is there that Mr. Oristaglio

25   had gender influencing his thinking at all?  Did you

1   hear about any crude comments or jokes from

2   Mr. Oristaglio?  Did he say anything that was -- that

3   Mrs. Svensson wrote down in her diary that somehow was

4   inappropriate?  There wasn't any such thing.  But he

5   confronts a crisis in the spring of 2002.  So what does

6   he do?  The Global Growth team that Mrs. Svensson was

7   on, that mutual fund, had turned a dollar into 48 cents

8   in a matter of less than two years.

9           On the other hand, his Core team, the Core

10  teams, a different unit, they were doing very well.

11  Their funds were above -- 91 percent of their funds were

12  above average for one year, 96 percent for three years.

13          So he takes the assets of this fund that was

14  losing money, that was being managed in part by

15  Ms. Svensson, and moves it to the people who were making

16  money for their investors.  That makes all the sense in

17  the world.  And if you're an investor, isn't that what

18  you want to have happened?  That's got nothing to do

19  with anybody's gender, that's got everything to do with

20  performance.  So now 75 percent of Mr. Swift's assets

21  are gone, they're going to be managed by somebody who is

22  making money.  There's no evidence of gender bias in any

23  of that.

24          He's left with a much smaller group.  So

25  what does he do?  First of all, Robert Swift is fired.

1  He's the head of the team.  He gets no second chance, he

2  gets no opportunity to transfer to a different

3  department.  He's male.  He's just fired.  He's cleaned

4  out.

5          You're going to hear about Steve Dexter, but

6  you remember in Mr. Oristaglio's presentation to the

7  firm in 2002 about what was going on, Mr. Dexter was

8  primarily responsible for operating something called the

9  International New Opportunities Fund.  It had started

10  getting better.  It was in the 45 percentile, starting

11  with one as being the best.  Mrs. Svensson's on a

12  one-year basis was at the 82nd percentile, and on a

13  three-year basis -- you'll have that, it's Defedants'

14  Exhibit 19 -- on a three-year basis was considerably

15  worse than Mr. Dexter's.

16          So here's the logic:  Is refusing to replace

17  Mr. Dexter, whose fund had turned around and had started

18  to perform better and had performed better over a

19  three-year position, is refusing to bump him out of that

20  position and replace him by Lisa Svensson whose fund did

21  worse, is that evidence of gender bias or is that

22  evidence of good management?  Would the investors be

23  thrilled with that kind of switch?  What possible reason

24  is there to replace Mr. Dexter, who had been performing

25  better, with Mrs. Svensson?

1    And by the way, with respect -- remember you

2  heard of the institutional funds from Global Growth

3  remained there, and you heard Mr. Dexter say they gave

4  that to Denise Seldon to manage.  So that portion of

5  what had been Mrs. Svensson's fund went to another

6  woman.  Is that evidence of gender discrimination?

7    Let's see what else happened.  Mr. Swift got

8  fired, he got no second chance.  And you remember that

9  chart with the growth people, where we went through and

10  we crossed out gone, gone, gone, gone, gone.  Most of

11  the managers of the Growth funds, they all got fired.

12  Do they get to say they didn't get a second chance

13  because they were men?  Or is the issue when you're

14  performance is terrible, there is a cost to pay?  They

15  didn't get any second chance, they were gone.  And

16  Mrs. Svensson at the time knew what the deal was.

17  Remember in her diary that we read during her

18  examination, she was terrified that she was going to be

19  fired along with Mr. Swift; for good reason, she knew

20  what the performance was.

21    In steps Mr. Oristaglio and he saves her.

22  Now, we can call that a transfer, we can call it a

23  demotion, we can call it a lifeline, we can call it the

24  second chance, the words don't matter.  She got an

25  opportunity that the others didn't.  Most of the males

Page 30

1  on those teams, they were fired.  She's given an

2  opportunity to go back to Research and re-establish

3  herself.  And who else got that kind of an opportunity?

4        What happens to her compensation?  Remember

5  her last year as a portfolio manager she had made

6  $655,000, the bonus pools had come down.  2001 --

7  remember they had gone from 2000 from $335 million, in

8  2001 they were $184 million.  In 2002, they went down

9  again, this time to $130 million.  What did they do to

10  Mrs. Svensson?  They didn't cut her at all.  They didn't

11  cut her at all.  And even with the bonus pools coming,

12  they gave her the same amount of cash but added on --

13  she said -- $128,000 worth of stock.  So while the bonus

14  pools were coming, coming down, when she had her --

15  after she had her, quote, demotion, they paid her more,

16  the compensation was higher.  Call that whatever you

17  want, it doesn't really matter, but let's see it for

18  what it is.  It's an opportunity they gave her to save

19  her job.

20        By the way, it will come out, and has come

21  out, that Mr. Oristaglio's judgment that Mrs. Svensson

22  potentially could be a good analyst again and that

23  Mr. Dexter could run that fund will prove to be

24  accurate, because in her first full year, only full year

25  in Research, she was in the top 25 percent of the Putnam

1  analysts.  There was also evidence, and you will see,

2  that Mr. Dexter, going forward, running that fund, was

3  in the top quartile of similar funds for the entire

4  United States.  So even forgetting an apples-to-apples

5  comparison, Mr. Oristaglio's assessment of who was apt

6  to be doing well at what proved to be accurate.

7       All right.  She calls it a demotion.  It's

8  interesting that there was no witness who was called,

9  there was no piece of paper that was shown to you, there

10 was no organization chart that calls it a demotion.  We

11 know her title didn't get cut, we know her compensation

12 went up from 2001, when she was a portfolio manager, to

13 2002.  And by the way, doesn't that prove that you can

14 make more money as an analyst than you can as a

15 portfolio manager, that it's not automatic?

16       All right.  So she's -- Mr. Oristaglio is

17 going to try to use her strengths, and now what happens?

18 She complains here that she didn't get an opportunity to

19 get to transfer to Core, to one of those funds.  And I

20 expect we're going to hear argument that she wants to

21 compare herself to some of the superstars and what they

22 were making managing Core funds, Mr. Makino, Mr. Josh

23 Byrne, Mr. Simon Davis.  But the issue is she had an

24 opportunity as a portfolio manager, she and her team ran

25 it into the ground.  These are people who were making

1    money.  This, again, is the equivalent of the .200

2    hitter who doesn't understand why Manny Ramirez is

3    making more money.  Of course he's making more money,

4    but it's not because he's Latin, it is because his

5    performance is different.  So simply putting on this is

6    the number of years Manny Ramirez was around and this is

7    the number of years somebody else is around, it's an

8    interesting statistic but it doesn't tell you anything

9    about the one metric which really matters, and that's

10   what goes on in this case.

11        We then -- let me just pause here because

12   you recall that Judge Saris told you the first question

13   that you're going to be asked is -- has to do with the

14   statute of limitations.  And let me just comment on

15   that.  Remember she was transferred in April of 2002,

16   and the question, I think -- the questions you'll be

17   struggling with is, for example, did Mr. Oristaglio

18   somehow mislead her into thinking that it was a

19   temporary position or that she would be coming out?  For

20   sure he said, look, I'm not closing the door for all

21   time, I'm open-minded, you know, things may happen.  But

22   he certainly never said -- and you heard his testimony

23   -- that this was some short-term thing.

24        And the second issue, we know she didn't

25   defer any kind of action, because she told us that.

1  Remember?  She told us that when she got word of this

2  transfer, she job hunted.  So that we know that she

3  acted on the assumption that she was going to be there

4  not just for a month or two months or three months, she

5  job-hunted.  The issue is, she couldn't find a job, so

6  she ended up staying and ended up sending

7  Mr. Oristaglio, remember, a thank-you note for giving

8  her the opportunity.

9          So then we get to her next supervisors, Bill

10 Landes and Steve Gorman.  Landes takes her into

11 Research, Gorman is her supervisor.  Any evidence of any

12 kind of untoward comments or anything they made about

13 women or about her or inappropriate behavior?  She had

14 her diary.  Zero.

15         They give her an opportunity in Global

16 Equity Research.  She asks to cover 14 stocks; Gorman

17 says to her, we're going to give you 11, get up to speed

18 about those, then we'll talk about the other ones.  So

19 it happened, two, at least, of the other ones were being

20 covered by a man named Jim Falvey.  Is that evidence of

21 discrimination?

22         She says she wants to manage the Global

23 Natural Resources Fund, which is in Research.  She gets

24 to do that within nine months.  She says that she

25 complains that Mr. Landes asked her to be the right-hand

Page 34

1    man of a guy named Michael Yogg who was an associate

2    director of Research.  She refuses.  Landes does nothing

3    to her, and within nine months appoints her as associate

4    director of Research.  Is that evidence of some kind of

5    gender discrimination or bias?

6            She asks for four analysts; they give her

7    three right away.  Not good enough; she wants the

8    fourth.  Who's the fourth?  Darren Peers.  Why does she

9    want Peers?  Because, remember -- and this came out in

10   her cross-examination -- Peers, quote, was clearly the

11   best junior analyst of this team and the one most likely

12   to make me successful as a manager.

13           What's significant about this other than the

14   obvious about making her successful as a manager?

15   Gender.  Gender.  The key to this business is

16   performance.  She's not asking for a woman, she's asking

17   for somebody who fits in that job.  And I don't suggest

18   she's biased against women, she's not.  But the issue is

19   when picking people for these teams, what you're doing

20   is matching up credentials.  She acted exactly the way

21   that the other Putnam managers acted, trying to pick the

22   most appropriate person for the spot.  She asked for

23   four analysts, all four that she asks for are male.

24   That doesn't prove that she's acting on the basis of

25   gender, it simply proves that she's acting rationally.

1  They had the talents and skills that she thought she

2  needed.  It is exactly the same kind of behavior for

3  which she criticizes other managers at Putnam.  And you

4  know, we can put up a chart if you want, if you want to

5  do raw numbers, that look -- 100 percent of the analysts

6  that she asked for were male.  When she asked for an

7  additional one, it was still 100 percent male.  There

8  was no change.  It was always 100 percent male.  That's

9  still true.  That's the I washed my car on Monday, it

10 rained on Tuesday.  That doesn't prove anything.  It

11 doesn't prove anything because it doesn't tell you

12 anything about anybody's reasons.

13          Falvey is managing Mr. Peers, Falvey is

14 managing -- Jim Falvey is managing the Natural Resources

15 Fund, and you heard Mary McNamee yesterday stating that

16 his performance was good.

17          The problem is Mrs. Svensson wants Peers and

18 she wants to manage the fund.  And so surprise,

19 surprise, she and Mr. Falvey don't get along.  And

20 remember from the cross-examination, within a couple of

21 weeks of joining Research, she's attempting to undermine

22 Mr. Falvey with his boss, saying that he doesn't know

23 how to manage people.  Imagine if somebody did that to

24 Mrs. Svensson.  Oh, wait, wait, we'll come to that, I

25 guess, later.  But imagine how she would react.  Imagine

1    how she would react if somebody wanted to take her fund

2    away from her.  Yet, that's exactly what she does to

3    Falvey.  Did she do that because he was a man?  I don't

4    suggest that.  But that's the problem with sort of stray

5    things that you can't connect the dots on.

6              So she and Falvey don't get along, he's in

7    her way.  What happens?  Well, we know what happens.

8    Within nine months that team had become so dysfunctional

9    and the strife so awful that management had to do

10   something.  And what did they do?  They fired Jim

11   Falvey.  They didn't give him a second chance, they

12   didn't offer to send him to a different department; they

13   fired Jim Falvey.  Is that evidence of gender animosity

14   against Lisa Svensson?  How does that work?  And by the

15   way, remember her expert, Dr. White, at this point did a

16   little cohort analysis of people within GER, and

17   remember she picked eight names and she wanted to be

18   compared for compensation and managers' ratings of

19   things, and remember what he found?  She was exactly in

20   the middle for manager's rating, and among the eight

21   names she chose, she was exactly in the middle for

22   compensation.  On her best case, does that prove gender

23   discrimination?

24             All right.  So now we go to early 2003.  The

25   conflict with Falvey is resolved because they fired

1    Falvey.  She now has all 14 stocks she wants; she now

2    picks up Darren Peers to supervise, so she has all four

3    of the analysts; she now manages the Global Natural

4    Resources Fund; and she's now got the title she wants,

5    associate director of research; all within nine months

6    of her getting there.  Life should be good.  Life should

7    be good at this point.  Steve Oristaglio's judgment has

8    been validated, she seems to be doing a good job there,

9    Dexter is doing a good job where he's doing.  And that

10   was the year, remember, even though the comp pool went

11   down, she had the same cash but an additional $128,000

12   worth of stock.  So much for this being a demotion.

13           At the end of 2002, however, she testifies

14   that she gets to participate in discussions, because

15   she's going to be an ADR, about compensation of other

16   analysts, and she discovers that a couple of men,

17   several men, are paid more than she is.  Never mind that

18   she's brand new, she hasn't even been there for a year;

19   never mind that she's coming out of disastrous

20   performance where she was and that she actually got a

21   raise.  She sees that some people got paid more.  Never

22   mind that there are a whole lot of people -- and you'll

23   have the entire chart -- you'll recall, got paid less

24   than she did.  If someone gets paid more and they're a

25   male, it must be because they're male.  Well, how does

1  she explain -- she's number eight out of the

2  approximately 50.  How does she explain that there are

3  the seven above her, two of them are female, Kelly

4  Morgan and Proeti Sayana.  That can't be gender.

5  So she focuses on the few men and not the

6  vast majority who are paid below her.

7  Remember what Mr. Tibbetts said, what they

8  were looking for was sustained, long-term, consistent

9  performance.  She had been there for a year and had done

10 well, her previous two years had been terrible.  So she

11 compares herself to Terry Norchi, who is a medical

12 doctor covering health stocks, had been there recently,

13 was on a guarantee, that was what was the basis of his

14 compensation; and Roger Sullivan, who made slightly more

15 than she did, who had been in the industry for a long

16 time and was their number one analyst for two or more

17 years.  It's performance.  And she compares herself to

18 two other people, Saba Malak and RJ Bukovac, they were

19 in the top 25 percent for two or more years.  That's the

20 obvious explanation.  It's performance.

21 By the way, Peers and O'Malley were in the

22 top 25 percent for two or more years and Peers was

23 number one for 2002, they got paid less than she did.

24 I don't know, maybe the fact that she wasn't

25 at the top ate away at her.  Maybe the fact that what

1   she really wanted to be was a portfolio manager ate away

2   at her.  But the fact that it bothered her, the fact

3   that she disagreed or wanted to do something different

4   doesn't prove that she was being discriminated against.

5   But it is this individual, then, in the spring of 2002

6   who confronts Josh Brooks when he's hired.  Remember,

7   Brooks had been up to be president, the CEO of a

8   different company.  And remember what she says in her

9   diary about Mr. Brooks.  He starts in April.  In April,

10  May, June and into July; he was very supportive of her.

11  She didn't write that about any other boss.  Remember

12  what, also, Mr. Brooks said:  He found a culture in the

13  department of fear and selfishness.  Selfishness because

14  people were focused on their compensation and titles

15  rather than on doing well for the investor.  Fear

16  because, essentially, if you're going to pick a stock as

17  an analyst, you're betting against millions of other

18  people who think the stock is fairly priced.  So there

19  has to be sort of a collegiate culture, and he thinks

20  the culture is broken, and he tells everybody that.

21  They know where he's coming from, including Lisa

22  Svensson.  There is no surprise about that.

23          What does Mrs. Svensson do?  She recalls

24  that he was supportive, she recalls he praised her at a

25  team luncheon.  She goes to him when he had been there

Page 40

1   little more than two weeks, this guy who says he's

2   worried about a culture of a selfishness, and says to

3   him, you know, it's managing director time and I heard

4   there may not be any promotions this year and I need a

5   promotion and, by the way, I need more money.  She had

6   only been promoted to ADR a couple of months earlier.

7           This is her welcome to her new boss.  He's

8   not furious.  You saw him, you heard how he described

9   that event.  He says he's going to check for her, he

10  does, and he gets back to her and says, yes, there's a

11  freeze on managing director promotions this year.

12          She then goes out on a trip to Europe, and

13  calls him, her new boss, about the indignity of having

14  to fly coach on the way home.  It was more, apparently,

15  than she could stand.  This is an individual who told

16  her he didn't care about titles and is worried about

17  selfishness in the department.

18          Even then, when she has lunch with Mr. Peers

19  afterwards to talk about it, remember what she told me?

20  He was supportive, he said yeah.  He was supportive.

21  He's taken that in stride, but a history here is being

22  built.

23          Then early on, she complains to Mr. Brooks

24  about one of her four analysts, Darren Peers, the

25  number-one ranked analyst.  She's complaining to him.

1  And then she complained slightly thereafter about one of

2  her other ones, Konstantin Stoev, he's one of her

3  weakest analysts, and she tells Mr. Brooks he was on the

4  verge of being fired.  She's undercutting her own team

5  to Mr. Brooks.  And then she tells Mr. Brooks that she

6  has a problem with a third of her analysts, Chris

7  O'Malley.  And Mr. Brooks is still supportive.  He says,

8  If you've got a problem -- because he doesn't know --

9  write it up.  Write it up.  He is still supportive.  He

10  doesn't say, you know, stop picking on the boys, leave

11  them alone.  He says, Write it up.

12          And then in short order, several things

13  happen.  One is -- and you heard the detail, the story

14  sort of filled in from Mr. Peers' deposition yesterday

15  -- Mr. Peers talks to Mr. Brooks.  He's the number-one

16  ranked analyst for the previous year and top 25 percent

17  for two years or more.  And he says he's got good

18  feelings about Putnam, he's been treated well, but he

19  wants to give Brooks a heads up, he's thinking of

20  leaving.  Why are you thinking of leaving?  He cannot be

21  managed by Mrs. Svensson anymore.  He makes no demands.

22  You know, there are a lot of ways that it can be

23  resolved, but he makes no demands.  He doesn't say it's

24  her or me.  He doesn't say I have to be transferred.  He

25  doesn't say I need more money.  He says I'm giving you a

1 heads up.  If you make a change, I might or might not;

2 he doesn't commit to staying.  He is giving Peers -- he

3 is giving Brooks a heads up.  Remember in the deposition

4 yesterday, he was afraid he was going to get fired for

5 talking up.  He's just saying that he's job hunting.

6        So now we've got this going into the mix of

7 the culture that Mr. Brooks is worried about.  Brooks

8 jumps to no conclusions, he takes no action against

9 anybody, he doesn't do anything to Mrs. Svensson.

10        And then in short order after that, he hears

11 that there's a problem with -- with Chris O'Malley.  And

12 remember,  Mrs. Svensson had already complained to Mr.

13 Brooks about Chris O'Malley.  And this time he hears it

14 from Mary McNamee.  And remember, she testified

15 yesterday, and she lets Mr. Brooks know that there are

16 issues now between O'Malley and Mrs. Svensson.  And it

17 comes across against this whole backdrop.  History

18 continues to sort of build itself.

19        And in due course they decide they don't know

20 who's right or wrong.  They decide they're going to look

21 into it.  It is a perfectly reasonable thing to do.  It

22 evidences no animosity or bias toward anybody.  Remember

23 Mrs. McNamee said she participated in this

24 investigation.  Mr. Brooks didn't tell her I want it to

25 come out one way or the other.  We need to look into it

Page 43

1   and get to the bottom of it.  Remember, Mrs. Svensson

2   had given Mr. O'Malley a 3.5 rating just the previous

3   January, same rating she got.  And then Brooks hears

4   that O'Malley is thinking of leaving.  At that point

5   what does a manager do, other than start scratching his

6   head, what is going on on that team?  We need to know

7   what's going on on that team.

8           So they did bullet points.  Remember August

9   8th, you'll have them in there, where Mrs. Svensson

10  writes up what her issues are with Mr. O'Malley.  And

11  she sends them to Mary McNamee, and Mary McNamee shares

12  them with Mr. Brooks, the manager, the head of that

13  Research team.  Brooks reads them, and among the things

14  that Mrs. Svensson said is she had one-on-one with

15  certain managers.  Brooks that afternoon runs into one

16  of those managers, Omid Kamshad, in the hall and asked

17  about Mr. O'Malley.  Kamshad says, I didn't talk to her

18  about O'Malley, and I don't have any problems with

19  O'Malley.  Well, what do you do as a manager at that

20  point if you're responsible?  You look further.

21          So McNamee and Brooks divide up people and

22  they start interviewing them, and the stories are the

23  same.  They've interviewed some overlapping but

24  different people, but what they're hearing is, one,

25  there weren't one-on-one's with all these managers; two,

Page 44

1    sure, there were criticisms, there are criticisms of

2    anybody, but there was an awful lot of positive things

3    that people were saying.  And you look at those bullet

4    points, there's no indication of anything positive.

5    There's no indication in there, you can't figure out

6    from that that there's some people that haven't been

7    spoken to.

8          So now what they're confronting -- and

9    remember Mrs. McNamee, she was more blunt than

10   Mr. Brooks was in terms of the nature of that document,

11   that it was essentially dishonest.

12         They check further now.  And remember, they

13   check with the team.  They knew about Peers and

14   O'Malley.  Remember, Brooks said he talked to

15   Mr. Eckland.  He was a third on that team.  Eckland

16   describes the team as dysfunctional.  There's that word

17   again, "dysfunctional."  And then the fourth is

18   Mr. Stoev, who doesn't know what Lisa Svensson is saying

19   behind his back.  He says, I've got no problem.  He

20   also, you heard from Ms. McNamee, happened to be the

21   weakest analyst on the team.

22         Then the two young females on the team come

23   and visit Mr. Brooks.  Leah Graham has no problem.

24   Krista Chihorek has the same issues that the guys have.

25   So now 50 percent -- one of the two young women and

1  three out of four of the men have got serious problems

2  with the team.

3         Now, we can say the entire team is out of

4  step, or you might think something else is going on.

5         Mr. Brooks, meanwhile, is confronting a

6  situation where he thinks two, and the two best, may be

7  leaving; the third, Eckland, if he's describing the team

8  as dysfunctional, he's thinking could be at risk for

9  leaving.  He doesn't know about Krista Chihorek, and he

10 says repeatedly he doesn't want to fire Lisa Svensson,

11 he wants to keep her, but he wants to keep her in a role

12 where she can be productive.  Is that evidence of gender

13 discrimination?

14        Do you remember on cross-examination he was

15 badgered for a while about he really wanted her to

16 leave, wanted her to leave, wanted her to leave, and

17 finally, in a very quiet voice, Mr. Peers said to --

18 Mr. Brooks said to Mr. Weir, no, I just wanted her to

19 stop hurting people.  That's what he was confronting.

20 That's what he was confronting.  So he was trying to

21 figure out a way where he had a chance of keeping as

22 many people as he possibly could.

23        So what happens?  He ultimately meets with

24 Mrs. Svensson on August 28.  And he tells her that he's

25 shocked at what he didn't find, and that she hadn't

1  spoken with everybody and didn't find any positive

2  feedback, of which there was a considerable amount.

3           What does Mrs. Svensson say?  She says, yes,

4  I didn't speak to everybody; and two, I didn't talk to

5  the people who had good things to say.  She offers to go

6  get her notes about the people she did talk to, but what

7  more is there to talk about?  She has admitted the

8  essence of what Mr. Brooks is worried about.  She hasn't

9  denied it.  There's no different story.  She's admitted

10  it.

11          So Brooks at that point tells her he had

12  consulted Mary McNamee from HR, she didn't have any

13  different views on what to do.  He said in light of

14  that, he was going to give her some alternatives.  Given

15  that review, and given that she had admitted it, if he

16  was somehow biased against women, they had grounds to

17  fire to her on the spot.  Brooks doesn't fire her on the

18  spot, because he testified he hoped that she stays,

19  repeatedly.  And he told Stoev, who told Mrs. Svensson,

20  and in Mrs. Svensson's diary it turns out she recorded,

21  that Mr. Brooks hoped that she had stayed.

22          He told her, option one, she can remain as

23  an analyst, the same way Michael Yogg, who is also an

24  ADR, is an analyst but doesn't manage people.  It's not

25  something unique to women.  But he's going to, for the

1  time being, take over management of the team and the

2  fund.  She will continue to participate.

3         He, remember, said he was working 12, 14

4  hours  a day at that time.  He wasn't looking for more

5  work, but decided not to give these analysts to somebody

6  else for fear that Lisa Svensson would have to report to

7  somebody else and that would be insensitive.  He's still

8  trying to be sensitive to her needs.

9         He gives her two other options.  He

10  understands that she might not -- remember, she's been

11  concerned about the title, she wanted promotions, so he

12  understands it might be an issue.  So he gives her two

13  other options:  One is stay and job-hunt, and the other

14  is to leave with your package.  But he wants her to

15  stay.  He doesn't tell her to clean out her desk, he

16  doesn't give her a deadline.  None of that is consistent

17  behavior with somebody who wants to fire her.  If he

18  wanted to, he could have just said, "You're fired."

19         She says she's upset at that meeting.  I

20  don't doubt that.  I think that's accurate testimony.

21  But what happens when people are upset in a meeting is

22  what one person says and the other person hears are not

23  always the same thing.  So she makes an appropriate

24  request after the meeting, she consults with a lawyer,

25  and she says I need the options in writing.  Now we know

1    what we're talking about.

2              She's testified about never being given an

3    opportunity for increased bonuses or having her bonus

4    cut or never having the opportunity for promotion or

5    taking the or ADR title away.  None of that is in that

6    writing on September 3 that Mr. Brooks gave to her.

7    None of that is in there.  He was prepared to talk about

8    a way it could be done better one way or the other, he

9    was prepared to talk about that.

10             So he gives her the writing.  There's no

11   request for clarification from Mrs. Svensson, wait a

12   minute, I thought it meant no raises, is that serious?

13   Or does she go to HR and say, is that for real?  What

14   kind of assurances can I get?  She takes the paper, then

15   Mr. Brooks doesn't hear from her until the 12th of

16   September.

17             At that meeting, she sets out to get fired.

18   That's all there is to it.  Remember in her diary she

19   wrote in that weekend before that Josh is going to have

20   to stand up and be a man and fire me.  And she sets out

21   to make sure that happens.  Brooks has offered her a

22   job, as had happened in the past, stay as an analyst.

23   She knows the context is her boss thinks that she has

24   written a dishonest review, that there is a problem on

25   her team.

1    So he's waiting for which of the options
2    does she want, including the one of staying and
3    continuing to make income.  What does she do?  She
4    starts poking her finger into his eye, over and over
5    again.  First, none of those are acceptable.  Who says
6    that to their boss and thinks they're going to get to
7    stay?  Brooks doesn't say, "You're fired."  He's still
8    trying to save her.  What would be acceptable?  In due
9    course, she says she needs an immediate promotion to
10   managing director, having been on the verge of getting
11   fired, and she can't trust him.  Again, in the eye of
12   her boss.  Who says that to their boss and thinks
13   there's going to be no consequences?  But there aren't.
14   Brooks says, What else?  She says, I need a $2 million
15   guarantee, a million this year and a million next year.
16   She says she did that because she was afraid her bonus
17   was going to go to zero.  There's a long range between
18   zero and a million dollars if you're trying to do
19   something reasonable.  She had made $655,000 the year
20   before.  And Brooks still doesn't say she's fired.  She
21   still has an opportunity to get off that limb.  She
22   makes clear she's not going to accept her redefined job.
23         And the following Monday, we know what
24   happens.  Mr. Brooks gives her another opportunity
25   simply to say she's resigning because maybe that will

1  make it easier on her, but, no, she's not leaving until

2  she hears the magic words "you're fired," and she's not

3  accepting her new defined job.  So Mr. Brooks, having no

4  alternative, at that point says, fine, you're fired

5  because we're not going to give you a million dollars

6  for each of the next two years and you're not going to

7  get elected managing director.  All along he's tried to

8  accommodate.

9         So now she apparently has what she wants.

10 Brooks himself is so hostile to women that after she's

11 gone, he hires another woman, Maria Drew, to replace

12 her.  Takes a couple of months to get Maria Drew up to

13 speed, but she does, and she ends up replacing her.

14        What is inexplicable about Mrs. Svensson's

15 behavior is the following:  She had received for 2002

16 $655,000, plus $128,000 worth of stock.

17        It is now September 15.  Brooks is giving

18 her the option to stay.  He's not asking for a ten-year

19 commitment, one year, he's not asking for any

20 commitment.  Is it not the most rational, obvious thing

21 in the world so say, you know what, I don't know if this

22 is going to work, but she's now consulted with counsel

23 and she's had weeks to think about it.  She knows that

24 bonuses come out in March, she knows that in March she's

25 going to get vested for another $255,000.  She doesn't

Page 51

1    have to sign a release in order to stay.  Is it not the

2    most obvious thing in the world to stay in a $655,000 a

3    year job and job-hunt?  Meanwhile, you're getting your

4    salary, meanwhile, you're eligible for a bonus, and

5    you're going to know whether there's a bonus or not if

6    you think that's -- there's any question about that in

7    your mind.  Meanwhile, you vest your $255,000.

8            You remember Dr. Siegel, he did his various

9    mathematical analyses, and in the end -- and we have

10   some problems, we'll talk about it in a second --

11   remember what he said?  The job that she had at that

12   moment, he put the value of it at $20 million.  She made

13   a decision at that point that she had a couple of weeks

14   to think about and the ability to consult with counsel

15   to walk away from a $20 million job, assuming Siegel,

16   her expert, is doing the math right.  That's the

17   decision she made.

18           Now, she has a right to make that decision,

19   but that's her decision.  It's not Putnam's decision.

20   And the consequences of that should be on her, not on

21   Putnam.  And to say even if you stay for six months,

22   you're going to know what it looks like there, you know

23   there's somebody else, Michael Yogg, who's in the same

24   department, who's senior, who's an ADR who is not

25   managing people.

1        Let's pause here for a second and just

2   comment on Siegel.  He does an analysis of what her,

3   quote, damages would be through age 65.  Did you hear

4   about anybody who made it that far as a portfolio

5   manager at Putnam or in the industry?  He certainly

6   didn't know.  He admits the bonus pools affect the comp

7   and they're coming down, but he doesn't adjust for that.

8   He admits the head counts since 2003 were coming down,

9   making the odds to stay less likely, he doesn't adjust

10  for that.  Most of all, performance makes a big

11  difference.  You're hitting .200 instead of .300, yet,

12  he makes no adjustment for that.  He just assumes she's

13  getting more and more money every year.

14        I suggest that's a parallel universe.  It is

15  not a universe that companies like Putnam exist in.  It

16  doesn't work that way.

17        So what happens is, rather than taking any

18  of these other steps, she decides, no, I'm going to turn

19  down that money and I'm going to sue for 24 years of

20  compensation in the future, whether I would have had any

21  chance of even getting that at Putnam.  That's her

22  discrimination case.  Where is there evidence that any

23  of these managers did anything to her because she was a

24  woman?

25        So then she's got a second part of her case,

1    and that's sort of charts and graphs, and let's talk

2    about that for a second.

3         One of things we know, we know from her

4    expert, Dr. White, that raw numbers don't tell you

5    anything, any more than the fact that she had and

6    selected four males to report to her tell you anything

7    at all about whether she's biased against women or not.

8    You can't know anything from that.

9         Let me give you another example.  One can

10   look at her legal team and one can chop it up, you know,

11   all sorts of ways.  The beginning of the case, a hundred

12   percent was male, at the end of the case a hundred

13   percent was male.  The case started a couple years ago,

14   apparently.  You can't from that infer she's making

15   decisions on the basis of gender.  She's got good and

16   valid reasons, they are good and competent lawyers.

17   There are a lot of reasons to choose them having nothing

18   to do with gender.

19        We're back to those kind of charts, so many

20   women, so many this.  That's just raw numbers because

21   you don't know any reasons.

22        That's why her expert, Dr. White, was so

23   important and so devastating to her case that we didn't

24   feel the need to even call an expert.  Because what

25   Dr. White said is for any of this to have any meaning,

1    it's got to be statistically significant.  Remember what

2    he said:  If you flip a coin ten times and it comes up

3    six times, that's an interesting observation, but it

4    doesn't prove and you can't infer that the coin is

5    fixed.  That's all these raw numbers do.

6         And so he does some statistical analysis of

7    names chosen by Mrs. Svensson.  And what does he find?

8    With respect to promotions, he finds no significant

9    differences at Putnam in the promotion rates of men and

10   women.  That kills that issue.  That just kills that

11   issue.

12        Second, in 2002, again among the people

13   selected by Mrs. Svensson in GER at Portfolio

14   Management, there is no statistical significance in the

15   amount which women got paid as compared to men.  That

16   kills that issue.  That's from her expert, Dr. White.

17        And then he does his GER analysis only,

18   where there's a statistically significant difference,

19   men versus women, among the eight that she chose; no

20   statistically significant difference.  In other words,

21   you can't rule out random chance or other factors.  You

22   cannot attribute any differences to gender.

23        He does the same analysis among portfolio

24   managers chosen by Ms. Svensson; no statistical

25   significance among men and women at all.

1    And then he focuses on demotions, and what
2  he says, one, I don't know what a demotion is, I took
3  Lisa Svensson's word for it.  She checked off names in a
4  phone book, that's what demotion is.  Even analyzing
5  that, if it's of any significance, he also looked
6  specifically at demotions from portfolio manager.
7  That's the one that Mrs. Svensson was concerned about.
8  She didn't want to go from portfolio manager to
9  Research.  He said from 1998 to 2002, four men lost
10  portfolio manager jobs, zero women.  You would have
11  expected statistically three quarters, so if you round
12  it off, it would be one woman.  Fewer women went from
13  portfolio to what they call a demotion than men.  What's
14  left to that case?  There is no statistical significance
15  of women being demoted from Portfolio Management
16  positions.  That's the one title that sort of matters
17  here that relates to her.
18    So at the end of the day, the narrative
19  isn't of discrimination, and the numbers don't prove
20  discrimination.  And we're back to the notion of a lot
21  of stray, unconnected facts.  I washed my car on Monday,
22  it rained on Tuesday.  Okay, but it doesn't prove that
23  it rained because I washed my car on Monday.  As much I
24  might like to think so and it is consistent, apparently,
25  with my history.

Page 56

1          Let me just touch on a couple of other

2    things.

3          I told you at the beginning of the case that

4    Putnam was fully prepared to take responsibility for its

5    actions.  We've talked about every one of her managers.

6    And it's hard to find in any document, in any testimony,

7    in any deposition any -- and any action, quite frankly,

8    from any of her managers any gender bias.  It was

9    performance-driven, just as her own choices were for

10   people she wanted to work with were performance-driven.

11         She got opportunity after opportunity.  They

12   hired her.  They gave her an opportunity to manage

13   money.  They didn't fire her when her team lost money.

14   They gave her what she wanted, everything she wanted

15   within nine months of when she went to the Research

16   department.  When they were faced with losing some of

17   their best young analysts because of what she was doing,

18   they were prepared to give her, yet, another chance

19   rather than terminating her.

20         There simply is no evidence that the

21   transfer, whether you call it a demotion -- and I don't

22   know how you get a demotion and get more money --

23   whether you call it a demotion, another chance, or

24   transfer, whatever, was caused by her gender.

25         The fact that she gets paid less than a

1  superstar in one of the Core teams that was making a lot

2  of money doesn't tell you anything because, for one

3  thing, you don't know what the rest of the people are

4  making.  It simply tells you there's a superstar who

5  performed and got paid more money, and tells you nothing

6  other than that, nothing about her gender.

7      From the first day of this case, I have sort

8  of in the back of my mind have been haunted by when I

9  went to high school, long enough they still taught some

10  Shakespeare, and I've been haunted by a passage from

11  Julius Caesar.  And it's -- if I remember it correctly,

12  it's Cassius talking to Brutus.  And they're talking

13  about Caesar and Caesar's success.  And the passage --

14  it's pretty famous -- the passage is:  "Men at some time

15  are masters of their fates.  The fault there, Brutus, is

16  not in our stars, but in ourselves."

17      Mrs. Svensson was master of her fate in so

18  many ways.  Her performance was something that was

19  within, for better or worse, her control; we do as well

20  as we can.  Her decisions time after time after time are

21  decisions that she made, including the decision to turn

22  her back on a job that her expert says was worth 20-some

23  million dollars for the rest of the career.

24      The fault there, Brutus, is not in our stars,

25  but in ourselves.

1    The problem is not in her gender.  The

2  problem is not in her gender, because there is not one

3  bit of evidence that anybody did anything adverse to her

4  because of her gender.  The fault is in herself, in the

5  sense of her performance and in her decisions.  And just

6  as Putnam should be accountable for its actions and

7  decisions, she needs to be accountable for her

8  performance and her actions and her decisions.

9    And I thank you very, very much again for

10  your kind patience.

11    THE COURT:  Why don't we stand up and

12  stretch for a few seconds.

13    (Pause.)

14    THE COURT:  All set?

15    MR. MOLONEY:  Well, here we are.  About

16  three weeks ago, you folks arrived downstairs on floor

17  number two, surrounded by a hundred or more other

18  people, none of whom you knew, after having received a

19  notice from our federal government that you were going

20  to do federal jury service, and you probably said,

21  uh-oh, what does this mean?  And you came here early on

22  that Monday morning, you went downstairs, you saw the

23  movie, still didn't know what this was going to be like,

24  and ended up in this courtroom, along with many other

25  people, and here you became jurors in the case of Lisa

1    Svensson v. Putnam Investments.  And this is why

2    Mrs. Svensson filed this suit against Putnam, to bring

3    her case and her claims against Putnam before ten people

4    who bring to this case independence, their experience,

5    their judgment, their sense of fair play, their

6    understanding of society and how people interact or

7    don't interact with, among, and between each other.  And

8    that's why we are here.

9         What people who haven't served on a jury

10   like this don't understand is that among the people

11   involved in the case, whether it's the parties to the

12   case, the lawyers, I'll even say the judge and the

13   clerks and whatnot, they don't understand how hard and

14   difficult and intense serving on a jury is.  You're here

15   early in the morning, you're taking notes, most of you,

16   listening, thinking, and trying to decide:  Do I believe

17   that person over there?  Is what he or she is saying

18   making sense?  Do the documents prove or disprove what

19   people contend happened?  Trying to sort it out, trying

20   to figure it out, bringing your whole lifetime

21   experience to decide whether the person over there is

22   telling all of the truth, half of the truth, or none of

23   the truth.

24        One example is on a document that you'll have

25   in front of you.

1      We've heard a lot about how disastrous

2  Mr. Swift's Growth group was in the year 2000, 2002, and

3  you heard from Mr. Oristaglio, who was in charge of

4  Mr. Swift and the Growth group for about a year before

5  the reorganization in the spring -- this is a copy of

6  the PDPR -- his performance review done by

7  Mr. Oristaglio.  Mr. Swift's grade, given to him by

8  Mr. Oristaglio, who sat over there, was a 3 for the

9  year, 2001.  A 3 means meets performance goals and

10  standards.

11      Mr. Oristaglio wrote this on January 2 of

12  '02, two, maybe three months before the reorganization.

13  He says, among other things:  The team -- Mr. Swift's

14  team, according to Mr. Oristaglio -- is very focused,

15  breaking down insight into its components, macro sector

16  company specific, et cetera, yet interacts with

17  quantitative and fundamental research in a positive way.

18  The team has improved its balance and its valuation

19  disciplines.  Nonetheless, excess returns were negative

20  with PMs not adding value this year, although modest by

21  Putnam Growth standards.

22      He says, 2001 was another difficult year for

23  Growth managers, and the International Growth was no

24  exception.  Having said that, Robert was active in

25  pushing the team down the right path, in pushing a more

1  balanced approach, greater discipline, and productivity.

2  These initiatives helped reduce the underperformance and

3  has set up a good platform for the future.  Overall,

4  long-term numbers in institutional are still above

5  average in certain products, though very volatile with

6  performance issues in Global Growth and a few

7  institutional products.

8      Within his team -- he also says, Within his

9  team, Robert has made great progress bringing them

10  together and creating a tightly-knit, functional team

11  and process.  Across investments at Putnam, Robert has

12  much work to do.  His criticism is often biting and

13  non-constructive, without trying to lead a solution down

14  a practical plan of action to resolve conflict and

15  generate momentum for changes.

16      Robert has great potential, given his

17  strategic vision and strong business acumen and

18  experience.  At times he displays leadership.  He must

19  change his attitude and approach.

20      This is Mr. Oristaglio determining that the

21  team in Growth under Mr. Swift was functioning and was

22  together, and to the extent there's any aspect of it

23  being dysfunctional, those are issues between Mr. Swift

24  and Mr. Oristaglio because Mr. Oristaglio doesn't like

25  his attitude.

1    Mrs. Svensson was a member of that

2    well-functioning, coordinated team, along with Mr.

3    Dexter and Mr. Hadden and other people.

4    What happened here?  And how do you figure

5    out what happened here?  You know, if you look at a

6    newspaper in the morning, you see a picture in black and

7    white, and when you look at it, it's all made up of

8    these tiny little dots, and the closer you get to the

9    dots, all you see is the dots, you don't see the

10   picture.

11   Now, we've been here for almost three weeks

12   and we have all of these exhibits and we have the Growth

13   and the large cap and small cap and we have this person

14   and that person.  It's just a sea of information.    Mr.

15   Weir and I have been working on this case since it was

16   filed in 2004, and we have difficulty picking up all of

17   those pieces of sand.  But when you stand back from the

18   dots and when you look at what is really in front of

19   you, what happened?

20   Lisa comes with a great deal of experience

21   in the oil and gas industry in other companies to

22   Putnam, and she asked before the offer letter comes, is

23   this a good place for women to work?  And that's because

24   one of the folks she interviewed with raised some issues

25   whether it was a good place for women to work.

1          So she asked Mr. O'Donell, and she decides

2     to accept the position and go to the job because she's

3     assured by Mr. O'Donell that whatever had gone on in the

4     past, he was going to try to take steps to fix it.

5     Unfortunately, Mr. O'Donell lasts only a certain period

6     of time before he's out of the picture.

7          And you've heard some talk about culture

8     change.  Culture change?  They had a problem before she

9     got there.  She's assured that this was going to be a

10    good place for women to work.  And what happened?  There

11    wasn't any change in the culture in that regard.  The

12    glass ceiling that existed before she got there, when

13    they couldn't keep women, I think that was it, it

14    lasted.  And it's still there today.

15         Remember the testimony about the women's

16    leadership forum?  They put that into place after Lisa

17    went.  Did anybody take any steps to do anything about

18    it?  The evidence is no.  Oh, we talk about it a lot, we

19    think it's a grand idea, but did anybody do anything

20    about it?  I don't think so, not based on the evidence

21    that we heard.

22         Anyway, she becomes a senior vice president

23    in April of '95, and she didn't become anything greater

24    on the officer title ever.  She became a senior vice

25    president in '95, and when she left -- when she was

Page 64

1   fired, when she was forced out in September of '03, that

2   was her title.

3           She becomes a portfolio manager and she does

4   very, very well, at least as good as the boys did.  And

5   her money increased, like the boys did at the time, like

6   any portfolio manager who was doing a good job.

7           Now, you heard about her grades: 4.78, 4,

8   3.5.  You heard about a 3.  First time she got a 3 was

9   when her 4.78 was written down by one Jack Morgan to 3.

10  And that's when she was put up for managing director.

11  And I think that you can apply your good sense and

12  understand that when somebody at the top of the heap

13  says the 4.78 -- her manager's rating by the person who

14  knew her work says she's a 4.78, which under the Putnam

15  rules should have been rounded to 5, it's written down

16  to 3 and she doesn't get managing director when the

17  people who vote thinks that she's a 3 and not a 5?

18          And what happened on the appointments for

19  managing director?  Mr. Kociubes talks about the year

20  where there was some females and some males, but you

21  heard the testimony just the other day over the next two

22  years, I think there was one female.  All the rest were

23  males.  And one of the last males we found out is

24  Mr. Brooks.  Mr. Brooks, who doesn't care about titles,

25  Mr. Brooks who wants to think everybody is equal,

1  Mr. Brooks with his $3 million guarantee, $2 million

2  minimum salary plus his stock, plus he was made an MD,

3  plus he was made a partner.  Is it any wonder that he

4  doesn't care about titles?  What's mine is mine, what's

5  yours is negotiable.

6        Now we come to 2002, and having -- given

7  Mr. Swift for his team responsibilities a 3 where he

8  meets performance goals and standards.  Mr. Oristaglio,

9  who sat over there, says the group that I'm responsible

10  for, for the last year, we got to make some changes.  He

11  doesn't change anything about himself, he changes

12  Mr. Swift.

13        It's announced that there's going to be a

14  reorganization.  Mrs. Svensson tries to find out what

15  her new opportunity is.  And she can't find anybody,

16  they're all gone, they're busy, they're out, see you

17  later.  She ends up talking to Ms. Sherry Holder-Watts.

18  And what does Ms. Sherry Holder-Watts tell her?  If you

19  don't take this, we're going to have a different kind of

20  conversation.

21        Mrs. Svensson, you heard her, said, I guess

22  there are no jobs in PM for women.  And the testimony

23  and the evidence is that Ms. Sherry Holder-Watts, doing

24  the bidding of Putnam and HR, just stared at her, looked

25  at her, and didn't deny it.

1      She goes to Mr. Oristaglio, who sat over

2   there, and she pleads her case, I don't want to go back

3   to research.  Why doesn't she want to go back to

4   research?  The career path at Putnam, what they pay for

5   is performance.  What they pay for and where the dollars

6   are, where the prestige is, where the career track is in

7   Portfolio Management, something that she has been

8   working her butt off since she got out of business

9   school.  And he says, You've got to go back.  She says,

10   I don't want to go back.  You have to go back, but I

11   will keep an eye out for you, and as positions in

12   Portfolio Management occur, either because people quit

13   or we underestimated the need, I'm going to keep you in

14   mind.  A few days later she writes an e-mail back to

15   him, and you saw it, it's Exhibits 104 and 105, and we

16   had him read the e-mail back to her, and the e-mail

17   confirms Mrs. Svensson's testimony.  He promised that he

18   would keep her in mind as positions opened up.

19      Again, it's out of sight, out of mind.  It's

20   like when she was up for MD and she didn't get it, the

21   next time around Mr. Swift told her, Well, you're on

22   maternity leave, out of sight, out of mind.  She was out

23   on maternity leave for about the last three weeks of

24   December in that year.  All of the good work she did

25   from January 1 of that year until about the third week

1   of December.  You're pregnant, you're, you know, out of

2   sight, out of mind.  Is that about performance or is

3   that about gender?

4              Does Mr. Oristaglio do anything about his

5   promise to her?  It turns out that he didn't.  But

6   there's Lisa Svensson.  She goes to the top guy, and she

7   says, I don't want to go back to research, but I'll be a

8   good soldier and I'll do it, but tell me that you can

9   bring me back and put me where I should be.  He promises

10  that he will do that.  Was she crazy to believe him?

11  Was that irrational to believe him, or was it

12  reasonable?  Would most people in her position who were

13  not mentally certifiable have done anything but what she

14  did?  I believe you, I will do what you ask, I

15  understand that you're going to be watching out for me,

16  I understand that this is going to be temporary, I have

17  to do what I have to do because you have told me and I

18  have no reason not to believe you, that you're going to

19  watch out for me and give me a Portfolio Management

20  position the way you promised me in the meeting and the

21  way you promised me in writing.

22              Now, in terms of the reorganization, what

23  happens?  And you saw some of the charts.  Remember the

24  blue boxes and the red boxes and the Growth team you saw

25  first and some days later we saw on the Core team, and

1  those exhibits are going to be going with you in the

2  jury room, so you can, if you want, take a look at the

3  names and the dates and whatnot, and also note on those

4  charts the dates are very specific.  Each chart says it

5  is as of a certain date.  Each chart has on the bottom

6  the documents that are in evidence and the source of the

7  information.  And virtually all of the information that

8  comes on those charts and virtually all of the stuff

9  that's on these tables over here are not Lisa Svensson's

10 documents that she made up for the purpose of the case,

11 they're the Putnam business records.

12         So those charts will be going with you for

13 your consideration.

14         But take a look.  Remember the red and the

15 blue?  Before the reorganization there were four or five

16 or six red boxes representing females.  The next one

17 there's one red box, the third chart, they're all blue.

18 Is that performance?  Is that gender?

19         We heard from a witness over there, I asked

20 him, You think all the men have all the wisdom and the

21 skill?  What did he say?  No, of course not, the women

22 have equal amounts of wisdom and skill.  Well, if that's

23 the case, why do the red boxes disappear?  Is that

24 performance or is it gender?

25         What happened over there?  Kelly Morgan,

Page 69

1    back to Research, off the good career track.  We heard

2    from Mary McNamee, we want to have dual career tracks,

3    we want to have people fulfilled in the Research

4    department.  Laudable goal.  Give them good jobs, give

5    them a lot of money.  We also want to have this other

6    career track in portfolio manager, better jobs, higher

7    pay, more prestige, dual tracks.  It's like separate but

8    equal, and we know what that means.

9            Anyway, the two females, back to the

10   second-class career track, and what happens to the boys,

11   Mr. Dexter, Mr. Hadden, and all the rest?  Do they get

12   fired?  They don't get fired.  They find a place for

13   them.  And what happens?  They stay, they get more

14   money, they get a better job.  Out go the females, we

15   take care of our friends, the males.

16           Remember there was a document that talked

17   about backfilling Anthony Sellitto, backfilling Tony,

18   and there was some testimony about it, and the document

19   will be with you.  And the comment from HR, need to know

20   where Steve O is on Lisa Svensson on backfilling Tony

21   Sellitto, otherwise we'll have to post the job.

22           Mr. Oristaglio admitted that he didn't offer

23   her that job or any other job.

24           Ms. McNamee would have you believe the

25   reason they didn't take Lisa Svensson out of Research

1  within a few months of her going back was because it

2  would be disruptive.  Yet, the evidence shows that they

3  took people out of Research who had been at Research for

4  a very long time, continuously, doing their models,

5  doing their analysis, making recommendations to the

6  portfolio managers.  They found a way to take two of the

7  boys,  Mr. Bogar and Mr. Cervone, out of Research and

8  put them in Portfolio Management.  Was that more

9  disruptive than it would have been taking Lisa Svensson

10 out of the Research department in June or July or August

11 of '03?  Is that performance?  Is that gender?  Is that

12 making excuses?  Is that inventing a story line after

13 the events took place?  I leave that for your kind

14 consideration.

15         Mr. Kociubes in his opening talked about how

16 ungrateful -- my sense as to what he was saying, I'm not

17 saying he said this literally -- but here we have this

18 woman who was ungrateful for what Putnam gave her.  She

19 had the effrontery to stand up to Putnam, and somehow

20 it's her fault.  And he also said, as he said today,

21 Putnam wants to be held accountable.

22         He talked about a conflict, and they said in

23 the opening, and it's the theme running through this,

24 that Lisa Svensson always was a bad manager, and that's

25 belied about her review forms.  If she were a bad

1    manager, would she have gotten a 4.78 or 4.0?  Would she

2    have been nominated as managing director as a bad

3    manager?  I ask you to apply your common sense to that

4    little piece of business.

5         Putnam would have you believe that Lisa

6    Svensson was an agent provocateur, that she was put into

7    Research and thereby attacked Mr. Falvey, provoking

8    conflict.  What really happened?  Lisa Svensson was told

9    unless you go to Research, we will have -- sounds like

10   in the movies -- we will have a different kind of

11   conversation.

12        She believes Mr. Oristaglio, and no

13   reasonable person would have had any other kind of

14   belief.  And she's told to meet with Mr. Landes, who was

15   the head of GER, the Research department.

16        What does Mr. Landes know at the time?  He

17   knows at the time that telecom and research was being

18   handled by a woman, Erin Spatz; he knows that

19   pharmaceuticals are being covered by a woman, Margaret

20   Smith; and he knows that energy and basic materials are

21   being run by Mr. Falvey.  He's the boss.  He's got three

22   people filling the slots.  In comes Mrs. Svensson, and

23   he says pick any one of these and tell me what you would

24   do in any of these positions.  What message is that?

25   The message that those facts indicate is that Landes

1  knew something.  He knew that each of those three people

2  were on the way out.  He gave her an opportunity to pick

3  any one of them.  What does she pick?  She picks energy

4  and basic materials.  Why is that?  Because she doesn't

5  like Falvey?  I don't think so.  It's because ever since

6  that high school science project, you heard her talk

7  about that, she became fascinated, for whatever reason,

8  where the oil is under the ground; and that's what she

9  did for her whole career, oil, natural gas, and that

10 kind of thing.  She says -- and she forms a business

11 plan, what she would like to do on energy and basic

12 materials.

13         Landes says you can get 90 percent of what

14 -- it's in the plan, it turns out she gets 45 to 50

15 percent of it.

16         But what happened to Margaret Smith after

17 this conversation?  Margaret Smith is gone.  What

18 happened to Erin Spatz after this conversation within a

19 month?  Erin Spatz is gone.  And what happens to Falvey?

20 He was a dead man walking until December, and he was

21 gone.  And don't you suppose that Mr. Falvey knew he was

22 a dead man walking?  And don't you suppose that

23 Mr. Falvey was upset?  And don't you suppose that the

24 real agent provocateur here was Putnam and Mr. Landes,

25 as Landes decided the three of them were going to go?

1  Lisa Svensson was not the agent provocateur, and there's

2  no other reasonable explanation offered or that applies.

3        Now, the career track there, as you go from

4  research to Portfolio Management to senior Portfolio

5  Management, director, and on up the food chain over

6  there, and all of this involves hundreds of thousands of

7  dollars.  I mean, the amounts of money that we're

8  talking about in this case are like baseball players and

9  football players and movies, people like that.  But

10  that's the career track.  And this case should be

11  analyzed on who plays by the rules -- the amount of

12  money is important, but it's beside the point.  Did

13  Putnam make its decisions on the basis of gender here?

14  Or should you believe their -- I'm going to say stories,

15  their explanations?  And I ask you to apply your life

16  experience to sort out that.

17        And part of what you can do when you try to

18  sort it out is to listen as the evidence comes in.  I

19  think you can listen to people and look at the

20  documents, and is only part of a document read?  Is a

21  paragraph left out?  Is the explanation that follows not

22  read to you?  Or is it like in the case of Dr. White,

23  Dr. White testified to things that were very helpful to

24  the plaintiff, he also talked about things that weren't

25  so helpful to the plaintiff.  Did the plaintiff side put

1  in both?  The plaintiff side did.  Did the plaintiff

2  side read favorable comments and not so favorable

3  comments?  I think we did.

4          I ask you think back about the testimony in

5  this case in whether Putnam brought the good and the bad

6  before you so you can make a judgment on all of the

7  evidence and not just part of the story.

8          Lisa Svensson decided she'd be a good

9  soldier.  She'd get 45 percent after being told she's

10  going to get 90 percent.  She believed Oristaglio.  And

11  then a couple of things happened with Mr. Landes.

12  Landes wants to appoint Michael Yogg, a male, to ADR.

13  And what does he tell Lisa Svensson?  I think I'll make

14  Mr. Yogg an ATR, but I want you to do the people

15  managing thing for a few years.  What does that mean?

16  Is that performance or is that gender?  The guy gets the

17  job, the guy gets the title, the guy gets the prestige,

18  but Mrs. Svensson does the people managing.  The people

19  managing.  Interesting, for two things.  He gets the

20  title, she gets the work.  Is that performance or is it

21  gender?  And think about it.  Yogg can't manage people,

22  Mrs. Svensson can manage people, and Landes wants her to

23  manage people.  Is that performance or is that gender?

24          In July of '02, the evidence is that

25  Mr. Sandy Mehta, M-e-h-t-a, a male, is going to be

1    leaving Putnam, and Mr. Bogar is put in his place.  And

2    she talks to Mr. Landes.  And he says, Well, Lisa, you

3    were considered for the job, but they wanted somebody

4    junior.  Uh-uh.  She says they wanted a guy, didn't

5    they?  And Landes says, Yes.  Is that performance or is

6    that gender?

7            This brings us to the beginning of '03.

8    Falvey, the dead man walking, finally is dead, he's

9    gone.  And then she is put in charge -- she's made

10   associate director of research, she's put back into the

11   Portfolio Management position, which is a portfolio

12   that's run out of the research department, the Global

13   Natural Resources Fund.  And she is supervising three

14   males at this point, Mr. Eckland, Mr. Stoev, and

15   Mr. O'Malley.  Along comes Peers again.  Where did Peers

16   come from?  Peers came from working for the dead man

17   walking, Falvey, Falvey, who was in conflict with Lisa

18   Svensson.  According to my friends for the defense side,

19   it's all Lisa's fault about the conflict, but you

20   understand that it was Mr. Landes and Putnam who had

21   made the decision on Falvey before Mrs. Svensson ever

22   talked to Mr. Landes about the work.

23           What kind of a view of the world and what

24   kind of a view of Lisa Svensson would the younger

25   Mr. Peers get from Mr. Falvey?  I think most people

1  would agree it would not be very favorable toward

2  Mrs. Svensson.

3          So he joins the team.  Mrs. Svensson tries

4  to get more money for Mr. Peers.  You heard that, too.

5  Because people at her level had decided that the better

6  performing of these younger people should get a bigger

7  bonus than the other ones, she knows that, she tries to

8  get more money; the powers that be say no.  Does this

9  indicate that Mrs. Svensson had something against

10 Mr. Peers?  I don't think so.

11         So Landes is moved out by the powers that

12 be, and in comes Brooks.  Brooks leaps from Delaware,

13 because he's losing out in the competition to replace

14 Mr. Haldeman, who had fled and become a high official at

15 Putnam.  What does he get?  He gets, coming in, a

16 guarantee for two years of a minimum $2 million cash

17 salary.  He gets appointed as a managing director, and

18 he's made a partner.  Do you remember some testimony

19 about other bonus pools?  Yet, this is the very same

20 year -- and just before this happens, the word comes

21 down from Mr. Lasser at the top of the food chain over

22 there, ah, we got too much title inflation, all this

23 stuff is on hold.  Uh-uh.  On hold of the last two years

24 of appointing, I think, all males but one female.

25 Everything is on hold?  Except for Mr. Brooks.  No

1    wonder he doesn't care about titles, because I've got

2    mine, and you shouldn't worry about your titles, you

3    don't have any.  So I've got mine, so I don't care about

4    titles.

5              Mrs. Svensson talks to Brooks after he gets

6    in and says that the folks are concerned because

7    Mr. Haldeman is known as the sweeper, people are going

8    to get fired, they fear, and Mr. Brooks tells her, Oh,

9    we need more experienced people here, you're going to be

10   the last to be fired, we need people like you.

11             Later in the year, Mrs. Svensson starts to

12   do her midyear reviews of the people who work for her.

13   And the evidence is that at this point, this becomes

14   something she didn't have to do, but she could do.

15   Brooks, who doesn't like titles, doesn't like reviews,

16   but she begins to do these reviews.  And what's her

17   state of mind in June, July, when she starts to review,

18   Stoev, Eckland, O'Malley, and Peers?  Well, I think you

19   can start back in December of '02 when she did her

20   review of Mr. O'Malley and she went to Mr. Kamshad, the

21   testimony is, Kamshad said, Don't talk to me, talk to my

22   team.  His team -- he didn't, but his team had concerns

23   and issues about Mr. O'Malley's performance.  And I

24   think the testimony was also that Mr. Scott came into

25   the meeting and said, You got a great team, Lisa, but

1    you'd be better off without O'Malley.

2          Did she take steps to fire O'Malley?  Did

3    she take steps to take any sanction against O'Malley?

4    The answer to that is no.  What does she give him?  A

5    3.5.  And she did it because she thought that O'Malley

6    was, in the words of the trade, a good stock picker.  He

7    had great ideas, but he had some issues and problems

8    about taking those good ideas and getting them all over

9    to the people who made the decisions, the portfolio

10   managers.  So she didn't take Mr. Scott's suggestion;

11   she tried to save and to help him.

12          So she's in this process here in mid '03

13   reviewing her people, and she starts going around and

14   talking to people.  Does she keep it all in her head?

15   No, she doesn't.  She starts making handwritten notes.

16   And you recall maybe a couple of weeks ago I had her

17   read her handwritten notes.  And those handwritten notes

18   are here on the table, and they'll go with you in the

19   jury box, and you can see the names of the people that

20   she talked to, and there will be a little paragraph

21   about O'Malley, there will be a little paragraph about

22   Stoev, there will be a line or two about Eckland and

23   whatnot.  It's all laid out there in the notes.  The

24   good and the bad about each of them, including O'Malley.

25   And then the last part of that exhibit, her calendar.

Page 79

1    It's kind of hard to read, but I asked her to -- you

2    know, what date and who you met, and she said, also, I

3    talked to other people on those other dates.  So that's

4    what she's doing in June and July.

5         She has a discussion, again, with

6    Mr.  Brooks, and Mr. Brooks says to her when she --

7    talks about some of this bad feedback as they talk about

8    in Putnam, from some quarters about O'Malley -- his word

9    was, It seems to me we have a laziness problem there.

10         Now, when she's trying to do these midyear

11   reviews and she's having to go to Europe to look at

12   these oil companies and whatnot, she never really

13   finishes that review process.  But what happens?  Leah

14   Graham comes to her and complains about O'Malley not

15   paying any attention to her, O'Malley not doing his

16   mentoring job, his advising job.  It's not only from

17   her, it comes from Austin Holly.

18         Now, this is raising the same issues that

19   were out there in December of '02 and that she was

20   trying to work with O'Malley on, and she's hearing from

21   some of these portfolio managers he still won't

22   communicate, he's late for meetings, whatever.

23         So she goes to Brooks, and what does Brooks

24   say?  Give him a warning.  Give him a warning.

25   Remember the manager book about the three steps?  Give

1    him a warning.  She says, I don't know how to do a

2    warning.  He says, Go, to HR, go she Mary McNamee.  So

3    she goes to McNamee, and McNamee says, Just dictate

4    something, a stream of consciousness, just put bullet

5    points down.  And then the rest of the conversation is,

6    Will you help me fix it to make it right, to prepare it

7    the way it should be?  McNamee assures her, I will do

8    that.  Did she do that?  Uh-uh.  Unbeknown to

9    Mrs. Svensson, McNamee goes to Brooks, and then what

10   happens under the guise as to what Mr. Stoev testified

11   to, Mr. Hutcherson came in to me and said we're going to

12   give Mrs. Svensson -- we're considering giving

13   Mrs. Svensson a promotion, so tell me about Lisa

14   Svensson.  Mr. Stoev tells the truth.  Remember he

15   talked about with his best manager that he ever had.

16   In fact, she took this dysfunctional situation and

17   improved it and got us going again.  He's telling

18   Mr. Hutcherson this while Mr. Hutcherson is taking

19   notes, according to Mr. Stoev, under the guise that

20   she's being considered for a promotion.  She wasn't

21   being considered for a promotion.  She was being

22   considered for an invitation out the door.

23           Did Putnam tell the truth in that instance?

24   I don't think so.  Were they considering her for a

25   promotion?  The answer to that is no.  Were they trying

1    to get information out of some of these people that

2    worked for her under a misrepresentation?  I think the

3    answer is yes.  Stoev tells the truth.  The best manager

4    I ever had.  She took a bad situation and made it a good

5    situation.

6              Now we have McNamee talking to a few people,

7    and you heard Joshua Huntington Brooks of the $3

8    million, $2 million -- $3 million, it's the $2 million

9    with the extra stock.  What's mine is mine, what's yours

10   is negotiable.

11             He sat over there for a couple of days.

12   What does he do?  Does he talk with her?  No.  He

13   decides he's going to do his own investigation.  So he

14   goes around and talks to lots of people.

15             McNamee, you heard her testify the other

16   day.  What did she recommend?  Mr. Brooks, after you do

17   your investigation, you should sit down with

18   Mrs. Svensson and discuss the situation.

19             I think Mr. Brooks was the one who talked

20   about she wouldn't have a constructive dialogue with me.

21   Constructive dialogue?  Did he offer to have a

22   constructive dialogue about whether or not anything that

23   O'Malley was saying was true?  He didn't want to have a

24   constructive dialogue on that point.  He had his mind

25   made up.

1    You may recall that I said in the opening

2  Mr. Brooks didn't want to confuse himself with the

3  facts.  The testimony from Mrs. Svensson and Mr. Brooks

4  brings you to that very point.  She comes into his

5  office on August 28 with her third revision of the

6  warning memo to O'Malley.  I don't need to read it.

7  I've already seen it.  We have a problem.  And she says,

8  What do you mean we have a problem?  He basically says,

9  You lied.  When you boil it all down, what he's saying

10  is, You lied to the organization.  That's kind of a

11  surprise, isn't it?  And she said, Well, let me go into

12  my office just down the hall and I'll get my notes, the

13  very notes you will be able to look at here, the notes

14  that she read from the stand over there.  Let me get my

15  notes, I can show you when I met with these people, who

16  I met with, and what they said.  That won't be

17  necessary.  That won't be necessary.  Do not confuse me

18  with the facts.  What didn't he want to be confused

19  about?  He thinks he can save and keep Mr. Darren Peers.

20    Remember Darren Peers in his deposition that

21  was read over there said, Well, if you terminate her,

22  I'll consider staying.  He wanted to save Mr. O'Malley.

23  And how could he do that?  He could only do that by

24  getting rid of Mrs. Svensson, the female.  It wasn't

25  about saving Lisa Svensson at all, it was about

1   Mr. Brooks and his agenda.  And his agenda was

2   Mrs. Svensson goes, Peers, the male, stays, O'Malley

3   stays.  Is that performance or is it about gender?

4          Now, Putnam wants to have you believe that

5   Mrs. Svensson, again, was being so ungrateful to Putnam

6   that she wouldn't take what she was being offered.  She

7   was given this wonderful -- another opportunity.  She

8   was given three alternatives:  Stay as an analyst with

9   no management responsibilities, no Portfolio Management

10  responsibilities.  In other words, go back to where you

11  were in 1994 with no possibility of career advancement,

12  no possibility of increases in compensation.  Or another

13  alternative would be stay for two or three months,

14  pretend to work, go find yourself another job, but then

15  you're out of here.  Or, sign here please.  Give us a

16  release of all claims, and you'll get your deferred,

17  basically.  That was what she already had earned, but

18  they had deferred payment of.

19         Was this a reassignment to comparable

20  position or to change?  Go back to where you were back

21  in 1994 with no chance of career advancement, depart

22  now, or take the money and run, give us a release.

23         They wanted her out, but they didn't want

24  to use the words "terminate."  What they wanted was go

25  quietly, pat her on the head, go away.  And you recall

1  that Mr. Brooks admitted resignation, termination, same

2  difference.

3          In that discussion with Brooks she said, I

4  want to be paid like the guys.  Brooks tries to convince

5  her that that isn't the case, but we know she wasn't

6  being paid like the guys.

7          Putnam makes a big deal, oh, she wanted this

8  guarantee, and she's talking to the guy who just a few

9  months ago got a $2 million minimum salary guarantee,

10 plus stock.  And there's other evidence that people who,

11 in addition to coming in from the outside have

12 guarantees, but people who already worked at Putnam were

13 getting these guarantees.  Why does she say she wants a

14 guarantee?  Because she doesn't trust Brooks at this

15 point, and she says she was fearful that if she took

16 this -- or one of his alternatives and stayed when he

17 said no career advancement and no increase in

18 compensation means zero bonus.  What do you do?  Do you

19 roll over and play dead, or do you fight for what you

20 think is fair?

21         Now, what happened, ultimately, there's the

22 termination letter, and they put the magic word on it.

23         Now, Brooks, before he gives that

24 termination letter goes to the people in the Research

25 department, and after telling Lisa that he's going to

1   consider these alternatives that she's proposing,

2   leading her to believe that the subject is still open,

3   he goes to the rest of the people in the Research

4   department and announces to them Lisa has decided to

5   leave.  And recall that on the printout of August 29,

6   Mrs. Svensson, I think, was ranked number one out of 57

7   people for alpha generation, and that represents how

8   well her recommendations, you know, worked out as

9   compared to the recommendations of the other people in

10  GER.

11          Now, what can you look at in terms of gender

12  discrimination in addition to some of the facts that

13  we've reviewed?

14          You can look at the reasons that are offered

15  by a company like Putnam to justify what they did, and

16  let's look at the series of reasons that these folks

17  have offered for the termination.

18          The first one was -- and you recall in that

19  e-mail that came on September 16 -- Kelly Morgan says

20  that she told Lauren Allen Smith, it wasn't a performing

21  issue, it was management dishonesty; in other words, it

22  was because Lisa lied.  That's number one.  Number two

23  was poor performance, that's written on the business

24  records as that's the reason.  And we know that's not

25  true.  We know that she didn't lie, so those aren't two.

1  Then Mr. Brooks, I'm amazed, the other reason was to

2  keep her from hurting people.  Keep her from hurting

3  people.  Well, that was reason number three.  And then,

4  out of the blue, desperately trying to find an excuse to

5  get out from the requirements of the management policy

6  handbook for treating people, you heard Mr. Kociubes

7  focus the attention of all concern on the word

8  "insubordination".

9       So we have really now the shifting

10  rationales, these multiple reasons for what happened:

11  management dishonesty, peer performance, stop hurting

12  people, and insubordination.  None of them are true.

13  None of them are true.  And there's a number of them.  I

14  mean, if there was a real non-gender reason, would that

15  not have been said from the get-go?  Would that not have

16  been the reason they clung to?  They didn't.  They knew

17  they had to change.  And what did they do?  They

18  changed?  And what should you conclude when the story

19  changed?  There's got to be something wrong with the

20  story, I think.

21       Let me just quickly talk about Dr. White

22  for a moment, then I do want to show you some of the

23  charts.

24       Dr. White did some analysis on the data,

25  and you recall that he redid his analysis after the

1    Judge had made some rulings as to who the comparators

2    were and whatnot.  And I think you recall that he

3    originally looked at 91 people, and then, apparently,

4    Putnam, then its expert, Dr. Bloom, looked at different

5    data.  And you heard Mr. Kociubes asking questions of

6    Dr. White and complaining that he didn't look at enough

7    data.  And then the Judge explained what happened during

8    discovery, that plaintiff asked for a lot of data,

9    Putnam said you're asking for too much, and then the

10   magistrate judge settled on the 91, and then Judge Saris

11   made some further rulings reducing the scope, out goes

12   Value, in comes Core group and the Growth group.

13           And what he found on this revised data was

14   he said consistent with what he found on his original

15   analysis.  And part of it dealt with the cohort

16   analysis, which he explained is what you do in the trade

17   or the profession when you don't have a huge ocean of

18   data, you have relatively limited data.  And he

19   testified that he had testified in other -- in another

20   federal court case on that.  And then he did some

21   analysis of some larger data.

22           He did find that there was a statistically

23   significant decrease in the representation of females

24   among officers, the assistant vice presidents to senior

25   managing director, between 1998 and '02.  And he found

1    there was a statistically significant pattern of

2    demotions adverse to plaintiff during the period.

3            He found there was a statistically

4    significant decrease in the representation of females

5    among senior vice presidents from '98 to 2002, and he

6    also found females tend to have lower levels of

7    compensation but comparable levels of performance

8    ratings and more years of investment experience and more

9    years of Putnam experience.  So if you have more years

10   of experience, comparable levels of performance, but

11   you're not getting paid as much as the guys are, is that

12   performance or is it gender?

13           He found that the general finding was that

14   the plaintiff had lower levels of compensation

15   comparable to performance reviews, more years of

16   investment and Putnam specific experience than the guys.

17   Is that performance or is it gender?

18           And by the way, where is the Putnam expert

19   to disagree with Dr. White?  Dr. Bloom has not testified

20   in this case.  And I leave it to you to decide what that

21   really means.

22           When it comes down to the key witnesses in

23   this case, you've got Mrs. Lisa Heitman Svensson and you

24   have Mr. Joshua Huntington Brooks, and you've looked at

25   them, you've heard them, you've thought about them,

Page 89

1   you've studied them, you've reflected upon them, and

2   whom do you believe?

3           Should you believe the person who is part of

4   the shifting stories and rationales, or should you

5   believe Mrs. Svensson?

6           Should you believe Mr. Brooks, who did not

7   want to confuse himself with the facts, who said that

8   won't be necessary that I read your revised memo, or

9   when she says let me go get the documents and he says

10  that won't be necessary?

11          Mr. Brooks, who said she would not have a

12  constructive dialogue about my three alternatives, the

13  very same fellow that Mrs. McNamee said you sit down

14  with Lisa Svensson and go over with her these claims

15  with her.  Did he ever do it?  He admitted that he

16  didn't.  Why?  It would get in his way.

17          Now, let me just touch upon a few other

18  things in terms of damages.

19          There was one witness who testified about

20  damages, and that was Dr. Siegel.  Putnam produced no

21  expert to testify on damages.  Dr. Siegel's resume´ and

22  Dr. White's resume´ are in the evidence, and you heard

23  them talk about their backgrounds and experience, where

24  they -- both of them have -- I'm sorry, both have

25  testified as experts for both plaintiffs and defendants.

1    And you heard him indicate that the economic loss to --

2    on a present value was, I think, almost to the penny

3    $32,133,973, breaking that into front pay and back pay.

4    The back pay is in the past, that came, according to his

5    calculations, $6,591,369, and the front pay was

6    $25,542,605.  And he explained how you reach that number

7    and so forth.

8              Two other aspects of damages, one is for

9    emotional distress, and it's appropriate within the

10   limits and guidance that the Court will give you to make

11   a decision on that, and also within the limits and

12   guidelines that the Court will give you in the

13   instructions to consider and make a decision about

14   punitive damages on whether Putnam should be punished

15   for its -- for its conduct.

16             Do I have -- Robert, can you tell me how

17   much time I have left?

18             THE COURT:  You have at least five minutes.

19             MR. MOLONEY:  At least five?  That's pretty

20   good.

21             Let me just show you the growth --

22             (Discussion off the record.)

23             THE COURT:  Robert is correcting me.  Four

24   minutes.

25             MR. MOLONEY:  Four minutes.  That sounds

1  like the last three weeks, your Honor.

2          Okay.  Here's an oldie but a goody.  This

3  is -- these little yellow stickers mean -- if you want

4  to look at that in the jury room, you can look at it.

5  December 31, '01, Putnam Growth team before the

6  Oristaglio reorganization.  There's Steve O, he calls

7  him.  If you look at the e-mails, it's always Steve O;

8  it's not Steve Oristaglio, it's Steve O.  Steve O here

9  at the top; you've got Swift; Miller; Wetlaufer; a

10  female, Beth Cotner.  And then all a sea of blue here,

11  except for Kelly Morgan and Lisa in red, Marjorie Parker

12  here in red.  And the blue and the white and the blue

13  and the white.  Remember the backfilling?  That's our

14  friend, another male, Mr. Anthony Sellitto; he's half

15  white and half blue because he was split.

16          So that's December 31, 2001.  And here we

17  go, June 30, 2002.  Where did all the red flowers go?

18  Steve O is at the top, and we're now down to one red.

19  That's June 30.  Remember?  Blue and red, the one red.

20          And by March 31 of '03, all blue.  Is that

21  performance or is that gender?

22          Remember he said when I asked him, Do all

23  the men have all the wisdom and skill?  Oh, no, women

24  have as much knowledge and skill.

25          Okay.

Page 92

1        Can I see the Core?

2        You've seen these before, but let me just

3   quickly run through them.  And this also -- you see the

4   yellow sticker up here.  Here we go, another oldie but

5   goody.  This is Core, December 31.  And one Carmel

6   Peters over here, of course, she goes.  But in the jury

7   room, if -- I'd invite you and I'd ask you to take a

8   look at these blue boxes and the names, count the jobs

9   and positions.  So that's December 31.

10       And here is June 30.  And you'll see where

11  all the guys go.  You know, the people who didn't get

12  canned.  Remember, Kelly Morgan and Lisa go off to

13  Research, but all these guys who are working on all

14  these Growth teams, well, you just compare these names

15  and see where they all went, and look at the additional

16  jobs, and are the additional jobs filled by the red

17  blocks?  No, they're filled by the blue boxes.  And we

18  have one box at June 30, Carmel Peters --

19       THE COURT:  Now you do have to finish.

20       MR. MOLONEY:  Okay.  This is the last one.

21       And that's March 31, and the one red box.

22       Anyway, I thank you for -- on behalf of  Mrs.

23  Svensson and her family, my colleague, Mr. Weir, and we

24  have presented our case for you, before you, rather, and

25  we trust that you will continue your good work and jury

1   service and we will be content with your jury service.

2   Thank you.

3         THE COURT:  Thank you.  See you at five of.

4         (Jury left the courtroom.)

5         THE COURT:  Do you want to see me at

6   sidebar?

7         MR. KOCIUBES:  Yes, your Honor.

8         (At sidebar on the record.)

9         MR. KOCIUBES:  There are a number of things

10   I would object to, I would ask for curative instructions

11   as going beyond the evidence.  For example, the comment

12   was made that Brooks said that he would not meet with

13   her.  The testimony was actually that he did.

14         THE COURT:  He would not what?

15         MR. KOCIUBES:  He would not meet with

16   Mrs. Svensson.  The testimony is that he did --

17         THE COURT:  I thought he was discussing that

18   he would meet with her but she wouldn't -- he wouldn't

19   talk to her about it.

20         MR. KOCIUBES:  No, I think it was on the

21   28th that he actually did meet to talk with her about

22   it.  So I think that's inconsistent with what the

23   argument was.

24         THE COURT:  No, he said he met with her but

25   he was then -- he wouldn't take the memo and he

1  wouldn't --

2      MR. KOCIUBES:  That portion I'm not

3  objecting to.

4      THE COURT:  Overruled.  Overruled.

5      MR. KOCIUBES:  And then, secondly, there was

6  reference, for example, to Bloom looking at different

7  data, and that's wholly improper.  Bloom didn't testify,

8  there was no evidence.

9      THE COURT:  I was worried about that as

10  well.

11      MR. MOLONEY:  I think --

12      THE COURT:  No, there's nothing about that.

13  I don't know what to say about that, though.  I mean,

14  because -- it's like don't think about the purple

15  elephant.

16      MS. KURKER:  The purpose was the inference

17  that he didn't testify because the evidence was bad.

18      THE COURT:  What do you want me to say?

19      MR. KOCIUBES:  The one I would ask is to

20  underscore the standard instruction about comments of

21  counsel are not necessarily -- for anything are not

22  necessarily evidence.

23      THE COURT:  I always say that.  Do you want

24  me to say specifically something about Bloom?

25      MR. KOCIUBES:  Yes, that there is no

1    inference that can be drawn one way or the other.

2         MR. MOLONEY:  He was on their list.

3         THE COURT:  Excuse me, excuse me.  But you

4    did argue what he would have looked at or didn't look

5    at, and so I think there should be no inference as to

6    what he would have said or looked at.  I mean, I think

7    that is unfair.

8         MR. MOLONEY:  I think the jury is entitled

9    to infer that a witness, who they would have called and

10   didn't call, and that they can make inferences from

11   that.  He's on their -- he was on their list --

12        THE COURT:  Maybe, but that --

13        MR. MOLONEY:  -- until a couple of days ago.

14        THE COURT:  You testified about what he

15   would have looked at.  I don't remember exactly how it

16   was phrased, but I think I'll say something, You

17   shouldn't make any inference to what Bloom would have

18   testified to.

19        MR. MOLONEY:  Your Honor, I think that is --

20   if the problem that you see is about the data he looked

21   at, that's one thing.  But the fact of the matter is,

22   he's on their list, they were going to call him, they

23   decided not to call him, and I think they can draw an

24   adverse inference.

25        THE COURT:  What's the next issue?

Page 96

1    MR. KOCIUBES:  The argument about there were

2  three or four people who essentially were on an internal

3  analysis in GER.  There was no evidence one way or other

4  in the record about that.

5    MR. MOLONEY:  Of course they can in infer

6  that.

7    THE COURT:  What are you talking about, the

8  Spatz -- dead man walking.

9    MR. KOCIUBES:  Yes, that's exactly right.

10    THE COURT:  I might not have used that

11  metaphor myself, but that's his call.  I'm not going to

12  say anything about that.  But I do think the Bloom thing

13  worried me a little bit just because he never did

14  testify.  It's really not clear to me what Judge Bowler

15  did or didn't do.  I sort of described in general how

16  people got the data, but I don't know what he looked at.

17    MR. MOLONEY:  Well, the key to it is the

18  only data that the experts could look at would be the

19  data concerning the people that you had ruled were

20  within the circle of comparators.

21    Now, White redid his calculations --

22    THE COURT:  And we shouldn't have talked

23  about Bloom.  You can say you can draw an inference from

24  the fact that he didn't testify, but you didn't, you

25  went over that.

Page 97

1          I don't know, Debra, can you put in a word

2     search where Bloom shows up, because I want to key it

3     into the phrase.

4               (Discussion off the record.)

5               MR. KOCIUBES:  Thank you, your Honor.

6               (End of discussion at sidebar.)

7               (Recess taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Resumed, 12:00 p.m.)

2      THE COURT:  So a couple of things.  So I have from

3  Debra the copies of the two references to Dr. Bloom.  One of

4  the references I think was appropriate, which is, you can

5  draw an inference from the fact that no expert testified.  I

6  think that's fair game.

7      The second piece, though, it talks about Dr. Bloom

8  looked at different data.  There's no evidence here, okay.

9  Well, I know we've argued about it, and maybe he did or he

10  didn't, and that's been part of the discovery dispute.

11      MR. MOLONEY:  No, I understand what you're saying.

12      THE COURT:  So now the question really is, what do

13  I do about that?  Do you think they remembered?

14      MR. KOCIUBES:  I'd request a jury instruction, your

15  Honor.

16      THE COURT:  That there's no evidence about what

17  data he looked at one way or another.

18      MR. MOLONEY:  But, your Honor, if you could clarify

19  it in a way that they understand that they can draw the

20  inference because --

21      THE COURT:  All I'm going to say is, you know, that

22  the parties agree that there was no evidence about Dr. Bloom,

23  who didn't testify, what data he did or didn't look at.

24  Okay?  And that's all I'm going to say.  I'm not going to

25  make any -- now, was there another issue?

Page 99

1          MR. MOLONEY:  We have an objection to part of the

2     Instruction No. 20.

3          THE COURT:  Okay, so help me because, for the

4     record, I handed these out at the start of the morning, but

5     everybody was quite busy doing their --

6          What's No. 20, back pay?

7          MR. MOLONEY:  Yes.

8          THE COURT:  I thought I picked up your stuff in

9     back pay.

10          MR. MOLONEY:  It's the cap.

11          THE COURT:  Oh, the cap.  You already said that.

12          MR. MOLONEY:  I know, but I just want to be sure on

13     the record --

14          THE COURT:  You're not preserving anything by doing

15     this.  You've got to do it after the charge, and I'll pull

16     you up here, okay?

17          And you might -- I've futzed a little bit more with

18     the statute of limitations thing because it isn't quite

19     clear.  You know, I was doing it quickly this morning, but I

20     think it still captures it, and if it doesn't, I'm sure

21     you'll help me at the side bar.

22          MR. RODRIQUES:  We're still cleaning up a few

23     exhibits from last night on redaction.

24          THE COURT:  We're not doing that now, though.

25     We're going to do that after the jury.

Page 100

1        MR. RODRIQUES:  After the charge, that's fine.

2        THE COURT:  They're waiting.  I'm going to get it

3   to them.  Everyone deserves a nice long lunch break away from

4   here.

5        (Jury enters the courtroom.)

6        THE CLERK:  Members of the jury, please remain

7   standing.  Everyone else, please be seated.

8        THE COURT:  Good afternoon.  There's an old

9   tradition in the courts of our Commonwealth and in this

10  Federal Court that at this stage of proceedings, the judge

11  stands and faces the jury and the jury faces the judge.  This

12  is the best way that I know how to symbolize the important

13  role that we both play in this system.

14        My job has been threefold:  The first was to

15  impanel a fair and impartial jury.  A long line of people

16  came up to me and said, "I can't be fair" or "I can't serve"

17  for one reason or another.  You are the people who have sworn

18  to us that you can be fair and impartial.  You have been

19  willing to serve, and I thank you very much for your

20  service.

21        My second job was to rule on the evidentiary

22  objections.  Sometimes we did that before you came in,

23  sometimes at side bar, sometimes right in front of you, and

24  sometimes after you left.

25        My third and final task is to give you the

1  instructions of law.  You must follow those instructions,

2  whether you agree with them or not.

3         As I am sure you will now agree, I have by far got

4  the easy job and you've got the tough one because you are the

5  ones who must render a unanimous verdict.  You're the ones

6  who must resolve disputes in the facts.  You're the ones who

7  determine the credibility of the witnesses, and you're the

8  ones who will, as I mentioned before, decide whether the

9  plaintiff has met her burden of proving her claims.

10         So I will be giving you a jury instruction now

11  which will be divided into three parts.  The first part is

12  quite general, and it's like the one I gave you on the very

13  first day of trial, what is evidence, what isn't evidence,

14  that sort of thing, but it will have an added significance to

15  you now because you've just sat through a trial.

16         The middle portion is very detailed and very

17  specific to what it is the plaintiff must prove.  And as I

18  mentioned, I find a couple of things the defendant has the

19  burden of proof on, and I'll be telling you about that.  And

20  I want you to take notes on that and get it down.  You can

21  write on that verdict form.  We're going to give you a fresh

22  and clean one so you can work on that back there, but I gave

23  you a very, I hope, clear verdict form of the decision tree

24  that you need to walk through at various points, and we'll go

25  through that now.

1          Then at the end I will talk to you about what I

2    call the mechanics of deliberation; how do you choose a

3    foreperson, how do you go about the deliberation process.

4          Now, you will not be immediately getting a copy of

5    this jury charge.  We will be giving you a tape recording,

6    which I have just pressed the button and will hopefully be

7    recording, and hopefully you'll be able to hear it.  And then

8    what we will be doing is giving you as soon as we can get it

9    done, Ms. Marzilli, the Court Reporter, a typed-up copy of

10   the charge.  But it might take a while, so what I really want

11   you to do is get going deliberating right away, and I want

12   you to take notes.  Notes will help you find out how to get

13   to the different portions of the charge you need and will

14   help you not daydream.  So why don't we sit down and get

15   going.

16         Do you all have right now -- I hope no one left it

17   back in the room -- the copy of the questionnaire because I

18   may be referring to it at various points here?  All right.

19         Now, I'm starting with the general instructions

20   about the function of the jury.  These instructions are about

21   the law you must apply.  I do not mean any of my instructions

22   to be understood by you as a comment by me on the evidence in

23   this case.  It is your function to determine the facts, and

24   although the law allows a judge in this court to sometimes

25   comment on evidence, I deliberately do not do so and instead

1    leave the fact-finding entirely in your hands.

2        Fortunately, you do not need to resolve every

3    dispute of fact raised by the evidence.  In order to know

4    which fact disputes are important, you need to know what

5    rules of law to apply.  I've explained some of these rules to

6    you during the trial and will explain all of them to you now.

7        The lawyers were allowed to comment during the

8    trial in their closing arguments on some of these rules, but

9    if what they say differs in any way from the instructions I'm

10   giving you or have given you, you must be guided only by the

11   instructions on the law as I state them.  Even if you

12   disagree with one or more of the rules of law I tell you

13   about, or don't understand the reason for some of them, you

14   are bound to follow them.  This is a fundamental part of our

15   system of government by law rather than by the individual

16   views of the judge and jury who have the responsibility for

17   deciding the case.

18       In many cases there is an element of sympathy which

19   surrounds the trial.  People involved in the case may be

20   deserving of sympathy, but not in a courtroom and not by a

21   jury, because sympathy is grounded in emotion, and you as the

22   jury must consider only the facts.

23       The courtroom is not a place for sympathy.  Even

24   more importantly, your jury room is not a place for

25   sympathy.  When you decide the case, you must decide on the

1  basis of the facts as you find them.  You must disregard

2  sympathy and emotion, and you must focus on the facts and

3  facts alone.  You should consider the evidence in a calm,

4  dispassionate, analytical manner.

5       The defendant, as you now know, is Putnam

6  Investments, and it is a corporation.  A corporation is

7  entitled to the same fair trial at your hands as a private

8  individual.  The law treats corporations as persons, and all

9  persons, including corporations, stand as equal before the

10  law and are to be dealt with as equals in a court of

11  justice.

12       Because a corporation is a legal entity, it can act

13  only through its agents; that is, through its employees, its

14  officers, and its representatives acting within the scope of

15  their official duties.  When you are deciding whether a

16  corporation is responsible for certain actions, you must look

17  to the conduct of the individuals acting on behalf of the

18  corporation.  If in their official duties employees of the

19  corporation took a particular action, then the corporation is

20  responsible for that action.

21       Evidence, let's go through what is evidence and

22  what isn't evidence.  The evidence in the case consists of

23  the sworn testimony of the witnesses, all exhibits received

24  in evidence and given a number, and all facts that have been

25  admitted or stipulated to.

1    I should add here that there have been a number of

2  things that we've called charts or chalks.  Many of those

3  have not come into evidence, and so therefore you will not be

4  getting those in the jury room.

5    You may consider both direct and circumstantial

6  evidence.  Direct evidence is direct proof of facts from

7  someone who has seen something or heard something or touched

8  something, used his or her senses in perceiving an event.

9  Your job is to decide if you believe that person or not.

10  Circumstantial evidence is proof of facts from which you may

11  reasonably infer or conclude that other facts exist.

12    Anything you may have seen or heard outside the

13  courtroom is of course not evidence, and you must disregard

14  it entirely.  Considering the evidence, you must find the

15  facts as you decide the evidence has proved them.  Also, from

16  the facts proved, you may draw reasonable inferences about

17  additional facts.  An inference is a deduction or

18  conclusion.  An inference is an additional finding that your

19  experience, reason, and common sense lead you to draw from

20  facts that you find are proved by the evidence.

21    You must use your common sense and common

22  experience in deciding whether proof of certain facts

23  provides a sufficient basis from which you can infer other

24  facts.  You may credit or discredit, as you see fit, direct

25  evidence of a fact.  Also, you may draw reasonable

1  inferences, or not, as you see fit, from circumstantial

2  evidence.  We use the phrase "circumstantial evidence" to

3  refer to evidence of some facts, including evidence and

4  circumstances from which a jury, using common sense and

5  common experience, may infer the existence or nonexistence of

6  another fact.

7           Now, you may remember at the start of the trial I

8  gave you the example of the difference between direct and

9  circumstantial evidence as follows:  Direct evidence is when

10  your daughter sees the letter carrier -- remember that

11  example? -- and the question is whether you believe her.

12  Does she have a motive to lie?  Was she wearing her glasses?

13  Is she remembering it correctly?  But she says she's seen it,

14  and then it's up to you as to whether or not you believe that

15  direct evidence.

16           Circumstantial evidence is different.  It's when no

17  one sees the letter carrier deliver the mail, and you come

18  home from work and you find it shoved through the mail slot.

19  The question is whether you can reasonably infer or conclude

20  that the letter carrier had been there; how else would the

21  mail have gone through the mail slot?

22           So, remember, it is up to you to decide both the

23  facts and the reasonable inferences to be drawn from the

24  facts, and you can rely on both direct and circumstantial

25  evidence in this case.

1    Many things happened over the course of this trial

2  which are not evidence, and I want to go through them right

3  now.  The opening statements were not evidence.  The closing

4  arguments that you just heard of counsel are not evidence in

5  the case.  Instructions of law are not evidence.  If somehow

6  either I or any of the attorneys refer to evidence

7  differently from the way you remember the evidence, let your

8  own memory control.

9    At times during the trial you heard a lawyer object

10  to a question asked by another lawyer and at times to the

11  answers made by witnesses.  It is a proper function of

12  lawyers to object.  That's their job.  They're relying on the

13  rules of evidence.  So you should never draw any inference or

14  make any findings against a side because they objected to the

15  evidence.  As I said, that's their job.

16    Also, when I sustained an objection to the

17  question, the witness was not allowed to answer it after my

18  ruling, so don't try and guess what the answer might have

19  been if I had not sustained the objection.  If an answer came

20  in after I sustained an objection, you are to disregard it.

21    Now, let me also say, if I limited the use to which

22  you can use information -- remember sometimes I said, well,

23  this is hearsay, it's only relevant as to what's in someone's

24  mind, you cannot consider it for the truth of the matters

25  asserted.  Also, I want to emphasize that I have no view as

1    to the appropriate outcome of this case or as to the

2    credibility of any of the witnesses.  I sometimes asked a

3    question of a witness if I didn't understand something, so I

4    was not intending in any way to indicate to you what I

5    thought of the witness.  And, similarly, as you may recall, I

6    asked certain questions the jurors offered.  You can treat

7    the answers to those like any other evidence.

8            Now, I wanted to mention, as I said, emphasize,

9    that the closing arguments are not evidence.  There was just

10   one point raised at side bar after you left, which is with

11   respect to what defendant's expert, a Dr. Bloom -- you heard

12   his name mentioned -- may or may not have reviewed as

13   statistical evidence; and there's no evidence of that in this

14   record, so that shouldn't be considered by you.

15           Now, let me talk to you about inconsistencies.  You

16   may consider inconsistencies or differences as you weigh

17   evidence, but you do not have to discredit testimony merely

18   because there are inconsistencies or differences in the

19   testimony of a witness, or between the testimony of different

20   witnesses.  Two or more persons witnessing an incident or a

21   transaction may see or hear it differently.  Innocent

22   misrecollection, like failure of recollection, is a common

23   experience.  In weighing the effect of any inconsistency or

24   difference, consider whether it concerns a matter of

25   importance or an unimportant detail, and whether it results

1  from an innocent error or intentional falsehood.

2          You are not required to accept testimony, even if

3  it is uncontradicted.  You may decide, because of the

4  witness's bearing and demeanor, or because of inherent

5  improbability, or for other reasons sufficient to you, that

6  testimony is not worthy of belief.  You may accept all of a

7  witness's testimony, or you may reject all of it, or you may

8  accept parts and reject other parts.

9          Now, you may recall that during the trial, a

10  witness was sometimes asked to give testimony about a

11  statement made before trial about some fact.  By a statement

12  about some fact, I mean a statement that says or implies that

13  some event occurred or some fact existed.  These before-trial

14  statements include statements that were made in documents.

15          A before-trial statement about a fact may be

16  brought to your attention to help you decide whether you

17  believe the testimony at trial of the witness who made the

18  statement before trial.  If you find that a witness before

19  trial knowingly gave a false statement concerning any

20  material matter, you may take that into account in deciding

21  whether to distrust that witness's testimony at trial.  Also,

22  if a witness said something different about any material

23  matter earlier, even though truthfully, and you decide that

24  the two statements are in conflict, then you may consider

25  whether there is a reason for you to doubt or discredit the

1  testimony given.

2          Unless I tell you otherwise, you are not to

3  consider a before-trial statement about a fact as evidence

4  for any other purpose than to determine how it bears, if at

5  all, on the credibility of the witness.

6          There are certain exceptions to this rule.  All

7  right, let me talk to you about the exception having to do

8  with a party; that is, Ms. Svensson or Putnam Investments, by

9  which I mean employees or officers acting within the scope of

10  their employment for Putnam.  If a party, or a representative

11  authorized to speak for a party, admitted some fact by an

12  earlier statement, act, or omission, then as against that

13  party, you may consider the earlier statement, act, or

14  omission as evidence of the truth of the fact so admitted.

15  Of course, you may also consider the statement like any other

16  before-trial statement, for the purpose of judging the

17  credibility of that person as a witness.

18          Also, regardless of whether the witness is a party,

19  if the earlier statement was inconsistent with his trial

20  testimony, or her trial testimony, and given under oath --

21  for example, in a deposition, you heard some of these

22  depositions -- you may consider the earlier statement both

23  for the purpose of judging the credibility of the person as a

24  witness and as evidence of the truth of the facts it

25  asserts.  If the earlier statement was consistent with the

1  person's trial testimony, you may consider it both for the

2  purpose of judging the credibility of the person as a witness

3  and of determining whether the trial witness recently

4  fabricated his testimony or had an improper influence or

5  motive.

6          As I said before, some statements were admitted for

7  a limited purpose.  Most commonly here it was state of mind.

8  Statements that I identified as relevant for that purpose may

9  be considered for that purpose, and do not consider it for

10  any other purpose.  And I also, you know, occasionally had

11  play acting.  There were certain depositions that were read

12  here because people were beyond the subpoena power of the

13  court.  You can consider those statements fully on the merits

14  as you would if the person was testifying here.

15          Now, witness credibility.  An important part of

16  your job as jurors will be deciding whether you believe what

17  each person had to say and how important that testimony was.

18  In making that decision, I suggest that you ask yourself a

19  few questions:  Did the person seem honest?  Did he or she

20  have some reason not to tell the truth?  Did he or she have

21  an interest in the outcome of the case?  Did the witness seem

22  to have a good memory?  Did the witness have the opportunity

23  and was the witness able to observe accurately the things he

24  or she testified about?  Did he or she understand the

25  questions and answer them directly?  Did the witness's

1    testimony differ from the testimony of other witnesses?  Was

2    the witness's testimony on cross-examination different from

3    the testimony given on direct examination?  These are some,

4    but not all, of the kinds of things that will help you decide

5    how much weight to give what a witness said.

6            You should consider any demonstrated bias,

7    prejudice, or hostility of a witness in deciding what weight

8    to give to the testimony of the witness.

9            The number of witnesses or number of exhibits or

10   length of the testimony is not what we mean when we speak of

11   the weight of the evidence.  Also, number and length are not

12   what we mean by evidence sufficient to meet the burden of

13   proof.  You determine the weight of the evidence and whether

14   the burden of proof is met by using your judgment about the

15   credibility and importance of the evidence.

16           Now, let me talk to you about the burden of proof.

17   The burden of proof in most circumstances rests with the

18   plaintiff.  There are a few issues here in which the

19   defendant has the burden of proof, and I will be careful to

20   explain them to you.  Whoever bears the burden of proof,

21   though, the burden is the burden in a civil case, not a

22   criminal case.  The issue must be proven by what we call in

23   the law a fair preponderance of the evidence.  What does that

24   mean, fair preponderance of the evidence?

25           So put the issue of proof beyond a reasonable

1   doubt -- you know proof beyond a reasonable doubt.  You've

2   all heard that.  That's the burden in a criminal case.  Put

3   it out of your mind.  Proof beyond a reasonable doubt is not

4   the burden in a civil case.

5           The standard here is that the plaintiff must prove

6   that her claims are more likely true than not true.  Let me

7   state it again:  Plaintiff must prove that her claims are

8   more likely true than not true.

9           A preponderance of the evidence means the greater

10  weight of the evidence.  It refers to the quality and

11  persuasiveness of the evidence, not the number of witnesses

12  or documents.  In determining whether a claim has been proven

13  by a preponderance of the evidence, you may consider all of

14  the testimony of all of the witnesses, regardless of whether

15  that witness was called by the plaintiff or the defendant,

16  and all of the relevant exhibits, no matter who introduced

17  those exhibits.

18          If you find that the credible evidence on a given

19  issue is evenly divided between the parties, by which I mean

20  that it is equally probable that one side is right as it is

21  that the other side is right, then you must decide that issue

22  against the party having the burden of proof.  Here that's

23  mostly the plaintiff, except where I tell you otherwise.

24  That is because the plaintiff, who has the burden of proof,

25  must prove more than simple equality of the evidence.  She

1    must prove each element at issue by a fair preponderance of

2    the evidence.

3          On the other hand, the party with the burden of

4    proof need prove no more than a preponderance.  So let me

5    again give you the way I think about it when I sit without a

6    jury.  I think of blindfolded Lady Justice with the scales of

7    justice in her hand.  The plaintiff has the burden of making

8    those scales tip, albeit slightly, in her favor.  But if at

9    the end of all of the evidence you find the scales are

10   equally balanced or balanced against her, she has not met her

11   burden of proof.

12         Similarly, there are several occasions here where

13   the defendant has the burden because there's a defense here,

14   an affirmative defense.  With respect to those defenses, the

15   defendant has the burden of proving the defense by a

16   preponderance of the evidence, by making those scales tip,

17   albeit slightly, in its favor.  But if at the end of all of

18   the evidence it hasn't proven its defense, that the scales

19   are evenly balanced or balanced against it, it hasn't met its

20   burden.  So it is the same standard whether it's the

21   plaintiff's burden or the defendant's burden:  The person has

22   to prove that the issue is more likely true than not true.

23         All right, now I am moving on to the middle portion

24   of these instructions, which are very specific to the jury

25   questionnaire, so I'm hoping you will get that out.

1    Now, let me say this:  The first question is a

2    statute of limitations issue, and I'm actually going to deal

3    with that last because I'm going to deal with the whole issue

4    of what is employment discrimination.  So I'm going to walk

5    you all the way through the law on that, and then I'm going

6    to backtrack around to Question A1.  So I'm really starting

7    here, although I'm not saying you need to.  As you notice, if

8    you say the first claim isn't timely, you jump right to

9    Section B.  But I'm going to start with employment

10   discrimination issues, and then I'm going to go back to the

11   statute of limitations.

12       So let me talk to you generally about the law.  The

13   plaintiff has alleged that Putnam intentionally discriminated

14   against her on the basis of her gender in two different

15   situations, Section A and Section B, when it moved her from

16   being a portfolio manager to the Research Team and when it

17   terminated her.

18       Under federal and state law, it is unlawful for an

19   employer to discharge, demote, or otherwise discriminate

20   against an individual with respect to her compensation,

21   terms, conditions, or privileges of employment because of her

22   gender, because of her sex.

23       To prevail on a claim of gender discrimination,

24   plaintiff must prove three things.  I'm going to read them

25   and then repeat them so you can get it down.

1        Plaintiff must prove, first, that Putnam made an

2   adverse employment decision with respect to Ms. Svensson.

3   First, repeating, that Putnam made an adverse employment

4   decision with respect to Ms. Svensson.

5        Second, that the adverse employment decision was

6   made because of her gender.  Second, that the adverse

7   employment decision was made because of her gender.

8        And, third, that any unlawful sex discrimination

9   proximately caused her damages.  Third, that any unlawful sex

10  discrimination proximately caused her damages.

11       Let me pause for a minute on the word "proximately"

12  because that's another legal term spelled p-r-o-x-i-m-a-t-e-l-y.

13  And I will talk later on about the legal concept of proximate

14  causation which has a specific meaning, but for right now

15  plaintiff must prove that any unlawful sex discrimination

16  proximately caused her damages.

17       And now let me go through in great detail what this

18  means.  What is an adverse employment action?  And you may

19  notice that that is the issue addressed in QA2.  If you have

20  found that the claim is timely, you get to QA2.  If you find

21  it isn't timely, of course you don't have to get to QA2, and

22  you go to Section B.

23       So what is an adverse employment action?  An

24  adverse employment action is one that, standing alone,

25  actually causes damage, tangible or intangible, to an

1   employee.  An adverse employment action is one that

2   materially and negatively changes the conditions of

3   plaintiff's employment.  You may consider whether the

4   employment action adversely and significantly affected the

5   employee's current wealth, including compensation, fringe

6   benefits or financial terms of employment, including

7   termination, or negatively affected the employee's career

8   prospects, thus impacting the employee's future wealth.  The

9   fact that an employee is unhappy with something his or her

10  employer did or failed to do is not enough to make that act

11  or omission an adverse employment action.

12          So in evaluating Mrs. Svensson's claim, what she

13  calls the demotion claim against Putnam in Section A, you

14  must first decide whether she suffered an adverse employment

15  action when defendant moved her from International Growth to

16  Global Equity Research.  If you find that the decision to

17  move Mrs. Svensson to the Global Equity Research team was not

18  an adverse employment action, then you must find for Putnam

19  on this claim and answer QA2 "no."  All right?  And then you

20  go all the way to Section B.

21          However, if you find that the decision to move her

22  did constitute an adverse employment action, you must answer

23  that "yes," and you move on to Question A3; that is, whether

24  Mrs. Svensson has proven by a preponderance of the evidence

25  that Putnam took this action against her because of her

1    gender.

2            Now, I want to go on again to the question of

3    whether there was a demotion or not.  You must decide whether

4    Putnam's employment action against Mrs. Svensson resulting in

5    her ceasing to be a portfolio manager and returning to the

6    Research Department as an analyst was a demotion.  That's a

7    fact question for you:  Was it a demotion?  I instruct you

8    that in order to be equivalent to a demotion, a transfer need

9    not result in a decrease in pay, title, or grade.  It can be

10   a demotion if the new position proves objectively worse,

11   objectively worse, such as providing less room for

12   advancement or less prestige.

13           Now, you will notice, if you get there, that I ask

14   in Question QA3 -- and you notice I'm tracking A so that you

15   stick with the section -- "Did plaintiff prove that defendant

16   made the decision to move plaintiff from the International

17   Growth Team to the Global Equity Research Team because of her

18   sex?"  Because of her sex.  So what do I mean by "because

19   of"?

20           When a plaintiff alleges disparate or different

21   treatment because of her gender, she must prove that her

22   gender actually motivated the employer's decision.  That is,

23   plaintiff must prove that her gender must have actually

24   played a role in the employer's decision-making process and

25   that her gender had a determinative influence on the

1  outcome.

2          So how are you going to decide this?  To decide the

3  reason Putnam took various employment actions -- and this

4  applies to all the claims here, not just to Section A -- to

5  decide the reason Putnam took various employment actions, you

6  will have to inquire into and determine the state of mind of

7  Putnam's employees charged with making the employment

8  decisions at issue in this case.  Sometimes an employee's

9  intent can be proven directly -- we just talked about direct

10  evidence -- for example, by a witness describing what his or

11  her state of mind was or by a witness testifying to what an

12  employee said that would be reflective of his or her state of

13  mind.

14          But at other times, intent or state of mind must be

15  proven indirectly or by circumstantial evidence, as we've

16  just discussed.  Here you may examine the actions and words

17  of the employees charged with making the employment decisions

18  at Putnam, the actions and words of persons who had influence

19  over these decision-makers, and all of the surrounding

20  circumstances, to help you determine what was the state of

21  mind, or intent, of those Putnam employees when they took the

22  employment actions with respect to Mrs. Svensson.

23          Now, Mrs. Svensson has introduced -- her lawyers

24  have introduced statistical evidence in support of her

25  discrimination claim.  You may consider statistical evidence

1   to support Mrs. Svensson's claim that Putnam intentionally

2   discriminated against her.

3        Employment decisions that are made because of

4   stereotypical thinking about a protected characteristic of

5   members of a protected class -- here we're talking about

6   women -- whether conscious or unconscious, are actionable.

7   The prohibition against disparate treatment because of gender

8   extends both to employer's acts based on conscious

9   gender-based animus and to employer decisions that are based

10  on stereotyped thinking or other forms of less conscious

11  bias.

12        One type of circumstantial evidence of

13  discrimination can be when a plaintiff points to males who

14  are similarly situated to her, but who did not suffer the

15  same adverse employment action or were treated differently.

16  You've heard me sometimes refer to them as "comparators," a

17  legal term, the comparators.

18        Who is a similarly situated male may vary given the

19  type of claim that the plaintiff asserts.  Generally,

20  however, the persons to whom plaintiff compares herself, the

21  comparators, need not be perfect replicas of her, but they

22  must closely resemble her with respect to relative facts and

23  circumstances.  Comparators need not have the same

24  supervisors or be on the same teams, but these are factors

25  you may consider.  Reasonableness is the touchstone.

1   Essentially, the plaintiff must persuade you that she's

2   comparing apples to apples.

3           In determining whether a Putnam Investments

4   professional is similarly situated to Mrs. Svensson, you

5   should consider the performance, qualifications, and conduct

6   of that person as compared to Mrs. Svensson's performance,

7   qualifications, and conduct.  You should also consider the

8   presence or absence of any meaningful differences or

9   mitigating circumstances that would distinguish their job

10  duties.

11          You may also consider how Putnam treated similarly

12  situated females as evidence of whether there was disparate

13  treatment.

14          Now, when assessing Putnam's stated reason for its

15  employment decisions regarding Mrs. Svensson, you should

16  focus on the motivation of the employer and not whether you

17  agree with its business judgment.  While an employer's

18  judgment may seem poor or erroneous to outsiders, the

19  relevant question is simply whether the given reason was a

20  pretext for unlawful discrimination.  The employer's stated

21  legitimate reason must be reasonably articulate and

22  nondiscriminatory, but does not have to be a reason that you,

23  the jury, would act on or approve.  An employer is entitled

24  to make its own policy and business judgments.  You may

25  consider the reasonableness or lack of reasonableness of a

1    stated business judgment along with all of the other evidence

2    in determining whether the defendant discriminated against

3    the plaintiff.

4         So the plaintiff may also prove, by a preponderance

5    of the evidence, that the defendant's stated reason to take

6    adverse employment action against the plaintiff is false or a

7    pretext for discrimination by persuading you that defendant's

8    offered reason is not the true reason why it took the action

9    against plaintiff.  If you find that the defendant's offered

10   reason was false or pretextual, the law allows you to infer

11   that the defendant had a discriminatory motive, and you may

12   find for the plaintiff for this reason alone, although you

13   are not required to do so.  Plaintiff has the burden of

14   proving that the reason given by Putnam was false and the

15   real reason was her gender.

16        Putnam has stated its reasons for moving Lisa

17   Svensson -- that's the alleged demotion claim -- and for

18   terminating Lisa Svensson.  If Mrs. Svensson proves that

19   these reasons were a pretext and that the true reason was her

20   gender, you should answer -- and we're at QA3 -- QA3 "yes."

21   If, though, you find the Putnam stated reason is the true

22   reason, you should answer QA3 "no."

23        You must move on to decide then whether gender was

24   a motivating factor, even if you find that other factors

25   played a role.  In deciding whether the reasons given by

Page 123

1    Putnam are believable, you should determine whether there are

2    weaknesses in Putnam's stated reasons and whether Putnam has

3    been consistent or inconsistent in its stated reasons.

4         If Svensson proves that gender was a motivating

5    factor -- now, this gets complicated, so stick with me here.

6    So, in other words, if you find that the determinative factor

7    was sex, you answer QA3 "yes."  If you find it wasn't the

8    determinative factor, you answer "no."

9         But now I'm moving you on to QA4 and QA5.  What do

10   you do if Ms. Svensson proves that gender was a motivating

11   factor for the decision but not the only reason?  The burden

12   then shifts to Putnam to prove that it would have fired her

13   anyway without considering her gender, or it would have

14   demoted her anyway without considering her gender.  So this

15   is what is called a "mixed motive" line of analysis, and it

16   is an alternative, so this is why I'm going to move you on to

17   it.

18        So this is in QA4 and QA5, and if you look in

19   Section B which deals with the termination, as you'll notice,

20   the first question is, did defendant make an adverse

21   employment decision because of her sex?  Was that the

22   determinative factor?  If you answer "yes," then you jump

23   over B2 and B3 and get to B4.  But if you say "no," then I am

24   instructing you that you must move on to the mixed motive

25   line of analysis.

1          Similarly in QA3, if you say "yes," it was because

2     of her sex, you jump over QA4 and QA5, and you would go to

3     QA6.  But if you find it wasn't the determinative factor, you

4     need to go on to QA4 and QA5.  Those are in two separate

5     spots now you're going to need, perhaps, to think about a

6     mixed motive analysis.  I am going to describe that in

7     greater detail to you right now.

8          Let me address plaintiff's mixed motive argument.

9     What do I mean by a mixed motive?  Federal law provides that

10    an unlawful employment action is established when the

11    complaining party -- here Mrs. Svensson -- demonstrates by a

12    preponderance of the evidence that sex was a motivating

13    factor for the employment decision, even though other factors

14    also motivated the decision.  However, an employer can then

15    avail itself of a defense that restricts the remedies if it

16    demonstrates that it would have taken the same action absent

17    the impermissible motivating factor.

18         So just so it doesn't sound like Greek to you, so

19    look at Question QA4, "Did plaintiff prove that gender was a

20    motivating factor in defendant's treatment of plaintiff?"

21    And if the answer was it was one of several factors, then you

22    move on to QA5, which is, "Did defendant --" did Putnam

23    here -- "prove that the defendant would have treated the

24    plaintiff similarly even if the plaintiff's gender had had no

25    role in the employment decision?"  And that makes a

1  difference as to the kinds of remedies that she would get.

2  So that is what we call mixed motive analysis.

3          Under this approach, Ms. Svensson must demonstrate

4  that her gender was a motivating factor in Putnam's adverse

5  employment actions against her.  She need not establish that

6  her gender was the only, or even the primary, reason for

7  Putnam's actions against her.

8          If you find that Putnam's adverse employment

9  actions against Mrs. Svensson were motivated both by gender

10 and a lawful reason, you must then decide whether

11 Mrs. Svensson is entitled to damages.  She's entitled to

12 damages unless Putnam proves by a preponderance of the

13 evidence that it would have made the same decision or

14 decisions, and taken the same action or actions against

15 Mrs. Svensson, even if her gender had played no role in the

16 employment decision.

17         It is not enough for Putnam to show that it was

18 motivated only in part by a legitimate reason.  Instead,

19 Putnam must show that a legitimate reason, standing alone,

20 would have induced it to make the same decision.  Putnam

21 bears the burden of proof on this issue.  Remember I said in

22 certain circumstances the defendant proves it, so in this

23 area, you'll notice QA5 is, did plaintiff prove that gender

24 was a motivating factor?  Then the burden shifts to the

25 defendant to prove that it would have treated the plaintiff

1    similarly even if the plaintiff's gender had no role in the

2    employment decision.

3            Now, if the defendant does make that burden of

4    proof and proves it and you say that defendant proved it,

5    then you do not -- you see it goes on to Section B because

6    she doesn't get these damages that are listed below.  But if

7    in fact the defendant doesn't make that burden, then you need

8    to answer QA6 and QA7.

9            So I've walk you through the decision tree.  You do

10   not even need to deal with mixed motive analysis if you

11   decide that gender was the determinative reason.

12           So let me now move on to causation.  If you find

13   that Putnam took an adverse employment action against

14   Ms. Svensson because of her gender, Ms. Svensson must prove

15   that any discriminatory act was the proximate cause of the

16   claimed damages -- "proximate," remember that's that legal

17   term again -- that any discriminatory act was the proximate

18   cause of her claimed damages.  In other words, she must prove

19   that any improper conduct was a substantial factor in causing

20   any injuries for which you compensate her.

21           So the causation question is in QA6 with respect to

22   the alleged demotion claim.  I'll come back.

23           Now, let me also talk to you for a minute about

24   termination.  These same instructions apply to the

25   termination claim, except the timeliness issue doesn't apply

1  there, so there's no statute of limitations question for you

2  there.  So the question is, "Did plaintiff prove that

3  defendant made an adverse employment decision regarding

4  plaintiff's employment because of her sex in September 2003?"

5  That is, of course, Mr. Brooks's decision.  And then you jump

6  over the mixed motive analysis if you decide that sex was the

7  determinative factor in that employment decision, but then if

8  you answer that "no," you then need to go on to that mixed

9  motive analysis to decide whether it was a factor, and then

10  the shifted burden to the defendant in Question B3, and then

11  the damage questions follow from that.

12      So now let me get to the issue of damages.  Now,

13  the fact that I instruct you on damages is not meant to imply

14  that you should reach this issue.  That is for you to

15  determine.  If Mrs. Svensson has proven to you that Putnam

16  unlawfully discriminated against her, then you must decide

17  the amount of damages, if any, that will fairly compensate

18  her.  The purpose of an award for compensatory damages is to

19  make Ms. Svensson whole for all the losses that she has

20  suffered because of Putnam's unlawful discrimination.

21      As the plaintiff, Ms. Svensson bears the burden of

22  proof on the damages caused by the improper conduct.  That's

23  that proximate causation concept.  Although uncertainty in

24  the amount of damages does not bar recovery, and mathematical

25  precision is not required, you must not speculate,

1   conjecture, or guess in awarding damages.  The award is

2   acceptable as long as it is based on just and reasonable

3   inferences from the evidence.

4           If you find that Putnam unlawfully discriminated

5   against Mrs. Svensson, then you may award her damages in the

6   following four areas, the four areas that you would think

7   about:  First, what we call back pay.  That's essentially,

8   and I'll go into it in detail -- I'll go into it in detail

9   later.  Second, front pay; third, emotional distress; and,

10  fourth, punitive damages.  So there's back pay, front pay,

11  emotional distress, punitive damages for you to consider.

12          Let me explain them in greater detail.  What is

13  back pay?  If you find that Putnam has unlawfully

14  discriminated against Mrs. Svensson, she is entitled to back

15  pay.  Back pay is the amount of Mrs. Svensson's lost earnings

16  from the date you find she was discriminated against until

17  this trial -- until this trial, until now.  This includes all

18  lost salary and employment benefits that would have

19  accumulated but for Putnam's discriminatory actions.  You

20  should also consider the duration of those benefits; that is,

21  what the appropriate time period for damages is.  You should

22  also include any increases in salary or other compensation

23  which you find she would have received as a portfolio manager

24  if she had not been unfairly demoted, and that's of course

25  disputed.

1    If, for example, you find that she was unfairly --

2  I'm giving you some scenarios just to give you a sense of the

3  decision tree, but of course all of this is up to you to

4  decide.  If, for example, you were to find she was unfairly

5  demoted but properly terminated, you must cap her damages as

6  of the date of the termination.  As another example, if you

7  find she was unfairly demoted and unfairly terminated, you

8  should consider the rate of compensation she would have

9  received absent the unlawful discrimination.  In other words,

10  plaintiff is entitled to all back pay she proves was caused

11  by the unlawful discrimination.

12    I want to instruct you that you should avoid

13  overlapping damages.  You know, so what I'm going to do at

14  the end, if you reach the issue of damages, is add together

15  the figures that you have here for the total award because I

16  obviously don't know what, if anything, you're going to do

17  with it, so I'm just going to add together, you know, the

18  back pay from the two different claims.  So you should be

19  careful to avoid overlapping damages so she is not

20  overcompensated.  If, for example, you find that

21  Mrs. Svensson gets back pay from her alleged demotion as well

22  as back pay from an alleged unfair termination, I'll add

23  these two figures together, so make sure you don't award

24  duplicative damages.

25    Now, front pay:  If you find that Ms. Svensson has

1    proven her claim of unlawful termination based on sex, by a

2    preponderance of the evidence, you may award her front pay.

3    That's going forward from now, which is the amount of damages

4    resulting from the loss of future earnings and benefits that

5    is attributable to the employer's misconduct.  You cannot

6    speculate in awarding front pay.  Rather, the determination

7    of the amount of the award must be proven with a reasonable

8    certainty.  You should make reasonable estimates based on the

9    evidence concerning the amount of future earnings, including

10   salary and benefits that Ms. Svensson would have received but

11   for Putnam's unlawful termination.

12           In determining front pay, you should consider and

13   weigh the following factors:  First, the amount of earnings,

14   including salary and benefits, that Ms. Svensson probably

15   would have received between now and her projected

16   termination, departure or retirement date, whichever you find

17   would have occurred first; second, Mrs. Svensson's probable

18   date of termination, departure or retirement, whichever would

19   have occurred first; the amount of earnings that Ms. Svensson

20   will receive from other employers; this of course would

21   reduce any front pay award available to her; the availability

22   of other comparable employment opportunities; and the

23   possibility of inflation and compensation increases or

24   decreases in the future.

25           If you award Mrs. Svensson front pay damages, keep

1  in mind that a plaintiff cannot be awarded damages that

2  overcompensate the losses that she suffered because of

3  defendant's conduct.  In order to avoid overcompensating

4  Ms. Svensson, you must consider that the amount of money you

5  give for future losses can be put in the bank where it can

6  earn interest.  So in making the award for front pay, you

7  must determine what amount of money, if invested today at a

8  reasonable rate of interest, would in the future provide

9  Ms. Svensson with the amount of money that you calculated she

10 would lose in the future as a result of the alleged unlawful

11 conduct.

12         Now, emotional distress.  If you find that

13 Ms. Svensson has been intentionally discriminated against,

14 you may award her reasonable damages for her emotional

15 distress caused by any unlawful discrimination.  Emotional

16 distress includes mental pain, discomfort, indignity,

17 depression, fear, anxiety, or humiliation caused by the

18 discrimination.  Although uncertainty in the amount of

19 damages does not bar recovery, and mathematical precision is

20 not required, you must not speculate, conjecture, or guess in

21 awarding damages.  The award is acceptable so long as it is

22 based on just and reasonable inferences from the evidence.

23         If you find that Mr. Brooks demoted Mrs. Svensson

24 because of her -- going to the 2003 time period -- if you

25 find that Mr. Brooks demoted Mrs. Svensson because of her

1  gender, but then reasonably terminated her for Putnam's

2  stated reason, you may award only the emotional distress

3  damages flowing from the demotion.

4        Again, make sure there are no duplicative damages

5  because I'll be adding the two sums together, if there are

6  two sums.

7        Now, let me talk to you for a minute about punitive

8  damages, and you'll notice that's in Section C.  If you find

9  that Putnam has acted intentionally and outrageously by

10  discriminating against Ms. Svensson, you may consider in your

11  discretion whether punitive damages are warranted.  It is not

12  enough just to prove gender discrimination.  Punitive damages

13  can be awarded only if you find that the defendant's conduct

14  is outrageous because of the defendant's evil motive, malice,

15  or its reckless indifference to plaintiff's rights.

16        Punitive damages are different from compensatory

17  damages such as back pay, front pay, or damages for emotional

18  distress.  Unlike compensatory damages, which serve to

19  compensate the victim for the harm she has suffered, the

20  purpose of punitive damages is to punish Putnam Investments

21  and to deter future acts of illegal discrimination.

22        In determining the amount of a punitive damage

23  awards -- and this is at your discretion -- if any, you

24  should consider the character and nature of Putnam's conduct;

25  Putnam's wealth, in order to determine what amount of money

1  is needed to punish Putnam's conduct and deter any future

2  acts of discrimination; the actual harm suffered by

3  Mrs. Svensson; and the magnitude of any potential harm to

4  other victims if similar behavior is not deterred.

5        If you do award punitive damages, you should fix

6  the amount by using calm discretion and sound reason.

7        Now, there is a defense to the punitive damages

8  claim here, and this is a defense upon which Putnam bears the

9  burden of proof by a preponderance.  You may not award

10  punitive damages if you find that Putnam has proven that it

11  made a good-faith effort to implement an antidiscrimination

12  policy.  However, in order to have made such a good-faith

13  effort, Putnam must do more than simply show that such an

14  antidiscrimination policy existed, or even that such a policy

15  was in writing.  A written statement without more is

16  insufficient to insulate an employer from punitive damages

17  liability.  Instead, Putnam must show that it made efforts to

18  implement its antidiscrimination policy through education of

19  its employees and active enforcement of its mandate.

20        You must also keep in mind that Putnam bears the

21  burden to establish its good faith efforts.  You are not

22  barred from assessing punitive damages unless Putnam has met

23  its burden of proving to you both that it had an

24  antidiscrimination policy and that it made efforts to

25  implement that policy.

1    So you may notice when I have the punitive damages,

2  the question is, do you find the defendant -- the defendant

3  here is Putnam Investments -- so the defendant, acting

4  through its employees, acted with evil motive, et cetera?

5  But it has a defense, that if you find that Putnam as an

6  institution met its burden to you that it had an

7  antidiscrimination policy and it made efforts to implement

8  that policy.  So there is that.

9    Also I have to say, in that mixed motive analysis,

10 if the burden shifts to the defendant and the defendant shows

11 that it would have made the same decision anyway, you cannot

12 award punitive damages.  So you'll see in how I've tracked

13 the instructions that go with that.

14    Now, certain things you shouldn't consider in

15 damages, I'll make it clear:  You should not consider the

16 issue of attorneys' fees, taxes, prejudgment interest in

17 awarding damages.  Don't take that into account.  I worry

18 about that later, if appropriate.  That's for me, not for

19 you.  So please don't take into account attorneys' fees,

20 possible taxes, or prejudgment interest rates.

21    Now, let me talk to you for a minute about the

22 concept of mitigation.  In determining the amount of damages,

23 if any, Ms. Svensson is entitled to recover, the law provides

24 that Ms. Svensson must make every reasonable effort to

25 minimize or reduce her damages for loss of compensation by

1  seeking employment.  This is called mitigation of damages.

2  However, it is Putnam's burden to prove by a preponderance of

3  the evidence that Ms. Svensson failed to mitigate her

4  damages.

5          If you determine that Ms. Svensson -- this is

6  another one that Putnam bears the burden on -- if you

7  determine that Ms. Svensson is entitled to damages, you must

8  reduce these damages by the amount that Ms. Svensson actually

9  earned following her discharge or the amount that you

10 determine Ms. Svensson could have earned through a reasonable

11 effort during the period from her discharge until the date of

12 trial.

13         If you determine that Ms. Svensson failed to seek

14 out or take advantage of a business or an employment

15 opportunity that was reasonable to her, then you should

16 reduce the amount of damages by the amount she would have

17 earned if she had sought out or taken advantage of that

18 employment opportunity.  In determining whether her failure

19 to seek out or take advantage of a business or an employment

20 opportunity was reasonable, you must be aware that

21 Ms. Svensson is only required to accept employment that is of

22 a like nature -- that is of a like nature.  In determining

23 whether employment is of a like nature, you may consider,

24 one, the type of work; two, the hours worked; three, the

25 compensation; four, the job security; five, the work

1    conditions; and, six, other conditions of employment.  So

2    that's the type of work, the hours to be worked, the

3    compensation, job security, work conditions, other conditions

4    of employment.

5          Now, to be very specific here, if you find that

6    plaintiff refused to accept Mr. Brooks's decision to redefine

7    her duties, you should consider whether -- and that's a fact

8    dispute -- but if you find that plaintiff refused to accept

9    Brooks's decision to redefine her duties, you should consider

10   whether plaintiff failed to mitigate her damages in deciding

11   whether to award her any back or front pay damages.  However,

12   to prevail on this mitigation defense, Putnam must prove that

13   the newly defined job was of a like nature to her previous

14   position as an Associate Director of Research.

15         Now, as I promised you, you think you're over, but

16   you've forgotten that I need to circle back and talk about

17   the statute of limitations.  Okay, so let me just circle all

18   the way back.  So I wanted to talk to you about employment

19   discrimination as a whole first, and now I am going to get to

20   the timeliness issue.

21         We're talking about QA1.  Putnam asserts

22   Ms. Svensson's claim arising from Putnam's employment action

23   resulting in her ceasing to be a portfolio manager and

24   returning to the Research Department as an analyst is

25   time-barred; in other words, barred by the statute of

Page 137

1    limitations.  Every case in court has some statute of

2    limitations, and their claim is that this claim is

3    time-barred.

4         Under the employment discrimination laws, Lisa

5    Svensson had to file a claim within 300 days after she

6    reasonably knew about the alleged discriminatory act, and

7    here it's roughly March of 2002, which is when the transfer

8    occurred.  It is undisputed that Ms. Svensson did not file a

9    timely charge with respect to the demotion claim, but there

10   is an exception to the rule, and this is the fact question

11   for you to address.

12        If you find that at the time of the action Putnam

13   held out the possibility of employment in other divisions or

14   positions -- in particular, the possibility that she would be

15   considered for portfolio manager positions as they became

16   possible -- if Mrs. Svensson proves that Putnam did hold out

17   such possibilities to her, then you must determine whether,

18   one, it was reasonable for Mrs. Svensson to believe that the

19   results of the employment action were temporary; two, that

20   these possibilities offered by Putnam lulled her into not

21   filing discrimination claims against Putnam so as to avoid

22   jeopardizing a possible future promotion; or, three, that

23   these possibilities that were being offered were

24   affirmatively misleading and caused Mrs. Svensson to be

25   unaware of the discriminatory animus with respect to the

1 employment action.

2      So, in other words, you must determine whether one

3 of those things occurred, that is -- I'll read it again --

4 whether it was reasonable for Mrs. Svensson to believe that

5 the results of the employment action were temporary, or that

6 these possibilities offered by Putnam lulled her into not

7 filing discrimination claims against Putnam so as to avoid

8 jeopardizing a possible future promotion, or that these

9 possibilities were affirmatively misleading and caused her to

10 be unaware of the discriminatory animus with respect to the

11 employment action.

12      You should also consider whether it was reasonable

13 for her to rely on these assurances until May 6, 2003.  That

14 was the time she would have needed to have filed it.  If it

15 was reasonable, you should answer -- in other words, if it

16 was reasonable for her to have relied on the assurances, she

17 has met her burden of proof that the claim was timely.  But

18 if it was not reasonable, you should answer QA1 "no," and you

19 don't have to answer any of the other questions, and you move

20 on to Section B.  So that's the timeliness issue that I've

21 been referring to.

22      Now, you will be glad to know that the hard part is

23 definitely over, okay.  So let me talk to you now about the

24 easier part, which is part three, the mechanics of getting

25 this case out to you to deliberate.

1        First, you've got to choose a foreperson when you

2   get back there.  The foreperson is not more equal than the

3   rest.  The foreperson is the person who will fill in the

4   verdict form, will make sure and certify to me that the

5   verdict is unanimous.  Whether it's "yes" or "no," it's got

6   to be unanimous, and then finally sign and date it.  So

7   that's the first thing that the foreperson will do.

8        The second thing that the foreperson will do will

9   be to write me questions.  Some of this is hard.  I've had,

10  like, I would say we've been meeting together every afternoon

11  for the last two afternoons for two or three hours, and my

12  law clerks and I have been doing a huge amount of research.

13  Some of this is hard, so there may be legal questions:  "What

14  did you mean by this, huh?  Go through that again," and there

15  just may be certain legal questions.  I urge you to listen to

16  my tape recording.  I'm hopefully speaking loud enough so you

17  can hear it.  Hopefully we'll get you a written charge which

18  will help you through this, and I've tried to be as clear as

19  I can in that verdict slip about where you go when, what you

20  need to answer.  So it may be that you're going to have some

21  big debate in there that I can resolve through a legal

22  ruling, so write it down and send it to me.  Don't ask

23  Mr. Alba because he may not get it exactly the way you mean

24  it, or don't ask the court security officer.  Write it down,

25  send it in to me.  The troops here are just waiting for your

1    every word.  I'll gather them together, and we'll try and

2    come up with an answer.  Sometimes I'll write it on a piece

3    of paper, "yes, no, maybe so," and I'll write it down exactly

4    how the instruction is.  But if it's a longer instruction, I

5    may bring you back in here, okay?  So the foreperson will

6    write down the questions, sign it, and as soon as we can,

7    because, like, I have other things this afternoon, we'll get

8    an answer back to you.

9           The third thing the foreperson will do will be to

10   read the verdict slip.  I, of course, only want one verdict

11   slip.  I know I've handed you lots so you can understand what

12   the decision tree was, but I only want one final verdict slip

13   for the record.  So the foreperson will be reading what the

14   verdict is, but the foreperson will not be standing alone.

15   He or she -- you'll hear us say, Mr. Alba or I, "So say you,

16   Mr. Foreperson?  So say you, all members of the jury?  So say

17   you, Madam Foreperson?  So say you, all members of the

18   jury?"  So you'll all be standing together to say that this

19   is the unanimous verdict.

20          I never want to know, "We're running five-five,

21   moving on to six-four."  I don't want to know what the split

22   is.  I don't want to know until it's unanimous.

23          Now, the second thing is that don't ever ask me

24   questions about, "What did so-and-so say on such and such a

25   date?"  As I said in the beginning, it's not like we have an

Page 141

1    automatic transcript.  I'm not going to say it's impossible

2    to put together a transcript.  Ms. Marzilli could.  It takes

3    two or three hours.  You don't want your deliberations to

4    stop.  Some of you have taken fabulous notes, I think better

5    than I did.  Some of you have taken less thorough notes, but

6    you've all been watching and paying attention.  It's your

7    collective memory that controls.  I won't know from my notes

8    any better than you will from yours.  If it's absolutely

9    essential that you get a transcript of someone's testimony,

10    it will take a while to put it together because I don't give

11    you just a little tidbit.  You get the whole thing, and it

12    takes a long time.  So please do that as your absolute last

13    resort.

14            Now, how do you go about the process of

15    deliberating, this very difficult process?  And I have never

16    been on a jury, although you must know that judges can be on

17    juries.  I've just never been selected.  Justice Breyer from

18    the Supreme Court was recently on a jury.  Judges can be.

19    But I always go back and talk to my juries afterwards, and

20    I'm always impressed at how seriously you take your jobs.

21    You understand how important this is to both sides.  They've

22    put a huge amount of effort into it.  I don't think they've

23    slept for three weeks, every night, every weekend, both

24    sides.  It means so much to both sides.

25            So, please, when you go into this jury room, you

1   need to deliberate, and that means you go in with your sense

2   of what's true and what's just, who's telling the truth and

3   who's not telling the truth?  But you need to be willing to

4   change your mind if there's a principled basis for doing so.

5        When I have to decide these things by myself, I

6   would give anything to have different people from different

7   walks of life and different employment experiences to pool my

8   common wisdom and say, "This makes sense, this doesn't make

9   sense."  Be willing to change your mind if it is a just and

10  reasonable thing to do.  No one should go into this jury room

11  and say, "I know what I'm going to do, and I'm never going to

12  change my mind."  That's not what deliberation is all about.

13       On the other hand, no one should change their mind

14  because the weather is finally nice, or you want to go to the

15  Red Sox game, or things are messy at work or at home.  It's

16  just too important.  Only change your mind if there's a

17  principled and rational basis for doing so.  Also, don't

18  change your mind just because someone disagrees with you.

19  Sometimes people disagree.  Only change your mind if there's

20  a good reason to do so.

21       So we're going to be sending in, unfortunately for

22  you, this huge pile of documents.  When we send them in, they

23  are the record in this case.  It's absolutely important that

24  we not lose any of them and that they don't get dirty.  So

25  I'm assuming lunch is waiting for you outside.  Put the pile

1    somewhere other than where lunch is so that nothing gets

2    spilled on them.  When I send you out for lunch, you can

3    start deliberating right away.  I just want to make sure that

4    the attorneys have a chance to go through and make sure that

5    everything is in order.  They actually spent a few hours

6    yesterday doing that.  If you think you should have received

7    something and didn't, you can ask me a question because maybe

8    a mistake was made.  As I said, there were certain things

9    that were diagrams or chalks, or this, that, or the other

10   thing, where it wasn't appropriate for it to come in, so you

11   won't necessarily get those.

12           Now, right now what I need to do is, I need to see

13   the attorneys over here because although we worked on these

14   for two afternoons running now, it may be that they want

15   something that will clarify what I said to you.  And rather

16   than send you all the way out and bring you all the way back

17   in again, why don't you stand, why don't you stretch, and

18   they're going to -- you're yawning.  At least you waited

19   until I was done.  And then what's going to happen is, I'll

20   give you any supplemental instruction that seems appropriate

21   and then send you out.  So while you can stand and stretch

22   and do whatever you want to do, please don't try and listen.

23   SIDE-BAR CONFERENCE:

24           THE COURT:  So I'll start with the plaintiff.

25           MR. MOLONEY:  We have an objection, your Honor, to

Page 144

1    the No. 20.

2         THE COURT:  Right.

3         MR. MOLONEY:  That's the part of the sentence that

4    says, "You must cap her damages as of the date of

5    termination."

6         THE COURT:  Thank you.  Anything else?

7         MR. MOLONEY:  Yes.  There are a couple of other

8    things.  You mentioned that -- in terms of federal law on the

9    mixed motive, I think it applies both to federal law and

10   state law.

11        THE COURT:  I don't need to tell them.  They won't

12   get that difference.  But you're right.

13        MR. MOLONEY:  Okay.  And then under Massachusetts

14   law for pretext, we believe the law is that if you find that

15   one of the reasons, that's sufficient.  You don't have to

16   find all of the reasons are bad.

17        THE COURT:  I think I said that.  I don't know what

18   I said that was wrong there.

19        MR. MOLONEY:  Okay, and then the final --

20        THE COURT:  Show it to me.  What did I say that was

21   wrong?

22        MR. MOLONEY:  As we read them and understood them,

23   that under Massachusetts law, if there are a number of

24   reasons, all you have to find is one of them is bad.  You

25   don't have to find that all of the reasons are bad.

1          THE COURT:  But I didn't say anything otherwise.  I

2   said, "You can infer, but you need not."  Anyway, I'm not

3   changing it.

4          MR. MOLONEY:  Okay.

5          THE COURT:  And what's the next one?

6          MR. MOLONEY:  And then on mitigation, that she

7   didn't have to go outside the geographic area or to take a

8   demotion or a demeaning job.

9          THE COURT:  They didn't argue that, and so I think

10  I said comparable or like nature, so I'm not going to change

11  that.

12         MR. RODRIQUES:  No. 13, your Honor, the statistical

13  significance instruction, we asked for an instruction that

14  there be some statistical significance, and you didn't give

15  that.

16         THE COURT:  No.

17         MR. RODRIQUES:  And you also mentioned that they

18  can consider evidence, but that we asked that they be

19  instructed they need not consider it, which is what you've

20  done with all the other kinds of circumstantial evidence.

21         THE COURT:  Let me see.  I'm not going to change

22  that.

23         MR. RODRIQUES:  Okay.

24         THE COURT:  And the reason I didn't is because

25  there were statistical evidence of the cohort, and I was

1   persuaded by that argument.  And, also, a lot of the

2   statistics were just how many people moved from one division

3   to another, and that isn't -- that it seems to me you can use

4   your common sense on.  But, anyway, go ahead.

5          MR. RODRIQUES:  No. 17, this is preserving some

6   issues we raised previously, your Honor.  No. 17, we argued

7   to you before that we don't think the mixed motive

8   instruction is proper in this case because it's not a mixed

9   motive case.  If this is a mixed motive case, every case is a

10  mixed motive case, and the First Circuit has said very few

11  cases are mixed motive cases, so --

12         THE COURT:  Yes, pre-Desert Palace.  Go ahead.  And

13  I was one of them.

14         MR. RODRIQUES:  As I recall.  No. 20, on back pay

15  you mentioned that she's entitled to any increases.  You

16  didn't mention whether they should account for any decreases,

17  which you did on the front pay side.  You didn't on the back

18  pay side.

19         THE COURT:  Do you care that much?

20         MR. RODRIQUES:  Yes.

21         MR. KOCIUBES:  There's evidence about that.

22         MR. RODRIQUES:  21, we want to preserve our

23  objection to the mention of retirement because we don't think

24  that's appropriate under First Circuit and state law.

25         Punitives, again, we want to preserve our

1    objection.  We don't think that there's evidence in the

2    record under Dart that warrants sending it to the jury.

3         And the last one is on the equitable tolling.  Oh,

4    I'm sorry, the next-to-the-last one.  No. 26, the wording you

5    use here is "a business or other employment opportunity that

6    was reasonable to her," which makes it sound as if it's

7    purely subjective.  And our concern is, it needs to be

8    objectively reasonable, not subjectively reasonable.

9         THE COURT:  Do you care enough?

10        MR. RODRIQUES:  Well, I mean, I think so.  And then

11   the last instruction is -- two more actually.  No. 27, you

12   gave the mitigation instruction about not accepting a

13   redefined role, but under Hazel, we don't think that has to

14   be of a like nature.

15        And on the statute of limitations -- and, again,

16   this is just preserving arguments we made earlier -- we don't

17   believe equitable tolling is appropriate in this case.  We

18   also don't believe that the fact that the action is temporary

19   is a sufficient basis.

20        THE COURT:  Okay.

21        MR. RODRIQUES:  And we believe that she needs to

22   show both No. 2 and No. 3, that it was affirmatively

23   misleading and she was actually --

24        THE COURT:  That's a new one.  That's brand-new.  I

25   don't know.  Did that come out of a -- no, we didn't discuss

Page 148

1   that one.

2           MR. RODRIQUES:  We argued it during the charge

3   conference, your Honor.

4           THE COURT:  I don't remember that.

5           MR. RODRIQUES:  In other words, this allows it to

6   be any one of these things, and we cited you the Rivera-Gomez

7   case in our instruction, which we said it had to be both.

8           THE COURT:  This is something not flagged and I

9   don't know the answer to.  Do you care?  I think this case is

10  not going to rise. . .  Do you remember?  I just didn't even

11  look at this.  I don't know.  Do you remember whether this is

12  disjunctive or conjunctive in Instruction No. 28?

13          MR. MOLONEY:  We're content with it.

14          THE COURT:  I know you're content with it, but you

15  don't want it to be wrong.  Go get -- do you have the case

16  here?

17          MR. MOLONEY:  Let me talk with --

18          MS. KURKER:  We do have the instruction, though.

19  It's not quoting the case law, though.

20          THE COURT:  This is something that wasn't flagged.

21  Was it mentioned somewhere?  Maybe.

22          (Pause.)

23          MR. MOLONEY:  Mr. Manwaring has spoken.

24          THE COURT:  What does he say?

25          MR. MOLONEY:  He says you've got to have that, and

1  then it's either two or three.  So it's one plus either two

2  or three.

3        THE COURT:  You know what?  I'm not going to hold

4  the jury for this.  This may be a longer discussion.  I may

5  need to get the case.  So unless you have the case right

6  there, I'm going to have to look at it.

7        MR. KOCIUBES:  Mr. Moloney has had a view on this.

8        MR. MOLONEY:  What I said was, you need to get to

9  one, and then it's either two or three.

10        MR. RODRIQUES:  See, that --

11        MR. MOLONEY:  Is that right?

12        MR. RODRIQUES:  No.  We think it's --

13        THE COURT:  Anyway, I'm not doing this now.  I'll

14  have to send it in to them if there's a change.  I don't

15  know.

16        MR. RODRIQUES:  That's fine.

17        THE COURT:  No one really spent any time on this,

18  and neither did I, because I took it from somewhere, and no

19  one really pushed me on it.  So I'm going to make the two

20  modifications, and then I'm going to say there's a debate

21  about a legal point on the statute of limitations which I may

22  get back to them on.

23        (End of side-bar conference.)

24        THE COURT:  So there are three issues here that

25  they've been going back and forth on.  One is, I wanted to

1    remind you that on back pay, you can consider whether or not

2    there would have been any decreases or increases.  So you

3    heard evidence sometimes it went up, sometimes it went down.

4    You can consider that issue.

5         Secondly, with respect to mitigation, whether or

6    not something is comparable or not comparable, it's got to be

7    objectively reasonable for her to not take the job.  In other

8    words, it can't just be some subjective feeling.  It's got to

9    be an objectively comparable job.

10        Now, the third thing is, we were having this heated

11   debate, which I know you'd be fascinated by, on the statute

12   of limitations and whether I correctly reflected some case

13   law.  And rather than holding you for it, I'm going to go

14   look up the case.  And if I have to change what I did, I will

15   send it to you in writing, okay?  So start with the other

16   issues, and then I'll be back to you in hopefully ten or

17   fifteen minutes with the exhibits, as well as if I have to

18   change anything on the statute of limitations, okay?

19        So I'll see you when you want to see me.  I never

20   try and rush you.  You have that room for as long as you want

21   with that pretty view and the food, which should be out there

22   waiting for you.

23             THE CLERK:  All rise for the jury.

24             (Jury excused, 1:20 p.m.)

25             (Discussion off the record.)

1    THE COURT:  So other than that, if that's so, what

2  we'll do is just give them a new written charge on that, all

3  right?  And why don't you be going through the exhibits.  I

4  should be down in about two minutes it should take us to look

5  at this thing, all right?  I'll be back.

6    (A recess was taken.)

7    (Resumed, 1:45 p.m.)

8    THE COURT:  Okay, so let me gloat for a minute.  So

9  the charge you gave me this morning said "or, or, or," so let

10  me start there.  That's why I wasn't alerted to this issue.

11    Now, having gone through the fast research,

12  however, I understand where the confusion is coming from,

13  which is there's a difference between federal law and state

14  law on this particular issue, which is what refreshed my own

15  recollection I went through in the summary judgment

16  decision.  I do think that federal law is tougher than state

17  law, but state law supports that you do not have to have an

18  active affirmatively misleading statement.  So I actually

19  agree with Mr. Manwaring.  Is that your name?

20    MR. MANWARING:  Yes, your Honor.

21    THE COURT:  Though my instruction was wrong on one

22  point, which is, the first "or" should be an "and," and then

23  it's an "or."  So that's what I think, so let me show it to

24  you.

25    MR. RODRIQUES:  So it's one and two or three.

1    THE COURT:  Look at it.  I redid the formatting

2  because otherwise it became too difficult.  I'm just going to

3  hand it to them.

4    MR. RODRIQUES:  In my own defense, your Honor, as

5  to what I filed this morning, I filed it on the assumption

6  that your Honor was not -- was going to stick with your prior

7  ruling, and I was changing the --

8    MR. MOLONEY:  There's reasonable doubt not

9  providing --

10    THE COURT:  Anyway, so the -- anyway.

11    MR. MOLONEY:  This is the new one?

12    THE COURT:  No.  That was what was filed this

13  morning, so the new one looks like this.

14    (At side bar.)

15    THE COURT:  State law, the Wheatley case, and there

16  are others, it's just a kinder standard than federal, this

17  particular one.  You were quite right when you cite the

18  federal, and I was trying to think, well, did I dream this

19  up?  And then I remembered the state law is gentler.

20    MR. MOLONEY:  God save the Commonwealth of

21  Massachusetts.

22    MR. MANWARING:  Yes.

23    THE COURT:  Okay?

24    MR. MANWARING:  Very good.

25    THE COURT:  All right, that's what I'm sending in.

Page 153

1    No. 28 is getting re-sent in.

2         MR. RODRIQUES:  Can we still note our objection for

3    the record to the instruction, your Honor.

4         THE COURT:  Yes, you can.  Okay, so let me -- I'm

5    going to give this to Robert to send this in.

6         Robert, so we're going to have to send that jury

7    instruction in.  That's a substitute for the statute of

8    limitations, which is now in writing.

9         (Discussion off the record.)

10        THE COURT:  Now, I understand there is still a

11   debate over these never-ending documents.

12        MR. MOLONEY:  Oh, we're getting down to the end.

13        THE COURT:  You don't need me to do anything?

14        MR. RODRIQUES:  Maybe on one, but --

15        THE COURT:  All right, so let's --

16        (Discussion off the record.)

17        THE COURT:  Is the plaintiff content with the form

18   of the exhibits?

19        MR. MOLONEY:  We are.

20        THE COURT:  Is the defendant content with the form

21   of the exhibits?

22        MS. KURKER:  Yes.

23        MS. HOLDEN:  We are.

24        THE COURT:  Now, what we are going to do right now

25   is bring in this box.  We're going to bring in the

1    supplemental jury instruction, the several charts, and then

2    we're going to bring in the tape recording.  Lee is going to

3    be working on the jury instructions.  Your job for the next

4    hour is to do nothing.  So I won't take questions, I won't do

5    anything.  Just disappear.  Now, let me just -- we can go off

6    the record.

7              (Discussion off the record.)

8              (The luncheon recess was taken, 1:55 p.m.)

9              (Resumed, 4:05 p.m.)

10             THE COURT:  The jury has asked, "Is instruction

11    No. 28, statute of limitations, the final definition that

12    pertains to the timeliness of the claim?"  And I think I

13    should say "yes."  Should I explain why it's different?

14             MR. MOLONEY:  Yes.  Yes, I think so.

15             MR. KOCIUBES:  Because that may be what they're

16    asking.  They may have not noticed the difference in

17    language, your Honor.

18             THE COURT:  Yes, I think that --

19             MR. KOCIUBES:  Because it's subtle, it's just a

20    word or two.

21             THE COURT:  I think that might be.  Should I just

22    bring them out and explain it?

23             MR. MOLONEY:  I think that might be a good idea.

24             THE COURT:  I think they're confused because it

25    doesn't look any different.  They didn't focus on the "or,

Page 155

1   or, or."

2        MR. MOLONEY:  Yes, right, I'd bring them out, bring

3   them out and just let them have it.

4        THE COURT:  But I think when I read it, I sort

5   of -- it's funny how sometimes when you read something, you

6   emphasize, I go "or" -- I think I should it a little bit

7   louder -- "or, or, or," and so they just may not be focusing

8   on the fact of what the difference is.

9        MR. MOLONEY:  I'd bring them out.

10       THE COURT:  I think I will bring them out, okay.

11       As I'm reading it, I'm wondering if this is the

12  confusion, which I'm now catching, okay?  I originally had

13  drafted this because, if you remember correctly, I had them

14  answering the timeliness thing at the end rather than the

15  first question.  And so I reworded it as I read it, and that

16  may not be clear.

17       THE CLERK:  All rise for the jury.

18       (Jury enters the courtroom.)

19       THE COURT:  You may be seated just for a second.

20  You asked me a question in the absolute appropriate way.

21  Where is that question?  Oh, there it is.  You say, "Is

22  Instruction No. 28, statute of limitations, the final

23  definition that pertains to the timeliness of the claim?"

24       So I brought you back in here because you may have

25  thought it sounded like exactly what I read to you, so was

1    this the final one?  Yes, it is the final one, and what we

2    changed is that last two paragraphs.  You may remember when I

3    read it to you, I said you can either do this or this or

4    this.  I think I read you the wrong -- counsel persuaded me

5    that there are really only two options, and those were the

6    two options that I've given you in this revised instruction,

7    all right?  So this is the final one.

8             But what I'm going to be doing for you is -- Lee

9    has been working really hard since you left -- I'm going to

10   get you a complete new set of instructions, and I'll

11   incorporate the new instructions that are accurate into the

12   complete total one you should be getting tomorrow morning.

13   But, yes, this is it.  The big difference is, you have two

14   options now instead of three the way I was reading you the

15   jury charge.

16            So I think that answers what you wanted to know,

17   but when you asked whether it's final, it's not the final,

18   final.  I'm going to get you a complete charge tomorrow

19   morning, if you're still here.

20            I'll let you go around 5:00.  If you're exhausted,

21   you can tell Mr. Alba, and I will let you go earlier, all

22   right?  So otherwise I'll see you at 5:00.  I'll bring you

23   back out here and send you home.  Thank you.

24            THE CLERK:  All rise for the jury.

25            (Jury excused.)

1          THE COURT:  It was an odd question, and I'm not

2    sure what it was driving at.  However, as soon as we get them

3    a complete set tomorrow -- is it possible, Lee, for you --

4    can you e-mail it to them so that you can proof it?  And

5    we'll hand it to them.

6          MR. MOLONEY:  Okay.

7          MR. KOCIUBES:  Thank you, your Honor.

8          THE COURT:  It makes me think they're on

9    Question 1.

10         MR. MOLONEY:  Yes.

11         (A recess was taken, 4:10 p.m.)

12         (Resumed, 4:37 p.m.)

13         THE COURT:  So let me say this:  This is a more

14   complicated questionnaire than many.  So if you think there's

15   a chance of an inconsistent verdict, whichever way this comes

16   out, someone should pull me up here, okay?

17         Okay, bring the jury in.

18         THE CLERK:  All rise for the jury.

19         (Jury enters the courtroom.)

20         THE CLERK:  Members of the jury, please remain

21   standing.  Everybody else, you may be seated.

22         THE COURT:  You may inquire.

23         THE CLERK:  Madam Foreperson, has the jury reached

24   a unanimous verdict?

25         THE FOREPERSON:  We have.

1          THE CLERK:  Would you please return your verdict to

2     the Court.

3          (Foreperson complies.)

4          THE CLERK:  Madam Foreperson, Question A1, did

5     plaintiff prove that the claim is timely?

6          THE FOREPERSON:  Yes.

7          THE CLERK:  Question A2, did plaintiff prove that

8     defendant's 2002 decision to move plaintiff from defendant's

9     International Growth Team to its Global Equity Research Team

10    was an adverse employment action?

11         THE FOREPERSON:  No.

12         THE CLERK:  Question B1, did plaintiff prove that

13    defendant made an adverse employment decision regarding

14    plaintiff's employment because of her sex in September,

15    2003?

16         THE FOREPERSON:  No.

17         THE CLERK:  Question B2, did plaintiff prove that

18    gender was a motivating factor in the defendant's employment

19    decision?

20         THE FOREPERSON:  No.

21         THE CLERK:  So say you, Madam Foreperson?  So say

22    you, all members of the jury?

23         THE FOREPERSON:  Yes.

24         THE JURY:  Yes.

25         THE CLERK:  Thank you.

1        THE COURT:  You may now be seated.  On behalf of

2   everyone in the court, I now thank you for your service.

3   It's been a long three weeks.  You can now talk about the

4   case with whomever you want to talk about it.  I just would

5   ask you to respect the confidences that maybe some of you

6   said in the jury room.  At this point, though, you should not

7   talk with anyone involved in this trial about the case unless

8   you do so under the auspices and the permission of the

9   court.  But otherwise you can talk about it with people at

10  home, you can talk about it with the press, you can talk

11  about it with anyone else.

12        I make it a practice to come back and thank you.

13  It's now twenty of 5:00.  If you want to leave, I won't be

14  insulted, but I come back for a few minutes just to thank you

15  and answer any questions you may have about the court.  So we

16  stand in recess.

17              (Jury excused.)

18              THE COURT:  We stand in recess.

19              (Adjourned, 4:40 p.m.)

20

21

22

23

24

25

Page 160

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS      ) ss.

CITY OF BOSTON                 )

        We, Debra M. Joyce and Lee A. Marzilli, do hereby certify that the foregoing transcript, Pages 1 through 159 inclusive, was recorded by us stenographically at the time and place aforesaid in Civil Action No. 04-12711-PBS, Lisa Svensson V. Putnam Investments, et al, and thereafter by us reduced to typewriting and is a true and accurate record of the proceedings.

        In witness whereof we have hereunto set our hand this 29th day of May, 2008.


                /s/ Debra M. Joyce

                /s/ Lee A. Marzilli

                _____

                DEBRA M. JOYCE, RMR, CRR

                LEE A. MARZILLI, RPR, CRR

                OFFICIAL COURT REPORTERS